## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ROYAL INDEMNITY COMPANY,

     Plaintiff,

   v.

PEPPER HAMILTON LLP, RODERICK GAGNÉ,
FREED MAXICK & BATTAGLIA CPAs,
McGLADREY & PULLEN, LLP, and
MICHAEL AQUINO,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 05-165

Hon. Joseph J. Farnan, Jr.

---

### McGLADREY & PULLEN, LLP's and MICHAEL AQUINO's
### MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS

DUANE MORRIS LLP

Michael R. Lastowski (Bar No. 3892)
Christopher M. Winter (Bar No. 4163)
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246
Phone: 302-657-4951
Fax: 302-657-4901

-and-

ARNOLD & PORTER LLP

Richard P. Swanson
Veronica E. Rendon
Jason M. Butler
399 Park Avenue
New York, NY 10022
Phone: 212-715-1000
Fax: 212-715-1399

*Attorneys for McGladrey & Pullen, LLP
and Michael Aquino*

June 10, 2005

# TABLE OF CONTENTS

Page

STATEMENT OF PROCEEDINGS ................................................................................. 1

PRELIMINARY STATEMENT .................................................................................. 1

SUMMARY OF ARGUMENT ................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 3

    CHRONOLOGY OF EVENTS ............................................................................ 3

    ROYAL'S KNOWLEDGE OF SFC'S FORBEARANCE PAYMENTS ........................ 17

    ROYAL'S DUE DILIGENCE ........................................................................... 18

ARGUMENT ...................................................................................................... 20

I.    ROYAL FAILS TO STATE A RICO CLAIM ...................................................... 21

    A.    Aquino Did Not Operate Or Manage The Alleged RICO Enterprise ................. 22

    B.    Royal Fails To Allege A Pattern of Racketeering Activity ................................ 24

    C.    Aquino Did Not Commit Any Predicate Act ................................................ 25

II.    ROYAL FAILS TO ALLEGE A RICO CONSPIRACY ........................................ 26

III.    ROYAL'S COMMON LAW CLAIMS ARE BARRED
    BY THE STATUTE OF LIMITATIONS .......................................................... 27

    A.    Royal's Common Law Causes of Action Are Untimely ................................. 27

    B.    Pennsylvania Law Governs This Action ..................................................... 28

    C.    Royal's Claims Are Untimely Under Delaware Law ..................................... 31

IV.    ROYAL FAILS TO STATE A CLAIM FOR CIVIL CONSPIRACY .......................... 32

V.    ROYAL'S FRAUD CLAIMS SHOULD BE DISMISSED ..................................... 33

VI.    ROYAL FAILS TO STATE CLAIMS FOR NEGLIGENCE
    AND NEGLIGENT MISREPRESENTATION ................................................... 36

VII.    ROYAL FAILS TO STATE A CLAIM FOR DEEPENING INSOLVENCY ................ 36

VIII.    ROYAL FAILS TO STATE A CLAIM FOR AIDING AND ABETTING
    A BREACH OF FIDUCIARY DUTY .............................................................. 37

CONCLUSION ................................................................................................... 39

## TABLE OF AUTHORITIES

### CASES

*131 Main Street Associates v. Manko,*
   897 F. Supp. 1507 (S.D.N.Y. 1995) ................................................................22

*Banks v. Wolk,*
   918 F.2d 418 (3d Cir. 1990) ..............................................................24, 25

*Beck v. Manufacturer's Hanover Trust Co.,*
   820 F.2d 46 (2d Cir. 1987), *cert. denied,* 484 U.S. 1005 (1989) ........................25

*Bhatla v. Resort Dev't Corp.,*
   720 F. Supp. 501 (W.D. Pa. 1989) ................................................................28

*Bortz v. Noon,*
   729 A.2d 555 (Pa. 1999) ................................................................36

*In re Burlington Coat Factory Sec. Litig.,*
   114 F.3d 1410 (3d Cir. 1997) ................................................................8

*Cohen v. Pelagatti,*
   364 Pa. Super. 573, 528 A.2d 657 (Pa. Super. Ct. 1987) ........................33

*Corning Inc. v. SRU Biosystems, LLC,*
   292 F. Supp. 2d 583 (D. Del. 2003) ........................................29, 31

*Cox v. Delaware Electric Co-Op, Inc.,*
   823 F. Supp. 241 (D. Del. 1993) ................................................................30

*Daniel Boone Area Sch. District v. Lehman Brothers, Inc.,*
   187 F. Supp. 2d 400 (W.D. Pa. 2002) ........................................37

*Department of Econ. Dev't v. Arthur Andersen & Co.,*
   924 F. Supp. 449 (S.D.N.Y. 1996) ................................................22, 23

*Diversified Group, Inc. v. Daugerdas,*
   139 F. Supp. 2d 445 (S.D.N.Y. 2001) ........................................30, 31

*Dongelewicz v. PNC Bank National Association,*
   No. 03-1045, 2004 WL 1661863 (3d Cir. July 23, 2004) ........................27

*Duane Morris, LLP v. Todi,*
   2002 WL 31053836 (Pa. Comm. Pl. Sept. 3, 2002) ................................34

*E.F. Hutton Mortgage Corp. v. Pappas,*
   690 F. Supp. 1465 (D. Md. 1988) ................................................34, 38

*Flanagan v. Shively,*
   783 F. Supp. 922 (M.D. Pa. 1992) ................................................................33

*Flood v. Makowski,*
   2004 WL 1908221 (M.D. Pa. Aug. 24, 2004) ......................................................37

*Greenberg v. Bear Stearns & Co.,*
   220 F.3d 22 (2d Cir. 2000), *cert. denied,* 531 U.S. 1075 (2001) ..........................38

*Guy v. Liederbach,*
   459 A.2d 744 (Pa. 1983)........................................................................................36

*H.J., Inc. v. Northwestern Bell Telephone Co.,*
   492 U.S. 229 (1989)..............................................................................................24

*H.N. Schnelling v. Prudential Securities, Inc.,*
   2004 WL 1790175 (E.D. Pa. Aug. 9, 2004) .........................................................27

*Harsco Corp. v. Kerkham, Stowell, Kondracki & Clarke,*
   961 F. Supp. 104 (M.D. Pa. 1997).......................................................................27

*Hill v. Equitable Trust Co.,*
   562 F. Supp. 1324 (D. Del. 1983)..................................................................28, 30

*Hindes v. Castle,*
   937 F.2d 868 (3d Cir. 1991) ............................................................................24, 25

*In re Ikon Office Solutions, Inc.,*
   277 F.3d 658 (3d Cir. 2002) ............................................................................26, 34

*Isaacson, Stropler & Co. v. Artisan's Savings Bank,*
   330 A.2d 130 (Del. 1974).....................................................................................31

*J.E. Roades & Sons, Inc. v. Ammeraal, Inc.,*
   1988 WL 116423 (Del. Super. Ct. Oct. 12, 1988)..........................................30, 31

*Jackson National Life Ins .Co. v Kennedy,*
   741 A.2d 377 (Del. Ch. 1999) .............................................................................38

*Jeter v. Brown & Williamson Tobacco Co.,*
   294 F. Supp. 2d 681 (W.D. Pa. 2003)..................................................................32

*Johnston Associate Inc. v. Rohm & Haas Co,*
   560 F. Supp. 916 (D. Del. 1983)..........................................................................31

*Kehr Packages v. Fieldcor, Inc.,*
   926 F.2d 1406 (3d Cir. 1991) ....................................................................24, 25, 26

*Khan v. State Board Of Auctioneer Examiners,*
   577 Pa. 166, 842 A.2d 936 (2004)......................................................................30

*Landell v. Lybrand,*
   107 A. 783 (Pa. 1919).........................................................................................36

*Leo v. Kerr-McGee Chemical Corp.*,
    37 F.3d 96 (3d Cir. 1994) .................................................................................................37

*Lichtman v. Taufer*,
    2004 WL 1632574 (Pa. Com. Pl. July 13, 2004)................................................................38

*In re Lukens Inc. Shareholders Litig.*,
    757 A.2d 720 (Del. Ch. 1999) .........................................................................................39

*Lum v. Bank of America*,
    361 F.3d 217 (3d Cir. 2004) .................................................................................25, 26, 34

*MBIA Ins. Corp. v. Royal Indemn. Co.*,
    221 F.R.D. 419 (D. Del. 2004) .........................................................................................34

*McHale v. NuEnergy Group*,
    2002 WL 321797 (E.D. Pa. Feb. 27, 2002) ......................................................................25

*McIntosh v. Arabian America Oil Co.*,
    633 F. Supp. 942 (D. Del. 1986).......................................................................................28

*Mellon Bank Corp. v. First Union*,
    951 F.2d 1399 (3d Cir. 1991) ...........................................................................................35

*Oatway v. American Int'l Group, Inc.*,
    325 F.3d 184 (3d Cir. 2003) .............................................................................................8

*Official Comm. Of Unsecured Creditors v. R. F. Lafferty & Co.*,
    267 F.3d 340 (3d Cir. 2001) ......................................................................................36, 37

*Pell v. Weinstein*,
    759 F. Supp. 1107 (M.D. Pa. 1991), *aff'd*, 961 F.2d 1568 (3d Cir. 1992) ...........................36

*Perma-Vault Safe Co. v. Keep-It-Safe, Inc.*,
    2004 WL 603392 (E.D. Pa. Mar. 25, 2004).......................................................................35

*In re Phar-Mor, Inc. Sec. Litig.*,
    893 F. Supp. 484 (W.D. Pa. 1995)...............................................................................30, 36

*Pierce v. Rossetta Corp.*,
    1992 WL 165817 (E.D. Pa. June 12, 1992) ......................................................................37

*Pittson Co. v. Sedgwick James of New York*,
    971 F. Supp. 915 (D. N.J. 1997)........................................................................................31

*Pomerantz v. Museum Partners, L.P.*,
    2005 WL 217039 (Del Ch. Jan. 24, 2005)....................................................................31, 32

*Production Resources Group, L.L.C. v. NCT Group, Inc.*,
    863 A.2d 772 (Del. Ch. 2004) .........................................................................................38

*Reliance Ins. Co. v. Eisner & Lubin,*
    685 F. Supp. 449 (D. N.J. 1988) ..................................................................................25

*Reves v. Ernst & Young,*
    507 U.S. 170 (1993) ...........................................................................................22, 23

*Rolick v. Collins Pine Co.,*
    925 F.2d 661 (3d Cir. 1991) ..............................................................................37

*Rose v. Bartle,*
    871 F.3d 331 (3d Cir. 1989) ..............................................................................26

*Rosenbaum & Co. v. H.J. Meyers Co., Inc.,*
    1997 WL 689288 (E.D. Pa. Oct. 9, 1997) .........................................................34

*Rothman v. Fillette,*
    469 A.2d 543 (1983) ..........................................................................................28

*In re Santa Fe Pacific Corp. Shareholders Litig.,*
    669 A.2d 59 (Del. 1995) ....................................................................................38

*Sciafe, Co. v. Rockwell-Standard Corp.,*
    285 A.2d 451 (Pa. 1971) ....................................................................................35

*Sedima S.P.R.L. v. Imrex Co.,*
    473 U.S. 479 (1985) ...........................................................................................21

*Sim Kar Lighting Fixture Co. v. Genlyte, Inc.,*
    906 F. Supp. 967 (D. N.J. 1995) ........................................................................33

*Smith v. Berg,*
    247 F.3d 532 (3d Cir. 2001) ..............................................................................26

*Thompson Coal Co. v. Pike Coal Co.,*
    412 A.2d 466 (Pa. 1979) ....................................................................................32

*Thompson v. Glenmede Trust Co,*
    1993 WL 197031 (E.D. Pa. June 8, 1993) .........................................................38

*Township of South Fayette v. Allegheny Cty. Housing Authority,*
    27 F. Supp. 2d 582 (W.D. Pa. 1998) ....................................................................5

*Travelers Indemnity Co. v. Lake,*
    594 A.2d 38 (Del. 1991) ....................................................................................28

*University of Maryland v. Peat, Marwick, Main & Co.,*
    996 F.2d 1534 (3d Cir. 1993) ........................................................................22, 23

*White Consolidated Industrial v. Island Kitchens, Inc.,*
    884 F. Supp. 176 (E.D. Pa. 1995) ......................................................................30

*Williams Controls, Inc. v. Parente,*
  39 F. Supp. 2d 517 (M.D. Pa. 1999) .................................................................36

*Ziemba v. Cascade Int'l, Inc.,*
  256 F.3d 1194 (11th Cir. 2001) ..............................................................26, 33

## FEDERAL STATUTES

18 U.S.C. § 1341 ..............................................................................................21

18 U.S.C. § 1343 ..............................................................................................21

18 U.S.C. § 1961(1) .....................................................................................21, 24

18 U.S.C. § 1962(c) ..................................................................21, 22, 23, 24, 26

18 U.S.C. § 1962(d) .........................................................................................21

Fed. R. Civ. Pro. 9(b) ...................................................................................25, 34

Fed. R. Civ. Pro. 12(b)(6) ...................................................................................1

## STATE STATUTES

10 Del. C. § 8106 .............................................................................................31

10 Del. C. § 8121 .............................................................................................28

42 Pa. Cons. Stat. Ann. § 5524 .........................................................................27

## MISCELLANEOUS

*Restatement (Second) of Conflict of Laws* §§ 145, 6 ...............................28, 29, 31

AT § 201.11 .......................................................................................................15

AU § 201 .............................................................................................................4

AU § 530 ...........................................................................................................14

AU § 622 .............................................................................................................4

Defendants McGladrey & Pullen, LLP ("McGladrey") and Michael Aquino ("Aquino") submit this memorandum in support of their motion, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the amended complaint of Royal Indemnity Company ("Royal") for failure to state a claim.

## STATEMENT OF PROCEEDINGS

Royal filed a complaint in this Court against the above-named defendants on March 18, 2005. On April 12, 2005, before any of the defendants filed a responsive pleading, Royal filed its first amended complaint (the "Complaint"). On May 23, 2005, the parties stipulated that defendants would respond to the Complaint on June 10, 2005. McGladrey and Aquino have today filed this motion to dismiss.

## PRELIMINARY STATEMENT

In an attempt to obfuscate McGladrey's and Aquino's limited involvement with Student Finance Corporation ("SFC") and Royal's due diligence efforts, Royal tells its story and that of SFC in an intentionally confusing fashion. Royal blurs timeframes to make it appear as though certain events coincided when, in fact, they often were separated in time by years. Royal also repeatedly refers to the purportedly wrongful conduct of Andrew Yao and other SFC officials, identifying numerous alleged misrepresentations and omissions, notwithstanding that they had no connection or relationship to McGladrey or Aquino.

While the Court, for purposes of this motion, must assume the truth of the facts alleged in the Complaint, when those facts are re-told in a straightforward, chronological fashion, the roles of the various parties, and the limited roles of McGladrey and Aquino, become much more apparent. Laid out in this fashion, the facts also demonstrate why the Complaint must be dismissed due to Royal's failure to state a claim for RICO, the running of the applicable statute of limitations, and the failure to state common law causes of action.

## SUMMARY OF ARGUMENT

1.    Royal cannot transform the performance of outside, routine accounting services into a violation of RICO. Courts refuse to impose RICO liability where, as here, Aquino

performed outside accounting services and Aquino did not control the alleged RICO enterprise. Royal's RICO claims also fail because Royal has failed to allege a "pattern of racketeering activity." The delivery of two sets of opinions over a nine-month period does not constitute a "pattern." Moreover, SFC is in bankruptcy and there is no threat of continued fraudulent activity. Finally, the issuance of McGladrey's and Aquino's audit reports does not constitute "predicate acts" of mail fraud. SFC's audited financial statements are business communications that placed Royal on notice of SFC's use of forbearance.

2.      Royal's remaining common law claims are barred by Pennsylvania's two-year statute of limitations. Royal concedes that, at the very latest, SFC's alleged "fraud [was] revealed" on March 20, 2002, when Andrew Yao purportedly confessed to Royal. Royal's claims, which were filed on March 18, 2005, are therefore untimely.

3.      Royal might argue that Delaware's three-year statute of limitations should apply. But, the purported fraud at issue was directed, orchestrated and conducted from Pennsylvania; the relationship between the parties was centered in Pennsylvania; and Royal's claims involve the allegedly fraudulent conduct of professionals located and licensed to practice within Pennsylvania's borders.

4.      Even were the Court to apply Delaware law, Royal's claims are still untimely. Under Delaware law, Royal's claims accrued at the latest on April 30, 2001, when McGladrey and Aquino issued a report on SFC's financial statements for the year 2000. Royal concedes that those statements contained detailed disclosures regarding forbearance, including that $2,012,190 and $9,515,841 in "forbearance payments" had been made in 1999 and 2000, respectively. If Royal in fact read and relied upon SFC's 2000 audited financial statements, it was on notice of SFC's alleged fraud.

5.    Royal's common law claims are also deficient as a matter of law.  Among other things, Royal fails to establish fraud or civil conspiracy.  Royal essentially attacks McGladrey's and Aquino's professional judgment; yet courts routinely hold that alleged violations of GAAP or GAAS are insufficient to allege fraud or establish *scienter*.  Moreover, Royal's allegations, when stripped of rhetoric, are entirely inconsistent with its claims of fraud and conspiracy.  And, Royal's allegations demonstrate that Royal relied exclusively on statements and information provided to it by SFC and Andrew Yao, and not McGladrey or Aquino, when Royal committed to insure SFC.  Royal's complaint should be dismissed in its entirety.

## STATEMENT OF FACTS

### CHRONOLOGY OF EVENTS

#### Andrew Yao, SFC and its Affiliates

SFC is "a corporation organized and existing under the laws of the Commonwealth of Pennsylvania...." (¶ 18)[1]  SFC was "ostensibly in the business of originating, purchasing and selling to investors tuition loans made primarily to truck driving students." (*Id.*)  Starting in 1999, SFC originated student loans utilizing financing from two "warehouse" lenders, Wilmington Trust and PNC Bank. (¶ 51)

Andrew Yao is a resident of Pennsylvania. (¶ 20)  According to Royal's Complaint: "Yao at all times pertinent to this action owned and controlled SFC" and Yao "at all times pertinent to this action was an officer and director of all three entities [SFC, Student Loan Servicing and Student Marketing Services]." (*Id.*)  At all times, Yao maintained an office in Radnor, Pennsylvania from which he managed SFC and made executive decisions regarding the company, including the decisions that are ultimately at issue in the case.

---

[1] All references to Royal's Complaint appear in the following format: (¶__). The Complaint is attached as Exhibit A to the Appendix of Exhibits to this Memorandum of Law.

Gary Hawthorne is alleged to have been "an officer and/or director of SLS and/or SFC" and, like Yao, is a resident of Pennsylvania. (¶ 21)  Consequently, SFC and its affiliates were owned and controlled out of Pennsylvania.

**The 1996 Securitization**

SFC completed its first securitization in 1996.  (¶ 23)  In the 1996 securitization, SFC sold student loans to a securitization trust called SFC Grantor Trust Series 1996-1.  The trust issued notes to institutional noteholders to be re-paid via collections received on the student loans.  Wells Fargo served as the Indenture Trustee and AIU Insurance Company ("AIU") issued a credit risk insurance policy covering the securitized loans.  Royal was not involved in the 1996 securitization. (*Id.*)

SFC "under the supervision and at the direction of Andrew Yao" in Pennsylvania, issued monthly "servicer reports" for the 1996 securitization.  (¶¶ 45, 97)  These servicer reports contained information about the performance of the securitized student loans, including the default and delinquency rates and payments received on the loans.  (¶ 45)  Royal does not allege that it received monthly servicer reports for SFC's 1996 securitization.

**May 1998:  BDO Seidman's Draft Agreed-Upon Procedures Report**

Royal alleges that in May 1998, SFC engaged the accounting firm BDO Seidman to perform certain agreed-upon procedures relating to the 1996 securitization.  (¶ 97)  "Agreed-upon procedures" or "AUPs" represent specified procedures performed by an accountant pursuant to an agreement between the accountant and his client.  Essentially they are creatures of contract.  These procedures are governed by different standards than the AICPA's Generally Accepted Auditing Standards or "GAAS," which are the standards cited by Royal throughout its Complaint.  *See* AU §622; *see also* AU §201.  Agreed-upon procedures engagements are not audits, and do not involve the same level of inquiry and review.

In this particular engagement, BDO, which is not named as a defendant, purportedly was asked to review monthly servicer reports related to the 1996 securitization.  (¶ 97)  BDO is not

- 4 -

alleged to have created the form of the monthly servicer reports, nor is it alleged to have

participated in determining the scope of the procedures to be performed.

Royal does not allege that it received or relied on any iteration of this draft report.  Indeed,

Royal does not allege that it received or relied on *any* audited financial statement or AUP report

prior to issuing its first insurance policies to SFC.

### November 1998:  Royal Negotiates Its First Insurance Policy

In 1998, SFC sought to expand its securitization business.  (¶ 24)  Royal claims that AIU

had decided to leave the business of providing credit risk insurance policies, requiring SFC to find

another insurance company.  (¶ 25)  SFC allegedly hired an insurance broker, Joe Domal of

International Benefits Group ("IBG"), to assist it in finding a new insurer.  (*Id.*)  Domal allegedly

contacted another broker, Ted Moor of T.E. Moor & Co., and Mr. Moor in turn contacted Royal.

Royal alleges that soon after its initial conversation with Mr. Moor, SFC sent Royal

"documents that purported to describe SFC's business and the performance of loans SFC

previously made."  (¶ 26)  Specifically, Royal claims that, on November 13, 1998, Yao allegedly

directed that a letter be sent to Royal, enclosing several documents:  (a) a "proposed term sheet;"

(b) an "historical performance chart;" (c) a "loss reserve chart;" (d) the AIU credit risk insurance

policy for the 1996 securitization, and (e) an "information summary regarding SFC."  (¶ 27)

The "information summary" allegedly stated that SFC "offered '100% recovery on

defaults' and that the transaction's reserves would 'protect[] the insurer' by growing in value to

three times the expected defaults."  (¶ 28) The "historical performance" chart allegedly showed

"zero net losses" incurred by AIU in the 1996 securitization, and further represented that the 1996

securitization had "low" default rates and "delinquency figures consistently under 20%."  (¶ 29)[2]

---

[2] In its Fourth Amended Petition filed against SLS and other SFC affiliates in Texas state court, *Royal Indemnity Co. v. T.E. Moor & Co.*, No. D167370 (Texas Dist. Ct. Jefferson Co. Jun. 5, 2003) (the "Texas Litigation"), Royal alleged that "the historical performance data [for the 1996 securitization] represented that, except for the month of October 1996, SFC's 'securitization pool' never had loans that were more than 90 days delinquent."  (Ex. B, at p. 11).  It is well established that on a motion to dismiss courts are permitted to consider pleadings in related cases. *See Township of South Fayette v. Allegheny Cty. Hous. Auth.*, 27 F. Supp. 2d 582 (W.D. Pa. 1998) (citing cases).

After reviewing SFC's November 13, 1998 letter and attachments, on November 23, 1998, Royal allegedly "posed a series of written questions to SFC, Yao, and their agents concerning the SFC student loan program." (¶ 31)  According to the Complaint, on or about November 30, 1998, "IBG, on behalf of SFC, sent Royal answers to these questions," which "had been prepared on behalf of SFC and Yao by its investment advisor, Loofbourrow & Associates...." (*Id.*)  In their answers, SFC and Yao allegedly represented that: (1) SFC's projected maximum cumulative default rate (before recoveries) was 25%; (2) SFC had obtained nearly 100% recovery on loan defaults over the prior five-year period; and (3) Royal had considerable loss coverage protection through a series of reserves established by SFC. (¶ 32)[3]

In making its initial insurance decision, Royal does not allege that it reviewed any audit report by any accounting firm.  This is because SFC had not yet issued any audited financial statements.  Nor does Royal allege that McGladrey or Aquino had any knowledge or involvement in the above dialogue between SFC and Royal.  The allegedly misleading November 1998 materials are alleged to have been prepared solely at the direction of Andrew Yao in Pennsylvania. (¶ 27)

### January 1999:  Royal's First Credit Risk Policy Becomes Effective

On January 22, 1999, Royal alleges that it "issued" its first SFC credit risk insurance policy in the amount of $75 million ("Policy No. 1"). (¶ 37)[4]  That same day, Wilmington Trust and SFC entered into a warehouse lending facility in the amount of $25 million.  (*Id.*)  Later, on July 16, 1999, SFC obtained another warehouse loan from PNC Bank in the amount of $50 million. (¶

---

[3] In the Texas Litigation, Royal alleged that the November 30, 1998 letter also explained SFC's insurance reserve system.  SFC purportedly maintained two funds to cover loan defaults:  (1) an "institutional" or "school" reserve fund, and (2) an "excess spread" reserve fund.  (Ex. B, p. 12).  The school reserve was funded by holding back a percentage of student tuition payments from the truck schools, and the excess spread reserve was funded by the difference between student interest payments and SFC's operating expenses – essentially a portion of SFC's profits.  (*Id.*)  Yao allegedly explained to Royal that defaults would initially be paid from the school reserve, giving the excess spread reserve time to build.  (*Id.*)

[4] Royal alleged in the Texas Litigation that it committed to provide insurance to SFC earlier than January 1999, and then engaged in substantial negotiations on the form of the policy which "culminated in an agreement under which Royal issued" its first policy to SFC, effective January 22, 1999.  (Ex. B, p. 14)

51(f)) According to Royal, "[t]he general purpose of the SFC polices was to provide coverage ... for loan defaults caused by students failing to make loan payments. Initial loan defaults were to be paid from reserves SFC established pursuant to the insurance policies (such as the Institutional Reserve or Experience Account)." (¶ 36)

In issuing Policy No. 1, Royal claims that it "justifiably rel[ied]" on the November 1998 documents provided to it by "SFC, Yao and their agents...." (*Id.*) McGladrey and Aquino are not alleged to have been one of those agents. SFC had not yet issued any audited financial statements, and Royal does not allege that it relied on any.

Royal alleges that it began receiving monthly servicer reports that "were prepared under the supervision and at the direction of Yao" in Pennsylvania. (¶¶ 45, 48) These servicer reports are alleged to have contained "detailed information" about the performance of the securitized student loans, including "the default and delinquency rates of the loans, and the payments received on the loans." (¶ 45) According to Royal, the monthly servicer reports "did not report as defaults those loans where the student had missed payments, but SFC had secretly made ghost payments." (*Id.*)

While Royal claims that SFC's servicer reports were "*later* certified by McGladrey and Aquino" (¶ 45, emphasis supplied), Royal does not (and cannot) allege that McGladrey or Aquino reviewed or reported on the monthly servicer reports issued in 1999, or that Royal ever read or relied on any such report in 1999.[5]

### December 1999: Royal Issues Its Master Policy to SFC

On December 1, 1999, without alleging it received any report or communication from McGladrey or Aquino, Royal issued a single "Master Policy" to SFC in the amount of $200 million. (Ex. C) Under the Master Policy, Royal agreed to issue "sub-policies," which would be

---

[5] The first contact McGladrey and Aquino had with the monthly servicer reports purportedly received by Royal was much later in 2001. By that point in time, the form of the servicer reports was well established and apparently accepted by the parties to the securitization, including Royal.

issued in cumulative amounts up to the $200 million limitation of coverage in the Master Policy. (Ex. C, pp. 3-4). Under the terms of the Master Policy, Royal "shall issue" sub-policies "subject only to [Royal's] receipt" of (1) a schedule of loans to be included in the sub-policy, (2) a certification that the net margin of those loans is more than 7% per annum, (3) an escrow agreement covering the loans, (4) evidence of sufficient crime and fraud insurance, and (5) payment of the sub-policy premium. (Ex. C, p. 5)  Most of the policies identified in Royal's Complaint are sub-policies of the Master Policy.[6]

In its Complaint, Royal intentionally de-emphasizes the Master Policy, which was issued well before Royal claims to have received *any* report issued by McGladrey or Aquino.  Because Royal's sub-policies merely re-allocated coverage to which Royal previously had committed, Royal's claims of reliance on McGladrey's and Aquino's work are significantly undermined.

### March 2000: Yao Considers Disclosing Forbearance Payments

Royal claims that on March 20, 2000, Yao considered "amending the servicer reports to disclose the existence of ghost payments," but decided to "continue to conceal the payments, their effect on the default rates, and the true default rates of the loans." (¶ 55)  Royal does not (and cannot) allege that McGladrey or Aquino were involved in that decision.

### April 2000:  Royal Reallocates Policy No. 1 To Cover A Securitization

In the Spring of 2000, SFC began to securitize the loans it had originated through its warehouse lending facilities.  Royal claims that on April 19, 2000, it "issued its first SFC securitization policy" in the amount of $50 million, Policy No. RST 293334. (¶ 49)  Confusingly, that policy bears an "inception date" of January 22, 1999, the same inception date as Policy No. 1.

---

[6] *See* ¶¶ 51(a)-(e), (g) describing Sub-Policies No. 293309; No. RST 147522; No. RST 147524; No. RST 147525; No. RST 147526; and No. RST 147533. Royal alleges that it eventually "amended and restated" the sub-policies to allocate coverage to SFC's securitizations. The inception date for these amended sub-policies remained the same as the original sub-policies. *See* ¶¶ 51(a)-(e), (g) describing Amended Sub-Policies No. RST 293309; RST 147522; No. RST 147524; No. RST 147525; and No. RST 147526. The Court can rely on the Master Policy on this motion. *See In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them."); *see also Oatway v. American Int'l Group, Inc.*, 325 F.3d 184, 185-86, n.1, n.3 (3d Cir. 2003).

(¶¶ 37, 49) Royal's allegations in the Texas Litigation explain the relationship between those two policies:

> Policy No. 1 carried a $75 million limit of (principal) liability. But the Wilmington Trust warehouse loan ultimately required only $25 million of that amount. Approximately $50 million in unused coverage under that policy was employed by SFC in April 2000, through a securitization by GT Series 2000-1 in the amount of $49,187,986. In connection with that securitization, Royal issued Policy No. RST 293334.

(Ex. B, p. 19) Thus, Royal first committed to insure $75 million of SFC's warehouse loans in Policy No. 1, and then Policy No. RST 293334 re-allocated almost $50 million of that pre-existing coverage to cover SFC's later securitization.

Royal does not allege that it performed any additional due diligence in connection with this re-allocation of insurance. As with the earlier issued policies, Royal does not allege that it relied on any audit or AUP reports issued by any accounting firm when it re-allocated coverage in this fashion.

### July 2000:  Freed Maxick Sachs & Murphy, P.C. Issues SFC's Audited Financial Statements For 1999

On July 26, 2000, Freed Maxick Sachs & Murphy, P.C. ("FMSM") issued its opinion on SFC's financial statements for the year ended December 31, 1999 (the "1999 audited financial statements"). (¶ 104) (*See* Ex. D) At that time, Aquino worked at FMSM.[7] This is the first SFC audit report referred to in the Complaint. The 1999 audit report was addressed to "Student Finance Corporation" in "Radnor, Pennsylvania," and was issued by FMSM's Philadelphia office. (*Id.* at 3)

Royal claims that it "received" SFC's 1999 audited financial statements. (¶ 108) Royal, however, does not allege when it purportedly received the financial statements, nor who purportedly provided them to Royal. Royal does not (and cannot) claim that either FMB, FMSM

---

[7] Although FMSM issued its opinion on SFC's 1999 financial statements, the Complaint names a different entity, Freed Maxick & Battaglia CPAs ("FMB") as a defendant. Upon information and belief, FMB did not exist when SFC's 1999 audited financial statements were issued, and Aquino had no relationship with FMB.

or Aquino did so. Royal also alleges that "Freed and Aquino intended that Royal rely" on the 1999 audited financial statements. No facts, however, are alleged to support this conclusion.[8]

In the first note entitled "Prepaid Credit Insurance," the 1999 audited financial statements disclose that Royal committed in July 2000 to issue an additional $350 million in credit insurance coverage. (Ex. D, p. 10) This commitment was in addition to the initial $75 million policy and the $200 million Master Policy described above, which, when added together, constitutes all of the credit insurance coverage Royal would ever issue for SFC. As with the prior policies, Royal committed to the additional $350 million *before* it claims to have received any audit or AUP report for SFC.

### October 2000: Yao Allegedly Conceals Forbearance Payments

Yao allegedly had prepared an internal "Cash Flow Projection for 2001," which projected that SFC would make "$19 million in 'Royal Forebearance' [sic] payments." (*Id.*) In October 2000, Royal claims that it requested a copy of SFC's cash flow projections for the year 2001. (¶ 55) Royal claims, however, that Yao chose not to disclose his original projection to Royal, and instead provided Royal with a projection that omitted any reference to forbearance. (*Id.*)

As with the material misrepresentations alleged above, Royal does not (and cannot) allege that McGladrey or Aquino were in any way involved in Yao's purported decision to withhold the unredacted cash flow projection from Royal, or that McGladrey or Aquino played any role in drafting or reviewing either version of the purported projection.

### Late 2000: Royal Becomes Concerned About SFC's Default Rates

In November 2000, Royal allegedly became concerned that the monthly servicer reports generated at the direction of Yao inaccurately reported SFC's true delinquency and default rates. (¶ 57) Royal allegedly asked SFC to "review and affirm the accuracy of the 25% maximum default

---

[8] Royal refers to the 1999 audited financial statements as the "2000 Audit Report," and the 2000 audited financial statements as the "2001 Audit Report." Because this is confusing, we refer to the reports as defined above and below.

- 10 -

rates SFC and Yao had originally represented, on or about November or December 1998, for the SFC student loan program." (*Id.*) In response, "an SFC officer" is alleged to have provided "financial modeling" to Royal that purportedly reaffirmed the 25% maximum default rate. (*Id.*)

Royal does not allege that it performed due diligence to substantiate this "financial modeling." Nor does Royal allege that McGladrey or Aquino played any role in drafting or reviewing the modeling.

### April 30, 2001:  McGladrey Issues SFC's Year 2000 Audited Financial Statements

On April 30, 2001, McGladrey rendered an audit opinion on SFC's financial statements for the year ended December 31, 2000 (the "2000 audited financial statements"). (Ex. E)  As with the 1999 audited financial statements, the 2000 audited financial statements were addressed to "Student Finance Corporation" in "Radnor, Pennsylvania," and issued from McGladrey's Philadelphia office. (*Id.* at 3)  Year 2000 is the only year on which McGladrey ever opined.  Mr. Aquino was then and currently is a partner of McGladrey.  McGladrey is a separate and independent accounting firm from FMSM and FMB.

Royal does not allege when it received or reviewed the 2000 audited financial statements. As with the 1999 audited financial statements, Royal makes only generalized allegations regarding its alleged receipt and review of the 2000 audited financial statements and AUP report.  Royal makes the conclusory allegation, general to all defendants and SFC, that "when issuing each of [its insurance] policies, Royal relied upon the original and continuing misrepresentations and material omissions of SFC and the Defendants set forth above...." (¶ 52)  Among other things, Royal fails to allege when it received McGladrey's and Aquino's reports, and by whom they were sent.  Royal does not (and cannot) claim that it received the reports directly from McGladrey or Aquino.

Royal concedes that the 2000 audited financial statements disclosed the existence, purpose and magnitude of the forbearance payments.  Royal nonetheless criticizes the disclosures, stating that the term forbearance payments "does not accurately describe ... forbearance in the student loan context." (¶ 118)  Royal's position is that the language could mislead a reader into thinking these

- 11 -

were not actual cash payments, but merely an agreement to defer payment to a later date. Royal's position does not square with the plain language of the financial statements.

In fact, the existence of cash forbearance payments and their materiality is expressly disclosed in the 2000 audited financial statements. For example, note 1, "Summary of Significant Accounting Policies," p. 13 states:

School Reserves

When originating or purchasing student loans, the Company generally funds only a portion of the principal borrowed. School reserves represent the unfunded portion of the loan to the student. Payment of such unfunded balance to the school is contingent upon certain criteria relating to: (1) the student meeting certain educational requirements, and (2) the Company receiving a specific number of timely payments from the student. These funds are released to the schools at various stages during the student's education, with the final portion released upon graduation if the student's loan is not delinquent.

The school reserve may include additional amounts designated to absorb forbearance made in accordance with school and borrower agreements and potential credit losses for sold loans based upon the deemed credit quality of the borrower. Ultimately, some of these amounts may be released to the schools under the terms of their agreements.

(Ex. E, p. 13) The financial statements indicate that the school reserve account was in excess of $26,000,000. (*Id.* at p. 4)

Likewise, note 3 to the financial statements, "Securitization and Retained Beneficial Interest," shows a total principal loan balance of $245,000,000, of which $184,000,000 had been securitized, $61,000,000 was available for sale, and $48,000,000 was 60 days or more past due. The note also states that "[t]he above information reflects school reserve forbearance." (*Id.* at p. 19)

Royal claims that these disclosures were "cryptic," and "misleading" (¶ 54), essentially because they did not disclose that these were actual cash payments being made. However, in note 7, "School Reserves," it is stated that:

A summary of the activity in school reserves was as follows:

| December 31, | 2000 | 1999 |
|---|---|---|
| Balance at beginning of year | $7,367,768 | $4,500,000 |
| Originations | 146,455,946 | 57,623,651 |
| Payments to schools | (111,877,722) | (42,850,518) |
| Forbearance payments | (9,515,841) | (2,012,190) |
| Allocations to allowance for credit losses | (5,182,163) | (9,893,175) |
| Charge-offs | (629,016) | - |
| Balance at end of year | $26,618,972 | $7,367,768 |

(*Id.* at p. 22)

Contrary to Royal's contention, it is clear from this table that "forbearance payments" were actual cash payments. Royal concedes as much when it says, "McGladrey certified and adopted SFC's intentionally deceptive and misleading term – 'forbearance' and, in one instance, 'forbearance payments' – in the Notes." (¶ 119) The fact of $9,515,841 in cash forbearance payments was disclosed on the face of SFC's 2000 audited financial statements.[9]

Royal concedes that it was McGladrey that insisted on these disclosures. (¶¶ 124-125) Specifically, Royal alleges that on March 27, 2001, during the course of McGladrey's work, Diane Messick, SFC's controller, conveyed to Yao a request made by Aquino. Aquino allegedly requested that Yao provide a written representation indicating that Royal "'under[stood] [SFC's] forbearance policy.'" (¶ 124) The very next day, Royal alleges that Ms. Messick conveyed another request by Aquino to Gary Hawthorne of SFC:

> Mike Aquino has requested a meeting with you to discuss forbearance in further detail. He would like a management letter explaining how the process is being managed in light of the increase in forbearance applied from 1999 to 2000.

(¶ 125)

The timing of the disclosures is logical. As alleged in the Complaint, SFC's forbearance payments had more than quadrupled from 1999 to 2000, from $2,012,190 to $9,515,841.

---

[9] Even if Royal believed that SFC's forbearance program involved deferment of student payments and not actual cash payments by SFC, the import of McGladrey's disclosures is the same. Royal still would have been on notice that SFC had not received $9,515,841 in student payments in 2000, which clearly would have had a significant impact on SFC's delinquency and default curves.

According to the 2000 audited financial statements, SFC also originated approximately $146 million of student loans in 2000, as compared to $57 million in 1999. (Ex. E, p. 22). Thus, SFC's use of forbearance payments as a percentage of SFC's annual originations roughly doubled from 1999 to 2000, from approximately 3.5% to 6%, respectively.

McGladrey's and Aquino's audit disclosures are inconsistent with Royal's claims of conspiracy to conceal SFC's forbearance program from Royal. If anything, Royal's allegations demonstrate that McGladrey and Aquino insisted on disclosures when SFC's use of forbearance payments became significant. The audit disclosures put or reasonably should have put Royal on notice of SFC's use of forbearance payments.[10]

### April 30, 2001:  McGladrey Issues AUPs on SFC's Securitization Trusts

McGladrey also performed AUPs on each of the four securitization trusts created and closed by SFC during 2000. (Ex. F) The resulting AUP reports, while dated February 21, 2001, were actually issued on April 30, 2001, the very same day that McGladrey's issued its audit opinion on SFC's December 31, 2000 financial statements.[11]

Royal claims that McGladrey failed to disclose in its AUP reports that SFC's monthly servicer reports inaccurately reflected the true default and delinquency rates of the securitized student loans. (¶¶ 128-29)  As discussed above, however, the form of SFC's monthly servicer reports was dictated by Andrew Yao. (¶ 45)  Moreover, in early 2001, when Aquino first reviewed a sampling of the year 2000 monthly servicer reports, the form of the reports apparently had been accepted by the parties to the securitization, including Royal, and it was not for McGladrey or Aquino to question.

---

[10]   Royal also fails to allege any extraordinary incentive for McGladrey or Aquino to have become involved in SFC's purported multi-million dollar conspiracy. To the contrary, stripped of rhetoric, Royal alleges that McGladrey and Aquino received nothing more than their regular auditing and accounting fees, and Royal otherwise alleges facts consistent with a normal, arms-length accountant-client relationship.

[11]   The 2000 audit and AUP issuance dates are shown on McGladrey's report control sheets. (Ex. G) Pursuant to AICPA guidelines, a report is to be dated as of the date of completion of the relevant fieldwork, even if the report is actually issued later (as is typically the case). *See* AU §530.

Additionally, as shown on the face of the AUP reports themselves, McGladrey was retained to perform discrete procedures in relation to the securitized trusts. It is for exactly that reason that the relevant professional standards relating to AUP engagements warn clients and third-parties to be wary about reliance on AUP reports. *See, e.g.*, AT 201.11 (clients "assume the risk that such procedures might be insufficient for their purposes.") Additionally, in each of its AUP reports, McGladrey warned that "[t]his report is intended solely for the information and use of Student Loan Servicing, LLC and the Trustee [i.e., Wells Fargo, the Trustee of the Grantor Trustee], and is not intended to be, and should not be used by anyone other than the listed parties." (Ex. F, p. 2)  Royal's claims of purported reliance on these reports are thus without basis.

Moreover, as noted above, the 2000 audited financial statements disclosed the existence of $9,515,841 in "forbearance payments," so when Royal allegedly read the AUPs (if indeed it did read them), Royal was on notice of the existence of the payments. If Royal did not read the 2000 audited financial statements, its entire theory of reliance collapses.

### May 2001: Royal's Concerns About SFC'S Default Rates Grow

Royal claims that in "early 2001," Royal again purportedly "became concerned about the growing number of loans that were being reported as delinquent" in SFC's monthly servicer reports. (¶ 58)  Royal thus allegedly asked Yao to provide "an explanation for the increasing percentage of delinquencies," because the monthly servicer reports "showed a high percentage of delinquencies." (*Id.*)  There is no allegation that McGladrey or Aquino played any role in these exchanges.

According to Royal, "rather than admitting the truth, an SFC officer told Royal on or about May 11, 2001" that "the high number of delinquencies was caused by students making advance payments on their loans prior to graduation [and that] [t]hese students purportedly would then forget to begin making monthly payments after graduation and would always remain thirty to sixty days delinquent once they resumed making payments." (*Id.*)

Whether or not this was a credible explanation was for Royal to determine. The explanation, however, did not come from McGladrey or Aquino. And, the explanation came only *after* McGladrey issued an opinion on the 2000 financial statements. As set forth above, the 2000 audited financial statements disclosed SFC's practice of making "forbearance payments" and even quantified the actual amount of cash payments made by SFC in 1999 and 2000.

### Mid 2001: Royal Continues to Insure SFC's Securitizations Despite Concerns

In the Texas Litigation, Royal alleged that in the Spring to Summer of 2001, the principal liability limits on the Master Policy were "approaching the existing commitment levels." (Ex. B, pp. 23-24). SFC therefore allegedly "requested that Royal agree to a massive cover...." (*Id.* at 24) Royal, however, "had concerns that the excess spread reserve was not building as rapidly as had been represented by SFC" and "questioned SFC about this development." (*Id.*) As stated above, the excess spread reserve was allegedly maintained by SFC to provide additional security to Royal for defaulted student loans.

SFC allegedly explained that the excess spread reserve "had not grown as represented" because SFC had changed its "internal accounting, from compound to simple interest accounting." (*Id.*) As a result, student loan payments allegedly were being allocated solely to principal, leaving no interest payments from which the excess spread reserve could grow. (*Id.*) Royal claims that this explanation was false and that SFC knew it was false when made. (*Id.*) As with many of the representations described above, McGladrey and Aquino are not alleged to have had any role in or knowledge of this exchange.

Royal further alleged in the Texas Litigation that a June 2001 meeting was held between Royal and SFC. (Ex. B, p. 24) At that meeting, Royal purportedly "again asked if the default rates assumed in [SFC's] modeling were reasonable and accurate, [and ] SFC officers and directors Gary Hawthorne and Perry Turnbull again assured Royal that they were." (*Id.*) Royal claims that these reassurances were also false when made. (*Id.*) Again, McGladrey and Aquino are not alleged to have had any role in or knowledge of this meeting.

- 16 -

"Relying on these representations" by SFC, Royal purportedly "committed to provide additional credit risk insurance on student loans." (Ex. B, p. 25) (¶ 51(f), (h) (i)) As shown by Royal's Texas pleading, in issuing these later policies, Royal allegedly relied upon material misrepresentations and omissions by Yao and others at SFC, and not by McGladrey or Aquino.

### Late 2001: Fraud Among SFC and the Trucking Schools

On October 22, 2001, Royal alleges that SFC's collection manager prepared a memorandum for SFC's credit committee regarding "suspected fraud" on behalf of the trucking schools involved in the SFC program. (¶ 60) The trucking schools allegedly were submitting falsified loan applications, promising students that loans would not have to be repaid, and issuing loans to students with criminal records. (*Id.*) Royal claims that this memorandum was withheld from Royal. Royal does not allege, nor can it, that McGladrey or Aquino had any role in connection with that report.

Royal further alleges that "SFC and Yao" conspired with the trucking schools to make the first three payments on the students' behalf. (¶ 62) The schools allegedly would make these initial payments to ensure that the school received the full tuition disbursement from SFC once a student graduated, while Yao and SFC purportedly obtained the benefit of these loans appearing "seasoned," even though the student himself had not made any payments. (¶ 63) Again, Royal does not allege any role by McGladrey or Aquino in this conspiracy with the trucking schools, which allegedly occurred in 2001. Neither McGladrey nor Aquino issued any SFC reports for the year 2001.

### March 20, 2002: Yao Confesses To Royal

On March 20, 2002, Royal claims that "Yao admitted to Royal for the very first time that SFC had been making the 'forbearance' payments to prevent student loans from being reported as defaults and that a large number of student loans would default immediately if SFC stopped making those payments." (¶ 68) Even if it claims not to have been previously, as of March 20,

2002, Royal was on actual notice of SFC's use of forbearance payments and any resulting claims that Royal may have had as a result.

Following this purported confession, on April 10, 2002, an unidentified SFC officer allegedly sent Royal an e-mail "in which SFC admitted that it had made a total of more than $50 million in ghost payments from January 2001 through March 2002." (¶ 70) These alleged payments purportedly occurred in 2001 – a year in which no audit or AUP reports were issued.

**ROYAL'S KNOWLEDGE OF SFC'S FORBEARANCE PAYMENTS**

Tellingly, Royal never claims that it was unaware of SFC's use of forbearance payments. Rather, in carefully constructed sentences, Royal claims that SFC's "use of ghost payments *to conceal defaults* was not disclosed to Royal before the negotiation and issuance of additional insurance policies." (¶ 43 (emphasis added))

Similarly, in describing Yao's purported March 2002 confession, Royal does not claim that Yao told Royal about SFC's use of forbearance payments for the first time. Rather, Royal claims that "Yao admitted to Royal for the very first time that SFC had been making 'forbearance' payments *to prevent loans from being reported as defaults* and that a large number of student loans would default immediately if SFC stopped making those payments." (¶ 68 (emphasis added)) These are but a few examples – such cleverly crafted sentences appear throughout Royal's Complaint. (*See, e.g.,* ¶¶ 7, 44)

This choice of language is not accidental. In at least one other litigation, Royal apparently produced documents which reveal that Yao told Royal about SFC's use of forbearance payments as early as March 2000, and that those payments "distort[ed] the default curve" of the loan pools. Specifically, Royal sued one of SFC's trucking schools, Commercial Driver Institute ("CDI"), in Tennessee. Following document discovery, CDI filed an answer and amended counterclaim against Royal in which CDI identified a March 6, 2000 letter from Andrew Yao to Royal. (Ex. H, ¶ 130) In that letter, Yao allegedly told Royal that:

- 18 -

> Also for students who are in forbearance, the schools advance payment on behalf
> of the student until the student resumes paying or until he defaults ... *this, of*
> *course, also distorts the default curve.*

(*Id.* (emphasis supplied))[12]

Moreover, as this Court is aware, Charles Stanziale, the Chapter 7 Trustee for SFC,

previously sued Royal in an adversary proceeding. In that matter, the Trustee alleged that Royal

was aware of SFC's use of forbearance payments, even if other SFC creditors were not. (Ex. I, ¶¶

44, 47-48)

**ROYAL'S DUE DILIGENCE**

Whether or not Royal actually knew that SFC was making forbearance payments, Royal

should have been so aware. Not only did SFC's 2000 audited financial statements make detailed

disclosures regarding the nature and quantity of such payments, Royal also had other information

available to it that should have revealed the fact of forbearance, including SFC's monthly servicer

reports. That such reports were a major red flag to Royal is objectively demonstrated by another

lender to SFC, SWH Funding Corporation ("SWH"). SWH is referenced in Royal's Complaint.

(*See, e.g.,* ¶ 66)

According to a complaint filed by SWH against SFC and Yao, in February 2002, SWH

considered loaning $10 million to SFC in connection with a securitization. (Ex. J, ¶ 38) In

conducting its initial due diligence, SWH allegedly discovered an "anomaly relating to the loan

delinquency rates reported by SFC." (*Id.* at ¶ 41) Specifically, SWH alleges that the "Servicer

Reports ... which SFC provided not only to SWH but to the insurance companies ... revealed that a

high percentage of the Comparable Loan Portfolio was substantially in arrears (i.e. 60-90 days

late), but only a small percentage of the Comparable Loan Portfolio was listed on the Servicer

Reports as being in 'Default' (*i.e.* more than 90 days in arrears)." (*Id.*) This "seemed highly

illogical" to SWH on its face, because in order for the delinquency rate to suddenly drop, "an

---

[12] Royal has not yet answered CDI's amended counterclaim.

unusually high number of the Student Loan borrowers that were substantially in arrears would have to start, and continue, making interest payments." (*Id*. at ¶ 42)

SWH conducted additional due diligence, including meeting with SFC employees, officers and directors. (*Id*. at ¶¶ 48-49) During the course of this additional due diligence, SWH purportedly learned about the use of forbearance payments to conceal true default rates. (*Id*. at ¶ 66)

Like SWH, Royal should have seen from the face of SFC's monthly servicer reports an unusually high number of delinquent loans, but an unusually low number of defaulted loans. And, in fact, it appears that Royal did notice this fact. (*See* pp. 10, 15, *supra*) Had Royal followed-up appropriately, it, too, would have (and should have) learned of the fact of forbearance.

## ARGUMENT

Royal waited until March 18, 2005 to file its complaint against McGladrey and Aquino. This is true notwithstanding that Yao purportedly disclosed the alleged fraud to Royal on March 20, 2002, and Royal has been actively litigating against a number of individuals and entities involved with SFC, including, among others, trucking schools, MBIA, Wells Fargo and Yao. The pleadings in these other cases reveal that Royal has been aware of its purported theory of liability against McGladrey and Aquino, yet waited years to file a claim. This delay is not accidental and demonstrates Royal's hesitancy to file claims it knows to be flawed.

In its Complaint, Royal asserts eleven causes of action: (1) Civil RICO; (2) RICO Conspiracy; (3) Civil Conspiracy to Commit Fraud; (4) Fraud; (5) Fraudulent Inducement; (6) Fraudulent Concealment; (7) Aiding and Abetting Fraud; (8) Negligence; (9) Negligent Misrepresentation; (10) Deepening Insolvency; and (11) Aiding and Abetting Breach of Fiduciary Duty. Each one of these claims should be dismissed.

## I.    ROYAL FAILS TO STATE A RICO CLAIM

Royal has asserted claims against Aquino for violations of civil RICO, 18 U.S.C. § 1962(c) ("Section 1962(c)"), and conspiracy to violate RICO, 18 U.S.C. § 1962(d) ("Section 1962(d)"). Royal claims that "non-parties Andrew Yao and Gary Hawthorne" along with Aquino and Gagne are RICO "persons," who operated a "RICO Enterprise" consisting of an "association-in-fact" between SFC, its related entities, Pepper, McGladrey and FMB. (¶¶ 136, 141) The alleged "goal" of the RICO Enterprise, Royal claims, was to "sell to investors as many student loans as possible," and the RICO persons allegedly "accomplished their objective" by convincing lenders to fund SFC, investors to "purchase the loans" and "convincing insurers, specifically Royal, to issue insurance policies...." (¶ 138)

Section 1962(c) makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c); *see also Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). Section 1962(d) makes it "unlawful to conspire to violate [Section 1962(c)]." 18 U.S.C. § 1962(d). Racketeering activity includes mail and wire fraud under 18 U.S.C. §§ 1341, 1343. *See* 18 U.S.C. § 1961(1). A pattern of racketeering activity "requires at least two acts of racketeering activity." *Id.* at 1961(5).

Royal's purported RICO claims should be dismissed for several reasons. *First*, Aquino's performance of outside accounting services is insufficient to constitute "control" of the purported RICO Enterprise. *Second*, the alleged predicate acts – the issuance of two audits and AUP reports within a nine-month period – were isolated events and do not constitute a "pattern" under RICO. *Third*, the predicate acts themselves are routine business communications that do not rise to the level of mail or wire fraud.

**A.    Aquino Did Not Operate Or Manage The Alleged RICO Enterprise**

Royal's Section 1962(c) claim fails to allege the essential element that Aquino

"conduct[ed] or participate[ed] directly or indirectly" in the RICO Enterprise. *Reves v. Ernst &*

*Young*, 507 U.S. 170, 185 (1993). Under the "'operation or management' test," which the Supreme

Court enunciated in *Reves*, one is liable under Section 1962(c) only if he "participate[d] in the

operation or management of the enterprise itself." *Id.* at 185. In order to meet the "operation or

management" test, the defendant must "direct[] the enterprise's affairs through a pattern of

racketeering activity." *Id.* As *Reves* makes clear, the routine provision of accounting services does

not meet these standards. *See id.*

As stated by the Third Circuit, "not even action involving some degree of decision making

constitutes participation in the affairs of an enterprise." *University of Maryland v. Peat, Marwick,*

*Main & Co.*, 996 F.2d 1534, 1538 (3d Cir. 1993). Mere association with an enterprise is not

sufficient to meet this test, nor is alleged "substantial persuasive power" over the enterprise's

affairs; the "test is not involvement, but control" over the alleged enterprise. *Department of Econ.*

*Dev. v. Arthur Andersen & Co.*, 924 F. Supp. 449, 465 (S.D.N.Y. 1996) (internal citations omitted).

Thus, "*Reves* makes it more difficult to find 'outsiders' such as accountants or lawyers liable"

under Section 1962(c). *Id.*; *see also 131 Main Street Assoc. v. Manko*, 897 F. Supp. 1507, 1527

(S.D.N.Y. 1995) (the "operation-or-management rule is intended to spare from RICO liability true

enterprise outsiders (such as outside accounting firms)"). And, here, the only individual who

allegedly controlled SFC and its related entities was Andrew Yao. (*See, e.g.*, ¶ 20 "Yao at all times

owned and controlled SFC.") While someone like Yao may properly be named to a RICO cause of

action, Aquino is not.

In *Reves*, the accounting firm Ernst & Young audited the financial statements of a farming

cooperative, and issued an opinion regarding the valuation of a gasohol plant. Ernst's audit opinion

falsely inflated the valuation of the gasohol plant, which extended the cooperative's solvency. As a

result, the cooperative became bankrupt and Ernst was sued by the trustee under Section 1962(c).

- 22 -

The Supreme Court affirmed the dismissal of the claims, reasoning that Ernst's failure to inform

the cooperative's board of directors that the gasohol plant had been falsely overvalued did not rise

to the level of "control" of the RICO enterprise.

Similarly, in *University of Maryland*, the accounting firm Peat Marwick was sued under

Section 1962(c) for issuing "false and misleading" financial statements regarding its client, Mutual

Fire, "ignoring numerous signs of Mutual Fire's precarious financial condition" and issuing an

unqualified audit opinion without "a reasonable basis." 996 F.2d at 1538.  The Third Circuit

affirmed dismissal of the Section 1962(c) claim:

> [T]hese services, like the audits, were merely financial services.... Simply
> because one provides goods or services that ultimately benefit the enterprise does
> not mean that one becomes liable under RICO as a result.

* * * *

> Plaintiffs have nowhere averred that Peat Marwick had any part in operating or
> managing the affairs of Mutual Fire.  Although they make much ado about how
> important and indispensable Peat Marwick's services were to Mutual Fire, the
> same could be said of many who are connected to Mutual Fire.  Similar to the
> allegation against the accounting firm in *Reves*, the plaintiffs' amended
> complaint, when distilled to its essence, is nothing more than an allegation that
> Peat Marwick performed materially deficient financial services.  It cannot be said
> that by merely performing what are generic financial and related services to an
> insurance company, even if they are later found to be deficient, an accounting
> firm has opened itself to liability under the federal racketeering statute.

*Id.* at 1539.

*Reves* and its progeny are fatal to Royal's Section 1962(c) claim.  Similar to the allegations

against the accounting firms in *Reves* and *University of Maryland*, Royal alleges that Aquino

participated in a RICO enterprise by advising SFC on "financial reporting requirements" and

through "the effective representation of [SFC]'s financial status...."  (¶ 151)  These routine

accounting services do not satisfy the "operation or management" test.  *See Reves*, 507 U.S. at 185;

*University of Maryland*, 996 F.2d at 1538; *Department of Econ. Dev't*, 924 F. Supp. at 469 ("even

when professionals go beyond their customary role, they will not be deemed to have participated in

the 'operation or management' of the enterprise itself") (internal quotation omitted).  *See also id.* at

467 ("even provision of services essential to the operation of the RICO enterprise itself is not the same as participating in the conduct of the affairs of the enterprise") (internal citation omitted).

### B.    Royal Fails To Allege A Pattern of Racketeering Activity

A "pattern of racketeering activity" under Section 1962(c) requires more than the commission of at least two predicate acts. *See* 18 U.S.C. § 1961(1), (5). A complaint must also adequately allege that the predicate acts "amount to or pose a threat of continued criminal activity." *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989). Continuity, in turn, is itself a "closed and open-ended concept." *Id.* at 241. To establish continuity, Royal must allege facts showing either "a closed period of repeated conduct," or "past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. In either case, continuity is "centrally a temporal concept" and "predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *Id.* Again, Royal's RICO claim should be dismissed.

*First*, Royal fails to allege closed-ended continuity. Closed-ended continuity requires allegations showing "a series of related predicates extending over a *substantial* period of time." *Id.* at 242 (emphasis added). Royal, however, alleges that Aquino committed three predicate acts between July 26, 2000 and April 30, 2001 – an approximate nine-month period. (¶ 160(b)). Courts routinely dismiss RICO claims based upon alleged predicate acts committed over such brief periods of time. *See, e.g., Hindes v. Castle*, 937 F.2d 868, 875 (3d Cir. 1991) (eight-month period of predicate acts does not satisfy continuity requirement); *Kehr Packages v. Fieldcor, Inc.*, 926 F.2d 1406, 1413 (3d Cir. 1991) (same); *Banks v. Wolk*, 918 F.2d 418, 423 (3d Cir. 1990) (same).

*Second*, Royal fails to allege facts showing any threat of continued criminal activity. Continuity can be established if the defendant made an explicit threat of continued fraudulent activity, or if the conduct is an "ongoing entities' regular way of doing business." *H.J., Inc.*, 492 U.S. at 242-43. Nothing of the sort is or can be alleged here. The predicate acts alleged against Aquino – issuance of opinions on SFC's 1999 and 2000 financial statements and 2000 AUP reports

- 24 -

– do not threaten continued criminal conduct. SFC is now bankrupt, a trustee is managing its

operations and assets, and the alleged goal of the purported conspiracy – to "sell as many student

loans as possible" (¶ 138) – is no longer a threat. *See id.* (dismissing RICO claim where "the

alleged purpose of scheme was achieved"); *Banks,* 918 F.2d at 423 (where there is no indication of

possible future misconduct, purported RICO claim "amounts to nothing more than an isolated

incident of 'garden variety' real estate fraud."); *Reliance Ins. Co. v. Eisner & Lubin,* 685 F. Supp.

449 (D. N.J. 1988) (three alleged fraudulent audits by accounting firm were "a 'one shot' deal" that

fail to establish RICO continuity); *Hindes,* 937 F.2d at 874-75.

### C.    Aquino Did Not Commit Any Predicate Act

Royal claims that Aquino committed "acts of mail and wire fraud" by issuing the 1999 and

2000 SFC audit reports as well as the 2000 AUP reports. (¶ 160(b)) These reports are alleged to

be "fraudulent and misleading" (*id.*), because they purportedly failed to adequately disclose SFC's

practice of making forbearance payments. (¶¶ 105,110,129) Yet, such allegations do not rise to

the level of mail fraud.

Where plaintiffs rely upon mail fraud as a basis for RICO liability, the allegations of fraud

must comply with Rule 9(b), which requires a heightened level of specificity. *See Lum v. Bank of*

*America,* 361 F.3d 217, 223 (3d Cir. 2004). Rule 9(b) also requires a plaintiff to plead facts

showing a strong inference of *scienter, see Beck v. Manufacturer's Hanover Trust Co.*, 820 F.2d

46, 49-50 (2d Cir. 1987), *cert. denied*, 484 U.S. 1005 (1989), and that the "fraudulent

misrepresentations or omissions [were] reasonably calculated to deceive persons of ordinary

prudence or comprehension." *Kehr Packages*, 926 at 1415. Royal does not meet these standards.

*First*, Royal's amended complaint is virtually bereft of *scienter* allegations, much less

allegations showing a "strong inference" of *scienter*. *McHale v. NuEnergy Group*, 2002 WL

321797, at *8 (E.D. Pa. Feb. 27, 2002).

*Second*, the reports issued by the various accounting firms were not "reasonably calculated

to deceive persons of ordinary prudence or comprehension," much less a sophisticated reader of

financial statements such as Royal. And, Royal could not have been deceived by SFC's 2000 audited financial statements, which, as discussed above, made detailed disclosures regarding forbearance, including the amount of cash payments made in 1999 and 2000. *See Kehr Packages,* 926 F.2d at 1415 ("normal business communications" that "contain no deceptive elements" amount to mere breach of contract, not mail fraud).

*Third,* it is well settled that violations of GAAP and GAAS, standing alone, are insufficient to establish fraud. *See In re Ikon Office Solutions, Inc.,* 277 F.3d 658 (3d Cir. 2002); *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1208 (11th Cir. 2001). Indeed, "the [mail fraud] statute does not reject all business practices that do not fulfill expectations." *Id.* at 1417 (quoting *United States v. Kreimer,* 609 F.2d 126, 128 (5th Cir. 1980)). At most, Royal's allegations sound in professional malpractice, not mail fraud. *Cf. Lum,* 361 F.3d at 226.

## II.     ROYAL FAILS TO ALLEGE A RICO CONSPIRACY

Count II of Royal's Complaint alleges that Gagne, Aquino, Hawthorne and Yao "conspired and formed an agreement or plan to violated [sic] 18 U.S.C. § 1962(c)." (¶ 168) In order to state a claim for RICO conspiracy, a complaint must allege facts showing that (1) the conspirators share a common purpose and (2) the defendant "knowingly agrees to facilitate a scheme, which includes the operation or management of a RICO enterprise." *Smith v. Berg,* 247 F.3d 532, 538 (3d Cir. 2001). And, a conspiracy claim must contain supporting factual allegations. *See Rose v. Bartle,* 871 F.3d 331, 366 (3d Cir. 1989).

Here, Royal's Complaint is bereft of factual allegations showing that Aquino shared a "common purpose" with Gagne, Hawthorne and Yao. Indeed, the facts alleged by Royal are entirely inconsistent with the existence of a conspiracy. As discussed above, Royal alleges that Aquino insisted upon detailed audit disclosures regarding forbearance in the 2000 audited financial statements, and that Aquino sought written assurances that Royal was aware of SFC's forbearance program. Moreover, the Complaint does not allege facts showing that Aquino communicated with Gagne or Hawthorne at all, and the mere provision of accounting services to SFC does not give rise

to an inference that Aquino agreed to commit predicate acts or that Aquino knew that the acts of

Gagne or others were part of racketeering activity. *See, e.g., Dongelewicz v. PNC Bank Nat'l*

*Ass'n*, No. 03-1045, 2004 WL 1661863, at \*6 (3d Cir. July 23, 2004).

## III.    ROYAL'S COMMON LAW CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

Royal's non-RICO common law claims are untimely. By Royal's own admission, Yao

"revealed" the alleged fraud to Royal on March 20, 2002, and Royal's claims against McGladrey

and Aquino are based upon audit opinions and AUP reports issued on or before April 30, 2001.

Yet, Royal waited until March 18, 2005 to sue McGladrey and Aquino.

Pennsylvania law, which applies to this action, mandates that all of Royal's common law

claims be filed within two years of when each claim accrued. Even if the Court were to apply the

date by which Royal concedes it was on actual notice of its claims – March 20, 2002 – Royal's

common law claims are time-barred.

Royal may argue that Delaware law, which has a three-year statute of limitations, applies

to this action. Although Pennsylvania law should apply here, even if Delaware law were applied,

Royal's common law claims would still be untimely. Delaware's statute of limitations runs from

the date of the allegedly wrongful act, here, April 30, 2001, and Royal did not file until more than

three years later.

### A.    Royal's Common Law Causes of Action Are Untimely

The Pennsylvania statute of limitations for Royal's common law causes of action is two

years. *See* 42 Pa. Cons. Stat. Ann. § 5524. Under Pennsylvania law, a cause of action accrues on

the date an injury is sustained, or when a party has a legal right to institute suit and can maintain a

successful action. *See H.N. Schnelling v. Prudential Secs., Inc.*, 2004 WL 1790175, at \*2 (E.D. Pa.

Aug. 9, 2004). Courts have held that claims based on negligence accrue at the point that the

alleged duties are breached, *see Harsco Corp. v. Kerkham, Stowell, Kondracki & Clarke*, 961 F.

Supp. 104 (M.D. Pa. 1997), and claims based upon fraud accrue when "the fraud [was] discovered

- 27 -

through the exercise of due diligence." *Rothman v. Fillette*, 469 A.2d 54, 546 n.3 (1983); *Bhatla v. Resort Dev. Corp.*, 720 F. Supp. 501 (W.D. Pa. 1989).

Here, Royal alleges that the "fraud [was] revealed ... [o]n or about March 20, 2002." (¶ 68) Although McGladrey believes Royal's common law claims accrued earlier, even were the Court to accept March 20, 2002 – the date Royal concedes "the fraud was revealed" – Royal's claims, filed on March 18, 2005, are time-barred under Pennsylvania law.

### B.    Pennsylvania Law Governs This Action

Because Royal missed the Pennsylvania statute of limitations, Royal may argue that the Delaware three-year statute of limitations should apply. But, the purported fraud emanated from Pennsylvania, not Delaware, and Pennsylvania has a greater interest in the application of its laws to this matter.

Under Delaware's borrowing statute, courts will apply either the limitations period of Delaware or of the state where the claim arises, whichever is shorter. *See* 10 Del. C. § 8121. To determine where the cause of action "arises," Delaware courts perform an analysis "similar ... to that made when making a substantive choice of law decision." *Hill v. Equitable Trust Co.*, 562 F. Supp. 1324, 1334 (D. Del. 1983); *see, e.g., McIntosh v. Arabian Am. Oil Co.*, 633 F. Supp. 942, 945 (D. Del. 1986). For substantive choice of law questions arising in tort actions, Delaware has adopted the "most significant relationship" test set forth in Sections 145 and 6 of the *Restatement (Second) of Conflict of Laws* (the "*Restatement*"). *See Travelers Indemnity Co. v. Lake*, 594 A.2d 38, 47 (Del. 1991).

Sections 145 and 6 of the Restatement call for consideration of the following factors:

[i] the place where the injury occurred; [ii] the place where the conduct causing the injury occurred, [iii] the domicile, residence, nationality, place of incorporation and place of business of the parties, [iv] the place where the relationship, if any between the parties is centered ..., [v] the needs of the interstate and international systems, [vi] the relevant policies of the forum, [vii] the relevant policies of the other interested states and the relevant interests of those states in the determination of the particular issue, [viii] the protection of justified expectations, [ix] the basic principles underlying the particular field of

law, [x] certainty, predictability and uniformity of result, and [xii] ease in the determination and application of the law to be applied.

*Restatement* §§ 145, 6.

When evaluating these facts, courts do not simply "add up the interests on both sides of the equation" and automatically apply the law of the state with the most contacts. *Corning Inc. v. SRU Biosystems, LLC,* 292 F. Supp. 2d 583, 585 (D. Del. 2003) (Farnan, J.). Rather, courts evaluate the contacts in accordance to their relative importance to the particular issue. *See id.* Here, Pennsylvania has the "most significant relationship" to Royal's claims against McGladrey.

*First,* all of the parties who are alleged to have engaged in fraudulent conduct are currently based in Pennsylvania and were based in Pennsylvania during the relevant period of time. As alleged in the Complaint, SFC is a Pennsylvania corporation, which is owned and controlled by Andrew Yao, a Pennsylvania resident. Yao, at all relevant times, maintained an office in Radnor, Pennsylvania from which he made decisions as well as the purported misrepresentations and omissions upon which Royal purportedly relied. Gary Hawthorne, another officer and director of SFC who allegedly engaged in fraudulent conduct, is also a Pennsylvania resident. Additionally, according to the Complaint, Yao (primarily) and Hawthorne (to a lesser extent), are alleged to have been the masterminds of SFC's fraud. (¶¶ 20, 21, 33-35, 45, 58)

*Second,* the McGladrey office that provided the accounting services in dispute is in Philadelphia, Pennsylvania. And, Aquino is a Pennsylvania resident who provided the accounting services at issue from McGladrey's and FMSM's Philadelphia offices. Additionally, McGladrey issued the disputed reports from its Philadelphia office and addressed those reports to SFC in Radnor, Pennsylvania.

Similarly, Pepper Hamilton is, according to the Complaint, a Pennsylvania limited liability partnership, and Rod Gagne, who is alleged to be a co-conspirator, is "a partner in the Philadelphia office" of Pepper Hamilton. (¶¶ 13, 14) The place where the relationship between the parties was centered is Pennsylvania.

- 29 -

*Third*, the place where the allegedly wrongful conduct occurred is Pennsylvania. As set forth above, Yao, Hawthorne, Pepper, Gagne, Aquino and McGladrey all purportedly performed their wrongful acts in Pennsylvania. And, in cases such as this, which involve allegations of intentional misconduct, Delaware courts prefer to apply the law of the place where the conduct allegedly occurred. *See J.E. Roades & Sons, Inc. v. Ammeraal, Inc.*, 1988 WL 116423, at *2 (Del. Super. Ct. Oct. 12, 1988); *see also Hill*, 562 F. Supp. at 1324. It is that state which has the greatest interest in punishing the wrongful conduct occurring within its own borders. *See id.* at 1334-35.

*In re Phar-Mor, Inc. Secs. Litig*, 893 F. Supp. 484 (W.D. Pa. 1995), is directly on point. There, the accounting firm Coopers & Lybrand was sued by a creditor of the firm's audit client for fraud, negligence, negligent misrepresentation and RICO claims on the theory that the creditor relied on Coopers' intentionally misleading audit opinion. *See id.* at 486-87. In a choice-of-law analysis under New Jersey law (which is substantially similar to Delaware), the court held that Pennsylvania law applied to the action. The court noted that Pennsylvania was "where the audit reports were prepared, signed and issued, and where Coopers' auditors are licensed." *Id.* at 488. *See also Cox v. Delaware Elec. Co-Op, Inc.*, 823 F. Supp. 241 (D. Del. 1993) (applying Delaware law where "any 'relationship' between plaintiffs and defendant arose out of the decedent's work which was done pursuant to a contract which called for work to be done in Delaware.").

*Fourth*, the relevant policies of Pennsylvania will be furthered by the application of Pennsylvania law. Pennsylvania has a paramount interest in regulating the conduct of professionals practicing within its borders. *See Khan v. State Bd. Of Auctioneer Examiners*, 577 Pa. 166, 842 A.2d 936 (2004). In cases involving alleged misconduct by licensed professionals, such as here, courts routinely apply the law of the jurisdiction in which the professional is licensed. *See, e.g., White Consolidated Indus. v. Island Kitchens, Inc.*, 884 F. Supp. 176, 180 (E.D. Pa. 1995) (applying New York law to protect "the interests of New York in regulating the conduct of attorneys practicing within its borders and the justifiable expectations of a New York client retaining New York counsel"); *Diversified Group, Inc. v. Daugerdas*, 139 F. Supp. 2d 445, 453

(S.D.N.Y. 2001); *Pittson Co. v. Sedgwick James of New York*, 971 F. Supp. 915, 924 (D. N.J. 1997) ("Although New York may have a slight interest in protecting its citizens who engage out of state [professionals], this interest is outweighed by Illinois' interest in regulating the conduct of [professionals].").

Similarly, Pennsylvania has the greatest interest to punish the alleged intentional wrongdoers. *See Johnston Assoc. Inc. v. Rohm & Haas Co*, 560 F. Supp. 916, 918 (D. Del. 1983) (the state where the alleged fraudulent conduct occurred has the most significant interest to punish alleged wrongdoers in its jurisdiction); *accord J.E. Rhoads & Sons, Inc.*, 1988 WL 116423, at * 1; *Restatement* § 145 Comment C ("If the primary purpose of the tort rule involved is to deter or punish misconduct ... the state where the conduct took place may be the state of dominant interest and thus that of most significant relationship."). *See also Corning Inc.*, 292 F. Supp. 2d at 585 (applying law of state where the conduct underlying any liability occurred). Pennsylvania law and its statute of limitations should be applied to Royal's common law claims, which, consequently, are time-barred.

C.    **Royal's Claims Are Untimely Under Delaware Law**

Even were the Court to apply Delaware law, Royal's common law claims are still untimely. The Delaware statute of limitations for common law causes of action is three years, which begins to run at the time of the alleged wrongful act. *See* 10 Del. C. § 8106; *Isaacson, Stropler & Co. v. Artisan's Savings Bank*, 330 A.2d 130, 132 (Del. 1974); *Pomerantz v. Museum Partners, L.P.*, 2005 WL 217039, at *3 (Del Ch. Jan. 24, 2005).

Royal may proceed on the theory that the limitations period began to run on March 20, 2002, when the fraud was "revealed" by Yao. However, as highlighted above, the essential "wrongful act" that forms the basis of all of Royal's common law claims is McGladrey's alleged failure to disclose adequately the nature and effect of forbearance payments in SFC's 2000 audited financial statements and AUP reports. Because these reports were issued on April 30, 2001, all of Royal's common law claims accrued at that time – almost four years before Royal brought suit.

*See, e.g., Pomerantz*, 2005 WL 217039, at *8. Royal's claims, filed on March 18, 2005, are thus time-barred under Delaware law as well.[13]

Royal is on the horns of a dilemma. Royal cannot dispute that $9,515,841 in forbearance payments was disclosed in the 2000 audited financial statements. Either Royal read the statements, in which case it was on notice of its claim for almost four years before it filed suit, or it did not, in which case it cannot prove an essential element of its claims, namely, reliance.

## IV.    ROYAL FAILS TO STATE A CLAIM FOR CIVIL CONSPIRACY

Count III of Royal's Complaint alleges that McGladrey and Aquino conspired to defraud "SFC's insurers and lenders, including Royal." (¶ 181) This allegation itself is reason to dismiss Royal's civil conspiracy claim. Malice, or an intent to injure, is an essential element of a conspiracy claim. *See Jeter v. Brown & Williamson Tobacco Co.*, 294 F. Supp. 2d 681, 688 (W.D. Pa. 2003). Malice exists only "where the sole purpose of the conspiracy is to cause harm to the party who claims to be injured." *Id.* (quoting *Spitzer v. Abdelhak*, 1999 WL 1204352, at *9 (E.D. Pa. Dec. 15, 1999)).

As Royal itself alleges, the purpose of the conspiracy was not to cause harm solely to Royal, but to "generate and then sell to investors as many securitized student loan pools as possible." (¶ 180) Because the alleged purpose of the conspiracy was to further defendants' own business interests, malice cannot be found as a matter of law. *See Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (1979) (where the facts show that a person acted to advance his own business interests, those facts constituted justification and negate any alleged intent to injure ); *Jeter*, 294 F. Supp. 2d at 688.

Moreover, Royal alleges that defendants shared an objective to defraud *all* of SFC's "insurers and lenders," not just Royal. (¶ 181) This allegation also negates a finding of malice directed at Royal. *See Thompson*, 488 Pa. at 211 ("Proof of malice, *i.e.*, an intent to injure, is

---

[13] To the extent Royal attempts to predicate liability for Aquino based on the issuance of an opinion on SFC's 1999 financial statements, the applicable statute of limitations would have run even earlier.

essential in proof of conspiracy.... There are no facts of record which indicate that [appellee] acted solely to injury appellants."); *Sim Kar Lighting Fixture Co. v. Genlyte, Inc.*, 906 F. Supp. 967, 977 (D. N.J. 1995) (claim dismissed when plaintiff failed to allege facts suggesting that conspiracy's objective was solely to harm plaintiff).

Furthermore, as in Royal's RICO conspiracy claim, Royal fails to allege any facts showing that McGladrey or Aquino shared a "common purpose or design" with its alleged co-conspirators. *See Cohen v. Pelagatti*, 364 Pa. Super. 573, 528 A.2d 657 (Pa. Super. Ct. 1987). Royal must expressly allege an agreement or make averments of communication, consultation, cooperation, or command from which such an agreement can be inferred. *See Flanagan v. Shively*, 783 F. Supp. 922, 928 (M.D. Pa. 1992). Here, the facts show that McGladrey and Aquino did not share any common purpose with SFC and did not participate in any conspiracy.

## V. ROYAL'S FRAUD CLAIMS SHOULD BE DISMISSED

Royal's claims for aiding and abetting fraud, fraud, fraudulent inducement and fraudulent concealment fail for a number of reasons.

*First*, Royal alleges that Aquino insisted upon disclosures in the 2000 audited financial statements and asked for written assurances that Royal was aware of SFC's practice of making forbearance payments. These allegations are entirely inconsistent with Royal's allegations of fraud, as are the detailed disclosures related to forbearance that do in fact appear in the 2000 audited financial statements. Moreover, Royal fails to allege that McGladrey or Aquino had any extraordinary incentive to participate in the purported fraud.

*Second*, Royal is merely attacking McGladrey's professional judgment for failing to disclose additional information. Such a claim does not sound in fraud. Violations of GAAP and GAAS, standing alone, are insufficient to create an inference of fraud, or to establish the *scienter* required for a claim of fraud. In *Ziemba*, the court ruled that allegations of violations of GAAP and GAAS, which included allegations that the accountant "did not make reasonably adequate

informative disclosures," were insufficient to meet the requirements of Rule 9(b), or to allege *scienter* or fraud. 256 F.3d at 1208.

In *E.F. Hutton Mortgage Corp. v. Pappas*, 690 F. Supp. 1465 (D. Md. 1988), a strikingly similar case, the court said "evidence indicating actionable fraud on the part of [Ernst & Whinney] simply does not exist in this case." *Id.* at 1471. The case involved alleged errors in accounting involving mortgage loan securitizations. The court said, "[i]f an accounting firm could be charged with fraud every time that its audit did not conform to generally accepted accounting principles, then every claim of malpractice would also constitute a claim of fraud." *Id. See also In re Ikon*, 277 F.3d at 658.

*Third*, Royal's Complaint against McGladrey fails to pass muster under Rule 9(b), which requires that allegations of fraud be made with particularity. *See Lum*, 361 F.3d at 217 (citing cases). As this Court has held, "[w]hen alleging fraudulent behavior against a group of defendants, a plaintiff is required to separately plead the fraudulent acts of each defendant to satisfy Rule 9(b)." *MBIA Ins. Corp. v. Royal Indemn. Co.*, 221 F.R.D. 419, 421 (D. Del. 2004) (Farnan, J.) Here, Royal relies almost exclusively upon collective pleading to satisfy the *scienter* and reliance elements of its fraud causes of action, lumping together the "Defendants," including Andrew Yao, in an attempt to accomplish cumulatively what it cannot do individually with respect to McGladrey and Aquino. (*See, e.g.*, ¶¶ 6, 50, 52) These so-called "Defendants" are unrelated entities, and "[c]ollective allegations of fraud against a group of defendants generally do not satisfy Rule 9(b)." *Id.* Such is the case here. *See, e.g., Rosenbaum & Co. v. H.J. Meyers Co., Inc.*, 1997 WL 689288, at *3 (E.D. Pa. Oct. 9, 1997) (dismissing common law fraud claim where "the Complaint simply blends the conduct and knowledge of the two defendants"); *Duane Morris, LLP v. Todi*, 2002 WL 31053836, at *4 (Pa. Comm. Pl. Sept. 3, 2002) (dismissing fraud claim where the complaint "does not plead any facts, let alone plead such facts with particularity, upon which to base the intent element of a fraudulent representation.").

*Finally*, Royal fails to allege facts showing that it "justifiably" relied on McGladrey's and Aquino's alleged misrepresentations. *See, e.g., Perma-Vault Safe Co. v. Keep-It-Safe, Inc.*, 2004 WL 603392, at *6 (E.D. Pa. Mar. 25, 2004) (dismissing fraud claim, where "[n]owhere does the complaint allege how defendants fraudulently induced plaintiff to change his position, or that he reasonably relied on any such fraud."). In determining whether reliance is justifiable, the degree of sophistication of the parties and the history, if any, behind the negotiation process are relevant factors." *Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Investments*, 951 F.2d 1399, 1411-12 (3d Cir. 1991). Whether reliance on an alleged misrepresentation is justified depends upon whether the recipient knew or should have known that the information supplied was false. *See Sciafe, Co. v. Rockwell-Standard Corp.*, 285 A.2d 451 (Pa. 1971).

The facts alleged here show that Royal relied exclusively on alleged misrepresentations of Yao and SFC in deciding to issue its insurance policies, and not on the work of McGladrey or Aquino. Moreover, Royal received multiple pieces of information that, at the very least, should have put Royal on notice of SFC's use of forbearance payments, including the 2000 audited financial statements with their disclosure, among other things, of $9,515,841 million in "forbearance payments." Royal also claims to have received monthly servicer reports that it admits contained information that repeatedly caused Royal to question whether it was receiving accurate delinquency and default information. Certainly, SWH, another SFC lender, was able to deduce the fact of forbearance from its reading of SFC's monthly servicer reports, which Royal concedes it received and reviewed. And, the AUP reports specifically warned third parties, such as Royal, against relying upon the reports.

Moreover, by the time that Royal purportedly received McGladrey's reports on or about April 30, 2001, Royal had allegedly:

- Committed to issue *all* of its SFC insurance polices (¶¶ 37, 49, 51);
- Been notified by Yao that SFC used forbearance payments and that those payments distorted the default rate of the securitized pools (Ex. H, ¶ 150); and

- 35 -

- Already questioned Yao on a number of occasions whether SFC's servicer reports were accurately reporting delinquency and default rates. (¶¶ 57, 58).

Royal's fraud claims should be dismissed.

## VI.    ROYAL FAILS TO STATE CLAIMS FOR NEGLIGENCE AND NEGLIGENT MISREPRESENTATION

Royal's fifth count alleges both negligence and negligent misrepresentation claims against McGladrey and Aquino. These claims are easily disposed of as a matter of law.

It has long been the rule in Pennsylvania that a plaintiff cannot maintain a negligence action against an accountant absent strict privity with that accountant. *See Landell v. Lybrand*, 107 A. 783 (Pa. 1919); *see also Guy v. Liederbach*, 459 A.2d 744 (Pa. 1983). Royal does not (and cannot) allege the existence of any contract between it and McGladrey or Aquino. To the contrary, Royal alleges that it was SFC, not Royal, who retained McGladrey and Aquino. (¶ 95) Royal's negligence claim is therefore deficient as a matter of law. *See, e.g., Pell v. Weinstein*, 759 F. Supp. 1107, 1109-10 (M.D. Pa. 1991) (dismissing accountant malpractice claim absent strict privity), *aff'd*, 961 F.2d 1568 (3d Cir. 1992); *Williams Controls, Inc. v. Parente*, 39 F. Supp. 2d 517 (M.D. Pa. 1999); *In re Phar Mor*, 893 F. Supp. at 484 (reviewing cases).

Additionally, Royal's negligent misrepresentation claims should be dismissed for many of the same reasons that its fraud claims are deficient. An essential element of negligent misrepresentation is that the plaintiff justifiably relied on the alleged misrepresentation. *See Bortz v. Noon*, 729 A.2d 555, 561 (Pa. 1999). For the reasons set forth above, Royal fails to allege justifiable reliance.

## VII.    ROYAL FAILS TO STATE A CLAIM FOR DEEPENING INSOLVENCY

In Count VII, Royal purports to assert a claim against McGladrey and Aquino for "deepening insolvency." This claim, however, is not an independent cause of action. It is merely a theory of damages, and should be dismissed on that basis. *See Official Comm. Of Unsecured Creditors v. R. F. Lafferty & Co.*, 267 F.3d 340 (3d Cir. 2001) ("[W]e believe that the soundness of

the theory ... would persuade the Pennsylvania Supreme Court to recognize 'deepening insolvency' as giving rise to a *cognizable injury* in the proper circumstances.") (emphasis added).

Royal pleads "deepening insolvency" as if it were a separate, cognizable cause of action. But "deepening insolvency" does not, by itself, constitute a cause of action. There must be some underlying tortious conduct which caused the insolvency to deepen. Here, that is not the case.

## VIII.   ROYAL FAILS TO STATE A CLAIM FOR AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY

Royal's eighth claim alleges that McGladrey and Aquino aided and abetted a breach of fiduciary duty allegedly owed by SFC's officers and directors to SFC's creditors. This claim is deficient in several respects.

The Pennsylvania Supreme Court has not recognized a cause of action for aiding and abetting a breach of fiduciary duty, and there is no reason to believe it will soon create such a tort. *See Rolick v. Collins Pine Co.*, 925 F.2d 661, 664 (3d Cir. 1991). Recent federal district court decisions have predicted that the Pennsylvania Supreme Court will not expand Pennsylvania law to embrace such an action. *See Flood v. Makowski*, No. Civ. A: CV-03-1803, 2004 WL 1908221, at *36 (M.D. Pa. Aug. 24, 2004) ("Pennsylvania has not recognized a cause of action for aiding and abetting breach of fiduciary duty, and neither will I."); *Daniel Boone Area Sch. Dist. v. Lehman Bros., Inc.*, 187 F. Supp. 2d 400, 413 (W.D. Pa. 2002) ("adoption of [the cause of action] would represent a significant expansion of Pennsylvania tort liability").[14]

Even were the Court to recognize such a cause of action, it would still fail. The few Pennsylvania courts that have recognized an aiding and abetting breach of fiduciary duty claim have stated its essential elements as follows:  (1) a breach of fiduciary duty owed to another;

---

[14] Some courts in the Eastern District of Pennsylvania have recognized a cause of action for aiding and abetting a breach of fiduciary duty based upon the decisions of lower Pennsylvania state courts. *See, e.g., Pierce v. Rossetta Corp.*, 1992 WL 165817 (E.D. Pa. June 12, 1992). However, the more recent authority from the Western District of Pennsylvania comports with well-settled precepts of federalism, which "require that [federal courts] permit state courts to decide whether and to what extent they will expand state common law.... Our role is to apply the current law of the jurisdiction, and leave it undisturbed." *Leo v. Kerr-McGee Chem. Corp.*, 37 F.3d 96, 101 (3d Cir. 1994).

(2) knowledge of the breach by the aider and abettor; and (3) substantial assistance or encouragement by the aider and abettor in effecting that breach. *See Lichtman v. Taufer*, 2004 WL 1632574, at **8-9 (Pa. Com. Pl. July 13, 2004). Royal fails to allege either the existence of a fiduciary duty, or that McGladrey or Aquino substantially assisted in a breach of it.

Royal makes the critical legal assumption that a fiduciary duty was even owed by SFC to SFC's creditors. In fact, there may be no fiduciary duty owed to individual creditors that would entitle them to bring suit. *See* Vice Chancellor Strine's discussion of fiduciary duties of directors of insolvent companies in *Production Resources Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 787-93 (Del. Ch. 2004). If there is no fiduciary duty, there can be no claim for aiding and abetting a breach of such duty.

Even if such a duty existed, the performance of a professional's routine or ordinary services does not constitute "substantial assistance." *See, e.g., Greenberg v. Bear Stearns & Co.*, 220 F.3d 22, 29 (2d Cir. 2000), *cert. denied*, 531 U.S. 1075 (2001) ("The simple providing of normal clearing services to a primary broker who is acting in violation of the law does not make out a case of aiding and abetting against the clearing broker"); *cf. E.F. Hutton*, 690 F. Supp. at 1465.

To satisfy the "substantial assistance" prong, Royal must allege "specific facts" showing that McGladrey and Aquino knowingly participated in the alleged breach. *See Jackson Nat'l Life Ins. Co. v Kennedy*, 741 A.2d 377, 392 (Del. Ch. 1999); *Lichtman*, 2004 WL 1632574, at **8-9. Royal's complaint is devoid of any such detail. Although Royal makes the conclusory allegation that McGladrey "assisted SFC in its cover-up" (¶ 40), that is insufficient to establish "substantial assistance" as a matter of law. *See Thompson v. Glenmede Trust Co.*, No. Civ. A. 92-5233, 1993 WL 197031, at *9 (E.D. Pa. June 8, 1993) (dismissing aiding and abetting claims where the complaint failed to sufficiently allege substantial assistance or encouragement). *See also In re Santa Fe Pacific Corp. Shareholders Litig.*, 669 A.2d 59, 72 (Del. 1995) (conclusory allegations that defendant "had knowledge of" and "knowingly and substantially participated and assisted"

- 38 -

failed to state a claim for aiding and abetting a breach of fiduciary duty). *See also In re Lukens Inc. Shareholders Litig.*, 757 A.2d 720, 735 (Del. Ch. 1999) (conclusory allegation that defendant "approved and urged" directors to take an act alleged to constitute a breach of the directors' fiduciary duty does not satisfy the pleading burden for aiding and abetting a breach of fiduciary duty).

## CONCLUSION

For the foregoing reasons, Royal's Complaint against McGladrey and Aquino should be dismissed in its entirety.

Date:    June 10, 2005
         Wilmington, Delaware


                              ARNOLD & PORTER LLP
                              Richard P. Swanson
                              Veronica E. Rendon
                              Jason M. Butler
                              399 Park Avenue
                              New York, NY 10022
                              Phone: 212-715-1000
                              Fax: 212-715-1399

                              -and-

                              DUANE MORRIS LLP

                              By:_____
                              Michael R. Lastowski (Bar No. 3892)
                              Christopher M. Winter (Bar No. 4163)
                              1100 North Market Street, Suite 1200
                              Wilmington, DE 19801-1246
                              Phone: 302-657-4951
                              Fax: 302-657-4901

                              *Attorneys for McGladrey & Pullen, LLP and
                              Michael Aquino*