# Exhibit B

CAUSE NO. D167370

| | | |
|---|---|---|
| ROYAL INDEMNITY COMPANY, | § | IN THE DISTRICT COURT OF |
| | § | FILED |
| Plaintiff, | § | DISTRICT COURT OF |
| | § | JEFFERSON CO TEXAS |
| v. | § | |
| | § | '03  JUN -5  P12:51 |
| T.E. MOOR & CO., | § | |
| MAC INSURANCE AGENCY, | § | |
| INTERNATIONAL BENEFITS | § | *Lolita Ramos* |
| GROUP, INC., SFC FINANCIAL II, LLC, | § | JEFFERSON COUNTY, TEXAS |
| SFC ACCEPTANCE II, LLC, | § | |
| SFC ACCEPTANCE III, LLC, | § | |
| SFC ACCEPTANCE IV, LLC, | § | |
| SFC ACCEPTANCE V, LLC, | § | |
| SFC ACCEPTANCE VI, LLC, | § | |
| SFC ACCEPTANCE VII, LLC, | § | |
| SFC ACCEPTANCE VIII, LLC, | § | |
| SFC ACCEPTANCE IX, LLC, | § | |
| DELTA CAREER INSTITUTE OF | § | |
| BEAUMONT, INC., D/B/A DELTA | § | |
| CAREER INSTITUTE, MP III | § | |
| HOLDINGS, INC. D/B/A MTA | § | |
| SCHOOLS-131, D/B/A MTA | § | |
| SCHOOLS-136, D/B/A MTA | § | |
| SCHOOLS-137, CONTINENTAL | § | 58TH JUDICIAL DISTRICT |
| ROAD WATCH CORPORATION | § | |
| D/B/A CONTINENTAL | § | |
| TRUCK DRIVER TRAINING & | § | |
| EDUCATION SCHOOL, INC. | § | |
| CUSTOM TRAINING, INC. | § | |
| D/B/A INTERNATIONAL SCHOOLS-TX, | § | |
| BEARCAT TRUCK DRIVING | § | |
| SCHOOL, INC., C & S TRAINING | § | |
| CENTERS, L.L.C. D/B/A C-1 TRUCK | § | |
| DRIVER TRAINING-FT. WORTH, | § | |
| FRANKLIN CAREER CENTER-DALLAS, | § | |
| L.L.C., LUFKIN TRUCK DRIVING | § | |
| ACADEMY, TEXAS TRUCK DRIVER | § | |
| INSTITUTE, INC. D/B/A TRUCK | § | |
| DRIVER INSTITUTE-IX, | § | |
| STUDENT MARKETING SERVICES, | § | |
| LLC and STUDENT LOAN | § | |
| SERVICING, LLC | § | |
| Defendants. | § | |

**PLAINTIFF'S FOURTH AMENDED PETITION**

1.      The Plaintiff intends to conduct discovery under level 3 of Rule 190 of the Texas Rules of Civil Procedure.

## NATURE OF THE CASE

2.      This action asserts claims against various defendants for (i) fraud, (ii) conspiracy to defraud, (iii) breach of contract, (iv) breach of fiduciary duty, and (v) negligent misrepresentation related to "Selected Policies" of insurance issued by Plaintiff Royal Indemnity Company ("Royal"). These Selected Policies and other policies (collectively, the "Policies") are described more fully below.

## JURISDICTION AND VENUE

3.      This matter falls within the general jurisdiction of this Court and the amount in controversy exceeds the Court's minimum jurisdictional limit.

4.      Venue is proper in Jefferson County, Texas under Tex. Civ. Prac. & Rem. Code § 15.002(a)(3) against Defendants T.E. Moor & Co. ("Moor"), MAC Insurance Agency ("MAC") and Delta Career Institute because they are not natural persons and have their principal offices in this county. Venue is proper against all other Defendants under Tex. Civ. Prac. & Rem. Code § 15.004 because all of Royal's claims against all Defendants arise out of the same transaction or occurrence, or series of transactions or occurrences, as more fully set forth herein.

## PARTIES

### Plaintiff

5.      Royal is a Delaware Capital Stock Insurance Company with its principal place of business in Charlotte, North Carolina.

-2-

### Defendants

6.   Moor has appeared and answered herein.

7.   MAC has appeared and answered herein.

8.   International Benefits Group, Inc. ("IBG") has appeared and answered herein.

9.   SFC Financial II, LLC ("Financial II") has appeared and answered herein.

10.   SFC Acceptance II, LLC ("Acceptance II") has appeared and answered herein.

11.   SFC Acceptance III, LLC ("Acceptance III") has appeared and answered herein.

12.   SFC Acceptance IV, LLC ("Acceptance IV") has appeared and answered herein.

13.   SFC Acceptance V, LLC ("Acceptance V") has appeared and answered herein.

14.   SFC Acceptance VI, LLC ("Acceptance VI") has appeared and answered herein.

15.   SFC Acceptance VII, LLC ("Acceptance VII") has appeared and answered herein.

16.   SFC Acceptance VIII, LLC ("Acceptance VIII") has appeared and answered herein.

17.   SFC Acceptance IX, LLC ("Acceptance IX") has appeared and answered herein.

18.   Delta Career Institute of Beaumont, Inc., d/b/a Delta Career Institute has appeared and answered herein.

19.   MP III Holdings, Inc. d/b/a MTA Schools-131, d/b/a MTA Schools-136, d/b/a MTA Schools-137 ("MTA") has appeared and answered herein.

- 3 -

20. Continental Road Watch Corporation d/b/a Continental Truck Driving Training & Education School, Inc. has appeared and answered herein.

21. Custom Training, Inc. d/b/a International Schools-TX has appeared and answered herein.

22. Bearcat Truck Driving School, Inc. has appeared and answered herein.

23. C & S Training Centers, L.L.C. d/b/a C-1 Truck Driver Training-Ft. Worth has appeared and answered herein.

24. Franklin Career Center-Dallas, L.L.C. ("Franklin") has appeared and answered herein.

25. Lufkin Truck Driving Academy has appeared and answered herein.

26. Texas Truck Driver Institute, Inc. d/b/a Truck Driver Institute-IX ("TTT") has appeared and answered herein.

27. Non-defendant Student Finance Corporation is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 170 Lukens Drive, New Castle, Delaware 19720. It was at all times pertinent to this action in the business of originating, purchasing and selling to investors tuition loans made to students of truck driving schools. Student Finance Corporation was the subject of an involuntary petition under Chapter 7 of the Bankruptcy Code filed by four petitioning creditors in the United States Bankruptcy Court for the District of Delaware on June 5, 2002. The Chapter 7 bankruptcy case

against Student Finance Corporation was converted on consent to a Chapter 11 case on November

4, 2002. Student Finance Corporation is not named as a party to this action.

████████████████████████████ ("SMS"), a limited liability company organized

and existing under the laws of Delaware, whose office address 170 Lukens Drive, New Castle

Delaware 19720, may be served with process by serving the Texas Secretary of State, 1019 Brazos

Street, Austin, Texas 78701. SMS was at all times pertinent to this action responsible for

recruiting schools into the SFC student loan programs, and managing the relationships between

SFC and the schools. SMS, at all material times to this action, is or has been engaged in business

in Texas, does not maintain a regular place of business in Texas, and does not have a designated

agent for service of process. This lawsuit arises out of or is connected with SMS's business in

Texas. SMS has purposefully availed itself of the privileges and benefits of conducting business

in Texas by contracting by mail and/or facsimile with Texas residents which contract was to be

performed in whole or in part in Texas, and by committing and conspiring to commit torts in

whole or in part in Texas, as more fully set forth herein.

████████████ Student Loan Servi████ LLC ("SLS"), a limited liability company organized and

existing under the laws of Delaware, whose office address is 170 Lukens Drive, New Castle,

Delaware 19720, may be served with process by serving the Texas Secretary of State, 1019 Brazos

Street, Austin, Texas 78701. SLS was responsible for servicing the student loans in the SFC

programs and providing information on the performance and status of the SFC student loans to

Royal. SLS, at all material times to this action, is or has been engaged in business in Texas, does

not maintain a regular place of business in Texas, and does not have a designated agent for service

of process. This lawsuit arises out of or is connected with SLS's business in Texas. SLS has

- 5 -

purposefully availed itself of the privileges and benefits of conducting business in Texas by contracting by mail and/or facsimile with Texas residents which contract was to be performed in whole or in part in Texas, and by committing and conspiring to commit torts in whole or in part in Texas, as more fully set forth herein.

30.    Non-defendant Andrew N. Yao ("Mr. Yao") is a resident of Pennsylvania.  Mr. Yao at all times pertinent to this action owned and controlled all of the SFC entities discussed above.  He at all times pertinent to this action was the 100% owner of Student Finance Corporation and Student Marketing Services.  He was also at all times pertinent to this action the 70% direct owner of SLS and indirectly owned the remaining 30% that was owned by Student Finance Corporation.  He was at all times pertinent to this action an officer and director of, and controlled, all three entities.  He was also at all times pertinent to this action the President and a director of each of the SFC Acceptance Entities described above and of SFC Financial II and controlled those entities.

31.    At all times relevant to this case, Student Finance Corporation, the SFC Acceptance II-IX, SFC Financial II, SLS and SMS were under common ownership and control and acted in concert.  They are referred to collectively herein as "SFC."

32.    IBG, Moor and MAC will be referred to collectively herein as the "Broker Defendants."

33.    The truck driving schools listed in paragraphs 18-26 above will be referred to collectively herein as the "School Defendants."

- 6 -

## OVERVIEW OF THE CASE

34.    Student Finance Corporation is purportedly in the business of providing tuition loans to students in various post-secondary trade schools, primarily truck-driving schools, throughout the United States. It is a licensed lender that, with the assistance of its affiliates, underwrites, warehouses, securitizes and services loans originated and made under various student loan programs. These loans are considered sub-prime loans and are backed by credit risk insurance provided by insurance companies such as Royal. Under these types of policies, insurance is provided as a source for repayment if the borrowers do not pay. At this time, there are more than 93,000 such student loans, totaling approximately $600,000,000, that are facially covered by the Policies.

35.    The Policies were issued by Royal from January 1999 through November 2001. It is now apparent that, in connection with obtaining the issuance of each of the Policies, SFC, the Broker Defendants, and the School Defendants made numerous misrepresentations of fact and concealed numerous other facts that were material to Royal's decision to issue the Policies. For example:

    a.    To convince Royal to issue the first policies, SFC understated the historical default rates of its pre-existing student loan programs, concealed its history of making secret "forbearance payments" on those loans to keep them from defaulting and being reported as defaulted loans, and misrepresented the quality of the loans and the underwriting criteria used in writing them;

    b.    The School Defendants at first relaxed, and then ignored entirely, the underwriting guidelines they were supposed to be following when generating the loans. The result was that loans were made to a far riskier pool of borrowing students;

    c.    When those loans predictably began to default at even higher rates, instead of disclosing the defaults, the School Defendants and SFC systematically

understated the cumulative default rates of those loans. They did so because they wanted Royal to continue writing insurance for the loans and knew it would not write that insurance if it knew how poorly the loans were performing; and

d.    At the same time, SFC and the School Defendants made secret so-called "forbearance payments" on massive numbers of defaulted loans, thereby preventing the loans from being reported to Royal as defaulted loans and masking the fact that the loan programs were an abysmal failure.

36.    As a result of these misrepresentations and omissions, SFC obtained from Royal about $650,000,000 of insurance based on information that was wholly, and materially, inaccurate as to the actual risks involved. The schools received more than $300 million in tuition loans on students, many of whom never should have received loans in the first place.

37.    In March 2002, SFC and the School Defendants ran out of borrowed funds with which to make the secret forbearance payments. Unable to continue hiding the abysmal default rates, SFC was forced to disclose the truth to Royal. Royal has now discovered that (i) the default rates for the insured loans are more than 83% across the various loan programs and (ii) hundreds of millions of dollars of loans are in technical default which theoretically give rise to immediate claims under the Policies.

38.    Royal did not intend to insure abnormal credit risks of this type and magnitude and would not have done so had SFC, the Broker Defendants or the School Defendants told the truth.

### BACKGROUND FACTS

#### SFC and the Broker Defendants Fraudulently Induce
#### Royal to Provide Credit Risk Insurance for SFC Loans

39.    Mr. Yao incorporated Student Finance Corporation in 1992. For the first few years of its existence, Student Finance Corporation apparently limited its activities to traditional lending arrangements, in which it purchased bundles of pre-arranged student loans at a discount with funds

that it borrowed from commercial banks and private investors. Seeking to engage in larger transactions, Student Finance Corporation at some point began to explore "securitized" arrangements, in which it could raise financing through the sale of asset-backed securities in the private securities markets. Specifically, Student Finance Corporation sought to sell bonds or trust certificates ("Certificates") backed by the payment obligations arising from the bundles of student loans that it purchased or originated. The student loans that it made or acquired were sold to a trustee who issued certificates to investors giving them the right to payments under the loans. To make the Certificates more attractive to investors by providing additional security for payment, Student Finance Corporation obtained credit risk insurance covering the underlying obligations. Thus, the theory was that SFC would obtain financing in the marketplace (rather than through bank loans) by selling Certificates backed by (i) the debt service from the underlying student loans and (ii) credit risk insurance that would cover shortfalls caused by unanticipated defaults by the student borrowers.

40.    SFC completed its first securitized transaction in 1996. In that transaction, SFC sold asset-backed certificates via a vehicle known as SFC Grantor Trust, Series 1996-1 ("GT 1996-1"). The certificates were backed by (i) a pool of approximately 1,056 truck-driving student loans that SFC or affiliates had acquired or made and (ii) a credit risk insurance policy issued by AIU Insurance Company. The insured under that policy was a non-defendant entity called SFC Acceptance, LLC, and the beneficiary was Bankers Trust Company, as trustee for the benefit of the certificate-holders. The policy was limited to an absolute aggregate liability of $7.9 million over the policy period. As with other SFC sponsored programs, the loans in this transaction were serviced (i.e., monitored and collected) by SFC or SLS. Including this transaction, SFC generated approximately 10,000 student loans in total from 1994 through 1998. On average, those loans

- 9 -

were for a term of 12.5 years, were in relatively small principal amounts generally not exceeding a few thousand dollars, and bore interest at the rate of 19-20%.

41.    In 1998, SFC sought to expand and enlarge its securitization programs.  To this end, SFC sought to persuade additional insurance companies to issue credit risk insurance policies in support of the proposed SFC sponsored transactions.  Among the "talking points" that SFC instructed the Broker Defendants to use in this regard was that the structure of SFC's transactions offered insureds 100% loss recovery.  Indeed, SFC stressed that prospective insurers were to be told that SFC not only had 100% loss recovery, but also that it had never used any reserves established in connection with the AIU policy or any other funding sources.  Thus, the message to be imparted to Royal was that the programs were safe, had 100% historical recovery, and posed little risk to an insurer.

42.    In the late summer of 1998, Bill Hibberd ("Hibberd"), Vice-President, Financial Enhancements, with Royal, was contacted by Ted Moor III, President of Moor, about SFC.  Moor knew that Royal was seeking out specialty type insurance opportunities.  Moor previously had introduced Royal to an auto loan deficiency program and served as Royal's agent on that program. Joe Domal ("Domal"), President of IBG, had told Moor about the SFC opportunity.  Soon after Moor's initial contact, Hibberd was provided by SFC, via the Broker Defendants, with several documents including (i) a private placement memorandum for the GT 1996-1 asset securitization, (ii) a one page summary sheet describing SFC, and (iii) several graphs showing historical default curves by year for loans originated by SFC.  These graphs contained false information about the historical default rates.  SFC and the Broker Defendants knew the information was false.

- 10 -

43.    Throughout the negotiation of the Policies from the Summer of 1998 through November 2001, the Broker Defendants were in frequent contact with each other, and much of the information and representations about SFC's loan programs were funneled by Domal and IBG through Moor and MAC's offices to Royal. In the beginning, SFC generated information to send to Royal and they sent it to IBG first who then forwarded it to Moor. Later, contacts were made directly by IBG with Royal.

44.    In November 1998, SFC's message was imparted to Royal through a series of contacts by Domal and Ted Moor, III or Gerald Parker ("Parker"). Parker was a director of Moor and worked out of Moor's Houston office. For example, by letter to Hibberd dated November 9, 1998, Domal provided information regarding SFC, proposed a meeting in which SFC would request that Royal agree to issue credit insurance for loan transactions intended by SFC (sooner or later) to be securitized, and represented that the structure of those transactions "establishes significant reserves in addition to built in school reserves that make this a very attractive position for an underwriter." Thereafter, by letter to Hibberd dated November 13, 1998, Domal forwarded additional information, including: (i) a proposed term sheet, (ii) a "loss projection" graph, (iii) "previous securitization pool performance" data, (iv) the AIU insurance policy, and (v) an "information summary" concerning SFC. Among other things, the "information summary" represented that SFC had 100% recovery on defaults, that the structure of its transactions "protects [the] insurer with 3x expected default coverage," and that significant reserves would be rapidly built up through both holdbacks from the Schools and the interest spread between the rates paid by the student borrowers and the much lower rates paid by SFC to its certificate-holders. The historical performance data represented that, except for the month of October 1996, SFC's "securitization pool" had never had loans that were 90 days or more delinquent. Domal's letter of

- 11 -

November 13, 1998 was expressly copied to and sent "on behalf of Ted Moor, III." The representations contained in these letters were false. SFC knew they were false.

45.    SFC, through Domal, Moor, and others, also misrepresented the quality of the loans that would be covered by the insurance and the underwriting criteria used in writing them. SFC sent to Royal the underwriting guidelines supposedly used in writing the loans and represented that the guidelines had been used and would be used for all loans insured by Royal. The guidelines required all schools whose students received SFC loans to, inter alia, maintain 67% graduation and job placement rates, have a CPA conduct annual compliance audits of the schools' financial aid policies, and comply with standards published by the United States Department of Education. In reality, the schools did not comply with these requirements. SFC and the Schools were aware of this fact, but did nothing about it.

46.    After reviewing the materials forwarded by Domal, Royal posed to SFC a series of questions concerning the proposed transaction. On November 30, 1998, Domal forwarded to Royal answers to those questions presented on behalf of SFC, in the form of a memorandum. In that memorandum, SFC represented, among other things, (i) that Royal would have two reserve funds--an institutional school holdback reserve of 18% of initial principal and an excess spread reserve funded by the difference between gross interest revenues and operating expenses-- available to cover defaults in the student loans; (ii) that the excess spread reserve would be funded by the excess spread each month; (iii) that the excess spread reserve "compounds very rapidly and builds to a considerable level over time[,]" and is not paid out until there is a minimum of 50% cash collateralization; (iv) that "[t]he purpose of the Institutional Reserve is to cover initial defaults and to give the Excess Spread time to build up[,]" and that by the time that reserve was

- 12 -

paid out, the excess spread reserve would have accumulated to a high level; (v) that an annexed "project default curve" setting forth cumulative default rates of 25% (before recoveries)  was based on the historical performance of SFC's loans; (vi) that Royal would obtain recoveries immediately from three sources, i.e., the institutional reserve, the excess spread, and the excess spread reserve; (vii) that, as payments on the loans were made, the excess spread reserve "builds at a rate of 9% per annum," while the principal balances on the loans decline; (viii) that "there is considerable loss coverage throughout the life of the pool[,]" that the excess spread rate is high and the excess spread reserve compounds very rapidly"; (ix) that, if recoveries were included (which they were not), then the collateralization rate would be even greater; (x) that Royal would have a loss coverage ratio  (measured as the cumulative reserve fund and excess spread divided by expected cumulative losses) of 3.4; (xi) that, in five years of loan originations, SFC had obtained "nearly 100% recovery" across all credit classes; and (xii) that SFC obtains recoveries immediately from the institutional school reserves, which "are in addition to" the reserves that Royal would hold.  Thus, representations were made to Royal that it could expect to be adequately protected by the reserves that would be maintained.  Further, SFC provided Royal with a table showing monthly default rates over a 15 year period to be used in Royal's modeling.  These representations were false.  SFC knew they were false.

47.    Relying upon the information and representations provided by SFC and the Broker Defendants, Royal prepared a detailed model with which to evaluate the proposed transaction. Built into the model were the default rates based on information provided to Royal by SFC and the Broker Defendants.  The model was provided to SFC and the Broker Defendants for review and affirmation that the assumptions contained therein--which were based on the representations made by SFC and the Broker Defendants--were accurate and reasonable.  Royal was told that the model

- 13 -

was accurate. For example Royal's employee, Tony McKenzie, was assured by SFC's Controller, Diane Messick, that the assumptions and facts upon which Royal's model was based were accurate and reasonable.

48.    Based upon the information, representations, and assurances so provided, Royal determined that it could underwrite the risk as represented. Accordingly, Royal, SFC, Moor and IBG began negotiating the structure and content of an insurance policy to that end. Those negotiations culminated in an agreement under which Royal issued its Policy Number RST 321376 ("Policy No. 1"), effective January 22, 1999. The insured under Policy No. 1 was SFC Financial I, LLC ("Financial I") and the beneficiary was Wilmington Trust Company of Pennsylvania ("Wilmington Trust").

49.    Policy No. 1 carried a limit of liability of $75,000,000 in principal amounts of student loans, plus three months interest thereon at the applicable contractual interest rate(s). While this coverage was intended eventually to be used for securitized transactions, the first tranche thereof was used to obtain a "warehouse" loan from Wilmington Trust in the approximate amount of $22.6 million. The loan proceeds were supposed to be used either to purchase student loans from truck-driving schools or to make loans to such students directly. The loans were then to be conveyed to, and remain in, the warehouse pending an asset securitization transaction. At that time, the loans would be removed from the warehouse and transferred to private investors, with the proceeds used to pay off the warehouse loan. In theory, the investors would then be repaid from the payments made on the underlying student loans.

50.    Unknown to Royal, SFC did not use the proceeds from the Wilmington Trust warehouse loan as represented and anticipated. Instead, more than $6.3 million of those proceeds

was transferred by SFC directly to insiders or affiliates. Moreover, at least some of the funds that were used to purchase student loans were used to "buy" loans already in its existing portfolio that SFC and affiliates knew were non-performing.

### The School Defendants Join the Fraud by Ignoring the Underwriting Requirements in Generating the Loans and Then Helping SFC Understate the Loan Default Rates

51.     The money loaned by SFC to the trucking schools was distributed directly to the schools (i.e., it was not distributed to the students, who were then responsible for making tuition payments to the schools). The schools, therefore, received an almost immediate benefit from each loan shortly after it was approved -- full tuition payment. The schools received the full tuition, except in very limited circumstances, even if the students failed to repay the loans. Further, except in very limited circumstances, there was no recourse against the schools if the student failed to repay the loans. Thus, the schools had an incentive to generate as many loans as possible, regardless of the students' creditworthiness or their ability to repay the loans.

52.     The School Defendants, with the assistance of SFC (and, in particular, SMS, which was responsible for recruiting schools into the student loan programs and managing the relationships with the schools) conspired to defraud Royal by generating as many loans, and therefore as much tuition money, as quickly as possible, without regard to the underwriting requirements, the quality of the loans, or the ability of the borrower to repay them. This fraud took the following form:

> a.     The School Defendants and SFC Ignored The Underwriting Guidelines Entirely: In an effort to earn as much tuition money as possible, the truck driving schools began relaxing and then ignoring entirely the underwriting guidelines that were supposed to govern the loan generation process. The School Defendants recruited and accepted anyone who was willing to attend the schools, regardless of their creditworthiness, their ability to repay the

- 15 -

loans, their criminal records, or their ability to obtain a job after completion of the coursework.

b.  The School Defendants Lied to the Students about the Loan Obligations: The School Defendants told students and loan co-signors that they would not have to repay the loans unless the students found a job and then the students' employers would repay the loans for them.

c.  The School Defendants Submitted Forged and Fraudulent Applications: The School Defendants and SFC began submitting numerous applications with forged applicant signatures, forged co-signor signatures, and the names of school employees as co-signors. The School Defendants issued loans to students with criminal records or physical and mental handicaps, both of which disqualified them from ever obtaining a truck driving license.

53.    The School Defendants knew that if a loan defaulted they would not suffer any loss -- they had already received full tuition payment. SFC would also not be harmed -- Royal's insurance purportedly would cover the loss. Consequently, the School Defendants generated as many loans as quickly as possible, without regard to their quality, knowing that Royal would be the only harmed party if those poorly-underwritten loans defaulted.

54.    SFC's knowledge of this fraud is displayed in its own internal documents. On or about October 22, 2001, a collections supervisor for SFC prepared a memorandum for SFC's Credit Committee that acknowledged the wrongdoing of the Schools. That memorandum noted that the School Defendants were:

a.  promising students that their employer would repay the loan, or that they would not be required to repay the loan if they failed to find employment;

b.  issuing loans to students with criminal records and physical or mental handicaps;

c.  submitting loan applications with signatures of school employees and false co-signors;

d.  issuing loans to students who were not creditworthy or employable;

e.  failing to maintain adequate graduation and placement rates; and

- 16 -

      f.      charging tuitions exceeding what any student, even if successfully placed, could be expected to repay on a truck driver's salary.

55.     Despite being aware of these problems in the loan application process, SFC did absolutely nothing to fix the problem after this memorandum was circulated to SFC's senior management.

### The School Defendants And SFC Mask The Increasing Default Rates Through Secret Forbearance Payments

56.     Because the underwriting process was being ignored entirely, the student loans began to default at astronomical rates. The abysmal performance of these loans was not disclosed to Royal until several years later -- in late March 2002. In fact, throughout this period of time, SFC represented that the loans were performing as expected and modeled.

57.     SFC and the School Defendants did not want Royal to learn about the increasing default rates because they wanted Royal to continue writing insurance policies. Thus, they concealed the defaults on the student loans by making secret "forbearance payments." If a borrower was 90 days delinquent in his repayment obligations, the loan was considered to be in default under the insurance policies, and had to be reported to Royal as a defaulted loan. As loans approached 90 days delinquency, SFC and the School Defendants made secret "forbearance payments" on behalf of the borrowers.

58.     In reports provided to Royal, SFC treated these "forbearance payments" as having been made by the student borrowers, even though they had really been made by SFC itself. In its reporting systems, SFC did not treat the loans that had received "forbearance payments" as defaulted loans. In reports provided to Royal, SFC did not treat these loans as defaulted loans either or inform Royal that SFC was making payments to keep the loans from defaulting.

59.    SFC and Mr. Yao represented to Royal that the student loans under the Royal policies that were receiving "forbearance payments" were performing and were not defaulting. SFC did not disclose to Royal that it was making the "forbearance payments" or that the "forbearance payments" were preventing massive amounts of otherwise-defaulting loans from being reported as defaults.  The decision to conceal from Royal the true default rates, the "forbearance payments" and their effect on the default rates was made by Yao.

60.    SFC's and the School Defendants' use of "forbearance payments" to conceal defaults was not disclosed to Royal before the negotiation and issuance of subsequent policies. Consequently, Royal continued to believe that the SFC student loan program was performing as originally represented by SFC.

61.    The School Defendants were aware of the forbearance payments.  Indeed, in their contracts with the students, the School Defendants gave themselves the express right to make these forbearance payments if the students missed a scheduled payment.  In their agreements with SFC, the School Defendants then turned around and assigned to the SFC affiliates the Schools' right to make forbearance payments.

62.    SFC made these payments because it did not want its potential insurers to know that the loan default rates were extremely high, and because SFC wanted its insurers to continue issuing insurance policies covering future loans.  The Schools Defendants encouraged and participated in the making of the forbearance payments because, without the insurance covering the loans, SFC would not have been able to sell the loans on the market to investors and thus, it would stop making the tuition loans entirely.  SFC and the School Defendants benefited greatly from the forbearance payment fraud.

- 18 -

**Royal Issues More Policies Based on the Misrepresentations and
Omissions of SFC, the Broker Defendants, and the School Defendants.**

63.    Over time, by written agreements between SFC and Royal, additional student loans were added to, and deleted from, the coverage of Policy No. 1. The final aggregate total of the loans covered by the policy is approximately $25 million. At no time in the course of adding loans to Policy No. 1 did anyone disclose the true default rates of the loans covered by the policy or the fact that forbearance payments were being made. Nor did SFC disclose to Royal that the default rates assumed in Royal's modeling for the transaction were hopelessly understated and in no way reflected the reality of the situation. Instead, SFC represented that the loans were performing.

64.    Policy No. 1 carried a $75 million limit of (principal) liability. But the Wilmington Trust warehouse loan ultimately required only $25 million of that amount. Approximately $50 million in unused coverage under the policy was employed by SFC in April 2000, through a securitization by GT Series 2000-1 in the amount of $49,187,986. In connection with that securitization, Royal issued its Policy Number RST 293334 ("Policy No. 2"), under which Acceptance II was the insured, Norwest Bank Minnesota, N.A.(later, Wells Fargo) was the beneficiary, and General Electric Capital Assurance Company was the purchaser of the certificates. In obtaining the issuance of Policy No. 2, SFC did not disclose to Royal either the actual default rates on prior loan programs or the fact that secret forbearance payments were made to keep delinquent loans from going into default. Nor did it disclose either that the secret payments masked the true performance of those loans or that the proceeds from the securitization would be used, in part, to continue the practice of making secret forbearance payments. Instead,

Royal was told that the existing programs were working well. In fact, these programs appeared to have default rates that were lower than had been expected and modeled.

65. In the meanwhile, SFC continued to expand their originations at a dramatic rate. For example, while they had generated approximately 10,000 loans during the period from 1994 through 1998, they generated 13,821 loans in 1999 alone. This exponential growth continued, with SFC generating 27,091 loans in 2000, 47,528 loans in 2001, and 8,705 loans in the first three months of 2002.

66. On December 3, 1999, Royal issued Policy Number RST 293309 ("Policy No. 3"). Policy No. 3 was issued by Royal in connection with a securitization by GT Series 2000-2. The insured under Policy No. 3 was Acceptance III, the beneficiary was Wells Fargo, and the purchasers of the certificates were TransAmerica Life Insurance and Annuity Company, Life Investors Insurance Company of America, and Keyport Benefit Life Insurance Company. Policy No. 3 was subsequently amended and restated, again effective December 3, 1999, and at least two endorsements thereto were issued over time. At none of these times, however, did SFC or the School Defendants correct their earlier misrepresentations to Royal or disclose the material facts that they had concealed from Royal. Policy No. 3 has a liability limit of $53,053,642.02 in principal, plus three months interest.

67. On April 30, 2000, Royal issued Policy Number RST 147522 ("Policy No. 4"). Policy No. 4 was originally issued in connection with a warehouse loan obtained by SFC or affiliates from Wilmington Trust, and carried a liability limit of $50 million in principal, plus three months interest. As originally issued, the insured under Policy No. 4 was Financial I, and the beneficiary was Wilmington Trust. However, on October 6, 2000, Policy No. 4 was amended and

restated, again effective April 30, 2000, in connection with a securitization by GT Series 2000-3. As amended and restated, the insured under Policy No. 4 was Acceptance IV, the beneficiary was Wells Fargo, and the purchasers of the certificates were PFL Life Insurance Company, ABS Fund, and The Prudential Insurance Company of America. Multiple endorsements to Policy No. 4 were also issued by Royal over time. At no time, however, did SFC or the School Defendants correct their misrepresentations to Royal or disclose the material facts that they had concealed from Royal, in obtaining Policy No. 4. Policy No. 4 has a liability limit of $48,459,255.76 in principal, plus three months interest.

68.    On August 30, 2000, Royal issued Policy Number RST 147524 ("Policy No. 5"). As eventually amended and restated, Policy No. 5 was issued in connection with a securitization by GT Series 2000-4. As amended and restated, the insured under Policy No. 5 was Acceptance V, the beneficiary was Wells Fargo, and the purchasers of the certificates were The Prudential Insurance Company of America, ABS Fund, American General Annuity Insurance Company, and Merit Life Insurance Company. Once again, SFC and the School Defendants neither corrected their misrepresentations or disclosed the material facts that they had concealed from Royal, in obtaining Policy No. 5. Policy No. 5 has a liability limit of $29,999,999.94 in principal.

69.    On November 27, 2000, Royal issued Policy Number RST 147525 ("Policy No. 6"). Policy No. 6 was originally issued in connection with a warehouse loan obtained by SFC or affiliates from Wilmington Trust, and carried a liability limit of $44,919,000 in principal, plus three months interest. As originally issued, the insured under Policy No. 6 was Financial I, and the beneficiary was Wilmington Trust. However, on April 24, 2002, Policy No. 6 was amended and restated, again effective November 27, 2000, in connection with a securitization by GT Series

2001-1. As amended and restated, the insured under Policy No. 6 was Acceptance VI, the beneficiary was Wells Fargo, and the purchasers of the certificates were TransAmerica Occidental Life Insurance Company, TransAmerica Life Insurance Company, Monumental Life Insurance Company, and New York Life Insurance and Annuity Corporation. Endorsements to Policy No. 6 were also issued by Royal over time. At no time, however, did SFC or the School Defendants either correct their misrepresentations or disclose the material facts they had concealed from Royal, in obtaining Policy No. 6. As amended and restated, Policy No. 6 has a liability limit of $55,616,550 in principal.

70. On January 31, 2001, Royal issued Policy Number RST 147526 ("Policy No. 7"). Policy No. 7 was originally issued in connection with a warehouse loan obtained by SFC or affiliates from Wilmington Trust and carried a liability limit of $50,000,000 in principal, plus three months interest. As originally issued, the insured under Policy No. 7 was Financial I, and the beneficiary was Wilmington Trust. As eventually restated and amended, again effective January 31, 2001, Policy No. 7 was issued in connection with a securitization by GT Series 2001-2. As amended and restated, the insured under Policy No. 7 was Acceptance VII, the beneficiary was Wells Fargo, and the purchasers of the certificates were Security Life of Denver Insurance Company, Ameribest Life Insurance Company, Equitable Life Insurance Company of Iowa, USG Annuity & Life Company, and ReliaStar Life Insurance Company. Endorsements to Policy No. 7 were also issued by Royal over time. At no time, however, did SFC or the School Defendants either correct their misrepresentations to Royal or disclose the material facts they had concealed from Royal, in obtaining Policy No. 7. As amended and restated, Policy No. 7 has a liability limit of $48,286,713.44 in principal.

71.    On April 19, 2001, Royal issued Policy Number RST 147527 ("Policy No. 8"). Policy No. 8 was issued in connection with a warehouse loan obtained by SFC or affiliates from Wilmington Trust and carried a liability limit of $25,000,000 in principal, plus three months interest.  By endorsement dated May 17, 2001, the principal liability limit was increased to $50,000,000.00.  Thereafter, on June 19, 2001, the parties agreed to commute Policy No. 8 and to transfer all coverage thereunder to a new policy, discussed below.  At no time, however, did SFC or the School Defendants either correct their misrepresentations to Royal or disclose the material facts they had concealed from Royal, in obtaining Policy No. 8 (or either the endorsement or the commutation thereof).

72.    On August 17, 2001, Royal issued Policy Number RST 147533 ("Policy No. 9). Policy No. 9 was issued in connection with a warehouse loan obtained by SFC or affiliates from Wilmington Trust and carried a liability limit of $5,518,459 in principal, plus three months interest.  The insured under Policy No. 9 was Financial I and the beneficiary was Wilmington Trust. As with the other insurance policies obtained from Royal, SFC failed to disclose the actual default rates that its loans were experiencing and affirmatively misrepresented that Royal's default rate assumptions were reasonable and accurate.  Further, SFC and the School Defendants failed to disclose that substantial forbearance payments were being made each month, in order to mask the true performance of the loans and to keep them from going into default.  Moreover, SFC and the School Defendants again did not disclose that the proceeds from the warehouse loan would be used to fund such forbearance payments.

73.    In the aggregate, the principal liability limits on the various policies were approaching the existing commitment levels.  Thus, to continue its scheme, SFC needed to obtain

- 23 -

still more insurance from Royal. To that end, and anticipating the need in the spring and summer of 2001, SFC requested that Royal agree to another massive cover, this time in the amount of $350 million. At that point, however, Royal had concerns that the excess spread reserve was not building as rapidly as had been represented by SFC. Royal questioned SFC about this development and was told that the reason the excess spread reserve had not grown as represented was that a change had been made in internal accounting, from compound to simple interest accounting. SFC represented that the result was that payments that otherwise would have gone partly to principal and partly to interest went instead solely to principal, thereby eliminating part of the interest to fund the excess reserve spread. Conversely, SFC did not disclose either that the loans were experiencing much higher default rates than had been represented or that the true performance of the loans was being masked by SFC's and the School Defendants' secret forbearance payments. Likewise, SFC and the School Defendants did not disclose that the proceeds from new loans and securitizations would be used to make forbearance payments.

74.    At a meeting in June 2001, Royal again asked if the default rates assumed in its modeling were reasonable and accurate. SFC officers and directors Gary Hawthorne and Perry Turnbull again assured Royal that they were. Thus, SFC continued to deceive Royal by (i) providing false information as to why the excess spread reserve was not building even though defaults appeared to be lower than expected, (ii) failing to disclose that the actual default rates were being hidden by SFC's and the School Defendant's secret forbearance payments, and (iii) representing that the assumptions used in the models were a correct application of historical loan performance.

75.    Again relying on these representations, Royal committed to provide additional credit risk insurance on student loans. Thus, on June 19, 2001, Royal issued its Policy Number RST 147529 ("Policy No. 10). Policy No. 10 was issued in connection with a warehouse loan obtained by SFC or affiliates from PNC and carried a liability limit of $150,000,000 in principal, plus three months interest. The insured under Policy No. 10 was Financial II and the beneficiary was PNC. Part of the coverage under Policy No. 10 was the coverage previously existing under Policy No. 8, which was commuted on the same date that Policy No. 10 was issued. In other words, the coverage under Policy No. 8 was transferred to Policy No. 10. An endorsement to Policy No. 10 was issued by Royal effective October 11, 2001. At no time, however, did SFC or the School Defendants either correct their misrepresentations to Royal or disclose the material facts that they had concealed from Royal, in obtaining Policy No. 10.

76.    On October 9, 2001, Royal issued its Policy Number RST 147537 ("Policy No. 11") in connection with a warehouse loan obtained by SFC from SWH. The insured under Policy No. 11 was Financial III, and the beneficiaries were SWH and Spectrum Origination, LLC. On November 9, 2001, however, Policy No. 11 was commuted, and the loans covered under the policy were transferred to Policy No. 10. At no time did SFC or the School Defendants either correct their misrepresentations or disclose the material facts they had concealed from Royal.

77.    On October 19, 2001, Royal issued its Policy Number RST 147538 ("Policy No. 12"), in connection with a securitization by GT Series 2001A-1 and pursuant to an Insurance Agreement of the same date ("Agreement I"). The insured under Policy No. 12 was Acceptance IX, and the beneficiary was Wells Fargo. Policy No. 12 has a liability limit of $120,000,000 in principal, plus three months interest. In obtaining the issuance of Policy No. 12,

- 25 -

SFC continued its pattern of misrepresentation and non-disclosure of material facts.  Once again, SFC and the School Defendants failed to inform Royal of the actual default rates that the loans were experiencing, that secret forbearance payments were made to keep loans from going into default, that SFC and the School Defendants were intentionally hiding and masking the true performance of the loans.

78.     SFC also did not disclose that many of the representations, warranties, and covenants set forth in Agreement I were completely false.  For example, SFC, SLS, and Acceptance IX represented in Agreement I that (i) all information relating to any of their financial conditions that had been provided to Royal was true and correct and not misleading in any material adverse respect when made; (ii) since the furnishing of such information, there had been no change or development known to them that would render any information true or misleading; and (iii) they had no knowledge of circumstances that could reasonably be expected to have a material adverse effect (defined as "a material adverse effect on the business, financial condition, or results of operations") on their financial condition as reported in their financial statements.  In addition, SFC, SLS, and Acceptance IX represented that all representations and warranties set forth in the offering documents issued in connection with the securitization and made by or attributable to them were true and correct in all material respects.  Further, they represented that SFC was solvent and would be solvent at the time that any student loans were added to Policy No. 12.  Each of these representations and warranties was false because, inter alia, neither the actual performance of the loans nor the fact that secret forbearance payments were made to mask performance had been disclosed to anyone.

- 26 -

79.    In addition, SFC, SLS, and Acceptance IX covenanted in Agreement I that they would comply with the covenants and conditions in the transaction documents executed in connection with the securitization, as well as with the requirements of all applicable laws. Further, SFC, SLS, and Acceptance IX covenanted that SLS would "employ reasonable collection methods and standards as set forth in the Servicing Agreement [executed in connection with the securitization]" in collecting the student loans involved therein.    Finally, SFC, SLS, and Acceptance IX covenanted, inter alia, that each student loan "must be originated in accordance with...[SFC's] Underwriting Policies [defined as the policies of SFC with respect to underwriting student loans as reflected in its procedures manual dated January 2001 and the credit scoring model revised January 24, 2000, as amended or modified from time to time]."    Each of these covenants has been breached, and SFC, SLS, and Acceptance IX knew they would be breached when they made them.  Indeed, each of these promises was false when made, and each covenant was breached from the inception of Agreement I.

80.    Finally, on November 15, 2001, Royal issued its Policy Number RST 147536 ("Policy No. 13") in connection with a securitization by GT Series 2001-3 and pursuant to an Insurance Agreement of the same date ("Agreement II").  The insured under Policy No. 13 was Acceptance VIII, and the beneficiary was Wells Fargo.  Policy No. 13 has a liability limit of $80,000,000 in principal, plus three months interest.  In obtaining the issuance of Policy No. 13, SFC continued its same pattern of misrepresentation and non-disclosure of material facts.  Once again, SFC failed to inform Royal of the actual default rates that the loans were experiencing, that massive secret forbearance payments were made to keep loans from going into default, that SFC and the School Defendants were intentionally hiding and masking the true performance of its loans.

- 27 -

81.    SFC also failed to disclose that many of the representations and warranties set forth in Agreement II were false.  The representations and warranties in Agreement II were false for the same reasons that the representations and warranties in Agreement I were false.  Likewise, the covenants in Agreement II were breached for the same reasons that the covenants in Agreement I were breached.  SFC, SLS, and Acceptance VIII knew that these warranties and covenants were false and had been breached.

82.    SLS's actions as a servicer of the loans was governed by pooling and servicing agreements (collectively referred herein as "Servicing Agreements") under which Royal was a third-party beneficiary.  Pursuant to the applicable Servicing Agreement, beginning in February 1999, Royal received monthly servicer reports and eventually delinquency/default statistics from Student Finance Corporation or SLS.  The servicer reports contained a line item that represented payments received during the collection period on student loans.  Unknown to Royal, this line included payments not only from students on their student loans, but also forbearance payments.  In each one of these reports, which were sent on a monthly basis, SFC mischaracterized "forbearance payments" made by SFC and the School Defendants as payments made by students.

83.    The Servicing Agreements contain additional representations and warranties made by SLS and the SFC Acceptance Entities that were false at the time they were made including:

a.    The student loan information set forth in the student loan schedule was true, accurate, and complete and the amounts were calculated in accordance with the agreements;

b.    No student loan was a defaulted student loan;

c.    No adverse selection procedures were utilized in selecting student loans and each student loan was for payment of tuition and expenses;

- 28 -

> d.  There is no default, breach or event permitting acceleration existing under the student loans;
>
> e.  No student loans made to students attending educational institutions with published cohort default rates greater than 20% have been acquired into the Trusts such that these loans would exceed 8% of the aggregate principal amount of student loans in the Trusts; and
>
> f.  Student loans or other property were not conveyed to the Trusts with the intent to hinder, delay or defraud creditors.

84.    SLS and SFC knew these representations were false when made.

85.    Additionally, pursuant to the Servicing Agreements, the SFC Acceptance Entities, as Settlors, were obligated to repurchase student loans if it was discovered by the Settlor, Servicer, or others that the representations and warranties made by the Settlors in connection with any student loan were incorrect at the time they were made or if any of the student loans contained a material defect that could not be cured in a certain amount of time.

86.    The SFC Acceptance Entities breached the Servicing Agreements by failing to repurchase student loans which it and the Servicer knew contained material defects, and student loans about which the they had made misrepresentations.

87.    The Servicing Agreements also required the retention of an auditor to analyze the servicer reports, compare them to the underlying data that supposedly supported them, and confirm the accuracy of the information in the servicer reports.

88.    SLS, the SFC Acceptance Entities, and a third party to this lawsuit jointly retained the accounting firm of McGladrey & Pullen ("McGladrey") who already was SFC's auditor, to perform these audits.

89.    McGladrey reviewed the servicer reports that Royal received, which did not disclose "forbearance payments" and the supporting documents which disclosed the payments. McGladrey's audit reports did not mention the "forbearance payments" anywhere, let alone note that the "forbearance payments" were not distinguished from the student borrower payments in the servicer reports.    The audit reports also did not mention that SFC was falsely recording the "forbearance payments" in the "payments received" column of the servicer reports.    Instead, McGladrey's reports gave SFC a clean bill of health, and copies of those reports were given to Royal.

90.    Representatives of Royal met with SFC at various times in 1999 and 2000 including March/April of 1999, March 2000, and November 2000.    In all of these meetings, the parties discussed the performance of the student loans, among other things.    SFC never alerted Royal to the true performance of the student loans and actual default rates on loans.    Instead, on each occasion, SFC represented that the student loans were performing even better than originally modeled.

91.    The servicer was supposed to submit a claim to Royal within ten days of a student loan becoming a defaulted student loan.    In most programs, claims submitted during the first twenty-four months after the applicable Policies' inception date were to be drawn against an experience account that performed like a deductible.    Procedurally, it was intended that the servicer submit a claim to Royal.    For unfunded experience accounts, Royal was supposed to pay the claim to the escrow agent or to the Trustee and SFC would then reimburse Royal for this claim.    By manipulating payments on the student loans by making the forbearance payments,

Royal was denied the benefit of the experience account and the information implicit in its proper functioning.

92.    On March 20, 2002, SFC finally disclosed some of the truth to Royal. On that day, SFC disclosed for the first time that forbearance payments had been made, but there were no funds with which to continue the practice. SFC also admitted that the default rates on the loans were higher than had been represented. But even these revelations neither told the full story nor revealed the full extent the fraud. For example, it now appears that the forbearance payments made from January 1, 2000 through March 31, 2002 totaled approximately $60 million. Moreover, SFC has acknowledged that such payments were made to keep loans from cycling into more advanced aging categories and thereby to avoid raising red flags with outside parties such as Royal. In other words, SFC and the School Defendants made forbearance payments on the loans whose performance they needed to mask in order to deceive and deter outside parties from learning the truth.

93.    All conditions to Royal's recovery have been fulfilled or waived.

## First Cause of Action -- Fraud

94.    This cause of action applies to all defendants.

95.    The preceding paragraphs of this Petition are incorporated by reference as if set forth in full herein.

96.    The defendants made various representations regarding the student loans and the various accounts, including, without limitation, those indicated above.

97.    These representations were false when made.

- 31 -

98.    These representations were made with knowledge of their falsity or were made recklessly without any knowledge of the truth and either as a positive assertion or in the form of promises without a present intention to perform them.

99.    The misrepresentations were material.

100.    The defendants made the misrepresentations with the intention they should be acted on by Royal in entering into the Selected Policies.

101.    Royal justifiably relied on these misrepresentations, acted by issuing the Selected Policies, and thereby has suffered injury.

102.    The defendants failed to disclose material facts with respect to the student loans and accounts as indicated above.    These material facts were within the knowledge of the defendants and the defendants knew that Royal was ignorant of these facts and did not have an equal opportunity to discover the truth.

103.    The defendants intended to induce Royal to enter into the Selected Policies by failing to disclose these facts.

104.    Royal has suffered injury as a result of acting without knowledge of the undisclosed facts.

**Second Cause of Action - Negligent Misrepresentation**

105.    This cause of action applies to all defendants.

106.    The preceding paragraphs of this Petition are incorporated by reference as if set forth in full herein.

107.     In the ordinary course of the businesses of the defendants, and as part of the asset securitizations and warehouse lines in which they realized pecuniary interests, the defendants made various misrepresentations as indicated above.     In the course of making the misrepresentations, they supplied information intended to guide Royal in its business.     Said information was false.     The defendants did not exercise reasonable care or competency in obtaining and/or communicating this information.

108.     Royal justifiably relied on the information obtained from the defendants and has suffered a pecuniary loss as a result.

### Third Cause of Action -- Breach of the Insurance Agreements and the Pooling and Servicing Agreements

109.     This cause of action applies to SLS and all of the SFC Acceptance Entities.

110.     The preceding paragraphs of this Petition are incorporated by reference as if set forth in full herein.

111.     SLS and all of the SFC Acceptance Entities breached the Insurance Agreements (Agreement I and Agreement II) and the Servicing Agreements as outlined above.

112.     As a result of these breaches, Royal has sustained financial harm.

### Fourth Cause of Action - Breach of Fiduciary Duty

113.     This cause of action applies to Moor and MAC.

114.     The preceding paragraphs of this Petition are incorporated by reference as if set forth in full herein.

- 33 -

115.   A relationship of trust and confidence existed between Royal and Moor and MAC. Moor and MAC purported to act as Royal's agents in investigating SFC and affiliates and in negotiating terms of the Selected Policies.   Moor and MAC owed Royal a fiduciary duty as Royal's agent.

116.   Moor and MAC acted in their own interest and not in Royal's interest.

117.   As a result, Moor and MAC obtained financial gain, and Royal suffered financial harm.

### Fifth Cause of Acton -- Civil Conspiracy

118.   This cause of action applies to all defendants.

119.   The preceding paragraphs of this Petition are incorporated by reference as if set forth in full herein.

120.   Royal will show that the defendants conspired by concerted action to effectuate the fraud and breach of contract as set forth above.

121.   Royal was damaged as a result of this conduct.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that Plaintiff recover its damages, costs, and a reasonable attorney's fee; and for such other and further relief to which it may show itself justly entitled.

Respectfully submitted,

WARE, SNOW, FOGEL & JACKSON, L.L.P.

By: _____

B. Lee Ware
State Bar No. 20861300
Paul W. Smith
State Bar No. 18662700
C. Dennis Barrow, Jr.
State Bar No.: 00796169
Pamela D. Thacker
State Bar No. 24013620
1111 Bagby, 49th Floor
Houston, Texas 77002
Telephone (713) 659-6400
Facsimile (713) 659-6262

ATTORNEYS FOR PLAINTIFF

Mike Jamail
Reaud Law Firm
801 Laurel St.
Beaumont, Texas 77701
Telephone: (409) 838-1000
Facsimile: (409) 813-1325

John Bissell
Mike Baker
Strong, Pipkin, Bissell & Ledyard, LLP
1111 Bagby, Suite 2300
Houston, Texas 77002-2546
Telephone: (713) 651-2900
Facsimile: (713) 651-1920

Michael H. Barr
Kenneth J. Pfaehler
SONNENSCHEIN NATH & ROSENTHAL
1221 Avenue of the Americas
New York, New York 10020-1089
(212) 768-6700
(212) 768-6800

Alan S. Gilbert
SONNENSCHEIN NATH & ROSENTHAL
8000 Sears Tower
233 S. Wacker Drive
Chicago, Illinois 60606
(312) 876-8000
(312) 876-7934

and

Daniel D. Barnowski
SONNENSCHEIN NATH & ROSENTHAL
1301 K Street, NW, Suite 600, East Tower
Washington, DC 20005
(202) 408-6400
(202) 408-6399

## CERTIFICATE OF SERVICE

Undersigned counsel certifies that a copy of the above and foregoing instrument has been forwarded to all counsel of record on this 4th day of June, 2003 as follows:

| | |
|---|---|
| Rick Lee Oldenettel<br>Oldenettel & Associates, P.C.<br>1360 Post Oak Blvd., Suite 2350<br>Houston, TX 77056<br>713.622.5161 (fax)<br>**Attorneys for T.E. Moor & Co. and MAC Insurance Agency** | Gerald R. Flatten<br>Rienstra, Dowell & Flatten<br>San Jacinto Building, Suite 1007<br>595 Orleans<br>Beaumont, TX 77701<br>409.833.9530 (fax)<br><br>David A. Gradwohl<br>Andrew W. Bonekemper<br>1250 South Broad Street, Suite 1000<br>P.O. Box 431<br>Lansdale, PA 19446-0431<br>215.699.0231 (fax)<br>**Attorneys for SFC Financial II, LLC<br>SFC Acceptance II, LLC<br>SFC Acceptance III, LLC<br>SFC Acceptance IV, LLC<br>SFC Acceptance V, LLC<br>SFC Acceptance VI, LLC<br>SFC Acceptance VII, LLC<br>SFC Acceptance VIII, LLC<br>SFC Acceptance IX, LLC** |
| James J. Ormiston<br>Looper, Reed & McGraw<br>1300 Post Oak Blvd., Suite 2000<br>Houston, TX 77056<br>713.986.7100 (fax)<br><br>Ralph A. Siciliano<br>David A. Pellegrino<br>Tannenbaum Halpern Syracuse & Hirschtritt<br>900 Third Avenue<br>New York, NY 10022-4775<br>212.371.1084 (fax)<br>**Attorneys for International Benefits Group, Inc.** | Philip D. Sharp<br>Julia K. Huff<br>Bracewell & Patterson, LLP<br>711 Louisiana Street, Suite 2900<br>Houston, TX 77002<br>713.221.1212 (fax)<br>**Attorneys for Texas Truck Driver Institute, Inc. d/b/a Truck Driver Institute-IX** |
| Cheryl D. Olesen<br>Walter J. Crawford, Jr.<br>Crawford & Olesen, LLP<br>550 Fannin, Suite 1200<br>Beaumont, TX 77701<br>409.832.9705 (fax)<br><br>Bart L. Greenwald<br>Frost Brown Todd, LLC<br>400 West Market Street, Suite 3200<br>Louisville, Kentucky 40202<br>502.581.1087 (fax)<br>**Attorneys for Franklin Career Center-Dallas,** | Roger C. Davie<br>Mayfield & Perrenot<br>609 N. Laurel St.<br>El Paso, TX 79903<br>915.533.0620 (fax)<br>**Attorneys for Custom Training, Inc. d/b/a International Schools-TX** |

| | |
|---|---|
| **L.L.C.** | |
| Don W. Duran<br>111 South Second Street<br>Lufkin, Texas 75901<br>936.632.8779 (fax)<br>**Attorneys for Lufkin Truck Driving Academy** | Lorenzo Brown<br>Lorenzo Brown & Associates<br>1704 North Hampton Road<br>Suite 208<br>DeSoto, TX 75115<br>972.224.3919 (fax)<br>**Attorneys for Continental Road Watch Corporation d/b/a Continental Truck Driver Training & Education School, Inc.** |
| Alan K. Cotler<br>Reed Smith<br>2500 One Liberty Place<br>1650 Market Street<br>Philadelphia, PA 19103-7301<br>215.851.1420 (fax)<br>**Attorneys for MP III Holdings, Inc. d/b/a MTA Schools -131 d/b/a MTA Schools-136, d/b/a MTA Schools -137** | Richard N. Evans, II<br>85 IH 10 North, Suite 111<br>Beaumont, Texas 77707<br>(409) 838-0523<br>**Attorney for Bearcat Truck Driving School, Inc.** |
| Kent W. Robinson<br>Jeffrey D. Migit<br>Andrews & Kurth<br>Mayor, Day & Caldwell LLP<br>600 Travis, Suite 4200<br>Houston, Texas 77002<br>(713) 220-4285 (fax)<br>**Attorneys for MTA Holdings, Inc. d/b/a MTA Schools-131, MTA Schools-136, and MTA Schools-137** | |

C. Dennis Barrow, Jr.