# Exhibit F

REPORT ON AGREED-UPON PROCEDURES
REVIEW OF MONTHLY SERVICER REPORTS
SFC Grantor Trust Series 2000-1

**INDEPENDENT ACCOUNTANT'S REPORT**

To the Members
Student Loan Servicing, LLC
Christiana Executive Campus
111 Continental Drive, Suite 408
Newark, Delaware 19713

We have performed the procedures described below, which were agreed to by Student Loan Servicing, LLC ("SLS") and Wells Fargo Bank Minnesota, N.A. ("Trustee"), to selected securitization records and servicer reports of SLS for April, July and December 2000, for the sole purpose of determining whether SLS maintained documentation to support the amounts contained in the servicer reports, as well as to verify the mathematical accuracy of the amounts reported, as required by Section 3.17 of the SFC Grantor Trust Series 2000-1 Pooling and Servicing Agreement ("PSA"). This engagement to apply agreed-upon procedures was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of the procedures is solely the responsibility of Student Loan Servicing, LLC as Servicer and Wells Fargo Bank Minnesota, N.A. as Trustee for the above mentioned Trust. Consequently, we make no representation regarding the sufficiency of the procedures described below, either for the purpose for which this report has been requested or for any other purpose. These procedures were performed in accordance with the arrangements set forth in our letter to you dated December 27, 2000.

The procedures we performed and our findings relative thereto are set forth in the accompanying Description of Procedures and Findings for SFC Grantor Trust 2000-1, which is an integral part of this report.

We were not engaged to, and did not, perform an audit of the securitization records in accordance with generally accepted auditing standards, the objective of which would be the expression of an opinion on the specified elements, accounts and items. Accordingly, we do not express such an opinion.

Had we performed additional procedures or had we conducted an audit of the securitization records in accordance with generally accepted auditing standards, other matters might have come to our attention that would have been reported to you.

This report relates only to the elements, accounts and items specified in the accompanying Description of Procedures and Findings for SFC Grantor Trust 2000-1 and does not extend to any financial statements of Student Loan Servicing, LLC taken as a whole.

This report is intended solely for the information and use of Student Loan Servicing, LLC and the Trustee, and is not intended to be, and should not be used by anyone other than the listed parties.

Philadelphia, PA
February 21, 2001

*McGladrey & Pullen, LLP*

2

## STUDENT LOAN SERVICING, LLC

## DESCRIPTION OF PROCEDURES AND FINDINGS
## FOR SFC GRANTOR TRUST 2000-1

### Detail Testing of Amounts Contained in the Monthly Servicer Report

This section should be read in conjunction with the April 30, 2000, July 31, 2000 and December 31, 2000 Monthly Servicer Reports ("MSR"). Items noted in *italics* refer to specific reports prepared by Student Loan Servicing, LLC ("SLS") used in preparing the MSR. Additionally, the procedures detailed below were performed on a sample of at least 25% of the Monthly Servicer Reports issued since inception of Grantor Trust Series 2000-1, namely, the months of April, July and December 2000, as required by the Pooling and Servicing Agreement ("PSA"). Further, as required by the PSA, the initial month of the Series (April 2000) was included in our sample.

The purpose of our procedures was to perform the following:

1) Test the above listed reports for accuracy, agreeing the amounts on the servicer reports to the detailed records of SLS. Such testing constituted a line-by-line verification of each amount on the servicer reports in our sample.

2) Examine the servicing procedures, manuals and guides of SLS, and records relating to the servicing of the student loans and the accounts and records of SLS relating to the student loan files contained in the Trust to ascertain compliance with the PSA.

Specific Procedures

We received Monthly Servicer Reports for the months of April, July and December 2000 from the Company's Finance Manager and performed the following:

1) Compared and recalculated the Scheduled Payments Received on Student Loans to the *Schedule of Payments Received Report.*

2) Compared the Prepayments on Student Loans to the *Schedule of Prepayment on Student Loans Report.*

3) Compared the Payaheads Received on Student Loans in the Current Month to the *Payahead Report.*

4) Compared the Recoveries Received on Delinquent Student Loans to the *Recoveries on Delinquent Student Loans Report.*

5) Compared the Transfers from Payahead for previously received payments due in the current period to the *Payahead Report* for the prior month.

6) Compared the Transfers from the Liquidity Reserve Account for Interest on Delinquent Student Loans to the *Schedule on Delinquent Student Loans Report* (Interest Past column).

7) Compared the Transfers from the Reserve Escrow Account for Principal on Delinquent Student Loans to the *Schedule on Delinquent Student Loans Report* (Principal Past column).

8) Compared the Transfers from the Reserve Escrow Account for Defaulted Student Loans to the *Schedule of Defaulted Student Loans Report* (sum of principal balance and 90 days' interest).

9) Compared the Insurer Payment on Defaulted Student Contracts to the *Recoveries on Claims Student Loans Report.*

10) Compared and recalculated the Interest Earned on Funds in the Collection Account and Payahead Account to the investment income statement from Wells Fargo Corporate Trust Services.

11) Compared the Miscellaneous item (April 2000 MSR only) to a list of loans indicating payments applied between 2/29/00 and 4/18/00. Due to the timing of purchasing these accounts by PNC Bank and Wilmington Trust, these loans were part of the Trust before the Series 2000-1 closing date of April 19, 2000.

12) Recalculated the amount reported as "Collection Account Cash Available for Distribution."

13) Agreed the amount carried forward at the top of page #2, "Collection Account Cash Available for Distribution" to page #1.

14) Agreed the amounts carried forward on page #2, "Transfers to the Payahead Account" and "Transfer to Reserve Escrow Account for Insurer Payments" to page #1.

15) Recalculated the MBIA Insurance Premium (July and December 2000 MSRs only) and verified the formula utilized in the calculation as defined in the Pooling and Servicing Agreement.

16) Recalculated the Senior Certificate Interest and Interest-Only Certificate Interest and verified the formulae utilized in these calculations as defined in the Pooling and Servicing Agreement.

17) Recalculated the Senior Certificate Principal Distribution and agreed the components thereof (Current Principal Due, Prepayments on Principal, Defaulted Principal) to the corresponding Company detailed reports.

18) Recalculated the Trustee Fees Payable and verified the formula utilized in the calculation as defined in the Pooling and Servicing Agreement. Also, agreed the Custodian Fee payable to Wells Fargo Corporate Trust Services (July and December 2000 MSRs only) to the Fee Invoice from Wells Fargo.

19) Compared the Master Servicer Fees Payable (July and December 2000 MSRs only) to the invoice from Finova Loan Administration and as defined in the PSA.

20) Recalculated the Expense Account Set-Aside and verified the formula utilized in the calculation as defined in the Pooling and Servicing Agreement.

21) Agreed the Replenishment of Liquidity Reserve Account from Previous Withdrawals to the supporting calculation on page #4 of the MSR (Liquidity Reserve Account).

22) Recalculated the Reserve Escrow Remittance Amount and verified the formula utilized in the calculation as defined in the Pooling and Servicing Agreement.

23) Recalculated the Potential Servicing Fee payable to Student Loan Servicing and verified the formula utilized in the calculation as defined in the Pooling and Servicing Agreement. Due to insufficient cash remaining in the Collection Account during April and December 2000, this fee was paid only for the month of July 2000.

24) Recalculated the balance in the Collection Account to be zero at the end of each reporting period.

25) Agreed the Original Senior Certificate Principal Balance to the Pooling and Servicing Agreement.

26) Agreed the Beginning of Period Senior Certificate Principal Balance to the end of period principal balance for the previous month.

27) Compared the following types of principal payments to the corresponding Company detailed reports and schedules:

> Scheduled Principal Payments
> Principal Payments Received between 2/29/00 and 4/18/00 (April 2000 MSR only)
> Principal Paid pursuant to Section 2.3 of the PSA (Repurchased Loan - April 2000 MSR only)
> Principal Paid on Delinquent Student Loans

28) Compared the Voluntary Prepayments to the *Schedule of Prepayment on Student Loans Report*.

5

29) Compared the Involuntary Prepayments to the *Schedule of Defaulted Student Loans Report* (Principal Balance column only).

30) Recalculated and compared the End of Period Senior Certificate Principal Balance to the *Outstanding Principal Balance Report.*

31) Recalculated the Required Interest on Senior Certificates and the I/O Certificate, and the Principal Distribution on Senior Certificates and verified the formulae utilized in the calculations as defined in the Pooling and Servicing Agreement.

32) Compared the Collateral Value to the *Prin Buckets Summary Report.* This report was available only for the July and December 2000 MSRs. For the April 2000 MSR, we determined that the collateral value equaled the Senior Certificate Principal Balance plus Principal Paid from the Excess Spread Account.

33) Compared the Original Liquidity Reserve Balance to the amount defined/required in the Pooling and Servicing Agreement, to the general ledger and to the bank statement from Wells Fargo.

34) Agreed the Beginning of Period Balance in the Liquidity Reserve Account to the bank statement from Wells Fargo and to the general ledger.

35) Compared the Interest Earned on Liquidity Reserve Account funds to the investment income statement from Wells Fargo Corporate Trust Services.

36) Compared the Transfers from Liquidity Reserve Account for Interest on Delinquent Student Loans to the *Schedule on Delinquent Student Loans Report* (Interest Past column).

37) Recalculated the Transfers from Collection Account for current period withdrawals, net of interest earned.

38) Recalculated and compared the End of Period balance in the Liquidity Reserve Account to the bank statement from Wells Fargo and to the general ledger.

39) Compared the Transfers into the Collection Account representing Principal Payments on Delinquent Student Loans to the *Scheduled Principal Payments Unpaid* report.

40) Compared the Transfers into the Collection Account representing Defaulted Student Loans to the *Schedule of Defaulted Student Loans Report* (sum of principal balance and 90 days' interest).

41) Compared the Transfers from the Collection Account representing Insurer Payments on Defaulted Student Contracts to the *Recoveries on Claims Student Loans Report.*

42) Recalculated the Reserve Remittance Amount and verified the formula utilized in the calculation as defined in the Pooling and Servicing Agreement.

43) Recalculated the Maximum Reserve Amount and verified the formula utilized in the calculation as defined in the Pooling and Servicing Agreement.

44) Agreed the Beginning of Period Balance in the Expense Account to the end of period balance for the previous month.

45) Compared the Expense Account Interest to the investment income statement from Wells Fargo Corporate Trust Services.

46) Agreed the amount carried forward as Expense Account Set-Aside to the amount reported on page 2 of the MSR.

47) Recalculated the End of Period Balance in the Expense Account.

48) Agreed the Beginning of Period Balance in the Payahead Account to the end of period balance for the previous month.

49) Compared the Interest Earned on Payahead Account to the investment income statement from Wells Fargo Corporate Trust Services.

50) Compared the Transfers from Payahead Account to the Collection Account to the *Payahead Report* for the prior month.

51) Compared the Transfers from the Collection Account for Payaheads Received in the Current Month to the *Payahead Report.*

52) Recalculated the End of Period Balance in the Payahead Account.

Findings

All amounts tested were found to be in agreement, except for the following:

38) The ending balance of the Liquidity Reserve Account in the bank statements and general ledger was greater than the balance on the servicer reports. This difference represented the interest earned on Liquidity Reserve funds during the prior month, which is recorded by the Bank in the current month. Therefore, April 2000 interest is posted in May 2000, May 2000 interest is posted in June 2000, etc.

Because the interest earned on the Liquidity Reserve Account is subsequently transferred to the Collection Account at Wells Fargo, SLS correctly stated the ending Liquidity Reserve balance on the servicer reports.

7

**Verification of Opening Account Balances with the Pooling and Servicing Agreement**

The SFC Grantor Trust Series 2000-1 Pooling and Servicing Agreement specifies a minimum opening balance for the Liquidity Reserve Account of $1,323,750. We agreed this balance to the Original Liquidity Reserve Balance on the servicer reports for April, July and December 2000. No exceptions were noted.

The Pooling and Servicing Agreement does not indicate a minimum balance for the Reserve Escrow Account in Series 2000-1.

**Verification of Totals on the Detailed Reports in SFC 2000**

We recalculated the December 2000 totals in each column on the detailed reports generated by the Company's data processing system (SFC 2000). No exceptions were noted.

**Testing of Cash Application**

From the population of accounts comprising Grantor Trust Series 2000-1, we selected a sample of ten loans each from the months of April, July and December 2000. A transaction history spread sheet was generated, indicating the following fields:

> Beginning principal balance
> Annual Percentage Rate (APR)
> Regular payment
> Transaction posting date
> Amount paid
> Amount paid ahead
> Interest due
> Principal due
> Interest past due
> Principal past due
> Next due date

- We determined the monthly accrued interest using the following formula: Beginning Principal Balance x APR/12.

- We recalculated the allocation between interest and principal for each loan in the sample and verified the accuracy of the next due date. The next due date serves as a proxy for the aging status of the account.

Findings

All amounts tested were found to be in agreement.

8

**Testing of Collection Activity**

From the population of accounts comprising Grantor Trust Series 2000-1, we selected a sample of ten delinquent loans each from the months of April, July and December 2000. We reviewed the collection activity screens on SFC 2000 and observed that the accounts were contacted regularly and in a timely manner.

**Findings**

No exceptions were noted.

REPORT ON AGREED-UPON PROCEDURES
REVIEW OF MONTHLY SERVICER REPORTS
SFC Grantor Trust Series 2000-2

**INDEPENDENT ACCOUNTANT'S REPORT**

To the Members
Student Loan Servicing, LLC
Christiana Executive Campus
111 Continental Drive, Suite 408
Newark, Delaware 19713

We have performed the procedures described below, which were agreed to by Student
Loan Servicing, LLC ("SLS") and Wells Fargo Bank Minnesota, N.A. ("Trustee"), to
selected securitization records and servicer reports of SLS for August and December
2000, for the sole purpose of determining whether SLS maintained documentation to
support the amounts contained in the servicer reports, as well as to verify the
mathematical accuracy of the amounts reported, as required by Section 3.16 of the SFC
Grantor Trust Series 2000-2 Pooling and Servicing Agreement ("PSA").    This
engagement to apply agreed-upon procedures was performed in accordance with
standards established by the American Institute of Certified Public Accountants.  The
sufficiency of the procedures is solely the responsibility of Student Loan Servicing, LLC
as Servicer and Wells Fargo Bank Minnesota, N.A. as Trustee for the above mentioned
Trust.   Consequently, we make no representation regarding the sufficiency of the
procedures described below, either for the purpose for which this report has been
requested or for any other purpose.  These procedures were performed in accordance with
the arrangements set forth in our letter to you dated December 27, 2000.

The procedures we performed and our findings relative thereto are set forth in the
accompanying Description of Procedures and Findings for SFC Grantor Trust 2000-2,
which is an integral part of this report.

We were not engaged to, and did not, perform an audit of the securitization records in
accordance with generally accepted auditing standards, the objective of which would be
the expression of an opinion on the specified elements, accounts and items. Accordingly,
we do not express such an opinion.

Had we performed additional procedures or had we conducted an audit of the
securitization records in accordance with generally accepted auditing standards, other
matters might have come to our attention that would have been reported to you.

This report relates only to the elements, accounts and items specified in the accompanying Description of Procedures and Findings for SFC Grantor Trust 2000-2 and does not extend to any financial statements of Student Loan Servicing, LLC taken as a whole.

This report is intended solely for the information and use of Student Loan Servicing, LLC and the Trustee, and is not intended to be, and should not be used by anyone other than the listed parties.

Philadelphia, PA
February 21, 2001

*McGladrey & Pullen, LLP*

2

**STUDENT LOAN SERVICING, LLC**

**DESCRIPTION OF PROCEDURES AND FINDINGS
FOR SFC GRANTOR TRUST 2000-2**

**Detail Testing of Amounts Contained in the Monthly Servicer Report**

This section should be read in conjunction with the August 31, 2000 and December 31, 2000 Monthly Servicer Reports ("MSR"). Items noted in *italics* refer to specific reports prepared by Student Loan Servicing, LLC ("SLS") used in preparing the MSR. Additionally, the procedures detailed below were performed on a sample of at least 25% of the Monthly Servicer Reports issued since inception of Grantor Trust Series 2000-2, namely, the months of August and December 2000, as required by the Pooling and Servicing Agreement ("PSA"). In addition, as required by the PSA, the initial month of the Series (August 2000) was included in our sample.

The purpose of our procedures was to perform the following:

1) Test the above listed reports for accuracy, agreeing the amounts on the servicer reports to the detailed records of SLS. Such testing constituted a line-by-line verification of each amount on the servicer reports in our sample.

2) Examine the servicing procedures, manuals and guides of SLS, and records relating to the servicing of the student loans and the accounts and records of SLS relating to the student loan files contained in the Trust to ascertain compliance with the PSA.

Specific Procedures

We received Monthly Servicer Reports for the months of August and December 2000 from the Company's Finance Manager and performed the following:

1) Compared and recalculated the Payments Received including Prepayments to the *Schedule of Payments Received Report.*

2) Compared the Recoveries Received on Delinquent Student Loans to the *Principal Reconciliation* worksheet (Delinquent Principal Purchased Paid column).

3) Compared the Transfers from Liquidity Reserve Account for Interest Shortfalls or Other Delinquent Interest to the *Shortfall/Excess on Student Loans Report.*

4) Compared the Transfers from Reserve Escrow Account for Principal on Delinquent Student Loans to the *Scheduled Principal Payments Unpaid Report.*

5) Compared the Transfers from Reserve Escrow Account for Defaulted Student Loans to the *Schedule of Defaulted Student Loans Report* (sum of principal balance and 90 days' interest).

6) Compared the Insurer Payment on Defaulted Student Contracts (December 2000 servicer report only) to the Notice of Demand from Royal Indemnity Company.

7) Compared the Interest Earned on Trust Funds in the Collection Account and Main Account Interest Earned (December 2000 servicer report only) to the investment income statement from Wells Fargo Corporate Trust Services.

8) Recalculated the amount reported as "Collection Account Cash Available for Distribution."

9) Agreed the amount carried forward at the top of page #2, "Collection Account Cash Available for Distribution" to page #1.

10) Compared the Transfer to Reserve Escrow Account for Insurance Payments on Defaulted Student Loans (December 2000 servicer report only) to the Notice of Demand from Royal Indemnity Company.

11) Compared the Transfers to Servicer for Amounts Attributable to Delinquency, Default, Penalty and Similar Fees to the *Schedule of Payments Received Report* (Fee Paid column).

12) Recalculated the MBIA Insurance Premium (December 2000 servicer report only) and verified the formula utilized in the calculation as defined in the Pooling and Servicing Agreement.

13) Recalculated the Senior Certificate Interest and Interest-Only Certificate Interest and verified the formulae utilized in these calculations as defined in the Pooling and Servicing Agreement.

14) Recalculated the Senior Certificate Principal Distribution and agreed the components thereof (Current Principal Payments, Prepayments on Principal, Recoveries on Principal Past Due, Delinquent Principal Due but not Received, Principal Portion of Defaulted Student Loans) to the corresponding Company detailed reports.

15) Compared the Master Servicer Fees Payable (December 2000 servicer report only) to the invoice from Finova Loan Administration and as defined in the PSA.

16) Recalculated the Trustee Fees Payable and verified the formula utilized in the calculation as defined in the Pooling and Servicing Agreement. Also, agreed the Custodian Fee payable to Wells Fargo Corporate Trust Services (December 2000 servicer report only) to the Fee Invoice from Wells Fargo.

4

17) Recalculated the Expense Account Set-Aside and verified the formula utilized in the calculation as defined in the Pooling and Servicing Agreement.

18) Agreed the Replenishment of Liquidity Reserve Account from Previous Withdrawals to the supporting calculation on page #4 of the MSR (Liquidity Reserve Account).

19) Recalculated the Servicing Fee payable to Student Loan Servicing and verified the formula utilized in the calculation as defined in the Pooling and Servicing Agreement.

20) Recalculated the Reserve Escrow Remittance Amount and verified the formula utilized in the calculation as defined in the Pooling and Servicing Agreement.

21) Recalculated the balance in the Collection Account to be zero at the end of each reporting period.

22) Agreed the Original Senior Certificate Principal Balance to the Pooling and Servicing Agreement.

23) Agreed the Beginning of Period Senior Certificate Holder Balance to the end of period principal balance for the previous month.

24) Compared the following types of principal payments to the corresponding Company detailed schedules and reports:

> Principal Payments
> Prepayments to Principal
> Principal Portion of Payments on Defaulted Student Loans
> Repurchases of Student Loans by Student Finance Corporation ("SFC")

25) Compared the Delinquent Principal to the *Scheduled Principal Payments Unpaid Report.*

26) Compared the Recoveries on Principal Paid Past Due to the *Principal Reconciliation* worksheet (Delinquent Principal Purchased Paid column).

27) Recalculated and compared the End of Period Senior Certificate Principal Balance to the *Outstanding Principal Balance Report.*

28) Recalculated the Required Interest on Senior Certificates and the I/O Certificate, and the Principal Distribution on Senior Certificates and verified the formulae utilized in the calculations as defined in the Pooling and Servicing Agreement.

29) Compared the Collateral Value to the *Student Loan Trial Balance.*

30) Compared the Original Liquidity Reserve Balance to the amount defined/ required by the Pooling and Servicing Agreement, to the general ledger and to the bank statement from Wells Fargo.

31) Agreed the Beginning of Period Balance in the Liquidity Reserve Account to the bank statement from Wells Fargo and to the general ledger.

32) Compared the Interest Earned on Liquidity Reserve Account funds (December 2000 servicer report only) to the investment income statement from Wells Fargo Corporate Trust Services.

33) Compared the Transfers to the Collection Account representing Interest Shortfalls and/or Delinquent Interest to the *Shortfall/Excess on Student Loans Report*.

34) Recalculated the Transfers from the Collection Account for current period withdrawals, net of interest earned and compared this amount to the Wells Fargo bank statement and general ledger.

35) Recalculated and compared the End of Period balance in the Liquidity Reserve Account to the bank statement from Wells Fargo and to the general ledger.

36) Compared the Beginning Balance in the Reserve Escrow Account (December 2000 servicer report only) to the general ledger and to the bank statement from Wilmington Trust.   NOTE: The beginning balance for the Reserve Escrow Account was not included on the August 2000 servicer report.

37) Compared the Transfers into the Collection Account representing Principal Payments on Delinquent Student Loans to the *Scheduled Principal Payments Unpaid* report, to the bank statement from Wilmington Trust and to the general ledger.

38) Compared the Transfers to the Collection Account representing Defaulted Student Loans to the *Schedule of Defaulted Student Loans Report* (sum of principal balance and 90 days' interest), to the bank statement from Wilmington Trust and to the general ledger.

39) Compared the Transfers from the Collection Account representing Insurance Transfers on Defaulted Student Contracts (December 2000 servicer report only) to the Notice of Demand from Royal Indemnity Company and to the bank statement from Wilmington Trust.

40) Recalculated the Reserve Remittance Amount and verified the formula utilized in the calculation as defined in the Pooling and Servicing Agreement.  Also, compared the Reserve Remittance Amount to the bank statement from Wilmington Trust and to the general ledger.

6

41) Recalculated and compared the Ending Balance in the Reserve Escrow Account (December 2000 MSR only) to the bank statement from Wilmington Trust and to the general ledger. NOTE: The August 2000 MSR did not include a line item for the ending balance in the Reserve Escrow Account.

42) Recalculated the Maximum Reserve Amount and verified the formula utilized in the calculation as defined in the Pooling and Servicing Agreement.

43) Agreed the Beginning of Period Balance in the Expense Account to the end of period balance for the previous month.

44) Compared the Expense Account Interest to the investment income statement from Wells Fargo Corporate Trust Services.

45) Agreed the amount carried forward as Expense Account Set-Aside to the amount reported on page 2 of the MSR.

46) Recalculated the End of Period Balance in the Expense Account.

Findings

All amounts tested were found to be in agreement, except for the following:

34) During September 2000, the Transfers from the Collection Account into the Liquidity Reserve Account totaling $140,345.67 were duplicated by Wells Fargo. The Bank posted the credit twice, but SLS properly recorded the transfer once in the general ledger. The duplicate transfer was appropriately reversed by Wells Fargo on January 10, 2001.

35) The ending balance in the Liquidity Reserve Account in the bank statements and general ledger was greater than the balance on the servicer reports. This difference represented the interest earned on Liquidity Reserve funds during the prior month, which is recorded by the Bank in the current month. Therefore, August 2000 interest is posted in September 2000, September 2000 interest is posted in October 2000, etc.

Because the interest earned on the Liquidity Reserve Account is subsequently transferred to the Collection Account at Wells Fargo, SLS correctly stated the ending Liquidity Reserve balance on the servicer reports.

36-41) The amounts reported on the MSR as transfers into/out of the Reserve Escrow Account are physically transferred by Wilmington Trust in the succeeding month. Transfers into the Collection Account at Wells Fargo are made before the 20th of each month, which is the determination date for the MSR. Although the Reserve Escrow bank statement balances do not coincide with the account balances on the servicer reports, these timing differences appear to be acceptable and should not distort the integrity of the MSR.

**Verification of Opening Account Balances with the Pooling and Servicing Agreement**

The SFC Grantor Trust Series 2000-2 Pooling and Servicing Agreement specifies a minimum opening balance for the Liquidity Reserve Account of $1,670,483. We agreed this balance to the Original Liquidity Reserve Balance on the servicer reports for August and December 2000. No exceptions were noted.

**Verifying Totals on the Detailed Reports in SFC 2000**

We recalculated the December 2000 totals in each column on the detailed reports generated by the Company's data processing system (SFC 2000). No exceptions were noted.

**Testing of Cash Application**

From the population of accounts comprising Grantor Trust Series 2000-2, we selected a sample of ten loans each from the months of August and December 2000. The Loan Transaction History screens were printed from the SFC 2000 system, which provided the following data:

> Loan amount
> Annual Percentage Rate (APR)
> Actual payment amount
> Transaction code
> Transaction date
> Posting date
> Principal amount
> Interest amount
> New due date

- We determined the monthly accrued interest using the following formula: Average Daily Balance x APR/360 x Actual # days since last payment.

- We recalculated the allocation between interest and principal for each loan in the sample and verified the accuracy of the new due date. The new due date serves as a proxy for the aging status of the account.

<u>Findings</u>

All amounts tested were found to be in agreement.

8

## Testing of Collection Activity

From the population of accounts comprising Grantor Trust Series 2000-2, we selected a sample of ten delinquent loans each from the months of August and December 2000. We reviewed the collection activity screens on SFC 2000 and observed that the accounts were contacted regularly and in a timely manner.

## Findings

No exceptions were noted.

REPORT ON AGREED-UPON PROCEDURES
REVIEW OF MONTHLY SERVICER REPORTS
SFC Grantor Trust Series 2000-3

## INDEPENDENT ACCOUNTANT'S REPORT

To the Members
Student Loan Servicing, LLC
Christiana Executive Campus
111 Continental Drive, Suite 408
Newark, Delaware 19713

We have performed the procedures described below, which were agreed to by Student Loan Servicing, LLC ("SLS") and Wells Fargo Bank Minnesota, N.A. ("Trustee"), to selected securitization records and servicer reports of SLS for October and December 2000, for the sole purpose of determining whether SLS maintained documentation to support the amounts contained in the servicer reports, as well as to verify the mathematical accuracy of the amounts reported, as required by Section 3.17 of the SFC Grantor Trust Series 2000-3 Pooling and Servicing Agreement ("PSA"). This engagement to apply agreed-upon procedures was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of the procedures is solely the responsibility of Student Loan Servicing, LLC as Servicer and Wells Fargo Bank Minnesota, N.A. as Trustee for the above mentioned Trust. Consequently, we make no representation regarding the sufficiency of the procedures described below, either for the purpose for which this report has been requested or for any other purpose. These procedures were performed in accordance with the arrangements set forth in our letter to you dated December 27, 2000.

The procedures we performed and our findings relative thereto are set forth in the accompanying Description of Procedures and Findings for SFC Grantor Trust 2000-3, which is an integral part of this report.

We were not engaged to, and did not, perform an audit of the securitization records in accordance with generally accepted auditing standards, the objective of which would be the expression of an opinion on the specified elements, accounts and items. Accordingly, we do not express such an opinion.

Had we performed additional procedures or had we conducted an audit of the securitization records in accordance with generally accepted auditing standards, other matters might have come to our attention that would have been reported to you.

This report relates only to the elements, accounts and items specified in the accompanying Description of Procedures and Findings for SFC Grantor Trust 2000-3 and does not extend to any financial statements of Student Loan Servicing, LLC taken as a whole.

This report is intended solely for the information and use of Student Loan Servicing, LLC and the Trustee, and is not intended to be, and should not be used by anyone other than the listed parties.

Philadelphia, PA
February 21, 2001

*McGladrey & Pullen, LLP*

2

## STUDENT LOAN SERVICING, LLC

## DESCRIPTION OF PROCEDURES AND FINDINGS
## FOR SFC GRANTOR TRUST 2000-3

### Detail Testing of Amounts Contained in the Monthly Servicer Report

This section should be read in conjunction with the October 31, 2000 and December 31, 2000 Monthly Servicer Reports ("MSR"). Items noted in *italics* refer to specific reports prepared by Student Loan Servicing, LLC ("SLS") used in preparing the MSR. Additionally, the procedures detailed below were performed on a sample of at least 25% of the MSRs issued since inception of Grantor Trust Series 2000-3, namely, the months of October and December 2000. In addition, as required by the PSA, the initial month of the Series (October 2000) was included in our sample.

The purpose of our procedures was to perform the following:

1) Test the above listed reports for accuracy, agreeing the amounts on the servicer reports to the detailed records of SLS. Such testing constituted a line-by-line verification of each amount on the servicer reports in our sample.

2) Examine the servicing procedures, manuals and guides of SLS, and records relating to the servicing of the student loans and the accounts and records of SLS relating to the student loan files contained in the Trust to ascertain compliance with the PSA.

### Specific Procedures

We received Monthly Servicer Reports for the months of October and December 2000 from the Company's Finance Manager and performed the following:

1) Compared and recalculated the Payments Received including Prepayments to the *Schedule of Payments Received Report*.

2) Compared the Payments Received including Prepayments, 9/1/00 through 9/30/00 (October 2000 Servicer Report only), to the list of September 2000 payments on GT 2000-3.

3) Compared the Recoveries Received on Delinquent Student Loans to the *Principal Reconciliation* worksheet (Delinquent Principal Purchased Paid column).

4) Compared the Transfers from Liquidity Reserve Account for Interest Shortfalls or Other Delinquent Interest to the *Shortfall/Excess on Student Loans Report*.

5) Compared the Transfers from Reserve Escrow Account for Principal on Delinquent Student Loans to the *Scheduled Principal Payments Unpaid Report*.

3

6) Compared the Transfers from Reserve Escrow Account for Defaulted Student Loans to the *Schedule of Defaulted Student Loans Report* (sum of principal balance and 90 days' interest).

7) Compared the Interest Earned on Trust Funds (December 2000 Servicer Report only) to the investment income statement from Wells Fargo Corporate Trust Services.

8) Recalculated the amount reported as "Collection Account Cash Available for Distribution."

9) Agreed the amount carried forward at the top of page #2, "Collection Account Cash Available for Distribution" to page #1.

10) Compared the Transfers to Servicer for Amounts Attributable to Delinquency, Default, Penalty and Similar Fees to the *Schedule of Payments Received Report* (Fee Paid column).

11) Recalculated the MBIA Insurance Premium (December 2000 MSR only) and verified the formula utilized in the calculation as defined in the PSA.

12) Recalculated the Senior Certificate Interest and Interest-Only Certificate Interest and verified the formulae utilized in these calculations as stated in the PSA.

13) Recalculated the Senior Certificate Principal Distribution and agreed the components thereof (Current Principal Payments, Prepayments on Principal, Recoveries on Principal Past Due, Delinquent Principal Due but not Received, Principal Portion of Defaulted Student Loans) to the corresponding Company detailed reports.

14) Recalculated the Trustee Fees Payable and verified the formula utilized in the calculation as defined in the PSA. Also, agreed the Custodian Fee payable to Wells Fargo Corporate Trust Services (December 2000 MSR only) to the Fee Invoice from Wells Fargo.

15) Recalculated the Escrow Agent Fees and verified the formula utilized in the calculation as defined in the PSA.

16) Compared the Master Servicer Fees Payable (December 2000 Servicer Report only) to the invoice from Finova Loan Administration and as defined in the PSA.

17) Recalculated the Expense Account Set-Aside and verified the formula utilized in the calculation as defined in the PSA.

18) Agreed the Replenishment of Liquidity Reserve Account from Previous Withdrawals to the supporting calculation on page #4 of the MSR (Liquidity Reserve Account).

19) Recalculated the *Servicing Fee* payable to Student Loan Servicing (December 2000 Servicer Report only) and verified the formula utilized in the calculation as defined in the PSA.

20) Recalculated the Reserve Escrow Remittance Amount and verified the formula utilized in the calculation as defined in the PSA.

21) Recalculated the balance in the Collection Account to be zero at the end of each reporting period.

22) Agreed the Original Senior Certificate Principal Balance to the PSA.

23) Agreed the Beginning of Period Senior Certificate Holder Balance to the end of period principal balance for the previous month.

24) Compared the Payments Received including Prepayments, 9/1/00 through 9/30/00 (October 2000 Servicer Report only), to the list of September 2000 payments on GT 2000-3.

25) Compared the following types of principal payments to the corresponding Company detailed reports and schedules:

> Principal Payments
> Prepayments to Principal
> Principal Portion of Payments on Defaulted Student Loans
> Repurchases of Student Loans by Student Finance Corporation ("SFC")

26) Compared the Recoveries on Principal Paid Past Due to the *Principal Reconciliation* worksheet (Delinquent Principal Purchased Paid column).

27) Compared the Delinquent Principal to the *Scheduled Principal Payments Unpaid Report.*

28) Recalculated and compared the End of Period Senior Certificate Principal Balance to the *Outstanding Principal Balance Report.*

29) Recalculated the Required Interest on Senior Certificates and the I/O Certificate, and the Principal Distribution on Senior Certificates and verified the formulae utilized in the calculations as defined in the PSA.

30) Compared the Collateral Value to the *Student Loan Trial Balance.*

31) Compared the Original Liquidity Reserve Balance to the amount as defined and required in the PSA, to the general ledger and to the bank statement from Wells Fargo.

32) Agreed the Beginning of Period Balance in the Liquidity Reserve Account to the bank statement from Wells Fargo and to the general ledger.

33) Compared the Interest Earned on Liquidity Reserve Account funds (December 2000 Servicer Report only) to the investment income statement from Wells Fargo Corporate Trust Services.

34) Compared the Transfers to the Collection Account representing Interest Shortfalls and/or Delinquent Interest to the *Shortfall/Excess on Student Loans Report*.

35) Recalculated the Transfers from the Collection Account for current period withdrawals, net of interest earned and compared this amount to the Wells Fargo bank statement and general ledger.

36) Recalculated and compared the End of Period balance in the Liquidity Reserve Account to the bank statement from Wells Fargo and to the general ledger.

37) Compared the Beginning Balance in the Reserve Escrow Account to the general ledger and to the bank statement from Wells Fargo.

38) Compared the Default Payments Received from Wilmington Trust and PNC Bank for Notices of Demand in November 2000 (December 2000 Servicer Report only) to the Wells Fargo bank statement and the general ledger.

39) Compared the Transfers into the Collection Account representing Principal Payments on Delinquent Student Loans to the *Scheduled Principal Payments Unpaid* report, to the bank statement from Wells Fargo and to the general ledger.

40) Compared the Transfers into the Collection Account representing Defaulted Student Loans to the *Schedule of Defaulted Student Loans* (sum of principal balance and 90 days' interest), to the bank statement from Wells Fargo and to the general ledger.

41) Recalculated the Reserve Remittance Amount and verified the formula utilized in the calculation as defined in the PSA. Also, compared the Reserve Remittance Amount to the bank statement from Wells Fargo and to the general ledger.

42) Recalculated and compared the Ending Balance in the Reserve Escrow Account to the bank statement from Wells Fargo and to the general ledger.

43) Recalculated the Maximum Reserve Amount and verified the formula utilized in the calculation as defined in the PSA.

44) Agreed the Beginning of Period Balance in the Expense Account to the end of period balance for the previous month.

45) Compared the Expense Account Interest to the bank statement from Wells Fargo.

46) Agreed the amount carried forward as Expense Account Set-Aside to the amount reported on page 2 of the Monthly Servicer Report.

47) Recalculated the End of Period Balance in the Expense Account.

Findings

All amounts tested were found to be in agreement, except for the following:

4 & 6) During October 2000, the total defaulted student loans were $60,331. However, the Reserve Escrow Account, which is designed for absorbing such defaults, was inadequate to cover this amount. Therefore, an additional $23,973 was erroneously transferred from the Liquidity Reserve Account into the Reserve Escrow Account. On the October 2000 MSR, the transfer was reflected as an increase in the net interest shortfall (Line 7: $457,673 to $481,646) and a decrease in defaulted student loan obligations (Line 10: $60,331 to $36,358). The Liquidity Reserve was subsequently correctly replenished, and all claims were filed for the correct amounts in a timely manner.

35) During October 2000, the Transfers from Collection Account for Current Period Withdrawals were overstated by $513.08. The correct transfer amount, $370,924.19, was confirmed through the Wells Fargo bank statement. The Finance Manager stated that the Liquidity Reserve Account section of the MSR would be adjusted in the January 2001 MSR.

36) The ending balance in the Liquidity Reserve Account in the bank statements and general ledger was greater than the balance on the servicer reports. This difference represented the interest earned on Liquidity Reserve funds during the prior month, which is recorded by the Bank in the current month. Therefore, August 2000 interest is posted in September 2000, September 2000 interest is posted in October 2000, etc.

Because the interest earned on the Liquidity Reserve Account is subsequently transferred to the Collection Account at Wells Fargo, SLS correctly stated the ending Liquidity Reserve balance on the servicer reports.

37) On the October MSR, the beginning balance in the Reserve Escrow Account was reported as $58,623.64, which exceeded the estimated amount in the Pooling and Servicing Agreement of $54,718.39. This difference actually improved the reserve position of SFC Acceptance IV, the owner of the account.

43) On the October MSR, the Maximum Reserve Amount was calculated using the beginning investor principal balance, rather than the ending student loan balance. Accordingly, the Maximum Reserve was overstated by $212,894.50. Management indicated that the underlying formula on the servicer report would be amended to generate the correct value.

7

37-42) The amounts reported on the MSR as transfers into/out of the Reserve Escrow Account are physically transferred by Wells Fargo in the succeeding month. Transfers into the Collection Account at Wells Fargo are made before the 20th of each month, which is the determination date for the MSR. Although the Reserve Escrow bank statement balances do not coincide with the account balances on the servicer reports, these timing differences appear to be acceptable and should not distort the integrity of the MSR.

### Verification of Opening Account Balances with the Pooling and Servicing Agreement

The SFC Grantor Trust Series 2000-3 Pooling and Servicing Agreement specifies a minimum opening balance for the Liquidity Reserve Account of $1,549,485. We agreed this balance to the Original Liquidity Reserve Balance on the servicer reports for October and December 2000. No exceptions were noted.

### Verifying Totals on the Detailed Reports in SFC 2000

We recalculated the December 2000 totals in each column on the detailed reports generated by the Company's data processing system (SFC 2000). No exceptions were noted.

### Testing of Cash Application

From the population of accounts comprising Grantor Trust Series 2000-3, we selected a sample of ten loans each from the months of October and December 2000. The Loan Transaction History screens were printed from the SFC 2000 system, which provided the following data:

> Loan amount
> Annual Percentage Rate (APR)
> Actual payment amount
> Transaction code
> Transaction date
> Posting date
> Principal amount
> Interest amount
> New due date

- We determined the monthly accrued interest using the following formula: Average Daily Balance x APR/360 x Actual # days since last payment.

8

- We recalculated the allocation between interest and principal for each loan in the sample and verified the accuracy of the new due date. The new due date serves as a proxy for the aging status of the account.

## Findings

All amounts tested were found to be in agreement.

## Testing of Collection Activity

From the population of accounts comprising Grantor Trust Series 2000-3, we selected a sample of ten delinquent loans each from the months of October and December 2000. We reviewed the collection activity screens on SFC 2000 and observed that the accounts were contacted regularly and in a timely manner.

## Findings

No exceptions were noted.

9

REPORT ON AGREED-UPON PROCEDURES
REVIEW OF MONTHLY SERVICER REPORTS
SFC Grantor Trust Series 2000-4

**INDEPENDENT ACCOUNTANT'S REPORT**

To the Members
Student Loan Servicing, LLC
Christiana Executive Campus
111 Continental Drive, Suite 408
Newark, Delaware 19713

We have performed the procedures described below, which were agreed to by Student Loan Servicing, LLC ("SLS") and Wells Fargo Bank Minnesota, N.A. ("Trustee"), to selected securitization records and servicer reports of SLS for December 2000, for the sole purpose of determining whether SLS maintained documentation to support the amounts contained in the servicer reports, as well as to verify the mathematical accuracy of the amounts reported, as required by Section 3.16 of the SFC Grantor Trust Series 2000-4 Pooling and Servicing Agreement ("PSA"). This engagement to apply agreed-upon procedures was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of the procedures is solely the responsibility of Student Loan Servicing, LLC as Servicer and Wells Fargo Bank Minnesota, N.A. as Trustee for the above mentioned Trust. Consequently, we make no representation regarding the sufficiency of the procedures described below, either for the purpose for which this report has been requested or for any other purpose. These procedures were performed in accordance with the arrangements set forth in our letter to you dated December 27, 2000.

The procedures we performed and our findings relative thereto are set forth in the accompanying Description of Procedures and Findings for SFC Grantor Trust 2000-4, which is an integral part of this report.

We were not engaged to, and did not, perform an audit of the securitization records in accordance with generally accepted auditing standards, the objective of which would be the expression of an opinion on the specified elements, accounts and items. Accordingly, we do not express such an opinion.

Had we performed additional procedures or had we conducted an audit of the securitization records in accordance with generally accepted auditing standards, other matters might have come to our attention that would have been reported to you.

This report relates only to the elements, accounts and items specified in the accompanying Description of Procedures and Findings for SFC Grantor Trust 2000-4 and does not extend to any financial statements of Student Loan Servicing, LLC taken as a whole.

This report is intended solely for the information and use of Student Loan Servicing, LLC and the Trustee, and is not intended to be, and should not be used by anyone other than the listed parties.

Philadelphia, PA
February 21, 2001

*McGladrey & Pullen, LLP*

2

**STUDENT LOAN SERVICING, LLC**

**DESCRIPTION OF PROCEDURES AND FINDINGS**
**FOR SFC GRANTOR TRUST 2000-4**

### Detail Testing of Amounts Contained in the Monthly Servicer Report

This section should be read in conjunction with the December 31, 2000 Monthly Servicer Report ("MSR"). Items noted in *italics* refer to specific reports prepared by Student Loan Servicing, LLC ("SLS") used in preparing the MSR. Additionally, the procedures detailed below were performed on a sample of at least 25% of the Monthly Servicer Reports issued since inception of Grantor Trust Series 2000-4. Our sample consisted solely of the initial month in the Series (December 2000), as required by the Pooling and Servicing Agreement ("PSA").

The purpose of our procedures was to perform the following:

1) Test the above listed reports for accuracy, agreeing the amounts on the servicer reports to the detailed records of SLS. Such testing constituted a line-by-line verification of each amount on the servicer reports in our sample.

2) Examine the servicing procedures, manuals and guides of SLS, and records relating to the servicing of the student loans and the accounts and records of SLS relating to the student loan files contained in the Trust to ascertain compliance with the PSA.

Specific Procedures

We received Monthly Servicer Report for the month of December 2000 from the Company's Finance Manager and performed the following:

1) Compared and recalculated the Payments Received including Prepayments to the *Schedule of Payments Received Report*.

2) Compared the Accrued Interest from the GT 2000-4 Settlement to the bank statement from Wells Fargo, indicating a transfer into the Collection Account.

3) Compared the Recoveries Received on Delinquent Student Loans to the *Delinquent Purchased Principal Transactions Report* (Delinquent Principal Purchased Paid column).

4) Compared the Transfers from Liquidity Reserve Account for Interest Shortfalls or Other Delinquent Interest to the *Shortfall/Excess on Student Loans Report*.

5) Compared the Transfers from Reserve Escrow Account for Principal on Delinquent Student Loans to the *Scheduled Principal Payments Unpaid Report*.

3

6) Recalculated the amount reported as "Collection Account Cash Available for Distribution."

7) Agreed the amount carried forward at the top of page #2, "Collection Account Cash Available for Distribution" to page #1.

8) Compared the Transfers to Servicer for Amounts Attributable to Delinquency, Default, Penalty and Similar Fees to the *Schedule of Payments Received Report* (Fee Paid column).

9) Recalculated the Senior Certificate Interest and Interest-Only Certificate Interest and verified the formulae utilized in these calculations as defined in the Pooling and Servicing Agreement.

10) Recalculated the Senior Certificate Principal Distribution and agreed the components thereof (Current Principal Payments, Prepayments on Principal, Recoveries on Principal Past Due, Delinquent Principal Due but not Received, Principal Portion of Defaulted Student Loans, Repurchased Loans) to the corresponding Company detailed reports.

11) Recalculated the Trustee Fees Payable and verified the formula utilized in the calculation as defined in the Pooling and Servicing Agreement.

12) Recalculated the Escrow Agent Fees and verified the formula utilized in the calculation as defined in the Pooling and Servicing Agreement.

13) Recalculated the Expense Account Set-Aside and verified the formula utilized in the calculation as defined in the Pooling and Servicing Agreement.

14) Agreed the Replenishment of Liquidity Reserve Account from Previous Withdrawals to the supporting calculation on page #4 of the MSR (Liquidity Reserve Account).

15) Recalculated the Servicing Fee payable to Student Loan Servicing and verified the formula utilized in the calculation as defined in the Pooling and Servicing Agreement.

16) Recalculated the Reserve Escrow Remittance Amount and verified the formula utilized in the calculation as defined in the Pooling and Servicing Agreement.

17) Recalculated the balance in the Collection Account to be zero at the end of the reporting period.

18) Agreed the Original Senior Certificate Principal Balance to the Pooling and Servicing Agreement.

19) Agreed the Beginning of Period Senior Certificate Holder Balance to the Original Senior Certificate Principal Balance.

20) Compared the following types of principal payments to the corresponding Company detailed reports and schedules:

> Principal Payments
> Prepayments to Principal

21) Compared the Recoveries on Principal Paid Past Due to the *Principal Reconciliation* worksheet (Delinquent Principal Purchased Paid column).

22) Compared the Delinquent Principal to the *Scheduled Principal Payments Unpaid Report.*

23) Recalculated and compared the End of Period Senior Certificate Principal Balance to the *Outstanding Investor Principal Balance Report.*

24) Recalculated the Required Interest on Senior Certificates and the I/O Certificate, and the Principal Distribution on Senior Certificates and verified the formulae utilized in the calculations as defined in the Pooling and Servicing Agreement.

25) Compared the Collateral Value to the *Student Loan Trial Balance.*

26) Compared the Original Liquidity Reserve Balance to the amount defined/required in the Pooling and Servicing Agreement, to the general ledger and to the bank statement from Wells Fargo.

27) Agreed the Beginning of Period Balance in the Liquidity Reserve Account to the amount defined/required in the Pooling and Servicing Agreement and to the general ledger.

28) Compared the Transfers to the Collection Account representing Interest Shortfalls and/or Delinquent Interest to the *Shortfall/Excess on Student Loans Report.*

29) Recalculated the Transfers from the Collection Account for current period withdrawals, net of interest earned and compared this amount to the Wells Fargo bank statement and general ledger.

30) Recalculated and compared the End of Period balance in the Liquidity Reserve Account to the bank statement from Wells Fargo and to the general ledger.

31) Compared the Beginning Balance in the Reserve Escrow Account to the general ledger and to the bank statement from Wells Fargo.

32) Compared the Transfers into the Collection Account representing Principal Payments on Delinquent Student Loans to the *Scheduled Principal Payments Unpaid Report*, to the bank statement from Wells Fargo and to the general ledger.

33) Compared the PNC Transfer from settlement on 12/18/00 to the Wells Fargo bank statement and the general ledger.

34) Recalculated the Reserve Remittance Amount and verified the formula utilized in the calculation as defined in the Pooling and Servicing Agreement. Also, compared the Reserve Remittance Amount to the bank statement from Wells Fargo and to the general ledger.

35) Recalculated and compared the Ending Balance in the Reserve Escrow Account to the bank statement from Wells Fargo and to the general ledger.

36) Recalculated the Maximum Reserve Amount and verified the formula utilized in the calculation as defined in the Pooling and Servicing Agreement.

37) Agreed the Beginning of Period Balance in the Expense Account to the bank statement from Wells Fargo.

38) Agreed the amount carried forward as Expense Account Set-Aside to the amount reported on page 2 of the MSR.

39) Recalculated the End of Period Balance in the Expense Account.

<u>Findings</u>

All amounts tested were found to be in agreement, except for the following:

5&10) The SLS reports entitled "Scheduled Principal Payments Unpaid" and "Current Principal Paid" reflected an adjustment of $8.85, which reduced the scheduled principal unpaid and increased the current principal paid.

31) On the December 2000 MSR, the beginning balance in the Reserve Escrow Account was reported as $59,757.67, which exceeded the estimated amount in the Pooling and Servicing Agreement of $59,500.00. This difference actually improved the reserve position of SFC Acceptance V, the owner of the account.

36) On the December 2000 MSR, the Maximum Reserve Amount was calculated using the beginning investor principal balance, rather than the ending student loan balance. Accordingly, the Maximum Reserve was overstated by $38,667.40. Management indicated that the underlying formula on the servicer report would be amended to generate the correct value.

6

31-35) The amounts reported on the MSR as transfers into/out of the Reserve Escrow Account are physically transferred by Wells Fargo in the succeeding month. Transfers to the Collection Account at Wells Fargo are made before the 20th of each month, which is the determination date for the MSR. Although the Reserve Escrow bank statement balances do not coincide with the account balances on the servicer reports, the timing differences appear to be acceptable and should not distort the integrity of the MSR.

### Verification of Opening Account Balances with the Pooling and Servicing Agreement

The SFC Grantor Trust Series 2000-4 Pooling and Servicing Agreement specifies a minimum opening balance for the Liquidity Reserve Account of $945,300. We agreed this balance to the Original Liquidity Reserve Balance on the servicer report for December 2000. No exceptions were noted.

### Verifying Totals on the Detailed Reports in SFC 2000

We recalculated the December 2000 totals in each column on the detailed reports generated by the Company's data processing system (SFC 2000). No exceptions were noted.

### Testing of Cash Application

From the population of accounts comprising Grantor Trust Series 2000-4, we selected a sample of ten loans from the month of December 2000. The Loan Transaction History screens were printed from the SFC 2000 system, which provided the following data:

> Loan amount
> Annual Percentage Rate (APR)
> Actual payment amount
> Transaction code
> Transaction date
> Posting date
> Principal amount
> Interest amount
> New due date

- We determined the monthly accrued interest using the following formula: Average Daily Balance x APR/360 x Actual # days since last payment.

- We recalculated the allocation between interest and principal for each loan in the sample and verified the accuracy of the new due date. The new due date serves as a proxy for the aging status of the account.

Findings

All amounts tested were found to be in agreement.

**Testing of Collection Activity**

From the population of accounts comprising Grantor Trust Series 2000-4, we selected a sample of ten delinquent loans from the month of December 2000. We reviewed the collection activity screens on SFC 2000 and observed that the accounts were contacted regularly and in a timely manner.

Findings

No exceptions were noted.