# Exhibit H

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ROYAL INDEMNITY COMPANY,                )
                                        )
        Plaintiff/Counter-Defendant,    )        No. 3-04-0107
                                        )
    v.                                  )        JUDGE ECHOLS
                                        )        MAGISTRATE JUDGE GRIFFIN
COMMERCIAL DRIVER                       )
INSTITUTE, INC., et al.                 )
                                        )
        Defendant/Counter-Plaintiffs and )
        Cross Plaintiffs.               )

### ANSWER, ADDITIONAL DEFENSES AND
### AMENDED COUNTERCLAIM AND CROSS-CLAIM

Defendants Commercial Driver Institute, Inc., Truck Driver Institute, Inc., Truck Driver Institute of Florida, Inc., Texas Truck Driver Institute, Inc., Truck Driver Institute of Indiana, Inc., Truck Driver Institute of Mississippi, Inc. Truck Driver Institute of Alabama, Inc., CDI Services, Inc. (referred to for purposes of this pleading unless otherwise stated as "CDI"), Thomas J. Gast and Joseph M. Gast (referred to collectively herein with CDI for purposes of the Answer and Additional Defenses below as "defendants") state as follows:

### ANSWER

1.      Defendants deny the allegations in paragraph 1.

2.      Defendants admit that CDI, with the exception of CDI Services, Inc., provides state-licensed truck driver training programs for individuals who want to obtain a commercial drivers license.  It is admitted that tuition was at a maximum of $5995 as of March 2002 for two week courses taught by CDI's state licensed professional instructors.  It is admitted that some

students financed their tuition for the CDI schools. It is admitted that CDI worked with students to obtain financing. Defendants deny the remaining allegations of paragraph 2.

3.    Defendants admit that SFC provided financing for some percentage of CDI students and that the number of students varied from year to year between 1998 and early 2002. It is admitted that SFC was in the business of making tuition loans to students of truck driving schools. Based upon information learned after April 2002, it is admitted that SFC borrowed money from banks to fund the purchase and/or origination of student loans, purchased insurance from plaintiff Royal Indemnity Company ("Royal") and other entities to insure against the default of the tuition loans, and then sold some portion of the student loans to institutional investors through securitization transactions. CDI states that Royal had knowledge of SFC's business practices, that the loans made to CDI's students were real loans and made to the CDI students in the ordinary course of CDI's business and that the students attending CDI schools received proper training with the belief that the students who financed their tuition would have the ability to repay the loans. Defendants deny the remaining allegations of paragraph 3 to the extent these allegations are directed at defendants.

4.    Defendants admit the allegations in paragraph 4.

5.    Defendants deny that CDI's schools were a cover for a fraudulent scheme and state that CDI's schools have been in business since 1973, more than twenty years before CDI entered into any contracts with SFC. It is denied that defendants conspired with SFC for any purpose whatsoever. Defendants deny that CDI ran a "loan mill" out of their schools. CDI admits that CDI enrolled some individuals with felony convictions subject to certain hiring criteria set by carriers regarding the nature and date of the conviction and that CDI advised such students of the potential barriers to employment and obtained placement waivers if the student

2

disclosed the felony conviction to CDI as the CDI school application required. Defendants deny the remaining allegations in paragraph 5.

6.     Defendants deny the allegations in paragraph 6 and state that the CDI student borrowers did graduate, were capable of holding jobs, and based on SFC's willingness to purchase and/or originate the loans and based on the training provided to these students, capable of repaying their loans.

7.     Defendants deny taking any action to conceal defaults from any party and deny having any knowledge of the default rate of the SFC loan portfolio at any time prior to April 2002. Defendants admit that James Pearson of SFC communicated to certain employees of CDI that the students could include the money for the initial two payments as part of their expenses for training and that CDI could advance these payments to the students. The students remained responsible for the first two payments and CDI never made payments for a student. Defendants deny the remaining allegations of paragraph 7(a) to the extent these allegations are directed at defendants.

Defendants state that Royal's policies speak for themselves. Based upon information learned after April 2002, SFC did make "forbearance payments" on student loans to prevent loans from defaulting and to make the loan portfolio appear to be performing better than it actually was performing. Royal knew that SFC was taking some action to prevent loans from defaulting and that the loan portfolio was not performing as expected. Royal knew that SFC was making forbearance payments and that SFC made $2 million in forbearance payments in 1999 and in excess of $9 million in forbearance payments in 2000. Defendants deny the remaining allegations in paragraph 7(b).

8.    Based on information learned after April 2002, it is admitted that SFC made in excess of $2 million in forbearance payments in 1999 and $9 million in forbearance payments in 2000 of which Royal had knowledge and in excess of $45 million in forbearance payments in 2001. SFC made at least in excess of $12 million in forbearance payments in 2002 with funds provided to it by Royal. Based on information learned after April 2002, it is admitted that SFC exhausted its sources of capital by March 20, 2002, and had a meeting with Royal at this time. It is denied that SFC first disclosed its practice of making forbearance payments to Royal on March 20, 2002. Defendants deny the remaining allegations in paragraph 8.

9.    Defendants admit that SFC is in Chapter 7 bankruptcy. Defendants are without knowledge to admit or deny whether SFC's principals pocketed astonishing amounts of money but it is believed that Andrew Yao, Perry Turnbull, and Jim Pearson profited tremendously from the fraud scheme which is the subject of CDI's amended counterclaim and cross-claim. It is admitted that SFC purchased and/or originated student loans from students attending CDI schools in the amount of or around $77 million from 1998 through 2002. Defendants deny the remaining allegations in paragraph 9.

10.    Defendants admit the allegations in paragraph 10.

11.    Defendants admit the allegations in paragraph 11, except that the mailing address in paragraph 11 (c) is P.O. Box 2664, Gulfport. MS 39505.

12.    Defendants admit the allegations in paragraph 12.

13.    Defendants admit the allegations in paragraph 13, except that the registered address is 3700 St. John's Parkway, Sanford, Florida 32771.

14.    Defendants admit the allegations in paragraph 14.

15.    Defendants admit the allegations in paragraph 15.

16.    Defendants admit the allegations in paragraph 16.

17.    Defendants admit the allegations in paragraph 17.

18.    Defendants deny that CDI Services, Inc., merged with CDI, Inc. and TDI, Inc., and states that these entities are separate corporations. Defendants admit the remaining allegations of paragraph 18.

19.    Defendants deny that the defendants engage in the "same business operations, deal with the same business partners and pursue the same business purposes." Defendants admit that Thomas Gast has an ownership interest in CDI and deny that Thomas Gast operated and controlled CDI. Defendants admit the remaining allegations in paragraph 19.

20.    Defendants deny that Thomas Gast manages and controls the affairs of all of the CDI defendants. Since 1997 and at age 65, Thomas Gast has participated in the operations of the companies in which he has an ownership interest on a part-time basis. Defendants admit that Thomas Gast has 100% ownership of Commercial Driver Institute, Inc., 51% ownership of Truck Driver Institute, Inc., 20% ownership of TDI Indiana, Inc., 100% ownership of TDI Florida, TDI Mississippi, TDI Alabama, and Texas TDI and 84% ownership of CDI Services, Inc. Defendants admit the remaining allegations in paragraph 20.

21.    Defendants admit that Joseph M. Gast resides at 52 Port Royal Way, Pensacola, Florida, that he is 49% owner and Vice President and director of TDI, Inc., the Vice-President of TTDI and the Secretary of TDIM. Defendants admit that Joseph Gast's involvement with CDI, during the time period relevant to this lawsuit, has been limited primarily to development of property and real estate for the CDI campuses. Defendants deny the remaining allegations in paragraph 21.

22.    Defendants deny the allegations in paragraph 22.

23.    Defendants deny the allegations in paragraph 23.

24.    Defendants do not have information or knowledge sufficient to admit or deny the allegations in this paragraph and, therefore, defendants deny these allegations.

25.    The allegations in paragraph 25 are not directed toward defendants and these allegations are neither admitted nor denied, though it is believed that the statements in this paragraph are accurate based on information available to defendants.

26.    Defendants deny that Mr. Turnbull had frequent contacts with CDI in Tennessee. Defendants deny that Mr. Turnbull had any contact with Thomas Gast or Joseph Gast. Defendants do not have information or knowledge sufficient to admit or deny the remaining allegations in this paragraph and, therefore, defendants deny these allegations.

27.    Defendants deny that Mr. Pearson had any contacts with Thomas Gast and Joseph Gast and state that Mr. Pearson had at least one contact with CDI in Tennessee. Defendants do not have information or knowledge sufficient to admit or deny the remaining allegations in this paragraph and, therefore, defendants deny these allegations.

28.    The allegations in paragraph 28 are not directed toward defendants and these allegations are neither admitted nor denied, though it is believed that the statements in this paragraph are accurate based on information available to defendants, with the exception that Mr. Hawthorne is a party to this action by virtue of the cross-claim filed against him in this matter.

29.    The allegations in paragraph 29 are not directed toward defendants and these allegations are neither admitted nor denied, though it is believed that the statements in this paragraph are accurate based on information available to defendants, with the exception that SLS is a party to this action by virtue of the cross-claim filed against SLS in this matter.

30.    The allegations in paragraph 30 are not directed toward defendants and these allegations are neither admitted nor denied, though it is believed that the statements in this paragraph are accurate based on information available to defendants.

31.    The allegations in paragraph 31 are legal conclusions. However, defendants admit that jurisdiction is proper.

32.    The allegations in paragraph 32 are legal conclusions. However, defendants admit that venue is proper.

33.    CDI admits that it advanced payments to certain students as stated in paragraph 7. Defendants deny the remaining allegations in paragraph 33.

34.    Defendants deny the allegations in paragraph 34.

35.    CDI admits that certain students admitted to the CDI schools may have been convicted of a felony as set forth in paragraph 5. Defendants deny the remaining allegations in paragraph 35.

36.    CDI admits that certain students admitted to the CDI schools had been convicted of a felony as set forth in paragraph 5. CDI also admits that certain carriers restrict employment of convicted felons and that these restrictions have changed over time. CDI disclosed these restrictions to students who disclosed to CDI the existence of a felony conviction as required by the CDI school's applications. Defendants deny the remaining allegations in paragraph 36.

37.    Defendants deny the allegations in paragraph 37.

38.    Defendants deny the allegations in paragraph 38.

39.    Defendants admit that classes generally began at the CDI schools on Mondays. Defendants deny that recruiters were paid on the number of students enrolled. Defendants deny the remaining allegations in paragraph 39.

7

40.     Defendants admit that the Tennessee Higher Education Commission ("THEC") requested that CDI remove the reference to the word "immediate" from a school brochure and states that this reference was removed. CDI states that students are required to sign a statement in the training agreement that states they understand that CDI does not guarantee job placement. Furthermore, students were eligible for immediate job placement after graduation. Defendants deny the remaining allegations in paragraph 40.

41.     Defendants deny the allegations in paragraph 41.

42.     Defendants deny the allegations in paragraph 42.

43.     Defendants deny the allegations in paragraph 43.

44.     Defendants admit that recruiters explained financing terms to students who applied for financing, including their anticipated payment each month. Defendants deny the remaining allegations in paragraph 44.

45.     Defendants deny the allegations in paragraph 45.

46.     CDI admits that the loan process was completed during the second week of class at Texas Truck Driver Institute to allow for students withdrawing after the first week of training. If a student withdrew at any time during training, there would be no charge to the student from CDI. This practice was intended to identify students that had a true interest in pursuing a career in the trucking industry and to allow other individuals to withdraw from the program without incurring an obligation to repay tuition. CDI admits that on isolated occasions students may have been provided with loan papers on the last day of class or after the scheduled graduation date because of some circumstance concerning the loan process. Defendants deny the remaining allegations in paragraph 46.

47.    Defendants deny the allegations in paragraph 47 and state that state-approved advertising and recruiting practices were used to enroll students.

48.    Defendants deny the allegations in paragraph 48.

49.    Defendants do not have information or knowledge sufficient to admit or deny the allegations in this paragraph and, therefore, defendants deny these allegations.

50.    Defendants admit that certain students and loan co-signors identified alleged forged signatures.  CDI encouraged these individuals to file affidavits of forgery with SFC.   In the event students could not obtain satisfaction from SFC with respect to such an issue, CDI would request loan withdrawals from SFC if appropriate.  Defendants deny the remaining allegations in paragraph 50.

51.    Defendants admit that SFC purchased and/or originated student loans from students at CDI schools pursuant to the contracts between SFC and CDI.  Defendants are unaware of efforts used by SFC to conduct underwriting on prospective loan candidates or what SFC communicated to Royal regarding its loan underwriting although, upon information and belief, such information was available to Royal.  Defendants deny the remaining allegations in paragraph 51.

52.    Defendants deny the allegations in paragraph 52.

53.    Defendants deny the allegations in paragraph 53.

54.    Defendants deny the allegations in paragraph 54.

55.    Defendants admit that students had to pass written examinations prior to graduation and these examinations  were administered pursuant to state-approved school guidelines.  These guidelines included whether a student would be permitted to re-take a written and/or performance examination.  Defendants deny the remaining allegations in paragraph 55.

56.    Defendants admit that certain CDI schools acted as third-party CDL testers pursuant to contracts with states in which the schools operated.  Defendants admit that students were tested pursuant to state procedures and requirements, including whether a student was permitted to take the CDL test more than once.  Defendants deny the remaining allegations in paragraph 56.

57.    Defendants deny the allegations in paragraph 57.

58.    Defendants state that students who tested positive on drug screens were required to comply with federal Department of Transportation regulations regarding a return to training and were allowed to return to training subject to compliance with these regulations.  Defendants deny the remaining allegations in paragraph 58.

59.    Defendants state that in Sanford, Florida, it was discovered that one or two employees were involved in selling commercial driver's licenses to outside individuals that never attended a CDI school.  The employee(s) were terminated immediately upon discovery of this information.  Defendants deny the remaining allegations in paragraph 59.

60.    Defendants state that they do not possess information regarding SFC's knowledge regarding CDI's business practices beyond what CDI communicated to SFC.  Defendants deny that loans to students were not "bona fide."  Defendants deny the remaining allegations in paragraph 60 to the extent these allegations are directed at defendants.

61.    Defendants deny the allegations in paragraph 61.

62.    Defendants are unaware of SFC's communications with Royal beyond the documents produced in this matter which speak for themselves and the testimony of SFC employees in SFC-related litigation.  Defendants deny making or having any knowledge of misrepresentations to SFC or Royal.  To the extent that SFC made misrepresentations to Royal

regarding any topic, defendants deny providing SFC with any information with which to make these misrepresentations. Defendants deny the remaining allegations in paragraph 62 to the extent these allegations are directed at defendants.

63.     Defendants deny any suggestion that the CDI students for which SFC purchased and/or originated student loans did not receive adequate training. To the extent that SFC made misrepresentations to Royal regarding any topic, defendants deny providing SFC with any information with which to make these misrepresentations. Defendants also state that Royal was in possession of information that made its reliance on representations made by SFC unreasonable. Defendants deny the remaining allegations in paragraph 63 to the extent they are directed at defendants.

64.     Defendants are unaware of SFC's communications with Royal beyond the documents produced in this matter which speak for themselves and the testimony of SFC employees in SFC-related litigation. To the extent that SFC made misrepresentations to Royal regarding any topic, defendants deny providing SFC with any information with which to make these misrepresentations. Defendants also state that Royal was in possession of information that made its reliance on any representations made by SFC unreasonable. Defendants deny the remaining allegations in paragraph 64.

65.     Defendants deny the allegations in paragraph 65.

66.     The allegations in paragraph 66 are not directed to defendants and, therefore, are neither admitted nor denied.

67.     The allegations in paragraph 67 are not directed to defendants and, therefore, are neither admitted nor denied.

11

68.     The allegations in paragraph 68 are not directed to defendants and, therefore, are neither admitted nor denied.

69.     The allegations in paragraph 69 are not directed to defendants and, therefore, are neither admitted nor denied.

70.     Defendants deny that the CDI schools were required to underwrite the student loans SFC purchased and/or originated and deny that SFC ever provided defendants with any policies or procedures concerning underwriting student loans. The remaining allegations in paragraph 70 are not directed to defendants and, therefore, are neither admitted nor denied.

71.     The allegations in paragraph 71 are not directed to defendants and, therefore, are neither admitted nor denied.

72.     Defendants admit that as of the date of the issuance of the first Royal policy, SFC was purchasing and/or originating student loans with respect to students attending CDI schools. Defendants deny providing any false information to SFC or Royal. The remaining allegations in paragraph 72 are not directed to defendants and, therefore, are neither admitted nor denied.

73.     Prior to April 2002, defendants had no knowledge of any communications between SFC and Royal. Defendants deny that loans were made to CDI students that could never obtain a trucking job or repay the loans. Defendants deny the remaining allegations of paragraph 73 to the extent these allegations are directed at defendants.

74.     Defendants deny the allegations in paragraph 74.

75.     CDI admits that it advanced payments to certain students beginning in or around February 2000 as stated in paragraph 7 above. Defendants deny making payments for students. Defendants deny the remaining allegations in paragraph 75.

76.     Based on information learned after April 2002, defendants admit that SFC securitized student loans.   Prior to that time, defendants were unaware of what, if anything, SFC did with the student loans after purchase and/or origination of any given loan.  Defendants deny the remaining allegations in paragraph 76 to the extent these allegations are directed at defendants.

77.     Defendants deny the allegations in paragraph 77.

78.     Defendants deny the allegations in paragraph 78 as Royal possessed information showing that student loans in the SFC loan portfolio were not performing well, yet it continued to issue new policies to SFC notwithstanding and with full knowledge of the foregoing. Defendants deny the remaining allegations in paragraph 78.

79.     CDI admits that it advanced payments to certain students as stated in paragraph 7. Defendants deny making payments for students.  The payments advanced to students took the form of money orders at SFC's request.  Defendants deny the remaining allegations in paragraph 79.

80.     CDI admits that prior to February 2000, it purchased money orders for students with funds provided to CDI by students at the time of the purchase of the money orders.  CDI generally purchased a number of money orders for new students collectively with the funds provided by students.  After or around February 2000, CDI advanced funds to certain students to purchase printed money orders if these students elected to finance their initial one or two payments collectively as a portion of their expenses as indicated in paragraph 7 above. Defendants deny the remaining allegations in paragraph 80.

81.     CDI admits that it advanced payments to certain students as stated in paragraph 7. Defendants deny making payments for students.  The CDI students electing to finance their

13

initial payments were responsible for repayment of these amounts.  Defendants deny the remaining allegations in paragraph 81.

82.     Defendants deny making payments for students.  Defendants do not possess information which would allow them to admit or deny the truth of the allegations in paragraph 82 concerning loan payments made by students of CDI schools and, therefore, demand strict proof thereof and deny the allegations in paragraph 82.

83.     Defendants admit that the loans purchased and/or originated by SFC were non-recourse loans.  The students remained responsible for the payment of these loans.  Defendants deny the remaining allegations of paragraph 83.

84.     Defendants admit that Thomas Gast and Joseph Gast have an ownership in the CDI schools.  Defendants deny the remaining allegations in paragraph 84.

85.     Defendants deny the allegations in paragraph 85.

86.     Defendants deny the allegations in paragraph 86.

87.     Defendants admit  that on September 19, 2001, James Pearson sent a letter to CDI and other schools from which SFC purchased and/or originated loans and that the  document speaks for itself.  Defendants deny the remaining allegations in paragraph 87.

88.     Based on information learned after April 2002, defendants admit that SFC made forbearance payments on loans to prevent the loans from defaulting.  Defendants did not have knowledge of SFC's practice of making these payments prior to this time. Royal, however, had knowledge that SFC was making such payments and the amount of such payments.   Defendants deny the remaining allegations in paragraph 88 to the extent these allegations are directed at defendants.

89.    Based on information learned after April 2002, defendants admit that SFC provided Royal with Servicer Reports, which contained detailed information about the performance of the SFC loans. These Servicer Reports, which were not provided to defendants, showed that astonishingly high numbers of loans were delinquent and on the verge of default in any given month. These Servicer Reports did not show a corresponding number of student loans defaulting each successive month thereby providing Royal with knowledge that SFC was taking action to prevent loans from defaulting through the making of forbearance payments. Defendants deny the remaining allegations in paragraph 89 to the extent these allegations are directed at defendants.

90.    Based on information learned after April 2002, defendants admit that SFC provided Royal with Servicer Reports, which contained detailed information about the performance of the SFC loans. These Servicer Reports, which were not provided to defendants, showed that astonishingly high numbers of loans were delinquent and on the verge of default in any given month. These Servicer Reports did not show a corresponding number of student loans defaulting each successive month thereby providing Royal with knowledge that SFC was taking action to prevent loans from defaulting through the making of forbearance payments. CDI admits to advancing payments to students as set forth in paragraph 7 above. Defendants deny making payments for students. Defendants deny the remaining allegations in paragraph 90 to the extent these allegations are directed at defendants.

91.    Based on information learned after April 2002, defendants admit that SFC provided Royal with Servicer Reports, which contained detailed information about the performance of the SFC loans. These Servicer Reports, which were not provided to defendants, showed that astonishingly high numbers of loans were delinquent and on the verge of default in

15

any given month. These Servicer Reports did not show a corresponding number of student loans defaulting each successive month thereby providing Royal with knowledge that SFC was taking action to prevent loans from defaulting through the making of forbearance payments. Defendants deny the remaining allegations in paragraph 91 to the extent these allegations are directed at defendants.

92.    Defendants deny the allegations in paragraph 92.

93.    Defendants state that the contracts at issue speak for themselves. Defendants admit that Thomas Gast signed the contract on behalf of each CDI school and that Perry Turnbull signed the contract on behalf of SMS. Defendants deny having any knowledge regarding the manner in which SFC used reserves. Defendants deny the remaining allegations in paragraph 93.

94.    Although prudent due diligence would seem to require review by Royal of such executed documents, defendants do not have information regarding whether Royal requested or was provided with the contracts between SMS and CDI (or other truck driving schools) pursuant to which SFC would purchase and/or originate the very loans which Royal insured. Defendants deny the remaining allegations in paragraph 94 to the extent these allegations are directed at defendants.

95.    Defendants deny making any misrepresentations either directly or indirectly to Royal. Defendants deny that Royal was induced to issue insurance policies by defendants. Based on information learned after April 2002, defendants admit that Royal issued the policies in paragraphs 95(a)-(j) and state that the policies speak for themselves. Defendants deny the remaining allegations in paragraph 95.

96.    Defendants deny making any misrepresentations either directly or indirectly to Royal. Defendants deny acting in concert with SFC and/or Andrew Yao. CDI states that Royal

issued each policy after having an opportunity to conduct due diligence and was in possession of information, of which defendants were unaware, which made it unreasonable for Royal to rely on any representations made by SFC in connection with issuance of each Royal policy and which showed that the SFC loan portfolio was performing poorly. Defendants deny the remaining allegations in paragraph 96 to the extent these allegations are directed to defendants.

97.     Defendants deny making any misrepresentations either directly or indirectly to Royal. Defendants deny acting in concert with SFC and/or Andrew Yao. CDI states that Royal issued each policy after having an opportunity to conduct due diligence and was in possession of information of which defendants were unaware which made it unreasonable for Royal to rely on any representations made by SFC in connection with issuance of each Royal policy and which showed that the SFC loan portfolio was performing poorly. Moreover, the Servicer Reports provided to Royal, which were not provided to defendants, showed that astonishingly high numbers of loans were delinquent and on the verge of default in any given month. These Servicer Reports did not show a corresponding number of student loans defaulting each successive month thereby providing Royal with knowledge that SFC was taking action to prevent loans from defaulting through the making of forbearance payments. Defendants deny the remaining allegations in paragraph 97 to the extent these allegations are directed to defendants.

98.     The allegations in paragraph 98 are not directed to defendants and, therefore, are neither admitted nor denied. To the extent these allegations are directed at defendants, defendants deny the allegations in paragraph 98 and state that SFC disclosed its practice of making forbearance payments to Royal and the amount of these payments, at a minimum, in SFC's financial statements provided to Royal. Royal issued its insurance policies

17

notwithstanding and with full knowledge of this and other information concerning the dismal performance of SFC's student loan portfolio and the abysmal servicing of the student loans by SLS which led to excessively high delinquencies.

99.     The allegations in paragraph 99 are not directed to defendants and, therefore, are neither admitted nor denied. However, based on information learned after April 2002, defendants admit that Yao prepared a cash flow projection for 2001 containing a column referred to as "Royal forbearance" and provided a document concerning cash flow to Royal that did not contain such a column. Defendants further state that neither cash flow projection was provided to defendants at any time prior to April 2002. Furthermore, and as set forth above, SFC nevertheless did not conceal its practice of making forbearance payments or the amounts of these payments from Royal.

100.     Based on information learned after April 2002, Royal acknowledged the poor performance of the SFC loan portfolio and the high level of delinquencies throughout Royal's relationship with SFC. Royal had in its possession information that rendered it unreasonable for Royal to rely on any representations made by SFC during this time period. The remaining allegations in paragraph 100 are not directed to defendants and, therefore, are neither admitted nor denied.

101.     Based on information learned after April 2002, defendants admit that Royal has stated accurately information that was communicated to Royal by representatives of SFC and that this information was not the reason for loan delinquencies. Defendants deny the remaining allegations of paragraph 101.

102.     Based on information learned after April 2002, defendants admit that Royal requested information from SFC during the June 2001 time period regarding the accuracy of the

18

25% maximum default rates. Based on the same information, defendants admit that SFC provided financial modeling to Royal in response. To the extent this information was false, defendants were unaware of the underlying information and did not provide such information to SFC and was unaware that any such information was provided to Royal. Royal was in possession of information that rendered any reliance on this information unreasonable. Defendants deny the remaining allegations of paragraph 102.

103.    Defendants deny that defendants knew about any misrepresentations by SFC and Yao to Royal. Defendants deny having any knowledge of the underlying information provided to Royal that Royal contends was false or that any such information was provided to Royal. To the extent any information was provided to Royal, Royal was in possession of information that rendered any reliance on this information unreasonable. Defendants deny the remaining allegations of paragraph 103 to the extent these allegations are directed at defendants.

104.    Defendants deny that Royal did not have knowledge of SFC's practice of making forbearance payments. The remaining allegations are not directed at defendants and, therefore, are neither admitted nor denied.

105.    Defendants deny committing any "abuses" or "generat[ing] as many loans as possible" without regard to underwriting criteria and deny that defendants were responsible for underwriting the loans purchased and/or originated by SFC. The remaining allegations in paragraph 105 are not directed to defendants and, therefore, are neither admitted nor denied.

106.    Defendants are without knowledge of whether SFC decided to weaken its underwriting criteria. Defendants deny that Yao made any decision regarding underwriting criteria in consultation with CDI. Defendants deny the remaining allegations in paragraph 106.

107. Based on information learned after April 2002, defendants admit that SFC prepared a memorandum dated October 22, 2001. Defendants admit that this memorandum alleges issues regarding the quality of the loans purchased and/or originated by SFC. Defendants deny the remaining allegations of paragraph 107 and the contents and allegations of the SFC memorandum referenced therein.

108. Defendants are without knowledge regarding the allegation in paragraph 108 and, therefore, neither admit nor deny the allegation and state that neither the memorandum nor its contents were disclosed to defendants.

109. Defendants deny the allegations in the memorandum referenced in paragraph 107 and admit that SFC continued to purchase and/or originate loans until March 2002 when SFC failed to fund in excess of $4 million in student loans with respect to CDI students.

110. Based on information learned after April 2002, defendants admit Yao disclosed SFC's practice of making forbearance payments to a third-party lender. SFC provided Royal with information concerning its practice of making forbearance payments and the amount of forbearance payments well prior to this date. The Servicer Reports provided to Royal also showed astonishingly high amounts of delinquent loans without a corresponding number of loans proceeding to default in each successive period. This fact showed Royal that SFC was taking some action to prevent loans from going to default, namely by making forbearance payments. Defendants deny the remaining allegations in paragraph 110.

111. Defendants deny the allegations in paragraph 111.

112. Defendants deny the allegations in paragraph 112.

113. Defendants do not have information in their possession regarding the default rate of SFC's loan portfolio and, therefore, deny these allegations and specifically deny being

provided with such information at any time prior to April 2002. To the extent defendants learned

any information concerning SFC's default rates, it has been through the course of discovery and

disclosures made in SFC-related litigation. Defendants further state that SFC's failure to follow

its own underwriting criteria and SLS's abysmal servicing of student loans in the SFC loan

portfolio contributed to any delinquency and/or default rate and that defendants were not aware

of such facts until after April 2002. Defendants deny the remaining allegations in paragraph 113.

114.    Defendants do not have information or knowledge sufficient to admit or deny the

allegations in this paragraph and, therefore, defendants deny these allegations.

115.    Defendants deny the allegations in paragraph 115 as these allegations relate to

defendants.

116.    Defendants deny the allegations in paragraph 116.

117.    CDI states that the website speaks for itself and defendants deny the allegations in

paragraph 117 to the extent these allegations are inconsistent with the contents of the website.

118.    CDI states that the website speaks for itself and defendants deny the allegations in

paragraph 118 to the extent these allegations are inconsistent with the contents of the website.

119.    CDI states that the website speaks for itself and defendants deny the allegations in

paragraph 119 to the extent these allegations are inconsistent with the contents of the website.

120.    CDI states that the website speaks for itself and defendants deny the allegations in

paragraph 120 to the extent these allegations are inconsistent with the contents of the website.

121.    Defendants admit the allegations in paragraph 121 as generally stating the manner

in which the CDI schools were referenced in discussions with SFC. Defendants deny the

remaining allegations in paragraph 121.

122.    CDI states that the filing referenced in paragraph 122 speaks for itself and defendants deny the allegations in paragraph 122 to the extent these allegations are inconsistent with the contents of this filing.

123.    Defendants admit that Thomas Gast has 100% ownership of Commercial Driver Institute, Inc., 51% ownership of Truck Driver Institute, Inc., 20% ownership of TDI Indiana, Inc., 100% ownership of TDI Florida, TDI Mississippi, TDI Alabama, and Texas TDI and 84% ownership of CDI Services, Inc. To the extent the allegations in paragraph 123 are inconsistent with the foregoing, defendants deny these allegations. Defendants admit that Thomas Gast holds the positions referenced in paragraph 123. Defendants deny the remaining allegations of paragraph 123.

124.    Defendants admit the allegations in paragraph 124.

125.    Defendants admit that paragraph 125 accurately states the officers and directors of the various defendants.

126.    Defendants admit the allegations in paragraph 126.

127.    Defendants admit the allegations in paragraph 127.

128.    CDI states that the website speaks for itself and defendants deny the allegations in paragraph 128 to the extent these allegations are inconsistent with the contents of the website.

129.    Defendants state that the complaint referenced in paragraph 129 speaks for itself and deny the allegations in paragraph 129 to the extent these allegations are inconsistent with the complaint referenced therein.

130.    Defendants state that the filings referenced in paragraph 130 speak for themselves and deny the allegations in paragraph 130 to the extent these allegations are inconsistent with the filings referenced therein.

131.    Defendants deny the allegations in paragraph 131.

132.    Defendants state that the complaint referenced in paragraph 132 speaks for itself and deny the allegations in paragraph 132 to the extent these allegations are inconsistent with the complaint referenced therein.

133.    Defendants state that the complaint referenced in paragraph 133 speaks for itself and deny the allegations in paragraph 133 to the extent these allegations are inconsistent with the complaint referenced therein. Defendants admit that some portion of the payments made by SFC pursuant to these contracts were sent to Tennessee. Defendants deny the remaining allegations of paragraph 133.

134.    Defendants admit the allegations in paragraph 134.

135.    Defendants admit the allegations in the first sentence of paragraph 135 and deny the allegations in the second sentence of paragraph 135.

136.    Defendants admit that inter-company loans have been made among the corporate defendants for legitimate purposes and on reasonable terms in the ordinary course of business. These loans are disclosed in CDI's financial statements which speak for themselves. Defendants deny the remaining allegations in paragraph 136.

137.    Defendants deny the allegations in paragraph 137.

138.    Defendants deny the allegations in paragraph 138.

139.    Defendants deny the allegations in paragraph 139.

<u>CLAIMS FOR RELIEF</u>

<u>COUNT I</u>

140.    Defendants incorporate by reference their responses to paragraphs 1 through 139 of this Complaint as if fully restated herein.

141.    Defendants deny the allegations in paragraph 141.

142.    Defendants deny the allegations in paragraph 142.

143.    Defendants deny the allegations in paragraph 143.

144.    Defendants deny the allegations in paragraph 144.

145.    Defendants deny the allegations in paragraph 145.

146.    Defendants admit that SFC purchased and/or originated loans from CDI students. Defendants deny that defendants were involved in any "Enterprise" with SFC, SMS or any other party and deny the remaining allegations in paragraph 146.

147.    Defendants deny the allegations in paragraph 147.

148.    Defendants deny the allegations in paragraph 148.

149.    The allegations in paragraph 149 are not directed to defendants and, therefore, are neither admitted nor denied.

150.    The allegations in paragraph 150 are not directed to defendants and, therefore, are neither admitted nor denied.

151.    The allegations in paragraph 151 are not directed to defendants and, therefore, are neither admitted nor denied.

152.    The allegations in paragraph 152 are not directed to defendants and, therefore, are neither admitted nor denied.

153.    Defendants admit that Thomas Gast and Joseph Gast have an ownership interest in the CDI corporate entities as set forth herein previously. Defendants admit that the CDI corporate defendants, with the exception of CDI Services, own and operate trucking schools. Defendants deny the remaining allegations in paragraph 153.

154.    Defendants deny the allegations in paragraph 154.

24

155.    Defendants deny the allegations in paragraph 155.

156.    Defendants admit that CDI personnel decide school-related issues.  Defendants deny the remaining allegations in paragraph 156.

157.    Defendants deny the allegations in paragraph 157.

158.    Defendants deny the allegations in paragraph 158.

159.    Defendants deny the allegations in paragraph 159.

160.    The allegations in paragraph 160 are not directed to defendants and, therefore, are neither admitted nor denied.

161.    Defendants deny that paragraph 161(a)-(h) constitutes an example of defendants' involvement in any sort of "fraudulent scheme" or "Enterprise" and defendants deny involvement in either of the foregoing.

a.    The allegations in paragraph 161(a) are not directed to defendants and, therefore, defendants neither admit nor deny these allegations except that defendants deny that such allegations show that defendants were involved in a "fraudulent scheme" or "Enterprise."

b.    The allegations in paragraph 161(b) are not directed to defendants and, therefore, defendants neither admit nor deny these allegations except that defendants deny that such allegations show that defendants were involved in a "fraudulent scheme" or "Enterprise."

c.    The allegations in paragraph 161(c) are not directed to defendants and, therefore, defendants neither admit nor deny these allegations except that defendants deny that such allegations show that defendants were involved in a "fraudulent scheme" or "Enterprise."

d.    The allegations in paragraph 161(d) are not directed to defendants and, therefore, defendants neither admit nor deny these allegations except that defendants deny that such allegations show that defendants were involved in a "fraudulent scheme" or "Enterprise."

25

e.    The allegations in paragraph 161(e) are not directed to defendants and, therefore, defendants neither admit nor deny these allegations except that defendants deny that such allegations show that defendants were involved in a "fraudulent scheme" or "Enterprise." Defendants also state that SFC did not conceal and did disclose its practice of making forbearance payments to Royal and that SFC provided information concerning the making of forbearance payments and the amount of forbearance payments to Royal.

f.    CDI admits that it received communications via facsimile from SFC. Defendants deny the remaining allegations in paragraph 161(f).

g.    CDI admits that it advanced payments to certain students as set forth in paragraph 7 above. Defendants deny making payments for students. Defendants deny that Royal did not have knowledge of SFC's practice of making forbearance payments and the amount of these payments. The remaining allegations in this paragraph are not directed to defendants and, therefore, neither admit nor deny these allegations except that defendants deny that such allegations show that defendants were involved in a "fraudulent scheme" or "Enterprise."

h.    The allegations in paragraph 161(h) are not directed to defendants and, therefore, defendants neither admit nor deny these allegations except that defendants deny that such allegations show that defendants were involved in a "fraudulent scheme" or "Enterprise." Defendants also state that SFC did not conceal and did disclose its practice of making forbearance payments to Royal and that SFC provided information concerning the making of forbearance payments and the amount of forbearance payments to Royal.

162.    The allegations in paragraph 162 are not directed to defendants and, therefore, defendants neither admit nor deny these allegations except that defendants deny that such allegations show that defendants were involved in a "fraudulent scheme" or "Enterprise."

26

163.    The allegations in paragraph 163 are not directed to defendants and, therefore, defendants neither admit nor deny these allegations except that defendants deny that such allegations show that defendants were involved in a "fraudulent scheme" or "Enterprise."

164.    Defendants deny the allegations in paragraph 164.

165.    CDI admits that it advanced payments to certain students as stated in paragraph 7. Defendants deny making payments for students. Defendants deny that the foregoing or any allegation in paragraph 165 is an example of the furtherance of any sort of "fraudulent scheme" or "Enterprise." Defendants deny the remaining allegations in paragraph 165.

166.    Defendants deny the allegations in paragraph 166.

167.    Defendants deny the allegations in paragraph 167.

168.    Defendants deny the allegations in paragraph 168.

169.    Defendants deny the allegations in paragraph 169.

170.    Defendants deny the allegations in paragraph 170.

171.    Defendants deny the allegations in paragraph 171.

### COUNT II

172.    Defendants incorporate by reference their responses to paragraphs 1 through 171 of this Complaint as if fully restated herein.

173.    Defendants deny the allegations in paragraph 173.

174.    Defendants deny the allegations in paragraph 174.

175.    Defendants deny the allegations in paragraph 175.

176.    Defendants deny the allegations in paragraph 176.

177.    Defendants deny the allegations in paragraph 177.

178.    Defendants deny the allegations in paragraph 178.

179.    Defendants deny the allegations in paragraph 179.

180.    Defendants deny the allegations in paragraph 180.

### COUNT III

181.    Defendants incorporate by reference their responses to paragraphs 1 through 180 of this Complaint as if fully restated herein.

182.    Defendants deny the allegations in paragraph 182.

183.    Defendants deny the allegations in paragraph 183.

184.    Defendants deny the allegations in paragraph 184

185.    Defendants deny the allegations in paragraph 185..

186.    Defendants deny the allegations in paragraph 186.

187.    Defendants deny the allegations in paragraph 187.

188.    Defendants deny the allegations in paragraph 188.

189.    Defendants deny the allegations in paragraph 189.

190.    Defendants deny the allegations in paragraph 190.

### COUNT IV

191.    Defendants incorporate by reference their responses to paragraphs 1 through 191 of this Complaint as if fully restated herein.

192.    Defendants deny the allegations in paragraph 192.

193.    Defendants deny the allegations in paragraph 193.

194.    Defendants deny the allegations in paragraph 194.

195.    Defendants deny the allegations in paragraph 195.

196.    Defendants deny the allegations in paragraph 196.

197.    Defendants deny the allegations in paragraph 197.

198. Defendants deny the allegations in paragraph 198.

199. Defendants deny the allegations in paragraph 199.

200. Defendants deny the allegations in paragraph 200.

## COUNT V

201. Defendants incorporate by reference their responses to paragraphs 1 through 200 of this Complaint as if fully restated herein.

202. Defendants deny the allegations in paragraph 202.

203. Defendants deny the allegations in paragraph 203.

204. Defendants deny the allegations in paragraph 204.

205. Defendants deny the allegations in paragraph 205.

206. Defendants deny the allegations in paragraph 206.

207. Defendants deny the allegations in paragraph 207.

## COUNT VI

208. Defendants incorporate by reference their responses to paragraphs 1 through 207 of this Complaint as if fully restated herein.

209. Defendants deny the allegations in paragraph 209.

210. Defendants deny the allegations in paragraph 210.

211. Defendants deny the allegations in paragraph 211.

212. Defendants deny the allegations in paragraph 212.

213. Defendants deny the allegations in paragraph 213.

214. Defendants deny the allegations in paragraph 214.

215. Defendants deny the allegations in paragraph 215.

216. Defendants deny the allegations in paragraph 216.

217.    Defendants deny the allegations in paragraph 217.

218.    Defendants deny the allegations in paragraph 218.

219.    Defendants deny the allegations in paragraph 219.

### COUNT VII

220.    Defendants incorporate by reference their responses to paragraphs 1 through 219 of this Complaint as if fully restated herein.

221.    Defendants admit that the defendants to Count VII entered into one or more contracts with SMS.

222.    Defendants state that the contracts signed by the defendants speak for themselves. Defendants deny the allegations in paragraph 222 to the extent these allegations are inconsistent with or an incomplete statement of the contracts at issue and deny the remaining allegations of paragraph 222.

223.    Defendants admit the allegations in paragraph 223 to the extent these allegations are consistent with the actual contracts executed by the defendants to this Count.

224.    Defendants deny the allegations in paragraph 224.

225.    Defendants admit that the contracts signed by the defendants speak for themselves. Defendants deny the allegations in paragraph 225 to the extent these allegations are inconsistent with or an incomplete statement of the contracts at issue and deny the remaining allegations of paragraph 225.

226.    Defendants admit the allegations in paragraph 226 to the extent these allegations are consistent with the actual contracts executed by the defendants to this Count. Defendants deny the remaining allegations of paragraph 226.

227.    Defendants deny the allegations in paragraph 227.

30

228.    Defendants deny the allegations in paragraph 228.

229.    Defendants deny the allegations in paragraph 229.

230.    Defendants deny the allegations in paragraph 230.

231.    All allegations not specifically admitted or denied in this Answer are hereby

denied.

### JURY DEMAND

232.    Defendants demand a jury to try this cause.

In response to the "WHEREFORE" paragraph, defendants deny that plaintiff Royal is

entitled to any judgment against defendants, deny that plaintiff Royal is entitled to any of the

relief it requests, including any claim for damages, treble damages, punitive damages, attorneys'

fees and/or costs, and pray that defendants be awarded their costs and attorneys' fees incurred in

defending this action and other such relief as the Courts deems proper.

## ADDITIONAL DEFENSES AND
## AMENDED COUNTERCLAIM AND CROSS-CLAIM

For their Additional Defenses against Royal, defendants Commercial Driver Institute, Inc., Truck Driver Institute, Inc., Truck Driver Institute of Florida, Inc., Texas Truck Driver Institute, Inc., Truck Driver Institute of Indiana, Inc., Truck Driver Institute of Mississippi, Inc. Truck Driver Institute of Alabama, Inc., CDI Services, Inc. (referred to for purposes of these Additional Defenses unless otherwise stated as "CDI"), Thomas J. Gast and Joseph M. Gast, and for their Amended Counterclaim and Cross-Claim, Commercial Driver Institute, Inc., Truck Driver Institute, Inc., Truck Driver Institute of Florida, Inc., Texas Truck Driver Institute, Inc., and Truck Driver Institute of Indiana, Inc. (referred to collectively for purposes of the CDI Amended Counterclaim and Cross-Claim as either "CDI" or "CDI Counter-Plaintiffs") state as follows:

### FACTUAL BACKGROUND

#### Summary

1.      This action stems from the massive and complex fraudulent scheme perpetrated on CDI by the Student Finance Corporation ("SFC") and its affiliates, including Student Marketing Services, LLC, and Student Loan Services, LLC, (collectively referred to herein as the "SFC Entities") at the direction of Andrew Yao, Gary Hawthorne and James Pearson (collectively the "SFC Control Group" and together with the SFC Entities, the "SFC Defendants"). The SFC Defendants engaged in a pervasive and complex scheme to defraud CDI on a vast scale by representing to CDI that the SFC Entities were financially sound, with the financial ability to fund and/or purchase student loans, when in fact that was not the case. At the time of each of the fraudulent representations and omissions made by the SFC Defendants, the

32

SFC Defendants knew that they were in fact operating a financially unsound enterprise that was essentially a sham operation, which could (and, in fact, did) come crashing down.

2.    For its part, Royal Indemnity Company ("Royal") provided insurance to the SFC Defendants which allowed the fraud scheme to flourish. Without issuance of this insurance by Royal, the SFC Defendants would not have been able to perpetrate their fraud on CDI. In exchange for providing this insurance, Royal received in excess of thirty-four million dollars ($34 million) in insurance premiums. Moreover, based on the information provided to Royal by the SFC Defendants, Royal knew of the fraudulent payments that kept SFC's scheme alive, knew of SFC's financial instability and knew that the SFC Defendants were breaching their duties to CDI.

3.    As set forth in greater detail below, internal Royal documents. and communications between SFC and Royal show that: Royal knew of the "extremely high delinquency rates [on the student loans held by SFC]. . . in the range of 65%"; that Royal was "in a lot of turmoil" regarding the account as early as April 2001; that Royal's SFC account "was a new revelation every day"; that if Royal did not continue to issue policies as of April 2001 that Royal "would surely get whacked"; that Royal was "get[ting] completely crucified on the build up on of the excess spread [reserve]"; that as of July 2001, if SFC did not find an insurance replacement "[SFC would] be dead in the water and so very well may we [Royal]"; that SFC could not "borrow without the insurance guarantee and [SFC] would not keep coming to us [Royal] if they had another carrier on the line"; and that personnel at Royal considered themselves to be "idiots" for continuing to re-certify SFC for additional insurance policies. Most shockingly, in an internal Royal email of December 4, 2001, a Royal executive raised the issue of how long Royal would keep SFC's business alive given what they knew as of that date

33

concerning SFC, stating: "And given their [SFC's] business model, how much longer we might want to keep them in business." (Emphasis supplied.) This and other information discussed below demonstrates that Royal knew of the dismal financial performance of the SFC loan portfolio and, consequently, SFC's financial condition. Royal also knew the critical role of the insurance policies issued by Royal to SFC played in SFC's business model and that SFC continued to represent itself to schools such as CDI as a viable business through the on-going purchase and/or origination of student loans. As such, Royal aided and abetted the SFC Defendants in the commission of their fraud causing damages to CDI.

## PARTIES

4.      Truck Driver Institute, Inc., is a corporation organized and existing under the laws of the State of Tennessee, with its principal place of business in Christiana, Rutherford County, Tennessee.

5.      Truck Driver Institute of Florida, Inc., is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Christiana, Rutherford County, Tennessee.

6.      Texas Truck Driver Institute, Inc., is a corporation organized and existing under the laws of the State of Texas, with its principal place of business in Christiana, Rutherford County, Tennessee.

7.      Truck Driver Institute of Indiana, Inc., is a corporation organized and existing under the laws of the State of Indiana, with its principal place of business in Christiana, Rutherford County, Tennessee.

34

8.     Commercial Driver Institute, Inc., is a corporation organized and existing under the laws of the State of Indiana, with its principal place of business in Christiana, Rutherford County, Tennessee.

9.     The entities in paragraphs 4-8 are referred to herein as "CDI" or the "CDI Counter-Plainitffs" for purposes of this pleading. CDI (an entity that, for purposes of this pleading, includes the CDI Counter-Plaintiffs) operates and manages numerous schools located throughout the country that provide training and instruction to semi-tractor-trailer drivers. The financial affairs of the schools operated by CDI are managed and controlled from CDI's principal offices in Christiana, Rutherford County, Tennessee. Many students enrolled in CDI's schools receive financial assistance, including loans provided by CDI's affiliates and by third-party lenders.

10.     SFC—not a party to this action—is a corporation organized and existing under the laws of the State of Pennsylvania. SFC is currently the subject of a Chapter 7 Bankruptcy proceeding in the United States Bankruptcy Court for the District of Delaware.

11.     Cross-Defendant *Student Marketing Services, LLC* ("SMS"), is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at Five Radnor Corporate Center, Suite 501, 100 Matsonford Road, Radnor, Pennsylvania. SMS is an affiliate of SFC and these entities share and/or have shared officers, directors and shareholders.

12.     Cross-Defendant Student Loan Services, LLC ("SLS"), is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at *Five Radnor Corporate Center, Suite 501, 100 Matonsford Road, Radnor,*

35

Pennsylvania. SLS is an affiliate of SFC and these entities shared officers, directors and shareholders. SMS and SLS are a part of the Student Finance Group.

13.     SFC and the SFC Entities were providers of loans to students enrolled at colleges, universities and career or technical schools, including those operated by CDI. The loans assisted students with the payment of their tuition and living expenses during their study at these institutions.

14.     Cross-Defendant Andrew N. Yao ("Yao") is a resident of Pennsylvania whose business address is 5 Radnor Corporate Center, Suite 501, 100 Matsonford Road, Radnor, PA 19087. At all times relevant to this action, Yao owned and controlled SFC and was the 100% owner of SFC and SMS. At all relevant times to this action, Yao was the 70% direct owner of SLS and indirectly owned the remaining 30% through his ownership of SFC. At all relevant times to this action, he was an officer and director of and controlled all three SFC Entities. At all times relevant to this action, Yao was engaged in business, and conspired to commit torts, in the State of Tennessee.

15.     Cross-Defendant Gary J. Hawthorne ("Hawthorne") is upon information and belief a resident of Pennsylvania whose business address is 5 Radnor Corporate Center, Suite 501, 100 Matsonford Road, Radnor, PA 19087. Hawthorne was the President and Chief Operating Officer of SFC and SLS. At all material times to this action, Hawthorne was engaged in business, and conspired to commit torts, in the State of Tennessee.

16.     Cross-Defendant Jim Pearson ("Pearson") is a resident of Pennsylvania whose home address is 911 Greene Countrie Drive, West Chester, Pennsylvania 19380. Pearson was the Vice-President of SMS. At all material times to this action, Pearson was engaged in business, and conspired to commit torts, in the State of Tennessee.

36

17.     Counter-defendant Royal Indemnity Company ("Royal") is a Delaware capital stock insurance company with its principal place of business at 9300 Arrowpoint Boulevard, Charlotte, North Carolina 28273-8135.

### The Structure of the SFC Defendants' Fraudulent Enterprise

18.     As set forth more fully herein, Yao and the SFC Defendants carried out a complex and massive scheme, using the SFC Entities as their vehicle, to defraud CDI and others. Royal aided and abetted Yao and the SFC Defendants in the commission of this fraud.

19.     The SFC Entities were founded, owned, and operated by Yao. Yao was the Chairman and Chief Executive Officer of the SFC Entities. In creating and developing his "business enterprise," Yao was assisted by Perry Turnbull ("Turnbull"), Hawthorne and Pearson, who formed the control group for the SFC Entities' operations. Together, they fashioned and operated the vehicle by which CDI, along with a number of other schools, were defrauded and substantially harmed.

20.     In 1992, Yao incorporated SFC. Prior to this time, Yao had owned a career college and had experience in the credit card industry, which provided him with both an understanding of how post-secondary career training programs operated and how the securitization markets worked. Additionally, Yao's contacts from the credit industry provided him with access to loan-funding sources.

21.     Initially, Yao directed SFC's activities towards traditional lending arrangements where SFC purchased bundles of pre-arranged student loan accounts at a discounted rate using funds that it had borrowed from commercial banks and private investors.

22.     As SFC expanded, its method of financing changed. With expansion, SFC financed its operation through "securitized" arrangements where it could raise financing through the sale of asset-backed securities in the private securities markets.

23.     The securitization process began with SFC's acquisition of student loans at a discount, using funds from a warehouse line of credit provided to certain of SFC's affiliates. SFC, through its affiliated entity, would pool the student loan accounts. The warehouse lender would obtain a security interest in the acquired student loan accounts.

24.     To complete the securitization transaction, SFC would sell the pooled student loan accounts to an affiliated bankruptcy remote entity. The bankruptcy remote entity would transfer the student loan accounts to a trust created by the bankruptcy remote entity. To fund the bankruptcy remote entity's purchase of the student loan accounts from SFC, the trust would sell either fixed-income trust certificates ("Certificates") or floating-rate notes ("Notes") to investors.

25.     Both the Certificates and Notes were backed by the principal and interest received from the student loan accounts and represented an undivided interest in the student loan accounts transferred to the trusts. The Certificates and Notes were sold to investors in private placement transactions for which private placement memoranda were issued. The private placement memoranda included such information as the default rates on the student loan accounts.

26.     SFC would obtain credit risk insurance covering the underlying obligations to make the Certificates or Notes more attractive to investors by providing additional security for payment.

27.     SFC completed its first securitized transactions in 1996 by selling asset-backed Certificates through an entity called SFC Grantor Trust. These Certificates were backed by a pool of approximately 1,056 loans to truck driving students that SFC acquired or made and a credit risk insurance policy issued by AIU Insurance Company. The insured under the policy was SFC Acceptance LLC and the beneficiary was Bankers Trust Company, which was the

trustee. Including this transaction, SFC or the SFC Entities generated approximately 10,000 student loans from 1994 to 1998.

28.    A different trust was created for each subsequent securitization. SFC Grantor Trust, Series 2000-1, SFC Grantor Trust, Series 2000-2, SFC Grantor Trust, Series 2000-3, SFC Grantor Trust, Series 2000-4, SFC Grantor Trust, Series 2001-1, SFC Grantor Trust, Series 2001-2, SFC Grantor Trust, Series 2001-3, and SFC Owner Trust 2001A-1 (the "Trusts") were created to complete the subsequent securitization transactions. Royal issued the credit risk insurance necessary for each of these securitizations.

29.    Using the proceeds of the securitizations, SFC would pay the outstanding amounts owed to the warehouse lenders for SFC's acquisition of the student loan accounts. Thus, through securitization, SFC replenished its warehouse lines of credit.

**SFC's Solicitation of CDI and CDI's Participation in the SFC Student Loan Program**

30.    In 1996, Turnbull and Pearson began contacting CDI in Tennessee and elsewhere seeking to market SFC's loan programs to CDI.

31.    After approximately one year of unsolicited sales calls and further information from SFC about its loan programs, CDI entered into written agreements with SFC in Rutherford County, Tennessee, pursuant to which SFC agreed to provide loans to CDI's students and to purchase certain tuition installment agreements entered into between CDI and their students.

32.    Despite having entered into the contract with SFC, students at CDI's truck driving schools continued to rely on other sources in financing their tuition at CDI's schools. For this reason, in November of 1997, Pearson traveled to Christiana, Rutherford County, Tennessee to persuade CDI to begin using SFC's loan and marketing services program.

33.    The loan programs that the SFC Entities operated and that were marketed and sold to CDI in Tennessee were structured so that depending on the state in which CDI's various

39

schools are located, the SFC Defendants used one of two methods to provide financing to CDI's students: a retail installment contract or a promissory note, both usually unsecured.

34.    With respect to the retail installment contracts, CDI was provided with applications to be completed by CDI's students, as well as form retail installment agreements to be entered into between CDI and their students. CDI would forward the completed application to SMS. SMS would then review the application to determine whether to approve the application. The decision of whether to approve the application was made solely by the SFC Defendants and based solely on the SFC Defendants' underwriting criteria, which was not shared with CDI. If SMS approved the purchase of the contracts, CDI would assign the contracts to one of the SFC Entities who would then pay CDI the face amount of the contracts, discounted by a contractually agreed upon discount rate and reserve percentage based upon the student's credit scores.

35.    With respect to the promissory notes, the loan program was structured so that CDI's students completed a loan application provided by the SFC Defendants. The completed application was then forwarded to SMS for review. SMS would then review the application to determine whether to approve the application.  The decision of whether to approve the application was made solely by the SFC Defendants and based solely on the SFC Defendants' underwriting criteria, which was not shared with CDI. If SMS approved an application, the student then executed a promissory note payable to SFC. CDI then forwarded the completed promissory note to SMS, which would then pay CDI the face amount of the loan, again discounted by a contractually agreed upon rate and reserve percentage based upon the student's credit score.

36.     At some point in 2000, after operating under the initial May 1997 agreements, Pearson and Turnbull approached CDI and raised the possibility of CDI entering into new Student Loan Processing Agreements and Student Loan Purchase Agreements with SMS for the various schools operated by CDI. Pearson told CDI that the loan portfolio was performing better than expected and that SMS wanted to increase the amount of money being forwarded to CDI's schools, but that it required CDI to sign new agreements. The SFC Defendants forwarded the proposed new agreements to CDI, which indicated additional credit tiers with increased "payouts" to the school. In reality, the SFC loan portfolio was performing poorly at this time as a result of the SFC Defendants' failure to follow appropriate underwriting criteria and to service the SFC loan portfolio properly.

37.     CDI entered into new Student Loan Processing Agreements and Student Loan Purchase Agreements with SMS on October 19, 2000. The Student Loan Purchase Agreements governed the SFC Entities' purchases of the installment contracts entered into between CDI and its students. The Student Loan Processing Agreements governed the promissory notes to be executed by CDI's students payable to SFC. Copies of the Student Loan Purchase Agreements and the Student Loan Processing Agreements are attached hereto collectively as Exhibit A.

38.     Pursuant to the parties' various agreements and prior course of dealing, the SFC Defendants would fund the amounts owing for the installment contracts and promissory notes on the 20th day of each month for those completed agreements that the SFC Defendants received during the first half of the previous month. Additionally, the SFC Defendants would pay CDI on the 25th day of each month for those agreements that were received during the second half of the previous month. Given that the SFC Defendants were able to continue perpetuating their fraud as will be discussed herein and thus hide the true financial instability of the SFC Entities from

41

CDI, CDI continued to forward retail installment contracts or promissory notes to the SFC Defendants in reliance on the misrepresented financial condition of SFC.

39.    The student promissory notes and/or retail installment contracts purchased by the SFC Defendants and insured by Royal contained a section entitled "Agreement to Advanced Funds and Repayment of Advanced Funds to School." This section provided: "ADVANCE OF FUNDS:  If you do not pay you scheduled payment to Student Finance Corporation, its successors and/or assigns (hereinafter referred to as the "Holder"), on the payment due date, [the school] may at its sole discretion and from time to time, advance funds to the Holder to cover such payment.. This advance of funds by the School will be reflected as a payment on your next bill. You agree that you will repay this advance of funds to the Holder upon its demand . . . ." These Promissory Notes and Retail Installment Contracts were assigned by schools to SFC and insured by Royal.  Once CDI assigned these loans to SFC, CDI had no involvement with or knowledge of any payments being made on the loans and no involvement with or knowledge of the servicing or monitoring of the loans whatsoever.

**The SFC Entities' Failure to Service Adequately the Loans Purchased and Originated and the SFC Defendants' Use of Forbearance Payments**

40.    In connection with the purchase and/or origination of a student loan, the SFC Defendants and SLS specifically had the obligation of servicing the loan. Servicing involved undertaking collection efforts and dealing with delinquent and defaulted student loan accounts.

41.    Upon information and belief, the servicing of the student loans by the SFC Defendants was abominable. The SFC Defendants failed to follow appropriate servicing guidelines and practices.

42.    The SFC Defendants' failure to service the student loan accounts properly led to high delinquencies and defaults among the SFC student loan portfolio.

43.    Unbeknownst to CDI, the SFC Defendants also failed to follow appropriate credit review and underwriting procedures in approving student loans for purchase and/or origination. As a result of the foregoing, SFC originated or acquired numerous student loans that eventually went into default.

44.    To avoid classifying student loans as "in default" as a result of the SFC Defendants' failure to service the student loans properly and to follow proper underwriting criteria, the SFC Defendants made payments on these loans from "school reserves," over which the SFC Defendants exercised complete control, and from their own funds. The SFC Defendants treated such payments, which it labeled "Forbearance Payments," as though they had been made by the student borrowers themselves.

45.    By using Forbearance Payments, the SFC Defendants manipulated and artificially depressed the default rates on its student loan portfolio. SFC hid its practice of using Forbearance Payments from CDI and, for the most part, from SFC's investors and creditors.

43