Royal, however, was aware of this practice and the amounts of forbearance payments being made by SFC.

46.    SFC used its practice of making Forbearance Payments as a means to artificially inflate the performance of its loan portfolio to investors. The appearance of a performing loan portfolio was critical to SFC's completion of various securitization transactions over time. These securitization transactions allowed SFC to have continued access to capital to purchase and/or originate student loans with respect to students attending trucking schools. SFC's use of Forbearance Payments, therefore, allowed SFC to inflate artificially its own financial condition with respect to its contracts with CDI. CDI relied on SFC's apparently healthy financial condition in continuing to allow SFC to purchase and/or originate student loans with respect to CDI students for which SFC did not have the financial means to pay.

47.    As a result of SFC's failure to follow appropriate credit review procedures and to properly service the loans by making appropriate collections efforts as it was obligated to do, over time, the number of borrowers failing to make timely payments on their student loans began to rise. With the rise in delinquency rates, the rate and amount of Forbearance Payments increased.

48.    In 1999, the total amount of Forbearance Payments was approximately $2 million. In 2000, it increased to $9.5 million. In the year preceding the filing of SFC's bankruptcy, the amount of Forbearance Payments had increased to $45 million.

49.    Proceeds from new loans and securitizations were being used to make Forbearance Payments, rather than to fund the obligations of SFC and the SFC Entities. As a result of the SFC Defendants' use of Forbearance Payments, SFC and the SFC Entities began experiencing extreme financial difficulties.

44

50.    From May 2001 through March 2002, using a *balance sheet test*, with the exception of October and November 2001, the SFC Entities had a negative equity.

51.    Until September 2001, the SFC Entities outwardly appeared to be able to meet their contractual obligations to CDI and funded the amounts owing for the installment contracts and promissory notes as required. In September 2001, the SFC Entities were unable to fund payments for student loan agreements from trucking schools including CDI. Despite its inability to fund student loan accounts, the SFC Defendants sought to continue their practice of making Forbearance Payments.

52.    On or about September 19, 2001, Pearson sent CDI an e-mail stating that defendants: "will be unable to fund according to our regular schedule this month. This turn off [*sic.*] events was unexpected and beyond all of our control [a reference to the events of September 11, 2001], and this temporary disruption in our schedule comes in spite our [sic] best efforts with our affiliates in the financial community." The e-mail then reassured plaintiffs that "*we do not have a liquidity or financial problem....*" (Emphasis added). At the close of this e-mail, Pearson provided even further reassurance of the SFC Defendants' stability and ability to fund CDI's promissory notes and/or retail installment contracts by including a funding calendar that extended fifteen months to December of 2002. In this e-mail, the SFC Defendants represented that the two February 2002 funding dates would be the 20th and 25th. A copy of the September 19, 2001 e-mail is attached hereto as Exhibit B. Unbeknownst to CDI, which still believed that the SFC Entities were a viable and legitimate business, SFC Defendants' sham operation had started to unravel.

53.    On or about October 22, 2001, the collections supervisor of SLS prepared a memorandum on "Asset Quality Issues," which was distributed to Yao, Hawthorne and Turnbull,

among others.  This memorandum reflected the deterioration of SFC's portfolio of student loan accounts as a result of the SFC Entities' failure to follow their own underwriting criteria in determining whether to purchase or originate student loans.  This memorandum was never shared with CDI.

54.    On or about December 19, 2001, the SFC Defendants provided additional assurance to CDI that the SFC Entities were financially stable and able to continue funding the promissory notes and/or retail installment contracts that CDI forwarded to them for funding.  On that day, Pearson wrote a letter to CDI introducing them to a new program called *Moving On*. Pearson's letter stated: "I look forward to speaking with you soon, and to working together to help your students start *Moving On* to a brighter future."  Unbeknownst to CDI, who still believed that the SFC Entities were a viable and legitimate business, the SFC Defendants' scheme was in the process of collapsing.  A copy of the December 19, 2001 letter is attached hereto as Exhibit C.

55.    By the end of 2001 or early 2002, upon information and belief, the SFC Defendants' massive scheme was collapsing and Yao and the other members of the Control Group and the SFC Entities lacked the funds to continue the SFC Defendants' operation including the making of Forbearance Payments.  The SFC Defendants' pattern of misrepresentation and fraud had caught up with them and they were experiencing severe and significant financial problems.

56.    During this time, however, the SFC Defendants caused SMS to transmit acceptance of 926 separate retail installment contracts and promissory notes for which applications had been submitted to the SFC Defendants by CDI.  Acceptance of these instruments was transmitted to CDI via the telephone wires, using either electronic mail or

46

facsimile. At the time of each of these acceptances, the SFC Defendants knew or should have known that the SFC Entities were insolvent and lacked the financial ability to fund these loans. The amount of each of these loans and the dates of the acceptances are set forth on Exhibit D.

57.    Following the acceptance of these instruments, and in reliance on the SFC Defendants' representations that the SFC Entities were legitimate enterprises with the financial ability to fund these loans, in late 2001 and early 2002, CDI forwarded four hundred four (404) retail installment contracts entered into between CDI and their students in the total face amount of Two Million Seven Hundred Seventy Four Thousand One Hundred Sixty Nine Dollars ($2,774,169) (the "Installment Contracts") and five hundred twenty two (522) promissory notes payable to SFC in the total face amount of Three Million Five Hundred Thirty Five Thousand Four Hundred Forty Six Dollars ($3,535,446) (the "Promissory Notes") to defendants.

58.    Pursuant to the parties' agreements, the SFC Defendants were to have wired payment for the Installment Contracts and the Promissory Notes to CDI's bank account in Rutherford County, Tennessee on February 20 and 25, 2002. In reliance on the SFC Defendants' representations and agreement to purchase the Installment Contracts and to fund the Promissory Notes, CDI provided training to the students who executed these contracts.

59.    Upon information and belief, the SFC Entities' financial difficulties climaxed in late January or early February of 2002, when they could not satisfy their contractual obligations to CDI and others. The SFC Entities could not fund their approximately $27 million purchase of student loan accounts at that time.

60.    Rather than finally revealing the truth behind SFC Defendants' scheme, the SFC Defendants continued to conceal the truth and continued their pattern of misrepresentation. On or about February 19, 2002, Turnbull and Pearson sent CDI a facsimile stating that there was a

47

delay in the February funding because the SFC Defendants' computer system was overloaded with information that the participating schools had not deleted from the SFC Defendants' webmail. The facsimile states that the overload of the computer system "corrupted [the SFC Defendants'] funding cycle" and that they were "in the process of restoring and checking by hand the funding for both the 20th of February and the 25th of February 2002." Turnbull and Pearson assured CDI (and the other schools) that they would "have February 20th funding reports restored by Friday February 22nd, 2002 & therefore fund on the same day (this Friday). We will work over the weekend to restore [*sic.*] February 25th, 2002 funding report which is significantly larger, and fund on Wednesday February 27th, 2002." The SFC Defendants' failure to fund had nothing to do with the alleged computer problems and related directly to their lack of funds. The SFC Defendants were merely attempting to delay the inevitable discovery of their massive fraud. A copy of the February 19, 2002 facsimile is attached hereto as Exhibit E.

### The SFC Defendants' Failure to Obtain Financing

61.     While the SFC Defendants' scheme was collapsing, Royal made a decision to end its support of the SFC Defendants' enterprise and end its involvement in the credit risk enhancement insurance business in the United States. Without the issuance of additional insurance policies by Royal, the SFC Defendants would not be able to complete additional securitizations and would have no access to funds to continue its scheme. Faced with this situation, the SFC Defendants explored additional sources of financing.

62.     In a desperate attempt to continue its quickly collapsing scheme, SFC endeavored to complete $80 million in interim financing with SWH Funding Corp. and Spectrum Group LLC (collectively "SWH"). SWH previously had provided funding to SFC. The SFC Defendants needed the funds from the interim financing to continue to make Forbearance Payments and fund student loan accounts.

63.    On February 6, 2002, SFC and Yao accepted a commitment letter from SWH for the $80 million interim financing.  This letter provided for a loan with a six month term subject to SWH's satisfactory completion of due diligence and SFC's and Yao's satisfaction of all other conditions precedent to SWH's obligation to fund.

64.    Pursuant to the February 6, 2002, commitment letter, the interim financing was to be secured by a first priority Uniform Commercial Code lien on SFC's interest as lender under the student loan accounts with an outstanding principal balance of $92,000,000.00.

65.    Unlike SWH's prior fundings, the commitment letter did not require that the loan collateral be insured.  As such, SWH undertook to conduct its own due diligence with respect to the student loan accounts that would serve as the loan collateral.

66.    Because the proposed loan collateral was to consist of new or recently originated student loan accounts, little or no payment history existed from which SWH could evaluate the quality of the proposed loan collateral.  As such, SWH undertook to evaluate representative samples from comparable pools of loans owned by SFC with a payment history in order to gauge the probable performance of the proposed loan collateral.

67.    The SFC Defendants assured SWH that the student loan accounts that would comprise the proposed loan collateral had been and would be originated based upon the same underwriting criteria as the student loans comprising the comparable pools of loans SWH would review.

68.    In the course of conducting its due diligence, SWH discovered an anomaly relating to the loan delinquency rates reported by the SFC Defendants.  Specifically, SFC's servicing and collection history reports ("Servicer Reports") for the comparable pools of loans produced by SLS – and which the SFC Defendants provided to Royal on a monthly basis and not

49

to trucking schools such as CDI, revealed that a high percentage of the comparable pools of loans was substantially in arrears (i.e., 60-90 days delinquent), but only a small percentage of the comparable pools of loans was listed on the Servicer Reports as being in "Default" (i.e., more than 90 days in arrears).

69.    The content of the Servicer Reports was illogical. In particular, it was not logical that so few of the student loan accounts in the comparable pools would go into default in light of how many were substantially in arrears. The cumulative default rates reported in the Servicer Reports were much lower than prudent underwriting would support and, upon information and belief, the historical norm for the type of sub-prime loans comprising the comparable loan pools. For such a result to occur, an unusually high number of student loan borrowers that were substantially in arrears would have to start, and continue, making interest payments. Royal knew all of this information. In fact, Royal had been provided these Reports on a monthly basis since the inception of the relationship between Royal and the SFC Defendants.

70.    Without credit enhancement through the issuance of insurance by Royal, the quality of the loan collateral was of paramount importance to SWH. For this reason, SWH investigated the factual basis for the information reported to it in the Servicer Reports in an effort to explain the apparent anomaly.

71.    During the course of the investigation, SWH spoke directly with representatives of the SFC Entities to determine whether the information in the Servicer Reports was accurate. The information obtained from these representatives did not explain the anomaly. Rather, the information provided by these representatives was inconsistent with the information in the Servicer Reports.

72.    SWH requested that the SFC Defendants provide an explanation for the anomalies SWH had uncovered.  SWH representatives were told by SFC's service manager that, although additional documentation regarding the performance of the comparable pools existed, she had been instructed by Gary Hawthorne to refer SWH only to the Servicer Reports for the answers to questions relating to loan performance.

73.    Over the weekend of March 2, 2002, SWH representatives had numerous telephone conversations with officers of the SFC Entities to explain SWH's concerns and to obtain adequate explanations from SFC.  On March 4, 2002, representatives of SWH met personally with Yao to discuss these issues.  Yao represented that he would investigate these matters with the appropriate personnel and attempt to resolve the issue.

74.    The next day, Yao offered the following startling explanation: the SFC Entities were artificially enhancing the performance of the comparable loan pools by using "school reserves to make Forbearance Payments on loans that were in arrears and that would otherwise have gone into Default.

75.    Yao subsequently provided an aging report for the comparable loan pools that had been repeatedly refused to SWH.  The aging report confirmed that the SFC Entities' use of forbearance masked the true, higher default rate for these loans.

76.    As a result of Yao's disclosures, SWH terminated its relationship with SFC, and the SFC Entities and the SFC Defendants found themselves without access to additional capital to continue to fund their scheme.

### The Collapse of the SFC Defendants' Scheme

77.    Upon information and belief, at some time prior to March 2002, Perry Turnbull received an email from the attorney representing the SFC Entities, advising him that it would be fraudulent for the SFC Entities to continue to purchase and originate loans without adequate

51

funds to complete these transactions. Nonetheless, the SFC Defendants continued to originate and purchase student loans from schools including CDI.

78.    On or about March 5, 2002, SFC borrowed an additional $3.3 million from a private investor group having other relations to SFC, for the purpose of funding the Forbearance Payments arising from defaults on student loan accounts in the month of February 2002.

79.    Subsequently, defendants continued their pattern of concealing the truth about their enterprise from CDI. On or about March 6, 2002, Turnbull and Pearson sent another facsimile to CDI, stating:

> Dear Valued Customer,
>
> We know that you are anxiously awaiting receipt of the funding that was originally scheduled for February 25. *We want to assure you that your institution will receive its funding very soon,* and in fact we now plan to fully fund both the February 25 disbursements and any exception funding due to your institution on Monday, March 11.
>
> *As we work to finalize the funding process,* we sincerely apologize for any inconvenience this may be causing you, and will [*sic.*] communicate with you daily as additional information becomes available to us.
>
> This delay in your funding is regrettable. *We have recently experienced a set of unanticipated and compounding challenges that have been entirely beyond our control,* and are now working diligently to resolve them in as efficient and timely a manner as possible. In business, as you know, we all attempt to plan for contingencies, but no one can plan for all of them.
>
> *Moving forward, we recognize your concerns, yet we want to reassure you of our ongoing strength.* Challenges like this have always made us stronger, and in fact we have already seen some positive developments come about as a result of this recent trial. (Emphasis added).

A copy of the March 6, 2002 facsimile is attached hereto as Exhibit F.

80.    Upon information and belief, Pearson and Turnbull sent CDI this letter promising funding at approximately the same time that Yao was revealing the truth of the SFC Defendants' underlying misrepresentations and omissions of material information to SWH. Contrary to the

statements made by Turnbull and Pearson, the problems that the SFC Defendants were experiencing were entirely within their control and the SFC Defendants had no "ongoing strength." On or about March 7, 2002, Turnbull and Pearson sent CDI an e-mail again apologizing for the funding delay and indicating that the SFC Defendants planned to disburse funds on March 11. A copy of the March 7, 2002 e-mail is attached hereto as <u>Exhibit G</u>.

81.    On or about March 11, 2002, Turnbull and Pearson sent CDI an e-mail stating:

> *Due to significant difficulties that have arisen in the capital markets during the past six months*, we find that our previously established processes are no longer working as they have done in the past. All of the assurances that we have received in the past two weeks with regards to capitalization and funding were based on our successful past experience in the capital markets; however, we have now resigned ourselves to the fact that conditions in the markets have indeed changed dramatically.
>
> > Much to our sincere disappointment, the result of these dramatic changes is that, at the present time, we are still unable to free the capital needed in order to complete this past round of funding, originally due on February 25.
>
> We cannot help but recognize that this is a tremendous difficulty for all of us; however, we cannot safely guarantee a funding date at this time. Furthermore, we believe that, based on our current negotiations with our contacts in the capital markets, the business model of our organization will require adjustments to the timeliness and percentages of future disbursements. We will, of course, provide you with these details of these changes as soon as possible.
>
> In the meantime, please be assured that we are involved in non-stop planning and negotiation to meet your February funding, as well as your future business needs. We foresee a long and prosperous future for our organization, and invite you to work with us throughout this process so that we may each gain from the strength of the other, and emerge together stronger than before....

(Emphasis added). Again, contrary to the statements made by Turnbull and Pearson, the present difficulties had nothing to do with problems in the capital markets, but were wholly the result of the SFC Defendants' misconduct. A copy of the March 11, 2002 e-mail is attached hereto as <u>Exhibit H</u>.

53

82.     With no available source of financing, SFC advised William Hibberd, Tony McKenzie and David Schneider with Royal that SFC could no longer operate without Royal's provision of an additional credit risk insurance policy. With SFC no longer in a position to make payments on the student loan accounts, Royal faced immediate claims on its credit risk insurance policies in excess of $100 million.

83.     To prevent claims from being made, Royal lent significant sums of money to SFC for the express and known purpose of allowing the SFC Defendants to continue to make Forbearance Payments to prevent the student loans from going into default. The decision to loan SFC this sum of money came after Royal had an additional opportunity to examine SFC's financial and operational records and with the knowledge that SFC was not a financially viable operation. Upon information and belief, based upon the investigation by McKenzie, Royal believed that the potential claims against Royal policies if the Forbearance Payments stopped would be approximately $150 million in March and $180 million in April.

84.     On or about March 28, 2002, with knowledge that SFC had been making Forbearance Payments and with full knowledge of SFC's financial and operational condition, Royal loaned $6,145,187.66 to SFC, with the express and known understanding that the proceeds of that loan would be used directly for payment of additional Forbearance Payments.

85.     On or about March 28, 2002—the very same day as Royal and SFC executed the promissory note in excess of $6 million to allow continuance of the SFC's fraudulent scheme, CDI received a facsimile from Turnbull and Pearson indicating that defendants had "recently completed several rounds of exciting and productive meetings among our senior staff and with leading transportation, finance and education experts, and…that our plans for the future of our organization and our products are nearly complete. Specifically, *we have surmounted the most*

54

*pressing insurance and liquidity concerns that stood in the way of our forward progress*, and have addressed the concerns that our financial partners expressed regarding the performance of future loans to CDL students." Additionally, they asked that CDI "hold off on making any financial or legal commitments in the interim." (Emphasis added). A copy of the March 28, 2002 e-mail is attached hereto as <u>Exhibit I</u>.

86.    Finally, on or about April 15, 2002, Pearson sent CDI a letter stating that defendants wanted to speak directly with CDI in order to resolve issues relating to defendants' "current difficulties." The letter states, in part, that "...if you think it could help, our owner Mr. Andrew Yao, could be a party to a call, or future calls, as well. *In speaking with Andrew he understands how personally involved I've been with your company and would like to find a quick and amicable solution.* Andrew has asked me to contact you to see if you would be open to me mediating a conversation between you and Andrew." A copy of the April 15, 2002 letter is attached hereto as <u>Exhibit J</u>.

87.    From April 2002 through May 2002, the accounting firm of Grant Thornton LLP, acting on behalf of Royal, performed a forensic investigation related to the student loan accounts and the financial activities of SFC. In the process of its investigation, Grant Thornton's representative Steven Haechen, on behalf of Royal, had access to SFC's computer systems and spent several days copying computer files maintained by SFC to Grant Thornton's own system. In addition to electronic information, Grant Thornton obtained numerous paper documents to complete its investigation.

88.    On or about April 29, 2002, well after Grant Thornton's investigation had commenced, Royal and SFC amended the Promissory Note to advance a total of $12,302,150.88 to SFC. As with the March loan, it was expressly known and understood by the SFC Defendants

and Royal that the proceeds would be applied directly to either the Trusts or to a particular lender for the purpose of making additional Forbearance Payments.

89.     Although Royal was not a lending institution, it provided funds to SFC to allow the continued operation of SFC, an operation that was insolvent using either a balance sheet or cash flow test.

90.     Despite repeated assurances since September 2001 regarding the financial condition of the SFC Entities and repeated assurances since February of 2002 that monies would be forthcoming, the SFC Defendants have never honored their obligations to CDI.  The total amount owing for the Installment Contracts and Promissory Notes accepted by the SFC Entities at a time when the SFC Defendants knew, or should have known, they did not have the financial ability to fund, is Four Million Three Hundred Seventy Seven Thousand Seven Hundred Twenty Five and 50/100 Dollars ($4,377,725.50).    A summary of the amount owing is set forth on Exhibit K.

### Royal's Involvement in SFC's Scheme

### The Policies Issued by Royal Insuring the Performance of SFC's Student Loans

91.     One of the centerpieces of the SFC Defendants' fraudulent scheme was the credit risk insurance policies issued by Royal.   Without either the use of Forbearance Payments (discussed above) or the Royal credit risk insurance policies, the SFC Defendants would not have been able to carry out their scheme.

92.     As stated, at some point, Yao shifted the focus of SFC's activities away from traditional lending arrangements and toward larger scale transactions whereby he could raise financing through the sale of asset-backed securities in the private securities markets in the form of Notes or Certificates.

93.    Because of the potentially high risk of default, the student loans on which Yao's companies focused were considered sub-prime. For this reason, to provide additional security for the purchasers of the Notes and Certificates, the income streams created from the student loan accounts were backed by the credit risk insurance issued by Royal (the "Royal Policies"). Through the Royal Policies, Royal agreed to insure and otherwise guarantee payments due to the Trusts from the student loan accounts. SFC completed a total of eight securitizations that were insured by Royal. With each of the eight securitizations completed by SFC, Royal would issue an additional insurance policy.

94.    The Royal Policies insured the payment of principal and ninety days interest in the event of default. As defined by the Royal Policies, default, and hence Royal's obligation to pay, did not occur unless a student loan account was more than ninety days delinquent.

95.    SFC was not named as the insured on the Royal Policies. Rather, the insured was the bankruptcy remote entity created by SFC to complete the transactions. The bankruptcy remote entity was a limited liability company managed by an entity other than SFC.

96.    Prior to Royal's issuance of the Royal Policies, Royal was afforded the opportunity to perform due diligence. Messrs. Hibberd, McKenzie, and Schneider were the individuals primarily responsible for negotiating the Royal Policies, conducting due diligence prior to the issuance of the Royal Policies and generally maintaining the relationship between SFC and the SFC Defendants and Royal.

97.    Without the Royal Policies, the SFC Defendants would not have been able to complete a securitization or have access to an on-going source of capital to fund their operations. In exchange for its issuance of the Royal Policies, Royal received tens of millions of dollars in premiums as well as additional payments from reserves and other accounts to protect its interest.

57

### The Protection of Royal's Interest through
### the Excess Spread Reserve and Forbearance Reserve

98.    Royal and SFC structured the insurance policies and agreements thereto to provide Royal with considerable protection in the event of defaults of student loans. SFC and Royal structured these protections with the hope that Royal would not be required to pay on claims until a certain level of student loans defaulted.

99.    The additional protection upon which Royal and SFC agreed took at least two forms: the Excess Spread Reserve and the Institutional Reserve – which was otherwise known as the Experience Account and/or the Forbearance Reserve.

100.    For the first six of the eight securitizations, the Royal Policies required that the bankruptcy remote entity create the Experience Account with an amount equal to 18% of the initial principal balances in each pool. This account was funded through reserves held back at the time of the purchase and/or origination of each loan funded by SFC.

101.    The Experience Account served the function of a deductible. As a claim would be made against Royal, Royal would pay the claim and then seek reimbursement from the Experience Account. The bankruptcy remote entity, by agreement, would advance funds to Royal to pay the initial claims.

102.    Royal's protection was enhanced further by the Excess Spread Reserve. Through the Excess Spread Reserve, a percentage of the income stream generated by the student loan accounts would be placed into this reserve account. Thus, as payments were made, the Excess Spread Reserve would increase. At the same time, because payments were being made on the particular student loan accounts, the outstanding balances, and Royal's exposure would decrease.

103.    Royal could seek redress from the Excess Spread Reserve in the event of non-payment.

104.   Since the Excess Spread Reserve was created from payments arising from the student loan accounts, if payments were not received on the student loan accounts, the Excess Spread Reserve could not build.

105.   In fact, the Excess Spread Reserve did not build as anticipated by Royal and, as a result, the SFC Entities provided additional security to Royal to further protect Royal against potential claims.

106.   At the same time Royal was aware that the Excess Spread Reserve was not building as contemplated, the payments that Royal received under the Experience Account were increasing.

107.   Given the increase in payments from the Experience Account, as well as the failure of the Excess Spread Reserve to build as contemplated, Royal knew that the student loan accounts were not performing over time as anticipated.

**Royal's knowledge of the poor performance of SFC's loan portfolio, practice of making forbearance payments and failure to service the student loans properly**

108.   Throughout its close relationship with SFC, Royal knew that SFC was making Forbearance Payments, that a massive number of student loans in SFC's loan portfolio were delinquent and on the verge of default, that SFC was taking some action designed to prevent loans from defaulting, and that SFC was failing to service loans properly.

109.   Although Royal has since disclaimed knowledge of the SFC Defendants' practice of making Forbearance Payments, the Report on Consolidated Financial Statements for the Years Ended December 31, 2000 and 1999 for Student Finance Corporation and Subsidiaries, which was provided to Royal, provides on page 13 that: "The school reserve may include additional amounts designated to absorb forbearance made in accordance with school and borrower agreements and potential credit losses for sold loans based upon the deemed credit quality of the

borrower." This Report also provides that well over $11 million in Forbearance Payments were made during 1999-2000 with $9,515,841.00 in Forbearance Payments being made during the 2000 fiscal year and $2,012,190.00 in Forbearance Payments being made during the 1999 fiscal year. This information was not provided to CDI.

110.    Royal also was provided with other information from which Royal knew that SFC and the SFC Defendants were taking steps to prevent poorly performing loans in the SFC student loan portfolio from being considered to be in default under terms of the insurance policies issued by Royal. Loans were divided into at least five different categories or "buckets" for purposes of determining their payment status: (1) current; (2) 0-30 days delinquent; (3) 30-60 days delinquent; (4) 60-90 days delinquent; and (5) default. Throughout the parties' relationship, Royal knew that the number of students loans that was considered to be in the 60-90 day bucket was increasing rapidly. In each successive month, however, a corresponding number of loans were not defaulting as would be expected. This information was provided to Royal on a monthly basis in the form of the Servicer Report.

111.    By September 2001, Royal was aware that massive numbers of student loan accounts were 60 to 90 days delinquent and on the verge of default based on the student loan account information provided to Royal by the SFC Defendants. In light of this fact, Royal knew that SFC's business was on the verge of collapse and yet SFC continued to purchase and/or originate student loans. Given Royal's access to such information, Royal knew that some action was being taken by SFC or the SFC Defendants to prevent these loans from progressing to the default bucket. This information was not provided to CDI.

112.    The Forbearance Payments prevented thousands of student loan accounts from going into default, and claims that otherwise would be made against Royal were not made.

113.    Based on internal Royal discussions set forth below, Royal knew that SLS failed to service the loans in the SFC loan portfolio and that this caused a massive number of loans to become delinquent.

### Royal's knowledge of SFC's business and its misrepresentation of its financial condition

114.    Through the due diligence it performed and its communications with SFC, Royal knew that SFC purchased and/or originated student loans from schools such as CDI.

115.    Royal insured the performance of student loans held by SFC which were the collateral for the warehouse lines of credit obtained by SFC and which were securitized by SFC.

116.    Based on its involvement in these transactions and the issuance of its insurance policies, Royal knew that SFC derived its funds to purchase and/or originate student loans from the warehouse lines of credit and the securitization transactions.

117.    Throughout its relationship with SFC, Royal maintained information showing when SFC would run out of cash with which to fund the purchase and/or origination of students loans and closely monitored the cash SFC had available to fund loans.

118.    Based on the information Royal received from SFC in the form of Servicer Reports, financial statements and other information, as will be discussed below, Royal knew that SFC was misstating the performance of its loan portfolio to obtain access to on-going sources of cash and, as a consequence, necessarily was misstating its financial position and its ability to continue to fund the purchase and/or origination of student loans.

119.    Based on the information available to Royal and confirmed by Royal internal emails as discussed below, Royal knew that SFC's business and fraud scheme were bound to and did in fact collapse.

120.    Royal knew that despite SFC's precarious financial condition that SFC continued to represent itself as a viable entity financially by, among other things, continuing to purchase and/or originate student loans from trucking schools such as CDI, and that SFC was not disclosing its true financial condition to schools such as CDI.    Through SFC's continued purchase and/or origination of loans from CDI despite the foregoing, Royal knew that SFC necessarily was affirmatively misrepresenting its financial condition and failing to disclose information to CDI that it had a duty to disclose.

### Specific examples of Royal's knowledge of SFC's fraud scheme, the poor performance of SFC's student loans and the fact that SFC's scheme was dependent on the insurance provided by Royal.

121.    Numerous facts illustrate Royal's knowledge of components of SFC's fraud scheme, including SFC's use of Forbearance Payments to prevent loans from defaulting, how poorly the SFC loan portfolio was performing, the deterioration of SFC's on-going financial condition and Royal's understanding that the insurance Royal provided to SFC was the critical component of SFC's fraud scheme.

122.    Prior to the issuance of its first policy on December 23, 1998, an insurance broker with whom Royal worked closely communicated to Royal in a memorandum that "WE [ROYAL] ARE IN THE BEST POSITION AN INSURER COULD EVER REQUEST."

123.    On January 6, 1999, another insurance broker explained to Royal the manner in which the "Institutional Reserve," which was also known as the "School Reserve" and the Forbearance Reserve, would work: "Any shortfall in the payments will be covered in the following priority: institutional reserves, excess spread reserve escrow account, claim payments by Royal."

124.  Shortly after the issuance of its first policy, SFC sought additional policies from Royal. In an email from the insurance broker with whom Royal worked closely, it was explained to William Hibberd of Royal that SFC was looking for a $200 million policy limit and that "we [Royal] are in the driver's seat."

125.  On June 10, 1999, an internal Royal email indicated that the Institutional Reserve – otherwise known as the Forbearance Reserve – "provides [Royal] protection for the first 24 months. This is an important feature that should be retained in any negotiations."

126.  On June 15, 1999, an internal Royal email indicated that Royal could sustain defaults of up to 50% without the Institutional Reserve and up to 60% with the Institutional Reserve. Royal also expressed a concern regarding SFC's loan servicing at this point stating: "[g]ood servicing is critical to the performance of any loan portfolio."

127.  With full knowledge of the foregoing, Royal issued policy RST 293309 with an effective date of December 3, 1999.

128.  Royal conducted a due diligence visit of SFC in February 2000 and requested a sample of 50 loans to determine whether appropriate underwriting criteria had been utilized.

129.  On February 11, 2000, David Schneider of Royal discussed a "delinquency issue" with an insurance broker who stated "I think we have a clearer picture of the 'delinquency' issue and although a point of concern, it does not appear critical at this time."

130.  In a letter from Andrew Yao through SFC's insurance broker to Mr. Schneider, Mr. Hibberd, and Mr. McKenzie of Royal dated March 6, 2000, Mr. Yao stated that "[a]lso for students who are in forbearance, the schools advance payment on behalf of the student until the student resumes paying or until he defaults . . . this, of course, also distorts the default curve." While CDI was not making payments on behalf of students who were in forbearance and,

63

therefore, not one of the "schools advanc[ing] payments on behalf of the student", this letter from Mr. Yao to Royal provided Royal with knowledge of the very practices of which Royal complains – namely artificial depression and distortion of the default curve based on payments made on behalf of students.

131.    On March 21, 2000, an internal Royal email indicates that Mr. McKenzie was looking into the issue of pre-payments – initial payments made by students – and its effect on the loan performance and defaults.

132.    On March 31, 2000, in an internal Royal email, Royal considered SFC's request for additional insurance and again considered the issue of student prepayments and the issue of the Excess Spread Reserve not building as anticipated.  Nonetheless, Mr. Hibberd of Royal stated "I have a good feeling about this account and want to keep it going."

133.    Notwithstanding and with full knowledge of the foregoing, Royal issued policy 147522 to SFC with an effective date of April 30, 2000, in connection with an SFC securitization.  On March 2, 2000, prior to the close of this securitization, an insurance broker referred to this securitization as "a fiasco."

134.    On May 10, 2000, in an internal Royal email, Mr. King and Mr. Hibberd of Royal discussed SFC's manipulation of its accounting treatment of the Institutional Reserve.

135.    On June 26, 2000, in an internal Royal email, Mr. Schneider and Mr. Hibberd discussed the failure of the Excess Spread Reserve to build as anticipated and the existence of several errors in the Servicer Reports being provided to Royal.  This email also discussed the depletion of the "Experience Account" that Royal understood held the Institutional Reserve, which was otherwise known as the Forbearance Reserve.

64

136.   Notwithstanding and with full knowledge of the foregoing, Royal issued policy RST 147524 to SFC with an effective date of August 20, 2000.

137.   On September 15, 2000, in an internal Royal email, Royal discussed putting together its SFC due diligence.   Mr. McKenzie indicated that an "important process to understand is how SFC uses the money which is withheld from schools, conceptually, the Institutional Reserves / Experience Account."   (Emphasis supplied.)   He continued "I am guessing that besides covering required defaults, it covers all of their operating costs and to some extent their securitization / financing costs and distributions to Yao."  In considering whether to question SFC on this account, Mr. McKenzie stated "[h]ow much information would we want and would we want covenants on the use of that money are two big questions . . . . One problem is we never asked for anything on the past two deals."

138.   In October 2000, Royal acknowledged that its due diligence and underwriting of the SFC account had been far from adequate and previously had no structure whatsoever.  As an example, an October 4, 2000, internal Royal email attaches a draft of an underwriting manual for financial enhancement insurance policies and states "still much work to be done; but at least it has a structure now."

139.   Also on October 4, 2000, Royal requested information from SFC concerning the use of the Institutional Reserve – otherwise known as the Forbearance Reserve – stating "[w]e would like to understand how the school reserves work for 1999, what the accounting treatment was for 1999, how the school reserves work for 2000 and what the accounting treatment is for 2000 and beyond."

140.    On October 6, 2000, an internal Royal email questions the ability of SFC to continue to do business without the insurance provided by Royal and refers to this as "[t]he ability to continue doing business question."

141.    On October 24, 2000, an internal Royal email recognized that SFC was running out of money under the policy limits in existence and projects that SFC would run out of policy limits and, consequently, its ability to generate new loans and complete securitization transactions within three months. Royal acknowledged that "[i]t would be very difficult unless they [SFC] have started to replace us at this late date."

142.    On November 2, 2000, SFC communicated to Royal that the funds from the Institutional Reserve "never gets paid to the schools." This fact confirmed that the schools had no right to or interest in the Institutional Reserve. SFC also stated "[r]ealistically we do not expect to pay any of [the reserves] to the schools."

143.    Notwithstanding and with full knowledge of the foregoing, Royal issued policy 147525 with an effective date of November 27, 2000.

144.    On December 15, 2000, in an internal Royal email, Royal considered whether to include 108 loans not signed by schools under its policies. Royal stated "I do not recall any audit or similar investigation of SFC where fraud prevention was evaluated . . . do you see any old Freed Maxic reports on SFC addressing school fraud? . . . Do you think we should employ Freed for an audit to investigate this?" Rather than discussing this issue with the schools directly, Royal decided to cover the loans at issue into its policy and, upon information and belief, never conducted any sort of investigation with respect to this issue and never communicated with the schools about this or any such similar issues.

145. Notwithstanding and with full knowledge of the foregoing, Royal issued policy RST 147526 to SFC with an effective date of January 31, 2001.

146. On February 2, 2001, Royal again acknowledged its inadequate due diligence and underwriting in connection with the SFC policies. This Royal email stated that "[a]ttached is a document that can serve as a starting point for our own underwriting due diligence procedures. This generally is information we want prior to our commitment, but also may serve us as ongoing verification once we have underwritten."

147. In an email dated February 7, 2001, Mr. Hibberd of Royal admitted that rating agencies examining the SFC transactions used a 75% default rate as a component of their rating examination. Mr. Hibberd disregarded this fact and stated "[t]his clearly seems ridiculous." Mr. Hibberd also stated that Royal could withstand default rates of about 50% under the policies that had been issued to date.

148. On March 13, 2001, Royal acknowledged that it was unaware of a certain component of the securitization transaction concerning interest-only ("I/O") certificates the proceeds of which were retained by SFC apparently unbeknownst to Royal. William Hibberd stated "I am embarrassed by this [I/O] thing we discovered yesterday. The sad thing is that we could have caught it but we never did . . . . What this means is that SFC is taking the profits out of the program long before the Excess Spread Reserve gets built up."

149. On March 26, 2001, Mr. Hibberd sent an email to Mr. McKenzie and Mr. Schneider each of Royal stating "I did a lot of thinking over the week-end about the SFC situation . . . We have a real problem with the excess spread account . . . . We also have a credit risk on the inforce policy . . . there is a pretty big theoretical credit risk . . . . I think if we are

unreasonable on the going forward [policies] we could perhaps lose the deal going forward."
(Emphasis supplied.)

150.    On April 5, 2001, in an internal Royal email, Mr. Hibberd stated that "Tony
[McKenzie] and I have spent an afternoon of fun and one of the discoveries is the extremely high
delinquency rate on these notes . . . it looks to be in the range of 65% . . . This account is a new
revelation every day." (Emphasis supplied.)

151.    On April 6, 2001, Mr. Hibberd sent an email to David Schneider stating "I'm in a
lot of turmoil on this account . . . .We are not going forward until we realize what is going on in
cash flows." (Emphasis supplied.)

152.    On April 9, 2001, David King of Royal advised Mr. Hibberd that he "should
strongly consider using an outside lawfirm to advise on changes to the SFC
agreement/structure." Prior to this point, it is unclear whether Royal was being represented by
counsel in connection with this deal. SFC was being represented by the law firm of Pepper
Hamilton LLP. Upon information and belief, Royal was also a client of Pepper Hamilton.

153.    Notwithstanding and with full knowledge of the foregoing, Royal issued policy
RST 147527 to SFC with an effective date of April 19, 2001.

154.    On April 20, 2001, Tony McKenzie sent an email to Diane Messick, Gary
Hawthorne and others at SFC recognizing the abysmal performance of SFC's portfolio. Mr.
McKenzie stated that 74% of the loans were current in April 2001 implying that $852,000 plus
should have been received while the Servicer Reports showed that only $120,000 had been
received. Mr. McKenzie recognized that "[i]t seems to continue that way through the rest of the
months."

155.    On April 24, 2001, in an internal Royal email, Mr. Hibberd admitted that he had "[a]nother sleepless night" regarding the SFC policies.  (Emphasis supplied.)  Mr. Hibberd further indicated that "[w]e need to do some thinking about just how we are going to proceed here and what the implications of different approaches are . . . Another strategy is not to commit to any further policies until we are satisfied with what the heck is going on up there [at SFC] . . . Perhaps we will not be satisfied, in which case, maybe we don't go forward.  If we don't go forward however, we will surely get whacked . . . ."  (Emphasis supplied.)

156.    On April 25, 2001, Diane Messick of SFC emailed Mr. McKenzie and advised him that up front payments by students at the time of loan origination and/or purchase by SFC contributed to loans falling into delinquency.

157.    On May 1, 2001, Mr. Hibberd sent an email to Mr. McKenzie indicating that "[f]or the first time since we discovered the problems in this program, I feel a little optimistic that we can fix the problems."  With respect to up-front payments by students at the time of loan origination and/or purchase by SFC, Mr. Hibberd stated "[w]e can't have this because we get completely crucified on the build up of the excess spread."

158.    On May 7, 2001, Mr. Hibberd stated in an email to Robert Van Epps at Royal that he knew "the harsh reality of policy #2 all too well.  It is what I think about every night when I wake up."  (Emphasis supplied.)

159.    On May 13, 2001, Mr. Hibberd sent an email to Mr. King of Royal regarding a meeting with SFC stating "I don't feel very comfortable with all this but I don't know if we are going to come up with anything much better."

160.    Notwithstanding and with full knowledge of the foregoing, Royal issued policy RST 147529 with an effective date of June 19, 2001.

161.   On July 5, 2001, in an internal Royal email, Mr. Hibberd acknowledged that the $250 million policy and a $50 million interim policy continued to perform poorly and identified the fact that SFC was advancing money to the securitization trusts.

162.   On July 10, 2001, Mr. McKenzie and Mr. Hibberd exchanged an email which stated that "I have started working on the Plan . . . What my schedule shows is that if the securitization happens about when I indicated, and they add $25 million of loans each month, the warehouse line will cap out at $150 million around May 2002. If they cannot find someone else to insure their securitizations, they will be dead in the water and so very well may we." (Emphasis supplied.)

163.   Notwithstanding and with full knowledge of the foregoing, Royal issued RST 147533 to SFC with an effective date of August 17, 2001.

164.   On August 20, 2001, in an internal Royal email, Mr. Hibberd observed that delinquencies remained high under the SFC policies.

165.   From May through September 2001, the payments Royal was receiving from the Excess Spread Reserve Account increased four fold.

166.   On September 18, 2001, in an internal Royal email, Mr. Schneider stated that "[w]e should discuss the longer term strategy on this account (should we go beyond the current commitment and implications for ending)." This email was in response to a request by SFC for temporary increase to the policy limit to avoid an interruption in SFC's business. The following day, SFC assured CDI that it did not have a liquidity problem.

167.   On September 26, 2001, Mr. McKenzie further inquired regarding the issues caused by the up-front payments by students at the time of origination and/or purchase of the loans by SFC. Mr. McKenzie stated that "[i]t would appear that you feel that the up front

payments have a negative financial impact. As a significant part of a school's operations, could you not ask the schools to cease this practice or is there a significant reason why up front payments are desirable." Mr. McKenzie also identified that, for the loan pools in five of the six securitizations completed as of that date, greater than 50% of the loans were between 60 and 90 days delinquent and on the verge of default. For three of the six securitizations completed as of that date, greater than 60% of the loans were 60 to 90 days delinquent and on the verge of default. This fact meant that the vast majority of all loans in the SFC loan pool were on the verge of default according to the information provided to Royal by SFC. From this information, Royal knew that SFC was on the verge of financial collapse as of September 26, 2001.

168.    Moreover, as of this time period, Mr. McKenzie was in constant communication with the SFC Defendants and had access to and knowledge of the SFC Entities' financial information and made frequent inquiries of the SFC Defendants regarding the performance of student loan accounts. Mr. McKenzie discussed with the SFC Defendants the performance of the student loan accounts and, in particular, the status of account reserves and delinquency statistics for the student loan accounts on a routine basis.

169.    Notwithstanding and with full knowledge of the foregoing, Royal issued policy RST 147538 to SFC with an effective date of October 9, 2001.

170.    Notwithstanding and with full knowledge of the foregoing, Royal issued policy RST 147538 to SFC with an effective date of October 19, 2001.

171.    Notwithstanding and with full knowledge of the foregoing, Royal issued policy RST 147536 to SFC with an effective date of November 15, 2001.

172.    On December 4, 2001, in an internal Royal email between Mr. McKenzie and Mr. Hibberd, Mr. McKenzie discussed when the subpolicies for SFC would end. Mr. McKenzie did

this "to give you [Mr. Hibberd] an idea of how much longer we are dependent on SFC for these funds. And given their business model, how much longer we might want to keep them in business." (Emphasis supplied.) In other words, Mr. Hibberd acknowledged that the Royal policies were keeping SFC in business as they allowed SFC access to capital and enabled SFC to complete securitization transactions and to continue to purchase and/or originate loans. Mr. McKenzie continued: "[t]hey [SFC] cannot borrow without the insurance guarantee and they would not keep coming to us if they had another carrier on the line." (Emphasis supplied.)

173.    In the same December 4, 2001, email, Mr. McKenzie also acknowledged the abysmal servicing loans by SFC and SLS: "As usual I have no idea what SLS servicing standards are. Not much effort is being put into the collections process, which shows in the delinquency statistics." (Emphasis supplied.) Upon information and belief, at this point, the delinquency statistics being provided to Royal showed delinquencies in excess of 60% as a result of the poor servicing of SLS.

174.    In the same December 4, 2001, email, Mr. McKenzie discussed the possibility of attempting to obtain "51% control in the business decisions relating to SLS . . . ." This discussion was in the context of Royal's decision of whether to put SFC out-of-business by refusing to extend them any additional insurance.

175.    In response to the servicing and performance issues raised by Mr. McKenzie's December 4, 2001, email, Mr. Hibberd stated: "[w]e also keep recertifying them so are we idiots?" (Emphasis supplied.)

176.    On January 25, 2002, in an internal Royal email, Mr. McKenzie stated that the servicing of the loans by SLS was "abominable" and acknowledged that "I still don't know if they [SFC] have corrected the up-front payment problem."

177.    As discussed above, after the March 20, 2002, meeting between Royal and Mr. Yao, notwithstanding and with full knowledge of the foregoing, Royal loaned SFC in excess of $12 million for the express purpose of making forbearance payments for the months of March 2002 and April 2002.

178.    During the time period of April or May 2002, SFC retained Royal's attorneys Sonnenschein, Nath & Rosenthal, to act, as stated in Sonnenschein's letter "as counsel in connection with [SFC's] attempt to obtain insurance coverage relating to the possible securitization pledge and/or sale of certain student loans."

179.    The efforts of SFC "to obtain insurance coverage relating to the possible securitization pledge and/or sale of certain student loans" with the assistance of Sonnenschein were abandoned in June 2002, when schools which had not received funding from SFC for the purchase and/or origination of students loans initiated legal proceedings against SFC.

### The Prior Lawsuits Brought by CDI and the Dismissal of these Suits

180.    The CDI Counter-Plaintiffs have pursued previously suits against the SFC Defendants in lawsuits filed in the Middle District of Tennessee.  These matters were captioned Truck Driver Institute, Inc. v. Yao, Civil Action No. 3-03-0377 (M.D. Tenn.) and Truck Driver Institute, Inc. v. Student Finance Corporation, Civil Action No. 3-02-0465 (M.D. Tenn.).

181.    Prior to and during the time when these lawsuits were pending, SFC bankruptcy-related proceedings filed in the Bankruptcy Court for the United States District Court for the District of Delaware were proceeding.  Furthermore, Royal had filed a lawsuit in Texas state court captioned Royal Indemnity Company v. Yao, Cause No. D16370 (Jefferson County Texas, 136th Judicial Distr.).  And, MBIA and Wells Fargo had filed a lawsuit against Royal in the United States District Court for the District of Delaware in response to Royal's attempts to

73

rescind the insurance policies it had issued to SFC captioned <u>MBIA Insurance Corporation v.</u> <u>Royal Indemnity Co.</u>, CA No. 02-1294 (D. Del.).

182.    In the pleadings, affidavits and declarations filed by Royal in the Texas state court litigation and in the bankruptcy proceedings, Royal asserted that SFC had fraudulently obtained insurance from Royal and that Royal had no knowledge of the practices of SFC in making forbearance payments.  The CDI Counter-Plaintiffs based their claims against the SFC Defendants in the prior lawsuits on Royal's allegations.

183.    Upon being sued by Royal in the Middle District of Tennessee in February 2004, CDI began an investigation into the claims asserted by Royal and the allegations Royal made previously in other SFC-related matters.  After reviewing hundreds of thousands of pages of documents, reviewing over thirty depositions and the review of pleadings in matters filed in the various SFC-related matters, the CDI Counter-Plaintiffs concluded, as demonstrated below, that Royal's allegations regarding its lack of knowledge of SFC's fraud were not true.

184.    Upon determining that Royal had knowledge of the foregoing, the CDI Counter-Plaintiffs dismissed their claims pending against the SFC Defendants in this District which were premised upon the CDI Counter-Plaintiffs mistaken belief that the insurance fraud with respect to Royal was a component of SFC's fraud scheme.  <u>See</u> <u>CDI, Inc. v. Yao</u>, Civ. No. 3-03-0377, Order of August 31, 2004 (Docket Entry No. 93) (closing the consolidated cases).

185.    The CDI Counter-Plaintiffs intend for this pleading to supersede all pleadings in the consolidated cases which have been closed by this Court.

## ADDITIONAL DEFENSES

### First Additional Defense
### (Aider and Abettor)

186.    Paragraphs 1 through 185 of these Additional Defenses and Amended Counterclaim and Cross-Claim are incorporated herein by reference as if set forth in full herein.

187.    As described above, Royal knew that SFC had grossly understated the default rates of the student loans, that SFC was undertaking efforts to prevent massive amounts of loans from proceeding to default, that the majority of the loans in the SFC loan portfolio were delinquent yet not proceeding to default in successive months, that SFC was making forbearance payments on student loan accounts, that SFC's true financial condition was dismal and that the servicing of SFC's loan portfolio by SFC and SLS was abominable.

188.    As described above, Royal knew that SFC necessarily was misstating its financial condition and continued to accept student loans without an ability to fund these loans.

189.    As described above, Royal knew that its insurance was the critical component of SFC's business and, therefore, its fraud scheme, and that SFC would have no access to the funds necessary to fund the purchase and/or origination of student loans without this insurance.

190.    By virtue of the foregoing, including the Counterclaim below and the facts above, Royal aided and abetted SFC's fraud.  As an aider and abettor of SFC's fraud, Royal is barred from recovery as a result of damages it claims to have sustained as a result of this fraud.

### Second Additional Defense
### (Assumption of the Risk)

191.    Paragraphs 1 through 185 of the Additional Defenses and Amended Counterclaim and Cross-Claims are incorporated by reference as if set forth in full herein.

192.    As described above, Royal knew that SFC had grossly understated the default rates of the student loans, that SFC was undertaking efforts to prevent massive amounts of loans

from proceeding to default, that the majority of the loans in the SFC loan portfolio were delinquent yet not proceeding to default in successive months, that SFC was making forbearance payments on student loan accounts, that SFC's true financial condition was dismal and that the servicing of the loans by SFC and SLS was abominable.

193.    Royal may not recover because it assumed the risk that it would suffer the damages of which it complains as a result of the nature of the policies it issued and the information and knowledge possessed by Royal at the time each of its policies was issued.

### Third Additional Defense
### (Comparative Fault)

194.    Paragraphs 1 through 185 of the Additional Defenses and Amended Counterclaim and Cross-Claims are incorporated by reference as if set forth in full herein.

195.    While defendants deny that Royal is entitled to any recovery from its Complaint, to the extent the alleged injuries to Royal were caused in whole or in part by parties other than defendants, including Royal, the SFC Defendants, SFC and/or other third parties, the claims of Royal should be dismissed, reduced, offset, or barred in accordance with the principles of comparative fault.

### Fourth Additional Defense
### (Contributory Negligence)

196.    Paragraphs 1 through 185 of the Additional Defenses and Amended Counterclaim and Cross-Claims are incorporated by reference as if set forth in full herein.

197.    While defendants deny that Royal is entitled to any recovery its Complaint, to the extent that Royal suffered damages, the claims of Royal should be dismissed, reduced, offset, or barred by the contributory negligence of Royal.

### Fifth Additional Defense
### (Fraud)

198.    Paragraphs 1 through 185 of the Additional Defenses and Amended Counterclaim and Cross-Claims are incorporated by reference as if set forth in full herein.

199.    Royal knowingly participated in SFC's fraud scheme and was aware of SFC's fraudulent conduct with respect to defendants.

200.    As described above, Royal knew that SFC had grossly understated the default rates of the student loans, that SFC was undertaking efforts to prevent massive amounts of loans from proceeding to default, that the majority of the loans in the SFC loan portfolio were delinquent yet not proceeding to default in successive months, that SFC was making forbearance payments on student loan accounts, that SFC's true financial condition was dismal and that the servicing of the loans in the SFC portfolio by SFC and SLS was abominable.

201.    For these reasons and the reasons set forth above and in the Counterclaim below, Royal's claims should be barred by fraud.

### Sixth Additional Defense
### (No proximate causation)

202.    Paragraphs 1 through 185 of the Additional Defenses and Amended Counterclaim and Cross-Claims are incorporated by reference as if set forth in full herein.

203.    Royal's injuries, if any, were not proximately caused by defendants' conduct.

### Seventh Additional Defense
### (Intervening Negligence)

204.    Paragraphs 1 through 185 of the Additional Defenses and Amended Counterclaim and Cross-Claims are incorporated by reference as if set forth in full herein.

205.  Royal's injuries, if any, were caused by the intervening and superseding negligence of third parties other than defendants or by the acts of others for whom defendants are not responsible.

### Eighth Additional Defense
### (Unclean Hands)

206.  Paragraphs 1 through 185 of the Additional Defenses and Amended Counterclaim and Cross-Claims are incorporated by reference as if set forth in full herein.

207.  Royal may not recover under the doctrine of unclean hands.

### Ninth Additional Defense
### (Res Judicata)

208.  Paragraphs 1 through 185 of the Additional Defenses and Amended Counterclaim and Cross-Claims are incorporated by reference as if set forth in full herein.

209.  Royal's claims are barred in whole or in part by the doctrine of res judicata.

### Tenth Additional Defense
### (Collateral Estoppel)

210.  Paragraphs 1 through 185 of the Additional Defenses and Amended Counterclaim and Cross-Claims are incorporated by reference as if set forth in full herein.

211.  Royal's claims are barred in whole or in part by the doctrine of collateral estoppel.

### Eleventh Additional Defense
### (Offset and Payment and Equitable Reduction)

212.  Paragraphs 1 through 185 of the Additional Defenses and Amended Counterclaim and Cross-Claims are incorporated by reference as if set forth in full herein.

213.  Royal's claims are barred in whole or in part by offset and payment and equitable reduction.

### Twelfth Additional Defense
#### (Failure to Mitigate Damages)

214.   Paragraphs 1 through 185 of the Additional Defenses and Amended Counterclaim and Cross-Claims are incorporated by reference as if set forth in full herein.

215.   As described above, Royal knew that SFC had grossly understated the default rates of the student loans, that SFC was undertaking efforts to prevent massive amounts of loans from proceeding to default, that the majority of the loans in the SFC loan portfolio were delinquent yet not proceeding to default in successive months, that SFC was making forbearance payments on student loan accounts, that SFC's true financial condition was dismal and that the servicing of the loans by SFC and SLS was abominable.

216.   While defendants deny that Royal is entitled to any recovery from its Complaint, to the extent that Royal suffered damages, Royal failed to take any action to mitigate the damages it claims it suffered as a result of the alleged conduct of SFC as set forth herein.  To the contrary, Royal continued to issue new policies to SFC notwithstanding and with full knowledge of the foregoing.  As such, Royal's recovery should be barred in whole or in part for failure to mitigate its damages.

### Thirteenth Additional Defense
#### (No punitive damages)

217.   Paragraphs 1 through 185 of the Additional Defenses and Amended Counterclaim and Cross-Claims are incorporated by reference as if set forth in full herein.

218.   Applicable law does not allow a claim for punitive damages against Royal under the facts of this case in light of Royal's knowledge and aiding and abetting of the underlying conduct of SFC of which it complains.

Defendants hereby give notice that they intend to rely upon other affirmative defenses as may become available or apparent during the course of discovery and thus reserve the right to amend their answer to assert any such defenses.

## COUNTERCLAIM AND CROSS-CLAIM

### JURISDICTION AND VENUE

219.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and 1367(a).

220.    Venue is proper in this court pursuant to 28 U.S.C. § 1391(b).

### COUNT ONE – FRAUD
### (WITH RESPECT TO YAO, PEARSON, HAWTHORNE, SMS AND SLS)

221.    The CDI Counter-Plaintiffs hereby incorporate and re-allege Paragraphs 1 through 185 and 219 through 220 of the Additional Defenses and Amended Counterclaim and Cross-Claim (referred to from this point forward as the "CDI Complaint").

222.    In the course of inducing the CDI Counter-Plaintiffs to forward the Promissory Notes and Installment Contracts to the SFC Defendants for funding, the SFC Defendants made certain fraudulent misrepresentations to the CDI Counter-Plaintiffs and failed to disclose certain material information regarding the true financial condition of the SFC Entities.

223.    Yao, Hawthorne, Turnbull and Pearson knew that they were operating a financially unstable and illegitimate enterprise, which would collapse if they did not make Forbearance Payments on student loan accounts and if Royal did not issue the credit risk insurance. The SFC defendants failed to disclose this information to the CDI Counter-Plaintiffs.

224.    Furthermore, with knowledge of the inherent underlying instability of their enterprise, the SFC Defendants falsely represented to the CDI Counter-Plaintiffs that they were a financially sound business and that they had the financial ability to fund the promissory notes and/or purchase the retail installment contracts that the CDI Counter-Plaintiffs forwarded to them and failed to disclose the true financial condition of the SFC Entities. The SFC Defendants had a duty to disclose this information to the CDI Counter-Plaintiffs.

225.    In 2000, when Pearson and Turnbull proposed that the CDI Counter-Plaintiffs enter into a new set of contracts with SMS, Pearson told the CDI Counter-Plaintiffs that the loan portfolio was performing better than expected and that SMS wanted to increase the amount of money being forwarded to the CDI Counter-Plaintiffs' schools, but that the CDI Counter-Plaintiffs needed to sign new agreements with SMS.    At that time, Pearson (and the other members of the Control Group) knew that, in fact, the loan portfolio was performing very poorly, with a high level of default.    At the time of Pearson's statement (and for some period of time before then), the SFC Defendants knew that Forbearance Payments were being made to mask the true default rates of the loans in the portfolio.    Pearson's representation regarding the loan portfolio's performance was false and intended to mislead the CDI Counter-Plaintiffs into believing that the SFC's Defendants' enterprise was financially sound.

226.    On or about September 19, 2001, Pearson sent the CDI Counter-Plaintiffs an e-mail reassuring the CDI Counter-Plaintiffs that "*we* [defendants'] *do not have a liquidity or financial problem....*" (Emphasis added).    At the close of this e-mail, Pearson provides further reassurance of the SFC Defendants' stability and ability to fund the CDI Counter-Plaintiffs' promissory notes and/or retail installment contracts by including a funding calendar that extended to December of 2002.    In this e-mail, the SFC Defendants represented that the two February 2002 funding dates would be the 20th and 25th.    Contrary to the representations that the SFC Defendants' enterprise was financially robust, the SFC Defendants knew that the Yao Entities were not financially sound, the SFC Defendants' massive sham operation had started to unravel, and that the SFC Entities' lacked the ability to fund the CDI Counter-Plaintiffs' promissory notes and purchase retail installment contracts.

227. At this point, the SFC Defendants' scheme was on the verge of collapse. Notwithstanding this fact, SFC continued to purchase and/or originate loans from CDI and continued to complete securitization transactions and thereby continued to misrepresent the on-going financial viability of the SFC business.

228. Even after the SFC Defendants and Royal met in March 2002, and Royal decided to extend over $12 million in loans to SFC to continue the practice of making Forbearance Payments, the SFC Defendants continued their false representations that the SFC Entities were financially stable and able to fund any promissory notes and/or purchase any retail installment contracts that were forwarded to them by the CDI Counter-Plaintiffs. In fact, the nine hundred and twenty six (926) acceptances of the promissory notes and retail installment contracts outlined *supra* were each a separate knowingly false representation that the SFC Entities were legitimate businesses and that they had the financial ability to purchase and/or fund the instruments. The SFC Defendants made or caused each one of these material misrepresentations knowing or recklessly disregarding the fact that they were contrary to the truth.

229. The SFC Defendants' misrepresentations to the CDI Counter-Plaintiffs and failure to disclose the true financial condition of the SFC Entities related to material and important facts. The SFC Defendants had a duty to disclose this information to CDI.

230. The CDI Counter-Plaintiffs reasonably relied on the SFC Defendants' misrepresentations and nondisclosure and continued to forward promissory notes and retail installment contracts to defendants for funding and/or purchase.

231. As a direct result of the SFC Defendants' fraudulent misrepresentations and omissions, the CDI Counter-Plaintiffs has suffered damages of at least Four Million Three Hundred Seventy Seven Thousand Seven Hundred Twenty Five and 50/100 Dollars

($4,377,725.50), plus prejudgment interest.  The CDI Counter-Plaintiffs are also entitled to an award of punitive damages for defendants' intentional conduct.

**COUNT TWO – CONSPIRACY TO DEFRAUD**
**(WITH RESPECT TO YAO, PEARSON, HAWTHORNE, SMS AND SLS)**

232.   The CDI Counter-Plaintiffs hereby incorporate and re-allege Paragraphs 1 through 185 and 219 through 231 of this CDI Complaint.

233.   Defendant Yao, the owner of the SFC Entities and the mastermind of the entire scheme, conspired with Pearson, Hawthorne, SMS and SLS to knowingly misrepresent to the CDI Counter-Plaintiffs that the SFC Entities were financially sound businesses and had the financial ability to fund and/or purchase student loans when in fact defendants knew or should have known that was not the case.  The SFC Defendants had a common purpose and conspired to make these misrepresentations to the CDI Counter-Plaintiffs on at least nine hundred and twenty six (926) separate occasions.   On each of these occasions, the SFC Defendants knew or recklessly disregarded the fact that the SFC defendants were in fact operating what was essentially a sham operation, which could (and, in fact, did) collapse at any moment.

234.   Each of the SFC Defendants knew or should have known that their fraudulent misrepresentations that the Yao Entities were financially sound and financially stable businesses were directed to the CDI Counter-Plaintiffs, residents of Tennessee.

235.   Each SFC Defendant had the intent to defraud the CDI Counter-Plaintiffs, which was common to each of them.

236.   Each SFC Defendant understood that the other co-conspirators shared their common purpose.

237.   As a result of the SFC Defendants' conspiracy to defraud, the CDI Counter-Plaintiffs have suffered damages in the amount of at least Four Million Three Hundred Seventy

Seven Thousand Seven Hundred Twenty Five and 50/100 Dollars ($4,377,725.50), plus prejudgment interest. CDI is also entitled to an award of punitive damages.

## COUNT THREE – VIOLATIONS OF 18 U.S.C. §§ 1961, 1962
### (WITH RESPECT TO YAO, PEARSON & HAWTHORNE)

238.    The CDI Counter-Plaintiffs hereby incorporate and re-allege Paragraphs 1 through 185 and 219 through 237 of this CDI Complaint.

239.    In violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, defendants Yao, Pearson, and Hawthorne, all persons within the meaning of RICO, conducted the SFC Entities' affairs through a well-established pattern of fraud and misrepresentation.   In fact, Yao as the mastermind and chief executive officer, developed and implemented a business model, with the willing assistance of the other members of the Control Group, which was essentially a massive fraud scheme.   In order to fuel this scheme, Yao and the other members of the Control Group needed to continue acquiring loans from unsuspecting schools, such as those operated by the CDI Counter-Plaintiffs.

240.    SMS and SFC are enterprises within the meaning of 18 U.S.C. § 1961(4), which are engaged in and affect interstate commerce by virtue of conducting business with schools throughout the United States.   Additionally, the numerous securitization and warehouse loan transactions were conducted in interstate commerce, as were the Forbearance Payments that defendants made to artificially decrease the default rate of the student loans.

241.    As set forth *supra*, Yao's, Pearson's, and Hawthorne's business was built on a foundation of fraud and misrepresentation.   These individuals lured the CDI Counter-Plaintiffs into sending their instruments to them for either purchase or funding by fraudulently misrepresenting that SMS and SFC were financially stable and legitimate businesses.   In fact, SMS and SFC were not financially stable and were anything but legitimate businesses.   As set

forth in <u>Exhibit D</u>, the nine hundred and twenty six (926) individual acceptances of CDI's promissory notes and retail installment contracts by SMS, which was under the direct control of Yao and the other members of the Control Group, were nine hundred and twenty six (926) fraudulent misrepresentations that the Yao Entities were fiscally stable, legitimate and had the ability to fund and/or purchase the instruments.   These individual's numerous fraudulent misrepresentations were all part of an intentional scheme to defraud the CDI Counter-Plaintiffs and each representation was transmitted by defendants via interstate wire communications. These acts constitute wire fraud within the meaning of 18 U.S.C. § 1343.

242.   Wire fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

243.   SMS's nine hundred and twenty six (926) fraudulent misrepresentations as detailed above constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

244.   Yao, Pearson, and Hawthorne, have conducted, and have conspired to conduct the affairs of the SFC Entities through a well-established pattern of wire fraud, which constitutes a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962 (c), (d).

245.   Yao is presently associated with Education Loan Services, another company owned by Yao, which upon information and belief is a business that shares many similarities with the SFC Entities.   Moreover, Hawthorne continues to work for SLS—one of the SFC Entities.   Consequently, there is the possibility that their fraudulent activities may continue into the future.

246.   As a direct and proximate result of these violations of 18 U.S.C. §§ 1962 (c), (d), CDI has suffered actual damages as a result of injury to its business and property of at least Four

Million Three Hundred Seventy Seven Thousand Seven Hundred Twenty Five and 50/100

Dollars ($4,377,725.50), plus prejudgment interest. The CDI Counter-Plaintiffs are also entitled

to treble damages and their attorney's fees as provided by 18 U.S.C. § 1962(c).

### COUNT FOUR – VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT (WITH RESPECT TO YAO, PEARSON, HAWTHORNE AND SMS)

247. The CDI Counter-Plaintiffs hereby incorporate and re-allege Paragraphs 1

through 185 and 219 through 246 of this CDI Complaint.

248. The actions of Yao, Pearson, Hawthorne and SMS constitute unfair and deceptive

acts or trade practices rendering these individuals liable to the CDI Counter-Plaintiffs under the

Tennessee Consumer Protection Act codified at Tenn. Code Ann. § 47-18-101, *et seq*.

249. These individuals engaged in unfair and deceptive acts, both individually and

collectively, by misrepresenting that SFC and the SFC Entities were financially sound, legitimate

businesses and that SFC and the SFC Entities had the financial ability to purchase and/or fund

the promissory notes and retail installment contracts that the CDI Counter-Plaintiffs forwarded to

them. As set forth *supra*, these individuals made these representations each time the SFC

Defendants accepted the nine hundred and twenty six (926) promissory notes and retail

installment contracts that the CDI Counter-Plaintiffs forwarded to defendants. Each time a

representation was made, these individuals knew that it was false.

250. As a direct and proximate result of defendants' violation of the Tennessee

Consumer Protection Act, the CDI Counter-Plaintiffs have suffered damages.

251. Defendants' conduct is a willful or knowing violation of the Tennessee Consumer

Protection Act thereby entitling the CDI Counter-Plaintiffs to a trebling of the damage award

plus their costs and expenses, including attorneys' fees.

## COUNT FIVE – AIDING AND ABETTING
### (WITH RESPECT TO ROYAL)

252.   The CDI Counter-Plaintiffs hereby incorporate and re-allege Paragraphs 1 through 185 and 219 through 251 of this CDI Complaint.

253.   The SFC Defendants falsely represented to the CDI Counter-Plaintiffs that the SFC Entities were a financially sound business and that they had the financial ability to fund the promissory notes and/or purchase the retail installment contracts that the CDI Counter-Plaintiffs forwarded to them.  The SFC Defendants breached their duty of disclosure to the CDI Counter-Plaintiffs by failing to disclose that the SFC Entities were a financially unstable and illegitimate enterprise that would collapse without the making of Forbearance Payments on student loans and the credit risk insurance provided by Royal.

254.   The SFC Defendants' misrepresentations and breach of this duty resulted in harm and damages to the CDI Counter-Plaintiffs.

255.   Royal provided substantial assistance to the SFC Defendants in making these misrepresentations and in breaching this duty by providing the SFC Entities with credit risk insurance which Royal knew was a key component to SFC's scheme.   Along with the Forbearance Payments, the credit risk insurance provided by Royal was the cornerstone of the SFC fraudulent scheme.  Without the issuance of the Royal Policies, the SFC Defendants would not have been able to obtain the funds necessary to carryout their fraudulent scheme.  The Royal Policies allowed the SFC Defendants to complete the securitization transactions and obtain funds to pay down the SFC Entities' warehouse lines of credit thereby providing the SFC Defendants with additional funds to make Forbearance Payments on the student loan accounts.

256.    Royal also provided substantial assistance to the SFC Defendants by lending the SFC Entities in excess of $12 million for the express and known purpose of allowing the SFC Defendants to continue to make Forbearance Payments on the student loan accounts.

257.    As a result of the due diligence it performed and the information provided to it by the SFC Defendants, Royal knew that the business of the SFC Defendants was the purchase of and origination of student loans for students enrolled in commercial truck driving schools such as the CDI Counter-Plaintiffs.

258.    As a result of the due diligence it performed and the information provided to it by the SFC Defendants, Royal knew that the SFC Defendants engaged in a  practice of making Forbearance Payments.  This information was disclosed to Royal in the financial statements provided to Royal.  Through the Servicer Reports provided to Royal by the SFC Defendants on a monthly basis, Royal knew that exceptionally large numbers of student loan accounts were delinquent and on the verge of default, but only a small percentage of these accounts were shown as being in Default in each successive month.  As of September 2001, Royal knew that SFC's business was on the verge of collapse and the SFC Defendants were failing to report the true performance of the student loan accounts.  Royal knew that, despite SFC's financial condition, SFC continued to misrepresent and failed to disclose its true financial condition to CDI through SFC's continued and on-going purchase and/or origination of student loans from CDI students without having the ability to fund the purchase and/or origination of these loans.

259.    Representatives of Royal, including  Mr. McKenzie, were also in constant communication with the SFC Defendants regarding the financial and operating condition of the SFC Entities and had access to student loan account information.

260.   Internally, Royal engaged in discussions regarding the on-going financial health of SFC and how long Royal should continue to keep SFC afloat.

261.   As a result of the due diligence it performed and the information provided to it by the SFC Defendants, Royal knew that the SFC Defendants were making Forbearance Payments that were masking the true nature of the performance of the student loan accounts. Based on the information provided to Royal, Royal also knew that the SFC Defendants affirmatively misrepresented and were failing to disclose the true financial condition of the SFC Entities which SFC had a duty to disclose. Royal knew that this conduct on the part of the SFC Defendants constituted a breach of duties the SFC Defendants owed to the CDI Counter-Plaintiffs.

262.   As a direct result of Royal's aiding and abetting the SFC Defendants' breach of the duties the SFC Defendants owed to the CDI Counter-Plaintiffs, the CDI Counter-Plaintiffs suffered damages. The CDI Counter-Plaintiffs are also entitled to an award of punitive damages for Royal's intentional conduct.

## PRAYER FOR RELIEF

WHEREFORE, the CDI Counter-Plaintiffs respectfully pray that the Court:

1.    Award judgment in favor of the CDI Counter-Plaintiffs and against all defendants, jointly and severally, in the amount of Four Million Three Hundred Seventy Seven Thousand Seven Hundred Twenty Five and 50/100 Dollars ($4,377,725.50), plus prejudgment interest.

2.    Award the CDI Counter-Plaintiffs punitive damages, jointly and severally, in the amount of at least Ten Million Dollars and 00/100 ($10,000,000.00).

3.    Award the CDI Counter-Plaintiffs trebled damages, as provided under 18 U.S.C. § 1964(c) and/or Tenn. Code Ann. § 47-18-109.

4.    Award the CDI Counter-Plaintiffs their attorneys' fees in an amount to be proven at trial.

5.    Afford the CDI Counter-Plaintiffs a trial by jury.

6.    Tax the court costs and discretionary costs of this action to defendants.

7.    Award such other and further relief that this Court finds appropriate.

Respectfully submitted:

Overton Thompson III
Matthew M. Curley
Britt K. Latham
Kathryn H. Walker
BASS, BERRY & SIMS PLC
315 Deaderick Street, Suite 2700
Nashville, Tennessee  37238
(615)742-6200

*Attorneys for Commercial Driver Institute,
Inc., Truck Driver Institute, Inc., Truck
Driver Institute, of Florida Inc., Texas Truck
Driver Institute, Inc., Truck Driver Institute
of Indiana, Inc., Truck Driver Institute of
Mississippi, Inc., CDI Services, Inc.,
Thomas J. Gast and Joseph M. Gast*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served via the methods indicated below on:

James G. Thomas
Neal & Harwell, PC
Suite 2000, One Nashville Place
150 Fourth Avenue North
Nashville, TN 37219
(Hand-delivery)

Michael H. Barr
Alan S. Gilbert
Daniel D. Barnowski
Sonnenschein Nath & Rosenthal LLP
1221 Avenue of the Americas, 24th Floor
New York, NY 10020-1089
(Via U. S. Mail)

Garry K. Grooms
STITES & HARBISON, PLLC
1800 Suntrust Center, 424 Church Street
Nashville, TN 37219-2387
(Hand-delivery)

Mr. Andrew Yao
Mr. Gary Hawthorne
c/o Bruce Haines
HANGLEY ARONCHICK SEGAL & PUDLIN
One Logan Square
Philadelphia, Pennsylvania 19103
(Via U.S. Mail)

on this the 22nd day of December, 2004.

_____

2533523.1