# Exhibit I

ORIGINAL

13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | : Chapter 7 |
| STUDENT FINANCE CORPORATION, | : Case No. 02-11620-JBR |
| DEBTOR. | : |
| | : Civil Action No. 03-507-JJF |
| CHARLES A. STANZIALE, JR., CHAPTER 7 TRUSTEE OF STUDENT FINANCE CORPORATION, | : Adversary Proceeding No. 02-6803 : |
| PLAINTIFF, | : |
| v. | : |
| ROYAL INDEMNITY COMPANY, | : |
| DEFENDANT. | : |

## AMENDED COMPLAINT

Charles A. Stanziale, Jr., Esquire, Chapter 7 Trustee ("Trustee") of Student Finance
Corporation ("SFC" or "Debtor"), by and through his undersigned counsel, pursuant to the
Court's Order dated March 23, 2004, and consistent with Federal Rules of Civil Procedure 15
and 41 and Federal Rules of Bankruptcy Procedure 7015 and 7041, hereby amends the pending
Complaint, withdraws without prejudice Counts I through VI thereof and represents in support of
this Amended Complaint as follows:

### Introduction

1.     This action arises from efforts by the Royal Indemnity Company ("Royal") to
limit its exposure to potentially hundreds of millions of dollars in claims under insurance policies
issued by Royal to SFC or SFC affiliated entities.  In so doing, Royal has harmed creditors of
SFC.

535609_1

2.     Immediately prior to its involuntary bankruptcy filing, SFC's business consisted of the acquisition and sale of accounts receivable comprised of student loan agreements. To complete its transactions, SFC utilized a credit risk enhancement provided from Royal to SFC's affiliated entities. The credit risk enhancement insured the income streams produced by the accounts receivable. In addition, on or about May 3, 2001, Royal Insurance Company of America, upon information and belief, an affiliate of Royal, issued a Directors' and Officers' Insurance Policy ("D&O Policy") to SFC and covered individuals.

3.     Through making so called "forbearance" payments (payments using SFC's own funds) on student loan accounts that would otherwise go into default, SFC protected Royal's interest by preventing claims from being made against Royal. Few parties, other than Royal and professionals and employees working for SFC, could have been aware that SFC was making payments on behalf of obligors. The result of these payments was that the actual default rates on the receivables were obscured. While the default rates on the receivables appeared to be very low, in fact, the default rates were very high.

4.     With mounting increases in the default rates on the accounts receivable, SFC's fortunes began to decline. No later than September 2001, SFC was unable to fund its obligations as they came due without resorting to additional financing. At that time, in order to sustain itself financially, SFC was required to use assets acquired in new financings to cure past due debts. SFC was caught in a cycle where, in order to survive, it was required to expand, but to expand, it was required to purchase and sell noncreditworthy accounts.

5.     SFC's downward financial spiral continued through February 2002, when Royal announced that it would no longer provide credit risk insurance. SFC, however, could not complete an additional securitization without a policy from Royal. If SFC could no longer

acquire additional assets, it could no longer make payments on student loans to prevent their default.

6.     SFC's financial tailspin was especially evident in or about March 2002, when Andrew Yao, former chief executive officer of SFC, advised William Hibberd, Account Manager of Royal's Financial & Risk Insurance Management Department, Tony McKenzie, and David Schneider of Royal that SFC could no longer operate without Royal's provision of an additional credit risk insurance policy. With SFC no longer in a position to make payments on behalf of obligors, Royal faced immediate claims on its credit risk insurance policies in excess of $100 million. SFC's precarious financial position also meant that it was more likely that third parties would seek redress from the D&O Policy for numerous breaches of fiduciary duty.

7.     To protect itself by preventing claims from being made against credit enhancement policies and preventing claims covered by the D&O Policy, Royal, although not a lender, lent $12,302,150.88 to SFC. The purpose for lending these funds was to allow SFC to continue to make payments to prevent the student loans from going into default. Royal extended this credit, after it had the opportunity to examine SFC's records and could determine that SFC was not a financially viable operation.

8.     Royal's credit extension allowed SFC representatives to continue in their breach of fiduciary duties. It allowed SFC to increase its debt level at a time when it was certain that SFC could not continue operating. It allowed SFC to delay a bankruptcy filing. With a bankruptcy filing, creditors would have been made aware of SFC's activities sooner and could have sought redress from the D&O Policy.

## Jurisdiction and Venue

9.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§§ 157, 1331, and 1334.

10.      This is an adversary proceeding brought pursuant to sections 541(a) and 544(a) of

title 11 of the United States Code (the "Bankruptcy Code"), Federal Rule of Bankruptcy Procedure

7001 and other applicable state and local laws.

11.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

12.      This is a core proceeding within the meaning of 28 U.S.C. § 157.

## The Parties

13.      Plaintiff, Charles A. Stanziale, Jr., is the duly-appointed Chapter 7 Trustee of

SFC, a Pennsylvania corporation with its principal place of business located at 170 Lukens

Drive, New Castle, Delaware 19720.

14.      Defendant Royal, a subsidiary of Royal & Sun Alliance Insurance Group, plc., is

a Delaware capital stock insurance company with its principal place of business located at 9300

Arrowpoint Boulevard, Charlotte, North Carolina 28723.

## Procedural Background

15.      On June 5, 2002 ("Filing Date") an involuntary bankruptcy petition was filed

against the Debtor.  With the consent of SFC, on November 4, 2002, the Bankruptcy Court

entered an order for relief under chapter 11 of the Bankruptcy Code.

16.      On September 29, 2003, the Bankruptcy Court appointed Mr. Stanziale as Chapter

11 Trustee for the Debtor.

17.    On November 14, 2003 ("Conversion Date"), upon the expedited motion of Mr. Stanziale, the Bankruptcy Court converted the matter to chapter 7. On November 20, 2003, Mr. Stanziale was appointed as the Chapter 7 Trustee of SFC.

18.    On or about November 20, 2002, SFC, as debtor-in-possession, filed the Complaint in the instant proceeding in the United States Bankruptcy Court, seeking damages from Royal. On May 23, 2003, the Complaint was removed from the Bankruptcy Court to the District Court. On March 23, 2004, this Court entered an Order ruling on Royal's Motion to Dismiss, dismissing two counts of the Complaint for lack of specificity and one for failure to state a claim and providing that an amended complaint be filed.

19.    Contemporaneous with the filing of the Amended Complaint, the Trustee is filing a Complaint to Avoid and Recover Fraudulent Transfers against Royal and other defendants in the Bankruptcy Court.

<u>Factual Background</u>

A. SFC and Its Business

20.    SFC was in the business of originating and acquiring non-guaranteed student loans and tuition installment agreements ("Student Loan Accounts"), primarily from truck driving schools.

21.    At the outset of its operations, SFC limited its activities to traditional lending arrangements, whereby it purchased bundles of pre-arranged Student Loan Accounts at a discount using funds borrowed from either commercial banks or private investors.

22.    As SFC expanded, its method of financing changed. With expansion, SFC financed its operation through securitization. Securitization allowed SFC to clear its credit lines, and thereby allowed the acquisition of additional Student Loan Accounts.

23.    The securitization process began with SFC's acquisition of Student Loan Accounts at a discount, using funds from a warehouse line of credit provided to certain of SFC's affiliates.    SFC, through an affiliated entity, would pool the Student Loan Accounts. The warehouse lender would obtain a security interest in the acquired Student Loan Accounts.

24.    To complete the securitization transaction, SFC would sell the pooled Student Loan Accounts to an affiliated bankruptcy remote entity.    The bankruptcy remote entity would transfer the Student Loan Accounts to a trust created by the bankruptcy remote entity.    To fund the bankruptcy remote entity's purchase of the Student Loan Accounts from SFC, the trust would sell either fixed-income trust certificates ("Certificates") or floating-rate notes ("Notes") to investors.

25.    Both the Certificates and Notes were backed by the principal and interest received from the Student Loan Accounts and represented an undivided interest in the Student Loan Accounts transferred to the Trusts.    The Certificates and Notes were sold to investors in private placement transactions for which private placement memoranda were issued.    The private placement memoranda included such information as the default rates on the Student Loan Accounts.

26.    A different trust was created for each securitization.    Thus, SFC Grantor Trust, Series 2000-1, SFC Grantor Trust, Series 2000-2, SFC Grantor Trust, Series 2000-3, SFC Grantor Trust, Series 2000-4, SFC Grantor Trust, Series 2001-1, SFC Grantor Trust, Series 2001-2, SFC Grantor Trust, Series 2001-3, and SFC Owner Trust 2001A-1 (the "Trusts") were created to complete securitization transactions.

27.    Because the Student Loan Accounts had been sold to the bankruptcy remote entities and subsequently transferred to the Trusts, payments by the borrowers underlying the Student Loan Accounts (the income stream) were remitted to the Trusts.

28.    Using the proceeds of the securitizations, the Debtor would pay the outstanding amounts owed to the warehouse lenders for SFC's acquisition of the Student Loan Accounts. Thus, through securitization, SFC replenished its warehouse line of credit.

**B. Credit Risk Enhancement**

29.    In order to provide additional security for the purchasers of the Notes and Certificates, the income streams created from the Student Loan Accounts were backed by credit risk insurance issued by Royal (the "Royal Policies"). Through the Royal Policies, Royal agreed to insure and otherwise guarantee payments due to the Trusts on account of the Student Loan Accounts. With each of the eight securitizations, Royal would issue an additional insurance policy.

30.    The Royal Policies insured the payment of principal and ninety days interest in the event of default. As defined by the Royal Policies, default, and hence Royal's obligation to pay, did not occur unless a Student Loan Account was more than ninety days delinquent.

31.    SFC was not named as the insured on the Royal Policies. Rather, the insured was the bankruptcy remote entity created by SFC to complete the transaction. The bankruptcy remote entity was a limited liability company managed by an entity other than SFC.

32.    Prior to Royal's issuance of the Royal Policies, Royal was afforded the opportunity to perform, and in fact did conduct, substantial due diligence. Through due diligence, SFC sought information concerning the expected default rates concerning the Student

Loan Accounts as well as information related to a previous securitization in which a different insurer provided a credit risk enhancement.

### C. Protection to Royal

33.     Royal requested information on how its interest was to be protected and from what sources the SFC affiliates would obtain funds to protect Royal's interest.

34.     Upon satisfaction that its interests would be protected and after substantial negotiation with SFC, Royal issued a policy to SFC's affiliated entity.

35.     In exchange for its issuance of the Royal Policies, Royal received tens of millions of dollars in premiums as well as additional payments to protect its interest.

36.     For the first six of the eight securitizations, the Royal Policies required that the bankruptcy remote entity create an unfunded account ("Experience Account") equal to 18% of the initial principal balances in each pool. The Experience Account served the function of a deductible. As a claim would be made against Royal, Royal would pay the claim and then seek reimbursement from the Experience Account. The bankruptcy remote entity, by agreement, would advance funds to Royal to pay the initial claims against Royal.

37.     Each of the eight securitizations included an Excess Spread Reserve. Through the Excess Spread Reserve, a percentage of the income stream generated by the Student Loan Accounts would be placed into this reserve account. Thus, as payments were made, the Excess Spread Reserve would increase. At the same time, because payments were being made on the particular Student Loan Accounts, the outstanding balances, and Royal's exposure would decrease.

38.     Royal could seek redress from the Excess Spread Reserve in the event of non-payment.

39.     Since the Excess Spread Reserve was created from payments arising from the Student Loan Accounts, if payments were not received on account of the Student Loan Accounts, the Excess Spread Reserve could not build.

40.     The Excess Spread Reserve did not build as anticipated by Royal and, as a result, SFC provided additional security to Royal to further protect Royal against potential claims.

41.     At the same time Royal noted that the Excess Spread Reserve was not building as contemplated, the payments which Royal received under the Experience Account were also increasing.

42.     With the increase in payments from the Experience Account as well as the failure of the Excess Spread Reserve to build as contemplated, it should have been evident to Royal that borrowers were not making the payments due on the Student Loan Accounts.

### D. The "Forbearance" Payments

43.     In addition to the payments received from the Experience Account and the Excess Spread Reserve, SFC segregated a portion of the agreed purchase price of the Student Loan Accounts into a separate account. From this account, the vocational schools allowed SFC to pay Student Loan Accounts that would otherwise be in default.

44.     Through its due diligence, before Royal issued its first policy, Hibberd was aware that SFC maintained accounts that SFC could use to pay claims that otherwise could be made against the Royal Policies.

45.     However, as indicated by Hibberd, Royal did not concern itself with this account because Royal did not consider this to be part of the Royal transaction. Rather, Royal considered this account to be another potential source of funds that could be used to protect Royal against claims.

46.    SFC's use of "forbearance" payments to make payments for obligors was referenced in footnotes in SFC's audited financial statement for the year 2000. This financial statement was furnished by SFC to Royal.

47.    The forbearance payments prevented numerous Student Loan Accounts from going into default, and claims that otherwise would be made against Royal were not made.

48.    The fact that SFC utilized such forbearance payments was not disclosed to all creditors or parties in interest.

49.    SFC did not disclose in the private placement memoranda issued in connection with the eight securitizations or in other reports detailing the payments received from the borrowers, that SFC was making the forbearance payments and thereby preventing certain Student Loan Accounts from going into default.

50.    Over time, the number of students failing to make timely payments on the Student Loan Accounts began to rise. With the rise in default rates, the rate and amount of forbearance payments increased, and SFC utilized its own funds to make forbearance payments.

51.    As a result of the forbearance payments, SFC was rendered insolvent. Proceeds from new loans and securitizations were being used to make forbearance payments rather than to fund SFC's obligations to creditors.

52.    In May 2001, using a balance sheet test, with the exceptions of October and November 2001, SFC had a negative equity. See Summary of Unaudited Balance Sheets attached hereto as Exhibit "A" and incorporated by reference.

53.    SFC was unable to pay its obligations as they came due. In September 2001, SFC was unable to fund its payments for student loan agreements from trucking schools. The monies that would be used to fund this purchase had been allocated to making forbearance payments.

Not until SFC was able to securitize newer loans was SFC able to fund its past purchase of Student Loan Accounts.

54.    Despite its inability to fund Student Loan Accounts, SFC sought to continue its practice of making forbearance payments.

55.    In February 2002, the Debtor was again unable to fund additional purchases of new Student Loan Accounts. Notwithstanding its agreements to purchase additional Student Loan Accounts and take possession of the Student Loan Accounts, SFC could not fund its approximately $27 million purchase of Student Loan Accounts. See List of Unfunded Schools (the "Schools List"), attached hereto as Exhibit "B" and incorporated by reference.

56.    On or about March 5, 2002, SFC borrowed an additional $3.3 million from a private investor group having other relations to SFC, for the purpose of funding the forbearance payments arising from defaults on Student Loan Accounts in the month of February 2002.

57.    Upon information and belief, notwithstanding the increase in forbearance payments and their drain on SFC's assets, SFC did not create a mechanism to control or otherwise limit the forbearance payments. This failure to do so, in addition to making and failing to disclose the forbearance payments, was a breach of the fiduciary duties owed by the officers of SFC to SFC and SFC's creditors.

### E. The Royal Credit Extensions

58.    As default rates continued to rise, it became evident that SFC would no longer be in a position to fund additional forbearance payments.

59.    On or about March 28, 2002, with knowledge that SFC had been making the forbearance payments, Royal loaned $6,145,187.66 to SFC, with the understanding that the proceeds of that loan would be used directly for payment of additional forbearance payments.

The loan was evidenced by the promissory note ("Promissory Note") attached hereto as Exhibit "C" and incorporated by reference.

60.    Prior to the execution of the Promissory Note, Tony McKenzie and Robert Van Epps, analysts employed by Royal, conducted due diligence, in March 2002, specifically focusing on the forbearance payments made by SFC.

61.    Upon information and belief, based upon the investigation by McKenzie and Van Epps, Royal believed that the potential claims against Royal policies if the forbearance payments stopped would be approximately $150 million in March and $180 million in April.

62.    From April 2002 through May 2002, the accounting firm of Grant Thornton LLP ("Grant"), acting on behalf of Royal, performed a forensic investigation related to the Student Loan Accounts and the financial activities of SFC.

63.    In the process of its investigation, Grant's representative, Steven Haenchen, on behalf of Royal, had access to SFC's computer systems and spent several days copying computer files maintained by SFC to Grant's own system. In addition to electronic information, Grant obtained numerous paper documents to complete its investigation.

64.    On or about April 29, 2002, Royal and SFC amended the Promissory Note to advance a total of $12,302,150.88 to SFC. A copy of the amended Promissory Note is attached hereto as Exhibit "D" and is incorporated by reference. As with the March loan, SFC directed that the proceeds be applied directly to either the Trusts or to a particular lender.

65.    Although Royal was not a lending institution, it provided funds to SFC to allow the continued operation of SFC, an operation that was insolvent using either a balance sheet or cash flow test.

66.    As a result of Royal's loan, SFC's creditors, with limited exceptions, were not allowed to discover SFC's true financial circumstances.

67.    Royal's credit extension provided no substantial value to SFC. It did, however, cause direct or proximate harm to SFC's creditors: Royal's credit extension plunged the Debtor into an additional $12,302,150.88 of debt.

### F.  The Royal D&O Policy

68.    To protect its directors and officers from potential claims, SFC purchased the D&O Policy from Royal. Royal agreed to insure SFC's directors and officers through May 3, 2002, for claims made against the directors and officers for, inter alia, breaches of fiduciary duty.

69.    During the policy period, the corporate officers of SFC breached their fiduciary duty to SFC and SFC's creditors by inter alia,:

(a)    concealing that SFC was making the forbearance payments to purchasers of the Notes and Certificates, and its creditors;

(b)    making misleading representations as to the default rates to purchasers of the Notes and Certificates;

(c)    failing to create mechanisms to prevent fraud by the vocational schools;

(d)    continuing to solicit business from vocational schools with high default rates;

(e)    causing SFC to continue to purchase Student Loan Accounts from vocational schools which allegedly defrauded SFC;

(f)    allowing employees to approve excessive compensation to Yao; and

(g)    failing to timely file a bankruptcy petition.

70.    The D&O Policy covered these breaches of fiduciary duty.

71.   The D&O Policy expired shortly after Royal's second extension of credit.

72.   The D&O Policy expired prior to the Filing Date, without the ability of creditors of SFC to seek redress from the D&O Policy.

## COUNT I
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

73.   The Trustee incorporates paragraphs 1-72 as though fully set forth herein.

74.   The Trustee stands in the shoes of a hypothetical creditor under section 544(a)(1) of the Bankruptcy Code.

75.   The Trustee also has authority to assert this Count I pursuant to section 541(a) of the Bankruptcy Code.

76.   The Debtor was insolvent in May 2001.

77.   As more fully set forth above, corporate officers and directors of SFC breached their fiduciary duties to SFC and SFC's creditors.

78.   Royal provided substantial direct assistance to SFC officers and directors in furtherance of their breaches of fiduciary duties by providing funding for the express purpose of making forbearance payments for Royal's own benefit.

79.   Royal's credit extensions encouraged and proximately caused SFC's officers and directors not to seek bankruptcy protection and SFC to instead incur additional debt.

80.   Royal provided this substantial assistance with actual or constructive knowledge that the effect thereof would be to cause the officers and directors to breach their fiduciary duties owed to SFC and SFC's creditors.

81.   Creditors were harmed as a result of Royal's actions.

82.   Through the conduct set forth in this Amended Complaint, Royal aided and abetted SFC's officers' and directors' breach of fiduciary duties to the Debtor and the Debtor's unsecured creditors and is therefore liable for damages in an amount to be determined at trial.

**COUNT II**
**EQUITABLE SUBORDINATION**

83.   The Trustee incorporates paragraphs 1-82 as though fully set forth herein.

84.   On or about May 14, 2003, Royal filed a proof of claim in the amount of $12,302,150.88 against SFC.

85.   Pursuant to Section 510(c) of the Bankruptcy Code, a Court may, under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest.

86.   Through engaging in the inequitable conduct described in this Amended Complaint, Royal has injured creditors and/or given an unfair advantage to Royal.

87.   At the time of Royal's inequitable conduct, the Debtor was insolvent and owed fiduciary duties to its creditors.

88.   Royal knew or should have known that as a result of its advancement of the $12,302,150.88 loan, that the breaches of fiduciary duties would not be discovered by creditors until after the D&O policy had expired.

89.   In taking the actions described in this Amended Complaint, Royal had:

    (a)   access to the computer database, books and records of the Debtor;

    (b)   opportunity to determine the then existing financial condition of the Debtor;

(c)    opportunity to assess, with all relevant information, what the financial condition of Debtor would be after each decision (i) to provide funding to the Debtor and (ii) to cause the Debtor to not timely file bankruptcy; and

(d)    opportunity to determine what the Debtor's ability would be to pay its obligations as they came due in the ordinary course of business, including obligations owed to general unsecured creditors.

90.    In contrast, creditors of the Debtor (other than professionals and insiders) did not participate in the within described transactions and did not have:

(a)    access to the financial information concerning the Debtor that was available to Royal;

(b)    the same opportunity as Royal to assess what the financial condition of the Debtor would be after each of the aforementioned transactions or actions;

(c)    the same opportunity as Royal to assess the Debtor's ability to pay its respective obligations in the ordinary course of its business after each transaction and action; or

(d)    input into whether the transactions should be consummated or an opportunity to comment upon or object to the transactions or actions.

91.    As a result of Royal's inequitable conduct, SFC's creditors have been deprived of valuable assets.

92.    By reason of the foregoing, SFC's unsecured creditors were harmed.

93.    Allowing Royal to receive payments on its claim prior to payment of the general unsecured creditors would be unfair and inequitable.

94.    Equitable subordination of Royal's claim is consistent with the Bankruptcy Code.

535609_1                                    16

95.     Because of the transactions and actions described herein, without prejudice to and expressly reserving the Trustee's rights to object to Royal's Proof of Claim, Royal's claims against the Debtor should be equitably subordinated to the claims of general unsecured creditors pursuant to section 510 of the Bankruptcy Code.

## COUNT III
## DEEPENING INSOLVENCY

96.     The Trustee incorporates paragraphs 1-95 as though fully set forth herein.

97.     The Trustee stands in the shoes of a hypothetical creditor under section 544(a)(1) of the Bankruptcy Code.

98.     The Trustee also has authority to assert this allegation pursuant to section 541(a) of the Bankruptcy Code.

99.     Royal loaned $12,302,150.88 to the Debtor for the purpose of allowing the Debtor to continue to mask defaults through forbearance payments.

100.    As a direct result of these advances, the Debtor was allowed to continue to operate and the Debtor's officers and directors continued to breach their fiduciary duties.

101.    As a result of the forbearance payments including financial contribution thereto, the filing of a bankruptcy petition was further delayed.  Unsecured creditors were deprived of an earlier opportunity to examine the Debtor's financial information.

102.    The Debtor's officers' and directors' breaches of their fiduciary duties would have entitled creditors to recover Royal against the D&O policy.

103.    By advancing the $12,302,150.88 to SFC, Royal knew, or should have known, that it was delaying SFC's bankruptcy filing and potential claims against the D&O policy.

104.    Unsecured creditors were deprived of sources of repayment and their claims were impaired as a result of the delay.

105. The delay in seeking bankruptcy protection caused SFC to increase the total amount of its debt. The amount available to distribute to creditors was diminished.

106. Accordingly, because Royal caused the Debtor to delay its eventual bankruptcy filing while the Debtor was insolvent, Royal caused additional harm to creditors of SFC and is liable for damages in an amount to be determined at trial.

WHEREFORE, the Trustee requests that the Court grant the following relief:

1. On Count I, grant judgment against Royal for damages sustained in an amount to be determined at trial, plus prejudgment interest;

2. On Count II, equitably subordinate Royal's claims to all general unsecured claims pursuant to section 510(c) of the Bankruptcy Code;

3. On Count III, grant judgment against Royal for damages sustained in an amount to be determined at trial, plus prejudgment interest;

4. Award prejudgment interest;

5. Award reasonable costs and attorneys' fees; and

6. Award such other and further relief as the Court may deem just and proper.

Dated: April 15, 2004

THE BAYARD FIRM

Charlene D. Davis (No. 2336)
Daniel K. Astin (No. 4068)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899
(302) 655-5000

Co-Counsel for Charles A. Stanziale,
Jr., Chapter 7 Trustee of Student
Finance Corporation

and

Sheryl L. Auerbach
Derrick A. Dyer
Dilworth Paxson LLP
1735 Market Street
Philadelphia, PA 19103
(215) 575-7000

Special Counsel for Charles A.
Stanziale Jr., Chapter 7 Trustee of
Student Finance Corporation