# Exhibit J

SOLOMON AND WEINBERG LLP
Two University Plaza
Hackensack, New Jersey 07601
(201) 487-6800
Attorneys for Plaintiff

SUPERIOR COURT BERGEN COUNTY
REC'D
APR 19 2002
DEPUTY CLERK

| | |
|---|---|
| SWH FUNDING CORP., Plaintiff, | SUPERIOR COURT OF NEW JERSEY BERGEN COUNTY – LAW DIVISION |
| - against - | DOCKET NO.: BER-L- |
| STUDENT FINANCE CORPORATION, and ANDREW N. YAO, Defendants. | Civil Action |
| | COMPLAINT |

Plaintiff SWH Funding Corp. ("Plaintiff" or "SWH"), by its attorneys, Solomon and Weinberg LLP, as and for its complaint against defendants respectfully alleges:

## NATURE OF THE ACTION

1. This is an action to collect $4,556,522 jointly and severally due and owing to SWH from defendant Student Finance Corporation ("SFC") and defendant Andrew N. Yao ("Yao") pursuant to the terms of a loan commitment letter, dated February 6, 2002, issued by SWH and accepted by SFC and by Yao, individually, as guarantor of SFC's obligations (the "February 2002 Commitment Letter").

## THE PARTIES

2. Plaintiff is a New Jersey corporation with its principal place of business at Two University Plaza, Hackensack, New Jersey 07601.

3. SFC is a Delaware corporation with its principal place of business at 170 Lukens Drive, New Castle, Delaware 19720. SFC, itself and through wholly-owned, single purpose,

bankruptcy remote entities, is in the business, among other things, of buying, servicing and selling portfolios of student loans.

4. Yao is an individual who, upon information and belief, resides at 107 Leighton Drive, Bryn Mawr, Pennsylvania 19010, and is the sole owner of SFC. Yao personally guaranteed the obligations of SFC under the February 2002 Commitment Letter.

## FACTUAL BACKGROUND

### A. The Parties' Prior Business Relationship

5. SWH is a private commercial lender specializing in non-institutional high yield loans, providing short-term bridge loans to borrowers who are unable to obtain funding through conventional sources.

6. SFC is in the business of buying, selling and servicing large portfolios of loans made to students to pay tuition costs ("Student Loans"), the vast majority of which are originated by trade schools ("Schools") attended by the student borrowers.

7. The Student Loans purchased by SFC are made by the Schools based upon underwriting criteria (otherwise known as "Credit Scoring Criteria") developed on a proprietary basis and supplied to the Schools by SFC. SFC's business objective is, on its face, to purchase Student Loans that, as a result of the application of uniform underwriting standards, will perform within predictable and acceptable parameters and thereby facilitate SFC's resale of the Student Loans at significant profit through the issuance of securities backed by the Student Loans ("Securitization").

8. SWH and Defendants have a business relationship that dates back to approximately January 2000. That business relationship consists principally of SWH making

commitment letters. As described more fully below, in the third instance in which SFC elected not to proceed to closing, SFC paid an application fee and incurred Break-Up Fees. The Break-Up Fees which SWH and SFC agreed to in connection with this third instance was to be paid in two installments. To date, SFC has not paid either installment of the agreed upon Break-Up Fee.

13. On two (2) prior occasions, SFC satisfied the conditions to funding set forth in the relevant commitment letter and the parties proceeded to close loans, in accordance with the relevant commitment letters, in the aggregate amount of $45,000,000. In connection with each such loan, SFC paid an application fee, a commitment fee, a draw down fee and other contractual fees required pursuant to the relevant commitment letter.

14. In all of the proposed and actual fundings prior to the December 2001 Commitment Letter (as defined below), the Student Loans were (or were to be) "credit-enhanced" by SFC's procurement of insurance from A.M. Best "A" or better rated companies, for the benefit of SWH, against loss sustained by reason of non payment.

**B. The December 2001 Commitment Letter**

15. By letter dated December 19, 2001 (the "December 2001 Commitment Letter"), SWH committed to extend a loan of $80,000,000 to a single purpose bankruptcy remote affiliate of SFC, upon satisfaction of certain conditions set forth in the December 2001 Commitment Letter (the "December Loan"). A true and correct copy of the December 2001 Commitment Letter is annexed hereto as <u>Exhibit A</u>.

16. The December 2001 Commitment Letter provided for the payment of a $400,000 application fee to SWH upon SFC's acceptance thereof. SFC accepted the December 2001 Commitment Letter and paid the $400,000 application fee.

available interim financing to SFC for periods prior to a Securitization (or other financing) during which SFC had a temporary need to obtain funds on an expedited basis.

9. During the course of the parties' relationship, SFC has sought such interim financing from SWH on at least six (6) separate occasions, including the financings that are the subject of the February 2002 Commitment Letter. With respect to each such proposed transaction, SWH issued and SFC and/or Yao accepted a commitment letter setting forth, among other things, the proposed terms of the loan to be made by SWH, the fees to be paid to SWH in exchange for its commitment to lend and the due diligence to be satisfactorily completed by SWH as a predicate to closing.

10. In each of the six (6) instances in which SWH has considered making a loan to SFC, the aforementioned commitment letters required the payment of various fees, calculated based on a percentage of the proposed loan, in exchange for SWH's commitment to (a) complete all of the extensive investigation, analysis and due diligence required to consider SFC's request within the short time frame required by SFC and (b) upon satisfactory completion of SWH's due diligence, supply the financing. Some fees were payable regardless of whether the loan proceeded to closing, while other fees were payable only if the loan proceeded to closing. The percentages of the loan comprising the fees payable pursuant to each commitment letter were comparable.

11. On three (3) prior occasions in which SWH issued and SFC and/or Yao accepted such commitment letters, SFC elected to obtain other sources of financing and did not close with SWH.

12. In two (2) of these three instances, SFC paid, inter alia, application fees and fees as a result of SFC's failure to close with SWH ("Break-Up Fees") required by the relevant

17. The December 2001 Commitment Letter provided that SFC would pay to SWH upon closing a commitment fee of 3.5% of the December Loan (i.e., $2,800,000).

18. The December 2001 Commitment Letter permitted SFC to be advanced portions of the December Loan upon request (a "Draw Down Request"), and provided that SFC would pay to SWH a draw down fee of 2.5% of each amount so requested to be drawn (a "Draw Down Fee").

19. The December 2001 Commitment Letter provided that SFC would pay to SWH a Break-Up Fee of 2% of the December Loan (i.e., $1,600,000) in the event that SFC did not close the December Loan with SWH and instead obtained financing from another source.

20. Promptly upon SFC's and Yao's acceptance of the December 2001 Commitment Letter, SWH commenced its due diligence.

21. Prior to the expiration of the December 2001 Commitment Letter, SWH agreed to accept a reduced Break-Up Fee in the amount of $1,200,000 instead of the larger $1,600,000 Break-Up Fee provided to be paid to SWH under the terms of the December 2001 Commitment Letter (the "Reduced December 2001 Break-Up Fee").

22. The December Loan did not close.

**C. The February 2002 Commitment Letter**

23. In January 2002, SFC requested that SWH again consider making a loan in the amount of $80,000,000 to a single purpose bankruptcy remote entity owned by SFC (the "February Loan").

24. SWH subsequently issued the February 2002 Commitment Letter and, on February 6, 2002, SFC and Yao accepted the February 2002 Commitment Letter by their

execution of same. A true and correct copy of the February 2002 Commitment Letter is annexed hereto as **Exhibit B**.

25. The February 2002 Commitment Letter provided for a loan with a six (6) month term at an annual interest rate of 12.5%, subject to SWH's satisfactory completion of due diligence and SFC's and Yao's satisfaction of all other conditions precedent to SWH's obligation to fund.

26. Pursuant to the February 2002 Commitment Letter, the February Loan could be drawn down upon in minimum increments of $10,000,000.

27. The February 2002 Commitment Letter did not require SFC or Yao to pay an application fee.

28. The February 2002 Commitment Letter provided that SWH earned a commitment fee (the "2002 Commitment Fee") of 3.5% of the February Loan (i.e., $2,800,000) upon SFC's first Draw Down Request. The Commitment Letter provided, in relevant part, as follows:

> Commitment Fee: 3.5% of the Loan Amount. Such Commitment Fee will be deemed earned upon Borrower's notification of its intention to draw upon the Loan (the "First Funding Notification"). The Commitment Fee will be payable at the earliest of a) the time of the Initial Funding, or, b) upon the earlier of (i) **five (5) days after the Borrower's failure or election not to close upon the date set for Initial Funding**, or (ii) termination of this Application by SFC after delivery of the First Funding Notice. . . . Nothing contained in this letter shall obligate SFC to pay the Commitment Fee if SWH refuses to fund following the Borrowers performance of its obligations and satisfaction of conditions precedent to such funding. [Emphasis added.]

29. The February 2002 Commitment Letter provided that SWH earned and SFC would pay to SWH a Draw Down Fee of 2.5% of each amount requested to be drawn pursuant

to the related Draw Down Request. The February 2002 Commitment Letter provided, in relevant part, as follows:

> Draw Down Fee: 2.5% of the amount of each funding. Each Drawdown Fee will be deemed earned upon the delivery of the First Funding Notification or each Subsequent Notification, as applicable, and will be based upon the amount requested in such notice. The Draw Down Fee will be paid upon the earlier of: (a) the Initial Funding or Subsequent Funding; or (b) **five (5) days following Borrower's failure or election not to close upon the scheduled Initial Funding or Subsequent Funding dates,** or (c) termination of this Application after delivery of notice of the Company's inability or unwillingness to complete the funding for which they provided notice. Nothing contained in this letter shall obligate SFC to pay the Draw Down Fee(s) if SWH refuses to fund the requested amount following the Borrowers performance of its obligations and satisfaction of conditions precedent to such funding. [Emphasis added.]

30. Pursuant to the February 2002 Commitment Letter, as an obligation separate and distinct from the respective obligations of SWH and SFC with respect to the February Loan, SFC agreed to pay and SWH agreed to accept the December 2001 Reduced Break-Up Fee in two (2) installments. The February 2002 Commitment Letter provides, in relevant part, as follows:

> December 19, 2001 Break Up Fee: Upon the counter-signature of This Letter, the Break Up Fee of 2% referenced in the December 19 Letter will be reduced to 1.5% ($1,200,000). **Borrower acknowledges that December 19, 2001 Break Up Fee has been fully earned and shall be paid.** Such payment will be made in two parts: (a) 0.50% ($400,000) no later than March 1, 2002, and (b) 1.00% ($800,000) on the earliest of (i) a securitization made possible by Interim Insurance, (ii) March 29, 2002, or (iii) an Initial Funding. [Emphasis added.]

31. By executing the February 2002 Commitment Letter, Yao personally guaranteed SFC's obligation to pay the Reduced December 2001 Break-Up Fee, the 2002 Commitment

Fee, each Draw Down Fee and SWH's costs and expenses. Specifically, the Commitment Letter provided, in relevant part, that:

> Guarantees: By his signature below, Andrew N. Yao hereby guarantees payment of the following, if and when the same become due hereunder: (i) the Commitment Fee; (ii) the Draw Down Fee; (iii) the December 19, 2001 Break-Up Fee; and (iv) all of Lender's costs and expenses.

32. By emails dated February 12, 2002 and February 15, 2002, SFC submitted to SWH its first Draw Down Request (the "First Funding Notification") in the amount of $12,260,870 and thereupon became obligated to pay to SWH the entire 2002 Commitment Fee and a 2.5% Draw Down Fee (i.e., $306,522) on the amount of funding requested. A true and correct copy of the First Funding Notification is annexed hereto as **Exhibit C**.

33. By emails dated February 26, 2002 and February 28, 2002, SFC submitted to SWH a second Draw Down Request (the "Second Funding Notification") in the amount of $8,521,739. Although the Second Funding Notification was less than the $10,000,000 minimum amount permitted to be advanced under the February 2002 Commitment Letter (the "Draw Down Minimum"), SWH did not object thereto and SFC agreed to pay a Draw Down Fee calculated on the Draw Down Minimum (i.e., $250,000). A true and correct copy of the Second Funding Notification is annexed hereto as **Exhibit D**.

34. SFC became obligated to pay SWH aggregate Drawn Down Fees of $556,522 by virtue of SFC's issuance of the First Funding Notification and the Second Funding Notification.

**D. SFC Failed to Meet Conditions Precedent to Closing**

35. Pursuant to the February 2002 Commitment Letter, the February Loan was to be secured by a first priority Uniform Commercial Code lien on SFC's interest, as lender, under

Student Loans (the "February Loan Collateral") with an outstanding principal balance of at least $92,000,000 (i.e., 115% of the February Loan).

36. Unlike SWH's prior proposed and actual fundings, however, the February 2002 Commitment Letter did not require that the February Loan Collateral be insured.

37. The February 2002 Commitment Letter contained several conditions precedent to SWH's obligation to fund the February Loan that related to the quality and character of the February Loan Collateral. Among the conditions precedent to SWH's obligation to proceed to closing were, inter alia:

> (i) Confirmation of the Student Loan amounts, review of the financial condition of the Borrower and Affiliates, delivery of opinions by Lender's counsel, and confirmation of all other material facts to the transaction;
>
> * * *
>
> (iv) The structure of the collateral pool and legal documents must be similar to that of a transaction which has received a rating from Moody's of A-3 or better, within the preceding 90 days, and could receive an equivalent rating from either Fitch and Standard and Poor's. In addition, the quality of the collateral must be able to support such a rating. Any comments received from Moody's regarding oversight of the collateral, or any other matter must be adequately addressed;
>
> (v) That such structure, as partially described in roman numeral (iv) listed above is "wrapable" by MBIA or other monoline insurance company so that the pool could receive a "AAA" rating from both Moody's and/or Standard and Poor's;
>
> * * *
>
> (viii) All appropriate due diligence on Borrower, Student Finance Corporation, senior officers of the company and affiliates, collateral investigation or any other inquiries deemed necessary by Lender; . . .

(ix) Confirmation that this pool of Student Loans is saleable in securitized form (without pool insurance) similar to prior SFC securitizations;

(x) Confirmation of all outstanding liabilities and amounts due on the Student Loans;

(xi) Any material changes in financial condition of SFC, after commitment and before funding, will be exceptions to the Lenders obligations;

(xii) . . . . At the time of each such [funding] notice SFC will also provide all additional due diligence material, including, but not limited to, a list of Student Loans serving as security, updated financial statements of the Company, any additional information regarding pool insurance and credit ratings. Any failure in the quality or acceptability of such material presented or requested will be an exception to the Lender's obligations . . .

38. Promptly upon SFC's and Yao's acceptance of the 2002 Commitment Letter, SWH commenced its due diligence.

39. Because the February Loan Collateral was to consist of new or recently originated Student Loans, little or no payment history existed from which SWH could evaluate, directly, the quality of the February Loan Collateral. Consequently, SWH undertook to evaluate representative samples from comparable pools of loans owned by SFC with a "seasoned" payment history (the "Comparable Loan Collateral") in order to gauge the probable performance of the February Loan Collateral.

40. SFC assured SWH that the Student Loans that would comprise the February Loan Collateral had been (and would be) originated based upon the same Credit Scoring Criteria as the Student Loans comprising the Comparable Loan Collateral.

41. In the course of conducting its due diligence of the Comparable Loan Collateral, SWH representatives discovered an anomaly relating to the loan delinquency rates reported by

SFC. Specifically, SFC's servicing and collection history reports for the Comparable Loan Collateral (the "Servicer Reports"), produced by a wholly owned subsidiary of SFC -- Student Loan Servicing ("SLS") -- and which SFC provided not only to SWH but to the insurance companies, rating agencies, its line-of-credit lender, and investment banks that participated in SFC's Securitizations, revealed that a high percentage of the Comparable Loan Portfolio was substantially in arrears (i.e., 60–90 days late), but only a small percentage of the Comparable Loan Portfolio was listed on the Servicer Reports as being in "Default" (i.e., more than ninety (90) days in arrears).

42. It seemed highly illogical to SWH, and its representatives participating in the due diligence, that so few of the Student Loans in the Comparable Loan Portfolio would go into Default in light of how many were substantially in arrears. The cumulative Default rate reported in the Servicer Reports were much lower than prudent underwriting would support and the historical norm for the type of sub-prime loans comprising the Comparable Loan Portfolio. In order for such a result to occur, an unusually high number of the Student Loan borrowers that were substantially in arrears would have to start, and continue, making interest payments.

43. Without credit enhancement through the issuance of insurance, the quality of the February Loan Collateral was, of course, of paramount importance to SWH, as reflected in the conditions to funding set forth in the February 2002 Commitment Letter. Thus, SWH investigated the factual basis for the information reported to it in the Servicer Reports in an effort to explain the apparent anomaly.

44. In the course of its due diligence, SWH representatives spoke directly with the SFC staff responsible for collection efforts to determine whether the information reported in

the Servicer Reports prepared by SFC's subsidiary was accurate. The information obtained from SFC servicing and collection staff did not explain the inconsistency. If anything, the SFC servicing and collection staff raised more concerns because the collection and reporting procedures they employed were inconsistent with the information set forth in the Servicer Reports.

45.   SWH representatives could not, after speaking with SFC personnel, determine how the collection and servicing efforts and procedures described to SWH could generate the information contained in the Servicer Reports. It appeared that the collection and servicing staff utilized entirely different time periods to measure the level of delinquency of a Student Loan than was reported in the Servicer Reports.

46.   SWH representatives requested that SFC provide documentation to explain the discrepancy between the information reported to it by the collection and servicing staff and the information set forth in the Servicer Reports.

47.   More importantly, SWH representatives requested that SFC provide an explanation for the anomalies described (i.e., how and why, notwithstanding the percentage of Student Loans in the Comparable Loan Portfolio that were substantially in arrears, the percentage of Student Loans in the Comparable Loan Portfolio falling into Default was so low).

48.   SWH representatives were told by SFC's service manager that, although additional documentation regarding the performance of the Comparable Loan Portfolio existed, she had been instructed by Gary Hawthorne, the President and Chief Operating Officer of SFC, to refer SWH only to the Servicer Reports for the answers to questions relating to loan performance.

49. Over the weekend of March 2, 2002, SWH representatives had numerous telephone conversations with officers of SFC to explain SWH's concerns and to obtain adequate explanations from SFC. On March 4, 2002, representatives of SWH met personally with Yao to discuss these issues. Yao represented that he would investigate these matters with the appropriate personnel at SFC and attempt to resolve the issue.

50. The next day, Yao offered the following startling explanation: SFC was artificially enhancing the performance of the Comparable Loan Portfolio by holding back a portion of the purchase price that SFC was to have paid to the Schools for Student Loans (the "Reserves"), and utilizing the Reserves to pay interest due on Student Loans that were in arrears and which would otherwise have gone into Default.

51. This admission was troubling for several reasons. First, SFC had expressly informed SWH and its representatives that SFC no longer held back Reserves, as it had done in the past. SFC had, therefore, made a material misrepresentation. Second, SFC's failure to disclose in the Servicer Reports the use of Reserves to pay interest due on the Student Loans necessarily results in the conclusion that the borrowers themselves were making the payments. SFC had, therefore, omitted a material fact necessary to make the Servicer Reports not misleading to SWH, insurance companies, rating agencies and the other participants in the Securitization process.

52. Yao subsequently provided an aging report for the Comparable Loan Portfolio that had repeatedly been refused to SWH and its representatives. The aging report confirmed that SFC's use of Reserves masked the true, higher Default rate of the Comparable Loan Portfolio.

53. The value of a portfolio of Student Loans with a Default rate that is approximately twice the reported rate is, by definition, substantially less than the value that can be attributed to a portfolio with a substantially lower Default rate. The risk to a lender with such a loan portfolio as its collateral is far greater. Accordingly, the security being offered by SFC for the February Loan, of which the Comparable Loan Portfolio was representative, fell far short of SWH's underwriting standards. SFC therefore failed to fulfill an essential condition precedent to funding set forth in the February 2002 Commitment Letter, including without limitation, the conditions quoted in Paragraph 37 above.

54. In addition to affecting the quality and value of the collateral for the February Loan, the disclosure that SFC had been using Reserves to prop up the reported performance of its Student Loans is likely to have a material negative impact on SFC, with regard to both the reporting of its financial condition and its continued ability to buy and service Student Loans. SFC's profitability depends on its ability to borrow money and buy, service, and sell Student Loans through Securitization. Disclosure to the financial community that the performance of the Student Loans owned by SFC is in fact much worse than SFC had reported will, undoubtedly, increase SFC's cost of doing business and reduce SFC's profit margin.

55. As a result of learning the true, higher, Default rate of SFC's Student Loans, Lenders and Securitization participants will, undoubtedly, insist that SFC make significant changes in its manner of doing business and its means of reporting its business results. First, lenders and others could insist that SFC provide higher quality collateral. Second, lenders and others may insist not only on receiving higher interest rates from SFC, but on a greater equity margin. In other words, a greater number of Student Loans may be required as collateral for the same amount of financing and the interest rate for such borrowing may increase.

Regardless of the specific changes that will take place in SFC's business operations, financing will be more expensive and SFC's profit margin will decrease as the economic reality of a high Default rate is felt.

56 Upon disclosing SFC's unreported use of Reserves, Yao acknowledged to SWH representatives that only SWH, and none of its insurance companies, investment bankers, other lenders or the financial rating agencies, was aware of the discrepancy between the reported and the actual Default rate of SFC's Student Loans, or the reasons therefor. Yao also acknowledged that SFC was required to disclose the true Default rate of its Student Loans to all of the foregoing groups with which SFC conducts its business. More recently, Yao informed SWH and its representatives that SFC disclosed the recent revelations to some of SFC's capital partners and insurers, and is trying to determine what changes must be implemented in order for SFC to continue its business. Upon information and belief, SFC has already begun to feel the adverse economic impact of its after-the-fact disclosure of its scheme. Yao has informed SWH and its representatives that SFC has not been able to maintain its prior levels of Student Loan purchases.

57. By letter dated March 12, 2002, SWH informed SFC that by virtue of SFC's failure to satisfy the express conditions precedent to SWH's obligations to fund the February Loan, SWH would not proceed to close. SWH also requested payment of the 2002 Commitment Fee and the Draw Down Fee, each of which were due and owing pursuant to the terms of the February 2002 Commitment Letter. A true and correct copy of SWH's March 12, 2002 letter is annexed hereto as **Exhibit E**.

58. SFC failed to pay the fees then due and owing and demanded by SWH's March 12, 2002 letter. By letter dated March 19, 2002, SWH repeated its demand for payment

of the 2002 Commitment Fee and the Draw Down Fee. A true and correct copy of SWH's March 19, 2002 letter is annexed hereto as **Exhibit F**.

**COUNT I**
**(Breach of Contract)**

59. SWH repeats and realleges the allegations set forth in Paragraphs 1 through 58 hereof as if set forth fully herein.

60. The February 2002 Commitment Letter constitutes a binding and enforceable agreement among SFC, Yao and SWH.

61. Pursuant to the February 2002 Commitment Letter, SFC was obligated to make an installment payment of the December 2001 Reduced Break-Up Fee in the amount of $400,000 on March 1, 2001. SFC did not make the required payment on March 1, 2002.

62. By letter dated March 7, 2002, SWH demanded payment of the March 1, 2001 installment payment. A true and correct copy of SWH's March 7, 20002 letter is annexed hereto as **Exhibit G**.

63. Pursuant to the February 2002 Commitment Letter, SFC was obligated to make an installment payment of the December 2001 Reduced Break-Up Fee in the amount of $800,000 on March 29, 2002. SFC did not make the required payment on March 29, 2002.

64. By letter dated March 29, 2002, SWH demanded payment of the March 29, 2002 installment payment. A true and correct copy of SWH's March 29, 2002 letter is annexed hereto as **Exhibit H**.

65. Despite due demand therefor, neither SFC nor Yao has paid any portion of the December 2001 Reduced Break-Up Fee.

66. By virtue of the foregoing, SFC and Yao have breached their obligations under the February 2002 Commitment Letter and SWH has been damaged in the amount of $1,200,000.

**COUNT II**
**(Breach of Contract)**

67. SWH repeats and realleges the allegations set forth in Paragraphs 1 through 66 hereof as if set forth fully herein.

68. Upon submission to SWH of the First Funding Notification, SFC and Yao became and are now jointly and severally liable to SWH for payment of the 2002 Commitment Fee in the amount of $2,800,000 and Draw Down Fees in the amount of $306,522.

69. Upon submission to SWH of the Second Funding Notification, SFC and Yao became and are now jointly and severally liable to SWH for payment of additional Drawn Down Fees in the amount of $250,000, resulting in aggregate Draw Down Fees owing of $556,522.

70. Despite due demand therefor, SFC and Yao have refused to pay any of the foregoing obligations to SWH.

71. SWH has fully performed all of its obligations under the February 2002 Commitment Letter.

72. By virtue of the foregoing, SFC and Yao have breached their obligations under the February 2002 Commitment Letter and SWH has been damaged in the amount of $3,356,522.

WHEREFORE, Plaintiff demands that judgment be entered against defendants, jointly and severally as follows:

A. On Count I, for judgment in the amount of $1,200,000;

B. On Count II, for judgment in the amount of $3,356,522;

C. On Counts I and II, for attorney's fees and costs of suit;

D. On Counts I and II, for interest at the statutory rate; and

E. For such other and further relief as the Court may deem just and proper.

Dated: April 19, 2002

SOLOMON AND WEINBERG LLP
Attorneys for Plaintiff

By: ______________________
CORY MITCHELL GRAY

DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, Cory Mitchell Gray is designated as trial counsel for the Plaintiff SWH Funding Corp.

CERTIFICATION PURSUANT TO R. 4:5-1

The undersigned certifies to the best of his knowledge that the matter in controversy is not the subject of any other action pending in any other Court or any pending arbitration proceeding, and that no other action or arbitration proceeding is contemplated.

Furthermore, to the best of his knowledge, the undersigned certifies that there are no other parties to be joined in this action, unless said parties are disclosed by subsequent discovery.

Dated: April 19, 2002

CORY MITCHELL GRAY