# Exhibit L

Not Reported in F.Supp.2d                                    **Page 636**
 Fed. Sec. L. Rep. P 92,899, RICO Bus.Disp.Guide 10,742
**(Cite as: 2004 WL 1908221 (M.D.Pa.))**
 <KeyCite Citations>

United States District Court,
M.D. Pennsylvania.

Stephen L. FLOOD, Luzerne County Controller,
and the Luzerne County Retirement
Board o/b/o the Luzerne County Employee
Retirement System, Plaintiffs,
v.
Thomas A. MAKOWSKI, et al., Defendants.

No. Civ.A. 3:CV-03-1803.

Aug. 24, 2004.

Albert S. Dandridge, III, Elizabeth Ainslie, Stephen J. Shapiro, Theresa E. Loscalzo, Wilbur L. Kipnes, Schnader Harrison Segal & Lewis LLP, Philadelphia, PA, Christopher P. Cullen, Dunmore, PA, for Plaintiffs.

Aaron Krauss, Cozen O'Connor, Andrew William Davitt, Denis C. Dice, Marshall, Dennehey, Warner, Coleman & Goggin, Brian E. Caine, Robert M. Cavalier, Lucas and Cavalier LLC, Anthony F. Zabicki, Jr., Stark and Stark, Charles J. Vinicombe, John B. Dempsey, Stephen C. Baker, Drinker Biddle & Reath LLP, Arlene Fickler, Lawrence T. Hoyle, Jr., Hoyle, Fickler, Herschel & Matthes LLP, David L. Braverman, Richard E. Miller, Ryan J. Durkin, Philadelphia, PA, Peter John Moses, John P. Moses, Moses & Gelso, LLP, Robert J. Gillespie, Jr., Mylotte, David & Fitzpatrick, Wilkes-Barre, PA, Adolfo Anzola, Luigi Spadafora, Matthew Tracy, Winget Spadafora & Schwartzberg, New York, NY, Cody H. Brooks, Kreder, Brooks, Hailstone & Ludwig, John J. Aponick, Jr., Marshall Dennehy Warner Coleman & Goggin, Scranton, PA, Allen M. Silk, Princeton, NJ, Jennifer A. Goaziou, Kevin M. Kinross, Randolph C. Wiseman, Bricker & Eckler, LLP, Columbus, OH, Jaime L. Theriot, James Kirk Quillian, Kevin A. Maxim, Troutman, Sanders, LLP, Atlanta, GA, Richard L. Bush, Powell, Trachtman, Logan, Carrle, Bowman & Lombardo, P.C., King of Prussia, PA, for Defendants.

MEMORANDUM

CAPUTO, J.

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d                                         **Page 637**
**(Cite as: 2004 WL 1908221 (M.D.Pa.))**

<div align="center">TABLE OF CONTENTS</div>

--------------------------------------------------------------------------

FACTUAL BACKGROUND ......................................................... 2

PROCEDURAL BACKGROUND ...................................................... 6

LEGAL STANDARD ............................................................. 8

DISCUSSION ................................................................. 9

1) Justiciability .......................................................... 9

2) Racketeer Influenced and Corrupt Organizations Act Claims .............. 11
    A) Statute of Limitations ............................................ 12
    B) Enterprise ........................................................ 14
    C) Count III-- s 1962(c) Participating in an Enterprise Through a
Pattern of Racketeering Activity ......................................... 16
        i) Standing ...................................................... 18
        ii) Two Predicate Acts ........................................... 19
            a) ASCO Affiliates ........................................... 22
            b) The Wells Agreement ....................................... 23
            c) Miscellaneous Defendants .................................. 24
        iii) Rule 9(b) .................................................... 26
        iv) Private Securities Litigation Reform Act ..................... 29
            a) The Board didn't know about hidden fees ................... 36
            b) The Board knew about hidden fees .......................... 38
        v) Relatedness and Continuity of Predicate Acts ................. 40
            a) The Board Members ......................................... 41
            b) The ASCO Affiliates ...................................... 44
            c) The Provident Agreements .................................. 48
            d) The Manulife Agreements ................................... 49
            e) The Wells Agreement ....................................... 50
            f) Miscellaneous Defendants .................................. 51
    D) Count IV-- s 1962(d) Conspiracy to Violate s 1962(c) .............. 53
    E) Count V-- s 1962(b) Interest or Control of an Enterprise .......... 56
    F) Count VI-- s 1962(d) Conspiracy to Violate s 1962(b) .............. 59

3) Count VII--Investment Advisor Act of 1940 ............................. 62

4) State Law Claims ...................................................... 63
    A) Supplemental Jurisdiction ......................................... 64
    B) Count I--Breach of Fiduciary Duty ................................. 66
    C) Count II--Aiding and Abetting Breach of Fiduciary Duty ............ 69
    D) Count VIII--Unjust Enrichment ..................................... 71

CONCLUSION ............................................................... 72

**\*1** Presently before the Court are nine separate motions to dismiss filed by various Defendants. (Docs. 46, 91, 93, 95, 96, 98, 100, 104, and 108.) In total, every Defendant except Linsco Private Ledger Corporation (hereinafter LPL) [FN1] filed a motion to dismiss. The motions challenge Plaintiffs' standing to bring the suit and argue that the claims are time barred and that the Complaint fails to state a claim upon which relief can be granted. For the reasons set forth below, I will grant the motions in part and deny the motions in part. The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a).

> FN1. LPL filed a Motion to Compel Arbitration and to Stay Proceedings (Doc. 102), which I will address separately.

### FACTUAL BACKGROUND

The present action focuses on the events leading up to and surrounding the investment contracts made by the Luzerne County Retirement Board (hereinafter the Board) and Board members during the period of 1988 and 2002. Plaintiffs allege that various Board members engaged in a pay-to-play scheme in which contracts to invest or manage pension plan assets were awarded in exchange for campaign contributions to various Board members' reelection campaigns.

Luzerne County maintains a pension plan for employees (hereinafter the Plan). The Plan is administered by the Board. In March, 1988, the Board retained ASCO Financial Group, Inc. (hereinafter ASCO) as an investment advisor to the Plan. ASCO remained the financial advisor until September 5, 2002. During the course of the relationship with ASCO, various Board members approved contracts to invest the Plan's money. The Complaint alleges that most of the contracts were not properly approved by the Board through a vote at a public meeting and were instead signed by individual Board members. The Board members allegedly involved are Thomas A. Makowski, Thomas P. Pizano, Frank Crossin, and Joseph Jones. [FN2] The following facts are alleged in the Complaint:

> FN2. The Complaint also alleges that Board members Joseph S. Tirpak, Jim Phillips, and Frank Trinisewski acted with the aforementioned Board

members in approving certain contracts (see, e.g., Doc. 1 ¶ 46), but they are not named as defendants.

The Plan entered into four contracts with Provident Mutual Life Insurance Company of Philadelphia (hereinafter Provident). The first contract was to manage $6 million of assets. The remaining three contracts were to purchase annuities totaling more than $60 million. The Plan paid more than $5 million in fees, which included commissions, over the course of the contracts. ASCO received commissions from Provident for each of these contracts, and certain ASCO officers received commissions for two of the Provident contracts. Joseph J. Joyce Associates, Inc. (hereinafter JJJA) also received commissions for each of the contracts. These contracts will be referred to throughout the opinion as the first, second, third, and fourth Provident Agreements. Nationwide Life Insurance Company (hereinafter Nationwide) is the successor-in-interest to Provident.

The Plan entered into two contracts with The Manufacturers Life Insurance Company (U.S.A.) (hereinafter Manulife). The contracts were for Manulife to manage a total of more than $20 million. The Plan paid nearly $1.9 million in fees and commissions over the course of the contracts. JJJA and Donald Williamson, ASCO's President and CEO, received commissions for both contracts. ASCO also received a commission for the first contract. These contracts will be referred to throughout the opinion as the first and second Manulife Agreements.

**\*2** The Plan entered into a contract with Wells Real Estate Funds, Inc. (hereinafter Wells). The contract called for two purchases into the Wells Real Estate Investment Trust, Inc. (hereinafter Wells REIT), the first for $1 million and the second for $9 million. The $10 million was given to FSC Securities Corporation (hereinafter FSC), which in turn transmitted the funds to Wells REIT. The Plan paid more than $300,000 in fees, which included commissions. Joseph C. Perfilio, Michael Joyce, and Donald Williamson all received commissions in relation to the Wells REIT purchases. This contract will be referred to throughout the opinion as the Wells Agreement.

The Plan entered into a contract with Rochdale



Not Reported in F.Supp.2d
(Cite as: 2004 WL 1908221, *2 (M.D.Pa.))

Page 639

Investment Management, Inc., [FN3] In which Rochdale invested $1.1 million through FSC. The Plan realized losses of more than $500,000 over the life of the investment. Joseph Perfilio and Donald Williamson received commissions related to the contract. This contract will be referred to throughout the opinion as the FSC Agreement.

FN3. Rochdale Investment Management, Inc. is not named as a defendant.

Donald Williamson signed a contract on behalf of the Plan in which First Security Investments, Inc. (hereinafter FSI) would manage $1.25 million of the Plan's assets. The funds were invested in FSI notes. The Plan realized a loss of more than $1.6 million over the life of the investment. Donald Williamson received a commission for his part in the contract. This contract will be referred to throughout the opinion as the FSI Agreement.

The Plan entered into a contract with LPL in which LPL would manage $1.5 million. The Plan paid $69,000 in fees, and realized a gain of more than $300,000. This contract will be referred to throughout the opinion as the LPL Agreement.

The Plan also entered into several contracts for investment advice and management. The Plan entered a contract with ASCO in 1988 for ASCO to act as an investment plan advisor. This arrangement lasted until 2002. In 1999, the Plan contracted with ASCO to administer the daily operations of the Plan. Maria Williamson, ASCO's Vice-President/ Operations, was responsible for overseeing these daily operations. The Plan entered a contract with Safeco Life Insurance Corporation (hereinafter Safeco) in which it was given money to invest. Safeco also acted to collect the fees the Plan paid to ASCO. In September, 2002, the Board dissolved its relationship with ASCO.

Between 1988 and 2002 Donald Williamson, Maria Williamson, John J. Joyce, Joseph Joyce, Jr. (hereinafter Joseph Joyce), Jerome McHale, Joyce Jackman & Bell Insurers (hereinafter JJ & B), William Joyce, Joseph Perfilio, Gary Houseman, Steven Alinikoff, Michael Hirthler, ASCO, Safeco, Joseph Joyce Insurance (hereinafter JJI), and Devonshire Capital Management, LLC (hereinafter Devonshire) made campaign contributions to various Board members. [FN4]

FN4. Jerome McHale, Gary Houseman, Steven Alinikoff, and Michael Hirthler are not named as defendants.

PROCEDURAL BACKGROUND

On October 9, 2003, Plaintiffs filed a ninety-eight page Complaint raising eight claims against twenty-six Defendants. Plaintiffs bring the following claims against Defendants as listed below:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.2d
(Cite as: 2004 WL 1908221, *2 (M.D.Pa.))

(1)     Count I     Breach of fiduciary duty--Defendants Makowski, Pizano, Crossin, Jones, ASCO, and Donald Williamson;

(2)     Count II     Aiding and abetting breach of fiduciary duty--Defendants

Nationwide, Manulife, Wells, Wells Investment Securities, Inc. (hereinafter Wells Investment), Wells REIT, FSC, FSI, LPL, Safeco, Devonshire, Perfilio, Joyce Associates, Inc., JJI, JJJA, JJ & B, Joseph Joyce, William Joyce, Michael Joyce, John Joyce, and Maria Williamson;

(3)     Count III     Arising from 18 U.S.C. s 1964(c) for violations of s 1962(c),

conducting and participating in an enterprise by engaging in a pattern of racketeering activity--all Defendants;

(4)     Count IV     Arising from 18 U.S.C. s 1964(c) for violations of s 1962(d),

conspiring to violate s 1962(c)--all Defendants;

(5)     Count V     Arising from 18 U.S.C. s 1964(c) for violations of s 1962(b), acquiring and maintaining an interest or control of an enterprise
engaged in a pattern of racketeering activity--all Defendants;

(6)     Count VI     Arising from 18 U.S.C. s 1964(c) for violations of s 1962(d),

conspiring to violate s 1962(b)--all Defendants;

(7)     Count VII     Violating the Investment Advisors Act--Defendants Donald

Williamson and ASCO; and

(8)     Count VIII     Unjust enrichment--Defendants ASCO, Donald Williamson,

FSC, FSI, LPL, Manulife, Nationwide, Wells, Wells REIT, Wells Investment, Perfilio, JJI, JJJA, Joseph Joyce, Michael Joyce, and John Joyce.

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



**\*3** All Defendants, with the exception of LPL, [FN5] filed a total of nine motions to dismiss. [FN6] (Docs. 46, 91, 93, 95, 96, 98, 100, 104, and 108.) In sum, the motions raised the following challenges: lack of standing, filing past the statute of limitations, lack of standing to bring the RICO claims, failure to state a claim upon which relief can be granted for the RICO claims, lack of supplemental jurisdiction to hear the state law claims, and failure to state a claim upon which relief can be granted for the state law claims of aiding and abetting breach of fiduciary duty and unjust enrichment. Plaintiffs filed a brief in opposition to one motion to dismiss (Doc. 46). (Doc. 85.) Because of the similarity of the issues among the motions, the Court permitted Plaintiffs to file a single brief in opposition to the remaining eight motions to dismiss. (Doc. 151.) The moving Defendants filed reply briefs. This matter is now ripe for disposition.

> FN5. LPL filed a Motion to Compel Arbitration and to Stay Proceedings (Doc. 102) which I will address separately.

> FN6. Safeco's motion was actually filed as a motion to dismiss or, in the alternative, a motion for summary judgment. (Doc. 93.) I chose not to convert the motion to one for summary judgment.

## LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. Dismissal is appropriate only if, accepting all factual allegations in the complaint as true and "drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations in the complaint." Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc., 140 F.3d 478, 483 (3d Cir.1998).

In deciding a motion to dismiss, the Court should consider the allegations in the complaint, exhibits attached to the complaint and matters of public record. See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir.1993). The Court may also consider "undisputedly authentic" documents where the plaintiff's claims are based on the documents and the defendant has attached a copy of the document to the motion to dismiss. Id. The Court need not assume that the plaintiff can prove facts that were not alleged in the complaint, see City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 263 (3d Cir.1998), nor credit a complaint's "bald assertions" or "legal conclusions." Morse v. Lower Marion Sch. Dist., 132 F.3d 902, 906 (3d Cir.1997).

When considering a Rule 12(b)(6) motion, the Court's role is limited to determining whether the plaintiff is entitled to offer evidence in support of the claims. See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The Court does not consider whether the plaintiff will ultimately prevail. See id. In order to survive a motion to dismiss, the plaintiff must set forth information from which each element of a claim may be inferred. See Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir.1993). The defendant bears the burden of establishing that the plaintiff's complaint fails to state a claim upon which relief can be granted. See Gould Elecs. v.. United States, 220 F.3d 169, 178 (3d Cir.2000).

## DISCUSSION

**\*4** Defendants raise many challenges to the Complaint in their motions to dismiss and supporting briefs. Most of the arguments are raised by all Defendants, while others are raised by some Defendants. In summary, the arguments raised by Defendants fall into four categories: challenges to the entire action; challenges that apply to all of the RICO claims, challenges that apply to all of the state law claims, and challenges to individual claims. I will address the general challenges first, and then I will address all of the challenges applicable to the federal claims before moving to the state law claims.

### 1) Justiciability

The Board member Defendants first challenge Plaintiffs' ability to bring this action. Defendants raise two arguments. First, the Board members contend that Plaintiffs lack standing to bring the suit, suggesting instead that the Plan beneficiaries must bring the action. Next, the Board members contend that the suit lacks redressability because any damages awarded against a Board member would have to be paid by the Plan.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Defendant Board members contend that Plaintiffs lack standing to bring the suit on two grounds: the Board is the Plaintiff at the same time the Board is "suing itself" (Doc. 105 at 25); and the Board has not suffered any injury. (Doc. 105 at 26.) I find both of these arguments without merit. First, the Board members mis-classify the nature of the action. The Board is not the sole Plaintiff in this action; Stephen L. Flood, the Luzeme County Controller is also a named Plaintiff. Second, there is nothing in the Complaint that ever suggests the Board is suing itself. The Board is suing individual Board members, not the legal entity that is the Luzeme County Retirement Board.

Defendants cite McCarrell v. Cumberland County Employees Retirement Board, 120 Pa.Cmwlth. 94, 547 A.2d 1293 (Pa.Commonw.Ct.1988), as suggesting that the only proper plaintiffs are the Plan's beneficiaries. I find McCarrell inapposite to the present case. McCarrell does not address the question whether a Board member may bring suit against other Board members on behalf of the fund. McCarrell likewise does not limit the fiduciary obligations of Board members to the beneficiaries of the plan. In fact, a full reading of McCarrell shows the Commonwealth Court was expanding the parties to whom the Board members owed duties, not restricting those duties. Pennsylvania law is clear that board members are fiduciaries of the fund. 16 P.S. § 11659; 20 Pa. Conn. Stat. Ann. § 7301. Therefore, because the Board members owed obligations to the fund directly, it only stands to reason that the fund can use the Board to directly enforce those duties owed to it.

Defendant Board members' argument that Plaintiffs lack an injury is equally unconvincing. The argument seems premised on the notion that the Board did not suffer any injury, only the Plan suffered an injury. As I stated previously, the Board is suing on behalf of the Plan. The Complaint adequately alleges that the Plan suffered injuries. See, e.g., discussion supra p. 18. Plaintiffs allege that the Board member Defendants entered into contracts which were unsound investments and which cost the Plan excessive management fees. The excessive fees allegation constitutes an actual, direct harm.

*5 Lastly, Defendant Board members suggest that the case against them lacks any available means of redress because any award against them would be paid by the fund, to the fund. This notion is premised upon an unusual reading of title 16, section 11654 of the Pennsylvania Code, which provides that "[the board members] shall be reimbursed for all expenses necessarily incurred in the performance of their duty." [FN7] Pennsylvania law makes clear that "necessarily incurred" expenses are only those expenses which needed to be incurred in the interest of the fund. In re Main, Inc. ., No. 98-158, 1999 WL 330239, at *6 (E.D.Pa. May 24, 1999) (discussing Pennsylvania law); see also Schwartz v. Keystone Oil Co., 25 A. 1018, 287 (Pa.1893). Clearly, the expenditure of money to defend actions in direct violation of the act (i.e., violations of fiduciary duties) would not be necessary expenses within the meaning of section 11654. If Plaintiffs' claims succeed against the Board members, they will have an available means of redress.

FN7. This sentence is interestingly juxtaposed to the sentences which require board members to take an oath of office that they will administer the fund fairly and without knowing violation of the provisions of the act. 16 P.S. § 11654.

2) Racketeer Influenced and Corrupt Organizations Act Claims

Plaintiffs raise four claims based on the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. (hereinafter RICO). Under RICO, "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor." 18 U.S.C. § 1964(c). Plaintiffs allege that Defendants violated § 1962(c), § 1962(b), and § 1962(d). Defendants challenge the RICO claims generally on the grounds that they are time-barred and that Plaintiffs do not allege the existence of an enterprise. Defendants also raise challenges to the individual RICO claims. I will address the general challenges first and then move to the claim-specific challenges.

A) Statute of Limitations

RICO has no explicit statute of limitations. Analogizing RICO to the Clayton Act, the Supreme Court adopted a four-year statute of limitations. Agency Holding Corp. v. Malley-Duff & Assocs., 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

121 (1987). In 2000, the Court of Appeals for the Third Circuit adopted an injury discovery test for determining when the statute of limitations begins to run. Forbes v. Engleson, 228 F.3d 471, 484 (3d Cir.2000). Under the injury discovery rule, the statute of limitations begins to accure when a plaintiff knew or should have known that it suffered injuries and that *the source of those injuries were the actions of another person.* Id. at 485. [FN8] For determining the "injury" from which to analyze the statute of limitations, courts look to the allegations in the complaint. See Prudential Ins. Co. of Amer. v. U.S. Gypsum, 359 F.3d 226, 234 (3d Cir.2004).

> FN8. *One unsettled point is whether the statute of limitations runs at the time plaintiffs should have known about the injury (the injury discovery rule), or at the time plaintiffs should have known about the injury and after all of the elements of a RICO claim exist (the injury discovery and pattern rule). Matthews v. Kidder, Peabody & Co., 260 F.3d 239, 245 n. 7 (3d Cir.2000). Under the injury discovery and pattern rule, when a plaintiff knows or should know about an injury before the necessary RICO elements exist, the RICO claim does not accrue until after the final element occurs, including a pattern of racketeering activity. Id.*

Plaintiffs argue that the doctrines of fraudulent concealment and adverse domination preserve their right to file suit beyond the four year statute of limitations. Under the fraudulent concealment doctrine, *knowledge of an injury caused by another* still accrues the statute of limitations, but the statute of limitations is tolled when a defendant actively misleads the victim about the cause of the injury. Forbes, 228 F.3d at 486. Plaintiffs are eligible for equitable tolling only if they exercised reasonable diligence in investigating their claims. Prudential, 359 F.3d at 283 (citing Klehr v. A.O. Smith Corp., 521 U.S. 179, 194, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997)).

*6 Thus, ordinarily when plaintiffs seek to demonstrate a case for equitable tolling, and defendants seek summary judgment on the issue, a court must determine (1) whether there is sufficient evidence to support a finding that defendants engaged in affirmative acts of concealment designed to mislead the plaintiffs regarding facts supporting their [RICO] claim, (2) *whether there is sufficient evidence to support a finding that plaintiffs exercised reasonable*

diligence, and (3) whether there is sufficient evidence to support a finding that plaintiffs were not aware, nor should they have been aware, of the facts supporting their claim until a time within the limitations period measured backwards from when the plaintiffs filed their complaint. Forbes, 228 F.3d at 487 (emphasis added). When evaluating fraudulent concealment, it requires a fact-specific analysis which is best reserved for summary judgment, rather than a motion to dismiss. Shapo v. O'Shaughnessy, 246 F.Supp.2d 935, 951 (N.D.Ill.2002) (citing Johnson Controls, Inc. v. Exide Corp., 129 F.Supp.2d 1137, 1142 (N.D.Ill.2001)).

Under the doctrine of adverse domination, the statute of limitations is tolled when the plaintiff is controlled or dominated by wrongdoers. See Shapo, 246 F.Supp.2d at 953 (citing Resolution Trust Corp. v. Gallagher, 800 F.Supp. 595, 600 (N.D.Ill.1992)). The principle underlying adverse domination is that officers or directors engaging in activities that harm an entity will not bring suit against themselves. Id.; see also Resolution Trust Corp. v. Gardner, 798 F.Supp. 790, 795 (D.D.C.1992) (adopting adverse domination and citing other federal jurisdictions that have). The statute of limitations does not begin to run until the entity is no longer controlled by the wrongdoers. Shapo, 246 F.Supp.2d at 953.

Reading the Complaint in the light most favorable to Plaintiffs, they allege the three elements necessary to prove fraudulent concealment: Defendants actively mislead Plaintiffs; the misleading prevented Plaintiffs from discovering the injury; and Plaintiffs did not fail to engage in reasonable due diligence. Plaintiffs allege that the investment companies conspired with the Board members to defraud the Plan, and in doing so they actively concealed the nature of the relationships between the Board, the investment companies, and ASCO employees. Plaintiffs also allege that the Board members adopted contracts outside of the public eye, without proper voting and not during public meetings. They further allege that the financial statements were concealed from the beneficiaries of the Plan by being sent to ASCO instead of the Board. All of these actions prevented the beneficiaries of the Plan from discovering the nature of the investment contracts in which the Plan's funds were being invested. Furthermore, because the Board was

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.2d
(Cite as: 2004 WL 1908221, *6 (M.D.Pa.))

Page 644

adversely dominated by the alleged wrongdoers, the statute of limitations was tolled until the Board was no longer controlled by those parties.

*7 Whether Plaintiffs will be successful in proving fraudulent concealment or adverse domination is a fact-specific analysis which is inappropriate for a motion to dismiss, Shapo, 246 F.Supp.2d at 951, but it is clear to the Court that Plaintiffs sufficiently pled fraudulent concealment and adverse domination to survive a motion to dismiss. Therefore, I will not dismiss Plaintiffs' action for failure to file within the prescribed statute of limitations.

B) Enterprise

An essential requirement of RICO is the existence of an enterprise. See, e.g., 18 U.S.C. § 1962(b) and (c). An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An enterprise must be an "entity separate and apart from the pattern of racketeering activity in which it engages." United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

The existence of an enterprise can be proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." Id. The Court of Appeals for the Third Circuit has expanded Turkette by requiring that the enterprise is an ongoing organization with a framework for making or carrying out decisions, that the various associates function as a continuing unit, and that the enterprise is separate and apart from the pattern of racketeering activity. United States v. Irizarry, 341 F.3d 273, 286 (3d Cir.2003) (quoting United States v. Riccobene, 709 F.2d 214, 222 (3d Cir.1983)). The ongoing nature of an enterprise does not require that all of the members participate from beginning to end. United States v. Parise, 159 F.3d 790, 795 (3d Cir.1998) (quoting United States v. Feldman, 853 F.2d 648, 659 (9th Cir.1988)). The enterprise must maintain a shared organizational pattern and system of authority. Id. (citing United States v. Lemm, 680 F.2d 1193, 1199 (8th Cir.1982)).

Plaintiffs argue that the enterprise consisted either

of the Board (Doc. 1 ¶ 184), or an association-in-fact of the Board members. (Doc. 1 ¶ 185.) Plaintiffs' claims are that the Board, which is responsible for administering the Plan's funds, engaged in racketeering activity that victimized the Plan. The present action is not unlike a situation in which board members of a corporation rob the corporation of its assets. In such instances, the wrongdoers and the victim are both internal to the corporation. However, the Court of Appeals for the Third Circuit has made clear that a corporation can be either the victim or the enterprise, not both. See discussion, Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., 46 F.3d 258, 267 (3d Cir.1995) (resolving conflict between Nat'l Org. for Women v. Scheidler, 510 U.S. 1215, 114 S.Ct. 1340, 127 L.Ed.2d 688 (1994) and Reves v. Ernst & Young, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993)). Thus, in instances in which the racketeering activity is committed by people within the company and the victim of the racketeering activity is the corporation, the enterprise is not the corporation itself; an association-in-fact of the board members or corporate officers constitutes the enterprise. Id. In the present case, the Plan was the victim, therefore, the Board of the Plan could not also be the enterprise. Instead, the association-in-fact of the Board members as alleged in the Complaint constituted the enterprise.

*8 An association-in-fact can be separate from the criminal activities by the fact that it engages in more than one scheme. See Town of Kearny v. Hudson Meadows Urban Corp., 829 F.2d 1263, 1266 (3d Cir.1987). Thus, the twelve separate schemes alleged in the Complaint suggest that the Board members' association-in-fact was separate from the racketeering activities. Because the organizational pattern and system of authority remained the same, the enterprise alleged was continuous over the course of the fourteen years, even though some of the members of the Board changed. See Parise, 159 F.3d at 795.

C) Count III-- § 1962(c) Participating in an Enterprise Through a Pattern of Racketeering Activity

Count III is based in 18 U.S.C. § 1964(c) and alleges that Defendants violated 18 U.S.C. § 1962(c). Section 1962(c) prohibits "any person employed by or associated with any enterprise

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d                                                    **Page 645**
(Cite as: 2004 WL 1908221, *8 (M.D.Pa.))

engaged in, or the activities of which affect, interstate commerce or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." A pattern of racketeering activity is established by showing at least two predicate acts that occurred within ten years of each other. 18 U.S.C. § 1961(5).

Any crime enumerated in 18 U.S.C. § 1961(1) may constitute a predicate act, which includes mail and wire fraud. 18 U.S.C. § 1961(1)(B). Where fraud is alleged as a predicate act, the plaintiff must allege the fraud with particularity. See generally Fed. R. Civ. P. 9(b). Any crime which constitutes a securities fraud is expressly excluded by the Private Securities Litigation Reform Act. 18 U.S.C. § 1964(c). Although two predicate acts are necessary to establish a pattern of racketeering activity, they are not necessarily sufficient. H.J. Inc. v. Northwestern Bell Tele. Co., 492 U.S. 229, 237, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The predicate acts must be related and amount to or threaten to become continued criminal activity. Id. at 239.

Thus, to survive a motion to dismiss, Plaintiffs' Complaint must allege, with particularity where fraud is alleged, at least two non-securities-related predicate acts which can be attributed to each Defendant, and those acts must be related and amount to continued criminal activity. Furthermore, Plaintiffs must have suffered an injury as a result of the racketeering activity. 28 U.S.C. § 1964(c). Defendants argue that Plaintiffs do not allege an injury from a violation of § 1962, nor do they allege a violation of § 1962 itself. Defendants argue that Plaintiffs do not allege predicate acts, that any acts alleged are not alleged with particularity, that any acts alleged are barred by the Private Securities Litigation Reform Act, and that any acts alleged do not constitute a pattern of racketeering activity. I will address each of these challenges in turn.

i) Standing

Although Plaintiffs have established the threshold requirement that they have standing to bring the present action, there is an independent question whether they have standing to bring a claim under RICO's civil remedies provision § 1964(c). See, e.g., Maio v.. Atena, Inc., 221 F.3d 472, 482 (3d

Cir.2000) (citing DeMauro v.. DeMauro, 115 F.3d 94, 96 (1st Cir.1997)). Standing to bring a RICO claim exists when there is an injury to a plaintiff's business or property and the injury was proximately caused by a violation of § 1962. Maio, 221 F.3d at 483; see also Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) ("[T]he plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation [of RICO]."). An injury must be a concrete financial loss to the plaintiff. Maio, 221 F.3d at 483-84. An out-of-pocket monetary loss satisfies this requirement. Id. Failure to perform a paid-for contractual right can constitute an injury. Id. at 490; see also Mehling v. N.Y. Life Ins. Co., 163 F.Supp.2d 502, 507 (E.D.Pa.2001).

*9 In the present case, the Plan, through its Board, is suing Defendants for entering into contracts which resulted in the Plan paying excessive fees, as well as suffering economic losses through bad investments. The payment of excessive fees was a loss suffered by the Plan directly, which it paid for out of its pocket. Likewise, the Complaint alleges the injury is the direct result of the frauds stemming from Defendant Board members and Defendant investment managers' collusion to enter the Plan into inappropriate contracts. I find Plaintiffs sufficiently allege an injury resulting from a pattern of racketeering activity.

ii) Two Predicate Acts

Defendants next argue that Plaintiffs' RICO claims fail to state a claim upon which relief can be granted because they fail to allege a violation of § 1962(c). Section 1962(c) requires that a defendant engage in a pattern of racketeering activity. A pattern of racketeering activity requires at least two predicate acts that occurred within ten years of each other. 18 U.S.C. § 1961(5). Any crime enumerated in 18 U.S.C. § 1961(1) may constitute a predicate act, which includes mail and wire fraud. 18 U.S.C. § 1961(1)(B).

In the present case, Plaintiffs' Complaint alleges that various Defendants committed acts of mail or wire fraud. Mail and wire fraud occur when there is: (1) a scheme to defraud; (2) use of the mails (for mail fraud) or interstate wire communications (for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.2d
(Cite as: 2004 WL 1908221, *9 (M.D.Pa.))

wire fraud) in furtherance of the scheme; and (3) fraudulent intent. United States v. Pharis, 298 F.3d 228, 234 (3d Cir.2002) (citing United States v. Strum, 671 F.2d 749, 751 (3d Cir.1982)).

Mail and wire fraud schemes to defraud do not require an actual misrepresentation of fact. See discussion, McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786, 791 (1st Cir.1990). Fraudulent schemes include schemes to deprive another of the "intangible right of honest services." 18 U.S.C. § 1346. State and local officials and public employees can be held accountable under the statute when they deprive "the citizens they serve of their right to honest services." United States v. Antico, 275 F.3d 245, 262 (3d Cir.2001). This doctrine is applied when an official takes bribes for official decisions or actions, or when an official fails to disclose a conflict of interest. See United States v. Panarella, 277 F.3d 678, 690 (3d Cir.2002).

The mailing does not have to contain a misrepresentation. " '[I]nnocent' mailings--ones that contain no false information--may supply the mailing element." Schmuck v. United States, 489 U.S. 705, 715, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). Moreover, the scheme itself does not have to contemplate the use of mails. Pharis, 298 F.3d at 234. "All that is required is that the defendants knowingly participated in a scheme to defraud and caused a mailing to be used in furtherance of the scheme." Id. (citing Strum, 671 F.2d at 751 and United States v. Pearlstein, 576 F.2d 531, 534 (3d Cir.1978)). "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can be reasonably foreseen, even though not actually intended, then he 'causes' the mails to be used." Pereira v. United States, 347 U.S. 1, 8-9, 74 S.Ct. 358, 98 L.Ed. 435 (1954) (citing United States v. Kenofskey, 243 U.S. 440, 37 S.Ct. 438, 61 L.Ed. 836 (1917)). Because the federal violation is the mailing, each use of the mails which is "incident to an essential part of the scheme" is a separate violation. Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1413 (3d Cir.1991) (quoting Pereira, 347 U.S. at 8).

*10 Plaintiffs allege that Board members were induced to award management and investment contracts on the basis of campaign contributions made to the Board members by people affiliated

with the contract recipients. Plaintiffs further allege that these contracts were improper for the fund and Defendants concealed the fees and costs of the contracts. These allegations of deceit are clearly sufficient to constitute a fraudulent scheme under the mail and wire fraud statutes. Particularly, there are at least two, if not three, separate fraudulent schemes occurring: a denial of honest dealings, intentional concealment of the contracts, and concealment of the terms of the contracts. Plaintiffs also allege more than fifty uses of mail or wire communications to further these schemes. Thus, Plaintiffs allege the basic elements of mail and wire fraud.

While Plaintiffs allege the basic elements of mail and wire fraud, it is less clear against which Defendants these allegations are made. Plaintiffs contend all Defendants conspired in the single scheme of pay-to-play contract granting, and, therefore, the actions of any party within the scheme constitutes mail or wire fraud committed by every Defendant. Plaintiffs base this argument on three separate allegations in the Complaint. First, the conclusory allegations in Paragraphs 196 and 213 that "defendants conspired to perpetuate a scheme" and the blanket allegations in Paragraph 188 which describe the scheme in general terms and refer to Defendants collectively as "the collaborators." These conclusory allegations in Plaintiffs' Complaint are insufficient to permit the Court to hold each Defendant accountable for the actions of every Defendant. The dealings alleged by Plaintiffs show a series of fraudulent schemes, each involving various Defendants.

As alleged in the Complaint, the schemes actually involved two sets of actors. First, there was a core group of participants who ran the pay-to-play schemes, these parties include the Board members, who approved the contracts, ASCO, which brokered the contracts and oversaw the daily financial operations of the Plan's funds, and various ASCO employees. The second set of actors were the parties who "purchased" contracts in the pay-to-play schemes. This includes the investment companies themselves, various people and entities who assisted in the purchase of the contract by making campaign contributions, as well as those who benefitted from the contract through commissions.

There is nothing in Plaintiffs' Complaint which



Not Reported in F.Supp.2d
(Cite as: 2004 WL 1908221, *10 (M.D.Pa.))

alleges that defendants were universally involved with the activities of every contract, or that Defendants even were aware that the other contracts existed. In essence, each contract purchase was a separate fraudulent scheme. As such, the use of mail or wire communications by one Defendant did not necessarily forward a scheme in which all of the Defendants were implicated. When evaluating whether there are two predicate acts alleged, I will review the allegations according to the activities alleged against an individual Defendant. For ASCO, Donald Williamson, Nationwide, JJ & B, Joseph Joyce, John Joyce, William Joyce, Manulife, FSI, and Safeco, the Complaint alleges two or more acts of mail or wire fraud committed by each Defendant directly. (Doc. 1 ¶ 189.)

**\*11** For the remaining Defendants, although the Complaint does not allege that they personally used the mail or wires twice, the Complaint may allege two or more predicate acts of mail or wire fraud against a defendant. A defendant can be held accountable for each use of mail or wire communications that forwards a scheme in which the defendant participated, as long as the use of the mail or wires was reasonably foreseeable by the defendant. See Pereira, 347 U.S. at 8-9.

a) ASCO Affiliates

For the Board members (Defendants Makowski, Pizano, Crossin, and Jones), the Complaint alleges that each campaign contribution was mailed. Although these Defendants did not initiate the mailings, it is clear that the mailing of the contributions furthered the pay-to-play scheme. The use of the mail is reasonably foreseeable in a pay-to-play scheme. Additionally, because the Complaint alleges that the Board members were all involved in the scheme for each contract, any use of mail or wire communications in furtherance of the schemes is an allegation of mail fraud against all of the Board members. Plaintiffs' Complaint alleges at least two predicate acts committed by Defendants Makowski, Pizano, Crossin, and Jones.

In regards to Maria Williamson, the Complaint alleges that she used the mail only once. (Doc. 1 ¶ 189mm.) However, the Complaint clearly alleges that Maria Williamson acted as the Vice President/ Operations for ASCO during the time in which ASCO administered the daily operations of the Plan.

(Doc. 1 ¶ 53.) It is a reasonable inference that Maria Williamson was involved with ASCO in the alleged fraudulent schemes which took place during this time period, thus, the uses of the mail related to those schemes  [FN9] constitutes mail fraud by Maria Williamson. Plaintiffs' Complaint alleges at least two predicate acts committed by Defendant Maria Williamson.

> FN9. For instance, ASCO mailed an administration agreement to Defendant Makowski allegedly in furtherance of a fraudulent scheme (Doc. 1 ¶ 189oo), and ASCO mailed a Special Agent's Agreement to Provident allegedly in furtherance of a fraudulent scheme. (Doc. 1 ¶ 189pp.)

b) The Wells Agreement

Perfilio is directly alleged to have committed a single act, in that he mailed a campaign contribution to Defendants Makowski and Pizano. (Doc. 1 ¶ 189gg.) Neither Michael Joyce nor FSC is directly alleged to have committed any acts. Wells, Wells REIT, and Wells Investment are directly alleged to have committed a single act, they mailed the Wells Agreement to the Plan. (Doc. 1 ¶ 189bb.) While the Complaint does not allege two acts against each of these Defendants directly, the Complaint clearly implicates all of these Defendants in the scheme to defraud the Plan related to the Wells Agreement. (Doc. 1 ¶¶ 116--125.)

The uses of the mails alleged were reasonably foreseeable as part of the Wells Agreement scheme. Because these Defendants are identified in a scheme together, the use of mail or wire to by any of these Defendants in furtherance of the scheme satisfies the use of mail or wire communications for all of these Defendants. Thus, the allegations that one Defendant used the mail or wires constitutes an allegation of mail or wire fraud against all of these Defendants. Plaintiffs' Complaint alleges at least two predicate acts committed by Defendants Perfilio, Michael Joyce, FSC, Wells, Wells REIT, and Wells Investment.

c) Miscellaneous Defendants

**\*12** For JJJA, there are no allegations that it directly used the mail or wires. The Complaint clearly implicates JJJA in the four Provident Agreements entered into between December, 1991,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.2d
(Cite as: 2004 WL 1908221, *12 (M.D.Pa.))

Page 648

and June, 2000, (see, e.g., Doc. 1 ¶¶ 66, 75, 85, 93) and the two Manulife Agreements. (Doc. 1 ¶¶ 103 and 109.) These allegations create a foundation to substantiate the blanket allegation that JJJA acted with other Defendants in a scheme. In particular, it is a reasonable inference that JJJA acted with Defendants ASCO, Donald Williamson, Nationwide, Manulife, William Joyce, Makowski, Pizano, Crossin, and Jones. The Complaint alleges multiple uses of the mail and wires by these Defendants to further the schemes in which JJJA was involved. These uses of the mail were reasonably foreseeable in the course of the schemes. Plaintiffs' Complaint alleges at least two predicate acts committed by Defendant JJJA.

In regards to Devonshire, the Complaint alleges that the Devonshire mailed a campaign contribution to Defendants Makowski and Pizano. [FN10] The Complaint does create some tangential connection between Devonshire and other named Defendants. The Complaint alleges that Donald Williamson, who made campaign contributions to Defendants Makowski, Pizano, Crossin, and Jones, was affiliated with Devonshire. The Complaint also links Devonshire with Perfilio, who is alleged to be involved in the FSC transaction campaign contributions to Defendants Makowski and Pizano.

> FN10. The allegation that Devonshire mailed the campaign contribution is in itself questionable because the Complaint alleges "a mailing on or about April 9, 1999 by Perfilio or Devonshire...." (Doc. 1 ¶ 189gg.) This allegation arguably lacks specificity required under Rule 9(b), see, e.g., Lum v. Bank of Am. ., 361 F.3d 217, 224-25 (3d Cir.2004), but I don't need to reach that issue because the Complaint's allegations fail against Devonshire on other grounds.

Aside from these connections, the Complaint fails to explain how Devonshire was in anyway connected with any of the transactions between the Board, ASCO, and the investment companies. The Complaint also does not indicate that either Defendants Donald Williamson or Perfilio were acting on behalf of Devonshire at the time they made the campaign contributions. The fact that Devonshire was tangentially connected to two named Defendants who were allegedly involved in a scheme to defraud does not create any inference that Devonshire was involved in the scheme. While the

fact that Devonshire made a political contribution may suggest its involvement in the pay-to-play scheme, the Complaint does not link Devonshire to a particular fraudulent scheme. Therefore, I cannot infer that it caused any mailings other than those which it made directly. I find that Plaintiffs' Complaint fails to allege two predicate acts and, consequently, fails to allege a pattern of racketeering activity by Defendant Devonshire.

JJI is alleged to have mailed a single campaign contribution. (Doc. 1 ¶ 188h.) Aside from this contribution, the Complaint fails to explain how JJI was in anyway connected with any of the transactions between the Board, ASCO, and the investment companies. While the fact that JJI made a political contribution may suggest its involvement in the pay-to-play scheme, the Complaint does not link JJI to a particular fraudulent scheme. Therefore, I cannot infer that it caused any mailings other than those which it made directly. I find that Plaintiffs' Complaint fails to allege two predicate acts, and, therefore, the Complaint fails to allege a pattern of racketeering activity by Defendant JJI.

*13 For Joyce Associates, Inc., I found no alleged connection between it and any criminal activity, let alone the requisite two predicate acts. The Complaint fails to allege that Joyce Associates, Inc. was in anyway connected with any of the allegedly fraudulent schemes between the Board, ASCO, and the investment companies. I find that Plaintiffs' Complaint fails to allege two predicate acts against Defendant Joyce Associates, Inc.

iii) Rule 9(b)

The next step in the analysis is to determine if the predicate acts alleged in the Complaint satisfy the requirements of Rule 9(b). Where fraud is alleged as a predicate act, Rule 9(b) requires that the plaintiff allege the fraud with particularity. Fed. R. Civ. P. 9(b). The particularity requirement can be satisfied through alleging the date, time, or place of the fraud, or by giving "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir.1984); see also Lum v. Bank of Am., 361 F.3d 217, 224 (3d Cir.2004). Plaintiffs must always allege who made the fraudulent representation, to whom the representation was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 1908221, *13 (M.D.Pa.))

made, and the general content of the misrepresentation. Saporito v. Combustion Eng'g Inc. ., 843 F.2d 666, 675 (3d Cir.1988), vacated on other grounds, 489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989).

Based on the above requirements, I find certain allegations are lacking in specificity. In particular, the allegation in Paragraph 189a lacks any specificity regarding who made the communication, to whom, or when the communication occurred. Similarly, the allegations in Paragraphs 189b, 189c, and 189d lack any specificity about when the conversations took place, and the allegations lack specificity about which fraudulent transaction was furthered by the communication. See Lum, 361 F.3d at 224. The allegations in Paragraphs 189e, 189f, 189n, and 189dd fail because they use the term "and/or" to identify the defendant initiating the communication. This connector does not identify who sent the communication, and it causes an ambiguity which does not satisfy Rule 9(b). Similarly, the allegations in Paragraphs 189y and 189gg fail to satisfy Rule 9(b) because they identify two Defendants as possible persons who initiated the communication. Like the use of "and/or" the use of "or" creates an ambiguity in the allegation that violates Rule 9(b). Paragraph 189tt fails to establish how the communication furthered the fraud, and it fails to establish the fraudulent nature of the statements in the communication.

The remainder of the allegations in Paragraph 189 satisfy the pleading requirements of Rule 9(b). The Complaint's allegations clearly define each of the campaign contributions, when they were mailed, by whom, and to whom. (See Doc. 1 ¶¶ 189 g, h, j, k, l, q, r, s, u, x, ee, ff, hh, ii, kk, mm, rr, and ss.) The Complaint also alleges with specificity the mailings in which the contracts were sent to the companies and the Board. These allegations include the date of the mailing, the contents of the mailing, who sent the mailing, and to whom it was sent. (See Doc. 1 ¶¶ 189 m, p, t, v, w, z, aa, bb, cc, jj, ll, nn, oo, pp, and qq.) There are further allegations that certain Defendants used wire communications in furtherance of the schemes. These allegations include the date of the call, the subject of the conversation, and the parties in the conversation. (See Doc. 1 ¶¶ 189 l and o.)

*14 Certain Defendants argue in their briefs that

the allegations of fraud lack specificity because the allegations do not explain how the use of mail or wire communications furthered the fraudulent scheme. While Rule 9(b) requires pleading with specificity, it does not erase the general standard that the Court should draw reasonable inferences in favor of Plaintiffs. See Lum, 361 F.3d at 22 (analyzing allegations of mail fraud for particularity while still drawing reasonable inferences in favor of plaintiffs). Although Plaintiffs' Complaint does not expressly identify how each particular mail or wire communication furthered the scheme, the Complaint clearly alleges facts which create an unquestionable inference that the alleged communications furthered the scheme.

Throughout the Complaint, Plaintiffs clearly explain the fraudulent scheme and how each Defendant is involved with the various contracts. (See Doc. 1 ¶¶ 44--143 and 188.) Plaintiffs' Complaint goes so far as to identify each contract, the campaign contributions linked to that contract, and the Defendants involved in that contract's creation, execution, and commissions which were awarded. (Doc. 1 ¶¶ 44--143.) The Complaint then alleges that certain mail and wire communications furthered the fraudulent scheme and lists those communications in Paragraph 189. The details of each communication in Paragraph 189 are given in a manner that injects precision and some measure of substantiation into their allegations of fraud.

The purpose of Rule 9(b) is to give Defendants notice of the precise misconduct claimed and to prevent false or unsubstantiated charges. Seville Indus. Machinery, 742 F.2d at 791. There is no ambiguity that in a pay-to-play scheme, a campaign contribution furthers the scheme. Likewise, there is no confusion that a fraudulent scheme to gain a contract with the Plan is furthered by mailing the contract to the Plan. I find the allegations give Defendants notice of the misconduct and meet the specificity requirements of Rule 9(b).

iv) Private Securities Litigation Reform Act

The next argument advanced by Defendants is that the frauds alleged cannot constitute predicate acts under RICO because they are securities violations. Mail and wire frauds may constitute predicate acts under RICO, but there is an exception created by the Private Securities Litigation Reform Act (hereinafter

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.2d
(Cite as: 2004 WL 1908221, *14 (M.D.Pa.))

PSLRA), which excludes frauds that constitute securities fraud. 18 U.S.C.1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court ... except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962."); see also Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc., 189 F.3d 321, 327 (3d Cir.1999) (citing Matthews v. Kidder, Peabody & Co., Inc., 161 F.3d 156, 157 (3d Cir.1998)). Any conduct which is actionable as fraud in the purchase or sale of securities cannot constitute a predicate offense under RICO, whether or not the Complaint expressly alleges securities fraud. Bald Eagle Area Sch. Dist., 189 F.3d at 330.

**\*15** Securities fraud is a scheme to defraud, a misleading statement, or an omission of a material fact in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). [FN11] Plaintiffs seeking relief for securities fraud under Rule 10b-5 must show:

> FN11. 15 U.S.C. § 78j reads in pertinent part: It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--... (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. The securities and Exchange Commission has promulgated rules which clarify the meaning of 15 U.S.C. § 78j: It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.   17 C.F.R. § 240.10b-5 (hereinafter Rule 10b-5).

(1) a misrepresentation or omission of a material fact in connection with the purchase or sale of a security;
(2) scienter on the part of the defendant;
(3) reliance on the misrepresentation; and
(4) damage resulting from the misrepresentation.
Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 173 (3d Cir.2001) (citing Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 135 F.3d 266, 269 (3d Cir.1998) and Semerenko v. Cendant Corp., 223 F.3d 165, 174 (3d Cir.2000)).

In addition, there is a second form of securities fraud, actionable under the Securities Act of 1933, 15 U.S.C. § 77, which permits recovery for certain misrepresentations in connection with a sale of securities:
Any person who--
(1) offers or sells a security in violation of section 77e of this title, or
(2) offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,
shall be liable ... to the person purchasing such security from him....
15 U.S.C. § 77l. Under the Securities Act of 1933, this form of securities fraud involves either a prospectus or an oral communication. Because the alleged facts of this case indicate that no prospectus was involved in the transactions and all of the fraudulent actions involved written contracts rather than oral statements, this type of securities fraud is inapplicable to the present case. I will limit my

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 1908221, *15 (M.D.Pa.))

analysis to the Rule 10b-5.

Plaintiffs contend that the alleged actions are not actionable as securities fraud, or, that the Court should not make an analysis at this time because of the fact-specific analysis required to determine if the alleged acts constitute securities fraud. I disagree that a fact-specific analysis prevents me from addressing this question at this time. Dismissal is appropriate only if, accepting all factual allegations in the complaint as true and "drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations in the complaint." Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc., 140 F.3d 478, 483 (3d Cir.1998). No relief could be granted under RICO if the predicate acts alleged are prohibited by the PSLRA. Because the Complaint is read in Plaintiff's favor, if the alleged facts can be read in a manner in which the allegations do not constitute a securities fraud, then I should rule in favor of Plaintiffs and permit the action to continue. Therefore, the question for me to decide is whether the allegations in the Complaint would always constitute a cause of action for securities fraud.

**\*16** There is an initial question whether the investments involved were actually securities.

The term "security" means any note, stock, treasury stock, security future, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the

maturity of which is likewise limited. 15 U.S.C. § 78c(a)(10) (Securities Act of 1934); see also United Housing Found., Inc. v. Forman, 421 U.S. 837, 847, n. 12, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) (the definition of security is essentially the same for the Securities Act of 1934 and the Securities Act of 1933). In determining whether a transaction involves a security, "form should be disregarded for substance and the emphasis should be on economic reality." Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967) (citing SEC v. W.J. Howey Co., 328 U.S. 293, 298, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946)).

In the present case, the allegations refer to secured notes, REITs, annuities, and other unidentified investments. While notes are usually securities, there are instances in which the nature of a particular transaction labeled a "note" prevents it from being treated as a security, for instance, when it is issued as collateral for a loan. Reves v. Ernst & Young, 494 U.S. 56, 65, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990) (citing Exch. Nat. Bank of Chicago v. Touche Ross & Co., 544 F.2d 1126, 1138 (2d Cir.1976)). As for annuities, they are generally not treated as securities, although there are also exceptions to this. 15 U.S.C § 77c(a)(8) (exempting annuity contracts from definition of security); but see SEC v. Variable Annuity Life Ins. Co. of Am., 359 U.S. 65, 79, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959) (variable annuity which did not guarantee pay-out unless investments succeeded was a security); SEC v. United Benefit Life Ins. Co., 387 U.S. 202, 211, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967) (flexible fund annuity which provided pay-out relative to investment success was a security). Contracts with brokers to invest in securities are not securities themselves, although they are often actionable because they are "in connection with" a security. See Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 943 (3d Cir.1985).

**\*17** It is apparent to me that whether the particular investments in the alleged frauds were securities would entail a fact-specific analysis of each particular investment. The facts alleged in the Complaint do not permit this analysis, nor do they need to. Plaintiffs' primary allegations relate to the manner in which contracts with the investment companies were entered into by the Board members. The specific investments resulting from those contracts do not need to be plead with particularity.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Construing the Complaint in the light most favorable to Plaintiffs, at least some (e.g., transaction involving annuities), if not all, of the transactions in question did not involve securities and, thus, could not form the basis of a securities fraud claim.

Moreover, even if some of the investments constituted securities, this does not end the Court's analysis. Defendants argue that since the alleged scheme is related to securities, any related fraud is precluded from forming the basis of a RICO violation because of the PSLRA. Only fraud which is actionable as securities fraud is precluded from forming the basis of a RICO claim. 18 U.S.C. § 1964(c). A fraud related to the purchase or sale of a security is not always actionable as a securities fraud; there must be a misrepresentation or omission of a material fact in connection with the purchase or sale of a security, scienter, reliance on the misrepresentation (reliance causation), and an injury proximately caused by the fraudulent misrepresentation (loss causation). Newton, 259 F.3d at 173.

For all Defendants, the Complaint alleges variations of the same factual scenario, that Defendants engaged in a relationship wherein contracts to invest money in securities were entered into in exchange for campaign contributions to Board members' reelection funds. The generic transaction is alleged as follows:
(1) A person connected with ASCO or an investment company would make a campaign contribution to a Board member's reelection fund. [FN12]

> FN12. In some of the transactions, the campaign contribution was made after the Board members signed the contract.

(2) A contract to invest the Plan's funds would be presented to Board members. The contract contained inappropriately risky investment strategies considering the Plan's purpose as a pension fund.
(3) One or more Board members would sign the contract, without presenting the contract at a public meeting, without the contract being reflected on the minutes of any meeting, and without holding a formal vote on the contract.
(4) The investment company would receive the

Plan's funds and invest it in accordance with the contract.
(5) Persons connected with the investment company and/or ASCO would receive commissions for the contract. The cost of the commissions were excessive and built into the contract price, in other words, hidden from the face of the contract.
(6) The investment manager or investment advisor would collect excessive fees.
(7) Interstate mails and/or wires were used in the furtherance or commission of the transaction.

**\*18** There are several steps to this transaction which are potentially fraudulent, and it is unclear from the Complaint which parties are involved in those fraudulent acts. [FN13] What is clear to the court is there are two possible scenarios:

> FN13. This would seemingly violate the pleading requirements of Rule 9(b), but that is not the case. Plaintiffs properly plead with particularity the fraudulent acts of mail and wire fraud. See discussion supra p. 27. Because Plaintiffs are not alleging securities fraud, they were not required to plead the scheme with particularity. However, this leaves the Court with slightly vague details about the exact nature of the fraudulent scheme, which is necessary to analyze whether the fraud is in connection with the purchase or sale of securities.

(1) The Board members were unaware of the excessive fees, hidden commissions, and inappropriate investment strategies.
(2) The Board members and the investment manager or investment advisor acted in complete unison, and the Board members were aware of the excessive fees, hidden commissions, and inappropriate investment strategies. [FN14]

> FN14. The Complaint states: "The Defendant Board Members permitted the Plan to pay excessive fees and commissions to the co-defendants in exchange for political contributions." (Doc. 1 ¶ 188c.) I am uncertain whether "permitted" expresses that the Board members knowingly adopted contracts with hidden fees, or that the Board members failed in their fiduciary obligations by not properly reviewing contracts before approving them because their approval was purchased in the pay-to-play scheme. In both of the scenarios above, the allegations in the Complaint do not meet all of the elements of a

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 1908221, *18 (M.D.Pa.))

securities fraud.

a) The Board didn't know about hidden fees

If the Board members were unaware of the hidden fees, then there were actually two separate frauds occurring simultaneously: (1) the investment companies were concealing the excessive fees, commissions and unsuitable investments from the Board and the beneficiaries; and (2) the Board members were concealing the pay-to-play scheme from the beneficiaries. In this scenario, the alleged fraudulent pay-to-play scheme does not constitute an actionable securities fraud because the misrepresentations or omissions were too attenuated to be in connection with the sale or purchase of securities.

A fraud is in connection with a purchase or sale of securities when there are "deceptive practices touching [upon the purchase or] sale of securities." Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 12-13, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). Frauds involving the trading process can be actionable under 10b-5. Angelastro, 764 F.2d at 943; see also Denison v. Kelly, 759 F.Supp. 199, 207 (3d Cir.1991). Hidden commissions in broker contracts can constitute securities fraud. Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 835 F.2d 1031, 1033 (3d Cir.1987). Misrepresentations regarding the terms of margin accounts are actionable securities frauds. Angelastro, 764 F.2d at 945. Even broker mismanagement of an account through investments inconsistent with the stated goals of the investor can constitute securities fraud when accompanied by assurances from the broker that the goals are being met. Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020, 1031 (3d Cir.1992).

The brokerage relationships are not securities transactions, but they are actionable in the securities fraud context because the relationships touch upon a securities transaction. Bankers Life, 404 U.S. at 10, 12-13. In the present case, the connection is even more removed from securities purchase or sale than a simple broker contract. [FN15] The pay-to-play scheme is a fraud between the fiduciaries who entered into the brokerage contracts and the beneficiaries of the plan. While the Supreme Court demonstrated in Bankers Life, that "in connection with" a securities transaction would be read broadly, there is one limitation which the Court

created--securities fraud should not be applied to internal corporate mismanagement. 404 U.S. at 12; see also Landy v. Fed. Deposit Ins. Corp., 486 F.2d 139, 155 (3d Cir.1973). I have been unable to find any comparable factual scenario to the present case which suggests that fraudulent omissions in this relationship are in connection with the purchase or sale of a securities fraud. This twice-removed relationship from the purchase or sale of a security is too attenuated to constitute a connection with the purchase or sale of securities. Both the Board members and the investment companies are still responsible for the second fraud because, as alleged, the investment companies engaged in the pay-to-play scheme by "purchasing" the contracts.

FN15. First, there was the purchase or sale of securities, which was done by the investment company and independent parties in the market. There was no fraud alleged in this transaction. Next, there was the contract between the Plan (represented by the Board) and the investment company. Clearly, if the investment companies concealed hidden commissions and other terms of the investment agreements, that fraud constitutes an actionable securities fraud. See, e.g., Ettinger, 835 F.2d at 1033. Any use of mail or wire communications in furtherance of this scheme is excluded by the PSLRA from acting as a RICO predicate act. Lastly, there was the Board members' denial of honest dealings scheme in the form of the alleged pay-to-play system of granting contracts.

b) The Board knew about hidden fees

*19 Alternatively, if the Board knew about the hidden fees, the allegations of mail and wire fraud are not actionable as a securities fraud because, as discussed in the previous section, the securities transactions are two transactions removed from any misrepresentations or omissions related to the pay-to-play scheme. [FN16] Arguably, the pay-to-play scheme is more closely related to the purchase or sale of securities in this scenario than if the Board didn't know about the hidden fees because the Board members were involved in the fraud of the concealed hidden fees. However, even if the pay-to-play scheme was connected with a securities transaction, the fraud would still not be actionable under securities laws because there is no reliance causation.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.2d
(Cite as: 2004 WL 1908221, *19 (M.D.Pa.))

FN16. First, there was the purchase or sale of securities, which was done by the investment company and independent parties in the market. There was no fraud alleged in this transaction. Next, there was the contract between the Plan (represented by the Board) and the investment company. Lastly, there was the Board members' denial of honest dealings scheme in the form of the alleged pay-to-play system of granting contracts.

Reliance causation requires that a plaintiff reasonably rely upon the fraudulent representation or omission when making the decision to purchase or sell a security. EP Medsystems, Inc. v. Echocath, Inc., 235 F.3d 865, 882 (3d Cir.2000); Newton, 259 F.3d at 172 (using the term "reliance causation"). In the facts alleged, the beneficiaries made no decision to purchase or sell; it was the Board members who entered into the contracts. If the Board members knew about the hidden fees, neither party to the contract was misled or intentionally uninformed as to the terms of the contract. The omissions were not relied upon to enter into the contract, nor did that concealment cause any detrimental reliance. [FN17]

FN17. The Court notes that the beneficiaries lack any ability to appoint, terminate, or otherwise control the Board members. Even if they were fully aware of the contracts' terms, the beneficiaries would have been unable to prevent the Board members from entering into the contracts.

One might see my present holding as conflicting with the Supreme Court's holding in Bankers Life. 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128. In Bankers Life, a new majority share holder installed a new president in the company, with the intent of defrauding the company of its assets. The president then convinced the board of directors to sell its nearly $5 million worth of bonds. The proceeds of that sale were eventually used to purchase a new bond for the company, but the president used that bond as collateral against a private loan. Although the deceit involved separate transactions from the sale of the bonds, the Supreme Court concluded that the actions were sufficiently connected with the securities sale to constitute securities fraud.

Bankers Life is distinguishable from the present case. In Bankers Life, the scheme influenced the board of directors' decision to sell the securities.

The fraudulent actors induced the innocent company's board of directors to sell the securities on the misrepresentation that the company would receive the proceeds, when in fact the benefit was passed to a private party. In contrast, in the present case, the Board members were not induced to enter the investment management contract on the basis of a fraud. The Board members were completely aware of the terms of the contract, and the fraud was only perpetrated against the beneficiaries of the plan.

In sum, viewing the Complaint in the light most favorable to Plaintiffs, allegations in the Complaint are not actionable as securities fraud. Therefore, the Complaint's predicate acts of mail and wire fraud are not barred by the PSLRA. However, because the analysis above is based on assumptions about the nature of the fraudulent scheme, I may be willing to reevaluate the issue on a motion for summary judgment if the facts differ materially from the assumptions in my analysis.

v) Relatedness and Continuity of Predicate Acts

*20 Lastly, in determining whether a Complaint alleges a pattern of racketeering activity, I must evaluate whether the predicate acts alleged create a pattern. When evaluating whether a pattern exists, the Court of Appeals for the Third Circuit advises courts to look at "the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity." Barticheck v. Fid. Union Bank/ First Nat'l State, 832 F.2d 36, 39 (3d Cir.1987); see also Marshall-Silver Constr. Co. v. Mendel, 894 F.2d 593, 596 (3d Cir.1990) (finding Barticheck factors still applicable after H.J. Inc. v. Northwestern Bell Tele. Co., 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)). [FN18] The predicate acts must be related and amount to or threaten to become continued criminal activity. H.J. Inc., 492 U.S. at 239.

FN18. In Tabas v. Tabas, the Court of Appeals for the Third Circuit recognized that Marshall-Silver was overruled insofar as it required a societal threat to prove a pattern of racketeering activity. 47 F.3d 1280, 1293 n. 17 (3d Cir.1995). That holding has no impact on the issue discussed above.

Criminal conduct is related "if it embraces

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 1908221, *20 (M.D.Pa.))

criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." Id. at 240 (applying definition of pattern from 18 U.S.C. § 3575(e) to RICO). In instances, such as the present case, where the conduct in question occurred in a closed period of time, continuity is established by showing conduct that occurred over a "substantial period of time." Id. at 242.

When the predicate acts are mail fraud, the mailings are less helpful in ascertaining continuity, and the underlying frauds are more determinative. Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1414 (3d Cir.1991). The RICO statute does not require more than one scheme to establish continuity, but "proof of multiple schemes is 'highly relevant' to the question of continuity." Id. at 1412 (quoting H.J. Inc., 492 U.S. at 240). In the Court of Appeals for the Third Circuit, schemes spanning up to one year have been found to be too short-term to establish continuity. Tabas, 47 F.3d at 1293; see also Hughes v. Consol-Pa. Coal Co., 945 F.2d 594, 610-11 (3d Cir.1991) (conduct lasting twelve months); Hindes v. Castle, 937 F.2d 868, 875 (3d Cir.1991) (eight month period); Kehr Packages, 926 F.2d at 1413 (same); Banks v. Wolk, 918 F.2d 418, 422-23 (3d Cir.1990) (same); Marshall-Silver Constr. Co., 894 F.2d at 597 (seven month period).

a) The Board Members

Plaintiffs allege that Defendants Makowski, Pizano, Crossin, and Jones used their positions on the Board to grant contracts in exchange for campaign contributions. They engaged in these activities in twelve separate contracts, spanning a time period of more than twelve years (from 1988 until 2001).

For Defendant Makowski, the Complaint alleges that he personally received at least nine campaign contributions (Doc. 1 ¶¶ 189 x, ee, ff, hh, ii, kk, mm, rr and ss) related to six different contracts. (Doc. 1 ¶¶ 77, 87, 105, 116, 126, 136 and 189kk.) In addition, because the Complaint alleges Makowski was involved in the scheme for every contract that the Board members entered into, there are potentially other legitimate allegations of mail fraud based on the uses of mail by other Board members which furthered the fraudulent scheme in which Makowski was involved. Regardless of these other mail frauds, the actions alleged are clearly related because they all share the same purpose, results (granting of contracts), participants (the Board members), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). Continuity between the acts is established by the repeat nature of the multiple contracts issued over a substantial period of time, in this case more than a decade. The Complaint sufficiently alleges that Makowski was engaged in a pattern of racketeering activity.

*21 For Defendant Pizano, he personally received at least nine campaign contributions (Doc. 1 ¶¶ 189 ee, ff, hh, ii, kk, mm, rr, and ss) related to six different contracts. (Doc. 1 ¶¶ 77, 87, 105, 116, 126, 136 and 189kk.) There are potentially other legitimate allegations of mail fraud because the Complaint also alleges Pizano was involved in the scheme for every contract that the Board members entered into. Regardless of these other mail frauds, the actions alleged are clearly related because they all share the same purpose, results (granting of contracts), participants (the Board members), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). Continuity between the acts is established by the repeat nature of the multiple contracts issued over a substantial period of time, in this case more than a decade. The Complaint sufficiently alleges that Pizano was engaged in a pattern of racketeering activity.

For Defendant Crossin, he personally received at least eight campaign contributions (Doc. 1 ¶¶ 189 j, k, l, q, r, s, u, and x) related to at least five different contracts. (Doc. 1 ¶¶ 48, 55, 68, 98, and 126.) There are potentially other legitimate allegations of mail fraud because the Complaint alleges Crossin was involved in the scheme for every contract that the Board members entered into. Regardless of these other mail frauds, the actions alleged are clearly related because they all share the same purpose, results (granting of contracts), participants (the Board members), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). Continuity between the acts is established by the repeat nature of the multiple contracts issued over a substantial period of time, in this case more than a decade. The

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Complaint sufficiently alleges that Crossin was engaged in a pattern of racketeering activity.

Although Jones did not personally receive campaign contributions, there are allegations of mail fraud against Defendant Jones. Because the Complaint alleges Jones was involved in the scheme for every contract that the Board members entered into, and because the mail was used to furthered the fraudulent schemes, those uses of the mail constitute allegations of mail fraud against Defendant Jones. See discussion supra p. 22. The campaign contributions alleged in Paragraph 189mm related to Jones' approval of the third Provident Agreement. (Doc. 1 ¶ 80.) The campaign contributions alleged in Paragraphs 189ee, 189ff, and 189hh related to Jones' approval of the Wells Agreement (Doc. 1 ¶ 118), and the campaign contributions alleged in Paragraph 189kk related to Jones' approval of the LPL Agreement. (Doc. 1 ¶ 136.)

For Defendant Jones, the actions alleged are clearly related because they all share the same purpose, results (granting of contracts), participants (the Board members), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). Continuity between the acts is established by the repeat nature of the multiple contracts issued over a substantial period of time, in this case nearly four years. The Complaint sufficiently alleges that Jones was engaged in a pattern of racketeering activity.

b) The ASCO Affiliates

**\*22** Plaintiffs allege that Defendant ASCO and its officers and affiliates acted in the scheme with the Board members and facilitated the pay-to-play scheme by making campaign contributions and brokering the contracts in exchange for collecting hidden fees. They engaged in these activities in twelve separate contracts, spanning a time period of more than twelve years (from 1988 until 2001).

For Defendant ASCO, the actions alleged are clearly related because they all share the same purpose (receiving commissions), results (brokering contracts), participants (the Board members), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). ASCO directly made at least three campaign contributions (Doc. 1 ¶¶ 189 g, r, and u) related to

two different contracts. (Doc. 1 ¶¶ 48 and 68.) The Complaint also alleges that ASCO used mail or wire communications on at least three occasions (Doc. 1 ¶¶ 189 m, oo, and pp), which furthered three schemes. (Doc. 1 ¶¶ 56, 90, and 53, respectively.) In addition, because the Complaint alleges ASCO was involved in the scheme for every contract that the Board members entered into, there are potentially other legitimate allegations of mail fraud based on the uses of mail by the investment companies and related parties that furthered the fraudulent scheme in which ASCO was involved. [FN19] Regardless of these other mail frauds, continuity between the acts is established by the repeat nature of the multiple contracts issued over a substantial period of time, in this case more than a decade. The Complaint sufficiently alleges that ASCO was engaged in a pattern of racketeering activity.

> FN19. Most notably are the fourteen acts of mail and wire fraud alleged against Donald Williamson, the President and CEO of ASCO, Maria Williamson, the Vice President/Operations of ASCO, John Joyce, the Secretary of ASCO, and Joseph Joyce, the Treasurer of ASCO. (Doc. 1 ¶¶ 189 i, o, u, j, k, p, l, w, mm, aa, ff, hh, nn, and ss.)

Defendant Donald Williamson is by far the defendant who is accused of personal involvement in the most number of transactions. It is alleged that at various times between 1988 and 2002, Donald Williamson was the President and CEO of ASCO (Doc. 1 ¶ 7), a representative for Safeco (Doc. 1 ¶ 49), a broker for Provident (Doc. 1 ¶ 59), a broker representative for FSC (Doc. 1 ¶ 119), an account representative for FSC (Doc. 1 ¶ 141), and a broker for FSI. (Doc. 1 ¶ 128.) He personally made three campaign contributions (Doc. 1 ¶¶ 189 k, hh, and ss) related to four different contracts. (Doc. 1 ¶¶ 55, 87, 105, and 116.) The Complaint also alleges that Donald Williamson used mail or wire communications on at least five occasions (Doc. 1 ¶¶ 189 i, o, w, aa, and nn), which furthered five schemes. Aside from his direct actions, the Complaint alleges that Donald Williamson was involved in the scheme for every contract that the Board members entered into. The acts alleged are clearly related because they all share the same purpose (facilitating the pay-to-play scheme), results (brokering contracts), participants (the Board

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



members and ASCO affiliates), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). Continuity between the acts is established by the repeat nature of the multiple contracts issued over a substantial period of time, in this case more than a decade. The Complaint sufficiently alleges that Donald Williamson was engaged in a pattern of racketeering activity.

**\*23** For Defendant Maria Williamson, the Complaint alleges that Maria Williamson acted as the Vice President/Operations for ASCO during the time in which ASCO administered the daily operations of the Plan. (Doc. 1 ¶ 53.) Thus, it is a reasonable inference that Maria Williamson was involved in the allegedly fraudulent schemes with ASCO from December, 1999, until October, 2002. During this time, ASCO was implicated in two schemes: the contract for ASCO to administer the daily operations of the Plan and the fourth Provident Agreement. [FN20] The Complaint also alleges that Maria Williamson committed an act of mail fraud related to the third Provident contract. (Doc. 1 ¶ 189mm.) The actions alleged are clearly related because they all share the same purpose (purchasing contracts), results (contracts with the Plan), participants (the Board members), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). Over a time span of approximately two years and ten months, Maria Williamson participated in three fraudulent schemes, and there were eight uses of mail communications to further those schemes, thus, the Complaint sufficiently establishes continuity and alleges that Maria Williamson was engaged in a pattern of racketeering activity.

> FN20. Acts of mail fraud related to those schemes includ ASCO mailing an administration agreement to Defendant Makowski (Doc. 1 ¶ 189oo) and ASCO mailing a Special Agent's Agreement to Provident. (Doc. 1 ¶ 189pp.)

The Complaint alleges that Safeco committed one act of mail fraud (Doc. 1 ¶ 189q) and one act of wire fraud (Doc. 1 ¶ 189i), both of which were connected to Safeco's contract with the Plan. Plaintiffs also attempt to link Safeco with ASCO's schemes, because Safeco collected ASCO's fees from the Plan. However, the fact that Safeco collected ASCO's fees does sufficiently allege that

Safeco was itself engaged in fraudulent conduct under the heightened pleading requirements of Rule 9(b). Thus, the only predicate acts alleged are the mail fraud and the wire fraud related to the single fraudulent scheme. These allegations do not establish the necessary. The Complaint fails to alleges that Safeco was engaged in a pattern of racketeering activity, and Count III will be dismissed against Safeco.

Joseph Joyce, ASCO's Treasurer, is alleged to be involved in two separate fraudulent schemes: the second Provident Agreement (Doc. 1 ¶ 68) and the ASCO contract. (See Doc. 1 ¶¶ 48 and 189u.) The Complaint alleges that Joseph Joyce used mail communications on at least two occasions to further these schemes. (Doc. 1 ¶¶ 189 j and u.) These transactions occurred over a period of nearly three years. (Id.) In addition, there are allegations that nine additional acts of mail fraud were committed to further the schemes in which Joseph Joyce participated. (Doc. 1 ¶¶ 189 h, g, l, o, r, s, w, z, and oo.) The actions alleged are clearly related because they all share the same purpose (inducing the Board members to grant contracts), results (contracts), participants (the Board members and ASCO), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). Eleven predicate acts to forward two schemes over the course of three years does sufficiently allege continuity in the predicate acts which suggests that Joseph Joyce was engaged in a pattern of racketeering activity.

**\*24** John Joyce, ASCO's Secretary, is alleged to be involved in two separate fraudulent schemes: the first Provident Agreement (Doc. 1 ¶ 55) and the second Provident Agreement. (See Doc. 1 ¶ 68.) The Complaint alleges that John Joyce used the mail twice to further these schemes. (Doc. 1 ¶¶ 189 p and l, respectively.) These transactions occurred over a period of less than five months. (Id.) In addition, there are allegations that eight additional acts of mail fraud were committed to further the schemes in which John Joyce participated. (Doc. 1 ¶¶ 189 j, k, m, p, r, s, w, and z.) Although the actions alleged are clearly related, the short time period over which the frauds occurred, five months, does not sufficiently allege continuity in the predicate acts to establish a pattern of racketeering activity. Count III will be dismissed against John Joyce.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.2d
(Cite as: 2004 WL 1908221, *24 (M.D.Pa.))

Page 658

c) The Provident Agreements

Defendant Nationwide is alleged to be involved with four separate fraudulent schemes, the four Provident Agreements created between December 18, 1991 and June 6, 2000. (Doc. 1 ¶¶ 58, 69, 80, and 89.) The Complaint alleges that Nationwide used mail or wire communications on at least three occasions (Doc. 1 ¶¶ 189 z, jj. and qq) which furthered three schemes. (Id.) There are allegations that thirteen additional acts of mail and wire fraud were committed to further the schemes in which Nationwide participated. (Doc. 1 ¶¶ 189 j, k, m, p, l, r, s, w, mm, aa, rr, ss, and pp.) The actions alleged are clearly related because they all share the same purpose (receiving contracts), results (contracts), participants (the Board members and ASCO), victims (the Plan and its beneficiaries), and methods of commission (third parties making donations to campaign funds). Continuity between the acts is established by the repeat nature of the multiple contracts issued over a substantial period of time, in this case nearly a decade. The Complaint sufficiently alleges that Nationwide was engaged in a pattern of racketeering activity.

JJJA is equally implicated in all of the Provident Agreements. [FN21] (See, e.g., Doc. 1 ¶¶ 65, 75, 81, and 90.) Like Nationwide, there are allegations that sixteen acts of mail and wire fraud were committed to further the schemes in which JJJA participated. (Doc. 1 ¶¶ 189 j, k, m, p, l, r, s, w, z, aa, jj, mm, pp, qq, rr, and ss.) The actions alleged are clearly related because they all share the same purpose (receiving commissions), results (contracts), participants (the Board members, ASCO), victims (the Plan and its beneficiaries), and methods of commission (third parties making donations to campaign funds). Continuity between the acts is established by the repeat nature of the multiple contracts issued over a substantial period of time. The Complaint sufficiently alleges that JJJA was engaged in a pattern of racketeering activity.

FN21. In addition to the Provident Agreements, JJJA is implicated in the Manulife Agreements. (See Doc. 1 ¶¶ 103 and 109.) These additional schemes reaffirm the pattern of racketeering activity by JJJA alleged in relation to the Provident Agreements.

d) The Manulife Agreements

Defendant Manulife is directly alleged to have committed three acts of mail fraud (Doc. 1 ¶¶ 189 v, cc, and ii) related to two separate transactions. (Doc. 1 ¶¶ 189v and 106.) These acts took place over almost six years. (Doc. 1 ¶¶ 189 v, cc, and ii.) In addition, there are four other acts of mail fraud related to the Manulife Agreements. (Doc. 1 ¶¶ 189 s, ee, ff, and hh.) The actions alleged are clearly related because they all share the same purpose (receiving contracts), results (contracts), participants (the Board members and ASCO), victims (the Plan and its beneficiaries), and methods of commission (third parties making donations to campaign funds). More than one scheme is not required to establish continuity, although "proof of multiple schemes is 'highly relevant.' ' Kehr Packages, Inc., 926 F.2d at 1412 (quoting H.J. Inc., 492 U.S. at 240). The Complaint alleges that Manulife participated in two fraudulent schemes over the course of six years, which involved seven acts of mail fraud to further those schemes. I find that seven predicate acts committed to forward two schemes sufficiently alleges a continuity in the predicate acts. The Complaint sufficiently alleges that Manulife was engaged in a pattern of racketeering activity.

e) The Wells Agreement

*25 Defendant FSC is linked with two separate transactions, the FSC Agreement and the Wells Agreement. The Complaint does not list any related uses of mail or wire communications in furtherance of the FSC Agreement. (Doc. 1 ¶¶ 141-143.) Therefore, the only predicate acts alleged against FSC are the ones related to the Wells Agreement. Defendants Perfilio, Michael Joyce, Wells, Wells REIT, and Wells Investment will be analyzed the same as FCS because each Defendant is only implicated in the Wells Agreement scheme. The Wells Agreement lists four separate uses of mail or wire communications in furtherance of the fraudulent scheme which transpired between February 2, 1999, and April 12, 1999--two months and ten days. (Doc. 1 ¶¶ 189 bb, ee, ff, and hh.)

While these acts of mail and wire fraud are clearly related, they lack the necessary continuity to establish a pattern of racketeering activity. When ascertaining whether the predicate acts establish continuity, the specific acts of mail fraud are less determinative than the number of schemes. Kehr Packages, Inc., 926 F.2d at 1414. Schemes lasting

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 1908221, *25 (M.D.Pa.))

less than a year are too short-term to create continuity. See Hughes, 945 F.2d at 610-11 (conduct lasting twelve months). The allegations against Defendants fail on both counts. The Complaint alleges that Defendants were involved in a single scheme with acts of fraud only occurring over two months and ten days. The Complaint does not sufficiently allege that FSC, Perfilio, Michael Joyce, Wells, Wells REIT, or Wells Investment were engaged in a pattern of racketeering activity. Count III will be dismissed against Defendants FSC, Perfilio, Michael Joyce, Wells, Wells REIT, and Wells Investment.

f) Miscellaneous Defendants

FSI is in a situation similar to the Wells Agreement Defendants. The Complaint alleges that FSI engaged in two acts of mail fraud related to the FSI transaction. (Doc. 1 ¶¶ 189 t and x.) These transactions occurred over a period of seven months. (Id.) The Complaint does not link FSI to any other schemes. Because the alleged predicate acts occurred in a time period of less than a year and they were both related to a single fraudulent scheme, the allegations fail to establish the necessary continuity. The Complaint does not sufficiently allege that FSI was engaged in a pattern of racketeering activity. Count III will be dismissed against FSI.

JJ & B is alleged to be involved with four separate fraudulent schemes: the second Provident Agreement (Doc. 1 ¶ 68), both Manulife Agreements (Doc. 1 ¶¶ 98 and 105). and the Wells Agreement. (Doc. 1 ¶ 116.) The Complaint alleges that JJ & B used mail communications on at least two occasions to further these schemes. (Doc. 1 ¶¶ 189 s and ee.) These transactions occurred over a period of nearly five years. (Id.) In addition, there are allegations that nine additional acts of mail fraud were committed to further the schemes in which JJ & B participated. (Doc. 1 ¶¶ 189 l, r, w, v, z, bb, cc, ff, and hh.) The actions alleged are clearly related because they all share the same purpose (inducing the Board members to grant contracts), results (contracts), participants (the Board members and ASCO), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). Continuity between the acts is established by the repeat nature of the four schemes over nearly five years furthered by eleven acts of mail fraud.

The Complaint sufficiently alleges that JJ & B was engaged in a pattern of racketeering activity.

*26 William Joyce is alleged to be involved with three separate fraudulent schemes: the fourth Provident Agreement (Doc. 1 ¶ 87), the second Manulife Agreement (Doc. 1 ¶ 105), and the Wells Agreement. (Doc. 1 ¶ 116.) The Complaint alleges that William Joyce used mail communications on at least two occasions to further these schemes. (Doc. 1 ¶¶ 189 ff and rr.) These transactions occurred over a period of more than fourteen months. (Id.) In addition, there are allegations that eight additional acts of mail and wire fraud were committed to further the schemes in which William Joyce participated. (Doc. 1 ¶¶ 189 bb, cc, ee, hh, ii, pp, qq, and ss.) While the alleged acts are clearly related, the short duration of the acts, approximately fourteen months, does not establish the requisite continuity in the predicate acts. The Complaint fails to allege that William Joyce was engaged in a pattern of racketeering activity. Count III will be dismissed against William Joyce.

In summary, the RICO § 1964(c) claim for alleged violations of § 1962(c) will be dismissed against the following Defendants because the Complaint fails to allege a pattern of racketeering activity: FCS, Perfilio, Joyce Associates, Inc., JJI, John Joyce, William Joyce, Michael Joyce, Wells, Wells REIT, Wells Investment, FSI, Safeco, and Devonshire. The Complaint sufficiently alleges a pattern of racketeering activity for the RICO § 1964(c) claim for alleged violations of § 1962(c) against the following Defendants: Makowski, Pizano, Crossin, Jones, ASCO, Donald Williamson, Maria Williamson, JJJA, JJ & B, Joseph Joyce, Manulife, and Nationwide.

D) Count IV-- § 1962(d) Conspiracy to Violate § 1962(c)

In Count IV of the Complaint, Plaintiffs allege that all Defendants conspired to violate § 1962(c), in violation of 18 U.S.C. § 1962(d). To sustain an action under § 1962(d), a plaintiff must prove:
   (1) that the defendant adopted the goal of furthering or facilitating the criminal endeavor, Salinas v. United States, 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997);
   (2) that the conspiracy, if completed, would satisfy all of the elements of either § 1962(a), (b),

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

or (c), Rehkop v. Berwick Healthcare Corp., 95 F.3d 285, 290 (3d Cir.1996); and
(3) that an injury resulted from an act related to the conspiracy which is enumerated in § 1961(1). Beck v. Prupis, 529 U.S. 494, 505, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000).
See generally Smith v. Berg, 247 F.3d 532, 536 (3d Cir.2001).

The Supreme Court has been very clear that RICO conspiracy under § 1962(d) should be analyzed consistent with common law concepts of conspiracy.
"One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense....
It makes no difference that the substantive offense under § 1962(c) requires two or more predicate acts. The interplay between subsection (c) and (d) does not permit us to excuse from the reach of conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense."
*27 Salinas, 522 U.S. at 65. Moreover, the complaint need not contain specifics allegations of overt acts committed by each defendant. See id. at 63-4 (explaining that federal conspiracy does not require an overt act, and comparing with RICO's even broader definition of conspiracy). All that is required is that the conspirator "adopt the goal of furthering or facilitating the criminal endeavor." Id. at 65.

"A conspiracy claim must also contain supportive factual allegations. The allegations must be sufficient to describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's general role in that conspiracy." Rose v. Bartle, 871 F.2d 331, 366 (3d Cir.1989) (internal quotations and citations omitted). This analysis does not rise to the level of particularity required by Rule 9(b) for allegations of fraud. Id.

"All defendants conspired to violate 18 U.S.C. § 1962(c). Among other things, defendants conspired to perpetuate a scheme to intentionally defraud the Plan for their own monetary benefit. In furtherance of that Agreement, defendants engaged in at least the following overt acts: ..." (Doc. 1 ¶ 196.) "Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further their

schemes." (Id. ¶ 197.) In Count IV, the Complaint not only alleges that Defendants adopted the goal of furthering or facilitating the criminal endeavor, it outlines the composition of the conspiracy (the Board members, ASCO and affiliates, and the contract companies and affiliates), the broad objectives of the conspiracy (the pay-to-play scheme), and what role Defendants played in the scheme.

The allegations in the Complaint are extremely thorough, with the exception of Defendant Joseph Associates, Inc. As I stated previously in my § 1962(c) analysis, the Complaint failed to allege that Joyce Associates, Inc. was in anyway connected with any of the allegedly fraudulent schemes between the Board, ASCO, and the investment companies. Aside from the similarity in names with other corporate and real Defendants, there is no connection between Joyce Associates, Inc. with any of the transactions, the companies involved in those transactions, the Board members, any campaign contributions, or any commissions. As such, I find that the Complaint does not sufficiently allege Defendant Joyce Associates, Inc.'s role in that conspiracy to sustain a claim under § 1964(c) for violations of § 1962(d). Count IV will be dismissed against Joseph Associates, Inc.

As I discussed in the previous section, the Complaint properly alleges a cause of action under § 1964(c) for violations of § 1962(c) against Defendants Makowski, Pizano, Crossin, Jones, ASCO, Donald Williamson, Maria Williamson, JJJA, JJ & B, Joseph Joyce, Manulife, and Nationwide. Thus, because the Complaint alleges that all Defendants conspired with the aforementioned Defendants against whom violations of 1962(c) are alleged, the completed conspiracy would satisfy all of the elements of § 1962(c). [FN22]

> FN22. "Under our interpretation, a plaintiff could, through a § 1964(c) suit for a violation of § 1962(d), sue co-conspirators who might not themselves have violated one of the substantive provisions of § 1962." Beck, 529 U.S. at 507.

*28 The Complaint also alleges that Plaintiffs sustained an injury resulting from the § 1962(c) violations, specifically, the Plan had to pay excessive fees, as well as suffer economic losses

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 1908221, *28 (M.D.Pa.))

through bad investments, as a direct result of the frauds committed by the Board member Defendants and the investment manager Defendants' collusion to enter the Plan into inappropriate contracts. I find Plaintiffs sufficiently allege an injury resulting from a predicate act enumerated in § 1961(1). I find that the Complaint sufficiently alleges a claim under § 1964(c) for violations of § 1962(d) against all Defendants except Joyce Associates, Inc.

E) Count V-- § 1962(b) Interest or Control of an Enterprise

Plaintiffs allege that all Defendants violated 18 U.S.C. § 1962(b), which states that "it shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." To establish a claim under § 1962(b), a plaintiff must allege that the defendant has an interest in control over an enterprise engaged in racketeering activity, that the defendant acquired the interest or control through racketeering, and that the plaintiff was injured from the defendant's interest or control of the enterprise. See Lightning Lube, Inc., v. Witco Corp., 4 F.3d 1153, 1190-1191 (3d Cir.1993). To state a RICO claim, the Complaint must contain more than mere conclusory accusations that a defendant controlled an enterprise. Glessner v. Kenny, 952 F.2d 702, 714 (3d Cir.1991), overruled on other grounds, Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc., 46 F.3d 258 (3d Cir.1995); see also Kaiser v. Stewart, No. Civ. A. 96-6643, 1997 U.S. Dist. LEXIS 12788, at *6 (E.D.Pa. Aug. 19, 1997) (citing Glessner ).

Control over a RICO enterprise requires more than participation in the operation or management of the enterprise. Kaiser, 1997 U .S. Dist. LEXIS 12788, at *4 (E.D.Pa. Aug. 19, 1997) (mere managerial control not enough); see also Browne v. Abdelhak, No. Civ. A. 98-6688, 2000 U.S. Dist. LEXIS, at * 31-2 (E.D.Pa. Aug. 23, 2000). A person controls a RICO enterprise when he has significant power over the functioning of the enterprise, comparable to that of a majority shareholder or someone with managerial control. See, e.g., T.I Construction v. Kiewit Eastern Co., No. Civ. A. 91-2638, 1992 U.S. Dist. LEXIS

11607, at *22 (E.D.Pa. Aug. 6, 1992). An interest in an RICO enterprise must rise to the level of a proprietary Interest. Kaiser, 1997 U.S. Dist. LEXIS 12788, at *9. "In addition, the plaintiff must establish that the interest or control of the RICO enterprise by the person is a result of racketeering .... it must be established firmly that there is a nexus between the interest and the alleged racketeering activities." Lightning Lube, 4 F.3d at 1190.

*29 Just as with the § 1964(c) claim stemming from a § 1962(c) violation, there is a threshold question whether Plaintiffs have standing to bring a claim for a violation of § 1962(b). In order to bring an action under § 1964(c) for a violation of § 1962(b), the injury must result from the acquisition or control of the enterprise, not merely a racketeering activity. Lightning Lube, 4 F.3d at 1190. "[A] plaintiff must show injury from the defendant's acquistion or control of an interest in a RICO enterprise, in addition to injury from the predicate acts." Id. (emphasis added). Merely repeating the same injuries that resulted from an alleged § 1962(c) violation is insufficient. Id. at 1191. The injury must be the result of the actions of the defendant in acquiring or maintaining control of the enterprise. The fact that a defendant could not have harmed the plaintiff "but for" the fact that he controlled the enterprise does not satisfy this test. Casper v. Webber Group, Inc., 787 F.Supp. 1480, 1495 (D.N.J.1992).

While Plaintiffs allege a nexus between racketeering activity and control of an enterprise, they fail to establish how they were injured as a result of Defendants' control of the enterprise independent of the injuries from the racketeering activities. Plaintiffs repeated the same injury for both their § 1962(c) and § 1962(b) claims:
192. As a direct and proximate result of the defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), the Plan has been injured in its business and property, in that, without limitation:
a. the Plan suffered a net loss of millions of dollars as a result of the performance of the inappropriate investments into which the defendants placed the Plan's funds;
b. the Plan paid millions of dollars in excessive fees and commissions in connections with the inappropriate investments into which the placed

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

the Plan's funds; and

c. the Plan paid millions of dollars in expense recovery charges when the Plan liquidated the inappropriate investments into which the placed the Plan's funds.

193. As a result of the defendants' violations of 18 U.S.C. § 1962(c), the Plan has been damages in its business or property in an amount to be proven at trial, but not less than $25 million. claims.

* * *

209. As a direct and proximate result of the defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), the Plan has been injured in its business and property, in that, without limitation:

a. the Plan suffered a net loss of millions of dollars as a result of the performance of the inappropriate investments into which the defendants placed the Plan's funds;

a. the Plan paid millions of dollars in excessive fees and commissions in connections with the inappropriate investments into which the placed the Plan's funds; and

b. the Plan paid millions of dollars in expense recovery charges when the Plan liquidated the inappropriate investments into which the placed the Plan's funds.

*30 210. As a result of the defendants' violations of 18 U.S.C. § 1962(b), the Plan has been damages in its business or property in an amount to be proven at trial, but not less than $25 million. (Doc. 1.)

Repeating the same injury is insufficient. Lightning Lube, 4 F.3d at 1191 ("Such an allegation is insufficient because it merely parrots the same injury that § 1962(c) is meant to remedy and fails to explain what additional injury resulted from the person's interest or control of the enterprise." (emphasis added)); see also Cheatle v. Katz, No. Civ. A. 02-4405, 2003 WL 21250583, at *6 (E.D.Pa. April 1, 2003). Moreover, the Injuries alleged stem from the underlying racketeering activity committed by Defendants, i.e., the mail and wire frauds, not from Defendants' control of the enterprise. Plaintiffs have failed to plead a claim under § 1962(b). I will dismiss Count V against all moving Defendants.

F) Count VI-- § 1962(d) Conspiracy to Violate § 1962(b)

As I stated before in my discussion of Count IV, to sustain an action under § 1962(d), a Plaintiff must prove:

(1) that the defendant adopted the goal of furthering or facilitating the criminal endeavor, Salinas v. United States, 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997);

(2) that the conspiracy if completed, would satisfy all of the elements of either § 1962(a), (b), or (c), Rehkop v. Berwick Healthcare Corp., 95 F.3d 285, 290 (3d Cir.1996); and

(3) that an injury resulted from an act related to the conspiracy which is enumerated in § 1961(1). Beck v. Prupis, 529 U.S. 494, 505, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000).

See generally Smith v. Berg, 247 F.3d 532, 536 (3d Cir.2001).

Although a conspiracy claim requires that the element of a § 1962(a), (b), or (c) violation are met, there does not need to be a successful claim under § 1962(a), (b), or (c) in order for a § 1962(d) claim to survive. Beck, 529 U.S. at 507. Moreover, In situations in which the claim for the substantive violation fails for failure to establish the injury requirement imposed by § 1964(c), the substantive allegations can still sustain a cause of action for a § 1962(d) violation. Rehkop, 95 F.3d at 290.

"A conspiracy claim must also contain supportive factual allegations. The allegations must be sufficient to describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's general role in that conspiracy." Rose v. Bartle, 871 F.2d 331, 366 (3d Cir.1989) (internal quotations and citations omitted). However, this analysis does not rise to the level of particularity required by Rule 9(b) for allegations of fraud. Id.

"All defendants conspired to violate 18 U.S.C. § 1962(b). Among other things, defendants conspired to perpetuate a scheme to acquire and maintain interests in and control of the enterprise through a pattern of racketeering activity." (Doc. 1 ¶ 213.) "Defendants have intentionally conspired to acquire or maintain their interests in the enterprise through a pattern of racketeering activity. Defendants knew their predicate acts were part of a pattern of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



racketeering activity and agreed to the commission of those acts to further their schemes." (Id. ¶ 214.) In Count VI, the Complaint not only alleges that Defendants adopted the goal of furthering or facilitating the criminal endeavor, it outlines the composition of the conspiracy (the Board members, ASCO and affillates, and the contract companies and affiliates), the broad objectives of the conspiracy (the pay-to-play scheme), and what role Defendants played in the scheme.

**\*31** The allegations in the Complaint are extremely thorough, with the exception of Defendant Joseph Associates, Inc. As I stated previously in my § 1962(c) analysis, the Complaint failed to allege that Joyce Associates, Inc. was in anyway connected with any of the allegedly fraudulent schemes between the Board, ASCO, and the investment companies. Aside from the similarity in names with other corporate and real Defendants, there is no connection between Joyce Associates, Inc. and any of the transactions, the companies involved in those transactions, the Board members, any campaign contributions, or any commissions. As such, I find that the Complaint does not sufficiently allege Defendant Joyce Associates, Inc.'s role in that conspiracy to sustain a claim under § 1964(c) for violations of § 1962(d).

As I discussed in the previous section, a § 1962(b) violation is established when the defendant has an interest in control over an enterprise engaged in racketeering activity which the defendant acquired the interest or control through racketeering. See Lightning Lube, 4 F.3d at 1190-1191. To state a RICO claim, the Complaint must contain more than mere conclusory accusations that a defendant controlled an enterprise. Glessner, 952 F.2d at 714, overruled on other grounds, Jaguar Cars, 46 F.3d 258; see also Kaiser, 1997 U.S. Dist. LEXIS 12788, at \*6 (citing Glessner ).

Control over a RICO enterprise requires more than participation in the operation or management of the enterprise. Kaiser, 1997 U .S. Dist. LEXIS 12788, at \*4 (mere managerial control not enough); see also Browne, 2000 U.S. Dist. LEXIS, at \*31-2. A person controls a RICO enterprise when he has significant power of the functioning of the enterprise, comparable to that of a majority shareholder or someone with managerial control. See, e.g., T.I Construction, 1992 U.S. Dist. LEXIS

11607, at \*22. An interest in an RICO enterprise must rise to the level of a proprietary interest. Kaiser, 1997 U.S. Dist. LEXIS 12788, at \*9. "In addition, the plaintiff must establish that the interest or control of the RICO enterprise by the person is a result of racketeering ....it must be established firmly that there is a nexus between the interest and the alleged racketeering activities." Lightning Lube, 4 F.3d at 1190.

The Complaint properly alleges that the Board members, and possibly ASCO, controlled the enterprise or malntained a proprietary interest in the enterprise. Specifically, the Board members benefitted financially from the transactions of the enterprise, as did ASCO. Moreover, the Board members had the ability to grant or deny a contract at their whim. Therefore, they were in a position in which they controlled the very actions of the enterprise, comparable to that of a shareholder with a controlling interest. Even if the actions alleged do not themselves rise to the level of control, Plaintiffs allege facts which could support the inference that Defendants intended to control an enterprise, which satisfies the pleading requirements for a conspiracy. See Salinas, 522 U.S. at 478 ("It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues...."). Thus, the completed conspiracy satisfies all of the elements of § 1962(b).

**\*32** The Complaint also alleges that Plaintiffs sustained an injury resulting from the § 1962(b) violations, specifically, the Plan had to pay excessive fees, as well as suffer economic losses through bad investments, as a direct result of the frauds committed by the Board member Defendants and the investment manager Defendants' collusion to enter the Plan into inappropriate contracts. I find Plaintiffs sufficiently allege an injury resulting from a predicate act enumerated in § 1961(1). I find that the Complaint sufficiently alleges a claim under § 1964(c) for violations of § 1962(d) against all Defendants except Joyce Associates, Inc.

### 3) Count VII--Investment Advisor Act of 1940

Count VII alleges that ASCO and Donald Williamson violated the Investment Advisors Act of 1940, 15 U.S.C. § 80b-1 et seq. (hereinafter IAA). Defendants ASCO and Williamson challenge this claim on the grounds that it is untimely. The IAA

Not Reported in F.Supp.2d

(Cite as: 2004 WL 1908221, *32 (M.D.Pa.))

does not contain an express statute of limitations. However, the Sarbanes-Oxley Act of 2002, 28 U.S.C. § 1658(b), created a statute of limitations applicable to the IAA.

> (a) Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues.
>
> (b) Notwithstanding subsection (a), a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)) [which includes the IAA], may be brought not later than the earlier of--
>
> (1) 2 years after the discovery of the facts constituting the violation; or
>
> (2) 5 years after such violation.

28 U.S.C. § 1658(b).

In the present case, Plaintiffs allege that ASCO and Donald Williamson began acting as agents in 1988. (See Doc. 85 at 18-19 .) Typically, courts have held that violations of the IAA are not continuing crimes. See discussion Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1040-42 (1992) ("[The unregistered investment advisor] harms the purchaser of his investment advice at the time he enters into a contract that commits the purchaser to pay for the advice."). However, the Complaint clearly alleges multiple violations committed during the course of the relationship between ASCO and the Board, each of which would create a separate time for the statute of limitations to accrue. The allegations of the Complaint are not clear about the timing of each of the violations. Therefore, at the present time, I will not dismiss Count VII. I will reserve ruling on the matter of the statute of limitations until the facts are more clearly developed to permit an appropriate analysis of when the statute of limitations accrued for the IAA claims.

#### 4) State Law Claims

Now that the federal law claims are resolved, I move to the state law claims. Plaintiffs raise a claim of breach of fiduciary duty against Defendants Makowski, Pizano, Crossin, Jones, ASCO, and Donald Williamson. They also raise a claim of

aiding and abetting breach of fiduciary duty against Defendants Nationwide, Manulife, Wells, Wells REIT, Wells Investment, FSC, FSI, LPL, Safeco, Devonshire, Perfilio, Joyce Associates, Inc., JJI, JJJA, JJ & B, Joseph Joyce, William Joyce, Michael Joyce, John Joyce, and Maria Williamson, Finally, Plaintiffs raise a claim is for unjust enrichment against ASCO, Donald Williamson, FSC, Perfilio, JJI, JJJA, Joseph Joyce, John Joyce, Michael Joyce, LPL, Manulife, Nationwide, Wells, Wells REIT, Wells Investment, and FSI. All of these claims are governed by Pennsylvania law.

#### A) Supplemental Jurisdiction

*33 As a preliminary matter, Defendants argue either that the Court should decline to exercise jurisdiction.

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental Jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). Cases that "derive from a common nucleus of operative fact" with federal claims are part of the same case or controversy. United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

In the present case, Plaintiffs allege federal claims against every Defendant in Counts III thought VI. The state law claims raised by Plaintiffs derive from the same operative facts as the federal law claims, giving me Jurisdiction under § 1367(a). The fact that I dismissed the federal claims against some Defendants does not destroy my supplemental jurisdiction over the state law claims raised against those Defendants. New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc., 101 F.3d 1492, 1508 (3d Cir.1996); see also Fralin v. County of Bucks, 296 F.Supp.2d 609, 616-617 (E.D.Pa.2003).

While I have supplemental jurisdiction, I also have discretion to decline to exercise that jurisdiction in certain circumstances.

The district courts may decline to exercise

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 1908221, *33 (M.D.Pa.))

supplemental jurisdiction over a claim under subsection (a) if ...

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). In deciding whether to retain supplemental jurisdiction, a court "should take into account generally accepted principles of "judicial economy, convenience, and fairness to the litigants." ' Growth Horizons, Inc. v. Delaware County, 983 F.2d 1277, 1284 (3d Cir.1993) (quoting Gibbs, 383 U.S. at 726).

This case is principally a RICO case, and the state law claims do not substantially predominate over the RICO claims. Likewise, although I have dismissed the federal claims against one Defendant, Joyce Associates, Inc., twenty-five of the twenty-six Defendants continue to have at least one federal claim pending. Given the complexity of the case and the interconnected nature of the transactions involved, it would be wasteful to dismiss Joyce Associates, Inc. on the basis that no federal claims survive. Judicial economy dictates that the case should be decided in a single forum. As such, I will not decline to exercise my supplemental jurisdiction.

### B) Count I--Breach of Fiduciary Duty

**\*34** In Count I, Plaintiffs raise a claim of breach of fiduciary duty against Defendants Makowski, Pizano, Crossin, Jones, ASCO, and Donald Williamson. All Defendants challenge the claim on the basis that it is time-barred. Defendants ASCO and Williamson further challenge Count I as failing to state a claim upon which relief can be granted because neither of them ever had a fiduciary relationship with the Plan. Breach of fiduciary duty has a statute of limitations of two years. 42 Pa. Conn. Stat. Ann. § 5524. As with the federal claims, Plaintiffs argue that the injuries occurred within the two-year statute of limitations, and, even if the injury occurred before then, the statute of limitations was tolled by fraudulent concealment and adverse domination. Assuming, arguendo, that the injuries occurred outside of the two-year statute of

limitations, Plaintiffs' claims survive because they have sufficiently pled grounds for fraudulent concealment, adverse domination, or both.

Pennsylvania applies a broader test [FN23] for fraudulent concealment than the federal test that I applied in the RICO analysis. See discussion supra p. 12.

> FN23. Pennsylvania's test, which is known as the "discovery rule" is broader than the RICO fraudulent concealment standard because it does not require active concealment. It only requires that a Plaintiff cannot discover the injury with the exercise of reasonable due diligence.

The "discovery rule" provides that where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed statutory period, the limitations period does not begin to run until the discovery of the injury is reasonably possible. The "discovery rule" arises from the inability of the injured party, despite the exercise of reasonable diligence, to know of the injury or its cause.

Hayward v. Med. Ctr. of Beaver County, 530 Pa. 320, 608 A.2d 1040, 1043 (Pa.1992) (internal citations omitted). It is clear that the discovery rule applies to the present case given Plaintiffs' allegations that the Board members actively concealed the contracts from the public. Therefore, the conclusion from my fraudulent concealment analysis is unchanged; Plaintiffs' claims are not time-barred because they successfully allege facts that trigger the discovery rule.

It is less clear whether Pennsylvania has adopted the doctrine of adverse domination. See discussion Resolution Trust Corp. v. Farmer, 865 F.Supp. 1143, 1152 n. 7 (E.D.Pa.1994); see also In re Lloyd Sec., No. 90-0985S, 1992 WL 119362, at *10 (Bankr.E.D.Pa. May 21, 1992).

> Considering the domination by Dahlen of the entire corporate management, as well as the confidence long placed in him by the members of the Association and later by the shareholders of Lutherland, it is natural that even when suspicion had been aroused it did not ripen into conviction in the minds of the dissident shareholders until an investigation by counsel revealed the true state of affairs and thereupon this action was promptly

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Page 666

instituted.

Lutherland, Inc. v. Dahlen, 357 Pa. 143, 53 A.2d 143, 157 (Pa.1947). Some courts have read the language in Lutherland as Pennsylvania's recognition of adverse domination. Harper v. Superior Tool and Die Co., Civ. A. No. 86-4188, 1987 WL 18414, at *3 (E.D.Pa.1987). Other courts have read it as a variation of fraudulent concealment. Resolution Trust Corp., 865 F.Supp. at 1152.

**\*35** Whatever name the principle in Lutherland takes, it is clear that the facts in Plaintiffs' Complaint allege a similar situation, where the Board was dominated by participants of the pay-to-play scheme who actively concealed the nature of the financial arrangements from the public view. These facts are sufficiently analogous to the facts in Lutherland to permit Plaintiffs to proceed. Thus, I will not dismiss Count I against Defendants Makowski, Pizano, Crossin, Jones because the claim is not time-barred. However, this decision is can be revisited on a motion for summary judgment because the analysis requires a fact-specific evaluation to determine the applicability of a case. Hayward, 608 A.2d at 1043.

ASCO and Donald Williamson further assert that Court I should be dismissed because they never owed a fiduciary obligation to the Plan. ASCO and Donald Williamson assert that they do not met the definition of a fiduciary under title 20, section 7301 of the Pennsylvania Code, [FN24] which regulates how fiduciaries make investments for a principal. Pennsylvania's title 20 also contains a broader definition of fiduciary which is applied more generally. That definition "[i]ncludes personal representatives, guardians, and trustees, whether domiciliary or ancillary, individual or corporate, subject to the jurisdiction of the orphans' court division." 20 Pa. Conn. Stat. Ann. § 102. ASCO and Donald Williamson meet neither of these definitions.

FN24. "The term 'fiduciary' as used in this chapter shall include an administer of a municipal pension or retirement plan and any other person whose fiduciary duties are, by statute, governed by the principles of this chapter." 20 Pa. Conn. Stat. Ann. § 7301. "The term 'fiduciary', as defined in [20 Pa. Conn. Stat. Ann. § 102] does not expressly include an 'attorney-in-fact' or an 'agent'." In re Estate of

Nicely, No. 184 OF 1995, 2003 WL 22183940, at *5 (Pa.Com.Pl. April 1, 2003).

Aside from the statutory fiduciaries, there is a long-standing common law definition of fiduciary in Pennsylvania. Basile v. H & R Block, Inc., 563 Pa. 359, 761 A.2d 1115 (Pa.2000) (Basile I); see discussion Basile v. H & R Block, Inc., 777 A.2d 95, 101 (Pa.Super.Ct.2001) (Basile II ). "An agency relationship is a fiduciary one, and the agent is subject to the duty of loyalty to act only for the principal's benefit." Basile I, 761 A.2d at 1120 (quoting Sutiff v. Sutliff, 515 Pa. 393, 528 A.2d 1318, 1323 (Pa.1987)). The agent [FN25] has a duty to act "with the utmost good faith," which includes a duty to disclose "all relevant information" to the principal. Id. (citing Sylvester v. Beck, 406 Pa. 607, 178 A.2d 755, 757 (Pa.1962)).

> FN25. The three elements of agency are: (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) understanding of the parties that the principal is to be in control of the undertaking. Basile I, 761 A.2d at 1120 (quoting Scott v. Purcell, 490 Pa. 109, 415 A.2d 56, 60 (Pa.1980)).

The Complaint alleges that ASCO and Donald Williamson were "agents" of the Board and "investment advisors." (Doc. 1 ¶ 171 .) As alleged in the Complaint, ASCO and Donald Williamson acted as agents of the Eoard and the Plan in many, if not all, of the twelve contracts at issue in this case. The further allegations that ASCO and Donald Williamson received commissions and withheld information from the Board and/or the Plan (e.g., the investment account statements were sent to ASCO, not the Board) amount to allegations of breaches of their common-law fiduciary duties. I find that the Complaint alleges a claim for which relief can be granted for breach of fiduciary duty against ASCO and Donald Williamson.

C) Count II--Aiding and Abetting Breach of Fiduciary Duty

**\*36** In Count II, Plaintiffs allege that various Defendants "aided and abetted" the breaches of fiduciary duties allegedly committed by Defendants Makowski, Pizano, Crossin, Jones, ASCO, and Donald Williamson. All Defendants named in Count

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



II challenge the claim on the grounds that the cause of action is not recognized in Pennsylvania. Plaintiffs acknowledge that the Pennsylvania Supreme Court has not recognized aiding and abetting breach of fiduciary duty, but they urge the Court to expand the law.

For issues of state law, the Court acts as if it were a state court, applying the state law as the state has constructed it, and interpreting novel questions in the manner the Court believes the state high court would interpret the issue. Rolick v. Collins Pine Co., 925 F.3d 661, 664 (3d Cir.1991). However, "it is not the role of a federal court to expand state law in ways not foreshadowed by state precedent." City of Philadelphia v. Beretta U.S.A. Corp., 277 F.3d 415, 421 (3d Cir.2002) (citing Camden County Bd. of Chosen Freeholders v. Beretta U.S.A. Corp., 123 F.Supp.2d 245 (D.N.J.2000)). "[F]ederal courts may not engage in judicial activism. Federalism concerns require that we permit state courts to decide whether and to what extent they will expand state common law.... Our role is to apply the current law of the jurisdiction, and leave it undisturbed." Leo v. Kerr-McGee Chem. Corp., 37 F.3d 96, 101 (3d Cir.1994) (quoting City of Philadelphia v. Lead Indus. Ass'n, 994 F.2d 112, 123 (3d Cir.1993)).

While some lower courts in Pennsylvania have recognized a cause of action for aiding and abetting breach of fiduciary duty, the number of cases is not overwhelming. Lichtman v. Taufer, 2004 WL 1632574 (Pa.Com.Pl. July 13, 2004) and Koken v. Steinberg, 825 A.2d 723 (Pa.Com.Pl.2003); see also Burnside v. Abbott Lab., 351 Pa.Super. 264, 505 A.2d 973, 982-83 (Pa.Super.Ct.1985) (favorably discussing aiding and abetting, but then holding "this case is an improper vehicle for the initial consideration of this cause of action by a court of this Commonwealth").

I am hesitant to create an entirely new cause of action on the basis of two cases from the lower courts in Pennsylvania and dictum from a third court. I am not alone in my hesitation. In 2002, the United States District Court for the Western District of Pennsylvania dismissed a claim of aiding and abetting a breach of fiduciary duty on the same grounds. Daniel Boone Area Sch. Dist. v.. Lehman Brothers, Inc., 187 F.Supp.2d 400, 413 (W.D.Pa.2002). I am aware that the United States

District Court for the Eastern District of Pennsylvania has been more willing to expand Pennsylvania law to include aiding and abetting breach of fiduciary duty. Adena, Inc. v. Cohn, 162 F.Supp.2d 351, 357-58 (E.D.Pa.2001); Stone Street Servs., Inc. v. Daniels, Civ. A. No. 00-1904, 2000 WL 1909373, at *3 (E.D.Pa. Dec.29, 2000); Kaiser v.. Stewart, Civ. A. No. 96-6643, 1997 U.S. Dist. LEXIS 12788, at *53 (E.D.Pa. Aug. 20, 1997); Schuylkill Skyport Inn, Inc. v. Rich, Civ. A. No. 95-3128, 1996 U.S. Dist. LEXIS 12655, at *120 (E.D.Pa. Aug.21, 1996); Wilbur W. Pierce v. Rosetta Corp., Civ. A. No. 88-5873, 1992 U.S. Dist. LEXIS 9065, at *6-7 (E.D. Pa. June 12, 1992). However, I am more persuaded by the caution urged by the Court of Appeals for the Third Circuit than I am by the non-binding decisions of the United States District Court for the Eastern District of Pennsylvania. Pennsylvania has not recognized a cause of action for aiding and abetting breach of fiduciary duty, and neither will I. Count II will be dismissed against all moving Defendants.

D) Count VIII--Unjust Enrichment

*37 The last claim in this action is for unjust enrichment against ASCO, Donald Williamson, FSC, Perfilio, JJI, JJJA, Joseph Joyce, John Joyce, Michael Joyce, LPL, Manulife, Nationwide, Wells, Wells REIT, Wells Investment, and FSI.

> Unjust enrichment is ... an equitable doctrine[, with the following elements:] benefits conferred on one party by another, appreciation of such benefits by the recipient, and acceptance and retention of these benefits under such circumstances that it would be inequitable [or unjust] for the recipient to retain the benefits without payment of value.

Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 447 (3d Cir.2000) (quoting 16 SUMMARY OF PA. JUR.2D COMMERCIAL LAW § 2.2 (1994)) (alterations in original). Whether unjust enrichment is appropriate in a particular case "depends on the unique factual circumstances of each case." Styer v. Hugo, 422 Pa.Super. 262, 619 A.2d 347, 350 (Pa.Super.Ct.1993).

Plaintiffs allege that the Plan conferred the benefit of fees and commissions upon Defendants in this claim, and they allege that Defendants received those benefits. Plaintiffs further contend that these

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.2d
(Cite as: 2004 WL 1908221, *37 (M.D.Pa.))

Page 668

benefits were received unjustly because of the fraud
and bribery involved in their procurement. At this
early stage in the case, I cannot make the factual
analysis required to determine whether the
circumstances constitute an inequity warranting
unjust enrichment, but it would be inappropriate to
dismiss the equitable claim at this time.  [FN26]

> FN26. An unjust enrichment claim can be an
> equitable stand-in a tort claim. Allegheny Gen.
> Hosp., 228 F.3d at 446-7 (discussing Steamfitters
> Local Union No. 420 Welfare Fund v. Philip
> Morris, Inc., 171 F.3d 912, 917-18 (3d Cir.1999),
> cert. denied, 528 U.S. 1105, 120 S.Ct. 844, 145
> L.Ed.2d 713, (2000)). In the present case, Plaintiffs
> properly allege multiple tort claims, which strongly
> suggest that the unjust enrichment claim should
> remain in the action.

## CONCLUSION

In summary, I will dismiss Count III against FCS,
Perfilio, Joyce Associates, Inc., JJI, John Joyce,
William Joyce, Michael Joyce, Wells, Wells REIT,
Wells Investment, FSI, Safeco, and Devonshire
because the Complaint fails to state a claim upon
which relief can be granted. Counts IV and VI will
be dismissed against Defendant Joyce Associates,
Inc. because the Complaint fails to state a claim
upon which relief can be granted. Count V will be
dismissed against all moving Defendants because the
Complaint fails to state a claim upon which relief
can be granted. Count II will be dismissed against
all moving Defendants because there is no such
cause of action. The remaining claims will not be
dismissed. Because of the complexity of the case, I
include the summary of the remaining claims:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 1908221, *37 (M.D.Pa.))

Page 669

(1)  Count I        Breach of fiduciary duty--Defendants Makowski, Pizano, Crossin, Jones, ASCO, and Donald Williamson;

(2)  Count II       Aiding and abetting breach of fiduciary duty--Defendant LPL;

(3)  Count III      Violating RICO s 1962(c), conducting and participating in an enterprise by engaging in a pattern of racketeering activity - Makowski, Pizano, Crossin, Jones, ASCO, Donald Williamson, Maria Williamson, JJJA, JJ & B, Joseph Joyce, Manulife, Nationwide, and LPL;

(4)  Count IV       Violating RICO s 1962(d), conspiring to violate s 1962(c)--all Defendants except Joyce Associates, Inc.;

(5)  Count V        Violating RICO s 1962(b), acquiring and maintaining an interest or control of an enterprise engaged in a pattern of racketeering activity--Defendant LPL;

(6)  Count VI       Violating RICO s 1962(d), conspiring to violate s 1962(b)--all Defendants except Joyce Associates, Inc.;

(7)  Count VII      Violating the Investment Advisors Act--Defendants Donald Williamson and ASCO.

(8)  Count VIII     Unjust enrichment--Defendants ASCO, Donald Williamson, FSC, FSI, LPL, Manulife, Nationwide, Wells, Wells REIT, Wells Investment, Perfilio, JJI, JJJA, Joseph Joyce, Michael Joyce, and John Joyce.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.2d
(Cite as: 2004 WL 1908221, *38 (M.D.Pa.))

**\*38** An appropriate Order follows.

### ORDER

NOW, this 24th day of August, 2004, IT IS HEREBY ORDERED that Defendants' nine motions to dismiss (Docs. 46, 91, 93, 95, 96, 98, 100, 104, and 108) are GRANTED in part and DENIED in part as follows:

(1) Count II is DISMISSED against Nationwide Life Insurance Company, The Manufacturers Life Insurance Company (U.S.A.), Wells Real Estate Funds, Inc., Wells Investment Securities, Inc., Wells Real Estate Investment Trust, Inc., FSC Securities Corporation, First Security Investments, Inc., Safeco Life Insurance Corporation, Devonshire Capital Management, LLC, Joseph C. Perfilio, Joyce Associates, Inc., Joseph Joyce Insurance, Joseph J. Joyce Associates, Inc., Joyce Jackman & Bell Insurers, Joseph Joyce, Jr., William Joyce, Michael Joyce, John J. Joyce, and Maria Williamson;

(2) Count III is DISMISSED against Defendants FCS Securities Corporation, Joseph C. Perfilio, Joyce Associates, Inc., Joseph Joyce Insurance, John J. Joyce, William Joyce, Michael Joyce, Wells Real Estate Funds, Inc., Wells Real Estate Investment Trust, Inc., Wells Investment Securities, Inc., First Security Investments, Inc., Safeco Life Insurance Corporation, and Devonshire Capital Management, LLC;

(3) Count IV is DISMISSED against Defendant Joyce Associates, Inc.

(4) Count V is DISMISSED against all Defendants except Linsco Private Ledger Corporation;

(5) Count VI is DISMISSED against Defendant Joyce Associates, Inc.

(6) The motions are otherwise DENIED.

2004 WL 1908221 (M.D.Pa.), Fed. Sec. L. Rep. P 92,899, RICO Bus.Disp.Guide 10,742

**END OF DOCUMENT**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo