# Exhibit P

2004 WL 603392 (E.D.Pa.)

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
PERMA-VAULT SAFE COMPANY
v.
KEEP-IT-SAFE, INC., Discount Safe Co., Gary Savrin, individually and t/a Savrin Associates, and Ronald S. Johnson
No. Civ.A.02-7960.
March 25, 2004.

Norman Perlberger, Perlberger Law Associates, PC, Ardmore, PA, for Plaintiff.
Eric C. Milby, Lundy Flitter Beldecos & Berger PC, Narberth, PA, for Defendants.

*MEMORANDUM & ORDER*

SURRICK, J.
*1 Presently before us is Defendants' Keep-It-Safe, Inc., Discount Safe Co., Gary Savrin, and Ronald Johnson's Motion to Dismiss Count I Pursuant to Fed.R.Civ.P. 12(b)(6) (Doc. No. 4). For the following reasons, Defendants' motion will be granted.
I. Background
This action arises out of the alleged breach of a non-compete agreement. On October 30, 2000, Plaintiff Perma-Vault Safe Company and Dornisch Discount Safe Co. ("Dornisch") purchased all of the assets of their parent, Bonafide Factory Products, Inc. ("Bonafide") pursuant to an Asset Purchase Agreement (the "Agreement"). (Compl.¶ 15.) At that time, Marvin Sobel [FN1] and Irving Plaksen were the owners of Bonafide. (*Id.* ¶ 9.) Defendant Gary Savrin, trading as Savrin Associates, acted as the outside auditor and accountant for Plaintiff and Dornisch. (*Id.* ¶¶ 6, 11.) Savrin also acted as Sobel's personal accountant. (*Id.* ¶ 12.) Defendant Ronald S. Johnson was the general manager of the Plaintiff and Dornisch. (*Id.* ¶ 10.) Plaintiff alleges that Johnson and Savrin were uniquely situated to secure inside corporate information, including Plaintiff's products, existing and prospective customer lists, vendors, distributors, banking relationships, inventory, computer security codes and data banks, product specifications, copyright, patent and trademark materials, advertising and sales materials, technical and bid specifications, cost of manufacturing and sales, pricing information, business strategies and processes, internal corporate and accounting books and records, all of which where privileged, secret, and confidential. (*Id.* ¶ 13.)

> FN1. Sobel was named as a defendant in this lawsuit but settled with Plaintiff on May 30, 2003. (Doc. No. 13.)

In connection with the Agreement, Sobel executed a non-compete agreement and a consulting agreement with Plaintiff. (*Id.* ¶ 15 .) In the non-compete agreement, Sobel agreed, among other things, for a period of three years (1) not to engage or compete with Plaintiff anywhere in the United States; (2) not to have any interest in any business (except a stock ownership not to exceed one percent of a publicly-traded company) that competes with Plaintiff; (3) not to divert or by aid of others do anything which would tend to divert any trade or business away from Plaintiff; (4) not to solicit, induce, or attempt to induce any employee or independent contractor of Plaintiff to leave or terminate his relationship so as to engage in a competitive business; and (5) not to use or disclose any of Plaintiff's confidential information. (*Id.* ¶ 16.)
Plaintiff alleges that Defendants conspired to compete with it in violation of Sobel's non-compete agreement and ultimately buy back the company at a distressed price when it should find itself unable to maintain sales and profit projections. (*Id.* ¶¶ 14, 29, 36 .) For example, Plaintiff alleges before that while still acting as Plaintiff's accountant, Johnson incorporated Defendant Keep-It-Safe, Inc. ("Keep-

It-Safe"). (*Id.* ¶ 18.) On October 30, 2000, Johnson stopped working for Perma-Vault and began working for Keep-It-Safe. (*Id.* ¶ 21.) Later, he joined Defendant Discount Safe Co., Inc. ("Discount"), a company incorporated by Savrin. (*Id.* ¶¶ 21-22.) Plaintiff alleges that both Keep-It-Safe and Discount are companies competing with Plaintiff. (*Id.* ¶ 23.)

*2 In February, 2001, Keep-It-Safe submitted a bid for supplying safes to Temple University, a job that was being bid upon by Plaintiff. Keep-It-Safe won the bid. (*Id.* ¶ 24.) Keep-It-Safe learned of this opportunity from an insider with Plaintiff. Plaintiff believes that Sobel and/or Johnson were instrumental in providing Keep-It-Safe with the sales lead, the details of Plaintiff's bid, and assistance in how to approach Temple representatives with a bid that would beat Plaintiff's bid. (*Id.* ¶ 25.) In March, 2001, Sobel approached employees of Plaintiff and solicited their help to undermine and destroy the company, telling them that they had a future with him in his retaking ownership and control of the company. (*Id.* ¶ 26.) Between June, 2001 and January, 2002, Sobel again met with employees of Plaintiff and encouraged them to stop working for Plaintiff and help Sobel compete with Plaintiff. (*Id.* ¶ 32.) Sobel indicated to one employee that the reason Plaintiff's sales were down thirty percent was because Sobel was successfully having business "siphoned off" and diverted elsewhere. (*Id.* ¶ 34.) Johnson also encouraged Plaintiff's employees to leave Plaintiff and compete with Plaintiff. (*Id.* ¶ 35.)

In the summer of 2001, Savrin disclosed to Gregg Feinberg (an attorney for Plaintiff) that Savrin had incorporated Keep-It-Safe "for the sole purpose of continuing to do business after the sale of Bonafide." (*Id.* ¶ 27.) Then, on August 8, 2001, Savrin wrote a letter indicating that he had information regarding "the acts and events of the executives concerning their behavior leading up to sale of the business." (*Id.* ¶ 28.) Based on Savrin's conversations with Feinberg, Plaintiff began investigating the connections of the individual Defendants to Plaintiff's competitors. (*Id.* ¶ 30.)

In connection with the sale of Bonafide's assets, Sobel knowingly overstated and misstated certain inventory in order to obtain additional cash from Plaintiff. (*Id.* ¶ 38.) Also, Plaintiff acquired inventory in the asset purchase that it found unsaleable. Plaintiff engaged Sobel under the terms of his consulting agreement to attempt to sell that inventory. (*Id.* ¶ 37.) Sobel made no attempt to sell the inventory as part of his scheme to bankrupt Plaintiff and buy it back at a distressed price. (*Id.* ¶ 38.)

In mid-October, 2001, and thereafter, Defendants tapped into Plaintiff's website and downloaded files in an effort to build websites for Keep-It-Safe and Discount. Defendants intended these websites to be similar to Plaintiff's website so the public would confuse Keep-It-Safe and Discount with Plaintiff. (*Id.* ¶ 39.) Defendants also hacked into Plaintiff's e-mail, on or before October 11, 2001, causing Plaintiff's e-mail services to be inoperative. (*Id.* ¶¶ 41-42.)

On January 15, 2002, Sobel urged Plaintiff's managers not to attend the annual NRA show because it was too pricey and not worth it. (*Id.* ¶ 46.) On February 28, 2002, after Plaintiff discovered that Sobel was conspiring against it, Plaintiff fired Sobel. Plaintiff alleges that after Sobel was fired he used confidential information to help companies he controlled win bids from Plaintiff. (*Id.* ¶¶ 47-50.)

*3 Realizing that Sobel was conspiring against it, Plaintiff decided to attend the NRA show. There it discovered that Johnson and Keep-It-Safe were soliciting business using sales materials and products virtually identical to those belonging to Plaintiff. (*Id.* ¶ 52.) At the SHDA annual conference, Johnson and Sobel solicited a number of customers, many if not all of whom considered their communications to be with Plaintiff under its "new name," Keep-It-Safe. (*Id.* ¶ 54.) The sales brochures, pricing lists, and other materials distributed at the conference by Keep-It-Safe were identical in format, content, wording, and design to Plaintiff's brochures and sales materials. Plaintiff alleges that Defendants were trying to confuse the public into believing that they were still doing business with Plaintiff. (*Id.* ¶ 55.)

On June 27 and September 12, 2002, Plaintiff alleges that Johnson and Sobel tried to interfere with Plaintiff's relationships with its customers and take business from Plaintiff. (*Id.* ¶¶ 56-57.) Johnson and Sobel told Houdini, one of Plaintiff's customers, that it should "watch out" for Plaintiff and that it should do business with Keep-It-Safe. (*Id.* ¶ 56.)

Plaintiff filed a seven count Complaint alleging violations of two federal statutes--the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964,*et seq.*, and the Lanham Act, 15 U.S.C. § 1051,*et seq.* --and numerous state law claims. Presently before us is Defendants' Motion to Dismiss the RICO claim.

II. Standard of Review

When considering a motion to dismiss a complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), this Court must "accept as true the facts alleged in the complaint and all reasonable inferences that can be drawn from them. Dismissal under Rule 12(b)(6) ... is limited to those instances where it is certain that no relief could be granted under any set of facts that could be

proved." *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990) (citing *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988)). For this reason, district courts strongly disfavor Rule 12 (b)(6) motions. *Melo-Sonics Corp. v. Cropp,* 342 F.2d 856 (3d Cir.1965); *Kuromiya v. United States,* 37 F.Supp.2d 717, 722 (E.D.Pa.1999). A court will only dismiss a complaint if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." ' *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249-50, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). Nevertheless, a court need not credit a plaintiff's "bald assertions" or "legal conclusions" when deciding a motion to dismiss. *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997).

III. Discussion

In Count I of the Complaint, Plaintiff alleges that Defendants' actions were a violation of the RICO Act. Under RICO, "[a]ny person injured in his business or property by reason of a violation of [RICO] section 1962 may bring a civil action for treble damages." 18 U.S.C. § 1964(c). Plaintiff alleges that Defendants violated §§ 1962(b), (c), and (d), by competing with Plaintiff by illegal means. (Compl.¶ 69.) Section 1962 provides in relevant part:

*4 (b) It shall be unlawful for any person through a *pattern of racketeering activity* or through collection of an unlawful debt to acquire or maintain, directly, or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commere, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a *pattern of racketeering activity* or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section.

18 U.S.C. §§ 1692(b), (c), and (d) (emphasis added). To assert a claim under any of these subsections of 1962, a plaintiff must show that defendants conducted the affairs of a RICO enterprise through a "pattern of racketeering activity." 18 U.S.C. § 1962. Section 1961(1) enumerates those predicate acts that may constitute "racketeering activity" for RICO purposes. *J. Plater-Zyberk v. Abraham,* Civ. A. No. 97-3322, 1998 WL 67545, at *5 (E.D.Pa. Feb.17, 1998). Section 1961(5) defines a pattern of racketeering activity as "requir [ing] at least two acts of racketeering activity, one of which occurred after the effective date of the chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Defendants contend that Plaintiff has not sufficiently alleged a violation of § 1962 for two reasons. First, Defendants argue that Plaintiff has failed to sufficiently allege the necessary "predicate offense." *See* 18 U.S.C. §§ 1962(b) and (c). Second, Defendants argue that Plaintiff has failed to sufficiently allege the existence of a "pattern of racketeering activity."

a. Predicate Act Requirement

In determining the sufficiency of a RICO claim, the court must first look to the predicate acts of racketeering activity. *See Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1411 (3d Cir.1991). In this case, Plaintiff alleges violations of the mail and wire fraud statutes. *See* 18 U.S.C. §§ 1341, 1343. [FN2] Mail and wire fraud are included in the list of predicate offenses. 18 U.S.C. § 1961(1). To prove a violation of the mail fraud statute, a plaintiff must show that the defendant employed the U.S. mails in furtherance of a scheme or artifice to defraud. *J. Plater-Zyberk,* 1998 WL 67545, at *6 (citing *Schmuck v. United States,* 489 U.S. 705, 715, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989)); *see also Philadelphia Reserve Supply Co. v. Nowalk & Assocs., Inc.,* 864 F.Supp. 1456, 1470 (E.D.Pa.1994) (citing 18 U.S.C. §§ 1341, 1343) ("Both the mail and wire fraud statutes require proof of (1) the defendant devising or intending to devise (2) a scheme or artifice to defraud, (3) the use of the mails or wires for the purpose of executing or attempting to execute the scheme or artifice, and (4) knowledge by the defendant of that use."). The scheme to defraud in connection with these two statutes "must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension." *Kehr,* 926 F.2d at 1415 (quoting *United States v. Pearlstein,* 576 F.2d 531, 535 (3d Cir.1978)). In that way, the federal standard for mail fraud is very similar to the Pennsylvania common law definition of fraud in Pennsylvania. *See e.g. Delaware Trust Co. v. Lai,* No. Civ. A. 96- 4784, 1998 WL 833854, at *6 (E.D.Pa. Nov.30, 1998) ("Fraud consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture.") (quoting *Moser v. DeSetta,* 527 Pa. 157,

589 A.2d 679, 682 (Pa.1991).

FN2. 18 U.S.C. § 1341 provides in relevant part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service ... shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343 provides in relevant part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses ... by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or

sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

*5 Plaintiff contends that the fraud in this case is actionable under RICO because the Supreme Court has instructed that RICO is to be read broadly. It is without question that mail and wire fraud are predicate acts under RICO. However, the Third Circuit has recognized that the broad definition of these crimes may be problematic:
"RICO enumerates the offenses which constitute 'racketeering activity,' including crimes that have traditionally been associated with the transgressions of racketeers.... The statutory enumeration is ... expansive and goes on to include specific federal offenses which, although they may often be committed by those whom we would categorize as 'racketeers,' also fall into the category of common law or 'garden variety' fraud and which would, in the past, have been the subject of commercial litigation under state law.
Tabas v. Tabas, 47 F.3d 1280, 1290 (3d Cir.1995). Despite this potential problem, the Supreme Court has continued to recognize the broad nature of the statutory language. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497- 78 (1985) ("RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, but also of its express admonition that RICO is to be liberally construed to effectuate its remedial purposes.").
Defendants contend that Plaintiff has not adequately stated a claim for mail and wire fraud. Rather than alleging mail and wire fraud, Defendants argue that at best the Complaint only alleges a breach by Sobel of his agreement not to compete. Plaintiff does allege that Defendants undertook a scheme to compete with Plaintiff and make "Perma-Vault fail as a company and take it back at a depressed value." (Compl.¶ 45.) But nowhere does Plaintiff allege that Defendants fraudulently induced it to purchase the assets of Bonafide or that he reasonably relied on any such fraud. Instead, Plaintiff alleges that "Sobel is believed to be the master-mind and primary mover of this conspiracy and enterprise, Defendants Savrin and Johnson, and the Corporate Defendants, Keep-it-Safe and Discount Safe, have engaged, participated and acted in furtherance of this conspiracy and enterprise." (Id. ¶ 68.)
Plaintiff's allegations regarding the acts of Defendants in furtherance of this conspiracy are limited. Savrin is accused of incorporating Keep-it-Safe, (id. ¶ 18), and Discount, (iId.¶ 22). Johnson is accused of leaving Perma-Vault and joining Keep-it-Safe and then Discount. (Id. ¶ 21.) Keep-it-Safe is accused of using information obtained from an insider at Perma-Vault to compete and win a job from Temple University. (Id. ¶ 25.) All of the Defendants are accused of illegally interfering with and causing harm to Plaintiff's website and e-mail system. (Id. ¶ 39-42.)

While Plaintiff's allegations are sufficient to state claims for numerous common law tort actions, none of the allegations against Defendants include any claims that could amount to a finding of fraud. In Pennsylvania, the elements of common law fraud include a material misrepresentation of an existing fact, scienter, justifiable reliance, and damages. See Booze v. Allstate Ins. Co., 750 A.2d 877, 880 (Pa.Super.Ct.2000). Merely characterizing immoral business conduct as "fraudulent" does not mean that Defendants are liable for fraud; the elements constituting fraud must be averred. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir.1997) ("[E]ven under a relaxed application of Rule 9(b), boilerplate and conclusory allegations will not suffice.").

*6 Plaintiff insists that the allegations of mail and wire fraud are premised on Sobel's actions. When Sobel sold Bonafide and its assets to Plaintiff, Sobel signed an extensive non-compete agreement that circumscribed his ability to compete with Perma-Vault. (Compl. Ex. A .) Despite this agreement, Sobel continued to compete with Perma-Vault through companies incorporated by Savrin and entities operated by his children. (Id. ¶¶ 27, 31.) Sobel solicited Plaintiff's employees to terminate their employment and join a new company that would compete with Perma-Vault. (Id. ¶¶ 32, 33.) Sobel is also accused of intentionally injuring Perma-Vault while serving as a paid consultant. (Id. ¶¶ 51, 53, 55, 56, 57.) These allegations clearly illustrate how Sobel breached the covenant not to compete. But again, they do not address any of the necessary elements of common law fraud. [FN3] Nowhere does the Complaint allege how Defendants fraudulently induced Plaintiff to change his position, or that he reasonably relied on any such fraud. See Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 746-47 (3d Cir.1996) (holding that a RICO plaintiff could not recover if it had not relied upon any of the misrepresentations by the defendant).

> FN3. Defendants argue that the common law "gist of the action" doctrine is relevant here. (Mot. to Dismiss Count I Pursuant to Fed.R.Civ.P. 12(b)(6) at 7.) "[T]he gist of the action test requires the court to determine from the complaint the essential nature of the claim alleged by distinguishing between contract and tort claims on the basis of the source of the duties allegedly breached; if the claim essentially alleges a breach of duties that flow from an agreement between the parties, the claim is contractual in nature, whereas if the duties allegedly breached were of a type imposed on members of society as a matter of social policy, the claim is essentially tort-based." Caudill Seed and Warehouse Co., Inc. v. Prophet 21, Inc., 123 F.Supp.2d 826, 833 (E.D.Pa.2000). The allegations concerning Sobel seem to flow from a contractual duty, while the claims against the remaining Defendants are tort-based. Though the
>
> claims against these Defendants are indeed based on torts, none of the allegations against Defendants allege the tort of fraud.

Only one allegation can be construed as an allegation of fraud in the Complaint. Plaintiff alleges that Sobel "knowingly overstated and misstated inventory upon sale of [Bonafide] to obtain additional cash from the Plaintiff and, despite his being specifically assigned to sell the bad inventory subsequent to the sale, made no attempt to do so as part of his scheme to bankrupt [Perma-Vault] and get [Perma-Vault] back at a distressed price." (Id. ¶ 38.) However, this allegation has no connection to the use of the mail or the wires, nor has Plaintiff sufficiently pled such a connection. Bidding for the Temple contract through the mail, and attacking Perma-Vault's website, can be connected to the allegations that Defendants were unfairly competing with Plaintiff, but these acts cannot be connected to the only fraudulent statement alleged in the Complaint--Sobel's overstatement of inventory.

Defendants contend that this case is factually similar to the case of J. Platzer-Zyberk. In that case plaintiff filed suit when his former business partners conspired to defraud him of his interest in the corporation. J. Platzer-Zyberk, 1998 WL 67545, at *1. Plaintiff claimed that after contractually committing himself to the corporation, his partners--the defendants, developed a scheme to deprive him of his contractual rights. Id. at *6. To effect this scheme, defendants "mailed and wired him" a series of letters that culminated in his termination. In dismissing the RICO claim, the court said, "[w]hile the letters to demand that plaintiff meet certain requirements to avoid termination, they are not deceptive. ... Indeed the entire scheme, while possibly treacherous, lacks fraudulence entirely." Id.

*7 We agree with Defendants that the case before us is factually similar to J. Platzer-Zyberk. Both cases involve situations where the primary complaint involves a breach of contract and other related business torts. In both instances Plaintiffs have attempted to supplement the complaint with a RICO claim based on this behavior. As the court determined in J. Platzer-Zyberk, we do not believe that the facts alleged in this Complaint are sufficient to find that the predicate offenses of mail or wire fraud has been committed.

Even if we were to construe Plaintiff's allegations of fraud extremely liberally, the Complaint would still not sufficiently allege fraud. Federal Rule of Civil Procedure 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). Rule 9(b) has been held to be applicable to RICO claims predicated on mail and wire fraud. See Lum v. Bank of Am., No. 01-4348, 2004 WL 485476, at *1 (3d Cir. Mar.11, 2004) (holding that RICO claim was properly dismissed because plaintiff failed to plead fraud with the specificity required by Rule 9(b)); see also Saporito v. Combustion Eng'g Inc., 843 F.2d 666, 673-76 (3d Cir.1988),va cated on other grounds, 489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989) (blanket allegations of mail and wire fraud in RICO case, without indicating who made or received fraudulent representation, are insufficient under Rule 9(b)); Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir.1984) (allegations must be such as "to place the defendants on notice of the precise misconduct with which they are charged). "Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Seville, 742 F.2d at 791. In the present case, Plaintiff's allegations of fraud are extremely general. The only fraud complained of was Sobel's overstatement of the inventory. This allegation lacks the specificity required under Rule 9(b). It does not specify what was misstated, to whom the misstatement was made, or the effect of this misstatement.

While we would usually grant Plaintiff the opportunity to amend the Complaint following a dismissal based on Rule 9(b), in this instance we do not believe that the insufficiency of the Complaint can be corrected through amendment. See Lum, 2004 WL 485476, at *2 (holding that district court's denial of leave to amend was proper where granting leave to amend would be futile). Even if the allegations of the misstatement were amended to specify how this fraudulent misstatement was made by use of the mail or wire, we think that the Complaint would still fail to sufficiently connect the statement made by Sobel to Defendants' actions. See Ideal Dairy Farms, 90 F.3d at 747 (upholding dismissal of RICO claim where alleged predicate acts lacked element of fraudulence). As a result we must dismiss the RICO claim.

*8 An appropriate Order follows.

ORDER

AND NOW, this 25 day of March, 2004, upon consideration of the Defendants' Motion to Dismiss Count I Pursuant to Fed.R.Civ.P. 12(b)(6) (Doc. No. 4), and all documents in support thereof, and opposition thereto, it is ORDERED that Defendants' Motion is GRANTED.

IT IS SO ORDERED.
E.D.Pa.,2004.
Perma-Vault Safe Company v. Keep-It-Safe, Inc.
2004 WL 603392 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:02CV07960 (Docket) (Oct. 18, 2002)
END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.