**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ROYAL INDEMNITY COMPANY | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :     Civil No. 05-165 (JJF) |
| | : |
| PEPPER HAMILTON LLP, ET AL. | : |
| | : |
| Defendants. | : |

---

**APPENDIX OF UNREPORTED CASES CITED IN THE BRIEF IN SUPPORT
OF THE MOTION OF W. RODERICK GAGNÉ FOR THE DISMISSAL OF
PLAINTIFF'S FIRST AMENDED COMPLAINT**

---

MORRIS, NICHOLS, ARSHT & TUNNELL
William H. Sudell, Jr. (No. 0463)
Donna L. Culver (No. 2983)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200

*Counsel for Defendants Pepper Hamilton LLP
and W. Roderick Gagné*

OF COUNSEL:

SCHNADER HARRISON SEGAL & LEWIS LLP
Elizabeth K. Ainslie, Esq.
Nicholas J. LePore, III, Esq.
Theresa E. Loscalzo, Esq.
Bruce P. Merenstein, Esq.
Stephen J. Shapiro, Esq.
1600 Market Street, Suite 3600
Philadelphia, PA  19103
(215) 751-2000

June 10, 2005

## TABLE OF CONTENTS

**EXHIBIT**

*Allstate Transp. Co. v. SEPTA*, No. 97-1482, 1997 U.S. Dist.
LEXIS 16638 (E.D. Pa. Oct. 20, 1997)..............................................................A

*Breslin v. Brainard*, No. 01-CA-7269, 2003 U.S. Dist.
LEXIS 19609 (E.D. Pa. Oct. 10, 2003).............................................................B

*Dianese, Inc. v. Commonwealth of Pennsylvania*, No. 01-CV-2520;
2002 U.S. Dist. LEXIS 10917 (E.D. Pa. June 19, 2002)..................................C

*Freed v. Universal Health Servs., Inc.,* No. 04-1233,
2005 U.S. Dist. LEXIS 7789 (E.D. Pa. May 3, 2005)......................................D

*Gates v. Ernst & Young,* No. 9302332, 1994 U.S. Dist. LEXIS
11456 (E.D. Pa. Aug. 15, 1994)........................................................................E

*Jeffreys v. Exten*, No 86-32-SLR, 1993 U.S. Dist.
LEXIS 18537 (D. Del. Dec. 30, 1993)...............................................................F

*New York Auto. Ins. Plan v. All Purpose Agency & Brokerage, Inc.*, No. 97-3164,
1998 U.S. Dist. LEXIS 15645 (S.D.N.Y. Oct. 6, 1998)...................................G

*Schuykill Skyport Inn, Inc. v. Rich*, No. 95-3128, 1996 U.S. Dist.
LEXIS 12655 (E.D. Pa. Aug. 21, 1996).............................................................H

# EXHIBIT A

LEXSEE 1997 U.S. DIST. LEXIS 16638

**ALLSTATE TRANSPORTATION CO., INC., Plaintiff v. SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, Defendant**

**CIVIL ACTION No. 97–1482**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1997 U.S. Dist. LEXIS 16638*

**October 20, 1997, Decided**
**October 20, 1997, Filed; October 21, 1997, Entered**

**SUBSEQUENT HISTORY:** Adopting Order of February 12, 1998, Reported at: *1998 U.S. Dist. LEXIS 1740.*

**DISPOSITION:** **[*1]** Defendant's Motion for Partial Judgment on the Pleadings granted with respect to Counts One, Twelve, Thirteen, Fourteen, Sixteen, Seventeen, and the demand for punitive damages. Motion denied with respect to Counts Two, Three, Four and Five.

**COUNSEL:** For ALLSTATE TRANSPORTATION CO., INC., PLAINTIFF: ROBERT J. BRAY, BRAY & REARDON, P.P.C., GLENSIDE, PA USA.

For SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, DEFENDANT: PENNY M. CONLY, DILWORTH, PAXSON, KALISH & KAUFFMAN LLP, PHILA, PA USA.

**JUDGES:** CHARLES B. SMITH, UNITED STATES MAGISTRATE JUDGE.

**OPINIONBY:** CHARLES B. SMITH

**OPINION:**

### MEMORANDUM AND ORDER

#### I. INTRODUCTION

The instant action has been brought by Allstate Transportation Co, Inc. ("Allstate") against Southeastern Pennsylvania Transportation Authority ("SEPTA") alleging various constitutional, statutory, state contract and state tort claims surrounding SEPTA's administration of its ParaTransit services. Defendant has filed a Motion for Partial Judgment on the Pleadings. For the reasons which follow, I will grant the Motion in part, and deny it in part.

#### II. FACTS AND HISTORY n1

n1 The exact factual history of this matter is somewhat cloudy due to the numerous contradictory allegations by both parties. The following account represents only those facts on which both parties agree – the specific allegations are addressed as necessary within the discussion of the individual counts.

**[*2]**

The following facts are undisputed. Since the early 1980's, the Commonwealth of Pennsylvania, through the Pennsylvania Department of Transportation ("PennDOT"), funded the § 203 Program to offer reduced cost transportation fares to senior citizens, both ambulatory and non–ambulatory, throughout the Commonwealth under mandate from the Americans with Disabilities Act, *42 U.S.C. § 12101* et. seq. (1988 ed., Supp. V) (ADA). By the late 1980's, PennDOT delegated its actual operating functions in the § 203 Program to a subcontractor who was, in turn to contract directly with certificated carrier subcontractors to perform the actual transportation services. This new system became known as the Shared Ride Program.

Following contracts with both KETRON, Inc. and The Bionetics Corporation, PennDOT hired the Southeastern Pennsylvania Transportation Authority (SEPTA), defendant in this matter, as the new subcontractor in charge of the Shared Ride Program. SEPTA, a state agency responsible for the mass transit system in Philadelphia, Bucks, Chester, Delaware and Montgomery Counties, has operated its ParaTransit Services program since 1992, funded in part with money from PennDOT and from federal **[*3]** sources.

Plaintiff, Allstate Transportation Co., Inc. ("Allstate"), is a Pennsylvania corporation which has been providing ParaTransit transportation services to aged and infirm customers in Philadelphia since 1988.

Due to its African–American ownership, Allstate was certified as a Disadvantaged Business Enterprise (DBE) contractor by SEPTA for the period of April 1993 to April 1996.

In 1992–1993, SEPTA solicited bids for new three year contracts in Philadelphia under the ADA Services program, with the contract award to go to the lowest responsible bidder. Allstate submitted a low bid on this work and received no preferences in the award of the bid. Other, non–DBE ParaTransit contractors were performing substantially similar Shared Ride services at higher rates which had been reached under negotiated, rather than low-bid, contracts. SEPTA awarded a portion of the work to Allstate and a portion to these other non–DBE carriers. The SEPTA and Allstate contract for ParaTransit services ran for the period of July 1, 1993 through June 30, 1996. Despite the fact that Allstate bid for work utilizing vans, sedans and lift–vans, only the work involving the lift–vans was allocated to Allstate. [*4]

In late 1995 to early 1996, SEPTA elected to discontinue the centralized reservation and scheduling operation. As a replacement, it proposed a new, decentralized system for reservations and scheduling containing a "Rider Choice" component, in which the carriers were to compete for all ParaTransit customers. SEPTA informed carriers who were awarded work under the decentralized system that they should be prepared to service a certain estimated, maximum number of trips at the start–up of the decentralized system in mid–1996.

Although Allstate submitted a bid, SEPTA did not award it contract in the Rider Choice program and, instead, elected three other competing carriers. However, pursuant to an option in the original SEPTA–Allstate contract, SEPTA unilaterally extended that contract to June 30, 1997. The purchase order amount was increased by $1,124,700, but all other terms and conditions were maintained, particularly Allstate's continued payment on an hourly basis. Plaintiff was to be eligible for overflow work generally consisting of rides which could not be immediately handled/scheduled by the three participating carriers. SEPTA printed marketing brochures for use by ParaTransit [*5] riders which listed the numbers for the three competing ParaTransit carriers as well as SEPTA's customer service number, but contained no number for Allstate as the "overflow" carrier.

On October 22, 1996, Walsh Cab Company t/a Access ParaTransit ("Access"), one of the three carriers, filed for bankruptcy in the United States Bankruptcy Court for the Eastern District of Pennsylvania, giving up the work allocated to it by SEPTA. The Bankruptcy Court approved a release of Access from all responsibility for default on its SEPTA contract and on its performance bond. Access also released SEPTA from all responsibility for Access's failure. Instead of awarding the work to Allstate, SEPTA took over Access's then–existing tours itself on a "emergency basis" and now operates under an entity known as Freedom Paratransit. Funding for the transaction came out of SEPTA's operating budget which is comprised in part with federal funds.

At the present time, SEPTA handles reservations, scheduling and assignments of Allstate's work. Allstate, however, rests on the verge of bankruptcy.

In early April, 1996, SEPTA notified Allstate regarding the DBE recertification process, but sent no additional, [*6] related correspondence, during the period between May, 1996 through February 27, 1997. Allstate filed the instant suit on February 27, 1997 alleging unlawful racial discrimination in violation of federal civil rights statutes n2 and the U.S. Constitution, as well as state contractual and tort claims, surrounding the original contract and the 1996 RFP Bidding and Award. n3 On February 28, 1997, one day later, SEPTA sent a letter to Allstate requesting additional information for the recertification and, since that date, has requested other related documents and information.

> n2 These statutes include *42 U.S.C. §§ 1981,* 1983, 1985 and 2000d(1994).

> n3 SEPTA, responded by way of Answer, Affirmative Defenses and Counterclaim on April 30, 1997.

Following the filing of suit, SEPTA issued, in May of 1997, a Request for Proposals ("1997 RFP") for all of the ParaTransit work that Allstate was then performing for SEPTA, as well as the ParaTransit work awarded to Access in 1993 and taken over by SEPTA/Freedom after Access [*7] filed for bankruptcy. The deadline, which was originally June 16, 1997, was extended to July 11, 1997. The performance bonding requirement associated with this RFP increased from the $100,000 required in previous ParaTransit contracts to the full amount of the contract.

On or about July 7, 1997, Allstate amended its Complaint to include three new claims related to the activities surrounding its recertification and the 1997 RFP. Specifically, Allstate charged that SEPTA engaged in a campaign to retaliate against it for filing this action, adopted limitations and specifications in its 1997 RFP that prevented small businesses from submitting proposals, and intentionally interfered with Allstate's contractual and business relationships. SEPTA entered its Answer to the Amended Complaint on July 21, 1997.

Through the instant Motion for Partial Judgment on the Pleadings, submitted on July 25, 1997, defendant seeks dismissal of ten of plaintiff's seventeen counts, and of plaintiff's seventeen separate requests for punitive damages. Each of these counts is discussed separately infra.

### III. LEGAL STANDARD

A Motion for Judgment on the Pleadings pursuant to *Rule 12(c) of the* [*8] *Federal Rules of Civil Procedure* is treated under the same standard as a motion to dismiss pursuant to Rule 12(b)(6). *DeBraun v. Meissner, 958 F. Supp. 227, 229 (E.D. Pa. 1997)*. In a Motion for Judgment on the Pleadings, this Court will accept as true all well-pleaded allegations in the complaint and draw all inferences in favor of the non-moving party. *Pennsylvania Nurses Ass'n v. Pa. State Educ. Ass'n, 90 F.3d 797, 799-800 (3d Cir.1996)*. Judgment will not be granted unless the movant clearly establishes that there is no material issue of fact to be resolved and that he is entitled to judgment as a matter of law. *Jablonski v. Pan American World Airways, Inc., 863 F.2d 289, 290 (3d Cir.1988)*. In addition, the court may consider matters of public record, orders and exhibits attached to the complaint. See *Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n.2 (3d Cir.1994)*. However, the court is not required to accept legal conclusions either alleged or inferred from the pleaded facts. *Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993)*. To survive a motion to dismiss, the plaintiff must set forth facts, and not mere conclusions, which state a claim as [*9] a matter of law. *Sterling, 897 F. Supp. at 895 (E.D. Pa. 1995)*. Where appropriate, the court may grant a Rule 12(c) motion for judgment on the pleadings in part, and deny it in part. See, e.g., *Society Hill Civic Ass'n v. Harris, 632 F.2d 1045 (3d Cir.1980)*.

### IV. DISCUSSION

### A. COUNT ONE – ALLSTATE'S DUE PROCESS AND EQUAL PROTECTION CLAIMS

Count One of the Amended Complaint seeks relief for alleged racial discrimination by defendant in violation of both the Due Process Clause and the Equal Protection Clause under the Fifth and Fourteenth Amendments to the U.S. Constitution. In opposition, defendant contends that plaintiff cannot maintain both a constitutional claim and a claim under *42 U.S.C. § 1983* (1994), alleged in Count Three

When a proper claim *42 U.S.C. § 1983* (1994) n4 is alleged, a plaintiff cannot proceed under the federal Constitution as a separate count, if both depend on the same action. *White v. Salisbury Twp. School Dist., 588 F. Supp. 608, 610, n.2 (E.D. Pa. 1984)*. In such a situation,

the Constitutional claim is "wholly subsumed" by the § 1983 claim. Id. The Fourth Circuit addressed the interplay between these two sources [*10] of legal rights and explained that a claim under the Fourteenth Amendment "merges into [a] § 1983 claim because § 1983 merely creates a statutory basis to receive a remedy for the deprivation of a constitutional right." *Hughes v. Bedsole, 48 F.3d 1376, 1383 n.6 (4th Cir. 1995)* cert. denied, *133 L. Ed. 2d 126, 116 S. Ct. 190 (1995)*. See also *Maxey v. Thompson, 680 F.2d 524, 526 (7th Cir. 1982)* (Posner, J.) ("A violation of the Fourteenth Amendment is also alleged, but we treat it as merged into the § 1983 allegation); *Rogin v. Bensalem Twp., 616 F.2d 680, 686 (3d Cir. 1980)* cert. denied, *Mark–Garner Assoc., Inc. v. Bensalem Twp., 450 U.S. 1029, 68 L. Ed. 2d 223, 101 S. Ct. 1737 (1981)* ("Indeed, § 1983 was designed to afford plaintiffs a cause of action for constitutional violations on the part of local governmental bodies and other state officials.").

n4 "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured. . ." *42 U.S.C. § 1983* (1994).

[*11]

Plaintiff has, in Counts One and Three of its Amended Complaint, asserted both a direct cause of action under the Fifth and Fourteenth Amendments and a claim under § 1983 based on the alleged discriminatory behavior by SEPTA. Because our precedents make clear that a separate constitutional claim is "wholly subsumed" by a § 1983 cause of action, count I of the Amended Complaint must be dismissed.

### B. COUNTS TWO, THREE AND FOUR – ALLSTATE'S CLAIMS UNDER *42 U.S.C. §§ 1981*, 1983 AND *42 U.S.C. § 2000d* (TITLE VI) AND DEPARTMENT OF TRANSPORTATION REGULATIONS PROMULGATED THEREUNDER REGARDING THE 1996 BIDDING AND AWARD.

Counts Two through Four of the Amended Complaint allege that defendant violated three anti-discrimination statues, *42 U.S.C. §§ 1981*, 1983 and 2000(d) (1994), by intentionally underpaying Allstate for the value of its performance, reducing the number of trips it handles, refusing to schedule customer trips for Allstate, refusing to promote Allstate's services to the public through advertisements for the ParaTransit program and not allowing Allstate to participate in the competitive "Rider Choice"

work while allowing all other non-minority contractors to do so. **[*12]** Defendant asserts, in response, that plaintiff fails to state a claim upon which relief can be granted with respect only to its allegations surrounding the award of the 1996 "Rider Choice" contracts.

As noted above, in order to sustain a motion for judgment on the pleadings, the court must "accept as true all well-pleaded allegations in the complaint" and determine whether, under any reasonable reading of the pleadings, the plaintiff may be entitled to relief. *Pennsylvania Nurses Ass'n., 90 F.3d at 799-800.* However, the Third Circuit has found that the "dual policy concerns" of shielding state officials from frivolous claims and providing these officials with sufficient notice to respond require that, for § 1983 claims, the "complaint contain a modicum of factual specificity, identifying the particular conduct of defendants that is alleged to have harmed the plaintiffs." n5 *Colburn v. Upper Darby Twp., 838 F.2d 663, 666 (3d Cir. 1988)* aff'd 946, F.2d 1017 (3d Cir. 1991) citing *Ross v. Meagan, 638 F.2d 646, 650 (3d Cir. 1981).* Nonetheless, this standard remains far from a bright-line rule and the sufficiency of a complaint must be judged on a case-by-case basis. **[*13]** *Frazier v. Southeastern Pennsylvania Transp. Auth., 785 F.2d 65, 67 (3d Cir. 1986).* The crucial questions are "whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer." Id. Notably, this standard does not place unreasonable expectations on the plaintiff. As the Third Circuit stated:

> n5 Although this section of the opinion deals with *42 U.S.C. §§ 1981,* 1983, and 2000d, the discussion focuses on § 1983 since the standards are similar. See, e.g., *Collins v. Chichester School Dist., 1997 U.S. Dist. LEXIS 10532, 1997 WL 411205* (E.D. Pa. July 22, 1997)(Discussing all three statutes under the same standards).

[A] court cannot expect a complaint to provide proof of plaintiffs' claims, nor a proffer of all available evidence. In civil rights cases . . . much of the evidence can be developed only through discovery. While plaintiffs may be expected to know the injuries they allegedly have suffered, it is not reasonable to expect **[*14]** them to be familiar at the complaint stage with the full range of the defendants' practices under challenge.

Id. To require more at this stage of the proceedings imposes an "impossible burden of knowledge on the plaintiffs." *District Council 47, AFL-CIO v. Bradley, 795 F.2d 310, 314 (3d Cir. 1986).*

Generally, § 1983 has two requirements: (1) the conduct complained of must be committed by a person acting under color of state law; and (2) the conduct complained of must have deprived the plaintiff of a right or privilege secured by the Constitution or the laws of the united States. Section 1983 does not by itself confer any substantive rights. Rather, it is a remedial provision to be employed only in the event of the deprivation of some right, privilege, or immunity guaranteed by the Constitution or laws of the United States. *Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 618, 60 L. Ed. 2d 508, 99 S. Ct. 1905 (1979).* Because the "state action" element is not at issue, I move directly to this second factor which requires plaintiff to identify a statutory or constitutional right.

Plaintiff asserts the equal protection issues of disparate treatment and disparate impact and a due process claim as **[*15]** bases for its § 1983 claim. Each of these is discussed in turn.

(1) Disparate Treatment

In the seminal McDonnell Douglas Corp. v. Green case, *411 U.S. 792 (1973),* the Supreme Court set forth a four step methodology for evaluating evidence in cases alleging purposeful discrimination where direct proof of intent is lacking. n6 While neither the Third Circuit, nor any other circuit, has used this identical methodology in the context of alleged discrimination in bidding for a public contract, the First Circuit, in *T & S Service Associates, Inc. v. Crenson, 666 F.2d 722 (1981),* has suggested a persuasive modification of the McDonnell test for such a situation. n7 The Court stated that the plaintiff, a qualified minority firm whose bid on a public contract was rejected, must prove a prima facie case by showing that:

> n6 The prima facie case is established by showing: (1) plaintiff belongs to a racial minority; (2) plaintiff applied and was qualified for the job at issue and employer was seeking applicants; (3) plaintiff was rejected despite his qualifications; and (4) after rejection, the position remained open and employer sought applicants with the same qualifications. *McDonnell, 402 U.S. at 802.*

**[*16]**

> n7 While the Court in T & S Service Associates decided the case under *42 U.S.C. § 1981* instead of § 1983, as in the instant case, it noted that the principles set forth "would seem equally applicable under either provision." Id. At 724, n.2.

(1) T & S is a minority-owned firm; (2) T & S's bid met the specifications required of those competing for the contract; (3) the T & S bid was significantly more advantageous to the Committee than the bid actually awarded, whether in terms of price or some other relevant factor; and (4) the Committee selected another contractor.

Id. at 725. Upon a showing of these elements, an inference arises that the bid was not awarded to the complaining party on the basis of race. Id.

In the case at bar, defendant asserts that plaintiff failed to state facts sufficient to infer a prima facie case of racial discrimination in the failure to award a public contract. While defendant is justified in questioning the shaky grounds alleged as a basis for this claim, it demands too much proof from simply the Amended Complaint. Unlike T&S, this case [*17] is still at the pleading stage and only requires the plaintiff to allege claims with a certain "modicum of factual specificity" so as to put the defendant on notice and to establish that the claim asserted is not frivolous.

Under the T&S framework, plaintiff's discrimination claim has undoubtedly satisfied factors one, two and four. n8 The third element, however, which requires plaintiff to show that its bid was "significantly more advantageous" than the bid actually awarded, has not been satisfied with similar clarity. The Amended Complaint states that "SEPTA management knew that Allstate's bid was a more than reasonable, appropriate and legitimate bid for the 'Rider's Choice' work being offered it," and Allstate's receipt of the bid would have satisfied SEPTA's affirmative action obligations, but SEPTA "simply disqualified Allstate altogether as a competitor" while allowing "all other non-minority competitors to so compete." Amended Complaint, PP53,92,99. Defendant's challenge to the sufficiency of these blanket statements certainly has merit, however this challenge ignores two factors. First, as emphasized before, unlike T&S, this case is only at the pleading stage and [*18] plaintiff has not had the benefit of time or discovery to make an honest, factual statement that its bid was more advantageous than the others. To require more imposes on plaintiff an "impossible burden of knowledge" of the other bids submitted. Second, the T&S standard is by no means rigid or binding on this court. Hence, looking beyond the four elements to the other allegations of racial discrimination within the Amended Complaint, there are sufficient factual pleadings to make, at least, a tenuous inference that the awarding of the bid was indeed motivated by racial concerns since Allstate, the only DBE, was the sole bidding carrier to be denied participation in the program. Moreover,

unlike T&S where the bid was the only action at issue, the failure to award the contract in this matter is merely an example of the alleged on-going discrimination. n9 To separate this one incident from the others would be premature at this time and may be better reserved for a motion for summary judgment.

> n8 Under the first element, the Amended Complaint states that Allstate's owner, Jerome Henderson, is an African-American and that Allstate had been certified by SEPTA as a minority business enterprise. Amended Complaint, at PP 4,6,7. Second, plaintiff alleges that its bid was "appropriate and legitimate" and did indeed satisfy SEPTA's requirements as set forth in the 1996 Rider's Choice Request For Proposals. Amended Complaint, at P 92. The fourth element is satisfied by the plaintiff's allegation that Access and two other non-minority companies were allowed to compete, to the exclusion of Allstate, in the 1996 Rider's Choice program. Amended Complaint, at PP 48,61.

[*19]

> n9 As stated supra, Allstate also alleged that SEPTA racially discriminated against it by intentionally underpaying Allstate for the value of its performance, reducing the number of trips, refusing to schedule customer trips for Allstate and refusing to promote Allstate's services to the public through advertisements for the ParaTransit program.

(2) Disparate Impact

While plaintiff's disparate treatment claims manage to attain the standard of satisfactory notice pleading, its allegations that defendant's practices have a disparate impact on minorities fail to even get to the starting gate. "Claims that stress 'disparate impact' involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Hazen Paper Co. v. Biggins, 507 U.S. 604, 609, 123 L. Ed. 2d 338, 113 S. Ct. 1701 (1993).* Plaintiffs can show a prima facie case under Title VII, and survive this motion for summary judgment, if they show that there is (1) a specific employment practice of the City that (2) creates a disparate [*20] impact, shown by statistical evidence. *Wards Cove Packing Co, Inc. v. Atonio, 490 U.S. 642, 657, 104 L. Ed. 2d 733, 109 S. Ct. 2115 (1989); Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 993–*

*95, 101 L. Ed. 2d 827, 108 S. Ct. 2777 (1988)*. Disparate impact cases typically focus on statistical disparities between members of the protected and unprotected classes. *DiBiase v. SmithKline Beecham Corp., 48 F.3d 719, 730 (3d Cir. 1995)* cert. denied, *133 L. Ed. 2d 210, 116 S. Ct. 306 (1995)*.

The Amended Complaint alleges no facts whatsoever which would even begin to constitute a claim for disparate impact. Plaintiffs only claims are that it was the only disadvantaged business enterprise ("DBE") participating in SEPTA's ParaTransit program. Amended Complaint, at PP33,37. This statement alone does not point to any policies, practices, regulations, conduct or rules of SEPTA that have "squeezed out" minorities from participation in the program. As such, this claim should be dismissed. n10

n10 Although irrelevant once the disparate impact claim has been dismissed, both parties argue about whether Title VI prohibits only intentional discrimination and the proper reading of *Guardians Assoc. v. Civil Service Comm'n, 463 U.S. 582, 77 L. Ed. 2d 866, 103 S. Ct. 3221 (1982)*. Well-established precedent clearly states that Title VI does prohibit only claims of intentional discrimination and that disparate impact allegations could be redressed only through "agency regulations designed to implement the purposes of Title VI." *Alexander v. Choate, 469 U.S. 287, 292–293, 83 L. Ed. 2d 661, 105 S. Ct. 712 (1985)*. See also *Chester Residents Concerned for Quality Living v. Seif, 944 F. Supp. 413, 416 (E.D. Pa. 1996)*("interpreting Alexander], we thus find that by alleging only discriminatory effect rather than discriminatory intent, plaintiffs failed in their complaint to allege a violation of Title VI.").

**[*21]**

(3) Procedural Due Process

Plaintiff, in Count One of its Complaint, alleges violation of the Due Process Clause resulting from defendant's failure to award it the 1996 RFP. n11

n11 Because Count I has been subsumed into the § 1983 assertion, this claim must be discussed at this junction.

The Supreme Court set forth the boundaries of the Fourteenth Amendment procedural due process protection for property interests in *Board of Regents v. Roth, 408 U.S. 564, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972)*,

noting that "to have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id. At 577*. In *Independent Enterprises, Inc. v. Pittsburgh Water and Sewer Authority, 103 F.3d 1165, 1176 (3d Cir. 1997)*, the Third Circuit held that the plaintiff, a low bidder on a public contract whose bid was rejected, could not pursue its procedural due process claims against **[*22]** the City "unless 'an independent source such as state law' affords it a 'legitimate claim of entitlement' to be awarded a municipal contract for which it was the lowest responsible bidder." Pennsylvania cases, interpreting Pennsylvania statutes, have long demonstrated that one who bids on a public contract has no legitimate expectation of receiving it until the contract is actually awarded. See *R.S. Noonan, Inc. V. School Dist. Of York, 400 Pa. 391, 162 A.2d 623 (1960)*; *J.P. Mascaro & Sons, Inc. V. Township of Bristol, 95 Pa. Commw. 376, 505 A.2d 1071 (1986)*. See also *ARA Servs., Inc. V. School Dist. Of Phila., 590 F. Supp. 622, 629 (E.D. Pa. 1984)*. Hence, until the bid is awarded, no procedural due process rights are at stake.

Plaintiff alleges that its property entitlement to the 1996 Rider Choice RFP was based on its status as the "only responsible MBE/DBE carrier that had submitted a bid for this RFP." Memorandum in Opposition to Defendant's Motion for Partial Judgment on the Pleadings ("Response"), at 5. It further asserts that the affirmative action policies of Title VI and the regulations implementing it require that at least some of the award should have gone to it because of **[*23]** its minority status. This argument, however, does not rise to the level of a protectable property interest since plaintiff could not reasonably assert that it had a legitimate expectation of receiving this contract. While SEPTA's motivations for denying the bid may remain a question of fact, they are irrelevant since the affirmative action policies do not guarantee that the contract be awarded to Allstate. Because Allstate cannot therefore allege a protectable property interest, this claim is dismissed on the pleadings.

C. COUNT SIXTEEN – ALLSTATE'S CLAIMS UNDER §§ 1981 AND 1983; AND *42 U.S.C. § 2000D* (TITLE VI) AND DEPARTMENT OF TRANSPORTATION REGULATIONS PROMULGATED THEREUNDER REGARDING THE 1997 RFP BONDING REQUIREMENT

Counts Fifteen and Sixteen of the Amended Complaint direct the court's attention to SEPTA's actions subsequent to the filing of this lawsuit. Plaintiff alleges, in Count Fifteen, that defendant discriminatorily retaliated against plaintiff by failing to recertify it as a DBE, by

spreading false and misleading information about plaintiff and by designing the 1997 Request for Proposals in such manner as to preclude plaintiff from being able to bid. Specifically, **[*24]** the Amended Complaint refers to the fact that the performance bonding requirement was set so high as to deny a small firm, such as Allstate, the chance to compete for the contract. Count Sixteen incorporates the allegations of the previous Count and asserts that the limitations and specifications contained in the 1997 RFP precluded small, minority/disadvantaged business enterprises from participating in the bid process. Defendant's only challenge to these allegations concerns the claims of discriminatory impact in Count Sixteen and, hence, I address only the sufficiency of that Count.

As addressed supra, disparate impact cases typically focus on statistical disparities between members of the protected and unprotected classes. *DiBiase, 48 F.3d at 730.* A prima facie case of disparate impact alleges(1) a specific employment practice of the City that (2) creates a disparate impact, shown by statistical evidence. *Wards Cove, 490 U.S. at 657; Watson v. Fort Worth Bank & Trust, 487 U.S. at 993-95.*

In the context of public contracts, bonding requirements have been deemed non-discriminatory. In rejecting a city's racial quota for public projects, the Supreme Court held that **[*25]** bonds are "nonracial factors which would seem to face a member of any racial group attempting to establish a new enterprise," and therefore cannot be deemed discriminatory. *City of Richmond v. J.A. Croson Co., 488 U.S. 469, 498, 102 L. Ed. 2d 854, 109 S. Ct. 706 (1989).* See also *Taylor v. City of St. Louis, 702 F.2d 695, 697* aff'd *702 F.2d 695 (8th Cir. 1983)* ("The [10% bid bond], neutral on its face and serving ends otherwise in the power of government to pursue, is not invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than another . . .Here, the bid bond requirement insures that only financially stable contractors will participate in the food service programs.") (citations omitted).

In the instant matter, defendant increased the performance bond requirement from the $100,000 required in previous ParaTransit contracts to the full amount of the contract. n12 Aside from its claim that this requirement was included specifically to prevent Allstate from bidding on the contract, plaintiff asserts that it has a disparate impact on all minority contractors. While the former assertion may in fact have merit and is not challenged in the present motion by **[*26]** defendants, the latter claim falters under current precedent. Any small business is affected by such a steep bond requirement – nothing in the Amended Complaint explains how this has a greater effect on minorities. Nor does plaintiff allege any demon-

strated impact on other DBEs aside from broad legal conclusions that minorities were excluded. n13 Therefore, Count Sixteen, to the extent it states a claim for disparate impact, must be dismissed.

n12 Plaintiff alleges that the 1997 contract was awarded for $32.7 million. Response, at 17, n.7.

n13 Plaintiff repeatedly refers to the various "preclusive" specifications and limitations in the 1997 RFP of which the bonding requirement is just one example. Response, at 16. It argues that it is not obligated to utilize a "laundry list" style of pleading. Id. at 17. While the Federal Rules of Civil Procedure do not require detailed pleading, plaintiff must at least set forth the requirements which it is challenging. *Sterling v. Southeastern Pennsylvania Transportation Authority, 897 F. Supp. 893, 895 (E.D. Pa. 1995)*(To survive a motion to dismiss, the plaintiff must set forth facts, and not mere conclusions, which state a claim as a matter of law.). Therefore, I cannot consider these alleged "specifications and requirements" in ruling on this particular Count.

**[*27]**

## D. COUNTS THIRTEEN AND FOURTEEN – ALLSTATE'S ALLEGATIONS OF UNLAWFUL CONSPIRACIES UNDER *42 U.S.C. § 1985*.

As part of its Complaint, plaintiff alleges that defendant conspired with Access, a non-DBE ParaTransit Company awarded a contract under the 1996 RFP, and Local 234 of the Transportation Workers Union ("Local 234"), for the purpose of depriving it of equal protection and due process rights. Defendant submits that plaintiff's allegations fail to assert any racial motivation behind these actions – an essential element of a *42 U.S.C. § 1985* (1994).

In order to state a cause of action for violation of *42 U.S.C. § 1985,* the following must be alleged: (1) a conspiracy by the defendants; (2) designed to deprive plaintiff of the equal protection of the laws or equal privileges and immunities; (3) the commission of an overt act in furtherance of that conspiracy; (4) a resultant injury to person or property or a deprivation of any right or privilege of citizens; and (5) defendants' actions were motivated by a racial or otherwise class-based invidiously discriminatory animus. *Litz v. Allentown, 896 F. Supp. 1401, 1414 n.14 (E.D. Pa. 1995)* citing *Griffin v. Breckenridge,* **[*28]** *403 U.S. 88, 102-103, 29 L. Ed. 2d 338, 91 S. Ct. 1790 (1983).*

The element of racial animus is essential to a proper

§ 1985 claim. *Robison v. Canterbury Village, Inc., 848 F.2d 424, 430 (3d Cir.1988); Pratt v. Thornburgh, 807 F.2d 355, 357 (3d Cir. 1986)* cert. denied *484 U.S. 839, 98 L. Ed. 2d 83, 108 S. Ct. 125 (1987)* ("as to the claim founded on *42 U.S.C. § 1985*(3), we need only say that it was properly denied since it is not alleged that the conspiracy involved in that count was motivated by a racial or class–based animus."). Section 1985(3) does not prohibit conspiracies motivated by economic or commercial animus. *United Brotherhood of Carpenters and Joiners of America v. Scott, 463 U.S. 825, 838, 77 L. Ed. 2d 1049, 103 S. Ct. 3352 (1983).* As the Court stated in Scott, "economic and commercial conflicts, we think, are best dealt with by statutes, federal or state, specifically addressed to such problems, as well as by the general law proscribing injuries to persons and property." *Id. at 839.*

The Amended Complaint contains no indications that the alleged conspiracies between SEPTA and Access and between SEPTA and Local 243 were prompted by any form of racial discrimination. Plaintiff asserts that "Allstate properly alleged § 1985(3) claims by incorporating **[*29]** within each Count the preceding allegations of the Amended Complaint which plainly describe SEPTA's acts of discrimination against Allstate motivated by race." Response, at 15–16. However, not only does this attempted "incorporation" fail to satisfy the specificity required for a federal civil rights claim, but plaintiff's own words in the Amended Complaint contradict its assertion that the conspiracies were motivated by racial animus.

With respect to the alleged conspiracy between SEPTA and Access, the Amended Complaint continuously refers to SEPTA's decision to favor Access above all other carriers, giving it a competitive advantage in the competition for "Rider Choice." Amended Complaint, at PP48,50,159. These statements suggest, not racial animus, but economic animus, since the other, non–minority carriers, were similarly injured. While plaintiff does assert that giving Access control of the majority of the ParaTransit business worked "to the particular detriment of Allstate," this is a broad, conclusory allegation supported by no factual assertions. n14 Amended Complaint, at P159 In light of the foregoing, Count 13 must be dismissed.

n14 Although not asserted by the defendant, the § 1985 claim for the alleged conspiracy between SEPTA and Access fails for another reason. Under basic legal terminology, a "conspiracy" requires some showing of agreement between two or more parties. *Iannelli v. U.S., 420 U.S. 770, 777, 43 L. Ed. 2d 616, 95 S. Ct. 1284 (1975)*(Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act.). Moreover,

under § 1985, the agreement must have been entered into for the purpose of denying equal protection of the laws. See *Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 275–276, 122 L. Ed. 2d 34, 113 S. Ct. 753 (1993)*(conspiracy is not 'for the purpose' of denying equal protection simply because it has an effect upon a protected right. The right must be 'aimed at'") Because, § 1985 claims must be pled with factual specificity, not mere conclusory allegations that a conspiracy existed,. *D.R. by L.R. v. Middle Bucks Area Vocational Technical School, 972 F.2d 1346, 1377 (3d Cir. 1992)* cert. denied *506 U.S. 1079, 122 L. Ed. 2d 354, 113 S. Ct. 1045 (1993)* (citations omitted), the complaint must establish an agreement with the common objective of denying equal protection.

In the instant case, plaintiff has failed to plead anywhere in their Amended Complaint that the alleged conspiracy between SEPTA and Access was the result of any *agreement* to deprive Allstate of equal protection of the laws. Plaintiff asserts that "SEPTA management had first decided *among themselves*" how much equipment to allocate to each carrier and that Allstate's share should go to Access." Amended Complaint, at P48 (emphasis added). Additionally, the Complaint says that "SEPTA management *unilaterally* . . . and *without notice to any of the bidders*" decided to favor Access in the "Rider Choice" program. Amended Complaint, at P50 (emphasis added). Moreover, Plaintiff's allegations refer to "SEPTA's decision to promote Access above *all others*," not just above Allstate. Amended Complaint at 63 (emphasis added). The first mention of any "conspiracy" appears in statements made within Count Thirteen which are conclusory and allege no specific factual claims aside from the broad statement that "SEPTA conspired with Access to favor Access when developing its plans for promoting the 'Rider Choice' program" and "SEPTA further conspired with Access to control the majority of the ParaTransit work . . . to the particular detriment of Allstate." Amended Complaint, at PP 156, 159. These blanket statements simply do not permit any inference of a conspiracy between Access and SEPTA since such claims appear to be unilateral actions by SEPTA.

**[*30]**

Regarding the alleged SEPTA/Local 234 conspiracy, paragraph 68 of the Amended Complaint explains that:

The illegal agreement was thus designed to accomplish mutually beneficial goals,

through illegal and improper means. The first goal (for SEPTA) was to make SEPTA a competitor in the private sector, ParaTransit marketplace without the objection of PennDOT, which had never authorized such a role. The second goal (for Local 234) was to save the union the loss in membership dues resulting from the Access employee–union members becoming unemployed.

Amended Complaint, at P68. n15 Only later does the Complaint state that "[the purpose of this conspiracy . . . was to deprive Allstate of equal protection and privileges due it under the law and the terms of the Federal contracts in the competition for and the performance of ParaTransit work." Amended Complaint at P170. Again, this broad, conclusory statement cannot support a § 1985 count. See *Ostrer v. Aronwald, 567 F.2d 551, 553* aff'd *567 F.2d 551 (2d Cir.1977)*(Complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, [*31] instead of a litany of general conclusions that shock but have no meaning.) Because the factual basis for this claim sounds in economic and commercial, not racial, animus, Count Fourteen does not state conduct which is actionable under § 1985(3).

> n15 The Amended Complaint also states that the agreement was "designed to defeat the lawful seniority rights of SEPTA's own employees." Amended Complaint, at P68.

E. COUNT SEVENTEEN – ALLSTATE'S CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACTUAL AND BUSINESS RELATIONSHIPS

Count Seventeen of the Amended complaint sounds in tort as plaintiff alleges interference with both existing and prospective business relations caused by defendant's actions following the commencement of this lawsuit.

To state a claim for tortious interference with contractual relations or prospective contractual relations, under Pennsylvania law, the complaint must allege the following elements: (1) a contractual or prospective relationship between the plaintiff and third parties; (2) a purpose [*32] or intent to harm the plaintiff by interfering with the contractual relationship or preventing the contractual relationship from accruing; (3) the absence of a privilege or justification on the part of the defendant; and (4) the occurrence of actual harm or damage to the plaintiff as a result of defendant's conduct. *Fluid Power, Inc. v. Vickers, Inc.,*

*1993 U.S. Dist. LEXIS 2012, 1993 WL 23854, *3* (E.D. Pa. Jan. 28, 1993). See also *Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 208, 412 A.2d 466, 471 (1979)*. If *existing* contracts were interfered with, the complaint should be able to allege what contracts or types of contracts they are. *Centennial School Dist. v. Independence Blue Cross, 885 F. Supp. 683 (E.D. Pa. 1994)*.

Proof of a claim of tortious interference with *prospective* contractual relations requires a showing of the existence of prospective contracts. *Alvord–Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1014 (3d Cir. 1993)* cert. denied, *National Decorating Products Ass'n, Inc. v. Alvord–Polk, Inc., 514 U.S. 1063, 115 S. Ct. 1691, 131 L. Ed. 2d 556 (1995)*. "A prospective contract 'is something less than a contractual right, something more than a mere hope'"(citations omitted). The Third Circuit has [*33] held that the Pennsylvania Supreme Court requires that there be an objectively reasonable probability that a contract will come into existence, *Schulman v. J.P. Morgan Inv. Management, Inc., 35 F.3d 799, 808 (3d Cir.1994)*. Such an expectation may arise from an unenforceable express agreement or an offer. *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia, 898 F.2d 914, 925 (3d Cir. 1990)* cert. denied, *498 U.S. 816 (1990)*. It exists if there is a reasonable probability that a contract will arise from the parties' current dealings. Glenn v. Point Park college, *441 Pa. 474, 272 A.2d 895, 898–899 (1971)*. Under Pennsylvania law, merely pointing to an existing business relationship or past dealings does not reach this level of probability. See *General Sound Telephone Co., Inc., v. AT & T Communications, Inc., 654 F. Supp. 1562, 1565 (E.D. Pa. 1987)* (opportunity to bid on a contract is insufficient to establish the existence of a prospective contract under Pennsylvania law which requires considerably more than a reasonable probability of a chance to obtain a contract); *Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 412 A.2d 466 (1979)* (Existing year–to–year [*34] lease on certain property did not amount to a reasonable probability of renewal, despite the existing business relationship).

Plaintiff first contends that defendant interfered with its existing contractual relationships. Amended Complaint, at P199. However, as defendant correctly notes, plaintiff failed to identify which existing contracts were hindered. While the Federal Rules of Civil Procedure do not require complainant to set forth in detail the facts upon which the claim is based, the "short and plain statement of the claim" must be sufficient to give the defendant notice of the claim and the grounds upon which it is based. *Breslin v. Vornado, Inc., 559 F. Supp. 187, 191 (E.D. Pa.1983)*. Plaintiff's allegations state that SEPTA's actions have interfered with "Allstate's present contract and business relationships with third parties, including

essential subcontractors of Allstate" and "Allstate's other ParaTransit business relationships." Amended Complaint, at PP 199, 201. Contrary to plaintiff's argument, this broad statement does not give any notice even as to the types of contracts involved. Instead, it suggests that the claim encompasses every possible contract into which [*35] Allstate would enter. n16

> n16 Plaintiff's reliance on *Fluid Power, Inc. v. Vickers, Inc., 1993 U.S. Dist. LEXIS 2012, 1993 WL 23854,* at *4 (E.D. Pa. Jan. 28, 1993) is misplaced. The Court noted that, because plaintiff specified at least one existing contract and gave to defendant a customer list identifying the other existing and prospective customers, defendant had notice of plaintiff's claim. Id. Plaintiff, in this case, asserts that it submitted information to SEPTA in its 1996 Rider Choice RFP which listed Allstate's subcontractors and other ParaTransit programs. Response, at 20. While plaintiff was not required to list each name within its complaint, proper notice pleading would have at least referred to this RFP and the names within it. A mere allegation that includes all business relationships with third parties, subcontractors and other ParaTransit business relationships does not satisfy the requirement of notice.

Similarly, with respect to the allegations of interference with prospective business relations, plaintiff has [*36] failed to identify with sufficient precision which prospective contracts they would have entered into but defendant's alleged interference. Again, the general allegation of interference with "Allstate's future contract and business relationships with third parties, including essential subcontractors of Allstate" is far too over-inclusive to provide any sufficient notice. Amended Complaint, at P203. Moreover, these contracts are far from reasonably probable. Plaintiff states only that "based on Allstate's previous contracts with such essential subcontractors and other ParaTransit business relationships, future contractual relationships were reasonably probable." Amended Complaint, at P203. However, as noted above, under Pennsylvania law, prior or existing business relationships, standing alone, do not suffice for a claim of interference with prospective business relationships. As such, Count 17, alleging a claim of tortious interference with contracts, must be dismissed on the pleadings.

## F. COUNT FIVE – ALLSTATE'S CLAIM UNDER *49 U.S.C. § 306*

Defendant vigorously argues that plaintiff's claim under *49 U.S.C. § 306* (1996) n17 must fail because: (1) this statute does not [*37] create a private cause of action; and (2) even if it does, plaintiff has failed to exhaust its administrative remedies. I address each of these declarations in turn.

> n17 Section 306(b) states: "A person in the United States may not be excluded from participating in, be denied the benefits of, or be subject to discrimination under, a project, program, or activity because of race, color, national origin or sex when any part of the project, program, or activity is financed through financial assistance under section 332 or 333 or chapter 221 or 249 of this title, section 211 or 216 of the Regional Rail Reorganization Act of 1973 . . . or title Vi of the Railroad Revitalization and Regulatory Reform Act of 1976 . . ."

### (i) Private Right of Action

In *Cort v. Ash, 422 U.S. 66, 78, 45 L. Ed. 2d 26, 95 S. Ct. 2080 (1975),* the United States Supreme Court set forth four factors which must be analyzed in determining whether a private right of action exists. n18 However, the Court has repeatedly emphasized that the focus of the inquiry is [*38] on the intent of Congress. *Touche Ross & Co. V. Redington, 442 U.S. 560, 61 L. Ed. 2d 82, 99 S. Ct. 2479 (1979); Merrill, Lynch, Pierce, Fenner & Smith, Inc. V. Curran, 456 U.S. 353, 72 L. Ed. 2d 182, 102 S. Ct. 1825 (1982).* See also *State of New Jersey Department of Environmental Protection and Energy v. Long Island Power Authority, 30 F.3d 403, 421 (3d Cir. 1994).* "The intent of Congress remains the ultimate issue, however, and 'unless this congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist.'" *Thompson v. Thompson, 484 U.S. 174, 179, 98 L. Ed. 2d 512, 108 S. Ct. 513 (1988)* quoting *Northwest Airlines, Inc. v. Transport Workers, 451 U.S. 77, 94, 67 L. Ed. 2d 750, 101 S. Ct. 1571 (1981).*

> n18 The four factors are: (1) whether plaintiff is one of the class for whose especial benefit the statute was enacted; (2) whether there is any implicit/explicit legislative intent to create or deny such a remedy; (3) whether such a remedy is consistent with the underlying purposes of the legislative scheme; and (4) whether this cause of action is one traditionally relegated to state law so that it would be inappropriate to infer one based solely on federal law. *Cort, 422 U.S. at 78.*

**[*39]**

Defendant contends that "there is absolutely no indication in the language or history of *49 U.S.C. § 306* that Congress intended to create a private cause of action." Motion for Partial Judgment on the Pleadings, at 24. However, defendant ignores the history behind the creation of this statutory provision. The Railroad Revitalization and Regulatory Reform Act ("4–R Act") of 1976, *45 U.S.C. § 821* et seq. (1987), contained within its provisions, specifically § 905, an almost mirror image anti–discrimination provision. n19 However, Congress repealed § 905 and replaced it with a "nearly identical provision," codified in *49 U.S.C. § 306*(b). *Organization of Minority Vendors, Inc. v. Illinois Central Gulf Railroad, 579 F. Supp. 574, 581 (N.D. Ill. 1983).* "The non–discrimination and affirmative action regulations promulgated under § 803 . . .have remained in effect. None of these statutory revisions appears to affect any of the plaintiffs' substantive rights." Id. See also Act of Dec. 13, 1982, Pub. L. No. 97–449, 1982 U.S.C.C.A.N. (96 Stat.) 4220 ("The statute is intended to remain substantively unchanged.").

> n19 This provision states: "No person in the United States shall on the ground of race, color, national origin, or sex be excluded from participation in, or denied the benefits of, or be subjected to discrimination under, any project, program, or activity funded in whole or in part through financial assistance under this Act." *45 U.S.C. § 905* (1987).

**[*40]**

Section 905 of the 4–R Act, which contained the anti–discrimination provision, has been deemed to create a private right of action. *Mikkilineni v. United Engineers and Constructors, 485 F. Supp. 1292, 1297 (E.D. Pa. 1980)*("We, therefore, hold that the Railroad Revitalization and Regulatory Reform Act of 1976 does imply a private cause of action in favor of plaintiff."). See also *Organization of Minority Vendors, 579 F. Supp. at 592* ("There can be little doubt that § 905 of the 4–R Act creates an implied private right of action in favor of these plaintiffs . . .congressional silence on the existence of a private remedy under the 4–R Act indicates only that Congress felt no need to stress the availability of such a right of action."). Because no substantive changes were made between the repeal of the anti–discrimination provision of the 4–R Act and the codification of *49 U.S.C. § 306,* it is a logical conclusion that § 306 does contain a private cause of action.

(ii) Exhaustion of Administrative Remedies

Federal regulations promulgated pursuant to the now–repealed *45 U.S.C. § 803* provided that disputes under this statute, "shall be resolved by informal means **[*41]** whenever possible." 49 C.F.R. § 256.21(d)(1) (1997). This court recognized the requirement of exhaustion of administrative remedies in Mikkilineni v. United Engineers and constructors, *485 F. Supp. at 1297* (holding that, even though the 4–R contains a private right of action, the court cannot reach the claim because plaintiff has not exhausted all administrative remedies as required by the act).

Although defendant argues that this necessarily means a plaintiff must exhaust administrative remedies under *49 U.S.C. § 306,* this argument makes too great a leap. The texts of the two anti–discrimination provisions are similar and, therefore, it is easy to infer that the implication of a private right of action in one creates a private right of action in the other. The same logic is not possible with respect to the administrative remedies. The regulations referred to in Mikkilineni and cited in defendant's memorandum apply only to federal railroad programs. See *49 C.F.R. § 265.3* (1997) n20 A thorough review of case law and legislative history reveals nothing that would indicate that the required exhaustion of administrative remedies in the 4–R Act applies to *49 U.S.C. § 306.* **[*42]** As such, defendant's motion to dismiss Count Five is denied.

> n20 "This part [including § 265.21] applies to any project, program, or activity funded in whole or in part through financial assistance provided under the Act, and to any activity funded under any provision of the Regional Rail Reorganization Act of 1973, as amended *(45 U.S.C. 701* et seq.) or the Rail Passenger Service Act, as amended *(45 U.S.C. 501* et seq.) amended by the Act including the financial assistance programs listed in Appendix A. It applies to contracts awarded to implement the Northeast Corridor Project and to financial assistance programs administered by the United States Railway Association." *49 C.F.R. § 265.3* (1997)

G. COUNT TWELVE – ALLSTATE'S CLAIM FOR BREACH OF THE DOCTRINE OF NECESSARY IMPLICATION

Counts Ten and Eleven of the Amended Complaint allege breach of contract by defendant based on defendant's failure to assign a sufficient amount of ParaTransit work to plaintiff. Plaintiff sets forth a separate cause **[*43]** of action, based on the same conduct, under the doctrine of necessary implication.

The doctrine of necessary implication serves to "allow the court to enforce the clear intentions of the parties and avoid injustice" in order to carry out the purpose for which the contract was made. *Slater v. Pearle Vision Center, 376 Pa. Super. 580, 586, 546 A.2d 676, 679 (1988)*. Thus, the Court will imply an obligation that was within the contemplation of the parties when the contract was drafted or is necessary in order to insure the intention of the parties will be carried out. *Doylestown Associates, L.P. v. Street Retail, Inc., 1996 U.S. Dist. LEXIS 15449, 1996 WL 601679* (E.D. Pa. Oct. 18, 1996). Even when a contract is not ambiguous, a court may utilize the doctrine of necessary implication to "avoid injustice" *Barmasters Bartending School, Inc. v. Authentic Bartending School, Inc., 931 F. Supp. 377 (E.D. Pa. 1996)*. Hence the doctrine is utilized in conjunction with a breach of contract action to protect the parties to that contract. See *Gallagher v. Upper Darby Township, 114 Pa. Commw. 463, 473, 539 A.2d 463, 467* appeal denied, *554 A.2d 513 (Pa. 1988)*("where an obligation was within the contemplation [*44] of the parties when making the contract or is necessary to carry out their intention, the law will imply that obligation and enforce it even though it is not specifically and expressly set forth in the written contract").

Plaintiff alleges that SEPTA breached its contract with Allstate under the doctrine of necessary implication. Amended Complaint at P152. However, instead of using the doctrine to support its contract claims set forth in Counts Ten and Eleven, plaintiff asserts it as a separate count. While defendant does not dispute the sufficiency of these contract claims, it does properly note that the doctrine of necessary implication does not support a separate count within the complaint for the identical conduct described in other counts. Hence, Count Twelve is dismissed on the pleadings.

## H. ALLSTATE'S DEMAND FOR PUNITIVE DAMAGES

In each of its seventeen separate counts, plaintiff demands punitive damages. Defendant, however, submits that SEPTA is similar to a municipal corporation and therefore maintains immunity against such damages.

Well–established precedent states that a municipal corporation is immune from punitive damages. *City of Newport v. Fact Concerts,* [*45] *Inc., 453 U.S. 247, 259 (1981)*. In City of Newport, the Supreme Court noted that "punitive damages imposed on a municipality are in effect a windfall to a fully compensated plaintiff, and are likely accompanied by an increase in taxes or a reduction of public services for the citizens footing the bill." *Id. at 267*. Nothing in any legislative history indicates that Congress wanted to abolish this doctrine in the cre-

ation of § 1983. *Id. at 259*. Justice Blackmun considered the history and policies behind § 1983 and the fact that civil/constitutional rights are at stake, but he ultimately held that neither the retributive nor preventative purpose of punitive damages is advanced by exposing municipalities to such damages. *Id. at 268*. Hence, the common law absolute immunity for municipalities in § 1983 actions against them continues to apply. *Id. at 269*.

In *Bolden v. Southeastern Pennsylvania Transportation Authority, 953 F.2d 807 (1991)* cert. denied, *504 U.S. 943, 112 S. Ct. 2281, 119 L. Ed. 2d 206 (1992)*, the Third Circuit concluded that "SEPTA, like a municipal corporation is immune from punitive damages under § 1983 . . . in view of the many characteristics that SEPTA shares with federal, [*46] state, and local agencies." *Id. at 829*. The immunity enjoyed by all of the levels of government supports the notion of granting SEPTA the same immunity. Id. Additionally, the same considerations of policy surrounding municipal immunity advocate in favor of treating SEPTA similarly since "awarding punitive damages against SEPTA might result in increased taxes or fares and thus punish taxpayers and users of mass transportation who cannot be regarded, except perhaps in an indirect and abstract sense, as bearing any guilt for constitutional violations that SEPTA may commit." *Id. at 830*. See also *Feingold v. SEPTA, 512 Pa. 567, 580, 517 A.2d 1270, 1277 (1986)* (Pennsylvania Supreme Court concludes that it would be inappropriate to assess punitive damages against SEPTA given its status as a commonwealth agency).

In light of the above, plaintiff's demands for punitive damages from SEPTA lack in legal support. This Circuit has expressly granted immunity to SEPTA from punitive damages.

Plaintiff's rebuttal to these cases stands on especially tenuous grounds. First, plaintiff, relying on Justice Blackmun's footnote in Newport, contends that this is the "extreme situation" [*47] constituting an exception to the generalized municipal immunity from punitive damages. Newport, at 267, n. 29. This contention misreads Justice Blackmun, who wrote:

> It is perhaps possible to imagine an extreme situation where the taxpayers are directly responsible for perpetrating an outrageous abuse of constitutional rights. nothing of that kind is presented by this case. Moreover, such an occurrence is sufficiently unlikely that we need not anticipate it here.

Nowhere in the Amended Complaint, Response to defendant's Motion or Reply does plaintiff attempt to show that

SEPTA's policies are the result of decisions made directly by the elected representatives of the citizens. Nowhere does plaintiff demonstrate why the taxpayers, who took no part in the alleged constitutional violations of the defendant, should bear the burden of this windfall to the plaintiff.

Moreover, plaintiff advances the untenable argument that because SEPTA is using federal monies, rather than simply state funds, they accepted federal duties and obligations. It asserts that there are totally different issues of public policy in this case, particularly "the federal power to remedy the historical **[*48]** injustice of racial discrimination." Response, at 27. Additionally, it claims that neither the Supreme Court in Newport, nor the Third Circuit in Bolden dealt with the situation of a state entity grossly misusing substantial federal funds. Even if these allegations are true, though, none of this justifies the increased taxes or fares that would be imposed on users of mass transportation. n21 Because plaintiff's arguments fail to refute the well-established immunity granted to municipalities, Allstate's seventeen demands for punitive damages are dismissed.

> n21 Plaintiff further contends that if it sued SEPTA officials in their individual capacities, it could get punitive damages and those damages may be indemnified by SEPTA itself. As support for this argument, though, plaintiff cites the dissent of a Third Circuit case which discusses the general rule of indemnification as a reason not to impose punitive damages on even officials that are sued as individuals and actually lends credence to the defendant's claim that punitive damages be denied in this matter. Judge Higginbotham, in his partial dissent in *Keenan v. City of Philadelphia, 983 F.2d 459 (3d Cir. 1992)* wrote:

>> Whereas one of the purposes of punitive damages is punishment, giving a punitive damage award in any amount to a plaintiff where the individual defendant does not pay fails to punish that individual defendant . . . The case at bar demonstrates my concern for the illogic of punitive damages when the municipality, not the employees, becomes the entity to-

tally 'footing the bill.' Although a city would not be directly liable for any punitive damages awards in a § 1983 case, Philadelphia is obligated to indemnify the individual defendants for their punitive damage liability.

> *Id. at 480–481* (citations omitted).

**[*49]**

## V. CONCLUSION

In light of the foregoing, defendant's Motion for Partial Judgment on the Pleadings is granted with respect to Counts One, Twelve, Thirteen, Fourteen, Sixteen, Seventeen, and the demand for punitive damages. The Motion is denied with respect to Counts Two, Three, Four and Five.

An appropriate order follows.

### ORDER

AND NOW, this 20th day of October, 1997, upon consideration of the Motion of Defendant Southeastern Pennsylvania Transportation Authority for Partial Judgment on the Pleadings, and Plaintiff Allstate Transportation Company, Inc.'s opposition thereto, it is ORDERED that the Motion is GRANTED in part and DENIED in part as follows:

1. Counts One, Twelve, Thirteen, Fourteen, Sixteen and Seventeen of the Amended Complaint are DISMISSED;

2. Allstate's demand for punitive damages is DISMISSED;

3. SEPTA's Motion regarding Counts Two, Three, Four and Five of the Amended Complaint is DENIED, to the extent these Counts state claims for disparate treatment.

It is so ORDERED.

BY THE COURT:

CHARLES B. SMITH

UNITED STATES MAGISTRATE JUDGE

# EXHIBIT B

LEXSEE 2003 U.S. DIST. LEXIS 19609

**MICHAEL T. BRESLIN, Plaintiff v. NORTON BRAINARD, et. al., Defendants.**

**NO. 0l–CA–7269**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2003 U.S. Dist. LEXIS 19609*

**October 10, 2003, Decided
October 14, 2003, Filed, Entered**

**SUBSEQUENT HISTORY:** Reconsideration denied by *Breslin v. Brainard, 2004 U.S. Dist. LEXIS 8594 (E.D. Pa., May 7, 2004)*
Affirmed by *Breslin v. Brainard, 2005 U.S. App. LEXIS 5661 (3d Cir. Pa., Apr. 7, 2005)*

**PRIOR HISTORY:** *Breslin v. Brainard, 2003 U.S. Dist. LEXIS 18147 (E.D. Pa., Sept. 15, 2003)*

**DISPOSITION:** [*1] Defendants' motions for partial summary judgment granted. Claims dismissed.

**LexisNexis(R) Headnotes**

**COUNSEL:** For MICHAEL T. BRESLIN, Plaintiff: JOHN F. INNELLI, LEAD ATTORNEY, MEDIA, PA.

For MICHAEL T. BRESLIN, Plaintiff: MICHAEL J. MOLDER, LEAD ATTORNEY, INNELLI AND MOLDER, PHILADELPHIA, PA.

For NORTON BRAINARD, WILLIAM OSWALD, CHARLES ARGEROS, SEAN HEIM, PAUL VANDERWOUDE, LEO REILLY, Defendants: SAMUEL L. SPEAR, LEAD ATTORNEY, SPEAR WILDERMAN BORISH ENDY SPEAR [*2] & RUNCKEL, PHILADELPHIA, PA.

For GERALD MCNAMARA, Defendant: ANDREW C. WHITE, LEAD ATTORNEY, LAW OFFICES OF ANDREW C. WHITE, LLC, CHARLES GILMAN, LEAD ATTORNEY, SILVERMAN & THOMPSON, BALTIMORE, MD.

For JAMES E. SMITH, JR., EDWARD F. KEYSER, JR., JAMES P. HOFFA, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, Defendants: SUSAN BOYLE, LEAD ATTORNEY, BAPTISTE AND WILDER P.C., WASHINGTON, DC.

For JAMES E. SMITH, JR., EDWARD F. KEYSER, JR., JAMES P. HOFFA, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, Defendants: THOMAS HERMAN KOHN, LEAD ATTORNEY, MARKOWITZ & RICHMAN, PHILADELPHIA, PA.

For EDWARD F. KEYSER, JR., JAMES P. HOFFA, CHARLES ARGEROS, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, Defendants: ROBERT M. BAPTISTE, LEAD ATTORNEY, BAPTISTE AND WILDER P.C., WASHINGTON, DC.

For T.D.'S PUB, Respondent: JOHN M. CORCORAN, LEAD ATTORNEY, PHILADELPHIA, PA.

For JOSHUA JOHNSON, Respondent: MICHAEL J. MOLDER, LEAD ATTORNEY, INNELLI AND MOLDER, PHILADELPHIA, PA.

For WILLIAM G. ANDERSON, Respondent: JOHN F. INNELLI, LEAD ATTORNEY, MEDIA, PA.

For JEAN MORRIS, Movant: JOHN F. INNELLI, LEAD ATTORNEY, MEDIA, PA.

**JUDGES:** William H. Yohn, Jr., Judge.

**OPINIONBY:** William H. Yohn, Jr.

**OPINION:**

[*3] **MEMORANDUM AND ORDER**

YOHN, J.

Plaintiff Michael Breslin brings an action against numerous defendants, alleging a deprivation of his federal civil rights under *42 U.S.C. § 1983* (Count I) n1, a state law conspiracy claim (Count II); a

substantive violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO") under *18 U.S.C. § 1962(c)* (Count III), and a RICO conspiracy claim under *18 U.S.C. § 1962(d)* (Count IV). The named defendants in Count II include Norton Brainard ("Brainard"), Gerald McNamara ("McNamara"), William Oswald ("Oswald"), James Smith ("Smith"), and Edward F. Keyser ("Keyser"). n2 The named defendants in Count III include Brainard, McNamara, Smith, Keyser, Charles Argeros ("Argeros"), Sean Heim ("Heim"), Paul Vanderwoude ("Vanderwoude") and Leo Reilly ("Reilly"). The named defendants in Count IV include Brainard, McNamara, Oswald, Smith, Keyser, Argeros, Heim, Vanderwoude, Reilly, James P. Hoffa ("Hoffa"), as well as the International Brotherhood of Teamsters.

> n1 The court addressed Count I of plaintiff's complaint in a separate memorandum and order. Because none of the named defendants in that count is involved in the pending motions to dismiss, the court's decision as to Count I has no bearing on the outcome of these motions.

[*4]

> n2 The plaintiff also named David Knorr ("Knorr") as a defendant in Count II. The court, however, granted summary judgment in Knorr's favor on that count in a separate memorandum and order.

Presently before the court are the following: (1) the motion of defendant McNamara for summary judgment pursuant to *Rule 56(c) of the Federal Rules of Civil Procedure* as to Counts II, III, and IV; (2) the combined motion of defendants Brainard, Reilly, Oswald, Argeros, Heim and Vanderwoude for summary judgment pursuant to *Rule 56(c)* as to Counts II, III, and IV; and (3) the combined motion of defendants IBT, Hoffa, Smith and Keyser for summary judgment pursuant to *Rule 56(c)* as to Counts II, III, and IV.

### BACKGROUND

The instant case involves allegations of a conspiracy among defendants to violate the substantive and conspiracy provisions of the civil RICO statute and the state's civil conspiracy law. The plaintiff, a union member, asserts that defendants plotted to harm him after he refused to support an opposition candidate during a battle for control of a local [*5] union. The undisputed facts of record are forth below; where a fact is in dispute, the court will recite the plaintiff's version. n3

> n3 On a motion for summary judgment, where a fact is in dispute, the court must apply the non-moving party's version as true. See *infra* Standard of Review.

At all times relevant, plaintiff was serving parole as the result of a state court conviction for aggravated assault. (Depo. of Michael Breslin at 36) n4; Def. Knorr's Mot. for Summ. J., Exh. 2, at 1 (Pa. Commw. Ct. Opinion). n5 One of the conditions of parole was that plaintiff "refrain from any assaultive behavior." Def. Knorr's Mot. for Summ. J., Exh. 4, Knorr Exh. 1, at 1 (form entitled "Conditions Governing Parole/Reparole"); *see also* Def. Knorr's Mot. for Summ. J., Exh. 1, at 6 (Depo. of Michael Breslin). The "Conditions Governing Parole/Reparole" form contained other conditions, including that plaintiff "not leave the district [of Philadelphia] without prior written permission of the parole supervision staff" [*6] and that plaintiff "refrain from owning or possessing any firearms or other weapons." Def. Knorr's Mot. for Summ. J., Exh. 4, Knorr Exh.1, at 1 (form entitled "Conditions Governing Parole/Reparole"). Furthermore, in consideration of being granted the privilege of parole, plaintiff "expressly consent[ed] to the search of [his] person, property and residence, without a warrant by agents of the Pennsylvania Board of Probation and Parole." *Id.* "Any items, in the possession of which constitutes a violation of parole/reparole shall be subject to seizure, and may be used as evidence in the parole revocation process." *Id.*

> n4 Where a reference to the record is titled "Depo. of   " that deposition can be found in a document labeled "Deposition References" and attached to Doc. 118.

> n5 He was also on supervised release at the time resulting from a separate federal offense.

Upon release from prison, plaintiff joined the Teamsters Local 115 as a member on February 28, 1999, and began working for the [*7] Huff Paper Co. on August 30, 1999. Pl.'s Opp. to Def.'s Joint Stmt. of Mat. Facts, n6 at P 6. When plaintiff joined Local 115, Johnny Morris ("Morris") was the Secretary–Treasurer and principal officer of the local. *Id.* P 7. Plaintiff, however, alleges that efforts were underway to oust Morris from certain leadership positions. Amend. Compl. at P 19. More specifically, plaintiff alleges that certain individuals within the local union struck a deal with Hoffa, the president of the International Brotherhood of Teamsters ("IBT"). *Id.* Under the arrangement, if Hoffa imposed an emergency trusteeship on Local 115, and thus enabled local union members and officers to oust Morris from his leadership

positions, then Hoffa would be allowed to fill vacancies on the Philadelphia Regional Port Authority, the IBT Joint Council 53, and the IBT Pennsylvania Council with "his people." *Id.* Plaintiff was informed of the arrangement between Hoffa and certain union members shortly after he joined the union in February 1999. *Id.* He was asked to support the imposition of the emergency trusteeship, but declined to do so. *Id.* at PP 19, 20. Plaintiff's refusal to offer his support, however, **[*8]** did not thwart the plan. On November 15, 1999, the IBT imposed an emergency trusteeship on Local 115 and removed Johnny Morris from his position as Secretary–Treasurer and principal officer. Pl.'s Opp. to Def.'s Joint Stmt. of Mat. Facts, at P 7.

> n6 In the document entitled "Joint Statement of Material Facts Not in Dispute of Defendants Brainard, Oswald, Argeros, Heim, Vanderwoude, Reilly, IBT, Hoffa, Smith and Keyser," the defendants present their summary of the relevant facts. In response, plaintiff filed a document entitled "Plaintiff's Opposition to the Joint Statement of Material Facts Not in Dispute of Defendants Brainard, Oswald, Argeros, Heim, Vanderwoude, Reilly, IBT, Hoffa, Smith and Keyser." In that document, plaintiff offers statement by statement admissions or denials to the facts presented by the defendants. For the sake of clarity and simplicity, the court will use this document in any instance where the plaintiff admits to the facts as presented by defendants.

One week after the change in leadership, **[*9]** on November 22, 1999, Heim, Argeros, Vanderwoude, and Reilly went to the Huff Paper Co., where plaintiff worked, to tell members about the trusteeship and to hand out papers. (Depo. of Michael Breslin at 143–144); Def.'s Joint Stmt. of Mat. Facts, at P 13 (stating that on November 22, 1999, Heim, Argeros, Vanderwoude, and Reilly went to the Huff Paper Co. to tell members about the trusteeship and to hand out papers). In response, the Huff Paper employees, including plaintiff, voiced their opposition to the trusteeship. Pl.'s Opp. to Def.'s Joint Stmt. of Mat. Facts, at P 13. Plaintiff and others told them: "Hey, we don't want you's down here. We don't want nothing to do with you. As far as we're concerned, what has happened is wrong." (Depo. of Michael Breslin at 144). Plaintiff alleges that Argeros responded by informing the Local 115 members who supported Morris that if they did not cooperate with the new IBT leadership they would "not get any representation whatsoever." Amend. Compl. at P 22. In addition, plaintiff alleges that Heim told Paul Bruhns, the grandson of Morris: "your grandfather f—up some

friends of mine, I been waiting a long time to f—you up." *Id.*

Two days **[*10]** later, on November 24, 1999, plaintiff and six other Local 115 members filed a grievance at the Local 115 Union Hall based on the above conduct. Pl.'s Opp. to Def.'s Joint Stmt. of Mat. Facts, at P 14. They presented their grievance to Smith, Brainard and a union attorney. *Id.* One week later, on December 1, 1999, plaintiff and two other Local 115 union members went to the Union Hall to ask Smith what was being done about the grievance they had filed on November 24, 1999. *Id.* at P 16. They were told by Smith that nothing further would be done with regard to their grievance. *Id.*.

On March 13, 2000, in response to the preceding events, plaintiff filed charges with the National Labor Relations Board ("NLRB"). Pl.'s Opp. to Def.'s Joint Stmt. of Mat. Facts, at P 17. The charges asserted that threats not to represent Huff Paper employees and a threat of bodily harm were made on November 22, 1999. *Id.* At the end of April 2000, plaintiff was told that the NLRB wanted plaintiff to appear in its office on May 5, 2000 9:00 a.m. to give a sworn statement in connection with the charges he had filed on March 13, 2000. Doc. 135, at 21.

After the trusteeship was imposed, plaintiff **[*11]** and others began demonstrating outside the local union hall. (Depo. of Michael Breslin at 85–86); Amend. Compl. at P 27. During the spring, the demonstrators and officers of the trusteeship would often yell at each other through a wire fence. (Video tapes). Plaintiff even admits making certain statements to Brainard: "I know where you go to church and I am going to come up there and visit you." Def. Knorr's Mot. for Summ. J., Exh. 1, at 21 (Depo. of Michael Breslin). He also admits telling Brainard: "I hope [your daughter] doesn't become a lying scumbag lawyer like you." Def. Knorr's Mot. for Summ. J., Exh. 1, at 11. (Depo. of Michael Breslin). In addition, plaintiff admits saying to McNamara: "How's [your daughter] doing?" and "I had [your daughter] when she was good." Def. Knorr's Mot. for Summ. J., Exh. 1, at 20–21 (Depo. of Michael Breslin).

As noted earlier, plaintiff was on federal supervised release and state parole for the time over which these events took place. Knowing that plaintiff was on supervised release and parole and believing that plaintiff was engaging in behavior in violation of such status, Brainard and McNamara sent several letters to plaintiff's federal **[*12]** probation officer. Pl. Exh. 22, Brainard Exh. 1, 2, 4, 5, 6 (letters to plaintiff's federal probation officer and the United States Attorney for the Eastern District of Pennsylvania from Brainard and McNamara). Those letters described Brainard and McNamara's concern for the

safety of their family members based on the statements made to them by plaintiff. Pl. Exh. 22, Brainard Exh. 1, 2, 4, 5, 6 (letters to plaintiff's federal probation officer and the United States Attorney for the Eastern District of Pennsylvania from Brainard and McNamara); Pl. Exh. 2, at 114–115 (Depo. of Norton Brainard) (admitting contacting plaintiff's federal probation officer to discuss his belief that plaintiff's conduct on the picket line outside the union hall was assaultive, and admitting sending letters to plaintiff's federal probation officer); Def. Knorr's Mot. for Summ. J., Exh. 4, at 45–46 (Depo. of David Knorr) (stating that he received telephone call from Brainard in which Brainard told Knorr his belief that plaintiff's conduct on the picket line outside the union hall was assaultive)

On May 3, 2000, plaintiff attended his regularly scheduled meeting with his federal probation officer, Magdelyn **[*13]** Baez ("Baez"). Amend. Compl. at P 31. At the meeting, Baez informed plaintiff that Brainard sent her a videotape of him on the picket line and that Brainard claimed that this behavior was a violation of plaintiff's federal supervised release. Id. Although Baez told plaintiff that she did not believe that plaintiff had violated the terms of his federal supervised release by picketing, she did caution him to be careful about what he said and did on the picket line. Id. She also stated to plaintiff that Brainard and McNamara had been seeking his arrest for the past six months. Id.

Also on May 3, 2000, plaintiff's state parole officer, Knorr, received information that plaintiff was harassing and threatening certain members of the union trusteeship. Knorr received a phone call from Brainard on May 3, 2000. Pl.'s Opp. to Def. Knorr's Stmt. of Mat. Facts, P 10 (plaintiff's acceptance of Knorr's version of facts). While the content of the conversation is in dispute, both sides agree that whatever was said caused Knorr to come to the Local 115 Union Hall on the following day. Pl.'s Opp. to Def. Knorr's Stmt. of Mat. Facts, P 15 (plaintiff's acceptance of Knorr's version of facts). **[*14]**

On May 4, 2000, Knorr came to the Local 115 Union Hall. He observed Breslin on the picket line and while it is undisputed that Breslin was engaged in the picket line on that day, Pl.'s Opp. to Def. Knorr's Stmt. of Mat. Facts, P 16 (plaintiff's acceptance of Knorr's version of facts), any characterization of Breslin's activities, either as threatening or assaultive or innocuous, is in dispute. Knorr then went into the union hall where he met with Brainard and Keyser as well as other members of the union trusteeship leadership group. Amend. Compl. P 32. While there, Knorr viewed a videotape of Breslin and others on the picket/demonstration line. Id. He then told Brainard and McNamara to prepare affidavits describing their complaints against Breslin. Id.

Later that afternoon, Knorr received and reviewed the affidavits of Brainard and McNamara. Def. Knorr's Mot. for Summ. J., Exh. 4, at 74 (Depo. of David Knorr); Def.'s Knorr's Stmt. of Mat. Facts, at P 22 (stating that Knorr received via fax the written affidavits of Brainard and McNamara); Pl.'s Opp. to Def. Knorr's Stmt. of Mat. Facts, P 22 (disputing when Knorr received McNamara's affidavit but stating that Knorr did have **[*15]** possession of the affidavit when he left the union hall); Pl.'s Memo. in Opp. to Def. Knorr's Mot. for Summ. J., at 6 (stating that Knorr "received affidavits prepared by Brainard and signed by Brainard and McNamara)." n7 Later that same day, May 4, 2000, Knorr left a citation at plaintiff's home directing him to appear at Knorr's office on the following day, May 5, 2000, which also happened to be the day that plaintiff was scheduled to provide testimony at the NLRB meeting. Amend. Compl. at P 32.

> n7 It is undisputed that Knorr received the affidavits. While plaintiff contests the timing of the preparation and delivery of one of the affidavits, Pl.'s Opp. to Def. Knorr's Stmt. of Mat. Facts, P 22 (asserting that Brainard prepared McNamara's affidavit while Knorr waited and that Knorr took the affidavit with him when he left the union hall), such a dispute is not material to the resolution of whether the content of the affidavits provided Knorr with reasonable suspicion to believe that plaintiff had violated a condition of his parole.

**[*16]**

When plaintiff arrived at Knorr's office on May 5, 2000, he was arrested and put in a holding cell. Id. at P 33. Approximately ten minutes after plaintiff was placed in the holding cell, Knorr arrived and said. "You don't have a clue why I'm arresting you ... *** Because you are a f — goon and thug for Johnny Morris and you're a – is going to jail." Id. at P 34; Def. Knorr's Answer to Pl.'s Amend. Compl. at P 34. While plaintiff was in the holding cell, Knorr searched plaintiff's car. Id. at P 35. During that search, three utility knives and a cell phone were found. Id. At 2:00 p.m., Knorr and four parole officers took plaintiff to his home where they conducted a search of his house. Id. at P 36. Nothing was found during the search of plaintiff's home. Id. Plaintiff was then sent to Graterford Prison, where he remained for one week while Knorr prepared the parole violation charges against him. Id. at P 37. As a result of his re–incarceration, plaintiff lost his job with the Huff Paper Co. Amend. Compl. at P 40.

Plaintiff was subsequently charged with four violations of his state parole. Id. More specifically, he was charged with violation of the **[*17]** following condi-

tions: (1) leaving the district of Philadelphia without the prior written permission of the parole supervision staff (Condition 1 n8 ); (2) owning or possessing any firearms or other weapons (Condition 5B); (3) engaging in assaultive behavior (Condition 5C); and (4) possessing a cell phone (Condition 7). Def. Knorr's Mot. for Summ. J., Exh. 3 (form entitled "Notice of Charges and Hearing") (attached to end of parole revocation hearing transcript).

> n8 The term "Condition    " refers to the conditions listed on the form entitled Conditions Governing Parole/Reparole. Def. Knorr's Mot. for Summ. J., Exh. 4 (Depo. of Knorr), Knorr Exh. 1, at 1 (form entitled "Conditions Governing Parole/Reparole").

Upon being informed of the charges, plaintiff requested a full parole panel hearing, which was granted and set for June 6, 2000. Amend. Compl. at P 38; *see also* Def. Knorr's Mot. for Summ. J., Exh. 3 (transcript of parole revocation hearing). Shortly before the hearing date, an additional count **[*18]** was added to the charge that plaintiff had violated Condition 5C by engaging in assaultive behavior. Def. Knorr's Mot. for Summ. J., Exh. 3 (form entitled "Notice of Charges and Hearing Amended") (attached to end of parole revocation hearing transcript). The count was based on an allegation by William Oswald ("Oswald"), a member of Local 115, that plaintiff had threatened and harassed Oswald at work. *Id.;* Amend. Compl. at P 38.

At the June 6, 2000 parole hearing, Knorr offered the testimony of Brainard, McNamara and Oswald in support of the charge that plaintiff engaged in assaultive behavior. *Id.* at P 39. n9 Knorr also offered his own testimony and documentary evidence in support of the other charges against plaintiff. Def. Knorr's Mot. for Summ. J., Exh. 3 (transcript of parole revocation hearing). Plaintiff, who was represented by counsel, had the opportunity to cross-examine Knorr's witnesses and to present his case, which included testifying on his own behalf and calling several witnesses. Def. Knorr's Mot. for Summ. J., Exh. 3 (transcript of parole revocation hearing). After allowing each side to present its case, and upon review of the evidence presented, the Pennsylvania **[*19]** Board of Probation and Parole concluded that plaintiff had violated the conditions of his parole by: (1) leaving the district of Philadelphia without the prior written permission of the parole supervision staff (Condition 1); (2) owning or possessing any firearms or other weapons (Condition 5B); (3) engaging in assaultive behavior (Condition 5C); and (4) possessing a cell phone (Condition 7). Def. Knorr's Mot. for Summ. J., Exh. 2, at 1 (Pa. Commw. Ct. Opinion). The Board revoked plaintiff's parole and recommitted him for

one year and twenty-nine days. Def. Knorr's Mot. for Summ. J., Exh 2, at 1, 2 (Pa. Commw. Ct. Opinion). Plaintiff then filed a petition for administrative relief from the Board's decision, which the Board denied. *Id.* at 2. Upon denial, plaintiff filed a petition for review with the Commonwealth Court of Pennsylvania, which affirmed the Board's decision. *Id.* at 2, 11.

> n9 In his response to plaintiff's amended complaint, Knorr appears to admit that Oswald provided false testimony at the hearing. Amend. Compl. at P40; Def. Knorr's Answer to Pl.'s Amend. Compl. at P40. There is nothing in the record, however, to confirm this admission.

**[*20]**

While the above events were occurring, other developments were taking place in the court system. On November 18, 1999, John Morris and others filed a complaint in the United States District Court for the Eastern District of Pennsylvania challenging the emergency trusteeship. *Morris v. Hoffa,* 2001 1231741, at *1 (E.D. Pa. Oct. 12, 2001). On December 28, 1999, the court granted the plaintiff's motion for a preliminary injunction to enjoin the defendants from exercising the emergency trusteeship. *Id.* Two days later, on December 30, 1999, the Third Circuit stayed the injunction order pending appeal. *Id.* During the pendency of the appeal, the IBT conducted internal hearings during January, February and March of 2000, and based on those hearings, the president of the international union, Hoffa, issued a decision to continue the trusteeship. *Id.* n10 On June 12, 2000, the Third Circuit dismissed the appeal as moot and vacated the preliminary injunction order. *Id.* Defendants in the matter then filed a motion for summary judgment. *Id.* While the motion was pending, the international union conducted elections for officers of Local 115. *Id.* In the election, the membership **[*21]** had the opportunity to nominate candidates and vote in a secret ballot election. Pl.'s Opp. to Def.'s Joint Stmt. of Mat. Facts, at P 10. As a result of that election, Smith was elected Secretary-Treasurer and Business Manager and Argeros was elected Trustee. *Id.* After the election, on June 13, 2001, the international union dissolved the trusteeship. *Morris, 2001 U.S. Dist. LEXIS 16692, 2001 WL 1231741, at *1.* Finally, on October 12, 2001, the district court refused Morris' request to overturn the trusteeship, holding that the post-hearing trusteeship "meets the requirements" of federal law and is entitled to a presumption of validity. *Id. 2001 U.S. Dist. LEXIS 16692, at * 6.*

> n10 These hearings were held in order to meet the IBT's requirements for imposing an emergency

trusteeship. *Id.* P 26. During the pendency of these hearings, plaintiff and other Local 115 members, believing the trusteeship was imposed for inappropriate reasons and that the IBT hearings were "a kangaroo court," picketed outside the Local 115 Union Hall. *Id.* P 27.

**[*22]**

Based on the aforementioned events, on December 31, 2001, the plaintiff in the instant case, Breslin, filed a complaint against the defendants. On November 1, 2002, the court, upon defendants' various motions to dismiss pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, dismissed plaintiff's substantive and conspiracy claims under the RICO statute without prejudice to plaintiff's right to file an amended complaint and directed plaintiff to submit a RICO Case Statement Plaintiff filed an amended complaint on November 25, 2002. In it, plaintiff alleges that the defendants violated *§§ 1962(c) and 1962(d)* of the civil RICO statute as well as the state civil conspiracy law. Presently before the court are the defendants' motions for summary judgment pursuant to *Rule 56(c)* as to Counts II, III and IV of plaintiff's complaint.

**STANDARD OF REVIEW**

Either party to a lawsuit may file a motion for summary judgment, and it will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving **[*23]** party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. "Facts that could alter the outcome are "material", and disputes are "genuine" if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 743 (3d Cir. 1996)* (citation omitted).

While the moving party bears the initial burden of showing that there is no genuine issue of material fact, *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*, *Rule 56(c)* "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," *Id. at 322*.

When a court evaluates a motion for summary judgment, "the evidence of the non-movant is to be believed." *Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. Additionally, "all justifiable **[*24]** inferences are to be drawn in [the non-movant's] favor." *Id.* Moreover, "'summary judgment may

not be granted ... if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed.'" *Ideal Dairy, 90 F.3d at 744* (citation omitted). At the same time, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990)*. The nonmovant must show more than "the mere existence of a scintilla of evidence" for elements on which he bears the burden of production. *Anderson, 477 U.S. at 252*. Thus, "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)* (citations omitted).

**DISCUSSION**

**I.** *18 U.S.C. § 1962(c)* **Claim (Count III)**

Count III of plaintiff's complaint alleges a civil cause of **[*25]** action under *§ 1962(c) of the RICO* statute. Amend. Compl at P 55-59. That section prohibits any person employed by or associated with an enterprise engaged in interstate commerce from conducting or participating in the affairs of the enterprise through a pattern of racketeering activity. *Tabas, 47 F.3d 1280, 1289*.

Plaintiff asserts that he suffered injury to the extent that he lost his job at the Huff Paper Co. and suffered the loss of a corruption-free union. "The RICO statute defines a 'pattern' of racketeering activity as requiring 'at least two acts of racketeering activity within a ten year period. *Id. at 1290* (citing *18 U.S.C. § 1961(5)*). Courts have since coined the two acts of racketeering activity the "predicate acts." In the instant case, plaintiff alleges that defendants committed the predicate acts of (1) witness tampering in violation of *18 U.S.C. § 1512(b)(3)*, and (2) attempted extortion in violation *18 U.S.C. § 1951(b)(2)*. Amend. Compl. at PP 57 and 58; Rico Case Stmt. at P 2. n11 "Racketeering activity," n12 as defined in the statute, includes both witness tampering **[*26]** and extortion.

> n11 Before assessing the validity of plaintiff's *§ 1962(c)* claim, the court notes that it will not treat plaintiff's mention of certain conduct in violation of *18 U.S.C. § 2341-2346* (relating to the illegal trafficking of contraband cigarettes) or *18 U.S.C. § 1955* (relating to the operation of an illegal gambling business) as predicate acts for purposes of his claim under *§ 1962(c)*. The court comes to this conclusion for several reasons.
>
> First, plaintiff did not initially pled these acts as predicate acts in his amended complaint. When

describing his claim under *18 U.S.C. § 1962(c)*, plaintiff listed only the witness tampering and extortion acts as predicate acts. Amend. Compl. at PP 57, 58. There was no mention of the illegal trafficking in contraband cigarettes or the operation of an illegal gambling business under Count III of the amended complaint. Amend Compl. at PP 55–59. Rather, the only mention of the cigarette and gambling acts is in plaintiff's Rico Case Statement and that mention does not make it clear that plaintiff is asserting these acts as predicate acts for purposes of his *§ 1962(c)* claim. When asked to described the predicate acts underlying his claim, plaintiff states "the predicate acts as they relate to plaintiff include witness intimidation and economic coercion," which the court assumes to be a reference to *18 U.S.C. § 1512* (relating to witness tampering) and *18 U.S.C. § 1951* (relating to extortion). Rico. Case Stmt. at 11. In describing the predicate acts of witness tampering and extortion, plaintiff mentions for the first time the cigarette and gambling acts:

> The purpose of these predicate acts [meaning the witness tampering and extortion acts] was to ensure plaintiff would not reveal the existence of the pre–Local 115 trusteeship agreement, the existence of which would cast into doubt the validity of the "emergency" trusteeship and possibly lead to the discovery of the predicate acts of trafficking in contraband cigarettes, in violation of *18 U.S.C. § 2341-2346*, operating illegal gambling businesses, in violation of *18 U.S.C. § 1955*, and submitting false claims to the Local 115 health and welfare fund, in violation of *18 U.S.C. § 664*.

Rico Case Stmt. at 11. Thus, the court finds that plaintiff never expressly listed the cigarette and gambling act violations as predicate acts in his amended complaint or RICO Case Statement.

There is a second problem with plaintiff's attempt to identify the cigarette and gambling violations as predicate acts. He offers no evidence that such acts in any way caused his injury. In order for a plaintiff to demonstrate a compensable injury under RICO, he must prove a causal connection between his injury and the criminal RICO violations — the predicate acts. *Sedima v. Imrex Co., 473 U.S. 479, 497, 87 L. Ed. 2d 346, 105 S. Ct. 3275 (1985)*. In other words, the act which allegedly caused the in-

jury to the plaintiff must itself be an overt act of racketeering that RICO defines as wrongful. *Beck v. Prupis, 529 U.S. 494, 505, 146 L. Ed. 2d 561, 120 S. Ct. 1608 (2000)*. It follows, therefore, that if a plaintiff cannot demonstrate a causal nexus between the predicate acts and his injury, he lacks standing to sue under RICO for that act. *Kramer v. Bachan Aerospace Corp., 912 F.2d 151, 154 (6th Cir. 1990)*.

In his amended complaint, plaintiff alleges that the defendants' RICO violations caused injury to the extent that he lost his job at the Huff Paper Co. Rico Case Stmt. at p15. Plaintiff has not, however, alleged nor can any reasonable inferences be drawn from the facts presented that violations of either the cigarette or gambling statutes caused plaintiff to lose his job. There is simply no basis upon which these two acts may be linked to the subsequent loss of plaintiff's job with the Huff Paper Co. Even the most generous reading of the record does not allow a reasonable inference that the decision of the Huff Paper Co. to terminate plaintiff's employment was caused by the acts of some of the defendants who allegedly engaged in cigarette trafficking and illegal gambling. Nor does plaintiff offer any facts in support of an allegation that these acts caused him to lose his job. Because plaintiff cannot demonstrate a causal nexus between the defendants' conduct in allegedly violating the cigarette and gambling statutes and the loss of his job, the court finds that plaintiff lacks standing to sue under RICO for these acts. *Kramer v. Bachan Aerospace Corp., 912 F.2d 151, 154 (6th Cir. 1990)*.

[*27]

n12 "Racketeering activity," as defined in the statute, includes "any act which is indictable under ... *section 1512* (relating to tampering with a witness, victim, or an informant) [and] ... *section 1951* (relating to interference with commerce, robbery, or extortion)." *18 U.S.C. § 1961(1)(B)*.

In order to prove a pattern of racketeering activity, a plaintiff must show more than the mere existence of the two predicate acts. *H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 237, 106 L. Ed. 2d 195, 109 S. Ct. 2893*, (noting that Congress intended showing of a pattern of racketeering activity to have a more stringent requirement than proof simply of two predicates acts). In addition, a plaintiff "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc., 492 U.S. at 239*. The

courts subsequently labeled these requirements the relatedness and continuity prongs. As the defendants assert that plaintiff is unable to satisfy either prong, the court will address each one separately.

**A. Relatedness**

Under the relatedness **[*28]** prong, "predicate acts are related if they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Tabas, 47 F.3d at 1292* (quoting *H.J. Inc., 492 U.S. at 240*).

Moving defendants argue that Breslin's alleged predicate acts, extortion and tampering with a federal witness, are not related because each act involves different defendants. Doc. 118, at 26. Plaintiff's response is that all of the acts occurred at the direction of defendant Smith. Doc. 134. at 6–7. Although only two of the factors were in the plaintiff's favor, namely that the acts seemed to target the same victim and both acts were arguably aimed at preventing union members and plaintiff specifically from exercising their rights to challenge the trusteeship, the court finds this sufficient to satisfy the relatedness requirement. It is certainly reasonable to infer that the acts of Argeros, Heim, Vanderwoude and Reilly to threaten plaintiff had the same underlying purpose as the acts of Brainard and McNamara to have plaintiff arrested. Both predicate acts were **[*29]** intended for a similar purpose – to scare plaintiff into submission so that the transition in Local 115's leadership would be unchallenged.

**B. Continuity**

Under the continuity prong, a plaintiff must show that the "predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." *H.J. Inc., 492 U.S. at 240*. In describing the concept, the Court offered the following description:

> 'Continuity' is both a closed–and open–ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept—and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear one to another, are distinct requirements.

*H.J. Inc., 492 U.S. at 241* (citation omitted). From this description, courts have further developed the concepts

of closed–and open–ended continuity.

1. Closed–ended Continuity

A party may establish continuity as a closed–ended concept **[*30]** by "proving a series of related predicates extending over a *substantial* period of time." *Tabas, 47 F.3d at 1292* (citing *H.J. Inc., at 242*). Although the Supreme Court has not explicitly defined what length of time qualifies as "substantial," it has stated that "predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long–term criminal conduct." *H.J. Inc., at 241*. Moreover, the Third Circuit has held that "conduct lasting no more than twelve months does not meet the standard for closed–ended continuity." *Tabas, 47 F.3d at 1293* (citing numerous Third Circuit cases for same proposition) (citations omitted). n13

> n13 Plaintiff does not contest the law as stated herein with reference to continuity, but rather belatedly adds the allegations of cigarette trafficking and illegal gambling to attempt to extend the period of time.

Defendants assert that plaintiff cannot **[*31]** establish the concept of closed–ended continuity as the acts alleged by plaintiff occurred over the course of less than six months, from November 22, 1999 (date of the alleged attempted extortion act at the Huff Paper Co.) until May 5, 2000 (date of the culmination of the alleged witness tampering act). Doc. 118, at 26; Doc. 119, at 20. Plaintiff asserts that the record shows predicate acts began in 1995 and continued through 2001. Doc. 134, at 6. Plaintiff makes this statement, however, in reliance on the conduct constituting the violations of the cigarette and gambling statutes, which allegedly both began in 1995. Pl. Exh. 12, at P 1–4 (aff. of Arlene Johnson). His reliance on these acts, however, is misplaced as the court has already decided that these acts do not constitute predicate acts for the purposes of plaintiff's *§ 1962(c)* claim. *See supra* pp. 16–17.

Thus, considering only the acts of attempted extortion and witness tampering, it is clear that the time between the acts was less than one year. There is no dispute that the alleged extortion conduct occurred on November 22, 1999. Pl. Exh. 17, at 54–59 (Depo. of Michael Breslin) (asserting that Argeros, Heim, Vanderwoude **[*32]** and Reilly went to Huff Paper Co. on November 22, 1999); Defs.' Joint Stmt. of Mat. Facts Not in Dispute (admitting that Argeros, Heim, Vanderwoude and Reilly went to Huff Paper Co. on November 22, 1999). Nor is there any dispute that the conduct constituting a violation of

the witness tampering statute started in early 2000 and concluded on May 5, 2000 with the arrest of plaintiff for a violation of the conditions of his parole. Pl. Exh. 22, Brainard Exh. 1, 2, 4, 5, 6 (letters to plaintiff's federal parole officer and the United States Attorney for the Eastern District of Pennsylvania from Brainard and McNamara seeking to having plaintiff arrested); Pl. Exh. 2, at 114–115 (Depo. of Norton Brainard) (admitting contacting plaintiff's federal parole officer to discuss his belief that plaintiff's conduct on the picket line outside the union hall was assaultive, and admitting sending letters to plaintiff's federal parole officer); Def. Knorr's Mot. for Summ. J., Exh. 4, at 45–46 (Depo. of David Knorr) (stating that he received telephone call from Brainard in which Brainard told Knorr his belief that plaintiff's conduct on the picket line outside the union hall was assaultive). There are **[*33]** no additional assertions or factual evidence indicating that any other acts occurred beyond this time frame. Thus, the period of time across which the predicate acts occurred constituted only a six–month period of time. As noted previously, the Third Circuit has repeatedly held that acts occurring during a time period of less than a one year period are insufficient to qualify for purposes of closed–ended continuity under RICO. *Tabas, 47 F.3d at 1293* (suggesting that the period must be at least one year). Accordingly, the court concludes that plaintiff does not satisfy the requirements of closed–ended continuity, and thus plaintiff's only possible argument to save his claim under *§ 1962(c)* is that open–ended continuity exists.

2. Open–Ended Continuity

Noting that "often a RICO action will be brought before continuity can be established in [a closed–ended] way," the Supreme Court stated that "in such cases, liability depends on whether the *threat* of continuity is demonstrated." *H.J. Inc., at 241*. The open–ended concept of continuity refers to "conduct that by its very nature projects into the future with a threat of repetition." *Tabas, 47 F.3d at 1292*; **[*34]** *see also H.J. Inc., at 242* (noting that the continuity prong may still be met if a plaintiff can prove a threat of continued racketeering activity). "Whether the predicate acts constitute a threat of continued racketeering activity depends on 'the specific facts of each case.'" *Tabas, 47 F.3d at 1296* (quoting *H.J. Inc., at 242*). "Open–ended continuity may be satisfied 'where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business ... or of conducting or participating in an ongoing and legitimate RICO "enterprise."'" *Tabas, 47 F.3d at 1296* (quoting *H.J. Inc., at 242–3*).

Defendants assert plaintiff is unable to satisfy the requirements of open–ended continuity. Doc. 118, at 27; Doc. 119, at 20. Believing that he has satisfied the re-

quirements of closed–ended continuity, plaintiff provides no argument as to whether open–ended continuity exists. He suggests no allegations or supporting evidence in the record from which to conclude that there was a threat of repeated criminal conduct. The conduct constituting a violation of the witness tampering statute ceased upon plaintiff's arrest on May 5, 2000. Nor **[*35]** does plaintiff assert that it has continued. The alleged violation of *18 U.S.C. § 1512(b)(1)* related only to plaintiff's role as a witness in a May 5, 2000 NLRB hearing and there are no allegations that plaintiff continues to be or intends to be a witness in any further NLRB hearing or other federal proceeding. Moreover, plaintiff's NLRB complaint, for which he was supposed to testify, has been resolved in favor of the defendants and against plaintiff. Pl. Exh. 22, Brainard Exh. 15 (letter from NLRB to plaintiff stating that the charge filed by plaintiff on March 13, 2000 "lacks merit" and thus will not be pursued by the NLRB). Thus, the court simply cannot find a basis in plaintiff's pleading or the record for the argument that defendants intended to interfere with his ability to act as a federal witness in the future and plaintiff has asserted none. Likewise, there is no assertion or evidence that the conduct constituting the attempted extortion occurred after November 22, 2000. Moreover, considering that the alleged purpose of both acts, the witness tampering and the extortion, was to ensure that the change in leadership of Local 115 went smoothly and without **[*36]** challenge, it is simply illogical to infer that the named defendants' racketeering activities continue to this day, given that the validity of the trusteeship is no longer in question. n14

> n14 The complaint fails to mention that on December 30, 1999, two days after the preliminary injunction was issued, the Third Circuit stayed the injunction order pending appeal, and that on June 12, 2000, the Third Circuit dismissed the appeal as moot and vacated the preliminary injunction order. *Morris v. Hoffa, 2001 U.S. Dist. LEXIS 16692, 2001 WL 1231741 (E.D. Pa. Oct. 12, 2001)*. The trusteeship was dissolved by IBT on June 13, 2001 and on October 12, 2001, the District Court refused Morris' request to overturn the trusteeship, holding that the post–hearing trusteeship "meets the requirements" of the federal law and is entitled to a presumption of validity. *Id. 2001 U.S. Dist. LEXIS 16692, at *6*.

Nor does plaintiff make any assertions or point to any evidence in the record from which the court could conclude that witness tampering and extortion are a regular **[*37]** way of conducting the defendants' ongoing legitimate businesses or of conducting or participating in an ongoing and legitimate RICO enterprise. Plaintiff made

no allegation that racketeering activity, in the form of witness tampering or extortion, was currently occurring at the enterprise.

Rather, the predicate acts alleged by plaintiff were part of a single-victim, single-injury, short-lived scheme with a distinct and finite purpose and no threat of continuation. *See Tarr v. Credit Suisse Asset Management, Inc., 958 F. Supp. 785, 800 (E.D.N.Y. 1997)* ("[A] series of predicate acts that, together, constitute a single scheme to accomplish 'one discrete goal' and are 'directed at one individual with no potential to extend to other persons or entities' does not satisfy the continuity requirement where there is no genuine threat of continuing illegal activity.") (citations omitted). Once achieved, the scheme would necessarily come to an end. Having failed to meet either test of continuity, plaintiff cannot support his claim that defendants engaged in the requisite pattern of racketeering activity. As such, the court will grant summary judgment in favor of the defendants **[*38]** as to claim stated in Count III of plaintiff's amended complaint under *§ 1962(c)*. n15

> n15 Defendants provided numerous other challenges to plaintiff's substantive RICO claim under *§ 1962(c)* in their motions for summary judgment. Because plaintiff failed to establish sufficient evidence to support the continuity element, the court finds it unnecessary to address the defendants' additional arguments or to parse the evidence as to each defendant. However, I do note that a number of these additional arguments have considerable force.

## II. *18 U.S.C. § 1962(d)* (Count IV)

In Count IV of his amended complaint, plaintiff asserts a claim under *§ 1962(d)* which states "it shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

Plaintiff cites *Salinas v. United States, 522 U.S. 52, 139 L. Ed. 2d 352, 118 S. Ct. 469 (1997)* and *Smith v. Berg, 247 F.3d 532 (3d Cir. 2001)* for the proposition **[*39]** that a plaintiff may still bring a claim under *§ 1962(d)* absent any claim under one of the substantive provisions of the statute, *§ 1962(a), (b) or (c)*. The cases plaintiff cites do not support this conclusion because they do not reach the issue of whether substantive violations are required for a conspiracy claim under *§ 1962(d)*. n16

> n16 Rather than supporting plaintiff's proposition, the cases stand for the rule that an individual

defendant need not be found liable under one of the substantive provisions in order for that same defendant to be found liable for conspiracy under *§ 1962(d)*. The courts did not address the question whether there must be a violation of one of the substantive provisions by someone; they simply held that a particular defendant need not have violated the substantive provision in order to be liable himself or herself under the conspiracy provision so long as some other defendant is liable under the substantive provision. Thus, a plaintiff could bring a claim against defendant X for violating one of the statute's substantive provisions in Count I of his complaint, and could still bring a claim against defendants X and Y for conspiring to violate that substantive provision, in violation of *§ 1962(d)* under Count II of his complaint without naming defendant Y in Count I. However, in order to prevail on his conspiracy claim against defendant Y, plaintiff must still prove that defendant X violated one of the statute's substantive provisions.

A detailed review of the facts in the cases proves this to be true. In *Salinas,* the initial complaint was brought against Salinas and another defendant named Marmolejo; it alleged that Salinas and Marmolejo violated *§ 1962(c)* and *§ 1962(d)*. *United States v. Marmolejo, 89 F.3d 1185, 1187 (5th Cir. 1996)* (recounting the facts of the case). The jury convicted Marmolejo of violating both *§ 1962(c)* and *§ 1962(d)* but it convicted Salinas only for violating *§ 1962(d)*. *Id.* Salinas appealed his conviction, and eventually reached the Supreme Court which held that a defendant need not personally commit the two predicate acts of racketeering activity required by *§ 1962(c)* in order to be held liable for conspiracy under *§ 1962(d)*. In its opinion, the Court specifically noted that only the conviction of Salinas was before it and that Marmolejo had been convicted of violating one of the substantive provisions. *Salinas, 522 U.S. at 56, 66.* Thus, because there was a conviction of a defendant under one of the substantive provisions of the statute, this opinion cannot stand for the proposition that a *§ 1962(d)* conspiracy claim can be brought without any substantive claim at all.

Similarly, in *Berg,* there was a substantive RICO violation. The district court denied defendant's motion to dismiss plaintiff's claim pursuant to *§ 1962(c)*, and thus allowed that claim to go forward. *Smith v. Berg, 247 F.3d 532, 2000 WL 365949,* at * 2 (E.D. Pa. Apr. 10, 2000). The court identified the issue presented as whether "a RICO conspiracy defendant need not *himself commit* or

agree to commit predicate acts." *Berg, 247 F.3d at 537* (emphasis added). Moreover, in describing the standard set forth in *Salinas,* the court stated:

> The plain implication of the standard set forth in Salinas is that one who opts into or participates in a conspiracy is liable for the acts of his co-conspirators which violate *section 1962(c)* even if the defendant did not personally agree to do, or to conspire with respect to, *any* particular element.

*Id.* (footnote omitted) (underlined emphasis added). As such, when the case reached the Third Circuit, there was a pending claim under one of the statute's substantive provisions, making it improbable, if not impossible, for the case to stand for the proposition that a plaintiff may still bring a claim under *§ 1962(d)* absent any viable claim against anyone under either *§§ 1962(a), (b) or (c).*

**[*40]**

Language from the Third Circuit initially suggested that a *§ 1962* substantive violation is a prerequisite for stating a conspiracy claim. In *Kehr Packages,* the Third Circuit stated without further analysis that "because we hold that plaintiffs did not state a valid claim under *§ 1962(c)* ... we need not consider whether the dependent *§ 1962(d)* claim has been properly alleged." *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1411 n. 1 (3d Cir. 1991).* The court also noted briefly in *Lightning Lube* that "any claim under *section 1962(d)* based on a conspiracy to violate the other subsections of *section 1962* necessarily must fail if the substantive claims are themselves deficient." *Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1191 (3d Cir. 1993).* These statements have been cited repeatedly verbatim by our district courts for the proposition that a conspiracy count cannot stand without successfully bringing a claim under one of the *§ 1962* substantive provisions. *See e.g., Nanya-Nashut ex rel. Hand v. BankOne, 2003 U.S. Dist. LEXIS 15653 at *15; Dianese, Inc. v. Pennsylvania, 2002 U.S. Dist. LEXIS 10917* **[*41]** *at *38; Morris v. First Union Nat'l Bank, 2002 U.S. Dist. LEXIS 418 at *17; Teti v. Towamencin Twp., 2001 U.S. Dist. LEXIS 15600 at *29.*

This language, however, is not dispositive of Breslin's case. In *Rehkop,* the Third Circuit limited the sweep of the language *of Lightning Lube,* when it noted that "the problem in *Lightning Lube* was that "the actions alleged to constitute violations of subsections 1962(a), (b), and (c) were not violations of these subsections." *Rehkop v. Berwick Healthcare Corp., 95 F.3d 285, 290 (3d Cir.*

*1996).* The *Rehkop* court noted that because the actions alleged in *Lightning Lube* could not constitute a substantive violation, they "failed to serve as the object of a *section 1962(d)* conspiracy." *Id.*

In *Rehkop,* the Third Circuit distinguished the facts before it from those *of Lightning Lube.* The *Rehkop* court explained that unlike *Lightning Lube,* Rehkop's allegations constituted a substantive violation under *§ 1962(c)* because they alleged one of the specific racketeering acts enumerated in *§ 1961(1)* of the act. However, Rehkop could not pursue such a claim because he could **[*42]** not show that he was harmed by the *§ 1962(c)* violation. *Id.* Nonetheless, the *Rehkop* court allowed the acts alleged in violation of *§ 1962(c),* which were racketeering acts as defined in the statute, to serve as the object of a *§ 1962(d)* conspiracy claim, and permitted the conspiracy claim to go forward even though the substantive RICO charges had been dismissed. The predicate acts of witness tampering and attempted extortion alleged in *Breslin* do constitute substantive violations of *§ 1962.* Thus, under *Rehkop,* defendants' alleged actions here may also serve as the object of a *§ 1962(d)* conspiracy claim. Even after it has been established that Breslin is unable to bring a successful claim under *§ 1962(c),* the Third Circuit has found that a plaintiff may pursue his conspiracy claim so long as he can show that harm ensued from the conspiracy. *Id.*

After *Rehkop,* the Supreme Court resolved any doubt that even after the dismissal of all substantive claims, a plaintiff may bring a *§ 1962(d)* claim if plaintiff establishes that injury was caused by an act of racketeering under *§ 1961(1). Beck v. Prupis, 529 U.S. 494, 505, 146 L. Ed. 2d 561, 120 S. Ct. 1608 (2000).* **[*43]** n17 "[An] injury caused by an overt act that is not an act of racketeering or otherwise wrongful under RICO ... is not sufficient to give rise to a cause of action ... for a violation of *§ 1962(d).*" *Id.* In *Beck,* the court found that termination of employment was not racketeering activity done in furtherance of respondents' conspiracy. *Id. at 499.* It is not within the statutory definition of racketeering activity at *§ 1961(1).* The Court also found that "a RICO conspiracy plaintiff must allege injury from an act that is analogous to an 'act of tortious character,' ... meaning an act that is independently wrongful under RICO." *Id. at 505.* The court noted that a plaintiff can bring a suit for civil conspiracy "only if he [has] been injured by an act that was itself tortious." n18 *Id. at 501.* Unlike termination of employment, acts of witness tampering and attempted extortion, as alleged by Breslin, are "racketeering acts" under the statute.

> N17 In *Beck,* the claims under *1962(a), (b), (c)* had been decided in favor of the defendants and were not at issue.

[*44]

n18 The agreement itself is not enough for liability and there must be acts of a tortious character in carrying it into execution.

Thus, where racketeering acts are alleged, the plaintiff may pursue a *§ 1962(d)* conspiracy claim where injury from the acts of racketeering may be shown. This seems to be the case in *Breslin,* where the predicate acts are based on witness tampering and attempted extortion—both violations of the designated predicate acts in the statute.

This, however, does not end our inquiry. The question remains whether plaintiff has met all of the requirements for establishing a *§ 1962(d)* conspiracy count, which makes it unlawful to "conspire to violate any of the provisions of subsections (a), (b) or (c)." As mentioned above, *section 1962(c)* makes it unlawful for certain persons "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a *pattern of racketeering activity.*" *18 U.S.C. § 1962 (2000)* (emphasis added). Even though a *1962(d)* conspiracy claim is not dependent upon successfully bringing a substantive [*45] claim under *1962(a), (b),* or *(c),* plaintiff's claim still fails because he cannot establish a *pattern* of racketeering activity due to lack of continuity.

"To plead conspiracy adequately, a plaintiff must set forth allegations that address the *period of the conspiracy,* the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose." *Shearin v. E.F. Hutton Group, Inc., 885 F.2d 1162, 1166–67 (3d Cir. 1989)*(emphasis added)(wherein the alleged scheme took place within a two–year time frame). n19 Underlying a *§ 1962(d)* claim is the requirement that plaintiff must show that defendants agreed to the commission of a "pattern of racketeering." *Banks v. Wolk, 918 F.2d 418, 421 (3d Cir. 1990).* Continuity is a necessary element to establish a "pattern" as noted earlier. Because the Third Circuit has repeatedly held that conduct must last over one year to meet the standard for continuity, and the alleged conspiracy and its resulting actions did not, I find that the plaintiff, as discussed *supra* pp.16–21, has not met the continuity requirement.

n19 The Supreme Court did not affect this standard with its decision in *Beck v. Prupis,* which called *Shearin* into question on other grounds. *529 U.S. 494, 146 L. Ed. 2d 561, 120 S. Ct. 1608 (2000).*

[*46]

Thus, even if liability under *§ 1962(d)* is not depen-

dent upon the successful showing of liability under one of the statute's substantive provisions, but only upon the allegation of a predicate act under this statute, the court must reject plaintiff's conspiracy claim pursuant to *§ 1962(d)* because the plaintiff has failed to demonstrate continuity. Accordingly, summary judgment in favor of the defendants will be granted as to Count IV.

## III. State Law Conspiracy Claim (Count II)

In Count II of plaintiff's amended complaint, he asserts a state law claim n20 for civil conspiracy against certain defendants. The court, however, will not reach the merits of this claim because it declines to exercise its supplemental jurisdiction pursuant to *28 U.S.C. § 1367.* Where a court rules against a plaintiff as to his federal claims prior to trial, the court has discretion to dismiss the non–federal claims over which it only has jurisdiction pursuant to the doctrine of supplemental jurisdiction. WILLIAM W. SCHWARZER, A. WALLACE TASHIMA & JAMES M. WAGSTAFFE, FEDERAL CIVIL PROCEDURE BEFORE TRIAL, § 2.91.1 (1999). "The district courts may decline to exercise supplemental [*47] jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction." *28 U.S.C. § 1367(c)(3).* This is precisely the circumstance in the instant case. Here, subject matter jurisdiction rested initially on a federal question pursuant to *28 U.S.C. § 1331,* namely plaintiff's claims under the federal RICO statute. However, as set forth previously, summary judgment in favor of defendants will be granted as to both federal claims, thus removing the federal claims. Thus, because this court has dismissed the claims over which it had original jurisdiction, *i.e.,* plaintiff's federal claims, n21 the court will, in its discretion, decline to exercise supplemental jurisdiction over plaintiff's state law claim. It will be dismissed without prejudice to the right of the plaintiff to bring it in another forum.

n20 The court concludes that this is a state law claim for two reasons. First, because plaintiff labels it as such in his amended complaint. *See* Amend. Compl. at 13 (labeling Count II "As to defendants Brainard, McNamara, Oswald, Smith, Keyser and Knorr For Conspiracy Under Pennsylvania Law"). Second, because the case cited by plaintiff in support of this count—*Progress Federal Savings Bank v. Lenders Assoc., Inc., 1995 U.S. Dist. LEXIS 11149, 1995 WL 464320 (E.D. Pa. Jul. 31, 1995)*—describes a state law civil conspiracy claim and recognizes that its subject matter jurisdiction is based on diversity. *Progress, 1995 U.S. Dist. LEXIS 11149, 1995 WL 464320,* at <*> 3, 4; Doc. 134, at

23.

**[*48]**

n21 No diversity jurisdiction has been alleged nor could it be established as plaintiff and a number of defendants are both located in Pennsylvania. Thus, without the federal claims, the court is without subject matter jurisdiction.

**CONCLUSION**

For the reasons set forth above, the court will grant the defendants' motions for summary judgment as to the substantive RICO claim and the conspiracy RICO claim and decline to exercise jurisdiction over the state law civil conspiracy claim. An appropriate order follows.

**ORDER**

And now, this 10th day of October, 2003, upon consideration of the combined motion of defendants the International Brotherhood of Teamsters, James Hoffa, Edward Keyser and James Smith for summary judgment as to Counts II, III, and IV pursuant to *Rule 56(c) of the Federal Rules of Civil Procedure* (Doc. 118); the combined motion of defendants Norton Brainard, William Oswald, Charles Argeros, Sean Heim, Paul Vanderwoude, and Leo Reilly for summary judgment as to Counts II, III, and IV pursuant to *Rule 56(c) of the Federal Rules of Civil Procedure* **[*49]** (Doc. 119); the motion of defendant Gerald McNamara for summary judgment as to Counts II, III, and IV pursuant to *Rule 56(c) of the Federal Rules of Civil Procedure* (Doc. 120); the response of plaintiff thereto; the combined reply thereto of defendants International Brotherhood of Teamsters, James Hoffa, Edward Keyser and James Smith; the combined reply thereto of defendants Norton Brainard, William Oswald, Charles Argeros, Sean Heim, Paul Vanderwoude, and Leo Reilly; and the sur-reply of plaintiff thereto, it is hereby ORDERED that the combined motion of defendants International Brotherhood of Teamsters, James Hoffa, Edward Keyser and James Smith for summary judgment as to Counts III and IV pursuant to *Rule 56(c) of the Federal Rules of Civil Procedure* is GRANTED; that the combined motion of defendants Norton Brainard, William Oswald, Charles Argeros, Sean Heim, Paul Vanderwoude, and Leo Reilly for summary judgment as to Counts III and IV pursuant to *Rule 56(c) of the Federal Rules of Civil Procedure* is GRANTED; and that the motion of defendant Gerald McNamara for **[*50]** summary judgment as to Counts III and IV pursuant to *Rule 56(c)* is GRANTED and judgment is entered in favor of those defendants on Counts III and IV of the complaint and against plaintiff. It is further ordered that Count II of the complaint is dismissed without prejudice. It is further ordered that the Clerk is directed to mark this case closed for statistical purposes.

William H. Yohn, Jr. Judge

# EXHIBIT C

LEXSEE 2002 U.S. DIST. LEXIS 10917

**DIANESE, INC., GAETANO DIANESE, and ROSEMARIE DIANESE, Plaintiffs, v. COMMONWEALTH OF PENNSYLVANIA, et al., Defendants.**

**CIVIL ACTION NO. 01–2520**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2002 U.S. Dist. LEXIS 10917*

**June 19, 2002, Decided**

**DISPOSITION:** Request for leave to amend amended complaint and motion for more definite statement denied. Motions for dismissal of defendants granted, and claims against Manufacturers & Traders Trust Bank Co. and Dryfoos dismissed. Amended complaint dismissed in entirety

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] GAETANO DIANESE, PLAINTIFF, Pro se, HAZLETON, PA USA.

ROSEMARIE DIANESE, PLAINTIFF, Pro se, HAZLETON, PA USA.

For ALBERT G. ALBERT, EDWARD J. ALBERT, GEORGE J. ALBERT, PETITIONERS: JOSEPH G. ALBERT, ALBERT & KAMAGE, FORTY FORT, PA USA.

For THE COMMONWEALTH OF PA, DEPT. OF GENERAL SERVICES, AND ITS OFFICIALS IN THEIR OFFICIAL CAPACITIES, MICHAEL PEAPOS, DAVID MCCARTY, MERLE H. RYAN, STEPHEN J. BUSTERNA, DEFENDANTS: RANDALL J. HENZES, OFFICE OF ATTORNEY GENERAL, PHILA, PA USA.

For MANUFACTURERS & TRADERS TRUST CO., DEFENDANT: DEBRA P. FOURLAS, MC NEES, WALLACE & NURICK, HARRISBURG, PA USA. NEDRIC L. NISSLY, HARRISBURG, PA USA. JAMES P. DEANGELO, MCNEES WALLACE & NURICK, HARRISBURG, PA USA.

For FIRST FEDERAL BANK, DEFENDANT: ANTHONY J. LUCADAMO, KENNEDY & LUCADAMO, PC, HAZLETON, PA USA.

For LAPUTKA, BAYLESS, ECKER & COHN, P.C.,

DEFENDANT: H. ROBERT FIEBACH, COZEN AND O'CONNOR, PHILADELPHIA, PA USA. JENNIFER M. MC HUGH, COZEN & O'CONNOR, PHILA, PA USA.

For VERIZON PENNSYLVANIA INC., MOVANT: LEE C. SWARTZ, HEPFORD, SWARTZ & MORGAN, HARRISBURG, PA USA. STEPHEN M. GREECHER, JR., HEPFORD, SWARTZ, MORGAN, HARRISBURG, PA USA.

For PNC FINANCIAL GROUP, INC. [*2] , (PNC BANK), DEFENDANT: TINA L. COLMAN, WIER & PARTNERS LLP, PHILADELPHIA, PA USA. SUSAN VERBONITZ, WEIR & PARTNERS, LLP, PHILADELPHIA, PA USA.

For NORTHEAST PA. FINANCIAL CORP., DEFENDANT: ANTHONY J. LUCADAMO, KENNEDY & LUCADAMO, PC, HAZLETON, PA USA.

For PARENTE, RANDOLPH ORLANDO, CAREY & ASSOCIATES, PC, DEFENDANT: ROBERT D. SCHAUB, ROSENN, JENKINS & GREENWALD, L.L.P., WILKES–BARRE, PA USA.

For DRYFOOS INSURANCE AGENCY, INC., DEFENDANT: WAYNE PARTENHEIMER, CAMPBELL O'KEEFE NOLAN & DALY, PHILADELPHIA, PA USA.

For BYERLY INSURANCE AGENTS AND BROKERS, INC., CENTRAL PENNSYLVANIA INDEMNITY SERVICES, DEFENDANTS: LORI A. ADAMCIK, MARSHALL & HADDICK, P.C., CAMP HILL, PA USA. CHARLES E. HADDICK, JR., MARSHALL & HADDICK, PC, CAMP HILL, PA USA.

For SELECTIVE INSURANCE, SELECTIVE WAY INSURANCE COMPANY, SELECTIVE INSURANCE GROUP, INC., DEFENDANTS: ERIC A. WEISS, MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN, PHILADELPHIA, PA USA.

For MID–STATES SURETY CORP., DEFENDANT: CHARLES E. WASILEFSKI, PETERS & WASLIEFSKI, HARRISBURG, PA USA.

For WASHINGTON INTERNATIONAL SURETY CORP., DEFENDANT: KEVAN F. HIRSCH, KAPLIN STEWART MELOFF REITER & STEIN PC, BLUE BELL, PA USA.

For [*3] BOROUGH OF JIM THORPE, DEFENDANT: ANDREA L. BENNETT, DEVLINE & DEVINE, CONSHOHOCKEN, PA USA.

For PINNACLE ROOFING & SHEET METAL, INC., DEFENDANT: CHARLES A. SHAFFER, KINGSTON, PA USA.

For UNITED STATES OF AMERICA/DEPARTMENT OF THE ARMY @TOBYHANNA ARMY DEPOT, DEFENDANT: JAMES G. SHEEHAN, U.S. ATTORNEY'S OFFICE, PHILA, PA USA. ANNETTA FOSTER GIVHAN, UNITED STATES ATTORNEY'S OFFICE, PHILADELPHIA, PA USA.

**JUDGES:** LOWELL A. REED, JR., S.J.

**OPINIONBY:** LOWELL A. REED, JR.

**OPINION:**

### MEMORANDUM

This action arises out of various contractual disputes involving a number of construction projects. Plaintiffs acting pro se, except for the corporate plaintiff which proceeds without representation and without pro se status, n1 have brought suit against over twenty defendants, including unnamed John Does, asserting claims under the Racketeer Influence and Corrupt Organization ("RICO") Act, *18 U.S.C. §§ 1961* et seq., and federal civil rights statutes, *42 U.S.C. §§ 1981*, 1983, 1985, and 1986. This Court has jurisdiction over the action pursuant to *28 U.S.C. § 1331*. Now before the Court is the motion of Dryfoos Insurance [*4] Agency, Inc. ("Dryfoos") for a more definite statement pursuant to *Federal Rule of Civil Procedure 12(e)* (Doc. No. 13), the motion of Pinnacle Roofing & Sheet Metal, Inc. ("Pinnacle") for summary judgment or in the alternative for dismissal (Doc. No. 23), and the motions for dis-

missal by the following defendants: Selective Insurance, Selective Way Insurance, and Selective Insurance Group (the "Selective Defendants") (Doc. Nos. 14, 91); Byerly Insurance Agents and Brokers, Inc., ("Byerly") and Central Pennsylvania Indemnity ("Central") (Doc. Nos. 16, 17); PNC Financial Group, Inc. ("PNC") (Doc. No. 22); First Federal Bank and Northeast PA Financial ("First Federal") (Doc. No. 24); Mid–States Surety Corp. ("Mid–States") (Doc. Nos. 27, 28); the Borough of Jim Thorpe (Doc. No. 49); the Commonwealth of Pennsylvania, the Department of General Services, Michael Peapos, David McCarty, Merle H. Ryan, and Steven Busterna (Doc. Nos. 50, 94); Laputka Bayless Ecker & Cohn, PC ("Laputka") (Doc. Nos. 58, 73, 78); Washington International Surety Corp. ("Washington") (Doc. No. 74); Parente Rudolph Orlando Carey & Associates ("Parente") (Doc. Nos. 79, 80); the United States, the Department of the Army, [*5] the Tobyhanna Army Depot, Fred Beynon and Alice Fitzgerald (Doc. No. 98); and the responses thereto (Doc. Nos. 219–235) as well as plaintiffs' request for leave to amend as incorporated in their responses. n2 For the reasons set forth below, the request for leave to amend the amended complaint will be denied, the motion for a more definite statement will be denied, the motions for dismissal of the defendants will be granted, and the claims against Manufacturers & Traders Trust Bank Co. ("M&T") and Dryfoos and the amended complaint will be dismissed in their entirety.

> n1 See Orders of August 16, 2001 (Doc. No. 84), and April 9, 2002 (Doc. No. 207).

> n2 All of the described motions and the plaintiffs' motion to amend are directed toward the amended complaint.

### I. Background n3

> n3 All facts are taken as true from the amended complaint, as required by law.

### [*6]

Plaintiff Dianese, Inc. is a contracting corporation that entered into several public works contracts with the Department of General Services ("DGS") of the Commonwealth of Pennsylvania (the "Commonwealth") between 1998 and 2000. Through a number of unresolved disputes that arose over the contracted projects in the Hamburg Center ("Hamburg project") and Eckley Miner's Village ("Eckley project"), plaintiffs have not yet received disputed payments for their com-

pleted work. Through alleged misrepresentations by the Commonwealth and plaintiffs' own lawyers' law firm, plaintiffs were persuaded to settle their claims pursued in the Commonwealth grievance process, but have yet to receive the promised settlement funds. Due to the resulting financial difficulties, the plaintiff corporation and its personal guarantors, plaintiffs Gaetano and Rosemarie Dianese, have encountered troubles in satisfying their loans and in paying their creditors. Plaintiffs subsequently had further problems in gaining additional financing, insurance, or performance bonds to secure their operations. In addition, contract disputes similar to those encountered in the Commonwealth projects have arisen in the plaintiffs' **[*7]** public works contracts with defendants the Borough of Jim Thorpe and the Tobyhanna Army Depot. Plaintiffs allege that the defendants have participated in a conspiracy to bankrupt plaintiffs by withholding contractually owed funds and by creating financial difficulties to prevent plaintiffs from further pursuing the disputed funds. Plaintiffs assert claims under the RICO and federal civil rights statutes against the state and federal government, several officials therein, financial and insurance organizations, creditors, and plaintiff's former law and accounting firms.

Plaintiffs originally filed suit in January 2001 on behalf of Dianese, Inc., its sole shareholder Gaetano Dianese, and his wife Rosemarie Dianese, asserting claims under section 1983 against the Commonwealth and the DGS. See *Dianese, Inc. v. Commonwealth of Pennsylvania, C.A. No. 01–488, 2001 U.S. Dist. LEXIS 11491* (E.D. Pa. April 17, 2001). On March 13, 2001, this Court dismissed the previous action based on the defendants' Eleventh Amendment immunity. Id.

In June 2001, plaintiffs brought this action, adding more defendants and asserting claims under both constitutional tort law as well as the **[*8]** civil RICO statute. Plaintiffs filed an amended complaint on June 12, 2001. With the exception of defendant M&T who filed an answer to the amended complaint, and defendant Dryfoos who filed a motion for a more definite statement, all of the remaining named defendants filed motions for dismissal. Plaintiffs' response to these motions were considerably delayed as they consistently challenged this Court's orders directing them to retain and utilize counsel for their corporation as required under the federal rules. See *Rowland v. California Men's Colony, 506 U.S. 194, 202, 113 S. Ct. 716, 121 L. Ed. 2d 656 (1993)*. Although counsel for plaintiffs entered an appearance in September 2001, plaintiffs continued both to dispute the legal requirement for counsel to represent Dianese, Inc. and to file papers pro se rather than through their counsel of record. Similarly, plaintiffs persisted in continually and impermissibly removing actions from state court to join this action despite various remand orders instructing plaintiffs as to the proper grounds for removal. Finally, on March 1, 2001, having found that the accumulated meritless pro se filings by plaintiffs constituted **[*9]** an abuse of the litigation process, the Court was forced to enjoin plaintiffs from filing any further non–responsive papers absent leave of Court. On March 26, 2002, the Court held a hearing to consider the motion of plaintiffs' counsel to withdraw and plaintiffs' request to represent Dianese, Inc. pro se. On April 9, 2002, the Court granted the motion for counsel to withdraw and allowed plaintiffs Gaetano and Rosemarie Dianese to proceed pro se, but determined that Dianese, Inc. did not qualify for an exception to the long–standing rule requiring representation of corporations by attorneys. The Court thus ordered that if plaintiffs could not retain counsel to file responses to the pending motions on behalf of Dianese, Inc., the corporation would go unrepresented. Plaintiffs have failed to do so; consequently, the plaintiff corporation has not responded to the pending motions. The motions to dismiss the claims asserted by the plaintiff corporation thus stand unopposed. Any further reference to plaintiffs herein shall be construed as referring solely to plaintiffs Gaetano and Rosemarie Dianese.

## II. Legal Standard

*Rule 12(b) of the Federal Rules of Civil Procedure* **[*10]** provides that "the following defenses may at the option of the pleader be made by motion: ... (6) failure to state a claim upon which relief can be granted." In deciding a motion to dismiss under Rule 12(b)(6), a court must take all well pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. See *Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S. Ct. 1843, 23 L. Ed. 2d 404 (1969)*. Because the Federal Rules of Civil Procedure require only notice pleading, the complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)*. A motion to dismiss should be granted only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984)*. In considering a motion to dismiss, the proper inquiry is not whether a plaintiff will ultimately prevail, but rather whether a plaintiff is permitted to offer evidence to support its claim. See *Children's Seashore House v. Waldman, 197 F.3d 654, 658 (3d Cir. 1999)*, cert. denied, *530 U.S. 1275, 120 S. Ct. 2742, 147 L. Ed. 2d 1006 (2000)* (quoting *Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)*. The moving party bears the burden of showing that the non–moving party has failed to state a claim for which relief can be granted. See *Gould Elec. Inc. v. United States, 220 F.3d 169, 178 (3d Cir. 2000)*. While all facts in the complaint must be accepted

as true, this Court "need not accept as true unsupported conclusions and unwarranted inferences." *Doug Grant, Inc. v. Greate Bay Casino Corp., 232 F.3d 173, 184 (3d Cir. 2000),* cert. denied, *532 U.S. 1038, 149 L. Ed. 2d 1003, 121 S. Ct. 2000 (2001)* (citations omitted).

This Court is mindful of the fact that pro se complaints are to be construed liberally to afford litigants all reasonable latitude. See *Haines v. Kerner, 404 U.S. 519, 520–21, 92 S. Ct. 594, 596, 30 L. Ed. 2d 652 (1972).* Nevertheless, this leniency does not excuse a pro se plaintiff from conforming to the rules of civil procedure or from pleading the essential elements of his claim. **[*12]** See *Floyd v. Brown & Williamson Tobacco Corp., 159 F. Supp. 2d 823, 832 (E.D. Pa. 2001); Smith v. SSA, 54 F. Supp. 2d 451, 454 (E.D. Pa. 1999).*

## III. Analysis

### A. Motion for Leave to Amend

In addition to their responses and as incorporated therein, plaintiffs Gaetano and Rosemarie Dianese filed a document entitled "New Amended Complaint" (Doc. No. 236, Appendix A) ("New Am. Compl."). The Court construes the submission of the New Amended Complaint as a request for leave to file a second amended complaint. After amending a complaint once or after an answer has been filed, the plaintiff may amend only with leave of court or the written consent of the opposing party, but "leave shall be freely given when justice so requires." *Fed. R. Civ. P. 15(a).* "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997)* (citations omitted). "Futility" means that the complaint, as amended, would fail to state a claim upon which relief could be granted. Id. (citing *Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996)).* **[*13]** In assessing "futility," the district court applies the same standard of legal sufficiency as applies under Rule 12(b)(6). Id.

Several defendants have argued that granting leave to file the new amended complaint would be futile as it still fails to state a claim for relief. The 116-paged proposed new amended complaint provides 404 paragraphs outlining a detailed, sometimes confusingly circuitous, description of the alleged conspiracy. The proffered new amended complaint provides greater factual specificity to support plaintiffs' claims. Nevertheless, even reading it liberally in favor of the plaintiffs, for the reasons set forth below, I conclude that the new amended complaint would still fail to state a claim upon which relief can be granted. Because I find that further amendment of the amended complaint would be futile, the request of plaintiffs for

leave to amend will be denied.

### B. Motions to Dismiss

#### 1. Jurisdiction

##### a. The Commonwealth Defendants

Plaintiffs have brought suit against the Commonwealth and the DGS, an agency of the Commonwealth (collectively, "the Commonwealth Defendants"). Additionally, they have sued Michael Peapos, Regional Director **[*14]** of DGS; David McCarty, Director of the Bureau of Construction of the Commonwealth; Merle H. Ryan, Deputy Secretary for Public Works of the Commonwealth; and Steven Busterna, an attorney in the Office of the Chief Counsel for the Commonwealth (collectively, the "State Officers"). The State Officers have all been sued in their official and individual capacity.

The Commonwealth Defendants have moved for dismissal based on the Eleventh Amendment. The Eleventh Amendment bars federal courts from hearing actions by private parties against a state and its agencies. n4 See *Kimel v. Florida Board of Regents, 528 U.S. 62, 120 S. Ct. 631, 643–44, 145 L. Ed. 2d 522 (2000); Seminole Tribe of Florida v. Florida, 517 U.S. 44, 116 S. Ct. 1114, 1122, 134 L. Ed. 2d 252 (1996).* This jurisdictional bar is both a testament to and protection of the sovereignty of each state as balanced against the power of the federal government. As part of the executive branch of the Commonwealth, the DGS is also protected by Eleventh Amendment immunity. See *71 Pa.C.S. § 61; Lavia v. Pennsylvania Dep't of Corrections, 224 F.3d 190, 195 (3d Cir. 2000).* Eleventh Amendment **[*15]** immunity is subject to two exceptions: congressional abrogation and state waiver. See *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 670, 119 S. Ct. 2219, 144 L. Ed. 2d 605 (1999).* Accordingly, unless the Commonwealth has consented to suit or Congress has expressly abrogated Eleventh Amendment immunity in the statutes under which plaintiffs have brought suit, this action is barred as against the Commonwealth and the DGS.

n4 The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Despite this wording, the Amendment has been long been held to immunize states in actions by any private citizen, including their own. See *Alden v. Maine, 527 U.S.*

*706, 729, 119 S. Ct. 2240, 144 L. Ed. 2d 636 (1999).*

The Pennsylvania legislature has made [*16] clear its intent to retain sovereign immunity from suit. See *1 Pa. Cons. Stat. Ann. § 2310; 42 Pa. Cons. Stat. Ann. § 8521.* This immunity has been waived in only a few specific exceptions, none of which apply in this instance. See *42 Pa. Cons. Stat. Ann. § 8522(b).* n5

> n5 The Commonwealth has waived sovereign immunity in negligence actions involving: (1) vehicle liability; (2) medical professional liability; (3) care, custody and control of personal property; (4) Commonwealth real estate; (5) potholes and other dangerous conditions; (6) care, custody and control of animals; (7) liquor store sales; (8) National Guard activity; and (9) toxoids and vaccines. *42 Pa.C.S. § 8522(b).*

Plaintiffs argue that this action falls within the exception involving personal property in the care, custody and control of the Commonwealth. See *42 Pa.C.S. § 8522(b)(3).* Nevertheless, for this exception to apply, the personal property must be the cause of the injury. See *Iseley v. Horn, Civ. No. 95-5389, 1996 U.S. Dist. LEXIS 13471* (E.D. Pa. September 3, 1996)(immunity not waived when improper confiscation, not property itself, caused injury); *Sugalski v. Commonwealth, 131 Pa. Commw. 173, 569 A.2d 1017, 1019 (1990)* (immunity not waived when improper handling of property caused injury). In contrast, plaintiffs have alleged that injury was caused by the improper retention of plaintiffs' property, rather than by the property itself. Accordingly, Pennsylvania has not waived its immunity in this action.

[*17]

Nor do the statutes under which plaintiffs have sued provide for suit against the Commonwealth. To abrogate the Eleventh Amendment, Congress must make its intention to do so "unmistakably clear in the language of the statute." *Kimel, 120 S. Ct. at 640.* Congress has not done so in RICO or in any of the federal civil rights statutes under which plaintiffs have brought suit. See *Will v. Michigan Dept. of State Police, 491 U.S. 58, 66, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989)* ("Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties."); *Boykin v. Bloomsburg Univ. of Pa., 893 F. Supp. 378, 394 (M.D. Pa. 1995)* (no abrogation of sovereign immunity intended in *42 U.S.C.*

*§§ 1981,* 1983, 1985 and 1986), aff'd, *91 F.3d 122 (3d Cir. 1996); Bair v. Krug, 853 F.2d 672, 674-75 (9th Cir. 1988)*(no abrogation of sovereign immunity intended in civil RICO statute); *Gaines v. Texas Tech University, 965 F. Supp. 886 (N.D. Tx. 1997)* [*18] (citing *Bair, 853 F.2d at 674-675); Molina v. New York, 956 F. Supp. 257, 260 (E.D.N.Y. 1995)* (dicta); *McMaster v. Minnesota, 819 F. Supp. 1429, 1434 (D. Minn. 1993),* aff'd *30 F.3d 976 (8th Cir. 1994)).* n6 Because Pennsylvania has not waived its sovereign immunity and Congress expressed no intention of disturbing the states' sovereign immunity in enacting the RICO and federal civil rights statutes, this suit is barred by the Eleventh Amendment as against the Commonwealth and the DGS.

> n6 Plaintiffs' reliance on *United States v. Burns, 683 F.2d 1056 (7th Cir. 1982),* involving the federal prosecution of an officer of a state agency for criminal RICO violations, is misplaced. A criminal prosecution by the United States against an individual state officer does not trigger the Eleventh Amendment, which protects states from suit by private citizens.

Plaintiffs have also brought suit against a number of state officers of the Commonwealth [*19] and the DGS in their official capacity. A suit against a state officer in his official capacity for monetary damages is the same as a suit against the state itself; thus, it too is barred by the Eleventh Amendment. See *Will v. Michigan Dep't of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989); Christy v. Pennsylvania Turnpike Comm'n, 54 F.3d 1140, 1143 n. 3 (3d Cir. 1995).* n7 Nevertheless, in their new amended complaint, plaintiffs also name the State Officers in their individual capacity. The Eleventh Amendment does not bar actions for monetary damages against state officers in their individual capacity. See *Hafer v. Melo, 502 U.S. 21, 27-31, 116 L. Ed. 2d 301, 112 S. Ct. 358 (1991).* Accordingly, plaintiffs' claims against the State Officers in their individual capacity are not jurisdictionally barred, but will be analyzed on their merits in the discussion below on the claims asserted.

> n7 The Court notes that there is an exception under *Ex Parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908),* that allows suit against individual state officers in their official capacity for injunctive relief. Nonetheless, because I conclude that the purported request for injunctive relief would in effect require payment of funds from the state treasury for past violations of federal law in violation of the Eleventh Amendment, see *Edelman v. Jordan, 415*

2002 U.S. Dist. LEXIS 10917, *19

U.S. 651, 668-69, 39 L. Ed. 2d 662, 94 S. Ct. 1347 (1974), and because the claims asserted by plaintiffs against the State Officers are untenable on their merits as discussed below, the Young exception will not save plaintiffs' complaint from dismissal.

[*20]

b. The Federal Defendants

Plaintiffs have brought suit against the United States, the Department of the Army, and the Tobyhanna Army Depot ("Tobyhanna") (collectively, the "Federal Defendants"). Additionally, they have sued Fred Beynon, Contract Administrator for Tobyhanna, and Alice Fitzgerald, Contracting Officer for Tobyhanna (collectively, the "Federal Officers"). The Federal Officers have been sued in their official and, as named in the new amended complaint, in their individual capacity.

The Federal Defendants have moved to dismiss the claims against them for lack of subject matter jurisdiction pursuant to *Federal Rule of Civil Procedure 12(b)(1)* and for failure to state a claim pursuant to Rule 12(b)(6). The United States and its agencies are shielded by sovereign immunity from suit, see *United States v. Mitchell, 463 U.S. 206, 211, 103 S. Ct. 2961, 77 L. Ed. 2d 580 (1983)*, but the federal government has provided for a limited waiver of its immunity under certain circumstances pursuant to the Federal Tort Claims Act ("FTCA") and the Tucker Act. *28 U.S.C. § 1346*.

Under the FTCA, the United States has consented to suit in [*21] federal district courts for certain torts committed by its employees. See *28 U.S.C. § 1346(b)* n8; *Fed. Deposit Ins. Corp. v. Meyer, 510 U.S. 471, 476-77, 114 S. Ct. 996, 127 L. Ed. 2d 308 (1994)*. The FTCA does not waive immunity for all torts, however. To be actionable under the FTCA, the United States must be liable to the claimant, "in accordance with the law of the place where the act or omission occurred." *28 U.S.C. 1346*(b). Courts have construed the phrase "the law of the place" to refer to the law of the state; thus, for liability to arise under the FTCA, the source of substantive liability must be state and not federal law. See *Meyer, 510 U.S. at 477-78; Chen v. United States, 854 F.2d 622, 626 (2d Cir. 1988)*.

> By definition, federal law, not state law, provides the source of liability for a claim alleging the deprivation of a federal constitutional right . . . . [The] United States simply has not rendered itself liable under § 1346(b) for constitutional tort claims.

*Meyer, 510 U.S. at 477-78*. Plaintiffs' constitutional tort and civil RICO [*22] claims are based on federal law. I therefore conclude that they are not cognizable under the FTCA.

> n8 Specifically, Section 1346(b) states, in relevant part:

>> Subject to the provisions of chapter 171 of this title, the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death cause by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

Under the Tucker Act, however, this Court has concurrent jurisdiction with the U.S. Court of Federal Claims over claims against the United States not exceeding $10,000, brought pursuant to the Constitution, federal statute or federal regulation. [*23] See *28 U.S.C. § 1346(a)(2)*; n9 *Mitchell, 463 U.S. at 211 n. 10*. Original jurisdiction over such claims seeking more than $10,000 vests exclusively in the U.S. Court of Federal Claims. See *Chabal v. Reagan, 822 F.2d 349, 353-54 (3d Cir. 1987); 28 U.S.C. § 1491* (the "Big Tucker Act"). n10 Plaintiffs seek over $10,000 for their claims under the RICO and federal civil rights statutes. Thus, under the Big Tucker Act, jurisdiction over plaintiffs' claims against the Federal Defendants is exclusively within the U.S. Court of Federal Claims, and is therefore outside of this Court's jurisdiction.

> n9 Specifically, Section 1346(a)(2) states, in relevant part:

>> The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:

>> . . . . (2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either

upon the Constitution, or any Act or Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort . . . .

[*24]

n10 The Claims Court is given "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).

I conclude that the federal government has not waived its immunity in this forum against the claims asserted by plaintiffs. I therefore conclude that plaintiffs' claims against defendants the United States, U.S. Army and Tobyhanna, must be dismissed for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

Where suit is brought against officers in their official capacity, the real party in interest is the governmental entity; thus the immunities available to the officer are those of the governmental entity. See Hafer v. Melo, 502 U.S. 21, 25, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991). Accordingly, the immunities available to the federal government are available to [*25] the Federal Officers in their official capacity. I therefore conclude that plaintiffs' claims against Amy Fitzgerald and Fred Beynon in their official capacity must also be dismissed for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Nevertheless, as with the State Officers, plaintiffs' claims against the Federal Officers in their individual capacity are not jurisdictionally barred, and will be analyzed on their merits in the following discussion on the claims asserted.

## 2. Claims Asserted

### a. Civil RICO

The RICO statute authorizes civil suits by "any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). Section 1962 contains four separate subsections, each of which address a different problem. See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1411 (3d Cir. 1991), cert. denied, 501 U.S. 1222, 115 L. Ed. 2d 1007, 111 S. Ct. 2839 (1991).

As explained by the Third Circuit Court of Appeals:

Section 1962(a) prohibits "any person who has received any income derived . . . from a pattern of [*26] racketeering activity" from using that money to acquire, establish or operate any enterprise that affects interstate commerce. Section 1962(b) prohibits any person from acquiring or maintaining an interest in, or controlling any such enterprise "through a pattern of racketeering activity." Section 1962(c) prohibits any person employed by or associated with an enterprise affecting interstate commerce from "conducting or participating . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity." Finally, section 1962(d) prohibits any person from "conspiring to violate any of the provisions of subsections (a), (b), or (c)."

Id. (alterations in original). In the new amended complaint, plaintiffs seek relief under each provision of section 1962; consequently, each will be considered in turn.

### i. Section 1962(a)

Plaintiffs assert section 1962(a) claims against the following defendants: the State and Federal Officers; PNC; First Federal; Dryfoos; Byerly; Central; Mid-States; Washington; Parente; Laputka; Pinnacle; and M&T. (New Am. Compl. at Count XII.) Section 1962(a) provides in relevant part:

It shall be unlawful for any person [*27] who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise . . . .

18 U.S.C. § 1962(a). Under Section 1962(a), a plaintiff must allege that he suffered an injury specifically from the use or investment of income in the named enterprise. See id.; Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1188 (3d Cir. 1993); Moore v. Reliance Standard Life Ins. Co., C.A. No. 98–4610, 1999 U.S. Dist. LEXIS 6699, at *3 (E.D. Pa. May 10, 1999); Lim v. New York Life Ins. Co., C.A. No. 97–1972, 1998 U.S. Dist. LEXIS 318, at *3 (E.D. Pa. Jan. 13, 1998). "This provision was primarily directed at halting the investment of racketeering proceeds

into legitimate business, including the practice of money laundering." *Lightning Lube, 4 F.3d at 1188.* The injury resulting from the use or investment of the racketeering income must be separate from any injury resulting from the [*28] racketeering acts themselves. See id. An allegation that the "use and investment of racketeering income keeps the defendant alive so that it may continue to injure plaintiff [] is insufficient to meet the injury requirement of section 1962(a)." Id.

Plaintiffs here generally allege that all the named defendants diverted the proceeds of the racketeering activity to support a "select group of persons . . . in the [public works] arena while denying that support to the plaintiffs." (New Am. Compl. at Count XII.) Plaintiffs proceed to allege more specifically that the State and Federal Officers used "the public funds at their disposal to invest back in government owned properties, through government contracts which generate income for all participants . . ., furthering the [enterprise's] activities, increasing their control on the market and subsequently enabling the participants to continue to invest that income for the continuation of the cycle." (Id.) Plaintiffs further allege that defendants PNC, First Federal, Dryfoos, Byerly, Central, Mid-States, Washington and Parente committed the section 1962(a) violation by investing their resources to maintain a monopoly over [*29] the public works arena and to further extend their control over the market. (Id.) Finally, plaintiffs allege that Laputka was a co-conspirator as a legal/investment advisor to the enterprise.

Plaintiffs have cited no authority and have made no logical showing that public funds available for public works projects constitute racketeering proceeds. I conclude that they are not. Additionally, the allegations reflect no investment by any of the defendants to acquire an interest in or establish or operate an enterprise, as required under section 1962(a). Finally, the alleged "unfair advantage" enjoyed by the other contractors does not establish the requisite link between any alleged use or investment and the plaintiffs' asserted injury of failing to receive the contractually owed funds or the resulting financial problems with their creditors, insurers, bonds companies and banks. Plaintiffs thus fail to allege an injury resulting from the use or investment of racketeering income as opposed to injury from the alleged racketeering acts themselves. I therefore conclude that even a liberal reading of the allegations set forth in either the amended or new amended complaint fails to show that [*30] plaintiffs have stated a claim for relief under section 1962(a).

### ii. Section 1962(b)

Plaintiffs assert section 1962(b) violations by all of the defendants. Section 1962(b) provides, in relevant part,

"It shall be unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise . . . . " *18 U.S.C. § 1962*(b). Thus, section 1962(b) requires a plaintiff to allege that he suffered an injury from the defendant's acquisition or control of an interest in a RICO enterprise. See *Lightning Lube, 4 F.3d at 1190; Moore, 1999 U.S. Dist. LEXIS 6699,* at *3. For example, such an injury occurs when "the owner of an enterprise infiltrated by the defendant as a result of racketeering activities is injured by the defendant's acquisition or control of his enterprise." *Lightning Lube, 4 F.3d at 1190* (citation omitted). The injury must be incurred from the acquisition or control of an interest in the RICO enterprise rather than from the pattern of racketeering. *Id. at 1191.* The plaintiff must also show [*31] that the interest or control of the RICO enterprise by the person resulted from the racketeering. See *id. at 1190.* It is insufficient to merely demonstrate that a person engaged in racketeering has an otherwise legitimate interest in an enterprise. See id. Rather, the plaintiff must firmly show a "nexus between the interest and the alleged racketeering activities." Id.

The amended and new amended complaints herein fail to make such allegations. In support of their assertion of a violation of section 1962(b), plaintiffs make the following allegations: (1) the State Officers, Federal Officers and the Borough of Jim Thorpe "used their official positions to contrive 'contract disputes,' abuse the contract and grievance procedures, harass the plaintiffs and otherwise assure that the plaintiffs suffered grave financial difficulties;" (2) PNC, First Federal and M&T manipulated the financing of public works projects and structured loans to plaintiffs in a way that would enable the RICO enterprise to eliminate them; (3) Parente manipulated the financial statements of plaintiffs to compel them to seek additional financing and thereby "leave them vulnerable" to the RICO [*32] enterprise; (4) Pinnacle maintained an interest in the enterprise by benefitting from the monopoly that the enterprise created; (5) Laputka used its position as legal counsel to plaintiffs in the grievance process to assist the abuse of the system by the Commonwealth Defendants; and (6) Dryfoos, Byerly, Central, the Selective Defendants, Mid-States and Washington used their positions as the insurance and bonding agents to plaintiffs "to either grant or deny bonding lines, bond claim coverage and insurance and insurance claim coverage as well as manipulated [sic] premiums" to leave plaintiffs vulnerable to the RICO enterprise. (New Am. Compl. at Count XIII.)

The allegations simply fail to allege the acquisition or control by any of the defendants of an interest in a RICO enterprise. Nor have plaintiffs pleaded facts from which the Court can reasonably infer such allegation. Moreover,

any injury incurred would have resulted from the alleged acts of racketeering, and not from the acquisition or control of an interest in a RICO enterprise. Accordingly, plaintiffs fail to state a claim under section 1962(b) against the defendants.

### iii. Section 1962(c)

Plaintiffs assert claims [*33] under section 1962(c) against the State and Federal Officers, M&T, PNC, First Federal, Parente, Laputka, Dryfoos, Byerly, Central, the Selective Defendants, and Mid-States. Section 1962(c) prohibits persons who are employed by or associated with an enterprise from conducting the enterprise's affairs through a pattern of racketeering. Plaintiffs allege that the named defendants conducted the enterprise's affairs through a pattern of racketeering as follows: (1) Michael Peapos committed at least two predicate acts of extortion and fraud in connection with the Hamburg and Eckley projects; (2) David McMarty committed at least two predicate acts of extortion and mail fraud in connection with the abuse of contract procedures in the Hamburg and Eckley projects; (3) Merle Ryan committed at least two predicate acts of extortion and fraud in connection with the withholding of liquidated damages on the Eckley project and of the settlement funds for the Hamburg project dispute; (4) Stephen Busterna committed at least two predicate acts of extortion and fraud in connection with the settlement agreement for the Hamburg project dispute; (5) M&T, PNC and First Federal each committed at least two predicate [*34] acts of extortion and fraud in connection with the preparation, execution, handling and collection process for plaintiff's loans; (6) Parente committed at least two predicate acts of extortion and fraud in connection with preparation, presentation and mailing of fraudulent financial statements and tax returns in connection with the loans from M&T; (7) Laputka committed at least two predicate acts of extortion and fraud in connection with its representation of plaintiffs in the Commonwealth grievance process and in the presentation of the fraudulent loan documents by M&T and First Federal; (8) Dryfoos committed at least two predicate acts of fraud in connection with the mishandling of insurance claims, over-billing and fraudulent insurance audits; (9) Byerly and Central committed at least two predicate acts of fraud in connection with the bonding line of plaintiffs for the Hamburg project and two other public works projects that were approved and then withdrawn; (10) the Selective Defendants committed at least two predicate acts of fraud in connection with over-billing and fraudulent insurance audits; (11) Mid-States committed at least two predicate acts of extortion and fraud in connection [*35] with invalid bond claims from the Eckley project and the project for the Borough of Jim

Thorpe; (12) Fred Beynon and Alice Fitzgerald committed at least two predicate acts of extortion and fraud in connection with the project at Tobyhanna by withholding funds due and contriving contract disputes by change orders and delays. (New Am. Compl. at Count XI.)

A RICO enterprise is an entity made up of a group of persons associated together for the common purpose of engaging in a course of conduct. See *United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981). To establish the existence of an enterprise, the plaintiffs must demonstrate: (1) that the enterprise is an ongoing organization with some sort of framework or superstructure for making or carrying out decisions; (2) that the members of the enterprise function as a continuing unit with established duties; and (3) that the enterprise must be separate and apart from the pattern of activity in which it engages. See *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 789–90. Normally, such factors are to be proven at trial, and a bare allegation that the defendants constituted an enterprise is sufficient [*36] for the claim to survive a motion to dismiss. *Id.* 742 F.2d at 790. Plaintiffs here allege that defendants are members of an enterprise that maintains "a monopoly of the area through a closed system of financing, and control of industry, public office and even the legal system, which is used to thwart any development that would not benefit it." (New Am. Compl. at PP 1, 3.) Normally, this bare allegation should suffice for the claim to survive a motion to dismiss, no matter how seemingly implausible.

Nevertheless, it is well settled in RICO law that the alleged racketeering activity complained of by a plaintiff must be separate and distinct from the enterprise itself. See *Turkette*, 452 U.S. at 583. "[A] conspiracy to perform the underlying criminal offense, standing alone, is not sufficient to allege the existence of an enterprise." *Seville*, 742 F.2d at 790 n.5. "It is an essential element of the RICO cause of action that the 'enterprise' be apart from the underlying pattern of racketeering activity." Id. "An enterprise is not merely a conspiracy and it should not be confused with an agreement to commit the alleged racketeering activity. [*37] " *Gates v. Ernst & Young, C.A. No. 93–2332, 1994 U.S. Dist. LEXIS 11456*, at *4 (E.D. Pa. August 15, 1994) (quoting *Hartz v. Friedman, 919 F.2d 469, 471 (7th Cir. 1990))*. Within the new amended complaint, plaintiffs proceed to identify the enterprise as "made up of a group of individuals, associated in fact and not a legal entity, which controls various legal entities for the purpose of carrying out the predicate acts." (New Am. Compl. at P 387.) (emphasis added). The alleged racketeering activities involved the following: withholding fraudulently disputed payments from plaintiffs for public works contracts; forcing plaintiffs to obtain fi-

nancing to complete the projects; fraudulently delaying resolution of the grievance process; and forcing plaintiffs into bankruptcy by demanding payments for the loans. (Id. at PP 329–338.) By their own allegations, plaintiffs have pleaded that the named enterprise is indistinguishable from the alleged conspiracy between the defendants. Accordingly, plaintiffs have failed to allege an enterprise separate from the alleged underlying pattern of racketeering activity. I therefore conclude that plaintiffs fail to [*38] state a claim under section 1962(c).

### iv. Section 1962(d)

Plaintiffs assert section 1962(d) claims against the Borough of Jim Thorpe, Pinnacle, the Federal Officers, Byerly, Central, the Selective Defendants, Mid-States, PNC, M&T, First Federal, Parent, Laputka, and Dryfoos. To state a claim under section 1962(d), plaintiffs must plead that the defendant: (1) knew of the RICO violations of the enterprise, and (2) agreed to facilitate those activities. See *Smith v. Berg, 247 F.3d 532, 538 (3d Cir. 2001).* The injury must have been caused by the RICO violation, rather than by any act in furtherance of the conspiracy. See *Beck v. Prupis, 529 U.S. 494, 505–507, 146 L. Ed. 2d 561, 120 S. Ct. 1608 (2000).* "Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient." *Lightning Lube, 4 F.3d at 1191.* I therefore conclude that because plaintiffs have failed in both the amended and new amended complaint to state a claim under any of the other subsections of section 1962, plaintiffs cannot pursue a claim under [*39] Section 1962(d).

### b. Federal Civil Rights Statutes

### i. Section 1981

Section 1981 of the federal civil rights provisions prohibits racial discrimination in the making and enforcement of contracts and property transactions. n11 See *Brown v. Philip Morris, Inc., 250 F.3d 789, 796 (3d Cir. 2001).* To state a claim under section 1981, plaintiffs must allege facts to support the following elements: "(1) [that plaintiff] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; (3) discrimination concerning one or more of the activities enumerated in the statute[,] which includes the right to make and enforce contracts." *Brown, 250 F.3d at 797* (alternations in original) (citation omitted). Accepting as true the facts alleged in the amended and new amended complaints, plaintiffs have failed to state a cause of action pursuant to section 1981. Plaintiffs do not allege to belong to a racial minority. Although plaintiffs creatively claim to "belong to the 'race' of individuals who are ei-

ther unwilling or unwelcome to participate" in the alleged RICO enterprise, (New Am. Compl. at P 366), this attempt to qualify [*40] for protection under the statute clearly fails. Consequently, I conclude that plaintiffs' section 1981 claim will be dismissed.

> n11 Section 1981(a) provides:
>
>> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other.
>
> *42 U.S.C. § 1981(a)*

### ii. Section 1983

Section 1983 provides a remedy for the violation of a federal constitutional or statutory right by a person "acting under color of state law." *42 U.S.C. § 1983.* n12 To state a claim under section 1983, plaintiffs must plead that the allegedly unlawful conduct: (1) was committed by someone acting under color of state law, [*41] and (2) deprived plaintiffs of rights, privileges or immunities protected by the Constitution or federal law. See *Cohen v. City of Philadelphia, 736 F.2d 81, 83 (3d Cir. 1984),* cert. denied, *469 U.S. 1019, 83 L. Ed. 2d 360, 105 S. Ct. 434 (1984).* Nevertheless, "government officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Wilson v. Layne, 526 U.S. 603, 609, 143 L. Ed. 2d 818, 119 S. Ct. 1692 (1999)* (quoting *Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982)).* Where the defendant in a section 1983 action claims qualified immunity, the court must first determine whether the allegations are sufficient to establish the violation of a federal constitutional right, and if so, whether that right was clearly established at the time of the alleged violation. See id. If the plaintiffs' allegations cannot meet this two-fold threshold inquiry, defendants are entitled [*42] to qualified immunity and dismissal of the case. See *Doe v. Delie, 257 F.3d 309,*

*314-15 (3d Cir. 2001).*

n12 Section 1983 provides, in relevant part:

> Every person, who under color of any statute, ordinance, regulation, custom or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

*42 U.S.C. § 1983.*

Plaintiffs claim that the State Officers denied them both procedural and substantive due process in violation of the Fourteenth Amendment by withholding the contractual funds due to plaintiffs and wreaking financial devastation to prevent plaintiffs from pursuing the disputed balance. (New Am. Compl. at PP 367-69.) Because the State Officers assert a qualified [*43] immunity defense, the Court must first determine whether plaintiffs have alleged the violation of a federal constitutional right.

"Procedural" due process defends against arbitrary government action by ensuring that adequate procedures are used when a state action impacts a person's "life, liberty or property" as protected under the 14th Amendment. n13 The Third Circuit Court of Appeals has ruled that there is adequate procedural due process when the state provides "reasonable remedies to rectify a legal error by a local administrative body." *Bello v. Walker, 840 F.2d 1124, 1128 (3d Cir. 1988).* The Pennsylvania Board of Claims has exclusive jurisdiction over contract disputes between Commonwealth agencies and a contractor. See *62 Pa.C.S. § 1701,* et seq. Appeals from decisions by the Board of Claims may be made to the Pennsylvania Commonwealth Court. See *62 Pa.C.S. § 1726; 42 Pa.C.S. § 763(a)(1).* The availability of a "full judicial mechanism with which to challenge the administrative decision in question" provides adequate due process, regardless of whether the plaintiff utilized the appellate procedure. *DeBlasio v. Zoning Bd. of Adjustment, 53 F.3d 592, 597* [*44] (3d Cir.), cert. denied, *516 U.S. 937, 133 L. Ed. 2d 247, 116 S. Ct. 352 (1995)* (internal citation omitted). Thus, although plaintiffs may not have taken advantage of these measures, n14 because Pennsylvania provides a reasonable procedural method to correct any errors by the

DGS grievance procedure, I conclude that there was sufficient procedural due process and plaintiffs cannot state a claim for the violation of their procedural due process rights.

n13 Although it is unclear whether the property interest arising from plaintiffs' state contracts is protectible under procedural due process, see *Reich v. Beharry, 883 F.2d 239, 242-43 (3d Cir. 1989)* ("wholesale federalization of state public contract law" was not purpose of due process clause), the Court need not reach this issue because constitutionally adequate procedures were available. See *DeBlasio, 53 F.3d at 597 n.4* (courts may proceed directly to evaluation of process).

n14 Plaintiffs allege that they commenced procedures under the Commonwealth's grievance process, but that the State Officers fraudulently persuaded plaintiffs to settle and then failed to pay the settlement offer as promised. (New Am. Compl. at PP 86-101.) They appear to have sought no recourse with the Board of Claims.

[*45]

"Substantive" due process "limits what government may do regardless of the fairness of procedures that it employs, and covers government conduct in both legislative and executive capacities." *Boyanowski v. Capital Area Intermediate Unit, 215 U.S. 396, 399* (3d Cir.), cert. denied, *531 U.S. 1011, 148 L. Ed. 2d 485, 121 S. Ct. 566 (2000)* (citing *County of Sacramento v. Lewis, 523 U.S. 833, 845-46, 140 L. Ed. 2d 1043, 118 S. Ct. 1708 (1998)).* Under certain circumstances, substantive due process claims may be brought when procedural fairness is not an issue. *Id. 215 U.S. at 402.* Nevertheless, "a substantive due process claim grounded in an arbitrary exercise of governmental authority may be maintained only where the plaintiff has been deprived of a 'particular quality of property interest.'" *Id. 215 U.S. at 402-03* (quoting *Indep. Enters., Inc. v. Pittsburgh Water & Sewer Auth., 103 F.3d 1165, 1179 (3d Cir. 1997)).* Although the "precise contours of the 'particular quality of interest'" have not been clearly defined, id. (quoting *Indep. Enters., 103 F.3d at 1180),* courts look to see whether the property interest [*46] rises to the level of "'the fundamental interests that previously have been viewed as implicitly protected by the Constitution.'" Id. (quoting *Mauriello v. Univ. of Med. & Dentistry of N.J., 781 F.2d 46 50 (3d Cir. 1986)* (quoting *Regents of Univ. of Michigan v. Ewing, 474 U.S. 214, 229-30, 106 S. Ct. 507, 88 L. Ed. 2d 523 (1985)* (Powell, J. concurring))). The Third Circuit Court of Appeals has determined that not all property interests created by state contracts invoke substantive due process

concerns. See *Reich, 883 F.2d at 243–45* (citing cases).

With regard to the property interests asserted here, this Court finds persuasive the decision in *Vartan v. Nix, 980 F. Supp. 138, 142–43 (E.D. Pa. 1997)* (Bartle, J.). Vartan involved a terminated contract for the construction and lease to the Commonwealth of a new state court-house in Harrisburg. The plaintiff sued the former Chief Justice of the Supreme Court of Pennsylvania for due process violations under section 1983, alleging that the former Chief Justice had intervened to cause the termination of the state contract. Judge Bartle compared the cases wherein the **[*47]** Third Circuit Court of Appeals had determined that substantive due process did not protect the state–created interest at issue, see *Ransom v. Marrazzo, 848 F.2d 398, 411–12 (3d Cir. 1988)* (right under state law to water and sewer services); *Reich, 883 F.2d at 239–40* (right to payment for legal services rendered to state), with the cases wherein the state–created interests were deemed protected, see *DeBlasio, 53 F.3d at 594–95* (right to seek variance for land use from local zoning law); *Neiderhiser v. Borough of Berwick, 840 F.2d 213* (3d Cir.), cert. denied, *488 U.S. 822, 102 L. Ed. 2d 44, 109 S. Ct. 67 (1988)* (right to seek exemption for land use from local zoning law). Finding that the property rights asserted by the plaintiff did not involve land use as those asserted in DeBlasio and Neiderhiser, and were not worthier than the rights asserted in Ransom and Reich, the Court concluded that the property rights arising under a commercial construction contract with the state did not trigger substantive due process protection. I approve and adopt the reasoning of Vartan, and similarly **[*48]** conclude that the alleged failure of the State Officers to pay plaintiffs disputed funds pursuant to public works contracts does not rise to level of a substantive due process violation.

Because plaintiffs cannot state a claim for due process violation under section 1983, and because they have not otherwise alleged the violation of a federal constitutional right, the State Officers are entitled to qualified immunity. Accordingly, their motion to dismiss the section 1983 claim will be granted.

Plaintiffs also assert section 1983 claims against the remaining defendants, alleging that they took joint action with the State Officers with a shared conspiratorial objective. (New Am. Compl. at P 371.) Private parties who willfully participate in a conspiracy with state officials to deprive a person of a constitutional right, act "under color of state law" for purposes of section 1983. See *Dennis v. Sparks, 449 U.S. 24, 27–28, 66 L. Ed. 2d 185, 101 S. Ct. 183 (1980)*. Nevertheless, because plaintiffs have failed to allege the deprivation of a constitutional right for the reasons I have set forth above, I conclude that they have

not stated a section 1983 claim against any of **[*49]** the remaining defendants on the asserted conspiracy theory .

### iii. Section 1985

Plaintiffs assert section 1985 claims against all of the defendants. Section 1985 of the federal civil rights provisions prohibits conspiracies to deprive a U.S. citizen of his constitutional rights based on invidious class–based discrimination. See *42 U.S.C. § 1985*. n15

> To state a claim under Section 1985 for private conspiracy, a plaintiff must allege: (a) that a racial or other class–based invidious discriminatory animus lay behind the coconspirators' actions, (b) that the coconspirators intended to deprive the victim of a right guaranteed by the Constitution against private impairment, and (c) that that right was consciously targeted and not just incidentally affected.

*Brown, 250 F.3d at 804*. Section 1985(3) is invoked to remedy discrimination based upon the plaintiff's "immutable characteristics, such as race or gender." *Rourke v. United States, 744 F. Supp. 100, 104–05 (E.D. Pa. 1988)*. As in their section 1981 claim, plaintiffs do not allege to be members of a racial minority or any other class based upon their **[*50]** immutable characteristics. I therefore conclude that plaintiffs have failed to state a claim under section 1985.

> n15 Section 1985(3) provides, in relevant part:
>
> > If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; . . . [and] in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for recovery of the damages, occasioned by such injury or deprivation against any one or more of the

conspirators.

*42 U.S.C. § 1985*(3).

#### iv. Section 1986

Plaintiffs assert section 1986 **[*51]** claims against all of the defendants. Section 1986 constitutes an additional safeguard against the wrongs prohibited by section 1985. n16 *Clark v. Clabaugh, 20 F.3d 1290, 1295 (3d Cir. 1994).* It provides a cause of action for recovery against anyone who with knowledge of a section 1985 conspiracy and the power to prevent its violation, neglects or refuses to do so. To state a claim under section 1986, plaintiffs must show the existence of a section 1985 conspiracy. Id. As discussed above, plaintiffs have failed to state a cause of action under section 1985; consequently, their section 1986 claim is untenable. I conclude that plaintiffs' claim under section 1986 will therefore be dismissed.

> n16 Section 1986 provides, in relevant part:
>
> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented . . . .
>
> *42 U.S.C. § 1986.*

**[*52]**

#### c. State Law Claims

Although not expressly pleaded, in Counts II, III, IX and X of the new amended complaint, plaintiffs request relief in the form of quantum meruit and expectation damages as against the Commonwealth Defendants and the Federal Defendants for breaches of contract in the public works projects. For the reasons I have explained above regarding the issues of sovereign immunity and Eleventh Amendment immunity, the Court lacks jurisdiction to entertain claims for breach of contract against the Commonwealth and the federal government.

Accordingly, any implied assertions of claims for breach of contract will be dismissed for lack of jurisdiction.

Although plaintiffs do not assert state law claims against any of the other defendants, to the extent any may be implied, the Court exercises its discretion to decline supplemental jurisdiction over them under *28 U.S.C. § 1367*(c)(3).

#### C. Remaining Defendants and the Motion for a More Definite Statement

Neither Manufacturers & Traders Trust Co. d/b/a M&T Bank ("M&T") nor Dryfoos have joined the other defendants in moving for dismissal. Dryfoos, though, has implicitly sought dismissal **[*53]** in the alternative by expressing its dissatisfaction with the amended complaint by filing a motion for a more definite statement. While neither vague nor ambiguous, see *FED. R. CIV. P. 12(e)*, because the amended complaint will be dismissed as to Dryfoos for failure to state a claim, the motion of Dryfoos for a more definite statement will be denied as moot. The Third Circuit Court of Appeals has held that the "district court may on its own initiative enter an order dismissing the action provided that the complaint affords a sufficient basis for the court's action." *Bryson v. Brand Insulations, Inc., 621 F.2d 556, 559 (3d Cir. 1980)* (court may sua sponte dismiss complaint on the pleadings if no set of facts can be adduced to support claim for relief, all allegations are taken as true, and all inferences are drawn in favor of plaintiff); see also *McKnight v. School Dist., C.A. No. 00-573, 2000 U.S. Dist. LEXIS 13864* at **3-4 (E.D. Pa. Sept. 25, 2000); *Locke v. Medlab/General Chem., C.A. No. 99-2137, 2000 U.S. Dist. LEXIS 982* at *5 (E.D. Pa. Feb. 3, 2000); *Byrd v. Parris, C.A. No. 99-769, 1999 U.S. Dist. LEXIS 15957* **[*54]** at **14-15 (E.D. Pa. Oct. 15, 1999). The above analysis of the insufficiency of the legal claims asserted against the moving defendants applies with equal force to the civil RICO and federal civil rights claims asserted against M&T and Dryfoos. Although the amended complaint is adequate for this Court to analyze, I conclude that plaintiffs have failed to state a claim for relief under the civil RICO and federal civil rights statutes against defendants Dryfoos and M&T; thus the complaint will be dismissed in its entirety. The failure of this Court to take this unilateral action would only prolong reaching the inevitable result reached here today and would add expense and energy-draining efforts to the lives of plaintiffs and these two defendants. *Federal Rule of Civil Procedure 1* provides that the rules " . . . shall be administered to secure the just, speedy, and inexpensive determination of every action."

#### IV. Conclusion

The Court is sympathetic to plaintiffs' complaints of unfair treatment by the state public works department, their frustrations over their inability to secure a lawyer, and their valiant attempts to further what they believe are righteous and legally supportable [*55] claims. Nonetheless, the law requires this Court to conclude that it is barred by the Eleventh Amendment from entertaining jurisdiction over the state entities, that it lacks jurisdiction over the claims asserted against the federal government, and that plaintiffs have not stated claims for relief under the RICO and federal civil rights statutes against any of the remaining defendants.

For the reasons set forth above, all claims here asserted against the Commonwealth, the DGS, the State Officers, the Federal Defendants, the Federal Officers, Pinnacle, the Selective Defendants, Byerly, Central, PNC, First Federal, Mid-States, the Borough of Jim Thorpe, Laputka, Washington and Parente, as well as against Dryfoos and M&T, will be dismissed.

An appropriate Order follows.

**ORDER**

**AND NOW**, this 19th day of June, 2002, upon consideration of the motion of Dryfoos Insurance Agency, Inc. ("Dryfoos") for a more definite statement pursuant to *Federal Rule of Civil Procedure 12(e)* (Doc. No. 13), the motion of Pinnacle Roofing & Sheet Metal, Inc. for summary judgment or in the alternative for dismissal (Doc. No. 23), and the motions for dismissal by the following defendants: Selective [*56] Insurance, Selective Way Insurance, and Selective Insurance Group (Doc. Nos. 14, 91); Byerly Insurance Agents and Brokers, Inc., and Central Pennsylvania Indemnity (Doc. Nos. 16, 17); PNC Financial Group, Inc. (Doc. No. 22); First Federal Bank and Northeast PA Financial (Doc. No. 24); Mid-States Surety Corp. (Doc. Nos. 27, 28); the Borough of Jim Thorpe (Doc. No. 49); the Commonwealth of Pennsylvania, the Department of General Services, Michael Peapos, David McCarty,

Merle H. Ryan, and Steven Busterna (Doc. Nos. 50, 94); Laputka Bayless Ecker & Cohn, PC (Doc. Nos. 58, 73, 78); Washington International Surety Corp. (Doc. No. 74); Parente Rudolph Orlando Carey & Associates (Doc. Nos. 79, 80); the United States, the Department of the Army, the Tobyhanna Army Depot, Fred Beynon and Alice Fitzgerald (Doc. No. 98); and the responses thereto (Doc. Nos. 219-235) as well as plaintiffs' request for leave to amend as incorporated therein (Doc. No. 236, Appendix A), and for the reasons set forth in the foregoing memorandum, **IT IS HEREBY ORDERED** that (1) the request of plaintiffs to file their new amended complaint is **DENIED**, (2) the motion of Dryfoos for a more definite statement is [*57] **DENIED**, (3) all of the motions to dismiss are **GRANTED**, and (4) the Court sua sponte determines that the claims against Dryfoos and Manufacturers & Traders Trust Bank Co. and the amended complaint are **DISMISSED** in their entirety.

**JUDGMENT** is hereby **ENTERED** against plaintiffs Dianese, Inc., Gaetano Dianese and Rosemarie Dianese, and in favor of defendants Pinnacle Roofing & Sheet Metal, Inc., Selective Insurance, Selective Way Insurance, and Selective Insurance Group, Byerly Insurance Agents and Brokers, Inc., Central Pennsylvania Indemnity, PNC Financial Group, Inc., First Federal Bank, Northeast PA Financial, Mid-States Surety Corp., the Borough of Jim Thorpe, the Commonwealth of Pennsylvania, the Department of General Services, Michael Peapos, David McCarty, Merle H. Ryan, Steven Busterna, Laputka Bayless Ecker & Cohn, PC, Washington International Surety Corp., Parente Rudolph Orlando Carey & Associates, the United States, the Department of the Army, the Tobyhanna Army Depot, Fred Beynon, Dryfoos Insurance Agency, Inc., and Manufacturers & Traders Trust Bank Co. for failure to state a claim and for want of jurisdiction.

This is a final Order. **[*58]**

**LOWELL A. REED, JR., S.J.**

# EXHIBIT D

LEXSEE 2005 U.S. DIST. LEXIS 7789

**LLOYD FREED, Individually and On Behalf of All Others Similarly Situated v. UNIVERSAL HEALTH SERVICES, INC., et al.**

**CIVIL ACTION NO. 04-1233 (Consolidated)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2005 U.S. Dist. LEXIS 7789; Fed. Sec. L. Rep. (CCH) P93,248*

**May 3, 2005, Decided**

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For Plaintiff LLOYD FREED, Individually and On Behalf of All Others Similarly Situated: MICHAEL T. FANTINI, BERGER AND MONTAGUE, P.C., Philadelphia, PA, SHERRIE R. SAVETT, BERGER AND MONTAGUE, P.C., Philadelphia, PA, WILLIAM S. LERACH, LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP, San Diego, CA, DEBORAH R. GROSS, LAW OFFICES BERNARD M. GROSS, PC, Philadelphia, PA.

For Plaintiff LISELOTTE KLEIN, Individually and On Behalf of All Others Similarly Situated: RICHARD A. MANISKAS, SCHIFFRIN & BARROWAY, LLP, Bala Cynwyd, PA, WILLIAM S. LERACH, LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP, San Diego, CA, DEBORAH R. GROSS, LAW OFFICES BERNARD M. GROSS, PC, Philadelphia, PA.

For Defendant UNIVERSAL HEALTH SERVICES, INC., ALAN B. MILLER, STEVE G. FILTON: GLEN P. BANKS, FULBRIGHT JAWORSKI, LLP, NEW YORK, NY, JAMES NESPOLE, FULBRIGHT & JAWORSKI, LLP, NEW YORK, NY, NEIL G. EPSTEIN, ECKERT, SEAMANS, CHERIN & MELLOTT, LLC, Philadelphia, PA.

For Movant PAMELA PONTIUS, ANN KUEFFNER, RUBEN KUEFFNER, ROBERT BALZHISER: DARREN J. CHECK, SCHIFFRIN & BARROWAY, LLP, RADNOR, PA.

For Movant NATIONAL ASBESTOS WORKERS PENSION FUND: DEBORAH R. GROSS, LAW OFFICES BERNARD M. GROSS, PC, [*2] Philadelphia, PA., LAURA ANDRACCHIO, LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP, San Diego, CA.

**JUDGES:** John R. Padova, J.

**OPINIONBY:** John R. Padova

**OPINION:**

**MEMORANDUM**

**Padova, J.**

Presently before the Court in this putative class action is Defendants' Motion to Dismiss the Amended Consolidated Class Action Complaint. For the reasons that follow, said Motion is granted.

**I. BACKGROUND**

This action is brought on behalf of a class of public investors who purchased the securities of Universal Health Services, Inc. ("UHS") during the period from July 21, 2003 through February 27, 2004 (the "relevant period"). In Count One of the Amended Consolidated Class Action Complaint (the "Amended Complaint"), Lloyd Freed (hereafter "Lead Plaintiff") alleges violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), *15 U.S.C. §§ 78j(b), 78t(a)*, and Rule 10b-5 promulgated thereunder, see *17 C.F.R. § 240.10b-5*, against UHS; Alan B. Miller, Chief Executive Officer of UHS and Chairman of UHS's Board of [*3] Directors; and Steve G. Filton, Chief Financial Officer of UHS. In Count Two of the Amended Complaint, Lead Plaintiff alleges violations of *Section 20(a) of the Exchange Act* against Defendants Miller and Filton (the "individual Defendants"). The essence of Lead Plaintiff's federal securities claims is that Defendants artificially inflated the price of UHS stock by issuing public statements and filing earnings reports that omitted or misstated material facts concerning UHS's rising level of bad debts, and by using accounting manipulations to materially overstate UHS's financial results. (Am. Cons. Comp.

2005 U.S. Dist. LEXIS 7789, *3; Fed. Sec. L. Rep. (CCH) P93,248

PP 3, 5, 7.)

UHS is a Delaware corporation which owns and operates acute care hospitals, behavioral health centers, ambulatory surgery centers and radiation oncology centers throughout North America and France, and maintains its principal corporate offices in Pennsylvania. (Id. PP 13, 31, 37.) UHS hospitals and staff provide services which include general surgery, internal medicine, obstetrics, emergency room care, operating room care, radiology, oncology, diagnostic care, coronary care, pediatric services, pharmacy services, and physiotherapy and laboratory procedures. (Id. **[*4]** P 23.) UHS receives payments for the services it renders from private–sector insurers, the federal government under the Medicare program, state governments under their Medicaid programs, and directly from uninsured patients. (Id.)

In 2001 and 2002, the overall hospital market sector began to experience a change in the mix of patients, which led to an increasing level of uninsured patients. (Id. P 24.) At the same time, insured individuals became responsible for an increasing percentage of health care expenditures because the burden of health care expenses was shifting from employers, private–sector insurers, and state and federal governments to individuals, while health insurance premiums, co–pay charges and deductibles were steadily rising. (Id.) Many hospitals responded to these industry–wide trends by increasing their levels of bad debt reserves in 2003. (Id. P 26.) UHS, however, reported that it was not affected by the changes other hospitals were experiencing, and decreased its level of bad debt reserves from 11.9% of revenue to 8.5% of revenue. (Id.) The Amended Complaint alleges that Defendants acted recklessly in reducing UHS's levels of bad debt reserves, **[*5]** and that Defendants kept UHS's bad debt reserves artificially low by materially understating the amount of bad debt UHS was experiencing, thereby overstating UHS's financial results. (Id. PP 27, 30.)

A. False and Misleading Statements During the Class Period

According to the Amended Complaint, Defendants' fraudulent scheme began with a July 21, 2003 press release over the PR Newswire, in which UHS announced that its net earnings per share increased by 19% for the three–month and six–month periods ended June 30, 2003, over the comparable periods in 2002. (Id. P 31.) The press release further stated that UHS's operating margin "increased to 16.7% in the three–month period ended June 30, 2003 as compared to 16.0% in the same period of the prior year." (Id.) The next day, in response to a question regarding UHS's bad debt expenses during a conference call with investors, Defendant Filton stated that "we actually think that our self-pay utilization as a percentage of overall utilization is pretty much pancake flat between 2003 and 2002 and have not seen significant changes." (Id. P 32.) One month later, on August 13, 2003, UHS filed its quarterly Form 10–Q report for **[*6]** the three month period ended June 30, 2003. (Id. P 33.) In this report, UHS represented that operating income and operating margins were important measures of UHS's performance. (Id.) The report further stated that "overall operating margins . . . were 16.7% and 16.0% during the three month periods ended June 30, 2003 and 2002, respectively. Operating income increased 15% to $300 million for the six month period ended June 30, 2003 from $261 million in the comparable prior year period." (Id.)

On October 20, 2003, UHS issued another press release over the PR Newswire, which stated that "earnings per share . . . for the three–month period ended September 30, 2003 were $.72, an 11% increase from the earnings recorded in the third quarter of 2002." (Id. P 37.) The next day, during a conference call with investors, Defendant Filton represented that "we're not seeing as some of the other companies have mentioned, a real increase in uninsured or at least uninsured after insurance patients or a difficulty in collecting from those patients." (Id. P 38.) On November 10, 2003, UHS filed its quarterly Form 10–Q report, which stated that

> Operating income increased **[*7]** 11% to $138 million for the three month period ended September 30, 2003 from $125 million in the comparable prior year quarter. Overall operating margins were 15.4% and 15.3% during the three month periods ended September 30, 2003 and 2002, respectively. The slight increase in the overall operating margin during the three month period ended September 30, 2003, as compared to the comparable prior year period, resulted from a decrease in the provision for doubtful accounts to 6.9% of net revenues during the third quarter of 2003 as compared to 7.7% in the comparable prior year quarter, partially offset by an increase in salaries, wages and benefits to 40.4% of net revenues during the 2003 third quarter as compared to 39.8% in the comparable prior year quarter. Contributing to the increase in salaries, wages and benefits during the third quarter of 2003 as compared to the comparable prior year quarter was an increase of .4% of net revenues in employee benefit expenses.

(Id. P 40.) Thereafter, during the 22nd Annual J.P.

2005 U.S. Dist. LEXIS 7789, *7; Fed. Sec. L. Rep. (CCH) P93,248

Morgan Health care Conference held in mid–January 2004, Defendant Miller stated that UHS's bad debt ratio had not been increasing at the same rate as its **[*8]** peers because UHS had not experienced a material adverse change in self–pay revenues in its markets or in the collection rates. (Id. P 45.) Defendant Miller further stated that he expected UHS's bad debt ratios to remain stable in the near term. (Id.)

The Amended Complaint alleges that these statements proved to have been false because, on February 18, 2004, UHS issued a press release over the PR Newswire which stated that

> the Company's provision for doubtful accounts was 7.8% of net revenues during the fourth quarter of 2003 as compared to 6.9% during the prior year's fourth quarter. The increase resulted primarily from an increase in uninsured and self–pay patients which unfavorably impacts the collectibility of our patient accounts. We expect this trend to continue until there is a notable strengthening of the labor market.

(Id. P 47.) On March 1, 2004, UHS issued another press release over the PR Newswire in which it announced that

> earnings per diluted share for the three–month period ending March 31, 2004, could be as much as 25% lower than the $.84 per diluted share recorded in the same period in the prior year. On a same facility basis, **[*9]** the Company's acute care hospitals have continued, in the first two months of 2004, to experience a decline in inpatient admissions. Moreover, during this period, certain of the Company's acute care facilities have been impacted by a negative shift in payor mix, a decline in intensity and an increase in length of stay. In addition, the rising level of uninsured and self–pay patients continue to unfavorably impact our bad debt expense. The Company is vigorously addressing each of these areas.

(Id. P 49.) In response to this announcement, UHS's stock dropped 21% to $44.88 per share on volume of 6.7 million shares. (Id. P 54.)

B. "True Facts" and Fraudulent Accounting Practices

The Amended Complaint alleges that, as early as July 23, 2003, Defendants were aware that UHS's bad debt exposure was increasing due to higher levels of uninsured patients and Medicare patients who remained hospitalized at UHS facilities beyond the period reimbursable by Medicaid and Medicare. (Id. P 42(e)–(f).) In addition, the Amended Complaint avers that UHS's operating income was inflated as a result of Defendants failure to (1) make sufficient allowance for the bad debt it was incurring; **[*10]** (2) properly write off uncollectible receivables; (3) properly deduct the appropriate allowance for doubtful accounts from operating income; and (4) comply with generally accepted accounting principles ("GAAP"). ( P 42(a)–(d).)Id.

In support of these allegations, the Amended Complaint pleads the following "true facts." First, Defendants were aware that UHS's levels of bad debt were steadily increasing from July 21, 2003 through February 27, 2004. (Id. PP 18, 60.) Second, Defendants admitted that the increase in UHS's bad debt reserves for the fourth quarter of 2003 was a "catch up" or "true–up" for insufficient bad debt reserves during the fiscal year 2003. (Id. PP 47–56.) Third, the low levels of bad debt UHS had reported were attributable to fraudulent accounting practices, which concealed the true amounts of bad debt UHS was encountering. (Id. PP 5, 34, 42, 51, 61, 66.)

The Amended Complaint further charges Defendants with deliberately falsifying UHS's true levels of bad debt and income by violating GAAP and Security and Exchange Commission ("SEC") rules governing the calculation of uncollectible receivables in its financial statements for purposes of inflating **[*11]** UHS's earnings and boosting UHS's stock. (Id. P 66.) Specifically, the Amended Complaint avers that Defendants improperly delayed the write–off of uncollectible accounts, intentionally understated UHS's provision for doubtful accounts, decreased UHS's level of bad debt reserves, and failed to disclose UHS's policy of accounting for doubtful accounts. (Id. PP 68, 73, 76.) These practices allegedly allowed UHS to materially inflate reported earnings and mislead investors during the relevant period. (Id. P 73, 80.)

Defendants have moved to dismiss both counts of the Amended Complaint pursuant to *Federal Rule of Civil Procedure 12(b)(6)* and *9(b)*, as well as under *§ 78u–4(b) of the PSLRA*.

II. LEGAL STANDARD

When determining a Motion to Dismiss pursuant to *Rule 12(b)(6)*, the court may look only to the facts alleged in the complaint and its attachments. *Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).* The court must accept as true all well pleaded allegations in the complaint and view them in the light most favorable to the Plaintiff. **[*12]** *Angelastro*

2005 U.S. Dist. LEXIS 7789, *12; Fed. Sec. L. Rep. (CCH) P93,248

*v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985).* A *Rule 12(b)(6)* motion will be granted when a Plaintiff cannot prove any set of facts, consistent with the complaint, which would entitle him or her to relief. *Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir. 1988).* Documents "integral to or explicitly relied upon in the complaint" and related matters of public record may be considered on a motion to dismiss. *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).*

## III. DISCUSSION

### A. Count One: *Rule 10b-5*

Defendants seek the dismissal of Count One of the Amended Complaint, which asserts a securities fraud claim against UHS and the individual Defendants pursuant to *Section 10(b)* and *Rule 10b-5*. *Section 10(b)* prohibits the "use or employment, in connection with the purchase or sale of any security, . . . of any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." *15 U.S.C. § 78j(b)*. *Rule 10b-5* makes it illegal "to make any untrue statement of a material fact or to omit to **[*13]** state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." *17 C.F.R. § 240.10b-5(b)*. To state a *Rule 10b-5* claim, a plaintiff must allege that the defendant (1) made a misstatement or an omission of a material fact; (2) with scienter; (3) in connection with the purchase or the sale of a security; (4) upon which the plaintiff reasonably relied; and (5) that plaintiff's reliance was the proximate cause of his or her injury. *In re IKON Office Solutions, Inc., 277 F.3d 658, 666 (3d Cir. 2002).*

### 1. Pleading fraud with particularity

Because a claim under *Section 10(b)* and *Rule 10b-5* is a claim for fraud, a plaintiff must also satisfy the heightened pleading standard of *Federal Rule of Civil Procedure 9(b)* and the PSLRA. *Cal. Pub. Employees' Retirement Sys. v. CHUBB Corp., 394 F.3d 126, 143 (3d Cir. 2004).* *Rule 9(b)* provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Fed. R. Civ. P. 9(b)*. **[*14]** "*Rule 9(b)* requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story'-that is, the 'who, what, when, where and how' of the events at issue." *In re Rockefeller Center Properties, Inc. Sec. Litig., 311 F.3d 198, 217 (3d Cir. 2002)* (quoting *In re Burlington Coat Factory, 114 F.3d at 1422)*). "Although *Rule 9(b)* falls short of requiring every material detail of the fraud

such as date, location, and time, plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *CHUBB, 394 F.3d at 144* (quoting *In re Rockefeller, 311 F.3d at 216)*). The court must analyze each statement at issue in order to assess whether each alleged misrepresentation is pleaded with the requisite specificity. *In re Westinghouse Sec. Litig., 90 F.3d 696, 712 (3d Cir. 1996).*

In addition, under the PSLRA, a *Rule 10b-5* complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement **[*15]** is misleading, and, if an allegation regarding the statement or omission is made on information and belief, n1 the complaint shall state with particularity all facts on which that belief is formed." *15 U.S.C. § 78u-4(b)(1)*. "Unless plaintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by *Rule 9(b)* and the [PSLRA], they may not benefit from inferences flowing from vague or unspecific allegations – inferences that may arguably have been justified under a traditional *Rule 12(b)(6)* analysis." *In re Rockefeller, 311 F.3d at 224*. "In other words, pursuant to this 'modified' *Rule 12(b)(6)* analysis, 'catch-all' or 'blanket' assertions that do not comply with the particularity requirements are disregarded." *CHUBB, 394 F.3d at 145*.

> n1 Lead Plaintiff agrees that the Amended Complaint's "true facts," which are based on the investigation of counsel, are pled on information and belief. (03/09/2004 Tr. at 30.)

**[*16]**

As mentioned above, Plaintiffs' 10b-5 claims are based on allegedly false or misleading statements contained in press releases issued by UHS, conference calls between financial analysts and the individual Defendants, and UHS's quarterly and annual earnings reports that were filed with the SEC. The subject matter of the alleged misstatements and misleading information falls into two general categories: (1) statements that UHS was not experiencing an increase in the levels of bad debt during the relevant period; and (2) Defendants' use of improper accounting methods to conceal the rising levels of bad debt and artificially inflate UHS's earnings.

Defendants do not dispute that Lead Plaintiff has identified Defendants' allegedly false and misleading statements with particularity. Defendants instead maintain that Lead Plaintiff has failed to plead sufficient "true facts" specifying why those statements were false. Under the heightened pleading standard imposed by *Rule 9(b)* and the PSLRA, "it is the 'true facts' recited in the [Amended Complaint] that are of paramount importance . . . because

2005 U.S. Dist. LEXIS 7789, *16; Fed. Sec. L. Rep. (CCH) P93,248

they provide the exclusive basis for [Lead Plaintiff's] claims that the various statements **[*17]** made throughout the [relevant period] were materially false and misleading . . . and that Defendants knew of the falsity of the statements and financial results." *CHUBB, 394 F.3d at 145*.

A complaint can meet these heightened pleading requirements by providing sufficient documentary evidence and/or a sufficient description of the personal sources which lead the plaintiff to believe that certain statements were false or misleading. *Id. at 147*. Here, Lead Plaintiff has not provided any documentary evidence to support the Amended Complaint's allegations of securities fraud, and instead is proceeding solely on the basis of information received from confidential sources. (See 03/09/2005 Tr. at 35.) Lead Plaintiff's reliance on confidential sources to supply the requisite particularity for their fraud claims, therefore, "assumes a heightened importance." *CHUBB, 394 F.3d at 149*.

In assessing the particularity of allegations made on information and belief which are based on statements by confidential sources, courts examine "the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, **[*18]** the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Id. at 147*. Under this standard, "so long as plaintiffs supply sufficient facts to support their allegations, there is no reason to inflict the obligation of naming confidential sources." Id. However, a complaint must contain sufficient information about each source "to support the probability that the source possesses the information alleged." *Id. at 155*. Accordingly, complaints that rely heavily on confidential sources to establish the "true facts" must contain information describing the time period during which the confidential sources were employed by the defendant corporation, the dates on which they acquired the information they purportedly possess, and the manner in which they had access to such information. *Id. at 148*.

Lead Plaintiff contends that Defendants were reckless in reducing UHS's bad debt reserves during the relevant period, and that Defendants' statements regarding UHS's consistently low levels of bad debt were false and misleading, because Defendants at the **[*19]** time were aware that UHS's was in fact experiencing an increase in its levels of bad debt. In support of this contention, the Amended Complaint cites to "a former UHS employee from the business office of LCH [Lancaster County Hospital]" who stated that when the area's county hospital closed in the fall of 2002, LCH "immediately began experiencing an influx of indigent patients seeking treatment through

the emergency room." (Am. Cons. Compl. P 30.) The Amended Consolidate Complaint further alleges that the Edinburg Regional Medical Center ("ERMC") served as the county hospital before being purchased by UHS, and that "[a] former ERMC director explained that ERMC inherited the large indigent patient population from the date of purchase." (Id.)

In addition, the Amended Complaint avers that UHS hospitals had begun to experience increased numbers of self-pay patients as early as April 2003, because ERMC at that time "internally recorded that bad debt was a concern." (Id. at 39.) The Amended Complaint does not mention the source from which Lead Plaintiff's counsel received this information. The Amended Complaint does allege, however, that "a former ERMC director confirmed that **[*20]** UHS management had been focusing on the length of stay issued [sic] at the ERMC facility from the beginning of 2003, if not earlier." (Id. P 52.) That former director further explained that "the length of stay issue . . . was related to the indigent patient population who had no coverage, and likely no ability to pay, from the point of initial service." (Id.)

Both the EMRC and LCH sources were employed in two local UHS hospitals, and none of them claim to have information regarding a nationwide increase in the treatment of indigent patients or rising levels of bad debt at UHS facilities in general. Moreover, the Amended Complaint does not allege when the confidential sources were employed by UHS, the dates on which they acquired the information they purportedly possess, or how these former employees had access to such information. See *CHUBB, 394 F.3d 148*. The Amended Complaint, therefore, pleads insufficient facts to support the probability that a person in the position occupied by the confidential sources would possess the information that UHS was experiencing an increase in levels of bad debt during the relevant period.

Lead Plaintiff also contends **[*21]** that Defendants acted recklessly when, in face of UHS's alleged rising exposure to bad debt, Defendants failed to increase UHS's bad debt reserves. In support of the contention that Defendants were aware of UHS's rising exposure to bad debt, the Amended Complaint cites to "former UHS personnel employed in the business office of [LCH]," who state that UHS "corporate procedure, unbeknownst to investors, dictated that no accounts less than 180 days old were to be considered bad debt even if an account was known or anticipated to be uncollectible from the date service was provided." (Am. Cons. Compl. P 28.) Similarly, a "former business office employee at LCH" stated that "UHS's practice was to bill Medicare and Medicaid for all services rendered and recognize all revenue at the time

2005 U.S. Dist. LEXIS 7789, *21; Fed. Sec. L. Rep. (CCH) P93,248

of service even if it was known or anticipated that a large portion of those claims would be denied." (Id. P 29) (emphasis deleted).

The Amended Complaint further cites "former employees from numerous hospitals" for the proposition that all LCH revenue "was sent to UHS's corporate office in electronic format approximately three to four times per day" and that "bi-weekly and monthly reports tracking [*22] accounts receivable and bad debt were provided to the appropriate executives at UHS's corporate headquarters." (Am. Cons. Compl. P 50.) The Amended Complaint goes on to state that

> former UHS personnel from the office of the controller at Summerlin Hospital Medical Center [] confirmed that each UHS Las Vegas area hospital submitted its financial information, including uncollectible receivable account amounts, to Valley Health Systems, a centralized business office responsible for billing patients, collecting receivables and writing off receivables that were not collected. Valley Health Systems consolidated the financial information from the hospitals and forwarded it to UHS's corporate accounting department at least on a monthly basis.

(Id.) In addition, the Amended Complaint avers that

> [a] former director of the Midwest Center for Youths and Family Services ("SMCH") stated there are 'no surprises or sudden changes' when it comes to bad debt levels as it is known at the point of service whether a patient is uninsured, and because any indicators for potential bad debt problems would appear in reports submitted to UHS corporate offices for monthly management [*23] meetings.

(Id.)

Notably, though all of these sources were employed in local UHS hospitals, the Amended Complaint fails to allege how they would have had access to information regarding UHS's operations nationwide. Where a complaint relies heavily on former employees who worked in the defendant corporation's local branches for information concerning the defendant corporation's business on a national scale, a "lack of allegations regarding how or why such employees would have access to the information they purport to possess is problematic." *CHUBB, 394 F.3d at 148.* The Amended Complaint also fails to allege at what time the confidential sources were employed by UHS, or

the dates on which they acquired the information they purportedly possess. See *id.* The Amended Complaint, therefore, pleads insufficient facts to support the probability that a person in the position occupied by the confidential sources would possess information regarding UHS's nationwide operating procedures. Accordingly, the Court finds that the Amended Complaint fails to plead the falsity of Defendants' statements during the relevant period with the particularity demanded by the [*24] PSLRA.

Lead Plaintiff further contends that Defendants committed accounting fraud when, in violation of the GAAP and SEC reporting requirements, Defendants falsely inflated UHS's earnings and assets as well as stockholders' equity earnings by failing to establish and maintain adequate bad debt reserves during the relevant period. n2 The Amended Complaint alleges that Defendants, in violation of the GAAP, delayed the recognition and write-off of uncollectible accounts, understated its provision for bad debt, and failed to restate UHS's previously misstated financial statements. n3 In support of these contentions, the only "true fact" the Amended Complaint alleges is that "former UHS employees stated that during the [relevant period], the Company mandated that no accounts less than 180 day [sic] delinquent be written off." (Am. Cons. Compl. P 70.)

> n2 Financial results reported in violation of GAAP are presumptively misleading. See *17 C.F.R. § 210.4-01(a)(1)*; *CHUBB, 394 F.3d at 152 n.16*.

> n3 Specifically, the Amended Complaint alleges that Defendants violated the following GAAP principles: (1) financial reporting should provide information that is useful to present and potential investors in making rational investment decisions; (2) omissions or misstatements are material if the judgment of a reasonable person relying on it would have been changed or influenced by the inclusion or correction of the item; (3) financial reporting should provide information about management's discharge of its stewardship responsibility to stockholders; (4) financial reporting should provide information about an enterprise's financial performance during a period; (5) financial reporting should be reliable in that it represents what it purports to represent; (6) no information that may be necessary to ensure that the report validly represents underlying events and conditions should be omitted; (7) conservatism should be used as a prudent reaction to uncertainty; and (8) contingencies that might result in gains should not be reflected in accounts.

[*25]

2005 U.S. Dist. LEXIS 7789, *25; Fed. Sec. L. Rep. (CCH) P93,248

As above, the Amended Complaint does not allege sufficient facts to support the probability that the confidential sources would possess the information they purport to possess. Indeed, the relevant confidential sources are identified only as "former UHS employees." In addition, the Amended Complaint does not rely on any sources, confidential or otherwise, to substantiate its allegations that UHS understated its provision for bad debt and would have been required to restate its earlier financial statements. The Court further notes that, where a complaint alleges that defendants distorted certain data disclosed to the public by using unreasonable accounting practices, the complaint must state what the unreasonable accounting practices were and how those practices distorted the disclosed data. *In re Burlington, 114 F.3d at 1417–18*. Statements of reserve amounts are "fraudulent only if . . . the responsible parties knew or should have known that [the amounts of reserve] were derived in a manner inconsistent with reasonable accounting practices." [*26] *Christidis v. Pa. Mortgage Trust, 717 F.2d 96, 100 (3d Cir. 1983)*. Accordingly, a complaint must plead with particularity "the manner in which, in establishing reserves for bad debts in the financial statements relied upon, the defendants knowingly departed from reasonable accounting practices." *Id.* To do so, the complaint must "include details about when and to what level the accounts receivable should have been written down, when and to what level the allowance should have been changed, why the allowance made by the corporation was unreasonable in light of the [bad debt] experienced, and how many accounts ultimately were uncollectible." *In re Loewen Group Inc. Secs. Litig., 2004 U.S. Dist. LEXIS 16601, Civ. A. No. 98–640, 2004 WL 1853137, at *11 (E.D. Pa. Aug. 18, 2004)*. In the absence of such allegations, "neither the increase of allowance toward the end of the class period nor the eventual financial ruin of [the defendant corporation] are proof that defendants committed any acts worse than mismanagement." [*27] *Id. 2004 U.S. Dist. LEXIS 16601, at *12*.

Here, the Amended Complaint does identify with sufficient particularity which GAAP procedures were allegedly violated. However, the Amended Complaint does not state when and to what level bad debt should have been recognized, when and to what level bad debt reserves should have been changed, or how many accounts ultimately were uncollectible. See *id.* Similarly, the Amended Complaint does not identify the data, or source of data, that was used to arrive at its conclusions, the amount by which reserves were distorted, or how much revenue was improperly recognized. See *CHUBB, 394 F.3d at 153*. Accordingly, the Court finds that the Amended Complaint fails to plead facts which would support the inference that Defendants were engaging in

accounting fraud with the particularity demanded by the PSLRA.

2. Failure to State a Claim: Falsity of Statements

The Amended Complaint's failure to plead the "true facts" with the particularity required by *Rule 9(b)* and the PSLRA supports dismissal apart from *Rule 12(b)(6)*. [*28]  *CHUBB, 394 F.3d at 156*. Dismissal, however is also warranted pursuant to *Rule 12(b)(6)* for failure to adequately plead the falsity of Defendants statements. As the Amended Complaint does not comply with the PSLRA's threshold pleading requirements, Lead Plaintiff may not benefit from inferences stemming from the unparticularized allegations mentioned above to establish the falsity of Defendants' statements during the Class Period. However, even if those allegations were accepted, they would not give rise to an inference that UHS was experiencing an increase in bad debt during the relevant period. Thus, the information provided by the LCH source does not establish that LCH was experiencing a rising exposure to bad debt beginning in July 2003, but merely that the closing of the county hospital one year earlier, in the fall of 2002, "immediately" caused LCH to see an influx of indigent patients. Similarly, the information provided by the EMRC source does not establish that EMRC experienced an increase in levels of indigent patients during the relevant period, or that UHS acquired EMRC, and therefore inherited its unusually high existing levels of bad debt, during that [*29] time. Moreover, the mere fact that EMRC "internally" recorded that bad debt was "a concern" at its facility, and that UHS "focused" on the length of patient stays at EMRC in early 2003, does not establish that either EMRC, or UHS as a whole, were in fact experiencing an increase in exposure to bad debt during the relevant period. Indeed, the Amended Complaint itself broadly asserts that "former employees of various UHS hospitals . . . . report that issues such as length of stay and increase in the numbers of self-pay patients were either non–existent, or had been recognized and discussed well before the [relevant period]." (Am. Cons. Compl. P 52.) The confidential sources, therefore, fail to establish that UHS was in fact experiencing an increase in levels of bad debt during the relevant period, much less that Defendants were aware of any such increase.

The only other source the Amended Complaint relies on for the falsity of Defendant's representations are statements made by Defendants' themselves and which, according to Lead Plaintiff, amount to admissions that Defendant's earlier statements were false. n4 In support of this argument, the Amended Complaint points to the following [*30] statements. First, in a press release issued by UHS over the PR Newswire on February 18, 2004, UHS reported that its provision for doubtful ac-

counts for the fourth quarter of 2003 was 7.8% of net revenues, as compared to 6.9% during the prior year's fourth quarter. (Am. Cons. Compl. P 47.) The press release went on to state that UHS "expects this trend to continue until there is a notable strengthening of the labor market." ( Id.) Second, in a press release issued by UHS over the PR Newswire on March 1, 2004, UHS reported that its earnings per diluted share for the three-month period ending March 31, 2004, could be as much as 25% lower than the earnings per diluted share recorded in the same period in the prior year. (Id. P 49.) UHS explained this development as follows:

> On a same facility basis, the Company's acute care hospitals have continued, in the first two months of 2004, to experience a decline in inpatient admissions. Moreover, during this period, certain of the Company's acute care facilities have been impacted by a negative shift in payor mix, a decline in intensity and an increase in length of stay. In addition, the rising level of uninsured and self-pay [*31] patients continues to unfavorably impact our bad debt expense.

(Id.)

> n4 The Court notes that the Amended Complaint also alleges that general industry trends showed an increase in levels of bad debt throughout the hospital sector during the relevant period. However, Lead Plaintiff has stated that those industry trends are not relied on to establish the falsity of Defendants' statements, but rather were included merely as "a background for . . . the entire situation." (03/09/05 Tr. at 29.) The Court agrees that the fact that UHS's competitors were experiencing an increase in bad debt is not relevant to a determination whether Defendants' statements that UHS's levels of bad debt during the relevant period remained comparatively stable were false.

Third, the Amended Complaint cites to the transcript of a conference call between the individual Defendants and analysts held on March 1, 2004. During that conference call, Filton stated that "bad debt expense remains a pressure point in our hospital" and [*32] that "for the most part the general admission softness and pressure on bad debt are dynamics that have been present now for several quarters and for the most part, again, we see across all of our facilities." (Id. P 51.) In response to one analyst's question concerning whether there was any catch-up charge in UHS's bad debt numbers, Filton further stated

that "the fourth quarter probably contained some intra or catch-up in 2004 . . . . Look, I am sure if we went through the detail we would find some element of catch-up in the first quarter of '04. I do not think it is material." (Id. P 53; 03/01/04 Conf. Tr., Defs.' Ex. 20.)

While Lead Plaintiff contends that these statements are admissions which demonstrate the falsity of Defendants' earlier representations, the statements in fact are entirely consistent with Defendants' prior disclosures. Indeed, the fact that pressure on bad debt had been present for several quarters in March 2004 is mirrored by UHS's steady increase in bad debt reserves during the relevant period from 6.83% of net revenues on June 30, 2003, to 8.42% of net revenues on March 31, 2004. (See Am. Cons. Compl. [*33] P 66.) Moreover, Filton's statements that the level of bad debt reserves in the fourth quarter of 2004 probably contained an immaterial element of catch-up does not amount to an admission that the statements made by Defendants during the relevant period were false. Courts have long recognized that "fraud cannot be inferred merely because at one time the firm bathes itself in a favorable light but later the firm discloses that things are less than rosy." *CHUBB, 394 F.3d at 158* (internal quotations omitted). The Court, therefore, concludes that even if the information provided by the confidential sources is taken into account, the Amended Complaint fails to establish the falsity of Defendants' statements during the relevant period. Accordingly, Defendants' Motion to Dismiss Count One of the Amended Complaint is granted. n5

> n5 Because the Court concludes that the Amended Complaint does not plead the "true facts" with sufficient particularity under the PSLRA and does not establish that Defendants' representations during the relevant period were false, the Court does not reach the question whether the Amended Complaint properly attributes the allegedly misleading statements to the Defendants, or adequately pleads the elements of scienter, materiality, and loss causation.

[*34]

## C. *Section 20(a) of the Exchange Act*

Defendants also move to dismiss Count Two of the Amended Complaint, which alleges that the individual Defendants violated *Section 20(a) of the Exchange Act*. *Section 20(a)* imposes joint and several liability on any person who "directly or indirectly controls any person liable" under any provision of the Exchange Act, "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." *15 U.S.C. § 78t(a)*. Plaintiffs

2005 U.S. Dist. LEXIS 7789, *34; Fed. Sec. L. Rep. (CCH) P93,248

alleging a *Section 20(a)* violation must plead facts showing (1) an underlying violation by the company; and (2) circumstances establishing the defendant's control over the company's actions. n6 *La Fata v. Raytheon Co., 207 F.R.D. 35, 45 n.5 (E.D. Pa. 2002)*. The heightened pleading requirements of *Rule 9(b)* do not apply to *Section 20(a)* claims. *In re U.S. Interactive, Inc. Sec. Litig., 2002 U.S. Dist. LEXIS 16009, Civ. A. No. 01–522, 2002 WL 1971252, at *20 (E.D. Pa. Aug. 23, 2002)* (citing **[*35]** *In re Tel–Save Sec. Litig., 1999 U.S. Dist. LEXIS 16800, Civ. A. No. 98–3145, 1999 WL 999427, at *6 (E.D. Pa. Oct. 19, 1999)); see also Newby v. Enron Corp. (In re Enron Corp. Secs, Derivative & ERISA Litig.), 2003 U.S. Dist. LEXIS 1668, Nos. MDL–1446, Civ. A. No. H–01–3624, 2003 WL 230688, at *11 (S.D. Tex. Jan. 28, 2003)* (concluding that *Rule 8* notice pleading standard applies to *Section 20(a)* claims because "the legislative history behind the controlling person provision of both the 1933 and 1934 Acts indicates that Congress sought to reach persons who tried to evade responsibility under the common law of agency by standing behind the scenes and having 'dummies' under their control commit the primary violations" and "without discovery, it would be extremely difficult to know facts where the controlling person was hiding behind the controlled person"). Here, the Amended Complaint fails to establish an underlying violation by UHS. *La Fata, 207 F.R.D. at 45 n.5.* Accordingly, Defendants' Motion to Dismiss Count Two of the Amended Complaint is granted.

N6 While Lead Plaintiff will also have to prove at trial that the individual Defendants were each "culpable participants" in the underlying fraud, *Rochez Bros., Inc. v. Rhoades, 527 F.2d 880, 889–90 (3d Cir. 1975)*, "the 'overwhelming trend in this circuit' is that culpable participation does not have to be plead to survive a motion to dismiss." *Jones v. Intelli–Check, Inc., 274 F. Supp. 2d 615, 645 (D.N.J. 2003)* (quoting *Derensis v. Coopers & Lybrand Chartered Accountants, 930 F. Supp. 1003, 1013 (D.N.J. 1996)).*

**[*36]**

D. Leave to Amend

Lead Plaintiff has requested that, should the Court grant any part of Defendants' Motion, the Court also grant Lead Plaintiff leave to amend the Amended Complaint. By adopting the PSLRA, Congress has evinced its intent to "provide a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis."

*GSC Partners CDO Fund v. Washington, 368 F.3d 228, 246 (3d Cir. 2004)* (quotations omitted). However, "ordinarily, leave to amend is granted when a complaint is dismissed on *Rule 9(b)* particularity grounds alone." *CHUBB, 394 F.3d at 165*. Here, the Amended Complaint is dismissed not only for failure to comply the particularity requirements imposed by *Rule 9(b)* and the PSLRA, but also for failure to state a claim pursuant to *Rule 12(b)(6)*. Nonetheless, the Court notes that the Amended Complaint could have been dismissed on particularity grounds alone, the Court was not previously called upon to rule on a motion to dismiss in this action, and Lead Plaintiff's investigation is ongoing. Accordingly, the Court will permit Lead Plaintiff to move for leave to file a Second Amended Consolidated Complaint **[*37]** which, in compliance with *Rule 11(b)* n7, corrects the Amended Complaint's *Rule 9(b)*, PSLRA and *Rule 12(b)(6)* pleading deficiencies.

n7 Pursuant to *Rule 11(b)* an attorney who presents a pleading to the court certifies that to the best of his or her knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, "the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." *Fed. R. Civ. P. 11(b)(3).*

III. CONCLUSION

For the foregoing reasons, the Court grants Defendants' Motion to Dismiss the Amended Complaint and permits Lead Plaintiff to move for leave to file a Second Amended Consolidated Complaint.

An appropriate Order follows.

**ORDER**

**AND NOW,** this 3rd day of May, 2005, upon consideration of Defendants' Motion to Dismiss the Amended Consolidated Class Action Complaint (Doc. No. 29), all submissions received **[*38]** in response thereto, and the argument held on March 9, 2005, **IT IS HEREBY ORDERED** that said Motion is **GRANTED** and the Amended Consolidated Complaint is **DISMISSED** in its entirety. **IT IS FURTHER ORDERED** that Lead Plaintiff may move for leave to file a Second Amended Consolidated Complaint within thirty (30) days of the date of this Order.

BY THE COURT:

John R. Padova, J.

# EXHIBIT E

LEXSEE 1994 U.S. DIST. LEXIS 11456

**ELMER D. GATES, Plaintiff, v. ERNST & YOUNG AND KEITH ORDEMANN, Defendants.**

**CIVIL ACTION NO. 93–CV–2332**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1994 U.S. Dist. LEXIS 11456*

**August 15, 1994, Decided
August 15, 1994, Filed; August 16, 1994, Entered**

**COUNSEL:** **[*1]** For ELMER D. GATES, PLAINTIFF: MALCOLM J. GROSS, GROSS, MC GINLEY, LA BARRE & EATON, ALLENTOWN, PA.

For ERNST & YOUNG, DEFENDANT: WILLIAM J. LEHANE, DRINKER, BIDDLE & REATH, PHILA, PA, MALCOLM J. GROSS, GROSS, MC GINLEY, LA BARRE & EATON, ALLENTOWN, PA, HERBERT J. SUE, ERNST & YOUNG, NEW YORK, NY, BARBARA A. TAYLOR, ERNST & YOUNG, NEW YORK, NY, MELISSA ZELEN NEIER, THE GENERAL COUNSEL'S OFFICE OF ERNST AND YOUNG, NEW YORK, NY. For KEITH ORDEMANN, DEFENDANT: CHRISTOPHER W. MATTSON, LANCASTER, PA, KENDRA D. MC GUIRE, BARLEY, SNYDER, SENFT & COHEN, LANCASTER, PA.

**JUDGES:** BUCKWALTER, J.

**OPINIONBY:** RONALD L. BUCKWALTER

**OPINION:**

**MEMORANDUM**

BUCKWALTER, J.

August 15, 1994

**INTRODUCTION**

Plaintiff brought this action against Ernst and Young and Keith Ordemann alleging Breach of Contract (Count I), Negligence (Count II), Breach of Fiduciary Duty (Count III), Violation of Federal Securities laws (Count IV) and Violations of RICO (Count V). Currently before this Court is defendants' motions for summary judgment. For the following reasons, defendants' motion for summary judgment is granted in part and denied in part.

**STATEMENT OF FACTS**

This action arises from plaintiff's failed investment in Birdsboro Ferrocast **[*2]** Inc. (BFI). In or around August or September of 1990, Keith Ordemann became aware that BFI was seeking investors to help finance the acquisition of a foundry in Bethlehem, Pennsylvania. See, Defendants' Exh 14, Ordemann Dep. at 57–59. In September of 1990 Ordemann passed on this information to the plaintiff who was one of his clients. Id at 58. Ordemann prepared financial information on the potential investment for Meridian Bank and this information was forwarded to Mr. Gates. See, Defendants' Exh. 11, Gates Dep. at 101–103. Plaintiff alleges that he relied on the financial information and advice supplied by Ordemann in deciding to invest in this project. Complaint P 11–31.

On March 21, 1991, the purchase of BFI was completed with an investment by Mr. Gates of at $300,000 and a personal guarantee of $1,000,000. Soon after the Birdsboro foundry began operation it experienced a multitude of difficulties and it ultimately filed for bankruptcy in April of 1992. Plaintiff alleges that he suffered damages in excess of $1,410,000. Complaint P 30.

Plaintiff argues that the defendants failed to use due diligence in investigating the risks of the investment, failed to disclose **[*3]** any potential conflicts of interest and otherwise that defendants fraudulently misrepresented the facts to Mr. Gates which caused him to invest project. He brings claims for Breach of Contract (Count I), Negligence (Count II), Breach of Fiduciary Duty (Count III), Violation of Federal Securities laws (Count IV) and Violations of RICO (Count V). Defendants filed a motion for summary judgment on all claims.

**DISCUSSION**

**I. RICO Claim**

**A. Enterprise requirement**

In Count V of plaintiff's complaint he alleges that

defendants violated the Racketeer Influenced Corrupt Organization Act, *18 U.S.C. §§ 1961–1968*. Section 1964 grants any person injured in his business or property by a violation of section 1962 the right to sue in federal court for damages. *18 U.S.C. § 1964*. n1 In order to maintain a claim under RICO, a plaintiff must prove the existence of a RICO enterprise and that the defendants engaged in a pattern of racketeering activity. Gates has failed to properly allege the existence of an enterprise in his complaint and he has failed to put forth any evidence to show that such an enterprise exists **[*4]** in this case.

> n1 Plaintiff has failed to properly allege a violation of section 1962 in his complaint and the complaint could be dismissed on those grounds alone.

It is well settled in RICO law that the alleged racketeering activity complained of by a plaintiff must be separate and distinct from the enterprise itself. See, *United States v. Turkette, 452 U.S. 576, 583, 101 S. Ct. 2524, 2528, 69 L. Ed. 2d 246 (1981)*. An enterprise is an entity made up of a group of persons associated together for the common purpose of engaging in a course of conduct. Id. The enterprise is separate and distinct from the pattern of racketeering. Id. An enterprise is not merely a conspiracy and it should not be confused with an agreement to commit the alleged racketeering activity. *Hartz v. Friedman, 919 F.2d 469, 471 (7th Cir. 1990)*.

An enterprise is proved by evidence of an ongoing organization, formal or informal and that the participants **[*5]** function as a continuing unit. *Turkette, 452 U.S. at 583, 101 S.Ct at 2528.* Although proof of an enterprise and racketeering activity may overlap, proof of one does not prove the other. They are separate elements of a RICO violation.

Plaintiff's alleges that the defendants' agreement to commit racketeering acts constitutes the enterprise. Complaint P 50. An enterprise is not simply an agreement to commit racketeering acts and therefore, the plaintiff's allegation is insufficient to establish a RICO violation. See, *Hartz, 919 F.2d at 471.* Plaintiff has supplied the court with no evidence of an organization that functions as a continuing unit through which racketeering activity is carried out. This Court finds no evidence to support the existence of an enterprise separate and distinct from the pattern of racketeering and thus, plaintiff cannot proceed with its RICO claim.

### B. Pattern of Racketeering

Plaintiff's proof establishing a pattern of racketeering is also very tenuous. The statute does not explicitly define a "pattern of racketeering", however, courts have established certain **[*6]** standards to follow in deciding whether a "pattern" exists. See, *Hughes v. Consol-Pennsylvania Coal Co., 945 F.2d 594, 609 (3d Cir. 1991)*. A pattern requires the commission of at least two predicate acts of racketeering activity. *945 F.2d at 609.* The plaintiff must then demonstrate that these acts are related and that there is continuity. *H.J. Inc. v. Northwestern Tel. Bell Co., 492 U.S. 229, 239, 109 S.Ct 2893, 2899, 106 L. Ed. 2d 195 (1989)*.

Continuity is a temporal concept. It is both a closed and open ended concept, referring either to a closed period of time with repeated conduct or to past conduct that by its nature projects into the future with a threat of repetition. *Hughes, 945 F.2d at 609.* This case does not involve an open ended scheme. n2 With a closed period a plaintiff must show a series of related predicates lasting a substantial period of time. Id. (emphasis added). There is no bright line rule for what constitutes a substantial period of time. Instead, each case is evaluated on its own facts on a case by case **[*7]** basis.

> n2 Under the open ended approach, a plaintiff must demonstrate a threat of continuity by proving that the predicate acts are a part of defendant's regular way of doing business. In other words, a plaintiff must prove that defendant operates a long term association that exists for criminal purposes. *Hughes, 945 F.2d at 610.*

"Where there is no threat of continuing criminal activity, duration is the sina qua non of continuity in a closed-ended scheme." *United States v. Pelullo, 964 F.2d 193, 208 (3d Cir. 1992).* Thus, the question faced by this Court is whether a scheme allegedly lasting approximately 18 months is a substantial period of time. In Hughes, the court found that a scheme lasting one year was not a substantial period of time. Cases finding a substantial period of time dealt with schemes that lasted for a number of years. *H.J. Inc., 492 U.S. at 250, 109 S.Ct at 2906* (scheme lasting **[*8]** six years); *Fleet Credit Corp. v. Sion, 893 F.2d 441, 447 (1st Cir. 1990)* (scheme lasting over four years); *Walk v. Baltimore & Ohio R.R., 890 F.2d 688, 690 (4th Cir. 1989)* (ten years); *Jacobson v. Cooper, 882 F.2d 717, 720 (2d Cir. 1989)* (several years); *Dana Corp. v. Blue Cross & Blue Shield Mut., 900 F.2d 882, 887 (6th Cir. 1990)* (Seventeen years).

In contrast, where the fraudulent scheme does not span years, courts have not found continuity. *Marshall-Silver Construction Co. v. Mendel, 894 F.2d 593, 598 (3d Cir. 1990)* (seven months showed neither long-term criminal conduct nor the threat thereof); *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1418 (3d Cir. 1991)*

(eight month period insufficient); *Hindes v. Castle, 937 F.2d 868, 875 (3d Cir. 1991)* (same). The court in Hughes decided that a scheme lasting twelve months was not a "substantial period of time" and therefore, there was no continuity. *945 F.2d at 611.*

Although each case **[*9]** is decided on its own specific facts, it is important to recognize that the cases where continuity was found involved schemes lasting several years. However, recently the Third Circuit has found that 19 months of racketeering activity is sufficient in a closed ended scheme. *Pelullo, 964 F.2d at 210.*

Plaintiff argues that the alleged scheme lasted from approximately March 1990 to September 1991. See, Plaintiff's Opposition to Defendants' Motion for Summary Judgment p. 48. However, he cites no evidence to support this claim. Defendant Ordemann testified that he first contacted Gates about the possible investment in September of 1990. Moreover, the deal was consummated in late March of 1991. Thus, the alleged fraudulent misrepresentations that led plaintiff to invest in BFI only lasted for eight months. Gates argues that the scheme actually lasted until the summer of 1991 because Ordemann was still withholding information about his alleged conflict of interest with BFI. In June of 1991, Ordemann left Ernst & Young and joined BFI. There was no further conflict after Ordemann left Ernst & Young. Thus, even if the plaintiff could show that the scheme lasted **[*10]** until the end of the summer of 1991, as he argues, the alleged scheme would only have lasted 12 months.

This is not the type of "long term criminal activity" covered by RICO. I do not find the required continuity in this case where there is a single scheme directed at one individual that lasts only 12 months. n3 This is a question of fact, but I must determine whether there is sufficient evidence that a genuine factual dispute exists. See, *Pelullo, 964 F.2d at 210.* Although this Court must view the facts in the light most favorable to the plaintiff, that does not mean I must accept every argument advanced by the plaintiff which is not supported by record evidence. Thus, based on the record, I find that the plaintiff cannot prove a pattern of racketeering in this case. Consequently, plaintiff's RICO claim shall be dismissed.

> n3 Plaintiff argues that there are multiple victims. While it is true that several persons may have been affected by this alleged scheme, it seems clear that Ordemann and Ernst & Young directed all of their alleged misrepresentations to Gates and he was the only investor they alleged misled.

**[*11]**
## II. Other Claims

I find that there are genuine issues of material fact for all of plaintiff's other claims and they may proceed to trial.

### CONCLUSION

For the above reasons, defendants' motion for summary judgment is granted in part and denied in part.

An order follows.

### ORDER

AND NOW, this 15th day of August, 1994, upon consideration of Defendants Keith Ordemann and Ernst & Young's Motions for Summary Judgment and Plaintiff's response thereto, it is hereby ORDERED and DECREED that Defendants' motions are GRANTED IN PART AND DENIED IN PART and Count V (RICO) of Plaintiff's complaint is dismissed with prejudice.

IT IS SO ORDERED.

BY THE COURT:

RONALD L. BUCKWALTER, J.

# EXHIBIT F

LEXSEE 1993 U.S. DIST. LEXIS 18537

**ROBERT F. JEFFREYS, JR., d/b/a JEFFREYS FLEX–FLOW RESTRICTOR COMPANY, Plaintiff, v. GERALD M. EXTEN, TOPSIDE CORPORATION, JOHN WILLIAM NUCCI, SALLY NUCCI, W.N., INC., GARY GOLDSTEIN, ESQUIRE, GAC LIMITED PARTNERSHIP, NICHOLAS TSOUKALAS, FLIGHTS END LIMITED PARTNERSHIP, and TOPSIDE MARINA LIMITED PARTNERSHIP, Defendants.**

**Civil Action No. 86–32–SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1993 U.S. Dist. LEXIS 18537*

**December 30, 1993, Decided**

**LexisNexis(R) Headnotes**

**COUNSEL:** **[*1]** Richard F. Stokes, Esquire, of Tunnell & Raysor, Wilmington, Delaware, and Elliott D. Goldberg, Esquire, of Goldberg, Baer, Romain & Abramson, Paoli, Pennsylvania, attorneys for plaintiff.

Gerald M. Exten, of Ocean View, Delaware, appearing Pro Se and on behalf of Topside Corporation and Topside Marina Limited Partnership.

Bayard J. Snyder, Esquire, of Snyder, Schlecker & Issaacs Wilmington, Delaware, and David H. Moskowitz, Esquire, of Lalvern, Pennsylvania, attorneys for John William Nucci and Sally Nucci.

Gary A. Goldstein, Esquire, of Stuart, Florida, appearing Pro Se.

William M. Chasanov, Esquire, of Brown, Shiels & Chasanov, Georgetown, Delaware, attorneys for defendant Nicholas Tsoukalas.

**JUDGES:** ROBINSON

**OPINIONBY:** SUE L. ROBINSON

**OPINION:**

MEMORANDUM OPINION

Dated: December 30, 1993

Wilmington, Delaware

SUE L. ROBINSON, District Judge

## I. INTRODUCTION

The plaintiff, Robert F. Jeffreys, Jr., brought this action alleging that the defendants committed violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *18 U.S.C. § 1961* et seq., The Act Concerning Fraudulent Conveyances, *6 Del. C. § 1301* et seq., and Delaware common law. **[*2]** Plaintiff alleged that the defendants engaged in an elaborate scheme to defraud the plaintiff of recovering his loan to and judgment against one of the defendants, Topside Corporation. Essentially, plaintiff contends that the defendants engaged in a series of complex commercial transactions, business activities and successive mortgage foreclosures, which were designed to strip Topside Corporation of its assets in order to prevent plaintiff from collecting the money owed him by Topside Corporation. The Court held a three–day bench trial. The following are the Court's findings of fact n1 and conclusions of law pursuant to *Fed.R.Civ.P. 52*.

> n1 The Court's findings of fact include activities occurring after November 11, 1984, as such activities are merely a continuation of those pled in the complaint.

## II. FINDINGS OF FACT n2

> n2 The parties stipulated to the authenticity of all documents offered into evidence. Defendants objected only on the grounds of relevancy with respect to all documents offered by plaintiff. The Court denies the relevancy objections as to all documents offered by plaintiff. Insofar as any of the documents which plaintiff offered into evidence may relate to transactions outside the applicable limitations period, the Court finds those documents and transactions are relevant to prove the state of mind

Case 1:05-cv-00165-JJF    Document 34-2    Filed 06/10/2005    Page 62 of 119

Page 2
1993 U.S. Dist. LEXIS 18537, *2

of various defendants. However, the Court has not considered as competent evidence the plethora of correspondence between non–parties.

[*3]

Because this case involved various financial transactions, for the most part, the facts of this case were not in dispute. The parties, however, vehemently disputed the inferences to be drawn from those facts. The Court finds that the testimony of both the plaintiff and the defendants was generally credible.

A. The Actors

Plaintiff, Robert F. Jeffreys, Jr. ("Jeffreys"), resides in King of Prussia, Pennsylvania, and conducts business as a subpartnership, Jeffreys Flex–Flow Restrictor Company.

Defendant Gerald M. Exten ("Exten") resides in Ocean View, Delaware. At all times relevant to these proceedings, Exten controlled Exten Associates, Inc. ("EAI"), a Maryland corporation which held property in Sussex County, Delaware. Exten also was president and majority shareholder of Topside Corporation ("Topside"), a Maryland Corporation which operated Topside Restaurant in Sussex County, Delaware. n3 Topside was the general partner of defendant Topside Marina Limited Partnership ("TMLP") a limited partnership organized under Maryland law. TMLP owned the property upon which the Topside Restaurant was built and located after 1980. Throughout the myriad transactions that occurred during the course [*4] of the existence of Topside and TMLP, Exten acted interchangeably as president of Topside and/or general partner of TMLP.

n3 Topside never answered the complaint. Plaintiff applied for entry of default against Topside. (D.I. 52, 78) The Clerk of the Court entered a default in appearance. (D.I. 79) Where there are several defendants in an action in which those defendants are alleged to be jointly liable, and one or more, but not all, of the defendants defaults, a court must wait until a final judgment is entered against the remaining defendants before entering a default judgment. *Frow v. De La Vega, 82 U.S. 552, 15 Wall. (82 U.S) 552, 21 L. Ed. 60 (1872).* If the suit is decided in favor of the complainant, then the default judgment can be entered in favor of the complainant; if the suit is decided against the complainant, then the default judgment cannot be entered in favor of the complainant. Id.; see also *U.S. ex rel. Dattola v. National Treasury Employees Union, 86 F.R.D. 496 (W.D. Pa. 1980).*

[*5]

Defendants John William Nucci ("Nucci") and Sally Nucci, husband and wife, reside in Brookmont, Maryland. Nucci was an alternate general partner of TMLP, and the president and sole shareholder of defendant W.N., Inc., a Maryland corporation. (Exhibit P-53)

Defendant Gary Goldstein, Esquire ("Goldstein"), resides in Stuart, Florida. Goldstein was a director of and shareholder in Topside and was the sole director and shareholder of O.C. Flights, Inc., a Maryland corporation. (Exhibit P-46) Goldstein also was a limited partner in GAC, Limited Partnership ("GAC"), a limited partnership organized under Maryland law. n4 GAC owned the property upon which the original Topside Restaurant was located prior to its being destroyed by fire in 1980. At various times, Goldstein was counsel to the following defendants: Topside, TMLP, W.N., Inc., and Flights End Limited Partnership.

n4 As with defendant Topside, GAC never answered the complaint and, therefore, the Clerk of the Court entered an order of default in appearance. (D.I. 79) See supra note 2.

[*6]

Defendant Flights End Limited partnership ("FELP") was a limited partnership organized under Maryland law.

Defendant Nicholas Tsoukalas ("Tsoukalas") managed, leased, and then owned the Topside Restaurant for a brief period from May, 1984 until May, 1986.

GNP Realty Development Corporation ("GNP") was a Maryland corporation controlled by Exten.

Tengees Limited Partnership ("Tengees") was a Maryland limited partnership in which Exten was a general partner and GNP was a limited partner.

B. The Property

At the heart of this litigation are certain parcels of property located in Sussex County, Delaware that were held at one time or another by EAI ("the Property"). The Property consisted of six parcels hereinafter designated as A–79, A–80, B, C, D, and E. Parcel A–79 consisted of approximately 1.1 acres upon which the original Topside Restaurant was located. Parcel A–80 consisted of approximately 14 acres upon which the second Topside Restaurant was built. The remaining parcels were at one time part of Parcel A–80. Parcel B consisted of approximately 9.5 acres. Parcel C was less than one–half acre. Parcel D consisted of slightly more than one–half acre. Parcel E consisted of that portion [*7] of land designated as Parcel A–80 upon which the new Topside Restaurant was built plus Parcel D.

C. The Pre–loan History of the Property

EAI owned both Parcels A–79 and A–80 and operated the Topside Restaurant located on the Property in 1972. (D.I. 153 at 69–70) EAI filed for bankruptcy in the United States District Court for the District of Maryland on July 1, 1974. (See *Matter of Exten Associates, Inc., 13 Bankr. 818 (Bankr. D. Md. 1981);* Exhibit P–108) n5 The Bankruptcy Court confirmed a plan of arrangement which provided that creditors' payments were to be secured by a $500,000 mortgage on the Topside Restaurant and Marina, however, the mortgage was never prepared or recorded. ( *Matter of Exten Associates, Inc., 13 Bankr. at 820;* Exhibit P–108; D.I. 154 at 129) The Bankruptcy Court rescinded the Confirmation Order and adjudicated EAI bankrupt on December 29, 1978. ( *Matter of Exten Associates, Inc., 13 Bankr. at 821;* Exhibit P–108; D.I. 153 at 73, 80) Concomitantly, Exten was involved in personal bankruptcy proceedings and, after extensive litigation, Exten was adjudicated personally bankrupt [*8] in 1981. (See *Matter of Exten Associates, 13 Bankr. at 821 n.3)*

> n5 The Court has relied upon the Bankruptcy Judge's opinion only with respect to the procedural aspects of the EAI bankruptcy. Plaintiff offered the opinion to provide other background with respect to the transactions discussed in the Bankruptcy Judge's opinion. However, the Bankruptcy Judge made no factual findings as that court was deciding a motion to dismiss on jurisdictional grounds. See *Matter of Exten Associates, Inc., 13 Bankr. at 821.*

On September 3, 1976, Goldstein, Exten, and others formed GAC, which acquired Parcel A–79 from EAI. (D.I. 153 at 68–70; Exhibit EG3–4, Exhibit RSA–1) Topside was incorporated in Maryland on February 18, 1977, with Goldstein serving as a director. (Exhibit P–106) On January 1, 1979, Topside leased Parcel A–79 from GAC and operated the Topside Restaurant until it burned to the ground on February 5, 1980. (D.I. 153 at 81, 102, 109, Exhibit RSA–2)

On December [*9] 12, 1978, Exten and Nucci formed TMLP, with Topside serving as the General Partner and Nucci, among others, as limited partners; Nucci ultimately was designated as Alternate General Partner. (Exhibit PS–34; D.I. 153 at 84–85, 88, D.I. 154 at 175–79) Topside had a "residual" interest in TMLP which amounted to 23 percent in 1978. (D.I. 153 at 91) At a foreclosure sale on January 9, 1979, TMLP purchased Parcel A–80 which had been held by EAI. (D.I. 153 at 88, 91, Exhibit P–1) On June 1, 1980, Topside signed two long–term leases with TMLP for use of a restaurant

to be built upon Parcel A–80 as well as for a parking lot and water and sewage treatment facilities. (D.I. 153 at 94, 100; Exhibit P–2, Exhibit P–3)

D. The Jeffreys Loan

Exten solicited a loan of $100,000 from Jeffreys to Topside to rebuild the Topside Restaurant and a loan agreement was executed on June 14, 1980. (D.I. 153 at 102, D.I. 155 at 128–30, 137, 163–64, 172–73, 175; Exhibit PA–B) This loan was not recorded. Neither Nucci nor Goldstein had actual knowledge of Jeffreys' loan to Topside until the commencement of the instant litigation. (D.I. 154 at 4–5, D.I. 154 at 107–08, D.I. 154 at 115) Exten assigned Jeffreys all [*10] of his stock in Topside as collateral, approximately 79 percent of the outstanding stock in Topside. (D.I. 153 at 115) The loan instrument specifically provided that Jeffreys was to "hold Exten's stock in trust for the specific purpose of collateral security against default." (Exhibit PA–B)

In negotiating for the loan, Jeffreys relied upon Topside's "Statement of Assets and Liabilities" (the "Statement") which Exten prepared and presented to Jeffreys. (Exhibit PA–A; D.I. 153 103–04, 109–10) This statement was dated May 9, 1980 and purported to represent Topside's financial condition as of April 30, 1980. (Exhibit PA–A) Jeffreys relied upon this Statement in deciding to loan the money to Topside. (D.I. 153 at 118; D.I. 155 at 128–30, 137, 163–64, 172–73, 175) The Statement indicated that in addition to Parcel A–80, which was listed as an asset worth $485,000 with an appraised value of $1,200,000, Topside had the following assets: cash – $1,850; rents receivable (from boat slips) – $13,050; insurance proceeds receivable – $575,000; personal property and fixtures – $15,000; equipment (tractors, boats, barges, lifts, etc.) – $207,000; tools – $8,500; Vehicles – $12,000; pre–paid [*11] insurance premiums – $10,300. All the assets together amounted to $1,328,300. (Exhibit PA–A) The Statement listed liabilities amounting to $846,200, including "Assignment of partial Insurance Proceeds" of $140,000. (Id.)

The Statement was materially false in listing Parcel A–80 as an asset of Topside when, in fact, Topside only held a 23% interest in TMLP, which actually owned Parcel A–80. (D.I. 153 at 112–14, Exhibit PA–A) Exten did not inform Jeffreys that it was TMLP, and not Topside, which owned Parcel A–80. (D.I. 153 at 114, D.I. 155 at 185) Topside had also conveyed a portion of Parcel A–80 (Parcel C) to Exten on June 2, 1980, but the conveyance was not recorded until February 29, 1984. (Exhibit PA–I) Thus, Topside held only two long–term leases with TMLP by which TMLP leased the Restaurant and Parcel A–80 to Topside in June 1980 for $47,900 per year. (Exhibit P–2, Exhibit P–3) These leases were not recorded until

October 22, 1980, four months after the Jeffreys loan. (Id.)

With part of the loan proceeds, Topside constructed a new Topside Restaurant on Parcel A-80, on the property adjacent to the location of the original Topside Restaurant. (D.I. 153 at 82, 116, D.I. 155 **[*12]** at 130, 139, 166) Jeffreys was involved in assisting in the operation of the restaurant. (D.I. 155 at 175)

In 1981, Exten informed Jeffreys that he had been personally adjudicated bankrupt and suggested that Jeffreys make any claims that he had relating to the loan in the Maryland Bankruptcy Court. (D.I. 155 at 138–39) By 1982, Exten had paid approximately $15,000 in principal on the loan and approximately $60,000 in interest. (D.I. 153 at 117–18)

On May 16, 1982, Exten, as president of Topside, and Jeffreys amended the original loan agreement to increase the principal to $167,739.15. (Exhibit PA-C; D.I. 153 at 117, D.I. 155 at 130) This accomplished a rollover of the balance of the unpaid principal and unpaid interest of the 1980 loan. (D.I. 155 at 141) As security for the loan, Exten again pledged all of his common stock in Topside (42,500 shares of 53,500 outstanding shares), and a U.C.C. Financing Statement which covered the equipment, furniture and other items which Topside purportedly owned. (Exhibit PA-C; D.I. 153 at 114–15, D.I. 155 at 137, 181) Jeffreys subsequently relinquished his security interest in the personal property in August, 1982. (D.I. 155 at 180–81; Exhibit **[*13]** G–16)

At some point in 1982, Topside defaulted on the loan to Jeffreys and Jeffreys subsequently instituted suit against Topside in the Delaware Superior Court. (D.I. 155 at 131, Exhibit PA-C) n6 Under the terms of the loan agreement with Topside, the default of the loan obligations should have enabled Jeffreys to become the majority shareholder in Topside. (Exhibit PA-B)

> n6 In the complaint, plaintiff alleged that his suit in Superior Court commenced on December 2, 1983. (D.I. 1 at P 21) Plaintiff, however, failed to prove this at trial.

On October 17, 1982, Exten mailed Jeffreys a letter that informed Jeffreys of difficulties with respect to Exten's bankruptcy and discussed "inventive planning" to protect Jeffreys' investment. (Exhibit P-110; D.I. 153 at 128) Exten proposed that Jeffreys purchase the restaurant from Topside, using the loan as part of the purchase price. (Exhibit P-110) The purpose of the offer was to circumvent his personal bankruptcy trustee's attempts to reach the Topside Restaurant. (Exhibit **[*14]** P-110)

E. Post-loan Activities

1. Settlement of EAI Bankruptcy Litigation

On October 7, 1982, Exten, Goldstein, GAC, TMLP, and Topside entered into a settlement agreement with the Trustee of the EAI bankrupt estate to pay the $500,000 that had been required originally under the 1974 bankruptcy plan. (Exhibit PA-H; D.I. 155 at 30–33) The $500,000 was to be paid by three different notes: the first note was to be for $150,000 and was to be guaranteed by Goldstein; the second note, for $200,000, was to be guaranteed by the Nuccis; the third note, for $150,000, was to be secured by a mortgage from TMLP on Parcel A-80. (Exhibit PA-H) Goldstein was to receive one-third of the fire insurance proceeds from the destruction of the original Topside Restaurant. (Exhibit PA-H) Nucci received a phone call from Exten requesting that he attend a meeting with Exten and Goldstein; after the meeting, Nucci relented to a request to serve as guarantor in order to protect the interests of other limited partners of TMLP who happened to be employees of Nucci. (D.I. 154 at 181–84) The Maryland Bankruptcy Court approved the settlement on February 3, 1983. (Exhibit P-32) The $500,000 appears to have been **[*15]** satisfied out of the proceeds of a transaction with Old Court Savings & Loan, Inc. ("Old Court").

2. Nucci Mortgage

In January, 1982, William and Sally Nucci executed a $140,000 mortgage with TMLP to secure a loan made by the Nuccis to TMLP to satisfy certain tax liabilities of TMLP. (D.I. 154 at 37–41, 192) Parcel A-80 served as the collateral for that mortgage. (Exhibit P-5) The Nuccis signed a release of that mortgage on February 2, 1983. (D.I. 154 at 37–41, Exhibit P-17) Subsequently, Exten phoned Nucci to inform him that the "release" had been a mistake, and that the mortgage should have been "subordinated." (D.I. 154 at 38)

3. Old Court Mortgage I

On February 2, 1983, two days before the Maryland Bankruptcy Court approved the EAI bankruptcy settlement agreement, TMLP executed a $1,575,000 mortgage with Old Court on Parcel A-80 ("Old Court Mortgage I") and $500,000 was placed into an escrow account for the benefit of the EAI bankruptcy settlement. (D.I. 153 at 141–42, D.I. 155 at 30–33, Exhibits P-13, P-14, P-15) The distribution of the remaining loan proceeds included the following disbursements: Goldstein received $16,000 in attorneys fees, and a check for $4,000 which **[*16]** he endorsed back to Jeffrey Levitt, the escrow agent at Old Court; $220,000 was placed in escrow for Old Court to service the debt owed on the mortgage for one year (D.I. 154 at 166); finance charges amounted to $47,250;

Murray Enterprises, Inc. received $405,762 in satisfaction of a mortgage executed on the Property several years before by EAI; First National Bank received $224,307 in satisfaction of a mortgage executed on the Property by EAI; and $75,000 was placed in escrow as a "Construction Loan." (Exhibit P-12) n7

n7 Plaintiff contends that the fees associated with the mortgage settlement were "excessive" and that Goldstein provided a "kickback" to Jeffrey Levitt of Old Court. Plaintiff has not supported these allegations, however, with any persuasive evidence.

Plaintiff alleges that these transactions were accomplished, in part, through the use of the United States mail. Plaintiff relies upon what appears to be correspondence with respect to these activities, however, there is nothing in the record to [*17] support a finding that any of this correspondence was placed into the postal stream. n8

n8 Plaintiff lists the following letters: Goldstein letter to Levitt (of Old Court), 2/1/83, Exhibit P-7; Goldstein letter to Levitt, 1/31/83, Exhibit P-8; Levitt letter to Old Court, 2/2/83, Exhibit P-21; Charles Street Title Co. letter to Meridian Mortgage Investments, Inc., 2/2/83, Exhibit P-24; Levitt letter to Jerome Cardin, Esq., 3/17/83, Exhibit P-25; Goldstein draw-down letter, 4/7/83, Exhibit P-30; Goldstein draw-down, 5/12/83, Exhibit P-31; Exten letter to Old Court, 8/15/83, Exhibit P-34. Of those documents, Exhibits P-7, P-8, P-30, and P-31 all expressly indicate that they were hand delivered. The other documents are merely photocopies of letters, without any testimony or other evidence that would indicate that they were actually placed into the United States' mail.

### 4. Elimination of Topside Assets

In September, 1983, after a three-year period in which Topside failed to fulfill its lease payment obligations to TMLP on [*18] the Topside Restaurant, Topside ceased operating the Restaurant. (D.I. 155 at 32–33) TMLP employed John Richardson to operate the restaurant for the last two months of 1983. (D.I. 155 at 50)

The equipment listed on the Topside Statement of Assets and Liabilities, such as the boats, barges, and lifts, was sold at some point between 1980 and 1983. (D.I. 153 at 137, D.I. 155 at 19–21) As a result of the settlement of litigation involving the fire insurance proceeds emanating from the destruction of the original Topside Restaurant,

Maryland National Bank received the fire insurance proceeds in partial satisfaction of a mortgage held on Parcel A–79 (D.I. 154 at 21, D.I. 155 at 197)

### 5. Nucci Mortgage II

On November 30, 1983, TMLP executed another mortgage for $140,000 with the Nuccis. (Exhibit PA–F) This mortgage "revived" the mortgage that the Nuccis had released prior to the Old Court Mortgage I. The Nuccis executed a release of the mortgage with respect to Parcel C on July 9, 1984. (D.I. 154 at 43, 96, Exhibit P-92) n9 The Nuccis executed a release of the mortgage with respect to Parcel A–80 and Parcel D on September 29, 1984. (D.I. 154 at 96–97, Exhibit P-95)

n9 In 1991, the Nuccis assigned whatever interest that they had in that mortgage to Old Court Land Corporation. (D.I. 154 at 193, Exhibit RS–D6)

[*19]

### 6. Joint Venture Between TMLP and FELP

On January 5, 1984, TMLP sold 51 percent of its holdings to FELP. (D.I. 154 at 61; Exhibit P-37) The consideration for the sale was an assumption of the existing Old Court Mortgage I and a $398,000 note to be payable out of the proceeds from the development of the joint venture property. (Exhibit P-37) Goldstein assisted in the formation of FELP in January, 1984. (D.I. 155 at 208–10) The partners in FELP were W.N., Inc. and O.C. Flights, Inc. as General Partners, and Nucci and O.C. Flights, Inc. as Limited Partners. (Exhibit P-43)

Nucci and Goldstein had two telephone conversations concerning the FELP joint venture in which the two defendants discussed the virtues of entering that joint venture and the settlement with Old Court. (D.I. 154 at 22–23, 30) Goldstein had at least one telephone conversation with Dennis Guidice of Old Court concerning the closing of the transaction and recommending Delaware counsel to assist in the transaction. (D.I. 154 at 137)

### 7. Release of Topside Leases

On January 10, 1984, Exten, as president of Topside, and Nucci, as alternate general partner of TMLP, signed a release of the Lease and Land Agreement between [*20] Topside and TMLP. (Exhibit P-42, D.I. 154 at 25) While Exten testified that these releases were never recorded, Exten admitted that the leases were at some point terminated. (D.I. 155 at 65–67) Thus, the only remaining assets held by Topside as of 1984 were a 23 percent share in TMLP and the liquor license for the Topside Restaurant. (D.I. 155 at 48)

### 8. Conveyance of Parcel B

On January 10, 1984, TMLP conveyed Parcel B to FELP, TMLP, and W.N. Inc. as co–tenants; FELP obtained a 50% interest, TMLP obtained a 49% interest, and W.N., Inc. obtained a 1% interest. n10 (D.I. 155 at 62–63; Exhibit PA–J; Exhibit P–41) The consideration stated in the deed was the assumption of indebtedness in the amount of $1,973,000. (Exhibit P–41) TMLP did not convey Parcel E, which is Parcel D and that portion of Parcel A–80 upon which the Restaurant was located. (Exhibit PA–J; Exhibit P–41)

> n10 This deed appears to have been recorded on March 20, 1984. (Exhibit PA–J)

### 9. Jeffreys obtains default judgment against Topside

On approximately [*21] January 13, 1984, Jeffreys obtained in the Delaware Superior Court a default judgment against Topside for defaulting on the loan. (D.I. 155 at 131; Exhibit P–131) n11 Jeffreys' counsel represented to this Court at trial that Jeffreys secured attachment of various equipment and personal property of Topside and that Jeffreys secured an injunction against the sale of other equipment. (D.I. 155 at 187–88) n12 While it appears, then, that Jeffreys undertook some efforts to collect on the judgment, his efforts have been unsuccessful to date. (D.I. 155 at 53, D.I. 155 at 131)

> n11 The Court bases this finding upon a copy of a motion for default judgment filed in Superior Court and dated January 13, 1984. The Court assumes that this judgment was entered on that date.

> n12 Jeffreys' counsel also represented that "there was a charging order entered upon the partnership interest of Topside Corporation on May 17, 1985." (D.I. 155 at 188) This, however, is not competent evidence upon which the Court can make a finding with respect to any attachment of the partnership interest. Plaintiff could have submitted a copy of this order to the Court. The Court's independent research uncovered an opinion in the Delaware Chancery Court that indicates that a charging order was issued in May of 1986. *Jeffreys v. Exten, 1988 WL 3636* at *2 (Del. Ct. Ch. January 11, 1988).

[*22]

### 10. Old Court Mortgage II

On February 9, 1984, FELP executed a $2,330,000 mortgage on Parcel B with Old Court ("Old Court Mortgage II"). n13 (Exhibits P–61, P–62, P–63) Although

the mortgage instrument describes the parcel as containing approximately 14 acres (Exhibit P–61), the record indicates that Parcel B consisted of only approximately 9 acres. (D.I. 155 at 63; Exhibit P–61) The money was disbursed as follows: $93,200 for "loan commitment fees, or points"; $27,040 for settlement expenses, including $10,000 in legal fees; $1,597,589.97 to pay off Old Court Mortgage I; $554,170.03 into "Escrow for Construction"; and $58,000 as an advance for Nucci. n14 (Exhibit P–60) Nucci's advance related to moneys advanced to satisfy certain tax obligations of TMLP. (D.I. 154 at 194)

> n13 Nucci signed an affidavit used in connection with Old Court Mortgage II on February 9, 1984 stating that there were no outstanding leases, judgments, or mortgages against Parcel A–80. (Exhibit P–116) In reality, Nucci held the revived $140,000 mortgage on Parcel A–80. (D.I. 154 at 43, Exhibit P–92) Nucci, on the advice of Goldstein, believed the affidavit to be true as he was told that the mortgage was going to be satisfied subsequently out of the Old Court Mortgage II settlement funds. (D.I. 154 at 48, 185)

[*23]

> n14 Again, plaintiff asserts that there were "uncharacteristically excessive closing costs" such as the points, document preparation, settlement preparation, legal fees, a pay off of the original mortgage in excess of the original principal, and the construction escrow." (D.I. 161 at 31–32) plaintiff offers no evidentiary support from the record for any of the above assertions; thus, the Court cannot find any of these facts.

Plaintiff alleges that this transaction was achieved through the use of the United States mail. Plaintiff lists sixteen letters that allegedly were mailed to complete the transaction (P–38, P–72, P–73, P–75, P–76, P–80, P–81 (2), P–84, P–85, P–86, P–88, P–89, P–90, P–91, P–94). However, plaintiff has failed to establish that the following documents were placed in the postal stream: P–38, P–72, P–73, P–76, P–81 (2), P–84, P–85, P–88, P–89, P–90, P–91, P–94. While in Exhibit P–81, plaintiff has provided a photocopy of an envelope which presumably contained a letter from Goldstein to Nucci, a photocopy of which is also included in Exhibit P–81, the photocopy does not have a postmark [*24] or any other indication that the envelope or its contents were placed in the postal stream.

The Court finds, however, that Exhibit P–75, a February 22, 1984 letter from Goldstein to Nucci, which contains documents and a letter purportedly sent to

Dennis Guidice of Old, was placed into the postal stream. Goldstein requested in Exhibit P-65 that Nucci ensure that FELP be named as beneficiary in an insurance policy covering the Topside Restaurant and Marina.

The Court finds that Exhibit P-86, a May 25, 1984 letter from Goldstein to Nucci regarding Old Court Mortgage II, also was placed into the postal stream. In that letter, Goldstein notified Nucci that there had been some irregularity with respect to Old Court Mortgage II, n15 that Goldstein would no longer continue to represent any of the parties in the matter, and Goldstein recommended that all parties retain counsel with regard to the matter.

> n15 Goldstein received a phone call from someone at Old Court several weeks after the settlement indicating that the mortgage and deed from the FELP transaction had not been recorded. (D.I. 154 at 148)

[*25]

11. Lease of Parcel A-80 to Tsoukalas

Notwithstanding the January, 1984 document that appeared to release Topside's leases on Parcel A-80 and the Restaurant (Exhibit P-42), on May 6, 1984, Topside, under the direction of Exten as its president, entered into a management agreement with defendant Tsoukalas that was designed to permit Tsoukalas to take over the management and liquor license of the Topside Restaurant. (D.I. 155 at 45–47, Exhibit PA–K)

On June 1, 1984, Tsoukalas entered into a lease agreement with TMLP for the Topside Restaurant for $60,000 per year. (D.I. 155 at 126, Exhibit PS–17) Exten signed the lease as General Partner of TMLP (presumably acting as Topside's president). (Exhibit PS–17) Tsoukalas made $60,000 in rental payments, with the first payable to Exten for $20,000, and the rest payable directly to TMLP. (Exhibit P-112, Exhibit P-113)

At some point in 1984, Jeffreys knew that Tsoukalas was operating the Topside Restaurant. (D.I. 155 at 174)

12. Exten Becomes General Partner of TMLP

On October 2, 1984, Nucci, as Alternate General Partner of TMLP, appointed Exten as TMLP's General Partner and ratified all of Exten's actions from July 31, 1981 to October 23, [*26] 1984. (Exhibit P-96) Thus, Exten, who had been president of Topside, which was in turn the General Partner of TMLP, was now acknowledged as being the General Partner of TMLP. Nucci and Exten had a telephone conversation regarding Exten's being retroactively appointed as General Partner of TMLP.

(D.I. 154 at 79)

13. Tsoukalas Mortgage

On December 5, 1984, TMLP sold Parcel E, including the Topside Restaurant, to Tsoukalas for stated consideration of $640,000. (D.I. 155 at 56, 126, Exhibit PA–L) This sale was undertaken at the direction of Exten in his capacity as president of Topside, the General Partner to TMLP. (Exhibit PS–32) Tsoukalas executed a mortgage for $615,000 with TMLP on December 5, 1984 ("Tsoukalas Mortgage"). (D.I. 155 at 64, Exhibit PA–L) The sales price, as reflected on the settlement sheet, was $640,000. (Exhibit P-118) n16 The settlement sheet also reflects a set-aside of $27,500 for outstanding judgments by individuals named McKibben and Perrin, who were Limited Partners of TMLP; these judgments were obtained against TMLP and Topside in Delaware Superior Court in October, 1983 and June, 1984. (Exhibit P-118; Exhibit P-123; Exhibit P-124; Exhibit P-125)

> n16 The Court presumes that Exhibit P-118, which is barely readable, is the settlement sheet for this loan.

[*27]

14. Shenandoah Mortgage I

On December 17, 1984, TMLP applied for a loan from the Shenandoah Federal Savings and Loan Association ("Shenandoah") for $450,000, and offered the Tsoukalas Mortgage as collateral. (D.I. 155 at 64, 70, Exhibit PS–19; Exhibit PS–20) On January 11, 1985, TMLP, with Exten signing on behalf of Topside as General Partner of TMLP, assigned the Tsoukalas Mortgage to Shenandoah. (Exhibit PS–23) Nucci and Exten guaranteed the loan. (Exhibit PS–33) Again, Nucci guaranteed the loan to protect the other limited partners. (D.I. 154 at 189) The settlement sheet reflects that TMLP received $377,991. (Exhibit PS–24) Approximately $198,000 was distributed among TMLP's Limited Partners to buy out the shares of some of those partners (Exhibit PS–1; D.I. 154 at 58, 100), including the following disbursements: $25,000 was paid to Nucci to reimburse an advance he had provided in order to settle litigation that had been brought by Exten's personal bankruptcy trustee against Exten, Topside, and TMLP (D.I. 154 at 68–70, 73); $61,616.94 was paid as Nucci's distribution to United Virginia Bank in payment of a loan undertaken by Nucci on behalf of TMLP (D.I. 154 at 72–73, 195); [*28] $55,000 was escrowed for road construction (D.I. 155 at 75); $10,000 went to Exten as a "Loan Brokerage Fee" (D.I. 155 at 75). By these transactions, TMLP bought approximately 40 to 50 percent of the outstanding interest of its limited partners. (D.I. 155 at 103–04) Therefore, Topside's interests in TMLP,

being "residual," correspondingly increased by approximately the same amount of the repurchase of the limited partners' interests.

Nucci had a telephone conversation with William DiLoreta of Shenandoah concerning Nucci's ability to serve as guarantor of the loan. (D.I. 154 at 80)

### 15. Instant Lawsuit

On January 21, 1986, Jeffreys filed the complaint in this action seeking recovery of the amount of the Delaware state court default judgment of $259,933.79 plus interest. (D.I. 1)

### 16. Tsoukalas Mortgage Foreclosed

Tsoukalas was unable to make the mortgage payments due in part to the lack of success in running the Topside Restaurant. (D.I. 154 at 115–18) In May, 1986, after Tsoukalas failed to meet payment obligations, TMLP and Shenandoah foreclosed on that mortgage. (Exhibit PS–85; Exhibit PS–86; D.I. 155 at 71–73) n17 Apparently, there was an entry of judgment by default with respect [*29] to the mortgage against Tsoukalas on July 24, 1986. (Exhibit PS–47) n18

> n17 The Court bases this finding in part upon a copy of a demand letter written by Exten and apparently co–signed by an agent of Shenandoah (Exhibit PS–85), as well as a copy of what appears to be a complaint filed in Delaware Superior Court. (Exhibit PS–45)

> n18 The Court makes this finding based upon a barely legible photocopy of what appears to be a motion for entry of a default judgment filed in the Delaware Superior Court pursuant to Superior Court Civil Rule 55. (D.I. PS–47)

### 17. Shenandoah Mortgage II

On June 10, 1986, Exten, acting through GNP, sought financing from Shenandoah to obtain Parcel E. (Exhibit PS–48) In June, 1986, Exten attempted to buy Parcel E on behalf of Tengees. (D.I. 155 at 73; Exhibit PS–50) On July 24, 1986, Exten, through Tengees, secured approval for a short term acquisition loan from Shenandoah in the amount of $855,000 to acquire Parcel E. (Exhibits PS–60 to PS–63) Nucci and Exten served as guarantors for [*30] the loan. (Exhibit PS–60) Nucci served as guarantor to extinguish the $450,000 obligation to Shenandoah, and to attempt to ensure that TMLP's limited partners obtained some return of their investment. (D.I. 154 at 190) Jeffreys filed a lis pendens with respect to the Property on September 22, 1986, notifying all parties with an inter-

est in the Property of the instant litigation. (Exhibit PS–68) Shenandoah purchased Parcel E for $673,547.10 at a Sheriff's sale on September 23, 1986. (Exhibit PS–47) Shenandoah obtained a Sheriff's Deed for that parcel on October 10, 1986. (Exhibit PS–47)

Shenandoah conveyed Parcel E to Tengees on October 15, 1986 for stated consideration of $674,000. (Exhibit PS–67) That deed conveyed title to a sewer system and a water and pump house to Tengees; however, TMLP still retained a fifty percent interest in both of those items. (Exhibit PS–67, Exhibit PS–2) n19 Tengees executed a mortgage with Shenandoah for $855,000 ("Shenandoah Mortgage II"). (Exhibit RS–B2) As part of the settlement, Shenandoah received $456,545.74 to satisfy TMLP's obligations to Shenandoah under Shenandoah Mortgage I. (Exhibit PS–65) Also at settlement, Tengees received $242,793.96; [*31] $112,900 went into a construction escrow. (Exhibit PS–65) Exten received $45,766 for moneys advanced by him to TMLP. (D.I. 155 at 109–10) United Virginia Bank received payments of $71,218.83 and $5,824.95 for obligations guaranteed by Nucci and Exten. (D.I. 155 at 111–12) Baltimore Trust received $10,501.06 in satisfaction of a loan that had been advanced to Nucci to help operate the restaurant. (D.I. 155 at 113–14) William Wilgus received $31,185.98 for his assistance in instituting the foreclosure proceedings. (D.I. 155 at 114) Exten received $48,000 in exchange for Parcel C. (D.I. 155 at 114) Exten used $12,889.49 to pay legal fees in two pending cases, a Jeffreys' case and a case involving Maryland Deposit Insurance Fund. (D.I. 155 at 123)

> n19 On March 15, 1989, Exten, as TMLP's General Partner, executed a quitclaim deed that conveyed TMLP's interest in the pump house and wastewater disposal system to Shenandoah. (Exhibit RSC–4)

### 18. Post–Tengees Activities

In May, 1987, as the result of the litigation [*32] involving the fire insurance proceeds from the original Topside Restaurant fire, there was a foreclosure sale of Parcel A–79, related to a mortgage held by Maryland National Bank. (D.I. 155 at 215) Goldstein and two others obtained and subsequently sold the parcel for $125,000. (D.I. 155 at 215–17)

In June, 1987, Exten, through Tengees, unsuccessfully attempted to sell Parcel E to Robert Kent for $1,200,000. (Exhibit PS–79) In January, 1988, Shenandoah foreclosed on Shenandoah Mortgage II and subsequently sold Parcel E to G.R. Contractors for $1,200,000. (Exhibit RS–B4; Exhibit PS–78; Exhibit RS–

B17)

On January 20, 1989, FELP, acting through Nucci and Exten, conveyed to G.R. Contractors an option to purchase Parcel B by satisfying the existing mortgage on the property. (Exhibit RS–D5)

F. General Findings

The Court finds generally that at no time, until the commencement of this lawsuit, did either Nucci or Goldstein have any specific knowledge of the nature and amount of Jeffreys' loan to Topside. (D.I. 155 at 125, D.I. 155 at 132–33, D.I. 154 at 4–5, D.I. 154 at 107–08, D.I. 154 at 115) Throughout his prepurchase dealings with Exten, Topside, and TMLP, Tsoukalas had no knowledge [*33] of the Nuccis, Jeffreys, or Jeffreys' judgment against Topside. (D.I. 154 at 114–17)

While Exten, acting pro se at the trial, indicated during questioning of Jeffreys that Jeffreys made a claim in his personal bankruptcy proceedings in Maryland and that his claim was discharged (D.I. 155 at 141–42), there is insufficient evidence in the record to support such a finding. Exten provided a schedule of debts filed in that bankruptcy proceeding that included Jeffreys' loan (Exhibit Exten–2), and Exten provided a Discharge of Debtor Order signed on March 12, 1985 by the Honorable James F. Schneider, Bankruptcy Judge for the United States Bankruptcy Court for the United States District Court for the District of Maryland. (Exhibit Exten–3) However, the Order merely states that Exten is "released from all dischargeable debts," and fails to list those debts. Thus, this Court cannot conclude from that Order that the Jeffreys' loan was discharged.

III. CONCLUSIONS OF LAW

Plaintiff has alleged five different causes of action: common law fraud; fraudulent conveyance; violations of *18 U.S.C. § 1962*(a); violations of *18 U.S.C. § 1962* [*34] (c); violations of *18 U.S.C. § 1962*(d). The complaint includes fifteen counts, with two of those counts having been dismissed prior to trial. *Jeffreys v. Exten, 784 F. Supp. 146 (D. Del. 1992).* The Court will address each remaining count in the complaint seriatim. Plaintiff bears the burden of proof by the preponderance of evidence. See *Nye Odorless Incinerator Corp. v. Felton, 35 Del. 236, 162 A. 504, 511 (Del. Super. 1931)* (fraud must be proved "to the satisfaction of the jury"); *Justice v. D.R. Builders, 1978 WL 2513* at *3 (Del. Ct. Ch. 1978) (fraudulent conveyance); *United States v. Local 560, 780 F.2d 267, 279–80 n.12 (3d Cir. 1985),* cert. denied, *476 U.S. 1140, 90 L. Ed. 2d 693, 106 S. Ct. 2247 (1986) (18 U.S.C. §§ 1962* et seq. ("RICO")).

A. Application of Maryland Partnership Law

Before addressing the counts in the complaint, the Court makes the following general conclusions of law. By virtue of the loan to and default judgment against Topside, plaintiff was a creditor of Topside. Topside's only asset at the time of [*35] the entry of the judgment was its 23% interest in TMLP. Thus, Topside's partnership interest in TMLP was an asset of Topside which could be used to satisfy Jeffreys' judgment against Topside. As TMLP was a Maryland partnership, the Court will look to Maryland partnership law to determine the extent of Jeffreys' interests with respect to the partnership. Under Maryland law, by virtue of his judgment against Topside, the general partner of TMLP, Jeffreys' rights with respect to the partnership were limited to obtaining a charging order against Topside's partnership interest and receiving the distributions due Topside as general partner. See Md. Code Ann. § 10–705. A charging order gives the judgment creditor "only the rights of an assignee of the partnership interest." Id. An assignment "entitles the assignee to receive, to the extent assigned, only the distributions to which the assignor would be entitled." Id. at § 10–702. Plaintiff, therefore, could never have become a creditor of TMLP by virtue of his judgment against Topside. n20 The Court also concludes that upon the default of the loan, Jeffreys was entitled to take ownership of Exten's shares in Topside, which constituted [*36] the majority of that stock. Therefore, Jeffreys could have taken direct control of Topside and TMLP by virtue of Topside's being general partner of TMLP. Plaintiff failed to take advantage of that opportunity.

n20 Plaintiff argues that "it has been held that the creditors of an individual partner gains an equal or superior equity as a creditor of the partnership when the funds advanced to the individual partner were used as the capital upon which the business of the partnership was commenced." (D.I. 161 at 68 (citing *Reeves, Stevens & Co. v. Ayers, 38 Ill. 418 (1865)).* Plaintiff further contends that because plaintiff's loan was used to establish the business of the partnership, and because Topside fraudulently represented itself as owning the property of the partnership, plaintiff should be deemed a creditor of TMLP. The Court rejects plaintiff's arguments. Ayers is materially distinguishable because in Ayers the contributing creditor had contributed all of the funds used for the startup of the firm and secured his interest with a mortgage on the parcels of property that were the assets of the partnership. Id. at 318–20. Here, there were other investments in the partnership and plaintiff did not execute a mortgage on the property. Finally, plaintiff's argument would be persuasive if the loan itself was before the Court. However, what is at issue in this case

is the judgment against Topside, not a loan to or judgment against TMLP.

**[*37]**

TMLP had no cognizable legal interest in Parcel A–79. GAC owned Parcel A–79, and this parcel was not the subject of any fraudulent transfers with respect to TMLP, Topside, or Jeffreys. Plaintiff failed to demonstrate that this parcel served as the basis for any mortgages or other encumbrances obligating TMLP. While GAC was a defendant in the EAI bankruptcy trustee litigation, there is nothing in the record to support a finding with respect to GAC's liability in that litigation. Thus, GAC, as owner of Parcel A–79, is not liable with respect to either the fraudulent conveyance counts or the RICO counts. Therefore, as GAC did not injure the plaintiff in any demonstrated respect, the Court will enter judgment in favor of GAC notwithstanding GAC's default in appearance.

B. Common Law Fraud

There are five elements of a common law fraud claim: "1) a false representation, usually one of fact, made by the defendant; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; **[*38]** and 5) damage to the plaintiff as the result of such reliance." *Stephenson v. Capano Development, 462 A.2d 1069, 1074 (Del. Supr. 1983)*. Thus, a claim for common law fraud requires a knowing or reckless misrepresentation of fact by a defendant, and an act or omission by the plaintiff in reliance upon that misrepresentation.

Although plaintiff appears to allege that virtually every action taken by the defendants amounted to common law fraud, as only defendants Exten and Topside made any representations to plaintiff, those are the only defendants who could be liable for common law fraud.

However, plaintiff's claim for fraud is barred by the statute of limitations. The last potential act that plaintiff took in reliance upon any fraudulent statements of fact by defendants Exten and Topside would be the rollover of the loan in 1982. The statute of limitations applicable to common law fraud is three years. *10 Del. C. § 8106*. Plaintiff commenced the instant action in January, 1986, which is over three years from the second loan. Thus, plaintiff's claim fails as being barred by the three year statute of limitations. n21

n21 Plaintiff has made no argument that the statute of limitations should be tolled for any reason.

**[*39]**

C. Fraudulent Conveyance

Plaintiff, in his proposed findings of fact and conclusions of law, contends that the evidence at trial established that the following were fraudulent conveyances:  the release of Topside's land lease and restaurant lease;  the "revival" of the $140,000 mortgage after the Nuccis executed an affidavit stating that the debt was extinguished;  the sale of Parcel E to Tsoukalas for stated consideration of $640,000 and the assignment of the $615,000 Tsoukalas Mortgage to Shenandoah for $450,000, when the property had been appraised at a value of $1,200,000; the transfer of Parcel B to FELP. See D.I. 161 at 65–69.

Under Delaware's Act Concerning Fraudulent Conveyances (the "Act"), a debtor's conveyance of assets with intent to "hinder, delay, or defraud either present or future creditors[] is fraudulent as to both present and future creditors." *10 Del. C. § 1307*. Similarly, the Act declares as fraudulent any conveyances "by a person who is or will be thereby rendered insolvent" if the conveyance is made "without a fair consideration." *10 Del. C. § 1304*. "Fair consideration" is defined as a good faith exchange for property or to satisfy an antecedent debt **[*40]** that is "a fair equivalent." *10 Del. C. § 1303*. See also *Tri–State Vehicle Leasing, Inc. v. Dutton, 461 A.2d 1007 (Del. Supr. 1983)*.

Once a party establishes by a preponderance of the evidence that the transferor conveyed the asset with specific intent to defraud the creditor, the creditor can obtain satisfaction. *Justice v. D.R. Builders, 1978 WL 2513* at *3 (Del. Ct. Ch. 1978). Also, if a creditor establishes by a preponderance of the evidence that the debtor conveyed an asset without fair consideration that renders the debtor insolvent, the creditor can obtain satisfaction. Id.

1. The Topside Leases

With respect to the release of the land lease and the restaurant lease, the Court concludes that the plaintiff has established that the release of these leases in January, 1984 was a fraudulent conveyance. The Court first notes that plaintiff has failed to sustain his burden of proving that the conveyance was not made for fair consideration. While plaintiff alleged such, the Court concludes that in consideration for Topside's release of the leases, TMLP forgave Topside's rent arrearage. As plaintiff has not demonstrated the value of the leases to **[*41]** Topside at the time, the Court is unable to determine whether the rent arrearage was a fair equivalent. Plaintiff also failed to prove that Topside was rendered insolvent at the time of the conveyance. At the time of the conveyance, Topside maintained a 23% interest in TMLP which, while subject

to encumbrances, had some value at that time.

Plaintiff, however, has sustained his burden with respect to proving a specific intent to defraud with regard to the release of the leases. The Court bases this conclusion upon the fact that the leases were released within three days of the entry of default judgment against Topside. The Court concludes that Exten, as president of Topside, was aware of Jeffreys' suit against Topside and Topside's failure to answer or otherwise defend that suit. Exten knew that assets of Topside would be subject to attachment after entry of judgment against Topside. Thus, the Court concludes that Exten, with specific intent to defraud plaintiff, released the leases to hinder the collection of Jeffreys' judgment. n22 The evidence in the record is insufficient to determine with certainty the total amount of damages sustained by Jeffreys with respect to this conveyance. **[*42]** The only evidence in the record concerns the subsequent brief lease to Tsoukalas for $60,000 a year, which is an increase of approximately $12,500 over the $47,500 Topside owed per year on the lease. Thus, for the period in which the lease was transferred to Tsoukalas, which was approximately six months (June to December 1984), the difference in value to Jeffreys amounts to $6,250 – which is one half year's worth of the excess amount of rent received by TMLP. The Court will assume that Topside could have sublet this property to Tsoukalas for this period of time and for this amount. The Court will enter judgment in favor of plaintiff as to Exten and Topside in the amount of $6,250.

> n22 "A transfer by the landlord will defeat the tenant's leasehold interest if such interest can be defeated, under controlling local law, by a bona fide purchaser and such a purchaser is involved." Restatement (Second) of Property, § 15.1 at 90 (1977). The sale to Tsoukalas defeated Topside's leasehold interest.

2. Transfer of liquor **[*43]** license

The Court makes the same conclusion with respect to the transfer of the liquor license to Tsoukalas. This conveyance occurred under similar circumstances. However, Jeffreys has not provided any evidence with which the Court can assign a value to the liquor license. Thus, the Court will award nominal damages of $1.00.

3. Conveyance of Parcel E to Tsoukalas

With respect to the transactions involving Tsoukalas, the Court concludes that the sale of partnership property could not have been a fraudulent conveyance as to Jeffreys because Jeffreys was not, and is not, a creditor of TMLP. n23 At most, Jeffreys was in a position to take the bene-

fits of Topside's partnership interest in TMLP by obtaining a charging order. Thus, the conveyance of TMLP property, while perhaps it could be fraudulent with respect to TMLP's creditors if it rendered the partnership insolvent or was made to a partner or to a non-partner without fair consideration, *10 Del. C. § 1308* (fraudulent conveyance of partnership property), could not be fraudulent with respect to Jeffreys.

> n23 The Court is also concerned that plaintiff waited two years to bring a lawsuit seeking to set aside this conveyance. As of 1984, plaintiff by his own admission was aware of the transactions resulting in Tsoukalas' operating the Topside Restaurant. Plaintiff, therefore, knew in 1984 that some conveyance with respect to Topside's lease had occurred. *Cooch v. Grier, 30 Del. Ch. 255, 59 A.2d 282 (Del. Ct. Ch. 1948).*

**[*44]**

Furthermore, the Court concludes that the conveyance to Tsoukalas was an arms length transaction to a bona fide purchaser for value. Plaintiff has failed to demonstrate that Tsoukalas knew or should have known of any improprieties with respect to this transaction. The Court found credible Mr. Tsoukalas' testimony at trial that he had no knowledge of Mr. Jeffreys, Mr. Jeffreys' loan, or any problems with the title to the property. Indeed, while plaintiff contends that a Mr. Eberly, an attorney who conducted a title search and found problems in the chain of title, was Tsoukalas' attorney, there is no evidence in the record to support either that allegation or the inference that Eberly ever communicated any such problems to Tsoukalas. The Court concludes that the transaction was for fair consideration. Tsoukalas paid $640,000 for the property, including the $615,000 mortgage with TMLP. n24 Thus, judgment will be entered against plaintiff as to Tsoukalas on Count XI.

> n24 Plaintiff erroneously contends that the "fair consideration" for the property would have been $1,200,000 which Exten stated as the assessed value of the property. (D.I. 161 at 69) First, the Court is skeptical that Exten's representation of $1,200,000, given as an assessment value of the whole of Parcel A–80 in the original Statement of Assets and Liabilities given to Jeffreys before he gave Topside the loan, relates to the smaller parcel of property that was sold to Tsoukalas, Parcel E. Second, the Court cannot conclude, as a matter of law, that the sale of a parcel of property for $640,000 was not fair consideration without significant proof that the property could have been sold

for a much greater amount at that time.

**[\*45]**

4. Nucci mortgage "revival" Plaintiff also attacks as a fraudulent conveyance the revival of the $140,000 Nucci mortgage. Plaintiff is correct that this transfer was without consideration. However, even assuming that this mortgage was a fraudulent conveyance, and not a revival of a mistakenly released (as opposed to subordinated) mortgage, there is no evidence in the record that this mortgage has ever been satisfied. Furthermore, as with the Tsoukalas transaction, this encumbrance on the Parcel A-80 could not be fraudulent with respect to Jeffreys as he was not a creditor of TMLP.

5. Conveyance of Parcel B to FELP

The Court concludes that the transfer of Parcel B to FELP was not a fraudulent conveyance. Again, as with the Tsoukalas transaction, the Court concludes that this conveyance could not be fraudulent with respect to Jeffreys as he was never a creditor of TMLP. n25 This transfer from TMLP to the FELP joint venture, of which TMLP was 49% owner, was made in exchange for FELP's assumption of the outstanding encumbrances on the parcel, which were in excess of $1,900,000. n26 TMLP benefitted significantly from FELP's assumption of its debt, which TMLP appeared unable to satisfy **[\*46]** at that time.

n25 The same reasoning holds true with respect to each of the conveyances of property by TMLP. As Jeffreys was never a creditor of TMLP, conveyances of TMLP's property could not be fraudulent with respect to Jeffreys.

n26 Plaintiff is not entitled to recover under *6 Del. C. § 1308*, which specifically concerns conveyances of partnership property to partners, because § 1308 applies only to creditors of the partnership and plaintiff was not a creditor of the partnership.

D. RICO

Plaintiff has stated his RICO theory in his proposed findings of fact and conclusions of law as follows:

There were multiple and separate fraudulent acts wherein the assets of TMLP were encumbered, diverted, stripped, and/or transferred, commencing with the first Old Court Savings and Loan transaction in February of 1983 and concluding with the Tengees/shenandoah transaction in 1986–87, without being altered in any sense by the present proceedings. One purpose of these acts was to prevent Plaintiff from collecting his **[\*47]** debt and later his judgment, initially by rendering Topside's interest in TMLP substantially worthless by virtue of the over–encumbrance of the assets of TMLP and ultimately by transferring the assets out of TMLP's ownership. In addition, other assets of TMLP were transferred from Topside's ownership without consideration to Topside and for the direct benefit of the Defendants (e.g., the operating leases for the Topside Restaurant Land and Management Agreement). . . . While each fraudulent action is distinct, each bares a similarity in relationship to the various schemes to defraud Plaintiff and therefore resulted in a series of injuries to Plaintiff over a significant period of time. Plaintiff was the only target of the Defendants, and the various schemes employed to discourage Plaintiff's enforcement of his judgment were carried out by several individuals and entities within their control.

D.I. 161 at 57–58. See also complaint at PP 18, 21 (actions of defendants undertaken to deprive plaintiff of his security for, and hinder repayment of, the debt from Topside).

The Court concludes that plaintiff is limited to this theory on the basis of his own arguments and on the basis **[\*48]** of the Court's pre-trial ruling with respect to plaintiff's standing. See *Jeffreys v. Exten, 784 F. Supp. at 159* (plaintiff has standing under RICO as creditor because plaintiff "alleges that the dissipation of corporate assets was directed specifically at hindering his ability to collect his debt") (emphasis added).

There are two particular elements that are common to any claim brought pursuant to RICO. First, a plaintiff must prove the existence of an "enterprise." Second, a plaintiff must prove a "pattern of racketeering activity."

1. Enterprise

An "enterprise" for the purposes of RICO is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *18 U.S.C. § 1961*(4).

Plaintiff alleges that the defendants, excluding Tsoukalas, together constituted an enterprise by virtue of operating as an "association–in–fact." In *United States v. Riccobene, 709 F.2d 214 (3d Cir.)*, cert. denied sub

nom *Ciancaglini v. United States, 464 U.S. 849, 104 S. Ct. 157, 78 L. Ed. 2d 145 (1983),* [*49] the Third Circuit laid out three requirements for proving the existence of an enterprise: 1) that the enterprise is an ongoing organization that has some sort of framework or superstructure used for making or carrying out decisions; 2) that the members of the enterprise function as a continuing unit with established duties; and 3) that the enterprise is separate and apart from the pattern of racketeering activity. *Id. at 221-24* (cited with favor in *Seville Indus. Machinery v. Southmost Machinery, 742 F.2d 786, 789-91 (3d Cir. 1984)).*

In 1987, in *Town of Kearny v. Hudson Meadows Urban Renewal, 829 F.2d 1263, 1268 (3d Cir. 1987),* the Third Circuit applied the "enterprise" test to an association–in–fact enterprise. The court reasoned that a RICO association–in–fact enterprise could be found where a group of individuals met numerous times in connection with more than one scheme, where one member provided the necessary funding and other members took the necessary action, where there was evidence of a decisionmaking structure, and where the enterprise existed separate and apart from the pattern of RICO [*50] activity. *Id. at 1266.*

The Court concludes that plaintiff has established by a preponderance of the evidence that the association–in–fact enterprise alleged to exist among the defendants had a specific structure to engage in the activities and transactions complained of by the plaintiff. The structure of the enterprise had Exten masterminding the various transactions to be undertaken, Goldstein negotiating to obtain the various mortgages and land conveyances with Old Court, with Nucci serving as guarantor when necessary. Nucci also stepped in, as Alternate General Partner, to authorize the various transactions on behalf of TMLP. Once Goldstein stepped out of the picture in May, 1984, Exten served as the negotiator on the Tsoukalas and Shenandoah transactions. Topside, TMLP, FELP, and W.N. were vehicles through which these transactions took place.

Plaintiff has failed to demonstrate, however, that these entities engaged in any activity aside from the alleged pattern of racketeering activity. Plaintiff's theory is that the pattern of racketeering activity was a scheme to manipulate and encumber the assets of TMLP in order to preclude plaintiff from satisfying [*51] his judgment against Topside, TMLP's General Partner. And, indeed, the only activities of record of the alleged enterprise involve transactions whereby the defendants manipulated the purchase and sale of Parcel A–80 in order to generate cash. Plaintiff has failed to demonstrate any activity engaged in by the members of the alleged association–in–fact enterprise as an enterprise other than the actions which plaintiff con-

tends constitute the pattern of racketeering activity. See *Parker and Parsley Petroleum v. Dresser Industries, 972 F.2d 580, 583 (5th Cir. 1992)* (no RICO enterprise where association–in–fact "has no existence as an entity separate and apart from the actual pattern of racketeering"); see also *Superior Oil Co. v. Fulmer, 785 F.2d 252 (8th Cir. 1986).*

### 2. Pattern of Racketeering Activity

Even assuming that plaintiff had established the existence of an association–in–fact enterprise, the Court makes the following conclusions with respect to the allegation that the enterprise engaged in a pattern of racketeering activity. A "pattern of racketeering activity" for the purposes of RICO "requires at least two acts [*52] of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." *18 U.S.C. § 1961(5).* A "racketeering activity" is defined as "any act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud)." *18 U.S.C. § 1961(1).*

In *H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989),* the Supreme Court held that "RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." Id. at 2900 (emphasis in original). "To establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of continuing racketeering activity." [*53] Id. at 2901 (emphasis in original). The continuity requirement can be "satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business . . . or of conducting or participating in an ongoing legitimate RICO 'enterprise.'" Id. at 2902.

#### a. The Predicate Acts

The mail fraud statute, *18 U.S.C. § 1341,* provides in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises . . ., for the purpose of executing such scheme or artifice or attempting to do so, . . . knowingly causes to be delivered by mail according to the direction thereon . . .

any . . . such matter or thing, shall be fined . . . or imprisoned . . . or both.

The wire fraud statute, *18 U.S.C. § 1343,* provides in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, **[*54]** or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined . . . or imprisoned . . . or both.

These two statutes are read in pari materia, and the requisite analysis for both are similar; "accordingly, the cases construing the mail fraud statute are applicable to the wire fraud statute as well." *United States v. Tarnopol, 561 F.2d 466, 475 (3d Cir. 1977);* see also *United States v. Zauber, 857 F.2d 137 (3d Cir. 1988),* cert. denied, *489 U.S. 1066 (1989).* In order to prove an instance of mail or wire fraud, the plaintiff must prove the existence of a scheme to defraud in which the defendant "causes" the mails or wires to be used in furtherance of or for the purpose of executing the scheme, together with a specific intent to commit fraud. See, e.g., *Pereira v. United States, 347 U.S. 1, 98 L. Ed. 435, 74 S. Ct. 358 (1954); United States v. Fagan, 821 F.2d 1002, 1008 (5th Cir. 1987),* **[*55]** cert. denied, *484 U.S. 1005, 98 L. Ed. 2d 649, 108 S. Ct. 697 (1988).*

A defendant "causes" the use of the mails or wires in violation of federal law when, in furtherance of the scheme to defraud, he "does an act with knowledge that the use of the mails [or wires] will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *Pereira, 347 U.S. at 8-9.* n27

n27 Several of the defendants erroneously argue that they cannot have committed mail or wire fraud with respect to the plaintiff because they did not send letters to or make phone calls to plaintiff. From the above discussion, it is clear that it is not necessary to demonstrate that each individual defendant personally used the mails or the wires. It is also not necessary for any of the uses of the mails or the wires to be directed to the plaintiff. Rather, the use of the mail or the wires must be in furtherance of the scheme or artifice to defraud.

A mailing is "for the **[*56]** purpose of executing a scheme to defraud" when that mailing "furthers" the scheme. *Tarnopol, 561 F.2d at 471-72.* The mailing must be closely related to the scheme, such that the success of the scheme is dependent in part upon the mailing. Id. (citing *United States v. LaFerriere, 546 F.2d 182, 187 (5th Cir. 1977)).* A mailing which is "merely . . . a convenient but not essential tool in carrying out" the scheme does not come within the scope of the statute. Id. See also *United States v. Giovengo, 637 F.2d 941, 945 (3d Cir. 1980)* (wire fraud conviction upheld because use of wire transmission was essential to success of scheme).

b. Scheme to Defraud

The Court concludes that plaintiff has failed to establish by a preponderance of the evidence that the defendants engaged in the scheme to defraud as theorized by plaintiff; that is, that the challenged transactions constituted a scheme designed specifically to deprive plaintiff of the satisfaction of his judgment against Topside. The Court bases this conclusion, in part, upon the fact that plaintiff has failed to prove that two of the alleged principals **[*57]** in this scheme to defraud plaintiff, Nucci and Goldstein, had any knowledge of plaintiff's loan to Topside or judgment against Topside until the commencement of this RICO action in January 1986. n28

n28 Plaintiff's theory is similar to a theory successfully espoused in *Bankers Trust Co. v. Rhoades, 859 F.2d 1096 (2d Cir. 1988),* cert. denied, *490 U.S. 1007, 104 L. Ed. 2d 158, 109 S. Ct. 1642 (1989).* In that case, the Second Circuit, in reversing a motion to dismiss, found that a plaintiff creditor had standing when in reliance upon misrepresentations regarding a bankrupt debtor's assets – supported in part by fraudulent conveyances of those assets – the creditor agreed to take a smaller percentage on its allowed claim under the plan of confirmation. *Id. at 1098-99.* The creditor was also the target of two frivolous lawsuits instituted by the debtor and facilitated by bribery of a South Carolina state court judge. Id. The predicate acts included bankruptcy fraud and bribery with respect to the South Carolina judge. Id. There is no question in Bankers Trust Co. that the bankruptcy fraud was targeted generally towards the creditor, and that the sham litigation and judicial bribery were targeted directly towards the plaintiff. Thus, the theory in Bankers Trust, if proven, unquestionably would establish a scheme directed specifically towards the plaintiff creditor because the only purpose of the bankruptcy fraud would be to defraud the creditor and the only purpose of bribing a judge in a lawsuit instituted against a particular creditor would be to harm that

creditor and cause direct injury to that creditor.

**[*58]**

The Court concludes that at best plaintiff has painted a colorable picture of a scheme by which certain of the defendants engaged in activity designed to defraud various financial institutions with respect to a cycle of obtaining and siphoning off funds through greater and greater mortgages, and then defaulting on those mortgages. The Court concludes that Jeffreys was not the target of this activity, but was injured, if at all, by these activities merely incidentally. Indeed, to the extent that plaintiff theorizes that the purpose of the challenged transactions was to dissipate the assets of TMLP in order to avoid satisfying his judgment against Topside, the Court concludes that each of the transactions with Old Court and Shenandoah, even if they were in fact fraudulent, resulted in TMLP obtaining greater liquid assets with which Jeffreys' judgment could have been satisfied. Thus, the Court concludes that the purpose of these encumbrances was not to render the parcel worthless, but was to obtain greater liquid assets for use by TMLP. n29

> n29 At this point, the Court notes that at any time after obtaining the 1984 default judgment, plaintiff could have exercised his option either to obtain the charging order on Topside's partnership, or execute on the security of Exten's majority holding of shares in Topside in order to take control of Topside and TMLP.

**[*59]**

c. Use of the Wires or the Mails

Plaintiff alleges in this case that defendants engaged in a series of financial transactions in order to prevent the satisfaction of plaintiff's judgment against Topside; i.e., according to plaintiff, defendants schemed to defraud him specifically. Assuming momentarily that plaintiff has successfully proven that he was the target of a scheme to defraud by defendants, the question is whether plaintiff has proven that defendants used the mails or wires in furtherance of the scheme.

1) By Mails

The Court concludes with respect to the majority of the letters in evidence that plaintiff has failed to establish that the letters were sent via the United States mail. Without evidence demonstrating that letters in evidence were actually sent via the United States mail, there can be no finding of mail fraud. See *United States v. Scott, 730 F.2d 143, 146–47* (3d Cir.) (proof of mailing may be circumstantial, including proof of office practice of mailing

as usual course of business), cert. denied sub nom, *Wilson v. United States, 469 U.S. 1075, 83 L. Ed. 2d 512, 105 S. Ct. 572,* (1984); see also *Cemar, Inc. v. Nissan Motor Corp. in U.S.A., 678 F. Supp. 1091, 1104 (D. Del. 1988).* **[*60]**

Plaintiff has offered sufficient evidence of mailing only with respect to four letters in evidence, Exhibits P–110, P–75, P–82, P–86. The Court concludes that these letters were placed into the United States mail.

The Court concludes that Exhibit P–110, the October 17, 1982 letter from Exten to Jeffreys in which Exten proposed a sale of the Topside Restaurant to Jeffreys in order to preclude that asset from being obtained by Exten's personal bankruptcy trustee, does not constitute a predicate act of mail fraud sufficient to support a finding of a "pattern of racketeering activity" with respect to Jeffreys. Clearly, the letter evidences a specific intent to engage in a scheme to remove the Topside Restaurant from the reach of Exten's creditors in his personal bankruptcy. However, with respect to Jeffreys, the letter is not in furtherance of a scheme to defraud Jeffreys of the loan to Topside, or the subsequent judgment against Topside that looms almost two years distant from the date of the letter.

The Court concludes that Exhibit P–75, a February 22, 1984 letter in which Goldstein requested that Nucci change the insurance policy on the restaurant and marina property to name FELP as **[*61]** the beneficiary, was not necessary to the accomplishment of any objectives of the purported scheme to defraud. The Old Court Mortgage II had settled on February 9, 1984, which was fifteen days before this letter was mailed. Plaintiff has failed to establish that the mailing of this letter was necessary or essential to the success of that or any other transaction.

There is insufficient evidence in the record to conclude that Exhibit P–82, a March 23, 1984 letter from First National Bank to Nucci regarding a payment of $73,929.49 on an unidentified loan guaranteed by Nucci on December 8, 1982, "furthered" any scheme to defraud. Plaintiff has provided no basis upon which the Court can make a determination that this particular correspondence is related to any obligations incurred by or actions taken by Nucci with respect to any of the transactions complained of by the plaintiff. While there is some evidence in the record concerning payments to First National Bank from TMLP funds, there is no evidence in the record to demonstrate that this letter is related to that transaction. Thus, the Court concludes that the mailing of this letter would not constitute a violation of the mail fraud **[*62]** statute.

The Court concludes that Exhibit P–86, a May 25, 1984 letter from Goldstein to Nucci regarding Old Court

Mortgage II, did not "further" any scheme to defraud anyone. The crux of this letter is that Goldstein, having determined that there had been some irregularity with respect to the Old Court Mortgage II, is extricating himself from any further relationship with Exten and Parcel A–80 or Parcel E. Thus, this letter was not essential to any of the transactions at issue in this case.

2) By Wires

The Court concludes that defendants, by their own admissions, engaged in wire communications that were essential to the success of the transactions in which they engaged. These communications include the following:

a) A 1982 phone call from Exten to Nucci to request Nucci's presence at a meeting regarding the EAI bankruptcy. (D.I. 154 at 8) This call assisted in settling the EAI bankruptcy litigation and extinguishing the personal liability of Exten and Goldstein, and by ensuring that the conveyance of Parcel A–80 to TMLP would not be set aside. To that end, Jeffreys benefited from this phone call because Parcel A–80 remained in the **[\*63]** possession of TMLP and, therefore, remained available for Jeffreys as an asset of TMLP for Jeffreys to attack in satisfaction of his debt.

b) An October 2, 1984 phone call between Exten and Nucci was placed concerning Exten's being named retroactively as General Partner of TMLP. (D.I. 154 at 79–80) This communication furthered Exten's ability to undertake the transactions after October, 1984.

c, d, and e) A 1984 call from Goldstein to Nucci regarding the need to redo the Old Court Mortgage II settlement. (D.I. 154 at 30) Two conversations in 1984 took place between Nucci and Goldstein concerning the FELP joint venture in which the two defendants discussed the virtues of entering that joint venture and the settlement with Old Court. (D.I. 154 at 22–23, 30) These communications furthered the success of the Old Court Mortgage II settlement and the FELP transaction by ensuring Nucci's participation.

f) A 1984 telephone conversation between Goldstein and Dennis Guidice of Old Court concerning the closing of the Old Court Mortgage II transaction and recommending Delaware counsel to assist in that transaction. (D.I. 154 at 137) This furthered the Old Court Mortgage II settlement.

g) A 1984 **[\*64]** telephone conversation between Nucci and William DiLoreta of Shenandoah concerning Nucci's ability to serve as guarantor of the loan. (D.I. 154 at 80) This furthered the assignment of the Tsoukalas Mortgage to Shenandoah.

3. The Specific RICO Counts

Assuming that plaintiff has proven the existence of an enterprise that engaged in a pattern of racketeering activity, the Court makes the following conclusions with respect to the RICO counts in the complaint.

a. Section 1962 (a) – Investment of proceeds from pattern of racketeering activity in enterprise engaged in interstate commerce

Plaintiff's first RICO claim is that the defendants violated *18 U.S.C. § 1962*(a). Section 1962(a) provides, in pertinent part:

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment **[\*65]** or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

The Third Circuit, in *Lightning Lube, Inc. v. Witco Corp., 1993 WL 345534* (3d Cir. Sept. 10, 1993), recently expounded upon the purposes of section 1962(a) and the elements required to allege a violation of section 1962(a).

> "This provision was primarily directed at halting the investment of racketeering proceeds into legitimate businesses, including the practice of money laundering." *Brittingham v. Mobil Corp., 943 F.2d 297, 303 (3d Cir. 1991)* (quoting 11 Cong. Rec. 35,199 (1970) (remarks of Rep. St. Germain) and 116 Cong. Rec. 607 (1970) (remarks of Sen. Byrd)). Under this section, a plaintiff must allege: (1) that the defendant has received money from a pattern of racketeering activity; (2) invested that money in an enterprise; and (3) that the enterprise affected interstate commerce. *Shearin, 885 F.2d at 1165*. Furthermore, the plaintiff must allege an injury resulting from the investment of racketeering income distinct from an injury caused by the predicate acts themselves. *Glessner v. Kenny, 952 F.2d 702, 708 (3d Cir. 1991);* **[\*66]** *Banks v. Wolk, 918 F.2d 418, 421 (3d Cir. 1990); Rose v. Bartle, 871 F.2d*

*331, 357–58 (3d Cir. 1989).* This allegation is required because section 1962(a) "is directed specifically at the use or investment of racketeering income, and requires that a plaintiff's injury be caused by the use or investment of income in the enterprise." *Brittingham, 943 F.2d at 303* (emphasis added); see also *Grider v. Texas Oil & Gas Corp., 868 F.2d 1147, 1149 (10th Cir. 1989)* (recognizing that section 1962(a) "does not state that it is unlawful to receive racketeering income . . . [rather] the statute prohibits a person who has received such income from using or investing it in the proscribed manner" (emphasis in original)), cert. denied, *493 U.S. 820, 110 S. Ct. 76, 107 L. Ed. 2d 43 (1989).*

*Lightning Lube, Inc., 1993 WL 345534 at *31.*

We have recognized repeatedly that this type of allegation—that the use and investment of racketeering income keeps the defendant alive so that it may continue to injure plaintiff—is [*67] insufficient to meet the injury requirement of section 1962(a). In such situations, we have held that the fact that a plaintiff claims that the injury allegedly perpetrated on it would not have occurred without the investment of funds from the initial racketeering activity does not change the fact the plaintiff's alleged injury stems from the pattern of racketeering, and not from the investment of funds by the defendant.

*Lightning Lube, Inc., 1993 WL 345534 at *32.*

Applying the above analysis to this case, the Court concludes that plaintiff has failed to establish a violation of § 1962(a) by any of the defendants. Plaintiff's theory under § 1962(a) is that by virtue of the series of mortgages encumbering Parcel A–80, the defendants were able to generate income which, rather than being "invested," were simply dissipated, thus paving the way for yet another property transfer and encumbrance. Clearly, this series of transactions (and, thus, plaintiff's injury due to the transactions) is neither consistent with that contemplated under § 1962(a); nor are these activities separable from the pattern of racketeering alleged.

b. Section 1962(c) – participation in enterprise through [*68] pattern of racketeering activity

Plaintiff's second RICO claim is that defendants violated *18 U.S.C. § 1962(c),* which provides in pertinent part:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Thus, to prevail on his § 1962(c) claim, plaintiff must have proven by a preponderance of the evidence that the defendants associated with an enterprise, and "participate[d] in the operation or management of an enterprise through a pattern of racketeering activity." *Reves v. Ernst & Young, 122 L. Ed. 2d 525, 113 S. Ct. 1163, 1172 (1993)*

1) Goldstein, the Nuccis, FELP and W.N. Inc.

Assuming arguendo that plaintiff had demonstrated the operation of an association–in–fact enterprise through a pattern of racketeering activity targeted towards defrauding the plaintiff, the Court concludes that defendants Nucci and Goldstein were unintentional participants [*69] in the enterprise's pattern of racketeering activity because they did not have any knowledge of Jeffreys' loan or judgment. n30 The Court bases this conclusion upon the credibility of these two defendants and the weight of the evidence. A person can be held liable for wire or mail fraud only if he or she acted with the intent to defraud. See *18 U.S.C. §§ 1341,* 1343; *United States v. Frankel, 721 F.2d 917, 920 (3d Cir. 1983).* Thus, without a demonstrated intent to defraud, the Court cannot find that these defendants committed acts constituting a pattern of racketeering activity based upon wire or mail fraud. It follows, therefore, that these defendants did not conduct an enterprise through a pattern of racketeering activity. Because FELP was merely a conglomeration of Nucci, W.N. Inc. and O.C. Flights, Inc. (and thus Goldstein), plaintiff similarly has failed to establish that FELP participated in an enterprise through a pattern of racketeering activity.

n30 While there may be a general rule that in a partnership, the knowledge possessed by the general partner is attributable to the rest of the partners, see *Posttape Associates v. Eastman Kodak Co., 537 F.2d 751, 757 (3d Cir. 1976)* (applying Pennsylvania law, noting that one partner's knowledge was knowledge of partnership), the same cannot be said of intent.

[*70]

The Court concludes that defendant Sally Nucci, whom plaintiff connects to the challenged transactions only through a theory of agency with respect to her husband, did not in any way personally participate in any of the challenged transactions. Therefore, even assuming plaintiff had established a RICO violation, because plaintiff failed to establish that Sally Nucci participated in the operation or management of an enterprise engaged in a pattern of racketeering activity, plaintiff's claims against Sally Nucci must fail. See *Reeves v. Ernst & Young, 113 S. Ct. at 1173.*

2) Exten, Topside, and TMLP

Because Exten was president of Topside and acted as general partner of TMLP, those entities could be liable for the acts taken by Exten in their name and for their benefit. See *Petro-Tech, Inc. v. Western Co. of North America, 824 F.2d 1349 (3d Cir. 1987).* Exten's culpability with respect to Jeffreys is evident from the initial fraudulent misrepresentation in procuring the loan from Jeffreys, the October 17, 1982 letter to Jeffreys regarding "inventive planning" to move the Topside Restaurant out of the reach of Exten's bankruptcy [*71] trustee, the fees received by Exten in the various transactions with the financial institutions, the transfer of the Topside Restaurant liquor license and the release of the Topside leases.

The Court concludes that Exten's acts of specifically defrauding the plaintiff are limited to only the release of the leases and the transfer of the liquor license. Plaintiff has failed to demonstrate, however, that either of these acts were accomplished through the use of the mails or the wires. n31 As discussed above, the only demonstrated use of the mails or the wires, aside from the "inventive planning" letter from Exten to Jeffreys, relate to securing the various mortgages on TMLP properties. The Court has concluded that plaintiff has failed to establish any specific intent to defraud him by securing these encumbrances; thus, those uses of the mails and wires cannot be construed as a pattern of racketeering activity.

> n31 The Court notes that plaintiff offered a copy of a letter from Exten to the Delaware Alcoholic Beverage Commission concerning the transfer of the liquor license. (Exhibit P-35) However, as with the majority of the letters offered by plaintiff, plaintiff failed to establish that the letter was placed into the postal stream.

[*72]

Therefore, because plaintiff has failed to establish that Exten operated an enterprise through a pattern of racketeering activity, the same is true with respect to the corporate and partnership entities, Topside and TMLP, through which Exten acted.

c. Section 1962(d) – RICO Conspiracy

Plaintiff's final claim is that the defendants conspired to commit RICO violations. *18 U.S.C. § 1962*(d) provides in pertinent part:

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

Because the Court has concluded that plaintiff has failed to prove either § 1962(a) or § 1962(c), plaintiff has failed to prove a conspiracy under § 1962(d). *Lightning Lube, Inc., 1993 WL 345534* at *36. Even assuming that plaintiff had proven a violation of § 1962(c), insofar as the Court has concluded that plaintiff has only demonstrated that Exten alone was acting with intent to defraud plaintiff, plaintiff has failed to prove a RICO conspiracy.

4. RICO Injury and Damages

RICO provides for recovery of treble damages for injuries sustained as the result of RICO violations. Particularly, [*73] *18 U.S.C. § 1964*(c) provides as follows:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States District Court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

Assuming arguendo that plaintiff had proven RICO violations, the Court concludes that plaintiff generally failed to prove any specific injury resulting from any such RICO violation.

Plaintiff claims that he has been injured in the amount of $751,000, which includes his $259,933.79 default judgment entered in the Superior Court of Delaware plus $491,273 in interest. Plaintiff argues that the evidence presented establishes that the RICO violations caused TMLP to become insolvent and, thus, prevented the recovery of his judgment against Topside, which was TMLP's General Partner.

Plaintiff's argument, while enticingly facile, is unpersuasive. Had plaintiff's state court judgment been against TMLP, perhaps the nexus between the RICO violations and the inability to collect on the judgment would be clear. However, plaintiff's [*74] judgment was against

1993 U.S. Dist. LEXIS 18537, *74

Topside, the General Partner of TMLP. Plaintiff's ability to recover as against the assets of TMLP is limited to charging Topside's interest and receiving the distributions due Topside as General Partner. See Md. Code Ann. § 10–705. Plaintiff has failed to prove what he would have received as a distribution from TMLP in the absence of the alleged RICO violations, or even that there would have been a distribution in the absence of the activity alleged as RICO violations. The Court again notes that the various encumbrances placed liquid assets in the hands of TMLP that would have been available to satisfy Jeffreys' judgment had Jeffreys taken the appropriate steps after securing his judgment to charge Topside's interests in TMLP or to execute on the security that he had with respect to the majority of Topside's shares.

Few acts of the defendants directly affected Jeffreys' interest in Topside. The most significant detrimental conduct by defendants was the removal of the personal property assets of Topside. Plaintiff, however, provided insufficient proof of what, when, where, and for what consideration these assets were sold. Plaintiff, therefore, also failed **[*75]** to demonstrate that these assets were eliminated within the four year statute of limitations. Thus, with respect to the personal property of Topside, the Court is unable to conclude that plaintiff was injured within the meaning of RICO during the applicable limitations period.

The only other acts directly affecting Topside were the release of its leases (land and restaurant lease) on January 10, 1984 and the transfer of the liquor license to Tsoukalas. As stated above, in the discussion of damages, these acts did injure plaintiff. However, plaintiff has failed to demonstrate a nexus between any of the alleged RICO violations and these injuries.

IV. CONCLUSION

For the foregoing reasons, the Court concludes that plaintiff failed to establish RICO violations with respect to all defendants; plaintiff's fraud claims are barred by the statute of limitations; and plaintiff failed to establish his claims of fraudulent conveyance with respect to every conveyance except the release of the Topside leases and the transfer of the Topside liquor license. n32 Thus, the Court will enter judgment in favor of Jeffreys and against Exten and Topside on the fraudulent conveyance counts with respect **[*76]** to the Topside leases and the Topside liquor license. Judgment will be in the amount of $6,251.00.

n32 The Court is aware that there is much more to this case than meets the eye on the evidence presented. However, the Court is bound to base its findings and conclusions on the evidence before it. Defendant Goldstein filed a motion for Rule 11 sanctions and attorneys' fees against plaintiff. (D.I. 166) The Court denies this motion, secure in the notion that defendant Goldstein is fortunate that plaintiff failed to sustain his burden in this matter. The Court will similarly dispose of the counterclaims of defendants FELP (D.I. 11), W.N., Inc. (D.I. 12), the Nuccis (D.I. 13), and Exten (D.I. 16) for attorneys' fees and costs.

EXHIBIT G

LEXSEE 1998 U.S. DIST. LEXIS 15645


**NEW YORK AUTOMOBILE INSURANCE PLAN, ALLSTATE INSURANCE CO., STATE FARM INSURANCE COMPANIES, Plaintiffs,-against-ALL PURPOSE AGENCY & BROKERAGE, INC., ANNA KITSIS, A R WAYS CONSTRUCTING CORP., VEKATERINA BASS, ADT CUSTOM MIRROR & FURNITURE, AMERICAN STANDARDS CABINETS, INC., SEMYON MEDNIK, EFIM MILRUD, ISAAK KIPNIS, Defendants.**


**97 Civ. 3164 (KTD)**


**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**


*1998 U.S. Dist. LEXIS 15645*


**October 2, 1998, Decided**
**October 6, 1998, Filed**


**DISPOSITION:** **[\*1]** Plaintiffs' motion for summary judgment against the Producer-Defendants granted as to liability on their fraud claim and denied as to all other claims. Case referred to Magistrate Judge Ellis for an inquest as to the plaintiffs' damages on their fraud claim.


**LexisNexis(R) Headnotes**


**COUNSEL:** Arthur J. Ciampi, MORRISON COHEN SINGER & WEINSTEIN LLP, New York, New York, for Plaintiffs.

Charles G. Fiore, LEWIS & FIORE, ESQS., New York, New York, for Defendants.


**JUDGES:** Kevin Thomas Duffy, U.S.D.J.


**OPINIONBY:** Kevin Thomas Duffy


**OPINION:**

**MEMORANDUM & ORDER**


**Kevin Thomas Duffy, U.S.D.J.:**

This case arises from a scheme orchestrated by defendants All Purpose Agency and Brokerage, Inc. ("All Purpose") and Anna Kitsis ("Kitsis") to fraudulently obtain reduced automobile insurance premium rates. The plaintiffs have moved for summary judgment and injunctive relief. For the following reasons, their motion is granted in part and denied in part.


**Factual Background**

Dramatis Personae

The New York Automobile Insurance Plan (the "Plan") is an unincorporated entity formed pursuant to § 5301 et seq. of the Insurance Law of the State of New York. New York residents who are eligible for but unable to obtain **[\*2]** automobile insurance may submit an application to the Plan. The Plan then assigns applicants to automobile insurers licensed to do business in the State of New York who, in turn, are required to accept assignments from the Plan.

Plaintiffs Allstate Insurance Company ("Allstate") and State Farm Mutual Automobile Insurance Companies ("State Farm") are each Illinois corporations duly licensed to sell automobile insurance in the State of New York. Both are required to and do accept assignments from the Plan.

To obtain insurance through the Plan, applicants must submit an application through a Certified Plan Producer ("Producer"). A Producer is an insurance broker certified by the Plan to submit applications. The application is executed by both the applicant and the Producer and thereafter submitted by the Producer to the Plan for assignment to an authorized insurer.

The Plan provides that the Producer and applicant must both certify as truthful all information included in the application — including information concerning where the applicant's vehicle is to be "garaged" or used. The Plan also directs the Producer to properly write and compute the premium rate of a policy. The Plan **[\*3]** does not verify the information on the application nor the Producer's computations.

The premium rates are set by the Insurance

Department of New York State which divides the State into designated territories and establishes premium rates for coverage of particular types of vehicles in each designated territory in the State. The premium rate is set separately for each territory where the vehicle is garaged, with higher premium rates for vehicles garaged in New York City than for those garaged in other regions of the state.

Defendant All Purpose was an insurance broker located Brooklyn, New York which was certified as a Producer. Defendant Anna Kitsis was the sole shareholder and only full time employee of All Purpose. The remainder of the defendants are individuals who applied for auto insurance from the Plan through All Purpose (the "Insured–Defendants").

The Complaint

On May 1, 1997, the Plaintiffs filed the Complaint in this action. The Complaint describes a scheme orchestrated by defendants Kitsis and All Purpose (collectively "Producer–Defendants") whereby Plan applications were submitted by the Producer–Defendants on behalf of the Insured–Defendants and many others [*4] (collectively "Insureds") that contained false information to obtain insurance at rock–bottom premiums.

This scheme was apparently uncovered as a result of an investigation conducted by plaintiff State Farm. The investigation revealed that, from 1995 to 1997, the Producer–Defendants submitted applications on behalf of the Insureds that: (i) falsely stated the place of garaging and operation of the Insureds' vehicles to be territories outside of New York City; and (ii) utilized forged and altered drivers' licenses in support of the applications.

Foth Affidavit

On June 12, 1998, the plaintiffs moved for summary judgment. In support of their motion, plaintiffs submitted an affidavit from Donald Foth, Superintendent of plaintiff State Farm. In the affidavit, Foth outlines the discoveries uncovered during State Farm's investigation into the activities of the Producer–Defendants.

Foth states that All Purpose and Kitsis submitted 127 applications to the Plan that falsely listed the garaging location for the Insured's vehicle. For all those vehicles, one of three locations was used:

. 80 vehicles listed on applications as garaged at 12 Thatcher Drive, Altamont, New York;

. [*5]  28 vehicles listed on applications as garaged at 1 Columbia Place, Albany, New

York;

. 19 vehicles listed on applications as garaged at 1737 Union Street, Schenectady, New York.

According to Foth, the investigation revealed that the vehicles at issue were not actually garaged at the locations above, but rather, were garaged and operated in New York City. To that end, Foth details the evidence gathered over the course of State Farms' investigation. Foth also provides records from State Farms' files supporting his claims.

The Mednik Affidavit

Also in support of their summary judgment motion, the plaintiffs submitted an affidavit from one of the Insured–Defendants — Semyon Mednik — that describes in detail his dealings with the Producer–Defendants.

In his affidavit, Mednik states that he first learned of All Purpose in August 1994 after he received a telephone solicitation at his home in his native language — Russian — offering "cheaper insurance". One year after receiving the solicitation, he called the number given in the solicitation and spoke with Anna Kitsis. Mednik then visited All Purpose's office in Brooklyn where Kitsis informed him that, in order to obtain [*6] cheaper insurance, Mednik would have to use a different address than his actual address in Brooklyn.

At Kitsis' direction, Mednik applied for a new drivers' license using 12 Thatcher Drive, Altamont, New York, as his address. Kitsis told Mednik that she would use that address on his Plan application. Kitsis also informed Mednik that, in order to have mail addressed to him at the 12 Thatcher Drive location forwarded to his actual address in Brooklyn, Mednik would have to pay fifty dollars. Mednik gave Kitsis a check for fifty dollars made payable to a company called "Altech".

Subsequently, Mednik received his drivers license at his home in Brooklyn. The license arrived in an envelope addressed to Mednik at his Brooklyn address with an Altamont, New York post mark. Inside the envelope with the Altamont post mark was a sealed envelope from the Department of Motor Vehicles addressed to the 12 Thatcher Drive location that actually contained the license.

Kitsis then submitted Mednik's application to the Plan using the 12 Thatcher Drive address. As a result, Mednik received insurance from plaintiff State Farm. The insurance documents that Mednik received from State Farm indicated that [*7]  his address was 12 Thatcher Drive, Altamont, New York. Like the drivers license, the mate-

rial that Mednik received from State Farm was received unopened in an envelope with an Altamont, New York postmark.

The Kitsis Deposition

In connection with this lawsuit, the plaintiffs deposed defendant Anna Kitsis on October 30, 1997. At that deposition, Kitsis asserted her Fifth–Amendment privilege against self–incrimination approximately fifty times — as to virtually every question relating to her activities with All Purpose and submission of applications to the Plan.

For example, Kitsis refused to answer questions concerning the submission of applications to the Plan. She invoked the privilege when asked whether she instructed applicants to change their addresses on their drivers' license or their Plan applications. She also invoked the privilege when asked whether she knew the Insured–Defendants and other individuals who allegedly submitted fraudulent applications through All Purpose — including Semyon Mednik. She also refused to testify concerning the three garaging locations.

Causes of Action

Based on the scheme orchestrated by the Producer–Defendants, the plaintiffs [*8] claim violations of:

.  Racketeering Influenced and Corrupt Organizations Act ("RICO"), *18 U.S.C. § 1962*(c) and (d), and 1964(c) (Claims 1–3);

.  *New York General Business Law §§ 349* et seq. (Claim 8);

.  Fraud (Claims 5 & 7);

.  Conversion (Claim 6).

Plaintiffs also seek a permanent injunction to enjoin defendants from "continuing to violate Plan rules and the statutes of the State of New York" (Claim 4).

**Discussion** n1

n1 I note that no Insured–Defendant has yet answered the Complaint. Moreover, with the exception of Semyon Mednik, the plaintiffs do not specifically mention any of the Insured–Defendants in their motion papers or supporting affidavits. Although records concerning some of the Insured–Defendants' insurance policies are attached to the Foth Affidavit, plaintiffs do not discuss these materials or elaborate on them in any way.

As a result, it is unclear whether the plaintiffs are seeking Summary Judgment against the Insured–Defendants as well as the Producer–Defendants. Whatever plaintiffs' intentions may be, for purposes of this Memorandum and Order, I will address solely plaintiffs' claims against the Producer–Defendants. Should the plaintiffs' wish to proceed against the Insured–Defendants, the proper method is by motion for a default — not by Summary Judgment.

**[*9]**

Summary judgment is appropriate when, viewing the evidence in a light most favorable to the non–movant, "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)* (court to inquire whether there is evidence favoring the nonmoving party sufficient for a jury to return a verdict for the party).

On a motion for summary judgment, the moving party must initially satisfy a burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* Once the moving party has met its burden, the nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial" in order to [*10] survive the motion. *Fed. R. Civ. P. 56(e); Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986).*

While the Court must construe all evidence and inferences in favor of the nonmoving party, to sustain its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* Mere conclusory allegations or denials will not suffice. *Williams, 781 F.2d at 323.*

Here, the Plaintiffs have clearly met their burden, and the Producer–Defendants have failed to meet theirs'. The Producer–Defendants rely solely on the four disputed issues of fact listed in their Local Rule 56.1 statement. They have, however, supplied no evidence to support their claims that disputed issues of fact exist concerning (1) who submitted the Fund applications at issue, and (2)

whether the Producer–Defendants had knowledge that the information contained in the applications was false and where the insured vehicles were actually used. (Producer–Defendants' Rule 56.1 Stmt at P 1–2). n2

> n2 Despite the Producer–Defendants' claims, there is no factual dispute concerning whether the Fund is a company because Plaintiff's concede that the Fund is an unincorporated entity in P 5 of the complaint. See Producer–Defendants' Rule 56.1 Stmt at P 4. Similarly without merit is any contention by the Producer–Defendants that the Plan is not a proper plaintiff because it lacks capacity to bring this action. The Producer–Defendants provide no authority for this proposition and it contradicts the host of cases brought by the Plan in this district and elsewhere.

**[*11]**

Also undermining the Producer–Defendants' claims is the fact that Kitsis invoked her Fifth Amendment privilege and refused to answer questions concerning precisely the issues that she alleges are in dispute. Such an invocation of the Fifth Amendment privilege does not free the Producer–Defendants from adducing proof in support of their burden and will not prevent an adverse finding or even summary judgment. See *United States v. Certain Real Property, 55 F.3d 78, 83 (2d Cir. 1995)*(citations omitted). Moreover, it is well settled that a court may draw adverse inferences against a party to a civil action when that party refuses to testify in the face of probative evidence. See *Baxter v. Palmigiano, 425 U.S. 308, 318, 47 L. Ed. 2d 810, 96 S. Ct. 1551 (1976)*.

Thus, because the Producer–Defendants have supplied no evidence to support their claims of a factual dispute, I must find that there are no disputed issues of fact. Because the undisputed facts do not support all of the plaintiffs' causes of action, however, I turn to the legal merits of the plaintiffs' claims — addressing only the Producer–Defendant's liability and saving the issue of damages for further proceedings.

I.  **[*12]**  RICO Claims

In considering RICO claims, courts must attempt to achieve results "consistent with Congress's goal of protecting legitimate business from infiltration by organized crime." *United States v. Porcelli, 865 F.2d 1352, 1362* (2d Cir.), cert. denied, *493 U.S. 810, 107 L. Ed. 2d 22, 110 S. Ct. 53 (1989)*. To that end, courts must ensure that RICO's severe penalties are limited to enterprises consisting of more than simple conspiracies to perpetrate acts of racketeering. See *Schmidt v. Bank, 16 F. Supp. 2d 340,*

*1998 U.S. Dist. LEXIS 12263, No. 98 Civ. 2901, 1998 WL 461452* at *2 (S.D.N.Y. 1998) (internal quotation marks and citations omitted). Thus, courts must be weary of the putative RICO case that is really "nothing more than an ordinary fraud case clothed in the Emperor's trendy garb." Id. (citing *In re Integrated Resources Real Estate, 850 F. Supp. 1105, 1148 (S.D.N.Y. 1994))*.

Here, an examination of the alleged racketeering enterprise reveals that the plaintiffs' RICO claims are nothing more than an attempt to extract treble damages from an ordinary fraud case. As described in the complaint, plaintiffs claim that the enterprise included:

> all persons or **[*13]** entities who were associated in fact with Producer–Defendants All Purpose and Kitsis including but not limited to the Insured–Defendants for the purpose of using the facilities of the Plan and its assignment mechanism to fraudulently obtain insurance coverage ...

(Complaint at P42). Such an association–in–fact does not constitute a racketeering enterprise.

In essence, plaintiffs allege that fraudulent insurance applications were submitted to the Plan through one insurance broker — the Producer–Defendants — but on behalf of numerous unrelated Insureds. This is a classic "hub and spoke" conspiracy, in which the Producer–Defendants were the "hub" and the various Insureds (including the Insured–Defendants) were the "spokes". Such a scheme is not one true common law conspiracy nor is it a RICO enterprise. n3 See *First Nationwide Bank v. Gelt Funding, Inc., 820 F. Supp. 89, 98 (S.D.N.Y. 1993)*, aff'd, *27 F.3d 763 (2d Cir. 1994)*, cert. denied, *513 U.S. 1079, 130 L. Ed. 2d 632, 115 S. Ct. 728 (1995)* (quoting *Kotteakos v. United States, 328 U.S. 750, 769, 90 L. Ed. 1557, 66 S. Ct. 1239 (1946))*.

> n3 Under Federal criminal statutory law this type of arrangement would constitute a number of criminal conspiracies with each individual Insured being a co-conspirator with the Producer–Defendants.

**[*14]**

A RICO enterprise is statutorily defined as "any individual partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *18 U.S.C. § 1961*(4). In interpreting this statute, the Supreme Court has defined a RICO enterprise as a "group of persons associated together for a common purpose of engaging in a common

course of conduct ... [It is] proved by evidence of an on-going organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette, 452 U.S. 576, 583, 69 L. Ed. 2d 246, 101 S. Ct. 2524 (1981).*

Courts in the Second Circuit must look to the "hierarchy, organization, and activities of an association-in-fact to determine whether its members function as a unit." *United States v. Coonan, 938 F.2d 1553, 1560–61 (2d Cir. 1991),* cert. denied, *503 U.S. 941 (1992).* For an association of individuals to constitute an enterprise, the individuals must "share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." See *First Nationwide, 820 F. Supp. at 98* (quoting **[*15]** *Moll v. U.S. Life Title Ins. Co., 654 F. Supp. 1012, 1031 (S.D.N.Y. 1987)).*

In First Nationwide Bank v. Gelt Funding, Inc., the court was faced with facts virtually identical to those at bar — the "enterprise" consisted of a scheme of fraudulently obtained loans involving one mortgage broker and several different borrowers seeking unrelated loans. *First Nationwide, 820 F. Supp. at 97.* The court found that such a classic "hub and spoke" arrangement could not constitute a RICO enterprise. *Id. at 97–98.*

Likewise, the scheme orchestrated by the Producer-Defendants cannot constitute a RICO enterprise. Clearly, the Insureds did not join together as a group to perpetrate the frauds against the Plaintiffs. See *Moll, 654 F. Supp. at 1031.* Rather, it appears that the Insureds each committed similar but independent frauds with the aid of the Producer-Defendants, and that each Insured acted on a particular occasion to benefit himself or herself and not to benefit any other insured. Such a series of discontinuous independent frauds is not an "enterprise". Each is a single two-party conspiracy. See *First Nationwide, 820 F. Supp. at 98.* See also *Cullen v. Paine Webber Group,* **[*16]** *689 F. Supp. 269, 273 (S.D.N.Y. 1988).*

Even if the association-in-fact enterprise were distilled to include only the Producer-Defendants — All Purpose and its sole shareholder and full-time employee, Kitsis — there would still be no RICO enterprise. Such an association-in-fact enterprise would violate the rule that the RICO "enterprise" and the RICO "person" must be distinct. See *Riverwoods Chappaqua Corp. v. Marine Midland Bank, 30 F.3d 339, 344 (2d Cir. 1994); Sulka v. Estate of Herink, No. 94 CV 4999, 1996 WL 612462 (E.D.N.Y. Aug. 13, 1996).*

Accordingly, because plaintiffs' RICO claims are insufficient as a matter of law, their motion for Summary Judgment is denied as to those claims.

## II. New York General Business Law

Plaintiffs also allege violations of *New York General Business Law §§ 349* et seq. (the "Statute"). Like the RICO claims, these claims are insufficient as a matter of law.

The Statute makes unlawful deceptive acts or practices in conducting a business or furnishing a service. Any person who has been injured by reason of a violation of the section may bring an action to recover actual damages and the court may, if it finds defendant acted **[*17]** willfully or knowingly violated the section, triple the damages to a maximum of $1,000 and award attorneys fees to a successful plaintiff. See *New York University v. Continental Ins. Co., 87 N.Y.2d 308, 662 N.E.2d 763, 770, 639 N.Y.S.2d 283 (N.Y. 1995).*

In order to trigger application of the Statute the alleged misconduct must be directed at consumers — including businesses acting in the role of consumers. See *Continental Ins., 662 N.E.2d at 770–71; Oswego Laborers Local 214 Pension Fund v. Marine Midland Bank, 85 N.Y.2d 20, 647 N.E.2d 741, 744, 623 N.Y.S.2d 529 (N.Y. 1995);* Richard A. Givens, Supplemental Practice Commentaries, §§ 349–50 (McKinney Supp. 1998).

Here, the misconduct was not directed at consumers — but at the insurance companies who provide coverage to consumers. In essence, the plaintiffs seek the protection of a statute that was intended not to protect them but to police them. Their assertion of claims under the Statute is misplaced.

Accordingly, plaintiffs' motion for summary judgment is denied as to their claims under *New York General Business Law §§ 349* et seq.

## III. Fraud

Unlike their RICO claims and claims under the Statute, plaintiffs' **[*18]** allegations of fraud are well founded. Under New York law, the elements of fraud are a representation of a material fact, falsity, scienter, reliance and injury. *Continental Ins., 662 N.E.2d at 769.* The record contains uncontroverted evidence satisfying each of these elements.

The Producer-Defendants falsely represented a material fact to the Plan — namely the location of garaging and use of the Insureds' vehicles. The Producer-Defendants' knowledge of the falsity of their representations — their scienter — is amply demonstrated by the Mednik affidavit.

The Plan clearly relied on the Producer-Defendants' misrepresentations in determining the amount of premiums appropriate for each Insured. These misrepresentations resulted in damage to the plaintiffs because they

were denied the true premiums for the Insureds' vehicles and assumed risk disproportionate with the premiums actually received.

As noted above, the Producer–Defendants have set forth no defense. Accordingly, I find that plaintiff's motion for summary judgment must be granted as to their fraud claims.

IV. Conversion

Based upon a theory of conversion, plaintiffs' sixth claim for relief against the Producer–Defendants **[*19]** alleges:

> Producer–Defendants have knowingly and intentionally accepted, retained and failed to remit to Plaintiffs all or partial amounts of premium payments collected or owing from insureds.

(Complaint at P71). Plaintiffs' have provided no evidence at all to support these claims.

No mention of the Producer–Defendants' failure to remit such payments is made in the Mednik or Foth Affidavits. No specific question regarding such payments was asked at Kitsis' deposition. Accordingly, plaintiffs' motion for summary judgment is denied as to their conversion claims.

V. Injunctive Relief

In their fourth claim, plaintiffs seek a permanent injunction enjoining and restraining defendants from:

> Submitting or causing to be submitted, to the Plan and/or assigned insurers: Applications and/or requests for policy changes or insurance coverage, in either written or oral form; issuing Temporary Identification Cards; or issuing any documents related to the procurement of insurance through the plan.

(Complaint at Demand for Judgment 5(a)).

Despite plaintiffs' claims, there is no need for such an injunction. The Producer–Defendants' Plan certifications have been **[*20]** revoked, and thus, their ability to perform the very activities which the plaintiffs seek to have enjoined has been thwarted. Accordingly, plaintiffs' motion for summary judgment is denied as to their request for injunctive relief.

**Conclusion**

For the forgoing reasons, the plaintiffs' motion for summary judgment against the Producer–Defendants is granted as to liability on their fraud claim and denied as to all other claims.

This case shall be referred to Magistrate Judge Ellis for an inquest as to the plaintiffs' damages on their fraud claim.

**SO ORDERED.**

Dated: New York, New York

October 2, 1998

Kevin Thomas Duffy, U.S.D.J.

EXHIBIT H

LEXSEE 1996 U.S. DIST. LEXIS 12655

**SCHUYLKILL SKYPORT INN, INC., et al. v. JOHN W. RICH, JR., et al.**

**Civil Action No. 95–3128**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1996 U.S. Dist. LEXIS 12655*

**August 20, 1996, Decided**
**August 21, 1996, FILED**

**PRIOR HISTORY: [*1]** 91–1898.

**DISPOSITION:** Motion to strike denied, motions for summary judgment filed by the Corporate Defendants and Tornetta denied, Corporate Attorneys' motion for summary judgment granted in part and denied in part, and Corporate Attorneys' motion to dismiss granted in part and denied in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** For SCHUYLKILL SKYPORT INN, INC., PLAINTIFF: MARIA T. CASEY, CURRAN LAW OFFICES, POTTSVILLE, PA. MICHAEL A. O'PAKE, CURRAN LAW OFFICES, POTTSVILLE, PA USA. JAMES J. RILEY, RILEY AND FANELLI, POTTSVILLE, PA USA. DANIELLE L. PEYAKOVICH, RILEY AND FANELLI, THE NECHO ALLEN, POTTSVILLE, PA USA.

For JAMES J. CURRAN, JR., Individually and Derivatively on behalf of, PLAINTIFF: MARIA T. CASEY, (See above). MICHAEL A. O'PAKE, (See above). JAMES J. RILEY, (See above). DANIELLE L. PEYAKOVICH, (See above).

For READING ANTHRACITE COMPANY, PLAINTIFF: MARIA T. CASEY, (See above). JAMES J. RILEY, (See above). DANIELLE L. PEYAKOVICH, (See above).

For SCHUYLKILL ENERGY RESOURCES, PLAINTIFF: MARIA T. CASEY, (See above). JAMES J. RILEY, (See above). DANIELLE L. PEYAKOVICH, (See above).

For JOHN W. RICH, JR., DEFENDANT: HOWARD A. ROSENTHAL, PELINO & LENTZ, P.C., PHILA, PA USA.

For JOHN W. RICH, SR., **[*2]** DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For BRIAN RICH, DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For ROBERT M. RYAN, DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For BONNIE R. RYAN, DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For TERRENCE RYAN, DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For GLORIA R. CURRAN, DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For MARIA CURRAN CANTWELL, DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For DAVID R. CHRIST, DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For GILBERTON COAL COMPANY, DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For GILBERTON ENERGY CORPORATION, DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For J.M.B., LTD., DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For WASTE MANAGEMENT & PROCESSORS, INC., DEFENDANT: HOWARD A. ROSENTHAL, (See above).

1996 U.S. Dist. LEXIS 12655, *2

For FILTER MEDIA, INC., DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For GILBERTON POWER COMPANY, DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For POTTSVILLE FUEL COMPANY, DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For JACK RICH, INC., DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For PORT CARBON MACHINE WORKS, [*3] DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For J & R ENGINEERING CORP., DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For R & R ENERGY CORP., DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For READING ANTHRACITE COMPANY, DEFENDANT: MARTIN J. CERULLO, FRUMKIN, SHRALOW & CERULLO, P.C., POTTSVILLE, PA USA.

For SCHUYLKILL ENERGY RESOURCES, INC., DEFENDANT: MARTIN J. CERULLO, (See above).

For LAWRENCE F. TORNETTA, DEFENDANT: MICHAEL LIEBERMAN, HANGLEY, ARONCHICK, SEGAL AND PUDLIN, PHILA, PA USA.

For MARTIN J. CERULLO, ESQUIRE, DEFENDANT: ARTHUR W. LEFCO, SHERR, JOFFE & ZUCKERMAN, P.C., W. CONSHOHOCK, PA USA.

For RI-CORP DEVELOPMENT, INC., DEFENDANT: HOWARD A. ROSENTHAL, PELINO & LENTZ, P.C., PHILA, PA USA.

For FRUMKIN, SHRALOW & CERULLO, DEFENDANT: ARTHUR W. LEFCO, (See above).

**JUDGES:** Edward N. Cahn, Chief Judge

**OPINIONBY:** Edward N. Cahn

**OPINION:**

  **MEMORANDUM**

CAHN, J.

August 20, 1996

Plaintiffs Schuylkill Skyport Inn, Inc. ("SSI") and James J. Curran, Jr. ("Curran") (collectively "Plaintiffs") bring this action against various directors, officers, and shareholders of Reading Anthracite Company ("RAC") and Schuylkill Energy Resources, Inc. ("SER"), [*4] n1 as well as against RAC's and SER's corporate counsel n2 and various other corporations involved in transactions with RAC and SER n3 (collectively "Defendants"). Also named as nominal defendants are RAC and SER. Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *18 U.S.C. §§ 1961*–1968, and bring state law claims for breach of fiduciary duty, waste of corporate assets, fraud and conversion. Currently before the court are motions for summary judgment filed by the Corporate Defendants, Tornetta and the Corporate Attorneys, and a motion to dismiss filed by the Corporate Attorneys. Additionally, the Corporate Defendants move to strike the Third Amended Complaint. For the reasons stated below, the motion to strike is denied, the motions for summary judgment filed by the Corporate Defendants and Tornetta are denied, the Corporate Attorneys' motion for summary judgment is granted in part and denied in part, and the Corporate Attorneys' motion to dismiss is granted in part and denied in part.

  n1 These defendants are: John W. Rich, Jr., John W. Rich, Brian R. Rich, Robert M. Ryan, Bonnie R. Ryan, Terrence Ryan, Gloria R. Curran, Maria Curran Cantwell, and David R. Christ (collectively "the Corporate Defendants"). Also named as a defendant is Lawrence F. Tornetta ("Tornetta").

[*5]

  n2 Corporate counsel named as defendants in this action are Martin J. Cerullo ("Cerullo") and the firm of Frumkin, Shralow & Cerullo ("FS&C") (collectively "the Corporate Attorneys").

  n3 These corporations are Gilberton Coal Company, Gilberton Energy Corporation, J.M.B., Ltd., Waste Management & Processors, Inc., Filter Media, Inc., Gilberton Power Company, Pottsville Fuel Company, Jack Rich, Inc., Port Carbon Machine Works, J&R Engineering Corp., R&R Energy Corp., Ri-Corp Development, Inc., and JMB Development, Inc.

**BACKGROUND**

SSI, SER and RAC are Pennsylvania corporations with places of business in Pottsville, Pennsylvania. SSI owns and collects royalties on various anthracite coal refuse banks and deposits of silt and slush. Curran is the sole income beneficiary of the Curran Trust, which owns fifty percent of the outstanding shares of SSI. Curran also is a direct or beneficial owner of thirty-five percent of the outstanding shares of SER and of over thirty-four percent of the outstanding shares of RAC. RAC engages in the mining, processing, and selling of anthracite coal and [*6] its refuse. SER is a culm-fired cogeneration facility which uses anthracite coal refuse as its primary fuel. Curran brings this action in his own behalf and derivatively on behalf of RAC and SER.

Plaintiffs allege that the Corporate Defendants, Tornetta, and the Corporate Attorneys, as members of the Rich Control Group ("RCG"), have engaged in various schemes against Curran, SSI, RAC, and SER. These purported schemes include: (1) the scheme to defraud Curran by depriving him of cash distributions from and diminishing his interests in RAC and SER; (2) conversion of SSI materials; (3) usurpation of corporate opportunities properly belonging to RAC, SER, and SSI; (4) engaging in related party transactions, (5) the scheme to harm RAC and SER by engaging in a series of reckless and intentional acts; and (5) the scheme to cause Curran to default on certain agreements and thereby cause him to lose stock in RAC and SER.

## DISCUSSION

Before the court is the Corporate Defendants' Motion to Strike the Third Amended Complaint and three motions for summary judgment filed by the Corporate Defendants, Tornetta, and the Corporate Attorneys. In addition the Corporate Attorneys have filed [*7] a motion to dismiss. Each of these motions will be discussed in turn.

## I. THE MOTION TO STRIKE THE THIRD AMENDED COMPLAINT

Plaintiffs assert that the Third Amended Complaint is "inconsistent with and in direct violation of this Court's Orders dated November 22, 1995 and April 1, 1996." (Corp. Defs.' Mot. Strike Third Am. Compl. & Resp. Pls.' Br. Supp. Third Am. Compl. at 1–2.) Issued after the filing of the Second Amended Complaint, the Order of November 22, 1995 directed that:

> Defendants shall file Motions to Dismiss or otherwise respond to the Second Amended Complaint within 60 days of the date of this Order. Plaintiffs shall file no further amendments to the Complaint without complying with *Rule 15(a), F.R.C.P.*

(Order of November 22, 1995, Schuylkill Skyport Inn, Inc. v. John W. Rich, Jr., (E.D. Pa.).) After Motions for Summary Judgment or to Dismiss were filed by Defendants, oral argument took place on March 28, 1996. At oral argument this court informed Plaintiffs that they would be given leave to file a third amended complaint limited to allegations involving Cerullo and FS&C and allegations involving Tornetta's alleged intent to force Curran [*8] to forfeit stock. (See N.T., 3/28/96 at 98–99, 139–40.) On April 1, 1996, this court issued the following order:

> It is hereby ORDERED that Plaintiffs have leave to amend the complaint in reference to allegations against Defendant Lawrence F. Tornetta, Martin J. Cerullo, and Frumkin, Shralow & Cerullo. This amendment shall be limited to matters raised in the on-record hearing of March 28, 1996.

(Order of April 1, 1996, Schuylkill Skyport Inn, Inc. v. John W. Rich, Jr., No. 95–3128) (E.D. Pa.).) Plaintiffs then filed a Third Amended Complaint.

The Corporate Defendants argue that Plaintiffs' amendments went beyond the limits imposed by this court and include "wholesale revisions of plaintiffs' allegations against the other defendants, whose Motion for Summary Judgment remains pending." (Corp. Defs.' Br. Supp. Mot. Strike Third Am. Compl. & Opp'n Pls.' Br. Supp. Third Am. Compl. at 4.)

Amendments are governed by *Rule 15(a) of the Federal Rules of Civil Procedure*, which reads in pertinent part:

> A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served, or if the pleading is one to which no responsive [*9] pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

Generally, an amendment which does not conform to Rule 15(a) is "without legal effect and any new matter it contains will not be considered unless the amendment is re-submitted for the Court's approval." *Straub v. Desa*

*Indus., Inc.,* 88 F.R.D. 6, 8 (M.D. Pa 1980). Nevertheless, "some courts have held that an untimely amended pleading served without judicial permission may be considered as properly introduced when leave to amend would have been granted had it been sought, and when it does not appear that any of the parties will be prejudiced by allowing the change." Id. "The grant or denial of an opportunity to amend is within the discretion of the District Court . . . . " *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962).*

In the instant case, the Corporate Defendants assert that they will be prejudiced if this court [*10] allows the Third Amended Complaint:

> If the Third Amended Complaint is allowed, defendants now will be required to re-file their Motion for Summary Judgment, addressing the same issues, as the new complaint not only restates the old claims, but also reorders claims and contains new claims not previously raised in any prior version of the Complaint. In these circumstances, the minimum prejudice to defendants will be all of the attorneys' fees and costs incurred to date, as well as the delay.

(Corp. Defs.' Br. Opp'n Pls.' Mot. Leave Amend Second Am. Compl. & Supp. Corp. Defs.' Pending Mot. Strike at 2.)

The Third Circuit Court of Appeals has stated that "'prejudice to the non-moving party is the touchstone for the denial of an amendment.'" *Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993)* (citation omitted). In *Thompson v. Glenmede Trust Co., 1994 U.S. Dist. LEXIS 16839, Civ. A. No. 92-5233, 1994 WL 675186* (E.D. Pa. Nov. 23, 1994), the court defined the contours of such prejudice:

> The non-moving party must do more than merely claim prejudice. "It must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered [*11] had the . . . amendments been timely." Mere passage of time, without more, does not require that a motion for leave to amend be denied; however, at some point, the delay will become undue, placing an unwarranted burden on the opposing party. Prejudice does not result merely from a party's having to incur additional counsel fees; nor does it result from a delay in the movement of the case.

> Prejudice under Rule 15 "means undue difficulty in prosecuting [or defending] a lawsuit as a result of a change in tactics or theories on the part of the other party."

Id. at *2 (citations omitted).

This court finds no unfair disadvantage to Defendants from allowing the Third Amended Complaint. First, although Plaintiffs have exceeded the scope of this court's Order of April 1, 1996 granting leave to amend, the changes in the Third Amended Complaint are not substantial, and, with minor exceptions, the motion for summary judgment already filed by the Corporate Defendants has not been rendered inapplicable. Although Plaintiffs have added some new allegations, they are closely related to the allegations in the Second Amended Complaint and the general theories of recovery remain the same. [*12] Second, to the extent there are significant differences between the Second and Third Amended Complaints, Defendants have not been deprived of an opportunity to respond to new allegations. The Corporate Defendants have already filed briefs and letters in response to the Third Amended Complaint. n4 These have been given full consideration by the court in its disposition of the instant motions. Although this court denies the Corporate Defendants' motion for summary judgment, as discussed below, the Corporate Defendants will be given leave to resubmit several of their arguments on a motion for judgment as a matter of law pursuant to *Rule 50(a) of the Federal Rules of Civil Procedure.* Defendants may further respond to new allegations at that time. Finally, as noted by the court in Thompson, increased fees and costs do not constitute prejudice.

> n4 Subsequent to the filing of the Third Amended Complaint, the Corporate Attorneys filed a motion for summary judgment which incorporated by reference their previous motion to dismiss. Tornetta submitted letter briefs in response to the Third Amended Complaint as a supplement to his previous motion for summary judgment.

[*13]

The Third Circuit has stated that "in the absence of substantial or undue prejudice, denial [of a motion to amend] instead must be based on bad faith or dilatory motives, truly undue or unexplained delay, repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment." *Lorenz, 1 F.3d at 1414.* This court finds none of these factors present in the instant case and therefore will accept the Third Amended Complaint and deny the Motion to Strike.

## II. MOTIONS FOR SUMMARY JUDGMENT FILED BY THE CORPORATE DEFENDANTS AND TORNETTA

The Federal Rules of Civil Procedure provide that summary judgment is appropriate if "there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The moving party bears the burden of "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non–moving party's case." *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. The non–moving party must then go beyond the pleadings to "establish the existence of each element on which it bears the burden of proof," **[*14]** *J.F. Feeser, Inc. v. Serv–A–Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990)* (citation omitted), cert. denied, *499 U.S. 921, 113 L. Ed. 2d 246, 111 S. Ct. 1313 (1991)*, because "a complete failure of proof concerning an essential element of the non–moving party's case necessarily renders all other facts immaterial." *Celotex, 477 U.S. at 323*.

When considering a motion for summary judgment, the court must draw all justifiable inferences in favor of the non–moving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. The court may not make credibility determinations or weigh the evidence. *Id. at 249*. If the record thus construed could not lead the trier of fact to find for the non–moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*.

The Corporate Defendants raise the following defenses in their Motion for Summary Judgment: (1) claim preclusion; (2) an inadequate pattern of racketeering to support claims under RICO; (3) estoppel; (4) the illegality of the 1980 Shareholders Agreement relied upon by Plaintiffs; **[*15]** (5) statute of limitations; (6) failure of the controlling documents to support Plaintiffs' claims about the manipulation of SER's financing; (7) Plaintiffs' failure to allege a distinct injury to Curran; and (8) Curran's lack of standing to seek the rescission or reformation of the Meridian Loan Agreement. Tornetta's motion incorporates by reference the Corporate Defendants' Motion for Summary Judgment. Tornetta elaborates on the res judicata argument and absence of a pattern of racketeering, particularly as these defenses relate to him. Tornetta also asserts that Plaintiffs have inadequately alleged any motivation on Tornetta's part to be involved in a scheme to deprive Curran of distributions from RAC and SER.

Each of the Corporate Defendants' defenses will be considered in turn. Tornetta's res judicata and pattern

of racketeering arguments will be considered alongside those of the Corporate Defendants. Finally, Tornetta's motivation argument will be examined.

### A. CLAIM PRECLUSION

The Corporate Defendants and Tornetta assert that most of Plaintiffs' claims are precluded by settlements and dismissals with prejudice in multiple prior actions in state and federal courts and **[*16]** to releases executed by Curran. Consideration of this argument warrants a general discussion of claim preclusion.

The doctrine of claim preclusion, or res judicata, provides that "a subsequent suit based on the same cause of action as a prior suit that involved the same parties or their privies is barred where there has been a final judgment on the merits in the prior suit." *Labelle Processing Co. v. Swarrow, 72 F.3d 308, 313 (3d Cir. 1995)*. n5 Federal courts must give state court judgments the same preclusive effect as would be given by the state court. *Migra v. Warren City Sch. Dist., 465 U.S. 75, 81, 79 L. Ed. 2d 56, 104 S. Ct. 892 (1984)*. Both federal and Pennsylvania courts have held that a dismissal with prejudice is considered a judgment on the merits for claim preclusion purposes. See, e.g., *Gambocz v. Yelencsics, 468 F.2d 837, 841 (3d Cir. 1972)* ("res judicata bars relitigation of the claims dismissed in the prior suit") (citations omitted); *Interdigital Technology Corp. v. OKI America, 866 F. Supp. 212, 213 (E.D. Pa. 1994)* (stating that "a dismissal with prejudice . . . acts as a judgment on the merits in favor of the dismissed defendant"); *Keystone Bldg.* **[*17]** *Corp. v. Lincoln Sav. & Loan Ass'n, 468 Pa. 85, 360 A.2d 191, 194 n.6 (Pa. 1976)* ("It is well settled, as a general proposition, that a judgment or decree, though entered by consent or agreement of the parties, is res judicata to the same extent as if entered after contest.") (citation omitted).

> n5 The Corporate Defendants also assert that Plaintiffs are barred from relitigating issues which arose under previous litigation. The doctrine of issue preclusion, or collateral estoppel, "may bar a claimant from relitigating issues decided in a previous action." *Labelle, 72 F.3d at 314 n.10*. Specifically, the Corporate Defendants argue that Plaintiffs' claim under the 1980 Stockholders Agreement is barred because the validity and enforceability of this agreement were disputed in earlier litigation that was dismissed. (Reply Argument Br. at 3.) Similarly, the Corporate Defendants argue that Plaintiffs' claims related to the ownership of various SSI banks are barred. Id. at 8. The Corporate Defendants contend that this ownership issue also was raised in earlier litigation that was

settled and dismissed with prejudice. Therefore, the Corporate Defendants assert that "any issue related to ownership (or purported theft) of the banks is now foreclosed by the dismissal with prejudice." Id. at 9.

Dismissals with prejudice unaccompanied by findings have no preclusive effect on issues. *Lawlor v. National Screen Serv. Corp., 349 U.S. 322, 327, 99 L. Ed. 1122, 75 S. Ct. 865 (1955)* (stating that a judgment unaccompanied by findings does not bind the parties on any issue); *see also Gambocz v. Yelencsics, 468 F.2d 837, 842 (3d Cir. 1972)* ("The orthodox doctrine of collateral estoppel . . . is inapplicable here because the first 'judgment was unaccompanied by findings and hence did not bind the parties on any issue.'") (citation omitted); *Interdigital Technology Corp. v. OKI America, 866 F. Supp. 212, 214 (E.D. Pa. 1994)* ("Issue preclusion . . . does not apply to an issue which was dismissed in an earlier litigation when no findings of fact or conclusions of law were made with respect to that issue."). In distinction from the case law cited by the Corporate Defendants in support of this argument, none of the earlier litigation involving the instant parties resulted in findings of fact by the court. Therefore, these issues are not precluded.

**[*18]**

Federal and Pennsylvania claim preclusion doctrines also preclude not only claims actually decided in prior actions, but also those which could have been brought. *Nanavati v. Burdette Tomlin Mem. Hosp., 857 F.2d 96, 111 (3d Cir. 1988)* (citations omitted), cert. denied, *489 U.S. 1078, 103 L. Ed. 2d 834, 109 S. Ct. 1528 (1989); Fox v. Gabler, 534 Pa. 185, 626 A.2d 1141, 1143 (Pa. 1993)*. Claim preclusion applies only to claims arising prior to the entry of judgment. *Alexander & Alexander v. Van Impe, 787 F.2d 163, 166 (3d Cir. 1986)* (stating that claim preclusion "does not bar claims arising subsequent to the entry of judgment and which did not then exist or could not have been sued upon in the prior action") (citation omitted). However, "merely adding some facts, naming additional defendants, or proposing a different theory of recovery will not convert one cause of action into a second cause of action and thereby evade the preclusive effect that the first cause of action has if both actions involve the same liability–creating conduct on the part of the defendants and the same alleged invasion of the plaintiffs' rights." *Wood v. Coleman, 1989 U.S. Dist. LEXIS 3012, CIV. A. No. 83–27, 1989 [*19] WL 29250,* at *15 (E.D. Pa. Mar. 29, 1989) (citation omitted).

For a prior judgment to have preclusive effect on a later action there must be an identity of (1) issues; (2) causes of action; (3) parties or their privies; and (4) the quality or capacity of the parties suing or being sued. *Duquesne Slag Products Co. v. Lench, 490 Pa. 102, 415 A.2d 53, 55 (Pa. 1980)*. In determining the identity of a cause of action, "res judicata generally is thought to turn on the essential similarity of the underlying events giving rise to the various legal claims." *McArdle v. Tronetti, 426 Pa. Super. 607, 627 A.2d 1219, 1222 (Pa. Super. 1993)* (citation omitted), appeal denied, *641 A.2d 587 (Pa. 1994); see also* Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc. – *Pension Fund v. Centra, 983 F.2d 495, 504 (3d Cir. 1992)* ("Whether two lawsuits are based on the identical cause of action 'turn[s] on the essential similarity of the underlying events giving rise to the various legal claims.'") (citation omitted); *United States v. Athlone Indus., Inc., 746 F.2d 977, 984 (3d Cir. 1984)* (stating that res judicata requires a plaintiff to "'present in one suit [*20] all the claims for relief that he may have arising out of the same transaction or occurrence'") (citation omitted).

The Corporate Defendants argue that "virtually all of the allegations of the Second Amended Complaint were resolved in prior federal RICO actions, as well as multiple state court proceedings. (Br. Supp. Corp. Defs.' Mot. Summ. J. at 4.) As the following discussion will show, the dismissals and releases in these earlier actions bar certain of Plaintiffs' claims arising before the dates of the dismissal or releases. However, they do not preclude claims arising thereafter. See *Lawlor v. National Screen Serv. Corp., 349 U.S. 322, 328, 99 L. Ed. 1122, 75 S. Ct. 865 (1955)* (stating that although a "judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case"). This court will first discuss generally the following issues raised by the parties in their res judicata arguments: (1) the impact of prior state judgments on later RICO actions in federal court; and (2) the application of the preclusion doctrine applied in **[*21]** *Main Line Theatres, Inc. v. Paramount Film Distrib. Corp., 298 F.2d 801 (3d Cir.), cert. denied, 370 U.S. 939, 8 L. Ed. 2d 807, 82 S. Ct. 1585 (1962).*

### 1. The Impact of Prior State Court Judgments on Later Rico Actions in Federal Court

Plaintiffs suggest that a plaintiff's failure to raise all federal RICO claims in a previous state court action has no preclusive effect on a later RICO action in federal court. (Pls.' Resp. Corp. Defs.' Mot. Summ. J. at 28.) This is incorrect. *McCarter v. Mitcham, 883 F.2d 196, 201 (3d Cir. 1989)* (finding that a judgment on the merits in a prior Pennsylvania court action precluded RICO claims

because such claims could have been brought in the earlier state court action). Therefore, any of Plaintiffs' RICO claims that could have been raised in earlier state court litigation are barred.

Plaintiffs argue that pre–settlement conduct may be alleged by Plaintiffs to establish a pattern of racketeering. (Pls.' Br. Supp. Resp. Corp. Defs.' Br. Supp. Mot. Strike at 19.) Plaintiffs erroneously rely on *Tabas v. Tabas, 1994 U.S. App. LEXIS 9355, Nos. 92–1495, 92–1529, 1994 WL 158772* (3d Cir. May 2, 1994) ("Tabas I"). The opinion and judgment in this case was vacated. **[*22]** See *Tabas v. Tabas, Nos. 92–1495, 92–1529, 1994 U.S. App. LEXIS 11956* (3d Cir. May 25, 1994). The opinion was then superseded by *Tabas v. Tabas, 47 F.3d 1280* (3d Cir.), cert. denied, *132 L. Ed. 2d 275, 115 S. Ct. 2269 (1995)* ("Tabas II"). Plaintiffs rely exclusively on footnote 15 in Tabas I, (see Pls.' Br. Supp. Resp. Corp. Defs.' Br. Supp. Mot. Strike at 20), which was not included in Tabas II. With no Third Circuit precedent to the contrary, this court finds that Plaintiffs are precluded from listing as predicate acts claims that were or could have been brought in prior actions settled or dismissed with prejudice. See *Spiegel v. Continental Ill. Nat'l Bank, 790 F.2d 638, 647* (7th Cir.) (finding that alleged predicate acts that had been dismissed in previous action were barred by res judicata), cert. denied, *479 U.S. 987, 93 L. Ed. 2d 582, 107 S. Ct. 579 (1986); Turkish v. Kasenetz, 832 F. Supp. 565, 570 (E.D.N.Y. 1993)* (finding that "plaintiffs may not relitigate claims of racketeering activity by defendant previously alleged in the action dismissed with prejudice by this court"), rev'd on other grounds, *27 F.3d 23 (2d Cir. 1994).* n6

> N6 Although Plaintiffs attempt to distinguish these two cases, this court finds their arguments unpersuasive.

**[*23]**

### 2. The Application of the Main Line Theatres Doctrine

The Corporate Defendants argue that because one of the prior settlements involving Curran and some of the Corporate Defendants disposed of actions wherein Curran sought injunctive relief, Curran is now barred from seeking redress on those same claims pursuant to the doctrine articulated in *Main Line Theatres, Inc. v. Paramount Film Distribution Corp., 298 F.2d 801* (3d Cir.), cert. denied, *370 U.S. 939, 8 L. Ed. 2d 807, 82 S. Ct. 1585 (1962).* (Br. Supp. Corp. Defs.' Mot. Summ. J. at 54–56). In Main Line Theatres, the court examined the release of claims of a suit which included in its prayers for relief a request for an injunction against prohibited conduct. The court deter-

mined that the release barred the plaintiffs from further litigation based on subsequent occurrences of the prohibited conduct because the court found that "a defendant offering a sum in settlement of a suit asking, among other things, for an injunction against certain conduct, would not understand that a similar demand could be asserted the day after the settlement." *Main Line Theatres, 298 F.2d at 803.*

Defendants assert that the **[*24]** Main Line Theatres doctrine should be applied to the October 13, 1994 Settlement Agreement. In the October 13, 1994 Settlement Agreement, Curran agreed to dismiss with prejudice three lawsuits. (Settlement Agreement of October 13, 1994 at 1–2, App. Corp. Defs.' Mot. Summ. J. at A735–36.) These lawsuits are Curran v. Tornetta, No. S–1091–94 (C.P. Schuylkill) ("Related Party Litigation"); Curran v. Rich, No. S–1567–1993 (C.P. Schuylkill) ("RICO Settlement Agreement Litigation"); and Schuylkill Skyport Inn, Inc. v. Reading Anthracite Company and Gilberton Coal Company, No. S–1608–93 (C.P. Schuylkill) ("SSI Litigation"). The Corporate Defendants contend that since injunctive relief was sought in these actions and there is no limiting language in the October 13, 1994 Settlement Agreement, Plaintiffs are barred from raising claims upon which the requests for injunctive relief were based pursuant to Main Line Theatres. This court, however, finds that the Main Line Theatres doctrine does not apply.

In Main Line Theatres, the court looked for the "reasonable understanding" between the parties:

> Here the suit contained a demand for injunctive prohibition **[*25]** of future wrongful conduct as well as a claim for money damages for alleged past misconduct. In such circumstances a reasonable person agreeing, without any expression of limitation, to accept a sum in settlement of the litigation should and reasonably would understand that both aspects of the suit were covered by the settlement. Certainly, a defendant offering a sum in settlement of a suit asking, among other things, for an injunction against certain conduct, would not understand that a similar demand could be asserted the day after settlement. This reasonable understanding determines the meaning of the assent expressed by the parties here.

*Main Line Theatres, 298 F.2d at 803* (emphasis supplied). In the instant case the settlement document at issue provides that Curran will dismiss with prejudice the

three aforementioned lawsuits. (Settlement Agreement of October 13, 1994 at 1–2, App. Corp. Defs.' Mot. Summ. J. at A735–36). There is no release language whatsoever. Subsequent to the Main Line Theatres decision, the Third Circuit Court of Appeals has made it clear that the Main Line Theatres doctrine can only be applied when the release language contains no limitations. [*26] In Tabas II, the court noted that the Main Line Theatres doctrine did not apply to releases with specific limiting language:

> In Main Line, plaintiffs could point to no limitations, expressed or implied, in their oral agreement with defendants. Accordingly, their settlement agreement covered their prayers for both injunctive relief and money damages. In the present case, however, the mutual release signed by plaintiffs and [defendant] expressly limits the applicability of the release to any claims arising "from the beginning of the world to November 20, 1987." This express limitation distinguishes the instant case from the facts presented in Main Line.

*Tabas II, 47 F.3d at 1289.*

Although the October 13, 1994 agreement has no limiting language such as that described in Tabas II, absent any language releasing Curran's claims, this court cannot say that the reasonable understanding between the parties was that Curran could never again bring claims for violations taking place after the settlement. Therefore, this court will not apply the Main Line Theatres doctrine.

In contrast, the other settlement agreements in Curran's prior actions all contain [*27] language limiting the release to claims Curran currently had against the various defendants. n7 Thus, these agreements cannot serve to preclude claims Curran brings for conduct occurring after the release dates.

> n7 The other pertinent settlement agreements brought to this court's attention by the Corporate Defendants are: two settlement agreements dated July 18, 1992, and one dated April 20, 1994. One of the agreements dated July 18, 1992 settles the following cases: Reading Anthracite Co. v. Lehigh Coal & Navigation Co., 91–CV–1898 (E.D. Pa.) ("RICO I"); James J. Curran, Jr. v. Lawrence F. Tornetta, 91–CV–2886 (E.D. Pa.) ("RICO II"); and Reading Anthracite Co. v. John W. Rich, Civ. A. No. 89–7110–05–01 (C.P. Bucks) ("the Bucks County Action"). The relevant release language provides that:

> > The parties agree that, subject to the terms of this Agreement, they shall mutually release, remise and discharge each other from any and all claims, disputes, suits, liabilities and complaints which any of them presently have against the other, especially, but not limited to the claims set forth in the referenced litigation.

(Settlement Agreement of July 18, 1992, App. Corp. Defs.' Mot. Summ. J. at A270 (emphasis supplied).)

The other agreement dated July 18, 1992 pertains to Schuylkill Skyport Inn, Inc. v. Gilberton Coal Co., 92–CV–1092 (E.D. Pa). Its pertinent language provides that:

> The parties agree that, subject to the terms of this Agreement, they shall mutually release, remise and discharge each other from any and all claims, disputes, suits, liabilities and complaints which any of them had against the other, especially, but not limited to the claim set forth in the referenced litigation.

(Settlement Agreement of July 18, 1992, App. Corp. Defs.' Mot. Summ. J. at A273 (emphasis supplied).)

The agreement dated April 20, 1994 pertains to the following cases: John J. Curran v. James J. Curran, No. S–2145-92 (C.P. Schuylkill); Lehigh Coal & Navigation Co. v. Lawrence F. Tornetta, (C.P. Carbon); RICO I; RICO II; Lehigh Coal & Navigation Co. v. Lawrence F. Tornetta, 92–CV–6030 (E.D. Pa.) ("Tornetta RICO Litigation"); Lehigh Coal & Navigation Co. v. John J. Curran, 93–CV–5572 (E.D. Pa.); James J. Curran, Jr. v. Gloria R. Curran, No. S–1699-93 (C.P. Schuylkill); and the Bucks County Action. This agreement provides in relevant part that:

> The James Curran Parties . . . hereby remise, release and forever discharge the Tornettas . . . of and from any and all . . . claims . . . that the James Curran Parties . . . ever had, now have or in the future may have or claim to have against the Tornetta Interests, for by reason of or arising out of any cause, matter, thing or event from the begin-

ning of the world to the Closing Date.

>(Settlement Agreement of April 20, 1994, App. Corp. Defs.' Mot. Summ. J. at A784–85 (emphasis supplied).)

**[*28]**

### 3. Failure to Make Distributions

Plaintiffs assert that the Defendants engaged in a scheme to defraud Curran by depriving him of cash distributions to which he is entitled. (Third Am. Compl. at 25.) Specifically, Plaintiffs assert that Defendants have accomplished this fraud by "refusing to make the distributions from RAC and SER which are required pursuant to the contract requirements of the December 12, 1980 Shareholder Agreement." Id. at 25.

Defendants point to much past litigation in their argument that this claim is barred. However, this court will discuss only the prior litigation that has the greatest preclusive effect. In Related Party Litigation Curran sued current Defendants Lawrence Tornetta, Robert Ryan, Terrence Ryan, Maria Curran Cantwell, Gloria Rich Curran, David Christ, John W. Rich, Jr., Brian Rich, RAC, and SER. Curran raised the claim of RAC's and SER's failure to pay dividends or inadequate dividends in his Memorandum in Support of the Petition for a Preliminary Injunction. (Mem. Supp. Pet. Prelim. Inj. at 55–57, Related Party Litigation, App. Corp. Defs.' Mot. Summ. J. at A720–22.) This action was dismissed with prejudice on October 28, **[*29]** 1994. (Praecipe to Dismiss of October 28, 1994, Related Party Litigation, App. Corp. Defs.' Mot. Summ. J. at A734.) Therefore, Plaintiffs are precluded from raising a claim for failure to pay dividends for any time prior to October 28, 1994. However, Plaintiffs allege that this failure to conform to the 1980 Shareholders Agreement continued to occur after this dismissal date. (See Ex. O, Third Am. Compl.) Therefore, a claim remains for the failure to pay dividends from October 28, 1994 to the present.

### 4. Related Party Transactions

Plaintiffs allege that RCG caused RAC and SER to purchase goods and/or services from related party companies, at prices in excess of their market values. (Third Am. Compl. P 70.) These related party transactions concern the purchases of goods and services from Commonwealth Insurance Company, Gilberton Energy Corp., Jack Rich, Inc., Pottsville Fuel Co., Waste Management & Processors, Inc. ("W.M.P.I."), Gilberton Coal Co., Port Carbon Machine Works, JMB, Ltd., J&R Engineering, R&R Energy Corp., and Filter Media. Id. PP 175–235. In Related Party Litigation, Curran claimed that

"affiliated party transactions in excess of $2,000,000 per **[*30]** year are taking place at RAC despite the fact that these transactions are not at arms length nor deemed fair to RAC and SER." (Compl. P 15, Related Party Litigation, App. Corp. Defs.' Mot. Summ. J. at A618.) All of the companies named in the instant case are named as related companies in Related Party Litigation. (Mem. Supp. Pet. Prelim. Inj. at 4–5, Related Party Litigation, App. Corp. Defs.' Mot. Summ. J. at A669–70.) Thus, all of the current claims could have been raised in Related Party Litigation. Because this action was dismissed with prejudice on October 28, 1994, any such claims arising before this date are barred. With the exception of Commonwealth Insurance Company, n8 Plaintiffs adequately allege that these related party transactions are ongoing. Therefore, a claim remains for transactions with all the named related parties, except Commonwealth Insurance Company, from October 28, 1994 to the present.

>n8 Although Plaintiffs allege that there was an "ongoing scheme to cause RAC and SER to purchase insurance without issuing bids," the facts alleged to support the claim of improper related party transactions with Commonwealth Insurance Company occur before October of 1994. (Third Am. Compl. PP 175, 177.) Therefore, Plaintiffs may not use transactions with Commonwealth Insurance Company to establish their claim of improper related party transactions.

**[*31]**

### 5. Reckless and Intentional Acts

Plaintiffs allege that RCG was involved in a "scheme to harm RAC and SER by engaging in a series of reckless and intentional acts." (Third Am. Compl. at 29.) Included here are: 1) the Blount matter; 2) the Anthracite Health and Welfare Fund; 3) fraudulent reports to RAC's auditors; 4) waste of corporate assets; 5) and the fraudulent payment of legal expenses. n9 (Third Am. Compl. at 29–30.)

>n9 Also included in these alleged reckless acts is "the scheme to divert RAC Sales to W.M.P.I." (Third Am. Compl. at 30.) This claim is examined in the discussion below on the alleged usurpation of corporate opportunities.

#### a. The Blount Matter

Plaintiffs contend that SER and RAC, under the control of RCG, conspired with others in August 1990 to cause Blount International, Ltd. ("Blount"), a general contractor in the construction of the SER cogeneration facil-

ity, to fail the required SER plant performance test. (Third Am. Compl. P 241.) Plaintiffs further assert that "when Blount [*32] discovered this conspiracy of RAC and SER . . ., [Blount] sued the companies and as a result thereof, the companies made significant payment and continued to make payments to Blount in excess of $4,000,000 all to the detriment of RAC and SER." Id. The Corporate Defendants argue that these claims are precluded because similar claims were raised in *Blount International, Ltd. v. Schuylkill Energy Resources, Inc., 1990 U.S. Dist. LEXIS 17366*, Civ. A. No. 88-3886 (E.D. Pa.) and Schuylkill Energy Resources, Inc. v. Blount International, Ltd, Civ. A. No. 90-6980 (E.D. Pa.). These cases were consolidated and finally dismissed with prejudice on February 11, 1993 because a settlement had been reached. As the captions to these cases suggest, these actions concerned claims between Blount and SER. n10 Therefore, the parties are distinct from the ones in the instant case, and these actions have no preclusive effect.

> n10 The Bank of New England intervened in Blount International, Ltd. v. Schuylkill Energy Resources, Inc. Combustion Engineering, Inc., Federal Insurance Company and Hub, Inc. were also named as parties in Schuylkill Energy Resources, Inc. v. Blount International, Ltd.

[*33]

Defendants further contend that the instant claims could have been raised in RICO II, and cite paragraphs 66-103 of the First Amended Complaint in that action. However, the claims asserted there concern the financing of SER in such a way as to impair SER's ability to repay RAC and to preclude any benefit to minority stockholders of SER and RAC. (First Am. Compl. PP 66-103, RICO II, App. Corp. Defs.' Mot. Summ. J. at A47-54.) These claims do not appear to arise from the same underlying events as the Blount matter. Therefore, this court finds that these claims could not have been raised in RICO II and are not precluded by the dismissal in that case.

#### b. The Anthracite Health and Welfare Fund

Plaintiffs allege that RCG engaged several mining companies to mine RAC's land, (Third Am. Compl. P 243), and that these companies along with RAC failed to pay royalties to the Anthracite Health and Welfare Fund as required by RAC's agreement with the United Mine Workers of America. Id. P 244. As a result of a suit brought by the Anthracite Health and Welfare Fund, RAC was ordered by the court to pay the amount due plus interest. Id. P 250. Plaintiffs claim that

by [*34] allowing Swank, Split Vein and/or

Norwood Mining to continue their operations through at least 1994, the Rich Control Group, acting in conspiracy with J.M.B., participated in an ongoing scheme to defraud the Health and Welfare fund, which scheme exposed RAC to liability and a judgment against it, thereby causing harm to RAC's business, reputation and property.

(Third Am. Compl. P 251.)

In RICO II Curran alleged that there was a "scheme to defraud the Health and Welfare Fund." (First Am. Compl. P 190, RICO II, App. Corp. Defs.' Mot. Summ. J. at A71.) This action was dismissed with prejudice as to all Defendants except Tornetta on March 5, 1993 (Order of March 5, 1993, RICO II, App. Corp. Defs.' Mot. Summ. J. at A277-78), and an action incorporating RICO II's claims against Tornetta, Tornetta RICO Litigation, was disposed of in a general release dated April 20, 1994. (April 24, 1994 Settlement Agreement, App. Corp. Defs.' Mot. Summ. J. at A783.) Therefore, any claims that Tornetta defrauded the Anthracite Health and Welfare Fund before April 20, 1994 are precluded. Any claims that the other Defendants defrauded this fund before March 5, 1993 are precluded as [*35] well. However, Plaintiffs allege this activity continued to occur after these dates. Thus, claims remain against Tornetta for defrauding this fund from April 20, 1994 to the present and against the other Defendants for such conduct from March 5, 1993 to the present.

#### c. Fraudulent Reports to RAC's Auditors

Plaintiffs claim that in 1992 some of the Defendants caused "fraudulent reports to be given to RAC's independent auditors, Price Waterhouse." (Third Am. Compl. P 265.) In Related Party Litigation, Curran raised claims of fraudulent reporting to Price Waterhouse and asserted that "there were numerous nondisclosed transactions that occurred in 1993 and continue to the present." (Mem. Supp. Pet. Prelim. Inj. at 38, Related Party Litigation, App. Corp. Defs.' Mot. Summ. J. at A703.) As noted previously, this action was dismissed with prejudice on October 28, 1994. Therefore, Plaintiffs' claim of fraudulent reporting to Price Waterhouse is barred.

#### d. Waste of Corporate Assets

Plaintiffs claim that from 1992 and continuing to the present, RCG, in conspiracy with W.M.P.I., has caused RAC to convey the majority of its anthracite waste material to W.M.P.I. at prices [*36] below market value. (Third Am. Compl. PP 279-80.) These claims have already been addressed in the discussion of related party transactions.

Plaintiffs also contend that members of RCG have engaged in other acts of waste, such as causing RAC and SER to purchase security services from J.M.B., in which some members of RCG are shareholders, directors, or officers. Id. P 290. This too has been addressed in the discussion of related party transactions.

Plaintiffs further allege that W.M.P.I. does not pay RAC for drying its material in RAC's Silt Drying Facility despite the fact that this is costly to RAC. (Third Am. Compl PP 287–88.) Curran could have raised claims about the Silt Drying Facility in Related Party Litigation. Because this action was dismissed with prejudice on October 28, 1994, any claims for the use of RAC's Silt Drying Facility before this date are barred. Because Plaintiffs assert that this activity is ongoing, a claim remains for the use of RAC's Silt Drying Facility from October 28, 1994 to the present.

In their allegations about waste of corporate assets, Plaintiffs also claim that a lease between Split Vein and RAC was disadvantageous to RAC. Id. PP 299–300. [*37] Plaintiffs further allege that RCG members "have caused RAC's equipment to be inadequately maintained and serviced," and "have caused RAC's personnel to abandon sound mining plans and procedures at the risk of causing severe economic consequences and short falls of coal for RAC." Id. PP 302–303. None of these claims appear to be precluded by dismissals in prior litigation.

### e. Litigation Fund

Plaintiffs assert that RCG has engaged in "fraudulently diverting funds available for distribution into a 'litigation fund' directed against James Curran individually." (Third Am. Compl. at 51.) Plaintiffs assert that "Defendants have failed to make full and fair disclosures to James Curran regarding their indemnification by RAC and/or SER." (RICO Case Statement at 28.) Plaintiffs further assert that Tornetta and other members of RCG "concealed payments and reimbursements" to Tornetta from Curran and the directors of RAC and SER appointed by him. (Third Am. Compl. P 306.)

Curran claimed that RCG members improperly paid litigation expenses in Related Party Litigation. (Mem. Supp. Pet. Prelim. Inj. at 50–51, Related Party Litigation, App. Corp. Defs.' Mot. Summ. J. at A715–16.) [*38] This court finds that claims about the formation of a litigation fund arise out of the same transaction or occurrence and thus could have been brought in Related Party Litigation. Therefore, claims relating to the formation of a litigation fund before the October 28, 1994 dismissal of this action are barred. Because Plaintiffs contend that this activity is ongoing, this claim cannot be dismissed in its entirety. This court is unable to determine from the record

before it whether concealment of payments to Tornetta are also barred because it is unclear when Plaintiffs became aware of such payments. Defendants have leave to challenge this claim on res judicata grounds at the Rule 50(a) stage.

### 6. Conversion of SSI Property

Plaintiffs allege that Defendants "defrauded SSI of its ownership rights by conspiring to convert materials owned by SSI through both removal and complete transfer of ownership of materials without SSI's permission or Fair Market Value payment." (Third Am. Compl. at 26.) Specifically, Plaintiffs refer to SSI's ownership of "various deposits of anthracite material," which

> includes, but is not limited to, deposits known as the "Golf Course Material" [*39] and other deposits that are the refuse resulting from the processing or preparation of material leased by SSI, or commingled therewith . . . "Oak Hill Slush Bank No. 73", "Oak Hill Slush Bank No. 78", "Oak Hill Refuse Banks 235 and 235R", "Bear Valley Slush Bank No. 4", "Burnside Refuse Bank No. 11", "Alaska Culm Bank No. 16", "Excelsior Refuse Bank No. 22", "Keystone Refuse Bank No. 67", "Cambridge Refuse Bank 241", "North Franklin Slush Bank No. 2" and "Gilberton Refuse No. 121."

Id. P 82. Plaintiffs allege that "in furtherance of the scheme of the Rich Control Group to deny SSI of the full benefit [of] its ownership interests, the Rich Control Group and the entities controlled by that Group, prepare and submit to SSI false and misleading reports of tonnage of anthracite waste material removed from banks subject to a continuing SSI royalty obligation with the intent that SSI rely on such reports and be deceived thereby." Id. P 83.

The Memorandum in Support of the Petition for a Preliminary Injunction in Related Party Litigation contains an allegation about the conversion of SSI materials: "A number of these [SSI owned culm and silt] banks are currently being [*40] used by RAC and Control Group Members' related parties without authorization from SSI." (Mem. Supp. Pet. Prelim. Inj. at 19, Related Party Litigation, App. Corp. Defs.' Mot. Summ. J. at A684.) Some of the items listed in the instant action are specifically mentioned: Oak Hill nos. 73, 78, 235, 235R, and Cambridge no. 241. (Mem. Supp. Pet. Prelim. Inj. at 16, Related Party Litigation, App. Corp. Defs.' Mot. Summ. J. at A681.) Plaintiffs are therefore barred from raising claims for conversion of the materials from

these specific banks before the October 28, 1994 dismissal date of this prior action. Because Plaintiffs allege the conversion continues to the present, the claim cannot be dismissed completely. Also, because of the alleged concealment, it is not clear that the claims concerning the other banks could have been raised. Defendants may address this at the Rule 50(a) stage.

Plaintiffs also assert that SSI "owns royalty rights on various banks which were sold to RAC and GCC pursuant to separate February 2, 1983 agreements." (Third Am. Compl. P 81.) Plaintiffs further assert that Defendants engaged in a scheme "to deprive SSI of royalty monies through conversion of SSI royalty [*41] monies by establishing a fraudulent 'escrow fund' set up by Defendants FS&C and Cerullo to Deprive SSI of Payments." Id. at 52. Specifically, Plaintiffs refer to the withholding of royalty payments due on a monthly basis from March 1993 to October 1994. Here Plaintiffs essentially repeat claims previously raised in Related Party Litigation. (Mem. Supp. Pet. Prelim. Inj. at 34, 57, Related Party Litigation, App. Corp. Defs.' Mot. Summ. J. at A699, A722.) Therefore, Plaintiffs' claims concerning the establishment of a fraudulent escrow fund and payment of SSI royalties are barred by the October 28, 1994 dismissal of Related Party Litigation.

### 7. Usurpation of Corporate Opportunities

Plaintiffs allege that RCG has usurped corporate opportunities of RAC, SER, and SSI. These allegations involve Ri–Corp Development, Inc. ("Ri-Corp"), JMB Development, Inc., and W.M.P.I. Each will be discussed in turn.

#### a. Ri–Corp

Plaintiffs allege that John Rich, Sr. ("Rich, Sr.") caused Gilberton Power Company, a general partnership, to be formed for the purpose of "acquiring, constructing, installing and operating an electricity and steam cogeneration facility." (Third Am. [*42] Compl. P 122.) Ri–Corp, a corporation owned by Rich, Sr., is a member of this partnership. Plaintiffs assert that Rich, Sr. had a fiduciary obligation to bring to the attention of RAC's and SSI's directors and shareholder the opportunity to participate in the ownership of GPC but failed to disclose the existence of this corporate opportunity. Id. P 124. Plaintiffs contend that because Rich, Sr. was aware of his obligation to RAC and SSI, he disguised his ownership interest in Ri–Corp, a member of the GPC partnership. n11

n11 In their discussion of Ri–Corp, Plaintiffs also repeat claims for the conversion of SSI material, which has already been discussed.

#### b. JMB Development, Inc.

Plaintiffs maintain that J.M.B. Development, Inc. is in direct competition with SER for the solicitation of private "endusers" of both steam and electricity. (Third Am. Compl. P 149.) RCG allegedly has prevented SER from developing end–users and channels all opportunities to develop end–users to Gilberton Power Co. through [*43] JMB Development, Inc. Id. P 152.

#### c. W.M.P.I.

Plaintiffs allege that since 1992 and continuing to the present, RCG members "without disclosure to the disinterested RAC directors and/or shareholders, have directed RAC's sales of its anthracite waste material to W.M.P.I.," an entity in which RCG members have an interest and which competes directly with RAC in the anthracite waste material market. (Third Am. Compl. PP 159, 166.) These sales have allegedly occurred at below market value and have prevented RAC from engaging in competition with W.M.P.I. by selling to other area cogeneration facilities. Additionally, Plaintiffs allege that RCG members have caused RAC to divert customers to W.M.P.I. and have caused RAC to forego contracts with area cogeneration facilities so that W.M.P.I. may have the benefit of these contracts. Id. P 163.

In Related Party Litigation Plaintiffs raised general claims about the usurpation of RAC's and SER's corporate opportunities. (Mem. Supp. Pet. Prelim. Inj. at 44, Related Party Litigation, App. Corp. Defs.' Mot. Summ. J. at A709.) Plaintiffs claim that they became aware of the extent of John Rich, Sr.'s involvement in Ri–Corp during [*44] discovery for Related Party Litigation in 1994. (Pls.' Argument Br. at 22.) The Corporate Defendants provide evidence of a disclosure to this effect to Plaintiffs during a deposition on May 18, 1992. (Dep. John W. Rich, Sr., 5/18/92, Ex. B, Reply Br. Supp. Corp. Defs.' Mot. Summ. J.) Therefore, this claim could have been raised in Related Party Litigation and is now precluded by the dismissal with prejudice in that action.

Additionally, Curran raised specific claims about diversion of RAC's customers to W.M.P.I. (Mem. Supp. Pet. Prelim. Inj. at 28, 58–63, Related Party Litigation, App. Corp. Defs.' Mot. Summ. J. at A693, A723–28.) All claims for usurpation of corporate opportunities were or could have been raised in this action. Therefore, Plaintiffs are barred from raising claims before the October 28, 1994 dismissal date. Because Plaintiffs allege an ongoing usurpation of corporate opportunities with respect to J.M.B. Development and W.M.P.I., a claim remains for the usurpation of these corporate opportunities from October 28, 1994 to the present.

## B. THE PATTERN OF RACKETEERING

In order for Defendants to have violated §§ 1962(a)–(c) of the RICO statute, they [*45] must have engaged in a pattern of racketeering activity or a collection of an unlawful debt. *18 U.S.C. §§ 1962*(a)–(c). Defendants contend that many of Defendants' acts alleged by Plaintiffs do not constitute the requisite racketeering activity. n12 Many of Defendants' alleged predicate acts, in and of themselves, are not included in the definition of racketeering activity listed in the RICO statute, n13 and are more properly considered breaches of fiduciary duty. Violating a fiduciary duty does not constitute racketeering activity under RICO. *Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1409 (11th Cir. 1994)*, cert. denied, *130 L. Ed. 2d 784, 115 S. Ct. 900 (1995)*. However, the RICO statute does include mail and wire fraud as racketeering activity. *18 U.S.C. § 1961*(1). Plaintiffs generally allege that these various breaches of fiduciary duty involved schemes to defraud and the use of the mails or wires. To the extent that these breaches of fiduciary duty fulfill the requirements of mail and wire fraud, this court will consider them predicate acts. See *United States v. Waymer, 55 F.3d 564, 571 (11th Cir. 1995)* ("A defendant's breach of a fiduciary duty may [*46] be a predicate for a violation of the mail fraud statute where the breach entails the violation of a duty to disclose material information."), cert. denied, *134 L. Ed. 2d 519, 116 S. Ct. 1350 (1996)*; *McLendon v. Continental Group, Inc., 602 F. Supp. 1492, 1508 (D.N.J. 1985)* (stating that the mail fraud statute "has been used to address various types of business–related fraud, most of which involve some sort of breach of fiduciary duty").

n12 The Corporate Defendants argue that the following do not constitute racketeering activity: (1) conversion of SSI property; (2) failure to distribute available SER monies; (3) concealing monies allegedly owed to Curran by SER through the creation of phantom expenses; (4) the related party transactions; and (5) usurpation of corporate opportunities. (Corp. Defs.' Br. Supp. Mot. Strike Third Am. Compl & Opp'n Pls.' Br. Supp. Third Am. Compl. at 18, 23, 25, 28; Reply Argument Br. at 10, 12, 16.)

Tornetta contends that "Tornetta's acts alleged by Curran, Jr., including his director's votes at RAC and SER and the settlement he reached with Curran, Jr. in the Tornetta RICO Litigation, could not be deemed predicate acts for purposes of liability under RICO." (Letter from Tornetta to the Court of May 9, 1996, at 3.) As to the Defendants' alleged acts of mail and wire fraud, Tornetta alleges that Plaintiffs rely on "the innocent acts of mailing implemented in connection with the Rich Control Group's alleged Schemes to defraud" Curran, including decisions of the Board of Directors. Id. Tornetta asserts that Plaintiffs have "completely failed to allege any fraud or misrepresentation with respect to Tornetta" and that absent the element of deceit there can be no mail or wire fraud. Id. at 4.

[*47]

n13 A predicate act or racketeering activity is defined in the RICO statute at *18 U.S.C. § 1961* (1).

The federal mail fraud statute, *18 U.S.C. § 1341*, and the federal wire fraud statute, *18 U.S.C. § 1343*, contain the following essential elements: (1) a scheme to defraud; n14 and (2) the use of the mails or wires for the purpose of executing the scheme. *18 U.S.C. §§ 1341*, 1343; see also *United States v. Frey, 42 F.3d 795, 797 (3d Cir. 1994)* (stating that these are the essential elements of the mail fraud statute) (citations omitted), cert. denied, *450 U.S. 998 (1981)*. The mail fraud statute is to be interpreted broadly. *McLendon, 602 F. Supp. at 1508*. Because Plaintiffs rely primarily on allegations of mail fraud, this court will focus on the elements of mail fraud.

n14 With respect to the scheme element, the mail and wire fraud statutes have been identically construed. *United States v. Siegel, 717 F.2d 9, 14 (2d Cir. 1993)*.

[*48]

"The courts have liberally construed the phrase 'scheme to defraud' to include 'any plan, consummated by the use of the mails, in which artifice or deceit is employed to obtain something of value with the intention of depriving the owner of his property.'" *Waldo v. North Am. Van Lines, Inc., 669 F. Supp. 722, 735–36 (W.D. Pa. 1987)* (citation omitted). A scheme to defraud "has a wider meaning than an individual act of fraud." *United States v. Massey, 48 F.3d 1560, 1566 (10th Cir.)*, cert. denied, *115 S. Ct. 2628 (1995)*. Such a scheme "refers to the overall design to defraud one or many by means of a common plan or technique." Id. The mail and wire fraud statutes are not limited by common law concepts of fraud. *McLendon, 602 F. Supp. at 1508*. For example, "the RICO predicate acts of mail and wire fraud do not require actual reliance." *Prudential Ins. Co. of America v. United States Gypsum Co., 828 F. Supp. 287, 295 (D.N.J. 1993)*. The Third Circuit Court of Appeals has defined this requisite deceit as follows:

Under the mail fraud statute, a scheme or ar-

tifice to defraud 'need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentations [*49] or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension.' The scheme need not involve affirmative misrepresentation, but the statutory term 'defraud' usually signifies 'the deprivation of something of value by trick, deceit, chicane or overreaching.'"

*Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1415* (3d Cir.), (citations omitted), cert. denied, *501 U.S. 1222, 115 L. Ed. 2d 1007, 111 S. Ct. 2839 (1991)*. Thus, in order to be a scheme under the mail fraud statute there must at least be the elements of deceit and deprivation or attempt to deprive. See *Pelletier v. Zweifel, 921 F.2d 1465, 1500* (11th Cir.) ("Under the mail and wire fraud statutes, a plaintiff only can show a scheme to defraud if he proves that some type of deceptive conduct occurred."), cert. denied, *502 U.S. 855, 112 S. Ct. 167, 116 L. Ed. 2d 131 (1991); United States v. Bronston, 658 F.2d 920, 927 (2d Cir. 1981)* (stating that although it is not necessary to show that a mail fraud scheme's victims were in fact defrauded, some actual harm or injury must at least have been contemplated), cert. denied, 456 U.S. (1982).

Concerning the element of [*50] "the use of the mails," the Third Circuit Court of Appeals has held that the mailing need not be essential to the scheme to defraud, it need only further such a scheme. *United States v. Adamo, 534 F.2d 31, 36 (3d Cir. 1976)*. Innocent mailing containing no false information may supply the mailing-element, and it is not necessary that the mailings be made by the defendant to an alleged victim of the fraud. *Schmuck v. United States, 489 U.S. 705, 715, 103 L. Ed. 2d 734, 109 S. Ct. 1443 (1989)*.

Thus the critical question here is whether the alleged schemes challenged by the Corporate Defendants and Tornetta have the requisite characteristics of deceit and deprivation and whether the mails or wires were used to further these schemes. If so, this court will consider them predicate acts.

**1. Failure to Distribute Available SER & RAC Monies**

As noted previously, Plaintiffs allege that Defendants engaged in a scheme to defraud Curran by depriving him of cash distributions to which he is entitled. (Third Am. Compl. at 25.) Specifically, Plaintiffs assert that Defendants have accomplished this fraud by "refusing to make the distributions from RAC and SER which are required pursuant [*51] to the contract requirements of the

December 12, 1980 Shareholder Agreement." Id.

If Plaintiffs' allegations were limited to Defendants' failure to fulfill their contractual obligations to make distributions, they would not rise to the level of a scheme to defraud because the element of deceit is missing. See *United States v. D'Amato, 39 F.3d 1249, 1261 n.8 (2d Cir. 1994)* ("A breach of contract does not amount to mail fraud.") Therefore, the "scheme" to defraud Curran by failing to make distributions from SER pursuant to the 1980 Shareholders Agreement does not constitute a predicate act. However, as to distributions from RAC, Plaintiffs allege that this scheme includes the making of misrepresentations to Meridian Bank. Specifically, Plaintiffs contend that RCG sought to evade paying distributions to Curran pursuant to the 1980 Shareholders Agreement by entering into a loan agreement ("the Loan Agreement") with Meridian Bank and that this Loan Agreement contains covenants that preclude these distributions. Plaintiffs' allegation that RCG conspired to defraud Curran by manipulating the Meridian Bank to make loans to RAC without disclosing the existence of the 1980 Shareholder [*52] Agreement contains the elements of deceit and deprivation necessary to a mail fraud claim. Although the alleged misrepresentation was made to Meridian Bank rather than to Curran, this is not fatal to Curran's pleading of a scheme under the mail fraud statute. *United States v. Pepper, 51 F.3d 469, 473 (5th Cir. 1995)* (stating that under the mail fraud statute there is no "requirement that direct misrepresentations must be made to the victims of the scheme"); *United States v. Kennedy, 64 F.3d 1465, 1476* (10th Cir.) (stating that under the mail fraud statute it is not necessary to provide evidence of actual misrepresentations to individual victims to establish existence of the alleged fraudulent scheme), cert. denied, *349 U.S. 932 (1995)*. But see, *Central Distributors of Beer, Inc. v. Conn, 5 F.3d 181, 184 (6th Cir. 1993)* (stating that "the fraud connected with mail or wire fraud must involve misrepresentations or omissions flowing from the defendant to the plaintiff"), cert. denied, *129 L. Ed. 2d 812, 114 S. Ct. 2678 (1994)*.

Concerning the second element of the mail fraud statute, Plaintiffs allege that RCG caused a letter to be sent to Meridian Bank; this letter [*53] "advised the Bank that RAC had the full corporate authority to enter into the transaction and failed to disclose to the Bank the existence of the 1980 Shareholders Agreement and 1992 Settlement Agreement." (Third Am. Compl. P 65.) As a result of this alleged misrepresentation, the Meridian Bank's Loan Agreement, which conflicts with the terms of the 1980 Stockholders Agreement, "abrogates" Curran's contract rights. Id. P 67. These allegations satisfy the mailing element. Therefore, the purported RCG scheme to defraud Curran by failing to make distributions from

RAC pursuant to the 1980 Shareholders Agreement constitutes a predicate act of mail fraud.

### 2. Related Party Transactions

As noted previously, Plaintiffs allege that RCG caused RAC and SER to purchase goods and/or services from related party companies, at prices in excess of the market values. (Third Am. Compl. P 70.) These transactions with related parties were allegedly conducted "without the knowledge and/or approval of the disinterested directors and/or shareholders of RAC and SER." (Third Am. Compl. P 235.) "Although mere breach of fiduciary duty, standing alone, may not necessarily constitute a mail fraud, the **[\*54]** concealment by a fiduciary of material information which he is under a duty to disclose to another under circumstances where the non–disclosure could or does result in harm to the other is a violation of the [mail fraud] statute." *United States v. Bronston, 658 F.2d 920, 926 (2d Cir. 1981)* (citations omitted), cert. denied, *456 U.S. 915, 72 L. Ed. 2d 174, 102 S. Ct. 1769 (1982).* Pursuant to § 1728 of the Business Corporation Law of 1988, the material facts concerning transactions or contracts between a business corporation and one or more of its directors or officers or between a business corporation and an entity in which one or more of its directors or officers has an interest must be disclosed to the board of directors or the shareholders. *15 Pa. Cons. Stat. Ann. § 1728.* n15 Therefore, Plaintiffs have alleged concealment of facts where there was a duty to disclose and have therefore adequately alleged deceit.

> n15 Pursuant to *15 Pa. Cons. Stat. Ann. § 1728*, these material facts need not be disclosed to the board or the shareholders if "the contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified by the board of directors or shareholders." *15 Pa. Cons. Stat. Ann. § 1728(a)(3).* However, even this condition presumes disclosure of some kind to the board or the shareholders to enable them to authorize, approve or ratify the contract or transaction.

**[\*55]**

The Corporate Defendants contend that there was no deprivation of property resulting from these related party transactions. (Corp. Defs.' Br. Supp. Mot. Strike at 25.) Plaintiffs allege, however, that these transactions "have caused RAC and SER substantial[] injury, reducing the amount of money in the companies and [money] available for distributions." (Third Am. Compl. P 72.) Although for purposes of the mail fraud statute, "proof of actual loss by the intended victim is not necessary," *United States v. Copple, 24 F.3d 535, 544 (3d Cir. 1994)* (citations

omitted), cert. denied, *130 L. Ed. 2d 400, 115 S. Ct. 488 (1994),* "the statutory term 'defraud' usually signifies 'the deprivation of something of value by trick, deceit, chicane or overreaching.'" *Kehr Packages, 926 F.2d at 1415.* Although it is not necessary to show that a mail fraud scheme's victims were in fact defrauded, some actual harm or injury must at least have been contemplated. *Bronston, 658 F.2d at 927.* Here, Plaintiffs have alleged that RAC and SER lost money on the purchase of goods and services with inflated prices. Therefore, Plaintiffs have adequately alleged the deceit and deprivations elements **[\*56]** of the mail fraud statute.

Plaintiffs allege that these related party transactions have involved "the repeated use of the United States mails or telephone calls in interstate commerce." (Third Am. Compl. P 179; see also id. PP 183–84, 190–91, 202, 210–11, 217, 221, 228, 223–33.) Additionally, Plaintiffs assert that these mailings include purchase orders, sales request, payments, account statements, and that the telephone calls include calls between RAC Sales and /or Purchasing Department and the related parties. (RICO Case Statement at 23.) Additionally, Plaintiffs assert that the use of the mails and wires occurred from 1992 to the present. Id. Because of the aforementioned preclusive effect of the dismissal in Related Party Litigation, this court will consider only mailings or telephone calls occurring after October 28, 1994. Plaintiffs have not presented the court with specific evidence of such mailings. However, this court's order of November 27, 1995 stayed discovery. Therefore, at this stage in the proceedings this court cannot grant the Corporate Defendants' Motion for Summary Judgment on the issue of whether the related party transactions constitute predicate acts. **[\*57]** Defendants have leave to present arguments on this issue at the Rule 50(a) stage.

### 3. Reckless Acts

Plaintiffs allege that RCG was involved in a "scheme to harm RAC and SER by engaging in a series of reckless and intentional acts." (Third Am. Compl. at 29; RICO Case Statement at 29.) Included here are (1) the Blount matter; (2) the Anthracite Health and Welfare Fund; (3) fraudulent reports to RAC's auditors; (4) waste of corporate assets; and (5) the fraudulent payment of legal expenses. n16 (Third Am. Compl. at 29–30.) Each of these alleged reckless or intentional acts will be discussed with the exception of the alleged fraudulent reports to RAC's auditors because that allegation concerns the purported fraudulent reporting to Price Waterhouse, which, as discussed above, is precluded.

> n16 Included in these alleged reckless acts is "the scheme to divert RAC Sales to W.M.P.I."

(Third Am. Compl. at 30.) This claim is examined in the discussion below on the alleged usurpation of corporate opportunities.

#### [*58] a. The Blount Matter

Plaintiffs allege that SER and RAC, while under the control of RCG, and members of a bank financing group, conspired against Blount International, Ltd. ("Blount") in August of 1990. Blount had been retained by SER to act as a general contractor in the construction of the SER cogeneration facility. (Third Am. Compl. P 241.) The alleged purpose of this purported conspiracy was to cause Blount to fail the SER plant performance test. This was supposedly accomplished by the delivery of low quality culm fuel to Blount and by adding moisture to the fuel. Blount discovered this alleged conspiracy and sued RAC and SER. The result has been payment to Blount in excess of $4 million. Id.

Plaintiffs have failed to properly allege deceit sufficient to establish a claim for mail or wire fraud. Therefore, this court finds that the Blount matter is not a predicate act.

#### b. The Anthracite Health and Welfare Fund

Plaintiffs allege RCG engaged several mining companies to mine RAC's land. (Third Am. Compl. P 243.) These companies and RAC failed to pay royalties to the Anthracite Health and Welfare Fund as required by RAC's agreement with the United Mine Workers of [*59] America. Id. P 244. Subsequent to a suit brought by the Anthracite Health and Welfare Fund, RAC was ordered by the court to pay the amount due plus interest. Id. P 250. Again, no element of deceit is alleged here. Therefore, this cannot be considered a predicate act.

#### c. Waste of Corporate Assets

Plaintiffs allege that since 1992 and continuing to the present members of RCG, in conspiracy with W.M.P.I., have caused RAC to convey the majority of its anthracite material to W.M.P.I. at below market prices and without notice to RAC's disinterested shareholders and/or directors. (Third Am. Compl. PP 279–80.) Plaintiffs contend that these sales are part of an ongoing scheme to "cripple RAC's ability to compete with W.M.P.I. in the cogeneration market by wasting its assets and diverting these assets to W.M.P.I." Id. P 282. This is essentially a reiteration of Plaintiffs' claim against RCG members for related party transactions. See id. PP 192–198. As noted previously, Plaintiffs have adequately alleged a mail fraud scheme involving related party transactions.

Plaintiffs also allege that RCG members have wasted corporate assets by causing RAC and SER to purchase se-

curity [*60] services from J.M.B., in which some members of RCG are shareholders, directors, or officers. (Third Am. Compl. P 290.) This too has been discussed above in the examination of related party transactions. Plaintiffs further allege that W.M.P.I. does not pay RAC for drying its material in RAC's Silt Drying Facility despite the fact that this is costly to RAC, (Third Am. Compl. PP 287), and that a lease between Split Vein and RAC was disadvantageous to RAC. Id. PP 299–300. Plaintiffs also contend that RCG members "have caused RAC's equipment to be inadequately maintained and serviced," and "have caused RAC's personnel to abandon sound mining plans and procedures at the risk of causing severe economic consequences and short falls of coal for RAC." Id. PP 302–303.

Absent in the preceding are allegations of deceit. Therefore, Plaintiffs have failed to establish a violation of the mail or wire fraud statutes. Therefore W.M.P.I.'s failure to pay for the use of RAC's drying facility, the Split Vein lease, and the inadequate maintenance and poor mining procedures do not constitute predicate acts.

#### d. Fraudulent Payment of Litigation Expenses

Plaintiffs assert that RCG has engaged [*61] in "fraudulently diverting funds available for distribution into a 'litigation fund' directed against James Curran individually." (Third Am. Compl. at 51.) Plaintiffs assert that "Defendants have failed to make full and fair disclosures to James Curran regarding their indemnification by RAC and/or SER." (RICO Case Statement at 28.) Plaintiffs further assert that Tornetta and other members of RCG "concealed payments and reimbursements to" Tornetta from Curran and the directors of RAC and SER appointed by him. (Third Am. Compl. P 306.) "A defendant's breach of a fiduciary duty may be a predicate for a violation of the mail fraud statute where the breach entails the violation of a duty to disclose material information." *United States v. Waymer, 55 F.3d 564, 571 (11th Cir. 1995)* (citation omitted), cert. denied, *134 L. Ed. 2d 519, 116 S. Ct. 1350 (1996)*. In the instant case Plaintiffs fail to provide the circumstances under which the alleged "concealment" occurred, making it impossible for this court to determine whether Defendants violated a duty to disclose. Plaintiff has the burden to provide such information surrounding the circumstances of any alleged fraud. In Seville Indus. [*62] *Machinery v. Southmost Machinery, 742 F.2d 786 (3d Cir. 1984)*, cert. denied, *469 U.S. 1211, 84 L. Ed. 2d 327, 105 S. Ct. 1179 (1985)*, the Third Circuit stated that "Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent be-

havior." *Id. at 791.* Plaintiffs have failed to meet this standard, rendering it impossible for this court to determine if there is requisite deceit here. Therefore, the alleged fraudulent payment of litigation expenses does not constitute a predicate act.

**4. Manipulation of Meridian Loan Agreements**

Plaintiffs contend that RCG manipulated the financing of the Meridian Bank loan "in such a manner that would preclude and prevent James Curran, and entities in which he has interests, from participating and competing with entities in which the Rich Control Group members have beneficial interests." (Third Am. Compl. P 75.) Because Plaintiffs have failed to allege the element of deceit, this does not constitute a predicate act.

**5. Manipulation [*63] of SER's Records**

Plaintiffs maintain that RCG members have engaged in a scheme "to defraud and prevent James Curran and entities in which he has an interest from engaging in any transactions with SER through the SER refinancing documents." (Third Am. Compl. at 40.) Plaintiffs contend that RCG "manipulated the refinancing of SER in such a manner that would preclude and prevent James Curran, and entities in which he has interests, from participating and competing with entities in which the Rich Control Group members have beneficial interests." (Third Am. Compl. P 77.) Because Plaintiffs have failed to allege the element of deceit, this does not constitute a predicate act.

**6. Conversion of SSI Property**

Plaintiffs allege that in furtherance of the alleged scheme to defraud SSI, "the Rich Control Group and the entities controlled by that Group, prepare and submit to SSI false and misleading reports of tonnage of anthracite waste material removed from banks subject to a continuing SSI royalty obligation with the intent that SSI rely on such reports and be deceived thereby." (Third Am. Compl. P 83.) Thus, the necessary elements of deceit and deprivation are present.

Plaintiffs [*64] contend that these purported fraudulent reports were sent through the mail. Id. P 84. Because Plaintiffs are precluded from raising conversion claims related to the Oak Hill Nos. 73, 78, 235, 235R and Cambridge No. 241 banks prior to October 28, 1994, any mailing Plaintiffs produce in reference to these banks must be from after this date. Plaintiffs have failed to provide evidence of such mailings thus far. n17 However, because discovery has been stayed in the instant case, Plaintiffs will be allowed to present such evidence at trial, at which time the Defendants may argue against the sufficiency of the evidence at the Rule 50(a) stage.

n17 In the RICO Case Statement Plaintiffs cite several letters in reference to the scheme to defraud SSI. (RICO Case Statement at 34-37.) Some of these letters refer to the Oak Hill banks, but only one is dated after October 28, 1994: the letter of Sean Curran to Gloria R. Curran dated December 2, 1994. Id. at 34. This letter, addressed to one of the Defendants, does not fulfill the mail fraud statute's requirement because it does not appear to be "incident to an essential part of the scheme." See *Pereira v. United States, 347 U.S. 1, 8, 98 L. Ed. 435, 74 S. Ct. 358 (1954).*

**[*65]**

**7. Concealing Monies**

Plaintiffs assert that RCG members have concealed and diverted monies that SER owes Curran. Basically, Plaintiffs allege that from 1992 to 1995 RCG members conducted a scheme wherein they have diverted and concealed monies which should have been distributed to SER shareholders. (Third Am. Compl. P 116.) To this end, RCG allegedly created "phantom expenses" at SER, diverted funds into a litigation fund, transferred money to RAC for an ash pit, and concealed from Curran the amount of monies available for distribution from RAC and SER. Each allegation will be examined in turn except the litigation fund which has already been discussed.

**a. Phantom Expenses**

Plaintiffs allege that in 1994 and 1995 and continuing to the present RCG members created "phantom expenses" and made intentional misrepresentations regarding other SER expenses. Id. P 118. By making such misrepresentations Defendants allegedly reduced the amount of monies available for distribution. Plaintiffs allege that this misrepresentation has involved the use of the mail. Id.

It has been recognized that "[a] stockholder's right to monitor and to police the behavior of the corporation [*66] and its officers is a property interest." *United States v. Wallach, 935 F.2d 445, 463 (2d Cir. 1991),* aff'd, *979 F.2d 912 (2d Cir. 1992),* cert. denied, *508 U.S. 939, 124 L. Ed. 2d 637, 113 S. Ct. 2414 (1993).* Plaintiffs have adequately alleged deceit and deprivation of this interest. Plaintiffs assert that this scheme is accomplished by means of a monthly mailing of an "Officers Certificate." (Third Am. Compl. P 118.) Therefore, Plaintiffs have adequately alleged the mailing element of a mail fraud violation.

**b. Ash Pit**

Plaintiffs contend that RCG has engaged in a scheme to defraud Curran and SER by "transferring one million

dollars to RAC for a 'development fee' for an ash disposal pit which SER does not need and which SER cannot use." (Third Am. Compl. at 52.) Because Plaintiffs have failed to adequately allege deceit, this does not constitute the predicate act of mail fraud.

### c. Concealing the Amount of Money Available for Distribution From SER and RAC

Plaintiffs assert that RCG has engaged a scheme to fraudulently conceal from Curran "the amount of monies available for distribution from RAC and SER to cause him to default on his contractual obligations [*67] pursuant to an April 20, 1994 Agreement with Tornetta." (Third Am. Compl. at 52.) Plaintiffs fail to articulate the nature of this alleged "fraudulent concealment." n18 Because this allegation is not in conformity with even a liberal construction of Rule 9(b), this general allegation of concealing the amount of money available for distribution does not constitute a predicate act.

> n18  In their Brief in Support of Plaintiffs' Response to Defendants' Brief in Support of Motion to Strike Third Amended Complaint, Plaintiffs allege that "despite the fact that James Curran and his representatives have made numerous requests to RAC's and SER's management and Cerullo for information, they have repeatedly been denied those requests because the defendants have contended that those matters are the subject of litigation." (Pls.' Br. Supp. Resp. Corp. Defs.' Br. Supp. Mot. Strike Third Am. Compl. at 16.)  With one exception, Plaintiffs cite letters postdating the initiation of the ongoing litigation in the instant case. Id. As noted, discovery has been stayed in this action. Therefore, failure of the parties to provide discoverable material does not rise to the level of fraudulent concealment. Plaintiffs also cite to a letter dated May 3, 1993 from John Rich, Jr. to James and Sean Curran. Id. at Ex. 3. At most this letter provides evidence that John Rich, Jr. told them that he believed they had received all the information to which they were entitled.

[*68]

### 8. Usurpation of Corporate Opportunities

Plaintiffs allege that RCG has usurped corporate opportunities of RAC, SER, and SSI. These allegations involve Ri–Corp, JMB Development, Inc. and W.M.P.I. Because the claim concerning Ri–Corp is precluded, the examination of these alleged predicate acts will be limited to JMB Development, Inc. and W.M.P.I.

### a. JMB Development, Inc.

Plaintiffs maintain that J.M.B. Development, Inc. is in direct competition with SER for the solicitation of private "end–users" of both steam and electricity. (Third Am. Compl. P 149.) RCG members allegedly have prevented SER from developing end–users and channel all opportunities to develop end–users to Gilberton Power Co. through JMB Development, Inc. Id. P. 152.

Plaintiffs allege that RCG and JMB Development, Inc. have fraudulently concealed these corporate opportunities. Id. P 153. Under Pennsylvania law, directors have a duty to disclose corporate opportunities to the corporation before seizing them for personal gain.  *CST, Inc. v. Mark, 360 Pa. Super. 303, 520 A.2d 469, 471 (Pa. Super.)* (stating that an officer or director may seize a corporate opportunity if, inter alia, the opportunity [*69] is disclosed to the shareholders) (citations omitted), appeal denied, *539 A.2d 811 (Pa. 1987).* Thus, the element of deceit is present because there was an alleged lack of disclosure when such a duty existed. See *D'Iorio v. Adonizio, 554 F. Supp. 222, 228 (M.D. Pa. 1982)* (finding adequate allegations of mail fraud where fraud alleged "appeared to be predicated on a breach of fiduciary duty including the wrongful siphoning off of business opportunities and assets").

Plaintiffs assert that this "diversion of SER's opportunities . . . was contemplated and achieved in part through use of the United States mails and telecommunications in interstate commerce." (Third Am. Compl. P 154.) Because of the preclusive effect of the October 28, 1994 dismissal of Related Party Litigation, Plaintiffs must provide evidence of use of the mails or wires incidental to an essential part of the scheme after this date or be subject to judgment in favor of Defendants at the Rule 50(a) stage.

### b. W.M.P.I.

Plaintiffs claim that RCG, acting in conspiracy with W.M.P.I., "fraudulently induced RAC to forego anthracite waste sales to the benefit of W.M.P.I." and RCG. Id. at 60. In service [*70] of this scheme, RCG members have caused RAC to divert customers to W.M.P.I. and caused RAC to forego contracts with area cogeneration facilities in order for W.M.P.I. to have the benefit of these contracts. Id. P 163. Plaintiffs also contend that RCG members have directed RAC's sales of its anthracite waste material to W.M.P.I., id. P 159, which has been addressed in the discussion of related party transactions.

The only element of deceit alleged by Plaintiffs concerns the lack of disclosures of RAC's sales to W.M.P.I. Because no deceit is alleged in relation to the purported diversion of customers and contracts to W.M.P.I., Plaintiffs have inadequately alleged a mail fraud scheme and thus these claims of diversion do not constitute predicate acts.

Case 1:05-cv-00165-JJF    Document 34-2    Filed 06/10/2005    Page 106 of 119

Page 19
1996 U.S. Dist. LEXIS 12655, *70

### 9. Scheme to Cause Curran to Default on the Agreement with Tornetta

Plaintiffs claim that "by depriving James Curran of cash distributions from RAC and SER, [RCG] members hope to cause James Curran to default on an agreement with Tornetta, a Rich Control Group member." (Third Am. Compl. at 30.) In furtherance of this scheme RCG members concealed the amount of monies available for distribution from RAC and SER, deprived [*71] RAC of corporate opportunities, depleted RAC's treasury through related party transactions, and engaged in willful and reckless acts of mismanagement to destroy the value of RAC and SER shares. Rather than alleging a predicate act, Plaintiffs here appear to discuss the purpose of some of the aforementioned predicate acts.

Tornetta argues that "it is well established that when economic reality renders a party's claims so 'implausible' that 'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" (Tornetta's Reply Br. Supp. Mot. Summ. J. at 4 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)).*) In Matsushita, the Court stated that "if the factual context renders [the plaintiffs'] claim implausible—if the claim is one that simply makes no economic sense—[plaintiffs] must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita, 475 U.S. at 587.*

Tornetta contends that "Curran, Jr.'s allegation that Tornetta is a member of the Rich Control Group—which [*72] is the sole basis for his claims against Tornetta—rests upon the inherently implausible proposition that Tornetta would have given up $4 million in distributions from RAC and SER in order to obtain contracts and indemnification worth approximately $50,000." Id. at 4. Tornetta bases this contention on Curran's allegation that his share of the distributions from RAC and SER that were wrongly withheld amounts to over $10 million. Id. at 4–5. Curran alleges that he has approximately a thirty-five percent interest in these companies, (Third Am. Compl. P 5), and Tornetta claims a fourteen percent stake in them. (Tornetta's Reply Br. Supp. Mot. Summ. J. at 5 n.5.) Because "Tornetta lost 40% of whatever distribution Curran, Jr. lost [,] if Curran, Jr. lost $10 million in distributions, Tornetta lost $4 million." Id. at 5. Tornetta argues that these losses are not offset by the funds he allegedly derived from related party transactions ($ 50,000) or the amount of money RAC allegedly spent in indemnifying him for legal expenses incurred in Tornetta RICO Litigation ($ 40,000). Id. at 5–6.

Plaintiffs respond in two ways. First, they correctly assert that economic [*73] motivation is not a prerequisite for liability under RICO. *National Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 114 S. Ct. 798, 803–04, 127 L. Ed. 2d 99 (1994).* Plaintiffs allege that the result of defaulting on his agreement with Tornetta would be "James Curran's loss of the RAC and SER pledged [stock], with the result that the Rich Control Group would obtain it." Id. Plaintiffs allege that control is part of Tornetta's motivation. (Plaintiff's letter to the court of 6/25/96, at 2.) Plaintiffs further allege that Tornetta has "personal and professional relationships with the Rich family, which relationships provide him with a motive to engage in racketeering activities with them against James Curran." (Pls.' Surreply to Tornetta's Mot. Summ. J. at 3.) Thus, Plaintiffs have alleged noneconomic motivations for Tornetta.

Second, Plaintiffs assert that they have provided sufficient evidence of an economic motivation to make it at least a triable issue. Id. at 3. Plaintiffs cite to the Stock Hypothecation, Transfer, Assignment and Security Agreement, by the terms of which Tornetta will gain stock with an alleged minimum value of $2.1 million if James Curran defaults [*74] on his financial obligations to Tornetta pursuant to the terms of the April 20, 1994 Settlement Agreement. Id. at 4–5. Tornetta responds that Lehigh Coal and Navigation Company ("LC&N") rather than Curran is obliged to pay Tornetta under the terms of that settlement agreement. (Letter of Lawrence Tornetta to the court of 5/9/96, at 3.) However, Tornetta acknowledges that Curran is the guarantor for LC&N's obligations under this settlement agreement. Id. Plaintiffs cite Curran's affidavit wherein Curran states that he relies on distributions from RAC and SER in order to meet the financial obligations under this agreement. (Pls.' Surreply to Tornetta's Mot. Summ. J. at 5.) Plaintiffs argue that Curran's reliance on distributions from RAC and SER to meet his obligations to Tornetta is a genuine issue of material fact. Id. Plaintiffs also provide evidence that Tornetta's indemnification from RAC may be larger than Tornetta suggests, that is, evidence that Tornetta is seeking $200,000 in indemnification from RAC and that such is being considered by RAC's management. Id.

In light of the alleged noneconomic motivation for Tornetta's involvement and factual questions surrounding [*75] Tornetta's economic motivation, the court will not grant summary judgment in favor of Tornetta on this issue.

### 10. Tornetta's Involvement in the Predicate Acts

Tornetta alleges that Curran cannot implicate him in any predicate acts of mail fraud because of the absence of deceit on the part of Tornetta. (See Letter of Lawrence Tornetta to the court of 5/9/96, at 4 (stating that Plaintiffs have "completely failed to allege any fraud or misrepresentation with respect to Tornetta").) Plaintiffs allege that

Tornetta, a director and shareholder of RAC and SER, was "a member of the Rich Control Group, [and agreed] to act in concert with the other members to commit predicate acts of mail and wire fraud." (Third Am. Compl. P 20.) Plaintiffs assert that Tornetta is liable at least for aiding and abetting. See *Fidelity Fed. Sav. & Loan Ass'n v. Felicetti, 830 F. Supp. 257, 261 (E.D. Pa. 1993)* (stating that "an aider and abettor of two predicate acts can be civilly liable under RICO") (citation omitted). Plaintiffs further assert that for § 1962(d) liability, Tornetta need not have committed the predicate acts; simply agreeing to the commission of these acts is sufficient for **[*76]** RICO liability. See *United States v. Adams, 759 F.2d 1099, 1116* (3d Cir.) (stating that "to be convicted of a RICO conspiracy, a defendant must agree only to the commission of the predicate acts, and need not agree to commit personally those acts"), cert denied, *474 U.S. 906,* and cert. denied, *474 U.S. 971, 88 L. Ed. 2d 321, 106 S. Ct. 336 (1985).* Because of the discovery stay and the dispute on these material facts, the court declines to grant summary judgment in favor of Tornetta on this issue. However, Tornetta has leave to resubmit this argument at the Rule 50(a) stage.

**11. Summary of Predicate Acts**

The court will consider the following as predicate acts because Plaintiffs have adequately alleged mail fraud schemes involving these acts: (1) the scheme to withhold distributions through the Meridian Bank Loan Agreement, (2) the related party transactions; (3) the conversion of SSI property; (4) the phantom expenses; and (5) the usurpation of corporate opportunities through J.M.B. Development. As noted, Defendants have leave to challenge the related party transactions, the conversion of SSI property, the diversion of corporate opportunities through J.M.B. Development, **[*77]** and Tornetta's involvement in the predicate acts at the Rule 50(a) stage.

Because Plaintiffs have alleged two or more predicate acts to establish a pattern of racketeering activity, n19 their RICO claims withstand the motions for summary judgment filed by Tornetta and the Corporate Defendants.

        n19 A pattern of racketeering activity requires at least two acts of racketeering activity. *18 U.S.C. § 1961(5).*

**C. ESTOPPEL**

The Corporate Defendants argue that Curran is equitably estopped from seeking to compel distributions under the 1980 Stockholders Agreement because he never made any distributions pursuant to the formula contained in that agreement. (Corp. Defs.' Br. Supp. Mot. Summ. J. at 57.) The Corporate Defendants allege that "there were no dis-

tributions to the stockholders for any reason from 1987 through September 6, 1990, when Curran Jr. was Chief Executive Officer of RAC." Id. at 58 (emphasis deleted). Further, Defendants assert that a letter by Curran dated May 18, 1989 shows that he "did not **[*78]** believe that the 1980 Stockholders Agreement was mandatory or effective, nor required any distribution to the shareholders." Id. Plaintiffs respond that Curran abided by the terms of the 1980 Shareholders' Agreement while he was CEO of RAC and distributions were made to RAC Shareholders from 1980 through 1989. (Pls.' Resp. Corp. Defs.' Mot. Summ. J. at 35.)

The doctrine of equitable estoppel is summarized as follows:

> Courts apply the doctrine of equitable estoppel to prevent a person from taking a position that is inconsistent with a position previously taken or acting differently than the manner in which that person induced another person by word or deed to expect. . . . There are two essential elements of equitable estoppel: inducement and justifiable reliance on that inducement. Such inducement may be words or conduct and a person may exhibit reliance by an act or forbearance "provided that a change in condition results causing disadvantage to the one induced." The party who asserts equitable estoppel must prove the elements of estoppel by "clear, precise and unequivocal evidence."

*Louis W. Epstein Family Partnership v. Kmart Corp., 828 F. Supp. 328,* **[*79]** *342–44 (E.D. Pa. 1993)* (citations omitted), aff'd in part and rev'd in part on other grounds, *13 F.3d 762 (1994).* The Corporate Defendants have not adequately alleged the elements of equitable estoppel. The Corporate Defendants' assertion that Curran's attempt to enforce the 1980 Stockholders Agreement is inconsistent with his previous behavior as the CEO of RAC might rise to the level of "inducement," but there is no claim that Defendants justifiably relied on such conduct to their disadvantage. Further, there is a factual dispute concerning whether Curran as a CEO paid dividends pursuant to the 1980 Shareholders Agreement which precludes granting a motion for summary judgment.

**D. THE ILLEGALITY OF THE 1980 SHAREHOLDERS AGREEMENT**

The Corporate Defendants claim that the Pennsylvania Business Corporation Law does not permit the 1980 Stockholders Agreement. (Corp. Defs.' Br.

Supp. Mot. Summ. J. at 59.) The Business Corporation Law provides that

> a distribution may not be made if . . . the corporation would be unable to pay its debts as they become due in the usual course of business; or [if] the total assets of the corporation would be less than the sum of its total [*80] liabilities plus . . . the amount that would be needed, if the corporation were to be dissolved at the time as of which the distribution is measured, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

*15 Pa. Cons. Stat. Ann. § 1551(b)(1)*, (2). The Corporate Defendants assert that the violation consists of the 1980 Stockholders Agreement's mandate of distributions of all "net profits" unconditionally. n20 This, the Corporate Defendants claim, renders the 1980 Shareholders Agreement unenforceable.

> n20 The Agreement reads in pertinent part:
>
> 2. The Stockholders herewith agree to vote for, vote to retain, and do nothing to interfere with Resolutions which shall remain in full force and effect from the date hereof until a written agreement is executed by all of the Stockholders to the contrary, which shall call for:
>
>> (a) the distribution by Reading to the Stockholders of 100% of the income of Reading from all royalties and/or funds otherwise derived from the sale or lease of Reading's assets, without diminution for expenses directly or indirectly related thereto; such distribution to be made within thirty (30) days after receipt of any such funds by Reading.
>>
>> (b) the distribution, as promptly as practical after the end of every corporate tax year, but in

> no event no later than [the] final date on which distribution thereof must be made in order to obtain the most advantageous tax treatment for Stockholders in connection therewith, of 100% of the operating profits of Reading; provided that in arriving at the amount of said profits, funds distributed pursuant to the preceding subparagraph shall first be deducted.

(1980 Shareholders Agreement, App. Corp. Defs.' Mot. Summ. J. at A1078.)

[*81]

At most the Corporate Defendants have shown that there may be circumstances when actions in conformity with the 1980 Shareholders Agreement could violate the Business Corporation Law, that is, if RAC were unable to pay its debts or if its liabilities exceeded its assets. "An agreement will be considered void for illegality only where only where it 'cannot be performed without violating a statute.'" *Rittenhouse v. Barclay White Inc., 425 Pa. Super. 501, 625 A.2d 1208, 1211 (Pa. Super. 1993)* (citations omitted). Because there are presumably circumstances when performance of the 1980 Shareholders Agreement does not violate the Business Corporation Law, this agreement is not unenforceable per se.

### E. STATUTE OF LIMITATIONS

The Corporate Defendants contend that Plaintiffs' claim of usurpation of corporate opportunities involving Ri–Corp is time-barred. (Corp. Defs.' Br. Supp. Mot. Summ. J. at 64.) As discussed previously, this claim is completely precluded. The Corporate Defendants also argue that claims that Ri–Corp converted silt from SSI are time-barred. They contend that Ri–Corp's "initial 'capital contribution' of 200,000 tons of silt in 1985 was purchased from Gilberton/Lawrence [*82] Fuels, and no subsequent 'contribution' has been made." (Corp. Defs.' Br. Supp. Mot. Summ. J. at 66–67.) They argue that even if conversion had occurred in 1985, that claim "would be barred by Pennsylvania's two-year statute of limitations at *42 Pa.C.S.A. § 5524*." Id. at 67.

Because a factual dispute exists as to whether conversion occurred in 1985, this cannot be resolved on a motion for summary judgment. Although Defendants correctly assert that there is a two–year statute of limitations for

conversion, the limitations period for conspiracy does not begin to run until after the commission of the last act of the conspiracy. See *Baker v. Rangos, 229 Pa. Super. 333, 324 A.2d 498, 510 (Pa. Super. 1974)* ("'Where there are continuous and repetitious acts or trespasses as a part of a continuous conspiracy, it has been held that the statute of limitations does not begin to run until after the commission of the last act of the conspiracy.'") (citations omitted). Plaintiffs allege that "the Rich Control Group conspired to defraud RAC and SSI of their property by causing Ri–Corp. to receive and use anthracite materials stolen from SSI and to receive and use anthracite materials improperly [*83] taken from RAC," (Third Am. Compl. at 55) and also allege this is part of an "ongoing scheme." Id. P 148. Plaintiffs contend that conversion of SSI material continues to the present. (Pls.' Resp. Corp. Defs.' Br. Supp. Mot. Summ. J. at 49; Third Am. Amended P 85.) Therefore, Plaintiffs' state law claim that Defendants conspired to convert SSI material may include incidents of conversion of SSI material from 1985 (unless such incidents are barred by claim preclusion, as discussed previously).

The Third Circuit Court of Appeals has established the following rule for determining when actions accrue in Civil RICO:

> The limitations period for a civil RICO claim runs from the date the plaintiff knew or should have known that the elements of a civil RICO cause of action existed, unless, as a part of the same pattern of racketeering activity, there is further injury to the plaintiff or further predicate acts occur which are part of the same pattern. In that case, the accrual period shall run from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering activity. The last predicate act need [*84] not have resulted in injury to the plaintiff but must be part of the same "pattern."

*Keystone Ins. Co. v. Houghton, 863 F.2d 1125, 1126 (3d Cir. 1988).* Plaintiffs allege that the acts of SSI conversion are part of an ongoing scheme continuing to the present. (Third Am. Compl. P 115.) Thus, Plaintiffs have adequately alleged further predicate acts occurring after 1985 and up to the present that are part of the same pattern. Therefore, Plaintiffs' RICO claim for conversion of SSI material in 1985 is not time–barred.

**F. FAILURE OF THE CONTROLLING DOCUMENTS TO SUPPORT PLAINTIFFS' CLAIMS ABOUT THE MANIPULATION OF**

**SER'S FINANCING**

The Corporate Defendants challenge Curran's allegation that RCG has "manipulated the finances of SER to reduce or eliminate monies and profits which should be paid to James Curran." (Third Am. Compl. at 48.) The Corporate Defendants argue that the controlling documents do not support these allegations concerning the funding of an ash pit and a litigation fund. n21

> n21 The Corporate Defendants also challenge allegations made by Plaintiffs in the Second Amended Complaint but not included in the Third Amended Complaint concerning: the Construction Account, the Prior Lender Indemnification Account, the Company Litigation Account, Overfunding of Principal Accounts, the 1994 Distribution, and the Project Revenue Account. As these allegations have not been repeated in the Third Amended Complaint, they are not considered by the court.

[*85]

**1. The Ash Pit**

Plaintiffs claim that RCG transferred from SER a million dollars to RAC for a development fee for an ash disposal pit "which SER does not need and which SER cannot use." (Third Am. Compl. at 52.) The Corporate Defendants argue that if SER had access to this pit, it could avoid costlier disposal methods. (Corp. Defs.' Br. Supp. Mot. Summ. J. at 76.) The Corporate Defendants provide evidence that the use of this pit "would result in savings to SER of approximately $1,000,000 per year." Id. The Corporate Defendants argue assert that "as the development fee was paid from SER to RAC, whose shareholders are virtually identical, the funds remained available to be distributed to the same shareholders, including Curran, Jr., at the discretion of the Board." Id. at 76–77. The Corporate Defendants also argue that the transfer of these funds to RAC subjects them to mandatory distribution for payment of taxes, which would benefit Curran, but that there would be no such benefit if the funds were left in SER. Id. at 77.

In their response, Plaintiffs provide enough evidence to render this issue a question for the jury. Plaintiffs present testimony that casts [*86] doubt on the financial benefit potentially resulting from the ash pit. (Pls.' Resp. Corp. Defs.' Br. Supp. Mot. Summ. J. at 45.) Plaintiffs also challenge the logic of the Corporate Defendants' suggestion that the money paid to RAC is not an actual loss to Curran due to the similarity between RAC's and SER's shareholders. Plaintiffs assert that requests to RAC by Curran or his nominees have been rejected. Id. at 45–

46. Finally, Plaintiffs argue that a fee paid to RAC for development costs of the ash pit "would not be subject to mandatory distribution for payment of taxes or otherwise." Id. at 46. Therefore, there is an issue of material fact concerning whether the investment in an ash pit was part of an alleged attempt to hurt Curran through the diversion of funds that could have been used to pay dividends.

### 2. The Litigation Reserve Fund

Plaintiffs allege that Defendants also engaged in a scheme of "fraudulently diverting funds available for distribution into a 'litigation fund' directed against James Curran individually." (Third Am. Compl. at 51.) The Corporate Defendants assert that in 1994 the distribution made was in accordance with the formula established by the [**87**] October 13, 1994 Settlement Agreement. (Corp. Defs.' Br. Supp. Mot. Summ. J. at 77–78.) Even if such is the case, Plaintiffs may still have a claim for diversion of money into a litigation fund in an intentional effort to reduce Curran's distributions in 1995. This court cannot now determine this based on the record before it.

### G. FAILURE TO ALLEGE A DISTINCT INJURY TO CURRAN

The Corporate Defendants contend that Curran "has not alleged any injury separate and distinct from the alleged harm to RAC and SER" and that because "all the damages he claims are derived exclusively from Curran, Jr.'s status as a shareholder, his individual claims must be dismissed." (Corp. Defs.' Br. Supp. Mot. Summ. J. at 80.) Plaintiffs argue, inter alia, that "Plaintiff Curran has standing to sue by virtue of the fact that he is a Shareholder in close corporations (RAC and SER) where the directors have violated a fiduciary duty owed directly to him." (Pls.' Resp. Corp. Defs.' Mot. Summ. J. at 52–53.)

Pursuant to Pennsylvania law the general rule is that an action to redress injuries to a corporation cannot be maintained by a shareholder in his own name but must be brought in the name of the corporation." [**88**] *John L. Motley Assocs., Inc. v. Rumbaugh, 104 Bankr. 683, 686 (E.D. Pa. 1989);* see also *Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727, 732 (3d Cir. 1970)* ("A stockholder of a corporation does not acquire standing to maintain an action in his own right, as a shareholder, when the alleged injury is inflicted upon the corporation and the only injury to the shareholder is the indirect harm which consists in the diminution in value of his corporate shares resulting from the impairment of corporate assets.").

One exception to the general rule that claims for injuries to the corporation must be brought derivatively exists "where there is a special duty, such as a contractual duty, between the wrongdoer and the stockholders." *Temp–Way Corp. v. Continental Bank, 139 Bankr. 299,*

*317 (E.D. Pa. 1992);* see also *John L. Motley Assocs., 104 Bankr. at 686* (stating that the aforementioned rule concerning bringing claims derivatively "does not apply in a case where the shareholder shows a violation of duty owed directly to him.") *Id. at 686.* In the instant case, Curran alleges that the Rich Control Group "refuses to make the distributions from RAC and SER which are required pursuant to [**89**] the contract requirements of the December 12, 1980 Shareholder Agreement." (Third Am. Compl. at 25.) This alleged breach of contractual duty between RCG members and Curran falls within this exception to the general rule regarding derivative claims. Therefore, Curran may raise individual claims based on RCG's alleged failure to distribute dividends according to the 1980 Shareholders Agreement.

The other general exception to the rule about derivative claims is when an individual has pled an injury separate and distinct from that incurred by the corporation. See *Adjusters, Inc. v. Computer Sciences Corp., 818 F. Supp. 120, 121 (E.D. Pa. 1993).* For example, in *Davis v. United States Gypsum Co., 451 F.2d 659 (3d Cir. 1971),* the plaintiff alleged harm not only to the corporation of which he was a minority shareholder, he also alleged that he lost money after the corporation went bankrupt and he became liable on notes which had been given by the corporation to suppliers and which he had guaranteed. *Id. at 660.* The plaintiff also alleged that he was induced to leave his job. Id. The kind of separateness between individual and corporate injuries present in Davis is lacking [**90**] in the instant case.

Therefore, with the exception of claims based on the 1980 Shareholders Agreement, all of Curran's state claims must be brought derivatively. This also applies to Curran's RICO claims. "Where a RICO violation injures only a corporation, a shareholder or employee of the corporation does not thereby obtain the right to sue under RICO." *A Pocono Country Place, Inc. v. Peterson, 675 F. Supp. 968, 975 (M.D. Pa. 1987)* (citation omitted); see also *In re Sunrise Sec. Litigation, 916 F.2d 874, 880 (3d Cir. 1990)* ("Federal courts that have considered the question in shareholder suits all have held that shareholders lack standing to assert RICO claims where their injuries are not direct and distinct from any injury sustained by the corporation and shareholders generally.").

### H. CURRAN'S LACK OF STANDING TO SEEK THE RESCISSION OR REFORMATION OF THE MERIDIAN LOAN AGREEMENT

The Corporate Defendants argue that "Curran, Jr. has no right to seek the rescission or reformation of Meridian's loan agreement with RAC," (Corp. Defs.' Br. Supp. Mot. Summ. J. at 63), because he is "neither a party nor privy to the Meridian loan agreement." Id. at 64. Plaintiffs

have [*91] not contested this point. The law cited by the Corporate Defendants supports a finding that Curran, individually, has no standing to seek rescission or reformation of this agreement. See *Castle v. Cohen, 676 F. Supp. 620, 627 (E.D. Pa. 1987)* ("Rescission . . . is appropriate only under extraordinary circumstances when the complaining party has suffered a breach of such a fundamental and material nature that it affects the very essence of the contract and serves to defeat the object of the parties.") (citations omitted), aff'd, *840 F.2d 173 (3d Cir. 1988); Lachner v. Swanson, 251 Pa. Super. 561, 380 A.2d 922, 925 (Pa. 1977)* ("Reformation of an instrument may be had by the parties to the instrument and by those standing in privity with them, but not by persons not parties or privies.") (citation omitted). However, insofar as Curran seeks this remedy derivatively, he seeks it on behalf of RAC, one of the parties to the agreement. Therefore, this court will not strike this request for relief.

### III. THE CORPORATE ATTORNEYS' MOTION FOR SUMMARY JUDGMENT

The Corporate Attorneys raise several arguments in support of their motion for summary judgment on Counts III (SSI's claim [*92] for violation of *18 U.S.C. § 1962*(c)) and VIII (Curran's claim for violations of *18 U.S.C. § 1962*(b) and § 1962(c)). The Corporate Attorneys contend that they cannot be held liable for a violation of § 1962(c) because Plaintiffs have failed to fulfill § 1962(c)'s distinctiveness requirement and because the attorneys have not participated in the operation or management of a RICO enterprise. They also contend that Plaintiffs' RICO claims are insufficiently specific as to the involvement of the Corporate Attorneys. In response, Plaintiffs contend that Cerullo has concealed information, thereby limiting the factual record available to Plaintiffs and that, therefore, summary judgment should not be granted. After examining this charge of concealment, the specific defenses raised by the Corporate Attorneys will be addressed.

#### A. CERULLO'S ALLEGED CONCEALMENT

Plaintiffs claim that in his September 21, 1995 and April 12, 1996 depositions, Cerullo refused to answer questions regarding his interaction with RCG members in the various RICO schemes, and that such information is relevant to determining whether the Corporate Attorneys engaged in the operation and management of the alleged [*93] RICO enterprises. (Pls.' Resp. Corp. Att'ys' Mot. Summ. J. at 3.) Therefore, Plaintiffs contend, the factual record is limited and the motion for summary judgment should not be granted. Id. at 4.

Plaintiffs have deposed Cerullo twice. The first deposition occurred on September 21, 1995. Pursuant to a discussion with this court, this deposition was limited to

the issue of the disqualification of Cerullo and his firm. Plaintiffs assert that at this deposition Cerullo concealed information about the following: (1) the conspiracy between RAC and the Bank of New York against Blount; (2) related party transactions; and (3) the litigation reserve account. (Pls.' Resp. Corp. Att'ys' Mot. Summ. J. at 2–5.)

This court notes, first, that with one exception, Plaintiffs declined to raise these issues before this court at the on-record conference on October 24, 1995 although other objections raised at the September deposition were addressed. Plaintiffs raised the issue of competitive bidding, which is pertinent to related party transactions. This court ruled that the attorney–client privilege barred Cerullo from answering questions about advice given on competitive bidding. (N.T., 10/24/95 [*94] at 66.)

Secondly, this court lifted the discovery stay to permit Plaintiffs to depose Cerullo on April 12, 1996 precisely for the purpose of determining the extent of the Cerullo's involvement in the operation or management of the alleged RICO enterprises. During that deposition Plaintiffs' counsel did not seek the information Plaintiffs now claim was concealed from them at the September deposition. Although counsel for RAC and SER did not withdraw objections asserted in the September deposition, (Dep. Cerullo, 4/12/96 at 117, attached to Corp. Att'ys' Mot. Summ. J.), he did note for the record that he was "not necessarily asserting the privilege in response to any questions [Plaintiffs' counsel] may ask until [he heard] what the questions [were]." Id. at 115. Also, counsel for RAC and SER withdrew all objections based on privilege at the April deposition. Id. at 116–17.

Therefore, this court finds there was no concealment as to any questions Plaintiffs raised in the September deposition. Rather, Plaintiffs' counsel failed to pursue these issues save for the issue of competitive bidding in reference to related party transactions, and this court found such information [*95] privileged.

Plaintiffs also contend that Cerullo concealed information relevant to the instant motion at the second deposition on April 14, 1996, when he refused to discuss a conversation with David Christ relating to whether or not the 1980 Shareholders Agreement had been followed. (Pls.' Resp. Corp. Att'ys' Mot. Summ. J. at 5.) In the April deposition Plaintiffs asked Cerullo what Christ's conclusions were with respect to whether the 1980 Shareholders' Agreement had been followed. (Dep. Cerullo, 4/12/96 at 49, attached to Corp. Atty's' Mot. Summ. J.) Counsel for RAC and SER objected on the basis of attorney–client privilege, id., but later withdrew the objection. Id. at 117. Plaintiffs also contend that Cerullo engaged in concealment by refusing to provide his opinion as to the enforceability of the 1980 Shareholders Agreement at the present

time and his opinion of a letter of May 17, 1989, written by his former partner, Abraham Frumkin, concerning the enforceability of the 1980 Shareholders Agreement. (Pls.' Resp. Corp. Att'ys' Mot. Summ. J. at 21 (citing Dep. Cerullo, 4/12/96 at 32–33, attached to Corp. Att'ys' Mot. Summ. J.).) This court finds that Cerullo's current opinion [*96] on these matters is not relevant to his operation or management of the alleged enterprises.

Plaintiffs also allege that Cerullo "has actively concealed information [about RAC and SER] from James Curran and his directors, despite James Curran's contractual and property rights in this information." (Pls.' Resp. Corp. Att'ys' Mot. Summ. J. at 32.) This court does not find that Cerullo's actions rise to the level of concealment. Plaintiffs' evidence, at most, shows that Cerullo did not provide information related to the instant litigation after this court's stay of discovery and that Cerullo gave an opinion about the ownership of SSI banks with which Plaintiffs disagree.

Plaintiffs have not provided evidence of concealment of material information. Therefore, this court will address the merits of the defenses presented by the Corporate Attorneys' in their Motion for Summary Judgment.

**B. 1962(c)**

Plaintiffs allege that the Corporate Attorneys have violated § 1962(c) of the RICO statute. Section 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to [*97] conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

*18 U.S.C. § 1962*(c). The Corporate Attorneys argue that the claims against them based on § 1962(c) should be dropped because Plaintiffs' allegations do not fulfill § 1962(c)'s distinctiveness requirement and because Plaintiffs have failed to show that the Corporate Attorneys participated in the conduct of the enterprise. Each of these arguments will be examined in turn.

**1. The Distinctiveness Requirement**

The Corporate Attorneys first argue that they are not properly distinct from one of the alleged RICO enterprises. Plaintiffs allege that the RICO enterprise is, alternatively, RAC, SER, or

the association in fact of Rich, Jr., Rich,

Sr., Brian Rich, Robert Ryan, Bonnie Ryan, Terrence Ryan, Gloria Curran, Maria Cantwell, David Christ, Tornetta, Cerullo, and FS&C, Gilberton Power, W.M.P.I., Ricorp., JMB and the other Defendants, including but not limited to other entities in which Defendants may have or had an interest . . . .

(Third Am. Compl. PP 338–340.) Concerning the alleged association [*98] in fact, the Corporate Defendants contend that by characterizing Cerullo and FS&C as both persons and part of the enterprise, Plaintiffs have failed to meet the distinctiveness requirement of § 1962(c). (Corp. Att'ys' Br. Supp. Mot. Summ. J. at 6.)

In *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., 46 F.3d 258 (3d Cir. 1995),* the Third Circuit Court of Appeals described the prevailing distinctiveness requirement:

> This requirement originates in the statute's textual directive that § 1962(c) liability requires conduct by defendant "persons" acting through an "enterprise." . . . [A] claim simply against one corporation as both "person" and "enterprise" is not sufficient. Instead, a viable § 1962(c) action requires a claim against defendant "persons" acting through a distinct "enterprise."

*Id. at 268.* However, in Jaguar Cars, the court of appeals liberalized this distinctiveness requirement by adding that "alleging conduct by officers or employees who operate or manage a corporate enterprise satisfies this requirement" because "[a] corporation is an entity legally distinct from its officers or employees, which satisfies the "enterprise" definition of [*99] 18 [U.S.C.] § 1961(4)." Id. Prior to Jaguar Cars's broadened interpretation of the distinctiveness requirement, the Third Circuit Court of Appeals had found the distinctiveness requirement was satisfied even where there was some overlap between the alleged "persons" and the "association in fact." *Petro-Tech, Inc. v. Western Co. of North America, 824 F.2d 1349, 1361 (3d Cir. 1987)* (finding that the corporation could be liable as a defendant person where the enterprise was alleged to be an association in fact consisting of the corporation and individual defendants); see also *Shearin v. E.F. Hutton Group, Inc., 885 F.2d 1162, 1165–66 (3d Cir. 1989)* (finding that the distinctiveness requirement is fulfilled where three corporations were alleged to be persons and where the enterprise was alleged to be an association in fact of the three corporations).

In the instant case, Plaintiffs' allegations that the

Case 1:05-cv-00165-JJF   Document 34-2   Filed 06/10/2005   Page 113 of 119

Page 26
1996 U.S. Dist. LEXIS 12655, *99

Corporate Attorneys are both persons and part of the association in fact satisfies the distinctiveness requirement of § 1962(c).

### 2. Participation in the Conduct of the Enterprise

The United States Supreme Court has held that "one is not liable [under *18 U.S.C.* **[*100]** *§ 1962*(c)] unless one has participated in the operation or management of the enterprise itself." *Reves v. Ernst & Young, 507 U.S. 170, 183, 122 L. Ed. 2d 525, 113 S. Ct. 1163 (1993).* In its application of Reves to the involvement of professionals providing services to RICO enterprises, the Court of Appeals for the Third Circuit has found that "simply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result." *University of Maryland v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1539 (3d Cir. 1993).*

By way of general response to the Corporate Attorneys' arguments about liability under § 1962(c), Plaintiffs contend that the Corporate Attorneys were in the "chain of command through which the enterprise's affairs were conducted." (Pls.' Resp. Corp. Atty's' Mot. Summ. J. at 14 (citing *United States v. Oreto, 37 F.3d 739, 750 (1st Cir. 1994),* cert. denied, *130 L. Ed. 2d 1116, 115 S. Ct. 1161 (1995)).*) In *Cohen v. Wolgin, 1995 U.S. Dist. LEXIS 972, Civ. No. 87-2007, 1995 WL 33095* (E.D. Pa. Jan. 24, 1995), the court denied the defendant lawyer-accountant's motion for summary judgment because it found that the accountant **[*101]** was "clearly in the 'chain of command.'" Id. at *17. The court based this finding on the fact that the plaintiff had alleged that the lawyer-accountant had misrepresented the financial status of the enterprise to its creditors and to the plaintiff and had directed that others make similar misrepresentations. Id. In Oreto the court found that "one may 'take part in' the conduct of an enterprise by knowingly implementing decisions, as well as by making them." *Oreto, 37 F.3d at 750.* Plaintiffs assert that "not only do Cerullo [and] FS&C carry out the orders of the Rich Control Group and facilitate the schemes to defraud [Plaintiffs], they also devise these schemes." (Pls.' Resp. Corp. Att'ys' Mot. Summ. J. at 14.) Plaintiffs also contend that "at the very least, a factual dispute exists regarding the role of Defendant Cerullo and the extent of his participation with the Rich Control Group in the management and control of the enterprises," and that therefore the 1962(c) claim against the Corporate Attorneys should not be dismissed. Id. at 16.

In Cohen, the court found that "there is evidence from which a jury could reasonably infer . . . that [the lawyer-accountant's] **[*102]** role . . . was not merely that of an independent entity providing accounting services to the

enterprise." *Cohen, 1995 WL 33095,* at *16. The critical question here is whether Plaintiffs have provided such evidence in this case. As noted earlier, in a motion for summary judgement the moving party bears the burden of showing that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* The non-moving party must then go beyond the pleadings to "establish the existence of each element on which it bears the burden of proof," *J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990)* (citation omitted), cert. denied, *499 U.S. 921, 113 L. Ed. 2d 246, 111 S. Ct. 1313 (1991),* because "a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex, 477 U.S. at 323.*

In the instant case the evidence presented by Plaintiffs is insufficient to defeat the motion for summary judgment. "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party **[*103]** for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)* (citation omitted). Because evidence that is "merely colorable" or "not significantly probative" cannot defeat a motion for summary judgment, id., the motion is granted as to the 1962(c) claims against the Corporate Attorneys. An examination of the Corporate Attorneys' position in the corporations involved in the association in fact and the Corporate Attorneys' involvement in each of the predicate acts reveals that the Corporate Attorneys did not participate in the conduct of the alleged enterprises through a pattern of racketeering activity.

### a. Cerullo's Position as an Officer of the Corporations Participating in the Alleged Association-In-Fact

The Corporate Attorneys argue that Cerullo's alleged status as an officer of the corporations comprising the association in fact does not support the contention that he engaged in the operation or management of a RICO enterprise. The Corporate Attorneys provide evidence that Cerullo serves only as an assistant secretary of some of the corporate defendants and that his officer status, as **[*104]** such, is limited to attestation purposes only. (Corp. Atty's' Br. Supp. Mot. Summ. J. at 7.)

This court finds that holding the position of assistant secretary is not enough, in and of itself, to satisfy § 1962(c)'s operation or management requirement. See *Webster v. Omnitrition Int'l, Inc., 79 F.3d 776, 789 (9th Cir. 1996)* (finding that attorney's "purely ministerial role as 'Assistant Secretary' in the corporation is insufficient to warrant liability under § 1962(c)"); *Biofeedtrac v. Kolinor Optical Enters., 832 F. Supp. 585, 591 (E.D.N.Y. 1993)*

1996 U.S. Dist. LEXIS 12655, *104

(stating that "the court places no weight on the facts that [an attorney] was the sole director, and later would become corporate secretary of [a defendant corporation]" because "corporate counsel customarily fill such roles without becoming a part of the operation or management of the enterprise.").

**b. The Scheme to Withhold Distributions through the Meridian Loan Agreement**

Plaintiffs contend that "through Defendant FS&C and Cerullo's affirmative actions to Meridian Bank, and the fraudulent concealment of the 1980 Shareholders Agreement, Defendants FS&C and Cerullo participated in the management of the enterprises." **[*105]** (Third Am. Compl. P 68.) Plaintiffs base this allegation on a letter dated November 30, 1993, from a member of FS&C to Meridian. Id. P 65; (see also Letter from Paul J. Datte of FS&C to Paul D. Cohn, Vice President of Meridian Bank, of 11/30/93, Ex. Q, Third Am. Compl.) According to Plaintiffs, "this letter advised the Bank that RAC had the full corporate authority to enter into [a loan agreement with the bank] and failed to disclose to the Bank the existence of the 1980 Shareholders Agreement and 1992 Settlement Agreement." (Third Am. Compl. P 65.)

This letter appears to implicate exactly the type of behavior the Reves court determined did not involve operation or management. In Reves, the Court found that the accounting firm had not engaged in the operation or management of the enterprise despite the fact that the firm had knowingly prepared misleading financial reports and knowingly presented an inaccurate picture of its clients' financial circumstances at the annual meeting and to the Board of Directors. See *Reves, 113 S. Ct. at 1173–74.* Even assuming that FS&C made misrepresentations in this letter, this alone does not rise to the level of "operation **[*106]** or management." See also *University of Maryland v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1539 (3d Cir. 1993)* (finding that allegations that auditor prepared false and misleading financial statements for insurer did not constitute operation or management); *Fidelity Fed. Sav. & Loan Ass'n v. Felicetti, 830 F. Supp. 257, 260 (E.D. Pa. 1993)* (finding that a realty appraiser's submission of misleading and fraudulent appraisals does not rise to the level of operation or management); *Gilmore v. Berg, 820 F. Supp. 179, 182–83 (D.N.J. 1993)* (finding that submission of tax opinion and forecast letters drafted by attorney and accountant and allegedly containing false statements did not constitute participation in directing the affairs of the RICO enterprise).

The instant case is distinguishable from Cohen. In Cohen, the court found that the plaintiff had adequately alleged liability under § 1962(c) on the part of the defendant accountant because the latter allegedly made mis-

representations about the financial status of the corporate enterprise to its creditors and to the plaintiff and directed that others make similar misrepresentations to creditors. *Cohen, 1995* **[*107]** *WL 33095* at * 17. The opinion letter in the instant case does not demonstrate the same level of operation or management.

**c. The Conversion Claims**

Plaintiffs allege that the Corporate Attorneys and RCG "fraudulently concealed from SSI the removal of anthracite material owned by SSI from the Oak Hill Refuse Banks Nos. 235 and 235R and Oak Hill Slush Area No. 78." (Third Am. Compl. P 85.) Plaintiffs contend that Cerullo misrepresented the ownership of the Oak Hill banks in a series of letters. Id. PP 87–90. The letters Plaintiffs have presented to the court reveal nothing more than Cerullo's opinion regarding the ownership of refuse banks. Even assuming, arguendo, that these letters contain misrepresentations, this does not rise to the level of operation and management for reasons already stated.

**d. Related Party Transactions, Phantom Expenses, and the Usurpation of Corporate Opportunities through JMB Development, Inc.**

Plaintiffs have not alleged any specific behavior delineating the Corporate Attorneys' role in the related party transactions, the phantom expenses, or the usurpation of corporate opportunities through JMB Development, Inc. Nor have Plaintiffs provided **[*108]** any evidence as to the Corporate Attorneys' operation or management through these racketeering activities.

**e. Aiding and Abetting**

Plaintiffs assert that the Corporate Attorneys are liable under § 1962(c) because they have aided and abetted the other Defendants involved in the operation and management of the RICO scheme. (Pls.' Resp. Corp. Att'ys' Mot. Summ. J. at 22; Third Am. Compl. P 389.) The Corporate Attorneys contend that under *Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 114 S. Ct. 1439, 128 L. Ed. 2d 119 (1994),* "a statute which [does] not include civil liability for aiders and abettors may not be construed to establish such liability," (Corp. Att'ys' Br. Supp. Mot. Dismiss at 10), and therefore there is no such liability under RICO. However, subsequent to Central Bank of Denver, the Third Circuit Court of Appeals held that "a defendant may be liable under RICO if he aided or abetted the commission of at least two predicate acts of mail fraud." *Jaguar Cars, 46 F.3d at 270.* n22 To establish liability of a defendant for aiding and abetting a predicate act under RICO the plaintiff must show "(1) that the substantive act has been **[*109]** committed, and (2) that the defendant alleged to have aided and abetted the act knew of the commission of the act and acted with

Case 1:05-cv-00165-JJF     Document 34-2     Filed 06/10/2005     Page 115 of 119

Page 28
1996 U.S. Dist. LEXIS 12655, *109

intent to facilitate it." Id.

> n22 In light of Jaguar Cars, other courts in this circuit have not extended Central Bank of Denver to RICO. See *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 1996 U.S. Dist. LEXIS 3427, Civ. A. No. 95–1698, 1996 WL 135336,* at *6 & n.5 (E.D. Pa. Mar. 19, 1996) (stating that in that in spite of Central Bank "this Court . . . is bound by current Third Circuit law, which, again, provides that civil RICO aiding and abetting liability does exist"). Although this court is doubtful about the viability of aiding and abetting claims under RICO after Central Bank, it, too, in light of Jaguar Cars, is reluctant to dismiss Plaintiffs' aiding and abetting claims.

Assuming arguendo that Plaintiffs are able to show aiding and abetting by the Corporate Attorneys, this court finds that this theory cannot be used to circumvent the operation and management test. Courts **[*110]** within this circuit have distinguished aiding and abetting from operation and management. See *Rolo v. City Investing Co. Liquidating Trust, 897 F. Supp. 826, 833 (D.N.J. 1995)* (finding it proper to dismiss aiding and abetting claims that did not meet the "operation or management" test of Reves); *Fidelity Fed. Sav. & Loan Ass'n, 830 F. Supp. at 261* (dismissing claims under 1962(c) because defendant did not operate or manage the alleged enterprise but declining to dismiss the aiding and abetting claims).

### C. WHETHER THE ALLEGATIONS AGAINST THE ATTORNEYS AS MEMBERS OF THE RICH CONTROL GROUP ARE INSUFFICIENTLY SPECIFIC

The Corporate Attorneys assert that "the general allegations against the Rich Control group lack any measure of precision or substance regarding the [Corporate Attorneys'] acts," and that therefore the RICO claims against the [Corporate Attorneys] should be dismissed. (Corp. Att'ys' Mot. Summ. J. at 15.) In *Seville Indus. Machinery v. Southmost Machinery, 742 F.2d 786 (3d Cir. 1984),* cert. denied, *469 U.S. 1211, 84 L. Ed. 2d 327, 105 S. Ct. 1179 (1985),* the court stated that "Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' **[*111]** of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Id. at 791.* This court has already determined that Plaintiffs have failed to make specific allegations concerning the Corporate Attorneys' involvement in the related party transactions, the phantom expenses, and

the usurpation of corporate opportunities through JMB Development, Inc. Therefore, these claims are stricken as to the Corporate Attorneys, and Plaintiffs may not base RICO claims against the Corporate Attorneys on these two predicate acts. The Corporate Attorneys' involvement in the other predicate acts (the scheme to withhold distributions through the Meridian Loan Agreement and the conversion of SSI property) has been discussed already. This court finds that the allegations concerning the Corporate Attorneys' involvement in these predicate acts is sufficiently specific to satisfy the standard established in Seville.

### IV. CORPORATE ATTORNEYS' MOTION TO DISMISS

In deciding a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, "all facts alleged in the **[*112]** complaint and all reasonable inferences that can be drawn from them must be accepted as true." *Malia v. General Elec. Co., 23 F.3d 828, 830* (3d Cir.) (citation omitted); cert. denied, *130 L. Ed. 2d 328, 115 S. Ct. 377 (1994).* The complaint should not be dismissed unless Plaintiffs allege "no set of facts in support of the claim that would entitle [them] to relief." *ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994).*

The Corporate Attorneys claim that Plaintiffs have failed to allege a claim against them under § 1962(a), § 1962(b), or § 1962(c), that the state fraud claims lack sufficient specificity, and that there is no cause of action for aiding and abetting a breach of fiduciary duty. n23

> n23 The Corporate Attorneys also challenge Curran's standing to seek relief from the Meridian Bank Loan Agreement. This issue has already been discussed previously and will not be addressed here.

### A. 1962(a)

The Corporate Attorneys argue that Plaintiffs have failed to allege a claim under 1962(a). **[*113]** n24 The Corporate Attorneys contend that Plaintiffs fail to allege "either Cerullo or FS&C receive income, that such income arose from racketeering activities, or that such income was invested or used in any way." (Corp. Att'ys' Mem. Supp. Mot. Dismiss at 3.) However, in Counts I and VII of the Third Amended Complaint, which contain Plaintiffs' claims for violation of § 1962(a), Plaintiffs allege that Defendants, including the Corporate Attorneys, have derived income through a pattern of racketeering activity. (Third Am. Compl. PP 324, 371.) In Counts I and VII Plaintiffs allege that Defendants, including the Corporate Attorneys, have used or invested this income

to acquire interests in or to operate the RICO enterprise. Id. PP 325, 372. Thus, Plaintiffs have adequately alleged a claim under § 1962(a).

> n24 Section 1962(a) provides in pertinent part:
>
> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

*18 U.S.C. § 1962*(a).

[*114]

**B. 1962(b)**

In order for there to be a violation of § 1962(b), n25 a defendant's racketeering activities must result in the acquisition or maintenance of an interest in or control of a RICO enterprise. The Corporate Attorneys argue that the claims against them based on § 1962(b) should be dismissed for three reasons. First, they argue that Curran's claim against them for violating § 1962(b) fails to include the allegation that the Corporate Attorneys acquired an interest in a RICO enterprise by means of a racketeering activity. Although Plaintiffs failed to make such an allegation in Count VIII (Curran's claim against Defendants based on § 1962(b)), (Third Am. Compl. P 382), Plaintiffs did make this allegation in Count II (SSI's claim against Defendants based on § 1962(b)). (Third Am. Compl. P 333.) This court will not dismiss Count VIII for a technical error when Plaintiffs have pled the elements of a § 1962(b) violation elsewhere in the Third Amended Complaint.

> n25 Section 1962(b) states:
>
> It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate

or foreign commerce.

*18 U.S.C. § 1962*(b).

[*115]

Secondly, the Corporate Attorneys argue that their omission from the list of Defendants who allegedly committed the predicate acts is fatal to Plaintiffs' claims under § 1962(b). However, as noted previously, this court finds that Plaintiffs have alleged specific involvement on the part of the Corporate Attorneys in the following predicate acts: the scheme to withhold distributions through the Meridian Loan Agreement and the conversion of SSI property.

Finally, the Corporate Attorneys claim that "the complaint does not assert how or when Cerullo or FS&C became members of the alleged association–in–fact, or any details of the existence of this association." (Corp. Att'ys' Mem. Supp. Mot. Dismiss at 4.) The Corporate Defendants have not briefed this argument nor presented to the court why, if such is true, this in and of itself should lead to a dismissal. This court finds Plaintiffs allegations of a § 1962(b) violation sufficient to overcome a motion for dismissal.

**C. 1962(d): CONSPIRACY**

The Corporate Attorneys argue that because Plaintiffs fail to identify overt acts or predicate acts committed or promised by the Corporate Attorneys in furtherance of a conspiracy, claims [*116] against them based on § 1962(d) should be dismissed. (Corp. Att'ys' Mem. Supp. Mot. Dismiss at 9–10.) The Corporate Attorneys also contend that Plaintiffs' allegations in this regard are not sufficiently specific. Id. at 9.

Although claims based on § 1962(c) are dismissed as to the Corporate Attorneys, this court notes that dismissal of claims under § 1962(d) after dismissal of claims under § 1962(c) is not automatic. *Fidelity Fed. Sav. & Loan Ass'n, 830 F. Supp. at 261.* Liability under § 1962(d) is based not on whether a defendant personally commits the predicate acts, but rather upon whether that defendant agrees to the commission of the predicate acts. *United States v. Adams, 759 F.2d 1099, 1116 (3d Cir. 1985).* The Third Circuit Court of Appeals has established the following criteria for determining whether a violation of § 1962(d) has occurred:

> In order to state a claim under RICO subsection [1962](d), a plaintiff must allege (1) agreement to commit the predicate acts of fraud, and (2) knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate section

1962(a), (b), or (c). Allegations of conspiracy are **[*117]** not measured under the . . . [*Fed.R.Civ.P.*] *9(b)* standard, which requires greater particularity of allegation of fraud, but are measured under the more liberal . . . [*Fed.R.Civ.P. 8(a)*] pleading standard." A conspiracy claim must also contain supportive factual allegations. The allegations must be sufficient to "describe the general composition of the conspiracy, some or all of its broad objective, and the defendant's general role in that conspiracy."

*Rose v. Bartle, 871 F.2d 331, 366 (3d Cir. 1989)* (citations omitted).

This court finds that in addition to providing evidence of the Corporate Attorneys' involvement in two of the alleged predicate acts, Plaintiffs have properly alleged the elements of conspiracy under § 1962(d), and these allegation are sufficient to withstand a motion to dismiss.

### D. LACK OF SPECIFICITY OF STATE CLAIMS FOR FRAUD

The Corporate Attorneys argue that Plaintiffs' common law fraud claims are insufficiently specific to satisfy the pleading requirements of *Federal Rule of Civil Procedure 9(b)*. As noted previously, in *Seville Indus. Machinery v. Southmost Machinery, 742 F.2d 786 (3d Cir. 1984),* cert. denied, *469 U.S. 1211, 84* **[*118]** *L. Ed. 2d 327, 105 S. Ct. 1179 (1985),* the Third Circuit stated that "Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Id. at 791.* The court found that although "allegations of 'date, place or time' fulfill these functions, . . . nothing in the rule requires them." Id. The court stated that "plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." Id.

The Corporate Attorneys also argue that Plaintiffs have failed to plead all the elements of common law fraud. "In order to establish a cause of action in fraud, a plaintiff must plead the following elements with particularity:

(1) a misrepresentation; (2) a fraudulent utterance thereof; (3) an intention by the maker to induce the recipient thereby; (4) justifiable reliance by the recipient on the misrepresentation; and (5) damage to the recipient as a proximate result of the misrepresentation.

**[*119]** *Rivello v. New Jersey Auto. Full Ins., 432 Pa. Super. 336, 638 A.2d 253, 257 (Pa. Super. 1994)* (citations omitted).

The only specific allegations concerning misrepresentations made by the Corporate Attorneys pertain to FS&C's letter to Meridian Bank which failed to disclose the 1980 Shareholders Agreement and Cerullo's letters allegedly misrepresenting the ownership of SSI banks. With respect to the letter to Meridian Bank, Plaintiffs have failed to aver damage to the recipient as a proximate result of the misrepresentation. With respect to the letters about SSI banks, Plaintiffs have failed to aver that Cerullo intended to induce the recipient and that there was justifiable reliance on the alleged misrepresentation. Therefore, the state claims for fraud are dismissed as to the Corporate Attorneys.

### E. BREACH OF FIDUCIARY DUTY

In Count XI of the Third Amended Complaint, Plaintiffs allege that the Corporate Attorneys aided and abetted breaches of fiduciary duty. (Third Am. Compl. P 411.) The Corporate Attorneys argue that there is no cause of action under Pennsylvania law for aiding and abetting a breach of fiduciary duty.

The Pennsylvania Supreme Court has not spoken on **[*120]** whether a claim for aiding and abetting the breach of a fiduciary duty would be recognized in Pennsylvania. *Thompson v. Glenmede Trust Co., 1994 U.S. Dist. LEXIS 16839, Civ. A. No. 92–5233, 1994 WL 675186,* at *5 (E.D. Pa. Nov. 23, 1994).* "When presented with a novel issue of law, or where applicable state precedent is ambiguous, absent or incomplete, [the federal court] must determine or predict how the highest state court would rule." *Rolick v. Collins Pine Co., 925 F.2d 661, 664 (3d Cir. 1991),* cert. denied, *507 U.S. 973, 122 L. Ed. 2d 787, 113 S. Ct. 1417 (1993).* In *Pierce v. Rosetta Corp., 1992 U.S. Dist. LEXIS 9065, Civ. A. No. 88–5873, 1992 WL 165817 (E.D. Pa. June 12, 1992),* the court predicted that the Pennsylvania Supreme Court would recognize a claim for aiding and abetting a breach of a fiduciary duty. Id. at *8. Other courts in the Eastern District of Pennsylvania have entertained state law claims based on aiding and abetting a breach of fiduciary duty. See, e.g., *SDK Investments, Inc. v. Ott, 1996 U.S. Dist. LEXIS 1678, No. CIV. A. 94–1111, 1996 WL 69402,* *12 (E.D. Pa. Feb. 15, 1996)* (stating that "to establish a claim for aiding and abetting breach of a fiduciary duty, plaintiffs must show (1) breach of a fiduciary duty owed **[*121]** to another; (2) knowledge of the breach by the aider or abettor, and (3) substantial assistance or encouragement by the aider or abettor in effecting that breach.") (citation omitted); *Thompson, 1994 WL 675186,* at *5 (allowing plaintiff to amend complaint

to include claim under Pennsylvania law for aiding and abetting breach of fiduciary duty). Therefore, this court finds that there is no basis for dismissing Plaintiffs' aiding and abetting claim.

## SUMMARY

In summary, the Motion to Strike the Third Amended Complaint is denied, but Defendants have leave to further address new claims at the Rule 50(a) stage.

The Corporate Defendants' and Tornetta's Motions for Summary Judgment are denied. However, Plaintiffs are prevented by claim preclusion from basing any claims on the transactions with Commonwealth Insurance Company, the alleged fraudulent reports to Price Waterhouse, the escrow fund, the failure to pay SSI royalties, and the usurpation of corporate opportunity relating to Ri-Corp, and from basing the following claims on incidents occurring before the following dates:

| CLAIM | DATE OF BAR |
| --- | --- |
| The failure to distribute dividends | 10/28/94 |
| Related party transactions | 10/28/94 |
| Defrauding the Anthracite Health & Welfare Fund | 4/20/94 for Tornetta |
| | 3/5/93 for Corporate Defendants |
| W.M.P.I. 's failure to pay RAC for use of its silt drying facility | 10/28/94 |
| Litigation fund | 10/28/94 |
| Conversion of Oak Hill # # 73, 78, 235, 235R & Cambridge 241 | 10/28/94 |
| Usurpation of corporate opportunities | 10/28/94 |

[*122]

Also, Defendants may address at the Rule 50(a) whether the claims of concealment of payments to Tornetta for litigation expenses and conversion of SSI materials (other than those listed above) are precluded.

Plaintiffs may base their RICO claims only on the following predicate acts: (1) the scheme to withhold distributions through the Meridian Bank Loan Agreement; (2) the related party transactions; (3) the conversion of SSI property; (4) the phantom expenses; and (5) the usurpation of corporate opportunities through J.M.B. Development, Inc. Defendants also have leave to challenge the related party transactions, the conversion of SSI property, the diversion of corporate opportunities through J.M.G.

Development, and Tornetta's involvement in the predicate acts at the Rule 50(a) stage.

Curran may base his individual claims only upon the alleged failure to distribute in accordance with the 1980 Stockholders Agreement.

The Corporate Attorneys' Motion for Summary Judgment is granted in part and denied in part. The claims based on § 1962(c) are dismissed. Also, Plaintiffs may base RICO claims against the Corporate Attorneys only on the following predicate acts: the scheme to withhold **[*123]** distributions through the Meridian Bank Loan Agreement and the conversion of SSI property. The Corporate Attorneys' Motion to Dismiss is granted in part and denied in part. The state fraud claims are dismissed

1996 U.S. Dist. LEXIS 12655, *123

as to the Corporate Attorneys.                           BY THE COURT:

                                                         Edward N. Cahn, Chief Judge