**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ROYAL INDEMNITY COMPANY | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil No. 05-165 (JJF) |
| | : |
| PEPPER HAMILTON LLP, ET AL. | : |
| | : |
| Defendants. | : |

---

**APPENDIX OF UNREPORTED CASES CITED IN BRIEF IN SUPPORT
OF MOTION OF PEPPER HAMILTON LLP FOR THE DISMISSAL
OF PLAINTIFF'S FIRST AMENDED COMPLAINT**

---

MORRIS, NICHOLS, ARSHT & TUNNELL
William H. Sudell, Jr. (No. 0463)
Donna L. Culver (No. 2983)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
(302) 658-3989 (Facsimile)

*Counsel for Defendants Pepper Hamilton LLP
and W. Roderick Gagné*

OF COUNSEL:

SCHNADER HARRISON SEGAL & LEWIS LLP
Elizabeth K. Ainslie, Esq.
Nicholas J. LePore, III, Esq.
Bruce P. Merenstein, Esq.
Stephen J. Shapiro, Esq.
1600 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 751-2000
(215) 751-2205 (Facsimile)

June 10, 2005

## TABLE OF CONTENTS

**EXHIBIT**

*Allstate Transp. Co. v. SEPTA*, No. 97-1482, 1997 U.S. Dist.
LEXIS 16638 (E.D. Pa. Oct. 20, 1997)..........................................................................A

*B. Lewis Productions, Inc. v. Bean*, No. 02-93-KAJ, 2005 U.S. Dist.
LEXIS 1549 (D. Del. Jan. 28, 2005)..............................................................................B

*Becker v. Chicago Title Ins. Co.*, 2004 U.S. Dist.
LEXIS 1988 (E.D. Pa. Feb. 4, 2004)..............................................................................C

*Bristol Twp. v. Independence Blue Cross*, 2001 U.S. Dist. LEXIS
16594 (E.D. Pa. Oct. 11, 2001)......................................................................................D

*Cedarbrook Plaza v. Gottfried*, No. 97-1560, 1997 U.S. Dist. LEXIS
8026 (E.D. Pa. Jun. 4, 1997)..........................................................................................E

*Corporate Aviation Concepts, Inc. v. Multi-Service Aviation Corp.*,
No. Civ-03-3020, 2004 U.S. Dist. LEXIS 17154 (E.D. Pa. Aug. 24, 2004)...................F

*Flood v. Makowski*, No. 03-1803, 2004 U.S. Dist.
LEXIS 16957 (M.D. Pa. Aug. 24, 2004).........................................................................G

*Lickman v. Henkel*, No. 01-2949, 2003 U.S. Dist.
LEXIS 1338, (E.D. Pa. Jan. 15, 2003)............................................................................H

*Marks v. Messick & Gray Constr., Inc.*, No. 98C-09-032, 2000 Del. Super.
LEXIS 131 (Del. Super. Apr. 18, 2000)...........................................................................I

*Simon v. UnumProvident Corp.*, No. 99-6638, 2002 U.S. Dist.
LEXIS 9331 (E.D. Pa. May 28, 2002).............................................................................J

*Spitzer v. Abdelhak*, No. 98-6475, 1999 U.S. Dist.
LEXIS 19110 (E.D. Pa. Dec. 15, 1999)...........................................................................K

# EXHIBIT A

LEXSEE 1997 U.S. DIST. LEXIS 16638

**ALLSTATE TRANSPORTATION CO., INC., Plaintiff v. SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, Defendant**

**CIVIL ACTION No. 97–1482**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1997 U.S. Dist. LEXIS 16638*

**October 20, 1997, Decided**
**October 20, 1997, Filed; October 21, 1997, Entered**

**SUBSEQUENT HISTORY:** Adopting Order of February 12, 1998, Reported at: *1998 U.S. Dist. LEXIS 1740.*

**DISPOSITION:** **[*1]** Defendant's Motion for Partial Judgment on the Pleadings granted with respect to Counts One, Twelve, Thirteen, Fourteen, Sixteen, Seventeen, and the demand for punitive damages. Motion denied with respect to Counts Two, Three, Four and Five.

**COUNSEL:** For ALLSTATE TRANSPORTATION CO., INC., PLAINTIFF: ROBERT J. BRAY, BRAY & REARDON, P.P.C., GLENSIDE, PA USA.

For SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, DEFENDANT: PENNY M. CONLY, DILWORTH, PAXSON, KALISH & KAUFFMAN LLP, PHILA, PA USA.

**JUDGES:** CHARLES B. SMITH, UNITED STATES MAGISTRATE JUDGE.

**OPINIONBY:** CHARLES B. SMITH

**OPINION:**

### MEMORANDUM AND ORDER

I. INTRODUCTION

The instant action has been brought by Allstate Transportation Co, Inc. ("Allstate") against Southeastern Pennsylvania Transportation Authority ("SEPTA") alleging various constitutional, statutory, state contract and state tort claims surrounding SEPTA's administration of its ParaTransit services. Defendant has filed a Motion for Partial Judgment on the Pleadings. For the reasons which follow, I will grant the Motion in part, and deny it in part.

### II. FACTS AND HISTORY n1

n1 The exact factual history of this matter is somewhat cloudy due to the numerous contradictory allegations by both parties. The following account represents only those facts on which both parties agree – the specific allegations are addressed as necessary within the discussion of the individual counts.

**[*2]**

The following facts are undisputed. Since the early 1980's, the Commonwealth of Pennsylvania, through the Pennsylvania Department of Transportation ("PennDOT"), funded the § 203 Program to offer reduced cost transportation fares to senior citizens, both ambulatory and non–ambulatory, throughout the Commonwealth under mandate from the Americans with Disabilities Act, *42 U.S.C. § 12101* et. seq. (1988 ed., Supp. V) (ADA). By the late 1980's, PennDOT delegated its actual operating functions in the § 203 Program to a subcontractor who was, in turn, to contract directly with certificated carrier subcontractors to perform the actual transportation services. This new system became known as the Shared Ride Program.

Following contracts with both KETRON, Inc. and The Bionetics Corporation, PennDOT hired the Southeastern Pennsylvania Transportation Authority (SEPTA), defendant in this matter, as the new subcontractor in charge of the Shared Ride Program. SEPTA, a state agency responsible for the mass transit system in Philadelphia, Bucks, Chester, Delaware and Montgomery Counties, has operated its ParaTransit Services program since 1992, funded in part with money from PennDOT and from federal **[*3]** sources.

Plaintiff, Allstate Transportation Co., Inc. ("Allstate"), is a Pennsylvania corporation which has been providing ParaTransit transportation services to aged and infirm customers in Philadelphia since 1988.

Due to its African–American ownership, Allstate was certified as a Disadvantaged Business Enterprise (DBE) contractor by SEPTA for the period of April 1993 to April 1996.

In 1992–1993, SEPTA solicited bids for new three year contracts in Philadelphia under the ADA Services program, with the contract award to go to the lowest responsible bidder. Allstate submitted a low bid on this work and received no preferences in the award of the bid. Other, non–DBE ParaTransit contractors were performing substantially similar Shared Ride services at higher rates which had been reached under negotiated, rather than low–bid, contracts. SEPTA awarded a portion of the work to Allstate and a portion to these other non–DBE carriers. The SEPTA and Allstate contract for ParaTransit services ran for the period of July 1, 1993 through June 30, 1996. Despite the fact that Allstate bid for work utilizing vans, sedans and lift–vans, only the work involving the lift–vans was allocated to Allstate. [*4]

In late 1995 to early 1996, SEPTA elected to discontinue the centralized reservation and scheduling operation. As a replacement, it proposed a new, decentralized system for reservations and scheduling containing a "Rider Choice" component, in which the carriers were to compete for all ParaTransit customers. SEPTA informed carriers who were awarded work under the decentralized system that they should be prepared to service a certain estimated, maximum number of trips at the start–up of the decentralized system in mid–1996.

Although Allstate submitted a bid, SEPTA did not award it contract in the Rider Choice program and, instead, elected three other competing carriers. However, pursuant to an option in the original SEPTA–Allstate contract, SEPTA unilaterally extended that contract to June 30, 1997. The purchase order amount was increased by $1,124,700, but all other terms and conditions were maintained, particularly Allstate's continued payment on an hourly basis. Plaintiff was to be eligible for overflow work generally consisting of rides which could not be immediately handled/scheduled by the three participating carriers. SEPTA printed marketing brochures for use by ParaTransit [*5] riders which listed the numbers for the three competing ParaTransit carriers as well as SEPTA's customer service number, but contained no number for Allstate as the "overflow" carrier.

On October 22, 1996, Walsh Cab Company t/a Access ParaTransit ("Access"), one of the three carriers, filed for bankruptcy in the United States Bankruptcy Court for the Eastern District of Pennsylvania, giving up the work allocated to it by SEPTA. The Bankruptcy Court approved a release of Access from all responsibility for default on its SEPTA contract and on its performance bond. Access also released SEPTA from all responsibility for Access's failure. Instead of awarding the work to Allstate, SEPTA took over Access's then–existing tours itself on an "emergency basis" and now operates under an entity known as Freedom Paratransit. Funding for the transaction came out of SEPTA's operating budget which is comprised in part with federal funds.

At the present time, SEPTA handles reservations, scheduling and assignments of Allstate's work. Allstate, however, rests on the verge of bankruptcy.

In early April, 1996, SEPTA notified Allstate regarding the DBE recertification process, but sent no additional, [*6] related correspondence, during the period between May, 1996 through February 27, 1997. Allstate filed the instant suit on February 27, 1997 alleging unlawful racial discrimination in violation of federal civil rights statutes n2 and the U.S. Constitution, as well as state contractual and tort claims, surrounding the original contract and the 1996 RFP Bidding and Award. n3 On February 28, 1997, one day later, SEPTA sent a letter to Allstate requesting additional information for the recertification and, since that date, has requested other related documents and information.

> n2 These statutes include *42 U.S.C. §§ 1981,* 1983, 1985 and 2000d(1994).

> n3 SEPTA, responded by way of Answer, Affirmative Defenses and Counterclaim on April 30, 1997.

Following the filing of suit, SEPTA issued, in May of 1997, a Request for Proposals ("1997 RFP") for all of the ParaTransit work that Allstate was then performing for SEPTA, as well as the ParaTransit work awarded to Access in 1993 and taken over by SEPTA/Freedom after Access [*7] filed for bankruptcy. The deadline, which was originally June 16, 1997, was extended to July 11, 1997. The performance bonding requirement associated with this RFP increased from the $100,000 required in previous ParaTransit contracts to the full amount of the contract.

On or about July 7, 1997, Allstate amended its Complaint to include three new claims related to the activities surrounding its recertification and the 1997 RFP. Specifically, Allstate charged that SEPTA engaged in a campaign to retaliate against it for filing this action, adopted limitations and specifications in its 1997 RFP that prevented small businesses from submitting proposals, and intentionally interfered with Allstate's contractual and business relationships. SEPTA entered its Answer to the Amended Complaint on July 21, 1997.

Through the instant Motion for Partial Judgment on the Pleadings, submitted on July 25, 1997, defendant seeks dismissal of ten of plaintiff's seventeen counts, and of plaintiff's seventeen separate requests for punitive damages. Each of these counts is discussed separately infra.

## III. LEGAL STANDARD

A Motion for Judgment on the Pleadings pursuant to *Rule 12(c) of the* [*8] *Federal Rules of Civil Procedure* is treated under the same standard as a motion to dismiss pursuant to Rule 12(b)(6). *DeBraun v. Meissner, 958 F. Supp. 227, 229 (E.D. Pa. 1997).* In a Motion for Judgment on the Pleadings, this Court will accept as true all well-pleaded allegations in the complaint and draw all inferences in favor of the non-moving party. *Pennsylvania Nurses Ass'n v. Pa. State Educ. Ass'n, 90 F.3d 797, 799-800 (3d Cir.1996).* Judgment will not be granted unless the movant clearly establishes that there is no material issue of fact to be resolved and that he is entitled to judgment as a matter of law. *Jablonski v. Pan American World Airways, Inc., 863 F.2d 289, 290 (3d Cir.1988).* In addition, the court may consider matters of public record, orders and exhibits attached to the complaint. See *Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n.2 (3d Cir.1994).* However, the court is not required to accept legal conclusions either alleged or inferred from the pleaded facts. *Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993).* To survive a motion to dismiss, the plaintiff must set forth facts, and not mere conclusions, which state a claim as [*9] a matter of law. *Sterling, 897 F. Supp. at 895 (E.D. Pa. 1995).* Where appropriate, the court may grant a Rule 12(c) motion for judgment on the pleadings in part, and deny it in part. See, e.g., *Society Hill Civic Ass'n v. Harris, 632 F.2d 1045 (3d Cir.1980).*

## IV. DISCUSSION

### A. COUNT ONE – ALLSTATE'S DUE PROCESS AND EQUAL PROTECTION CLAIMS

Count One of the Amended Complaint seeks relief for alleged racial discrimination by defendant in violation of both the Due Process Clause and the Equal Protection Clause under the Fifth and Fourteenth Amendments to the U.S. Constitution. In opposition, defendant contends that plaintiff cannot maintain both a constitutional claim and a claim under *42 U.S.C. § 1983* (1994), alleged in Count Three

When a proper claim *42 U.S.C. § 1983* (1994) n4 is alleged, a plaintiff cannot proceed under the federal Constitution as a separate count, if both depend on the same action. *White v. Salisbury Twp. School Dist., 588 F. Supp. 608, 610, n.2 (E.D. Pa. 1984).* In such a situation,

the Constitutional claim is "wholly subsumed" by the § 1983 claim. Id. The Fourth Circuit addressed the interplay between these two sources [*10] of legal rights and explained that a claim under the Fourteenth Amendment "merges into [a] § 1983 claim because § 1983 merely creates a statutory basis to receive a remedy for the deprivation of a constitutional right." *Hughes v. Bedsole, 48 F.3d 1376, 1383 n.6 (4th Cir. 1995)* cert. denied, *133 L. Ed. 2d 126, 116 S. Ct. 190 (1995).* See also *Maxey v. Thompson, 680 F.2d 524, 526 (7th Cir. 1982)* (Posner, J.) ("A violation of the Fourteenth Amendment is also alleged, but we treat it as merged into the § 1983 allegation); *Rogin v. Bensalem Twp., 616 F.2d 680, 686 (3d Cir. 1980)* cert. denied, *Mark–Garner Assoc., Inc. v. Bensalem Twp., 450 U.S. 1029, 68 L. Ed. 2d 223, 101 S. Ct. 1737 (1981)* ("Indeed, § 1983 was designed to afford plaintiffs a cause of action for constitutional violations on the part of local governmental bodies and other state officials.").

n4 "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured. . ." *42 U.S.C. § 1983* (1994).

**[*11]**

Plaintiff has, in Counts One and Three of its Amended Complaint, asserted both a direct cause of action under the Fifth and Fourteenth Amendments and a claim under § 1983 based on the alleged discriminatory behavior by SEPTA. Because our precedents make clear that a separate constitutional claim is "wholly subsumed" by a § 1983 cause of action, count I of the Amended Complaint must be dismissed.

### B. COUNTS TWO, THREE AND FOUR – ALLSTATE'S CLAIMS UNDER *42 U.S.C. §§ 1981,* 1983 AND *42 U.S.C. § 2000d* (TITLE VI) AND DEPARTMENT OF TRANSPORTATION REGULATIONS PROMULGATED THEREUNDER REGARDING THE 1996 BIDDING AND AWARD.

Counts Two through Four of the Amended Complaint allege that defendant violated three anti-discrimination statues, *42 U.S.C. §§ 1981,* 1983 and 2000(d) (1994), by intentionally underpaying Allstate for the value of its performance, reducing the number of trips it handles, refusing to schedule customer trips for Allstate, refusing to promote Allstate's services to the public through advertisements for the ParaTransit program and not allowing Allstate to participate in the competitive "Rider Choice"

work while allowing all other non-minority contractors to do so. **[*12]** Defendant asserts, in response, that plaintiff fails to state a claim upon which relief can be granted with respect only to its allegations surrounding the award of the 1996 "Rider Choice" contracts.

As noted above, in order to sustain a motion for judgment on the pleadings, the court must "accept as true all well-pleaded allegations in the complaint" and determine whether, under any reasonable reading of the pleadings, the plaintiff may be entitled to relief. *Pennsylvania Nurses Ass'n., 90 F.3d at 799-800.* However, the Third Circuit has found that the "dual policy concerns" of shielding state officials from frivolous claims and providing these officials with sufficient notice to respond require that, for § 1983 claims, the "complaint contain a modicum of factual specificity, identifying the particular conduct of defendants that is alleged to have harmed the plaintiffs." n5 *Colburn v. Upper Darby Twp., 838 F.2d 663, 666 (3d Cir. 1988)* aff'd 946, F.2d 1017 (3d Cir. 1991) citing *Ross v. Meagan, 638 F.2d 646, 650 (3d Cir. 1981).* Nonetheless, this standard remains far from a bright-line rule and the sufficiency of a complaint must be judged on a case-by-case basis. **[*13]** *Frazier v. Southeastern Pennsylvania Transp. Auth., 785 F.2d 65, 67 (3d Cir. 1986).* The crucial questions are "whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer." Id. Notably, this standard does not place unreasonable expectations on the plaintiff. As the Third Circuit stated:

> n5 Although this section of the opinion deals with *42 U.S.C. §§ 1981,* 1983, and 2000d, the discussion focuses on § 1983 since the standards are similar. See, e.g., *Collins v. Chichester School Dist., 1997 U.S. Dist. LEXIS 10532, 1997 WL 411205* (E.D. Pa. July 22, 1997)(Discussing all three statutes under the same standards).

[A] court cannot expect a complaint to provide proof of plaintiffs' claims, nor a proffer of all available evidence. In civil rights cases . . . much of the evidence can be developed only through discovery. While plaintiffs may be expected to know the injuries they allegedly have suffered, it is not reasonable to expect **[*14]** them to be familiar at the complaint stage with the full range of the defendants' practices under challenge.

Id. To require more at this stage of the proceedings imposes an "impossible burden of knowledge on the plaintiffs." *District Council 47, AFL-CIO v. Bradley, 795 F.2d 310, 314 (3d Cir. 1986).*

Generally, § 1983 has two requirements: (1) the conduct complained of must be committed by a person acting under color of state law; and (2) the conduct complained of must have deprived the plaintiff of a right or privilege secured by the Constitution or the laws of the united States. Section 1983 does not by itself confer any substantive rights. Rather, it is a remedial provision to be employed only in the event of the deprivation of some right, privilege, or immunity guaranteed by the Constitution or laws of the United States. *Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 618, 60 L. Ed. 2d 508, 99 S. Ct. 1905 (1979).* Because the "state action" element is not at issue, I move directly to this second factor which requires plaintiff to identify a statutory or constitutional right.

Plaintiff asserts the equal protection issues of disparate treatment and disparate impact and a due process claim as **[*15]** bases for its § 1983 claim. Each of these is discussed in turn.

**(1) Disparate Treatment**

In the seminal McDonnell Douglas Corp. v. Green case, *411 U.S. 792 (1973),* the Supreme Court set forth a four step methodology for evaluating evidence in cases alleging purposeful discrimination where direct proof of intent is lacking. n6 While neither the Third Circuit, nor any other circuit, has used this identical methodology in the context of alleged discrimination in bidding for a public contract, the First Circuit, in *T & S Service Associates, Inc. v. Crenson, 666 F.2d 722 (1981),* has suggested a persuasive modification of the McDonnell test for such a situation. n7 The Court stated that the plaintiff, a qualified minority firm whose bid on a public contract was rejected, must prove a prima facie case by showing that:

> n6 The prima facie case is established by showing: (1) plaintiff belongs to a racial minority; (2) plaintiff applied and was qualified for the job at issue and employer was seeking applicants; (3) plaintiff was rejected despite his qualifications; and (4) after rejection, the position remained open and employer sought applicants with the same qualifications. *McDonnell, 402 U.S. at 802.*

**[*16]**

> n7 While the Court in T & S Service Associates decided the case under *42 U.S.C. § 1981* instead of § 1983, as in the instant case, it noted that the principles set forth "would seem equally applicable under either provision." Id. At 724, n.2.

(1) T & S is a minority-owned firm; (2) T & S's bid met the specifications required of those competing for the contract; (3) the T & S bid was significantly more advantageous to the Committee than the bid actually awarded, whether in terms of price or some other relevant factor; and (4) the Committee selected another contractor.

Id. at 725. Upon a showing of these elements, an inference arises that the bid was not awarded to the complaining party on the basis of race. Id.

In the case at bar, defendant asserts that plaintiff failed to state facts sufficient to infer a prima facie case of racial discrimination in the failure to award a public contract. While defendant is justified in questioning the shaky grounds alleged as a basis for this claim, it demands too much proof from simply the Amended Complaint. Unlike T&S, this case [*17] is still at the pleading stage and only requires the plaintiff to allege claims with a certain "modicum of factual specificity" so as to put the defendant on notice and to establish that the claim asserted is not frivolous.

Under the T&S framework, plaintiff's discrimination claim has undoubtedly satisfied factors one, two and four. n8 The third element, however, which requires plaintiff to show that its bid was "significantly more advantageous" than the bid actually awarded, has not been satisfied with similar clarity. The Amended Complaint states that "SEPTA management knew that Allstate's bid was a more than reasonable, appropriate and legitimate bid for the 'Rider's Choice' work being offered it," and Allstate's receipt of the bid would have satisfied SEPTA's affirmative action obligations, but SEPTA "simply disqualified Allstate altogether as a competitor" while allowing "all other non-minority competitors to so compete." Amended Complaint, PP53,92,99. Defendant's challenge to the sufficiency of these blanket statements certainly has merit, however this challenge ignores two factors. First, as emphasized before, unlike T&S, this case is only at the pleading stage and [*18] plaintiff has not had the benefit of time or discovery to make an honest, factual statement that its bid was more advantageous than the others. To require more imposes on plaintiff an "impossible burden of knowledge" of the other bids submitted. Second, the T&S standard is by no means rigid or binding on this court. Hence, looking beyond the four elements to the other allegations of racial discrimination within the Amended Complaint, there are sufficient factual pleadings to make, at least, a tenuous inference that the awarding of the bid was indeed motivated by racial concerns since Allstate, the only DBE, was the sole bidding carrier to be denied participation in the program. Moreover,

unlike T&S where the bid was the only action at issue, the failure to award the contract in this matter is merely an example of the alleged on-going discrimination. n9 To separate this one incident from the others would be premature at this time and may be better reserved for a motion for summary judgment.

n8 Under the first element, the Amended Complaint states that Allstate's owner, Jerome Henderson, is an African-American and that Allstate had been certified by SEPTA as a minority business enterprise. Amended Complaint, at PP 4,6,7. Second, plaintiff alleges that its bid was "appropriate and legitimate" and did indeed satisfy SEPTA's requirements as set forth in the 1996 Rider's Choice Request For Proposals. Amended Complaint, at P 92. The fourth element is satisfied by the plaintiff's allegation that Access and two other non-minority companies were allowed to compete, to the exclusion of Allstate, in the 1996 Rider's Choice program. Amended Complaint, at PP 48,61.

[*19]

n9 As stated supra, Allstate also alleged that SEPTA racially discriminated against it by intentionally underpaying Allstate for the value of its performance, reducing the number of trips, refusing to schedule customer trips for Allstate and refusing to promote Allstate's services to the public through advertisements for the ParaTransit program.

(2) Disparate Impact

While plaintiff's disparate treatment claims manage to attain the standard of satisfactory notice pleading, its allegations that defendant's practices have a disparate impact on minorities fail to even get to the starting gate. "Claims that stress 'disparate impact' involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Hazen Paper Co. v. Biggins, 507 U.S. 604, 609, 123 L. Ed. 2d 338, 113 S. Ct. 1701 (1993).* Plaintiffs can show a prima facie case under Title VII, and survive this motion for summary judgment, if they show that there is (1) a specific employment practice of the City that (2) creates a disparate [*20] impact, shown by statistical evidence. *Wards Cove Packing Co, Inc. v. Atonio, 490 U.S. 642, 657, 104 L. Ed. 2d 733, 109 S. Ct. 2115 (1989); Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 993–*

Case 1:05-cv-00165-JJF    Document 36-2    Filed 06/10/2005    Page 9 of 121

Page 6
1997 U.S. Dist. LEXIS 16638, *20

*95, 101 L. Ed. 2d 827, 108 S. Ct. 2777 (1988)*. Disparate impact cases typically focus on statistical disparities between members of the protected and unprotected classes. *DiBiase v. SmithKline Beecham Corp., 48 F.3d 719, 730 (3d Cir. 1995)* cert. denied, *133 L. Ed. 2d 210, 116 S. Ct. 306 (1995)*.

The Amended Complaint alleges no facts whatsoever which would even begin to constitute a claim for disparate impact. Plaintiffs only claims are that it was the only disadvantaged business enterprise ("DBE") participating in SEPTA's ParaTransit program. Amended Complaint, at PP33,37. This statement alone does not point to any policies, practices, regulations, conduct or rules of SEPTA that have "squeezed out" minorities from participation in the program. As such, this claim should be dismissed. n10

n10 Although irrelevant once the disparate impact claim has been dismissed, both parties argue about whether Title VI prohibits only intentional discrimination and the proper reading of *Guardians Assoc. v. Civil Service Comm'n, 463 U.S. 582, 77 L. Ed. 2d 866, 103 S. Ct. 3221 (1982)*. Well-established precedent clearly states that Title VI does prohibit only claims of intentional discrimination and that disparate impact allegations could be redressed only through "agency regulations designed to implement the purposes of Title VI." *Alexander v. Choate, 469 U.S. 287, 292–293, 83 L. Ed. 2d 661, 105 S. Ct. 712 (1985)*. See also *Chester Residents Concerned for Quality Living v. Seif, 944 F. Supp. 413, 416 (E.D. Pa. 1996)*("interpreting Alexander], we thus find that by alleging only discriminatory effect rather than discriminatory intent, plaintiffs failed in their complaint to allege a violation of Title VI.").

**[*21]**

(3) Procedural Due Process

Plaintiff, in Count One of its Complaint, alleges violation of the Due Process Clause resulting from defendant's failure to award it the 1996 RFP. n11

n11 Because Count I has been subsumed into the § 1983 assertion, this claim must be discussed at this junction.

The Supreme Court set forth the boundaries of the Fourteenth Amendment procedural due process protection for property interests in *Board of Regents v. Roth, 408 U.S. 564, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972)*,

noting that "to have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id. At 577*. In *Independent Enterprises, Inc. v. Pittsburgh Water and Sewer Authority, 103 F.3d 1165, 1176 (3d Cir. 1997)*, the Third Circuit held that the plaintiff, a low bidder on a public contract whose bid was rejected, could not pursue its procedural due process claims against **[*22]** the City "unless 'an independent source such as state law' affords it a 'legitimate claim of entitlement' to be awarded a municipal contract for which it was the lowest responsible bidder." Pennsylvania cases, interpreting Pennsylvania statutes, have long demonstrated that one who bids on a public contract has no legitimate expectation of receiving it until the contract is actually awarded. See *R.S. Noonan, Inc. V. School Dist. Of York, 400 Pa. 391, 162 A.2d 623 (1960)*; *J.P. Mascaro & Sons, Inc. V. Township of Bristol, 95 Pa. Commw. 376, 505 A.2d 1071 (1986)*. See also *ARA Servs., Inc. V. School Dist. Of Phila., 590 F. Supp. 622, 629 (E.D. Pa. 1984)*. Hence, until the bid is awarded, no procedural due process rights are at stake.

Plaintiff alleges that its property entitlement to the 1996 Rider Choice RFP was based on its status as the "only responsible MBE/DBE carrier that had submitted a bid for this RFP." Memorandum in Opposition to Defendant's Motion for Partial Judgment on the Pleadings ("Response"), at 5. It further asserts that the affirmative action policies of Title VI and the regulations implementing it require that at least some of the award should have gone to it because of **[*23]** its minority status. This argument, however, does not rise to the level of a protectable property interest since plaintiff could not reasonably assert that it had a legitimate expectation of receiving this contract. While SEPTA's motivations for denying the bid may remain a question of fact, they are irrelevant since the affirmative action policies do not guarantee that the contract be awarded to Allstate. Because Allstate cannot therefore allege a protectable property interest, this claim is dismissed on the pleadings.

C. COUNT SIXTEEN – ALLSTATE'S CLAIMS UNDER §§ 1981 AND 1983; AND *42 U.S.C. § 2000D* (TITLE VI) AND DEPARTMENT OF TRANSPORTATION REGULATIONS PROMULGATED THEREUNDER REGARDING THE 1997 RFP BONDING REQUIREMENT

Counts Fifteen and Sixteen of the Amended Complaint direct the court's attention to SEPTA's actions subsequent to the filing of this lawsuit. Plaintiff alleges, in Count Fifteen, that defendant discriminatorily retaliated against plaintiff by failing to recertify it as a DBE, by

spreading false and misleading information about plaintiff and by designing the 1997 Request for Proposals in such manner as to preclude plaintiff from being able to bid. Specifically, **[*24]** the Amended Complaint refers to the fact that the performance bonding requirement was set so high as to deny a small firm, such as Allstate, the chance to compete for the contract. Count Sixteen incorporates the allegations of the previous Count and asserts that the limitations and specifications contained in the 1997 RFP precluded small, minority/disadvantaged business enterprises from participating in the bid process. Defendant's only challenge to these allegations concerns the claims of discriminatory impact in Count Sixteen and, hence, I address only the sufficiency of that Count.

As addressed supra, disparate impact cases typically focus on statistical disparities between members of the protected and unprotected classes. *DiBiase, 48 F.3d at 730.* A prima facie case of disparate impact alleges(1) a specific employment practice of the City that (2) creates a disparate impact, shown by statistical evidence. *Wards Cove, 490 U.S. at 657; Watson v. Fort Worth Bank & Trust, 487 U.S. at 993-95.*

In the context of public contracts, bonding requirements have been deemed non–discriminatory. In rejecting a city's racial quota for public projects, the Supreme Court held that **[*25]** bonds are "nonracial factors which would seem to face a member of any racial group attempting to establish a new enterprise," and therefore cannot be deemed discriminatory. *City of Richmond v. J.A. Croson Co., 488 U.S. 469, 498, 102 L. Ed. 2d 854, 109 S. Ct. 706 (1989).* See also *Taylor v. City of St. Louis, 702 F.2d 695, 697* aff'd *702 F.2d 695 (8th Cir. 1983)* ("The [10% bid bond], neutral on its face and serving ends otherwise in the power of government to pursue, is not invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than another . . .Here, the bid bond requirement insures that only financially stable contractors will participate in the food service programs.") (citations omitted).

In the instant matter, defendant increased the performance bond requirement from the $100,000 required in previous ParaTransit contracts to the full amount of the contract. n12 Aside from its claim that this requirement was included specifically to prevent Allstate from bidding on the contract, plaintiff asserts that it has a disparate impact on all minority contractors. While the former assertion may in fact have merit and is not challenged in the present motion by **[*26]** defendants, the latter claim falters under current precedent. Any small business is affected by such a steep bond requirement – nothing in the Amended Complaint explains how this has a greater effect on minorities. Nor does plaintiff allege any demon-

strated impact on other DBEs aside from broad legal conclusions that minorities were excluded. n13 Therefore, Count Sixteen, to the extent it states a claim for disparate impact, must be dismissed.

> n12 Plaintiff alleges that the 1997 contract was awarded for $32.7 million. Response, at 17, n.7.

> n13 Plaintiff repeatedly refers to the various "preclusive" specifications and limitations in the 1997 RFP of which the bonding requirement is just one example. Response, at 16. It argues that it is not obligated to utilize a "laundry list" style of pleading. Id. at 17. While the Federal Rules of Civil Procedure do not require detailed pleading, plaintiff must at least set forth the requirements which it is challenging. *Sterling v. Southeastern Pennsylvania Transportation Authority, 897 F. Supp. 893, 895 (E.D. Pa. 1995)*(To survive a motion to dismiss, the plaintiff must set forth facts, and not mere conclusions, which state a claim as a matter of law.). Therefore, I cannot consider these alleged "specifications and requirements" in ruling on this particular Count.

**[*27]**

D. COUNTS THIRTEEN AND FOURTEEN – ALLSTATE'S ALLEGATIONS OF UNLAWFUL CONSPIRACIES UNDER *42 U.S.C. § 1985.*

As part of its Complaint, plaintiff alleges that defendant conspired with Access, a non–DBE ParaTransit Company awarded a contract under the 1996 RFP, and Local 234 of the Transportation Workers Union ("Local 234"), for the purpose of depriving it of equal protection and due process rights. Defendant submits that plaintiff's allegations fail to assert any racial motivation behind these actions – an essential element of a *42 U.S.C. § 1985* (1994).

In order to state a cause of action for violation of *42 U.S.C. § 1985,* the following must be alleged: (1) a conspiracy by the defendants; (2) designed to deprive plaintiff of the equal protection of the laws or equal privileges and immunities; (3) the commission of an overt act in furtherance of that conspiracy; (3) a resultant injury to person or property or a deprivation of any right or privilege of citizens; and (5) defendants' actions were motivated by a racial or otherwise class–based invidiously discriminatory animus. *Litz v. Allentown, 896 F. Supp. 1401, 1414 n.14 (E.D. Pa. 1995)* citing *Griffin v. Breckenridge,* **[*28]** *403 U.S. 88, 102–103, 29 L. Ed. 2d 338, 91 S. Ct. 1790 (1983).*

The element of racial animus is essential to a proper

§ 1985 claim. *Robison v. Canterbury Village, Inc., 848 F.2d 424, 430 (3d Cir.1988); Pratt v. Thornburgh, 807 F.2d 355, 357 (3d Cir. 1986)* cert. denied *484 U.S. 839, 98 L. Ed. 2d 83, 108 S. Ct. 125 (1987)* ("as to the claim founded on *42 U.S.C. § 1985*(3), we need only say that it was properly denied since it is not alleged that the conspiracy involved in that count was motivated by a racial or class-based animus."). Section 1985(3) does not prohibit conspiracies motivated by economic or commercial animus. *United Brotherhood of Carpenters and Joiners of America v. Scott, 463 U.S. 825, 838, 77 L. Ed. 2d 1049, 103 S. Ct. 3352 (1983).* As the Court stated in Scott, "economic and commercial conflicts, we think, are best dealt with by statutes, federal or state, specifically addressed to such problems, as well as by the general law proscribing injuries to persons and property." *Id. at 839.*

The Amended Complaint contains no indications that the alleged conspiracies between SEPTA and Access and between SEPTA and Local 243 were prompted by any form of racial discrimination. Plaintiff asserts that "Allstate properly alleged § 1985(3) claims by incorporating **[*29]** within each Count the preceding allegations of the Amended Complaint which plainly describe SEPTA's acts of discrimination against Allstate motivated by race." Response, at 15-16. However, not only does this attempted "incorporation" fail to satisfy the specificity required for a federal civil rights claim, but plaintiff's own words in the Amended Complaint contradict its assertion that the conspiracies were motivated by racial animus.

With respect to the alleged conspiracy between SEPTA and Access, the Amended Complaint continuously refers to SEPTA's decision to favor Access above all other carriers, giving it a competitive advantage in the competition for "Rider Choice." Amended Complaint, at PP48,50,159. These statements suggest, not racial animus, but economic animus, since the other, non-minority carriers, were similarly injured. While plaintiff does assert that giving Access control of the majority of the ParaTransit business worked "to the particular detriment of Allstate," this is a broad, conclusory allegation supported by no factual assertions. n14 Amended Complaint, at P159 In light of the foregoing, Count 13 must be dismissed.

n14 Although not asserted by the defendant, the § 1985 claim for the alleged conspiracy between SEPTA and Access fails for another reason. Under basic legal terminology, a "conspiracy" requires some showing of agreement between two or more parties. *Iannelli v. U.S., 420 U.S. 770, 777, 43 L. Ed. 2d 616, 95 S. Ct. 1284 (1975)*(Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act.). Moreover,

under § 1985, the agreement must have been entered into for the purpose of denying equal protection of the laws. See *Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 275-276, 122 L. Ed. 2d 34, 113 S. Ct. 753 (1993)*(conspiracy is not 'for the purpose' of denying equal protection simply because it has an effect upon a protected right. The right must be 'aimed at'") Because, § 1985 claims must be pled with factual specificity, not mere conclusory allegations that a conspiracy existed,. *D.R. by L.R. v. Middle Bucks Area Vocational Technical School, 972 F.2d 1346, 1377 (3d Cir. 1992)* cert. denied *506 U.S. 1079, 122 L. Ed. 2d 354, 113 S. Ct. 1045 (1993)* (citations omitted), the complaint must establish an agreement with the common objective of denying equal protection.

In the instant case, plaintiff has failed to plead anywhere in their Amended Complaint that the alleged conspiracy between SEPTA and Access was the result of any *agreement* to deprive Allstate of equal protection of the laws. Plaintiff asserts that "SEPTA management had first decided *among themselves*" how much equipment to allocate to each carrier and that Allstate's share should go to Access." Amended Complaint, at P48 (emphasis added). Additionally, the Complaint says that "SEPTA management *unilaterally . . .* and *without notice to any of the bidders*" decided to favor Access in the "Rider Choice" program. Amended Complaint, at P50 (emphasis added). Moreover, Plaintiff's allegations refer to "SEPTA's decision to promote Access above *all others*," not just above Allstate. Amended Complaint at 63 (emphasis added). The first mention of any "conspiracy" appears in statements made within Count Thirteen which are conclusory and allege no specific factual claims aside from the broad statement that "SEPTA conspired with Access to favor Access when developing its plans for promoting the 'Rider Choice' program" and "SEPTA further conspired with Access to control the majority of the ParaTransit work . . . to the particular detriment of Allstate." Amended Complaint, at PP 156, 159. These blanket statements simply do not permit any inference of a conspiracy between Access and SEPTA since such claims appear to be unilateral actions by SEPTA.

**[*30]**

Regarding the alleged SEPTA/Local 234 conspiracy, paragraph 68 of the Amended Complaint explains that:

The illegal agreement was thus designed to accomplish mutually beneficial goals,

through illegal and improper means. The first goal (for SEPTA) was to make SEPTA a competitor in the private sector, ParaTransit marketplace without the objection of PennDOT, which had never authorized such a role. The second goal (for Local 234) was to save the union the loss in membership dues resulting from the Access employee–union members becoming unemployed.

Amended Complaint, at P68. n15 Only later does the Complaint state that "[the purpose of this conspiracy . . . was to deprive Allstate of equal protection and privileges due it under the law and the terms of the Federal contracts in the competition for and the performance of ParaTransit work." Amended Complaint at P170. Again, this broad, conclusory statement cannot support a § 1985 count. See *Ostrer v. Aronwald, 567 F.2d 551, 553* aff'd *567 F.2d 551 (2d Cir.1977)*(Complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, [*31] instead of a litany of general conclusions that shock but have no meaning.)  Because the factual basis for this claim sounds in economic and commercial, not racial, animus, Count Fourteen does not state conduct which is actionable under § 1985(3).

> n15 The Amended Complaint also states that the agreement was "designed to defeat the lawful seniority rights of SEPTA's own employees." Amended Complaint, at P68.

E. COUNT SEVENTEEN – ALLSTATE'S CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACTUAL AND BUSINESS RELATIONSHIPS

Count Seventeen of the Amended complaint sounds in tort as plaintiff alleges interference with both existing and prospective business relations caused by defendant's actions following the commencement of this lawsuit.

To state a claim for tortious interference with contractual relations or prospective contractual relations, under Pennsylvania law, the complaint must allege the following elements:  (1) a contractual or prospective relationship between the plaintiff and third parties; (2) a purpose [*32] or intent to harm the plaintiff by interfering with the contractual relationship or preventing the contractual relationship from accruing; (3) the absence of a privilege or justification on the part of the defendant; and (4) the occurrence of actual harm or damage to the plaintiff as a result of defendant's conduct.  *Fluid Power, Inc. v. Vickers, Inc.,*

*1993 U.S. Dist. LEXIS 2012, 1993 WL 23854, *3 (E.D. Pa. Jan. 28, 1993)*. See also *Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 208, 412 A.2d 466, 471 (1979).* If *existing* contracts were interfered with, the complaint should be able to allege what contracts or types of contracts they are.  *Centennial School Dist. v. Independence Blue Cross, 885 F. Supp. 683 (E.D. Pa. 1994).*

Proof of a claim of tortious interference with *prospective* contractual relations requires a showing of the existence of prospective contracts.  *Alvord–Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1014 (3d Cir. 1993)* cert. denied, *National Decorating Products Ass'n, Inc. v. Alvord–Polk, Inc., 514 U.S. 1063, 115 S. Ct. 1691, 131 L. Ed. 2d 556 (1995).* "A prospective contract 'is something less than a contractual right, something more than a mere hope'"(citations omitted). The Third Circuit has [*33] held that the Pennsylvania Supreme Court requires that there be an objectively reasonable probability that a contract will come into existence, *Schulman v. J.P. Morgan Inv. Management, Inc., 35 F.3d 799, 808 (3d Cir.1994).* Such an expectation may arise from an unenforceable express agreement or an offer.  *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia, 898 F.2d 914, 925 (3d Cir. 1990)* cert. denied, *498 U.S. 816 (1990).* It exists if there is a reasonable probability that a contract will arise from the parties' current dealings. Glenn v. Point Park college, *441 Pa. 474, 272 A.2d 895, 898–899 (1971).* Under Pennsylvania law, merely pointing to an existing business relationship or past dealings does not reach this level of probability. See *General Sound Telephone Co., Inc., v. AT & T Communications, Inc., 654 F. Supp. 1562, 1565 (E.D. Pa. 1987)* (opportunity to bid on a contract is insufficient to establish the existence of a prospective contract under Pennsylvania law which requires considerably more than a reasonable probability of a chance to obtain a contract); *Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 412 A.2d 466 (1979)* (Existing year–to–year [*34] lease on certain property did not amount to a reasonable probability of renewal, despite the existing business relationship).

Plaintiff first contends that defendant interfered with its existing contractual relationships. Amended Complaint, at P199. However, as defendant correctly notes, plaintiff failed to identify which existing contracts were hindered. While the Federal Rules of Civil Procedure do not require complainant to set forth in detail the facts upon which the claim is based, the "short and plain statement of the claim" must be sufficient to give the defendant notice of the claim and the grounds upon which it is based.  *Breslin v. Vornado, Inc., 559 F. Supp. 187, 191 (E.D. Pa.1983).* Plaintiff's allegations state that SEPTA's actions have interfered with "Allstate's present contract and business relationships with third parties, including

essential subcontractors of Allstate" and "Allstate's other ParaTransit business relationships." Amended Complaint, at PP 199, 201. Contrary to plaintiff's argument, this broad statement does not give any notice even as to the types of contracts involved. Instead, it suggests that the claim encompasses every possible contract into which [*35] Allstate would enter. n16

> n16 Plaintiff's reliance on *Fluid Power, Inc. v. Vickers, Inc., 1993 U.S. Dist. LEXIS 2012, 1993 WL 23854,* at *4 (E.D. Pa. Jan. 28, 1993) is misplaced. The Court noted that, because plaintiff specified at least one existing contract and gave to defendant a customer list identifying the other existing and prospective customers, defendant had notice of plaintiff's claim. Id. Plaintiff, in this case, asserts that it submitted information to SEPTA in its 1996 Rider Choice RFP which listed Allstate's subcontractors and other ParaTransit programs. Response, at 20. While plaintiff was not required to list each name within its complaint, proper notice pleading would have at least referred to this RFP and the names within it. A mere allegation that includes all business relationships with third parties, subcontractors and other ParaTransit business relationships does not satisfy the requirement of notice.

Similarly, with respect to the allegations of interference with prospective business relations, plaintiff has [*36] failed to identify with sufficient precision which prospective contracts they would have entered into but defendant's alleged interference. Again, the general allegation of interference with "Allstate's future contract and business relationships with third parties, including essential subcontractors of Allstate" is far too over-inclusive to provide any sufficient notice. Amended Complaint, at P203. Moreover, these contracts are far from reasonably probable. Plaintiff states only that "based on Allstate's previous contracts with such essential subcontractors and other ParaTransit business relationships, future contractual relationships were reasonably probable." Amended Complaint, at P203. However, as noted above, under Pennsylvania law, prior or existing business relationships, standing alone, do not suffice for a claim of interference with prospective business relationships. As such, Count 17, alleging a claim of tortious interference with contracts, must be dismissed on the pleadings.

## F. COUNT FIVE – ALLSTATE'S CLAIM UNDER *49 U.S.C. § 306*

Defendant vigorously argues that plaintiff's claim under *49 U.S.C. § 306* (1996) n17 must fail because: (1) this statute does not [*37] create a private cause of action; and (2) even if it does, plaintiff has failed to exhaust its administrative remedies. I address each of these declarations in turn.

> n17 Section 306(b) states: "A person in the United States may not be excluded from participating in, be denied the benefits of, or be subject to discrimination under, a project, program, or activity because of race, color, national origin or sex when any part of the project, program, or activity is financed through financial assistance under section 332 or 333 or chapter 221 or 249 of this title, section 211 or 216 of the Regional Rail Reorganization Act of 1973 . . . or title Vi of the Railroad Revitalization and Regulatory Reform Act of 1976 . . ."

### (i) Private Right of Action

In *Cort v. Ash, 422 U.S. 66, 78, 45 L. Ed. 2d 26, 95 S. Ct. 2080 (1975),* the United States Supreme Court set forth four factors which must be analyzed in determining whether a private right of action exists. n18 However, the Court has repeatedly emphasized that the focus of the inquiry is [*38] on the intent of Congress. *Touche Ross & Co. V. Redington, 442 U.S. 560, 61 L. Ed. 2d 82, 99 S. Ct. 2479 (1979); Merrill, Lynch, Pierce, Fenner & Smith, Inc. V. Curran, 456 U.S. 353, 72 L. Ed. 2d 182, 102 S. Ct. 1825 (1982).* See also *State of New Jersey Department of Environmental Protection and Energy v. Long Island Power Authority, 30 F.3d 403, 421 (3d Cir. 1994).* "The intent of Congress remains the ultimate issue, however, and 'unless this congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist.'" *Thompson v. Thompson, 484 U.S. 174, 179, 98 L. Ed. 2d 512, 108 S. Ct. 513 (1988)* quoting *Northwest Airlines, Inc. v. Transport Workers, 451 U.S. 77, 94, 67 L. Ed. 2d 750, 101 S. Ct. 1571 (1981).*

> n18 The four factors are: (1) whether plaintiff is one of the class for whose especial benefit the statute was enacted; (2) whether there is any implicit/explicit legislative intent to create or deny such a remedy; (3) whether such a remedy is consistent with the underlying purposes of the legislative scheme; and (4) whether this cause of action is one traditionally relegated to state law so that it would be inappropriate to infer one based solely on federal law. *Cort, 422 U.S. at 78.*

**[*39]**

Defendant contends that "there is absolutely no indication in the language or history of *49 U.S.C. § 306* that Congress intended to create a private cause of action." Motion for Partial Judgment on the Pleadings, at 24. However, defendant ignores the history behind the creation of this statutory provision. The Railroad Revitalization and Regulatory Reform Act ("4–R Act") of 1976, *45 U.S.C. § 821* et seq. (1987), contained within its provisions, specifically § 905, an almost mirror image anti–discrimination provision. n19 However, Congress repealed § 905 and replaced it with a "nearly identical provision," codified in *49 U.S.C. § 306*(b). *Organization of Minority Vendors, Inc. v. Illinois Central Gulf Railroad, 579 F. Supp. 574, 581 (N.D. Ill. 1983).* "The non–discrimination and affirmative action regulations promulgated under § 803 . . .have remained in effect. None of these statutory revisions appears to affect any of the plaintiffs' substantive rights." Id. See also Act of Dec. 13, 1982, Pub. L. No. 97–449, 1982 U.S.C.C.A.N. (96 Stat.) 4220 ("The statute is intended to remain substantively unchanged.").

> n19 This provision states: "No person in the United States shall on the ground of race, color, national origin, or sex be excluded from participation in, or denied the benefits of, or be subjected to discrimination under, any project, program, or activity funded in whole or in part through financial assistance under this Act." *45 U.S.C. § 905* (1987).

**[*40]**

Section 905 of the 4–R Act, which contained the anti–discrimination provision, has been deemed to create a private right of action. *Mikkilineni v. United Engineers and Constructors, 485 F. Supp. 1292, 1297 (E.D. Pa. 1980)*("We, therefore, hold that the Railroad Revitalization and Regulatory Reform Act of 1976 does imply a private cause of action in favor of plaintiff."). See also *Organization of Minority Vendors, 579 F. Supp. at 592* ("There can be little doubt that § 905 of the 4–R Act creates an implied private right of action in favor of these plaintiffs . . .congressional silence on the existence of a private remedy under the 4–R Act indicates only that Congress felt no need to stress the availability of such a right of action."). Because no substantive changes were made between the repeal of the anti–discrimination provision of the 4–R Act and the codification of *49 U.S.C. § 306,* it is a logical conclusion that § 306 does contain a private cause of action.

(ii) Exhaustion of Administrative Remedies

Federal regulations promulgated pursuant to the now–repealed *45 U.S.C. § 803* provided that disputes under this statute, "shall be resolved by informal means **[*41]** whenever possible." 49 C.F.R. § 256.21(d)(1) (1997). This court recognized the requirement of exhaustion of administrative remedies in Mikkilineni v. United Engineers and constructors, *485 F. Supp. at 1297* (holding that, even though the 4–R contains a private right of action, the court cannot reach the claim because plaintiff has not exhausted all administrative remedies as required by the act).

Although defendant argues that this necessarily means a plaintiff must exhaust administrative remedies under *49 U.S.C. § 306,* this argument makes too great a leap. The texts of the two anti–discrimination provisions are similar and, therefore, it is easy to infer that the implication of a private right of action in one creates a private right of action in the other. The same logic is not possible with respect to the administrative remedies. The regulations referred to in Mikkilineni and cited in defendant's memorandum apply only to federal railroad programs. See *49 C.F.R. § 265.3* (1997) n20 A thorough review of case law and legislative history reveals nothing that would indicate that the required exhaustion of administrative remedies in the 4–R Act applies to *49 U.S.C. § 306.* **[*42]** As such, defendant's motion to dismiss Count Five is denied.

> n20 "This part [including § 265.21] applies to any project, program, or activity funded in whole or in part through financial assistance provided under the Act, and to any activity funded under any provision of the Regional Rail Reorganization Act of 1973, as amended *(45 U.S.C. 701* et seq.) or the Rail Passenger Service Act, as amended *(45 U.S.C. 501* et seq.) amended by the Act including the financial assistance programs listed in Appendix A. It applies to contracts awarded to implement the Northeast Corridor Project and to financial assistance programs administered by the United States Railway Association." *49 C.F.R. § 265.3* (1997)

G. COUNT TWELVE – ALLSTATE'S CLAIM FOR BREACH OF THE DOCTRINE OF NECESSARY IMPLICATION

Counts Ten and Eleven of the Amended Complaint allege breach of contract by defendant based on defendant's failure to assign a sufficient amount of ParaTransit work to plaintiff. Plaintiff sets forth a separate cause **[*43]** of action, based on the same conduct, under the doctrine of necessary implication.

The doctrine of necessary implication serves to "allow the court to enforce the clear intentions of the parties and avoid injustice" in order to carry out the purpose for which the contract was made. *Slater v. Pearle Vision Center, 376 Pa. Super. 580, 586, 546 A.2d 676, 679 (1988).* Thus, the Court will imply an obligation that was within the contemplation of the parties when the contract was drafted or is necessary in order to insure the intention of the parties will be carried out. *Doylestown Associates, L.P. v. Street Retail, Inc., 1996 U.S. Dist. LEXIS 15449, 1996 WL 601679* (E.D. Pa. Oct. 18, 1996). Even when a contract is not ambiguous, a court may utilize the doctrine of necessary implication to "avoid injustice" *Barmasters Bartending School, Inc. v. Authentic Bartending School, Inc., 931 F. Supp. 377 (E.D. Pa. 1996).* Hence the doctrine is utilized in conjunction with a breach of contract action to protect the parties to that contract. See *Gallagher v. Upper Darby Township, 114 Pa. Commw. 463, 473, 539 A.2d 463, 467* appeal denied, *554 A.2d 513 (Pa. 1988)*("where an obligation was within the contemplation [*44] of the parties when making the contract or is necessary to carry out their intention, the law will imply that obligation and enforce it even though it is not specifically and expressly set forth in the written contract").

Plaintiff alleges that SEPTA breached its contract with Allstate under the doctrine of necessary implication. Amended Complaint at P152. However, instead of using the doctrine to support its contract claims set forth in Counts Ten and Eleven, plaintiff asserts it as a separate count. While defendant does not dispute the sufficiency of these contract claims, it does properly note that the doctrine of necessary implication does not support a separate count within the complaint for the identical conduct described in other counts. Hence, Count Twelve is dismissed on the pleadings.

## H. ALLSTATE'S DEMAND FOR PUNITIVE DAMAGES

In each of its seventeen separate counts, plaintiff demands punitive damages. Defendant, however, submits that SEPTA is similar to a municipal corporation and therefore maintains immunity against such damages.

Well–established precedent states that a municipal corporation is immune from punitive damages. *City of Newport v. Fact Concerts,* [*45] *Inc., 453 U.S. 247, 259 (1981).* In City of Newport, the Supreme Court noted that "punitive damages imposed on a municipality are in effect a windfall to a fully compensated plaintiff, and are likely accompanied by an increase in taxes or a reduction of public services for the citizens footing the bill." *Id. at 267.* Nothing in any legislative history indicates that Congress wanted to abolish this doctrine in the cre-

ation of § 1983. *Id. at 259.* Justice Blackmun considered the history and policies behind § 1983 and the fact that civil/constitutional rights are at stake, but he ultimately held that neither the retributive nor preventative purpose of punitive damages is advanced by exposing municipalities to such damages. *Id. at 268.* Hence, the common law absolute immunity for municipalities in § 1983 actions against them continues to apply. *Id. at 269.*

In *Bolden v. Southeastern Pennsylvania Transportation Authority, 953 F.2d 807 (1991)* cert. denied, *504 U.S. 943, 112 S. Ct. 2281, 119 L. Ed. 2d 206 (1992),* the Third Circuit concluded that "SEPTA, like a municipal corporation is immune from punitive damages under § 1983 . . . in view of the many characteristics that SEPTA shares with federal, [*46] state, and local agencies." *Id. at 829.* The immunity enjoyed by all of the levels of government supports the notion of granting SEPTA the same immunity. Id. Additionally, the same considerations of policy surrounding municipal immunity advocate in favor of treating SEPTA similarly since "awarding punitive damages against SEPTA might result in increased taxes or fares and thus punish taxpayers and users of mass transportation who cannot be regarded, except perhaps in an indirect and abstract sense, as bearing any guilt for constitutional violations that SEPTA may commit." *Id. at 830.* See also *Feingold v. SEPTA, 512 Pa. 567, 580, 517 A.2d 1270, 1277 (1986)* (Pennsylvania Supreme Court concludes that it would be inappropriate to assess punitive damages against SEPTA given its status as a commonwealth agency).

In light of the above, plaintiff's demands for punitive damages from SEPTA lack in legal support. This Circuit has expressly granted immunity to SEPTA from punitive damages.

Plaintiff's rebuttal to these cases stands on especially tenuous grounds. First, plaintiff, relying on Justice Blackmun's footnote in Newport, contends that this is the "extreme situation" [*47] constituting an exception to the generalized municipal immunity from punitive damages. Newport, at 267, n. 29. This contention misreads Justice Blackmun, who wrote:

> It is perhaps possible to imagine an extreme situation where the taxpayers are directly responsible for perpetrating an outrageous abuse of constitutional rights. nothing of that kind is presented by this case. Moreover, such an occurrence is sufficiently unlikely that we need not anticipate it here.

Nowhere in the Amended Complaint, Response to defendant's Motion or Reply does plaintiff attempt to show that

SEPTA's policies are the result of decisions made directly by the elected representatives of the citizens. Nowhere does plaintiff demonstrate why the taxpayers, who took no part in the alleged constitutional violations of the defendant, should bear the burden of this windfall to the plaintiff.

Moreover, plaintiff advances the untenable argument that because SEPTA is using federal monies, rather than simply state funds, they accepted federal duties and obligations. It asserts that there are totally different issues of public policy in this case, particularly "the federal power to remedy the historical **[*48]** injustice of racial discrimination." Response, at 27. Additionally, it claims that neither the Supreme Court in Newport, nor the Third Circuit in Bolden dealt with the situation of a state entity grossly misusing substantial federal funds. Even if these allegations are true, though, none of this justifies the increased taxes or fares that would be imposed on users of mass transportation. n21 Because plaintiff's arguments fail to refute the well-established immunity granted to municipalities, Allstate's seventeen demands for punitive damages are dismissed.

> n21 Plaintiff further contends that if it sued SEPTA officials in their individual capacities, it could get punitive damages and those damages may be indemnified by SEPTA itself. As support for this argument, though, plaintiff cites the dissent of a Third Circuit case which discusses the general rule of indemnification as a reason not to impose punitive damages on even officials that are sued as individuals and actually lends credence to the defendant's claim that punitive damages be denied in this matter. Judge Higginbotham, in his partial dissent in *Keenan v. City of Philadelphia, 983 F.2d 459 (3d Cir. 1992)* wrote:
>
> Whereas one of the purposes of punitive damages is punishment, giving a punitive damage award in any amount to a plaintiff where the individual defendant does not pay fails to punish that individual defendant . . . The case at bar demonstrates my concern for the illogic of punitive damages when the municipality, not the employees, becomes the entity to-

tally 'footing the bill.' Although a city would not be directly liable for any punitive damages awards in a § 1983 case, Philadelphia is obligated to indemnify the individual defendants for their punitive damage liability.

> *Id. at 480–481* (citations omitted).

**[*49]**

## V. CONCLUSION

In light of the foregoing, defendant's Motion for Partial Judgment on the Pleadings is granted with respect to Counts One, Twelve, Thirteen, Fourteen, Sixteen, Seventeen, and the demand for punitive damages. The Motion is denied with respect to Counts Two, Three, Four and Five.

An appropriate order follows.

### ORDER

AND NOW, this 20th day of October, 1997, upon consideration of the Motion of Defendant Southeastern Pennsylvania Transportation Authority for Partial Judgment on the Pleadings, and Plaintiff Allstate Transportation Company, Inc.'s opposition thereto, it is ORDERED that the Motion is GRANTED in part and DENIED in part as follows:

1. Counts One, Twelve, Thirteen, Fourteen, Sixteen and Seventeen of the Amended Complaint are DISMISSED;

2. Allstate's demand for punitive damages is DISMISSED;

3. SEPTA's Motion regarding Counts Two, Three, Four and Five of the Amended Complaint is DENIED, to the extent these Counts state claims for disparate treatment.

It is so ORDERED.

BY THE COURT:

CHARLES B. SMITH

UNITED STATES MAGISTRATE JUDGE

# EXHIBIT B

LEXSEE 2005 U.S. DIST. LEXIS 1549

**B. LEWIS PRODUCTIONS, INC., Plaintiff, v. VAUGHN BEAN, Defendant.**

**Civil Action No. 02-93-KAJ**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 1549*

**January 28, 2005, Decided**

**DISPOSITION:** Motion for partial summary judgment was denied.

**LexisNexis(R) Headnotes**

**COUNSEL: [*1]** For B. LEWIS PRODUCTIONS INC., Plaintiff: Leonard L. Williams, Leonard L. Williams, Esq., Wilmington, DE; Gregory Brian Williams, Fox Rothschild LLP, Wilmington, DE; Darryl K. Fountain, Darryl K. Fountain, Esq., Wilmington, DE.

For VAUGHN BEAN, Defendant: David L. Finger, David L. Finger, Esq., Wilmington, DE.

For VAUGHN BEAN, Third-party plaintiff: David L. Finger, David L. Finger, Esq., Wilmington, DE.

For BUTCH LEWIS, A DELAWARE CITIZEN, Third-party defendant: Gregory Brian Williams, Fox Rothschild LLP, Wilmington, DE.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Kent A. Jordan

**OPINION:**

### MEMORANDUM ORDER

This is a breach of contract and fraud action, brought under the diversity jurisdiction of this court. (See Docket Item ["D.I."] 1.) Plaintiff and counterclaim defendant B. Lewis Productions, Inc. ("BLP"), a New York corporation with its principal place of business in New York, and third-party defendant Butch Lewis ("Lewis"), a citizen of Delaware, filed a motion *in limine* (D.I. 62 at 18-23; the "Motion") seeking to prevent the defendant, Vaughn Bean ("Bean"), a citizen of Illinois, (D.I. 35 at PP 14-16) from introducing at trial any evidence **[*2]** of damages predating February 4, 1999, because "Bean's counterclaims and third-party claims are barred by the applicable statute of

limitations ... ." n1 The case is scheduled to go to trial next week. As I indicated during the pretrial conference last week (1/18/05 Tr. at 14-15), the Motion is nothing less than a motion for partial summary judgment and, therefore, should have been raised by BLP and Lewis no later than the dispositive motion deadline set in the scheduling order.

> n1 BLP and Bean are parties to a contract pursuant to which BLP was to provide services promoting Bean as a heavyweight boxer. As originally filed, BLP's and Lewis's motion *in limine* sought to prevent any evidence of damages predating July 11, 2000, three years prior to Bean's filing of his counterclaims and third-party claims. (See D.I. 62 at 18.) In a follow-up letter to the court, Plaintiff amended the requested date to preclude evidence of damages prior to February 4, 1999, three years prior to the filing of the Complaint. (See D.I. 66 at 4-5.)

**[*3]**

Bean has rightly complained of the dereliction of BLP and Lewis in this regard. (D.I. 72.) He asserts that their affirmative statement in a stipulated scheduling order in this case that "the parties agree that neither will make a case-dispositive motion" (D.I. 51 at 3) should be taken as effecting a waiver of the statute of limitations defense that they now seek to raise. BLP and Lewis counter that they are not bound by a decision to forego an earlier dispositive motion and that, having raised the affirmative defense in their replies to the counterclaims and third-party claims, they should be free to raise the statute of limitations defense as late as a motion for judgment as a matter of law under *Rule 50*. n2

> n2 The cases they cite, however, are not enlightening, since they merely note that a statute of limitations defense was addressed in the context of a *Rule 50* motion and they say nothing of whether the movant had ignored a specific scheduling order.

Nor do they address the circumstance where a party affirmatively represents that no dispositive motions will be made.

**[*4]**

Bean has a serious argument that, under the circumstances, the earlier representations and litigation of conduct of BLP and Lewis should constitute a waiver of their statute of limitations defense. Ultimately, however, the substantive rights of the parties in this case ought not turn on a procedural failure when there is a dispositive legal issue that both sides flowing from on notice of from the pleadings and on which no one has been deprived of the opportunity to take discovery or to present argument. I therefore decline to hold that there has been a waiver of the statute of limitations defense or a procedural default warranting a sanction akin to waiver.

As to the substance of the Motion, the parties agree, it seems, that if Delaware's three year statute of limitations applies, then Bean has no counterclaim or third–party claim for damages flowing from events that occurred prior to February 4, 1999. The parties also apparently agree that New York law applies to the substantive claims in the case and that, if New York's six year statute of limitations also applies, the counterclaims and third–party claims will reach back to February of 1996. (*See* D.I. 62 at 18–23.) The dispute, **[*5]** of course, is over which statute of limitations applies. BLP and Lewis argue that, under Delaware's borrowing statute, Delaware's three year statute must apply. (*Id.* at 18–21.) Bean argues that the Delaware Supreme Court's recent interpretation of the borrowing statute means that New York's lengthier statute of limitations applies. (*Id.* at 21–23.) Bean's view is the correct one.

Bean's argument includes the assertion that critical aspects of his counterclaims and third–party claims would not be time barred under the longer New York statute of limitations and that it would be manifestly unfair to allow BLP and Lewis to bring this case in Delaware, forcing Bean to bring his compulsory counterclaims, and thereby deprive him of the longer statute of limitations that would have applied had he been permitted to bring his action in New York.

Delaware's borrowing statute states as follows:

Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the **[*6]** cause of action arose, for bringing an action upon such cause of action. Where the cause of action originally accrued in favor of a person who at the time of such accrual was a resident of this State, the time limited by the law of this State shall apply.

*10 Del. C. § 8121.*

Counterclaims are "actions" for statute of limitations purposes. *See Delaware Chemicals, Inc. v. Reichhold Chemicals, Inc., 35 Del. Ch. 493, 121 A.2d 913, 918 (Del. Ch. 1956)* ("a counterclaim seeking affirmative relief is an 'action' within the meaning of the statute [of limitations]"). But that does not necessarily mean that they are "actions" for purposes of the borrowing statute. On the contrary, two weeks ago, the Delaware Supreme Court issued its *en banc* decision in *Saudi Basic Industries Corp. v. Mobil Yanbu Petrochemical Co., Inc., 2005 Del. LEXIS 41, 2005 WL 120789 (Del. Jan. 14, 2005)*, in which it held, in circumstances with similarities to those here, that a "literal construction of the borrowing statute, if adopted, would subvert the statute's underlying purpose[,]" which is to discourage forum shopping. *Id. 2005 Del. Lexis 41 [WL] at *9.* The court observed that,

borrowing statutes such as [Delaware's] **[*7]** are typically designed to address a specific kind of forum shopping scenario—cases where a plaintiff brings a claim in a Delaware court that (i) arises under the law of a jurisdiction other than Delaware and (ii) is barred by that jurisdiction's statute of limitations but would not be time-barred in Delaware, which has a longer statute of limitations. Under that 'standard scenario,' the borrowing statute operates to prevent the plaintiff from circumventing the shorter limitations period mandated by the jurisdiction where the cause of action arose.

*Id.* However, the court noted, a literal application of the statute cannot be countenanced when it would circumvent the purpose of the statute, as is the case when a plaintiff can be seen to be taking advantage of the shorter Delaware statute of limitations to deprive a defendant of claims he would otherwise have. *Id. 2005 Del. LEXIS 41, [WL] at *10* (holding that literal application of borrowing statute would subvert the statute by allowing plaintiff "to prevail on a limitations defense that would never have been available to it had the [defendants'] ... claims been brought in the jurisdiction where the cause of action arose").

Delaware's connection **[*8]** to this matter appears

2005 U.S. Dist. LEXIS 1549, *8

to be far less significant than New York, which BLP and Lewis have themselves conceded is the jurisdiction whose substantive law applies. (D.I. 62 at 3 n.1.) While the contract was executed in Delaware, neither of the parties to the contract, BLP and Bean, are citizens of this state, nor does it appear that performance of the contractual obligations was anticipated to take place in this state. The tort claims too appear to be wholly unrelated to this jurisdiction. Indeed, BLP and Lewis acknowledge that "Bean was not a Delaware resident and his claims arose outside of Delaware." (D.I. 66 at 4.)

Thus, the same kinds of considerations that operated to make the literal application of Delaware's borrowing statute inappropriate in *Saudi Basic* appear to be applicable here. Allowing BLP and Lewis to bring suit here and have the advantage of the shorter statute of limitations would effectively encourage the forum shopping denounced by the Delaware Supreme Court, and it would unfairly deprive Bean of rights to which he may otherwise be entitled. n3 Consequently, I hold that Delaware's borrowing statute does not apply and, therefore, neither does Delaware's three year **[*9]** statute of limitations. *See Saudi Basic, 2005 Del. LEXIS 41, 2005 WL 120789 at *10* ("because the Superior Court properly ruled that the borrowing statute did not apply, it follows that that court also correctly held that [the defendants'] counterclaims ... were not time-barred.") The Motion is DENIED.

      n3 I emphasize that, on a more developed record, my conclusions about the locus of the dis-

putes would perhaps be different, but the lack of record support for BLP's and Lewis's late-filed Motion is a problem of their own creation. I also reiterate that this is not a case where discovery had closed without an opportunity to explore facts and legal theories pertinent to the Motion, nor is it a case where significant expense had been invested by either side in reliance on positions taken during discovery or motions practice. On the contrary, this case has been notable chiefly for the absence of pretrial engagement by the parties. Hence, considering the Motion on its merits is unfair to neither party, and the outcome is not influenced by factors which might exist in the context of a more developed record. If, for any reason, a higher court should disagree with my ruling on this issue, the trial record should be sufficiently clear, both in the presentation of the evidence and in the form of the verdict, to permit damages predating February 4, 1999 to be backed out of the verdict without the necessity of a retrial. The parties are instructed to prepare their proofs accordingly and to confer on an appropriate form of verdict.

**[*10]**

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

January 28, 2005
Wilmington, Delaware

EXHIBIT C

LEXSEE 2004 U.S. DIST. LEXIS 1988

**JULIE A. BECKER, et al. v. CHICAGO TITLE INSURANCE COMPANY, et al.**

**CIVIL ACTION NO. 03–2292**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2004 U.S. Dist. LEXIS 1988*

**February 4, 2004, Decided**

**DISPOSITION:** Motion to Sever was granted, Motions to Strike and Dismiss were each granted in part and denied in part, and Plaintiffs was given leave to file amended complaint.

**LexisNexis(R) Headnotes**

**COUNSEL:** **[*1]** For JULIE A. BECKER, MICHAEL BLIMM, SHARON BLIMM, H/W, WALTER MCCALL, KEVIN SMALL, KIRSTEN SMALL, H/W, JACQUELYNE SHINES, PAUL DONAHUE, JOAN DONAHUE, H/W, DARRELL SMITH, MARGARET E. HILDEBRANDT, CHRISTINE C. BURKE, ON THEIR BEHALF AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, Plaintiffs: ANDREW R. SPIEGEL, PHILADELPHIA, PA. JOHN B. TAULANE, III, GILFILLAN, GILPIN AND BREHMAN, JENKINTOWN, PA.

For CHICAGO TITLE INSURANCE COMPANY, FIDELITY NATIONAL TITLE INSURANCE COMPANY, FIDELITY NATIONAL TITLE INSURANCE COMPANY OF NEW YORK, Defendants: ELISA COHEN LACIANCA, BLANK ROME COMISKY & MCCAULEY, MEDIA PA. FRANCIS X. CROWLEY, BLANK ROME COMISKY & MCCAULEY, LLP, MEDIA, PA.

For COMMONWEALTH LAND TITLE INSURANCE CO., LAWYERS TITLE INSURANCE CORPORATION, STEWART TITLE GUARANTY COMPANY, CONESTOGA TITLE INSURANCE COMPANY, Defendants: EDWARD J. HAYES, FOX ROTHSCHILD LLP, PHILADELPHIA, PA.

For FIRST AMERICAN TITLE INSURANCE COMPANY, Defendant: CHARLES A. NEWMAN, BRYAN CAVE, LLP, ST. LOUIS, MO. DOUGLAS W. KING, BRYAN CAVE LLP, ST. LOUIS, MO. FRANCIS P. DEVINE, III, WHITE & WILLIAMS LLP, PHILADELPHIA, PA. KARA R. YANCEY, BRYAN CAVE LLP, ST. LOUIS, MO. MARIA FEELEY, PEPPER HAMILTON LLP, **[*2]** PHILADELPHIA, PA.

For SAVINGS ABSTRACT COMPANY, INC, ABSTRACT PROFESSIONALS, LTD., ARACOR SEARCH & ABSTRACT SERVICES, INC., ABSTRACTING COMPANY OF NORTHAMPTON COUNTY, Defendants: BLAIR H. GRANGER, BLAIR H. GRANGER & ASSOCIATES, P.C., PAOLI, PA.

For REALTY LAND TRANSFER, LLC, SOUTHEASTERN ABSTRACT COMPANY, INC., ta WEICHERT CLOSING SERVICES, CO., STATEWIDE ABSTRACT GROUP, INC., Defendants: J. BRADFORD MCILVAIN, DILWORTH PAXSON LLP, PHILADELPHIA, PA.

For OLDE CITY ABSTRACT, INC., Defendant: BARRY E. UNGAR, WOLF BLOCK SCHORR & SOLIS–COHEN, PHILA, PA.

**JUDGES:** MICHAEL M. BAYLSON, U.S.D.J.

**OPINIONBY:** MICHAEL M. BAYLSON

**OPINION:**

    MEMORANDUM

**Baylson, J.**

    Plaintiffs allege overcharging of notary fees in connection with real estate transactions. Presently before this Court are three motions by Defendants. Defendants First American Title Company and Olde City Abstract, Inc. have filed a Motion to Sever. Defendants First American Title Company, Olde City Abstract, Inc., Fidelity National Title Insurance Company, Fidelity National Title Insurance of New York, and Chicago Title

2004 U.S. Dist. LEXIS 1988, *2

Insurance Company have brought a Motion to Strike and all Defendants have brought a Motion to Dismiss. **[*3]** For the reasons that follow, the Motion to Sever will be granted, the Motions to Strike and Dismiss will each be granted in part and denied in part, and Plaintiffs will be given leave to file an amended complaint.

### I. Factual and Procedural Background

Plaintiffs in this case are individuals who, between June 15, 2001 and December 16, 2002, participated in real estate closings at which they paid fees for notary services. Plaintiffs allege that Defendants overcharged them for notary fees incurred at these real estate closings, in vi-olation of the fee schedule of permissible notary charges set forth in the Pennsylvania Notary Public Law, *57 P.S. § 147, et seq.* ("Notary Public Law"). n1 It is alleged that Defendants not only overlooked, but also encouraged, ti-tle clerks to overcharge consumers for notary fees at real estate closings. Defendants are corporations who were ei-ther the title underwriters for the policies issued in these transactions, or the title agents in these transactions, act-ing as agents for one of the title underwriters. No plaintiff is alleged to have engaged in a transaction involving more than one title agent or more than one title underwriter, so **[*4]** that each plaintiff is discretely connected with one pair of Defendants in this case, as indicated below:

| Plaintiff | Defendant Title insurer | Defendant Title agent | Notary charge | Settlement Date |
|---|---|---|---|---|
| Julie Becker | Conestoga Title Insurance Co. | ABCO–Abstracting Company | $ 20.00 | Sept. 4, 2002 |
| Michael and Sharon Blimm | Stewart Title Insurance | Aracor Search & Abstract Services, Inc. | $ 25.00 | Oct. 25, 2001 |
| Joan and Paul Donahue | Commonwealth Land Title Insurance Co. | Savings Abstract Co. | $ 25.00 | Nov. 28, 2001 |
| Jacquelyne Shines | Commonwealth Land Title Insurance Co. | Savings Abstract Co. | $ 25.00 | Feb. 27, 2002 |
| Walter McCall | Lawyers Title Insurance Co. | Abstract Professionals, Ltd. | $ 20.00 | June 15, 2001 |
| Kevin and Kirsten Small | Fidelity National Title Insurance Co. | Realty Land Transfer, LLC | $ 25.00 | August 28, 2002 |
| Margaret E. Hildebrandt | Chicago Title Insurance Co. | Statewide Abstract Group, Inc. | $ 6.00 | May, 28 2002 |
| Christine Burke | First American Title Insurance Co. | Olde City Abstract, Inc. | $ 30.00 | Dec. 16, 2002 |
| Darryl Smith | Fidelity National Title Insurance of New York | Weichert Closing Services, Inc. | $ 25.00 | May 8, 2002 |

**[*5]**

n1 In 1988, two class actions were filed in this district presenting similar allegations of overcharg-ing for notary services. A settlement agreement was reached in that case, and the Court's approval of the settlement was set forth in an Order dated October 29, 1990. *Callahan v. Commonwealth Title Insurance Company, 1990 U.S. Dist. LEXIS 14524 (E.D. Pa. October 29, 1990)* (Hutton, J.). The agree-ment required Defendants to discontinue the prac-tice of notarial overcharging of Plaintiffs and to affirmatively inform consumers of the correct fees. Chicago Title Insurance Company, Lawyers Title Insurance, Co., and Commonwealth Land Title Insurance Company were all parties to the prior litigation. The other defendant title insurers and all of the title agents in the case before this Court were

not parties to the action.

Plaintiffs' Amended Complaint raises the following claims:

Count One: Violation of the Real Estate Settlement Procedures Act ("RESPA") *12 U.S.C. § 2603,* **[\*6]** *et seq.*

Count Two: Breach of Settlement Agreement (against only Chicago Title Insurance, Lawyers Title Insurance and Commonwealth Land Title Insurance Company)

Count Three: Negligent Supervision

Count Four: Civil Conspiracy

Count Five: Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, *73 Pa. Cons. Stat. § 201-1 et seq.* ("UTPCPL")

Count Six: Unjust Enrichment

Plaintiffs filed their original Complaint on April 14, 2003. Defendants filed a Motion to Dismiss on July 23, 2003. Plaintiffs filed their Amended Complaint on September 4, 2003. All Defendants filed a Motion to Dismiss pursuant to *Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6)* on September 30, 2003 and Defendants First American Title Insurance Company and Olde City Abstract, Inc. filed a Motion to Sever and a Motion to Strike on September 30, 2003. Defendants Fidelity National Title Insurance of New York, Fidelity National Title Insurance Company, and Chicago Title Insurance Company joined the Motion to Strike on October 14, 2003. Briefing was **[\*7]** completed by the parties on October 30, 2003. The Court held oral argument on all pending motions on January 22, 2004.

This Court has federal question jurisdiction pursuant to *28 U.S.C. § 1331,* as Plaintiffs raise a claim under RESPA, *12 U.S.C. § 2603 et seq.,* which states "Any action pursuant to the provisions of section 6, 8, or 9 [*12 U.S.C. § 2605, 2607, or 2608*] may be brought in the United States district court or in any other court of competent jurisdiction, for the district in which the property involved is located, or where the violation is alleged to have occurred." *12 U.S.C. § 2614 (2003).* Venue is proper as the transactions in question occurred in the Eastern District of Pennsylvania.

## II. Parties

Both the Motion to Sever and the subject matter jurisdiction issue in the Motion to Dismiss implicate which parties will be allowed to continue in this Court. Thus, for efficiency's sake, the Court will first dispose of those issues.

### A. Motion to Sever

Defendants First American Title Insurance Company ("First American") and Olde City Abstract, Inc. ("Olde **[\*8]** City") filed a Motion to Sever the allegations of Plaintiff Christine Burke against them. Plaintiff Burke does not oppose the Motion.

*Federal Rule of Civil Procedure 20* permits joinder of multiple plaintiffs whose claims (1) "arise out of the same transaction, occurrence, or series of transactions or occurrences" and (2) will present some "question of law or fact [in] common." *Fed. R. Civ. P. 20(a).* When parties fail to satisfy the requirements of *Rule 20(a),* they are considered to be misjoined and severable pursuant to *Federal Rule of Civil Procedure 21.* See *Norwood Co. v. RLI Ins. Co. et.al., 2002 U.S. Dist. LEXIS 5974, 2002 WL 523946 at *2 (E.D. Pa. April 4, 2002),* citing C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 1683 at 475 (3d ed. 2001) (finding parties improperly joined because they did not meet the requirements of *Fed. R. Civ. P. 20(a)).*

Defendants argue that each set of Plaintiff and Defendant title agent and Defendant title underwriter in this case involves a discrete set of claims arising **[\*9]** out of a transaction independent from the others in this case. Thus, the first requirement of *Rule 20* is not met. In addition, the fact that each set of Plaintiff and Defendants involves separate plaintiffs and companies, with different closing procedures, means that separate questions of fact will exist for each set of Plaintiff and Defendants, and thus the second requirement of *Rule 20* is not met.

In addition, at oral argument, the Court raised the issue of why, if Plaintiff Burke and the corresponding Defendants are severed, each set of Plaintiff and Defendants should not also be severed. The parties agreed that severing each set of Plaintiff and Defendants would be the appropriate course of action. In addition, at the Court's suggestion, the parties agreed, because there are common issues of law, that discovery and pretrial motions would be coordinated among the parties and that all claims and defenses would be contained in a single case. Accordingly, as discussed at oral argument, the Court requests that Plaintiffs, assuming they do file an amended complaint, file a single complaint for all Plaintiffs, but assert on behalf of each Plaintiff the factual allegations

and claims **[*10]** against the two defendants applicable to that Plaintiff, and incorporate by reference the allegations and claims that are common to all parties. As the Motion to Sever is unopposed and as the claims of each Plaintiff are subject to severance pursuant to *Federal Rule of Civil Procedure 21*, the Motion to Sever will be granted.

### B. Subject Matter Jurisdiction – Statute of Limitations

Defendants argue that Count One should be dismissed with prejudice pursuant to *Rule 12(b)(1)* and/or *Rule 12(b)(6)* to the extent it purports to allege claims under RESPA on behalf of Plaintiffs Michael and Sharon Blimm, Joan and Paul Donahue, Jacqueline Shines, and Walter McCall, since their alleged claims arose from closings that took place earlier than one year before the complaint was filed, as RESPA imposes a one year statute of limitations. Additionally, Defendants argue that the allegations concerning Plaintiff Darrell Smith appeared only in the Amended Complaint filed September 4, 2003, which is also more than one year after the alleged transaction involving Plaintiff Smith and thus is barred by *12 U.S.C. § 2614*.

Plaintiffs **[*11]** concede that the claims brought by Plaintiffs Michael and Sharon Blimm under RESPA are untimely under *12 U.S.C. § 2614*. Thus, these claims will be dismissed. Plaintiffs argue, however, that Plaintiffs Joan and Paul Donahue, Jacqueline Shines, and Walter McCall have all stated timely claims under RESPA due to the doctrine of equitable tolling. Plaintiffs also argue that Darryl Smith's claim was filed in the original complaint, within one year of his settlement, that the allegations in the amended complaint relate back to that original complaint, and therefore, his claim is timely under *12 U.S.C. § 2614*.

#### a. Plaintiffs Donahue, Shines and McCall: Equitable Tolling

The parties agree that *12 U.S.C. § 2614* applies to this issue, and that this Court lacks subject matter jurisdiction over any claim brought more than one year after the transaction occurred which allegedly gave rise to the cause of action. The parties disagree as to whether the doctrine of equitable tolling applies to *§ 2614* and whether, if the doctrine does apply, Plaintiffs have pled facts that properly invoke equitable tolling.

The Third Circuit **[*12]** has held that, absent explicit statutory language to the contrary, namely an explicit link between expiration of a statute of limitations and the expiration of jurisdiction, equitable tolling will be read into a statute. *Ramadan v. The Chase Manhattan Corp., 156 F.3d 499, 504 (3d Cir. 1998)*. In addition, two courts in this district have held that Ramadan requires equitable

tolling principles to apply to RESPA because the one year statute of limitations is not explicitly jurisdictional. *Solar v. Millenium Fin., Inc., 2002 U.S. Dist. LEXIS 8923, at *2 (E.D. Pa. May 17, 2002)*; *Smith v. Equicredit Corp., 2002 U.S. Dist. LEXIS 19395, (E.D. Pa. October 4, 2002)*. Accordingly, this Court will apply the test for equitable tolling to this case.

Equitable tolling stops "the statute of limitations from running when the date on which the claim accrued has already passed." *Lake v. Arnold, 232 F.3d 360, 370 (3d Cir. 2000)*. This doctrine allows a court to "extend a statute of limitations on a case–by–case basis to prevent inequity." *Colletti v. N.J. Transit Corp., 50 Fed. Appx. 513, 2002 U.S. App. LEXIS 15463 (3d. Cir. 2002)*. **[*13]** Equitable tolling is appropriate in three situations: (1) when the defendant has actively misled the plaintiff respecting the facts which comprise the plaintiff's cause of action; (2) when the plaintiff in some extraordinary way has been prevented from asserting his rights; and (3) when the plaintiff has timely asserted his rights in the wrong forum. *U.S. v. Midgley, 142 F.3d 174, 179 (3d Cir. 1998)* (quoting *Kocian v. Getty Refining & Mktg. Co., 707 F.2d 748, 753 (3d. Cir. 1983))*. In addition, a plaintiff must have "exercised reasonable diligence in investigating and bringing the claims." *Miller v. New Jersey Dep't of Corrections, 145 F.3d 616, 618–19 (3d Cir. 1998)*.

Plaintiffs Donahue, Shines, and McCall contend they all dealt with either Defendant Commonwealth or Defendant Lawyers' Title, and their respective agents. These Plaintiffs argue that these defendants were also parties to the Callahan order, see n. 1, supra, and thus had an affirmative duty to prevent consumers from being overcharged. Plaintiffs argue that Defendants misrepresented the correct notary charges and, thus, misled the Plaintiffs in such a way as **[*14]** to fulfill the requirements of equitable tolling. Even if all of Plaintiffs' allegations are true, as this Court must assume in deciding a motion to dismiss, Plaintiffs have not alleged any fraudulent actions by Defendants that would have concealed from Plaintiffs their claims in this case. In fact, according to Plaintiffs, the amounts charged for notary services were listed on the forms presented to Plaintiffs at closing, and the statutorily appropriate notary fees are clearly set forth in the Notary Public Law. Although Defendants may have charged Plaintiffs an improper notary fee, they did not prevent Plaintiffs from discovering through reasonable diligence the actual fee they had been charged or the statutorily appropriate fee. In addition, Plaintiffs have not presented any allegations that would otherwise show that Plaintiffs were prevented from asserting their rights within one year of their settlements with Defendants. Accordingly, equitable tolling is not appropriate here, Plaintiffs Donahue, Shines and McCall have not filed

their claims within the statute of limitations of RESPA, and their claims will be dismissed.

### b. Plaintiff Smith: Relation Back

Defendants further **[*15]** argue that Plaintiff Smith's claims are time–barred because he did not make any factual allegations in the original Complaint, where his name only appeared in the caption of the case, but nowhere else. Defendants argue that, because Plaintiff Smith only raised his claims in the Amended Complaint, which was filed more than a year after his real estate closing, his claims are barred.

*Rule 15(c)(2)* states: "An amendment of a pleading relates back to the date of the original pleading when . . . the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." "Amendments that merely correct technical deficiencies or expand or modify the facts alleged in the earlier pleading meet the *Rule 15(c)* test and will relate back. Thus, amendments that do nothing more than restate the original claim with greater particularity or amplify the details of the transaction alleged in the preceding pleading fall within *Rule 15(c)*)." 6A Wright, Miller & Kane, Federal Practice and Procedure § 1497 (2d ed. 1990). See *Egervary v. Young, 159 F. Supp. 2d 132, 156 (E.D. Pa. 2001)* (holding **[*16]** that the relation back doctrine applies where amended complaint restates original allegations with more specificity).

In the original Complaint, the only mention of Plaintiff Smith is the listing of his name in the caption and the only mention of Defendants Fidelity New York and Weichert Closing Services ("Weichert") is in the caption and listing of parties. (Complaint P 13–14). There is no description of the transaction that occurred between Smith and the two Defendants and there are no allegations as to whether these Defendants were involved in a transaction with Smith, what amount these two Defendants charged Smith, or whether this amount represented an overcharge. In the Amended Complaint, Plaintiffs present factual allegations concerning the date of Smith's real estate transaction, the property involved, that Fidelity New York and Weichert were the insurance company and closing agent respectively, the amount charged for notary fees, and the allegation that this amount was a significant overcharge based on the number of notarizations required. (Amended Complaint P 63–64). However, as noted above, the original pleading in this case did not allege any conduct, transaction, or occurrence **[*17]** involving Plaintiff Smith or these two Defendants. Thus, the Amended Complaint does more than correct technical deficiencies or amplify the facts contained in the allegations; rather, it presents facts and allegations involving Plaintiff

Smith for the first time. Plaintiff Smith does not meet the standards of *Fed. R. Civ. P. 15(c)(2)* and his Amended Complaint does not relate back to the Original Complaint. Accordingly, Plaintiff Smith has failed to raise his claims under Count One within the one year limitations period of RESPA and his claims will be dismissed.

As the sole basis for subject matter jurisdiction in this Court is the claim for violation of RESPA in Count One, the dismissal of Count One for Plaintiffs Blimm, Donahue, Shines, McCall, and Smith means that these parties may no longer remain as parties in this Court. Accordingly, all claims by these Plaintiffs will be dismissed without prejudice. Thus, the parties remaining before this Court are Plaintiffs Becker, Small, Hildebrandt, and Burke and the corresponding Defendants. Accordingly, the Motion to Strike and the Motion to Dismiss will only be addressed as they relate to these **[*18]** Plaintiffs.

## III. Motion to Strike

Defendants First American and Olde City filed a Motion to Strike several items from the Amended Complaint, which was subsequently joined by Fidelity National Title Insurance of New York ("Fidelity New York"), Fidelity National Title Insurance Company ("Fidelity National"), and Chicago Title Insurance Company ("Chicago Title"). For the reasons that follow, the Court will deny the Motion to Strike in part and grant it in part.

### A. Legal Standard

*Federal Rule of Civil Procedure 12(f)* provides that the court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *Fed. R. Civ. P. 12(f)*. Motions to strike are generally disfavored. See, e.g., *DiPietro v. Jefferson Bank, 1993 U.S. Dist. LEXIS 4047, 1993 WL 101356, at *1 (E.D. Pa. March 30, 1993)*. This Court has observed that the "standard for striking under *Rule 12(f)* is strict" and that "only allegations that are so unrelated to plaintiffs' claims as to be unworthy of any consideration" should be stricken. Id. (quoting *In re Catanella and E.F. Hutton and Co., Inc., 583 F. Supp. 1388, 1400 (E.D. Pa. 1984)).* **[*19]**

### B. Discussion

Defendants move to strike from the Amended Complaint Plaintiffs' requests for punitive damages, treble damages, and attorneys' fees as well as Plaintiffs' references to a fiduciary relationship. These motions will be addressed as they relate to each claim in the Complaint. As a preliminary matter, there is no motion to strike the

claims for punitive or treble damages or attorneys' fees as pertains to Count One, the claim under RESPA. In addition, as discussed below, Count Two, the breach of settlement claim, will be dismissed for lack of standing. Thus, the remaining claims for the purposes of the Motion to Strike are Claims Three through Six.

### 1. Count Three: Negligent Supervision

Defendants move to strike from the Amended Complaint Plaintiffs' requests for punitive damages in Count Three, Negligent Supervision, which is a state claim based in tort. The Pennsylvania Supreme Court adheres to the *Restatement of Torts (Second) § 908(2)*, which states that "punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." See **[*20]** *Feld v. Merriam, 506 Pa. 383, 485 A.2d 742, 747–8 (Pa. 1984)* (stating that Pennsylvania has adopted *Restatement § 908(2)*). Plaintiffs have alleged that Defendants have, due to either indifference or malice, participated in a scheme to defraud consumers, in violation of state law and despite the consent decree in Callahan. If Plaintiffs' allegations are taken as true, as they must be at this early stage in the litigation, then there is the possibility that a court could find Defendants' actions to be sufficiently outrageous to allow for punitive damages. Given the strict standard of *Rule 12(f)* and the importance of allowing Plaintiffs discovery to develop their case, Defendants' Motion to Strike requests for punitive damages in Count Three will be denied.

Defendants also move to strike Plaintiffs' request for treble damages under Count Three. Plaintiffs have conceded that treble damages are not appropriate for this claim. Defendants also move to strike Plaintiffs' request for attorneys' fees under Count Three and Plaintiffs have conceded that there is no statute authorizing attorneys' fees for this claim. Accordingly, Defendants' motion to strike requests for treble **[*21]** damages and attorneys' fees in Count Three will be granted.

### 2. Count Four: Conspiracy

Defendants also move to strike Plaintiffs' requests for punitive damages and attorneys' fees in Count Four, which is a claim for civil conspiracy. As discussed above with respect to negligent supervision, it is appropriate at this stage in the proceedings for a claim for punitive damages to proceed. Also for the reasons discussed above and because Plaintiffs concede that attorneys' fees are not authorized, Defendants' motion to strike requests for attorneys' fees will be granted.

### 3. Count Five: UTPCPL

Defendants also move to strike Plaintiffs' requests

for punitive damages and treble damages in Count Five, which is a claim under the UTPCPL. The UTPCPL specifically authorizes the grant of treble damages. *73 Pa. Cons. Stat. § 201-9.2(a)*. Although, as Defendants note, some cases require a finding of outrageous or unconscionable behavior for such damages, at this stage in the litigation, the claim will be permitted. See *McClelland v. Hyundai Motor Am., 851 F. Supp. 680, 681 (E.D. Pa. 1994)* (denying treble damages under UTPCPL because defendant **[*22]** did not act outrageously); *Smith v. Chrysler Motors Corp., 1990 U.S. Dist. LEXIS 5963, 1990 WL 65700 (E.D. Pa. May 15, 1990)* (same); *In re Bryant, 111 B.R. 474 (E.D. Pa. 1990)* (under UTPCPL, treble damages are appropriate when defendant's conduct is unconscionable). Accordingly, Defendants' motion regarding Count Five will be denied. The Court notes that, assuming Plaintiffs file an Amended Complaint, they should replead these claims for damages as required by the statute.

### 4. Count Six: Restitution

Defendants also move to strike Plaintiffs' request for attorneys' fees under Count Six, which is a claim for restitution. As there is no statute authorizing an award of attorneys' fees for this claim, Defendants' motion will be granted and Plaintiffs, assuming they file an Amended Complaint, should replead this claim as a request for equitable relief.

### 5. Fiduciary Relationship

Defendants move to strike Plaintiffs' references to a fiduciary relationship and fiduciary duty in the Amended Complaint, arguing that Plaintiffs raise no claim for breach of fiduciary duty, but state the legal conclusion that such a duty existed. In addition, Defendants **[*23]** argue that Pennsylvania law does not recognize a fiduciary relationship between a borrower and a title insurer in a transaction, citing *In re Johnson, 292 B.R. 821, 828 (Bankr. E.D. Pa. 2003)*.

At oral argument, Plaintiffs argued that they are not suggesting that a fiduciary relationship exists between an insurer and an insured due to the insurance contract, but, rather, they are suggesting that a fiduciary relationship exists between a title agent and the insured due to the role of the title agent during settlement. Plaintiffs suggest that the title agent acts in a role analogous to that of an escrow agent at settlement and that, because of that role, a fiduciary relationship exists.

This argument is flawed in theory and the facts alleged by Plaintiffs do not support this allegation. A fiduciary relationship arises under Pennsylvania law where "'one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on

one side, or weakness, dependence or justifiable trust, on the other.'" *L&M Bev. Co. v. Guinness Import Co., 1995 U.S. Dist. LEXIS 19443, *13–14 (E.D. Pa. Dec. 29, 1995)* **[*24]** (quoting *Commonwealth, Dep't of Transp. v. E–Z Parks, 153 Pa. Commw. 258, 620 A.2d 712, 717 (Pa. Commw. Ct. 1993))*. After establishing that a fiduciary duty exists, the plaintiff must then show that a subsequent breach occurred. Id. Plaintiffs make no allegations that the title agents and Plaintiffs were on unequal terms, either because the title agents had more power or information or because Plaintiffs had a dependence on the title agents.

In addition, Plaintiffs' theory of fiduciary duty is not implicated in the facts that Plaintiffs allege. The role of the agent at settlement is to disburse the funds as listed on the HUD–1 Settlement Statement. Plaintiffs make no allegations that any defendant instructed the agent not to disburse the notary funds listed on the HUD–1 Statement, to disburse them in different amounts, or to remove the funds from the Statement. The injury complained of is not mismanagement of the escrow funds, but rather over-charging for the notary service, which does not implicate the alleged fiduciary duty. For these reasons, Plaintiffs' argument of a fiduciary duty fails and Defendants' Motion to Strike references **[*25]** to a fiduciary relationship or fiduciary duty will be granted.

### IV. Motion to Dismiss

As to the remaining arguments in the Motion to Dismiss, Defendants argue that Count Two should be dismissed because none of the named Plaintiffs has standing to bring the claim, that counts Three through Six should be dismissed because there is no private right of action under the Pennsylvania Notary Public Law, that Counts Three through Five should be dismissed for failure to state a claim, and that Count Six should be dismissed to the extent it requests injunctive relief. Defendants' argument regarding subject matter jurisdiction has already been addressed and each remaining argument will be addressed, in turn, below.

### A. Legal Standard

When deciding a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, the Court may look only to the facts alleged in the complaint and its attachments. *Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994)*. The Court must accept as true all well–pleaded allegations in the complaint and view them in the light most favorable to the plaintiff. **[*26]** *Angelastro v. Prudential–Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985)*. A *Rule 12(b)(6)* motion will be granted only when it is certain that no relief could be granted under any set of facts that could be proved by the

plaintiff. *Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir. 1988)*.

When deciding a motion to dismiss for lack of subject matter jurisdiction pursuant to *Rule 12(b)(1) of the Federal Rules of Civil Procedure*, the plaintiff bears the burden of persuading the Court that subject matter jurisdiction exists. *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)*. This Court is required to accept as true all factual allegations and any reasonable inferences that can be derived therefrom. See *Frederick v. Dep't of Pub. Welfare, 157 F. Supp. 2d 509, 515 (E.D. Pa. 2001)* citing *Mortensen v. First Fed. Sav. and Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)*.

### B. Discussion

#### 1. Standing to Bring Count Two: Breach of Settlement

Defendants argue that Plaintiffs have no standing to bring Count Two for breach of settlement **[*27]** because they were not parties to the original consent decree in Callahan, see n. 1, supra, or, in the alternative, because they were not intended third party beneficiaries of the consent decree. Plaintiffs argue that they have standing to bring Count Two against Defendants Chicago Title, Commonwealth, and Lawyers Title, since these defendants were all parties to the consent decree that Plaintiffs are seeking to enforce, and because Plaintiffs, as intended third party beneficiaries, can properly bring such an action. As Plaintiffs Donahue, Shines and McCall will be dismissed from this action, per the above discussion on the statute of limitations, the only parties that would remain under Count Two are Plaintiff Hildebrandt and the corresponding Defendant, Chicago Title.

The issues in dispute are whether a non–party to the Callahan consent decree can enforce that agreement if that party was an intended third party beneficiary of the agreement and, if so, whether Plaintiff Hildebrandt is an intended third party beneficiary. The controlling case on this issue is *Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 750, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975),* **[*28]** a case addressing a consent decree entered into by the government, which states that it is well settled "that a consent decree is not enforceable directly or in a collateral proceeding by those who are not parties to it even though they were intended to be benefitted by it." Despite the language of Blue Chip, some courts have allowed intended third party beneficiaries of consent decrees to enforce the decrees. See *Hook v. State of Arizona, 972 F.2d 1012 (9th Cir. 1992), Berger v. Heckler, 771 F.2d 1556 (2d Cir. 1985)*. But see *Rafferty v. NYNEX Corp., 314 U.S. App. D.C. 1, 60 F.3d 844, 849 (D.C. Cir. 1995), Aiken v. City of Memphis, 37 F.3d 1155 (6th Cir. 1994), Gautreaux v.*

*Pierce, 743 F.2d 526 (7th Cir. 1984)*.

The Third Circuit has not expressly addressed the issue of whether Blue Chip allows for third party beneficiaries to enforce a consent decree. The implicit application of Blue Chip by courts in this circuit reaches results that, although not explicitly addressing the issue, suggest that third party beneficiaries cannot enforce a consent decree. In *Washington Hospital v. John F. White, Jr., 889 F.2d 1294 (3d Cir. 1989)*, [*29] the Third Circuit found that a third party beneficiary to a stipulation with the same effect as a consent decree, who was specifically mentioned in the stipulation as a beneficiary, had standing to enforce the court's order. In that case, the court did not mention Blue Chip, instead relying on the provision in *Fed. R. Civ. P. 71* providing that "when an order is made in favor of a person who is not a party to the action, that person may enforce obedience to the party by the same process as if a party." In Ford Motor Co. v. Summit Motor Products, the Third Circuit recognized the holding in Blue Chip as controlling authority, and noted the conflict between it and the enforcement provisions of RICO, before finding that a non-party to a consent decree could allege the violation of that decree as a predicate act for a RICO claim. *930 F.2d 277, 285 (3d Cir. 1991)*. In *Coca-Cola Bottling Co. v. Coca-Cola Co., 988 F.2d 386, 401-02 (3d Cir. 1993)*, the Third Circuit affirmed a district court decision that used Blue Chip to determine that only parties who could trace their contractual rights to the original parties [*30] to a consent decree had standing to enforce the consent decree, reasoning that these individuals were intended beneficiaries within the scope of the language of the consent decree, see *Coca-Cola Bottling Co. v. Coca-Cola Co., 654 F. Supp. 1419 (D. Del. 1987)*. In *Cicirello v. New York Telephone Co., 123 F.R.D. 523, 526 (E.D. Pa. 1989)*, the court construed the enforcement provision of a consent decree to not allow standing for third party beneficiaries, but noted that some consent decrees could reflect an understanding that non-party beneficiaries could enforce those decrees. Finally, in *Local 634 Sch. Cafeteria Workers v. Hanley, 1996 U.S. Dist LEXIS 4422, at *6-7 (E.D. Pa. April 4, 1996)*, the court found that Blue Chip and Ford Motor, together, dictated that a non-party to a consent decree did not have standing to enforce it, even if the decree was intended, in part, to benefit organizations like that non-party.

Of the applications of Blue Chip in this circuit, the only case that narrowly follows the language of Blue Chip is Local 634. The court in Local 634 relies on Ford Motor, using that case as clear [*31] precedent in this circuit for the proposition that third party beneficiaries can never enforce consent decrees. In all of the other cases, the courts decide not to allow third party beneficiaries to enforce consent decrees, despite noting explicitly or im-

plicitly that a circumstance could exist where third party beneficiaries may enforce such a decree. This Court concludes that cases in both this circuit and this district have followed Blue Chip in not allowing third party beneficiaries to enforce consent decrees, and this Court will do the same. Accordingly, Plaintiff Hildebrandt does not have standing to bring a claim for breach of settlement and that claim will be dismissed. n2

> n2 Plaintiffs, in their briefs and at oral argument, argue that, although the class in Callahan consisted of only past consumers who had been overcharged for notary fees, the consent decree explicitly provided that the Callahan defendants must actively advise future consumers of the proper notary charges. (Callahan Settlement Agreement at 4). Specifically, in his memorandum opinion approving the consent decree, Judge Hutton stated "the court takes notice that the proposed settlement is intended to and will benefit the class and the general public." *Callahan v. Commonwealth Land Title Insurance Co., 1990 U.S. Dist. LEXIS 14524, at *56 (E.D. Pa. 1990)*. Even if all Plaintiffs were intended third party beneficiaries, they fail to answer why such a claim is not brought before Judge Hutton, who retains jurisdiction over the consent decree.

[*32]

## 2. Counts Three Through Six: Private Right of Action under the Pennsylvania Notary Public Law

Defendants argue that Counts Three through Six should be dismissed with prejudice because there is no private right of action under the Pennsylvania Notary Public Law, *57 Pa. Cons. Stat. § 147 et seq.* Defendants argue that Plaintiffs are attempting to create a private right of action with Counts Three through Six, when the Notary Public Law does not explicitly provide a right of action, and when one cannot be implied. Plaintiffs argue that they can allege state law actions based on common law and statutory claims and that the Notary Public Law does not preclude Plaintiffs' causes of action set forth in the Third through Sixth Counts of the Amended Complaint. Plaintiffs contend that their claims in Counts Three through Six do not arise under the Notary Public Law, rather they are raising state law claims for which the fees authorized in the Notary Public Law are evidence.

The Court believes that Defendants are trying to "shoehorn" Plaintiffs' state law claims into the Notary Public Law because the latter does not provide for a private right of action. [*33] Defendants cannot force Plaintiffs, at the pleading stage of this case, to plead

a violation of the Notary Public Law itself, rather than common law or other statutory claims with the Notary Public Law's fee provision as evidence. As this Court is considering a motion to dismiss, all of Plaintiffs' allegations must be accepted as true and Plaintiffs have pled causes of action in Counts Three through Six that stand on their own under Pennsylvania law. See *Alfred M. Lutheran v. A.P. Weilersbacher, Inc., 437 Pa. Super. 391, 650 A.2d 83, 86, n. 6 (Pa. Super. 1994)* (finding that a statute's enforcement provisions do not preclude a party from obtaining remedies otherwise authorized by statute or common law). In this case, Plaintiffs have pled claims for negligent supervision, civil conspiracy, unjust enrichment, and violation of the UPTCPL. These claims, taken as true as they must be in this stage of the proceedings, are not private actions under the Notary Public Law, but rather independent claims under state law. The Court requests, however, that assuming Plaintiffs file an Amended Complaint, these claims include greater specificity. Accordingly, Defendants' Motion to **[*34]** Dismiss Counts Three through Six will be denied.

### 3. Count Three: Economic Loss Doctrine

Defendants argue that Count Three should be dismissed with prejudice pursuant to *Fed. R. Civ. P. 12(b)(6)* because Plaintiffs fail to state a claim for negligent supervision, as they have not alleged physical harm. Defendants argue that Plaintiffs' claims are barred by the Economic Loss Doctrine, stating that economic losses may not be recovered in tort, absent physical injury or property damage. Plaintiffs argue they have pled each element necessary to sustain an action for negligent supervision and that the Economic Loss Doctrine is inapplicable to the facts of this case, as evidenced by courts in this district that have allowed the tort of negligent supervision to proceed in cases where the harm was purely economic.

The Economic Loss Doctrine, although not explicitly adopted by the Pennsylvania Supreme Court, has been widely applied by both the appellate courts of Pennsylvania and the federal courts in the Third Circuit. Contrary to Defendants' characterization, the Economic Loss Doctrine's rationale turns less on the absence of physical injury **[*35]** and more on the fact that a party's claims flow from failed commercial expectations. The doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995)*. The doctrine has been held to apply to transactions involving services contracts, claims brought by individuals, and claims of intentional and statutory fraud. See *Werwinski v. Ford Motor Co., 286 F.3d 661, 673–81 (3d Cir. 2002)* (applying doctrine to individual consumers and to intentional fraud

claim), *Factory Market, Inc. v. Schuller International, Inc., 987 F. Supp. 387, 396–97 (E.D. Pa. 1997)* (applying doctrine to contract for services). The Economic Loss Doctrine has traditionally been applied to products liability actions, while the corresponding "gist of the action" doctrine is applied to other types of actions. The gist of the action doctrine provides "to be construed as in tort . . . the wrong ascribed to defendant must be the gist of the action, the contract being collateral." *Etoll, Inc. v. Elias/Savion Advertising, Inc., 2002 Pa. Super. 347, 811 A.2d 10, 14 (Pa. Super. Ct. 2002)*. **[*36]** "In other words, a claim should be limited to a contract claim when the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied in the law of torts." *Id.* (quoting *Bohler–Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 104 (3d Cir. 2001)*).

As compared to cases where plaintiffs are raising tort claims for a harm that is addressed in the terms of the contract and can be remedied by traditional contract claims, Plaintiffs here raise no claims arising from an express contract for title insurance or for notary services with Defendants. Rather, they are raising tort and statutory claims for which any contract would provide evidence. See *O'Keefe v. Mercedes–Benz, U.S.A., LLC, 214 F.R.D. 266, 278 (E.D. Pa. 2003)* (finding that economic loss doctrine does not apply because Plaintiff raised statutory and common law tort claims and Plaintiff's claims do not stem solely from contract law).

The relationship between purchasers of real estate and the person administering the settlement might give rise to an implied contract, but also encompasses professional services, requiring a certain level of expertise, **[*37]** the lack of which could give rise to a tort claim. See *Commonwealth to Use of Willow Highlands Co. v. United States Fidelity & Guaranty Co., 364 Pa. 543, 73 A.2d 422 (Sup. Ct. 1950)* (holding that a notary is a public officer and, as such, owes a duty to the public to discharge his functions with diligence); *Commonwealth for Use of Smolovitz v. American Surety Company of New York, 188 Pa. Super. 513, 149 A.2d 515 (Super. Ct. 1959)* (same). It is also important to note that, at this stage in the litigation, the parties have not even addressed the issue of whether there were contracts for real estate closing services between the Plaintiffs and Defendants and, if such contracts exist, their terms have not been presented to the Court. Accordingly, the principles of the Economic Loss Doctrine and the Gist of the Action Doctrine do not apply to this case and Defendants' Motion to Dismiss Count Three will be denied.

### 4. Count Four: Failure to State a Claim for Civil Conspiracy

Defendants argue that Count Four should be dismissed

with prejudice pursuant to *Fed. R. Civ. P. 12(b)(6)* because Plaintiffs fail to state [*38] a claim for conspiracy under Pennsylvania law. Plaintiffs argue that they have properly pled the elements of conspiracy. Further, at oral argument, Plaintiffs clarified that the conspiracy they are alleging is a vertical one, between the title insurers and their title agents, rather than a horizontal conspiracy among the various insurers.

Defendants first argue that, because a conspiracy claim must be predicated on an actionable offense and Plaintiffs have only pled a violation of the Notary Public Law, the conspiracy claim cannot stand. As discussed above, Plaintiffs have raised independent state law tort claims as well as a claim under RESPA, and have not, as Defendants argue, only raised a claim under a nonexistent private right of action under the Notary Public Law. Accordingly, Defendants first argument as to the conspiracy claim fails.

In the alternative, Defendants argue that Plaintiffs have not adequately pled their conspiracy claim because they have not provided the required minimum description of the alleged violations, namely "the general composition of the conspiracy, some or all of its broad objectives, and defendant's general role in the conspiracy." *Mowrer v. Armour Pharmaceutical Co., 1993 U.S. Dist LEXIS 18367, at *8 (E.D. Pa. Dec. 30, 1993)* [*39] . Defendants argue that, consistent with other cases in this district, Plaintiffs have not adequately alleged a conspiracy claim here because they have not made any factual allegations as to how the defendants conspired, the role of any particular defendant, or any other description of the alleged conspiracy. In addition, Defendants argue that Plaintiffs have failed to allege the requisite malice or intent to injure.

Pennsylvania law provides that the elements of a civil conspiracy are "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *Bristol Township v. Independence Blue Cross, 2001 U.S. Dist. LEXIS 16594 (E.D. Pa. October 12, 2001).* An essential element of proof for conspiracy is malice or intent to injure. *Strickland v. University of Scranton, 700 A.2d 979, 987 (Pa. Super. Ct. 1997).* Pennsylvania courts have found that this element of malice will only be found when the sole purpose of the conspiracy is to cause harm to [*40] the party who has been injured. *Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 412 A.2d 466, 472 (Pa. 1979).* In addition, where the facts show that a person acted to advance his own business interests, and not solely to injure the party injured, those facts negate any alleged intent to injure. *Id.*

Plaintiffs' claims for conspiracy are woefully inadequate and will be dismissed without prejudice and, if the facts so support, Plaintiffs may amend their complaint to allege the requisite elements with specificity. n3

> n3 At oral argument, the Court reminded Plaintiffs' Counsel of his obligations under *Fed. R. Civ. P. 11* with regard to the conspiracy allegations in any Amended Complaint. The facts alleged in any Amended Complaint should reflect the appropriate level of investigation under *Rule 11*.

### 5. Count Five: Failure to State a Claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law

Defendants argue that Count Five should [*41] be dismissed with prejudice pursuant to *Fed. R. Civ. P. 12(b)(6)* because Plaintiffs fail to state a claim for violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") *73 Pa. Cons. Stat. § 201-1, et seq.* since: (1) the UTPCPL does not create a private right of action for alleged violations of the Notary Public Law; (2) plaintiffs have failed to plead the required elements of common law fraud; and (3) recovery under the UTPCPL is barred here by the Economic Loss Doctrine. Plaintiffs argue that they have properly set forth a claim under the UTPCPL. Plaintiffs assert that, because of the 1996 amendments to that statute, adding the element of deception, the UTPCPL has been interpreted to mean that proof of common law fraud is not required. Plaintiffs also assert that the Economic Loss Doctrine is inapplicable to Plaintiffs' claim.

Defendants' contentions regarding a private right of action under the Notary Public Law and the Economic Loss Doctrine have been addressed above. In short, as explained above in reference to Plaintiffs' other claims, Plaintiffs are not attempting to bring [*42] a private right of action under the Notary Public Law, rather they are raising independent claims. In addition, the Economic Loss Doctrine is not applicable, at least at this stage of the case, on a motion to dismiss. See *O'Keefe v. Mercedes-Benz, U.S.A., LLC, 214 F.R.D. 266 (E.D. Pa. 2003)* (Van Antwerpen, J.) (affirming a class action settlement, by holding that the Economic Loss Doctrine does not preclude relief under the UTPCPL, even where the consumer suffers only monetary damages).

As to whether the UTPCPL requires Plaintiffs to allege the elements of common law fraud, this Court adopts the reasoning of Judge McLaughlin in *Flores v. Shapiro & Kreisman, 246 F. Supp. 2d 427, 432 (E.D. Pa. 2002)* and Judge Sigmund in *In re Patterson, 263 B.R. 82, 92-93 (Bankr. E.D. Pa. 2001).* Relying on the 1996 amend-

ments to the statute, these two colleagues held that other cases in this district and in the Third Circuit, that are not precedential, and which rely on *Booze v. Allstate Ins. Co., 2000 PA Super 112, 750 A.2d 877, 880 (Pa. Super. 2000)*, should not control. n4 The Superior Court in Booze held that a claim under the **[*43]** UTPCPL requires proof of the elements of common law fraud, but the Superior Court did not discuss the 1996 Amendments and relied on pre-1996 precedents to reach its conclusion. Thus, Booze and the federal cases that cite it cannot properly be relied upon for the proposition that, despite the 1996 Amendments, the elements of common law fraud are still required for a claim under the UTPCPL. In addition, the Commonwealth Court in *Commonwealth v. Percudani, 825 A.2d 743, 747 (Pa. Comm. 2003)* did discuss the 1996 Amendments, as did Judges McLaughlin and Sigmund, and concluded that the 1996 Amendments, by amending the UTPCPL to prohibit both fraudulent conduct and deception instead of solely fraud, eliminated the need to plead all of the elements of common law fraud. This Court adopts this reasoning and, thus, Plaintiffs in this case are required to plead either deception or fraudulent conduct. Plaintiffs have not alleged facts with enough specificity to sustain a claim for deception under the UTPCPL, and will thus be given leave to amend to plead facts with the proper specificity.

> n4  Among these federal cases are *Sponaugle v. First Union Mortg. Corp., 40 Fed. Appx. 715, 718 (3d Cir. 2002); Glatthorn v. Independence Blue Cross, 34 Fed. Appx. 420, 422 (3d Cir. 2002); Fresh Start Indus. v. ATX Telecomms. Servs., 295 F. Supp. 2d 521, 2003 U.S. Dist. LEXIS 22707 (E.D. Pa. December 11, 2003); Canty v. Equicredit Corp. of Am., 2003 U.S. Dist. LEXIS 8819 (E.D. Pa. May 8, 2003); O'Keefe v. Mercedes-Benz, U.S.A., LLC, 214 F.R.D. 266 (E.D. Pa. 2003); Dawson v. Dovenmuehle Mortg., Inc., 214 F.R.D. 196 (E.D. Pa. 2003)*. State cases include *Weinberg v. Sun Co., 565 Pa. 612, 618, 777 A.2d 442 (2001); Skurnowicz v. Lucci, 2002 Pa. Super. 140, 798 A.2d 788, (Pa. Super. 2002); Debbs v. Chrysler Corp., 2002 PA Super 326, 810 A.2d 137, 156 (Pa. Super. 2002); Booze v. Allstate Ins. Co., 2000 PA Super 112, 750 A.2d 877, 880 (Pa. Super. 2000)*.

**[*44]**

As to fraud, the parties dispute whether the elements are properly pled. Defendants argue that Plaintiffs have failed to properly plead the elements of reliance and materiality. The elements of common law fraud are:

> (1) a false representation of an existing fact

or a non-privileged failure to disclose; (2) materiality, unless misrepresentation is intentional or involves a non-privileged failure to disclose; (3) scienter, which may either be actual knowledge or reckless indifference to the truth; (4) justifiable reliance on the misrepresentation, so that the exercise of common prudence or diligence could not have ascertained the truth; and (5) damage as a proximate result.

*Dawson v. Dovenmuehle Mortg., Inc., 214 F.R.D. 196 (E.D. Pa. 2003)*. With regard to the element of reliance, Plaintiffs argue that it is unnecessary to prove reliance when a confidential relationship exists between the parties, and that a finding of a fiduciary duty relieves a plaintiff of proving reliance, as reliance is inherent in such a relationship. *Basile v. H&R Block Eastern Tax Services, Inc., 2001 PA Super 136, 777 A.2d 95, 108 (Pa. Super. 2001)*. Plaintiffs **[*45]** correctly state Pennsylvania law on this point, but even taking Plaintiffs' allegations as true, the facts in this case will not allow allegations of a fiduciary relationship, as discussed above regarding the Motion to Strike. See *In re Johnson, 292 B.R. 821, 828 (Bankr. E.D. Pa. 2003)* (finding that Pennsylvania law does not recognize a fiduciary relationship between an insurer and an insured). As Plaintiffs cannot properly plead a fiduciary relationship, they must plead reliance. Their Complaint does not do so and, thus, Plaintiffs will be given leave to amend this claim with the proper specificity.

As to materiality, Plaintiffs are required to allege materiality and they have properly done so. As recognized in Callahan, the small amount per overcharge does not necessarily make Plaintiffs' claims inconsequential. Rather, Plaintiffs' allegations of overcharging, especially when viewed through the lens of a putative class action, allege a significant liability. In addition, Defendants' arguments that Plaintiffs would have consummated their real estate transactions, even if they knew they were being overcharged, draws conclusions that are both premature and unsupported **[*46]** by Plaintiffs' allegations.

Accordingly, Defendants Motion to Dismiss Count Five will be granted without prejudice and Plaintiffs will be given leave to amend the Complaint with sufficient specificity to plead a claim for deception and/or fraudulent conduct under the UTPCPL.

**6. Count Six: Failure to State a Claim Upon Which Injunctive Relief Can Be Granted**

Defendants argue that injunctive relief is inappropriate in Count Six. Plaintiffs admit that they are not entitled to injunctive relief under RESPA or the UTPCPL, but ar-

gue that equitable relief in the form of an injunction is available to the Plaintiffs for the other claims set forth in the Amended Complaint. Defendants do not disagree. Accordingly, the Court will dismiss Plaintiffs' claims for injunctive relief under RESPA and the UTPCPL and Plaintiffs, assuming they submit an Amended Complaint, should plead their claims for injunctive relief with the proper specificity.

**V. Conclusion**

For the reasons above, Defendants' Motion to Sever will be granted, Defendants' Motion to Strike will be granted in part and denied in part and Defendants' Motion to Dismiss will be granted in part and denied in part.

Plaintiffs **[*47]** are given leave to file an Amended Complaint. In accordance with this opinion, the remaining parties before this Court are:

| Plaintiff | Defendant Title Insurer | Defendant Title Agent |
|---|---|---|
| Julie Becker | Conestoga Title Insurance Co. | ABCO–Abstracting Company |
| Kevin and Kirsten Small | Fidelity National Title Insurance Co. | Realty Land Transfer, LLC |
| Margaret E. Hildebrandt | Chicago Title Insurance Co. | Statewide Abstract Group, Inc. |
| Christine Burke | First American Title Insurance Co. | Olde City Abstract, Inc. |

Each set of Plaintiff and Defendants are severed into a separate cause of action. The remaining claims, to be repleaded in an Amended Complaint are: (1) Violation of the Real Estate Settlement Procedures Act *12 U.S.C. § 2603, et seq.*, (2) Negligent Supervision, (3) Civil Conspiracy, (4) Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, *73 Pa. Cons. Stat. § 201-1 et seq.*, and (5) Unjust Enrichment.

**A. Case Management**

Following the oral argument on the Motion to Dismiss, the Court had a discussion with counsel concerning future proceedings **[*48]** in the case. All parties requested that the Court allow a period of time for discovery and briefing on the class action issue before beginning general discovery on the merits. The Court agreed to this request, however, noting that there was not necessarily a bright line distinction between class action discovery and merits discovery. The Defendants will be permitted to request documents from and take the depositions of Plaintiffs, and Plaintiffs will be able to obtain discovery from Defendants of their general policies, practices and procedures concerning the subject matter of this case, i.e., notary fees charged at real estate settlements.

The Court notes that it is also interested in the economic aspects of this case proceeding as a class action,

including such topics as who retains the notary fees that are charged to members of the putative class, whether the Defendants received any benefit from the allegedly improper fees, how the cost of attorneys' fees, management, and administration of this case as a class action would compare to any benefits to members of the class, and whether the Defendants, or any other persons or parties, would be unjustly enriched by being allowed to **[*49]** retain improper notary fees, assuming arguendo that such were collected from members of the putative class. In other words, the Court believes it is appropriate for class action discovery to focus on the economic aspects of the case from all relevant perspectives.

An appropriate order follows.

**ORDER**

AND NOW, this    day of February, 2004, for the reasons stated in the foregoing Memorandum, it is hereby ORDERED that:

1. All claims by Plaintiffs Michael and Sharon Blimm, Joan and Paul Donahue, Jacqueline Shines, Walter McCall, and Darrell Smith under Count One are DISMISSED WITH PREJUDICE. As this Court, then, lacks subject matter jurisdiction over these Plaintiffs, all remaining claims by Plaintiffs Michael and Sharon Blimm, Joan and Paul Donahue, Jacqueline Shines, Walter McCall, and Darrell Smith are DISMISSED

WITHOUT PREJUDICE.

2. The Motion to Sever by Defendants First American Title Insurance Co. and Olde City Abstract, Inc. (Doc. No. 19) is GRANTED and the claims of each Plaintiff against the corresponding Defendants are severed from the clams of the other Plaintiffs.

3. The Motion to Strike by Defendants First American Title Insurance Co., **[*50]** Olde City Abstract, Inc., Chicago Title Insurance Co., Fidelity National Title Insurance Co., and Fidelity National Title Insurance Co. of New York (Doc. No. 20) is GRANTED IN PART AND DENIED IN PART.

4. The Motion to Dismiss by all Defendants (Doc. No. 17) is GRANTED IN PART and DENIED IN PART.

5. The Motion to Sever (Doc. No. 11), Motion to Strike (Doc No. 12), and Motion to Dismiss (Doc. No. 13) filed July 23, 2003 are DISMISSED AS MOOT.

6. Plaintiffs may file an amended complaint in accordance with this Order within 14 days.

7. The parties are subject to the following schedule:

a. Track Assignment: The parties agree that this case is properly assigned to the Special Management Track pursuant to Sections 1:01–1:05 of this Court's Expense and Delay Reduction Plan.

b. Initial Disclosures and Class Discovery and Briefing: The parties will follow the following schedule:

i. *Rule 26 (a)(1)* disclosures and initial Requests for Production of Documents shall be served by all parties by February 20, 2004.

ii. Discovery shall initially be limited to class certification issues before the Court's ruling on any class certification motion, and such discovery **[*51]** shall be completed by June 15, 2004.

iii. The Court will hold a telephone con-ference on the status of discovery on April 5, 2004 at 4:30 p.m. Any then existing disputes about discovery that the parties have been unable to resolve shall be the subject of a Motion to Compel filed not later than April 1, 2004.

iv. Plaintiffs shall identify their expert witness(es) on class certification issues, if any, and provide *Rule 26(a)(2)(B)* reports for those experts on or before April 30, 2004.

v. Defendants shall identify their expert witness(es) on class certification issues, if any, and provide *Rule 26(a)(2)(B)* reports for those experts on or before June 1, 2004.

vi. Plaintiffs shall file their class certification motion and brief in support together with all supporting affidavits and all other evidence as to each defendant on or before June 30, 2004.

vii. Defendants shall file their responses to the class certification motion and brief in support together with all supporting affidavits and all other evidence on July 22, 2004.

viii. Plaintiffs shall file their reply brief on the class certification motion (which shall be limited to a discussion of only new points raised by Defendants) **[*52]** on July 29, 2004.

ix. The Court shall then schedule a hearing in early August on the class certification motion.

c. After rendering its decision(s) as to class certification and notice, the Court shall set a further scheduling conference to address the completion of discovery, dispositive motion practice, trial preparation, and trial.

**BY THE COURT:**

**MICHAEL M. BAYLSON, U.S.D.J.**

# EXHIBIT D

LEXSEE 2001 U.S. DIST. LEXIS 16594

**BRISTOL TOWNSHIP Plaintiff, v. INDEPENDENCE BLUE CROSS et al. Defendants.**

**CIVIL ACTION, NO. 01–4323**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2001 U.S. Dist. LEXIS 16594*

**October 10, 2001, Decided**
**October 11, 2001, Filed; October 12, 2001, Entered**

**DISPOSITION:** Defendants' motions to dismiss were granted in part and denied in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** **[*1]** For BRISTOL TOWNSHIP, PLAINTIFF, LARRY HAFT, TIMBY & HAFT, P.C., NEWTOWN, PA USA.

For INDEPENDENCE BLUE CROSS, DEFENDANT: ERIC KRAEUTLER, MORGAN, LEWIS & BOCKIUS LLP, PHILADELPHIA, PA USA.

For DAVID N. BANET & ASSOCIATES, DEFENDANT: JEFFREY S. FELDMAN, MONTGOMERY MC CRACKEN WALKER & RHOADS, PHILA, PA USA

For ERIC VACCA, DEFENDANT: STEPHEN R. BOLDEN, FELL & SPALDING, PHILADELPHIA, PA USA.

TIMBY & DILLON, P.C., THOMAS E. TIMBY, FRANCIS X. DILLON, RESPONDENTS: JOSEPH GOLDBERG, PHILA, PA USA.

**JUDGES:** Clarence C. Newcomer, S.J.

**OPINIONBY:** Clarence C. Newcomer

**OPINION:**

### MEMORANDUM

Newcomer, S.J.

Defendants Independence Blue Cross and David N. Banet & Associates have each filed motions to dismiss plaintiff's Amended Complaint. Those motions, and plaintiff's responses thereto are presently before the Court.

## I. BACKGROUND

Plaintiff Bristol Township ("Bristol") his filed a sixteen count Amended Complaint against Independence Blue Cross ("IBC"), David N. Banet & Associates ("Banet"), and Eric Vacca ("Vacca"). IBC now asks the Court to dismiss three causes of action Bristol asserts against it: 1) a claim for an accounting (Count I); 2) fraud (Count VII); **[*2]** and 3) a claim under the Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C. §§ 1961–68* ("RICO") (Count XVI). Banet also asks the Court to dismiss the causes of action Bristol has asserted against it: 1) a claim for accounting (Count I); 2) breach of contract (Count X); 3) fraud (Count XI); 4) breach of fiduciary duty (Count XII); 5) conversion (Count XIII); 6) civil conspiracy (Count XIV); 7) negligence (Count XV); and 7) RICO (Count XVI).

Bristol is a Pennsylvania township with its offices located at 2501 Bath Road, Bristol, Pennsylvania, 19007. IBC is a Pennsylvania corporation that provides health and medical insurance coverage under individual and group insurance policies with its offices at 1901 Market Street, Philadelphia, Pennsylvania. Banet is a corporation engaged in the insurance brokerage business with offices located at 5 Frame Avenue, Malvern, Pennsylvania. Defendant Vacca is an individual whose address is 224 West Mt. Airy Avenue, Philadelphia, Pennsylvania.

Bristol alleges that it provided health insurance to its employees through IBC over a six year period ending in 2000. Vacca was appointed as Bristol's insurance broker in January **[*3]** 1994, but Bristol alleges that Vacca did not negotiate, service, place, renew, manage, originate, solicit, purchase or sell the health insurance Bristol provided its employees through IBC. However, Bristol claims that from 1994 to 2000 IBC paid Vacca commissions from money added to Bristol's insurance premiums without Bristol's authorization. Although it concedes it has no means of calculating the alleged commissions,

Bristol believes IBC paid Vacca over $400,000 in commissions.

Bristol also alleges that IBC continued to pay Vacca these commissions after Vacca became an employee of Banet sometime before February 1999. Bristol further alleges that IBC paid Vacca these commissions after February 19, 1999, the day Vacca's insurance broker's license was suspended after Vacca pled guilty or no contest to charges of conflict of interest, bribery and tampering with public records or information. Because Vacca's license was suspended, Bristol contends Vacca was not legally entitled to collect the commissions.

In light of these facts, the Court turns to the IBC and Banet's Motions to Dismiss.

## II. DISCUSSION

Both IBC and Banet move the Court to dismiss pursuant to *Federal Rule* [*4] *of Civil Procedure 12(b)(6)*. When evaluating a Motion to Dismiss pursuant to Rule 12(b)(6), the Court must accept each allegation in a well pleaded complaint as true. *Albright v. Oliver, 510 U.S. 266, 268, 127 L. Ed. 2d 114, 114 S. Ct. 807 (1994).* Additionally, a Motion to Dismiss should only be granted if the Court finds that no proven set of facts would entitle the plaintiff to recovery under the filed pleadings. *Conley v. Gibson, 355 U.S. 41, 45–46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).*

It is also firmly established that in reviewing a *Federal Rule of Civil Procedure 12(b)(6)* motion, the Court must draw all reasonable inferences in the plaintiff's favor. *Schrob v. Catterson, 948 F.2d 1402, 1405 (3rd Cir. 1991).*

### A. IBC and Bristol's Motions to Dismiss

#### 1. Bristol's Claim for Breach of Contract Against Banet (Count X)

Banet moves to dismiss Bristol's breach of contract claim against Banet. To plead a breach of contract, a plaintiff must allege: 1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract and (3) resultant damages. *Williams v. Nationwide Mut. Ins. Co., 2000 PA Super 110, 750 A.2d 881, 884 (Pa. Super. Ct.2000).* [*5] After reviewing Bristol's Amended Complaint, the Court finds that Bristol fails to allege the existence of a contract with Banet, its essential terms, and fails to explain how Banet breached the contract if it did exist. The Court will therefore dismiss Bristol's breach of contract claim against Banet.

#### 2. Bristol's Claim for Breach of Fiduciary Duty Against Banet (Count XII)

Banet also contends that Bristol fails to state a valid claim for breach of fiduciary duty against it because Banet was not Bristol's fiduciary. In response, Bristol argues that because Banet employed Vacca, Bristol Township's insurance broker, and collected commissions from IBC through Vacca, Banet acted as Bristol's agent, and therefore fiduciary. It is true that an agent's duty to his principal is the same as that of a fiduciary. *Garbish v. Malvern Federal Sav. and Loan Assn., 358 Pa. Super. 282, 517 A.2d 547, 554 (Pa. Super. Ct. 1986).* A fiduciary has the duty to act for the benefit of another as to matters within the scope of the relation. Id.

In support of its contention that Banet was Bristol's agent and fiduciary through Banet's employment of Vacca, Bristol cites [*6] the *Restatement (Second) of Agency, § 15* cmt. e:

> One acting for the benefit of another without a manifestation of consent by the other may subject himself to the liabilities of an agent at the election of the principal. Thus, one who purports to act on behalf of another but without the authority to do so is subject to liability to the other as if he were a disobedient agent if he affects the principal's interests either by binding the principal to a third person where he has apparent authority, or by disposing of or meddling with the principal's assets.

Assuming this Court were to adopt the Restatement's view of the law, Bristol fails to claim that Banet employed Vacca while Vacca still served as Bristol's broker. To the contrary, Bristol's Amended Complaint explains that "plaintiff does not have knowledge of the. . . specific nature of the relationship between Vacca and Banet." Amended Complaint P 19. Further, Bristol's Amended Complaint states that "Banet was never appointed or retained by Bristol as its insurance broker." Amended Complaint P 21. Because Bristol has failed to allege that Vacca served as its broker while Banet employed him, it has not stated a claim for [*7] breach of fiduciary duty against Bristol.

#### 3. Bristol's Claim for an Accounting (Count I)

IBC moves to dismiss Count I of plaintiff's Complaint where Bristol demands that IBC provide Bristol with a full and complete accounting of the commissions IBC allegedly paid Vacca at Bristol's expense.

Some courts have explained that accounting is an equitable remedy which is available only when there is no adequate remedy at law. *Benefit Control Methods v. Health Care Services, Inc., 1998 U.S. Dist. LEXIS 376, 1998 WL*

*22080,* at \*2 (E.D.Pa. Jan 16, 1998); *Taylor v. Wachtler, 825 F. Supp. 95, 104 (E.D.Pa.1993).* Other courts recognize that an action for an accounting also exists at law and is proper where:

> (1) there was a valid contract, express or implied, between the parties whereby the defendant
>
>> (a) received monies as agent, trustee or in any other capacity whereby the relationship created by the contract imposed a legal obligation upon the defendant to account to the plaintiff for the monies received by the defendant, or
>>
>> (b) if the relationship created by the contract between the plaintiff and defendant created a legal duty upon the defendant to **[\*8]** account and the defendant failed to account and the plaintiff is unable, by reason of the defendant's failure to account, to state the exact amount due him, and
>
> (2) that the defendant breached or was in dereliction of his duty under the contract.

*Haft v. U.S. Steel Corp., 346 Pa. Super. 404, 499 A.2d 676, 677–78* (Pa. Super. Ct. Oct 18, 1985; see also *Berger & Montague, P.C. v. Scott & Scott, LLC, 153 F. Supp. 2d 750, 754 (E.D.Pa. 2001)*(recognizing that a claim of accounting may exist both in equity and at law.

Here, IBC only argues that Bristol cannot state an equitable claim for accounting, but fails to address whether Bristol can state a cause of action for an accounting at law. Moreover, IBC does not move to dismiss Bristol's breach of contract claim against it, nor has IBC argued that it was not under a legal obligation to account to Bristol. Consequently, the Court will not dismiss plaintiff's claim for an accounting against IBC.

Banet also moves to dismiss Bristol's claim for an accounting. However, unlike IBC, Banet argues that Bristol has failed to state a claim for legal or equitable accounting. The Court agrees. To the extent **[\*9]** Bristol seeks an accounting against Banet on equitable grounds, Bristol has an adequate remedy at law: discovery. *Benefit Control*

*Methods v. Health Care Svcs., Inc., 1998 U.S. Dist. LEXIS 376, 1998 WL 22080,* at \*2 (E.D.Pa. Jan. 16, 1998). To the extent Bristol seeks an accounting at law against Banet, as explained above, Bristol has failed to allege the existence of a contract between it and Banet, and has failed to allege that Banet was Bristol's agent. Thus, Bristol has failed to state a claim for accounting against Banet.

### 4. Bristol's Claims for Fraud (Count VII and XI)

IBC also moves to dismiss Bristol's fraud claim. IBC first argues that the economic loss doctrine bars Bristol's fraud claim. The economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995).* "The rationale of the economic loss rule is that tort law is not intended to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement." *Sun Co., Inc. (R & M) v. Badger Design & Constructors, Inc., 939 F. Supp. 365, 372 (E.D.Pa. 1996)* **[\*10]** (quoting *Palco Linings, Inc. v. Pavex, Inc., 755 F. Supp. 1269, 1271 (M.D.Pa. 1990)).* Thus, to determine whether the economic loss doctrine precludes recovery, the court must consider whether the damages plaintiff seeks to recover "were in the contemplation of the parties at the origination of the agreement." *Cortez v. Keystone Bank, Inc., 2000 U.S. Dist. LEXIS 5705, 2000 WL 536666,* at \*8 (E.D.Pa. May 03, 2000)(quoting *Duquesne Light Co., 66 F.3d at 618).*

However, there is a split of authority among Pennsylvania district courts as to whether the economic loss doctrine applies to intentional fraud claims. Compare *KNK Medical–Dental Specialities, Ltd. v. Tamex Corp., 2000 U.S. Dist. LEXIS 14536, 2000 WL 1470665* (E.D.Pa. Sep 28, 2000)(Van Antwerpin, J.)(unwilling to dismiss plaintiff's fraud claim on the economic loss rule because of the lack of clarity from either Pennsylvania state courts or the Third Circuit); *Sunquest Info. Systems v. Dean Witter Reynolds, 40 F. Supp. 2d 644, 658 (W.D.Pa. 2000)*(finding economic loss rule inapplicable to tort claim based on intentionally false representation); *Palco Linings, Inc. v. Pavex, Inc., 755 F. Supp. 1269, 1271 (M.D.Pa. 1990)* **[\*11]** (noting the exception to the economic loss rule but not relying on it); *Peerless Wall & Window Coverings, Inc. v. Synchronics, Inc., 85 F. Supp. 2d 519, 535 (W.D.Pa.2000)*(same); with *Montgomery County v. Microvote Corp., 2000 U.S. Dist. LEXIS 983, 2000 WL 134708,* at \*7 (E.D.Pa. Feb. 3, 2000)(Kelly, J.)(concluding economic loss rule bars recovery for both negligent and intentional misrepresentation); *Werwinski v. Ford Motor Co., 2000 U.S. Dist. LEXIS 11977, 2000 WL 1291576,* at \*5 (E.D.Pa. Aug. 15, 2000)(Buckwalter,

J.)("This Court finds more persuasive the reasoning of courts that do bar fraud claims that are intertwined with contract claims and the only resulting loss has been economic.").

Nevertheless, this Court does not need to reconcile the differing opinions of courts in this Circuit. At this early stage of the litigation, the Court is unconvinced that plaintiff has not stated a claim for fraud separate and distinct from its breach of contract claim. Plaintiff's fraud claim involves parties who were not parties to the contract between IBC and Bristol, and IBC's alleged payment of the commissions were not contemplated in the contract between IBC [*12] and Bristol. Moreover, it would be of no consequence if plaintiff's case did rely on the same set of facts because those facts can give rise to both causes of action. *KNK Medical–Dental Specialities, Ltd., 2000 U.S. Dist. LEXIS 14536, 2000 WL 1470665, at 6.* Additionally, if plaintiff's allegations are true, this case involves more than negligent misrepresentation. Indeed, plaintiff alleges that IBC actively concealed the commissions it paid Vacca both in its invoices and throughout their six year relationship. Thus, the Court will not dismiss plaintiff's fraud claim based upon the economic loss doctrine.

Alternatively, IBC argues the Bristol's fraud claim should be dismissed because there is no confidential relationship between Bristol and IBC, and therefore, IBC had no duty to tell Bristol that its invoices included inflated premiums to conceal the commissions IBC allegedly paid Vacca.

It is true that there is no liability for fraudulent concealment absent some duty to speak. *Duquesne Light Co. v. Westinghouse Electric Corp., 66 F.3d 604, 611–12 (3d Cir. 1995); City of Rome v. Glanton, 958 F. Supp. 1026, 1038 (E.D.Pa. 1997).* While a duty to speak does arise [*13] in fiduciary and confidential relationships, a "duty to speak may also arise as a consequence of an agreement between parties, or as a result of one party's reliance on the other's representations, if one party is the only source of information to the other party, or the problems are not discoverable by other reasonable means." *City of Rome, 958 F. Supp. at 1038.* Additionally, a duty to speak may also occur when disclosure is necessary to prevent an ambiguous or partial statement from being misleading. Id.; see also *Duquesne, 66 F.3d at 612–13.*

Assuming, as this Court must, that plaintiff's allegations are true, IBC and Bristol not only had an agreement, but IBC and not Bristol knew that IBC was paying Vacca commissions. Further, Bristol relied on IBC invoices when paying IBC for the premiums Bristol owed IBC. According to Bristol though, those premiums were inflated to hide the commissions IBC paid Vacca. Thus, IBC has not persuaded the Court that Bristol has failed to

state a claim for fraud.

Banet has also moved to dismiss Bristol's claim of fraud against it. Banet first argues that Bristol's Amended Complaint fails to state a claim for fraud. [*14] Upon a review of plaintiff's Amended Complaint and the relevant law, the Court disagrees at this juncture.

Banet further contends that Bristol's Complaint fails to allege fraudulent misrepresentation with sufficient particularity. Claims for fraud must be pleaded with adequate particularity to satisfy *Rule 9(b) of the Federal Rules of Civil Procedure. Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984).* However, "in applying Rule 9(b), 'focusing exclusively on its "particularity language" is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.'" Id. (citations omitted). The rule's purpose is to give notice to the defendant of the precise misconduct with which she is charged, and to protect her from any spurious charges of fraudulent or immoral behavior. *In Re Meridian Securities Litigation, 772 F. Supp. 223, 229 (E.D.Pa. 1991).* As long as there is some precision and some measure of substantiation in the pleadings, the rule will be satisfied. Id.

Here, Bristol has adequately plead its claims of fraud. Bristol alleges that Banet approved and [*15] furthered IBC's alleged scheme to charge Bristol for commissions Bristol did not approve. The Complaint alleges the time frame of the alleged fraud, the means used to perpetrate the fraud, and each defendant's conduct. Consequently, the Court will not dismiss plaintiff's fraud claims against Banet.

### 5. Bristol's Claims for Conversion, Civil Conspiracy and Negligence (Counts XIII, XIV and XV)

Banet argues that Bristol's claim for conversion against it should be dismissed. Under Pennsylvania law conversion is the "deprivation of another's right of property in, or use or possession of a chattel, or other interference therewith, without the owner's consent and without lawful justification." *Cennav. United States, 402 F.2d 168, 170 (3d Cir. 1968).* Banet argues that Bristol fails to allege that Banet interfered with Bristol's property, and at worst, it only accepted commissions from IBC.

Bristol argues that it has alleged that Banet and IBC agreed to charge Bristol for commissions for which Banet was not entitled, and disguised the overcharges as premiums. Thus, Bristol contends it has properly alleged conversion. If Bristol's allegations are true, then [*16] Banet has interfered with Bristol's property, and may be liable for conversion. The Court will not dismiss Bristol's con-

version claim at this time.

Banet further argues that the Court should dismiss Bristol's claim of civil conspiracy. To prove a civil conspiracy under Pennsylvania law, a plaintiff must show the following elements: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage. *SNA, Inc. v. Array, 51 F. Supp. 2d 554, 561 (E.D.Pa. 1999).* Proof of malice or an intent to injure is essential to the proof of a conspiracy. *Strickland v. University of Scranton, 700 A.2d 979, 987–88 (Pa. Super. Ct. 1997).* An action will lie only where the sole purpose of the conspiracy is to cause harm to the party who claims to be injured. *Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 412 A.2d 466, 472 (Pa. 1979).* Thus, where the facts show that a person acted to advance his own business interests, those facts constitute justification and negate any alleged [*17] intent to injure. Id.

Banet argues that because Bristol's Complaint alleges that one purpose of the conspiracy was to further defendants' business dealings and obtain money for Vacca and/or Banet, Bristol failed to allege that Banet has acted with malice. The Court agrees. That it may have been necessary to deceive plaintiff to carry out their scheme does not indicate that the defendants acted with malice solely to injure plaintiff. *Spitzer v. Abdelhak, 1999 U.S. Dist. LEXIS 19110, 1999 WL 1204352,* at *9 (E.D.Pa. Dec 15, 1999).* The Court will dismiss plaintiff's claim of civil conspiracy.

In addition, Banet asks this Court to dismiss Bristol's negligence claim. However, after reviewing plaintiff's Complaint, and the parties briefs, Banet has not persuaded the Court that it should dismiss Bristol's negligence claim at this juncture.

### 6. Bristol's RICO Claim (Count XVI)

IBC and Banet argue that Bristol's RICO claim should be dismissed. First Banet claims that Bristol's RICO claim fails to allege that defendants engaged in interstate commerce. More specifically, Banet argues that Bristol's Complaint concedes that all defendants here are located and conduct business in Pennsylvania, [*18] and fails to allege that defendants conduct business outside of Pennsylvania.

*18 U.S.C. 1962*(a) makes it unlawful:

for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of any unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

The requirement that RICO affect interstate commerce is satisfied by "minimal" effects. *Rose v. Bartle, 871 F.2d 331, 357 (3d Cir. 1989).*

Here, even if Bristol has failed to expressly plead the interstate aspect of defendants activities, the interstate requirement may be reasonably inferred from the nature of defendants' activities in the field of employee benefits. See *Shearin v. E.F. Hutton Group, Inc., 885 F.2d 1162, 1166 (3d Cir. 1989)*(explaining that the interstate requirement may [*19] be reasonably inferred from the nature of a defendant's activities). Indeed, Congress has expressly found that:

employee benefit plans. . . have become an important factor in commerce because of the interstate character of their activities, and of the activities of their participants, and the employers, employee organizations, and other entities by which they are established or maintained; that a large volume of the activities of such plans are carried on by means of the mails and instrumentalities of interstate commerce. . .

*29 U.S.C. § 1001.* Moreover, plaintiff has alleged that the defendants carried out their unlawful scheme through the United States mails. Thus, given the low threshold of activity that satisfies the interstate requirement, and defendants interstate activities, the Court will not dismiss plaintiff's RICO claim on this ground.

IBC and Banet then argue that Bristol has failed to allege that defendants exist as an enterprise within the meaning of RICO. To support that contention, they urge the Court to apply the Supreme Court's decision in *United States v. Turkette, 452 U.S. 576, 69 L. Ed. 2d 246, 101 S. Ct. 2524 (1981),* [*20] and the Third Circuit's decision in *United States v. Riccobene, 709 F.2d 214, 221 (3d Cir. 1983).* IBC and Banet therefore invite this Court to commit reversible error.

In *Seville Indus. Machinery Corp. v. Southmost Machinery Corp., 742 F.2d 786, 789–90 (3d Cir. 1984),*

2001 U.S. Dist. LEXIS 16594, *20

the Third Circuit explained:

In so ruling, the district court confused what must be pleaded with what must be proved. Riccobene and Turkette certainly stand for the proposition that a plaintiff, to recover, must prove that an alleged enterprise possesses the three described attributes. But neither case speaks to what must be pleaded in order to state a cause of action. The district court erred in applying the Riccobene–Turkette proof analysis to the allegations in Seville's complaint.

We need cite no authority for the proposition that the Federal Rules of Civil Procedure were designed to eliminate the vagaries of technical pleading that once plagued complainants, and to replace them with the considerably more liberal requirements of so–called "notice" pleading. Under the modern federal rules, it is enough that a complaint put the defendant on notice of the claims **[*21]** against him. It is the function of discovery to fill in the details, and of trial to establish fully each element of the cause of action.

In the present case, Seville identified the four entities it believed were the enterprises that had been marshalled against it. The rules of pleading require nothing more at this early juncture than that bare allegation.

*742 F.2d at 789–90* (citations omitted). Like the plaintiff in Seville, Bristol has alleged that the defendants were an enterprise, and the Court will not dismiss plaintiff's RICO claim.

An appropriate Order follows.

Clarence C. Newcomer, S.J.

**ORDER**

AND NOW, this 10th day of October, 2001, the Court hereby ORDERS as follows:

1. Upon consideration of IBC's Motion to Dismiss, said Motion is DENIED.

2. Upon consideration of Banet's Motion to Dismiss, said Motion is GRANTED in part and DENIED in part. Said Motion is GRANTED to the extent the Court hereby DISMISSES Count I (Accounting) against Banet, but not the other defendants. The Court further GRANTS said Motion to the extent the Court hereby DISMISSES Counts X (Breach of Contract), XII (Breach of Fiduciary Duty), and XIV (Civil Conspiracy). **[*22]** Nevertheless, the Court grants plaintiff ten (10) days to properly amend its Complaint. Defendant Banet's Motion is DENIED in all other respects.

AND IT IS SO ORDERED

Clarence C. Newcomer, S.J.

<u>EXHIBIT E</u>

LEXSEE 1997 U.S. DIST. LEXIS 8026

CEDARBROOK PLAZA, INC. v. JEFFREY GOTTFRIED

CIVIL ACTION NO. 97–1560

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

*1997 U.S. Dist. LEXIS 8026; Bankr. L. Rep. (CCH) P77,404*

June 4, 1997, Decided

June 6, 1997, FILED, ENTERED

**DISPOSITION:** **[*1]** Defendant's Motion to Dismiss the Complaint (Doc. No. 2) and Plaintiff's Memorandum in Opposition thereto (Doc. No. 3), IT IS HEREBY ORDERED THAT: 1. Defendant's Motion is GRANTED IN PART AND DENIED IN PART. 2. Defendant's Motion is DENIED with respect to Count I. 3. Defendant's Motion is GRANTED with respect to Count II. 4. Defendant's Motion is GRANTED with respect to Cedarbrook's attempt to assert a claim for alter ego liability against Gottfried. 5. Count II of the Complaint is DISMISSED.

**LexisNexis(R) Headnotes**

**COUNSEL:** For CEDARBROOK PLAZA, INC., PLAINTIFF: DAVID SMITH, JEANNETTE M. BRIAN, SCHNADER, HARRISON, SEGAL & LEWIS, PHILA, PA USA.

For JEFFREY GOTTFRIED, DEFENDANT: DANIEL S. BERNHEIM, 3RD, SILVERMAN, COOPERSMITH, HILLMAN AND FRIMMER, PHILA, PA USA.

**JUDGES:** John R. Padova, J.

**OPINIONBY:** John R. Padova

**OPINION:**

**MEMORANDUM**

**Padova, J.**

June 4, 1997

Plaintiff, Cedarbrook Plaza, Inc. ("Cedarbrook") brings this action against Defendant Jeffrey Gottfried, alleging breach of contract, violations of the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa. Cons. Stat. Ann. §§ 5101–5110 (West Supp. 1997), and fraudulent trans-

fer under common law. Gottfried submits, for the Court's consideration, **[*2]** a motion to dismiss Cedarbrook's Complaint for failure to state a claim upon which relief can be granted, pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. For the following reasons, Gottfried's Motion will be granted in part and denied in part.

**I. Factual Allegations**

**A. The Lease and Guaranty**

The Complaint alleges the following facts, which the Court must consider true for purpose of adjudicating Gottfried's Motion. Gottfried is the sole shareholder and CEO of National Furniture Warehouse, Inc., t/a "Furniture to Go" ("National"). On June 27, 1995, National entered into a Lease and Security Agreement ("Lease") with Cedarbrook to lease 24,000 square feet of retail space at the Cedarbrook Plaza shopping center in Wyncote, Pennsylvania.

Section 11.01 of the Lease lists the "Events of Default," which include, inter alia, the following:

> (a) If Tenant defaults in the payment of any rent, including but not limited to Fixed Minimum Rent and additional rent, or any other charges due hereunder for five (5) days after the same is due. Notwithstanding anything to the contrary, on no more than two (2) occasions in any twelve (12) month period, Tenant shall be provided **[*3]** with five (5) days notice of default and opportunity to cure the default before Landlord shall exercise its remedies hereunder, unless to do so would seriously jeopardize the health, safety or welfare of the Shopping Center of any Tenant herein.

(Compl. Ex. A at 21). Section 11.04 allows acceleration

1997 U.S. Dist. LEXIS 8026, *3; Bankr. L. Rep. (CCH) P77,404

upon default:

> Upon occurrence of any Event of Default, all Fixed Minimum Rent and additional rent and other charges that would otherwise have been due periodically throughout the Term (or extended term) of the Lease had there been no Event of Default, shall be automatically accelerated and all such rent, charges and amounts shall be immediately due and payable by Tenant to Landlord, and, to the extent not paid on demand, shall bear daily interest thereon at the higher of (a) the rate of sixteen percent (16%) per annum or (b) highest rate of interest allowable by law (hereinafter referred to as "Default Interest").

(Compl. Ex. A at 23). Section 11.05(e) contains a warrant of attorney provision empowering any attorney to confess judgment against National for sums due under the Lease, including "accelerated rent." (See Compl. P 8; Ex. A at 24–25). Finally, the Lease [*4] imposes the following obligation on Gottfried, as sole shareholder of National:

> Guarantor, Jeffrey Gottfried ("Guarantor") hereby unconditionally and irrevocably guarantees and shall be a surety for the monetary obligations of the Tenant hereunder, as and only as follows:

> * * *

> (ii) Guarantor also irrevocably guarantees and serves as surety with respect to the obligation of the Tenant to keep the Leased Premises stocked with a full inventory of new merchandise, owned outright by Tenant and unencumbered with any lien or encumbrance superior to that of the Landlord, which full inventory must have a wholesale fair market value of at least $300,000.00. Upon monetary default and following all applicable cure periods, and in the event that such inventory is not in the Leased Premises, Guarantor shall be obligated to and shall promptly pay to Landlord on demand the difference between $300,000.00 and the amount of inventory actually in the Leased Premises. In the event that any of said inventory is encumbered with a lien superior to that of Landlord, then Guarantor shall be obligated to and shall promptly pay Landlord on demand the amount so encumbered by the superior lien.

[*5]

(Compl. Ex. A at 36) ("Guaranty").

### B. Cedarbrook's Initial Lawsuit Against National

The lease commenced November 1, 1995, and Cedarbrook extended rent abatements and cash incentives to National through September, 1996. Despite these abatements, National defaulted on its rent obligations in April, 1996, and, to date, has failed to pay its rent. As required by § 11.01(a) of the Lease, Cedarbrook notified National of its default on two separate occasions, June 10, 1996 and September 30, 1996, demanding National to cure. (See Compl. PP 9–11; Ex. B; Ex. C).

Acting within its rights as articulated in the warrant of attorney provision, § 11.05(e), Cedarbrook filed a complaint against National in confession of judgment in this Court for sums owed by National in the amount of $4,296,382.88 ("Initial Lawsuit"). On October 10, 1996, the Court entered judgment by confession against National in the Initial Lawsuit. See Cedarbrook Plaza, Inc. v. National Warehouse, Inc. t/a "Furniture to Go", No. 96–6891 (E.D. Pa. Oct. 9, 1996) (order entering judgment by confession) (Doc. No. 2).

On November 12, 1996, Cedarbrook (1) filed a Praecipe for Writ of Execution Upon a Confessed [*6] Judgment directing the United States Marshall for the Eastern District of Pennsylvania ("Marshall") to levy upon "all goods, merchandise and inventory of [National]" and (2) obtained a Writ of Execution. (Compl. Ex. E). On December 18, 1996, the Marshall served National with the Writ and levied upon National's property at the Cedarbrook Plaza store. (Compl. P 15). On January 28, 1997, National filed a motion to strike or open the judgment, and Cedarbrook filed an answer in opposition. That Motion is still pending, and the Initial Lawsuit has been placed in civil suspense. (Compl. P 16; Pl.'s Mem. Opp. at 2). n1

> n1 On February 24, 1997, National filed bankruptcy in the United States Bankruptcy Court for the Southern District of Florida. A stay has been entered pursuant to *11 U.S.C.A. § 362* (West 1993 & Supp. 1997) which halts "litigation, lien enforcement, and other actions, judicial or otherwise, that are attempts to enforce or collect prepetition claims." 3 *Collier on Bankruptcy P 362.01* (1996).

### C. Cedarbrook's [*7] Lawsuit Against Gottfried

On March 3, 1997, Cedarbrook initiated the instant lawsuit against Gottfried after Gottfried informed Cedarbrook that he "caused National to become judgment–proof by closing all seven of the other stores that had been owned and operated by [National] and by open-

1997 U.S. Dist. LEXIS 8026, *7; Bankr. L. Rep. (CCH) P77,404

ing other stores under the corporate umbrella of another entity whose assets, according to Gottfried, cannot be reached by Cedarbrook to satisfy its judgment." (Compl. P 18). Gottfried also told Cedarbrook that the only assets available are the inventory items at the Cedarbrook Plaza store, the liquidation of which would result in $50,000. "Gottfried removed from [National] assets and opportunities of [National], including the assets of the [National] store he closed, without adequate consideration therefor, leaving [National] unable to meet its normal operating expenses, including payment of sums owed Cedarbrook." (Compl. PP 18–19).

## II. Specific Counts in the Instant Complaint

The Complaint presents two counts against Gottfried. Count I calls for Gottfried to make payment on the Guaranty in an amount equal to $300,000, less the wholesale market value of the inventory at **[*8]** National's Cedarbrook Plaza store. (See Compl. P 22). Count II alleges both (1) a violation the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa. Cons. Stat. Ann. §§ 5101–5110 (West Supp. 1997), and (2) fraudulent transfer under common law. Specifically:

> On information and belief, the actions of [National] and Gottfried in removing assets and opportunities from [National], including closing the seven other stores that had been owned and operated by [National], removing the assets of those stores from [National] and the creation of new Furniture to Go stores under a different corporate umbrella, were done with the actual intent to hinder, delay, or defraud Cedarbrook in the collection of [National's] obligations under the lease and judgment obtained by Cedarbrook and were also done without a reasonably equivalent value in exchange.

> After [National] closed the other [National] stores and opened its new stores under a different corporate umbrella, the only assets of [National] still available to satisfy Cedarbrook's judgment were the contents of [National's] sole remaining store at Cedarbrook Plaza. The value of the contents of [National's] **[*9]** Cedarbrook Plaza store were unreasonably small in relation to [National's] lease obligations to Cedarbrook.

> [National] and Jeffrey Gottfried were fully aware that their actions in closing the seven other [National] stores, removing the assets of those stores from [National] and

> opening stores under a separate corporate entity would leave [National] unable to pay its obligation to Cedarbrook.

> * * *

> All transfers of assets and opportunities out of [National] resulting from the closing of other [National] stores and the opening of new stores under a different corporate umbrella should be avoided and those assets and opportunities should be returned to [National] to satisfy the judgment against [National].

> By this conduct, Gottfried has made himself responsible for [National's] obligations to Cedarbrook.

> WHEREFORE, plaintiff Cedarbrook Plaza, Inc. demands judgment against defendant Jeffrey Gottfried in excess of $75,000, plus interest and costs, including attorneys' fees, as well as any other relief the circumstances may require.

(Compl. PP 24–30).

## III. Standard of Review

A claim may be dismissed under Fed. **[*10]** R. Civ. P. 12(b)(6) only if plaintiff can prove no set of facts in support of the claim that would entitle plaintiff to relief. *ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994).* The reviewing court must consider only those facts alleged in the complaint and accept all of the allegations as true. Id.. See also *Rocks v. Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989)* (holding that when deciding a motion to dismiss for failure to state a claim, the court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the nonmoving party").

## IV. Discussion

### A. The Guaranty

Gottfried moves to dismiss Count I of the Complaint (demanding payment under the Guaranty), arguing that Cedarbrook has failed to allege the specific elements of an actionable breach of contract claim. Gottfried cites *Kerrigan v. Villei, 1996 U.S. Dist. LEXIS 2195, No. 95-4334, 1996 WL 84271 (E.D. Pa. Feb. 28, 1996)* (requiring allegations of "the existence of a contract, which created the duties of the defendant, the failure of the defendant to

Case 1:05-cv-00165-JJF    Document 36-2    Filed 06/10/2005    Page 46 of 121

Page 4

1997 U.S. Dist. LEXIS 8026, *10; Bankr. L. Rep. (CCH) P77,404

comply with his duties, the damages suffered by plaintiff as a result [*11] of the breach, and the full satisfaction by plaintiff of his own obligations under the contract") (citing *Public Serv. Entertainment Group v. Philadelphia Elec. Co., 722 F. Supp. 184, 219 (D.N.J. 1989)).* According to Gottfried, Cedarbrook must allege that: (1) the wholesale market value of the inventory at National's Cedarbrook Plaza location was less than $300,000 — as opposed to the liquidation value; (2) that Cedarbrook obtained an appraisal of the inventory; and that (3) subsequent to this appraisal, Cedarbrook issued a legitimate demand to Gottfried to pay the difference between the value of the inventory and $300,000. In the absence of these assertions, argues Gottfried, Cedarbrook ultimately fails to allege (1) Gottfried's failure to comply with his contractual duties, (2) the extent of Cedarbrook's damages, and (3) Cedarbrook's full satisfaction of its contractual obligations. Gottfried asserts that without these conditions precedent, Cedarbrook's breach of contract claim on the Guaranty is not ripe for adjudication.

Cedarbrook protests that the Complaint establishes a breach of contract action by alleging that Gottfried promptly agreed to pay Cedarbrook upon [*12] National's default, that all applicable cure periods have expired, and that Gottfried owes the difference between $300,000 and the fair market value of the actual inventory. More specifically, Cedarbrook maintains that filing and serving the present Complaint — which calls for payment under the Guaranty–constitutes a "demand," and the Lease is silent in prescribing the manner in which "demand" shall occur. Neither the Guaranty nor the Lease, argues Cedarbrook, require an appraisal prior to payment, and a condition precedent requiring as much must be explicitly stated in the Guaranty.

The Court finds that the Complaint adequately states a cause of action for breach of contract. Cedarbrook's general theory is that Gottfried agreed, through the Guaranty, to provide Cedarbrook with the difference between $300,000 and the value of the inventory at National's Cedarbrook Plaza store in the event of National's default. National has defaulted; Cedarbrook wants to collect; and Gottfried is not paying. Cedarbrook thus successfully alleges (1) the existence of a contract which created Gottfried's duties under the Guaranty (Compl. PP 5–6); (2) Gottfried's failure to comply with these duties [*13] (Compl. P 22); (3) Cedarbrook's damages as a result of Gottfried's breach (Compl. P 22); and (4) Cedarbrook's full satisfaction of its obligations under the contract, i.e., waiting for the expiration of the cure periods. (Compl. PP 9–10, 11).

Concededly, the lease requires Cedarbrook to "demand" payment. Neither the Lease nor the specific

Guaranty provisions, however, describe exactly how a demand is to be made. In the absence of such an explanation, the Court considers the filing of the Complaint a demand for Guaranty payments. See e.g., *In re Fulghum Constr. Corp., 78 Bankr. 146, 153 (M.D. Tenn. 1987)* (noting, in an action brought by a bankruptcy trustee against the debtor's sole shareholder to recover preferential transfers, that "generally interest should be paid from the time a demand was made for a return of property, or, in the case where no demand was made, from the date the complaint was filed to the entry of the judgment" and concluding that "the filing of the complaint in this action constituted a demand"), rev'd on other grounds, *872 F.2d 739 (6th Cir. 1989); In re Foreman Indus., Inc., 59 Bankr. 145, 155 (S.D. Ohio 1986)* (finding that "where no demand for [*14] payment had been made prior to the commencement of this case, the filing of the complaint constitutes such a demand").

Similarly, the Lease does not impose any specific obligation on Cedarbrook to appraise the value of the inventory before demanding payment. The Lease would have to specifically articulate a condition precedent requiring this. See *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1007, 1016 (3d Cir. 1980)* (noting "the rule in Pennsylvania is that a condition precedent to an obligation must be expressed by clear language or it will be construed as a promise or covenant. Language not clearly written as a condition precedent is presumed not to be, unless the contrary appears to be the intention of the parties"); *Acme Markets, Inc. v. Federal Armored Express, Inc., 437 Pa. Super. 41, 648 A.2d 1218, 1220 (Pa. Super. Ct. 1994)* (noting "while the parties to a contract need not utilize any particular words to create a condition precedent, an act or event designated in a contract will not be construed as constituting one unless that clearly appears to have been the parties' intention").

The Court finds unpersuasive Gottfried's argument that the Complaint does not allege [*15] the inventory's wholesale value. Whether the purported $50,000 value of the inventory is its wholesale or liquidation value presents a factual question. It is possible that both the liquidation and the wholesale values are $50,000. At this stage, the Court assumes that $50,000 is the wholesale value of the inventory.

Cedarbrook need only furnish "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2).* See 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990) (stating "Rule 8 indicates that a complaint need only set out a generalized statement of facts from which defendant will be able to frame a responsive pleading. Few complaints fail to meet this liberal stan-

Case 1:05-cv-00165-JJF     Document 36-2     Filed 06/10/2005     Page 47 of 121

Page 5

1997 U.S. Dist. LEXIS 8026, *15; Bankr. L. Rep. (CCH) P77,404

dard"). Having accomplished this, the Court shall deny Gottfried's Motion to Dismiss the Guaranty Count.

**B. Fraudulent Transfer**

Gottfried protests that Cedarbrook lacks standing to assert fraudulent transfer claims. Attempting to assert these causes of action, argues Gottfried, violates the automatic stay. Cedarbrook maintains that its fraudulent transfer claims are not subject to the automatic stay because **[*16]** this lawsuit is being brought against Gottfried and not National.

The Bankruptcy Code's "automatic stay" precludes:

> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
>
> * * *
>
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . .

*11 U.S.C.A. § 362*(a) (West 1993 & Supp. 1997). The purpose of the automatic stay is to give "the debtor a 'breathing spell' by halting the collection process. It enables the debtor to attempt a repayment or reorganization plan with an aim toward satisfying existing debt." *In re Siliciano, 13 F.3d 748, 750 (3d Cir. 1994)* (citation omitted).

This provision results in a "broad stay of litigation, lien enforcement, and other actions, judicial or otherwise, that are attempts to enforce or collect prepetition claims . . . . and stays **[*17]** a wide range of actions that would affect or interfere with property of the estate, property of the debtor, or property in the custody of the estate." 3 *Collier on Bankruptcy P 362.01* (1996). More specifically, § 362 aims:

> to prevent a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts. The stay insures that the debtor's affairs will be centralized, initially, in a single forum in order to prevent conflicting judgments from different courts and in order to harmonize all of the creditors' interests with one another.

The automatic stay prevents creditors from reaching assets of the debtor's estate piece-meal and preserves the debtor's estate so that all creditors and their claims can be assembled in the bankruptcy court for a single organized proceeding.

*In re Colonial Realty Co., 980 F.2d 125, 133 (2d Cir. 1992)* (citations omitted).

Section 362 "applies to almost any type of formal or informal action taken against the debtor or the property of the estate." 3 *Collier on Bankruptcy P 362.03* (1996). In fact, Courts have extended the automatic stay to prohibit creditors from initiating proceedings **[*18]** alleging fraudulent transfer of the debtor's assets.

> A substantial body of case law stands for the proposition that commencement of bankruptcy stays any state court fraudulent conveyance actions involving a debtor or his transferees. The case law reaches this conclusion by two different paths. One line of cases holds that fraudulently transferred property constitutes property of the debtor's estate, pursuant to § 541(a)(1), because the debtor retains an equitable interest in such property. Consequently, those cases state that *§ 362(a)(3) of the Bankruptcy Code* stays an act by a creditor to 'obtain possession of the property of the estate.' Thus, pursuing a debtor's spouse to recover property fraudulently transferred violates the automatic stay.
>
> A second line of cases holds that any property that the trustee recovers, pursuant to *§ 550 of the Bankruptcy Code*, becomes property of a debtor's estate under § 541(a)(3); until the trustee recovers the property, however, it does not constitute property of the debtor's estate. Nonetheless, these courts hold that any state court lawsuit to recover a fraudulent conveyance violates the automatic stay under § 362(a)(1), an action **[*19]** 'to recover a claim against the debtor.'

*In re Fletcher, 176 Bankr. 445, 452 (Bankr. W.D. Mich. 1995).*

The progenitor of the first approach is *Mortgageamerica Corp. v. The American Nat'l Bank of Austin (In re Mortgageamerica, Corp.), 714 F.2d 1266 (5th Cir. 1983),* where the American National Bank of Austin ("American") obtained a judgment against the Mortgageamerica Corporation. American

Case 1:05-cv-00165-JJF    Document 36-2    Filed 06/10/2005    Page 48 of 121

Page 6

1997 U.S. Dist. LEXIS 8026, *19; Bankr. L. Rep. (CCH) P77,404

then filed a separate lawsuit against Joe R. Long, who controlled Mortgageamerica, claiming Long deliberately stripped Mortgageamerica of its assets and defrauded its creditors. Specifically, American brought claims against Long based upon the "corporate trust fund" doctrine, the "denuding the corporation" theory, and the Texas Fraudulent Transfers Act, *Tex. Bus. & Com. Code Ann. §§ 24.02–.03* (Vernon 1968). One month after American brought its suit against Long, Mortgageamerica was forced into involuntary bankruptcy. The United States Court of Appeals for the Fifth Circuit found that the automatic stay prohibited American from pursuing the separate lawsuit against Long:

> An action under the Fraudulent Transfers Act is essentially one for property that properly belongs to the debtor [**20**] and to which the debtor has fraudulently transferred in an effort to put it out of reach of the creditors . . . . The automatic stay under section 362(a) thus applies and prevents a creditor from continuing to pursue a cause of action under the Texas Fraudulent Transfers Act after a petition for bankruptcy has been filed . . . . Actions for the recovery of the debtor's property by individual creditors under state fraudulent conveyance laws would interfere with this estate and with the equitable distribution scheme dependent upon it, and are therefore appropriately stayed under § 323(a)(3). Any other result would produce near anarchy where the only discernable organizing principle would be first–come–first–served. Even without the Bankruptcy Code and the policies that support it, we would be reluctant to elevate such a principle to a rule of law.

*Id. at 1275–76* (citations omitted).

The second approach has its origins in Colonial, where involuntary bankruptcy proceedings were initiated against a partnership and its two general partners. Subsequent to the bankruptcy proceeding, the Federal Deposit Insurance Corporation ("FDIC"), acting as receiver for failed creditors [**21**] of the partnership, instituted a separate lawsuit against transferees of the general partners to recover transferred funds, alleging that the general partners conveyed such funds in an effort to hinder, delay, and defraud the FDIC. Like Mortgageamerica, the United States Court of Appeals for the Second Circuit found, albeit employing different reasoning, that the automatic stay precluded the FDIC from bringing the separate lawsuit. Colonial, however, did not accept Mortgageamerica's view that the separate lawsuit against the transferees threatened "property of the estate."

> If property that has been fraudulently transferred is included in the § 541(a)(1) definition of property of the estate, then § 541(a)(3) is rendered meaningless with respect to property recovered pursuant to fraudulent transfer actions. Further, the inclusion of property recovered by the trustee pursuant to his avoidance powers in a separate definitional subparagraph clearly reflects the congressional intent that such property is not to be considered property of the estate until it is recovered.

*980 F.2d at 131* (citations omitted). Colonial still found the automatic stay applicable, [**22**] however, because "upon analysis, a third–party action to recover fraudulently transferred property is properly regarded as undertaken 'to recover a claim against the debtor' and subject to the automatic stay pursuant to § 362(a)(1)." See *Colonial, 980 F.2d at 131–32*.

Other courts, while acknowledging the divergent approaches employed in these cases, still consider them a source of instruction when deciding whether to prevent creditors from initiating a separate lawsuit to recover fraudulently transferred property. Recently, the United States Bankruptcy Court for the Southern District of Ohio followed Mortgageamerica notwithstanding Colonial because "despite Colonial Realty, the Fifth Circuit continues to adhere to Mortgageamerica . . . . . [Colonial] questioned only the rationale upon which Mortgageamerica was based; it agreed with the outcome in that case and reached the same outcome." *In re Swallen's, Inc., 205 Bankr. 879, 882 n.2 (Bankr. S.D. Ohio 1997)* (citations omitted). See also *Fletcher, 176 Bankr. at 452* (concluding "regardless of the difference in rationale for their conclusions, the courts agree that commencing a bankruptcy case stays [**23**] any state court fraudulent conveyance actions by a creditor"). Indeed, Mortgageamerica still presents a viable approach. n2

> n2 See e.g., *In re Criswell, 102 F.3d 1411, 1417 n.27 (5th Cir. 1997)* (stating "even though a Second Circuit decision [Colonial] has criticized part of our reasoning, the Mortgageamerica decision remains binding precedent in this circuit"); *S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition, Inc.), 817 F.2d 1142, 1150 n.9 (5th Cir. 1987)* (stating "our decision and analysis in [Mortgageamerica] has been cited with approval by several courts and represents the accepted

Case 1:05-cv-00165-JJF    Document 36-2    Filed 06/10/2005    Page 49 of 121

Page 7
1997 U.S. Dist. LEXIS 8026, *23; Bankr. L. Rep. (CCH) P77,404

interpretation of the scope of section 362(a)(3) stays") (citing *Cumberland Oil Corp. v. Thropp, 791 F.2d 1037, 1042* (2d Cir.), cert. denied, *479 U.S. 950, 107 S. Ct. 436, 93 L. Ed. 2d 385 (1986); Delgado Oil Co., Inc. v. Torres, 785 F.2d 857, 861 (10th Cir. 1986);* and *In re Central Heating & Air Conditioning, Inc., 64 Bankr. 733, 735–37 (N.D. Ohio 1986)); In re Ciccone, 171 Bankr. 4, 5 n.2 (Bankr. D.R.I. 1994)* (noting "we agree with the holding of Colonial on this issue, but do not follow that case in its abandonment of Mortgageamerica as to the estate property issue. We find no acceptable reason for departing from the Mortgageamerica holding") (citation omitted).

[*24]

In the case sub judice, Cedarbrook alleges that both National and Gottfried are stripping National of its assets in an effort to hinder, delay, and defraud creditors. (See Compl. PP 19, 24–30). The automatic stay prohibits Cedarbrook from initiating, after the filing of a bankruptcy petition, a third-party action against Gottfried to recover fraudulently transferred property. Such an action is both one "to recover a claim against the debtor" and "to obtain possession of property of the estate" as contemplated by §§ 362(a)(1) and (a)(3). Accordingly, the Court will grant Gottfried's Motion to Dismiss Cedarbrook's fraudulent transfer claim and its claim under the Uniform Fraudulent Transfer Act. n3

> n3 Gottfried also attacks the particularity with which Cedarbrook has pled its fraudulent transfer claims. The Court need not assess the particularity of Cedarbrook's allegations of fraud, however, in light its decision with respect to the scope of the automatic stay.

> The particularity issue is, nonetheless, capable of repetition. Specifically, the Court notes that had Cedarbrook alleged common law fraud, as opposed to fraudulent transfer, against Gottfried — with the appropriate particularity as required by *Fed. R. Civ. P. 9(b)* — the automatic stay might not apply. See *In re Phar-Mor, Inc. Sec. Litig., 164 Bankr. 903, 905 (W.D. Pa. 1994)* ((1) finding automatic stay was not violated by a separate lawsuit claiming violations of state securities laws, fraud, and negligent misrepresentation because those claims were distinct and personal to the plaintiffs and (2) relying on authority that (a) "property of the debtor cannot be extended to include the separate obligations of the non-bankrupt third party;" and (b) "[an] action for negligence against accounting firm alleging that creditors relied on false financial statements [is]

personal to [the] creditors and cannot be asserted by [the] trustee of debtor") (citations omitted).

[*25]

Cedarbrook contends, in the alternative, that even if the automatic stay prohibits the fraudulent transfer claim, the Court should sever the fraudulent transfer claim and place it in civil suspense. The Court declines to exercise this option. The statutory bar imposing a broad stay of litigation in § 362 precludes Cedarbrook from stating a viable cause of action against Gottfried for fraudulent transfer. In the absence of relief authorized by the Bankruptcy Court, the Court must do more than just sever the unsustainable claim. It must dismiss it.

**C. Alter Ego Theory**

Cedarbrook argues that the Complaint clearly states a cause of action for alter ego liability by alleging that National's principal and sole shareholder, Gottfried, transferred corporate assets to a newly created corporate entity. According to Cedarbrook, this new entity amounts to nothing more than a continuation of the debtor [National], formed solely to act as a repository for National's assets and thereby to hinder, delay, and defraud National's creditors. Gottfried protests that the automatic stay prohibits Cedarbrook's alter ego claim. The Court agrees.

The Court finds ample authority to support the proposition [*26] that the automatic stay precludes Cedarbrook from bringing a claim against Gottfried based on an alter ego theory of liability. *St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688 (2d Cir. 1989)* provides instruction. St. Paul reviewed cases from other United States Circuit Courts of Appeals that have decided the issue. See *id. at 696–99* (examining specifically *Steyr-Daimler-Puch of Am. Corp. v. Pappas, 852 F.2d 132 (4th Cir. 1988); Koch Refining v. Farmers Union Cent. Exch., Inc., 831 F.2d 1339 (7th Cir. 1987)*, cert. denied, *485 U.S. 906, 108 S. Ct. 1077, 99 L. Ed. 2d 237 (1988); Mixon v. Anderson (In re Ozark Restaurant Equip. Co.), 816 F.2d 1222 (8th Cir.)*, cert. denied, *484 U.S. 848, 108 S. Ct. 147, 98 L. Ed. 2d 102 (1987); S.I. Acquisition [5th Cir.]; and Delgado [10th Cir.]).* A review of these decisions led St. Paul to the following conclusion:

> We agree with those courts that have held that the determination of whether a claim may be brought by a creditor of a bankrupt corporation outside the bankruptcy proceedings depends on an analysis of state law. Under the Bankruptcy Code, the bankruptcy trustee may bring claims founded, inter alia, on the [*27] rights of the debtor and on certain rights of the debtor's creditors. Whether

Case 1:05-cv-00165-JJF    Document 36-2    Filed 06/10/2005    Page 50 of 121

Page 8

1997 U.S. Dist. LEXIS 8026, *27; Bankr. L. Rep. (CCH) P77,404

the rights belong to the debtor or the individual creditors is a question of state law.

* * *

If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action . . . . The claims, if proved, would have the effect of bringing the property of the third party into the debtor's estate, and thus would benefit all creditors. It therefore would be illogical to distinguish between this type of claim against a third party and a claim against the debtor.

* * *

Therefore, because an alter ego claim is the property of the estate, and because the injury in this case is a generalized one, which is already being litigated by the bankruptcy trustee and by the unsecured creditors' committee, [Plaintiff] does not have standing to assert its alter ego claim outside of the bankruptcy proceeding.

*884 F.2d at 700-05* (citations omitted). St. Paul's conclusion comported with those reached by the United States [*28] Courts of Appeals for the Fourth, Fifth, Seventh, and Tenth Circuits.

Only Ozark, a decision from the United States Court of Appeals for the Eighth Circuit, reached a different result. Ozark acknowledged that "causes of action belonging to the debtor at the commencement of the case are included within the definition of property of the estate," and "whenever a cause of action 'belongs' to the debtor corporation, the trustee has the authority to pursue it in bankruptcy proceedings." Ozark ultimately found, however, that where:

the applicable state law makes such obligations or liabilities run to the corporate creditors personally, rather than to the corporation, such rights of action are not assets of the estate under Section 541(a) that are enforceable by the trustee under Section 704(1). In this respect, we recognize that generally the corporate veil is never pierced for the benefit of the corporation or its stockholders. This general statement of the law is followed in Arkansas, where the courts have held that a

corporate entity is to be disregarded only if the corporate structure is illegally or fraudulently abused to the detriment of a third person [*29] . Thus, the obligations and liabilities of an action to pierce the corporate veil in Arkansas do not run to the corporation, but to third parties, e.g., creditors of the corporation.

* * *

Because the corporate entity will be disregarded under Arkansas law only if it has been abused to the detriment of a third person, and because the nature of the alter ego theory of piercing the corporate veil makes it one personal to the corporate creditors rather than the corporation itself, it is axiomatic that the claim does not become property of the estate under Section 541(a)(1), nor is it enforceable by the trustee under Section 704(1).

*Ozark, 816 F.2d at 1224-25* (citations omitted). n4

n4 The United States Court of Appeals for the Third Circuit has not spoken to the issue. A few lower courts have noticed the divergence in approaches but have refrained from reaching a decision. See *Algemene Bank Nederland, N.V. v. Hallwood Indus., Inc., 133 Bankr. 176, 179-80 (W.D. Pa. 1991)* (noting that "the Court of Appeals for the Third Circuit has not yet spoken on the issues addressed in Matter of S.I. Acquisition"); *Begier v. Price Waterhouse, 81 Bankr. 303, 305 (E.D. Pa. 1987)* (refraining from deciding which approach is more appropriate). Phar-Mor neither invoked nor rejected the approach taken in S.I. Acquisition, noting "S.I. Acquisition has no bearing on the instant action because the Debtor and Coopers are separate, unaffiliated entities, and while the Debtor may be entitled to an award of damages from property of Coopers, a judgment in favor of the Debtor would not transform the entire assets of Coopers into property of the Debtor." *Phar-Mor, 164 B.R. at 906.*

**[*30]**

The Court finds that Cedarbrook presents a claim for "generalized" harm. The injury alleged "is primarily to the corporation, and is injury to the plaintiff creditor only insofar as it decreases the assets of the corporation to which he must look for satisfaction of his debt[. Thus,] the suit is for a tort suffered by the corporation, and properly brought by the trustee." *Begier, 81 Bankr. at 305.* The

Case 1:05-cv-00165-JJF    Document 36-2    Filed 06/10/2005    Page 51 of 121

Page 9

1997 U.S. Dist. LEXIS 8026, *30; Bankr. L. Rep. (CCH) P77,404

claim is not personal to Cedarbrook. See id. (noting "if there is a special damage to the creditor suing, not common to other creditors, then it is a personal creditor action which the trustee may not pursue").

Cedarbrook's alter ego claim rests on allegations that the new corporation is the alter ego of Gottfried, a fiduciary, who is fraudulently transferring assets. Cedarbrook avers "general" injury that is not specific to any particular creditor because the purported conduct alleges the dissipation of assets belonging to National's estate. Thus, other creditors, besides Cedarbrook, stand to suffer injury. Allowing the claim to proceed would, in effect, elevate Cedarbrook to the status of a preferred creditor with rights superior to those of National's other creditors. **[*31]** See *St. Paul, 884 F.2d at 704* (noting "PepsiCo's harm is precisely that suffered by all other creditors of CL and Lee Way: because CL and Lee Way were used by Banner to preferentially pay off debts owed to Banner, all other creditors of CL and Lee Way fell into disfavored positions" and describing the "proper remedy" in alter ego action as "bringing an action alleging preferential or fraudulent transfer of assets"); *Begier, 81 Bankr. at 306* (listing, as examples of general claims brought on behalf of all creditors, a "claim to recover fraudulently transferred property of the debtor under a theory of corporate trust fund or state fraudulent transfer action . . . [or an] alter ego action to recover preferential transfers and to hold the alter ego liable for the obligations of the debtor") (citations omitted).

Notwithstanding Ozark, which constitutes a minority view and rests specifically on Arkansas law, the Court finds persuasive the logic employed in St. Paul. Cedarbrook fails to supply the Court with any Pennsylvania case suggesting that Pennsylvania law mirrors Arkansas law on this issue. Cedarbrook also fails to demonstrate how the harm it alleges represents particularized **[*32]** injury. On the contrary, the harm alleged is general as it merely involves the dissipation of assets belonging to National's estate. It therefore affects all of National's creditors. Accordingly, Cedarbrook's alter ego

claim fails. n5

    n5 By letter dated May 30, 1997, Cedarbrook informed the Court that National filed, in the United States Bankruptcy Court for the Southern District of Florida, a "Motion to Dismiss [Its] Chapter 11 Case." The Court notes, however, that dismissal of National's Chapter 11 case subsequent to Cedarbrook's filing the instant lawsuit against Gottfried does not alter the fact that the Bankruptcy Code barred both the fraudulent transfer and alter ego claims in the instant action at the time Cedarbrook filed it.

An appropriate Order follows.

**ORDER**

    **AND NOW,** this 4th day of June, 1997, upon consideration of Defendant's Motion to Dismiss the Complaint (Doc. No. 2) and Plaintiff's Memorandum in Opposition thereto (Doc. No. 3), **IT IS HEREBY ORDERED THAT:**

    1. **[*33]** Defendant's Motion is **GRANTED IN PART AND DENIED IN PART**.

    2. Defendant's Motion is **DENIED** with respect to Count I.

    3. Defendant's Motion is **GRANTED** with respect to Count II.

    4. Defendant's Motion is **GRANTED** with respect to Cedarbrook's attempt to assert a claim for alter ego liability against Gottfried.

5. Count II of the Complaint is **DISMISSED**.

    BY THE COURT

    John R. Padova, J.

# EXHIBIT F

LEXSEE 2004 U.S. DIST. LEXIS 17154

**CORPORATE AVIATION CONCEPTS, INC., and CFS AIR LLC, Plaintiffs, v. MULTI-SERVICE AVIATION CORPORATION, Defendant, v. GENERAL ELECTRIC CAPITAL CORPORATION Third–Party Defendant.**

**CIVIL ACTION NO. 03–3020**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2004 U.S. Dist. LEXIS 17154*

**August 24, 2004, Decided**
**August 25, 2004, Filed; August 25, 2004, Entered**

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part, Count dismissed at *Corporate Aviation Concepts, Inc. v. Multi–Service Aviation Corp., 2005 U.S. Dist. LEXIS 3495 (E.D. Pa., Mar. 8, 2005)*

**PRIOR HISTORY:** *Corporate Aviation Concepts, Inc. v. Multiservice Aviation Corp., 2003 U.S. Dist. LEXIS 21108 (E.D. Pa., Nov. 13, 2003)*

**DISPOSITION:** Third–party defendant's motion to dismiss granted and all claims against third–party defendant dismissed. Plaintiff's motion to dismiss granted and all counterclaims against plaintiff dismissed.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For CORPORATE AVIATION CONCEPTS, INC., Plaintiff: CHARLENE K. FULLMER, DUANE MORRIS, LLP, PHILADELPHIA, PA; EDWARD M. DUNHAM, JR., DUANE MORRIS, LLP, PHILADELPHIA, PA.

For CFS AIR LLC, Plaintiff: KEITH E. SMITH, PIPER RUDNICK, LLP, PHILADELPHIA, PA.

For MULTI–SERVICE AVIATION, CORPORATION, Defendant: EDWARD J. KELLEHER, ARCHER AND GREINER, P.C., HADDONFIELD, NJ.

For CFS AIR LLC, Counter Defendant: KEITH E. SMITH, PIPER RUDNICK, LLP, PHILADELPHIA, PA.

For MULTI–SERVICE AVIATION CORPORATION, ThirdParty Plaintiff: EDWARD J. KELLEHER, ARCHER AND GREINER, P.C., HADDONFIELD, NJ.

For GENERAL ELECTRIC CAPITAL CORP., A/K/A

GE CAPITAL CORP., ThirdParty Defendant: KEITH E. SMITH, PIPER RUDNICK, LLP, PHILADELPHIA, PA.

**JUDGES:** William H. Yohn, Jr., Judge.

**OPINIONBY:** William H. Yohn, Jr.

**OPINION:**

### Memorandum and Order

YOHN, J.

This case was originally a declaratory judgment action filed by plaintiffs Corporate Aviation Concepts, Inc. ("CAC") and CFS Air, LLC ("CFS") against Multi-Service Aviation Corporation ("MSC"), seeking a judicial determination that liens, placed by MSC upon three aircraft owned and operated by plaintiffs, were invalid. MSC then filed counterclaims and a third–party [*2] complaint. Currently pending before this court are the motions to dismiss the counterclaims by CFS and the third–party complaint by General Electric Capital Corporation ("GEC"). n1 For the reasons stated below, these motions will be granted.

> n1 Plaintiff CAC has not moved to dismiss the counterclaims asserted against it, which are identical to those asserted against CFS. As a matter of judicial efficiency, however–because these counterclaims involve the same factual allegations, the same parties, and the same legal theories as those challenged by CFS; and because MSC has had an opportunity to address these issues–to the extent that MSC has failed to state legally sufficient claims against CAC, I will dismiss those counterclaims against CAC as well. *See Roman v. Jeffes, 904 F.2d 192, 196 (3d Cir. 1990)* ("there are times when a court may *sua sponte* raise the issue of the defi-

ciency of a pleading under *Rule 12(b)(6)* provided that the litigant has had the opportunity to address the issue either orally or in writing") (citing *Bryson v. Brand Insulations, Inc.*, 621 F.2d 556, 559 (3d Cir. 1980) and *Dougherty v. Harper's Magazine Co.*, 537 F.2d 758, 761 (3d Cir. 1976)).

**[*3]**

**Background** n2

> n2 The facts giving rise to MSC's attempted placement of liens upon plaintiff's aircraft are not essential to the disposition of this motion. For this reason, the ensuing factual account will be limited to the factual allegations underlying MSC's claims for fraud and other business torts. A complete discussion of the extension of credit–by MSC–to various aircraft now operated by plaintiffs, the resulting debt incurred by the owners and guarantor of those aircraft, and MSC's placement of liens upon those aircraft, can be found in this court's opinion denying MSC's motion to dismiss or transfer. *See Corporate Aviation Concepts, Inc. v. Multiservice Aviation Corp.*, 2003 U.S. Dist. LEXIS 21108, 2003 WL 22794693 (E.D. Pa. Nov. 13, 2003).

MSC's claims for creditor fraud and conspiracy depend upon the precise nature of the business and ownership relationships between and among CAC, an aviation services corporation based in Washington state; CFS, an aircraft leasing company operating out of Connecticut; GEC, the **[*4]** manager and 100% owner of CFS; and Northwestern Aircraft Capital Corp. (NWACC"), an aircraft dealer and distributor based in Washington state. Accordingly, I will go into some detail as to the structure of these businesses and their relationships with one another. For the purposes of this motion to dismiss only, the facts as related below presume MSC's allegations to be true.

MSC is a credit card processing company which issues corporate aviation cards to qualified businesses in the aviation industry. *See* defendant's official website, at https://aviation.multiservice.com/mscavi_index.shtml. Each credit card is attached to a specific aircraft, and with the card the operator of an aircraft can purchase fuel and services from approved MSC operators.

Sometime in the mid–1990s, MSC issued lines of credit to three aviation service providers–NW Executive, NW Leasing, and JS Aviation–all of which are owned by parent corporation NWACC. *See* Def.'s Am. Countercl. (Doc. # 22) at 7, P 10, 13. As the parent corporation,

NWACC issued Corporate Guarantees to MSC pursuant to which it ensured prompt payment of all debt incurred by these three companies through use of the Multi–Service credit **[*5]** card. *Id.* PP 6, 8–9.

NW Executive, NW Leasing, and JS Aviation used their Multi–Service cards to purchase aviation fuel and products and are currently in default under the terms of Multi–Service's Cardholder Agreement. *Id.* PP 18–20. As a result of unpaid credit card bills, NW Executive owes $19,464.20 to MSC, NW Leasing owes $147,004.45, and JS Aviation owes $183,486.60. *Id.* Despite its Corporate Guarantees, NWACC has failed to satisfy these debts or otherwise make payment to MSC. *Id.* P 21. As a result, MSC filed multiple claims of lien with the Federal Aviation Administration ("FAA") and the State of Kansas which attach to three specific aircraft. *Id.* P 22. n3

> n3 The three aircraft at issue are a Gates Learjet 55, Registration No. N29NW ("Gates 55"); a Gulf Stream American G-1159A, Registration No. N312NW ("Gulf Stream American"); and a Gates Learjet 35A, Registration No. N325NW ("Gates 35A").

At approximately the same time these liens were filed, the aircraft in question–which were under **[*6]** the control of NWACC or its subsidiaries–were sold, assigned, and ultimately came to be owned by CFS, which then leased them to CAC. n4 According to defendant, GEC and CFS financed and created CAC for the specific and fraudulent purpose of continuing the operation of these three aircraft, and the leasing of the three aircraft to CAC was designed to defraud MSC from recovering on its liens. This set of transactions forms the basis of defendant's counterclaims and third–party complaint, and merits somewhat detailed discussion.

> n4 To reiterate, GEC, the third–party defendant in this case, is the manager and 100% owner of CFS. Def.'s Am. Countercl. P 24.

With respect to the first aircraft, the Gulf Stream American, MSC alleges that it was originally owned by NWACC and was sold to GEC for "$ 1.00 and OVC" on April 4, 2003. *Id.* P 26. As of April 1, 2003, however, CAC had entered into an agreement to lease the Gulf Stream American from GEC. *Id.* P 27. Cory Coyle, an NWACC officer, signed both the lease for the **[*7]** Gulf Stream American, on behalf of CAC, and its bill of sale, on behalf of NWACC. *Id.* P 28. According to MSC, Coyle's dual role as an officer for both NWACC and CAC raises suspicion as to the legitimacy of the CAC business entity.

Case 1:05-cv-00165-JJF    Document 36-2    Filed 06/10/2005    Page 55 of 121

Page 3
2004 U.S. Dist. LEXIS 17154, *7

On May 19, 2003, GEC sold its ownership interest in the Gulf Stream American to CFS and assigned to CFS its lessor's interest in the aircraft as well. *Id.* PP 31–32. With respect to the Gulf Stream American, then, MSC's allegations appear to establish that this aircraft–originally owned and operated by NWACC and its subsidiaries–is currently being leased by CAC from CFS, its owner.

The second aircraft in question, the Gates 55, is alleged to have been leased to NWACC by GEC sometime prior to November 7, 2002. *Id.* P 34. GEC then assigned its lessor's interest in the Gates 55 to CFS, sometime after this date. *Id.* P 35. The Gates 55 is currently operated by CAC pursuant to a lease with CFS. The third aircraft, however–the Gates 35A–receives much less specific treatment by defendant in its factual allegations and is alleged only to be currently owned by CFS and to have been–at one time–owned or leased by NWACC. *Id.* P 36.

In connection [*8] with the multiple transfers of these three aircraft, MSC has asserted six counterclaims against CAC, five against CFS, and brought a six–count third–party complaint against GEC. The essence of its complaint is that CFS and GEC conspired to create CAC, transfer ownership of the aircraft, and keep the aircraft in operation as a means of defrauding

MSC and obstructing its efforts to enforce its liens. According to MSC, the formation of CAC enabled CFS and/or GEC to avoid taking "immediate write–downs of at least $8,500,000." *Id.* P 39. MSC further alleges that CFS and/or GEC, in order to form CAC, purchased equipment, furnishings, trade names, and customer lists from NWACC and its subsidiaries. *Id.* P 40.

In MSC's first count, n5 it brings a claim for creditor fraud and deepening insolvency. MSC's second count alleges civil conspiracy, and its third claim is for aiding and abetting fraud. In counts four and five, MSC advances theories of joint venture and instrumentality liability. Finally, counts six and seven bring causes of action which sound in unjust enrichment. MSC asserts each of its claims against CAC, CFS, and GEC, except for count five, in which it relies upon the instrumentality [*9] theory to bring causes of action against only CAC and GEC. I will discuss each claim in turn.

n5 The specific nature of MSC's six claims against CFS and GEC is altogether unclear from the complaint itself. The six counts are untitled and make no reference to the legal theories upon which they are based. In its opposition to the parties' motions to dismiss, however, MSC made clear–for the first time–the theories underlying its six claims. I will therefore evaluate the legal sufficiency of MSC's claims according to its after–the–fact titling

thereof. Although movants were originally handicapped by MSC's imprecise pleading, their reply memorandum makes clear that they are now aware of the nature of the claims brought against them and have had sufficient opportunity to respond.

**Legal Standard**

In ruling on a motion to dismiss for failure to state a claim upon which relief may be granted, n6 the court must accept as true all well–pleaded allegations of fact in the complaint and any reasonable inferences [*10] that may be drawn therefrom, in order to determine whether "under any reasonable reading of the pleadings, the [complainant] may be entitled to relief." *Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)* (citations omitted); *Colburn v. Upper Darby Township, 838 F.2d 663, 665–66 (3d Cir. 1988), cert. denied, 489 U.S. 1065, 103 L. Ed. 2d 808, 109 S. Ct. 1338 (1989)* (citations omitted). Although the court must construe the complaint in the light most favorable to the complainant, it need not accept as true legal conclusions or unwarranted factual inferences. *See Conley v. Gibson, 355 U.S. 41, 45–46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).* Courts will grant a 12(b)(6) motion to dismiss "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984).*

N6 Movants also cite *Rule 9(b)* in their motions to dismiss, alleging that MSC's claims, which involve fraud, have not been pleaded with sufficient specificity. Because I hold that each of MSC's counterclaims and third–party claims is legally insufficient, I need not assess the degree of particularity with which they have been pleaded.

[*11]

**Discussion**

1. Count I: Deepening Insolvency and Creditor Fraud

In count one MSC asserts claims against CAC, CFS, and GEC for deepening insolvency and creditor fraud. MSC alleges that GEC and CFS created a new corporate entity–CAC–in an attempt to allow its predecessor, NWACC, to avoid its debts while continuing the same operations under a new name. According to MSC, its first claim is supported by several allegations: GEC and CFS were involved in the funding of CAC; CAC is a successor to NWACC; NWACC owed approximately $247,000.00

to MSC; GEC and CFS entered into new leases with CAC for aircraft formerly in the possession of NWACC; GEC benefitted financially from the creation of CAC because it was able to avoid taking an immediate write–down of $8,500,000.00; and the creation of CAC prohibited MSC from enforcing its liens against NWACC.

The tort of "deepening insolvency" has never been discussed by Pennsylvania courts. The Third Circuit, however, has had occasion to evaluate the theory of "deepening insolvency" under Pennsylvania law and concluded, after lengthy analysis, that "if faced with the issue, the Pennsylvania Supreme Court would determine that 'deepening **[*12]** insolvency' may give rise to a cognizable injury." *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 349 (3d Cir. 2001).* Expanding upon the nature of this tort, the Third Circuit held that deepening insolvency occurs where corporate property is injured through the fraudulent or concealed expansion of corporate debt and prolongation of corporate life. *Id. at 347.* This tort rests upon the theory that a corporation, even when insolvent, can have valuable corporate property; the fraudulent incurrence of additional debt, however, can damage that value by hastening bankruptcy, undermining business relationships, and dissipating corporate assets. *Id. at 349–50.*

The *R.F. Lafferty* Court stressed the significance of the injury to the debtor[[corporation, ]]however, and cited numerous cases in which debtors or committees suing on behalf of debtors were the injured parties. *Id. at 347–50.* Indeed, the Third Circuit clearly imagined the "injury" in a deepening insolvency case to be suffered by the debtor corporation itself, and specifically found that the plaintiff in *R.F. Lafferty* **[*13]** was asserting claims on behalf of the bankrupt corporations. *Id. at 348–49.* Only after holding that "the claims here belong to the Debtors, rather than to the creditors," did the Third Circuit undertake its deepening insolvency analysis. *Id. at 349.* Its acceptance of deepening insolvency as a cognizable cause of action under Pennsylvania law, therefore, does not appear to have contemplated the type of claim asserted by MSC; that is, a claim for deepening insolvency brought against companies allegedly related to the insolvent corporation, by an unsecured creditor of the insolvent corporation. MSC does not allege that it is bringing its claim on behalf of NWACC or its subsidiaries, nor does it allege that NWACC was injured by the prolonging of its corporate life or incurrence of fraudulent debt.

Because MSC has failed to allege the elements of deepening insolvency, however, I need not determine whether an unsecured creditor has standing to bring deepening insolvency claims against a bankrupt corporations successors. As articulated by the Third Circuit, deepen-

ing insolvency involves "prolonging an insolvent corporation's life through bad debt. **[*14]** " *Id. at 350.* More specifically, the tort requires a showing of "fraudulent expansion of corporate debt and prolongation of corporate life." *Id. at 347.* MSC has not alleged that CAC, CFS, or GEC expanded NWACC's debt in any way. The unpaid credit card bills of NW Executive, NW Leasing, and JS Aviation existed prior to the creation of CAC and MSC has not alleged that CFS or GEC caused this debt to be increased. Furthermore, MSC has alleged no facts suggesting that the accumulation of debt was fraudulent; the only "debt" at issue in this case is the unpaid credit card bills, a debt which was incurred through purchase of aviation fuel on legitimately extended credit.

While certain aircraft formerly operated by NWACC may be under new leases, this fact alone does not constitute a fraudulent prolonging of corporate life through the incurrence of bad debt. MSC has failed to allege any facts which would support a claim for deepening insolvency and these claims will therefore be dismissed with prejudice.

MSC's first count also mentions "creditor fraud" as a theory of recovery. Pennsylvania courts have never recognized creditor fraud as a cause of action under **[*15]** Pennsylvania law. Assuming without deciding, however, that the Pennsylvania Supreme Court would–if faced with the issue–recognize this tort, MSC has nonetheless failed to state a legally sufficient claim for creditor fraud.

In *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.,* the Third Circuit–predicting New Jersey law–held that a plaintiff states a claim for creditor fraud under New Jersey law by alleging "that an attorney has knowingly and intentionally participated in a client's unlawful conduct to hinder, delay, and/or fraudulently obstruct the enforcement of a judgment of a court." *331 F.3d 406, 414 (3d Cir. 2003)* (emphasis added). Relying upon this articulation of the elements of creditor fraud, as urged to do by MSC, it is clear that MSC has not stated a claim for creditor fraud. While MSC alleges an outstanding debt owed it by the NWACC subsidiaries, this debt is in the form of an unpaid credit card bill. MSC does not assert that it has obtained a "judgment" for this amount, nor that CAC, CFS, or GEC have obstructed the enforcement of any such judgment. Furthermore, while MSC alleges that the transfer of aircraft ownership and leasing rights **[*16]** interfered with its attempts to enforce its liens, it has failed to assert any facts supporting a finding of unlawful conduct or intentional obstruction. Accordingly, MSC's claim and counterclaims for creditor fraud cannot stand and will be dismissed with prejudice.

2. Count II: Civil Conspiracy

In count two MSC asserts claims against each party for civil conspiracy. In order to overcome a motion to dismiss a civil conspiracy claim, MSC must allege "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *Strickland v. Univ. of Scranton, 700 A.2d 979, 987–88 (Pa. Super. 1997)* (citing *Smith v. Wagner, 403 Pa. Super. 316, 588 A.2d 1308, 1311–12 (Pa. Super. 1991))*. "Proof of malice, i.e., an intent to injure, is essential in proof of a conspiracy." *Skipworth v. Lead Indus. Assoc., Inc., 547 Pa. 224, 235, 690 A.2d 169 (1997)* (citation omitted).

MSC has not alleged that any party acted with malice. Furthermore, MSC asserts that CAC, CFS, **[*17]** and GEC funded and created CAC; while MSC suggests that the motivation in creating this business was to ensure the continued operation of certain aircraft, MSC makes no allegation that the actual formation of CAC involved unlawful purposes. Because MSC has failed to allege any particular unlawful purpose or unlawful means, and because it has not alleged malice, it has failed to set forth a cause of action for civil conspiracy. MSC's second claim and counterclaims, therefore, will be dismissed, but without prejudice since it may be that with the benefit of discovery MSC may be able to rectify these deficiencies.

### 3. Count III: Aiding and Abetting Fraud

MSC's third count asserts a claim for aiding and abetting fraud. There can be no aiding and abetting of fraud unless there is fraud in the first place, and MSC has failed to assert any instance of fraud on the part of defendants. To plead fraud under Pennsylvania law, MSC must allege "(1) a misrepresentation (2) made by a person (3) with the intent to induce the recipient to act on it (4) which the recipient justifiably relies on and (5) which proximately damages the recipient." *Knop v. McMahan, 872 F.2d 1132, 1140 (3d Cir. 1989)* **[*18]** (citing *Delahanty v. First Pa. Bank, N.A., 318 Pa. Super. 90, 464 A.2d 1243, 1252 (Pa. Super. 1983))*.

MSC's aiding and abetting claim evidently rests upon CFS and GEC's "scheme to defraud a lien creditor." Opp'n at 8. MSC, however, has pointed to no misrepresentation, no reliance, and no damage as a result of this reliance. Indeed, in its account of the allegedly fraudulent creation of CAC, MSC fails to so much as suggest that CFS and GEC made misrepresentations upon which MSC relied.

Setting aside MSC's clear failure to plead "all averments of fraud...with particularity," as required by *Fed. R. Civ. P. 9(b)*, MSC has also failed to allege the basic requirements of fraud under Pennsylvania law. MSC's

claims for aiding and abetting fraud, therefore, will be dismissed without prejudice pursuant to *Rule 12(b)(6)*. MSC may replead this claim, if it can do so without violating *Rule 11*.

### 4. Counts IV and V: Joint Venture and Instrumentality Theories

MSC's fourth count alleges that CFS, GEC, and CAC formed an agreement to keep certain aircraft in operation and that this agreement amounted to a joint venture. Accordingly, MSC **[*19]** asserts a theory of joint venture liability.

Under Pennsylvania law, a joint venture is an "association of persons or corporations who by contract, express, or implied, agree to engage in a common enterprise for their mutual profit." *Duquesne Light Co. v. Woodland Hills Sch. Dist., 700 A.2d 1038, 1055 (Pa. Cmwlth. 1997)* (citing *Richardson v. Walsh Constr. Co., 334 F.2d 334, 336 (3d Cir. 1964))*. The "rights, duties, and obligations of joint venturers, as between themselves, depend primarily upon the terms of the contract by which they assume that relationship." *Snellbaker v. Herrmann, 315 Pa. Super. 520, 462 A.2d 713, 717 (Pa. Super. 1983)*. Certain factors are essential to a joint venture: "(1) each party to the venture must make a contribution, not necessarily of capital, but by way of services, skill, knowledge, materials or money; (2) profits must be shared among the parties; (3) there must be a 'joint proprietary interest and right of mutual control over the subject matter' of the enterprise; (4) usually, there is a single business transaction rather than a general and continuous transaction." *Id. at 716* (quoting *McRoberts v. Phelps, 391 Pa. 591, 599, 138 A.2d 439 (1958))*. **[*20]** Absent a limitation in the contract, "a joint venturer will be held responsible with his or her associates" for losses. *Id. at 717*.

In order to proceed under a theory of joint venture liability, therefore, MSC must first allege the existence of a joint venture. In its fourth count, MSC alleges that there existed an agreement among CAC, CFS, and GEC which included "a contribution by each party,...a joint proprietary interest, the right to share in profits and losses, and the right of joint control." Am. Countercl. P 58. If true, these elements would support the finding of a joint venture. MSC, however, has alleged no facts in support of the legal conclusions stated in paragraph 58. While this court is required to accept all well-pleaded allegations of fact as true, it need not accept unsupported or conclusory statements, unwarranted inferences, or sweeping legal conclusions. MSC's assertion that CFS, CAC, and GEC formed a joint venture is wholly unsupported by MSC's factual allegations, as MSC has alleged nothing with respect to the existence or terms of an agreement to

form a joint venture. Furthermore, in order to be liable as a joint venture there must be an underlying tort [*21] by the participants in the joint venture, which MSC has failed to allege. Accordingly, count IV will be dismissed without prejudice for failure to state a claim upon which relief can be granted. MSC may again replead if it can do so consistent with *Rule 11*.

In count five, MSC alleges that CAC was formed as a continuation or successor to NWACC and that CAC, under an instrumentality theory, is therefore liable to MSC for the debts of NWACC and its subsidiaries.

Under Pennsylvania's instrumentality doctrine, a corporation "may be held liable for the debts of another corporation where it misuses that corporation as a mere business conduit for its own purposes." *Combustion Sys. Servs. v. Schuylkill Energy Resources, 1993 U.S. Dist. LEXIS 17714, 1993 WL 514496, *4 (E.D. Pa. Dec. 1, 1993)*. To recover under this theory, the following three elements are required:

> (1) That one corporation controlled another corporation to such a degree that the controlled corporation is a mere instrumentality;

> (2) That the controlling corporation is perpetrating a fraud or wrong through the controlled corporation (e.g., torts, violation of a statute, or stripping a subsidiary of its assets); and

> (3) [*22] An unjust loss or injury to the claimant, such as insolvency of a controlled corporation.

*May v. Club Med Sales, Inc., 832 F. Supp. 937, 938–39 (E.D. Pa. 1993)* (citing *Stinson v. GAF Corp., 757 F. Supp. 644, 645 (W.D. Pa. 1990)*). A finding that one corporation is a mere instrumentality of another requires that "the controlling corporation wholly ignored the separate status of the controlled corporation and so dominated the affairs of the controlled corporation that its separate existence was a mere sham. *Id.* (citing *Culbreth v. Amosa, Ltd., 898 F.2d 13, 14 (3d Cir. 1990)*). Put differently, assertion of an instrumentality or alter–ego theory requires "a threshold showing that the controlled corporation acted robot– or puppet–like in mechanical response to the controller's tugs on its strings or pressure on its buttons." *Culbreth, 898 F.2d at 15*.

In count five, MSC identifies six individuals who served as officers, directors, employees, shareholders, and/or members of both[[NWACC or its subsidiaries ]][[and]][[CAC. ][*See*][Am. Countercl. ]]PP 61–62. It also alleges that CAC currently [*23] maintains offices in Bellevue, Washington and Allentown, Pennsylvania, and that NWACC and its subsidiaries formerly maintained offices in these same two cities. *Id.* PP 63–64. Furthermore, MSC alleges that CAC now operates aircraft formerly operated by NWACC, NW Executive, NW Leasing, and JS Aviation. *Id.* PP 65–66. And finally, MSC contends that CAC is a consolidation or continuation of the NWACC entities, that CAC was formed in order to enable NWACC to escape its debts, that CAC purchased NWACC assets for inadequate consideration, and that CAC–as a continuation of NWACC–therefore assumed its legal and financial obligations. *Id.* P 67.

Because MSC has identified debt owed it by NWACC and has set forth facts that, if true, could support its theory that CAC is the mere instrumentality of NWACC, NW Executive, NW Leasing, or JS Aviation, it has stated a claim against CAC on these grounds.

MSC also brings this claim against GEC, alleging that GEC has "actual and total control over CFS," that CFS is being misused by GEC, and that GEC and is therefore also liable on an instrumentality theory. Third Party Compl. PP 25–27. Despite MSC's contention [*24] that "fraud or injustice has or will proximately result from the misuse of CFS by [GEC], including damages to Multi Service," MSC has failed to allege any way in which CFS is liable to it in the first place. Even if CFS is a mere instrumentality of GEC, GEC cannot be held liable on an instrumentality theory absent something to be held liable for. Because MSC has made out no claim against CFS, it cannot rely upon a theory of instrumentality liability to recover damages it has not alleged for a tort it has not identified. MSC's fifth claim will therefore be dismissed, again without prejudice, as to GEC.

### 5. Counts VI and VII: Unjust Enrichment

In its sixth counterclaim, MSC argues that CAC has been unjustly enriched by its retention of the benefits conferred upon it by MSC, in the form of credit extended to NWACC through the Multi–Service credit card. Its seventh counterclaim asserts the same cause of action against CFS. In the sixth count of its third party complaint MSC makes similar allegations relating to GEC, claiming that GEC has been unjustly enriched by its use of the claimed once–indebted aircraft.

Under Pennsylvania law, a claim for unjust enrichment requires three [*25] elements: "benefits conferred on one party by another, appreciation of such benefits by the recipient, and acceptance and retention of these benefits under such circumstances that it would be inequitable [or unjust] for the recipient to retain the benefits without

payment of value." *Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 477 (3d Cir. 2000)* (citing 16 Summary of Pa. Jur. 2d *Commercial Law* § 2.2); *see also Temple Univ. Hosp. Inc. v. Healthcare Mgmt. Alternatives, Inc., 2003 PA Super 332, 832 A.2d 501, 507 (Pa. Super. 2003)* (same).

MSC has alleged that it extended credit to NW Executive, NW Leasing, and JS Aviation–and that NWACC issued a guaranty to MSC on behalf of those companies. These companies, now insolvent, have not paid more that $247,000.00 of past due credit card debt. MSC has not alleged that this line of credit was extended to CAC, CFS, or GEC, however, and therefore has not demonstrated that this "benefit" was conferred upon these parties by MSC. n7 Moreover, MSC has failed to allege that anyone other than NWACC "accepted" these benefits.

n7 It appears that the credit card debt was accumulated mainly through the purchase of airplane fuel. Fuel burned by aircraft under the ownership or control of NWACC, however, cannot possibly be held to have enriched CAC, CFS, or GEC, which had no interest in the aircraft at the time the fuel was purchased with the Multi Service Card. Fuel consumed by another business's aircraft cannot be considered a "benefit" to the companies now in control of those same aircraft.

**[*26]**

While MSC may be able to recover this debt through bankruptcy proceedings or other debt collection measures–or by establishing that CAC is liable under an instrumentality theory–it cannot recover against other parties based on an unjust enrichment theory for a benefit clearly conferred upon NW Executive, NW Leasing, and JS Aviation. MSC's sixth and seventh counterclaims will be dismissed with prejudice, as will the sixth claim in its third party complaint.

**Conclusion**

For the foregoing reasons, MSC has failed to state a claim against either CFS or GEC upon which relief can be granted. With the exception of its claim under an instrumentality theory, MSC has also failed to state a legally sufficient claim against CAC. An appropriate order follows.

**ORDER**

YOHN, J.

And now, this _____th day of August, 2004, upon consideration of third–party defendant General Electric

Capital Corp.'s motion to dismiss and defendant Multi-Service Aviation Corp.'s opposition thereto, and upon consideration of plaintiff CFS Air's motion to dismiss and Multi–Service's opposition thereto, it is hereby ORDERED that:

1.) General Electric Capital Corp.'s motion to dismiss (Doc. # 27) is **[*27]** GRANTED and all claims against GEC are DISMISSED;

    a.) Counts I and VI of Multi-Service's Third–Party Complaint (Doc. # 22) are DISMISSED with prejudice;

    b.) Counts II, III, IV, and V of Multi-Service's Third–Party Complaint are DISMISSED without prejudice to the right of Multi-Service to file an amended Third-Party Complaint within twenty days of the date of this order;

2.) Plaintiff CFS Air's motion to dismiss (Doc. # 28) is GRANTED and all counterclaims against CFS Air are DISMISSED;

    a.) Counts I and VII of Multi-Service's counterclaim complaint (Doc. # 22) are DISMISSED, as to plaintiff CFS Air, with prejudice;

    b.) Counts II, III, and IV of Multi-Service's counterclaim complaint are DISMISSED without prejudice to the right of Multi-Service to file an amended Third–Party Complaint within twenty days of the date of this order.

3.) Multi-Service's counterclaims 1, 2, 3, 4, and 6 against plaintiff Corporate Aviation Concepts, Inc. are DISMISSED;

    a.) Counts I and VI of Multi-Services's counterclaim complaint are DISMISSED, as to plaintiff CAC, with prejudice.

    b.) Counts II, III, and IV of Multi-Service's counterclaim complaint are DISMISSED, **[*28]** as to plaintiff CAC, without prejudice to the right of Multi-Service to file an amended Third–Party Complaint within twenty days of the date of this order;

4.) A status conference will be held on September 16, 2004, at 4:00 p.m. in chambers.

William H. Yohn, Jr., Judge.

# EXHIBIT G

LEXSEE 2004 U.S. DIST. LEXIS 16957

**STEPHEN L. FLOOD, Luzerne County Controller, and THE LUZERNE COUNTY RETIREMENT BOARD o/b/o THE LUZERNE COUNTY EMPLOYEE RETIREMENT SYSTEM, Plaintiffs, v. THOMAS A. MAKOWSKI, et al., Defendants.**

CIVIL ACTION NO. 3:CV-03-1803

UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

*2004 U.S. Dist. LEXIS 16957; Fed. Sec. L. Rep. (CCH) P92,899*

**August 24, 2004, Decided**

**DISPOSITION:** Defendants' motions to dismiss were granted in part and denied in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** **[*1]** For Stephen L. Flood, Luzerne County Controller, The Luzerne County Retirement Board, on behalf of The Luzerne County Employee Retirement System, Plaintiffs: Albert S. Dandridge, III, Schnader Harrison Segal & Lewis LLP, Philadelphia, PA. Christopher P. Cullen, Dunmore, PA. Elizabeth Ainslie, Schnader Harrison Segal & Lewis LLP, Philadelphia, PA. Stephen J. Shapiro, Schnader, Harrison, Segal & Lewis LLP, Philadelphia, PA. Theresa E. Loscalzo, Schnader Harrison Segal & Lewis LLP, Philadelphia, PA. Wilbur L. Kipnes, Schnader Harrison Segal & Lewis, LLP, Philadelphia, PA.

For Thomas A. Makowski, Defendant: Aaron Krauss, Cozen O'Connor, Philadelphia, PA. Peter John Moses, Moses & Gelso, LLP, Wilkes-Barre, PA. John P. Moses, Moses & Gelso, Wilkes-Barre, PA.

**JUDGES:** A. Richard Caputo, United States District Judge.

**OPINIONBY:** A. Richard Caputo

**OPINION:**

**MEMORANDUM**

Presently before the Court are nine separate motions to dismiss filed by various Defendants. (Docs. 46, 91, 93, 95, 96, 98, 100, 104, and 108.) In total, every Defendant except Linsco Private Ledger Corporation (hereinafter LPL) n1 filed a motion to dismiss. The motions challenge Plaintiffs' standing to bring the suit and argue **[*2]** that the claims are time barred and that the Complaint fails to state a claim upon which relief can be granted. For the reasons set forth below, I will grant the motions in part and deny the motions in part. The Court has jurisdiction pursuant to *28 U.S.C. § 1331* and *28 U.S.C. § 1367(a)*.

> n1 LPL filed a Motion to Compel Arbitration and to Stay Proceedings (Doc. 102), which I will address separately.

**FACTUAL BACKGROUND**

The present action focuses on the events leading up to and surrounding the investment contracts made by the Luzerne County Retirement Board (hereinafter the Board) and Board members during the period of 1988 and 2002. Plaintiffs allege that various Board members engaged in a pay-to-play scheme in which contracts to invest or manage pension plan assets were awarded in exchange for campaign contributions to various Board members' re-election campaigns.

Luzerne County maintains a pension plan for employees (hereinafter the Plan). The Plan is administered **[*3]** by the Board. In March, 1988, the Board retained ASCO Financial Group, Inc. (hereinafter ASCO) as an investment advisor to the Plan. ASCO remained the financial advisor until September 5, 2002. During the course of the relationship with ASCO, various Board members approved contracts to invest the Plan's money. The Complaint alleges that most of the contracts were not properly approved by the Board through a vote at a public meeting and were instead signed by individual Board members. The Board members allegedly involved are Thomas A. Makowski, Thomas P. Pizano, Frank Crossin, and Joseph Jones. n2 The following facts are alleged in the Complaint:

> n2 The Complaint also alleges that Board members Joseph S. Tirpak, Jim Phillips, and Frank

Case 1:05-cv-00165-JJF    Document 36-2    Filed 06/10/2005    Page 62 of 121

Page 2

2004 U.S. Dist. LEXIS 16957, *3; Fed. Sec. L. Rep. (CCH) P92,899

Trinisewski acted with the aforementioned Board members in approving certain contracts (*see, e.g.,* Doc. 1 P46), but they are not named as defendants.

The Plan entered into four contracts with Provident Mutual Life Insurance Company of Philadelphia (hereinafter Provident). The **[*4]** first contract was to manage $6 million of assets. The remaining three contracts were to purchase annuities totaling more than $60 million. The Plan paid more than $5 million in fees, which included commissions, over the course of the contracts. ASCO received commissions from Provident for each of these contracts, and certain ASCO officers received commissions for two of the Provident contracts. Joseph J. Joyce Associates, Inc. (hereinafter JJJA) also received commissions for each of the contracts. These contracts will be referred to throughout the opinion as the first, second, third, and fourth Provident Agreements. Nationwide Life Insurance Company (hereinafter Nationwide) is the successor-in-interest to Provident.

The Plan entered into two contracts with The Manufacturers Life Insurance Company (U.S.A.) (hereinafter Manulife). The contracts were for Manulife to manage a total of more than $20 million. The Plan paid nearly $1.9 million in fees and commissions over the course of the contracts. JJJA and Donald Williamson, ASCO's President and CEO, received commissions for both contracts. ASCO also received a commission for the first contract. These contracts will be referred **[*5]** to throughout the opinion as the first and second Manulife Agreements.

The Plan entered into a contract with Wells Real Estate Funds, Inc. (hereinafter Wells). The contract called for two purchases into the Wells Real Estate Investment Trust, Inc. (hereinafter Wells REIT), the first for $1 million and the second for $9 million. The $10 million was given to FSC Securities Corporation (hereinafter FSC), which in turn transmitted the funds to Wells REIT. The Plan paid more than $300,000 in fees, which included commissions, Joseph C. Perfilio, Michael Joyce, and Donald Williamson all received commissions in relation to the Wells REIT purchases. This contract will be referred to throughout the opinion as the Wells Agreement.

The Plan entered into a contract with Rochdale Investment Management, Inc., n3 in which Rochdale invested $1.1 million through FSC. The Plan realized losses of more than $500,000 over the life of the investment. Joseph Perfilio and Donald Williamson received commissions related to the contract. This contract will be referred to throughout the opinion as the FSC Agreement.

    n3 Rochdale Investment Management, Inc. is not named as a defendant.

**[*6]**

Donald Williamson signed a contract on behalf of the Plan in which First Security Investments, Inc. (hereinafter FSI) would manage $1.25 million of the Plan's assets. The funds were invested in FSI notes. The Plan realized a loss of more than $1.6 million over the life of the investment. Donald Williamson received a commission for his part in the contract. This contract will be referred to throughout the opinion as the FSI Agreement.

The Plan entered into a contract with LPL in which LPL would manage $1.5 million. The Plan paid $69,000 in fees, and realized a gain of more than $300,000. This contract will be referred to throughout the opinion as the LPL Agreement.

The Plan also entered into several contracts for investment advice and management. The Plan entered a contract with ASCO in 1988 for ASCO to act as an investment plan advisor. This arrangement lasted until 2002. In 1999, the Plan contracted with ASCO to administer the daily operations of the Plan. Maria Williamson, ASCO's Vice-President/Operations, was responsible for overseeing these daily operations. The Plan entered a contract with Safeco Life Insurance Corporation (hereinafter Safeco) in which it was given money **[*7]** to invest. Safeco also acted to collect the fees the Plan paid to ASCO. In September, 2002, the Board dissolved its relationship with ASCO.

Between 1988 and 2002 Donald Williamson, Maria Williamson, John J. Joyce, Joseph Joyce, Jr. (hereinafter Joseph Joyce), Jerome McHale, Joyce Jackman & Bell Insurers (hereinafter JJ&B), William Joyce, Joseph Perfilio, Gary Houseman, Steven Alinikoff, Michael Hirthler, ASCO, Safeco, Joseph Joyce Insurance (hereinafter JJI), and Devonshire Capital Management, LLC (hereinafter Devonshire) made campaign contributions to various Board members. n4

    n4 Jerome McHale, Gary Houseman, Steven Alinikoff, and Michael Hirthler are not named as defendants.

**PROCEDURAL BACKGROUND**

On October 9, 2003, Plaintiffs filed a ninety-eight page Complaint raising eight claims against twenty-six Defendants. Plaintiffs bring the following claims against Defendants as listed below:

2004 U.S. Dist. LEXIS 16957, *7; Fed. Sec. L. Rep. (CCH) P92,899

---

| (1) | Count I | Breach of fiduciary duty – Defendants Makowski, Pizano, Crossin, Jones, ASCO, and Donald Williamson; |
|---|---|---|
| (2) | Count II | Aiding and abetting breach of fiduciary duty – Defendants Nationwide, Manulife, Wells, Wells Investment Securities, Inc. (hereinafter Wells Investment), Wells REIT, FSC, FSI, LPL, Safeco, Devonshire, Perfilio, Joyce Associates, Inc., JJI, JJJA, JJ&B, Joseph Joyce, William Joyce, Michael Joyce, John Joyce, and Maria Williamson; |
| (3) | Count III | Arising from *18 U.S.C. § 1964*(c) for violations of § 1962(c), conducting and participating in an enterprise by engaging in a pattern of racketeering activity – all Defendants; |
| (4) | Count IV | Arising from *18 U.S.C. § 1964*(c) for violations of § 1962(d), conspiring to violate § 1962(c) – all Defendants; |
| (5) | Count V | Arising from *18 U.S.C. § 1964*(c) for violations of § 1962(b), acquiring and maintaining an interest or control of an enterprise engaged in a pattern of racketeering activity – all Defendants; |
| (6) | Count VI | Arising from *18 U.S.C. § 1964*(c) for violations of § 1962(d), conspiring to violate § 1962(b) – all Defendants; |
| (7) | Count VII | Violating the Investment Advisors Act – Defendants Donald Williamson and ASCO; and |
| (8) | Count VIII | Unjust enrichment – Defendants ASCO, Donald Williamson, FSC, FSI, LPL, Manulife, Nationwide, Wells, Wells REIT, Wells Investment, Perfilio, JJI, JJJA, Joseph Joyce, Michael Joyce, and John Joyce. |

---

**[*8]**

All Defendants, with the exception of LPL n5, filed a total of nine motions to dismiss. n6 (Docs. 46, 91, 93, 95, 96, 98, 100, 104, and 108.) In sum, the motions raised the following challenges: lack of standing, filing past the statute of limitations, lack of standing to bring the RICO claims, failure to state a claim upon which relief can be granted for the RICO claims, lack of supplemental jurisdiction to hear the state law claims, and failure to state a claim upon which relief can be granted for the state law claims of aiding and abetting breach of fiduciary duty and unjust enrichment. Plaintiffs filed a brief in opposition to one motion to dismiss (Doc. 46). (Doc. 85.) Because of the similarity of the issues among the motions, the Court permitted Plaintiffs to file a single brief in opposition to the remaining eight motions to dismiss. (Doc. 151.) The moving Defendants filed reply briefs. This matter is now ripe for disposition.

n5 LPL filed a Motion to Compel Arbitration and to Stay Proceedings (Doc. 102) which I will address separately.

n6 Safeco's motion was actually filed as a motion to dismiss or, in the alternative, a motion for

2004 U.S. Dist. LEXIS 16957, *8; Fed. Sec. L. Rep. (CCH) P92,899

summary judgment. (Doc. 93.) I chose not to convert the motion to one for summary judgment.

**[*9]**

### LEGAL STANDARD

*Rule 12(b)(6) of the Federal Rules of Civil Procedure* provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. Dismissal is appropriate only if, accepting all factual allegations in the complaint as true and "drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations in the complaint." *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc., 140 F.3d 478, 483 (3d Cir. 1998).*

In deciding a motion to dismiss, the Court should consider the allegations in the complaint, exhibits attached to the complaint and matters of public record. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).* The Court may also consider "undisputedly authentic" documents where the plaintiff's claims are based on the documents and the defendant has attached a copy of the document to the motion to dismiss. *Id.* The Court need not assume that the plaintiff can prove facts that were not alleged in the complaint, **[*10]** *see City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 263 (3d Cir. 1998),* nor credit a complaint's "bald assertions" or "legal conclusions." *Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).*

When considering a *Rule 12(b)(6)* motion, the Court's role is limited to determining whether the plaintiff is entitled to offer evidence in support of the claims. *See Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974).* The Court does not consider whether the plaintiff will ultimately prevail. *See id.* In order to survive a motion to dismiss, the plaintiff must set forth information from which each element of a claim may be inferred. *See Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993).* The defendant bears the burden of establishing that the plaintiff's complaint fails to state a claim upon which relief can be granted. *See Gould Elecs. v. United States, 220 F.3d 169, 178 (3d Cir. 2000).*

### DISCUSSION

Defendants raise many challenges to the Complaint in their motions to dismiss and supporting briefs. Most of the arguments are raised by all Defendants, while others are **[*11]** raised by some Defendants. In summary, the arguments raised by Defendants fall into four categories: challenges to the entire action; challenges that apply to all of the RICO claims, challenges that apply to all of the state law claims, and challenges to individual claims. I will address the general challenges first, and then I will address all of the challenges applicable to the federal claims before moving to the state law claims.

### 1) Justiciability

The Board member Defendants first challenge Plaintiffs' ability to bring this action. Defendants raise two arguments. First, the Board members contend that Plaintiffs lack standing to bring the suit, suggesting instead that the Plan beneficiaries must bring the action. Next, the Board members contend that the suit lacks redressability because any damages awarded against a Board member would have to be paid by the Plan.

Defendant Board members contend that Plaintiffs lack standing to bring the suit on two grounds: the Board is the Plaintiff at the same time the Board is "suing itself" (Doc. 105 at 25); and the Board has not suffered any injury. (Doc. 105 at 26.) I find both of these arguments without merit. First, the Board **[*12]** members mis-classify the nature of the action. The Board is not the sole Plaintiff in this action; Stephen L. Flood, the Luzerne County Controller is also a named Plaintiff. Second, there is nothing in the Complaint that ever suggests the Board is suing itself. The Board is suing individual Board members, not the legal entity that is the Luzerne County Retirement Board.

Defendants cite *McCarrell v. Cumberland County Employees Retirement Board, 120 Pa. Commw. 94, 547 A.2d 1293 (Pa. Commonw. Ct. 1988),* as suggesting that the only proper plaintiffs are the Plan's beneficiaries. I find *McCarrell* inapposite to the present case. *McCarrell* does not address the question whether a Board member may bring suit against other Board members on behalf of the fund. *McCarrell* likewise does not limit the fiduciary obligations of Board members to the beneficiaries of the plan. In fact, a full reading of *McCarrell* shows the Commonwealth Court was expanding the parties to whom the Board members owed duties, not restricting those duties. Pennsylvania law is clear that board members are fiduciaries of *the fund. 16 P.S. § 11659; 20 PA. CONS. STAT. ANN. § 7301.* Therefore, **[*13]** because the Board members owed obligations to the fund directly, it only stands to reason that the fund can use the Board to directly enforce those duties owed to it.

Defendant Board members' argument that Plaintiffs lack an injury is equally unconvincing. The argument seems premised on the notion that the Board did not suffer any injury, only the Plan suffered an injury. As I stated previously, the Board is suing on behalf of the Plan. The Complaint adequately alleges that the Plan suffered injuries. *See, e.g.,* discussion *supra* p. 18. Plaintiffs allege that the Board member Defendants entered into contracts

Case 1:05-cv-00165-JJF    Document 36-2    Filed 06/10/2005    Page 65 of 121

Page 5

2004 U.S. Dist. LEXIS 16957, *13; Fed. Sec. L. Rep. (CCH) P92,899

which were unsound investments and which cost the Plan excessive management fees. The excessive fees allegation constitutes an actual, direct harm.

Lastly, Defendant Board members suggest that the case against them lacks any available means of redress because any award against them would be paid by the fund, to the fund. This notion is premised upon an unusual reading of *title 16, section 11654* of the Pennsylvania Code, which provides that "[the board members] shall be reimbursed for all expenses necessarily incurred in the performance of their duty." n7 Pennsylvania **[*14]** law makes clear that "necessarily incurred" expenses are only those expenses which needed to be incurred in the interest of the fund. *718 Arch St. Assocs., Ltd. v. Blatstein (In re Main, Inc.), 1999 U.S. Dist. LEXIS 7559, No. 98–158, 1999 WL 330239, at *6 (E.D. Pa. May 24, 1999)* (discussing Pennsylvania law); *see also Schwartz v. Keystone Oil Co., 153 Pa. 283, 287, 25 A. 1018 (Pa. 1893)*. Clearly, the expenditure of money to defend actions in direct violation of the act (i.e., violations of fiduciary duties) would not be necessary expenses within the meaning of *section 11654*. If Plaintiffs' claims succeed against the Board members, they will have an available means of redress.

> N7 This sentence is interestingly juxtaposed to the sentences which require board members to take an oath of office that they will administer the fund fairly and without knowing violation of the provisions of the act. *16 P. S. § 11654*.

## 2) Racketeer Influenced and Corrupt Organizations Act Claims

Plaintiffs raise four claims based on the Racketeer Influenced and **[*15]** Corrupt Organizations Act, *18 U.S.C. § 1961 et seq.* (hereinafter RICO). Under RICO, "any person injured in his business or property by reason of a violation of *section 1962* of this chapter may sue therefor." *18 U.S.C. § 1964(c)*. Plaintiffs allege that Defendants violated *§ 1962(c), § 1962(b),* and *§ 1962(d)*. Defendants challenge the RICO claims generally on the grounds that they are time-barred and that Plaintiffs do not allege the existence of an enterprise. Defendants also raise challenges to the individual RICO claims. I will address the general challenges first and then move to the claim-specific challenges.

### A) Statute of Limitations

RICO has no explicit statute of limitations. Analogizing RICO to the Clayton Act, the Supreme Court adopted a four-year statute of limitations. *Agency Holding Corp. v. Malley–Duff & Assocs., 483 U.S. 143, 156, 97 L. Ed. 2d 121, 107 S. Ct. 2759 (1987)*. In 2000, the Court of Appeals for the Third Circuit adopted an injury discovery test for determining when the statute of limitations begins to run. *Forbes v. Eagleson, 228 F.3d 471, 484 (3d Cir. 2000)*. Under the injury discovery **[*16]** rule, the statute of limitations begins to accrue when a plaintiff knew or should have known that it suffered injuries and that the source of those injuries were the actions of another person. *Id. at 485*. n8 For determining the "injury" from which to analyze the statute of limitations, courts look to the allegations in the complaint. *See Prudential Ins. Co. of Amer. v. U.S. Gypsum, 359 F.3d 226, 234 (3d Cir. 2004)*.

> n8 One unsettled point is whether the statute of limitations runs at the time plaintiffs should have known about the injury (the injury discovery rule), or at the time plaintiffs should have known about the injury and after all of the elements of a RICO claim exist (the injury discovery and pattern rule). *Mathews v. Kidder, Peabody & Co., 260 F.3d 239, 245 n.7 (3d Cir. 2000)*. Under the injury discovery and pattern rule, when a plaintiff knows or should know about an injury before the necessary RICO elements exist, the RICO claim does not accrue until after the final element occurs, including a pattern of racketeering activity. *Id.*

**[*17]**

Plaintiffs argue that the doctrines of fraudulent concealment and adverse domination preserve their right to file suit beyond the four year statute of limitations. Under the fraudulent concealment doctrine, knowledge of an injury caused by another still accrues the statute of limitations, but the statute of limitations is tolled when a defendant actively misleads the victim about the cause of the injury. *Forbes, 228 F.3d at 486*. Plaintiffs are eligible for equitable tolling only if they exercised reasonable diligence in investigating their claims. *Prudential, 359 F.3d at 238* (citing *Klehr v. A.O. Smith Corp., 521 U.S. 179, 194, 138 L. Ed. 2d 373, 117 S. Ct. 1984 (1997)*).

> Thus, ordinarily when plaintiffs seek to demonstrate a case for equitable tolling, and defendants seek *summary judgment* on the issue, a court must determine (1) whether there is sufficient evidence to support a finding that defendants engaged in affirmative acts of concealment designed to mislead the plaintiffs regarding facts supporting their [RICO] claim, (2) whether there is sufficient evidence to support a finding that plaintiffs exercised

Case 1:05-cv-00165-JJF    Document 36-2    Filed 06/10/2005    Page 66 of 121

Page 6

2004 U.S. Dist. LEXIS 16957, *17; Fed. Sec. L. Rep. (CCH) P92,899

reasonable diligence, and **[\*18]** (3) whether there is sufficient evidence to support a finding that plaintiffs were not aware, nor should they have been aware, of the facts supporting their claim until a time within the limitations period measured backwards from when the plaintiffs filed their complaint.

*Forbes, 228 F.3d at 487* (emphasis added). When evaluating fraudulent concealment, it requires a fact–specific analysis which is best reserved for summary judgment, rather than a motion to dismiss. *Shapo v. O'Shaughnessy, 246 F. Supp. 2d 935, 951 (N.D. Ill. 2002)* (citing *Johnson Controls, Inc. v. Exide Corp., 129 F. Supp. 2d 1137, 1142 (N.D. Ill. 2001)*).

Under the doctrine of adverse domination, the statute of limitations is tolled when the plaintiff is controlled or dominated by wrongdoers. *See Shapo, 246 F. Supp. 2d at 953* (citing *Resolution Trust Corp. v. Gallagher, 800 F. Supp. 595, 600 (N.D. Ill. 1992)*). The principle underlying adverse domination is that officers or directors engaging in activities that harm an entity will not bring suit against themselves. *Id.; see also Resolution Trust Corp. v. Gardner, 798 F. Supp. 790, 795 (D.D.C. 1992)* **[\*19]** (adopting adverse domination and citing other federal jurisdictions that have). The statute of limitations does not begin to run until the entity is no longer controlled by the wrongdoers. *Shapo, 246 F. Supp. 2d at 953.*

Reading the Complaint in the light most favorable to Plaintiffs, they allege the three elements necessary to prove fraudulent concealment: Defendants actively mislead Plaintiffs; the misleading prevented Plaintiffs from discovering the injury; and Plaintiffs did not fail to engage in reasonable due diligence. Plaintiffs allege that the investment companies conspired with the Board members to defraud the Plan, and in doing so they actively concealed the nature of the relationships between the Board, the investment companies, and ASCO employees. Plaintiffs also allege that the Board members adopted contracts outside of the public eye, without proper voting and not during public meetings. They further allege that the financial statements were concealed from the beneficiaries of the Plan by being sent to ASCO instead of the Board. All of these actions prevented the beneficiaries of the Plan from discovering the nature of the investment contracts in which **[\*20]** the Plan's funds were being invested. Furthermore, because the Board was adversely dominated by the alleged wrongdoers, the statute of limitations was tolled until the Board was no longer controlled by those parties.

Whether Plaintiffs will be successful in proving fraudulent concealment or adverse domination is a fact–specific analysis which is inappropriate for a motion to dismiss, *Shapo, 246 F. Supp. 2d at 951*, but it is clear to the Court that Plaintiffs sufficiently pled fraudulent concealment and adverse domination to survive a motion to dismiss. Therefore, I will not dismiss Plaintiffs' action for failure to file within the prescribed statute of limitations.

**B) Enterprise**

An essential requirement of RICO is the existence of an enterprise. *See, e.g., 18 U.S.C. § 1962(b) and (c).* An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *18 U.S.C. § 1961(4).* An enterprise must be an "entity separate and apart from the pattern of racketeering activity in which it engages." **[\*21]** *United States v. Turkette, 452 U.S. 576, 583, 69 L. Ed. 2d 246, 101 S. Ct. 2524 (1981).*

The existence of an enterprise can be proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* The Court of Appeals for the Third Circuit has expanded *Turkette* by requiring that the enterprise is an ongoing organization with a framework for making or carrying out decisions, that the various associates function as a continuing unit, and that the enterprise is separate and apart from the pattern of racketeering activity. *United States v. Irizarry, 341 F.3d 273, 286 (3d Cir. 2003)* (quoting *United States v. Riccobene, 709 F.2d 214, 222 (3d Cir. 1983)*). The ongoing nature of an enterprise does not require that all of the members participate from beginning to end. *United States v. Parise, 159 F.3d 790, 795 (3d Cir. 1998)* (quoting *United States v. Feldman, 853 F.2d 648, 659 (9th Cir. 1988)*). The enterprise must maintain a shared organizational pattern and system of authority. *Id.* (citing *United States v. Lemm, 680 F.2d 1193, 1199 (8th Cir. 1982)*). **[\*22]**

Plaintiffs argue that the enterprise consisted either of the Board (Doc. 1 P184), or an association–in–fact of the Board members. (Doc. 1 P185.) Plaintiffs' claims are that the Board, which is responsible for administering the Plan's funds, engaged in racketeering activity that victimized the Plan. The present action is not unlike a situation in which board members of a corporation rob the corporation of its assets. In such instances, the wrongdoers and the victim are both internal to the corporation. However, the Court of Appeals for the Third Circuit has made clear that a corporation can be either the victim or the enterprise, not both. *See discussion, Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., 46 F.3d 258, 267 (3d Cir. 1995)* (resolving conflict between *Nat'l Org. for Women v. Scheidler, 510 U.S. 1215, 127 L. Ed. 2d 688, 114 S. Ct. 1340 (1994)* and *Reves v. Emst & Young, 507 U.S. 170, 122 L. Ed. 2d 525,*

2004 U.S. Dist. LEXIS 16957, *22; Fed. Sec. L. Rep. (CCH) P92,899

*113 S. Ct. 1163 (1993))*. Thus, in instances in which the racketeering activity is committed by people within the company and the victim of the racketeering activity is the corporation, the enterprise is not the corporation itself; an association–in–fact of the board members or corporate **[*23]** officers constitutes the enterprise. *Id.* In the present case, the Plan was the victim, therefore, the Board of the Plan could not also be the enterprise. Instead, the association–in–fact of the Board members as alleged in the Complaint constituted the enterprise.

An association–in–fact can be separate from the criminal activities by the fact that it engages in more than one scheme. *See Town of Keamy v. Hudson Meadows Urban Corp., 829 F.2d 1263, 1266 (3d Cir. 1987)*. Thus, the twelve separate schemes alleged in the Complaint suggest that the Board members' association–in–fact was separate from the racketeering activities. Because the organizational pattern and system of authority remained the same, the enterprise alleged was continuous over the course of the fourteen years, even though some of the members of the Board changed. See *Parise, 159 F.3d at 795*.

### C) Count III – § 1962(c) Participating in an Enterprise Through a Pattern of Racketeering Activity

Count III is based in *18 U.S.C. § 1964(c)* and alleges that Defendants violated *18 U.S.C. § 1962(c)*. *Section 1962(c)* prohibits "any person employed **[*24]** by or associated with any enterprise engaged in, or the activities of which affect, interstate commerce or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." A pattern of racketeering activity is established by showing at least two predicate acts that occurred within ten years of each other. *18 U.S.C. § 1961(5)*.

Any crime enumerated in *18 U.S.C. § 1961(1)* may constitute a predicate act, which includes mail and wire fraud. *18 U.S.C. § 1961(1)(B)*. Where fraud is alleged as a predicate act, the plaintiff must allege the fraud with particularity. See *generally FED. R. CIV. P. 9(b)*. Any crime which constitutes a securities fraud is expressly excluded by the Private Securities Litigation Reform Act. *18 U.S.C. § 1964(c)*. Although two predicate acts are necessary to establish a pattern of racketeering activity, they are not necessarily sufficient. *H. J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 237, 106 L. Ed. 2d 195, 109 S. Ct. 2893 (1989)*. **[*25]** The predicate acts must be related and amount to or threaten to become continued criminal activity. *Id. at 239*.

Thus, to survive a motion to dismiss, Plaintiffs' Complaint must allege, with particularity where fraud is alleged, at least two non–securities–related predicate

acts which can be attributed to each Defendant, and those acts must be related and amount to continued criminal activity. Furthermore, Plaintiffs must have suffered an injury as a result of the racketeering activity. *18 U.S.C. § 1964(c)*. Defendants argue that Plaintiffs do not allege an injury from a violation of *§ 1962*, nor do they allege a violation of *§ 1962* itself. Defendants argue that Plaintiffs do not allege predicate acts, that any acts alleged are not alleged with particularity, that any acts alleged are barred by the Private Securities Litigation Reform Act, and that any acts alleged do not constitute a pattern of racketeering activity. I will address each of these challenges in turn.

#### i) Standing

Although Plaintiffs have established the threshold requirement that they have standing to bring the present action, there is an independent question whether they **[*26]** have standing to bring a claim under RICO's civil remedies provision *§ 1964(c)*. *See, e.g., Maio v. Aetna Inc., 221 F.3d 472, 482 (3d Cir. 2000)* (citing *DeMauro v. DeMauro, 115 F.3d 94, 96 (1st Cir. 1997))*. Standing to bring a RICO claim exists when there is an injury to a plaintiff's business or property and the injury was proximately caused by a violation of *§ 1962*. *Maio, 221 F.3d at 483*; *see also Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 87 L. Ed. 2d 346, 105 S. Ct. 3275 (1985)* ("The plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation [of RICO]."). An injury must be a concrete financial loss to the plaintiff. *Maio, 221 F.3d at 483–84*. An out–of–pocket monetary loss satisfies this requirement. *Id.* Failure to perform a paid–for contractual right can constitute an injury. *Id. at 490*; *see also Mehling v. N.Y. Life Ins. Co., 163 F. Supp. 2d 502, 507 (E.D. Pa. 2001)*.

In the present case, the Plan, through its Board, is suing Defendants for entering into contracts **[*27]** which resulted in the Plan paying excessive fees, as well as suffering economic losses through bad investments. The payment of excessive fees was a loss suffered by the Plan directly, which it paid for out of its pocket. Likewise, the Complaint alleges the injury is the direct result of the frauds stemming from Defendant Board members and Defendant investment managers' collusion to enter the Plan into inappropriate contracts. I find Plaintiffs sufficiently allege an injury resulting from a pattern of racketeering activity.

#### ii) Two Predicate Acts

Defendants next argue that Plaintiffs' RICO claims fail to state a claim upon which relief can be granted because they fail to allege a violation of *§ 1962(c)*. *Section 1962(c)* requires that a defendant engage in a pattern of

2004 U.S. Dist. LEXIS 16957, *27; Fed. Sec. L. Rep. (CCH) P92,899

racketeering activity. A pattern of racketeering activity requires at least two predicate acts that occurred within ten years of each other. *18 U.S.C. § 1961(5)*. Any crime enumerated in *18 U.S.C. § 1961(1)* may constitute a predicate act, which includes mail and wire fraud. *18 U.S.C. § 1961(1)(B)*.

In the present case, Plaintiffs' Complaint [*28] alleges that various Defendants committed acts of mail or wire fraud. Mail and wire fraud occur when there is: (1) a scheme to defraud; (2) use of the mails (for mail fraud) or interstate wire communications (for wire fraud) in furtherance of the scheme; and (3) fraudulent intent. *United States v. Pharis, 298 F.3d 228, 234 (3d Cir. 2002)* (citing *United States v. Sturm, 671 F.2d 749, 751 (3d Cir. 1982)*).

Mail and wire fraud schemes to defraud do not require an actual misrepresentation of fact. *See discussion, McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786, 791 (1st Cir. 1990)*. Fraudulent schemes include schemes to deprive another of the "intangible right of honest services." *18 U.S.C. § 1346*. State and local officials and public employees can be held accountable under the statute when they deprive "the citizens they serve of their right to honest services." *United States v. Antico, 275 F.3d 245, 262 (3d Cir. 2001)*. This doctrine is applied when an official takes bribes for official decisions or actions, or when an official fails to disclose a conflict of interest. *See United States v. Panarella, 277 F.3d 678, 690 (3d Cir. 2002)*. [*29]

The mailing does not have to contain a misrepresentation. "'Innocent' mailings – ones that contain no false information – may supply the mailing element." *Schmuck v. United States, 489 U.S. 705, 715, 103 L. Ed. 2d 734, 109 S. Ct. 1443 (1989)*. Moreover, the scheme itself does not have to contemplate the use of mails. *Pharis, 298 F.3d at 234*. "All that is required is that the defendants knowingly participated in a scheme to defraud and caused a mailing to be used in furtherance of the scheme." *Id.* (citing *Sturm, 671 F.2d at 751* and *United States v. Pearlstein, 576 F.2d 531, 534 (3d Cir. 1978)*). "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can be reasonably foreseen, even though not actually intended, then he 'causes' the mails to be used." *Pereira v. United States, 347 U.S. 1, 8–9, 98 L. Ed. 435, 74 S. Ct. 358 (1954)* (citing *United States v. Kenofskey, 243 U.S. 440, 61 L. Ed. 836, 37 S. Ct. 438 (1917)*). Because the federal violation is the mailing, each use of the mails which is "incident to an essential part of the scheme" is a separate violation. [*30] *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1413 (3d Cir. 1991)* (quoting *Pereira, 347 U.S. at 8*).

Plaintiffs allege that Board members were induced to award management and investment contracts on the basis of campaign contributions made to the Board members by people affiliated with the contract recipients. Plaintiffs further allege that these contracts were improper for the fund and Defendants concealed the fees and costs of the contracts. These allegations of deceit are clearly sufficient to constitute a fraudulent scheme under the mail and wire fraud statutes. Particularly, there are at least two, if not three, separate fraudulent schemes occurring: a denial of honest dealings, intentional concealment of the contracts, and concealment of the terms of the contracts. Plaintiffs also allege more than fifty uses of mail or wire communications to further these schemes. Thus, Plaintiffs allege the basic elements of mail and wire fraud.

While Plaintiffs allege the basic elements of mail and wire fraud, it is less clear against which Defendants these allegations are made. Plaintiffs contend all Defendants conspired in the single scheme of pay–to–play [*31] contract granting, and, therefore, the actions of any party within the scheme constitutes mail or wire fraud committed by every Defendant. Plaintiffs base this argument on three separate allegations in the Complaint. First, the conclusory allegations in Paragraphs 196 and 213 that "defendants conspired to perpetuate a scheme" and the blanket allegations in Paragraph 188 which describe the scheme in general terms and refer to Defendants collectively as "the collaborators." These conclusory allegations in Plaintiffs' Complaint are insufficient to permit the Court to hold each Defendant accountable for the actions of every Defendant. The dealings alleged by Plaintiffs show a series of fraudulent schemes, each involving various Defendants.

As alleged in the Complaint, the schemes actually involved two sets of actors. First, there was a core group of participants who ran the pay–to–play schemes, these parties include the Board members, who approved the contracts, ASCO, which brokered the contracts and oversaw the daily financial operations of the Plan's funds, and various ASCO employees. The second set of actors were the parties who "purchased" contracts in the pay–to–play schemes. This [*32] includes the investment companies themselves, various people and entities who assisted in the purchase of the contract by making campaign contributions, as well as those who benefitted from the contract through commissions.

There is nothing in Plaintiffs' Complaint which alleges that Defendants were universally involved with the activities of every contract, or that Defendants even were aware that the other contracts existed. In essence, each contract purchase was a separate fraudulent scheme. As such, the use of mail or wire communications by one Defendant did not necessarily forward a scheme in which

2004 U.S. Dist. LEXIS 16957, *32; Fed. Sec. L. Rep. (CCH) P92,899

all of the Defendants were implicated. When evaluating whether there are two predicate acts alleged, I will review the allegations according to the activities alleged against an individual Defendant. For ASCO, Donald Williamson, Nationwide, JJ&B, Joseph Joyce, John Joyce, William Joyce, Manulife, FSI, and Safeco, the Complaint alleges two or more acts of mail or wire fraud committed by each Defendant directly. (Doc. 1 P189.)

For the remaining Defendants, although the Complaint does not allege that they personally used the mail or wires twice, the Complaint may allege two or more predicate [*33] acts of mail or wire fraud against a defendant. A defendant can be held accountable for each use of mail or wire communications that forwards a scheme in which the defendant participated, as long as the use of the mail or wires was reasonably foreseeable by the defendant. *See Pereira, 347 U.S. at 8–9.*

### a) ASCO Affiliates

For the Board members (Defendants Makowski, Pizano, Crossin, and Jones), the Complaint alleges that each campaign contribution was mailed. Although these Defendants did not initiate the mailings, it is clear that the mailing of the contributions furthered the pay–to–play scheme. The use of the mail is reasonably foreseeable in a pay–to–play scheme. Additionally, because the Complaint alleges that the Board members were all involved in the scheme for each contract, any use of mail or wire communications in furtherance of the schemes is an allegation of mail fraud against all of the Board members. Plaintiffs' Complaint alleges at least two predicate acts committed by Defendants Makowski, Pizano, Crossin, and Jones.

In regards to Maria Williamson, the Complaint alleges that she used the mail only once. (Doc. 1 P189mm.) However, the Complaint clearly [*34] alleges that Maria Williamson acted as the Vice President/Operations for ASCO during the time in which ASCO administered the daily operations of the Plan. (Doc. 1 P53.) It is a reasonable inference that Maria Williamson was involved with ASCO in the alleged fraudulent schemes which took place during this time period, thus, the uses of the mail related to those schemes n9 constitutes mail fraud by Maria Williamson. Plaintiffs' Complaint alleges at least two predicate acts committed by Defendant Maria Williamson.

       n9 For instance, ASCO mailed an administration agreement to Defendant Makowski allegedly in furtherance of a fraudulent scheme (Doc. 1 P189oo), and ASCO mailed a Special Agent's Agreement to Provident allegedly in furtherance of a fraudulent scheme. (Doc. 1 P189pp.)

### b) The Wells Agreement

Perfilio is directly alleged to have committed a single act, in that he mailed a campaign contribution to Defendants Makowski and Pizano. (Doc. 1 P189gg.) Neither Michael Joyce nor FSC is directly alleged to have [*35] committed any acts. Wells, Wells REIT, and Wells Investment are directly alleged to have committed a single act, they mailed the Wells Agreement to the Plan. (Doc. 1 P189bb.) While the Complaint does not allege two acts against each of these Defendants directly, the Complaint clearly implicates all of the these Defendants in the scheme to defraud the Plan related to the Wells Agreement. (Doc. 1 PP116 – 125.)

The uses of the mails alleged were reasonably foreseeable as part of the Wells Agreement scheme. Because these Defendants are identified in a scheme together, the use of mail or wire to by any of these Defendants in furtherance of the scheme satisfies the use of mail or wire communications for all of these Defendants. Thus, the allegations that one Defendant used the mail or wires constitutes an allegation of mail or wire fraud against all of these Defendants. Plaintiffs' Complaint alleges at least two predicate acts committed by Defendants Perfilio, Michael Joyce, FSC, Wells, Wells REIT, and Wells Investment.

### c) Miscellaneous Defendants

For JJJA, there are no allegations that it directly used the mail or wires. The Complaint clearly implicates JJJA in the four Provident [*36] Agreements entered into between December, 1991, and June, 2000, (*see, e.g.,* Doc. 1 PP66, 75, 85, 93) and the two Manulife Agreements. (Doc. 1 PP103 and 109.) These allegations create a foundation to substantiate the blanket allegation that JJJA acted with other Defendants in a scheme. In particular, it is a reasonable inference that JJJA acted with Defendants ASCO, Donald Williamson, Nationwide, Manulife, William Joyce, Makowski, Pizano, Crossin, and Jones. The Complaint alleges multiple uses of the mail and wires by these Defendants to further the schemes in which JJJA was involved. These uses of the mail were reasonably foreseeable in the course of the schemes. Plaintiffs' Complaint alleges at least two predicate acts committed by Defendant JJJA.

In regards to Devonshire, the Complaint alleges that the Devonshire mailed a campaign contribution to Defendants Makowski and Pizano. n10 The Complaint does create some tangential connection between Devonshire and other named Defendants. The Complaint alleges that Donald Williamson, who made campaign contributions to Defendants Makowski, Pizano, Crossin, and Jones, was affiliated with Devonshire. The

2004 U.S. Dist. LEXIS 16957, *36; Fed. Sec. L. Rep. (CCH) P92,899

Complaint also links Devonshire [*37] with Perfilio, who is alleged to be involved in the FSC transaction campaign contributions to Defendants Makowski and Pizano.

> n10 The allegation that Devonshire mailed the campaign contribution is in itself questionable because the Complaint alleges "a mailing on or about April 9, 1999 by Perfilio or Devonshire . . . ." (Doc. 1 P189gg.)  This allegation arguably lacks specificity required under *Rule 9(b), see, e.g., Lum v. Bank of Am., 361 F.3d 217, 224-25 (3d Cir. 2004)*, but I don't need to reach that issue because the Complaint's allegations fail against Devonshire on other grounds.

Aside from these connections, the Complaint fails to explain how Devonshire was in anyway connected with any of the transactions between the Board, ASCO, and the investment companies. The Complaint also does not indicate that either Defendants Donald Williamson or Perfilio were acting on behalf of Devonshire at the time they made the campaign contributions. The fact that Devonshire was tangentially connected to two [*38] named Defendants who were allegedly involved in a scheme to defraud does not create any inference that Devonshire was involved in the scheme. While the fact that Devonshire made a political contribution may suggest its involvement in the pay-to-play scheme, the Complaint does not link Devonshire to a particular fraudulent scheme. Therefore, I cannot infer that it caused any mailings other than those which it made directly. I find that Plaintiffs' Complaint fails to allege two predicate acts and, consequently, fails to allege a pattern of racketeering activity by Defendant Devonshire.

JJI is alleged to have mailed a single campaign contribution. (Doc. 1 P188h.) Aside from this contribution, the Complaint fails to explain how JJI was in anyway connected with any of the transactions between the Board, ASCO, and the investment companies. While the fact that JJI made a political contribution may suggest its involvement in the pay-to-play scheme, the Complaint does not link JJI to a particular fraudulent scheme. Therefore, I cannot infer that it caused any mailings other than those which it made directly. I find that Plaintiffs' Complaint fails to allege two predicate acts, and, therefore, [*39] the Complaint fails to allege a pattern of racketeering activity by Defendant JJI.

For Joyce Associates, Inc., I found no alleged connection between it and any criminal activity, let alone the requisite two predicate acts. The Complaint fails to allege that Joyce Associates, Inc. was in anyway connected with any of the allegedly fraudulent schemes between the Board, ASCO, and the investment companies. I find

that Plaintiffs' Complaint fails to allege two predicate acts against Defendant Joyce Associates, Inc.

### iii) *Rule 9(b)*

The next step in the analysis is to determine if the predicate acts alleged in the Complaint satisfy the requirements of *Rule 9(b)*. Where fraud is alleged as a predicate act, *Rule 9(b)* requires that the plaintiff allege the fraud with particularity. *FED. R. CIV. P. 9(b)*. The particularity requirement can be satisfied through alleging the date, time, or place of the fraud, or by giving "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984); see also Lum v. Bank of Am., 361 F.3d 217, 224 (3d Cir. 2004).* [*40]  Plaintiffs must always allege who made the fraudulent representation, to whom the representation was made, and the general content of the misrepresentation. *Saporito v. Combustion Eng'g Inc., 843 F.2d 666, 675 (3d Cir. 1988), vacated on other grounds, 489 U.S. 1049, 103 L. Ed. 2d 576, 109 S. Ct. 1306 (1989).*

Based on the above requirements, I find certain allegations are lacking in specificity. In particular, the allegation in Paragraph 189a lacks any specificity regarding who made the communication, to whom, or when the communication occurred. Similarly, the allegations in Paragraphs 189b, 189c, and 189d lack any specificity about when the conversations took place, and the allegations lack specificity about which fraudulent transaction was furthered by the communication. *See Lum, 361 F.3d at 224.* The allegations in Paragraphs 189e, 189f, 189n, and 189dd fail because they use the term "and/or" to identify the defendant initiating the communication. This connector does not identify who sent the communication, and it causes an ambiguity which does not satisfy *Rule 9(b)*. Similarly, the allegations in Paragraphs 189y and 189gg fail to satisfy *Rule 9(b)* because they identify [*41] two Defendants as possible persons who initiated the communication. Like the use of "and/or" the use of "or" creates an ambiguity in the allegation that violates *Rule 9(b)*. Paragraph 189tt fails to establish how the communication furthered the fraud, and it fails to establish the fraudulent nature of the statements in the communication.

The remainder of the allegations in Paragraph 189 satisfy the pleading requirements of *Rule 9(b)*. The Complaint's allegations clearly define each of the campaign contributions, when they were mailed, by whom, and to whom. (*See* Doc. 1 PP189 g, h, j, k, *l*, q, r, s, u, x, ee, ff, hh, ii, kk, mm, rr, and ss.) The Complaint also alleges with specificity the mailings in which the contracts were sent to the companies and the Board. These allegations include the date of the mailing, the contents

2004 U.S. Dist. LEXIS 16957, *41; Fed. Sec. L. Rep. (CCH) P92,899

of the mailing, who sent the mailing, and to whom it was sent. (*See* Doc. 1 PP189 m, p, t, v, w, z, aa, bb, cc, jj, ll, nn, oo, pp, and qq.) There are further allegations that certain Defendants used wire communications in furtherance of the schemes. These allegations include the date of the call, the subject of the conversation, and the parties in the **[*42]** conversation. (*See* Doc. 1 PP189 i and o.)

Certain Defendants argue in their briefs that the allegations of fraud lack specificity because the allegations do not explain how the use of mail or wire communications furthered the fraudulent scheme. While *Rule 9(b)* requires pleading with specificity, it does not erase the general standard that the Court should draw reasonable inferences in favor of Plaintiffs. *See Lum, 361 F.3d at 222* (analyzing allegations of mail fraud for particularity while still drawing reasonable inferences in favor of plaintiffs). Although Plaintiffs' Complaint does not expressly identify how each particular mail or wire communication furthered the scheme, the Complaint clearly alleges facts which create an unquestionable inference that the alleged communications furthered the scheme.

Throughout the Complaint, Plaintiffs clearly explain the fraudulent scheme and how each Defendant is involved with the various contracts. (*See* Doc. 1 PP44 – 143 and 188.) Plaintiffs' Complaint goes so far as to identify each contract, the campaign contributions linked to that contract, and the Defendants involved in that contract's creation, execution, and **[*43]** commissions which were awarded. (Doc. 1 PP44 – 143.) The Complaint then alleges that certain mail and wire communications furthered the fraudulent scheme and lists those communications in Paragraph 189. The details of each communication in Paragraph 189 are given in a manner that injects precision and some measure of substantiation into their allegations of fraud.

The purpose of *Rule 9(b)* is to give Defendants notice of the precise misconduct claimed and to prevent false or unsubstantiated charges. *Seville Indus. Machinery, 742 F.2d at 791*. There is no ambiguity that in a pay–to–play scheme, a campaign contribution furthers the scheme. Likewise, there is no confusion that a fraudulent scheme to gain a contract with the Plan is furthered by mailing the contract to the Plan. I find the allegations give Defendants notice of the misconduct and meet the specificity requirements of *Rule 9(b)*.

#### iv) Private Securities Litigation Reform Act

The next argument advanced by Defendants is that the frauds alleged cannot constitute predicate acts under RICO because they are securities violations. Mail and wire frauds may constitute predicate acts under RICO, but there is an **[*44]** exception created by the Private Securities Litigation Reform Act (hereinafter PSLRA), which excludes frauds that constitute securities fraud. *18 U.S.C. 1964(c)* ("Any person injured in his business or property by reason of a violation of *section 1962* of this chapter may sue therefor in any appropriate United States district court . . . except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of *section 1962*."); *see also Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc., 189 F.3d 321, 327 (3d Cir. 1999)* (citing *Matthews v. Kidder, Peabody & Co., 161 F.3d 156, 157 (3d Cir. 1998)*). Any conduct which is actionable as fraud in the purchase or sale of securities cannot constitute a predicate offense under RICO, whether or not the Complaint expressly alleges securities fraud. *Bald Eagle Area Sch. Dist., 189 F.3d at 330*.

Securities fraud is a scheme to defraud, a misleading statement, or an omission of a material fact in connection with the purchase or sale of securities. *15 U.S.C. § 78j(b)*. n11 **[*45]** Plaintiffs seeking relief for securities fraud under *Rule 10b–5* must show:

> (1) a misrepresentation or omission of a material fact in connection with the purchase or sale of a security;

> (2) scienter on the part of the defendant;

> (3) reliance on the misrepresentation; and

> (4) damage resulting from the misrepresentation.

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 173 (3d Cir. 2001)* (citing *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 135 F.3d 266, 269 (3d Cir. 1998)* and *Semerenko v. Cendant Corp., 223 F.3d 165, 174 (3d Cir. 2000)*).

> n11 *15 U.S.C. § 78j* reads in pertinent part: It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange —
>
>      . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not

Case 1:05-cv-00165-JJF    Document 36-2    Filed 06/10/2005    Page 72 of 121

Page 12

2004 U.S. Dist. LEXIS 16957, *45; Fed. Sec. L. Rep. (CCH) P92,899

so registered, or any securities–based swap agreement (as defined in *section 206B of the Gramm–Leach–Bliley Act*), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

The securities and Exchange Commission has promulgated rules which clarify the meaning of *15 U.S.C. § 78j*:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

*17 C.F.R. § 240.10b–5* (hereinafter *Rule 10b–5*).

**[*46]**

In addition, there is a second form of securities fraud, actionable under the Securities Act of 1933, *15 U.S.C. § 77*, which permits recovery for certain misrepresentations in connection with a sale of securities:

Any person who—

(1) offers or sells a security in violation of section 77e of this title, or

(2) offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes

an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

shall be liable . . . to the person purchasing such security from him . . . .

*15 U.S.C. § 77l*. Under the Securities Act of 1933, this form of securities fraud involves either a prospectus or an oral **[*47]** communication. Because the alleged facts of this case indicate that no prospectus was involved in the transactions and all of the fraudulent actions involved written contracts rather than oral statements, this type of securities fraud is inapplicable to the present case. I will limit my analysis to the *Rule 10b–5*.

Plaintiffs contend that the alleged actions are not actionable as securities fraud, or, that the Court should not make an analysis at this time because of the fact–specific analysis required to determine if the alleged acts constitute securities fraud. I disagree that a fact–specific analysis prevents me from addressing this question at this time. Dismissal is appropriate only if, accepting all factual allegations in the complaint as true and "drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations in the complaint." *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc., 140 F.3d 478, 483 (3d Cir. 1998)*. No relief could be granted under RICO if the predicate acts alleged are prohibited by the PSLRA. Because the Complaint is read in Plaintiff's favor, if the alleged **[*48]** facts can be read in a manner in which the allegations do not constitute a securities fraud, then I should rule in favor of Plaintiffs and permit the action to continue. Therefore, the question for me to decide is whether the allegations in the Complaint would always constitute a cause of action for securities fraud.

There is an initial question whether the investments involved were actually securities.

The term "security" means any note, stock, treasury stock, security future, bond, debenture, certificate of interest or participation in any profit–sharing agreement or in any

2004 U.S. Dist. LEXIS 16957, *48; Fed. Sec. L. Rep. (CCH) P92,899

oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any **[*49]** certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

*15 U.S.C. § 78c(a)(10)* (Securities Act of 1934); *see also United Housing Found., Inc. v. Forman, 421 U.S. 837, 847, n.12, 44 L. Ed. 2d 621, 95 S. Ct. 2051 (1975)* (the definition of security is essentially the same for the Securities Act of 1934 and the Securities Act of 1933). In determining whether a transaction involves a security, "form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight, 389 U.S. 332, 336, 19 L. Ed. 2d 564, 88 S. Ct. 548 (1967)* (citing *SEC v. W.J. Howey Co., 328 U.S. 293, 298, 90 L. Ed. 1244, 66 S. Ct. 1100 (1946)*).

In the present case, the allegations refer to secured notes, REITs, annuities, and other unidentified investments. While notes are usually **[*50]** securities, there are instances in which the nature of a particular transaction labeled a "note" prevents it from being treated as a security, for instance, when it is issued as collateral for a loan. *Reves v. Ernst & Young, 494 U.S. 56, 65, 108 L. Ed. 2d 47, 110 S. Ct. 945 (1990)* (citing *Exch. Nat. Bank of Chicago v. Touche Ross & Co., 544 F.2d 1126, 1138 (2d Cir. 1976)*). As for annuities, they are generally not treated as securities, although there are also exceptions to this. *15 U.S.C § 77c(a)(8)* (exempting annuity contracts from definition of security); *but see SEC v. Variable Annuity Life Ins. Co. of Am., 359 U.S. 65, 79, 3 L. Ed. 2d 640, 79 S. Ct. 618 (1959)* (variable annuity which did not guarantee pay-out unless investments succeeded was a security); *SEC v. United Benefit Life Ins. Co., 387 U.S. 202, 211, 18 L. Ed. 2d 673, 87 S. Ct. 1557 (1967)* (flexible fund annuity which provided pay-out relative to investment success was a security). Contracts with brokers to invest in securities are not securities themselves, although they are often actionable because they are "in connection with" a security. *See Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 943 (3d Cir. 1985)*. **[*51]**

It is apparent to me that whether the particular investments in the alleged frauds were securities would entail a fact-specific analysis of each particular investment. The facts alleged in the Complaint do not permit this analysis, nor do they need to. Plaintiffs' primary allegations relate to the manner in which contracts with the investment companies were entered into by the Board members. The specific investments resulting from those contracts do not need to be plead with particularity. Construing the Complaint in the light most favorable to Plaintiffs, at least some (e.g., transaction involving annuities), if not all, of the transactions in question did not involve securities and, thus, could not form the basis of a securities fraud claim.

Moreover, even if some of the investments constituted securities, this does not end the Court's analysis. Defendants argue that since the alleged scheme is related to securities, any related fraud is precluded from forming the basis of a RICO violation because of the PSLRA. Only fraud which is *actionable as securities fraud* is precluded from forming the basis of a RICO claim. *18 U.S.C. § 1964(c)*. A fraud related **[*52]** to the purchase or sale of a security is not always actionable as a securities fraud; there must be a misrepresentation or omission of a material fact in connection with the purchase or sale of a security, scienter, reliance on the misrepresentation (reliance causation), and an injury proximately caused by the fraudulent misrepresentation (loss causation). *Newton, 259 F.3d at 173*.

For all Defendants, the Complaint alleges variations of the same factual scenario, that Defendants engaged in a relationship wherein contracts to invest money in securities were entered into in exchange for campaign contributions to Board members' reelection funds. The generic transaction is alleged as follows:

> (1) A person connected with ASCO or an investment company would make a campaign contribution to a Board member's reelection fund. n12

> (2) A contract to invest the Plan's funds would be presented to Board members. The contract contained inappropriately risky investment strategies considering the Plan's purpose as a pension fund.

2004 U.S. Dist. LEXIS 16957, *52; Fed. Sec. L. Rep. (CCH) P92,899

(3) One or more Board members would sign the contract, without presenting the contract at a public meeting, without the contract being reflected [*53] on the minutes of any meeting, and without holding a formal vote on the contract.

(4) The investment company would receive the Plan's funds and invest it in accordance with the contract.

(5) Persons connected with the investment company and/or ASCO would receive commissions for the contract. The cost of the commissions were excessive and built into the contract price, in other words, hidden from the face of the contract.

(6) The investment manager or investment advisor would collect excessive fees.

(7) Interstate mails and/or wires were used in the furtherance or commission of the transaction.

n12 In some of the transactions, the campaign contribution was made after the Board members signed the contract.

There are several steps to this transaction which are potentially fraudulent, and it is unclear from the Complaint which parties are involved in those fraudulent acts. n13 What is clear to the court is there are two possible scenarios:

(1) The Board members were unaware of the [*54] excessive fees, hidden commissions, and inappropriate investment strategies.

(2) The Board members and the investment manager or investment advisor acted in complete unison, and the Board members were aware of the excessive fees, hidden commissions, and inappropriate investment strategies. n14

In both of the scenarios above, the allegations in the Complaint do not meet all of the elements of a securities fraud.

n13 This would seemingly violate the pleading requirements of *Rule 9(b)*, but that is not the

case. Plaintiffs properly plead with particularity the fraudulent *acts* of mail and wire fraud. *See* discussion *supra* p. 27. Because Plaintiffs are not alleging securities fraud, they were not required to plead the *scheme* with particularity. However, this leaves the Court with slightly vague details about the exact nature of the fraudulent scheme, which is necessary to analyze whether the fraud is in connection with the purchase or sale of securities.

n14 The Complaint states: "The Defendant Board Members permitted the Plan to pay excessive fees and commissions to the co-defendants in exchange for political contributions." (Doc. 1 P188c.) I am uncertain whether "permitted" expresses that the Board members knowingly adopted contracts with hidden fees, or that the Board members failed in their fiduciary obligations by not properly reviewing contracts before approving them because their approval was purchased in the pay-to-play scheme.

[*55]

### a) The Board didn't know about hidden fees

If the Board members were unaware of the hidden fees, then there were actually two separate frauds occurring simultaneously: (1) the investment companies were concealing the excessive fees, commissions and unsuitable investments from the Board and the beneficiaries; and (2) the Board members were concealing the pay-to-play scheme from the beneficiaries. In this scenario, the alleged fraudulent pay-to-play scheme does not constitute an actionable securities fraud because the misrepresentations or omissions were too attenuated to be in connection with the sale or purchase of securities.

A fraud is in connection with a purchase or sale of securities when there are "deceptive practices touching [upon the purchase or] sale of securities." *Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 12-13, 30 L. Ed. 2d 128, 92 S. Ct. 165 (1971).* Frauds involving the trading process can be actionable under 10b-5. *Angelastro, 764 F.2d at 943; see also Denison v. Kelly, 759 F. Supp. 199, 207 (3d Cir. 1991).* Hidden commissions in broker contracts can constitute securities fraud. *Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 835 F.2d 1031, 1033 (3d Cir. 1987).* [*56] Misrepresentations regarding the terms of margin accounts are actionable securities frauds. *Angelastro, 764 F.2d at 945.* Even broker mismanagement of an account through investments inconsistent with the stated goals of the investor can constitute securities fraud when accompanied by assurances from the broker that the goals are being met. *Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020, 1031 (3d Cir. 1992).*

The brokerage relationships are not securities transactions, but they are actionable in the securities fraud context because the relationships touch upon a securities transaction. *Bankers Life, 404 U.S. at 10, 12-13.* In the present case, the connection is even more removed from securities purchase or sale than a simple broker contract. n15 The pay-to-play scheme is a fraud between the fiduciaries who entered into the brokerage contracts and the beneficiaries of the plan. While the Supreme Court demonstrated in *Bankers Life,* that "in connection with" a securities transaction would be read broadly, there is one limitation which the Court created – securities fraud should not be applied to internal corporate mismanagement. *404 U.S. at 12;* [*57] *see also Landy v. Fed. Deposit Ins. Corp., 486 F.2d 139, 155 (3d Cir. 1973).* I have been unable to find any comparable factual scenario to the present case which suggests that fraudulent omissions in this relationship are in connection with the purchase or sale of a securities fraud. This twice-removed relationship from the purchase or sale of a security is too attenuated to constitute a connection with the purchase or sale of securities. Both the Board members and the investment companies are still responsible for the second fraud because, as alleged, the investment companies engaged in the pay-to-play scheme by "purchasing" the contracts.

> n15 First, there was the purchase or sale of securities, which was done by the investment company and independent parties in the market. There was no fraud alleged in this transaction. Next, there was the contract between the Plan (represented by the Board) and the investment company. Clearly, if the investment companies concealed hidden commissions and other terms of the investment agreements, that fraud constitutes an actionable securities fraud. *See, e.g., Ettinger, 835 F.2d at 1033.* Any use of mail or wire communications in furtherance of this scheme is excluded by the PSLRA from acting as a RICO predicate act. Lastly, there was the Board members' denial of honest dealings scheme in the form of the alleged pay-to-play system of granting contracts.

[*58]

**b) The Board knew about hidden fees**

Alternatively, if the Board knew about the hidden fees, the allegations of mail and wire fraud are not actionable as a securities fraud because, as discussed in the previous section, the securities transactions are two transactions removed from any misrepresentations or omissions related to the pay-to-play scheme. n16 Arguably, the pay-to-play scheme is more closely related to the purchase or sale of securities in this scenario than if the Board didn't

know about the hidden fees because the Board members were involved in the fraud of the concealed hidden fees. However, even if the pay-to-play scheme was connected with a securities transaction, the fraud would still not be actionable under securities laws because there is no reliance causation.

> n16 First, there was the purchase or sale of securities, which was done by the investment company and independent parties in the market. There was no fraud alleged in this transaction. Next, there was the contract between the Plan (represented by the Board) and the investment company. Lastly, there was the Board members' denial of honest dealings scheme in the form of the alleged pay-to-play system of granting contracts.

[*59]

Reliance causation requires that a plaintiff reasonably rely upon the fraudulent representation or omission when making the decision to purchase or sell a security. *EP Medsystems, Inc. v. Echocath, Inc., 235 F.3d 865, 882 (3d Cir. 2000); Newton, 259 F.3d at 172* (using the term "reliance causation"). In the facts alleged, the beneficiaries made no decision to purchase or sell; it was the Board members who entered into the contracts. If the Board members knew about the hidden fees, neither party to the contract was misled or intentionally uninformed as to the terms of the contract. The omissions were not relied upon to enter into the contract, nor did that concealment cause any detrimental reliance. n17

> n17 The Court notes that the beneficiaries lack any ability to appoint, terminate, or otherwise control the Board members. Even if they were fully aware of the contracts' terms, the beneficiaries would have been unable to prevent the Board members from entering into the contracts.

[*60]

One might see my present holding as conflicting with the Supreme Court's holding in *Bankers Life. 404 U.S. 6, 30 L. Ed. 2d 128, 92 S. Ct. 165.* In *Bankers Life,* a new majority share holder installed a new president in the company, with the intent of defrauding the company of its assets. The president then convinced the board of directors to sell its nearly $5 million worth of bonds. The proceeds of that sale were eventually used to purchase a new bond for the company, but the president used that bond as collateral against a private loan. Although the deceit involved separate transactions from the sale of the bonds, the Supreme Court concluded that the actions were sufficiently connected with the securities sale to constitute

2004 U.S. Dist. LEXIS 16957, *60; Fed. Sec. L. Rep. (CCH) P92,899

securities fraud.

*Bankers Life* is distinguishable from the present case. In *Bankers Life*, the scheme influenced the board of directors' decision to sell the securities. The fraudulent actors induced the innocent company's board of directors to sell the securities on the misrepresentation that the company would receive the proceeds, when in fact the benefit was passed to a private party. In contrast, in the present case, the Board members were not [*61] induced to enter the investment management contract on the basis of a fraud. The Board members were completely aware of the terms of the contract, and the fraud was only perpetrated against the beneficiaries of the plan.

In sum, viewing the Complaint in the light most favorable to Plaintiffs, allegations in the Complaint are not actionable as securities fraud. Therefore, the Complaint's predicate acts of mail and wire fraud are not barred by the PSLRA. However, because the analysis above is based on assumptions about the nature of the fraudulent scheme, I may be willing to reevaluate the issue on a motion for summary judgment if the facts differ materially from the assumptions in my analysis.

### v) Relatedness and Continuity of Predicate Acts

Lastly, in determining whether a Complaint alleges a pattern of racketeering activity, I must evaluate whether the predicate acts alleged create a pattern. When evaluating whether a pattern exists, the Court of Appeals for the Third Circuit advises courts to look at "the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character [*62] of the unlawful activity." *Barticheck v. Fid. Union Bank/First Nat'l State, 832 F.2d 36, 39 (3d Cir. 1987)*; *see also Marshall–Silver Constr. Co. v. Mendel, 894 F.2d 593, 596 (3d Cir. 1990)* (finding *Barticheck* factors still applicable after *H. J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 106 L. Ed. 2d 195, 109 S. Ct. 2893 (1989)*). n18 The predicate acts must be related and amount to or threaten to become continued criminal activity. *H.J. Inc., 492 U.S. at 239*.

> n18 In *Tabas v. Tabas*, the Court of Appeals for the Third Circuit recognized that *Marshall–Silver* was overruled insofar as it required a societal threat to prove a pattern of racketeering activity. *47 F.3d 1280, 1293 n.17 (3d Cir. 1995)*. That holding has no impact on the issue discussed above.

Criminal conduct is related "if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise

are interrelated [*63] by distinguishing characteristics and are not isolated events." *Id. at 240* (applying definition of pattern from *18 U.S.C. § 3575(e)* to RICO). In instances, such as the present case, where the conduct in question occurred in a closed period of time, continuity is established by showing conduct that occurred over a "substantial period of time." *Id. at 242*.

When the predicate acts are mail fraud, the mailings are less helpful in ascertaining continuity, and the underlying frauds are more determinative. *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1414 (3d Cir. 1991)*. The RICO statute does not require more than one scheme to establish continuity, but "proof of multiple schemes is 'highly relevant' to the question of continuity." *Id. at 1412* (quoting *H.J. Inc., 492 U.S. at 240*). In the Court of Appeals for the Third Circuit, schemes spanning up to one year have been found to be too short–term to establish continuity. *Tabas, 47 F.3d at 1293*; *see also Hughes v. Consol–Pa. Coal Co., 945 F.2d 594, 610–11 (3d Cir. 1991)* (conduct lasting twelve months); *Hindes v. Castle, 937 F.2d 868, 875 (3d Cir. 1991)* [*64] (eight month period); *Kehr Packages, 926 F.2d at 1413* (same); *Banks v. Wolk, 918 F.2d 418, 422–23 (3d Cir. 1990)* (same); *Marshall–Silver Constr. Co., 894 F.2d at 597* (seven month period).

### a) The Board Members

Plaintiffs allege that Defendants Makowski, Pizano, Crossin, and Jones used their positions on the Board to grant contracts in exchange for campaign contributions. They engaged in these activities in twelve separate contracts, spanning a time period of more than twelve years (from 1988 until 2001).

For Defendant Makowski, the Complaint alleges that he personally received at least nine campaign contributions (Doc. 1 PP189 x, ee, ff, hh, ii, kk, mm, rr and ss) related to six different contracts. (Doc. 1 PP77, 87, 105, 116, 126, 136 and 189kk.) In addition, because the Complaint alleges Makowski was involved in the scheme for every contract that the Board members entered into, there are potentially other legitimate allegations of mail fraud based on the uses of mail by other Board members which furthered the fraudulent scheme in which Makowski was involved. Regardless of these other mail frauds, the actions alleged are clearly [*65] related because they all share the same purpose, results (granting of contracts), participants (the Board members), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). Continuity between the acts is established by the repeat nature of the multiple contracts issued over a substantial period of time, in this case more than a decade. The Complaint sufficiently alleges that Makowski was engaged in a pattern of racketeering activity.

2004 U.S. Dist. LEXIS 16957, *65; Fed. Sec. L. Rep. (CCH) P92,899

For Defendant Pizano, he personally received at least nine campaign contributions (Doc. 1 PP189 ee, ff, hh, ii, kk, mm, rr, and ss) related to six different contracts. (Doc. 1 PP77, 87, 105, 116, 126, 136 and 189kk.) There are potentially other legitimate allegations of mail fraud because the Complaint also alleges Pizano was involved in the scheme for every contract that the Board members entered into. Regardless of these other mail frauds, the actions alleged are clearly related because they all share the same purpose, results (granting of contracts), participants (the Board members), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). Continuity between the acts **[*66]** is established by the repeat nature of the multiple contracts issued over a substantial period of time, in this case more than a decade. The Complaint sufficiently alleges that Pizano was engaged in a pattern of racketeering activity.

For Defendant Crossin, he personally received at least eight campaign contributions (Doc. 1 PP189 j, k, *l*, q, r, s, u, and x) related to at least five different contracts. (Doc. 1 PP48, 55, 68, 98, and 126.) There are potentially other legitimate allegations of mail fraud because the Complaint alleges Crossin was involved in the scheme for every contract that the Board members entered into. Regardless of these other mail frauds, the actions alleged are clearly related because they all share the same purpose, results (granting of contracts), participants (the Board members), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). Continuity between the acts is established by the repeat nature of the multiple contracts issued over a substantial period of time, in this case more than a decade. The Complaint sufficiently alleges that Crossin was engaged in a pattern of racketeering activity.

Although Jones **[*67]** did not personally receive campaign contributions, there are allegations of mail fraud against Defendant Jones. Because the Complaint alleges Jones was involved in the scheme for every contract that the Board members entered into, and because the mail was used to furthered the fraudulent schemes, those uses of the mail constitute allegations of mail fraud against Defendant Jones. *See* discussion *supra* p. 22. The campaign contributions alleged in Paragraph 189mm related to Jones' approval of the third Provident Agreement. (Doc. 1 P80.) The campaign contributions alleged in Paragraphs 189ee, 189ff, and 189hh related to Jones' approval of the Wells Agreement (Doc. 1 P118), and the campaign contributions alleged in Paragraph 189kk related to Jones' approval of the LPL Agreement. (Doc. 1 P136.)

For Defendant Jones, the actions alleged are clearly related because they all share the same purpose, results (granting of contracts), participants (the Board members),

victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). Continuity between the acts is established by the repeat nature of the multiple contracts issued over a substantial period **[*68]** of time, in this case nearly four years. The Complaint sufficiently alleges that Jones was engaged in a pattern of racketeering activity.

**b) The ASCO Affiliates**

Plaintiffs allege that Defendant ASCO and its officers and affiliates acted in the scheme with the Board members and facilitated the pay–to–play scheme by making campaign contributions and brokering the contracts in exchange for collecting hidden fees. They engaged in these activities in twelve separate contracts, spanning a time period of more than twelve years (from 1988 until 2001).

For Defendant ASCO, the actions alleged are clearly related because they all share the same purpose (receiving commissions), results (brokering contracts), participants (the Board members), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). ASCO directly made at least three campaign contributions (Doc. 1 PP189 g, r, and u) related to two different contracts. (Doc. 1 PP48 and 68.) The Complaint also alleges that ASCO used mail or wire communications on at least three occasions (Doc. 1 PP189 m, oo, and pp), which furthered three schemes. (Doc. 1 PP56, 90, and 53, respectively.) In addition, **[*69]** because the Complaint alleges ASCO was involved in the scheme for every contract that the Board members entered into, there are potentially other legitimate allegations of mail fraud based on the uses of mail by the investment companies and related parties that furthered the fraudulent scheme in which ASCO was involved. n19 Regardless of these other mail frauds, continuity between the acts is established by the repeat nature of the multiple contracts issued over a substantial period of time, in this case more than a decade. The Complaint sufficiently alleges that ASCO was engaged in a pattern of racketeering activity.

n19 Most notably are the fourteen acts of mail and wire fraud alleged against Donald Williamson, the President and CEO of ASCO, Maria Williamson, the Vice President/Operations of ASCO, John Joyce, the Secretary of ASCO, and Joseph Joyce, the Treasurer of ASCO. (Doc. 1 PP189 i, o, u, j, k, p, *l*, w, mm, aa, ff, hh, nn, and ss.)

Defendant Donald Williamson is by far the defendant who is accused **[*70]** of personal involvement in the most number of transactions. It is alleged that at various

times between 1988 and 2002, Donald Williamson was the President and CEO of ASCO (Doc. 1 P7), a representative for Safeco (Doc. 1 P49), a broker for Provident (Doc. 1 P59), a broker representative for FSC (Doc. 1 P119), an account representative for FSC (Doc. 1 P141), and a broker for FSI. (Doc. 1 P128.) He personally made three campaign contributions (Doc. 1 PP189 k, hh, and ss) related to four different contracts. (Doc. 1 PP55, 87, 105, and 116.) The Complaint also alleges that Donald Williamson used mail or wire communications on at least five occasions (Doc. 1 PP189 i, o, w, aa, and nn), which furthered five schemes. Aside from his direct actions, the Complaint alleges that Donald Williamson was involved in the scheme for every contract that the Board members entered into. The acts alleged are clearly related because they all share the same purpose (facilitating the pay–to–play scheme), results (brokering contracts), participants (the Board members and ASCO affiliates), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). Continuity between the [*71] acts is established by the repeat nature of the multiple contracts issued over a substantial period of time, in this case more than a decade. The Complaint sufficiently alleges that Donald Williamson was engaged in a pattern of racketeering activity.

For Defendant Maria Williamson, the Complaint alleges that Maria Williamson acted as the Vice President/Operations for ASCO during the time in which ASCO administered the daily operations of the Plan. (Doc. 1 P53.) Thus, it is a reasonable inference that Maria Williamson was involved in the allegedly fraudulent schemes with ASCO from December, 1999, until October, 2002. During this time, ASCO was implicated in two schemes: the contract for ASCO to administer the daily operations of the Plan and the fourth Provident Agreement. n20 The Complaint also alleges that Maria Williamson committed an act of mail fraud related to the third Provident contract. (Doc. 1 P189mm.) The actions alleged are clearly related because they all share the same purpose (purchasing contracts), results (contracts with the Plan), participants (the Board members), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). Over [*72] a time span of approximately two years and ten months, Maria Williamson participated in three fraudulent schemes, and there were eight uses of mail communications to further those schemes, thus, the Complaint sufficiently establishes continuity and alleges that Maria Williamson was engaged in a pattern of racketeering activity.

n20 Acts of mail fraud related to those schemes includ ASCO mailing an administration agreement to Defendant Makowski (Doc. 1 P189oo)

and ASCO mailing a Special Agent's Agreement to Provident. (Doc. 1 P189pp.)

The Complaint alleges that Safeco committed one act of mail fraud (Doc. 1 P189q) and one act of wire fraud (Doc. 1 P189i), both of which were connected to Safeco's contract with the Plan. Plaintiffs also attempt to link Safeco with ASCO's schemes, because Safeco collected ASCO's fees from the Plan. However, the fact that Safeco collected ASCO's fees does sufficiently allege that Safeco was itself engaged in fraudulent conduct under the heightened pleading requirements of *Rule 9(b)*. [*73] Thus, the only predicate acts alleged are the mail fraud and the wire fraud related to the single fraudulent scheme. These allegations do not establish the necessary. The Complaint fails to alleges that Safeco was engaged in a pattern of racketeering activity, and Count III will be dismissed against Safeco.

Joseph Joyce, ASCO's Treasurer, is alleged to be involved in two separate fraudulent schemes: the second Provident Agreement (Doc. 1 P68) and the ASCO contract. (*See* Doc. 1 PP48 and 189u.) The Complaint alleges that Joseph Joyce used mail communications on at least two occasions to further these schemes. (Doc. 1 PP189 j and u.) These transactions occurred over a period of nearly three years. (*Id.*) In addition, there are allegations that nine additional acts of mail fraud were committed to further the schemes in which Joseph Joyce participated. (Doc. 1 PP189 h, g, *l*, o, r, s, w, z, and oo.) The actions alleged are clearly related because they all share the same purpose (inducing the Board members to grant contracts), results (contracts), participants (the Board members and ASCO), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign [*74] funds). Eleven predicate acts to forward two schemes over the course of three years does sufficiently allege continuity in the predicate acts which suggests that Joseph Joyce was engaged in a pattern of racketeering activity.

John Joyce, ASCO's Secretary, is alleged to be involved in two separate fraudulent schemes: the first Provident Agreement (Doc. 1 P55) and the second Provident Agreement. (*See* Doc. 1 P68.) The Complaint alleges that John Joyce used the mail twice to further these schemes. (Doc. 1 PP189 p and *l*, respectively.) These transactions occurred over a period of less than five months. (*Id.*) In addition, there are allegations that eight additional acts of mail fraud were committed to further the schemes in which John Joyce participated. (Doc. 1 PP189 j, k, m, p, r, s, w, and z.) Although the actions alleged are clearly related, the short time period over which the frauds occurred, five months, does not sufficiently allege continuity in the predicate acts to establish a pat-

2004 U.S. Dist. LEXIS 16957, *74; Fed. Sec. L. Rep. (CCH) P92,899

tern of racketeering activity. Count III will be dismissed against John Joyce.

### c) The Provident Agreements

Defendant Nationwide is alleged to be involved with four separate fraudulent **[*75]** schemes, the four Provident Agreements created between December 18, 1991 and June 6, 2000. (Doc. 1 PP58, 69, 80, and 89.) The Complaint alleges that Nationwide used mail or wire communications on at least three occasions (Doc. 1 PP189 z, jj, and qq) which furthered three schemes. (*Id.*) There are allegations that thirteen additional acts of mail and wire fraud were committed to further the schemes in which Nationwide participated. (Doc. 1 PP189 j, k, m, p, *l*, r, s, w, mm, aa, rr, ss, and pp.) The actions alleged are clearly related because they all share the same purpose (receiving contracts), results (contracts), participants (the Board members and ASCO), victims (the Plan and its beneficiaries), and methods of commission (third parties making donations to campaign funds). Continuity between the acts is established by the repeat nature of the multiple contracts issued over a substantial period of time, in this case nearly a decade. The Complaint sufficiently alleges that Nationwide was engaged in a pattern of racketeering activity.

JJJA is equally implicated in all of the Provident Agreements. n21 (*See, e.g.,* Doc. 1 PP65, 75, 81, and 90.) Like Nationwide, there are allegations **[*76]** that sixteen acts of mail and wire fraud were committed to further the schemes in which JJJA participated. (Doc. 1 PP189 j, k, m, p, *l*, r, s, w, z, aa, jj, mm, pp, qq, rr, and ss.) The actions alleged are clearly related because they all share the same purpose (receiving commissions), results (contracts), participants (the Board members, ASCO), victims (the Plan and its beneficiaries), and methods of commission (third parties making donations to campaign funds). Continuity between the acts is established by the repeat nature of the multiple contracts issued over a substantial period of time. The Complaint sufficiently alleges that JJJA was engaged in a pattern of racketeering activity.

> n21 In addition to the Provident Agreements, JJJA is implicated in the Manulife Agreements. (*See* Doc. 1 PP103 and 109.) These additional schemes reaffirm the pattern of racketeering activity by JJJA alleged in relation to the Provident Agreements.

### d) The Manulife Agreements

Defendant Manulife is directly alleged **[*77]** to have committed three acts of mail fraud (Doc. 1 PP189 v, cc, and ii) related to two separate transactions. (Doc. 1

PP189v and 106.) These acts took place over almost six years. (Doc. 1 PP189 v, cc, and ii.) In addition, there are four other acts of mail fraud related to the Manulife Agreements. (Doc. 1 PP189 s, ee, ff, and hh.) The actions alleged are clearly related because they all share the same purpose (receiving contracts), results (contracts), participants (the Board members and ASCO), victims (the Plan and its beneficiaries), and methods of commission (third parties making donations to campaign funds). More than one scheme is not required to establish continuity, although "proof of multiple schemes is 'highly relevant.'" *Kehr Packages, Inc., 926 F.2d at 1412* (quoting *H.J. Inc., 492 U.S. at 240*). The Complaint alleges that Manulife participated in two fraudulent schemes over the course of six years, which involved seven acts of mail fraud to further those schemes. I find that seven predicate acts committed to forward two schemes sufficiently alleges a continuity in the predicate acts. The Complaint sufficiently alleges that Manulife was engaged **[*78]** in a pattern of racketeering activity.

### e) The Wells Agreement

Defendant FSC is linked with two separate transactions, the FSC Agreement and the Wells Agreement. The Complaint does not list any related uses of mail or wire communications in furtherance of the FSC Agreement. (Doc. 1 PP141–143.) Therefore, the only predicate acts alleged against FSC are the ones related to the Wells Agreement. Defendants Perfilio, Michael Joyce, Wells, Wells REIT, and Wells Investment will be analyzed the same as FCS because each Defendant is only implicated in the Wells Agreement scheme. The Wells Agreement lists four separate uses of mail or wire communications in furtherance of the fraudulent scheme which transpired between February 2, 1999, and April 12, 1999 – two months and ten days. (Doc. 1 PP189 bb, ee, ff, and hh.)

While these acts of mail and wire fraud are clearly related, they lack the necessary continuity to establish a pattern of racketeering activity. When ascertaining whether the predicate acts establish continuity, the specific acts of mail fraud are less determinative than the number of schemes. *Kehr Packages, Inc., 926 F.2d at 1414.* Schemes lasting less than **[*79]** a year are too short-term to create continuity. *See Hughes, 945 F.2d at 610–11* (conduct lasting twelve months). The allegations against Defendants fail on both counts. The Complaint alleges that Defendants were involved in a single scheme with acts of fraud only occurring over two months and ten days. The Complaint does not sufficiently allege that FSC, Perfilio, Michael Joyce, Wells, Wells REIT, or Wells Investment were engaged in a pattern of racketeering activity. Count III will be dismissed against Defendants FSC, Perfilio, Michael Joyce, Wells, Wells REIT, and

Wells Investment.

#### f) Miscellaneous Defendants

FSI is in a situation similar to the Wells Agreement Defendants. The Complaint alleges that FSI engaged in two acts of mail fraud related to the FSI transaction. (Doc. 1 PP189 t and x.) These transactions occurred over a period of seven months. (*Id.*) The Complaint does not link FSI to any other schemes. Because the alleged predicate acts occurred in a time period of less than a year and they were both related to a single fraudulent scheme, the allegations fail to establish the necessary continuity. The Complaint does not sufficiently allege that FSI **[*80]** was engaged in a pattern of racketeering activity. Count III will be dismissed against FSI.

JJ&B is alleged to be involved with four separate fraudulent schemes: the second Provident Agreement (Doc. 1 P68), both Manulife Agreements (Doc. 1 PP98 and 105), and the Wells Agreement. (Doc. 1 P116.) The Complaint alleges that JJ&B used mail communications on at least two occasions to further these schemes. (Doc. 1 PP189 s and ee.) These transactions occurred over a period of nearly five years. (*Id.*) In addition, there are allegations that nine additional acts of mail fraud were committed to further the schemes in which JJ&B participated. (Doc. 1 PP189 *l*, r, w, v, z, bb, cc, ff, and hh.) The actions alleged are clearly related because they all share the same purpose (inducing the Board members to grant contracts), results (contracts), participants (the Board members and ASCO), victims (the Plan and its beneficiaries), and methods of commission (donations to campaign funds). Continuity between the acts is established by the repeat nature of the four schemes over nearly five years furthered by eleven acts of mail fraud. The Complaint sufficiently alleges that JJ&B was engaged in a **[*81]** pattern of racketeering activity.

William Joyce is alleged to be involved with three separate fraudulent schemes: the fourth Provident Agreement (Doc. 1 P87), the second Manulife Agreement (Doc. 1 P105), and the Wells Agreement. (Doc. 1 P116.) The Complaint alleges that William Joyce used mail communications on at least two occasions to further these schemes. (Doc. 1 PP189 ff and rr.) These transactions occurred over a period of more than fourteen months. (*Id.*) In addition, there are allegations that eight additional acts of mail and wire fraud were committed to further the schemes in which William Joyce participated. (Doc. 1 PP189 bb, cc, ee, hh, ii, pp, qq, and ss.) While the alleged acts are clearly related, the short duration of the acts, approximately fourteen months, does not establish the requisite continuity in the predicate acts. The Complaint fails to allege that William Joyce was engaged in a pattern of racketeering activity. Count III will be dismissed

against William Joyce.

In summary, the *RICO § 1964(c)* claim for alleged violations of *§ 1962(c)* will be dismissed against the following Defendants because the Complaint fails to allege a pattern of racketeering activity: **[*82]** FCS, Perfilio, Joyce Associates, Inc., JJI, John Joyce, William Joyce, Michael Joyce, Wells, Wells REIT, Wells Investment, FSI, Safeco, and Devonshire. The Complaint sufficiently alleges a pattern of racketeering activity for the *RICO § 1964(c)* claim for alleged violations of *§ 1962(c)* against the following Defendants: Makowski, Pizano, Crossin, Jones, ASCO, Donald Williamson, Maria Williamson, JJJA, JJ&B, Joseph Joyce, Manulife, and Nationwide.

#### D) Count IV – *§ 1962(d)* Conspiracy to Violate *§ 1962(c)*

In Count IV of the Complaint, Plaintiffs allege that all Defendants conspired to violate *§ 1962(c)*, in violation of *18 U.S.C. § 1962(d)*. To sustain an action under *§ 1962(d)*, a plaintiff must prove:

> (1) that the defendant adopted the goal of furthering or facilitating the criminal endeavor, *Salinas v. United States, 522 U.S. 52, 65, 139 L. Ed. 2d 352, 118 S. Ct. 469 (1997)*;

> (2) that the conspiracy, if completed, would satisfy all of the elements of either *§ 1962(a), (b), or (c), Rehkop v. Berwick Healthcare Corp., 95 F.3d 285, 290 (3d Cir. 1996)*; and

> (3) that an injury resulted from an act related to the conspiracy **[*83]** which is enumerated in *§ 1961(1). Beck v. Prupis, 529 U.S. 494, 505, 146 L. Ed. 2d 561, 120 S. Ct. 1608 (2000)*.

*See generally Smith v. Berg, 247 F.3d 532, 536 (3d Cir. 2001).*

The Supreme Court has been very clear that RICO conspiracy under *§ 1962(d)* should be analyzed consistent with common law concepts of conspiracy.

> "One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense. . . .

> It makes no difference that the substantive offense under *§ 1962(c)* requires two or more predicate acts. The interplay between subsection (c) and (d) does not permit us to excuse

Case 1:05-cv-00165-JJF    Document 36-2    Filed 06/10/2005    Page 81 of 121

Page 21

2004 U.S. Dist. LEXIS 16957, *83; Fed. Sec. L. Rep. (CCH) P92,899

from the reach of conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense."

*Salinas, 522 U.S. at 65.* Moreover, the complaint need not contain specifics allegations of overt acts committed by each defendant. *See id. at 63-4* (explaining that federal conspiracy does not require an overt act, and comparing with RICO's even broader definition of conspiracy). All that is required is that the conspirator "adopt the goal **[*84]** of furthering or facilitating the criminal endeavor." *Id. at 65.*

"A conspiracy claim must also contain supportive factual allegations. The allegations must be sufficient to describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's general role in that conspiracy." *Rose v. Bartle, 871 F.2d 331, 366 (3d Cir. 1989)* (internal quotations and citations omitted). This analysis does not rise to the level of particularity required by *Rule 9(b)* for allegations of fraud. *Id.*

"All defendants conspired to violate *18 U.S.C. § 1962(c)*. Among other things, defendants conspired to perpetuate a scheme to intentionally defraud the Plan for their own monetary benefit. In furtherance of that Agreement, defendants engaged in at least the following overt acts: . . ." (Doc. 1 P196.) "Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further their schemes." (*Id.* P197.) In Count IV, the Complaint not only alleges that Defendants adopted the goal of furthering or facilitating the criminal endeavor, it outlines **[*85]** the composition of the conspiracy (the Board members, ASCO and affiliates, and the contract companies and affiliates), the broad objectives of the conspiracy (the pay-to-play scheme), and what role Defendants played in the scheme.

The allegations in the Complaint are extremely thorough, with the exception of Defendant Joseph Associates, Inc. As I stated previously in my *§ 1962(c)* analysis, the Complaint failed to allege that Joyce Associates, Inc. was in anyway connected with any of the allegedly fraudulent schemes between the Board, ASCO, and the investment companies. Aside from the similarity in names with other corporate and real Defendants, there is no connection between Joyce Associates, Inc. with any of the transactions, the companies involved in those transactions, the Board members, any campaign contributions, or any commissions. As such, I find that the Complaint does not sufficiently allege Defendant Joyce Associates, Inc.'s role in that conspiracy to sustain a claim under *§ 1964(c)* for violations of *§ 1962(d)*. Count IV will be dismissed against

Joseph Associates, Inc.

As I discussed in the previous section, the Complaint properly alleges a cause of action under *§ 1964(c)* **[*86]** for violations of *§ 1962(c)* against Defendants Makowski, Pizano, Crossin, Jones, ASCO, Donald Williamson, Maria Williamson, JJJA, JJ&B, Joseph Joyce, Manulife, and Nationwide. Thus, because the Complaint alleges that all Defendants conspired with the aforementioned Defendants against whom violations of *1962(c)* are alleged, the completed conspiracy would satisfy all of the elements of *§ 1962(c)*. n22

> n22 "Under our interpretation, a plaintiff could, through a *§ 1964(c)* suit for a violation of *§ 1962(d)*, sue co-conspirators who might not themselves have violated one of the substantive provisions of *§ 1962*." *Beck, 529 U.S. at 507.*

The Complaint also alleges that Plaintiffs sustained an injury resulting from the *§ 1962(c)* violations, specifically, the Plan had to pay excessive fees, as well as suffer economic losses through bad investments, as a direct result of the frauds committed by the Board member Defendants and the investment manager Defendants' collusion to enter the Plan into inappropriate **[*87]** contracts. I find Plaintiffs sufficiently allege an injury resulting from a predicate act enumerated in *§ 1961(1)*. I find that the Complaint sufficiently alleges a claim under *§ 1964(c)* for violations of *§ 1962(d)* against all Defendants except Joyce Associates, Inc.

### E) Count V – § 1962(b) Interest or Control of an Enterprise

Plaintiffs allege that all Defendants violated *18 U.S.C. § 1962(b)*, which states that "it shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." To establish a claim under *§ 1962(b)*, a plaintiff must allege that the defendant has an interest in control over an enterprise engaged in racketeering activity, that the defendant acquired the interest or control through racketeering, and that the plaintiff was injured from the defendant's interest or control of the enterprise. *See Lightning Lube, Inc., v. Witco Corp., 4 F.3d 1153, 1190-1191 (3d Cir. 1993)*. To state a RICO claim, **[*88]** the Complaint must contain more than mere conclusory accusations that a defendant controlled an enterprise. *Glessner v. Kenny, 952 F.2d 702, 714 (3d Cir 1991), overruled on other grounds, Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc., 46 F.3d 258 (3d Cir. 1995); see also Kaiser v. Stewart, No. Civ. A. 96-*

Case 1:05-cv-00165-JJF    Document 36-2    Filed 06/10/2005    Page 82 of 121

Page 22

2004 U.S. Dist. LEXIS 16957, *88; Fed. Sec. L. Rep. (CCH) P92,899

*6643, 1997 U.S. Dist. LEXIS 12788, at *6 (E.D. Pa. Aug. 19, 1997) (citing Glessner).*

Control over a RICO enterprise requires more than participation in the operation or management of the enterprise. *Kaiser, 1997 U.S. Dist. LEXIS 12788, at *4 (E.D. Pa. Aug. 19, 1997)* (mere managerial control not enough); *see also Browne v. Abdelhak, No. Civ. A. 98-6688, 2000 U.S. Dist. LEXIS, at *31-2 (E.D. Pa. Aug. 23, 2000).* A person controls a RICO enterprise when he has significant power over the functioning of the enterprise, comparable to that of a majority shareholder or someone with managerial control. *See, e.g., T.I Constr. Co. v. Kiewit Eastern Co., No. Civ. A. 91-2638, 1992 U.S. Dist. LEXIS 11607, at *22 (E.D. Pa. Aug. 6, 1992).* An interest in an RICO enterprise must rise to the level of a **[*89]** proprietary interest. *Kaiser, 1997 U.S. Dist. LEXIS 12788, at *9.* "In addition, the plaintiff must establish that the interest or control of the RICO enterprise by the person is a result of racketeering. . . . it must be established firmly that there is a nexus between the interest and the alleged racketeering activities." *Lightning Lube, 4 F.3d at 1190.*

Just as with the *§ 1964(c)* claim stemming from a *§ 1962(c)* violation, there is a threshold question whether Plaintiffs have standing to bring a claim for a violation of *§ 1962(b).* In order to bring an action under *§ 1964(c)* for a violation of *§ 1962(b),* the injury must result from the acquisition or control of the enterprise, not merely a racketeering activity. *Lightning Lube, 4 F.3d at 1190.* "[A] plaintiff must show injury from the defendant's acquisition or control of an interest in a RICO enterprise, *in addition to* injury from the predicate acts." *Id.* (emphasis added). Merely repeating the same injuries that resulted from an alleged *§ 1962(c)* violation is insufficient. *Id. at 1191.* The injury must be the result of the actions of the defendant in **[*90]** acquiring or maintaining control of the enterprise. The fact that a defendant could not have harmed the plaintiff "but for" the fact that he controlled the enterprise does not satisfy this test. *Casper v. Webber Group, Inc., 787 F. Supp. 1480, 1495 (D.N.J. 1992).*

While Plaintiffs allege a nexus between racketeering activity and control of an enterprise, they fail to establish how they were injured as a result of Defendants' control of the enterprise independent of the injuries from the racketeering activities. Plaintiffs repeated the same injury for both their *§ 1962(c)* and *§ 1962(b)* claims:

192. As a direct and proximate result of the defendants' racketeering activities and violations of *18 U.S.C. § 1962(c),* the Plan has been injured in its business and property, in that, without limitation:

a. the Plan suffered a net loss of millions of dollars as a result of the performance of the inappropriate investments into which the defendants placed the Plan's funds;

b. the Plan paid millions of dollars in excessive fees and commissions in connections with the inappropriate investments into which the placed the Plan's funds; **[*91]** and

c. the Plan paid millions of dollars in expense recovery charges when the Plan liquidated the inappropriate investments into which the placed the Plan's funds.

193. As a result of the defendants' violations of *18 U.S.C. § 1962(c),* the Plan has been damages in its business or property in an amount to be proven at trial, but not less than $25 million. claims.

* * *

209. As a direct and proximate result of the defendants' racketeering activities and violations of *18 U.S.C. § 1962(b),* the Plan has been injured in its business and property, in that, without limitation:

a. the Plan suffered a net loss of millions of dollars as a result of the performance of the inappropriate investments into which the defendants placed the Plan's funds;

a. the Plan paid millions of dollars in excessive fees and commissions in connections with the inappropriate investments into which the placed the Plan's funds; and

b. the Plan paid millions of dollars in expense recovery charges when the Plan liquidated the inappropriate investments into which the placed the Plan's funds.

210. As a result of the defendants' **[*92]** violations of *18 U.S.C. § 1962(b),* the Plan has been damages in its business or property in an amount to be proven at trial, but not less than $25 million.

Case 1:05-cv-00165-JJF    Document 36-2    Filed 06/10/2005    Page 83 of 121

Page 23

2004 U.S. Dist. LEXIS 16957, *92; Fed. Sec. L. Rep. (CCH) P92,899

(Doc. 1.)

Repeating the same injury is insufficient. *Lightning Lube, 4 F.3d at 1191* ("Such an allegation is insufficient because it merely parrots the same injury that *§ 1962(c)* is meant to remedy and fails to explain what *additional injury* resulted from the person's interest or control of the enterprise." (emphasis added)); *see also Cheatle v. Katz, 2003 U.S. Dist. LEXIS 6625, No. Civ. A. 02-4405, 2003 WL 21250583, at *6 (E.D. Pa. April 1, 2003)*. Moreover, the injuries alleged stem from the underlying racketeering activity committed by Defendants, i.e., the mail and wire frauds, not from Defendants' control of the enterprise. Plaintiffs have failed to plead a claim under *§ 1962(b)*. I will dismiss Count V against all moving Defendants.

### F) Count VI – § 1962(d) Conspiracy to Violate § 1962(b)

As I stated before in my discussion of Count IV, to sustain an action under *§ 1962(d)*, a Plaintiff must prove:

(1) that the defendant adopted the goal of furthering or facilitating **[*93]** the criminal endeavor, *Salinas v. United States, 522 U.S. 52, 65, 139 L. Ed. 2d 352, 118 S. Ct. 469 (1997)*;

(2) that the conspiracy if completed, would satisfy all of the elements of either *§ 1962(a), (b), or (c), Rehkop v. Berwick Healthcare Corp., 95 F.3d 285, 290 (3d Cir. 1996)*; and

(3) that an injury resulted from an act related to the conspiracy which is enumerated in *§ 1961(1). Beck v. Prupis, 529 U.S. 494, 505, 146 L. Ed. 2d 561, 120 S. Ct. 1608 (2000)*.

*See generally Smith v. Berg, 247 F.3d 532, 536 (3d Cir. 2001)*.

Although a conspiracy claim requires that the element of a *§ 1962(a), (b), or (c)* violation are met, there does not need to be a successful claim under *§ 1962(a), (b), or (c)* in order for a *§ 1962(d)* claim to survive. *Beck, 529 U.S. at 507*. Moreover, in situations in which the claim for the substantive violation fails for failure to establish the injury requirement imposed by *§ 1964(c)*, the substantive allegations can still sustain a cause of action for a *§ 1962(d)* violation. *Rehkop, 95 F.3d at 290*.

"A conspiracy claim must also contain supportive factual allegations. The **[*94]** allegations must be sufficient to describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's

general role in that conspiracy." *Rose v. Bartle, 871 F.2d 331, 366 (3d Cir. 1989)* (internal quotations and citations omitted). However, this analysis does not rise to the level of particularity required by *Rule 9(b)* for allegations of fraud. *Id.*

"All defendants conspired to violate *18 U.S.C. § 1962(b)*. Among other things, defendants conspired to perpetuate a scheme to acquire and maintain interests in and control of the enterprise through a pattern of racketeering activity." (Doc. 1 P213.) "Defendants have intentionally conspired to acquire or maintain their interests in the enterprise through a pattern of racketeering activity. Defendants knew their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further their schemes." (*Id.* P214.) In Count VI, the Complaint not only alleges that Defendants adopted the goal of furthering or facilitating the criminal endeavor, it outlines the composition of the conspiracy (the Board members, ASCO and **[*95]** affiliates, and the contract companies and affiliates), the broad objectives of the conspiracy (the pay-to-play scheme), and what role Defendants played in the scheme.

The allegations in the Complaint are extremely thorough, with the exception of Defendant Joseph Associates, Inc. As I stated previously in my *§ 1962(c)* analysis, the Complaint failed to allege that Joyce Associates, Inc. was in anyway connected with any of the allegedly fraudulent schemes between the Board, ASCO, and the investment companies. Aside from the similarity in names with other corporate and real Defendants, there is no connection between Joyce Associates, Inc. and any of the transactions, the companies involved in those transactions, the Board members, any campaign contributions, or any commissions. As such, I find that the Complaint does not sufficiently allege Defendant Joyce Associates, Inc.'s role in that conspiracy to sustain a claim under *§ 1964(c)* for violations of *§ 1962(d)*.

As I discussed in the previous section, a *§ 1962(b)* violation is established when the defendant has an interest in control over an enterprise engaged in racketeering activity which the defendant acquired the interest or control **[*96]** through racketeering. *See Lightning Lube, 4 F.3d at 1190-1191*. To state a RICO claim, the Complaint must contain more than mere conclusory accusations that a defendant controlled an enterprise. *Glessner, 952 F.2d at 714, overruled on other grounds, Jaguar Cars, 46 F.3d 258; see also Kaiser, 1997 U.S. Dist. LEXIS 12788, at *6* (citing *Glessner*).

Control over a RICO enterprise requires more than participation in the operation or management of the enterprise. *Kaiser, 1997 U.S. Dist. LEXIS 12788, at *4* (mere managerial control not enough); *see also Browne, 2000*

*U.S. Dist. LEXIS, at \*31–2.* A person controls a RICO enterprise when he has significant power of the functioning of the enterprise, comparable to that of a majority shareholder or someone with managerial control. *See, e.g., T.I Construction, 1992 U.S. Dist. LEXIS 11607, at \*22.* An interest in an RICO enterprise must rise to the level of a proprietary interest. *Kaiser, 1997 U.S. Dist. LEXIS 12788, at \*9.* "In addition, the plaintiff must establish that the interest or control of the RICO enterprise by the **[\*97]** person is a result of racketeering. . . . it must be established firmly that there is a nexus between the interest and the alleged racketeering activities." *Lightning Lube, 4 F.3d at 1190.*

The Complaint properly alleges that the Board members, and possibly ASCO, controlled the enterprise or maintained a proprietary interest in the enterprise. Specifically, the Board members benefitted financially from the transactions of the enterprise, as did ASCO. Moreover, the Board members had the ability to grant or deny a contract at their whim. Therefore, they were in a position in which they controlled the very actions of the enterprise, comparable to that of a shareholder with a controlling interest. Even if the actions alleged do not themselves rise to the level of control, Plaintiffs allege facts which could support the inference that Defendants intended to control an enterprise, which satisfies the pleading requirements for a conspiracy. *See Salinas, 118 S. Ct. at 478* ("It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues . . . ."). Thus, the completed conspiracy satisfies all of the elements of *§ 1962(b).* **[\*98]**

The Complaint also alleges that Plaintiffs sustained an injury resulting from the *§ 1962(b)* violations, specifically, the Plan had to pay excessive fees, as well as suffer economic losses through bad investments, as a direct result of the frauds committed by the Board member Defendants and the investment manager Defendants' collusion to enter the Plan into inappropriate contracts. I find Plaintiffs sufficiently allege an injury resulting from a predicate act enumerated in *§ 1961(1).* I find that the Complaint sufficiently alleges a claim under *§ 1964(c)* for violations of *§ 1962(d)* against all Defendants except Joyce Associates, Inc.

### 3) Count VII – Investment Advisor Act of 1940

Count VII alleges that ASCO and Donald Williamson violated the Investment Advisors Act of 1940, *15 U.S.C. § 80b–1 et seq.* (hereinafter IAA). Defendants ASCO and Williamson challenge this claim on the grounds that it is untimely. The IAA does not contain an express statute of limitations. However, the Sarbanes–Oxley Act of 2002, *28 U.S.C. § 1658(b),* created a statute of limitations ap-

plicable to the IAA.

> (a) Except as otherwise provided **[\*99]** by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues.

> (b) Notwithstanding subsection (a), a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (*15 U.S.C. 78c(a)(47)*) [which includes the IAA], may be brought not later than the earlier of—

>> (1) 2 years after the discovery of the facts constituting the violation; or
>> (2) 5 years after such violation.

*28 U.S.C. § 1658(b).*

In the present case, Plaintiffs allege that ASCO and Donald Williamson began acting as agents in 1988. (*See* Doc. 85 at 18–19.) Typically, courts have held that violations of the IAA are not continuing crimes. *See discussion Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1040–42 (1992)* ("[The unregistered investment advisor] harms the purchaser of his investment advice at the time he enters into a contract **[\*100]** that commits the purchaser to pay for the advice."). However, the Complaint clearly alleges multiple violations committed during the course of the relationship between ASCO and the Board, each of which would create a separate time for the statute of limitations to accrue. The allegations of the Complaint are not clear about the timing of each of the violations. Therefore, at the present time, I will not dismiss Count VII. I will reserve ruling on the matter of the statute of limitations until the facts are more clearly developed to permit an appropriate analysis of when the statute of limitations accrued for the IAA claims.

### 4) State Law Claims

Now that the federal law claims are resolved, I move to the state law claims. Plaintiffs raise a claim of breach of fiduciary duty against Defendants Makowski, Pizano, Crossin, Jones, ASCO, and Donald Williamson. They also raise a claim of aiding and abetting breach of fiduciary duty against Defendants Nationwide, Manulife, Wells, Wells REIT, Wells Investment, FSC, FSI, LPL,

2004 U.S. Dist. LEXIS 16957, *100; Fed. Sec. L. Rep. (CCH) P92,899

Safeco, Devonshire, Perfilio, Joyce Associates, Inc., JJI, JJJA, JJ&B, Joseph Joyce, William Joyce, Michael Joyce, John Joyce, and Maria Williamson. Finally, **[*101]** Plaintiffs raise a claim is for unjust enrichment against ASCO, Donald Williamson, FSC, Perfilio, JJI, JJJA, Joseph Joyce, John Joyce, Michael Joyce, LPL, Manulife, Nationwide, Wells, Wells REIT, Wells Investment, and FSI. All of these claims are governed by Pennsylvania law.

### A) Supplemental Jurisdiction

As a preliminary matter, Defendants argue either that the Court should decline to exercise jurisdiction.

> In any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

*28 U.S.C. § 1367(a).* Cases that "derive from a common nucleus of operative fact" with federal claims are part of the same case or controversy. *United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966).*

In the present case, Plaintiffs allege federal **[*102]** claims against every Defendant in Counts III thought VI. The state law claims raised by Plaintiffs derive from the same operative facts as the federal law claims, giving me jurisdiction under *§ 1367(a)*. The fact that I dismissed the federal claims against some Defendants does not destroy my supplemental jurisdiction over the state law claims raised against those Defendants. *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc., 101 F.3d 1492, 1508 (3d Cir. 1996); see also Fralin v. County of Bucks, 296 F. Supp. 2d 609, 616-617 (E.D. Pa. 2003).*

While I have supplemental jurisdiction, I also have discretion to decline to exercise that jurisdiction in certain circumstances.

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . .
>
> > (1) the claim raises a novel or complex issue of State law,
> > (2) the claim substantially pre-

dominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons **[*103]** for declining jurisdiction.

*28 U.S.C. § 1367(c).* In deciding whether to retain supplemental jurisdiction, a court "should take into account generally accepted principles of 'judicial economy, convenience, and fairness to the litigants.'" *Growth Horizons, Inc. v. Delaware County, 983 F.2d 1277, 1284 (3d Cir. 1993)* (quoting *Gibbs, 383 U.S. at 726*).

This case is principally a RICO case, and the state law claims do not substantially predominate over the RICO claims. Likewise, although I have dismissed the federal claims against one Defendant, Joyce Associates, Inc., twenty-five of the twenty-six Defendants continue to have at least one federal claim pending. Given the complexity of the case and the interconnected nature of the transactions involved, it would be wasteful to dismiss Joyce Associates, Inc. on the basis that no federal claims survive. Judicial economy dictates that the case should be decided in a single forum. As such, I will not decline to exercise my supplemental jurisdiction.

### B) Count I – Breach of Fiduciary Duty

In Count I, Plaintiffs raise a claim of breach of fiduciary duty against Defendants **[*104]** Makowski, Pizano, Crossin, Jones, ASCO, and Donald Williamson. All Defendants challenge the claim on the basis that it is time-barred. Defendants ASCO and Williamson further challenge Count I as failing to state a claim upon which relief can be granted because neither of them ever had a fiduciary relationship with the Plan. Breach of fiduciary duty has a statute of limitations of two years. *42 PA. CONS. STAT. ANN. § 5524.* As with the federal claims, Plaintiffs argue that the injuries occurred within the two-year statute of limitations, and, even if the injury occurred before then, the statute of limitations was tolled by fraudulent concealment and adverse domination. Assuming, *arguendo,* that the injuries occurred outside of the two-year statute of limitations, Plaintiffs' claims survive because they have sufficiently pled grounds for fraudulent concealment, adverse domination, or both.

Pennsylvania applies a broader test n23 for fraudulent concealment than the federal test that I applied in the RICO analysis. *See* discussion *supra* p. 12.

2004 U.S. Dist. LEXIS 16957, *104; Fed. Sec. L. Rep. (CCH) P92,899

The "discovery rule" provides that where the existence of the injury is not known to the complaining party and such knowledge [*105] cannot reasonably be ascertained within the prescribed statutory period, the limitations period does not begin to run until the discovery of the injury is reasonably possible. The "discovery rule" arises from the inability of the injured party, despite the exercise of reasonable diligence, to know of the injury or its cause.

*Hayward v. Med. Ctr. of Beaver County, 530 Pa. 320, 608 A.2d 1040, 1043 (Pa. 1992)* (internal citations omitted). It is clear that the discovery rule applies to the present case given Plaintiffs' allegations that the Board members actively concealed the contracts from the public. Therefore, the conclusion from my fraudulent concealment analysis is unchanged; Plaintiffs' claims are not time–barred because they successfully allege facts that trigger the discovery rule.

      n23 Pennsylvania's test, which is known as the "discovery rule" is broader than the RICO fraudulent concealment standard because it does not require active concealment. It only requires that a Plaintiff cannot discover the injury with the exercise of reasonable due diligence.

[*106]

It is less clear whether Pennsylvania has adopted the doctrine of adverse domination. *See discussion Resolution Trust Corp. v. Farmer, 865 F. Supp. 1143, 1152 n.7 (E.D. Pa. 1994); see also Shields v. National Union Fire Ins. Co., 1992 Bankr. LEXIS 764, No. 90–0985S, 1992 WL 119362, at *10 (Bankr. E.D. Pa. May 21, 1992).*

      Considering the domination by Dahlen of the entire corporate management, as well as the confidence long placed in him by the members of the Association and later by the shareholders of Lutherland, it is natural that even when suspicion had been aroused it did not ripen into conviction in the minds of the dissident shareholders until an investigation by counsel revealed the true state of affairs and thereupon this action was promptly instituted.

*Lutherland, Inc. v. Dahlen, 357 Pa. 143, 53 A.2d 143, 147 (Pa. 1947).* Some courts have read the language in *Lutherland* as Pennsylvania's recognition of adverse domination. *Harper v. Superior Tool and Die Co., 1987 U.S. Dist. LEXIS 9217, Civ. A. No. 86–4188, 1987 WL 18414, at *3 (E.D. Pa. 1987).* Other courts have read it as a variation of fraudulent concealment. *Resolution Trust Corp., 865 F. Supp. at 1152.* [*107]

Whatever name the principle in *Lutherland* takes, it is clear that the facts in Plaintiffs' Complaint allege a similar situation, where the Board was dominated by participants of the pay–to–play scheme who actively concealed the nature of the financial arrangements from the public view. These facts are sufficiently analogous to the facts in *Lutherland* to permit Plaintiffs to proceed. Thus, I will not dismiss Count I against Defendants Makowski, Pizano, Crossin, Jones because the claim is not time-barred. However, this decision is can be revisited on a motion for summary judgment because the analysis requires a fact–specific evaluation to determine the applicability to a case. *Hayward, 608 A.2d at 1043.*

ASCO and Donald Williamson further assert that Count I should be dismissed because they never owed a fiduciary obligation to the Plan. ASCO and Donald Williamson assert that they do not met the definition of a fiduciary under *title 20, section 7301* of the Pennsylvania Code, n24 which regulates how fiduciaries make investments for a principal. Pennsylvania's title 20 also contains a broader definition of fiduciary which is applied more generally. That definition [*108] "includes personal representatives, guardians, and trustees, whether domiciliary or ancillary, individual or corporate, subject to the jurisdiction of the orphans' court division." *20 PA. CONS. STAT. ANN. § 102.* ASCO and Donald Williamson meet neither of these definitions.

      n24 "The term 'fiduciary' as used in this chapter shall include an administer of a municipal pension or retirement plan and any other person whose fiduciary duties are, by statute, governed by the principles of this chapter." *20 PA. CONS. STAT. ANN. § 7301.* "The term 'fiduciary', as defined in [*20 PA. CONS. STAT. ANN. § 102*] does not expressly include an 'attorney–in–fact' or an 'agent'." *In re Estate of Nicely,* No. 184 OF 1995, *2003 WL 22183940,* at *5 (Pa. Com. Pl. April 1, 2003).

Aside from the statutory fiduciaries, there is a long–standing common law definition of fiduciary in Pennsylvania. *Basile v. H&R Block, Inc., 563 Pa. 359, 761 A.2d 1115 (Pa. 2000) (Basile I); see discussion Basile v. H&R Block, Inc., 2001 PA Super 136, 777 A.2d 95, 101 (Pa. Super. Ct. 2001)* [*109] *(Basile II).* "An agency relationship is a fiduciary one, and the agent is subject to

Case 1:05-cv-00165-JJF    Document 36-2    Filed 06/10/2005    Page 87 of 121

Page 27

2004 U.S. Dist. LEXIS 16957, *109; Fed. Sec. L. Rep. (CCH) P92,899

the duty of loyalty to act only for the principal's benefit." *Basile I, 761 A.2d at 1120* (quoting *Sutliff v. Sutliff, 515 Pa. 393, 528 A.2d 1318, 1323 (Pa. 1987)*). The agent n25 has a duty to act "with the utmost good faith," which includes a duty to disclose "all relevant information" to the principal. *Id.* (citing *Sylvester v. Beck, 406 Pa. 607, 178 A.2d 755, 757 (Pa. 1962)*).

> n25 The three elements of agency are: (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) understanding of the parties that the principal is to be in control of the undertaking. *Basile I, 761 A.2d at 1120* (quoting *Scott v. Purcell, 490 Pa. 109, 415 A.2d 56, 60 (Pa. 1980)*).

The Complaint alleges that ASCO and Donald Williamson were "agents" of the Board and "investment advisors." (Doc. 1 [*110] P171.) As alleged in the Complaint, ASCO and Donald Williamson acted as agents of the Board and the Plan in many, if not all, of the twelve contracts at issue in this case. The further allegations that ASCO and Donald Williamson received commissions and withheld information from the Board and/or the Plan (e.g., the investment account statements were sent to ASCO, not the Board) amount to allegations of breaches of their common-law fiduciary duties. I find that the Complaint alleges a claim for which relief can be granted for breach of fiduciary duty against ASCO and Donald Williamson.

### C) Count II – Aiding and Abetting Breach of Fiduciary Duty

In Count II, Plaintiffs allege that various Defendants "aided and abetted" the breaches of fiduciary duties allegedly committed by Defendants Makowski, Pizano, Crossin, Jones, ASCO, and Donald Williamson. All Defendants named in Count II challenge the claim on the grounds that the cause of action is not recognized in Pennsylvania. Plaintiffs acknowledge that the Pennsylvania Supreme Court has not recognized aiding and abetting breach of fiduciary duty, but they urge the Court to expand the law.

For issues of state law, the Court acts [*111] as if it were a state court, applying the state law as the state has constructed it, and interpreting novel questions in the manner the Court believes the state high court would interpret the issue. *Rolick v. Collins Pine Co., 925 F.2d 661, 664 (3d Cir. 1991)*. However, "it is not the role of a federal court to expand state law in ways not foreshadowed by state precedent." *City of Philadelphia v. Beretta U.S.A. Corp., 277 F.3d 415, 421 (3d Cir. 2002)* (citing *Camden County Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.,*

*123 F. Supp. 2d 245 (D.N.J. 2000)*). "Federal courts may not engage in judicial activism. Federalism concerns require that we permit state courts to decide whether and to what extent they will expand state common law . . . . Our role is to apply the current law of the jurisdiction, and leave it undisturbed." *Leo v. Kerr–McGee Chem. Corp., 37 F.3d 96, 101 (3d Cir. 1994)* (quoting *City of Philadelphia v. Lead Indus. Ass'n, 994 F.2d 112, 123 (3d Cir. 1993)*).

While some lower courts in Pennsylvania have recognized a cause of action for aiding and abetting breach of fiduciary duty, the number [*112] of cases is not overwhelming. *Lichtman v. Taufer, 2004 WL 1632574 (Pa. Com. Pl. July 13, 2004)* and *Koken v. Steinberg, 825 A.2d 723 (Pa. Com. Pl. 2003)*; *see also Burnside v. Abbott Lab., 351 Pa. Super. 264, 505 A.2d 973, 982–83 (Pa. Super. Ct. 1985)* (favorably discussing aiding and abetting, but then holding "this case is an improper vehicle for the initial consideration of this cause of action by a court of this Commonwealth").

I am hesitant to create an entirely new cause of action on the basis of two cases from the lower courts in Pennsylvania and dictum from a third court. I am not alone in my hesitation. In 2002, the United States District Court for the Western District of Pennsylvania dismissed a claim of aiding and abetting a breach of fiduciary duty on the same grounds. *Daniel Boone Area Sch. Dist. v. Lehman Brothers, Inc., 187 F. Supp. 2d 400, 413 (W.D. Pa. 2002)*. I am aware that the United States District Court for the Eastern District of Pennsylvania has been more willing to expand Pennsylvania law to include aiding and abetting breach of fiduciary duty. *Adena, Inc. v. Cohn, 162 F. Supp. 2d 351, 357–58 (E.D. Pa. 2001)*; [*113] *Stone St. Servs. v. Daniels, 2000 U.S. Dist. LEXIS 18904, Civ. A. No. 00–1904, 2000 WL 1909373, at *3 (E.D. Pa. Dec. 29, 2000)*; *Kaiser v. Stewart, Civ. A. No. 96-6643, 1997 U.S. Dist. LEXIS 12788, at *53 (E.D. Pa. Aug. 20, 1997)*; *Schuylkill Skyport Inn, Inc. v. Rich, Civ. A. No. 95-3128, 1996 U.S. Dist. LEXIS 12655, at *120 (E.D. Pa. Aug. 21, 1996)*; *Pierce v. Rossetta Corp., Civ. A. No. 88–5873, 1992 U.S. Dist. LEXIS 9065, at *6–7 (E.D. Pa. June 12, 1992)*. However, I am more persuaded by the caution urged by the Court of Appeals for the Third Circuit than I am by the non-biding decisions of the United States District Court for the Eastern District of Pennsylvania. Pennsylvania has not recognized a cause of action for aiding and abetting breach of fiduciary duty, and neither will I. Count II will be dismissed against all moving Defendants.

### D) Count VIII – Unjust Enrichment

The last claim in this action is for unjust enrichment against ASCO, Donald Williamson, FSC, Perfilio, JJI, JJJA, Joseph Joyce, John Joyce, Michael Joyce, LPL, Manulife, Nationwide, Wells, Wells REIT, Wells

2004 U.S. Dist. LEXIS 16957, *113; Fed. Sec. L. Rep. (CCH) P92,899

Investment, and FSI.

> Unjust enrichment **[*114]** is . . . an equitable doctrine[, with the following elements:] benefits conferred on one party by another, appreciation of such benefits by the recipient, and acceptance and retention of these benefits under such circumstances that it would be inequitable [or unjust] for the recipient to retain the benefits without payment of value.

*Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 447 (3d Cir. 2000)* (quoting 16 SUMMARY OF PA. JUR. 2D COMMERCIAL LAW § 2.2 (1994)) (alterations in original). Whether unjust enrichment is appropriate in a particular case "depends on the unique factual circumstances of each case." *Styer v. Hugo, 422 Pa. Super. 262, 619 A.2d 347, 350 (Pa. Super. Ct. 1993).*

Plaintiffs allege that the Plan conferred the benefit of fees and commissions upon Defendants in this claim, and they allege that Defendants received those benefits. Plaintiffs further contend that these benefits were received unjustly because of the fraud and bribery involved in their procurement. At this early stage in the case, I cannot make the factual analysis required to determine whether the circumstances constitute an inequity warranting **[*115]** unjust enrichment, but it would be inappropriate to dismiss the equitable claim at this time. n26

> n26 An unjust enrichment claim can be an equitable stand-in a tort claim. *Allegheny Gen. Hosp., 228 F.3d at 446-7* (discussing *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 917-18 (3d Cir. 1999), cert. denied, 528 U.S. 1105, 145 L. Ed. 2d 713 (2000)).* In the present case, Plaintiffs properly allege multiple tort claims, which strongly suggest that the unjust enrichment claim should remain in the action.

**CONCLUSION**

In summary, I will dismiss Count III against FCS, Perfilio, Joyce Associates, Inc., JJI, John Joyce, William Joyce, Michael Joyce, Wells, Wells REIT, Wells Investment, FSI, Safeco, and Devonshire because the Complaint fails to state a claim upon which relief can be granted. Counts IV and VI will be dismissed against Defendant Joyce Associates, Inc. because the Complaint fails to state a claim upon which relief **[*116]** can be granted. Count V will be dismissed against all moving Defendants because the Complaint fails to state a claim upon which relief can be granted. Count II will be dismissed against all moving Defendants because there is no such cause of action. The remaining claims will not be dismissed. Because of the complexity of the case, I include the summary of the remaining claims:

| | | |
|---|---|---|
| (1) | Count I | Breach of fiduciary duty – Defendants Makowski, Pizano, Crossin, Jones, ASCO, and Donald Williamson; |
| (2) | Count II | Aiding and abetting breach of fiduciary duty – Defendant LPL; |
| (3) | Count III | Violating RICO § 1962(c), conducting and participating in an enterprise by engaging in a pattern of racketeering activity – Makowski, Pizano, Crossin, Jones, ASCO, Donald Williamson, Maria Williamson, JJJA, JJ&B, Joseph Joyce, Manulife, Nationwide, and LPL; |
| (4) | Count IV | Violating RICO § 1962(d), conspiring to violate § 1962(c) – all Defendants except Joyce Associates, Inc.; |
| (5) | Count V | Violating RICO § 1962(b), acquiring and maintaining an interest or control of an enterprise engaged in a pattern of racketeering activity – Defendant LPL; |
| (6) | Count VI | Violating RICO § 1962(d), conspiring to violate |

2004 U.S. Dist. LEXIS 16957, *116; Fed. Sec. L. Rep. (CCH) P92,899

§ 1962(b) – all Defendants except Joyce Associates, Inc.;

(7)    Count VII    Violating the Investment Advisors Act – Defendants Donald Williamson and ASCO.

(8)    Count VIII    Unjust enrichment – Defendants ASCO, Donald Williamson, FSC, FSI, LPL, Manulife, Nationwide, Wells, Wells REIT, Wells Investment, Perfilio, JJI, JJJA, Joseph Joyce, Michael Joyce, and John Joyce.

---

**[\*117]**

An appropriate Order follows.

August 24, 2004
Date

A. Richard Caputo

United States District Judge

**ORDER**

**NOW,** this 24th day of August, 2004, **IT IS HEREBY ORDERED** that Defendants' nine motions to dismiss (Docs. 46, 91, 93, 95, 96, 98, 100, 104, and 108) are **GRANTED in part** and **DENIED in part** as follows:

(1) Count II is **DISMISSED** against Nationwide Life Insurance Company, The Manufacturers Life Insurance Company (U.S.A), Wells Real Estate Funds, Inc., Wells Investment Securities, Inc., Wells Real Estate Investment Trust, Inc., FSC Securities Corporation, First Security Investments, Inc., Safeco Life Insurance Corporation, Devonshire Capital Management, LLC, Joseph C. Perfilio, Joyce Associates, Inc., Joseph Joyce Insurance, Joseph J. Joyce Associates, Inc., Joyce Jackman & Bell Insurers, Joseph Joyce, Jr., William Joyce, Michael Joyce, John J. Joyce, and Maria Williamson;

(2) Count III is **DISMISSED** against Defendants FCS Securities Corporation, Joseph C. Perfilio, Joyce Associates, Inc., Joseph Joyce Insurance, John J. Joyce, William Joyce, Michael Joyce, Wells Real Estate Funds, Inc., Wells Real Estate Investment Trust, **[\*118]** Inc., Wells Investment Securities, Inc., First Security Investments, Inc., Safeco Life Insurance Corporation, and Devonshire Capital Management, LLC;

(3) Count IV is **DISMISSED** against Defendant Joyce Associates, Inc.

(4) Count V is **DISMISSED** against all Defendants except Linsco Private Ledger Corporation;

(5) Count VI is **DISMISSED** against Defendant Joyce Associates, Inc.

(6) The motions are otherwise **DENIED.**

A. Richard Caputo

United States District Judge

# EXHIBIT H

LEXSEE 2003 U.S. DIST. LEXIS 1338

## PAULA LICKMAN VS. MARIE HENKEL, ET AL

### C.A. NO. 01–2949

## UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### 2003 U.S. Dist. LEXIS 1338

### January 15, 2003, Decided
### January 16, 2003, Filed; January 17, 2003, Entered

**SUBSEQUENT HISTORY:** Affirmed without opinion by *Lickman v. Henkel, 2004 U.S. App. LEXIS 27515* (3d Cir. Pa., Dec. 3, 2004)

**DISPOSITION: [*1]** Defendant David Lyle Segal's motion to dismiss the Complaint granted. Plaintiff's motion to amend the complaint denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** Paula Lickman, PLAINTIFF, Pro se, Dallas, TX USA.

For Marie E Henkel, DEFENDANT: Paul J Greco, Morgan, Lewis & Bockius LLP, Philadelphia, PA USA.

For Lynnea S Concannon, Sean Concannon, DEFENDANTS: Jay S Rothman, Marshall, Dennehey, Warner, Coleman and Goggin, Philadelphia, PA USA.

For William M O'Connell, III, Barbin and O'Connell, PC, DEFENDANTS: Patricia S Biswanger, Cozen and O'Connor, Philadelphia, PA USA.

For Marcy Shain, DEFENDANT: Robert M Berger, Joseph N Bongiovanni, III, Bongiovanni & Berger, David Lyle Segal, Philadelphia, PA USA.

**JUDGES:** CHARLES R. WEINER.

**OPINIONBY:** CHARLES R. WEINER

**OPINION:**

MEMORANDUM OPINION AND ORDER

WEINER, J.

JANUARY 15, 2003

The Court ordered plaintiff to show cause why the motions of the defendant David Lyle Segal (subsequently joined in by defendant Marcy Shain) to dismiss the original complaint under Rule 12(b)(6) and to dismiss plaintiff's **[*2]** motion to amend the complaint should not be granted. The Court held a show cause hearing at which all interested parties appeared.

Although we must accept all allegations in the complaint as true. Plaintiff's original complaint contains over 186 allegations and her proposed amended complaint contains an additional 17 allegations. The vast majority of these allegations are irrelevant for purposes of deciding whether this suit should be dismissed. We will, therefore, only state the relevant allegations from plaintiff's complaint with the most of the facts coming from undisputed authentic documents in the record. n1

> n1 Because the only documents we rely on from the record are "undisputedly authentic documents" of which plaintiff obviously had notice, we need not convert defendant's Rule 12(b)(6) motion into a motion for summary judgment. In re: *Rockefeller Ctr. Props. Secs. Lit., 184 F.3d 280, 287 (3d Cir. 1999)*.

1. On March 27, 1998, plaintiff filed a petition under Chapter 7 of the Bankruptcy **[*3]** Code as the debtor in bankruptcy with the United States Bankruptcy Court, Middle District of Florida, Orlando Division, Docket No. 98–02632–637.

2. Marie E. Henkel was named as trustee for plaintiff in the bankruptcy matter.

3. Tibey Pfeiffer died on May 4, 1998.

4. On July 13, 1998, Letters Testamentary were granted by the Register of Wills of Philadelphia County, Pennsylvania, upon the admission of the last will and testament of Ms. Pfeiffer to Marcy Shain as Executrix.

5. Plaintiff is named as a specific legatee and as a 15% residuary legatee of the estate of Tibey Pfeiffer. The specific legacies had been distributed to plaintiff several years earlier. The amount of $42,500 in advancements had also been paid to plaintiff before Ms Pfeiffer's death.

6. The trustee in bankruptcy learned of plaintiff's inheritance in August of 1999, whereupon she moved to re-open the bankruptcy estate and to have the inheritance included as property of the bankruptcy estate.

7. After a trial thereon, the Honorable Karen Jennemann, Bankruptcy Judge, found, inter alia, as follows:

> 4. The interest of Paula Lickman in the probate of Tibey Pfeiffer is property of bankruptcy estate pursuant [*4] to *11 U.S.C. § 541* (a)(5). n2

> 5. The automatic stay imposed by *11 U.S.C. § 362*(a)(3) applies to all property of the bankruptcy estate until it is no longer property of the bankruptcy estate ...
> 7. The pleadings filed by Paula Lickman in the Court of Common Pleas of Philadelphia County, Orphan's Court Division, to remove the executrix, to change venue, and to strike the notice of appearance filed by Marie E. Henkel were filed in violation of the automatic stay ...

Order of Bankruptcy Court filed on October 18, 1999.

> n2 *11 U.S.C. § 541*(a)(5)(A) provides, in pertinent part:

> (A) The commencement of a case ... creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held: .. (5) Any interest in property that would have been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date-- (A) by bequest, devise or inheritance.

[*5]

Accordingly, Judge Jennemann ordered, inter alia:

> 1. Marie E. Henkel, as trustee for the bankruptcy estate of Paula Lickman is the only party authorized to take any action on behalf of Paula Lickman regarding any interest Paula Lickman has in the probate estate

of Tibey Pfeiffer.
> 2. All causes of action that Paula Lickman may have arising from the administration of the probate estate of Tibey Pfeiffer are property of the bankruptcy estate and may only be pursued by Marie E. Henkel as trustee.
> 3. All parties in interest in the Tibey Pfeiffer probate estate are enjoined from taking any further action that may affect or impair the bankruptcy estate's interest in the probate estate without prior approval of the Bankruptcy Court ...

Order of Bankruptcy Court filed on October 18, 1999.

8. Plaintiff appealed the Bankruptcy Court's Order to the United States District Court for the Middle District of Florida which dismissed the appeal on April 18, 2000.

9. Plaintiff appealed the Bankruptcy Court's Order to the United States Court of Appeals for the Eleventh Circuit which affirmed the district court on March 30, 2001.

10. On February 28, 2000, upon motion of the trustee, [*6] Marie E. Henkel, and after a trial thereon, Judge Jennemann further Ordered, inter alia:

> 3. The Notice of Trustee's Intent to Sell Property of the Estate including all of Paula Lickman's interest in the probate estate of Tibey Pfeiffer as well as any causes of action deriving therefrom is approved. The objections filed by the Debtor pro se and through counsel are overruled.

Order of Bankruptcy Court filed on February 28, 2000. Plaintiff did not appeal this Order.

11. On March 31, 2000, defendant Marcy Shain purchased the trustee Marie Henkel's interest in Paula Lickman's portion of the probate estate of Tibey Pfeiffer, including all causes of action deriving therefrom.

12. On May 24, 2001, plaintiff filed in the Court of Common Pleas of Philadelphia County, Orphans' Court Division (Docket No. 1410 of 1998) a "Petition for Citation to Declare Void an Agreement made by Respondent Executrix to Extinguish Petitioner's Claims against Respondent."

13. On June 13, 2001, the Honorable Alex Bonavitacola, Orphans' Court Judge, Decreed that the Petition be "... Denied, Without Prejudice, However, to the right of Petitioner to challenge the validity of the subject Agreement [*7] in proceedings before the Auditing Judge in the Audit of the Accounts of the Executrix."

Decree of June 14, 2001, Court of Common Pleas of Philadelphia County, Orphans Division.

14. On June 15, 2001, plaintiff filed the action sub judice against the trustee and the trustee's counsel, seeking money damages for civil theft, conspiracy, breach of fiduciary duty and abuse of process arising from the trustee's sale of the probate estate asset to Marcy Shain. Stripped to its essentials, the Complaint alleges a vast conspiracy among Ms. Shain, her attorney, Ms. Henkel and her attorney and even the bankruptcy judge to bribe the bankruptcy trustee in a grand scheme to steal plaintiff's inheritance.

15. On August 8, 2001, the trustee filed an Adversary Proceeding with the Bankruptcy Court, contending, inter alia, that the debtor's actions in filing suits in Pennsylvania violated the automatic stay provided by *11 U.S.C. § 362*. The trustee sought a contempt citation, damages, sanctions and injunctive relief.

16. On September 6, 2001 the Bankruptcy Court entered a temporary restraining order enjoining the debtor and her Pennsylvania attorney from prosecuting in **[*8]** any way (1) the action or proceeding pending in the Pennsylvania Orphans' Court to void the bankruptcy sale approved by this court, (2) Civil Action No. 01–2949 pending in the United States District Court for the Eastern District of Pennsylvania, and (3) Civil Action No. 01–4014 pending in the United States District Court for the Eastern District of Pennsylvania, including, without limitation, seeking temporary or preliminary relief from either of those courts. The temporary restraining order also prohibited the debtor and her counsel from filing new actions to attack the trustee or her counsel on account of their services on behalf of the bankruptcy estate.

17. On September 13, 2001, the Bankruptcy Court entered an "Agreed Preliminary Injunction" in which plaintiff consented to the continuation of the same terms as the temporary restraining order pending final determination of the adversary proceeding.

18. On June 10, 2002, plaintiff filed a motion to amend the complaint in the case sub judice, seeking to add her brother, Stephen, as a plaintiff and withdrawing claims against all the named defendants except David Lyle Segal and Marcy Shain.

19. On June 20, 2002, the plaintiff **[*9]** filed in the Orphans Court a petition to show cause why the funds sold from Marie Henkel to Marcy Shain should not be returned to the estate, the sale agreement between Marie Henkel and Marcy Shain should not be declared unenforceable and the executrix Marcy Shain should not be removed.

20. On July 11, 2002, the trustee filed a motion for

sanctions against the debtor and her attorney for actions taken in violation of the Bankruptcy Court's preliminary injunction.

21. On August 19, 2002, the Bankruptcy Court found that the debtor and her counsel had violated the preliminary injunction by filing in the Pennsylvania probate court a petition to declare the trustee's sale agreement unenforceable, a petition for special and permanent injunction against the trustee, and a notice of appeal of the probate court's order denying the petition for special and permanent injunction. The Bankruptcy Court also found that the debtor and her counsel had violated the preliminary injunction by filing in the Pennsylvania appellate court a motion or a stay pending appeal and for temporary restraining order against the trustee. The court entered an order assessing sanctions against the debtor and her counsel **[*10]** in the amount of $5670.00. The court's order also directed the debtor and her counsel to withdraw all papers that had been filed in violation of its preliminary injunction and assessed a coercive sanction in the amount of $100 each per day in the event the debtor and her counsel did not comply with the court's order.

22. On October 1, 2002, Judge Lazarus of the Probate Court dismissed this petition, stating that plaintiff lacked standing to raise objections to the account or to challenge the sale of the probate asset from Marie Henkel to Marcy Shain.

23. The debtor subsequently filed a motion to dissolve the preliminary injunction on the basis that it was improperly entered and is no longer necessary to avoid irreparable harm.

24. On December 12, 2002, the Bankruptcy Court denied the debtor's motion to dissolve the injunction.

The Court finds that this case must be dismissed for the following reasons:

1. Plaintiff is precluded from prosecuting this suit by the Order of the Bankruptcy Court which specifically stated:

> 1. Marie E. Henkel, as trustee for the bankruptcy estate of Paula Lickman is the only party authorized to take any action on behalf of Paula Lickman regarding **[*11]** any interest Paula Lickman has in the probate estate of Tibey Pfeiffer.
> "2. All causes of action that Paula Lickman may have arising from the administration of the probate estate of Tibey Pfeiffer are property of the bankruptcy estate and may only be pursued by Marie E. Henkel as trustee.

2003 U.S. Dist. LEXIS 1338, *11

"3. All parties in interest in the Tibey Pfeiffer probate estate are enjoined from taking any further action that may affect or impair the bankruptcy estate's interest in the probate estate without prior approval of the Bankruptcy Court ...."

2. Plaintiff is precluded from prosecuting this suit by the Preliminary Injunction entered by the Bankruptcy Court on September 13, 2001 which enjoined plaintiff and her counsel from prosecuting in any way ... (2) Civil Action No. 01–2949 pending in the United States District Court for the Eastern District of Pennsylvania ...

3. Like the Bankruptcy Court for the Middle District of Florida and the Philadelphia Orphans Court, this court also concludes that plaintiff has no standing to bring this action claiming the defendants conspired to steal her inheritance since all of plaintiff's right, title and interest in her share of Tibey Pfeiffer's estate **[*12]** was automat-

ically transferred by means of *11 U.S.C. § 541*(a)(5)(A) to her trustee in bankruptcy in Florida, Marie E. Henkel. Case No. 98–02632–6J7, U.S. Bankruptcy Court, Middle District of Florida, Orlando Division.

ORDER

The motion of the defendant David Lyle Segal to dismiss the Complaint (Doc. # 15) is GRANTED.

The Complaint is DISMISSED WITH PREJUDICE.

The motion of the plaintiff to amend the complaint (Doc. # 22) is DENIED.

The motion of the defendant to dismiss plaintiff's motion to amend the complaint (Doc. # 23) is DENIED as moot.

IT IS SO ORDERED.

CHARLES R. WEINER

# EXHIBIT I

LEXSEE 2000 DEL. SUPER. LEXIS 131

**MARK MARKS Plaintiff, v. MESSICK & GRAY CONSTRUCTION, INC., a Delaware corporation, TYSON FOODS, INC., a Delaware corporation, STEPHEN GRAY, t/a GRAY'S MILLING, Defendants.**

**C.A. NO. 98C–09–032 HDR**

**SUPERIOR COURT OF DELAWARE, KENT**

*2000 Del. Super. LEXIS 131*

**January 18, 2000, Submitted
April 18, 2000, Decided**

**SUBSEQUENT HISTORY: [*1]**

Released for Publication by the Court May 30, 2000.

**DISPOSITION:**

Plaintiff's Motion to Apply Delaware Law GRANTED. Defendant Tyson Foods Inc.'s Cross–Motion to Apply Maryland Law DENIED. Defendant Tyson Foods Inc.'s Motion for Summary Judgment DENIED.

**LexisNexis(R) Headnotes**

**COUNSEL:** Douglas B. Catts, Esq. and Donna L. Harris, Esq., of Schmittinger & Rodriguez, P.A., Dover, Delaware, for Plaintiff.

Arthur D. Kuhl, Esq., Law Offices of Michael A. Pedicone, P.A., Wilmington, Delaware and Sue Lawless, Esq., of Franklin & Prokopik, P.C., Baltimore, Maryland, for Defendant Tyson Foods, Inc.

Carl N. Kunz, III, Esq., of Murphy, Spadaro & Landon, Wilmington, Delaware, for Defendant Messick & Gray Construction, Inc.

Andre M. Beauregard, Esq., of Brown, Shiels, Beauregard & Chasanov, Rehoboth Beach, Delaware, for Defendant Gray's Milling.

**JUDGES:** HENRY DUPONT RIDGELY, President Judge.

**OPINIONBY:** HENRY DUPONT RIDGELY

**OPINION:**

Upon Plaintiff's Motion to Apply Delaware Law.

Upon Defendant Tyson Foods Inc.'s Cross–Motion to Apply Maryland Law.

Upon Defendant Tyson Foods Inc.'s Motion for Summary Judgment.

RIDGELY, President Judge

This civil action arises from an industrial accident involving a Delaware worker employed by [*2] a Delaware painting contractor under a contract for services with a Delaware corporation for work to be performed at one of its plants in Maryland. The issues under the motions now before me are whether Delaware or Maryland law applies and whether Defendant Tyson Foods, Inc. is entitled to summary judgment. Because Delaware has the most significant relationship with the parties and the occurrence, I hold that Delaware law applies. Because material issues of fact exist, I further hold that Tyson's is not entitled to summary judgment.

I. FACTS

Plaintiff Mark Marks is a resident of Seaford, Delaware. Gray's Milling is a sole proprietorship owned by Stephen Gray that has its principal place of business in Bridgeville, Delaware. Messick & Gray Construction, Inc. is a Delaware corporation with its principal place of business in Bridgeville, Delaware. Tyson Foods, Inc. is also a Delaware corporation and it transacts business nationwide and in Delaware where it sells products, conducts operations and enters into contracts with Delaware companies.

Tyson entered into a contract with Gray's Milling for the painting of grain tanks in Snow Hill, Maryland. Although Messick & Gray and Gray's [*3] Milling are two separate entities, they frequently have worked together in Delaware. The work done at Tyson's Snow Hill, Maryland plant was the first occasion on which Messick & Gray and Gray's Milling had ever worked together in

2000 Del. Super. LEXIS 131, *3

Maryland. Pursuant to its contract with Tyson, Messick & Gray was to perform demolitions of old grain tanks and the construction of new ones. In order to complete this contract, Messick & Gray subcontracted Gray's Milling to do some of the demolition work. When Tyson later learned that Messick & Gray would be unable to do the painting work on the tanks, it hired Gray's Milling to do that work. While this work was being done on September 22, 1997, Marks was injured while painting the tanks. Employees of Messick and Gray, who were working above him, allegedly caused a forty pound iron angle to fall upon his head.

II. DISCUSSION

A. Choice of Law

Delaware applies the "most significant relationship test" of the Restatement (Second) of Conflicts in order to resolve choice of law issues. n1 Section 145 of the Restatement provides:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state [*4] which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

n1 *Travelers Indemnity Co. v. Lake, Del. Supr., 594 A.2d 38, 40 (1991).*

Section Six of the Restatement lists the following factors which must be applied in determining which state has the most significant relationship to the parties and the occurrence:

(a) the needs of the interstate [*5] and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

In actions for personal injury, the law of the state where the injury occurred usually applies. n2 However, the law of some other state will apply instead if that state has a more significant relationship to the occurrence and the parties. n3 The law selected by application of the rule of Section 145 determines whether the actor's conduct was tortious, n4 what defenses may be raised, n5 and whether contributory fault bars the plaintiffs recovery in whole or in part. n6

n2 *Restatement (Second) of Conflicts § 146* (1969).

n3 *Id.*

n4 *Id.* § 156(1).

n5 *Id.* § 161.

n6 *Id.* § 164.

[*6]

The most significant relationship test requires the court to apply the law of the state with the most *significant* contacts, as opposed to the highest number of contact listed in Sections 145 and 6. In other words, the test is qualitative, not quantitative. n8 The inherent flexibility of this test mandates that each case be decided on its own facts. n9 If the facts warrant it, the court may

decide to apply the law of one state to some issues, while applying the law of a different state to other issues. n10

> n7 *Lake, 594 A.2d at 48 n.6.*
>
> n8 *See id.*
>
> n9 *Id. at 48.*
>
> n10 *See Restatement (Second) of Conflicts § 145(2) (1969); see also Sabell v. Pacific Intermountain Express Co., Colo. Ct. App., 36 Colo. App. 60, 536 P.2d 1160, 1165–66 (1975)* (applying Iowa law to the issue of the standard of care and Colorado law to the issue of comparative or contributory negligence).

Tyson seeks a determination that Maryland law applies. Maryland [*7] has enacted a statutory cap that limits a plaintiffs ability to collect non-economic damages. n11 Delaware, on the other hand, imposes no such restriction. The policy behind Maryland's cap on non-economic damages is to ensure that Maryland citizens will be able to procure insurance at an affordable rate. n12 However, Delaware has a strong public policy against imposing any limitation on damages in order to ensure that its citizens receive the full recovery that the jury awards them. n13 In *Judge Trucking v. Cooper,* this Court noted that Delaware has refused to limit the amount of damages that individuals may recover. n14 Since none of the parties to the *Judge Trucking* case were Maryland residents, the Court found that a refusal to apply Maryland's cap on non-economic damages would not have any impact on the ability to obtain affordable insurance in Maryland. n15 As a result, the Court found that Delaware's interest with respect to this particular issue was greater, qualitatively, than Maryland's, and that therefore, Delaware law should apply. n16

> n11 *Md. Code Ann., Courts and Judicial Proceedings § 11–108 (1999).*

[*8]

> n12 *Anchor Packing Co. v. Grimshaw, Md. Ct. Sp. App., 115 Md. App. 134, 692 A.2d 5, 13 (1997).*
>
> n13 *Judge Trucking Co. v. Cooper, 1994 Del. Super. LEXIS 487, *16, C.A. No. 92 C–03–041, 1994 WL 680029 at * 5, Graves, I. (Sept. 19, 1994) (Mem. Op.).*
>
> n14 *Id.*
>
> n15 *Id.*
>
> N16 *Id.*

Another Delaware precedent that is helpful here is *Rew v. Sizzler Restaurant International, Inc.* n17 *Rew* involved a slip and fall that occurred at a Sizzler Restaurant located in Maryland. n18 The plaintiff was a Delaware resident, and the Defendant was a Delaware corporation that operated restaurants nationwide. n19 This Court declared that the occurrence of the accident in Maryland was fortuitous, and that the consequences of the injuries would have the greatest impact in Delaware, where the plaintiff resided. n20 The Court concluded that, while Maryland restaurateurs probably had expectations that Maryland law would apply, "the relative importance of the issue of equitable and adequate compensation for the [plaintiff's] alleged personal injuries" favored the application of [*9] Delaware law on the issue of the Plaintiffs right to recover damages. n21 Therefore, the Court held that Maryland's cap on non-economic: damages would not apply. n22

> n17 Del. Super., C.A. No. 93C–06–021, Ridgely, P.J. (May 12, 1995) (Tr. Ct. Dec.).
>
> n18 *Id.*
>
> n19 *Id.*
>
> n20 *Id.*
>
> n21 *Id.*
>
> n22 *Rew,* C.A. No. 93C–06–021.

The present case is similar to both *Judge Trucking* and *Rew.* The parties in the present case all have significant contacts with Delaware. Although the accident occurred at Tyson's plant in Maryland, and Tyson does business nationwide, Tyson is a Delaware corporation and it transacts business in Delaware. Indeed, all parties are either Delaware citizens or Delaware business entities. Furthermore, the consequences of the alleged injuries are occurring here. I find that the most significant contacts are in Delaware as opposed to Maryland. While Maryland has an interest in allowing all businesses to better afford insurance coverage for activities [*10] there, Delaware has a greater interest, qualitatively, in applying its law on the issue of a Delaware citizen's right to recover the full amount of actual damages. I conclude Delaware law should apply on this issue.

Turning to the issue of contributory or comparative negligence, *Section 164 of the Restatement (Second) of Conflict of Laws* provides:

> (1) The law selected by application of the rule of § 145 determines whether contributory fault on the part of the plaintiff precludes

his recovery in whole or in part.

(2) The applicable law will usually be the local law of the state where the injury occurred.

The Court has already selected Delaware law under the rule of *§ 145*. While Section 164 appears to suggest that the law of the state where the injury occurred will usually apply, it must be read in context with Section 146 which provides that the law of some other state will apply if that state has a more significant relationship to the occurrence and the parties than the state where the injury occurred.

Maryland follows the common law standard of contributory negligence, which acts as a complete bar to the plaintiffs recovery. n23 Delaware has enacted a comparative **[*11]** negligence statute. n24 In Delaware, the plaintiff can still recover, provided that his or her negligence does not exceed the combined negligence of all of the defendants. n25

n23 *Union Memorial Hospital v. Dorsey, Md. Ct. Sp. App., 125 Md. App. 275, 724 A.2d 1272, 1275 (1999).*

n24 *10 Del. C. § 8132.*

n25 *Id.*

In *Rew,* this Court held that Delaware law applied to the issue of the plaintiffs comparative negligence. n26 I reasoned that the occurrence of the accident in Maryland was fortuitous and that the consequences of the injuries would be felt in Delaware, where the plaintiff resided. n27 Furthermore, while Maryland restaurateurs probably had expectations that Maryland law would apply, "the relative importance of the issue of equitable and adequate compensation for the alleged personal injuries" in the case favored "a choice of Delaware law on the issue of comparative negligence." n28

n26 *Rew,* C.A. No. 93C-06-021.

**[*12]**

n27 *Id.*

n28 *Id.*

Other jurisdictions have also held that, with respect to the issue of comparative or contributory negligence, the law of the state where the injury occurred does not

apply when another state has a more significant relationship to the occurrence and the parties. In *Chambers v. Dakotah Charter, Inc.,* the plaintiff sustained injuries in Missouri when she slipped and fell on the steps of a bus. n29 The court held that South Dakota's comparative negligence should apply instead of Missouri's comparative negligence law, because the piece of candy that caused the plaintiff to slip and fall was distributed to passengers in South Dakota, because "South Dakota was the domicile, residence, place of incorporation and place of business of the parties, as well as the place where the relationship of the parties was centered," and because the economic impact of the law would be felt in South Dakota, where the parties resided. n30

n29 *S.D. Supr., 488 N.W.2d 63, 64 (1992).*

**[*13]**

n30 *488 N.W.2d at 68-69.*

In *Sabell v. Pacific Intermountain Express Co.,* the plaintiff suffered injuries as the result of a motor vehicle accident that took place in Iowa. n31 The plaintiff was a resident of Colorado, and the two corporate defendants were both residents of and authorized to do business in Colorado. n32 The court held that, with respect to the issue of comparative or contributory negligence,

the specific approach to applying the choice of law rule of § 145 should be that the domicile, residence, nationality, place of incorporation and place of business of the parties, and the place where the relationship, if any, between the parties is centered, are to be weighed more heavily and are to be given more importance in such a choice of law determination, than the contacts of the place where the injury occurred, and the place where the conduct causing the injury occurred. n33

n31 *536 P.2d at 1162.*

n32 *Id.*

n33 *536 P.2d at 1166.*

**[*14]**

The court pointed out that Colorado, as the forum state, had a legitimate interest in applying its law and policy regarding comparative negligence to both its own res-

idents and to other persons who sought relief in Colorado courts. n34 The court, thus, decided to apply Colorado's comparative negligence statute instead of Iowa's doctrine of common law contributory negligence. n35

n34 *Id.*

n35 *Id.*

The United States District Court for the District of Colorado later relied on *Sabell* in *Conlin v. Hutcheon* n36 In *Conlin,* the plaintiff was a citizen of Illinois, the defendant was a citizen of Colorado, and the injury occurred in Nebraska. n37 The relationship between the plaintiff and the defendant was centered in Nebraska, because they were both enrolled at Wayne State University in Nebraska and were temporarily residing in Wayne, Nebraska. n38 Even though the relationship between the parties was centered in Nebraska, the Court found that the occurrence of the injury in that state was **[*15]** fortuitous, and that Colorado's relevant policies which promoted rules of recovery in negligence actions surpassed Nebraska's policies and interests in the determination of the issue. n39 Consequently, the Court applied Colorado's comparative negligence statute rather than Nebraska's doctrine of contributory negligence.

n36 *560 F. Supp. 934, 935–36 (1983).*
n37 *Id. at 934.*
n38 *Id. at 935.*
n39 *Id. at 936.*

n40 *Id.*

Turning to the choice of law issue on standard of care, Delaware and Maryland law differ regarding the standard of care required of a landowner with respect to passive or latent dangerous conditions on the premises. Under Maryland law, an owner is not liable for injuries to an employee of an independent contractor unless the premises remain under the owner's control and "the injuries arise out of the abnormally dangerous condition of the premises, the owner being chargeable with knowledge of the danger. **[*16]** " n41 Under Delaware law, an owner is not liable for injuries sustained by an employee of an independent contractor from hazards created by the doing of the contract work or the condition of the premises or the manner in which the work is performed unless the owner retains active control over the manner in which the work is performed and the methods used. n42 The Delaware standard is less favorable to landowners than the Maryland standard, because Delaware does not require the condition causing the injuries to be abnormally dangerous.

n41 *LeVonas v. Acme Paper Board Co., Md. Ct. App., 184 Md. 16, 40 A.2d 43, 45 (1944); Cutlip v. Lucky Stores, Inc., Md. Ct. Sp. App., 22 Md. App. 673, 325 A.2d 432, 438 (1974).*

n42 *O'Connor v. Diamond State Telephone Co., Del. Super., 503 A.2d 661, 663 (1985); Seeney v. Dover Country Club Apts., Del. Super., 318 A.2d 619, 621 (1974).*

Delaware and Maryland law do not differ, however, regarding the standard **[*17]** of care required of a landowner for active negligence. When a defendant actively creates a dangerous condition that causes injury, the reasonable prudent person standard applies. n43 According to this standard, the defendant has a duty to act reasonably under the circumstances and to protect others against reasonably foreseeable events. n44

n43 *Bryant v. Delmarva Power & Light Co., Del. Super., 1995 Del. Super. LEXIS 438, C.A. No. 89 C–08–070, 1995 WL 653987* at * 13–14, Babiarz, J. (Oct. 2, 1995); *Figgs v. Bellevue Holding Co., Del. Super., 652 A.2d 1084, 1092–93 (1994); Delmarva Power & Light Co. v. Burrows, Del. Supr., 435 A.2d 716, 718 (1981); Eastern Shore Public Service Co. v. Corbett, Md. Ct. App., 227 Md. 411, 177 A.2d 701, 709 (1962).*

n44 *Burrows, 435 A.2d at 718; Corbett, 177 A.2d at 709.*

Marks has not alleged that Tyson is vicariously liable for acts of negligence committed by employees of Gray's Milling or Messick **[*18]** & Gray. Instead, Marks claims that Tyson actively created the dangerous condition that caused his injuries. Because Delaware and Maryland law do not differ regarding the standard of care applicable to a landowner for active negligence, it is unnecessary for the court to make a choice of law ruling on this issue.

## B. Defendant Tyson's Motion for Summary Judgment

Tyson argues it is entitled to summary judgment because it owed no legal duty to Marks on the facts of this case. At this stage, the facts must be viewed in the light most favorable to Marks as the non–moving party. Additional facts relevant to Tyson's motion for summary judgment are as follows: Tyson acted as a prime contractor when it entered into separate contracts with Gray's

Milling and Messick & Gray without the use of a general contractor or a construction manager. Tyson gave each contractor a schedule for its job and issued deadlines for completion of the work. Tyson knew that material had been left on the drag conveyor above where Marks was working. However, Tyson did not speak with anyone from Messick & Gray about the material or ask why it was there. Tyson was also aware that the contractors were being scheduled [*19] as they were. The employees of Gray's Milling informed Tyson that they did not want persons working overhead while they were painting because of safety concerns. The employees of Messick & Gray also informed Tyson that other contractors should not be working below them for safety reasons. Marty Hale, Messick & Gray's crew foreman, dealt with Tyson directly regarding this safety issue, because Gray's Milling was working for Tyson under a separate contract at the time, and Tyson was responsible for scheduling the two contractors' work. After Hale had informed Tyson about the situation, Tyson indicated that it would take care of it. Thus, Tyson was aware that Messick & Gray's employees were working above Gray's Milling's employees and knew about the safety issue.

Tyson argues that it owed no duty to Marks, because Gray's Milling was an independent contractor, and Tyson was merely a property owner that did not retain sufficient control over the work area. Marks argues that summary judgment is inappropriate, because Tyson had a duty to exercise reasonable care under the circumstances and it breached this duty by creating the dangerous condition that caused his injury.

The Court must grant [*20] summary judgment if the evidence in the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." n45 The moving party has the burden of demonstrating that no issue of material fact exists. n46 The Court must view all facts and inferences in a light most favorable to the non-moving party. n47 The non-moving party "may not rest upon the mere allegations or denials of [its] pleading," but must set forth in its response, by affidavits or otherwise, specific facts demonstrating the existence of a material issue for trial. n48 If the non-moving party fails to respond in this manner, the Court must grant summary judgment. n49

n45 Super. Ct. Civ. R. 56(c); *Borish v. Graham, Del. Super., 655 A.2d 831, 833 (1994).*

n46 *Boorish, 655 A.2d at 833.*

n47 *Allstate Auto Leasing Co. v. Caldwell, Del. Super., 394 A.2d 748, 752 (1978).*

n48 Super. Ct. Civ. R. 56(e).

n49 *Id.*

[*21]

Tyson has failed to show that, as a matter of law, it owed no duty to Marks. Furthermore, genuine issues of material fact exist regarding whether Tyson actively created the dangerous condition that caused Marks' injuries and whether Tyson acted reasonably to protect against a reasonably foreseeable risk of harm.

Under Delaware law, a property owner generally has no duty to protect an independent contractor from the dangers created by the doing of the work, the condition of the premises or the manner in which the work is performed, unless the owner retains control over the manner of carrying out the work and the methods used. n50 Under Maryland law, an owner is not liable for injuries to an employee of an independent contractor unless the premises remain under the owner's control and the injuries result from the abnormally dangerous condition of the premises. n51 However, under both Delaware and Maryland law, when the defendant actively creates the hazardous condition that causes the plaintiffs injury, the defendant has a duty to act as a reasonable, prudent person under the circumstances. n52 Under the reasonable prudent person standard, a person or entity has a duty to behave reasonably [*22] and to protect against reasonably foreseeable events. n53 A party can be held liable for simple negligence if he or she breaches this duty "by failing to protect against an event that a reasonably prudent person would protect against." n54 Whether an entity has breached this duty can be demonstrated by its failure to comply with OSHA regulations, as a violation of these regulations constitutes evidence of negligence n55

n50 *Seeney, 318 A.2d at 621; O'Connor, 503 A.2d at 663.*

n51 *LeVonas, 40 A.2d at 45; Cutlip, 325 A.2d at 438.*

n52 *Bryant, 1995 Del. Super. LEXIS 438, *38, C.A. No. 89 C-08-070, 1995 WL 653987* at * 13–14; *Figgs, 652 A.2d at 1092–93; Burrows, 435 A.2d at 718; Corbett, 177 A.2d at 709.*

n53 *Burrows, 435 A.2d at 718; Corbett, 177 A.2d at 709.*

n54 *Bryant, 1995 Del. Super. LEXIS 438, *38, C.A. No. 89 C-08-070, 1995 WL 653987* at * 13 (quoting *Figgs, 652 A.2d at 1092,* and *Burrows, 435 A.2d at 718); see Corbett, 177 A.2d at 709.*

[*23]

n55 *Toll Brothers, Inc. v. Considine, Del. Supr., 706 A.2d 493, 498 (1998); DiSabatino Bros. v. Baio, Del. Supr., 366 A.2d 508, 511 (1976); Brady v. Parsons Co., Md. Ct. App., 327 Md. 275, 609 A.2d 297, 306 (1992).*

In the present case, Marks does not contend that the contract work itself created the peril or that the premises were inherently dangerous. Nor does he maintain that Tyson is vicariously liable for acts of negligence that Gray's Milling and Messick & Gray committed. Instead, he claims that Tyson actively created a dangerous condition that would not normally have existed under a painting contract. Marks has proffered the testimony of an expert on safety management and contractor safety who has opined that Tyson breached the standards of care found in the OSHA regulations and ANSI standards and was actively negligent in creating a hazardous condition at its workplace. Specifically, the expert has opined that Tyson actively created a hazardous condition: first, in scheduling its contractors so that one contractor was doing work directly **[*24]** above the area where another contractor was working; second, by failing to declare the area a construction area so that employees and subcontractors would be aware that it was a 100% hard hat area; and finally, by failing to move Messick & Gray's employees and their materials so that they were not directly above Gray's Milling's employees. Because a genuine issues of material fact exist regarding whether Tyson breached the standard of care, I deny summary judgment.

III. CONCLUSION

Delaware has the most significant relationship, qualitatively, with the parties and the occurrence with respect to the choice of law issues in this case. Therefore, Marks' Motion to Apply Delaware Law is *GRANTED*. Because there are issues of material fact as to whether Tyson actively created the hazardous condition that caused Marks' injuries and whether Tyson breached its duty to protect Gray's Milling's employees against all reasonably foreseeable risks of harm, Tyson's motion for summary judgment is *DENIED*.

IT IS SO ORDERED.

HENRY DUPONT RIDGELY

President Judge

EXHIBIT J

LEXSEE 2002 U.S. DIST. LEXIS 9331

## MICHAEL SIMON v. UNUMPROVIDENT CORPORATION, et al.

### CIVIL ACTION NO. 99-6638

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### *2002 U.S. Dist. LEXIS 9331*

### May 23, 2002, Decided
### May 28, 2002, Filed; May 29, 2002, Entered

**SUBSEQUENT HISTORY:** Motion granted by, Request denied by *Simon v. Unum Provident Corp., 2003 U.S. Dist. LEXIS 7775* (E.D. Pa., Apr. 16, 2003)

**DISPOSITION:** Defendants' motion for partial summary judgment granted in part and denied in part. Plaintiff's motion for summary judgment denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For MICHAEL SIMON, PLAINTIFF: STUART A. CARPEY, KREITHEN, BARON AND CARPEY, P.C., PHILA, PA USA. BONNY G. RAFEL, HACK, PIRA, O'DAY, MERKLINGER, WALLACE & MCKENNA, FLORHAM PARK, NJ USA.

For UNUM PROVIDENT CORPORATION, THE PAUL REVERE LIFE INSURANCE COMPANY, PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, THE PROVIDENT COMPANIES, INC., DEFENDANTS: JAMES M. DUNN, WHITE AND WILLIAMS, PHILA, PA USA. ANDREW F. SUSKO, WHITE AND WILLIAMS, PHILA, PA USA. DARYN E. RUSH, WHITE AND WILLIAMS, PHILA, PA USA. WESLEY R. PAYNE, WHITE & WILLIAMS LLP, PHILADELPHIA, PA USA.

**JUDGES:** HERBERT J. HUTTON, J.

**OPINIONBY:** HERBERT J. HUTTON

**OPINION:**

### MEMORANDUM AND ORDER

HUTTON, J.

May 23, 2002

Currently, before the Court are Defendants

UnumProvident Corporation, Provident Companies, Inc., Provident Life and Accident Insurance Company and the Paul Revere Life Insurance Company's Motion for Partial Summary Judgment (Docket No. 69), Plaintiff's Response to Defendants' Motion for Partial Summary Judgment and Cross-Motion for Summary Judgment (Docket No. 77), Defendants' Reply to Plaintiff's Response to Defendants' Motion for Partial Summary Judgment and Defendants' Reply to Plaintiff's Motion for Summary Judgment [*2] (Docket No. 89), Plaintiff's Addendum and Supplemental Memorandum of Law in Support of Plaintiff's Response to Defendants' Motion for Partial Summary Judgment (Docket Nos. 99, 100), Defendants' Response to Plaintiff's Addendum (Docket No. 108), Defendants' Response to Plaintiff's Supplemental Memorandum of Law (Docket No. 110); Plaintiff's Addendum to Plaintiff's Memorandum of Law (Docket No. 140) and Defendants' Response to Plaintiff's Addendum (Docket No. 141). For the reasons discussed below, Defendants' Motion for Partial Summary Judgment is **GRANTED IN PART, DENIED IN PART** and Plaintiff's Motion for Summary Judgment is **DENIED**.

### I. BACKGROUND

The instant action arises out of the termination of benefit payments and denial of a claim of disability. On January 8, 1991, Plaintiff Michael Simon ("Plaintiff") purchased an occupation specific Lifetime Disability Income Policy from Defendant Paul Revere Insurance Company ("Paul Revere"). At the time Plaintiff purchased the policy, he was employed as an Options Floor Trader at the Philadelphia Stock Exchange in Philadelphia, Pennsylvania, a position he held since 1984. Under the terms of the policy, Plaintiff was [*3] to pay an annual premium of $1,984.63 for coverage in the amount of $5,000 of benefits per month. The policy also included an option to increase Plaintiff's monthly total disability benefits, which Plaintiff purchased, thus entitling him to a monthly benefit of $6,720.

2002 U.S. Dist. LEXIS 9331, *3

In January of 1994, Plaintiff began treatment with psychiatrist John Harding, M.D. for severe anxiety and depression. Plaintiff initially remained at work as an Options Floor Trader at the Philadelphia Stock Exchange despite undergoing treatment, including medication and psychotherapy, with Dr. Harding. After being admitted on an emergency basis to Charter Fairmount Institute, however, Plaintiff filed a claim for total disability benefits pursuant to the disability policy on September 18, 1995. Paul Revere paid the benefits to Plaintiff on a monthly basis until May 17, 1999 when Plaintiff's benefits were terminated. Prior to the termination of Plaintiff's disability payments, Paul Revere became a wholly-owned subsidiary of Provident Companies, Inc. ("Provident") on March 27, 1997. Provident, in turn, merged with Unum Corporation on June 30, 1999 forming an entity known as UnumProvident Corporation ("UnumProvident"). [*4]

In November of 1999, Plaintiff instituted the instant lawsuit in the Court of Common Pleas of Philadelphia County alleging that he was wrongfully denied benefits under the disability insurance policy. Plaintiff named UnumProvident, Provident, Provident Life and Accident Insurance Company ("Provident Life") and Paul Revere as defendants to the instant action. Defendants then removed the case to this Court on December 30, 1999 based on diversity jurisdiction under *28 U.S.C. § 1332.* Following the case's removal, Plaintiff filed a four-count Amended Complaint on January 18, 2000 alleging causes of action for breach of contract, bad faith, unfair trade practices and consumer protection law violations and civil conspiracy. Defendants UnumProvident, Provident, Provident Life and Paul Revere now move for partial summary judgment on all counts. Plaintiff opposes Defendants' motion and also cross-motions for summary judgment as to Plaintiff's bad faith claim.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no [*5] genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c).* The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to go beyond the mere pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial. See *id. at 324.* A genuine issue is one in which the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*

*v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

When deciding a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the nonmovant. *Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992),* cert. denied, *507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).* Moreover, [*6] a court may not consider the credibility or weight of the evidence in deciding a motion for summary judgment, even if the quantity of the moving party's evidence far outweighs that of its opponent. Id. Nonetheless, a party opposing summary judgment must do more than just rest upon mere allegations, general denials or vague statements. *Saldana v. Kmart Corp., 43 V.I. 361, 260 F.3d 228, 232 (3d Cir. 2001).*

## III. DISCUSSION

### A. Breach of Contract

First, Defendants UnumProvident, Provident and Provident Life seek summary judgment on Count I of Plaintiff's Amended Complaint for breach of contract. To establish a cause of action for breach of contract under Pennsylvania law, n1 Plaintiff must allege (1) the existence of a contract between the parties, (2) a breach of a duty imposed by the contract and (3) resultant damages. See *CoreStates Bank, N.A. v. Cutillo, 1999 PA Super 14, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999).* According to Defendants, Plaintiff is unable to maintain a cause of action for breach of contract as a matter of law against UnumProvident, Provident and Provident Life because these Defendants were not parties to [*7] the original insurance contract. See Defs.' Mot. Summ. J. at P 15. "It is fundamental contract law that one cannot be liable for a breach of contract unless one is a party to that contract." *Electron Energy Corp. v. Short, 408 Pa. Super. 563, 597 A.2d 175, 177 (Pa. Super. Ct. 1991),* aff'd, *533 Pa. 66, 618 A.2d 395 (Pa. 1993)* (citations omitted). Plaintiff does not dispute that UnumProvident, Provident and Provident Life are non signatories to the insurance contract which is the fulcrum of this dispute, nor does Plaintiff allege that he had a separate contract with these Defendants. Rather Plaintiff, advancing theories of joint venture, joint enterprise and alter ego, asserts that UnumProvident, Provident and Provident Life acted "jointly in furtherance of a common plan or scheme to deny Plaintiff his rights under his disability insurance contract." Pl.'s Resp. to Defs.' Mot. Summ. J. at 6.

n1 Neither party disputes the applicability of Pennsylvania law to the policy at issue. See *Centennial Ins. Co. v. Meritor Sav. Bank, Inc., 1992 U.S. Dist. LEXIS 9456, 1992 WL 164906,* at *2

(E.D. Pa. 1992) (holding that "an insurance contract is governed by the law of the state in which the contract was made"), aff'd, *993 F.2d 876 (3d Cir. 1993).*

**[\*8]**

Under Pennsylvania law, a corporation is generally regarded as a "separate and independent entity." *Commonwealth v. Vienna Health Prods., Inc., 726 A.2d 432, 434 (Pa. Commw. Ct. 1999).* Accordingly, a parent corporation is not generally liable for the contractual obligations of a subsidiary, even if the parent wholly owns the subsidiary. See *Quandel Group v. Chamberlin Co., Inc., 1999 U.S. Dist. LEXIS 8796, 1999 WL 386602,* at *2 n.1 (E.D. Pa. 1999) (citing *Botwinick v. Credit Exch., Inc., 419 Pa. 65, 213 A.2d 349, 353–54 (Pa. 1965)); Jean Anderson Hierarchy of Agents v. Allstate Life Ins. Co., 2 F. Supp. 2d 688, 691 (E.D. Pa. 1998); Nobers v. Crucible, Inc., 602 F. Supp. 703, 706 (W.D. Pa. 1985).* Nevertheless, liability may be imposed where a parent corporation so dominates the activities of a subsidiary that it is necessary to treat the dominated corporation as an "alter ego" of the principal. See *Botwinick, 213 A.2d at 354* (recognizing that "alter ego" theory under Pennsylvania law requires "domination and control by the parent corporation [that] renders the subsidiary a mere **[\*9]** instrumentality of the parent"); see also *Garden State Tanning, Inc. v. Mitchell Mfg. Group, Inc., 55 F. Supp. 2d 337, 344 (E.D. Pa. 1999)* ("Pennsylvania requires a very high showing of domination and control in order to establish 'alter–ego liability.'") (quoting *Jiffy Lube Int'l v. Jiffy Lube, 848 F. Supp. 569, 580 (E.D. Pa. 1994)).*

To warrant piercing the veil on an alter–ego theory, a plaintiff must demonstrate that the parent company exercised "complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own." *Craig v. Lake Asbestos of Quebec, Ltd., 843 F.2d 145, 150 (3d Cir. 1988);* see also *Culbreth v. Amosa Ltd., 898 F.2d 13, 14 (3d Cir. 1990)* (holing that a plaintiff seeking to pierce the corporate veil on an alter–ego theory must establish that "the controlling corporation wholly ignored the separate status of the controlled corporation and so dominated and controlled its affairs that its separate existence is a mere sham"). Relevant factors **[\*10]** include "the failure to observe corporate formalities; non-payment of dividends; insolvency of debtor corporation; siphoning the funds from corporation by dominant shareholders; non-functioning of other officers and directors; absence of corporate records; whether the corporation is a mere facade for the operations of a common shareholder or shareholders; and gross undercapitalization." *Eastern*

*Minerals & Chemicals Co. v. Mahan, 225 F.3d 330, 333 n.7 (3d Cir. 2000)* (citation omitted).

Defendants contend that Plaintiff cannot prevail on an alter ego theory because each Defendant is a single corporate entity that is not responsible for the acts of the other. n2 See Defs.' Reply to Pl.'s Resp. to Defs.' Mot. Summ. J. at 4. Therefore, Defendants reason that UnumProvident, Provident and Provident Life are entitled to summary judgment on Plaintiff's breach of contract claim since only Paul Revere entered into the contract with Plaintiff. See id. at 2. Interestingly, these Defendants have advanced the same argument in other jurisdictions, but have met with little success. See *Brennan v. Paul Revere Life Ins. Co., 2002 U.S. Dist. LEXIS 446, 2002 WL 54558 (N.D. Ill. 2002);* **[\*11]** *Eldridge v. Provident Companies, Inc., 2001 Mass. Super. LEXIS 5, 2001 WL 13344 (Mass. Super. Ct. 2001).*

> n2 In support of their contention, Defendants rely heavily on the case of *Hudock v. Donegal Mut. Ins. Co., 438 Pa. 272, 264 A.2d 668 (Pa. 1970).* In Hudock, plaintiffs/insureds brought an action for breach of contract against two independent adjustment companies who were hired by the insurer to adjust plaintiffs' fire loss claim. See *id. at 276.* The Pennsylvania Supreme Court found that plaintiffs could not maintain a breach of contract action against the independent adjustment companies because they failed to show that a contractual relationship existed between themselves and the adjustment companies. See *id. at 279.* The court found that while the independent adjustment companies had a duty to the insurance company, this duty did not extend to create a contractual obligation between the adjusters and the insureds. See id. Hudock, however, is distinguishable from the case at bar. Here, the Court is not presented with the case where a plaintiff is attempting to sue an independent adjustment company. Rather, Plaintiff has brought a cause of action against principal corporations and their wholly–owned subsidiaries who maintain a single unified claims department. Moreover, Plaintiff here has raised the question as to whether the parent companies so dominated Paul Revere that Paul Revere acted as their alter–ego during the termination of Plaintiff's benefits in May of 1999.

**[\*12]**

In *Brennan v. Paul Revere Life Ins. Co., 2002 U.S. Dist. LEXIS 446, 2002 WL 54558 (N.D. Ill. Jan. 15, 2002),* a case factually similar to the case at bar, a trader on the floor of the Chicago Stock Exchange purchased disability insurance from Paul Revere in 1989. See id. at *1.

Brennan subsequently became disabled in 1997 and began to collect under the terms of the policy in September of that year. Id. After his benefits were terminated in 1999, Brennan brought suit against Paul Revere, Provident and Provident Life. n3 See id. As in the instant case, Provident moved for summary judgment on the grounds that "it did not issue the policy to Brennan and had no contractual relationship with him . . ." Id. at *3. The court, however, rejected Provident's argument, finding that questions of fact remained as to "which defendant was responsible for handling – and rejecting – Brennan's claim" following Provident's merger with Paul Revere. Id.

n3 The plaintiff in Brennan, however, did not advance a breach of contract theory against defendants. Rather, plaintiff alleged that defendants "acted vexatiously and unreasonably in investigating and terminating his claim" in violation of section 155 of the Illinois Insurance Code. See Brennan, 2002 U.S. Dist. LEXIS 446, 2002 WL 54558, at *2. Nevertheless, the Court finds the reasoning in Brennan relevant to the question now before the Court. Section 155 of the Illinois Insurance Code provides that:

a court may award attorney fees and specified penalties in an action against an insurer when the court determines, in its discretion, that the insurer's delay in settling a claim was unreasonable and vexatious considering the totality of the circumstances. The remedy is available to an insured who encounters unnecessary difficulties when an insurer withholds policy benefits. It is designed to protect insured parties who are forced to expend attorneys' fees where the insurer refuses to pay under the terms of the policy.

Garcia v. Lovellette, 265 Ill. App. 3d 724, 639 N.E.2d 935, 937 (Ill. App. 2 Dist. 1994) (internal citations omitted). Therefore, since liability under section 155 may be imposed only on an insurer, Provident, like it has done in the instant case, contended it could not be held liable because it was not an insurer and had not entered into the insurance contract. See Brennan, 2002 U.S. Dist. LEXIS 446, 2002 WL 54558, at *2.

[*13]

In Eldridge v. Provident Companies, Inc., 2001 Mass. Super. LEXIS 5, 2001 WL 13344 (Mass. Super. Ct. Jan.

4, 2001), plaintiffs brought a broker class action lawsuit against Provident, Provident Life, Paul Revere and UnumProvident. See id. at *1. Unlike Brennan where the plaintiff was an insured, the plaintiffs in Eldridge were employed by Paul Revere as full time insurance agents prior to the merger with Provident. See Hughes v. Provident Companies, Inc., 2000 Mass. Super. LEXIS 135, 2000 WL 331977, at *1 (Mass. Super. Ct. 2000). After Provident acquired Paul Revere, however, "Paul Revere and Provident notified all agents that their employment as agents was being terminated as of June 30, 1997 and that they would thereafter be re-employed by Provident as independent contractors. As a result of that change in their employment status, agents no longer received employee benefits or office and other expense support . . . Plaintiffs argued that their termination constituted an additional violation of their Agent Agreements." Id. Defendants sought summary judgment on behalf of Paul Revere and UnumProvident, arguing that "the defendant operating [*14] companies are independent, solvent companies . . .." Eldridge, 2001 Mass. Super. LEXIS 5, 2001 WL 13344, at *4. Again, the court declined to grant summary judgment in favor of Defendants on this ground because evidence of record, including "intermingling of corporate activity" and "active manipulation of related business entities by the same controlling persons," was sufficient to demonstrate a material issue of fact as to whether the corporate veil should be pierced and the holding companies held liable. Id. at *5–6.

With regards to Defendants Provident and UnumProvident, the Court finds that a material issue of fact exists as to whether Paul Revere functioned as the alter ego of Provident/UnumProvident at the time Plaintiff's disability benefits were terminated. Plaintiff has presented evidence that, after the merger with Paul Revere, Provident considered Paul Revere's income its own (see Pl.'s Resp. to Defs.' Mot. Summ. J., Ex. 4), Provident issued checks to insureds on behalf of Paul Revere (see id. at Ex. 11), and Provident treated Paul Revere's personnel as its own. See id. at Ex. 15, Ex. 16; see also Hangarter v. Paul Revere Life Ins. Co., 2001 U.S. Dist. LEXIS 17975, 2001 WL 1246623, at *3 (N.D. Cal. 2001) [*15] (finding that evidence in lawsuit tended to show "that when Provident acquired Paul Revere, as part of the transition, Paul Revere employees became Provident employees and implemented Provident's policies for handling claims, . . . targeting certain types of claims for termination."). Heidi Scuderi, the claims representative assigned to Plaintiff's case, was an employee of Provident/UnumProvident at the time Plaintiff's benefits were terminated. See Dep. of H. Scuderi, Dec. 13, 2000, at 13. Moreover, the Worcester claims office, which handled Plaintiff's claim, did not

distinguish in its monthly reporting between Provident claims and Paul Revere claims. See Pl.'s Resp. to Defs.' Mot. Summ. J. at 18; Ex. 34. This evidence, and the reasonable inferences that may be drawn therefrom, is sufficient to create a genuine issue of material fact as to whether Provident, now UnumProvident, so dominated the finances, policies and business practices of Paul Revere as to render Paul Revere without a "'mind, will or existence of its own.'" *Stevens, 2000 WL 1848593*, at *3. Therefore, the Court denies Defendants' motion for partial summary judgment **[*16]** as it pertains to Provident and UnumProvident.

The same cannot be said about Defendant Provident Life. Plaintiff fails to produce evidence of any kind that affiliates Provident Life with this case other than it being a subsidiary of UnumProvident. As previously mentioned, Provident Life is a subsidiary of UnumProvident that is authorized and licensed to conduct business as an insurance company. The record at bar, however, is devoid of any evidence linking Provident Life to Plaintiff's claim or the facts of this case. The only connection Provident Life has with the other Defendants is that it, like Paul Revere, is a subsidiary of Provident, and thus became a subsidiary of UnumProvident. Plaintiff does not allege that Provident Life exercised any dominion and control over Paul Revere's claims, finances or policies, or that Provident Life issued, investigated or terminated Plaintiff's disability benefits. In fact, Plaintiff makes only vague and conclusory statements regarding Provident Life's involvement that are unsupported by any evidence. In order to defeat a motion for summary judgment, Plaintiff must move beyond such illusory allegations in favor of competent evidence. *Saldana v. Kmart Corp., 43 V.I. 361, 260 F.3d 228, 232 (3d Cir. 2001).* **[*17]** With regards to Defendant Provident Life, Plaintiff has failed to do so. Accordingly, Defendants' motion for partial summary judgment is granted as to Provident Life and Plaintiff's claims against Provident Life are hereby dismissed with prejudice.

**B. Bad Faith**

Next, Defendants seek the entry of summary judgment on Count II of Plaintiff's Amended Complaint for bad faith. See Defs.' Mot. Summ. J. at P 25–33. Plaintiff, in turn, cross-claims for summary judgment in his favor on the same count. See Pl.'s Resp. to Defs.' Mot. Summ. J. at 33. Pennsylvania has established a statutory remedy for bad faith on the part of insurance companies. See *42 Pa.C.S.A. § 8371*. Section 8371 provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may

take all of the following actions:

> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

> (2) Award punitive damages against the insurer.

> (3) Assess court costs and attorneys fees against the insurer.

*42 Pa.C.S. A. § 8371*. **[*18]** While the statute itself does not define bad faith, several courts have enunciated the standard for assessing insurer bad faith under section 8371. "The term bad faith includes any frivolous or unfounded refusal to pay proceeds of a policy. For purposes of an action against an insurer for failure to pay a claim, such conduct imparts a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self interest or ill will; mere negligence or bad judgment is not bad faith." *Keefe v. Prudential Prop. & Cas. Ins. Co., 203 F.3d 218, 225 (3d Cir. 2000)* (internal citations omitted).

In order to recover under a bad faith claim, a plaintiff must show (1) that the defendant did not have a reasonable basis for denying benefits under the policy; and (2) that the defendant knew or recklessly disregarded its lack of reasonable basis in denying the claim. Id. The plaintiff has the burden of proving both of these elements by clear and convincing evidence. *Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997); see also Greco v. Paul Revere Life Ins. Co., 1999 U.S. Dist. LEXIS 110, 1999 WL 95717, at *3 (E.D. Pa. 1999).* **[*19]** Accordingly, Plaintiff faces the same stringent "clear and convincing evidence" standard in opposing a motion for summary judgment. See *Greco, 1999 U.S. Dist. LEXIS 110, 1999 WL 95717,* at *3. "Thus, to defeat a motion for summary judgment, plaintiff must present sufficient evidence such that, if believed, a jury could find bad faith under the clear and convincing evidence standard." Id.

Defendants allege that Plaintiff cannot maintain a cause of action for bad faith under Pennsylvania law because Defendants reasonably relied on the reports of independent medical experts in terminating Plaintiff's disability claim. See Defs.' Mot. Summ. J. at P 30–33. Specifically, Defendants contend that they relied on the report of Dr. Timothy J. Michals, a psychiatrist, that concluded Plaintiff was able to return to his profession as an options trader. See Defs.' Reply to Pl.'s Resp. to Defs.' Mot. Summ. J. at 11–15. In forming their decision to terminate Plaintiff's benefits, Defendants also claim that they

reasonably relied on the report of Dr. Steven Samuel, a psychologist. See Defs.' Mem. in Supp. of Mot. Summ. J. at 15. Plaintiff counters that Defendants **[*20]** recklessly disregarded the initial report of Dr. Samuel which concluded that Plaintiff was totally disabled and unable to return to his former profession as an options trader on the Stock Exchange floor. See Pl.'s Resp. to Defs.' Mot. Summ. J. at 25.

The evidence of record reveals that Dr. Stephen Samuel evaluated Plaintiff in April and May of 1999 and submitted a report in which he concluded that Plaintiff was "totally and permanently impaired from functioning as a trader on the options floor" and that "returning to that environment . . . would result in a decisive psychological regression and is, therefore, from a clinical standpoint contraindicated." See Pl.'s Resp. to Defs.' Mot. Summ. J., Ex. 26., at 4–5. Dr. Samuel faxed the report to Genex Services, a contractor of Provident, who in turn faxed it to Andrew Carlson, a non–medical psychiatric consultant employed by Provident/UnumProvident. See id., Ex. 27. Carlson then phoned Dr. Samuel regarding the report and explained to Dr. Samuel that he found the above–quoted paragraph "confusing." See Dep. of Steven Samuel, Ph.D., Jan. 31, 2002, at 76; see also id. at 90 ("Mr. Carlson called me and alerted me that there **[*21]** was a problem in his mind with the language of the report . . ..."). Following the phone conversation, Dr. Samuel issued a second report. See Pl.'s Resp. to Defs.' Mot. Summ. J., Ex. 30. While the first four pages of the second report are identical to the first, Dr. Samuel's opinion that Plaintiff was "totally and permanently impaired from functioning as a trader on the options floor" and that "returning to that environment . . . would result in a decisive psychological regression" was eradicated completely from the second report. Compare Pl.'s Resp. to Defs.' Mot. Summ. J., Ex. 26 ("First Report"), at 4–5 with Ex. 30 ("Second Report"), at 4–5.

In this case, it is undisputed that the disability insurance policy issued to Plaintiff was an occupation specific policy which defined Plaintiff's occupation as an "options floor trader." Heidi Scuderi, the Provident/UnumProvident claims adjuster assigned to Plaintiff's claim, testified that the Defendants' claims department developed a policy that "options traders' duties are not specific to the floor" and that "they can trade in other areas such as computerized trading." Dep. of Heidi Scuderi, Dec. 13, 2001, at 120–21. Plaintiff **[*22]** has presented evidence which, if credited by a jury, would show Dr. Samuel's disability opinion that Plaintiff was totally and permanently disabled from returning to the floor of the Philadelphia Stock Exchange was redacted shortly after Andrew Carlson spoke with Dr. Samuel about the language of the report. See Pl.'s Resp. to Defs.' Mot.

Summ. J., Ex. 26. ("First Report"), at 4–5. Furthermore, Plaintiff has presented evidence from which a reasonable jury could conclude that Dr. Michals was made aware of Defendants' policy regarding options traders' ability to work off the floor before Dr. Michals issued his opinion that Plaintiff can return to his "previous employment as a trader," not as a floor trader. See Pl.'s Resp. to Defs.' Mot. Summ. J., Ex. 38 ("Report of J. Pickering," Nov. 2, 1995); see also Defs.' Reply to Pl.'s Resp. to Defs.' Mot. Summ. J. Ex. G ("Report of Timothy J. Michals, M.D.," June 14, 1999, at 7) (emphasis added). Plaintiff has therefore adduced sufficient evidence from which a jury could find under the clear and convincing standard that Defendants acted in bad faith in its investigation of Plaintiff's claim and in its dealings with independent **[*23]** medical experts upon whose reports they allegedly based their decision to terminate Plaintiff's benefits. Accordingly, Defendants are not entitled to summary judgment on Plaintiff's contention that the denial of his disability claim violated the Pennsylvania Bad Faith Statute.

The Court, however, agrees with Defendants that Plaintiff's cross–motion for summary judgment as to the bad faith count must also be denied. See Defs.' Reply to Pl.'s Resp. to Defs.' Mot. Summ. J. at 15. As Defendants point out, a material issue of fact exists as to whether or not Plaintiff is "psychiatrically totally disabled" and, therefore, whether Plaintiff is fit to return to work as an options floor trader. See id. Plaintiff, therefore, is not entitled to judgment as a matter of law on his claim that Defendants terminated his benefits in bad faith when a question of fact exists as to whether Plaintiff was entitled to benefits under the policy in May of 1999. Accordingly, Plaintiff's cross–motion for summary judgment is denied.

## C. Unfair Trade Practices and Consumer Protection Law Violations

Next, Defendants move for summary judgment with regards to Count III of Plaintiff's Amended **[*24]** Complaint for a violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), *73 P.S. § 201–1* et seq. According to Defendants, Plaintiff is unable to produce any evidence to support a finding of malfeasance on the part of Defendants, as is required under the UTPCPL. See Defs.' Mot. Summ. J. at P 39. The UTPCPL provides a private cause of action for:

> any person who purchases or leases goods or services primarily for personal, family, or household purposes and thereby suffers any ascertainable loss of money or property, as a result of the use or employment by any

person of a method, act or practice declared unlawful by Section 3 of this Act . . .

73 P.S. § 201–9.2. "In Pennsylvania, only malfeasance, the improper performance of a contractual obligation, raises a cause of action under the Unfair Trade Practices and Consumer Protection Law, . . . and an insurer's mere refusal to pay a claim which constitutes nonfeasance, the failure to perform a contractual duty, is not actionable." *Horowitz v. Fed. Kemper Life Assur. Co., 57 F.3d 300, 307 (3d Cir. 1995)* (citing *Gordon v. Pennsylvania Blue Shield, 378 Pa. Super. 256, 548 A.2d 600, 604 (Pa. 1988)).* **[*25]** Allegations of misrepresentations and affirmative course of fraudulent conduct constitute malfeasance. *Henry v. State Farm Ins. Co., 788 F. Supp. 241, 245–46 (E.D. Pa. 1992).*

The Court agrees that the bulk of Count III of Plaintiff's Amended Complaint is filled with boiler plate language of "unfair methods of competition" and "unfair or deceptive trade practices" in an attempt to set forth a claim under the UTPCPL. For instance, Plaintiff claims that Defendants engaged in deceptive practices actionable under the UTPCPL by "purporting to offer total disability insurance with a lifetime monthly benefit in the amount of $6,720.00 . . . when Defendants had no intention of providing such coverage" and by "advertising goods or services with intent not to sell them as advertised." See Pl.'s Am. Compl. at P 30. It is unclear how Plaintiff can purport that Defendants had "no intention" of providing coverage under the policy when Plaintiff received disability benefits under the terms of the policy for almost four years, from September 18, 1995 to May 17, 1999. There is no evidence of record to support the bulk of Plaintiff's claims under the UTPCPL.

However, while the **[*26]** Court agrees with Defendants that Plaintiff's allegation that Defendants failed to pay on Plaintiff's claim without reasonable foundation is nonfeasance and therefore is not actionable under the UTPCPL as a matter of law, Plaintiff may proceed on his claim under the UTPCPL because a material issue of fact exists as to whether Defendants acted with malfeasance in investigating Plaintiff's claim. See *Cake v. Provident Life & Accident Ins. Co., 1999 U.S. Dist. LEXIS 371, 1999 WL 48778,* at *2 (E.D. Pa. 1999). Courts in this District have found that "in the course of denying a claim for coverage . . . an insurer may engage in conduct that constitutes malfeasance or misfeasance and which thus could be actionable under the Consumer Protection Law." Id. at *2 (citing *Smith v. Nationwide Mut. Fire Ins. Co., 935 F. Supp. 616, 620–21 (W.D. Pa. 1996)* (allegation that post-loss investigation was performed improperly states claim); *Parasco v. Pacific Indem. Co., 870 F.*

*Supp. 644, 648 (E.D. Pa. 1994)* (allegations that post-loss investigation was conducted in unfair manner and that insurer made misrepresentations regarding nature of its contractual **[*27]** obligations stated claim)). For instance, in Cake v. Provident Life & Accident Ins. Co., the court found that the plaintiff's allegation that the insurer "'conducted an unreasonable investigation of plaintiff's claim' suggests more than a failure to investigate. Rather, it suggests that defendant undertook an investigation and performed it improperly." See *Cake, 1999 U.S. Dist. LEXIS 371, 1999 WL 48778,* at *2.

Here, Plaintiff has provided evidence from which a reasonable jury could conclude that Defendants improperly performed an investigation as to whether Plaintiff was totally disabled and could not perform his occupation as an options floor trader. As noted above, Dr. Samuel redacted a statement from his report that Plaintiff was completely disabled from performing his occupation as an options trader on the floor after a phone conversation with Provident/UnumProvident employee Andrew Carlson. Based on this evidence and the reasonable inferences that may be drawn therefrom, a jury could conclude that Defendants acted with malfeasance when investigating Plaintiff's claim. Therefore, Plaintiff may proceed under the UTPCPL based on this ground.

### D. Civil Conspiracy

Finally, **[*28]** Defendants seek the entry of summary judgment in their favor with regards to Count IV of Plaintiff's Amended Complaint for civil conspiracy. In Count IV, Plaintiff contends that Defendants conspired to unlawfully and wrongfully prevent Plaintiff from receiving his disability benefits under the policy. See Pl.'s Am. Compl. at P 35. To prove a civil conspiracy under Pennsylvania law, a plaintiff must show the following elements: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage. See *SNA, Inc. v. Array, 51 F. Supp. 2d 554, 561 (E.D. Pa. 1999);* see also *Skipworth v. Lead Indus. Ass'n, Inc., 547 Pa. 224, 690 A.2d 169, 174 (Pa. 1997); Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 412 A.2d 466, 472 (Pa. 1979).* Proof of malice or an intent to injure is essential to the proof of a conspiracy. *Strickland v. Univ. of Scranton, 700 A.2d 979, 987–88 (Pa. Super. Ct. 1997).* "Merely describing something as malicious is not sufficient **[*29]** to give the proper inference of malice. . . . malice requires an allegation that the sole purpose of the conspiracy was to injure the Plaintiff[]." *Spitzer v. Abdelhak, 1999 U.S. Dist. LEXIS 19110, 1999 WL 1204352,* at *9 (E.D. Pa. 1999)(citing *Thompson Coal, 412 A.2d at 466).*

Plaintiff proclaimed in his Amended Complaint that he intended to gain evidence to support his conspiracy theory through discovery. See Pl.'s Am. Compl. at P 36. The discovery deadline in the instant case has long since past and yet Plaintiff is unable to produce even circumstantial evidence to support an inference of his conspiracy claim. An action for conspiracy will lie only where the sole purpose of the conspiracy is to cause harm to the party who claims to be injured. See *Thompson Coal, 412 A.2d at 472.* Thus, where the facts show that a person acted to advance his own business interests, those facts constitute justification and negate any alleged intent to injure. See id.; see also *GMH Assoc., Inc. v. Prudential Realty Group, 2000 PA Super 59, 752 A.2d 889, 905 (Pa. Super. Ct. 2000).* While there is evidence to support an inference **[*30]** that Defendants terminated Plaintiff's disability benefits to support their business interest, there is no indication that they did so out of malice towards Plaintiff.

The Court also notes that, with regards to Plaintiff's civil conspiracy claim, Plaintiff's argument that Defendants functioned as a single entity is a double-edged sword. In order to proceed on a breach of contract theory against Provident and UnumProvident, Plaintiff had to demonstrate that a material issue of fact exists as to whether Provident, now UnumProvident, and Paul Revere functioned as a single entity. With regards to Plaintiff's civil conspiracy claim, however, this argument cuts the other way. "A single entity cannot conspire with itself and, similarly, agents of a single entity cannot conspire among themselves." *Rutherfoord v. Presbyterian-Univ. Hosp., 417 Pa. Super. 316, 612 A.2d 500, 508 (Pa. Super. Ct. 1992).* All of the participants of Defendants' alleged conspiracy were employees or contractors of Provident/UnumProvident. Accordingly, Plaintiff's claim for civil conspiracy cannot withstand Defendants' motion for summary judgment.

An appropriate Order follows.

**ORDER**

AND **[*31]** NOW, this 23rd day of May, 2002, upon consideration of Defendants UnumProvident, Provident Companies, Inc., Provident Life and Accident Insurance Company and the Paul Revere Life Insurance Company's Motion for Partial Summary Judgment (Docket No. 69), Plaintiff's Response to Defendants' Motion for Partial Summary Judgment and Cross-Motion for Summary Judgment (Docket No. 77), Defendants' Reply to Plaintiff's Response to Defendants' Motion for Partial Summary Judgment and Defendants' Reply to Plaintiff's Motion for Summary Judgment (Docket No. 89), Plaintiff's Addendum and Supplemental Memorandum of Law in Support of Plaintiff's Response to Defendants' Motion for Partial Summary Judgment (Docket Nos. 99, 100), Defendants' Response to Plaintiff's Addendum (Docket No. 108), Defendants' Response to Plaintiff's Supplemental Memorandum of Law (Docket No. 110); Plaintiff's Addendum to Plaintiff's Memorandum of Law (Docket No. 140) and Defendants' Response to Plaintiff's Addendum (Docket No. 141), IT IS HEREBY ORDERED that Defendants' Motion for Partial Summary Judgment is **GRANTED IN PART, DENIED IN PART** and Plaintiff's Motion for Summary Judgment on the bad faith count is **DENIED [*32]** .

(1) Defendants' Motion for Partial Summary Judgment is **GRANTED** as to Provident Life;

IT IS FURTHER ORDERED that Plaintiff's claims against Provident Life are hereby **DISMISSED WITH PREJUDICE**.

(2) Defendants' Motion for Partial Summary Judgment on Count I of Plaintiff's Amended Complaint for breach of contract is **DENIED** as to Provident Companies, Inc. and UnumProvident;

(3) Defendants' Motion for Partial Summary Judgment as to Count II of Plaintiff's Amended Complaint for bad faith is **DENIED;**

(4) Plaintiff's Cross-Motion for Summary Judgment on Count II of Plaintiff's Amended Complaint for Bad Faith is **DENIED**;

(5) Defendants' Motion for Partial Summary Judgment as to Count III of Plaintiff's Amended Complaint for a violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, *73 P.S. § 201-1* is **DENIED**;

(6) Defendants' Motion for Partial Summary Judgment as to Count IV of Plaintiff's Amended Complaint for Civil Conspiracy is **GRANTED**;

IT IS FURTHER ORDERED that Count IV of Plaintiff's Amended Complaint is hereby **DISMISSED WITH PREJUDICE**.

BY THE COURT:

HERBERT J. HUTTON, J.

EXHIBIT K

LEXSEE 1999 U.S. DIST. LEXIS 19110

**STANLEY SPITZER, M.D., DANIEL MASON, M.D.; JERROLD SCHWABER, Ph.D. and DONALD FOX, M.D., on behalf of themselves and all others similarly situated, Plaintiffs, v. SHERIF ABDELHAK, DONALD KAYE, M.D., DAVID McCONNELL, LEONARD L. ROSS, Ph.D, NANCY A WYNSTRA, ESQ. DWIGHT KASPERBAUER, ANTHONY M. SANZO, WILLIAM P. SNYDER, III, DOUGLAS D. DANFORTH, J. DAVID BARNES, FRANK CAHOUET, HARRY R. EDELMAN, III, ROBERT L. FLETCHER FRANCIS B. NEMICK, JR., THOMAS O'BRIEN, ROBERT B. PALMER and JOHN DOES 1–100, Defendants.**

CIVIL ACTION NO. 98–6475

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*1999 U.S. Dist. LEXIS 19110*

**December 15, 1999, Decided**

**DISPOSITION:** [*1] The Motions to Dismiss of all Defendants DENIED as to Counts I & II and GRANTED as to Count III.

**LexisNexis(R) Headnotes**

**COUNSEL:** For STANLEY SPITZER, M.D., DANIEL MASON, M.D., JERROLD SCHWABER, Ph.D, DONALD FOX, M.D., PLAINTIFFS: DENISE DAVIS SCHWARTZMAN, CHIMICLES AND TIKELLIS, HAVERFORD, PA USA. MICHAEL D. GOTTSCH, CHIMICLES, JACOBSEN & TIKELLIS, HAVERFORD, PA USA. NICHOLAS E. CHIMICLES, CHIMICLES & TIKELLIS LLP, HAVERFORD, PA USA.

For SHERIF S. ABDELHAK, DEFENDANT: GEORGE E. MC GRANN, JUDITH F. OLSON, SWEENEY METZ FOX MC GRANN & SCHERMER, PITTSBURGH, PA USA.

For DONALD KAYE, M.D., DEFENDANT: JEFFREY ISTVAN, FINE, KAPLAN AND BLACK, PHILA, PA USA.

For DAVID MCCONNELL, DEFENDANT: AMY L. RONALLO, BABST, CALLAND, CLEMENTS & ZOMNIR, P.C., PITTSBURGH, PA USA. KEVIN K. DOUGLASS, BABST, CALLAND, CLEMENTS AND ZOMNIR, PITTSBURGH, PA USA. LAURENCE L. SMITH, NEIL A. MORRIS ASSOCIATES, P.C., PHILADELPHIA, PA USA.

For LEONARD L. ROSS, Ph.D., DWIGHT KASPERBAUER, DEFENDANTS: MARY CATHERINE ROPER, ESQ., AMY E. PIZZUTILLO, KIRKE D. WEAVER, DRINKER BIDDLE & REATH LLP, PHILADELPHIA, PA USA.

For NANCY A. WYNSTRA, ESQUIRE, DEFENDANT: SAL COGNETTI, JR., FOLEY, COGNETTI & COMERFORD, SCRANTON, PA USA. [*2] JEFFREY B. MC CARRON, PHILADELPHIA, PA USA. JEFFREY B. BALICKI, JEFFREY R. LALAMA, FRANCIS C. RAPP, JR., FELDSTEIN GRINBERG STEIN & MC KEE, PITTSBURGH, PA USA.

For ANTHONY M. SANZO, DEFENDANT: DAVID F. BINDER, RAYNES, MC CARTY, BINDER, ROSS & MUNDY, PHILA, PA USA. WILLIAM F. MANIFESTO, ELLEN M. VIAKLEY, MANIFESTO AND DONAHOE, P.C., PITTSBURGH, PA USA.

For WILLIAM P. SNYDER, III, DOUGLAS D. DANFORTH, J. DAVID BARNES, FRANK CAHOUET, HARRY R. EDELMAN, III, ROBERT L. FLETCHER, FRANCIS B. NEMICK, JR., ROBERT B. PALMER, DEFENDANTS: ROBERT L. BYER, KIRKPATRICK & LOCKHART, PITTSBURGH, PA USA. DAVID L. MC CLENAHAN, WENDY E. SMITH, NICHOLAS P. VARI, JOHN T. WALDRON, III, KIRKPATRICK & LOCKHART, PITTSBURGH, PA USA.

For THOMAS O'BRIEN, DEFENDANT: WILLIAM J. O'BRIEN, CONRAD, O'BRIEN, GELLMAN & ROHN, P.C., PHILA, PA USA. NICHOLAS M. CENTRELLA,

CONRAD, O'BRIEN, GELLMAN AND ROHN, PHILA, PA USA.

**JUDGES:** RONALD L. BUCKWALTER, J.

**OPINIONBY:** RONALD L. BUCKWALTER

**OPINION: MEMORANDUM**

BUCKWALTER, J.

December 15, 1999

Presently before the Court are the Motions to Dismiss of various Defendants. n1 Separate motions to dismiss have been submitted by Officer Defendants Abdelhak, Kaye, McConnell, **[*3]** Wynstra and Sanzo, as well as by Trustee Defendant O'Brien. Defendants Kasperbauer and Ross submitted a joint motion and the Trustee Defendants submitted a group motion n2. For the reasons stated below, the Motions of all Defendants are denied in part and granted in part.

n1 Seven of the defendants were officers of the various entities discussed throughout the memo ("Officer Defendants"). The remaining defendants were trustees of the same entities, specifically AHERF (the "Trustee Defendants"). The Officer Defendants are as follows: Sherif Abdelhak ("Abdelhak") was at all relevant times, the President and CEO of AHERF; Donald Kaye ("Kaye") was President and CEO of Allegheny University Hospitals–East and the Allegheny University of the Health Sciences ("AUHS"); David C. McConnell ("McConnell") was Vice–President and Chief Financial Officer ("CFO") of AHERF; Leonard Lester Ross, Ph.D ("Dr. Ross") served as Provost of AUHS and previously was the dean of MCP Hahnemann School of Medicine; Nancy Ann Wynstra, Esq. ("Wynstra") was at all relevant times the Executive Vice President, General Counsel and Secretary of AHERF; Dwight L. Kasperbauer ("Kasperbauer") was at all relevant times Executive Vice President and Chief Human Resources Officer at AHERF; Anthony M. Sanzo ("Sanzo") replaced Abdelhak as AHERF CEO in June, 1998 and before that had held several key positions within AHERF and related entities.

The Trustee Defendants include William P. Snyder ("Snyder"), Douglas D. Danforth ("Danforth"), J. David Barnes ("Barnes"), Frank Cahouet ("Cahouet"), Harry R. Edelman, III ("Edelman"), Robert L. Fletcher ("Fletcher"), Francis B. Nemick ("Nemick"), Thomas O'Brien ("O'Brien") and Robert B. Palmer ("Palmer").
**[*4]**

n2 The Court will refer throughout this memorandum to the various Defendants' Motions to Dismiss as the "Defendants' Motion to Dismiss". When applicable, it will refer to the specific Defendant's Motion.

## I. FACTUAL BACKGROUND

This action for civil violations of the RICO statute, as well as claims for intentional interference with contractual relations and civil conspiracy, arises from the demise of Allegheny Health Education and Research Foundation, a now bankrupt charitable foundation. ("AHERF"). AHERF consisted of many separate legal entities which operated through several subsidiaries. See Compl. P 13. The two main subsidiaries relevant to this case are Allegheny East and Allegheny West. Allegheny East consisted of the following facilities:

a. Allegheny University of the Health Sciences ("AUHS")

b. Allegheny University Medical Practices ("AUMP")

c. Allegheny University Hospitals, Centennial including Graduate, City Avenue and Parkview Hospitals

d. Allegheny University Hospitals East including Bucks County, Elkins Park, Hahnemann, MCP and St. Christopher's Hospital **[*5]** for Children Hospitals.

e. Rancocas General Hospital in New Jersey

All of the Allegheny East entities, with the exception of Rancocas General Hospital, filed for Chapter 11 bankruptcy in July, 1998.

The path to bankruptcy began in 1988 when, under the leadership of Abdelhak, AHERF began to create the Allegheny East network with the purchase of the Medical College of Pennsylvania ("MCP"). The rationale behind this move was to affiliate Allegheny General Hospital ("AGH") in Pittsburgh with a teaching hospital in order to continue the stream of federal money that AGH had been receiving to train medical interns. Compl. P17. Throughout the 1990's, Allegheny East continued to grow by acquiring hospitals in the Philadelphia area. It also be-

gan purchasing the private practices of physicians. Compl. P 21. However, by early 1998, Allegheny East was losing a great deal of money, up to $1 million a day. Although several attempts were made to salvage the division, they all ultimately failed. Therefore, on July 21, 1998 AHERF filed under Chapter 11 for itself and Allegheny East. The hospitals operated through the Allegheny West subsidiary were exempted from the bankruptcy. **[*6]** Compl. P 41.

## II. PROCEDURAL BACKGROUND

This action was originally filed on December 14, 1998. The proceedings were stayed by this Court on March 25, 1999 pending a determination by the Bankruptcy Court whether this action would violate the automatic stay of the related bankruptcy proceedings. However, on August 17, 1999, this Court's stay was lifted for the limited purpose of allowing the parties to proceed with motions to dismiss. Thereupon the Officer and Trustee Defendants submitted the present Motions to Dismiss.

## III. LEGAL STANDARD

When deciding to dismiss a claim pursuant to Rule 12(b)(6) a court must consider the legal sufficiency of the complaint and dismissal is appropriate only if it is clear that "beyond a doubt ... the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *McCann v. Catholic Health Initiative, 1998 U.S. Dist. LEXIS 14011, 1998 WL 575259* at *1 (E.D. Pa. Sep. 8, 1998) (quoting *Conley v. Gibson, 355 U.S. 41, 45–46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)).* The court assumes the truth of plaintiff's allegations, and draws all favorable inferences therefrom. See, *Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d. Cir. 1989).* **[*7]** However, conclusory allegations that fail to give a defendant notice of the material elements of a claim are insufficient. See *Sterling v. SEPTA, 897 F. Supp. 893, 895 (E.D. Pa.1995).* The pleader must provide sufficient information to outline the elements of the claim, or to permit inferences to be drawn that these elements exist. *Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d. Cir. 1993).*

## IV. DISCUSSION

The Plaintiffs assert a substantive RICO claim as well as RICO conspiracy by Defendants under *18 U.S.C. §§ 1962*(c) and (d) respectively (Count I). In addition, they allege intentional interference with current and prospective contractual relations (Count II), and civil conspiracy (Count III), under state law. Pursuant to § 1962(c), it is unlawful "for any person employed by or associated with any enterprise engaged in or the activities of which affect interstate or foreign commerce, to conduct

or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." § 1962(d) dictates that "it shall be unlawful for any person to conspire to violate any of the provisions **[*8]** of subsections (a), (b), or (c) of this section." n3 Not only does the Defendant have to meet all the requirements of § 1962(c), but the Plaintiff must properly allege that the Defendant committed the elements of the predicate acts that form the basis for the "pattern of racketeering activity".

> n3 Under the Definitions section of the statute set forth at *18 U.S.C. § 1961;*
>
> (1) "Racketeering activity" means (A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical... which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of > title 18, United States Code:....Section 1341 (relating to mail fraud),...Section 1343 (relating to wire fraud)...;
>
> (3) "person" includes any individual or entity capable of holding a legal or beneficial interest in property;
>
> (4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;
>
> (5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding the period of imprisonment) after the commission of a prior act of racketeering.

**[*9]**

### A. Rico Standing

The Defendants' first challenge the Plaintiffs' standing to bring this suit.

Case 1:05-cv-00165-JJF    Document 36-2    Filed 06/10/2005    Page 116 of 121

Page 4
1999 U.S. Dist. LEXIS 19110, *9

In order to have RICO standing, a plaintiff must allege facts sufficient to establish that the RICO pattern complained of is the proximate cause of one's injury. *Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268–70, 117 L. Ed. 2d 532, 112 S. Ct. 1311 (1992).* A plaintiff fails to satisfy RICO standing requirements if his injury merely flows from that incurred by a third party. *Id. at 271.* The Holmes Court found that it was unlikely that Congress intended an expansive reading of RICO. Id. Therefore, "but for" causation is not enough to confer standing under RICO. See *In re Phar–Mor, Inc. Securities Litigation, 900 F. Supp. 777, 781–83 (W.D. Pa. 1994)* (plaintiff's injury caused by fraud considered derivative when fraud was not directed towards plaintiffs and damages sustained were incidental to the injuries suffered by the corporation). The directness relationship of injury to fraud has been central to the analysis of proximate causation for several reasons. See *Assoc. Gen. Contractors of Calif. v. Calif. St.. Council of Carpenters, 459 U.S. 519 540, 74 L. Ed. 2d 723, 103 S. Ct. 897 (1983).* **[*10]** First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. *Holmes, 503 U.S. at 269–270.* Second, distinct from the problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. *Blue Shield of Virginia v. McCready, 457 U.S. 465, 473–475, 73 L. Ed. 2d 149, 102 S. Ct. 2540 (1982).* Third, directly injured individuals can generally vindicate the law without raising these two problems. *Holmes, 503 U.S. at 270.*

Applying these factors to the present case shows that Plaintiffs have standing to assert their RICO claims. The Plaintiffs in this case allege that the requisite predicate acts were directed towards them. See Compl. PP 18–19, 21, 27. They claim that the Defendants, as a necessary part of the fraudulent scheme, defrauded them in order to profit from Plaintiffs' businesses and professional **[*11]** reputations. Following the current pleadings as now alleged, a trier of fact could trace the cause of Plaintiff's loss directly to Defendants' actions. Since they now allege injuries to both their property and reputation, the injury is direct. Second, the Plaintiffs are not seeking the same damages for the same injury as other parties. AHERF could not possibly make a claim for loss of "professional reputation", as can the Plaintiffs. Therefore, the claims by Plaintiffs could not be raised by AHERF or any other third party.

It is clear that Plaintiffs do not have automatic standing under RICO merely because of their status as employees.

See *Rehkop v. Berwick Healthcare Corp. 95 F.3d 285 (3d Cir. 1996)* (hospital employee did not have standing because hospital's alleged racketeering did not substantially cause his termination). However, this holding does not establish a black letter rule against any employee bringing suit alleging RICO injuries. See *Shearin v. E.F. Hutton Group, Inc., 885 F.2d 1162, 1170 (3d Cir.1989)* (loss of earnings, benefits, and reputation were sufficient injuries to state claim under section 1962(d)). So long as the plaintiffs **[*12]** can allege a direct relationship between their injury and the racketeering activity engaged in by the Defendants, standing can be conferred. See *Mruz v. Caring, Inc., 991 F. Supp. 701, 712 (D. N.J. 1998)* (plaintiff had standing because his termination was a direct result of the enterprise's racketeering activity).

Plaintiffs allege that their injuries would have resulted even without the insolvency of AHERF and Allegheny East. See Compl. P 43. This helps distinguish this case from many other cases where Plaintiffs incurred losses only as a result of an entity's insolvency. See, e.g. *Kaiser v. Stewart, 965 F. Supp. 684 (E.D. Pa. 1997)* (Policyholders of failed insurance company had no standing because the fraud was directed at Insurance Commission and no injuries would have resulted if the company had not failed). In the long run, Plaintiffs may not be able to prove direct damages unrelated to the insolvency of AHERF and Allegheny East. The facts may clearly show that Plaintiffs' injuries resulted only from the demise of the entities that provided their income. If that becomes the case, then their injuries would be derivative and their RICO **[*13]** claim would have to be dismissed because of a lack of standing. However, at this point, the Court can not find that there is no set of facts under which the Plaintiffs could prove that their injuries are directly related to the alleged fraud perpetrated by the Defendants. Therefore, the motion to dismiss must be denied on the standing issue.

**B. Elements of a RICO Claim**

The Defendants challenge every element of the Plaintiffs' substantive RICO claim. In order to state a RICO claim under 1962(c), Plaintiffs' must allege the existence of an enterprise, that the person was associated with the enterprise and participated in its affairs, through a pattern of racketeering activity.

1. Enterprise:

RICO requires that Plaintiffs plead the existence of an enterprise (affecting interstate commerce), comprised of a group of persons or entities associated together, formally or informally, for the purpose of engaging in a course of conduct. An enterprise is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.

*United States v. Turkette, 452 U.S. 576, 583, 69 L. Ed. 2d 246, 101 S. Ct. 2524 (1981).* [*14] The Plaintiff's have pleaded four alternative enterprises. For example, one alleged enterprise, consists of AHERF and Allegheny East, formed and operated for the common purpose of benefitting the individual Defendants and AHERF's western operations. See Compl. PP 61(c). Plaintiffs have alleged that it was controlled by Defendants and operated as a continuing unit. At this stage of the proceedings Plaintiffs have alleged enough information for Defendants to understand which enterprise was used to conduct racketeering activity. The Court also disagrees with the Trustee Defendants assertion that the Plaintiffs have failed to allege the five elements necessary to plead the existence of a RICO enterprise found by the district court in *Lujan v. Mansmann, 956 F. Supp. 1218, 1231 (E.D. Pa. 1997).* See Trustees' Memo at 15. The Court also finds that an enterprise which controlled 10 hospitals in Pennsylvania and one in New Jersey would likely have an effect on interstate commerce.

2. Control:

In order to state a claim for violation of § 1962(c), a plaintiff must allege that defendants participated directly or indirectly in the conduct or affairs of the [*15] enterprise. The Supreme Court has clarified this prerequisite to liability as requiring that the defendant participate in the operation or management of the enterprise itself. *Reves v. Ernst & Young, 507 U.S. 170, 183, 122 L. Ed. 2d 525, 113 S. Ct. 1163 (1993).* The Reves Court held that operation and control could extend beyond the upper levels of management to anyone who exerts control over its affairs. Id. The Officer Defendants were top management and are alleged to have played active roles in the management of AHERF and Allegheny East. See *Jaguar Cars v. Royal Oaks Motor Car Co., 46 F.3d 258, 264 (3d Cir. 1995)* (corporate officers and directors managing affairs are no longer shielded from liability after Reves). The Trustee Defendants were members of the key committees within AHERF. These Defendants voted on compensation and other crucial matters that are alleged to be part of the overall fraudulent scheme behind this action. Liability under § 1962(c) is not limited to those with primary responsibility for the enterprise's affairs, and while defendants must have participated in the enterprise's affairs, the level of that participation [*16] need not be substantial. *Reves, 507 U.S. at 179.* The Plaintiffs have adequately plead control by all Defendants.

3. Predicate Acts:

In the instant case, the predicate acts alleged are mail fraud in violation of *18 U.S.C. § 1341;* wire fraud *(18 U.S.C. § 1343),* money laundering *(18 U.S.C. § 1957)* and interstate transportation of fraudulently obtained money ( *§ 18 U.S.C. 2314).* All of these predicate acts contain an element of fraud. *Rule 9(b) of the Federal Rules of Civil Procedure* provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Fed.R.Civ.P. 9(b).* The Third Circuit has held that Rule 9(b) requires plaintiffs to plead with particularity the "circumstances" of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior. See *Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir.1984),* cert denied, [*17] *469 U.S. 1211, 84 L. Ed. 2d 327, 105 S. Ct. 1179 (1985).* Allegations of "date, place or time" fulfill these functions, but nothing in the rule requires them. Id. The rule is satisfied where some precision and some measure of substantiation is present in the pleadings. See *Killian v. McCulloch, 850 F. Supp. 1239, 1254 (E.D. PA.1994).*

The Defendants argue that the Plaintiffs have not adequately plead the requisite predicate acts as to each of the individual Officer and Trustee Defendants. The federal mail and wire fraud statutes prohibit the use of mails or interstate wire for the purpose of carrying out any scheme or artifice to defraud. *18 U.S.C. §§ 1341* and 1343. Wholly intrastate use of the mails for fraud violates the mail fraud statute. *In re Burzynski, 989 F.2d 733, 742 (5th Cir. 1993).* However, the wire fraud statute is only violated through the interstate use of the wire. See *Smith v. Ayres, 845 F.2d 1360, 1366 (5th Cir. 1988).* Since mere intrastate use of the wire in furtherance of fraud can not constitute wire fraud, it follows that these same acts can not serve as predicate acts for [*18] a RICO Complaint. Id.

In the present Complaint, it is alleged that the defendants used interstate wires and/or the mails in furtherance of their scheme to defraud the Plaintiffs because by these mediums the Plaintiffs received their pay. See Compl. P 47. The Plaintiffs do not state which wire transfers in furtherance of the fraud were made interstate. They also do not explain how "mailing or wiring salary checks" furthered the fraudulent scheme. For purposes of the motion to dismiss, though, the Plaintiffs do not need to further explain how the mailing or wiring of checks contributed to fraud. See *Tabas v. Tabas, 47 F.3d 1280, 1295 n. 18 (3d. Cir. 1995)* (wholly innocent mailings can satisfy the making element). "Mailings designed to lull victims into a false sense of security... and therefore make the apprehension of defendants less likely than if no mailings had taken place" can constitute actionable fraud. See *Kehr Packages v. Fidelcor, Inc., 926 F.2d 1406, 1416 n.3 (3d Cir. 1991).* The law of this Circuit suggests that if Plaintiffs received any mail or interstate wires which are remotely connected to a concurrent scheme to defraud, the [*19] predicate

acts of mail and wire fraud are met. Since in this case the Plaintiffs have alleged both a scheme to defraud and that they received mailings and wires from the Defendants, the Plaintiffs have adequately plead "predicate acts".

Defendants argue that Plaintiffs have failed to connect the fraud to the mailing or wirings. But that is not true, even if the connection is somewhat nebulous. The Plaintiffs allege that the Defendants' fraud of portraying Allegheny East as a viable health care system would have been exposed earlier if the Defendants had not used the mail and wires to send paychecks to them. The inference that could be drawn is that Plaintiffs would have realized much sooner the precarious position of Allegheny East if they had not received their pay by wire or mail.

In order to plead mail or wire fraud as a predicate act of which each Defendant must have participated two or more times, the Plaintiff must allege facts giving rise to a strong inference of scienter on the part of each Defendant. See, e.g., *Beck v. Manufacturers Hanover Trust, Co., 820 F.2d 46, 49–50 (2d Cir. 1987)*, cert. denied *484 U.S. 1005, 98 L. Ed. 2d 650, 108 S. Ct. 698*, overruled on other [*20] grounds by, *United States v. Indelicato, 865 F.2d 1370*, (2d Cir. 1989). Plaintiffs can establish scienter by pleading facts showing conscious or reckless behavior to defraud. Knowledge concerning a company's key businesses or transactions may be attributable to the company, its officers and directors. See, *In re Aetna Inc. Sec. Litigation, 34 F. Supp. 2d 935, 953 (E.D. Pa. 1999)* (Padova, J.); *Epstein v. Itron, 993 F. Supp. 1314, 1325 (E.D. Wash. 1998)* ("facts critical to a business' core operation or an important transaction generally are so apparent that their knowledge may be attributed to the company and its officers"). The major purchases engaged in by AHERF during the 1990's were important transactions and the precarious state of the foundations finances were facts critical to such transactions. Therefore, each of the Officer Defendants, all of who are alleged to have played a key role in the operations of AHERF and Allegheny East, could probably have attributed to them the knowledge of the fraud alleged by Plaintiffs, as could many of the Trustee Defendants.

Another method for establishing a strong inference of scienter is [*21] to allege facts showing a motive for committing fraud and a clear opportunity for doing so. See *Goldman v. Belden, 754 F.2d 1059, 1070 (2d Cir. 1985)*. Plaintiffs have pleaded facts establishing motive for each of the Defendants. In essence, the Plaintiffs allege that Abdelhak and the other Defendants defrauded the Plaintiffs in order to "raid the assets" of Allegheny East so as to increase their wealth and prestige. That the "mailing" part of the fraud was "routine" does not affect its qualification as a predicate act. The Plaintiffs have alleged fraud that was at least incidentally assisted by the use of the mails and the wires. The motive for all Defendants to engage in this fraud was to increase their salary and prestige in the community. The Plaintiffs specifically allege that the Defendants voted to increase their own salaries even in the face of bankruptcy. Compl. PP 7, 26, 34. Since Plaintiffs also allege that the misleading statements concerning the goals and health of the Allegheny system were made in order to increase prestige, a favorable inference towards Plaintiffs' position could be made that by increasing the size of the enterprise they controlled, [*22] the Trustee Defendants and Officer Defendants expected to increase their professional prestige. Prestige and wealth could also be inferred to be the motivations behind the misrepresentations made both to Plaintiffs and in AHERF's financial statements concerning the financial health of the organization.

The opportunity prong of the "motivation and opportunity" scienter analysis essentially asks whether each of the Defendants played a part or had the opportunity to defraud Plaintiffs. The Plaintiffs have not, in each instance, alleged specific acts against each individual defendant. However, such an absence, at this stage of the proceedings is not fatal to a complaint. The Plaintiffs state, and we accept as true, that the information before them at this point is not adequate to more fully detail their fraud allegations against the individual defendants. n4 When Defendants remain in control of the necessary details, the requirements of Rule 9(b) can be more leniently met. See *S & W Contracting Services, Inc., 1998 U.S. Dist. LEXIS 3966*, at *10–12. (Plaintiff's complaint met 9(b) requirements despite failure to provide date, time or details of alleged frauds where that [*23] information lay within the sole possession of the defendants.) The Plaintiffs do make specific allegations against the Defendants as a group. For example, they allege that the Defendants caused the removal of large amounts of funds from restricted accounts in order to cover Allegheny East's pitiful financial state. Compl. PP 27–30. The Plaintiffs also state that every Officer Defendant signed the fraudulent 1997 Annual Report. As for the Trustee Defendants, even if their position within AHERF were not central enough to attribute knowledge of the fraudulent scheme to them, they at least had the opportunity to participate in the fraud through the positions that they held. Trustee Defendants Snyder, Barnes and Edelman also allegedly signed the 1997 Annual Report. The named Trustees are members of the Executive, Compensation and Ethics Committee of the Boards. According to the Complaint, they quadrupled AHERF's D&O insurance in the Spring of 1998 with the intention of protecting themselves and the officers against disaster in the coming collapse of Allegheny East. See Compl. P 10. The unique position that these individuals held within the larger group of trustees gave them an

opportunity [*24] to participate in the continuing fraud. Therefore, on the basis of the Complaint, the Court finds that Plaintiffs have adequately plead predicate acts against each of the Officer and Trustee Defendants.

> n4 The situation here is distinguishable from Saporito v. Combustion Eng'g, Inc., in which the Court found no indication by Plaintiffs that the evidence needed to flesh out its allegations were not available to them at the time of the Complaint.

4. Pattern:

In order to show a pattern of racketeering activity, the Plaintiffs must show that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 241, 106 L. Ed. 2d 195, 109 S. Ct. 2893 (1989).* The H.J. Court described continuity as referring to either a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. *Id. at 241.* A party may [*25] establish closed end continuity by proving a series of related predicates extending over a substantial period of time. *Id. at 242.* The Third Circuit has consistently held that periods of less than one year are not "substantial periods of time" for purposes of forming a RICO pattern. *Tabas, 47 F.3d at 1293.* Defendants argue that Plaintiff only has alleged fraudulent statements that were made after the beginning of 1998 (thereby extending over less than a twelve-month period). However, this does not recognize that what Plaintiffs have alleged is that the Defendants have engaged in a fraudulent scheme since 1994, and used the mails to conduct the fraud by mailing salary checks to Plaintiffs and others. Activity extending over four years satisfies the continuity requirement. See *United States v. Pelullo, 964 F.2d 193, 209 (3d Cir. 1992)* (holding that a jury could find nineteen month period sufficient to establish continuity). Even so the Plaintiffs have clearly stated that the June 1997 Annual Report contained misrepresentations. See Compl. P 22. Therefore, contrary to Defendant's position, the Plaintiff's have alleged specific fraudulent [*26] acts extending beyond the twelve month limit needed to satisfy the continuity requirement. In determining continuity, the Court looks beyond the mailing prong of the mail fraud predicate to the duration of the "scheme to defraud". *Tabas, 47 F.3d at 1293.* The Plaintiffs have sufficiently alleged that Defendants planned to defraud them since 1994 by falsely stating the goals and viability of the Allegheny System. The Plaintiffs have plead continuity.

5. Relatedness:

Predicate acts are sufficiently related when they have similar purposes, results, participants, victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated events. *H.J. Inc., 492 U.S. at 240.* As the Third Circuit has stated, the "relatedness" test as outlined in H.J. is broad. See *Banks v. Wolk, 918 F.2d 418, 422 (3d Cir. 1990).* Plaintiffs have alleged that the same Officer and Trustee Defendants committed a series of illegal predicate acts for the same purpose, to enrich themselves personally and professionally. That is sufficient to show relatedness. Therefore, Plaintiffs have adequately plead a pattern of [*27] racketeering activity.

**C. RICO Conspiracy**

In order to state a claim under RICO's § 1692(d), a plaintiff must allege (1) an agreement to commit the predicate acts of fraud, and (2) knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate § 1962(a), (b), or (c). *Odesser v. Continental Bank, 676 F. Supp. 1305, 1312 (E.D. PA.1987).* "Allegations of conspiracy are not measured under the ... [Fed.R.Civ.P.] 9(b) standard, which requires greater particularity of allegation of fraud, but are measured under the more liberal ... Fed.R.Civ.P. 8(a) pleading standard." *Rose v. Bartle, 871 F.2d 331, 366 (3d. Cir. 1989).* To plead conspiracy adequately, a plaintiff must set forth the period and objective of the conspiracy as well as certain actions taken by the defendants to achieve its purpose. See *Shearin v. Hutton, 885 F.2d 1162, 1166 (3d Cir. 1989).* The Plaintiffs have stated that the time of the conspiracy was from 1994 to the present (the time of the filing of the Complaint). See Compl. P 51. The objective alleged by Plaintiffs was to expand and operate Allegheny East by fraudulently [*28] representing its financial stability in order to reap benefits on the Defendants. See Compl. 2–3. Finally, Plaintiffs allege many acts committed by Defendants in furtherance of the conspiracy, including expansion through the purchase of hospitals and physician practices, falsifying financial statements and misrepresenting the viability of the organization. See Compl. PP 16–34. It is also necessary for the Plaintiffs to allege an agreement among the conspirators. See *United States v. Boffa, 688 F.2d 919, 937 (3d Cir. 1982)* (individual, by his words or actions, must have objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes). The Plaintiffs specifically allege that all of the Defendants agreed to participate in the fraudulent scheme. See Compl. P 63. Therefore, the Plaintiffs have adequately plead conspiracy under § 1962(d).

**D. State Law Claims**

This Court has subject matter jurisdiction over the

federal claims of the Plaintiffs under *28 U.S.C. § 1331.* Now having determined that the Plaintiffs have stated federal RICO **[*29]** claims under § 1962(c)-(d), the Court can have supplemental subject matter jurisdiction over the Plaintiffs state law claims as well. See *28 U.S.C. § 1367*(a).

1. Civil Conspiracy:

A cause of action for civil conspiracy requires that two or more persons combine or enter an agreement to commit an unlawful act or to do an otherwise lawful act by unlawful means. *Slaybaugh v. Newman, 330 Pa. Super. 216, 221, 479 A.2d 517 (1984).* Proof of malice is an essential part of a cause of action for conspiracy. *Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 211, 412 A.2d 466 (1979).* However, an action will lie only where the sole purpose of the conspiracy is to cause harm to the party who claims to be injured. Id. ("Proof of malice, i.e., an intent to injure, is essential in proof of conspiracy ... There are no facts of record which indicate that [appellee] acted solely to injury appellants"). See *Sim Kar Lighting Fixture Co. v. Genlyte, Inc. 906 F. Supp. 967, 977 (D. N.J. 1995)* (claim dismissed when plaintiff failed to allege facts suggesting that conspiracy's objective was solely to harm plaintiff). Civil **[*30]** conspiracy becomes actionable when some overt act is done in pursuance of the common purpose or design held by the conspirators, and actual damage results. See *Cohen v. Pelagatti, 364 Pa. Super. 573, 528 A.2d 657 (Pa. Super. 1987).* The plaintiff must expressly allege an agreement or make averments of communication, consultation, cooperation, or command from which such an agreement can be inferred. See *Flanagan v. Shively, 783 F. Supp. 922, 928 (M.D. Pa. 1992).* But plaintiffs are not required to allege exactly where, when and with what words an agreement was made. *Id. at 929.*

As discussed above with regard to the RICO conspiracy, Plaintiffs have alleged an agreement by the Defendants to conduct unlawful acts and that Defendants took actions in furtherance of the conspiracy. However, the state law differs from the federal law in its requirement that the Plaintiffs also allege malice. Merely describing something as malicious is not sufficient to give the proper inference of malice, meaning an intent to injure. As described above, malice requires an allegation that the sole purpose of the conspiracy was to injure the Plaintiffs. See **[*31]** *Thompson, 488 Pa. at 211* (the Pennsylvania Supreme Court held that where the facts show that a person acted to advance his own business interests, those facts constituted justification and negate any alleged intent to injure ) As Plaintiffs have stated elsewhere, the Defendant's purpose of the conspiracy was to benefit themselves personally and professionally. The fact that it may have been necessary to deceive Plaintiffs

in order to carry out their scheme in no way indicates that they acted with malice solely to injure Plaintiffs. Therefore, the Defendants Motion to dismiss Count III for Civil Conspiracy is granted.

2. Intentional Interference with Contractual Relations:

To maintain an action for intentional interference with contractual relations a plaintiff must allege:

(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;

(2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;

(3) the absence of a privilege or justification on the part of the defendant; and

(4) the occasioning of actual **[*32]** legal damage as a result of the defendant's conduct.

*Shiner v. Moriarty, 706 A.2d 1228, 1238 (Pa. Super. 1998).*

Plaintiffs adequately allege existing contractual relations with third parties. See Compl. P 66. The Plaintiffs also allege that Defendants acted purposefully, with knowledge that their actions would damage Plaintiffs' contractual relations. See Compl. P 67. The issue remains whether Defendants had the specific intent to harm the Plaintiffs existing and prospective contractual relations. But intent may be shown "where the actor knows an injury is certain or substantially certain to occur as a result of his action. *Total Care Sys., Inc. v. Coons, 860 F. Supp. 236, 241 (E.D Pa. 1994).* Since Plaintiffs have alleged that Defendants had knowledge that Plaintiffs would be injured, they have satisfied the intent requirement n5. The third element of a tortious interference claim is met by Plaintiffs claim that Defendants improper conduct was without justification or privilege. Compl. P 68.

n5 The Plaintiffs allegations survive here because knowledge can be used to show intent and they allege knowledge by defendants. However, in the civil conspiracy context, the malice element requires the higher showing that the motivation behind the conspiracy be to injure the Plaintiffs. They have not alleged this set of facts.

– – – – – – – – – – – – – – – – – –End Footnotes– – – – – – – – – – – – – –

**[*33]**

1999 U.S. Dist. LEXIS 19110, *33

The gravamen of this tort is the lost pecuniary benefits flowing from the contract itself; other losses, such as emotional distress and loss of reputation, are consequential harms. *Shiner, 706 A.2d at 1239.* Although non-pecuniary harms are recoverable in an intentional interference action, such an action cannot be maintained in the absence of pecuniary loss flowing from the interference. *Pelagatti v. Cohen, 370 Pa. Super. 422, 435, 536 A.2d 1337 (1987).* Plaintiffs do claim injury to both their reputations and incomes. See Compl. P 69. As long as some pecuniary loss has been alleged, non-pecuniary damages can be granted as well. See *Shiner, 706 A.2d at 1239.* The Court disagrees with Defendant Abdelhak's assertion that Plaintiffs have not alleged direct pecuniary loss. See Abdelhak Mem. at 29. Although Plaintiffs do not state how their patient income decreased as a direct result of Defendants' illegal conduct, they do allege that the income has decreased as an injury separate from their loss of professional reputation. See Compl. P 69. Therefore, Plaintiffs claim for intentional interference with contractual relations will **[*34]** not be dismissed.

**V. CONCLUSION**

The Defendants' Motions to Dismiss are denied with respect to Count I (violations of *18 U.S.C. § 1962*(c)–(d)–substantive RICO claim and RICO conspiracy) and Count II (intentional interference with contractual relations). However, Defendants' Motions are granted with respect to Count III (Civil Conspiracy).

An appropriate order follows.

**ORDER**

AND NOW, this 15th day of December, 1999, after consideration of the Defendants' Motions to Dismiss (Docket Nos. 34, 35, 36, 38, 39, 40, 41 and 45) and the Plaintiffs' response to the Motion to Dismiss (Docket No. 46), as well as the Defendants' Reply (Docket No. 47, 48, 49, 50, 51, 52, 57, and 64) and Plaintiffs' Sur-Reply (Docket No. 63), it is hereby **ORDERED** that:

1. The Motions to Dismiss of all Defendants are **DENIED** as to Counts I & II; and

2. The Motions to Dismiss of all Defendants are **GRANTED** as to Count III.

BY THE COURT:

RONALD L. BUCKWALTER, J.