IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROYAL INDEMNITY COMPANY,

                    Plaintiff,

        *vs.*

PEPPER HAMILTON LLP, W. RODERICK GAGNÉ, FREED
MAXICK & BATTAGLIA CPAS PC, MCGLADREY &
PULLEN, LLP and MICHAEL AQUINO,

                    Defendants.

C.A. No. 05-165

Judge Joseph J. Farnan, Jr.

# ROYAL INDEMNITY COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

ASHBY & GEDDES
Lawrence C. Ashby (I.D. #468)
Philip Trainer, Jr. (I.D. #2788)
222 Delaware Avenue, 17th Floor
Wilmington, Delaware 19899
(302) 654-1888
(302) 654-2067 (Fax)

SONNENSCHEIN NATH & ROSENTHAL LLP
Michael H. Barr
Kenneth J. Pfaehler
Richard M. Zuckerman
1221 Avenue of the Americas
New York, New York 10020-1089
(212) 768-6700
(212) 768-6800 (fax)
        and
Alan S. Gilbert
John I. Grossbart
8000 Sears Tower, 233 S. Wacker Drive
Chicago, Illinois 60606
(312) 876-8000
(312) 876-7934 (fax)

*Attorneys for*
*Plaintiff Royal Indemnity Company*

July 29, 2005

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................................ v

Statement of Nature and Stage of the Proceeding .......................................................... 1

Preliminary Statement ................................................................................................... 1

Summary of Argument ................................................................................................... 5

    Royal's Common Law Claims........................................................................................ 5

        Royal's Common Law Claims Are Timely ................................................................ 6

        Royal's Common Law Claims State Valid Causes of Action ................................. 7

    Royal's RICO Claims ................................................................................................. 8

Statement of Facts ......................................................................................................... 9

    SFC And The Student Loan Fraud .............................................................................. 9

    The Lawyers' Knowledge Of And Central Role In The Conduct Of The
    Fraud Scheme ...................................................................................................... 12

        The False And Misleading PPMs ........................................................................... 13

    The Accountants' Knowledge Of And Central Role In The Conduct Of The
    Fraud Scheme ...................................................................................................... 14

        The False And Misleading 2000 Audit Report ..................................................... 15

        The False And Misleading 2001 Audit Report ..................................................... 15

        The False And Misleading 2001 Accountant's Report ....................................... 17

    SFC's Fraudulent Scheme Is Revealed And SFC Is Forced Into Bankruptcy .......... 17

Related Proceedings ....................................................................................................... 18

    Related Proceedings In This Court And The Bankruptcy Court .............................. 18

    Decisions In Related Proceedings ............................................................................ 19

    Status Of Related Proceedings ................................................................................. 20

Standards of Review ....................................................................................................... 21

Argument ........................................................................................................................ 22

Defendants' Motions to Dismiss Should be Denied ...................................................... 22

I.    Royal's Common Law Claims Are Timely, and Properly Plead Valid Causes
    of Action ...................................................................................................................... 22

    A.    Royal's Common Law Claims Are Subject To The Statute Of
        Limitations Of Delaware ................................................................................. 23

    B.    Royal's Common Law Claims Are Timely .................................................... 26

        1.    Royal's Claims Were Brought Within The Three-Year Limitations
            Period Under Delaware Law ...................................................................... 26

2.    Royal's Complaint Is Timely Even If Pennsylvania's Statute of
      Limitations Applies To This Action ................................................................ 28

C.  The Substance Of Royal's Common Law Claims Is Governed By The
    Law Of Delaware (By Itself, Or Considered With The Law Of North
    Carolina) ................................................................................................................ 29

    1.    Restatement (Second) Of Conflicts Of Laws § 148 Provides
          Delaware's Controlling Choice Of Law Principles Specifically
          Applicable To Fraud Claims ................................................................... 30

    2.    Under Delaware Choice Of Law Principles, Delaware Law
          (Considered by Itself, Or With North Carolina Law) Governs
          Royal's Claims ........................................................................................ 32

    3.    For Purposes Of Conflict Of Laws Analysis, Delaware And North
          Carolina May Be Considered A Single State Because Their
          Applicable Statutes of Limitations and Substantive Law Are the
          Same ........................................................................................................ 37

    4.    Pennsylvania Law Does Not Govern ...................................................... 37

          a)    The Domicile Of The Wrong-Doer Does Not Control In A
                Fraud Case Under Restatement § 148 ............................................ 37

          b)    The Place Of Wrongful Conduct Is Not Controlling Under
                Restatement § 148 .......................................................................... 38

          c)    Delaware Does Not Defer To The Law Of The State Where A
                Professional Is Licensed ................................................................. 40

D.  Royal's Common Law Claims Properly Plead Valid Causes of Action ....................... 41

    1.    Fraud (Count IV) ..................................................................................... 41

          a)    Royal Has Pled That Defendants Acted With An Intent To
                Deceive Royal ................................................................................. 42

          b)    Royal Has Pled That It Justifiably Relied On Defendants'
                Misleading Reports .......................................................................... 43

          c)    Royal Has Satisfied The Requirements Of Rule 9(b) For
                Pleading Fraud With Particularity.................................................... 45

    2.    Civil Conspiracy To Commit Fraud (Count III) ..................................... 49

          a)    Royal Has Properly Pled Civil Conspiracy Under Both
                Delaware And North Carolina Law .................................................. 49

          b)    Royal's Civil Conspiracy Count Even Meets the Additional
                "Malice" Requirement of Pennsylvania Law (Which, In Any
                Event, Does Not Apply)................................................................... 50

    3.    Aiding And Abetting Fraud (Count V);  Aiding And Abetting
          Breach Of Fiduciary Duty (Count VIII).................................................. 52

a) Delaware And North Carolina Both Recognize The Torts Of Aiding And Abetting Fraud, And Aiding And Abetting Breach Of Fiduciary Duty ............................................................. 52

b) Even If Pennsylvania Law Applied To This Action, Aiding And Abetting Is A Valid Cause Of Action Under Pennsylvania Law ..................... 53

c) Royal Has Stated A Claim For Aiding And Abetting Breach Of Fiduciary Duty ......................................................... 55

4. Deepening Insolvency (Count VII) ............................................... 56

a) Delaware, North Carolina And Pennsylvania Each Recognize A Cause Of Action Based On Deepening Insolvency ........................... 56

b) Royal Has Standing To Assert A Cause Of Action Based On Deepening Insolvency ..................................................... 58

c) Royal's Deepening Insolvency Claim Is Not Barred By The Automatic Stay ............................................................. 60

d) Royal Has Alleged Sufficient Facts To State A Claim For Deepening Insolvency ..................................................... 61

e) Royal's Allegations Of Fraud Have Been Pled With Sufficient Particularity To Support Royal's Deepening Insolvency Claim ..................... 63

5. Negligence and Negligent Misrepresentation (Count VI) ....................... 63

a) Royal Has Properly Pled Negligence And Negligent Misrepresentation Under Delaware And North Carolina Law ....................... 63

b) Royal's Claims of Negligence And Negligent Misrepresentation Are Sound, Even If Pennsylvania Law Applies ................................ 64

II. Royal's RICO Claims Against Gagné And Aquino (Counts I and II) Properly Plead Valid Causes Of Action ........................................................... 66

A. Royal's RICO Claims Are Not Precluded By The Private Securities Litigation Reform Act Because The Predicate Acts Are Insurance Fraud—Not "Actionable As Fraud in the Purchase or Sale of Securities" ................... 66

B. Royal Has Properly Pled The Existence Of A RICO Enterprise ................... 70

1. The Association-In-Fact Of SFC, SFC-Related Entities, Pepper, McGladrey And Freed Is A RICO Enterprise ................................ 70

2. Gagné And Aquino Took Part In The Operation And Management Of The RICO Enterprise ..................................................... 72

C. Royal Has Properly Pled A Pattern Of Racketeering Activity And That Aquino Committed Predicate Acts ................................................. 74

a) Pattern Of Racketeering Activity ......................................... 74

b) Aquino's Predicate Acts .................................................. 76

D. Royal Has Properly Pled The Existence Of A RICO Conspiracy ................... 76

III.  Freed Is A Proper Party To This Action ................................................................................... 77

Conclusion ........................................................................................................................................... 80

## TABLE OF AUTHORITIES

### CASES

*AES Corp., v. Dow Chemical Company,* No. Civ. A. 99-673-JJF, 2001 WL
34367296 (D. Del. Jan. 19, 2001) ..............................................................................31

*AeroGlobal Capital Management, LLC v. Cirrus Industrial*, 871 A.2d 428 (Del.
2005) ...........................................................................................................................11, 49

*Albert v. Alex Brown Management Services*, 2005 WL 1594085 (Del. Ch. June
29, 2005) .....................................................................................................................27

*American Energy Technologies, Inc. v. Colley & McCoy Co.,* No. Civ. A. 98-398-
MMS, 1999 WL 301648 (D. Del. 1999)..............................................................23, 24

*Anderson v. Airco, Inc.*, No. Civ. A. 02C-12-091-HDR, 2004 WL 1551484 (Del.
Super. Ct. 2004) ..........................................................................................................11, 52

*B. Lewis Productions, Inc. v. Bean*, No. Civ. A. 02-93-KAJ, 2005 WL 273298
(D. Del. Jan. 28, 2005).................................................................................................24

*Babiarz v. Bell Atlantic-Pennsylvania, Inc.,* No. 1863, 2001 WL 1808554 (Pa. Ct.
Com. Pl. July 10, 2001) ...............................................................................................51

*Baker v. Cambridge Chase, Inc.*, 725 A.2d 757 (Pa. Super. Ct. 1999) ............................64

*Bald Eagle Area School District v. Keyston Finance, Inc.*,
189 F.3d 321 (3d Cir. 1999) ........................................................................................9, 67

*Bhatla v. Resort Development Corp.*, 720 F. Supp. 501 (W.D. Pa. 1989)...............7, 27, 28

*Biofeedtrac, Inc. v. Kolinar Optical Enterprise & Consultants*, 832 F. Supp. 585
(E.D.N.Y. 1993)...........................................................................................................74

*Blow v. Shaughnessy*, 364 S.E.2d 444 (N.C. Ct. App. 1988) ........................................8, 52

*Bohus v. Beloff*, 950 F.2d 919 (3d Cir. 1991) ............................................................28, 53

*Bristol Twp. v. Independence Blue Cross*, No. Civ. A. 01-4323, 2001 WL
1231708 (E.D. Pa. Oct. 10, 2001).................................................................................51

*Brown v. SAP America, Inc.*, No. Civ. A. 98-507-SLR, 1999 WL 803888 (D. Del.
Sept. 13, 1999) ..........................................................................................................30, 31, 35

*In re Burlington Coat Factory Sec. Litigation*, 114 F.3d 1410 (3d Cir. 1997)...........21, 48

*Burnside v. Abbott Laboratories*, 351 A.2d 973 (Pa. Super. Ct., 1985) ...........................54

*Butala v. Agashiwala*, No. 95 Civ. 936-JGK, 1997 WL 79845 (S.D.N.Y. Feb. 24,
1997) ...........................................................................................................................27

*CF Industries v. Transcontinental Gas Pipe Line Corp.*, 448 F. Supp. 475 (W. D. N.C. 1978)................................................................................................22, 44

*California Public Employees' Retirement System v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004)................................................................................................68

*Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972)....................................59

*Carello v. PricewaterhouseCoopers LLP*, Civ. A. 01C-10-219RRC, 2002 WL 145111 (Del. Super. July 3, 2002) .............................................................63

*Cavalier Clothes, Inc. v. Major Coat Co.*, No. Civ. A. 89-3325, 1991 WL 125179 (E.D. Pa. June 26, 1991) ..........................................................................6, 23

*Cerullo v. Harper Collins Publishers, Inc.*, No. 01C-03-21-CHT, 2002 WL 243387 (Del. Super. Ct. Feb. 19, 2002) ...................................................25

*In re Chambers Development Sec. Litigation*, 848 F. Supp. 602 (W.D. Pa. 1994) ..........65

*City of Philadelphia v. Human Services Consultants,* No. 00950, 2004 WL 717240 (Pa. Ct. Com. Pl. Mar. 23, 2004) ...................................................51

*Coleman v. PricewaterhouseCoopers, LLC.*, 854 A.2d 838 (Del. 2004) .........................27

*Combustion Engineering, Inc. v. Saporito*, 489 U.S. 1049 (1989)...................................48

*Commissioner v. Estate of Bosch*, 387 U.S. 456 (1967)....................................................53

*Conley v. Gibson*, 355 U.S. 41 (1957) ..............................................................................21

*Corning Inc. v. SRU Biosystems, LLC.*, 292 F. Supp. 2d 583 (D. Del. 2003) ..................30

*Corporate Aviation Concepts, Inc. v. Multi-Serv. Aviation Corp.,* No. Civ. A. 03-3020, 2004 WL 1900001 (E.D. Pa. Aug. 25, 2004) ...................................59

*Cox v. Delaware Electric Co-Op., Inc.*, 823 F. Supp. 241 (D. Del. 1993) ......................39

*Cuffee v. In re Atlantic Bus. & Community Development Corp. (In re Atlantic Bus. & Community Corp.)*, 901 F.2d 325 (3d Cir. 1990) ............................................60

*D'Angelo v. Petroleos Mexicanos*, 398 F. Supp. 72 (D. Del. 1975) ................................24

*David B. Lilly Co., Inc. v. Fisher*, 18 F.3d 1112 (3d Cir. 1994)............................... *passim*

*DiFrega v. Pugliese*, 596 S.E.2d 456 (N.C. Ct. App. 2004).........................................7, 49

*Dianese, Inc. v. Commonwealth of Pennsylvania*, C.A. No. 01-2520, 2002 WL 1340316 (E.D. Pa. June 19, 2002) ..............................................................72

*Diversified Group, Inc. v. Daugerdas*, 139 F. Supp. 2d 445 (S.D.N.Y. 2001).................40

*E.F. Hutton Mortgage Corp. v. Pappas*, 690 F. Supp. 1465 (D. Md. 1988) ....................42

*In re Eagle Building Technologies, Inc., Securities Litigation*, 319 F. Supp. 2d
    1318 (S.D. Fla. 2004)................................................................................42

*Electric World v. Barefoot*, 570 S.E.2d 225 (N.C. Ct. App. 2002) ..................................49

*Ellipsis, Inc., v. The Colorworks, Inc.*, 329 F. Supp. 2d 962 (W.D. Tenn. 2004)..............22

*F.D.I.C. v. Brossman*, No. Civ. A. 81C-DE-116, 1984 WL 553542 (Del. Super.
    Ct. June 12, 1984) ................................................................................24

*Feinberg v. Saunders, Karp & Megrue, L.P.*, No. 97-207-SLR, 1998 WL 863284
    (D. Del. Nov. 13, 1998) ...............................................................31, 35, 39

*Feltman v. Prudential Bache Securities*, 122 B.R. 466 (S.D. Fla. 1990) ........................59

*Fender v. Deaton*, 571 S.E.2d 1 (N.C. Ct. App. 2002)................................................7, 41

*Fine v. Checcio*, 870 A.2d 850 (Pa. 2005).......................................................................28

*Flood v. Makowski*, No. Civ. A. 3:CV-03-1803, 2004 WL 1908221 (M.D. Pa.
    Aug. 24, 2004) ................................................................................54

*Gates v. Ernst & Young, No. Civ. A. 93-CV-2332*, 1994 WL 444709 (E.D. Pa.
    Aug. 15, 1994) ................................................................................71

*Gatz v. Ponsoldt*, 297 F. Supp. 2d 719 (D. Del. 2003) ....................................................70

*Geyer v. Ingersoll Publications Co.*, 621 A.2d 784 (Del. Ch. 1992)................................55

*Gilmore v. Berg*, 820 F. Supp. 179 (D.N.J. 1993) ..........................................................74

*Gopez v. Shin*, 736 F. Supp. 51 (D. Del. 1990)................................................................27

*Griffin v. Wheeler-Leonard & Co.*, 225 S.E.2d 557 (N.C. 1976) ....................................41

*Guaranty Trust Co. v. York*, 326 U.S. 99 (1945) .............................................................23

*H.J. Inc., v. Northwestern Bell Telegraph Co.*, 492 U.S. 229 (1989)..........................74, 75

*Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*, 955 F. Supp. 248
    (S.D.N.Y. 1997) ................................................................................74

*Healthguard of Lancaster, Inc. v. Gartenberg*, No. Civ. A. 02-2611, 2004 WL
    632722 (E.D. Pa. Mar. 5, 2005)........................................................68

*In re High Strength Steel, Inc.*, 269 B.R. 560 (Bankr. D. Del. 2001)..............................54

*Hill v. Equitable Trust Co.*, 562 F. Supp. 1324 (D. Del. 1983)...................................24, 38

*Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir 1995) ........................................59

*Homer National Bank v. Namie*, 96 B.R. 652 (W.D. La. 1989) ........................................61

*Hood v. McConemy*, 53 F.R.D. 435 (D. Del. 1971)............................................................26

*In re Ikon Office Solutions, Inc. Sec. Litigation*, 86 F. Supp. 2d 481 (E.D. Pa. 2000) .............................................................................................................................70

*In re Ikon Office Solutions, Inc. Sec. Litigation*, 277 F.3d 658 (3d Cir. 2002) ..........42, 69

*J. E. Rhoads & Sons, Inc. v. Ammeraal, Inc.*, 1988 WL 116423 (Del. Super. Ct. Oct. 12, 1988) ....................................................................................................................38

*Jaguar Cars, Inc v. Royal Oaks Motor Car Co., Inc.*, 46 F.3d 258 (3d Cir. 1995).......9, 71

*Jeffreys v. Exten*, No. 86-32-SLR, 1993 U.S. Dist. LEXIS 18537 (D. Del. Dec. 30, 1992) ...........................................................................................................................72

*Johnston Associate, Inc. v. Rohm and Haas Co.*, 560 F. Supp. 916 (D. Del. 1983)..........40

*Juran v. Bron*, No. 16464, 2000 WL 1521478 (Del. Ch. Oct. 6, 2000) ............................37

*Kahn v. State Board of Auctioneer Examiners*, 842 A.2d 936 (Pa. 2004).........................40

*Kaiser v. Stewart*, No. Civ. A. 96-6643, 1997 WL 476455 (E.D. Pa. Aug. 19, 1997) ............................................................................................................................54

*Kalmich v. Bruno*, 553 F.2d 549 (7th Cir. 1977) ..............................................................23

*Kline v. Ball*, 452 A.2d 727 (Pa. Super. Ct., 1982)...........................................................54

*Koch v. First Union Corp.,*  No. 0549, 2002 WL 372939 (Pa. Ct. Com. Pl. Jan. 12, 2002) ...........................................................................................................................51

*Koken v. Steinberg*, 825 A.2d 723 (Pa. Commw. Ct. 2003) ..............................................54

*Langford v. City of Atlantic City*, 235 F.3d 845 (3d Cir. 2000)........................................21

*Levine v. Metal Recovery Technologies, Inc.*, 182 F.R.D. 112 (D. Del. 1998) ..........21, 47

*Lock v. Schreppler*, 426 A.2d 856 (Del. 1981) ..................................................................44

*Lord v. Sourder*, 748 A.2d 393 (Del. 2000).........................................................11, 41, 42

*MBIA v. Royal*, 221 F.R.D. 419 (D. Del. 2004)........................................................ *passim*

*MBIA v. Royal*, 286 F. Supp. 2d 347 (D. Del.  2003) ................................................ *passim*

*MBIA v. Royal*, 312 F. Supp. 2d 583 (D. Del. 2004) ................................................. *passim*

*In re ML-Lee Acquisition Fund II, L.P. and ML-Lee Acquisition Fund (Retirement Accounts) II, L.P. Sec. Litigation*, 848 F. Supp. 527 (D. Del. 1994) ...............................................................................................21, 27

*Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001)............................................................52

*Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 513 S.E.2d 320 (N.C. 1999) ...............................................................................................................63

*McRoberts v. S.I.V.I. (In re Bequette)*, 184 B.R. 327 (Bankr. S.D. Ill. 1995) .................61

*Mediators v. Manney (In re Mediators, Inc.)*, 105 F.3d 822 (2d Cir. 1997) ....................60

*In re Meridian Securities Litigation*, 772 F. Supp. 223 (E.D. Pa. 1991).....................45, 47

*Michaels Building Co. v. Ameritrust Co., N.A.*, 848 F.2d 674 (6th Cir. 1988).................45

*Miller v. Post Public Co.*, 110 A.2d 265 (Pa. 1920) ....................................................50, 51

*Moffatt Enterprises, Inc. v. Borden Inc.*, 807 F.2d 1169 (3d Cir. 1986) ..........................64

*Naporano Iron & Metal Co. v. America Crane Corp.*, 79 F. Supp. 2d 494 (D.N.J. 2000) .............................................................................................................48

*Odesser v. Continental Bank*, 676 F. Supp. 1305 (E.D. Pa. 1987) ...................................76

*Official Committee of Unsecured Creditors of RSL Com Primecall v. Beckoff (In re RSL Com Primecall)*, No. 01-11457 et al., 2003 WL 22989669 (Bankr. S.D.N.Y. 2003) ...................................................................................................59

*Official Committee of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.)*, 299 B.R. 732 (Bankr. D. Del. 2003) ...............................56, 57, 62

*Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340 (3d Cir. 2001)................................................................................................. passim

*Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380 (3d Cir. 1994).................28

*Pell v. Weinstein*, 759 F. Supp. 1107 (M.D. Pa. 1991) ....................................................66

*In re Phar Mor, Inc. Sec. Litigation*, 892 F. Supp. 676 (W.D. Pa. 1995).........................66

*In re Phar Mor, Inc. Sec. Litigation*, 893 F. Supp. 484 (W.D. Pa. 1995)...................39, 66

*Pierce v. Rossetta Corp.*, No. Civ. A. 88-5873, 1992 WL 165817 (E.D. Pa. June 12, 1992)............................................................................................................54

*Pittston Co. v. Sedgwick James of New York, Inc.*, 971 F. Supp. 915 (D.N.J. 1997) ........40

*Polycast Technology Corp. v. Uniroyal, Inc.*, 728 F. Supp. 926
(S.D.N.Y. 1989) ........................................................................................43, 45, 46

*Pomeranz v. Museum Partners, L.P.*, No. Civ. A. 20211, 2005 WL 217039
(Del.Ch. Jan. 24, 2005) ..................................................................................26

*Production Resources Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772 (Del. Ch.
2004) ................................................................................................................55

*In re Prudential Insurance Co. of America Sales Practice Litigation*, 133 F.3d
225 (3d Cir. 1998).............................................................................................68

*Rempel v. Nationwide Life Insurance Co.*, 370 A.2d 366 (Pa. 1977)...............................64

*Reves v. Ernst & Young*, 507 U.S. 170 (1993)...................................................................72

*Reynolds v. Condon*, 908 F. Supp. 1494 (N.D. Iowa 1995)...............................................74

*Rose v. Bartle*, 871 F.2d 331 (3d Cir. 1989) .................................................................9, 76

*Rosenblum v. Rosenblum*, 181 A. 583 (Pa. 1935)............................................................50

*Ross v. Johns-Manville Corp.*, 766 F.2d 823 (3d Cir. 1985) ...........................................23

*Rothman v. Gregor*, 220 F.3d 81 (2nd Cir. 2000) ...........................................................42

*SEC v. Zandford*, 535 U.S. 813 (2002) .............................................................................68

*S & R Associates, L.P., III v. Shell Oil Co.*, 725 A.2d 431 (Del. Super. Ct. 1998) ..........27

*Sandvick AB v. Advent International Corp.*, 83 F. Supp. 2d 442 (D. Del. 1999) .............45

*Saporito v. Combustion Engineering, Inc.*, 843 F.2d 666 (3d Cir.1988)..........................48

*Saudi Basic Industries Corp. v. Mobil Yanbu Petrochemical Co., Inc.*,
866 A.2d 1 (Del. 2005) ................................................................................6, 24

*Schuylkill Skyport Inn v. Rich*, No. Civ. A. 95-3128, 1996 WL 502280 (E.D. Pa.
Aug. 20, 1996) ................................................................................................54

*Segen v. Comvest Venture Partners, LP*, No. Civ. A. 04-822-JJF, 2005 WL
1320875 (D. Del. June 2, 2005).......................................................................21

*Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786
(3d Cir. 1984)............................................................................................45, 70

*Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2nd Cir. 1991) ....................59

*Skipworth by Williams v. Lead Industrial Association*, 547 A.2d 169 (Pa., 1997) .....53, 54

*Smith v. Berg*, 247 F.3d 532 (3d Cir. 2001) .................................................................76

*Sompo Japan Ins., Inc. v. Deloitte & Touche, L.L.P.*, No. 03 CVS 5547, 2005 WL 1412741 (Super. Ct., Guilford County Business Ct. June 10, 2005) ..........................52

*Spitzer v. Abdelhak*, No. Civ. A. 95-4243 Section "T"(3), 1999 WL 1204352 (E.D. Pa. Dec. 15, 1999) .............................................................................................51

*St. Paul Fire and Marine Insurance Co. v. Birch, Stewart, Kolasch & Birch, LLP*, 233 F. Supp. 2d 171 (D. Mass. 2002) ........................................................................39

*State Farm Mutual Automobile Insurance Co. v. Makris*, No. Civ. A. 01-5351, 2003 WL 924615 (E.D. Pa. Mar. 4, 2003) ...................................................................68

*State of N.C. v. ILA Corp.*, 513 S.E.2d 812 (N.C. Ct. App. 1999)....................................57

*Stephenson v. Capano Development Inc.*, 462 A.2d 1069 (Del. 1983) ............................41

*Stetser v. TAP Pharmaceutical Products, Inc.*, 598 S.E.2d 570 (N.C. Ct. App. 2004) ..........................................................................................................................52

*Stone St. Services v. Daniels*, No. Civ. A. 00-1904, 2000 WL 1909373 (E.D. Pa. Dec. 29, 2000).........................................................................................................54

*In re Student Finance Corp.,* No. Civ. A 03-507-JJF, 2004 WL 609329 (D. Del. Mar. 23, 2004) .........................................................................................................44

*System Operations, Inc. v. Scientific Games Development Corp.*, 555 F.2d 1131 (3d Cir. 1977)............................................................................................................29

*Tabas v. Tabas*, 47 F.3d 1280 (3d Cir. 1995) ...........................................................9, 75

*Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466 (Pa. 1979)...........................8, 50, 51

*Tiernan v. Devoe*, 923 F.2d 1024 (3d Cir. 1991)............................................................53

*Tracinda Corporation v. DaimlerChrysler AG*, 197 F. Supp. 2d 42 (D. Del. 2002)...........9

*Travelers Indemnity Co. v. Lake*, 594 A.2d 38 (Del. 1991)....................................... *passim*

*United Mine Workers v. Gibbs*, 383 U.S. 715 (1966).......................................................29

*United States v. Parise*, 159 F.3d 790 (3d Cir. 1998).......................................9, 71, 72, 73

*United States v. Shifman*, 124 F.3d 31 (1st Cir. 1997) ....................................................73

*United States v. Smith*, 82 F.3d 1261 (3d Cir. 1996) .......................................................76

*University of Maryland v. Peat, Marwick, Main & Co.*, 996 F.2d 1534 (3d Cir. 1993) .........................................................................................................................74

*Vendsouth, Inc. v. Arth*, No. 00-10112C-7G, ADV. 01-2016, 2003 WL 22399581
    (Bankr. M.D.N.C.2003). ...................................................................................52

*Vietnam Veterans of America, Inc. v. Guerdon Industrial, Inc.*, 644 F. Supp. 951
    (D. Del. 1986) .................................................................................................45

*In re Westinghouse Sec. Litigation*, 832 F. Supp. 948 (W.D. Pa. 1993) .........................65

*White Consolidated Industrial, Inc. v. Island Kitchens, Inc.*, 884 F. Supp. 176
    (E.D. Pa. 1995)................................................................................................40

*Wilder v. Williams*, No. Civ. A. 87-1043, 1989 WL 67821 (W.D. Pa. Feb. 7,
    1989) ...............................................................................................................65

*Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey & Associates*, 39
    F. Supp. 2d 517 (M.D. Pa. 1999) ...................................................................65

*Wolf v. Magness Const. Co.,* No. Civ. A. 13004, 1995 WL 571896 (Del. Ch. Sept.
    11, 1995) ......................................................................................................8, 63

*Ziemba v. Cascade International, Inc.*, 256 F.3d 1194 (11th Cir. 2001)..........................42

## FEDERAL STATUTES

11 U.S.C. § 362 ...........................................................................................................60, 61

11 U.S.C. § 362(h) ......................................................................................................60, 61

11 U.S.C. § 541 ..................................................................................................................61

11 U.S.C. § 1109...........................................................................................................60, 61

18 U.S.C. § 1962(c) ....................................................................................................*passim*

Fed. R. Civ. P. 8 ...........................................................................................................20, 22

Fed. R. Civ. P. 8(a) .............................................................................................................22

Fed. R. Civ. P. 9 .......................................................................................................7, 21, 45, 63

Fed. R. Civ. P. 9(b) .....................................................................................................*passim*

Fed. R. Civ. P. 12(b)(6) ...................................................................................20, 21, 22, 80

Private Securities Litigation Reform Act, Pub. L. No. 104-67,
    109 Stat. 737 (1995)......................................................................................*passim*

## STATE STATUTES

42 Pa. Cons. Stat. § 5524 .....................................................................................................6, 28

Del. Code Ann. tit. 10, § 8106 ...................................................................6, 25

Del. Code Ann. tit. 10, § 8121 ...................................................................6, 23

N.C. Gen. Stat. § 1-52(9) ............................................................................25

## MISCELLANEOUS

Restatement (Second) of Conflicts of Laws

    § 6 .......................................................................................................39

    § 145 ...........................................................................................30, 32, 39

    § 146 .....................................................................................................39

    § 148 ............................................................................................. *passim*

    § 188 .....................................................................................................37

Restatement (Second) of Torts

    § 552 ................................................................................................64, 65

    § 876 ............................................................................................. *passim*

Strong's 5 N.C. Index 4th *Conspiracy* § 1 ........................................................49

## STATEMENT OF NATURE AND STAGE OF THE PROCEEDING

Plaintiff Royal Indemnity Company ("Royal") respectfully submits this memorandum of law in opposition to Defendants' motions to dismiss Royal's First Amended Complaint, Docket Item Number ("D.I.") 14 ("Am. Comp."), filed April 12, 2005, in which Royal asserts common law and RICO claims arising out of the Student Finance Corporation ("SFC") fraud.[1]  The Defendants in this action are:  Pepper Hamilton LLP ("Pepper"), the law firm which worked for SFC throughout the period of the fraud; W. Roderick Gagné ("Gagné"), a partner at Pepper; McGladrey & Pullen, LLP ("McGladrey") and Freed Maxick & Battaglia CPAs ("Freed"), the accounting firms that worked for SFC throughout the period of the fraud; and Michael Aquino ("Aquino"), currently a partner at McGladrey and formerly a partner at Freed (collectively, "Defendants").

## PRELIMINARY STATEMENT

In this action, Royal seeks to recover, from some of the principal fraud-feasors[2] in the SFC scheme, the amounts (among other damages) that this Court directed Royal to pay under its credit risk insurance policies—policies that would never have been issued absent the fraudulent conduct of Pepper, Gagné, Freed, McGladrey, and Aquino.  This Court's previous holding in *MBIA v. Royal* that Royal had waived the defense of fraudulent inducement (if affirmed on appeal) means that Royal is obliged to pay the beneficiaries of its credit risk insurance policies, and that the task of seeking recovery from the actual fraud-feasors falls on Royal's shoulders. That is what Royal is doing in this case.

---

[1] On July 11, 2005, this Court "So Ordered" a Stipulation that Royal would file a single memorandum, not to exceed 80 pages, in opposition to the Defendants' motions, by July 29, 2005.

[2] As discussed below, the other principal fraud-feasors (specifically Andrew Yao ("Yao") and numerous SFC-related entities) were joined as third-party defendants and sued for fraud by Royal in *MBIA Ins. Co. v. Royal Indem. Co.*, Civ. A-02-1294 (JJF) (D. Del.) ("*MBIA v. Royal*").  The instant fraud action was brought by Royal when this Court, indicating its preference that Royal file a new, separate action against the Defendants here, denied Royal's motion to amend its third-party complaint adding the Defendants to the *MBIA v. Royal* action.

A brief description of SFC will place this action in the context of the four separate, but highly related proceedings pending before this Court that resulted from the collapse of SFC's fraudulent scheme. As the Court knows, SFC purported to be in the business of originating or purchasing tuition loans made to students enrolled in truck driving schools, bundling the loans into pools, obtaining credit risk insurance (from Royal) and financial guaranties (from MBIA Insurance Corporation ("MBIA")) backing the loans, and then selling the loans. But that did not happen for all of the student loans. Some loans were never pooled, much less securitized and sold in the private securities market. In fact, SFC's business was a guise for a $600 million insurance fraud: SFC misrepresented its operations and the historical and ongoing performance of the loans to obtain the Royal insurance policies. SFC knew that there had been, and would be, massive defaults in the loans because the loans were issued without regard to the creditworthiness or employability of the students. SFC covertly arranged with the schools to make the first few payments on the student loans (to make it appear that the loans were performing) and then SFC secretly used other funds to make additional payments on the student loans (to hide the massive default rates). The scheme was structured so that ultimately investors would look either to MBIA, on its financial guaranty, or to Royal, on its credit risk insurance policies, for payment, and would not themselves suffer any loss, and that MBIA or Royal would be left holding the bag for this massive fraud. At its core, the scheme was an insurance fraud on a massive scale.

Yao and his cohorts at SFC were not able to, and did not, run a $600 million fraud on their own—they had the active and knowing participation of Gagné (and his law firm, Pepper) and Aquino (and his accounting firms, Freed and McGladrey) to guide the fraudulent scheme, and give it an appearance of legitimacy with fraudulent financial statements and legal documents. Royal would never have issued the insurance policies at issue here without audited

financials and other seemingly objective proof that validated what Royal had heard from SFC itself.  SFC and the Defendants consistently and seamlessly re-enforced and confirmed each other's misstatements and omissions to the end.

In response to Royal's allegations, the Defendants pretend that this is a professional negligence case or that they lacked *scienter*.  What none of them ever mention in the motions to dismiss, but what is abundantly clear in the specific averments of Royal's Amended Complaint, is that Defendants all knew since at least 1999—and well before all or nearly all of the Royal insurance policies were issued—that SFC was running a fraud scheme, and that Royal did not know this until SFC came crashing down in 2002.  The Defendants were not duped, like Royal, into believing SFC was something that it was not; the Defendants knew exactly what SFC was up to and became paid participants in the fraud.

What did the Defendants know?

**Aquino, Freed and McGladrey (the "Accountants")** knew since 1998 that, in Aquino's associate's ***own words***, SFC's practice of secretly paying on defaulted student loans and lying about it "distorts the delinquency and default ratios of the [loan] pool."  (Am. Comp. ¶ 98.)  The Accountants represented SFC for nearly four more years after that telling observation and were paid millions in the process.  They even went so far as to adopt and use a misleading cover term that has an actual, but different, meaning in the student loan context—"forbearance payments"— to describe SFC's practice of paying on defaulted loans to cover the defaults.  This was done as part of the Accountants' calculated effort to generate seemingly coherent SFC financials while still concealing the massive explosion in secret payments made to cover loan defaults.

**Pepper and Gagné (the "Lawyers")** knew since at least 1999, when they represented SFC in litigation with one of the truck driving schools in the SFC program, that SFC made secret payments "to buffer against defaults" that were "invisible" to investors (*id.* ¶ 76), that SFC's

historic loan default rate was as high as 70.25% (Royal, as the Lawyers knew, was told the rate was 25% or less) (*id.* ¶¶ 77, 83), and that the truck driving schools themselves, not the students, were making initial student loan payments to make the loans appear to be performing (*id.* ¶ 78). The Lawyers represented SFC for nearly four more years after these revelations and were also paid millions in the process. Gagné, through family loans to SFC, made millions more. And, like the Accountants, the Lawyers too, in ***their own words***, discussed with SFC how SFC's practice of making secret payments to cover loan defaults "looks like SFC is manipulating the pool performance." (*Id.* ¶ 79.) The Lawyers also recognized that "Royal [would] be directly affected" by the secret payments and that disclosing the secret payments to Royal, would be "difficult" (*id.* ¶ 79), because of course, Royal did not know they were occurring.[3] The secret payments were not disclosed to Royal by any of the Defendants, ***ever***, and they were not disclosed by SFC for another two years after the Lawyers made the above internal statements and Royal had issued hundreds of millions of dollars in credit risk insurance policies.

In their motions, Defendants fictionalize Royal's pleadings, excising any reference to the Defendants' knowing participation in the scheme, and run for cover under Pennsylvania law, particularly its statute of limitations, in the vain hope that, by miscasting both Royal's allegations and the elements of Pennsylvania law, Defendants can escape their fraud unscathed. Defendants further argue that Royal cannot bring some of its claims, saying that those claims can only be brought by the Trustee, notwithstanding their blatantly inconsistent assertions in the Trustee's actions that the Trustee could not bring those very claims.

---

[3] Years later Gagné would echo these very words when, after SFC confessed the fraud, Gagné admitted in an internal memo to his fellow Pepper partners both that SFC was "using its own funds to make payments on the student loans so that the student loans would not appear to be in default," and that "[w]e also know that Royal was not aware of this situation, and now faces significant losses as a result of these loans becoming defaulted . . . ." (Am. Comp. ¶ 90.)

Defendants are wrong on all counts. In their rush to apply Pennsylvania law, Defendants ignore that this Court, sitting in Delaware, must apply Delaware's statute of limitations to this action brought by a Delaware resident, like Royal. Delaware's substantive law also applies, because Delaware has the most significant relationship to the matters at issue. And, even beyond that, once Defendants' contortion of Pennsylvania law is parsed, it is clear that Royal's common law claims are viable no matter which state's law applies.

Gagné furthermore attempts to escape Royal's RICO allegations by invoking the Private Securities Litigation Reform Act, Pub. L. No. 104-67, 109 Stat. 737, 758 (1995) ("PSLRA") and its bar to using, as a predicate RICO offense, conduct that would be "actionable as fraud in the purchase or sale of securities." *Id.* But PSLRA does not apply because the predicate acts here are not "actionable" as securities fraud. Gagné and Aquino's other arguments regarding Royal's RICO claim are merely pleading quibbles, both inaccurate and insufficient to warrant dismissal of Royal's RICO claims.

Having been held liable on its insurance policies, Royal is entitled to seek to recover its damages from the persons who actually committed the fraud. Royal took its first step to make that recovery in its third party complaint in *MBIA v. Royal* against Yao and the SFC-related entities. This Court denied the motion to dismiss by those defendants. *MBIA Ins. Corp. v. Royal Indem. Co.,* 221 F.R.D. 419 (D. Del. 2004) *("MBIA III").* In this case, Royal takes another vital step to recover its damages from the other actual fraud-feasors and Yao's co-conspirators. Defendants' motion to dismiss should similarly be denied.

## SUMMARY OF ARGUMENT[4]

**Royal's Common Law Claims**

All of Royal's common law claims are timely, and properly plead valid causes of action.

---

[4] Unpublished opinions referenced below are contained in Royal's Compendium Of Unpublished Cases, filed concurrently herewith.

**Royal's Common Law Claims Are Timely**

1.      In an attempt to argue that Royal's common law claims are time-barred, Defendants argue that Royal's claims should be subject to Pennsylvania's statute of limitations, 42 PA. CONS. STAT. § 5524 (2005) (two years from discovery of defendants' participation in a fraud) rather than Delaware's statute of limitations, DEL. CODE ANN. tit. 10, § 8106 (2005) (three years from such discovery).  Defendants' argument is without basis:  As a federal court exercising supplemental jurisdiction, this Court applies the statute of limitations of the forum state, Delaware.  *David B. Lilly Co. v. Fisher,* 18 F.3d 1112, 1117 (3d Cir. 1994);  *Cavalier Clothes, Inc. v. Major Coat Co.*, No. Civ. A. 89-3325, 1991 WL 125179, at *3 (E.D. Pa. Jun. 26, 1991).  While Delaware has a "borrowing statute," DEL. CODE ANN. tit. 10, § 8121 (2005)— which, where applicable, makes claims in Delaware courts subject to the same statute of limitations that is applicable to the questions of substantive law—that statute expressly does not apply to claims of a Delaware resident (such as Royal, which is a Delaware corporation) brought in a Delaware court.  *Saudi Basic Indus. Corp. v. Mobil Yanbu Petrochemical Co.,* 866 A.2d 1, 30 (Del. 2005).  Royal's claims—brought within three years of the discovery of the fraud (and, indeed, within one year of learning of Defendants' participation in the fraud)—are timely under Delaware's three-year statute of limitations.

2.      Royal's claims would also be timely even under Pennsylvania's two-year limitations period, because it did not learn of Defendants' role in the fraud until late 2004, less than a year before filing this action.  *Bhatla v. Resort Dev. Corp.*, 720 F. Supp. 501, 512 (W.D. Pa. 1989).

**Royal's Common Law Claims State Valid
Causes of Action**

3.      Royal's common law claims also state valid causes of action.  Those claims are governed by Delaware law (considered by itself, or with the law of North Carolina) because Delaware and North Carolina overwhelmingly have the "most significant relationship to the occurrence and the parties."  *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 43-48 (Del. 1991). There are no significant differences in the law applicable in this case between Delaware and North Carolina.

4.      Royal has more than met all pleading requirements under Delaware (and North Carolina) law.  On its central claim of fraud, Royal has properly pled:  (1) a false representation; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or refrain from acting; (4) an act taken by plaintiff in justifiable reliance upon the false representation; and (5) resulting damage.  *Lord v. Souder*, 748 A.2d 393, 402 (Del. 2000); *Fender v. Deaton*, 571 S.E.2d 1, 3 (N.C. Ct. App. 2002).  Royal has also pled fraud with the particularity required by FED. R. CIV. P. 9—as this Court has already found in reviewing the adequacy of Royal's pleading of fraud against defendants in related cases.  *MBIA III*, 221 F.R.D. at 421.

5.      Royal's conspiracy count also properly pleads all of the required elements under Delaware and North Carolina law:  (1) a combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage.  *See, e.g.*, *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus.*, 871 A.2d 428, 437 (Del. 2005); *DiFrega v. Pugliese*, 596 S.E.2d 456, 461 (N.C. Ct. App. 2004).  Even if the additional requirement for pleading conspiracy under Pennsylvania law were to apply—a claim of "malice"—it is met here.  *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979).

6.      Royal has similarly adequately pled all of its other common law claims:  Aiding and abetting fraud and aiding and abetting breach of fiduciary duty, RESTATEMENT (SECOND) OF TORTS, § 876(b) (1979),  *Anderson v. Airco, Inc.*, No. 02C-12-091-HDR, 2004 WL 1551484, at *8 (Del. Super. Ct. June 30, 2004), *Blow v. Shaughnessy*, 364 S.E.2d 444, 447-48 (N.C. Ct. App. 1988); deepening insolvency, *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 350-52 (3d Cir. 2001); and negligence and negligent misrepresentation, *Wolf v. Magness Const. Co.*, No. Civ. A. 13004, 1995 WL 571896, at *2 (Del. Ch. Sept. 11, 1995); *Hunter v. Guardian Life Ins. Co. of Am.*, 593 S.E.2d 595, 600 (N.C. App. Ct. 2004).

7.      Pepper's argument that Royal cannot sue Pepper for "deepening insolvency" because "those damages are recoverable only by SFC's bankruptcy estate, not by individual creditors of SFC such as Royal" (Pepper Br., D.I. 36, at 16) is particularly disingenuous, because Pepper argued, in opposition to the Trustee's claim of "deepening insolvency" (and other claims) that "the Trustee has no standing" to bring such claims, which should instead be brought by Royal.[5]

**Royal's RICO Claims**

8.      Royal has pled, as the predicate acts for its RICO claims, insurance fraud committed through wire fraud and mail fraud.  Gagné argues that that conduct cannot qualify as RICO  predicate acts, because the PSLRA prohibits using conduct "actionable" as a violation of the federal securities laws as RICO predicate acts.  (Gagné Br., D.I. 34, at 8-14.)  However, the predicate acts pled by Royal are not "***actionable*** as fraud in the purchase or sale of securities" because in some SFC transactions—such as the transactions with Wilmington Trust of Pennsylvania ("Wilmington Trust") and PNC Bank ("PNC"), which extended warehouse loans

---

[5] Brief In Support of Motion of Pepper Hamilton LLP et ano. for the Dismissal of Counts, etc. (Dec. 22, 2004), *Trustee v. Pepper,* 04-1551 (JJF), D.I. 20, (D. Del.) at 13-14.

to SFC—there were no securities sold at all.  Thus, as a clear matter of law, there could not have

been, and was not, securities fraud.  Moreover, in those SFC transactions in which securities

were sold, the fraud perpetrated on Royal was insurance fraud, wholly separate and distinct from

the later offering of securities; and in all events, none of the conduct was "actionable" as

securities fraud because the purchasers of securities, who are guaranteed payment under MBIA's

financial guaranty, sustained no injury, a necessary element for a claim to be "actionable" as

securities fraud.  *Bald Eagle Area School Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 329-30 (3d

Cir. 1999).

9.      Royal has met the other pleading requirements of its RICO claims, including:  a

RICO enterprise, *Jaguar Cars, Inc v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 266 (3d Cir.

1995); Gagné and Aquino's participation in the "operation and management" of that enterprise,

*United States v. Parise,* 159 F.3d 790, 796-97 (3d Cir. 1998); a pattern of racketeering activity,

*Tabas v. Tabas,* 47 F.3d 1280, 1294 (3d Cir. 1995); and a RICO conspiracy, *Rose v. Bartle*, 871

F.2d 331, 366 (3d Cir. 1989).

## STATEMENT OF FACTS[6]

**SFC And The Student Loan Fraud**

As this Court is well aware, SFC was ostensibly in the business of originating or

purchasing tuition loans made to students enrolled in truck driving schools.  *MBIA v. Royal,* 286

F. Supp. 2d 347, 348-49 (D. Del. 2003) ("*MBIA I*").  (Am. Comp. ¶ 1.)  SFC's principal place of

business was in New Castle, Delaware.  (*Id.* ¶ 18.)  SFC financed its origination and purchase of

student loans with so-called "warehouse loans" from Wilmington Trust and PNC, and obtained

---

[6] McGladrey includes references to allegations made by parties other than Royal in other actions, and documents cited by parties other than Royal in other actions.  (*See*, *e.g.*,  McGladrey Br., D.I. 31, at 18-19.)  This offering of other parties' allegations, and other parties' evidence, is improper on a motion to dismiss, on which the Court should consider only the allegations of the Amended Complaint in this action and documents relied on by Royal therein.  *See Tracinda Corporation v. DaimlerChrysler AG,* 197 F. Supp. 2d 42, 57 (D. Del. 2002) (Farnan, J.).

credit risk insurance policies from Royal for the benefit of Wilmington Trust and PNC, insuring the payment of those loans. (*Id.* ¶ 37.) SFC then pooled most of the student loans and transferred them to trusts, which in turn "issued trust certificates or floating-rate notes to investors, which entitled the investors to income streams from the underlying loans." *MBIA I*, 286 F. Supp. 2d at 348-49. (Am. Comp. ¶¶ 2-3, 37.) The underlying payment obligations were secured by credit risk insurance policies issued by Royal. *MBIA I*, 286 F. Supp. 2d at 349. (Am. Comp. ¶¶ 1, 36.) MBIA also issued financial guaranty insurance policies that "guarantee[d] the Trust's payment obligations on the [trust certificates]." *MBIA I*, 286 F. Supp. 2d at 349. These bundled, secured, and guaranteed loan pools were then sold as asset-backed securities in the private securities market. *See, e.g., MBIA I.* (Am. Comp. ¶¶ 18, 23, 37.) Numerous student loans, however, never were pooled or securitized, thus leaving the so-called warehouse lenders (Wilmington Trust and PNC) at risk on those non-performing loans and looking to Royal for payment. *See, e.g., MBIA v. Royal,* 312 F. Supp. 2d 583 (D. Del. 2004) ("*MBIA II*").

SFC engaged in a massive insurance fraud, orchestrated and operated by Yao and the Defendants here, among others. *MBIA I*, 286 F. Supp. 2d at 350-51. (Am. Comp. ¶¶ 13-21, 51, 141-42.) To dupe Royal into issuing the policies, SFC and the Defendants lied for years. (Am. Comp. *passim*.) While the misrepresentations and omissions were myriad, there were three key areas of deceit that fueled the fraud, and about which the Defendants were aware:

> ■ ***At the outset of each student loan, SFC engaged in fraud, with Defendants' knowledge, by having the truck driving schools instead make the first two or three payments on the loans issued to their students.*** Through these "seasoning" payments, SFC made it appear that each student had diligently made the first two or three payments on his loan when, in fact, the student had made no payments at

all.  Royal was never told of this practice by SFC or Defendants.  (Am. Comp. ¶¶ 30-67.)

▪ ***After the issuance of the student loans, SFC masked the actual student loan default rates by itself secretly making payments on otherwise defaulted student loans and then, with the Defendants, lying about it.***  *MBIA I*, 286 F. Supp. 2d at 350-51.  (Am. Comp. ¶¶ 38-44.)  These payments were never disclosed to Royal—SFC and the Defendants kept them secret.  *MBIA I*, 286 F. Supp. 2d at 350.  (Am. Comp. ¶¶ 68-71.)  Internally, SFC referred to these secret payments as "ghost payments."  (Am. Comp. ¶ 38.)  SFC and the Defendants also referred to these payments by the code word "forbearance payments," to make the payments seem like they were legitimate student loan payments, *i.e.*, made by actual students, when they were not.  *MBIA I*, 286 F. Supp. 2d at 350.  (*See, e.g.*, Am. Comp. ¶¶ 54-56, 68.)  By never disclosing the "ghost payments," and by computing default rates as though the "ghost payments" were *bona fide* payments made by students, SFC and the Defendants consistently misrepresented to Royal that the actual defaults on the SFC student loans would not exceed, and historically had not exceeded, 25%.  (*See, e.g.*, Am. Comp. ¶ 57.)  In fact, as SFC and the Defendants knew, the defaults were not only historically, but also expected to be, orders of magnitude higher than 25%.  *MBIA I*, 286 F. Supp. 2d at 350-51.  (*See, e.g.,* Am. Comp. ¶¶ 29, 57, 69, 77.)

▪ ***The reason for the massive defaults was because SFC, in conjunction with the truck driving schools, was issuing wholly fraudulent loans to students who had no hope of ever paying on the loans.***  *MBIA I*, 286 F. Supp. 2d at 351.  (Am. Comp. ¶ 34.)

- 11 -

From 1999 until 2002, Royal issued insurance policies on approximately $600 million worth of SFC loans.  (*Id.* ¶¶ 48-51.)  The Defendants all were full participants in the loan fraud and worked with SFC to ensure that Royal issued, and kept issuing, policies.  (*Id.* ¶¶ 72-134.)

**The Lawyers' Knowledge Of And Central Role
In The Conduct Of The Fraud Scheme**

Pepper partner Gagné had represented Yao for approximately eleven years before Gagné and Pepper began representing SFC.  (Am. Comp. ¶ 72.)  The Lawyers functioned essentially as in-house counsel for SFC, providing legal services and the documentation necessary for SFC's loan sale transactions for the duration of time that Royal was issuing policies.  (*Id.*)

Since at least 1999, before Royal issued all but the first policy relating to SFC, the Lawyers knew of both SFC's conspiracy with the truck driving schools to make the first two or three payments of a student's loan and SFC's secret practice of making ghost payments to conceal student defaults.  (*Id.* ¶¶ 75-78.)  In 1999, Pepper represented SFC in litigation in this Court with one of the truck driving schools.  *Nielsen Elec. Inst. v. Student Finance Corp.*, 99-285-JJF (D. Del.) (filed May 6, 1999).  Documents produced by Pepper, as SFC's counsel, in the *Nielsen* litigation revealed historical default rates for SFC loans as high as 70%, while Royal was being told simultaneously by SFC that historical default rates were below 25%.  (*Id.* ¶¶ 77.)

Simultaneous with the *Nielsen* litigation, the Lawyers directly discussed the nature of SFC's deception of Royal with SFC.  (*Id.* ¶ 79.)  In March, 2000, again before the majority of the Royal insurance policies were issued, Pepper partner Gagné discussed with Yao in an email how SFC's practice of making, but not disclosing, ghost payments "looks like SFC is manipulating pool performance."  (*Id.*)  In that same email, Gagné acknowledged that Royal was specifically affected by the ghost payments and that discussing SFC's practice of making secret ghost payments with Royal, with the concatenate revelation that the loan default rates were not as

represented, "[would] be difficult," because, of course, Royal did not know that they were

occurring.  (*Id.* ¶ 79.)  Gagné went on to note that he would be meeting with Royal personally.

(*Id.*)  SFC and Gagné decided that the ghost payments should not be disclosed, and SFC and

Pepper continued to hide the practice from Royal for two more years.  (*Id.* ¶¶ 68-71.)

Despite the Lawyers' knowledge of the fraudulent scheme, they continued providing

legal services and advice to SFC, including issuing knowingly false and misleading legal

documents, and knowingly facilitating and participating in the scheme, through May 2002.  (*Id.* ¶

89.)  The Lawyers received approximately $3.2 million in fees from SFC over the course of the

representation.  (*Id.* ¶ 72.)  Additionally, from 1996 until 2002, Gagné's family made some $37

million in loans to SFC, upon which it was paid some $6 million in interest and fees—which

gave Gagné a stake in keeping the fraudulent scheme alive, and which made it impossible for

Gagné (or Pepper) to give disinterested legal advice (had they wanted to).  (*Id.* ¶¶ 86-87.)

Aquino (but not Royal) was aware of the arrangements between Gagné's family and SFC and

provided advice to both Gagné's family and SFC on how to book these transactions.  (*Id.* ¶ 86.)

### The False And Misleading PPMs

One of the key, but by no means only, facets of the Lawyers' representation of SFC was

the drafting and issuance of PPMs.  (Am. Comp. ¶ 81.)  The PPMs were generated to describe

the SFC loan pools to potential investors, and, more importantly, to ensure that the lies told by

SFC to Royal were properly re-enforced and validated by SFC's external legal documents.  (*Id.*)

A total of eight PPMs were issued and each one, along with many other related documents, was

emailed in draft and final form by Pepper to Royal in North Carolina.  (*Id.* ¶¶ 82-84.)  Pepper

knew that Royal was reviewing and relying on the content of the PPMs.  (*Id.* ¶ 84.)  Indeed, the

first PPM was generated and emailed to Royal nearly simultaneously with Gagné's

correspondence with Yao about SFC's secret ghost payments and how discussing their impact on

Royal would be "difficult." (*Id.* ¶ 82.) While the Lawyers were aware of both the secret seasoning payments and the secret ghost payments, the PPMs, in draft or in final form, do not disclose either practice or the "manipulative" effect those practices had on the default profile of the SFC loans. (*Id.* ¶¶ 82-83.) The PPMs also included other material omissions and misrepresentations, including failing to provide true and accurate historical loan performance information and claiming loan performance was impossible to predict, even though the Lawyers and SFC knew that historical default patterns were reliably above 50%, and as high as 70%, at that time. (*Id.* ¶ 83.)

**The Accountants' Knowledge Of And Central
Role In The Conduct Of The Fraud Scheme**

Just as Gagné had represented Yao before the SFC fraud took shape, Aquino had represented Yao and SFC since before Royal issued its first policy relating to SFC. (Am. Comp. ¶ 95.) Aquino was SFC's outside auditor and accountant continuously from 1998 through 2002, during which time Aquino worked for BDO Seidman (1998-1999), Freed (1999-2000) and McGladrey (2000-present). (*Id.* ¶ 95.)

In May 1998, nearly a year before Royal issued its first policy relating to SFC, Aquino's associate, Jeff Westad, discovered that SFC was making secret ghost payments and that such payments were not being disclosed in monthly servicer reports (MSRs) provided by SFC to investors. (*Id.* ¶¶ 97-98.) Westad noted that SFC's practice of itself secretly paying on defaulted loans "*distort[ed] the delinquency and default ratios of the [loan] pool*." (*Id.* ¶ 98.) These are the same secret payments Gagné described as "*look[ing] like SFC is manipulating pool performance*." (*Id.* ¶ 79.) Thus, before Royal issued its first policy, the Accountants knew of, and decided to join in, SFC's scheme to defraud Royal. (*Id.* ¶¶ 97-103.) They did so by, among other ways, issuing at least three sets of false and misleading financial reports.

- 14 -

**The False And Misleading 2000 Audit
Report**

On July 26, 2000, while Aquino was at Freed, Freed issued its 2000 Independent

Auditor's Report, providing Freed's opinion of SFC's 1998 and 1999 financial statements

("2000 Audit Report").  Aquino supervised the creation of the 2000 Audit Report.  (*Id.* ¶ 104.)

While the 2000 Audit Report claimed to be prepared in conformity with Generally Accepted

Accounting Standards ("GAAS") and also opined that the financial statements fairly expressed

SFC's financial position, those statements were false.  (*Id.* ¶¶ 106-07.)  As Aquino had

discovered at least two years prior, the secret ghost payments materially distorted "the

delinquency and default ratios of the [loan] pool[s]," yet the secret ghost payments were neither

mentioned, disclosed, nor otherwise addressed in the 2000 Audit Report.  (*Id.* ¶ 107.)  Royal

received the 2000 Audit Report in its offices in North Carolina and relied on the information

contained therein in continuing to issue the insurance policies.  (*Id.* ¶ 108.)  Royal issued some

$132 million of insurance policies subsequent to the 2000 Audit Report and prior to the 2001

Audit Report.  (*Id.* ¶ 104.)

**The False And Misleading 2001 Audit
Report**

On April 6, 2001, McGladrey (where Aquino then worked) issued the Independent

Auditor's Report on Consolidated Financial Statements for the year ended December 31, 2000

("2001 Audit Report"), that provided McGladrey's opinion of SFC's 2000 financial statements

and re-enforced, and was consistent in all respects with, the misrepresentations and omissions

made in Pepper's PPMs and in the 2000 Audit Report.  (*Id.* ¶ 109.)  As he did with the 2000

Audit Report, Aquino supervised the creation of the 2001 Audit Report.  And, as Freed did in the

2000 Audit Report, McGladrey knowingly lied when it stated that the 2001 Audit Report was

prepared in accordance with GAAS; McGladrey also knowingly lied when it claimed that, in its

opinion, the financial statements fairly expressed SFC's financial position. (*Id.* ¶ 111.) By the time that the 2001 Audit Report was issued, Aquino had known for at least three years that the secret ghost payments materially distorted "the delinquency and default ratios of the [loan] pool[s]." (*Id.*) The practice of making the secret ghost payments and the secret ghost payments themselves were not disclosed in the 2001 Audit Report. (*Id.* ¶ 111.)

The 2001 Audit Report was materially misleading in several respects. In the allowance for credit losses section of the report, the 2001 Audit Report reflected that McGladrey allowed SFC to post a number for credit losses on future loan pools—that is, an amount sufficient to cover anticipated defaults—of only 10%. (*Id.* ¶¶ 112-13.) Aquino and McGladrey knew that this was false: In order to fairly express SFC's financial position, the percentage of "anticipated defaults" had to be computed before taking into account the "seasoning payments" and "ghost payments"—and thus would have been 50% or more—not 10%. (*Id.* ¶¶ 113-15.)

While the 2001 Audit Report did not disclose the secret ghost payments, it did use the term "forbearance payments" without stating what was meant by that term. (*Id.* ¶¶ 116-17, 119.) The term "forbearance payments" does have a legitimate meaning in the student loan context: *i.e.*, a reduced **payment made by a student** while his loan is subject to a "forbearance agreement," *i.e.*, an agreed-upon temporary reduction in the payment schedule. (*Id.* ¶ 118.) But the 2001 Audit Report misused the term instead, without explanation, to refer to what SFC called internally "ghost payments"—SFC's secret practice of **SFC making payments** on student loans to keep them from being reported as defaulted. (*Id.*) SFC's secret ghost payments were not "forbearance payments," since the payments were not made by the borrower pursuant to a "forbearance agreement" or otherwise. (*Id.*)

Royal received the 2001 Audit Report in its offices in North Carolina and relied on the information contained therein, continuing to issue insurance policies relating to SFC. (*Id.* ¶ 129.) Royal issued $400 million of policies subsequent to the 2001 Audit Report. (*Id.* ¶ 109.)

### The False And Misleading 2001 Accountant's Report

McGladrey also issued an Independent Accountant's Report on Agreed-Upon Procedures ("2001 Accountant's Report") verifying certain financial reporting in the MSRs issued to Royal, among others. (*Id.* ¶¶ 128-29.) McGladrey stated that the 2001 Accountant's Report was issued pursuant to American Institute of Certified Public Accountant ("AICPA") standards, knowing that that statement was false, because the MSRs did not disclose the secret ghost payments or their distorting effect on reported default rates. (*Id.*) Royal received the 2001 Accountant's Report at its offices in North Carolina and relied on the report in continuing to issue the insurance policies. (*Id.*)

### SFC's Fraudulent Scheme Is Revealed And SFC Is Forced Into Bankruptcy

On or about March 20, 2002, Yao admitted to Royal for the first time that SFC had been making the secret ghost payments and that a large number of student loans would immediately default if the ghost payments ceased. *MBIA I*, 286 F. Supp. 2d at 350-51. (Am. Comp. ¶ 68.) Royal did not know of SFC's practice of making the secret ghost payments before Yao's confession. (*Id.* ¶ 68-69.) A month later, Royal learned that, between January 2001 and March 2002 alone, SFC had made some $50 million in ghost payments on student loans that were covered by insurance policies issued by Royal. (*Id.* ¶ 70.) SFC was ultimately forced into bankruptcy on June 5, 2002. *See MBIA I*, 286 F. Supp. 2d at 350. (Am. Comp. ¶ 18.)

On April 18, 2002, three weeks after Yao's revelations to Royal, Gagné issued a memo to his partners in which he recommended withdrawing as SFC's counsel, acknowledged that Royal

knew nothing of the fraud scheme, and acknowledged that Pepper could be sued for its role in the scheme. (*Id.* ¶ 90.) Nevertheless, Pepper continued as SFC's counsel until it had ensured the return of assets to Gagné's family, work for which Pepper billed SFC. (*Id.* ¶¶ 92-94.) McGladrey, too, ceased representing SFC at this time. (*Id.* ¶ 16.) Royal did not discover the Defendants' role in the SFC fraud until the fall of 2004. (*Id.* ¶ 71.)

## RELATED PROCEEDINGS

**Related Proceedings In This Court And The Bankruptcy Court**

When the SFC fraud scheme collapsed, the following litigation ensued:

- *In re Student Finance Corporation, Debtor*, No. 02-11620-WS (Bkrpty D. Del.) ("*In re SFC*"). On June 5, 2002, an involuntary petition in bankruptcy was filed against SFC before the Bankruptcy Court in this District. The bankruptcy proceedings remain pending in this District, where SFC had operated its principal place of business at 170 Lukens Drive, New Castle, Delaware 19720.

- *MBIA Insurance Corporation and Wells Fargo Bank Minnesota, N.A., etc. v. Royal Indemnity Company v. PNC Bank, N.A.*, Civ. A-02-1294-JJF (D. Del.) ("*MBIA v. Royal*"). MBIA, which has acknowledged it is obligated to pay investors on the MBIA financial guaranty, and Wells Fargo Bank Minnesota, N.A. ("Wells Fargo"), as Trustee under trusts established in the securitizations, sued Royal on its credit risk insurance policies. Royal sued PNC Bank, N.A. ("PNC"), which had extended a "warehouse loan" to SFC—used to fund student loans which were then "warehoused" until SFC assembled them in pools for sale to ultimate investors—to declare the Royal insurance policy related thereto void, and PNC counterclaimed to enforce the insurance policy.

- ▪ *Wilmington Trust of Pennsylvania v. Royal Indemnity Company,* Civ. A-02-1361-JJF (D. Del.) ("*Wilmington Trust v. Royal*").  Wilmington Trust, which had extended a "warehouse loan" to SFC similar to that of PNC, sued Royal on its Royal insurance policy.

- ▪ *Stanziale, as Trustee  v. Pepper Hamilton et al.*, 04-1551 (JJF) (D. Del.) ("*Trustee v. Pepper*") and *Stanziale, as Trustee  v. McGladrey & Pullen, LLP et al.*, 05-72 (JJF) (D. Del.) ("*Trustee v. McGladrey*").  The SFC bankruptcy trustee, Charles Stanziale ("Trustee") sued Pepper, Gagné, Gagné's family members and trusts with which he was affiliated, McGladrey, and Aquino in two separate actions in the Bankruptcy Court, which actions were transferred to this Court.

- ▪ In *MBIA v. Royal* and *Wilmington Trust v. Royal,* Royal filed third party complaints against Yao and various entities related to SFC.

- ▪ In *MBIA v. Royal*, Royal filed a counterclaim against Wells Fargo for breach of contract.

**Decisions In Related Proceedings**

This Court has issued the following decisions (among others) in the related proceedings:

- ▪ On October 8, 2003, this Court granted MBIA and Wells Fargo's motions for summary judgment in *MBIA v. Royal*, holding that the Royal credit risk insurance policies were guaranties under Delaware law, and that Royal had waived the defense of fraud in the inducement.  *MBIA I,*  286 F. Supp. 2d 347.

- ▪ On March 26, 2004, this Court granted PNC and Wilmington Trust's motions for summary judgment in *MBIA v. Royal* and *Wilmington Trust v. Royal,* similarly holding that Royal had waived defenses of fraud in the inducement.  *MBIA II,* 312 F. Supp. 2d 583.

- On April 6, 2004, this Court denied FED. R. CIV. P. 12(b)(6) motions by the SFC-related entities to dismiss Royal's third party complaints in *MBIA v. Royal* and in *Wilmington Trust v. Royal,* holding that Royal's pleading—asserting claims comparable to those made in this action—met the requirements of FED. R. CIV. P. 8 and 9(b).  *MBIA III,* 221 F.R.D. 419.

**Status Of Related Proceedings**

On October 27, 2003, this Court entered judgment against Royal in favor of Wells Fargo for $269,851,527.  On April 28, 2004, this Court entered judgment against Royal in favor of PNC for $110,449,275.  On August 6, 2004, this Court entered judgment against Royal in favor of Wilmington Trust for $12,908,966.43.  Each judgment further directed Royal to pay additional claims under the policies as they become due.  With the additional claims since made, interest and other charges, the aggregate judgments exceed $500 million.

Royal's appeals from the judgments were argued before the United States Court of Appeals for the Third Circuit on January 19, 2005.  Royal subsequently settled with PNC.  The other appeals remain *sub judice.  MBIA v. Royal,* Civ. A. No. 04-2206 (3d Cir.); *Wilmington Trust v. Royal,* Civ. A. No. 04-2207 (3d Cir.).

Royal's third party action against Yao and the SFC-related entities remains pending in this Court, as does Royal's counterclaim against Wells Fargo and the Trustee's actions against Pepper, Gagné, Freed, McGladrey, and Aquino (the Defendants here) and Gagné's family and related trusts.  As noted above, this Court has denied a motion to dismiss Royal's third party action against Yao and the SFC-related entities.  *MBIA III,* 221 F.R.D. 419.  There are fully briefed motions to dismiss pending in the Trustee's actions.  Wells Fargo has filed a motion to dismiss Royal's counterclaim.  On June 13, 2005, this Court issued Orders consolidating the

actions for discovery (reserving whether the actions would be consolidated for additional

purposes).  Written discovery is set to begin on September 7, 2005.

## STANDARDS OF REVIEW

Throughout their motions to dismiss, Defendants repeatedly argue that Royal failed to

plead sufficient facts and failed to establish certain elements of its claim.  These arguments

fundamentally misunderstand the burdens imposed by federal pleading requirements—an issue

directly addressed by this Court in *MBIA III* when it rejected virtually identical arguments made

by the SFC-related entities on their motions to dismiss Royal's third party complaint.  This Court

held:

STANDARDS OF REVIEW

I. Rule 12(b)(6)

A motion to dismiss tests the legal sufficiency of the complaint.  *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).  In reviewing a motion to dismiss pursuant to Rule 12(b)(6), courts "must accept as true the factual allegations in the [c]omplaint and all reasonable inferences that can be drawn therefrom." *Langford v. City of Atlantic City*, 235 F.3d 845, 847 (3d Cir. 2000).  A court will grant a motion to dismiss only when it appears that a plaintiff could prove no set of facts that would entitle him or her to relief.  *Id.*

II. Rule 9(b)

Rule 9(b) requires a party alleging fraud or mistake to plead with particularity the circumstances constituting his or her claims.  Fed. R. Civ. P. 9(b).  The intent behind Rule 9(b) is to give defendants notice of the claims against them and to reduce the number of frivolous actions.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997).  Accordingly, Rule 9(b) does not require the "exhaustive cataloging of facts but only sufficient factual specificity to provide assurance that plaintiff has investigated ... the alleged fraud and reasonably believes that a wrong has occurred.' "*Levine v. Metal Recovery Tech., Inc.*, 182 F.R.D. 112, 116 (D. Del. 1998) (quoting *In re ML-Lee Acquisition Fund II, L.P. and ML-Lee Acquisition Fund (Retirement Accounts) II, L.P. Sec. Litig.*, 848 F. Supp. 527, 555 (D. Del. 1994)).

*MBIA III,* 221 F.R.D. at 420-21.

This Court's statement of the standard of review in *MBIA III* is, of course, consistent with (and required by) the well-settled notice pleading principles that underlie Rule 8 of the Federal Rules of Civil Procedure. FED. R. CIV. P. 8(a); *Segen v. Comvest Venture Partners, LP,* No. Civ. A. 04-822-JJF, 2005 WL 1320875, at *4 (D. Del. June 2, 2005) (Farnan, J.). Moreover, "[t]he question of reasonable reliance and the corollary question of plaintiffs' diligence in investigating facts available to them are matters of fact not generally appropriate for treatment under Rule 12(b)(6)." *CF Indus. v. Transcontinental Gas Pipe Line Corp.,* 448 F. Supp. 475, 483 (W.D.N.C. 1978). "The reasonableness of [a plaintiff's] belief is an issue of fact which cannot be weighed on defendant's 12(b)(6) motion." *Ellipsis, Inc. v. Colorworks, Inc.,* 329 F. Supp. 2d 962, 968 (W.D. Tenn. 2004). These same standards of review apply here.

In this action, Royal pleads claims against each of the Defendants—Pepper, Gagné, Freed, McGladrey, and Aquino—with detail at least as great as was pleaded against the SFC-related entities, which this Court found sufficient in denying those defendants' motions to dismiss.

## ARGUMENT

## DEFENDANTS' MOTIONS TO DISMISS SHOULD BE DENIED

### I. ROYAL'S COMMON LAW CLAIMS ARE TIMELY, AND PROPERLY PLEAD VALID CAUSES OF ACTION

All of Royal's common law claims are timely, and properly plead valid causes of action, whether those claims are evaluated under the laws of Delaware (or Delaware considered together with North Carolina), as they should be, or under the law of Pennsylvania (as Defendants argue, in the unfounded hope that a different statute of limitations and certain peculiar requirements of Pennsylvania law will give them a means to escape responsibility for their unlawful conduct).

While the laws of Delaware and North Carolina are the same on both the statute of limitations (three years from discovery of defendants' fraudulent conduct) and applicable substantive law, the law of Pennsylvania is, in certain instances, different *(e.g.*, the statute of limitations is two years from such discovery).  Different rules apply to choice of law on the statute of limitations and choice of law on substantive claims, but these rules all lead to the conclusion that Delaware law, or Delaware law considered together with North Carolina law, applies.

**A.    Royal's Common Law Claims Are Subject To**
**The Statute Of Limitations Of Delaware**

Because statutes of limitations are generally considered procedural rather than substantive law, *Kalmich v. Bruno,* 553 F.2d 549, 553 (7th Cir. 1977), *cert. denied,* 434 U.S. 940 (1977), a federal court will apply the statute of limitations of the forum state, whether sitting in diversity, *Guaranty Trust Co. of New York v. York,* 326 U.S. 99 (1945), *David B. Lilly Co. v. Fisher,* 18 F.3d 1112, 1117 (3d Cir. 1994) ("*Lilly Co.*"), *Ross v. Johns-Manville Corp.,* 766 F.2d 823, 826 (3d Cir. 1985), *American Energy Tech., Inc. v. Colley & McCoy Co.*, No. 98-398 MMS, 1999 WL 301648, at *2 (D. Del. April 15, 1999), or exercising supplemental jurisdiction, *see Cavalier Clothes, Inc. v. Major Coat Co.*, No. 89-3325, 1991 WL 125179, at *3 (E.D. Pa. June 26, 1991).

This Court thus must apply the law of Delaware to statute of limitations issues. However, as part of applying the law of Delaware, this Court is obliged to consider whether Delaware's borrowing statute also applies.  DEL. CODE ANN. tit. 10, § 8121 2005;  *David B. Lilly Co. v. Fisher,* 18 F.3d at 1117; *American Energy Technologies, Inc. v. Colley & McCoy Co.,* No. 98-398 MMS, 1999 WL 301648, at *2 (D. Del. 1999).  Delaware's borrowing statute provides:

- 23 -

> Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action.  ***Where the cause of action originally accrued in favor of a person who at the time of such accrual was a resident of this State, the time limited by the law of this State shall apply.***

DEL. CODE ANN. tit. 10, § 8121 (2005).  (emphasis added).

Thus the second sentence expressly limits the application of the borrowing statute:  If an action is brought by a resident of Delaware in the courts (federal or state) of Delaware, the statute of limitations of Delaware applies, even if that is a longer statute of limitations than the place where the cause of action "arose."  As the Supreme Court of Delaware held earlier this year in *Saudi Basic Indus. Corp. v. Mobil Yanbu Petrochemical Co.,* 866 A.2d 1 (Del. 2005):

> Our [borrowing] statute does not apply to a resident of this State suing on a foreign cause of action provided he was a resident when the cause of action arose. As to such a resident the common law rule that the lex fori [i.e., the law of the forum, Delaware] governs the matter of limitations of actions is left in full force.

866 A.2d at 17.  *See also David B. Lilly Co. v. Fisher,* 18 F.3d at 1117.

The second sentence of § 8121 controls here, because Royal, which is incorporated in Delaware, is a "resident of this State" for purposes of the borrowing statute.  *Lilly Co.,* 18 F.3d at 1117 ("Because the Lilly Co. was a Delaware resident during the relevant time period," the statute of limitations of Delaware applied to legal malpractice claim against New York law firm.); *F.D.I.C. v. Brossman*, No. 81C-DE-116, 1984 WL 553542, at *1-2 (Del. Super. Ct. June 12, 1984) (finding bank to be Delaware "resident"); *Hill v. Equitable Trust Co.,* 562 F. Supp. 1324, 1333 n. 15 (D. Del. 1983); *D'Angelo v. Petroleos Mexicanos*, 398 F. Supp. 72, 79 (D. Del. 1975) (Delaware corporation entitled to benefit of § 8121).  Thus, under § 8121, the statute of

limitations of Delaware applies—regardless of where the cause of action "arose."[7]  That, alone, should end the inquiry.

But, even if the first sentence of § 8121 applied—which it clearly does not—it would still yield the conclusion that Delaware law governs the statute of limitations.  Under the first sentence of the borrowing statute, the question is whether the cause of action "arises" in a state other than Delaware.  The appropriate analysis to be used under this provision is the same used when making a substantive choice of law decision, as is discussed below:  The state which has the "most significant relationship to the occurrence and the parties" is considered the state in which the cause of action "arose."  *Cerullo v. Harper Collins Publishers, Inc.,* No. 01C-03-21-CHT, 2002 WL 243387, at *4 (Del. Super. Ct. February 19, 2002) (in cases brought by non-residents, Delaware courts apply the statute of limitations of the same state whose substantive law applies).  As discussed below, that analysis leads to the conclusion that the law of Delaware (considered alone, or with the law of North Carolina) applies.

In sum, Delaware's statute of limitations, which runs three years from the discovery of defendants' fraudulent conduct, applies to all of Royal's common law claims.[8]

---

[7] In a footnote (Pepper Br. at 9 n. 5), Pepper argues that, under *Saudi Basic,* this Court should not apply the clear language of the second sentence of Section 8121 to Royal's claims because doing so would "subvert the statute's underlying purpose," which was to prevent forum-shopping.  Pepper's argument cannot be reconciled with the clear statement in *Saudi Basic* that, as to a resident of Delaware suing in the courts of Delaware, "the common law rule that the *lex fori* [*i.e.,* the law of the forum, Delaware] governs the matter of limitations of actions is left in full force."  866 A.2d at 17.  Pepper's insinuation that Royal engaged in "forum shopping" in deciding to file this action in this Court is nonsense.  Royal's expectation, as a Delaware resident, that it may rely on a limitations period exclusively and explicitly provided by law to Delaware residents does not constitute the kind of "forum shopping" discussed in the cases cited by Pepper.  *See also B. Lewis Productions, Inc. v. Bean,* No. 02-93-KAJ, 2005 WL 273298, at *3 (D. Del. Jan. 28, 2005).  Both of those cases involved situations where a non-Delaware plaintiff had chosen to sue in Delaware specifically to impose on the Delaware defendant, through Section 8121, an already-expired limitations period for defendant's counterclaims, which were still viable in the jurisdiction where they arose.  No such prejudice to Defendants is implicated here.  Pepper's argument also ignores the fact that, before this action was filed, this Court already had before it two related actions, *MBIA v. Royal* and *Wilmington Trust v. Royal,* brought against Royal in this Court.  It was not forum shopping for Royal to decide that its claims against these Defendants should be filed in the same court that was already hearing related cases.

**B.    Royal's Common Law Claims Are Timely**

**1.    Royal's Claims Were Brought Within The Three-Year Limitations Period Under Delaware Law**

Royal's Complaint is timely under the three-year statute of limitations applicable under Delaware law. *See* DEL. CODE ANN. tit. 10, § 8106 (2005).[9]  Since Royal could not and did not uncover SFC's fraud before March 21, 2002—and indeed, did not and could not uncover the Accountants' and Lawyers' participation in that fraud until the fall of 2004—Royal's March 18, 2005 filing of this action was within Delaware's three-year statute of limitations. *See, e.g. Hood v. McConemy*, 53 F.R.D. 435, 446-447 (D. Del. 1971) (limitations period is tolled by defendant's fraudulent concealment of cause of action until such time as plaintiff becomes aware of it).

Pepper does not contest Royal's allegation that it "learned about the fraud at SFC on March 20, 2002." (Pepper Br. at 11.)  McGladrey argues that Royal's claims are barred, even by a three-year statute of limitations, because Royal's claims against McGladrey and Aquino "accrued" on April 30, 2001, when McGladrey issued certain false financial statements. (McGladrey Br. at 31-32.)  Similarly, Freed argues that claims against it "accrued" on July 26, 2000, when Freed issued its false financial statements.  (Freed Br. at 12.)  The Accountants thus argue that the date of "accrual" is the controlling date for measuring the limitations period under Delaware law.  It is not.  Under Delaware's discovery rule, Royal is entitled to a period of tolling until at least March 20, 2002, the earliest possible date by which Royal can be said to have uncovered the fraud involving SFC.[10]

---

[8] Neither Gagné nor Aquino, the two Defendants against whom RICO claims are asserted, makes any argument that those claims are barred by any statute of limitations.

[9] North Carolina also applies a three years from discovery limitations period to fraud claims.  N.C. Gen. Stat. § 1-52(9) (2005).

[10] Royal is actually entitled to have the statute tolled until the fall of 2004, when Royal discovered these Defendants' knowing participation and facilitation of the fraud scheme.  (*See* Am. Comp. ¶ 71.)

In Delaware, while a cause of action "accrues" at the time of the wrongful act, *see Pomeranz v. Museum Partners, L.P.*, No. 20211, 2005 WL 217039, at *3 (Del. Ch. Jan. 24, 2005), the limitations period is tolled in each of three circumstances, all of which are present here:  (i) the injury was "inherently unknowable" at the time of the wrongdoing; (ii) the defendants' committed one or more acts of fraudulent concealment of their wrongdoing; and (iii) the plaintiff reasonably relied on the competence and good faith of a fiduciary.  *See Albert v. Alex Brown Management Servs.*, No. 762-N, 2005 WL 1594085, at *19 (Del. Ch. June 29, 2005). These bases are especially likely to exist in cases involving accountant or attorney malfeasance, and application of the discovery rule in these cases is favored by the Delaware Supreme Court. *See Coleman v. PricewaterhouseCoopers, LLC*, 854 A.2d 838, 842 (Del. 2004).

Royal did not know—and could not have known—about the nature of the fraudulent ghost payments or the existence of the conspiracy to fraudulently induce Royal to issue credit-risk insurance policies until the scheme was revealed by Yao on March 20, 2002.  To the extent that McGladrey intends to contest the facts concerning when Royal could have reasonably discovered McGladrey's fraud, that argument "depends on a fully developed factual record not presently before this Court" and the dismissal motion should be denied.  *Gopez v. Shin*, 736 F. Supp. 51, 58 (D. Del. 1990); *In re ML-Lee Acquisition Fund II, L.P. and ML-Lee Acquisition Fund (Retirement Accounts) II, L.P. Sec. Litig.,* 848 F. Supp. at 554 (denying dismissal after drawing "all reasonable inferences" from plaintiff's complaint to demonstrate that the injury was unknowable); *S & R Associates, L.P., III v. Shell Oil Co.*, 725 A.2d 431, 439 (Del. Super. Ct. 1998) (date plaintiff was on notice of claim was material issue of fact).  In sum, Royal's claims are not barred by Delaware's three-year statute of limitations.

2. **Royal's Complaint Is Timely Even If
   Pennsylvania's Statute of Limitations Applies To
   This Action**

Royal's Amended Complaint is timely even if Pennsylvania's shorter statute of limitations applies to Royal's claims. Under Pennsylvania's two-year statute of limitations, Royal's claims would be timely, since Royal did not, and could not, learn of ***Defendants' role*** in the conspiracy and fraud prior to the fall of 2004, as Royal has expressly pled. (Am. Comp. ¶ 71.) *Bhatla v. Resort Dev. Corp.*, 720 F. Supp. 501, 512 (W.D. Pa. 1989); *Butala v. Agashiwala*, No. 95 CIV 936 JGK, 1997 WL 79845, at *5 (S.D.N.Y. Feb. 24, 1997) ("Although a plaintiff may have knowledge of the underlying fraud, inquiry notice for statute of limitations purposes is only triggered when the plaintiff is placed on notice of the fraudulent activities of the particular defendants being sued").

Royal has pled that, while it first learned of SFC's fraud on or about March 20, 2002, Royal did not learn, and could not have learned, of Defendants' knowing participation in the fraud scheme until the fall of 2004, approximately six months before Royal filed this action. While Pennsylvania's statute of limitations for Royal's claims here is two years, *see* 42 PA. CONS. STAT. § 5524 (2005), claims involving fraud, such as Royal's, do not accrue "until the fraud has been discovered by the exercise of due diligence." *See Bhatla v. Resort Dev. Corp.*, 720 F. Supp. 501, 512 (W.D. Pa. 1989). The Pennsylvania discovery rule considers the "plaintiff's cognizance, or imputed cognizance, of actual injury," in order to "determine the accrual date of a claim." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1390 (3d Cir. 1994).

Thus, Pennsylvania's two-year statute of limitations is tolled whenever a defendant engages in "some affirmative and independent act of concealment" that prevents plaintiff from discovering its claim against that defendant. *Bohus v. Beloff*, 950 F.2d 919, 926 (3d Cir. 1991).

Indeed, it is sufficient merely that the defendant's act "causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts." *Fine v. Checcio*, 870 A.2d 850, 860 (Pa. 2005). When a defendant fraudulently conceals his wrongdoing, the limitations period does not commence until the plaintiff, "exercising reasonable diligence," knew or should have known of the claim against defendant. *Bohus v. Beloff*, 950 F.2d at 926; *Fine v. Checcio*, 870 A.2d at 861.

The crux of Royal's claim here is that Defendants knowingly participated in the fraud involving SFC and hid their participation. While Royal learned of SFC's wrongdoing in March 2002, Defendants' wrongdoing was not revealed by Yao's confession. At that time, Royal did not know, and could not know, whether Defendants were participants in the fraud or were ignorant of the scheme. As Royal has pled, and as must be accepted as true for purposes of this motion, Royal did not learn, and could not have learned, of Defendants' knowing participation in the fraud scheme until 2004. (Am. Comp. ¶ 71 ("Royal discovered for the first time the Defendants' knowing participation" in the fall of 2004).) Royal's allegations are more than sufficient to meet the tolling requirements under Pennsylvania's discovery rule.[11]

**C.  The Substance Of Royal's Common Law Claims Is Governed By The Law Of Delaware (By Itself, Or Considered With The Law Of North Carolina)**

Under Delaware's choice of law principles,[12] which require application of the law of the state with the "most significant relationship to the occurrence and the parties," *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 43-48 (Del. 1991) ("*Travelers*"), an evaluation of the substance of

---

[11] It is ironic that McGladrey, which successfully fought Royal's every effort to seek discovery from McGladrey in the SFC bankruptcy, is now arguing Royal somehow should have divined McGladrey's role in the fraud involving SFC at an earlier date. *In re Student Finance Corp. (McGladrey v. Royal)*, Civ. A. No. 04-1473-JJF (D. Del.); December 7, 2004 Order (granting McGladrey's stay of bankruptcy order permitting Royal Rule 2004 discovery); *Id.*; December 23, 2004 Order (denying Royal's motion for reconsideration of December 7, 2004 Order).

[12] A federal district court exercising its jurisdiction over state law claims will apply the choice of law principles followed by the venue in which the district court sits. *See System Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1136 (3d Cir. 1977) (*citing United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).

Royal's common law claims is governed either by: (1) the law of **Delaware**—the state where SFC maintained its principal place of business, the state where Royal is incorporated, and the state whose law this Court held applicable (it was not contested) to all questions relating to the insurance policies, *MBIA I,* 286 F. Supp. 2d at 355; *MBIA II,* 312 F. Supp. 2d at 586, by itself; or (2) considered with the law of **North Carolina**—the state where Royal maintains its principal place of business, the state from where the $600 million in fraudulently-induced insurance policies were issued, and the state where Royal has been damaged. There are no significant differences in the law applicable in this case between Delaware and North Carolina.

> **1. Restatement (Second) Of Conflicts Of Laws § 148 Provides Delaware's Controlling Choice Of Law Principles Specifically Applicable To Fraud Claims**

In *Travelers,* decided nearly a decade and a half ago, the Delaware Supreme Court adopted the conflict of laws principle of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS (1971) (the "Restatement")—which applies the substantive tort law of the state with the "most significant relationship to the occurrence and the parties"—and thus abandoned the prior *lex loci* conflicts rule. *Travelers*, 594 A.2d at 43-48; Restatement, § 145(1); *see, e.g., Corning Inc. v. SRU Biosystems, LLC*, 292 F. Supp. 2d 583, 584-85 (D. Del. 2003) (Farnan, J.). In determining the state with the "most significant relationship to the occurrence and the parties," the Restatement provides specific guidelines related to specific torts, including the fraud-related claims at issue here:

> (1)    When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and….

> (2)    When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

>    (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
>
>    (b) the place where the plaintiff received the representations,
>
>    (c) the place where the defendant made the representations,
>
>    (d) the domicile, residence, nationality, place of incorporation and place of business of the parties,
>
>    (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
>
>    (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement § 148 ("Fraud and Misrepresentation"). This Court has consistently applied the specialized rules of Restatement § 148 in determining the law applicable to claims of fraud. *AES Corp. v. Dow Chemical Co.*, No. 99-673-JJF, 2001 WL 34367296, at *6-7 (D. Del. Jan. 19, 2001); *Brown v. SAP America, Inc.*, No. Civ. A. 98-507-SLR, 1999 WL 803888, at *6-8 (D. Del. Sept. 13, 1999); *Feinberg v. Saunders, Karp & Megrue, L.P.*, No. 97-207-SLR, 1998 WL 863284, at *10-11 (D. Del. Nov. 13, 1998).

The Restatement also provides guidance as to the relative importance this Court should place on the various contacts to be considered under Restatement § 148:

- The place where plaintiff acted in reliance on the defendants' misrepresentations is more important than where the misrepresentations were made. Restatement § 148 cmt. g.

- The place where plaintiff first received the misrepresentations is of equal importance with the place where defendants made them. Restatement § 148 cmt. g.

- Plaintiff's place of incorporation and principal place of business are more important than the equivalent contacts for defendants. Restatement § 148 cmt. i.

- ▪ Financial losses sustained "will usually be of greatest concern to the state with which the person suffering the loss has the closest relationship."  Restatement § 148 cmt. i.

- ▪ If any two of the above-mentioned contacts, apart from the defendant's domicile, state of incorporation, or place of business, are located wholly in a single state, this will usually be the state of the applicable law with respect to most issues. Restatement § 148 cmt. j.

These rules are consistently applied and followed by this Court.  *See Brown v. SAP America, Inc.*, No. Civ. A. 98-507-SLR, 1999 WL 803888, at *6-7; *Feinberg v. Saunders, Karp & Megrue, L.P.*, No. 97-207-SLR, 1998 WL 863284, at *10-11 (quoting comments g, i and j).

  **2. Under Delaware Choice Of Law Principles,
    Delaware Law (Considered by Itself, Or With
    North Carolina Law) Governs Royal's Claims**

In this case, Delaware and North Carolina have the most significant relationship to Royal's claims against the Defendants.  There is no need to determine the choice of law as between Delaware and North Carolina because the substantive law of those states is the same.

Restatement § 148 cmt. m states:

> When rule of two or more states is the same.  When certain contacts involving a tort are located in two or more states with identical local law rules on the issue in question, the case will be treated for choice-of-law purposes as if these contacts were grouped in a single state.

(incorporating Restatement § 145 cmt. i, by reference).

As pled in Royal's complaint and not contradicted by Defendants:

- ▪ All acts by Royal in reliance on Defendants' misrepresentations were taken at Royal's principal place of business in North Carolina or at SFC's principal place

of business in Delaware.[13] (*See*, *e.g.*, Am. Comp. ¶¶ 12, 156, 160.)  These acts included issuing the credit risk insurance policies for the "warehouse" loans (Am. Comp. ¶¶ 36-37), issuing the credit risk insurance policies for the various SFC securitizations (Am. Comp. ¶¶ 48-51), and making the various decisions leading up to the issuance of the insurance policies.

- Royal, the primary target and victim of defendants' scheme, is a Delaware corporation that maintains its principal place of business in North Carolina.  (Am. Comp. ¶ 12.)

- The misrepresentations made or facilitated by Defendants were received by Royal in North Carolina or were received by Royal during visits by its personnel to SFC's Delaware office (*see, e.g.,* Am. Comp. ¶¶ 12, 32, 34, 45, 104, 109, 129, 156, 160, 177, 179.)

- Some or all of the Accountants' reports were sent to Royal in North Carolina from SFC's Delaware offices. (*Id.* ¶¶ 12, 156, 160.)

- The insurance policies, the focus of the fraud, were issued from North Carolina, where Royal maintains its principal place of business.  (Am. Comp. ¶¶ 12, 51.)

- This Court has already ruled that "it is uncontested that Delaware law governs" interpretation of the insurance policies issued by Royal.  *MBIA I*, 286 F. Supp. 2d at 355; *MBIA II,* 312 F. Supp. 2d at 586.

- Royal has sustained damages in North Carolina—*e.g.,* if the judgments in favor of Wells Fargo and Wilmington Trust and against Royal are affirmed, based on

---

[13] It is not only properly pled in the Amended Complaint (Am. Comp. ¶ 18) but has been admitted by SFC that SFC's principal place of business was in New Castle, Delaware.   Answer, Affirmative Defenses, and Counterclaim of Student Finance Corporation, *In re SFC,* No. 02-11620 (Bkrptcy, D. Del.) (June 25, 2002).

claims relating to the insurance policies Royal was fraudulently induced to issue, those payments will originate in North Carolina.

In contrast, the contacts with Pennsylvania cited by Pepper and McGladrey (Pepper Br. at 8-9; McGladrey Br. at 29-30) in arguing that Pennsylvania law should apply are far more modest:

- Pepper and McGladrey note that Pepper is a Pennsylvania Limited Liability Partnership and SFC is a Pennsylvania corporation, but fails to note that Pepper maintains offices in both Pennsylvania and Delaware, and that SFC's principal place of business was in Delaware. (Am. Comp. ¶¶ 13, 18.)

- McGladrey notes that Aquino resides and maintained an office in Pennsylvania, but omit the fact that the actions of Aquino (and his accounting firms, McGladrey and Freed) at issue here were done in connection with audits of SFC, and thus were necessarily done, in principal part, at SFC's principal place of business in Delaware, and omit the fact that the Accountants sent their fraudulent reports to Delaware and North Carolina. (Am. Comp. ¶¶ 13, 15, 16, 160.)

- Pepper and McGladrey note that Yao, too, resides and maintained an office in Pennsylvania, and obscure the fact that what Yao did in Pennsylvania was to give instructions that were carried out by other SFC employees at SFC's principal office in Delaware. Indeed, the paragraphs of the Amended Complaint that Pepper cites for the proposition that Yao conducted business in Pennsylvania recounted that in two e-mails sent "between Yao's office in Pennsylvania and SFC's offices in Delaware," "Yao directed that SFC not amend the servicer reports" that failed to disclose fraudulent payments and "Yao directed that Royal not be provided a copy of [a] Projection" of the magnitude of such fraudulent

payments.  (Am. Comp. ¶¶ 156(d), (e).)  Yao thus directed that acts to defraud Royal be undertaken in Delaware, at SFC's principal offices in Delaware.

Prioritizing these contacts according to Restatement § 148, the most significant contact for choice of law purposes is the place where Royal "acted in reliance" on the Defendants' misrepresentations; in this case, Delaware and North Carolina.  Restatement § 148 cmt. g.  Likewise, Delaware and North Carolina have the "greatest concern" with the fraud and misrepresentation claims because the party suffering the resultant losses, Royal, has the "closest relationship" with those states.  Restatement § 148 cmt. i.  In particular, the Royal policies were issued out of North Carolina and any judgments ultimately paid on those policies will come from Royal's headquarters in North Carolina.  Moreover, Defendants' misrepresentations, and those facilitated by the Defendants, were received by Royal in either Delaware or North Carolina, a factor of equal, if not greater, significance to where the Defendants made those misrepresentations.  Restatement § 148, 148 cmt. g.  And, of course, Defendants themselves visited SFC's Delaware offices at various times and directed communications there during the course of participating in the fraud scheme.  Delaware and North Carolina have the most significant relationship to this action and the law of either of those states should govern.

Specifically, under the "general approach" suggested by the Restatement, *see* Restatement § 148, 148 cmt. j, the Court should generally apply the law of whatever state in which "any two" contacts "apart from the defendant's domicile, state of incorporation, or place of business," occur.  *Id.*  Because the place of Royal's various acts in reliance on Defendants' misrepresentations, the place where Royal first received those misrepresentations, the place where Royal was to render performance under the insurance contract, and Royal's domicile and place of business were *all* either in Delaware or North Carolina, both states overwhelmingly

- 35 -

satisfy the Restatement's "any two" test.  Indeed, four of the five relevant[14] types of contacts

under § 148 point to either Delaware or North Carolina.  This Court has applied this exact

analysis in similar circumstances.  *See Brown*, No. 98-507-SLR, 1999 WL 803888, at *6-8

(applying Texas law under § 148 where Texas-based plaintiff entered into software licensing

contract and paid money thereon from Texas headquarters; received defendant's

misrepresentations in Texas; and expected to render future contractual performance in Texas);

*Feinberg*, No. 97-207-SLR, 1998 WL 863284, at *10-11 (applying New York law under § 148's

"any two" test where plaintiff was induced to enter consulting agreement in New York and

received misrepresentations in New York, notwithstanding that plaintiff was Pennsylvania

resident and rendered performance in many states including Pennsylvania).

Furthermore, it cannot be disputed that Delaware is the nexus point for all of the claims

between the parties.  Because SFC's operational headquarters (and its principal place of

business) were in Delaware, and because the conspiracy to defraud Royal revolves around SFC,

Delaware forms the hub of all the activities in this case.  Pepper and Gagné provided legal

services to and concerning SFC's Delaware-based business; McGladrey and Freed issued

financial opinions based on SFC's Delaware-based business; SFC's business was based in

Delaware; and Royal is a Delaware corporation.  In short, Delaware is at the center of the "entire

web of relationships" between the parties, and its law should control the instant matter.  *David B.*

*Lilly Co. v. Fisher*, 18 F.3d 1112, 1120 (3d Cir. 1994) (applying Delaware law in part because

"entire web of relationships" located there).

---

[14] The sixth type of contact identified by § 148 is "the place where a tangible thing … was
situated," Restatement § 148(2)(e), is not at issue in this case.

### 3. For Purposes Of Conflict Of Laws Analysis, Delaware And North Carolina May Be Considered A Single State Because Their Applicable Statutes of Limitations and Substantive Law Are the Same

Delaware and North Carolina, whose law is the same in all pertinent respects, each have a significantly more substantial relationship with this matter than does Pennsylvania.  Combined, their relationship to this matter dwarfs that of Pennsylvania.[15]

This Court may wish to choose between Delaware and North Carolina precedent for purposes of convenience (in future briefs from the parties) or applying specific language (*e.g.,* in jury instructions).  Royal suggests that the Court rely upon the law of Delaware—the center of the "entire web" of relationships in this case.

### 4. Pennsylvania Law Does Not Govern

In order to argue that Pennsylvania law governs this action, Defendants must totally ignore, and do, the sea-change in Delaware choice of law analysis initiated by the *Travelers* decision—which replaced a *lex loci* analysis with a "significant relationship" analysis.

#### a) The Domicile Of The Wrong-Doer Does Not Control In A Fraud Case Under Restatement § 148

Both McGladrey and Pepper argue that, since they are domiciled in Pennsylvania, Pennsylvania law should apply.  (McGladrey Br. at 28-29; Pepper Br. at 8-9.)  However, under Restatement § 148 and applicable Delaware law, in a fraud action, Defendants' domiciles are of

---

[15] This Court need not determine whether Delaware or North Carolina has the greater relationship with this action because, as noted above, Restatement § 148 cmt. m. provides: "When rule of two or more states is the same.  When certain contacts involving a tort are located in two or more states with identical local law rules on the issue in question, the case will be treated for choice-of-law purposes as if these contacts were grouped in a single state."  *Id.* (incorporating Restatement, § 145 cmt. i., by reference).  Thus, under Delaware's choice of law rules, Delaware's and North Carolina's contacts should be considered together, and this action should thus be governed by the laws of those states.

less importance than Royal's, and are also less important than both the place of Royal's reliance and the place Royal first received the misrepresentations. Restatement § 148 cmts. g-j. This, of course, is as it should be. The law of the state where the fraud-feasors chose to reside or act should matter less than the law of the state where the plaintiff was harmed. Further, the case law Pepper cites in support of its argument (Pepper Br. at 9), relates to the choice of law applicable to a breach of contract claim, which has a wholly different Restatement analysis and does not apply here. *See Juran v. Bron*, No. 16464, 2000 Del. Ch. LEXIS 143, at *38 (Del. Ch. Oct. 6, 2000) (cited in Pepper Br. at 9); *see also* Restatement § 188 (providing special choice of law rules for contract cases).

> ### b)    The Place Of Wrongful Conduct Is Not Controlling Under Restatement § 148

McGladrey, inexplicably relying on pre-*Travelers* Delaware precedent,[16] argues that, in cases involving intentional torts, "Delaware courts prefer to apply the law of the place where the conduct … occurred." (McGladrey Br. at 30.) McGladrey asserts that Defendants' misrepresentations were uttered in Pennsylvania, therefore Pennsylvania law should govern. This argument is wrong, both factually and legally.

First, as a factual matter, Defendants' misrepresentations, and their facilitation of SFC's fraudulent scheme, were not limited to Pennsylvania. Defendants were in regular contact with SFC, which was based in Delaware. Some or all of the Accountants' reports were sent to Royal from SFC's Delaware offices, and Pepper regularly communicated with Royal in North Carolina, including sending the misleading PPMs to Royal in North Carolina.

Second, McGladrey's erroneous assertion that Delaware "prefers" to apply the law of the place where the tortious conduct occurred is drawn exclusively from cases decided before the

---

[16] McGladrey relies on a 1983 case, *Hill v. Equitable Trust Co.*, 562 F. Supp. 1324 (D. Del. 1983) and a 1988 case, *J. E. Rhoads & Sons, Inc. v. Ammeraal, Inc.*, 1988 WL 116423 (Del. Super. Ct. Oct. 12, 1988), both decided before the 1991 *Travelers* decision. (McGladrey Br. at 30.)

Delaware Supreme Court's *Travelers* decision in 1991.  Prior to that decision, Delaware

followed the *lex loci* doctrine for choice of law analysis, under which "the law to apply to an

intentional tort is the law of the place where the conduct comprising the tortious act occurs."

*J. E. Rhoads & Sons, Inc. v. Ammeraal, Inc.*, 1988 WL 116423, at *3, n. 1 (Del. Super. Ct.

Oct. 12, 1988).[17]  In *Travelers*, the Delaware Supreme Court expressly replaced the *lex loci*

analysis with the Restatement analysis discussed above.  *See Travelers*, 594 A.2d, *passim*.

Under the Restatement analysis, the site of the tortious conduct is just one of the factors to be

considered, and is not controlling.  *See* Restatement, §§ 6, 145, 148; *see also, e.g., St. Paul Fire

and Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP*, 233 F. Supp. 2d 171, 178 (D.

Mass. 2002) (under Restatement, professional malpractice is "performed" where advice is

received, not provided).  McGladrey's *lex loci* cases are no longer good law.

     Finally, McGladrey's prominent reliance on *In re Phar-Mor, Inc. Securities Litigation*,

893 F. Supp. 484 (W.D. Pa. 1995), a case McGladrey wrongly claims is "directly on point," is

misplaced.  (McGladrey Br. at 30.)  At issue in *Phar-Mor* was the application of New Jersey's

"governmental interest" choice of law analysis, 893 F. Supp. at 488, a minority choice of law

position that is materially different from the Restatement analysis applied by Delaware.  Indeed,

the governmental interest test followed by New Jersey was specifically considered and rejected

by the Delaware Supreme Court in *Travelers*.[18]  *Phar-Mor* is not controlling, or even applicable,

law in Delaware courts.[19]

---

[17] While the *Rhoads* court surmised, in *dicta*, that its conclusion would be the same had it applied the
Restatement principles, 1988 WL 116423, at *2, the torts at issue in *Rhoads* concerned unfair competition
and trade secrets violations and, consequently, the court did not consider Restatement § 148, which
applies here.

[18] *See Travelers*, 594 A.2d, at 46-47 (describing the "governmental interest" test as one of three possible
competing approaches, and rejecting it in favor of the Restatement method).

[19] *Cox v. Delaware Electric Co-Op, Inc.*, 823 F. Supp. 241 (D. Del. 1993), also cited by McGladrey, is
equally inapposite.   *Cox* involved an industrial accident properly analyzed under Restatement § 146, not
Restatement § 148.

c)    **Delaware Does Not Defer To The Law Of
The State Where A Professional Is
Licensed**

McGladrey also argues that Pennsylvania law should apply because Defendants are

professionals licensed in Pennsylvania.  (McGladrey Br. at 30.)  But Delaware courts give no

special weight to the licensing state in actions against licensed professionals; that is not a factor

listed in Restatement § 148.  *See, e.g., Feinberg*, No. 97-207-SLR, 1998 WL 863284, at *10-11.

Under Delaware choice of law rules, Pennsylvania's interest in regulating the conduct of

professionals licensed by it "is not dispositive."  *David B. Lilly Co., Inc. v. Fisher*, 18 F.3d 1112,

1120 (3d Cir. 1994) (applying Delaware conflict of laws rules to reject argument that New York

law should apply because New York had a paramount interest in regulating attorneys licensed in

that state).[20]

This is not a professional malpractice case; it is a fraud case.  It would be peculiar indeed

if a licensed professional who committed a fraud could defend himself by invoking the more

lenient law of his licensing jurisdiction, while a lay person who committed the same fraud would

be subject to the more stringent law of the state with the most significant relationship with the

matter.

Equally peculiar, but necessary to Defendant's argument, is the notion that Delaware has

no interest in the fraud committed by these Accountants and Lawyers within Delaware because

---

[20] Further, all the cases McGladrey cites on this issue either do not relate to choice of law issues, or, when they do, do not involve fraud claims and invoke doctrines not applicable to Delaware choice of law issues (like *lex loci* or "governmental interest").  *See Kahn v. State Board of Auctioneer Examiners*, 842 A.2d 936 (2004) (holding merely that states have an interest in establishing standards for licensing the professionals practicing therein; no discussion of choice of law rules or principles); *White Consolidated Indus., Inc. v. Island Kitchens, Inc.*, 884 F. Supp. 176 (E.D. Pa. 1995) (holding that under Pennsylvania's Rules of Professional Conduct, New York's disciplinary rules applied to attorney's motion to withdraw as counsel where both client and counsel were based in New York); *Diversified Group, Inc. v. Daugerdas*, 139 F. Supp. 2d  445 (S.D.N.Y. 2001) (applying NY choice of law rules in attorney-client context); *Pittston Co. v. Sedgwick James of New York, Inc.*, 971 F. Supp. 915 (D.N.J. 1997) (applying New Jersey "governmental interest" test in attorney-client context); *Johnston Assoc., Inc. v. Rohm and Haas Co.*, 560 F. Supp. 916, 917-18 (D. Del. 1983) (pre-*Travelers* case applying *lex loci* analysis).

they are licensed in other states.  We are aware of no authority suggesting that is the public

policy of this state.

### D.    Royal's Common Law Claims Properly Plead Valid Causes of Action

Much of Defendants' challenge to the adequacy of the pleading of Royal's common law

claims is based on (a) Defendants' fallacious argument that those claims are governed by

Pennsylvania law, which in certain instances includes additional elements of proof not present in

Delaware and North Carolina law; and (b) Defendants' attempts to apply statutory requirements

applicable to the pleading of securities fraud claims under the federal securities laws to the

pleading of common law fraud claims.  Under the law of Delaware (considered by itself, or with

the law of North Carolina), Royal has met all of the pleading requirements of each of its

common law causes of action.  Indeed, Royal has met all pleading requirements even if

Pennsylvania law applied.

### 1.    Fraud (Count IV)

Royal's Amended Complaint adequately pleads each of the elements of fraud under

Delaware law:  (1) a false representation; (2) the defendant's knowledge or belief that the

representation was false, or was made with reckless indifference to the truth; (3) an intent to

induce the plaintiff to act or refrain from acting; (4) an act taken by plaintiff in justifiable

reliance upon the false representation; and (5) resulting damage.  *See, e.g. Lord v. Souder*, 748

A.2d 393, 402 (Del. 2000).  North Carolina applies analogous elements.  *Fender v. Deaton*, 571

S.E.2d 1, 3, 191 (N.C. Ct. App. 2002).[21]  Delaware and North Carolina both recognize that, in

---

[21] In North Carolina, the elements of fraud are "[1] false representation, or concealment of a material fact,
[2] reasonably calculated to deceive, [3] made with intent to deceive, [4] which does in fact deceive,
[5] resulting in damage to the injured party."  *Fender v. Deaton*, 571 S.E.2d at 3.  There is no dissonance
between North Carolina's "reasonably calculated to deceive" language and the Delaware language
because the effect of proving both the second and third elements of the Delaware cause of action

addition to affirmative fraudulent acts, concealment of material facts can support a fraud action.

*Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983); *Griffin v. Wheeler-Leonard & Co.*, 225 S.E.2d 557, 565 (N.C. 1976).

> **a)    Royal Has Pled That Defendants Acted**
> **With An Intent To Deceive Royal**

Ignoring the fact that Royal's fraud claims are claims of common law fraud, McGladrey

and Freed argue that alleged violations of GAAP and GAAS standards are not sufficient to plead

fraud under the federal securities laws.  (McGladrey Br. at 33-34; Freed Br. at 13, *citing Ziemba*

*v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1208 (11th Cir. 2001); *Rothman v. Gregor,* 220 F.3d 81, 98

(2d Cir. 2000); *In re Ikon Office Solutions, Inc. Sec. Litig.,* 277 F.3d 658 (3d Cir. 2002); *E.F.*

*Hutton Mortgage Corp. v. Pappas,* 690 F. Supp. 1465, 1471 (D. Md. 1988).)  That line of

authority has no application to the common law fraud claims brought by Royal here.  Rather,

> [i]t is well-settled under both Delaware law and the law of most other
> jurisdictions that the scienter or requirement [of intent to deceive] can be satisfied
> by a showing of recklessness.

*Lord v. Souder,* 748 A.2d at 402 (Del. 2000).  Moreover, even under the heightened pleading

requirements for statutory claims of federal securities fraud:

> GAAP and GAAS violations provide evidence of scienter when accompanied by
> additional facts and circumstances that raise an issue of fraudulent intent. …  For
> example, a 'drastic overstatement' combined with GAAP violations can be
> enough to raise the requisite inference of scienter" in a securities fraud case.

*In re Eagle Building Tech., Inc., Sec. Litig.,* 319 F. Supp. 2d 1318, 1331 (S.D. Fla. 2004).[22]

---

(knowledge/reckless disregard of falsity, and intent to deceive) is to prove, *ipso facto*, that the defendant
reasonably calculated to deceive the plaintiff.

[22] Defendants McGladrey and Aquino are correct that in the securities fraud case of *E.F. Hutton,* the court
found no "evidence indicating actionable fraud on the part of E&W."  (McGladrey Br. 34.)  However, the
court came to its conclusion because, unlike the McGladrey and Freed Defendants, E&W was completely
unaware of, and did not participate in, the fraud being committed by the CEO of the company it audited.
*E.F. Hutton,* 690 F. Supp. at 1471.  Likewise, in *Ziemba, In re Ikon*, and *Rothman,* the other statutory
securities fraud cases relied upon by McGladrey and Freed, the plaintiffs did not plead that defendants

Here, Royal has not simply pled that the Accountants violated these accounting standards. Rather, Royal has alleged that the Accountants were active participants in SFC's fraud and knew their reports were misleading on the issue most critical to whether or not there would be claims under the Royal insurance policies—the loan default rates. Even under the heightened standards, Royal has pled facts sufficient to show that the Accountants acted with *scienter*.[23]

### b) Royal Has Pled That It Justifiably Relied On Defendants' Misleading Reports

The Accountants also contend that Royal has not alleged justifiable reliance. (McGladrey Br. at 35; Freed Br. at 13.) In support of this contention, they erroneously assert that Royal had committed to issue all of its insurance policies prior to the time their respective reports were issued. (McGladrey Br. at 35; Freed Br. at 13.) However, the Complaint contains specific allegations about the amount of insurance Royal in fact issued after the Accountants issued the 2000 and 2001 Audit Reports. After receiving and relying on Freed's 2000 Audit Report (and before it received McGladrey's 2001 Audit Report), Royal issued approximately $132 million worth of insurance policies related to SFC. (Am. Comp. ¶¶ 51, 54, 104.) After receiving and relying on McGladrey's 2001 Audit Report, Royal issued over $400 million worth

---

had actual knowledge of the fraud, as Royal has here. *In re Ikon* at 673; *Ziemba,* 256 F.3d at 1210; *Rothman,* 220 F.3d at 98. (McGladrey Br. 33-34; Freed Br. 13.)

[23] The Accountants further claim that Aquino's 2001 request for a written assurance that Royal understood the SFC forbearance policy shows that Aquino did not intend to deceive Royal. (McGladrey Br. 33; Freed Br. 13.) But Aquino knew the use of the term "forbearance" was misleading, and yet neither he nor McGladrey "insisted on a disclosure in the financial statements explaining that 'forbearance payments' actually were payments made by SFC to prevent loans from defaulting, with a consequent distortion of SFC's actual default rates." (Am. Comp. ¶¶ 126-127.) McGladrey and Aquino also claim that Royal fails to allege any "extraordinary incentive" for them to participate in the fraud. (McGladrey Br. 33.) "Extraordinary incentive" is not an element of a fraud claim. As described above, Royal has sufficiently alleged Defendants' intent to induce Royal to act. (*See, e.g.,* Am. Comp. ¶¶ 95, 116, 119, 187.) In addition, Royal has alleged that McGladrey received over $1 million in fees from SFC. (Am. Comp. ¶ 96.) *See Polycast Tech. Corp. v. Uniroyal, Inc.,* 728 F. Supp. 926, 937 (S.D.N.Y. 1989) (denying motion to dismiss where defendant company received $1 million per year for services that furthered the fraud).

of SFC policies.  (*Id.* ¶¶ 51, 54, 109.)  Moreover, even had Royal made a commitment **to SFC** to

issue policies with certain aggregate limits, if Royal had discovered the fraud after making that

commitment but before the actual policies were issued **to beneficiaries other than SFC,** Royal

could have lawfully declined to issue the policies and sustained no damage.  The critical date is

thus not when Royal made a commitment to SFC to issue the policies, but when Royal actually

issued the policies to beneficiaries other than SFC; that was done after Defendants' fraudulent

conduct, upon which Royal relied.

McGladrey also claims that Royal could not have justifiably relied because the 2001

Audit Report put Royal on notice of SFC's forbearance payments.  (McGladrey Br. at 35.)  But

Royal explained in detail in the Complaint how the misleading references to "forbearance" in the

2001 Report were just another way to cover up SFC's fraudulent scheme.  (Am. Comp. ¶¶ 109-

27.)[24]

> Justifiable reliance requires that the representation relied upon involve a matter
> which a reasonable person would consider important in determining his choice of
> action in the transaction in question, … however, it is not required that a
> reasonable person would make a choice solely upon the basis of that matter.

*Lock v. Schreppler,* 426 A.2d 856, 863 (Del. Super. Ct. 1981) (*cited by In re Student Finance*

*Corp.*, No. Civ. A 03-507-JJF 2004 WL 609329, at *4 (D. Del. Mar. 23, 2004) (Farnan, J.)).

While there is no question that Royal relied upon many misrepresentations made by SFC when

deciding to issue its insurance policies, Royal also relied upon the misleading Accountants'

reports.  (Am. Comp. ¶ 54.)  The issue of whether Royal's reliance was justifiable is intensely

---

[24] McGladrey further erroneously claims that another SFC lender, SWH Funding Corp. ("SWH"), was
able to "deduce the fact of forbearance from its reading of SFC's monthly servicer reports."  (McGladrey
Br. 35.)  However, when asked by SWH, Yao admitted that SFC had been making the ghost payments.  In
contrast, whenever Royal raised questions with SFC, Yao and others continually lied to Royal and
effectively prevented Royal from learning about the fraudulent scheme.  (¶¶ 55-64.)  Indeed, Yao
confessed to SWH that he had concealed the payments and the true default rates from Royal.  (¶ 66.)

fact specific and inappropriate for disposition on a motion to dismiss.  *See CF Indus.,* 448 F.

Supp. at 483.

### c)     Royal Has Satisfied The Requirements Of Rule 9(b) For Pleading Fraud With Particularity

Finally, there is no basis for Defendants' claim that Royal has not satisfied its FED. R.

CIV. P. 9(b) obligations to plead fraud with particularity.

> In ruling upon a motion to dismiss under Rule 9(b) for failure to plead fraud with particularity, a court must factor in the policy of simplicity in pleading which the drafters of the Federal Rules codified in Rule 8.  Rule 8 requires a short and plain statement of the claim, and calls for "simple, concise, and direct" allegations. Indeed, Rule 9(b)'s particularity requirement does not mute the general principles set out in Rule 8; rather, the two rules must be read in harmony.

*Michaels Bldg. Co. v. Ameritrust Co.*, *N.A.*, 848 F.2d 674, 679 (6th Cir. 1988).  As this Court held

in rejecting the Rule 9(b) arguments of the SFC Group of Entities:

> [t]he intent behind Rule 9(b) is to give defendants notice of the claims against them and to reduce the number of frivolous actions. Accordingly, Rule 9(b) does not require the exhaustive cataloging of facts but only sufficient factual specificity to provide assurance that plaintiff has investigated . . . the alleged fraud and reasonably believes that a wrong has occurred.

*MBIA III,* 221 F.R.D. at 421 (internal citations omitted).  On a motion to dismiss claims under

Rule 9(b), "the Court must construe the allegations of the complaint 'with great generosity' in

favor of the pleader."  *Polycast Tech. Corp. v. Uniroyal, Inc.*, 728 F. Supp. 926, 935 (S.D.N.Y.

1989).  As the Third Circuit has held,

> Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior.  It is certainly true that allegations of 'date, place or time' fulfill these functions, but nothing in the rule requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud.

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir. 1984); *In re*

*Meridian Sec. Litig.,* 772 F. Supp. 223, 229 (E.D. Pa. 1991) (as "long as the allegations of fraud

reflect precision and some measure of substantiation, the complaint is adequate"); *Vietnam Veterans of Am., Inc. v. Guerdon Indus., Inc.,* 644 F. Supp. 951, 959 (D. Del. 1986) (Farnan, J.) (by "informing defendants of the precise transactions at issue, and the fraud alleged to have occurred in those transactions, the amended complaint is clearly sufficient").

McGladrey and Aquino's argument that Royal "relies almost exclusively upon collective pleading to satisfy the scienter and reliance elements" (McGladrey Br. at 34) is simply wrong. Royal has pled separate particularized allegations against each of the Defendants.[25]  (Am. Comp. ¶¶ 59, 95-96,104-08 (Freed); ¶¶ 96-134 (McGladrey); ¶¶ 72-94 (Pepper and Gagné).)

The Complaint makes specific allegations against Pepper and Gagné, including:

- Pepper was well aware of SFC's systemic practice of making ghost payments and hid this information from Royal.  (Am. Comp. ¶¶ 74-77, 177.)

- Pepper and Gagné had discussions with SFC in March 2000 about the way the ghost payments "manipulated" the performance of the SFC loan pools.  Pepper had these discussions prior to the time Royal began issuing policies in connection with SFC's securitizations.  (*Id.* ¶ 79.)

- Pepper knew the effect the ghost payments would have on Royal, yet did not disclose SFC's practice of making these payments to Royal.  (*Id.* ¶¶ 79-80.)

- Pepper and Gagné subsequently issued eight knowingly false and misleading Private Placement Memoranda that ensured Royal would issue policies to SFC. (*Id.* ¶¶ 53, 74, 82-83, 176.)

---

[25] Of course, Rule 9(b) does not require Royal to distinguish between Aquino and his accounting firms, McGladrey and Freed, or between Gagné and his law firm, Pepper.  Each was an agent of his respective firm.  When "there is an agency relationship between the defendants, however, the principal may be found liable for the fraudulent acts of its agent."  *Sandvick AB v. Advent Int'l Corp.*, 83 F. Supp. 2d 442, 448 (D. Del. 1999); *MBIA,* 221 F.R.D. at 421 (denying motion to dismiss where there was an agency relationship between the defendants); *see also Polycast Tech. Corp. v. Uniroyal, Inc.,* 728 F. Supp. at 937 (S.D.N.Y. 1989).

- Pepper sent draft and final versions of the PPMs to Royal, and knew that Royal intended to rely on their content.  (*Id.* ¶ 84.)

The Complaint similarly contains particularized allegations against McGladrey and Aquino, including:

- Since 1998, Aquino had been well aware of SFC's systemic practice of making ghost payments, and that the practice "distort[ed] the delinquency and default ratios of the [loan] pool."  (Am. Comp. ¶¶ 98, 102.)

- Aquino knew this practice prevented claims from being made on defaulted loans.  (*Id.* ¶ 103.)

- On February 21, 2001, McGladrey knowingly issued false and misleading Accountants Reports, and knew that Royal would rely on the Reports.  (*Id.* ¶¶ 128-29.)

- On April 6, 2001, McGladrey knowingly issued a false and misleading Audit Report, and knew that Royal would receive the Report.  (*Id.* ¶¶ 109-11.)

- McGladrey actively participated in formulating misleading language contained in the 2001 Audit Report.  (*Id.* ¶ 123.)

- McGladrey knew that Royal was not aware of SFC's practice of making the ghost payments, and actively hid that information from Royal.  (*Id.* ¶¶ 124, 179.)

- Royal justifiably relied on the reports issued by McGladrey.  (*Id.* ¶ 134.)

- Royal issued additional insurance to SFC after receiving the reports issued by McGladrey.  (*Id.* ¶¶ 104, 109.)

In addition to the allegations above against Aquino which are attributable to Freed, Royal has made similarly specific allegations against Freed:

- On July 26, 2000, Freed knowingly issued a false and misleading Auditor's Report, and Freed knew that Royal would receive the Report. (Am. Comp. ¶ 104.)

- Freed and Aquino intended that Royal rely on the Report. (*Id.* ¶ 108.)

- Royal issued additional insurance to SFC after receiving this Report. (*Id.* ¶ 104.)

"Rule 9(b) provides that malice, intent, knowledge, and other conditions of mind of a person may be averred generally." *Levine v. Metal Recovery Tech., Inc.,* 182 F.R.D. 112, 116 (D. Del. 1998) (Farnan, J.) (denying motion to dismiss based on Rule 9(b)); *In re Meridian Sec. Litig.,* 772 F. Supp. 223, 230 (E.D. Pa. 1991) ("Rule 9(b) clearly states that malice, intent, knowledge and other conditions of mind may be averred generally").

In this case, Royal more than complied with Rule 9(b)'s requirements. Its allegations detail the fraudulent scheme, the scheme's participants, the accompanying fraudulent misrepresentations or omissions, the makers of the misrepresentations or omissions, the timing of the misrepresentations, and the basis for finding the statements or omissions fraudulent. Royal has also detailed the role played by each participant in the scheme, how they benefited thereby, the reliance by Royal, and the damages Royal suffered therefore. Finally, as described above, the Complaint provides precise examples of the fraud perpetrated by each Defendant.

In reviewing the adequacy of Royal's pleadings against these Defendants, this Court, of course, is not plowing unbroken ground. The claims against these Defendants are similar to Royal's claims of fraud against their co-conspirator Yao and the SFC-related entities. Indeed, the claims against these Defendants are far more detailed in alleging which of the Defendants engaged in which acts. In holding that the claims against Yao and the SFC-related entities met all pleading requirements, this Court concluded:

[E]ach Third-Party Defendant in the SFC Group of Entities has notice of the allegations against which they must defend, thus distinguishing the instant action from cases where courts are compelled to dismiss complaints because of vague attributions of fraudulent statements to "defendants." *Naporano Iron & Metal Co. v. Am. Crane Corp.*, 79 F. Supp. 2d 494, 511 (D.N.J. 2000) (citing *Saporito v. Combustion Eng'g, Inc.*, 843 F.2d 666 (3d Cir.1988), *vacated on other grounds*, *Combustion Eng'g, Inc. v. Saporito*, 489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989)). The Third-Party Complaint details specific instances of fraud and misrepresentation [record citations omitted], concealment [record citations omitted], and the dates of these wrongful acts [record citations omitted] committed by Mr. Yao individually or through the SFC Group of Entities that he owned and/or controlled. Accordingly, as the purpose of Rule 9(b) is to give defendants notice of the claims against them, *Burlington*, 114 F.3d at 1418, the Court concludes that Royal's identification of specific instances of fraud, misrepresentation, and concealment, satisfy its burden of pleading under the Federal Rules.

*MBIA III*, 221 F.R.D. at 422. This Court should reach the same conclusion here.

### 2.    Civil Conspiracy To Commit Fraud (Count III)

#### a)    Royal Has Properly Pled Civil Conspiracy Under Both Delaware And North Carolina Law

Royal's allegations of civil conspiracy are more than sufficient under both Delaware and North Carolina law. Delaware recognizes a claim for civil conspiracy, the elements of which are: (1) a combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage. *See, e.g. AeroGlobal Capital Mgmt., LLC v. Cirrus Indus. Inc.*, 871 A.2d 428, 437 n. 8 (Del. 2005). North Carolina recognizes the same claim and elements. *See, e.g. DiFrega v. Pugliese*, 596 S.E.2d 456, 461-62 (N.C. Ct. App. 2004) ("A claim for civil conspiracy consists of: [1] an agreement between two or more persons; [2] to do an unlawful act or to do a lawful act in an unlawful way; [3] which agreement results in injury to the plaintiff"); *see also Elec. World v. Barefoot*, 570 S.E.2d 225, 230 (N.C. Ct. App. 2002); 5 N.C. Index 4th *Conspiracy* § 1 (facilitation of fraud is a type of conspiracy).

In its allegations of civil conspiracy against the Defendants, Royal alleges in detail how Defendants acted in agreement to further the illegal fraud scheme run through SFC, fraudulently

inducing Royal to issue some $600 million in SFC policies.  (Am. Comp. ¶¶ 173-84.)

Defendants, while addressing neither Delaware nor North Carolina law in their briefs, do not

seriously contend otherwise.  Instead, Defendants argue that Royal has not met the unique malice

requirement for a civil conspiracy claim under Pennsylvania law.  Because Pennsylvania law

does not apply, Defendants' only attack on the civil conspiracy allegations fails.

> **b)**     **Royal's Civil Conspiracy Count Even**
> **Meets the Additional "Malice"**
> **Requirement of Pennsylvania Law**
> **(Which, In Any Event, Does Not Apply)**

Pennsylvania law requires an additional element to plead civil conspiracy:  malice.

While, as Royal has shown, Pennsylvania law does not apply to this action, even if it did, Royal

has still met Pennsylvania's "malice" requirement because Royal has pled that the Defendants

collectively acted in furtherance of a fraud intended to injure Royal.

In *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979), the Pennsylvania

Supreme Court held that a defendant acts with malice if he intends to injure the plaintiff without

legal justification.  The issue in *Thompson* was whether the defendants were merely exercising

their own lawful rights, or were acting without legal justification.  As the *Thompson* court stated:

> Assume that what is done is intentional, and that it is calculated to do harm to
> others.  Then comes the question, Was it done with or without 'just cause or
> excuse'?  If it was bona fide done in the use of a man's own property * * * such
> legal justification would * * * exist not the less because what was done might
> seem to others to be selfish or unreasonable. * * * But such legal justification
> would not exist when the act was merely done with the intention of causing
> temporal harm, without reference to one's own lawful gain, or the lawful
> enjoyment of one's own rights.

*Thompson* at 211 (*quoting Rosenblum v. Rosenblum*, 181 A. 583, 585 (Pa. 1935); *see also Miller*

*v. Post Pub. Co.*, 110 A. 265, 266 (Pa. 1920) ("Where the act is **lawful** for the individual it can

be the subject of conspiracy when done in concert only where there is a direct intention that

injury shall result from it…") (emphasis added).

Defendants argue that Royal's allegations fail because Royal alleged that, through acting to harm Royal, Defendants also benefited. Defendants turn the malice requirement on its head. Under the Defendants' analysis of Pennsylvania law, a law firm or accounting firm that knowingly facilitates and perpetuates a fraud escapes the ambit of Pennsylvania civil conspiracy law so long as they get paid for doing it. Indeed, under Defendants' analysis, lawyers who conspire to steal funds from a client's trust account are not liable for civil conspiracy if they were motivated, in part, by the prospect of their own pecuniary benefit, as they of course would be. The law does not so hold.[26] Royal has alleged not only that the Defendants were paid for their professional services, but that the Defendants intentionally furthered a fraud scheme, the goal of which was to defraud Royal. These allegations distinguish Royal's complaint from those in *Thompson* and *Miller*, because Royal is alleging conduct that has no just cause or excuse: Fraud is never legally justified; it can never be a part of one's lawful pursuit of economic self-interest.

A civil conspiracy which alleges illegal conduct—and not merely conduct which contributes to the harm, but which is facially illegal—will be upheld as long as there is a showing of an intent to injure. In cases like these, malice is found in the illegal misconduct,

---

[26] Defendants' cases, all federal cases interpreting *Thompson*, mechanically apply the malice requirement without distinguishing between the pursuit of lawful and unlawful business interests. The federal cases all turn *Thompson*'s distinction between harm caused by legitimate business activities (not actionable) and harm caused by unlawful (*i.e.*, intentional) business activities, like fraud, resulting in harm to the plaintiff (actionable), into a requirement that defendants act solely to harm a plaintiff and receive no personal benefit in the process. To the extent these federal cases can be read to suggest that defendants can commit facially unlawful acts against a plaintiff and still have no malice towards them so long as some personal benefit inures to the defendants, they distort *Thompson* and are inapposite as federal misapplication of state law. *Cf. Bristol Twp. v. Independence Blue Cross*, Civ. A. 01-4323, 2001 WL 1231708, at *5-6 (E.D. Pa. Oct. 11, 2001) (holding that defendant's unlawful deception indicates no malice where it was also motivated by personal gain) (citing *Spitzer v. Abdelhak*, No. Civ. A. 95-4243 Section "T"(3), 1999 WL 1204352, at *9 (E.D. Pa. Dec. 15, 1999). *Thompson* exempted only defendants who pursue legitimate business interests, nothing more. If a Pennsylvania law-based civil conspiracy claim can be defeated simply by showing that the defendant stood to gain personally, as would almost always be the case, regardless of the defendant's unlawful conduct, then there is little value left in the tort. *Thompson* does not so hold.

even if there was a component of the conduct that benefited the defendant. *Koch v. First Union Corp.*, No. 100727, WL 372939 (Pa. Ct. Com. Pl. Jan. 10, 2002) (malice found in defendants' acts of misrepresenting and concealing facts concerning loans to plaintiffs).[27]

Royal has alleged that the Defendants committed fraud with the intent to injure Royal. There can be no legal justification for this conduct, and absent such justification, Pennsylvania's malice requirement is satisfied.

### 3. Aiding And Abetting Fraud (Count V); Aiding And Abetting Breach Of Fiduciary Duty (Count VIII)

#### a) Delaware And North Carolina Both Recognize The Torts Of Aiding And Abetting Fraud, And Aiding And Abetting Breach Of Fiduciary Duty

Both Delaware and North Carolina recognize claims for aiding and abetting torts under the Restatement (Second) of Torts, § 876(b). *Anderson v. Airco, Inc.*, No. Civ. A. 02C-12-091-HDR, 2004 WL 1551484, at *8 (Del. Super. Ct. June 30, 2004); *Malpiede v. Townson*, 780 A.2d 1075, 1096-97 (Del. 2001) (breach of fiduciary duty); *Blow v. Shaughnessy*, 364 S.E.2d 444, 447-48 (N.C. Ct. App. 1988) (applying § 876 to fraud and breach of fiduciary duty case); *Stetser v. TAP Pharm. Prods., Inc.*, 598 S.E.2d 570, 583 (N.C. Ct. App. 2004); *Vendsouth, Inc. v. Arth*, No. 00-10112C-7G, ADV. 01-2016, 2003 WL 22399581, at *16 (Bankr. M.D.N.C. Oct. 10, 2003) (specifically holding that North Carolina recognizes claim for aiding and abetting breach

---

[27] *See also Babiarz v. Bell Atlantic-Pennsylvania, Inc.*, No. 1863, 2001 WL 1808554 (Phila. Ct. Com. Pl. Jul. 10, 2001) (malice found in illegal attempt to avoid paying full union wages); *City of Phila. v. Human Servs. Consultants*, No. 950 Mar. Term 2003, 2004 WL 717240 (Pa. Ct. Com. Pl. Mar. 23, 2004) (upholding civil conspiracy claim against defendant who was alleged to have committed fraud, while dismissing claim against defendants who were not alleged to have committed fraud.)

of fiduciary duty).[28] Thus, under Delaware and North Carolina law, Royal's aiding and abetting

claims are valid.

> b) **Even If Pennsylvania Law Applied To This Action, Aiding And Abetting Is A Valid Cause Of Action Under Pennsylvania Law**

Even if Pennsylvania law applied to this action, Royal's aiding and abetting causes of

action are viable.  Defendants' assertion that the tort of aiding and abetting does not exist in

Pennsylvania is a plain misstatement of the law.  The Pennsylvania Supreme Court has expressly

adopted Restatement (Second) Torts § 876, which is the Restatement section governing torts

regarding "persons acting in concert," including aiding and abetting.  *Skipworth v. Lead Indus.*

*Ass'n, Inc.*, 690 A.2d 169, 174-75 (Pa. 1997); *see also* Restatement (Second) Torts § 876.

In *Skipworth,* the Pennsylvania Supreme Court expressly acknowledged a "concert of

action" claim under Restatement (Second) Torts § 876(a), which provides that

> for harm resulting to a third person from the tortious conduct of another, one is
> subject to liability if he (a) does a tortious act in concert with the other or
> pursuant to a common design with him. . . .

690 A.2d at 174 (citing Restatement (Second) Torts § 876(a) (ellipsis in original).

The question before this Court is thus:  Did the Supreme Court of Pennsylvania's

decision in *Skipworth* recognize a claim for "aiding and abetting" a tort, and, if not—in light of

*Skipworth* and other applicable authority—would the Pennsylvania Supreme Court recognize

such a claim if it were deciding this case?  *Bohus v. Beloff,* 950 F.2d 919, 924 (3d Cir. 1991) (in

resolving Pennsylvania state law question not definitively answered by the Pennsylvania

Supreme Court, federal court must "predict how the Pennsylvania Supreme Court would decide

---

[28] While a recent unreported decision of a North Carolina trial court, *Sompo Japan Ins., Inc. v. Deloitte & Touche, L.L.P.*, No. 03 CVS 5547, 2005 WL 1412741, at *4 (Super. Ct., Guilford County Business Ct. June 10, 2005), suggests that in certain circumstances an aiding and abetting fraud claim would be redundant of a pre-existing fraud claim, that decision is in conflict with North Carolina appellate authority.  *See Blow*, 364 S.E.2d at 447-48.

this case."), *citing Commissioner v. Estate of Bosch,* 387 U.S. 456, 464-65 (1967) *and Tiernan v. Devoe,* 923 F.2d 1024, 1033 (3d Cir. 1991).

The reasoning of *Skipworth* suggests that the Pennsylvania Supreme Court intended to embrace all of § 876, not just § 876(a), and that to the extent that it did not do so in *Skipworth*, it would if presented with the issue. *Skipworth* therefore strongly suggest that the Pennsylvania Supreme Court would recognize claims for aiding and abetting a tort.

*Skipworth* recognized § 876 as it was applied in two earlier lower court decisions, *Burnside v. Abbott Laboratories*, 505 A.2d 973 (Pa. Super. Ct. 1985), and *Kline v. Ball*, 452 A.2d 727 (Pa. Super. Ct. 1982), both of which embraced § 876 in its entirety. *Kline* even cited and relied heavily on a Restatement comment specific to § 876(b) which discusses aiding and abetting tort liability. *Kline*, 452 A.2d at 729. Decisions subsequent to *Kline*, *Burnside*, and *Skipworth* have all consistently held—or, pre-*Skipworth*, predicted—that Pennsylvania recognizes the tort of aiding and abetting tort liability under § 876(b). *See Pierce v. Rossetta Corp.*, No. Civ. A. 88-5873, 1992 WL 165817, at *6-8 (E.D. Pa. June 12, 1992) (adopting aiding and abetting breach of fiduciary duty); *Green v. Altman*, Civ. A. 03-6437 2004, WL 2106552, at *8 (E.D. Pa. Sept. 21, 2004); *Stone St. Servs., Inc. v. Daniels*, No. Civ. A. 00-1904, 2000 WL 1909373, at *3 (E.D. Pa. Dec. 29, 2000); *Kaiser v. Stewart*, 1997 WL 476455, at *11 (E.D. Pa. Aug. 19, 1997); *Schuylkill Skyport Inn v. Rich*, No. Civ. A. 95-3128 1996 WL 502280, at *38 (E.D. Pa. Aug. 21, 1996); *In re High Strength Steel, Inc.*, 269 B.R. 560, 571 (Bankr. D. Del. 2001); *Koken v. Steinberg*, 825 A.2d 723, 731 (Pa. Commw. Ct. 2003) (specifically discussing *Skipworth* and finding *Skipworth* adopted Restatement (Second) Torts § 876 in its entirety).[29]

_____

[29] *Flood v. Makowski*, No. Civ. A. 3:CV-03-1803, 2004 WL 1908221 (M.D. Pa. Aug. 24, 2004), cited by Defendants, discussed neither *Skipworth* nor §876, and acknowledged the contrary trend in Pennsylvania federal and state courts. As such, its value as persuasive authority is limited.

Thus, in predicting how the Pennsylvania Supreme Court would resolve this issue (if Pennsylvania law applied), this Court should recognize claims for "aiding and abetting" torts.

c)      <strong>Royal Has Stated A Claim For Aiding<br>And Abetting Breach Of Fiduciary Duty</strong>

The Accountants further claim that Royal has failed to properly plead the cause of action for aiding and abetting breach of fiduciary duty because (1) SFC did not owe a fiduciary duty to its creditors and (2) McGladrey did not offer substantial assistance to SFC in breaching its duties. Neither argument has merit. First, the Accountants flatly mischaracterize their own case law when they state, citing *Production Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772 (Del. Ch. 2004), that "there may be no fiduciary duty owed to individual creditors that would entitle them to bring suit" for breach of fiduciary duty. (McGladrey Br. at 38.) *Production Resources* plainly holds that directors of insolvent corporations owe fiduciary duties to the corporation's creditors:

> When a firm has reached a point of insolvency, it is settled that under Delaware law, the firm's directors are said to owe fiduciary duties to the company's creditors. ***This is an uncontroversial proposition*** . . . .

863 A.2d at 790-91 (emphasis added); *see also Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 790 (Del. Ch. 1992) ("fiduciary duties to creditors arise when one is able to establish the fact of insolvency"). Royal has clearly properly pled both that SFC was insolvent, that SFC's insolvency gave rise to a fiduciary duty on the part of SFC's officers and directors to Royal, and that Defendants' knowing participation in the fraud aided and abetted the breaches of that duty by SFC's officers and directors. (Am. Comp. ¶¶ 211-14.)

If the Accountants' point, not clearly articulated, is that the officers' and directors' fiduciary duty is owed to ***all creditors***, not just Royal, and therefore any cause of action belongs to the Trustee instead of Royal, then the Accountants (like Pepper, *see infra*) are arguing out of

both sides of their  mouths.  Here, the Accountants seemingly intimate Royal has no standing to

bring a breach of fiduciary duty claim because the claim belongs to the Trustee, while in the

Trustee's action, McGladrey and Aquino have argued that the Trustee does not have standing to

bring a breach of fiduciary duty claim on behalf of all creditors.  (*In re SFC*, Case No. 05-CV-72,

Mem. of Law in Support of Mot. to Dismiss of McGladrey & Pullen, LLP and Michael Aquino at

10-22 (Filed March 1, 2005).)  McGladrey and Aquino want the Court to simply extinguish both

the Trustee's and Royal's viable breach of fiduciary duty claims through selective, inequitable,

and inaccurate invocation of standing doctrines.

The Accountants' final point on aiding and abetting breach of fiduciary duty—that Royal

has not pled that McGladrey offered "substantial assistance" to the SFC fraud (McGladrey Br. at

38)—is based on a complete misrepresentation of Royal's Amended Complaint, which contains

detailed factual allegations regarding McGladrey's knowing participation in the student loan

fraud and specifies how McGladrey's knowingly false and misleading financial reports were

essential to the success of the fraud scheme.

### 4.    Deepening Insolvency (Count VII)

Defendants argue that Royal's claim for deepening insolvency (Count VII) should be

dismissed on various grounds.  Each of the arguments advanced by Defendants fails.

### a)    Delaware, North Carolina And Pennsylvania Each Recognize A Cause Of Action Based On Deepening Insolvency

Contrary to Pepper's assertion, deepening insolvency is not just a theory of damages, but

a cause of action, as the Third Circuit itself has noted.  *Official Committee of Unsecured*

*Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 350 (3d Cir. 2001) ("*Lafferty*") (observing

"growing acceptance of the deepening insolvency theory" as a cause of action); *see also Official*

*Committee of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.)*, 299

B.R. 732 (Bankr. D. Del. 2003) ("*Exide*") (acknowledging deepening insolvency as a cause of action); *State of N.C. v. ILA Corp.*, 513 S.E.2d 812 (N.C. Ct. App. 1999) ("*ILA Corp.*") (implicitly recognizing deepening insolvency cause of action).

Each of Delaware, North Carolina and Pennsylvania have either been found by federal courts to recognize a claim for deepening insolvency (Delaware and Pennsylvania) or have implicitly recognized the claim themselves (North Carolina).

In *Exide*, this District's Bankruptcy Court acknowledged that the Delaware Supreme Court had not ruled on whether Delaware recognized a cause of action based on deepening insolvency and then determined, relying on *Lafferty*, that Delaware courts would recognize the tort of deepening insolvency because (1) the theory was inherently sound, (2) there was growing acceptance of the theory among courts and (3) Delaware common law holds that the law provides a remedy where there is an injury. *Exide*, 299 B.R. at 752. Similarly, the North Carolina Court of Appeals also has implicitly approved the concept of deepening insolvency. *See ILA Corp.*, 513 S.E.2d at 823. In *ILA Corp.*, the liquidator of an insurance company sued the director and CEO for breach of fiduciary duty and negligent mismanagement of the insolvent insurer. *Id.* at 816. The Court of Appeals suggested that the director, through various misdeeds, had acted to deepen the insolvency of the company and found the director had breached his fiduciary duties and had proximately caused damage to the insolvent company by allowing it to sink into insurmountable debt. *Id.* at 822-23.

While Defendants, citing *Lafferty*, contend that Pennsylvania law does not recognize a cause of action for deepening insolvency (Pepper Br. at 16), *Lafferty* plainly **does** hold that Pennsylvania recognizes deepening insolvency claims: "'[D]eepening insolvency' constitute[s] a ***valid cause of action*** under Pennsylvania state law." *Id.* at 344 (emphasis supplied). Further, at least one court within this district has confirmed the Third Circuit's recognition of deepening

insolvency as a viable cause of action.  *See Exide*, at 751, n. 11 (discussing *Lafferty*'s holding

that Pennsylvania would recognize tort of deepening insolvency).

Defendants' claims that deepening insolvency is not a recognized cause of action are

simply wrong.

> **b)    Royal Has Standing To Assert A Cause**
> **Of Action Based On Deepening**
> **Insolvency**

Defendants next argue that, even if deepening insolvency is a cause of action, Royal has

no standing to bring the claim.  (Pepper Br. at 17.)  Defendants again erroneously rely on

*Lafferty*, this time as holding that only a debtor has standing to attempt to recover "deepening

insolvency" damages.  (Pepper Br. at 16-17.)

Courts, including specifically the Third Circuit in *Lafferty*, have recognized that a

creditor may have a separate, individualized cause of action, apart from any action the

bankruptcy trustee may bring on behalf of the estate, for damages resulting from a specific fraud

perpetrated on the individual creditor through the tort of deepening insolvency.  *See Lafferty*,

267 F.3d at 347 (preserving creditor's right to bring a separate cause of action for deepening

insolvency, noting the "possibility of a distinct and separate injury to the debtor corporations").

As *Lafferty* clearly demonstrates, the Third Circuit contemplated that the trustee

(standing in the shoes of the debtor) and a creditor (suffering a distinct injury from the debtor)

could feasibly bring two separate claims against the tortfeasor.  To be clear, Royal is not seeking

recovery of damages for an injury to SFC or its estate.  *Cf. Lafferty*, 267 F.3d at 348 (noting that

where  the corporate body is damaged, "it is the corporate body that possesses the right to sue").

Rather, Royal is pursuing redress for *its own* injuries resulting from the Defendants' actions

which deepened the insolvency of SFC.[30]  Such claims, which are specific to Royal, may not be

pursued by the Trustee.  *See Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972)

(holding that a trustee may not pursue a lawsuit on behalf of a specific creditor of the estate).[31]

Defendants' argument that only the Trustee has standing to bring a deepening insolvency

claim is particularly disingenuous since Defendants have argued vehemently in their motions to

dismiss the actions brought by the Trustee that the Trustee is precluded from bringing a

deepening insolvency claim because that claim belongs to Royal and other creditors (and also

because of an *in pari delicto* defense).  Compare Pepper's arguments:

| Pepper's Argument In Support of Its Motion to Dismiss Trustee's Claims (Brief In Support of Motion of Pepper Hamilton LLP et ano. for the Dismissal of Counts, etc. (Dec. 22, 2004), *Trustee v. Pepper,* 04-1551 (JJF) (D. Del.)  at 13-14.) | Pepper's Argument In Support of Its Motion to Dismiss Royal's Claims (Pepper Br. at 16-17.) |
|---|---|
| "The Trustee lacks standing to bring each of his state law claims (Counts I – V) [including deepening insolvency, Count II] because the Trustee alleges injury to the Debtor's creditors." | "Royal lacks standing to recover damages allegedly incurred by SFC as a result of 'deepening insolvency' because those damages are recoverable only by SFC's bankruptcy estate, not by individual creditors of SFC such as Royal." |

---

[30] The Defendants cite *Corporate  Aviation Concepts, Inc. v. Multi-Serv. Aviation Corp.*, Case No. Civ. A. 03-3020, 2004 WL 1900001, at *3 (E.D. Pa. Aug. 25, 2004) in support of their position that Royal lacks standing.  In that case, however, the court expressly declined to rule on the issue of "whether an unsecured creditor has standing to bring deepening insolvency claims against a bankrupt corporation['s] successors" because the court found the defendant had failed to adequately allege the elements of deepening insolvency in its counterclaim. *Id.* at *4.

[31] Deepening insolvency is thus like any other claim in bankruptcy:  Where a specific creditor is harmed by the wrongful conduct of a defendant, the claim properly belongs to the creditor.  *See Official Committee of Unsecured Creditors of RSL Com Primecall v. Beckoff (In re RSL Com Primecall)*, 2003 WL 22989669, *4 (Bankr. S.D.N.Y. Dec. 11, 2003) ("Fraud is a claim that peculiarly belongs to individual plaintiffs who had different access to information about [the debtor] at different times, and in some cases may not have relied on any information."); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120 (2d Cir. 1991); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1094 (2d Cir. 1995); *cf Feltman v. Prudential Bache Secs.*, 122 B.R. 466 (S.D. Fla. 1990) (claims specific to creditors cannot be brought by bankruptcy trustee).

Defendants want the Court both to deny Royal's standing to bring a deepening insolvency claim and bar the trustee's claim on the ground that the claim should have been brought by Royal (and other creditors), allowing Defendants to walk away without ever having to defend the claim on its merits.  Defendants cannot so deftly escape liability for "deepening insolvency."  *See*, *e.g.*, *Mediators Inc.  v. Manney (In re Mediators, Inc.)*, 105 F.3d 822, 826 (2d Cir. 1997) (holding certain claims against third-party defendants "belong to the creditors *qua* creditors" because, among other reasons, trustee may face *in pari delicto* defense).

### c) Royal's Deepening Insolvency Claim Is Not Barred By The Automatic Stay

Defendants also argue that Section 362 of the Bankruptcy Code, the automatic stay provision, bars Royal from bringing its deepening insolvency claim because doing so would somehow interfere with property of SFC, as the debtor.  (Pepper Br. at 18.)  Defendants have no authority to enforce the automatic stay provision under Bankruptcy Code Sections 362(h) or (b), which are not applicable in any event.

Section 362(h) is merely a mechanism to provide a remedy to an individual injured by a willful violation of the automatic stay.  Defendants have not claimed that they have been damaged by any purported violation of the automatic stay.  Furthermore, certain of the corporate Defendants have failed to demonstrate that they are even entitled to a remedy under Section 362(h) as corporate creditors.  *See* 11 U.S.C. § 362(h) (providing remedy to *individuals* injured by a willful violation of the stay).  While the Third Circuit has ruled that a *corporate debtor* may be entitled to relief under Section 362(h), *see Cuffee v. In re Atlantic Bus. & Community Dev. Corp. (In re Atlantic Bus. & Community Corp.)*, 901 F.2d 325, 328 (3d Cir. 1990),  Defendants

cite no authority indicating that Section 362(h) relief may be afforded to a non-debtor corporation.[32]

Defendants also claim they have standing to enforce the stay under either Section 1109 of the Bankruptcy Code.  Section 1109, however, gives a party in interest the right to be heard in a *bankruptcy case*.  See 11 U.S.C. § 1109.  ("A party in interest . . . may raise and may appear and be heard on any issue *in a case* under this chapter.") (emphasis added).  The current action is pending in the district court and is not a proceeding in SFC's bankruptcy case (or even an adversary proceeding within SFC's bankruptcy case).  The right to be heard under Section 1109 does not extend to actions or proceedings not occurring within the context of the bankruptcy case.  See 11 U.S.C. § 1109.

Finally, even if the Defendants have the right to enforce the automatic stay, Royal's cause of action is not property of the estate under 11 U.S.C. § 541.  As discussed above, Royal has an independent claim for deepening insolvency against the Defendants (which is separate from any cause of action the estate or its representatives may have against the Defendants) which *belongs to Royal*.  Royal is entitled to assert its claim without the need to seek relief from the automatic stay.

> **d)** **Royal Has Alleged Sufficient Facts To**
> **State A Claim For Deepening Insolvency**

Nor is there any basis for Defendants' argument that Royal has failed to adequately plead the elements of such a claim.  (Pepper Br. at 19.)  Defendants fail to cite any case law to support their argument that a plaintiff such as Royal—*i.e.,* a plaintiff that is *not* standing in the shoes of

---

[32] In fact, one of the cases cited by the corporate Defendants directly contradicts their position that they are entitled to stay relief under 11 U.S.C. § 362(h).  *See McRoberts v. S.I.V.I. (In re Bequette)*, 184 B.R. 327, 335 (Bankr. S.D. Ill. 1995) ("This Court . . . agrees that . . . the damages remedy of § 362(h) is limited to *natural persons and is not available to corporate plaintiffs* such as the Bank.") (emphasis added).  The case of *Homer Nat'l Bank v. Namie*, 96 B.R. 652 (W.D. La. 1989), also cited by the Defendants, is inapposite on this point because the only issue before the court was whether a "creditor" could seek relief under Section 362(h).

the debtor—needs to allege a harm to the debtor corporation in order to assert a deepening insolvency claim. The plaintiffs in both *Lafferty* and *Exide* were creditors committees who were authorized to bring actions on behalf of the bankruptcy estate and so were ***standing in the shoes of the debtor corporation*** whey they brought deepening insolvency claims against various defendants. Thus, an allegation of harm to the debtor corporation was naturally an essential part of each plaintiffs' claim. Unlike the plaintiffs in *Lafferty* and *Exide*, however, Royal is suing for an injury to itself caused by the Defendants' actions which had the effect of wrongfully expanding SFC's debt to Royal. Consequently, the elements of a deepening insolvency claim—to the extent they can even be said to be set forth in *Lafferty* and *Exide*[33]—which require a showing of an injury to the debtor are not applicable in this context.

In any event, Royal has pled harm to SFC by demonstrating that the Defendants helped SFC fraudulently incur additional debt while it sank deeper into insolvency, thereby damaging both Royal and SFC. (Am. Comp. ¶¶ 81, 104, 109.) In *Exide*, the defendants also moved to dismiss the plaintiff's complaint alleging that the plaintiff had not adequately pled a deepening insolvency claim. *See Exide*, 299 B.R. at 736, 751. However, the court denied the motion where, as Royal has here, the plaintiff had alleged that the defendants caused the debtor to operate fraudulently at "ever increasing levels of insolvency" and "to suffer massive losses and become more deeply insolvent, costing creditors substantial value." *See Exide*, 299 B.R. at 750-51. Royal, too, has alleged that through the knowing assistance of the Defendants, SFC continued to operate fraudulently while incurring excessive debt, became increasingly insolvent, and caused Royal to suffer massive financial harm. *See also Lafferty*, 267 F.3d at 349.

---

[33] While the *Lafferty* and *Exide* cases discuss the tort of deepening insolvency, neither decision sets forth the elements of a such a cause of action.

> **e)** **Royal's Allegations Of Fraud Have Been Pled With Sufficient Particularity To Support Royal's Deepening Insolvency Claim**

While Defendants have failed to provide any support for their position that a claim for deepening insolvency must be pled with particularity under FED. R. CIV. P. 9(b) (Pepper Br. at 22), the allegations averred in Royal's Amended Complaint nevertheless meet the heightened pleading requirements of Rule 9(b) as discussed above.

> **5.** **Negligence and Negligent Misrepresentation (Count VI)**

> **a)** **Royal Has Properly Pled Negligence And Negligent Misrepresentation Under Delaware And North Carolina Law**

Royal has adequately pled claims of negligence and negligent misrepresentation under Delaware and North Carolina law. In both Delaware and North Carolina, the elements of a claim for negligent misrepresentation are: (1) a plaintiff's justifiable reliance (2) on false information (3) provided by a defendant who owed plaintiff a duty of reasonable care in providing the information (4) that results in a pecuniary loss. *Wolf v. Magness Const. Co.*, No. Civ. A. 13004, 1995 WL 571896, at *2 (Del. Ch. Sept. 11, 1995); *Hunter v. Guardian Life Ins. Co. of Am.*, 593 S.E.2d 595, 600 (N.C. App. 2004). And, in actions against accounts, neither Delaware nor North Carolina require contractual privity for such actions. *Carello v. PricewaterhouseCoopers LLP*, Civ. A. 01C-10-219RRC, 2002 WL 145111, at *7 (Del. Super. July 3, 2002) (holding Delaware does not require contractual privity for accountant liability); *Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 513 S.E.2d 320, 324 (N.C. 1999) (noting North Carolina has expressly rejected "privity" and "near privity" approaches to accountant liability).

      **b)**      **Royal's Claims of Negligence And**
                         **Negligent Misrepresentation Are Sound,**
                         **Even If Pennsylvania Law Applies**

McGladrey and Freed argue that Royal's claims for negligence and negligent misrepresentation should be dismissed because Pennsylvania does not recognize claims for negligence brought against accountants unless brought by a plaintiff in contractual privity with the accountant.  (McGladrey Br. at 36; Freed Br. at 13-14.)  At the same time, McGladrey argues that the Trustee for SFC—which *was* McGladrey's client—cannot sue McGladrey because of lack of standing based on the *in pari delicto* doctrine.[34]  This argument is wrong, and has been repeatedly rejected by controlling Pennsylvania case law—even if Pennsylvania law applied.

The Pennsylvania Supreme Court has specifically adopted Restatement (Second) of Torts, § 552,[35] which provides:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise the care of competence in obtaining or communicating the information.

> (2) … The liability stated in Subsection (1) is limited to loss suffered

>      (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

>      (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

---

[34] Memorandum of Law In Support of Motion to Dismiss of McGladrey & Pullen LLP and Aquino, *Trustee v. McGladrey,* 05-72 (JJF) (D. Del.) (March 1, 2005) at 10.

[35] *Rempel v. Nationwide Life Ins. Co.*, 370 A.2d 366, 367 (Pa. 1977) (adopting first Restatement position); *Baker v. Cambridge Chase, Inc.*, 725 A.2d 757, 770 (Pa. Super. Ct. 1999) (quoting Restatement (Second) position); *see also Moffatt Enters., Inc. v. Borden Inc.*, 807 F.2d 1169, 1174 (3rd Cir. 1986) ("Pennsylvania has adopted Restatement (Second) of Torts § 552 regarding the elements of negligent misrepresentation").

Royal's Amended Complaint plead each of these elements. The Accountants were all aware that Royal was providing hundreds of millions of dollars in insurance policies. (Am. Comp. ¶¶ 104, 109.) The Accountants also knew that Royal was the audience for the various accounting reports. (*Id.* ¶¶ 104, 109, 124.) Indeed, Aquino had specific discussions with Yao while preparing the reports about what Royal did and did not know about the fraud scheme. (*Id.* ¶ 124.) Royal has also pled that the Defendants and SFC intended Royal to rely on the reports and that Royal justifiably relied on the reports in issuing the insurance policies. (*Id.* ¶¶ 72-134.) Further, disputes regarding justifiable reliance are properly for the jury. *See Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey & Assocs.*, 39 F. Supp. 2d 517, 534 (M.D. Pa. 1999).

To the extent the Accountants mean to argue that § 552 and Pennsylvania law do not encompass misrepresentations made by accountants, they are mistaken. As explained in detail in *Williams Controls, Inc.*, 39 F. Supp. 2d at 527-534—a case upon which the Accountants themselves rely—the drafters' comments accompanying § 552 unambiguously illustrate that § 552 is intended to apply to accountants and other professionals. *Id.*; *see also*, Restatement (Second) of Torts, § 552, illustrations 3, 5, 10 (considering liability of hypothetical accounting firm). Indeed, *Williams Controls* concluded that, even based solely on § 552, an accounting firm could be held liable for the negligent preparation of financial statements. *Williams Controls*, 39 F. Supp. 2d at 529.

Numerous federal courts considering Pennsylvania law have similarly held, while rejecting the Accountants' argument that negligent misrepresentation requires privity between the accountant and the plaintiff. *See, e.g. In re Chambers Dev. Sec. Litig.*, 848 F. Supp. 602, 626 (W.D. Pa. 1994); *In re Westinghouse Sec. Litig.*, 832 F. Supp. 948, 987 (W.D. Pa. 1993); *Wilder v. Williams*, Civ. A. No. 87-1043, 1989 WL 67821, at *4 (W.D. Pa. Feb. 7, 1989) (permitting

action where plaintiff relied on accountants' financial documents in purchase of client

company).[36]

## II. ROYAL'S RICO CLAIMS AGAINST GAGNÉ AND AQUINO (COUNTS I AND II) PROPERLY PLEAD VALID CAUSES OF ACTION

Royal has properly pled both a RICO count and a RICO conspiracy count against Gagné

and Aquino.  The Amended Complaint alleges that these RICO violations were committed by

four conspirators—including not only Gagné and Aquino, but also Yao, the owner of SFC

(whom Royal has sued as a third party defendant in *MBIA v. Royal*) and Gary Hawthorne,

another officer of SFC.[37]

Gagné attempts to argue that the RICO claims are precluded by the PSLRA, which

prohibits using conduct "actionable" as a violation of the federal securities laws as RICO

predicate acts, while Gagné and Aquino each attempt to argue that Royal has not met all of the

requirements of RICO pleading.  None of Gagné and Aquino's arguments has merit.

**A.      Royal's RICO Claims Are Not Precluded By The Private Securities Litigation Reform Act Because The Predicate Acts Are Insurance Fraud—Not "Actionable As Fraud in the Purchase or Sale of Securities"**

Arguing that the RICO predicate acts alleged by Royal constitute securities fraud, Gagné

claims that the RICO counts are barred by the PSLRA, which provides that:

> no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.

---

[36] The Accountants cite to *In re Phar Mor, Inc. Sec. Litig.*, 893 F. Supp. 484 (W.D. Pa. 1995) and *Pell v. Weinstein*, 759 F. Supp. 1107, 1119-20 (M.D.Pa. 1991) as holding that privity is required for Royal's negligent misrepresentation claim.  However, those cases considered the availability of third-party negligence actions for professional malpractice, not for negligent misrepresentation, and are not applicable here.  *See Pell*, 759 F. Supp. at 1119-20 (action for professional negligence in corporate acquisition between shareholders of target company and accountants for acquiring company); *In re Phar Mor, Inc. Sec. Litig.*, 892 F. Supp. 676, 694 (W.D. Pa. 1995) (decision preceeding 893 F. Supp. 484) (holding that the "negligent misrepresentation claims of plaintiffs are merely cloaked professional malpractice claims," and imputing the privity requirement that would govern malpractice-type claims).

[37] Gagné, Aquino, Yao, and Hawthorne are referred to in the Amended Complaint as the "RICO Persons."

PSLRA, Pub. L. No. 104-67, 109 Stat. 737, 758 (1995). The question presented by PSLRA is straightforward: Would the predicate acts alleged by Royal be "***actionable*** as fraud in the purchase or sale of securities"? *Bald Eagle Area School Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 329 (3d Cir. 1999) (emphasis added). The simple answer is "no"—the predicate acts pled by Royal are common law fraud—and, specifically, insurance fraud—not "***actionable*** as fraud in the purchase or sale of securities." (emphasis added).

This is clearest in those SFC transactions that did not involve securities at all, let alone their purchase or sale. For example, SFC's loan transaction with Wilmington Trust was described by Wilmington Trust, in its complaint against Royal, as follows:

> On January 22, 1999, SFC Financial [an affiliate of SFC] entered into a Student Loan Warehouse Line of Credit Agreement … with Wilmington Trust pursuant to which Wilmington Trust extended loans and established a 'warehouse' credit facility to enable SFC Financial, itself or through … affiliates … to originate or acquire student loans. … As collateral for the underlying loans … SFC Financial procured from Royal the Policies naming Wilmington Trust as the beneficiary.

Complaint [of Wilmington Trust], *Wilmington Trust v. Royal,* No. 02-1361 (JJF) (D. Del.). No securities were sold to or purchased by anyone in connection with SFC's transaction with Wilmington Trust (which, as noted above, has obtained a $12.9 million judgment against Royal). There was not, and could not have been, securities fraud in the Wilmington Trust transaction.[38] The same is true of SFC's transactions with PNC, which resulted in a $110.5 million judgment against Royal. Thus—even if the remainder of Defendants' argument about PSLRA were valid, which it is not—Royal would still have valid RICO claims based on the damages Royal

---

[38] In *MBIA I,* 286 F. Supp. 2d at 348, this Court noted, with respect to some of SFC's transactions, that "SFC sought to engage in larger transactions through 'securitized' arrangements, where it could raise financing through the sale of asset-backed securities in the private securities market." In citing that part of this Court's opinion (Gagné Br. at 10), Gagné fails to note that this Court was merely describing some of SFC's transactions, that this Court did not yet have before it the facts relating to the Wilmington Trust transaction (which clearly does not involve the purchase or sale of securities), and that there was no legal consequence (in the matter then before the Court) to the issue of whether or not those transactions constituted the sale of securities, and the issue thus was not litigated.

sustained as a result of having been fraudulently-induced to issue policies to Wilmington Trust and PNC.

Moreover, the fraud scheme was designed so that either Royal, as insurer, or MBIA, as financial guarantor, would be left holding the bag when the fraud scheme inevitably collapsed—and that no damages would be sustained by any investors in the securitizations. The core of this scheme was insurance fraud, not securities fraud. Insurance fraud via mail or wire fraud is a proper RICO predicate act. *See In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 133 F.3d 225, 231 (3d Cir. 1998) (plaintiffs' insurance fraud claim deemed a proper RICO predicate act); *State Farm Mut. Auto. Ins. Co. v. Makris*, No. Civ. A. 01-5351, 2003 WL 924615, at *9 (E.D. Pa. Mar. 4, 2003) (permitting RICO action for insurance fraud); *Healthguard of Lancaster, Inc. v. Gartenberg*, No. Civ. A. 02-2611, 2004 WL 632722, at *12 (E.D. Pa. Mar. 5, 2004) (submission of false insurance claims via postal service constitutes a predicate act under RICO).

Gagné and Aquino, among others, committed insurance fraud separate from, and at best as a prelude to their *possible* commission of securities fraud in *some* of the transactions; and that *separate* insurance fraud qualifies as a RICO predicate act. *SEC v. Zandford*, 535 U.S. 813, 825 n. 4 (2002) ("If, for example, a broker embezzles cash from a client's account or takes advantage of the fiduciary relationship to induce his client into a fraudulent real estate transaction, then the fraud would not include the requisite connection to a purchase or sale of securities"). But even in those SFC transactions in which the interests sold in pooled loans might be considered securities, no claim for securities fraud could be pled because the "purchasers," *i.e.*, the investors, are guaranteed payment under MBIA's financial guaranty. They simply *were not injured,* which is one of the elements of a securities fraud claim. *See California Pub. Employees' Ret. Sys. v. Chubb Corp.,* 394 F.3d 126, 143 (3d Cir. 2004) ("To state a claim for relief under section 10(b), a plaintiff must plead facts demonstrating that (1) the defendant made

a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading; (2) the defendant acted with scienter; and (3) the plaintiff's reliance on the defendant's misstatement **caused him or her injury.**  *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1417 (3d Cir.1997)")  (emphasis added*); In re Ikon Office Solutions, Inc.,* 277 F.3d 658, 666 (3d Cir. 2002) ("*Ikon*").  And, consistent with the structure of the insurance fraud, no investor in this matter has sued for securities fraud.

Gagné no doubt recognizes that the absence of "injury" to any purchaser of securities is fatal to his PSLRA argument, and seeks to obscure that issue by intentionally omitting that element from his description of the Third Circuit's decision in *Ikon*.  While Gagné states that *Ikon* requires a showing of only "proximate causation" to plead securities fraud (Gagné Br. at 12), *Ikon* actually requires that a plaintiff show "that the plaintiff's reliance was the proximate cause **of his or her injury**," *Ikon*, 277 F.3d at 666 (emphasis added).

In *Bald Eagle Area School Dist. v. Keystone Fin., Inc.*, the Third Circuit noted that the PSLRA provided a simple test defining the scope of its prohibition of the use of violations of the securities laws as RICO predicate acts:

> [T]he proper focus of the analysis is on whether the conduct pled as predicate offenses is **actionable as securities fraud**—not on whether the conduct is intrinsically connected to, and dependant upon, conduct actionable as securities fraud.

189 F.3d at 329 (emphasis added).  The conduct pled here as predicate acts—the fraudulent representations to Royal, which induced Royal to issue the credit risk insurance policies—is not "actionable as fraud in the purchase or sale of securities fraud" for two reasons:  (i) because in some transactions no security was involved; and (ii) because in those transactions in which securities arguably were issued the insurance fraud was separate from any securities fraud, and in any event, no purchaser of a purported security sustained any damages.

In the cases that Gagné cites in support of his PSLRA argument, not only did the predicate acts alleged all relate to the purchase or sale of stock, but they all involved conduct that was **"actionable"** as securities fraud. *See In re Ikon Office Solutions, Inc. Sec. Litig.*, 86 F. Supp. 2d 481 (E.D. Pa. 2000) ("The court finds that under the Third Circuit's decision in *Bald Eagle,* 189 F.3d at 321, the actions alleged in support of the RICO count are **actionable** as securities fraud and therefore cannot constitute proper predicate acts necessary to sustain a claim under 18 U.S.C. § 1962(d)") (emphasis added); *Gatz v. Ponsoldt*, 297 F. Supp. 2d 719, 731 (D. Del. 2003) ("Applying the *Bald Eagle* test, the court concludes that the conduct alleged as predicate acts by the plaintiffs would be **actionable** as securities fraud and, consequently, may not serve as predicate acts for purpose of a civil RICO action") (emphasis added).  Here, because the predicate acts were not "actionable" as fraud in the purchase or sale of securities, PSLRA does not bar the RICO claims.

**B.  Royal Has Properly Pled The Existence Of A RICO Enterprise**

> **1.  The Association-In-Fact Of SFC, SFC-Related Entities, Pepper, McGladrey And Freed Is A RICO Enterprise**

Under the Federal Rules, a party need only make a "bare allegation" of an "enterprise" to survive a motion to dismiss.  *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 790 (3d Cir. 1984) (cited by Gagné) (finding enterprise properly pled where entities constituting enterprise identified in complaint and noting "[t]he rules of pleading require nothing more at this early juncture than that bare allegation"); *Dianese, Inc. v. Commw. of Pa.*, No. Civ. A. 01-2520, 2002 WL 1340316, at *10 (E.D. Pa. June 19, 2002) (cited by Gagné) ("[n]ormally [a] bare allegation [of enterprise] should suffice for the claim to survive a motion to dismiss…")

Royal, having plainly identified the entities that comprise, and the nature of, the enterprise at issue here (Am. Compl. ¶¶ 141-52), has met the Federal Rules' pleading requirements. (*Id.*)

Nevertheless, Gagné erroneously claims that Royal's enterprise averment fails because Royal has allegedly pled that the enterprise and the acts of racketeering were one and the same (Gangé Br. at 14-19)—in particular that "the combination of Pepper, McGladrey and Freed, along with [SFC and the SFC-related entities]" had "no existence apart from Royal's alleged conspiracy." (*Id.* at 18.) This argument completely ignores the plain allegations of Royal's Amended Complaint. Royal has not pled that Pepper, McGladrey, Freed, SFC and the SFC-related entities were engaged solely and only in a conspiracy, but, rather, that through the association-in-fact of those entities—all of whom were engaged in the business of generating and selling the SFC loans—formed the enterprise through which the RICO Persons conducted their pattern of racketeering activity. (Am. Compl. ¶¶ 141-152.)

Here, the persons engaged in the acts of racketeering activity—including Yao, Gagné and Aquino—were separate from the association-in-fact enterprise of SFC, Pepper, McGladrey and Freed through which the RICO Parties acted. *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc.*, 46 F.3d 258, 268 (3d Cir. 1995) (holding corporation is separate "enterprise" from acts of racketeering engaged in by officers and employees of said corporation). Royal's allegation of an enterprise (SFC, the SFC-related entities, Pepper, McGladrey, and Freed) associated-in-fact for a business purpose other than racketeering (the SFC loan program) separate from the RICO Persons (Yao, Hawthorn, Gagné, and Aquino) and their racketeering activities (using the mail and wires to defraud Royal) sets Royal's allegations apart from those in Gagné's cases. *See Gates v. Ernst & Young*, No. Civ. A. 93-CV-2332, 1994 WL 444709, at *2 (E.D. Pa. Aug. 15, 1994) (plaintiff alleged only that "the defendants' agreement to commit racketeering acts [itself] constitute[d] the enterprise"); *Dianese, Inc.*, 2002 WL 1340316, at *11 (plaintiff alleged that

enterprise was group of individuals that controlled various entities "***for the purpose of carrying***

***out the predicate acts***" and was therefore "indistinguishable" from the conspiracy) (emphasis in

original); *Jeffreys v. Exten*, No. 86-32-SLR, 1993 U.S. Dist. LEXIS 18537, at *51 (D. Del.

Dec. 30, 1992) (plaintiff alleged enterprise only engaged in racketeering).  Contrary to Gagné's

allegations (Gagné Br. at 18), Royal has alleged that the normal business of the enterprise, the

legitimate legal and financial advice given to SFC for legitimate loans—even though those loans

were dwarfed by the fraudulent loans—was different from the acts of racketeering perpetrated by

the RICO Persons.  (Am. Comp. ¶¶ 141-52; 153-66.)

Finally, Gagné's contention that Royal has merely pled a "hub and spoke" conspiracy

(Gagné's Br. at 17 n. 7) is equally baseless.  Royal has adequately alleged that SFC, the SFC-

related entities, Pepper, McGladrey and Freed all knew each other existed and were aware of

their roles sufficient to create a RICO Enterprise by an association-in-fact:  "All of the RICO

Persons did business with some or all of the individual members of the RICO Enterprise and

with the RICO Enterprise as a collective unit." (Am. Comp. ¶ 149; *see also Id.* ¶ 86.)  *See United*

*States v. Parise,* 159 F.3d 790, 796 (3d Cir. 1998).

### 2.    Gagné And Aquino Took Part In The Operation And Management Of The RICO Enterprise

Gagné and Aquino also argue that the RICO claims should be dismissed absent an

allegation that they controlled the RICO enterprise.  (Gagné Br. at 19-24; McGladrey Br. at 22-

24.)  This argument, too, fails.  The allegations of the Amended Complaint are more than

sufficient to meet the statutory requirements that a RICO defendant "conduct or participate,

directly or indirectly, in the conduct of such enterprise's affairs."  18 U.S.C. § 1962(c); *Reves v.*

*Ernst & Young,* 507 U.S. 170, 179 (1993) (endorsing "operation and management" test for

determining whether a defendant's participation in the conduct of an enterprise's affairs met this statutory requirement).

Royal has pled that both Gagné and Aquino were critical players in the RICO enterprise, responsible for the issuing of documents essential to defrauding Royal—the PPMs (Gagné) and the accounting reports (Aquino). Those functions were key in the "operation and management" of the RICO enterprise.

> [T]he "operation or management" test is designed to limit RICO liability under § 1962(c) to those situations in which the government can demonstrate "a nexus between the person and the conduct in the affairs of an enterprise."

*United States v. Parise,* 159 F.3d at 796, *quoting Univ. of Md. at Balt. v. Peat, Marwick, Main & Co.,* 996 F.2d 1534, 1539 (3d Cir. 1993). The law does not require that a defendant mastermind a RICO enterprise, or be its "CEO", to be liable for participation in its "operation and management." *United States v. Shifman*, 124 F.3d 31, 36 (1st Cir. 1997) (RICO liability extends to those "plainly integral to carrying out" the enterprise's activities).

So long as a defendant "knowingly further[s] the illegal aims of the enterprise by carrying out the directives of those in control," *Parise*, 159 F.3d at 796, he is participating in the conduct of the affairs of the enterprise. Royal has easily met these pleading standards. Even if Gagné and Aquino were not in charge of their own portions of the RICO enterprise, and Royal has properly alleged they were, at minimum Royal has shown that they were knowingly furthering the illegal aims of the enterprise, that there was a "nexus" between their conduct and the affairs of the enterprise, and that they were "integral to carrying out" the enterprise's activities.

The cases cited by Gagné or Aquino all dealt with "outside" professionals who could not have "operated" or "managed" the "enterprise," either because of how the enterprise was pled, or because the professionals were not even alleged to have known of the fraudulent activity

underlying the RICO scheme, let alone alleged to have funded it, as Gagné did through his family members and trusts.[39]  Royal's RICO allegations here are distinguishable from all of Gagné's and Aquino's cases.  Here, Gagné and Aquino are RICO defendants who knowingly participated in the fraudulent scheme and their respective law and accounting firms are named members of the RICO enterprise but are not RICO defendants.  As such, the Amended Complaint properly alleges Gagné and Aquino's role in the "operation and management" of the RICO enterprise.

## C.    Royal Has Properly Pled A Pattern Of Racketeering Activity And That Aquino Committed Predicate Acts

Aquino argues that Royal has failed to allege a pattern of racketeering activity because Royal has not alleged closed-end continuity or a continued threat of criminal activity.  Aquino also argues that Royal has not properly alleged that he committed any predicate acts of wire or mail fraud.  These arguments, too, are without merit.

### a)    Pattern Of Racketeering Activity

Aquino's argument that "closed-ended continuity" requires "predicates extending of a substantial period of time" (McGladrey Br. at 24) misstates the law.  In *H.J. Inc., v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 242 (1989), the Supreme Court stated that continuity can be shown by a closed period of repeated conduct or where the predicate acts are part of the way a party regularly conducts business.

---

[39] *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison* 955 F. Supp. 248 (S.D.N.Y. 1997) (accounting firm named RICO defendant and not alleged as part of the RICO enterprise or to have knowingly participated in fraud); *Univ. of Md. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534 (3d Cir. 1993) (same and also noting accounting firm merely provided financial services); *Reynolds v. Condon* 908 F. Supp. 1494 (N.D. Iowa 1995) (law firm only alleged member of RICO enterprise involving alleged extortion in divorce action); *Gilmore v. Berg*, 820 F. Supp. 179 (D.N.J. 1993) (neither attorney nor accountant alleged knowing participants in scheme; attorney named RICO defendant but law firm not alleged as part of RICO enterprise; *Biofeedtrac, Inc. v. Kolinar Optical Enter. & Consultants*, 832 F. Supp. 585 (E.D.N.Y. 1993) (decided on summary judgment, not motion to dismiss, and lawyer RICO defendant not found to have affected client's business decisions).

> The continuity requirement is likewise satisfied where it is shown that the
> predicates are a regular way of conducting defendant's ongoing legitimate
> business (in the sense that it is not a business that exists for criminal purposes), or
> of conducting or participating in an ongoing and legitimate RICO 'enterprise.'

*H.J., Inc.*, 492 U.S. at 243.  This is exactly what Royal has pled:  Aquino used the acts performed

in the "regular way" of conducting the "legitimate business" of McGladrey and Freed to further

the RICO enterprise.

Aquino's claim that courts look only to the specific period of time in which the predicate

acts were committed, rather than to the duration of the entire fraudulent scheme, to evaluate the

continuity requirement, is wrong.  Courts look to the entire scheme when evaluating the

continuity requirement and not just the predicate acts.  *Tabas v. Tabas,* 47 F.3d 1280, 1294 (3d

Cir. 1995) (analyzing scope and duration of entire scheme, not just predicate acts advancing

scheme).  In this case, the entire pattern of racketeering activity as to Royal took place over a

period of more than three years, from at least the time SFC transmitted to Royal via interstate

mail the first fraudulent term sheets (November 13, 1998) (Am. Comp. ¶ 27), through the

disclosure and collapse of the fraud scheme, as to SFC, in March 2002 (Am. Comp. ¶¶ 68-71).

The series of predicate acts over this three-plus year period is sufficient to find close-ended

continuity.  *Tabas,* 47 F.3d at 1294 (close-ended continuity over a period of 33 months).

Aquino is also incorrect in arguing that Royal has failed to allege facts showing any

threat of continued criminal activity.  Royal has alleged that Aquino facilitated the fraud, with

knowledge, across nearly four years and three accounting firms.  (Am. Comp. ¶¶  95-130.)

During that entire period, Aquino advised Yao and SFC.  Aquino is also alleged to have known

about, and specifically advised, Gagné and his family regarding their transactions with SFC.

Aquino is still an accountant working for McGladrey; Gagné is still a partner at Pepper

Hamilton.  Pepper and Gagné continued to represent and be paid by SFC for months after the

fraud was publicly disclosed to Royal. On the facts alleged, there is ample evidence for Royal to

show that there is a threat of continued criminal activity involving the RICO parties.

### b) Aquino's Predicate Acts

Aquino's claim that Royal has not properly alleged mail fraud fails for the reasons

discussed, *supra*, in Section I.D.1 (Fraud) of the Argument.

## D. Royal Has Properly Pled The Existence Of A RICO Conspiracy

Royal has not only properly pled a valid RICO claim against a Gagné and Aquino, Royal

has pled a valid RICO conspiracy as well.

> In order to state a claim pursuant to § 1962(d), a complaint must allege
> (1) agreement to commit the predicate acts of fraud, and (2) knowledge that those
> acts were part of a pattern of racketeering activity conducted in such way as to
> violate section 1962(a), (b) or (c).

*Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989), *quoting Odesser v. Continental Bank,* 676 F.

Supp. 1305, 1312 (E.D. Pa. 1987). Royal has satisfied this standard.

Gagné's objection to Royal's RICO conspiracy claim is simple (and wrong). Gagné

claims that because Royal supposedly failed to plead Gagné's active participation in a RICO

violation, Royal cannot plead a RICO conspiracy. As discussed above, Royal has pled RICO

violations by all the RICO Persons, including Gagné. More importantly, under *Smith v. Berg*,

247 F.3d 532, 538 n. 12 (3d Cir. 2001), even if Royal had not pled that Gagné himself performed

predicate acts, so long as he had knowledge of RICO violations and facilitated them, Gagné can

be liable for RICO conspiracy.

Aquino's arguments—he claims that Royal alleged no "common purpose" to the

scheme—are equally flawed.

> When the activities are interdependent or mutually supportive to any degree, the
> inference becomes compelling that the participants are involved in but one
> conspiracy.

*United States v. Smith*, 82 F.3d 1261, 1269 (3d Cir. 1996). Royal has more than satisfied this standard. Here, the activities of Gagné, Aquino, Yao, and Hawthorne—i.e., the "RICO Persons"—were "interdependent" and "mutually supportive" in facilitating the fraud upon Royal. Each of these persons played his role, supporting each of the others, in concealing the true nature of the loan scheme, the massive loan defaults, and SFC's clandestine ghost payments. And, of course, Aquino and Gagné are both alleged to have done far more here than "the mere provision of accounting services"—they are alleged to have participated in the orchestration and concealment of the SFC loan scheme. Aquino, who knew of SFC's secret ghost payments in 1998 but continued to advise SFC and legitimize its fraudulent transactions with "certified" accounting reports, and Gagné, who similarly sought to legitimize SFC's fraud with, among other documents, the PPMs, clearly shared in the "common purpose" of defrauding Royal.

### III. FREED IS A PROPER PARTY TO THIS ACTION

Freed claims that it should be dismissed as a party because Freed says that Freed Maxick & Battaglia CPAs, P.C. ("FMB"), the named defendant, is not the same entity as Freed, Maxick, Sachs & Murphy, P.C. ("FMSM"), which issued the 2000 Audit Report. (Freed Br. at 1, 3-4.) To support its argument, Freed goes outside the allegations of the Amended Complaint, and attaches documents from the New York Department of State (*Id.*, Ex. A thereto) which give 2001 as the date of formation of FMB, and which show FMSM as still in existence.

Oddly, having made the decision to go outside the allegations of the Amended Complaint, Freed has elected not to submit an affidavit describing the relationship between FMB and FMSM, even though the fact that there is some relationship between the two is transparent from the Department of State documents: FMB and FMSM share the same "DOS [Department of State]" and "Principal Executive Office" addresses, "800 Liberty Building, Buffalo, New York, 14202"; and FMB and FMSM share the same "Chairman or Chief Executive Officer",

Robert Glaser, whose address is also "800 Liberty Building, Buffalo, New York, 14202." (*Id.*, Ex. A thereto.)

The Department of State records—standing alone—do not resolve FMB's contention that it had nothing to do with the fraudulent conduct at issue in this case. Moreover, if one were to go outside the parameters of the Amended Complaint, other publicly available documents at least cast doubt on FMB's contention that it was born pure *in 2001,* and that it had nothing to do with FMSM or McGladrey. For example, in seeking Bankruptcy Court approval that a debtor retain FMB as its accountant, FMB has represented that "FMB has *a 40-year history* of professionalism and a reputation for providing trusted, quality service—a commitment that has not changed." Application to Employ Freed Maxick & Battaglia, CPAs, PC as Accountant Filed by Debtor Sheehan Memorial Hospital, *In re Sheehan Memorial Hospital, Debtor* 1-04-11548-CLB (Bkrptcy W.D.N.Y.) (D.I. 170, June 28, 2004) (emphasis added). (Royal's Appendix ("Royal's App."), Ex. A at B20.) FMB's own website similarly claims that FMB was "**[f]ormed in 1958**" (emphasis added), and recites that it is still "[a]ffiliated with RSM McGladrey, the 5th largest accounting and consulting firm in the U.S."

*http://www.freedmaxick.com/ftp_only/FreedMaxickFacts.pdf.* (emphasis added). (Royal's App., Ex. B at B21.) And in 2001, when Freed states it ended its affiliation with McGladrey, it was reported in the press—in a story quoting Mr. Glaser, the managing partner of Freed—that *FMSM was merely adopting a new name, FMB*, not that individual partners of FMSM had formed a new firm, FMB:

> Freed Maxick Sachs & Murphy P.C. has backed out of a merger of its accounting services with McGladrey & Pullen LLP, a national organization associated with H&R Block Inc.
>
> The Buffalo firm also has changed its name to Freed Maxick & Battaglia CPAs PC to acknowledge the Batavia accounting office Freed Maxick acquired in 1999. The local firm was to have adopted the McGladrey name.

> The decision to separate the local firm from the national organization appears to be mutual:  Freed Maxick preferred to retain its own identity and avoid the overhead while McGladrey wanted to concentrate on bigger markets, according to the firms.
>
> "It became obvious to us that the economics of running the McGladrey firm in Western New York, looking at the economics of our client base, it didn't make sense," said Robert Glaser, Freed Maxick's managing partner.

*Freed Maxick Merger Ends After 10 Months*, Buffalo Business First, Sept. 12, 2001, *available at* http://www.bizjournals.com/buffalo/stories/2001/09/10/daily12.html.  (Royal's App. Ex. C at B22.)

Of course, Royal does not suggest that this Court decide the relationship between FMB and FMSM based on news articles or statements on FMB's website or even FMB's court filings in other actions.  Royal merely points to this material to illustrate that if one is to look beyond the Amended Complaint (which adequately pleads that FMB is a proper party to this action), one must do so after discovery of the relationship between FMB and FMSM, including documents from the transactions by which Freed ended its relationship with McGladrey, and with proper evidence, such as deposition testimony, setting forth the facts.  That inquiry may result in Royal's consenting to the dismissal of FMB as a defendant and/or seeking to add FMSM as a defendant.

# CONCLUSION

For the foregoing reasons, Royal respectfully requests this Court to deny with prejudice the Defendants' FED. R. CIV. P. 12(b)(6) Motions To Dismiss.

Dated:  July 29, 2005

Respectfully submitted,

ASHBY & GEDDES

/s/ Philip Trainer, Jr.
Lawrence C. Ashby (I.D. #468)
Philip Trainer, Jr. (I.D. #2788)
Tiffany L. Geyer (I.D. #3950)
222 Delaware Avenue, 17th Floor
Wilmington, Delaware 19899
(302) 654-1888
(302) 654-2067 (Fax)

Michael H. Barr
Kenneth J. Pfaehler
Richard M. Zuckerman
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, New York  10020-1089
(212) 768-6700
(212) 768-6800 (fax)
        and
Alan S. Gilbert
John I. Grossbart
SONNENSCHEIN NATH & ROSENTHAL LLP
8000 Sears Tower
233 S. Wacker Drive
Chicago, Illinois  60606
(312) 876-8000
(312) 876-7934 (fax)

*Attorneys for Plaintiff*
*Royal Indemnity Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 29, 2005, I electronically filed the attached **ROYAL INDEMNITY COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** with the Clerk of Court using CM/ECF, which will send notification of such filing to the following:

William H. Sudell, Jr., Esquire
Morris Nichols Arsht & Tunnell
1201 North Market Street
Wilmington, DE 19899-1347

James L. Holzman, Esquire
J. Clayton Athey, Esquire
Prickett, Jones & Elliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE 19899

Michael R. Lastkowski, Esquire
Christopher M. Winter, Esquire
Duane Morris LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801

I hereby certify that on July 29, 2005, I have forwarded by Federal Express, the attached document to the following non-registered participants:

John H. Eickemeyer, Esquire
Jonathan A. Wexler, Esquire
Vedder, Price, Kaufman & Kammholz, P.C.
805 Third Avenue
New York, NY 10022

Elizabeth K. Ainslie, Esquire
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103

Richard P. Swanson, Esquire
Veronica E. Rendon, Esquire
Arnold & Porter LLP
399 Park Avenue
New York, NY  10022-4690


_/s/ Tiffany Geyer Lydon_____
Tiffany Geyer Lydon (I.D. # 3950)

155805.1

2