# EXHIBIT 3

Westlaw.

Not Reported in F.Supp.2d                                    Page 1
1999 WL 301648 (D.Del.)
**(Cite as: 1999 WL 301648 (D.Del.))**

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
AMERICAN ENERGY TECHNOLOGIES, INC.,
Plaintiff,
v.
COLLEY & MCCOY CO. and MCDONALD'S
CORPORATION, Defendants.
**No. CIV. A. 98-398 MMS.**

April 15, 1999.

Joseph J. Longobardi, III, Esq., Wilmington,
Delaware; Of Counsel: Daniel L. McCaughan, Esq.,
Exton, Pennsylvania; attorneys for plaintiff.

Richard K. Herrmann, Esq., and Mary B. Matterer,
Esq., of Blank Rome Comisky & McCauley LLP,
Wilmington, Delaware; attorneys for defendants.

MEMORANDUM OPINION

SCHWARTZ, Senior District J.

I. INTRODUCTION

*1 Defendants Colley & McCoy Company
("Colley") and McDonald Corporation ("McDonald)
move for summary judgment on the grounds that
plaintiff American Energy Technologies, Inc.'s
("American") breach of contract claim is barred by
Delaware's statute of limitations. Plaintiff in opposing
defendants' motion argues that choice of law
provision in the contract agreed to by the parties calls
for the contract to be interpreted according to the
laws of the Commonwealth of Virginia. Therefore,
the plaintiff asserts Virginia and not Delaware's
statute of limitations governs the relevant limitation
period. Under the Virginia statute of limitations the
lawsuit is timely.

The Court has diversity jurisdiction under 28 U.S.C.
§ 1332 and supplemental jurisdiction over the state
law claims pursuant to 28 U.S.C. § 1367. For
reasons that follow, the Court will grant defendants'
motion for summary judgment.

II. FACTS

The facts are undisputed. Plaintiff American offered
to install energy saving equipment in defendant
Colley's restaurants, which plaintiff asserted would
help reduce energy costs. Colley accepted American's
offer and the parties entered into a contract on August
3, 1993 (the "Contract"). The Contract specified that
Colley would be in default in the event that it failed
to make the required payments within 10 days of
receiving an invoice. Soon after the equipment was
installed disputes arose between the parties. By letter
dated July 19, 1994, Colley returned American's July
12 invoice unpaid, setting forth the reasons for
disputing the amounts American claimed to be due.

On June 6, 1995, American's attorneys sent a letter
of default to Colley stating in relevant part:
  At this point, my client has instructed me to notify
  you that you are in default ....
  .... I have been instructed to offer you a settlement
  under which you pay to my client the sum of
  $92,000. If you would like to accept this offer,
  please notify me in writing within 5 business days
  of receipt of this letter. If I do not receive a written
  response, I have been instructed to begin litigation
  at once.

More than three years after sending the notice of
default, and almost four years after the July 12 bill
was contested, American filed this lawsuit on July 8,
1998, claiming damages for breach of contract and
unjust enrichment.

III. STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, the
court may grant summary judgment if "there is no
genuine issue as to any material fact and ... the
moving party is entitled to judgment as a matter of
law." Fed.R.Civ.P. 56(c). "Only disputes over facts
that might affect the outcome of the suit under the
governing law will properly preclude the entry of
summary judgment." Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 248 (1986). A dispute is genuine
only if a reasonable jury could return a verdict for the
nonmoving party. See id. When considering a motion
for summary judgment, the court must "view all facts
and inferences in the light most favorable to the party
opposing the motion." Stephens v. Kerrigan, 122
F.3d 171, 176-177 (3d Cir.1997). The Supreme Court
has clarified that the moving party must "bear the
initial responsibility of informing the Court of the
basis for its motion, and identifying those portions of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 301648 (D.Del.)
**(Cite as: 1999 WL 301648 (D.Del.))**

Page 2

'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). After such a demonstration has been made, however, the nonmoving party must go beyond the pleadings and, based on the same types of evidence, must demonstrate "specific facts showing that there is a genuine issue for trial." *Id. at 324.* The nonmoving party cannot rest on his allegations without "any significant probative evidence tending to support the complaint." *Anderson,* 477 U.S. at 249 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 290 (1968)). *See also Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989) (stating that a non-moving party must "adduce more than a scintilla of evidence in its favor ... and cannot simply reassert factually unsupported allegations contained in its pleadings").

## IV. DISCUSSION

**\*2** The dispositive legal issue before the Court is which state's statute of limitations to apply: Delaware or Virginia. American asserts that the Court is required to apply the Virginia statute of limitations. In support of its assertion, American points to the choice of law provision in the contract that states in relevant part:

VENUE: The agreement shall be interpreted according to the laws of the Commonwealth of Virginia. It is further agreed that should legal action be filed to enforce any part of the agreement, the parties hereto expressly agree that the jurisdiction shall be in the Commonwealth of Virginia for Federal purposes, and Henrico County for State purposes and the venu [sic] for state purposes shall be exclusively [the] Commonwealth of Virginia.

American decided to initiate legal action to enforce the agreement in a federal court in Delaware rather than in Virginia, as the terms of the choice of law provision that it relies upon calls for. Notwithstanding this dichotomy, American argues this Court should apply Virginia's five-year statue of limitation in contract disputes, because the choice of law provision calls for the contract to be interpreted in accordance with the laws of the Commonwealth of Virginia. [FN1] American cites to numerous cases in support of its assertion that courts are required to give legal effect to choice of law provisions that are the products of arms length bargaining between sophisticated parties. [FN2]

FN1. The relevant portion of applicable Virginia law relating to statutes of limitations states the following:
In action on any contract which is not otherwise specified and which is in writing signed by the party to be charged thereby, or by his agent, action must be brought within five years whether such writing be under seal or not.
Code of Virginia, Chapter IV--Section 8.01-246.

FN2. The Court notes that American is barred from bringing this lawsuit in Delaware by the express terms of the choice of law provision. American asserted during oral argument that it brought suit in Delaware because it no longer resided in Virginia. Inconvenience to American is not reason enough to excuse its noncompliance with the express terms of the choice of law provision.

While this proposition of law is sound, it is only applicable to the statutes of limitations if the choice of law provision states with specificity that it applies to them. Statutes of limitations are generally considered to be procedural rather than substantive law. *Kalmich v. Bruno,* 553 F.2d 549, 553, (7th Cir.1977), *cert. denied* 434 U.S. 940 (1977). Choice of law provisions in contracts are generally understood to incorporate only substantive law, not procedural law such as statutes of limitation. *Des Brisay v. Goldfield Corp.,* 637 F.2d 680, 682 (9th Cir.1981). The United States Court of Appeals for the Third Circuit in *Gluck v. Unisys Corp.,* 960 F.2d 1168, 1179 (3d Cir.1991), has held that "choice of law provisions in contracts do not apply to statutes of limitations, unless the reference is express." *See also Federal Deposit Ins. Corp. v. Peterson,* 770 F.2d 141, 142 (10th Cir.1985) (absent an express statement of intent, a choice of law provision will not be interpreted as covering a statute of limitations); *Des Brisay,* 637 F.2d at 682 (the intention of the parties to contractually agree upon a limitation period must be clearly expressed if a court has to give it effect). The choice of law provision does not expressly provide for the laws of the Commonwealth of Virginia to apply to the statute of limitations. [FN3] Therefore, the Court holds that Virginia's five-year statute of limitations for contract cases to be inapplicable.

FN3. American wants to conduct discovery so that it can ascertain the implicit

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3
1999 WL 301648 (D.Del.)
(Cite as: 1999 WL 301648 (D.Del.))

understanding of the parties with respect to the choice of law provision vis-a-vis the statute of limitations. American's discovery request will be denied. The relevant inquiry is whether the choice of law provision expressly states that it applies to the statute of limitations. Moreover, American wants to conduct discovery in order to determine the implicit understanding of the parties, when at the same time it is breaching the express terms of the choice of law provision that bars it from bringing suit in Delaware.

Further, in determining the applicable limitations period, this Court, guided by the Erie doctrine, must apply the statutes of limitations of the forum state in diversity cases. _Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed.2079 (1945); see Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. (1938)._ A federal court sitting in diversity is required to apply Delaware's borrowing statute, _10 Del.C. § 8121,_ when the cause of action arises outside of Delaware. _See Ontario Hydro v. Zallea Systems, Inc., 569 F.Supp. 1261, 1264 (D.Del.1983)._ Since the litigants agree the breach of Contract occurred outside of Delaware, the Court is required to apply the Delaware borrowing statute, which states in pertinent part:

**\*3** Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such a cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action.

10 Del.C. § 8121.

The borrowing statute by its terms requires the Court to apply the shorter of Delaware's statute of limitations [FN4] or the statute of limitations of the state where the cause of action arose. The parties are not in agreement as to whether the cause of action arose in Virginia or New Hampshire. The Court need not decide whether the cause of action arose in Virginia or New Hampshire because in either case this lawsuit had to be filed, at the most, within a period of three years from the time American learned of the Contract breach, so as too not run afoul of Delaware's three-year statute of limitations.

FN4. Delaware's three-year statute of limitations set forth in 10 Del.C. § 8106 applies as this a breach of contract claim.

Whether the statute of limitation began to run when Colley refused to pay the invoice on July 19, 1994 or when American's letter dated June 6, 1995 was received is not dispositive. It is clear that at least as of June 6, 1995, American had notice that Colley had breached the Contract. Either date is more than three years before American filed this lawsuit on July 8, 1998. Therefore, the Court holds that this lawsuit is time barred.

## V. CONCLUSION

For the reasons stated above, defendants' motion for summary judgment will be granted.

1999 WL 301648 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:98CV00398 _____ (Docket)
(Jul. 08, 1998)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

Westlaw.

Not Reported in A.2d                                                                                            Page 1
2004 WL 1551484 (Del.Super.), Prod.Liab.Rep. (CCH) P 17,054
**(Cite as: 2004 WL 1551484 (Del.Super.))**

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
Richard V. ANDERSON, et. ux. Plaintiffs,
v.
AIRCO, INC., et al. Defendants.
**No. Civ.A. 02C-12-091HDR.**

Submitted March 16, 2004.
Decided June 30, 2004.

Upon Defendants' Motions to Dismiss Denied in Part
and Granted in Part.

Robert Jacobs, and David A. Arndt, Jacobs &
Crumplar, P.A., Wilmington, Delaware, for
Plaintiffs.

Matthew P. Donelson, and Joel M. Doner,
Wilbraham, Lawler & Buba, P.C., Wilmington,
Delaware for Defendant Airco, Inc.

James W. Semple, Morris, James, Hitchens &
Williams, LLP, Wilmington, Delaware for Defendant
Air Products & Chemicals, Inc.

Albert Manwaring, IV, and Joseph S. Naylor, Pepper
Hamilton, LLP, Wilmington, Delaware for Defendant
Allied Signal, Inc.

John L. Reed, and Gary W. Lipkin, Duane Morris,
Wilmington, Delaware for Defendants American
Chemistry Council, B.F. Goodrich Corp., Conoco
Inc., The Dow Chemical Company, Epec Polymers
Inc., ICI Americas, Inc., PPG Industries, Inc., Pactiv
Corp., PolyOne Corporation, Shell Oil Co., Tenneco
Inc., Tenneco Automotive, Inc., Union Carbide
Corp., Uniroyal Inc. and Zeneca, Inc.

Michael P. Kelly, McCarter & English, LLP,
Wilmington, Delaware for Defendant Bayer
CropScience Inc.

Randall E. Robbins, Ashby & Geddes, Wilmington,
Delaware for Defendant Borden Chemical, Inc.

Adam C. Balick, Balick & Balick, Wilmington,
Delaware for Defendant Bridgestone/Firestone, Inc.

John D. Balaguer, and William L. Doerler, White &
Williams, Wilmington, Delaware for Defendants
Chevron USA Inc., Gulf Oil Corp. and Monsanto
Company.

Frederick L. Cottrell, II, and Alyssa Schwartz,
Richards, Layton & Finger P.A., Wilmington,
Delaware for Defendant Occidental Oxychem.

Jeffrey L. Moyer, and Anne Shea Gaza, Richards,
Layton & Finger P . A., Wilmington, Delaware for
Defendant Formosa Plastics Corporation.

Somers S. Price, Jr., and W. Harding Drane, Jr.,
Potter, Anderson & Corroon LLP, Wilmington,
Delaware for Defendant Gencorp and Olin Corp.

Donald E. Reid, Morris, Nichols, Arsht & Tunnell,
Wilmington, Delaware for Defendant Georgia-Pacific
Corp.

Kevin J. Connors, Marshall, Dennehey, Warner,
Coleman & Goggin, Wilmington, Delaware for
Defendant The Goodyear Tire & Rubber Company.

James P. Hall, Phillips, Goldman & Spence,
Wilmington, Delaware for Defendant Society of
Plastics Industry, Inc.

Richard D. Allen, Morris, Nichols, Arsht & Tunnell,
for Defendant Westlake Vinyls Inc.

David C. Malatesta, Jr., Kent and McBride, P.C.,
Wilmington, Delaware, for Defendant Whittaker
Corporation.

ORDER DENYING IN PART AND GRANTING IN
PART DEFENDANTS' MOTIONS TO DISMISS

RIDGELY, President J.

*1 Now, therefore, for the reasons stated in the
Opinion filed this date, IT IS ORDERED THAT:
  1. Counts Two, Four, and Five of the Complaint
  filed by Richard V. and Sheri R. Anderson are
  dismissed as to Defendants The American
  Chemistry Council, Conoco, Inc., B.F. Goodrich
  Company, ICI Americas, Inc., PolyOne Corp., PPG
  Industries, Inc., Shell Oil Co., Uniroyal, Inc. and
  Zeneca, Inc.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 2
2004 WL 1551484 (Del.Super.), Prod.Liab.Rep. (CCH) P 17,054
(Cite as: 2004 WL 1551484 (Del.Super.))

2. In all other respects, the Defendants' motions to dismiss are denied.

## OPINION

Plaintiff Richard V. Anderson and his wife, Sheri R. Anderson, have filed this civil action against Airco, Inc., and thirty-five other defendants. [FN1] The Andersons seek compensatory and punitive damages for injuries allegedly sustained as a result of prolonged workplace exposure to vinyl chloride monomer ("VCM"), a chemical compound manufactured, marketed, and utilized by various representatives active in the polyvinyl industry.

> FN1. The other defendants are as follows: Air Products and Chemicals, Inc.; Allied Signal, Inc.; The American Chemistry Council; Bayer Cropscience, Inc.; B.F. Goodrich Company; Borden Chemical, Inc.; Bridgestone/Firestone, Inc.; Chevron U.S.A., Inc.; Condea Vista Company; Conoco, Inc.; The Dow Chemical Company; Epec Polymers Inc.; Formosa Plastics Corporation; Gencorp; Georgia-Pacific Corporation; The Goodyear Tire and Rubber Company; Gulf Oil Corporation; ICI Americas, Inc.; Monsanto Company; Occidental Oxychem; Olin Corporation; Pactiv Corporation; Pantasote, Inc.; PolyOne Corporation; PPG Industries, Inc.; Sasol North America, Inc.; Shell Oil Company; Society of the Plastics Industry, Inc; Tenneco, Inc.; Tenneco Automotive, Inc.; Union Carbide Corporation; Uniroyal, Inc.; Westlake Vinyls, Inc.; Whittaker Corporation; and Zeneca, Inc.

A majority of the defendants have filed motions to dismiss. Three motions to dismiss are before the Court and I will address each of these motions in this opinion. The first motion is a consolidated motion filed by Defendants The American Chemistry Council; Conoco Inc.; B.F. Goodrich Company; [FN2] ICI Americas, Inc.; PolyOne Corporation; PPG Industries, Inc.; Shell Oil Company; Uniroyal, Inc.; and Zeneca, Inc. (collectively "Consolidated Defendants"). [FN3] The two remaining motions to dismiss have been individually filed by Defendants Georgia-Pacific Corporation and the Society of the Plastics Industry, Inc. ("SPI"). [FN4]

> FN2. In their pleadings, Consolidated Defendants have identified, among the others "ConocoPhillips Company" and "Goodrich Corporation" as moving

defendants. In the interests of accuracy and consistency, the Court instead has followed the original case caption, which lists "Conoco, Inc.," and "B.F. Goodrich Company."

> FN3. A joinder has been filed by Honeywell International Inc. who has not been identified in the caption of this case. No stipulation or motion has been filed to address the identification of Honeywell as a successor of Allied Signal, Inc. Pending any such amendment, I decline to address any joinder of Honeywell.

> FN4. Georgia-Pacific is sued individually in Count Three, while SPI is named in Counts Four through Eight. Because Count Three raises issues unique to Georgia-Pacific, it is addressed separately from those raised by the other defendants in this opinion. SPI's contentions, however, do not warrant independent treatment, and thus are incorporated into Consolidated Defendants' motion to dismiss.

For the reasons set forth below, the motions are denied in part and granted in part. I first hold that federal law does not preempt the Andersons' state common law claims. The negligence claims in Counts One and Three are not subject to dismissal because the Andersons have pled with particularity each element of the common law tort of negligence. Similarly, because the Andersons have sufficiently alleged each element of the torts of conspiracy and aiding and abetting, Counts Six and Seven will not be dismissed. Count Eight, asserting a derivative cause of action for loss of consortium, therefore also survives the motions to dismiss.

Counts Two, Four, and Five, on the other hand, each fail to state a cause of action upon which relief may be granted. Count Two is dismissed because Delaware law applies to this case and a claim of strict products liability is not recognized here. Finally, Counts Four and Five which involve alleged fraud are dismissed because the Andersons have failed to allege with particularity facts showing reliance by Anderson or facts showing an intent by the moving defendants to induce action by him.

## I. BACKGROUND

From 1986 to 1993, Plaintiff Richard V. Anderson was employed by the Georgia Gulf Corporation, a subsidiary of Georgia-Pacific and manufacturer and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                  Page 3
2004 WL 1551484 (Del.Super.), Prod.Liab.Rep. (CCH) P 17,054
(Cite as: 2004 WL 1551484 (Del.Super.))

marketer of chlorovinyl products. In 2002, Anderson contracted glioblastoma multiform, a type of brain cancer, allegedly as a result of handling VCM compounds at the company's plant in New Castle, Delaware. In December 2002, Anderson, along with his wife, Sheri R. Anderson, filed suit against Consolidated Defendants, Georgia-Pacific, SPI (collectively "Defendants"), and others not involved in this motion, alleging eight instances of tortious conduct on the part of all defendants, who variously comprise suppliers, marketers, and manufacturers in the vinyl compound industry. [FN5] Specifically, the Andersons allege: negligent failure to warn of the known hazards of VCM (Count One); strict products liability (Count Two); negligent and intentional failure of Georgia-Pacific individually to provide a safe workplace (Count Three); reckless failure to provide sufficient warning of the dangers of VCM (Count Four); fraudulent concealment and misrepresentation of the dangers of VCM (Count Five); conspiracy to commit fraud, misrepresentation, and fraudulent concealment of the dangers of VCM (Count Six); aiding and abetting the alleged fraudulent concealment (Count Seven); and loss of consortium (Count Eight).

> FN5. The Complaint further groups all Defendants into two categories: (1) "Supplier Defendants"--Airco, Conoco, PolyOne, PPG, Shell, and Georgia-Pacific; and (2) "Non-Supplier Defendants"--Airco, American Chemistry Council, Conoco, Georgia-Pacific, B.F. Goodrich Company, ICI, PolyOne, PPG, Shell, SPI, Uniroyal, and Zeneca. The former are alleged to have supplied the VCM that Anderson handled at the Georgia Gulf plant. The Andersons accuse the Non-Supplier Defendants, referred to in the Complaint as "Conspiring Defendants," of conspiring to conceal the hazards of VCM. See Pl. Compl. ¶ 3, at 5 (Dec. 11, 2002).

*2 The Andersons claim that Defendants collectively engaged in an industry-wide campaign to conceal the ill effects of VCM exposure and that, in particular, Anderson's brain cancer was caused by his unprotected handling of this compound. Vinyl chloride monomer ($C_2H_3Cl$) is a colorless gas used primarily in the production of polyvinyl chloride (PVC) homopolymer and copolymer resins, a construction-related material used in, among other applications, flooring and piping. [FN6] A known carcinogen, several studies have linked prolonged exposure to VCM to various forms of cancer. [FN7]

The compound is also addressed in the Occupational Safety and Health Act of 1970 ("OSHA"), [FN8] the Clean Air Act of 1970, [FN9] and accompanying federal regulations. [FN10]

> FN6. See Vinyl Chloride Monomer, Georgia Gulf Product Information, available at http://www.ggc.com/docs/products/el/vcm_info.pdf (describing VCM's chemical properties and outlining its commercial applications)(last visited June 24, 2004).

> FN7. Report on Carcinogens, Tenth Edition, U.S. Department of Health and Human Services, Public Health Service, National Toxicology Program (Dec.2002), available at ehp.niehs.nih.gov/roc/tenth/profiles/s186viny.pdf. See also Kathleen M. Rest & Nicholas A. Ashford, Regulation and Technological Options: The Case of Occupational Exposure to Formaldehyde, 1 Harv. J. Law & Tec. 63, 76-77 (1988) (recounting congressional and industrial response to the dangers of vinyl chloride and the latter's remedial actions)(last visited June 24, 2004).

> FN8. 29 U.S.C. § § 651-678.

> FN9. See 42 U.S.C. § 7412(b)(1) (providing list of "hazardous air pollutants," including vinyl chloride).

> FN10. See 29 C.F.R. § 1910.1017 (regulating exposure limits, medical surveillance, signs and labels, and other aspects of the production of vinyl chloride).

The Andersons originally filed this action in Superior Court, Defendants removed the case in January 2003 to the United States District Court for the District of Delaware, [FN11] claiming questions of federal law predominated the Andersons' complaint. In an Order dated July 28, 2003, the District Court remanded the case to this Court. [FN12] Defendants then filed the pending motions to dismiss.

> FN11. See 28 U.S.C. § 1441.

> FN12. Anderson v. Airco, Inc., 2003 U.S. Dist. LEXIS 13765 (D.Del.).

## II. STANDARD OF REVIEW
A Rule 12(b)(6) motion to dismiss requires the Court

Not Reported in A.2d                                                    Page 4
2004 WL 1551484 (Del.Super.), Prod.Liab.Rep. (CCH) P 17,054
(Cite as: 2004 WL 1551484 (Del.Super.))

to determine whether the plaintiff may recover under any reasonably conceivable set of circumstances susceptible to proof under the complaint. [FN13] Dismissal is warranted where the plaintiff has failed to plead facts supporting an element of the claim, or that under no reasonable interpretation of the facts alleged could the complaint state a claim for which relief might be granted. [FN14] Although the trial court need not "accept every strained interpretation of the allegations[,]" a plaintiff is "entitled to all reasonable inferences that logically flow from the face of the complaint." [FN15] As a general rule, vagueness and lack of detail are insufficient grounds for dismissal. [FN16]

> FN13. *Evans v. Perillo,* 2000 Del.Super. LEXIS 243, at *5-6.

> FN14. *Id.*

> FN15. *Malpiede v. Townson,* 780 A.2d 1075, 1083 (Del.2000).

> FN16. *Evans,* 2000 Del.Super. LEXIS 243, at *6.

 Special rules of pleading apply to claims of fraud, negligence, or mistake under Delaware Civil Rule 9(b). A complaint alleging fraud, negligence, or mistake must state with particularity the showing the condition of mind. [FN17] In the fraud context, a plaintiff must refer to the time, place, and contents of the false representations, as well as the identity of and benefit to the person making the alleged misrepresentations. [FN18] To sufficiently plead negligence, a defendant must be put on notice of what duty was breached, who breached it, the breaching act, and the party upon whom the act was performed. [FN19]

> FN17. Super. Ct. Civ. R. 9(b).

> FN18. *Nutt v. A.C. & S., Inc.,* 466 A.2d 18 (Del.Super.Ct.1983); *see also Autrey v. Chemtrust Industries Corp.,* 362 F.Supp. 1085, 1092, 1093 (D.Del.1973).

> FN19. *Myer v. Dyer,* 542 A.2d 802 (Del.Super.Ct.1987).

## III. CONSOLIDATED DEFENDANTS' MOTION TO DISMISS
### A. Preemption
Consolidated Defendants first claim that federal workplace safety laws preempt all of the Andersons'

allegations of misconduct. They argue that their cause of action comprises, in essence, a claim of inadequate warnings, a subject specifically addressed by federal law. In response, the Andersons contend that the federal safety legislation is not meant to supercede all state tort law. According to the Andersons, their claims are grounded in state common law and do not implicate any federal regulatory scheme.

 *3 OSHA is designed to remedy the "substantial burden" that "personal injuries and illnesses arising out of work situations impose [on] interstate commerce in terms of lost production, wage loss, medical expenses, and disability compensation payments." [FN20] In regulating workplace safety, Congress sought, inter alia, to encourage states "to assume the fullest responsibility for the administration and enforcement of their occupational safety and health laws [ ..., and] to improve the administration and enforcement ..." of such laws. [FN21] Workplace standards for vinyl chloride are controlled generally through the Hazard Communication Standard ("HCS"), [FN22] and directly by way of other federal regulations. [FN23] Because federal law regulates this aspect of VCM handling, any state labeling law to the contrary is unenforceable. [FN24]

> FN20. 29 U.S.C. § 651[ (a) ] (no subsection designation in original).

> FN21. *Id.* § 651(b)(11).

> FN22. 29 C.F.R. § 1910.1200 (ensuring that the "hazards of all chemicals produced or imported are evaluated, and that information concerning their hazards is transmitted to employers and employees.").

> FN23. *See id.* § 1910.1017(1) (regulating signs and labeling of vinyl chloride operations).

> FN24. *See generally Gade v. National Solid Wastes Management Assoc ., 505 U.S. 88, 96-97 (1992);* Ferdinand S. Tinio, Annotation, *Pre-emptive Effect of Occupational Safety and Health Act of 1970 and Standards Issued Thereunder,* 88 A.L.R. Fed. 833 (2004). *See also Manufacturers Assoc. of Tri-County v. Knepper,* 801 F.2d 130 (3d. Cir.1986) (holding that HCS preempts Pennsylvania hazardous-substance outreach-program

Not Reported in A.2d
2004 WL 1551484 (Del.Super.), Prod.Liab.Rep. (CCH) P 17,054
(Cite as: 2004 WL 1551484 (Del.Super.))

regulation to the extent it applied to disclosure of workplace hazards in manufacturing sector); *New Jersey State Chamber of Commerce v. Hughey*, 774 F.2d 587 (3d. Cir.1985) (preempting state statute mandating disclosure of substances that may pose environmental hazards).

In determining whether a state action is preempted by the federal law, the Court must look to the congressional intent behind the federal provisions in issue. [FN25] As the District Court noted in its remand order in this case, the traditional police powers of the states will not be superceded by a federal act absent a "clear and manifest purpose of Congress" to do so. [FN26] In the context of OSHA, Congress has expressly saved two areas from federal preemption . [FN27] First, Congress directed that:

FN25. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 208 (1985).

FN26. *Anderson v. Airco*, 2003 U.S. Dist. LEXIS 13765, at *5, quoting *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 605 (1991).

FN27. See *Gade*, 505 U.S. at 96-97.

[n]othing in this Act shall be construed to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment. [FN28]

FN28. 29 U.S.C. § 653(b)(4).

Congress also noted that the Act does not "prevent any State agency or court from asserting jurisdiction under State law over any occupational safety or health issue with respect to which no standard is in effect." [FN29]

FN29. *Id.* § 667(a).

In support of their argument, Consolidated Defendants point to numerous decisions from a variety of jurisdictions detailing the extent that state warning laws have been preempted by regulations issued under OSHA's authority. [FN30] Unlike the claims in these cases, however, the Andersons have raised here a theory of tortious conduct based on

common law principles of negligence and fraud. By directing that OSHA shall not be construed to "enlarge or diminish ... the common law ... rights, duties, or liabilities of employers and employees ...," Congress signaled an intent to leave state law tort actions intact. [FN31] Because the Andersons' inadequate warning claims are grounded in tort law, not administrative labeling requirements, [FN32] OSHA does not preempt any count of the complaint.

FN30. See, e.g., *United Steelworkers v. Auchter*, 763 F.2d 728 (3d. Cir.1985) (discussing preemptive effect of HazCom Standard on state hazard disclosure laws in manufacturing sector); *In re Wireless Tel. Radio Frequency Emissions Prods. Liab. Litig.*, 248 F.Supp.2d 452, 461 (D.Md.2003) (noting that congressional intent controls determination of preemptive effect).

FN31. Cf. *Aetna v. Davila*, No. 02-1845, ___ U.S. ___ (June 21, 2004), 2004 U.S. LEXIS 4571 (holding federal retirement insurance legislation preempts similar state statute because of congressional intent to furnish private remedy exclusively in federal courts).

FN32. Cf. *Papas v. Upjohn Co.*, 985 F.2d 516, 518 (11th Cir.1993) (preempting state law defective labeling action under federal insecticide legislation's labeling and packaging standards); *Hawkins v. Leslie's Pool Mart, Inc.*, 184 F.3d 244, 251 (3d. Cir.1999) (rejecting state action that sought labeling "different from that approved by the EPA .... " under same federal insecticide legislation).

Furthermore, Consolidated Defendants' present claim that the "preemption doctrine requires dismissal of this state-law tort action" is identical to the federal jurisdiction argument raised in the U.S. District Court. [FN33] In its remand order, the U.S. District Court expressly held that the Andersons' claims are not preempted by the labeling standards of OSHA. [FN34] The Consolidated Defendants thus failed to establish "either that federal law creates the cause of action or that the plaintiff's right to relief reasonably depends on resolution of a substantial question of federal law." [FN35] Therefore, it necessarily follows that the federal legislation does not preempt the Andersons' state-law claims.

FN33. Def. Mot. to Dismiss, at 5.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 1551484 (Del.Super.), Prod.Liab.Rep. (CCH) P 17,054
(Cite as: 2004 WL 1551484 (Del.Super.))

Page 6

FN34. *Anderson,* 2003 U.S. Dist. LEXIS 13765, at *6-7 ("The Court finds that the state tort laws at issue have not been preempted by the HazCom Standard or the VCM warning and labeling standard.").

FN35. *Elf Aquitaine, Inc. v. Placid Oil Co.,* 624 F.Supp. 994, 997 (D.Del.1985).

*B. Negligent Failure to Warn*

**\*4** Separately, the Supplier Defendants contend that the Andersons' negligence claims in Count One must be dismissed because Anderson has failed to establish a causal link between his injuries and any particular defendant's activity. According to the Supplier Defendants, the Complaint fails to inculpate the particular defendants that manufactured or supplied the VCM that allegedly caused Anderson's condition.

The Andersons disagree, emphasizing that the Complaint establishes each supplier has the duty to provide VCM in a manner that ensures its subsequent safe handling. The Supplier Defendants breached this duty, according to the Andersons, by failing to provide sufficient information regarding proper handling procedures and by actively concealing this information from them.

The parties cite several cases for their respective positions. In *Money v. Manville Corporation Asbestos Disease Compensation Fund,* several employees of Delmarva Power and Light filed suit against various manufacturers of asbestos products, alleging a number of torts, including negligence. [FN36] After the close of the plaintiffs' evidence, the Superior Court granted a directed verdict in favor of the manufacturers. Specifically, the Court held that, in the absence of expert medical testimony "providing a direct nexus between the defendants' asbestos products and plaintiffs' asbestos-related injuries," the plaintiffs had failed to establish a prima facie case on the issue of causation. [FN37]

FN36. 596 A.2d 1372 (Del.1991).

FN37. *Id.* at 1374 (recounting the Superior Court's reasoning).

Similarly, in *Lipscomb v. Champlain Cable Corporation,* the Superior Court granted summary judgment in favor of an asbestos manufacturer. [FN38] According to the Court, the plaintiff-employee failed to establish a proper "product nexus"--the "factual connection in space and time between a particular plaintiff and a particular defendant's product." [FN39] The employer in *Lipscomb* handled two types of piping, one of which contained asbestos. Because he failed to offer any evidence as to which particular pipe he handled, the Court found that Lipscomb could not prove causation. [FN40]

FN38. *Lipscomb v. Champlain Cable Corp.,* 1988 Del.Super. LEXIS 338 (adopting Master's Report).

FN39. *Id.* at *1. *See also Nutt v. A.C. & S. Co.,* 517 A.2d 690, 692 (Del.Super.Ct.1986) (analyzing product nexus in the summary judgment context, and holding that a plaintiff must offer "some evidence that not only was a particular defendant's asbestos containing product present at the job site, but also that the plaintiff was in proximity to that product at the time it was being used.") (citing *In re Asbestos Litigation,* 509 A.2d 1116 (Del.Super.Ct.1986)).

FN40. *Id.* at *6. For the same reasons, the Court also found an insufficient causal link between Lipscomb's asbestos-related injury and the claim that he handled "unknown sheets of asbestos paper." *See id.*

Finally, in *Threadgill v. Manville Corporation Asbestos Disease Compensation Fund,* another asbestos-exposure case, the Delaware District Court denied a motion for a new trial after a jury returned a verdict in favor of the defendant asbestos manufacturer. [FN41] The District Court noted that "the jury was free to conclude on this record that plaintiffs had failed to establish [a] product nexus" because there was no evidence "explicitly placing Mr. Threadgill in proximity to Manville's asbestos-containing products at the time those products were being used." [FN42] Because the plaintiff's case was "entirely circumstantial," the District Court refused to disturb the jury's verdict. [FN43]

FN41. *Threadgill v. Manville Corp. Asbestos Disease Compensation Fund,* 1990 U.S. Dist. LEXIS 19083 (D.Del.).

FN42. *Id.* at *8.

FN43. *Id.*

I find that all three cases are distinguishable, at this stage of the proceeding. Initially, I note that I must

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                      Page 7
2004 WL 1551484 (Del.Super.), Prod.Liab.Rep. (CCH) P 17,054
**(Cite as: 2004 WL 1551484 (Del.Super.))**

review the Complaint to determine whether under any reasonable interpretation of the facts alleged could the Andersons state a claim, and if so, whether each element of the negligence claim is properly pled. *Money, Lipscomb,* and *Threadgill* were decided at the directed verdict, summary judgment, and post-trial stages of litigation, respectively. In each case, discovery was complete or at least commenced, and in one a verdict had been returned. All three are similar, moreover, in that the plaintiffs had an opportunity to present at least part of their evidence in countering their opponents' attacks. Here, the Court is reviewing only the sufficiency of the Complaint.

**\*5** Substantively, Count One of the Complaint alleges that the "supplier defendants were negligent in that they did not give any warning of the hazards known to them," promoted "representations that denied and underestimated the value of VCM," and failed to conduct "scientific and medical tests to examine and eliminate the hazards of the products they sold, manufactured, and distributed...." [FN44] Through this language, the Andersons have sufficiently alleged the four elements of a negligence action: duty (here, the obligation to warn), the breaching party (the supplier defendants, who are specifically named at the outset of the Complaint), the breaching act (failing to warn), and the injured party (Anderson). In the Complaint, the Andersons need not prove proximate cause because they need not prove their case at this stage of litigation. Accordingly, dismissal at this stage is inappropriate.

> FN44. Pl. Compl. ¶ 11.

### C. Strict Products Liability

Count Two of the Complaint asserts a claim of strict products liability against the Supplier Defendants, alleging that the VCM Anderson was exposed to was "defective and unreasonably dangerous" by virtue of its toxicity and carcinogenicity. [FN45] The Supplier Defendants, according to the Andersons, are strictly liable for Anderson's injuries because of their failure to warn of such dangers. In response, the Supplier Defendants maintain that Delaware does not recognize a strict tort liability in causes of action based on the sale of goods.

> FN45. *Id.* ¶ 13.

In *Cline v. Prowler Industries of Maryland,* the Delaware Supreme Court expressly rejected the doctrine of strict tort liability in the sales context. [FN46] Concerned that it "would be engaging in

impermissible judicial legislation," the Court held that Delaware's version of the Uniform Commercial Code [FN47] preempted any strict liability claim. [FN48] The Andersons, however, claim that Delaware law does not apply to their claim, asserting instead that the "places where the tortious conduct leading to injury occurred were in the states where the [Supplier] Defendants caused their literature to be created and in the States where [they] had their various meetings." [FN49]

> FN46. 418 A.2d 968 (Del.1980); *see also LeJeune v. Bliss-Salem, Inc.,* 85 F.3d 1069, 1071 (3d. Cir.1996) (contrasting Pennsylvania and Delaware products liability jurisprudence).

> FN47. 6 Del. C. § 1-101, *et seq.*

> FN48. *Cline,* 418 A.2d at 974. See also Anita Berstein, *The New-Tort Centrifuge,* 49 DEPAUL L.REV. 413, 425 (1999) (comparing the historical rise of strict liability in tort with the subsequent UCC scheme that "codif [ied] the law of warranties, disclaimers, and third-party beneficiaries.").

> FN49. Pl. Resp. at 27.

In determining which jurisdiction's law applies to a cause of action sounding in tort, Delaware courts follow the tenets of the Restatement (Second) of Conflict of Laws. [FN50] Section 145 provides: "[T]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in [Section 6]." [FN51] Whether a significant relationship attaches to a particular jurisdiction depends upon seven policy considerations enumerated in Section 6:

> FN50. See *Travelers Indem. Co. v. Lake,* 594 A.2d 38 (Del.1991). *See also* Symeon C. Symeonides, *The Judicial Acceptance of the Second Conflicts Restatement: A Mixed Blessing,* 56 MD. L.REV. 1248, 1252, t.1 (1997) (surveying the forty-one jurisdictions, including Delaware, that have abandoned the *lex loci delicti* rule for tort conflicts).

> FN51. Restatement (Second) of Conflict of Laws, § 145(1).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 1551484 (Del.Super.), Prod.Liab.Rep. (CCH) P 17,054
**(Cite as: 2004 WL 1551484 (Del.Super.))**

Page 8

(1) the needs of the interstate and international systems;

(2) the relevant policies of the forum;

(3) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;

*6 (4) the protection of justified expectations;

(5) the basic policies underlying the particular field of law;

(6) certainty, predictability and uniformity of result; and

(7) ease in the determination and application of the law to be applied. [FN52] Furthermore, Section 145 lists the following relational and geographic contacts a court should consider when applying the above factors:

> FN52. *Id.* § 6; *see also Lake,* 594 A.2d at 47.

(a) the place where the injury occurred;

(b) the place where the conduct causing the injury occurred;

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and

(d) the place where the relationship, if any, between the parties is centered. [FN53]

> FN53. RESTATEMENT, *supra* n. 41, § 145(2).

The Restatement, in addition to these wide-ranging considerations, provides a specific framework for personal injury actions:

[I]n an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in [the Section 6 policy considerations] to the occurrence and the parties, in which event the local law of the other state will be applied. [FN54]

> FN54. *Id.* § 146.

Thus, where the tortious conduct and injury occur in different jurisdictions, the state that has the most significant relationship to the action is generally the one in which the plaintiff was injured. [FN55]

> FN55. *Id.* § 146 cmt. e. In choosing which laws to apply, Courts favored the situs of

injury well before the first Restatement's adoption in 1934. *See, e. g., Cameron v. Vandergriff,* 13 S.W. 1092 (Ark.1890); *Le Forest v. Tolman,* 117 Mass. 109 (1875) ("[T]he act which is the cause of the injury and the foundation of the action must at least be actionable or punishable by the law of the place in which it is done, if not also by the law of the place in which redress is sought.") (citing *Smith v. Condry,* 42 U.S. 28 (1843)). *But cf.* Ehrenzweig, *The Place of Acting in Intentional Multistate Torts,* 36 MINN. L.REV. 1 (1951) (favoring the application of local law of state where conduct occurred); Rheinstein, *The Place of Wrong,* 19 TULANE L.REV. 4 (1944) (advocating the same).

The Andersons claim that the Supplier Defendants' actions outside of Delaware resulted in a national deception of VCM workers. They contend that these interstate activities, in turn, engendered a significant relationship to the locus of production, *i.e.,* production and marketing decisions made in Kentucky, Louisiana, and Texas led directly to Anderson's condition. In this case, the alleged injury occurred in Delaware at Anderson's place of employment. Similarly, the Supplier Defendants delivered VCM to the Georgia Gulf plant in Delaware. Even assuming *arguendo* that some wrongful conduct occurred at the site of production, this fact is outweighed by the subsequent interactions between the parties and events in Delaware. [FN56] I am persuaded that Delaware has the most significant relationship to the occurrence at issue and the parties in this case. Because Delaware law applies and does not recognize a claim of strict products liability, Count Two of the Complaint must be dismissed.

> FN56. *See* RESTATEMENT, *supra* n. 41, § 146 cmt. e ("The local law of the state where the personal injury occurred is most likely to be applied when the injured person has a settled relationship to that state....").

### D. Fraud

The remainder of the Complaint alleges an industry-sponsored campaign to mislead the public about the health effects of vinyl chloride exposure. [FN57] Count Four, titled "Recklessness and Conduct of Defendants," sets out a broad timeline of events concerning the Non-Supplier Defendants and their activities within the vinyl chloride industry. The Andersons allege that these parties agreed, over a span of thirty years, to make public false statements

Not Reported in A.2d
2004 WL 1551484 (Del.Super.), Prod.Liab.Rep. (CCH) P 17,054
(Cite as: 2004 WL 1551484 (Del.Super.))

Page 9

regarding VCM through several industry-wide agreements. Specifically, the Andersons recount meetings concerning SD-56, a vinyl chloride safety data sheet promulgated by the Manufacturing Chemists Association ("MCA") in 1953, as well as medical and experimental worker testing allegedly designed to conceal the carcinogenicity and other effects of vinyl chloride exposure. According to the Andersons, these actions "caused inaccurate and insufficient information regarding [vinyl chloride] to be available and but for this, [Anderson] would not have been injured." [FN58]

FN57. Count Three, asserting a claim solely against Georgia-Pacific, is addressed in Section IV, *infra.*

FN58. Pl. Compl. ¶ 76, at 42.

*7 Count Five, titled "Fraud of the Defendants," alleges that an MCA-sponsored epidemiological study of the vinyl chloride industry, commissioned in 1966, was compromised by various activities of the Non-Supplier Defendants. Stemming from "improper sponsor influence," the value of "delay ... to the vinyl chloride industry," and a dearth of "public [and] governmental interest in the hazards posed by ... vinyl chloride monomer," [FN59] the study was repeatedly delayed and ultimately voted down by an MCA committee attended by representatives of various Non-Supplier Defendants. [FN60] Because the MCA and the Non-Supplier Defendants "specifically voted not to spend any money at all on trying to find the cause of the disease in the future," [FN61] Anderson contends he relied on "faulty" information which ultimately caused his injury.

FN59. *Id.* ¶ 77, at 42.

FN60. The Andersons claim that present at this meeting were the agents of "at least" Olin Corporation, Union Carbide Corporation, 3M, DuPont, Dow Chemical Company, and Uniroyal, Inc.

FN61. *Id.* ¶ 90, at 47-48.

Delaware's fraud jurisprudence requires that a plaintiff allege: (1) a false representation, usually one of fact, that was made by the defendant; (2) with knowledge or belief of its falsity or with reckless indifference to the truth; (3) with an intent to induce action or inaction; (4) plaintiff's response is taken in justifiable reliance on the representation; and (5) an injury results from such reliance. [FN62] Relatedly,

these elements also comprise a claim of fraudulent concealment, except that a plaintiff must allege a deliberate concealment by the defendant. [FN63] Failure to allege any of the elements warrants dismissal of the claim. [FN64]

FN62. *See, e.g., Stephenson v. Capano Development, Inc.,* 462 A.2d 1069, 1074 (Del.1983) (recounting fraud' s elements at common law and discussing each requirement in depth); *see generally* PROSSER AND KEETON ON THE LAW OF TORTS 725, 728 (5th ed.1984).

FN63. *Nicolet v. Nutt,* 525 A.2d 146, 149 (Del.1987) (citing *Stephenson,* 462 A.2d at 1074).

FN64. *Zerby v. Allied Signal Inc.,* 2001 Del.Super. LEXIS 16 (dismissing fraud and other claims against defendant vinyl chloride manufacturers).

Although Rule 12(b)(6) "should not be read to impose a requirement that certain magic words be repeated throughout a Complaint," [FN65] Rule 9(b) requires that the circumstances constituting fraud be alleged with particularity. [FN66] This requirement serves to allow defendants to prepare an effective response and defense, eliminate complaints "filed as a pretext for discovery," and to protect defendants from "unfounded charges of wrong-doing" injurious to their "reputation and goodwill." [FN67]

FN65. *Snyder v. Butcher & Co.,* 1992 Del.Super. LEXIS 362, at *19.

FN66. Super Ct. Civ. R. 9(b) (directing that fraud be alleged with "particularity").

FN67. *C.V. One v. Resources Group,* 1982 Del.Super. LEXIS 943.

In their Complaint, the Andersons fail to state how the Non-Supplier Defendants intended Anderson to act or refrain from acting. Similarly, the Complaint does not indicate any reliance on a specific representation made by the Non-Supplier Defendants. The Andersons can only allege a general reliance, based solely on information sources promulgated throughout the industry. [FN68] Although the Complaint specifies the time, place, and contents of the alleged false representations involving several, but not all, of the Non-Supplier Defendants, within the vinyl chloride industry, there is no allegation of

Not Reported in A.2d                                                                    Page 10
2004 WL 1551484 (Del.Super.), Prod.Liab.Rep. (CCH) P 17,054
**(Cite as: 2004 WL 1551484 (Del.Super.))**

any representation to Anderson directly or indirectly as an employee of any Non-Supplier Defendant or of a company supplied with such defendants products. [FN69] General allegations of fraud are insufficient. [FN70] Consistent with this Court's ruling in *Zerby*, [FN71] I hold that Counts Four and Five fail to state a cause of action.

> FN68. *See* Pl. Compl. ¶ 91, at 48 (Anderson *"relied on the information* available to him when he worked at the [Georgia Gulf plant] and as a result of the misinformation ... was injured.") (emphasis added); *id.* ¶ 99, at 50 (Anderson "was made aware of the levels of VCM that were allegedly safe as published by [the Non-Supplier] defendants. He was made aware of a low risk of only liver cancer at the levels of his exposure *and relied on this information* to his detriment.") (emphasis added).

> FN69. *Zerby*, 2001 Del.Super. LEXIS 16, at *20-21 ("The fact, if it is a fact, that the non-supplier defendants fraudulently concealed or misrepresented the dangers of vinyl chloride with the intent to deceive and mislead and to be relied upon by Ms. Zerby and persons like Ms. Zerby whose employment responsibilities exposed them to vinyl chloride, does not state a cause of action where plaintiff was not employed by defendant or a company supplied with defendant's products.") (quotation marks omitted).

> FN70. *See Strasburger v. Mars, Inc.,* 83 A.2d 101, 104 (Del.1951).

> FN71. 2001 Del.Super. LEXIS 16.

### E. Conspiracy and Aiding and Abetting

**\*8** Counts Six, "Conspirac[y] to Commit Fraud and Misrepresentation and Concealment by All Defendants," and Seven, "Aiding and Abetting," reiterate the fraud narrative in Count Five, specifically linking both the Supplier and Non-Supplier Defendants to the industry events concerning VCM safety. Although the Andersons cannot maintain their fraud claims, their conspiracy and aiding and abetting allegations are viable.

*Nicolet v. Nutt,* a conspiracy action stemming from asbestos-related injuries, holds that:

> if competent medical evidence as to the dangers of asbestos was intentionally misrepresented and

suppressed in order to cause plaintiffs to remain ignorant thereof, coupled with proof that such suppression caused injury to a plaintiff, the alleged tort [of conspiracy] is established. [FN72]

> FN72. *Nicolet v. Nutt,* 525 A.2d 146, 148 (Del.1987).

This reasoning has been adopted in the vinyl chloride context. [FN73] Accordingly, if proved, the Andersons would be entitled to relief under the Complaint.

> FN73. *Zerby,* 2001 Del.Super. LEXIS 16, at *24 (holding that if non-suppliers of vinyl chloride "conspired with the suppliers to misrepresent and suppress vinyl chloride's dangers, all the conspirators, including the non-supplier conspirators, can be held liable.").

As to aiding and abetting, the Restatement provides:
For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he ... knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.... [FN74]

> FN74. Restatement (Second) of Torts, § 876(b), *adopted by Patton v. Simone,* 1992 Del.Super. LEXIS 316.

In alleging that the Non-Supplier Defendants deliberately plotted to conceal the health risks surrounding VCM exposure, the Andersons have sufficiently pled the three elements that comprise aiding and abetting: tortious conduct, knowledge, and substantial assistance. [FN75] As to the first element, the Complaint sufficiently alleges negligence as the underlying wrong supporting the derivative conspiracy and aiding and abetting claims. [FN76] In addition, in setting forth its litany of conspiratorial events and accusing the Non-Supplier Defendants of designing and implementing a comprehensive plan of secrecy, the Complaint adequately alleges the latter two elements of aiding and abetting. Accordingly, Count Seven will not be dismissed under Rule 12(b)(6).

> FN75. *Patton,* 1992 Del.Super. LEXIS 316, at *22.

> FN76. *See Nutt v. A.C. & S. Co.,* 517 A.2d 690, 694 (Del.Super.Ct.1986) ("Civil

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 11
2004 WL 1551484 (Del.Super.), Prod.Liab.Rep. (CCH) P 17,054
**(Cite as: 2004 WL 1551484 (Del.Super.))**

conspiracy is not an independent cause of action in Delaware, but requires an underlying wrong which would be actionable absent the conspiracy."); *Phoenix Canada Oil Co. v. Texaco, Inc.,* 455 F.Supp. 749, 752 (D.Del.1978), *aff'd* 595 F.2d 1213 (3d. Cir.1979).

### F. Loss of Consortium

Count Eight asserts a claim on behalf of Mrs. Anderson for damages due to loss of consortium. Because the negligence and conspiracy counts remain, the consortium claim survives as well. [FN77]

> FN77. *See Jones v. Elliott,* 551 A.2d 62, 64-65 (Del.1988); *Lacy v. G.D. Searle & Co.,* 484 A.2d 527 (Del.Super.Ct.1984).

### IV. GEORGIA-PACIFIC'S MOTION TO DISMISS

The Complaint's third count alleges that Georgia-Pacific, as parent company of Anderson's employer, Georgia Gulf, negligently or intentionally exposed Anderson to unsafe levels of VCM "as a result of the manufacturing facilities Georgia-Pacific designed and controlled and provided to Georgia Gulf...." [FN78] Because the company governed the "health and safety" and "[d]isclosures of medical effects of VCM" at Georgia Gulf "through about 1986," Georgia-Pacific "caused [Anderson] to be exposed to high levels of VCM...." [FN79]

> FN78. Pl. Compl. ¶ 20, at 14.

> FN79. *Id.* ¶ ¶ 19-20.

Georgia-Pacific seeks dismissal on several grounds. First, it takes issue with the timing alleged in the complaint. Specifically, Georgia-Pacific notes that Anderson was employed by Georgia Gulf's predecessor, Ethyl Corporation, for several months in 1983, thus making his employment allegations inaccurate. Since it did not purchase Ethyl' s plant until late 1983, Georgia-Pacific insists it could not have controlled the dissemination of information regarding VCM, and therefore cannot be held liable for Anderson's injuries. For the years Anderson was employed by Georgia Gulf, Georgia-Pacific contends that Delaware's workers' compensation laws bar any direct claim against it. [FN80] The company also argues that the Andersons' claims are general and conclusory, devoid of the factual circumstances surrounding Georgia-Pacific's control of Georgia Gulf.

> FN80. *See* 19 Del. C. § 2304.

*9 The purpose of the workers' compensation law is to give an injured employee "a prompt and sure means of receiving compensation and medical care without subjecting that worker to the hazards and delays of a lawsuit." [FN81] Compensation for injuries sustained in the course of employment is thus controlled solely by this statutory scheme, "regardless of the question of negligence and to the exclusion of all other rights and remedies." [FN82]

> FN81. *Frank C. Sparks Co. v. Huber Baking Co.,* 96 A.2d 456 (Del.1953).

> FN82. 19 Del. C. § 2304.

The viability of the Andersons' cause of action against Georgia-Pacific, as parent company to Anderson's direct employer, Georgia Gulf, thus turns on the relationship of the parties within the meaning of the workers' compensation laws. The term *employer* is defined as "all those who employ others unless they are excluded from the application of this chapter by any provision of" the workers' compensation laws. [FN83] The definition of *employee,* a term that has "probably produced more reported cases than any definition of status in the modern history of law," [FN84] is conceptually more problematic.

> FN83. 19 Del. C. § 2301(10).

> FN84. 3 ARTHUR LARSON & LEX K. LARSON, LARSON'S WORKERS' COMPENSATION LAW § 60.01 (2003). *See also Harris v. Seiavitch,* 9 A.2d 375 (Pa.1939); Restatement of Agency (Second) § 220 (defining "servant" as a "person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.").

Courts generally follow the common-law distinction between employee and independent contractor. [FN85] In Delaware, the four elements of the test are: (1) who hired the employee; (2) who may discharge the employee; (3) who pays the employee's wages; and (4) who has the power to control the conduct of the employee when he is performing the particular job in question. [FN86] Although the rules are firmly established, their application to the numerous

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 1551484 (Del.Super.), Prod.Liab.Rep. (CCH) P 17,054
(Cite as: 2004 WL 1551484 (Del.Super.))

Page 12

circumstances that may arise under them remains elusive. [FN87] But however nuanced the application of the rule is, it is well-settled that where one is determined to be an employee, the workers' compensation laws preempt any common-law remedy against the employer for personal injury. [FN88]

> FN85. *See* Restatement of Agency (Second) § 220(2) (listing factors for consideration).

> FN86. *Lester C. Newton Trucking Co, v. Neal,* 204 A.2d 393, 395 (Del.1964); *Hering v. Central Grain,* 1999 Del.Super. LEXIS 156; *see also White v. Gulf Oil Corp.,* 406 A.2d 48 (Del.1979) (holding that statutory definitions in workers' compensations laws do not abrogate common-law concepts governing employer-employee relationship).

> FN87. *See, e.g., Murray's Case,* 154 A. 352, 354 (Me.1931)* ("No hard and fast rule can be made as to when one undertaking to do work for another is an independent contractor or an employee within the meaning of a Workmen's Compensation Act, but each case must be determined on its own facts.").

> FN88. *Powell v. Interstate Vendaway, Inc.,* 300 A.2d 241 (Del.Super.Ct.1972).

On a motion to dismiss, the Court need not "blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable...." [FN89] In determining whether the Andersons would be entitled to relief under any "any set of facts that might be shown to exist consistent with the well-pleaded allegations in the complaint," [FN90] the Court must be satisfied that the Complaint contains more than conclusory and generalized accusations. [FN91] The Andersons contend that Georgia-Pacific controlled the operations, including the safety protocols, of the plant in which Anderson worked. When taken in the context of the Complaint's broad allegations of negligence against the Supplier Defendants, Count Three inculpates Georgia-Pacific, as owner and controller of Georgia Gulf, in the negligent failure of the Supplier Defendants to provide a safe working environment. If true, Georgia-Pacific could be considered Anderson's employer, or as a dual-employer concurrent with Georgia Gulf. [FN92] But under the workers' compensation exclusionary provisions, this state of affairs would disallow any

claim for personal injury against Georgia-Pacific . [FN93]

> FN89. *Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988), *overruled on other grounds, Brehm v. Eisner,* 746 A.2d 244 (Del.2000).

> FN90. *In re Tri-Star Pictures,* 634 A.2d 319 (Del.1993).

> FN91. *Loudon v. Archer-Daniels-Midland Co.,* 700 A.2d 135 (Del.1997); *Grobow,* 539 A.2d at 187.

> FN92. *Loden v. Getty Oil Co.,* 316 A.2d 214, 216 (Del.Super.Ct.1974), *citing* 1A LARSON'S WORKERS' COMPENSATION LAW 839, § 48.40 (recognizing dual-employment relationships for purpose of workers' compensation).

> FN93. *See* 19 Del. C. § 2304.

**\*10** For Georgia-Pacific to be immune from suit by virtue of this principle, however, the Court must find that Anderson is in fact an employee of the parent company. Delaware law recognizes the individuality of corporate entities. [FN94] Moreover, the fact that two corporations have a common central management and control does not override or negate the separate identity of the corporations. [FN95] Thus, whether Anderson can be considered an "employee" of Georgia-Pacific is controlled by the four employment criteria set forth in *Neal.* At this stage of litigation, however, the details of Anderson's relationship, if any, with Georgia-Pacific are insufficiently developed to warrant analysis under this test. As the Complaint serves only a notice function, in this context, the Andersons need not prove their case within it. The allegations in Count Three therefore provide little factual guidance for the Court in determining, for example, who hired Anderson or from which accounts his pay is drawn. [FN96] On the present record, application of the *Neal* test is premature. Accordingly, dismissal of Count Three is unwarranted at this stage of litigation.

> FN94. *Stauffer v. Standard Breads, Inc.,* 178 A.2d 311 (Del. Ch.1962), *aff'd* 187 A.2d 78 (Del.1962).

> FN95. *Skouras v. Admiralty Enterprises, Inc.,* 386 A.2d 674 (Del. Ch.1978).

> FN96. *Cf. Jordan v. E.I. du Pont De*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 1551484 (Del.Super.), Prod.Liab.Rep. (CCH) P 17,054
**(Cite as: 2004 WL 1551484 (Del.Super.))**

*Nemours & Co.,* 1986 Del.Super. LEXIS 1371, at *2 (Del.Super.Ct.1986) (discussing details of "working relationship" between defendants contractor and subcontractor and analyzing parties' relationship under *Neal* ); *Loden, 316 A.2d 214* (examining employment relationship in the context of *Neal* ).

## V. CONCLUSION

As to Counts One, Three, Six, Seven, and Eight, the Defendants' motions to dismiss are *DENIED.* As to Counts Two, Four and Five, Defendants' motions to dismiss are *GRANTED.* An order will be entered consistent with this opinion.

2004 WL 1551484 (Del.Super.), Prod.Liab.Rep. (CCH) P 17,054

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

Westlaw.

Slip Copy                                                                                    Page 1
2005 WL 273298 (D.Del.)
**(Cite as: 2005 WL 273298 (D.Del.))**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
B. LEWIS PRODUCTIONS, INC., Plaintiff,
v.
Vaughn BEAN, Defendant.
No. 02-93-KAJ.

Jan. 28, 2005.

*MEMORANDUM ORDER*

JORDAN, J.

**\*1** This is a breach of contract and fraud action, brought under the diversity jurisdiction of this court. (*See* Docket Item ["D.I."] 1.) Plaintiff and counterclaim defendant B. Lewis Productions, Inc. ("BLP"), a New York corporation with its principal place of business in New York, and third-party defendant Butch Lewis ("Lewis"), a citizen of Delaware, filed a motion *in limine* (D.I. 62 at 18-23; the "Motion") seeking to prevent the defendant, Vaughn Bean ("Bean"), a citizen of Illinois, (D.I. 35 at ¶ ¶ 14-16) from introducing at trial any evidence of damages predating February 4, 1999, because "Bean's counterclaims and third-party claims are barred by the applicable statute of limitations...." [FN1] The case is scheduled to go to trial next week. As I indicated during the pretrial conference last week (1/18/05 Tr. at 14-15), the Motion is nothing less than a motion for partial summary judgment and, therefore, should have been raised by BLP and Lewis no later than the dispositive motion deadline set in the scheduling order.

> FN1. BLP and Bean are parties to a contract pursuant to which BLP was to provide services promoting Bean as a heavyweight boxer. As originally filed, BLP's and Lewis's motion *in limine* sought to prevent any evidence of damages predating July 11, 2000, three years prior to Bean's filing of his counterclaims and third-party claims. (*See* D.I. 62 at 18.) In a follow-up letter to the court, Plaintiff amended the requested date to preclude evidence of damages prior to February 4, 1999, three years prior to the filing of the Complaint. (*See* D.I. 66 at 4-5.)

Bean has rightly complained of the dereliction of BLP and Lewis in this regard. (D.I.72.) He asserts that their affirmative statement in a stipulated scheduling order in this case that "the parties agree that neither will make a case-dispositive motion" (D.I. 51 at 3) should be taken as effecting a waiver of the statute of limitations defense that they now seek to raise. BLP and Lewis counter that they are not bound by a decision to forego an earlier dispositive motion and that, having raised the affirmative defense in their replies to the counterclaims and third-party claims, they should be free to raise the statute of limitations defense as late as a motion for judgment as a matter of law under Rule 50. [FN2]

> FN2. The cases they cite, however, are not enlightening, since they merely note that a statute of limitations defense was addressed in the context of a Rule 50 motion and they say nothing of whether the movant had ignored a specific scheduling order. Nor do they address the circumstance where a party affirmatively represents that no dispositive motions will be made.

Bean has a serious argument that, under the circumstances, the earlier representations and litigation of conduct of BLP and Lewis should constitute a waiver of their statute of limitations defense. Ultimately, however, the substantive rights of the parties in this case ought not turn on a procedural failure when there is a dispositive legal issue that both sides have been on notice of from the pleadings and on which no one has been deprived of the opportunity to take discovery or to present argument. I therefore decline to hold that there has been a waiver of the statute of limitations defense or a procedural default warranting a sanction akin to waiver.

As to the substance of the Motion, the parties agree, it seems, that if Delaware's three year statute of limitations applies, then Bean has no counterclaim or third-party claim for damages flowing from events that occurred prior to February 4, 1999. The parties also apparently agree that New York law applies to the substantive claims in the case and that, if New York's six year statute of limitations also applies, the counterclaims and third-party claims will reach back to February of 1996. (*See* D.I. 62 at 18-23.) The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                       Page 2
2005 WL 273298 (D.Del.)
**(Cite as: 2005 WL 273298 (D.Del.))**

dispute, of course, is over which statute of limitations applies. BLP and Lewis argue that, under Delaware's borrowing statute, Delaware's three year statute must apply. (*Id.* at 18-21.) Bean argues that the Delaware Supreme Court's recent interpretation of the borrowing statute means that New York's lengthier statute of limitations applies. (*Id.* at 21-23.) Bean's view is the correct one.

\*2 Bean's argument includes the assertion that critical aspects of his counterclaims and third-party claims would not be time barred under the longer New York statute of limitations and that it would be manifestly unfair to allow BLP and Lewis to bring this case in Delaware, forcing Bean to bring his compulsory counterclaims, and thereby deprive him of the longer statute of limitations that would have applied had he been permitted to bring his action in New York.

Delaware's borrowing statute states as follows:
Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action. Where the cause of action originally accrued in favor of a person who at the time of such accrual was a resident of this State, the time limited by the law of this State shall apply.
10 *Del. C.* § 8121.

Counterclaims are "actions" for statue of limitations purposes. *See Delaware Chemicals, Inc. v. Reichhold Chemicals, Inc.,* 121 A .2d 913, 918 (Del. Ch.1956) ("a counterclaim seeking affirmative relief is an 'action' within the meaning of the statute [of limitations]"). But that does not necessarily mean that they are "actions" for purposes of the borrowing statute. On the contrary, two weeks ago, the Delaware Supreme Court issued its *en banc* decision in *Saudi Basic Industries Corp. v. Mobil Yanbu Petrochemical Co., Inc.,* 2005 WL 120789 (Del. Jan. 14, 2005), in which it held, in circumstances with similarities to those here, that a "literal construction of the borrowing statute, if adopted, would subvert the statute's underlying purpose[,]" which is to discourage forum shopping. *Id.* at \*9. The court observed that,
[b]orrowing statutes such as [Delaware's] are typically designed to address a specific kind of forum shopping scenario--cases where a plaintiff brings a claim in a Delaware court that (i) arises

under the law of a jurisdiction other than Delaware and (ii) is barred by that jurisdiction's statute of limitations but would not be time-barred in Delaware, which has a longer statute of limitations. Under that 'standard scenario,' the borrowing statute operates to prevent the plaintiff from circumventing the shorter limitations period mandated by the jurisdiction where the cause of action arose.
*Id.* However, the court noted, a literal application of the statute cannot be countenanced when it would circumvent the purpose of the statute, as is the case when a plaintiff can be seen to be taking advantage of the shorter Delaware statute of limitations to deprive a defendant of claims he would otherwise have. *Id.* at \*10 (holding that literal application of borrowing statute would subvert the statute by allowing plaintiff "to prevail on a limitations defense that would never have been available to it had the [defendants'] ... claims been brought in the jurisdiction where the cause of action arose").

\*3 Delaware's connection to this matter appears to be far less significant than New York, which BLP and Lewis have themselves conceded is the jurisdiction whose substantive law applies. (D.I. 62 at 3 n. 1.) While the contract was executed in Delaware, neither of the parties to the contract, BLP and Bean, are citizens of this state, nor does it appear that performance of the contractual obligations was anticipated to take place in this state. The tort claims too appear to be wholly unrelated to this jurisdiction. Indeed, BLP and Lewis acknowledge that "Bean was not a Delaware resident and his claims arose outside of Delaware." (D.I. 66 at 4.)

Thus, the same kinds of considerations that operated to make the literal application of Delaware's borrowing statute inappropriate in *Saudi Basic* appear to be applicable here. Allowing BLP and Lewis to bring suit here and have the advantage of the shorter statute of limitations would effectively encourage the forum shopping denounced by the Delaware Supreme Court, and it would unfairly deprive Bean of rights to which he may otherwise be entitled.   [FN3] Consequently, I hold that Delaware's borrowing statute does not apply and, therefore, neither does Delaware's three year statute of limitations. *See Saudi Basic,* 2005 WL 120789 at \*10 ("because the Superior Court properly ruled that the borrowing statute did not apply, it follows that that court also correctly held that [the defendants'] counterclaims ... were not time-barred.") The Motion is DENIED.

FN3. I emphasize that, on a more developed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 3
2005 WL 273298 (D.Del.)
**(Cite as: 2005 WL 273298 (D.Del.))**

record, my conclusions about the locus of the disputes would perhaps be different, but the lack of record support for BLP's and Lewis's late-filed Motion is a problem of their own creation. I also reiterate that this is not a case where discovery had closed without an opportunity to explore facts and legal theories pertinent to the Motion, nor is it a case where significant expense had been invested by either side in reliance on positions taken during discovery or motions practice. On the contrary, this case has been notable chiefly for the absence of pretrial engagement by the parties. Hence, considering the Motion on its merits is unfair to neither party, and the outcome is not influenced by factors which might exist in the context of a more developed record. If, for any reason, a higher court should disagree with my ruling on this issue, the trial record should be sufficiently clear, both in the presentation of the evidence and in the form of the verdict, to permit damages predating February 4, 1999 to be backed out of the verdict without the necessity of a retrial. The parties are instructed to prepare their proofs accordingly and to confer on an appropriate form of verdict.

2005 WL 273298 (D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 6

Westlaw.

Not Reported in A.2d                                                                                              Page 1
2001 WL 1808554 (Pa.Com.Pl.)
**(Cite as: 2001 WL 1808554 (Pa.Com.Pl.))**

▷
Only the Westlaw citation is currently available.

Pennsylvania Court of Common Pleas.
Michael F. BABIARZ, Plaintiff
v.
BELL ATLANTIC-PENNSYLVANIA, INC., Bell-
Atlantic Communications and Construction
Services, Inc., Bell Atlantic Corporation, and Verizon
Communications, Inc.,
Defendants
**No. 1863 AUG.TERM 2000.**

July 10, 2001.

OPINION

HERRON, J.

**\*1** This action involves the submission of a marketing plan by an employee to his employer, pursuant to the employer's solicitation of its employees for innovative ideas, and the alleged failure of the employer to compensate the employee or to keep the plan confidential from other branches of the company or give credit to the employee for his submission despite the employer's alleged assurances that the employee would receive credit for his idea.

Presently before this court are the Preliminary Objections of defendants, Bell-Atlantic-Pennsylvania ("BA-PA"), Bell Atlantic Communications and Construction Services, Inc. ("BACCSI"), Bell Atlantic Corporation ("Bell Atlantic") and Verizon Communications, Inc. ("Verizon"), to the Amended Complaint of plaintiff, Michael F. Babiarz ("Babiarz"), as well as plaintiff's response in opposition to the Preliminary Objections. Plaintiff has also filed a Petition to Amend his First Amended Complaint, which defendants oppose as to the proposed substantive amendments. For purposes of judicial economy, the court will consider both motions in conjunction with one another.

For the reasons set forth in this Opinion, the Preliminary Objections are overruled in part and sustained in part. Additionally, the Petition to Amend the First Amended Complaint is granted.

BACKGROUND

Taken as true, the operative facts, as pleaded in the Amended Complaint, are as follows. [FN1] Babiarz has been continually employed by defendant BA-PA and did not have an employment relationship with any defendant other than BA-PA. Am.Compl. at ¶ 1. Babiarz was employed in the capacity of a service technician to install and repair telephone lines and other telecommunications products. *Id.* at ¶ 6. Defendants BA-PA is a separate and distinct corporation from BACCSI. *Id.* at ¶¶ 2-3. Bell Atlantic had control over the business operations of BA-PA and BACCSI. *Id.* at ¶ 4. Verizon is the successor in interest to one or more of the defendants. *Id.* at ¶ 5. As alleged, a confidential and/or fiduciary relationship existed between Babiarz and Bell Atlantic and/or BA-Pa. *Id.* at ¶ 7.

> FN1. The Amended Complaint is attached at Exhibit A to the Preliminary Objections. All references to "Exhibits" in this Opinion shall be understood as those exhibits attached to defendants' Preliminary Objections, plaintiff's Response, and/or the respective memoranda.

In 1993, BA-PA began a series of seminars entitled "Bell Atlantic Way" in order to solicit its employees for new and innovative ideas to help BA-PA compete in the marketplace and boost its revenues. *Id.* at ¶ 8. Pursuant to this solicitation, Babiarz approached his immediate supervisor, Bill Fagan to explain that he had an idea but was wary that he might not get recognition for it. *Id.* at ¶ 9. Mr. Fagan assured him that he would protect the idea. *Id.* Under the belief that disclosure would be confidential, Babiarz then revealed the "Bell Atlantic Ready" plan to Mr. Fagan. *Id.*

The "Bell Atlantic Ready" plan was a marketing and technical plan or process whereby new home construction and other premises would be certified "Bell Atlantic Ready", meaning the inside wiring to the premises was in good working order. *Id.* at ¶ 10. The plan included the following elements: advanced home wiring, option for various multimedia taps, options for additional telephone taps, options for pre-wiring a home office, options for providing computer networking support, and options for providing home intercom systems in an integrated home wiring system. *Id.* at ¶ 11. Babiarz suggested target markets including new home construction, existing homes and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 1808554 (Pa.Com.Pl.)
**(Cite as: 2001 WL 1808554 (Pa.Com.Pl.))**

businesses being refitted with new wiring technologies. *Id.* He also suggested promotional devices such as gifting customers with complimentary services for a fixed period of time, delivery of promotional materials to home owners and other promotional devices. *Id.* Bell Atlantic Ready was allegedly the intellectual creation of Babiarz and it purportedly represented a new technical plan and business process, including marketing and promotional aspects. *Id.* at ¶ 12. The Bell Atlantic Ready plan was purportedly reduced to writing, in at least two documents which were disclosed by Babiarz. *Id.* at ¶ 13. As alleged, Babiarz, at no time, surrendered, transferred, abandoned and/or assigned his rights or interest in Bell Atlantic Ready to any of the defendants. *Id.* at ¶ 14. In addition, developing concepts, such as the Bell Atlantic Ready program, are purportedly not within Babiarz's usual scope of employment. *Id.* at ¶ 39. The program was allegedly developed by Babiarz during his own personal time. *Id.*

**\*2** Following the presentation of his idea to Mr. Fagan, Babiarz presented his idea to various supervisors in the company. ¶ ¶ 15-17. During these presentations, Babiarz believed that his disclosure would be held in confidence. *Id.* Babiarz also informed BA-PA that any patent and/or registration pertaining to Bell Atlantic Ready should reflect his invention, authorship and/or origination of the same, and that he should receive appropriate compensation if the idea is successful. *Id.* at ¶ 17. As alleged, Babiarz was assured that he would be recognized for the idea and, if it was successful, he would be entitled to the maximum amounts under the Champion Program and the Spirit of Excellence award program. *Id.* at ¶ 18. Babiarz was also assured that the full extent of the Champion Program benefits would be available to him despite the fact that he was not a member of management, but no such payments or recognition were ever made. *Id.*

Thereafter, BA-PA informed Bell Atlantic and/or BACCSI about Bell Atlantic Ready, who then purportedly acted in concert to deprive Babiarz of his property. *Id.* at ¶ 19. Defendants allegedly credited a non-union management employee, Chris Creager, instead of Babiarz, with the development and invention of Bell Atlantic Ready. *Id.* Incidentally, BA-PA pays full union wages under relevant collective bargaining agreements, while BACCSI is a corporation with either non-union employees or staffed by employees not paid according to full union scale at rates commensurate with employees hired by BA-PA. *Id.* The Bell Atlantic Ready program was

disclosed to all defendants, notwithstanding any proprietary rights which Babiarz purportedly had to the program. *Id.* at ¶ 20. Also, the program is now referred to as Verizon Ready and incorporates all of the elements originally disclosed by Babiarz. *Id.* at ¶ 21.

From 1994 through 1995, Babiarz, unaware of the disclosure to BACCSI, cooperated with agents of BA-PA in developing Bell Atlantic Ready. *Id.* at ¶ ¶ 22-24. During the course of a teleconference in March, 1995, Babiarz was informed that Bell Atlantic would no longer pursue the Bell Atlantic Ready program. *Id.* at ¶ 24. At this time, Babiarz was informed that his offer of Bell Atlantic Ready was rejected. *Id.* at ¶ 25. During this time period, Babiarz maintained a "unit diary" which contained a chronological record of all occurrences related to the submission and development of Bell Atlantic Ready. *Id.* at ¶ 29. At some time after Babiarz was informed that Bell Atlantic would no longer be pursuing the idea, the unit diary disappeared and was purportedly stolen by BA-PA to defeat plaintiff's ability to substantiate that he originated the idea for Bell Atlantic Ready. *Id.*

In September, 1998, Babiarz heard a radio advertisement for Bell Atlantic Ready, which was the first time Babiarz knew that defendants had "appropriated" the program idea for commercial use. *Id.* at ¶ 30. Babiarz then contacted David Rufibach, his immediate supervisor, and requested a meeting with Malik Waliyyudin to discuss why he had not been recognized for the concept. *Id.* at ¶ 31. On October 1, 1998, the meeting took place. *Id.* at ¶ 32. On October 13, 1998, Babiarz encountered Mr. Waliyyudin and was informed that Chris Creager had been given the credit for Bell Atlantic Ready and that Babiarz had "signed away all of his rights." *Id.* at ¶ 33. On October 26, 1998, Babiarz wrote to Terri Dean, General Manager of Philadelphia Region of BA-PA, asking for recognition that he had originated the idea. *Id.* at ¶ 34. Then, in December, 1998, a meeting took place between Babiarz, Ms. Dean and Mr. Waliyyuddin, in which they purportedly acknowledged that Bell Atlantic Ready had been developed by Babiarz. *Id.* at ¶ 35. Babiarz stated he would settle the matter if he received acknowledgment and his full compensation under the Champion program and Spirit of Excellence award. *Id.* In January, 1999, BA-PA refused to give Babiarz recognition but referred him to BACCSI. *Id .* at ¶ ¶ 36-37. On February 12, 1999, Babiarz wrote BACCSI asking for recognition for the origination of Bell Atlantic Ready, to which BACCSI never

Not Reported in A.2d
2001 WL 1808554 (Pa.Com.Pl.)
**(Cite as: 2001 WL 1808554 (Pa.Com.Pl.))**

Page 3

responded. *Id.* at ¶¶ 38-39. BACCSI, at the behest of Bell Atlantic and BA-PA, has allegedly proceeded to market the Bell Atlantic Ready concept to the public and has realized profits of millions of dollars. *Id.* at ¶ 40.

**\*3** With this background, plaintiff filed its original Complaint on August 18, 2000. On October 10, 2000, defendants filed Preliminary Objections. On October 30, 2000, plaintiff filed an Amended Complaint, setting forth counts for civil conspiracy, accounting, conversion, unfair competition-misappropriation of trade secret, misappropriation of invention, breach of fiduciary duty, fraud, breach of contract and/or quasi-contract, unjust enrichment, restitution pursuant to § 136 of the Restatement of Restitution and breach of trust. Am.Compl. at ¶¶ 42-67. Plaintiff seeks both compensatory and punitive damages, as well as requesting the option to rescind its contract(s). Defendants have filed Preliminary Objections, setting forth a demurrer to each count of the Amended Complaint, and contend primarily that Babiarz cannot succeed on any of his claims because he does not have a property interest in the marketing suggestion made in his role as employee. Additionally, plaintiff has filed a Petition to file a Second Amended Complaint and defendants have filed a response, opposing any amendment as to the additional factual or substantive allegations and the proposed additional exhibits.

This court will address the respective motions *seriatim.*

DISCUSSION
I. PRELIMINARY OBJECTIONS

Rule 1028(a)(4) of the Pennsylvania Rules of Civil Procedure [Pa.R.C.P.] allows for preliminary objections based on legal insufficiency of a pleading or a demurrer. When reviewing preliminary objections in the form of a demurrer, "all well-pleaded material, factual averments and all inferences fairly deducible therefrom" are presumed to be true. *Tucker v. Philadelphia Daily News,* 757 A.2d 938, 941-42 (Pa.Super.Ct.2000). Preliminary objections, whose end result would be the dismissal of a cause of action, should be sustained only where "it is clear and free from doubt from all the facts pleaded that the pleader will be unable to prove facts legally sufficient to establish [its] right to relief." *Bourke v. Kazara,* 746 A.2d 642, 643 (Pa.Super.Ct.2000) (citation omitted). However, the pleaders' conclusions of law, unwarranted inferences from the facts, argumentative allegations, or expressions of opinions are not

considered to be admitted as true. *Giordano v. Ridge,* 737 A.2d 350, 352 (Pa.Commw.Ct.1999), *aff'd.* 559 Pa. 283, 739 A.2d 1052 (1999), *cert. denied,* 121 S.Ct. 307 (U.S.2000). In addition, it is not necessary to accept as true averments in the complaint which conflict with exhibits attached to the complaint. *Philmar Mid-Atlantic, Inc. v. York Street Associates II,* 389 Pa.Super. 297, 300, 566 A.2d 1253, 12 (1989).

Applying this standard to the present case, this court finds that plaintiff may maintain causes of action for rescission and unjust enrichment, breach of fiduciary duty, fraud, civil conspiracy and an accounting, but plaintiff may not maintain his other causes of action based on misappropriation of a trade secret or invention since he voluntarily submitted his marketing concept(s) to BA-PA pursuant to an employee solicitation with the expectation that he would be adequately compensated and given credit for the idea.

A. *Plaintiff Has Sufficiently Stated a Cause of Action for Civil Conspiracy Which May in Conjunction with Valid Rescission, Unjust Enrichment and Breach of Fiduciary Duty Claims*

**\*4** Defendants rely on three grounds for demurrer to this count: (1) there is no underlying cause of action to support the purported conspiracy; (2) plaintiff has failed to allege that defendants acted with the requisite malice; and (3) plaintiff has failed to plead sufficient facts to support his claim. Defs. Mem. of Law, at 8. In response, plaintiff argues that defendants were not acting to further a "legitimate" business purpose, but instead, "stole [Babiarz's] idea and transferred it to their non union (or lower wage scale) subsidiary and credited a non-union management employee with the development of the idea so as to avoid in part any obligation under relevant collective bargaining agreements." Plaintiff contends that this conduct may violate the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (5). [FN2] Pl. Mem. of Law, at 9. Alternatively, plaintiff asserts that defendants fraudulently induced Babiarz to reveal a trade secret, which is not a legitimate business interest. *Id.*

> FN2. Incidentally, in his Complaint, plaintiff does not explicitly present a claim for a violation of the National Labor Relations Act and this court cannot now construe any of the allegations to imply such a violation.

In order to state a civil action for conspiracy,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 1808554 (Pa.Com.Pl.)
**(Cite as: 2001 WL 1808554 (Pa.Com.Pl.))**

plaintiff must allege the following: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose and (3) actual legal damage." _McKeeman v. Corestates Bank, N.A.,_ 751 A.2d 655, 660 (Pa.Super.Ct.2000) (citations omitted). Further, "absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act." _Id._ (citing _Pelagatti v. Cohen,_ 370 Pa.Super. 422, 431, 536 A.2d 1337, 1342 (1987)). In addition, "[p]roof of malice, i.e., an intent to injure, is essential in proof of a conspiracy." _Skipworth by Williams v. Lead Indus. Ass'n,_ 547 Pa. 224, 235, 690 A.2d 169, 174 (1997)(citing _Thompson Coal Co. v. Pike Coal Co.,_ 488 Pa. 198, 211, 412 A.2d 466, 472 (1979)). However, plaintiff need not aver specifically the time, place or date for a conspiratorial meeting or the precise date on which the conspiracy was entered. _Smith v. Wagner,_ 403 Pa.Super. 316, 324, 588 A.2d 1308, 1312 (1991)(quoting P.L.E. Conspiracy § 26).

In Count I, plaintiff alleges in pertinent part that:

43. The actions of the defendants, jointly and severally, constituted a civil conspiracy amongst them to engage in a concerted action for an illegal, unlawful and/or inappropriate purpose, namely to convert plaintiff's interests and property in and to Bell Atlantic Ready for the interests of BACCSI and/or the other defendants and to deprive the plaintiff of his rights and/or entitlements with respect to the appropriation of Bell Atlantic Ready by BACCSI and/or others acting in conjunction with and/or conspiracy with BACCSI.

44. The defendants herein acted with malice and intent to deprive the plaintiff of his lawful interests in aforesaid.

Am.Compl. at ¶¶ 43-44. Plaintiff also alleged that defendants, acting in concert, were motivated by an improper and/or illegal attempt to have BA-PA avoid paying full union wages as required by the collective bargaining agreements and give the credit for Bell Atlantic Ready to a non-union management employee, Chris Creager. _Id._ at ¶ 19.

*5 Taking these allegations as true, as this court must for purposes of a demurrer, it seems that plaintiff has alleged the sufficient elements for a civil conspiracy count. Further, the allegation in paragraph 19 of the Amended Complaint is sufficient to set forth the requisite malice. In addition, the allegations in the Amended Complaint, as a whole, are sufficiently factually specific to enable defendants to prepare their defense and apprise them of the nature

of the civil conspiracy claim. _See Krajsa v. Keypunch, Inc.,_ 424 Pa.Super. 230, 235, 622 A.2d 335, 357 (1993). "It is not necessary that the plaintiff identify the specific legal theory underlying the complaint." _Id. See also, In re The Barnes Foundation,_ 443 Pa.Super. 369, 381, 661 A.2d 889, 895 (1995)("a pleading should formulate the issues by fully summarizing the material facts, and as a minimum, a pleader must set forth concisely the facts upon which [the] cause of action is based.").

The real issue rests with whether plaintiff has stated any viable, underlying cause of action. This court, as discussed below, finds that plaintiff has sufficiently stated his claims for rescission and unjust enrichment, as well as his claims for breach of fiduciary duty and fraud. Plaintiff, thus, may maintain his civil conspiracy claim with respect to these underlying claims.

Therefore, the Preliminary Objections to Count I are overruled.

### B. _Plaintiff May Maintain a Cause of Action for an Accounting as Incident to His Underlying and Viable Causes of Action_

Defendants assert that Babiarz's claim for an accounting must also fail under Pa.R.C.P. 1021 because there is no underlying claim for breach of contract. Alternatively, defendants contend that Babiarz has no claim under Pa.R.C.P. 1530 because (1) there is no fiduciary relationship between an employee and employer giving rise to a duty to account for economic activity relating to one of defendants' products; (2) Babiarz failed to allege sufficient facts for a cause of action for fraud; and (3) Babiarz has failed to allege facts which establish that he has no adequate remedy at law. Defs. Mem. of Law, at 11-12. Plaintiff, in turn, argues that it has adequately alleged a fiduciary relationship, as well as fraud and misrepresentation claims against defendants. Pl. Mem. of Law, at 10. Plaintiff also argues that he is entitled to an accounting on an independent basis because of the alleged misappropriation of a trade secret. _Id._ at 10-11.

In requesting an accounting, a complaint "seeks to turn over to the party wrongfully deprived of possession all benefits accruing to defendant by reason of its wrongful possession." _Boyd & Mahoney v. Chevron U.S.A.,_ 419 Pa.Super. 24, 35, 614 A.2d 1191, 1197 (1992). In reviewing a request for an accounting, "it is reasonable for the court to permit some latitude since often times it is not certain what

claims a plaintiff may have until the accounting is completed." *In re Estate of Hall,* 517 Pa. 115, 136, 535 A.2d 47, 58 (1987). An equitable accounting is proper where a fiduciary relationship exists between the parties, where fraud or misrepresentation (of the correct amount due) is alleged, or where the accounts are mutual or complicated, and plaintiff does not possess an adequate remedy at law. *Rock v. Pyle,* 720 A.2d 137, 142 (Pa.Super.Ct.1998)(citing *Buczek v. First Nat'l Bank of Mifflintown,* 366 Pa.Super. 551, 556, 531 A.2d 1122, 1124 (1987)). *See also, Pittsburgh's Airport Motel, Inc. v. Airport Asphalt and Excavating Co.,* 469 A.2d 226, 229 (Pa.Super.1983); *Meier v. Maleski,* 648 A.2d 595 (Pa.Commw.Ct.1994).

*6 Alternatively, plaintiff may seek his remedy for an accounting under Pa.R.C.P. 1021. However, the right to relief pursuant to Rule 1021 is "merely an incident to a proper assumpsit claim." *Buczek,* 366 Pa.Super. at 555, 531 A.2d at 1123. Additionally, a plaintiff may seek an accounting for profits under a contract to assign a purported invention. *See Sylvester v. Simplex Engineering Co.,* 326 Pa. 235, 241-42, 192 A. 125, 128 (1937)(affirming decree ordering an accounting for profits earned by defendant corporation from invention assigned by alleged inventor/employee).

In Count II, plaintiff avers that defendants should provide an accounting to the plaintiff for all economic activity which they have engaged in pertaining to the marketing and/or sale of Bell Atlantic Ready, on account of the defendants' alleged misappropriation of the program. Am.Compl. at ¶ 46. Plaintiff also has alleged that a confidential and/or fiduciary relationship existed between himself and Bell Atlantic and BA-PA. *Id.* at ¶¶ 6, 15. Like the civil conspiracy claim, the count for an accounting may only survive if one or more of the other counts also survive. Since some of plaintiff's other claims will withstand demurrer, the count for an accounting may also remain. Therefore, the Preliminary Objections to Count II are overruled.

*C. Plaintiff May Not Maintain a Cause of Action for Conversion Where His Idea--the "Bell Atlantic Ready" Plan Was Voluntarily Submitted by Plaintiff to His Employer Pursuant to an Employee Solicitation to Boost the Company's Revenues*

Defendants demur to Count III, sounding in conversion, on the grounds that plaintiff has not sufficiently pled and cannot prove that he has any property interest in Defendants' Verizon Ready

program. Defs. Mem. of Law, at 13. Defendants argue that Babiarz admits he submitted his idea for Bell Atlantic Ready to the Champion Program, which purportedly provides that once the marketing suggestion is made, it becomes the "sole property of Bell Atlantic and the Champion Program." *Id. See also,* Prel.Obj., Exhibit B. Plaintiff, in turn, argues that he alleged a property interest in Bell Atlantic Ready in paragraphs 10 thru 13 of the Amended Complaint, and that the concept is a business method giving rise to a property interest. Pl. Mem. of Law, at 16. Plaintiff also argues that he alleged that defendants used or possessed Bell Atlantic Ready without lawful justification and without Babiarz's permission. Id. at 17. [FN3]

FN3. Alternatively, defendants argue that Babiarz admits, in paragraphs 9 and 47 of his first complaint, that his idea is a "shop right," allowing BA-PA as employer to a non-exclusive and non-transferrable royalty-free license. Defs. Mem. of Law, at 14. At oral argument, plaintiff's council clarified that the allegation in the first complaint "was that [plaintiff] had a shop right, not the defendant, [b]ut that was a misuse of the notion of a shop right ... and there was certainly nothing to suggest that defendant had a shop right." 4/23/01 N.T. at 35.
As explained by the Pennsylvania Superior Court, a "shop right" arises "where the employee devises the invention on the employer's time and at the latter's expense using his materials and facilities, and allows him to use the invention without special compensation." *Aetna-Standard Engineering Co. v. Rowland,* 343 Pa.Super. 64, 70-71, 493 A.2d 1375, 1379 (1985). The court explained that the shop-right rule creates an exception from the employee's patent right to exclude others from making or using his invention. *Id.* at 70, 493 A.2d at 1379. It also stated that "[a]s in the law on assignment of inventions, the employment relationship, standing alone, does not give the employer a shop right; the employer might have to show an express agreement for the right." *Id.* Additionally, "absent an express contrary agreement, an employee must assign his invention to his employer if he was hired for the purpose of using his inventive ability to solve a specific problem or to design a certain procedure or device for the employer." *Id.* at 70, 493 A.2d at 1378.
Here, plaintiff explicitly alleges that he was

Not Reported in A.2d
2001 WL 1808554 (Pa.Com.Pl.)
(Cite as: 2001 WL 1808554 (Pa.Com.Pl.))

hired as a service technician and that developing concepts, like the Bell Atlantic Ready plan, are not within the usual scope of plaintiff's employment and was developed by plaintiff during his own personal time. Am.Compl. at ¶ ¶ 6, 39. Further, plaintiff's disclosure of his plan was allegedly made pursuant to assurances that he would receive appropriate compensation and credit and that the plan would be kept confidential. *Id.* at ¶ ¶ 9, 15-18. Additionally, plaintiff alleged that he, at no time, surrendered, transferred, abandoned or assigned his rights or interest in Bell Atlantic Ready to any of the defendants. *Id.* at ¶ 14. However, plaintiff also alleges that he participated with other Bell Atlantic employees in developing his idea for Bell Atlantic Ready between June of 1994 and January of 1995 when the idea was recommended for a trial study in the Baltimore Region to be conducted in April of 1995. *Id.* at 23. Since these allegations are somewhat contradictory, this court cannot now determine whether any of the defendants had a "shop right" in the Bell Atlantic Ready concept, which remains a factual issue. Yet, it appears that some sort of agreement did exist between plaintiff and BA-PA to use and develop the Bell Atlantic Ready plan in exchange for appropriate compensation. Still, plaintiff does not state a cause of action for conversion.

Conversion is defined under Pennsylvania law as: "the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." *McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 659 n. 3 (Pa.Super.Ct.2000)(quoting *Stevenson v. Economy Bank of Ambridge*, 413 Pa. 442, 451, 197 A.2d 721, 726 (1964)). *Accord, L.B. Foster Co. v. Charles Caracciolo Steel & Metal Yard, Inc.*, 2001 WL 515071, at *5 (Pa.Super.Ct. Apr. 30, 2001). The party claiming conversion must have had actual or constructive possession of a chattel or an immediate right to possession of a chattel at the time of the alleged conversion. *Chrysler Credit Corp. v. Smith*, 434 Pa.Super. 429, 434, 643 A.2d 1098, 1100 (1994) (citation omitted). "Money may be the subject of conversion." *McKeeman*, 751 A.2d at 659 n. 3 (quoting *Shonberger v. Oswell*, 365 Pa.Super. 481, 484-85, 530 A.2d 112, 114 (1987)). However, "failure to pay a debt is not conversion." *Bernhardt v.*

*Needleman*, 705 A.2d 875, 878 (Pa.Super.Ct.1998)(citing *Petroleum Marketing v. Metropolitan Petroleum Corp.*, 396 Pa. 48, 52, 151 A.2d 616, 619 (1959)).

*7 Additionally, a fraudulent conversion claim requires that "the money or property so fraudulently withheld or converted by the defendant must have belonged to the party so injured." *Pearl Assurance Co. v. National Ins. Agency, Inc.*, 151 Pa.Super. 146, 155, 30 A.2d 333, 337 (1943). The *Pearl Assurance* court also stated the following with regard to this tort:

[i]t did not apply to one who borrowed money, even though he may have had no intention of paying the loan, for by the act of lending, the money became the property of the borrower ...; nor to articles or property transferred to the defendant with the purpose and intent of passing to him the property and title; nor is it to be applied as a means of collecting a mere debt; nor to assignment of a debt. It does apply, however, where the money, securities, or property belonging to A. are intrusted [*sic*] to the defendant to deliver to B., or to sell or dispose of the same, and to collect and pay the money received or the net proceeds arising from such sale or disposal to A., and instead he fraudulently applies the same to his own use ....

*Id.* at 155, 30 A.2d at 337 (citations and internal quotations omitted).

Plaintiff repeatedly alleged that Bell Atlantic Ready was his idea or his property, which he disclosed to supervisors of BA-PA under the belief that the information would be confidential and that he would receive recognition and compensation. Am.Compl. at ¶ ¶ 9-12. He also alleged that he never abandoned, transferred or assigned his interest in the concept to any of the defendants. *Id.* at ¶ 14. He also alleged that he was assured that if the idea was successful, he would be entitled to the maximum amounts under the Champion Program and Spirit of Excellence award program, but that no such payments or recognition were ever made. *Id.* at ¶ 18. Plaintiff further alleged that notwithstanding the fact that Bell Atlantic Ready was a proprietary concept and property belonging to Babiarz, BA-PA and Bell Atlantic caused the concept to be transferred and disclosed to BACCSI for its commercial purposes, and/or to its successor, Verizon. *Id.* at ¶ 20. Such conduct is alleged to have unlawfully deprived Babiarz of the use and possession of Bell Atlantic Ready and have interfered with his ability to benefit from his invention, ownership and control. *Id.* at ¶ 48.

Even taking these allegations as true, this court finds

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 7
2001 WL 1808554 (Pa.Com.Pl.)
(Cite as: 2001 WL 1808554 (Pa.Com.Pl.))

that plaintiff has not stated a cause of action for conversion. Rather, plaintiff alleges, and therefore admits, that he voluntarily submitted his idea for Bell Atlantic Ready pursuant to a solicitation of employees for new ideas to help BA-PA compete in the marketplace and boost its revenues. *Id.* at ¶ 9. He alleges, and therefore admits, that he worked with other employees of BA-PA in developing his idea. *Id.* at ¶¶ 22-23. [FN4] Further, he alleges, and therefore admits, that he expected to be compensated to the maximum extent allowed by the Champion Program and Spirit of Excellence award(s). *Id.* at ¶¶ 18, 35. These allegations, in their clearest and truest sense, reflect that Babiarz did not have actual or constructive possession of his idea in the Bell Atlantic Ready plan, or an immediate right to possession of his idea. Rather, all of plaintiff's allegations, taken together, sound more like a failure to appropriately compensate plaintiff for his idea despite an alleged agreement or assurances that he would be paid such compensation. No conversion action would lie in this instance under the facts alleged. Admittedly, "parties are liberally granted leave to amend their pleadings." *Frey v. Pennsylvania Elec. Co.,* 414 Pa.Super. 535, 538, 607 S.2d 796, 797 (1992). However, this court cannot now surmise how plaintiff will be able to plead facts to sustain a cause of action in conversion.

> FN4. The allegations in paragraphs 22 and 23 of the Amended Complaint indicate that defendants could arguably have had a "shop right" in Bell Atlantic Ready, since they helped develop the idea. Nonetheless, factual issues exist which prevent the court from making that determination at this time. *See* note 3 *supra.*

**\*8** For these reasons, the Preliminary Objections to Count III are sustained with prejudice.

D. *Plaintiff Cannot Maintain Causes of Action for Misappropriation of Trade Secret, Or Misappropriation of Invention since Plaintiff Voluntarily Disclosed His Idea for the Benefit of His Employer and Plaintiff Is Still an Employee of the Defendant BA-PA*

With respect to Count IV of the Amended Complaint for misappropriation of trade secret, defendants assert that Pennsylvania law does not recognize a cause of action for unfair competition or misappropriation of a trade secret by an employee against his employer. Defs. Mem. of Law, at 15-19. In response, plaintiff contends that no Pennsylvania court has limited trade

secret actions to those claims brought by an employer against an employee; that trade secret claims are recognized in relationships other than an employer/employee; and that it sufficiently alleged that plaintiff had disclosed the Bell Atlantic Ready business method under the belief that a confidential relationship existed between plaintiff and defendants. Pl. Mem. of Law, at 24-28.

As to Count V for misappropriation of invention, defendants argue that plaintiff has failed to allege that he is the owner of an invention; that any such invention has not been patented, trademarked or otherwise safeguarded; or that it was Babiarz who invested the time, effort and money in developing the Bell Atlantic Ready idea. Defs. Mem. of Law, at 19-20. Plaintiff, in turn, contends that he has sufficiently alleged that he was in possession of an invention in the Bell Atlantic Ready plan, which was misappropriated when defendants unlawfully seized it. Pl. Mem. of Law, at 29-35.

Notwithstanding plaintiff's allegations, this court finds that plaintiff cannot maintain either a cause of action for misappropriation of trade secret or misappropriation of an invention since plaintiff's allegations belie themselves and negate the essential requirement that defendants somehow "misappropriated" property belonging to the plaintiff where plaintiff submitted the Bell Atlantic Ready program to be used in defendants' business.

Black's Law Dictionary (6th ed.1990) defines "misappropriation" as "[t]he unauthorized, improper, or unlawful use of funds or other property for purpose other than that for which intended." The Pennsylvania Superior Court also described the tort of "misappropriation" as having three elements: (1) plaintiff "has made a substantial investment of time, effort and money into creating the thing misappropriated such that the court can characterize that 'thing' as a kind of property right," (2) the defendant "has appropriated the 'thing' at little or no cost, such that the court can characterize defendant's own actions as 'reaping where it has not sown," ' and (3) the defendant "has injured plaintiff by the misappropriation." *Sorbee Int'l. Ltd. v. Chubb Custom Ins. Co.,* 735 A.2d 712, 716 (Pa.Super.Ct.1999)(quoting *Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group,* 50 Cal.App.4th 548, 561, 59 Cal.Rptr.2d 36, 43 (1996)). [FN5]

> FN5. Though *Sorbee* addressed a very different issue, i.e., whether a manufacturer's

Not Reported in A.2d                                                    Page 8
2001 WL 1808554 (Pa.Com.Pl.)
**(Cite as: 2001 WL 1808554 (Pa.Com.Pl.))**

misuse of certain terms involved a misappropriation of advertising ideas within the meaning of a commercial liability insurance policy, this court finds its definition of "misappropriation" to be persuasive in the present case, notwithstanding that it relied on a California case.

\*9 A cause of action for misappropriation of trade secrets requires the plaintiff to plead the following elements:

(1) that there was a trade secret ...; (2) that it was of value to *employer* [owner] and important in the conduct of his business; (3) that by reason of discovery of ownership the *employer* had the right to the use and enjoyment of the secret; and (4) that the secret was communicated to the employee while he was in a position of trust and confidence and under such circumstances to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer.

*A.M. Skier Agency, Inc. v. Gold*, 747 A.2d 936, 940 (Pa.Super.Ct.2000)(citing *Gruenwald v. Advanced Computer Applications, Inc.*, 730 A.2d 1004, 1012-13 (Pa.Super.Ct.1999)(emphasis added). Moreover, an employer is entitled to protect its confidential or trade secret information, independent of a non-disclosure agreement, pursuant to the law of agency or unfair trade practices. *Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy*, 415 Pa. 276, 284, 203 A.2d 469, 473 (1964); *Morgan's Home Equip. v. Martucci*, 390 Pa. 618, 622, 136 A.2d 838, 842 (1957).

Further, as provided by Section 1 of the Restatement (Third) of Unfair Competition,

One who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless: (a) the harm results from ... other acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public; ...

Rest. (Third) Unfair Competition § 1 (1995). Comment (g) to that section states the following in pertinent part:

A primary purpose of the law of unfair competition is the identification and redress of business practices that hinder rather than promote the efficient operation of the market .... An act or practice is likely to be judged unfair only it if substantially interferes with the ability of others to

compete on the merits of their products or otherwise conflicts with accepted principles of public policy recognized by statute or common law. As a general matter, if the means of competition are otherwise tortious with respect to the injuries, they will also ordinarily constitute an unfair method of competition.... *A competitor who diverts business from another by means of fraudulent misrepresentations or through the wrongful use of confidential information, for example, may in some circumstances be subject to liability for unfair competition even if the conduct is not specifically actionable under the rules relating to deceptive marketing or the appropriation of trade secrets ....* A person likely to be damaged by unfair competition of another may obtain an injunction against a continuation of the conduct. The court may also award appropriate monetary relief.

\*10 Rest. (Third) Unfair Competition § 1, cmt. (g) (emphasis added). *See also, Lakeview Ambulance and Medical Servs., Inc. v. Gold Cross Ambulance and Medical Servs., Inc.*, 1995 WL 842000, At \*3 (C.P. Mercer Cty. Oct. 18, 1995)(denying demurrer to count for unfair competition).

Such an action usually involves a former employee who acquires the trade secrets or inventions of his former employer and utilizes them to the employer's disadvantage after leaving the company. *Gruenwald*, 730 A.2d at 1012. However, similar to the present case, in *Gruenwald*, the plaintiff, a former employee/director of the corporation, alleged that he retained "ownership" of the technology he created for the company, and that the company's use of his technology was a misappropriation of his trade secret. *Id.* at 1013. The court ruled that "[b]y reserving ownership of his 'inventions' rather than assigning them to the corporation, [the director/employee] was not operating in the company's best interest. *Id.* The court also found that plaintiff had produced no patents issued to him for the technology or a licensing agreement permitting the company to use the technology, but that the defendant/company had produced a licensing agreement to use certain language, and plaintiff had registered his trademark in the technology, on behalf of the company. *Id.* Therefore, the court found that any protectable trade secrets belonged to the company, which, at least, held a shop right or a license to use the technology. *Id.* at 1013-14.

Here, plaintiff's own allegations indicate that his Bell Atlantic Ready plan was intended to be used to boost BA-PA's revenues; that plaintiff would be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 1808554 (Pa.Com.Pl.)
(Cite as: 2001 WL 1808554 (Pa.Com.Pl.))

compensated pursuant to the company's rewards program--the Champion Program; and that the idea was developed in 1994 to 1995 by plaintiff and other Bell Atlantic employees until the company decided to no longer pursue it, but rejected the plaintiff's offer. Am.Compl. at ¶¶ 9, 18, 23-25. The problem rests with what occurred after the plan was purportedly rejected, i.e., the alleged failure to credit or compensate plaintiff for the idea, giving credit instead to a non-union management employee and causing the plan to be disseminated to BACCSI, a purportedly separate corporation from BA-PA, which also refused to give plaintiff credit despite plaintiff's inquiry. *Id.* at ¶¶ 30-39. This conduct of defendants is alleged to constitute unfair competition by appropriation of a trade secret and unlawful appropriation of an invention from its rightful inventor, resulting in the destruction of plaintiff's patent rights. *Id.* at ¶¶ 50, 52. Even taking as true these allegations, this court does not find that plaintiff has stated a claim for "misappropriation" as to either count. Rather, plaintiff's redress is more properly addressed by contract or quasi-contract principles. [FN6]

> FN6. In making this determination, this court does not now say that the plaintiff's idea is not sufficiently novel or concrete. Rather, the circumstances of the disclosure and the use by the defendants appear to be fundamentally based on contract or quasi-contract principles, rather than misappropriation of a trade secret. *See* Rest. (Third) Unfair Competition § 39, cmt. h (1995).

Therefore, the demurrers to Counts IV and V are sustained with prejudice.

### E. *Plaintiff Has Pled The Bare Allegations To Make Out A Cause of Action For Breach of Fiduciary Duty In Order To Withstand Demurrer*

**\*11** Defendants demur to Count VI on the grounds that Pennsylvania law does not recognize a claim for breach of fiduciary duty by an employee against his employer based the employee's claimed property interest from submission of a marketing concept and that plaintiff has failed to allege any misrepresentation made by defendants or the other requisite elements for this cause of action. Defs. Mem. of Law, at 21. In response, plaintiff argues that he has sufficiently stated a cause of action for breach of fiduciary duty relating to his submission of the Bell Atlantic Ready plan. Pl. Mem. of Law, at 36-37.

This court now finds that the plaintiff has sufficiently stated the elements for a breach of fiduciary duty based on the alleged confidential relationship.

Recently, the Pennsylvania Superior Court repeated the general concepts for finding a confidential relationship and the resulting fiduciary duty in *Basile v. H & R Block, Inc.,* 2001 WL 460913, at *4-5 (Pa.Super.Ct. May 3, 2001). "The essence of [a confidential] relationship is trust and reliance on one side, and a corresponding opportunity to abuse that trust for personal gain on the other." *Id.* at *4 (quoting *In re Estate of Scott,* 455 Pa. 429, 432, 316 A.2d 883, 885 (1974). A confidential relationship thus exists where the parties do not deal on equal terms, "but, on the one side there is an overmastering influence, or on the other, weakness, dependence or trust, justifiably reposed." *Id.* (quoting *Frowen v. Blank,* 293 Pa. 137, 145-46, 425 A.2d 412, 416-17 (1981). "[T]he party in whom the trust and confidence are reposed must act with scrupulous fairness and good faith in his dealings with the other and refrain from using his position to the other's detriment and his own advantage." *Id.* (quoting *Young v. Kaye,* 443 Pa. 335, 342, 279 A.2d 759, 763 (1971). "[A] confidential relationship and the resulting fiduciary duty may attach 'wherever one occupies toward, another such a position of advisor or counsellor [*sic* ] as reasonably to inspire confidence that he will act in good faith for the other's interest'." *Id.* at * 5 (citation omitted). Such a relationship may be found as between trustee and cestui que trust, guardian and ward, attorney and client, or principal and agent, or where the facts and circumstances so indicate and are apparent on the record. *Id.*

Here, plaintiff alleged that a confidential and/or fiduciary relationship existed between plaintiff and defendants Bell Atlantic and/or BA-PA. Am.Compl. at ¶ 7. Plaintiff also alleged that he disclosed his idea for Bell Atlantic Ready to his supervisors, at different instances, under the belief and representation that his disclosure would be held confidential and the representation by management that his idea would be protected and he would receive recognition. *Id.* at ¶¶ 9, 15, 16, 26, 27. Further, plaintiff alleged that BA-PA and Bell Atlantic caused the Bell Atlantic Ready plan to become known to BACCSI in order to deprive plaintiff of his property and avoid BA-PA from having to pay full union wages for the plan as was required by the relevant collective bargaining agreements by crediting a non-union management

employee and not the plaintiff with the development and invention of Bell Atlantic Ready. *Id.* at ¶ 19. Plaintiff also alleged that BA-PA stole the plaintiff's "unit diary" to hinder plaintiff's ability to substantiate that he originated the idea for Bell Atlantic Ready. *Id.* at ¶ 29. Additionally, plaintiff alleged that Bell Atlantic and BA-PA acted in a fiduciary and/or confidential capacity with respect to plaintiff's interests and caused plaintiff to "trust and rely upon their treating him fairly and dealing with him at a non-arms length, good faith, fair dealing basis" but they failed to treat plaintiff in this way. *Id.* at ¶ ¶ 54-55.

**\*12** Accepting these allegations as true, this court cannot now say with certainty that plaintiff cannot maintain his count for breach of fiduciary duty. Therefore, the demurrer to Count VI is overruled. [FN7]

> FN7. This court also notes that normally, it is the agent or employee who owes the fiduciary duty to his principal or employer, and not the other way around. *See* Restatement (Second) of Agency § 395 (1957). However, it is not clear that an employer can never owe a confidential or fiduciary duty to his employee if the circumstances warrant finding such a duty. Here, plaintiff will have to adduce clear and precise evidence to maintain his claim and prove the existence of a fiduciary relationship.

*F. Plaintiff's Claim for Fraud Withstands Demurrer Where it Alleges That Defendants Had a Present Intent to Not Honor Their Promises to Adequately Compensate Plaintiff failed to Recognize Plaintiff for His Idea Despite Their Assurances*

Defendants demur to plaintiff's count for fraud on the grounds that (1) the terms and conditions of the Champion program negate plaintiff's cause of action for fraud; (2) defendants were not under a duty to inform plaintiff as to any information concerning the Bell Atlantic Ready plan and plaintiff cannot duplicate his conversion claim and recast it in fraud; (3) plaintiff cannot maintain a fraud claim based on a promise to pay him in the future; and (4) plaintiff's allegations for fraud are insufficiently specific. Defs. Mem. of Law, at 22-26. In response, plaintiff argues that (1) defendants improperly rely upon Champion program documents which are outside of the record and not verified by defendants; (2) defendants were under a duty to disclose information concerning their

plans for Bell Atlantic Ready which they failed to do; (3) plaintiff sufficiently alleges that at the time defendants made their promises, they had no present intent to honor them; and (4) that plaintiff has set forth sufficient facts to show that defendants fraudulently induced the disclosure of the Bell Atlantic Ready plan. Pl. Mem. of Law, at 37-41.

"Fraud is a claim easily made but difficult to support. Once an allegation of fraud is injected into a case, even though it may ultimately be shown to be without any arguable merit, the whole tone and tenor of the matter changes." *New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp.,* 387 Pa.Super. 537, 553, 564 A.2d 919, 927 (1989). It "consists of anything calculated to deceive whether by single act or combination, or by suppression of truth, or suggestion of what is false whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture." *Delahanty v. First Pennsylvania Bank, N.A.,* 318 Pa.Super. 90, 107, 464 A.2d 1243, 1251 (1983)(citing *Frowen v. Blank,* 493 Pa. 137, 143, 425 A.2d 412, 415 (1981)). It is also true that "the breach of a promise to do something in the future is not actionable in fraud." *Shoemaker v. Commonwealth Bank,* 7000 A.2d 1003, 1006 (Pa.Super.Ct.1997)(citing *Krause v. Great Lake Holdings, Inc.,* 387 Pa.Super. 56, 67, 563 A.2d 1182, 1187 (1989)). However, a statement of present intention, made at the time of contracting, which is false when uttered may constitute a fraudulent misrepresentation of fact. *Brentwater Homes, Inc. v. Weibley,* 471 Pa. 17, 23, 369 A.2d 1172, 1175 (1977). *See also, College Watercolor Group, Inc. v. Newbauer,* 428 Pa. 103, 115, 360 A.2d 200, 206 (1976).

**\*13** To establish a cause of action for fraudulent misrepresentation, the plaintiff must allege the following elements:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

*Bortz v. Noon,* 556 Pa. 489, 499, 729 A.2d 555, 560 (1999)(citing *Gibbs v. Ernst,* 538 Pa. 193, 207, 647 A.2d 882, 889 (1994). Further, "[t]he tort of intentional non-disclosure has the same elements as intentional misrepresentation 'except in the case of intentional non-disclosure, the party intentionally conceals a material fact rather than making an

affirmative misrepresentation." ' *Id. See* Restatement (Second) of Torts, § 550 (1976)(describing liability for fraudulent concealment). "Mere silence in the absence of a duty to speak, however, cannot suffice to prove fraudulent concealment." Sevin v. Kelshaw, 417 Pa.Super. 1, 9, 611 A.2d 1232, 1236 (1992) (citation omitted). In addition, "[a] misrepresentation is material if it is of such character that had it not been made, or ... had it been made, the transaction would not have been consummated." Id. at 10, 611 A.2d at 1237.

Moreover, under Pa.R.C.P. 1019(b), allegations of fraud must be pled with particularity. *See also,* Martin v. Lancaster Battery Co., 530 Pa. 11, 18, 606 A.2d 444, 448 (1992)(an allegation of fraud must "explain the nature of the claim to the opposing party so as to permit the preparation of a defense" and be "sufficient to convince the court that the averments are not merely subterfuge.").

In Count VII of the Amended Complaint, which was mislabelled as Count V,    [FN8] plaintiff sets forth the following allegation:

> FN8. As discussed *infra,* plaintiff, in his Petition to Amend the Complaint, moves to correct this defect in numbering. As defendants do not oppose this correction, the court will grant this portion of plaintiff's petition.

58. The actions of the defendants, acting in concert with each other, constituted a fraud upon the plaintiff in that, inter alia, they materially concealed from the plaintiff that Bell Atlantic Ready, in which the plaintiff had an interest, property and otherwise, would be converted to the use of BACCSI and/or one or more of the other defendants without the permission and/or knowledge of the plaintiff. The defendants also defrauded the plaintiff in that they falsely represented to the plaintiff that he would be paid for Bell Atlantic Ready and/or receive compensation, adequate in nature, for the use of Bell Atlantic Ready.
Am.Compl. at ¶ 58. Plaintiff also alleged that he was assured by Bill Fagan, his supervisor, and Joe Sheely, Fagan's supervisor, that he would be recognized for his idea and would be entitled to the maximum amounts under the Champion Program and Spirit of Excellence award program if the idea was successful and despite the fact that he was not a member of management. Id. at ¶ 18. However, as alleged, no such payments or recognition were ever

made. *Id.* Further, plaintiff alleged that his offer of Bell Atlantic Ready was rejected in 1995 after certain development meeting had taken place, but that, in 1998, plaintiff had learned that defendants had appropriated Bell Atlantic Ready for their own use. *Id.* at ¶ ¶ 24-25, 30. Additionally, plaintiff alleged that the assurance(s) that he would receive adequate and appropriate compensation and recognition for Bell Atlantic Ready were material inducements for him to disclose Bell Atlantic Ready, were made with the intent to deceive the plaintiff, caused plaintiff to believe that he would be appropriately and adequately compensated, and constituted fraud in the inducement. *Id.* at ¶ 41.

*14 Taking these allegations as true, this court finds that plaintiff has sufficiently stated a cause of action for fraud. It is true that plaintiff cannot support his fraud claim based on a defective claim for conversion. However, this court can reasonably infer that plaintiff is alleging that defendants' assurances that plaintiff would be adequately paid and protected to the maximum limits of the Champion Program were false when uttered in order to induce plaintiff to reveal his idea. Further, though plaintiff does not explicitly allege justifiable reliance, this court may infer this requisite element when reviewing the other allegations in the Amended Complaint. This court also finds that plaintiff's allegations are sufficient to enable defendants to prepare their defense.

Moreover, though the court may review the Champion documents attached to the defendants' Preliminary Objections, it is not clear that these documents constitute an enforceable contract which would bar plaintiff's claim for fraud.

The general rule is that a demurrer cannot aver the existence of facts not apparent from the face of the challenged pleading. Martin v. Commonwealth, Dept. of Transp., 124 Pa.Commw. 625, 629, 556 A.2d 969, 971 (1989) (citation omitted). A limited exception to this rule is recognized where a plaintiff avers the existence of a written agreement and relies upon it to establish his cause of action. *Id.* In such instance, a defendant may properly annex that agreement without creating an impermissible speaking demurrer since the agreement is a factual matter arising out of the complaint itself. *Id. See also,* Detweiler v. School Dist. of Hatfield, 376 Pa. 555, 559, 104 A.2d 110, 11 (1954)(allowing the court to review the documents attached to defendants' preliminary objections were such documents formed the foundation of the lawsuits, but not accepting, as true, the averment as to the legal effect of such documents); *Eberhart v.*

Not Reported in A.2d                                                                   Page 12
2001 WL 1808554 (Pa.Com.Pl.)
**(Cite as: 2001 WL 1808554 (Pa.Com.Pl.))**

*Nationwide Mut. Ins. Co.*, 238 Pa.Super. 558, 563-64, 362 A.2d 1094, 1097 (1976)(holding that the trial court cannot consider the policy, introduced into the record by the defendant making preliminary objections, in order to construe the intent of the parties until it is established that the policy is in fact the one issued to the plaintiff).

Here, plaintiff's counsel at oral argument clarified that plaintiff did not have an objection to letting the documents in the record but did object as to defendants' assertion that the documents form a contract. 4/23/01 N.T. at 40. Additionally, plaintiff refers to the Champion Program and his entitlement to benefits under the program in several places in his Amended Complaint. Am.Compl. at ¶ ¶ 18, 35, 36. Under these circumstances, the court may consider these documents.

The Champion Program appears to govern how ideas from employees are submitted, what compensation will be paid to employees who are associates and what compensation will be paid to managers, as well as the responsibilities of the company. *See* Preliminary Objections, Exhibit B. Specifically, after an idea is accepted, associates (or managers who submit ideas only) will receive compensation of $250 for an idea that results in an approved Business Opportunity Assessment (BOA). *Id.* After which, the associates "will be kept abreast of development of the idea and may receive additional compensation once the product or service is implemented." *Id.* If an idea results in a product or service that generates $10,000 in gross revenue, the employee will receive additional compensation of $2,500 and recognition. *Id.* Managers, on the other hand, may become involved in the BOA and the product's development and can be eligible for additional compensation, up to $50,000 once the product or service has resulted in $1 million or more in revenue. *Id.* The documents also included a "Champion Program Idea Submission Form" which included the following language above the lines for the employee's signature:

> *\*15 I acknowledge that this idea is the sole property of Bell Atlantic and the Champion Program. My claim to this idea is limited to any rewards instituted as part of the Champion Program. I understand that submission of an idea does not guarantee acceptance to the Champion Program.*
> Signature

---

          Date      Title     
*Id.* (emphasis added). The record does not contain a page with plaintiff's signature on the above form. In a

separate exhibit, attached by defendants, it appears that plaintiff received $250 pursuant to the Champion Program. *See* Preliminary Objections, Exhibit C. Plaintiff did admit having received the $250, which plaintiff maintains is "clearly a prize that the plaintiff got for reaching level one consideration," but plaintiff disputes that an enforceable contract was formed from the receipt of these monies which would bar plaintiff from any additional recovery. 4/23/01 N.T. at 42-43.

Notwithstanding the terms of the Champion Program, it is not clear that the parties had an enforceable contract which would bar the plaintiff's claim for fraud, or that the terms of the Champion Program solely govern the agreement between the parties, or that the agreement was fully integrated. Rather, certain issues of fact exist regarding whether an enforceable contract was formed and what constitutes that contract. [FN9]

> FN9. For this reason, the court need not now address whether the parol evidence rule would apply to the present case to bar the admission of parol evidence to vary the terms of the written agreement.

For these reasons, the demurrer to Count VII, sounding in fraud, is overruled.

*G. Plaintiff May Maintain Causes of Action for Rescission And/or Unjust Enrichment, but May Not Recover for Damages on a Breach of Contract Theory and May Not Recover on a Restitution Theory for Tortious Use of a Trade Secret*

This court addresses together plaintiff's contract and quasi-contract claims, which were mis-labeled as Counts VII, VIII and IX, but are really Counts VIII, IX and X. [FN10] Defendants argue that plaintiff's claims for quasi contract and/or implied contract are legally insufficient because an enforceable contract existed between the parties, plaintiff fails to allege facts sufficient to support his request to rescind the contract or avoid it on the grounds of misrepresentation, and defendants are the owners of Verizon Ready, which defendants contend is not Babiarz's marketing suggestion. Defs. Mem. of Law, at 26-29. In response, plaintiff argues alternatively that no contract exists between the parties, entitling him to quasi-contractual remedies, or if a contract does exist, it has been rescinded through defendants' willful failure to pay and defendants' alleged fraudulent inducement. Pl. Mem. of Law, at 41-50.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 1808554 (Pa.Com.Pl.)
(Cite as: 2001 WL 1808554 (Pa.Com.Pl.))

Page 13

FN10. In Plaintiff's Petition to Amend his Complaint, he proposes to correct this mis-numbering, and defendants do not oppose this correction. Therefore, the court is granting that part of the petition.

In Count VIII of the Amended Complaint, entitled "Breach of Contract and/or Quasi Contract and/or Implied Contract" against BA-PA, Bell Atlantic and Verizon, plaintiff alleges, in pertinent part, that "[he] had a contract, and/or implied contract and/or quasi contract with [BA-PA] wherein [BA-PA] was to secure, compensate and protect the plaintiff's interests in Bell Atlantic Ready, which they failed to do. The contractual relationship consisted, inter alia, of oral representations, conduct, courses of conduct, and writings which are not fully in the possession of plaintiff .... As a result of the aforesaid, the plaintiff has been injured in an amount in excess of Fifty Thousand ($50,000.00).". Am. Compl. at ¶ ¶ 58-59. As to this count, plaintiff demands monetary damages, or in the alternative, the election to rescind the contract on the grounds of misrepresentation or abuse, of fiduciary relation and proceed on a restitution theory. *See id.* Alternatively, in Count IX, plaintiff alleges that "[t]he actions of the defendants as aforesaid caused the defendants, jointly and severally, to [be] unjustly enriched." *Id* . at ¶ 61. Additionally, in Count X, plaintiff pleads a cause of action for restitution pursuant to Section 136 of the Restatement of Restitution based on the defendants allegedly tortious use of a trade secret owned by or developed by the plaintiff. *Id.* at ¶ 63.

*16 For the following reasons, this court finds that plaintiff has sufficiently stated a claim for rescission in Count VIII and a claim for unjust enrichment in Count IX, but may not recover damages on a breach of contract theory or restitution for tortious use of a trade secret.

It is true that a plaintiff may plead alternative causes of action for breach of contract and unjust enrichment in the same complaint. *See* Pa.R.C.P. 1020(c); *J.A. & W.A. Hess, Inc. v. Hazle Township*, 465 Pa. 465, 468, 350 A.2d 858, 860 (1976)(holding that trial court erred in refusing to consider unjust enrichment claim along with breach of contract claim); *Lampl v. Latkanich*, 210 Pa.Super. 83, 88, 231 A.2d 890, 892 (1967). Further, the complaint is not defective merely because the causes of action are inconsistent or conflicting. *Baron v. Bernstein*, 175 Pa.Super. 608, 610, 106 A.2d 668, 669 (1954). However, it is also true that a plaintiff cannot recover on a claim for unjust enrichment if such claim is based on a breach

of a written contract. *See Birchwood Lakes Community Ass'n v. Comis*, 296 Pa.Super. 77, 442 A.2d 304, 308 (1982); *Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir.1987). Otherwise, there would be an election of remedies problem.

The Pennsylvania Superior Court has established that a plaintiff "may not maintain at the same time in separate counts of one action, or in two different suits claims for rescission of a contract and restitution on the one hand and for damages for breach of the same contract together with expectation interest, on the other hand." *Wedgewood Diner, Inc. v. Good*, 368 Pa.Super. 480, 483, 534 A.2d 537, 538 (1987)(quoting *Raw v. Lehnert*, 238 Pa.Super. 324, 329 n. 3, 357 A.2d 574, 576 n. 3 (1976). As noted in *Good*,

[i]t is a general rule that a person defrauded in a sales or other contract has a choice of remedies; he may rescind the contract and recover what he has paid, or he may affirm the contract and recover damages for the fraud and deceit practiced upon him. Once such a person has made a binding election of one remedy over the other, however, he will be precluded from thereafter maintaining an action on the other ....

*Id.* at 482, 534 A.2d at 538 (citation omitted). *Accord Baker v. Cambridge Chase, Inc.*, 725 A.2d 757, 766 (Pa.Super.Ct.1999).

To maintain a cause of action for breach of contract, the plaintiff must allege and ultimately prove (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages. *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa.Super.1999) (citations omitted). Further, "[w]hile not every term of a contract must be stated in complete detail, every element must be specifically pleaded." *Id.* at 1058. Additionally, "where contractual promises or covenants are mutual and dependent, the failure of one party to perform authorizes the other to rescind the contract." *Id.* (citation omitted). Rescission is proper where the plaintiff "has suffered a breach so material and substantial in nature that it affects the very essence of the contract and serves to defeat the objective of the parties." *Keenheel v. Commonwealth*, 134 Pa.Commw. 494, 502, 579 A.2d 1358, 1362 (1993).

*17 On the other hand, unjust enrichment is a quasi-contractual doctrine based in equity which requires plaintiffs to establish the following: (1) benefits conferred on defendants by plaintiffs; (2)

Not Reported in A.2d                                                                Page 14
2001 WL 1808554 (Pa.Com.Pl.)
**(Cite as: 2001 WL 1808554 (Pa.Com.Pl.))**

appreciation of such benefits by defendants; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendants to retain the benefit without payment of value. _Wiernik v. PHH U.S. Mortgage Corp., 736 A.2d 616, 622 (Pa .Super.Ct.1999), appeal denied, 561 Pa. 700, 751 A.2d 193 (2000)._

In support of their objections, defendants attached various documents, encompassing the terms of the Champion Program to show that an enforceable contract existed between BA-PA and the plaintiff. It may be inappropriate to raise this defense in preliminary objections. _See, Graham v. Harleysville Ins. Co., 429 Pa.Super. 444, 446-47, 632 A.2d 939, 940-41 (1993)_(noting that issue of contractual limitation in insurance policy as a defense should have been pleaded as new matter in responsive pleading, rather than by preliminary objection in the nature of a demurrer). Further, as noted above, it is unclear that the plaintiff's submission of Bell Atlantic Ready pursuant to the Champion Program did constitute an enforceable contract or whether the limitations in the Champion documents would preclude plaintiff from recovering on an unjust enrichment theory.

This court finds _Schott v. Westinghouse Electric Corp., 436 Pa. 279, 259 A.2d 443 (1969)_ directly on point. In _Schott,_ the plaintiff-employee submitted a suggestion on a standard form to the defendant company regarding certain panels used on circuit brakers manufactured by the defendant. _Id. at 283, 259 A.2d at 445._ The Suggestion Committee rejected the employee's suggestion on the grounds that it would necessitate large expenditures, but it allowed the employee to resubmit his suggestion after one year. _Id._ The employee did resubmit his suggestion on the form prescribed by the Company, but it again was rejected. _Id. at 284, 259 A.2d at 445._ The company then allegedly adopted the suggestion and used it in a redesign without compensating the plaintiff. _Id. at 284, 259 A.2d at 446._ The employee then filed his complaint, praying for an accounting and demanding damages for a percentage of the company's savings from the use of the employee's suggestion,. _Id. at 284, 259 A.2d at 446._ The lower court sustained the company's preliminary objections, finding that the suggestion program was an invitation to the company's employees to make an offer, that the employee's offer was subject to acceptance or rejection by the company through its committees and that the offer had been duly and consistently rejected by the company. _Id._ The lower court also sustained the objections to the amended complaint which

sought damages under a contract theory and under an unjust enrichment theory, properly set forth in separate counts. _Id. at 286, 259 A.2d at 447._

**\*18** The Pennsylvania Supreme Court in _Schott_ reversed and found that the employee had stated a cause of action in unjust enrichment but could not recover under a theory of performance of a unilateral contract. _Id. at 287, 259 A.2d at 447._ The court found that there was never an offer and an acceptance of the offer on its own terms. _Id. at 289, 259 A.2d at 448._ [FN11] However, the court also reasoned that the employee could maintain an unjust enrichment claim for benefits conferred on the company by the employee's submission of a valuable idea since it was not clear on the facts alleged that the employee expected no payment for his idea or conferred the benefit of his idea officiously. _Id. at 292, 259 A .2d at 449._

> FN11. The _Schott_ court did not address whether the purported contract was unilateral or bilateral in nature since it found that the employee's idea had not been "accepted" in any event. _Id. at 287-88, 259 A.2d at 447._ Similarly, here, this court need not address whether the plaintiff's purported contract was unilateral or bilateral.

Here, as in _Schott,_ it is not clear whether the plaintiff had an enforceable contract with any of the defendants, notwithstanding the terms of the Champion Program. Further, unlike in _Schott,_ this court is faced with allegations of fraud in the inducement. The Champion Program documents clearly indicated that the company would keep an associate informed of development of the idea and allow the associate to receive additional compensation of $2500 if the idea generated $10,000 in gross revenue. Preliminary Objections, Exhibit B. Plaintiff alleged that he was not so informed or compensated pursuant to the Champion Program. Am.Compl. at ¶ 18. Even assuming that the Champion Program did govern the terms of the contractual relationship between the plaintiff and BA-PA, defendant BA-PA could have so materially breached the contract as to give grounds for the plaintiff to rescind the contract. _See Keenheel, 134 Pa.Commw. at 502, 579 A.2d at 1362._ In addition, notwithstanding the title of Count VIII, the allegations appear to state a claim for rescission based on misrepresentation or abuse of a fiduciary relation rather than damages on a breach of contract theory. [FN12] Moreover, the plaintiff may rescind the contract and proceed on an unjust enrichment

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 1808554 (Pa.Com.Pl.)
(Cite as: 2001 WL 1808554 (Pa.Com.Pl.))

theory for the value of the benefit he conferred on the defendants, i.e., the value of the Bell Atlantic Ready plan.

> FN12. When faced with a conflict between the allegations of a count and the count's titled, Pennsylvania courts look at the allegations and not the title. *See, e.g., Zernhelt v. Lehigh County Office of Children and Youth Servs., 659 A.2d 89 (Pa.Commw.Ct.1995)*(treating a count titled "negligent infliction of emotional distress" as a claim for intentional infliction of emotional distress); *Maute v. Frank, 441 Pa.Super. 401, 403-04, 657 A.2d 985, 986 (1995)*("since the complaint states a viable mandamus claim, we will treat that portion of the action as such, regardless of the fact that the complaint is not titled properly as one involving mandamus").

Since this court cannot say with certainty that plaintiff has not pled sufficient facts to be able to rescind the contract and proceed on an unjust enrichment theory, the court is overruling the Preliminary Objections to Counts VIII and IX.

However, this court also finds that plaintiff has not stated a cause of action for restitution pursuant to Section 136 of the Restatement (First) of Restitution (1936). This section provides that "[a] person who has tortiously used a trade name, trade secret, franchise, profit à prendre, or other similar interest of another, is under a duty of restitution for the value of the benefit thereby received." Rest. (1st) of Restitution, § 136 (1936). This court found no Pennsylvania case, nor has either party cited one, which adopts this section of the Restatement, or provides for liability of an employer to his current employee for tortious use of a trade secret, when that alleged secret was voluntarily disclosed to the employer by the employee under the employee's expectation that he would be compensated and credited with the idea. As noted above, plaintiff remains an employee of defendant BA-PA. Am.Compl. at ¶ 1. Further, this court did not find that plaintiff could maintain an action for misappropriation of trade secret or invention. Similarly, this court must conclude that plaintiff cannot claim restitution based on tortious use of a trade secret. Moreover, this claim for restitution appears to be redundant of plaintiff's claim for unjust enrichment in Count IX.

**\*19** Therefore, the demurrer to Count X is sustained

with prejudice.

*H. Plaintiff May Maintain His Cause of Action For Imposition of A Constructive Trust As Incident to His Claims For Unjust Enrichment, Breach of Fiduciary Duty and Fraud*

Defendants also demur to Count XI on the grounds that plaintiff has not averred facts which are legally sufficient to establish that the marketing suggestion or the Verizon Ready program of defendants is subject to a trust, constructive or otherwise, for the benefit of Babiarz. Defs. Mem. of Law, at 31-32. Plaintiff asserts that it would be appropriate for this court to impose a constructive trust since he has alleged sufficient facts to state a claim for misappropriation of a trade secret. Pl. Mem. of Law, at 55.

Establishing a constructive trust is an equitable remedy that is applied "when a person holding title to property is subject to an equitable duty to convey it to another on the ground he would be unjustly enriched if he were permitted to retain it." *DeMarchis v. D'Amico, 432 Pa.Super. 152, 166, 637 A.2d 1029, 1036 (1994)* (citing *Yohe v. Yohe, 466 Pa. 405, 411, 353 A.2d 417, 421 (1976)*). A court's focus in determining whether a constructive trust should be established is the existence of unjust enrichment:

> Generally, an equitable duty to convey property arises only in the presence of fraud, duress, undue influence, mistake or abuse of a confidential relationship. There is, however, no rigid standard for determining whether the facts of a particular case require a court of equity to impose a constructive trust; the test is merely whether unjust enrichment can be avoided.

*Koffman v. Smith, 453 Pa.Super. 15, 32, 682 A.2d 1282, 1291 (1996)* (citations omitted) (rejecting the argument that establishment of a constructive trust requires a fiduciary relationship). *See also Hercules v. Jones, 415 Pa.Super. 449, 458, 609 A.2d 837, 841 (1992)* ("[t]he controlling factor in determining whether a constructive trust should be imposed is whether it is necessary to prevent unjust enrichment").

In addition, certain sections of the Restatement (First) of Restitution (1936) are relevant for ascertaining whether a constructive trust may be imposed. For instance, Section 166 states that "[w]here the owner of property transfers it, being induced by fraud, duress or undue influence of the transferee, the transferee holds the property upon a constructive trust for the transferor." Rest. (First) of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 16
2001 WL 1808554 (Pa.Com.Pl.)
**(Cite as: 2001 WL 1808554 (Pa.Com.Pl.))**

Restitution § 166. Also, Section 190 provides that "[w]here a fiduciary relation to another acquires property, and the acquisition or retention of the property is in violation of his duty as a fiduciary, he holds it upon a constructive trust for the other." Rest. (First) of Restitution § 190.

Here, in Count XI, plaintiff sets forth the following allegations:

> 65. The transfer of the trade secret and/or trade name by plaintiff to the defendants as aforedescribed was induced by fraud and/or undue influence exerted by the defendants, jointly and severally and, as such, the defendants hold said property upon a constructive trust for the benefit of the plaintiff pursuant to Section 166 of the Restatement of Restitution.

> **\*20** 66. Defendants, jointly and severally, are also trustees and/or trustees ex malificio [*sic*] for the plaintiff, of the plaintiff's property as aforesaid. Said rights of the plaintiff arise, inter alia, pursuant to Section 190 of the Restatement of Restitution.

Am.Compl. at ¶¶ 65-66. Taking these allegations as true, it cannot be said with certainty that plaintiff cannot maintain a cause of action for the imposition of a constructive trust on defendants for the benefit of the plaintiff. Further, as noted above, plaintiff has sufficiently stated causes of action for breach of fiduciary duty, fraud and unjust enrichment.

Therefore, the Preliminary Objections to Count XI are overruled.

## II. PETITION TO AMEND COMPLAINT

In his Petition to Amend his Complaint, plaintiff seeks to amplify his allegations with reference to actual documents produced by defendants, as well as correcting certain mis-numbered paragraphs and counts, and adding *ad damnum* clauses to Counts IV (misappropriation of trade secret) and V (misappropriation of invention). Defendants do not object to the plaintiff's proposed amendments which correct mis-numbered paragraphs and counts and include missing *ad damnum* clauses. However, defendants do object to the inclusion of new factual averments and exhibits which they argue does not revive the fatal deficiencies in plaintiff's cause of action for fraud.

Pursuant to Pa.R.C.P. 1033, a party may amend his complaint either by filed consent of the adverse party or by leave of court. The rule also provides that "[t]he amended pleading may aver transactions or occurrences which have happened before or after the

filing of the original pleading, even though they give rise to a new cause of action or defense." Pa.R.C.P. 1033. The trial court has broad discretion in determining whether to allow amendment. *Capobianchi v. BIC Corp.*, 446 Pa.Super. 130, 134, 666 A.2d 344, 346 (1995). "Amendments are to be liberally permitted except where surprise or prejudice to the other party will result, or where the amendment is against a positive rule of law." *Burger v. Borough of Ingram*, 697 A.2d 1037, 1041 (Pa.Commw.Ct.1997) (citation omitted). While recognizing this liberal amendment policy, a court is not required to allow amendment of a pleading if a party will be unable to state a claim on which relief could be granted. *Werner v. Zazyczny*, 545 Pa. 570, 583, 681 A.2d 1331, 1338 (1996).

Here, plaintiff's Proposed Second Amended Complaint adds additional factual averments and includes additional exhibits which give some background to plaintiff's claims, but these additions do not add a new cause of action. For instance, the new allegations reveal that plaintiff submitted his idea in order to help create union jobs and improve relations between Bell Atlantic and its union employees. *See* Proposed Second Am.Compl. at ¶ 10(a). Other allegations do add to the circumstances in which the Bell Atlantic Ready plan was rejected and then ultimately pursued by the defendants. *See id.* at ¶¶ 25(a)-(f), 29(a).

**\*21** This court does not find that permitting the plaintiff's amendment is against a positive rule of law since it has already found that plaintiff's first amended complaint already stated a cause of action for fraud. The proposed amendment merely adds additional facts and content relating to the defendants' intent. Moreover, defendants do not oppose the amendment to correct mis-numbered paragraphs or counts. In any event, however, plaintiff may not reassert his claims for conversion, misappropriation of trade secret or misappropriation of invention, which this court has dismissed with prejudice.

Therefore, the Petition to Amend the Complaint is granted.

## CONCLUSION

For the reasons set forth above, the Preliminary Objections to Counts III, IV and V of the (First) Amended Complaint are sustained with prejudice and these counts are stricken. The remaining Preliminary Objections are overruled. The court is also granting the plaintiff's Petition to Amend his Complaint. The court will enter a contemporaneous Order in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 1808554 (Pa.Com.Pl.)
(Cite as: 2001 WL 1808554 (Pa.Com.Pl.))

accordance with this Opinion.

ORDER

AND NOW, this 10th day of July, 2001, upon consideration of defendants' Preliminary Objections to the Amended Complaint, plaintiff's opposition thereto, all respective memoranda, as well as plaintiff's Petition to Amend his Complaint, defendants' opposition thereto, all other matters of record, and having heard oral argument on this matter, it is hereby ORDERED that:

(1) defendants' Preliminary Objections to Counts III, IV and V of the Amended Complaint are sustained with prejudice and these counts are stricken;

(2) the remaining Preliminary Objections to the Amended Complaint are overruled;

(3) plaintiff's Petition to Amend his Complaint is granted, except with regard to Counts III, IV and V of his Second Amended Complaint; and

(4) defendants shall file an Answer to the Second Amended Complaint within twenty (20) days of entry of this Order.

2001 WL 1808554 (Pa.Com.Pl.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.