# EXHIBIT 9

Westlaw.

Not Reported in F.Supp.                                                    Page 1
1997 WL 79845 (S.D.N.Y.), RICO Bus.Disp.Guide 9242
**(Cite as: 1997 WL 79845 (S.D.N.Y.))**

**H**

**Motions, Pleadings and Filings**

United States District Court, S.D. New York.
Ajitkumar R. BUTALA, Gita A. Butala, Bhuprenda
V. Dudhia, Surendra D.
Mahadevia, Panna S. Mahadevia, Pankaj Mehta,
Smitha Mehta, Aliakbar Noorani,
Bipin Parikh, Dilip J. Patel, Kalpana D. Patel,
Mahendra D. Patel, Chhaya M.
Patel, Rajnikant Patel, USHA Patel, Ramachandra G.
Patel, Jasumati Patel,
Rajnikant Shah, Subodhchandra Trivedi, and Sudha
Trivedi, Plaintiffs,
v.
Mahesh AGASHIWALA and Loma Agashiwala,
Defendants.
**No. 95 CIV. 936 JGK.**

Feb. 24, 1997.
Krishnan S. Chittur, New York City, for plaintiffs.

John M. Burns, III, Sheldon S. Lustigman, Andrew
V. Lustigman, The Lustigman Firm, New York City,
for defendants.

*OPINION AND ORDER*

KOELTL, District Judge:

**\*1** This motion to dismiss the First Amended
Complaint (the "Amended Complaint") arises in an
action brought by twenty individual investors against
two accountants, Mahesh and Loma Agashiwala. In
*Butala v. Agashiwala*, 916 F. Supp. 314 (S.D.N.Y.
1996) ("*Butala I*"), the Court dismissed without
prejudice the plaintiffs' original complaint. The Court
dismissed the plaintiff's RICO claims pursuant to
Fed. R. Civ. P. 12(b)(6) on the basis of the statute of
limitations and, in the alternative, for failure to plead
fraudulent concealment with particularity under Rule
9(b), *see id.* at 320- 22, and declined supplemental
jurisdiction over the plaintiffs' state law claims
pursuant to 28 U.S.C. § 1367(c)(3), *see id.* at 322.

On April 29, 1996, the plaintiffs filed the Amended
Complaint. The plaintiffs assert two claims under the
Racketeer Influenced and Corrupt Organizations Act
("RICO"), 18 U.S.C. § 1961 *et seq.*, and three

supplemental claims under New York law for fraud,
negligent misrepresentation and breach of fiduciary
duty. The plaintiffs allege that the defendants made
statements with respect to certain real estate
investments that were fraudulent and form the basis
for the underlying predicate acts of securities fraud
under Sections 10(b) and 15(c) of the Securities
Exchange Act of 1934, 15 U.S.C. § § 78j(b), 78o(c),
and Sections 5, 12, and 17(a) of the Securities Act of
1933, 15 U.S.C. § § 77e, 77l, 77q, mail fraud, 18
U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, and
fraud in the sale of securities, 18 U.S.C. § 1961(1).
The plaintiffs allege that the defendants conducted
and participated in the conduct of an enterprise
through a pattern of racketeering activity in violation
of 18 U.S.C. § 1962(c) (Count I), and conspired to
do so in violation of 18 U.S.C. § 1962(d) (Count II).
The plaintiffs seek compensatory damages in the
amount of their lost investments, treble damages, and
attorneys' fees and expenses.

The defendants now move (i) to dismiss both RICO
claims pursuant to Fed. R. Civ. P. 12(b)(6) as time
barred, or, (ii) in the alternative, to dismiss the
complaint for failure to plead fraud with particularity
under Fed. R. Civ. P. 9(b), or, finally, (iii) to dismiss
the second RICO claim for failure to state a
claim under Fed. R. Civ. P. 12(b)(6). The plaintiffs also
move to disqualify the defendants' attorneys on the
grounds that the conduct of those attorneys violated
Canons 4, 5, and 9 of the American Bar Association
Code of Professional Responsibility ("the ABA
Code").

I.

On a motion to dismiss, the Court "'must accept the
material facts alleged in the complaint as true and
construe all reasonable inferences in the plaintiff's
favor.'" *Gant v. Wallingford Bd. of Educ.*, 69 F.3d
669, 673 (2d Cir. 1995) (considering a motion to
dismiss pursuant to Fed. R. Civ. P. 12(b)(6)) (quoting
*Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.),
*cert. denied*, 115 S. Ct. 117 (1994)). In the present
case, the Complaint alleges the following facts.

**\*2** Some of the twenty plaintiffs in this action were
accounting clients of the defendants, and the others
were friends and co-investors of such clients. (Am.
Compl. ¶ ¶ 1, 9, 15.) The defendants, with others,
organized a real estate venture to build residential
townhouses and condominiums in Newark, New

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2
1997 WL 79845 (S.D.N.Y.), RICO Bus.Disp.Guide 9242
**(Cite as: 1997 WL 79845 (S.D.N.Y.))**

Jersey through the creation of two limited partnerships, the Gouverneur Commons Townhouse Associates-1987, L.P. ("GCTA") and the New Jersey Townhouse Associates-1987, L.P. ("NJTA"). (Am. Compl. ¶ ¶ 10-11.) The defendants prepared financial projections that showed anticipated returns in excess of 140% for each of the limited partnerships. (Am. Compl. ¶ 12.) The defendants also made oral representations to the plaintiffs including the following: (i) investors would realize at least a 15% annual return; (ii) investors would receive a full return of capital with substantial profits; (iii) the managers of the venture were experienced, reliable, and trustworthy; (iv) a performance bond of $1.5 million had been put up by the contractors; (v) the defendants were the accountants for the real estate venture; and (vi) the defendants were co-investors in the limited partnerships. (Am. Compl. ¶ ¶ 16-19.) Subsequently, between 1987 and 1988, the plaintiffs invested $840,000 in GCTA and NJTA. (Am. Compl. ¶ ¶ 1, 19-20, 35, 117.)

Shortly after each investment closed, the plaintiffs began to receive monthly distribution checks, which allegedly represented installments on their 15% annual return. (Am. Compl. ¶ 36.) In April 1989, however, the monthly checks bounced. (Am. Compl. ¶ 43.) No further checks were sent. Consequently, the plaintiffs did not recover their capital by February 1990, nor did they realize a 15% annual return or total returns in excess of 140%. One defendant sent a letter to investors dated June 23, 1989, indicating that the real estate venture was having "problems." (Am. Compl. ¶ ¶ 46-47.) The plaintiffs allege that a meeting was held on June 29, 1989, which was attended by the defendants, several investors including six of the plaintiffs, and two of the defendants' alleged co-conspirators. (Am. Compl. ¶ 51.) The defendants' co-conspirators made various commitments and representations to the investors. (Am. Compl. ¶ ¶ 51-55.) At that meeting, the plaintiffs, other investors, and the defendants formed an "Action committee" for managing the partnership. (Am. Compl. ¶ ¶ 54-56.)

The plaintiffs further allege that the defendants claimed to have been duped by the managers of the real estate venture and that the defendants coordinated lawsuits brought against those managers and took other actions to curtail the losses. The plaintiffs assert that on October 5, 1990, in response to the inquiry of two plaintiffs regarding the defendants' role in the fraud, the attorney hired by the Action committee explained that "[h]is investigations had not, as of then, uncovered any tangible evidence

of [the] defendants' *knowing* participation in the fraud." (Am. Compl. ¶ ¶ 81-82 (emphasis in original).) The plaintiffs contend that the defendants concealed their own part in the fraud by controlling the lawsuits, and that the plaintiffs only learned of the defendants' fraudulent acts in February 1993. (Am. Compl. ¶ ¶ 73, 100-02.) Accordingly, the plaintiffs now sue the defendants for violations of RICO arguing that the defendants themselves, and in conspiracy with others, conducted an enterprise through a pattern of racketeering thereby inducing the plaintiffs to make the doomed investments and deliberately covered up the existence of claims against themselves.

II.

*3 The defendants move to dismiss the two RICO claims pursuant to Fed. R. Civ. P. 12(b)(6) on the basis of the statute of limitations. The defendants argue that RICO claims have a four-year statute of limitations which began to run when the plaintiffs discovered or with reasonable diligence should have discovered their injuries. The defendants assert that the plaintiffs' injuries occurred at the time they purchased their limited partnership interests and that they were placed on inquiry notice of their injuries by November 1989 by which time several events had occurred: (1) the GCTA plaintiffs had received a letter from their attorney in February 1989 that "adverte[ed] to irregularities in GCTA's management, and recommend[ed] litigation," (Am. Compl. ¶ 58 n.3); (2) plaintiff Ramachandra Patel had "reported to the Action Committee about the lack of construction activity and neighbors' assertions about disputes concerning the subject property," (Am. Compl. ¶ 57); (3) the NJTA plaintiffs had retained an attorney by the end of August 1989, (Am. Compl. ¶ ¶ 57, 63-64); and (4) the promises that the plaintiffs would receive replacement checks for the bounced April 1989 checks by July 7, 1989, that the plaintiffs would receive disbursement checks for May through July 1989 by July 1989, and that construction of five townhouses would be completed in 90 days and five more in 120 days were not honored, (Am. Compl. ¶ ¶ 52, 59). The defendants argue that these events put the plaintiffs on notice of their injuries and that, therefore, the statute of limitations began to run no later than November 1989. Since more than four years elapsed between November 1989 and the filing of this lawsuit on February 9, 1995, the suit is untimely. In response, the plaintiffs argue, first, that the statute did not begin to run until they acquired information in 1993 that suggested the probability that these particular defendants had participated in the fraud and that, therefore, their claims are timely.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 3
1997 WL 79845 (S.D.N.Y.), RICO Bus.Disp.Guide 9242
**(Cite as: 1997 WL 79845 (S.D.N.Y.))**

Second, the plaintiffs argue that, in any event, the statute was tolled on the basis of the defendants' fraudulent concealment.

### A.

The statute of limitations for civil enforcement actions under RICO is four years. *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.,* 483 U.S. 143, 156 (1987). A cause of action under RICO accrues when the plaintiff suffers an injury, and the statute of limitations begins to run when the plaintiff discovers or should discover that injury. *See Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1102 (2d Cir. 1988), *cert. denied,* 490 U.S. 1007 (1989); *see also In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.,* 850 F. Supp. 1105, 1117-18 (S.D.N.Y. 1993)("The RICO limitations test here, then, is an objective one, to wit, when a reasonable person should have discovered the RICO injury, the RICO statute of limitations will start to run."); *Ackerman v. Nat'l Property Analysts, Inc.,* 887 F. Supp. 494, 503 (S.D.N.Y. 1992). In the case of the purchase of allegedly fraudulent limited partnerships, ordinarily the injury occurs at the time of purchase. *See Fisher v. Reich,* No. 92 Civ. 4158, 1995 WL 23966, at *3 (S.D.N.Y. Jan. 10, 1995)("Where, as here, plaintiffs acquired limited partnership interests based upon the defendants' alleged fraudulent statements and offering material, the injury to plaintiffs is the purchase of the partnership interests."); *Ackerman,* 887 F. Supp. 503-04 ("[T]he injury to plaintiffs is the actual purchase of the partnership interest rather than each subsequent payment of that interest."); *Gould v. Berk & Michaels, P.C.,* No. 89 Civ. 5036, 1990 WL 41706, at *5 (S.D.N.Y. Apr. 5, 1990)("A [securities-based] RICO cause of action accrues on the date of the last sale to plaintiffs, subject to tolling for fraudulent concealment.").

*4 In the present case, the plaintiffs' alleged injuries occurred when they purchased the limited partnership interests in late 1987 and early 1988. (Am. Compl. ¶ ¶ 19-20, 35.) The plaintiffs allege that these investments were fraudulent from their inception. Consequently, the plaintiffs were injured when they purchased them. Nothing is pleaded indicating that there was ever a question as to whether the plaintiffs were injured at all. The only issue the plaintiffs raise is the amount of their damages, not the existence of them. Accordingly, the plaintiffs' injuries occurred at the time the limited partnership interests were purchased.

### B.

"Once a court determines when the injury occurred, it must calculate the four-year RICO statute of limitations from the date when plaintiff discovered or should have discovered their injury." *Ackerman,* 887 F. Supp. at 503. Therefore, on a motion to dismiss, a RICO claim will be time-barred if the facts alleged in the complaint indicate that the plaintiff, with reasonable diligence, should have uncovered the alleged fraud prior to the limitations period. *See Kinley Corp. v. Integrated Resources Equity Corp. (In re Integrated Resources, Inc. Real Estate Ltd. Partnerships Sec. Litig.),* 851 F. Supp. 556, 567-68 (S.D.N.Y. 1994) ("The limitations period for a fraud-based RICO action commences when Plaintiffs are placed on notice of facts which should arouse suspicion."); *Integrated Resources,* 850 F. Supp. at 1118; *Griffin v. McNiff,* 744 F. Supp. 1237, 1255 (S.D.N.Y. 1990), *aff'd,* 996 F.2d 303 (2d Cir. 1993). "The time from which the statute of limitations begins to run is not the time at which a plaintiff becomes aware of all of the various aspects of the alleged fraud, but rather the statute runs from the time at which the plaintiff should have discovered the general fraudulent scheme." *Dolan v. Rothschild Reserve Int'l, Inc.,* No. 90 Civ. 1003, 1991 WL 155770, at *2 (S.D.N.Y. Aug. 6, 1991) (quoting *Klein v. Bower,* 421 F.2d 338, 343 (2d Cir. 1970)).

To determine when the plaintiff should have discovered the scheme requires a two part inquiry: *first,* whether the plaintiffs received information sufficient to alert a reasonable person to the probability that they had been misled, that is, whether the plaintiffs were on inquiry notice; and *second,* whether the plaintiffs responded to such notice with reasonable diligence. *See Lenz v. Associated Inns and Restaurants Co. of America,* 833 F. Supp. 362, 370 (S.D.N.Y. 1993); *In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.,* 815 F. Supp. 620, 638-39 (S.D.N.Y. 1993). Where the undisputed facts set forth in the complaint establish inquiry notice and the lack of due diligence, "resolution of the issue on a motion to dismiss is appropriate." *Dodds v. Cigna Sec. Inc.,* 12 F.3d 346, 352 n.3 (2d Cir. 1993), *cert. denied,* 114 S. Ct. 1401 (1994); *see Griffin,* 744 F. Supp. at 1255 ("On a motion to dismiss, when the facts alleged in the complaint indicate that, with reasonable diligence, plaintiffs should have uncovered the alleged fraud prior to the limitations period, the claim will be time-barred."). However, "[i]ssues of due diligence and constructive knowledge depend on inferences drawn from the facts of each particular case similar to the type of inferences that must be drawn in determining intent and good faith.... When conflicting inferences can be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4
1997 WL 79845 (S.D.N.Y.), RICO Bus.Disp.Guide 9242
**(Cite as: 1997 WL 79845 (S.D.N.Y.))**

drawn from the facts ... summary judgment is inappropriate." *Robertson v. Seidman & Seidman,* 609 F.2d 583, 591 (2d Cir. 1979) (citations omitted).

*\*5* The plaintiffs argue that although they had knowledge of various irregularities in 1989, they were not placed on inquiry notice as to the participation of these particular defendants in the fraud until 1993. Although a plaintiff may have knowledge of the underlying fraud, inquiry notice for statute of limitations purposes is only triggered when the plaintiff is placed on notice of the fraudulent activities of the particular defendants being sued. *See Robertson,* 609 F.2d at 591-92; *Dayton Monetary Assocs. v. Donaldson, Lufkin, & Jenrette Sec. Corp.,* Nos. 91 Civ. 2050, 91 Civ. 4944, 91 Civ. 5000, 91 Civ. 5622, 91 Civ. 6432, 1992 WL 204374, at *3-*4 (S.D.N.Y. Aug. 11, 1992); *Stern v. Grossman,* No. 86 CIV. 0837, 1989 WL 38349, at *4 (S.D.N.Y. Apr. 12, 1989); *Huang v. Sentinel Gov't Sec.,* 709 F. Supp. 1290, 1300-01 (S.D.N.Y. 1989).

In this case, assuming the allegations in the Amended Complaint are true, there is ample evidence that the plaintiffs were on inquiry notice as to the fraudulent activities of these defendants at the latest by October 1990. By that time, many of the defendants' representations -- that the real estate ventures were "solid and fool-proof," and defendants' co-conspirators were "experienced professionals," "very reliable," and "trustworthy" real estate entrepreneurs (Am. Compl. ¶ 16); that as accountants for GCTA and NJTA, the defendants would ensure the safekeeping as well as proper flow of funds, (Am. Compl. ¶ 17); that the investments were completely safe (Am. Compl. ¶ 17); and that the defendants personally, uniformly, and explicitly guaranteed each plaintiff immediate returns of at least 15% p.a. payable monthly, and a full return of capital with substantial profits within two years, (Am. Compl. ¶ 18) -- had proven untrue. *See, e.g., Lenz,* 833 F. Supp. at 375 ("[C]lear evidence that an investment asset has declined in value or has been subject to an artificially inflated estimate of its value, in direct contradiction of representation made to the plaintiff at the time of sale, constitutes inquiry notice as to the probability of fraud."); *Griffin,* 744 F. Supp at 1256 (plaintiffs on notice when made aware of unfavorable estimates regarding oil reserves, conflicting with projections, and withdrawal of public accountants); *Henkind v. Brauser,* No. 87 Civ. 4072, 1989 WL 54109, at *7-*8 (S.D.N.Y. May 17, 1989) (plaintiffs on notice where they had "gone through two reporting cycles without having received the promised information about the operation of the

Partnership"); *Anisfeld v. Cantor Fitzgerald & Co., Inc.,* 631 F. Supp. 1461, 1466 (S.D.N.Y. 1986) (inquiry notice triggered by financial reports showing partnership suffered losses since inception, rent revenues below projections, occupancy rates below projections, and condition of premises in disrepair); *see also Farr v. Shearson Lehman Hutton, Inc.,* 755 F. Supp 1219, 1225 (S.D.N.Y. 1991) (financial report showed risky, illiquid investment rather than promised conservative one, and put plaintiff on inquiry notice; § 10(b) claim); *Miller v. Grigoli,* 712 F. Supp. 1087, 1092 (S.D.N.Y. 1989) (letters from partnership indicating problems with investment put investor on inquiry notice; § 10(b) claim).

*\*6* More importantly, by October 1990, the plaintiffs' suspicions regarding the defendants' role in the fraud had been raised to such a degree that plaintiffs Ramachandra and Rajani Patel asked the attorney hired by the Action Committee whether the defendants were involved in the fraud. (Am. Compl. ¶ 81.) Thus, the plaintiffs were on inquiry notice regarding the defendants' role in the fraud no later than October 1990, and the statute of limitations began to run at least by that time.

### C.

The plaintiffs next argue that, even if the statute of limitations had begun to run, the statute was tolled by the defendants' fraudulent concealment, and that the plaintiffs exercised due diligence once they became aware of the problems with their investments. The plaintiffs argue both that the defendants took affirmative steps to cover their tracks and that the nature of the fraud was self-concealing.

Under the doctrine of fraudulent concealment, the statute of limitations will be tolled if the plaintiff pleads, with particularity, either active concealment or passive concealment. In order to establish active concealment, the plaintiff must prove that the defendant took subsequent affirmative steps in addition to the original fraud to prevent the plaintiff from discovering the fraud. *See Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.,* 778 F. Supp. 695, 700-01 & n.7 (S.D.N.Y. 1991) (finding that there was a genuine issue of material fact with regard to active concealment where the plaintiff alleged that the defendants affirmatively denied, in numerous SEC filings and filings with the Federal Reserve Board, that they received payments from organizers and promoters of investment ventures as consideration for recommendations and sales of security interests to the plaintiffs and where the defendants made several knowingly false statements in an attempt to conceal

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 5
1997 WL 79845 (S.D.N.Y.), RICO Bus.Disp.Guide 9242
**(Cite as: 1997 WL 79845 (S.D.N.Y.))**

the payments received); *Clute v. Davenport Co., 584 F. Supp. 1562, 1579 & n.4 (D. Conn. 1984)* (finding the plaintiffs' allegations of concealment sufficient where they asserted a cover-up designed to prevent discovery of the earlier fraud as well as the initial deception); *see also Baskin v. Hawley, 807 F.2d 1120, 1130- 31 (2d Cir. 1986)* (finding active concealment where a union misrepresented to a member that his employer was not bound to collective bargaining agreement); *Huang, 709 F. Supp. at 1300* (finding active concealment to be a reasonable inference where the plaintiffs were unable to inspect the partnership records because the defendant's managing general partner misrepresented to them that he was taking all legal steps to get the records returned from the government when they had already been returned). Where there is active concealment, the plaintiff is not required to establish due diligence; the statute of limitations is tolled until the plaintiff has actual knowledge of the defendant's fraudulent conduct. *See Baskin, 807 F.2d at 1131; Robertson, 609 F.2d at 593; Borden, 778 F. Supp. at 700; Huang, 709 F. Supp. at 1300; Clute, 584 F. Supp. at 1578.*

**\*7** "Passive concealment occurs when the defendant commits fraud but then takes no further action to disguise the fraud from the plaintiff." *Clute, 584 F. Supp. at 1578 n.4; see also Borden, 778 F. Supp. at 700 n.7.* In order to establish passive concealment, the plaintiff must prove that the defendant wrongfully concealed the fraud, that the plaintiff exercised due diligence in pursuing discovery of the fraud, and that the plaintiff failed to discover the fraud within the limitations period. *See Butala I, 916 F. Supp. at 319; Griffin, 744 F. Supp. at 1256* (citing *Donahue v. Pendleton Woolen Mills, Inc., 633 F. Supp. 1423, 1443 (S.D.N.Y. 1986)); see also Bankers Trust, 859 F.2d at 1105* (applying standard tolling exceptions for civil RICO statute of limitations, and citing *New York v. Hendrickson Bros., Inc., 840 F.2d 1065, 1083-84 (2d Cir.), cert. denied, 488 U.S. 848 (1988)).*

In pleading either active or passive concealment, the plaintiff must comply with the particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *See Greenwald v. Munko, 840 F. Supp 198, 202 (E.D.N.Y. 1993); Glick v. Berk & Michaels, P.C., No. 90 Civ. 4230, 1991 WL 152614, at \*9 (S.D.N.Y. July 26, 1991)(citing Moviecolor Ltd. v. Eastman Kodak Co., 288 F.2d 80, 88 (2d Cir.), cert. denied, 368 U.S. 821 (1961)); Griffin, 744 F. Supp. at 1256; Moll v. U.S. Life Title Ins. Co. of New York, 700 F. Supp. 1284, 1289-90 (S.D.N.Y. 1989).* The allegations in the Amended Complaint are far more particular and extensive than those found insufficient in *Butala I.*

In the Amended Complaint, the plaintiffs allege that the defendants engaged in both active and passive concealment. The plaintiffs contend that the defendants actively concealed their wrongdoing through various affirmative actions. They argue that the defendants failed to reveal to the plaintiffs certain crucial facts: that the defendants received cash commissions of at least six percent for each unit they sold to the plaintiffs, that the defendants cloned the projections with reckless disregard for the truth, and that the defendants systematically falsified bank documents. [FN1] However, the defendants' failure to disclose these facts constitutes passive rather than active concealment. The plaintiffs, however, also allege a detailed active campaign calculated to cover up the defendants' alleged role in the fraud and to portray the defendants as innocent victims. The plaintiffs allege that the defendants distanced themselves from the other wrongdoers, emphatically behaved as injured investors themselves, told investors that they had resigned as accountants for the partnerships, advised investors not to pay on the Notes, repeatedly assured the plaintiffs that the defendants would take care of everything, convened and conducted meetings purportedly for protecting investors, acted as co-investigators of the fraud, took charge of communications with the attorneys, bargained down attorneys' contingent fees, sent to the plaintiffs copies of the defendants' apparently indignant faxes to the other alleged wrongdoers, and actively shut out Action Committee member plaintiff Ramachandra Patel from important meetings. (Am. Compl. ¶ ¶ 43-99.) These actions raise at least a question of fact as to whether there was active concealment of the fraud.

> FN1. The plaintiffs also allege that the defendants concealed the fact that they had not invested any of their own funds in the partnerships. However, not only is this fact contradicted in the response to the plaintiffs' motion to disqualify, (Bartfield Decl. ¶ 16), but the plaintiffs assert the opposite in their motion to disqualify:
> [D]efendant Mahesh Agashiwala appears to have cut a special deal -- i.e., different from that he recommended to other investors (including the 14 plaintiffs herein) -- with Chase Lincoln. Mr. Agashiwala also appears to have had ownership interests and was apparently representing the broker-dealer, Melvest, Inc., in the formation of the limited

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 6
1997 WL 79845 (S.D.N.Y.), RICO Bus.Disp.Guide 9242
**(Cite as: 1997 WL 79845 (S.D.N.Y.))**

partnerships.
(Chittur Aff. ¶ 30.)

**\*8** The plaintiffs also argue that the statute of
limitations should be tolled because the defendants
fraudulently concealed the crucial facts mentioned
above despite the defendants' duty to disclose them to
the plaintiffs or, in other words, engaged in passive
concealment. Although it is doubtful that the
defendants owed the plaintiffs a fiduciary duty in
their capacity as accountants, see *Fund of Funds, Ltd.
v. Arthur Andersen & Co.,* 545 F. Supp. 1314, 1356
(S.D.N.Y. 1982) ("Courts do not generally regard the
accountant-client relationship as a fiduciary one.");
see also *Greenblatt v. Richard Potasky Jewelers, No.
93 Civ. 3652, 1994 WL 9754, at \*4 (S.D.N.Y. Jan.
13, 1994); Mishkin v. Peat, Marwick, Mitchell & Co.,*
658 F. Supp. 271, 273 & n.10 (S.D.N.Y. 1987), "it is
nonetheless fundamental that a person who speaks
has a duty to disclose enough to prevent his words
from being misleading. A statement disclosing
favorable information but omitting all reference to
material unfavorable facts breaches that duty. This
principle is plainly applicable to the question of
whether a defendant has engaged in fraudulent
concealment." *Baskin,* 807 F.2d at 1132 (citations
omitted). Therefore, the plaintiffs' allegations that the
defendants concealed the fact that they had received
cash commissions of at least six percent for each unit
they sold to the plaintiffs, that the defendants had
cloned the projections with reckless disregard for the
truth, and that the defendants had systematically
falsified bank documents create factual issues as to
whether there was passive concealment of the
defendant's role in the fraud.

Furthermore, it cannot be decided as a matter of law
that the plaintiffs failed to exercise due diligence
when they consulted with their attorney concerning
their suspicions about the defendants' role in the
fraud. (Am. Compl. ¶ 81.) Their attorney told them
that he had not uncovered any tangible evidence of
the defendants' participation in the fraud and that he
would cease representing the defendants if his
investigations showed otherwise. (Am. Compl. ¶ 82.)

The plaintiffs also allege that they were unable to
discover the defendants' role in the fraud until 1993,
when they received tangible evidence of the
defendants' falsification of bank documents, thus
showing the defendants' alleged involvement in the
fraud. The plaintiffs have therefore pleaded the
elements of passive concealment with sufficient
particularity to create an issue of fact as to whether
they have established fraudulent concealment in

order to toll the statute of limitations.

Accordingly, because there are issues of fact as to
whether the statute of limitations should be tolled as a
result of the defendants' active and passive
concealment of their role in the fraud, dismissal of
this action is inappropriate.

### III.

In the alternative, the defendants move to dismiss the
entire Complaint pursuant to *Fed. R. Civ. P. 9(b)* for
failure to plead fraud with adequate specificity.
Where the predicate acts of a civil RICO claim sound
in fraud or mistake, the pleading of those predicate
acts must satisfy the requirements *Rule 9(b). Butala
I,* 916 F. Supp. at 321 (collecting cases). To comply
with *Rule 9(b)*, the complaint must allege specifically
when and where the misrepresentations took place,
the content of those misrepresentations, and the
identity of the person or persons making them. See
*Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1775
(2d Cir. 1993); *Ross v. Bolton,* 904 F.2d 819, 823 (2d
Cir. 1990); *Wexner v. First Manhattan Co.,* 902 F.2d
169, 172 (2d Cir. 1990). The plaintiff must also
explain how the misrepresentations were fraudulent.
See *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir. 1989);
*Baxter v. A.R. Baron & Co., Inc.,* No. 94 Civ. 3913,
1995 WL 600720, at \*3-\*5 (S.D.N.Y. Oct. 12, 1995).
Although *Rule 9(b)* allows a plaintiff to allege
fraudulent intent generally, a plaintiff must allege
facts that give rise to a strong inference of fraudulent
intent. See *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d
1124, 1128 (2d Cir. 1994). This strong inference can
be established either "(a) by alleging facts to show
that defendants had both motive and opportunity to
commit fraud, or (b) by alleging facts that constitute
strong circumstantial evidence of conscious
misbehavior or recklessness." *Id.*

**\*9** The defendants contend that although the
plaintiffs have attempted to cure the deficiencies of
their original complaint, [FN2] they have not shown
how the alleged misrepresentations were fraudulent,
that the defendants knew they were untrue, or that the
plaintiffs reasonably relied on the misrepresentations.
However, the plaintiffs have provided allegations that
are sufficiently particularized to survive challenge
under *Rule 9(b).* For example, the plaintiffs allege
that the defendants' representations that induced them
to invest in the partnerships were fraudulent because
the defendants simply cloned the projections for the
partnerships from preexisting documents, (Am.
Compl. ¶ 14), that the defendants doctored financial
information given by the plaintiffs prior to
submission to financial institutions in order to qualify

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                       Page 7
1997 WL 79845 (S.D.N.Y.), RICO Bus.Disp.Guide 9242
**(Cite as: 1997 WL 79845 (S.D.N.Y.))**

them for financing under the lending guidelines, (Am. Compl. ¶ ¶ 28-34), and that the defendants used the invested money to purchase property that was substantially inferior to the property the defendants had represented they would develop, (Am. Compl. ¶ 38). The Amended Complaint contains adequate allegations of motive and opportunity given the alleged hidden commission coupled with the defendants' alleged participation in the preparation of allegedly fraudulent documentation. Moreover, the detailed allegations in the Amended Complaint provide strong circumstantial evidence of conscious misbehavior or recklessness by the defendants sufficient to survive a motion to dismiss. Finally, the Amended Complaint contains numerous allegations of the plaintiffs' reasonable reliance on the defendants' misrepresentations based on the defendants' superior knowledge of the transactions and the defendants' role as accountants and financial advisors for some of the plaintiffs. (Am. Compl. ¶ ¶ 1, 9, 15, 19, 20, 22, 23, 117, 136, 140.)

> FN2. For example, the Amended Complaint does identify the specific plaintiffs to whom enumerated communications were made, the times and places for those communications, and what was said. (Am. Compl. ¶ ¶ 15-20.)

Given the number and specificity of the misrepresentations, the allegations of how they were fraudulent, the allegations of scienter by the defendants, and the reasonable reliance by the plaintiffs, the plaintiffs have alleged sufficient facts at this stage of the pleadings. Accordingly, the defendant's motion to dismiss the Amended Complaint based on a failure to plead fraud with sufficient particularity under Rule 9(b) is denied.

                          IV.

The defendants also move to dismiss the second RICO count for conspiracy, 18 U.S.C. § 1962(d), for failure to state the claim properly. Section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section." 18 U.S.C. § 1962(d). In order to state a claim for conspiracy, the plaintiffs must claim that each alleged co-conspirator agreed to commit at least two predicate acts of racketeering activity. See Hecht v. Commerce Clearing House, 897 F.2d at 25.

The conclusory nature of the plaintiffs' allegations with respect to the alleged conspiracy requires

dismissal of the plaintiffs' claim under § 1962(d). See R.C.M. Executive Gallery Corp. v. Rols Capital Co., No. CIV. 8571, 1997 WL 27059, at *10 (S.D.N.Y. Jan. 27, 1997). Although the plaintiffs make a conclusory allegation of conspiracy in one paragraph of their Amended Complaint, (Am. Compl. ¶ 132), the allegation falls short of that required to sustain a conspiracy claim. See Hecht, 897 F.2d at 25 ("Because the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement.") (citations omitted); Trautz v. Weisman, 809 F. Supp. 239, 246 (S.D.N.Y. 1992) (at the very least, a plaintiff must allege facts that imply an agreement to commit two predicate acts to state a sufficient claim under § 1962(d); there must be actual knowing participation by the defendant; mere knowledge of the conspiracy is insufficient); Laverpool v. New York City Transit Auth., 760 F. Supp. 1046, 1060 (E.D.N.Y. 1991) ("Bare or conclusory allegations of participation in a conspiracy under section 1962(d) will not avail on a motion to dismiss, and the plaintiff must plead allegations that each defendant knowingly agreed to participate in the conspiracy, particularly when the predicate acts alleged are fraud." (citations omitted)); Friedman v. Arizona World Nurseries Ltd. Partnership, 730 F. Supp. 521, 548-49 (S.D.N.Y. 1990), aff'd, 927 F.2d 594 (2d Cir. 1991) (conclusory allegations that did not sufficiently allege that each defendant personally agreed to commit two or more predicate acts held insufficient). Therefore, plaintiffs' § 1962(d) claim is dismissed. This claim is dismissed without prejudice to repleading such a claim within thirty (30) days of the date of this Opinion. In Butala I, the Court did not reach the issue of the deficiency of the pleading of the conspiracy claim. See Butala I, 916 F. Supp. at 322 n.2. The plaintiffs have thus not attempted to replead this claim and should be afforded the opportunity to do so. See Luce v. Edelstein, 802 F.2d 49, 52 (2d Cir. 1986) ("Complaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend.").

                          V.

**\*10** The plaintiffs also move to disqualify the defendants' attorneys based on Canons 4, 5, and 9 of the ABA Code. In this Circuit, a motion to disqualify an attorney is committed to the discretion of the district court. See Cheng v. GAF Corp., 631 F.2d 1052, 1055 (2d Cir. 1980) (collecting cases), [FN3] vacated on other grounds, 450 U.S. 903 (1981); Decora Inc. v. DW Wallcovering, Inc., 899 F. Supp. 132, 135 (S.D.N.Y. 1995). [FN4] Motions to disqualify are generally viewed with disfavor in this

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1997 WL 79845 (S.D.N.Y.), RICO Bus.Disp.Guide 9242
(Cite as: 1997 WL 79845 (S.D.N.Y.))

Circuit. *In re Maritima Aragua, S.A.,* 847 F. Supp. 1177, 1179 (S.D.N.Y. 1994) (collecting cases); *Huntington v. Great Western Resources, Inc.,* 655 F. Supp. 565, 571 (S.D.N.Y. 1987) ("The Second Circuit has emphasized in its most recent disqualification opinions that a court's ultimate objective in weighing disqualification questions is to ensure that the balance of presentations in a litigation will not be tainted by improper disclosures.... Courts have been directed to take a 'restrained approach that focuses primarily on preserving the integrity of the trial process.'" (citations omitted)). "Such motions 'are often interposed for tactical reasons and result in unnecessary delay.... Thus, although doubts should be resolved in favor of disqualification, the party seeking disqualification must carry a heavy burden, and must meet a high standard of proof before a lawyer is disqualified." *April Broadcasting, Inc. v. Smith,* No. 95 Civ. 7664, 1996 WL 137487, at *3 (S.D.N.Y. March 27, 1996) (quoting *Bennett Silvershein Assocs. v. Furman,* 776 F. Supp. 800, 802 (S.D.N.Y. 1991) (citations omitted)); *see also Evans v. Artek Sys. Corp.,* 715 F.2d 788, 791 (2d Cir. 1983); *Maritima,* 847 F. Supp. at 1180.

> FN3. In *Baird v. Hilton Hotel Corp.,* 771 F. Supp. 24, 27 n.1 (E.D.N.Y. 1991), the court noted, "[I]t is abundantly clear that the Second Circuit considers the reasoning of its first *Cheng* opinion to be sound, even though it recognizes, as a procedural matter, the opinion is not binding on the district courts of this circuit."

> FN4. In *Evans v. Artek Sys. Corp.,* 715 F.2d 788 (2d Cir. 1983), the Court of Appeals set forth the competing interests that courts attempt to accommodate when deciding motions for disqualification by application of the substantial relationship test described below:
> The objective of the disqualification rule is to "preserve the integrity of the adversary process," *Board of Education of the City of New York v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir. 1979). However, while we have not hesitated to disqualify counsel when the circumstances warranted it, we have also noted that "there is a particularly trenchant reasons for requiring a high standard of proof on the part of one who seeks to disqualify his former counsel, for in disqualification matters we must be solicitous of a client's right freely to chose his counsel -- a right which of course must

be balanced against the need to maintain the highest standards of the profession." *Government of India v. Cook Industries, Inc.,* 569 F.2d 737, 739 (2d Cir. 1978). We have also noted that disqualification motions "are often interposed for tactical reasons," and that "even when made in the best of faith, such motions inevitably cause delay." *Board of Education v. Nyquist, supra,* 590 F.2d at 1246 (2d Cir. 1979); *see Allegaert v. Perot,* 565 F.2d 246, 251 (2d Cir. 1977). *Evans,* 715 F.2d at 791-92.

The plaintiffs argue that Joseph Bartfield, John Burns, III, the Lustigman firm, and all their associates/affiliates should be disqualified from representing the defendants because they have been privy to confidential attorney-client information and because disqualification is necessary to avoid any appearance of professional impropriety. *See* ABA Code Canon 4 ("A Lawyer should preserve the confidences and secrets of a client."); ABA Code Canon 5 ("A lawyer should exercise independent professional judgment on behalf of a client."); ABA Code Canon 9 ("A Lawyer should avoid even the appearance of professional impropriety."); New York Code of Professional Responsibility Disciplinary Rule 5-108 (providing that unless a lawyer obtains the consent of a former client, he cannot "[t]hereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client"); New York Code of Professional Responsibility Disciplinary Rule 5-105(D) ("While lawyers are associated in a law firm, none of them shall knowingly accept or continue employment when any one of them practicing alone would be prohibited from doing so under ... DR 5-108 ....").

*11 "As a general rule, disqualification is necessary when an attorney's successive representation of adverse interests raises the possibility that in the present matter that attorney will improperly use confidences gained in the prior representation to the detriment of the former client." *Red Ball Interior Demolition Corp. v. Palmadessa,* 908 F. Supp. 1226, 1239 (S.D.N.Y. 1995). Judge Weinfeld, addressing a lawyer's duty to preserve client confidences in subsequent representations in the seminal case of *T.C. Theatre Corp. v. Warner Bros. Pictures,* 113 F. Supp. 265 (S.D.N.Y. 1953), stated that in order for former clients of an attorney to obtain the disqualification of the attorney when the attorney appears in an adverse position in a subsequent representation:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 9
1997 WL 79845 (S.D.N.Y.), RICO Bus.Disp.Guide 9242
(Cite as: 1997 WL 79845 (S.D.N.Y.))

[T]he former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation.

*Id.* at 268. The Court of Appeals for the Second Circuit has affirmed that *T.C. Theatre Corp.* provides the basis for the approach courts are to take when determining whether an attorney should be disqualified from a matter because of a representation of an adverse party in a related matter. An attorney may be disqualified in such circumstances if:

(1) the moving party is a former client of the adverse party's counsel;

(2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and

(3) the attorney whose disqualification is sought has access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client. [FN5]

FN5. An attorney's access to privileged information is sufficient to warrant disqualification, because there is a presumption that access to privileged information will be accompanied by actual possession of such information. However, this presumption may be rebutted and disqualification avoided if an attorney can prove that he or she does not possess privileged information. *See Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 518 F.2d 751, 756-57 (2d Cir. 1975), overruled on other grounds by Armstrong v. McAlpin, 625 F.2d 433 (2d Cir. 1980), vacated and remanded, 449 U.S. 1106 (1981); Cheng, 631 F.2d at 1056-57.* The rule's provision for disqualification in the absence of proof of actual possession of confidential information is further supported by Canon 9. However, the appearance of impropriety alone is not sufficient to warrant disqualification. *See Board of Educ. of City of New York v. Nyquist, 590 F.2d 1241, 146-47 (2d Cir. 1979).*

*Evans, 715 F.2d at 791; see also Cheng, 631 F.2d at 1055-56; Emle Indus., Inc. v. Patentex, Inc., 478 F.2d* 562, 570-71 (2d Cir. 1973); *Decora, 899 F. Supp. at 135.*

In this case, the plaintiffs allege that Mr. Bartfield should be disqualified because he represented fourteen of the twenty plaintiffs in a prior action by Chase Lincoln First Bank ("Chase") against the plaintiffs that arose out of the real estate ventures at issue in this action. The plaintiffs further allege that Mr. Bartfield received confidential information concerning those plaintiffs in the course of that representation. It is clear that at least some of the plaintiffs were his clients in a prior action, that the prior action is substantially related to the current action, and that he was likely to have had access to confidential information in the course of that representation. Although Mr. Bartfield attempts to rebut the presumption that he came into contact with confidential information regarding the plaintiffs, (Bartfield Decl. ¶ ¶ 10, 18), he admits that some investors did supply him with documents, records, and information concerning Chase and the partnerships at issue in this case, (Bartfield Decl. ¶ 8), and that he received some personal information from at least some of the plaintiffs for purposes of settlement, (Bartfield Decl. ¶ ¶ 17-18). He denies that any of this information was confidential and alleges that the information was essentially information that was to be produced to Chase in the course of the litigation. However, Mr. Bartfield apparently does not seek to represent the defendants in this case, although he continues to represent the defendants in personal matters. (Lustigman Decl. ¶ 9; Agashiwala ¶ 5).

*12 The plaintiffs argue that the plaintiffs' attorneys of record, Mr. Lustigman and Mr. Burns, should also be disqualified because they have consulted with Mr. Bartfield in connection with the defendants' case and the production of documents. [FN6] The defendants assert that Mr. Bartfield never received any confidential information from the plaintiffs, and they thus seek to rebut any presumption of the receipt of such information based on Mr. Bartfield's prior representation of the plaintiffs. The defendants also assert that Mr. Bartfield has never shared any confidential information relating to any plaintiff with the Lustigman firm, (Lustigman Decl. ¶ 7), and that "if defendants are not successful in dismissing the amended complaint on motion and the case goes forward, we would not discuss the merits or the underlying factual basis of the case with attorney Bartfield." (Lustigman Decl. ¶ 9.) However, the defendants admit that Mr. Lustigman and Mr. Burns have discussed the motions in this case as well as

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                Page 10
1997 WL 79845 (S.D.N.Y.), RICO Bus.Disp.Guide 9242
**(Cite as: 1997 WL 79845 (S.D.N.Y.))**

some of the underlying transactions alleged in the Amended Complaint with Mr. Bartfield. (Lustigman Decl. ¶ ¶ 8, 9; Burns Decl. ¶ 5.) And the plaintiffs seek to present to the Court *in camera* information to show that confidential information was provided to Mr. Bartfield. There is therefore at least an issue of fact as to whether Mr. Bartfield received confidential information regarding some of the plaintiffs and whether he shared that information with Mr. Lustigman and Mr. Burns.

> FN6.  The plaintiffs also argue that the Lustigman firm should be disqualified because of its association or affiliation with Mr. Bartfield. They point to the fact that Mr. Bartfield and the Lustigman firm share office space and have the same fax number with the sender's script on top of the faxes reading "Bartfield/Lustigman." However, the defendants assert that Mr. Bartfield and the Lustigman firm have totally separate and distinct legal practices, clients, telephone numbers, and legal stationery and maintain separate files. (Lustigman Decl. ¶ 4.) The real issue is whether the Lustigman firm has received any confidential information from Mr. Bartfield regarding the plaintiffs.

 Accordingly, the Court will hold an evidentiary hearing to resolve any outstanding factual disputes on the motion for disqualification.

CONCLUSION

 For the reasons explained above, the defendants' motion to dismiss is granted with respect to Court II of the Amended Complaint (18 U.S.C. § 1962(d)) without prejudice to the filing of a Second Amended Complaint repleading such a claim within thirty (30) days of the date of this Opinion. The defendants' motion to dismiss is otherwise denied. An evidentiary hearing will be scheduled on the plaintiffs' motion to disqualify the defendants' attorneys.

 SO ORDERED.

 1997 WL 79845 (S.D.N.Y.), RICO Bus.Disp.Guide 9242

**Motions, Pleadings and Filings (Back to top)**

• 1:95cv00936 _ _ _ _ _ (Docket) (Feb. 09, 1995)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 10

Westlaw.

Not Reported in A.2d                                                         Page 1
2002 WL 1454111 (Del.Super.)
**(Cite as: 2002 WL 1454111 (Del.Super.))**

**C**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
Mark W. CARELLO and Karen Carello Nocket,
Plaintiffs,
v.
PRICEWATERHOUSECOOPERS LLP, Defendant.
**No. Civ.A. 01C-10-219RRC.**

Submitted May 23, 2002.
Decided July 3, 2002.

Upon Defendant's Motion for Summary Judgment.
Denied.

Kevin William Gibson, Gibson & Perkins, P.C.,
Media, Pennsylvania, for Plaintiffs.

Gregory V. Varallo, Richards, Layton & Finger,
P.A., Wilmington, Delaware, and Martin L.
Perschetz, Schulte Roth & Zabel LLP, New York,
New York (pro hac vice), for Defendant.

MEMORANDUM OPINION

COOCH, J.

INTRODUCTION

**\*1** Before the Court is a motion for summary
judgment ("the Motion") filed by defendant
PricewaterhouseCoopers LLP ("PwC") [FN1]
against plaintiffs Mark W. Carello and Karen Carello
Nocket ("Plaintiffs"). Plaintiffs' action sounds in tort
for negligent misrepresentation, specifically the
alleged negligence of a public accountant to a third
party with whom there was no privity of contract and
where the only harm suffered was economic in
nature. The issue here is whether PwC owed
Plaintiffs a duty, such duty potentially arising either
through 1) Plaintiffs' inclusion in a class of similarly-
situated business owners who relied to their detriment
on what Plaintiffs allege are the negligently-audited
financial statements of Lason, Inc. ("Lason") and
which were prepared by PwC, or 2) a showing that
Plaintiffs alone relied to their detriment on those
allegedly negligently-audited statements. In either

scenario, at the time PwC was auditing Lason's
financial statements, in order for a duty to arise, PwC
would have had to have known (or have had reason
to have known) that Lason would share its financial
statements with the class or with Plaintiffs as part of
a potential business transaction.

> FN1. PwC originally filed a motion to
> dismiss the complaint but both parties
> attached affidavits to their subsequent
> submissions in connection with that motion;
> the Court, with the agreement of the parties,
> will therefore treat the motion as one for
> summary judgment. *See* Super. Ct. Civ. R.
> 12(b) (providing that a motion to dismiss
> shall be treated as one for summary
> judgment if "matters outside the pleadings
> are presented to and not excluded by the
> Court").

In their proposed First Amended Complaint, [FN2]
Plaintiffs allege that PwC negligently audited the
financial statements of its client, Lason; Plaintiffs
aver that they relied upon those statements in
subsequently deciding to sell their business,
Delaware Processing Services, Inc. ("DPS") to
Lason. PwC advances two grounds for summary
judgment in its Motion: 1) that under Superior Court
Civil Rule 12(b)(6), Plaintiffs have failed to state a
claim upon which relief can be granted; [FN3] and
2) that under Superior Court Civil Rule 9(b),
Plaintiffs have failed to plead negligence with
particularity.

> FN2. Plaintiffs originally filed a Complaint
> alleging negligence and fraud, and they
> sought an award of punitive damages. At
> oral argument on PwC's Motion, the Court
> granted Plaintiffs leave to submit a proposed
> amended complaint (as well as affidavits) in
> connection with Court-ordered supplemental
> memoranda. The proposed First Amended
> Complaint does not include a fraud count
> but avers only negligence.

> FN3. Although originally filed as a motion
> to dismiss, PwC's submissions on the motion
> subsequent to the original motion's
> conversion did not re-characterize PwC's
> argument; PwC has maintained throughout
> this litigation that it is entitled to judgment

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2002 WL 1454111 (Del.Super.)
(Cite as: 2002 WL 1454111 (Del.Super.))

as a matter of law because it did not owe Plaintiffs any duty at the time Plaintiffs decided to sell their business because they decided to sell after Lason made an SEC filing on March 31, 1999.

Because there are material facts in dispute and PwC is not entitled to judgment as a matter of law when those facts are viewed in a light most favorable to Plaintiffs, PwC's motion for summary judgment is DENIED.

FACTS

Plaintiffs were the sole shareholders of DPS, a company whose purpose was to service "financial institutions and similarly situated institutions in capturing and processing data"; [FN4] each plaintiff owned 50% of DPS's issued and outstanding stock prior to selling DPS to Lason. [FN5] Plaintiffs sold DPS to Lason through a transaction that closed on November 19, 1999 and which involved a complicated deferred "earn out" formula that was apparently engineered to partly compensate Plaintiffs *in futuro*. Plaintiffs allege that in deciding to sell their business to Lason, they in part relied "on [a] review ... of ... statements [relating to Lason's financial health] and [PwC's] assessment of the financial condition of Lason as represented by such audited financial statements...." [FN6] PwC had "audited Lason's annual financial statements." [FN7]

FN4. First Am. Compl. ¶ 6.

FN5. First Am. Compl. ¶ 5.

FN6. First Am. Compl. ¶ 68.

FN7. Def.'s Mot. ¶ 1.

A further chronology drawn from the First Amended Complaint follows: "In April, 1998, the Plaintiffs ... were contacted by ... representatives of Lason, soliciting DPS's data entry business for a Lason subsidiary ..."; [FN8] "In the third quarter of 1998 ... DPS began doing business with Lason through its subsidiary"; [FN9] "During the period 1996 through 1999, Lason completed the acquisition of 76 companies (55 of which were completed during the two year period 1998-1999)"; [FN10] "The Plaintiffs, as part of their investigation to enter into the sale ... reviewed and relied on Lason's Annual Report, 10-K and the audited financial statements accompanying such reports for the periods ending December 31, 1997, and December 31, 1998 ... together with Lason's ... 10-Q, and the unaudited

financial statements accompanying such report, for the periods ending December 31, 1998, March 31, 1999, and June 30, 1999 ..."; [FN11] "The Plaintiffs subsequently learned [after DPS was acquired by Lason] that Lason's reported revenues on its audited financial statements, and its 10Ks, and 10Qs, for the reporting fiscal years 1997, 1998, and 1999, which were prepared by ... [PwC], were not based upon an accounting method which was in conformity with Generally Accepted Accounting Principles ('GAAP')." [FN12]

FN8. First Am. Compl. ¶ 11.

FN9. First Am. Compl. ¶ 12.

FN10. First Am. Compl. ¶ 13.

FN11. First Am. Compl. ¶ 54.

FN12. First Am. Compl. ¶ 93.

*2 On December 5, 2001, Lason filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code. [FN13] As a result of the accounting irregularities that Plaintiffs allege existed in Lason's audited financial statements and (presumably) because of Lason's subsequent filing for bankruptcy protection, Plaintiffs aver that Lason "cannot and will not be able to" pay the "earn out" Plaintiffs argue is now due them as part of the DPS acquisition. Plaintiffs assert that PwC is liable to them "in that had [PwC] not misstated the income of Lason contrary to [Generally Accepted Accounting Principles], Plaintiffs never would have agreed to sell DPS to Lason." [FN14]

FN13. First Am. Compl. ¶ 106.

FN14. First Am. Compl. ¶ 120.

Additionally, Plaintiffs claim that they relied on the alleged oral representations of Timothy Molnar, a PwC employee whom Plaintiffs apparently believed was a certified public accountant and who Plaintiffs state "specifically advised the Plaintiffs that the structure of the Lason [acquisition] was a 'fair one' and represented a 'good deal' for the Plaintiffs...." [FN15] The oral representations Plaintiffs purportedly relied upon included an alleged statement by Molnar to the effect that "if there was anything else the Plaintiffs should look at or needed to know about the financial condition of Lason [in consideration of whether to sell their business to Lason][,] what ... [PwC] reported to the SEC ...

Not Reported in A.2d
2002 WL 1454111 (Del.Super.)
(Cite as: 2002 WL 1454111 (Del.Super.))

Page 3

should be alright [sic]." In affidavits they have submitted in connection with this litigation, Plaintiffs state that after "meeting with Mr. Molnar ... and after reviewing Lason's audited financial statements together with the 10Ks and the 10Qs prepared by ... [PwC] ... [we] decided to accept Lason's terms and proceed with the sale of our DPS stock to Lason." [FN16]

> FN15. First Am. Compl. ¶ 65.

> FN16. Carello Aff. ¶ 5 (Ex. A to Pls.' Sur Reply); Carello Nocket Aff. ¶ 5 (Ex. B to Pls.' Sur Reply)

PwC has attached two affidavits to its submissions opposing Plaintiffs' asserted cause of action. The first affidavit is from Timothy Molnar, the PwC employee whom Plaintiffs allege was the CPA who made certain representations concerning the financial health of Lason to Plaintiffs when they were contemplating the sale of their business; in his affidavit, Molnar denies he participated in PwC's audit of Lason's financial records, states that he was unfamiliar with Lason's financial condition (and denies that he made any representations to the contrary), and refutes that he ever represented to Plaintiffs that he was a CPA. [FN17] The second of PwC's attached affidavits is from Cheryl L. Dunn, the "engagement partner" for PwC's audits of the financial statements of Lason, Inc. Dunn's affidavit states "I am confident that, at the time of the issuance of PwC's audit opinion of the 1998 [Lason] financial statements, I did not know about a potential acquisition by Lason of DPS." [FN18]

> FN17. See Molnar Aff. ¶ ¶ 3, 4, 5 (Ex. A to Def.'s Supplemental Reply Mem.).

> FN18. Dunn Aff. ¶ 4 (Ex. B to Def.'s Supplemental Reply Mem.).

## CONTENTIONS OF THE PARTIES

Plaintiffs concede (and PwC argues) that in Delaware the applicable standard of the tort of negligent misrepresentation lies in section 552 of the Restatement (Second) of Torts. That section, in pertinent part, provides that:

**\*3** (1) One who, in the course of business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others ... is subject to liability for pecuniary loss caused to [those others] by their justifiable reliance ...

(2) ... the liability is limited to loss suffered (a) by the person or one of a limited group of persons for whose benefit and guidance [the information supplier] ... knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that [the information supplier] knows that the recipient ... intends [the information to influence].... [FN19]

> FN19. Restatement (Second) of Torts § 552 (1977).

The pertinent factual allegations Plaintiffs make in support of their argument that PwC should now be found liable under the Restatement formulation follow: "Upon information and belief, DPS, was targeted for acquisition by Lason as early as the third financial quarter of 1998, and no later than January of 1999, during or prior to the period ... [PwC] was performing [its] 1999 audit of Lason's financial statements"; [FN20] "Upon information and belief, the Defendant as an integral part of Lason's acquisition team had actual knowledge that the Plaintiffs were targeted for acquisition by Lason during or prior to the period the Defendant was performing its 1999 audit of Lason's financial statements"; [FN21] "It is believed and therefore averred, that ... [PwC] as an integral member of the Lason acquisition team was or should have been aware that companies considering an acquisition by Lason, such as DPS, would rely on the audited financial statements of Lason, and its 10Ks and 10Qs filed with the SEC, to determine if they should accept Lason's offer of purchase"; [FN22] that "as discovery ensues, [Plaintiffs] will be able to prove that [PwC] was actively assisting Lason in gobbling up companies"; [FN23] and "As a result and direct proximate cause of ... [PwC's] negligence, the Plaintiffs have been and will be damaged, in that had ... [PwC] not misstated the income of Lason contrary to GAAP, Plaintiffs never would have agreed to sell DPS to Lason." [FN24]

> FN20. First Am. Compl. ¶ 20.

> FN21. First Am. Compl. ¶ 21.

> FN22. First Am. Compl. ¶ 64.

> FN23. Pls.' Answer to Def.'s Mot. at 4 n. 4.

> FN24. First Am. Compl. ¶ 120.

Despite the attached Cheryl L. Dunn affidavit (the "engagement partner" for PwC's audits of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2002 WL 1454111 (Del.Super.)
(Cite as: 2002 WL 1454111 (Del.Super.))

Page 4

financial statements of Lason, Inc) to the effect that "at the time of the issuance of PwC's audit opinion of the 1998 [Lason] financial statements" PwC did not know about a potential acquisition of DPS by Lason, Plaintiffs state that they "would suspect that ... [PwC] has hundreds of employees that may have a different recollection" and that they "have the absolute right to take discovery on this potential issue." [FN25]

FN25. Pls.' Sur Reply at 2.

In response, PwC argues that under section 552 of the Restatement (Second) of Torts, Plaintiffs have failed to allege the requisite duty PwC would have had to have owed them for PwC now to be potentially liable to Plaintiffs. Specifically, PwC argues that Plaintiffs have failed to allege a "pecuniary loss caused by justifiable reliance upon ... false information" [FN26] because "the last audited financial statements issued before the sale of DPS was even contemplated were for the year ending December 31, 1998[and] ... [t]hus [P]laintiffs allege that Lason's failure to make a payment due after October 31, 2000 was caused by PwC's audit report on financial statements for a period that ended almost *two years earlier.*" [FN27] PwC argues that Plaintiff's factual averments "contain[ ] no cognizable allegation that PwC's audit reports-rather than Lason's subsequent financial problems-caused [P]laintiffs' losses." [FN28] In support of its argument that PwC did not owe Plaintiffs a duty as alleged, PwC states that the pleadings "make[ ] clear that PwC could not possibly have known about a proposed sale of DPS to Lason, or [have] intimated that its audit reports be used in connection with such a sale, since [P]laintiffs claim not even to have been approached about the sale until July 1, 1999" and "the audited financial statements on which [P]laintiffs claim to have relied ... were filed with the S.E.C. on March 31, 1998 and March 31, 1999, respectively." [FN29] PwC argues "to be liable for negligent misrepresentation under Restatement Section 552, a defendant must have owed to the plaintiff the requisite duty *at the time the alleged misrepresentations were made.*" [FN30] Citing *Outdoor Techs., Inc v. Allfirst Fin., Inc.,* [FN31] PwC further argues that Plaintiffs' averments, particularly those relative to their encounter with Timothy Molnar, the PwC employee whom Plaintiffs allege was the PwC CPA who made certain representations to them, fail to establish a business relationship with PwC such that PwC can now be held liable to Plaintiffs.

FN26. Def.'s Mot. ¶ 2.

FN27. *Id.* (emphasis in original).

FN28. *Id.*

FN29. Def.'s Mot. ¶ 3.

FN30. Def.'s Supplemental Reply Mem. at 1 (emphasis in original); Def.'s Reply Mem. at 3.

FN31. 2001 WL 541472 (Del.Super.) (granting defendant-banks' motion for summary judgment because those banks and their counsel did not owe a duty to non-customer attempting to cash a check drawn on them).

*4 Additionally, PwC argues that "a complaint alleging negligent misrepresentation ... must allege 'the specific manner in which the [statement] is misleading' (citation omitted)," and that although the pleadings "purport [ ] to set forth numerous Generally Accepted Accounting Principles, [they] fail to allege how any of these principles allegedly [were] violated." [FN32] Accordingly, PwC argues that it is entitled to judgment as a matter of law because Plaintiffs have failed to plead negligence with particularity as required by Superior Court Civil Rule 9(b).

FN32. Def.'s Mot. ¶ 5.

STANDARD OF REVIEW

Summary judgment is granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. [FN33] The court must view the facts in a light most favorable to the non-moving party. [FN34] A court "reviews the summary judgment motion and response papers and seeks to determine whether the record reveals a disputed factual issue material enough to require a trial and factfinder determination...." [FN35] A "nontrivial factual dispute created by the nonmovant [such as by the attachment of an affidavit disputing the other side's allegations] will usually bar summary judgment so long as the contested facts are material even if the nonmovant's support is considered weak by the court." [FN36]

FN33. Super. Ct. Civ. R. 56(c); *Burkhart v. Davies,* 602 A.2d 56, 59 (Del.1991).

FN34. *Merrill v. Crothall-American, Inc.,* 606 A.2d 96, 99-100 (Del.1992).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2002 WL 1454111 (Del.Super.)
**(Cite as: 2002 WL 1454111 (Del.Super.))**

Page 5

FN35. 11 James Wm. Moore et al., Moore's Federal Practice § 56.11[5] [a], at 56-108 (3d ed.2002).

FN36. *Id.,* § 56.11[7][b], at 56-124.

## DISCUSSION

In order for PwC to be potentially held liable to Plaintiffs, Plaintiffs must show that PwC owed Plaintiffs a duty, either through Plaintiffs' inclusion in a class of similarly-situated business owners who relied to their detriment on what Plaintiffs allege are the negligently-audited financial statements of Lason and which were prepared by PwC, or through a showing that Plaintiffs alone relied to their detriment on those allegedly negligently-audited statements. In either scenario, at the time PwC was auditing Lason's financial statements, PwC would have had to have known (or have had reason to have known) that Lason would share those statements with the class or with Plaintiffs as part of a potential business transaction.

As noted by this Court in its 1990 decision in *Guardian Construction Co. v. Tetra Tech Richardson, Inc.,* [FN37] "Delaware case law is divided on the issue of whether privity of contract is a prerequisite for the imposition of liability on a negligence theory where the damages sought to be recovered are purely economic." [FN38] Finding, however, that a lack of contractual privity between the design engineer and the general contractor involved there was "not fatal," the *Guardian Construction* court held that section 552 of the Restatement (imposing liability on suppliers of information to third parties who are intended recipients of the information when that information contains negligent misrepresentations) was the proper standard for claims of negligent misrepresentation brought in the Delaware courts, and the Court then "specifically adopt[ed]" the Restatement's standard. [FN39]

FN37. 583 A.2d 1378 (Del.Super.Ct.1990) (holding in part that claim of general contractor and subcontractor against design engineer for negligent misrepresentation as to tidal heights and project benchmarks in seaside construction project was cognizable despite lack of contractual privity between the parties).

FN38. *Guardian Construction,* 583 A.2d at 1384.

FN39. *Id.* at 1386.

*5 It has been said that "the Restatement rule ... appears to be a sensible and moderate approach to the potential consequences of imposing unlimited negligence liability ... [on third parties with whom there is no privity of contract and where the only harm alleged is economic in nature]." [FN40] This Court, in *Danforth v. Acorn Structures, Inc.* [FN41] stated that the Restatement view represented "the definite weight of authority." [FN42] Some courts have taken different approaches than that suggested by the Restatement, however, either on the one hand "by denying recovery to third parties for auditor negligence in the absence of a third party relationship to the auditor that is 'akin to privity[ ]'," or on the other hand by allowing recovery "based on auditor negligence to third parties whose reliance on the audit report was 'foreseeable[ ]'." [FN43] But "most jurisdictions, supported by the weight of commentary and the modern English common law ... have steered [the] middle course ... of § 552." [FN44]

FN40. *Bily v. Arthur Young & Co.,* 834 P.2d 745, 769 (Cal.1992) (adopting the Restatement rule and rejecting the "foreseeability" approach that California courts had until that time followed in a case where investors in corporation brought a professional malpractice action against an independent auditor that had examined a corporation's books prior to the corporation's initial public offering).

FN41. 1991 WL 269956 (Del.Super.), *aff'd on other grounds,* 608 A.2d 1194 (Del.1992).

FN42. *Id.* at *2.

FN43. *Bily,* at 752.

FN44. *Id.*

While "most jurisdictions" have analyzed negligent misrepresentation liability of accountants to third parties under the Restatement approach, interpretations of section 552 "vary ... [and][t]he more expansive cases [*i.e.,* those jurisdictions purporting to use section 552 in their analyses but not concentrating on limiting recovery to a person or group of persons that the accountant actually knew would rely on an audit report] have been criticized as effectively eliminating all of the restrictions the

Not Reported in A.2d
2002 WL 1454111 (Del.Super.)
(Cite as: 2002 WL 1454111 (Del.Super.))

Restatement sought to impose." [FN45] One court has stated that the "better reasoned decisions interpret § 552 as limiting ... potential liability ... to actual knowledge of the limited although unnamed group ... as well as actual knowledge of the particular financial transaction that such information is designed to influence ... measured at the moment the audit report is published...." [FN46] Such an interpretation is supported by comment h to section 552 itself, which provides:

> FN45. Elizabeth Williams, *Cause of Action Against Accountant for Negligent Performance of Professional Services,* 15 COA.2d 395 (2000); *cf. Christiana Marine Serv. Corp. v. Texaco Fuel and Marine Mktg. Inc.,* 2002 WL 1335360 (Del.Super.) (finding that company whose primary business purpose was the transportation of fuel oil was not "in the business of supplying information" as required by section 552, and recognizing that those courts that have taken a more "expansive view" of that section may hold otherwise).

> FN46. *Nycal Corp. v. KPMG Peat Marwick LLP,* 688 N.E.2d 1368, 1372 (Mass.1998) (applying the Restatement standard to an action brought by a buyer of the controlling interest in a corporation against the accountants who had audited the financial statements accompanying the company's annual report and holding that accountants were not liable to purchaser because they had no knowledge that the controlling interest was to be sold).

... it is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied ... it is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it ... it is enough ... that the maker ... knows that his recipient intends to transmit the information to a similar person, persons or group. [FN47]

> FN47. Restatement (Second) of Torts § 552 cmt. h (1977).

Thus a plaintiff invoking a cause of action under negligent misrepresentation involving section 552 must show that the defendant supplied the information to a party for use in that party's business transactions with the plaintiff or a class of which the plaintiff was a member. [FN48]

> FN48. *But cf. Danforth v. Acorn Structures,* 1991 WL 269056, at *2 (Del.Super.) (stating that under section 552 "the plaintiff must show that the defendant supplied the information to *the plaintiff* for use in business transactions with third parties) (emphasis added); *Christiana Marine Serv. Corp. v. Texaco Fuel and Marine Mktg. Inc.,* 2002 WL 1335360, at *6 (Del.Super.) (quoting *Acorn Structures* ).

*6 The reasoning behind limiting the liability of an information-providing party (including accountants who audit financial statements) rests on the theory that "the misinformer actually knows [that the relying party] will receive inaccurate information ... because the misinformer knows that [its] client will channel the work product to that restricted group." [FN49] An illustration of these liability-limiting concepts can be found in an illustration to comment h to section 552 of the Restatement:

> FN49. *First Nat'l Bank of Commerce v. Monco Agency Inc.,* 911 F.2d 1053, 1060 (5th Cir.1990) (holding that under Louisiana law circumstantial evidence offered by a bank of an accounting firm's knowledge that statements it had audited for its client would be relied on by the bank in making loans to the firm's client did not raise genuine issue of material fact so as to prevent summary judgment in favor of the accounting firm).

A, an independent public accountant, is retained by B Company to conduct an annual audit of the customary scope for the corporation and to furnish his opinion on the corporation's financial statements. A is not informed of any intended use of the financial statements; but A knows that the financial statements, accompanied by an auditor's opinion, are customarily used un a wide variety of financial transactions by the corporation and that they may be relied upon by lenders, investors, shareholders, creditors, purchasers and the like, in numerous possible kinds of transactions. In fact B Company uses the financial statements ... to obtain a loan from X Bank ... [and] through reliance upon [the negligently prepared financial statements] ... X

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 7
2002 WL 1454111 (Del.Super.)
**(Cite as: 2002 WL 1454111 (Del.Super.))**

Bank suffers pecuniary loss. A is not liable to X Bank. [FN50]

FN50. Restatement (Second) of Torts § 552 cmt. h, illus. 10 (1977).

Thus, under the Restatement, an information supplier retained to furnish information for no particular purpose does not undertake a duty to third parties when the information supplier neither knows nor has reason to know of the intended use to which that information will be put by the information supplier's client.

* * *

In this case, Plaintiffs have alleged their reliance on certain financial statements of Lason that were audited by PwC at a time when a class of persons similar to and including Plaintiffs were allegedly contemplating the sale of their businesses to Lason; Plaintiffs also allege that they would not have sold their business to Lason had the statements PwC audited not been "misstated" and "contrary to Generally Accepted Accounting Principles." Plaintiffs apparently have not been able to collect that part of the purchase price that was to accumulate after the close of the sale of DPS to Lason, given that Lason subsequently filed for bankruptcy. Plaintiffs have therefore potentially shown the cause and effect of their claimed loss, contrary to PwC's assertion that Plaintiffs have failed to show "that PwC's audit reports-rather than Lason's subsequent financial problems-caused [P]laintiffs' losses." [FN51]

FN51. Def.'s Mot. ¶ 2.

Plaintiffs may also possibly be able to show that they were within a "limited group of persons" for whose benefit and guidance PwC knew Lason intended to supply their audited statements and to whom PwC knew that Lason intended to influence with those same statements. [FN52] Plaintiffs attempt to provide this crucial link when they allege that "as discovery ensues, [Plaintiffs] will be able to prove that [PwC] was actively assisting Lason in gobbling up companies." [FN53] Given that Plaintiffs allege that from 1996 through 1999 Lason "completed the acquisition of 76 companies," [FN54] and that PwC presumably was the accounting firm that Lason retained during this time period, Plaintiffs' assertion that PwC played some part in Lason's competitive acquisitioning might be established.

FN52. See Restatement (Second) of Torts § 552 (1977).

FN53. Pls.' Answer to Def.'s Mot. at 4 n. 4.

FN54. First Am. Compl. ¶ 13.

**\*7** If in fact Lason was "actively gobbling up companies," and PwC was in fact Lason's accounting firm during this time period, it is possible that PwC knew or should have known that third parties might be relying on the PwC work product Plaintiffs claim was negligently prepared, because "in many cases, the accountant preparing a financial statement for his client, although he does not know the identity of the particular party or parties to whom his client intends to exhibit his report, is aware of the use to which his client intends to put the report, and thus is aware of the class of parties to whom the report will be exhibited." [FN55] Under the facts as Plaintiffs present them (that Lason completed the acquisition of 76 companies during the period 1996 through 1999, all the while using PwC's services), such a class could possibly consist of those entities or persons who utilized the PwC reports as part of their pre-sale considerations in those years Lason was actively acquiring other businesses, *i.e.,* those parties who would reasonably rely on the statement PwC audited for Lason with knowledge that Lason would then show the statements to third parties with an interest similar to that of Plaintiffs. Such a class, if so determined, would comport with the Restatement's contemplated limitation on liability, and in so doing, should allay the concerns of an accountant's liability to an unknown class for unknown amounts in an unknowable time frame. Thus, PwC's argument that it is not liable for Lason's failure to make "earn out" payments to Plaintiffs in late 2000 based on the fact that PwC's alleged negligently-prepared work product covered a period ending at least two years prior is not persuasive at this summary judgment stage; to the extent that Lason's last public filing prior to the sale of Plaintiffs' business occurred in March 1999, given that Plaintiffs may have been members of a class of companies Lason "gobbled up" between 1996 and 1999, and to whom PwC potentially knew its work product was to be distributed, the March 1999 date is not critical. Additionally, should Plaintiffs eventually be able to show that they were in fact a member of such a class, PwC's argument that Plaintiffs cannot show "something more than a casual business encounter" [FN56] with PwC would be meritless, as a business relationship between the class members and PwC via Lason and its utilization of PwC's auditing services for the purpose of acquiring members of the class might well impliedly establish the requisite business relationship.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 8
2002 WL 1454111 (Del.Super.)
(Cite as: 2002 WL 1454111 (Del.Super.))

FN55. Jack W. Shaw, Jr., Annotation, *Liability of Public Accountant to Third Parties,* 46 A.L.R.3d 979, 1003 (1972).

FN56. *Outdoor Technologies,* 2001 WL 541472, at *5.

PwC's claim that liability may be improperly imposed on a party such as PwC (as enunciated by illustration to comment 10 of the Restatement) is unfounded. That illustration applies only to audited statements where the auditor neither knows nor has reason to know of the intended use to which the audited statements will be put. In the illustration, the financial statements were audited by an accountant primarily to benefit its own client and only collaterally or incidentally audited to benefit a potential lender. The facts of this case, if developed as Plaintiffs allege, tend to show otherwise. This Court cannot be sure from the present state of the record what knowledge PwC had at the time it audited the relevant Lason statements, and for whose benefit the services were performed. Where "reasonable minds could conclude from the allegations [in the pleadings] that ... annual audits ... were prepared for another purpose [other than being prepared solely to file with the SEC], that being the influencing of the transactions in question," a motion to dismiss can be denied under § 552. [FN57] In the context (as here) of a motion for summary judgment and at the outset of litigation, "the record is necessarily thin ... [and][a]s litigation continues with ensuing disclosure and discovery, the record becomes far richer factually." [FN58]

FN57. *In re Smartalk Teleservices, Inc. Securities Litigation,* 124 F.Supp.2d 505, 525 (S.D.Ohio 2000) (denying motion to dismiss and holding that auditors owed a third party a duty of care where there were aware during preparation of documents that their client was interested in acquiring another company, which company was one of only four on national participants in the market).

FN58. Moore's, *supra* note 35, § 56.11[3], at 56-98.

*8 Having found that on the present record PwC is not entitled to judgment as a matter of law, the Court could deny PwC's motion for summary judgment on that prong alone. However, the competing affidavits submitted by the parties additionally show that there

are some material facts in dispute-namely, what PwC knew about Lason's potential use for the statements PwC was auditing, and when PwC knew it. Summary judgment is not warranted on that prong either. As an oft-cited treatise states, in the context of a summary judgment motion, a court is constrained to deny the motion even if the "nonmovant's support is considered weak by the court." [FN59] Summary judgment will further not be granted if "upon examination of all the facts, it seems desirable to inquire [more] thoroughly into them in order to clarify the application of the law to the circumstances." [FN60] Here, the Court cannot presently know what facts Plaintiffs may ultimately be able to establish, but at this juncture the Court will allow further discovery based on Plaintiffs' somewhat meager but legally sufficient showing of material facts in dispute.

FN59. Moore's, *supra* note 36.

FN60. *Ebersole v. Lowengrub,* 180 A.2d 467, 470 (Del.1962) (reversing grant of summary judgment where the record failed to explain why a driver of a motor vehicle suddenly stopped his vehicle thereby causing a multiple-vehicle collision).

* * *

PwC's second argument that the pleadings fail to plead negligence with particularity is also not persuasive. In *Snyder v. Butcher & Co.,* [FN61] the defendants filed a motion to dismiss predicated on plaintiffs' alleged failure to plead fraud and negligence with particularity, even though the plaintiffs had identified the promotional materials they relied upon in deciding to invest in privately-owned radio stations, had identified the alleged misrepresentations contained in those promotional materials, and had identified the parties who prepared and distributed the promotional materials. This Court there permitted the fraud and negligence claims to withstand the motion to dismiss as "Defendants [we]re informed of the act Plaintiff complain [ed] of and ... [could] adequately prepare for response and defense[;] the Amended Complaint d[id] not seem to be a pretext for a fishing expedition, but contain[ed] allegations of a substantial suit[;] ... [and] Defendants [we]re being exposed to a suit which, while it may not [have] ultimately be[en] successful ... [could not] correctly be characterized as unfounded." [FN62] Additionally, the rule requiring particularity in the pleading of negligence "must be applied in light of the particular situation presented in any case," [FN63] and less particularity is required "when the

facts lie more in the knowledge of the opposite party, than of the party pleading." [FN64] The Court finds those statements and the holding of *Snyder* applicable to this case, requiring denial of PwC's motion for summary judgment on this ground.

> FN61. 1992 WL 240344 (Del.Super.) (denying motion to dismiss and holding in part that claims of fraud and negligence were sufficiently pleaded to satisfy Superior Court Civil Rule 9(b)).

> FN62. *Snyder,* 1992 WL 240344, at *10.

> FN63. *Phillips v. Delaware Power & Light Co.,* 194 A.2d 690, 697 (Del.Super.Ct.1963)

> FN64. *Id.*

## CONCLUSION

 For the reasons stated above, PwC's motion for summary judgment is DENIED. The Court will deem the Plaintiffs' First Amended Complaint filed today; PwC shall file an answer to that amended complaint by July 15, 2002.

IT IS SO ORDERED.

2002 WL 1454111 (Del.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.