# EXHIBIT 11

Westlaw.

Not Reported in F.Supp.                                    Page 1
1991 WL 125179 (E.D.Pa.)
**(Cite as: 1991 WL 125179 (E.D.Pa.))**

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
CAVALIER CLOTHES, INC.,
v.
MAJOR COAT CO., et al.
**Civ. a. No. 89-3325.**

June 26, 1991.

Curran, Winning & Fioravanti, P.C., Media, Pa.,
William J. Winning,   Howard E. O'Leary, Dykema
Gossett, Washington, D.C., for plaintiff.

J. Clayton Undercofler, III, Saul, Ewing, Remick &
Saul, Philadelphia, Pa., for Dale Fashions, Inc. and
George Chinnici.

William J. Barker, Jr., Stradley Ronon, Philadelphia,
Pa., for Joseph Chinnici.

Murray Abramowitz, pro se.

Arthur Makadon, Ballard, Spahr, Andrews &
Ingersoll, Philadelphia, Pa.,  S. Melissa G. Forstner,
Anjali Jesseramsing, for Donald Derossi & Derossi &
Son Co.

Cagno Joseph, pro se.

Francis L. Zarrilli, Fronefield and DeFuria, Media,
Pa., for Coccia Frank.

Sherry, Donald, in pro. per.

*MEMORANDUM AND ORDER*

DuBOIS, District Judge.

*1 Plaintiff, a New York corporation involved in the
manufacture of military clothing, alleges that
defendants conspired to lock it out of the bidding
process for clothing contracts for the United States
Department of Defense.   The First Amended
Complaint (hereafter "Amended Complaint") sets
forth federal claims under the Racketeer Influenced
and Corrupt Organizations Act,  18 U.S.C. §

1962(c) and (d), the Sherman Act, 15 U.S.C. § § 1
and 2, the Clayton Act, 15 U.S.C. § 13(c), and the
Robinson-Patman Act,  15 U.S.C.  § 13(c), common
law claims for intentional interference with
prospective business relations, conspiracy, and fraud,
and a statutory antitrust claim under the New York
Donnelly Act, N.Y. Gen. Bus. Law § 340.

Plaintiff has moved to compel defendants Dale
Fashions, Inc. ("Dale"), George Chinnici, and Frank
Coccia to produce various financial documents.   In
response, Dale and George Chinnici have cross-
moved to dismiss the common law and Donnelly Act
claims for failure to state a claim upon which relief
can be granted. [FN1]  Dale and George Chinnici
contend that these claims are barred by the applicable
statutes of limitations and that no ground exists for
compelling production of the financial documents
sought by plaintiff.   For the reasons that follow, the
cross-motion of Dale and George Chinnici will be
denied and plaintiff's motion will be granted.

I. BACKGROUND

There are 11 defendants in this action.    At all
relevant times, Dale, Major Coat Co., and DeRossi
and Son Co. were military clothing manufacturers;
George Chinnici, Joseph Chinnici, and Donald
DeRossi were the respective principals of these
companies.   Leo Lamer and Joseph Cagno worked as
consultants for the defendant military clothing
manufacturers, and Frank Coccia, Donald Sherry, and
Murray Abramowitz were employed at a branch of
the Defense Personnel Supply Center ("DPSC") in
Philadelphia which was responsible for the
procurement of clothing for the Department of
Defense. [FN2]

Plaintiff alleges that at various times from the mid-
1970's through January 1987, Coccia, Sherry, and
Abramowitz accepted bribes and gratuities paid by
the defendant clothing manufacturers and their
consultants. Amended Complaint ¶ ¶ 33-50.   In
return, Coccia, Sherry, and Abramowitz allegedly
treated defendant clothing manufacturers favorably in
bidding on military clothing contracts and worked to
exclude plaintiff from the bidding process, ultimately
barring it from bidding on contracts. Id. ¶ ¶ 21-29,
33-50.  Plaintiff contends that it was prevented from
discovering defendants' "conspiracy, acts and
practices until at least February 3, 1987, due to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1991 WL 125179 (E.D.Pa.)
(Cite as: 1991 WL 125179 (E.D.Pa.))

defendants and their conspirators fraudulent concealment...." *Id.* ¶ 51. With the exception of Donald DeRossi, all defendants have been convicted of criminal charges relating to the alleged scheme.

## II. ANALYSIS

### A. *Dale and George Chinnici's Cross-Motion for Judgment on the Pleadings*

A motion for judgment on the pleadings will not be granted " 'unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law.' " *Jablonski v. Pan Am. World Airways*, 863 F.2d 289, 290 (3d Cir.1988) (quoting *Society Hill Civic Ass'n v. Harris*, 632 F.2d 1045, 1054 (3d Cir.1980)). In considering a motion for judgment on the pleadings, a court must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Id.*

*2 Dale and George Chinnici argue that they are entitled to judgment as a matter of law because plaintiff's common law claims are time-barred under Pennsylvania law. Plaintiff responds that the relevant statutes of limitations must be determined under New York law because New York has the most significant interest in having its law applied and that the common law claims were filed within New York's limitations periods.

Jurisdiction over plaintiff's common law claims is based on diversity of citizenship; accordingly, the Court must follow Pennsylvania's choice of law rules in determining the applicable statute of limitations. *Guaranty Trust Co. v. York*, 326 U.S. 99 (1945). Pennsylvania courts will apply the Pennsylvania statute of limitations, except where a claim accrues outside Pennsylvania in a jurisdiction with a shorter limitations period. *See Ross v. Johns-Manville Corp.*, 766 F.2d 823, 826 & n. 3 (3d Cir.1985) (citing *Freeman v. Lawton*, 353 Pa. 613, 46 A.2d 205, 207 (1946)); *Aamco Transmissions v. Harris*, No. 89-5533, slip op. at 4-5 & n. 3 (E.D.Pa. Mar. 13, 1991) (Pollak, J.). In the latter instance, Pennsylvania's borrowing statute directs that the statute of limitations of the jurisdiction in which the claim accrued shall govern. 42 Pa.Cons.Stat. § 5521(b). Even assuming, as plaintiff argues, that plaintiff's common law claims accrued in New York, the borrowing statute is inapplicable because New York law would not bar plaintiff's claims before the two-year Pennsylvania statute of limitations. [FN3] Accordingly, Pennsylvania law will be utilized in

determining whether plaintiff's claims are time-barred.

Under Pennsylvania law, where a defendant fraudulently conceals information essential to a cause of action, the statute of limitations will not start to run until plaintiff knew, or through the exercise of reasonable diligence should have known, of his injury and its cause. *See Urland v. Merrell-Dow Pharmaceuticals*, 822 F.2d 1268, 1273-74 (3d Cir.1987); *Bickell v. Stein*, 291 Pa.Super. 145, 435 A.2d 610, 612-13 (1981). It is plaintiff's burden to allege facts which explain why it was unable to discover the operative facts for its cause of action sooner than it did. *Bickell*, 435 A.2d at 612.

Dale and George Chinnici contend that the common law claims must be dismissed because the Amended Complaint only alleges that defendants fraudulently concealed the basis for plaintiff's claims *until* February 3, 1987, and the original complaint was not filed until more than two years later on May 4, 1989. However, plaintiff has alleged that defendants' fraudulent concealment prevented discovery of critical information "*until at least* February 3, 1987." Amended Complaint ¶ 51 (emphasis added). Among other things, plaintiff alleges that defendants concealed their actions by making their bribes in cash and using a code to refer to such payments during telephone conversations. *Id.* Moreover, Dale and George Chinnici allegedly paid a bribe to Coccia as recently as January 1987, and all defendants were allegedly involved in the payment or acceptance of bribes through early 1986. *Id.* ¶¶ 29-50.

*3 Viewed in the light most favorable to plaintiff, the allegations in the Amended Complaint are minimally sufficient to create a material issue of fact as to how long defendants fraudulently concealed information essential to plaintiff's common law claims. Given the dates on which defendants were allegedly involved in making or accepting bribes, it is conceivable that plaintiff could prove that defendants fraudulently concealed essential information through May 4, 1987, in which case the common law claims asserted in the original complaint on May 4, 1989 would not be barred by the statute of limitations. Accordingly, the Court finds that Dale and George Chinnici have failed to meet their burden of establishing that no material issue of fact remains to be resolved, and their cross-motion for judgment on the pleadings will be denied insofar as it relates to plaintiff's common law claims.

Left unresolved by the foregoing analysis is the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 3
1991 WL 125179 (E.D.Pa.)
**(Cite as: 1991 WL 125179 (E.D.Pa.))**

question of whether plaintiff's statutory antitrust claim under the Donnelly Act, <u>N.Y. Gen. Bus. Law §
340(1)</u>, is time-barred. The Donnelly Act claim is before the Court under the doctrine of pendent jurisdiction. The applicable statute of limitations for a pendent state law claim is the limitations period that would be applied by the state in which the court hearing the claim sits. *See Reid v. Madison*, 455 F.Supp. 1066, 1068 (E.D.Va.1978). Thus, the relevant inquiry here is what statute of limitations Pennsylvania courts would apply to a Donnelly Act claim.

Because Pennsylvania has no antitrust statute, there is no precise analogue by which to determine the appropriate limitations period. Some guidance, however, may be gained from examining the limitations periods for causes of action which address conduct similar to that proscribed by the Donnelly Act. [FN4]

"The Donnelly Act has, as its purpose, the prevention of anticompetitive practices." *Progressive Milk Co. v. Luna*, 126 A.D.2d 247, 513 N.Y.S.2d 399, 401 (1987). Pennsylvania seeks to prevent unfair competition through the tort of intentional interference with prospective business relations [FN5] and the Unfair Trade Practices and Consumer Protection Law, 73 Pa.Cons.Stat. § § 201-1 to 205-10. However, these causes of action are not restricted to behavior that is solely anticompetitive in nature. The tort of intentional interference with prospective contractual or business relations has application whenever "the defendant engages in any conduct that amounts to a recognized tort when that tort deprives the plaintiff of customers or other prospects." W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on Torts § 130, at 1014 (5th ed. 1984). Similarly, the reach of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL") extends to "passing off, misappropriation, trademark infringement, disparagement, false advertising, fraud, breach of contract, and breach of warranty." *Gabriel v. O'Hara*, 368 Pa.Super. 383, 534 A.2d 488, 494 (1987) (footnotes omitted). Thus, neither the tort of intentional interference with prospective contractual relations nor the UTPCPL provides a close fit with the Donnelly Act claim being advanced by plaintiff. Moreover, the two Pennsylvania causes of action have different limitations periods. *Id.* at 493-96 (six-year catch-all statute of limitations for UTPCPL cause of action); 42 Pa.Cons.Stat. § 5524(7) (two-year statute of limitations applied to "[a]ny other action or proceeding to recover damages for injury to

person or property which is founded on negligent, intentional, or otherwise tortious conduct"). For these reasons, the Court finds that the applicable Pennsylvania statute of limitations is the six-year period, which applies to causes of action not "subject to another limitation specified in [42 Pa.Cons.Stat. § 5501-36] nor excluded from the application of a period of limitation by section 5531." 42 Pa.Cons.Stat. § 5527. [FN6] Accordingly, the cross-motion of Dale and George Chinnici for judgment on the pleadings will also be denied insofar as it relates to plaintiff's New York Donnelly Act claim.

B. *Plaintiff's Motion to Compel Production of Financial Documents*

*4 There remains the issue of whether plaintiff is entitled to discover tax returns and financial statements, including net worth statements and balance sheets, from Dale, George Chinnici, and Frank Coccia. Such discovery will be permitted on two grounds.

First, the documents may provide evidence of payments to Coccia from the defendant clothing manufacturers or their consultants or evidence of the bribes allegedly paid by Dale and George Chinnici and their agents to Defense Department officials. [FN7] *See Halperin v. Berlandi*, 114 F.R.D. 8, 11 (D.Mass.1986).

Second, plaintiff has requested punitive damages in connection with its common law claims and is entitled to discover financial information in support of its punitive damages claim. Pennsylvania law governs plaintiff's punitive damages claim. [FN8] Under Pennsylvania law, a plaintiff must make a prima facie showing of defendants' liability for punitive damages before discovery of financial documents will be permitted to ascertain net worth. *See Vivino v. Everlast Sporting Goods Mfg. Co.*, No. 87-1161 (E.D.Pa. Sept. 25, 1987) (Pollak, J.). The Court finds that plaintiff has made the required showing, given the detailed allegations of criminal and other conduct in the Amended Complaint and defendants' convictions on criminal charges arising out of the same scheme on which this civil action is based. Recognizing the privacy concerns implicated by the disclosure of income tax returns and other financial information, *see De Masi v. Weiss*, 669 F.2d 114, 119-20 (3d Cir.1982), the Court will make such disclosure subject to a confidentiality order.

III. CONCLUSION

Not Reported in F.Supp.
1991 WL 125179 (E.D.Pa.)
(Cite as: 1991 WL 125179 (E.D.Pa.))

Page 4

For the above-stated reasons, the cross-motion of defendants, Dale Fashions, Inc. and George Chinnici, for judgment on the pleadings will be denied because a material issue of fact exists as to whether the common law claims of plaintiff Cavalier Clothes, Inc., are barred by the statute of limitations and plaintiff's New York Donnelly Act claim is not time-barred. Plaintiff's motion to compel discovery of financial documents from defendants Dale, George Chinnici, and Frank Coccia will be granted because the information sought is relevant to plaintiff's federal and state causes of action and because plaintiff has made a prima facie showing of defendants' liability for punitive damages.

An appropriate Order will follow.

### ORDER

AND NOW, to wit, this 26th day of June, 1991, upon consideration of the Supplemental Memorandum of plaintiff Cavalier Clothes, Inc., in Support of Motion to Compel Production of Defendants' Financials and Tax Returns (Document No. 54), the Response of defendants Dale Fashions, Inc., and George Chinnici and Countermotion to Dismiss State Claims with Prejudice (Document No. 57), the Memorandum of plaintiff in Opposition to the Countermotion (Document No. 61), and the Reply of Dale Fashions, Inc., and George Chinnici to plaintiff's Memorandum (Document No. 62), IT IS ORDERED as follows:

1. Plaintiff's Motion to Compel Production of Defendants' Financials and Tax Returns is GRANTED;

*5 2. Defendants Dale Fashions, Inc., and George Chinnici shall produce all income tax returns and financial statements, including income statements and balance sheets, from 1981 to the present, within fourteen (14) days of the date of this order;

3. Defendant Frank Coccia shall produce all income tax returns and financial statements, including but not limited to income statements and balance sheets, from 1984 to the present, within 20 days of the date of this order;

4. The discovery ordered in paragraphs 1 through 3 of this Order shall be subject to a confidentiality order to be prepared by counsel for plaintiff, approved by counsel for defendants Dale Fashions, Inc., George Chinnici, and Frank Coccia, and submitted to the Court for approval within ten (10) days of the date of this order;

5. The Countermotion of defendants Dale Fashions, Inc., and George Chinnici to Dismiss State Claims with Prejudice, treated as a cross-motion for judgment on the pleadings, is DENIED without prejudice to renewal of the statute of limitations defense in a motion for summary judgment or at trial.

IT IS FURTHER ORDERED that, with respect to any Motions for Summary Judgment which are filed, and any Responses to such Motions, the parties shall include an analysis of all remaining choice of law issues.

FN1. Because Dale and George Chinnici did not file their Countermotion to Dismiss State Claims until after answering the Amended Complaint, their cross-motion will be treated as one for judgment on the pleadings. Fed.R.Civ.P. 12(c); see 2A Moore's Federal Practice ¶ 12.15, at 12-104 to 12-105 (2d ed. 1990). The Court will not consider matters outside the pleadings which were submitted by the parties. Therefore, the cross-motion of Dale and George Chinnici will not be treated as one for summary judgment. Fed.R.Civ.P. 12(c).

FN2. Abramowitz also worked in Camden, New Jersey, as an Industrial Specialist with the Defense Contract Administration Service and was responsible for contract management, quality assurance, and financial management of contracts awarded by DPSC.

FN3. There is no dispute that under Pennsylvania law, plaintiff's common law claims of intentional interference with prospective business relations, fraud, and conspiracy would be governed by a two-year statute of limitations. See 42 Pa.Cons.Stat. § 5524(7). It is also undisputed that under New York law, plaintiff's fraud and conspiracy claims would be governed by a six-year statute of limitations, N.Y.Civ.Prac.L. & R. 213(8), and that the tortious interference claim would be governed by a three-year limitations period, N.Y.Civ.Prac.L. & R. 214(4).

FN4. Dale and George Chinnici argue that the antitrust claim should be governed by the two-year limitations period which applies to "[a]n action for taking, detaining

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1991 WL 125179 (E.D.Pa.)
(Cite as: 1991 WL 125179 (E.D.Pa.))

Page 5

or injuring personal property," 42 Pa.Cons.Stat. § 5524(3), and to "[a]ny other action or proceeding to recover damages for injury to ... property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud, except an action or proceeding subject to another limitation specified in this subchapter," id. § 5524(7).

FN5. See W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on Torts § 130, at 1013-14 (5th ed. 1984) (noting overlap in the purposes of the tort of interference with business prospects and antitrust law).

FN6. The Donnelly Act includes a four-year statute of limitations. N.Y.Gen.Bus. Law § 340(5). To the extent Pennsylvania's borrowing statute would require the application of New York's shorter limitations period, plaintiff's Donnelly Act claim is not time-barred. The final bribe allegedly paid by Dale and George Chinnici was in January 1987, and the original complaint was filed a little more than two years later on May 4, 1989.

FN7. The bald assertion by Dale and George Chinnici that discovery of the requested financial documents is unnecessary because plaintiff has already received FBI and DCIS statements and all documents relating to the guilty pleas of various defendants is insufficient to satisfy their burden of establishing that plaintiff can obtain the information sought through alternative sources.

FN8. Under controlling Pennsylvania choice of law principles, the Court must determine which jurisdiction has the greatest "interest in the problem and ... is the most intimately concerned with the outcome." See In re Complaint of Bankers Trust Co., 752 F.2d 874, 882 (3d Cir.1984). This determination is made by evaluating the nature of the contacts that the relevant states have with respect to the controversy and making a qualitative appraisal of the relevant states' policies in regard to the controversy. Melville v. American Home Assurance Co., 584 F.2d 1306, 1311 (3d Cir.1978).

Punitive damages serve to punish a defendant and to deter future misconduct. Restatement (Second) of Torts § 908(1) (1979). Accordingly, in addressing a choice of laws question on the issue of punitive damages, the Court must consider where the alleged misconduct occurred and, if dealing with a corporate defendant, the state of incorporation and its principal place of business. See Serbin Dev. Corp. v. North River Ins. Co., No. 85-4273 (E.D.Pa. Apr. 8, 1986) (O'Neill, J.) (predicting that Pennsylvania Supreme Court will adopt such a test based on choice of law analyses in other jurisdictions that relied on choice of law principles similar to those of Pennsylvania).

Plaintiff contends that New York law should be applied because the effects of defendants' alleged criminal and fraudulent behavior, including bankruptcy, were felt in New York by a New York corporation. However, the Amended Complaint contains no specific allegation of misconduct that occurred in New York; moreover, none of the defendants is a citizen of New York. Thus, New York's interest in having its laws applied to the issue of punitive damages is not particularly strong.

New Jersey and Pennsylvania have a much greater interest in having their state's laws applied. All eleven defendants, are citizens of either New Jersey or Pennsylvania. Moreover, the defendants allegedly met in these states to plan payment of bribes and paid bribes in these states. As between New Jersey and Pennsylvania, the Court finds that Pennsylvania has the most significant interest in having its laws applied because DPSC, which is responsible for awarding military clothing contracts and employed the officials who were allegedly bribed by the defendant clothing manufacturers, is located in Philadelphia.

1991 WL 125179 (E.D.Pa.)

Motions, Pleadings and Filings (Back to top)

•         2:89CV03325        (Docket) (May. 04, 1989)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 12

Westlaw.

Not Reported in A.2d                                                          Page 1
2002 WL 243387 (Del.Super.), 30 Media L. Rep. 1499
(Cite as: 2002 WL 243387 (Del.Super.))

C
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
Edward CERULLO, Plaintiff,
v.
HARPER COLLINS PUBLISHERS, INC., William
Morrow & Co., Inc., Joseph Jett and
Sabra Chartrand, Defendants.
Brian FINKELSTEIN, Plaintiff,
v.
HARPER COLLINS PUBLISHERS, INC., William
Morrow & Co., Inc., Joseph Jett and
Sabra Chartrand, Defendants.
No. CIV.A. 01C-03-21-CHT.

Submitted: May 7, 2001.
Decided: Feb. 19, 2002.

In separate suits, plaintiffs asserted defamation
claims against authors of book and its publisher. On
defendants' motion to dismiss one case, and motion to
stay proceedings in the other, the Superior Court,
New Castle County, Toliver, J., held that: (1)
evidence was sufficient to show that one plaintiff was
a Delaware resident, exempt from the Delaware
Borrowing Statute which requires application of
foreign statute of limitations to cause of action
arising outside of the state; (2) pursuant to the
Delaware Borrowing Statute, the New York statute of
limitations applied to defamation claim which arose
in New York but which was filed in Delaware court
by non-resident plaintiff; and (3) it was appropriate to
stay proceedings in Delaware defamation action,
where plaintiff filed previous action in New York
involving the same parties and issues as the Delaware
suit, and problem of one defendant's avoidance of
service in New York, which might have prevented
New York court from doing prompt and complete
justice, had been resolved.

Motions granted.

West Headnotes

[1] Limitation of Actions ⚖➞2(1)
241k2(1) Most Cited Cases
Evidence that plaintiff owned a residence in
Delaware and resided there a portion of each year,

and that he was an active member of the local
community, was sufficient to show that he was a
Delaware resident, exempt from the Delaware
Borrowing Statute which requires application of
foreign statute of limitations to cause of action
arising outside of the state. 10 Del.C. § 8121

[2] Limitation of Actions ⚖➞2(3)
241k2(3) Most Cited Cases
Pursuant to the Delaware Borrowing Statute, the New
York statute of limitations applied to defamation
claim which arose in New York but which was filed
in Delaware court by non-resident plaintiff. 10
Del.C. § 8121; McKinney's CPLR § 215(3).

[3] Action ⚖➞69(5)
13k69(5) Most Cited Cases
It was appropriate to stay proceedings in Delaware
defamation action, where plaintiff filed previous
action in New York involving the same parties and
issues as the Delaware suit, and problem of one
defendant's avoidance of service in New York, which
might have prevented New York court from doing
prompt and complete justice, had been resolved.
On the Defendants' Motion to Dismiss.

Jesse A. Finkelstein, Esquire, Peter B. Ladig,
Esquire, Richards, Layton & Finger, Wilmington,
and Andrew W. Hayes, Esquire, Boies, Schiller &
Flexner, LLP, Armonk, N.Y. 10504, for the
Plaintiffs.

Philip A. Rovner, Esquire, Potter Anderson &
Corroon LLP, Wilmington, Slade R. Metcalf,
Esquire and Katherine M. Bolger, Esquire, Squadron,
Ellenoff, Plesent & Sheinfeld, LLP, New York, N.Y.
10176, for the Defendants.

OPINION AND ORDER

TOLIVER, J.

FACTS AND PROCEDURAL POSTURE
*1 The motions before the Court arise from
defamation claims brought by the Plaintiffs, Edward
Cerullo and Brian Finkelstein, against the
Defendants, Harper Collins Publishers, Inc., William
Morrow & Co., Inc., Joseph Jett and Sabra Chartrand.
The alleged defamatory statements were included in a
book, "Black and White on Wall Street", authored by
Mr. Jett and Mr. Chartrand and published by Morrow

Not Reported in A.2d
2002 WL 243387 (Del.Super.), 30 Media L. Rep. 1499
(Cite as: 2002 WL 243387 (Del.Super.))

Page 2

and later by Harper Collins. [FN1]

> FN1. "Black and White on Wall Street" was originally published in March of 1999. Later that year, Harper Collins and Morrow merged, and through this merger Harper Collins succeeded to the liability of Morrow.

The Cerullo litigation of this case was originally initiated in the State of New York by Mr. Cerullo on August 25, 1999 against the same Defendants. Mr. Cerullo's Delaware action was commenced on March 2, 2001. Mr. Finkelstein did not file suit in New York but began his grievance against the same Defendants in Delaware on the same date. On March 28, 2001, the Defendants filed the instant motions to dismiss the Plaintiffs' complaints with one exception because of Mr. Cerullo's pending motion in New York. Mr. Finkelstein and Mr. Cerullo are represented by the same attorneys. In addition, both cases have been assigned to the undersigned although they have not been formally consolidated. [FN2]

> FN2. The Defendants' alternative motion to stay the proceedings applies to Mr. Cerullo's action only and not to Mr. Finkelstein.

The Defendants' motion to dismiss is based on two contentions. First, the Delaware Borrowing Statute, 10 Del. C. § 8121, [FN3] requires that New York substantive and procedural law be applied. That law requires the initiation of actions in the State of New York within one year of the defamatory communication. N.Y. C.P.L.R. § 215(3). The Plaintiffs' actions are therefore barred because those actions were more than one year from the alleged defamation. The Plaintiffs have filed these lawsuits in the State of Delaware, the Defendants argue, to take advantage of the longer statute of limitations period provided by this state, which allows two years to initiate litigation. The Delaware Borrowing Statute proscribes such forum shopping and requires that the Court apply the law of the state wherein the action arose. [FN4]

> FN3. Section 8121 states:
> Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action. Where the cause of action

originally accrued in favor of a person who at the time of such accrual was a resident of this State, the time limited by the law of this State shall apply.

> FN4. Section 8121.

Secondly, the Defendants argue that if the Court denies dismissal based upon their statute of limitations theory, it should nevertheless dismiss the action on the basis of *forum non conveniens.* The Plaintiffs' causes of action, they argue, have no connection with the State of Delaware other than the fact that Harper Collins is incorporated in this state. Accordingly, they should be dismissed.

Finally, as to Mr. Cerullo alone, the Defendants argue that this Court should stay the instant action until the New York Supreme Court resolves his litigation in that state because the New York action was filed first and the issues and parties are identical to those raised here.

The Plaintiffs have filed separate memorandums opposing the Defendants' motions. Mr. Cerullo contends that the Court should not dismiss the action pursuant to the Delaware Borrowing Statute because the statute requires that Delaware law be applied to residents of the State of Delaware. The two-year period as set forth in 10 Del. C. § 8119 would apply and the Delaware action was therefore timely filed. In addition, the law relied upon by the Defendants requires that the Court weigh certain factors and exercise its discretion in favor of finding that Mr. Cerullo's claim arose in Delaware. Therefore, and again, Delaware law, including its statute of limitations, should be applied.

*2 In response to the Defendants' contention that the case should be dismissed on *forum non conveniens* grounds, Mr. Cerullo first asserts that the Defendants have cited no Delaware case where the plaintiff was a resident of this state and the court granted dismissal based on *forum non conveniens* grounds. Moreover, analyzing the factors applicable to a *forum non conveniens* analysis, Delaware is the proper forum given the Defendants' failure to tip the scales in their favor in that regard. If dismissal is granted, Mr. Cerullo will likely be without a forum to promptly and completely adjudicate his claims due to the efforts of the Defendants to have the New York action dismissed by that state's courts. For this same reason, this Court should not grant the Defendants' alternative motion to have the action stayed. Stated differently, because Mr. Jett has successfully evaded

service in New York, Delaware may be the only state in which Mr. Cerullo can have his claims adjudicated. [FN5]

> FN5. In the time period that has elapsed since oral arguments on these motions took place, the Defendants have notified the Court that the Supreme Court of New York denied the pending motion to dismiss. Presumably the case is now proceeding to its ultimate resolution.

Mr. Finkelstein argues that the theory upon which the Defendants' motion for dismissal is based is flawed because they rely upon the Delaware Borrowing Statute and *Dymond v. Nat'l Broadcasting Corp., 559 F.Supp. 734 (D.Del.1983).* The *Dymond* case established that conflict of law issues should be determined on the basis of *lex loci delictus.* [FN6] Mr. Finkelstein contends that the United States Supreme Court and subsequent state court decisions have since rejected that method of determining such issues. This Court, as a result, should at least consider the circumstances of this action and therefore apply the Delaware statute of limitations.

> FN6. The law of the jurisdiction where the wrong was alleged to have occurred.

Mr. Finkelstein also contends that the Defendants' motion to dismiss based upon *forum non conveniens* should be denied because the Defendants' have failed to meet the burden imposed upon the moving party in such situations. Delaware is the proper forum in which the litigation should proceed. If the action is dismissed, he may be precluded from bringing the action in any other forum.

### DISCUSSION

A motion to dismiss a complaint pursuant to Superior Court Civil Rule 12(b)(6) for failure to state a claim upon which relief can be sustained, will not be granted unless the plaintiff will not be able to recover under any circumstances susceptible of proof given the allegations raised in that document. *Spence v. Funk,* 396 A.2d 967 (Del.1978); and *Bissel v. Papastavros' Assocs. Med. Imaging,* 626 A.2d 856 (Del.Super.1995), *appeal denied,* 623 A.2d 1142 (Del.1993). For purposes of reviewing the complaint, those allegations are accepted as true and the test of sufficiency is lenient. *State ex rel. Certain-Teed Prods. Corp. v. United Pac. Ins. Co.,* 389 A.2d 777 (Del.Super.1978). The nonmoving party is entitled to an opportunity to present material in response. Super. Ct. Civ. R. 12(b). Where matters outside the

pleadings are considered, such a motion becomes a motion for summary judgment and is disposed of pursuant to Rule 56. *Shultz v. Delaware Trust Co.,* 360 A.2d 576 (Del.Super.1976).

*3 Because affidavits and exhibits were filed by the parties in support of their respective positions, the Defendants' motions will be considered as seeking summary judgment. In this regard, the burden is similar. A motion for summary judgment will only be granted where the moving party establishes that there is no genuine issue of material fact in dispute and that the movant is entitled to judgment as a matter of law. *Martin v. Nealis Motors, Inc.,* 247 A.2d 831 (Del.1968); and *Burish v. Graham,* 655 A.2d 831 (Del.Super.1994). The facts must be viewed in the light which is most favorable to the nonmoving party, *Pullman, Inc. v. Phoenix Steel Corp.,* 304 A.2d 334 (Del.Super.1973); and the motion will not be granted, even in the absence of any dispute of material fact, where it seems desirable to inquire further into the facts to clarify the application of the law to the facts. *Guy v. Judicial Nominating Comm.,* 659 A.2d 777 (Del.Super.1995). However, the role of the Court is not to weigh evidence, and uncontroverted statements are to be accepted as true. *Battista v. Chrysler Corp.,* 454 A.2d 286 (Del.Super.1982).

### The Delaware Borrowing Statute

[1] The Delaware Borrowing Statute was designed to prevent forum shopping by out of state residents. *Pack v. Beech Aircraft Corp.,* 132 A.2d 54, 57 (Del.1957). Its general purpose "is to shorten the period of limitation applicable to actions arising in foreign jurisdictions if the foreign statute specifies a shorter period. *Id.* at 57. Notwithstanding the above, it is clear that this statute was *not* intended to prevent a resident of the state from bringing an action in this state against a defendant who is subject to the jurisdiction of the Delaware Courts, even when the cause of action arose outside of the state. The Supreme Court held:

> Our statute does not apply to a resident of this State suing on a foreign cause of action, provided he was a resident when the cause of action arose. As to such a resident the common law rule that the *lex fori* governs the matter of limitation of actions is left in full force.
> *Id.*

Mr. Cerullo asserts that his action is not barred by the Delaware Borrowing Statute because he is, in fact, a Delaware resident. His assertion of residency is based upon his sworn affidavit in which he claims

Not Reported in A.2d                                                                                                    Page 4
2002 WL 243387 (Del.Super.), 30 Media L. Rep. 1499
(Cite as: 2002 WL 243387 (Del.Super.))

to own a home in Delaware which is used exclusively by his family, that he has a Delaware driver's license, is a member of the Rehoboth Beach Delaware Planning Commission, and that he is also involved in several community organizations and committees in Delaware.

The Delaware Courts have never defined the term "state resident" as it relates to the Delaware Borrowing Statute. However, the statute, "as originally adopted, ... was almost a verbatim copy of Section 13 of the New York Practice Act." *Id.* at 58. Given the similarities of the two statutes, guidance from the New York courts on this issue is appropriate. The New York courts have determined that the issue of whether one is considered a resident for purposes of its borrowing statute "turns on whether [the individual] has a significant connection with some locality in the state as the result of living there for some length of time during the course of a year." *Antone v. General Motors Corp.*, 64 N.Y.2d 20, 484 N.Y.S.2d 514, 518, 473 N.E.2d 742 (N.Y.1984) (*citing, Matter of Newcomb*, 192 N.Y. 238, 84 N.E. 950 (N.Y.1908); and *Hurley v. Union Trust Co.*, 244 A.D. 590, 280 N.Y.S. 474 (N.Y.App.Div.1935); *see also* Reese and Green, *op. cit.*, 6 Vand.L.Rev., at p. 563, 280 N.Y.S. 474). This Court adopts the New York test as the baseline for determining Delaware residency in regards to the Delaware Borrowing Statute.

*4 As applied to the case *sub judice,* Mr. Cerullo has offered sufficient evidence of state residency to withstand a motion to dismiss under § 8121. As previously stated he owns and resides for a portion of each year at a residence in Rehoboth Beach, Delaware, and he is an active member of that community. Mr. Finkelstein makes no such claim of Delaware residency. Instead he contends that the Defendants' reliance on *Dymond v. Nat'l Broad. Corp., supra* is misplaced. *Dymond* stands for the proposition that in a multi-state defamation case, a Delaware court should apply the statute of limitations of the state whose substantive law is applicable to the claim. Mr. Finkelstein asserts that because *Dymond* was decided before *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), the law derived from *Keeton* controls this action. He alleges that applied to his case, *Keeton* demands that "this court should at least examine the circumstances of this action, and upon doing so, apply the Delaware statute of limitations to Finkelstein's claim." Finkelstein Mem. at 2.

[2] Unfortunately, at least from his perspective, Mr.

Finkelstein's Memorandum fails to cite a specific passage from *Keeton* in support of this contention. Moreover, Chief Justice Rehnquist specifically declared that the issue being decided in that case was "personal jurisdiction, not choice-of-law." *Keeton, 465 U.S. at 778.* This Court cannot therefore give *Keeton* the construction that Mr. Finkelstein proposes. *Dymond* remains the controlling law in Delaware on this issue. As a result, the plaintiff's domicile [FN7] generally controls which state's substantive law must be employed, which in turn prescribes the applicable statute of limitations.

> FN7. The *Dymond* Court held that Delaware courts must apply the foreign state's statute of limitations whenever it would apply that state's substantive law. *Dymond, 559 F.Supp. at 736.* Delaware is a *lex loci delicti* jurisdiction in regards to choice of law issues. *Id. at 737.* However, the Court noted that the issue had never been addressed in a multi-state defamation action. To determine such issues, other states have used two different tests. The first such test applies the law of the plaintiff's domicile without explicit consideration of other factors. *Id.* The second such test applies the "law of the plaintiff's domicile unless other factors strongly suggest that the laws of another state are more applicable." *Id.* at 738. The Court did not reach the issue of which test was applicable in Delaware, because under either approach the result called for was the application of the foreign state's law. *Id.*

Even if this Court were to consider other factors in making this decision as Mr. Finkelstein proposes, New York would nevertheless remain the controlling law because there are no factors, save for Mr. Finkelstein's filing of his complaint in Delaware, that would compel the Court to decide in his favor. Accordingly, the filing of Mr. Finkelstein's complaint was not timely pursuant to New York law because it was filed more than one year after the cause of action arose. N.Y. C.P.L.R. § 215(3). Therefore, summary judgment must be granted in the Defendants' favor as their motion pertains to Mr. Finkelstein.

*Forum Non Conveniens*

Motions to dismiss based on *forum non conveniens* are granted only if, upon the sound discretion of the trial court, the defendant meets its heavy burden of proving inconvenience. *Parvin v. Kaufmann*, 236 A.2d 425, 427-428 (Del.1967). To do so, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 5
2002 WL 243387 (Del.Super.), 30 Media L. Rep. 1499
(Cite as: 2002 WL 243387 (Del.Super.))

defendant must show that the circumstances are such that the case is "one of the rare cases where the drastic relief of dismissal is warranted based on a strong showing that the burden of litigating in this forum is so severe as to result in manifest hardship to the defendant." *Ison v. DuPont de Nemours, 729 A.2d 832, 842 (Del.1999)*. Such hardship is analyzed by the court by applying the six factors known collectively in Delaware as the *Cryo-Maid* factors. These factors are as follows:

*5 1. The relative ease of access to proof;

2. the availability of compulsory process for witnesses;

3. the possibility of viewing the premises;

4. whether the controversy is dependent upon application of Delaware law which the courts of this State more properly should decide than those of another jurisdiction;

5. the pendency or nonpendency of a similar action or actions in another jurisdiction; and

6. all other practical problems that would make trial of the case easy, expeditious and inexpensive.

*Id.* at 837-38 (citing *General Foods Corp. v. Cryo-Maid, Inc., 198 A.2d 681 (Del.1964)*. In reviewing these factors as they apply to the facts at hand, it is clear that the Defendants have failed to meet their burden of showing true inconvenience and hardship. Based upon *Dymond,* this court concludes that it should apply the law of the domicile of the plaintiff. *Dymond, 559 F.Supp. at 737.*

While the Court did find that Mr. Cerullo was a resident of Delaware for purposes of the Delaware Borrowing Statute only, *no* finding has been made regarding his domicile. [FN8] However, assuming *arguendo* it is determined that his domicile is in New York, this Court may nevertheless interpret another jurisdiction's laws, *Mt. Hawley Insurance Co. v. Jenny Crag, 668 A.2d 763 (Del.Super.1995);* and as such, this factor does not present a hardship sufficient to warrant dismissal.

> FN8. This opinion addresses Mr. Cerullo's residence, not his domicile. A person may have more than one residence, but only one domicile. *Martinez v. Bynum, 461 U.S. 321, 338-340, 103 S.Ct. 1838, 75 L.Ed.2d 879 (1983).*

The Defendants have also failed to show a true inconvenience in regards to the factor of "access to proof or witnesses". It is asserted that all the relevant proof and witnesses are in the State of New York. However, this assertion alone does not demonstrate a true inconvenience or hardship. Given its proximity to Delaware as well as the advanced state of the means of transportation available between the two locations, travel from New York to Delaware would be no more of a hardship or inconvenience than would travel from one corner of the State of New York to the opposite corner.

Nor does the factor of the "availability of compulsory process" weigh heavily in favor of the Defendants. While it is true that many of the potential witnesses could not be compelled to come to Delaware to testify, the Defendants have not shown that such compulsory process would be any more likely in New York. Indeed, the Defendants do not allege that all witnesses, or even the majority of the witnesses would be subject to process in New York. All that is alleged is that all of the potential witnesses reside outside of the State of Delaware. Defs'. Mot. at 10. Furthermore, one of the coauthors of the book, who is also one of the key defendants in this matter, Mr. Jett, has yet to be located and served in New York. The fact that he has been served in Delaware appears to make this action *more* convenient, at least in terms of service of process. As such, the compulsory process factor does not demand dismissal due to *forum non conveniens.*

*6 The parties agree that the factor of "the possibility of viewing the premises" is not relevant to this action, and warrants no discussion here.

The "pendency of a similar action in another jurisdiction" is the factor that weighs most heavily in favor of the Defendants in this action. The New York action was filed prior to the Delaware action and defending this action in two different jurisdictions would likely impose some hardship on the Defendants. However, this hardship is off set by the fact that had Mr. Jett made himself available to process in New York at the outset of that litigation, it is likely that the matter would have been on track to be promptly adjudicated in that state.

Finally, the Defendants claim that the factor of "all other practical problems that would make the trial of case easy, expeditious and inexpensive" weighs in their favor because none of the allegations in Mr. Cerullo's complaint have any connection to Delaware other than Harper Collins' incorporation in Delaware. Aside from the fact that Mr. Cerullo owns a summer home in Delaware, the Defendants' contention in this regard is true. However, as is stated above, Mr. Cerullo must be considered a Delaware resident for purposes of the Delaware Borrowing Statute. Given this status, the Delaware Courts do in fact have an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                              Page 6
2002 WL 243387 (Del.Super.), 30 Media L. Rep. 1499
**(Cite as: 2002 WL 243387 (Del.Super.))**

interest in adjudicating a claim brought by a state resident against a defendant incorporated in Delaware.

Proceeding with this matter in Delaware is likely to be less convenient to the Defendants than proceeding in the State of New York. However, in light of the New York Supreme Court's June 22, 2001 decision to deny the Defendants' motion to dismiss, that litigation will proceed. *See Cerullo v. Morrow,* N.Y.Supr., No. 99/117910, Kapnick, J. (June 22, 2001). Therefore, as will be discussed more thoroughly below, this Court will stay the Delaware proceedings pending the outcome of the New York action. Any ruling on dismissal of the Complaint against Mr. Cerullo on *forum non conveniens* grounds is therefore premature.

*Staying the Proceedings*

[3] When considering a motion to stay the proceedings, the court should freely exercise it's discretion:

> ... in favor of a stay when there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, involving the same parties, and the same issues; that, as a general rule, litigation should be confined to the forum in which it is first commenced ...; that these concepts are impelled by considerations of comity and the necessities of an orderly and efficient administration of justice.

*McWane Cast Iron Pipe Corp. v. McDowell, Wellman Eng'g. Co.,* 263 A.2d 281, 283 (Del.1970). The purpose of effectuating a stay is to "avoid wasteful duplication of time, effort and expense that occurs when judges, lawyers, parties and witnesses are simultaneously engaged in the adjudication of the same cause of action in two courts." *Dura Pharm. v. Scandipharm, Inc.,* 713 A.2d 925, 928 (Del.Ch.1998).

*7 The New York action was filed before the Delaware action and should therefore be considered as "first filed." In addition, the New York case involves the same parties and the same issues as does the lawsuit filed in Delaware. Notwithstanding the existence of these factors, "[t]he *McWane* 'first filed' analysis is not a bright-line rule to be applied mechanically." *Caravetta v. McKesson HBOC, Inc.,* Del.Super., C.A. No. 00C-04-214, Herlihy, J. (Sept. 7, 2000) (Mem. Op. at 3). Mr. Cerullo contends that by virtue of Mr. Jett's avoidance of process in New York, Mr. Jett has delayed and will continue to delay that action, which ultimately prevents the New York

courts of doing prompt and/or complete justice. This Court agrees, but as of June 3, 2001, that issue was resolved and the matter is apparently proceeding as scheduled. Consequently, considering all of these circumstances together, this Court must find that a stay of the proceedings is appropriate to allow the New York courts to proceed first.

CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss against the Plaintiff, Brian Finkelstein, is hereby granted, and the Defendants' Motion to Stay the Proceedings against the Plaintiff, Edward Cerullo, is hereby granted.

IT IS SO ORDERED.

2002 WL 243387 (Del.Super.), 30 Media L. Rep. 1499

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 13

Westlaw.

Not Reported in A.2d                                                                                    Page 1
2004 WL 717240 (Pa.Com.Pl.)
**(Cite as: 2004 WL 717240 (Pa.Com.PL))**

Only the Westlaw citation is currently available.

Court of Common Pleas of Pennsylvania,
Philadelphia County.
CITY OF PHILADELPHIA, County of Luzerne,
County of Lehigh, Plaintiffs,
v.
HUMAN SERVICES CONSULTANTS, II, INC.,
Human Services Consultants Management,
Inc., Richard Adams, Linda Adams, Safari Corp.,
Edgewater, Inc., Defendants.
**Nos. 00950MARCH.TERM2003, CONTROL
010307.**

March 23, 2004.

MEMORANDUM OPINION

JONES, J.

*1 Presently before the court are the Preliminary
Objections of Defendants Human Services
Consultants, II, Inc., (HSC, II), Human Services
Consultants Management, Inc.(HSCM), Richard
Adams, Linda Adams and Edgewater, Inc. [FN1] For
the reasons that follow, this court sustains in part and
overrules in part Defendants' Preliminary Objections.

    FN1. Defendant Safari Corp. filed
    preliminary objections which the court will
    dispose of in a separate order.

BACKGROUND

 The instant lawsuit arises out of three separate
contracts for residential services to mentally ill and
mentally retarded individuals between Human
Services Consultants, Inc. ("HSC") [FN2] and the
City of Philadelphia, County of Luzerne and County
of Lehigh. Plaintiffs have brought causes of action
against Defendants for breach of contract (Count I),
violation of the 4300 regulations (Count II), fraud
(Count III), civil conspiracy (Count IV), negligence
(Count V), fraudulent transfers (Count VI), and
violation of 62 P.S. § 1407(a)-(e) (Count VII).

    FN2. HSC is presently in bankruptcy and
    according to plaintiffs is not a party to this
    action.

DISCUSSION

 A. Plaintiffs have failed to state a claim against
Linda Adams for Breach of Contract but have stated
a claim against Richard Adams.

 Defendants have demurred to Count I of the
amended complaint on the basis that Defendants
Richard Adams and Linda Adams were not parties to
the purported contracts. Plaintiffs argue that the
allegations of the amended complaint are sufficient to
pierce the corporate veil for the Adams'.

 In Pennsylvania, there is a strong presumption
against piercing the corporate veil. *Lumax Industries,
Inc. v. Aultman,* 543 Pa. 38, 41-41, 669 A.2d 893,
895 (Pa.1995). "Piercing the corporate veil is an
exception, and courts should start from the general
rule that the corporate entity should be upheld unless
specific, unusual circumstances call for [such] an
exception." *JK Roller Architects, LLC' v. Tower
Investments, Inc.,* 2003 WL 1848101, *
1(2003)(Jones)(quoting *First Realvest, Inc. v. Avery
Builders, Inc. .,* 410 Pa.Super. 572, 600 A.2d 601,
604 (Pa.Super.1991). Under Pennsylvania law, the
following factors are to be considered in determining
whether to pierce the corporate veil: 1)
undercapitalization; 2) failure to adhere to corporate
formalities; 3) substantial intermingling of corporate
and personal affairs; and 4) use of the corporate form
to perpetuate a fraud. *Id* (quoting *Lumax Indus. v.
Aultman,* 543 Pa. 38, 669 A.2d 893 (Pa.1995)).

 In order to withstand a demurrer, Plaintiff must set
forth the conduct which the Adams' allegedly
engaged in that would bring their actions within the
parameters of a cause of action based on a theory of
piercing the corporate veil. *Id.* While it is not
necessary to set forth the evidences by which facts
are to be proved, it is essential that the facts the
pleader depends upon to show liability be averred. *Id.*

 Paragraphs 21, 23, 29 and 30 are the allegations
which arguably support a cause of action against
Linda Adams individually under the theory of
piercing the corporate veil. Paragraphs 21 and 23
identify Linda Adams as second in command with
absolute control over the management and financial
affairs of HSC, HSCII and HSCM. These paragraphs
are insufficient to support the extreme remedy of
piercing the corporate veil. The general rule is that a

corporation shall be regarded as an independent entity even if its stock is owned entirely by one person. *College Watercolor Group, Inc. v. William H. Newbauer, Inc.*, 468 Pa. 103, 117, 360 A.2d 200, 207 (1976).

**\*2** Paragraph 29 and 30 allege that HSCM needed extra money from HSC to fund a lavish lifestyle for Linda Adams. These are conclusions of law and are insufficient to withstand a demurrer since Plaintiffs failed to plead what Linda Adams allegedly did to bring her actions within the parameters of piercing the corporate veil.

Paragraphs 21, 22, 23, 29, 30, 47, 48, 49 are the allegations which arguably support a cause of action against Richard Adams individually under a theory of piercing a corporate veil. Paragraphs 21, 22 and 23, similar to the paragraphs alleged against Linda Adams, are insufficient to pierce the corporate veil against Richard Adams. However, Paragraphs 29, 30, 47, 48 and 49 do set forth conduct which Richard Adams allegedly engaged in to bring his actions within the parameters of a cause of action based on a theory of piercing the corporate veil.

Accordingly, Defendant Linda Adams preliminary objections to Count I are sustained and Richard Adams preliminary objections to Count I are overruled.

B. Plaintiff Fails to Attach the Writings upon which Suit is Based.

Defendants assert that Plaintiff has violated Rule 1019(i) [FN3] by failing to attach all the contracts upon which suit is based. Rule 1019(i) provide:

> FN3. The parties reference Rule 1019(h). Rule 1019(h) was amended effective January 1, 2001 and was relettered as Rule 1019(i).

When any claim or defense is based upon a writing, the pleader shall attach a copy of the writing, or the material part thereof, but if the writing or copy is not accessible to the pleader, it is sufficient so to state, together with the reason, and to set forth the substance in writing. Pa. R. Civ. P. 1019(i).

Based on the plain language of the amended complaint, Plaintiffs' claims are based upon the various agreements entered into between HSC and Plaintiffs. The amended complaint does not attach any of the contracts between HSC and the County Plaintiffs and the third contract between the City of

Philadelphia and HSC. However, Plaintiffs maintain that the contracts that are attached are similar to those not attached and are representative of the material part upon which suit is based. Based on the foregoing, the court will overrule Defendants' Preliminary Objection with the qualification that Plaintiffs provide Defendants with a copy of the contracts upon which their amended complaint is based within ten days from the date of this order.

C. The Fraud and Negligence Counts against Defendant Richard Adams Are Barred by Pennsylvania's Gist of the Action.

Plaintiffs' fraud and negligence claims against Richard Adams are barred by the gist of the action doctrine. The gist of the action doctrine precludes plaintiffs from recasting ordinary breach of contract claims into tort claims." *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 14 (Pa.Super.2002). The gist of the action doctrine bars tort claims that: (1) arise solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; and (4) where the tort essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of the contract. *Id.* at 19.

**\*3** Here, since Plaintiffs' allege conduct which could potentially pierce the corporate veil and since Plaintiffs' fraud claim is based upon misrepresentations made by Richard Adams in performance of the contracts, the fraud claim is barred by the gist of the action. The Superior Court in *eToll, Inc. v. Elias/Savion Advertising, Inc* ., supra, specifically held that claims of fraud in the performance of the contract are barred by the gist of the action doctrine. Given this clear precedent, the court finds that Plaintiffs' fraud claim is barred against Richard Adams. However, Plaintiffs fraud claims against HSCM are not barred by the gist of the action doctrine since HSCM is not a party to the contracts in issue, therefore the doctrine does not apply. Accordingly, Defendants preliminary objections to Count III of Plaintiffs' amended complaint alleging fraud is sustained in part as it pertains to Richard Adams and overruled in part as it pertains to HSCM.

In addition to a fraud claim, Plaintiffs also allege negligence claims (Count V) against Richard Adams as well as other defendants. Similar to the fraud claim alleged against Richard Adams, the gist of the action

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

doctrine also bars the negligence claim against Richard Adams. The negligence claim against Richard Adams concerns Adams' performance of the contracts. Accordingly, Defendants' preliminary objection to Count V of Plaintiffs' amended complaint is sustained as it pertains to Richard Adams.

D. The Negligence Count is not barred by the Economic Loss Doctrine as it pertains to Defendants Human Services Consultants Management, Inc., Linda Adams, Human Services Consultants, Inc. II and Edgewater, Inc..

The purpose of the economic loss doctrine, as adopted in Pennsylvania, is "maintaining the separate spheres of the law of contract and tort." _Waterware Div. v. Ametek/US Gauge Div._ 51 Pa. D. & C. 4th 201, (2001)(quoting _New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp.,_ 387 Pa.Super. 537, 550, 564 A.2d 919, 925 (1989). The Commonwealth's version of the doctrine precludes recovery for economic losses in a negligence action if the only damage sustained by the plaintiff is damage to the product itself, but no other property damage or personal injury resulted. _Id._ If the only damages from the alleged tort are economic, the tort claims cannot stand. _New Hope Books, Inc. v. Datavision Prologix, Inc.,_ 2003 WL 21672991, *5 (2003)(Cohen).

Here, plaintiffs allege that the defendants were negligent for failing to discover the check kiting scheme, supervise the individuals involved in the scheme and stop the scheme. As a direct result of defendants' negligence, the plaintiffs seek compensatory damages. Said damages do not appear at this stage to constitute the type of damages barred by the economic loss doctrine. Accordingly, Defendants' preliminary objections to Count V with the exception of Richard Adams are overruled.

E. Plaintiffs Claims under 62 P.S. § 1407 provides for a Civil Remedy.

**\*4** Count VII of Plaintiffs' amended complaint alleges a cause of action under 62 P.S. § 1407, Pennsylvania's Medicaid Fraud Abuse and Control Act. Defendants argue that Plaintiffs claims fail as a matter of law since the statute does not provide for a private cause of action. The court does not agree.

Title 62 P.S. § 1407 is found within Article XIV entitled "Fraud and Abuse Control". This article sets forth a detailed scheme of provider prohibited acts and recipient prohibited acts. [FN4] Section 1407(a)

of the Code enumerates the various provider prohibited acts. Section 1407(c)(1) of the Code provides that if the department determines that a provider has committed any prohibited act or has failed to satisfy any requirement under 1407(a), it shall have the authority to immediately terminate, upon notice to the provider, the provider agreement and to institute a civil suit against such provider in the court of common pleas for twice the amount of excess benefits or payments plus legal interest from the date the violation (s) occurred. _Id._ Thus, the statute does provide for a private cause of action. Accordingly, Defendants preliminary objections are overruled. [FN5] However, pursuant to the statute, a provider is defined as an individual or medical facility which signs an agreement with the department to participate in a medical assistance program. The only defendants who signed the contracts at issue are HSC and arguably Richard Adams. Therefore, plaintiffs' claims under 62 P.S. § 1407 are dismissed as to other named defendants.

> FN4. 62 P.S. § 1401, defines "provider" as "any individual or medical facility which signs an agreement with the department to participate in the medical assistance program, including, but not limited, to licensed practitioners, pharmacies, hospitals, nursing homes, clinics, home health agencies and medical purveyors." Section 1401 also defines "recipient" as "an eligible person who receives medical assistance from a participating provider."

> FN5. Although the court finds that the statute provides for a private cause of action, the court questions whether the statute is applicable to the case at hand.

F. Plaintiffs have failed to allege sufficient facts to allege conspiracy.

Count IV of Plaintiffs' amended complaint sets forth a claim for civil conspiracy against all defendants. In order to assert a claim for civil conspiracy, plaintiffs must allege "that [each defendant] entered into an unlawful agreement for the express purpose of committing either a criminal act or an intentional tort." _Romy, M.D. v. Burke,_ 2003 WL 21205975 *4 (2003)(Sheppard)(quoting _Burnside v. Abbot Laboratories,_ 351 Pa.Super. 264, 278, 505 A.2d 973, 981 (Pa.Super.1985). In addition, plaintiffs must allege facts showing concerted action or agreement, "a contemporaneous and negligent failure to act" is not sufficient. _Id._ Furthermore, plaintiffs must allege

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

facts to show malice, i.e. of each defendant's intent to injure plaintiffs. *Id.* While Plaintiffs have set forth the underlying tort claim against HSME i.e. fraud, the Plaintiffs have not set forth an underlying tort claim against the remaining defendants. Therefore, the conspiracy count fails against these defendants. In the event Plaintiffs are capable of stating a conspiracy claim, against Richard Adams, Linda Adams, HSC, II and Edgewater, Inc., Plaintiffs are granted leave to amend the amend complaint within ten days from the date of this order. [FN6]

> FN6. All other Preliminary Objections are overruled.

CONCLUSION

 Based on the forgoing, the court sustains in part and overrules in part Defendants Preliminary Objections as follows:

 **\*5** 1. Defendants' Preliminary Objection to Count I (Breach of Contract) of Plaintiffs' amended complaint is SUSTAINED as it pertains to Linda Adams and OVERRULED as it pertains to Richard Adams.

 2. Defendants' Preliminary Objection for failure to attach documents pursuant to Pa. R. Civ. P. 1019(i) is OVERRULED with the qualification that Plaintiffs are ordered to produce the contracts identified by Defendants within ten days from the date of this order.

 3. Defendants' Preliminary Objections to Count III (fraud) are SUSTAINED as it pertains to Richard Adams and OVERRULED as it pertains to Human Services Consultants Management, Inc.

 4. Defendants' Preliminary Objections to Count IV (conspiracy) are OVERRULED as to Human Services Consultants Management, Inc. and SUSTAINED as to Human Services Consultants, II, Inc., Richard Adams, Linda Adams and Edgewater, Inc. Plaintiffs are granted leave to amend the amended complaint within ten days from the date of this order.

 5. Defendants' Preliminary Objections to Count V (negligence) are OVERRULED as to Human Services Consultants, II, Inc., Human Services Consultants Management, Inc., Linda Adams and Edgewater, Inc. and SUSTAINED as to Richard Adams.

 6. Defendants Preliminary Objections to Count VI

(fraudulent conveyance) and Count VII (violation 62 P.S. 1407(a)-(e)) are OVERRULED.

ORDER

 AND NOW, this 23rd day of March, 2004, upon consideration of Defendants Human Services Consultants, II, Human Services Consultants Management, Inc., Richard Adams, Linda Adams and Edgewater Inc.'s Preliminary Objections to Plaintiffs' amended complaint, Plaintiffs response thereto, memorandum, all matters of record and in accord with the Memorandum Opinion, it is hereby ORDERED and DECREED as follows:

 1. Defendants' Preliminary Objection to Count I (Breach of Contract) of Plaintiffs' amended complaint is SUSTAINED as it pertains to Linda Adams and OVERRULED as it pertains to Richard Adams.

 2. Defendants' Preliminary Objection for failure to attach documents pursuant to Pa. R. Civ. P. 1019(i) is OVERRULED with the qualification that Plaintiffs are ordered to produce the contracts identified by Defendants within ten days from the date of this order.

 3. Defendants' Preliminary Objections to Count III (fraud) are SUSTAINED as it pertains to Richard Adams and OVERRULED as it pertains to Human Services Consultants Management, Inc.

 4. Defendants' Preliminary Objections to Count IV (conspiracy) are OVERRULED as to Human Services Consultants Management, Inc. and SUSTAINED as to Human Services Consultants, II, Inc., Richard Adams, Linda Adams and Edgewater, Inc. Plaintiffs are granted leave to amend the amended complaint within ten days from the date of this order.

 5. Defendants Preliminary Objections to Count V (negligence) are OVERRULED as to Human Services Consultants Management. Inc., Human Services Consultants Management, Inc., Linda Adams and Edgewater, Inc. and SUSTAINED as to Richard Adams.

 **\*6** 6. Defendants Preliminary Objections to Count VI (fraudulent conveyance) and Count VII (violation 62 P.S. 1407(a)-(e)) are OVERRULED.

 2004 WL 717240 (Pa.Com.Pl.)

END OF DOCUMENT

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
2004 WL 1900001 (E.D.Pa.)
**(Cite as: 2004 WL 1900001 (E.D.Pa.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
CORPORATE AVIATION CONCEPTS, INC., and
CFS Air LLC, Plaintiffs,
v.
MULTI-SERVICE AVIATION CORPORATION,
Defendant,
v.
GENERAL ELECTRIC CAPITAL CORPORATION
Third-Party Defendant.
**No. Civ.A. 03-3020.**

Aug. 25, 2004.

Charlene K. Fullmer, Edward M. Dunham, Jr.,
Duane Morris LLP, Philadelphia, PA, for Plaintiffs.

Edward J. Kelleher, Archer and Greiner, P.C.,
Haddonfield, NJ, for Defendant and Third-Party
Plaintiff.

Keith E. Smith, Piper Rudnick LLP, Philadelphia,
PA, for Plaintiff, Counter Defendant and Third-Party
Defendant.

Memorandum and Order

YOHN, J.

*1 This case was originally a declaratory judgment
action filed by plaintiffs Corporate Aviation
Concepts, Inc. ("CAC") and CFS Air, LLC ("CFS")
against Multi-Service Aviation Corporation ("MSC"),
seeking a judicial determination that liens, placed by
MSC upon three aircraft owned and operated by
plaintiffs, were invalid. MSC then filed
counterclaims and a third-party complaint. Currently
pending before this court are the motions to dismiss
the counterclaims by CFS and the third-party
complaint by General Electric Capital Corporation
("GEC"). [FN1] For the reasons stated below, these
motions will be granted.

FN1. Plaintiff CAC has not moved to
dismiss the counterclaims asserted against it,

which are identical to those asserted against
CFS. As a matter of judicial efficiency,
however--because these counterclaims
involve the same factual allegations, the
same parties, and the same legal theories as
those challenged by CFS; and because MSC
has had an opportunity to address these
issues--to the extent that MSC has failed to
state legally sufficient claims against CAC, I
will dismiss those counterclaims against
CAC as well. See Roman v. Jeffes, 904 F.2d
192, 196 (3d Cir.1990) ( "there are times
when a court may sua sponte raise the issue
of the deficiency of a pleading under Rule
12(b)(6) provided that the litigant has had
the opportunity to address the issue either
orally or in writing") (citing Bryson v. Brand
Insulations, Inc., 621 F.2d 556, 559 (3d
Cir.1980) and Dougherty v. Harper's
Magazine Co., 537 F.2d 758, 761 (3d
Cir.1976)).

Background [FN2]

FN2. The facts giving rise to MSC's
attempted placement of liens upon plaintiff's
aircraft are not essential to the disposition of
this motion. For this reason, the ensuing
factual account will be limited to the factual
allegations underlying MSC's claims for
fraud and other business torts. A complete
discussion of the extension of credit--by
MSC--to various aircraft now operated by
plaintiffs, the resulting debt incurred by the
owners and guarantor of those aircraft, and
MSC's placement of liens upon those
aircraft, can be found in this court's opinion
denying MSC's motion to dismiss or
transfer. See Corporate Aviation Concepts,
Inc. v. MultiService Corp., 2003 WL
22794693 (E.D.Pa. Nov.13, 2003).

MSC's claims for creditor fraud and conspiracy
depend upon the precise nature of the business and
ownership relationships between and among CAC, an
aviation services corporation based in Washington
state; CFS, an aircraft leasing company operating out
of Connecticut; GEC, the manager and 100% owner
of CFS; and Northwestern Aircraft Capital Corp.
(NWACC"), an aircraft dealer and distributor based
in Washington state. Accordingly, I will go into some

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

detail as to the structure of these businesses and their relationships with one another. For the purposes of this motion to dismiss only, the facts as related below presume MSC's allegations to be true.

MSC is a credit card processing company which issues corporate aviation cards to qualified businesses in the aviation industry. *See* defendant's official website, at https://aviation.multiservice.com/mscavi_index.shtml . Each credit card is attached to a specific aircraft, and with the card the operator of an aircraft can purchase fuel and services from approved MSC operators.

Sometime in the mid-1990s, MSC issued lines of credit to three aviation service providers--NW Executive, NW Leasing, and JS Aviation--all of which are owned by parent corporation NWACC. *See* Def.'s Am. Countercl. (Doc. # 22) at 7, ¶ 10, 13. As the parent corporation, NWACC issued Corporate Guarantees to MSC pursuant to which it ensured prompt payment of all debt incurred by these three companies through use of the Multi-Service credit card. *Id.* ¶¶ 6, 8-9.

NW Executive, NW Leasing, and JS Aviation used their Multi-Service cards to purchase aviation fuel and products and are currently in default under the terms of Multi-Service's Cardholder Agreement. *Id.* ¶ 18-20. As a result of unpaid credit card bills, NW Executive owes $19,464.20 to MSC, NW Leasing owes $147,004.45, and JS Aviation owes $183,486.60. *Id.* Despite its Corporate Guarantees, NWACC has failed to satisfy these debts or otherwise make payment to MSC. *Id.* ¶ 21. As a result, MSC filed multiple claims of lien with the Federal Aviation Administration ("FAA") and the State of Kansas which attach to three specific aircraft. *Id.* ¶ 22. [FN3]

> FN3. The three aircraft at issue are a Gates Learjet 55, Registration No. N29NW ("Gates 55"); a Gulf Stream American G-1159A, Registration No. N312NW ("Gulf Stream American"); and a Gates Learjet 35A, Registration No. N325NW ("Gates 35A").

At approximately the same time these liens were filed, the aircraft in question--which were under the control of NWACC or its subsidiaries--were sold, assigned, and ultimately came to be owned by CFS, which then leased them to CAC. [FN4] According to defendant, GEC and CFS financed and created CAC

for the specific and fraudulent purpose of continuing the operation of these three aircraft, and the leasing of the three aircraft to CAC was designed to defraud MSC from recovering on its liens. This set of transactions forms the basis of defendant's counterclaims and third-party complaint, and merits somewhat detailed discussion.

> FN4. To reiterate, GEC, the third-party defendant in this case, is the manager and 100% owner of CFS. Def.'s Am. Countercl. ¶ 24.

*2 With respect to the first aircraft, the Gulf Stream American, MSC alleges that it was originally owned by NWACC and was sold to GEC for "$1.00 and OVC" on April 4, 2003. *Id.* ¶ 26. As of April 1, 2003, however, CAC had entered into an agreement to lease the Gulf Stream American from GEC. *Id.* ¶ 27. Cory Coyle, an NWACC officer, signed both the lease for the Gulf Stream American, on behalf of CAC, and its bill of sale, on behalf of NWACC. *Id.* ¶ 28. According to MSC, Coyle's dual role as an officer for both NWACC and CAC raises suspicion as to the legitimacy of the CAC business entity. On May 19, 2003, GEC sold its ownership interest in the Gulf Stream American to CFS and assigned to CFS its lessor's interest in the aircraft as well. *Id.* ¶¶ 31-32. With respect to the Gulf Stream American, then, MSC's allegations appear to establish that this aircraft--originally owned and operated by NWACC and its subsidiaries--is currently being leased by CAC from CFS, its owner.

The second aircraft in question, the Gates 55, is alleged to have been leased to NWACC by GEC sometime prior to November 7, 2002. *Id.* ¶ 34. GEC then assigned its lessor's interest in the Gates 55 to CFS, sometime after this date. *Id.* ¶ 35. The Gates 55 is currently operated by CAC pursuant to a lease with CFS. The third aircraft, however--the Gates 35A--receives much less specific treatment by defendant in its factual allegations and is alleged only to be currently owned by CFS and to have been--at one time--owned or leased by NWACC. *Id.* ¶ 36.

In connection with the multiple transfers of these three aircraft, MSC has asserted six counterclaims against CAC, five against CFS, and brought a six-count third-party complaint against GEC. The essence of its complaint is that CFS and GEC conspired to create CAC, transfer ownership of the aircraft, and keep the aircraft in operation as a means of defrauding MSC and obstructing its efforts to enforce its liens. According to MSC, the formation of

CAC enabled CFS and/or GEC to avoid taking "immediate write-downs of at least $8,500,000." *Id.* ¶ 39. MSC further alleges that CFS and/or GEC, in order to form CAC, purchased equipment, furnishings, trade names, and customer lists from NWACC and its subsidiaries. *Id.* ¶ 40.

In MSC's first count, [FN5] it brings a claim for creditor fraud and deepening insolvency. MSC's second count alleges civil conspiracy, and its third claim is for aiding and abetting fraud. In counts four and five, MSC advances theories of joint venture and instrumentality liability. Finally, counts six and seven bring causes of action which sound in unjust enrichment. MSC asserts each of its claims against CAC, CFS, and GEC, except for count five, in which it relies upon the instrumentality theory to bring causes of action against only CAC and GEC. I will discuss each claim in turn.

> FN5. The specific nature of MSC's six claims against CFS and GEC is altogether unclear from the complaint itself. The six counts are untitled and make no reference to the legal theories upon which they are based. In its opposition to the parties' motions to dismiss, however, MSC made clear--for the first time--the theories underlying its six claims. I will therefore evaluate the legal sufficiency of MSC's claims according to its after-the-fact titling thereof. Although movants were originally handicapped by MSC's imprecise pleading, their reply memorandum makes clear that they are now aware of the nature of the claims brought against them and have had sufficient opportunity to respond.

Legal Standard

In ruling on a motion to dismiss for failure to state a claim upon which relief may be granted, [FN6] the court must accept as true all well-pleaded allegations of fact in the complaint and any reasonable inferences that may be drawn therefrom, in order to determine whether "under any reasonable reading of the pleadings, the [complainant] may be entitled to relief." *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir.1996) (citations omitted); *Colburn v. Upper Darby Township*, 838 F.2d 663, 665-66 (3d Cir.1988), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989) (citations omitted). Although the court must construe the complaint in the light most favorable to the complainant, it need not accept as true legal conclusions or unwarranted factual

inferences. *See Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Courts will grant a 12(b)(6) motion to dismiss "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

> FN6. Movants also cite Rule 9(b) in their motions to dismiss, alleging that MSC's claims, which involve fraud, have not been pleaded with sufficient specificity. Because I hold that each of MSC's counterclaims and third-party claims is legally insufficient, I need not assess the degree of particularity with which they have been pleaded.

Discussion

*1. Count I: Deepening Insolvency and Creditor Fraud*

**\*3** In count one MSC asserts claims against CAC, CFS, and GEC for deepening insolvency and creditor fraud. MSC alleges that GEC and CFS created a new corporate entity--CAC--in an attempt to allow its predecessor, NWACC, to avoid its debts while continuing the same operations under a new name. According to MSC, its first claim is supported by several allegations: GEC and CFS were involved in the funding of CAC; CAC is a successor to NWACC; NWACC owed approximately $247,000.00 to MSC; GEC and CFS entered into new leases with CAC for aircraft formerly in the possession of NWACC; GEC benefitted financially from the creation of CAC because it was able to avoid taking an immediate write-down of $8,500,000.00; and the creation of CAC prohibited MSC from enforcing its liens against NWACC.

The tort of "deepening insolvency" has never been discussed by Pennsylvania courts. The Third Circuit, however, has had occasion to evaluate the theory of "deepening insolvency" under Pennsylvania law and concluded, after lengthy analysis, that "if faced with the issue, the Pennsylvania Supreme Court would determine that 'deepening insolvency' may give rise to a cognizable injury." *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 349 (3d Cir.2001). Expanding upon the nature of this tort, the Third Circuit held that deepening insolvency occurs where corporate property is injured through the fraudulent or concealed expansion of corporate debt and prolongation of corporate life. *Id.* at 347. This tort rests upon the theory that a corporation,

Not Reported in F.Supp.2d
2004 WL 1900001 (E.D.Pa.)
(Cite as: 2004 WL 1900001 (E.D.Pa.))

Page 4

even when insolvent, can have valuable corporate property; the fraudulent incurrence of additional debt, however, can damage that value by hastening bankruptcy, undermining business relationships, and dissipating corporate assets. *Id.* at 349-50.

The *R.F. Lafferty* Court stressed the significance of the injury to the *debtor* corporation, however, and cited numerous cases in which debtors or committees suing on behalf of debtors were the injured parties. *Id.* at 347- 50. Indeed, the Third Circuit clearly imagined the "injury" in a deepening insolvency case to be suffered by the debtor corporation itself, and specifically found that the plaintiff in *R.F. Lafferty* was asserting claims on behalf of the bankrupt corporations. *Id.* at 348-49. Only after holding that "the claims here belong to the Debtors, rather than to the creditors," did the Third Circuit undertake its deepening insolvency analysis. *Id.* at 349. Its acceptance of deepening insolvency as a cognizable cause of action under Pennsylvania law, therefore, does not appear to have contemplated the type of claim asserted by MSC; that is, a claim for deepening insolvency brought *against* companies allegedly related to the insolvent corporation, *by* an unsecured creditor of the insolvent corporation. MSC does not allege that it is bringing its claim on behalf of NWACC or its subsidiaries, nor does it allege that NWACC was injured by the prolonging of its corporate life or incurrence of fraudulent debt.

*4 Because MSC has failed to allege the elements of deepening insolvency, however, I need not determine whether an unsecured creditor has standing to bring deepening insolvency claims against a bankrupt corporations successors. As articulated by the Third Circuit, deepening insolvency involves "prolonging an insolvent corporation's life through had debt." *Id.* at 350. More specifically, the tort requires a showing of "fraudulent expansion of corporate debt and prolongation of corporate life." *Id.* at 347. MSC has not alleged that CAC, CFS, or GEC expanded NWACC's debt in any way. The unpaid credit card bills of NW Executive, NW Leasing, and JS Aviation existed prior to the creation of CAC and MSC has not alleged that CFS or GEC caused this debt to be increased. Furthermore, MSC has alleged no facts suggesting that the accumulation of debt was fraudulent; the only "debt" at issue in this case is the unpaid credit card bills, a debt which was incurred through purchase of aviation fuel on legitimately extended credit.

While certain aircraft formerly operated by NWACC may be under new leases, this fact alone does not constitute a fraudulent prolonging of corporate life through the incurrence of bad debt. MSC has failed to allege any facts which would support a claim for deepening insolvency and these claims will therefore be dismissed with prejudice.

MSC's first count also mentions "creditor fraud" as a theory of recovery. Pennsylvania courts have never recognized creditor fraud as a cause of action under Pennsylvania law. Assuming without deciding, however, that the Pennsylvania Supreme Court would--if faced with the issue--recognize this tort, MSC has nonetheless failed to state a legally sufficient claim for creditor fraud.

In *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, the Third Circuit--predicting New Jersey law--held that a plaintiff states a claim for creditor fraud under New Jersey law by alleging "that an attorney has knowingly and intentionally participated in a client's unlawful conduct to hinder, delay, and/or fraudulently obstruct the enforcement of a *judgment* of a court." 331 F.3d 406, 414 (3d Cir.2003) (emphasis added). Relying upon this articulation of the elements of creditor fraud, as urged to do by MSC, it is clear that MSC has not stated a claim for creditor fraud. While MSC alleges an outstanding debt owed it by the NWACC subsidiaries, this debt is in the form of an unpaid credit card bill. MSC does not assert that it has obtained a "judgment" for this amount, nor that CAC, CFS, or GEC have obstructed the enforcement of any such judgment. Furthermore, while MSC alleges that the transfer of aircraft ownership and leasing rights interfered with its attempts to enforce its liens, it has failed to assert any facts supporting a finding of unlawful conduct or intentional obstruction. Accordingly, MSC's claim and counterclaims for creditor fraud cannot stand and will be dismissed with prejudice.

### 2. Count II: Civil Conspiracy

*5 In count two MSC asserts claims against each party for civil conspiracy. In order to overcome a motion to dismiss a civil conspiracy claim, MSC must allege "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *Strickland v. Univ. of Scranton,* 700 A.2d 979, 987-88 (Pa.Super.1997) (citing *Smith v. Wagner,* 403 Pa.Super. 316, 588 A.2d 1308, 1311-12 (Pa.Super.1991)). "Proof of malice, i.e., an intent to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5
2004 WL 1900001 (E.D.Pa.)
**(Cite as: 2004 WL 1900001 (E.D.Pa.))**

injure, is essential in proof of a conspiracy." _Skipworth v. Lead Indus. Assoc., Inc.,_ 547 Pa. 224, 235, 690 A.2d 169 (1997) (citation omitted).

MSC has not alleged that any party acted with malice. Furthermore, MSC asserts that CAC, CFS, and GEC funded and created CAC; while MSC suggests that the motivation in creating this business was to ensure the continued operation of certain aircraft, MSC makes no allegation that the actual formation of CAC involved unlawful purposes. Because MSC has failed to allege any particular unlawful purpose or unlawful means, and because it has not alleged malice, it has failed to set forth a cause of action for civil conspiracy. MSC's second claim and counterclaims, therefore, will be dismissed, but without prejudice since it may be that with the benefit of discovery MSC may be able to rectify these deficiencies.

### 3. Count III: Aiding and Abetting Fraud

MSC's third count asserts a claim for aiding and abetting fraud. There can be no aiding and abetting fraud unless there is fraud in the first place, and MSC has failed to assert any instance of fraud on the part of defendants. To plead fraud under Pennsylvania law, MSC must allege "(1) a misrepresentation (2) made by a person (3) with the intent to induce the recipient to act on it (4) which the recipient justifiably relies on and (5) which proximately damages the recipient." _Knop v. McMahan,_ 872 F.2d 1132, 1140 (3d Cir.1989) (citing _Delahanty v. First Pa. Bank, N.A.,_ 318 Pa.Super. 90, 464 A.2d 1243, 1252 (Pa.Super.1983)).

MSC's aiding and abetting claim evidently rests upon CFS and GEC's "scheme to defraud a lien creditor." Opp'n at 8. MSC, however, has pointed to no misrepresentation, no reliance, and no damage as a result of this reliance. Indeed, in its account of the allegedly fraudulent creation of CAC, MSC fails to so much as suggest that CFS and GEC made misrepresentations upon which MSC relied.

Setting aside MSC's clear failure to plead "all averments of fraud ... with particularity," as required by Fed.R.Civ.P. 9(b), MSC has also failed to allege the basic requirements of fraud under Pennsylvania law. MSC's claims for aiding and abetting fraud, therefore, will be dismissed without prejudice pursuant to Rule 12(b)(6). MSC may replead this claim, if it can do so without violating Rule 11.

### 4. Counts IV and V: Joint Venture and

### Instrumentality Theories

*6 MSC's fourth count alleges that CFS, GEC, and CAC formed an agreement to keep certain aircraft in operation and that this agreement amounted to a joint venture. Accordingly, MSC asserts a theory of joint venture liability.

Under Pennsylvania law, a joint venture is an "association of persons or corporations who by contract, express, or implied, agree to engage in a common enterprise for their mutual profit." _Duquesne Light Co. v. Woodland Hills Sch. Dist.,_ 700 A.2d 1038, 1055 (Pa.Cmwlth.1997) (citing _Richardson v. Walsh Constr. Co.,_ 334 F.3d 334, 336 (3d Cir.1964)). The "rights, duties, and obligations of joint venturers, as between themselves, depend primarily upon the terms of the contract by which they assume that relationship." _Snellbaker v. Herrmann,_ 315 Pa.Super. 520, 462 A.2d 713, 717 (Pa.Super.1983). Certain factors are essential to a joint venture: "(1) each party to the venture must make a contribution, not necessarily of capital, but by way of services, skill, knowledge, materials or money; (2) profits must be shared among the parties; (3) there must be a 'joint proprietary interest and right of mutual control over the subject matter' of the enterprise; (4) usually, there is a single business transaction rather than a general and continuous transaction." _Id._ at 716 (quoting _McRoberts v. Phelps,_ 391 Pa. 591, 599, 138 A.2d 439 (1958)). Absent a limitation in the contract, "a joint venturer will be held responsible with his or her associates" for losses. _Id._ at 717.

In order to proceed under a theory of joint venture liability, therefore, MSC must first allege the existence of a joint venture. In its fourth count, MSC alleges that there existed an agreement among CAC, CFS, and GEC which included "a contribution by each party, ... a joint proprietary interest, the right to share in profits and losses, and the right of joint control." Am. Countercl. ¶ 58. If true, these elements would support the finding of a joint venture. MSC, however, has alleged no facts in support of the legal conclusions stated in paragraph 58. While this court is required to accept all well-pleaded allegations of fact as true, it need not accept unsupported or conclusory statements, unwarranted inferences, or sweeping legal conclusions. MSC's assertion that CFS, CAC, and GEC formed a joint venture is wholly unsupported by MSC's factual allegations, as MSC has alleged nothing with respect to the existence or terms of an agreement to form a joint venture. Furthermore, in order to be liable as a joint venture there must be an underlying tort by the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1900001 (E.D.Pa.)
(Cite as: 2004 WL 1900001 (E.D.Pa.))

participants in the joint venture, which MSC has failed to allege. Accordingly, count IV will be dismissed without prejudice for failure to state a claim upon which relief can be granted. MSC may again replead if it can do so consistent with Rule 11.

In count five, MSC alleges that CAC was formed as a continuation or successor to NWACC and that CAC, under an instrumentality theory, is therefore liable to MSC for the debts of NWACC and its subsidiaries.

**\*7** Under Pennsylvania's instrumentality doctrine, a corporation "may be held liable for the debts of another corporation where it misuses that corporation as a mere business conduit for its own purposes." *Combustion Sys. Servs., Inc. v. Schuylkill Energy Res., Inc.,* 1993 WL 514496, \*4 (E.D.Pa. Dec.1, 1993). To recover under this theory, the following three elements are required:

    (1) That one corporation controlled another corporation to such a degree that the controlled corporation is a mere instrumentality;

    (2) That the controlling corporation is perpetrating a fraud or wrong through the controlled corporation (e.g., torts, violation of a statute, or stripping a subsidiary of its assets); and

    (3) An unjust loss or injury to the claimant, such as insolvency of a controlled corporation.

*May v. Club Med Sales, Inc.,* 832 F.Supp. 937, 938-39 (E.D.Pa.1993) (citing *Stinson v. GAF Corp.,* 757 F.Supp. 644, 645 (W.D.Pa.1990)). A finding that one corporation is a mere instrumentality of another requires that "the controlling corporation wholly ignored the separate status of the controlled corporation and so dominated the affairs of the controlled corporation that its separate existence was a mere sham. *Id.* (citing *Culbreth v. Amosa, Ltd.,* 898 F.2d 13, 14 (3d Cir.1990)). Put differently, assertion of an instrumentality or alter-ego theory requires "a threshold showing that the controlled corporation acted robot-or puppet-like in mechanical response to the controller's tugs on its strings or pressure on its buttons." *Culbreth,* 898 F.2d at 15.

In count five, MSC identifies six individuals who served as officers, directors, employees, shareholders, and/or members of *both* NWACC or its subsidiaries *and* CAC. *See* Am. Countercl. ¶ ¶ 61-62. It also alleges that CAC currently maintains offices in Bellevue, Washington and Allentown, Pennsylvania, and that NWACC and its subsidiaries formerly maintained offices in these same two cities. *Id.* ¶ ¶ 63-64. Furthermore, MSC alleges that CAC now operates aircraft formerly operated by NWACC, NW

Executive, NW Leasing, and JS Aviation. *Id.* ¶ ¶ 65-66. And finally, MSC contends that CAC is a consolidation or continuation of the NWACC entities, that CAC was formed in order to enable NWACC to escape its debts, that CAC purchased NWACC assets for inadequate consideration, and that CAC--as a continuation of NWACC--therefore assumed its legal and financial obligations. *Id.* ¶ 67.

Because MSC has identified debt owed it by NWACC and has set forth facts that, if true, could support its theory that CAC is the mere instrumentality of NWACC, NW Executive, NW Leasing, or JS Aviation, it has stated a claim against CAC on these grounds.

MSC also brings this claim against GEC, alleging that GEC has "actual and total control over CFS," that CFS is being misused by GEC, and that GEC is therefore also liable on an instrumentality theory. Third Party Compl. ¶ ¶ 25-27. Despite MSC's contention that "[f]raud or injustice has or will proximately result from the misuse of CFS by [GEC], including damages to Multi Service," MSC has failed to allege any way in which CFS is liable to it in the first place. Even if CFS is a mere instrumentality of GEC, GEC cannot be held liable on an instrumentality theory absent something to be held liable *for*. Because MSC has made out no claim against CFS, it cannot rely upon a theory of instrumentality liability to recover damages it has not alleged for a tort it has not identified. MSC's fifth claim will therefore be dismissed, again without prejudice, as to GEC.

*5. Counts VI and VII: Unjust Enrichment*

**\*8** In its sixth counterclaim, MSC argues that CAC has been unjustly enriched by its retention of the benefits conferred upon it by MSC, in the form of credit extended to NWACC through the Multi-Service credit card. Its seventh counterclaim asserts the same cause of action against CFS. In the sixth count of its third party complaint MSC makes similar allegations relating to GEC, claiming that GEC has been unjustly enriched by its use of the claimed once-indebted aircraft.

Under Pennsylvania law, a claim for unjust enrichment requires three elements: "benefits conferred on one party by another, appreciation of such benefits by the recipient, and acceptance and retention of these benefits under such circumstances that it would be inequitable [or unjust] for the recipient to retain the benefits without payment of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

value." *Allegheny Gen. Hosp. v. Philip Morris, Inc.,* 228 F.3d 429, 427 (3d Cir.2000) (citing 16 Summary of Pa. Jur.2d *Commercial Law* § 2.2); *see also Temple Univ. Hosp. Inc. v. Healthcare Mgmt. Alternatives, Inc.,* 832 A.2d 501, 507 (Pa.Super.2003) (same).

MSC has alleged that it extended credit to NW Executive, NW Leasing, and JS Aviation--and that NWACC issued a guaranty to MSC on behalf of those companies. These companies, now insolvent, have not paid more that $247,000.00 of past due credit card debt. MSC has not alleged that this line of credit was extended to CAC, CFS, or GEC, however, and therefore has not demonstrated that this "benefit" was conferred upon these parties by MSC. [FN7] Moreover, MSC has failed to allege that anyone other than NWACC "accepted" these benefits.

> FN7. It appears that the credit card debt was accumulated mainly through the purchase of airplane fuel. Fuel burned by aircraft under the ownership or control of NWACC, however, cannot possibly be held to have enriched CAC, CFS, or GEC, which had no interest in the aircraft at the time the fuel was purchased with the Multi Service Card. Fuel consumed by another business's aircraft cannot be considered a "benefit" to the companies now in control of those same aircraft.

While MSC may be able to recover this debt through bankruptcy proceedings or other debt collection measures--or by establishing that CAC is liable under an instrumentality theory--it cannot recover against other parties based on an unjust enrichment theory for a benefit clearly conferred upon NW Executive, NW Leasing, and JS Aviation. MSC's sixth and seventh counterclaims will be dismissed with prejudice, as will the sixth claim in its third party complaint.

Conclusion

For the foregoing reasons, MSC has failed to state a claim against either CFS or GEC upon which relief can be granted. With the exception of its claim under an instrumentality theory, MSC has also failed to state a legally sufficient claim against CAC. An appropriate order follows.

ORDER

And now, this _____ th day of August, 2004, upon consideration of third-party defendant General Electric Capital Corp.'s motion to dismiss and defendant Multi-Service Aviation Corp.'s opposition thereto, and upon consideration of plaintiff CFS Air's motion to dismiss and Multi-Service's opposition thereto, it is hereby ORDERED that:

1.) General Electric Capital Corp.'s motion to dismiss (Doc. # 27) is GRANTED and all claims against GEC are DISMISSED;
  a.) Counts I and VI of Multi-Service's Third-Party Complaint (Doc. # 22) are DISMISSED with prejudice;
  b.) Counts II, III, IV, and V of Multi-Service's Third-Party Complaint are DISMISSED without prejudice to the right of Multi-Service to file an amended Third-Party Complaint within twenty days of the date of this order;

**\*9** 2.) Plaintiff CFS Air's motion to dismiss (Doc. # 28) is GRANTED and all counterclaims against CFS Air are DISMISSED;
  a.) Counts I and VII of Multi-Service's counterclaim complaint (Doc. # 22) are DISMISSED, as to plaintiff CFS Air, with prejudice;
  b.) Counts II, III, and IV of Multi-Service's counterclaim complaint are DISMISSED without prejudice to the right of Multi-Service to file an amended Third-Party Complaint within twenty days of the date of this order.

3.) Multi-Service's counterclaims 1, 2, 3, 4, and 6 against plaintiff Corporate Aviation Concepts, Inc. are DISMISSED;
  a.) Counts I and VI of Multi-Service's counterclaim complaint are DISMISSED, as to plaintiff CAC, with prejudice.
  b.) Counts II, III, and IV of Multi-Service's counterclaim complaint are DISMISSED, as to plaintiff CAC, without prejudice to the right of Multi-Service to file an amended Third-Party Complaint within twenty days of the date of this order;

4.) A status conference will be held on September 16, 2004, at 4:00 p.m. in chambers.

2004 WL 1900001 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

•     2:03cv03020    (Docket) (May. 08, 2003)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.