EXHIBIT 14

Westlaw.

Not Reported in F.Supp.2d                                          Page 1
2004 WL 1900001 (E.D.Pa.)
**(Cite as: 2004 WL 1900001 (E.D.Pa.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
CORPORATE AVIATION CONCEPTS, INC., and
CFS Air LLC, Plaintiffs,
v.
MULTI-SERVICE AVIATION CORPORATION,
Defendant,
v.
GENERAL ELECTRIC CAPITAL CORPORATION
Third-Party Defendant.
**No. Civ.A. 03-3020.**

Aug. 25, 2004.
Charlene K. Fullmer, Edward M. Dunham, Jr.,
Duane Morris LLP, Philadelphia, PA, for Plaintiffs.

Edward J. Kelleher, Archer and Greiner, P.C.,
Haddonfield, NJ, for Defendant and Third-Party
Plaintiff.

Keith E. Smith, Piper Rudnick LLP, Philadelphia,
PA, for Plaintiff, Counter Defendant and Third-Party
Defendant.

Memorandum and Order

YOHN, J.

*1 This case was originally a declaratory judgment
action filed by plaintiffs Corporate Aviation
Concepts, Inc. ("CAC") and CFS Air, LLC ("CFS")
against Multi-Service Aviation Corporation ("MSC"),
seeking a judicial determination that liens, placed by
MSC upon three aircraft owned and operated by
plaintiffs, were invalid. MSC then filed
counterclaims and a third-party complaint. Currently
pending before this court are the motions to dismiss
the counterclaims by CFS and the third-party
complaint by General Electric Capital Corporation
("GEC"). [FN1] For the reasons stated below, these
motions will be granted.

FN1. Plaintiff CAC has not moved to
dismiss the counterclaims asserted against it,

which are identical to those asserted against
CFS. As a matter of judicial efficiency,
however--because these counterclaims
involve the same factual allegations, the
same parties, and the same legal theories as
those challenged by CFS; and because MSC
has had an opportunity to address these
issues--to the extent that MSC has failed to
state legally sufficient claims against CAC, I
will dismiss those counterclaims against
CAC as well. *See Roman v. Jeffes,* 904 F.2d
192, 196 (3d Cir.1990) ( "there are times
when a court may *sua sponte* raise the issue
of the deficiency of a pleading under Rule
12(b)(6) provided that the litigant has had
the opportunity to address the issue either
orally or in writing") (citing *Bryson v. Brand
Insulations, Inc.,* 621 F.2d 556, 559 (3d
Cir.1980) and *Dougherty v. Harper's
Magazine Co.,* 537 F.2d 758, 761 (3d
Cir.1976)).

Background [FN2]

FN2. The facts giving rise to MSC's
attempted placement of liens upon plaintiff's
aircraft are not esential to the disposition of
this motion. For this reason, the ensuing
factual account will be limited to the factual
allegations underlying MSC's claims for
fraud and other business torts. A complete
discussion of the extension of credit--by
MSC--to various aircraft now operated by
plaintiffs, the resulting debt incurred by the
owners and guarantor of those aircraft, and
MSC's placement of liens upon those
aircraft, can be found in this court's opinion
denying MSC's motion to dismiss or
transfer. *See Corporate Aviation Concepts,
Inc. v. MultiService Corp.,* 2003 WL
22794693 (E.D.Pa. Nov.13, 2003).

MSC's claims for creditor fraud and conspiracy
depend upon the precise nature of the business and
ownership relationships between and among CAC, an
aviation services corporation based in Washington
state; CFS, an aircraft leasing company operating out
of Connecticut; GEC, the manager and 100% owner
of CFS; and Northwestern Aircraft Capital Corp.
(NWACC"), an aircraft dealer and distributor based
in Washington state. Accordingly, I will go into some

Not Reported in F.Supp.2d
2004 WL 1900001 (E.D.Pa.)
(Cite as: 2004 WL 1900001 (E.D.Pa.))

detail as to the structure of these businesses and their relationships with one another. For the purposes of this motion to dismiss only, the facts as related below presume MSC's allegations to be true.

MSC is a credit card processing company which issues corporate aviation cards to qualified businesses in the aviation industry. *See* defendant's official website, at https://aviation.multiservice.com/mscavi_index.shtml . Each credit card is attached to a specific aircraft, and with the card the operator of an aircraft can purchase fuel and services from approved MSC operators.

Sometime in the mid-1990s, MSC issued lines of credit to three aviation service providers--NW Executive, NW Leasing, and JS Aviation--all of which are owned by parent corporation NWACC. *See* Def.'s Am. Countercl. (Doc. # 22) at 7, ¶ 10, 13. As the parent corporation, NWACC issued Corporate Guarantees to MSC pursuant to which it ensured prompt payment of all debt incurred by these three companies through use of the Multi-Service credit card. *Id.* ¶¶ 6, 8-9.

NW Executive, NW Leasing, and JS Aviation used their Multi-Service cards to purchase aviation fuel and products and are currently in default under the terms of Multi-Service's Cardholder Agreement. *Id.* ¶ 18-20. As a result of unpaid credit card bills, NW Executive owes $19,464.20 to MSC, NW Leasing owes $147,004.45, and JS Aviation owes $183,486.60. *Id.* Despite its Corporate Guarantees, NWACC has failed to satisfy these debts or otherwise make payment to MSC. *Id.* ¶ 21. As a result, MSC filed multiple claims of lien with the Federal Aviation Administration ("FAA") and the State of Kansas which attach to three specific aircraft. *Id.* ¶ 22. [FN3]

> FN3. The three aircraft at issue are a Gates Learjet 55, Registration No. N29NW ("Gates 55"); a Gulf Stream American G-1159A, Registration No. N312NW ("Gulf Stream American"); and a Gates Learjet 35A, Registration No. N325NW ("Gates 35A").

At approximately the same time these liens were filed, the aircraft in question--which were under the control of NWACC or its subsidiaries--were sold, assigned, and ultimately came to be owned by CFS, which then leased them to CAC. [FN4] According to defendant, GEC and CFS financed and created CAC

for the specific and fraudulent purpose of continuing the operation of these three aircraft, and the leasing of the three aircraft to CAC was designed to defraud MSC from recovering on its liens. This set of transactions forms the basis of defendant's counterclaims and third-party complaint, and merits somewhat detailed discussion.

> FN4. To reiterate, GEC, the third-party defendant in this case, is the manager and 100% owner of CFS. Def.'s Am. Countercl. ¶ 24.

*2 With respect to the first aircraft, the Gulf Stream American, MSC alleges that it was originally owned by NWACC and was sold to GEC for "$1.00 and OVC" on April 4, 2003. *Id.* ¶ 26. As of April 1, 2003, however, CAC had entered into an agreement to lease the Gulf Stream American from GEC. *Id.* ¶ 27. Cory Coyle, an NWACC officer, signed both the lease for the Gulf Stream American, on behalf of CAC, and its bill of sale, on behalf of NWACC. *Id.* ¶ 28. According to MSC, Coyle's dual role as an officer for both NWACC and CAC raises suspicion as to the legitimacy of the CAC business entity. On May 19, 2003, GEC sold its ownership interest in the Gulf Stream American to CFS and assigned to CFS its lessor's interest in the aircraft as well. *Id.* ¶¶ 31-32. With respect to the Gulf Stream American, then, MSC's allegations appear to establish that this aircraft--originally owned and operated by NWACC and its subsidiaries--is currently being leased by CAC from CFS, its owner.

The second aircraft in question, the Gates 55, is alleged to have been leased to NWACC by GEC sometime prior to November 7, 2002. *Id.* ¶ 34. GEC then assigned its lessor's interest in the Gates 55 to CFS, sometime after this date. *Id.* ¶ 35. The Gates 55 is currently operated by CAC pursuant to a lease with CFS. The third aircraft, however--the Gates 35A-- receives much less specific treatment by defendant in its factual allegations and is alleged only to be currently owned by CFS and to have been--at one time--owned or leased by NWACC. *Id.* ¶ 36.

In connection with the multiple transfers of these three aircraft, MSC has asserted six counterclaims against CAC, five against CFS, and brought a six-count third-party complaint against GEC. The essence of its complaint is that CFS and GEC conspired to create CAC, transfer ownership of the aircraft, and keep the aircraft in operation as a means of defrauding MSC and obstructing its efforts to enforce its liens. According to MSC, the formation of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1900001 (E.D.Pa.)
(Cite as: 2004 WL 1900001 (E.D.Pa.))

Page 3

CAC enabled CFS and/or GEC to avoid taking "immediate write-downs of at least $8,500,000." *Id.* ¶ 39. MSC further alleges that CFS and/or GEC, in order to form CAC, purchased equipment, furnishings, trade names, and customer lists from NWACC and its subsidiaries. *Id.* ¶ 40.

In MSC's first count, [FN5] it brings a claim for creditor fraud and deepening insolvency. MSC's second count alleges civil conspiracy, and its third claim is for aiding and abetting fraud. In counts four and five, MSC advances theories of joint venture and instrumentality liability. Finally, counts six and seven bring causes of action which sound in unjust enrichment. MSC asserts each of its claims against CAC, CFS, and GEC, except for count five, in which it relies upon the instrumentality theory to bring causes of action against only CAC and GEC. I will discuss each claim in turn.

> FN5. The specific nature of MSC's six claims against CFS and GEC is altogether unclear from the complaint itself. The six counts are untitled and make no reference to the legal theories upon which they are based. In its opposition to the parties' motions to dismiss, however, MSC made clear--for the first time--the theories underlying its six claims. I will therefore evaluate the legal sufficiency of MSC's claims according to its after-the-fact titling thereof. Although movants were originally handicapped by MSC's imprecise pleading, their reply memorandum makes clear that they are now aware of the nature of the claims brought against them and have had sufficient opportunity to respond.

Legal Standard

In ruling on a motion to dismiss for failure to state a claim upon which relief may be granted, [FN6] the court must accept as true all well-pleaded allegations of fact in the complaint and any reasonable inferences that may be drawn therefrom, in order to determine whether "under any reasonable reading of the pleadings, the [complainant] may be entitled to relief." *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996) (citations omitted); *Colburn v. Upper Darby Township,* 838 F.2d 663, 665-66 (3d Cir.1988), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989) (citations omitted). Although the court must construe the complaint in the light most favorable to the complainant, it need not accept as true legal conclusions or unwarranted factual inferences. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Courts will grant a 12(b)(6) motion to dismiss "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

> FN6. Movants also cite Rule 9(b) in their motions to dismiss, alleging that MSC's claims, which involve fraud, have not been pleaded with sufficient specificity. Because I hold that each of MSC's counterclaims and third-party claims is legally insufficient, I need not assess the degree of particularity with which they have been pleaded.

Discussion

*1. Count I: Deepening Insolvency and Creditor Fraud*

**\*3** In count one MSC asserts claims against CAC, CFS, and GEC for deepening insolvency and creditor fraud. MSC alleges that GEC and CFS created a new corporate entity--CAC--in an attempt to allow its predecessor, NWACC, to avoid its debts while continuing the same operations under a new name. According to MSC, its first claim is supported by several allegations: GEC and CFS were involved in the funding of CAC; CAC is a successor to NWACC; NWACC owed approximately $247,000.00 to MSC; GEC and CFS entered into new leases with CAC for aircraft formerly in the possession of NWACC; GEC benefitted financially from the creation of CAC because it was able to avoid taking an immediate write-down of $8,500,000.00; and the creation of CAC prohibited MSC from enforcing its liens against NWACC.

The tort of "deepening insolvency" has never been discussed by Pennsylvania courts. The Third Circuit, however, has had occasion to evaluate the theory of "deepening insolvency" under Pennsylvania law and concluded, after lengthy analysis, that "if faced with the issue, the Pennsylvania Supreme Court would determine that 'deepening insolvency' may give rise to a cognizable injury." *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.,* 267 F.3d 340, 349 (3d Cir.2001). Expanding upon the nature of this tort, the Third Circuit held that deepening insolvency occurs where corporate property is injured through the fraudulent or concealed expansion of corporate debt and prolongation of corporate life. *Id.* at 347. This tort rests upon the theory that a corporation,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1900001 (E.D.Pa.)
(Cite as: 2004 WL 1900001 (E.D.Pa.))

Page 4

even when insolvent, can have valuable corporate property; the fraudulent incurrence of additional debt, however, can damage that value by hastening bankruptcy, undermining business relationships, and dissipating corporate assets. *Id.* at 349-50.

The *R.F. Lafferty* Court stressed the significance of the injury to the *debtor* corporation, however, and cited numerous cases in which debtors or committees suing on behalf of debtors were the injured parties. *Id.* at 347- 50. Indeed, the Third Circuit clearly imagined the "injury" in a deepening insolvency case to be suffered by the debtor corporation itself, and specifically found that the plaintiff in *R.F. Lafferty* was asserting claims on behalf of the bankrupt corporations. *Id.* at 348-49. Only after holding that "the claims here belong to the Debtors, rather than to the creditors," did the Third Circuit undertake its deepening insolvency analysis. *Id.* at 349. Its acceptance of deepening insolvency as a cognizable cause of action under Pennsylvania law, therefore, does not appear to have contemplated the type of claim asserted by MSC; that is, a claim for deepening insolvency brought *against* companies allegedly related to the insolvent corporation, *by* an unsecured creditor of the insolvent corporation. MSC does not allege that it is bringing its claim on behalf of NWACC or its subsidiaries, nor does it allege that NWACC was injured by the prolonging of its corporate life or incurrence of fraudulent debt.

*4 Because MSC has failed to allege the elements of deepening insolvency, however, I need not determine whether an unsecured creditor has standing to bring deepening insolvency claims against a bankrupt corporations successors. As articulated by the Third Circuit, deepening insolvency involves "prolonging an insolvent corporation's life through had debt." *Id.* at 350. More specifically, the tort requires a showing of "fraudulent expansion of corporate debt and prolongation of corporate life." *Id.* at 347. MSC has not alleged that CAC, CFS, or GEC expanded NWACC's debt in any way. The unpaid credit card bills of NW Executive, NW Leasing, and JS Aviation existed prior to the creation of CAC and MSC has not alleged that CFS or GEC caused this debt to be increased. Furthermore, MSC has alleged no facts suggesting that the accumulation of debt was fraudulent; the only "debt" at issue in this case is the unpaid credit card bills, a debt which was incurred through purchase of aviation fuel on legitimately extended credit.

While certain aircraft formerly operated by NWACC may be under new leases, this fact alone does not

constitute a fraudulent prolonging of corporate life through the incurrence of bad debt. MSC has failed to allege any facts which would support a claim for deepening insolvency and these claims will therefore be dismissed with prejudice.

MSC's first count also mentions "creditor fraud" as a theory of recovery. Pennsylvania courts have never recognized creditor fraud as a cause of action under Pennsylvania law. Assuming without deciding, however, that the Pennsylvania Supreme Court would--if faced with the issue--recognize this tort, MSC has nonetheless failed to state a legally sufficient claim for creditor fraud.

In *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.,* the Third Circuit--predicting New Jersey law--held that a plaintiff states a claim for creditor fraud under New Jersey law by alleging "that an attorney has knowingly and intentionally participated in a client's unlawful conduct to hinder, delay, and/or fraudulently obstruct the enforcement of a *judgment* of a court." 331 F.3d 406, 414 (3d Cir.2003) (emphasis added). Relying upon this articulation of the elements of creditor fraud, as urged to do by MSC, it is clear that MSC has not stated a claim for creditor fraud. While MSC alleges an outstanding debt owed it by the NWACC subsidiaries, this debt is in the form of an unpaid credit card bill. MSC does not assert that it has obtained a "judgment" for this amount, nor that CAC, CFS, or GEC have obstructed the enforcement of any such judgment. Furthermore, while MSC alleges that the transfer of aircraft ownership and leasing rights interfered with its attempts to enforce its liens, it has failed to assert any facts supporting a finding of unlawful conduct or intentional obstruction. Accordingly, MSC's claim and counterclaims for creditor fraud cannot stand and will be dismissed with prejudice.

### 2. Count II: Civil Conspiracy

*5 In count two MSC asserts claims against each party for civil conspiracy. In order to overcome a motion to dismiss a civil conspiracy claim, MSC must allege "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *Strickland v. Univ. of Scranton,* 700 A.2d 979, 987-88 (Pa.Super.1997) (citing *Smith v. Wagner,* 403 Pa.Super. 316, 588 A.2d 1308, 1311-12 (Pa.Super.1991)). "Proof of malice, i.e., an intent to

Not Reported in F.Supp.2d                                                                                      Page 5
2004 WL 1900001 (E.D.Pa.)
**(Cite as: 2004 WL 1900001 (E.D.Pa.))**

injure, is essential in proof of a conspiracy." *Skipworth v. Lead Indus. Assoc., Inc.,* 547 Pa. 224, 235, 690 A.2d 169 (1997) (citation omitted).

MSC has not alleged that any party acted with malice. Furthermore, MSC asserts that CAC, CFS, and GEC funded and created CAC; while MSC suggests that the motivation in creating this business was to ensure the continued operation of certain aircraft, MSC makes no allegation that the actual formation of CAC involved unlawful purposes. Because MSC has failed to allege any particular unlawful purpose or unlawful means, and because it has not alleged malice, it has failed to set forth a cause of action for civil conspiracy. MSC's second claim and counterclaims, therefore, will be dismissed, but without prejudice since it may be that with the benefit of discovery MSC may be able to rectify these deficiencies.

### 3. Count III: Aiding and Abetting Fraud

MSC's third count asserts a claim for aiding and abetting fraud. There can be no aiding and abetting of fraud unless there is fraud in the first place, and MSC has failed to assert any instance of fraud on the part of defendants. To plead fraud under Pennsylvania law, MSC must allege "(1) a misrepresentation (2) made by a person (3) with the intent to induce the recipient to act on it (4) which the recipient justifiably relies on and (5) which proximately damages the recipient." *Knop v. McMahan,* 872 F.2d 1132, 1140 (3d Cir.1989) (citing *Delahanty v. First Pa. Bank, N.A.,* 318 Pa.Super. 90, 464 A.2d 1243, 1252 (Pa.Super.1983)).

MSC's aiding and abetting claim evidently rests upon CFS and GEC's "scheme to defraud a lien creditor." Opp'n at 8. MSC, however, has pointed to no misrepresentation, no reliance, and no damage as a result of this reliance. Indeed, in its account of the allegedly fraudulent creation of CAC, MSC fails to so much as suggest that CFS and GEC made misrepresentations upon which MSC relied.

Setting aside MSC's clear failure to plead "all averments of fraud ... with particularity," as required by Fed.R.Civ.P. 9(b), MSC has also failed to allege the basic requirements of fraud under Pennsylvania law. MSC's claims for aiding and abetting fraud, therefore, will be dismissed without prejudice pursuant to Rule 12(b)(6). MSC may replead this claim, if it can do so without violating Rule 11.

### 4. Counts IV and V: Joint Venture and

### Instrumentality Theories

**\*6** MSC's fourth count alleges that CFS, GEC, and CAC formed an agreement to keep certain aircraft in operation and that this agreement amounted to a joint venture. Accordingly, MSC asserts a theory of joint venture liability.

Under Pennsylvania law, a joint venture is an "association of persons or corporations who by contract, express, or implied, agree to engage in a common enterprise for their mutual profit." *Duquesne Light Co. v. Woodland Hills Sch. Dist.,* 700 A.2d 1038, 1055 (Pa.Cmwlth.1997) (citing *Richardson v. Walsh Constr. Co.,* 334 F.3d 334, 336 (3d Cir.1964)). The "rights, duties, and obligations of joint venturers, as between themselves, depend primarily upon the terms of the contract by which they assume that relationship." *Snellbaker v. Herrmann,* 315 Pa.Super. 520, 462 A.2d 713, 717 (Pa.Super.1983). Certain factors are essential to a joint venture: "(1) each party to the venture must make a contribution, not necessarily of capital, but by way of services, skill, knowledge, materials or money; (2) profits must be shared among the parties; (3) there must be a 'joint proprietary interest and right of mutual control over the subject matter' of the enterprise; (4) usually, there is a single business transaction rather than a general and continuous transaction." *Id.* at 716 (quoting *McRoberts v. Phelps,* 391 Pa. 591, 599, 138 A.2d 439 (1958)). Absent a limitation in the contract, "a joint venturer will be held responsible with his or her associates" for losses. *Id.* at 717.

In order to proceed under a theory of joint venture liability, therefore, MSC must first allege the existence of a joint venture. In its fourth count, MSC alleges that there existed an agreement among CAC, CFS, and GEC which included "a contribution by each party, ... a joint proprietary interest, the right to share in profits and losses, and the right of joint control." Am. Countercl. ¶ 58. If true, these elements would support the finding of a joint venture. MSC, however, has alleged no facts in support of the legal conclusions stated in paragraph 58. While this court is required to accept all well-pleaded allegations of fact as true, it need not accept unsupported or conclusory statements, unwarranted inferences, or sweeping legal conclusions. MSC's assertion that CFS, CAC, and GEC formed a joint venture is wholly unsupported by MSC's factual allegations, as MSC has alleged nothing with respect to the existence or terms of an agreement to form a joint venture. Furthermore, in order to be liable as a joint venture there must be an underlying tort by the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1900001 (E.D.Pa.)
**(Cite as: 2004 WL 1900001 (E.D.Pa.))**

participants in the joint venture, which MSC has failed to allege. Accordingly, count IV will be dismissed without prejudice for failure to state a claim upon which relief can be granted. MSC may again replead if it can do so consistent with Rule 11.

In count five, MSC alleges that CAC was formed as a continuation or successor to NWACC and that CAC, under an instrumentality theory, is therefore liable to MSC for the debts of NWACC and its subsidiaries.

*7 Under Pennsylvania's instrumentality doctrine, a corporation "may be held liable for the debts of another corporation where it misuses that corporation as a mere business conduit for its own purposes." *Combustion Sys. Servs., Inc. v. Schuylkill Energy Res., Inc.,* 1993 WL 514496, *4 (E.D.Pa. Dec.1, 1993).* To recover under this theory, the following three elements are required:

> (1) That one corporation controlled another corporation to such a degree that the controlled corporation is a mere instrumentality;
> (2) That the controlling corporation is perpetrating a fraud or wrong through the controlled corporation (e.g., torts, violation of a statute, or stripping a subsidiary of its assets); and
> (3) An unjust loss or injury to the claimant, such as insolvency of a controlled corporation.

*May v. Club Med Sales, Inc.,* 832 F.Supp. 937, 938-39 (E.D.Pa.1993) (citing *Stinson v. GAF Corp.,* 757 F.Supp. 644, 645 (W.D.Pa.1990)). A finding that one corporation is a mere instrumentality of another requires that "the controlling corporation wholly ignored the separate status of the controlled corporation and so dominated the affairs of the controlled corporation that its separate existence was a mere sham. *Id.* (citing *Culbreth v. Amosa, Ltd.,* 898 F.2d 13, 14 (3d Cir.1990)). Put differently, assertion of an instrumentality or alter-ego theory requires "a threshold showing that the controlled corporation acted robot-or puppet-like in mechanical response to the controller's tugs on its strings or pressure on its buttons." *Culbreth,* 898 F.2d at 15.

In count five, MSC identifies six individuals who served as officers, directors, employees, shareholders, and/or members of *both* NWACC or its subsidiaries *and* CAC. *See* Am. Countercl. ¶¶ 61-62. It also alleges that CAC currently maintains offices in Bellevue, Washington and Allentown, Pennsylvania, and that NWACC and its subsidiaries formerly maintained offices in these same two cities. *Id.* ¶¶ 63-64. Furthermore, MSC alleges that CAC now operates aircraft formerly operated by NWACC, NW

Executive, NW Leasing, and JS Aviation. *Id.* ¶¶ 65-66. And finally, MSC contends that CAC is a consolidation or continuation of the NWACC entities, that CAC was formed in order to enable NWACC to escape its debts, that CAC purchased NWACC assets for inadequate consideration, and that CAC--as a continuation of NWACC--therefore assumed its legal and financial obligations. *Id.* ¶ 67.

Because MSC has identified debt owed it by NWACC and has set forth facts that, if true, could support its theory that CAC is the mere instrumentality of NWACC, NW Executive, NW Leasing, or JS Aviation, it has stated a claim against CAC on these grounds.

MSC also brings this claim against GEC, alleging that GEC has "actual and total control over CFS," that CFS is being misused by GEC, and that GEC and is therefore also liable on an instrumentality theory. Third Party Compl. ¶¶ 25-27. Despite MSC's contention that "[f]raud or injustice has or will proximately result from the misuse of CFS by [GEC], including damages to Multi Service," MSC has failed to allege any way in which CFS is liable to it in the first place. Even if CFS is a mere instrumentality of GEC, GEC cannot be held liable on an instrumentality theory absent something to be held liable *for.* Because MSC has made out no claim against CFS, it cannot rely upon a theory of instrumentality liability to recover damages it has not alleged for a tort it has not identified. MSC's fifth claim will therefore be dismissed, again without prejudice, as to GEC.

### 5. Counts VI and VII: Unjust Enrichment

*8 In its sixth counterclaim, MSC argues that CAC has been unjustly enriched by its retention of the benefits conferred upon it by MSC, in the form of credit extended to NWACC through the Multi-Service credit card. Its seventh counterclaim asserts the same cause of action against CFS. In the sixth count of its third party complaint MSC makes similar allegations relating to GEC, claiming that GEC has been unjustly enriched by its use of the claimed once-indebted aircraft.

Under Pennsylvania law, a claim for unjust enrichment requires three elements: "benefits conferred on one party by another, appreciation of such benefits by the recipient, and acceptance and retention of these benefits under such circumstances that it would be inequitable [or unjust] for the recipient to retain the benefits without payment of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1900001 (E.D.Pa.)
(Cite as: 2004 WL 1900001 (E.D.Pa.))

Page 7

value." *Allegheny Gen. Hosp. v. Philip Morris, Inc.,* 228 F.3d 429, 427 (3d Cir.2000) (citing 16 Summary of Pa. Jur.2d *Commercial Law* § 2.2); *see also Temple Univ. Hosp. Inc. v. Healthcare Mgmt. Alternatives, Inc.,* 832 A.2d 501, 507 (Pa.Super.2003) (same).

MSC has alleged that it extended credit to NW Executive, NW Leasing, and JS Aviation--and that NWACC issued a guaranty to MSC on behalf of those companies. These companies, now insolvent, have not paid more that $247,000.00 of past due credit card debt. MSC has not alleged that this line of credit was extended to CAC, CFS, or GEC, however, and therefore has not demonstrated that this "benefit" was conferred upon these parties by MSC. [FN7] Moreover, MSC has failed to allege that anyone other than NWACC "accepted" these benefits.

> FN7. It appears that the credit card debt was accumulated mainly through the purchase of airplane fuel. Fuel burned by aircraft under the ownership or control of NWACC, however, cannot possibly be held to have enriched CAC, CFS, or GEC, which had no interest in the aircraft at the time the fuel was purchased with the Multi Service Card. Fuel consumed by another business's aircraft cannot be considered a "benefit" to the companies now in control of those same aircraft.

While MSC may be able to recover this debt through bankruptcy proceedings or other debt collection measures--or by establishing that CAC is liable under an instrumentality theory--it cannot recover against other parties based on an unjust enrichment theory for a benefit clearly conferred upon NW Executive, NW Leasing, and JS Aviation. MSC's sixth and seventh counterclaims will be dismissed with prejudice, as will the sixth claim in its third party complaint.

Conclusion

For the foregoing reasons, MSC has failed to state a claim against either CFS or GEC upon which relief can be granted. With the exception of its claim under an instrumentality theory, MSC has also failed to state a legally sufficient claim against CAC. An appropriate order follows.

ORDER

And now, this _____ th day of August, 2004, upon consideration of third-party defendant General

Electric Capital Corp.'s motion to dismiss and defendant Multi-Service Aviation Corp.'s opposition thereto, and upon consideration of plaintiff CFS Air's motion to dismiss and Multi-Service's opposition thereto, it is hereby ORDERED that:

1.) General Electric Capital Corp.'s motion to dismiss (Doc. # 27) is GRANTED and all claims against GEC are DISMISSED;
  a.) Counts I and VI of Multi-Service's Third-Party Complaint (Doc. # 22) are DISMISSED with prejudice;
  b.) Counts II, III, IV, and V of Multi-Service's Third-Party Complaint are DISMISSED without prejudice to the right of Multi-Service to file an amended Third-Party Complaint within twenty days of the date of this order;

**\*9** 2.) Plaintiff CFS Air's motion to dismiss (Doc. # 28) is GRANTED and all counterclaims against CFS Air are DISMISSED;
  a.) Counts I and VII of Multi-Service's counterclaim complaint (Doc. # 22) are DISMISSED, as to plaintiff CFS Air, with prejudice;
  b.) Counts II, III, and IV of Multi-Service's counterclaim complaint are DISMISSED without prejudice to the right of Multi-Service to file an amended Third-Party Complaint within twenty days of the date of this order.

3.) Multi-Service's counterclaims 1, 2, 3, 4, and 6 against plaintiff Corporate Aviation Concepts, Inc. are DISMISSED;
  a.) Counts I and VI of Multi-Service's counterclaim complaint are DISMISSED, as to plaintiff CAC, with prejudice.
  b.) Counts II, III, and IV of Multi-Service's counterclaim complaint are DISMISSED, as to plaintiff CAC, without prejudice to the right of Multi-Service to file an amended Third-Party Complaint within twenty days of the date of this order;

4.) A status conference will be held on September 16, 2004, at 4:00 p.m. in chambers.

2004 WL 1900001 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• _____ 2:03cv03020 _____ (Docket) (May. 08, 2003)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 15

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292
(Cite as: 2002 WL 1340316 (E.D.Pa.))

**H**

**Motions, Pleadings and Filings**

United States District Court, E.D. Pennsylvania.
DIANESE, INC., Gaetano Dianese, and Rosemarie
Dianese, Plaintiffs,
v.
COMMONWEALTH OF PENNSYLVANIA, et al.,
Defendants.
**No. CIV.A. 01-2520.**

June 19, 2002

Reed, S. J.

*MEMORANDUM*

*1 This action arises out of various contractual disputes involving a number of construction projects. Plaintiffs acting *pro se,* except for the corporate plaintiff which proceeds without representation and without *pro se* status, [FN1] have brought suit against over twenty defendants, including unnamed John Does, asserting claims under the Racketeer Influence and Corrupt Organization ("RICO") Act, 18 U.S.C. § § 1961 *et seq.,* and federal civil rights statutes, 42 U.S.C. § § 1981, 1983, 1985, and 1986. This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331. Now before the Court is the motion of Dryfoos Insurance Agency, Inc. ("Dryfoos") for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e) (Doc. No. 13), the motion of Pinnacle Roofing & Sheet Metal, Inc. ("Pinnacle") for summary judgment or in the alternative for dismissal (Doc. No. 23), and the motions for dismissal by the following defendants: Selective Insurance, Selective Way Insurance, and Selective Insurance Group (the "Selective Defendants") (Doc. Nos.14, 91); Byerly Insurance Agents and Brokers, Inc., ("Byerly") and Central Pennsylvania Indemnity ("Central") (Doc. Nos.16, 17); PNC Financial Group, Inc. ("PNC") (Doc. No. 22); First Federal Bank and Northeast PA Financial ("First Federal") (Doc. No. 24); Mid-States Surety Corp. ("Mid-States") (Doc. Nos.27, 28); the Borough of Jim Thorpe (Doc. No. 49); the Commonwealth of Pennsylvania, the Department of General Services, Michael Peapos, David McCarty, Merle H. Ryan, and Steven Busterna (Doc. Nos.50, 94); Laputka Bayless Ecker & Cohn, PC ("Laputka") (Doc. Nos.58, 73, 78); Washington

International Surety Corp. ("Washington") (Doc. No. 74); Parente Rudolph Orlando Carey & Associates ("Parente") (Doc. Nos.79, 80); the United States, the Department of the Army, the Tobyhanna Army Depot, Fred Beynon and Alice Fitzgerald (Doc. No. 98); and the responses thereto (Doc. Nos.219-235) as well as plaintiffs' request for leave to amend as incorporated in their responses. [FN2] For the reasons set forth below, the request for leave to amend the amended complaint will be denied, the motion for a more definite statement will be denied, the motions for dismissal of the defendants will be granted, and the claims against Manufacturers & Traders Trust Bank Co. ("M & T") and Dryfoos and the amended complaint will be dismissed in their entirety.

FN1. See Orders of August 16, 2001 (Doc. No. 84), and April 9, 2002 (Doc. No. 207).

FN2. All of the described motions and the plaintiffs' motion to amend are directed toward the amended complaint.

I. Background [FN3]

FN3. All facts are taken as true from the amended complaint, as required by law.

Plaintiff Dianese, Inc. is a contracting corporation that entered into several public works contracts with the Department of General Services ("DGS") of the Commonwealth of Pennsylvania (the "Commonwealth") between 1998 and 2000. Through a number of unresolved disputes that arose over the contracted projects in the Hamburg Center ("Hamburg project") and Eckley Miner's Village ("Eckley project"), plaintiffs have not yet received disputed payments for their completed work. Through alleged misrepresentations by the Commonwealth and plaintiffs' own lawyers' law firm, plaintiffs were persuaded to settle their claims pursued in the Commonwealth grievance process, but have yet to receive the promised settlement funds. Due to the resulting financial difficulties, the plaintiff corporation and its personal guarantors, plaintiffs Gaetano and Rosemarie Dianese, have encountered troubles in satisfying their loans and in paying their creditors. Plaintiffs subsequently had further problems in gaining additional financing, insurance, or performance bonds to secure their operations. In

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

addition, contract disputes similar to those encountered in the Commonwealth projects have arisen in the plaintiffs' public works contracts with defendants the Borough of Jim Thorpe and the Tobyhanna Army Depot. Plaintiffs allege that the defendants have participated in a conspiracy to bankrupt plaintiffs by withholding contractually owed funds and by creating financial difficulties to prevent plaintiffs from further pursuing the disputed funds. Plaintiffs assert claims under the RICO and federal civil rights statutes against the state and federal government, several officials therein, financial and insurance organizations, creditors, and plaintiffs' former law and accounting firms.

Plaintiffs originally filed suit in January 2001 on behalf of Dianese, Inc., its sole shareholder Gaetano Dianese, and his wife Rosemarie Dianese, asserting claims under <u>section 1983</u> against the Commonwealth and the DGS. *See Dianese, Inc. v. Commonwealth of Pennsylvania,* C.A. No. 01-488, 2001 U.S. Dist. LEXIS 11491 (E.D. Pa. April 17, 2001). On March 13, 2001, this Court dismissed the previous action based on the defendants' Eleventh Amendment immunity. *Id.*

**\*2** In June 2001, plaintiffs brought this action, adding more defendants and asserting claims under both constitutional tort law as well as the civil RICO statute. Plaintiffs filed an amended complaint on June 12, 2001. With the exception of defendant M & T who filed an answer to the amended complaint, and defendant Dryfoos who filed a motion for a more definite statement, all of the remaining named defendants filed motions for dismissal. Plaintiffs' response to these motions were considerably delayed as they consistently challenged this Court's orders directing them to retain and utilize counsel for their corporation as required under the federal rules. *See* <u>Rowland v. California Men's Colony, 506 U.S. 194, 202, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993).</u> Although counsel for plaintiffs entered an appearance in September 2001, plaintiffs continued both to dispute the legal requirement for counsel to represent Dianese, Inc. and to file papers *pro se* rather than through their counsel of record. Similarly, plaintiffs persisted in continually and impermissibly removing actions from state court to join this action despite various remand orders instructing plaintiffs as to the proper grounds for removal. Finally, on March 1, 2001, having found that the accumulated meritless *pro se* filings by plaintiffs constituted an abuse of the litigation process, the Court was forced to enjoin plaintiffs from filing any further non-responsive papers absent leave of Court. On March 26, 2002, the

Court held a hearing to consider the motion of plaintiffs' counsel to withdraw and plaintiffs' request to represent Dianese, Inc. *pro se.* On April 9, 2002, the Court granted the motion for counsel to withdraw and allowed plaintiffs Gaetano and Rosemarie Dianese to proceed *pro se,* but determined that Dianese, Inc. did not qualify for an exception to the long-standing rule requiring representation of corporations by attorneys. The Court thus ordered that if plaintiffs could not retain counsel to file responses to the pending motions on behalf of Dianese, Inc., the corporation would go unrepresented. Plaintiffs have failed to do so; consequently, the plaintiff corporation has not responded to the pending motions. The motions to dismiss the claims asserted by the plaintiff corporation thus stand unopposed. Any further reference to plaintiffs herein shall be construed as referring solely to plaintiffs Gaetano and Rosemarie Dianese.

## II. Legal Standard

**\*3** <u>Rule 12 (b) of the Federal Rules of Civil Procedure</u> provides that "the following defenses may at the option of the pleader be made by motion: ... (6) failure to state a claim upon which relief can be granted." In deciding a motion to dismiss under <u>Rule 12(b)(6),</u> a court must take all well pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *See* <u>Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969).</u> Because the Federal Rules of Civil Procedure require only notice pleading, the complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." <u>Fed.R.Civ.P. 8(a).</u> A motion to dismiss should be granted only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). In considering a motion to dismiss, the proper inquiry is not whether a plaintiff will ultimately prevail, but rather whether a plaintiff is permitted to offer evidence to support its claim. *See* <u>Children's Seashore House v. Waldman,</u> 197 F.3d 654, 658 (3d Cir.1999), cert. denied, <u>530 U.S. 1275, 120 S.Ct. 2742, 147 L.Ed.2d 1006 (2000)</u> (quoting <u>Nami v. Fauver, 82 F.3d 63, 65 (3d Cir.1996).</u> The moving party bears the burden of showing that the non-moving party has failed to state a claim for which relief can be granted. *See* <u>Gould Elec. Inc. v. United States,</u> 220 F.3d 169, 178 (3d Cir.2000). While all facts in the complaint must be accepted as true, this Court "need not accept as true

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

unsupported conclusions and unwarranted inferences." *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 184 (3d Cir.2000), cert. denied, 532 U.S. 1038, 121 S.Ct. 2000, 149 L.Ed.2d 1003 (2001) (citations omitted).

This Court is mindful of the fact that *pro se* complaints are to be construed liberally to afford litigants all reasonable latitude. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 230 L.Ed.2d 652 (1972). Nevertheless, this leniency does not excuse a *pro se* plaintiff from conforming to the rules of civil procedure or from pleading the essential elements of his claim. *See Floyd v. Brown & Williamson Tobacco Corp.*, 159 F.Supp. ed 823, 832 (E. D.Pa.2001); *Smith v. SSA*, 54 F.Supp.2d 451, 454 (E.D.Pa.1999).

III. Analysis

A. Motion for Leave to Amend

In addition to their responses and as incorporated therein, plaintiffs Gaetano and Rosemarie Dianese filed a document entitled "New Amended Complaint" (Doc. No. 236, Appendix A) ("New Am. Compl."). The Court construes the submission of the New Amended Complaint as a request for leave to file a second amended complaint. After amending a complaint once or after an answer has been filed, the plaintiff may amend only with leave of court or the written consent of the opposing party, but "leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir.1997) (citations omitted). "Futility" means that the complaint, as amended, would fail to state a claim upon which relief could be granted. *Id.* (citing *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir.1996)). In assessing "futility," the district court applies the same standard of legal sufficiency as applies under Rule 12(b)(6). *Id.*

Several defendants have argued that granting leave to file the new amended complaint would be futile as it still fails to state a claim for relief. The 116-paged proposed new amended complaint provides 404 paragraphs outlining a detailed, sometimes confusingly circuitous, description of the alleged conspiracy. The proffered new amended complaint provides greater factual specificity to support plaintiffs' claims. Nevertheless, even reading it

liberally in favor of the plaintiffs, for the reasons set forth below, I conclude that the new amended complaint would still fail to state a claim upon which relief can be granted. Because I find that further amendment of the amended complaint would be futile, the request of plaintiffs for leave to amend will be denied.

B. Motions to Dismiss

1. Jurisdiction

a. The Commonwealth Defendants

*4 Plaintiffs have brought suit against the Commonwealth and the DGS, an agency of the Commonwealth (collectively, "the Commonwealth Defendants"). Additionally, they have sued Michael Peapos, Regional Director of DGS; David McCarty, Director of the Bureau of Construction of the Commonwealth; Merle H. Ryan, Deputy Secretary for Public Works of the Commonwealth; and Steven Busterna, an attorney in the Office of the Chief Counsel for the Commonwealth (collectively, the "State Officers"). The State Officers have all been sued in their official and individual capacity.

The Commonwealth Defendants have moved for dismissal based on the Eleventh Amendment. The Eleventh Amendment bars federal courts from hearing actions by private parties against a state and its agencies. [FN4] *See Kimel v. Florida Board of Regents*, 528 U.S. 62, 120 S.Ct. 631, 643-44, 145 L.Ed.2d 522 (2000); *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252 (1996). This jurisdictional bar is both a testament to and protection of the sovereignty of each state as balanced against the power of the federal government. As part of the executive branch of the Commonwealth, the DGS is also protected by Eleventh Amendment immunity. *See* 71 Pa.C.S. § 61; *Lavia v. Pennsylvania Dep't of Corrections*, 224 F.3d 190, 195 (3d Cir.2000). Eleventh Amendment immunity is subject to two exceptions: congressional abrogation and state waiver. *See College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). Accordingly, unless the Commonwealth has consented to suit or Congress has expressly abrogated Eleventh Amendment immunity in the statutes under which plaintiffs have brought suit, this action is barred as against the Commonwealth and the DGS.

FN4. The Eleventh Amendment provides: "The Judicial power of the United States

Not Reported in F.Supp.2d                                                                 Page 4
2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292
(Cite as: 2002 WL 1340316 (E.D.Pa.))

shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Despite this wording, the Amendment has been long been held to immunize states in actions by any private citizen, including their own. See *Alden v. Maine,* 527 U.S. 706, 729, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999).

The Pennsylvania legislature has made clear its intent to retain sovereign immunity from suit. See 1 Pa. Cons.Stat. Ann. § 2310; 42 Pa. Cons.Stat. Ann. § 8521. This immunity has been waived in only a few specific exceptions, none of which apply in this instance. See 42 Pa. Cons.Stat. Ann. § 8522(b). [FN5]

> FN5. The Commonwealth has waived sovereign immunity in negligence actions involving: (1) vehicle liability; (2) medical professional liability; (3) care, custody and control of personal property; (4) Commonwealth real estate; (5) potholes and other dangerous conditions; (6) care, custody and control of animals; (7) liquor store sales; (8) National Guard activity; and (9) toxoids and vaccines. 42 Pa.C.S. § 8522(b).
> Plaintiffs argue that this action falls within the exception involving personal property in the care, custody and control of the Commonwealth. *See* 42 Pa.C.S. § 8522(b)(3). Nevertheless, for this exception to apply, the personal property must be the cause of the injury. *See Iseley v. Horn,* Civ. No. 95-5389, 1996 U.S. Dist. LEXIS 13471 (E.D.Pa. September 3, 1996)(immunity not waived when improper confiscation, not property itself, caused injury); *Sugalski v. Commonwealth,* 131 Pa. Commw. 173, 569 A.2d 1017, 1019 (1990) (immunity not waived when improper handling of property caused injury). In contrast, plaintiffs have alleged that injury was caused by the improper retention of plaintiffs' property, rather than by the property itself. Accordingly, Pennsylvania has not waived its immunity in this action.

Nor do the statutes under which plaintiffs have sued provide for suit against the Commonwealth. To abrogate the Eleventh Amendment, Congress must make its intention to do so "unmistakably clear in the language of the statute." *Kimel,* 120 S.Ct. at 640. Congress has not done so in RICO or in any of the federal civil rights statutes under which plaintiffs have brought suit. *See Will v. Michigan Dept. of State Police,* 491 U.S. 58, 66, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties."); *Boykin v. Bloomsburg Univ. of Pa.,* 893 F.Supp. 378, 394 (M.D.Pa.1995) (no abrogation of sovereign immunity intended in 42 U.S.C. § § 1981, 1983, 1985 and 1986), *aff'd,* 91 F.3d 122 (3d Cir.1996); *Bair v. Krug,* 853 F.2d 672, 674-75 (9th Cir.1988)(no abrogation of sovereign immunity intended in civil RICO statute); *Gaines v. Texas Tech University,* 965 F.Supp. 886 (N.D.Tx.1997) (citing *Bair,* 853 F.2d at 674-675); *Molina v. New York,* 956 F.Supp. 257, 260 (E.D.N.Y.1995) (dicta); *McMaster v. Minnesota,* 819 F.Supp. 1429, 1434 (D.Minn.1993), *aff'd* 30 F.3d 976 (8th Cir.1994)). [FN6] Because Pennsylvania has not waived its sovereign immunity and Congress expressed no intention of disturbing the states' sovereign immunity in enacting the RICO and federal civil rights statutes, this suit is barred by the Eleventh Amendment as against the Commonwealth and the DGS.

> FN6. Plaintiffs' reliance on *United States v. Burns,* 683 F.2d 1056 (7th Cir.1982), involving the federal prosecution of an officer of a state agency for criminal RICO violations, is misplaced. A criminal prosecution by the United States against an individual state officer does not trigger the Eleventh Amendment, which protects states from suit by private citizens.

**\*5** Plaintiffs have also brought suit against a number of state officers of the Commonwealth and the DGS in their official capacity. A suit against a state officer in his official capacity for monetary damages is the same as a suit against the state itself; thus, it too is barred by the Eleventh Amendment. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Christy v. Pennsylvania Turnpike Comm'n,* 54 F.3d 1140, 1143 n. 3 (3d Cir.1995). [FN7] Nevertheless, in their new amended complaint, plaintiffs also name the State Officers in their individual capacity. The Eleventh Amendment does not bar actions for monetary damages against state officers in their individual capacity. *See Hafer v. Melo,* 502 U.S. 21, 27-31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). Accordingly,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 5
2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292
(Cite as: 2002 WL 1340316 (E.D.Pa.))

plaintiffs' claims against the State Officers in their individual capacity are not jurisdictionally barred, but will be analyzed on their merits in the discussion below on the claims asserted.

> FN7. The Court notes that there is an exception under *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 442, 2 L.Ed. 714 (1908), that allows suit against individual state officers in their official capacity for injunctive relief. Nonetheless, because I conclude that the purported request for injunctive relief would in effect require payment of funds from the state treasury for past violations of federal law in violation of the Eleventh Amendment, *see Edelman v. Jordan,* 415 U.S. 651, 668-69, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), and because the claims asserted by plaintiffs against the State Officers are untenable on their merits as discussed below, the *Young* exception will not save plaintiffs' complaint from dismissal.

b. The Federal Defendants

*6 Plaintiffs have brought suit against the United States, the Department of the Army, and the Tobyhanna Army Depot ("Tobyhanna") (collectively, the "Federal Defendants"). Additionally, they have sued Fred Beynon, Contract Administrator for Tobyhanna, and Alice Fitzgerald, Contracting Officer for Tobyhanna (collectively, the "Federal Officers"). The Federal Officers have been sued in their official and, as named in the new amended complaint, in their individual capacity.

The Federal Defendants have moved to dismiss the claims against them for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim pursuant to Rule 12(b)(6). The United States and its agencies are shielded by sovereign immunity from suit, *see United States v. Mitchell,* 463 U.S. 206, 211, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), but the federal government has provided for a limited waiver of its immunity under certain circumstances pursuant to the Federal Tort Claims Act ("FTCA") and the Tucker Act. 28 U.S.C. § 1346.

Under the FTCA, the United States has consented to suit in federal district courts for certain torts committed by its employees. *See* 28 U.S.C. § 1346(b) [FN8]; *Fed. Deposit Ins. Corp. v. Meyer,* 510 U.S. 471, 476-77, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). The FTCA does not waive immunity for

all torts, however. To be actionable under the FTCA, the United States must be liable to the claimant, "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. 1346(b). Courts have construed the phrase "the law of the place" to refer to the law of the state; thus, for liability to arise under the FTCA, the source of substantive liability must be state and not federal law. *See Meyer,* 510 U.S. at 477-78; *Chen v. United States,* 854 F.2d 622, 626 (2d Cir.1988).

> FN8. Specifically, Section 1346(b) states, in relevant part:
> Subject to the provisions of chapter 171 of this title, the district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death cause by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

By definition, federal law, not state law, provides the source of liability for a claim alleging the deprivation of a federal constitutional right.... [The] United States simply has not rendered itself liable under § 1346(b) for constitutional tort claims. *Meyer,* 510 U.S. at 477-78. Plaintiffs' constitutional tort and civil RICO claims are based on federal law. I therefore conclude that they are not cognizable under the FTCA.

Under the Tucker Act, however, this Court has concurrent jurisdiction with the U.S. Court of Federal Claims over claims against the United States not exceeding $ 10,000, brought pursuant to the Constitution, federal statute or federal regulation. *See* 28 U.S.C. § 1346(a)(2); [FN9] *Mitchell,* 463 U.S. at 211 n. 10. Original jurisdiction over such claims seeking more than $ 10,000 vests exclusively in the U.S. Court of Federal Claims. *See Chabal v. Reagan,* 822 F.2d 349, 353-54 (3d Cir.1987); 28 U.S.C. § 1491 (the "Big Tucker Act"). [FN10] Plaintiffs seek over $ 10,000 for their claims under the RICO and federal civil rights statutes. Thus, under the Big Tucker Act, jurisdiction over plaintiffs' claims against the Federal Defendants is exclusively within the U.S. Court of Federal Claims, and is therefore outside of

Not Reported in F.Supp.2d
2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292
(Cite as: 2002 WL 1340316 (E.D.Pa.))

this Court's jurisdiction.

> FN9. Specifically, Section 1346(a)(2) states, in relevant part:
> The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:
> .... (2) Any other civil action or claim against the United States, not exceeding $ 10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort....

> FN10. The Claims Court is given "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).

I conclude that the federal government has not waived its immunity in this forum against the claims asserted by plaintiffs. I therefore conclude that plaintiffs' claims against defendants the United States, U.S. Army and Tobyhanna, must be dismissed for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

**\*7** Where suit is brought against officers in their official capacity, the real party in interest is the governmental entity; thus the immunities available to the officer are those of the governmental entity. *See Hafer v. Melo, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).* Accordingly, the immunities available to the federal government are available to the Federal Officers in their official capacity. I therefore conclude that plaintiffs' claims against Amy Fitzgerald and Fred Beynon in their official capacity must also be dismissed for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Nevertheless, as with the State Officers, plaintiffs' claims against the Federal Officers in their individual capacity are not jurisdictionally barred, and will be analyzed on their merits in the following discussion on the claims asserted.

2. Claims Asserted

a. Civil RICO

The RICO statute authorizes civil suits by "any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). Section 1962 contains four separate subsections, each of which address a different problem. *See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1411 (3d Cir.1991), cert. denied, 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991).* As explained by the Third Circuit Court of Appeals:

> Section 1962(a) prohibits "any person who has received any income derived ... from a pattern of racketeering activity" from using that money to acquire, establish or operate any enterprise that affects interstate commerce. Section 1962(b) prohibits any person from acquiring or maintaining an interest in, or controlling any such enterprise "through a pattern of racketeering activity." Section 1962(c) prohibits any person employed by or associated with an enterprise affecting interstate commerce from "conducting or participating ... in the conduct of such enterprise's affairs through a pattern of racketeering activity." Finally, section 1962(d) prohibits any person from "conspiring to violate any of the provisions of subsections (a), (b), or (c)."

*Id.* (alterations in original). In the new amended complaint, plaintiffs seek relief under each provision of section 1962; consequently, each will be considered in turn.

i. Section 1962(a)

Plaintiffs assert section 1962(a) claims against the following defendants: the State and Federal Officers; PNC; First Federal; Dryfoos; Byerly; Central; Mid-States; Washington; Parente; Laputka; Pinnacle; and M & T. (New Am. Compl. at Count XII.) Section 1962(a) provides in relevant part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise....

**\*8** 18 U.S.C. § 1962(a). Under Section 1962(a), a plaintiff must allege that he suffered an injury specifically from the use or investment of income in the named enterprise. *See id.; Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1188 (3d Cir.1993); Moore v. Reliance Standard Life Ins. Co.,* C.A. No. 98-4610, 1999 U.S. Dist. LEXIS 6699, at \*3 (E.D.Pa. May 10,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1999); *Lim v. New York Life Ins. Co.,* C.A. No. 97-1972, 1998 U.S. Dist. LEXIS 318, at *3 (E.D.Pa. Jan.13, 1998). "This provision was primarily directed at halting the investment of racketeering proceeds into legitimate business, including the practice of money laundering." *Lightning Lube,* 4 F.3d at 1188. The injury resulting from the use or investment of the racketeering income must be separate from any injury resulting from the racketeering acts themselves. *See id.* An allegation that the "use and investment of racketeering income keeps the defendant alive so that it may continue to injure plaintiff [ ] is insufficient to meet the injury requirement of section 1962(a)." *Id.*

Plaintiffs here generally allege that all the named defendants diverted the proceeds of the racketeering activity to support a "select group of persons ... in the [public works] arena while denying that support to the plaintiffs." (New Am. Compl. at Count XII.) Plaintiffs proceed to allege more specifically that the State and Federal Officers used "the public funds at their disposal to invest back in government owned properties, through government contracts which generate income for all participants ..., furthering the [enterprise's] activities, increasing their control on the market and subsequently enabling the participants to continue to invest that income for the continuation of the cycle." (*Id.*) Plaintiffs further allege that defendants PNC, First Federal, Dryfoos, Byerly, Central, Mid-States, Washington and Parente committed the section 1962(a) violation by investing their resources to maintain a monopoly over the public works arena and to further extend their control over the market. (*Id.*) Finally, plaintiffs allege that Laputka was a co-conspirator as a legal/investment advisor to the enterprise.

Plaintiffs have cited no authority and have made no logical showing that public funds available for public works projects constitute racketeering proceeds. I conclude that they are not. Additionally, the allegations reflect no investment by any of the defendants to acquire an interest in or establish or operate an enterprise, as required under section 1962(a). Finally, the alleged "unfair advantage" enjoyed by the other contractors does not establish the requisite link between any alleged use or investment and the plaintiffs' asserted injury of failing to receive the contractually owed funds or the resulting financial problems with their creditors, insurers, bonds companies and banks. Plaintiffs thus fail to allege an injury resulting from the use or investment of racketeering income as opposed to injury from the alleged racketeering acts themselves. I therefore conclude that even a liberal reading of the

allegations set forth in either the amended or new amended complaint fails to show that plaintiffs have stated a claim for relief under section 1962(a).

ii. Section 1962(b)

*9 Plaintiffs assert section 1962(b) violations by all of the defendants. Section 1962(b) provides, in relevant part, "It shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise.... " 18 U.S.C. § 1962(b). Thus, section 1962(b) requires a plaintiff to allege that he suffered an injury from the defendant's acquisition or control of an interest in a RICO enterprise. *See Lightning Lube,* 4 F.3d at 1190; *Moore,* 1999 U.S. Dist. LEXIS 6699, at *3. For example, such an injury occurs when "the owner of an enterprise infiltrated by the defendant as a result of racketeering activities is injured by the defendant's acquisition or control of his enterprise." *Lightning Lube,* 4 F.3d at 1190 (citation omitted). The injury must be incurred from the acquisition or control of an interest in the RICO enterprise rather than from the pattern of racketeering. *Id.* at 1191. The plaintiff must also show that the interest or control of the RICO enterprise by the person resulted from the racketeering. *See id.* at 1190. It is insufficient to merely demonstrate that a person engaged in racketeering has an otherwise legitimate interest in an enterprise. *See id.* Rather, the plaintiff must firmly show a "nexus between the interest and the alleged racketeering activities." *Id.*

The amended and new amended complaints herein fail to make such allegations. In support of their assertion of a violation of section 1962(b), plaintiffs make the following allegations: (1) the State Officers, Federal Officers and the Borough of Jim Thorpe "used their official positions to contrive 'contract disputes,' abuse the contract and grievance procedures, harass the plaintiffs and otherwise assure that the plaintiffs suffered grave financial difficulties;" (2) PNC, First Federal and M & T manipulated the financing of public works projects and structured loans to plaintiffs in a way that would enable the RICO enterprise to eliminate them; (3) Parente manipulated the financial statements of plaintiffs to compel them to seek additional financing and thereby "leave them vulnerable" to the RICO enterprise; (4) Pinnacle maintained an interest in the enterprise by benefitting from the monopoly that the enterprise created; (5) Laputka used its position as legal counsel to plaintiffs in the grievance process to assist the abuse of the system by the Commonwealth

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                         Page 8
2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292
**(Cite as: 2002 WL 1340316 (E.D.Pa.))**

Defendants; and (6) Dryfoos, Byerly, Central, the Selective Defendants, Mid-States and Washington used their positions as the insurance and bonding agents to plaintiffs "to either grant or deny bonding lines, bond claim coverage and insurance and insurance claim coverage as well as manipulated [sic] premiums" to leave plaintiffs vulnerable to the RICO enterprise. (New Am. Compl. at Count XIII.)

The allegations simply fail to allege the acquisition or control by any of the defendants of an interest in a RICO enterprise. Nor have plaintiffs pleaded facts from which the Court can reasonably infer such allegation. Moreover, any injury incurred would have resulted from the alleged acts of racketeering, and not from the acquisition or control of an interest in a RICO enterprise. Accordingly, plaintiffs fail to state a claim under section 1962(b) against the defendants.

### iii. Section 1962(c)

*10 Plaintiffs assert claims under section 1962(c) against the State and Federal Officers, M & T, PNC, First Federal, Parente, Laputka, Dryfoos, Byerly, Central, the Selective Defendants, and Mid-States. Section 1962(c) prohibits persons who are employed by or associated with an enterprise from conducting the enterprise's affairs through a pattern of racketeering. Plaintiffs allege that the named defendants conducted the enterprise's affairs through a pattern of racketeering as follows: (1) Michael Peapos committed at least two predicate acts of extortion and fraud in connection with the Hamburg and Eckley projects; (2) David McMarty committed at least two predicate acts of extortion and mail fraud in connection with the abuse of contract procedures in the Hamburg and Eckley projects; (3) Merle Ryan committed at least two predicate acts of extortion and fraud in connection with the withholding of liquidated damages on the Eckley project and of the settlement funds for the Hamburg project dispute; (4) Stephen Busterna committed at least two predicate acts of extortion and fraud in connection with the settlement agreement for the Hamburg project dispute; (5) M & T, PNC and First Federal each committed at least two predicate acts of extortion and fraud in connection with the preparation, execution, handling and collection process for plaintiff's loans; (6) Parente committed at least two predicate acts of extortion and fraud in connection with preparation, presentation and mailing of fraudulent financial statements and tax returns in connection with the loans from M & T; (7) Laputka committed at least two predicate acts of extortion and fraud in connection with its representation of plaintiffs in the

Commonwealth grievance process and in the presentation of the fraudulent loan documents by M & T and First Federal; (8) Dryfoos committed at least two predicate acts of fraud in connection with the mishandling of insurance claims, over-billing and fraudulent insurance audits; (9) Byerly and Central committed at least two predicate acts of fraud in connection with the bonding line of plaintiffs for the Hamburg project and two other public works projects that were approved and then withdrawn; (10) the Selective Defendants committed at least two predicate acts of fraud in connection with over-billing and fraudulent insurance audits; (11) Mid-States committed at least two predicate acts of extortion and fraud in connection with invalid bond claims from the Eckley project and the project for the Borough of Jim Thorpe; (12) Fred Beynon and Alice Fitzgerald committed at least two predicate acts of extortion and fraud in connection with the project at Tobyhanna by withholding funds due and contriving contract disputes by change orders and delays. (New Am. Compl. at Count XI.)

A RICO enterprise is an entity made up of a group of persons associated together for the common purpose of engaging in a course of conduct. *See United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).* To establish the existence of an enterprise, the plaintiffs must demonstrate: (1) that the enterprise is an ongoing organization with some sort of framework or superstructure for making or carrying out decisions; (2) that the members of the enterprise function as a continuing unit with established duties; and (3) that the enterprise must be separate and apart from the pattern of activity in which it engages. *See Seville Indus., 742 F.2d at 789-90.* Normally, such factors are to be proven at trial, and a bare allegation that the defendants constituted an enterprise is sufficient for the claim to survive a motion to dismiss. *Id.* at 790. Plaintiffs here allege that defendants are members of an enterprise that maintains "a monopoly of the area through a closed system of financing, and control of industry, public office and even the legal system, which is used to thwart any development that would not benefit it." (New Am. Compl. at ¶ ¶ 1, 3.) Normally, this bare allegation should suffice for the claim to survive a motion to dismiss, no matter how seemingly implausible.

*11 Nevertheless, it is well settled in RICO law that the alleged racketeering activity complained of by a plaintiff must be separate and distinct from the enterprise itself. *See Turkette, 452 U.S. at 583.* "[A] conspiracy to perform the underlying criminal

Not Reported in F.Supp.2d                                                                     Page 9
2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292
(Cite as: 2002 WL 1340316 (E.D.Pa.))

offense, standing alone, is not sufficient to allege the existence of an enterprise." *Seville,* 742 F.2d at 790 n. 5. "It is an essential element of the RICO cause of action that the 'enterprise' be apart from the underlying pattern of racketeering activity." *Id.* "An enterprise is not merely a conspiracy and it should not be confused with an agreement to commit the alleged racketeering activity." *Gates v. Ernst & Young,* C.A. No. 93-2332, 1994 U.S. Dist. LEXIS 11456, at *4 (E.D.Pa. August 15, 1994) (quoting *Hartz v. Friedman,* 919 F.2d 469, 471 (7th Cir.1990)). Within the new amended complaint, plaintiffs proceed to identify the enterprise as "made up of a group of individuals, associated in fact and not a legal entity, which controls various legal entities *for the purpose of carrying out the predicate acts.*" (New Am. Compl. at ¶ 387.) (emphasis added). The alleged racketeering activities involved the following: withholding fraudulently disputed payments from plaintiffs for public works contracts; forcing plaintiffs to obtain financing to complete the projects; fraudulently delaying resolution of the grievance process; and forcing plaintiffs into bankruptcy by demanding payments for the loans. (*Id.* at ¶ ¶ 329--338.) By their own allegations, plaintiffs have pleaded that the named enterprise is indistinguishable from the alleged conspiracy between the defendants. Accordingly, plaintiffs have failed to allege an enterprise separate from the alleged underlying pattern of racketeering activity. I therefore conclude that plaintiffs fail to state a claim under section 1962(c).

iv. Section 1962(d)

*12 Plaintiffs assert section 1962(d) claims against the Borough of Jim Thorpe, Pinnacle, the Federal Officers, Byerly, Central, the Selective Defendants, Mid-States, PNC, M & T, First Federal, Parent, Laputka, and Dryfoos. To state a claim under section 1962(d), plaintiffs must plead that the defendant: (1) knew of the RICO violations of the enterprise, and (2) agreed to facilitate those activities. *See Smith v. Berg,* 247 F.3d 531, 538 (3d Cir.2001). The injury must have been caused by the RICO violation, rather than by any act in furtherance of the conspiracy. *See Beck v. Prupis,* 529 U.S. 494, 505-507, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000). "Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient." *Lightning Lube,* 4 F.3d at 1191. I therefore conclude that because plaintiffs have failed in both the amended and new amended complaint to state a claim under any of the other subsections of section

1962, plaintiffs cannot pursue a claim under Section 1962(d).

b. Federal Civil Rights Statutes

i. Section 1981

Section 1981 of the federal civil rights provisions prohibits racial discrimination in the making and enforcement of contracts and property transactions. [FN11] *See Brown v. Philip Morris, Inc.,* 250 F.3d 789, 796 (3d Cir.2001). To state a claim under section 1981, plaintiffs must allege facts to support the following elements: "(1) [that plaintiff] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; (3) discrimination concerning one or more of the activities enumerated in the statute[,] which includes the right to make and enforce contracts." *Brown,* 250 F.3d at 797 (alternations in original) (citation omitted). Accepting as true the facts alleged in the amended and new amended complaints, plaintiffs have failed to state a cause of action pursuant to section 1981. Plaintiffs do not allege to belong to a racial minority. Although plaintiffs creatively claim to "belong to the 'race' of individuals who are either unwilling or unwelcome to participate" in the alleged RICO enterprise, (New Am.Compl. at ¶ 366), this attempt to qualify for protection under the statute clearly fails. Consequently, I conclude that plaintiffs' section 1981 claim will be dismissed.

> FN11. Section 1981(a) provides:
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other. 42 U.S.C. § 1981(a)

ii. Section 1983

Section 1983 provides a remedy for the violation of a federal constitutional or statutory right by a person "acting under color of state law." 42 U.S.C. § 1983. [FN12] To state a claim under section 1983, plaintiffs must plead that the allegedly unlawful conduct: (1) was committed by someone acting under color of state law, and (2) deprived plaintiffs of rights, privileges or immunities protected by the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 10
2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292
**(Cite as: 2002 WL 1340316 (E.D.Pa.))**

Constitution or federal law. *See Cohen v. City of Philadelphia,* 736 F.2d 81, 83 (3d Cir.1984), *cert. denied,* 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984). Nevertheless, "government officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Where the defendant in a section 1983 action claims qualified immunity, the court must first determine whether the allegations are sufficient to establish the violation of a federal constitutional right, and if so, whether that right was clearly established at the time of the alleged violation. *See id.* If the plaintiffs' allegations cannot meet this two-fold threshold inquiry, defendants are entitled to qualified immunity and dismissal of the case. *See Doe v. Delie,* 257 F.3d 309, 314-15 (3d Cir.2001).

> FN12. Section 1983 provides, in relevant part:
> Every person, who under color of any statute, ordinance, regulation, custom or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. 42 U.S.C. § 1983.

Plaintiffs claim that the State Officers denied them both procedural and substantive due process in violation of the Fourteenth Amendment by withholding the contractual funds due to plaintiffs and wreaking financial devastation to prevent plaintiffs from pursuing the disputed balance. (New Am.Compl. at ¶ ¶ 367-69.) Because the State Officers assert a qualified immunity defense, the Court must first determine whether plaintiffs have alleged the violation of a federal constitutional right.

**\*13** "Procedural" due process defends against arbitrary government action by ensuring that adequate procedures are used when a state action impacts a person's "life, liberty or property" as protected under the 14th Amendment. [FN13] The Third Circuit Court of Appeals has ruled that there is

adequate procedural due process when the state provides "reasonable remedies to rectify a legal error by a local administrative body." *Bello v. Walker,* 840 F.2d 1124, 1128 (3d Cir.1988). The Pennsylvania Board of Claims has exclusive jurisdiction over contract disputes between Commonwealth agencies and a contractor. *See* 62 Pa.C.S. § 1701, *et seq.* Appeals from decisions by the Board of Claims may be made to the Pennsylvania Commonwealth Court. *See* 62 Pa.C.S. § 1726; 42 Pa.C.S. § 763(a)(1). The availability of a "full judicial mechanism with which to challenge the administrative decision in question" provides adequate due process, regardless of whether the plaintiff utilized the appellate procedure. *DeBlasio v. Zoning Bd. of Adjustment,* 53 F.3d 592, 597 (3d Cir.), *cert. denied,* 516 U.S. 937, 116 S.Ct. 352, 133 L.Ed.2d 247 (1995) (internal citation omitted). Thus, although plaintiffs may not have taken advantage of these measures, [FN14] because Pennsylvania provides a reasonable procedural method to correct any errors by the DGS grievance procedure, I conclude that there was sufficient procedural due process and plaintiffs cannot state a claim for the violation of their procedural due process rights.

> FN13. Although it is unclear whether the property interest arising from plaintiffs' state contracts is protectible under procedural due process, *see Reich v. Beharry,* 883 F.2d 239, 242-43 (3d Cir.1989) ( "wholesale federalization of state public contract law" was not purpose of due process clause), the Court need not reach this issue because constitutionally adequate procedures were available. *See DeBlasio,* 53 F.3d at 597 n. 4 (courts may proceed directly to evaluation of process).

> FN14. Plaintiffs allege that they commenced procedures under the Commonwealth's grievance process, but that the State Officers fraudulently persuaded plaintiffs to settle and then failed to pay the settlement offer as promised. (New Am.Compl. at ¶ ¶ 86-- 101.) They appear to have sought no recourse with the Board of Claims.

"Substantive" due process "limits what government may do regardless of the fairness of procedures that it employs, and covers government conduct in both legislative and executive capacities." *Boyanowski v. Capital Area Intermediate Unit,* 215 F.3d 396, 399 (3d Cir.), *cert. denied,* 531 U.S. 1011, 121 S.Ct. 566, 148 L.Ed.2d 485 (2000) (citing *Count of Sacramento*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 11
2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292
(Cite as: 2002 WL 1340316 (E.D.Pa.))

*v. Lewis,* 523 U.S. 833, 845-46, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). Under certain circumstances, substantive due process claims may be brought when procedural fairness is not an issue. *Id.* at 402. Nevertheless, "a substantive due process claim grounded in an arbitrary exercise of governmental authority may be maintained only where the plaintiff has been deprived of a 'particular quality of property interest.' " *Id.* at 402-03 (quoting *Indep. Enters., Inc. v. Pittsburgh Water & Sewer Auth.,* 103 F.3d 1165, 1179 (3d Cir.1997)). Although the "precise contours of the 'particular quality of interest' " have not been clearly defined, *id.* (quoting *Indep. Enters.,* 103 F.3d at 1180), courts look to see whether the property interest rises to the level of " 'the fundamental interests that previously have been viewed as implicitly protected by the Constitution.' " *Id.* (quoting *Mauriello v. Univ. of Med. & Dentistry of N.J.,* 781 F.2d 46 50 (3d Cir.1986) (quoting *Regents of Univ. of Michigan v. Ewing,* 474 U.S. 214, 229-30, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (Powell, J. concurring))). The Third Circuit Court of Appeals has determined that not all property interests created by state contracts invoke substantive due process concerns. *See Reich,* 883 F.2d at 243-45 (citing cases).

With regard to the property interests asserted here, this Court finds persuasive the decision in *Vartan v. Nix,* 980 F.Supp. 138, 142-43 (E.D.Pa.1997) (Bartle, J.). *Vartan* involved a terminated contract for the construction and lease to the Commonwealth of a new state courthouse in Harrisburg. The plaintiff sued the former Chief Justice of the Supreme Court of Pennsylvania for due process violations under section 1983, alleging that the former Chief Justice had intervened to cause the termination of the state contract. Judge Bartle compared the cases wherein the Third Circuit Court of Appeals had determined that substantive due process did not protect the state-created interest at issue, *see Ransom v. Marrazzo,* 848 F.2d 398, 411-12 (3d Cir.1988) (right under state law to water and sewer services); *Reich,* 883 F.2d at 239-40 (right to payment for legal services rendered to state), with the cases wherein the state-created interests were deemed protected, *see DeBlasio,* 53 F.3d at 594-95 (right to seek variance for land use from local zoning law); *Neiderhiser v. Borough of Berwick,* 840 F.2d 213 (3d Cir.), *cert. denied,* 488 U.S. 822, 109 S.Ct. 67, 102 L.Ed.2d 44 (1988) (right to seek exemption for land use from local zoning law). Finding that the property rights asserted by the plaintiff did not involve land use as those asserted in *DeBlasio* and *Neiderhiser,* and were not worthier than the rights asserted in *Ransom* and *Reich,* the

Court concluded that the property rights arising under a commercial construction contract with the state did not trigger substantive due process protection. I approve and adopt the reasoning of *Vartan,* and similarly conclude that the alleged failure of the State Officers to pay plaintiffs disputed funds pursuant to public works contracts does not rise to level of a substantive due process violation.

*14 Because plaintiffs cannot state a claim for due process violation under section 1983, and because they have not otherwise alleged the violation of a federal constitutional right, the State Officers are entitled to qualified immunity. Accordingly, their motion to dismiss the section 1983 claim will be granted.

Plaintiffs also assert section 1983 claims against the remaining defendants, alleging that they took joint action with the State Officers with a shared conspiratorial objective. (New Am. Compl. at ¶ 371.) Private parties who willfully participate in a conspiracy with state officials to deprive a person of a constitutional right, act "under color of state law" for purposes of section 1983. *See Dennis v. Sparks,* 449 U.S. 24, 27-28, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980). Nevertheless, because plaintiffs have failed to allege the deprivation of a constitutional right for the reasons I have set forth above, I conclude that they have not stated a section 1983 claim against any of the remaining defendants on the asserted conspiracy theory.

iii. Section 1985

*15 Plaintiffs assert section 1985 claims against all of the defendants. Section 1985 of the federal civil rights provisions prohibits conspiracies to deprive a U.S. citizen of his constitutional rights based on invidious class-based discrimination. *See* 42 U.S.C. § 1985. [FN15]

> FN15. Section 1985(3) provides, in relevant part:
> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; ... [and] in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292
(Cite as: 2002 WL 1340316 (E.D.Pa.))

property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for recovery of the damages, occasioned by such injury or deprivation against any one or more of the conspirators. 42 U.S.C. § 1985(3).

To state a claim under Section 1985 for private conspiracy, a plaintiff must allege: (a) that a racial or other class-based invidious discriminatory animus lay behind the coconspirators' actions, (b) that the coconspirators intended to deprive the victim of a right guaranteed by the Constitution against private impairment, and (c) that that right was consciously targeted and not just incidentally affected.
Brown, 250 F.3d at 804. Section 1985(3) is invoked to remedy discrimination based upon the plaintiff's "immutable characteristics, such as race or gender." Rourke v. United States, 744 F.Supp. 100, 104-05 (E.D.Pa.1988). As in their section 1981 claim, plaintiffs do not allege to be members of a racial minority or any other class based upon their immutable characteristics. I therefore conclude that plaintiffs have failed to state a claim under section 1985.

iv. Section 1986

Plaintiffs assert section 1986 claims against all of the defendants. Section 1986 constitutes an additional safeguard against the wrongs prohibited by section 1985. [FN16] Clark v. Clabaugh, 20 F.3d 1290, 1295 (3d Cir.1994). It provides a cause of action for recovery against anyone who with knowledge of a section 1985 conspiracy and the power to prevent its violation, neglects or refuses to do so. To state a claim under section 1986, plaintiffs must show the existence of a section 1985 conspiracy. Id. As discussed above, plaintiffs have failed to state a cause of action under section 1985; consequently, their section 1986 claim is untenable. I conclude that plaintiffs' claim under section 1986 will therefore be dismissed.

FN16. Section 1986 provides, in relevant part:
Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so, if such wrongful act be committed, shall be

liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented.... 42 U.S.C. § 1986.

c. State Law Claims

Although not expressly pleaded, in Counts II, III, IX and X of the new amended complaint, plaintiffs request relief in the form of quantum meruit and expectation damages as against the Commonwealth Defendants and the Federal Defendants for breaches of contract in the public works projects. For the reasons I have explained above regarding the issues of sovereign immunity and Eleventh Amendment immunity, the Court lacks jurisdiction to entertain claims for breach of contract against the Commonwealth and the federal government. Accordingly, any implied assertions of claims for breach of contract will be dismissed for lack of jurisdiction.

Although plaintiffs do not assert state law claims against any of the other defendants, to the extent any may be implied, the Court exercises its discretion to decline supplemental jurisdiction over them under 28 U.S.C. § 1367(c)(3).

C. Remaining Defendants and the Motion for a More Definite Statement

Neither Manufacturers & Traders Trust Co. d/b/a M & T Bank ("M & T") nor Dryfoos have joined the other defendants in moving for dismissal. Dryfoos, though, has implicitly sought dismissal in the alternative by expressing its dissatisfaction with the amended complaint by filing a motion for a more definite statement. While neither vague nor ambiguous, see Fed.R.Civ.P. 12(e), because the amended complaint will be dismissed as to Dryfoos for failure to state a claim, the motion of Dryfoos for a more definite statement will be denied as moot. The Third Circuit Court of Appeals has held that the "district court may on its own initiative enter an order dismissing the action provided that the complaint affords a sufficient basis for the court's action." Bryson v. Brand Insulations, Inc., 621 F.2d 556, 559 (3d Cir.1980) (court may sua sponte dismiss complaint on the pleadings if no set of facts can be adduced to support claim for relief, all allegations are taken as true, and all inferences are drawn in favor of plaintiff); see also McKnight v. School Dist., C.A. No. 00-573, 2000 U.S. Dist. LEXIS 13864 at ----3-4 (E.D.Pa. Sept. 25, 2000); Locke v. Medlab/General

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292
(Cite as: 2002 WL 1340316 (E.D.Pa.))

*Chem.,* C.A. No. 99-2137, 2000 U.S. Dist. LEXIS 982 at *5 (E.D.Pa. Feb.3, 2000); *Byrd v. Parris,* C.A. No. 99-769, 1999 U.S. Dist. LEXIS 15957 at ----14-15 (E.D.Pa. Oct.15, 1999). The above analysis of the insufficiency of the legal claims asserted against the moving defendants applies with equal force to the civil RICO and federal civil rights claims asserted against M & T and Dryfoos. Although the amended complaint is adequate for this Court to analyze, I conclude that plaintiffs have failed to state a claim for relief under the civil RICO and federal civil rights statutes against defendants Dryfoos and M & T; thus the complaint will be dismissed in its entirety. The failure of this Court to take this unilateral action would only prolong reaching the inevitable result reached here today and would add expense and energy-draining efforts to the lives of plaintiffs and these two defendants. Federal Rule of Civil Procedure 1 provides that the rules " ... shall be administered to secure the just, speedy, and inexpensive determination of every action."

IV. Conclusion

**\*16** The Court is sympathetic to plaintiffs' complaints of unfair treatment by the state public works department, their frustrations over their inability to secure a lawyer, and their valiant attempts to further what they believe are righteous and legally supportable claims. Nonetheless, the law requires this Court to conclude that it is barred by the Eleventh Amendment from entertaining jurisdiction over the state entities, that it lacks jurisdiction over the claims asserted against the federal government, and that plaintiffs have not stated claims for relief under the RICO and federal civil rights statutes against any of the remaining defendants.

For the reasons set forth above, all claims here asserted against the Commonwealth, the DGS, the State Officers, the Federal Defendants, the Federal Officers, Pinnacle, the Selective Defendants, Byerly, Central, PNC, First Federal, Mid-States, the Borough of Jim Thorpe, Laputka, Washington and Parente, as well as against Dryfoos and M & T, will be dismissed.

**\*17** An appropriate Order follows.

### ORDER

AND NOW, this 19th day of June, 2002, upon consideration of the motion of Dryfoos Insurance Agency, Inc. ("Dryfoos") for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e) (Doc. No. 13), the motion of Pinnacle Roofing

& Sheet Metal, Inc. for summary judgment or in the alternative for dismissal (Doc. No. 23), and the motions for dismissal by the following defendants: Selective Insurance, Selective Way Insurance, and Selective Insurance Group (Doc. Nos.14, 91); Byerly Insurance Agents and Brokers, Inc., and Central Pennsylvania Indemnity (Doc. Nos.16, 17); PNC Financial Group, Inc. (Doc. No. 22); First Federal Bank and Northeast PA Financial (Doc. No. 24); Mid-States Surety Corp. (Doc. Nos.27, 28); the Borough of Jim Thorpe (Doc. No. 49); the Commonwealth of Pennsylvania, the Department of General Services, Michael Peapos, David McCarty, Merle H. Ryan, and Steven Busterna (Doc. Nos.50, 94); Laputka Bayless Ecker & Cohn, PC (Doc. Nos.58, 73, 78); Washington International Surety Corp. (Doc. No. 74); Parente Rudolph Orlando Carey & Associates (Doc. Nos.79, 80); the United States, the Department of the Army, the Tobyhanna Army Depot, Fred Beynon and Alice Fitzgerald (Doc. No. 98); and the responses thereto (Doc. Nos.219-235) as well as plaintiffs' request for leave to amend as incorporated therein (Doc. No. 236, Appendix A), and for the reasons set forth in the foregoing memorandum, IT IS HEREBY ORDERED that (1) the request of plaintiffs to file their new amended complaint is DENIED, (2) the motion of Dryfoos for a more definite statement is DENIED, (3) all of the motions to dismiss are GRANTED, and (4) the Court *sua sponte* determines that the claims against Dryfoos and Manufacturers & Traders Trust Bank Co. and the amended complaint are DISMISSED in their entirety.

JUDGMENT is hereby ENTERED against plaintiffs Dianese, Inc., Gaetano Dianese and Rosemarie Dianese, and in favor of defendants Pinnacle Roofing & Sheet Metal, Inc., Selective Insurance, Selective Way Insurance, and Selective Insurance Group, Byerly Insurance Agents and Brokers, Inc., Central Pennsylvania Indemnity, PNC Financial Group, Inc., First Federal Bank, Northeast PA Financial, Mid-States Surety Corp., the Borough of Jim Thorpe, the Commonwealth of Pennsylvania, the Department of General Services, Michael Peapos, David McCarty, Merle H. Ryan, Steven Busterna, Laputka Bayless Ecker & Cohn, PC, Washington International Surety Corp., Parente Rudolph Orlando Carey & Associates, the United States, the Department of the Army, the Tobyhanna Army Depot, Fred Beynon, Dryfoos Insurance Agency, Inc., and Manufacturers & Traders Trust Bank Co. for failure to state a claim and for want of jurisdiction.

This is a final Order.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 14
2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292
**(Cite as: 2002 WL 1340316 (E.D.Pa.))**

 2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide
10,292

   **Motions, Pleadings and Filings (Back to top)**

•          2:01CV02520              (Docket)
(May. 22, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.