# EXHIBIT 19

Westlaw.

Not Reported in F.Supp.  
1994 WL 444709 (E.D.Pa.), RICO Bus.Disp.Guide 8625  
(Cite as: 1994 WL 444709 (E.D.Pa.))

Page 1

**H**

**Motions, Pleadings and Filings**

United States District Court,  
E.D. Pennsylvania.  
Elmer D. GATES, Plaintiff,  
v.  
ERNST & YOUNG and Keith Ordemann,  
Defendants.  
No. CIV. A. 93-CV-2332.

Aug. 15, 1994.

MEMORANDUM

BUCKWALTER.

INTRODUCTION

*1 Plaintiff brought this action against Ernst and Young and Keith Ordemann alleging Breach of Contract (Count I), Negligence (Count II), Breach of Fiduciary Duty (Count III), Violation of Federal Securities laws (Count IV) and Violations of RICO (Count V). Currently before this Court is defendants' motions for summary judgment. For the following reasons, defendants' motion for summary judgment is granted in part and denied in part.

STATEMENT OF FACTS

This action arises from plaintiff's failed investment in Birdsboro Ferrocast Inc. (BFI). In or around August or September of 1990, Keith Ordemann became aware that BFI was seeking investors to help finance the acquisition of a foundry in Bethlehem, Pennsylvania. *See*, Defendants' Exh 14, Ordemann Dep. at 57-59. In September of 1990 Ordemann passed on this information to the plaintiff who was one of his clients. *Id* at 58. Ordemann prepared financial information on the potential investment for Meridian Bank and this information was forwarded to Mr. Gates. *See*, Defendants' Exh. 11, Gates Dep. at 101-103. Plaintiff alleges that he relied on the financial information and advice supplied by Ordemann in deciding to invest in this project. Complaint ¶ 11-31.

On March 21, 1991, the purchase of BFI was completed with an investment by Mr. Gates of $300,000 and a personal guarantee of $1,000,000. Soon after the Birdsboro foundry began operation it experienced a multitude of difficulties and it ultimately filed for bankruptcy in April of 1992. Plaintiff alleges that he suffered damages in excess of $1,410,000. Complaint ¶ 30.

Plaintiff argues that the defendants failed to use due diligence in investigating the risks of the investment, failed to disclose any potential conflicts of interest and otherwise that defendants fraudulently misrepresented the facts to Mr. Gates which caused him to invest project. He brings claims for Breach of Contract (Count I), Negligence (Count II), Breach of Fiduciary Duty (Count III), Violation of Federal Securities laws (Count IV) and Violations of RICO (Count V). Defendants filed a motion for summary judgment on all claims.

DISCUSSION  
I. *RICO Claim*

A. Enterprise requirement

In Count V of plaintiff's complaint he alleges that defendants violated the Racketeer Influenced Corrupt Organization Act, 18 U.S.C. §§ 1961-1968. Section 1964 grants any person injured in his business or property by a violation of section 1962 the right to sue in federal court for damages. 18 U.S.C. § 1964. [FN1] In order to maintain a claim under RICO, a plaintiff must prove the existence of a RICO enterprise and that the defendants engaged in a pattern of racketeering activity. Gates has failed to properly allege the existence of an enterprise in his complaint and he has failed to put forth any evidence to show that such an enterprise exists in this case.

It is well settled in RICO law that the alleged racketeering activity complained of by a plaintiff must be separate and distinct from the enterprise itself. *See*, *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). An enterprise is an entity made up of a group of persons associated together for the common purpose of engaging in a course of conduct. *Id.* The enterprise is separate and distinct from the pattern of racketeering. *Id.* An enterprise is not merely a conspiracy and it should not be confused with an agreement to commit the alleged racketeering activity. *Hartz v. Friedman*, 919 F.2d 469, 471 (7th Cir.1990).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1994 WL 444709 (E.D.Pa.), RICO Bus.Disp.Guide 8625
(Cite as: 1994 WL 444709 (E.D.Pa.))

Page 2

*2 An enterprise is proved by evidence of an ongoing organization, formal or informal and that the participants function as a continuing unit. _Turkette, 452 U.S. at 583, 101 S.Ct at 2528_. Although proof of an enterprise and racketeering activity may overlap, proof of one does not prove the other. They are separate elements of a RICO violation.

Plaintiff's alleges that the defendants' agreement to commit racketeering acts constitutes the enterprise. Complaint ¶ 50. An enterprise is not simply an agreement to commit racketeering acts and therefore, the plaintiff's allegation is insufficient to establish a RICO violation. See, _Hartz_, 919 F.2d at 471. Plaintiff has supplied the court with no evidence of an organization that functions as a continuing unit through which racketeering activity is carried out. This Court finds no evidence to support the existence of an enterprise separate and distinct from the pattern of racketeering and thus, plaintiff cannot proceed with its RICO claim.

B. Pattern of Racketeering

Plaintiff's proof establishing a pattern of racketeering is also very tenuous. The statute does not explicitly define a "pattern of racketeering", however, courts have established certain standards to follow in deciding whether a "pattern" exists. See, _Hughes v. Consol-Pennsylvania Coal Co._, 945 F.2d 594, 609 (3d Cir.1991). A pattern requires the commission of at least two predicate acts of racketeering activity. 945 F.2d at 609. The plaintiff must then demonstrate that these acts are related and that there is continuity. _H.J. Inc. v. Northwestern Tel. Bell Co._, 492 U.S. 229, 239, 109 S.Ct 2893, 2899, 106 L.Ed.2d 195 (1989).

Continuity is a temporal concept. It is both a closed and open ended concept, referring either to a closed period of time with repeated conduct or to past conduct that by its nature projects into the future with a threat of repetition. _Hughes_, 945 F.2d at 609. This case does not involve an open ended scheme. [FN2] With a closed period a plaintiff must show a series of related predicates lasting a *substantial* period of time. _Id._ (emphasis added). There is no bright line rule for what constitutes a substantial period of time. Instead, each case is evaluated on its own facts on a case by case basis.

"Where there is no threat of continuing criminal activity, duration is the sina qua non of continuity in a closed-ended scheme." _United States v. Pelullo_, 964 F.2d 193, 208 (3d Cir.1992). Thus, the question faced by this Court is whether a scheme allegedly lasting approximately 18 months is a substantial period of time. In _Hughes_, the court found that a scheme lasting one year was not a substantial period of time. Cases finding a substantial period of time dealt with schemes that lasted for a number of years. _H.J. Inc._, 492 U.S. at 250, 109 S.Ct at 2906 (scheme lasting six years); _Fleet Credit Corp. v. Sion_, 893 F.2d 441, 447 (1st Cir.1990) (scheme lasting over four years); _Walk v. Baltimore & Ohio R.R._, 890 F.2d 688, 690 (4th Cir.1989) (ten years); _Jacobson v. Cooper_, 882 F.2d 717, 720 (2d Cir.1989) (several years); _Dana Corp. v. Blue Cross & Blue Shield Mut._, 900 F.2d 882, 887 (6th Cir.1990) (Seventeen years).

*3 In contrast, where the fraudulent scheme does not span years, courts have not found continuity. _Marshall-Silver Construction Co. v. Mendel_, 894 F.2d 593, 598 (3d Cir.1990) (seven months showed neither long-term criminal conduct nor the threat thereof); _Kehr Packages, Inc. v. Fidelcor, Inc._, 926 F.2d 1406, 1418 (3d Cir.1991) (eight month period insufficient); _Hindes v. Castle_, 937 F.2d 868, 875 (3d Cir.1991) (same). The court in _Hughes_ decided that a scheme lasting twelve months was not a "substantial period of time" and therefore, there was no continuity. 945 F.2d at 611.

Although each case is decided on its own specific facts, it is important to recognize that the cases where continuity was found involved schemes lasting several years. However, recently the Third Circuit has found that 19 months of racketeering activity is sufficient in a closed ended scheme. _Pelullo_, 964 F.2d at 210.

Plaintiff argues that the alleged scheme lasted from approximately March 1990 to September 1991. See, Plaintiff's Opposition to Defendants' Motion for Summary Judgment p. 48. However, he cites no evidence to support this claim. Defendant Ordemann testified that he first contacted Gates about the possible investment in September of 1990. Moreover, the deal was consummated in late March of 1991. Thus, the alleged fraudulent misrepresentations that led plaintiff to invest in BFI only lasted for eight months. Gates argues that the scheme actually lasted until the summer of 1991 because Ordemann was still withholding information about his alleged conflict of interest with BFI. In June of 1991, Ordemann left Ernst & Young and joined BFI. There was no further conflict after Ordemann left Ernst & Young. Thus, even if the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1994 WL 444709 (E.D.Pa.), RICO Bus.Disp.Guide 8625
**(Cite as: 1994 WL 444709 (E.D.Pa.))**

Page 3

plaintiff could show that the scheme lasted until the end of the summer of 1991, as he argues, the alleged scheme would only have lasted 12 months.

This is not the type of "long term criminal activity" covered by RICO. I do not find the required continuity in this case where there is a single scheme directed at one individual that lasts only 12 months. [FN3] This is a question of fact, but I must determine whether there is sufficient evidence that a genuine factual dispute exists. *See, Pelullo,* 964 F.2d at 210. Although this Court must view the facts in the light most favorable to the plaintiff, that does not mean I must accept every argument advanced by the plaintiff which is not supported by record evidence. Thus, based on the record, I find that the plaintiff cannot prove a pattern of racketeering in this case. Consequently, plaintiff's RICO claim shall be dismissed.

II. Other Claims

I find that there are genuine issues of material fact for all of plaintiff's other claims and they may proceed to trial.

CONCLUSION

For the above reasons, defendants' motion for summary judgment is granted in part and denied in part.

An order follows.

ORDER

AND NOW, this 15th day of August, 1994, upon consideration of Defendants Keith Ordemann and Ernst & Young's Motions for Summary Judgment and Plaintiff's response thereto, it is hereby ORDERED and DECREED that Defendants' motions are GRANTED IN PART AND DENIED IN PART and Count V (RICO) of Plaintiff's complaint is dismissed with prejudice.

*4 IT IS SO ORDERED.

> FN1. Plaintiff has failed to properly allege a violation of section 1962 in his complaint and the complaint could be dismissed on those grounds alone.

> FN2. Under the open ended approach, a plaintiff must demonstrate a threat of continuity by proving that the predicate acts are a part of defendant's regular way of doing business. In other words, a plaintiff must prove that defendant operates a long term association that exists for criminal purposes. *Hughes,* 945 F.2d at 610.

> FN3. Plaintiff argues that there are multiple victims. While it is true that several persons may have been affected by this alleged scheme, it seems clear that Ordemann and Ernst & Young directed all of their alleged misrepresentations to Gates and he was the only investor they alleged misled.

1994 WL 444709 (E.D.Pa.), RICO Bus.Disp.Guide 8625

**Motions, Pleadings and Filings (Back to top)**

• 2:93cv02332 (Docket) (May. 03, 1993)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 20

**Westlaw.**

Not Reported in F.Supp.2d  
2004 WL 632722 (E.D.Pa.)  
(Cite as: 2004 WL 632722 (E.D.Pa.))

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,  
E.D. Pennsylvania.  
HEALTHGUARD OF LANCASTER, INC., Plaintiff  
v.  
Mark GARTENBERG; Steven Gartenberg; Mark Tischler; Greenfield Sports Medicine & Rehab, P.C.; Premier Sports Medicine & Rehab Center, P.C.; Main Line Medical Services, Inc., Defendants  
No. Civ.A. 02-2611.

Filed May 1, 2002.  
March 5, 2004.

represented by Andrew F. Lucarelli, Hartman Underhill & Brubaker LLP, Lancaster, PA, Lead Attorney, Attorney to be Noticed, Robert M. Frankhouser, Hartman Underhill & Brubaker LLP, Lancaster, PA, Lead Attorney, for Healthguard of Lancaster, Inc., Plaintiff.

represented by Dorothy M. Claeys, Lawrence J. Tabas, Richard P. Limburg, Obermayer Rebmann, Maxwell & Hippel LLP, Philadelphia, PA, Lead Attorney, Attorney to be Noticed, for Mark Gartenberg, Defendant.

represented by Dorothy M. Claeys, Lawrence J. Tabas, Richard P. Limburg, (See above for address), Lead Attorney, Attorney to be Noticed, for Steven Gartenberg, Defendant.

represented by Dorothy M. Claeys, Lead Attorney, Attorney to be Noticed, John W. Morris, Philadelphia, PA, Lead Attorney, Attorney to be Noticed, Lawrence J. Tabas, Richard P. Limburg, (See above for address), Lead Attorney, Attorney to be Noticed, for Mark Tischler, Defendant.

represented by Dorothy M. Claeys, John W. Morris, Lawrence J. Tabas, Richard P. Limburg, (See above for address), Lead Attorney, Attorney to be Noticed, for Greenfield Sports Medicine & Rehab, P.C., Defendant.

represented by Dorothy M. Claeys, John W. Morris, Lawrence J. Tabas, Richard P. Limburg, (See above for address), Lead Attorney, Attorney to be Noticed, for Premier Sports Medicine & Rehab Center, P.C., Defendant.

represented by Dorothy M. Claeys, Lawrence J. Tabas, Richard P. Limburg, (See above for address), Lead Attorney, Attorney to be Noticed, for Main Line Medical Services, Inc., Defendant.

*MEMORANDUM*

BAYLSON, J.

I. *Statement of the Case*

*1 Plaintiff is a health maintenance organization which has brought a civil RICO claim against Defendants, alleging fraudulent billing processes in providing medical and/or chiropractic services in the Lancaster, Pennsylvania area. The issues involved in this case are serious, as any fraudulent diversion of healthcare funds for fraud must, if proven, be dealt with severely. As discussed below, although the record contains evidence of fraud, the Court concludes that Plaintiff has been unable to connect the dots of fraud to the rigorous requirements of civil RICO. Thus, Defendants' Motion for Summary Judgment will be granted, and its state law claims will be dismissed without prejudice for refiling, in state court, should Plaintiff so choose.

On December 6, 2002, the Court granted Defendants' Motion to Dismiss Plaintiff's original RICO Complaint, which also asserted various state law claims (insurance fraud, common law fraud, and breach of warranty), but granted Plaintiff leave to file an Amended Complaint along with a RICO Case Statement. Plaintiff did so and engaged in discovery for a number of months. On October 8, 2003, Defendants jointly moved for summary judgment, asserting that Plaintiff, despite completion of discovery, has not demonstrated evidence to support the elements of RICO, or any genuine issues of fact for trial as to the RICO claims.

Defendants' Motion states that it relies on "the pleadings, answers to interrogatories, and deposition testimony of Dr. David Raab to show that Healthguard has neither alleged nor produced

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

evidence of any scheme to defraud or any specific predicate acts constituting a pattern of racketeering activity." In opposition, Plaintiff has relied on affidavits of two chiropractors and one medical doctor, who were employed by one or more of the Defendants, and a large group of papers summarizing allegedly fraudulent bills submitted by Defendant Main Line Medical Services, Inc. ("MLM") to Plaintiff, but has not submitted any deposition excerpts or other documents.

Prior to oral argument on December 23, 2003, the Court requested Plaintiff to be prepared at the oral argument to document its evidence and supporting case law as to several elements of RICO (Docket No. 51).

II. *Statement of Facts and Contentions*

Plaintiff is a health maintenance organization with 100,000 members, which operates in and around Lancaster, Pennsylvania. As Plaintiff describes its operations, Healthguard members receive medical services from participating healthcare providers, such as Defendants, who submit insurance claims to Healthguard seeking payment for services rendered. When a healthcare provider submits a claim for payment, the provider warrants to Healthguard that the services identified in the claim were actually provided in the manner described in the claim and were medically appropriate. Upon receipt of a claim, Healthguard forwards payment to the healthcare provider on behalf of the member.

*2 Plaintiff alleges that Defendants, who operate a chiropractic business and provider chiropractic services to Healthguard members, devised a scheme to make their business more profitable, but in doing so, engaged in various fraudulent practices, including submitting false claims for medical services. Plaintiff asserts that the claims submitted under the provider number for one physician, Dr. David Raab, described medical services that either were not performed by a physician, were not performed properly, were not performed at all, or were not medically necessary or appropriate. Although Plaintiff has demonstrated genuine issues of fact as to elements of the common law tort of fraud, the issue before the Court is whether there is sufficient evidence meeting the requirements of RICO.

Plaintiff's Amended Complaint and RICO case statement asserts that the RICO scheme was implemented through one of the Defendants, MLM, a management company owned and operated by other Defendants, which conducted extensive telemarketing to solicit patients for Defendants' medical practices, and then processed the insurance claims generated by each practice. Plaintiff asserts that in conducting the affairs of MLM, Defendants caused thousands of fraudulent insurance claims to be sent through the U.S. mail to Healthguard (and other health insurers) for processing and payment.

III. *Summary Judgment Motion*

The first issue is whether the Defendants have properly supported their Motion for Summary Judgment. In its landmark decision in <u>Celotex Corp. v. Catrett, 477 U.S. 317 (1986)</u>, the Supreme Court rejected the holdings of some lower courts which had required the moving party to submit affidavits or other sworn materials to contradict the pleadings of the non-moving party, and held that the moving party need only "show" the court where there was one or more deficiencies in the existence of an element essential to the non-moving party's case and on which the non-moving party will bear the burden of proof at trial:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

\* \* \*

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

\* \* \*

> In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts

showing that there is a genuine issue for trial."

\* \* \*

*3 Instead, as we have explained, the burden on the moving party may be discharged by "showing"-- that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case.
477. U.S. at 322-25.

First, Defendants rely on Plaintiff's pleadings, including the RICO Case Statement which the Court required at the outset of the case as indicative of its claim that Plaintiff has not presented sufficient evidence to create a triable issue of fact for trial. As discussed above, this satisfies Defendant's burden, under Rule 56 procedure. However, Plaintiff cannot rely on its own unsworn pleadings to rebut a motion for summary judgment, rather Plaintiff must demonstrate to the Court that it has sufficient evidence to create a triable issue of fact as required by Celotex. See Id. at 322 (summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ."); see also Fed R. Civ. P. 56(e) ("the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").

Second, Defendants rely on their own answers to certain interrogatories served by Plaintiff. In the interrogatories, the individual Defendants describe their professional qualifications and their relationship to the corporate entities. Defendant Mark Gartenberg does not identify himself as a chiropractor or other health professional, nor of having any role as an officer or a director of any of the Defendant corporations. (M.G.Interrog.¶ ¶ 4,7.) He was, however, an employee of MLM and the father of Defendant Steven Gartenberg. (Id. ¶ 6.) Steven Gartenberg asserts that he is the sole shareholder, owner, director and officer of MLM since December 1998, and is also an officer of a non-party entity, CMS, Inc., which he describes as doing telemarketing for Greenfield. (S.G.Interrog.¶ ¶ 4, 8.) The other individual Defendant, Mark Tischler, describes himself as a chiropractor who has been an employee of Greenfield (M.T.Interrog.¶ 4) and MLM at various times, and was also a director and officer of a non-party entity referred to as Bala Medical Management ("Bala"), from 1999-2002. (Id.) [FN1]

FN1. Bala is not further identified in Defendants' papers, but there are implications that Bala had a role in the relationships among the various individuals and corporate Defendants. However, it does not appear to have been pursued by Plaintiff or explained by Defendants. There is little in the record as to Bala Medical Management, Inc. Dr. Raab testified that Bala provided unspecified services for Greenfield (Raab Dep. at 11, 71). Tischler was the president and sole shareholder of Bala (see M.T. Interrog. ¶ ¶ 4, 8).

Although normally answers to interrogatories are used by the party propounding the interrogatories, there is no reason, under the rules and decided cases under Rule 33 of the Federal Rules of Civil Procedure, that a party may not use his or its own sworn answers to interrogatories, which are not otherwise contested to prove a point in supporting a motion for summary judgment. [FN2] See Celotex, supra at 325 (explaining that "the burden on the moving party may be discharged by 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case."); Santa Fe Natural Tobacco Co. v. Judge, 963 F.Supp. 437, 439 (M.D.Pa.1997) (granting a plaintiff's motion for summary judgment where the plaintiff supported its motion with defendant's answers to interrogatories).

FN2. It should be noted that these answers to interrogatories are not self-serving narratives, but are merely descriptive. It is also necessary to point out that the Defendants interposed so-called "form objections" to the interrogatories before answering them. However, Plaintiff does not appear to have contested the adequacy or accuracy of the answers, and thus the Court will consider them.

*4 Third, Defendants rely on the deposition of Dr. David Raab, [FN3] a long-standing physician in the Lancaster, Pennsylvania area, who had retired from various private practices and then took a job with Defendant Greenfield Sports Medicine and Rehab, P.C. ("Greenfield") as medical director--a position in which he was not required to fully understand anything about the business side of Greenfield. Dr. Raab worked at Greenfield from approximately May 17, 1999 to sometime in November of 2000. Prior to commencing his employment, Dr. Raab signed the incorporation of Greenfield on April 22, 1999. He

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

also signed a consent to be the sole Director of the Board of Directors of Greenfield, which indicated that he was also President and Treasurer, and that Defendant Mark Tischler would be Secretary, (*see* Exhibits 3-4), and he signed a Service Agreement between Greenfield and a non-party, Bala Medical Management, Inc., dated April 22, 1999, in which Dr. Raab summarized in his deposition as providing that he would make medical decisions, but not business decisions on behalf of Greenfield.

> FN3. Defense Counsel deposed Dr. Raab. Plaintiff's counsel did not ask any questions. The record shows that Plaintiff's counsel had previously interviewed Dr. Raab. There is no affidavit from Dr. Raab, in the record, further explaining his knowledge of the facts.

Dr. Raab also testified to his work in reviewing different medical forms, including filling out claim sheets that MLM submitted to Plaintiff. He had the impression, but had no direct evidence to support it, that the Gartenberg Defendants controlled Greenfield and that Greenfield was a subsidiary of Bala. (Raab Dep. at 70, 75). Specifically, Raab stated that he did not know exactly what the relationship was between Greenfield, Bala and the Gartenberg defendants. (*Id.* at 75.) He also stated that he did not know whether or not Tischler was the president of Bala but knew that Tischler did communicate with Bala. (*Id.* at 70-71) However, the record contains no evidence as to the content of Tischler's communications with Bala. Finally, after working at Greenfield for approximately eighteen months, Dr. Raab left because he came to believe that a number of the tests that were being performed were unnecessary (*Id.* at 58-59, 64).

In opposition to summary judgment, Plaintiff supplies three affidavits by doctors who were employed by one or more of the Defendants, and the aforementioned large volume of billing statements. Although Plaintiff submitted an expert report as part of its papers in opposition, it is unsworn and this Court cannot rely upon the expert statement. *Small v. Lehman,* 98 F.3d 762, 765 (3d Cir.1996) ("Rule 56 of the Federal Rules of Civil Procedure states that motions both for and in opposition to summary judgment may be supported by affidavits; unsworn statements, such as those relied upon in the instant matter, fail to meet this requirement.") Plaintiff has not submitted any other factual materials. It does not appear from the record that any of the individual Defendants were ever deposed, or that Plaintiff invoked Federal Rule of Civil Procedure 30(b)(6) and deposed a representative of any of the corporate defendants.

IV. *RICO Requirements*

*5 The Amended Complaint in this case (¶ ¶ 36-37) charged Defendants of violating two sections of RICO, 18 U.S.C. § § 1962(c) and (d), which are defined as follows:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

As the Supreme Court has held in *Sedima SPRL v. Imrex Co.,* 473 U.S. 479, 496 (1985), "a plaintiff must show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity as well as injury resulting from the conduct constituting a violation." Prior to the oral argument on December 23, 2003, the Court issued an Order requesting Plaintiff to be prepared to demonstrate the existence of a genuine issue for trial on several of these elements including conspiracy as charged in 18 U.S.C. § 1962(d), predicate acts (which are defined in the statute), relatedness (of the various predicate acts to the alleged pattern of racketeering activity), and also what evidence there is that injury was suffered as a result of the activities alleged, and also what evidence Healthguard had, in the record, to support its definition of an "enterprise."

After review of the papers and the arguments of counsel, the Court has identified several areas in which Plaintiff has failed to establish the elements of RICO liability:
1. A confusing and legally insufficient identification of an "enterprise."
2. A lack of evidence that any of the Defendants were in "control" of the enterprise.
3. A lack of evidence to show that there was a "pattern" of racketeering activity.
4. A lack of evidence of conspiracy.

A. *The "Enterprise"*

The Amended Complaint, ¶ 30, and the RICO Case Statement, ¶ C(1), alleged that MLM is the

"enterprise." In filing its response to the Court's Order of December 11, 2003, Plaintiff asserted that MLM "constituted an enterprise through which 'persons' Mark Gartenberg, Steven Gartenberg, and Mark Tischler acted." However, at oral argument Healthguard's counsel identified the enterprise as "a combination of individuals with professional corporations known as Greenfield Sports Medicine and Premier Sports Medicine ... all of the individuals ... and the two professional corporations ... as well as the billing enterprise [MLM]." Plaintiff's counsel made it explicit that the enterprise "is a combination of the Defendants." Asked whether there is any difference between the Defendants and the enterprise, he said "the Defendants made up the enterprise, each of the entities provided a different piece." In response to a question as to whether the enterprise and the Defendants are identical, Plaintiff's counsel unequivocally stated "yes." (N.T. at 11-12). Plaintiff's counsel subsequently articulated this contention as follows: "It's the individuals and Main Line Medical acting through an otherwise legitimate business organization, i.e., Greenfield and Premier." (N.T. p. 37).

*6 Section 1961(4) provides that the term "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." The leading Supreme Court case interpreting the enterprise requirement is _United States v. Turkette_, 452 U.S. 576 (1981) in which the court noted that the term encompasses both legitimate and illegitimate organizations without distinction and that it can be proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The court noted that there is a difference between the "enterprise" and "pattern" requirements: "The 'enterprise' is not the 'pattern of racketeering activity', it is an entity separate and apart from the pattern of activity in which it engages. 452 U.S. at 583.

Much has been written about the requirement of an "enterprise" in civil RICO cases. _See generally_, Gregory P. Joseph, _Civil Rico: A Definitive Guide_ 67-79 (2d Ed.2000). In this case, the Court finds it helpful to distinguish between the elements of common law fraud and the elements of RICO as follows: proving common law fraud requires a showing of fraudulent statements made with the intent to deceive someone, _see Sowell v. Butcher & Singer, Inc._, 926 F.2d 289, 296 (3d Cir.1991) (noting that common law fraud requires that there be a misrepresentation made with the intent that the receiver of the misrepresentation be induced to act in reliance thereof), however, in order for a plaintiff to turn a fraud case into RICO, the plaintiff must also show that the fraud was carried out through the operation of what may functionally be referred to as a "superstructure" which the RICO statute calls an "enterprise." In other words, the plaintiff proceeding to trial in a RICO case must show more than fraud. It must show that the conduct of the fraudulent scheme was perpetrated through an enterprise (either an existing entity or an association of individuals and entities).

Federal courts have required a showing of distinctiveness between the enterprise and the individuals who are allegedly controlling the enterprise. It must be noted that only the person and not the enterprise is liable under § 1962(c). _See Hirsch v. Enright Refining Co._, 751 F.2d 628, 633 (3d Cir.1984) ("the 'person' subject to liability cannot be the same entity as the 'enterprise.' ").

The Third Circuit clarified this rule in _Jaguar Cars, Inc. v. Royal Oaks Motor Car Co._, 46 F.3d 258 (3d Cir.1995), in which a RICO plaintiff alleged the existence of an enterprise consisting of a corporation and its officers and employees, who managed the corporation through a pattern of racketeering activity. After a trial, the jury found for plaintiff and awarded damages against the individual defendants. Although _Jaguar Cars_ is sometimes referred to as a case that bears on the appropriate definition of an "enterprise," its holding is really confined to the requirement of a "person" in control of an "enterprise" with a conclusion "that when officers and/or employees operate and manage a legitimate corporation, and use it to conduct a pattern of racketeering activity in interstate commerce, those defendant persons are properly liable under § 1962(c)." 46 F.3d at 269. In _Jaguar Cars_, the theory of liability was not dissimilar to the theory in the present case. Plaintiff, Jaguar Automobile Company, accused the defendants, operating a Jaguar dealership, of fraud in the handling of warranty claims, specifically that the defendants submitted, and were paid, for warranty claims for work that was never done, or was grossly misrepresented. The plaintiff alleged that Royal Oaks [the dealership] "is the enterprise through which the defendants conducted their racketeering activity." _See_ 46 F.3d at 264. The defendants asserted that this was a fatal designation of an enterprise because the plaintiff had ignored the distinctiveness requirement, and that the "person" in "control" (i.e., the defendants) could not be the same as the enterprise.

*7 Although the Third Circuit in *Jaguar Cars* never specifically ruled on the propriety of the designated "enterprise", it did find that under the Supreme Court's decision in *Reves v. Ernst & Young*, 507 U.S. 170 (1993), "liability under § 1962(c) is limited to those who 'participate in the operation or management of the enterprise itself." ' 46 F.3d at 265-66. Under this holding, the Third Circuit concluded, (and in the process abrogated earlier holdings to the contrary), that the distinctiveness requirement was satisfied when officers and employees of the corporation operate and manage a legitimate corporation and use it to conduct a pattern of racketeering activity.

More recently, the Supreme Court in *Cedric Kushner Motions Ltd. v. King*, 533 U.S. 158 (2001) endorsed the holding in *Jaguar Cars* and concluded that the defendant in that case was a "person" (the president and sole shareholder of a corporation) who was sufficiently distinct from the alleged enterprise, the corporation itself, to satisfy the enterprise/person distinctiveness requirement. The court specifically noted the principle that in order to establish liability under § 1962(c), a party must allege a "person" who is separate and distinct from the alleged enterprise. The Supreme Court concluded that under circumstances where "a corporate employee, acting within the scope of his authority, allegedly conducts the corporation's affairs in a RICO-forbidden way .... [that the] corporate owner/employee ... is distinct from the corporation itself." *Cedric Kushner Promotions. Ltd. v. King*, 533 U.S. at 162.

Plaintiff asserts that its definition of an enterprise consisting of all the Defendants is appropriate, notwithstanding the lack of distinctiveness, under the *Jaguar Cars* ruling, because the Plaintiff alleges, as in *Jaguar Cars*, that the individual Defendants used at least one of the corporate Defendants (MLM) to conduct the pattern of racketeering activity. In *Jaguar Cars*, the Third Circuit noted (despite the caption of the case) that "Jaguar has not brought a claim against Royal Oaks, but instead seeks recovery from the [individual] defendants, as persons operating and managing the Royal Oaks enterprise through a pattern of racketeering activity." 46 F.3d at 268. Thus, in *Jaguar Cars*, the enterprise and the defendants were not identical.

Although the Amended Complaint and RICO Case Statement assert that the "enterprise" is MLM, the above-quoted statements at oral argument contradict that, and ask the Court to allow the case to proceed with an enterprise identical to the Defendants. This is clearly not proper under *King*, because Plaintiff has completely blurred and ignored the distinctiveness requirement. *Accord Baker v. IBP*, Nos. 02-3967 & 02-4065, slip op. at 11 (7th Cir. Feb. 4, 2004) (holding that "[w]ithout a difference between the defendant and the 'enterprise' there can be no violation of RICO.").

*8 However, if the Court were to ignore counsel's expanded definition of an enterprise and consider that the enterprise is, as alleged in the Amended Complaint and RICO Case Statement, limited to MLM, the evidence still does not withstand summary judgment. Virtually the only evidence in the record as to the affairs of MLM comes from its own answers to interrogatories. MLM is owned and controlled by Defendant Steven Gartenberg, (MLM Interrog. ¶ ¶ 3, 5), but it states that it has no written or oral management, marketing or consulting agreements with Defendants Tischler, Greenfield or Premier. (*Id.* ¶ 7.) It also denies that it provides services to patients, and it has not employed any Pennsylvania licensed healthcare professional other than Steven Gartenberg. (*Id.* ¶ 10.)

Considering further Dr. Raab's deposition testimony, although he does refer to MLM at times, it is clear that he was at least an employee of Greenfield, [FN4] and that he does not show any personal knowledge of the affairs of MLM. Furthermore, as will be discussed in greater detail below, while three affidavits from doctors who worked for Greenfield refer to MLM, they do so only in the context of MLM performing billing and/or telemarketing services for Greenfield.

> FN4. Exhibits attached to his deposition show that even if he was not aware of it, Dr. Raab may have been a the sole incorporator, director, president, treasurer and sole shareholder of Greenfield. (Raab Dep. Ex. 2- 4.)

Therefore, even assuming that the Court would allow the case to go forward with Plaintiff's original designation of MLM as the "enterprise", there is insufficient evidence in the record as to the function and activities of MLM, and to show that it was through MLM that the other Defendants conducted any pattern of racketeering activity.

B. *Control*

As noted above, the Third Circuit, in *Jaguar Cars*,

Case 1:05-cv-00165-JJF   Document 46-12   Filed 07/29/2005   Page 12 of 20

Not Reported in F.Supp.2d
2004 WL 632722 (E.D.Pa.)
(Cite as: 2004 WL 632722 (E.D.Pa.))

Page 7

discusses the sufficiency of evidence necessary for a plaintiff to show that a particular defendant was in "control" of the enterprise conducting the pattern of racketeering activity. In that case, the court acknowledged that there was no dispute that the dealership conducted a pattern of racketeering activity. However, one of the individual defendants disputed the sufficiency of the evidence as to whether or not he was one of those in "control" of the enterprise. The court reviewed specific evidence that showed that this individual was a supervisor of someone who was carrying out the illegal scheme, "met with him daily to discuss the operation of the dealership, including its parts and service department, and was majority owner of the dealership, and was otherwise actively involved in its operation." 46 F.3d at 270-71. The court found that the evidence was sufficient for the jury to find that this individual defendant was liable because he was aware of, if not participating in, the illegal scheme. The court recognized that under *Reves, supra,* the evidence must show that a defendant participated in the operation or management of the enterprise itself.

The Court will now review the evidence in this case to see whether this requirement is met. In Plaintiff's response to the Court's Order of December 11, 2003, the Plaintiff relies on the affidavits of Dr. Craig W. Colditz, Dr. Brian F. Wallace, and Dr. Leilani Gyening, but the Court cannot conclude from these affidavits that there is a genuine issue of fact for trial as to the element of "control" regarding any of the Defendants.

*9 Dr. Wallace testified that he was hired by Defendant Tischler, and that his treatments would be billed under Dr. Gyening's physician number. Dr. Wallace said he was instructed (but does not say by whom) to use a billing code for manual therapy technique, which carried a $100 charge for a chiropractic adjustment for which he had previously charged $25. He also stated that Defendant Tischler pressured him to "do more testing" and told him that "we must get our numbers up." Each day Dr. Wallace would receive a phone call from either Mark or Steven Gartenberg inquiring about the number of patients that were seen each day and the amount billed. The only reference to MLM was that it performed "telemarketing for patients."

The affidavit of Dr. Colditz indicates that he was interviewed by Steven Gartenberg who said he would be employed by a non-party chiropractic management system, in its Lancaster County office. In this employment, Dr. Colditz received instructions from Defendant Tischler. Initially, Tischler did the billing for the office by entering procedure codes into a computer and transmitting them to MLM. Colditz later assumed this responsibility and billed for Dr. Raab as well. Dr. Colditz also said that at the conclusion of each day, Mark Gartenberg called the Lancaster County office to find out the number of new patients that appeared, what had been billed for each day, and to advise about what new patients his telemarketing operation had generated for the next day. MLM would fax a schedule of new patients generated by its telemarketing operations for the Lancaster County office. In Dr. Colditz' experience, the patients who came to the Greenfield office thought they were coming to a medical practice. He also said that he was pressured by Defendant Tischler to perform more testing and on some unspecified number of occasions where Colditz believed testing was unnecessary for a particular patient, Tischler directed him to do the testing anyway.

Dr. Gyening had originally submitted an unsworn statement, but at the suggestion of the Court, Plaintiff provided an affidavit from Dr. Gyening filed as of January 13, 2004, which mentions several of the Defendants, and reiterates some of the same facts Dr. Wallace provided as to the method of doing business, billing practices, etc. She states that after a period of time, she became concerned that some of the documents relating to the formation of Premier Sports Medicine and Rehabilitation Center ("Premier"), which she was filling out, should not be submitted based upon her belief that the activities of Dr. Tischler and MLM were illegal. Nonetheless, Dr. Gyening testified that despite her objection the documents were filed with the Commonwealth of Pennsylvania and they listed her as the President of Premier. This is virtually the only mention of Defendant Premier in the entire case.

Dr. Raab also provided testimony on the issue of control, but little of it was based on personal knowledge, except that Defendant Tischler had asked for Dr. Raab's signature so that Tischler could make a rubberstamp of the same, (Raab Dep. at 13) and that Dr. Raab gave his consent to Tischler to use his signature stamp on a Greenfield checking account (*Id.* at 13-14). Plaintiff fails to connect these facts to any of the alleged racketeering acts by any of the Defendants.

*10 On the issue of control, Dr. Raab testified (*Id.* at 21) that Dr. Tischler instigated the treatment plans, but Dr. Raab did not make any change in the diagnostic procedure, depending on who the carrier

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

was. Dr. Raab also said that he never received any supervision from Mark or Steven Gartenberg. He stated that "to my understanding, Greenfield was simply a subsidiary of Bala or Mr. Gartenberg." (Raab Dep. at 75.) He did not state the basis of his knowledge.

The above summary of the testimony of the activities of the Defendants only shows that Plaintiff has evidence that they were in formal control (i.e., directors and/or officers) of the various entities. However, the Court has examined the record and is unable to find that any of the Defendants controlled the "enterprise," however defined, despite contradictory assertions from time to time in this case.

Completely lacking from the record in this case is any direct firsthand testimony as to how the alleged "enterprise" (in either way it has been defined) operated. Giving Plaintiff every inference, there is basically no information whatsoever about Defendant Premier. It appears that Defendant Greenfield operated a chiropractic and/or medical practice in the Lancaster area and was a legitimate medical business, seeing and treating patients. The claim forms submitted on behalf of Greenfield to Plaintiff appear to have been verified by Dr. Raab, and despite this practice having continued for 18 months, it was only the very end of this period, in approximately November of 2000 that Dr. Raab concluded that improper claims were being made.

The evidence does not show that Defendant Tischler, assuming arguendo that he was in control of Greenfield, had any specific role in the alleged "pattern of racketeering." He may have on some occasions directed a doctor to do tests the doctor did not think were necessary, and said to one of the doctors that "we need to get our numbers up." While this may constitute evidence of fraud, it certainly is not sufficient to prove that he was in "control" of a racketeering enterprise, as defined by RICO, and as alleged by Plaintiff.

There is no evidence in the record as to activities by Defendant Mark Gartenberg.

As to Defendant Steven Gartenberg, his answers to interrogatories only establish that he was the owner of MLM, he was never an employee of Bala, and he was not a shareholder of any corporate entity that provided management services to the medical or chiropractic practices whose services or bills Healthguard is challenging in this case. This assertion is not challenged by Plaintiff.

Additionally, although the record acknowledges that Steven Gartenberg was in control of MLM, there is no firsthand testimony as to how MLM operated, or how it conducted its day-to-day working relationship with Greenfield or Premier. There is no evidence that Mark or Steven Gartenberg had any participation in the affairs of Greenfield; there is no evidence that Tischler had any participation in the affairs of MLM. The mere fact that MLM had a telemarketing operation that referred patients to Greenfield, or that it performed billing for Greenfield, does not make for fraud, and does not establish that any of these defendants controlled an enterprise engaged in a pattern of racketeering activity.

*11 The Court does acknowledge that the doctors' affidavits do evidence, in general, a practice by Greenfield of billing chiropractic services as medical services, presumably to achieve a higher reimbursement rate. There is also evidence that Greenfield occasionally billed for tests that were not appropriate prescribed or needed. However, there is no quantification whatsoever of these practices, and although there was evidence that Tischler was the person responsible for more than some of these practices, the record contains no evidence that he was in "control."

The physician affidavits also refer to the fact that Greenfield only wanted to treat patients who had insurance coverage. Although this practice was not uniform, the Court finds nothing illegal about it.

The record evidence would also allow an inference that Greenfield provided services by both a medical and chiropractic doctor. The physician would prescribe diagnostic testing, following which the patient would receive a chiropractic examination and treatment. Dr. Colditz says that the treatment plan for each patient was virtually identical, irrespective of the patient's complaints. Dr. Colditz also says that after procedure codes were entered into the computer at Greenfield, they were electronically transferred to MLM, which also performed billing services. (Colditz Aff. ¶ 5). Once again, the Plaintiff fails to connect this evidence with any act by a particular Defendant that would provide support for a genuine issue for trial that such Defendant was in "control" of an enterprise.

Returning to the issue of the definition of the "enterprise" with respect to the foregoing discussion regarding "control," the Court again concludes that if

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

its ignores the suggestion of Plaintiff's counsel at oral argument that the enterprise is all of the Defendants, and assumes that Plaintiff would, if it could, proceed to trial on its original allegation that the enterprise is MLM, there is insufficient evidence to proceed on that basis. As noted above, the only Defendant as to whom there is any evidence of control regarding MLM is Steven Gartenberg, who was the owner and sole officer of MLM. However, the Court also concludes that the mere ownership of a corporation is not necessarily synonymous with "control" of that corporation for RICO purposes. *See e.g. Jaguar Cars, 46 F.3d at 270-71* (examining whether or not a 51% owner of a claimed enterprise controlled that enterprise). Rather, there needs to be evidence in the record as to Steven Gartenberg's activities on a day-to-day, month-to-month or year-to-year basis in order for the Court to infer that he controlled MLM as a racketeering enterprise. The only evidence of MLM's role is that it processed bills and performed telemarketing services for Greenfield. The fact that a minor portion of those bills were allegedly, or even presumptively, fraudulent does not make up the elements of RICO.

Alternatively, assuming that the enterprise is as described at the oral argument, all of the Defendants, and the Court ignores the distinctiveness requirement, there is still no evidence that any of the individual Defendants were in control of all of the organizations named as both Defendants and members of this enterprise, i.e., MLM, Greenfield and Premier.

*12 Although Plaintiff, in its Amended Complaint and RICO Case Statement, asserts that all three of the individual Defendants controlled the enterprise and used the enterprise to conduct a pattern of racketeering activity, the above review shows there is really nothing in the summary judgment record to support these contested allegations. As such, Plaintiff has not met its burden of coming forward with evidence of a genuine issue for trial.

V. *Pattern of Racketeering Activity*

In moving for summary judgment, Defendants assert that the Plaintiff has failed to show a genuine issue of fact for trial on the requirement of a "pattern of racketeering activity." Defendants' brief relies extensively on the pleadings, i.e., the Amended Complaint and the RICO Case Statement, but the obligation of the Court is to look at the record of the case as it exists at this time, including depositions, answers to interrogatories, etc. in determining whether Plaintiff has come forward with sufficient evidence to show a genuine issue for trial.

The requisite pattern is demonstrated by showing both that the various predicate acts are "related" and also are "continuous". See *H. J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989), Kehr Packages, Inc. v. Fidelcor Inc., 926 F.2d 1406, 1411-12 (3d Cir.1991)*. Plaintiff has shown the requisite predicate acts which took place in this case--namely the mailing of the claim forms, which was allegedly fraudulent and could constitute the crime of mail fraud. Defendants do not dispute that Plaintiff has demonstrated "relatedness". *See* (Defendants' Brief at 20.) However, Defendant does contend that Plaintiff has failed to demonstrate continuity, because Plaintiff only alleges a single victim and a single scheme episode, which began with the incorporation of Greenfield on April 20, 1999 and terminated in October 2000, when Healthguard ceased paying Greenfield's invoices. Plaintiff asserts that the fraud extended for at least 26 months. Both parties agree that the leading case on continuity in this Circuit is *Tabas v. Tabas, 47 F.3d 1280, 1292 (3d Cir.1995)*, which discusses the differences between closed and open-ended continuity. The Third Circuit has held that one year is not sufficient for a closed-ended scheme. *Hughes v. Consol-Pa Coal Co., 945 F.2d 594 (3d Cir.1991), cert. denied, 504 U.S. 955 (1992)*.

At oral argument, Plaintiff's counsel asserted that the scheme was "close-ended" because "it had a defined end, they ceased business and ceased submitting claims." (N.T. 23). The Court will accept this characterization, but the evidence is too insufficient to form a "pattern."

Although the Court would not grant summary judgment against Plaintiff merely because the Plaintiff was the only victim of the alleged scheme, the lack of evidence as to the manner in which the alleged scheme was carried out is fatal. The affidavits of the three physicians who worked at Greenfield only supply sporadic evidence of fraud; they do not establish that there was a routine or even a common or usual manner of treating patients, which is required to establish a pattern. There is an absence of universality about the conduct of the Greenfield office where they worked, from which a jury could find a pattern. Although their affidavits do establish instances of conduct that would be readily characterized as fraudulent, the Court cannot conclude from the affidavits themselves (which along with Dr. Raab's deposition are the only evidence of how the Greenfield practice was conducted) that there is sufficient evidence to show that there existed

a "pattern of racketeering activity."

*13 Plaintiff asserts that Defendants submitted hundreds of false claims, which Plaintiff asserts amount to $249,814.11. (N.T. at 21.) In support, Plaintiff refers to a chart (Ex. E), which shows that a large number of claims lacked documentary support. However, the absence of documentation does not equate to fraud. It was incumbent upon Plaintiff to provide an affidavit explaining such a complex document and why the absence of documentation would allow the Court to find a genuine issue of fact for trial. Also, at oral argument, Plaintiff's counsel did not explain how Exhibit E establishes evidence of fraud. (N.T. at 20-22.) Hence, there is no evidence that the uniform practice and procedure of the Greenfield office was to conduct tests that were not needed, or to charge higher rates than allowed, etc. for the patients whose care was outlined in Exhibit E. In fact, there is nothing in the three affidavits or the testimony of Dr. Raab which provides any consistency or quantification whatsoever as to the extent of the alleged fraudulent practices.

Even if the unsworn expert report, excluded above, were to be admitted for the truth of the matters asserted in opposition to summary judgment, the Court notes that it would be of very limited value. First, Dr. Shyminsky's expert qualifications are not set forth. The report is in the form of a memorandum dated July 8, 2003 to Thomas P. Brennan, Director of Special Investigations, without indicating the entity to which Mr. Brennan is related. The report reviews the records of 35 separate patients of Greenfield, noting progress notes, complaints, treatment and claims. The conclusion states in part "the medical necessity for the services billed has not been established ..., that virtually every patient received trigger point injections or nerve blocks, diagnostic studies were performed routinely, and the treatment plan did not appear to be tapered for the patient individually, the number of services provided appears to be in excess of what would be expected, the length of treatment appears to be excessive, and exceeded what would generally be expected per the patient's condition, and the documentation submitted in a particular physician's progress notes did not substantiate the medical necessity for the diagnostic studies performed or the medical necessity for the frequency of such studies."

These findings and conclusions may be relevant and important on a claim of fraud, and they would tend to establish that the mailings of such forms to MLM would constitute "predicate acts." However, assuming the existence of mail fraud, it still leaves the Plaintiff's evidence lacking on the other elements of RICO. The expert report does not connect the 35 allegedly fraudulent submissions to the conduct of the enterprise as part of a "pattern" alleged or discuss the conduct of any of the individuals who are alleged to be in control of the enterprise.

VI. *Conspiracy*

As noted above, the Plaintiff was also proceeding on § 1962(d) which makes it unlawful for any person to conspire to violate § 1962(c).

*14 Defendants cannot be liable for a conspiracy to violate RICO if the evidence is insufficient to hold any of them liable for a violation of RICO itself under § 1962(c). *See State Farm Mut. Auto. Ins. Co. v. Makris,* No. 01-5351, 2003 U.S. Dist. LEXIS 3374 (E.D.Pa. Mar. 4, 2003) (noting that an element of a § 1962(c) claim involves " 'knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate section 1962(a), (b) or (c)." ') (quoting *Rose v. Bartle,* 871 F.2d 331, 366 (3d Cir.1989)). Thus, the Court need not dwell on this except to note that at oral argument the Court queried Plaintiff's counsel on the allegations of conspiracy, and disputes the adequacy of Plaintiff's reliance on the affidavits of Drs. Wallace and Colditz, and the subsequently submitted affidavit of Dr. Gyening. There is nothing in these affidavits to establish who participated in the illegal conspiracy.

Thus, Defendants' motion for summary judgment will be granted on Count I. An appropriate Order follows.

ORDER

AND NOW THIS 5th day of March, 2004, it is hereby ORDERED that Defendants' Motion for Summary Judgment (Docket No. 37) is GRANTED, as to Count I of Plaintiff's Complaint. Judgment is entered in favor of Defendants and against Plaintiff as to Count I. Counts II-IV are dismissed without prejudice for lack of subject matter jurisdiction. The Clerk is directed to close this case.

2004 WL 632722 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

•     2:02cv02611    (Docket) (May. 01, 2002)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 21

Westlaw.

Not Reported in A.2d
1988 WL 116423 (Del.Super.)
(Cite as: 1988 WL 116423 (Del.Super.))

Page 1

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware, New Castle County.
J.E. RHOADS & SONS, INC., a Delaware corporation, Plaintiff,
v.
AMMERAAL, INC., a Delaware corporation, and Ammeraal Conveyor Belting B.V., a foreign corporation, Defendants.
AMMERAAL, INC., Third-Party Plaintiff,
v.
Edward K. MOL, Third-Party Defendant.

Submitted: April 14, 1988.
Decided: Oct. 21, 1988.

Upon defendants Ammeraal, Inc. and Ammeraal Conveyor Belting B.V.'s motion for reargument. Denied.

Richard R. Wier, Jr., and Walter P. McEvilly, Jr., Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for plaintiff.

William D. Bailey, Jr., and Charles Gruver, III, Bayard, Handelman & Murdoch, P.A., Wilmington, and Gerard B. Gallagher, and David L. Joslyn, Gallagher & Joslyn, Oakbrook, Ill., for defendants Ammeraal, Inc. and Ammeraal Conveyor Belting, B.V..

*MEMORANDUM OPINION*

GEBELEIN, Judge.

*1 Before this Court is defendants' Ammeraal Conveyor Belting B.V. (Belting) and Ammeraal, Inc.'s (Ammeraal) motion for reargument of that portion of this Court's March 30, 1988 opinion denying defendants' motion to strike and dismiss Counts II and III of the Third Amended Complaint. Counts II and III allege that defendants violated Delaware's Deceptive Trade Practices Act, 6 *Del.C.* § 2531 *et. seq.*, and its Uniform Trade Secrets Act, 6 *Del.C.* § 2001 *et. seq.*, respectively. Defendants argue that to apply these acts to conduct allegedly occurring exclusively outside of the State violates Delaware law and the Commerce and Due Process Clauses of the U.S. Constitution.

Pertinent facts are as follows. J.E. Rhoads & Sons, Inc. (Rhoads) alleged in Count II that defendants violated the Deceptive Trade Practices Act by contacting Rhoads' customers and luring them away via a series of misrepresentations concerning plaintiff. Defendants assert that all contact was made via phone calls from Michigan to customers throughout the U.S.

Count III charges defendants with misappropriating Rhoads' trade secrets, in violation of the Trade Secrets Act. Trade Secrets were listed as the Rhoads' customer list, information on Rhoads' customers, pricing, and the like and secrets and information on the MARS account. All items allegedly were used to take away Rhoads' customers. Defendants assert that "the acts complained of occurred in the State of Michigan". For support, defendants cite the fact that defendants' employees divided up the customer list and called Rhoads' customers from Grand Rapids. (Depo. John C. Spicer, pp. 241-244, Defendants' Opening Brief, Ex.D). Evidently, the argument is that the information was not misappropriated, if at all, until defendants contacted Rhoads' customers; i.e., the information was rightfully in defendants' hands, but was misappropriated when used for an improper purpose.

Defendants first argue that to apply the Delaware Trade Practices and the Uniform Trade Secrets Acts to their conduct violates Delaware law. They base this assertion on the premise that all of the purported misrepresentations and other conduct occurred physically outside of Delaware, in Michigan. Because the legislature did not express its intent to apply the applicable laws to actions occurring outside of the jurisdiction, defendants reason that the acts should not apply.

In deciding that the Delaware Acts were applicable to defendants' alleged conduct, this Court examined several factors. First and foremost was the contention that the alleged misrepresentations and misuse of information occurred when defendants contacted Rhoads' customers throughout the U.S.; i.e., the misconduct occurred when and where the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00165-JJF    Document 46-12    Filed 07/29/2005    Page 18 of 20

Not Reported in A.2d
1988 WL 116423 (Del.Super.)
(Cite as: 1988 WL 116423 (Del.Super.))

Page 2

customers answered the phone or letter. *See, J.E. Rhoads & Sons, Inc. v. Ammeraal, Inc., et al.,* Del.Super., C.A. No. 83C-NO-98, Gabelein, J. (March 30, 1988). [FN1]

This Court determined that because there was no clear, single situs for the alleged wrongful acts, the law of the place of injury, Delaware, should apply. *Id. See also, Autrey v. Chemitrust Industries Corp., Inc.,* D.Del., 362 F.Supp. 1085 (1973) (wrong is deemed to occur where misrepresentation operated to cause loss.) This is in keeping with Delaware's adherence to the *lex loci delecti* rule for negligent torts. It is in seeming contrast to the holdings of *Data General Corp. v. Digital Computer Controls, Inc.,* Del.Ch., 357 A.2d 105 (1975) and *Johnston Associates, Inc. v. Rohm & Haas Co.,* D.Del., 560 F.Supp. 916 (1983), wherein the Courts applied the law of the place of defendant's conduct, rather than injury, to intentional torts. Neither case expressly overruled *Autrey. See also, Hill v. Equitable Trust Co.,* D.Del., 562 F.Supp. 1324 (1983) (in case of intentional torts, the law of the place of defendant's conduct is applied). In both *Johnston* and *Data General,* the situs of the conduct was clear and singular. The *Hill* securities law case involved in part non-resident plaintiffs complaining of conduct centered in Maryland. *Hill,* 562 F.Supp. at 1135. Such conduct included making and accepting payment of the loans in question, bribing defendant's employees, and failing to disclose material information, all taking place within Maryland. *Id.* The Court noted that Maryland limitations law was even more compelling under the "most significant relationship test." *Id.* The *Johnston* Court also noted that its holding was in accord with the modern trend to apply the law of the state with the most significant relationship to the occurrence in a contract case.

*2 This Court found that the same results would apply in the *Rhoads* case under the modern trend, as follows:

The *Restatement of Conflict of Laws* 2d, § 145, outlines contacts to be taken into account in determining the law applicable to an issue in an interests analysis. They are: 1) place of injury, 2) place of conduct, 3) domicile, residence, place of incorporation and business, 4) place where relationship entered. In the instant case, the place of injury is Delaware. The place of conduct is not clearly ascertainable, although if it were, it would be heavily weighed. Ammeraal and plaintiff are incorporated in Delaware; Belting is a foreign corporation, with a foreign domicile. Plaintiff's principal place of business is Delaware; Ammeraal's is Michigan. The relationship does not appear to be centered in one particular place, as plaintiff placed orders with defendants and then distributed the merchandise to their customers. The letter agreement originated with defendants, but was mailed to defendants in Delaware, and presumably was accepted there. From the foregoing, it appears that Delaware has the most significant relationship to the issue.

*Rhoads,* C.A. No. 83C-NO-98 at 40.

In addition to the foregoing, plaintiffs compiled the customer list and MARS information for Ammeraal in Delaware. When the relationship began, Rhoads was the exclusive sales agent for Ammeraal products in the U.S.; its principal place of business is in Delaware. Thus, defendants' stateside business was for many years conducted solely via a Delaware business.

Defendants argue that this Court's holding is in conflict with the principle of law that in the absence of legislative intent, as established on the face of legislation, State law applies only to actions occurring within a State's borders. They assert that mere residency or incorporation in the State is not enough to alter this territorial limitation.

Defendants first cite for support *Carter v. Department of Public Safety,* Del.Super., 290 A.2d 652 (1972). The Court there held that it was impermissible to punish an individual under Delaware law for an action occurring exclusively in another state. Therefore, it was improper to revoke a Delaware motor vehicle license under Delaware's driving under the influence statute based upon a like conviction in Maryland. The Court reasoned that revocation of the license was improper without due process protections; i.e., notice and an opportunity to be heard.

Here, conduct did not lie exclusively in another state, and defendants have full notice and opportunity to be heard.

Defendants also point to *Singer v. Magnavox Co.,* Del.Supr., 380 A.2d 969 (1977) as confirming territorial limits on State law. In *Singer,* plaintiffs unsuccessfully attempted to apply the Delaware Securities Act (prohibiting fraud or deceit in the offer or sale of securities) to defendants' alleged misrepresentation in the solicitation of proxies. *Id. at* 981. Plaintiffs were Pennsylvania residents. The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00165-JJF   Document 46-12   Filed 07/29/2005   Page 19 of 20

Not Reported in A.2d
1988 WL 116423 (Del.Super.)
(Cite as: 1988 WL 116423 (Del.Super.))

Page 3

proxies were not solicited in Delaware. The contract leading to the merger was not made in Delaware, but in New York, and the sale did not occur in Delaware. *Id.* at 981-982. Finally, materials disseminated in connection with the tender offer and merger originated outside Delaware. *Id.* The Court ruled that the fact that the corporate merger vote occurred in Delaware was insufficient contact with the alleged fraud to permit plaintiffs to invoke the Delaware Act. *Id.* at 982. It was too fragile a basis to establish subject matter jurisdiction over alleged fraud in Pennsylvania, or a contract in New York. Plaintiff's arguments regarding the registration of the merger documents in Delaware and the statutory situs of the stock likewise were found to be tenuous. *Id.*

*3 The Court viewed the Securities Act as a Blue Sky law governing transactions subject to Delaware jurisdiction under traditional tests. *Id.* at 981. It did not read the Act as an attempt to introduce Delaware commercial law into the internal affairs of a corporation merely because it was chartered in the State. *Id.*

Unlike in *Singer*, the instant case involves a Delaware situs as the place of contract, as plaintiff's residence and principal place of business, as the place of alleged economic injury, and as the place of incorporation for Ammeraal, Inc. and Rhoads. Further, the material constituting the allegedly misappropriated trade secrets originated here. There is no clear situs for the targeted conduct, as neither party has plead or proved the locales of customer contact, except that they were "nationwide". Looking to the traditional tests for jurisdiction, this Court finds nothing to change its original opinion.

Next, defendants point to *State ex rel. Walker v. Harrington*, Del.Supr., 30 A.2d 688 (1943). That case held unconstitutional an act which authorized qualified military personnel absent from the district to vote at encampments outside of the State, as the Constitution requires polling places for the reception of ballots to be located within State limits. The Court noted, therefore, that the laws of a State have no binding effect beyond its territorial limits, and that one who swears or affirms falsely when challenged for bribery during out-of-state voting cannot be prosecuted here for perjury. *Id.* at 692. Unlike in the present case, *Walker* did not involve the question of purportedly extraterritorial conduct with an impact in this State. Rather, it addressed the constitutionality of a law establishing out-of-state polling places for Delaware elections.

Defendants are correct in their assertion that territorial limitation is unaltered by Delaware residency or incorporation alone. But that is not the case here.

The Delaware Supreme Court has not had the opportunity to address the issue of whether the State's two relevant Acts would apply in multi-state misrepresentation or unfair trade practices cases with significant ties to Delaware. In any event, this Court need not choose between the "lex loci delecti" and more modern "most significant relationship rule", as the same result should obtain from either test, as discussed *supra*. Courts facing a similar issue have resolved the question accordingly. *See, Engine Specialties, Inc. v. Bombardier, Ltd.*, 1st Cir., 605 F.2d 1 (1979); *American Rockwool, Inc. v. Owens-Corning Fiberglas*, D.E.N.C., 640 F.Supp. 1411 (1986); *but see, American Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.*, 2d Cir., 439 F.2d 428 (1971).

Under the *lex loci delecti* rule, Delaware law should apply. In general, courts have found that the law to apply to an intentional tort is the law of the place where the conduct comprising the tortious act occurs. *See, Data General, supra; Johnston Associates, supra; Marra v. Bushee*, D.Vt., 317 F.Supp. 972, 974 (1970), aff'd in relevant part, reversed in part, 2d Cir., 447 F.2d 1282 (1971). The purpose of the law against intentional torts is more punitive than the compensatory purpose of laws against negligent torts. Because of these divergent purposes, the law of the place of the injury is more logical for negligent torts, and the law of the place of the conduct is more sensible for intentional torts. *See*, e.g., *Marra v. Bushee*, 2d Cir., 447 F.2d 1282 (1971); *Autrey, supra*.

*4 This Court has found no Delaware cases which state the purpose of either the Unfair Trade Practices Act or Uniform Trade Secrets Act. However, as these Acts are Uniform Acts, the interpretation of these Acts by courts of sister states may be useful to this Court. In *Kozuch v. Cra-Mar Video Center, Inc.*, Ind.App., 478 N.E.2d 110 (1985), the Indiana Court of Appeals found that the Uniform Trade Secrets Act was enacted "to serve the public interest by giving protection to trade secrets, valuable assets to any business." *Id.* at 114. This Court adopts the position of the Indiana Court that the primary purpose of the Uniform Trade Secrets Act is for protection of a business's assets. It follows logically that the purpose is compensatory.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1988 WL 116423 (Del.Super.)
**(Cite as: 1988 WL 116423 (Del.Super.))**

Page 4

The Unfair Trade Practices Act has been construed in *Gross-Haentjens v. Leckenby*, Ore.App., 589 P.2d 1209 (1979). In *Gross-Haentjens*, the Oregon Court of Appeals found that the purpose of the Act is to provide for restitution for economic loss. *Id.* at 1210. Support for the Act's compensatory purpose can be drawn from Delaware case law as well. In *Air Reduction Co. v. Airco Supply Co.*, Del.Ch., 258 A.2d 302, the Court of Chancery found that the plaintiff did not need to show intent to injure by the defendant in order to recover. If intent does not need to be shown to recover damages, *a fortiori* the purpose of the Act is to compensate.

Both of these Acts have as a primary purpose compensation for losses. Because the primary purpose is compensation, the rationale for negligent torts choice of law decisions should apply rather than the rationale for intentional torts. Therefore, the place of the injury should control which state law should apply under a *lex loci delecti* approach. Using a "most significant relationship" test, the same result would obtain, because the purpose for the law is a factor in the analysis.

The defendants next argue that to apply Delaware law to them would violate both the Commerce Clause and the Due Process Clause of the United States Constitution. They cite correctly the principle that a forum state may not apply its law when the factual and legal situations have little or no contact with the State. But that is not the case here. The Court has reviewed the numerous and significant contacts that Delaware shares with this case, *supra*. The activities giving rise to this lawsuit did not occur wholly outside the State's borders, as the defendants maintain. The application of Delaware laws to these defendants who have acted, in part, in Delaware, does not offend the Commerce Clause of the United States Constitution. The defendants' due process argument rests on the ground that a forum state may not exercise its laws over cases with little or no connection to it. While the Court agrees with this principle, it does not agree that Delaware has such a small connection with this case. The Court has reviewed the connections, and finds that they are sufficient to withstand a due process challenge to the application of Delaware law.

*5 Therefore, the defendants' motion for reargument is hereby DENIED.

IT IS SO ORDERED.

FN1. The most widely accepted conflicts rule is that a tort is governed by the law of the place where it occurred. 4 Callman, *Unfair Competition, Trademarks & Monopolies*, "Jurisdiction of the Courts", § 23.20 (1983). The tort is complete where the "last act" necessary to complete the tort took place. "[S]uch torts as false advertisement, disparagement and the like are not committed where the statement is conceived, mailed or published, but where it reaches an audience." (cites omitted) *Id.* at p. 83. Each deception is a distinct and separate act. The tort does not occur where the preparatory steps are taken. *Id.*

1988 WL 116423 (Del.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.