# EXHIBIT 22

1993 U.S. Dist. LEXIS 18537

ROBERT F. JEFFREYS, JR., d/b/a JEFFREYS FLEX-FLOW RESTRICTOR COMPANY, Plaintiff, v. GERALD M. EXTEN, TOPSIDE CORPORATION, JOHN WILLIAM NUCCI, SALLY NUCCI, W.N., INC., GARY GOLDSTEIN, ESQUIRE, GAC LIMITED PARTNERSHIP, NICHOLAS TSOUKALAS, FLIGHTS END LIMITED PARTNERSHIP, and TOPSIDE MARINA LIMITED PARTNERSHIP, Defendants.

Civil Action No. 86-32-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

1993 U.S. Dist. LEXIS 18537

December 30, 1993, Decided

COUNSEL: [*1] Richard F. Stokes, Esquire, of Tunnell & Raysor, Wilmington, Delaware, and Elliott D. Goldberg, Esquire, of Goldberg, Baer, Romain & Abramson, Paoli, Pennsylvania, attorneys for plaintiff.

Gerald M. Exten, of Ocean View, Delaware, appearing Pro Se and on behalf of Topside Corporation and Topside Marina Limited Partnership.

Bayard J. Snyder, Esquire, of Snyder, Schlecker & Issaacs Wilmington, Delaware, and David H. Moskowitz, Esquire, of Lalvern, Pennsylvania, attorneys for John William Nucci and Sally Nucci.

Gary A. Goldstein, Esquire, of Stuart, Florida, appearing Pro Se.

William M. Chasanov, Esquire, of Brown, Shiels & Chasanov, Georgetown, Delaware, attorneys for defendant Nicholas Tsoukalas.

JUDGES: ROBINSON

OPINIONBY: SUE L. ROBINSON

OPINION: MEMORANDUM OPINION

Dated: December 30, 1993

Wilmington, Delaware

SUE L. ROBINSON, District Judge

## I. INTRODUCTION

The plaintiff, Robert F. Jeffreys, Jr., brought this action alleging that the defendants committed violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., The Act Concerning Fraudulent Conveyances, 6 Del. C. § 1301 et seq., and Delaware common law. [*2] Plaintiff alleged that the defendants engaged in an elaborate scheme to defraud the plaintiff of recovering his loan to and judgment against one of the defendants, Topside Corporation. Essentially, plaintiff contends that the defendants engaged in a series of complex commercial transactions, business activities and successive mortgage foreclosures, which were designed to strip Topside Corporation of its assets in order to prevent plaintiff from collecting the money owed him by Topside Corporation. The Court held a three-day bench trial. The following are the Court's findings of fact n1 and conclusions of law pursuant to Fed.R.Civ.P. 52.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n1 The Court's findings of fact include activities occurring after November 11, 1984, as such activities are merely a continuation of those pled in the complaint.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## II. FINDINGS OF FACT n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n2 The parties stipulated to the authenticity of all documents offered into evidence. Defendants objected only on the grounds of relevancy with respect to all documents offered by plaintiff. The Court denies the relevancy objections as to all documents offered by plaintiff. Insofar as any of the documents which plaintiff offered into evidence may relate to transactions outside the applicable limitations period, the Court finds those documents and transactions are relevant to prove the state of mind of various defendants. However, the Court has not considered as competent evidence the

1993 U.S. Dist. LEXIS 18537

plethora of correspondence between non-parties.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*3]

Because this case involved various financial transactions, for the most part, the facts of this case were not in dispute. The parties, however, vehemently disputed the inferences to be drawn from those facts. The Court finds that the testimony of both the plaintiff and the defendants was generally credible.

A. The Actors

Plaintiff, Robert F. Jeffreys, Jr. ("Jeffreys"), resides in King of Prussia, Pennsylvania, and conducts business as a subpartnership, Jeffreys Flex-Flow Restrictor Company.

Defendant Gerald M. Exten ("Exten") resides in Ocean View, Delaware. At all times relevant to these proceedings, Exten controlled Exten Associates, Inc. ("EAI"), a Maryland corporation which held property in Sussex County, Delaware. Exten also was president and majority shareholder of Topside Corporation ("Topside"), a Maryland corporation which operated Topside Restaurant in Sussex County, Delaware. n3 Topside was the general partner of defendant Topside Marina Limited Partnership ("TMLP") a limited partnership organized under Maryland law. TMLP owned the property upon which the Topside Restaurant was built and located after 1980. Throughout the myriad transactions that occurred during the course [*4] of the existence of Topside and TMLP, Exten acted interchangeably as president of Topside and/or general partner of TMLP.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n3 Topside never answered the complaint. Plaintiff applied for entry of default against Topside. (D.I. 52, 78) The Clerk of the Court entered a default in appearance. (D.I. 79) Where there are several defendants in an action in which those defendants are alleged to be jointly liable, and one or more, but not all, of the defendants defaults, a court must wait until a final judgment is entered against the remaining defendants before entering a default judgment. Frow v. De La Vega, 82 U.S. 552, 15 Wall. (82 U.S) 552, 21 L. Ed. 60 (1872). If the suit is decided in favor of the complainant, then the default judgment can be entered in favor of the complainant; if

the suit is decided against the complainant, then the default judgment cannot be entered in favor of the complainant. Id.; see also U.S. ex rel. Dattola v. National Treasury Employees Union, 86 F.R.D. 496 (W.D. Pa. 1980).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*5]

Defendants John William Nucci ("Nucci") and Sally Nucci, husband and wife, reside in Brookmont, Maryland. Nucci was an alternate general partner of TMLP, and the president and sole shareholder of defendant W.N., Inc., a Maryland corporation. (Exhibit P-53)

Defendant Gary Goldstein, Esquire ("Goldstein"), resides in Stuart, Florida. Goldstein was a director of and shareholder in Topside and was the sole director and shareholder of O.C. Flights, Inc., a Maryland corporation. (Exhibit P-46) Goldstein also was a limited partner in GAC, Limited Partnership ("GAC"), a limited partnership organized under Maryland law. n4 GAC owned the property upon which the original Topside Restaurant was located prior to its being destroyed by fire in 1980. At various times, Goldstein was counsel to the following defendants: Topside, TMLP, W.N., Inc., and Flights End Limited Partnership.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n4 As with defendant Topside, GAC never answered the complaint and, therefore, the Clerk of the Court entered an order of default in appearance. (D.I. 79) See supra note 2.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*6]

Defendant Flights End Limited partnership ("FELP") was a limited partnership organized under Maryland law.

Defendant Nicholas Tsoukalas ("Tsoukalas") managed, leased, and then owned the Topside Restaurant for a brief period from May, 1984 until May, 1986.

GNP Realty Development Corporation ("GNP") was a Maryland corporation controlled by Exten.

Tengees Limited Partnership ("Tengees") was a Maryland limited partnership in which Exten was a general partner and GNP was a limited partner.

1993 U.S. Dist. LEXIS 18537

## B. The Property

At the heart of this litigation are certain parcels of property located in Sussex County, Delaware that were held at one time or another by EAI ("the Property"). The Property consisted of six parcels hereinafter designated as A-79, A-80, B, C, D, and E. Parcel A-79 consisted of approximately 1.1 acres upon which the original Topside Restaurant was located. Parcel A-80 consisted of approximately 14 acres upon which the second Topside Restaurant was built. The remaining parcels were at one time part of Parcel A-80. Parcel B consisted of approximately 9.5 acres. Parcel C was less than one-half acre. Parcel D consisted of slightly more than one-half acre. Parcel E consisted of that portion [*7] of land designated as Parcel A-80 upon which the new Topside Restaurant was built plus Parcel D.

## C. The Pre-loan History of the Property

EAI owned both Parcels A-79 and A-80 and operated the Topside Restaurant located on the Property in 1972. (D.I. 153 at 69-70) EAI filed for bankruptcy in the United States District Court for the District of Maryland on July 1, 1974. (See Matter of Exten Associates, Inc., 13 Bankr. 818 (Bankr. D. Md. 1981); Exhibit P-108) n5 The Bankruptcy Court confirmed a plan of arrangement which provided that creditors' payments were to be secured by a $ 500,000 mortgage on the Topside Restaurant and Marina, however, the mortgage was never prepared or recorded. ( Matter of Exten Associates, Inc., 13 Bankr. at 820; Exhibit P-108; D.I. 154 at 129) The Bankruptcy Court rescinded the Confirmation Order and adjudicated EAI bankrupt on December 29, 1978. ( Matter of Exten Associates, Inc., 13 Bankr. at 821) When D.I. 153 at 73, 80) Concomitantly, Exten was involved in personal bankruptcy proceedings and, after extensive litigation, Exten was adjudicated personally bankrupt [*8] in 1981. (See Matter of Exten Associates, 13 Bankr. at 821 n.3)

------------ Footnotes ----------

n5 The Court has relied upon the Bankruptcy Judge's opinion only with respect to the procedural aspects of the EAI bankruptcy. Plaintiff offered the opinion to provide other background with respect to the transactions discussed in the Bankruptcy Judge's opinion. However, the Bankruptcy Judge made no factual findings so that court was deciding a motion to dismiss on jurisdictional grounds. See Matter of Exten Associates, Inc., 13 Bankr. at 821.

------------ End Footnotes------------

On September 3, 1976, Goldstein, Exten, and others formed GAC, which acquired Parcel A-79 from EAI. (D.I. 153 at 68-70; Exhibit EG3-4, Exhibit RSA-1) Topside was incorporated in Maryland on February 18, 1977, with Goldstein serving as a director. (Exhibit P-106) On January 1, 1979, Topside leased Parcel A-79 from GAC and operated the Topside Restaurant until it burned to the ground on February 5, 1980. (D.I. 153 at 81, 102, 109, Exhibit RSA-2)

On December [*9] 12, 1978, Exten and Nucci formed TMLP, with Topside serving as the General Partner and Nucci, among others, as limited partners; Nucci ultimately was designated as Alternate General Partner. (Exhibit PS-34; D.I. 153 at 84-85, 88, D.I. 154 at 175-79) Topside had a "residual" interest in TMLP which amounted to 23 percent in 1978. (D.I. 153 at 91) At a foreclosure sale on January 9, 1979, TMLP purchased Parcel A-80 which had been held by EAI. (D.I. 153 at 88, 91, Exhibit P-1) On June 1, 1980, Topside signed two long-term leases with TMLP for use of a restaurant to be built upon Parcel A-80 as well as for a parking lot and water and sewage treatment facilities. (D.I. 153 at 94, 100; Exhibit P-2, Exhibit P-3)

## D. The Jeffreys Loan

Exten solicited a loan of $ 100,000 from Jeffreys to Topside to rebuild the Topside Restaurant and a loan agreement was executed on June 14, 1980. (D.I. 153 at 102, D.I. 155 at 128-30, 137, 163-64, 172-73, 175; Exhibit PA-B) This loan was not recorded. Neither Nucci nor Goldstein had actual knowledge of Jeffreys' loan to Topside until the commencement of the instant litigation. (D.I. 154 at 4-5, D.I. 154 at 107-08, D.I. 154 at 115) Exten assigned Jeffreys all [*10] of his stock in Topside as collateral, approximately 79 percent of the outstanding stock in Topside. (D.I. 153 at 115) The loan instrument specifically provided that Jeffreys was to "hold Exten's stock in trust for the specific purpose of collateral security against default." (Exhibit PA-B)

In negotiating for the loan, Jeffreys relied upon Topside's "Statement of Assets and Liabilities" (the "Statement") which Exten prepared and presented to Jeffreys. (Exhibit PA-A; D.I. 153 103-04, 109-10) This statement was dated May 9, 1980 and purported to represent Topside's financial condition as of April 30, 1980. (Exhibit PA-A) Jeffreys relied upon this Statement in deciding to loan the money to Topside. (D.I. 153 at 118; D.I. 155 at 128-30, 137, 163-64, 172-73, 175) The Statement indicated that in addition to Parcel A-80, which was listed as an asset worth $ 485,000 with an appraised value of $ 1,200,000,

1993 U.S. Dist. LEXIS 18537

Topside had the following assets: cash - $ 1,850; rents receivable (from boat slips) - $ 13,050; insurance proceeds receivable - $ 575,000; personal property and fixtures - $ 15,000; equipment (tractors, boats, barges, lifts, etc.) - $ 207,000; tools - $ 8,500; Vehicles - $ 12,000; pre-paid [*11] insurance premiums - $ 10,300. All the assets together amounted to $ 1,328,300. (Exhibit PA-A) The Statement listed liabilities amounting to $ 846,200, including "Assignment of partial Insurance Proceeds" of $ 140,000. (Id.)

The Statement was materially false in listing Parcel A-80 as an asset of Topside when, in fact, Topside only held a 23% interest in TMLP, which actually owned Parcel A-80. (D.I. 153 at 112-14, Exhibit PA-A) Exten did not inform Jeffreys that it was TMLP, and not Topside, which owned Parcel A-80. (D.I. 153 at 114, D.I. 155 at 185) Topside had also conveyed a portion of Parcel A-80 (Parcel C) to Exten on June 2, 1980, but the conveyance was not recorded until February 29, 1984. (Exhibit PA-I) Thus, Topside held only two long-term leases with TMLP by which TMLP leased the Restaurant and Parcel A-80 to Topside in June 1980 for $ 47,900 per year. (Exhibit P-2, Exhibit P-3) These leases were not recorded until October 22, 1980, four months after the Jeffreys loan. (Id.)

With part of the loan proceeds, Topside constructed a new Topside Restaurant on Parcel A-80, on the property adjacent to the location of the original Topside Restaurant. (D.I. 153 at 82, 116, D.I. 155 [*12] at 130, 139, 166) Jeffreys was involved in assisting in the operation of the restaurant. (D.I. 155 at 175)

In 1981, Exten informed Jeffreys that he had been personally adjudicated bankrupt and suggested that Jeffreys make any claims that he had relating to the loan in the Maryland Bankruptcy Court. (D.I. 155 at 138-39) By 1982, Exten had paid approximately $ 15,000 in principal on the loan and approximately $ 60,000 in interest. (D.I. 153 at 117-18)

On May 16, 1982, Exten, as president of Topside, and Jeffreys amended the original loan agreement to increase the principal to $ 167,739.15. (Exhibit PA-C; D.I. 153 at 117, D.I. 155 at 130) This accomplished a rollover of the balance of the unpaid principal and unpaid interest of the 1980 loan. (D.I. 155 at 141) As security for the loan, Exten again pledged all of his common stock in Topside (42,500 shares of 53,500 outstanding shares), and a U.C.C. Financing Statement which covered the equipment, furniture and other items which Topside purportedly owned. (Exhibit PA-C; D.I. 153 at 114-15, D.I. 155 at 137, 181) Jeffreys subsequently relinquished his security interest in the personal property in August, 1982. (D.I. 155 at 180-81; Exhibit [*13] G-16)

At some point in 1982, Topside defaulted on the loan to Jeffreys and Jeffreys subsequently instituted suit against Topside in the Delaware Superior Court. (D.I. 155 at 131, Exhibit PA-C) n6 Under the terms of the loan agreement with Topside, the default of the loan obligations should have enabled Jeffreys to become the majority shareholder in Topside. (Exhibit PA-B)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

n6 In the complaint, plaintiff alleged that his suit in Superior Court commenced on December 2, 1983. (D.I. 1 at P 21) Plaintiff, however, failed to prove this at trial.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

On October 17, 1982, Exten mailed Jeffreys a letter that informed Jeffreys of difficulties with respect to Exten's bankruptcy and discussed "inventive planning" to protect Jeffreys' investment. (Exhibit P-110; D.I. 153 at 128) Exten proposed that Jeffreys purchase the restaurant from Topside, using the loan as part of the purchase price. (Exhibit P-110) The purpose of the offer was to circumvent his personal bankruptcy trustee's attempts to reach the Topside Restaurant. (Exhibit [*14] P-110)

E. Post-loan Activities

1. Settlement of EAI Bankruptcy Litigation

On October 7, 1982, Exten, Goldstein, GAC, TMLP, and Topside entered into a settlement agreement with the Trustee of the EAI bankrupt estate to pay the $ 500,000 that had been required originally under the 1974 bankruptcy plan. (Exhibit PA-H; D.I. 155 at 30-33) The $ 500,000 was to be paid by three different notes: the first note was to be for $ 150,000 and was to be guaranteed by Goldstein; the second note, for $ 200,000, was to be guaranteed by the Nuccis; the third note, for $ 150,000, was to be secured by a mortgage from TMLP on Parcel A-80. (Exhibit PA-H) Goldstein was to receive one-third of the fire insurance proceeds from the destruction of the original Topside Restaurant. (Exhibit PA-H) Nucci received a phone call from Exten requesting that he attend a meeting with Exten and Goldstein; after the meeting, Nucci relented to a request to serve as guarantor in order to protect the interests of other limited partners of TMLP who happened to be employees of Nucci. (D.I. 154 at 181-84) The Maryland Bankruptcy Court approved the settlement on February 3, 1983. (Exhibit P-32) The $ 500,000 appears to have been [*15] satisfied out of the

1993 U.S. Dist. LEXIS 18537

proceeds of a transaction with Old Court Savings & Loan, Inc. ("Old Court").

2. Nucci Mortgage

In January, 1982, William and Sally Nucci executed a $ 140,000 mortgage with TMLP to secure a loan made by the Nuccis to TMLP to satisfy certain tax liabilities of TMLP. (D.I. 154 at 37-41, 192) Parcel A-80 served as the collateral for that mortgage. (Exhibit P-5) The Nuccis signed a release of that mortgage on February 2, 1983. (D.I. 154 at 37-41, Exhibit P-17) Subsequently, Exten phoned Nucci to inform him that the "release" had been a mistake, and that the mortgage should have been "subordinated." (D.I. 154 at 38)

3. Old Court Mortgage I

On February 2, 1983, two days before the Maryland Bankruptcy Court approved the EAI bankruptcy settlement agreement, TMLP executed a $ 1,575,000 mortgage with Old Court on Parcel A-80 ("Old Court Mortgage I") and $ 500,000 was placed into an escrow account for the benefit of the EAI bankruptcy settlement. (D.I. 153 at 141-42, D.I. 155 at 30-33, Exhibits P-13, P-14, P-15) The distribution of the remaining loan proceeds included the following disbursements: Goldstein received $ 16,000 in attorneys fees, and a check for $ 4,000 which [*16] he endorsed back to Jeffrey Levitt, the escrow agent at Old Court; $ 220,000 was placed in escrow for Old Court to service the debt owed on the mortgage for one year (D.I. 154 at 166); finance charges amounted to $ 47,250; Murray Enterprises, Inc. received $ 405,762 in satisfaction of a mortgage executed on the Property several years before by EAI; First National Bank received $ 224,307 in satisfaction of a mortgage executed on the Property by EAI; and $ 75,000 was placed in escrow as a "Construction Loan." (Exhibit P-12) n7

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n7 Plaintiff contends that the fees associated with the mortgage settlement were "excessive" and that Goldstein provided a "kickback" to Jeffrey Levitt of Old Court. Plaintiff has not supported these allegations, however, with any persuasive evidence.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

Plaintiff alleges that these transactions were accomplished, in part, through the use of the United States mail. Plaintiff relies upon what appears to be correspondence with respect to these activities,

however, there is nothing in the record to     [*17] support a finding that any of this correspondence was placed into the postal stream. n8

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n8 Plaintiff lists the following letters: Goldstein letter to Levitt (of Old Court), 2/1/83, Exhibit P-7; Goldstein letter to Levitt, 1/31/83, Exhibit P-8; Levitt letter to Old Court, 2/2/83, Exhibit P-21; Charles Street Title Co. letter to Meridian Mortgage Investments, Inc., 2/2/83, Exhibit P-24; Levitt letter to Jerome Cardin, Esq., 3/17/83, Exhibit P-25; Goldstein draw-down letter, 4/7/83, Exhibit P-30; Goldstein draw-down, 5/12/83, Exhibit P-31; Exten letter to Old Court, 8/15/83, Exhibit P-34. Of those documents, Exhibits P-7, P-8, P-30, and P-31 all expressly indicate that they were hand delivered. The other documents are merely photocopies of letters, without any testimony or other evidence that would indicate that they were actually placed into the United States' mail.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

4. Elimination of Topside Assets

In September, 1983, after a three-year period in which Topside failed to fulfill its lease payment obligations to TMLP on [*18] the Topside Restaurant, Topside ceased operating the Restaurant. (D.I. 155 at 32-33) TMLP employed John Richardson to operate the restaurant for the last two months of 1983. (D.I. 155 at 50)

The equipment listed on the Topside Statement of Assets and Liabilities, such as the boats, barges, and lifts, was sold at some point between 1980 and 1983. (D.I. 153 at 137, D.I. 155 at 19-21) As a result of the settlement of litigation involving the fire insurance proceeds emanating from the destruction of the original Topside Restaurant, Maryland National Bank received the fire insurance proceeds in partial satisfaction of a mortgage held on Parcel A-79 (D.I. 154 at 21, D.I. 155 at 197)

5. Nucci Mortgage II

On November 30, 1983, TMLP executed another mortgage for $ 140,000 with the Nuccis. (Exhibit PA-F) This mortgage "revived" the mortgage that the Nuccis had released prior to the Old Court Mortgage I. The Nuccis executed a release of the mortgage with

1993 U.S. Dist. LEXIS 18537

respect to Parcel C on July 9, 1984. (D.I. 154 at 43, 96, Exhibit P-92) n9 The Nuccis executed a release of the mortgage with respect to Parcel A-80 and Parcel D on September 29, 1984. (D.I. 154 at 96-97, Exhibit P-95)

-------------- Footnotes --------- ------

n9 In 1991, the Nuccis assigned whatever interest that they had in that mortgage to Old Court Land Corporation. (D.I. 154 at 193, Exhibit RS-D6)

------------ End Footnotes------- ------

[*19]

## 6. Joint Venture Between TMLP and FELP

On January 5, 1984, TMLP sold 51 percent of its holdings to FELP. (D.I. 155 at 61; Exhibit P-37) The consideration for the sale was an assumption of the existing Old Court Mortgage I and a $ 398,000 note to be payable out of the proceeds from the development of the joint venture property. (Exhibit P-37) Goldstein assisted in the formation of FELP in January, 1984. (D.I. 155 at 208-10) The partners in FELP were W.N., Inc. and O.C. Flights, Inc. as General Partners, and Nucci and O.C. Flights, Inc. as Limited Partners. (Exhibit P-43)

Nucci and Goldstein had two telephone conversations concerning the FELP joint venture in which the two defendants discussed the virtues of entering that joint venture and the settlement with Old Court. (D.I. 154 at 22-23, 30) Goldstein had at least one telephone conversation with Dennis Guidice of Old Court concerning the closing of the transaction and recommending Delaware counsel to assist in the transaction. (D.I. 154 at 137)

## 7. Release of Topside Leases

On January 10, 1984, Exten, as president of Topside, and Nucci, as alternate general partner of TMLP, signed a release of the Lease and Land Agreement between [*20] Topside and TMLP. (Exhibit P-42, D.I. 154 at 25) While Exten testified that these releases were never recorded, Exten admitted that the leases were at some point terminated. (D.I. 155 at 65-67) Thus, the only remaining assets held by Topside as of 1984 were a 23 percent share in TMLP and the liquor license for the Topside Restaurant. (D.I. 155 at 48)

## 8. Conveyance of Parcel B

On January 10, 1984, TMLP conveyed Parcel B to FELP, TMLP, and W.N. Inc. as co-tenants; FELP obtained a 50% interest, TMLP obtained a 49% interest, and W.N., Inc. obtained a 1% interest. n10

(D.I. 155 at 62-63; Exhibit PA-J; Exhibit P-41) The consideration stated in the deed was the assumption of indebtedness in the amount of $ 1,973,000. (Exhibit P-41) TMLP did not convey Parcel E, which is Parcel D and that portion of Parcel A-80 upon which the Restaurant was located. (Exhibit PA-J; Exhibit P-41)

-------------- Footnotes --------- ------

n10 This deed appears to have been recorded on March 20, 1984. (Exhibit PA-J)

------------ End Footnotes------- ------

## 9. Jeffreys obtains default judgment against Topside

On approximately [*21] January 13, 1984, Jeffreys obtained in the Delaware Superior Court a default judgment against Topside for defaulting on the loan. (D.I. 155 at 131; Exhibit PA-C) n11 Jeffreys' counsel represented to this Court at trial that Jeffreys secured attachment of various equipment and personal property of Topside and that Jeffreys secured an injunction against the sale of other equipment. (D.I. 155 at 187-88) n12 While it appears, then, that Jeffreys undertook some efforts to collect on the judgment, his efforts have been unsuccessful to date. (D.I. 155 at 53, D.I. 155 at 131)

-------------- Footnotes --------- ------

n11 The Court bases this finding upon a copy of a motion for default judgment filed in Superior Court and dated January 13, 1984. The Court assumes that this judgment was entered on that date.

n12 Jeffreys' counsel also represented that "there was a charging order entered upon the partnership interest of Topside Corporation on May 17, 1985." (D.I. 155 at 188) This, however, is not competent evidence upon which the Court can make a finding with respect to any attachment of the partnership interest. Plaintiff could have submitted a copy of this order to the Court. The Court's independent research uncovered an opinion in the Delaware Chancery Court that indicates that a charging order was issued in May of 1986. Jeffreys v. Exten, 1988 WL 3636 at *2 (Del. Ct. Ch. January 11, 1988).

1993 U.S. Dist. LEXIS 18537

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*22]

10. Old Court Mortgage II

On February 9, 1984, FELP executed a $ 2,330,000 mortgage on Parcel B with Old Court ("Old Court Mortgage II"). n13 (Exhibits P-61, P-62, P-63) Although the mortgage instrument describes the parcel as containing approximately 14 acres (Exhibit P-61), the record indicates that Parcel B consisted of only approximately 9 acres. (D.I. 155 at 63; Exhibit P-61) The money was disbursed as follows: $ 93,200 for "loan commitment fees, or points"; $ 27,040 for settlement expenses, including $ 10,000 in legal fees; $ 1,597,589.97 to pay off Old Court Mortgage I; $ 554,170.03 into "Escrow for Construction"; and $ 58,000 as an advance for Nucci. n14 (Exhibit P-60) Nucci's advance related to moneys advanced to satisfy certain tax obligations of TMLP. (D.I. 154 at 194)

- - - - - - - - - - - - - Footnotes - - - - - - - - - -

n13 Nucci signed an affidavit used in connection with Old Court Mortgage II on February 9, 1984 stating that there were no outstanding leases, judgments, or mortgages against Parcel A-80. (Exhibit P-116) In reality, Nucci held the revived $ 140,000 mortgage on Parcel A-80. (D.I. 154 at 43, Exhibit P-92) Nucci, on the advice of Goldstein, believed the affidavit to be true as he was told that the mortgage was going to be satisfied subsequently out of the Old Court Mortgage II settlement funds. (D.I. 154 at 48, 185)

[*23]

n14 Again, plaintiff asserts that there were "uncharacteristically excessive closing costs" such as the points, document preparation, settlement preparation, legal fees, a pay off of the original mortgage in excess of the original principal, and the construction escrow." (D.I. 161 at 31-32) plaintiff offers no evidentiary support from the record for any of the above assertions; thus, the Court cannot find any of these facts.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Plaintiff alleges that this transaction was achieved through the use of the United States mail. Plaintiff lists sixteen letters that allegedly were mailed to complete the transaction (P-38, P-72, P-73, P-75, P-76, P-80, P-81 (2), P-84, P-85, P-86, P-88, P-89, P-90, P-91, P-94). However, plaintiff has failed to establish that the following documents were placed in the postal stream: P-38, P-72, P-73, P-76, P-81 (2), P-84, P-85, P-88, P-89, P-90, P-91, P-94. While in Exhibit P-81, plaintiff has provided a photocopy of an envelope which presumably contained a letter from Goldstein to Nucci, a photocopy of which is also included in Exhibit P-81, the photocopy does not have a postmark [*24] or any other indication that the envelope or its contents were placed in the postal stream.

The Court finds, however, that Exhibit P-75, a February 22, 1984 letter from Goldstein to Nucci, which contains documents and a letter purportedly sent to Dennis Guidice of Old, was placed into the postal stream. Goldstein requested in Exhibit P-65 that Nucci ensure that FELP be named as beneficiary in an insurance policy covering the Topside Restaurant and Marina.

The Court finds that Exhibit P-86, a May 25, 1984 letter from Goldstein to Nucci regarding Old Court Mortgage II, also was placed into the postal stream. In that letter, Goldstein notified Nucci that there had been some irregularity with respect to Old Court Mortgage II, n15 that Goldstein would no longer continue to represent any of the parties in the matter, and Goldstein recommended that all parties retain counsel with regard to the matter.

- - - - - - - - - - - - - Footnotes - - - - - - - - - -

n15 Goldstein received a phone call from someone at Old Court several weeks after the settlement indicating that the mortgage and deed from the FELP transaction had not been recorded. (D.I. 154 at 148)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*25]

11. Lease of Parcel A-80 to Tsoukalas

Notwithstanding the January, 1984 document that appeared to release Topside's leases on Parcel A-80 and the Restaurant (Exhibit P-42), on May 6, 1984, Topside, under the direction of Exten as its president, entered into a management agreement with defendant Tsoukalas that was designed to permit Tsoukalas to take over the management and liquor license of the Topside Restaurant. (D.I. 155 at 45-47, Exhibit PA-K)

On June 1, 1984, Tsoukalas entered into a lease agreement with TMLP for the Topside Restaurant for $ 60,000 per year. (D.I. 155 at 126, Exhibit PS-17) Exten

Page 7

1993 U.S. Dist. LEXIS 18537

signed the lease as General Partner of TMLP (presumably acting as Topside's president). (Exhibit PS-17) Tsoukalas made $ 60,000 in rental payments, with the first payable to Exten for $ 20,000, and the rest payable directly to TMLP. (Exhibit P-112, Exhibit P-113)

At some point in 1984, Jeffreys knew that Tsoukalas was operating the Topside Restaurant. (D.I. 155 at 174)

## 12. Exten Becomes General Partner of TMLP

On October 2, 1984, Nucci, as Alternate General Partner of TMLP, appointed Exten as TMLP's General Partner and ratified all of Exten's actions from July 31, 1981 to October 23, [*26] 1984. (Exhibit P-96) Thus, Exten, who had been president of Topside, which was in turn the General Partner of TMLP, was now acknowledged as being the General Partner of TMLP. Nucci and Exten had a telephone conversation regarding Exten's being retroactively appointed as General Partner of TMLP. (D.I. 154 at 79)

## 13. Tsoukalas Mortgage

On December 5, 1984, TMLP sold Parcel E, including the Topside Restaurant, to Tsoukalas for stated consideration of $ 640,000. (D.I. 155 at 56, 126, Exhibit PA-L) This sale was undertaken at the direction of Exten in his capacity as president of Topside, the General Partner to TMLP. (Exhibit PS-32) Tsoukalas executed a mortgage for $ 615,000 with TMLP on December 5, 1984 ("Tsoukalas Mortgage"). (D.I. 155 at 64, Exhibit PA-L) The sales price, as reflected on the settlement sheet, was $ 640,000. (Exhibit P-118) n16 The settlement sheet also reflects a set-aside of $ 27,500 for outstanding judgments by individuals named McKibben and Perrin, who were Limited Partners of TMLP; these judgments were obtained against TMLP and Topside in Delaware Superior Court in October, 1983 and June, 1984. (Exhibit P-118; Exhibit P-123; Exhibit P-124; Exhibit P-125)

- - - - - - - - - - - - - Footnotes - - - - - - - - - - -

n16 The Court presumes that Exhibit P-118, which is barely readable, is the settlement sheet for this loan.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*27]

## 14. Shenandoah Mortgage I

On December 17, 1984, TMLP applied for a loan from the Shenandoah Federal Savings and Loan Association

("Shenandoah") for $ 450,000, and offered the Tsoukalas Mortgage as collateral. (D.I. 155 at 64, 70, Exhibit PS-19; Exhibit PS-20) On January 11, 1985, TMLP, with Exten signing on behalf of Topside as General Partner of TMLP, assigned the Tsoukalas Mortgage to Shenandoah. (Exhibit PS-23) Nucci and Exten guaranteed the loan. (Exhibit PS-33) Again, Nucci guaranteed the loan to protect the other limited partners. (D.I. 154 at 189) The settlement sheet reflects that TMLP received $ 377,991. (Exhibit PS-24) Approximately $ 198,000 was distributed among TMLP's Limited Partners to buy out the shares of some of those partners (Exhibit PS-1; D.I. 154 at 58, 100), including the following disbursements: $ 25,000 was paid to Nucci to reimburse an advance he had provided in order to settle litigation that had been brought by Exten's personal bankruptcy trustee against Exten, Topside, and TMLP (D.I. 154 at 68-70, 73); $ 61,616.94 was paid as Nucci's distribution to United Virginia Bank in payment of a loan undertaken by Nucci on behalf of TMLP (D.I. 154 at 72-73, 195); [*28] $ 55,000 was escrowed for road construction (D.I. 155 at 75); $ 10,000 went to Exten as a "Loan Brokerage Fee" (D.I. 155 at 75). By these transactions, TMLP bought approximately 40 to 50 percent of the outstanding interest of its limited partners. (D.I. 155 at 103-04) Therefore, Topside's interests in TMLP, being "residual," correspondingly increased by approximately the same amount of the repurchase of the limited partners' interests.

Nucci had a telephone conversation with William DiLoreta of Shenandoah concerning Nucci's ability to serve as guarantor of the loan. (D.I. 154 at 80)

## 15. Instant Lawsuit

On January 21, 1986, Jeffreys filed the complaint in this action seeking recovery of the amount of the Delaware state court default judgment of $ 259,933.79 plus interest. (D.I. 1)

## 16. Tsoukalas Mortgage Foreclosed

Tsoukalas was unable to make the mortgage payments due in part to the lack of success in running the Topside Restaurant. (D.I. 154 at 115-18) In May, 1986, after Tsoukalas failed to meet payment obligations, TMLP and Shenandoah foreclosed on that mortgage. (Exhibit PS-85; Exhibit PS-86; D.I. 155 at 71-73) n17 Apparently, there was an entry of judgment by default with respect [*29] to the mortgage against Tsoukalas on July 24, 1986. (Exhibit PS-47) n18

- - - - - - - - - - - - - Footnotes - - - - - - - - - - -

n17 The Court bases this finding in part upon a copy of a demand letter written by

1993 U.S. Dist. LEXIS 18537

Exten and apparently co-signed by an agent of Shenandoah (Exhibit PS-85), as well as a copy of what appears to be a complaint filed in Delaware Superior Court. (Exhibit PS-45)

n18 The Court makes this finding based upon a barely legible photocopy of what appears to be a motion for entry of a default judgment filed in the Delaware Superior Court pursuant to Superior Court Civil Rule 55. (D.I. PS-47)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

17. Shenandoah Mortgage II

On June 10, 1986, Exten, acting through GNP, sought financing from Shenandoah to obtain Parcel E. (Exhibit PS-48) In June, 1986, Exten attempted to buy Parcel E on behalf of Tengees. (D.I. 155 at 73; Exhibit PS-50) On July 24, 1986, Exten, through Tengees, secured approval for a short term acquisition loan from Shenandoah in the amount of $ 855,000 to acquire Parcel E. (Exhibits PS-60 to PS-63) Nucci and Exten served as guarantors for [*30] the loan. (Exhibit PS-60) Nucci served as guarantor to extinguish the $ 450,000 obligation to Shenandoah, and to attempt to ensure that TMLP's limited partners obtained some return of their investment. (D.I. 154 at 190) Jeffreys filed a lis pendens with respect to the Property on September 22, 1986, notifying all parties with an interest in the Property of the instant litigation. (Exhibit PS-68) Shenandoah purchased Parcel E for $ 673,547.10 at a Sheriff's sale on September 23, 1986. (Exhibit PS-47) Shenandoah obtained a Sheriff's Deed for that parcel on October 10, 1986. (Exhibit PS-47)

Shenandoah conveyed Parcel E to Tengees on October 15, 1986 for stated consideration of $ 674,000. (Exhibit PS-67) That deed conveyed title to a sewer system and a water and pump house to Tengees; however, TMLP still retained a fifty percent interest in both of those items. (Exhibit PS-67, Exhibit PS-2) n19 Tengees executed a mortgage with Shenandoah for $ 855,000 ("Shenandoah Mortgage II"). (Exhibit PS-B2) As part of the settlement, Shenandoah received $ 456,545.74 to satisfy TMLP's obligations to Shenandoah under Shenandoah Mortgage I. (Exhibit PS-65) Also at settlement, Tengees received $ 242,793.96; [*31] $ 112,900 went into a construction escrow. (Exhibit PS-65) Exten received $ 45,766 for moneys advanced by him to TMLP. (D.I. 155 at 109-10) United Virginia Bank received payments of $ 71,218.83 and $ 5,824.95 for obligations guaranteed by Nucci and Exten. (D.I. 155 at 111-12) Baltimore Trust

received $ 10,501.06 in satisfaction of a loan that had been advanced to Nucci to help operate the restaurant. (D.I. 155 at 113-14) William Wilgus received $ 31,185.98 for his assistance in instituting the foreclosure proceedings. (D.I. 155 at 114) Exten received $ 48,000 in exchange for Parcel C. (D.I. 155 at 114) Exten used $ 12,889.49 to pay legal fees in two pending cases, a Jeffreys' case and a case involving Maryland Deposit Insurance Fund. (D.I. 155 at 123)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n19 On March 15, 1989, Exten, as TMLP's General Partner, executed a quitclaim deed that conveyed TMLP's interest in the pump house and wastewater disposal system to Shenandoah. (Exhibit RSC-4)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

18. Post-Tengees Activities

In May, 1987, as the result of the litigation [*32] involving the fire insurance proceeds from the original Topside Restaurant fire, there was a foreclosure sale of Parcel A-79, related to a mortgage held by Maryland National Bank. (D.I. 155 at 215) Goldstein and two others obtained and subsequently sold the parcel for $ 125,000. (D.I. 155 at 215-17)

In June, 1987, Exten, through Tengees, unsuccessfully attempted to sell Parcel E to Robert Kent for $ 1,200,000. (Exhibit PS-79) In January, 1988, Shenandoah foreclosed on Shenandoah Mortgage II and subsequently sold Parcel E to G.R. Contractors for $ 1,200,000. (Exhibit RS-B4; Exhibit PS-78; Exhibit RS-B17)

On January 20, 1989, FELP, acting through Nucci and Exten, conveyed to G.R. Contractors an option to purchase Parcel B by satisfying the existing mortgage on the property. (Exhibit RS-D5)

F. General Findings

The Court finds generally that at no time, until the commencement of this lawsuit, did either Nucci or Goldstein have any specific knowledge of the nature and amount of Jeffreys' loan to Topside. (D.I. 155 at 125, D.I. 155 at 132-33, D.I. 154 at 4-5, D.I. 154 at 107-08, D.I. 154 at 115) Throughout their prepurchase dealings with Exten, Topside, and TMLP, Tsoukalas had no knowledge [*33] of the Nuccis, Jeffreys, or Jeffreys' judgment against Topside. (D.I. 154 at 114-17)

1993 U.S. Dist. LEXIS 18537

While Exten, acting pro se at the trial, indicated during questioning of Jeffreys that Jeffreys made a claim in his personal bankruptcy proceedings in Maryland and that the claim was discharged (D.I. 155 at 141-42), there is insufficient evidence in the record to support such a finding. Exten provided a schedule of debts filed in that bankruptcy proceeding that included Jeffreys' loan (Exhibit Exten-2), and Exten provided a Discharge of Debtor Order signed on March 12, 1985 by the Honorable James F. Schneider, Bankruptcy Judge for the United States Bankruptcy Court for the United States District Court for the District of Maryland. (Exhibit Exten-3) However, the Order merely states that Exten is "released from all dischargeable debts," and fails to list those debts. Thus, this Court cannot conclude from that Order that the Jeffreys' loan was discharged.

## III. CONCLUSIONS OF LAW

Plaintiff has alleged five different causes of action: common law fraud; fraudulent conveyance; violations of 18 U.S.C. § 1962(a); violations of 18 U.S.C. § 1962 [*34] (c); violations of 18 U.S.C. § 1962(d). The complaint includes fifteen counts, with two of those counts having been dismissed prior to trial. Jeffreys v. Exten, 784 F. Supp. 146 (D. Del. 1992). The Court will address each remaining count in the complaint seriatim. Plaintiff bears the burden of proof by the preponderance of evidence. See Nye Odorless Incinerator Corp. v. Felton, 35 Del. 236, 162 A. 504, 511 (Del. Super. 1931) (fraud must be proved "to the satisfaction of the jury"); Justice v. D.R. Builders, 1978 WL 2513 at *3 (Del. Ct. Ch. 1978) (fraudulent conveyance); United States v. Local 560, 780 F.2d 267, 279-80 n.12 (3d Cir. 1985), cert. denied, 476 U.S. 1140, 90 L. Ed. 2d 693, 106 S. Ct. 2247 (1986) (18 U.S.C. §§ 1962 et seq. ("RICO")).

### A. Application of Maryland Partnership Law

Before addressing the counts in the complaint, the Court makes the following general conclusions of law. By virtue of the loan to and default judgment against Topside, plaintiff was a creditor of Topside. Topside's only asset at the time of [*35] the entry of the judgment was its 23% interest in TMLP. Thus, Topside's partnership interest in TMLP was an asset of Topside which could be used to satisfy Jeffreys' judgment against Topside. As TMLP was a Maryland partnership, the Court will look to Maryland partnership law to determine the extent of Jeffreys' interests with respect to the partnership. Under Maryland law, by virtue of his judgment against Topside, the general partner of TMLP, Jeffreys' rights with respect to the partnership were limited to obtaining a charging order against Topside's

partnership interest and receiving the distributions due Topside as general partner. See Md. Code Ann. § 10-705. A charging order gives the judgment creditor "only the rights of an assignee of the partnership interest." Id. An assignment "entitles the assignee to receive, to the extent assigned, only the distributions to which the assignor would be entitled." Id. at § 10-702. Plaintiff, therefore, could never have become a creditor of TMLP by virtue of his judgment against Topside. n20 The Court also concludes that upon the default of the loan, Jeffreys was entitled to take ownership of Exten's shares in Topside, which constituted [*36] the majority of that stock. Therefore, Jeffreys could have taken direct control of Topside and TMLP by virtue of Topside's being general partner of TMLP. Plaintiff failed to take advantage of that opportunity.

-------------- Footnotes ----------

n20 Plaintiff argues that "it has been held that the creditors of an individual partner gains an equal or superior equity as a creditor of the partnership when the funds advanced to the individual partner were used as the capital upon which the business of the partnership was commenced." (D.I. 161 at 68 (citing Reeves, Stevens & Co. v. Ayers, 38 Ill. 418 (1865)). Plaintiff further contends that because plaintiff's loan was used to establish the business of the partnership, and because Topside fraudulently represented itself as owning the property of the partnership, plaintiff should be deemed a creditor of TMLP. The Court rejects plaintiff's arguments. Ayers is materially distinguishable because in Ayers the contributing creditor had contributed all of the funds used for the startup of the firm and secured his interest with a mortgage on the parcels of property that were the assets of the partnership. Id. at 318-20. Here, there were other investments in the partnership and plaintiff did not execute a mortgage on the property. Finally, plaintiff's argument would be persuasive if the loan itself was before the Court. However, what is at issue in this case is the judgment against Topside, not a loan to or judgment against TMLP.

------------ End Footnotes---------------

[*37]

TMLP had no cognizable legal interest in Parcel A-79. GAC owned Parcel A-79, and this parcel was not the subject of any fraudulent transfers with respect to TMLP, Topside, or Jeffreys. Plaintiff failed to demonstrate that this parcel served as the basis for any mortgages or other encumbrances obligating TMLP. While GAC was a defendant in the EAI bankruptcy trustee litigation, there is nothing in the record to support a finding with respect to GAC's liability in that litigation. Thus, GAC, as owner of Parcel A-79, is not liable with respect to either the fraudulent conveyance counts or the RICO counts. Therefore, as GAC did not injure the plaintiff in any demonstrated respect, the Court will enter judgment in favor of GAC notwithstanding GAC's default in appearance.

B. Common Law Fraud

There are five elements of a common law fraud claim: "1) a false representation, usually one of fact, made by the defendant; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation;  [*38]  and 5) damage to the plaintiff as the result of such reliance." Stephenson v. Capano Development, 462 A.2d 1069, 1074 (Del. Supr. 1983). Thus, a claim for common law fraud requires a knowing or reckless misrepresentation of fact by a defendant, and an act or omission by the plaintiff in reliance upon that misrepresentation.

Although plaintiff appears to allege that virtually every action taken by the defendants amounted to common law fraud, as only defendants Exten and Topside made any representations to plaintiff, those are the only defendants who could be liable for common law fraud.

However, plaintiff's claim for fraud is barred by the statute of limitations. The last potential act that plaintiff took in reliance upon any fraudulent statements of fact by defendants Exten and Topside would be the rollover of the loan in 1982. The statute of limitations applicable to common law fraud is three years. 10 Del. C. § 8106. Plaintiff commenced the instant action in January, 1986, which is over three years from the second loan. Thus, plaintiff's claim fails as being barred by the three year statute of limitations. n21



-------------- Footnotes ---------
------

n21 Plaintiff has made no argument that the statute of limitations should be tolled for any reason.

------------ End Footnotes--------
------

[*39]

C. Fraudulent Conveyance

Plaintiff, in his proposed findings of fact and conclusions of law, contends that the evidence at trial established that the following were fraudulent conveyances: the release of Topside's land lease and restaurant lease; the "revival" of the $ 140,000 mortgage after the Nuccis executed an affidavit stating that the debt was extinguished; the sale of Parcel E to Tsoukalas for stated consideration of $ 640,000 and the assignment of the $ 615,000 Tsoukalas Mortgage to Shenandoah for $ 450,000, when the property had been appraised at a value of $ 1,200,000; the transfer of Parcel B to FELP. See D.I. 161 at 65-69.

Under Delaware's Act Concerning Fraudulent Conveyances (the "Act"), a debtor's conveyance of assets with intent to "hinder, delay, or defraud either present or future creditors[] is fraudulent as to both present and future creditors." 10 Del. C. § 1307. Similarly, the Act declares as fraudulent any conveyances "by a person who is or will be thereby rendered insolvent" if the conveyance is made "without a fair consideration." 10 Del. C. § 1304. "Fair consideration" is defined as a good faith exchange for property or to satisfy an antecedent debt [*40] that is "a fair equivalent." 10 Del. C. § 1303. See also Tri-State Vehicle Leasing, Inc. v. Dutton, 461 A.2d 1007 (Del. Supr. 1983).

Once a party establishes by a preponderance of the evidence that the transferor conveyed the asset with specific intent to defraud the creditor, the creditor can obtain satisfaction. Justice v. D.R. Builders, 1978 WL 2513 at *3 (Del. Ct. Ch. 1978). Also, if a creditor establishes by a preponderance of the evidence that the debtor conveyed an asset without fair consideration that renders the debtor insolvent, the creditor can obtain satisfaction. Id.

1. The Topside Leases

With respect to the release of the land lease and the restaurant lease, the Court concludes that the plaintiff has established that the release of these leases in January, 1984 was a fraudulent conveyance. The Court first notes that plaintiff has failed to sustain his burden of proving that the conveyance was not made for fair consideration. While plaintiff alleged such, the Court concludes that in consideration for Topside's release of the leases, TMLP forgave Topside's rent arrearage. As plaintiff has not demonstrated the value of the leases to [*41] Topside at the time, the Court is unable to determine whether the rent arrearage was a fair equivalent. Plaintiff also failed to prove that Topside

1993 U.S. Dist. LEXIS 18537

was rendered insolvent at the time of the conveyance. At the time of the conveyance, Topside maintained a 23% interest in TMLP which, while subject to encumbrances, had some value at that time.

Plaintiff, however, has sustained his burden with respect to proving a specific intent to defraud with regard to the release of the leases. The Court bases this conclusion upon the fact that the leases were released within three days of the entry of default judgment against Topside. The Court concludes that Exten, as president of Topside, was aware of Jeffreys' suit against Topside and Topside's failure to answer or otherwise defend that suit. Exten knew that assets of Topside would be subject to attachment after entry of judgment against Topside. Thus, the Court concludes that Exten, with specific intent to defraud plaintiff, released the leases to hinder the collection of Jeffreys' judgment. n22 The evidence in the record is insufficient to determine with certainty the total amount of damages sustained by Jeffreys with respect to this conveyance. [*42] The only evidence in the record concerns the subsequent brief lease to Tsoukalas for $ 60,000 a year, which is an increase of approximately $ 12,500 over the $ 47,500 Topside owed per year on the lease. Thus, for the period in which the lease was transferred to Tsoukalas, which was approximately six months (June to December 1984), the difference in value to Jeffreys amounts to $ 6,250 - which is one half year's worth of the excess amount of rent received by TMLP. The Court will assume that Topside could have sublet this property to Tsoukalas for this period of time and for this amount. The Court will enter judgment in favor of plaintiff as to Exten and Topside in the amount of $ 6,250.

--------------- Footnotes ---------------

n22 "A transfer by the landlord will defeat the tenant's leasehold interest if such interest can be defeated, under controlling local law, by a bona fide purchaser and such a purchaser is involved." Restatement (Second) of Property, § 15.1 at 90 (1977). The sale to Tsoukalas defeated Topside's leasehold interest.

------------ End Footnotes- ---------------

2. Transfer of liquor [*43] license

The Court makes the same conclusion with respect to the transfer of the liquor license to Tsoukalas. This conveyance occurred under similar circumstances. However, Jeffreys has not provided any evidence with which the Court can assign a value to the liquor license. Thus, the Court will award nominal damages of $ 1.00.

3. Conveyance of Parcel E to Tsoukalas

With respect to the transactions involving Tsoukalas, the Court concludes that the sale of partnership property could not have been a fraudulent conveyance as to Jeffreys because Jeffreys was not, and is not, a creditor of TMLP. n23 At most, Jeffreys was in a position to take the benefits of Topside's partnership interest in TMLP by obtaining a charging order. Thus, the conveyance of TMLP property, while perhaps it could be fraudulent with respect to TMLP's creditors if it rendered the partnership insolvent or was made to a partner or to a non-partner without fair consideration, 10 Del. C. § 1308 (fraudulent conveyance of partnership property), could not be fraudulent with respect to Jeffreys.

--------------- Footnotes ---------------

n23 The Court is also concerned that plaintiff waited two years to bring a lawsuit seeking to set aside this conveyance. As of 1984, plaintiff by his own admission was aware of the transactions resulting in Tsoukalas' operating the Topside Restaurant. Plaintiff, therefore, knew in 1984 that some conveyance with respect to Topside's lease had occurred. Cooch v. Grier, 30 Del. Ch. 255, 59 A.2d 282 (Del. Ct. Ch. 1948).

------------ End Footnotes- ---------------

[*44]

Furthermore, the Court concludes that the conveyance to Tsoukalas was an arms length transaction to a bona fide purchaser for value. Plaintiff has failed to demonstrate that Tsoukalas knew or should have known of any improprieties with respect to this transaction. The Court found credible Mr. Tsoukalas' testimony at trial that he had no knowledge of Mr. Jeffreys, Mr. Jeffreys' loan, or any problems with the title to the property. Indeed, while plaintiff contends that a Mr. Eberly, an attorney who conducted a title search and found problems in the chain of title, was Tsoukalas' attorney, there is no evidence in the record to support either that allegation or the inference that Eberly ever communicated any such problems to Tsoukalas. The Court concludes that the transaction was for fair consideration. Tsoukalas paid $ 640,000 for the property, including the $ 615,000 mortgage with TMLP. n24 Thus, judgment will be entered against plaintiff as to Tsoukalas on Count XI.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n24 Plaintiff erroneously contends that the "fair consideration" for the property would have been $ 1,200,000 which Exten stated as the assessed value of the property. (D.I. 161 at 69) First, the Court is skeptical that Exten's representation of $ 1,200,000, given as an assessment value of the whole of Parcel A-80 in the original Statement of Assets and Liabilities given to Jeffreys before he gave Topside the loan, relates to the smaller parcel of property that was sold to Tsoukalas, Parcel E. Second, the Court cannot conclude, as a matter of law, that the sale of a parcel of property for $ 640,000 was not fair consideration without significant proof that the property could have been sold for a much greater amount at that time.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*45]

4. Nucci mortgage "revival" Plaintiff also attacks as a fraudulent conveyance the revival of the $ 140,000 Nucci mortgage. Plaintiff is correct that this transfer was without consideration. However, even assuming that this mortgage was a fraudulent conveyance, and not a revival of a mistakenly released (as opposed to subordinated) mortgage, there is no evidence in the record that this mortgage has ever been satisfied. Furthermore, as with the Tsoukalas transaction, this encumbrance on the Parcel A-80 could not be fraudulent with respect to Jeffreys as he was not a creditor of TMLP.

5. Conveyance of Parcel B to FELP

The Court concludes that the transfer of Parcel B to FELP was not a fraudulent conveyance. Again, as with the Tsoukalas transaction, the Court concludes that this conveyance could not be fraudulent with respect to Jeffreys as he was not a creditor of TMLP. n25 This transfer from TMLP to the FELP joint venture, of which TMLP was 49% owner, was made in exchange for FELP's assumption of the outstanding encumbrances on the parcel, which were in excess of $ 1,900,000. n26 TMLP benefitted significantly from FELP's assumption of its debt, which TMLP appeared unable to satisfy [*46] at that time.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n25 The same reasoning holds true with respect to each of the conveyances of property by TMLP. As Jeffreys was never a creditor of TMLP, conveyances of TMLP's property could not be fraudulent with respect to Jeffreys.

n26 Plaintiff is not entitled to recover under 6 Del. C. § 1308, which specifically concerns conveyances of partnership property to partners, because § 1308 applies only to creditors of the partnership and plaintiff was not a creditor of the partnership.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

D. RICO

Plaintiff has stated his RICO theory in his proposed findings of fact and conclusions of law as follows:
There were multiple and separate fraudulent acts wherein the assets of TMLP were encumbered, diverted, stripped, and/or transferred, commencing with the first Old Court Savings and Loan transaction in February of 1983 and concluding with the Tengees/shenandoah transaction in 1986-87, without being altered in any sense by the present proceedings. One purpose of these acts was to prevent Plaintiff from collecting his [*47] debt and later his judgment, initially by rendering Topside's interest in TMLP substantially worthless by virtue of the over-encumbrance of the assets of TMLP and ultimately by transferring the assets out of TMLP's ownership. In addition, other assets of TMLP were transferred from Topside's ownership without consideration to Topside and for the direct benefit of the Defendants (e.g., the operating leases for the Topside Restaurant Land and Management Agreement). . . . While each fraudulent action is distinct, each bares a similarity in relationship to the various schemes to defraud Plaintiff and therefore resulted in a series of injuries to Plaintiff over a significant period of time. Plaintiff was the only target of the Defendants, and the various schemes employed to discourage Plaintiff's enforcement of his judgment were carried out by several individuals and entities within their control.
D.I. 161 at 57-58. See also complaint at PP 18, 21 (actions of defendants undertaken to deprive plaintiff of his security for, and hinder repayment of, the debt from Topside).

The Court concludes that plaintiff is limited to this theory on the basis of his own arguments and on the basis [*48] of the Court's pre-trial ruling with respect to plaintiff's standing. See Jeffreys v. Exten, 784 F.

1993 U.S. Dist. LEXIS 18537

Supp. at 159 (plaintiff has standing under RICO as creditor because plaintiff "alleges that the dissipation of corporate assets was directed specifically at hindering his ability to collect his debt") (emphasis added).

There are two particular elements that are common to any claim brought pursuant to RICO. First, a plaintiff must prove the existence of an "enterprise." Second, a plaintiff must prove a "pattern of racketeering activity."

1. Enterprise

An "enterprise" for the purposes of RICO is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

Plaintiff alleges that the defendants, excluding Tsoukalas, together constituted an enterprise by virtue of operating as an "association-in-fact." In United States v. Riccobene, 709 F.2d 214 (3d Cir.), cert. denied sub nom Ciancaglini v. United States, 464 U.S. 849, 104 S. Ct. 157, 78 L. Ed. 2d 145 (1983), [*49] the Third Circuit laid out three requirements for proving the existence of an enterprise: 1) that the enterprise is an ongoing organization that has some sort of framework or superstructure used for making or carrying out decisions; 2) that the members of the enterprise function as a continuing unit with established duties; and 3) that the enterprise is separate and apart from the pattern of racketeering activity. Id. at 221-24 (cited with favor in Seville Indus. Machinery v. Southmost Machinery, 742 F.2d 786, 789-91 (3d Cir. 1984)).

In 1987, in Town of Kearny v. Hudson Meadows Urban Renewal, 829 F.2d 1263, 1268 (3d Cir. 1987), the Third Circuit applied the "enterprise" test to an association-in-fact enterprise. The court reasoned that a RICO association-in-fact enterprise could be found where a group of individuals met numerous times in connection with more than one scheme, where one member provided the necessary funding and other members took the necessary action, where there was evidence of a decisionmaking structure, and where the enterprise existed separate and apart from the pattern of RICO [*50] activity. Id. at 1266.

The Court concludes that plaintiff has established by a preponderance of the evidence that the association-in-fact enterprise alleged to exist among the defendants had a specific structure to engage in the activities and transactions complained of by the plaintiff. The structure of the enterprise had Exten masterminding the various transactions to be undertaken, Goldstein negotiating to obtain the various mortgages and land

conveyances with Old Court, with Nucci serving as guarantor when necessary. Nucci also stepped in, as Alternate General Partner, to authorize the various transactions on behalf of TMLP. Once Goldstein stepped out of the picture in May, 1984, Exten served as the negotiator on the Tsoukalas and Shenandoah transactions. Topside, TMLP, FELP, and W.N. were vehicles through which these transactions took place.

Plaintiff has failed to demonstrate, however, that these entities engaged in any activity aside from the alleged pattern of racketeering activity. Plaintiff's theory is that the pattern of racketeering activity was a scheme to manipulate and encumber the assets of TMLP in order to preclude plaintiff from satisfying [*51] his judgment against Topside, TMLP's General Partner. And, indeed, the only activities of record of the alleged enterprise involve transactions whereby the defendants manipulated the purchase and sale of Parcel A-80 in order to generate cash. Plaintiff has failed to demonstrate any activity engaged in by the members of the alleged association-in-fact enterprise as an enterprise other than the actions which plaintiff contends constitute the pattern of racketeering activity. See Parker and Parsley Petroleum v. Dresser Industries, 972 F.2d 580, 583 (5th Cir. 1992) (no RICO enterprise where association-in-fact "has no existence as an entity separate and apart from the actual pattern of racketeering"); see also Superior Oil Co. v. Fulmer, 785 F.2d 252 (8th Cir. 1986).

2. Pattern of Racketeering Activity

Even assuming that plaintiff had established the existence of an association-in-fact enterprise, the Court makes the following conclusions with respect to the allegation that the enterprise engaged in a pattern of racketeering activity. A "pattern of racketeering activity" for the purposes of RICO "requires at least two acts [*52] of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). A "racketeering activity" is defined as "any act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud)." 18 U.S.C. § 1961(1).

In H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989), the Supreme Court held that "RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." Id. at 2900 (emphasis in original).

"To establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of continuing racketeering activity." [*53] Id. at 2901 (emphasis in original). The continuity requirement can be "satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business . . . or of conducting or participating in an ongoing legitimate RICO 'enterprise.'" Id. at 2902.

a. The Predicate Acts

The mail fraud statute, 18 U.S.C. § 1341, provides in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises . . ., for the purpose of executing such scheme or artifice or attempting to do so, . . . knowingly causes to be delivered by mail according to the direction thereon . . . any . . . such matter or thing, shall be fined . . . or imprisoned . . . or both.

The wire fraud statute, 18 U.S.C. § 1343, provides in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, [*54] or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined . . . or imprisoned . . . or both.

These two statutes are read in pari materia, and the requisite analysis for both are similar; "accordingly, the cases construing the mail fraud statute are applicable to the wire fraud statute as well." United States v. Tarnopol, 561 F.2d 466, 475 (3d Cir. 1977); see also United States v. Zauber, 857 F.2d 137 (3d Cir. 1988), cert. denied, 489 U.S. 1066 (1989). In order to prove an instance of mail or wire fraud, the plaintiff must prove the existence of a scheme to defraud in which the defendant "causes" the mails or wires to be used in furtherance of or for the purpose of executing the scheme, together with a specific intent to commit fraud. See, e.g., Pereira v. United States, 347 U.S. 1, 98 L. Ed. 435, 74 S. Ct. 358 (1954); United States v. Fagan, 821 F.2d 1002, 1008 (5th Cir. 1987), [*55] cert. denied, 484 U.S. 1005, 98 L. Ed. 2d 649, 108 S. Ct. 697 (1988).

A defendant "causes" the use of the mails or wires in violation of federal law when, in furtherance of the scheme to defraud, he "does an act with knowledge that the use of the mails [or wires] will follow in the ordinary course of business, or where such use can

reasonably be foreseen, even though not actually intended." Pereira, 347 U.S. at 8-9. n27

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n27 Several of the defendants erroneously argue that they cannot have committed mail or wire fraud with respect to the plaintiff because they did not send letters to or make phone calls to plaintiff. From the above discussion, it is clear that it is not necessary to demonstrate that each individual defendant personally used the mails or the wires. It is also not necessary for any of the uses of the mails or the wires to be directed to the plaintiff. Rather, the use of the mail or the wires must be in furtherance of the scheme or artifice to defraud.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

A mailing is "for the [*56] purpose of executing a scheme to defraud" when that mailing "furthers" the scheme. Tarnopol, 561 F.2d at 471-72. The mailing must be closely related to the scheme, such that the success of the scheme is dependent in part upon the mailing. Id. (citing United States v. LaFerriere, 546 F.2d 182, 187 (5th Cir. 1977)). A mailing which is "merely . . . a convenient but not essential tool in carrying out" the scheme does not come within the scope of the statute. Id. See also United States v. Giovengo, 637 F.2d 941, 945 (3d Cir. 1980) (wire fraud conviction upheld because use of wire transmission was essential to success of scheme).

b. Scheme to Defraud

The Court concludes that plaintiff has failed to establish by a preponderance of the evidence that the defendants engaged in the scheme to defraud as theorized by plaintiff; that is, that the challenged transactions constituted a scheme designed specifically to deprive plaintiff of the satisfaction of his judgment against Topside. The Court bases this conclusion, in part, upon the fact that plaintiff has failed to prove that two of the alleged principals [*57] in this scheme to defraud plaintiff, Nucci and Goldstein, had any knowledge of plaintiff's loan to Topside or judgment against Topside until the commencement of this RICO action in January 1986. n28

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n28 Plaintiff's theory is similar to a theory successfully espoused in Bankers Trust Co.

1993 U.S. Dist. LEXIS 18537

v. Rhoades, 859 F.2d 1096 (2d Cir. 1988), cert. denied, 490 U.S. 1007, 104 L. Ed. 2d 158, 109 S. Ct. 1642 (1989). In that case, the Second Circuit, in reversing a motion to dismiss, found that a plaintiff creditor had standing when in reliance upon misrepresentations regarding a bankrupt debtor's assets - supported in part by fraudulent conveyances of those assets - the creditor agreed to take a smaller percentage on its allowed claim under the plan of confirmation. Id. at 1098-99. The creditor was also the target of two frivolous lawsuits instituted by the debtor and facilitated by bribery of a South Carolina state court judge. Id. The predicate acts included bankruptcy fraud and bribery with respect to the South Carolina judge. Id. There is no question in Bankers Trust Co. that the bankruptcy fraud was targeted generally towards the creditor, and that the sham litigation and judicial bribery were targeted directly towards the plaintiff. Thus, the theory in Bankers Trust, if proven, unquestionably would establish a scheme directed specifically towards the plaintiff creditor because the only purpose of the bankruptcy fraud would be to defraud the creditor and the only purpose of bribing a judge in a lawsuit instituted against a particular creditor would be to harm that creditor and cause direct injury to that creditor.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[*58]**

The Court concludes that at best plaintiff has painted a colorable picture of a scheme by which certain of the defendants engaged in activity designed to defraud various financial institutions with respect to a cycle of obtaining and siphoning off funds through greater and greater mortgages, and then defaulting on those mortgages. The Court concludes that Jeffreys was not the target of this activity, but was injured, if at all, by these activities merely incidentally. Indeed, to the extent that plaintiff theorizes that the purpose of the challenged transactions was to dissipate the assets of TMLP in order to avoid satisfying his judgment against Topside, the Court concludes that each of the transactions with Old Court and Shenandoah, even if they were in fact fraudulent, resulted in TMLP obtaining greater liquid assets with which Jeffreys' judgment could have been satisfied. Thus, the Court concludes that the purpose of these encumbrances was

not to render the parcel worthless, but was to obtain greater liquid assets for use by TMLP. n29

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n29 At this point, the Court notes that at any time after obtaining the 1984 default judgment, plaintiff could have exercised his option either to obtain the charging order on Topside's partnership, or execute on the security of Exten's majority holding of shares in Topside in order to take control of Topside and TMLP.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[*59]**

c. Use of the Wires or the Mails

Plaintiff alleges in this case that defendants engaged in a series of financial transactions in order to prevent the satisfaction of plaintiff's judgment against Topside; i.e., according to plaintiff, defendants schemed to defraud him specifically. Assuming momentarily that plaintiff has successfully proven that he was the target of a scheme to defraud by defendants, the question is whether plaintiff has proven that defendants used the mails or wires in furtherance of the scheme.

1) By Mails

The Court concludes with respect to the majority of the letters in evidence that plaintiff has failed to establish that the letters were sent via the United States mail. Without evidence demonstrating that letters in evidence were actually sent via the United States mail, there can be no finding of mail fraud. See United States v. Scott, 730 F.2d 143, 146-47 (3d Cir.) (proof of mailing may be circumstantial, including proof of office practice of mailing as usual course of business), cert. denied sub nom, Wilson v. United States, 469 U.S. 1075, 83 L. Ed. 2d 512, 105 S. Ct. 572, (1984); see also Cemar, Inc. v. Nissan Motor Corp. in U.S.A., 678 F. Supp. 1091, 1104 (D. Del. 1988). **[*60]**

Plaintiff has offered sufficient evidence of mailing only with respect to four letters in evidence, Exhibits P-110, P-75, P-82, P-86. The Court concludes that these letters were placed into the United States mail.

The Court concludes that Exhibit P-110, the October 17, 1982 letter from Exten to Jeffreys in which Exten proposed a sale of the Topside Restaurant to Jeffreys in order to preclude that asset from being obtained by Exten's personal bankruptcy trustee, does not constitute a predicate act of mail fraud sufficient to support a finding of a "pattern of racketeering activity"

1993 U.S. Dist. LEXIS 18537

with respect to Jeffreys. Clearly, the letter evidences a specific intent to engage in a scheme to remove the Topside Restaurant from the reach of Exten's creditors in his personal bankruptcy. However, with respect to Jeffreys, the letter is not in furtherance of a scheme to defraud Jeffreys of the loan to Topside, or the subsequent judgment against Topside that looms almost two years distant from the date of the letter.

The Court concludes that Exhibit P-75, a February 22, 1984 letter in which Goldstein requested that Nucci change the insurance policy on the restaurant and marina property to name FELP as [*61] the beneficiary, was not necessary to the accomplishment of any objectives of the purported scheme to defraud. The Old Court Mortgage II had settled on February 9, 1984, which was fifteen days before this letter was mailed. Plaintiff has failed to establish that the mailing of this letter was necessary or essential to the success of that or any other transaction.

There is insufficient evidence in the record to conclude that Exhibit P-82, a March 23, 1984 letter from First National Bank to Nucci regarding a payment of $ 73,929.49 on an unidentified loan guaranteed by Nucci on December 8, 1982, "furthered" any scheme to defraud. Plaintiff has provided no basis upon which the Court can make a determination that this particular correspondence is related to any obligations incurred by or actions taken by Nucci with respect to any of the transactions complained of by the plaintiff. While there is some evidence in the record concerning payments to First National Bank from TMLP funds, there is no evidence in the record to demonstrate that this letter is related to that transaction. Thus, the Court concludes that the mailing of this letter would not constitute a violation of the mail fraud [*62] statute.

The Court concludes that Exhibit P-86, a May 25, 1984 letter from Goldstein to Nucci regarding Old Court Mortgage II, did not "further" any scheme to defraud anyone. The crux of this letter is that Goldstein, having determined that there had been some irregularity with respect to the Old Court Mortgage II, is extricating himself from any further relationship with Exten and Parcel A-80 or Parcel E. Thus, this letter was not essential to any of the transactions at issue in this case.

2) By Wires

The Court concludes that defendants, by their own admissions, engaged in wire communications that were essential to the success of the transactions in which they engaged. These communications include the following:

a) A 1982 phone call from Exten to Nucci to request Nucci's presence at a meeting regarding Nucci's serving as a guarantor for the settlement of the EAI bankruptcy. (D.I. 154 at 8) This call assisted in settling the EAI bankruptcy litigation and extinguishing the personal liability of Exten and Goldstein, and by ensuring that the conveyance of Parcel A-80 to TMLP would not be set aside. To that end, Jeffreys benefited from this phone call because Parcel A-80 remained in the [*63] possession of TMLP and, therefore, remained available for Jeffreys as an asset of TMLP for Jeffreys to attack in satisfaction of his debt.

b) An October 2, 1984 phone call between Exten and Nucci was placed concerning Exten's being named retroactively as General Partner of TMLP. (D.I. 154 at 79-80) This communication furthered Exten's ability to undertake the transactions after October, 1984.

c, d, and e) A 1984 call from Goldstein to Nucci regarding the need to redo the Old Court Mortgage II settlement. (D.I. 154 at 30) Two conversations in 1984 took place between Nucci and Goldstein concerning the FELP joint venture in which the two defendants discussed the virtues of entering that joint venture and the settlement with Old Court. (D.I. 154 at 22-23, 30) These communications furthered the success of the Old Court Mortgage II settlement and the FELP transaction by ensuring Nucci's participation.

f) A 1984 telephone conversation between Goldstein and Dennis Guidice of Old Court concerning the closing of the Old Court Mortgage II transaction and recommending Delaware counsel to assist in that transaction. (D.I. 154 at 137) This furthered the Old Court Mortgage II settlement.

g) A 1984 [*64] telephone conversation between Nucci and William DiLoreta of Shenandoah concerning Nucci's ability to serve as guarantor of the loan. (D.I. 154 at 80) This furthered the assignment of the Tsoukalas Mortgage to Shenandoah.

3. The Specific RICO Counts

Assuming that plaintiff has proven the existence of an enterprise that engaged in a pattern of racketeering activity, the Court makes the following conclusions with respect to the RICO counts in the complaint.

a. Section 1962 (a) - Investment of proceeds from pattern of racketeering activity in enterprise engaged in interstate commerce

Plaintiff's first RICO claim is that the defendants violated 18 U.S.C. § 1962(a). Section 1962(a) provides, in pertinent part:

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has

1993 U.S. Dist. LEXIS 18537

participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment [*65] or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

The Third Circuit, in Lightning Lube, Inc. v. Witco Corp., 1993 WL 345534 (3d Cir. Sept. 10, 1993), recently expounded upon the purposes of section 1962(a) and the elements required to allege a violation of section 1962(a).

"This provision was primarily directed at halting the investment of racketeering proceeds into legitimate businesses, including the practice of money laundering." Brittingham v. Mobil Corp., 943 F.2d 297, 303 (3d Cir. 1991) (quoting 11 Cong. Rec. 35,199 (1970) (remarks of Rep. St. Germain) and 116 Cong. Rec. 607 (1970) (remarks of Sen. Byrd)). Under this section, a plaintiff must allege: (1) that the defendant has received money from a pattern of racketeering activity; (2) invested that money in an enterprise; and (3) that the enterprise affected interstate commerce. Shearin, 885 F.2d at 1165. Furthermore, the plaintiff must allege an injury resulting from the investment of racketeering income distinct from an injury caused by the predicate acts themselves. Glessner v. Kenny, 952 F.2d 702, 708 (3d Cir. 1991); [*66] Banks v. Wolk, 918 F.2d 418, 421 (3d Cir. 1990); Rose v. Bartle, 871 F.2d 331, 357-58 (3d Cir. 1989). This allegation is required because section 1962(a) "is directed specifically at the use or investment of racketeering income, and requires that a plaintiff's injury be caused by the use or investment of income in the enterprise." Brittingham, 943 F.2d at 303 (emphasis added); see also Grider v. Texas Oil & Gas Corp., 868 F.2d 1147, 1149 (10th Cir. 1989) (recognizing that section 1962(a) "does not state that it is unlawful to receive racketeering income . . . [rather] the statute prohibits a person who has received such income from using or investing it in the proscribed manner" (emphasis in original)), cert. denied, 493

U.S. 820, 110 S. Ct. 76, 107 L. Ed. 2d 43 (1989).

Lightning Lube, Inc., 1993 WL 345534 at *31.

We have recognized repeatedly that this type of allegation--that the use and investment of racketeering income keeps the defendant alive so that it may continue to injure plaintiff--is [*67] insufficient to meet the injury requirement of section 1962(a). In such situations, we have held that the fact that a plaintiff claims that the injury allegedly perpetrated on it would not have occurred without the investment of funds from the initial racketeering activity does not change the fact the plaintiff's alleged injury stems from the pattern of racketeering, and not from the investment of funds by the defendant.

Lightning Lube, Inc., 1993 WL 345534 at *32.

Applying the above analysis to this case, the Court concludes that plaintiff has failed to establish a violation of § 1962(a) by any of the defendants. Plaintiff's theory under § 1962(a) is that by virtue of the series of mortgages encumbering Parcel A-80, the defendants were able to generate income which, rather than being "invested," were simply dissipated, thus paving the way for yet another property transfer and encumbrance. Clearly, this series of transactions (and, thus, plaintiff's injury due to the transactions) is neither consistent with that contemplated under § 1962(a); nor are these activities separable from the pattern of racketeering alleged.

b. Section 1962(c) - participation in enterprise through [*68] pattern of racketeering activity

Plaintiff's second RICO claim is that defendants violated 18 U.S.C. § 1962(c), which provides in pertinent part:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Thus, to prevail on his § 1962(c) claim, plaintiff must have proven by a preponderance of the evidence that the defendants associated with an enterprise, and

1993 U.S. Dist. LEXIS 18537

"participate[d] in the operation or management of an enterprise through a pattern of racketeering activity." Reves v. Ernst & Young, 122 L. Ed. 2d 525, 113 S. Ct. 1163, 1172 (1993)

1) Goldstein, the Nuccis, FELP and W.N. Inc.

Assuming arguendo that plaintiff had demonstrated the operation of an association-in-fact enterprise through a pattern of racketeering activity targeted towards defrauding the plaintiff, the Court concludes that defendants Nucci and Goldstein were unintentional participants [*69] in the enterprise's pattern of racketeering activity because they did not have any knowledge of Jeffreys' loan or judgment. n30 The Court bases this conclusion upon the credibility of these two defendants and the weight of the evidence. A person can be held liable for wire or mail fraud only if he or she acted with the intent to defraud. See 18 U.S.C. §§ 1341, 1343; United States v. Frankel, 721 F.2d 917, 920 (3d Cir. 1983). Thus, without a demonstrated intent to defraud, the Court cannot find that these defendants committed acts constituting a pattern of racketeering activity based upon wire or mail fraud. It follows, therefore, that these defendants did not conduct an enterprise through a pattern of racketeering activity. Because FELP was merely a conglomeration of Nucci, W.N. Inc. and O.C. Flights, Inc. (and thus Goldstein), plaintiff similarly has failed to establish that FELP participated in an enterprise through a pattern of racketeering activity.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

n30 While there may be a general rule that in a partnership, the knowledge possessed by the general partner is attributable to the rest of the partners, see Posttape Associates v. Eastman Kodak Co., 537 F.2d 751, 757 (3d Cir. 1976) (applying Pennsylvania law, noting that one partner's knowledge was knowledge of partnership), the same cannot be said of intent.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*70]

The Court concludes that defendant Sally Nucci, whom plaintiff connects to the challenged transactions only through a theory of agency with respect to her husband, did not in any way personally participate in any of the challenged transactions. Therefore, even assuming plaintiff had established a RICO violation, because plaintiff failed to establish that Sally Nucci participated in the operation or management of an enterprise engaged in a pattern of racketeering activity,

plaintiff's claims against Sally Nucci must fail. See Reeves v. Ernst & Young, 113 S. Ct. at 1173.

2) Exten, Topside, and TMLP

Because Exten was president of Topside and acted as general partner of TMLP, those entities could be liable for the acts taken by Exten in their name and for their benefit. See Petro-Tech, Inc. v. Western Co. of North America, 824 F.2d 1349 (3d Cir. 1987). Exten's culpability with respect to Jeffreys is evident from the initial fraudulent misrepresentation in procuring the loan from Jeffreys, the October 17, 1982 letter to Jeffreys regarding "inventive planning" to move the Topside Restaurant out of the reach of Topside's bankruptcy [*71] trustee, the fees received by Exten in the various transactions with the financial institutions, the transfer of the Topside Restaurant liquor license and the release of the Topside leases.

The Court concludes that Exten's acts of specifically defrauding the plaintiff are limited to only the release of the leases and the transfer of the liquor license. Plaintiff has failed to demonstrate, however, that either of these acts were accomplished through the use of the mails or the wires. n31 As discussed above, the only demonstrated use of the mails or the wires, aside from the "inventive planning" letter from Exten to Jeffreys, relate to securing the various mortgages on TMLP properties. The Court has concluded that plaintiff has failed to establish any specific intent to defraud him by securing these encumbrances; thus, those uses of the mails and wires cannot be construed as a pattern of racketeering activity.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

n31 The Court notes that plaintiff offered a copy of a letter from Exten to the Delaware Alcoholic Beverage Commission concerning the transfer of the liquor license. (Exhibit P-35) However, as with the majority of the letters offered by plaintiff, plaintiff failed to establish that the letter was placed into the postal stream.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*72]

Therefore, because plaintiff has failed to establish that Exten operated an enterprise through a pattern of racketeering activity, the same is true with respect to the corporate and partnership entities, Topside and TMLP, through which Exten acted.

c. Section 1962(d) - RICO Conspiracy

Plaintiff's final claim is that the defendants conspired to commit RICO violations. 18 U.S.C. § 1962(d) provides in pertinent part:

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

Because the Court has concluded that plaintiff has failed to prove violations of either § 1962(a) or § 1962(c), plaintiff has failed to prove a conspiracy under § 1962(d). Lightning Lube, Inc., 1993 WL 345534 at *36. Even assuming that plaintiff had proven a violation of § 1962(c), insofar as the Court has concluded that plaintiff has only demonstrated that Exten alone was acting with intent to defraud plaintiff, plaintiff has failed to prove a RICO conspiracy.

4. RICO Injury and Damages

RICO provides for recovery of treble damages for injuries sustained as the result of RICO violations. Particularly, [*73] 18 U.S.C. § 1964(c) provides as follows:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States District Court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

Assuming arguendo that plaintiff had proven RICO violations, the Court concludes that plaintiff generally failed to prove any specific injury resulting from any such RICO violation.

Plaintiff claims that he has been injured in the amount of $ 751,000, which includes his $ 259,933.79 default judgment entered in the Superior Court of Delaware plus $ 491,273 in interest. Plaintiff argues that the evidence presented establishes that the RICO violations caused TMLP to become insolvent and, thus, prevented the recovery of his judgment against Topside, which was TMLP's General Partner.

Plaintiff's argument, while enticingly facile, is unpersuasive. Had plaintiff's state court judgment been against TMLP, perhaps the nexus between the RICO violations and the inability to collect on the judgment would be clear. However, plaintiff's [*74] judgment was against Topside, the General Partner of TMLP. Plaintiff's ability to recover as against the assets of TMLP is limited to charging Topside's interest and receiving the distributions due Topside as General Partner. See Md. Code Ann. § 10-705. Plaintiff has failed to prove what he would have received as a distribution from TMLP in the absence of the alleged RICO violations, or even that there would have been a

distribution in the absence of the activity alleged as RICO violations. The Court again notes that the various encumbrances placed liquid assets in the hands of TMLP that would have been available to satisfy Jeffreys' judgment had Jeffreys taken the appropriate steps after securing his judgment to charge Topside's interests in TMLP or to execute on the security that he had with respect to the majority of Topside's shares.

Few acts of the defendants directly affected Jeffreys' interest in Topside. The most significant detrimental conduct by defendants was the removal of the personal property assets of Topside. Plaintiff, however, provided insufficient proof of what, when, where, and for what consideration these assets were sold. Plaintiff, therefore, also failed [*75] to demonstrate that these assets were eliminated within the four year statute of limitations. Thus, with respect to the personal property of Topside, the Court is unable to conclude that plaintiff was injured within the meaning of RICO during the applicable limitations period.

The only other acts directly affecting Topside were the release of its leases (land and restaurant lease) on January 10, 1984 and the transfer of the liquor license to Tsoukalas. As stated above, in the discussion of damages, these acts did injure plaintiff. However, plaintiff has failed to demonstrate a nexus between any of the alleged RICO violations and these injuries.

IV. CONCLUSION

For the foregoing reasons, the Court concludes that plaintiff failed to establish RICO violations with respect to all defendants; plaintiff's fraud claims are barred by the statute of limitations; and plaintiff failed to establish his claims of fraudulent conveyance with respect to every conveyance except the release of the Topside leases and the transfer of the Topside liquor license. n32 Thus, the Court will enter judgment in favor of Jeffreys and against Exten and Topside on the fraudulent conveyance counts with respect [*76] to the Topside leases and the Topside liquor license. Judgment will be in the amount of $ 6,251.00.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - - -

n32 The Court is aware that there is much more to this case than meets the eye on the evidence presented. However, the Court is bound to base its findings and conclusions on the evidence before it. Defendant Goldstein filed a motion for Rule 11 sanctions and attorneys' fees against plaintiff. (D.I. 166) The Court denies this motion, secure in the notion that defendant Goldstein is fortunate that plaintiff failed

1993 U.S. Dist. LEXIS 18537

to sustain his burden in this matter. The Court will similarly dispose of the counterclaims of defendants FELP (D.I. 11), W.N., Inc. (D.I. 12), the Nuccis (D.I. 13), and Exten (D.I. 16) for attorneys' fees and costs.


- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -