# EXHIBIT 23

Westlaw.

Not Reported in A.2d
2000 WL 1521478 (Del.Ch.)
(Cite as: 2000 WL 1521478 (Del.Ch.))

Page 1

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
Jan G. JURAN, individually and as Trustee of the Jan G. Juran Trust and Juran
Investments, Inc., a Delaware corporation, Plaintiffs,
v.
Guillermo BRON, Bron Corporation, a Delaware corporation, Bastion Capital Fund,
L.P., a Delaware limited partnership, Bastion Partners, L.P., a Delaware
partnership, Bastion Capital Corporation, a Delaware corporation, BCC Soccer,
Inc., a Delaware corporation, Daniel D. Villanueva and Villanueva Investments,
Inc., a Delaware corporation, Defendants.
No. Civ.A. 16464.

Submitted June 20, 2000.
Decided Oct. 6, 2000.

Elizabeth M. McGeever, Paul M. Lukoff, and Elizabeth A. Wilburn, of Prickett, Jones & Elliott, Wilmington, Delaware, for Plaintiffs.

Edward P. Welch, Robert S. Saunders, and Laura S. Clare, of Skadden, ARPS, Slate, Meagher & Flom, LLP, Wilmington, Delaware, for Defendants.

MEMORANDUM OPINION

CHANDLER, Chancellor.

*1 This lawsuit arises from a dispute between plaintiff Jan G. Juran ("Juran") and defendants William Bron ("Bron") and Daniel Villanueva ("Villanueva") over their management of, and participation in, a private equity fund. Plaintiffs [FN1] Juran and Juran Investments, Inc. ("Juraco") filed this suit on June 22, 1998 alleging fraud, breach of fiduciary duty, and breach of contract. A trial took place on October 18-22, 1999.

FN1. For simplicity, where I refer to "plaintiffs," I mean either, or both, Juran and Juraco. Where specificity is necessary, the specific party is named.

In a sentence, a personality conflict between Juran and Bron caused this conflict. The inability of the parties to resolve the rift between the two partners resulted in this litigation. With this background in mind, this is the Court's post-trial opinion.

I. FINDINGS OF FACT

In the early 1990s, defendants Bron and Villanueva joined together to raise a private equity fund called Bastion. Bron and Villanueva created three Delaware business entities: Bastion Capital Fund, L.P. (the "Fund"), Bastion Partners, L.P. ("BPLP" or the "Partnership"), and Bastion Capital Corporation Management ("BCC" or the "Management Company"). [FN2] The relationship among the three entities is complex. In the simplest terms possible, the defendants operated these entities as follows: Bron wholly owns a corporation called Bron Corporation ("Bronco"). Villanueva wholly owns a corporation called Villanueva Investments, Inc. ("Villaco"). Villaco and Bronco served as the joint general partner of BPLP. BPLP, in turn, served as the general partner of the Fund. BPLP, in addition to serving as the general partner of the Fund, was also a 3% limited partner in the Fund. The Partnership joined a number of other entities as limited partner investors in the Fund. The Fund, in turn, invested in a number of portfolio companies. The Management Company, BCC, pursuant to a management services agreement, ran the Fund. Bron and Villanueva each individually owned one-half of the Management Corporation.

FN2. For simplicity, where I refer to "defendants," I mean all named defendants collectively. Where specificity is necessary, the specific party is named.

After canvassing the market for four years, the defendants raised approximately $72.5 million in commitments from three institutional investors. In July 1994, the Fund completed its first closing. Shortly thereafter, the Fund invested in a Spanish language television network, Telemundo Group, Inc. ("Telemundo"). This particular investment plays a significant role in this litigation.

The private equity industry considers any fund under $100 million small. The defendants, therefore, deemed it necessary to bring in a more seasoned

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

professional with more extensive experience in the private equity industry. Such an addition, the defendants hoped, would enable Bastion to grow its fund beyond the $100 million threshold.

In the spring of 1994, Bron and Villanueva solicited plaintiff Jan Juran, a private equity principal at Butler Capital Corporation ("Butler"), to join them as a third partner. The defendants assert that they brought Juran in as a "junior partner" and as an "employee," but the trial has made clear that Bron and Villanueva solicited Juran as an equal partner. They did so with the hope that Juran's track record in the private equity industry would instill confidence in the investors who had previously hesitated to invest due to the defendants' relative inexperience in the industry. Bron and Villanueva hoped Juran's addition would help grow Bastion beyond $100 million.

*2 In August 1994, Bron and Villenueva presented Juran with a term sheet containing all material terms of Juran's agreement (the "1994 Term Sheet"). Juran accepted the defendants' offer and informed Butler that he was resigning. The parties negotiated for two items: (1) a partnership agreement whereby Juraco, a company controlled by Juran, would become a general partner in the Partnership, and (2) an employment contract where Juran himself would join the Management Company.

The 1994 Term Sheet indicates that the defendants wanted a creative ownership structure under which Juraco would not technically be a general partner. The defendants desired such a structure to prevent jeopardizing Bastion's investment in the PCS industry. [FN3] The flexible ownership structure, however, does not alter the fact that both Bron and Villenueva intended to bring Juran in as their equal.

> FN3. Federal regulations regarding minority preferences in this industry were being structured. Villanueva warned Bron that in order to qualify for these preferences, Bastion might have to be 100% minority-owned. Bron explained this to Juran, and because Juran was not a minority, Bron included in the 1994 Term Sheet a provision regarding PCS.

In addition to discussing the partnership agreement, Bron and Juran discussed the employment agreement. The 1994 Term Sheet reflected that, after one year, the defendants could terminate Juran's employment with the Management Company "at-will." The parties discussed compensation and agreed that Juran would receive the same compensation as Bron and Villanueva, provided that Juran would reimburse Bron and Villenueva approximately $500,000 for organizational expenses advanced prior to Juran's involvement and pay them a $1.5 million placement fee.

Shortly after joining Bastion, Juran became concerned because Bron and Villenueva had not presented him with the written partnership agreement reducing the 1994 Term Sheet to a final agreement. Juran asked Bron for a written agreement reflecting his promised 20% equity participation in Bastion. In December, following a number of requests, Bron finally gave Juran a draft agreement. Juran insists that the December draft did not reflect the terms to which the parties agreed in the 1994 Term Sheet. For example, instead of making Juran a general partner, it gave Juran the title of "special general partner." Although Bastion's involvement in the PCS industry motivated this choice of title, it left Juran uneasy because he wanted assurance that Bron and Villanueva were bringing him in as their equal, as they had previously discussed. Juran also rejected the draft because he said it eliminated his vesting rights. The draft specifically stated, however, that the partnership could redeem his interest if Juraco failed to meet its capital calls, a subject not covered in the 1994 Term Sheet. Finally, Juran objected to provisions in the draft that provided Bron and Villanueva with the power to distribute investment points to employees. Juran feared this power could be used to dilute his 20% equity interest. Juran rejected the December draft.

In June 1995, Juran still had not received a finalized partnership agreement. At that time, he told Bron and Villanueva that he would have to resign if he did not have a partnership agreement by June 30, 1995. Juran wanted to finalize the partnership agreement because he, Bron, and Villanueva had represented to Bastion's investors that Juran was a "managing partner." Moreover, Juran, quite reasonably, wanted an explicit agreement in order to protect his investment in Bastion. Juran did not receive a partnership agreement from the defendants by June 30, 1995. He resigned on July 3, 1995.

*3 The resignation surprised Bron and Villanueva. They moved quickly to try to resolve this issue because they did not want to delay closing the Fund's second round of financing. Bron presented Juran with a partnership agreement reflecting the August 1994 Term Sheet. Juran was a co-general partner with Bron and Villanueva and a 20% limited partner in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Partnership. On July 13, 1995, Bron, Villanueva, and Juran executed a Second Amended and Restated Partnership Agreement for the Partnership ("Partnership Agreement"). This effectively brought Juran "back into the fold."

On July 13, 1995, Bron and Villanueva also executed an employment contract ("Employment Agreement") with Juran. The Employment Agreement reflected the previous discussions that Juran's employment would be "at-will." Simultaneously, Juran purchased 50 shares of BCC stock, the equivalent of 20% of the corporation.

Both the Partnership Agreement and the Employment Agreement contain intertwining provisions germane to this litigation. Those provisions will be discussed in detail as they relate to discussions in the analysis section.

Shortly after both the Partnership and Employment Agreements were signed, Bastion completed its second closing on July 15, 1995. The fund received an additional $47 million in commitments. The second closing should have been a cause for celebration. The three partners did not celebrate, however, as the personality conflict between Bron and Juran grew more acute.

As noted above, personality differences between Bron and Juran have driven, and continue to drive, this litigation. Their feud began during their tense and difficult negotiations regarding the Employment Agreement and Partnership Agreement. Following the second closing, an irreparable rift had developed between the two. It is apparent from record evidence and the testimony at trial, Juran's rigid, meticulous style simply clashed with Bron's more "fast and loose" approach.

The record contains a number of examples of Juran's painstaking methods. For example, while describing his career before joining Bastion, Juran stated that his boss at Butler Capital, where Juran gained much of his experience in the private equity industry, had been extraordinarily meticulous and demanding. Juran adopted a similar style that he brought with him to Bastion. Indicative of his demeanor was his practice of sending memos to his partners, rather than walking over to their offices. Indeed, after it was clear to Juran that this litigation would ensue, he took copious notes in his daily planner of every single phone conversation that he had with his partners. Although Juran's diligence is clear, his unrelenting approach may have been abrasive to some in the industry. For instance, in 1996, Bron received a complaint about Juran from a partner at the Wasserstein Perella firm.

Bron took the opposite approach to his work. Bron's original attempt to call Juran a "Special Partner" to avoid running afoul of the Federal regulations regarding minority preferences in the PCS wireless communications industry reflect his approach. Moreover, Bron and Villanueva had worked together for a number of years before Juran joined Bastion; therefore, they trusted each other. They preferred to talk to each other about the business face-to-face without writing memos or other formality. Villanueva told Juran on a number of occasions that Bastion was not a formal operation.

*4 By August 1995, however, it was clear that Bron and Juran were not getting along. Despite the fact that Bron and Villaneuva typically avoided formality, on August 7, 1995, Bron asked Villanueva if he would enter into a stockholders' voting agreement. They agreed that at any time after October 15, 1995, they would both vote their shares of BCC stock in favor of Juran's termination as a BCC employee if one of them desired such a vote. To this end, Bron and Villaneuva executed a written agreement giving each of them a mutual proxy to vote the other's shares with respect to Juran's termination.

In April 1996, the tensions between Bron and Juran boiled over into a heated argument. Villanueva, like a middle child caught between two fighting siblings, tried desperately to hold the "family" together. The tensions and arguments between Bron and Juran, however, were adversely affecting the office environment. Villanueva concluded that the relationship was irretrievably broken and that Juran's termination was necessary to preserve Bastion as he and Bron had built it. Villanueva testified that he reached this conclusion on his own and was the first to broach the subject with Bron. They both decided to terminate Juran's employment. On May 9, 1996, Bron and Villanueva signed a letter terminating Juran's employment. Juran was notified orally and given the letter indicating that he would no longer be associated with Bastion. At this point, Juran was automatically converted from a general partner in BPLP to a "special limited partner" and required to sell back his stock in BCC. He was also provided with a severance check representing two week's salary. The parties attempted to negotiate a separation agreement, but were unsuccessful. It is Juran's termination that gave rise to this litigation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## II. ANALYSIS

*A. Plaintiffs' Fraud Claim*

Juran contends that Bron and Villanueva fraudulently induced him to enter an employment and partnership relationship with them. Specifically, Juran argues that the defendants committed fraud by not disclosing an agreement between Bron and Villanueva that if either of them wished to oust Juran, the other would respect the wishes of the first and also vote for Juran's termination. Moreover, as the argument goes, by concealing this agreement, Juran was fraudulently induced to join initially, and ultimately remain associated with, Bron and Villanueva because he relied on the provisions of the Employment Agreement and the Partnership Agreement requiring the unanimous agreement of Bron and Villanueva in any decision to terminate his association. Ultimately, Juran contends that, because Villanueva agreed to terminate him based on Bron's request, and in compliance with the arrangement between Villanueva and Bron, his termination was not based on the unanimous vote of both. Thus, Juran insists his termination was procedurally flawed because it was in derogation of the Employment and Partnership Agreements.

*5 The defendants center their counter-arguments on two primary theories. First, they argue that Juran's claim that he was fraudulently induced to join Bron and Villanueva in 1994 is barred by Delaware's three-year statute of limitations. [FN4] Second, they contend that the plaintiff has not proven all the elements necessary for a cause of action based on fraud. Specifically, the defendants urge that any loose agreement that they may have had to respect the other's wish with regards to the ouster of a third partner was never formalized until August 7, 1995-*after* both alleged acts of fraudulent inducement. [FN5]

>FN4. The evidence indicates that Juran first became aware of the alleged fraudulent conduct around the time he was terminated. This would put that time in May 1996. The action was brought in June 1998-just over *two* years from when Juran learned of the alleged fraud. This issue is, however, moot in light of my ultimate decision on the claim.

>FN5. Juran alleges two counts of fraudulent inducement. First, when he negotiated for his employment in August 1995 and, second, when he was persuaded not to resign in July 1995. In both cases, Juran claims that his association with Bron and Villanueva was predicated on the understanding that one could not unilaterally terminate his employment. Rather, any such ouster would require the unanimous consent of both.

Under California law, [FN6] an action for fraud may arise under either the common law or by statute. The elements of common law fraud are: "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, *i.e.,* to induce reliance; (d) justifiable reliance; and (e) resulting damage." [FN7]

>FN6. The parties have stipulated that California law will govern the resolution of Juran's fraud claim.

>FN7. *Lazar v. Rykoff-Sexton, Inc.,* Ca.Supr., 49 Cal.Rptr.2d 377, 380 (1996).

Fraudulent acts are also proscribed by statute. For instance, the California Civil Code describes actual fraud between contracting parties as:
>Actual fraud, within the meaning of this Chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract:
>1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;
>2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true;
>3. The suppression of that which is true, by one having knowledge or belief of the fact;
>4. A promise made without any intention of performing it; or,
>5. Any other act fitted to deceive. [FN8]

>FN8. Cal. Civil Code § 1572.

With this body of law as a backdrop, the California Supreme Court, in a trilogy of cases, examined how tort actions for fraud interrelate with more traditional breach of contract actions and govern the relationship between an employer and an employee. [FN9] In *Lazar,* the Court extensively analyzed, and further clarified, its earlier decisions in *Hunter* and *Foley.*

>FN9. *See Lazar, supra; Hunter v. Up-Right, Inc.,* Ca.Supr., 6 Cal.4th 1174, 26

Cal.Rptr.2d 8, 864 P.2d 88 (1994); *Foley v. Interactive Data Corp.,* Ca.Supr., 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373 (1988).

The California Supreme Court, in *Lazar,* was faced with a factual situation somewhat analogous to that currently before this Court. Lazar was contentedly employed as president of a family-owned restaurant equipment company in New York. The Defendant, Rycoff-Sexton, Inc., approached Lazar and successfully persuaded him to relocate his family to California to work for Rycoff-Sexton, Inc. In doing so, Lazar was assured that his job would be secure and that he would receive frequent increases in his salary. Lazar did not, however, receive a written employment contract. These assurances were "hollow" and Lazar was eventually given the choice of resignation or termination. He resigned and brought an action for promissory fraud for inducing him to leave a secure job in New York and move to California. After making its way to the California Supreme Court, the Court limited its review to "whether, or under what circumstances, a plaintiff may state a cause of action for fraudulent inducement of employment contract." [FN10]

> FN10. *Lazar,* 49 Cal.Rptr.2d at 380, 909 P.2d 981.

\*6 The Court ultimately found that Lazar's termination was proper because he was an "at-will" employee. He was, however, allowed to pursue his claim for fraudulent inducement because his allegations, if true, would satisfy all the elements of promissory fraud. [FN11] Because Lazar's termination itself was not the problem, the Supreme Court's discussion of *Hunter* and *Foley* is most germane to the present action.

> FN11. *Id.* at 381.

In *Hunter,* the California Supreme Court "concluded wrongful termination of employment ordinarily does not give rise to a cause of action for fraud or deceit, even if a misrepresentation is utilized to effect the termination." [FN12] In so ruling, the Court intended "to preclude fraud recovery ... where 'the result of [the employer]'s misrepresentation is indistinguishable from an ordinary constructive wrongful termination." ' [FN13]

> FN12. *Id.* at 382.
>
> FN13. *Id.* at 384.

This clarification of its decision in *Hunter* evinces the California Supreme Court's intention to look at the true nature of the action to define the corresponding cause of action. [FN14] Moreover, the Court notes its "consistent refusal to validate tort remedies for breach of contract...." [FN15] Finally, the California Supreme Court indicated that a cause of action for fraud will not lie where the wrongful conduct is really a breach of the employment contract, and "so long as the alleged injury would not have occurred but for the employment termination, ... the employee is generally limited to a contractual remedy." [FN16]

> FN14. *Lazar,* 49 Cal.Rptr.2d at 386, 909 P.2d 981 ("Here [in *Lazar* ] we are not dealing with allegations of breach of a contract provision, but with allegations of fraud. *Foley* was a contract case in which we declined to expand the availability of tort remedies for breach of contract; this is a tort case in which we are being asked by defendant to constrict traditional tort remedies.").
>
> FN15. *Id.* at 387.
>
> FN16. *Id.* at 387-88 (quoting *Hine v. Dittrich,* Ca. Ct.App., 228 Cal.App.3d 59, 278 Cal.Rptr. 330(1991)).

Considering the foregoing California decisions, I am convinced that Juran's fraud claim must fail. First, as discussed more fully below, I find that the fraud claim is really a claim for damages from a perceived breach of his employment agreement. As such, the fraud claim would run afoul of *Lazar* and its predecessors and fail. Second, and also discussed more fully below, even if the fraud claim did not fail under *Lazar,* Juran cannot satisfy the elements for a prima facie case of fraud.

Juran claims he was defrauded by the voting agreement between Bron and Villanueva because he did not get the benefit of the unanimous voting requirements of both the Employment Agreement and the Partnership Agreement. Because that contractual term, unanimity, was important to him, he argues that he was fraudulently induced to join, and remain with, Bron and Villanueva at Bastion and its related entities.

On September 1, 1994, Juran, Bron, and Villanueva executed an Employment Agreement that set forth

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2000 WL 1521478 (Del.Ch.)
**(Cite as: 2000 WL 1521478 (Del.Ch.))**

Page 6

the terms of Juran's employment. One provision of this agreement provides in pertinent part that:

> At the present time, Management and Bastion have delegated to Bron the primary responsibility for managing the day to day administrative affairs of Management and Bastion, *provided all investment, hiring, and compensation decisions shall be subject to the general governance provision of Section 3.01(a) of the Bastion partnership agreement.* [FN17]

> FN17. Employment Agreement § 1.5, Sept. 1, 1994 (Pls.' Ex. 19) (emphasis added).

*7 Section 3.01(a) of the partnership agreement, in turn, provides that Bron and Villanueva would manage the affairs of the partnership by "unanimous agreement." [FN18]

> FN18. Second Amended and Restated Agreement of Limited Partnership of Bastion Partners, L.P., Art. III, § 3.01(a), July 13, 1995 (Pls.' Ex. 14).

On August 7, 1995, Bron and Villanueva executed a letter stating in its entirety:

> As controlling shareholders of the Corporation we hereby agree that after October 15, 1995 at the request of one or the other, we will each vote our shares of the Corporation so as to cause the Corporation to terminate Jan Juran's employment with the corporation, provided that at least fifteen (15) days prior to the intended date of such termination, either you or me, as the case may be, delivers to the other written notice of his intent to terminate Jan Juran. If Jan Juran's employment is terminated pursuant hereto, we hereby agree to take all actions necessary to terminate Juran Investments, Inc. as a general partner of Bastion Partners, L.P. This is the entire agreement of the parties with respect to the subject matter hereof. [FN19]

> FN19. Letter, Aug. 7, 1995 (Pls.' Ex. 23).

Juran argues that the agreement memorialized by the August 7 th letter vitiates the unanimity provisions of the employment and partnership agreements. Moreover, Juran contends that his termination, effected pursuant to the August 7 th letter, is in derogation of the contractual provisions set forth above because it is not a "unanimous" decision.

Despite Juran's assertions that he was fraudulently induced to join Bron and Villanueva, I can see no way to view this claim as anything but a claim for breach of contract that led to his wrongful termination. The promises he relies on are the express written provisions of two contracts. These are not akin to the pre-employment oral promises made to Lazar. As such, the purported fraud claim runs afoul of *Lazar* and fails.

Even as a breach of contract claim, I do not understand how the agreement between Bron and Villanueva robbed Juran of the unanimity provisions of the contracts. Juran consistently urged that the parties intended these provisions to require "separate unanimous consent," apparently meaning some sort of exercise of independent free-will on the part of both Bron and Villanueva at the precise moment they voted for his termination. I do not read the plain meaning of these contract provisions as being so restrictive. On their face, these contract provisions require that both Bron and Villanueva vote for his termination and that one, without the other, cannot unilaterally oust Juran. They require two votes; Juran received two votes. The letter of August 7 th does not change this, despite Juran's personalized concept of "separate unanimous consent." [FN20]

> FN20. Even if I accepted Juran's "separate, unanimous consent" concept, it would not change the result. The evidence at trial persuades me that Bron and Villanueva did voluntarily, and independently, come to the conclusion that Juran had to be fired. The August 7, 1995, letter did not influence the deliberative process by which Bron and Villanueva reached their joint conclusion.

Even without the *Lazar* problem, Juran's fraud claims independently fail because he cannot satisfy the requirements for either common law or statutory fraud. The first element of common law fraud is that there must be a "misrepresentation." [FN21] That misrepresentation can consist of either a false representation, concealment, or nondisclosure. [FN22] Plaintiffs have not established that at the time Juran initially joined Bron and Villanueva, or when he was later persuaded to stay, that they misrepresented a material fact either affirmatively or by omission.

> FN21. *Lazar,* 49 Cal.Rptr.2d at 380, 909 P.2d 981.

> FN22. *Id.*

*8 The plaintiffs claim that Bron and Villanueva

Not Reported in A.2d  
2000 WL 1521478 (Del.Ch.)  
**(Cite as: 2000 WL 1521478 (Del.Ch.))**

Page 7

failed to disclose their mutual proxy agreement both in 1994, when the defendants were negotiating the Term Sheet with Juran, and then again in 1995, when the defendants asked Juran to withdraw his resignation. Moreover, the plaintiffs argue that the failure to disclose this information constitutes a material omission. Juran's basic argument is that if he would have known about the agreement between Bron and Villanueva, he would have taken different actions, whether it would have been negotiating a different agreement, or electing not to join Bastion altogether.

Juran's argument faces several obstacles, not the least of which is my finding above, that even with the secret voting agreement, he nonetheless received exactly what he wanted-a unanimous vote by Bron and Villanueva in matters relating to his employment. Thus, there was no material misrepresentation inherent in the existence of the agreement.

Moreover, I find that the plaintiffs have not established that an enforceable secret voting agreement, even if it had been a material misrepresentation, existed in either written or oral form at the time Juran claims he was defrauded. The written agreement was signed on August 7, 1995. This date follows both August 1994, when Juran first joined Bastion, and July 1995 when he was persuaded to stay.

Perhaps the closer question is whether some form of enforceable oral agreement existed between Bron and Villanueva before that time. While it is true that Bron and Villanueva had an understanding regarding management decisions for Bastion, it is less clear that the two had a specific, binding oral agreement which would have bound both men to always vote in unison. It is quite natural that two men that have a long working relationship and a business history would want to be "on the same page" in running their business. It is also quite understandable that two partners who had worked to build a private equity fund from scratch wanted to protect the business in case a new partner they brought in did not work out. A "gentlemen's agreement" between two friends who work together to refuse to allow a new partner to affect their relationship, or threaten the business they have worked hard to construct, is very different from a binding oral contract, the terms of which demand that one partner vote with the other partner if that other partner invokes the provisions of the oral contract.

While Bron and Villanueva likely had some kind of general understanding akin to a high level of mutual respect, it is not evident that any agreement legally bound both men. Indeed, Bron likely felt it was necessary to create a written agreement on August 7 th because he recognized the "gentlemen's agreement" or mutual respect that existed between Bron and Villanueva would not be legally binding. Moreover, while Villanueva was trying to hold Bastion together with all three parties involved, he likely signed the agreement because he remained loyal to his original partner, Bron, and had already himself anticipated a continuing problem between Bron and Juran. Ultimately, in August 1995, Villanueva likely foresaw that Juran might have to be terminated to restore peace and order to the business. In April 1996, Villanueva approached Bron about the issue of termination. Based on these facts, I cannot find that the mutual understanding of two partners, prior to adding a third, rises to the level of an enforceable oral agreement. Moreover, I find as a factual matter that the voting agreement did not play any significant role in Juran's termination since Villanueva first approached Bron about the subject and not the other way around.

*9 Plaintiffs' fraud claims ultimately fail. First, the trilogy of cases ending with *Lazar* provides no support for these fraud claims. No evidence was presented at trial to indicate that Juran's claims related to his termination, allegedly through the use of the voting agreement, are anything but a claim for the wrongful breach of his employment contract. Under *Lazar,* where the alleged wrongful conduct is really in the nature of a breach of contract, no tort action for fraud will lie. That is the case here. Even without *Lazar,* the plaintiffs' fraud claims fail because they cannot show a fraudulent misrepresentation or omission that satisfies the elements for either common law fraud or statutory fraud. Because the claims fail on the first element, I need not address the remaining elements.

*B. Plaintiffs' Breach of Fiduciary Duty Claims*

Plaintiffs contend that defendants, as partners and majority shareholders, owe them fiduciary duties and that their actions have breached those duties. First, as partners, Juran argues that Bron and Villanueva breached their fiduciary duties by entering into the voting agreement on August 7 th and by not providing him access to certain financial records of the partnership. Second, he urges that as controlling shareholders of BCC, the management company and holder of the LA Soccer investment, Bron and Villanueva owed him fiduciary duties that were

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

breached by the voting agreement of August 7 th and by diluting his interest in the LA Soccer investment. The defendants, in turn, argue that the Delaware Supreme Court's decision in *Riblet Products Corp. v. Nagy* [FN23] prevents a claim for breach of fiduciary duty where the acts allegedly in breach of the duty are related to an employment contract and the person's role as an employee, rather than as a shareholder or partner.

>   FN23. 683 A.2d 37 (1996).

Under Delaware law, "[a] majority shareholder of a corporation clearly owes fiduciary duties to the minority shareholders." [FN24] Similarly, one partner owes the other partners fiduciary duties. [FN25] These concepts are relatively straightforward until an employment relationship among the parties is thrown into the mix. Where a partner or minority shareholder, who is also an employee, is injured by the acts of his partners or the majority shareholders, they may, or may not, have breached their fiduciary duties. If the minority shareholder/partner/employee is injured in his capacity as a shareholder or partner, the acts against him may be a breach of fiduciary duty. Where, however, the person is injured as an employee, such as in a breach of an employment contract situation, his remedy would be under the contract. [FN26]

>   FN24. *Zirn v. VLI Corp.*, Del. Ch., C.A. No. 9488, Hartnett, V.C. (Feb. 15, 1991), mem. op. at 8 (citing *Ivanhoe Partners v. Nemont Mining Corp.*, Del.Supr., 535 A.2d 1334 (1987)).
>
>   FN25. See *Boxer v. Husky Oil Co.*, Del. Ch., 429 A.2d 995, 997 (1981).
>
>   FN26. *Riblet Products Corp.*, 683 A.2d 37 (1996).

Plaintiffs' claims that Bron and Villanueva breached their fiduciary duties towards him by entering into the voting agreement fail for two reasons. First, as discussed above, I do not find that the voting agreement between Bron and Villanueva involves any form of culpable conduct. Thus, it cannot form the basis for a breach of fiduciary duty claim. Second, also discussed more fully above, Juran's perceived injury from the voting agreement is his interpretation of how it affects his employment agreement. This is an issue of contract interpretation and, under *Riblet Products Corp.*, will not give rise to a breach of fiduciary duty action.

*10 The next claim, that defendants will not provide plaintiffs with financial information relating to the various entities and transactions, may be a breach of fiduciary duty. These issues will, however, resolve themselves in the discussion below concerning the breach of contract claims. Likewise, the issue of the dilution of Juran's interest in the LA Soccer investment will be discussed more fully below.

C. *Claims for Additional Sums Due under the Contracts*

Plaintiffs contend they are due additional sums under various contracts governing the relationships between the plaintiffs and defendants. Specifically, they claim:

1. They should receive a $314,815 "placement fee" as provided for by the Employment Agreement;
2. They should receive an award of $530,000 representing the "consulting fees" that Bron and Villanueva paid to themselves. Plaintiffs contend these fees are merely disguised bonuses and that he should receive an equal amount as provided by the Employment Agreement;
3. The defendants improperly reduced Juran's ownership interest in BCC's investment in LA Soccer; and
4. The defendants miscalculated the plaintiffs' share of the profits from the partnership's investment in Telemundo.

The defendants, in turn, defend their actions on various grounds. With respect to the "placement fee," they argue that the plaintiff is not entitled to this money because he was terminated prior to his rights to the fee vesting. Moreover, conditions precedent to the payment of the fee are not satisfied in that Bron and Villanueva have not recouped certain organizational expenses or an "initial placement fee" as provided for in the contracts. Defendants also claim that this is a claim for wages and is barred by the one-year statute of limitations, 10 *Del. C.* § 8111.

Similarly, defendants argue that Juran is not entitled to his share of the "consulting fees" because: (1) the defendants have not recouped the organizational expenses and the initial placement fee, and (2) that this is a claim for wages and is barred by the same one-year statute of limitations.

Defendants also defend the reduction of Juran's interest in the LA Soccer investment by arguing that it was entirely proper because Juran did not participate in subsequent capital calls. As a result,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2000 WL 1521478 (Del.Ch.)
**(Cite as: 2000 WL 1521478 (Del.Ch.))**

Page 9

they say, Juran's proportional contribution was diluted. Finally, defendants contend that their calculation of the profits to be distributed from the Telemundo investment is correct under the contracts.

I believe it is most appropriate to begin by addressing the defendants' arguments that the plaintiffs' claims are barred by the one-year statute of limitations of 10 Del. C. § 8111. Before the Court can address this issue, it must be satisfied that the Delaware statute would apply to this action that arises from conduct in California and that adopting the one-year limitations period would be appropriate for an action in equity.

Where the law of two different states may apply to an action, Delaware courts apply the Restatement (Second) Conflicts of Laws to determine which state law applies. [FN27] With respect to questions of which state's statute of limitations to apply, the courts are instructed by the Restatement to apply the statute of limitations of the forum. [FN28] Thus, in this case, the Court would look to the statute of limitations laws of Delaware.

> FN27. *Asten, Inc. v. Wangner Systems Corp.,* Del. Ch., C.A. No. 15617, Steele, V.C. (Sept. 23, 1999), mem. op. at 5.

> FN28. *Restatement (Second) Conflict of Laws* § 142. See also *Lumb v. Cooper,* Del.Super., 266 A.2d 196, 198 (1970) ("[L]imitations questions are generally settled by the law of the forum.").

*11 The General Assembly, however, has modified this general rule by statute. Delaware has adopted a "borrowing statute" that provides, in pertinent part:

> Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action. [FN29]

> FN29. 10 Del. C. § 8121.

There are three limitations periods that may apply to this action. First, as noted above, I have determined that this action is in the nature of a suit for breach of contract. Under Delaware law, a breach of contract action is subject to a three-year statute of limitations. [FN30] California, however, has established a four-year statute of limitations for breach of contract. Finally, the defendants urge that these claims are for wages or salary and are, thus, subject to Delaware's one-year limitations period for wage or salary claims. [FN31] The complexity of this issue, in this particular case, is compounded by the fact that the parties, in the Employment Agreement, have adopted a choice of law provision stating that the "Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to conflict of law rules thereof." [FN32]

> FN30. 10 Del. C. § 8106.

> FN31. 10 Del. C. § 8111.

> FN32. Employment Agreement § 6.2 (Sept. 1, 1994) (Pls.' Ex. 19).

I do not find that the choice of law provision is dispositive on this issue. First, there is some authority, which I find persuasive, that while generally choice of law provisions will be given effect, those provisions will only include the statute of limitations of the chosen jurisdiction if their inclusion is specifically noted. [FN33] Second, and more importantly, I find that this case presents one of those "unusual" or "special" circumstances where the Court, as a Court of Equity, should not look to the applicable statute of limitations at law for guidance.

> FN33. See *American Energy Tech. v. Colley & McCoy Co.,* D. Del., Civ. A. 98-398 MMS, 1999 WL 301648, Schwartz, J. (April 15, 1999).

Generally, a statute of limitations for an action at law that is analogous to the action in equity will guide an Equity Court in applying the equitable doctrine of laches. [FN34] Moreover, "[a] statute of limitations is not binding upon a court of equity" and will not be applied where there are "unusual" or special circumstances. [FN35] The case presently before this Court presents those special or unusual circumstances where it would be inequitable to apply the statute of limitations at law. [FN36]

> FN34. See *The Scott Fetzer Company v. Douglas Components Corp.,* Del. Ch., C.A. No. 11327, Hartnett, V.C. (April 12, 1994), mem. op. at 8.

> FN35. *Id.*

> FN36. By finding as I do on this issue, it is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

not necessary to this action to decide which limitations period would apply to this action. This Court did, however, examine the question closely. Had the special circumstances not been present, or had this been an action at law, this Court believes that, despite the choice of law provision in the contract, Delaware limitations periods would apply. This includes Delaware's borrowing statute. Either way, the Court is presented with a three-year limitations period for a contract action or a one-year period for a wage claim action. Based on past judicial interpretation of the wage claim statute, 10 Del. C. § 8111, I would also be inclined to view the plaintiffs' claims for the placement fee and consulting fees as falling within the purview of this statute.

This is a California case. The parties were California residents at all relevant times to this action. The Employment Agreement was executed in California and the performance of the contract was to be in California. The contract specifies that it is subject to California law. Finally, the alleged breach of this agreement occurred in California. The cause of action accrued in, and has the most significant ties to, California. The parties are in the Delaware Court of Chancery because the organizational parties were established under Delaware law and presumably to take advantage of this Court's experience in handling disputes of this nature. For these reasons, it would be inequitable to rigidly apply a Delaware statute of limitations to this action.

*12 I also find that my ruling on this issue falls squarely within the policy behind Delaware's borrowing statute. The borrowing statute, 10 Del. C. § 8121, was designed to protect Delaware's courts from having to adjudicate stale out-of-state claims. The typical problem this statute addresses is where a plaintiff's action is barred in its "home state" because the limitations period has run, but the Delaware courts may have jurisdiction over the parties and the action would not yet be barred under Delaware law. By forcing the Delaware courts to apply the shorter of the two periods, the General Assembly sought to prevent forum shopping to take advantage of a longer limitations period.

Here, we do not have that situation. The plaintiffs have come to a jurisdiction with a *shorter,* rather than a longer, limitations period. Thus, there is no danger of forum shopping here.

For this action, the possible limitations periods at law that may have applied ranged from a low of one-year to a high of four-years. With this range in mind, I find that the plaintiffs' claims are not barred by laches. They did not sit on their rights. Juran was terminated in May 1996 and the action was brought in June 1998. This two-year period falls in the middle of the range noted above, is shorter than both the California and the Delaware limitations periods for contract actions, and is only one-year longer than the statute of limitations for wage claims. Moreover, the defendants have not shown they have been prejudiced by any unnecessary delay in bringing the action. For these reasons, I find that the plaintiffs' claims are not time-barred.

I now turn to the merits of the plaintiffs' claims that he is entitled to a "placement fee" and certain "consulting fees" under the Employment Agreement.

(i) *The Placement Fee*

Juran argues that he is entitled, under the terms of his employment agreement, to receive a "placement fee" of $314,815.00. The defendants, however, contend that the fee is not due because other terms of the Employment Agreement absolve them from paying the fee.

Section 5.6 of the Employment Agreement provides that:
> The parties hereto agree that, for their efforts in forming the Fund and raising its initial capitalization, Bron and Villanueva shall each receive a placement fee of $750,000.00, which fee shall be paid as soon as practicable from fees earned by Management from the Fund. Following payment of the $750,000.00 fee to each of Bron and Villanueva, Bron Villanueva, and Juran shall each be entitled to receive a placement fee of $314,815.00 for their efforts in raising subsequent capital for the Fund. In all circumstances, such amounts of $314,815.00 shall be paid (x) only after the amounts payable under Sections 5.5 and 5.6 have been paid, (y) at the same time and on a pro rata basis to each of Bron, Villanueva and Juran, and (z) as soon as practicable from the fees earned by the Management from the Fund. [FN37]

  FN37. Employment Agreement § 5.6 (Sept. 1, 1994) (Pls.' Ex. 19).

*13 The defendants argue that § 3.4(c) trumps § 5.6. Section 3.4(c) provides that:
> Should Juran's employment by Management

continue beyond the Term of this Agreement, such employment shall be terminable at the will of either party, at any time, with or without cause or reason, *and Management shall have no liability or obligation to Juran other than* for any unpaid salary which shall have accrued as of the date of such termination or upaid benefits to which Juran is entitled, if any, under the terms and conditions of any applicable employee benefit plans. [FN38]

> FN38. Employment Agreement § 3.4(c) (emphasis added).

I do not read these two sections of the Employment Agreement as being mutually exclusive. First, the plaintiffs argue persuasively that when read in context, § 3.4(c) relieves the defendants from paying Juran any severance payments following termination after one year of employment. Sections 3.4(a) and (b) provide for termination only "for cause" and varying severance payments if Juran is terminated during either the first or second six months of employment. Section 3.4(c) continues that thought but changes Juran's employment to "at will" and eliminates any severance payment provisions. Second, § 3.4(d), which requires Juran to sell back his stock in BCC upon termination, expressly includes the placement fee to be paid under § 5.6 in the calculation of the sum Juran is to be paid for his shares. Finally, and most importantly, the defendants acknowledged at the time of termination that Juran was entitled to the "placement fee." [FN39]

> FN39. Letter from Villanueva to Juran, June 13, 1996 (Pls.' Ex. 37) ("Although Bastion is not obligated to pay your salary beyond your termination date, we are providing you herewith a severance check in the amount of two week's salary (less deductions and withholding). You will separately receive information about continuance of health coverage at your own expense. *Finally, of course, the placement fee will be handled in accordance with paragraph 5.6 of your Employment Agreement."* ) (emphasis added).

Section 5.6 falls under a heading of "Additional Agreements." While headings are not dispositive, I find that it is, indeed, an "additional agreement" and is segregated from the provisions of § 3.4(c) and that the defendants acknowledged the same shortly after Juran's termination. Their arguments now, to the contrary, are disingenuous. Thus, the language of § 3.4(c) in no way affects the requirement to pay the "placement fee."

There are, however, conditions precedent to Juran's entitlement to the placement fee. First, all sums owed to Bron and Villanueva under § § 5.5 and 5.6 must have been paid. Second, they must all be paid at the same time. Third, the fee must be paid as soon as practicable.

It is difficult for this Court to determine whether, and to what extent, Bron and Villanueva have received either the refund of organizational expenses under § 5.5 or the $750,000 placement fee of § 5.6. This difficulty is directly related to the failure on the part of the defendants to keep adequate records. I do, however, find credible evidence that both Bron and Villanueva received significant monetary distributions from BCC from time to time. [FN40] Some of these distributions were characterized as "loans," but there is inadequate documentation to support this classification. Because there is no documentation to support a finding of whether, and to what extent, this precondition has been satisfied, I find it inequitable at this point to force the plaintiff to wait for the defendants to pay themselves these sums and adequately document the payments. Moreover, considering the contentious nature of their relationship with Juran, I find it unlikely that defendants would *ever* officially pay themselves the fees. At this point, I think it is more likely that defendants would forego the payment (if it has not already been made in a disguised form) so as to deny Juran what he is rightfully owed. For these reasons, this pre-condition is met.

> FN40. The plaintiffs argue that defendants used BCC as their personal "piggy bank." After reviewing the evidence presented at trial, I do not think that characterization is entirely unfair.

*14 Next, they must all be paid the $314,815.00 at the same time. While the fee may not have been paid to date, there is nothing to prevent Bron and Villanueva from paying themselves at the same time they pay Juran.

Finally, the fee must be paid as soon as practicable from fees earned by BCC. The greatest obstacle to this precondition is if BCC did not have the financial resources to pay the fee. Evidence introduced at trial indicates that BCC earned over $11 million in management fees from 1995 to the time of trial. Because BCC appears to be thriving, I believe it is fair to treat the "practicability" requirement as

satisfied. [FN41]

> FN41. If the defendants want to continue to argue that BCC does not have the wherewithal to make the payment to Juran, the plaintiffs may seek an order from this Court directing an independent accounting firm to conduct an audit of BBC's financial records.

Because the conditions precedent to paying the placement fee are either excused or are met, I find that it is practicable for BCC to pay Juran the placement fee owed him under § 5.6 of the Employment Agreement. Thus, the defendants are ordered to pay Juran the $314,815.00 placement fee as required by the Employment Agreement. [FN42]

> FN42. Subject to the defendants' right to demonstrate that BBC does not have the ability, presently or in the near future, to make the required payment. In the event, as noted above, plaintiffs may apply for relief from the Court in the form of an independent accounting.

(ii) *The Consulting Fees*

Juran argues that Bron and Villanueva received over $530,000 in "consulting fees" that are really disguised bonuses or compensation. [FN43] As the argument goes, because he is entitled to the "same total compensation (including base salary and such benefits and bonuses, if any)" as Bron and Villanueva, he is entitled to receive similar "bonuses." [FN44]

> FN43. This figure is lifted from a Profit and Loss Statement for BCC for 1995. This statement shows that the "consulting fees" were a significant (25%) delineated deduction from the management fees received as income ($2,023,865). (Pls.' Ex. 28).

> FN44. Employment Agreement § 2.1.

The defendants do not quarrel with this amount but rather with the classification. At trial, the defendants never could identify why these amounts were labeled "consulting fees." There was no evidence that they were paid for consulting services. Bron and Villanueva argue instead that no matter what the nomenclature, they were really just advances on the amounts owed them under § § 5.5 and 5.6 of the Employment Agreement.

This argument fails for many of the same reasons as noted above. There is scant evidence of the amount of organizational expenses actually incurred by Bron and Villanueva and there is little or no documentation of how much of this amount has been repaid under § 5.5. Likewise, as noted above, there is little evidence of whether, and to what extent, Bron and Villanueva have been paid the $750,000 placement fees of § 5.6.

They could have classified the $530,000 as a return of either of these amounts. They, however, did not do so. Rather, they chose for reasons known only to defendants to label these cash distributions as "consulting fees." But I am not required to accept "labels" when the evidence adduced at trial points logically in a different direction. I find these payments are indistinguishable from compensation and that Juran is entitled to an equal amount under § 2 .1 of the Employment Agreement. Defendants shall pay to Juran a like amount of compensation that they have already paid to themselves, which appears in this case to be $265,000. [FN45]

> FN45. Juran pulled the $530,000 figure from the financial statement. That amount represents the *total* for both Bron and Villanueva. Thus, Juran would receive an amount equal to one-half of that figure, or $265,000.

(iii) *The LA Soccer Investment Proceeds*

*15 In 1996, Bron, Villanueva, and Juran agreed to invest in a professional soccer team through the Los Angeles Soccer Limited Partnership. The minimum investment was $100,000 and the three agreed to go together to invest that amount. Bron and Villanueva would each contribute 40% and Juran 20%. Thus, for the first installment of $60,000, Juran paid $12,000 and Bron and Villanueva each paid $24,000. To avoid the necessity of forming another entity to make this investment, the parties submitted their money to BCC which then made the investment in LA Soccer. Later, this investment interest was transferred to a new company formed for this purpose, BCC Soccer, Inc. ("BCC Soccer"). LA Soccer made three capital calls between 1997 and 1998 amounting to the remaining $40,000 owed on the original $100,000 investment plus an additional $25,000. This resulted in a total investment by BCC Soccer of $125,000.

Juran refused to honor the capital calls and remit his 20% for each. Bron and Villanueva made up the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

deficiencies. In late 1998, LA Soccer was sold and BCC Soccer received proceeds in the neighborhood of $215,000. [FN46] Shortly before trial, Juran received a check for $20,734 representing 9.6% of the $215,977 reportedly received from LA Soccer. Juran's interest was reduced from 20% to 9.6% because he contributed only $12,000 of the total $125,000 invested in LA Soccer (12,000/125,000 = 9.6%).

> FN46. Plaintiffs contest the exact amount received by BCC Soccer, Inc., but it is not material to my opinion.

Juran argues he was not required to honor the capital calls and that his initial 20% interest could not be abated for that reason. For this argument, Juran points to a letter from Bron and Villanueva of March 20, 1996. The letter provides in whole:

> Notwithstanding Section 3.4 of your Employment Agreement dated as of September 1, 1994, in the event that you become no longer a shareholder in Bastion Capital Corporation ("Bastion") prior to the ultimate sale or disposition of Bastion's investment in Los Angeles Soccer Partner, L.P. (or its successors and assigns), you will receive the same economic consideration (including tax treatment, etc.) from Bastion in respect of such investment as if you had continued to be a 20% shareholder in Bastion. [FN47]

> FN47. Letter, March 20, 1996 (Pls.' Ex. 29).

This letter, however, does not require Bron and Villanueva to provide Juran with a windfall where he has not made a 20% contribution to the entire investment. It merely states that in the event Juran's employment is terminated, and his interest in BCC extinguished, his interest in the LA Soccer investment would not be erased by means of his termination. His interest would not be affected *by reason of his termination* or, in other words, if he had *not* "continued to be a 20% shareholder in Bastion."

Juran did not honor the capital calls. I can find no contractual provision absolving him of that responsibility. That being the case, Juran is not entitled to a windfall. Thus, the reduction of his interest from 20% to 9.6% was proper. Because there appears to be some question whether the final proceeds from LA Soccer totaled $215,977, I will direct the defendants to provide plaintiffs with adequate documentation to verify the appropriate final figure.

(iv) *Telemundo*

*16 Beginning in July 1994, the Fund made three separate investments in Telemundo Group, Inc. ("Telemundo"). The three investments were known among the parties as Tranches 1, 2, and 3. Tranches 1 and 2 were a part of the Fund's portfolio made before Juran's termination. The investment in Tranche 3, however, was made after Juran's separation from Bastion. Thus, there are two categories of investments in the fund as related to Juran. First are those investments made before his termination and in which he participates in the profits and losses. Second are those investments made after his separation and in which he does *not* participate. [FN48]

> FN48. This "pooling" scheme is discussed in detail below.

The parties do not dispute that Juran would, and should, participate in any gains from Tranches 1 and 2, as well as an investment in Nextwave. Juran would not, however, participate in the gains and losses from Tranche 3 and an investment in Renaissance Cosmetics, Inc. ("RCI").

In August 1996, the Fund's entire investment in Telemundo (Tranches 1, 2, and 3) was sold for $81.5 million. Of these sale proceeds, $77 million can be attributed to the Fund's investment in Tranches 1 and 2. Moreover, since Tranches 1 and 2 originally cost $22 million, the gain on these two investments was $55 million. The gain on Tranche 3 was approximately $4.4 million. Thus, the total gain realized by the Fund on this investment was nearly $60 million.

This gain was distributed to BPLP and the other partners in the Fund pursuant to the distribution scheme in the Fund's partnership agreement. The parties agree that BPLP, for its 1% general partner and 3% limited partner interests in the fund, received a distribution of those profits from the Fund in the amount of $5.354 million dollars. It is the subsequent "carving" of this "goose" that will determine the serving each of the partners of BPLP will receive and is the subject of the current dispute.

Juran ultimately received a check for $366,933, purportedly representing his share of the distribution from the Fund for the sale of Telemundo. Juran argues that §§ 5.10 and 7.02 of BPLP's Partnership Agreement govern the further distribution of the $5.354 million between Bron, Villanueva, and Juran.

Specifically, Juran contends that these sections demand a distribution scheme where the total distribution from the Fund is divided into two pools. One pool reflects the gains on the sale of Telemundo Tranches 1 and 2 and a "write down" reflecting losses from the investment in Nextwave. The other pool reflects the gains from the sale of Telemundo Tranche 3 and another "write down" to account for significant losses from the investment in RCI. Juran argues that, by following this "pooling" requirement of § 7.02 and then applying the distribution scheme of § 5.10(b), he should have received approximately $1.8 million.

Defendants respond that in calculating the distribution, certain sections of the Fund's partnership agreement also come into play. The ultimate result of the defendants' distribution scheme is that the significant losses from the RCI investment are offset by the Telemundo Tranches 1 and 2 profits. Under this distribution scheme, the defendants calculate Juran's share at just over $800,000. This amount was then reduced to $366,933 to account for reserves that the defendants deemed necessary to cover any future exercise of "claw-back" provisions in both the Fund's and BPLP's partnership agreements.

*17 The parties agree that the distribution from the Fund to BPLP of $5.354 million was a correct distribution under the Fund's partnership agreement. Thus, this Court's focus will be on how the BPLP partnership agreement orchestrates the distribution among its partners, Bron, Villanueva, and Juran.

I note at the outset that both parties appear to agree that § 7.02 and § 5.10(b) of the Partnership Agreement are the applicable sections. As in any partnership, the relationship of the parties to one another within that partnership often also determines their financial relationship. Here, § 7.02 defines the relationship between the parties upon the occurrence of a "disabling event." In this case, the disabling event was Juran's termination. Section 7.02 provides in substantial part that:

> Section 7.02 *General Partner to become Special Limited Partner upon Disabling Event.* In the event that either Villanueva, Bron or Juran shall have (a) ceased to be an active principal of either the Management Company or the General Partner Company of which he is an Affiliate, ... ( ... hereinafter referred to as a "Disabling Event"), Bronco (in the case of a Disabling Event of Bron or Bronco), or Villaco (in the case of a Disabling Event of Villanueva or Villaco), or Juraco (in the case of a disabling event of Juran or Juraco) shall no longer be a General Partner, but rather shall automatically become a Special Limited Partner and shall receive all cash distributions and Net Income and Net Loss allocations that Bronco, Villaco or Juraco, as the case may be, would have otherwise been entitled to receive absent such Disabling Event with respect to investments made by the Fund prior to such Disabling Event; *provided* that upon the Disabling Event of Bron or Bronco, or Villanueva or Villaco, or Juran or Juraco, Bronco (in the case of a Disabling Event of Bron or Bronco) or Villaco (in the case of a Diabling Event of Villa or Villaco) or Juraco (in the case of a disabling event or Juran or Juraco) shall no longer be obligated to make any further Capital Contributions.... *The new Special Limited Partner shall only be entitled to Investment Points [FN49] with respect to the Partnership's share of investments made by the Fund prior to the Disabling Event of Bron or Bronco, Villanueva or Villaco, or Juran or Juraco, as applicable. All future Investment Points and obligations to make Capital Contributions shall be assigned to the remaining General Partners, if they remain. The allocations of Net Income and Net Loss and distributions shall be adjusted to provide for two separate pools of Investment Accounts: [FN50] (a) one pool for all investments in Portfolio Companies made by the Fund with respect to which the Special Limited Partner has an interest and (b) another pool for all future transactions for which the Special Limited Partner will not invest. The allocations of Net Income and net loss and distributions shall be separately maintained for each pool. A Special Limited Partner shall not be relieved of any liabilities attributable to the period that it was a General Partner.* [FN51]

>> FN49. Defined as: *"Investment Points--* initially mean with respect to (i) Bronco, 40, (ii) Villaco, 40 and (iii) Juraco, 20." See Partnership Agreement § 1.01.

>> FN50. *"Investment Account--*has the meaning set forth in Section 5.01(c). See Partnership Agreement § 1.01. Section 5.01(c) defines Investment Account as:
>> A separate investment account ... shall be established for each Partner for the investments by the Partnership in the Fund's investment in each separate Portfolio Company. The Investment Account shall be created with a Partner's Capital Contribution with respect to the investments in the relevant Portfolio Company and the income

or gain from the disposition of such investments and it shall be debited with the distributions and losses attributable to the disposition of any such investments."

FN51. Partnership Agreement § 7.02 (emphasis added).

*18 This section provides the initial framework for dividing distributions among the partners where one has become a Special Limited Partner. In the present case, Juran had become a Special Limited Partner at the time the distribution was made. Thus, the distribution from the Fund is subject to the "pooling" scheme of § 7.02.

Under this scheme, Juran "shall only be entitled to Investment Points with respect to the Partnership's share of investments made by the Fund prior to the Disabling Event of ... Juraco. All future Investment points and obligations to make Capital Contributions shall be assigned to the remaining General Partners...." [FN52] In this case, Juran had an interest in Telemundo Tranches 1 and 2 and Nextwave. Juran did not, however, have an interest in Telemundo Tranche 3 and RCI. Under this system, Juran enjoys both the "upside" and the "downside" of the former, but not the latter. This system makes sense and is clear from the plain language of the partnership agreement.

FN52. Id.

Once the "pools" have been identified, and the distributions assigned to the proper pool, § 5.10(b) prescribes the appropriate division of the money in the pools between the partners. Depending on the source of the distribution, the division will be based on either the partner's "Capital Contributions with respect to the fund's investment in a particular Portfolio Company producing such distribution" or their respective "Investment Points with respect to the Fund's investment in a particular Portfolio Company producing such distribution...." [FN53]

FN53. See Partnership Agreement § § 5.10(b)(i)-(v).

I find that the initial calculations of Bastion's in-house analyst and those of the plaintiffs' expert accurately reflect my interpretation of these provisions of the Partnership Agreement. Bastion's in-house analyst, Scott Kim, was asked to calculate the partners' distributive share of the $5.354 million. Using the above provisions of the partnership agreement as his guide, he concluded that Juran was entitled to $1.815 million. [FN54] The plaintiff's expert, Roger Bennett, independently came to a similar conclusion. Bennett reached this figure by creating the two "pools" and filling pool 1 with the profits from the sale of Telemundo Tranches 1 and 2, and then "siphoning off" the Nextwave write-down. The second pool was filled with the much more meager profits from the sale of Telemundo Tranche 3 and then drained in whole by the significant write-down for the investment in RCI. After offsetting the profits by the write-downs in each pool, pool one, in which Juran had an interest, had a net profit of $9.1 million. Pool two, however, was dry. Then, after applying the 40-40-20 distribution of § 5.10(b) to this profit (20% x $9.1 million), Bennett and Kim determined that Juran was entitled to receive approximately $1.8 million, [FN55] Villanueva was entitled to $2.367 million, and Bron was entitled to $1.75 million. [FN56]

FN54. See Kim's calculations on Bates No. 5291 (Pls.' Ex. 73).

FN55. Kim and Bennett differ slightly on this amount. Kim found Juran was entitled to $1.815 million and Bennett found he should receive $1.825 million.

FN56. The analysts calculated these numbers using Bates No. 5291 (Pls.' Ex. 73).

I think it significant to note at this point that, at trial, evidence developed showing that Kim's calculations were presented to Bron, and it was only after Bron saw these calculations that he told Kim to go back to the drawing board. Bron's rationale for doing so was dubious, at best. Suffice it to say that defendants' strained interpretation of the BPLP partnership agreement had the ultimate effect of using the significant profits from Tranches 1 and 2 of Telemundo to offset Bron and Villanueva's losses on RCI and provide them with an 8% [FN57] return on the losing RCI investment. This reduced Juran's share from $1.8 million to $849,000 and increased Bron and Villanueva's share by approximately $500,000 each.

FN57. The Fund's partnership agreement provides that investors are to realize at least an 8% return on even losing investments through the "claw-back" provisions discussed below.

*19 Defendants make much of a provision in the

1994 Term Sheet that states that Juran's interest is subject to the Fund's claw-back provisions and that "he will suffer to the detriment of the deals he has not invested in." [FN58] This language is in a document separate from the Partnership Agreement. The Partnership Agreement contains a "merger" clause. The defendants have provided no argument or evidence that would convince this Court to look beyond the parties' fully integrated writing, the Partnership Agreement.

> FN58. 1994 Term Sheet, ¶ 6.

Defendants' result does not comport with either the language, or the spirit, of the pooling concept of § 7.02. I find the calculations of Kim and Bennett accurately reflect the distribution scheme established by the BPLP Partnership Agreement. Juran participated in Telemundo Tranches 1 and 2 and Nextwave. Thus, he is entitled to experience both the highs and lows of these investments. He is not, however, to be saddled with losses from investments made by Bron and Villanueva after the Disabling Event, his termination. Considering the foregoing, I find that Juran is entitled to $1.815 million as his share of the profits from the Fund's sale of the Telemundo investments. This is the share Bastion's analyst found based on his "common sense" understanding of the various contracts. He has no stake in this litigation and I find his results credible. This amount, however, may be subject to reduction by amounts he has already received and "reserves" being held to protect against future exercise of the "claw-back" provisions. This is discussed below.

(v) *The "Claw-Back" Reserves*

Even under the defendants' calculations, Juran was entitled to nearly $850,000, yet he received a check for $366,933. The defendants argue that the nearly $500,000 difference reflects an amount being withheld from Juran's distribution as a reserve to cover any potential, future exercise of "claw-back" provisions in both the Fund's Partnership Agreement and BPLP's Partnership Agreement. [FN59] These claw-back provisions establish a system where, if the Fund's required rate of return will not be realized in the future, the Fund may look to its investors, the partners, for a return of excess profits they received in the past. [FN60] Thus, the Fund could seek a return of past profits from BPLP. To address this situation, BPLP's partnership Agreement contains a similar provision so that if BPLP has to refund a portion of past distributions to the Fund, BPLP may, in turn, seek to recover the same from its partners. [FN61]

> FN59. Bron and Villanueva have elected to retain a total of $2.5 million as a reserve from the Telemundo distribution.
>
> FN60. *See* Second Amended and Restated Agreement of Limited Partnership of Bastion Capital Fund, L.P., a Delaware Limited Partnership § 9.3 (July 11, 1994) (Pls.' Ex. 2).
>
> FN61. "*Partnership Give Back.* To the extent that the Partnership is responsible for contributing money to the Fund pursuant to Section 9.3 of the Fund Agreement, such contribution shall be made by the Partners who received distributions in respect of their Investment Points in proportion to their Investment Points that gave rise to the original distribution from the Partnership." BPLP Partnership Agreement § 8.03 (Pls.' Ex. 14)

The defendants argue that their actions in retaining these funds as a reserve are entirely proper because § 5.10(a) of the Partnership Agreement allows them to retain these reserves in their "sole discretion." "Sole discretion" is not always unfettered discretion. [FN62]

> FN62. *See Schnell v. Chris-Craft Indus., Inc.,* Del.Supr., 285 A.2d 437, 439 (1971) ("[I]nequitable action does not become permissible simply because it is legally possible.").

I find that the defendants' sole discretion, in this case, has been exercised in bad faith. First, it is obvious that the relationship between the parties, at the time of the distribution, was irretrievably broken. As such, the danger for a "bad faith" exercise of this power is that much greater.

*20 Defendants contend that this is precisely why there is a need to maintain this reserve-so that they will not have problems collecting should the claw-back provisions ever come into play. I find this argument unpersuasive. Juran, like the other non-BPLP partners of the Fund, is contractually bound to refund these sums should the claw-back provisions ever have to be exercised. The effort necessary to collect from Juran is no greater than that of other partners.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

I also find it telling that no real thought or analysis went into calculating the amount sufficient for a "reasonable" reserve. Here, it appears that we have the reverse-an entirely excessive reserve under the circumstances. For instance, in calculating the reserve amount, Bron completed "back of the envelope" calculations that assumed all of the Fund's investments would be 100% losses. Certain Fund investments, however, have built-in guarantees of profit and, thus, cannot cause the losses Bron fears.

Where one partners' share is disproportionately affected by this exercise of "sole discretion," it is further evidence of bad faith. Using defendants' calculations it appears that Villanueva received 63% of his full distribution while Juran received only 38%. [FN63] Such disparity of treatment among partners bespeaks bad faith and inequitable conduct.

> FN63. Plaintiffs extract these numbers from Bates 5241 (Pls.' Ex. 72).

Finally, I am troubled by the fact that even if the reserve in this case were proper, there does not appear to be a mechanism for Juran to recover this money should the "doomsday predictions" never come to fruition. That money could conceivably be held well beyond Juran's lifetime "just in case."

While it is true that Bron and Villanueva have the power to maintain certain reserves, this power must be exercised in good faith. I do not find that to be the case here. There was no effort to determine whether the circumstances required such a reserve and what amount would be appropriate under the circumstances. Despite their differences, I also do not believe that the defendants have shown that collecting this money from Juran, if and when the claw-back provisions are exercised, will be any more difficult than collecting from other partners. Finally, Juran is disproportionately affected by this exercise of power. A greater percentage of his return was withheld and there is no mechanism in place for him to get this money back. Considering the foregoing, the defendants' exercise of their power to hold certain reserves was improper in this case and, thus, a breach of their fiduciary duties owed to a partner. Juran is entitled to his entire share of the distribution from the Telemundo investment subject to the risk (however small) that he may have to refund a portion of these profits in the future if the claw-back provisions ever are exercised.

*D. Defendants' Failure to Provide Financial Information*

The plaintiffs argue that Article 9 of BPLP's Partnership Agreement requires the Partnership to prepare audited financial statements at the end of each fiscal year. The Partnership has not provided the plaintiffs with financial statements audited by a national accounting firm as required by the agreement. [FN64] Plaintiffs also contend that they have been harmed by the defendants' failure to provide unaudited financial statements [FN65] and timely Schedule K-1's. [FN66]

> FN64. Partnership Agreement § 9.01.
>
> FN65. *Id.* at § 9.02.
>
> FN66. *Id.* at § 9.03.

*21 Defendants counter that all necessary financial information concerning BPLP was included in the Fund's financial statements and tax returns. The Fund's financial statements are audited by a national accounting firm and form the basis for BPLP's tax returns. At the Partnership level, there are very few "transactions" that would form the basis for financial statements. For instance, when the Fund makes an investment, BPLP receives one check from each partner and then remits one check to the Fund. When the Fund's position in an investment is liquidated, the opposite occurs.

Article 9 of the Partnership Agreement provides for certain reports that must be provided to partners. The evidence presented in this action does not show that these provisions of the partnership have been precisely followed in all cases. The evidence does show, however, that plaintiffs received most of the necessary financial information from various other sources, albeit somewhat late in many circumstances. While I cannot condone the defendants' actions in ignoring these provisions they contractually agreed to, I do not find, on these facts, that a wholesale accounting of the partnerships' affairs is necessary to protect the plaintiffs. To this end, I order the defendants to provide the necessary information to the plaintiffs to carryout the provisions of this decision. For instance, I have found that Juran is entitled to 9.6% of the proceeds from the sale of LA Soccer. There appears, however, to be a slight discrepancy on the exact amount realized by BCC Soccer. The defendants are ordered to provide sufficient documentation of this transaction for the parties to calculate the correct figure. The parties should work together to "flesh out" the framework provided by this decision. Should they not be able to,

the Court is prepared to revisit this issue.

### III. CONCLUSION

Neither party is a true "winner" in this action. An arguably successful professional relationship was torn apart by personality conflicts. The breaking-up process resulted in this litigation. Considering the evidence presented at trial and the arguments advanced both at trial and in post-trial briefing, I find the following:

1. The plaintiffs' fraud claims fail. The voting agreement between Bron and Villanueva did not constitute fraud. Juran's complaints were really in the nature of a breach of an employment agreement. As such, under *Lazar,* the fraud claims must fall. I also find that the voting agreement did not breach the Employment Agreement. First, it is not clear that the agreement was ever followed. To the contrary, the evidence showed that Villanueva first approached Bron about Juran's termination. Second, the Employment Agreement provides for unanimous consent, and that is precisely what Juran received. Both Bron and Villanueva voted to terminate Juran.

2. Juran's breach of fiduciary duty claims fail for similar reasons. First, I do not find that the existence of a voting agreement, that did not appear to come into play, by itself, constitutes a breach of fiduciary duty. Moreover, I have found this to be an action for the breach of an employment contract. Thus, under *Riblet,* the breach of fiduciary duty claims fail.

*22 3. Finally, there are the plaintiffs' claims for additional sums under the contracts and additional financial disclosures. I find that the conditions are met and that plaintiffs are entitled to the "Placement Fee" of $314,815.00. I also find that the plaintiffs are entitled to an equal share of "consulting fees" in the amount of $265,000.00. The plaintiffs' claim for additional sums from the sale of the LA Soccer investment, however, fail. Because he refused to honor capital calls, Juran's interest was reduced to 9.6%. To the extent there is some discrepancy in the amount realized from that sale, the defendants are directed to provide the necessary financial data to ascertain the true figure. Finally, there are the profits from the Telemundo investment. I find that Juran is entitled to the $1.815 million as calculated by Kim, less the amount he has already received.

4. I do not, however, order that pre-judgment or post-judgment interest be paid on these amounts at this time. This issue was not adequately addressed in the briefs. Counsel should confer and if no agreement on this can be reached, counsel shall submit letter memoranda setting forth their respective positions.

5. Finally, pursuant to Court of Chancery Rule 54(d), I conclude that the parties should share the costs of this litigation equally.

Counsel shall confer in order to submit an appropriate implementing Order.

2000 WL 1521478 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.