# EXHIBIT 28

**Westlaw.**

Not Reported in A.2d  
2005 WL 217039 (Del.Ch.)  
(Cite as: 2005 WL 217039 (Del.Ch.))

Page 1

C  
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.  
Jacques POMERANZ, Amalgamated Sludge LLC, formerly known as Sludge Management, LLC, a Nevada Limited Liability company, Eric Nettere, Alan W. Steinberg Partners, LP, a New York Limited Partnership, David Scott Associates, LP, a Virginia Limited Partnership, Robert Goldfein, E.A. Moose Co., LP, a Delaware Limited Partnership Robert Gilman, Steven Chaleff, ICMC Paramount Fund, LP, a Texas Limited Partnership, Richard and Teresa Lillibridge, Plaintiffs,  
v.  
MUSEUM PARTNERS, L.P., a Delaware Limited Partnership, Asher B. Edelman, Northstar Partnership, L.P., a Delaware Limited Partnership, Presidio Capital Corp., a British Virgin Islands Corporation, and Gerald Agranoff, Defendants.  
No. Civ.A. 20211.

Submitted Oct. 27, 2004.  
Decided Jan. 24, 2005.  
David J. Margules, and Joanne P. Pinckney, Bouchard Margules & Friedlander, P.A., Wilmington, Delaware; Joshua L. Dratel, and Mark J. Eberle, Joshua L. Dratel, P.C., New York, New York, for Plaintiffs.

Gregory P. Williams, and Peter B. Ladig, Richards, Layton & Finger, P.A., Wilmington, Delaware; Barbara L. Moore, and John J. Tumilty, Edwards & Angell, LLP, Boston, Massachusetts, for Defendants NorthStar Partnership, L.P. and Presidio Capital Corp.

Kurt M. Heyman, and Patricia L. Enerio, the Bayard Firm, Wilmington, Delaware, for Defendants Museum Partners, L.P. and Asher B. Edelman.

MEMORANDUM OPINION

STRINE, Vice Chancellor.

*1 This case centers on the coordinated withdrawal of two affiliated limited partners, NorthStar Partnership, L.P. and Presidio Capital Corp., NorthStar's subsidiary, from two related limited partnerships, Museum Partners, L.P. and Musee Partners L.P. Defendant Asher Edelman was the general partner of both Museum Partners and Musee. Defendant NorthStar held the largest number of units in Museum Partners. The goal of both partnerships was to acquire shares of Societe du Louvre ("Societe"), a French conglomerate, and to pressure its management into a sale of assets or other value-maximizing transaction.

In June 1999, Edelman informed the unitholders of Museum Partners that the entity's life was being extended through June 30, 2000 by vote of NorthStar, which held a majority of the LP units. But, on February 10, 2000, NorthStar exercised its purported right to withdraw from Museum Partners, arguably triggering a right to a payment equivalent to its share of the entity's liquidation value. At the same time, Presidio purportedly withdrew from Musee.

In this action, the plaintiffs, Jacques Pomeranz and other remaining limited partners of Museum Partners, allege that these withdrawals and the contract compromising NorthStar and Presidio's demands for payment (the "Withdrawal Agreement"), breached the limited partnership agreement ("LP Agreement"), [FN1] were consummated in violation of fiduciary duties owed to Museum Partners and its limited partners, gutted Museum Partners financially, and caused them cognizable damage. In response, on March 12, 2003, NorthStar and Presidio moved to dismiss the complaints against them, arguing, among other things, that the plaintiffs' claims are barred by applicable statutes of limitations and the doctrine of laches. Because the resolution of the timeliness of the plaintiffs' various claims in their First Amended Complaint ("Complaint") [FN2] disposes of those claims, I need not reach their argument that the complaint fails to state a claim against them. Instead, this opinion addresses only NorthStar and Presidio's argument that the plaintiffs' claims against them were not timely filed.

FN1. References to the Withdrawal Agreement attached as Exhibit E to the Complaint, will be cited as "Withdrawal

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> Agreement at ___." Similarly, references to the Museum Partners Limited Partnership Agreement, attached as Exhibit A to the Complaint, will be indicated as "LP Agreement at § ___." All of the other exhibits cited were attached to the Complaint and will be cited simply as "Ex. ___."
>
> FN2. The plaintiffs' claims include: 1) breach of contract; 2) tortious interference with contract; 3) breach of fiduciary duty; 4) aiding and abetting of a breach of fiduciary duty; and 5) unjust enrichment.

The analysis is straightforward. The plaintiffs filed their initial complaint in this matter on March 26, 2003 but did not name NorthStar and Presidio as defendants until they filed an amended complaint on January 9, 2004. Because the allegedly wrongful conduct of NorthStar and Presidio occurred in 2000, each of the plaintiffs' claims accrued more than three years before January 9, 2004. The analogous statutes of limitations all have three year filing periods. The plaintiffs were keenly aware that a statute of limitations issue might arise, and therefore attempted to plead facts that would allow for tolling of the relevant statutes of limitations, making their claims timely. Put simply, the plaintiffs must prevail on the tolling question or their claims are barred. The plaintiffs bear the burden of showing that tolling is appropriate.

*2 For reasons that I will explain, the plaintiffs do not plead facts excusing the untimeliness of their filing. The plaintiffs had sufficient notification by October 2000, at the latest, of both the withdrawal of NorthStar and the possibly injurious effect of that event on the viability of Museum Partners, to be put on inquiry notice of the claims alleged in the Complaint. As a result, the plaintiffs' claims are time-barred.

No inequity is worked by this conclusion. Had the plaintiffs commenced their investigation in a timely manner, they would have discovered all the relevant details sooner. Even after missing the starting gun triggered by inquiry notice, plaintiffs were in possession of all major pieces of the puzzle by July 2001. They filed the initial complaint in this matter well after receiving this material and chose not to include NorthStar and Presidio as defendants despite challenging the validity of the Withdrawal Agreement in that original pleading, waiting almost three years from receiving the information to amend their complaint. In light of these facts, I grant NorthStar and Presidio's motion to dismiss.

I. *Analytical Framework*
A. *Procedural Standard*

A statute of limitations defense may be raised and decided on a motion to dismiss. [FN3] As this court has made clear, "[w]hen it is clear from the face of the Complaint (and the documents incorporated by reference in it) that plaintiffs' tolling theories fail even to raise a legitimate doubt about the time the claims accrued, dismissal is appropriate if the claims were filed after the applicable limitations period expired." [FN4]

> FN3. *United States Cellular Investment Co. of Allentown v. Bell Atlantic Mobile Systems, Inc.,* 677 A.2d 497, 502 (Del.1996).
>
> FN4. *In re Dean Witter Partnership Litig.,* 1998 WL 442456, at *6 n. 44 (Del. Ch. July 17, 1998), aff'd, 725 A.2d 441 (Del.1999) (Table); *see also Kahn v. Seaboard Corp.,* 625 A.2d 269, 277 (Del. Ch.1993) (noting that it is "well settled that where the complaint itself alleges facts that show that the complaint is filed too late, the matter may be raised on a motion to dismiss").

Because over three years elapsed between the major events alleged in the Complaint to constitute wrongdoing by NorthStar and Presidio and the filing of that pleading, NorthStar and Presidio have appropriately raised, at this juncture, the question of whether the plaintiffs' claims are time-barred. As will be explained, the most efficient manner to dispose of the dismissal motion is to determine whether the Complaint sufficiently supports their contention that their tardy filing was excused by relevant tolling doctrines, and, in particular, their more specific assertion that they did not receive inquiry notice of their claims until after January 9, 2001.

To obtain the benefit of tolling, the plaintiffs must allege facts that support the applicability of an equitable exception to laches and the relevant statutes of limitations because "the party asserting that tolling applies ... bear[s] the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled." [FN5] In this regard, I accept well-pled facts alleged in the Complaint as true and view them in the light most favorable to the plaintiffs, but I do not accept conclusory allegations without specific factual allegations to support them.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2005 WL 217039 (Del.Ch.)
(Cite as: 2005 WL 217039 (Del.Ch.))

Page 3

[FN6]

> FN5. *Dean Witter,* 1998 WL 442456, at *6 (citing *United States Cellular,* 677 A.2d at 504).
>
> FN6. *In re Tri-Star Pictures, Inc., Litig.,* 634 A.2d 319, 326 (Del.1993); *Dean Witter,* 1998 WL 442456, at *4.

### B. *The Relevant Statutes Of Limitations And The Impact Of Tolling*

All parties generally agree that three years is the relevant limitations period for each of the plaintiffs' substantive claims, [FN7] and that this court typically applies the limitations period at law by analogy to equitable claims in order to apply the doctrine of laches. Therefore, the critical question is when to start counting the three year period for each of the plaintiffs' claims.

> FN7. The plaintiffs make various claims against NorthStar and Presidio. As to the plaintiffs' claim for breach of fiduciary duty, see *Dean Witter,* 1998 WL 442456, at *4; *Fike v. Ruger,* 754 A.2d 254, 260 (Del. Ch.1999), aff'd 752 A.2d 112 (Del.2000); as to the plaintiffs' claim for breach of contract, see 10 *Del. C.* § 8106; *Fike,* 754 A.2d at 260; as to the plaintiffs' claim for tortious interference, see *Williams v. Caruso,* 966 F.Supp. 287, 293 (D.Del.1997); as to plaintiffs' claim for unjust enrichment, see *Merck & Co. v. SmithKline Beecham Pharms. Co.,* 1999 WL 669354, at *42 (Del. Ch. Aug. 5, 1999), aff'd, 766 A.2d 442 (Del.2000). *See generally Kahn v. Seaboard Corp.,* 625 A.2d 269, 272 (Del. Ch.1993) ("where the statute bars the legal remedy, it shall bar the equitable remedy in analogous cases or in reference to the same subject matter."). As is discussed later, there is an argument that some or all of the plaintiffs' claims are governed by 6 *Del. C.* § 17-607 of the Delaware Revised Uniform Limited Partnership Act ("DRULPA"), which states in pertinent part that "[u]nless otherwise agreed, a limited partner who receives a distribution from a limited partnership shall have no liability under this chapter or other applicable law for the amount of the distribution after the expiration of 3 years from the date of distribution." As I find, however, even if § 17-607 were applicable, the outcome would not change.

*3 As a general matter, it is well-settled that "a cause of action 'accrues' [for purposes of a statute of limitations] ... at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action." [FN8] The courts of this state have repeatedly emphasized that this is the prevailing rule. [FN9] Thus, to the extent that the claims against NorthStar and Presidio were based on wrongful acts occurring before January 9, 2001, the claims against them would, absent extraordinary circumstances, be time-barred. As it turns out, and as discussed in greater detail below, the wrongful acts alleged in the Complaint occurred during the year 2000. Therefore, to prevent their claims from being time-barred, the plaintiffs must demonstrate a basis for tolling the various limitations periods. [FN10]

> FN8. *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* 860 A.2d 312, 319 (Del.2004).
>
> FN9. *See, e.g., SmithKline Beecham Pharms. Co. v. Merck & Co.,* 766 A.2d 442, 450 (Del.2000) ("This statute [10 *Del. C.* § 8106], ... is not a 'discovery statute' and the limitations period begins to run from the time the cause of action accrues. This is so 'even if the plaintiff is ignorant of the cause of action." ') (citing *Dean Witter,* 1998 WL 442456, at *4).
>
> FN10. *Dean Witter,* 1998 WL 442456, at *6.

Various theories exist under which a plaintiff may seek tolling of the statute of limitations. [FN11] But any possible tolling exception to the strict application of the statute of limitations tolls the statute *"only until the plaintiff discovers (or [by] exercising reasonable diligence should have discovered) his injury."* [FN12] When plaintiffs are on inquiry notice, the statute of limitations begins to run. [FN13] Inquiry notice does not require full knowledge of the material facts; rather, plaintiffs are on inquiry notice when they have sufficient knowledge to raise their suspicions to the point where persons of ordinary intelligence and prudence would commence an investigation that, if pursued would lead to the discovery of the injury. [FN14]

> FN11. The parties debate whether any of the tolling justifications available to plaintiffs-- 1) that their injuries were inherently unknowable, 2) that the facts of their injuries were fraudulently concealed from them, or 3) that equitable tolling applies because they

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

justifiably relied on Edelman's disclosures because he was a fiduciary--are actually applicable against NorthStar and Presidio. But I need not and do not decide which, if any, of these doctrines applies, recognizing that the defendants contend that none do. Inherently unknowable injuries typically involve acts of malpractice or fraud of the kind that are not alleged with respect to NorthStar and Presidio. *See Becker v. Hamada, Inc.,* 455 A.2d 353, 356 (Del.1982) (quoting *Omaha Paper Stock Co. v. Martin K. Eby Constr. Co.,* 230 N.W.2d 87, 89-90 (Neb.1975)); *see also In re ML/EQ Real Estate Partnership Litig.,* 1999 WL 1271885, at *2 n. 12 (Del. Ch. Dec. 21, 1999) (noting that the inherently unknowable doctrine rarely, if ever, should apply in the entity law context). The doctrine of fraudulent concealment arguably does not apply because plaintiffs have not pled any "affirmative act of concealment" by either NorthStar or Presidio that was "intended to put a plaintiff off the trail of inquiry." *Dean Witter,* 1998 WL 442456, at *5. Of the plaintiffs' theories, equitable tolling is the most logical. Equitable tolling usually applies to claims involving self dealing "where a plaintiff reasonably relies on the competence and good faith of a fiduciary," and the plaintiffs here say they relied on Edelman. *Dean Witter,* 1998 WL 442456, at *6. The plaintiffs also make a very strained, if extensively pressed, argument that NorthStar was a fiduciary simply because it owned a majority of the Partnership's units. I need not address that less-than-convincing contention.

FN12. *Dean Witter,* 1998 WL 442456, at *6 (emphasis in original); *see In re ML-Lee Acquisition Fund II, L.P. Litig.,* 848 F.Supp. 527, 554 (D.Del.1994) (discussing inherently unknowable injuries); *United States Cellular,* 677 A.2d at 503 (discussing equitable tolling); *Litman v. Prudential-Bache Properties, Inc.,* 1994 WL 30529, at *8 (Del. Ch. Jan. 14, 1994) (discussing fraudulent concealment).

FN13. *See Dean Witter,* 1998 WL 442456, at *6 n. 43 (collecting cases showing that the statute of limitations runs from the point of inquiry notice under several tolling theories).

FN14. *Dean Witter,* 1998 WL 442456, at *7.

Because all of the plaintiffs' tolling arguments depend for their vitality on the question of when the plaintiffs were on inquiry notice, I have concentrated my analysis on that question. As I will explain, the plaintiffs' Complaint demonstrates that they were on inquiry notice no later than October 2000--more than three years before the Complaint was filed. That conclusion obviates the need to consider any other elements of the plaintiffs' tolling arguments.

II. *Factual Background* [FN15]

FN15. As alluded to above, on this motion to dismiss, the facts are drawn from the Complaint and attached exhibits, and all reasonable inferences are drawn in favor of the plaintiffs.

A. *Formation And Purpose Of The Museum Partners And Musee Partnerships*

Edelman formed Museum Partners (or the "Partnership") in 1996. Both Museum Partners and Musee were formed as "special single purpose investment vehicles," specifically to purchase shares of Societe, a French conglomerate owning a variety of companies from luxury hotels and perfume and crystal manufacturers to a money-management firm. Societe was and continues to be controlled by the Taittinger family. Edelman's plan was to combine the efforts of Museum Partners, the onshore vehicle, and Musee, the offshore vehicle, with two other Edelman-controlled entities, together obtaining enough voting and non-voting stock of Societe to pressure the Taittingers to break up or restructure the company and realize what Edelman believed to be an exploitable disparity between Societe's stock trading value and its break-up value.

*4 Museum Partners collected approximately $35.5 million in capital contributions. NorthStar contributed $25 million of this amount, fully 70% of the initial capitalization of the Partnership and more than double the contributions of all other limited partners combined. The relative size of NorthStar's contribution was known to the other limited partners; NorthStar was described to the other limited partners as having the "Majority-in-Interest" of the limited partners, [FN16] a term defined in the LP Agreement as meaning that NorthStar had contributed more then 50% of all limited partner capital. [FN17] NorthStar's controlled affiliate, Presidio, also invested in Musee, the offshore vehicle.

> FN16. *See, e.g.,* Ex. D.
>
> FN17. *See* LP Agreement at § 14.2.

When formed, according to the terms of the LP Agreement, Museum Partners was to continue through June 30, 1998 with Edelman retaining the right (which he exercised) to extend the Partnership through December 31, 1998. Thereafter, the Partnership could only be extended by agreement of the general partner, Edelman, and the Majority-in-Interest of the limited partners. [FN18]

> FN18. There is no specific provision relating to extension of the term of the Partnership in the LP Agreement. Presumably, extension was accomplished via amendment of § 8.1(d) which sets the date of dissolution at June 30, 1998. An amendment of the LP Agreement, pursuant to § 14.2, may be accomplished in a writing signed by the general partner and by the Majority-in-Interest of the Limited Partners, that is "Limited Partners whose Capital Accounts constitute more then 50% of the aggregate value of the Capital Accounts of all Limited Partner[s]." LP Agreement at § 14.2.

B. *The 1999--2000 Renewal Of Museum Partners*
On June 9, 1999, Edelman sent a letter to the limited partners urging them to continue to participate in the Partnership for another year. NorthStar had already agreed with Edelman to extend under the terms of the LP Agreement. Because NorthStar itself was the Majority-in-Interest limited partner, NorthStar's agreement with Edelman was sufficient to effect the extension; therefore the extension was presented to the other limited partners as a fait accompli. [FN19] In the letter, Edelman offered several positive comments on the state of Museum Partners' health and suggested, without promising, that the Partnership might soon realize profits based on the estimated 60% difference between Societe's trading price and its break-up value.

> FN19. Ex. D; *see* LP Agreement at § 14.2. The plaintiffs have alleged that NorthStar's agreement to extend the Partnership from 1999 to 2000 was accompanied by a side agreement between NorthStar and Edelman that has never been produced to plaintiffs despite repeated requests for its production. As disturbing as this allegation is, it does not salvage plaintiffs' claims because, as explained below, plaintiffs were aware of sufficient other facts to put them on inquiry notice before January 9, 2001. Similarly, the plaintiffs' recent submission relating to NorthStar's subscription agreement does not affect the timeliness of their claims. *See infra* note 73.

C. *The Withdrawal of NorthStar And Presidio On February 10, 2000 And The Withdrawal Agreement Dated April 19, 2000*
The Complaint alleges that NorthStar effected its withdrawal on February 10, 2000, after it reviewed a financial report, allegedly prepared for its sole benefit and dated the same day, covering the period from January 1, 2000 to February 10, 2000. [FN20] The report showed that the Partnership had suffered substantial losses for the year. [FN21] Although it had agreed to extend the term of the Partnership through July 31, 2000, NorthStar demanded exit from Museum Partners on February 10, 2000. NorthStar premised its request for a withdrawal distribution on § 7.2 of the LP Agreement, which it read as authorizing its request to withdraw and as entitling it to receive the value of its interest in the Partnership, as of February 10, 2000, within 30 days of its request for withdrawal, i.e., by March 9, 2000. [FN22] Presidio made a comparable demand on Musee at the same time.

> FN20. Complaint at ¶ 33; Ex. G (financials, dated February 10, 2000, allegedly prepared for NorthStar's review).
>
> FN21. *See* Ex. G (showing that the Partnership had lost $7.8 million dollars for the year and, on the attached schedule, attributing all $7.8 million of that loss to the limited partners).
>
> FN22. *See* Ex. F. (referring to the withdrawal notice that NorthStar provided to Edelman on February 10, 2000 and claiming default).
> Section 7.2(b) of the LP Agreement provides, in relevant part:
> If the Partnership is continued after the Withdrawal Date, such Limited Partner shall be entitled to receive within 30 days thereafter, in accordance with this Section 7.2, the value of such Limited Partner's interest in the Partnership as of the applicable Withdrawal Date....

In the Complaint, the plaintiffs contend that

NorthStar had no right to demand withdrawal from Museum Partners under the Partnership Agreement and that it breached the LP Agreement by doing so. Nevertheless, Edelman, as general partner, acknowledged that NorthStar had the right to withdraw and that NorthStar had a right to receive the distribution equal to its pro rata share of Museum Partners' liquidation value on March 9, 2001. [FN23]

> FN23. Section 7.2(c) of the LP Agreement provides, in relevant part:
> The value of a withdrawing Limited Partner's interest in the Partnership shall be that amount that the Limited Partner would have received had the Partnership been dissolved as of the Withdrawal Date, its debts and liabilities paid or provided for and its assets distributed in the order of priority set forth in Section 8.3. Such value shall be determined in the manner provided in Section 10.4.

*5 But Museum Partners and Musee did not have readily available currency to pay NorthStar and Presidio, presumably because their assets were tied up in pursuing their mutual goal of pressuring the Taittingers through block-holdings in Societe. In other words, if Museum Partners and Musee sold enough Societe shares to satisfy the demand for withdrawal, they would thereby lose much of whatever leverage they had to exercise over Societe. Additionally, the Societe shares could not be transferred directly to NorthStar or Presidio to pay the debt because transfers were prohibited by existing loan agreements between Museum Partners and Musee and Banque de Credit Agricole (Swiss) SA and Great American Insurance Company. To resolve this dilemma, Edelman entered into the Withdrawal Agreement with NorthStar and Presidio on behalf of Museum Partners and Musee on April 19, 2000. [FN24]

> FN24. The Withdrawal Agreement was later revised on October 25, 2000 to extend the Agreement's Outside Date, when all payments and additional distributions were due, from September 30, 2000 to December 31, 2000.

In the Withdrawal Agreement, Museum Partners and Musee acknowledged that NorthStar and Presidio had the right to withdraw and that they were entitled to withdrawal distributions of $12,057,565 and $11,701,595 respectively. Museum Partners and Musee also agreed that they would pay NorthStar and Presidio an additional $250,000 for each 30 day period during which the distributions had not been paid. This new debt, the "Additional Distribution Amount", would also accrue interest at 8% per annum, compounded monthly, until it was paid. The Withdrawal Agreement also provided an upside for NorthStar and Presidio by entitling them to an increased payment if the value of the Societe shares held by the partnerships increased before they were paid, while guaranteeing that they would not receive less than their original claims for distributions, plus the Additional Distribution Amounts. Thus, under the Withdrawal Agreement, NorthStar and Presidio retained the upside benefits of limited partner status while mitigating much, if not all, of the downside risk.

The Withdrawal Agreement also gave NorthStar and Presidio absolute priority in recovery of their capital, as against other limited partners (i.e., the plaintiffs) who might later withdraw. The provision suggests that before Museum could pay any other Museum Partners limited partner, Museum Partners first had to pay off its entire debt to NorthStar *and* Musee had to pay off its entire debt to Presidio.

### D. *The Limited Partners Receive Unaudited Partnership Financials For The Period Ending March 31, 2000*

At about the same time that Edelman and NorthStar (and Presidio) were negotiating the Withdrawal Agreement in April 2000, the Limited Partners received unaudited financial statements for the Partnership for the period beginning January 1, 2000 and ending March 31, 2000. The March 2000 financials, for the first time, split the schedule listing Partnership interests into two intra-period schedules, a pre-February 10, 2000 schedule dealing with the period January 1, 2000 through February 10, 2000 (or "March Schedule 1"), and a post-February 10, 2000 schedule dealing with the period February 11, 2000 through March 31, 2000 (or "March Schedule 2"). [FN25] Importantly, March Schedule 1 appears to show the exactly the same financial information that was depicted in the February 10, 2000 financials that were allegedly provided only to NorthStar. [FN26]

> FN25. Ex. I.

> FN26. *Compare* Ex. G at 3 (financials allegedly prepared exclusively for NorthStar), *with* Ex. I at 3 (March 31, 2000 financials distributed to the limited partners). It should be noted that March Schedule 1 embodies the same information

Not Reported in A.2d
2005 WL 217039 (Del.Ch.)
(Cite as: 2005 WL 217039 (Del.Ch.))

Page 7

that the plaintiffs allege was disclosed only to NorthStar in the February 10, 2000 financials, including the negative $7,772,766 attributable as a loss to partner capital in column 6, P & L ALLOC. *Compare* Ex. G at 3 of 3 (financials allegedly prepared exclusively for NorthStar on February 10, 2000), *with* Ex. I at 3 of 4 (March Schedule 1, distributed to the limited partners). The names of the limited partners have been removed in Exhibit I, but the financial information is identical.

*6 Taken together, March Schedules 1 and 2 show the reduction of four capital accounts, totaling $25 million of initial contribution, to zero. [FN27] The plaintiffs have conceded that a rational investor, upon receiving these schedules, would have concluded that NorthStar had withdrawn. [FN28] The reason why that is so obvious is because the $12,057,565 withdrawal shown on March Schedule 2 represented the departure of 66% of Museum Partners' $18,370,157 capital as of February 11, 2000--a diminution that could only have been attributable to the withdrawal of the limited partner holding over a majority of the units, NorthStar.

FN27. *Id.*

FN28. Pl. Rep. Br. at 27; *see also* Tr. of Oral Argument at 47-48, 99.

But the plaintiffs note that March Schedule 2 also shows $4.1 million in allocated profit and results in a balance sheet for the entire period that shows $10.4 million remaining in the Partnership's capital accounts. [FN29] The plaintiffs contend that this balance sheet fraudulently inflated the value of the Partnership, and moreover, falsely reported that NorthStar had received its $12.1 million upon withdrawal. For Pomeranz, for example, this allegedly inflated result implied that his initial investment of $250,000, worth $302,692 on January 1, 2000, was worth $338,267 on March 31, 2000. In the big picture, the March Schedules suggest that even though the Partnership had only $18.4 million in capital when NorthStar withdrew its $12.1 million in February, somehow the remaining capital had increased between February 10, 2000 and March 31, 2000, a period of about seven weeks, from $6.3 million ($18.370 million-- $12.058 million = $6.312 million) on February 11, 2000 to $10.4 million on March 31, 2000. [FN30]

FN29. Ex. I.

FN30. *Id.* One wonders if, upon receiving the March Schedules, the plaintiffs speculated that NorthStar had exited at precisely the *wrong* moment, that is, just before the Partnership's $6.3 million became $10.4 million, a 65% return in seven weeks.

In sum, the plaintiffs essentially concede that they were on notice as of April 2000 of NorthStar's withdrawal. Although they premise a claim explicitly on the contention that the withdrawal was, in itself, a breach of the LP Agreement, the plaintiffs argue that this violation of their contractual rights did not matter to them then because they were told by Edelman that the overall condition of Museum Partners was healthy.

E. *The 2000--2001 Renewal Of Museum Partners*
On June 9, 2000, Edelman wrote to the limited partners seeking another extension of Museum Partners. In that letter, Edelman failed to disclose: 1) that the $12.1 million represented in the March Schedules as a withdrawal had not in fact been paid; 2) that the Withdrawal Agreement had been reached and the material terms of that Agreement; 3) that, in particular, substantial interest penalties under the terms of that Agreement were continuing to accrue; and 4) that the Withdrawal Agreement was executed because Museum Partners could not afford to pay NorthStar. Instead, Edelman stressed (or invented) the positive and told the limited partners that their investments had increased in value and that Edelman had confidence that the Partnership's strategy would triumph within the year.

In one respect, the June 2000 letter differed materially from its 1999 counterpart. In June 1999, Edelman had informed the other limited partners that NorthStar had chosen, with him, to extend the life of Museum Partners for another year. In contrast, the June 2000 letter clearly makes renewal of the Partnership contingent on the agreement of the limited partners and does not mention NorthStar. [FN31] By making the renewal of the Partnership contingent upon plaintiffs' consent, the letter signaled that NorthStar's dominant position had changed from the year before.

FN31. Ex. K ("In order to move forward, I must once again ask you to extend the partnership from its June 30th expiration date for another year.... I am asking you to sign the enclosed document so that we can affect [sic] the extension of the partnership.").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2005 WL 217039 (Del.Ch.)
**(Cite as: 2005 WL 217039 (Del.Ch.))**

Page 8

*7 Based on the disclosures that the other limited partners had received, several of them, including plaintiffs, voted in June of 2000 to extend the life of Museum Partners for another year. Unbeknownst to those limited partners voting to extend, seven other limited partners chose at that time to withdraw, and were paid the value of their capital accounts as of July 1, 2000.

### F. *Disclosures Following The Vote To Extend Through Year End 2000*

Although not attached to the Complaint, the June 2000 financials apparently reaffirmed the impression of vitality suggested by the March Schedules. [FN32] The September 30, 2000 financials, however, were considerably less upbeat. The $10.4 million in assumed ending capital in March 2000, which reportedly had grown to $15.3 million by the end of June, fell drastically to $8.9 million in September, while allocated profits and losses showed a $6.4 million loss for the period. Overall, the Partnership balance sheet reflected a net loss of $5.1 million. The financials still did not reflect the growing debt owed to NorthStar, nor did they reflect the withdrawal of the seven limited partners at the end of June, 2000. What they did show, however, according to the Complaint, was that "the Partnership's allocated profits [had] been *devalued by $15.4 million since June 30, 2000."* [FN33]

> FN32. Ex. L (suggesting that Partnership capital at the end of June was in excess of $15 million).

> FN33. Complaint at ¶ 42 (emphasis in the original).

### G. *2001--NorthStar Finally Gets Paid; The Partnership Restates Its June 2000 Financials To Report the Payment To NorthStar; and The Plaintiffs Finally Learn About and Obtain A Copy Of The Withdrawal Agreement*

On or about January 14, 2001, NorthStar was finally paid the $12,057,565 that it was allegedly entitled to receive as of March 9, 2000 under the LP Agreement and that, by virtue of the Withdrawal Agreement, Museum Partners had promised to pay. Together with this sum, NorthStar received $1,296,109 as an Additional Distribution Amount, and $2,615,630.86 as a result of the upside protection provided by the Withdrawal Agreement; together, these additional payments totaled $3,911,739.86. [FN34]

> FN34. Complaint at ¶¶ 27-28, 44.

In March 2001, following an audit for the year 2000 (and the payment of almost $16 million in total to NorthStar), Museum Partners restated its June 30, 2000 financials to show, for the first time, the payment to NorthStar, with penalties, and to reduce allocated profit by $3 million, as of February 11, 2000, as a "realized loss on securities" to "account for the withdrawal and escrow established with the securities used to pay out NorthStar." [FN35]

> FN35. Complaint at ¶ 53.

Upon receiving the restated financials, the plaintiffs begin demanding copies of all agreements surrounding NorthStar's withdrawal from the Partnership, including the Withdrawal Agreement. The plaintiffs obtained a copy of the Withdrawal Agreement on July 11, 2001.

In the meantime, Museum Partners' strategy to pressure Societe disintegrated. All of the Societe shares were sold, leaving Museum Partners as a mere vehicle for litigation between the Partnership and Societe. According to the plaintiffs, they have been left holding the bag for the departing limited partners and have received, on a per unit basis, a mere pittance compared to the value received by NorthStar.

### H. *The Plaintiffs File Suit In This Court*

*8 Nearly two years after securing a copy of the Withdrawal Agreement, the plaintiffs filed their original complaint in this action on March 26, 2003. In that complaint, the plaintiffs accused Edelman of exceeding his authority in agreeing to a Withdrawal Agreement that directly violated the LP Agreement in several respects. But in that initial complaint, the plaintiffs did not name NorthStar and Presidio as defendants. Moreover, despite being dissatisfied with Museum Partners' response to their informal requests for information, the plaintiffs waited until September 23, 2002 to formally demand to inspect the books and records of the Partnership. Unsatisfied with Edelman's response to that demand, the plaintiffs pursued a books and records action in this court, filed January 21, 2003. The plaintiffs received the fruits of that litigation on February 11, 2003 but waited until January 9, 2004 to amend their complaint and to plead claims for the first time against NorthStar and Presidio.

### III. *LEGAL ANALYSIS*
### A. *The Accrual of The Plaintiffs' Claims*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

To determine when the plaintiffs had inquiry notice of their claims, it is necessary to briefly identify the nature of those claims. The plaintiffs allege that NorthStar breached the LP Agreement by demanding to withdraw when the LP Agreement denied them that right, and also by securing certain contractual benefits through the Withdrawal Agreement that conflict with LP Agreement provisions. By participating in this course of conduct, Presidio is alleged to have tortiously interfered with the LP Agreement. Alternatively, NorthStar and Presidio are alleged to have been unjustly enriched by receiving excessive payments under the Withdrawal Agreement.

Relatedly, the plaintiffs argue that by demanding withdrawal and securing the Withdrawal Agreement, NorthStar either breached the fiduciary duties that it owed to plaintiffs (supposedly because it owned a majority of the limited partner units) or aided and abetted Edelman's breaches of fiduciary duty. Presidio is also alleged to have aided and abetted breaches of fiduciary duty. In these respects, it is alleged that NorthStar and Presidio had access to financial information other limited partners did not and sought an excessive withdrawal payment.

As to all these claims, it is clear that the plaintiffs contend that the execution of the Withdrawal Agreement caused them injury and constituted a breach of contract, tortious interference with contract, a breach of fiduciary duty or aiding and abetting a breach of fiduciary duty, and unjust enrichment. Absent their ability to prove that the Withdrawal Agreement is invalid on some legal or equitable basis, the plaintiffs have no grounds to challenge any later payments made in accordance with that Agreement. In other words, the plaintiffs' claims accrued on April 19, 2000, the date that the allegedly wrongful Withdrawal Agreement was executed, and an argument can be made that some of their claims accrued earlier, on February 10, 2000, at the time of NorthStar's allegedly improper withdrawal.

*9 I so conclude even if § 17-607 of DRULPA applies to the plaintiffs' claims. That statute provides in pertinent part that:
> [u]nless otherwise agreed, a limited partner who receives a distribution from a limited partnership shall have no liability under this chapter or other applicable law for the amount of the distribution after the expiration of 3 years from the date of distribution. [FN36]

FN36. 6 Del. C. § 17-607(c).

The plaintiffs argue that § 17-607 applies and that the January 9, 2004 Complaint is timely (albeit barely) because NorthStar did not receive the payments provided for in the Withdrawal Agreement until January 14, 2001. These payments, they allege, are distributions for purposes of § 17-607. By contrast, NorthStar contends that, to the extent that § 17-607 applies, it received its "distribution" on April 19, 2000 when the Withdrawal Agreement was executed.

Candidly, the briefing addressing the scope of § 17-607's applicability was sparse and the relevant commentators [FN37] provide little insight into how broadly that section's sweep should be in situations like this one. Fortunately, however, the breadth of § 17-607's applicability is not important for this opinion because I conclude that it is inapplicable on the facts presented in this case or, if applicable, does not affect the question of whether the plaintiffs claims are time-barred.

FN37. E.g., Martin I. Lubaroff & Paul M. Altman, Lubaroff and Altman on Delaware Limited Partnerships, § 6.7 (2004).

Rather than receiving a distribution in strict accordance with § 17-607 of the LP Agreement, NorthStar accepted in compromise a new set of rights, articulated in the Withdrawal Agreement. That the Withdrawal Agreement required Museum Partners, as part of its total obligations to NorthStar, to make a payment equal to NorthStar's calculation of its distributional entitlement under the LP Agreement and subject to § 17-607, does not alter the fact that NorthStar had accepted a new contractual form of consideration, in lieu of payment under the LP Agreement on the date due. As a result, I conclude that § 17-607 does not apply; instead the plaintiffs are challenging the validity of a payment under a contract with a party that had become a creditor by virtue of that agreement.

Even if § 17-607 applies, I would conclude that the three year period began to run on the date the Withdrawal Agreement was originally signed, at the latest. [FN38] The "distribution" would have to be deemed the Withdrawal Agreement itself, which was the payment that Museum Partners made to NorthStar in response to its demand to withdrawal. In this regard, I perceive nothing in § 17-607 that suggests an intention to permit a plaintiff, who claims that a limited partner's demand for withdrawal was a per se breach of the LP Agreement and that the contract

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

compromising that demand for payment was invalid, to sit on its rights until payments under that supposedly invalid contract are actually made.

> FN38. An argument can also be made that it ran from March 9, 2000, when NorthStar was arguably due its withdrawal payment under § 7.2(c) of the LP Agreement.

For all these reasons, I conclude that the determinative question on this motion, as to all claims, is whether the plaintiffs were on inquiry notice before January 9, 2001. [FN39] I answer that question next.

> FN39. The defendants have not argued that the statute of limitations established under 6 Del. C. § 17-607(c) cannot be subject to equitable tolling and nothing in this opinion should be read as a holding on that question. Based on the lack of arguments to this effect, I therefore assume, without deciding, that § 17-607(c) of DRULPA may be tolled when appropriate under the Delaware jurisprudence developed under other statutes of limitations.

B. *When Were The Plaintiffs On Inquiry Notice?*
*10 The plaintiffs assert that the information required to bring the Complaint was withheld from them and invoke principles of equitable tolling in support of the timeliness of their action. [FN40] In particular, they contend that they relied on Edelman as a fiduciary to provide them with the material facts about the status of Museum Partners and that his non-disclosures of key facts, such as the execution and terms of the Withdrawal Agreement, tolled the running of the limitation periods for their claims. By contrast, NorthStar and Presidio contend that the plaintiffs were on inquiry notice as to their claims as early as April 2000 and no later than October 2000. [FN41] For the following reasons, I conclude that the defendants have the better of the argument.

> FN40. Pl. Br. at 24-27; *see* Eberle Affidavit at ¶ 7 (alleging that plaintiffs did not know of Presidio until production of the Withdrawal Agreement on July 11, 2001).

> FN41. Def. Br. at 16-17; *see Merck & Co. v. SmithKline Beecham Pharms. Co.*, 1999 WL 669354 (Del. Ch. Aug. 5, 1999).

1. *Plaintiffs Were On Inquiry Notice Of NorthStar's Purported Withdrawal*

*In April 2000*
In support of their contention that the plaintiffs received inquiry notice in April 2000, NorthStar and Presidio point to the March Schedules sent to the plaintiffs that month. As noted, in those statements, there is a breakdown of the partners' capital into two intra-period schedules, one covering January 1, 2000 through February 10, 2000 (i.e., March Schedule 1) and a second covering February 11, 2000 through March 31, 2000 (i.e., March Schedule 2). This breakdown, the defendants quite rationally contend, indicates that an important event occurred on that date. March Schedule 2 shows that four unitholders, representing investors who had made $25 million in initial contributions, were removing the $12.1 million remaining in their capital accounts, and reducing the value of their capital accounts to zero. [FN42]

> FN42. Ex. I at 4.

No matter how the plaintiffs slice this information, it reveals that a withdrawal had occurred that was extremely large relative to the size of Museum Partners. First, March Schedule 2 clearly reports that the total capital of the Partnership dropped 66% on February 11, when the capital of $18,370,157 was reduced by a $12,057,565 withdrawal to a mere $6,312,592. [FN43] And, of course, the plaintiffs have alleged in their Complaint that such a withdrawal was a per se breach of the LP Agreement. [FN44] The plaintiffs attempt to slight the significant of the withdrawal's size by contending that they were lulled by the healthy profits recorded on March Schedule 2. But even taking into account the allegedly misleading allocation of $4.1 million in profits shown on March Schedule 2, the plaintiffs cannot avoid the conclusion that the March Schedules still should have raised their eyebrows regarding what was happening to the financial strength of the Partnership. Taken together, the March Schedules depicted the Partnership reporting an aggregate allocated loss of $3,663,876 for the period January 1, 2000 through March 31, 2000. [FN45] During this same period, the Partnership's assumed capital fell for the total period from $26,342,923 to $10,421,482. That represented a diminution of 60% in the Partnership's capital. [FN46]

> FN43. *Id.*

> FN44. Complaint at ¶ ¶ 26, 91. These portions of the Complaint were added when the original complaint was amended to name NorthStar and Presidio as defendants. The original complaint alleges a similar theory:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that NorthStar and Presidio demanded withdrawal without having any right to do so, that Edelman exceeded his authority in agreeing to the Withdrawal Agreement, and that the Withdrawal Agreement directly violated the LP Agreement for various reasons, including that NorthStar: 1) demanded more than its liquidation value in its calculation of its withdrawal distribution; 2) secured an entitlement to receive excessive payments on top of that allegedly excessive withdrawal distribution; and 3) secured unfair priority for itself and Presidio over other limited partners.

> FN45. This loss for the entire period is derived by adding the $4,108,890 of reported allocated profit on March Schedule 2 to the initial allocated loss for the period of $7,772,766 reported on March Schedule 1.
>
> FN46. Ex. I.

*11 A rational limited partner investor in a single purpose entity, where the goal is to bring pressure on another company to force its management to negotiate with your entity, should have suspected that the loss of 60% of the Partnership's available capital very well might endanger that business strategy. Why? The reason is obvious: the strategy was premised on having a large block of Societe shares to exert pressure on the Taittinger family. Less capital leads to owning fewer shares which, in turn, leads to less pressure which thus calls the whole strategy into question. The plaintiffs, as rational investors, should have begun asking questions.

Critically, at oral argument, their counsel candidly admitted that the plaintiffs were on inquiry notice as of April 2000 of the fact that NorthStar was the limited partner that had withdrawn:
> THE COURT: But when your clients got this thing [the March 31, 2000 financials], they might have known that somebody large withdrew.
> [PLAINTIFFS' COUNSEL]: That's correct, Your Honor. They did know. I mean, I can't argue that looking at this, you don't know it's NorthStar.
> THE COURT: But what you are saying is you get-- you are assuming that NorthStar has been paid.
> [PLAINTIFFS' COUNSEL]: Correct. [FN47]

> FN47. Tr. of Oral Argument at 47-48; *see also* Pl. Br. at 27 ("Plaintiffs might have deduced during 2000 that the withdrawing limited partner was NorthStar....").

So the plaintiffs knew, sometime in 2000 and as early as April of 2000 not only that someone had withdrawn, but that NorthStar had withdrawn, allegedly in breach of the LP Agreement.

Thus, at least with respect to this particular breach of contract claim, plaintiffs were on inquiry notice, upon receiving the March 31, 2000 Schedules in April 2000, that NorthStar had breached the LP agreement and should have suspected that the breach, because of the sheer size of the withdrawal, would jeopardize the Partnership's ability to pressure the Taittinger family and realize the break-up value of Societe, the stated purpose of the Partnership. For rational investors, this in and of itself is probably enough "that persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued*, would lead to discovery of the injury." [FN48] But this is not the only indication that plaintiff had of NorthStar's withdrawal in breach of the LP Agreement or the harm that arose as a result.

> FN48. *Dean Witter*, 1998 WL 442456, at *7 (emphasis in original).

### 2. *The Renewal Letter In June 2000 Also Implied That NorthStar Had Withdrawn*

In contrast to the 1999 extension letter informing the limited partners that NorthStar and Edelman had decided to extend the Partnership, the 2000 extension letter made extension contingent upon the limited partners' agreement to extend and never mentioned NorthStar. [FN49] If NorthStar had retained its Majority-in-Interest position, the Partnership could only be extended by and with its consent--the other limited partners' agreement was irrelevant. The absence of any mention of NorthStar sharply contrasted with the prior year's notice and constituted further inquiry notice of NorthStar's withdrawal. [FN50]

> FN49. *Compare* Ex. D, *with* Ex. K.
>
> FN50. Recall that seven partners chose not to extend their interest in the Partnership in June 2000, and received the value of their interest as of that time.

### 3. *The Bleaker Picture Of The Partnership's Financial Condition Reported In October 2000, Should Have Prompted Inquiry By The Plaintiffs*

*12 Having conceded that inquiry notice of NorthStar's withdrawal existed as early as April 2000, the plaintiffs have attempted to change the focus of their argument to emphasize that although they had inquiry notice of their claims that NorthStar's demand to withdraw, and Edelman's acceptance of that demand, were improper under the LP Agreement and under fiduciary principles, they were lulled into believing that Museum Partners was thriving irrespective of the departure of its largest unitholder and that the pressure strategy would succeed despite a drastic reduction in the Partnership's capital. As a result, the plaintiffs were supposedly excused from acting upon their claim that NorthStar's withdrawal was a per se breach of the LP Agreement, on the basis of a novel "no harm, no foul" exception to the statute of limitations.

The problems with their argument are several. First of all, their argument rests on the dubious proposition that a plaintiff can know of causes of action that she thereafter asserts but argue that the statute was tolled until she understood the economic impact that the wrongful acts had caused her. That is, as to the plaintiffs' claim that NorthStar's demand for withdrawal, and Edelman's acknowledgement of the validity of that demand, breached the LP Agreement, the plaintiff is arguing that inquiry notice does not run until it had notice of the full economic impact of the wrong. That is not the law-- "having all the facts necessary to articulate the wrong is not required." [FN51]

> FN51. *In re Dean Witter Partnership Litigation,* 1998 WL 442456, at *7 n. 49 (the " 'statutory period does not await plaintiffs' leisurely discovery of the full details of the alleged scheme.' ... It may have taken an expert to unravel the entire scheme alleged by plaintiffs. But having all of the facts necessary to articulate the wrong is *not* required.") (*citing McCoy v. Goldberg,* 748 F.Supp. 146, 158 (S.D.N.Y.1990) (emphasis in original).

The plaintiffs, even if they relied on a fiduciary, only receive the benefit of tolling until they "had reason to know that a wrong has been committed." [FN52] Here plaintiffs believed that NorthStar had breached the LP agreement by withdrawing. As our Supreme Court expressly held in an analogous case, the "doctrine of equitable tolling does not apply [when plaintiffs] had reason to know of the breach of the Agreement." [FN53]

> FN52. *Id.* at *5.

> FN53. *United States Cellular,* 677 A.2d at 503.

Contrary to the plaintiffs' assertion here, they may not simply wait until the details of the harm are provided to them before the statute begins to run. [FN54] Knowing of a wrong is sufficient to require action to preserve one's rights. [FN55] Delaware law expects some initiative from plaintiffs, even those who rely on fiduciaries. [FN56]

> FN54. *Dean Witter,* 1998 WL 442456, at *7 ("Inquiry notice does *not* require *actual* discovery of the reason for the injury.") (emphasis in original).

> FN55. *In re USACafes, L.P. Litig.,* 1993 WL 18769, at *6 (Del. Ch. Jan. 21, 1993) ("when facts are disclosed that give rise to inquiry, an applicable statute of limitations will require timely action to preserve rights.").

> FN56. *See Adams v. Jankouskas,* 452 A.2d 148, 157 (Del.1982) ( "Equity aids the vigilant, not those who slumber on their rights.").

Second, and as important, the Complaint itself indicates that the plaintiffs were on inquiry notice as to the economic impact of NorthStar's demand for withdrawal no later than October 2000 when they received the September 30, 2000 financials which provided a striking contrast to the comparatively sunnier, earlier disclosures. According to the plaintiffs, the September financials depicted that "the Partnership's allocated profits [had] been *devalued by $15,397,107 since June 30, 2000."* [FN57]

> FN57. Complaint at ¶ 42 (emphasis in the original). I must confess that I cannot follow the plaintiffs' math on this particular point. As I read the financials, the assumed ending capital of the limited partners was reportedly $10.4 million at the end of March (Ex. I), $15.3 million at the end of June, and $8.9 million at the end of September (Ex. L). This implies a $6.4 million loss for the period of June 30--September 30, 2000. *Id.* Such a loss, approximately 42% in three months, is certainly material, but, as far as I can tell, not on the order of magnitude of a $15.4 million devaluation. In any event, the message that the September financials gave,

and that plaintiffs received at the time, was exceptionally negative, and that alone is sufficient to support the conclusion that they were on inquiry notice.

Now, it is of course true that the plaintiffs argue that the September financials did not constitute adequate notice of the impact of NorthStar's withdrawal because those financials attributed the devaluation to events post-dating the withdrawal indicated in the March financials. According to the plaintiffs, they did not receive inquiry notice until at least March 2001 because the causal link had not been provided to them. In March 2001, the Partnership: 1) restated its results for the quarter ending on June 30, 2000; 2) showed, for the first time, the nearly $16 million that NorthStar actually received in January 2001, pursuant to the Withdrawal Agreement; and 3) revealed the fact that NorthStar had not, in fact, been paid roughly $12.1 million in February of 2000 as the earlier financials had implied. It was only then that the plaintiffs supposedly realized that the downward shift in the Partnership's fortunes had anything to do with NorthStar's withdrawal. Moreover, it was only at that time that they were aware of the need to track down the Withdrawal Agreement itself, the document that gave them notice of Presidio's role.

*13 The difficulty for the plaintiffs is that their argument depends on the premise that inquiry notice only exists once they were aware of all material facts relevant to their claims. That is not the case. Equitable exceptions to statutes of limitations are narrow and designed to prevent injustice. [FN58] Once a plaintiff is on notice of facts that ought to make her suspect wrongdoing, she is obliged to diligently investigate and to file within the limitations period as measured from that time. [FN59]

> FN58. *Ambase Corp. v. City Investing Co.,* 2001 WL 167698, at *6 (Del. Ch. Feb. 7, 2001) ("Equitable tolling doctrines are an exception to the normal rule, and should not be lightly invoked."); *see also United States v. All Funds Distributed To Weiss,* 345 F.3d 49, 54-55 (2d Cir.2003) (equitable tolling is a narrow exception reserved for extraordinary situations in order to prevent injustice); *Olson v. Mobil Oil Co.,* 904 F.2d 198, 201 (4th Cir.1990) ("Equitable tolling is a narrow limitations exception, however. Courts cannot countenance ad hoc litigation for every missed deadline. The repose that statutes of limitations provide will be lost if their applicability is up for grabs in every case.") (quotations omitted).

> FN59. *E.g., Dean Witter,* 1998 WL 442456, at *8 (" '[W]hen facts are disclosed that give rise to inquiry, an applicable statute of limitations will require timely action to preserve rights.' ... It is not too much to ask investors ... to read past the rosy forecasts and actually look at the cold, hard figures provided to them.... [The contradiction between the two] should prompt[ ] an inquiry by plaintiff into the health of their investments") (citing *In re USACafes,* 1993 WL 18769, at *6); *see also Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 96 (1990) ( "Federal courts have typically extended equitable relief only sparingly. We have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies.... We have generally been much less forgiving ... where the claimant failed to exercise due diligence in preserving his legal rights."); *Johnson v. Nyack Hospital,* 86 F.3d 8, 12 (2d Cir.1996) (affirming that plaintiffs' claims were time barred when plaintiffs' delay was "excessive and occasioned by plaintiffs' lack of diligence").

Although the plaintiffs have, as a pleading matter, demonstrated that Edelman did not disclose all the material facts that he should have in 2000, their own complaint demonstrates that, no later than the beginning of October 2000, they were on inquiry notice that NorthStar had purportedly withdrawn, that the withdrawal substantially reduced the capital of the Partnership, and that the Partnership's value had plummeted for no apparent reason as of September 2000. Given that Societe shares were publicly traded and the complaint does not allege that their per share value had decreased, a rational investor should have been suspicious that the reported withdrawal of 66% of the Partnership's capital in mid-February 2000--or over $12 million--had injured the Partnership.

Indeed, the Complaint itself makes this very assertion:
> Instead, at the time of extension [June 2000], Plaintiffs believed, based on explicit representations by defendant Edelman, that their investments in the Partnership had appreciated. It was not until the end of September 2000, however, that Plaintiffs were first alerted to the fact that even as of Spring 2000, when they decided to extend the Partnership, their interests were worth significantly less than what was reported to them

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contemporaneously (at the time they made the decision to extend the Partnership), and that they had borne the draconian financial burden of the Withdrawal Agreement.

Recognizing that by its plain terms, the Complaint admits knowledge of the Withdrawal Agreement as of the end of September 2000, [FN60] one of the plaintiffs' lawyers filed an affidavit taking back this statement and indicating that although plaintiffs knew of the financial straits of the Partnership in early October, they did not know of the link between this financial collapse and NorthStar's withdrawal until it was revealed to them in March 2001. Unfortunately for plaintiffs the fact that they did not know, in these circumstances, only highlights the fact that they did not ask, either about the allegedly improper withdrawal or the inexplicable reversal of the Partnership's fortunes--and, as rational investors, they should have.

> FN60. I assume that the reference to the "end of September 2000" refers a receipt of the information contained in the September 30, 2000 financials, therefore while the plaintiffs may have been alerted by the Partnership at the end of September, they would not have been on notice of this information until they received it, sometime in October of 2000.

Although I am willing to decide this motion on the basis that the plaintiffs did not become aware of the Withdrawal Agreement until March 2001, the Complaint was not inaccurate about the plaintiffs' understanding, as of early October 2000, of the Partnership's decidedly bleaker financial status. Rather, paragraph 37 of the Complaint is properly read as an acknowledgement of the importance of the September financials and their obvious provision of inquiry notice. The dramatic devaluation and losses reported in the September financials provided reason to suspect that the huge withdrawal reported in the March 2000 financials had harmed the Partnership. At the very least, the September financials ought to have raised plaintiffs' suspicions, and this is all that is required for inquiry notice. "Once a plaintiff is in possession of facts that make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice." [FN61]

> FN61. See Dean Witter, 1998 WL 442456, at *7 n. 49 (quoting Harner v. Prudential Sec. Inc., 785 F.Supp. 626, 633 (E.D.Mich.1992), aff'd, 35 F.3d 565 (6th Cir.1994)).

*14 Nor does the fact that Edelman was a fiduciary excuse the plaintiffs' torpor. Although reliance on fiduciaries may toll the statute of limitations in appropriate circumstances, "the trusting plaintiff must still be reasonably attentive to his interest." [FN62] Plaintiffs must remain alert to red-flags that should prompt "an inquiry by plaintiffs into the health of their investments" even when those red-flags are "accompanied by optimistic projections." [FN63] Here, the plaintiffs were on inquiry notice of the per se breach of the LP Agreement represented by the withdrawal, the massive size of the withdrawal in relation to the value of the Partnership as a whole, the difficulty of achieving the Partnership's goals if the size of its Societe holdings had to be downsized by at least 60% as implied by the March Schedules, and of the possible relation between that withdrawal and the drastic and unexplained reduction of the Partnership's value as reported by Edelman in the September financials. However distorting Edelman's prior words might have been, by October 2000, it was unreasonable for the plaintiffs to ignore the obvious warnings because, by that time, Edelman's previous optimism, standing in stark contradiction to the bleak financial reality, should have, if anything, deepened, and not dampened, their suspicions.

> FN62. Dean Witter, 1998 WL 442456, at *8.

> FN63. Id. at *8-9; see also Fike, 754 A.2d at 262 ("[Plaintiff], however trusting he may have been that his partners would act in good faith, had some obligation to be 'reasonably attentive' to his investment interests.") (citations omitted).

In so ruling, I necessarily reject the plaintiffs' untenable suggestion that they were not "actually" on inquiry notice until they acquired the Withdrawal Agreement itself. [FN64] Only at that time, say the plaintiffs, were they aware of the precise terms of that Agreement, including the formula for determining the payout to NorthStar, and the provisions giving NorthStar a priority position over other limited partners, not only for itself, but also for its affiliate Presidio, which was not even a limited partner in Museum Partners. [FN65] But to credit plaintiffs' argument would subvert the concept of inquiry notice, by providing a ready excuse for untimely filing whenever a plaintiff was not aware of all material facts relating to its claims, not only as to their possible existence, but as to the extent of the harm they caused.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                       Page 15
2005 WL 217039 (Del.Ch.)
**(Cite as: 2005 WL 217039 (Del.Ch.))**

FN64. Pl. Br. 26 n. 12.

FN65. Pl. Br. 27.

Our law, as was well described by Chancellor Chandler in *In re Dean Witter Partnership Litig.,* sharply contrasts with the views advocated by the plaintiffs:

> [T]he limitations period is tolled until such time that persons of average intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued,* would lead to discovery of the injury. Inquiry notice does *not* require *actual* discovery of the reason for the injury. Nor does it require plaintiffs' awareness of all aspects of the alleged wrongful conduct. Rather the statute of limitations begins to run when plaintiffs should have discovered the general fraudulent scheme. [FN66]

    FN66. *Dean Witter,* 1998 WL 442456, at *7 (emphasis in original) (citations omitted).

Likewise, our Supreme Court has aptly stated that "whatever is notice calling for inquiry is notice of everything to which such inquiry might have led," [FN67] including, in this case, the causal link between NorthStar's withdrawal and the consequent damage to the Partnership.

    FN67. *United States Cellular,* 677 A.2d at 504 n. 7 (citing with approval *Kahn v. Seaboard Corp.,* 625 A.2d 269, 277 (Del. Ch.1993), and its adoption of the federal standard from *Tobacco and Allied Stocks, Inc. v. Transamerica Corp.,* 143 F.Supp. 323, 328-29 (D.Del.1956)).

*15 In deciding this case, the relatively generous approach our state has taken to tolling doctrines must be borne in mind. In general, Delaware law does not begin the running of the statute of limitations at all when a tolling doctrine applies--even one not involving any fraudulent concealment--until the plaintiff is on inquiry notice, giving the plaintiff the full limitations period to file after receiving that notice. [FN68] Arguably, it would be more faithful to the statutory intent behind statutes of limitations for Delaware common law to permit plaintiffs to rely upon tolling exceptions only when inquiry notice of their claims was either received at a time too close to the expiration of the limitations period to reasonably expect a timely filing or after the limitations period had already expired. Even in those circumstances, the statute should arguably be tolled only for a period reasonably necessary to enable the filing of a complaint. [FN69]

    FN68. *E.g., Dean Witter,* 1998 WL 442456, at *5-7.

    FN69. In the case of equitable tolling, Judge Posner of the Seventh Circuit has expressed support for an approach of that kind, stating: We do not think equitable tolling should bring about an automatic extension of the statute of limitations by the length of the tolling period or any other definite term. It is, after all, an equitable doctrine. It gives the plaintiff extra time, if he needs it. If he doesn't need it, there is no reason for depriving the defendants of the protection of the statute of limitations. Statutes of limitation are not arbitrary obstacles to the vindication of just claims, and therefore they should not be given a grudging application. They protect important social interests in certainty, accuracy and repose.... When as here the necessary information is gathered after the claim arose but before the statute of limitations has run, the presumption should be that the plaintiff could bring the suit within the statutory period and should have done so. The presumption will be more easily rebuttable the nearer the date of obtaining the information is to the date at which the statutory period runs out.
    *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 452-53 (7th Cir.1990), *cert. den'd,* 501 U.S. 1261 (1991).

Given the generosity of our approach to equitable tolling--which gives the plaintiff the full measure of the limitations period running from the date when inquiry notice was first received [FN70]--our courts should be careful to apply the concept of inquiry notice as Chancellor Chandler did in *Dean Witter* [FN71] and expect plaintiffs to act with reasonable alacrity once they have reason to suspect that their rights were injured. By any reasonable measure, the plaintiffs' antenna should have been raised no later than October 2000. [FN72] They had a full three years after that to file suit against NorthStar and Presidio and failed to do so. By acting too slowly, the plaintiffs, by tactical choice, forfeited their right to seek relief from NorthStar and Presidio and must look for relief only against Edelman and the other defendants they sued with the required promptness.

    FN70. *E.g., Dean Witter,* 1998 WL 442456,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d  
2005 WL 217039 (Del.Ch.)  
**(Cite as: 2005 WL 217039 (Del.Ch.))**

Page 16

at *5-7.

FN71. *See generally* Dean Witter, 1998 WL 442456, *passim*.

FN72. The plaintiffs concede that they received a copy of the Withdrawal Agreement in July 2001 but waited over two years after that to sue NorthStar and Presidio. By contrast, in the *Cada* case cited in note 69, Judge Posner found that the plaintiff had the necessary information to bring suit eight months before the end of the statutory period and affirmed a finding that his claims were time-barred.

### IV. *Conclusion*

For all the foregoing reasons, I find that all of the plaintiffs' claims against NorthStar and Presidio are time-barred and therefore grant the motion to dismiss the claims against them. [FN73]

FN73. A week or so ago, the plaintiffs wrote a letter alerting the court to the existence of a subscription agreement between Museum Partners and NorthStar that purportedly gave NorthStar the right to withdraw at any time. The plaintiffs, however, had expressly agreed not to use ongoing discovery in connection with this motion, the briefing for which was completed. Thus, I conclude that the plaintiffs should not have submitted this document and do not consider it. As important, by their own arguments, the plaintiffs adhere to the view that, irrespective of the document, NorthStar had no right to withdraw. Therefore, the emergence of this document does nothing to undermine the conclusion that, as to their claim that the withdrawal was a per se breach of the LP Agreement and as to their related claims concerning the circumstances of NorthStar's withdrawal, plaintiffs were on inquiry notice no later than October 2000.

IT IS SO ORDERED.

2005 WL 217039 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.