# EXHIBIT 29

# Westlaw.

Not Reported in F.Supp.                                                                                                    Page 1
1996 WL 502280 (E.D.Pa.), RICO Bus.Disp.Guide 9190
(Cite as: 1996 WL 502280 (E.D.Pa.))

**H**

**Motions, Pleadings and Filings**

United States District Court, E.D. Pennsylvania.
SCHUYLKILL SKYPORT INN, INC., et al.
v.
John W. RICH, Jr., et al.
**Civ. A. No. 95-3128.**

Aug. 21, 1996.
Maria T. Casey, Michael A. O'Pake, Curran Law
Offices, Pottsville, PA, James J. Riley, Danielle L.
Peyakovich, Riley and Fanelli, Pottsville, PA, for
Schuylkill Skyport Inn, Inc., James J. Curran, Jr.

Maria T. Casey, Curran Law Offices, Pottsville, PA,
James J. Riley, Danielle L. Peyakovich, Riley and
Fanelli, Pottsville, PA, for Reading Anthracite
Company, Schuylkill Energy Resources.

Howard A. Rosenthal, Pelino & Lentz, P.C.,
Philadelphia, PA, for John W. Rich, Jr., John W.
Rich, Sr., Brian Rich, Robert M. Ryan, Bonnie R.
Ryan, Terrence Ryan, Gloria R. Curran, Maria
Curran Cantwell, David R. Christ, Gilberton Coal
Company, Gilberton Energy Corporation, J.M.B.,
Ltd., Waste Management & Processors, Inc., Filter
Media, Inc., Gilberton Power Company, Pottsville
Fuel Company, Jack Rich, Inc., Port Carbon Machine
Works, J & R Engineering Corp., R & R Energy
Corp., RI-Corp. Development, Inc.

Martin J. Cerullo, Frumkin, Shralow & Cerullo,
P.C., Pottsville, PA, Reading Anthracite Company,
Schuylkill Energy Resources, Inc.

James J. Riley, Riley and Fanelli, Pottsville, PA,
Daniel B. Huyett, Stevens & Lee, Reading, PA, for
Meridian Bank.

Michael Lieberman, Hangley, Aronchick, Segal and
Pudlin, Philadelphia, PA, for Lawrence F. Tornetta.

Arthur W. Lefco, Sherr, Joffe & Zuckerman, P.C.,
W. Conshohock, PA, for Martin J. Cerullo, Frumkin,
Shralow & Cerullo.

*MEMORANDUM*

CAHN, Chief Judge.

*1 Plaintiffs Schuylkill Skyport Inn, Inc. ("SSI") and
James J. Curran, Jr. ("Curran") (collectively
"Plaintiffs") bring this action against various
directors, officers, and shareholders of Reading
Anthracite Company ("RAC") and Schuylkill Energy
Resources, Inc. ("SER"), [FN1] as well as against
RAC's and SER's corporate counsel [FN2] and
various other corporations involved in transactions
with RAC and SER [FN3] (collectively
"Defendants"). Also named as nominal defendants
are RAC and SER. Plaintiffs allege violations of the
Racketeer Influenced and Corrupt Organizations Act
("RICO"), 18 U.S.C. § § 1961-1968, and bring state
law claims for breach of fiduciary duty, waste of
corporate assets, fraud and conversion. Currently
before the court are motions for summary judgment
filed by the Corporate Defendants, Tornetta and the
Corporate Attorneys, and a motion to dismiss filed by
the Corporate Attorneys. Additionally, the Corporate
Defendants move to strike the Third Amended
Complaint. For the reasons stated below, the motion
to strike is denied, the motions for summary
judgment filed by the Corporate Defendants and
Tornetta are denied, the Corporate Attorneys' motion
for summary judgment is granted in part and denied
in part, and the Corporate Attorneys' motion to
dismiss is granted in part and denied in part.

> FN1. These defendants are: John W. Rich,
> Jr., John W. Rich, Brian R. Rich, Robert M.
> Ryan, Bonnie R. Ryan, Terrence Ryan,
> Gloria R. Curran, Maria Curran Cantwell,
> and David R. Christ (collectively "the
> Corporate Defendants"). Also named as a
> defendant is Lawrence F. Tornetta
> ("Tornetta").

> FN2. Corporate counsel named as
> defendants in this action are Martin J.
> Cerullo ("Cerullo") and the firm of Frumkin,
> Shralow & Cerullo ("FS & C") (collectively
> "the Corporate Attorneys").

> FN3. These corporations are Gilberton Coal
> Company, Gilberton Energy Corporation,
> J.M.B., Ltd., Waste Management &
> Processors, Inc., Filter Media, Inc.,
> Gilberton Power Company, Pottsville Fuel
> Company, Jack Rich, Inc., Port Carbon

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                        Page 2
1996 WL 502280 (E.D.Pa.), RICO Bus.Disp.Guide 9190
(Cite as: 1996 WL 502280 (E.D.Pa.))

Machine Works, J & R Engineering Corp., R & R Energy Corp., Ri-Corp Development, Inc., and JMB Development, Inc.

BACKGROUND

SSI, SER and RAC are Pennsylvania corporations with places of business in Pottsville, Pennsylvania. SSI owns and collects royalties on various anthracite coal refuse banks and deposits of silt and slush. Curran is the sole income beneficiary of the Curran Trust, which owns fifty percent of the outstanding shares of SSI.  Curran also is a direct or beneficial owner of thirty-five percent of the outstanding shares of SER and of over thirty-four percent of the outstanding shares of RAC.  RAC engages in the mining, processing, and selling of anthracite coal and its refuse.  SER is a culm-fired cogeneration facility which uses anthracite coal refuse as its primary fuel. Curran brings this action in his own behalf and derivatively on behalf of RAC and SER.

Plaintiffs allege that the Corporate Defendants, Tornetta, and the Corporate Attorneys, as members of the Rich Control Group ("RCG"), have engaged in various schemes against Curran, SSI, RAC, and SER. These purported schemes include: (1) the scheme to defraud Curran by depriving him of cash distributions from and diminishing his interests in RAC and SER; (2) conversion of SSI materials;  (3) usurpation of corporate opportunities properly belonging to RAC, SER, and SSI;   (4) engaging in related party transactions, (5) the scheme to harm RAC and SER by engaging in a series of reckless and intentional acts;  and (5) the scheme to cause Curran to default on certain agreements and thereby cause him to lose stock in RAC and SER.

DISCUSSION

Before the court is the Corporate Defendants' Motion to Strike the Third Amended Complaint and three motions for summary judgment filed by the Corporate Defendants, Tornetta, and the Corporate Attorneys.  In addition the Corporate Attorneys have filed a motion to dismiss.  Each of these motions will be discussed in turn.

I. THE MOTION TO STRIKE THE THIRD AMENDED COMPLAINT

*2 Plaintiffs assert that the Third Amended Complaint is "inconsistent with and in direct violation of this Court's Orders dated November 22, 1995 and April 1, 1996." (Corp.Defs.' Mot.Strike

Third Am.Compl. & Resp.Pls.' Br.Supp.Third Am.Compl. at 1-2.)   Issued after the filing of the Second Amended Complaint, the Order of November 22, 1995 directed that:

> Defendants shall file Motions to Dismiss or otherwise respond to the Second Amended Complaint within 60 days of the date of this Order. Plaintiffs shall file no further amendments to the Complaint without complying with Rule 15(a), F.R.C.P.

(Order of November 22, 1995, *Schuylkill Skyport Inn, Inc. v. John W. Rich, Jr.,* No. 95-3128 (E.D.Pa.).)  After Motions for Summary Judgment or to Dismiss were filed by Defendants, oral argument took place on March 28, 1996.  At oral argument this court informed Plaintiffs that they would be given leave to file a third amended complaint limited to allegations involving Cerullo and FS & C and allegations involving Tornetta's alleged intent to force Curran to forfeit stock.  (*See* N.T., 3/28/96 at 98-99, 139-40.)  On April 1, 1996, this court issued the following order:

> [I]t is hereby ORDERED that Plaintiffs have leave to amend the complaint in reference to allegations against Defendant Lawrence F. Tornetta, Martin J. Cerullo, and Frumkin, Shralow & Cerullo.  This amendment shall be limited to matters raised in the on-record hearing of March 28, 1996.

(Order of April 1, 1996, *Schuylkill Skyport Inn, Inc. v. John W. Rich, Jr.,* No. 95-3128) (E.D.Pa.).) Plaintiffs then filed a Third Amended Complaint.

The Corporate Defendants argue that Plaintiffs' amendments went beyond the limits imposed by this court and include "wholesale revisions of plaintiffs' allegations against the other defendants, whose Motion for Summary Judgment remains pending." (Corp.Defs.' Br.Supp.Mot.Strike Third Am.Compl. & Opp'n Pls.' Br.Supp.Third Am.Compl. at 4.)

Amendments are governed by Rule 15(a) of the Federal Rules of Civil Procedure, which reads in pertinent part:

> A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served, or if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served.   Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party;  and leave shall be freely given when justice so requires. Generally, an amendment which does not conform to Rule 15(a) is "without legal effect and any new

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 3
1996 WL 502280 (E.D.Pa.), RICO Bus.Disp.Guide 9190
(Cite as: 1996 WL 502280 (E.D.Pa.))

matter it contains will not be considered unless the amendment is re-submitted for the Court's approval." *Straub v. Desa Indus., Inc.,* 88 F.R.D. 6, 8 (M.D.Pa 1980). Nevertheless, "some courts have held that an untimely amended pleading served without judicial permission may be considered as properly introduced when leave to amend would have been granted had it been sought, and when it does not appear that any of the parties will be prejudiced by allowing the change." *Id.* "[T]he grant or denial of an opportunity to amend is within the discretion of the District Court...." *Foman v. Davis,* 371 U.S. 178, 182 (1962).

*3 In the instant case, the Corporate Defendants assert that they will be prejudiced if this court allows the Third Amended Complaint:

> If the Third Amended Complaint is allowed, defendants now will be required to re-file their Motion for Summary Judgment, addressing the same issues, as the new complaint not only restates the old claims, but also reorders claims and contains new claims not previously raised in any prior version of the Complaint. In these circumstances, the *minimum* prejudice to defendants will be all of the attorneys' fees and costs incurred to date, as well as the delay.

(Corp.Defs.' Br.Opp'n Pls.' Mot.Leave Amend Second Am.Compl. & Supp.Corp.Defs.' Pending Mot.Strike at 2.)

The Third Circuit Court of Appeals has stated that " 'prejudice to the non-moving party is the touchstone for the denial of an amendment.' " *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1414 (3d Cir.1993) (citation omitted). In *Thompson v. Glenmede Trust Co.,* Civ.A. No. 92-5233, 1994 WL 675186 (E.D.Pa. Nov. 23, 1994), the court defined the contours of such prejudice:

> The non-moving party must do more than merely claim prejudice. "It must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the ... amendments been timely." Mere passage of time, without more, does not require that a motion for leave to amend be denied; however, at some point, the delay will become undue, placing an unwarranted burden on the opposing party. Prejudice does not result merely from a party's having to incur additional counsel fees; nor does it result from a delay in the movement of the case. Prejudice under Rule 15 "means undue difficulty in prosecuting [or defending] a lawsuit as a result of a change in tactics or theories on the part of the other party."

*Id.* at *2 (citations omitted).

This court finds no unfair disadvantage to Defendants from allowing the Third Amended Complaint. First, although Plaintiffs have exceeded the scope of this court's Order of April 1, 1996 granting leave to amend, the changes in the Third Amended Complaint are not substantial, and, with minor exceptions, the motion for summary judgment already filed by the Corporate Defendants has not been rendered inapplicable. Although Plaintiffs have added some new allegations, they are closely related to the allegations in the Second Amended Complaint and the general theories of recovery remain the same. Second, to the extent there are significant differences between the Second and Third Amended Complaints, Defendants have not been deprived of an opportunity to respond to new allegations. The Corporate Defendants have already filed briefs and letters in response to the Third Amended Complaint. [FN4] These have been given full consideration by the court in its disposition of the instant motions. Although this court denies the Corporate Defendants' motion for summary judgment, as discussed below, the Corporate Defendants will be given leave to resubmit several of their arguments on a motion for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. Defendants may further respond to new allegations at that time. Finally, as noted by the court in *Thompson,* increased fees and costs do not constitute prejudice.

> FN4. Subsequent to the filing of the Third Amended Complaint, the Corporate Attorneys filed a motion for summary judgment which incorporated by reference their previous motion to dismiss. Tornetta submitted letter briefs in response to the Third Amended Complaint as a supplement to his previous motion for summary judgment.

*4 The Third Circuit has stated that "[i]n the absence of substantial or undue prejudice, denial [of a motion to amend] instead must be based on bad faith or dilatory motives, truly undue or unexplained delay, repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment." *Lorenz,* 1 F.3d at 1414. This court finds none of these factors present in the instant case and therefore will accept the Third Amended Complaint and deny the Motion to Strike.

II. MOTIONS FOR SUMMARY JUDGMENT FILED BY THE CORPORATE DEFENDANTS

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                  Page 4
1996 WL 502280 (E.D.Pa.), RICO Bus.Disp.Guide 9190
(Cite as: 1996 WL 502280 (E.D.Pa.))

AND TORNETTA

The Federal Rules of Civil Procedure provide that summary judgment is appropriate if "there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of " 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The non-moving party must then go beyond the pleadings to "establish the existence of each element on which it bears the burden of proof," *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir.1990) (citation omitted), *cert. denied*, 499 U.S. 921 (1991), because "a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

When considering a motion for summary judgment, the court must draw all justifiable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court may not make credibility determinations or weigh the evidence. *Id.* at 249. If the record thus construed could not lead the trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The Corporate Defendants raise the following defenses in their Motion for Summary Judgment: (1) claim preclusion; (2) an inadequate pattern of racketeering to support claims under RICO; (3) estoppel; (4) the illegality of the 1980 Shareholders Agreement relied upon by Plaintiffs; (5) statute of limitations; (6) failure of the controlling documents to support Plaintiffs' claims about the manipulation of SER's financing; (7) Plaintiffs' failure to allege a distinct injury to Curran; and (8) Curran's lack of standing to seek the rescission or reformation of the Meridian Loan Agreement. Tornetta's motion incorporates by reference the Corporate Defendants' Motion for Summary Judgment. Tornetta elaborates on the res judicata argument and absence of a pattern of racketeering, particularly as these defenses relate to him. Tornetta also asserts that Plaintiffs have inadequately alleged any motivation on Tornetta's part to be involved in a scheme to deprive Curran of distributions from RAC and SER.

**\*5** Each of the Corporate Defendants' defenses will be considered in turn. Tornetta's res judicata and pattern of racketeering arguments will be considered alongside those of the Corporate Defendants. Finally, Tornetta's motivation argument will be examined.

### A. CLAIM PRECLUSION
The Corporate Defendants and Tornetta assert that most of Plaintiffs' claims are precluded by settlements and dismissals with prejudice in multiple prior actions in state and federal courts and to releases executed by Curran. Consideration of this argument warrants a general discussion of claim preclusion.

The doctrine of claim preclusion, or res judicata, provides that "a subsequent suit based on the same cause of action as a prior suit that involved the same parties or their privies is barred where there has been a final judgment on the merits in the prior suit." *Labelle Processing Co. v. Swarrow*, 72 F.3d 308, 313 (3d Cir.1995). [FN5] Federal courts must give state court judgments the same preclusive effect as would be given by the state court. *Migra v. Warren City Sch. Dist.*, 465 U.S. 75, 81 (1984). Both federal and Pennsylvania courts have held that a dismissal with prejudice is considered a judgment on the merits for claim preclusion purposes. *See, e.g., Gambocz v. Yelencsics*, 468 F.2d 837, 841 (3d Cir.1972) ("res judicata bars relitigation of the claims dismissed in the prior suit") (citations omitted); *Interdigital Technology Corp. v. OKI America*, 866 F.Supp. 212, 213 (E.D.Pa.1994) (stating that "a dismissal with prejudice ... acts as a judgment on the merits in favor of the dismissed defendant"); *Keystone Bldg. Corp. v. Lincoln Sav. & Loan Ass'n*, 360 A.2d 191, 194 n. 6 (Pa.1976) ("[I]t is well settled, as a general proposition, that a judgment or decree, though entered by consent or agreement of the parties, is res judicata to the same extent as if entered after contest.") (citation omitted).

> FN5. The Corporate Defendants also assert that Plaintiffs are barred from relitigating issues which arose under previous litigation. The doctrine of issue preclusion, or collateral estoppel, "may bar a claimant from relitigating issues decided in a previous action." *Labelle*, 72 F.3d at 314 n. 10. Specifically, the Corporate Defendants argue that Plaintiffs' claim under the 1980 Stockholders Agreement is barred because the validity and enforceability of this agreement were disputed in earlier litigation that was dismissed. (Reply Argument Br. at 3.) Similarly, the Corporate Defendants

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                 Page 5
1996 WL 502280 (E.D.Pa.), RICO Bus.Disp.Guide 9190
**(Cite as: 1996 WL 502280 (E.D.Pa.))**

argue that Plaintiffs' claims related to the ownership of various SSI banks are barred. *Id.* at 8. The Corporate Defendants contend that this ownership issue also was raised in earlier litigation that was settled and dismissed with prejudice. Therefore, the Corporate Defendants assert that "any issue related to ownership (or purported theft) of the banks is now foreclosed by the dismissal with prejudice." *Id.* at 9.

Dismissals with prejudice unaccompanied by findings have no preclusive effect on issues. *Lawlor v. National Screen Serv. Corp.,* 349 U.S. 322, 327 (1955) (stating that a judgment unaccompanied by findings does not bind the parties on any issue); *see also Gambocz v. Yelencsics,* 468 F.2d 837, 842 (3d Cir.1972) ("[T]he orthodox doctrine of collateral estoppel ... is inapplicable here because the first 'judgment was unaccompanied by findings and hence did not bind the parties on any issue.' ") (citation omitted); *Interdigital Technology Corp. v. OKI America,* 866 F.Supp. 212, 214 (E.D.Pa.1994) ("Issue preclusion ... does not apply to an issue which was dismissed in an earlier litigation when no findings of fact or conclusions of law were made with respect to that issue."). In distinction from the case law cited by the Corporate Defendants in support of this argument, none of the earlier litigation involving the instant parties resulted in findings of fact by the court. Therefore, these issues are not precluded.

Federal and Pennsylvania claim preclusion doctrines also preclude not only claims actually decided in prior actions, but also those which could have been brought. *Nanavati v. Burdette Tomlin Mem. Hosp.,* 857 F.2d 96, 111 (3d Cir.1988) (citations omitted), *cert. denied,* 489 U.S. 1078 (1989); *Fox v. Gabler,* 626 A.2d 1141, 1143 (Pa.1993). Claim preclusion applies only to claims arising prior to the entry of judgment. *Alexander & Alexander v. Van Impe,* 787 F.2d 163, 166 (3d Cir.1986) (stating that claim preclusion "does not bar claims arising *subsequent* to the entry of judgment and which did not then exist or could not have been sued upon in the prior action") (citation omitted). However, "merely adding some facts, naming additional defendants, or proposing a different theory of recovery will not convert one cause of action into a second cause of action and thereby evade the preclusive effect that the first cause of action has if both actions involve the same liability-creating conduct on the part of the

defendants and the same alleged invasion of the plaintiffs' rights." *Wood v. Coleman,* CIV.A. No. 83-27, 1989 WL 29250, at *15 (E.D.Pa. Mar. 29, 1989) (citation omitted).

*6 For a prior judgment to have preclusive effect on a later action there must be an identity of (1) issues; (2) causes of action; (3) parties or their privies; and (4) the quality or capacity of the parties suing or being sued. *Duquesne Slag Products Co. v. Lench,* 415 A.2d 53, 55 (Pa.1980). In determining the identity of a cause of action, "*res judicata* generally is thought to turn on the essential similarity of the underlying events giving rise to the various legal claims." *McArdle v. Tronetti,* 627 A.2d 1219, 1222 (Pa.Super.1993) (citation omitted), *appeal denied,* 641 A.2d 587 (Pa.1994); *see also Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc.--Pension Fund v. Centra,* 983 F.2d 495, 504 (3d Cir.1992) ( "Whether two lawsuits are based on the identical cause of action 'turn[s] on the essential similarity of the underlying events giving rise to the various legal claims.' ") (citation omitted); *United States v. Athlone Indus., Inc.,* 746 F.2d 977, 984 (3d Cir.1984) (stating that res judicata requires a plaintiff to " 'present in one suit all the claims for relief that he may have arising out of the same transaction or occurrence' ") (citation omitted).

The Corporate Defendants argue that "[v]irtually all of the allegations of the Second Amended Complaint were resolved in prior federal RICO actions, as well as multiple state court proceedings. (Br.Supp.Corp. Defs.' Mot.Summ.J. at 4.) As the following discussion will show, the dismissals and releases in these earlier actions bar certain of Plaintiffs' claims arising before the dates of the dismissal or releases. However, they do not preclude claims arising thereafter. *See Lawlor v. National Screen Serv. Corp.,* 349 U.S. 322, 328 (1955) (stating that although a "judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case"). This court will first discuss generally the following issues raised by the parties in their res judicata arguments: (1) the impact of prior state judgments on later RICO actions in federal court; and (2) the application of the preclusion doctrine applied in *Main Line Theatres, Inc. v. Paramount Film Distrib. Corp.,* 298 F.2d 801 (3d Cir.), *cert. denied,* 370 U.S. 939 (1962).

1. The Impact of Prior State Court Judgments on Later Rico Actions in Federal

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 6
1996 WL 502280 (E.D.Pa.), RICO Bus.Disp.Guide 9190
**(Cite as: 1996 WL 502280 (E.D.Pa.))**

Court
Plaintiffs suggest that a plaintiff's failure to raise all federal RICO claims in a previous state court action has no preclusive effect on a later RICO action in federal court. (Pls.' Resp.Corp.Defs.' Mot.Summ.J. at 28.) This is incorrect. *McCarter v. Mitcham,* 883 F.2d 196, 201 (3d Cir.1989) (finding that a judgment on the merits in a prior Pennsylvania court action precluded RICO claims because such claims could have been brought in the earlier state court action). Therefore, any of Plaintiffs' RICO claims that could have been raised in earlier state court litigation are barred.

*7 Plaintiffs argue that pre-settlement conduct may be alleged by Plaintiffs to establish a pattern of racketeering. (Pls.' Br.Supp.Resp.Corp.Defs.' Br.Supp.Mot.Strike at 19.) Plaintiffs erroneously rely on *Tabas v. Tabas,* Nos. 92-1495, 92-1529, 1994 WL 158772 (3d Cir. May 2, 1994) ("*Tabas I* "). The opinion and judgment in this case was vacated. *See Tabas v. Tabas,* Nos. 92-1495, 92-1529, 1994 U.S.App. LEXIS 11956 (3d Cir. May 25, 1994). The opinion was then superseded by *Tabas v. Tabas,* 47 F.3d 1280 (3d Cir.), *cert. denied,* 115 S.Ct. 2269 (1995) ( "*Tabas II* "). Plaintiffs rely exclusively on footnote 15 in *Tabas I,* (*see* Pls.' Br.Sup.Resp.Corp.Defs.' Br.Supp.Mot.Strike at 20), which was not included in *Tabas II.* With no Third Circuit precedent to the contrary, this court finds that Plaintiffs are precluded from listing as predicate acts claims that were or could have been brought in prior actions settled or dismissed with prejudice. *See Spiegel v. Continental Ill. Nat'l Bank,* 790 F.2d 638, 647 (7th Cir.) (finding that alleged predicate acts that had been dismissed in previous action were barred by res judicata), *cert. denied,* 479 U.S. 987 (1986); *Turkish v. Kasenetz,* 832 F.Supp. 565, 570 (E.D.N.Y.1993) (finding that "plaintiffs may not relitigate claims of racketeering activity by defendant previously alleged in the action dismissed with prejudice by this court"), *rev'd on other grounds,* 27 F.3d 23 (2d Cir.1994). [FN6]

> FN6. Although Plaintiffs attempt to distinguish these two cases, this court finds their arguments unpersuasive.

### 2. The Application of the *Main Line Theatres* Doctrine
The Corporate Defendants argue that because one of the prior settlements involving Curran and some of the Corporate Defendants disposed of actions wherein Curran sought injunctive relief, Curran is now barred from seeking redress on those same claims pursuant to the doctrine articulated in *Main Line Theatres, Inc. v. Paramount Film Distribution Corp.,* 298 F.2d 801 (3d Cir.), *cert. denied,* 370 U.S. 939 (1962). (Br.Supp.Corp.Defs.' Mot.Summ.J. at 54-56). In *Main Line Theatres,* the court examined the release of claims of a suit which included in its prayers for relief a request for an injunction against prohibited conduct. The court determined that the release barred the plaintiffs from further litigation based on subsequent occurrences of the prohibited conduct because the court found that "a defendant offering a sum in settlement of a suit asking, among other things, for an injunction against certain conduct, would not understand that a similar demand could be asserted the day after the settlement." *Main Line Theatres,* 298 F.2d at 803.

Defendants assert that the *Main Line Theatres* doctrine should be applied to the October 13, 1994 Settlement Agreement. In the October 13, 1994 Settlement Agreement, Curran agreed to dismiss with prejudice three lawsuits. (Settlement Agreement of October 13, 1994 at 1-2, App.Corp.Defs.' Mot.Summ.J. at A735-36.) These lawsuits are *Curran v. Tornetta,* No. S-1091-94 (C.P. Schuylkill) ("*Related Party Litigation* "); *Curran v. Rich,* No. S-1567-1993 (C.P. Schuylkill) ("*RICO Settlement Agreement Litigation* "); and *Schuylkill Skyport Inn, Inc. v. Reading Anthracite Company and Gilberton Coal Company,* No. S-1608-93 (C.P. Schuylkill) ("*SSI II* "). The Corporate Defendants contend that since injunctive relief was sought in these actions and there is no limiting language in the October 13, 1994 Settlement Agreement, Plaintiffs are barred from raising claims upon which the requests for injunctive relief were based pursuant to *Main Line Theatres.* This court, however, finds that the *Main Line Theatres* doctrine does not apply.

*8 In *Main Line Theatres,* the court looked for the "reasonable understanding" between the parties:
> Here the suit contained a demand for injunctive prohibition of future wrongful conduct as well as a claim for money damages for alleged past misconduct. In such circumstances a reasonable person agreeing, without any expression of limitation, to accept a sum in settlement of the litigation should and reasonably would understand that both aspects of the suit were covered by the settlement. Certainly, a defendant offering a sum in settlement of a suit asking, among other things, for an injunction against certain conduct, would not understand that a similar demand could be asserted the day after settlement. *This reasonable understanding determines the meaning of the*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 7
1996 WL 502280 (E.D.Pa.), RICO Bus.Disp.Guide 9190
**(Cite as: 1996 WL 502280 (E.D.Pa.))**

*assent expressed by the parties here.*
*Main Line Theatres,* 298 F.2d at 803 (emphasis supplied). In the instant case the settlement document at issue provides that Curran will dismiss with prejudice the three aforementioned lawsuits. (Settlement Agreement of October 13, 1994 at 1-2, App.Corp.Defs.' Mot.Summ.J. at A735-36). There is no release language whatsoever. Subsequent to the *Main Line Theatres* decision, the Third Circuit Court of Appeals has made it clear that the *Main Line Theatres* doctrine can only be applied when the release language contains no limitations. In *Tabas II,* the court noted that the *Main Line Theatres* doctrine did not apply to releases with specific limiting language:

> In *Main Line,* plaintiffs could point to no limitations, expressed or implied, in their oral agreement with defendants. Accordingly, their settlement agreement covered their prayers for both injunctive relief and money damages. In the present case, however, the mutual release signed by plaintiffs and [defendant] expressly limits the applicability of the release to any claims arising "from the beginning of the world to November 20, 1987." This express limitation distinguishes the instant case from the facts presented in *Main Line.*
> *Tabas II, 47 F.3d at 1289.*

Although the October 13, 1994 agreement has no limiting language such as that described in *Tabas II,* absent any language releasing Curran's claims, this court cannot say that the reasonable understanding between the parties was that Curran could never again bring claims for violations taking place after the settlement. Therefore, this court will not apply the *Main Line Theatres* doctrine.

In contrast, the other settlement agreements in Curran's prior actions all contain language limiting the release to claims Curran currently had against the various defendants. [FN7] Thus, these agreements cannot serve to preclude claims Curran brings for conduct occurring after the release dates.

> FN7. The other pertinent settlement agreements brought to this court's attention by the Corporate Defendants are: two settlement agreements dated July 18, 1992, and one dated April 20, 1994. One of the agreements dated July 18, 1992 settles the following cases: *Reading Anthracite Co. v. Lehigh Coal & Navigation Co.,* 91-CV-1898 (E.D.Pa.) ("*RICO I* "); *James J. Curran, Jr. v. Lawrence F. Tornetta,* 91-CV-2886 (E. D.Pa.) ("*RICO II* "); and *Reading*

*Anthracite Co. v. John W. Rich,* Civ.A. No. 89-7110-05-01 (C.P. Bucks) ("*the Bucks County Action* "). The relevant release language provides that: The parties agree that, subject to the terms of this Agreement, they shall mutually release, remise and discharge each other from any and all claims, disputes, suits, liabilities and complaints which any of them *presently* have against the other, especially, but not limited to the claims set forth in the referenced litigation.
(Settlement Agreement of July 18, 1992, App.Corp.Defs.' Mot.Summ.J. at A270 (emphasis supplied).)
The other agreement dated July 18, 1992 pertains to *Schuylkill Skyport Inn, Inc. v. Gilberton Coal Co.,* 92-CV-1092 (E.D.Pa). Its pertinent language provides that:
The parties agree that, subject to the terms of this Agreement, they shall mutually release, remise and discharge each other from any and all claims, disputes, suits, liabilities and complaints which any of them *had* against the other, especially, but not limited to the claim set forth in the referenced litigation.
(Settlement Agreement of July 18, 1992, App.Corp.Defs.' Mot.Summ.J. at A273 (emphasis supplied).)
The agreement dated April 20, 1994 pertains to the following cases: *John J. Curran v. James J. Curran,* No. S-2145-92 (C.P. Schuylkill); *Lehigh Coal & Navigation Co. v. Lawrence F. Tornetta,* (C.P. Carbon); *RICO I; RICO II; Lehigh Coal & Navigation Co. v. Lawrence F. Tornetta,* 92-CV-6030 (E.D.Pa.) ("*Tornetta RICO Litigation* "); *Lehigh Coal & Navigation Co. v. John J. Curran,* 93-CV-5572 (E.D.Pa.); *James J. Curran, Jr. v. Gloria R. Curran,* No. S-1699-93 (C.P. Schuylkill); and *the Bucks County Action.* This agreement provides in relevant part that:
The James Curran Parties ... hereby remise, release and forever discharge the Tornetta ... of and from any and all ... claims ... that the James Curran Parties ... ever had, now have or in the future may have or claim to have against the Tornetta Interests, for by reason of or arising out of any cause, matter, thing or event from the beginning of the world *to the Closing Date.*
(Settlement Agreement of April 20, 1994, App.Corp.Defs.' Mot.Summ.J. at A784-85

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                      Page 8
1996 WL 502280 (E.D.Pa.), RICO Bus.Disp.Guide 9190
(Cite as: 1996 WL 502280 (E.D.Pa.))

(emphasis supplied).)

### 3. Failure to Make Distributions

Plaintiffs assert that the Defendants engaged in a scheme to defraud Curran by depriving him of cash distributions to which he is entitled. (Third Am.Compl. at 25.) Specifically, Plaintiffs assert that Defendants have accomplished this fraud by "refusing to make the distributions from RAC and SER which are required pursuant to the contract requirements of the December 12, 1980 Shareholder Agreement." *Id.* at 25.

*9 Defendants point to much past litigation in their argument that this claim is barred. However, this court will discuss only the prior litigation that has the greatest preclusive effect. In *Related Party Litigation* Curran sued current Defendants Lawrence Tornetta, Robert Ryan, Terrence Ryan, Maria Curran Cantwell, Gloria Rich Curran, David Christ, John W. Rich, Jr., Brian Rich, RAC, and SER. Curran raised the claim of RAC's and SER's failure to pay dividends or inadequate dividends in his Memorandum in Support of the Petition for a Preliminary Injunction. (*Mem.Supp.Pet.Prelim.Inj.* at 55-57, *Related Party Litigation,* App.Corp.Defs.' Mot.Summ.J. at A720-22.) This action was dismissed with prejudice on October 28, 1994. (Praecipe to Dismiss of October 28, 1994, *Related Party Litigation,* App.Corp.Defs.' Mot.Summ.J. at A734.) Therefore, Plaintiffs are precluded from raising a claim for failure to pay dividends for any time prior to October 28, 1994. However, Plaintiffs allege that this failure to conform to the 1980 Shareholders Agreement continued to occur after this dismissal date. (*See* Ex. O, Third Am.Compl.) Therefore, a claim remains for the failure to pay dividends from October 28, 1994 to the present.

### 4. Related Party Transactions

Plaintiffs allege that RCG caused RAC and SER to purchase goods and/or services from related party companies, at prices in excess of their market values. (Third Am.Compl. ¶ 70.) These related party transactions concern the purchases of goods and services from Commonwealth Insurance Company, Gilberton Energy Corp., Jack Rich, Inc., Pottsville Fuel Co., Waste Management & Processors, Inc. ("W.M.P.I."), Gilberton Coal Co., Port Carbon Machine Works, JMB, Ltd., J & R Engineering, R & R Energy Corp., and Filter Media. *Id.* ¶ ¶ 175-235. In *Related Party Litigation,* Curran claimed that "[a]ffiliated party transactions in excess of $2,000,000 per year are taking place at RAC despite the fact that these transactions are not at arms length

nor deemed fair to RAC and SER." (Compl. ¶ 15, *Related Party Litigation,* App.Corp.Defs.' Mot.Summ.J. at A618.) All of the companies named in the instant case are named as related companies in *Related Party Litigation.* (Mem.Supp.Pet.Prelim.Inj. at 4-5, *Related Party Litigation,* App.Corp.Defs.' Mot.Summ.J. at A669-70.) Thus, all of the current claims could have been raised in *Related Party Litigation.* Because this action was dismissed with prejudice on October 28, 1994, any such claims arising before this date are barred. With the exception of Commonwealth Insurance Company, [FN8] Plaintiffs adequately allege that these related party transactions are ongoing. Therefore, a claim remains for transactions with all the named related parties, except Commonwealth Insurance Company, from October 28, 1994 to the present.

> FN8. Although Plaintiffs allege that there was an "ongoing scheme to cause RAC and SER to purchase insurance without issuing bids," the facts alleged to support the claim of improper related party transactions with Commonwealth Insurance Company occur before October of 1994. (Third Am.Compl. ¶ ¶ 175, 177.) Therefore, Plaintiffs may not use transactions with Commonwealth Insurance Company to establish their claim of improper related party transactions.

### 5. Reckless and Intentional Acts

Plaintiffs allege that RCG was involved in a "scheme to harm RAC and SER by engaging in a series of reckless and intentional acts." (Third Am.Compl. at 29.) Included here are: 1) the Blount matter; 2) the Anthracite Health and Welfare Fund; 3) fraudulent reports to RAC's auditors; 4) waste of corporate assets; 5) and the fraudulent payment of legal expenses. [FN9] (Third Am.Compl. at 29-30.)

> FN9. Also included in these alleged reckless acts is "the scheme to divert RAC Sales to W.M.P.I." (Third Am.Compl. at 30.) This claim is examined in the discussion below on the alleged usurpation of corporate opportunities.

#### a. The Blount Matter

*10 Plaintiffs contend that SER and RAC, under the control of RCG, conspired with others in August 1990 to cause Blount International, Ltd. ("Blount"), a general contractor in the construction of the SER cogeneration facility, to fail the required SER plant performance test. (Third Am.Compl. ¶ 241.) Plaintiffs further assert that "[w]hen Blount

Not Reported in F.Supp.                                                                          Page 9
1996 WL 502280 (E.D.Pa.), RICO Bus.Disp.Guide 9190
**(Cite as: 1996 WL 502280 (E.D.Pa.))**

discovered this conspiracy of RAC and SER ...,
[Blount] sued the companies and as a result thereof,
the companies made significant payment and
continued to make payments to Blount in excess of
$4,000,000 all to the detriment of RAC and SER." *Id.*
The Corporate Defendants argue that these claims are
precluded because similar claims were raised in
*Blount International, Ltd. v. Schuylkill Energy
Resources, Inc.,* Civ.A. No. 88-3886 (E.D.Pa.) and
*Schuylkill Energy Resources, Inc. v. Blount
International, Ltd,* Civ.A. No. 90-6980 (E.D.Pa.).
These cases were consolidated and finally dismissed
with prejudice on February 11, 1993 because a
settlement had been reached. As the captions to
these cases suggest, these actions concerned claims
between Blount and SER. [FN10] Therefore, the
parties are distinct from the ones in the instant case,
and these actions have no preclusive effect.

> FN10. The Bank of New England intervened
> in *Blount International, Ltd. v. Schuylkill
> Energy Resources, Inc.* Combustion
> Engineering, Inc., Federal Insurance
> Company and Hub, Inc. were also named as
> parties in *Schuylkill Energy Resources, Inc.
> v. Blount International, Ltd.*

Defendants further contend that the instant claims
could have been raised in *RICO II,* and cite
paragraphs 66-103 of the First Amended Complaint
in that action. However, the claims raised there
concern the financing of SER in such a way as to
impair SER's ability to repay RAC and to preclude
any benefit to minority stockholders of SER and
RAC. (First Am.Compl. ¶ ¶ 66-103, *RICO II,*
App.Corp.Defs.' Mot.Summ.J. at A47-54.) These
claims do not appear to arise from the same
underlying events as the Blount matter. Therefore,
this court finds that these claims could not have been
raised in *RICO II* and are not precluded by the
dismissal in that case.

### b. The Anthracite Health and Welfare Fund
Plaintiffs allege that RCG engaged several mining
companies to mine RAC's land, (Third Am.Compl. ¶
243), and that these companies along with RAC
failed to pay royalties to the Anthracite Health and
Welfare Fund as required by RAC's agreement with
the United Mine Workers of America. *Id.* ¶ 244.
As a result of a suit brought by the Anthracite Health
and Welfare Fund, RAC was ordered by the court to
pay the amount due plus interest. *Id.* ¶ 250.
Plaintiffs claim that
> [b]y allowing Swank, Split Vein and/or Norwood
> Mining to continue their operations through at least

1994, the Rich Control Group, acting in conspiracy
with J.M.B., participated in an ongoing scheme to
defraud the Health and Welfare fund, which
scheme exposed RAC to liability and a judgment
against it, thereby causing harm to RAC's business,
reputation and property.
(Third Am.Compl. ¶ 251.)

In *RICO II* Curran alleged that there was a "scheme
to defraud the Health and Welfare Fund." (First
Am.Compl. ¶ 190, *RICO II,* App.Corp.Defs.'
Mot.Summ.J. at A71.) This action was dismissed
with prejudice as to all Defendants except Tornetta
on March 5, 1993 (Order of March 5, 1993, *RICO II,*
App.Corp.Defs.' Mot.Summ.J. at A277-78), and an
action incorporating *RICO II* 's claims against
Tornetta, *Tornetta RICO Litigation,* was disposed of
in a general release dated April 20, 1994. (April 24,
1994 Settlement Agreement, App.Corp.Defs.'
Mot.Summ.J. at A783.) Therefore, any claims that
Tornetta defrauded the Anthracite Health and
Welfare Fund before April 20, 1994 are precluded.
Any claims that the other Defendants defrauded this
fund before March 5, 1993 are precluded as well.
However, Plaintiffs allege this activity continued to
occur after these dates. Thus, claims remain against
Tornetta for defrauding this fund from April 20, 1994
to the present and against the other Defendants for
such conduct from March 5, 1993 to the present.

### c. Fraudulent Reports to RAC's Auditors
Plaintiffs claim that in 1992 some of the Defendants
caused "fraudulent reports to be given to RAC's
independent auditors, Price Waterhouse." (Third
Am.Compl. ¶ 265.) In *Related Party Litigation,*
Curran raised claims of fraudulent reporting to Price
Waterhouse and asserted that "there were numerous
nondisclosed transactions that occurred in 1993 and
continue to the present." (Mem.Supp.Pet.Prelim.Inj.
at 38, *Related Party Litigation,* App.Corp.Defs.'
Mot.Summ.J. at A703.) As noted previously, this
action was dismissed with prejudice on October 28,
1994. Therefore, Plaintiffs' claim of fraudulent
reporting to Price Waterhouse is barred.

### d. Waste of Corporate Assets
*11 Plaintiffs claim that from 1992 and continuing to
the present, RCG, in conspiracy with W.M.P.I., has
caused RAC to convey the majority of its anthracite
waste material to W.M.P.I. at prices below market
value. (Third Am.Compl. ¶ ¶ 279-80.) These
claims have already been addressed in the discussion
of related party transactions.

Plaintiffs also contend that members of RCG have

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 10
1996 WL 502280 (E.D.Pa.), RICO Bus.Disp.Guide 9190
(Cite as: 1996 WL 502280 (E.D.Pa.))

engaged in other acts of waste, such as causing RAC and SER to purchase security services from J.M.B., in which some members of RCG are shareholders, directors, or officers. *Id.* ¶ 290. This too has been addressed in the discussion of related party transactions.

Plaintiffs further allege that W.M.P.I. does not pay RAC for drying its material in RAC's Silt Drying Facility despite the fact that this is costly to RAC. (Third Am.Compl ¶ ¶ 287-88.) Curran could have raised claims about the Silt Drying Facility in *Related Party Litigation.* Because this action was dismissed with prejudice on October 28, 1994, any claims for the use of RAC's Silt Drying Facility before this date are barred. Because Plaintiffs assert that this activity is ongoing, a claim remains for the use of RAC's Silt Drying Facility from October 28, 1994 to the present.

In their allegations about waste of corporate assets, Plaintiffs also claim that a lease between Split Vein and RAC was disadvantageous to RAC. *Id.* ¶ ¶ 299-300. Plaintiffs further allege that RCG members "have caused RAC's equipment to be inadequately maintained and serviced," and "have caused RAC's personnel to abandon sound mining plans and procedures at the risk of causing severe economic consequences and short falls of coal for RAC." *Id.* ¶ ¶ 302- 303. None of these claims appear to be precluded by dismissals in prior litigation.

e. Litigation Fund
Plaintiffs assert that RCG has engaged in "fraudulently diverting funds available for distribution into a 'litigation fund' directed against James Curran individually." (Third Am.Compl. at 51.) Plaintiffs assert that "Defendants have failed to make full and fair disclosures to James Curran regarding their indemnification by RAC and/or SER." (RICO Case Statement at 28.) Plaintiffs further assert that Tornetta and other members of RCG "concealed payments and reimbursements" to Tornetta from Curran and the directors of RAC and SER appointed by him. (Third Am.Compl. ¶ 306.)

Curran claimed that RCG members improperly paid litigation expenses in *Related Party Litigation.* (Mem.Supp.Pet.Prelim.Inj. at 50-51, *Related Party Litigation,* App.Corp.Defs.' Mot.Summ.J. at A715-16.) This court finds that claims about the formation of a litigation fund arise out of the same transaction or occurrence and thus could have been brought in *Related Party Litigation.* Therefore, claims relating to the formation of a litigation fund before the October 28, 1994 dismissal of this action are barred.

Because Plaintiffs contend that this activity is ongoing, this claim cannot be dismissed in its entirety. This court is unable to determine from the record before it whether concealment of payments to Tornetta are also barred because it is unclear when Plaintiffs became aware of such payments. Defendants have leave to challenge this claim on res judicata grounds at the Rule 50(a) stage.

6. Conversion of SSI Property
*12 Plaintiffs allege that Defendants "defraud[ed] SSI of its ownership rights by conspiring to convert materials owned by SSI through both removal and complete transfer of ownership of materials without SSI's permission or Fair Market Value payment." (Third Am.Compl. at 26.) Specifically, Plaintiffs refer to SSI's ownership of "various deposits of anthracite material," which

> includes, but is not limited to, deposits known as the "Golf Course Material" and other deposits that are the refuse resulting from the processing or preparation of material leased by SSI, or commingled therewith ... "Oak Hill Slush Bank No. 73", "Oak Hill Slush Bank No. 78", "Oak Hill Refuse Banks 235 and 235R", "Bear Valley Slush Bank No. 4", "Burnside Refuse Bank No. 11", "Alaska Culm Bank No. 16", "Excelsior Refuse Bank No. 22", "Keystone Refuse Bank No. 67", "Cambridge Refuse Bank 241", "North Franklin Slush Bank No. 2" and "Gilberton Refuse No. 121."

*Id.* ¶ 82. Plaintiffs allege that "[i]n furtherance of the scheme of the Rich Control Group to deny SSI of the full benefit [of] its ownership interests, the Rich Control Group and the entities controlled by that Group, prepare and submit to SSI false and misleading reports of tonnage of anthracite waste material removed from banks subject to a continuing SSI royalty obligation with the intent that SSI rely on such reports and be deceived thereby." *Id.* ¶ 83.

The Memorandum in Support of the Petition for a Preliminary Injunction in *Related Party Litigation* contains an allegation about the conversion of SSI materials: "A number of these [SSI owned culm and silt] banks are currently being used by RAC and Control Group Members' related parties without authorization from SSI." (Mem.Supp.Pet.Prelim.Inj. at 19, *Related Party Litigation,* App.Corp.Defs.' Mot.Summ.J. at A684.) Some of the items listed in the instant action are specifically mentioned: Oak Hill nos. 73, 78, 235, 235R, and Cambridge No. 241. (Mem.Supp.Pet.Prelim.Inj. at 16, *Related Party Litigation,* App.Corp.Defs.' Mot.Summ.J. at A681.) Plaintiffs are therefore barred from raising claims for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 11
1996 WL 502280 (E.D.Pa.), RICO Bus.Disp.Guide 9190
(Cite as: 1996 WL 502280 (E.D.Pa.))

conversion of the materials from these specific banks before the October 28, 1994 dismissal date of this prior action. Because Plaintiffs allege the conversion continues to the present, the claim cannot be dismissed completely. Also, because of the alleged concealment, it is not clear that the claims concerning the other banks could have been raised. Defendants may address this at the Rule 50(a) stage.

Plaintiffs also assert that SSI "owns royalty rights on various banks which were sold to RAC and GCC pursuant to separate February 2, 1983 agreements." (Third Am.Compl. ¶ 81.) Plaintiffs further assert that Defendants engaged in a scheme "to deprive SSI of royalty monies through conversion of SSI royalty monies by establishing a fraudulent 'escrow fund' set up by Defendants FS & C and Cerullo to Deprive SSI of Payments." *Id.* at 52. Specifically, Plaintiffs refer to the withholding of royalty payments due on a monthly basis from March 1993 to October 1994. Here Plaintiffs essentially repeat claims previously raised in *Related Party Litigation.* (Mem.Supp.Pet.Prelim.Inj. at 34, 57, *Related Party Litigation,* App.Corp.Defs.' Mot.Summ.J. at A699, A722.) Therefore, Plaintiffs' claims concerning the establishment of a fraudulent escrow fund and payment of SSI royalties are barred by the October 28, 1994 dismissal of *Related Party Litigation.*

7. Usurpation of Corporate Opportunities
*13 Plaintiffs allege that RCG has usurped corporate opportunities of RAC, SER, and SSI. These allegations involve Ri-Corp Development, Inc. ("Ri-Corp"), JMB Development, Inc., and W.M.P.I. Each will be discussed in turn.

a. Ri-Corp
Plaintiffs allege that John Rich, Sr. ("Rich, Sr.") caused Gilberton Power Company, a general partnership, to be formed for the purpose of "acquiring, constructing, installing and operating an electricity and steam cogeneration facility." (Third Am.Compl. ¶ 122.) Ri-Corp, a corporation owned by Rich, Sr., is a member of this partnership. Plaintiffs assert that Rich, Sr. had a fiduciary obligation to bring to the attention of RAC's and SSI's directors and shareholder the opportunity to participate in the ownership of GPC but failed to disclose the existence of this corporate opportunity. *Id.* ¶ 124. Plaintiffs contend that because Rich, Sr. was aware of his obligation to RAC and SSI, he disguised his ownership interest in Ri-Corp, a member of the GPC partnership. [FN11]

FN11. In their discussion of Ri-Corp,

Plaintiffs also repeat claims for the conversion of SSI material, which has already been discussed.

b. JMB Development, Inc.
Plaintiffs maintain that J.M.B. Development, Inc. is in direct competition with SER for the solicitation of private "end-users" of both steam and electricity. (Third Am.Compl. ¶ 149.) RCG allegedly has prevented SER from developing end-users and channels all opportunities to develop end-users to Gilberton Power Co. through JMB Development, Inc." *Id.* ¶ 152.

c. W.M.P.I.
Plaintiffs allege that since 1992 and continuing to the present, RCG members "without disclosure to the disinterested RAC directors and/or shareholders, have directed RAC's sales of its anthracite waste material to W.M.P.I.," an entity in which RCG members have an interest and which competes directly with RAC in the anthracite waste material market. (Third Am.Compl. ¶ ¶ 159, 166.) These sales have allegedly occurred at below market value and have prevented RAC from engaging in competition with W.M.P.I. by selling to other area cogeneration facilities. Additionally, Plaintiffs allege that RCG members have caused RAC to divert customers to W.M.P.I. and have caused RAC to forego contracts with area cogeneration facilities so that W.M.P.I. may have the benefit of these contracts. *Id.* ¶ 163.

In *Related Party Litigation* Plaintiffs raised general claims about the usurpation of RAC's and SER's corporate opportunities. (Mem.Supp.Pet.Prelim.Inj. at 44, *Related Party Litigation,* App.Corp.Defs.' Mot.Summ.J. at A709.) Plaintiffs claim that they became aware of the extent of John Rich, Sr.'s involvement in Ri-Corp during discovery for *Related Party Litigation* in 1994. (Pls.' Argument Br. at 22.) The Corporate Defendants provide evidence of a disclosure to this effect to Plaintiffs during a deposition on May 18, 1992. (Dep. John W. Rich, Sr., 5/18/92, Ex. B, Reply Br.Supp.Corp.Defs.' Mot.Summ.J.) Therefore, this claim could have been raised in *Related Party Litigation* and is now precluded by the dismissal with prejudice in that action.

*14 Additionally, Curran raised specific claims about diversion of RAC's customers to W.M.P.I. (Mem.Supp.Pet.Prelim.Inj. at 28, 58-63, *Related Party Litigation,* App.Corp.Defs.' Mot.Summ.J. at A693, A723-28.) All claims for usurpation of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 12
1996 WL 502280 (E.D.Pa.), RICO Bus.Disp.Guide 9190
(Cite as: 1996 WL 502280 (E.D.Pa.))

corporate opportunities were or could have been raised in this action. Therefore, Plaintiffs are barred from raising claims before the October 28, 1994 dismissal date. Because Plaintiffs allege an ongoing usurpation of corporate opportunities with respect to J.M.B. Development and W.M.P.I., a claim remains for the usurpation of these corporate opportunities from October 28, 1994 to the present.

B. THE PATTERN OF RACKETEERING

In order for Defendants to have violated § § 1962(a)-(c) of the RICO statute, they must have engaged in a pattern of racketeering activity or a collection of an unlawful debt. 18 U.S.C. § § 1962(a)-(c). Defendants contend that many of Defendants' acts alleged by Plaintiffs do not constitute the requisite racketeering activity. [FN12] Many of Defendants' alleged predicate acts, in and of themselves, are not included in the definition of racketeering activity listed in the RICO statute, [FN13] and are more properly considered breaches of fiduciary duty. Violating a fiduciary duty does not constitute racketeering activity under RICO. Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1409 (11th Cir.1994), cert. denied, 115 S.Ct. 900 (1995). However, the RICO statute does include mail and wire fraud as racketeering activity. 18 U.S.C. § 1961(1). Plaintiffs generally allege that these various breaches of fiduciary duty involved schemes to defraud and the use of the mails or wires. To the extent that these breaches of fiduciary duty fulfill the requirements of mail and wire fraud, this court will consider them predicate acts. See United States v. Waymer, 55 F.3d. 564, 571 (11th Cir.1995) ("A defendant's breach of a fiduciary duty may be a predicate for a violation of the mail fraud statute where the breach entails the violation of a duty to disclose material information."), cert. denied, 116 S.Ct. 1350 (1996); McLendon v. Continental Group, Inc., 602 F.Supp. 1492, 1508 (D.N.J.1985) (stating that the mail fraud statute "has been used to address various types of business-related fraud, most of which involve some sort of breach of fiduciary duty").

FN12. The Corporate Defendants argue that the following do not constitute racketeering activity: (1) conversion of SSI property; (2) failure to distribute available SER monies; (3) concealing monies allegedly owed to Curran by SER through the creation of phantom expenses; (4) the related party transactions; and (5) usurpation of corporate opportunities. (Corp.Defs.' Br.Supp.Mot.Strike Third Am.Compl &

Opp'n Pls.' Br.Supp.Third Am.Compl. at 18, 23, 25, 28; Reply Argument Br. at 10, 12, 16.)

Tornetta contends that "Tornetta's acts alleged by Curran, Jr., including his director's votes at RAC and SER and the settlement he reached with Curran, Jr. in the Tornetta RICO Litigation, could not be deemed predicate acts for purposes of liability under RICO." (Letter from Tornetta to the Court of May 9, 1996, at 3.) As to the Defendants' alleged acts of mail and wire fraud, Tornetta alleges that Plaintiffs rely on "the innocent acts of mailing implemented in connection with the Rich Control Group's alleged Schemes to defraud" Curran, including decisions of the Board of Directors. Id. Tornetta asserts that Plaintiffs have "completely failed to allege any fraud or misrepresentation with respect to Tornetta" and that absent the element of deceit there can be no mail or wire fraud. Id. at 4.

FN13. A predicate act or racketeering activity is defined in the RICO statute at 18 U.S.C. § 1961(1).

The federal mail fraud statute, 18 U.S.C. § 1341, and the federal wire fraud statute, 18 U.S.C. § 1343, contain the following essential elements: (1) a scheme to defraud; [FN14] and (2) the use of the mails or wires for the purpose of executing the scheme. 18 U.S.C. § § 1341, 1343; see also United States v. Frey, 42 F.3d 795, 797 (3d Cir.1994) (stating that these are the essential elements of the mail fraud statute) (citations omitted), cert. denied, 450 U.S. 998 (1981). The mail fraud statute is to be interpreted broadly. McLendon, 602 F.Supp. at 1508. Because Plaintiffs rely primarily on allegations of mail fraud, this court will focus on the elements of mail fraud.

FN14. With respect to the scheme element, the mail and wire fraud statutes have been identically construed. United States v. Siegel, 717 F.2d 9, 14 (2d Cir.1993).

*15 "The courts have liberally construed the phrase 'scheme to defraud' to include 'any plan, consummated by the use of the mails, in which artifice or deceit is employed to obtain something of value with the intention of depriving the owner of his property.' " Waldo v. North Am. Van Lines, Inc., 669 F.Supp. 722, 735-36 (W.D.Pa.1987) (citation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 13
1996 WL 502280 (E.D.Pa.), RICO Bus.Disp.Guide 9190
**(Cite as: 1996 WL 502280 (E.D.Pa.))**

omitted). A scheme to defraud "has a wider meaning than an individual act of fraud." *United States v. Massey*, 48 F.3d 1560, 1566 (10th Cir.), *cert. denied*, 115 S.Ct. 2628 (1995). Such a scheme "refers to the overall design to defraud one or many by means of a common plan or technique." *Id.* The mail and wire fraud statutes are not limited by common law concepts of fraud. *McLendon*, 602 F.Supp. at 1508. For example, "the RICO predicate acts of mail and wire fraud do not require actual reliance." *Prudential Ins. Co. of America v. United States Gypsum Co.*, 828 F.Supp. 287, 295 (D.N.J.1993). The Third Circuit Court of Appeals has defined this requisite deceit as follows:

> Under the mail fraud statute, a scheme or artifice to defraud 'need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension.' The scheme need not involve affirmative misrepresentation, but the statutory term 'defraud' usually signifies 'the deprivation of something of value by trick, deceit, chicane or overreaching.' "

*Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir.), (citations omitted), *cert. denied*, 501 U.S. 1222 (1991). Thus, in order to be a scheme under the mail fraud statute there must at least be the elements of deceit and deprivation or attempt to deprive. *See Pelletier v. Zweifel*, 921 F.2d 1465, 1500 (11th Cir.) ("Under the mail and wire fraud statutes, a plaintiff only can show a scheme to defraud if he proves that some type of deceptive conduct occurred."), *cert. denied*, 112 S.Ct. 167 (1991); *United States v. Bronston*, 658 F.2d 920, 927 (2d Cir.1981) (stating that although it is not necessary to show that a mail fraud scheme's victims were in fact defrauded, some actual harm or injury must at least have been contemplated), *cert. denied*, 456 U.S. (1982).

Concerning the element of "the use of the mails," the Third Circuit Court of Appeals has held that the mailing need not be essential to the scheme to defraud, it need only further such a scheme. *United States v. Adamo*, 534 F.2d 31, 36 (3d Cir.1976). Innocent mailing containing no false information may supply the mailing element, and it is not necessary that the mailings be made by the defendant to an alleged victim of the fraud. *Schmuck v. United States*, 489 U.S. 705, 715 (1989).

Thus the critical question here is whether the alleged schemes challenged by the Corporate Defendants and Tornetta have the requisite characteristics of deceit

and deprivation and whether the mails or wires were used to further these schemes. If so, this court will consider them predicate acts.

### 1. Failure to Distribute Available SER & RAC Monies

**\*16** As noted previously, Plaintiffs allege that Defendants engaged in a scheme to defraud Curran by depriving him of cash distributions to which he is entitled. (Third Am.Compl. at 25.) Specifically, Plaintiffs assert that Defendants have accomplished this fraud by "refusing to make the distributions from RAC and SER which are required pursuant to the contract requirements of the December 12, 1980 Shareholder Agreement." *Id.*

If Plaintiffs' allegations were limited to Defendants' failure to fulfill their contractual obligations to make distributions, they would not rise to the level of a scheme to defraud because the element of deceit is missing. *See United States v. D'Amato*, 39 F.3d 1249, 1261 n. 8 (2d Cir.1994) ("A breach of contract does not amount to mail fraud.") Therefore, the "scheme" to defraud Curran by failing to make distributions from SER pursuant to the 1980 Shareholders Agreement does not constitute a predicate act. However, as to distributions from RAC, Plaintiffs allege that this scheme includes the making of misrepresentations to Meridian Bank. Specifically, Plaintiffs contend that RCG sought to evade paying distributions to Curran pursuant to the 1980 Shareholders Agreement by entering into a loan agreement ("the Loan Agreement") with Meridian Bank and that this Loan Agreement contains covenants that preclude these distributions. Plaintiffs' allegation that RCG conspired to defraud Curran by manipulating the Meridian Bank to make loans to RAC without disclosing the existence of the 1980 Shareholder Agreement contains the elements of deceit and deprivation necessary to a mail fraud claim. Although the alleged misrepresentation was made to Meridian Bank rather than to Curran, this is not fatal to Curran's pleading of a scheme under the mail fraud statute. *United States v. Pepper*, 51 F.3d 469, 473 (5th Cir.1995) (stating that under the mail fraud statute there is no "requirement that direct misrepresentations must be made to the victims of the scheme"); *United States v. Kennedy*, 64 F.3d 1465, 1476 (10th Cir.) (stating that under the mail fraud statute it is not necessary to provide evidence of actual misrepresentations to individual victims to establish existence of the alleged fraudulent scheme), *cert. denied*, 349 U.S. 932 (1995). *But see, Central Distributors of Beer, Inc. v. Conn*, 5 F.3d 181, 184 (6th Cir.1993) (stating that "the fraud connected with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Page 14
1996 WL 502280 (E.D.Pa.), RICO Bus.Disp.Guide 9190
(Cite as: 1996 WL 502280 (E.D.Pa.))

mail or wire fraud must involve misrepresentations or omissions flowing from the defendant to the plaintiff"), *cert. denied,* 114 S.Ct. 2678 (1994).

Concerning the second element of the mail fraud statute, Plaintiffs allege that RCG caused a letter to be sent to Meridian Bank;  this letter "advised the Bank that RAC had the full corporate authority to enter into the transaction and failed to disclose to the Bank the existence of the 1980 Shareholders Agreement and 1992 Settlement Agreement." (Third Am.Compl. ¶ 65.)    As a result of this alleged misrepresentation, the Meridian Bank's Loan Agreement, which conflicts with the terms of the 1980 Stockholders Agreement, "abrogates" Curran's contract rights. *Id.* ¶ 67.   These allegations satisfy the mailing element.   Therefore, the purported RCG scheme to defraud Curran by failing to make distributions from RAC pursuant to the 1980 Shareholders Agreement constitutes a predicate act of mail fraud.

2. Related Party Transactions
*17 As noted previously, Plaintiffs allege that RCG caused RAC and SER to purchase goods and/or services from related party companies, at prices in excess of the market values.  (Third Am.Compl. ¶ 70.)   These transactions with related parties were allegedly conducted "without the knowledge and/or approval of the disinterested directors and/or shareholders of RAC and SER." (Third Am.Compl. ¶ 235.)   "Although mere breach of fiduciary duty, standing alone, may not necessarily constitute a mail fraud, the concealment by a fiduciary of material information which he is under a duty to disclose to another under circumstances where the non-disclosure could or does result in harm to the other is a violation of the [mail fraud] statute." *United States v. Bronston,* 658 F.2d 920, 926 (2d Cir.1981) (citations omitted), *cert. denied,* 456 U.S. 915 (1982).   Pursuant to § 1728 of the Business Corporation Law of 1988, the material facts concerning transactions or contracts between a business corporation and one or more of its directors or officers or between a business corporation and an entity in which one or more of its directors or officers has an interest must be disclosed to the board of directors or the shareholders.   15 Pa.Cons.Stat.Ann. § 1728. [FN15]    Therefore, Plaintiffs have alleged concealment of facts where there was a duty to disclose and have therefore adequately alleged deceit.

FN15. Pursuant to 15 Pa.Cons.Stat.Ann. § 1728, these material facts need not be disclosed to the board or the shareholders if

"the contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified by the board of directors or shareholders." 15 Pa.Cons.Stat.Ann. § 1728(a)(3).    However, even this condition presumes disclosure of some kind to the board or the shareholders to enable them to authorize, approve or ratify the contract or transaction.

The Corporate Defendants contend that there was no deprivation of property resulting from these related party transactions. (Corp.Defs.' Br.Supp.Mot. Strike at 25.)    Plaintiffs allege, however, that these transactions "have caused RAC and SER substantial [ ] injury, reducing the amount of money in the companies and [money] available for distributions." (Third Am.Compl. ¶ 72.) Although for purposes of the mail fraud statute, "[p]roof of actual loss by the intended victim is not necessary," *United States v. Copple,* 24 F.3d 535, 544 (3d Cir.1994) (citations omitted), *cert. denied,* 115 S.Ct. 488 (1994), "the statutory term 'defraud' usually signifies 'the deprivation of something of value by trick, deceit, chicane or overreaching.' " *Kehr Packages,* 926 F.2d at 1415.   Although it is not necessary to show that a mail fraud scheme's victims were in fact defrauded, some actual harm or injury must at least have been contemplated. *Bronston,* 658 F.2d at 927.    Here, Plaintiffs have alleged that RAC and SER lost money on the purchase of goods and services with inflated prices.   Therefore, Plaintiffs have adequately alleged the deceit and deprivations elements of the mail fraud statute.

Plaintiffs allege that these related party transactions have involved "the repeated use of the United States mails or telephone calls in interstate commerce." (Third Am.Compl. ¶ 179; *see also id.* ¶¶ 183-84, 190-91, 202, 210-11, 217, 221, 228, 223-33.) Additionally, Plaintiffs assert that these mailings include purchase orders, sales request, payments, account statements, and that the telephone calls include calls between RAC Sales and/or Purchasing Department and the related parties.   (RICO Case Statement at 23.) Additionally, Plaintiffs assert that the use of the mails and wires occurred from 1992 to the present. *Id.*   Because of the aforementioned preclusive effect of the dismissal in *Related Party Litigation,* this court will consider only mailings or telephone calls occurring after October 28, 1994. Plaintiffs have not presented the court with specific evidence of such mailings.   However, this court's order of November 27, 1995 stayed discovery. Therefore, at this stage in the proceedings this court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.