# EXHIBIT C

LEXSEE 1999 U.S. DIST LEXIS 2849

HEMISPHERX BIOPHARMA, INC., Plaintiff v. MANUEL P. ASENSIO and ASENSIO & CO. INC., et al., Defendants

CIVIL ACTION NO. 98-5204

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1999 U.S. Dist. LEXIS 2849; Fed. Sec. L. Rep. (CCH) P90,446

March 12, 1999, Decided
March 15, 1999, Filed

**DISPOSITION:** [*1] CIBC Wood Gundy Securities, Inc.'s Motion to Dismiss GRANTED, and Defendant dismissed from the case. Fort Hill Group, Inc.'s Motion to Dismiss GRANTED, Counts I and III dismissed and Count II remains; Manuel P. Asensio and Asensio & Co., Inc.'s Motion GRANTED with respect to Counts I, III, and VIII of the Amended Complaint, and DENIED with respect to Count VII; Counts II, V, VI and VII remain.

**LexisNexis(R) Headnotes**

**COUNSEL:** For HEMISPHERX BIOPHARMA, INC., PLAINTIFF: KIMBERLY A. HENDRIX, DAVID C. FRANCESKI, JR., MICHAEL D. O'MARA, STRADLEY, RONON, STEVENS & YOUNG, LLP, PHILA, PA USA.

For MANUEL P. ASENSIO, ASENSIO & COMPANY, INC., DEFENDANTS: LAWRENCE G. MC MICHAEL, DILWORTH, PAXSON, LLP, PHILADELPHIA, PA USA.

For FORT HILL PARTNERS, DEFENDANT: JEFFREY S. FELDMAN, ABRAHAMS, LOEWENSTEIN, BUSHMAN & KAUFFMAN, PC, PHILA, PA USA.

For SHARPE CAPITAL, INC., DEFENDANT: BERNARD E. JUDE QUINN, GERMAN, GALLAGHER & MURTAGH, PHILA, PA USA. THOMAS A. RIGILANO, SINGER, FRUMENTO, LLP, NEW YORK, NY USA.

For FORT HILL GROUP, INC, DEFENDANT: RALPH J. KELLY, ABRAHAMS, LOEWENSTEIN, BUSHMAN & KAUFFMAN, PC, PHILA, PA USA.

For CIBC WOOD GUNDY SECURITIES, INC., DEFENDANT: MARC J. SONNENFELD, KAREN ANNE POHLMANN, [*2] MORGAN, LEWIS & BOCKIUS LLP, PHILADELPHIA, PA USA.

**JUDGES:** John R. Padova, J.

**OPINIONBY:** JOHN R. PADOVA

**OPINION:**

MEMORANDUM

Padova, J.

March 12, 1999

Plaintiff, Hemispherx Biopharma, Inc. ("HBI"), is in the process of developing and testing a new drug, AMPLIGEN, which may be useful in the treatment of immune system diseases, notably, chronic fatigue syndrome ("CFS"). Plaintiff accuses Defendants of disseminating false information about the drug and the company and of engaging in illegal short selling of Plaintiff's stock, which allegedly resulted in great economic harm to HBI. Four Defendants have filed three Motions to Dismiss. For reasons stated below, two of the Motions will be granted, and one will be granted in part and denied in part.

**I. BACKGROUND**

In its Amended Complaint, Plaintiff alleges the following: Dr. William A. Carter, Chairman and CEO of HBI, co-invented an anti-viral compound known as AMPLIGEN in 1972. Since then, Dr. Carter has refined, tested, and promoted AMPLIGEN. (Amend. Compl. P 5.) In 1980, Dr. Carter re-organized HBI for the purpose of testing and promoting AMPLIGEN in the treatment of a number of medical diseases, including CFS. AMPLIGEN has undergone years [*3] of testing, evaluation, and regulatory review by the Food and Drug Administration ("FDA"), including clinical trials with humans. It has been the subject of hundreds of peer-

Case 1:05-cv-00165-JJF   Document 50-4   Filed 08/16/2005   Page 3 of 13

Page 2
1999 U.S. Dist. LEXIS 2849, *3; Fed. Sec. L. Rep. (CCH) P90,446

reviewed articles by physicians and research professionals throughout the world, and has received research funding of over $10,000,000 from the National Institutes of Health (Id. PP 16-18.) Since 1980, HBI has spent more than $150,000,000 on the development of AMPLIGEN, and in October, 1995, HBI participated in its first public offering. It has continued to raise capital through subsequent public and private offerings. Currently, HBI has over 41,000,000 shares on a fully diluted basis and is traded on the American Stock Exchange. (Id. P 19.) AMPLIGEN has completed Phase II human testing on more than 200 CFS patients. As result, it has received Investigative New Drug status from the FDA and has been approved for Phase III clinical trials. AMPLIGEN is the only drug compound in advanced testing for the treatment of CFS. (Id. PP 20-21.) It has shown no clinically significant side effects and has produced evidence of improvement in the vast majority of those tested. (Id. P 22.) As a result of its testing [*4] success, AMPLIGEN has created considerable investor interest in HBI. Between July, 1998 and early September, 1998, the price of HBI's publicly traded securities rose to a high in excess of $13.00 per share. (Id. P 23.)

In mid September, HBI allegedly became the target of a short-selling conspiracy to manipulate and depress the price of its common stock. (Id. P 24.) In mid-September, 1998, Defendants Manual P. Asensio and Asensio & Company, Inc. (the "Asensio Defendants") allegedly produced and disseminated a wholly inaccurate "research" report regarding HBI which included a "strong sell" recommendation and contained numerous material misrepresentations, omissions of fact, and "blatant lies" about HBI, AMPLIGEN, and Dr. Carter. (Id. PP 24, 27, 28.) The Asensio Defendants also allegedly disseminated similar comments to Business Week Magazine, and they were published in the September 28, 1998 issue, which was distributed on the Internet on September 17, 1998. (Id. P 25.) As a direct result, Plaintiff alleges, the price of HBI stock plummeted in late September from 13 3/8 to 4 7/8 in a matter of days. (Id. P 24.) Before, and in anticipation of, the dissemination [*5] of their fraudulent report, the Asensio Defendants allegedly engaged in heavy, illegal short selling of HBI's common stock, to their substantial profit and the substantial detriment of HBI. n1 The alleged illegal practices included selling on the "down tick," and selling short "naked" at a time when Defendants neither owned, nor had any reason to believe they could borrow, sufficient shares to make delivery on their short sales. n2 (Id. P 26.) The Asensio Defendants allegedly continue to disseminate false and misleading information in an ongoing effort to discredit HBI and ruin it financially. (Id. P 32, 33.) They and the other Defendants allegedly traded and continue to trade illegally in Plaintiff's stock, manipulating the price to their advantage and to Plaintiff's detriment. As a direct result of the alleged illegal short selling scheme, by late September, 1998, HBI's market capitalization had declined by more than $300,000,000 on a fully diluted basis. (Id. P 31.)

n1 "Short selling" takes place when a speculator sells stock he does not own, in anticipation of a fall in the price prior to his covering purchase of those shares. See *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 1997 U.S. Dist. LEXIS 8808, No. 92 CIV. 6879(CSH), *1997 WL 299430*, at *1 n.1 (S.D.N.Y. June 4, 1997).

[*6]

n2 Rule 10a-1(a), promulgated pursuant section 10(a) of the Securities Exchange Act, is sometimes called the "down-tick" rule. It provides:

> No person shall, for his own account or for the account of any other person, effect on a national securities exchange a short sale of any security (1) below the price at which the last sale thereof, regular way, was effected on such exchange, or (2) at such price unless such price is above the next preceding different price at which a sale of such security, regular way, was effected on such exchange . . . .

*United States v. Peltz*, 433 F.2d 48, 54 (2d cir. 1970). Selling on the "down-tick" is therefore selling in violation of this rule.

Someone sells a "naked option" when he owns none of the stock with which to honor the commitments. A "naked option" is one created without backing by either futures contracts or actual ownership of what is sold. The seller speculates that the cost per share of the stock will fall below the option price. *Kelley v. Carr*, 442 F. Supp. 346, 349 (W.D. Mich., 1977); *Peterson v. Hazen*, 37 B.R. 329, 330 (M.D. Fla. 1983).

[*7]

HBI initiated this action against the Asensio Defendants and other Defendants who allegedly joined in their scheme. Its Amended Complaint alleges these claims against the following remaining Defendants : n3 violations of Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C.A. § 1964* (West 1984 & Supp. 1988)

Case 1:05-cv-00165-JJF   Document 50-4   Filed 08/16/2005   Page 4 of 13

Page 3

1999 U.S. Dist. LEXIS 2849, *7; Fed. Sec. L. Rep. (CCH) P90,446

("RICO") against the Asensio Defendants, Defendant Fort Hill Group, Inc. ("Fort Hill"), and unidentified John Doe Defendants 1-20 ("John Does") who were employees of the corporate Defendants (Count I); violations of section 10(a) of the Securities Exchange Act of 1934, ("section 10(a)"), *15 U.S.C.A. § 78j*(a)(West 1997), and Rule 10a-1 promulgated thereunder, 17 C.F.R. § 240.10a.1 against all Defendants (Count II); common law fraud against the Asensio Defendants, Fort Hill, and the John Doe Defendants (Count III); common law fraud against CIBC Wood Gundy Securities, Inc. ("Wood Gundy") and Sharpe Capital, Inc. ("Sharpe") (Count IV); intentional interference with existing and prospective business relations against the Asensio Defendants (Count V); defamation against the Asensio Defendants (Count VI); trade disparagement against the Asensio Defendants (Count VII); negligence [*8] against the Asensio Defendants (Count VIII); and negligence against Wood Gundy and Sharpe (Count IX).

> n3 Defendants who have been voluntarily dismissed and one against whom a default has been entered are not included here.

There are three Motions to Dismiss. n4 The first, from the Asensio Defendants, seeks dismissal of Counts I (RICO), III (common law fraud), VII (disparagement) and VIII (negligence). The second, from Fort Hill, seeks dismissal of Count I (RICO) and III (common law fraud). The third Motion, from Wood Gundy, seeks dismissal of all counts against it : Count II (section 10(a)), Count IV (common law fraud) and Count IX (negligence). Because of the great overlap in the Counts and the Motions, the three Motions will be considered together herein.

> n4 Defendant Sharpe has filed an Answer to the Amended Complaint, and the John Does have not responded.

[*9]

## II. LEGAL STANDARD

A claim may be dismissed under *Fed. R. Civ. P. 12(b)(6)* only if the plaintiff can prove no set of facts in support of the claim that would entitle him to relief. *ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994)*. The reviewing court must consider only those facts alleged in the complaint and accept all of the allegations as true. Id.; see also *Rocks v. Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989)* (holding that in deciding a motion to dismiss for failure to state a claim, the court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the nonmoving party"). The issue is not whether the plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claim. *Lake v. Arnold, 112 F.3d 682 (3d Cir. 1997)* (citing *Scheuer v. Rhodes, 416 U.S. 232, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974))*.

## III. DISCUSSION

### A. Count I - Civil Rico

HBI has alleged that the Asensio Defendants, along with Fort Hill and the John Does, engaged in a pattern of racketeering in violation of *18 U.S.C.A. §* [*10] *1962* by using mail and wire fraud to further their scheme of manipulation and illegal short selling of HBI's common stock. n5

> n5 The Amended Complaint alleges that those Defendants committed the fraud by
>
>> (a) knowingly and willfully transmitting or causing to be transmitted, through the interstate mails, communications in furtherance of the aforementioned fraudulent scheme or artifice to defraud HBI of money or property, accomplished through the making of false statements, in violation of *18 U.S.C. § 1341*; and
>>
>> (b) knowingly and willfully transmitting sounds and other information by wire communications in interstate commerce in furtherance of the aforementioned fraudulent scheme or artifice to defraud HBI of money or property, accomplished through the making of false statements, in violation of *18 U.S.C. § 1343*.
>
> (Amend. Compl. P 38(a), (b).)

The Asensio Defendants and Fort Hill argue that HBI is precluded from maintaining the RICO claim because of the 1995 Private Securities Litigation Reform [*11] Act ("Reform Act") by which Congress amended RICO. It provides:

> Any person injured in his business or property by reason of a violation of Section 1962 of this chapter may sue therefor . . . except that no person may rely upon any conduct

Case 1:05-cv-00165-JJF    Document 50-4    Filed 08/16/2005    Page 5 of 13

Page 4
1999 U.S. Dist. LEXIS 2849, *11; Fed. Sec. L. Rep. (CCH) P90,446

that would have been actionable as fraud in the purchase or sale of securities to establish a violation of Section 1962.

*18 U.S.C.A. § 1964*(c).

In a recent case, *ABF Capital Management v. Askin Capital Management, L.P., 957 F. Supp. 1308 (S.D.N.Y. 1997)*, the court stated that, in amending the RICO statute, "Congress made clear its intent to prevent invocation of RICO in ordinary [securities] fraud cases, which were beyond the original purposes of the law." *Id. at 1319*. ABF Capital Management goes on to quote from the legislative history of the Reform Act, in which the Senate Committee stated:

> The Committee amends Section 1964(c) of Title 18 of the U.S. Code to remove any conduct that would have been actionable as fraud in the purchase or sale of securities as a predicate act of racketeering under civil RICO. The Committee intends this amendment to eliminate securities fraud as a predicate act of racketeering [*12] in a civil RICO action. In addition, a plaintiff may not plead other specified offenses, such as mail or wire fraud, as predicate acts of racketeering under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.

Id. (quoting S. Rep. No. 98, 104th Cong., 1st Sess. (June 19, 1995)).

HBI argues in response that the Court should dismiss its RICO claim only upon a finding that it has an "actionable" securities claim. Its position depends on its interpretation of language contained in the Reform Act : "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of Section 1962." *18 U.S.C.A. § 1964*(c). Plaintiff takes this to mean that no person may rely on conduct that would have been actionable by that person as fraud in the purchase or sale of securities. Therefore, Plaintiff argues, it is precluded from asserting a RICO claim only if this Court finds that it has a cause of action under the Securities Exchange Act.

HBI acknowledges that its claims under RICO and the Securities Exchange Act cannot both go forward and states that it has pleaded [*13] them in the alternative. See *Triple Crown America, Inc. v. Biosynth AG, 1997 U.S. Dist. LEXIS 14740, No. CIV.A. 96-7476, 1997 WL 611621, at 8 (E.D. Pa. Sept. 17, 1997)* (stating that "a plaintiff may plead multiple or alternative claims regardless of consistency in the statement of facts or legal theory asserted."). Plaintiff accepts that, if this Court finds that it has a cause of action under the Securities Exchange Act, it will have no cause of action under RICO; however, if the Court finds it has no actionable claim of securities fraud under the Securities Exchange Act, Plaintiff argues that the language of the Reform Act allows it to go forward with its RICO claim.

Defendants contend that the plain language of the Reform Act lends itself to only one interpretation. When construing a statute, the Court begins with the plain language of the statute, which controls unless literal application of the statute produces a result which is irreconcilable with the purpose of the statute. See *United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 242, 109 S. Ct. 1026, 1031, 103 L. Ed. 2d 290 (1989)*. Defendants' position is that when Congress stated that "no person" could bring a civil RICO action alleging [*14] conduct that would have been actionable as securities fraud, it meant just that. It did not mean "no person except one who has no other actionable securities fraud claim." It did not specify that the conduct had to be actionable as securities fraud by a particular person to serve as a bar to a RICO claim by that same person.

The Court finds nothing in the language of the Reform Act to suggest that an exception will be made to the bar against securities fraud actions under RICO if a particular plaintiff cannot bring an action under the Securities Exchange Act, when others could bring an action on the basis of the same alleged conduct of the defendant. In addition, the legislative history of the Reform Act, as quoted in ABF Capital Management, suggests that the purpose of the Reform Act was to limit the uses to which RICO could be put in general terms rather than as to particular plaintiffs. The Senate Committee Report stated, "The Committee intends this amendment to eliminate securities fraud as a predicate act of racketeering in a civil RICO action." *ABF Capital Management, 957 F. Supp. at 1319* (quoting S. Rep. No. 98, 104th Cong., 1st Sess. (June 19, 1995)).

Plaintiff [*15] cites *District 65 Retirement Trust v. Prudential Securities, Inc., 925 F. Supp. 1551 (N.D. Ga. 1996)*, for the statement (for which the case provides no source) that the purpose of the Reform Act was "to prevent duplicative recovery for injuries arising out of securities fraud." *Id. at 1567*. Plaintiff's position seems to be that the Court can dismiss its RICO claim only if it determines that Plaintiff's claim will be duplicative. Even if one purpose of the Reform Act was to prevent duplicative recovery, it does not follow that Congress intended to allow use of RICO in securities fraud cases wherever there was not duplicative recovery. The legislative history

Case 1:05-cv-00165-JJF    Document 50-4    Filed 08/16/2005    Page 6 of 13

Page 5
1999 U.S. Dist. LEXIS 2849, *15; Fed. Sec. L. Rep. (CCH) P90,446

indicates that Congress intended that RICO, which provides treble damages and attorney's fees, not be used for securities fraud claims at all because there were, generally speaking, other statutes that more appropriately provided for recovery in such cases. The United States Court of Appeals for the Third Circuit ("Third Circuit") states, "It is clear from the legislative history that the intention behind the RICO Amendment was 'to address a significant number of frivolous actions based on alleged securities law violations,'" [*16] and that the focus was clearly "on completely eliminating the so-called 'treble damages blunderbuss of RICO in securities fraud cases.'" *Mathews v. Kidder, Peabody & Co., 161 F.3d 156, 164 (3d Cir. 1998)* (quoting 141 Cong. Rec. H2771 (daily ed. Mar. 7, 1995) (statement of Rep. Cox)).

The Court concludes that Defendants' interpretation of *18 U.S.C.A. § 1964*(c) is correct as a matter of law and that the Reform Act bars Plaintiff's claim under RICO. Whether Plaintiff has a cause of action under the Securities Exchange Act will be considered next.

### B. Count II – Section 10(a) of the Securities Exchange Act

Plaintiffs typically bring private actions for securities fraud under section 10(b) of the Securities Exchange Act, *15 U.S.C.A. § 78j*(b) (West 1997), and Rule 10b-5 promulgated thereunder, *17 C.F.R. § 240.10b-5*. n6 Federal courts have found an implied private right of action under section 10(b), but Plaintiff states that it cannot bring an action under that section because the right of action is limited to investors, and Plaintiff has neither bought nor sold securities in connection with Defendants' alleged illegal scheme. Plaintiff therefore seeks to sue under section [*17] 10(a), a section for which no private right of action has been recognized by any court.

> n6 Section 10(b) provides that it shall be unlawful for any person:
>
> > (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
>
> *15 U.S.C.A. § 78j*(b).

Plaintiff alleges that all of the Defendants violated section 10(a) of the Act, *15 U.S.C.A. § 78j*(a) (West 1997), and Rule 10a-1 promulgated thereunder, *17 C.F.R. § 240.10a-1*. Section 10(a) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange —
>
> (a) To effect a short sale, or to use [*18] or employ any stop-loss order in connection with the purchase or sale, of any security registered on a national securities exchange, in contravention of such rule and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

*15 U.S.C.A. § 78j*(a).

Defendant Wood Gundy moves to dismiss Count II, arguing that there is no private right of action under section 10(a). n7 It is undisputed that section 10(a) does not expressly confer a private right of action for parties such as HBI. The issue is whether the section implies a private right of action. No court has concluded that there is such a private right of action, and the one court that considered the question decided that there was none. *Advanced Magnetics, Inc. v. Bayfront Partners, Inc., 1997 U.S. Dist. LEXIS 8808,* No. 92 CIV. 6879(CSH), *1997 WL 299430,* at *6 (S.D.N.Y. June 4, 1997). The question of whether there is an implied private right of action in section 10(a) is one of statutory construction. *Cannon v. Univ. of Chicago, 441 U.S. 677, 688, 99 S. Ct. 1946, 1953, 60 L. Ed. 2d 560 (1979).* "What must ultimately be determined is whether Congress intended to create the [*19] private remedy asserted," *Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 15-16, 100 S. Ct. 242, 245, 62 L. Ed. 2d 146 (1970),* "not . . . whether this Court thinks that it can improve upon the statutory scheme that Congress enacted into law." *Touche Ross & Co. v. Redington, 442 U.S. 560, 578, 99 S. Ct. 2479, 2490, 61 L. Ed. 2d 82 (1979).* As the Supreme Court has stated, "the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Id., 442 U.S. at 568, 99 S. Ct. at 2485 (1979)* (quoting *Cannon, 441 U.S. at 688, 99 S. Ct. at 1953*) (internal quotations and citation omitted).

> n7 Plaintiff alleged a cause of action under section 10(a) against all Defendants in Count II, but only Wood Gundy moved to dismiss that Count.

Case 1:05-cv-00165-JJF    Document 50-4    Filed 08/16/2005    Page 7 of 13

1999 U.S. Dist. LEXIS 2849, *19; Fed. Sec. L. Rep. (CCH) P90,446

Page 6

The text of the statute itself does not suggest a private right of action. The Supreme Court has stated that "when Congress wished to provide a private damages remedy, it knew [*20] how to do so and did so expressly." *Advanced Magnetics, 1997 WL 299430,* at *4 (quoting *Touche Ross, 442 U.S. at 572, 99 S. Ct. at 2487).* Congress did provide such private remedies under other sections of the Securities Exchange Act, such as sections 6, 16(b), and 18. Given such provisions elsewhere in the statute, the absence of a provision for a private right of action in section 10(a) "strongly suggests" that Congress did not intend there to be one. *Transamerica Mortgage Advisors, 444 U.S. at 20, 100 S. Ct. at 247;* see also *Scientex Corp. v. Kay, 689 F.2d 879, 882-83 (9th Cir. 1982)* (absence of private right of action under § 16(a) can be inferred from explicit civil remedy contained in § 16(b)).

The Supreme Court recognized an implied private right of action in section 10(b) in *Superintendent of Insurance v. Bankers Life & Cas. Co., 404 U.S. 6, 13 n.9, 92 S. Ct. 165, 169 n.9, 30 L. Ed. 2d 128 (1971);* however, the Court noted in a later case that it had "simply explicitly acquiesced in the 25-year-old acceptance by the lower federal courts of an implied action under 10(b)." *Touche Ross, 442 U.S. at 577 n.19, 99 S. Ct. at 2490 n.19* (citing *Cannon, 441* [*21] *U.S. 677 at 690-693 n.13, 99 S. Ct. at 1954-55).* In Touche Ross, the Supreme Court declined to find an implied private right of action in section 17(a) of the Securities Exchange Act, stating that there was no similar history of longstanding lower-court interpretation in the case before it. The Court noted that it had earlier recognized an implied private right of action in § 14(a) of the Act in favor of shareholders for losses resulting from deceptive proxy solicitations in *J.I. Case v. Borak, 377 U.S. 426, 84 S. Ct. 1555, 12 L. Ed. 2d 423 (1964).* It stated that, to the extent that its analysis in Touche Ross differed from that in Borak, "it suffices to say that in a series of cases since Borak we have adhered to a stricter standard for the implication of private causes of action, and we follow that stricter standard today." *Touche Ross, 442 U.S. at 578, 99 S. Ct. at 2490.* Touche Ross thus suggests that, absent the long historical acceptance of a private right of action in section 10(b), the Court would not have recognized one. No court has ever recognized such a right in section 10(a).

Touche Ross has not acted as a complete bar to finding a previously [*22] unrecognized implied private right of action in the Securities Exchange Act. Some years after Touche Ross had been decided, the United States Court of Appeals for the Second Circuit found an implied private right of action in section 14(d)(6) of the Act in *Pryor v. United States Steel Corp., 794 F.2d 52, 57 (2d Cir. 1986).* However, in that section, the statute specifically identified the beneficiaries of the provisions at issue, and conferred on them a substantive right, which is not the case with respect to section 10(a). n8 Id.

   n8 The section at issue, § 14(d)(6), provides in part:

   > Where any person makes a tender offer, or request or invitation for tenders, for less than all the outstanding equity securities of a class, and where a greater number of securities is deposited pursuant thereto within ten days after copies of the offer or request or invitation are first published or sent or given to security holders than such person is bound or willing to take up and pay for, the securities taken up shall be taken up as nearly as may be pro rata, disregarding fractions, according to the number of securities deposited by each depositor.

   The Pryor court found that this section identified the beneficiaries as the shareholders and conferred on them a substantive right to have their shares purchased on a pro rata basis. *Pryor, 794 F.2d at 57.*

[*23]

In *Cort v. Ash, 422 U.S. 66, 95 S. Ct. 2080, 45 L. Ed. 2d 26 (1979),* the Supreme Court identified four factors to be considered in deciding whether to imply a private right of action, but the factors may best be considered simply as further indicators of Congressional intent. The Pryor court noted that

> the [Supreme] Court has since [Cort] refined that test by emphasizing indications, either explicit or implicit, of Congressional intent. One commentator has thus noted that "the Supreme Court [has] compressed the Cort test to a consideration of legislative intent, and we have stated that, "while [the Cort] factors remain relevant, the central inquiry must be whether Congress intended to create a private cause of action." We view the Cort factors, therefore, as proxies for Congressional intent.

*Pryor, 794 F.2d at 57* (citations omitted).

The first Cort factor is whether the plaintiffs are "one of a class for whose especial benefit the statute was en-

Case 1:05-cv-00165-JJF    Document 50-4    Filed 08/16/2005    Page 8 of 13

Page 7
1999 U.S. Dist. LEXIS 2849, *23; Fed. Sec. L. Rep. (CCH) P90,446

acted." *Cort, 422 U.S. at 78, 95 S. Ct. at 2088* (quotations omitted). Plaintiff claims that it is an intended beneficiary of the section, but this Court cannot see any reason for such [*24] a conclusion. Unlike section 14(d)(6), section 10(a) names no beneficiaries and confers no substantive rights on anyone. The section refers to protecting investors and the public interest, and does not mention the companies whose shares might be sold short.

The second Cort factor is whether there is any "indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one." *Cort, 422 U.S. at 78, 95 S. Ct. at 2088*. As noted above, there is no indication in the language of the statute as to Congressional intent. The legislative history of the Act with respect to section 10(a) was carefully reviewed in Advanced Magnetics. This Court will not review here all the arguments that that court considered, but will state that it agrees with the conclusion of the Advanced Magnetics court that the legislative history is ambiguous and does not compel a reading either for or against a private right of action. *Advanced Magnetics, 1997 WL 299430*, at *5.

The third Cort factor is the importance of private enforcement to effectuate Congress's goal. The Securities and Exchange Commission can enforce section 10(a), but its resources are limited [*25] and it must decide on its priorities in enforcement actions. The enforcement of section 10(a) might not be high on its list. Of course, that can be said with respect to many sections of the Securities Exchange Act and, in that sense, the goal of many sections of the Act might be better served if a private right of action were recognized. n9

> n9 If the Court were to decide that a private right of action was the best way to effectuate Congress' goal, there would remain the question of whether such a right resided only in investors, as in section 10(b), or whether it would extend to companies whose shares were sold short. Plaintiff has argued that the right would have to rest in the company because, in Defendants' scheme, the company was the injured party and the investors came out ahead because they got the stock at a cheap price; however, it is not clear to the Court that short sales are always harmful to companies, or that they always benefit investors. For example, if a defendant sold shares it did not own in anticipation of a drop in the market, and the market did drop, those investors to whom it sold at the higher price would not benefit.

[*26]

The fourth and final Cort factor is whether the cause of action is one that is "traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law." *Cort, 422 U.S. at 78, 95 S. Ct. at 2088*. In this case, where Defendants are alleged to have violated a federal statute, the Court would not be intruding into the province of state law in recognizing a federal remedy.

At oral argument, Plaintiff contended that there was no logic as to why there should be a private right of action with respect to 10(b) and not with respect to 10(a). The Supreme Court has indicated that its recognition of the private remedy in 10(b) did not rest on logic, but on a historical pattern that is absent in this case. However, even if "logic" were to compel recognition of a private right of action in section 10(a), the same logic might also compel recognition of the private remedy only for those who had such a remedy under section 10(b) : investors, and not for companies like HBI, whose stock was sold short. n10

> n10 At oral argument, Plaintiff argued that a difference in the grammar of subsections (a) and (b) of section 10 allowed a private right of action in 10(a) to be recognized in favor of companies like itself, while 10(b) recognized an implied right of action in investors. It noted that, in section 10(a), unlike in section 10(b), the reference to purchase and sale of securities is in a clause by itself. The reference to short sales is in another clause, suggesting that short sales were meant to be enforced by another party. Even accepting Plaintiff's argument, which the Court does not, the other party could be the Commission rather than HBI.

[*27]

To summarize, the following factors go into this Court's determination of whether Congress intended a private right of action under section 10(a) in a company whose stock was adversely affected by a violation of the section. Against recognition of the right are : that the section contains no explicit private remedy, whereas other sections of the Act do, strongly suggesting that one was not intended; that no court has found that such a remedy exists; that the Supreme Court has indicated it recognized a private remedy under section 10(b) because the lower courts had accepted such a remedy for 25 years; and that the Supreme Court has indicated that it has adopted stricter standards for recognizing such private remedies since the last case in which it recognized such a remedy under the Securities Exchange Act. In favor of recognition are that a private right of action might be an efficacious way of enforcing the subsection's goals, and that considerations of federalism would not prevent recognizing an implied private right of action. Factors that weigh neither

Case 1:05-cv-00165-JJF   Document 50-4   Filed 08/16/2005   Page 9 of 13

Page 8
1999 U.S. Dist. LEXIS 2849, *27; Fed. Sec. L. Rep. (CCH) P90,446

way are that the language of the section in itself does not favor one position or the other and that the legislative history is [*28] ambiguous. Given all these factors, the Court concludes that the balance of factors weighs against recognizing a private right of action under section 10(b) of the Securities Exchange Act, and that Plaintiff cannot bring a claim under that section.

### C. Counts III and IV – Common Law Fraud

To state a cause of action for common law fraud in Pennsylvania, the plaintiff must allege the following:

> (1) a misrepresentation; (2) a fraudulent utterance thereof; (3)an intention by the maker that the recipient will thereby be induced to act; (4) justifiable reliance by the recipient upon the misrepresentation; and (5) damage to the recipient as the proximate result.

*Drapeau v. Joy Technologies*, 447 Pa. Super. 560, 670 A.2d 165, 171 (Pa. Super. Ct. 1996)(Beck, J., concurring) (citing *Woodward v. Dietrich*, 378 Pa. Super. 111, 548 A.2d 301, 307 (Pa. Super. Ct. 1988)). Plaintiff has alleged these elements, but not from the perspective of a recipient who was intended to act and who did act in reliance on the misrepresentation. Plaintiff appears to be alleging that it was harmed by the reliance of others, who were investors, on Defendants' misrepresentations, and on their actions in reliance. [*29] Plaintiff also alleges that Defendants' illegal scheme and material misrepresentations constituted, and were intended to constitute, a fraud on the market as to Plaintiff's common stock. (Amend. Compl. P 51.) Plaintiff does not claim that anyone relied directly on Defendants' misrepresentations; it hopes to substitute fraud on the market for direct reliance. The Third Circuit has explained the fraud on the market theory as follows:

> The fraud on the market theory is based on the hypothesis that, in an open and developed market, the price of a company's stock is determined by the available material information regarding the company and its businesses. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. The misstatements may affect the price of the stock, and thus defraud purchasers who rely on the price as an indication of the stock's value. . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentation. In both cases, defendants' fraudulent statements or omissions cause plaintiffs [*30] to purchase stock they would not have purchased absent defendants' misstatements and/or omissions.

*Peil v. Speiser*, 806 F.2d 1154, 1160-61 (3d Cir. 1986) (citation omitted).

In Peil v. Speiser, a securities fraud cause, the Third Circuit held that plaintiffs who purchased stock in an open and developed market did not have to prove that they acted in direct reliance on the defendants' misrepresentations, but could satisfy their burden of proof on the element of causation by showing that the defendants made material misrepresentations that affected the market. Id. The Peil court noted that, while the fraud on the market theory was good law with respect to the Securities Exchange Act, no state court had adopted it and "thus direct reliance remains a requirement of a common law securities fraud claim." Id. at 1163 n.17.

After Peil was decided, the Supreme Court recognized fraud on the market as a substitute for direct reliance in securities fraud cases. *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988). Following Basic, several judges on this Court, in deciding common law negligent misrepresentations claims under Pennsylvania [*31] law, have predicted that the Pennsylvania Supreme Court would allow plaintiffs to proceed on the fraud on the market theory. See *In re Regal Communications Corp. Securities Litigation*, 1996 U.S. Dist. LEXIS 10287, Master File No. 94-179, 1996 WL 411654 (E.D. Pa. July 17, 1996; *In re Healthcare Services Group, Inc. Securities Litigation*, 1993 U.S. Dist. LEXIS 2847, CIV. A. No. 91-6097, 1993 WL 54437 (E.D. Pa. March 1, 1993; *In re Atlantic Financial Federal Securities Litigation*, 1990 U.S. Dist. LEXIS 14807, No. 98-0654, 1990 WL 171191 (E.D. Pa. Oct. 31, 1990). I agree with that prediction; however, that will not help Plaintiff because the fraud on the market theory does not eliminate the need for a plaintiff to have acted in reliance. It only eliminates the need for a plaintiff to have acted in direct reliance. As explained in Peil, the fraud on the market theory allows purchasers to claim that they acted in reliance on the market price in purchasing particular stocks, that the market price was, in turn, affected by a defendant's misrepresentations and that their indirect reliance on those misrepresentations caused their losses. When that happens, a purchaser mistakenly thinks that the market price represents the stock's true value, not its value [*32] as distorted by the defendant's misrepresentations.

At oral argument on the Motions, Plaintiff's counsel explained its reliance in the following terms : "The in-

Case 1:05-cv-00165-JJF   Document 50-4   Filed 08/16/2005   Page 10 of 13

Page 9

1999 U.S. Dist. LEXIS 2849, *32; Fed. Sec. L. Rep. (CCH) P90,446

tegrity of the market is what we rely on in raising capital, in maintaining our relationships with our investors, in maintaining our relationships with our patients for that matter because they depend on our continued existence." (Tr. of 2/11/99 at 41.) However, that is a different kind of reliance. Plaintiff alleges reliance on the integrity of the market in general terms. Everyone who has anything to do with the market relies on its integrity in those terms. That kind of reliance is much too attenuated to be considered comparable to the reliance by investors that the federal courts have recognized in the fraud on the market theory. This Court has predicted that the Pennsylvania Supreme Court will adopt the federal use of indirect reliance by investors in the fraud on the market theory; however, what Plaintiff proposes goes far beyond that. Plaintiff wishes this Court to predict that the Pennsylvania Supreme Court will apply fraud on the market theory where companies rely on the integrity of the market in their general business [*33] dealings. Given the dimensions of the fraud on the market theory in federal law and the fact that the Pennsylvania Supreme Court has not yet adopted even that, this Court is unwilling to predict that the Pennsylvania Supreme Court will adopt the theory in the broader form Plaintiff now seeks.

In order to state a claim for securities fraud, Plaintiff must allege that it acted in reliance on Defendants' misrepresentations, or that it acted in reliance on the market as distorted by Defendants' misrepresentations. Plaintiff does not allege that it acted in such reliance. It did not mistakenly think that the market reflected the true worth of its stock and act in reliance on that belief. Indeed, Plaintiff does not allege that it took any action at all in reliance on the distortions in the market caused by Defendants' misrepresentations. It therefore has failed to allege the key elements of common law fraud : losses cause by action in reliance on Defendants' misrepresentations. Plaintiff claims that others acted in indirect reliance on Defendants' misrepresentations and that, as a result, Plaintiff suffered economic loss. That is not sufficient to allege common law fraud. Plaintiff itself [*34] must have taken steps to change its position as a result of being misled directly or indirectly by Defendants' misrepresentations. The reliance requirement is not satisfied where Plaintiff was a passive recipient of the actions of others who acted in reliance on Defendants' misrepresentations. The Court concludes that Plaintiff has not stated a cause of action for common law fraud.

### D. Count VII – Trade Disparagement

This Court has described the elements of this tort as follows:

> The publication of a disparaging statement concerning the product of another is actionable where (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the statement is false or acts in reckless disregard of its falsity.

*Swift Brothers v. Swift & Sons, Inc., 921 F. Supp. 267, 276 (E.D. Pa. 1995)* (internal quotations and citations omitted). Pennsylvania law requires that a plaintiff claiming trade disparagement plead damages with "considerable specificity." Id. As a judge of this [*35] Court has explained, even under the liberal federal rules of pleading,

> it [is] . . . necessary for the plaintiff to allege either the loss of particular customers by name, or a general diminution in its business, and extrinsic facts showing that such special damages were the natural and direct result of the false publication. If the plaintiff desires to predicate its right to recover damages upon general loss of custom, it should . . . [allege] facts showing an established business, the amount of sales for a substantial period preceding the publication, and amount of sales subsequent to the publication, facts showing that such loss in sales were the natural and probable result of such publication, and facts showing the plaintiff could not allege the names of particular customers who withdrew or withheld their custom.

*KBT Corp., Inc. v. Ceridian Corp., 966 F. Supp. 369, 375 (E.D. Pa. 1997)* (internal quotations and citations omitted).

Plaintiff cannot allege a loss of particular customers. Instead, it must take the second approach, alleging a general diminution in value. Plaintiff has alleged the following: that its first public offering was in October, 1995; [*36] that as a result of that and subsequent offerings, it

Case 1:05-cv-00165-JJF    Document 50-4    Filed 08/16/2005    Page 11 of 13

Page 10

1999 U.S. Dist. LEXIS 2849, *36; Fed. Sec. L. Rep. (CCH) P90,446

now has outstanding over 41,000,000 shares on a fully diluted basis; that prior to Defendants' fraudulent practices, as of early September, 1998, it had a market capitalization of $250,000,000; that it is currently traded on the American Stock Exchange; that, as a result of its testing program, its stock rose in the late summer of 1998 to a high price of 13 3/8; that in September, 1998, it plummeted to a low price of 4 7/8 in a matter of days following Defendants' publication of its false report and its "strong sell" recommendation; that as a direct result of Defendants' misrepresentations and its illegal short selling, by late September, 1998, Plaintiff's market capitalization had declined by in excess of $330,000,000 on a fully diluted basis. (Amend. Compl. PP 19-31.)

Defendants argue that showing a "spike" in market price is not enough, that Plaintiff must allege that its stock sustained a particular price over a period of time to satisfy the standard as described in KBT. KBT dealt with an alleged loss of advertising business by a radio station, and the requirements stated in KBT were tailored to a case alleging [*37] a loss of business. In KBT, the only allegation of damage was that, "as a result of the defendants' false and fraudulent reports, plaintiffs did suffer and continue to suffer lost revenues from a reduction in advertising contracts . . . and from the refusal of new prospective advertisers to do business with plaintiffs." *KBT, 966 F. Supp. at 375.*

Plaintiff in this case has alleged considerably more than the plaintiffs in KBT. Plaintiff has presented a high and a low point of its stock and a figure as to the decline in its capitalization. The Court concludes that the Complaint alleges damages in sufficient detail and the claim of disparagement will forward.

### E. Counts VIII and IX – Negligence

Plaintiff alleges that, as a result of the Asensio Defendants' negligence in preparing their research reports, and the negligence of other Defendants in failing to obtain stock to cover their short sales, Plaintiff "has sustained financial harm, which is continuing." (Amend. Compl. P 83, 88.) Defendants move to dismiss these Counts on the basis of Pennsylvania's economic loss doctrine, which, they argue, does not allow a cause of action for negligence where the only damage is [*38] economic and there is no damage to the person or to tangible property.

In *Margolis v. Jackson, 375 Pa. Super. 182, 543 A.2d 1238 (Pa. Super. Ct. 1988),* a financial management partnership allegedly suffered economic loss when medical services were negligently rendered to one of its partners, who then became seriously ill and was unable to perform his duties in the partnership. *Id. 543 A.2d at 1239.* The injured partner sued for personal injury, and the partnership sued for economic loss. The Pennsylvania Superior Court reviewed a number of Pennsylvania cases and concluded that the cases

> clearly limit the extent that a negligent tortfeasor will be made legally liable for an economic loss caused directly or indirectly by the tortfeasor's negligent act or conduct. Purely economical loss, when not accompanied with or occasioned by injury, is considered beyond the scope of recovery even if a direct result of the negligent act.

Id. at 1240. The Margolis court noted that recovery for purely economic loss that was due to negligence was not allowed even in a case where a plaintiff had no other opportunity to recover. Id. at 1239-1240 (citing Whirley Industries, [*39] *Inc. v. Segel, 316 Pa. Super. 75, 462 A.2d 800 (Pa. Super. Ct. 1983)).* In KBT v. Ceridian, a case factually closer to the instant one, a radio station sought to recover in negligence for revenue lost from advertising contracts, allegedly because the defendants disseminated negligently collected data that reflected poorly on the station. The district court, applying Pennsylvania law, dismissed the negligence count on the basis of the economic loss doctrine. *KBT, 966 F. Supp. at 377-78.*

Plaintiff argues that the economic loss doctrine has no application under the facts of this case for several reasons. First, it argues that the doctrine "is limited in large part to cases involving the sale of products that later prove to be defective," (Pl.'s Resp. at 13) citing as an example *New York State Electric & Gas Corp. v. Westinghouse, 387 Pa. Super. 537, 564 A.2d 919 (Pa. Super Ct. 1989)* (holding economic loss doctrine bars plaintiff from suing manufacturer in negligence for economic losses allegedly caused by defect in generator). It is true that the doctrine has been developed primarily in cases in which defective products were at issue, and in those cases, the primary purpose [*40] of the doctrine was to keep separate the spheres of tort and contract law. The Third Circuit has stated that, in general, the economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Duquesne Light Co. v. Westinghouse Electric Corp., 66 F.3d 604, 618 (3d Cir. 1995).* However, the doctrine has also been applied to other kinds of cases, such as Margolis, which alleged economic loss as a result of negligent medical care to a third party, and KBT, which alleged loss of advertising revenue as a result of negligent collection and dissemination of data concerning a radio station. In neither case was a defective product at issue and in neither case was

Case 1:05-cv-00165-JJF   Document 50-4   Filed 08/16/2005   Page 12 of 13

Page 11

1999 U.S. Dist. LEXIS 2849, *40; Fed. Sec. L. Rep. (CCH) P90,446

there any contractual relation between the parties.

Second, Plaintiff argues that the economic loss doctrine has been applied where there was no contractual privity when the losses were so unforeseeable as to prevent recovery on a negligence theory. *Moore v. Pavex, Ind., 356 Pa. Super. 50, 514 A.2d 137 (Pa. Super. Ct. 1986)* (no recovery for economic loss where economic loss was caused by interruption of water service when construction worker unforeseeably [*41] ruptured city water main with jackhammer). Again, the fact that the doctrine has been applied to cases in which the damages were not foreseeable does not mean that it cannot be applied to cases where the damages were foreseeable. In Margolis, in discussing the economic loss doctrine, the Pennsylvania Superior Court stated, "Although some of the discussion behind the previous holdings centered around the foreseeability of the loss, other factors, perhaps even more convincing than foreseeability itself, have figured prominently in those holding as well." *Margolis, 543 A.2d at 1240*. The court went on to state that:

> To allow a cause of action for negligent cause of purely economic loss would be to open the door to every person in the economic chain of the negligent person or business to bring a cause of action. Such an outstanding burden is clearly inappropriate and a danger to our economic system.

Id. (quoting *Aikens v. Baltimore and Ohio Railroad Co., 348 Pa. Super. 17, 501 A.2d 277, 279 (1985))*. While the cases to which the doctrine has been applied are often ones in which the harm was not foreseeable, it has also been applied to cases in which the harm [*42] was foreseeable. See e.g. *KBT, 966 F. Supp. at 377-78*. Plaintiff has cited no case in which a court declined to apply the doctrine on the ground that the injury was foreseeable, and this Court has found none.

Third, Plaintiff argues that Defendants cannot credibly argue that the Pennsylvania courts would extend the economic loss doctrine to this case because Plaintiff might then be left without a remedy. At this point, Plaintiff does have other remedies. Its claims for defamation, disparagement, and interference with business relations will go forward. But even if it had no other remedies, it is not clear that a Pennsylvania court would on that basis let this claim go forward. In Whirley, the Pennsylvania Superior Court held that there could be no recovery for purely economic loss due to negligence even where the plaintiff had no other opportunity to recover. *Whirley, 316 Pa. Super. 75, 462 A.2d 800*. The argument that the negligence claim should be allowed to remain in the case because none of the other claims may result in recovery for Plaintiff is therefore unpersuasive.

Finally, apart from the economic loss doctrine, there is a question as to whether Plaintiff has [*43] any viable theories of negligence under which to pursue his claims. Plaintiff alleges that the Asensio Defendants negligently collected the data on which they based their damaging publication. The collection of the data would not, by itself, have resulted in any harm to Plaintiff. It was the dissemination of the negligently collected data that allegedly resulted in the harm. Therefore, Plaintiff is alleging negligent misrepresentation. In Pennsylvania, a claim of negligent misrepresentation allows a plaintiff to sue for economic damages as a result of a defendant's negligence; however, that claim, like the claim of common law fraud, includes as one of its elements that the person alleging the loss took action in justifiable reliance on the defendant's misrepresentation. See Restatement (Second) of Torts, § 552 (1977); *Rempel v. Nationwide Life Ins. Co., 471 Pa. 404, 370 A.2d 366 (1977)*. Just as Plaintiff has not adequately alleged that it acted in reliance on Defendants' misrepresentations in its claim of common law fraud, it has not adequately alleged that it acted in such reliance in its claim of negligent misrepresentation, and that claim will be dismissed.

Plaintiff's [*44] negligence claim against Defendant Wood Gundy alleges that Wood Gundy was negligent in failing to assure that it could deliver HBI stock before accepting orders for the short sales, in violation of the rules of the National Association of Securities Dealers, Inc., the policies and rules of the American Stock Exchange, and the Constitution of the American stock Exchange. There is a question whether any of the rules and policies Defendant allegedly violated create a duty of care in favor of companies listed on the stock exchange that would impose tort liability on Defendants for Plaintiff's losses; however Defendant has not raised this question, and it will not be considered here. In the case of Wood Gundy, dismissal of the negligence claim rests solely on the economic loss doctrine.

## IV. CONCLUSION

Of the five Counts that the Defendants have moved to dismiss, RICO, section 10(a), common law fraud, disparagement, and negligence, all except disparagement will be dismissed as to those Defendants who moved for their dismissal. This results in the complete dismissal of Wood Gundy from the case, as all Counts against it will be dismissed. As to the Asensio Defendants, Counts I, [*45] III, and VIII will be dismissed against them, leaving Counts II (section 10(a)), V (intentional interference with existing and prospective business relations), VI (defamation) and

Page 12
1999 U.S. Dist. LEXIS 2849, *45; Fed. Sec. L. Rep. (CCH) P90,446

VII (disparagement). Counts I and III will be dismissed against Fort Hill, leaving only Count II (section 10(a) against it. An appropriate Order follows.

ORDER

**AND NOW**, this 12th day of March, 1999, upon consideration of the Motions to Dismiss of Manuel P. Asensio and Asensio & Co., Inc. (Doc. No. 6), Fort Hill Group, Inc. (Doc. No. 9), and CIBC Wood Gundy Securities, Inc. (Doc. No. 24), the responses, replies, and all submissions thereto, it is **HEREBY ORDERED** that

1. The Motion to Dismiss of CIBC Wood Gundy Securities, Inc. is **GRANTED,** and that Defendant is dismissed from the case;

2. The Motion to Dismiss of Fort Hill Group, Inc. is **GRANTED**; Counts I and III are dismissed and Count II remains;

3. The Motion of Manuel P. Asensio and Asensio & Co., Inc. is **GRANTED** with respect to Counts I, III, and VIII of the Amended Complaint, and **DENIED** with respect to Count VII; Counts II, V, VI and VII remain.

BY THE COURT:

John R. Padova, J.