EXHIBIT D

LEXSEE 1996 U.S. DIST LEXIS 12655

**SCHUYLKILL SKYPORT INN, INC., et al. v. JOHN W. RICH, JR., et al.**

**Civil Action No. 95–3128**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1996 U.S. Dist. LEXIS 12655*

**August 20, 1996, Decided**
**August 21, 1996, FILED**

**PRIOR HISTORY:** [*1] 91–1898.

**DISPOSITION:** Motion to strike denied, motions for summary judgment filed by the Corporate Defendants and Tornetta denied, Corporate Attorneys' motion for summary judgment granted in part and denied in part, and Corporate Attorneys' motion to dismiss granted in part and denied in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** For SCHUYLKILL SKYPORT INN, INC., PLAINTIFF: MARIA T. CASEY, CURRAN LAW OFFICES, POTTSVILLE, PA. MICHAEL A. O'PAKE, CURRAN LAW OFFICES, POTTSVILLE, PA USA. JAMES J. RILEY, RILEY AND FANELLI, POTTSVILLE, PA USA. DANIELLE L. PEYAKOVICH, RILEY AND FANELLI, THE NECHO ALLEN, POTTSVILLE, PA USA.

For JAMES J. CURRAN, JR., Individually and Derivatively on behalf of, PLAINTIFF: MARIA T. CASEY, (See above). MICHAEL A. O'PAKE, (See above). JAMES J. RILEY, (See above). DANIELLE L. PEYAKOVICH, (See above).

For READING ANTHRACITE COMPANY, PLAINTIFF: MARIA T. CASEY, (See above). JAMES J. RILEY, (See above). DANIELLE L. PEYAKOVICH, (See above).

For SCHUYLKILL ENERGY RESOURCES, PLAINTIFF: MARIA T. CASEY, (See above). JAMES J. RILEY, (See above). DANIELLE L. PEYAKOVICH, (See above).

For JOHN W. RICH, JR., DEFENDANT: HOWARD A. ROSENTHAL, PELINO & LENTZ, P.C., PHILA, PA USA.

For JOHN W. RICH, SR., [*2] DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For BRIAN RICH, DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For ROBERT M. RYAN, DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For BONNIE R. RYAN, DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For TERRENCE RYAN, DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For GLORIA R. CURRAN, DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For MARIA CURRAN CANTWELL, DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For DAVID R. CHRIST, DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For GILBERTON COAL COMPANY, DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For GILBERTON ENERGY CORPORATION, DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For J.M.B., LTD., DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For WASTE MANAGEMENT & PROCESSORS, INC., DEFENDANT: HOWARD A. ROSENTHAL, (See above).

1996 U.S. Dist. LEXIS 12655, *2

For FILTER MEDIA, INC., DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For GILBERTON POWER COMPANY, DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For POTTSVILLE FUEL COMPANY, DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For JACK RICH, INC., DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For PORT CARBON MACHINE WORKS, [*3] DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For J & R ENGINEERING CORP., DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For R & R ENERGY CORP., DEFENDANT: HOWARD A. ROSENTHAL, (See above).

For READING ANTHRACITE COMPANY, DEFENDANT: MARTIN J. CERULLO, FRUMKIN, SHRALOW & CERULLO, P.C., POTTSVILLE, PA USA.

For SCHUYLKILL ENERGY RESOURCES, INC., DEFENDANT: MARTIN J. CERULLO, (See above).

For LAWRENCE F. TORNETTA, DEFENDANT: MICHAEL LIEBERMAN, HANGLEY, ARONCHICK, SEGAL AND PUDLIN, PHILA, PA USA.

For MARTIN J. CERULLO, ESQUIRE, DEFENDANT: ARTHUR W. LEFCO, SHERR, JOFFE & ZUCKERMAN, P.C., W. CONSHOHOCK, PA USA.

For RI-CORP DEVELOPMENT, INC., DEFENDANT: HOWARD A. ROSENTHAL, PELINO & LENTZ, P.C., PHILA, PA USA.

For FRUMKIN, SHRALOW & CERULLO, DEFENDANT: ARTHUR W. LEFCO, (See above).

**JUDGES:** Edward N. Cahn, Chief Judge

**OPINIONBY:** Edward N. Cahn

**OPINION:**

### MEMORANDUM

CAHN, J.

August 20, 1996

Plaintiffs Schuylkill Skyport Inn, Inc. ("SSI") and James J. Curran, Jr. ("Curran") (collectively "Plaintiffs") bring this action against various directors, officers, and shareholders of Reading Anthracite Company ("RAC") and Schuylkill Energy Resources, Inc. ("SER"), [*4] n1 as well as against RAC's and SER's corporate counsel n2 and various other corporations involved in transactions with RAC and SER n3 (collectively "Defendants"). Also named as nominal defendants are RAC and SER. Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *18 U.S.C. §§ 1961–1968*, and bring state law claims for breach of fiduciary duty, waste of corporate assets, fraud and conversion. Currently before the court are motions for summary judgment filed by the Corporate Defendants, Tornetta and the Corporate Attorneys, and a motion to dismiss filed by the Corporate Attorneys. Additionally, the Corporate Defendants move to strike the Third Amended Complaint. For the reasons stated below, the motion to strike is denied, the motions for summary judgment filed by the Corporate Defendants and Tornetta are denied, the Corporate Attorneys' motion for summary judgment is granted in part and denied in part, and the Corporate Attorneys' motion to dismiss is granted in part and denied in part.

n1 These defendants are: John W. Rich, Jr., John W. Rich, Brian R. Rich, Robert M. Ryan, Bonnie R. Ryan, Terrence Ryan, Gloria R. Curran, Maria Curran Cantwell, and David R. Christ (collectively "the Corporate Defendants"). Also named as a defendant is Lawrence F. Tornetta ("Tornetta"). [*5]

n2 Corporate counsel named as defendants in this action are Martin J. Cerullo ("Cerullo") and the firm of Frumkin, Shralow & Cerullo ("FS&C") (collectively "the Corporate Attorneys").

n3 These corporations are Gilberton Coal Company, Gilberton Energy Corporation, J.M.B., Ltd., Waste Management & Processors, Inc., Filter Media, Inc., Gilberton Power Company, Pottsville Fuel Company, Jack Rich, Inc., Port Carbon Machine Works, J&R Engineering Corp., R&R Energy Corp., Ri-Corp Development, Inc., and JMB Development, Inc.

### BACKGROUND

1996 U.S. Dist. LEXIS 12655, *5

SSI, SER and RAC are Pennsylvania corporations with places of business in Pottsville, Pennsylvania. SSI owns and collects royalties on various anthracite coal refuse banks and deposits of silt and slush. Curran is the sole income beneficiary of the Curran Trust, which owns fifty percent of the outstanding shares of SSI. Curran also is a direct or beneficial owner of thirty–five percent of the outstanding shares of SER and of over thirty–four percent of the outstanding shares of RAC. RAC engages in the mining, processing, and selling of anthracite coal and [*6] its refuse. SER is a culm–fired cogeneration facility which uses anthracite coal refuse as its primary fuel. Curran brings this action in his own behalf and derivatively on behalf of RAC and SER.

Plaintiffs allege that the Corporate Defendants, Tornetta, and the Corporate Attorneys, as members of the Rich Control Group ("RCG"), have engaged in various schemes against Curran, SSI, RAC, and SER. These purported schemes include: (1) the scheme to defraud Curran by depriving him of cash distributions from and diminishing his interests in RAC and SER; (2) conversion of SSI materials; (3) usurpation of corporate opportunities properly belonging to RAC, SER, and SSI; (4) engaging in related party transactions, (5) the scheme to harm RAC and SER by engaging in a series of reckless and intentional acts; and (5) the scheme to cause Curran to default on certain agreements and thereby cause him to lose stock in RAC and SER.

## DISCUSSION

Before the court is the Corporate Defendants' Motion to Strike the Third Amended Complaint and three motions for summary judgment filed by the Corporate Defendants, Tornetta, and the Corporate Attorneys. In addition the Corporate Attorneys have filed [*7] a motion to dismiss. Each of these motions will be discussed in turn.

## I. THE MOTION TO STRIKE THE THIRD AMENDED COMPLAINT

Plaintiffs assert that the Third Amended Complaint is "inconsistent with and in direct violation of this Court's Orders dated November 22, 1995 and April 1, 1996." (Corp. Defs.' Mot. Strike Third Am. Compl. & Resp. Pls.' Br. Supp. Third Am. Compl. at 1–2.) Issued after the filing of the Second Amended Complaint, the Order of November 22, 1995 directed that:

> Defendants shall file Motions to Dismiss or otherwise respond to the Second Amended Complaint within 60 days of the date of this Order. Plaintiffs shall file no further amendments to the Complaint without complying with *Rule 15(a), F.R.C.P.*

(Order of November 22, 1995, Schuylkill Skyport Inn, Inc. v. John W. Rich, Jr., (E.D. Pa.).) After Motions for Summary Judgment or to Dismiss were filed by Defendants, oral argument took place on March 28, 1996. At oral argument this court informed Plaintiffs that they would be given leave to file a third amended complaint limited to allegations involving Cerullo and FS&C and allegations involving Tornetta's alleged intent to force Curran [*8] to forfeit stock. (See N.T., 3/28/96 at 98–99, 139–40.) On April 1, 1996, this court issued the following order:

> It is hereby ORDERED that Plaintiffs have leave to amend the complaint in reference to allegations against Defendant Lawrence F. Tornetta, Martin J. Cerullo, and Frumkin, Shralow & Cerullo. This amendment shall be limited to matters raised in the on-record hearing of March 28, 1996.

(Order of April 1, 1996, Schuylkill Skyport Inn, Inc. v. John W. Rich, Jr., No. 95–3128) (E.D. Pa.).) Plaintiffs then filed a Third Amended Complaint.

The Corporate Defendants argue that Plaintiffs' amendments went beyond the limits imposed by this court and include "wholesale revisions of plaintiffs' allegations against the other defendants, whose Motion for Summary Judgment remains pending." (Corp. Defs.' Br. Supp. Mot. Strike Third Am. Compl. & Opp'n Pls.' Br. Supp. Third Am. Compl. at 4.)

Amendments are governed by *Rule 15(a) of the Federal Rules of Civil Procedure*, which reads in pertinent part:

> A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served, or if the pleading is one to which no responsive [*9] pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

Generally, an amendment which does not conform to Rule 15(a) is "without legal effect and any new matter it contains will not be considered unless the amendment is re-submitted for the Court's approval." *Straub v. Desa*

*Indus., Inc.,* 88 F.R.D. 6, 8 (M.D. Pa 1980). Nevertheless, "some courts have held that an untimely amended pleading served without judicial permission may be considered as properly introduced when leave to amend would have been granted had it been sought, and when it does not appear that any of the parties will be prejudiced by allowing the change." Id. "The grant or denial of an opportunity to amend is within the discretion of the District Court . . . . " *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962).*

In the instant case, the Corporate Defendants assert that they will be prejudiced if this court [*10] allows the Third Amended Complaint:

> If the Third Amended Complaint is allowed, defendants now will be required to re-file their Motion for Summary Judgment, addressing the same issues, as the new complaint not only restates the old claims, but also reorders claims and contains new claims not previously raised in any prior version of the Complaint. In these circumstances, the minimum prejudice to defendants will be all of the attorneys' fees and costs incurred to date, as well as the delay.

(Corp. Defs.' Br. Opp'n Pls.' Mot. Leave Amend Second Am. Compl. & Supp. Corp. Defs.' Pending Mot. Strike at 2.)

The Third Circuit Court of Appeals has stated that "'prejudice to the non-moving party is the touchstone for the denial of an amendment.'" *Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993)* (citation omitted). In *Thompson v. Glenmede Trust Co., 1994 U.S. Dist. LEXIS 16839, Civ. A. No. 92-5233, 1994 WL 675186 (E.D. Pa. Nov. 23, 1994),* the court defined the contours of such prejudice:

> The non-moving party must do more than merely claim prejudice. "It must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered [*11] had the . . . amendments been timely." Mere passage of time, without more, does not require that a motion for leave to amend be denied; however, at some point, the delay will become undue, placing an unwarranted burden on the opposing party. Prejudice does not result merely from a party's having to incur additional counsel fees; nor does it result from a delay in the movement of the case.

> Prejudice under Rule 15 "means undue difficulty in prosecuting [or defending] a lawsuit as a result of a change in tactics or theories on the part of the other party."

Id. at *2 (citations omitted).

This court finds no unfair disadvantage to Defendants from allowing the Third Amended Complaint. First, although Plaintiffs have exceeded the scope of this court's Order of April 1, 1996 granting leave to amend, the changes in the Third Amended Complaint are not substantial, and, with minor exceptions, the motion for summary judgment already filed by the Corporate Defendants has not been rendered inapplicable. Although Plaintiffs have added some new allegations, they are closely related to the allegations in the Second Amended Complaint and the general theories of recovery remain the same. [*12] Second, to the extent there are significant differences between the Second and Third Amended Complaints, Defendants have not been deprived of an opportunity to respond to new allegations. The Corporate Defendants have already filed briefs and letters in response to the Third Amended Complaint. n4 These have been given full consideration by the court in its disposition of the instant motions. Although this court denies the Corporate Defendants' motion for summary judgment, as discussed below, the Corporate Defendants will be given leave to resubmit several of their arguments on a motion for judgment as a matter of law pursuant to *Rule 50(a) of the Federal Rules of Civil Procedure.* Defendants may further respond to new allegations at that time. Finally, as noted by the court in Thompson, increased fees and costs do not constitute prejudice.

> n4 Subsequent to the filing of the Third Amended Complaint, the Corporate Attorneys filed a motion for summary judgment which incorporated by reference their previous motion to dismiss. Tornetta submitted letter briefs in response to the Third Amended Complaint as a supplement to his previous motion for summary judgment.

[*13]

The Third Circuit has stated that "in the absence of substantial or undue prejudice, denial [of a motion to amend] instead must be based on bad faith or dilatory motives, truly undue or unexplained delay, repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment." *Lorenz, 1 F.3d at 1414.* This court finds none of these factors present in the instant case and therefore will accept the Third Amended Complaint and deny the Motion to Strike.

1996 U.S. Dist. LEXIS 12655, *13

## II. MOTIONS FOR SUMMARY JUDGMENT FILED BY THE CORPORATE DEFENDANTS AND TORNETTA

The Federal Rules of Civil Procedure provide that summary judgment is appropriate if "there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* The moving party bears the burden of "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* The non-moving party must then go beyond the pleadings to "establish the existence of each element on which it bears the burden of proof," [*14] *J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990)* (citation omitted), cert. denied, *499 U.S. 921, 113 L. Ed. 2d 246, 111 S. Ct. 1313 (1991),* because "a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex, 477 U.S. at 323.*

When considering a motion for summary judgment, the court must draw all justifiable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* The court may not make credibility determinations or weigh the evidence. *Id. at 249.* If the record thus construed could not lead the trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).*

The Corporate Defendants raise the following defenses in their Motion for Summary Judgment: (1) claim preclusion; (2) an inadequate pattern of racketeering to support claims under RICO; (3) estoppel; (4) the illegality of the 1980 Shareholders Agreement relied upon by Plaintiffs; [*15] (5) statute of limitations; (6) failure of the controlling documents to support Plaintiffs' claims about the manipulation of SER's financing; (7) Plaintiffs' failure to allege a distinct injury to Curran; and (8) Curran's lack of standing to seek the rescission or reformation of the Meridian Loan Agreement. Tornetta's motion incorporates by reference the Corporate Defendants' Motion for Summary Judgment. Tornetta elaborates on the res judicata argument and absence of a pattern of racketeering, particularly as these defenses relate to him. Tornetta also asserts that Plaintiffs have inadequately alleged any motivation on Tornetta's part to be involved in a scheme to deprive Curran of distributions from RAC and SER.

Each of the Corporate Defendants' defenses will be considered in turn. Tornetta's res judicata and pattern of racketeering arguments will be considered alongside those of the Corporate Defendants. Finally, Tornetta's motivation argument will be examined.

### A. CLAIM PRECLUSION

The Corporate Defendants and Tornetta assert that most of Plaintiffs' claims are precluded by settlements and dismissals with prejudice in multiple prior actions in state and federal courts and [*16] to releases executed by Curran. Consideration of this argument warrants a general discussion of claim preclusion.

The doctrine of claim preclusion, or res judicata, provides that "a subsequent suit based on the same cause of action as a prior suit that involved the same parties or their privies is barred where there has been a final judgment on the merits in the prior suit." *Labelle Processing Co. v. Swarrow, 72 F.3d 308, 313 (3d Cir. 1995).* n5 Federal courts must give state court judgments the same preclusive effect as would be given by the state court. *Migra v. Warren City Sch. Dist., 465 U.S. 75, 81, 79 L. Ed. 2d 56, 104 S. Ct. 892 (1984).* Both federal and Pennsylvania courts have held that a dismissal with prejudice is considered a judgment on the merits for claim preclusion purposes. See, e.g., *Gambocz v. Yelencsics, 468 F.2d 837, 841 (3d Cir. 1972)* ("res judicata bars relitigation of the claims dismissed in the prior suit") (citations omitted); *Interdigital Technology Corp. v. OKI America, 866 F. Supp. 212, 213 (E.D. Pa. 1994)* (stating that "a dismissal with prejudice . . . acts as a judgment on the merits in favor of the dismissed defendant"); *Keystone Bldg.* [*17] *Corp. v. Lincoln Sav. & Loan Ass'n, 468 Pa. 85, 360 A.2d 191, 194 n.6 (Pa. 1976)* ("It is well settled, as a general proposition, that a judgment or decree, though entered by consent or agreement of the parties, is res judicata to the same extent as if entered after contest.") (citation omitted).

n5 The Corporate Defendants also assert that Plaintiffs are barred from relitigating issues which arose under previous litigation. The doctrine of issue preclusion, or collateral estoppel, "may bar a claimant from relitigating issues decided in a previous action." *Labelle, 72 F.3d at 314 n.10.* Specifically, the Corporate Defendants argue that Plaintiffs' claim under the 1980 Stockholders Agreement is barred because the validity and enforceability of this agreement were disputed in earlier litigation that was dismissed. (Reply Argument Br. at 3.) Similarly, the Corporate Defendants argue that Plaintiffs' claims related to the ownership of various SSI banks are barred. Id. at 8. The Corporate Defendants contend that this ownership issue also was raised in earlier litigation that was

1996 U.S. Dist. LEXIS 12655, *17

settled and dismissed with prejudice. Therefore, the Corporate Defendants assert that "any issue related to ownership (or purported theft) of the banks is now foreclosed by the dismissal with prejudice." Id. at 9.

Dismissals with prejudice unaccompanied by findings have no preclusive effect on issues. *Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 327, 99 L. Ed. 1122, 75 S. Ct. 865 (1955) (stating that a judgment unaccompanied by findings does not bind the parties on any issue); see also *Gambocz v. Yelencsics, 468 F.2d 837, 842 (3d Cir. 1972)* ("The orthodox doctrine of collateral estoppel . . . is inapplicable here because the first 'judgment was unaccompanied by findings and hence did not bind the parties on any issue.'") (citation omitted); *Interdigital Technology Corp. v. OKI America, 866 F. Supp. 212, 214 (E.D. Pa. 1994)* ("Issue preclusion . . . does not apply to an issue which was dismissed in an earlier litigation when no findings of fact or conclusions of law were made with respect to that issue."). In distinction from the case law cited by the Corporate Defendants in support of this argument, none of the earlier litigation involving the instant parties resulted in findings of fact by the court. Therefore, these issues are not precluded.

[*18]

Federal and Pennsylvania claim preclusion doctrines also preclude not only claims actually decided in prior actions, but also those which could have been brought. *Nanavati v. Burdette Tomlin Mem. Hosp., 857 F.2d 96, 111 (3d Cir. 1988)* (citations omitted), cert. denied, 489 U.S. 1078, 103 L. Ed. 2d 834, 109 S. Ct. 1528 (1989); *Fox v. Gabler, 534 Pa. 185, 626 A.2d 1141, 1143 (Pa. 1993)*. Claim preclusion applies only to claims arising prior to the entry of judgment. *Alexander & Alexander v. Van Impe, 787 F.2d 163, 166 (3d Cir. 1986)* (stating that claim preclusion "does not bar claims arising subsequent to the entry of judgment and which did not then exist or could not have been sued upon in the prior action") (citation omitted). However, "merely adding some facts, naming additional defendants, or proposing a different theory of recovery will not convert one cause of action into a second cause of action and thereby evade the preclusive effect that the first cause of action has if both actions involve the same liability–creating conduct on the part of the defendants and the same alleged invasion of the plaintiffs' rights." *Wood v. Coleman, 1989 U.S. Dist. LEXIS 3012, CIV. A. No. 83–27, 1989* [*19] *WL 29250, at *15 (E.D. Pa. Mar. 29, 1989)* (citation omitted).

For a prior judgment to have preclusive effect on a

later action there must be an identity of (1) issues; (2) causes of action; (3) parties or their privies; and (4) the quality or capacity of the parties suing or being sued. *Duquesne Slag Products Co. v. Lench, 490 Pa. 102, 415 A.2d 53, 55 (Pa. 1980)*. In determining the identity of a cause of action, "res judicata generally is thought to turn on the essential similarity of the underlying events giving rise to the various legal claims." *McArdle v. Tronetti, 426 Pa. Super. 607, 627 A.2d 1219, 1222 (Pa. Super. 1993)* (citation omitted), appeal denied, 641 A.2d 587 (Pa. 1994); see also Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc. – Pension Fund v. Centra, 983 F.2d 495, 504 (3d Cir. 1992) ("Whether two lawsuits are based on the identical cause of action 'turn[s] on the essential similarity of the underlying events giving rise to the various legal claims.'") (citation omitted); *United States v. Athlone Indus., Inc., 746 F.2d 977, 984 (3d Cir. 1984)* (stating that res judicata requires a plaintiff to "'present in one suit [*20] all the claims for relief that he may have arising out of the same transaction or occurrence'") (citation omitted).

The Corporate Defendants argue that "virtually all of the allegations of the Second Amended Complaint were resolved in prior federal RICO actions, as well as multiple state court proceedings. (Br. Supp. Corp. Defs.' Mot. Summ. J. at 4.) As the following discussion will show, the dismissals and releases in these earlier actions bar certain of Plaintiffs' claims arising before the dates of the dismissal or releases. However, they do not preclude claims arising thereafter. See *Lawlor v. National Screen Serv. Corp., 349 U.S. 322, 328, 99 L. Ed. 1122, 75 S. Ct. 865 (1955)* (stating that although a "judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case"). This court will first discuss generally the following issues raised by the parties in their res judicata arguments: (1) the impact of prior state judgments on later RICO actions in federal court; and (2) the application of the preclusion doctrine applied in [*21] *Main Line Theatres, Inc. v. Paramount Film Distrib. Corp., 298 F.2d 801 (3d Cir.)*, cert. denied, 370 U.S. 939, 8 L. Ed. 2d 807, 82 S. Ct. 1585 (1962).

**1. The Impact of Prior State Court Judgments on Later Rico Actions in Federal Court**

Plaintiffs suggest that a plaintiff's failure to raise all federal RICO claims in a previous state court action has no preclusive effect on a later RICO action in federal court. (Pls.' Resp. Corp. Defs.' Mot. Summ. J. at 28.) This is incorrect. *McCarter v. Mitcham, 883 F.2d 196, 201 (3d Cir. 1989)* (finding that a judgment on the merits in a prior Pennsylvania court action precluded RICO claims

because such claims could have been brought in the earlier state court action). Therefore, any of Plaintiffs' RICO claims that could have been raised in earlier state court litigation are barred.

Plaintiffs argue that pre-settlement conduct may be alleged by Plaintiffs to establish a pattern of racketeering. (Pls.' Br. Supp. Resp. Corp. Defs.' Br. Supp. Mot. Strike at 19.) Plaintiffs erroneously rely on *Tabas v. Tabas, 1994 U.S. App. LEXIS 9355, Nos. 92-1495, 92-1529, 1994 WL 158772* (3d Cir. May 2, 1994) ("Tabas I"). The opinion and judgment in this case was vacated. [*22] See *Tabas v. Tabas, Nos. 92-1495, 92-1529, 1994 U.S. App. LEXIS 11956* (3d Cir. May 25, 1994). The opinion was then superseded by *Tabas v. Tabas, 47 F.3d 1280* (3d Cir.), cert. denied, *132 L. Ed. 2d 275, 115 S. Ct. 2269 (1995)* ("Tabas II"). Plaintiffs rely exclusively on footnote 15 in Tabas I, (see Pls.' Br. Supp. Resp. Corp. Defs.' Br. Supp. Mot. Strike at 20), which was not included in Tabas II. With no Third Circuit precedent to the contrary, this court finds that Plaintiffs are precluded from listing as predicate acts claims that were or could have been brought in prior actions settled or dismissed with prejudice. See *Spiegel v. Continental Ill. Nat'l Bank, 790 F.2d 638, 647* (7th Cir.) (finding that alleged predicate acts that had been dismissed in previous action were barred by res judicata), cert. denied, *479 U.S. 987, 93 L. Ed. 2d 582, 107 S. Ct. 579 (1986); Turkish v. Kasenetz, 832 F. Supp. 565, 570 (E.D.N.Y. 1993)* (finding that "plaintiffs may not relitigate claims of racketeering activity by defendant previously alleged in the action dismissed with prejudice by this court"), rev'd on other grounds, *27 F.3d 23 (2d Cir. 1994)*. n6

N6 Although Plaintiffs attempt to distinguish these two cases, this court finds their arguments unpersuasive.

[*23]

## 2. The Application of the Main Line Theatres Doctrine

The Corporate Defendants argue that because one of the prior settlements involving Curran and some of the Corporate Defendants disposed of actions wherein Curran sought injunctive relief, Curran is now barred from seeking redress on those same claims pursuant to the doctrine articulated in *Main Line Theatres, Inc. v. Paramount Film Distribution Corp., 298 F.2d 801* (3d Cir.), cert. denied, *370 U.S. 939, 8 L. Ed. 2d 807, 82 S. Ct. 1585 (1962)*. (Br. Supp. Corp. Defs.' Mot. Summ. J. at 54–56). In Main Line Theatres, the court examined the release of claims of a suit which included in its prayers for relief a request for an injunction against prohibited conduct. The court deter-

mined that the release barred the plaintiffs from further litigation based on subsequent occurrences of the prohibited conduct because the court found that "a defendant offering a sum in settlement of a suit asking, among other things, for an injunction against certain conduct, would not understand that a similar demand could be asserted the day after the settlement." *Main Line Theatres, 298 F.2d at 803.*

Defendants assert that the [*24] Main Line Theatres doctrine should be applied to the October 13, 1994 Settlement Agreement. In the October 13, 1994 Settlement Agreement, Curran agreed to dismiss with prejudice three lawsuits. (Settlement Agreement of October 13, 1994 at 1–2, App. Corp. Defs.' Mot. Summ. J. at A735–36.) These lawsuits are Curran v. Tornetta, No. S-1091-94 (C.P. Schuylkill) ("Related Party Litigation"); Curran v. Rich, No. S-1567-1993 (C.P. Schuylkill) ("RICO Settlement Agreement Litigation"); and Schuylkill Skyport Inn, Inc. v. Reading Anthracite Company and Gilberton Coal Company, No. S-1608–93 (C.P. Schuylkill) ("SSI II"). The Corporate Defendants contend that since injunctive relief was sought in these actions and there is no limiting language in the October 13, 1994 Settlement Agreement, Plaintiffs are barred from raising claims upon which the requests for injunctive relief were based pursuant to Main Line Theatres. This court, however, finds that the Main Line Theatres doctrine does not apply.

In Main Line Theatres, the court looked for the "reasonable understanding" between the parties:

Here the suit contained a demand for injunctive prohibition [*25] of future wrongful conduct as well as a claim for money damages for alleged past misconduct. In such circumstances a reasonable person agreeing, without any expression of limitation, to accept a sum in settlement of the litigation should and reasonably would understand that both aspects of the suit were covered by the settlement. Certainly, a defendant offering a sum in settlement of a suit asking, among other things, for an injunction against certain conduct, would not understand that a similar demand could be asserted the day after settlement. This reasonable understanding determines the meaning of the assent expressed by the parties here.

*Main Line Theatres, 298 F.2d at 803* (emphasis supplied). In the instant case the settlement document at issue provides that Curran will dismiss with prejudice the

three aforementioned lawsuits. (Settlement Agreement of October 13, 1994 at 1–2, App. Corp. Defs.' Mot. Summ. J. at A735–36). There is no release language whatsoever. Subsequent to the Main Line Theatres decision, the Third Circuit Court of Appeals has made it clear that the Main Line Theatres doctrine can only be applied when the release language contains no limitations. [*26] In Tabas II, the court noted that the Main Line Theatres doctrine did not apply to releases with specific limiting language:

> In Main Line, plaintiffs could point to no limitations, expressed or implied, in their oral agreement with defendants. Accordingly, their settlement agreement covered their prayers for both injunctive relief and money damages. In the present case, however, the mutual release signed by plaintiffs and [defendant] expressly limits the applicability of the release to any claims arising "from the beginning of the world to November 20, 1987." This express limitation distinguishes the instant case from the facts presented in Main Line.

*Tabas II, 47 F.3d at 1289.*

Although the October 13, 1994 agreement has no limiting language such as that described in Tabas II, absent any language releasing Curran's claims, this court cannot say that the reasonable understanding between the parties was that Curran could never again bring claims for violations taking place after the settlement. Therefore, this court will not apply the Main Line Theatres doctrine.

In contrast, the other settlement agreements in Curran's prior actions all contain [*27] language limiting the release to claims Curran currently had against the various defendants. n7 Thus, these agreements cannot serve to preclude claims Curran brings for conduct occurring after the release dates.

> n7 The other pertinent settlement agreements brought to this court's attention by the Corporate Defendants are: two settlement agreements dated July 18, 1992, and one dated April 20, 1994. One of the agreements dated July 18, 1992 settles the following cases: Reading Anthracite Co. v. Lehigh Coal & Navigation Co., 91–CV–1898 (E.D. Pa.) ("RICO I"); James J. Curran, Jr. v. Lawrence F. Tornetta, 91–CV–2886 (E.D. Pa.) ("RICO II"); and Reading Anthracite Co. v. John W. Rich, Civ. A. No. 89–7110–05–01 (C.P. Bucks) ("the Bucks County Action"). The relevant release language provides that:

> The parties agree that, subject to the terms of this Agreement, they shall mutually release, remise and discharge each other from any and all claims, disputes, suits, liabilities and complaints which any of them presently have against the other, especially, but not limited to the claims set forth in the referenced litigation.

(Settlement Agreement of July 18, 1992, App. Corp. Defs.' Mot. Summ. J. at A270 (emphasis supplied).)

The other agreement dated July 18, 1992 pertains to Schuylkill Skyport Inn, Inc. v. Gilberton Coal Co., 92–CV–1092 (E.D. Pa). Its pertinent language provides that:

> The parties agree that, subject to the terms of this Agreement, they shall mutually release, remise and discharge each other from any and all claims, disputes, suits, liabilities and complaints which any of them had against the other, especially, but not limited to the claim set forth in the referenced litigation.

(Settlement Agreement of July 18, 1992, App. Corp. Defs.' Mot. Summ. J. at A273 (emphasis supplied).)

The agreement dated April 20, 1994 pertains to the following cases: John J. Curran v. James J. Curran, No. S–2145–92 (C.P. Schuylkill); Lehigh Coal & Navigation Co. v. Lawrence F. Tornetta, (C.P. Carbon); RICO I; RICO II; Lehigh Coal & Navigation Co. v. Lawrence F. Tornetta, 92–CV–6030 (E.D. Pa.) ("Tornetta RICO Litigation"); Lehigh Coal & Navigation Co. v. John J. Curran, 93–CV–5572 (E.D. Pa.); James J. Curran, Jr. v. Gloria R. Curran, No. S–1699–93 (C.P. Schuylkill); and the Bucks County Action. This agreement provides in relevant part that:

> The James Curran Parties . . . hereby remise, release and forever discharge the Tornettas . . . of and from any and all . . . claims . . . that the James Curran Parties . . . ever had, now have or in the future may have or claim to have against the Tornetta Interests, for by reason of or arising out of any cause, matter, thing or event from the begin-

ning of the world to the Closing Date.

(Settlement Agreement of April 20, 1994, App. Corp. Defs.' Mot. Summ. J. at A784–85 (emphasis supplied).)

[*28]

### 3. Failure to Make Distributions

Plaintiffs assert that the Defendants engaged in a scheme to defraud Curran by depriving him of cash distributions to which he is entitled. (Third Am. Compl. at 25.) Specifically, Plaintiffs assert that Defendants had accomplished this fraud by "refusing to make the distributions from RAC and SER which are required pursuant to the contract requirements of the December 12, 1980 Shareholder Agreement." Id. at 25.

Defendants point to much past litigation in their argument that this claim is barred. However, this court will discuss only the prior litigation that has the greatest preclusive effect. In Related Party Litigation Curran sued current Defendants Lawrence Tornetta, Robert Ryan, Terrence Ryan, Maria Curran Cantwell, Gloria Rich Curran, David Christ, John W. Rich, Jr., Brian Rich, RAC, and SER. Curran raised the claim of RAC's and SER's failure to pay dividends or inadequate dividends in his Memorandum in Support of the Petition for a Preliminary Injunction. (Mem. Supp. Pet. Prelim. Inj. at 55–57, Related Party Litigation, App. Corp. Defs.' Mot. Summ. J. at A720–22.) This action was dismissed with prejudice on October 28, [*29] 1994. (Praecipe to Dismiss of October 28, 1994, Related Party Litigation, App. Corp. Defs.' Mot. Summ. J. at A734.) Therefore, Plaintiffs are precluded from raising a claim for failure to pay dividends for any time prior to October 28, 1994. However, Plaintiffs allege that this failure to conform to the 1980 Shareholders Agreement continued to occur after this dismissal date. (See Ex. O, Third Am. Compl.) Therefore, a claim remains for the failure to pay dividends from October 28, 1994 to the present.

### 4. Related Party Transactions

Plaintiffs allege that RCG caused RAC and SER to purchase goods and/or services from related party companies, at prices in excess of their market values. (Third Am. Compl. P 70.) These related party transactions concern the purchases of goods and services from Commonwealth Insurance Company, Gilberton Energy Corp., Jack Rich, Inc., Pottsville Fuel Co., Waste Management & Processors, Inc. ("W.M.P.I."), Gilberton Coal Co., Port Carbon Machine Works, JMB, Ltd., J&R Engineering, R&R Energy Corp., and Filter Media. Id. PP 175–235. In Related Party Litigation, Curran claimed that

"affiliated party transactions in excess of $2,000,000 per [*30] year are taking place at RAC despite the fact that these transactions are not at arms length nor deemed fair to RAC and SER." (Compl. P 15, Related Party Litigation, App. Corp. Defs.' Mot. Summ. J. at A618.) All of the companies named in the instant case are named as related companies in Related Party Litigation. (Mem. Supp. Pet. Prelim. Inj. at 4–5, Related Party Litigation, App. Corp. Defs.' Mot. Summ. J. at A669–70.) Thus, all of the current claims could have been raised in Related Party Litigation. Because this action was dismissed with prejudice on October 28, 1994, any such claims arising before this date are barred. With the exception of Commonwealth Insurance Company, n8 Plaintiffs adequately allege that these related party transactions are ongoing. Therefore, a claim remains for transactions with all the named related parties, except Commonwealth Insurance Company, from October 28, 1994 to the present.

> n8 Although Plaintiffs allege that there was an "ongoing scheme to cause RAC and SER to purchase insurance without issuing bids," the facts alleged to support the claim of improper related party transactions with Commonwealth Insurance Company occur before October of 1994. (Third Am. Compl. PP 175, 177.) Therefore, Plaintiffs may not use transactions with Commonwealth Insurance Company to establish their claim of improper related party transactions.

[*31]

### 5. Reckless and Intentional Acts

Plaintiffs allege that RCG was involved in a "scheme to harm RAC and SER by engaging in a series of reckless and intentional acts." (Third Am. Compl. at 29.) Included here are: 1) the Blount matter; 2) the Anthracite Health and Welfare Fund; 3) fraudulent reports to RAC's auditors; 4) waste of corporate assets; 5) and the fraudulent payment of legal expenses. n9 (Third Am. Compl. at 29–30.)

> n9 Also included in these alleged reckless acts is "the scheme to divert RAC Sales to W.M.P.I." (Third Am. Compl. at 30.) This claim is examined in the discussion below on the alleged usurpation of corporate opportunities.

#### a. The Blount Matter

Plaintiffs contend that SER and RAC, under the control of RCG, conspired with others in August 1990 to cause Blount International, Ltd. ("Blount"), a general contractor in the construction of the SER cogeneration facil-

1996 U.S. Dist. LEXIS 12655, *31

ity, to fail the required SER plant performance test. (Third Am. Compl. P 241.) Plaintiffs further assert that "when Blount [*32] discovered this conspiracy of RAC and SER . . ., [Blount] sued the companies and as a result thereof, the companies made significant payment and continued to make payments to Blount in excess of $4,000,000 all to the detriment of RAC and SER." Id. The Corporate Defendants argue that these claims are precluded because similar claims were raised in *Blount International, Ltd. v. Schuylkill Energy Resources, Inc., 1990 U.S. Dist. LEXIS 17366,* Civ. A. No. 88–3886 (E.D. Pa.) and Schuylkill Energy Resources, Inc. v. Blount International, Ltd, Civ. A. No. 90–6980 (E.D. Pa.). These cases were consolidated and finally dismissed with prejudice on February 11, 1993 because a settlement had been reached. As the captions to these cases suggest, these actions concerned claims between Blount and SER. n10 Therefore, the parties are distinct from the ones in the instant case, and these actions have no preclusive effect.

> n10 The Bank of New England intervened in Blount International, Ltd. v. Schuylkill Energy Resources, Inc. Combustion Engineering, Inc., Federal Insurance Company and Hub, Inc. were also named as parties in Schuylkill Energy Resources, Inc. v. Blount International, Ltd.

[*33]

Defendants further contend that the instant claims could have been raised in RICO II, and cite paragraphs 66–103 of the First Amended Complaint in that action. However, the claims raised there concern the financing of SER in such a way as to impair SER's ability to repay RAC and to preclude any benefit to minority stockholders of SER and RAC. (First Am. Compl. PP 66–103, RICO II, App. Corp. Defs.' Mot. Summ. J. at A47–54.) These claims do not appear to arise from the same underlying events as the Blount matter. Therefore, this court finds that these claims could not have been raised in RICO II and are not precluded by the dismissal in that case.

**b. The Anthracite Health and Welfare Fund**

Plaintiffs allege that RCG engaged several mining companies to mine RAC's land, (Third Am. Compl. P 243), and that these companies along with RAC failed to pay royalties to the Anthracite Health and Welfare Fund as required by RAC's agreement with the United Mine Workers of America. Id. P 244. As a result of a suit brought by the Anthracite Health and Welfare Fund, RAC was ordered by the court to pay the amount due plus interest. Id. P 250. Plaintiffs claim that

by [*34] allowing Swank, Split Vein and/or

Norwood Mining to continue their operations through at least 1994, the Rich Control Group, acting in conspiracy with J.M.B., participated in an ongoing scheme to defraud the Health and Welfare fund, which scheme exposed RAC to liability and a judgment against it, thereby causing harm to RAC's business, reputation and property.

(Third Am. Compl. P 251.)

In RICO II Curran alleged that there was a "scheme to defraud the Health and Welfare Fund." (First Am. Compl. P 190, RICO II, App. Corp. Defs.' Mot. Summ. J. at A71.) This action was dismissed with prejudice as to all Defendants except Tornetta on March 5, 1993 (Order of March 5, 1993, RICO II, App. Corp. Defs.' Mot. Summ. J. at A277–78), and an action incorporating RICO II's claims against Tornetta, Tornetta RICO Litigation, was disposed of in a general release dated April 20, 1994. (April 24, 1994 Settlement Agreement, App. Corp. Defs.' Mot. Summ. J. at A783.) Therefore, any claims that Tornetta defrauded the Anthracite Health and Welfare Fund before April 20, 1994 are precluded. Any claims that the other Defendants defrauded this fund before March 5, 1993 are precluded as [*35] well. However, Plaintiffs allege this activity continued to occur after these dates. Thus, claims remain against Tornetta for defrauding this fund from April 20, 1994 to the present and against the other Defendants for such conduct from March 5, 1993 to the present.

**c. Fraudulent Reports to RAC's Auditors**

Plaintiffs claim that in 1992 some of the Defendants caused "fraudulent reports to be given to RAC's independent auditors, Price Waterhouse." (Third Am. Compl. P 265.) In Related Party Litigation, Curran raised claims of fraudulent reporting to Price Waterhouse and asserted that "there were numerous nondisclosed transactions that occurred in 1993 and continue to the present." (Mem. Supp. Pet. Prelim. Inj. at 38, Related Party Litigation, App. Corp. Defs.' Mot. Summ. J. at A703.) As noted previously, this action was dismissed with prejudice on October 28, 1994. Therefore, Plaintiffs' claim of fraudulent reporting to Price Waterhouse is barred.

**d. Waste of Corporate Assets**

Plaintiffs claim that from 1992 and continuing to the present, RCG, in conspiracy with W.M.P.I., has caused RAC to convey the majority of its anthracite waste material to W.M.P.I. at prices [*36] below market value. (Third Am. Compl. PP 279–80.) These claims have already been addressed in the discussion of related party transactions.

1996 U.S. Dist. LEXIS 12655, *36

Plaintiffs also contend that members of RCG have engaged in other acts of waste, such as causing RAC and SER to purchase security services from J.M.B., in which some members of RCG are shareholders, directors, or officers. Id. P 290. This too has been addressed in the discussion of related party transactions.

Plaintiffs further allege that W.M.P.I. does not pay RAC for drying its material in RAC's Silt Drying Facility despite the fact that this is costly to RAC. (Third Am. Compl PP 287–88.) Curran could have raised claims about the Silt Drying Facility in Related Party Litigation. Because this action was dismissed with prejudice on October 28, 1994, any claims for the use of RAC's Silt Drying Facility before this date are barred. Because Plaintiffs assert that this activity is ongoing, a claim remains for the use of RAC's Silt Drying Facility from October 28, 1994 to the present.

In their allegations about waste of corporate assets, Plaintiffs also claim that a lease between Split Vein and RAC was disadvantageous to RAC. Id. PP 299–300. [*37] Plaintiffs further allege that RCG members "have caused RAC's equipment to be inadequately maintained and serviced," and "have caused RAC's personnel to abandon sound mining plans and procedures at the risk of causing severe economic consequences and short falls of coal for RAC." Id. PP 302–303. None of these claims appear to be precluded by dismissals in prior litigation.

### e. Litigation Fund

Plaintiffs assert that RCG has engaged in "fraudulently diverting funds available for distribution into a 'litigation fund' directed against James Curran individually." (Third Am. Compl. at 51.) Plaintiffs assert that "Defendants have failed to make full and fair disclosures to James Curran regarding their indemnification by RAC and/or SER." (RICO Case Statement at 28.) Plaintiffs further assert that Tornetta and other members of RCG "concealed payments and reimbursements" to Tornetta from Curran and the directors of RAC and SER appointed by him. (Third Am. Compl. P 306.)

Curran claimed that RCG members improperly paid litigation expenses in Related Party Litigation. (Mem. Supp. Pet. Prelim. Inj. at 50–51, Related Party Litigation, App. Corp. Defs.' Mot. Summ. J. at A715–16.) [*38] This court finds that claims about the formation of a litigation fund arise out of the same transaction or occurrence and thus could have been brought in Related Party Litigation. Therefore, claims relating to the formation of a litigation fund before the October 28, 1994 dismissal of this action are barred. Because Plaintiffs contend that this activity is ongoing, this claim cannot be dismissed in its entirety. This court is unable to determine from the record

before it whether concealment of payments to Tornetta are also barred because it is unclear when Plaintiffs became aware of such payments. Defendants have leave to challenge this claim on res judicata grounds at the Rule 50(a) stage.

### 6. Conversion of SSI Property

Plaintiffs allege that Defendants "defrauded SSI of its ownership rights by conspiring to convert materials owned by SSI through both removal and complete transfer of ownership of materials without SSI's permission or Fair Market Value payment." (Third Am. Compl. at 26.) Specifically, Plaintiffs refer to SSI's ownership of "various deposits of anthracite material," which

> includes, but is not limited to, deposits known as the "Golf Course Material" [*39] and other deposits that are the refuse resulting from the processing or preparation of material leased by SSI, or commingled therewith . . . "Oak Hill Slush Bank No. 73", "Oak Hill Slush Bank No. 78", "Oak Hill Refuse Banks 235 and 235R", "Bear Valley Slush Bank No. 4", "Burnside Refuse Bank No. 11", "Alaska Culm Bank No. 16", "Excelsior Refuse Bank No. 22", "Keystone Refuse Bank No. 67", "Cambridge Refuse Bank 241", "North Franklin Slush Bank No. 2" and "Gilberton Refuse No. 121."

Id. P 82. Plaintiffs allege that "in furtherance of the scheme of the Rich Control Group to deny SSI of the full benefit [of] its ownership interests, the Rich Control Group and the entities controlled by that Group, prepare and submit to SSI false and misleading reports of tonnage of anthracite waste material removed from banks subject to a continuing SSI royalty obligation with the intent that SSI rely on such reports and be deceived thereby." Id. P 83.

The Memorandum in Support of the Petition for a Preliminary Injunction in Related Party Litigation contains an allegation about the conversion of SSI materials: "A number of these [SSI owned culm and silt] banks are currently being [*40] used by RAC and Control Group Members' related parties without authorization from SSI." (Mem. Supp. Pet. Prelim. Inj. at 19, Related Party Litigation, App. Corp. Defs.' Mot. Summ. J. at A684.) Some of the items listed in the instant action are specifically mentioned: Oak Hill nos. 73, 78, 235, 235R, and Cambridge no. 241. (Mem. Supp. Pet. Prelim. Inj. at 16, Related Party Litigation, App. Corp. Defs.' Mot. Summ. J. at A681.) Plaintiffs are therefore barred from raising claims for conversion of the materials from

1996 U.S. Dist. LEXIS 12655, *40

these specific banks before the October 28, 1994 dismissal date of this prior action. Because Plaintiffs allege the conversion continues to the present, the claim cannot be dismissed completely. Also, because of the alleged concealment, it is not clear that the claims concerning the other banks could have been raised. Defendants may address this at the Rule 50(a) stage.

Plaintiffs also assert that SSI "owns royalty rights on various banks which were sold to RAC and GCC pursuant to separate February 2, 1983 agreements." (Third Am. Compl. P 81.) Plaintiffs further assert that Defendants engaged in a scheme "to deprive SSI of royalty monies through conversion of SSI royalty [*41] monies by establishing a fraudulent 'escrow fund' set up by Defendants FS&C and Cerullo to Deprive SSI of Payments." Id. at 52. Specifically, Plaintiffs refer to the withholding of royalty payments due on a monthly basis from March 1993 to October 1994. Here Plaintiffs essentially repeat claims previously raised in Related Party Litigation. (Mem. Supp. Pet. Prelim. Inj. at 34, 57, Related Party Litigation, App. Corp. Defs.' Mot. Summ. J. at A699, A722.) Therefore, Plaintiffs' claims concerning the establishment of a fraudulent escrow fund and payment of SSI royalties are barred by the October 28, 1994 dismissal of Related Party Litigation.

### 7. Usurpation of Corporate Opportunities

Plaintiffs allege that RCG has usurped corporate opportunities of RAC, SER, and SSI. These allegations involve Ri-Corp Development, Inc. ("Ri-Corp"), JMB Development, Inc., and W.M.P.I. Each will be discussed in turn.

#### a. Ri-Corp

Plaintiffs allege that John Rich, Sr. ("Rich, Sr.") caused Gilberton Power Company, a general partnership, to be formed for the purpose of "acquiring, constructing, installing and operating an electricity and steam cogeneration facility." (Third Am. [*42] Compl. P 122.) Ri-Corp, a corporation owned by Rich, Sr., is a member of this partnership. Plaintiffs assert that Rich, Sr. had a fiduciary obligation to bring to the attention of RAC's and SSI's directors and shareholder the opportunity to participate in the ownership of GPC but failed to disclose the existence of this corporate opportunity. Id. P 124. Plaintiffs contend that because Rich, Sr. was aware of his obligation to RAC and SSI, he disguised his ownership interest in Ri-Corp, a member of the GPC partnership. n11

> n11 In their discussion of Ri-Corp, Plaintiffs also repeat claims for the conversion of SSI material, which has already been discussed.

#### b. JMB Development, Inc.

Plaintiffs maintain that J.M.B. Development, Inc. is in direct competition with SER for the solicitation of private "endusers" of both steam and electricity. (Third Am. Compl. P 149.) RCG allegedly has prevented SER from developing end-users and channels all opportunities to develop end-users to Gilberton Power Co. through [*43] JMB Development, Inc. Id. P 152.

#### c. W.M.P.I.

Plaintiffs allege that since 1992 and continuing to the present, RCG members "without disclosure to the disinterested RAC directors and/or shareholders, have directed RAC's sales of its anthracite waste material to W.M.P.I.," an entity in which RCG members have an interest and which competes directly with RAC in the anthracite waste material market. (Third Am. Compl. PP 159, 166.) These sales have allegedly occurred at below market value and have prevented RAC from engaging in competition with W.M.P.I. by selling to other area cogeneration facilities. Additionally, Plaintiffs allege that RCG members have caused RAC to divert customers to W.M.P.I. and have caused RAC to forego contracts with area cogeneration facilities so that W.M.P.I. may have the benefit of these contracts. Id. P 163.

In Related Party Litigation Plaintiffs raised general claims about the usurpation of RAC's and SER's corporate opportunities. (Mem. Supp. Pet. Prelim. Inj. at 44, Related Party Litigation, App. Corp. Defs.' Mot. Summ. J. at A709.) Plaintiffs claim that they became aware of the extent of John Rich, Sr.'s involvement in Ri-Corp during [*44] discovery for Related Party Litigation in 1994. (Pls.' Argument Br. at 22.) The Corporate Defendants provide evidence of a disclosure to this effect to Plaintiffs during a deposition on May 18, 1992. (Dep. John W. Rich, Sr., 5/18/92, Ex. B, Reply Br. Supp. Corp. Defs.' Mot. Summ. J.) Therefore, this claim could have been raised in Related Party Litigation and is now precluded by the dismissal with prejudice in that action.

Additionally, Curran raised specific claims about diversion of RAC's customers to W.M.P.I. (Mem. Supp. Pet. Prelim. Inj. at 28, 58-63, Related Party Litigation, App. Corp. Defs.' Mot. Summ. J. at A693, A723-28.) All claims for usurpation of corporate opportunities were or could have been raised in this action. Therefore, Plaintiffs are barred from raising claims before the October 28, 1994 dismissal date. Because Plaintiffs allege an ongoing usurpation of corporate opportunities with respect to J.M.B. Development and W.M.P.I., a claim remains for the usurpation of these corporate opportunities from October 28, 1994 to the present.

1996 U.S. Dist. LEXIS 12655, *44

## B. THE PATTERN OF RACKETEERING

In order for Defendants to have violated §§ 1962(a)–(c) of the RICO statute, they [*45] must have engaged in a pattern of racketeering activity or a collection of an unlawful debt. *18 U.S.C. §§ 1962*(a)–(c). Defendants contend that many of Defendants' acts alleged by Plaintiffs do not constitute the requisite racketeering activity. n12 Many of Defendants' alleged predicate acts, in and of themselves, are not included in the definition of racketeering activity listed in the RICO statute, n13 and are more properly considered breaches of fiduciary duty. Violating a fiduciary duty does not constitute racketeering activity under RICO. *Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1409 (11th Cir. 1994),* cert. denied, *130 L. Ed. 2d 784, 115 S. Ct. 900 (1995).* However, the RICO statute does include mail and wire fraud as racketeering activity. *18 U.S.C. § 1961*(1). Plaintiffs generally allege that these various breaches of fiduciary duty involved schemes to defraud and the use of the mails or wires. To the extent that these breaches of fiduciary duty fulfill the requirements of mail and wire fraud, this court will consider them predicate acts. See *United States v. Waymer, 55 F.3d 564, 571 (11th Cir. 1995)* ("A defendant's breach of a fiduciary duty may [*46] be a predicate for a violation of the mail fraud statute where the breach entails the violation of a duty to disclose material information."), cert. denied, *134 L. Ed. 2d 519, 116 S. Ct. 1350 (1996); McLendon v. Continental Group, Inc., 602 F. Supp. 1492, 1508 (D.N.J. 1985)* (stating that the mail fraud statute "has been used to address various types of business–related fraud, most of which involve some sort of breach of fiduciary duty").

n12 The Corporate Defendants argue that the following do not constitute racketeering activity: (1) conversion of SSI property; (2) failure to distribute available SER monies; (3) concealing monies allegedly owed to Curran by SER through the creation of phantom expenses; (4) the related party transactions; and (5) usurpation of corporate opportunities. (Corp. Defs.' Br. Supp. Mot. Strike Third Am. Compl & Opp'n Pls.' Br. Supp. Third Am. Compl. at 18, 23, 25, 28; Reply Argument Br. at 10, 12, 16.)

Tornetta contends that "Tornetta's acts alleged by Curran, Jr., including his director's votes at RAC and SER and the settlement he reached with Curran, Jr. in the Tornetta RICO Litigation, could not be deemed predicate acts for purposes of liability under RICO." (Letter from Tornetta to the Court of May 9, 1996, at 3.) As to the Defendants' alleged acts of mail and wire fraud, Tornetta alleges that Plaintiffs rely on "the innocent acts of mailing implemented in connection with the Rich Control Group's alleged Schemes to defraud" Curran, including decisions of the Board of Directors. Id. Tornetta asserts that Plaintiffs have "completely failed to allege any fraud or misrepresentation with respect to Tornetta" and that absent the element of deceit there can be no mail or wire fraud. Id. at 4.

[*47]

n13 A predicate act or racketeering activity is defined in the RICO statute at *18 U.S.C. § 1961* (1).

The federal mail fraud statute, *18 U.S.C. § 1341,* and the federal wire fraud statute, *18 U.S.C. § 1343,* contain the following essential elements: (1) a scheme to defraud; n14 and (2) the use of the mails or wires for the purpose of executing the scheme. *18 U.S.C. §§ 1341,* 1343; see also *United States v. Frey, 42 F.3d 795, 797 (3d Cir. 1994)* (stating that these are the essential elements of the mail fraud statute) (citations omitted), cert. denied, *450 U.S. 998 (1981).* The mail fraud statute is to be interpreted broadly. *McLendon, 602 F. Supp. at 1508.* Because Plaintiffs rely primarily on allegations of mail fraud, this court will focus on the elements of mail fraud.

n14 With respect to the scheme element, the mail and wire fraud statutes have been identically construed. *United States v. Siegel, 717 F.2d 9, 14 (2d Cir. 1993).*

[*48]

"The courts have liberally construed the phrase 'scheme to defraud' to include 'any plan, consummated by the use of the mails, in which artifice or deceit is employed to obtain something of value with the intention of depriving the owner of his property.'" *Waldo v. North Am. Van Lines, Inc., 669 F. Supp. 722, 735–36 (W.D. Pa. 1987)* (citation omitted). A scheme to defraud "has a wider meaning than an individual act of fraud." *United States v. Massey, 48 F.3d 1560, 1566 (10th Cir.),* cert. denied, *115 S. Ct. 2628 (1995).* Such a scheme "refers to the overall design to defraud one or many by means of a common plan or technique." Id. The mail and wire fraud statutes are not limited by common law concepts of fraud. *McLendon, 602 F. Supp. at 1508.* For example, "the RICO predicate acts of mail and wire fraud do not require actual reliance." *Prudential Ins. Co. of America v. United States Gypsum Co., 828 F. Supp. 287, 295 (D.N.J. 1993).* The Third Circuit Court of Appeals has defined this requisite deceit as follows:

Under the mail fraud statute, a scheme or ar-

tifice to defraud 'need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentations [*49] or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension.' The scheme need not involve affirmative misrepresentation, but the statutory term 'defraud' usually signifies 'the deprivation of something of value by trick, deceit, chicane or overreaching.'"

*Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1415* (3d Cir.), (citations omitted), cert. denied, *501 U.S. 1222, 115 L. Ed. 2d 1007, 111 S. Ct. 2839 (1991)*. Thus, in order to be a scheme under the mail fraud statute there must at least be the elements of deceit and deprivation or attempt to deprive. See *Pelletier v. Zweifel, 921 F.2d 1465, 1500* (11th Cir.) ("Under the mail and wire fraud statutes, a plaintiff only can show a scheme to defraud if he proves that some type of deceptive conduct occurred."), cert. denied, *502 U.S. 855, 112 S. Ct. 167, 116 L. Ed. 2d 131 (1991); United States v. Bronston, 658 F.2d 920, 927 (2d Cir. 1981)* (stating that although it is not necessary to show that a mail fraud scheme's victims were in fact defrauded, some actual harm or injury must at least have been contemplated), cert. denied, 456 U.S. (1982).

Concerning the element of [*50] "the use of the mails," the Third Circuit Court of Appeals has held that the mailing need not be essential to the scheme to defraud, it need only further such a scheme. *United States v. Adamo, 534 F.2d 31, 36 (3d Cir. 1976)*. Innocent mailing containing no false information may supply the mailing element, and it is not necessary that the mailings be made by the defendant to an alleged victim of the fraud. *Schmuck v. United States, 489 U.S. 705, 715, 103 L. Ed. 2d 734, 109 S. Ct. 1443 (1989)*.

Thus the critical question here is whether the alleged schemes challenged by the Corporate Defendants and Tornetta have the requisite characteristics of deceit and deprivation and whether the mails or wires were used to further these schemes. If so, this court will consider them predicate acts.

### 1. Failure to Distribute Available SER & RAC Monies

As noted previously, Plaintiffs allege that Defendants engaged in a scheme to defraud Curran by depriving him of cash distributions to which he is entitled. (Third Am. Compl. at 25.) Specifically, Plaintiffs assert that Defendants have accomplished this fraud by "refusing to make the distributions from RAC and SER which are required pursuant [*51] to the contract requirements of the December 12, 1980 Shareholder Agreement." Id.

If Plaintiffs' allegations were limited to Defendants' failure to fulfill their contractual obligations to make distributions, they would not rise to the level of a scheme to defraud because the element of deceit is missing. See *United States v. D'Amato, 39 F.3d 1249, 1261 n.8 (2d Cir. 1994)* ("A breach of contract does not amount to mail fraud.") Therefore, the "scheme" to defraud Curran by failing to make distributions from SER pursuant to the 1980 Shareholders Agreement does not constitute a predicate act. However, as to distributions from RAC, Plaintiffs allege that this scheme includes the making of misrepresentations to Meridian Bank. Specifically, Plaintiffs contend that RCG sought to evade paying distributions to Curran pursuant to the 1980 Shareholders Agreement by entering into a loan agreement ("the Loan Agreement") with Meridian Bank and that this Loan Agreement contains covenants that preclude these distributions. Plaintiffs' allegation that RCG conspired to defraud Curran by manipulating the Meridian Bank to make loans to RAC without disclosing the existence of the 1980 Shareholder [*52] Agreement contains the elements of deceit and deprivation necessary to a mail fraud claim. Although the alleged misrepresentation was made to Meridian Bank rather than to Curran, this is not fatal to Curran's pleading of a scheme under the mail fraud statute. *United States v. Pepper, 51 F.3d 469, 473 (5th Cir. 1995)* (stating that under the mail fraud statute there is no "requirement that direct misrepresentations must be made to the victims of the scheme"); *United States v. Kennedy, 64 F.3d 1465, 1476* (10th Cir.) (stating that under the mail fraud statute it is not necessary to provide evidence of actual misrepresentations to individual victims to establish existence of the alleged fraudulent scheme), cert. denied, *349 U.S. 932 (1995)*. But see, *Central Distributors of Beer, Inc. v. Conn, 5 F.3d 181, 184 (6th Cir. 1993)* (stating that "the fraud connected with mail or wire fraud must involve misrepresentations or omissions flowing from the defendant to the plaintiff"), cert. denied, *129 L. Ed. 2d 812, 114 S. Ct. 2678 (1994)*.

Concerning the second element of the mail fraud statute, Plaintiffs allege that RCG caused a letter to be sent to Meridian Bank; this letter [*53] "advised the Bank that RAC had the full corporate authority to enter into the transaction and failed to disclose to the Bank the existence of the 1980 Shareholders Agreement and 1992 Settlement Agreement." (Third Am. Compl. P 65.) As a result of this alleged misrepresentation, the Meridian Bank's Loan Agreement, which conflicts with the terms of the 1980 Stockholders Agreement, "abrogates" Curran's contract rights. Id. P 67. These allegations satisfy the mailing element. Therefore, the purported RCG scheme to defraud Curran by failing to make distributions from

RAC pursuant to the 1980 Shareholders Agreement constitutes a predicate act of mail fraud.

### 2. Related Party Transactions

As noted previously, Plaintiffs allege that RCG caused RAC and SER to purchase goods and/or services from related party companies, at prices in excess of the market values. (Third Am. Compl. P 70.) These transactions with related parties were allegedly conducted "without the knowledge and/or approval of the disinterested directors and/or shareholders of RAC and SER." (Third Am. Compl. P 235.) "Although mere breach of fiduciary duty, standing alone, may not necessarily constitute a mail fraud, the [*54] concealment by a fiduciary of material information which he is under a duty to disclose to another under circumstances where the non–disclosure could or does result in harm to the other is a violation of the [mail fraud] statute." *United States v. Bronston, 658 F.2d 920, 926 (2d Cir. 1981)* (citations omitted), cert. denied, *456 U.S. 915, 72 L. Ed. 2d 174, 102 S. Ct. 1769 (1982)*. Pursuant to § 1728 of the Business Corporation Law of 1988, the material facts concerning transactions or contracts between a business corporation and one or more of its directors or officers or between a business corporation and an entity in which one or more of its directors or officers has an interest must be disclosed to the board of directors or the shareholders. *15 Pa. Cons. Stat. Ann. § 1728.* n15 Therefore, Plaintiffs have alleged concealment of facts where there was a duty to disclose and have therefore adequately alleged deceit.

> n15 Pursuant to *15 Pa. Cons. Stat. Ann. § 1728,* these material facts need not be disclosed to the board or the shareholders if "the contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified by the board of directors or shareholders." *15 Pa. Cons. Stat. Ann. § 1728(a)(3).* However, even this condition presumes disclosure of some kind to the board or the shareholders to enable them to authorize, approve or ratify the contract or transaction.

[*55]

The Corporate Defendants contend that there was no deprivation of property resulting from these related party transactions. (Corp. Defs.' Br. Supp. Mot. Strike at 25.) Plaintiffs allege, however, that these transactions "have caused RAC and SER substantial[] injury, reducing the amount of money in the companies and [money] available for distributions." (Third Am. Compl. P 72.) Although for purposes of the mail fraud statute, "proof of actual loss by the intended victim is not necessary," *United States v. Copple, 24 F.3d 535, 544 (3d Cir. 1994)* (citations

omitted), cert. denied, *130 L. Ed. 2d 400, 115 S. Ct. 488 (1994),* "the statutory term 'defraud' usually signifies 'the deprivation of something of value by trick, deceit, chicane or overreaching.'" *Kehr Packages, 926 F.2d at 1415.* Although it is not necessary to show that a mail fraud scheme's victims were in fact defrauded, some actual harm or injury must at least have been contemplated. *Bronston, 658 F.2d at 927.* Here, Plaintiffs have alleged that RAC and SER lost money on the purchase of goods and services with inflated prices. Therefore, Plaintiffs have adequately alleged the deceit and deprivations elements [*56] of the mail fraud statute.

Plaintiffs allege that these related party transactions have involved "the repeated use of the United States mails or telephone calls in interstate commerce." (Third Am. Compl. P 179; see also id. PP 183–84, 190–91, 202, 210–11, 217, 221, 228, 223–33.) Additionally, Plaintiffs assert that these mailings include purchase orders, sales request, payments, account statements, and that the telephone calls include calls between RAC Sales and /or Purchasing Department and the related parties. (RICO Case Statement at 23.) Additionally, Plaintiffs assert that the use of the mails and wires occurred from 1992 to the present. Id. Because of the aforementioned preclusive effect of the dismissal in Related Party Litigation, this court will consider only mailings or telephone calls occurring after October 28, 1994. Plaintiffs have not presented the court with specific evidence of such mailings. However, this court's order of November 27, 1995 stayed discovery. Therefore, at this stage in the proceedings this court cannot grant the Corporate Defendants' Motion for Summary Judgment on the issue of whether the related party transactions constitute predicate acts. [*57] Defendants have leave to present arguments on this issue at the Rule 50(a) stage.

### 3. Reckless Acts

Plaintiffs allege that RCG was involved in a "scheme to harm RAC and SER by engaging in a series of reckless and intentional acts." (Third Am. Compl. at 29; RICO Case Statement at 29.) Included here are (1) the Blount matter; (2) the Anthracite Health and Welfare Fund; (3) fraudulent reports to RAC's auditors; (4) waste of corporate assets; and (5) the fraudulent payment of legal expenses. n16 (Third Am. Compl. at 29–30.) Each of these alleged reckless or intentional acts will be discussed with the exception of the alleged fraudulent reports to RAC's auditors because that allegation concerns the purported fraudulent reporting to Price Waterhouse, which, as discussed above, is precluded.

> n16 Included in these alleged reckless acts is "the scheme to divert RAC Sales to W.M.P.I."

(Third Am. Compl. at 30.) This claim is examined in the discussion below on the alleged usurpation of corporate opportunities.

### [*58] a. The Blount Matter

Plaintiffs allege that SER and RAC, while under the control of RCG, and members of a bank financing group, conspired against Blount International, Ltd. ("Blount") in August of 1990. Blount had been retained by SER to act as a general contractor in the construction of the SER cogeneration facility. (Third Am. Compl. P 241.) The alleged purpose of this purported conspiracy was to cause Blount to fail the SER plant performance test. This was supposedly accomplished by the delivery of low quality culm fuel to Blount and by adding moisture to the fuel. Blount discovered this alleged conspiracy and sued RAC and SER. The result has been payment to Blount in excess of $4 million. Id.

Plaintiffs have failed to properly allege deceit sufficient to establish a claim for mail or wire fraud. Therefore, this court finds that the Blount matter is not a predicate act.

### b. The Anthracite Health and Welfare Fund

Plaintiffs allege RCG engaged several mining companies to mine RAC's land. (Third Am. Compl. P 243.) These companies and RAC failed to pay royalties to the Anthracite Health and Welfare Fund as required by RAC's agreement with the United Mine Workers of [*59] America. Id. P 244. Subsequent to a suit brought by the Anthracite Health and Welfare Fund, RAC was ordered by the court to pay the amount due plus interest. Id. P 250. Again, no element of deceit is alleged here. Therefore, this cannot be considered a predicate act.

### c. Waste of Corporate Assets

Plaintiffs allege that since 1992 and continuing to the present members of RCG, in conspiracy with W.M.P.I., have caused RAC to convey the majority of its anthracite material to W.M.P.I. at below market prices and without notice to RAC's disinterested shareholders and/or directors. (Third Am. Compl. PP 279–80.) Plaintiffs contend that these sales are part of an ongoing scheme to "cripple RAC's ability to compete with W.M.P.I. in the cogeneration market by wasting its assets and diverting these assets to W.M.P.I." Id. P 282. This is essentially a reiteration of Plaintiffs' claim against RCG members for related party transactions. See id. PP 192–198. As noted previously, Plaintiffs have adequately alleged a mail fraud scheme involving related party transactions.

Plaintiffs also allege that RCG members have wasted corporate assets by causing RAC and SER to purchase se-

curity [*60] services from J.M.B., in which some members of RCG are shareholders, directors, or officers. (Third Am. Compl. P 290.) This too has been discussed above in the examination of related party transactions. Plaintiffs further allege that W.M.P.I. does not pay RAC for drying its material in RAC's Silt Drying Facility despite the fact that this is costly to RAC, (Third Am. Compl. PP 287), and that a lease between Split Vein and RAC was disadvantageous to RAC. Id. PP 299–300. Plaintiffs also contend that RCG members "have caused RAC's equipment to be inadequately maintained and serviced," and "have caused RAC's personnel to abandon sound mining plans and procedures at the risk of causing severe economic consequences and short falls of coal for RAC." Id. PP 302–303.

Absent in the preceding are allegations of deceit. Therefore, Plaintiffs have failed to establish a violation of the mail or wire fraud statutes. Therefore W.M.P.I.'s failure to pay for the use of RAC's drying facility, the Split Vein lease, and the inadequate maintenance and poor mining procedures do not constitute predicate acts.

### d. Fraudulent Payment of Litigation Expenses

Plaintiffs assert that RCG has engaged [*61] in "fraudulently diverting funds available for distribution into a 'litigation fund' directed against James Curran individually." (Third Am. Compl. at 51.) Plaintiffs assert that "Defendants have failed to make full and fair disclosures to James Curran regarding their indemnification by RAC and/or SER." (RICO Case Statement at 28.) Plaintiffs further assert that Tornetta and other members of RCG "concealed payments and reimbursements to" Tornetta from Curran and the directors of RAC and SER appointed by him. (Third Am. Compl. P 306.) "A defendant's breach of a fiduciary duty may be a predicate for a violation of the mail fraud statute where the breach entails the violation of a duty to disclose material information." *United States v. Waymer, 55 F.3d 564, 571 (11th Cir. 1995)* (citation omitted), cert. denied, *134 L. Ed. 2d 519, 116 S. Ct. 1350 (1996)*. In the instant case Plaintiffs fail to provide the circumstances under which the alleged "concealment" occurred, making it impossible for this court to determine whether Defendants violated a duty to disclose. Plaintiff has the burden to provide such information surrounding the circumstances of any alleged fraud. In Seville Indus. [*62] *Machinery v. Southmost Machinery, 742 F.2d 786 (3d Cir. 1984),* cert. denied, *469 U.S. 1211, 84 L. Ed. 2d 327, 105 S. Ct. 1179 (1985),* the Third Circuit stated that "Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent be-

1996 U.S. Dist. LEXIS 12655, *62

havior." *Id. at 791.* Plaintiffs have failed to meet this standard, rendering it impossible for this court to determine if there is requisite deceit here. Therefore, the alleged fraudulent payment of litigation expenses does not constitute a predicate act.

#### 4. Manipulation of Meridian Loan Agreements

Plaintiffs contend that RCG manipulated the financing of the Meridian Bank loan "in such a manner that would preclude and prevent James Curran, and entities in which he has interests, from participating and competing with entities in which the Rich Control Group members have beneficial interests." (Third Am. Compl. P 75.) Because Plaintiffs have failed to allege the element of deceit, this does not constitute a predicate act.

#### 5. Manipulation [*63] of SER's Records

Plaintiffs maintain that RCG members have engaged in a scheme "to defraud and prevent James Curran and entities in which he has an interest from engaging in any transactions with SER through the SER refinancing documents." (Third Am. Compl. at 40.) Plaintiffs contend that RCG "manipulated the refinancing of SER in such a manner that would preclude and prevent James Curran, and entities in which he has interests, from participating and competing with entities in which the Rich Control Group members have beneficial interests." (Third Am. Compl. P 77.) Because Plaintiffs have failed to allege the element of deceit, this does not constitute a predicate act.

#### 6. Conversion of SSI Property

Plaintiffs allege that in furtherance of the alleged scheme to defraud SSI, "the Rich Control Group and the entities controlled by that Group, prepare and submit to SSI false and misleading reports of tonnage of anthracite waste material removed from banks subject to a continuing SSI royalty obligation with the intent that SSI rely on such reports and be deceived thereby." (Third Am. Compl. P 83.) Thus, the necessary elements of deceit and deprivation are present.

Plaintiffs [*64] contend that these purported fraudulent reports were sent through the mail. Id. P 84. Because Plaintiffs are precluded from raising conversion claims related to the Oak Hill Nos. 73, 78, 235, 235R and Cambridge No. 241 banks prior to October 28, 1994, any mailing Plaintiffs produce in reference to these banks must be from after this date. Plaintiffs have failed to provide evidence of such mailings thus far. n17 However, because discovery has been stayed in the instant case, Plaintiffs will be allowed to present such evidence at trial, at which time the Defendants may argue against the sufficiency of the evidence at the Rule 50(a) stage.

n17 In the RICO Case Statement Plaintiffs cite several letters in reference to the scheme to defraud SSI. (RICO Case Statement at 34–37.) Some of these letters refer to the Oak Hill banks, but only one is dated after October 28, 1994: the letter of Sean Curran to Gloria R. Curran dated December 2, 1994. Id. at 34. This letter, addressed to one of the Defendants, does not fulfill the mail fraud statute's requirement because it does not appear to be "incident to an essential part of the scheme." See *Pereira v. United States, 347 U.S. 1, 8, 98 L. Ed. 435, 74 S. Ct. 358 (1954).*

[*65]

#### 7. Concealing Monies

Plaintiffs assert that RCG members have concealed and diverted monies that SER owes Curran. Basically, Plaintiffs allege that from 1992 to 1995 RCG members conducted a scheme wherein they have diverted and concealed monies which should have been distributed to SER shareholders. (Third Am. Compl. P 116.) To this end, RCG allegedly created "phantom expenses" at SER, diverted funds into a litigation fund, transferred money to RAC for an ash pit, and concealed from Curran the amount of monies available for distribution from RAC and SER. Each allegation will be examined in turn except the litigation fund which has already been discussed.

#### a. Phantom Expenses

Plaintiffs allege that in 1994 and 1995 and continuing to the present RCG members created "phantom expenses" and made intentional misrepresentations regarding other SER expenses. Id. P 118. By making such misrepresentations Defendants allegedly reduced the amount of monies available for distribution. Plaintiffs allege that this misrepresentation has involved the use of the mail. Id.

It has been recognized that "[a] stockholder's right to monitor and to police the behavior of the corporation [*66] and its officers is a property interest." *United States v. Wallach, 935 F.2d 445, 463 (2d Cir. 1991),* aff'd, *979 F.2d 912 (2d Cir. 1992),* cert. denied, *508 U.S. 939, 124 L. Ed. 2d 637, 113 S. Ct. 2414 (1993).* Plaintiffs have adequately alleged deceit and deprivation of this interest. Plaintiffs assert that this scheme is accomplished by means of a monthly mailing of an "Officers Certificate." (Third Am. Compl. P 118.) Therefore, Plaintiffs have adequately alleged the mailing element of a mail fraud violation.

#### b. Ash Pit

Plaintiffs contend that RCG has engaged in a scheme to defraud Curran and SER by "transferring one million

1996 U.S. Dist. LEXIS 12655, *66

dollars to RAC for a 'development fee' for an ash disposal pit which SER does not need and which SER cannot use." (Third Am. Compl. at 52.) Because Plaintiffs have failed to adequately allege deceit, this does not constitute the predicate act of mail fraud.

### c. Concealing the Amount of Money Available for Distribution From SER and RAC

Plaintiffs assert that RCG has engaged in a scheme to fraudulently conceal from Curran "the amount of monies available for distribution from RAC and SER to cause him to default on his contractual obligations [*67] pursuant to an April 20, 1994 Agreement with Tornetta." (Third Am. Compl. at 52.) Plaintiffs fail to articulate the nature of this alleged "fraudulent concealment." n18 Because this allegation is not in conformity with even a liberal construction of Rule 9(b), this general allegation of concealing the amount of money available for distribution does not constitute a predicate act.

> n18 In their Brief in Support of Plaintiffs' Response to Defendants' Brief in Support of Motion to Strike Third Amended Complaint, Plaintiffs allege that "despite the fact that James Curran and his representatives have made numerous requests to RAC's and SER's management and Cerullo for information, they have repeatedly been denied those requests because the defendants have contended that those matters are the subject of litigation." (Pls.' Br. Supp. Resp. Corp. Defs.' Br. Supp. Mot. Strike Third Am. Compl. at 16.) With one exception, Plaintiffs cite letters postdating the initiation of the ongoing litigation in the instant case. Id. As noted, discovery has been stayed in this action. Therefore, failure of the parties to provide discoverable material does not rise to the level of fraudulent concealment. Plaintiffs also cite to a letter dated May 3, 1993 from John Rich, Jr. to James and Sean Curran. Id. at Ex. 3. At most this letter provides evidence that John Rich, Jr. told them that he believed they had received all the information to which they were entitled.

[*68]

### 8. Usurpation of Corporate Opportunities

Plaintiffs allege that RCG has usurped corporate opportunities of RAC, SER, and SSI. These allegations involve Ri–Corp, JMB Development, Inc. and W.M.P.I. Because the claim concerning Ri–Corp is precluded, the examination of these alleged predicate acts will be limited to JMB Development, Inc. and W.M.P.I.

### a. JMB Development, Inc.

Plaintiffs maintain that J.M.B. Development, Inc. is in direct competition with SER for the solicitation of private "end–users" of both steam and electricity. (Third Am. Compl. P 149.) RCG members allegedly have prevented SER from developing end–users and channel all opportunities to develop end–users to Gilberton Power Co. through JMB Development, Inc. Id. P. 152.

Plaintiffs allege that RCG and JMB Development, Inc. have fraudulently concealed these corporate opportunities. Id. P 153. Under Pennsylvania law, directors have a duty to disclose corporate opportunities to the corporation before seizing them for personal gain. *CST, Inc. v. Mark, 360 Pa. Super. 303, 520 A.2d 469, 471 (Pa. Super.)* (stating that an officer or director may seize a corporate opportunity if, inter alia, the opportunity [*69] is disclosed to the shareholders) (citations omitted), appeal denied, *539 A.2d 811 (Pa. 1987)*. Thus, the element of deceit is present because there was an alleged lack of disclosure when such a duty existed. See *D'Iorio v. Adonizio, 554 F. Supp. 222, 228 (M.D. Pa. 1982)* (finding adequate allegations of mail fraud where fraud alleged "appeared to be predicated on a breach of fiduciary duty including the wrongful siphoning off of business opportunities and assets").

Plaintiffs assert that this "diversion of SER's opportunities . . . was contemplated and achieved in part through use of the United States mails and telecommunications in interstate commerce." (Third Am. Compl. P 154.) Because of the preclusive effect of the October 28, 1994 dismissal of Related Party Litigation, Plaintiffs must provide evidence of use of the mails or wires incidental to an essential part of the scheme after this date or be subject to judgment in favor of Defendants at the Rule 50(a) stage.

### b. W.M.P.I.

Plaintiffs claim that RCG, acting in conspiracy with W.M.P.I., "fraudulently induced RAC to forego anthracite waste sales to the benefit of W.M.P.I." and RCG. Id. at 60. In service [*70] of this scheme, RCG members have caused RAC to divert customers to W.M.P.I. and caused RAC to forego contracts with area cogeneration facilities in order for W.M.P.I. to have the benefit of these contracts. Id. P 163. Plaintiffs also contend that RCG members have directed RAC's sales of its anthracite waste material to W.M.P.I., id. P 159, which has been addressed in the discussion of related party transactions.

The only element of deceit alleged by Plaintiffs concerns the lack of disclosures of RAC's sales to W.M.P.I. Because no deceit is alleged in relation to the purported diversion of customers and contracts to W.M.P.I., Plaintiffs have inadequately alleged a mail fraud scheme and thus these claims of diversion do not constitute predicate acts.

### 9. Scheme to Cause Curran to Default on the Agreement with Tornetta

Plaintiffs claim that "by depriving James Curran of cash distributions from RAC and SER, [RCG] members hope to cause James Curran to default on an agreement with Tornetta, a Rich Control Group member." (Third Am. Compl. at 30.) In furtherance of this scheme RCG members concealed the amount of monies available for distribution from RAC and SER, deprived [*71] RAC of corporate opportunities, depleted RAC's treasury through related party transactions, and engaged in willful and reckless acts of mismanagement to destroy the value of RAC and SER shares. Rather than alleging a predicate act, Plaintiffs here appear to discuss the purpose of some of the aforementioned predicate acts.

Tornetta argues that "it is well established that when economic reality renders a party's claims so 'implausible' that 'the record taken as a whole could not lead a rational trier of fact to find for the non–moving party, there is no 'genuine issue for trial.'" (Tornetta's Reply Br. Supp. Mot. Summ. J. at 4 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)).)* In Matsushita, the Court stated that "if the factual context renders [the plaintiffs'] claim implausible—if the claim is one that simply makes no economic sense — [plaintiffs] must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita, 475 U.S. at 587.*

Tornetta contends that "Curran, Jr.'s allegation that Tornetta is a member of the Rich Control Group — which [*72] is the sole basis for his claims against Tornetta — rests upon the inherently implausible proposition that Tornetta would have given up $4 million in distributions from RAC and SER in order to obtain contracts and indemnification worth approximately $50,000." Id. at 4. Tornetta bases this contention on Curran's allegation that his share of the distributions from RAC and SER that were wrongly withheld amounts to over $10 million. Id. at 4–5. Curran alleges that he has approximately a thirty–five percent interest in these companies, (Third Am. Compl. P 5), and Tornetta claims a fourteen percent stake in them. (Tornetta's Reply Br. Supp. Mot. Summ. J. at 5 n.5.) Because "Tornetta lost 40% of whatever distribution Curran, Jr. lost [,] if Curran, Jr. lost $10 million in distributions, Tornetta lost $4 million." Id. at 5. Tornetta argues that these losses are not offset by the funds he allegedly derived from related party transactions ($ 50,000) or the amount of money RAC allegedly spent in indemnifying him for legal expenses incurred in Tornetta RICO Litigation ($ 40,000). Id. at 5–6.

Plaintiffs respond in two ways. First, they correctly assert that economic [*73] motivation is not a prerequi-

site for liability under RICO. *National Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 114 S. Ct. 798, 803–04, 127 L. Ed. 2d 99 (1994).* Plaintiffs allege that the result of defaulting on his agreement with Tornetta would be "James Curran's loss of the RAC and SER pledged [stock], with the result that the Rich Control Group would obtain it." Id. Plaintiffs allege that control is part of Tornetta's motivation. (Plaintiff's letter to the court of 6/25/96, at 2.) Plaintiffs further allege that Tornetta has "personal and professional relationships with the Rich family, which relationships provide him with a motive to engage in racketeering activities with them against James Curran." (Pls.' Surreply to Tornetta's Mot. Summ. J. at 3.) Thus, Plaintiffs have alleged noneconomic motivations for Tornetta.

Second, Plaintiffs assert that they have provided sufficient evidence of an economic motivation to make it at least a triable issue. Id. at 3. Plaintiffs cite to the Stock Hypothecation, Transfer, Assignment and Security Agreement, by the terms of which Tornetta will gain stock with an alleged minimum value of $2.1 million if James Curran defaults [*74] on his financial obligations to Tornetta pursuant to the terms of the April 20, 1994 Settlement Agreement. Id. at 4–5. Tornetta responds that Lehigh Coal and Navigation Company ("LC&N") rather than Curran is obliged to pay Tornetta under the terms of that settlement agreement. (Letter of Lawrence Tornetta to the court of 5/9/96, at 3.) However, Tornetta acknowledges that Curran is the guarantor for LC&N's obligations under this settlement agreement. Id. Plaintiffs cite Curran's affidavit wherein Curran states that he relies on distributions from RAC and SER in order to meet the financial obligations under this agreement. (Pls.' Surreply to Tornetta's Mot. Summ. J. at 5.) Plaintiffs argue that Curran's reliance on distributions from RAC and SER to meet his obligations to Tornetta is a genuine issue of material fact. Id. Plaintiffs also provide evidence that Tornetta's indemnification from RAC may be larger than Tornetta suggests, that is, evidence that Tornetta is seeking $200,000 in indemnification from RAC and that such is being considered by RAC's management. Id.

In light of the alleged noneconomic motivation for Tornetta's involvement and factual questions surrounding [*75] Tornetta's economic motivation, the court will not grant summary judgment in favor of Tornetta on this issue.

### 10. Tornetta's Involvement in the Predicate Acts

Tornetta alleges that Curran cannot implicate him in any predicate acts of mail fraud because of the absence of deceit on the part of Tornetta. (See Letter of Lawrence Tornetta to the court of 5/9/96, at 4 (stating that Plaintiffs have "completely failed to allege any fraud or misrepresentation with respect to Tornetta").) Plaintiffs allege that

Tornetta, a director and shareholder of RAC and SER, was "a member of the Rich Control Group, [and agreed] to act in concert with the other members to commit predicate acts of mail and wire fraud." (Third Am. Compl. P 20.) Plaintiffs assert that Tornetta is liable at least for aiding and abetting. See *Fidelity Fed. Sav. & Loan Ass'n v. Felicetti, 830 F. Supp. 257, 261 (E.D. Pa. 1993)* (stating that "an aider and abettor of two predicate acts can be civilly liable under RICO") (citation omitted). Plaintiffs further assert that for § 1962(d) liability, Tornetta need not have committed the predicate acts; simply agreeing to the commission of these acts is sufficient for [*76] RICO liability. See *United States v. Adams, 759 F.2d 1099, 1116* (3d Cir.) (stating that "to be convicted of a RICO conspiracy, a defendant must agree only to the commission of the predicate acts, and need not agree to commit personally those acts"), cert denied, *474 U.S. 906,* and cert. denied, *474 U.S. 971, 88 L. Ed. 2d 321, 106 S. Ct. 336 (1985).* Because of the discovery stay and the dispute on these material facts, the court declines to grant summary judgment in favor of Tornetta on this issue. However, Tornetta has leave to resubmit this argument at the Rule 50(a) stage.

**11. Summary of Predicate Acts**

The court will consider the following as predicate acts because Plaintiffs have adequately alleged mail fraud schemes involving these acts: (1) the scheme to withhold distributions through the Meridian Bank Loan Agreement, (2) the related party transactions; (3) the conversion of SSI property; (4) the phantom expenses; and (5) the usurpation of corporate opportunities through J.M.B. Development. As noted, Defendants have leave to challenge the related party transactions, the conversion of SSI property, the diversion of corporate opportunities through J.M.B. Development, [*77] and Tornetta's involvement in the predicate acts at the Rule 50(a) stage.

Because Plaintiffs have alleged two or more predicate acts to establish a pattern of racketeering activity, n19 their RICO claims withstand the motions for summary judgment filed by Tornetta and the Corporate Defendants.

n19 A pattern of racketeering activity requires at least two acts of racketeering activity. *18 U.S.C. § 1961*(5).

**C. ESTOPPEL**

The Corporate Defendants argue that Curran is equitably estopped from seeking to compel distributions under the 1980 Stockholders Agreement because he never made any distributions pursuant to the formula contained in that agreement. (Corp. Defs.' Br. Supp. Mot. Summ. J. at 57.) The Corporate Defendants allege that "there were no dis-

tributions to the stockholders for any reason from 1987 through September 6, 1990, when Curran Jr. was Chief Executive Officer of RAC." Id. at 58 (emphasis deleted). Further, Defendants assert that a letter by Curran dated May 18, 1989 shows that he "did not [*78] believe that the 1980 Stockholders Agreement was mandatory or effective, nor required any distribution to the shareholders." Id. Plaintiffs respond that Curran abided by the terms of the 1980 Shareholders' Agreement while he was CEO of RAC and distributions were made to RAC Shareholders from 1980 through 1989. (Pls.' Resp. Corp. Defs.' Mot. Summ. J. at 35.)

The doctrine of equitable estoppel is summarized as follows:

> Courts apply the doctrine of equitable estoppel to prevent a person from taking a position that is inconsistent with a position previously taken or acting differently than the manner in which that person induced another person to expect. . . . There are two essential elements of equitable estoppel: inducement and justifiable reliance on that inducement. Such inducement may be words or conduct and a person may exhibit reliance by an act or forbearance "provided that a change in condition results causing disadvantage to the one induced." The party who asserts equitable estoppel must prove the elements of estoppel by "clear, precise and unequivocal evidence."

*Louis W. Epstein Family Partnership v. Kmart Corp., 828 F. Supp. 328,* [*79] *342–44 (E.D. Pa. 1993)* (citations omitted), aff'd in part and rev'd in part on other grounds, *13 F.3d 762 (1994).* The Corporate Defendants have not adequately alleged the elements of equitable estoppel. The Corporate Defendants' assertion that Curran's attempt to enforce the 1980 Stockholders Agreement is inconsistent with his previous behavior as the CEO of RAC might rise to the level of "inducement," but there is no claim that Defendants justifiably relied on such conduct to their disadvantage. Further, there is a factual dispute concerning whether Curran as a CEO paid dividends pursuant to the 1980 Shareholders Agreement which precludes granting a motion for summary judgment.

**D. THE ILLEGALITY OF THE 1980 SHAREHOLDERS AGREEMENT**

The Corporate Defendants claim that the Pennsylvania Business Corporation Law does not permit the 1980 Stockholders Agreement. (Corp. Defs.' Br.

1996 U.S. Dist. LEXIS 12655, *79

Supp. Mot. Summ. J. at 59.) The Business Corporation Law provides that

> a distribution may not be made if . . . the corporation would be unable to pay its debts as they become due in the usual course of business; or [if] the total assets of the corporation would be less than the sum of its total [*80] liabilities plus . . . the amount that would be needed, if the corporation were to be dissolved at the time as of which the distribution is measured, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

*15 Pa. Cons. Stat. Ann. § 1551(b)(1)*, (2). The Corporate Defendants assert that the violation consists of the 1980 Stockholders Agreement's mandate of distributions of all "net profits" unconditionally. n20 This, the Corporate Defendants claim, renders the 1980 Shareholders Agreement unenforceable.

> n20 The Agreement reads in pertinent part:
>
> 2. The Stockholders herewith agree to vote for, vote to retain, and do nothing to interfere with Resolutions which shall remain in full force and effect from the date hereof until a written agreement is executed by all of the Stockholders to the contrary, which shall call for:
>
> > (a) the distribution by Reading to the Stockholders of 100% of the income of Reading from all royalties and/or funds otherwise derived from the sale or lease of Reading's assets, without diminution for expenses directly or indirectly related thereto; such distribution to be made within thirty (30) days after receipt of any such funds by Reading.
> >
> > (b) the distribution, as promptly as practical after the end of every corporate tax year, but in

> no event no later than [the] final date on which distribution thereof must be made in order to obtain the most advantageous tax treatment for Stockholders in connection therewith, of 100% of the operating profits of Reading; provided that in arriving at the amount of said profits, funds distributed pursuant to the preceding subparagraph shall first be deducted.

(1980 Shareholders Agreement, App. Corp. Defs.' Mot. Summ. J. at A1078.)

[*81]

At most the Corporate Defendants have shown that there may be circumstances when actions in conformity with the 1980 Shareholders Agreement could violate the Business Corporation Law, that is, if RAC were unable to pay its debts or if its liabilities exceeded its assets. "An agreement will be considered void for illegality only where only where it 'cannot be performed without violating a statute.'" *Rittenhouse v. Barclay White Inc., 425 Pa. Super. 501, 625 A.2d 1208, 1211 (Pa. Super. 1993)* (citations omitted). Because there are presumably circumstances when performance of the 1980 Shareholders Agreement does not violate the Business Corporation Law, this agreement is not unenforceable per se.

## E. STATUTE OF LIMITATIONS

The Corporate Defendants contend that Plaintiffs' claim of usurpation of corporate opportunities involving Ri-Corp is time-barred. (Corp. Defs.' Br. Supp. Mot. Summ. J. at 64.) As discussed previously, this claim is completely precluded. The Corporate Defendants also argue that claims that Ri-Corp converted silt from SSI are time-barred. They contend that Ri-Corp's "initial 'capital contribution' of 200,000 tons of silt in 1985 was purchased from Gilberton/Lawrence [*82] Fuels, and no subsequent 'contribution' has been made." (Corp. Defs.' Br. Supp. Mot. Summ. J. at 66–67.) They argue that even if conversion had occurred in 1985, that claim "would be barred by Pennsylvania's two-year statute of limitations at *42 Pa.C.S.A. § 5524*." Id. at 67.

Because a factual dispute exists as to whether conversion occurred in 1985, this cannot be resolved on a motion for summary judgment. Although Defendants correctly assert that there is a two-year statute of limitations for

conversion, the limitations period for conspiracy does not begin to run until after the commission of the last act of the conspiracy. See *Baker v. Rangos, 229 Pa. Super. 333, 324 A.2d 498, 510 (Pa. Super. 1974)* ("'Where there are continuous and repetitious acts or trespasses as a part of a continuous conspiracy, it has been held that the statute of limitations does not begin to run until after the commission of the last act of the conspiracy.'") (citations omitted). Plaintiffs allege that "the Rich Control Group conspired to defraud RAC and SSI of their property by causing Ri-Corp. to receive and use anthracite materials stolen from SSI and to receive and use anthracite materials improperly [*83] taken from RAC," (Third Am. Compl. at 55) and also allege this is part of an "ongoing scheme." Id. P 148. Plaintiffs contend that conversion of SSI material continues to the present. (Pls.' Resp. Corp. Defs.' Br. Supp. Mot. Summ. J. at 49; Third Am. Amended P 85.) Therefore, Plaintiffs' state law claim that Defendants conspired to convert SSI material may include incidents of conversion of SSI material from 1985 (unless such incidents are barred by claim preclusion, as discussed previously).

The Third Circuit Court of Appeals has established the following rule for determining when actions accrue in Civil RICO:

> The limitations period for a civil RICO claim runs from the date the plaintiff knew or should have known that the elements of a civil RICO cause of action existed, unless, as a part of the same pattern of racketeering activity, there is further injury to the plaintiff or further predicate acts occur which are part of the same pattern. In that case, the accrual period shall run from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering activity. The last predicate act need [*84] not have resulted in injury to the plaintiff but must be part of the same "pattern."

*Keystone Ins. Co. v. Houghton, 863 F.2d 1125, 1126 (3d Cir. 1988).* Plaintiffs allege that the acts of SSI conversion are part of an ongoing scheme continuing to the present. (Third Am. Compl. P 115.) Thus, Plaintiffs have adequately alleged further predicate acts occurring after 1985 and up to the present that are part of the same pattern. Therefore, Plaintiffs' RICO claim for conversion of SSI material in 1985 is not time-barred.

**F.  FAILURE OF THE CONTROLLING DOCUMENTS TO SUPPORT PLAINTIFFS' CLAIMS ABOUT THE MANIPULATION OF**

**SER'S FINANCING**

The Corporate Defendants challenge Curran's allegation that RCG has "manipulated the finances of SER to reduce or eliminate monies and profits which should be paid to James Curran." (Third Am. Compl. at 48.) The Corporate Defendants argue that the controlling documents do not support these allegations concerning the funding of an ash pit and a litigation fund. n21

> n21 The Corporate Defendants also challenge allegations made by Plaintiffs in the Second Amended Complaint but not included in the Third Amended Complaint concerning: the Construction Account, the Prior Lender Indemnification Account, the Company Litigation Account, Overfunding of Principal Accounts, the 1994 Distribution, and the Project Revenue Account. As these allegations have not been repeated in the Third Amended Complaint, they are not considered by the court.

[*85]

**1. The Ash Pit**

Plaintiffs claim that RCG transferred from SER a million dollars to RAC for a development fee for an ash disposal pit "which SER does not need and which SER cannot use." (Third. Am. Compl. at 52.) The Corporate Defendants argue that if SER had access to this pit, it could avoid costlier disposal methods. (Corp. Defs.' Br. Supp. Mot. Summ. J. at 76.) The Corporate Defendants provide evidence that the use of this pit "would result in savings to SER of approximately $1,000,000 per year." Id. The Corporate Defendants argue assert that "as the development fee was paid from SER to RAC, whose shareholders are virtually identical, the funds remained available to be distributed to the same shareholders, including Curran, Jr., at the discretion of the Board." Id. at 76–77. The Corporate Defendants also argue that the transfer of these funds to RAC subjects them to mandatory distribution for payment of taxes, which would benefit Curran, but that there would be no such benefit if the funds were left in SER. Id. at 77.

In their response, Plaintiffs provide enough evidence to render this issue a question for the jury. Plaintiffs present testimony that casts [*86] doubt on the financial benefit potentially resulting from the ash pit. (Pls.' Resp. Corp. Defs.' Br. Supp. Mot. Summ. J. at 45.) Plaintiffs also challenge the logic of the Corporate Defendants' suggestion that the money paid to RAC is not an actual loss to Curran due to the similarity between RAC's and SER's shareholders. Plaintiffs assert that requests to RAC by Curran or his nominees have been rejected. Id. at 45–

46. Finally, Plaintiffs argue that a fee paid to RAC for development costs of the ash pit "would not be subject to mandatory distribution for payment of taxes or otherwise." Id. at 46. Therefore, there is an issue of material fact concerning whether the investment in an ash pit was part of an alleged attempt to hurt Curran through the diversion of funds that could have been used to pay dividends.

### 2. The Litigation Reserve Fund

Plaintiffs allege that Defendants also engaged in a scheme of "fraudulently diverting funds available for distribution into a 'litigation fund' directed against James Curran individually." (Third Am. Compl. at 51.) The Corporate Defendants assert that in 1994 the distribution made was in accordance with the formula established by the [*87] October 13, 1994 Settlement Agreement. (Corp. Defs.' Br. Supp. Mot. Summ. J. at 77–78.) Even if such is the case, Plaintiffs may still have a claim for diversion of money into a litigation fund in an intentional effort to reduce Curran's distributions in 1995. This court cannot now determine this based on the record before it.

### G. FAILURE TO ALLEGE A DISTINCT INJURY TO CURRAN

The Corporate Defendants contend that Curran "has not alleged any injury separate and distinct from the alleged harm to RAC and SER" and that because "all the damages he claims are derived exclusively from Curran, Jr.'s status as a shareholder, his individual claims must be dismissed." (Corp. Defs.' Br. Supp. Mot. Summ. J. at 80.) Plaintiffs argue, inter alia, that "Plaintiff Curran has standing to sue by virtue of the fact that he is a Shareholder in close corporations (RAC and SER) where the directors have violated a fiduciary duty owed directly to him." (Pls.' Resp. Corp. Defs.' Mot. Summ. J. at 52–53.)

Pursuant to Pennsylvania law the general rule is that an action to redress injuries to a corporation cannot be maintained by a shareholder in his own name but must be brought in the name of the corporation." [*88] John L. Motley Assocs., Inc. v. Rumbaugh, 104 Bankr. 683, 686 (E.D. Pa. 1989); see also Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727, 732 (3d Cir. 1970) ("A stockholder of a corporation does not acquire standing to maintain an action in his own right, as a shareholder, when the alleged injury is inflicted upon the corporation and the only injury to the shareholder is the indirect harm which consists in the diminution in value of his corporate shares resulting from the impairment of corporate assets.").

One exception to the general rule that claims for injuries to the corporation must be brought derivatively exists "where there is a special duty, such as a contractual duty, between the wrongdoer and the stockholders." Temp-Way Corp. v. Continental Bank, 139 Bankr. 299,

317 (E.D. Pa. 1992); see also John L. Motley Assocs., 104 Bankr. at 686 (stating that the aforementioned rule concerning bringing claims derivatively "does not apply in a case where the shareholder shows a violation of duty owed directly to him.") Id. at 686. In the instant case, Curran alleges that the Rich Control Group "refuses to make the distributions from RAC and SER which are required pursuant to [*89] the contract requirements of the December 12, 1980 Shareholder Agreement." (Third Am. Compl. at 25.) This alleged breach of contractual duty between RCG members and Curran falls within this exception to the general rule regarding derivative claims. Therefore, Curran may raise individual claims based on RCG's alleged failure to distribute dividends according to the 1980 Shareholders Agreement.

The other general exception to the rule about derivative claims is when an individual has pled an injury separate and distinct from that incurred by the corporation. See Adjusters, Inc. v. Computer Sciences Corp., 818 F. Supp. 120, 121 (E.D. Pa. 1993). For example, in Davis v. United States Gypsum Co., 451 F.2d 659 (3d Cir. 1971), the plaintiff alleged harm not only to the corporation of which he was a minority shareholder, he also alleged that he lost money after the corporation went bankrupt and he became liable on notes which had been given by the corporation to suppliers and which he had guaranteed. Id. at 660. The plaintiff also alleged that he was induced to leave his job. Id. The kind of separateness between individual and corporate injuries present in Davis is lacking [*90] in the instant case.

Therefore, with the exception of claims based on the 1980 Shareholders Agreement, all of Curran's state claims must be brought derivatively. This also applies to Curran's RICO claims. "Where a RICO violation injures only a corporation, a shareholder or employee of the corporation does not thereby obtain the right to sue under RICO." A Pocono Country Place, Inc. v. Peterson, 675 F. Supp. 968, 975 (M.D. Pa. 1987) (citation omitted); see also In re Sunrise Sec. Litigation, 916 F.2d 874, 880 (3d Cir. 1990) ("Federal courts that have considered the question in shareholder suits all have held that shareholders lack standing to assert RICO claims where their injuries are not direct and distinct from any injury sustained by the corporation and shareholders generally.").

### H. CURRAN'S LACK OF STANDING TO SEEK THE RESCISSION OR REFORMATION OF THE MERIDIAN LOAN AGREEMENT

The Corporate Defendants argue that "Curran, Jr. has no right to seek the rescission or reformation of Meridian's loan agreement with RAC," (Corp. Defs.' Br. Supp. Mot. Summ. J. at 63), because he is "neither a party nor privy to the Meridian loan agreement." Id. at 64. Plaintiffs

have [*91] not contested this point. The law cited by the Corporate Defendants supports a finding that Curran, individually, has no standing to seek rescission or reformation of this agreement. See *Castle v. Cohen, 676 F. Supp. 620, 627 (E.D. Pa. 1987)* ("Rescission . . . is appropriate only under extraordinary circumstances when the complaining party has suffered a breach of such a fundamental and material nature that it affects the very essence of the contract and serves to defeat the object of the parties.") (citations omitted), aff'd, *840 F.2d 173 (3d Cir. 1988); Lachner v. Swanson, 251 Pa. Super. 561, 380 A.2d 922, 925 (Pa. 1977)* ("Reformation of an instrument may be had by the parties to the instrument and by those standing in privity with them, but not by persons not parties or privies.") (citation omitted). However, insofar as Curran seeks this remedy derivatively, he seeks it on behalf of RAC, one of the parties to the agreement. Therefore, this court will not strike this request for relief.

### III. THE CORPORATE ATTORNEYS' MOTION FOR SUMMARY JUDGMENT

The Corporate Attorneys raise several arguments in support of their motion for summary judgment on Counts III (SSI's claim [*92] for violation of *18 U.S.C. § 1962*(c)) and VIII (Curran's claim for violations of *18 U.S.C. § 1962*(b) and § 1962(c)). The Corporate Attorneys contend that they cannot be held liable for a violation of § 1962(c) because Plaintiffs have failed to fulfill § 1962(c)'s distinctiveness requirement and because the attorneys have not participated in the operation or management of a RICO enterprise. They also contend that Plaintiffs' RICO claims are insufficiently specific as to the involvement of the Corporate Attorneys. In response, Plaintiffs contend that Cerullo has concealed information, thereby limiting the factual record available to Plaintiffs and that, therefore, summary judgment should not be granted. After examining this charge of concealment, the specific defenses raised by the Corporate Attorneys will be addressed.

#### A. CERULLO'S ALLEGED CONCEALMENT

Plaintiffs claim that in his September 21, 1995 and April 12, 1996 depositions, Cerullo refused to answer questions regarding his interaction with RCG members in the various RICO schemes, and that such information is relevant to determining whether the Corporate Attorneys engaged in the operation and management of the alleged [*93] RICO enterprises. (Pls.' Resp. Corp. Att'ys' Mot. Summ. J. at 3.) Therefore, Plaintiffs contend, the factual record is limited and the motion for summary judgment should not be granted. Id. at 4.

Plaintiffs have deposed Cerullo twice. The first deposition occurred on September 21, 1995. Pursuant to a discussion with this court, this deposition was limited to

the issue of the disqualification of Cerullo and his firm. Plaintiffs assert that in this deposition Cerullo concealed information about the following: (1) the conspiracy between RAC and the Bank of New York against Blount; (2) related party transactions; and (3) the litigation reserve account. (Pls.' Resp. Corp. Att'ys' Mot. Summ. J. at 2–5.)

This court notes, first, that with one exception, Plaintiffs declined to raise these issues before this court at the on-record conference on October 24, 1995 although other objections raised at the September deposition were addressed. Plaintiffs raised the issue of competitive bidding, which is pertinent to related party transactions. This court ruled that the attorney–client privilege barred Cerullo from answering questions about advice given on competitive bidding. (N.T., 10/24/95 [*94] at 66.)

Secondly, this court lifted the discovery stay to permit Plaintiffs to depose Cerullo on April 12, 1996 precisely for the purpose of determining the extent of the Cerullo's involvement in the operation or management of the alleged RICO enterprises. During that deposition Plaintiffs' counsel did not seek the information Plaintiffs now claim was concealed from them at the September deposition. Although counsel for RAC and SER did not withdraw objections asserted in the September deposition, (Dep. Cerullo, 4/12/96 at 117, attached to Corp. Att'ys' Mot. Summ. J.), he did note for the record that he was "not necessarily asserting the privilege in response to any questions [Plaintiffs' counsel] may ask until [he heard] what the questions [were]." Id. at 115. Also, counsel for RAC and SER withdrew all objections based on privilege at the April deposition. Id. at 116–17.

Therefore, this court finds there was no concealment as to any questions Plaintiffs raised in the September deposition. Rather, Plaintiffs' counsel failed to pursue these issues save for the issue of competitive bidding in reference to related party transactions, and this court found such information [*95] privileged.

Plaintiffs also contend that Cerullo concealed information relevant to the instant motion at the second deposition on April 14, 1996, when he refused to discuss a conversation with David Christ relating to whether or not the 1980 Shareholders Agreement had been followed. (Pls.' Resp. Corp. Att'ys' Mot. Summ. J. at 5.) In the April deposition Plaintiffs asked Cerullo what Christ's conclusions were with respect to whether the 1980 Shareholders' Agreement had been followed. (Dep. Cerullo, 4/12/96 at 49, attached to Corp. Att'ys' Mot. Summ. J.) Counsel for RAC and SER objected on the basis of attorney–client privilege, id., but later withdrew the objection. Id. at 117. Plaintiffs also contend that Cerullo engaged in concealment by refusing to provide his opinion as to the enforceability of the 1980 Shareholders Agreement at the present

time and his opinion of a letter of May 17, 1989, written by his former partner, Abraham Frumkin, concerning the enforceability of the 1980 Shareholders Agreement. (Pls.' Resp. Corp. Att'ys' Mot. Summ. J. at 21 (citing Dep. Cerullo, 4/12/96 at 32–33, attached to Corp. Atty's' Mot. Summ. J.).) This court finds that Cerullo's current opinion [*96] on these matters is not relevant to his operation or management of the alleged enterprises.

Plaintiffs also allege that Cerullo "has actively concealed information [about RAC and SER] from James Curran and his directors, despite James Curran's contractual and property rights in this information." (Pls.' Resp. Corp. Atty's' Mot. Summ. J. at 32.) This court does not find that Cerullo's actions rise to the level of concealment. Plaintiffs' evidence, at most, shows that Cerullo did not provide information related to the instant litigation after this court's stay of discovery and that Cerullo gave an opinion about the ownership of SSI banks with which Plaintiffs disagree.

Plaintiffs have not provided evidence of concealment of material information. Therefore, this court will address the merits of the defenses presented by the Corporate Attorneys' in their Motion for Summary Judgment.

**B. 1962(c)**

Plaintiffs allege that the Corporate Attorneys have violated § 1962(c) of the RICO statute. Section 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to [*97] conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

*18 U.S.C. § 1962*(c). The Corporate Attorneys argue that the claims against them based on § 1962(c) should be dropped because Plaintiffs' allegations do not fulfill § 1962(c)'s distinctiveness requirement and because Plaintiffs have failed to show that the Corporate Attorneys participated in the conduct of the enterprise. Each of these arguments will be examined in turn.

**1. The Distinctiveness Requirement**

The Corporate Attorneys first argue that they are not properly distinct from one of the alleged RICO enterprises. Plaintiffs allege that the RICO enterprise is, alternatively, RAC, SER, or

the association in fact of Rich, Jr., Rich,

Sr., Brian Rich, Robert Ryan, Bonnie Ryan, Terrence Ryan, Gloria Curran, Maria Cantwell, David Christ, Tornetta, Cerullo, and FS&C, Gilberton Power, W.M.P.I., Ricorp., JMB and the other Defendants, including but not limited to other entities in which Defendants may have or had an interest . . . .

(Third Am. Compl. PP 338–340.) Concerning the alleged association [*98] in fact, the Corporate Defendants contend that by characterizing Cerullo and FS&C as both persons and part of the enterprise, Plaintiffs have failed to meet the distinctiveness requirement of § 1962(c). (Corp. Att'ys' Br. Supp. Mot. Summ. J. at 6.)

In *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., 46 F.3d 258 (3d Cir. 1995)*, the Third Circuit Court of Appeals described the prevailing distinctiveness requirement:

> This requirement originates in the statute's textual directive that § 1962(c) liability requires conduct by defendant "persons" acting through an "enterprise." . . . [A] claim simply against one corporation as both "person" and "enterprise" is not sufficient. Instead, a viable § 1962(c) action requires a claim against defendant "persons" acting through a distinct "enterprise."

*Id. at 268.* However, in Jaguar Cars, the court of appeals liberalized this distinctiveness requirement by adding that "alleging conduct by officers or employees who operate or manage a corporate enterprise satisfies this requirement" because "[a] corporation is an entity legally distinct from its officers or employees, which satisfies the "enterprise" definition of [*99] 18 [U.S.C.] § 1961(4)." Id. Prior to Jaguar Cars's broadened interpretation of the distinctiveness requirement, the Third Circuit Court of Appeals had found the distinctiveness requirement was satisfied even where there was some overlap between the alleged "persons" and the "association in fact." *Petro–Tech, Inc. v. Western Co. of North America, 824 F.2d 1349, 1361 (3d Cir. 1987)* (finding that the corporation could be liable as a defendant person where the enterprise was alleged to be an association in fact consisting of the corporation and individual defendants); see also *Shearin v. E.F. Hutton Group, Inc., 885 F.2d 1162, 1165–66 (3d Cir. 1989)* (finding that the distinctiveness requirement is fulfilled where three corporations were alleged to be persons and where the enterprise was alleged to be an association in fact of the three corporations).

In the instant case, Plaintiffs' allegations that the

Corporate Attorneys are both persons and part of the association in fact satisfies the distinctiveness requirement of § 1962(c).

### 2. Participation in the Conduct of the Enterprise

The United States Supreme Court has held that "one is not liable [under *18 U.S.C.* [*100] *§ 1962(c)*] unless one has participated in the operation or management of the enterprise itself." *Reves v. Ernst & Young, 507 U.S. 170, 183, 122 L. Ed. 2d 525, 113 S. Ct. 1163 (1993).* In its application of Reves to the involvement of professionals providing services to RICO enterprises, the Court of Appeals for the Third Circuit has found that "simply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result." *University of Maryland v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1539 (3d Cir. 1993).*

By way of general response to the Corporate Attorneys' arguments about liability under § 1962(c), Plaintiffs contend that the Corporate Attorneys were in the "chain of command through which the enterprise's affairs were conducted." (Pls.' Resp. Corp. Atty's' Mot. Summ. J. at 14 (citing *United States v. Oreto, 37 F.3d 739, 750 (1st Cir. 1994)*, cert. denied, *130 L. Ed. 2d 1116, 115 S. Ct. 1161 (1995)).) In Cohen v. Wolgin, 1995 U.S. Dist. LEXIS 972, Civ. No. 87–2007, 1995 WL 33095 (E.D. Pa. Jan. 24, 1995), the court denied the defendant lawyer–accountant's motion for summary judgment because it found that the accountant [*101] was "clearly in the 'chain of command.'" Id. at *17. The court based this finding on the fact that the plaintiff had alleged that the lawyer–accountant had misrepresented the financial status of the enterprise to its creditors and to the plaintiff and had directed that others make similar misrepresentations. Id. In Oreto the court found that "one may 'take part in' the conduct of an enterprise by knowingly implementing decisions, as well as by making them." *Oreto, 37 F.3d at 750.* Plaintiffs assert that "not only do Cerullo [and] FS&C carry out the orders of the Rich Control Group and facilitate the schemes to defraud [Plaintiffs], they also devise these schemes." (Pls.' Resp. Corp. Att'ys' Mot. Summ. J. at 14.) Plaintiffs also contend that "at the very least, a factual dispute exists regarding the role of Defendant Cerullo and the extent of his participation with the Rich Control Group in the management and control of the enterprises," and that therefore the 1962(c) claim against the Corporate Attorneys should not be dismissed. Id. at 16.

In Cohen, the court found that "there is evidence from which a jury could reasonably infer . . . that [the lawyer–accountant's] [*102] role . . . was not merely that of an independent entity providing accounting services to the

enterprise." *Cohen, 1995 WL 33095,* at *16. The critical question here is whether Plaintiffs have provided such evidence in this case. As noted earlier, in a motion for summary judgement the moving party bears the burden of showing that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* The non-moving party must then go beyond the pleadings to "establish the existence of each element on which it bears the burden of proof," *J.F. Feeser, Inc. v. Serv–A–Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990)* (citation omitted), cert. denied, *499 U.S. 921, 113 L. Ed. 2d 246, 111 S. Ct. 1313 (1991),* because "a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex, 477 U.S. at 323.*

In the instant case the evidence presented by Plaintiffs is insufficient to defeat the motion for summary judgment. "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party [*103] for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)* (citation omitted). Because evidence that is "merely colorable" or "not significantly probative" cannot defeat a motion for summary judgment, id., the motion is granted as to the 1962(c) claims against the Corporate Attorneys. An examination of the Corporate Attorneys' position in the corporations involved in the association in fact and the Corporate Attorneys' involvement in each of the predicate acts reveals that the Corporate Attorneys did not participate in the conduct of the alleged enterprises through a pattern of racketeering activity.

### a. Cerullo's Position as an Officer of the Corporations Participating in the Alleged Association–In–Fact

The Corporate Attorneys argue that Cerullo's alleged status as an officer of the corporations comprising the association in fact does not support the contention that he engaged in the operation or management of a RICO enterprise. The Corporate Attorneys provide evidence that Cerullo serves only as an assistant secretary of some of the corporate defendants and that his officer status, as [*104] such, is limited to attestation purposes only. (Corp. Atty's' Br. Supp. Mot. Summ. J. at 7.)

This court finds that holding the position of assistant secretary is not enough, in and of itself, to satisfy § 1962(c)'s operation or management requirement. See *Webster v. Omnitrition Int'l, Inc., 79 F.3d 776, 789 (9th Cir. 1996)* (finding that attorney's "purely ministerial role as 'Assistant Secretary' in the corporation is insufficient to warrant liability under § 1962(c)"); *Biofeedtrac v. Kolinor Optical Enters., 832 F. Supp. 585, 591 (E.D.N.Y. 1993)*

1996 U.S. Dist. LEXIS 12655, *104

(stating that "the court places no weight on the facts that [an attorney] was the sole director, and later would become corporate secretary of [a defendant corporation]" because "corporate counsel customarily fill such roles without becoming a part of the operation or management of the enterprise.").

### b. The Scheme to Withhold Distributions through the Meridian Loan Agreement

Plaintiffs contend that "through Defendant FS&C and Cerullo's affirmative actions to Meridian Bank, and the fraudulent concealment of the 1980 Shareholders Agreement, Defendants FS&C and Cerullo participated in the management of the enterprises." [*105] (Third Am. Compl. P 68.) Plaintiffs base this allegation on a letter dated November 30, 1993, from a member of FS&C to Meridian. Id. P 65; (see also Letter from Paul J. Datte of FS&C to Paul D. Cohn, Vice President of Meridian Bank, of 11/30/93, Ex. Q, Third Am. Compl.) According to Plaintiffs, "this letter advised the Bank that RAC had the full corporate authority to enter into [a loan agreement with the bank] and failed to disclose to the Bank the existence of the 1980 Shareholders Agreement and 1992 Settlement Agreement." (Third Am. Compl. P 65.)

This letter appears to implicate exactly the type of behavior the Reves court determined did not constitute operation or management. In Reves, the Court found that the accounting firm had not engaged in the operation or management of the enterprise despite the fact that the firm had knowingly prepared misleading financial reports and knowingly presented an inaccurate picture of its clients' financial circumstances at the annual meeting and to the Board of Directors. See Reves, 113 S. Ct. at 1173–74. Even assuming that FS&C made misrepresentations in this letter, this alone does not rise to the level of "operation [*106] or management." See also University of Maryland v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1539 (3d Cir. 1993) (finding that allegations that auditor prepared false and misleading financial statements for insurer did not constitute operation or management); Fidelity Fed. Sav. & Loan Ass'n v. Felicetti, 830 F. Supp. 257, 260 (E.D. Pa. 1993) (finding that a realty appraiser's submission of misleading and fraudulent appraisals does not rise to the level of operation or management); Gilmore v. Berg, 820 F. Supp. 179, 182–83 (D.N.J. 1993) (finding that submission of tax opinion and forecast letters drafted by attorney and accountant and allegedly containing false statements did not constitute participation in directing the affairs of the RICO enterprise).

The instant case is distinguishable from Cohen. In Cohen, the court found that the plaintiff had adequately alleged liability under § 1962(c) on the part of the defendant accountant because the latter allegedly made mis-

representations about the financial status of the corporate enterprise to its creditors and to the plaintiff and directed that others make similar misrepresentations to creditors. Cohen, 1995 [*107] WL 33095 at * 17. The opinion letter in the instant case does not demonstrate the same level of operation or management.

### c. The Conversion Claims

Plaintiffs allege that the Corporate Attorneys and RCG "fraudulently concealed from SSI the removal of anthracite material owned by SSI from the Oak Hill Refuse Banks Nos. 235 and 235R and Oak Hill Slush Area No. 78." (Third Am. Compl. P 85.) Plaintiffs contend that Cerullo misrepresented the ownership of the Oak Hill banks in a series of letters. Id. PP 87–90. The letters Plaintiffs have presented to the court reveal nothing more than Cerullo's opinion regarding the ownership of refuse banks. Even assuming, arguendo, that these letters contain misrepresentations, this does not rise to the level of operation and management for reasons already stated.

### d. Related Party Transactions, Phantom Expenses, and the Usurpation of Corporate Opportunities through JMB Development, Inc.

Plaintiffs have not alleged any specific behavior delineating the Corporate Attorneys' role in the related party transactions, the phantom expenses, or the usurpation of corporate opportunities through JMB Development, Inc. Nor have Plaintiffs provided [*108] any evidence as to the Corporate Attorneys' operation or management through these racketeering activities.

### e. Aiding and Abetting

Plaintiffs assert that the Corporate Attorneys are liable under § 1962(c) because they have aided and abetted the other Defendants involved in the operation and management of the RICO scheme. (Pls.' Resp. Corp. Att'ys' Mot. Summ. J. at 22; Third Am. Compl. P 389.) The Corporate Attorneys contend that under Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 114 S. Ct. 1439, 128 L. Ed. 2d 119 (1994), "a statute which [does] not include civil liability for aiders and abettors may not be construed to establish such liability," (Corp. Att'ys' Br. Supp. Mot. Dismiss at 10), and therefore there is no such liability under RICO. However, subsequent to Central Bank of Denver, the Third Circuit Court of Appeals held that "a defendant may be liable under RICO if he aided or abetted the commission of at least two predicate acts of mail fraud." Jaguar Cars, 46 F.3d at 270. n22 To establish liability of a defendant for aiding and abetting a predicate act under RICO the plaintiff must show "(1) that the substantive act has been [*109] committed, and (2) that the defendant alleged to have aided and abetted the act knew of the commission of the act and acted with

intent to facilitate it." Id.

n22 In light of Jaguar Cars, other courts in this circuit have not extended Central Bank of Denver to RICO. See *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 1996 U.S. Dist. LEXIS 3427, Civ. A. No. 95-1698, 1996 WL 135336*, at *6 & n.5 (E.D. Pa. Mar. 19, 1996) (stating that in that in spite of Central Bank "this Court . . . is bound by current Third Circuit law, which, again, provides that civil RICO aiding and abetting liability does exist"). Although this court is doubtful about the viability of aiding and abetting claims under RICO after Central Bank, it, too, in light of Jaguar Cars, is reluctant to dismiss Plaintiffs' aiding and abetting claims.

Assuming arguendo that Plaintiffs are able to show aiding and abetting by the Corporate Attorneys, this court finds that this theory cannot be used to circumvent the operation and management test. Courts [*110] within this circuit have distinguished aiding and abetting from operation and management. See *Rolo v. City Investing Co. Liquidating Trust, 897 F. Supp. 826, 833 (D.N.J. 1995)* (finding it proper to dismiss aiding and abetting claims that did not meet the "operation or management" test of Reves); *Fidelity Fed. Sav. & Loan Ass'n, 830 F. Supp. at 261* (dismissing claims under 1962(c) because defendant did not operate or manage the alleged enterprise but declining to dismiss the aiding and abetting claims).

## C. WHETHER THE ALLEGATIONS AGAINST THE ATTORNEYS AS MEMBERS OF THE RICH CONTROL GROUP ARE INSUFFICIENTLY SPECIFIC

The Corporate Attorneys assert that "the general allegations against the Rich Control group lack any measure of precision or substance regarding the [Corporate Attorneys'] acts," and that therefore the RICO claims against the [Corporate Attorneys] should be dismissed. (Corp. Att'ys' Mot. Summ. J. at 15.) In *Seville Indus. Machinery v. Southmost Machinery, 742 F.2d 786 (3d Cir. 1984)*, cert. denied, *469 U.S. 1211, 84 L. Ed. 2d 327, 105 S. Ct. 1179 (1985)*, the court stated that "Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' [*111] of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Id. at 791*. This court has already determined that Plaintiffs have failed to make specific allegations concerning the Corporate Attorneys' involvement in the related party transactions, the phantom expenses, and

the usurpation of corporate opportunities through JMB Development, Inc. Therefore, these claims are stricken as to the Corporate Attorneys, and Plaintiffs may not base RICO claims against the Corporate Attorneys on these two predicate acts. The Corporate Attorneys' involvement in the other predicate acts (the scheme to withhold distributions through the Meridian Loan Agreement and the conversion of SSI property) has been discussed already. This court finds that the allegations concerning the Corporate Attorneys' involvement in these predicate acts is sufficiently specific to satisfy the standard established in Seville.

## IV. CORPORATE ATTORNEYS' MOTION TO DISMISS

In deciding a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, "all facts alleged in the [*112] complaint and all reasonable inferences that can be drawn from them must be accepted as true." *Malia v. General Elec. Co., 23 F.3d 828, 830 (3d Cir.) (citation omitted), cert. denied, 130 L. Ed. 2d 328, 115 S. Ct. 377 (1994)*. The complaint should not be dismissed unless Plaintiffs allege "no set of facts in support of the claim that would entitle [them] to relief." *ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994)*.

The Corporate Attorneys claim that Plaintiffs have failed to allege a claim against them under § 1962(a), § 1962(b), or § 1962(c), that the state fraud claims lack sufficient specificity, and that there is no cause of action for aiding and abetting a breach of fiduciary duty. n23

n23 The Corporate Attorneys also challenge Curran's standing to seek relief from the Meridian Bank Loan Agreement. This issue has already been discussed previously and will not be addressed here.

### A. 1962(a)

The Corporate Attorneys argue that Plaintiffs have failed to allege a claim under 1962(a). [*113] n24 The Corporate Attorneys contend that Plaintiffs fail to allege "either Cerullo or FS&C receive income, that such income arose from racketeering activities, or that such income was invested or used in any way." (Corp. Att'ys' Mem. Supp. Mot. Dismiss at 3.) However, in Counts I and VII of the Third Amended Complaint, which contain Plaintiffs' claims for violation of § 1962(a), Plaintiffs allege that Defendants, including the Corporate Attorneys, have derived income through a pattern of racketeering activity. (Third Am. Compl. PP 324, 371.) In Counts I and VII Plaintiffs allege that Defendants, including the Corporate Attorneys, have used or invested this income

1996 U.S. Dist. LEXIS 12655, *113

to acquire interests in or to operate the RICO enterprise. Id. PP 325, 372. Thus, Plaintiffs have adequately alleged a claim under § 1962(a).

n24 Section 1962(a) provides in pertinent part:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

*18 U.S.C. § 1962(a).*

[*114]

**B. 1962(b)**

In order for there to be a violation of § 1962(b), n25 a defendant's racketeering activities must result in the acquisition or maintenance of an interest in or control of a RICO enterprise. The Corporate Attorneys argue that the claims against them based on § 1962(b) should be dismissed for three reasons. First, they argue that Curran's claim against them for violating § 1962(b) fails to include the allegation that the Corporate Attorneys acquired an interest in a RICO enterprise by means of a racketeering activity. Although Plaintiffs failed to make such an allegation in Count VIII (Curran's claim against Defendants based on § 1962(b)), (Third Am. Compl. P 382), Plaintiffs did make this allegation in Count II (SSI's claim against Defendants based on § 1962(b)). (Third Am. Compl. P 333.) This court will not dismiss Count VIII for a technical error when Plaintiffs have pled the elements of a § 1962(b) violation elsewhere in the Third Amended Complaint.

n25 Section 1962(b) states:

It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate

or foreign commerce.

*18 U.S.C. § 1962(b).*

[*115]

Secondly, the Corporate Attorneys argue that their omission from the list of Defendants who allegedly committed the predicate acts is fatal to Plaintiffs' claims under § 1962(b). However, as noted previously, this court finds that Plaintiffs have alleged specific involvement on the part of the Corporate Attorneys in the following predicate acts: the scheme to withhold distributions through the Meridian Loan Agreement and the conversion of SSI property.

Finally, the Corporate Attorneys claim that "the complaint does not assert how or when Cerullo or FS&C became members of the alleged association–in–fact, or any details of the existence of this association." (Corp. Att'ys' Mem. Supp. Mot. Dismiss at 4.) The Corporate Defendants have not briefed this argument nor presented to the court why, if such is true, this in and of itself should lead to a dismissal. This court finds Plaintiffs allegations of a § 1962(b) violation sufficient to overcome a motion for dismissal.

**C. 1962(d): CONSPIRACY**

The Corporate Attorneys argue that because Plaintiffs fail to identify overt acts or predicate acts committed or promised by the Corporate Attorneys in furtherance of a conspiracy, claims [*116] against them based on § 1962(d) should be dismissed. (Corp. Att'ys' Mem. Supp. Mot. Dismiss at 9–10.) The Corporate Attorneys also contend that Plaintiffs' allegations in this regard are not sufficiently specific. Id. at 9.

Although claims based on § 1962(c) are dismissed as to the Corporate Attorneys, this court notes that dismissal of claims under § 1962(d) after dismissal of claims under § 1962(c) is not automatic. *Fidelity Fed. Sav. & Loan Ass'n, 830 F. Supp. at 261.* Liability under § 1962(d) is based not on whether a defendant personally commits the predicate acts, but rather upon whether that defendant agrees to the commission of the predicate acts. *United States v. Adams, 759 F.2d 1099, 1116 (3d Cir. 1985).* The Third Circuit Court of Appeals has established the following criteria for determining whether a violation of § 1962(d) has occurred:

In order to state a claim under RICO subsection [1962](d), a plaintiff must allege (1) agreement to commit the predicate acts of fraud, and (2) knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate section

1996 U.S. Dist. LEXIS 12655, *116

1962(a), (b), or (c). Allegations of conspiracy are [*117] not measured under the . . . [*Fed.R.Civ.P.] 9(b)* standard, which requires greater particularity of allegation of fraud, but are measured under the more liberal . . . [*Fed.R.Civ.P. 8(a)*] pleading standard." A conspiracy claim must also contain supportive factual allegations. The allegations must be sufficient to "describe the general composition of the conspiracy, some or all of its broad objective, and the defendant's general role in that conspiracy."

*Rose v. Bartle, 871 F.2d 331, 366 (3d Cir. 1989)* (citations omitted).

This court finds that in addition to providing evidence of the Corporate Attorneys' involvement in two of the alleged predicate acts, Plaintiffs have properly alleged the elements of conspiracy under § 1962(d), and these allegation are sufficient to withstand a motion to dismiss.

## D. LACK OF SPECIFICITY OF STATE CLAIMS FOR FRAUD

The Corporate Attorneys argue that Plaintiffs' common law fraud claims are insufficiently specific to satisfy the pleading requirements of *Federal Rule of Civil Procedure 9(b)*. As noted previously, in *Seville Indus. Machinery v. Southmost Machinery, 742 F.2d 786 (3d Cir. 1984)*, cert. denied, *469 U.S. 1211, 84 [*118] L. Ed. 2d 327, 105 S. Ct. 1179 (1985)*, the Third Circuit stated that "Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Id. at 791*. The court found that although "allegations of 'date, place or time' fulfill these functions, . . . nothing in the rule requires them." Id. The court stated that "plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." Id.

The Corporate Attorneys also argue that Plaintiffs have failed to plead all the elements of common law fraud. "In order to establish a cause of action in fraud, a plaintiff must plead the following elements with particularity:

> (1) a misrepresentation; (2) a fraudulent utterance thereof; (3) an intention by the maker to induce the recipient thereby; (4) justifiable reliance by the recipient on the misrepresentation; and (5) damage to the recipient as a proximate result of the misrepresentation.

[*119] *Rivello v. New Jersey Auto. Full Ins., 432 Pa. Super. 336, 638 A.2d 253, 257 (Pa. Super. 1994)* (citations omitted).

The only specific allegations concerning misrepresentations made by the Corporate Attorneys pertain to FS&C's letter to Meridian Bank which failed to disclose the 1980 Shareholders Agreement and Cerullo's letters allegedly misrepresenting the ownership of SSI banks. With respect to the letter to Meridian Bank, Plaintiffs have failed to aver damage to the recipient as a proximate result of the misrepresentation. With respect to the letters about SSI banks, Plaintiffs have failed to aver that Cerullo intended to induce the recipient and that there was justifiable reliance on the alleged misrepresentation. Therefore, the state claims for fraud are dismissed as to the Corporate Attorneys.

## E. BREACH OF FIDUCIARY DUTY

In Count XI of the Third Amended Complaint, Plaintiffs allege that the Corporate Attorneys aided and abetted breaches of fiduciary duty. (Third Am. Compl. P 411.) The Corporate Attorneys argue that there is no cause of action under Pennsylvania law for aiding and abetting a breach of fiduciary duty.

The Pennsylvania Supreme Court has not spoken on [*120] whether a claim for aiding and abetting the breach of a fiduciary duty would be recognized in Pennsylvania. *Thompson v. Glenmede Trust Co., 1994 U.S. Dist. LEXIS 16839, Civ. A. No. 92–5233, 1994 WL 675186*, at *5 (E.D. Pa. Nov. 23, 1994).* "When presented with a novel issue of law, or where applicable state precedent is ambiguous, absent or incomplete, [the federal court] must determine or predict how the highest state court would rule." *Rolick v. Collins Pine Co., 925 F.2d 661, 664 (3d Cir. 1991)*, cert. denied, *507 U.S. 973, 122 L. Ed. 2d 787, 113 S. Ct. 1417 (1993)*. In *Pierce v. Rosetta Corp., 1992 U.S. Dist. LEXIS 9065, Civ. A. No. 88–5873, 1992 WL 165817 (E.D. Pa. June 12, 1992)*, the court predicted that the Pennsylvania Supreme court would recognize a claim for aiding and abetting a breach of a fiduciary duty. Id. at *8. Other courts in the Eastern District of Pennsylvania have entertained state law claims based on aiding and abetting a breach of fiduciary duty. See, e.g., *SDK Investments, Inc. v. Ott, 1996 U.S. Dist. LEXIS 1678, No. CIV. A. 94–1111, 1996 WL 69402*, *12 (E.D. Pa. Feb. 15, 1996) (stating that "to establish a claim for aiding and abetting breach of a fiduciary duty, plaintiffs must show (1) breach of a fiduciary duty owed [*121] to another; (2) knowledge of the breach by the aider or abettor, and (3) substantial assistance or encouragement by the aider or abettor in effecting that breach.") (citation omitted); *Thompson, 1994 WL 675186*, at *5 (allowing plaintiff to amend complaint

1996 U.S. Dist. LEXIS 12655, *121

to include claim under Pennsylvania law for aiding and abetting breach of fiduciary duty). Therefore, this court finds that there is no basis for dismissing Plaintiffs' aiding and abetting claim.

## SUMMARY

In summary, the Motion to Strike the Third Amended Complaint is denied, but Defendants have leave to further address new claims at the Rule 50(a) stage.

The Corporate Defendants' and Tornetta's Motions for Summary Judgment are denied. However, Plaintiffs are prevented by claim preclusion from basing any claims on the transactions with Commonwealth Insurance Company, the alleged fraudulent reports to Price Waterhouse, the escrow fund, the failure to pay SSI royalties, and the usurpation of corporate opportunity relating to Ri–Corp, and from basing the following claims on incidents occurring before the following dates:

| CLAIM | DATE OF BAR |
|---|---|
| The failure to distribute dividends | 10/28/94 |
| Related party transactions | 10/28/94 |
| Defrauding the Anthracite Health & Welfare Fund | 4/20/94 for Tornetta |
| | 3/5/93 for Corporate Defendants |
| W.M.P.I.'s failure to pay RAC for use of its silt drying facility | 10/28/94 |
| Litigation fund | 10/28/94 |
| Conversion of Oak Hill # # 73, 78, 235, 235R & Cambridge 241 | 10/28/94 |
| Usurpation of corporate opportunities | 10/28/94 |

[*122]

Also, Defendants may address at the Rule 50(a) whether the claims of concealment of payments to Tornetta for litigation expenses and conversion of SSI materials (other than those listed above) are precluded.

Plaintiffs may base their RICO claims only on the following predicate acts: (1) the scheme to withhold distributions through the Meridian Bank Loan Agreement; (2) the related party transactions; (3) the conversion of SSI property; (4) the phantom expenses; and (5) the usurpation of corporate opportunities through J.M.B. Development, Inc. Defendants also have leave to challenge the related party transactions, the conversion of SSI property, the diversion of corporate opportunities through J.M.G.

Development, and Tornetta's involvement in the predicate acts at the Rule 50(a) stage.

Curran may base his individual claims only upon the alleged failure to distribute in accordance with the 1980 Stockholders Agreement.

The Corporate Attorneys' Motion for Summary Judgment is granted in part and denied in part. The claims based on § 1962(c) are dismissed. Also, Plaintiffs may base RICO claims against the Corporate Attorneys only on the following predicate acts: the scheme to withhold [*123] distributions through the Meridian Bank Loan Agreement and the conversion of SSI property. The Corporate Attorneys' Motion to Dismiss is granted in part and denied in part. The state fraud claims are dismissed

1996 U.S. Dist. LEXIS 12655, *123

as to the Corporate Attorneys.

BY THE COURT:

Edward N. Cahn, Chief Judge