# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ROYAL INDEMNITY COMPANY | : | |
| Plaintiff, | : | Civil No. 05-165(JJF) |
| vs. | : | |
| PEPPER HAMILTON LLP, ET AL. | : | |
| Defendants. | : | |

---

## REPLY BRIEF IN SUPPORT OF MOTION OF PEPPER HAMILTON LLP
## FOR THE DISMISSAL OF PLAINTIFF'S FIRST AMENDED COMPLAINT

---

MORRIS, NICHOLS, ARSHT & TUNNELL
William H. Sudell, Jr., Esq. (No. 0463)
Donna L. Culver, Esq. (No. 2983)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200
(302) 658-3989 (facsimile)

*Counsel for defendant Pepper Hamilton LLP*

OF COUNSEL:

SCHNADER HARRISON SEGAL & LEWIS LLP
Elizabeth K. Ainslie, Esq.
Nicholas J. LePore, III, Esq.
Bruce P. Merenstein, Esq.
Stephen J. Shapiro, Esq.
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 751-2000
(215) 751-2205 (facsimile)

August 16, 2005

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ............................................................................................... 1

ROYAL'S MISREPRESENTATIONS ................................................................. 1

ARGUMENT ..................................................................................................... 7

I.    ROYAL'S STATE LAW CLAIMS ARE TIME BARRED ......................... 7

    A.    Royal is not entitled to invoke the "Delaware resident exception" of the
        Delaware Borrowing Statute. ...................................................... 7

    B.    Royal's allegation that it could not have discovered the alleged wrongdoing
        by the Pepper Defendants until March 2004 is contradicted by Royal's own
        allegations ................................................................................. 9

II.   PENNSYLVANIA LAW APPLIES TO THIS ACTION .......................... 10

III.  ROYAL HAS FAILED TO STATE A CLAIM FOR CONSPIRACY UNDER
      PENNSYLVANIA LAW .................................................................... 11

IV.   NEITHER PENNSYLVANIA NOR NORTH CAROLINA RECOGNIZES A
      CAUSE OF ACTION FOR AIDING AND ABETTING. ........................ 12

V.    ROYAL'S "DEEPENING INSOLVENCY" CLAIM FAILS AS A MATTER OF
      LAW ............................................................................................ 15

    A.    Pennsylvania, Delaware and North Carolina do not recognize a cause of
        action for "deepening insolvency" ............................................. 15

    B.    Royal lacks standing to recover "deepening insolvency" damages because
        those damages are the property of SFC's bankruptcy estate ...................... 17

    C.    Royal's "deepening insolvency" claim is barred by the automatic stay ............... 18

    D.    Royal has failed to plead a claim for "deepening insolvency" ..................... 19

CONCLUSION ................................................................................................. 20

## TABLE OF AUTHORITIES

### *Cases*

*AES Corp. v. Dow Chem. Co.*, Civil Action No. 99-673,
2001 U.S. Dist. LEXIS 25557 (D. Del. Jan. 19, 2001) ................................................. 10

*Antone v. General Motors Corp.*, 473 N.E.2d 742 (N.Y. 1984) ................................................. 7

*Beverly Plaza Associates v. Saul (In re Kroh Bros. Dev. Co.)*,
91 B.R. 525 (Bankr. W.D. Mo. 1988) ................................................. 18

*Blow v. Shaughnessy*, 364 S.E.2d 444 (N.C. Ct. App. 1988) ................................................. 14

*Boykin v. Bennett*, 118 S.E.2d 12 (N.C. 1961)................................................. 13

*Brown v. SAP Am., Inc.*, C.A. No. 98-507,
1999 U.S. Dist. LEXIS 15525 (D. Del. Sept. 13, 1999)................................................. 10

*Butala v. Agashiwala*, 95 Civ. 936, 1997 U.S. Dist. LEXIS 1934 (S.D.N.Y. Feb. 24, 1997)................................................. 9

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) ................................................. 14

*Cerullo v. Harper Collins Pub.*, 30 Med. L. Rptr. 1499 (Del. Super. Ct. 2001) ................................................. 7

*D'Angelo v. Petroleos Mexicanos*, 398 F. Supp. 72 (D. Del. 1975) ................................................. 8

*Daniel Boone Area School District v. Lehman Brothers*, 187 F. Supp. 2d 400 (W.D. Pa. 2002) ......... 12-13

*David B. Lilly Co. v. Fisher*, 18 F.3d 1112 (3d Cir. 1994) ................................................. 8

*FDIC v. Brossman*, Civil Action No. 81C-DE-116,
1984 Del. Super. LEXIS 826 (Del. Super. Ct. Sept. 5, 1984) ................................................. 8

*Feinberg v. Saunders, Karp & Megrue, L.P.*, C.A. No. 97-207,
1998 U.S. Dist LEXIS 19144 (D. Del. Nov. 13, 1998) ......................................... 10

*Ford Motor Credit Co. v. Hemsley (In re Bennett)*, 317 B.R. 313 (Bankr. D. Md. 2004).......................... 18

*Hill v. Equitable Trust Co.*, 562 F. Supp. 1324 (D. Del. 1983) ................................................. 8

*Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995) ................................................. 9-10

*McRoberts v. S.I.V.I. (In re Bequette)*, 184 B.R. 327 (Bankr. S.D. Ill. 1995) ................................................. 18

*Moseley v. Arth (In re Vendsouth, Inc.)*, No. 00-10112C-7G, ADV. 01-2016, 2003 WL 22399581
(Bankr. M.D.N.C. Oct. 10, 2003) ................................................. 14

*Nat'l Union Fire Ins. Co. v. Forman 635 Joint Venture*, 94 Civ. 1312,
1996 U.S. Dist. LEXIS 13014 (S.D.N.Y. Sept. 6, 1996) ................................................. 7-8

*Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs.)*,
    299 B.R. 732 (Bankr. D. Del. 2003) ........................................................................ 16

*Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*,
    267 F.3d 340 (3d Cir. 2001) ........................................................ 15-17, 19

*Rolick v. Collins Pine Co.*, 925 F.2d 661 (3d Cir. 1991) ............................................. 13

*Royal v. Pepper, et al.*, 05-165 (D. Del.) ....................................................................... 4

*Sompo Japan Ins. Inc. v. Deloitte & Touche, LLP*, 03 CVS 5547,
    2005 NCBC LEXIS 1, (N.C. Super. Ct., Guilford County, June 10, 2005) ............ 14-15

*Skipworth v. Lead Indus. Ass'n*, 690 A.2d 169 (Pa. 1997) ........................................ 12

*Stanziale v. Pepper, et. al.*, 04-1551 (D. Del.) .............................................................. 4

*State ex. rel. Long v. ILA Corp.*, 513 S.E.2d 812 (N.C. Ct. App. 1999) ..................... 16

*Stetser v. TAP Pharm. Prods. Inc.*, 598 S.E.2d 570 (N.C. Ct. App. 2004) ................. 14

*TUG Liquidation, LLC v. Atwood (In re Buildnet, Inc.)*, No. 01-82293,
    2004 WL 1534296 (Bankr. M.D.N.C. June 16, 2004) ......................................... 17

*Travelers Indem. Co. v. Lake*, 594 A.2d 38 (Del. 1991) ............................................. 10

*W & G Milford Assoc., L.P. v. Jeffcor, Inc.*, C. A. No. 89C-JN-161,
    1991 Del. Super. LEXIS 229 (Del. Super. Ct. Apr. 12, 1991) ................................. 8

*WM High Yield Fund v. O'Hanlon*, No. 00-3423,
    2005 U.S. Dist. LEXIS 12064 (E.D. Pa. May 13, 2005) ...................................... 12

### Statutes

Del. Code Ann. Tit. 10, § 8121 (2005) ........................................................................... 7

N.Y. C.P.L.R. § 503 (2005) ............................................................................................ 7

### Other Authorities

Restatement (Second) of Conflicts of Law § 145 ........................................................ 10

Restatement (Second) of Conflicts of Law § 146 ........................................................ 10

Restatement (Second) of Conflicts of Law § 148 ........................................................ 10

Restatement (Second) of Torts § 876 ...................................................................... 12-15

## INTRODUCTION

Faced with the many legal authorities supporting Pepper's request for dismissal of Royal's state law tort actions, Royal simply makes up its own law in an attempt to salvage its claims. Although Royal goes to great lengths to avoid the clear legal authority cited by the Pepper Defendants, Royal's repeated failure to support its own preferred view of the law is telling. Pepper's motion to dismiss should be granted.

## ROYAL'S MISREPRESENTATIONS

In its brief in opposition to Pepper's Motion to Dismiss, Royal repeatedly misrepresents its own allegations as well as the arguments set forth by Pepper. Before addressing the dispositive legal issues involved in its motion, Pepper must set the record straight.

***The March 2, 2000, e-mail.*** Throughout its brief, Royal relies repeatedly on its mischaracterization of a March 2, 2000, e-mail that Gagné sent to Yao, to support its allegation that Gagné knew SFC was making "ghost payments" on behalf of students who had defaulted on their loans. *See, e.g*, Royal Br. at 4, 12-13. The e-mail, which Royal reproduced in its entirety in its Amended Complaint but quoted from selectively in its brief, reads as follows:

> As you can tell, **I think the use of the School Reserves to make monthly payments on the Student Loans will take a considerable amount of thought and work** to wind through the bankruptcy issues, the consumer finance laws, the School Agreements, the Royal Policy and the Term Securitizations. **The confluence of parties and disciplines and the need to track the payments from another source may make the problem not feasible** but we will take a crack at it.
>
> In addition, we will have to see how the Capital Markets will react. I alluded to the fact that the market already is leery of how complicated the deals are for there size. Adding this factor will considerably compound the complexity. I know you said that they should not rely on it. However, if they should not then it looks like SFC is manipulating the pool performance. It seems to have some arbitrary elements. In short, this is something that we will need to bring on after discussing it with several parties, including Rusty Sailor (sic) [of PNC Capital Markets, one of SFC's investment bankers] and John [Loufborrow, the other of SFC's investment bankers].

> The final element is the Royal who will be directly affected and
> is **if** the plan is being used now.  **The discussion with the Royal
> will be difficult.**  They are a little skittish right now because you
> are having difficulty going to market and laying a major
> restructuring on them may be untimely.  In addition, if the
> payments have been made in this pool it would impact them and
> they will be concerned that it affects the experience account.  I
> will also have to look at the Bankruptcy implications before the
> 3/22 meeting, which I have been asked to attend by the Royal, if
> it's okay with you.
>
> **To implement the new program is not impossible, but it will
> not be easy.**

Am. Compl. ¶ 79 (Royal's emphasis removed; emphasis added).

The full text of the e-mail (rather than the selected excerpts relied upon by Royal)
thus makes clear that Gagné was commenting on a ***proposal*** floated by Yao to use school reserves
to make monthly payments on the student loans.  Gagné specifically referred to Yao's proposal as
"the ***new*** program."  *Id.* (emphasis added).  Gagné advised that this new program "will not be
easy," "will take a considerable amount of thought and work," and may be "not feasible" in light
of the many issues involved.  *Id.*  Most significantly so far as the present case is concerned,
Gagné informed Yao that SFC would need to disclose this new proposal to and negotiate it with
Royal before implementing it:  "The discussion with the Royal will be difficult."  *Id.*  In other
words, Gagné insisted that Yao disclose his new proposal to Royal and the investment bankers so
that the proposed payments would **not** be "ghost" payments.  Moreover, and contrary to Royal's
mischaracterizations, the e-mail proves that Gagné did **not** know Yao was making "ghost
payments":  "The final element is the Royal who will be directly affected and is ***if*** the plan is
being used now."  *Id.* (emphasis added).

Should this case proceed to discovery, the Pepper Defendants will prove that,
after Gagné sent the March 2, 2000 e-mail to Yao, Pepper did not perform the "considerable
amount of . . . work" necessary for Yao to implement his new proposal.  In fact, the Pepper
Defendants will show, if necessary, that having understood from Gagné's e-mail that Pepper

2

would not implement Yao's proposal without addressing the significant hurdles involved (including informing Royal), Yao retained a different law firm to implement one piece of Yao's proposal, but Yao did not take the additional steps advised by Gagné. Regardless of those non-record facts, however, it is clear that the March 2, 2000 e-mail on its face does not support Royal's allegation that the Pepper Defendants knew SFC was making "ghost payments" on behalf of students. Royal's argumentative mischaracterizations to the contrary should be disregarded.

*The Nielsen case.* Royal explains in its Amended Complaint and brief that Pepper represented SFC in a litigation matter (the "*Nielson* case") during which SFC produced documents showing that the default rates on SFC's student loans were higher than reported. *See* Royal Br. at 12. Royal alleges that the "Lawyers" – a defined term that includes Gagné (*see* Royal Br. at 3) – knew about the "ghost payments" as a result of their involvement with the *Nielson* case. Royal's argument, based on nothing other than its definitional generalizations, is yet another mischaracterization. Royal has not alleged (and cannot allege) that Gagné knew anything about documents produced by SFC in the *Nielson* case, because Gagné, a business lawyer, was not involved in the *Nielson* litigation. Therefore, nothing in Royal's discussion of the *Nielson* case supports its contention that Gagné knew about SFC's "ghost payments."

Moreover, nowhere in Royal's Amended Complaint does Royal allege, contrary to the implications of Royal's brief, that any of the discovery in the *Nielson* case alerted **any** Pepper lawyer to either SFC's use of the phrase, "ghost payments," or SFC's practice of making what Royal refers to as "ghost payments." At most, the reasonable inference to be drawn from the allegation of the Amended Complaint is that one or more litigators from Pepper became aware that delinquency rates on the loans at issue in *Nielson* were at one level; no inference can reasonably be drawn that those litigators were familiar with SFC's PPM's in different, unrelated transactions, or knew how the data in those PPMs compared with the data developed in the *Nielson* litigation. Therefore, no inference can reasonably be drawn that those litigators would have recognized any inconsistency, let alone called any inconsistency to Gagné's attention.

3

*The Pepper Defendants' standing arguments in the Trustee's case.* By mischaracterizing Pepper's briefs, Royal attempts to manufacture a false discrepancy between Pepper's position in the Trustee's case with respect to standing to bring a cause of action for deepening insolvency, and the standing argument Pepper asserts in this case with respect to that claim. *See* Royal's Br. at 8, 59. Pepper's position on standing is clear and consistent between the two cases:

| **Pepper's Position on Standing in the Trustee's Case** (from Pepper's Reply Brief in Support of its Motion to Dismiss in *Stanziale v. Pepper, et al.*, 04-1551 (D. Del.), at 8 & fn. 9) (emphasis added; citations omitted)) | **Pepper's Position on Standing in Royal's Case** (from Pepper's Brief in Support of its Motion to Dismiss in *Royal v. Pepper, et al.*, 05-165 (D. Del.), at 16) |
|---|---|
| "Because the Trustee lacks standing to bring claims on behalf of creditors of SFC, the Trustee's two tort claims that belong to SFC's creditors – negligent misrepresentation and aiding and abetting breach of fiduciary duty – must be dismissed. . . . **The remaining tort claims alleged by the Trustee are all property of the debtor, which the Trustee has standing to pursue** under Section 541. Specifically . . . [a]ccording to *Lafferty*, **the Trustee's deepening insolvency claim . . . belongs to SFC, not its creditors. Even though the Trustee has standing to bring these claims**, they are nonetheless barred by the in pari delicto doctrine (and for other reasons) . . . ." | "Royal lacks standing to recover damages allegedly incurred by SFC as a results of 'deepening insolvency' because those damages are recoverable only by SFC's bankruptcy estate, not by individual creditors of SFC such as Royal." |

In its brief, Royal blatantly misrepresents Pepper's argument in the Trustee's case. In Pepper's main brief in support of its motion to dismiss the Trustee's case – the very document from which Royal pulls the out-of-context quote on page 59 of its brief – Pepper explained that the Trustee lacks standing to bring his deepening insolvency claim **only** to the extent that the Trustee purports to bring the cause of action *on behalf of SFC's creditors*. *See* Pepper's Brief in Support of its Motion to Dismiss in the Trustee's case at 11-12. In fact, Pepper specifically noted that the Trustee would have standing to bring a deepening insolvency claim *on behalf of SFC* if he had so alleged:

4

> In *Lafferty*, the Third Circuit concluded that the assignee of a bankruptcy estate had standing to bring its claim because the court saw "no indication that the [assignee] is attempting to recover for injuries to the creditors." *Lafferty*, 267 F.3d at 349. Here, by contrast, the Trustee explicitly alleges injury to SFC's creditors. The Trustee lacks standing to seek recovery for those alleged injuries. Furthermore, to the extent the Trustee is alleging that both SFC and the creditors were injured, the Trustee should be required to identify with specificity the damages inflicted upon SFC and the damages inflicted upon its creditors. The Trustee then should be precluded from recovering any damages inflicted upon SFC's creditors.

*Id.* at 12, fn. 8. Therefore, it is Royal's mischaracterization of Pepper's argument, not the argument itself, that is "particularly disingenuous." Royal Br. at 8, 59.

**Royal's discovery of SFC's fraud.** Although Royal is well aware that the Pepper Defendants are required to assume as true the well-pleaded allegations in Royal's Amended Complaint for purposes of this motion to dismiss, Royal nevertheless states that Pepper "does not contest" Royal's allegation that it first discovered the fraud at SFC in March 2002. *See* Royal Br. at 26. This could not be further from the truth. If and when it becomes necessary for the Pepper Defendants to do so, they will prove that Royal was aware of SFC's fraud years before March 2002. For instance, the Pepper Defendants will prove that one of Royal's employees described SFC as a "Ponzi scheme" in an internal e-mail to several other Royal employees dated September 28, 2000 – almost eighteen months before Royal claims it discovered that SFC was a fraudulent operation. *See* App. C-1. The Pepper Defendants, if necessary, also will obtain and pursue further discovery on many of the documents described in the counterclaim asserted against Royal in Texas state court by MP III Holdings, Inc., the operator of some of the truck driver training schools that participated in SFC's student loan program. *See* App. C-5 – C-53. These documents, which show that Royal was on notice of SFC's questionable status well before March 2002, include:

- An internal Royal e-mail dated October 6, 2000, questioning SFC ability to stay in business. App. C-35 (¶ 125);

5

- An internal Royal e-mail dated October 24, 2000, noting that SFC was running out of money.  App. C-35 (¶ 126);

- An internal Royal e-mail dated March 26, 2001, recognizing that there was a "real problem" at SFC that could lead to "a pretty big theoretical credit risk." App. C-36 (¶ 130);

- An internal Royal e-mail dated April 5, 2001, stating that Royal had discovered "the extremely high delinquency rate on these notes . . . it looks to be in the range of 65%."  App. C-36 – C-37 (¶ 131);

- An internal Royal e-mail dated April 6, 2001, questioning whether Yao might try to flee the country and stating that the author, a Royal employee, was "in a lot of turmoil on this account."  App. C-37 (¶ 132);

- An e-mail from Royal to SFC dated April 20, 2001, acknowledging that the amount of money SFC was collecting from students did not correlate with the percentage of loans that SFC represented were performing.  App. C-37 (¶ 134);

- An internal Royal e-mail dated May 7, 2001, in which a Royal employee claimed to understand "the hard reality of policy #2 all too well.  It is what I think about every night when I wake up."   App. C-38 (¶ 138);

- An internal Royal e-mail dated July 5, 2001, acknowledging that two of Royal's policies totaling $300 million were performing poorly.  App. C-38 (¶ 140);

- An internal Royal e-mail dated July 10, 2001, stating that "If they [SFC] cannot find someone else to insure their securitizations, they will be dead in the water and so very well may we."  App. C-38 (¶ 141);

- An internal Royal e-mail dated December 4, 2001, asking "given their [SFC's] business model, how much longer we might want to keep them in business." App. C-39 (¶ 144);

- An internal Royal e-mail dated December 4, 2001, acknowledging that the delinquency rates on the student loans were high due to poor loan servicing. App. C-39 (¶ 145);

- An internal Royal e-mail dated December 4, 2001, in which a Royal employee asked "are we idiots?" for continuing to do business with SFC.  App. C-39 – C-40 (¶ 147).[1]

---

[1]     Pepper is not relying upon any of these non-record documents in support of its motion to dismiss.  The documents are attached only to combat Royal's mischaracterization of Pepper's position.

6

# ARGUMENT

## I.     ROYAL'S STATE LAW CLAIMS ARE TIME BARRED.

### A.     Royal is not entitled to invoke the "Delaware resident exception" of the Delaware Borrowing Statute.

Royal's argument that it is entitled to the "Delaware resident exception" to the Delaware borrowing statute is wrong because Royal is not a "resident" of Delaware as that term is construed in connection with the borrowing statute.

The last sentence of Delaware's borrowing statute provides that "[w]here [a] cause of action originally accrued in favor of a person who at the time of such accrual ***was a resident of this State***, the time limited by the law of this State shall apply." 10 Del. C. § 8121 (emphasis added).  In *Cerullo v. Harper Collins Pub.*, 30 Med. L. Rptr. 1499 (Del. Super. Ct. 2001), the court noted that no Delaware court has defined the term "state resident" for purposes of the Delaware borrowing statute. *See id*. at 1502  However, because the Delaware borrowing statute was copied almost verbatim from the New York borrowing statute, the court noted that "guidance from the New York courts on this issue is appropriate" and proceeded to "adopt[] the New York test as the baseline for determining Delaware residency in regards to the Delaware Borrowing Statute." *Id.*

The "New York test" that the *Cerullo* court adopted is set forth in *Antone v. General Motors Corp.*, 473 N.E.2d 742, 746 (N.Y. 1984):  "[I]f an individual can show that he is a resident of a particular county in the State for venue purposes, he will also be a resident of the State itself for purposes of [the New York borrowing statute]." *Antone*, 473 N.E. 2d 747.  Under New York's venue rules, a domestic corporation "shall be deemed a resident of the county in which its principal office is located." N.Y. C.P.L.R. § 503.  In other words, a New York corporation that does not have a principal office in New York is not a "resident" of New York for purposes of the New York borrowing statute.  Indeed, "a corporation's state of incorporation is its domicile, and its principal place of business is its residence." *National Union Fire Ins. Co. v.*

7

*Forman 635 Joint Venture*, 94 Civ. 1312, 1996 U.S. Dist. LEXIS 13014, *10 (S.D.N.Y. Sept. 6, 1996) (holding that a Pennsylvania corporation with its principal place of business in New York was a resident of New York, not Pennsylvania, for purposes of New York's borrowing statute). *Cf. W & G Milford Assoc. L.P. v. Jeffcor, Inc.*, C. A. No. 89C-JN-161, 1991 Del. Super. LEXIS 229, *10 (Del. Super. Ct. Apr. 12, 1991) (holding that, for purposes of Delaware's costs statute, a corporation is a "resident" of the county in which its principal place of business is located), *aff'd in part, rev'd in part on other grounds*, No. 173, 1991 Del. LEXIS 447 (Del. Dec. 27, 1991).[2]

Here, although Royal is incorporated in Delaware, its principal place of business is located in North Carolina. *See* Am. Compl. ¶ 12. Therefore, Royal is not a "resident" of Delaware for purposes of Delaware's borrowing statute and is not entitled to utilize Delaware's statute of limitations where, as here, the limitations period of the state in which the cause of action arose (Pennsylvania) is shorter.

---

[2] Royal's contention that a corporation incorporated in Delaware is necessarily a "resident" of Delaware for purposes of the Delaware borrowing statute, regardless of the location of its principal place of business (*see* Royal Br. at 24), is contradicted by Royal's own case law. In *Hill v. Equitable Trust Co.*, 562 F. Supp. 1324 (D. Del. 1983), this Court held that a corporation was a resident of Delaware for purposes of the Delaware borrowing statute because it "is incorporated in Delaware **and** has its principal place of business in Bear, Delaware." *Id*. at 1333, n.15 (emphasis added). The other cases cited by Royal also do not support its argument. In the only Delaware state court case cited by Royal (which analyzed the applicability of Delaware's tolling statute, not the borrowing statute), the court simply stated without discussion that the bank involved in the case was a resident of Delaware. *See FDIC v. Brossman*, Civil Action No. 81C-DE-116, 1984 Del. Super. LEXIS 826, *1 (Del. Super. Ct. Sept. 5, 1984), *aff'd*, 510 A.2d 471 (Del. 1986). Nothing in the *Brossman* opinion suggests that the principal place of business of the bank – the Farmers Bank of the State of Delaware – was not located in Delaware. Similarly, in the two other federal cases cited by Royal the courts simply stated that corporations were residents of Delaware for purposes of the borrowing statute. *See David B. Lilly Co. v. Fisher*, 18 F.3d 1112, 1117 (3d Cir. 1994); *D'Angelo v. Petroleos Mexicanos*, 398 F. Supp. 72, 79 (D. Del. 1975). In neither case did the courts indicate that the principal places of business of the respective corporations was located outside of Delaware.

**B.**     **Royal's allegation that it could not have discovered the alleged wrongdoing by the Pepper Defendants until March 2004 is contradicted by Royal's own allegations.**

Royal's contention that its state law causes of action would be timely even under Pennsylvania's two year statute of limitations, because it did not discover Pepper's alleged wrongdoing until 2004 (*see* Royal Br. at 28-29), is undercut by Royal's own allegations. Royal alleges that Gagné knew SFC was making ghost payments to conceal the default rates of student loans, but failed to disclose this information in draft PPMs sent to Royal or at any other time. *See* Am. Compl. ¶ 58, 82.[3] However, Royal alleges that Yao confessed to Royal in March of 2002 that SFC "had been making the secret ghost payments and that a large number of student loans would immediately default if the ghost payments ceased." Royal Br. at p. 17. Therefore, even assuming as true Royal's contention that Pepper was aware of the ghost payments, Royal, by its own allegations, knew no later than March 2002 that Pepper had not disclosed the ghost payments in the PPMs or otherwise.

Whether Royal had actual knowledge in March 2002 that Pepper was (supposedly) aware of the ghost payments is irrelevant because, as Royal's own case law demonstrates, Royal was on inquiry notice of its claims against Pepper no later than March 2002, when it discovered (supposedly for the first time) that the information about default rates it received from Pepper was not correct: "[P]laintiffs were on inquiry notice regarding the defendants' role in the fraud no later than October 1990 [because] [b]y that time, many of the defendants' representations . . . had proven untrue." *Butala v. Agashiwala*, 95 Civ. 936, 1997 U.S. Dist. LEXIS 1934, *14-16 (S.D.N.Y. Feb. 24, 1997) (cited in Royal's brief at p. 28). Because Royal's conclusory allegation that it did not discover Pepper's supposed participation in SFC's fraud until the Fall of 2004 is contradicted by other more specific allegations in Royal's papers, it should be disregarded. *See, e.g., Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092

---

[3]     Defendants will, should it become necessary, prove that this allegation is false, but, as they must, will assume the allegation is true for purposes of this motion.

(2d Cir. 1995) ("General, conclusory allegations need not be credited . . . when they are belied by more specific allegations of the complaint.").

## II.    PENNSYLVANIA LAW APPLIES TO THIS ACTION.

Royal's argument that the law of Delaware governs the substance of its claims, pursuant to the choice of law principles set forth in § 148 of the Second Restatement of Conflicts of Law, is incorrect for the simple reason that Delaware has not adopted § 148.

In *Travelers Indemnity Co. v. Lake*, 594 A.2d 38 (Del. 1991), the case upon which Royal ostensibly relies in support of its contention that Delaware has adopted § 148 of the Restatement (*see* Royal Br. at 30), the Supreme Court of Delaware ***only*** adopted § 145(1) (and perhaps § 146) of the Restatement. *See id.* at 47. The *Travelers* court made no mention of § 148 and Royal has not cited to (nor have the Pepper Defendants been able to locate) a single Delaware case that has adopted § 148 of the Restatement as the law of Delaware.[4] Because the Delaware courts have not adopted § 148, Royal's entire choice of law analysis, which relies solely on § 148, is irrelevant and should be disregarded.[5]

---

[4]    The federal cases cited by Royal are inapposite. In *AES Corporation v. Dow Chemical Co.*, Civil Action No. 99-673, 2001 U.S. Dist. LEXIS 25557 (D. Del. Jan. 19, 2001), this Court applied Texas choice of law rules and cited to Texas state law adopting § 148 of the Restatement. *See id.* at *19. In neither *Brown v. SAP America, Inc.*, C.A. No. 98-507, 1999 U.S. Dist. LEXIS 15525 (D. Del. Sept. 13, 1999), nor *Feinberg v. Saunders, Karp & Megrue, L.P.*, C.A. No. 97-207, 1998 U.S. Dist LEXIS 19144 (D. Del. Nov. 13, 1998), did the courts cite to a single case in which a Delaware court adopted § 148 of the Restatement. In fact, Judge Robinson's opinion in *Brown* reiterated that the Delaware courts only have adopted § 145(1) of the Restatement. *See Brown*, 1999 U.S. Dist. LEXIS, at * 17.

[5]    Even assuming that the Delaware courts had adopted § 148, that section applies only to fraud claims. Royal has failed to perform the separate choice of law analysis under § 145(1) that would govern its five other state law tort claims. Indeed, Royal is attempting by sleight of hand to sweep away Pepper's choice of law arguments without actually addressing them. Pepper moved to dismiss all of Royal's state law claims on the ground that they are time-barred, but only moved to dismiss on grounds of Pennsylvania substantive law Royal's claims for conspiracy, aiding and abetting, and deepening insolvency. Royal's response – that its fraud claim (a claim that Pepper did not move to dismiss on substantive grounds) is governed by the law of Delaware and/or North Carolina – is wholly irrelevant to the issue at hand and does not respond to the issue Pepper briefed; namely whether Royal's claims for conspiracy, aiding and abetting, and deepening insolvency are governed by Pennsylvania law pursuant to the "most significant relationship" test found in § 145(1) of the Restatement.

Therefore, the Court must look to § 145 of the Restatement when analyzing the choice of law issues in this case. As Pepper explained in its main brief, an analysis under § 145 demonstrates that Pennsylvania law applies to this action because, among other reasons, Yao was running SFC out of an office in Pennsylvania, and because Pepper's alleged wrongful conduct (the drafting of PPMs) took place in Pennsylvania. *See* Am. Compl. ¶¶ 156(d), 156(e), 160; Main Brief at 7-9.

### III.    ROYAL HAS FAILED TO STATE A CLAIM FOR CONSPIRACY UNDER PENNSYLVANIA LAW.

In its main brief, Pepper cited eight federal district court cases that stand for the proposition that a plaintiff only states a cause of action for conspiracy under Pennsylvania law where he alleges "malice" – *i.e.*, that the defendant engaged in the conspiracy with the ***sole*** intent of injuring the plaintiff. *See* Main Br. at 11-13. Having failed to allege malice, Royal argues instead that this Court should simply disregard the holding of the many courts that have addressed the issue and adopt Royal's preferred spin on Pennsylvania law. According to Royal, which apparently believes that it has a better grasp on Pennsylvania law than eight federal judges sitting in various district courts throughout this circuit, all eight cases cited by Pepper were wrongly decided and relied upon a "misapplication of state law." Royal Br. at 51, n.26. However, Royal's exact argument recently was rejected by yet another federal district court judge sitting in Pennsylvania:

> Defendants assert[ed] that the element of malice requires a showing that "the sole purpose of the conspiracy is to cause harm to the party who has been injured." Plaintiffs respond[ed] that the holding of *Thompson Coal* has been misconstrued and does not stand for the proposition that an intent to injure the plaintiff must be the sole purpose and objective of the conspiracy and that, therefore, they have demonstrated "malice" by setting forth the actions and inaction taken by the [defendants] without just cause or excuse. However, Plaintiffs [like Royal here] cite no authority supportive of their reading of *Thompson Coal*. By contrast, a number of courts in this district have construed the *Thompson Coal* holding as creating a "sole purpose" requirement. . . . In light of the significant amount of persuasive authority so holding, this Court concludes that Plaintiffs must

11

> demonstrate that the sole purpose and objective of any
> conspiracy among the Defendants must have been a malicious
> intent to injure Plaintiffs.

*WM High Yield Fund v. O'Hanlon*, No. 00-3423, 2005 U.S. Dist LEXIS 12064 (E.D. Pa. May 13,

2005) (granting motion to dismiss conspiracy claim where "[t]he fact that it may have been

necessary [for the defendants] to deceive Plaintiffs in order to carry out their scheme in no way

indicates that they acted with malice solely to injure Plaintiffs") (citations omitted).

## IV.    NEITHER PENNSYLVANIA NOR NORTH CAROLINA RECOGNIZES A CAUSE OF ACTION FOR AIDING AND ABETTING.

Royal's suggestion that this Court should predict that the Pennsylvania Supreme

Court would adopt § 876(b) of the Second Restatement of Torts (aiding and abetting) because the

Pennsylvania Supreme Court recognized the entirely different tort (concert of action) when it

adopted § 876(a) of the Restatement is nonsensical.   In fact, Royal's argument is directly

contradicted by the authority cited by Pepper in its main brief, which Royal conspicuously

ignores.

In *Daniel Boone Area School District v. Lehman Brothers*, 187 F. Supp. 2d 400

(W.D. Pa. 2002) (discussed by Pepper at page 14 of its main brief but ignored by Royal), the

plaintiff brought a cause of action for both concert of action and aiding and abetting breach of

fiduciary duty.  *See id.* at 412-13.  The *Daniel Boone* court acknowledged that the Pennsylvania

Supreme Court recognized a cause of action for concert of action when it adopted § 876(a) of the

Restatement in *Skipworth v. Lead Industries*, 690 A.2d 169 (Pa. 1997).  *See Daniel Boone*, 187 F.

Supp. 2d at 412.  However, notwithstanding its citation to and discussion of *Skipworth*, the

*Daniel Boone* court refused to recognize a cause of action for aiding and abetting because "the

Pennsylvania Supreme Court has not yet adopted § 876(b) as the law of Pennsylvania."  *Id.* at

413.  *See also WM High Yield Fund*, 2005 U.S. Dist LEXIS 12064, at *50 ("[T]his Court follows

the lead of the majority of other courts in this district, in declining to expand Pennsylvania law,

and holds that the Pennsylvania Supreme Court would not permit such an action [for aiding and abetting fraud].").

   The court in *Daniel Boone* refused to extend the holding of *Skipworth* to recognize a cause of action for aiding and abetting (as Royal asks this Court to do) because to do so "would represent a significant expansion of Pennsylvania tort liability." *Id*. The concert of action tort permits the imposition of liability only where "***both*** persons who are alleged to have acted in concert ***each*** committed a 'tortious act.'" *Id*. at 412 (emphasis added).   Aiding and abetting liability under § 876(b) of the Restatement, by contrast, attaches where one party provides substantial assistance to a tortfeasor, but does not himself commit a tort. *See* Restatement (Second) of Torts § 876(b). Because liability under § 876(b) can attach where a party has not himself committed a tort, the difference between the two causes of action is significant, as the *Daniel Boone* court recognized. Royal's attempt to gloss over this important distinction between the two torts by arguing that the adoption of one should lead to the adoption of the other should be rejected.

   In addition, even assuming the law of North Carolina applied to this action (it does not), Royal's aiding and abetting claim still would fail because North Carolina, like Pennsylvania, does not recognize a cause of action for aiding and abetting. To begin with, and contrary to Royal's assertion, North Carolina does not recognize a cause of action for aiding and abetting because the North Carolina Supreme Court never has addressed the issue. Royal has not cited to (nor have the Pepper Defendants been able to locate) a single case in which the North Carolina Supreme Court recognized a cause of action for aiding and abetting.[6] Therefore, if this Court determines that North Carolina law applies, it must predict whether the North Carolina Supreme Court would likely adopt the tort if presented with the issue, giving proper regard to the

---

   [6] In *Boykin v. Bennett*, 118 S.E.2d 12 (N.C. 1961), the Supreme Court of North Carolina recognized the concert of action tort, not a claim for aiding and abetting: "We find that the complaint sufficiently alleges that defendants willfully and ***jointly*** engaged in [the tortious conduct]." *Id*. at 16 (emphasis added).

decisions of North Carolina's intermediate appellate court. *See Rolick v. Collins Pine Co.*, 925

F.2d 661, 664 (3d Cir. 1991). Based on the fact that the North Carolina Court of Appeals has not

adopted § 876(b) even when presented with the opportunity to do so, this court should predict that

the North Carolina Supreme Court will not adopt the tort either.

In *Blow v. Shaughnessy*, 364 S.E.2d 444 (N.C. Ct. App. 1988), one of the cases

upon which Royal relies, the issue before the Court of Appeals was whether the trial court erred

in giving a jury instruction on the definition of the term "substantial assistance," one of the

elements of an aiding and abetting claim. *See id.* at 447. The court held that, although a cause of

action for aiding and abetting had never previously been addressed by the Court of Appeals of

North Carolina, the cause of action was recognized in federal securities fraud cases. *See id.* The

court then looked to the comments of § 876(b) of the Restatement for guidance in defining the

term "substantial assistance," but did **not** adopt § 876(b) as the law of North Carolina, even

though it certainly had the opportunity to do so. Furthermore,

> Shortly after the decision in *Blow*, its federal underpinnings were
> removed by the United States Supreme Court in *Central Bank of
> Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S.
> 164 (1994), which held that there was not a cause of action for
> aiding and abetting under federal securities laws.

*Sompo Japan Ins. Inc. v. Deloitte & Touche, LLP*, 03 CVS 5547, 2005 NCBC LEXIS 1, *8, 10

(N.C. Super. Ct., Guilford County, June 10, 2005) ("[T]he underlying rationale for the *Blow*

opinion was eliminated by *Central Bank*."). In other words, *Blow* did not adopt § 876(b) as the

law of North Carolina, and to the extent *Blow* recognized the cause of action based on the federal

securities laws, the foundation for that holding has since been removed.[7]

---

[7]    Nor does the other Court of Appeals opinion cited by Royal hold that North
Carolina recognizes a cause of action for aiding and abetting. In *Stetser v. TAP Pharmaceutical
Products, Inc.*, 598 S.E.2d 570 (N.C. Ct. App. 2004), the court noted that "[o]ur Supreme Court
has adopted [§ 876] of the Restatement *as it applie[s] to the negligence of joint tortfeasors*." *Id.*
at 583 (citing *Boykin*) (emphasis added). In other words, *Stetser* simply reiterated the fact that
North Carolina has recognized the concert of action tort, but said nothing about a cause of action
for aiding and abetting. *See Sompo Japan Ins. Inc.*, 2005 NCBC LEXIS, at *7 ("*Stetser* neither
recognizes all aiding and abetting claims nor specifically recognizes a claim for aiding and

In short, although North Carolina does recognize the concert of action tort, it has not recognized a cause of action for aiding and abetting and is not likely to do so. *Sompo Japan Ins. Inc.*, 2005 MCBC LEXIS, at *3 ("[T]he North Carolina appellate courts have not adopted and will not adopt Section 876 on a wholesale basis [but] will adopt portions of Section 876 on a case-specific basis, guided by the 'concert of action' involved."). This Court similarly should predict that the North Carolina Supreme Court would not recognize a cause of action for aiding and abetting.

## V.    ROYAL'S "DEEPENING INSOLVENCY" CLAIM FAILS AS A MATTER OF LAW.

### A.    Pennsylvania, Delaware and North Carolina do not recognize a cause of action for "deepening insolvency."

Royal mischaracterizes the holding of *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340 (3d Cir. 2001). Although Royal claims that the Third Circuit predicted that the Pennsylvania Supreme Court would adopt a deepening insolvency cause of action, the court repeatedly stated that deepening insolvency is a *theory of damages*:

- "[W]e must now determine whether the alleged *theory of injury* – 'deepening insolvency' – is cognizable under Pennsylvania law." *Id*. at 349 (emphasis added);

- "We conclude that, if faced with the issue, the Pennsylvania Supreme Court would determine that 'deepening insolvency' may give rise to a *cognizable injury*." *Id*. (emphasis added);

- "[W]e believe that the . . . Pennsylvania Supreme Court [would] recognize 'deepening insolvency' as giving rise to a *cognizable injury* in the proper circumstances." *Id*. at 352 (emphasis added).

In fact, the plaintiff in *Lafferty* did not even assert a cause of action for deepening insolvency — and thus, whether or not to recognize one was not an issue before the Third Circuit. Rather, as in *every one* of the cases surveyed by the court in *Lafferty*, the Third Circuit simply acknowledged that deepening insolvency might be recognized by Pennsylvania's courts as a theory of damages

---

abetting fraud."). A bankruptcy court opinion cited by Royal, *Moseley v. Arth (In re Vendsouth, Inc.)*, No. 00-10112C-7G, ADV. 01-2016, 2003 WL 22399581 (Bankr. M.D.N.C. Oct. 10, 2003), also is of no value because it relied solely on *Blow* and, in any event, is not controlling.

for a defendant's wrongdoing. The Pennsylvania Supreme Court does not recognize a cause of action for deepening insolvency and *Lafferty* repeatedly referred to "deepening insolvency" as a theory of damages.

Nor, contrary to Royal's assertion, is deepening insolvency a recognized cause of action under the law of Delaware or North Carolina, even assuming the law of either of those states applied here. *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs.)*, 299 B.R. 732 (Bankr. D. Del. 2003), the case upon which Royal relies to supports its argument that the Delaware Supreme Court would recognize a cause of action for deepening insolvency, does not support Royal's position. The *Exide* court explicitly relied upon *Lafferty* which, as described above, stands for the proposition that deepening insolvency describes *damages* that a debtor corporation can seek to recover if a party commits a tort that results in a wrongful increase in the corporation's debt. *See id.* at 751-52 (noting that the *Lafferty* court determined that deepening insolvency is a "cognizable injury"). In any event, the Bankruptcy Court's prediction of Delaware state law in *Exide* is not binding on this Court.

*State ex. rel. Long v. ILA Corp.*, 513 S.E.2d 812 (N.C. Ct. App. 1999), the case upon which Royal relies to support its contention that North Carolina recognizes a cause of action for deepening insolvency, says no such thing. The plaintiff in *ILA* did not bring a claim for deepening insolvency, and the court never mentioned such a claim. *See id.* at 816 (plaintiff stated claims for breach of fiduciary duty and negligent mismanagement). In fact, the only time the court in *ILA* even came close to mentioning the concept of deepening insolvency was in the section of the opinion discussing damages. *See id.* at 823 ("While the reinsurance agreement deepened ILA's statutory insolvency, defendant continued to operate ILA in a reckless manner"). In other words, *ILA* supports Pepper's argument that deepening insolvency is nothing more than a theory of damages, as suffered by the entity whose insolvency has been "deepened." To hold otherwise would present significant proximate cause issues, exposing the supposed tortfeasor to liability not only to the debtor whose insolvency was wrongfully increased, but also, potentially,

16

to all with whom the debtor interacted, or with whom they interacted, in ever widening circles.

No Pennsylvania, Delaware or North Carolina decision requires or supports such a departure from

traditional proximate cause analysis.

**B.      Royal lacks standing to recover "deepening insolvency" damages because those damages are the property of SFC's bankruptcy estate.**

Only SFC possibly could have incurred "deepening insolvency" damages, as

those damages are defined in *Lafferty*: "an injury to ***the Debtors' corporate property*** from the

fraudulent expansion of corporate debt and prolongation of corporate life." *Lafferty*, 267 F.3d at

347 (emphasis added).   Only SFC (through its trustee) has standing to bring a cause of action to

recover for an injury to SFC's corporate property.  Simply put, an individual creditor such as

Royal cannot recover damages for deepening insolvency:

> Corporate waste and deepening insolvency are claims designed
> for the protection of creditors and shareholders in general
> because they are derivative of an injury to the corporation, and
> are not the result of a direct injury sustained by a single creditor.
> These are not claims that address injuries sustained by [a
> creditor] individually, but rather, injuries suffered by [the
> debtor].

*TUG Liquidation, LLC v. Atwood (In re Buildnet, Inc.)*, No. 01-82293, 2004 WL 1534296, *7

(Bankr. M.D.N.C. June 16, 2004).  Indeed, Royal fails to cite a single case in which any court

ever has held that a creditor has standing to bring a claim for deepening insolvency.  The Court

should decline Royal's invitation to make new law, especially where doing so would run counter

to the Third Circuit's holding in *Lafferty*.[8]

---

[8]      Royal takes language from *Lafferty* out of its context to support its contention
that *Lafferty* "preserv[ed a] creditor's right to bring a separate cause of action for deepening
insolvency." Royal Br. at 58.  The language in *Lafferty* to which Royal cites stands only for the
unremarkable proposition that it is possible that both a debtor corporation and its creditors can
suffer damages if agents of the debtor corporation engage in a Ponzi scheme. *See Lafferty*, 267
F.3d at 347 (stating that, where agents of the debtor engage in an "alleged Ponzi scheme . . . the
most obvious damages [are] those sustained by the creditors [but] the possibility of a distinct and
separate injury to the debtor corporation cannot be eliminated . . . .").  Although debtors and
creditors both may suffer injury when the debtor's agents perpetuate a Ponzi scheme, that does
not mean that creditors of the corporation have standing to seek recovery for the deepening
insolvency damages inflicted upon the corporation.  In short, *Lafferty* did not hold and does not

**C.**    **Royal's "deepening insolvency" claim is barred by the automatic stay.**

In response to Pepper's argument that the automatic stay provisions of the Bankruptcy Code prohibit Royal from seeking to recover SFC's alleged deepening insolvency damages, Royal contends that the Pepper Defendants lack standing to invoke the automatic stay because: (1) Pepper and Gagné have suffered no injury as a result of Royal's violation of the stay; and (2) Pepper is not a natural person. Royal also argues that it has not violated the automatic stay because its deepening insolvency claim is not the property of SFC's bankruptcy estate. Each of these arguments is incorrect.

First, Pepper and Gagné are damaged by Royal's violation of the automatic stay because they are forced to incur legal fees defending against the same cause of action in two separate cases. Second, a corporate creditor does have standing to enforce the automatic stay pursuant to § 362(h) of the Bankruptcy Code. *See Ford Motor Credit Co. v. Hemsley (In re Bennett)*, 317 B.R. 313, 317-18 (Bankr. D. Md. 2004) (holding that creditor Ford Motor Credit Company had standing to pursue relief under § 362(h)); *Beverly Plaza Assocs. v. Saul (In re Kroh Bros. Dev. Co.)*, 91 B.R. 525, 539 (Bankr. W.D. Mo. 1988) (holding that creditor limited partnership could pursue damages under § 362(h)).[9] In any event, there is no question that Gagné qualifies as an "individual" under § 362(h) who has standing to enforce the automatic stay

---

even suggest that creditors have standing to recover deepening insolvency damages. To the contrary, the *Lafferty* court made clear that creditors do not have standing to recover deepening insolvency damages. *See id.* at 349 (holding that the plaintiff had standing to pursue deepening insolvency damages because the court saw "no indication that the [assignee] is attempting to recover for injuries to the creditors").

[9]    Even if Pepper did lack standing under § 362(h) to raise Royal's violation of the automatic stay, this Court nevertheless could invoke its civil contempt powers to punish Royal's willful violation of the automatic stay: "[E]ven those courts finding that damages are unavailable to corporate entities under § 362(h) have observed that corporate plaintiffs injured by violations of the stay may obtain damages by invoking the court's civil contempt power." *McRoberts v. S.I.V.I. (In re Bequette)*, 184 B.R. 327, 335 (Bankr. S.D. Ill. 1995). Pepper hereby requests, in the alternative, that the Court hold Royal in civil contempt for willfully violating the automatic stay and order Royal to pay the legal fees Pepper incurred in defending against the deepening insolvency claim.

18

provisions of the Bankruptcy Code. Finally, the deepening insolvency claim is the property of SFC's bankruptcy estate, as explained in the previous section.

**D.    Royal has failed to plead a claim for "deepening insolvency."**

Royal's contention that it need not allege harm to SFC in order to recover deepening insolvency damages is simply wrong. *Lafferty*, the controlling Third Circuit opinion on the subject, **defines** "deepening insolvency" as "injury to the Debtors' corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life." *Lafferty*, 267 F.3d at 347. Without injury to SFC's corporate property, no damages for deepening insolvency exist.

To escape the clear language of *Lafferty*, Royal contends that it need not plead the elements (such as injury to the debtor) of a deepening insolvency "claim" to the extent those principles are set forth in *Lafferty* because, unlike the plaintiff in *Lafferty*, it is not asserting the claim on behalf of the debtor. *See* Royal Br. at 62. Royal offers no authority to support this assertion. Royal also fails to cite a single case in which any court ever has held that a creditor may bring a deepening insolvency "claim," let alone set forth the elements that a creditor must assert in order to state a deepening insolvency "claim." Therefore, it is apparently Royal's position that, although it cannot tell the Court what the elements of its deepening insolvency "claim" are, it nevertheless has pleaded them all.

Finally, citing to paragraph 81 of its Amended Complaint (but not quoting it), Royal claims that it has in any event pled that Pepper's conduct caused harm to SFC. *See* Royal Br. at 62. Nothing in that paragraph says anything about harm to SFC:

> To better attract investors – thereby generating fees for Pepper –
> Pepper and Gagné, with the participation of SFC and others,
> prepared Private Placement Memoranda ("PPMs"), and
> distributed them to potential investors and to Royal. The PPMs
> were issued in order for SFC to make required disclosures to
> potential investors. The PPMs purported to describe the material
> characteristics of SFC's securitized loan pools.

19

Am. Compl. ¶ 81. Royal has failed to plead that SFC suffered harm and, therefore, its deepening insolvency "claim" should be dismissed.

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in Pepper's main brief in support of its motion to dismiss, Pepper respectfully requests that this Court dismiss all of Royal's claims against it.

Dated:  August 16, 2005
        Wilmington, Delaware

_____
William H. Sudell, Jr., Esq. (No. 0463)
Donna L. Culver (No. 2983)
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200
(302) 658-3989 (facsimile)

*Counsel for defendant Pepper Hamilton LLP*

OF COUNSEL:

SCHNADER HARRISON SEGAL & LEWIS LLP
Elizabeth K. Ainslie, Esq.
Nicholas J. LePore, III, Esq.
Bruce P. Merenstein, Esq.
Stephen J. Shapiro, Esq.
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 751-2000
(215) 751-2205 (facsimile)