## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROYAL INDEMNITY COMPANY | : | |
| | : | |
| Plaintiff, | : | Civil No. 05-165(JJF) |
| | : | |
| vs. | : | |
| | : | |
| | : | |
| PEPPER HAMILTON LLP, ET AL. | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

### APPENDIX OF EXHIBITS TO THE REPLY BRIEF IN SUPPORT OF MOTION OF PEPPER HAMILTON LLP FOR THE DISMISSAL OF PLAINTIFF'S FIRST AMENDED COMPLAINT

---

MORRIS, NICHOLS, ARSHT & TUNNELL
William H. Sudell, Jr., Esq. (No. 0463)
Donna L. Culver, Esq. (No. 2983)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200
(302) 658-3989 (facsimile)

*Counsel for defendant Pepper Hamilton LLP*

OF COUNSEL:

SCHNADER HARRISON SEGAL & LEWIS LLP
Elizabeth K. Ainslie, Esq.
Nicholas J. LePore, III, Esq.
Bruce P. Merenstein, Esq.
Stephen J. Shapiro, Esq.
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 751-2000
(215) 751-2205 (facsimile)

August 16, 2005

## TABLE OF CONTENTS

EXHIBIT                                                                      PAGE

September 28, 2000, internal Royal e-mail                                    C-1

MP III Holdings, Inc.'s Second Amended Answer and Counterclaim              C-2 – C-53
in *Royal Indemnity Co. v. T.E. Moor & Co., et al.,* No. D-167370
(58th Judicial District, Jefferson County, Texas)

TONY MCKENZIE

09/28/2000 03:47 PM

To: BILL HIBBERD/CARM/ROYAL-SSD@ROYAL-HQ, David King/Farmington/OrionCapital@OrionCapital

cc: D SCHNEIDER/CARM/ROYAL-SSD@ROYAL-HQ

Subject: Student Loan Due Diligence

THE CONFERENCE CALL WILL BE AT 9:30. BILL & I WILL CALL DAVE KING.

Bill & Dave,

I have been thinking about what we want to do. I think Dave's questions from his review of the financial statements are good and we should go through them to decide how to phrase them with SFC. However, I think we need to get an understanding from SFC of how their "business model" is intended to work. Tied up in this idea is their forecast of when they expect the operation to make a profit. I also think we need to see SFC/Yao's model for the way the loan pools will develop.

By their business model, I mean where are they getting the cash to run the business. In the early stages of a loan portfolio's life, it does not generate enough excess cash after satisfying excess spread requirements, servicer fees, bank costs, etc, to support the loan making operation. I think this scenario will continue until the 50% limit is reached on the Excess Spread Reserve in the $75M policy and SFC begins to get distributions.

My thinking is the operation has to get its cash from the "Institutional Reserves", which make up the basis of our Experience Account. For 1999, I think we need to understand how much money was actually withheld from the schools for these reserves and what they did with the money. The financial statements seemed to indicate they borrowed $78.6M on the Whse lines (Sources &Uses) and payed $44.9M to the schools (P15 School Reserve Analysis), a difference of $33.7M. I have tried to account for this difference from info in the statements, but am coming up $4.0M short assuming what I have included is correct. I think we need to know what they expect to get from the $200M loans and where do they expect it to go. I guess the biggest numbers are how much of the Institutional/ School Reserves they feel they will need to pay in 2000 and 2001 and what they expect to be the defaults from both the $75m & $200M policies. This is where I think it would be helpful to see Yao's model. I have asked about it several times and have not yet got it. I have shared my model with them.

Hopefully this rambling makes some sense. I guess what I am saying is, I think SFC is running a kind of Ponzi scheme. They are using money, which should be held for tomorrow, to pay costs today and are hoping for fresh money coming in tomorrow until the securitizations finally start generating cash. My original model shows this would occur at the 5 year mark. My new, improved model shows this to be at 6 years.

I guess the question is, "Can they stay in business about one year after we add the last loan that we are going to ensure?".

Long winded as usual.     Tony

ROY 105161

NO. D-167370

| ROYAL INDEMNITY COMPANY, | § | IN THE DISTRICT COURT OF |
|---|---|---|
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| T.E. MOOR & CO., et al. | § | |
| | § | |
| Defendants. | § | 58th JUDICIAL DISTRICT |

## MP III HOLDINGS, INC.'S SECOND AMENDED ANSWER
## AND COUNTERCLAIM

TO THE HONORABLE JUDGE OF SAID COURT:

**COMES NOW** Defendant, MP III HOLDINGS, INC. d/b/a MTA Schools-131,

MTA Schools-136 and MTA Schools-137 ("MP III"), and files this Second Amended

Answer and Counterclaim, and in support of which avers:

### GENERAL DENIAL

1.     MP III denies each and every, all and singular, the material allegations in

Plaintiff's Seventh Amended Petition and demands strict proof thereof.

WHEREFORE, MP III requests that this Court enter an Order denying Royal's

demands for relief, dismissing Royal's Amended Petition with prejudice, and awarding

MP III such other and further relief, including costs, attorneys' fees, and punitive

damages to the extent permitted by law, as this Court may deem proper.

### SPECIAL DENIALS

1.     MP III specially denies that it executed or authorized the execution of any

written instrument or contract that is the foundation in whole or in part of Royal's Seventh

Amended Petition.

C-2

2.           MP III further specially denies that Royal satisfied the following conditions

precedent:

•           Royal failed to fulfill the conditions and obligations of its contract of

insurance issued to Student Financial Corporation and Student Finance Corporation's affiliates,

subsidiaries, agents and lenders (collectively, "Insured Parties");

•           Royal failed to give notice and opportunity to cure as required;

•           Royal failed to perform the requirements of the Texas

Insurance Code, Tex. Ins. Code Ann. (Vernon 2003); and

•           Royal failed to pay damages to Student Finance Corporation

and the Insured Parties.

## AFFIRMATIVE DEFENSES

3.     MP III alleges the following affirmative defenses:

•           All or part of Plaintiff's claims are barred by either the two or four

year statute of limitations.  Plaintiff has alleged that Defendants engaged in fraud,

fraudulent non-disclosure, negligent misrepresentation, aiding and abetting, and

conspiracy to engage in each of the foregoing.  Damages, if any, flowing from such acts

are alleged to be defaulted student loans from students of the Defendants' schools.  Some

or all of the damages are barred by either the two or four year statute of limitations.

•           Plaintiff has failed to mitigate its damages which it claims flow

from the alleged acts of Defendants.

•           Plaintiff failed to prudently or adequately underwrite, investigate

or perform any due diligence with respect to the student loans, default rates of those

loans, SFC's origination of student loans, and SFC's servicing of the student loans.

2

Plaintiff's losses, if any, are due to its own negligence rather than acts or failure by

Defendants or due to reliance by Plaintiff on any acts or failure by Defendants.

•    As set forth in the Counterclaim, Royal has engaged in a massive

fraud. For this reason and the reasons set forth in the Counterclaim, Royal's claims are

barred by fraud.

•    All or some of Royal's claims are barred or offset under the

doctrines of contributory and comparative negligence.

•    Royal's injuries, if any, were not proximately caused by MP III.

•    Royal's claims are barred by the doctrine of unclean hands.

•    Royal's claims are barred by waiver.

•    Royal's claims are barred by estoppel

•    Royal's claims are barred by laches.

•    Royal's claims are barred by illegality.

•    Royal's claims are barred by the doctrine of payment.

•    Royal's claims are barred by intervening negligence.

•    Royal's claims are barred by the failure of privity and the doctrine

of economic loss.

•    Royal's claims are barred by collateral estoppel, issue preclusion,

and claim preclusion.

•    Royal's claims are barred by res judicata.

•    Royal's claims are barred by offset, payment, and equitable

reduction.

•    Royal's claims are barred by failure of consideration.

3

- Royal's claims are barred by limitation of liability and damages under Tex. Civ. Prac. & Rem. Code § 41.008, and any other applicable limitation theory or statute.

- Royal failed to comply with the Texas Insurance Code, Tex. Ins. Code Ann. (Vernon 2003).

- Royal failed to comply with the policies of insurance issued to SFC and SFC's affiliates, subsidiaries, agents, and lenders.

- Royal failed to give notice and opportunity to cure.

- Royal failed to mitigate its damages (if any).

- Royal knowingly and expressly consented to and participated in any wrongful actions.

WHEREFORE, MP III requests that this Court enter an Order denying Royal's demands for relief, dismissing Royal's Amended Petition with prejudice, and awarding MP III such other and further relief, including costs, attorneys' fees, and punitive damages to the extent permitted by law, as this Court may deem proper.

## COUNTERCLAIM

### Background

1.    Royal's lawsuit against MP III is an intricate and nefarious scheme designed to defraud MP III and others out of scores of millions of dollars. About three weeks ago, on June 22, 2005, Royal belatedly produced a crucial email (the "September 28, 2000 email") and other critical documents, burying them among 30,000 other documents, which were out of sequence, in no logical order, and were comprised of thousands of duplicate pages previously produced. The September 28, 2000 email annuls

4

and contradicts much of Royal's officers' deposition testimony, and establishes – with Royal's own words – that Royal's lawsuit is frivolous and abusive. It also supports MP III bringing this Counterclaim against Royal for damages Royal caused MP III. SFC bought millions of dollars of MP III's student's loans. At the time SFC imploded with the help of Royal's fraudulent conduct and assistance, SFC owed MP III about $5,000,000. Without Royal's improper and actionable conduct, MP III would not have experienced these losses.

2.       Based on the September 28, 2000 email and other documents produced on June 22, 2005, we now know that Royal knew about and willfully furthered a fraudulent scheme, partnering with SFC to divert money from its proper purpose of servicing student loans. It is now apparent that Royal's complaint against MP III is nothing more than a fraudulent effort to divert attention from its own wrongdoing and the damages that it caused others to sustain. We now know that Royal has not only maliciously averred fraudulent and frivolous claims, but it has buttressed its abusive contentions with contrived and knowingly inaccurate testimony from its own witnesses and employees.

3.       In its infancy, Royal's wrongdoing involved issuing numerous insurance policies ("the Royal Policies") to SFC despite knowing that SFC was precariously straddled on the precipice of financial ruin. At some point during its relationship with SFC, Royal learned that SFC was improperly using Royal's insurance policies to issue private security offerings, the capital from which SFC used not to service existing loans as it should have, but instead to purchase new loans and to make payments on delinquent loans to prevent them from going into default. Even though it knew how SFC was using

the money raised from the private security offerings, Royal continued to issue new multi-million dollar insurance policies to SFC.

     4.     The entire scheme perpetrated by Royal and SFC – which Royal itself recognized as a "Ponzi Scheme" in its September 28, 2000 email – depended on SFC's ability to continuously generate new money from these private security offerings to purchase additional student loans from MP III and other schools and to make payments on delinquent loans. Without the backing of the Royal Policies, SFC would have been unable to successfully issue new security offerings to further the Ponzi scheme.

     5.     In addition, we now know that Royal knew that an ever increasing proportion of SFC's loans were delinquent and nearly in default and that SFC was improperly siphoning money from reserve accounts known as the "Experience Account" and the "Express Spread Account" to keep student loans from going into default.

     6.     Based on financial projections prepared by Royal's Tony McKenzie ("McKenzie"), which McKenzie summarized in the September 28, 2000 email, Royal gambled that when SFC eventually acquired a large enough mass of loans, the return from the loans would offset the amounts that SFC was diverting from the cash flow to artificially deflate the default curve. As McKenzie stated, "[t]hey [SFC] are using money, which should be held for tomorrow, to pay costs today and are hoping for fresh money coming in tomorrow until the securitizations finally start generating cash."

     7.     Royal's gamble failed. The scheme eventually imploded as SFC exhausted the Experience Account and the Excess Spread Account, depleted its other accounts, and was unable to assemble sufficient cash to issue a new security offering.

Even an eleventh hour multi-million dollar loan from Royal did not save SFC. SFC collapsed and is now in bankruptcy.

8.    As set forth in greater detail below, internal Royal documents and communications between SFC and Royal show that: Royal knew of the "extremely high delinquency rates [on the student loans held by SFC] . . . in the range of 65%"; that "SFC is running a kind of Ponzi Scheme"; that "the operation has to get its cash from the 'Institutional Reserves', which make up the basis of our [Royal] Experience Account"; that the shortfall in the Excess Spread Account was due to "delinquencies and not fees"; that "something is eating up the excess spread [reserve] before it has a chance to get to us [Royal]; that "SFC is taking the profits out of the program long before the excess spread reserve gets built up"; that "it would be very difficult . . . to replace us [Royal] at this late date"; that Royal was "in a lot of turmoil" regarding the account; that Royal's SFC account "was a new revelation every day"; that if Royal did not continue to issue policies as of April 2001 that Royal "would surely get whacked"; that Royal was "get[ting] completely crucified on the build up on of the excess spread [reserve]"; that as of July 2001, if SFC did not find an insurance replacement "[SFC would] be dead in the water and so very well may we [Royal]"; that SFC could not "borrow without the insurance guarantee and [SFC] would not keep coming to us [Royal] if they had another carrier on the line"; and that personnel at Royal considered themselves to be "idiots" for continuing to re-certify SFC for additional insurance policies. Most shockingly, in an internal Royal email of December 4, 2001, a Royal executive raised the issue of how long Royal would keep SFC's business alive given what they knew as of that date concerning SFC, stating: "And given their [SFC's] business model, how much longer we might want to keep them

7

in business." (emphasis added). This and other information discussed below

demonstrates that Royal knew of the dismal financial performance of the SFC loan

portfolio and, consequently, SFC's financial condition. Royal also knew the critical role

of the insurance policies issued by Royal to SFC played in SFC's business model and that

SFC continued to represent itself to schools such as MP III as a viable business through

the on-going origination of student loans.

       9.      After SFC collapsed, Royal embarked on a hostile campaign of lawsuits

designed to mask its own fraud and negligence committed during its partnership with

SFC. In a splurge of desperate litigiousness designed to divert attention from its own

wrongdoing, Royal has sued countless truck driving schools, the former law firm that

represented SFC, and most recently, individual officers of MP III. In one of Royal's

actions against a truck driving school in federal court in Tennessee, Commercial Driver

Institute ("CDI"), CDI sued Royal with a Counterclaim that mirrors MP III's

Counterclaim. In response, Royal filed a motion to dismiss. In June 2005, the court

denied Royal's motion, holding:

> CDI has alleged numerous facts, specific as to date and
> substance, indicating that Royal's staff, including Mr.
> Hibberd, Mr. McKenzie, and Mr. Schneider, had actual
> knowledge that SFC was making forbearance payments to
> create the illusion that SFC's student loan accounts were
> performing, that many student loans within SFC's portfolio
> were actually in or near default, that SFC's loan servicing
> was "abominable," that SFC was taking out profit before
> the insurance reserves had a chance to build up, that SFC
> was running out of cash and was unable to meet its lending
> obligations, and that SFC continued to accept student loans
> from CDI and other schools despite SFC's conduct and
> precarious financial condition.

(A copy of the opinion is attached as "Ex. A").

8

10.     As a consequence of Royal's baseless lawsuit and its orchestrated false testimony, MP III has expended hundreds of thousands of dollars and countless hours defending Royal's action. These damages are above and beyond the damages that MP III sustained from the collapse of SFC, which were also proximately caused by Royal. Indeed, as a result of Royal's failure to disclose the true financial condition of SFC to MP III and the other schools and as a result of Royal's insurance scheme with SFC, MP III sustained millions of dollars in damages when SFC collapsed.

### Parties

11.     Counterclaim Defendant Royal Indemnity Company ("Royal") is a Delaware capital stock insurance company with its principal place of business at 9300 Arrow Point Boulevard, Charlotte, North Carolina 28273.

12.     Counterclaim Plaintiff MP III Holdings d/b/a MTA Schools-131, MTA Schools-136, and MTA Schools-137 ("MP III") is a corporation organized and existing under the laws of Delaware with its former principal place of business in Elizabethtown, Pennsylvania.

13.     Student Finance Corporation is not a party to this action. Student Finance Corporation is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania. Student Finance Corporation is currently the subject of a Chapter 7 Bankruptcy proceeding in the United States Bankruptcy Court for the District of Delaware. Student Finance Corporations' affiliates are Student Marketing Services, LLC and Student Loan Services, LLC. Student Finance Corporation, Student Marketing Services, LLC, and Student Loan Services, LLC are collectively referred to herein as "SFC."

9

14.    Andrew Yao ("Yao") is not a party to this action. At all times relevant to this action, Yao owned and controlled SFC.

**Royal and SFC were Partners in the Scheme**

15.    As in its action against CDI, in Royal's action against MP III, Royal claims that SFC misrepresented the rate of defaults on the student loans that it had originated with the students of the trucking schools. Royal also claims that SFC never disclosed that it was making payments on many of the student loans to keep the loans from going into default. The documents that Royal produced on June 22, 2005 to MP III unequivocally establish that Royal's claims are groundless and fraudulent, that Royal in fact knew that SFC was paying on the delinquent student loans – later called "Forbearance Payments" by SFC – after learning that many of the student loans would be in default if not for SFC making payments on delinquent loans. Even more disturbing, these documents – produced shortly before trial - reveal that much of Royal's officers' testimony during their depositions was at times cunningly vague, and at other times, outright untrue.

16.    Either from the beginning of Royal and SFC's relationship or sometime during it, Royal insured SFC's securitization offerings knowing that SFC was on the brink of financial ruin. Royal knew that without its insurance policies, SFC would collapse.

17.    SFC financed the purchase, origination, and service of student loans through "securitized" arrangements where it raised financing through the sale of security offerings in the private securities market. The securities offered were "bundles" of

10

student loans, the vast majority of which were issued to students of the truck driver training schools.

18.    The securitization process began with SFC's acquisition of student loans at a discount, using funds from a warehouse line of credit provided to certain SFC affiliates. SFC, through its affiliated entity, pooled the student loan accounts.

19.    SFC sold the pooled student loan accounts to an affiliated, now-bankrupt remote entity. The remote entity transferred the student loan accounts to a trust created by the remote entity. To fund the remote entity's purchase of the student loan accounts from SFC, the trust sold certificates and notes to investors. The certificates and notes were backed or secured by the principal and interest received from the student loan accounts.

20.    To promote the sale of these securities and to supposedly provide stability to the investments, SFC purchased credit risk insurance issued by Royal ("the Royal Policies"), which provided a guaranty to the investors.

21.    Through the Royal Policies, Royal agreed to insure and otherwise guarantee the payments due under the security offerings from the student loan accounts.

22.    Between January 1999 and November 2001, Royal issued 11 insurance policies to SFC covering approximately $716 million in student loans.

23.    SFC paid Royal at least $34.6 million in premiums for the 11 policies.

24.    Prior to Royal's issuance of the Royal Policies, Royal was afforded the opportunity to perform due diligence on the loans. William Hibberd ("Hibberd"), Tony McKenzie ("McKenzie"), David Schneider ("Schneider"), and Robert Van Epps ("Van Epps") were primarily responsible for handling this due diligence and negotiating the

Royal Policies with SFC. Hibberd, McKenzie, Schneider, and Van Epps were also primarily responsible for managing Royal's SFC account.

25.    Royal's due diligence on SFC was grossly negligent. Nonetheless, even Royal's superficial due diligence uncovered glaring red flags related to SFC's policies and practices. Among other things, Royal knew that SFC was failing to follow proper credit policy procedures and underwriting procedures and that SFC had a negative net worth.

26.    Through the due diligence it performed and its communications with SFC, Royal knew that SFC originated student loans from students at 50 to 60 truck driver training schools around the country, including MP III. During this due diligence, Royal did not communicate with the schools. Royal did not contact the schools or interview anybody at the schools or seek to review the loan documents, contracts, applications or any other materials in the school's possession. MP III, if approached by Royal, would not have hesitated to permit Royal to review its loan procedures, documents and operations – Royal failed to avail itself of this opportunity.

27.    With each of SFC's securitizations, Royal issued a new insurance policy. In the event of default on individual student loans in the securitization pools, the Royal Policies insured the payment of the principal and 90 days interest on the loans. As defined by the Royal Policies, default, and hence Royal's obligation to pay, did not occur unless a student loan account was more than 90 days delinquent.

28.    Based on its involvement in these transactions and the issuance of its insurance policies, Royal knew that SFC derived its funds to originate student loans from the securitization transactions as well as a line of credit called the "warehouse line,"

12

which used the student loans as collateral. Royal's policies insured the loans purchased from the securitization transactions and the warehouse line of credit.

29.    Royal and SFC structured their relationship to provide protection to Royal in the event of defaults on the student loan accounts. Specifically, SFC created an Experience Account that was funded through reserves held back when SFC originated each student loan account.

30.    The Experience Account served the function of a deductible on the Royal Policies. When a claim for non-payment on a loan would be made against Royal, Royal would pay the claim and then seek reimbursement from the Experience Account.

31.    Royal's protection was enhanced further by the Excess Spread Reserve. Through the Excess Spread Reserve, a percentage of the income stream generated by the student loan accounts would be placed into this reserve account. Thus, as loans performed and new securitizations were funded, the Excess Spread Reserve would increase. At the same time, because payments were being made on the particular student loan accounts, the outstanding balances, and Royal's exposure, would decrease.

32.    Royal could seek redress from the Excess Spread Reserve and the Experience Account in the event of non-payment on any insured loan.

### Royal's False Assertion that it was "Blind-Sided" by SFC's Wrongdoing

33.    In Royal's Complaint, Royal avers that until March 2002, it was unaware that a progressively large number of SFC's loans were delinquent. *See* Royal's Amended Petition at ¶¶ 9, 10. Royal claims that it first became aware of problems during a March

13

C-14

20, 2002 telephone call wherein Yao purportedly confessed the dire financial state of SFC.

34.    During discovery, Royal buttressed this claim with contrived and orchestrated testimony proffered by McKenzie and Hibberd. McKenzie testified that prior to March of 2002, Royal trusted SFC and would have stopped doing business with SFC if Royal was aware of any wrongdoing. In particular, McKenzie stated that in December, 2000, he did not "recall anything at the time that was raising tremendous concerns about the performance of the loans."

35.    McKenzie repeated variations of this theme throughout his deposition. When asked if he had any doubts about Yao in 2000 or 2001, McKenzie responded, "if we had thought that they were doing something wrong, we would have stopped doing business. We could have stopped doing business at any time." Moreover, he stated, "if there had been a reason along the way for us to have not trusted Andrew Yao or SFC, we would have stopped doing business with them."

36.    McKenzie testified that as of April 2001, "we didn't think that the basis of the transaction that we were seeing or – or doing business with – we didn't think that there was anything wrong with that transaction, with the legitimacy of it."

37.    McKenzie testified that as of December 2001, "at the time, I don't think we thought we were dealing with something that wasn't legitimate, something that wasn't performing. Yes, there were issues that needed to be addressed; but there again, we weren't seeing anything that led us to believe at that time that there wasn't a legitimate transaction that we were dealing with, that there was something where we needed to, you

14

know, raise the red flag and – and, you know, do – do something drastic; call in the FBI, call in, you know – and I don't know who."

      38.    McKenzie claimed that Royal was "blind-sided" by Yao's supposed confessions in March of 2002 that SFC was making Forbearance Payments and that the default rate on SFC's student loans was exceptionally high. He stated, "To be honest, we were so stunned by what he said, we were almost like deers caught in the headlights. We didn't know what to say to each other. Really, for a while we just didn't react. It was just so incomprehensible. What we were saying is just we were so blind-sided."

      39.    McKenzie also stated that "[i]t was after the March phone call of Mr. Yao" that Royal first reached the conclusion that it did not have confidence in SFC's management.

      40.    Likewise, Hibberd averred in an affidavit that the March 2002 telephone call with Yao "was the first time that the nature and scope of SFC's forbearance payments was communicated to Royal." At his deposition, he testified that "[i]t was definitely late March of 2002" when Royal learned of the Forbearance Payments.

      41.    Hibberd also declared that "Royal had been unaware of the effect of these [forbearance] payments on default rates and that, without such payments, default rates that SFC had said were under 20% in reality exceeded 50%." He also testified that Royal was not concerned with continuing to do business with SFC. "At some point we became comfortable with going forward [with issuing additional insurance policies to SFC], which implied we were, we felt we had a good enough understanding of the cash flows of these specific transactions."

15

42.    Testimony of other Royal employees has revealed the failures of Hibberd's and McKenzie's job performance. At the deposition of John Tighe ("Tighe"), Royal's CEO, when Tighe was presented with his written evaluation of Hibberd's performance, he confirmed that Hibberd's oversight of the SFC account was "unsatisfactory." He conceded in Hibberd's evaluation that "controls were not in place and bottom line results will ultimately be costly" and "the lack of discipline, missing information and disregard for underwriting guidelines that they put in place is unacceptable on the SFC account."

43.    Robert Van Epps confirmed at his deposition that Royal never secured any reinsurance to protect the Royal Policies. Failing to secure such reinsurance grossly violated industry standards, particularly for large insurance policies such as the Royal Policies. Royal also failed to make sure there was an exclusion from insurance coverage if losses occurred from fraud. This was gross negligence on Royal's part.

### Royal's Knowledge and Furtherance of the Scheme

44.    The September 28, 2000 email recently produced by Royal reveals that Royal was anything but "blind-sided," as McKenzie testified at his deposition. In the September 28, 2000 email, McKenzie summarized his analysis of SFC's finances to Hibberd and Schneider.

45.    In the email, McKenzie stated, "where are they [SFC] getting the cash to run the business. In the early stages of a loan portfolio's life, it does not generate enough excess cash after satisfying excess spread requirements, servicer fees, bank costs, etc, to support the loan making operation. . . . My thinking is the operation has to get its cash from the 'Institutional Reserves', which make up the basis of our Experience Account."

16

In other words, McKenzie believed that SFC was siphoning money from the Experience Account for improper purposes. Instead of using the Experience Account for its intended purpose – as a deductible to compensate Royal on any defaulting loans – SFC was diverting money from the account to purchase new student loans and to make payments on existing loans.

     46.    McKenzie further explained on September 28, 2000, "I guess what I am saying is, I think SFC is running a kind of Ponzi scheme. They are using money, which should be held for tomorrow, to pay costs today and are hoping for fresh money coming in tomorrow until the securitizations finally start generating cash." (emphasis added). Thus, Royal and SFC were gambling that SFC's future mass of loans would eventually generate sufficient return to make up for the losses that resulted from SFC siphoning money from the Experience Account and elsewhere to purchase new loans and to make payments on existing delinquent loans.

     47.    In the email, McKenzie observed that the Ponzi Scheme would not work without new multi-million dollar insurance policies from Royal. He wrote, "I think we need to know what they expect to get from the $200M loans and where do they expect it to go. I guess the biggest numbers are how much of the Institutional/ School Reserves they feel they will need to pay in 2000 and 2001 and what they expect to be the defaults from both the $75m & $200M policies. This is where I think it would be helpful to see Yao's model. I have asked about it several times and have not yet got it."

     48.    McKenzie stated that under his "improved" financial "model," he calculated that the securitizations would "finally start generating cash . . .at 6 years."

17

49.    The email ends with "I guess the question is, 'Can they stay in business about one year after we add the last loan that we are going to ensure?"

50.    McKenzie has yet to be deposed about this September 28, 2000 email. Royal produced it over three months after his deposition was taken.

51.    When asked about the September 28, 2000 email at his deposition on June 29, 2005, Van Epps explained, "I wouldn't call it a Ponzi scheme because I think a Ponzi Scheme is, has a criminal negative connotation to it and it's something that eventually has to collapse, whereas at this point when we [Royal] were looking at it we felt that they [SFC] were using money today to pay off things from the past, certainly not what we wanted them to use the money for, and, and not how we wanted the structure to work, but we believed that it, there was a finite amount of time that we had to go though this and at that time the securitizations would start producing enough cash for SFC that they would be able to stop with that pay-as-you-go type of structure."

52.    With full knowledge of the foregoing financial practices of SFC, Royal continued to issue insurance policies to SFC, right up until SFC financially collapsed in June of 2002. Out of the 11 policies that Royal issued to SFC, it issued six after the September 28, 2000 email. Out of the $716 million in total insurance coverage under these 11 policies, the final six policies consisted of $459 million in coverage.

53.    Royal issued policy RST 147525 to SFC with an effective date of November 27, 2000. This policy covered approximately $55,616,550 in student loans.

54.    Royal issued policy RST 147526 to SFC with an effective date of January 31, 2001. This policy covered approximately $48,286,713 in student loans.

18

55.    Royal issued policy RST 147529 to SFC with an effective date of June 19,
2001. This policy covered approximately $150,000,000 in student loans.

56.    Royal issued policy RST 147533 to SFC with an effective date of August
17, 2001. This policy covered approximately $5,518,459 in student loans.

57.    Royal issued policy RST 147538 to SFC with an effective date of October
9, 2001. This policy covered approximately $100,000,000 in student loans.

58.    Royal issued policy RST 147536 to SFC with an effective date of
November 15, 2001. This policy covered approximately $80,000,000 in student loans.

59.    Royal had a pecuniary interest in furthering the admitted Ponzi Scheme.
With each new insurance policy, Royal received a hefty multi-million dollar premium. In
total, it received at least $34.6 million in premium payments from SFC. Moreover, Royal
was gambling, based on McKenzie's financial model, that SFC would eventually turn a
profit on the Ponzi Scheme. Royal had no concern for the losses the truck driving
training schools would experience.

60.    Hibberd, McKenzie, Schneider, and Van Epps knew that without Royal's
insurance, SFC would collapse, exposing Royal to claims.

### Royal Failed to Conduct Proper Due Diligence on SFC

61.    In violation of industry custom and practice and in gross and reckless
disregard for the potential impact of its actions and omissions on MP III and the other
trucking schools, Royal failed to conduct proper due diligence on SFC before issuing
each of the Royal Policies.

62.    Proper due diligence would have included, among other things, research
and background checks on SFC's officers and personnel, review and analysis of SFC's

19

financial statements and financial health, review of the underlying loan agreements, contacting the schools, interviewing prior insurers, reviewing and analyzing the default rate of the student loans, conducting an extensive review of the entire student loan program, reviewing the manner in which loans are originated, and reviewing the manner in which loans are serviced. Royal failed to conduct proper due diligence in any of these areas.

63.    Instead of conducting an independent investigation of SFC, Royal relied on SFC's representations about its business.

64.    Prior to partnering with SFC and issuing its Royal Policies, Royal had no experience with credit risk insurance, no experience with SFC, no experience with the truck driver training schools, and no knowledge of the practices and procedures of the truck driver schools.

65.    Prior to issuing the Royal Policies, Royal never interviewed or contacted MP III or any of the other trucking schools.

66.    Royal never conducted a background check on any of the principals of SFC, including Yao.

67.    In 1998, Royal never performed due diligence on the financial health of SFC.

68.    In 1999, Royal never performed due diligence on the financial health of SFC.

69.    In 2000, Royal never performed due diligence on the financial health of SFC.

20

70.    In 2001, Royal never performed due diligence on the financial health of SFC.

71.    Before issuing the Royal Policies, Royal never reviewed the actual student loan agreements.

72.    In addition, Royal never reviewed the contracts between SFC and MP III, wherein SFC agreed to service loans.  At his deposition, McKenzie admitted this failure.  McKenzie also conceded that the forbearance reserve process that was mentioned in at least one of those agreements was "hidden in plain sight," and he conceded that Royal would have known about it had Royal simply read the agreement.  McKenzie testified:

> If anyone looking at this contract [between MP III and SFC dated October 12, 2000], they would – and read this Paragraph 7, they would see that term [forbearance reserve process] and – and see it there.
>
> Q.  So, it wasn't in hiding.  It was all there to be read if the agreement was just read, right?
>
> Counsel: Objection to form.
>
> A[McKenzie].    There again, sir, sometimes things are hidden in plain sight.

73.    Before issuing the Royal Policies, Royal never reviewed SFC's Policy and Procedures Manual, which describes a "recourse default" procedure and states that a student loan account will only be flagged after it has missed "two (2) consecutive payments over a 60-day period" and is "anywhere between 61 to 91 days" delinquent.

74.    Before issuing the Royal Policies, Royal never requested due diligence or information from SFC's prior insurer, American International Group.

21

75.    Royal conducted no independent research on driver training school's

student loan default rates. Instead, Royal relied on aggregate default rate reports

provided by SFC.

76.    Royal failed to take precautions despite a disturbing concession by SFC's

auditor. In an audit of SFC's financial statements, dated November 30, 1998, SFC's

auditor stated:

> <u>Management [of SFC] has elected to omit substantially all
> of its disclosures required by generally accepted accounting
> practices.</u> If the omitted disclosures were included in the
> financial statements, they might influence the user's
> conclusions about the company's financial position and
> results of operations and cash flows. Accordingly, these
> financial statements are not designed for those for those
> who are not informed about these matters.

(emphasis added). This report was a glaring red flag, and Royal knew or should have

understood the implications of these statements.

77.    From the time it issued its first Royal Policy until the date that SFC went

into bankruptcy, Royal failed to take any remedial action to protect MP III and the other

trucking schools from the Ponzi Scheme, even though it knew about SFC's dire financial

condition, even though it knew that SFC was diverting money from the Experience

Account and the Excess Spread Account to make payments on delinquent loans to

prevent them from defaulting, even though it knew that SFC depended on the Royal

Policies so that it could continue to issue new security offerings and further the Ponzi

scheme, even though it knew that large numbers of student loans were on the verge of

default, and even though Hibberd was experiencing "sleepless nights" over the SFC

account. See <i>infra</i>, ¶ 140.

22