78.    Beyond Royal's failed due diligence, the content of the Royal Policies also shows Royal's utter disregard for its obligations.

79.    Royal failed to purchase reinsurance for its Royal Policies. Instead, Royal retained full exposure on the policies.

80.    Royal's failure to obtain reinsurance on the Royal Policies violated statutory requirements followed by most states, including Delaware, Royal's domiciliary, that establish an upper limit of exposure on the policyholders' surplus. In Delaware, the insurer cannot retain an amount on any loss exposure in excess of ten percent of the policyholders' surplus, although few insurers retain even the legal maximum of ten percent. *See* 18 Del. C §909.

81.    In 1999, Royal's policyholders' surplus was $576 million. In 2000, Royal's policyholders' surplus was $361.5 million. In 2001, Royal's policyholders' surplus was $514 million. In 2002, Royal's policyholders' surplus was $547.9 million.

82.    Thus, under Delaware law, Royal was not permitted to retain more than the following exposure on any one risk: $57.6 million in 1999, $36.2 million in 2000, $51.4 million in 2001, and $54.8 million in 2002.

83.    The amounts of the Royal Policies, and therefore Royal's exposure, consistently and regularly exceeded these statutory thresholds.

84.    By failing to obtain re-insurance or otherwise to limit its exposure to an amount within the statutory limits, Royal demonstrated a gross and reckless disregard for industry standards, legal and statutory obligations, and the harm that its actions could have on MP III and the trucking schools.

23

85.    Tighe testified about Royal's failure to limit this risk exposure in the SFC

account, admitting that Royal "should have had controls" in place.  Tighe testified:

> ...the typical underwriter in Royal & SunAlliance for
> many, many, many years would be to limit the size of a net
> underwriting position to at or around five million bucks.
> And typically have reinsurance trees that are built up from
> the $5,000,000 net that allows the underwriter to aggregate
> their exposures, to manage the aggregations.
>
> So for each and every underwriting position you
> take, if you limit it to $5,000,000, you know, you can
> quantify how much you have exposed in any given
> portfolio of business.  And in Bill [Hibberd]'s case they
> were taking underwriting positions that ultimately were far
> greater than the $5,000,000 net to the company and, and I
> thought with the benefit of hindsight – and I'll be the first
> to tell you, when you look at it in hindsight and you see
> what ultimately it could cost the company, $500,000,000,
> you say, geez, Bill, <u>I think you should have had controls in
> place to limit your underwriting position to a lesser number
> than five hundred million bucks.</u>

(emphasis added).

86.    Tighe also testified that Hibberd, McKenzie, and Van Epps had "disregard

for underwriting guidelines," that the underwriting policies "were not "fully

documented," and that Royal's guidelines "were in [Royal's] head."  Tighe testified:

> And I said, Rob [Van Epps], I just, you know, want
> to know how closely you followed it [the underwriting
> manual].  And he said, what do you mean?  And I said, did
> you do background checks?  And Rob said, no, this was
> written along the way.   I think they had some pretty
> disciplined thought process on how they were going to do
> it, but it wasn't fully documented.
>
> And I remember looking at Rob and just kind of
> walking away and, you know, I was just, that was it.  And
> that's what I was talking to here was, you know, <u>you had
> underwriting guidelines that were in your head, you hadn't
> fully documented them yet, and even within the practices,
> the background checks, you didn't do.</u>  So I was just
> dumping my ire on Bill.

24

(emphasis added).

87.    In addition to failing to follow proper underwriting guidelines, Royal failed to exclude fraudulent acts from coverage under the Royal Policies.

88.    In the insurance field, insurance is typically protection against events of fortuitous nature - not against intentional acts. It is standard industry practice for insurers to exclude fraudulent acts from insurance policies.

89.    Royal's failure to include this fraud exclusion in the Royal Policies demonstrates lack of diligence, gross and reckless disregard for the implications of its actions, and a total indifference to the harm that it could cause others to sustain.

**Royal Knew that SFC was not Properly Servicing the Loans**

90.    In connection with the origination of a student loan, SFC had the obligation of servicing the loan. Servicing involved undertaking collection efforts and dealing with delinquent and defaulted student loan accounts.

91.    Unknown to MP III, SFC's servicing of the student loans was abominable. Among other things, SFC failed to follow appropriate servicing guidelines and practices.

92.    SFC's failure to service the student loan accounts properly led to high delinquencies and defaults among the SFC student loan portfolio.

93.    Unknown to MP III, SFC also failed to follow appropriate credit review and underwriting procedures in approving student loans for origination.

94.    Royal knew that SFC was not properly servicing the loans and that this was causing many of SFC's loans to become delinquent and to hang on the edge of default. In an October 26, 2001 email, Charlie Schiver, a Royal employee, queried to

25

Hibberd whether the "servicing company is a problem." This email was among those withheld from MP III and belatedly produced on June 22, 2005.

95.    Similarly, in another email belatedly produced on June 22, 2005, Andrew Jacobsen, also a Royal employee, advised Hibberd that "[t]he questions come (sic) down to comfort with the servicing of the loans and the ability of the finance company to recover defaulted amounts." The email is dated June 4, 1999.

96.    An August 1999 Due Diligence report by SFC's auditor, Baker & Associates, which both Hibberd and McKenzie testified that they had received and read, revealed multiple red flags and issues with SFC's procedures, including but not limited to:

> • At present, there is no documented nonperforming asset charge-off policy. A review of the current delinquency indicated that the last time loans were charged-off from the portfolio was in early 1997. Since that time, all defaults have remained active without regard to the probability of repayment . . .
>
> • Although some quality control – audit type activities are in place, the need still exists to employ a more formal independent audit program, given the anticipated expansion and growth in the unsecured student loan area . . .
>
> • While exceptions to published underwriting criteria are documented, the performance of these loans on an individual basis is not monitored . . .
>
> • Although published credit policies and procedures were in keeping with industry practices regarding format, basis, and direction, they often failed to indicate implementation responsibility . . .
>
> • Applications from schools are screened and approved by management prior to acceptance by SFC. The procedures, however, are not adequately documented nor monitored for compliance . . .

26

- A review of 15 randomly selected recent originations revealed that five loan applications did not indicate personal references (three of which the borrower had no prior established credit). This practice, in our opinion, creates problems in servicing accounts when the borrower fails to pay as agreed, by not having referenced for skip tracing . . .

- [With regard to collection procedures,] [p]ublished information with respect to required activities and procedures to follow-up was found to be very limited in both scope and content. The procedures did not follow the typical loan collection problem solving format used by a majority of experienced collection personnel . . .

- The true cause of delinquency [of loans], from an "original affordability" stand point, was not consistently identified / documented in the system . . .

- At present, collection personnel are evaluated subjectively without regard to quantifiable statistics such as: contact attempts / contacts made; promises secured; promises kept and repossessions. This practice is not only a deviation from industry practices but also generally results in reactive versus proactive delinquency control on the part of management, should delinquency or losses start to rise . . .

- [With regard to "Loss Handling /Asset Recovery"], [f]rom a practical perspective, none of the activities related to daily tasks (with the exception of reports) have been put into any instruction type format (what to do, when, why, etc.) . . .

- The customer service activities have not been incorporated into a formal structure. Consequently, a log of inquiries / complaints is not maintained, therefore reports are not available to determine how much time is spent on customer service . . .

Without the Report as an exhibit at his deposition, McKenzie remarkably characterized the conclusions from the Baker Report as "indicating that SFC's policies and procedures for underwriting of servicing were all, you know, reasonable and adequate" and "pretty

27

C-28

good." Likewise, without the Report entered as an exhibit, Hibberd said that the Report characterized SFC as "good and improving."

97.    McKenzie and Hibberd intentionally distorted the substance of the Report. McKenzie, Hibberd and Royal were well aware as early as 1999 that SFC was a time bomb ready to explode. But, Royal sought nearly $40 million in premiums, never believing it would have to pay for any coverage – and ignored the consequences to the schools which relied on SFC for funding.

### Royal Knew about the Forbearance Payments and the Non-Performing Student Loans

98.    Royal knew that SFC was making payments on delinquent student loan accounts.

99.    To avoid classifying student loans as "in default" as a result of SFC's failure to service the loans properly and to follow proper underwriting criteria, SFC made payments on these loans from its own funds. SFC labeled such payments "Forbearance Payments," a label that was disclosed by SFC to Royal in March of 2002 by Yao but a practice which was known by Royal since the Fall of 2000.

100.    By using Forbearance Payments, SFC manipulated and artificially depressed the default rates on its student loan portfolio. Royal was aware of SFC's practice of making Forbearance Payments.

101.    In 1999, the total amount of Forbearance Payments was approximately $2 million. In 2000, it increased to $9.5 million. In the year preceding the filing of SFC's bankruptcy, the amount of Forbearance Payments had increased to $45 million.

102.    SFC used proceeds from the securitizations to make Forbearance Payments, rather than to fund its servicing obligations. As a result, SFC began

28

experiencing extreme financial difficulties. By the Fall of 2000, Royal knew that SFC could not continue the Ponzi Scheme without Royal's assistance.

103.    Royal knew that SFC was making Forbearance Payments, that a massive number of student loans in SFC's loan portfolio were delinquent and on the verge of default, that SFC was taking some action designed to prevent loans from defaulting, and that SFC was failing to service loans properly.

104.    Although Royal claims no knowledge of SFC's practice of making Forbearance Payments, the report on Consolidated Financial Statements for the Years Ended December 31, 2000 and 1999 for Student Finance Corporation and Subsidiaries, which was provided to Royal, states that "The school reserve may include additional amounts designated to absorb forbearance made in accordance with school and borrower agreements and potential credit losses for sold loans based upon the deemed credit quality of the borrower." This Report also provides that well over $11 million in Forbearance Payments were made during the years 1999 and 2000.

105.    In addition, Yao told Royal about the Forbearance Payments in a March 6, 2000 teleconference, a point which he also reiterated in a follow-up memorandum addressed to Royal's McKenzie, Hibberd, and Schneider. The memorandum states that "[a]lso for students who are in forbearance, the schools advance payment on behalf of the student until the student resumes paying or until he defaults . . . this, of course, also distorts the default curve" Although Yao wrongly reports that the schools made the Forbearance Payments which in fact SFC made, Royal nevertheless knew of the Forbearance Payments. This memorandum provided Royal with knowledge of the very

29

practices of which Royal complains – namely artificial depression and distortion of the student loan default curve based on payments made on behalf of the students.

106.    On January 6, 1999, SFC's insurance broker explained to Royal the manner in which the "Institutional Reserve" - otherwise known as the Forbearance Reserve, which was part of the Experience Account – would work: "Any shortfall in the payments will be covered in the following priority: institutional reserves, excess reserve escrow account, claim payments by Royal." Again, this shows that Royal knew about the Forbearance Payments – precisely the practice about which it complains as having been hidden by SFC and the schools.

107.    Royal also knew that the loans were not producing revenue because the Excess Spread Reserve was not growing. Since SFC's Excess Spread Reserve was created from payments arising from the performance of the student loan accounts, if payments were not received on the student loan accounts, the Excess Spread Reserve could not build.

108.    In fact, the Excess Spread Reserve did not build as anticipated by Royal. Among the documents belatedly produced by Royal on June 22, 2005 is a key April 3, 2001 email, wherein McKenzie writes to Rob Schrof, Hibberd, and others, stating that his calculations "seem[ ] to suggest that the Excess Spread expected is somehow not materializing in the cash flows" and that "what I did above [with certain calculations] seems to say that the actual cash is not coming through to match."

109.    Likewise, in an April 5, 2001 email, which was also belatedly produced on June 22, 2005, McKenzie comments, "something is eating up the excess spread before it has a chance to get to us/the Excess Spread Reserve, rather than the money not making it

30

into the cash flows." This email and McKenzie's April 3, 2001 email described above demonstrate that Royal knew that the student loans were not performing properly and producing revenue, because the Excess Spread Reserve was not growing.

110.    In another critical document Royal belatedly produced on June 22, 2005, Scott Schauer ("Schauer"), an employee of Loofborrow, which was an investment banking firm hired by SFC, explained to McKenzie that the shortfall in the Excess Spread Account was due to "delinquencies and not fees." Further, the analysis attached to Schauer's email indicates that SFC was diverting millions of dollars from the Excess Spread Account to sustain delinquent student loans from going into default. This email is dated April 17, 2001.

111.    In a May 23, 2001 memorandum from SFC's attorney, Rod Gagne ("Gagne"), to Royal, which Royal also just produced on June 22, 2005, Gagne likewise confirms that SFC used the Express Spread Account to prevent delinquent loans from going into default. In the memorandum, Gagne also states that the aging of the loans – the temporal spread showing how overdue delinquent payments were – was not necessary or material to Royal's decision to insure the loans.

112.    Hibberd, McKenzie, and Schneider were in regular communication with each other and with SFC, and other emails and documents evidence and reflect Royal's knowledge of SFC's dire financial state.

113.    Royal was aware that massive numbers of student loan accounts were 60 to 90 days delinquent and on the verge of default based on the student loan account information provided to Royal by SFC.

31

114.     Notwithstanding this and with knowledge of SFC's financial morass, Royal continued to issue insurance policies and loans to SFC to earn millions of dollars in premiums thereby enabling SFC to continue its Ponzi Scheme and ultimately cause millions of dollars of damage to MP III and the other schools.

### The Scheme Unravels

115.     Prior to the issuance of its first policy on December 23, 1998, an insurance broker with whom Royal worked closely communicated to Royal in a memorandum that "WE [ROYAL] ARE IN THE BEST POSITION AN INSURER COULD EVER REQUEST."

116.     Shortly after the issuance of its first policy, SFC sought additional policies from Royal. In an email from the insurance broker with whom Royal worked closely, the broker explained to Hibberd that SFC was looking for a $200 million policy limit and that "we [Royal] are in the driver's seat."

117.     In a June 4, 1999 email, Hibberd commented to Andrew Jacobson of Royal, "One point I'll make on the recovery issue. Even if we model it with no recoveries, which is how Tony [McKenzie] wrote his model, it will take extreme default frequencies for us to go into the toilet." Royal produced this email in its recent June 22, 2005 production.

118.     On June 10, 1999, an internal Royal email states that the Institutional reserve – otherwise known as the Forbearance Reserve which was part of the Experience Account – "provides [Royal] protection for the first 24 months. This is an important feature that should be retained in any negotiations."

32

C-33

119.    On June 15, 1999, an internal Royal email stated that Royal could sustain defaults of up to 50% without the Institutional Reserve and up to 60% with the Institutional Reserve. Royal also expressed concern regarding SFC's loan servicing at this point stating: "[g]ood servicing is critical to the performance of any loan program."

120.    On February 11, 2000, Schneider discussed the "delinquency issue" with an insurance broker who stated, "I think we have a clearer picture of the 'delinquency' issue and although a point of concern, it does not appear critical at this time."

121.    On March 21, 2000, an internal Royal email states that McKenzie was looking into the issue of pre-payments – initial payments made by students – and its effect on the loan performance and defaults.

122.    On March 31, 2000, in an internal Royal email, Royal considered SFC's request for additional insurance and again considered the issue of student prepayments and the issue of the Excess Spread Reserve not building as anticipated. Nonetheless, Hibberd stated, "I have a good feeling about this account and want to keep it going."

123.    On September 15, 2000, in an internal Royal e-mail, Royal discussed putting together its SFC due diligence. McKenzie stated that an "important process to understand is how SFC uses the money which is withheld from schools, conceptually the Institutional Reserves / Experience Account." He continued, "I am guessing that besides covering required defaults, it covers all of their operating costs and to some extent their securitization / financing costs and distributions to Yao." In considering whether to question SFC on this account, McKenzie stated, "[h]ow much information would we want and would we want covenants on the use of that money, are two big questions . . . One problem is we never asked for anything on the past two deals."

33

124.    On October 4, 2000, an internal Royal email admits that its due diligence and underwriting of the SFC account had been far from adequate and previously had no structure whatsoever. The email attached a draft of an underwriting manual for financial enhancement insurance policies and stated, "still much work to be done; but at least it has a structure now."

125.    On October 6, 2000, an internal Royal email questions the ability of SFC to continue to do business without the insurance provided by Royal and refers to this as "[t]he ability to continue doing business question." Thus, as early as October 2000, Royal knew SFC may not be able to function as a going concern. Yet it still wrote hundreds of millions of dollars of insurance so it could collect multi-millions of dollars of premiums.

126.    On October 24, 2000, an internal Royal email stated that SFC was running out of money under the policy limits in existence and consequently, would be unable to complete securitization transactions. Royal acknowledged that "it would be very difficult, unless they [SFC] have started something, to replace us at this late date."

127.    On December 15, 2000, in an internal Royal email, Royal considered whether to include 108 loans not signed by schools under its policies. Royal stated, "I do not recall seeing any audit or similar investigation of SFC where fraud prevention was evaluated . . . do you see any old Freed Maxic reports on SFC address school fraud . . . Do you think we should employ Freed for an audit to investigate this?" Rather than discussing this issue with the schools directly, Royal decided to cover the loans at issue into its policy and never conducted any sort of investigation with respect to this issue and never communicated with the schools about this or any such similar issues.

34

128.    On February 2, 2001, Royal again admitted its inadequate due diligence
and underwriting in connection with the SFC policies. In an email on this date, Royal
states, "[a]ttached is a document that can serve as a starting point for our own
underwriting due diligence procedures."

129.    On March 13, 2001, Royal conceded that it was unaware of a certain
component of the securitization transaction concerning interest-only ("I/O") certificates,
the proceeds of which were retained by SFC. Hibberd stated, "I'm embarrassed by this
[I/O] thing we discovered yesterday. The sad thing is that we could have caught it, but
never did . . . What htis (sic) means is that SFC is taking the profits out of the program
long before the excess spread reserve gets built up." Upon reviewing this email at his
deposition, Van Epps confirmed that Royal knew, at least as of the date of this email, that
SFC's Express Spread Reserve Account, which was supposed to build up to protect
Royal from defaulting student loans, was not in fact building up. Indeed, Yao was taking
millions of dollars out of the business for his personal use. Royal would have discovered
this had it done proper monitoring and due diligence.

130.    On March 26, 2001, Hibberd sent an email to McKenzie and Schneider
stating, "I did a lot of thinking over the week-end (sic) about the SFC situation . . . [W]e
have a real problem with the excess spread account . . . We also have a credit risk on the
inforce policy . . . there is a pretty big theoretical credit risk . . . I think if we are really
inreasonable (sic) on the going forward [policies] . . . we could perhaps lose the deal
going forward."

131.    On April 5, 2001, in an internal Royal email, Hibberd stated, "Tony
[McKenzie] and I have spent an afternoon of fun and one of the discoveries is the

35

extremely high delinquency rate on these notes . . . it looks to be in the range of 65% . . . This account is a new revelation every day."

132.    On April 6, 2001, Hibberd and Schneider exchanged emails contemplating how much free money SFC may have on hand in case Yao decided to flee the country. Hibberd commented, "I'm in a lot of turmoil on this account."

133.    On April 9, 2001, David King ("King") of Royal advised Hibberd that he "should strongly consider using an outside lawfirm to advise on changes to the SFC agreement/structure."

134.    On April 20, 2001, McKenzie sent an email to Diane Messick ("Messick"), Gary Hawthorne and others at SFC recognizing the abysmal performance of SFC's portfolio. McKenzie stated that 74% of the loans were current in April 2001 implying that $852,000 plus should have been received while the Servicer Reports showed that only $120,000 had been received. McKenzie recognized that "[i]t seems to continue that way through the rest of the months."

135.    On April 24, 2001, in an internal Royal email, Hibberd admitted that he had "[a]nother sleepless night" regarding the Royal Policies. He also stated, "If we don't go forward [with more policies to SFC], however, we will surely get whacked . . ."

136.    On April 25, 2001, Messick emailed McKenzie and advised him that up front payments by students at the time of loan origination and/or purchase by SFC contributed to loans falling into delinquency.

137.    On May 1, 2001, commenting on up-front payments by students at the time of loan purchase or origination, Hibberd wrote to McKenzie in an email: "[w]e

36

can't have this [up-front payments] because we get completely crucified on the build-up of the excess spread."

138.    On May 7, 2001, Hibberd stated in an email to Robert Van Epps of Royal that he knew "the harsh reality of policy #2 all too well. It is what I think about every night when I wake up."

139.    On May 13, 2001, Hibberd sent an email to King regarding a meeting with SFC stating "I don't feel real comfortabel (sic) with all this but I don't know if we are going to come up with anything much better. We may have to do some combination of experience account plus frther (sic) contributions to exces (sic) spread."

140.    On July 5, 2001, in an internal Royal email, McKenzie acknowledged that the $250 million policy and a $50 million interim policy continued to perform poorly and identified the fact that SFC was advancing money to the securitization trusts.

141.    On July 10, 2001, McKenzie wrote to Hibberd in an email, "If they [SFC] cannot find someone else to insure their securitizations, they will be dead in the water and so very well may we."

142.    On September 17, 2001, in an internal Royal email, Schneider stated that "[w]e should discuss the longer term strategy on this account (e.g., should we go beyond the current commitment and implications for ending.)" This email was in response to a request by SFC for a temporary increase to the policy limit to avoid an interruption in SFC's business.

143.    On September 26, 2001, McKenzie further inquired regarding the issues caused by the up-front payments by students at the time of origination of the loans by SFC. McKenzie stated that "[i]t would appear you feel up front payments have a

37

negative financial impact. As a significant financial part of a school's operations, could you not ask the schools to cease this practice or is there a significant reason why up front payments are desirable."

144.    In a December 4, 2001 email, McKenzie sent Hibberd and Schneider financial spreadsheets for the Experience Account. He wrote, "[t]he reason I am providing you these is to give an idea of how much longer we are dependent on SFC for these funds. And given their business model, how much longer we might want to keep them in business." McKenzie acknowledged that the Royal policies were keeping SFC in business as they allowed SFC access to capital and enabled SFC to complete securitization transactions and to continue to originate loans. McKenzie continued: "[t]hey [SFC] cannot borrow without the Insurance Guarantee and they would not keep coming to us if they had another carrier on the line."

145.    In the same December 4, 2001 email, McKenzie also acknowledged the abysmal servicing of loans by SFC: "As usual I have no idea what SLS' service standards are . . . not much effort is being put into the collections process, which shows in the delinquency stats."

146.    In the same December 4, 2001 email, McKenzie discussed the possibility of attempting to obtain "51% control in the business decisions relating to SLS . . .:" This discussion was in the context of Royal's decision whether to put SFC out of business by refusing to extend them any additional insurance.

147.    In response to the servicing and performance issues raised by McKenzie in the December 4, 2001 email, Hibberd stated: "[w]e also keep re-certifying them, so, are we idiots?" While Royal was wondering whether they were "idiots," they allowed the

38

C-39

SFC Ponzi Scheme to continue – all to the eventual multi-million dollar detriment of MP III and the other schools.

148.    On January 25, 2002, in an internal email, McKenzie stated that the servicing of the loans by SFC was "abominable" and acknowledged that "I still don't know if they [SFC] have corrected the Up-Front Payment problem." While Royal collected its premiums, it helped perpetuate the Ponzi scheme.

149.    By January 2002, it had become apparent that SFC had utterly depleted the Experience Account. McKenzie wrote to Hibberd and Schneider, "[w]e are owed $3.73M on the Experience Accounts."

150.    In February 2002, SFC was unable to find sufficient capital to conduct another round of security offerings. The following month, SFC advised Royal that SFC could no longer operate unless Royal provided it with millions of more dollars. In other words, SFC wanted Royal to help it continue the Ponzi Scheme further.

151.    To forestall SFC's imminent collapse and continue the Ponzi Scheme, Royal loaned significant sums of money to SFC. In particular, SFC used this money to make Forbearance Payments on loans to prevent them from going into default, the same Forbearance payments Royal complains of in its Petition suing the schools. In considering whether to go forward with a new deal with SFC, McKenzie wrote to Hibberd and Schneider on April 15, 2002, commenting, "As I said, I do not know whether we 'own' Andrew [Yao] or whether he owns us." Royal produced this email in its belated June 22, 2005 production.

39

152.    In an April 21, 2002 email that was also just produced on June 22, 2005,

McKenzie contemplates whether Royal itself should make Forbearance Payments on the

loans for April of 2002. He wrote:

> On another note, if we are going to make a Forbearance
> Payment for April we need to decide ASAP how much we
> are going to pay:
>
> 1) the full amount, approximately $6.6 to $7.0 Million
> 2) only the amount to keep the 60 to 90 day loans from
> defaulting, approximately $3.0 to $3.5 Million
> 3) Not pay any
>
> SFC has about $3 Million in cash. Are we going to
> demand they pay any part of 1 or 2. SFC's systems are not
> that flexible, so we need to tell them what we are going to
> do by Monday or Tuesday at the latest.

153.    On or about March 28, 2002, with full knowledge of SFC's fraudulent

financial and operational condition, Royal gave $6,145,187.66 to SFC in the form of a

Promissory Note. Royal intentionally made this loan so that SFC could continue to make

Forbearance Payments and continue the Ponzi Scheme – all to the detriment of MP III

and the other schools. Van Epps testified, "On the phone call with Mr. Yao, we were told

that they did not have money to make that month's forbearance payment, which I believe

was around $6,000,000, and if they didn't make that, then somewhere, $120,000,000,

$150,000,000 of loans was going to default and Royal was going to be called upon to

make that payment. So Royal's, so what, what SFC did was ask Royal to loan them the

money to make that forbearance payment."

154.    On or about April 29, 2002, Royal and SFC amended the Promissory Note

to advance a total of $12,302,150.88 to SFC. Again, Royal knew that SFC would use this

money to make Forbearance Payments and continue the Ponzi Scheme.

40

C-41

**Royal's Ponzi Scheme Caused MP III to Sustain Millions of Dollars in Damages**

155.    Royal intentionally and wantonly failed to notify MP III (as well as other schools doing business with SFC) about the admitted "Ponzi Scheme" and that SFC was on the brink of financial collapse.

156.    Royal had a pecuniary motivation to refrain from notifying MP III.  If Royal unveiled the scheme, then MP III and likely the other schools would have severed their dealings with SFC, opting instead for a financially stable business partner which could honestly and professionally fund the loans.

157.    If the schools departed SFC's book of business, then Royal would have been deprived of its multi-million dollar premiums as well as exposed to loss from policies already issued.

158.    As the scheme began to crumble and SFC careened toward financial disaster, SFC repeatedly re-assured MP III and the other schools that its "business model is strong."  For example, in October 2001, SFC told the schools that "SFC is a strong and vibrant company."

159.    Royal knew that SFC was re-assuring the schools.  Royal knew that SFC was lying and Royal knowingly and in concert with SFC continued the Ponzi Scheme all to the detriment of the schools.

160.    When SFC did finally collapse, MP III sustained millions of dollars in damages.  SFC could not pay the monies owed MP III for student tuitions.

161.    Under MP III's agreements with SFC, MP III received payments from SFC for the tuition loans within 45 days after each student graduated.

41

C-42

162.    When SFC collapsed, MP III was strapped with the overhead costs, training expenditures, fees, and other costs for the schooling of all of its students who had loans from SFC who were then enrolled as well as for all of the students who had SFC loans and who had recently graduated.

163.    In its lawsuit, Royal seeks to reap even more money at the expense of the already once defrauded MP III.

164.    Three weeks ago, on June 22, 2005 – nearly three years after MP III's first request for documents on November 26, 2002 and a little more than two months before the start of trial - Royal produced the September 28, 2000 email, which combined with other documents also produced on June 22, 2005, are the most critical documents in this case. The September 28, 2000 email and the other inculpatory documents were buried among approximately 30,000 apparently randomly shuffled documents. Many or most of the other documents had already been produced, and these documents were inserted among the mix. Royal and its lawyers hoped that these inculpatory documents would never be discovered because they confirm Royal's complicity with SFC in the Ponzi Scheme.

## COUNT I – NEGLIGENCE

165.    MP III incorporates by reference the allegations of Paragraphs 1 to 164 of this Counterclaim as set forth at length herein.

166.    Royal had a duty to act as a reasonably prudent person would under the same or similar circumstances, considering the reasonably foreseeable risk or probability of injury to individuals and entities situated such as MP III.

42

167. By funding, insuring, and assisting SFC in the Ponzi Scheme, Royal breached its duty.

168. As a proximate result of Royal's actions and omissions, MP III sustained millions of dollars in damages when SFC collapsed.

169. MP III is entitled to compensatory damages and other damages.

## COUNT II – GROSS NEGLIGENCE

170. MP III incorporates by reference the allegations of Paragraphs 1 to 169 of this Counterclaim as set forth at length herein.

171. Royal had a duty to act as a reasonably prudent person would under the same or similar circumstances, considering the reasonably foreseeable risk or probability of injury to individuals and entities situated such as MP III.

172. By funding, insuring, and assisting SFC, Royal breached its duty.

173. Royal's acts and omissions involved an extreme degree of risk, considering the probability and potential harm to others, including MP III and others similarly situated.

174. Royal was aware of the risk to others by its acts and omissions but nevertheless proceeded in conscious indifference of the rights and welfare of others, including MP III and others similarly situated. Royal acted wantonly, recklessly, and with conscious disregard for the damages it was inflicting on MP III.

175. Royal's acts and omissions were malicious.

176. As a proximate result of Royal's actions and omissions, MP III sustained millions of dollars in damages when SFC collapsed.

177. MP III is entitled to compensatory damages and other damages.

43

178.    Royal's Ponzi Scheme was so egregious that punitive damages should be assessed against Royal.

### COUNT III – NEGLIGENT MISREPRESENTATION

179.    MP III incorporates by reference the allegations of Paragraphs 1 to 178 of this Counterclaim as set forth at length herein.

180.    In the course of Royal's business, Royal funded, insured, and assisted SFC even though Royal knew or was negligent in not knowing that SFC was on the verge of collapse, that a vast number of SFC's student loans were delinquent, and that SFC was using Forbearance Payments to keep loans from defaulting.

181.    Royal's insurance policies enabled SFC to make security offerings and gave credibility to SFC in the market.

182.    By funding, insuring, and assisting SFC, Royal enabled SFC to purchase and originate new student loans.

183.    Royal's funding, insurance policies, and assistance enabled SFC to make Forbearance Payments from the Experience Account, the Express Spread Account, and from other SFC accounts and monies.

184.    Royal failed to exercise reasonable care in deciding to fund, insure, and assist SFC.

185.    MP III actually and justifiably relied upon SFC's representations that its business was financially sound and that it had the financial ability to fund and service the student loan accounts.

186.    These representations would not have been possible – indeed, SFC would have quickly collapsed – without Royal's ongoing assistance, funding, and insurance.

44

187.    Royal and SFC failed to disclose to MP III that SFC was a financially unstable and illegitimate enterprise that would collapse without the making of Forbearance Payments on student loans and the credit risk insurance provided by Royal

188.    As the proximate result of Royal's actions, MP III sustained damages in the millions of dollars when SFC collapsed.

189.    MP III is entitled to compensatory damages and other damages.

190.    Royal's scheme was so egregious that punitive damages should be assessed against Royal.

### COUNT IV – FRAUDULENT MISREPRESENTATION

191.    MP III incorporates by reference the allegations of Paragraphs 1 to 189 of this Counterclaim as set forth at length herein.

192.    In the course of Royal's business, Royal funded, insured, and assisted SFC even though Royal knew or should have known that SFC was on the verge of collapse, that a vast number of SFC's student loans were delinquent, and that SFC was using Forbearance Payments to keep loans from defaulting.

193.    Royal's insurance policies enabled SFC to make security offerings and gave credibility to SFC in the market.

194.    Royal's funding, insurance policies, and assistance enabled SFC to purchase and originate new student loans.

195.    Royal's funding, insurance policies, and assistance enabled SFC to make Forbearance Payments from the Experience Account, the Excess Spread Account, and from other SFC accounts and monies.

45

196.    Royal intended for others to act and rely upon its assistance, funding, and insurance that they provided to SFC.

197.    MP III actually and justifiably relied upon SFC's representations that its business was financially sound and that it had the financial ability to fund and service the contracts that MP III forwarded to it.

198.    Royal and SFC failed to disclose that SFC was a financially unstable and illegitimate enterprise that would collapse without the making of Forbearance Payments on student loans and the credit risk insurance provided by Royal.

199.    These representations would not have been possible – indeed, SFC would have quickly collapsed – without Royal's ongoing assistance, funding, and insurance.

200.    As the proximate result of Royal's actions, MP III sustained damages in the millions of dollars when SFC collapsed.

201.    MP III is entitled to compensatory damages and other damages.

202.    Royal's fraudulent scheme was so egregious that punitive damages should be assessed against Royal.

## COUNT V – FRAUDULENT NONDISCLOSURE

203.    MP III incorporates by reference the allegations of Paragraphs 1 to 202 of this Counterclaim as set forth at length herein.

204.    In the course of its business, Royal knew that SFC was on the verge of collapse, that a vast number of SFC's student loans were delinquent, and that SFC was using Forbearance Payments to keep loans from defaulting.

205.    Royal knew of MP III's existence, and it knew that MP III had a business relationship with SFC and was relying on SFC.

46

C-47

206.    Royal was in a superior and a special position to notify MP III of the financial problems at SFC.

207.    Instead of notifying MP III of SFC's financial problems, Royal instead continued to fund, insure, and assist SFC.

208.    Royal and SFC failed to disclose that SFC was a financially unstable and illegitimate enterprise that would collapse without the making of Forbearance Payments on student loans and the credit risk insurance provided by Royal.

209.    These representations would not have been possible – indeed, SFC would have quickly collapsed – without Royal's ongoing assistance, funding, and insurance in the Ponzi Scheme.

210.    As the proximate result of Royal's actions, MP III sustained damages in the millions of dollars when SFC collapsed.

211.    MP III is entitled to compensatory damages and other damages.

212.    Royal's fraudulent scheme was so egregious that punitive damages should be assessed against Royal.

### COUNT VI - CONSPIRACY TO COMMIT FRAUD

213.    MP III incorporates by reference the allegations of Paragraphs 1 to 212 of this Counterclaim as set forth at length herein.

214.    Royal formed a common plan or agreement with SFC, the objective of which was to generate and sell loans to investors despite SFC's precarious financial state. In furtherance of this conspiracy, Royal issued 11 Royal Policies to SFC, which allowed SFC to continue to originate student loans and to make Forbearance Payments on student loans. Royal also provided one or more loans to SFC in the form of a Promissory Note.

47

215.    Royal's insurance policies, funding, and assistance enabled SFC to make security offerings and gave credibility to SFC in the market.

216.    SFC knowingly and recklessly made material misrepresentations to MP III about the health and financial condition of its business.

217.    SFC intended for MP III to act upon its representations and omissions.

218.    MP III actually and justifiably relied upon SFC's representations that its business was financially sound and that it had the financial ability to fund and service the contracts that MP III forwarded to it.

219.    Royal and SFC failed to disclose that SFC was a financially unstable and illegitimate enterprise that would collapse without the making of Forbearance Payments on student loans and the credit risk insurance provided by Royal. Royal conspired with SFC in perpetuating the Ponzi Scheme.

220.    Through its insurance, funding, and assistance, Royal furthered the fraudulent scheme.

221.    As the proximate result of SFC's and Royal's actions, MP III sustained damages in the millions of dollars when SFC collapsed.

222.    MP III is entitled to compensatory damages and other damages.

223.    The fraudulent scheme was so egregious that punitive damages should be assessed against Royal.

### COUNT VII – AIDING AND ABETTING

224.    MP III incorporates by reference the allegations of Paragraphs 1 to 223 of this Counterclaim as set forth at length herein.

225.    SFC made representations to MP III that its business was financially sound and that it had the financial ability to fund and service the contracts that MP III forwarded to it.

226.    SFC breached its duty of disclosure to MP III by failing to disclose that it was a financially unstable and illegitimate enterprise that would collapse without the making of Forbearance Payments on student loans and the credit risk insurance provided by Royal.

227.    SFC's misrepresentations and breach of this duty resulted in harm and damages to MP III.

228.    Royal provided substantial assistance to SFC in making these misrepresentations and in breaching this duty by providing SFC with credit risk insurance which Royal knew was a key component of SFC's enterprise. Royal also provided a loan to SFC, knowing that it would be used by SFC to make Forbearance Payments.

229.    As a proximate result of Royal's aiding and abetting SFC's breach of duties and misrepresentations, MP III suffered damages. Royal aided and abetted SFC in all of the wrong doing alleged in the counterclaim and in furthering the Ponzi Scheme.

230.    MP III is entitled to compensatory damages and other damages.

231.    The scheme was so egregious that punitive damages should be assessed against Royal.

49

WHEREFORE, MP III demands judgment against Royal for an amount to be determined at trial, together with interest, Court costs, attorneys' fees, punitive damages, and any other relief that the Court deems just and proper.

Respectfully submitted,

**GERMER GERTZ, L.L.P.**

By: _____

Lawrence Germer
State Bar No. 07824000
Germer Gertz, L.L.P.
550 Fannin, Suite 500
Beaumont, Texas 77701
(409) 654-6700
(409) 835-2115 (Fax)

Amy Keith
State Bar No. 11185530
Germer Gertz Beaman & Brown LLP
301 Congress Ave, Ste 1825
Austin, Texas 78701
(512) 472-0288
(512) 472-0721 (Fax)

**OF COUNSEL:**
Alan K. Cotler
Andrew P. Hoppes
Steven T. Voigt
REED SMITH LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103
(215) 851-8100
(215) 851-1420 (Fax)

ATTORNEYS FOR DEFENDANTS MP III HOLDINGS, INC., D/B/A MTA SCHOOLS-131, MTA SCHOOLS-136, AND MTA SCHOOLS-137

**<u>Jury Trial Demanded</u>**

50

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing MP III Holdings Second Amended Answer and Counterclaim has been provided to the following counsel/parties of record on this 20th day of July, 2005:

**Attorneys for Plaintiff, Royal Indemnity**
Harvey G. Brown
Howard L. Close
Andrew Love
*WRIGHT, BROWN & CLOSE, LLP*
Three Riverway, Suite 600
Houston, TX 77056
Via Federal Express

Michael H. Barr
*SONNENSCHEIN NATH & ROSENTHAL*
1221 Avenue of the Americas
New York, NY 10020-1089
Via U.S. Mail

Alan S. Gilbert
*SONNENSCHEIN NATH & ROSENTHAL*
233 South Wacker Drive, Suite 8000
Chicago, IL 60606
Via U.S. Mail

Daniel D. Barnowski
*SONNENSCHEIN NATH & ROSENTHAL*
1301 K Street, NW, Suite 600
Washington, DC 20005
Via U.S. Mail

**Student Marketing Services, LLC**
**And Student Loan Servicing, LLC**
Harold Hendrickson, President
Student Loan Servicing, LLC
1405 Foulk Road
Wilmington, DE 19803
Via U.S. Mail

**Attorneys for Coastal College, Inc.:**
Tara G. Richard
Cornelius R. Heusel
Patrick J. Veters

51

*JONES WALKER WAECHTER POITEVENT*
201 St. Charles Ave., 50th Floor
New Orleans, LA  70170-5100
Via U.S. Mail

R. Kelly Donaldson
Ruth Brewer Schuster
*JONES WALKER WAECHTER POITEVENT*
10001 Woodloch Forest Dr., Ste 350
The Woodlands, TX  77380
Via U.S. Mail

_____
Lawrence Louis Germer

52

C-53