EXHIBIT F

LEXSEE 1998 U.S. DIST. LEXIS 19144

**BARRY FEINBERG, Plaintiff, v. SAUNDERS, KARP & MEGRUE, L.P., and SKM PARTNERS, L.P., Defendants.**

**C.A. No. 97–207–SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1998 U.S. Dist. LEXIS 19144*

**November 13, 1998, Decided**

**NOTICE:** [*1]  FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** Defendants' motion for partial summary judgment (D.I. 82) denied in part and granted in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** For Plaintiff: Thomas R. Hunt, Esquire, Derek C. Abbott, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware.

For Plaintiff: Daniel V. Folt, Esquire, Cozen and O'Connor, Philadelphia, Pennsylvania.

For Plaintiff: H. Robert Fiebach, Esquire, Lillian E. Benedict, Esquire, Of Counsel, Cozen and O'Connor, Philadelphia, Pennsylvania.

For Defendants: Kevin G. Abrams, Esquire, John A. Parkins, Jr., Esquire, Peter B. Ladig, Esquire, Richards, Layton, & Finger, Wilmington, Delaware.

**JUDGES:** Sue L. Robinson, District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

**MEMORANDUM OPINION**

Dated: November 13, 1998
Wilmington, Delaware

**ROBINSON, District Judge**

**I. INTRODUCTION**

Plaintiff Barry Feinberg filed this action against defendants Saunders, Karp & Megrue, L.P. ("SKM") and SKM Partners, L.P. ("SKM Partners") on April 22, 1997

seeking money damages arising out of the parties' prior business dealings. (D.I. 1) Plaintiff alleges that defendants willfully breached the terms of his employment contract or, alternatively, that [*2]  they fraudulently induced him to enter into a consulting contract and to continue working for them after execution of the agreement. (D.I. 1, 37) In his amended complaint, plaintiff presents claims of breach of contract, fraudulent misrepresentation, breach of the duty of good faith and fair dealing, accounting, unjust enrichment, tortious interference with contractual and business relationships, and promissory estoppel. (D.I. 37) The court has jurisdiction over this matter pursuant to *28 U.S.C. § 1332.*

Presently before the court is defendants' motion for partial summary judgment. (D.I. 82) Defendants have moved to dismiss all of plaintiff's claims with the exception of the breach of contract and unjust enrichment claims. (D.I. 82) Defendants also seek to dismiss plaintiff's claim for damages to the extent they are based on an alleged "two percent" agreement. (D.I. 82) This motion has been fully briefed and is ripe for decision. For the following reasons, defendants' motion shall be denied in part and granted in part.

**II. BACKGROUND n1**

n1 For purposes of this motion, defendants have agreed to accept as true plaintiff's allegations in the second amended complaint and his deposition testimony. (D.I. 83 at 2)

[*3]

**A. The Parties**

Plaintiff is a resident of Pennsylvania who for 17 years served as the president and chief executive officer of a highly profitable, regional electronics and appliance store chain. (D.I. 37, PP 1, 7) At the time relevant to this action, plaintiff ran a marketing consultancy firm under the name Kaiser, Feinberg & Associates and taught retail market-

1998 U.S. Dist. LEXIS 19144, *3

ing at the Wharton School of Finance of the University of Pennsylvania. (D.I. 37, P 7)

At all times relevant, defendant SKM was a Delaware limited partnership with its principal place of business in New York. (D.I. 37, P 2) None of SKM's partners is known to be a resident of Pennsylvania. (D.I. 37, P 2) In 1994, SKM was an advisor to the SK Equity Fund, L.P. ("Fund I"). n2 (D.I. 37, P 9) As an advisor, SKM: (1) identified business opportunities for the Funds; (2) worked with companies in which the Funds had invested ("portfolio companies") in order to increase their value; and (3) developed and implemented exit strategies that would maximize the Funds' return on their investment. (D.I. 37, P 9) Through the Saunders, Karp Investment Fund ("SKIF"), employees and partners of SKM were allowed to invest in those companies [*4] in which the Funds invested. (D.I. 37, P 10)

> n2 SKM later became an advisor to SKM Equity Fund, L.P. ("Fund II") (collectively "the Funds"). (D.I. 37, P 9)

Defendant SKM Partners is the general partner of SKM. (D.I. 37, P 3) It too is a Delaware limited partnership with its principal place of business in New York. (D.I. 37, P 3) The general partners of SKM Partners are Thomas A. Saunders, III ("Saunders"), Allan W. Karp ("Karp"), and John F. Megrue, Jr. ("Megrue"). (D.I. 37, P 3) None of the partners of SKM Partners is known to be a resident of Pennsylvania. (D.I. 37, P 3)

**B. The Consulting Agreement**

In early 1994, Megrue approached plaintiff about becoming a consultant to SKM. (D.I. 37, P 8; D.I. 87 at B16(a), B185) In June 1994, plaintiff met with Megrue, Saunders, and Lillian Lebek, SKM's controller ("Lebek"), at SKM's offices in New York to discuss the possibility of a formal working relationship. n3 (D.I. 87 at B16–17, B187–88) Approximately one week after that meeting, Megrue again invited plaintiff [*5] to SKM's offices in New York to discuss the proposed consulting relationship. (D.I. 87 at B18–19) According to plaintiff, during this meeting Megrue outlined the relationship that would exist between the two parties. (D.I. 87 at B19) Specifically, plaintiff contends that he was promised: (1) an annual salary of $250,000 (to be reduced by compensation received from portfolio companies); (2) the opportunity to co-invest between $250,000 and $1 million in each SKM retail-related business; (3) 25 to 40% of the management option pool that would be set up for each of the companies in which investments were made; and (4) reimbursement for all direct out-of-pocket expenses incurred as a result of his consulting work, except for maintenance of

his Philadelphia office. n4 (D.I. 87 at B19–20, B101–03) In return for his compensation, plaintiff was expected to spend 75% of his time on SKM matters. n5 (D.I. 87 at B20) Although the relationship was expected to be long-term, it was to be reviewed annually to assess progress and mutual satisfaction. n6 (D.I. 87 at B22) It was plaintiff's understanding that his work would involve evaluating potential investments for SKM although he was not specifically [*6] told by Megrue. (D.I. 87 at B20–21)

> n3 Prior to this time, plaintiff had rendered services to SKM on an informal basis, i.e., without compensation. (D.I. 87 at B5–16, B185)

> n4 Megrue believed that plaintiff would not be required to relocate but would maintain his headquarters in Philadelphia and travel to locations as necessary, even if that required him to be away from his family five days a week. (D.I. 87 at B198–99)

> n5 As a result of this time commitment, which constituted approximately 30 hours per week, plaintiff was forced to close his own consulting business. (D.I. 87 at B40–41) Plaintiff contends that defendants were well aware that such a commitment would mandate such a result. (D.I. 37, P 14)

> n6 The terms of the proposal were set forth in an internal SKM memorandum dated June 16, 1994, prior to the meeting between Megrue and plaintiff. (D.I. 87 at B188, B241)

At the conclusion of the meeting, plaintiff indicated to Megrue that the terms were acceptable and that he would like to proceed [*7] with the consulting arrangement. n7 (D.I. 87 at B21, B203–04) The parties shook hands, and Megrue indicated that he would be sending plaintiff a letter regarding the arrangement. (D.I. 87 at B104–05, B204)

> n7 According to plaintiff, the investment and option terms were of paramount importance; he would not have entered into the relationship with SKM had he known he would not receive those benefits. (D.I. 87 at B103–04)

Approximately four days after this meeting, plaintiff received a letter from Megrue dated June 20, 1994, "outlining our general understanding about how this will work" ("June 20 Letter"). (D.I. 87 at B106–08, B239–40) The June 20 Letter set forth the terms as discussed at the June meeting. (D.I. 87 at B239–40, B106) The June 20

1998 U.S. Dist. LEXIS 19144, *7

Letter concluded:

> If you have any questions about this pro-
> posal, give me a call. Otherwise, I propose
> that we start formally on July 1 and suggest
> that we meet in the next 10 days to talk about
> title, integration plans, deal flow, decision
> making, etc..

(D.I. [*8] 87 at B240) Plaintiff viewed this letter as "a
written confirmation and documentation of the proposal
[Megrue] made to [him] in New York and which [he
had] accepted," not as a letter of intent. (D.I. 87 at B108)
Upon receipt of the letter at his residence in Pennsylvania,
plaintiff called Megrue "to reiterate that [he] had accepted
[Megrue's] proposal." (D.I. 87 at B109, B113)

Sometime after plaintiff assumed his duties as consul-
tant for SKM on or about July 1, 1994, Karp approached
Lebek and asked her to contact corporate counsel regard-
ing the preparation of a formal consulting agreement.
(D.I. 87 at B109, B136, B139, B149, B206) On July 14,
1994, Lebek sent to counsel a copy of "our 'agreement'"
with plaintiff, indicating that the "objective [was] to have
a 'simple' consulting agreement without getting into non-
compete issues, etc." (D.I. 87 at B301) Following dis-
cussions with counsel, on July 15, 1994, Lebek sent an
internal memorandum to the partners of SKM review-
ing her "concerns/questions" about the proposed consult-
ing arrangement. (D.I. 87 at B242, B305) The consulting
agreement went through numerous drafts before a final
version was prepared. (D.I. 87 at B159-63, [*9] B166-
68, B244-52)

At the end of July, plaintiff received a letter from
Lebek dated July 28, 1994, along with his first monthly
consulting payment. (D.I. 87 at B254) The letter stated in
part:

> We are in the process of preparing a very sim-
> ple consulting agreement which I will for-
> ward to you as soon as a draft is available.
> This agreement will provide a basic outline of
> the terms of your arrangement with [SKM].
> We hope to have this agreement ready within
> a week, at which time, we all should sit down
> and discuss this and other administrative as-
> pects of our relationship.

(D.I. 87 at B110, B254) Plaintiff, who assumed the agree-
ment Lebek referred to was merely a more formal version
of the agreement that he had reached with Megrue, made
no objection within the month following receipt of this
letter. (D.I. 87 at B28-29, B110)

On August 10, 1994, Lebek transmitted by facsimile

a draft agreement to plaintiff for his review. (D.I. 87 at
B29-30, B111, B168-69, B171-72, B255-65) On August
29, 1994, plaintiff contacted Lebek to ask with whom he
should discuss the proposal, and she referred him to an
attorney. (D.I. 87 at B30, B111, B167-68) Plaintiff dis-
cussed with the attorney [*10] a proposed indemnification
clause. (D.I. 87 at B31-33) Plaintiff also had substantive
concerns regarding a 30-day termination provision that
appeared in the draft agreement as well as apparent mod-
ifications to the rights to co-invest and receive options
given under his prior agreement with Megrue. (D.I. 87 at
B33-39(a)) Plaintiff contacted Karp to inquire as to the
need for the agreement. (D.I. 87 at B28-29) According
to plaintiff, Karp indicated that plaintiff should "just for-
get about it," n8 and no discussion regarding plaintiff's
concerns ever occurred. (D.I. 87 at B29, B111(a))

> n8 Karp did not recall making such a statement.
> (D.I. 87 at B140)

The final version of the consulting agreement, which
incorporated, inter alia, changes in the indemnification
provision stipulated by plaintiff, n9 subsequently was
drafted. (D.I. 84 at A117-25; D.I. 87 at B173-74) Copies
of the agreement were circulated to the parties, however,
it was never executed due to plaintiff's continued concerns
regarding the wording of [*11] the indemnification pro-
vision. (D.I. 87 at B131, B163-64, B174-77) Eventually,
SKM ceased its attempts to execute a formal consulting
agreement with plaintiff. (D.I. 87 at B140)

> n9 According to the record, the only provision
> plaintiff requested to have changed was the indem-
> nification clause.

### C. Plaintiff's Consulting Relationship with SKM

After assuming his duties at SKM, plaintiff divided
his time between his office in Philadelphia and the office
he maintained at SKM headquarters in New York. In gen-
eral, plaintiff would spend two days a week in New York
and three days a week in Philadelphia, although often
he would travel to the location of potential investments
as part of his review. (D.I. 87 at B60-61, B91(d), B115)
Initially, plaintiff attended numerous meetings with in-
vestment bankers as well as various SKM meetings. (D.I.
87 at B60-61) All of the meetings plaintiff attended were
held in New York. (D.I. 87 at B60-61)

In November 1994, plaintiff originated his first trans-
action as a consultant with [*12] SKM. (D.I. 87 at
B60, B62-64) The transaction involved a chain of ath-
letic footwear stores known as Sneaker Stadium, which
plaintiff was responsible for bringing to SKM's attention.

1998 U.S. Dist. LEXIS 19144, *12

(D.I. 87 at B206–07) SKM ultimately agreed to invest $3 million in the company. (D.I. 87 at B64) Plaintiff was offered the opportunity and agreed to co–invest $250,000 directly and $50,000 through the SKIF in Sneaker Stadium. (D.I. 87 at B64–65) By their terms, SKM's investment as well as plaintiff's direct investment, which paralleled SKM's investment, were "staged" or "staggered." (D.I. 87 at B66) At the time of the investment, SKM was given the opportunity to designate a member of the board of Sneaker Stadium; plaintiff was asked to serve as SKM's designee. (D.I. 87 at B207–08)

Because of dissatisfaction with Sneaker Stadium's earnings, SKM decided not to continue with the later stages of its investment. (D.I. 87 at B69) Although legally plaintiff's ability to continue making investments in Sneaker Stadium was not contingent upon SKM's funding the deal, plaintiff felt there existed a "practical prohibition" to his doing so. (D.I. 87 at B67–68) Thus, plaintiff opted to discontinue his funding after [*13] having invested approximately $150,000 ($ 50,000 of which was invested through SKIF) in Sneaker Stadium. (D.I. 87 at B69)

Although some full-time employees of Sneaker Stadium received options, plaintiff did not. (D.I. 87 at B70–73) Plaintiff questioned Megrue about what he perceived to be a violation of the June 20 Letter. Megrue explained that the Sneaker Stadium deal was unique in that it was a "club deal," i.e., a number of other investors were involved. (D.I. 87 at B72–73) According to Megrue, since the other investors in the deal were not receiving options, SKM would not be able to obtain options for plaintiff. (D.I. 87 at B70–73) Plaintiff opted not to press the issue at that time, believing that SKM would "try to make it up" to him in future deals. (D.I. 87 at B73) Had he received options, plaintiff would have been the only non-full time employee to do so. (D.I. 87 at B72) Sneaker Stadium was subsequently sold for $93 million, resulting in a return of approximately 3.4 times the original investment. (D.I. 37, P 26)

The second transaction in which plaintiff participated involved the recapitalization of Souper Salad, Inc. ("Souper Salad"), a company headquartered in San Antonio, [*14] Texas that owned and operated a series of family restaurants. (D.I. 37, P 28; D.I. 87 at B45) Plaintiff did not play a role in negotiating the Souper Salad deal, but he did review documents and visit stores on behalf of SKM. (D.I. 87 at B74) Ultimately, plaintiff invested $291,667 directly and $48,362 through SKIF in Souper Salad. (D.I. 87 at B74) In addition, plaintiff received options for 111,111 shares of the company's stock at $3.50 per share pursuant to the terms of the Nonqualified Stock Option Agreement. n10 (D.I. 87 at B266–91) Plaintiff also

served as chairman of the board of directors of Souper Salad, a position he assumed at SKM's request soon after the closing of the deal in March 1995. (D.I. 87 at B59, B66, B87, B208)

n10 Pursuant to the terms of the Nonqualified Stock Option Agreement, these options were not fully vested until June 30, 2000.

In November 1995, Fund I invested in Hibbett Sporting Goods, Inc. ("Hibbett"), a retail operator of 70 sporting goods stores. (D.I. 37, P 36) Although plaintiff [*15] played a significant role in SKM's decision to make the investment, he was not granted any options in Hibbett nor was he allowed to co–invest. (D.I. 37, P 37; D.I. 87 at B79) When questioned by plaintiff, Megrue explained that, because of the nature of the parties involved in the transaction, the closing was difficult and as a result he was unable to secure options for plaintiff. n11 (D.I. 87 at B80) Since he could not secure options for plaintiff, Megrue stated that he did not think it fair to ask plaintiff to make a direct investment in Hibbett. (D.I. 87 at 80) According to plaintiff, he indicated to Megrue that he would still like to invest in Hibbett, but that Megrue implied plaintiff would be "doing him a favor" were he not to insist on co–investing since Megrue did not wish to reopen the deal. (D.I. 87 at B80–81) Plaintiff contends he was assured that this transaction was an aberration and that he would receive investment opportunities and options in all future deals. (D.I. 37, P 41) Based on these representations, plaintiff agreed to serve on the board of directors of Hibbett. (D.I. 37, P 42; D.I. 87 at B79)

n11 According to Clyde Anderson, who negotiated the deal on behalf of the owners of Hibbett, no one at SKM ever approached him about reserving options. (D.I. 87 at B226–28)

[*16]

Plaintiff also played a significant role in the recapitalization of The Children's Place Retail Stores, Inc. ("the Children's Place"). Plaintiff not only brought the investment to the attention of SKM but he also reviewed the company's financial materials, projected the company's growth, visited stores, and participated in the negotiations. (D.I. 87 at B82–85) During the course of negotiations, plaintiff informed Megrue that he wished to receive options and invest in the Children's Place. (D.I. 37, P 48) Plaintiff ultimately co–invested $249,842 (exclusive of his SKIF investment) in the company n12 but, like the rest of SKM, he did not receive any options. (D.I. B86–87) When plaintiff questioned the lack of options, Megrue explained that SKM did not want to negotiate

1998 U.S. Dist. LEXIS 19144, *16

for options on behalf of plaintiff since it was purchasing only a minority position in the company. (D.I. 37, P 53) Karp assured plaintiff that he would receive options in the Charlotte Russe deal, another SKM transaction. (D.I. 37, P 53) At the owner's request, plaintiff served as a member of the Children's Place board of directors. (D.I. 87 at B87, B236–37)

> n12 Plaintiff contends that this investment came about only because a shareholder in the Children's Place decided to sell his interest in the company. (D.I. 37, P 51)

[*17]

The Charlotte Russe deal, which involved the purchase by Fund I of the diluted shares of the company, closed in September 1996. (D.I. 37, P 56) During negotiations of the transaction, Karp "specifically" promised plaintiff that he would receive options for 2% of the company and would be allowed to make a direct investment in an amount that would equate to a direct ownership of 2% of the company. (D.I. 87 at B89–90) Correspondence from Karp to Danny Lawrence, CEO of Charlotte Russe, indicated that SKM "anticipated reserving options for an additional 4% of the company to be designated 2% for Bank of Boston and 2% for an outside SK[M] advisor [(plaintiff)] who would join us on the board of Charlotte Russe." (D.I. 87 at B127(a)–28, B292–300) According to plaintiff this promise mitigated his "feelings" that he was not receiving what he was entitled to with respect to the Hibbett and Children's Place transactions. (D.I. 87 at B91) It also led him to believe Megrue's representations that those transactions, in fact, had been aberrations. (D.I. 87 at B91)

Despite Karp's assurances, plaintiff not only did not receive any options in Charlotte Russe but he also was not permitted to make [*18] a direct investment in the company. (D.I. 87 at B88) Moreover, when the transaction closed, plaintiff was not given a role in Charlotte Russe because a new CEO was already in place. (D.I. 87 at B209–11) According to Megrue, since plaintiff was not going to be playing an active role in the company, direct investment and/or options would not be appropriate. (D.I. 87 at B209)

### D. Deterioration of the Consulting Arrangement

In the summer of 1995, Karp and Megrue met with plaintiff to review the consulting relationship. (D.I. 87 at B91(a)–(c)) Karp and Megrue indicated not only that they were getting a substantial benefit from the relationship but also that they were pleased with how things were working. (D.I. 87 at B91(a)–(c)) Their only criticism was that plaintiff was too aggressive in questioning statements and

projections from companies that were being considered as potential investments. (D.I. 87 at B91(a)–(c)) There was no discussion at that time concerning plaintiff's compensation, options, or co-investments. (D.I. 87 at 91(c))

Plaintiff's second review occurred in the summer of 1996. (D.I. 87 at B91(d)) Megrue did not participate. Karp indicated that he was pleased with [*19] plaintiff's performance and that his "aggressive behavior" was no longer an issue. (D.I. 87 at B91(d)–(e)) Plaintiff's compensation and opportunity to receive options and co-invest were not discussed. (D.I. 87 at B91(e)) Both of these reviews were oral.

In October 1996, Megrue and Karp met with plaintiff to discuss his future relationship with SKM. (D.I. 87 at B92) They submitted a proposal to plaintiff that set forth the terms of his "current deal" and the terms of a "proposed deal." (D.I. 87 at B93. B304) The proposed deal reduced not only plaintiff's annual salary to $60,000 but also limited his co-investment to $100,000 per deal. (D.I. 87 at B304) Plaintiff's time commitment also was reduced from approximately 80% to 25-35%. (D.I. 87 at B304) In early November, plaintiff rejected the proposal and offered to resign. (D.I. 87 at B93–94) Megrue and Karp indicated that they did not want plaintiff to resign as they valued his efforts, rather they wanted the working relationship to continue. (D.I. 87 at B93–94) Plaintiff indicated he was willing to engage in negotiations as long as the final deal addressed some of his grievances with respect to the current arrangement. (D.I. 87 at [*20] B96)

The parties engaged in further negotiations but eventually reached an impasse. n13 In late 1996 or early 1997, plaintiff met with legal counsel regarding his relationship with SKM. (D.I. 87 at B96) In response to a letter dated February 7, 1997, sent from plaintiff's counsel to Megrue, Karp met with plaintiff on February 14, 1997. (D.I. 87 at B96–97) During the meeting, Karp asked plaintiff whether he felt he had claims in connection with any prior transactions involving SKM and the portfolio companies. (D.I. 87 at B97) According to plaintiff, when he answered in the affirmative, Karp responded, "Well, that being the case, you know, you are fired." (D.I. 87 at B97) Karp informed plaintiff that he was not to attend the upcoming operations meeting at Souper Salad, and he demanded plaintiff's resignation from the boards of the portfolio companies. (D.I. 87 at B97) If plaintiff did not resign from the boards, Karp indicated that plaintiff would be removed. (D.I. 87 at B98–99)

> n13 While these negotiations were ongoing, Fund I invested in SWH Corporation, the owner of 22 family-style restaurants. (D.I. 37, PP 61–62) Plaintiff was not permitted to invest directly in

1998 U.S. Dist. LEXIS 19144, *20

this portfolio company but was allowed to invest $50,000 through SKIF. (D.I. 37, P 63)

In addition, in late 1996 or early 1997, an entity owned by Fund I invested in East Side Mario's, a restaurant chain, receiving 100% of the company stock. (D.I. 37, P 84) Although plaintiff was responsible for bringing this deal to SKM's attention, he was not permitted to co-invest in this deal or receive options. (D.I. 37, PP 83, 86)

[*21]

Plaintiff opted not to tender his resignation from the boards. (D.I. 87 at B98) On April 25, 1997, plaintiff received a letter from Clint Shackelford, Vice President and Chief Financial Officer of Souper Salad, informing him that on April 17, 1997 a majority of the shareholders had elected a new board and plaintiff had not been re-elected. (D.I. 87 at B 303) The letter went on to indicate that plaintiff had until July 16, 1997 to exercise the 20% of the stock options in which he was vested. (D.I. 87 at B303) Plaintiff also was removed from the boards of Hibbett and the Children's Place.

## III. CONFLICT OF LAW

As a threshold matter the court must determine which law applies to the claims against defendants, a matter which the parties vigorously dispute. A federal court sitting in diversity applies the choice of law rules of the forum state, see *Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941),* in this case Delaware law. The Delaware Supreme Court, in *Travelers Indem. Co. v. Lake, 594 A.2d 38, 41, 47 (Del. 1991),* adopted the Restatement (Second) of Conflict of Law's ("the Restatement") "most significant relationship" [*22] test for choice of law questions sounding in both tort and contracts. See *Pig Improvement Co. v. Middle States Holding Co., 943 F. Supp. 392, 396 (D. Del. 1996).* The Restatement provides separate analyses for contract and tort claims. Restatement § 188 governs plaintiff's contract claims (i.e., breach of contract, unjust enrichment, and promissory estoppel), while § 185 governs his tort-based claim (i.e., fraudulent misrepresentation). n14

n14 In his answering brief, plaintiff indicated that the parties were settling the accounting claim (count IV) and that he had consented to withdrawal of his claims for tortious interference (count VI) and breach of the covenant of good faith and fair dealing (count III). (D.I. 85 at 12 n.3) Consequently, count IV is moot and counts VI and III shall be dismissed without prejudice.

### A. The Contract Claims

Section 188 of the Restatement provides that in the absence of an effective choice-of-law by the parties, the following contacts should be considered [*23] when determining the applicable law:

(a) the place of contracting,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract, n15 and
(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

Restatement § 188(2) (1971). According to the Restatement, "these contacts are to be evaluated according to their relative importance with respect to the particular issue." Id. Generally, "if the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied." Id. § 188(3). In evaluating these factors, the court "should give consideration to the relevant policies of all potentially interested states and the relative interests of those states in the decision of the particular issue." Id. cmt. e.

n15 This factor is inapplicable to the case at bar.

**Place of contracting.** According to the    [*24] Restatement, the place of contracting is the

place where occurred the last act necessary, under the forum's rules of offer and acceptance, to give the contract binding effect, assuming, hypothetically, that the local law of the state where the act occurred rendered the contract binding.

Id. Under Delaware law, "an offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Grasso v. First USA Bank, 713 A.2d 304, 308 (Del. Super. Ct. 1998)* (quoting Restatement (Second) of Contracts § 24)). Compliance with the terms of the offer generally constitutes acceptance. See id. Although acceptance can be shown by conduct indicating assent, to be effective, the act must be intentional. See id.

Here, plaintiff contends that a contract was formed at the second June meeting held at SKM's offices in New York. During this meeting, plaintiff alleges that the terms

1998 U.S. Dist. LEXIS 19144, *24

of the agreement were discussed and agreed to:

> Q. Do you believe that the agreement was reached at this meeting that took place at [SKM]?
>
> A. Absolutely.

(D.I.    [*25]    87 at B22) Alternatively, plaintiff avers that the "last act necessary" to give the contract binding effect was his telephone acceptance of the June 20 Letter. Plaintiff contends that this act was performed in Pennsylvania because his call to SKM's New York offices was placed from Pennsylvania. (D.I. 85 at 15)

The court finds this alternative argument contradicted by plaintiff's own testimony. Plaintiff testified that he considered the June 20 Letter a confirmation of the pre-existing agreement:

> Q. What was your understanding in 1994 as to what the word "Proposal" referred to [in the June 20 Letter]?
>
> A. What I believe it referred to was the fact that in New York John made me a proposal to enter into a contract with [SKM] for consulting services and that I had accepted that proposal and that this letter was just a confirmation of the proposal he made to me and my acceptance thereof.
>
> Q. So to make sure I understand what you are saying, is it your testimony that when he used the word "Proposal" in the letter, he was just describing the proposal he had made you before and that you had accepted?
>
> A. That's what I believed, yes.

(D.I. 87 at B108) According [*26] to plaintiff, he believed his telephonic acceptance to be a mere restatement of his prior, in-person acceptance:

> Q. Then why did you call?
>
> A. I called him to thank him for the letter and to reiterate that I had accepted his proposal and was very excited about, you know, working with him.

(D.I. 87 at B109) Moreover, the fact that plaintiff placed the call to New York from Pennsylvania does not render Pennsylvania the situs of acceptance. Rather, agreement

from separate states by phone indicates that no single place of agreement exists. Consequently, the court concludes that the place of contracting was New York. n16

> n16 Plaintiff argues that, by asking the court to accept plaintiff's allegation that the contract was formed in New York, defendants are attempting "to manipulate the choice-of-law rules to circumvent their contractual obligations" since they ultimately intend to argue that no contract was formed under New York law. (D.I. 85 at 16-17) Plaintiff contends that defendants must commit at this point either that a contract was formed in New York and New York was the place of contracting or that no contract was formed, otherwise the court should defer ruling on the choice-of-law issue until it is determined at trial whether a contract was formed. (D.I. 85 at 17) The court disagrees with plaintiff's assessment that it should defer the choice-of-law issue until trial, finding that, accepting plaintiff's allegations as true (as defendants have conceded with respect to this motion), it has sufficient facts to enable it to apply the law to the facts before it. Moreover, the language of the Restatement requires the court to "assume[], hypothetically, that the local law of the state where the act occurred rendered the contract binding." Restatement cmt. e. Thus, the court must presume, at this stage in the analysis, that under New York law the contract is enforceable.

[*27]

**Place of negotiation.** Accepting plaintiff's assertion that a contract was formed following the second meeting in New York, then New York is the situs of the negotiations. Plaintiff's testimony and the record as a whole indicates that all of the negotiations regarding the consulting agreement took place in June 1994 at SKM's offices in New York.

**Place of performance.** The contract at issue in the instant action is a service contract. As such, the validity of the contract and the rights created thereunder are to be determined by "the local law of the state where the contract required that the service, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship." Restatement § 196. Where, as here, "the employee's duties will require him to travel with fair frequency between two or more states[,] . . . the place where the major portion of the services is to be rendered, provided there is such a place, is the contact that will be given the greatest weight in determining, with respect to most issues the state of the applicable law." Id. cmt. b.

Here, the record indicates that [*28] the performance of services occurred in a variety of states. At the time of contracting, it was expected that plaintiff would maintain a fully outfitted office in Philadelphia where he would work on SKM matters, and that he would spend two days a week at SKM's offices in New York, where he also would have an office. n17 In addition, it was expected that plaintiff's duties would necessitate his travel to the location of various portfolio companies, requiring him to spend three–plus days per week away from Philadelphia. It also was expected that plaintiff would serve on the boards of various portfolio companies; as it turns out, plaintiff served on the board of four portfolio companies, none of which were headquartered in either Philadelphia or New York. Performance of the consulting agreement required plaintiff to attend numerous meetings in New York; there is no indication in the record that any meetings or activities (with the exception of plaintiff's review of potential investments and possible receipt of telephone calls concerning SKM business n18 at his Philadelphia office) concerning SKM matters took place in Pennsylvania.

n17 Per the terms of the agreement, plaintiff was expected to devote 75% of his time to SKM matters. Given a 5 day work week, this means that plaintiff was expected to commit approximately 4 days per week to SKM. Thus, at most plaintiff spent two days per week working on SKM matters at his Philadelphia office, not three as he contends. [*29]

n18 Plaintiff submitted copies of seven telephone message memoranda, which indicate that various individuals attempted to reach him at his New York office and, finding him absent, indicated they would attempt to reach him at his Philadelphia office. (D.I. 93) The nature of the business to be discussed is not indicated on the memoranda nor is it clear that calls to plaintiff's Philadelphia office ever were placed. Assuming that the calls were placed, seven calls over two–and–a–half years, without more, does not warrant a conclusion that a substantial portion of plaintiff's activities was performed in Pennsylvania.

The record, therefore, indicates that a major portion of the services called for under the agreement were not rendered in a single state. Rather, performance occurred in a number of states. However, of all the states in which performance occurred, the record indicates that services were rendered more often in New York than in any other state. Nevertheless, where as here time is divided among

two or more states, "the place of performance [bears] little weight in the choice of the applicable [*30] law." Id. § 188 cmt. e. n19

n19 Comment e provides that

the place of performance can bear little weight in the choice of the applicable law when (1) at the time of contracting it is either uncertain or unknown, or when (2) performance by a party is to be divided more or less equally among two or more states with different local law rules on the particular issue.

Plaintiff argues that, even if New York rather than Pennsylvania was the state where the services were to be performed, Pennsylvania law still should be applied because under New York law the contract might be rendered unenforceable. See id. § 196 cmt d (stating that "on occasion, a state which is not the place where the contract requires that the services . . . should be rendered . . . [might be] the state of the applicable law[,] . . . when the contract would be invalid under the local law of the state where the services are to be rendered but valid under the local law of another state with a close relationship to the transaction and the parties") However, since under the circumstances at bar, the rule set forth in § 196 is not determinative of the applicable law, the court need not address plaintiff's concern. See id. cmt a ("The rule applies if the major portion of the services called for by the contract is to be rendered in a single state and it is possible to identify this state at the time the contract is made.")

[*31]

**Domicil, residence, place of incorporation and business.** The significance of these contacts depends "upon the extent to which they are grouped with other contacts." Id. Here, plaintiff is a resident of Pennsylvania. By contrast, at the time the second amended complaint was filed, both SKM and SKM Partners were Delaware limited partnerships with registered offices in Delaware and principal places of business in New York. Since the place of contracting and negotiation was New York, greater importance is attached to the fact that SKM's and SKM Partner's principal places of business are New York.

Weighing these contacts relative to their importance to the issues, the court concludes that New York has the "most significant relationship" to the contract–based claims at bar. By contrast, Pennsylvania has little relationship to these claims. Accordingly, the factual analysis

1998 U.S. Dist. LEXIS 19144, *31

required by § 188 indicates that New York law should govern plaintiff's contract claims.

## B. The Tort–based Claims

Plaintiff's tort–based claim is based on fraudulent misrepresentation. Where as here, plaintiff's action in reliance took place in a state other than that where the misrepresentations were [*32] made, § 148 of the Restatement sets forth six contacts to be taken into consideration when determining the state with the "most significant relationship":

> (a) the place, or places where the plaintiff acted in reliance upon the defendant's representations,
> (b) the place where the plaintiff received the representations,
> (c) the place where the defendant made the representations,
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, n20 and
> (f) the place where plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Id. § 148(2). The relative importance of these contacts is to "be determined in the light of the choice–of–law principles stated in § 6 n21 with emphasis upon the purpose sought to be achieved by the relevant tort rules of the potentially interested states, the particular issues and the tort involved." Id. cmt. e. In the case at bar, plaintiff alleges that defendants misrepresented to him that [*33] he would have investment opportunities and receive options, knowing that such was necessary to get plaintiff to work for them as a consultant since doing so would require him to close down his own consulting business. (D.I. 37, PP 95–98) Plaintiff avers that he relied on these misrepresentations, eventually closing his consulting business in order to provide consulting services to SKM. (D.I. 37, PP 99–100)

> n20 Under the circumstances at bar, this factor is inapplicable.

> n21 Section 6 delineates the following considerations

> > (a) the needs of the interstate and international systems,

> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectation,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Id. § 6.

[*34]

**The place of reliance.** The importance of this factor depends not only on whether the action in reliance takes place in a single state or is divided among several states but also on whether it is taken pursuant to the terms of an agreement made by the plaintiff with the defendant. See id. cmt. f. Here, plaintiff's reliance takes the form of entering into a contract with SKM for the provision of consulting services. The record indicates that plaintiff believed he entered into a consulting agreement at SKM's offices in New York in June 1994. Pursuant to the terms of that agreement, plaintiff began providing consulting services to SKM beginning July 1, 1994. As discussed above, and as contemplated by the parties to the agreement, these services were performed in a number of states, with New York being the state in which the majority of services was provided. With respect to this claim, however, plaintiff alleges that he closed his consulting business in Pennsylvania in reliance on defendants' misrepresentations. Thus, the court cannot conclude that "a major portion of the action in reliance [took] place in one state and a lesser part in another." Id. Rather, it appears [*35] from the record that plaintiff acted in reliance in a variety of states, particularly Pennsylvania and New York, and that neither state "has a more important contact with the occurrence than does the" other. Id.

**The place plaintiff received the representations.** "This is the place where the representations were first communicated to the plaintiff." Id. cmt. g. Plaintiff agrees that initial representations were made to him at SKM's offices in New York but argues that "the single most important set of misrepresentations—those contained in the June 20 Letter—were received by plaintiff in Pennsylvania." (D.I. 85 at 24) However, as the court previously noted, by plaintiff's own admission the June 20 Letter merely confirmed and set forth in writing the provisions that he previously had accepted during the meeting with Megrue

in June. Thus, although representations were made to plaintiff throughout his tenure with SKM, the "first" alleged misrepresentations were communicated to plaintiff at SKM's offices in New York.

**Place where defendants made the false representations.** "This contact is as important as, and occupies a position wholly analogous to, the place of conduct [*36] that results in injury to person or to tangible things." Id. cmt. h. The record reveals that defendants' alleged misrepresentations were all made in New York: the initial negotiations took place in New York, the June 20 Letter was mailed from New York, and the renegotiations took place in SKM's offices in New York. In fact, plaintiff has not pointed to any representation made by a defendant in a state other than New York. n22 Accordingly, this factor favors the application of New York law.

> n22 Plaintiff argues that the June 20 Letter represents the contract between the parties and that, because it was sent to and received in Pennsylvania, this factor favors the application of Pennsylvania law. The court is not persuaded by this argument.

**The domicil, residence, and place of incorporation and business of the parties.** These factors are of "substantial significance" where, as here, the loss is pecuniary in nature. Since the loss is of "greatest concern to the state with which the person suffering the loss [*37] has the closest relationship[,] . . . the domicil, residence and place of business of the plaintiff are more important than are similar contacts on the part of the defendant." Id. cmt. i. As noted above, plaintiff is a resident of Pennsylvania whereas defendants are both Delaware limited partnerships with principal places of business in New York.

**Place of performance.** This contact is important "provided that [it] can be identified and that at least the **great bulk** of plaintiff's performance is to take place in a single state." Id. cmt. i (emphasis added). As discussed above, the record indicates that plaintiff's performance occurred in a variety of states, with more of the services being rendered in New York than in any other state. However, the court is unwilling to classify the services rendered in New York as being "the great bulk" of plaintiff's performance. Thus, this contact bears less weight in the choice of the applicable law.

Although "no definite rules as to the selection of the applicable law can be stated[,] . . . if any two of the above-mentioned contacts, apart from the defendant's domicil, state of incorporation or place of business, are located [*38] wholly in a single state, this will usually be the state of the applicable law with respect to most issues." Id. cmt. j. Here, defendants made and plaintiff received

the alleged misrepresentations in New York. Since these two contacts are located wholly in New York, and since much of plaintiff's action in reliance and performance occurred in New York, the court concludes that New York has the "most significant relationship" to plaintiff's tort-based claim. Accordingly, the analysis required by § 148 indicates that New York law should govern the fraudulent misrepresentation claim at bar.

**C. Policy Considerations: Restatement § 6**

Because the contacts favor the application of New York law, it should be applied unless the policy considerations set forth in § 6 of the Restatement, n23 see supra n.20, establish a dominant and significant relationship with Pennsylvania. The court will address the factors seriatim.

> n23 The factor relating to the relevant policy of the forum state will not be considered since Delaware has no interest in the case apart from the fact that the cause of action was filed here.

[*39]

**The needs of the interstate system.** According to the Restatement, choice-of-law rules should "further harmonious relations between the states and to facilitate commercial intercourse between them." Id. § 6 cmt. d. "The consistency and predictability which emanate from a clear rule foster commerce and harmonious interstate relations by reducing the uncertainty associated with entering into commercial transactions." *NL Indus. v. Commercial Union Ins. Co., 65 F.3d 314, 326 (3d Cir. 1995).* The multifactored analyses set forth in §§ 148 and 188 of the Restatement facilitate the promotion of these principles. Here, these factual analyses favor the application of New York law. "Thus, both generally and under the specific facts of this case, the needs of the interstate system would be best served by the choice of New York law." Id.

**Relevant policies of other interested states.** Pursuant to this factor, the court should "appraise the relative interests of the states involved in the determination of the particular issue. In general, it is fitting that the state whose interests are most deeply affected should have its local law applied." Id. cmt. f. Plaintiff [*40] contends that at trial defendants will argue that the June 20 Letter constitutes an unenforceable agreement to agree, not a contract. Under New York law, "an agreement to agree is unenforceable because it is indefinite and uncertain." *Silverman v. Silverman, 249 A.D.2d 378, 671 N.Y.S.2d 145, 146 (N.Y. App. Div. 1998).* By contrast, "it is well settled in Pennsylvania that where the parties have settled upon the essential terms and the only remaining act to be done is the formalization of the agreement, the latter

Case 1:05-cv-00165-JJF    Document 53-7    Filed 08/16/2005    Page 12 of 16

Page 11
1998 U.S. Dist. LEXIS 19144, *40

is not inconsistent with the present contract." *SDK Invs., Inc. v. Ott, 1996 U.S. Dist. LEXIS 1678, No. Civ. A. 94–1111, 1996 WL 69402* at *11 (E.D. Pa. 1996) (quoting *Melo–Sonics Corp. v. Cropp, 342 F.2d 856, 859–60 (3d Cir. 1965))*. Thus, under Pennsylvania law, the contemplated future writing is merely a formality as long as the essential terms are agreed upon. See id.

A similar split in the substantive law exists with respect to plaintiff's fraudulent misrepresentation claim. Persuasive New York authority indicates that, under New York law, a plaintiff must allege a fraudulent misrepresentation collateral to the contract in order to make out a fraudulent misrepresentation claim. See, e.g., *Papa's–June* [*41] *Music, Inc. v. McLean, 921 F. Supp. 1154, 1160–62 (S.D.N.Y. 1996)* (finding that pursuant to New York caselaw "a contract claim cannot be converted into a fraud claim by the addition of an allegation that the promisor intended not to perform when he made the promise"). Pennsylvania law, however, allows an action for fraud that is based on future promises if, at the time the promises were made, the defendant knew that they would not be carried out. See, e.g., *Killian v. McCulloch, 850 F. Supp. 1239, 1252–54 (E.D. Pa. 1994)* (finding that plaintiffs had adequately stated a claim for fraudulent misrepresentation where they alleged that oral and written misrepresentations by defendants induced them to continue their employment); *Phoenix Technologies, Inc. v. TRW, Inc., 834 F. Supp. 148, 151–52 (E.D. Pa. 1993)* (finding that a fraudulent misrepresentation claim can be premised upon a promised future act if the present intention to perform the act is false when uttered).

Given the substantive split in the states' laws, a ruling that will accommodate the interests of both states is not feasible. Therefore, the court must adopt the law of the state it perceives as being "most deeply [*42] affected." The court finds that state to be New York. Although Pennsylvania's interest in compensating Pennsylvania plaintiffs in tort and contract cases is at issue, the court is unable to say that interest outweighs the interest New York has in protecting defendants under the same circumstances or the significant relationship the facts have to the state of New York. Accordingly, this factor favors the application of New York law to the issues at bar.

**Protection of justified expectations.** This factor seeks to promote commercial transactions and thereby maintain a healthy business environment. According to the Restatement, "generally speaking, it would be unfair and improper to hold a person liable under the local law of one state when he had justifiably molded his conduct to conform to the requirements of another state." Restatement § 6 cmt. g. Despite plaintiff's arguments to the contrary, all reasonable expectations do not point to

reliance on Pennsylvania law. Rather, given that all negotiations took place in New York and the offer was made and accepted in New York, it is rational to assume that the parties reasonably expected the application of New York law to [*43] the agreement. The fact that it was anticipated that plaintiff would maintain a Philadelphia office and that Lebek discouraged plaintiff's use of SKM stationary because of potential tax liabilities does not alter the court's opinion. Moreover, there is no indication or allegation that plaintiff "molded his conduct to conform" to Pennsylvania state law in anticipation of its application to the consulting agreement. Consequently, New York law is favored.

**The basic policies underlying the relevant fields of law.** This factor is important

where the policies of the states are largely the same but where there are nevertheless minor differences between their relevant local law rules. In such instances, there is good reason for the court to apply the local law of that state which will best achieve the basic policy, or policies, underlying the particular field of law involved.

Id. cmt. h. Contract law policy deals primarily with the proper standards to be employed and the procedures for the fair interpretation of contracts, accounting for the intentions of the parties involved. Tort law policies, on the other hand, regulate the standards and procedures used to determine [*44] liability, fix compensation, and deter tortious conduct. In the case at bar, the sole interest Pennsylvania would have in applying its contract and tort law would be to compensate a plaintiff who resides within its borders. By contrast, as the site of contracting and the place where the alleged misrepresentations were made and received, New York has an interest not only in the means of interpreting the contract but also in the fashioning of any penalty that should be imposed by either the contract or tort system. Accordingly, the court concludes that New York law "will best achieve the basic . . . policies[] underlying the field[s] of law involved." Id.

**Certainty, predictability and uniformity of result.** This factor is important "in areas where the parties are likely to give advance thought to the legal consequences of their transactions" and parallels the concerns addressed by the first and fourth factors. Id. cmt. i. New York was the place of contracting and thus, as discussed above, the parties reasonably must have expected New York law to apply to any contract–based claims. Moreover, New York, as the locus of the dissemination and receipt of the allegedly fraudulent [*45] misrepresentations, could logically presume that its law would govern any tort–based claims.

Although it is not outside the realm of possibility that one might have considered the application of Pennsylvania law to the instant action, Pennsylvania's interests are relatively minor as compared to those of New York. Thus, under the circumstances, selection of New York law best promotes the values of certainty, predictability, and uniformity.

**Ease of determination and application.** The Restatement explains that "choice-of-law rules should be easy to apply" but that "it is obviously of greater importance that choice-of-law rules lead to desirable results." Id. cmt. j. For the foregoing reasons, application of New York law will lead to the most "desirable results" because such is in accord with the parties' reasonable expectations as well as general contract and tort policies. Facilitation of interstate commercial transactions is thereby promoted.

Since the factual analyses required by sections § 148 and 188 and the policy considerations of § 6 indicate that application of New York law is required, the court concludes that New York law applies to the merits of this action.

**[*46] IV. STANDARD OF REVIEW**

A court shall grant summary judgment only "when the admissible evidence fails to demonstrate a genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." *Wetzel v. Tucker, 139 F.3d 380, 383 n.2 (3d Cir. 1998)* (citing *Fed.R.Civ.P. 56(c)).* The moving party bears the burden of proving that no genuine issue of material fact exists. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)* (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita at 587 (quoting *Fed.R.Civ.P. 56(e)).* The court will "view the underlying facts and all reasonable inferences therefrom in the [*47] light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).* The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* If the nonmoving

party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).*

**V. DISCUSSION**

Having decided that New York applies to the instant action, the court will now address the issues raised by the parties, which will be resolved by applying New York law.

**A. Fraudulent Misrepresentation**

In his complaint, plaintiff alleges that Megrue and Karp, on behalf of defendants, misrepresented to him that, if he accepted the consulting position with SKM, he would be allowed [*48] investment opportunities and receive options in the portfolio companies. (D.I. 37, P 95) According to plaintiff, at the time the representations were made, Megrue and Karp had no intention of permitting him to co-invest or to receive options. (D.I. 37, P 96) Rather, these alleged misrepresentations solely were made to induce him to enter into a consulting arrangement with and to continue working for SKM. (D.I. 37, P 97) According to plaintiff, defendants were well aware that his work for SKM would necessitate the closing of his consulting business (which he eventually did) and that he would not do so unless he had the opportunity to co-invest and receive options in the portfolio companies. (D.I. 37, PP 98-99)

Plaintiff concedes that, under New York law, "a contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations." *Rocanova v. Equitable Life Assurance Soc'y of the United States, 83 N.Y.2d 603, 634 N.E.2d 940, 944, 612 N.Y.S.2d 339 (N.Y. 1994).* He argues, however, that what is at issue in the case at bar "is whether a cause of action for fraud may properly be sustained on the basis of an [*49] allegation that the defendant made a promise to perform under the express terms of the contract while intending not to abide by its terms." *Smehlik v. Athletes & Artists, Inc., 861 F. Supp. 1162, 1172 (W.D.N.Y. 1994).* On this issue, plaintiff contends, the New York courts are split.

To support his proposition, plaintiff relies on apparently conflicting decisions from the various departments of the New York Appellate Division. Compare *McKernin v. Fanny Farmer Candy Shops, Inc., 176 A.D.2d 233, 574 N.Y.S.2d 58, 59 (N.Y. App. Div. 2d Dept. 1991)* (stating that where a fraud claim "is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous

1998 U.S. Dist. LEXIS 19144, *49

to the terms of the parties' agreement, a cause of action sounding in fraud does not lie") and *Caniglia v. Chicago Tribune–New York News Syndicate, Inc., 204 A.D.2d 233, 612 N.Y.S.2d 146, 147 (N.Y. App. Div. 1st Dept. 1994)* (stating that "a cause of action does not arise[] where . . . the only fraud alleged merely relates to a contracting party's alleged intent to breach a contractual obligation") with *Shlang v. Bear's Estates Development of* [*50] *Smallwood, N.Y., Inc., 194 A.D.2d 914, 599 N.Y.S.2d 141, 143 (N.Y. App. Div. 3d Dept. 1993)* (stating that to sustain a claim for fraudulent inducement apart from a breach of contract claim "the misrepresentations alleged . . . must be misstatements of material fact or promises made with a present, albeit undisclosed, intent not to perform them").

Plaintiff also relies on a decision of the New York Court of Appeals, *Graubard Mollen Dannett & Horowitz v. Moskovitz, 86 N.Y.2d 112, 653 N.E.2d 1179, 629 N.Y.S.2d 1009 (N.Y. 1995),* which he contends is "fully supportive of the Third Department view." (D.I. 85 at 36) In *Graubard,* a law firm brought suit against a former partner alleging breach of his retirement agreement, pursuant to which the partners had agreed to "integrate, to the extent possible, relationships between the firm's clients and the other partners." *653 N.E.2d at 1181.* The firm also asserted a claim for fraud based on oral representations made by the former partner to the firm, prior to its approval of the retirement agreement, that he "would act to ensure the future of the firm by integrating and institutionalizing the clients when he never intended to do so and indeed [*51] was even considering the formation of a new partnership." Id. at 1184. In support of its decision permitting plaintiff to go forward with both the contract and fraud claims, the court stated that "[a] false statement of intention is sufficient to support an action for fraud, even where that statement relates to an agreement between the parties." Id. at 1184.

As plaintiff points out, courts which have considered *Graubard* have distinguished it, concluding not only that it has not changed the law in New York but also that it is consistent on its facts with the collateral promise rule. See, e.g., *Rays Trading (H.K.) Co. Ltd. v. Judy–Philippine, Inc., 1998 U.S. Dist. LEXIS 9702, No. 98 Civ. 0170 (JGK), 1998 WL 355422* at *3 (S.D.N.Y. July 2, 1998); *Int'l Cabletel Inc. v. Le Groupe Videotron Ltee, 978 F. Supp. 483, 486–90 (S.D.N.Y. 1997); Papa's–June Music, Inc., 921 F. Supp. at 1161–62; Big Apple Car, Inc. v. City of New York, 234 A.D.2d 136, 650 N.Y.S.2d 730, 732 (N.Y. App. Div. 1996).* According to these courts,

> any apparent tension between the two aforementioned principles of New York law has been reconciled through a rule, widely

adopted by the state and federal courts, pursuant [*52] to which a false promise can support a claim of fraud only where that promise was "collateral or extraneous" to the terms [of] an enforceable agreement in place between the parties.

*Int'l Cabletel Inc., 978 F. Supp. at 487;* accord *Rays Trading (H.K.) Co. Ltd., 1998 U.S. Dist. LEXIS 9702, 1998 WL 355422* at *2. These courts have surveyed the numerous decisions of the Appellate Division addressing this issue and have determined that the "overwhelming" majority view is "that a false promise, whenever made, cannot give rise to a fraud claim where that promise is directly incorporated into a written agreement between the parties." *Int'l Cabletel Inc., 978 F. Supp. at 489;* see also *Papa's–June Music, Inc., 921 F. Supp. at 1160–61; PI, Inc. v. Quality Prods., Inc., 907 F. Supp. 752, 760–62 (S.D.N.Y. 1995).*

Such an assessment appears to be consistent with a post–*Graubard* decision of the New York Court of Appeals. In *New York Univ. v. Continental Ins. Co., 87 N.Y.2d 308, 662 N.E.2d 763, 768–69, 639 N.Y.S.2d 283 (N.Y. 1995),* the court considered whether the insured could, along with its breach of contract claim, bring a claim of fraud in the inducement based upon the insurer's alleged [*53] false representations that it would evaluate the insured's claim in good faith. The court dismissed the insured's claim, reasoning that a covenant of good faith and fair dealing is implicit in every contract and, thus, "where . . . the complaint does not state the specific promises or omissions of material facts allegedly made by the insurer, it alleges nothing more than a breach of contract and any covenants implied; it does not allege a cause of action for fraud in the inducement." *662 N.E.2d at 769* ("General allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support the claim."); see also *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc., 98 F.3d 13, 19 (2d Cir. 1996)* (finding that intentionally false statements indicating defendant's intent to perform under the contract were insufficient to support a claim of fraud under New York law).

Under the circumstances at bar, therefore, to maintain a claim for fraud, plaintiff must demonstrate either: (1) a legal duty separate from the duty to perform under the contract; (2) a fraudulent misrepresentation collateral or extraneous to the contract; or (3) special damages [*54] that were proximately caused by the alleged misrepresentations and that are unrecoverable as contract damages. See *Bridgestone/Firestone, Inc., 98 F.3d at 20; Papa's–June Music, Inc., 921 F. Supp. at 1161.* Plaintiff's

1998 U.S. Dist. LEXIS 19144, *54

fraudulent misrepresentation claim meets none of these requirements. The gravamen of the claim is that defendants misrepresented that plaintiff would be afforded the opportunity to co–invest and receive options in the portfolio companies. n24 These promises were not collateral to the agreement but were memorialized as some of defendants' principle obligations under the contract. Thus, defendants' allegedly fraudulent statements cannot support the present cause of action. n25

> n24 Despite plaintiff's argument to the contrary, defendants' promise to create an option pool for each retail deal is not collateral to their contractual promise to grant plaintiff 25 to 40% of those options since the latter is contingent upon the former.

> n25 Plaintiff has not argued, nor can he, that he has pled special damages. Although he alleges that he closed his consulting business in reliance on defendants' alleged misrepresentations, plaintiff contends that defendants were well aware at the time of contracting that the terms of the arrangement would mandate such a result. Thus, any damages associated with the close of his business were reasonably foreseeable at the time of contracting and are not "special damages" under contract law.

[*55]

Even assuming arguendo that plaintiff need not demonstrate a promise collateral to the terms of his consulting agreement, the complaint still fails to state a cause of action. Other than conclusory allegations, there is nothing in the complaint or in any of the documentation submitted by plaintiff in opposition to defendants' motion for partial summary judgment from which a reasonable juror could conclude that when defendants made the alleged misrepresentations they were acting with fraudulent intent. n26 The mere fact that plaintiff was not always given the opportunity to co–invest or receive options is insufficient to demonstrate that defendants falsely stated their intentions. General allegations without more are insufficient to support plaintiff's claim.

> n26 As evidence of fraudulent intent, plaintiff points to the deposition testimony of Karp and Megrue, which indicates that they never intended to provide plaintiff the opportunity to invest in and receive options in **all** of the portfolio companies. According to their testimony, these individuals understood the consulting agreement to provide plaintiff with these opportunities only with respect to those portfolio companies in which he was going to play an active management role. Taken in context, therefore, these statements do not demonstrate

fraudulent intent.

[*56]

Accordingly, the court finds that plaintiff has failed to state a cause of action with respect to his fraudulent misrepresentation claim. Consequently, count II of the complaint shall be dismissed.

**B. Promissory Estoppel**

Count VI of the complaint contends that the same promises allegedly constituting the consulting agreement, i.e., that plaintiff would be entitled to co–invest and receive stock options in the portfolio companies, coupled with plaintiff's reliance, binds defendants on a theory of promissory estoppel. (D.I. 37, PP 1116–117). The doctrine of promissory estoppel is an equitable remedy "designed to enforce a contract in the interest of justice where some contract formation problem would otherwise prevent enforcement." *In re Gulf Oil/Cities Service Tender Offer Litig., 725 F. Supp. 712, 735 (S.D.N.Y. 1989).* Thus, it is applicable only in the absence of an enforceable contract; when an enforceable contract does exist, the parties cannot assert a claim for promissory estoppel based on promises that contradict the contract. n27 See id.; *NCC Sunday Inserts, Inc. v. World Color Press, Inc., 759 F. Supp. 1004, 1011 (S.D.N.Y. 1991).*

> n27 Defendants cite *Swerdloff v. Mobil Oil Corp., 74 A.D.2d 258, 427 N.Y.S.2d 266, 268–69 (N.Y. App. Div. 1980)* for the proposition that under New York law there are only two types of cases involving promissory estoppel: as a substitute for consideration and as a bar to the assertion of the Statute of Frauds. (D.I. 83 at 23–24) Review of the relevant case law reveals, however, that Swerdloff does not state accurately the current law on promissory estoppel in New York. See, e.g., *Ripple's of Clearview, Inc. v. Le Havre Assocs., 88 A.D.2d 120, 452 N.Y.S.2d 447 (2d Dept. 1982); Cyberchron Corp. v. Calldata Sys. Dev., Inc., 47 F.3d 39, 45–46 (2d Cir. 1995).*

[*57]

Under New York law, a claim for promissory estoppel requires a showing of: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance by the party to whom the promise is made; and (3) an injury sustained by the party asserting estoppel brought about by his reliance. See *Ripple's of Clearview, Inc. v. Le Havre Assocs., 88 A.D.2d 120, 452 N.Y.S.2d 447, 449 (N.Y. App. Div. 1982); Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 301 (2d Cir. 1996).* Furthermore, the injury

asserted must be "unconscionable," i.e., "injury beyond that which flows naturally (expectation damages) from the non–performance of the unenforceable agreement." See *Merex A.G. v. Fairchild Weston Sys., Inc., 29 F.3d 821, 826 (2d Cir. 1994)*; see also *Readco, Inc., 81 F.3d at 301*; *Marbax Assocs. Ltd. Partnership v. Resources Property Improvement Corp., 196 A.D.2d 727, 601 N.Y.S.2d 917, 917 (N.Y. App. Div. 1993); D & N Boening, Inc. v. Kirsch Beverages, Inc., 99 A.D.2d 522, 471 N.Y.S.2d 299, 302 (N.Y. App. Div. 1984)*. In the case at bar, the only injuries asserted by plaintiff are those suffered as a result of the nonperformance of the consulting agreement. These are not the [*58] type of injuries contemplated by New York law that would warrant application of the doctrine of promissory estoppel. See, e.g., *Philo Smith & Co., Inc. v. USLIFE Corp., 554 F.2d 34, 36 (2d Cir. 1977)* (finding that loss of fee was not "the sort of irremediable change in position normally associated with the doctrine of promissory estoppel"); *Celi v. Canadian Occidental Petroleum Ltd., 804 F. Supp. 465, 471 (E.D.N.Y. 1992)* (inducing an individual to leave his current employment through an offer of a different position and benefits does not constitute unconscionable injury); *Dalton v. Union Bank of Switzerland, 134 A.D.2d 174, 520 N.Y.S.2d 764, 766 (N.Y. App. Div. 1987)* ("The fact that defendant promised plaintiff employment at a certain salary with certain other benefits, which induced him to leave his former job and forego the possibility of other employment in order to remain with defendant, does not create a cause of action for promissory estoppel."). The court finds that the injuries alleged by plaintiff are not "unconscionable" as a matter of law. Thus, plaintiff has failed to state a claim for promissory estoppel under New York law. Accordingly, count VI shall be dismissed.

## [*59] VI. CONCLUSION

For the reasons stated above, the court finds that New York law applies to the merits of plaintiff's contract–and tort–based claims. The court further finds as a matter of law that, under New York law, counts II and VI of the complaint fail to set forth claims of fraudulent misrepresentation and promissory estoppel respectively. The court also finds defendants' request for summary judgment with respect to plaintiff's damages claims premature. n28 Therefore, defendants' motion shall be denied in part and granted in part. An appropriate order shall issue.

n28 Defendants also seek summary judgment with respect to plaintiff's petition for damages based on an "alleged 'two percent' agreement." (D.I. 82) To the extent that plaintiff's damages are based upon a contract whose existence and terms are still at issue, the court finds defendants' request premature. Accordingly, the court shall deny defendants' motion in this regard.