# EXHIBIT G



Not Reported in B.R. Page 1
Not Reported in B.R., 2003 WL 22399581
**(Cite as: Not Reported in B.R.)**

Not Reported in B.R., 2003 WL 22399581
Only the Westlaw citation is currently available.
United States Bankruptcy Court,M.D. North Carolina.
In re: VENDSOUTH, INC., Debtor.
William O. MOSELEY, Jr., Trustee for Vendsouth, Inc., Plaintiff,
v.
Terrance F. ARTH, Judy Ann Arth, Mark Sylvester and Branch Banking & Trust Company, Defendants.
**No. 00-10112C-7G, ADV. 01-2016.**

Oct. 10, 2003.

Phillip E. Bolton, Greensboro, NC, for Debtor.
William O. Moseley, Jr., Greensboro, NC, for Trustee.

*MEMORANDUM OPINION*

STOCKS , Bankruptcy J.
**\*1** This adversary proceeding came before the court on August 6, 2002, for hearing upon motions for summary judgment filed by the plaintiff and defendant Branch Banking & Trust Company ("BB & T"). The plaintiff's motion is for partial summary judgment as to his preference claim against BB & T. BB & T's motion is for summary judgment as to all claims alleged by the plaintiff. Edwin R. Gatton and Charles M. Ivey, III appeared on behalf of the plaintiff and D. Anderson Carmen and Walter W. Pitt appeared on behalf of BB & T. Having considered the motions, the materials submitted in support of and in opposition to the respective motions, the briefs filed by the parties and the arguments of counsel, the court finds and concludes as follows:

### JURISDICTION

The court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Middle District of North Carolina on August 15, 1984. The motions for summary judgment which are before the court are matters which this court may hear and determine.

### FACTUAL BACKGROUND

Vendsouth, Inc. ("Vendsouth"), the Debtor, was a wholesale distributor of foods, primarily snack foods, for sale in vending machines. Vendsouth was wholly owned either by Terrance Arth or by Terrance and Judy Arth. Terrance Arth was President of Vendsouth and Judy Arth, Terrance Arth's wife, served as the company's Secretary. Mark Sylvester was the company's Controller. Terrance Arth, Judy Arth and Mark Sylvester were the officers of Vendsouth ("Vendsouth Officers").

On May 21, 1997, Vendsouth and Lighthouse Financial Corp. ("Lighthouse") entered into a Loan and Security Agreement and Vendsouth signed a Demand Promissory Note in the amount of $1,000,000.00. This loan was secured by the inventory and accounts receivable of Vendsouth. Vendsouth initially established bank accounts at Centura Bank. Thereafter, in February of 1998, Vendsouth established three bank accounts at BB & T. Only two of the accounts were involved in the transactions giving rise to this proceeding, these being account no. 5211437903 (the "Operating Account") and account no. 5211437881 (the "Blocked Account"). In establishing these accounts, BB & T, Vendsouth and Lighthouse entered into an agreement entitled "Agreement Relating to Deposit Account" which related to the Blocked Account (the "Blocked Account Agreement"). The Blocked Account was to be used by Vendsouth to deposit the collections from its accounts receivable. Vendsouth was to inform Lighthouse of the amount of the deposits made into the Blocked Account. Lighthouse was then authorized to withdraw the deposits daily by a check drawn on the Blocked Account. Lighthouse was authorized to withdraw the entire amount deposited in the account without regard to whether the funds had been collected. In effect, BB & T agreed to grant unlimited provisional credit to all checks deposited in the account. Thus, Lighthouse would clear the account by drawing a check on the account balance each day.

**\*2** Vendsouth and BB & T also arranged for a cash management service which allowed the Operating Account to be used as a controlled disbursement account. This service was one of several "treasury services" that BB & T offered its customers. By

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2003 WL 22399581
**(Cite as: Not Reported in B.R.)**

Page 2

accessing a computer system at BB & T, Vendsouth was able to determine, no later than 10:00 a.m. each day, the checks that would hit the Operating Account that day. Vendsouth could then communicate with Lighthouse and arrange for Lighthouse to wire transfer sufficient funds into the Operating Account so that all of the checks that would be presented that day would clear. As a result of the operation of the cash management service, any checks drawn on and presented for payment on the Operating Account after this information was provided to Vendsouth, which usually was no later than 10:00 a.m., would not clear until the following day. Thus, any such check drawn on the Operating Account and deposited in the Blocked Account would post on the Operating Account one day after the check was deposited in the Blocked Account and provisional credit had been granted. The result was a one-day float.

In July of 1998, approximately five months after Vendsouth opened the accounts at BB & T, Vendsouth began perpetuating loan fraud against Lighthouse. Such loan fraud involved Vendsouth reporting fictitious sales to Lighthouse in order to receive loan advances from Lighthouse greater than it was legitimately entitled to receive. Vendsouth furthered the fraud by also reporting to Lighthouse fictitious collections of nonexistent receivables. The Blocked Account had been established to receive payments from customers of Vendsouth, i.e., payments on legitimate accounts receivable, and Vendsouth initially used the Block Account for that purpose. However, in July of 1998, Vendsouth began depositing its own checks drawn on the Operating Account into the Blocked Account ("on us" checks). Thereafter, between July 13, 1998, and November of 1999, Vendsouth, on a daily basis, deposited checks into the Blocked Account which were payable to Vendsouth and drawn off the Vendsouth Operating Account. These checks, which greatly exceeded the actual funds in the Operating Account, were not payments on accounts receivable of Vendsouth and were not on their face payments on accounts receivable of Vendsouth. However, BB & T accepted them for deposit into the Blocked Account and gave immediate provisional credit based upon them. These deposits created the impression that Vendsouth was receiving payments from customers, causing Lighthouse to make advances based on the "deposits". Also, because of the one-day float, Vendsouth was able to obtain the new advances from Lighthouse to "cover" the "on us" checks before the checks posted to the Operating Account. The result was a kiting scheme involving a circular movement of funds in which Vendsouth was "borrowing" funds from BB & T to pay lighthouse (which occurred when BB & T paid the Lighthouse draws on the Blocked Account), and then borrowing from Lighthouse to repay BB & T (which occurred when Lighthouse wired funds into the Operating Account and those funds were used to cover the "on us" checks that had been deposited into the Blocked Account). This illicit scheme went undetected and continued with the amounts involved increasing as the scheme continued. During the period between July 1998 and November 1999, Vendsouth deposited in excess of 1,250 of these checks into the Blocked Account, aggregating in their total face amount in excess of $106,000,000.00. This scheme continued until BB & T caused its collapse on November 9, 1999.

**\*3** On Friday, November 5, 1999, Vendsouth deposited four "on us" checks, written and drawn on the Operating Account, into the Blocked Account. These were check numbers 10589, 10590, 10591 and 10592, which totaled in the aggregate $976,616.13. BB & T granted provisional credit based upon these checks and allowed Lighthouse to withdraw $986,431.95 from the Blocked Account pursuant to a check on the Blocked Account that had been issued by Lighthouse on November 4, 1999. Lighthouse then wired $895,000.00 into the Operating Account as a new advance to Vendsouth. This advance was used to cover four "on us" checks deposited prior to November 5, 1999, those checks being checks numbered 10584, 10585, 10586 and 10587 in a total amount of $899,462.35.

On Monday, November 8, 1999, Vendsouth deposited three "on us" checks, written and drawn on the Operating Account, into the Blocked Account. These were checks numbered 10610, 10611 and 10612, which totaled in the aggregate $850,570.17. However, on Monday, November 8, due to an apparent computer malfunction at BB & T, no information regarding which checks would clear the Operating Account that day was available and, therefore, Vendsouth was unable to determine how much money to request Lighthouse to wire into the Operating Account. BB & T informed Vendsouth to hold off and everything would double up on Tuesday, November 9. Thus, on Monday, November 8, 1999, Lighthouse did not make a wire transfer into the Operating Account and no checks cleared the Operating Account.

By the morning of Tuesday, November 9, 1999, Vendsouth had deposited, into the Blocked Account, seven "on us" checks totaling $1,827,186.20. These

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00165-JJF   Document 53-8   Filed 08/16/2005   Page 4 of 17

Not Reported in B.R.
Not Reported in B.R., 2003 WL 22399581
(Cite as: Not Reported in B.R.)

Page 3

seven checks consisted of the "on us" checks that had been deposited on November 5 and November 8. BB & T had granted provisional credit for all seven checks. BB & T had also decided to stop allowing the deposit of "on us" checks and to end Vendsouth's kiting. But, without a wire transfer from Lighthouse into the Operating Account there were insufficient funds available to allow the seven "on us" checks to clear.

On the morning of Tuesday, November 9, BB & T's computer system was again in operation and BB & T furnished to Vendsouth information about the checks that would clear the Operating Account that day. The figure furnished to Vendsouth consisted almost entirely of the $1,827,186.20 represented by the seven "on us" checks deposited on Friday, November 5 and Monday, November 8. In response to the information furnished by BB & T, Vendsouth requested Lighthouse to wire $1,977,000.00 into the Operating Account on November 9 at approximately 12:30 p.m., which Lighthouse did. Lighthouse then issued a check drawn on the Blocked Account in the amount of $1,986,718.08 and deposited it in its account at Bank of America.

BB & T used the $1,977,000.00 received from Lighthouse to fund the provisional credit that had been issued with respect to the seven "on us" checks deposited by Vendsouth on November 5 and 8 in the total amount of $1,827,186.20. Pursuant to the decision BB & T had earlier made to end the kite, BB & T refused to accept any further "on us" checks for deposit into the Blocked Account after November 8. Thus, at the end of the day on November 9, 1999, BB & T had no remaining risk from any provisional credit it had granted for "on us" checks and was issuing no further provisional credit for "on us" checks since it no longer was accepting any "on us" checks for deposit into the Blocked Account. On November 12, 1999, the check drawn by Lighthouse on the Blocked Account in the amount of $1,986,718.08 was returned "NSF" to Lighthouse.

*4 The check-kiting scheme was effectively terminated through BB & T's actions on November 9 and at that point BB & T retained no risk from the check kite while Lighthouse was now owed a substantial sum of money that it could not collect from Vendsouth's accounts at BB & T.

On January 19, 2000, Vendsouth filed a voluntary petition under Chapter 7 of the Bankruptcy Code and William O. Moseley, Jr., the plaintiff in this proceeding, was appointed Chapter 7 Trustee for Vendsouth. On March 8, 2001, the complaint in this adversary proceeding was filed, alleging six causes of action against BB & T. In the first cause of action the plaintiff alleges that BB & T received a preferential transfer when BB & T used the funds that were wire transferred into Vendsouth's Operating Account on November 9 to settle or fund provisional credit that earlier had been used when checks drawn on the Blocked Account were paid by BB & T. The remaining claims against BB & T are for (1) Breach of Contract, (2) Aiding and Abetting Breach of Fiduciary Duty, (3) Unfair and Deceptive Trade Practices, (4) Conversion, and (5) Conspiracy.

SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure which is incorporated into Rule 7056 of the Federal Rules of Bankruptcy Procedure, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). See also *In re Specialty Retail Concepts, Inc.* 108 B.R. 104, 106-07 (W.D.N.C.1989) ; *In re Caucus Distributors, Inc.* 83 B.R. 921, 926 (Bankr.E.D.Va.1988).

In order to carry this burden a plaintiff who is moving for summary judgment must show through affidavits, depositions or admissions all facts required to support each element of the claim and that none of those facts are disputed. *See* MOORE'S FEDERAL PRACTICE, § 56.13, p. 56-134 (3d ed.1998) (movant must make a prima facie case for summary judgment by establishing (1) the apparent absence of any genuine dispute of material fact and (2) movant's entitlement to judgment as a matter of law on the basis of the undisputed facts). In determining whether the evidence is sufficient to establish the claim, the evidence must be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *See In re Graham,* 94 B.R. 386, 388 (Bankr.E.D.Pa.1988) ; *In re Trauger,* 101 B.R. 378, 381 (Bankr.S.D.Fla.1989). However, the existence of a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R. Page 4
Not Reported in B.R., 2003 WL 22399581
**(Cite as: Not Reported in B.R.)**

factual dispute is material and precludes summary judgment only if the disputed fact is determinative of the outcome under applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion, and also must identify those portions of the record that it believes demonstrates the absence of a genuine issue of material fact. Only after the movant has sustained the initial burden of production does the burden shift to the nonmovant to show the court that there is a genuine issue for trial. However, once this is done, the opposing party must set forth the specific facts showing there is a genuine issue for trial. Only when the entire record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, can the court find there is no genuine issue for trial. *See In re Trauger*, 101 B.R. at 380, citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 2513, 89 L.Ed.2d 538 (1986). However, the "existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury [or judge in a nonjury case] could reasonably find for the plaintiff." *Harleysville Mutual Insurance Co. v. Packer*, 60 F.3d 1116, 1120 (4th Cir.1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 244 (1986).

DISCUSSION

I. THE PREFERENTIAL TRANSFER CLAIM.

*5 Plaintiff's first claim for relief is based upon § 547 of the Bankruptcy Code. The plaintiff contends that BB & T received a preferential transfer when BB & T used the funds that were wire transferred into Vendsouth's Operating Account on November 9 to cover the "on us" checks and thereby fund provisional credit that had been utilized by Vendsouth when checks written on the Blocked Account earlier were paid by BB & T.

Section 547, in relevant part, provides:
  (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property-
  (1) to or for the benefit of a creditor;
  (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
  (3) made while the debtor was insolvent;
  (4) made-
  (A) on or within 90 days before the date of the filing of the petition ...
  (5) that enables such creditor to receive more than such creditor would receive if-
  (A) the case were a case under chapter 7 of this title.
  (B) the transfer had not been made; and
  (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

By its terms, § 547 is applicable where there has been a transfer of a property interest of the debtor which occurs under the circumstances enumerated in § 547. The property involved in plaintiff's preference claim consists of the funds that were transferred into Vendsouth's Operating Account on November 9. The origin of such funds was a $1,977,000.00 wire transfer from Lighthouse. Such transfer and deposit was the result of Lighthouse having made a loan advance to Vendsouth. Although the funds came from Lighthouse, once the loan advance was made by Lighthouse the resulting loan proceeds belonged to Vendsouth. Once the loan was approved, Vendsouth had the right to control where and in what manner the loan proceeds were distributed or paid. The loan advance on November 9 was not requested nor made on condition that it be used to pay BB & T or any other creditor of Vendsouth. Hence, when the funds that were wired to the Operating Account on November 9 were used by BB & T to cover "on us" checks and resolve provisional credit that had been extended by BB & T and used by Vendsouth, there was a "transfer of an interest of the debtor in property" for purposes of § 547. *See Matter of Smith*, 966 F.2d 1527, 1533 (7th Cir.1992) (a "transfer of borrowed funds is a preferential transfer of the debtor's property under § 547(b), assuming the other elements of that section are met"); *In re Bohlen Enterprises, Ltd.*, 859 F.2d 561, 567 (8th Cir.1988) ; *Smyth v. Kaufman (In re J.B. Koplik & Co.)*, 114 F.2d 40, 42 (2d Cir.1940). It also seems clear that there was a transfer of such funds to BB & T after Lighthouse wire transferred the $1,977,000.00 into the Operating Account. Such transfer occurred when BB & T caused the funds to be transferred from the Operating Account to BB & T in order to settle the provisional credit that previously had been extended when Vendsouth deposited the seven "on us" checks into the Blocked Account.

*6 Two of the other elements under § 547 are not in dispute. The parties do not dispute that Vendsouth was insolvent on November 9, nor is there any dispute regarding the fact that the November 9 transaction giving rise to the preference claim

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

occurred within 90 days of the filing of the petition. The issues which remain with respect to the claim under § 547 are whether the transfer to BB & T was on account of an antecedent debt and, if so, whether the transfer enabled BB & T to receive more than it would have in a Chapter 7 case and the transfer had not been made. These two issues are sharply contested.

1. Was There an Antecedent Debt?

A "debt" is defined in § 101(12) of the Bankruptcy Code as "liability on a claim." Section 101(5)(A) defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." "Congress intended to adopt the broadest available definition of [the term claim]." *Summit Financial Services, Inc. v. Bank of Newnan*, 240 B.R. 105, 112 (N.D.Ga.1999) (quoting *Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 558, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990)). Hence, if a "claim" exists for which the debtor is liable, there is a "debt" for purposes of bankruptcy law.

Whether a "claim" exists is determined, in the absence of overriding federal law, by reference to state law. *See Grogan v. Garner*, 498 U.S. 279, 283-84, 111 S.Ct. 654, 657-58, 112 L.Ed.2d 755 (1991). In this case, North Carolina law is the relevant state law. Ordinarily, under North Carolina law, when a company makes a deposit into its bank account the bank becomes the debtor of the company for the amount of money deposited. *See Lipe v. Guilford Nat'l Bank*, 236 N.C. 328, 330-31, 72 S.E.2d 759, 761 (1952). If the deposit consists of a check drawn on another bank, the depositary bank may grant its customer provisional credit while the check proceeds through the collection process. Under what circumstances does the relationship between the depositary bank and its customer change such that the bank becomes a creditor of the customer to whose account the provisional credit was granted? This is an issue that apparently has not been addressed by the courts in North Carolina. The opinions from the courts that have considered the issue suggest that there are three events after a customer deposits a check at a bank that may cause the relationship between a bank and its customer to become one where the customer becomes a debtor of the bank. The three events are (1) when the bank extends provisional credit to the customer based upon the deposited check, (2) when the customer draws upon the provisional credit or (3) only after the bank dishonors the check. The plaintiff contends that the controlling event is the second event, while BB & T contends that the third event is the earliest point at which the customer may become a debtor of the bank.

*7 The provisional crediting of deposited checks is authorized by the Uniform Commercial Code as adopted in North Carolina. *See* G.S. § § 25-4-201 and 25-4-212. These statutes permit a bank to extend provisional credit before the bank knows whether the deposited check will be paid when presented to the payor bank. However, the extension of provisional credit, like a line of credit or issuance of a credit card, provides nothing more than an opportunity for the customer to obtain funds from the bank. The customer does not owe the bank anything simply because provisional credit has been extended. Hence, it is widely accepted that the extension of provisional credit does not change the relationship between the bank and its customer and that no debt obligation is created by the mere extension of provisional credit by a bank. *See Laws v. United Missouri Bank of Kansas City*, 98 F.3d 1047, 1050 (8th Cir.1996) ; *Summit Financial Svcs. v. Bank of Newnan*, 240 B.R. 105, 114 (N.D.Ga.1999) ; *In re Frigitemp*, 34 B.R. 1000, 1015-16 (S.D.N.Y.1983) aff'd 753 F.2d 230 (2d Cir.1985) ; *McElmore v. Third National Bank in Nashville*, 123 B.R. 801, 810-11 (M.D.Tenn.1991). The court agrees with these decisions and concludes that no debt was created in the present case merely because BB & T granted provisional credit when the seven "on us" checks were deposited into the Blocked Account.

The second event that can lead to the creation of a debt owed by the customer to the bank is when the customer draws upon the provisional credit extended by the bank. Although there is a split in the cases regarding the effect of a customer drawing upon provisional credit granted by a bank, the court has concluded that the better view is that a debt arises when the customer draws upon the provisional credit. It is "the use of provisional credit [that] reverses the ordinary debtor/creditor relationship between a bank and its depositor." *McElmore*, 123 B.R. at 811; *see also Summit Financial Svcs.*, 240 B.R. at 115. When a customer draws upon provisional credit, the customer becomes obligated to the bank to pay the amount advanced by the bank as a result of the use of the provisional credit. In the normal course of events the check that was deposited and was the source upon which the bank granted the provisional credit will

Not Reported in B.R.
Not Reported in B.R., 2003 WL 22399581
**(Cite as: Not Reported in B.R.)**

clear and any provisional credit drawn upon will be paid off from the funds collected by the bank and deposited in the customer's account. However, if the check does not clear and is returned unpaid, the customer must repay the bank for any provisional credit drawn upon. Thus, once a customer draws upon provisional credit, the customer owes the bank a debt that must be repaid either by making the deposited check good or by depositing other funds sufficient to cover the funds drawn. In this case, BB & T had a claim against the Debtor at the point in time when the draws were made by Lighthouse against the provisional credit extended by BB & T when the seven "on us" checks earlier were deposited in the Blocked Account. Because Vendsouth (through Lighthouse) made draws on provisional credit resulting from the deposit of the "on us" checks, a pre-petition debt was owed to BB & T when the $1,977,000.00 was deposited in the Operating Account. Thus, for purposes of § 547(b)(2), BB & T was owed an "antecedent debt" when the wire transfer into the Operating Account was made on November 9.

**\*8** The court does not accept BB & T's argument that a debt can arise only after a bank dishonors a check for which provisional credit was extended and is not willing to follow the cases which support BB & T's argument. See _Laws v. United Missouri Bank of Kansas City_, 98 F.3d 1047, 1051 (8th Cir.1996) (concluding that banks do not behave as if they have a right to collect on provisional credit until the deposit has been dishonored and thus a debt is not created until the bank dishonors the deposit and seeks to collect any provisional credit drawn upon); _In re Spring Grove Livestock Exchange, Inc._, 205 B.R. 149 (Bankr.D.Minn.1997). Moreover, even if the court followed the decision in the _Laws_ case, BB & T would not be entitled to summary judgment with respect to the preference claim. In _Laws_ the court concluded that _"routine_ advances against uncollected deposits do not create a 'debt' to the bank." _Laws_, 98 F.2d at 1051 (Emphasis supplied). The court reasoned that a contrary rule would be inconsistent with "the strong federal policy in favor of expedited funds availability" and "might cause banks to terminate a service that is invaluable in today's economy." _Id_. The court then observed that the advances in _Laws_ were not advances that a bank routinely makes available and that the bank therefore was not entitled to summary judgment. _Id_. at 1051-52. After becoming aware of the negative collected funds balances, the bank in _Laws_ gave the debtor the option of eliminating the negative balances or paying interest on the negative balances. _Id_. at 1051. The court observed that had there been an explicit agreement to treat the negative collected funds as loans, such an agreement clearly would give rise to a debt for purposes of § 547. _Id_. at 1052. The court then held that whether such an agreement could be implied from the arrangement for the debtor to pay interest on the negative collected funds balances was "a disputed issue of material fact" which precluded the granting of summary judgment. _Id_. Likewise, there is evidence in the record in the present case that is sufficient to raise a factual issue as to an implied agreement to treat the negative collected funds balances related to the Blocked Account as loans. In the first instance, the advances against uncollected funds giving rise to the negative balances were not in any sense routine. Instead, the advances were made pursuant to the Blocked Account Agreement which was a non-standard agreement with Vendsouth and Lighthouse which significantly changed BB & T's routine practices regarding advances against uncollected funds. Under the Blocked Account Agreement BB & T agreed that Lighthouse could withdraw funds on a daily basis in an amount which was the total of deposits each banking day regardless of whether such deposits represented collected funds. It is a reasonable inference from the evidence that BB & T knew from the outset that such an agreement likely would give rise to negative balances which proved to be the case during the continuation of the agreement. The Blocked Account Agreement itself provided that the relationship between BB & T and Vendsouth under the agreement was "a debtor/creditor relationship." Under the Blocked Account Agreement, BB & T collected "account analysis charges" on transfers of uncollected balances as payment "for the use of said funds." These "charges" were based upon the prime rate of interest charged by BB & T on loans and the "charges" were computed by applying the interest rate against the negative balances in the same manner that an interest rate would be applied against a loan balance in order to compute the amount of interest owed by the customer. Taken in the light most favorable to the plaintiff, which is required in determining whether BB & T is entitled to summary judgment, these circumstances are sufficient to raise a disputed issue of material fact as to whether there was an express or implied agreement to treat the negative balances resulting from implementation of the Blocked Account Agreement as loans.

**\*9** Because the controlling factor in determining whether a debt to BB & T existed is whether Vendsouth drew upon the provisional credit that was extended by BB & T, and since it is undisputed that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2003 WL 22399581
**(Cite as: Not Reported in B.R.)**

Page 7

such draws were made, the court concludes that for purposes of § 547(b)(2), an "antecedent debt" was owed to BB & T prior to the wire transfer on November 9. Having concluded that an "antecedent debt" existed, the court further concludes that the use of the funds that were wired to the Operating Account to cover the seven "on us" checks and satisfy the provisional credit obligation of Vendsouth constituted a transfer of an interest in property of the debtor to or for the benefit of BB & T for purposes of § 547 of the Bankruptcy Code.

2. Did the Transfer Enable BB & T to Receive More than It Would Have in a Case Under Chapter 7 If the Transfer Had Not Been Made?

BB & T argues that it did not receive more than it would have under Chapter 7 because it had a security interest in the "kited checks" pursuant to G.S. § 25-4-208. This provision from Article 4 of the UCC provides:
   (a) A *collecting bank* has a security interest in an item and any accompanying documents or the proceeds of either:
   (1) In case of an item deposited in an account, to the extent to which credit given for the item has been withdrawn or applied;
   (2) In case of an item for which it has given credit available for withdrawal as of right, to the extent of the credit given, whether or not the credit is drawn upon or there is a right of charge-back; or
   (3) If it makes an advance on or against the item.
(Emphasis added). Under this provision, a "collecting bank" may acquire a security interest in a deposited item that is not honored by the payor bank. BB & T contends that it was a "collecting bank" with respect to the seven "on us" checks and therefore had a security interest in the "on us" checks. The court disagrees. The definition of a "collecting bank" and the other banks involved in the collection process is contained in G.S. § 25-4-105, which provides as follows:
   In this Article:
   ...
   (2) "Depositary bank" means the first bank to take an item even though it is also the payor bank, unless the item is presented for immediate payment over the counter.
   (3) "Payor bank" means a bank that is the drawee of a draft.
   ...
   (4) "Collecting bank" means a bank handling an item for collection *except the payor bank*.
(Emphasis supplied).

BB & T argues that G.S. § 25-4-105 allows a bank to be classified as both a "collecting bank" and a "payor bank" because the definitions allow such multiple classifications for a single bank. BB & T points to the definition of a "depositary bank" which permits a bank to be a "depositary bank" even though it is also a "payor bank." However, contrary to BB & T's assertion, the statutory definitions do not permit a bank to be a "collecting bank" and a "payor bank." *Id.* While the definition of a "depositary bank" allows a bank to be a "depositary bank" even though the bank is also a "payor bank," the definitions of "intermediary bank," "presenting bank" and "collecting bank," except from their definitions any bank that is also a "payor bank." G.S. § 25-4-105. To accept BB & T's position that a bank can be a "payor bank" and a "collecting bank" would require the court to ignore the plain language of G.S. § 25-4-105(4) and render meaningless the language, "except the payor bank" in that definition. The court is not willing to ignore the plain language of the statue and alter the definition of "collecting bank" by ignoring a part of the definition.

*10 Furthermore, Comment 3 to G.S. § 25-4-105 further undermines BB & T's position. "A bank that takes an 'on us' item for collection, for application to a customer's loan, or first handles the item for other reasons is a depositary bank even though it is also the payor bank." G.S. § 25-4-105, Comment 3. When a check is deposited in an account at the same bank on which the check was drawn, the bank is both a depositary and a payor bank, and because "the code specifically defines a collecting bank as any bank handling an item for collection except a payor bank[,][t]he bank ... cannot claim defenses available to a collecting bank." *Sunshine v. Bankers Trust Co.*, 34 N.Y.2d 404, 408, 358 N.Y.S.2d 113, 314 N.E.2d 860 (1974). Thus, when a bank takes an "on us" item for collection, the bank is considered a "payor bank" and not a "collecting bank" and cannot claim any defenses, such as the security interest BB & T has attempted to claim, that are only allowed to a collecting bank.

In language that is clear and unambiguous, G.S. § 25-4-105(3) provides that a bank is a "payor bank" if the bank is the "drawee of the draft." In this case, it is undisputed that BB & T was the drawee of the "on us" checks. Thus, BB & T was the "payor bank" with respect to the "on us" checks. A "collecting bank" is a bank handling the checks for collection "except the payor bank." Since BB & T was the "payor bank," BB & T does not qualify as a "collecting bank" and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2003 WL 22399581
**(Cite as: Not Reported in B.R.)**

Page 8

therefore cannot invoke G.S. § 25-4-208 in order to acquire a security interest in the "on us" checks.

BB & T argues that each BB & T branch involved in the check kiting scheme should be treated as a separate bank when applying the definitions found in Article 4 of the UCC. BB & T contends that if each branch is treated as a separate bank then BB & T is a "collecting bank" as to the Blocked Account where the kited checks were deposited and the funds were withdrawn by Lighthouse, and a "payor bank" as to the Operating Account, the account on which the checks were drawn and ultimately paid from.

BB & T first argues that G.S. § 25-4-106 provides for separate branches of the same bank to be treated as separate banks. BB & T maintains that since the checks were deposited into the Blocked Account at the Jamestown and Airpark branches, but the Vendsouth accounts were housed at the Skeet Club Road branch, that BB & T could be both a "collecting bank" as to the Jamestown and Airpark branches and a "payor bank" as to the Skeet Club Road branch. Contrary to BB & T's assertion G.S. § 25-4-106 does not allow for different classification of the branches in this case. Under G.S. § 25-4-106, "[a] branch or separate office of a bank is a separate bank for purposes of computing the time within which and determining the place at which action may be taken or to which notices or orders must be given under this Article and under Article 3." This language does not provide for individual branches of a bank to be treated as separate banks for all purposes. The individual branches are treated as separate banks only for purposes of timing and location of specific actions, notices and orders that must take place. The individual branches are not treated as separate banks for determining the classification of the bank in the collections process and whether a security interest was created. The Comment to this section further evidences the limited scope of this provision. "Warranties by one branch to another branch under Sections 4-207 and 4-208 (each considered as a separate bank) do not make sense." G.S. § 25-4-106, Uniform Commercial Code, Comment 3.

*11 Assuming that it is not desirable to make each branch a separate bank for all purposes, this section provides that a branch or separate office is a separate bank for certain purposes. In so doing the single legal entity of the bank as a whole is preserved, thereby carrying with it the liability of the institution as a whole on such obligations as it may be under. On the other hand, in cases in which the Article provides a number of time limits for different types of action by banks, if a branch functions as a separate bank, it should have the time limits available to a separate bank.

G.S. § 25-4-106, Comment 4. Thus, the plain language of the statute and the Comments do not permit treatment of individual branches as separate banks for classification purposes in the collection process as it relates to the creation of a security interest under G.S. § 25-4-208.

The cases relied upon by BB & T do not support BB & T's position for a broader reading that would allow BB & T to be both the "payor bank" at one branch and the "collecting bank" at another bank. The only case that provides a broader reading of this section is *Lawrence v. Bank of America,* 163 Cal.App.3d 431, 209 Cal.Rptr. 541 (1985). However that case is distinguishable. First, the California version of the Uniform Commercial Code at the time the case was decided was different from North Carolina's version of Article 4. The California version of § 4-105 had an additional subdivision (g) which provided, "[e]ach branch or separate office of a bank shall be deemed a separate bank for the purpose of the definitions in this section." *Id.* at 434-35, 209 Cal.Rptr. 541. California's version of § 4-106 was also different from North Carolina's version in that it provided that, "receipt of any notice or order by, or the knowledge of, one branch or separate office of a bank is not actual or constructive notice to or knowledge of any other branch or separate office of the same bank and does not impair the right of such other branch or separate office to be a holder in due course of an item." *Id.* at 435, 209 Cal.Rptr. 541. The Comment concerning this addition explains why this additional subdivision was added, "[t]his section is of special importance in California because of the prevalence of branch banking. In many other states branch banking is prohibited." *Id.* at 435, 209 Cal.Rptr. 541. Thus, although the court in *Lawrence* treated separate branches of a bank as separate banks, it did so because of statutory language which is different from the North Carolina statutes and which provided for a much broader definition of when branches of a bank are to be deemed separate banks. Unlike California, the North Carolina version of Article 4 which is applicable in this case does not include a provision that "[e]ach branch or separate office of a bank shall be deemed a separate bank for the purpose of the definitions in this section." North Carolina provides for treatment of separate branches as individual banks only for the limited purposes listed in § 25-4-106, none of which is applicable in this case. Accordingly, the individual branches of BB & T cannot be treated as separate banks for purposes of determining whether a security interest was acquired by BB & T

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2003 WL 22399581
(Cite as: Not Reported in B.R.)

Page 9

pursuant to G.S. § 25-4-208. Therefore, since BB & T does not meet the definition of a "collecting bank", BB & T may not invoke the provisions of G.S. § 25-4-208 and therefore did not acquire a security interest in the "on us" checks pursuant to that provision of Article 4.

*12 Nor did BB & T acquire a security interest pursuant to the common law banker's lien. The common law banker's lien is a possessory lien on tangible property such as commercial paper or securities that are deposited with a bank. See Goggin v. Bank of America, 183 F.2d 322, 324-327 (9th Cir.1950) ("a banker has a general lien upon all the securities in his hands belonging to any particular person for his general balance"). The security interest asserted by BB & T does not involve a lien upon tangible property and hence finds no support in the common law.

BB & T's final argument that it did not receive more than it would have received in a Chapter 7 case is that any antecedent debt owed BB & T would be a secured claim under § 506 of the Bankruptcy Code because BB & T had the right to setoff any such debt by the balance in the Operating Account. However, the ability of a creditor to setoff a mutual debt by the creditor to a debtor is subject to the provisions of § 553 of the Bankruptcy Code. Thus, in order to prevail on the basis of setoff, BB & T must establish that it has a right of setoff under non-bankruptcy law and that such right is preserved under § 553. Subsection (a)(3) of § 553 precludes a setoff where the debt owed by the creditor was incurred for the purpose of obtaining a right of setoff against the debtor. The effect of this provision is that a bank's setoff rights apply only to deposits made in good faith, made in the due course of business and subject to withdrawal at the will of the depositor. Setoff cannot be exercised where a deposit is accepted by a bank pursuant to a pre-conceived plan to apply it on a pre-existing claim against the depositor. See PRS Prods., Inc. v. Mandan Security Bank, 574 F.2d 414 (8th Cir.1978) ; In re Kitrell, 115 B.R. 873 (Bankr.M.D.N.C.1990) ; In re T & T Parts Warehouse, Inc., 39 B.R. 399 (Bankr.W.D.Mich.1984) ; In re Dutton, 15 B.R. 318 (Bankr.N.J.1982). In the present case, the evidence is sufficient to support a finding that BB & T was fully aware of the "on us" check scheme and kite and that Vendsouth was perpetuating loan fraud no later than Monday, November 8; that BB & T was fully aware of the pattern of deposits by Vendsouth and the wires by Lighthouse, including the timing of such deposits; that on Tuesday morning, November 9, with full knowledge of an existing, ongoing kite and fraud, BB & T notified Vendsouth by computer of the amount of funds Vendsouth needed to deposit into its operating account to cover checks that would post on November 9; that BB & T was fully aware that seven of the checks which it notified Vendsouth would post were kited checks on which BB & T had previously made payment in an amount in excess of $1,800,000.00; that BB & T transmitted such information to Vendsouth with the knowledge that Vendsouth would use such information in order to induce Lighthouse to wire funds into the Operating Account in order that BB & T could gain access to the funds; and that BB & T already had a plan in place to use the wired funds to cover the obligation of Vendsouth which had resulted from Vendsouth's use of provisional credit. Considered in the light most favorable to the plaintiff, the evidence is sufficient to raise an issue for the trier of fact as to whether the "debt" that was incurred by BB & T accepting the wire transfer as a deposit was incurred for the purpose of obtaining the right of setoff that BB & T claims it is entitled to assert. Additionally, there are issues to be resolved at trial related to the "perpetually fluctuating ebbs and flows" of the Vendsouth accounts and the extent to which any right of setoff available to BB & T would be reduced by application of § 553(b). See Pereira v. United Jersey Bank, 201 B.R. 644, 663 (S.D.N.Y.1996). The result is that there are issues of fact as to whether BB & T is entitled to claim the status of a secured creditor based upon the right of setoff. Hence, it cannot be concluded as a matter of law that BB & T received more than it would have received in a Chapter 7 case. The plaintiff therefore is not entitled to summary judgment on the preference claim. Nor is BB & T entitled to summary judgment on the preference claim. Instead, the preference claim must proceed to trial where the only issues remaining for determination will be the issues related to setoff.

*13 Remaining for determination is BB & T's motion for summary judgment as to the plaintiff's claims for breach of contract, aiding and abetting a breach of fiduciary duty, unfair or deceptive trade practice, conspiracy to defraud and conversion.

II. THE BREACH OF CONTRACT CLAIM.

In the breach of contract claim the plaintiff alleges that BB & T breached the Blocked Account Agreement. The principal allegation is that BB & T had a duty under the contract to refuse to accept the "on us" checks and thereby prevent Vendsouth from

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                                                          Page 10
Not Reported in B.R., 2003 WL 22399581
(Cite as: Not Reported in B.R.)

depositing such checks into the Blocked Account. According to the plaintiff, such duty was breached when BB & T permitted Vendsouth to make numerous deposits of "on us" checks which drove Vendsouth into "spiraling, ever-increasing indebtedness" and led to the eventual insolvency and bankruptcy of Vendsouth. BB & T denies that it had any duty under the Blocked Account Agreement to refuse to accept the "on us" checks. Even if such duty existed, BB & T asserts that a breach of contract claim by Vendsouth would be barred because the deposit of the "on us" checks constituted a breach of contract by Vendsouth and also because the doctrine of *in pari delicto* would bar any recovery by Vendsouth. Since the plaintiff stands in the shoes of Vendsouth in asserting a contract claim, BB & T argues that the plaintiff likewise is barred from any recovery on the contract claim.

The terms of the Blocked Account Agreement must be examined in order to determine the nature and extent of the duties of BB & T with regard to the Blocked Account. Generally speaking, a "blocked" account is one in which the owner of the account makes deposits into the account for the benefit of another party, with the owner of the account agreeing that withdrawals from the account will be made by that party rather than the owner of the account. The Blocked Account Agreement in this case is such an agreement. However, it was not prepared on a standard bank form, but instead was negotiated by the parties. In the first paragraph of the Agreement, there is an acknowledgment that Vendsouth had granted a security interest in its accounts receivable to Lighthouse and had agreed to deposit its accounts receivable remittances into the account to be opened under the Blocked Account Agreement. The next sentence of the agreement states the purpose of the Agreement. According to this provision, BB & T, Lighthouse and Vendsouth were entering into the Agreement in order "to provide for the disposition of net proceeds from checks which are to be deposited to [Lighthouse's] account in [the Blocked Account]." Clearly, the "checks" referred to in this provision are checks from Vendsouth's customers in payment of the accounts receivable of Vendsouth and the intent of the parties was "to provide for" the disposition of the proceeds from such checks to Lighthouse via the Blocked Account. Pursuant to paragraph 1(d), the method for the "disposition" of proceeds that was agreed upon was by means of a check drawn on the Blocked Account "on a daily basis [for] the total amount of *such deposits* each banking day." This reference to "such deposits" also is a reference to deposits of remittance checks from customers of Vendsouth, the only kind of deposits previously referred to in the Agreement. BB & T's role under the Blocked Account Agreement is described as being "an item processor and not an auditor." However, the Agreement does not contain any definition for either "item processor" or "auditor" but does provide that BB & T is "to perform the services agreed upon and to furnish the required reports and other forms in accordance with the processing schedule, exercising the same degree of care used in processing items and data and in compiling reports for its own use." The parties are in sharp disagreement regarding the meaning and effect of this language and have widely divergent views regarding the nature and extent of the "services agreed upon", regarding what constitutes "the required reports and other forms" and regarding what is required of BB & T in exercising "the same degree of care used in processing items and data and in compiling reports for its own use."

*14 If a contract is clearly expressed and without ambiguity, it must be interpreted and enforced as written. Whether the language of a contract is ambiguous or unambiguous is a question of law to be determined by the court. See <u>Anderson v. Anderson, 145 N.C.App. 453, 458, 550 S.E.2d 266, 269-70 (2001)</u>. In making this determination, all of the terms of the agreement should be considered and the words used in the contract should be given their usual and ordinary meaning. *Id.* Having made such a review and evaluation of the Blocked Account Agreement, including the above-quoted language, the court has concluded that the Blocked Account Agreement is ambiguous because it is fairly and reasonably susceptible to various constructions and leaves uncertainty as to exactly what was agreed upon by the parties. See <u>Dockery v. Quality Plastic Custom Molding, Inc., 144 N.C.App. 419, 422, 547 S.E.2d 850, 852 (2001)</u>; <u>Barrett Kays & Associates, P.A. v. Colonial Bldg. Co., Inc., 129 N.C.App. 525, 528, 500 S.E.2d 108, 111 (1998)</u>; <u>Drye v. Nationwide Mut. Ins. Co., 126 N.C.App. 811, 813-14, 487 S.E.2d 148, 149-50 (1997)</u>. Where a contract is ambiguous, the interpretation and meaning of the contract becomes a question for determination by the trier of fact. See <u>Robinson, Bradshaw & Hinson v. Smith, 129 N.C.App. 305, 498 S.E.2d 841 (1998)</u>; <u>Lewis v. Carolina Squire, Inc., 91 N.C.App. 588, 372 S.E.2d 882 (1988)</u>; <u>Joyner v. Adams, 87 N.C.App. 570, 361 S.E.2d 902 (1987)</u>. It follows that summary judgment may not be entered with respect to what was required of BB & T regarding the "on us" checks that were deposited in the Blocked Account. That matter may be determined only by the trier of fact after considering the evidence regarding the intent of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R. Page 11
Not Reported in B.R., 2003 WL 22399581
**(Cite as: Not Reported in B.R.)**

parties and any other competent evidence. Moreover, good faith and fair dealing is required of all parties to a contract which imposes a duty on each party to a contract to do everything that the contract presupposes that such party will do in order to accomplish its purpose. See _Ultra Innovations v. Food Lion_, 130 N.C.App. 315, 318, 502 S.E.2d 685 (1998) ; _Weyerhaeuser Co. v. Godwin Building Supply Co., Inc._, 40 N.C.App. 743, 746, 253 S.E.2d 625 (1979). The impact of this principle likewise is a matter which must await the resolution of the disputed factual matters at the trial of this proceeding.

Another argument by BB & T is that the fraudulent conduct of the Vendsouth Officers is imputed to Vendsouth and thus to the plaintiff as Chapter 7 trustee such that as a matter of law the plaintiff cannot prevail on a cause of action for breach of contract. BB & T correctly points out that when a bankruptcy trustee proceeds under § 541 to pursue a pre-petition claim possessed by the debtor and is not proceeding under his bankruptcy avoiding powers, the trustee stands in the shoes of the debtor and may not prevail if the debtor could not have prevailed on the claim. See _In re Hedged-Investments Assoc., Inc._, 84 F.3d 1281, 1285 n. 6 (10th Cir.1996) ; _In re Ostrom-Mann, Inc._, 188 B.R. 245, 251 (C.D.Ill.1995).

**\*15** North Carolina law recognizes the general principle that the knowledge of a corporate officer or agent obtained in his capacity as officer or agent is imputed to the corporation. See _Whitten v. Bob King's AMC/Jeep, Inc._, 292 N.C. 84, 91, 231 S.E.2d 891, 895 (1977). North Carolina also recognizes the doctrine of _in pari delicto_ which is a legal defense that "deals generally with parties whose equal, mutual, and simultaneous fault casts them in the role of joint conspirators." _Food Lion, Inc. v. Capital Cities/ABC, Inc._, 951 F.Supp. 1233, 1235 (M.D.N.C.1996) (citing _Lawler v. Gilliam_, 569 F.2d 1283, 1292 (4th Cir.1978)). Thus, if the interests of the corporation and its officers or directors are clearly aligned with those of the corporation, the corporation is properly charged with the knowledge and actions of the individual officers or directors. See _Hice v. Hil-Mil, Inc._, 301 N.C. 647, 654, 273 S.E.2d 268, 272 (1981). However, an exception to this rule is the "adverse interest exception" which provides that a corporation is generally not chargeable with the knowledge of its officer or director concerning a transaction in which the officer or director is acting in his own behalf. _Id._

In the present case, there is evidence which would support a finding that the fraudulent conduct and alleged breach of contract in pursuing the check scheme involving the "on us" checks by Vendsouth's officers was not for the benefit of Vendsouth. The check kite increased the debt owed by Vendsouth and merely prolonged its existence well beyond its point of insolvency. Arguably, the actions of the Vendsouth Officers provided no benefit to Vendsouth or its creditors. A scheme by management to drive a company into greater debt and toward its ultimate financial ruin is not for the benefit of the corporation and tends to show that management's interests were not aligned with that of the company. See _In re Investors Funding Corp._, 523 F.Supp. 533, 541 (S.D.N.Y.1980). Although the check scheme extended Vendsouth's existence by maintaining a circular flow of money, this did not benefit Vendsouth. "A corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it." _Id_ . One inference that can be drawn from the evidence is that Vendsouth did not benefit from its continued existence; rather only Vendsouth's officers benefitted from its continued existence beyond the point of insolvency. See also _McHale v. Huff_, 109 B.R. 506, 512 (Bankr.S.D.Fla.1989) ("[a] corporation is damaged where its officers and directors fraudulently conceal its insolvency and allow the corporation to continue incurring more and more debt and become more and more insolvent."); _Schact v. Brown_, 711 F.2d 1343, 1350 (7th Cir.1983) (Prolonging the use of a corporation beyond its insolvency constitutes an injury to the insolvent corporation.). Taken as a whole and considered in the light most favorable to the plaintiff, the record reflects a material question of fact as to whether the acts of the Vendsouth Officers were for the benefit of Vendsouth such that the interests of the Vendsouth Officers and Vendsouth were aligned or whether the acts of the Officers were to the detriment of Vendsouth such that the knowledge and actions of the Vendsouth Officers should not be imputed to Vendsouth. Since there is evidence to support the adverse interest exception, a material issue of fact is presented which must be decided at trial rather than by a summary judgment.

**\*16** BB & T also contends that the plaintiff is barred from recovering on a contract claim by provisions in Paragraph 4 of the Blocked Account Agreement which preclude any liability on the part of BB & T. BB & T first points to a provision that provides that BB & T is "not liable to Lighthouse for any loss occasioned by Vendsouth's failure to adhere to its agreements with Lighthouse." This argument must fail because this action is to recover losses allegedly

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2003 WL 22399581
**(Cite as: Not Reported in B.R.)**

Page 12

sustained by Vendsouth, the borrower under the agreement, and not losses to Lighthouse. While Lighthouse may have suffered losses in the same fraudulent activities, the plaintiff is seeking to recover for Vendsouth's losses. Therefore, this provision is inapplicable and not relevant to the plaintiff's claim. The other provisions in paragraph 4 of the Blocked Account Agreement purport to relieve BB & T from liability resulting from a lack of ordinary care on the part of BB & T or purport to limit BB & T's liability to acts or omissions constituting wilful misconduct. These provisions must yield to G.S. § 25-4-103 which provides that "parties to the agreement cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure." Under this provision, BB & T cannot absolve itself of liability for its own failure to exercise ordinary care or its lack of good faith. Taken in the light most favorable to the plaintiff, the evidence is sufficient to raise a jury issue as to whether bank employees exercised ordinary, reasonable care regarding the Blocked Account and the fraudulent check scheme involving the "on us" checks. Additionally, the limitation in paragraph 4(c) only prevents liability if the claim is based on a failure to act that is caused by circumstances outside of BB & T's reasonable control. The plaintiff's evidence, when viewed in the light most favorable to the plaintiff, is sufficient to raise an issue of fact as to whether the claim and loss asserted by the plaintiff were caused by circumstances outside of BB & T's control. Thus, when the evidence is viewed in the light most favorable to the plaintiff, there is a material issue of fact as to whether the contractual limitations on liability operate to bar the plaintiff from recovering against BB & T for breach of the Blocked Account Agreement. Summary judgment for BB & T on the basis of such provisions therefore is not appropriate.

### III. CLAIM FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY.

North Carolina law recognizes a cause of action for aiding and abetting breach of fiduciary duty. *See Blow v. Shaughnessy*, 88 N.C.App. 484, 490-01, 364 S.E.2d 444, 447-48 (1988). The elements of the cause of action are: (i) the existence of a breach of a fiduciary duty by the primary party; (ii) knowledge of this violation by the aiding and abetting party; and (iii) substantial assistance by the aider and abettor in the breach of fiduciary duty by the primary party. *See id.* Plaintiff's evidence is sufficient to satisfy the requirement that there be a breach of a fiduciary duty by the primary parties in this case, the Vendsouth Officers. Such breach occurred when, in order to obtain credit from Lighthouse far in excess of that which was legitimately available, the Vendsouth Officers drew numerous large checks on the Operating Account. Such checks were deposited in the Blocked Account by the Vendsouth Officers in order to create the false appearance that Vendsouth was collecting far greater accounts receivable than actually existed and the Vendsouth Officers then used their knowledge of the one-day float in order to perpetuate the scheme. However, BB & T asserts that plaintiff has failed to produce evidence sufficient to create an issue of fact as to the second and third elements of the claim and that summary judgment therefore should be entered in its favor.

1. Knowledge of the breach of fiduciary duty.

**\*17** BB & T argues that the plaintiff must show that BB & T had actual knowledge of the violation of fiduciary duty as opposed to having only constructive knowledge of the violation. Although the North Carolina courts have not decided the issue of whether actual knowledge on the part of the aiding and abetting party is required, there is sound authority from outside of North Carolina to support BB & T's position. *See Kolbeck v. LIT America, Inc.*, 939 F.Supp. 240, 246 (S.D.N.Y.1996). In *Kolbeck*, the court specifically rejected the contention that constructive knowledge was sufficient to establish a claim for aiding and abetting a breach of fiduciary duty and held that actual knowledge must be shown. *Id.* at 247. In so holding, the court cited § 876(b) of the *Restatement of the Law, Second, Torts* and observed that aiding and abetting breach of fiduciary duty was analogous to criminal aiding and abetting, which made a defendant a principal when he "consciously shares in any criminal act." *Id.* The court then concluded "that the Restatement's 'roughly similar' doctrine of tortuous aiding and abetting requires actual knowledge as well." *Id.* This conclusion is consistent with § 876 of the *Restatement* which recognizes the tort occurs where one who *"knows* that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other." (Emphasis supplied). This use of "knows" suggests a reference to actual knowledge of the breach of fiduciary duty rather than merely constructive knowledge. Also, in *Blow* the court approved jury instructions in which the judge told the jury that "You'd have to know about the fraud." *Blow*, 88 N.C.App. at 493, 364 S.E.2d at 449.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2003 WL 22399581
**(Cite as: Not Reported in B.R.)**

Page 13

Based upon the foregoing, the court concludes that the North Carolina Court, when called upon to decide the issue, would require that actual knowledge of a breach of fiduciary duty must be shown in order to establish a claim for aiding and abetting breach of fiduciary duty. However, such knowledge may be shown by circumstantial evidence provided that the proof is sufficient to demonstrate actual awareness of the breach of fiduciary duty by the primary party. *See Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 96 (5th Cir.1975). *In accord Metge v. Baehler,* 762 F.2d 621, 625 (8th Cir.1985) ("The requisite intent and knowledge may be shown by circumstantial evidence.").

Taking the evidence in the light most favorable to the plaintiff, as the court must do in ruling on BB & T's motion for summary judgment, the court finds that there is circumstantial evidence in the record from which a jury could find that employees of BB & T had actual knowledge that the Arths were acting unlawfully and breaching fiduciary duties owed to Vendsouth by depositing the "on us" checks in the Blocked Account. The sheer number of "on us" checks involved, the nature and size of the checks that were deposited, the special type of account in which the deposits were made and the lengthy period during which the scheme involving the checks continued support this conclusion. Also, the evidence is sufficient to support a finding that BB & T was aware that the Blocked Account was opened in connection with the lending relationship between Vendsouth and Lighthouse and that the account was intended to provide a means for remittances on Vendsouth's accounts receivable to be paid to Lighthouse as the secured creditor of Vendsouth. The evidence also is sufficient to support a finding that BB & T was aware that the "on us" checks, which clearly were not remittances from customers, were being deposited into the Blocked Account. There is testimony in the record that the tellers who accepted the Vendsouth deposits examined each check deposited and when a check was deposited which was drawn on a BB & T account they would note it and check the availability of funds in the account. (Land Deposition, p. 56). At least one teller recalls Vendsouth Officers depositing the "on us" checks through the drive-through window at the bank. Donna Watson, another bank employee, admitted knowing about the "on us" deposits early in the banking relationship. She also stated that she was aware, prior to November 1999, that "there was a Vendsouth account-excuse me-a Vendsouth check deposited into the other account." (Watson deposition, p. 55). Although not sure of the exact date, Ms. Watson believes that she learned this within the first 45 to 90 days of the account relationship. (Id. at 55-57). Between July of 1998 and November of 1999, 1, 250 of the "on us" checks were deposited into the Blocked Account. Such checks were unusual on their face, particularly since they were being deposited into a special "blocked" account that had been established to receive payments from customers of Vendsouth. The "on us" checks consisted of checks written by Vendsouth which were payable to itself in very large amounts. Many of these checks were for amounts in excess of $100,000.00 and a number of the checks were for amounts that exceeded $200,000.00. A total of 1,250 of these "on us" checks were presented to BB & T and deposited by bank employees on nearly a daily basis for approximately seventeen months, resulting in an aggregate deposit of $106,000,000.00. During the period when the "on us" checks were being deposited, BB & T had procedures in place to identify check kiting and other fraudulent banking activities. Ms. Cynthia Perkins, a regional branch operations manager, stated in her deposition that BB & T generated various reports, including the "Drawing on Uncollected Funds" and "Drawing on Today's Deposits" reports that showed that Vendsouth had a negative uncollected balance in the accounts and that Vendsouth was drawing on that day's deposits almost constantly. Such reports are used by BB & T to identify potentially fraudulent activity, including the kiting of checks. Ms. Perkins also testified that large uncollected fund balance with "on us" items was suspect. (Perkins Deposition, pp. 77-78 & 95-96). These reports were examined by BB & T managers. Bank employees admit that a negative uncollected balance is an indication of a check kite and that it is the bank's practice and procedure to investigate in order to determine the source of the negative uncollected balance. (Watson Deposition pp. 26-30). Ms. Watson also stated that it was bank policy to investigate an account if it showed up as a kite suspect and not to disregard any account that showed up on the report without investigating (*Id.* at pp. 26-30). Plaintiff's expert, Paul Boone, found that Vendsouth appeared on the branch reports as a kite suspect almost every day from August of 1998 until November of 1999. It is a reasonable inference from the evidence that BB & T followed its procedures and that such an investigation was made with respect to the Vendsouth accounts. The depositions of the BB & T employees and plaintiff's experts are sufficient to support a finding that if the accounts were examined and researched the check kite likely would have been discovered. According to Ms. Watson, she reviewed the bank reports and was well-aware that Vendsouth appeared on those reports periodically and that she

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

may have requested research from Quick Report regarding specific deposits. (Watson deposition, pp. 47-49). She recalls that she would have received information about the deposits as part of the research. She testified at her deposition that the response she received would have included a listing of the checks such as "Well, this is a check that's drawn on us. It's dr@awn on BB & T and it is-the payee on the check is Vendsouth" and they would provide her with the specific account number the check was drawn on. (Id. at 52). Although BB & T contends that all of the employees, including Ms. Watson, stated that they were unaware of the check kite because kiting "involves more than one bank", the record as a whole, when viewed in the light most favorable to the plaintiff, is sufficient to permit a jury to find that BB & T had knowledge of the "on us" deposits used to perpetrate the check kite and that check kiting and fraud were being perpetrated by employees of Vendsouth.

2. Substantial Assistance.

*18 The term "substantial assistance" was discussed at some length by the court in *Blow, Blow*, 88 N.C.App. at 489-93, 364 S.E.2d at 447-49. The court relied on the definition of substantial assistance found in the official comment to § 876(b) of the *Restatement of Torts*, which provides, "If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act." *Id.* at 490, 364 S.E.2d at 447. The court required a showing of "substantial causal connection between the culpable conduct of the alleged aider and abetter and the harm to the plaintiff, or a showing that the encouragement or assistance is a substantial factor in causing the resulting tort." *Id.* at 491, 364 S.E.2d at 448 (citing *Metge*, 762 F.2d at 624). The plaintiff contends that assistance provided by BB & T included continuing to accept the "on us" checks for deposit and continuing to grant provisional credit on the basis of the "on us" checks.

The Trustee argues that the fraud being perpetrated could not have continued if BB & T had not continued to accept the "on us" checks and grant provisional credit based on such checks. According to the plaintiff, if BB & T had stopped accepting the "on us" checks, the check kite would have collapsed and the fraud would have halted. BB & T argues that there is no evidence that BB & T had knowledge of or consciously intended to assist or participate in the check kite. This Court disagrees. Whether BB & T's activities gave such substantial assistance to Vendsouth as to make them liable as an aider-abettor, is a question of fact to be determined at trial. Taking the facts in the light most favorable to the nonmoving party, BB & T became aware that Vendsouth was depositing "on us" checks drawn on the Operating Account which had insufficient funds to cover the checks. As discussed previously, Vendsouth's accounts showed up on an almost daily basis on various BB & T account reports that indicated potentially fraudulent activities including a possible check kite. Ms. Watson, an employee of BB & T was aware of the "on us" checks and had reviewed those reports and, in the light most favorable to the plaintiff, performed a Quick Report investigation. Thus, there is evidence to support a finding that BB & T was aware of the fraudulent activity that comprised the check kite and breach of fiduciary duty. BB & T also knew that Lighthouse had agreed to wire money into the Operating Account to cover checks drawn on the account. The Trustee also produced evidence that BB & T benefitted from the continuation of the Arths' fraudulent activities. The Blocked Account Agreement provides that Vendsouth will pay BB & T prime plus 3% for the use of uncollected funds. Thus when Vendsouth deposited the "on us" checks into the Blocked Account and Lighthouse withdrew the money from the Blocked Account, Vendsouth would owe fees to BB & T for the use of the funds. Taken in the light most favorable to the plaintiff, which the court must do at this juncture, this is circumstantial evidence of motivation on the part of BB & T for allowing the deposit of the "on us" checks to continue. The plaintiff also produced evidence tending to show that the "on us" check scheme and check kite could not have continued unless BB & T continued to accept the "on us" checks. If BB & T had refused to accept the "on us" checks and halted the unwarranted provisional credit, the Vendsouth Officers could not have continued the fraud and breach of fiduciary duty. Taken together, BB & T's knowledge of the "on us" deposits combined with the benefits to the bank by the continuation of the fraud and the fact that but for the continued acceptance of the "on us" checks and granting of provisional credit, the check kite could not have continued, the plaintiff has put forth evidence of sufficient facts to defeat BB & T's motion for summary judgment. Accordingly, BB & T's motion for summary judgment on the plaintiff's claim for aiding and abetting a breach of fiduciary duty will be DENIED.

IV. CLAIM FOR UNFAIR OR DECEPTIVE

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R. Page 15
Not Reported in B.R., 2003 WL 22399581
**(Cite as: Not Reported in B.R.)**

TRADE PRACTICE.

**\*19** G.S. § 75-1.1 provides that "unfair or deceptive acts or practices in or affecting commerce are declared unlawful." To prevail on a claim based upon this statute the plaintiff must prove: (1) an unfair or deceptive act or practice or an unfair method of competition; (2) in or affecting commerce; (3) which proximately caused actual injury to the plaintiff. See In re Kittrell, 115 B.R. 873 (Bankr.M.D.N.C.1990) ; Pinehurst, Inc. v. O'Leary Bros. Realty, 79 N.C.App. 51, 338 S.E.2d 918 (1986). "A precise definition of unfair or deceptive acts is not possible, but whether a particular act is unfair or deceptive depends on the facts surrounding the transaction and the impact on the marketplace." See Concrete Service Corp. v. Investors Group, Inc., 79 N.C.App. 678, 685, 340 S.E.2d 755, 760 (1986); see also Marshall v. Miller, 302 N.C. 539, 548, 276 S.E.2d 397, 402 (1981). A practice is unfair when it offends established public policy or when it is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. Marshall at 548, 276 S.E.2d at 402. A practice is deceptive if it has a tendency to deceive, but actual deception need not be proved. See Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir.1987) ; In re Kittrell, 115 B.R. at 877; Concrete Service Corp., 79 N.C.App. at 686, 340 S.E.2d at 760.

In a claim for unfair and deceptive trade practices, the fact finder must first determine whether the defendant engaged in the alleged unfair or deceptive conduct and whether such conduct was the proximate cause of injury or damage to the plaintiff. If the alleged conduct and injury are established, then the court determines as a matter of law whether the conduct in question violates G.S. § 75-1.1 , i.e., whether the conduct was a deceptive or unfair trade practice. See In re Bebber, 192 B.R. 120, 122 (Bankr.W.D.N.C.1995); see also Concrete Service Corp., 79 N.C.App. at 686, 340 S.E.2d 755; Medina v. Town and Country Ford, Inc., 85 N.C.App. 650, 355 S.E.2d 831 (1987), aff'd 321 N.C. 591, 364 S.E.2d 140 (1988). A plaintiff need not show "bad faith, deliberate or knowing acts of deception, or actual deception." In re Hageman v. Twin City Chrysler-Plymouth, Inc., 681 F.Supp. 303, 305 (M.D.N.C.1981) (quoting Overstreet v. Brookland Inc., 52 N.C.App. 444, 452-53, 279 S.E.2d 1, 7 (1981)). "An action for unfair or deceptive acts or practices is *sui generis.*" Concrete Service Corp., 79 N.C.App. at 685, 340 S.E.2d at 760. "Therefore, traditional common law defenses such as contributory negligence or good faith are not relevant; what is relevant is the effect of the actor's conduct on the consuming public." Id.; see also Winston Realty Co., Inc. v. G.H.G. Inc., 314 N.C. 90, 95, 331 S.E.2d 677, 680 (1985). Commerce includes all business activities, however denominated. G.S. § 75-1.1(b).

Based upon the same evidence found sufficient to raise jury issues as to the claim for aiding and abetting breach of fiduciary duty, the court concludes that there are jury issues as to the unfair or deceptive trade practice claim under G.S. § 75-1.1. BB & T's motion for summary judgment as to the claim under G.S. § 75-1.1 therefore shall be DENIED.

V. CLAIM FOR ACTS COMMITTED PURSUANT TO CONSPIRACY.

**\*20** In this claim the plaintiff seeks to recover damages allegedly sustained by Vendsouth as a result of acts committed pursuant to an alleged conspiracy to defraud Vendsouth involving BB & T and the Vendsouth Officers. This claim apparently is based upon the contention that the check scheme and kite involving the "on us" checks constituted a fraud on Vendsouth. The claim against BB & T is based upon the further contention that BB & T conspired with the Arths to carry out such fraud (i.e., the check scheme and kite). While North Carolina law does not recognize a claim merely for conspiracy, it does recognize a claim for damages caused by acts carried out pursuant to a conspiracy. Such a claim arises where there is an agreement between two or more persons to do an unlawful act or to do a lawful act in an unlawful manner and, as a result of acts done in furtherance of and pursuant to the agreement, damage occurs to the plaintiff. See Dickens v. Puryear, 302 N.C. 437, 456, 276 S.E.2d 325, 337 (1981) ; Fox v. Wilson, 85 N.C.App. 292, 301, 354 S.E.2d 737, 743 (1987). In such a case, the elements of a claim for civil conspiracy are: (1) that the defendants agreed to engage in tortuous conduct; (2) that one of the defendants committed an overt tortuous act in furtherance of the agreement; and (3) that the plaintiff suffered damages from the act. See Neugent v. Beroth Oil Co., 149 N.C.App. 38, 53, 560 S.E.2d 829, 839 (2001) ; Nye v. Oates, 96 N.C.App. 343, 347, 385 S.E.2d 529, 531-32 (1989). Although the evidence is sufficient to support a finding that BB & T had knowledge of the improper activities of the Vendsouth Officers, there is insufficient evidence to support a finding that there was any agreement by BB & T to participate in defrauding Vendsouth or to assist Vendsouth with perpetuating a fraud on Vendsouth. "Although an action for civil conspiracy

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R. Page 16
Not Reported in B.R., 2003 WL 22399581
**(Cite as: Not Reported in B.R.)**

may be established by circumstantial evidence, sufficient evidence of the agreement must exist 'to create more than a suspicion or conjecture in order to justify submission of the issue to a jury." ' *Boyd v. Drum,* 129 N.C.App. 586, 592, 501 S.E.2d 91, 96 (1998) (citing *Dickens v. Puryear,* 302 N.C. 437, 456, 276 S.E.2d 325, 337 (1981)). Without sufficient evidence of an agreement, an essential element of the conspiracy claim is missing and BB & T therefore is entitled to summary judgment as to the conspiracy claim.

### VI. CLAIM FOR CONVERSION.

Under North Carolina law, conversion is "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Spinks v. Taylor,* 303 N.C. 256, 264, 278 S.E.2d 501, 506 (1981). The plaintiff contends that a conversion of Vendsouth funds occurred on November 9, 1999, when BB & T "seized funds that were available for the use of Vendsouth in the accounts at BB & T." The funds that the plaintiff contends were converted on that date apparently consist of the funds that were wire transferred into the Operating Account by Lighthouse on November 9, 1999, following the request by Vendsouth that Lighthouse do so. There is no dispute regarding the disposition of the funds that were wire transferred into the Operating Account on November 9, 1999. BB & T used $1,827,186.20 of such transfer to fund Vendsouth's obligation to BB & T as a result of Vendsouth (through Lighthouse) having used provisional credit that earlier was granted when the "on us" checks were deposited into the Blocked Account. BB & T argues that no conversion occurred, relying upon the general rule that when funds are deposited in a checking account by a customer the relationship that arises is one in which the customer becomes a creditor of the bank with the customer having the right to have the "debt" repaid by withdrawing funds from the account or having the bank honor checks drawn on the account. BB & T argues that it was authorized to honor checks drawn on the account and that it was merely doing so when it charged the account for the amount of the "on us" checks. The authority for a bank to charge a customer's account is derived from G.S. § 25-4-401 which provides that a bank may charge against the account of a customer for items that are "properly payable" from the account. In order to be "properly payable" an item must be authorized by the customer and in accordance with any agreement between the customer and the bank. Having considered the evidence in the light most favorable to the plaintiff, the court finds that a genuine issue of fact exist as to whether the "on us" checks were "properly payable" under the circumstances which existed on November 9, 1999, when BB & T charged the Operating Account for the amount of the "on us" checks. BB & T therefore is not entitled to summary judgment as to the conversion claim.

### CONCLUSION

**\*21** In accordance with the foregoing, an order will be entered contemporaneously with the filing of this memorandum opinion denying the plaintiff's motion for summary judgment as to the preference claim, granting BB & T's motion for summary judgment as to the conspiracy to defraud claim and denying BB & T's motion for summary judgment as to all other claims.

### *ORDER*

In accordance with the memorandum opinion filed contemporaneously herewith, it is ORDERED, ADJUDGED AND DECREED as follows:

(1) Plaintiff's motion for summary judgment is denied;

(2) Defendant BB & T's motion for summary judgment is granted as to plaintiff's claim for civil conspiracy; and

(3) Defendant BB & T's motion for summary judgment is denied as to all other claims asserted by the plaintiff.

Bkrtcy.M.D.N.C.,2003.
In re Vendsouth, Inc.
Not Reported in B.R., 2003 WL 22399581

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.