# EXHIBIT J

**Westlaw.**

Not Reported in B.R.
Not Reported in B.R., 2004 WL 1534296
**(Cite as: Not Reported in B.R.)**

Page 1

**H**
Not Reported in B.R., 2004 WL 1534296
Only the Westlaw citation is currently available.
United States Bankruptcy Court,M.D. North Carolina.
In re: BUILDNET, INC., et al., Debtors.
TUG LIQUIDATION, LLC, Individually and as assignee of BuildNet, Inc., Plaintiff,
v.
Bayard M. ATWOOD, et al., Defendant.
**Nos. 01-82293, 01-82294, 01-82295, 01-82296, 01-82297, 01-82298, 01-82299, 04-09003.**

June 16, 2004.

John A. Northen, Chapel Hill, NC, Richard M. Hutson, II, Durham, NC, for Debtors.
Jeffrey D. Horst, Atlanta, GA, Michael L. Robinson, Robert J. Lawing, Winston-Salem, NC, for Plaintiff.
Carrie Ann Hartman, L. Joseph Loveland, David L. Balser, Atlanta, GA, Gregg E. McDougal, Raleigh, NC, Susan D. Resley, Austin, TX, Judith M. Krieg, Hogan & Hartson, LLP, Denver, CO, June L. Basden, Greensboro, NC, Paul H. Schwartz, Cooley Godward, LLP, Broomfield, CO, David J. Farber, Patton Boggs, LLP, Washington, DC, for Defendants.

MEMORANDUM OPINION

CARRUTHERS, Bankruptcy J.
**\*1** This matter came on before the Court for hearing on April 20, 2004 upon the Motions to Dismiss by Bayard M. Atwood; Keith T. Brown; Justin Hall-Tipping; Norvell E. Miller; Nathan P. Morton; William W. Neal, III; Joel Koblentz; Peter J. Smith; Jack F. Kemp; Charles M. Cosby; Peter B. Drayson; Stephen L. Holcombe; Steven C. Thompson, Sr.; and Peter Abene, Sr. (collectively referred to as the "Defendants") pursuant to Fed.R.Civ.P. 12(b)(6) and the Defendants' Motion for Sanctions. After review of the Motions and consideration of the matters asserted therein, the Court makes the following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

This action, which involves the bankruptcy estate of BuildNet., Inc. and its subsidiaries, (collectively referred to as "BuildNet" or "Debtor"), comes before this Court after being transferred to this district from the Northern District of Georgia. The District Court for the Middle District of North Carolina subsequently transferred this action to this bankruptcy court. Section 1334(a) vests original and exclusive jurisdiction in the district court over all cases arising under the Bankruptcy Code. Section 1334(b) provides that the District Court shall have original but not exclusive jurisdiction over all civil proceedings "arising under title 11, or arising in or related to cases under title 11." The District Court has determined that subject matter jurisdiction is found under § 1334(b). However the extent to which the bankruptcy court, rather than the District Court can adjudicate the matter must be determined pursuant to 28 U.S.C. § 157. This court obtained jurisdiction by referral from the District Court under 28 U.S.C. § 157. This section allows the bankruptcy court to hear and determine all cases under Title 11 and all core proceedings arising under Title 11 or arising in a case under Title 11. Other proceedings that are otherwise related to Title 11 cases are considered non-core proceedings. In non-core proceedings, absent consent of the parties, the bankruptcy court has limited jurisdiction and cannot issue a final judgment. It can only submit proposed findings of fact and conclusions of law to the district court, which in turn, can enter a final judgment. Bankruptcy Rule 7008 requires that every complaint allege whether the action is core or non-core. TUG Liquidation, LLC ("TUG" or "Plaintiff") has not complied with this provision and shall have ten days from entry of this order to comply.

BuildNet filed a petition under Chapter 11 of the Bankruptcy Code on August 8, 2001 and BuildNet's estate is currently under administration by this Court. The present action arises out of a complaint filed on January 7, 2003 (the "Complaint") and subsequently amended on April 19, 2003 (the "Amended Complaint") by TUG, individually and as assignee of BuildNet, against the Defendants, all former officers and directors of BuildNet. For the purposes of these motions to dismiss, the Plaintiff's version of the facts set forth in the Complaint and Amended Complaint will be taken as true, and nothing herein shall constitute a finding of fact by this Court.

BACKGROUND

**\*2** BuildNet, formed in 1996, was engaged in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.  
Not Reported in B.R., 2004 WL 1534296  
**(Cite as: Not Reported in B.R.)**

Page 2

business of the development and sale of software based on a concept of collaborative e-commerce solutions for the residential construction industry. BuildNet hoped to design and implement an internet-based marketplace, called the BuildNet Exchange, which could provide informational and procurement links between homebuilders, suppliers and manufacturers. In 1999, BuildNet raised over $35 million through a sale of Series B preferred stock for sustaining operations, developing the BuildNet Exchange, and acquisition activity for construction management software companies. Also that year, certain defendants authorized the issuance of a Private Placement Memorandum (the "PPM") for the sale of Series C preferred stock. BuildNet raised approximately $107 million from the sale of Series C preferred stock. According to BuildNet's projections in the PPM, this amount should have been sufficient to carry BuildNet through its period of losses and well into profitability.

In late 1999, BuildNet approached TUG about acquiring its business. During negotiations, several defendants made presentations to TUG in which they focused on BuildNet's strong financial condition, success in raising money, its management team's experience and strength, and their expectations for an initial public offering (the "IPO"). BuildNet provided TUG with the PPM for TUG's due diligence and was told it contained the necessary financial and operational information. The Plaintiff alleges that the PPM contained material misrepresentations regarding BuildNet's business plan, including misrepresenting BuildNet's current burn rate, grossly underestimating anticipated losses, misrepresenting the capabilities of the BuildNet Exchange, and omitting the fact that BuildNet would be unable to pay its debts (including any due TUG) if the IPO was unsuccessful.

On January 18, 2000, BuildNet acquired TUG, which became The Unilink Group, LLC ("UniLink"), for $27 Million. In connection with this acquisition, BuildNet executed and delivered a $27 million promissory note ("Note") with a term of 24 months to TUG and a security agreement ("Security Agreement") granting TUG a security interest in the purchased assets. The Note was convertible in its entirety into common BuildNet stock.

In the Amended Complaint, TUG alleges that between the time that BuildNet purchased UniLink and the bankruptcy filing, the Defendants grossly mismanaged UniLink. TUG contends that the Defendants failed to devise a business plan to integrate UniLink's operations into BuildNet. BuildNet removed former top management, and instead, had more than four different people overseeing UniLink in the first four months after its acquisition, and provided no new direction. Senior officers arbitrarily changed UniLink's pricing plan and for several months, instructed UniLink's sales force not to make any sales because of the officers' inability to devise an effective pricing strategy. At the time of purchase, UniLink's workforce was comprised of over 75 employees and had an annual revenue run rate in excess of $4,500,000. At the time of the bankruptcy filing, UniLink had less then five employees and minimal revenue.

*3 The purchase of UniLink was one of many acquisitions made by BuildNet in the year 2000. With no business plan for the integration of additional companies, some defendants authorized the purchase of additional companies, while others traveled extensively around the world investigating other opportunities. BuildNet acquired four companies in January 2000 alone. BuildNet lost $53 million during this same time period. In July 2000, the Board of Directors authorized seven additional acquisitions without any due diligence reports, final acquisition documents, integration plans or analysis of the impact on BuildNet. Despite huge losses, the Defendants made no effort to control spending. For example, BuildNet entered into a lease for the BuildNet Exchange at a cost of $350,000 per month, and directors of BuildNet continued to authorize that officers receive exorbitant salaries. FN1 Meanwhile, BuildNet's Chairman, Keith Brown, was busy writing a book, developing a new business venture called "SmartPlan," and starting three other companies: Interactive Marketplace Incubator, Interactive Marketplace Ventures and International MarketPlace Venture Management.

> FN1. At least one of the directors, Atwood was both an officer and a director.

Finally, after a third quarter loss of an additional $34,086,756 in the fall of 2000, the officers and directors began to make some effort to reduce the work force, and yet, severance packages ranging from $50,000 to over $800,000 were paid out to resigning officers. For example Atwood, who served as the Chief Operating Officer and as a member of the Board of Directors, was paid the sum of $75,000 upon his resignation and the Board authorized a payment of $25,000 per month for a period of three years. In February 2001, while BuildNet was in dire financial straits, promissory notes previously

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.  
Not Reported in B.R., 2004 WL 1534296  
**(Cite as: Not Reported in B.R.)**

Page 3

executed by various executives in consideration for the purchase of stock were reduced to ten percent of the balance, and in July 2001, just prior to bankruptcy, some defendants authorized the repurchase of stock in consideration for the cancellation of promissory notes totaling $1,670,000.

After the bankruptcy filing, TUG filed an unsecured claim in the amount of approximately $30 million against BuildNet. TUG repurchased its former business, and is now the holder of an unsecured claim in the amount of $21 million. TUG also began to raise questions about the possibility of claims related to the mismanagement or irregularity in the affairs of the Debtors. TUG filed a motion for an order directing a Rule 2004 examination of certain documents in the Debtors' possession or control.

On December 6, 2001, the court appointed Holmes P. Harden (the "Examiner") as an examiner to investigate and file a Statement of Investigation concerning any fact ascertained pertaining to incompetence, misconduct, mismanagement or irregularity in the management of BuildNet, or pertaining to a cause of action available to the estates with respect to any present or former officer or director of BuildNet. The Examiner filed his Preliminary Report on April 9, 2002. The report identified the existence of several claims BuildNet might have against certain officers and directors. BuildNet's counsel and the Examiner pursued some claims as a result of the evidence discovered during the investigation; however, TUG disagreed with some of the findings in the Preliminary Report and believed that BuildNet may have additional claims. The parties eventually reached an agreement whereby BuildNet assigned to TUG those claims which neither BuildNet nor the Examiner wished to pursue in consideration for $15,000 and TUG agreed to withdraw its objection to the BuildNet's proposed plan of reorganization. This court entered an order ("Assignment Order") on September 4, 2002 authorizing BuildNet to assign and transfer its rights to pursue, settle or collect monies from those claims. In addition, on October 15, 2002, the parties entered into a contract for the transfer and assignment of such claims ("Assignment").

*4 In the Amended Complaint, the Plaintiff asserts claims both on behalf of itself, individually, and on behalf of BuildNet, as assignee. Individually, TUG has asserted the following claims: (Count I) fraud; (Count II) negligent misrepresentation; (Count III) breach of fiduciary duty and constructive fraud; (Count VIII) corporate waste; (Count IX) deepening insolvency; and (Count X) unfair and deceptive acts. As assignee of BuildNet, TUG has asserted the following claims: (Count III) breach of fiduciary duty and constructive fraud; (Count IV) gross negligence; (Count V) breach of duty of loyalty; (Count VII) unlawful stock redemption pursuant to 8 Del. C. § 174(a); (Count VIII) corporate waste; and (Count IX) deepening insolvency. FN2

> FN2. A claim for breach of employment agreement (Count VI) was also asserted by TUG as assignee of BuildNet and dismissed in a separate order.

DISCUSSION

(1) The Standard governing a Rule 12(b)(6) motion

The court may grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7012(b), only if it appears beyond a doubt that the nonmoving party can prove no set of facts in support of its claim which would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In making this determination, the court should accept as true all well-pleaded allegations of the complaint, and construe the complaint in the light most favorable to the nonmoving party. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.1993) *cert. denied*, 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). "[A] complaint must include only 'a short and plain statement of the claim showing that the pleader is entitled to relief' ... such a statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *Swierkievicz v. Sorema NA*, 534 U.S. 506, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002) (quoting *Conley v. Gibson*, 355 U.S. at 47). To survive a motion to dismiss, a claim based on fraud must be pled with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure.

Therefore, a "Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir.1999). The test is not whether the Plaintiff will ultimately prevail

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.  
Not Reported in B.R., 2004 WL 1534296  
**(Cite as: Not Reported in B.R.)**

Page 4

but whether the claimant is entitled to offer evidence to support the claims. _In re Bernstein_, 259 B.R. 555, 556 (Bankr.D.N.J.2001).

(2) TUG'S individual claims

In its Amended Complaint, TUG individually has asserted a total of six claims against various defendants. The claims asserted by TUG individually fall into two general categories. First, some of the claims brought by TUG individually rest upon a basic premise that the Defendants breached a duty owed _directly_ to TUG. These claims include those for fraud (Count I); negligent misrepresentation (Count II); and unfair and deceptive acts (Count X). FN3 These three claims are predicated upon actions by the Defendants directed specifically towards TUG and are personal to TUG. The other type of claim brought by TUG individually is that in which the alleged injuries were sustained by BuildNet and all of its creditors, including TUG. These are claims that are predicated upon fiduciary duties owed to BuildNet's creditors in general upon insolvency: corporate waste (Count VIII), and deepening insolvency (Count IX). Lastly, Count III, TUG's claim for breach of fiduciary duty and constructive fraud, appears to fall into both categories.

> FN3. The parties did not specifically address whether North Carolina law or Georgia law applies to these claims, but cite North Carolina cases in their briefs. Accordingly, the court will apply North Carolina law to these claims.

*5 In Count I of the Amended Complaint, TUG brings a claim for fraud against defendants Abene, Atwood, Brown, Drayson, Holcombe, Morton and Thompson ("Count I Defendants"). To state a claim for fraud under North Carolina law, the plaintiff must allege (1) false representation or concealment of a material fact; (2) reasonably calculated to deceive; (3) made with intent to deceive; (4) which does in fact deceive; and (5) which results in damage to the plaintiff. _Andrews v. Fitzgerald_, 823 F.Supp. 356, 375 (M.D.N.C.1993); _Becker v. Graber Builders, Inc._, 149 N.C.App. 787, 793, 561 S.E.2d 905 (2002). Federal Rule of Civil Procedure 9(b) requires a plaintiff alleging fraud to plead with particularity such that "upon a liberal construction of the whole pleading, the charge of fraud might be supported by proof of the alleged constitutive facts." _Carver v. Roberts_, 78 N.C.App. 511, 513, 337 S.E.2d 126, 128 (1985) (quoting _Manufacturing Co. v. Taylor_, 230 N.C. 680, 686, 55 S.E.2d 311, 315 (1949)).

The Count I Defendants contend that the Complaint fails to adequately delineate the specific facts which would support the elements of this claim; however, the court finds that any deficiencies which may have existed with regard to the original Complaint have been corrected in the Amended Complaint. The Amended Complaint sets forth allegations of specific misrepresentations and omissions by specific defendants. TUG contends that the Count I Defendants were responsible for preparing the PPM, that they knew the PPM was provided to TUG for its due diligence and that these defendants knew or should have known that the PPM contained numerous material misrepresentations and omissions. TUG recites the specific statements in the PPM that were allegedly false and lists specific facts that were omitted from the PPM. TUG also sets forth with particularity various meetings at which specific Count I Defendants made allegedly false representations. TUG contends that all of these alleged misrepresentations and omissions were made with an intent to induce reliance, did in fact induce reliance, and resulted in damages of at least $27 million. The court finds that TUG has pled with sufficient particularity to state a claim for fraud, therefore, the Count I Defendants' motions to dismiss will denied.

In Count II, TUG asserts a claim for negligent misrepresentation against Abene, Atwood, Brown, Cosby, Drayson, Hall-Tipping, Holcombe, Miller, Morton, Neal, and Thompson ("Count II Defendants"). Negligent misrepresentation occurs when (1) a party justifiably relies, (2) to his detriment, (3) on information prepared without reasonable care, (4) by one who owed the relying party a duty of care." _Brinkman v. Barrett Kays & Assoc., P.A._, 155 N.C.App. at 742, 575 S.E.2d 40, 43-44 (citing _Simms v. Prudential Live Ins. Co. of America_, 140 N.C.App. 529, 532, 537 S.E.2d 237, 240 (2000)).

In this case, TUG's claim for negligent misrepresentation is based upon the allegations set forth in support of its claim for fraud. In addition, TUG alleges that the Count II Defendants took no steps to monitor, manage or control the accuracy of information presented to TUG both verbally and in writing thereby causing damages to TUG by inducing reasonable reliance upon the information. These allegations are sufficient to withstand the Count II Defendants' Rule 12(b)(6) motion to dismiss.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*6 Recently, TUG added a claim pursuant to N.C. Gen.Stat. § 75-16 for unfair and deceptive acts. To prevail on a claim for unfair and deceptive trade practices, a plaintiff must show: (1) an unfair or deceptive act or practice; (2) in or affecting commerce; (3) which proximately caused actual injury to plaintiffs. Canady v. Mann, 107 N.C.App. 252, 260, 419 S.E.2d 597, 602 (1992). A trade practice is unfair if it is immoral, unethical, oppressive, unscrupulous, substantially injurious to consumers or if it offends established public policy. Marshall v. Miller, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981). A trade practice is considered deceptive if it has the capacity or tendency to deceive. Id. In North Carolina, "[p]roof of fraud necessarily constitutes a violation of the prohibition against unfair and deceptive trade practices." Webb v. Triad Appraisal and Adjustment Service, Inc., 84 N.C.App. 446, 449, 352 S.E.2d 859, 862 (1987) ; Hunter v. Guardian Life Ins. Co. of America, 593 S.E.2d 595, 601 (N.C.App. Feb.3, 2004). Because the Plaintiff has alleged facts which, if proven, could support a finding of fraud, it has also alleged facts which could support a finding of unfair and deceptive practices.

TUG alleges that because of the sale of the assets of TUG to BuildNet in exchange for a $27 million promissory note, TUG had a special relationship with the Debtor which might create a duty other than that owed to other creditors of the corporation. TUG contends that they were induced to sell their assets based on fraudulent, reckless, and negligent misrepresentations and the failure to disclose material facts during the acquisition negotiations. These claims are personal to TUG and are not claims that belong to the corporation.

TUG individually asserts two general claims related to fiduciary duties owed to the corporation's creditors: corporate waste (Count VIII), and deepening insolvency (Count IX). FN4 The Defendants contend that the Plaintiff does not have standing to pursue fiduciary duty related causes of action individually if those causes of action are common to all creditors.

> FN4. TUG also asserts these same two claims as assignee of BuildNet, but the court will address those separately.

A single creditor may not individually maintain a general action against a corporation's directors and officers if that creditor shares that injury common to all creditors and has personally been injured only in an indirect manner. In re Sunshine Precious Metals, Inc., 157 B.R. 159, 162 (Bankr.D.Idaho 1993); see also Delgado Oil Co., Inc., v. Torres, 785 F.2d 857, 861 (10th Cir.1986) (liability of the corporation's fiduciary for violating a trust relationship applied to all creditors); Whirlpool Corp. v. CIT Group/Business Credit, Inc., 258 F.Supp.2d 1140, 1146 (D.Hawai'i 2003) (creditor may have a superior interest, but still does not have standing to pursue an action for injury suffered by all creditors); PHP Liquidating, LLC., 291 B.R. 592, 599 (D.Del.2003) (claim for violation of a statute prohibiting a corporation from purchasing its own shares when its capital is impaired was a general claim which only a trustee or debtor could bring); In re Stoll, 252 B.R. 492 (9th Cir. BAP 2000). An injury that is common to all creditors is properly brought through the debtor corporation. Upon the filing of a bankruptcy petition, general claims held by the debtor's creditors become property of the bankruptcy estate. See 11 U.S.C. § 541. Section 544(b) of the Bankruptcy Code grants only trustees or debtors-in-possession standing to pursue general claims held by the debtor's creditors. PHP Liquidating, LLC v. Robbins, 291 B.R. at 599.

*7 In determining whether a claim is general to all creditors and derivative of an injury to the corporation, the court must examine whether the asserted cause of action involves an injury particular to one creditor, or whether it is a cause of action that might be asserted by any creditor. In re Sunshine Precious Metals, Inc., 157 B.R. at 162. Corporate waste and deepening insolvency are claims designed for the protection of creditors and shareholders in general because they are derivative of an injury to the corporation, and are not the result of a direct injury sustained by a single creditor. These are not claims that address injuries sustained by TUG individually, but rather, injuries suffered by BuildNet. Therefore, to the extent that TUG *individually* attempts to state a claim for either corporate waste (Count VIII) or deepening insolvency (Count IX), those claims must be dismissed. Typical derivative claims that can be brought on behalf of the corporation and, thus, are 541 property rights of the debtor include claims for mismanagement, breach of fiduciary duty, and corporate waste. In re Granite Partners, L.P., 194. B.R. 318, 327-28 (Bankr.S.D.N.Y.1996).

The only remaining claim brought by TUG individually is Count III, breach of fiduciary duty and constructive fraud, which is asserted against all Defendants. As stated in the Amended Complaint,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2004 WL 1534296
**(Cite as: Not Reported in B.R.)**

Page 6

this claim is brought by TUG individually *both* by virtue of its special relationship to BuildNet and as a creditor in general. To the extent that TUG individually seeks to bring this claim on behalf of all creditors, this claim must be dismissed for the reasons set forth above regarding the claims for corporate waste and deepening insolvency. However, in North Carolina, a creditor may bring a claim against a director of a corporation alleging that the director has committed constructive fraud by breaching his or her fiduciary duty owed directly to the creditor. *Keener Lumber Co., Inc. v. Perry*, 149 N.C.App. 19, 26-27, 560 S.E.2d 817, 823 (2002) (citing *Lillian Knitting Mills Co. v. Earle*, 233 N.C. 74, 62 S.E.2d 492 (1950)). If that claim is founded upon injuries particular or personal to the individual creditor, it is a claim that belongs to the creditor, not the corporation. *Id.* In Count III of the Amended Complaint, TUG has alleged that the Defendants were in a fiduciary relationship specifically with TUG, that the Defendants breached their fiduciary duty to TUG, and that TUG suffered an injury particular to itself. These allegations are sufficient to withstand the Defendants' motion to dismiss.

In sum, TUG may assert a claim for a specific injury to TUG which is distinct from the action that may be maintained by the Debtor. *See In re Reliance Acceptance Group, Inc.*, 235 B.R. 548 (D.Del.1999); and *In re Van Dresser Corp.*, 128 F.3d 945, 949 (6th Cir.1997). TUG has a personal claim if they have been injured and no other claimant or creditor has an interest in the cause.

(3) Claims brought by TUG as assignee of BuildNet

**\*8** Immediately after this case was filed, the Bankruptcy Administrator sent out a notice requesting that unsecured creditors form a creditors' committee in the case. Due to lack of response, no committee was formed. TUG, as the holder of the largest unsecured claim in the case, wanted the Debtor-in-Possession to pursue various actions against the officers and directors of the company. With the consent of the Debtor-in-Possession, the Bankruptcy Administrator and TUG, it was agreed that inasmuch as there was no creditors' committee, the best course of action would be to appoint an Examiner to investigate facts pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement or irregularity in the management of the affairs of the Debtors, or pertaining to the course of action available to the estates with respect to any present or former officer. Holmes Hardin was appointed Examiner and filed a preliminary report with his findings on April 9, 2002. TUG disagreed with some of the Examiner's findings and conclusions and filed a Motion to Compel Debtor-in-Possession to Dispose of Property of the Estate, or in the Alternative, for Authorization to Assert Claims on behalf of the Debtor. Notice of the Motion to compel the debtor to sell the remaining claims and causes of action to TUG for the sum of $15,000, subject to a higher bidder by another party, was transmitted to all creditors in the case. No higher offer was obtained and no party objected to the sale of these causes of action to TUG. An order approving the Agreement between TUG and the Debtor-in-Possession was memorialized by order of this court on September 4, 2002.

The Debtor-in-Possession and the Examiner elected to pursue certain causes of action in this case. However, the Debtor elected to sell other causes of action to TUG for the sum of $15,000. This court stated that it was not making any determination as to the merits of the claim or whether TUG could legally purchase the claims, in part because the claims had not been identified. It is clear that the bankruptcy code permits a debtor-in-possession the power to use, sell or lease property of the estate. 11 U.S.C. § 363.

The Defendants contend that the assignment of tort claims from BuildNet to TUG was invalid inasmuch as it violates North Carolina public policy. If the assignment is invalid, TUG lacks standing to bring any tort claims as assignee of BuildNet. Prior to addressing the assignability of these claims, the court must determine what state's law applies to this case, which is heard by this court pursuant to 28 U.S.C. § 1334. Claims that are based upon state law must apply choice of law rules of the forum state absent a compelling federal interest which dictates otherwise. *In re Merritt Dredging Company, Inc.*, 839 F.2d 203, 206 (4th Cir.1988). Therefore, this court must look to North Carolina choice of law rules to determine which body of state law is controlling.

BuildNet was incorporated in North Carolina on October 24, 1996, and reincorporated in Delaware on March 28, 2000. Both North Carolina and Delaware follow the "internal affairs" doctrine under which the corporate law of the jurisdiction of the organization would govern the duties of the directors and the relationship between the directors, officers and shareholders. Under the "internal affairs" doctrine, the law of the jurisdiction of incorporation generally governs claims related to the internal affairs of a corporation. *DeWitt v. Hutchins*, 309 F.Supp.2d 743

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2004 WL 1534296
**(Cite as: Not Reported in B.R.)**

Page 7

(M.D.N.C. March 23, 2004) ; *Dassault Falcon Jet Corp. v. Oberflex*, 909 F.Supp. 345 (M.D.N.C.1995). Therefore, this court would look to both North Carolina and Delaware law to determine whether the Amended Complaint alleges facts sufficient to state the alleged claims. However, the court need not make a determination as to the sufficiency of the facts alleged in the Amended Complaint unless it determines that TUG has standing to bring the Assigned Claims.

**\*9** As assignee of BuildNet, TUG has asserted six claims including, a claim for breach of fiduciary duty and constructive fraud, gross negligence, breach of duty of loyalty, unlawful stock redemption pursuant to 8 Del. C. § 174(a), corporate waste, and deepening insolvency (together referred to herein as the "Assigned Claims"). TUG asserts that it has standing to pursue the Assigned Claims by virtue of the Assignment and Assignment Order. The Assignment itself is a contract between BuildNet and TUG, which may be distinguished from the underlying claims. While this court was unable to locate any North Carolina cases that specifically address the issue of choice of law for an assignment of claim, under general North Carolina choice of law rules, the validity and interpretation of a contract are presumed to be governed by the law of the state in which the contract was formed. FN5 See *Tanglewood Land Co. v. Byrd*, 299 N.C. 260, 261 S.E.2d 655 (1980) ; *Cable Tel Services, Inc. v. Overland Contracting, Inc.*, 154 N.C.App. 639, 642, 574 S.E.2d 31, 33 (2002) ; *Key Motorsports, Inc. v. Speedvision Network, L.L.C.*, 40 F.Supp.2d 344, 346 (M.D.N.C.1999). In this case, the Assignment Order was issued by this court in the bankruptcy proceeding in North Carolina, and the Assignment bears the heading for the Middle District of North Carolina. In contrast, the assignability of a claim may be viewed in light of the nature of the claim being assigned, as defined by the jurisdiction that created it. Accordingly, at least one court has held that, "the assignability of the right or obligation being assigned is determined by looking to the law which would govern the underlying contract (or ... tort) which enabled the right to come into existence." *Conopco, Inc. v. McCreadie*, 826 F.Supp. 855, 864 (D.N.J.1993), aff'd 40 F.3d 1239 (3rd Cir.1994).

> FN5. As a general rule, when a contract contains a choice of law provision, North Carolina courts will honor that provision unless the law of the chosen state violates a fundamental public policy of the forum state. *Behr. v. Behr*, 46 N.C.App. 694, 266 S.E.2d 393 (1980). In this case, the Assignment does not contain a choice of law provision.

In any case, North Carolina courts will not apply the law of a foreign state if it offends the public policy of the forum. *Boudreau v. Baughman*, 322 N.C. 331, 368 S.E.2d 849 (1988). Rather, courts will apply North Carolina law if the law of the other state offends North Carolina public policy. *Clayton v. Burnett*, 135 N.C.App. 746, 749, 522 S.E.2d 785, 787 (1999). Because the Defendants contend that the Assignment offends North Carolina public policy, this court must examine North Carolina law to determine the validity of the Assignment.

In North Carolina, an action arising out of a contract can generally be assigned; however, an assignment of a personal tort claim is void as against public policy because it promotes champerty. *Horton v. New South Insurance Co.*, 122 N.C.App. 265, 268, 468 S.E.2d 856, 858 (1996). FN6 Champerty is a form of officious intermeddling in a lawsuit, whereby a stranger makes a bargain with a plaintiff to carry on a lawsuit at his or her own expense. *Daimlerchrysler Corp. v. Kirkhart*, 148 N.C.App. 572, 561 S.E.2d 276 (2002).

> FN6. In contrast, under Delaware law the question of assignability of a cause of action depends upon whether the cause of action would survive and pass to the personal representative; therefore, most tort claims and bad faith actions are assignable. *Starr v. Nationwide Mut. Ins. Co.*, 548 A.2d 22, 25 (Del.Ch.1988) ; *Industrial Trust Co. v. Stidham*, 33 A.2d 159 (Del.1942) ; *In re Penn Central Transportation Co.*, 337 F.Supp. 791 (E.D.Pa.1972); *In re Emerging Communications, Inc. Shareholders Litigation*, 2004 WL 1043794, \*29 (Del.Ch. May 03, 2004).

The classic example of a personal tort claim is the personal injury claim. North Carolina courts have consistently held that the assignment of a personal injury claim is against public policy. *Charlotte-Mecklenburg Hosp. Authority v. First of Georgia Ins. Co.*, 340 N.C. 88, 91, 455 S.E.2d 655, 657 (1995) ; *N.C. Baptist Hospitals, Inc. v. Mitchell*, 88 N.C.App. 263, 362 S.E.2d 841 (1987). Tort claims such as unfair and deceptive trade practices, personal injury, bad faith refusal to settle, breach of fiduciary duty,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2004 WL 1534296
**(Cite as: Not Reported in B.R.)**

Page 8

and tortious breach of contract are personal to a plaintiff and cannot be assigned. *See Investors Title Ins. Co. v. Herzig,* 330 N.C. 681, 413 S.E.2d 268, 271-72 (1992) (invalidating assignment of claims for unfair trade practices); *Terrell v. Lawyers' Mutual Liab. Ins. Co. of North Carolina,* 131 N.C.App. 655, 660, 507 S.E.2d 923, 926 (1998) (invalidating assignment of claim for tortious bad faith); *Horton v. New South Insurance Co.,* 122 N.C.App. at 269, 468 S.E.2d at 859 (purported assignment of claims for unfair and deceptive practices, bad faith refusal to settle, breach of fiduciary duty, and tortious breach of contract is void).

**\*10** North Carolina has not defined the term "personal tort." In some jurisdictions, the case law makes a clear distinction between personal torts and property torts. If the tort is to the person, such as bodily injury, injury to reputation or for emotional distress, the claim cannot be assigned. In contrast, torts which involve damage to property are assignable. *See Gremminger v. Missouri Labor and Industrial Relations Commission* 129 S.W.3d 399 (Mo.App.2004). While no North Carolina case could be found regarding this distinction, there is case law stating that a tort claim arising from property damage can be assigned. *See J & B Slurry Seal Company v. Mid South Aviation,* 88 N.C.App. 1, 362 S.E.2d 812 (1987) ("tort and contract claims arising from property damage or loss may be assigned *in toto* "); *American Surety Co. of N.Y. v. Baker,* 172 F.2d 689, 692 (4th Cir.1949) (under law of North Carolina, a tort to personal property is assignable). However, more recent North Carolina case law appears more concerned about the distinction between an action arising out of contract and actions sounding in tort than whether the injury is to a person or property. *See Horton,* 122 N.C.App. at 268-69, 468 S.E.2d at 858 (allegations seeking damages based on tort, not merely on simple breach of contract, may not be assigned). Such cases have focused on the special relationship of trust and confidence between the parties in finding a tort "personal," rather than whether a person or property has been damaged. *Id.*

The Plaintiff argues that, inasmuch as the causes of action are § 541 property, "once they become part of the estate, the trustee and the bankruptcy court have the power to sell and assign the claims." The Plaintiff contends that such an assignment is property and federal law prevails over state law where there is a conflict. FN7 The court is required to review 11 U.S.C. § 541 (property of the estate), 11 U.S.C. § 363 (authorizing the sale of property), and the preemption doctrine.

> FN7. TUG does not believe that its assignment should be invalidated for public policy reasons but contends that if the court follows *Horton,* federal law should preempt North Carolina law.

Federal law, specifically 11 U.S.C. § 541, defines what types of property comprise the bankruptcy estate. Section 541 reads in pertinent part:
  (a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
  (1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.
  ...
  (c)(1)Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law-
  (A) that restricts or conditions transfer of such interest by the debtor;
11 U.S.C. § 541.

Causes of action are clearly § 541 property whether or not they are transferable by the debtor. *See In re Cottrell,* 876 F.2d 540, 542-43 (6th Cir.1989) (personal injury action was estate property notwithstanding that action was non-transferable under Kentucky law); *Tignor v. Parkinson,* 729 F.2d 977, 980-81 (4th Cir.1984) (unliquidated personal injury claim was § 541 property notwithstanding that claim was nontransferable under Virginia law) (effectively overruled on other grounds by Va.Code. Ann. § 34-28.1 ); *Integrated Solutions,* 124 F.3d 487 (3rd Cir.1997) (claims for unfair competition, breach of duty of loyalty, misappropriating confidential information, and interference with contractual relations were property of the estate notwithstanding New Jersey law prohibiting assignment of prejudgment tort claims).

**\*11** While federal law determine the scope of the estate property, a debtor's interest in property is determined by state law. *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) ; *In re Equipment Services Inc.,* 290 F.3d 739 (4th Cir.2002) (Chapter 11 debtor's property interest

at the time it files its bankruptcy petition are generally determined as a matter of state law); *In re Scalon*, 239 F.3d 1195 (11th Cir.2001); *In re O'Dowd*, 233 F.3d 197 (3rd Cir.2000); *In re Newpower*, 233 F.3d 922 (6th Cir.2000; *In re Pettit*, 217 F.3d 1072 (9th Cir.2000). The tort based causes of action acquired by TUG are § 541 property. They continue to be § 541 property nonwithstanding any North Carolina case law that prohibits their transfer. However, the sale of these tort claims under § 363 does nothing to change the impact of North Carolina policy that prohibits the assignment of tort claims.

Nothing in § 363 authorizes a trustee or a debtor to sell property in violation of a state law transfer restriction. "[N]either § 363(b)(1) nor § 704(1) expressly authorizes the trustee to sell property in violation of state law transfer restrictions." *Integrated Solutions*, 124 F.3d at 493. *See also In re Schauer*, 835 F.2d 1222, 1225 (8th Cir.1987) (trustee's power to transfer property of bankruptcy estate could be restricted by Minnesota property law); *In re Bishop College*, 151 B.R. 394, 398 (Bankr.D.N.Tex.1993) (the bankruptcy estate receives assets "subject to any restrictions imposed by state law").

North Carolina prohibits the assignment of personal tort claims. The Debtor's ability to sell those claims under § 363 is not "an empowering statute in the sense that new rights or powers for dealing with the property of the estate are created." *In re FCX, Inc.*, 853 F.2d 1149, 1155 (4th Cir.1988). In *Butner*, the Supreme Court made it clear that state law governs absent a compelling conflict with federal law to warrant preempting state law. *Butner*, 440 U.S. at 55, 99 S.Ct. at 918. North Carolina has established valid public policy arguments to restrict the assignment of tort claims. There is not a competing federal interest that would warrant a different result.

In conclusion, Counts III, IV, V, VIII, and IX are all personal tort claims which constitute § 541 estate property. The extent of the debtor's interest in property is governed by North Carolina law and limitations on that interest imposed by state law are applicable in bankruptcy. The assignment of these personal tort claims was in violation of North Carolina public policy and TUG may not go forward with these claims.

As for the claim for unlawful stock redemption, the court finds that the assignment was valid. The Delaware Code prohibits a corporation from purchasing its own shares when its capital is impaired as follows:

Every corporation may purchase, redeem, receive, take or otherwise acquire ... its own shares; provided, however, that no corporation shall ... [p]urchase or redeem its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation.

*12 8 Del. C. § 160(a)(2002). Section 174 provides for liability of directors of a corporation for unlawful payment of a dividend or unlawful stock redemption. 8 Del. C. § 174(c)(2002). Because TUG is seeking a statutory remedy against the Defendants for violations of Delaware corporate law, the court finds that the assignment of this claim does not violate North Carolina public policy. Furthermore, the court finds that the allegations contained within the Complaint are sufficient to state a claim. Therefore, the court will deny the Defendants' motion to dismiss this claim.

(4) Request for Costs

The Defendants have requested that the court impose sanctions upon TUG for its last minute filing of the Amended Complaint. The Amended Complaint was filed at 5:03 p.m. on April 19, 2004. The hearing on the motions to dismiss the original Complaint was scheduled for 9:30 a.m. the following morning. Counsel for TUG did not attempt to notify opposing counsel and numerous parties traveled from out-of-state to attend the hearing. Such conduct was certainly lacking in professional courtesy, but it was not procedurally improper. Inasmuch as no answer had been filed, TUG had the right, as a matter of law, to amend the Complaint. While the timing of the amendment was unfortunate, TUG's actions do not give rise to sanctions. Many of the arguments raised in the Defendants' motions were addressed by the Amended Complaint. FN8 Nevertheless, the court was still able to hear legal arguments related to the assignability of the claims, as set forth above. For these reasons, the court will not impose costs.

> FN8. In particular, the Defendants had alleged that TUG's Complaint failed to allege extraordinary circumstances that might overcome the presumption of the business judgment rule. The Amended Complaint addresses this criticism by including such allegations which, if true, would overcome the business judgment rule. Of course, this issue is now largely moot

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.  
Not Reported in B.R., 2004 WL 1534296  
**(Cite as: Not Reported in B.R.)**

Page 10

since the claims related to corporate mismanagement have been dismissed.

**(5) Bankruptcy Rule 7008(a)**

Finally, the court notes that the Amended Complaint contained no statement that the proceeding was core or non-core as Bankruptcy Rule 7008(a) requires. The court will not dismiss the Complaint for its failure to comply with Fed. R. Bankr.P. 7008(a) which requires complaints, counterclaims, cross-claims, and third-party complaints in adversary proceedings to "contain a statement that the proceeding is core or non-core." Dismissal for this reason is unwarranted in this case; but the court will direct the Plaintiff to filed an amended pleading to cure the procedural defect within 10 days of the entry of this memorandum opinion. *In re Edwards,* 112 B.R. 30, 31 (Bankr.W.D.Mo.1990) ( "Mandate of Rule 7008(a) is clear and omission of the 'core proceeding' designation, while potentially fatal, is not a mortal wound to the complaint but what can be healed through the amendment process of Rule 7015").

Based upon the foregoing, the Defendants' Motions to Dismiss TUG's individual claims for fraud, negligent misrepresentation, breach of fiduciary duty and constructive fraud, and unfair and deceptive acts are denied. The Defendants' Motions to Dismiss TUG's claim as assignee for BuildNet for unlawful stock redemption is denied. The remaining claims will be dismissed. An Order will be entered consistent with this Memorandum Opinion.

ORDER

**\*13** For the reasons set forth in the memorandum opinion entered contemporaneously herewith, it is ORDERED and ADJUDGED that the Motions to Dismiss by Bayard M. Atwood; Keith T. Brown; Justin Hall-Tipping; Norvell E. Miller; Nathan P. Morton; William W. Neal, III; Joel Koblentz; Peter J. Smith; Jack F. Kemp; Charles M. Cosby; Peter B. Drayson; Stephen L. Holcombe; Steven C. Thompson, Sr.; and Peter Abene, Sr. for counts IV, V, VIII, and IX are GRANTED. It is ORDERED that the Motions to Dismiss Counts I, II, VII, and X are DENIED. It is FURTHER ORDERED that the Motions to Dismiss TUG's individual claim in count III is DENIED, and the Motions to Dismiss TUG's claim as assignee of BuildNet in count III is GRANTED.

Bkrtcy.M.D.N.C.,2004.  
In re Buildnet, Inc.  
Not Reported in B.R., 2004 WL 1534296

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.