# EXHIBIT C

Westlaw.

Not Reported in F.Supp.                                                                                      Page 1
Not Reported in F.Supp., 1989 WL 52375
**(Cite as: Not Reported in F.Supp.)**

**H**
Not Reported in F.Supp., 1989 WL 52375
Only the Westlaw citation is currently available.
  United States District Court, S.D. New York.
  Daniel J. DEVANEY, as trustee under Chapter 11
  of the Bankruptcy Code for CB & R (Holdings)
  Ltd., American Marine Industries, Inc., Chester,
  Blackburn & Roder, Inc., Chester, Blackburn &
  Roder (N.Y.), Inc., Pan Antilles Shipping
  Company, Current Trader Ltd., Atlantic Clipper
  Ltd., Atlantic Intrepid Ltd., Pan American Mall
  Line, Inc., Marine Terminals, Inc. and Linea
  Naviera Panatlantica, S.A., Debtors; and
  Panatlantic, Inc., Current Marine, Inc., Chester,
  Blackburn & Roder (South Atlantic), Inc., Chester,
  Blackburn & Roder, Ltd., Panamerica Inc. and
  Pancaribe, Inc., debtors-in-Possession under
  Chapter 11 of the Bankruptcy Code, Plaintiffs,
                               v.
  A.P. CHESTER, J.C. Sklaire, R.A. Chester, Jeremy
  Chester, John Lynch, Howard Morgan, Sheldon H.
  Kinney, Joseph Carroll, Paul A. Jasinski, John P.
  Love, Evangelos Alexander, John W. Battles,
  William Beylund, W.R. Blackburn, Alan
  Bouwmeester, R. Ross Camardella, Kevin Chester,
  Britt Chester, Kristine Chester, Kenneth Coleman,
  Frank Dapena, John Davidson, Peter Evelyn, P.K.
  Fung, Michele Grindlinger, Bruno Lehoucq, Ruth
  Lehoucq, Joseph Perez-Jones, Carmen Pizzaro,
  Ronald Rasmus, Wade Battles, Robert Shay, Joseph
  Sierra, Aline Sklaire, William Stewart, Perry
  Walter, Hill Betts & Nash, (In the capacity of
  Escrow Agent only), Grayson & Bock, Salomon
  Brothers, Inc., First Boston Commercial
  Corporation, First Boston Commercial Paper
  Corporation, Erik K. Klaussmann, III, and David
  Lindsay, Defendants.
           **No. 83 CIV. 8455 (JFK).**

                    May 10, 1989.

Hahn & Hessen, New York City (Steven J. Mandelsberg, Barry M. Schkolnick, of counsel), for plaintiff.
Solinger Grosz & Goldwasser, New York City (Dan L. Goldwasser, John H. Eickemeyer, Barbara S. Baron, Virginia Whalen, of counsel), for defendant Grayson & Bock.

OPINION and ORDER

KEENAN, District Judge.
*1 This matter is before the Court on the motion of defendant Grayson & Bock ("G & B") pursuant to Fed.R.Civ.P. 56 to dismiss the ninth claim for relief in the plaintiff Trustee's Fourth Amended Complaint. The Trustee's ninth claim for relief, sharpened by a staggering amount of discovery, alleges that G & B negligently failed to include a " going concern" qualification in an audited consolidated financial statement of American Marine Industries, Inc. ("AMI") for the year ending February 28, 1982. The Trustee maintains that this qualification would have alerted CB & R (Holdings), Ltd. ("CB & R") (i) that based upon the operating course directed by AMI management, AMI might not survive beyond February 28, 1983, and (ii) that the consolidated financial statement's valuation of AMI's assets might be inaccurate. Conceding for purposes of this motion that they should have qualified the financial statement, G & B argues that given the awareness of CB & R's principals of the bleak financial condition of AMI during the relevant period, CB & R could not have reasonably relied on the unqualified consolidated financial statement in deciding to acquire AMI.
For the reasons set forth below, the Court grants summary judgment to G & B.

*FACTS*

This lawsuit has been the subject of numerous earlier reported and unreported decisions and unless the facts uniquely affect this motion, the Court will not address them in this opinion. Familiarity with the core facts is assumed. *See, e.g., Devaney v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 2
Not Reported in F.Supp., 1989 WL 52375
**(Cite as: Not Reported in F.Supp.)**

*Chester*, 813 F.2d 566 (2d Cir.1987); *Devaney v. Chester*, 1989 U.S. Dist LEXIS 2743 (S.D.N.Y. March 22, 1989). During the spring and summer of 1982, Erik K. Klaussmann, III and David Lindsay preliminarily investigated the possibility of acquiring AMI, an integrated shipping company. They attended several meetings with AMI management and obtained numerous documents concerning the operations of AMI and its subsidiaries. These documents indicated that AMI was a highly inefficient, poorly managed operation. Klaussmann and Lindsay, however, believed that adroit management could rejuvenate AMI and transform it into a profitable operation.

On August 2, 1982 Klaussmann and Lindsay entered into a Memorandum of Understanding with AMI's shareholders. The Memorandum of Understanding provided that CB & R (Klaussmann and Lindsay's investment vehicle) was prepared to conduct a detailed review of AMI's records up to the present provided that AMI's shareholders committed to sell at least 80% of AMI's outstanding stock upon receipt of an offer of a minimum of $30.00 per share. Shortly after executing the Memorandum of Understanding, CB & R retained the First Boston Corporation ("First Boston") as its investment banker and advisor. First Boston agreed to assist in obtaining adequate financing for the contemplated transaction and undertook to assist in the evaluation of a variety of information provided by AMI about its operations.

In late August or early September, 1982, G & B, AMI's independent auditors for more than a decade, issued a group of audit reports on the financial statements of AMI and its subsidiaries for the year ending February 28, 1982. The group consisted of audited consolidated financial statements which related to the entire AMI group of companies as a combined unit, and audited consolidating financial statements which contained the financial statements of each individual subsidiary in worksheet format prior to consolidation. The audited consolidated financial statements contained a "clean" opinion in that they did not contain a going concern qualification. The audited consolidating statements, however, contained a going concern qualification as to several AMI subsidiaries. The Trustee does not dispute that the figures in the audited statements are materially accurate. He asserts, however, that if a going concern qualification had been part of the audited consolidated financial statement, CB & R would not have acquired AMI. It is therefore necessary to explain the significance of a going concern qualification.

*2 A going concern qualification speaks to two aspects of a company's operations: its asset valuations and its continued existence. First, the qualification apprises the reader that the value of the company's assets may not be fairly reflected on the balance sheet because the company's continued existence is in jeopardy and upon liquidation the assets might command less than their book value. Second, the qualification indicates the accountant's conclusion that the continued viability of the company for one year from the date of the balance sheet is questionable. *See* Deposition of Vincent J. Love, Def. Exh. C, ("Love Dep.") pp. 83-85.

In order to secure third party financing for the AMI acquisition, CB & R and First Boston prepared a Confidential Offering Memorandum (the "Memorandum") for distribution to prospective lenders. The Memorandum, dated September 9, 1982, cataloged AMI's myriad difficulties with insightful detail, and attributed the problems to poor management. Relying on independent appraisals of AMI's assets, the Memorandum concluded "that the reported asset value and net worth of AMI are understated." Memorandum at 16. Reassured by this information and confident in their own management abilities, Klaussmann and Lindsay believed that they could return AMI to profitability.

On November 24, 1982 CB & R purchased AMI for approximately $9.6 million. Klaussmann and Lindsay's efforts to reverse the decline of AMI proved unsuccessful, and in June, 1983 CB & R filed a petition in bankruptcy.

*DISCUSSION*

Summary judgment may be rendered where the record reflects "that there is no genuine issue as to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 52375
**(Cite as: Not Reported in F.Supp.)**

Page 3

any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine if the evidence could permit a reasonable jury to reach a verdict for either side. See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Materiality is determined by reference to the substantive law " that might affect the outcome of the case." *Id.* In making this determination, the court does not resolve disputed issues; rather, it must "assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986).

The movant bears the initial burden of establishing the absence of any genuine issue of fact. See *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970). This burden is satisfied by the movant's demonstrating that the opponent's claim has no factual basis. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). The opponent then must adduce "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In doing so, the opponent may not "rely on mere speculation or conjecture as to the true nature of the facts...." *Knight,* 804 F.2d at 12. In sum, "Rule 56 mandates the entry of summary judgment ... against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. Guided by these principles, the Court examines the applicable law and G & B's motion.

*3 Under New York law, a party asserting a negligent misrepresentation claim must demonstrate:

"1. knowledge or its equivalent that the information is required for a serious purpose;

2. that the party to whom it is given intends to rely and act upon it;

3. injury in person or property because of such reliance; and

4. the relationship of the parties, arising out of contract or otherwise, is such that in morals and good conscience one party has the right to rely upon the other for information and the other owed a duty to give it with care."

*Zampatori v. United Parcel S'vce,* 125 Misc.2d 405, 408, 479 N.Y.S.2d 470, 472 (Sup.Ct. Monroe Co. 1984). An allegedly tortious act or omission is a proximate cause of the injury if it is a "substantial factor" in bringing about the injury. See *Texasgulf Inc. v. Colt Electronics Co., Inc.,* 615 F.Supp. 648, 660 n. 21 (S.D.N.Y.1984).

The Trustee's ninth claim for relief asserts that CB & R was injured by G & B's failure to include a going concern qualification in the audited consolidated financial statement. He maintains, in essence, that the negligent omission of a going concern qualification was a substantial factor in CB & R's decision to purchase AMI because the presence of a qualification would have dissuaded CB & R from acquiring AMI. G & B contends that CB & R did not rely on its opinion of AMI and therefore G & B did not cause CB & R's loss. Because the Trustee has failed to produce any admissible evidence which would link G & B's conduct to CB & R's injury, the Court agrees with G & B.

While the Trustee argues to the contrary, it is apparent that CB & R was aware of precisely what it claims a going concern qualification would have indicated. The record abundantly demonstrates that Klaussmann and Lindsay independently reached the conclusion about AMI's finances that the Trustee now maintains G & B should have. It is equally clear that Klaussmann and Lindsay relied on independent appraisals of AMI's major assets in determining to acquire AMI.

A. *Continued Existence*

As noted above, a going concern qualification alerts the reader that the continued existence of a company for a one year period is in doubt. In arguing that a going concern qualification in the audited consolidated statement would have deterred CB & R from purchasing AMI, the Trustee perforce states that CB & R was not aware of AMI's gloomy

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                                       Page 4
Not Reported in F.Supp., 1989 WL 52375
**(Cite as: Not Reported in F.Supp.)**

financial situation. This contention is wholly unsupported in the record.

The Confidential Offering Memorandum issued by CB & R presented in painstaking detail the perceived inefficiencies of AMI. For example, the Memorandum opined that

"... costs in all areas of operations are seriously out of control Aside from General and Administrative overhead costs ... all costs relating to vessel operations are now considered to be out of hand."

Memorandum at 19. *See also id.,* ¶ 16-29. The Memorandum concluded that

"so much disarray now exists in the company, that *immediate action* is required in all functional areas to put the company in a proper operating mode."

*4 *Id.* at 20 (emphasis added).

If the precarious future of AMI was not evident to CB & R when the Memorandum was issued in September, 1982, any optimism had to be swept away in October, 1982. At that time Klaussmann and Lindsay received AMI's *unaudited* financial statement for the six months ending August 31, 1982. The statement showed a staggering loss of $4.5 million to AMI, double the figure hazarded in the Memorandum. *See* Memorandum at 17. This information awakened the very doubts in Klaussmann and Lindsay's minds that a going concern qualification would have.

Klaussmann testified that

"We estimated that the time period that the company could continue at those levels was probably in excess of 3 to 4 months, but I would say five, six months.

As I said earlier, if the balance sheet is reflective of the obligations of the company, that the company, in our view, at that time could surely have not lasted at that operating level a full year...."

Deposition of Erik K. Klaussmann ("Klaussmann Dep.") at pp. 309-10. Similarly, Lindsay recounted that

"it was clear to anybody that if the situation had not changed, that sure, they would have run out of time and gone bankrupt as a consequence."

Deposition of David Lindsay ("Lindsay Dep.") at p. 275.

It cannot be seriously urged that Klaussmann and Lindsay were not aware that AMI was in desperate financial straits. Therefore, the contention that G & B misled Klaussmann and Lindsay by implicitly representing that AMI would survive another year continuing under current management's guidance is errant because a party cannot justifiably rely on a representation known to be false. *See Long Island Lighting Co. v. Transamerica Delaval, Inc.,* 646 F.Supp. 1442, 1452-53 (S.D.N.Y.1986).

The Court finds *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,* 684 F.Supp. 27 (S.D.N.Y.1988), *aff'd,* 865 F.2d 492 (2d Cir.1989) controlling on this point. In *Ryder,* plaintiff contracted to purchase oil from TOI. Merrill Lynch certified to plaintiff that TOI possessed the contracted-for oil. In fact, Merrill Lynch had failed to make the inquiry of TOI, and TOI did not have the oil. Plaintiff paid TOI pursuant to the contract, but never received the oil. Plaintiff then sued Merrill Lynch, claiming that if Merrill Lynch had properly performed its duty, it would have discovered that the oil did not exist and plaintiff would not have consummated the transaction.

Merrill Lynch moved for summary judgment, contending that plaintiff, by reason of extensive prior contracts with TOI, knew that TOI was a commodities exchange trader and thus was almost certain not to possess the contracted-for oil. Although Merrill Lynch was clearly negligent in failing to inquire whether TOI possessed the oil, the Court held that

"fault unrelated by casual connection to injury is without legal significance. Causation is missing in this case because, at the time [plaintiff] determined to enter into this contract with TOI, [plaintiff] had a degree of knowledge approaching certainty that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  Page 5
Not Reported in F.Supp., 1989 WL 52375
**(Cite as: Not Reported in F.Supp.)**

TOI did not at the time of contracting have physical possession of the quantity of oil covered by the contract."

*5 Ryder, 684 F.Supp. at 35, aff'd, 865 F.2d 492 (2d Cir.1989).

Similarly, CB & R undoubtedly appreciated the precarious future which awaited AMI when it decided to purchase the foundering operation. Simply put, a going concern qualification would only have disclosed to CB & R that which it already knew.

The Trustee contends that Ryder's rationale is inapposite because there Merrill Lynch had no prior dealings with TOI, whereas here G & B was AMI's longtime accountant and was familiar with AMI's value. This position is unpersuasive because clearly the salient factor in Ryder was the plaintiff's "knowledge approaching certainty" of the facts which it maintained Merrill Lynch should have disclosed. Although the relationship among the parties must be considered in evaluating the plausibility of reliance, that inquiry must give way when the record conclusively establishes a plaintiff's knowledge of facts it claims another should have provided.

The Trustee has failed to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). He adduces only "conclusory assertions of reliance and causation voiced by" Klaussmann, Lindsay and an expert witness. Ryder, 684 F.Supp. at 35, aff'd, 865 F.2d 492 (2d Cir.1989). As the Second Circuit Court of Appeals has observed, " 'mere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion.' " Argus, Inc. v. Eastman Kodak, Co., 801 F.2d 38, 42 (2d Cir.1986) (citation ommitted), cert. denied, 479 U.S. 1088 (1987). Moreover, testimony indicating how the principals of CB & R would have acted had a going concern qualification been issued would be inadmissible at trial:

"Vague, self-serving speculative testimony concerning what a party would have done under different circumstances is generally not admissible... . Inadmissible evidence, even if admitted without objection, does not provide the basis upon which a verdict can be predicated."

Bridgen v. Scott, 456 F.Supp. 1048, 1063 (S.D.Tex.1978); see also Elyria-Lorain Broadcasting Co. v. Lorain Journal Co., 298 F.2d 356, 360 (6th Cir.1961) ("[A] witness may not testify to what he would have done had the situation been different from what it actually was."). The Trustee's failure to advance any admissible evidence demonstrating an issue of fact regarding causation or reliance entitles G & B to summary judgment.

The Court has considered and rejected the Trustee's argument that reliance should be presumed here. The doctrine of presumed reliance announced in Affiliated Ute Citizens v. United States, 406 U.S. 128 (1972) is predicted on a "fraud on the market theory" and is unavailable where the transaction at issue is "personally negotiated." Litton Indus., Inc. Lehman Bros. Kuhn Loeb, Inc., 1989 U.S. Dist. LEXIS 3004, p. 8 (S.D.N.Y. March 27, 1989).

B. *Asset Valuations*

A going concern qualification also warns the reader that the value of a company's assets may not be fairly reflected on the balance sheet because the company's continued existence is questionable. The Trustee argues that had G & B qualified the audited consolidated financial statement, CB & R would have realized that AMI's assets were significantly overvalued and declined to purchase AMI. This contention is belied by the fact that CB & R obtained independent appraisals of AMI's assets upon which they clearly relied in concluding that G & B had understated the net worth of AMI.

*6 Upon deciding to pursue the acquisition of AMI in earnest, Klaussmann, Lindsay, and First Boston retained independent appraisers to value AMI's fixed assets. See Klaussmann Dep. at 258-59. Every "major asset" of AMI was appraised. Id. at 261. At his deposition, Lindsay testified:

"... having had the major assets of the company

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 6
Not Reported in F.Supp., 1989 WL 52375
**(Cite as: Not Reported in F.Supp.)**

valued or appraised, the appraised values at that time appeared to be in excess of the book values." Lindsay Dep. at 462.

Klaussmann and Lindsay evidenced their confidence in the independent appraisals and their dispute with G & B's valuation of AMI's worth in the Private Placement Memorandum where they stated:

"that the reported asset value and net worth of AMI are understated."

Memorandum at 16.

As reported in the Memorandum, the independent appraisals listed AMI's net worth at $34.2 million. G & B's consolidating financial statement for the year ending February 28, 1982 listed AMI's net worth at $7.9 million, $26.2 less than Klaussmann and Lindsay's representation. Concededly, $10 million of the adjustment resulted from assets to be gained through the acquisition, with no allowance for the corresponding liabilities. *See* Memorandum at 10. It is inescapable, however, that Klaussmann and Lindsay estimated AMI's net worth to be at least $16 million greater than G & B's book value even before the acquisition.

Therefore, the Trustee's contention that a going concern qualification would have dissuaded Klaussmann and Lindsay from purchasing AMI is contrary to common sense. Klaussmann and Lindsay simply did not rely on G & B's valuation of AMI's assets, as demonstrated in the Memorandum. The inclusion or omission of information in a Private Placement Memorandum is certainly the most telling evidence of what its authors considered material to an investment in a foundering company.

The evanescence of the Trustee's causation theory is again demonstrated when the significance of a going concern qualification is further examined. A going concern qualification's expression of doubt of the company's ability to continue for a year after the balance sheet date is necessarily predicated on the basis of current management's plans. *See* Love Dep. at 85. It is undisputed that Klaussmann and Lindsay contemplated sweeping policy, personnel and operational changes when they assumed the helm at AMI. *See* Memorandum at 20-30; Klaussmann Dep. at 254; Lindsay Dep. at 475-76.

Their confidence in the efficacy of these changes in restoring AMI to profitability obviously assuaged their concerns over the future of AMI. As demonstrated *supra* pp. 10-11, Klaussmann and Lindsay were well aware that AMI was moribund under existing management. A going concern qualification, by definition, would only have repeated this to them.

### CONCLUSION

For the reasons set forth above, defendant Grayson and Bock's motion for summary judgment as to the ninth claim for relief is granted. All of the parties remaining in this lawsuit are directed to appear for a conference in Courtroom 444 on June 2, 1989 at 10:00 a.m. to establish a ready-for-trial date.

*7 SO ORDERED.

S.D.N.Y.,1989.
Devaney v. Chester
Not Reported in F.Supp., 1989 WL 52375

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.