# EXHIBIT B

NO. D-167370

| | | |
|---|---|---|
| ROYAL INDEMNITY COMPANY, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| T.E. MOOR & CO., et al. | § | |
| | § | |
| Defendants. | § | 58th JUDICIAL DISTRICT |

## MP III HOLDINGS, INC.'S SECOND AMENDED ANSWER AND COUNTERCLAIM

TO THE HONORABLE JUDGE OF SAID COURT:

**COMES NOW** Defendant, MP III HOLDINGS, INC. d/b/a MTA Schools-131, MTA Schools-136 and MTA Schools-137 ("MP III"), and files this Second Amended Answer and Counterclaim, and in support of which avers:

### GENERAL DENIAL

1.    MP III denies each and every, all and singular, the material allegations in Plaintiff's Seventh Amended Petition and demands strict proof thereof.

WHEREFORE, MP III requests that this Court enter an Order denying Royal's demands for relief, dismissing Royal's Amended Petition with prejudice, and awarding MP III such other and further relief, including costs, attorneys' fees, and punitive damages to the extent permitted by law, as this Court may deem proper.

### SPECIAL DENIALS

1.    MP III specially denies that it executed or authorized the execution of any written instrument or contract that is the foundation in whole or in part of Royal's Seventh Amended Petition.

2.        MP III further specially denies that Royal satisfied the following conditions precedent:

•    Royal failed to fulfill the conditions and obligations of its contract of insurance issued to Student Financial Corporation and Student Finance Corporation's affiliates, subsidiaries, agents and lenders (collectively, "Insured Parties");

•    Royal failed to give notice and opportunity to cure as required;

•    Royal failed to perform the requirements of the Texas Insurance Code, Tex. Ins. Code Ann. (Vernon 2003); and

•    Royal failed to pay damages to Student Finance Corporation and the Insured Parties.

## AFFIRMATIVE DEFENSES

3.        MP III alleges the following affirmative defenses:

•    All or part of Plaintiff's claims are barred by either the two or four year statute of limitations. Plaintiff has alleged that Defendants engaged in fraud, fraudulent non-disclosure, negligent misrepresentation, aiding and abetting, and conspiracy to engage in each of the foregoing. Damages, if any, flowing from such acts are alleged to be defaulted student loans from students of the Defendants' schools. Some or all of the damages are barred by either the two or four year statute of limitations.

•    Plaintiff has failed to mitigate its damages which it claims flow from the alleged acts of Defendants.

•    Plaintiff failed to prudently or adequately underwrite, investigate or perform any due diligence with respect to the student loans, default rates of those loans, SFC's origination of student loans, and SFC's servicing of the student loans.

2

Plaintiff's losses, if any, are due to its own negligence rather than acts or failure by Defendants or due to reliance by Plaintiff on any acts or failure by Defendants.

- As set forth in the Counterclaim, Royal has engaged in a massive fraud. For this reason and the reasons set forth in the Counterclaim, Royal's claims are barred by fraud.

- All or some of Royal's claims are barred or offset under the doctrines of contributory and comparative negligence.

- Royal's injuries, if any, were not proximately caused by MP III.

- Royal's claims are barred by the doctrine of unclean hands.

- Royal's claims are barred by waiver.

- Royal's claims are barred by estoppel

- Royal's claims are barred by laches.

- Royal's claims are barred by illegality.

- Royal's claims are barred by the doctrine of payment.

- Royal's claims are barred by intervening negligence.

- Royal's claims are barred by the failure of privity and the doctrine of economic loss.

- Royal's claims are barred by collateral estoppel, issue preclusion, and claim preclusion.

- Royal's claims are barred by res judicata.

- Royal's claims are barred by offset, payment, and equitable reduction.

- Royal's claims are barred by failure of consideration.

3

- Royal's claims are barred by limitation of liability and damages under Tex. Civ. Prac. & Rem. Code § 41.008, and any other applicable limitation theory or statute.

- Royal failed to comply with the Texas Insurance Code, Tex. Ins. Code Ann. (Vernon 2003).

- Royal failed to comply with the policies of insurance issued to SFC and SFC's affiliates, subsidiaries, agents, and lenders.

- Royal failed to give notice and opportunity to cure.

- Royal failed to mitigate its damages (if any).

- Royal knowingly and expressly consented to and participated in any wrongful actions.

WHEREFORE, MP III requests that this Court enter an Order denying Royal's demands for relief, dismissing Royal's Amended Petition with prejudice, and awarding MP III such other and further relief, including costs, attorneys' fees, and punitive damages to the extent permitted by law, as this Court may deem proper.

## **COUNTERCLAIM**

### **Background**

1.    Royal's lawsuit against MP III is an intricate and nefarious scheme designed to defraud MP III and others out of scores of millions of dollars. About three weeks ago, on June 22, 2005, Royal belatedly produced a crucial email (the "September 28, 2000 email") and other critical documents, burying them among 30,000 other documents, which were out of sequence, in no logical order, and were comprised of thousands of duplicate pages previously produced. The September 28, 2000 email annuls

4

and contradicts much of Royal's officers' deposition testimony, and establishes – with Royal's own words – that Royal's lawsuit is frivolous and abusive. It also supports MP III bringing this Counterclaim against Royal for damages Royal caused MP III. SFC bought millions of dollars of MP III's student's loans. At the time SFC imploded with the help of Royal's fraudulent conduct and assistance, SFC owed MP III about $5,000,000. Without Royal's improper and actionable conduct, MP III would not have experienced these losses.

    2.     Based on the September 28, 2000 email and other documents produced on June 22, 2005, we now know that Royal knew about and willfully furthered a fraudulent scheme, partnering with SFC to divert money from its proper purpose of servicing student loans. It is now apparent that Royal's complaint against MP III is nothing more than a fraudulent effort to divert attention from its own wrongdoing and the damages that it caused others to sustain. We now know that Royal has not only maliciously averred fraudulent and frivolous claims, but it has buttressed its abusive contentions with contrived and knowingly inaccurate testimony from its own witnesses and employees.

    3.     In its infancy, Royal's wrongdoing involved issuing numerous insurance policies ("the Royal Policies") to SFC despite knowing that SFC was precariously straddled on the precipice of financial ruin. At some point during its relationship with SFC, Royal learned that SFC was improperly using Royal's insurance policies to issue private security offerings, the capital from which SFC used not to service existing loans as it should have, but instead to purchase new loans and to make payments on delinquent loans to prevent them from going into default. Even though it knew how SFC was using

the money raised from the private security offerings, Royal continued to issue new multi-million dollar insurance policies to SFC.

4.    The entire scheme perpetrated by Royal and SFC – which Royal itself recognized as a "Ponzi Scheme" in its September 28, 2000 email – depended on SFC's ability to continuously generate new money from these private security offerings to purchase additional student loans from MP III and other schools and to make payments on delinquent loans. Without the backing of the Royal Policies, SFC would have been unable to successfully issue new security offerings to further the Ponzi scheme.

5.    In addition, we now know that Royal knew that an ever increasing proportion of SFC's loans were delinquent and nearly in default and that SFC was improperly siphoning money from reserve accounts known as the "Experience Account" and the "Express Spread Account" to keep student loans from going into default.

6.    Based on financial projections prepared by Royal's Tony McKenzie ("McKenzie"), which McKenzie summarized in the September 28, 2000 email, Royal gambled that when SFC eventually acquired a large enough mass of loans, the return from the loans would offset the amounts that SFC was diverting from the cash flow to artificially deflate the default curve. As McKenzie stated, "[t]hey [SFC] are using money, which should be held for tomorrow, to pay costs today and are hoping for fresh money coming in tomorrow until the securitizations finally start generating cash."

7.    Royal's gamble failed. The scheme eventually imploded as SFC exhausted the Experience Account and the Excess Spread Account, depleted its other accounts, and was unable to assemble sufficient cash to issue a new security offering.

6

Even an eleventh hour multi-million dollar loan from Royal did not save SFC.  SFC collapsed and is now in bankruptcy.

8.    As set forth in greater detail below, internal Royal documents and communications between SFC and Royal show that:  Royal knew of the "extremely high delinquency rates [on the student loans held by SFC] . . . in the range of 65%"; that "SFC is running a kind of Ponzi Scheme"; that "the operation has to get its cash from the 'Institutional Reserves', which make up the basis of our [Royal] Experience Account"; that the shortfall in the Excess Spread Account was due to "delinquencies and not fees"; that "something is eating up the excess spread [reserve] before it has a chance to get to us [Royal]; that "SFC is taking the profits out of the program long before the excess spread reserve gets built up"; that "it would be very difficult . . . to replace us [Royal] at this late date"; that Royal was "in a lot of turmoil" regarding the account; that Royal's SFC account "was a new revelation every day"; that if Royal did not continue to issue policies as of April 2001 that Royal "would surely get whacked"; that Royal was "get[ting] completely crucified on the build up on of the excess spread [reserve]"; that as of July 2001, if SFC did not find an insurance replacement "[SFC would] be dead in the water and so very well may we [Royal]"; that SFC could not "borrow without the insurance guarantee and [SFC] would not keep coming to us [Royal] if they had another carrier on the line"; and that personnel at Royal considered themselves to be "idiots" for continuing to re-certify SFC for additional insurance policies.  Most shockingly, in an internal Royal email of December 4, 2001, a Royal executive raised the issue of how long Royal would keep SFC's business alive given what they knew as of that date concerning SFC, stating: "And given their [SFC's] business model, how much longer we might want to keep them

7

<u>in business.</u>" (emphasis added). This and other information discussed below demonstrates that Royal knew of the dismal financial performance of the SFC loan portfolio and, consequently, SFC's financial condition. Royal also knew the critical role of the insurance policies issued by Royal to SFC played in SFC's business model and that SFC continued to represent itself to schools such as MP III as a viable business through the on-going origination of student loans.

9.     After SFC collapsed, Royal embarked on a hostile campaign of lawsuits designed to mask its own fraud and negligence committed during its partnership with SFC. In a splurge of desperate litigiousness designed to divert attention from its own wrongdoing, Royal has sued countless truck driving schools, the former law firm that represented SFC, and most recently, individual officers of MP III. In one of Royal's actions against a truck driving school in federal court in Tennessee, Commercial Driver Institute ("CDI"), CDI sued Royal with a Counterclaim that mirrors MP III's Counterclaim. In response, Royal filed a motion to dismiss. In June 2005, the court denied Royal's motion, holding:

> CDI has alleged numerous facts, specific as to date and substance, indicating that Royal's staff, including Mr. Hibberd, Mr. McKenzie, and Mr. Schneider, had actual knowledge that SFC was making forbearance payments to create the illusion that SFC's student loan accounts were performing, that many student loans within SFC's portfolio were actually in or near default, that SFC's loan servicing was "abominable," that SFC was taking out profit before the insurance reserves had a chance to build up, that SFC was running out of cash and was unable to meet its lending obligations, and that SFC continued to accept student loans from CDI and other schools despite SFC's conduct and precarious financial condition.

(A copy of the opinion is attached as "Ex. A").

8

10.    As a consequence of Royal's baseless lawsuit and its orchestrated false testimony, MP III has expended hundreds of thousands of dollars and countless hours defending Royal's action. These damages are above and beyond the damages that MP III sustained from the collapse of SFC, which were also proximately caused by Royal. Indeed, as a result of Royal's failure to disclose the true financial condition of SFC to MP III and the other schools and as a result of Royal's insurance scheme with SFC, MP III sustained millions of dollars in damages when SFC collapsed.

## Parties

11.    Counterclaim Defendant Royal Indemnity Company ("Royal") is a Delaware capital stock insurance company with its principal place of business at 9300 Arrow Point Boulevard, Charlotte, North Carolina 28273.

12.    Counterclaim Plaintiff MP III Holdings d/b/a MTA Schools-131, MTA Schools-136, and MTA Schools-137 ("MP III") is a corporation organized and existing under the laws of Delaware with its former principal place of business in Elizabethtown, Pennsylvania.

13.    Student Finance Corporation is not a party to this action. Student Finance Corporation is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania. Student Finance Corporation is currently the subject of a Chapter 7 Bankruptcy proceeding in the United States Bankruptcy Court for the District of Delaware. Student Finance Corporations' affiliates are Student Marketing Services, LLC and Student Loan Services, LLC. Student Finance Corporation, Student Marketing Services, LLC, and Student Loan Services, LLC are collectively referred to herein as "SFC."

9

14.     Andrew Yao ("Yao") is not a party to this action. At all times relevant to this action, Yao owned and controlled SFC.

### Royal and SFC were Partners in the Scheme

15.     As in its action against CDI, in Royal's action against MP III, Royal claims that SFC misrepresented the rate of defaults on the student loans that it had originated with the students of the trucking schools. Royal also claims that SFC never disclosed that it was making payments on many of the student loans to keep the loans from going into default. The documents that Royal produced on June 22, 2005 to MP III unequivocally establish that Royal's claims are groundless and fraudulent, that Royal in fact knew that SFC was paying on the delinquent student loans – later called "Forbearance Payments" by SFC – after learning that many of the student loans would be in default if not for SFC making payments on delinquent loans. Even more disturbing, these documents – produced shortly before trial - reveal that much of Royal's officers' testimony during their depositions was at times cunningly vague, and at other times, outright untrue.

16.     Either from the beginning of Royal and SFC's relationship or sometime during it, Royal insured SFC's securitization offerings knowing that SFC was on the brink of financial ruin. Royal knew that without its insurance policies, SFC would collapse.

17.     SFC financed the purchase, origination, and service of student loans through "securitized" arrangements where it raised financing through the sale of security offerings in the private securities market. The securities offered were "bundles" of

10

student loans, the vast majority of which were issued to students of the truck driver training schools.

18.    The securitization process began with SFC's acquisition of student loans at a discount, using funds from a warehouse line of credit provided to certain SFC affiliates. SFC, through its affiliated entity, pooled the student loan accounts.

19.    SFC sold the pooled student loan accounts to an affiliated, now-bankrupt remote entity. The remote entity transferred the student loan accounts to a trust created by the remote entity. To fund the remote entity's purchase of the student loan accounts from SFC, the trust sold certificates and notes to investors. The certificates and notes were backed or secured by the principal and interest received from the student loan accounts.

20.    To promote the sale of these securities and to supposedly provide stability to the investments, SFC purchased credit risk insurance issued by Royal ("the Royal Policies"), which provided a guaranty to the investors.

21.    Through the Royal Policies, Royal agreed to insure and otherwise guarantee the payments due under the security offerings from the student loan accounts.

22.    Between January 1999 and November 2001, Royal issued 11 insurance policies to SFC covering approximately $716 million in student loans.

23.    SFC paid Royal at least $34.6 million in premiums for the 11 policies.

24.    Prior to Royal's issuance of the Royal Policies, Royal was afforded the opportunity to perform due diligence on the loans. William Hibberd ("Hibberd"), Tony McKenzie ("McKenzie"), David Schneider ("Schneider"), and Robert Van Epps ("Van Epps") were primarily responsible for handling this due diligence and negotiating the

Royal Policies with SFC. Hibberd, McKenzie, Schneider, and Van Epps were also primarily responsible for managing Royal's SFC account.

25.     Royal's due diligence on SFC was grossly negligent. Nonetheless, even Royal's superficial due diligence uncovered glaring red flags related to SFC's policies and practices. Among other things, Royal knew that SFC was failing to follow proper credit policy procedures and underwriting procedures and that SFC had a negative net worth.

26.     Through the due diligence it performed and its communications with SFC, Royal knew that SFC originated student loans from students at 50 to 60 truck driver training schools around the country, including MP III. During this due diligence, Royal did not communicate with the schools. Royal did not contact the schools or interview anybody at the schools or seek to review the loan documents, contracts, applications or any other materials in the school's possession. MP III, if approached by Royal, would not have hesitated to permit Royal to review its loan procedures, documents and operations – Royal failed to avail itself of this opportunity.

27.     With each of SFC's securitizations, Royal issued a new insurance policy. In the event of default on individual student loans in the securitization pools, the Royal Policies insured the payment of the principal and 90 days interest on the loans. As defined by the Royal Policies, default, and hence Royal's obligation to pay, did not occur unless a student loan account was more than 90 days delinquent.

28.     Based on its involvement in these transactions and the issuance of its insurance policies, Royal knew that SFC derived its funds to originate student loans from the securitization transactions as well as a line of credit called the "warehouse line,"

12

which used the student loans as collateral. Royal's policies insured the loans purchased from the securitization transactions and the warehouse line of credit.

29. Royal and SFC structured their relationship to provide protection to Royal in the event of defaults on the student loan accounts. Specifically, SFC created an Experience Account that was funded through reserves held back when SFC originated each student loan account.

30. The Experience Account served the function of a deductible on the Royal Policies. When a claim for non-payment on a loan would be made against Royal, Royal would pay the claim and then seek reimbursement from the Experience Account.

31. Royal's protection was enhanced further by the Excess Spread Reserve. Through the Excess Spread Reserve, a percentage of the income stream generated by the student loan accounts would be placed into this reserve account. Thus, as loans performed and new securitizations were funded, the Excess Spread Reserve would increase. At the same time, because payments were being made on the particular student loan accounts, the outstanding balances, and Royal's exposure, would decrease.

32. Royal could seek redress from the Excess Spread Reserve and the Experience Account in the event of non-payment on any insured loan.

**Royal's False Assertion that it was "Blind-Sided" by SFC's Wrongdoing**

33. In Royal's Complaint, Royal avers that until March 2002, it was unaware that a progressively large number of SFC's loans were delinquent. *See* Royal's Amended Petition at ¶¶ 9, 10. Royal claims that it first became aware of problems during a March

20, 2002 telephone call wherein Yao purportedly confessed the dire financial state of SFC.

34.     During discovery, Royal buttressed this claim with contrived and orchestrated testimony proffered by McKenzie and Hibberd. McKenzie testified that prior to March of 2002, Royal trusted SFC and would have stopped doing business with SFC if Royal was aware of any wrongdoing. In particular, McKenzie stated that in December, 2000, he did not "recall anything at the time that was raising tremendous concerns about the performance of the loans."

35.     McKenzie repeated variations of this theme throughout his deposition. When asked if he had any doubts about Yao in 2000 or 2001, McKenzie responded, "if we had thought that they were doing something wrong, we would have stopped doing business. We could have stopped doing business at any time." Moreover, he stated, "if there had been a reason along the way for us to have not trusted Andrew Yao or SFC, we would have stopped doing business with them."

36.     McKenzie testified that as of April 2001, "we didn't think that the basis of the transaction that we were seeing or – or doing business with – we didn't think that there was anything wrong with that transaction, with the legitimacy of it."

37.     McKenzie testified that as of December 2001, "at the time, I don't think we thought we were dealing with something that wasn't legitimate, something that wasn't performing. Yes, there were issues that needed to be addressed; but there again, we weren't seeing anything that led us to believe at that time that there wasn't a legitimate transaction that we were dealing with, that there was something where we needed to, you

14

know, raise the red flag and – and, you know, do – do something drastic; call in the FBI,

call in, you know – and I don't know who."

38.    McKenzie claimed that Royal was "blind-sided" by Yao's supposed

confessions in March of 2002 that SFC was making Forbearance Payments and that the

default rate on SFC's student loans was exceptionally high. He stated, "To be honest, we

were so stunned by what he said, we were almost like deers caught in the headlights. We

didn't know what to say to each other. Really, for a while we just didn't react. It was

just so incomprehensible. What we were saying is just we were so blind-sided."

39.    McKenzie also stated that "[i]t was after the March phone call of Mr.

Yao" that Royal first reached the conclusion that it did not have confidence in SFC's

management.

40.    Likewise, Hibberd averred in an affidavit that the March 2002 telephone

call with Yao "was the first time that the nature and scope of SFC's forbearance

payments was communicated to Royal." At his deposition, he testified that "[i]t was

definitely late March of 2002" when Royal learned of the Forbearance Payments.

41.    Hibberd also declared that "Royal had been unaware of the effect of these

[forbearance] payments on default rates and that, without such payments, default rates

that SFC had said were under 20% in reality exceeded 50%." He also testified that Royal

was not concerned with continuing to do business with SFC. "At some point we became

comfortable with going forward [with issuing additional insurance policies to SFC],

which implied we were, we felt we had a good enough understanding of the cash flows of

these specific transactions."

15

42.　　Testimony of other Royal employees has revealed the failures of Hibberd's and McKenzie's job performance. At the deposition of John Tighe ("Tighe"), Royal's CEO, when Tighe was presented with his written evaluation of Hibberd's performance, he confirmed that Hibberd's oversight of the SFC account was "unsatisfactory." He conceded in Hibberd's evaluation that "controls were not in place and bottom line results will ultimately be costly" and "the lack of discipline, missing information and disregard for underwriting guidelines that they put in place is unacceptable on the SFC account."

43.　　Robert Van Epps confirmed at his deposition that Royal never secured any reinsurance to protect the Royal Policies. Failing to secure such reinsurance grossly violated industry standards, particularly for large insurance policies such as the Royal Policies. Royal also failed to make sure there was an exclusion from insurance coverage if losses occurred from fraud. This was gross negligence on Royal's part.

**Royal's Knowledge and Furtherance of the Scheme**

44.　　The September 28, 2000 email recently produced by Royal reveals that Royal was anything but "blind-sided," as McKenzie testified at his deposition. In the September 28, 2000 email, McKenzie summarized his analysis of SFC's finances to Hibberd and Schneider.

45.　　In the email, McKenzie stated, "where are they [SFC] getting the cash to run the business. In the early stages of a loan portfolio's life, it does not generate enough excess cash after satisfying excess spread requirements, servicer fees, bank costs, etc, to support the loan making operation. . . . My thinking is the operation has to get its cash from the 'Institutional Reserves', which make up the basis of our Experience Account."

In other words, McKenzie believed that SFC was siphoning money from the Experience Account for improper purposes. Instead of using the Experience Account for its intended purpose – as a deductible to compensate Royal on any defaulting loans – SFC was diverting money from the account to purchase new student loans and to make payments on existing loans.

46.    McKenzie further explained on September 28, 2000, "I guess what I am saying is, I think SFC is running a kind of Ponzi scheme. They are using money, which should be held for tomorrow, to pay costs today and are hoping for fresh money coming in tomorrow until the securitizations finally start generating cash." (emphasis added). Thus, Royal and SFC were gambling that SFC's future mass of loans would eventually generate sufficient return to make up for the losses that resulted from SFC siphoning money from the Experience Account and elsewhere to purchase new loans and to make payments on existing delinquent loans.

47.    In the email, McKenzie observed that the Ponzi Scheme would not work without new multi-million dollar insurance policies from Royal. He wrote, "I think we need to know what they expect to get from the $200M loans and where do they expect it to go. I guess the biggest numbers are how much of the Institutional/ School Reserves they feel they will need to pay in 2000 and 2001 and what they expect to be the defaults from both the $75m & $200M policies. This is where I think it would be helpful to see Yao's model. I have asked about it several times and have not yet got it."

48.    McKenzie stated that under his "improved" financial "model," he calculated that the securitizations would "finally start generating cash . . .at 6 years."

17

49.    The email ends with "I guess the question is, 'Can they stay in business about one year after we add the last loan that we are going to ensure?"

50.    McKenzie has yet to be deposed about this September 28, 2000 email. Royal produced it over three months after his deposition was taken.

51.    When asked about the September 28, 2000 email at his deposition on June 29, 2005, Van Epps explained, "I wouldn't call it a Ponzi scheme because I think a Ponzi Scheme is, has a criminal negative connotation to it and it's something that eventually has to collapse, whereas at this point when we [Royal] were looking at it we felt that they [SFC] were using money today to pay off things from the past, certainly not what we wanted them to use the money for, and, and not how we wanted the structure to work, but we believed that it, there was a finite amount of time that we had to go though this and at that time the securitizations would start producing enough cash for SFC that they would be able to stop with that pay-as-you-go type of structure."

52.    With full knowledge of the foregoing financial practices of SFC, Royal continued to issue insurance policies to SFC, right up until SFC financially collapsed in June of 2002. Out of the 11 policies that Royal issued to SFC, it issued six after the September 28, 2000 email. Out of the $716 million in total insurance coverage under these 11 policies, the final six policies consisted of $459 million in coverage.

53.    Royal issued policy RST 147525 to SFC with an effective date of November 27, 2000. This policy covered approximately $55,616,550 in student loans.

54.    Royal issued policy RST 147526 to SFC with an effective date of January 31, 2001. This policy covered approximately $48,286,713 in student loans.

18

55.    Royal issued policy RST 147529 to SFC with an effective date of June 19, 2001. This policy covered approximately $150,000,000 in student loans.

56.    Royal issued policy RST 147533 to SFC with an effective date of August 17, 2001. This policy covered approximately $5,518,459 in student loans.

57.    Royal issued policy RST 147538 to SFC with an effective date of October 9, 2001. This policy covered approximately $100,000,000 in student loans.

58.    Royal issued policy RST 147536 to SFC with an effective date of November 15, 2001. This policy covered approximately $80,000,000 in student loans.

59.    Royal had a pecuniary interest in furthering the admitted Ponzi Scheme. With each new insurance policy, Royal received a hefty multi-million dollar premium. In total, it received at least $34.6 million in premium payments from SFC. Moreover, Royal was gambling, based on McKenzie's financial model, that SFC would eventually turn a profit on the Ponzi Scheme. Royal had no concern for the losses the truck driving training schools would experience.

60.    Hibberd, McKenzie, Schneider, and Van Epps knew that without Royal's insurance, SFC would collapse, exposing Royal to claims.

**Royal Failed to Conduct Proper Due Diligence on SFC**

61.    In violation of industry custom and practice and in gross and reckless disregard for the potential impact of its actions and omissions on MP III and the other trucking schools, Royal failed to conduct proper due diligence on SFC before issuing each of the Royal Policies.

62.    Proper due diligence would have included, among other things, research and background checks on SFC's officers and personnel, review and analysis of SFC's

financial statements and financial health, review of the underlying loan agreements, contacting the schools, interviewing prior insurers, reviewing and analyzing the default rate of the student loans, conducting an extensive review of the entire student loan program, reviewing the manner in which loans are originated, and reviewing the manner in which loans are serviced. Royal failed to conduct proper due diligence in any of these areas.

63.    Instead of conducting an independent investigation of SFC, Royal relied on SFC's representations about its business.

64.    Prior to partnering with SFC and issuing its Royal Policies, Royal had no experience with credit risk insurance, no experience with SFC, no experience with the truck driver training schools, and no knowledge of the practices and procedures of the truck driver schools.

65.    Prior to issuing the Royal Policies, Royal never interviewed or contacted MP III or any of the other trucking schools.

66.    Royal never conducted a background check on any of the principals of SFC, including Yao.

67.    In 1998, Royal never performed due diligence on the financial health of SFC.

68.    In 1999, Royal never performed due diligence on the financial health of SFC.

69.    In 2000, Royal never performed due diligence on the financial health of SFC.

70.    In 2001, Royal never performed due diligence on the financial health of SFC.

71.    Before issuing the Royal Policies, Royal never reviewed the actual student loan agreements.

72.    In addition, Royal never reviewed the contracts between SFC and MP III, wherein SFC agreed to service loans.  At his deposition, McKenzie admitted this failure. McKenzie also conceded that the forbearance reserve process that was mentioned in at least one of those agreements was "hidden in plain sight," and he conceded that Royal would have known about it had Royal simply read the agreement.  McKenzie testified:

> If anyone looking at this contract [between MP III and SFC dated October 12, 2000], they would – and read this Paragraph 7, they would see that term [forbearance reserve process] and – and see it there.
>
> Q.  So, it wasn't in hiding.  It was all there to be read if the agreement was just read, right?
>
> Counsel:  Objection to form.
>
> A[McKenzie].    There again, sir, sometimes things are hidden in plain sight.

73.    Before issuing the Royal Policies, Royal never reviewed SFC's Policy and Procedures Manual, which describes a "recourse default" procedure and states that a student loan account will only be flagged after it has missed "two (2) consecutive payments over a 60-day period" and is "anywhere between 61 to 91 days" delinquent.

74.    Before issuing the Royal Policies, Royal never requested due diligence or information from SFC's prior insurer, American International Group.

75.    Royal conducted no independent research on driver training school's student loan default rates. Instead, Royal relied on aggregate default rate reports provided by SFC.

76.    Royal failed to take precautions despite a disturbing concession by SFC's auditor. In an audit of SFC's financial statements, dated November 30, 1998, SFC's auditor stated:

> Management [of SFC] has elected to omit substantially all of its disclosures required by generally accepted accounting practices. If the omitted disclosures were included in the financial statements, they might influence the user's conclusions about the company's financial position and results of operations and cash flows. Accordingly, these financial statements are not designed for those for those who are not informed about these matters.

(emphasis added). This report was a glaring red flag, and Royal knew or should have understood the implications of these statements.

77.    From the time it issued its first Royal Policy until the date that SFC went into bankruptcy, Royal failed to take any remedial action to protect MP III and the other trucking schools from the Ponzi Scheme, even though it knew about SFC's dire financial condition, even though it knew that SFC was diverting money from the Experience Account and the Excess Spread Account to make payments on delinquent loans to prevent them from defaulting, even though it knew that SFC depended on the Royal Policies so that it could continue to issue new security offerings and further the Ponzi scheme, even though it knew that large numbers of student loans were on the verge of default, and even though Hibberd was experiencing "sleepless nights" over the SFC account. See *infra*, ¶ 140.

22

78.     Beyond Royal's failed due diligence, the content of the Royal Policies also shows Royal's utter disregard for its obligations.

79.     Royal failed to purchase reinsurance for its Royal Policies.  Instead, Royal retained full exposure on the policies.

80.     Royal's failure to obtain reinsurance on the Royal Policies violated statutory requirements followed by most states, including Delaware, Royal's domiciliary, that establish an upper limit of exposure on the policyholders' surplus.  In Delaware, the insurer cannot retain an amount on any loss exposure in excess of ten percent of the policyholders' surplus, although few insurers retain even the legal maximum of ten percent.  *See* 18 Del. C §909.

81.     In 1999, Royal's policyholders' surplus was $576 million.  In 2000, Royal's policyholders' surplus was $361.5 million.  In 2001, Royal's policyholders' surplus was $514 million.  In 2002, Royal's policyholders' surplus was $547.9 million.

82.     Thus, under Delaware law, Royal was not permitted to retain more than the following exposure on any one risk:  $57.6 million in 1999, $36.2 million in 2000, $51.4 million in 2001, and $54.8 million in 2002.

83.     The amounts of the Royal Policies, and therefore Royal's exposure, consistently and regularly exceeded these statutory thresholds.

84.     By failing to obtain re-insurance or otherwise to limit its exposure to an amount within the statutory limits, Royal demonstrated a gross and reckless disregard for industry standards, legal and statutory obligations, and the harm that its actions could have on MP III and the trucking schools.

23

85.    Tighe testified about Royal's failure to limit this risk exposure in the SFC account, admitting that Royal "should have had controls" in place.  Tighe testified:

>    ...the typical underwriter in Royal & SunAlliance for many, many, many years would be to limit the size of a net underwriting position to at or around five million bucks. And typically have reinsurance trees that are built up from the $5,000,000 net that allows the underwriter to aggregate their exposures, to manage the aggregations.
>
>    So for each and every underwriting position you take, if you limit it to $5,000,000, you know, you can quantify how much you have exposed in any given portfolio of business.  And in Bill [Hibberd]'s case they were taking underwriting positions that ultimately were far greater than the $5,000,000 net to the company and, and I thought with the benefit of hindsight – and I'll be the first to tell you, when you look at it in hindsight and you see what ultimately it could cost the company, $500,000,000, you say, geez, Bill, I think you should have had controls in place to limit your underwriting position to a lesser number than five hundred million bucks.

(emphasis added).

86.    Tighe also testified that Hibberd, McKenzie, and Van Epps had "disregard for underwriting guidelines," that the underwriting policies "were not "fully documented," and that Royal's guidelines "were in [Royal's] head."  Tighe testified:

>    And I said, Rob [Van Epps], I just, you know, want to know how closely you followed it [the underwriting manual].  And he said, what do you mean?  And I said, did you do background checks?  And Rob said, no, this was written along the way.  I think they had some pretty disciplined thought process on how they were going to do it, but it wasn't fully documented.
>
>    And I remember looking at Rob and just kind of walking away and, you know, I was just, that was it.  And that's what I was talking to here was, you know, you had underwriting guidelines that were in your head, you hadn't fully documented them yet, and even within the practices, the background checks, you didn't do.  So I was just dumping my ire on Bill.

24

(emphasis added).

87.    In addition to failing to follow proper underwriting guidelines, Royal failed to exclude fraudulent acts from coverage under the Royal Policies.

88.    In the insurance field, insurance is typically protection against events of fortuitous nature - not against intentional acts. It is standard industry practice for insurers to exclude fraudulent acts from insurance policies.

89.    Royal's failure to include this fraud exclusion in the Royal Policies demonstrates lack of diligence, gross and reckless disregard for the implications of its actions, and a total indifference to the harm that it could cause others to sustain.

### Royal Knew that SFC was not Properly Servicing the Loans

90.    In connection with the origination of a student loan, SFC had the obligation of servicing the loan. Servicing involved undertaking collection efforts and dealing with delinquent and defaulted student loan accounts.

91.    Unknown to MP III, SFC's servicing of the student loans was abominable. Among other things, SFC failed to follow appropriate servicing guidelines and practices.

92.    SFC's failure to service the student loan accounts properly led to high delinquencies and defaults among the SFC student loan portfolio.

93.    Unknown to MP III, SFC also failed to follow appropriate credit review and underwriting procedures in approving student loans for origination.

94.    Royal knew that SFC was not properly servicing the loans and that this was causing many of SFC's loans to become delinquent and to hang on the edge of default. In an October 26, 2001 email, Charlie Schiver, a Royal employee, queried to

Hibberd whether the "servicing company is a problem." This email was among those withheld from MP III and belatedly produced on June 22, 2005.

95.    Similarly, in another email belatedly produced on June 22, 2005, Andrew Jacobsen, also a Royal employee, advised Hibberd that "[t]he questions come (sic) down to comfort with the servicing of the loans and the ability of the finance company to recover defaulted amounts." The email is dated June 4, 1999.

96.    An August 1999 Due Diligence report by SFC's auditor, Baker & Associates, which both Hibberd and McKenzie testified that they had received and read, revealed multiple red flags and issues with SFC's procedures, including but not limited to:

> • At present, there is no documented nonperforming asset charge-off policy. A review of the current delinquency indicated that the last time loans were charged-off from the portfolio was in early 1997. Since that time, all defaults have remained active without regard to the probability of repayment . . .
>
> • Although some quality control – audit type activities are in place, the need still exists to employ a more formal independent audit program, given the anticipated expansion and growth in the unsecured student loan area . . .
>
> • While exceptions to published underwriting criteria are documented, the performance of these loans on an individual basis is not monitored . . .
>
> • Although published credit policies and procedures were in keeping with industry practices regarding format, basis, and direction, they often failed to indicate implementation responsibility . . .
>
> • Applications from schools are screened and approved by management prior to acceptance by SFC. The procedures, however, are not adequately documented nor monitored for compliance . . .

- A review of 15 randomly selected recent originations revealed that five loan applications did not indicate personal references (three of which the borrower had no prior established credit). This practice, in our opinion, creates problems in servicing accounts when the borrower fails to pay as agreed, by not having referenced for skip tracing . . .

- [With regard to collection procedures,] [p]ublished information with respect to required activities and procedures to follow-up was found to be very limited in both scope and content. The procedures did not follow the typical loan collection problem solving format used by a majority of experienced collection personnel . . .

- The true cause of delinquency [of loans], from an "original affordability" stand point, was not consistently identified / documented in the system . . .

- At present, collection personnel are evaluated subjectively without regard to quantifiable statistics such as: contact attempts / contacts made; promises secured; promises kept and repossessions. This practice is not only a deviation from industry practices but also generally results in reactive versus proactive delinquency control on the part of management, should delinquency or losses start to rise . . .

- [With regard to "Loss Handling /Asset Recovery"], [f]rom a practical perspective, none of the activities related to daily tasks (with the exception of reports) have been put into any instruction type format (what to do, when, why, etc.) . . .

- The customer service activities have not been incorporated into a formal structure. Consequently, a log of inquiries / complaints is not maintained, therefore reports are not available to determine how much time is spent on customer service . . .

Without the Report as an exhibit at his deposition, McKenzie remarkably characterized

the conclusions from the Baker Report as "indicating that SFC's policies and procedures

for underwriting of servicing were all, you know, reasonable and adequate" and "pretty

good." Likewise, without the Report entered as an exhibit, Hibberd said that the Report characterized SFC as "good and improving."

97.     McKenzie and Hibberd intentionally distorted the substance of the Report. McKenzie, Hibberd and Royal were well aware as early as 1999 that SFC was a time bomb ready to explode. But, Royal sought nearly $40 million in premiums, never believing it would have to pay for any coverage – and ignored the consequences to the schools which relied on SFC for funding.

### Royal Knew about the Forbearance Payments and the Non-Performing Student Loans

98.     Royal knew that SFC was making payments on delinquent student loan accounts.

99.     To avoid classifying student loans as "in default" as a result of SFC's failure to service the loans properly and to follow proper underwriting criteria, SFC made payments on these loans from its own funds. SFC labeled such payments "Forbearance Payments," a label that was disclosed by SFC to Royal in March of 2002 by Yao but a practice which was known by Royal since the Fall of 2000.

100.     By using Forbearance Payments, SFC manipulated and artificially depressed the default rates on its student loan portfolio. Royal was aware of SFC's practice of making Forbearance Payments.

101.     In 1999, the total amount of Forbearance Payments was approximately $2 million. In 2000, it increased to $9.5 million. In the year preceding the filing of SFC's bankruptcy, the amount of Forbearance Payments had increased to $45 million.

102.     SFC used proceeds from the securitizations to make Forbearance Payments, rather than to fund its servicing obligations. As a result, SFC began

experiencing extreme financial difficulties. By the Fall of 2000, Royal knew that SFC could not continue the Ponzi Scheme without Royal's assistance.

103.    Royal knew that SFC was making Forbearance Payments, that a massive number of student loans in SFC's loan portfolio were delinquent and on the verge of default, that SFC was taking some action designed to prevent loans from defaulting, and that SFC was failing to service loans properly.

104.    Although Royal claims no knowledge of SFC's practice of making Forbearance Payments, the report on Consolidated Financial Statements for the Years Ended December 31, 2000 and 1999 for Student Finance Corporation and Subsidiaries, which was provided to Royal, states that "The school reserve may include additional amounts designated to absorb forbearance made in accordance with school and borrower agreements and potential credit losses for sold loans based upon the deemed credit quality of the borrower." This Report also provides that well over $11 million in Forbearance Payments were made during the years 1999 and 2000.

105.    In addition, Yao told Royal about the Forbearance Payments in a March 6, 2000 teleconference, a point which he also reiterated in a follow-up memorandum addressed to Royal's McKenzie, Hibberd, and Schneider. The memorandum states that "[a]lso for students who are in forbearance, the schools advance payment on behalf of the student until the student resumes paying or until he defaults . . . this, of course, also distorts the default curve" Although Yao wrongly reports that the schools made the Forbearance Payments which in fact SFC made, Royal nevertheless knew of the Forbearance Payments. This memorandum provided Royal with knowledge of the very

29

practices of which Royal complains – namely artificial depression and distortion of the
student loan default curve based on payments made on behalf of the students.

106.    On January 6, 1999, SFC's insurance broker explained to Royal the
manner in which the "Institutional Reserve" - otherwise known as the Forbearance
Reserve, which was part of the Experience Account - would work: "Any shortfall in the
payments will be covered in the following priority: institutional reserves, excess reserve
escrow account, claim payments by Royal" Again, this shows that Royal knew about the
Forbearance Payments – precisely the practice about which it complains as having been
hidden by SFC and the schools.

107.    Royal also knew that the loans were not producing revenue because the
Excess Spread Reserve was not growing.  Since SFC's Excess Spread Reserve was
created from payments arising from the performance of the student loan accounts, if
payments were not received on the student loan accounts, the Excess Spread Reserve
could not build.

108.    In fact, the Excess Spread Reserve did not build as anticipated by Royal.
Among the documents belatedly produced by Royal on June 22, 2005 is a key April 3,
2001 email, wherein McKenzie writes to Rob Schrof, Hibberd, and others, stating that his
calculations "seem[ ] to suggest that the Excess Spread expected is somehow not
materializing in the cash flows" and that "what I did above [with certain calculations]
seems to say that the actual cash is not coming through to match."

109.    Likewise, in an April 5, 2001 email, which was also belatedly produced on
June 22, 2005, McKenzie comments, "something is eating up the excess spread before it
has a chance to get to us/the Excess Spread Reserve, rather than the money not making it

into the cash flows." This email and McKenzie's April 3, 2001 email described above demonstrate that Royal knew that the student loans were not performing properly and producing revenue, because the Excess Spread Reserve was not growing.

110.    In another critical document Royal belatedly produced on June 22, 2005, Scott Schauer ("Schauer"), an employee of Loofborrow, which was an investment banking firm hired by SFC, explained to McKenzie that the shortfall in the Excess Spread Account was due to "delinquencies and not fees." Further, the analysis attached to Schauer's email indicates that SFC was diverting millions of dollars from the Excess Spread Account to sustain delinquent student loans from going into default. This email is dated April 17, 2001.

111.    In a May 23, 2001 memorandum from SFC's attorney, Rod Gagne ("Gagne"), to Royal, which Royal also just produced on June 22, 2005, Gagne likewise confirms that SFC used the Express Spread Account to prevent delinquent loans from going into default. In the memorandum, Gagne also states that the aging of the loans – the temporal spread showing how overdue delinquent payments were – was not necessary or material to Royal's decision to insure the loans.

112.    Hibberd, McKenzie, and Schneider were in regular communication with each other and with SFC, and other emails and documents evidence and reflect Royal's knowledge of SFC's dire financial state.

113.    Royal was aware that massive numbers of student loan accounts were 60 to 90 days delinquent and on the verge of default based on the student loan account information provided to Royal by SFC.

31

114.    Notwithstanding this and with knowledge of SFC's financial morass, Royal continued to issue insurance policies and loans to SFC to earn millions of dollars in premiums thereby enabling SFC to continue its Ponzi Scheme and ultimately cause millions of dollars of damage to MP III and the other schools.

**The Scheme Unravels**

115.    Prior to the issuance of its first policy on December 23, 1998, an insurance broker with whom Royal worked closely communicated to Royal in a memorandum that "WE [ROYAL] ARE IN THE BEST POSITION AN INSURER COULD EVER REQUEST."

116.    Shortly after the issuance of its first policy, SFC sought additional policies from Royal. In an email from the insurance broker with whom Royal worked closely, the broker explained to Hibberd that SFC was looking for a $200 million policy limit and that "we [Royal] are in the driver's seat."

117.    In a June 4, 1999 email, Hibberd commented to Andrew Jacobson of Royal, "One point I'll make on the recovery issue. Even if we model it with no recoveries, which is how Tony [McKenzie] wrote his model, it will take extreme default frequencies for us to go into the toilet." Royal produced this email in its recent June 22, 2005 production.

118.    On June 10, 1999, an internal Royal email states that the Institutional reserve – otherwise known as the Forbearance Reserve which was part of the Experience Account – "provides [Royal] protection for the first 24 months. This is an important feature that should be retained in any negotiations."

119.   On June 15, 1999, an internal Royal email stated that Royal could sustain defaults of up to 50% without the Institutional Reserve and up to 60% with the Institutional Reserve.  Royal also expressed concern regarding SFC's loan servicing at this point stating: "[g]ood servicing is critical to the performance of any loan program."

120.   On February 11, 2000, Schneider discussed the "delinquency issue" with an insurance broker who stated, "I think we have a clearer picture of the 'delinquency' issue and although a point of concern, it does not appear critical at this time."

121.   On March 21, 2000, an internal Royal email states that McKenzie was looking into the issue of pre-payments – initial payments made by students – and its effect on the loan performance and defaults.

122.   On March 31, 2000, in an internal Royal email, Royal considered SFC's request for additional insurance and again considered the issue of student prepayments and the issue of the Excess Spread Reserve not building as anticipated.  Nonetheless, Hibberd stated, "I have a good feeling about this account and want to keep it going."

123.   On September 15, 2000, in an internal Royal e-mail, Royal discussed putting together its SFC due diligence.  McKenzie stated that an "important process to understand is how SFC uses the money which is withheld from schools, conceptually the Institutional Reserves / Experience Account."  He continued, "I am guessing that besides covering required defaults, it covers all of their operating costs and to some extent their securitization / financing costs and distributions to Yao."  In considering whether to question SFC on this account, McKenzie stated, "[h]ow much information would we want and would we want covenants on the use of that money, are two big questions . . . One problem is we never asked for anything on the past two deals."

33

124.    On October 4, 2000, an internal Royal email admits that its due diligence and underwriting of the SFC account had been far from adequate and previously had no structure whatsoever. The email attached a draft of an underwriting manual for financial enhancement insurance policies and stated, "still much work to be done; but at least it has a structure now."

125.    On October 6, 2000, an internal Royal email questions the ability of SFC to continue to do business without the insurance provided by Royal and refers to this as "[t]he ability to continue doing business question." Thus, as early as October 2000, Royal knew SFC may not be able to function as a going concern. Yet it still wrote hundreds of millions of dollars of insurance so it could collect multi-millions of dollars of premiums.

126.    On October 24, 2000, an internal Royal email stated that SFC was running out of money under the policy limits in existence and consequently, would be unable to complete securitization transactions. Royal acknowledged that "it would be very difficult, unless they [SFC] have started something, to replace us at this late date."

127.    On December 15, 2000, in an internal Royal email, Royal considered whether to include 108 loans not signed by schools under its policies. Royal stated, "I do not recall seeing any audit or similar investigation of SFC where fraud prevention was evaluated . . . do you see any old Freed Maxic reports on SFC address school fraud . . . Do you think we should employ Freed for an audit to investigate this?" Rather than discussing this issue with the schools directly, Royal decided to cover the loans at issue into its policy and never conducted any sort of investigation with respect to this issue and never communicated with the schools about this or any such similar issues.

34

128.    On February 2, 2001, Royal again admitted its inadequate due diligence and underwriting in connection with the SFC policies. In an email on this date, Royal states, "[a]ttached is a document that can serve as a starting point for our own underwriting due diligence procedures."

129.    On March 13, 2001, Royal conceded that it was unaware of a certain component of the securitization transaction concerning interest-only ("I/O") certificates, the proceeds of which were retained by SFC. Hibberd stated, "I'm embarrassed by this [I/O] thing we discovered yesterday. The sad thing is that we could have caught it, but never did . . . What htis (sic) means is that SFC is taking the profits out of the program long before the excess spread reserve gets built up." Upon reviewing this email at his deposition, Van Epps confirmed that Royal knew, at least as of the date of this email, that SFC's Express Spread Reserve Account, which was supposed to build up to protect Royal from defaulting student loans, was not in fact building up. Indeed, Yao was taking millions of dollars out of the business for his personal use. Royal would have discovered this had it done proper monitoring and due diligence.

130.    On March 26, 2001, Hibberd sent an email to McKenzie and Schneider stating, "I did a lot of thinking over the week-end (sic) about the SFC situation . . . [W]e have a real problem with the excess spread account . . . We also have a credit risk on the inforce policy . . . there is a pretty big theoretical credit risk . . . I think if we are really inreasonable (sic) on the going forward [policies] . . . we could perhaps lose the deal going forward."

131.    On April 5, 2001, in an internal Royal email, Hibberd stated, "Tony [McKenzie] and I have spent an afternoon of fun and one of the discoveries is the

35

extremely high delinquency rate on these notes . . . it looks to be in the range of 65% . . . This account is a new revelation every day."

132.    On April 6, 2001, Hibberd and Schneider exchanged emails contemplating how much free money SFC may have on hand in case Yao decided to flee the country. Hibberd commented, "I'm in a lot of turmoil on this account."

133.    On April 9, 2001, David King ("King") of Royal advised Hibberd that he "should strongly consider using an outside lawfirm to advise on changes to the SFC agreement/structure."

134.    On April 20, 2001, McKenzie sent an email to Diane Messick ("Messick"), Gary Hawthorne and others at SFC recognizing the abysmal performance of SFC's portfolio. McKenzie stated that 74% of the loans were current in April 2001 implying that $852,000 plus should have been received while the Servicer Reports showed that only $120,000 had been received. McKenzie recognized that "[i]t seems to continue that way through the rest of the months."

135.    On April 24, 2001, in an internal Royal email, Hibberd admitted that he had "[a]nother sleepless night" regarding the Royal Policies. He also stated, "If we don't go forward [with more policies to SFC], however, we will surely get whacked . . ."

136.    On April 25, 2001, Messick emailed McKenzie and advised him that up front payments by students at the time of loan origination and/or purchase by SFC contributed to loans falling into delinquency.

137.    On May 1, 2001, commenting on up-front payments by students at the time of loan purchase or origination, Hibberd wrote to McKenzie in an email: "[w]e

36

can't have this [up-front payments] because we get completely crucified on the build-up of the excess spread."

138.    On May 7, 2001, Hibberd stated in an email to Robert Van Epps of Royal that he knew "the harsh reality of policy #2 all too well. It is what I think about every night when I wake up."

139.    On May 13, 2001, Hibberd sent an email to King regarding a meeting with SFC stating "I don't feel real comfortabel (sic) with all this but I don't know if we are going to come up with anything much better. We may have to do some combination of experience account plus frther (sic) contributions to exces (sic) spread."

140.    On July 5, 2001, in an internal Royal email, McKenzie acknowledged that the $250 million policy and a $50 million interim policy continued to perform poorly and identified the fact that SFC was advancing money to the securitization trusts.

141.    On July 10, 2001, McKenzie wrote to Hibberd in an email, "If they [SFC] cannot find someone else to insure their securitizations, they will be dead in the water and so very well may we."

142.    On September 17, 2001, in an internal Royal email, Schneider stated that "[w]e should discuss the longer term strategy on this account (e.g., should we go beyond the current commitment and implications for ending.)" This email was in response to a request by SFC for a temporary increase to the policy limit to avoid an interruption in SFC's business.

143.    On September 26, 2001, McKenzie further inquired regarding the issues caused by the up-front payments by students at the time of origination of the loans by SFC. McKenzie stated that "[i]t would appear you feel up front payments have a

37

negative financial impact. As a significant financial part of a school's operations, could you not ask the schools to cease this practice or is there a significant reason why up front payments are desirable."

144.    In a December 4, 2001 email, McKenzie sent Hibberd and Schneider financial spreadsheets for the Experience Account. He wrote, "[t]he reason I am providing you these is to give an idea of how much longer we are dependent on SFC for these funds. And given their business model, how much longer we might want to keep them in business." McKenzie acknowledged that the Royal policies were keeping SFC in business as they allowed SFC access to capital and enabled SFC to complete securitization transactions and to continue to originate loans. McKenzie continued: "[t]hey [SFC] cannot borrow without the Insurance Guarantee and they would not keep coming to us if they had another carrier on the line."

145.    In the same December 4, 2001 email, McKenzie also acknowledged the abysmal servicing of loans by SFC: "As usual I have no idea what SLS' service standards are . . . not much effort is being put into the collections process, which shows in the delinquency stats."

146.    In the same December 4, 2001 email, McKenzie discussed the possibility of attempting to obtain "51% control in the business decisions relating to SLS . . .:" This discussion was in the context of Royal's decision whether to put SFC out of business by refusing to extend them any additional insurance.

147.    In response to the servicing and performance issues raised by McKenzie in the December 4, 2001 email, Hibberd stated: "[w]e also keep re-certifying them, so, are we idiots?" While Royal was wondering whether they were "idiots," they allowed the

38

SFC Ponzi Scheme to continue – all to the eventual multi-million dollar detriment of MP III and the other schools.

148.    On January 25, 2002, in an internal email, McKenzie stated that the servicing of the loans by SFC was "abominable" and acknowledged that "I still don't know if they [SFC] have corrected the Up-Front Payment problem." While Royal collected its premiums, it helped perpetuate the Ponzi scheme.

149.    By January 2002, it had become apparent that SFC had utterly depleted the Experience Account. McKenzie wrote to Hibberd and Schneider, "[w]e are owed $3.73M on the Experience Accounts."

150.    In February 2002, SFC was unable to find sufficient capital to conduct another round of security offerings. The following month, SFC advised Royal that SFC could no longer operate unless Royal provided it with millions of more dollars. In other words, SFC wanted Royal to help it continue the Ponzi Scheme further.

151.    To forestall SFC's imminent collapse and continue the Ponzi Scheme, Royal loaned significant sums of money to SFC. In particular, SFC used this money to make Forbearance Payments on loans to prevent them from going into default, the same Forbearance payments Royal complains of in its Petition suing the schools. In considering whether to go forward with a new deal with SFC, McKenzie wrote to Hibberd and Schneider on April 15, 2002, commenting, "As I said, I do not know whether we 'own' Andrew [Yao] or whether he owns us." Royal produced this email in its belated June 22, 2005 production.

39

152.    In an April 21, 2002 email that was also just produced on June 22, 2005,

McKenzie contemplates whether Royal itself should make Forbearance Payments on the

loans for April of 2002.  He wrote:

> On another note, if we are going to make a Forbearance
> Payment for April we need to decide ASAP how much we
> are going to pay:
>
> 1) the full amount, approximately $6.6 to $7.0 Million
> 2) only the amount to keep the 60 to 90 day loans from
> defaulting, approximately $3.0 to $3.5 Million
> 3) Not pay any
>
> SFC has about $3 Million in cash.  Are we going to
> demand they pay any part of 1 or 2.  SFC's systems are not
> that flexible, so we need to tell them what we are going to
> do by Monday or Tuesday at the latest.

153.    On or about March 28, 2002, with full knowledge of SFC's fraudulent

financial and operational condition, Royal gave $6,145,187.66 to SFC in the form of a

Promissory Note.  Royal intentionally made this loan so that SFC could continue to make

Forbearance Payments and continue the Ponzi Scheme – all to the detriment of MP III

and the other schools.  Van Epps testified, "On the phone call with Mr. Yao, we were told

that they did not have money to make that month's forbearance payment, which I believe

was around $6,000,000, and if they didn't make that, then somewhere, $120,000,000,

$150,000,000 of loans was going to default and Royal was going to be called upon to

make that payment.  So Royal's, so what, what SFC did was ask Royal to loan them the

money to make that forbearance payment."

154.    On or about April 29, 2002, Royal and SFC amended the Promissory Note

to advance a total of $12,302,150.88 to SFC.  Again, Royal knew that SFC would use this

money to make Forbearance Payments and continue the Ponzi Scheme.

40

**Royal's Ponzi Scheme Caused MP III to Sustain Millions of Dollars in Damages**

155.    Royal intentionally and wantonly failed to notify MP III (as well as other schools doing business with SFC) about the admitted "Ponzi Scheme" and that SFC was on the brink of financial collapse.

156.    Royal had a pecuniary motivation to refrain from notifying MP III.  If Royal unveiled the scheme, then MP III and likely the other schools would have severed their dealings with SFC, opting instead for a financially stable business partner which could honestly and professionally fund the loans.

157.    If the schools departed SFC's book of business, then Royal would have been deprived of its multi-million dollar premiums as well as exposed to loss from policies already issued.

158.    As the scheme began to crumble and SFC careened toward financial disaster, SFC repeatedly re-assured MP III and the other schools that its "business model is strong." For example, in October 2001, SFC told the schools that "SFC is a strong and vibrant company."

159.    Royal knew that SFC was re-assuring the schools.  Royal knew that SFC was lying and Royal knowingly and in concert with SFC continued the Ponzi Scheme all to the detriment of the schools.

160.    When SFC did finally collapse, MP III sustained millions of dollars in damages.  SFC could not pay the monies owed MP III for student tuitions.

161.    Under MP III's agreements with SFC, MP III received payments from SFC for the tuition loans within 45 days after each student graduated.

41

162.    When SFC collapsed, MP III was strapped with the overhead costs, training expenditures, fees, and other costs for the schooling of all of its students who had loans from SFC who were then enrolled as well as for all of the students who had SFC loans and who had recently graduated.

163.    In its lawsuit, Royal seeks to reap even more money at the expense of the already once defrauded MP III.

164.    Three weeks ago, on June 22, 2005 – nearly three years after MP III's first request for documents on November 26, 2002 and a little more than two months before the start of trial - Royal produced the September 28, 2000 email, which combined with other documents also produced on June 22, 2005, are the most critical documents in this case. The September 28, 2000 email and the other inculpatory documents were buried among approximately 30,000 apparently randomly shuffled documents. Many or most of the other documents had already been produced, and these documents were inserted among the mix. Royal and its lawyers hoped that these inculpatory documents would never be discovered because they confirm Royal's complicity with SFC in the Ponzi Scheme.

### COUNT I – NEGLIGENCE

165.    MP III incorporates by reference the allegations of Paragraphs 1 to 164 of this Counterclaim as set forth at length herein.

166.    Royal had a duty to act as a reasonably prudent person would under the same or similar circumstances, considering the reasonably foreseeable risk or probability of injury to individuals and entities situated such as MP III.

42

167. By funding, insuring, and assisting SFC in the Ponzi Scheme, Royal breached its duty.

168. As a proximate result of Royal's actions and omissions, MP III sustained millions of dollars in damages when SFC collapsed.

169. MP III is entitled to compensatory damages and other damages.

### COUNT II – GROSS NEGLIGENCE

170. MP III incorporates by reference the allegations of Paragraphs 1 to 169 of this Counterclaim as set forth at length herein.

171. Royal had a duty to act as a reasonably prudent person would under the same or similar circumstances, considering the reasonably foreseeable risk or probability of injury to individuals and entities situated such as MP III.

172. By funding, insuring, and assisting SFC, Royal breached its duty.

173. Royal's acts and omissions involved an extreme degree of risk, considering the probability and potential harm to others, including MP III and others similarly situated.

174. Royal was aware of the risk to others by its acts and omissions but nevertheless proceeded in conscious indifference of the rights and welfare of others, including MP III and others similarly situated. Royal acted wantonly, recklessly, and with conscious disregard for the damages it was inflicting on MP III.

175. Royal's acts and omissions were malicious.

176. As a proximate result of Royal's actions and omissions, MP III sustained millions of dollars in damages when SFC collapsed.

177. MP III is entitled to compensatory damages and other damages.

43

178. Royal's Ponzi Scheme was so egregious that punitive damages should be assessed against Royal.

### COUNT III – NEGLIGENT MISREPRESENTATION

179. MP III incorporates by reference the allegations of Paragraphs 1 to 178 of this Counterclaim as set forth at length herein.

180. In the course of Royal's business, Royal funded, insured, and assisted SFC even though Royal knew or was negligent in not knowing that SFC was on the verge of collapse, that a vast number of SFC's student loans were delinquent, and that SFC was using Forbearance Payments to keep loans from defaulting.

181. Royal's insurance policies enabled SFC to make security offerings and gave credibility to SFC in the market.

182. By funding, insuring, and assisting SFC, Royal enabled SFC to purchase and originate new student loans.

183. Royal's funding, insurance policies, and assistance enabled SFC to make Forbearance Payments from the Experience Account, the Express Spread Account, and from other SFC accounts and monies.

184. Royal failed to exercise reasonable care in deciding to fund, insure, and assist SFC.

185. MP III actually and justifiably relied upon SFC's representations that its business was financially sound and that it had the financial ability to fund and service the student loan accounts.

186. These representations would not have been possible – indeed, SFC would have quickly collapsed – without Royal's ongoing assistance, funding, and insurance.

44

187.    Royal and SFC failed to disclose to MP III that SFC was a financially unstable and illegitimate enterprise that would collapse without the making of Forbearance Payments on student loans and the credit risk insurance provided by Royal

188.    As the proximate result of Royal's actions, MP III sustained damages in the millions of dollars when SFC collapsed.

189.    MP III is entitled to compensatory damages and other damages.

190.    Royal's scheme was so egregious that punitive damages should be assessed against Royal.

### COUNT IV – FRAUDULENT MISREPRESENTATION

191.    MP III incorporates by reference the allegations of Paragraphs 1 to 189 of this Counterclaim as set forth at length herein.

192.    In the course of Royal's business, Royal funded, insured, and assisted SFC even though Royal knew or should have known that SFC was on the verge of collapse, that a vast number of SFC's student loans were delinquent, and that SFC was using Forbearance Payments to keep loans from defaulting.

193.    Royal's insurance policies enabled SFC to make security offerings and gave credibility to SFC in the market.

194.    Royal's funding, insurance policies, and assistance enabled SFC to purchase and originate new student loans.

195.    Royal's funding, insurance policies, and assistance enabled SFC to make Forbearance Payments from the Experience Account, the Excess Spread Account, and from other SFC accounts and monies.

196.    Royal intended for others to act and rely upon its assistance, funding, and insurance that they provided to SFC.

197.    MP III actually and justifiably relied upon SFC's representations that its business was financially sound and that it had the financial ability to fund and service the contracts that MP III forwarded to it.

198.    Royal and SFC failed to disclose that SFC was a financially unstable and illegitimate enterprise that would collapse without the making of Forbearance Payments on student loans and the credit risk insurance provided by Royal.

199.    These representations would not have been possible – indeed, SFC would have quickly collapsed – without Royal's ongoing assistance, funding, and insurance.

200.    As the proximate result of Royal's actions, MP III sustained damages in the millions of dollars when SFC collapsed.

201.    MP III is entitled to compensatory damages and other damages.

202.    Royal's fraudulent scheme was so egregious that punitive damages should be assessed against Royal.

### COUNT V – FRAUDULENT NONDISCLOSURE

203.    MP III incorporates by reference the allegations of Paragraphs 1 to 202 of this Counterclaim as set forth at length herein.

204.    In the course of its business, Royal knew that SFC was on the verge of collapse, that a vast number of SFC's student loans were delinquent, and that SFC was using Forbearance Payments to keep loans from defaulting.

205.    Royal knew of MP III's existence, and it knew that MP III had a business relationship with SFC and was relying on SFC.

46

206.    Royal was in a superior and a special position to notify MP III of the financial problems at SFC.

207.    Instead of notifying MP III of SFC's financial problems, Royal instead continued to fund, insure, and assist SFC.

208.    Royal and SFC failed to disclose that SFC was a financially unstable and illegitimate enterprise that would collapse without the making of Forbearance Payments on student loans and the credit risk insurance provided by Royal.

209.    These representations would not have been possible – indeed, SFC would have quickly collapsed – without Royal's ongoing assistance, funding, and insurance in the Ponzi Scheme.

210.    As the proximate result of Royal's actions, MP III sustained damages in the millions of dollars when SFC collapsed.

211.    MP III is entitled to compensatory damages and other damages.

212.    Royal's fraudulent scheme was so egregious that punitive damages should be assessed against Royal.

### COUNT VI - CONSPIRACY TO COMMIT FRAUD

213.    MP III incorporates by reference the allegations of Paragraphs 1 to 212 of this Counterclaim as set forth at length herein.

214.    Royal formed a common plan or agreement with SFC, the objective of which was to generate and sell loans to investors despite SFC's precarious financial state. In furtherance of this conspiracy, Royal issued 11 Royal Policies to SFC, which allowed SFC to continue to originate student loans and to make Forbearance Payments on student loans. Royal also provided one or more loans to SFC in the form of a Promissory Note.

215.    Royal's insurance policies, funding, and assistance enabled SFC to make security offerings and gave credibility to SFC in the market.

216.    SFC knowingly and recklessly made material misrepresentations to MP III about the health and financial condition of its business.

217.    SFC intended for MP III to act upon its representations and omissions.

218.    MP III actually and justifiably relied upon SFC's representations that its business was financially sound and that it had the financial ability to fund and service the contracts that MP III forwarded to it.

219.    Royal and SFC failed to disclose that SFC was a financially unstable and illegitimate enterprise that would collapse without the making of Forbearance Payments on student loans and the credit risk insurance provided by Royal.  Royal conspired with SFC in perpetuating the Ponzi Scheme.

220.    Through its insurance, funding, and assistance, Royal furthered the fraudulent scheme.

221.    As the proximate result of SFC's and Royal's actions, MP III sustained damages in the millions of dollars when SFC collapsed.

222.    MP III is entitled to compensatory damages and other damages.

223.    The fraudulent scheme was so egregious that punitive damages should be assessed against Royal.

### COUNT VII – AIDING AND ABETTING

224.    MP III incorporates by reference the allegations of Paragraphs 1 to 223 of this Counterclaim as set forth at length herein.

48

225. SFC made representations to MP III that its business was financially sound and that it had the financial ability to fund and service the contracts that MP III forwarded to it.

226. SFC breached its duty of disclosure to MP III by failing to disclose that it was a financially unstable and illegitimate enterprise that would collapse without the making of Forbearance Payments on student loans and the credit risk insurance provided by Royal.

227. SFC's misrepresentations and breach of this duty resulted in harm and damages to MP III.

228. Royal provided substantial assistance to SFC in making these misrepresentations and in breaching this duty by providing SFC with credit risk insurance which Royal knew was a key component of SFC's enterprise. Royal also provided a loan to SFC, knowing that it would be used by SFC to make Forbearance Payments.

229. As a proximate result of Royal's aiding and abetting SFC's breach of duties and misrepresentations, MP III suffered damages. Royal aided and abetted SFC in all of the wrong doing alleged in the counterclaim and in furthering the Ponzi Scheme.

230. MP III is entitled to compensatory damages and other damages.

231. The scheme was so egregious that punitive damages should be assessed against Royal.

WHEREFORE, MP III demands judgment against Royal for an amount to be determined at trial, together with interest, Court costs, attorneys' fees, punitive damages, and any other relief that the Court deems just and proper.

Respectfully submitted,

**GERMER GERTZ, L.L.P.**

By: _____

    Lawrence Germer
    State Bar No. 07824000
    Germer Gertz, L.L.P.
    550 Fannin, Suite 500
    Beaumont, Texas 77701
    (409) 654-6700
    (409) 835-2115 (Fax)

    Amy Keith
    State Bar No. 11185530
    Germer Gertz Beaman & Brown LLP
    301 Congress Ave, Ste 1825
    Austin, Texas 78701
    (512) 472-0288
    (512) 472-0721 (Fax)

    **OF COUNSEL:**
    Alan K. Cotler
    Andrew P. Hoppes
    Steven T. Voigt
    REED SMITH LLP
    2500 One Liberty Place
    1650 Market Street
    Philadelphia, PA 19103
    (215) 851-8100
    (215) 851-1420 (Fax)

    ATTORNEYS FOR DEFENDANTS MP III
    HOLDINGS, INC., D/B/A MTA
    SCHOOLS-131, MTA SCHOOLS-136,
    AND MTA SCHOOLS-137

**Jury Trial Demanded**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing MP III Holdings Second Amended Answer and Counterclaim has been provided to the following counsel/parties of record on this 20th day of July, 2005:

**Attorneys for Plaintiff, Royal Indemnity**
Harvey G. Brown
Howard L. Close
Andrew Love
*WRIGHT, BROWN & CLOSE, LLP*
Three Riverway, Suite 600
Houston, TX 77056
Via Federal Express

Michael H. Barr
*SONNENSCHEIN NATH & ROSENTHAL*
1221 Avenue of the Americas
New York, NY 10020-1089
Via U.S. Mail

Alan S. Gilbert
*SONNENSCHEIN NATH & ROSENTHAL*
233 South Wacker Drive, Suite 8000
Chicago, IL 60606
Via U.S. Mail

Daniel D. Barnowski
*SONNENSCHEIN NATH & ROSENTHAL*
1301 K Street, NW, Suite 600
Washington, DC 20005
Via U.S. Mail

**Student Marketing Services, LLC**
**And Student Loan Servicing, LLC**
Harold Hendrickson, President
Student Loan Servicing, LLC
1405 Foulk Road
Wilmington, DE 19803
Via U.S. Mail

**Attorneys for Coastal College, Inc.:**
Tara G. Richard
Cornelius R. Heusel
Patrick J. Veters

51

*JONES WALKER WAECHTER POITEVENT*
201 St. Charles Ave., 50th Floor
New Orleans, LA  70170-5100
Via U.S. Mail

R. Kelly Donaldson
Ruth Brewer Schuster
*JONES WALKER WAECHTER POITEVENT*
10001 Woodloch Forest Dr., Ste 350
The Woodlands, TX  77380
Via U.S. Mail

_____
Lawrence Louis Germer