**EXHIBIT F**

**Westlaw.**

Not Reported in F.Supp.2d                                                                                            Page 1

Not Reported in F.Supp.2d, 1999 WL 803888
(Cite as: Not Reported in F.Supp.2d)

▷

Not Reported in F.Supp.2d, 1999 WL 803888
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Bart A. BROWN, Jr., as Chapter 7 Trustee for Foxmeyer Drug Corporation, Foxmeyer Drug Company Healthcare Transportation System, Inc., Merchandise Coordinator Services Corporation, Foxmeyer Software, Inc. and Health Mart, Inc., Plaintiffs,
v.
SAP AMERICA, INC. and SAP AG, Defendants.
No. C.A. 98-507-SLR.

Sept. 13, 1999.

Norman L. Pernick , Mark Minuti , and Scott J. Jensen , of Saul, Ewing, Remick & Saul LLP, Wilmington, Delaware. Daniel B. Goldman , Mark W. Smith , and Joseph E. Gehring, Jr. , of Kasowitz, Benson, Torres & Friedman LLP, New York, New York, for Plaintiff, of counsel.
David E. Brand , of Prickett, Jones, Elliott & Kristol , Wilmington, Delaware, Kell M. Damsgaard , and Tracy Zurzolo Frisch , of Morgan, Lewis & Bockius LLP, Philadelphia, Pennsylvania, for Defendants, of counsel.

MEMORANDUM OPINION

ROBINSON, J.

I. INTRODUCTION

*1 Currently before the court is a motion to dismiss plaintiff Bart A. Brown, Jr.'s complaint. FN1 (D.I.7) Plaintiff is the Chapter 7 Trustee for the consolidated bankrupt estates of FoxMeyer Corporation and FoxMeyer Drug Company (collectively, "FoxMeyer"). FN2 Plaintiff's complaint alleges breach of contract and a variety of other claims against defendants SAP AG and SAP America, a German software designer and its American subsidiary, respectively. FN3 The court has jurisdiction over this matter as a civil action " related to" a bankruptcy proceeding. See 28 U.S.C. § 1334(b). Neither party disputes that this district is the proper venue for this suit. See 28 U.S.C. § 1409(a). For the following reasons, the court shall grant in part and deny in part defendants' motion.

> FN1. Defendants also filed a motion to strike plaintiff's claim for damages. (D.I.4) The parties informed the court in a December 4, 1998 letter that they "have agreed to enter into a stipulation pursuant to which defendants will withdraw their motion to strike and plaintiff, with the Court's permission will amend the complaint." (D.I.14) Neither an amended complaint nor a stipulation withdrawing defendants' motion to strike has been filed.
>
> FN2. Plaintiff also purports to represent Healthcare Transportation System, Inc., Merchandise Coordinator Services Corp., FoxMeyer Software, Inc., and Health Mart, Inc. Although plaintiff lists these corporations in the complaint's caption, it is not apparent from the complaint whether these corporations are subsidiaries of FoxMeyer or how defendants' alleged misconduct affected these corporations.
>
> FN3. According to the complaint, SAP is an acronym for "Systems, Applications, and Products." (D.I.1, ¶ 9) SAP America is incorporated under the laws of Delaware and has its principal place of business in Pennsylvania.

II. BACKGROUND

For purposes of this motion to dismiss, the court accepts the following facts, taken from plaintiff's complaint, as true. This suit has its genesis in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 1999 WL 803888
(Cite as: Not Reported in F.Supp.2d)

FoxMeyer's August 1996 filing for Chapter 11 reorganization in the District of Delaware. FN4 Prior to filing for bankruptcy, FoxMeyer was a wholesale drug distribution company specializing in purchasing pharmaceutical and health care products from various drug manufacturers and reselling them to hospitals and other health care providers. (D.I.1, ¶ 14) Shortly after filing for reorganization, the bankruptcy court ordered each of the debtors' cases converted to a Chapter 7 liquidation proceeding. The bankruptcy court then appointed plaintiff as Chapter 7 Trustee. Thereafter, plaintiff filed the present suit.

> FN4. All but one of the debtors are incorporated in Delaware and have principal places of business in Carrollton, Texas. According to the complaint, Health Mart, Inc. is incorporated under the laws of Colorado and has its principal place of business in Carrollton, Texas. (D.I.1, ¶ 8)

According to the complaint, defendants sold defective software to FoxMeyer that crippled FoxMeyer's business and ultimately contributed to its financial demise. FoxMeyer purchased software from defendants in an effort to upgrade its existing computerized distribution system, which it regarded as outmoded, inefficient, and expensive to maintain. FoxMeyer hoped a systems upgrade would reduce its operating costs and enhance customer satisfaction through faster and more accurate order processing and shipping. During the summer of 1993, defendants' officials convinced FoxMeyer executives to purchase defendants' "R/3" Software after allegedly promising that the R/3 system could
• operate all aspects of FoxMeyer's distribution business, other than purchasing, including its financial/accounting, inventory control/materials management, sales distribution and order processing, and other business processes at all of FoxMeyer's warehouses;
• handle the daily transactional demands of FoxMeyer's order processing, warehousing, and shipping operations-the latter two involving purchase orders that required next-day delivery and the generation of hundreds of thousands of " invoice lines" in the tracking of drug items, quantities, and prices;
• absorb higher processing volumes than FoxMeyer's existing computer system;
• interface with other components of FoxMeyer's information system software; and
*2 • save FoxMeyer upwards of ten million dollars.
(D.I.1, ¶ 18) As part of their sales pitch, defendants presented a mock demonstration of the R/3 Software that purported to simulate the software's ability to handle FoxMeyer's inventory volume. Defendants also conducted a series of tests that purportedly confirmed the R/3 Software's compatibility with FoxMeyer's business needs. Plaintiff contends, however, that these tests were " severely flawed" and that defendants knew, or were reckless in failing to know, that the R/3 Software could not handle the volume of transactions at FoxMeyer's warehouses. (D.I.1, ¶¶ 19-21)

Relying on defendants' representations, FoxMeyer purchased defendants' R/3 Software and signed an " End-User Software License Agreement" ("the Agreement") with SAP America on September 30, 1993. FN5 Although plaintiff's complaint often fails to distinguish between SAP AG and SAP America, SAP AG was not a party to the Agreement. (See D.I. 9, Ex. A) The Agreement granted FoxMeyer a license for the use of various R/3 "modules," including those for sales distribution, order processing, inventory management, and financial accounting. The Agreement warranted

> FN5. Even though the Agreement is not attached to the complaint, the court may still refer to it on a motion to dismiss. See *Pension Benefit Guaranty Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993) (holding that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document ").

that the Software, when delivered, will be in good working order for twelve (12) months after the date of delivery and will perform in substantial

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 3
Not Reported in F.Supp.2d, 1999 WL 803888
(Cite as: Not Reported in F.Supp.2d)

compliance with the specifications contained in that portion of the Documentation pertaining to the Software, when used, without material alteration, on [FoxMeyer's computers], in accordance with the instructions set forth in the Documentation.(D.I.9, Ex. A, ¶ 8.1) The Agreement also included the following disclaimer in capitals:

> SAP DISCLAIMS ALL OTHER WARRANTIES EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(D.I.9, Ex. A, ¶ 8.6) The parties also agreed that defendants would not be responsible for modifying and improving "the software or documentation to fit the particular requirements of [FoxMeyer]." FN6 (D.I.9, Ex. A, ¶ 9.2) SAP provided Andersen Consulting and FoxMeyer with technical support. (D.I. 8 at 7) Finally, the Agreement provided that if FoxMeyer suffered "any damages or loss in any way connected with any software (including the [R/3] Software) or services furnished by SAP whether by SAP's negligence, or any breach of any other duty," FoxMeyer's sole remedy would be "(i) replacement of the Software or performance of services or (ii) return or credit of an appropriate portion of any payment made or to be made by [FoxMeyer] with respect to such Software or services." (D.I.9, Ex. A, ¶ 9.1) The Agreement explicitly disclaimed liability for consequential damages. (D.I.1, ¶ 9.3)

> FN6. FoxMeyer retained Andersen Consulting to install the software and adapt it to FoxMeyer's particular business needs. (D.I.1, ¶ 22)

Around July 1994 and prior to the complete installation of the R/3 Software, FoxMeyer contracted to distribute pharmaceuticals to the University HealthSystem Consortium ("UHC"), a nationwide network of teaching hospitals. The UHC contract required FoxMeyer to open six new warehouses to service the various UHC hospitals. FoxMeyer decided to install the R/3 Software at these six UHC warehouses during January and February of 1995 and, immediately thereafter, at its remaining seventeen warehouses. (D.I.1, ¶ 25)

*3 Around November of 1994, defendants advised FoxMeyer that the R/3 system could not handle the invoice volumes at any of the seventeen non-UHC warehouses. FN7 (D.I.1, ¶ 26) In December 1994, FoxMeyer officials met with SAP AG officials in Walldorf, Germany to discuss these unanticipated shortcomings in the R/3 Software. (D.I.1, ¶ 27) FoxMeyer and defendants decided to proceed with the implementation of the R/3 Software at the six UHC warehouses (which had lower invoice volumes) and to delay their plan to convert FoxMeyer's other warehouses to the R/3 system. Defendants agreed, however, to correct the volume problems so that FoxMeyer could utilize the R/3 Software at all of its warehouses.

> FN7. Plaintiff claims that in 1996 the R/3 Software could handle only 10,000 "invoice lines" per day whereas FoxMeyer's antiquated Unisys system processed 420,000 invoice lines each day. (D.I.1, ¶ 31)

In August of 1995, FoxMeyer executives again visited SAP AG's headquarters in Germany to discuss modifications to the R/3 Software. During that visit, SAP AG officials claimed that they had developed a solution to the R/3 Software's volume limitations. They proposed to split the R/3 modules so that the sales, distribution, and order processing module would run on a separate processor from the inventory management and financial accounting modules. Plaintiff claims that defendants knew this solution was not feasible and that defendants never intended to implement it. (D.I.1, ¶¶ 29-30) As a result, FoxMeyer never installed the R/3 Software at its seventeen non-UHC warehouses. Instead, the sales-distribution-order processing functions continued to operate on FoxMeyer's existing computer system until FoxMeyer's bankruptcy in August 1996. According to the complaint, defendants never corrected the R/3 Software's defects. This lack of an efficient data processing system allegedly crippled FoxMeyer's operations.

Plaintiff alleges that SAP America, by selling defective software to FoxMeyer, breached both the Agreement and the Agreement's express warranties

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 1999 WL 803888
**(Cite as: Not Reported in F.Supp.2d)**

that the R/3 Software would be "in good working order" and would "perform in substantial compliance with the specifications" contained in the Agreement. Plaintiff also asserts several claims against both SAP America and SAP AG. Specifically, count three of the complaint alleges breach of express and implied warranties that the R/3 Software could process FoxMeyer's invoice volumes and that the software was merchantable and fit for a particular purpose. (D.I.1, ¶¶ 45-50) Count four alleges that both defendants fraudulently misrepresented and concealed material facts, including the ability of the R/3 Software to perform as required and defendants' ability to correct the software's defects. (D.I.1, ¶¶ 52-58) In counts five and six, plaintiff alleges negligent misrepresentation and negligence and gross negligence by both defendants. Finally, count seven alleges a promissory estoppel claim and seeks recovery for damages incurred by FoxMeyer's reliance on defendants' promises.

## II. STANDARD OF REVIEW

In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the court must construe the complaint in favor of the plaintiff, accepting as true all material allegations of the complaint. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 483 (3d Cir.1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* A court may dismiss claims pursuant to Rule 12(b)(6) only if the plaintiff cannot demonstrate any set of facts that would entitle it to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991).

## III. CHOICE OF LAW

*4 Before addressing the sufficiency of plaintiff's complaint, the court must determine what state's law applies to the asserted claims. To this end, the court first must ascertain whether federal or Delaware law provides the choice of law rules. The court shall follow the rule observed by federal courts in diversity cases and apply the choice of law rules of the state in which the court sits. *See, e.g., In re Eagle Enters., Inc.,* 223 B.R. 290, 292 (Bankr.E.D.Pa.1998) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co .,* 313 U.S. 487, 496 (1941)), *aff'd,* No.Civ.A. 98-4749 (E.D.Pa. Aug. 16, 1999). Accordingly, the court shall use Delaware's choice of law provisions to determine what state law governs plaintiff's claims.

Both parties agree that Pennsylvania law should govern plaintiff's contract claims. The choice of law provision contained in the Agreement signed by the parties provides that it "shall be governed by and construed under Pennsylvania law." (D.I.9, Ex. A, ¶ 14.10) Delaware courts honor such choice of law provisions in contracts, so long as some material connection links the chosen jurisdiction to the transaction. *See Suburban Trust & Sav. Bank v. University of Del.,* 910 F.Supp. 1009, 1013 (D.Del.1995) ; *Wilmington Trust Co. v. Wilmington Trust Co.,* 24 A.2d 309, 313 (Del.1942) ; *Cooper v. Ross & Roberts, Inc.,* 505 A.2d 1305, 1306 (Del.Super.1986). Because SAP America has its principal place of business in Pennsylvania, that essential connection is present. *See Suburban Trust & Savings Bank,* 910 F.Supp. at 1013. Therefore, the court shall apply Pennsylvania law in reviewing plaintiff's contract claims.

The parties disagree as to the law applicable to plaintiff's tort claims. Plaintiff's tort claims consist of fraudulent misrepresentation and concealment (count four), negligent misrepresentation (count five), and negligence and gross negligence (count six). Plaintiff contends that, under Delaware's "most significant relationship" test, Texas law governs. *See Travelers Indem. Co. v. Lake,* 594 A.2d 38, 47 (Del.1991) (adopting Restatement (Second) of Conflicts § 145(1) (1971)). Defendants, on the other hand, seem to deny that the "most significant relationship" test applies and argue instead that Pennsylvania law governs plaintiff's tort claims. Defendants rely on § 201 of the Restatement, which states that "[t]he effect of misrepresentation ... upon

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 5

Not Reported in F.Supp.2d, 1999 WL 803888
(Cite as: Not Reported in F.Supp.2d)

a contract is determined by the law selected by application of the rules of §§ 187-188." Section 187 of the Restatement provides, in pertinent part, that courts should apply a party's choice of law provision unless,
   (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
   (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the [most significant relationship test of § 188 of the Restatement], would be the state of the applicable law in the absence of an effective choice of law by the parties.
*5 Restatement (Second) of Conflict of Laws § 187(a)-(b) (1971).

Neither Delaware courts nor federal courts applying Delaware law have employed § 202 to determine the state law applicable to tort claims arising out of a contract dispute. Instead, Delaware courts have applied the Restatement's "most significant relationship" test to tort claims associated with contract disputes. *See, e.g., Pig Improvement Co. v. Middle States Holding Co.,* 943 F.Supp. 392, 396 (D.Del.1996); *Travelers Indem, Co.,* 594 A.2d at 47. Indeed, courts have recognized that a contract's choice of law provision does not necessarily govern fraud, misrepresentation, and other tort claims related to the contract. *See Sutter Home Winery, Inc. v. Vintage Selections, Ltd.,* 971 F.2d 401, 407 (9th Cir.1992) (explaining that, "[c]laims arising in tort are not ordinarily controlled by a contractual choice of law provision"); *Union Oil Co. of Cal. v. John Brown E & C,* No. 94 C 4424, 1994 WL 535108, at *2-3 (N.D.Ill. Sept. 30, 1994) (applying Illinois law to tort claims in spite of contract's California choice of law provision); *Furniture Consultants, Inc. v. Datatel Minicomputer Co .,* No. 85 Civ. 8518, 1986 WL 7792, at *2 (S.D.N.Y. Jul. 10, 1986) (applying New York law to negligence and fraud claims arising out of contract governed by Maryland law, where the alleged negligence and fraud occurred in New York); *Computerized Radiological Servs., Inc. v. Syntex Corp.,* 595 F.Supp. 1495, 1503 (E.D.N.Y.1984) (noting that,

despite a contract's choice of law provision, "a tort claim arising out of the contract may be governed by the law of a different forum"), *rev'd in part on other grounds,* 786 F.2d 72 (2d Cir.1986). Other courts have recognized that, "[c]ontractual choice of law provisions ... do not govern tort claims between contracting parties unless the fair import of the provision embraces all aspects of the legal relationship." *Jiffy Lube Int'l, Inc. v. Jiffy Lube of Pa., Inc.,* 848 F.Supp. 569, 576 (E.D.Pa.1994). In *Jiffy Lube,* the district court concluded that the contract's choice of law provision did not govern the related tort claims because, as in the present case, the choice of law provision was limited on its face to the construction, interpretation, and enforcement of "this agreement." *Id.; but see Corestates Bank, N.A. v. Signet Bank,* No. Civ. A. 96-3199, 1996 WL 482909, at *5 (E.D.Pa. Aug. 26, 1996) (applying contract's Virginia choice of law provision to related tort claims where provision explicitly provided that choice of law governed validity of contract); *PTI Servs., Inc. v. Quotron Sys., Inc.,* Civ. A. No. 94-2068, 1995 WL 241411, at *8-9 (E.D.Pa. Apr. 19, 1995) (applying contract's New York choice of law provision to related tort claims where New York had most significant contacts to alleged fraudulent inducement and misrepresentation claims).

In the present case, it is not evident that the Agreement's choice of law provision "embraces all aspects" of FoxMeyer and SAP America's legal relationship. *See Jiffy Lube,* 848 F.Supp. at 576. Although the Agreement provides that FoxMeyer " consents to the jurisdiction of any federal or state court sitting in Delaware County, Pennsylvania for all claims, suits, or actions arising under this Agreement" (D.I.9, ¶ 14.10), the fact that FoxMeyer consented to venue in Pennsylvania does not compel the conclusion that Pennsylvania law must govern all non-contract claims. Because the fair import of the Agreement's choice of law provision does not embrace plaintiff's tort claims, the court shall employ Delaware's "most significant relationship" test to determine the law applicable to plaintiff's tort claims.

*6 Delaware courts have adopted § 145(1) of the Second Restatement of Conflicts, which contains

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 6

Not Reported in F.Supp.2d, 1999 WL 803888
(Cite as: Not Reported in F.Supp.2d)

the general principles of the "most significant relationship" test. It provides that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." FN8 *Id.* § 145(1). This rule applies generally to all torts, while other related sections of the Restatement provide more detailed factors to assess the significance of a state's relationship to particular torts. *See id.* § 145 cmt. a. In this case, § 148 of the Second Restatement of Conflicts is particularly relevant to plaintiff's tort claims. That section provides a more detailed choice of law analysis for the torts of fraud and misrepresentation. Section 148(2) FN9 sets forth six factors to assess which state has the most significant relationship to the tort and to the parties. Those factors are:

> FN8. Section 6 of the Second Restatement of Conflicts provides the following broad choice of law policy considerations:
> (1) the needs of the interstate and international systems,
> (2) the relevant policies of the forum,
> (3) the relevant policies of other interested states,
> (4) the protection of justified expectations,
> (5) the basic policies underlying the particular field of law,
> (6) certainty, predictability, and uniformity of result, and
> (7) ease in the determination and application of the law to be applied.
> *Id.* § 6.
>
> FN9. The first subsection of § 148 provides that, "when a plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state" controls the claims unless, "some other state has a more significant relationship." *Id.* § 148(1). This section is inapplicable because FoxMeyer's action in reliance (*i.e.,* the payment of the licensing fees and the making of plans to convert their computer

system) occurred in Texas while some of the alleged misrepresentations occurred in Germany at SAP AG's headquarters. (D.I.1, ¶¶ 30, 56-57) There are no allegations that any misrepresentations occurred in Pennsylvania. Thus, § 148(2) applies because "the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made." *Id.* § 148(2).

(1) the place, or places, where the [injured party] acted in reliance upon defendant[s'] representations,
  (2) the place where the [injured party] received the representations,
  (3) the place where the defendant[s] made the representations,
  (4) the domicil ... place of incorporation and place of business of the parties,
  (5) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
  (6) the place where the [injured party] is to render performance under a contract which [it] has been induced to enter by the false representations of the defendant[s].

*Id.* § 148(2). Although no "definite rules as to the selection of the applicable law can be stated[,] ... [i]f any two of the above-mentioned contacts ... are located wholly in a single state, this will usually be the state of the applicable law with respect to most issues." *Id.* § 148 cmt. j. Since these factors overlap the broad policy concerns enumerated in § 6, the court shall analyze the more factually based contacts of § 145 in conjunction with the more policy-oriented principles of § 6. FN10 An analysis of these factors reveals that Texas has the most significant relationship with the parties and with the occurrence of the alleged torts. FN11

> FN10. Some principles of § 6 are of lesser importance than others. For instance, the needs of the interstate system and the ease in determining and applying the law are neutral considerations in this case.
>
> FN11. Although neither party raises the issue, the court notes that there is a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                            Page 7
Not Reported in F.Supp.2d, 1999 WL 803888
(Cite as: Not Reported in F.Supp.2d)

colorable argument in favor of applying German law to at least some of plaintiff's complaints. SAP AG is a German corporation and at least one instance of alleged misrepresentation and concealment occurred at a meeting between executives of SAP AG and FoxMeyer in Germany. (D.I.1, ¶ 30) For the reasons that follow, however, the court concludes that the state of Texas has the "most significant relationship" with plaintiff's tort claims.

1. The Place Where FoxMeyer Acted in Reliance upon Defendants' Alleged Misrepresentations

This factor focuses on whether the reliance occurred in a single state or among several states. *Id.* § 148 cmt. f. The complaint reveals that FoxMeyer acted in reliance upon the defendants' alleged misrepresentations in Texas, where its executives made plans to replace their existing computer system with the R/3 software. Indeed, it appears from the complaint that the installation of the R/3 Software occurred primarily at FoxMeyer's Texas facilities. (D.I.1, ¶ 24) A party's "action in reliance provides a more important contact when it is confined to a single state than when it is divided among two or more." *Id.* Further, FoxMeyer presumably paid the R/3 Software's licensing fees to defendants from its Texas headquarters. Reliance may take the form of relinquishing tangible assets such as money. *Id.* FoxMeyer also hired Andersen Consulting to help install the R/3 Software at FoxMeyer's Texas offices. (D.I.1, ¶ 22) The Restatement contemplates that a party's reliance also may take the form of "entering into a contract with ... a third person." *Id.* The complaint does not allege that FoxMeyer took any actions in reliance in Pennsylvania. Thus, this factor points to Texas as the state with the most significant relationship to the tort claims. The court also notes that Texas has an interest in protecting its citizens from fraud and misrepresentation. *See id.* § 6(c).

2. The Place where FoxMeyer Received the Alleged Misrepresentations

*7 This factor focuses on the place where the alleged misrepresentations were "first communicated" to the party. This place "constitutes approximately as important a contact as does the place where the defendant made the representations." *Id.* § 148 cmt. g. According to the complaint, defendants received most of the alleged misrepresentations in Texas. For example, FoxMeyer officials first learned of the R/3 Software's purported virtues during pre-contract meetings at FoxMeyer's Texas headquarters. (D.I.1, ¶ 19) At no point does plaintiff allege that FoxMeyer received misleading information at SAP America's Pennsylvania offices; however, plaintiff does claim that SAP AG officials misled FoxMeyer during meetings in Germany, where SAP AG officials allegedly misrepresented their ability to correct the R/3 Software's volume limitations. (D.I.1, ¶¶ 30, 56-57) The great weight of the complaint, though, addresses misrepresentations received at FoxMeyer's Texas headquarters. The complaint does not indicate that defendants made any misrepresentations in Pennsylvania. Because the offending conduct occurred largely at FoxMeyer's headquarters, this third Restatement factor also points to Texas as the state with the most significant relationship to the parties and to the alleged torts. A state "whose interests are most deeply affected should have its local law applied." *Id.* § 6 cmt. f.

3. The Domicil, Place of Incorporation, and Place of Business of the Parties

The principal place of business of the injured party is "of substantial significance" when the loss is, as here, pecuniary in nature. *Id.* § 148 cmt. i. "This is so because a financial loss will usually be of greatest concern to the state with which the person suffering the loss has the closest relationship." *Id.* FoxMeyer's principal place of business was in Texas. (D.I.1, ¶ 8) When it signed the Agreement, FoxMeyer was incorporated in Kansas, but, at some time before filing for bankruptcy, FoxMeyer reincorporated in Delaware. Nonetheless, the aggrieved party's principal place of business is a more important contact than the place of incorporation. *See id.* Defendants, on the other hand, have their headquarters in Pennsylvania and Germany. SAP America is incorporated under the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 8
Not Reported in F.Supp.2d, 1999 WL 803888
(Cite as: Not Reported in F.Supp.2d)

laws of Delaware, while SAP AG is a German corporation. The Restatement notes that "[t]he domicil, residence and place of business of the [injured party] are more important than are similar contacts" of the defendants. *Id.* Accordingly, this factor also points to Texas as the state with the most significant relationship to plaintiff's claims.

### 4. The Place Where a Tangible Thing Which Is the Subject of the Transaction Between the Parties Was Situated at the Time

When defendants made the alleged pre-contract misrepresentations, SAP AG apparently had possession of the R/3 Software (the "tangible thing") in Germany. During the attempted installation of the software, and the attendant alleged misrepresentations, FoxMeyer had a copy of the R/3 Software at its offices in Texas. Although this factor does not definitively indicate that Texas law is applicable to plaintiff's tort claims, it does weigh slightly in favor of that conclusion. Moreover, it indicates that Pennsylvania law has little relevance to plaintiff's tort claims.

### 5. The Place Where FoxMeyer Was to Render Performance under the Agreement

*8 The Agreement imposed a variety of performance duties on FoxMeyer including the payment of license, maintenance, and other fees to SAP America. (D.I.9, Ex. A, ¶¶ 4.1-4.4) Although the Agreement did not specify a particular place for FoxMeyer's performance, the only logical place for the performance of such duties would be at FoxMeyer's Texas headquarters. Thus, this final factor also points to Texas as the state with the most significant relationship to plaintiff's tort claims.

All of the aforementioned factors favor the application of Texas law to plaintiff's tort claims. Moreover, applying Texas law to those claims comports with the policy considerations outlined in § 6 of the Restatement of Conflicts. Accordingly, for purposes of this motion only, the court shall review plaintiff's tort claims in light of Texas law.

### IV. DISCUSSION

#### A. Plaintiff's Breach of Contract and Warranty Counts

In count one of the complaint, plaintiff claims that FoxMeyer and SAP America entered into an enforceable contract that SAP America unilaterally and materially breached. (D.I.1, ¶¶ 36-40) Count two alleges that SAP America breached the Agreement's express warranty that "the Software, when delivered, will be in good working order ... and will perform in substantial compliance with [the Software's] specifications...." (D.I.1, ¶ 42) Plaintiff claims that SAP America breached this express warranty by (i) providing FoxMeyer with a defective software system unable to handle FoxMeyer's transaction volumes and (ii) by failing to correct this material defect. (D.I.1, ¶¶ 41-44) In count three, plaintiff alleges breach of express and implied warranties by both SAP America and SAP AG-specifically, express and implied warranties of merchantability and fitness for a particular purpose. (D.I.1, ¶¶ 45-51) For each of these counts, plaintiff seeks consequential damages.

Defendants move to dismiss these three counts on the ground that the Agreement explicitly disclaimed SAP America's liability for consequential damages. FN12 The following language of the Agreement, signed by FoxMeyer and SAP America, purports to limit SAP America's liability:

> FN12. Defendants also argue that the Agreement's limitation of implied warranties provision bars counts two and three of the complaint. Because the court believes that the Agreement's limitation of damages claim bars those counts, it shall not address defendants' disclaimer of warranties arguments.

9. *LIMITATION OF LIABILITY*
9.1 ... [FoxMeyer's] sole and exclusive remedies for any damages or loss in any way connected with any software ... or services furnished by SAP whether by SAP's negligence, or any breach of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                 Page 9
Not Reported in F.Supp.2d, 1999 WL 803888
(Cite as: Not Reported in F.Supp.2d)

any other duty, shall be, at SAP's option, (i) replacement of the [R/3] Software or performance of services or (ii) return or credit of an appropriate portion of any payment made or to be made by [FoxMeyer] with respect to such Software or services.
....
9.3 ANYTHING TO THE CONTRARY HEREIN NOTWITHSTANDING, UNDER NO CIRCUMSTANCES SHALL SAP BE LIABLE TO [FOXMEYER] OR ANY OTHER PERSON OR ENTITY FOR SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR INDIRECT DAMAGES, LOSS OF GOOD WILL, OR BUSINESS PROFITS, WORK STOPPAGE, DATA LOSS, THIRD PARTY CLAIMS, COMPUTER FAILURE OR MALFUNCTION, ANY AND ALL OTHER COMMERCIAL DAMAGES OR LOSS, AND EXEMPLARY OR PUNITIVE DAMAGES.

*9 (D.I. 9, Ex. A, ¶¶ 9.1, 9.3 (emphasis added)). At issue is whether these limitation of liability provisions bar plaintiff's breach of contract and breach of warranty claims.

### 1. Plaintiff's Attempt to Rescind the Agreement's Limitation of Liability Provisions

In an effort to save his breach of contract and warranty claims from these limitation of liability provisions, plaintiff argues that these provisions are not enforceable because defendants procured the Agreement through fraud. Plaintiff does not argue that defendants procured the particular release provisions by fraud but, rather, that they fraudulently induced FoxMeyer to sign the entire Agreement. (D.I. 15 at 11-14) If plaintiff were alleging only fraud, the Agreement's limitation of liability provisions would not bar plaintiff's fraud and misrepresentation claims. See *Moffatt Enters., Inc. v. Borden, Inc.*, 807 F.2d 1169, 1174 (3d Cir.1986). This is so because fraud renders the entire contract void, including the limitation of liability provisions. Here, however, plaintiff attempts to maintain a breach of contract and warranty action by using his fraud allegations to surgically remove only the Agreement's limitation of liability provisions. This he cannot do. If proven, fraud in the inducement would vitiate the entire Agreement, leaving plaintiff without a contract upon which to premise counts one through three. See *Germantown Mfg. Co. v. Rawlinson*, 491 A.2d 138, 141 (Pa.Super.Ct.1985) (noting that "fraud taints with illegality and invalidity anything its evil shadow darkens"); *Stringert & Bowers, Inc. v. On-Line Sys., Inc.*, 345 A.2d 194, 196 (Pa.Super.Ct.1975) (explaining that fraud in the inducement renders a contract voidable by the defrauded party). Consequently, a party cannot both affirm the existence of a contract while, at the same time, seek rescission of the contract under a theory of fraudulent inducement. See 12 Samuel Williston, *A Treatise on the Law of Contracts* § 1525A, at 621 (3d ed. 1970) ("One who has been induced by fraud to enter into a contract may either rescind the contract and recover what he has parted with or affirm the contract and sue for damages caused by the fraud. He cannot do both, because the two remedies are inconsistent and mutually exclusive.") (quotation, citation, and footnote omitted); see also *Katz v. Aetna Cas. & Sur. Co.*, Civ.A.No. 89-4421, 1993 WL 8749, at *2 (E.D.Pa. Jan. 11, 1993) (commenting that the "equitable remedy of rescission and the legal remedy of damages are inconsistent and mutually exclusive"); *Nocito v. Lannuitti*, 167 A.2d 262, 262 (Pa.1961) (explaining that if procurement of a release from damages was by fraud, aggrieved party had choice either to disaffirm the contract and return consideration or affirm the voidable contract and waive the fraud claim). In sum, plaintiff cannot spare his breach of contract and warranty claims from the Agreement's limited liability provisions by asserting fraudulent inducement of the Agreement itself.

### 2. The Agreement's Limited Liability Provisions Bar Plaintiff's Breach of Contract and Warranty Claims Against SAP America

*10 Accordingly, the court must determine whether the Agreement's limitation of liability provisions bar plaintiff's breach of contract and warranty claims. The Agreement signed by FoxMeyer and SAP America specifically limits FoxMeyer's damages to either replacement of the R/3 Software or return or credit of an appropriate portion of the license fee

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 10

Not Reported in F.Supp.2d, 1999 WL 803888
(Cite as: Not Reported in F.Supp.2d)

paid by FoxMeyer to SAP America. (D.I.9, ¶ 9.1) Counts one through three of plaintiff's complaint, however, seek only consequential damages in the amount of $500 million.

Pennsylvania's version of the Uniform Commercial Code ("UCC") permits parties to limit "the remedies of the buyer to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts." Pa. Stat. Ann. tit. 13, § 2719(a)(1). Moreover, contracts may limit or exclude consequential damages unless the limitation or exclusion would be unconscionable. *Id.* § 2719(c). There is no dispute that the UCC governs the Agreement. Where the limitation is not unconscionable, courts routinely enforce limitation of liability clauses negotiated between sophisticated parties. *See, e.g., Valhal Corp. v. Sullivan Assocs., Inc.,* 44 F.3d 195, 203-04 (3d Cir.1995) (citing authorities); *Pig Improvement Co.,* 943 F.Supp. at 400-01.

In the present case, plaintiff does not contend that the Agreement's preclusion of consequential damages was unconscionable. Thus, the only question is whether these provisions govern plaintiff's breach of contract and warranty claims. The Agreement's limitation of liability provision unambiguously provides that the "sole and exclusive remedy" for damages or loss "in any way connected with any software ... or services furnished by SAP ... or any breach of any other duty" shall be replacement of the R/3 Software or return of license fees paid by FoxMeyer. (D.I.9, Ex. A, ¶ 9.1) This provision, as well as the Agreement's disclaimer of consequential damages, governs plaintiff's breach of contract and warranty claims because those claims seek consequential damages for losses "connected with" the R/3 Software. Because Pennsylvania courts routinely enforce limitation of liability clauses in the absence of unconscionability, the court must uphold the parties' Agreement and dismiss counts one, two, and three, insofar as count three relates to SAP America.

3. Plaintiff's Breach of Warranty Claim Against SAP AG

In count three, plaintiff also alleges that SAP AG breached various express and implied warranties, including warranties of merchantability and fitness for a particular purpose. Plaintiff argues that, because SAP AG was not a party to the Agreement, it cannot take advantage of the Agreement's limitation of liability provisions. At issue is whether a non-signatory parent corporation can benefit from limitation of liability provisions in a contract signed by its subsidiary. Because this is a matter of contract interpretation, Pennsylvania law governs.

*11 Citing *Scarpitti v. Webory,* 609 A.2d 147, 150-51 (Pa.1992) and other cases, defendants argue that in Pennsylvania a non-signatory to a contract may benefit from the contract's provisions when " circumstances show that it will effectuate the intent of the parties." (D.I. 17 at 16) In *Scarpitti,* the Pennsylvania Supreme Court held that purchasers of real estate lots were third party beneficiaries of a contract between the real estate developer and an architect, such that the purchasers had standing to sue the architect for breach of contract. Even assuming a third party beneficiary analysis is appropriate to the facts at bar, the rule in *Scarpitti* would not allow SAP AG to benefit from the Agreement's limitation of liability provisions. In *Scarpitti,* the Supreme Court fashioned a very narrow exception to the general rule that "a party becomes a third party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself." *Id.* at 150. The exception applies only

> where the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties and the performance satisfies an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

*Id.* at 150-51. In the present case, the Agreement does not express an intent to benefit SAP AG. Moreover, the circumstances are not "so compelling " that recognition of SAP AG's right to invoke the Agreement's limitation of damages provision is " necessary to effectuate the intentions of the parties." *Id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 11
Not Reported in F.Supp.2d, 1999 WL 803888
(Cite as: Not Reported in F.Supp.2d)

Defendants also rely on *Hammermill Paper Co. v. C.T. Main Constr., Inc.,* 662 F.Supp. 816, 818-19 (W.D.Pa.1987), to support their argument that a non-signatory parent corporation can invoke a limitation of liability provision contained in a contract signed by its subsidiary. In *Hammermill,* the district court ruled that a limitation of warranties clause contained in a contract between a general contractor and a subcontractor prevented a paper company (who was not a party to the contract) from suing the general contractor and the subcontractor for breach of implied warranties arising out of a botched repair of the paper company's boilers by the contractors. *Id.* The *Hammermill* court's holding rests primarily upon that court's concern for a commercial supplier's ability to limit its liability effectively. FN13

> FN13. The *Hammermill* court's holding is questionable in light of *Kassab v. Central Soya,* 246 A.2d 848 (Pa.1968), which held that privity of contract was not necessary in a breach of implied warranty action against a remote manufacturer.

Such concerns are not present in the instant case. If SAP AG wanted the benefit of the Agreement's limitation of liability provisions it should have insisted that SAP America include a provision in the Agreement so limiting SAP AG's liability. It did not do so, and SAP AG cannot now invoke the Agreement's protections merely by virtue of its corporate relationship with SAP America. In a factually similar case, the Third Circuit held that two parent corporations could not invoke the arbitration and forum selection clauses in a contract signed by their Italian subsidiary. *See Dayhoff Inc. v. H.J. Heinz Co.,* 86 F.3d 1287, 1297 (3d Cir.1996). The Third Circuit commented that, "there is no more reason to disregard the corporate structure with respect to such claims as there would be to disregard it with respect to other legal matters." The court also noted that if the parent corporation "wanted to be able to invoke the arbitration and forum selection clauses, they should have directed [their Italian subsidiary] to include appropriate language in the ... agreements allowing them to do so." *Id.*

*12 The allegations contained in the complaint also provide an independent basis for SAP AG's liability. The complaint specifically accuses SAP AG of making various express and implied warranties in its efforts to convince FoxMeyer to purchase the R/3 Software. Accordingly, the court declines to dismiss count three's breach of express and implied warranty claims against SAP AG.

B. Plaintiff's Fraud and Negligence Counts

In counts four through six, plaintiff alleges fraudulent misrepresentation and concealment (count four), negligent misrepresentation (count five), and negligence and gross negligence (count six) by both defendants. In support of their motion to dismiss these counts, defendants argue that these fraud and negligence claims are merely repackaged contract claims that are barred by the economic loss rule. Because counts four through six concern plaintiff's tort claims, Texas law governs.

1. The Economic Loss Rule

Generally, where a plaintiff suffers only economic loss to the subject of a contract, the plaintiff's cause of action sounds only in contract, not in tort. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 45-46 (Tex.1997). Texas courts have adopted this so-called " economic loss rule" to bar tort claims alleging that a party negligently failed to perform a contract. *See, e.g., Southwestern Bell Tel. Co. v.. Delanney,* 809 S.W.2d 493 (Tex.1991). In *Delanney,* the Texas Supreme Court held that an allegation that a telephone company negligently failed to publish an advertisement sounded in contract, not in tort. The Texas Supreme Court provided several guidelines on distinguishing contract and tort causes of action. The court noted that, "[i]f the defendant's conduct ... would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort." *Id.* at 494. Conversely, "if the defendant's conduct ... would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract." *Id.* The Texas court also

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 12

Not Reported in F.Supp.2d, 1999 WL 803888
(Cite as: Not Reported in F.Supp.2d)

explained that, "[w]hen the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract." *Id.*

Although applicable to tort claims arising out of a negligent failure to perform a contract, the *Delanney* analysis does not apply to fraudulent inducement claims. The Texas Supreme Court has recognized that, "the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself." *Formosa,* 960 S.W.2d at 46. Thus, "tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract." *Id.* at 47.

2. Counts Four and Five

*13 In count four, plaintiff alleges that both defendants "made various misrepresentations of material facts, and failed to disclose material facts, to FoxMeyer regarding ... the ability of the R/3 [S]oftware to perform as required to meet FoxMeyer's transactional volume levels and to operate FoxMeyer's sales and distribution and order processing functions." (D.I.1, ¶ 53) Plaintiff alleges that defendants made these representations to induce FoxMeyer to purchase the R/3 Software and defendants knew the falsity of these representations. (D.I.1, ¶¶ 54-55)

In light of the Texas Supreme Court's decision in *Formosa,* the economic loss rule does not bar count four of plaintiff's complaint. Count four unambiguously alleges conduct that, if true, constitutes a cause of action for fraud in the inducement. Because defendants have a separate duty to avoid the fraudulent procurement of contracts, count four states a valid cause of action. Count five alleges virtually identical conduct under the heading of negligent misrepresentation. Plaintiff claims that, in attempting to induce FoxMeyer to purchase the R/3 Software, defendants "failed to exercise reasonable care and competence in obtaining and communicating information to FoxMeyer, and failed to ensure that the information provided to FoxMeyer was complete and accurate." (D.I.1, ¶ 61) Essentially, count five is a negligent inducement claim. As a species of fraudulent inducement, the economic loss rule does not bar it. Accordingly, the court shall deny defendants' motion to dismiss counts four and five of the complaint.

3. Count Six

In count six, plaintiff alleges negligence and gross negligence and asserts that both defendants " breached the professional duty and/or duty of ordinary care owed to FoxMeyer by ... failing to provide a computer system that was capable of processing FoxMeyer's transactional volume levels ... . and by failing to implement necessary and appropriate modifications to the R/3 [S]oftware in a timely manner...." (D.I.1, ¶ 71) Because the conduct alleged in this claim would not give rise to liability independent of the contract between FoxMeyer and defendants, the claim sounds in contract, not in tort. *See Delanney,* 809 S.W.2d at 494. It, therefore, is barred by the economic loss rule. Accordingly, the court shall dismiss count six of plaintiff's complaint.

4. Plaintiff Has Pled Its Fraud Claims with Particularity

Defendants argue that plaintiff has not pled its fraud claims with the requisite particularity. Rule 9(b) of the Federal Rules of Civil Procedure requires that, " [i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Courts interpret Rule 9(b) liberally. *See United States v. Kensington Hosp.,* 760 F.Supp. 1120, 1125 (E.D.Pa.1991). "The purpose of the rule is to meaningfully respond to a complaint," *In re Docteroff,* 133 F.3d 210, 217 (3d Cir.1997), and it does not require date, time, and place allegations. *See Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984) (explaining that, "[p]laintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 13
Not Reported in F.Supp.2d, 1999 WL 803888
(Cite as: Not Reported in F.Supp.2d)

*14 Counts four and five of the complaint satisfy the requirements of Rule 9(b). Both counts identify the entities that made the alleged misrepresentations. Plaintiff is not required to identify the specific author and recipient of each alleged misrepresentation. *See, e.g., S. Megga Telecomm. Ltd. v. Lucent Techs., Inc.,* No. 96-357-SLR, 1997 WL 86413, at *7 (D.Del. Feb. 14, 1997). Moreover, both counts identify when and where defendants made the alleged misrepresentations. (D.I.1, ¶¶ 17, 19, 21, 23, 27, 29-31) In short, counts four and five put defendants "on notice of the precise misconduct with which they are charged." *See Seville,* 742 F.2d at 791. The court, therefore, shall deny defendants' motion to dismiss counts four and five.

C. Plaintiff's Promissory Estoppel Count

In count seven of the complaint, plaintiff alleges that both defendants "made numerous promises regarding ... the qualities, characteristics, performance and value of the R/3 [S]oftware, including the purported capacity of that software to handle FoxMeyer's transactional volumes and operate its sales and distribution and order processing functions." (D.I.1, ¶ 75) Plaintiff also alleges that both defendants promised to correct the R/3 Software's defects. (D.I.1, ¶ 77) FoxMeyer allegedly relied to its detriment upon these promises by entering into the Agreement with defendants and by continuing to pay license fees after discovering the software's defects. Defendants urge the court to dismiss count seven, arguing that a promissory estoppel claim is not viable where there is a valid, written contract. Because this issue involves the interpretation of the Agreement, Pennsylvania law controls.

Promissory estoppel is an equitable remedy applicable in the absence of a contract; "it is not designed to protect parties who do not adequately memorialize their contracts in writing." *Iverson Baking Co. v. Weston Foods, Ltd.,* 874 F.Supp. 96, 102 (E.D.Pa.1995). A party pleading promissory estoppel must establish that "(1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise." *Crouse v. Cyclops Indus.,* 704 A.2d 1090, 1093 (Pa.Super.Ct.1997). Although a party may plead breach of contract and promissory estoppel in the alternative, "if the court finds that a contract exists, the promissory estoppel claim must fall." *Iverson Baking Co.,* 874 F.Supp. at 102 (citing Pennsylvania case law).

The parties concede that the Agreement signed by FoxMeyer and SAP America is a valid, enforceable contract. Accordingly, plaintiff's promissory estoppel claim against SAP America "must fall." *Id.* FoxMeyer, however, had no written contract with SAP AG. Moreover, plaintiff has alleged that SAP AG officials promised that the R/3 Software would meet FoxMeyer's business needs, that FoxMeyer relied on these promises to its detriment, and that injustice can be avoided only by enforcing those promises. (D.I.1, ¶¶ 74-80) Because plaintiff has stated a *prima facie* case of promissory estoppel against SAP AG, the court shall deny defendants' motion to dismiss count seven as it relates to SAP AG.

V. CONCLUSION

*15 For the aforementioned reasons, the court shall grant in part and deny in part defendants' motion to dismiss. An appropriate order shall issue.

D.Del.,1999.
Brown v. SAP America, Inc.
Not Reported in F.Supp.2d, 1999 WL 803888

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.