**EXHIBIT N**



Not Reported in A.2d                                                                                                    Page 1

Not Reported in A.2d, 1999 WL 1271885
(Cite as: Not Reported in A.2d)

**H**
Not Reported in A.2d, 1999 WL 1271885
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
In re ML/EQ REAL ESTATE PARTNERSHIP LITIGATION
No. CIV.A. 15741.

Dec. 21, 1999.

Pamela S. Tikellis , Esquire, James C. Strum , Esquire, Robert J. Kriner , Esquire, of Chimicles & Tikellis , Wilmington, Delaware; Of Counsel: Nicholas E. Chimicles , Esquire, Michael D. Gottsch , Esquire, of Chimicles & Tikellis , Haverford, Pennsylvania; Joel Bernstein , Esquire, Diane Zilka , Esquire, of Goodkind, Labaton, Rudoff & Sucharow, New York, New York, Attorneys for Plaintiffs.
Alan J. Stone , Esquire, Jessica Zeldin , Esquire, of Morris, Nichols, Arsht & Tunnell , Wilmington, Delaware; Of Counsel: Robert S. Smith , Esquire, Steven G. Rawlings , Esquire, Stacey A. Shortall , Esquire, of Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York, Attorneys for Defendants EREIM Managers Corp., The Equitable Life Assurance Society of the United States, Equitable Real Estate Investment Management, Inc., EREIM L.P. Corp., and EREIM LP Associates.
Andre G. Bouchard , Esquire, Joel E. Friedlander , Esquire, of Bouchard Margules Friedlander & Maloneyhuss , Wilmington, Delaware, Attorneys for Defendant ML/EQ Real Estate Portfolio.

MEMORANDUM OPINION

STRINE, Vice Chancellor.
*1 Plaintiffs Marion F. Scher and Donald T. Follette are unitholders in defendant ML/EQ Real Estate Portfolio, L.P., which is a Delaware publicly registered limited partnership. They bring this action on their own behalf and on behalf of a yet to be certified class consisting of other ML/EQ unitholders ("Unitholders").

In simple terms, the complaint alleges that the defendants, who are all affiliates of defendant Equitable Life Assurance Society of the United States and who control ML/EQ, have managed that partnership for the benefit of Equitable and not the Unitholders. Among other things, the plaintiffs allege that the defendants have failed to pay out to the Unitholders the proper amount of distributable cash, have mischaracterized those distributions they did make so as to benefit Equitable at the expense of the Unitholders, and have off-loaded onto ML/EQ poorly performing real estate assets-"dogs" -owned by Equitable.

Before me now is the defendants' motion to dismiss elements of the plaintiffs' claims as barred by the statute of limitations. Many of the claims in the complaint challenge actions of the directors taken well before June 16, 1994, three years before the original complaint was filed. The premise of the defendants' motion is that all these actions were sufficiently disclosed to the Unitholders in public filings, thereby precluding the applicability of any so-called tolling doctrines. In this opinion, I find that ML/EQ made sufficient disclosure so as to place the Unitholders on inquiry notice of their claims relating to acts of the defendants before June 16, 1994 and that those claims are time-barred. But, for reasons I explain below, I believe that the implications of that finding for the plaintiffs' overall case are somewhat less significant than the defendants assert.

*I. Procedural And Legal Framework*

*A. Can I Address The Defendants' Limitations Defense On This Motion?*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                               Page 2

Not Reported in A.2d, 1999 WL 1271885
(Cite as: Not Reported in A.2d)

The defendants raise their statute of limitations defense on a facial challenge to the complaint. In a *footnote,* the plaintiffs assert that it is procedurally improper for me to resolve the statute of limitations issue now because the question of "whether the statute of limitations has been tolled is fact-intensive and is not resolved by reference to the pleading." FN1 Although it is "well settled that where the complaint itself alleges facts that show that the complaint is filed too late, the matter may be raised by [a] motion to dismiss," FN2 this rule is at times of somewhat limited utility, if one is candid about the inquiry often mandated by a motion to dismiss on statute of limitations grounds.

> FN1. Pls. Br. at 8 n. 3.
>
> FN2. *Kahn v. Seaboard Corp.,* Del. Ch., 625 A.2d 269, 277 (1993).

It is, of course, the plaintiffs' burden to plead facts to "demonstrate that the statute of limitations was, in fact, tolled." FN3 In this case, like many others, however, the defendants rely heavily on documents purportedly demonstrating that the plaintiffs had timely access to the facts underlying their claims such that they should be deemed to have been given "inquiry notice" and be barred from pursuing their claims on that basis. The court's ability to consider these documents is therefore critical to resolving this motion. But, as in other cases, FN4 it is clear that many of the most important public filings relied upon the defendants on this motion (e.g., the 1992 and 1993 ML/EQ 10-Ks) were consulted, if not specifically relied upon, by the plaintiffs in drafting the complaint. FN5 "[B]y expressly referring to and so heavily relying on these documents in the Amended Complaint, plaintiffs have incorporated them by reference ...." FN6

> FN3. *In re Dean Witter Partnership Litig.,* Del. Ch., Consol. C.A. No. 14816, mem. op at 16, Chandler, C. (July 17, 1998), *aff'd,* Del.Supr., 725 A.2d 441 (1999).
>
> FN4. *E.g., In re Dean Witter,* mem. op. at 18 n. 46.
>
> FN5. *See, e.g.* Compl. ¶ 24 (citing offering prospectus for ML/EQ), ¶ 48 (citing to 1993 10-K), ¶ 53 (citing to 1995 10-K), ¶ 87 (citing to 1988 10-K and a 1988 8-K), ¶ 88 (citing to 1992 10-K), ¶ 89 (referring to disclosures in 10-Ks subsequent to 1992).
>
> FN6. *In re Dean Witter,* mem. op. at 18 n. 46.

*2 But, frankly, I am not sure that all the documents proffered by the defendants in support of the motion are so integral to the plaintiffs' complaint as to render them properly cognizable on a motion to dismiss. FN7 If not, can the defendants rely upon them? This raises a broader issue: are defendants who are the subject of claims that on the face of the complaint appear to be time-barred therefore stuck with the unappetizing choice between litigating the motion without access to their most formidable weapon- evidence of inquiry notice-or acceding to discovery as the price of obtaining a dismissal of time-barred claims? I think not.

> FN7. Our Supreme Court has cautioned trial courts to be sparing in our resort to documents outside the pleadings. *In re Santa Fe Pacific Corp. Shareholders Litig.,* Del.Supr., 669 A.2d 59, 68-70 (1995) ; *Vanderbilt Income and Growth Associates, L.L.C. v. Arvida/JMB Managers, Inc.,* Del.Supr., 691 A.2d 609, 613-14 (1996).

Rather, resort to Chancery Court Rule 56 seems fair and appropriate in such circumstances. Treating a limitations motion in this manner does not prejudice the plaintiffs in any manner because the plaintiffs can easily rebut the defendants' proof without recourse to discovery. Put simply, if the defendants come forth with evidence demonstrating that the plaintiffs had access to information that should have put the plaintiffs on inquiry notice of claims, the plaintiffs can easily produce affidavits denying that they had access to such information or, as they have here, file briefs asserting that the information pointed to by the defendants was insufficient to provide inquiry notice. The plaintiffs do not need

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                     Page 3

Not Reported in A.2d, 1999 WL 1271885
(Cite as: Not Reported in A.2d)

discovery to develop additional evidence- evidence they obviously did not have at the time they filed their complaint-to prove that they did not possess, at times much earlier than filing, information sufficient to put them on inquiry notice.

Where inquiry notice is the critical issue, the plaintiffs' access to and the sufficiency of the information pointed to by the defendants will usually be the only relevant issues. If there is no need for a further factual inquiry to resolve these issues, summary judgment can appropriately be granted to the party whose position is correct as a matter of law.

It is on that alternative FN8 and straightforward basis that I will proceed to resolve this motion. If, after reviewing the defendants' evidence, there is no dispute that the information was provided or available to the plaintiffs and was sufficient to put the plaintiffs on inquiry notice of their claims, judgment will be granted for the defendants.

> FN8. That is, it is an alternative ground to my reliance on the fact that the plaintiffs incorporated many of the key documents into their complaint. I would also note that the plaintiffs have taken substantial discovery in this case, although that discovery has been less than complete as to events before June 16, 1994.

B. *Basic Statute Of Limitations Principles*

The amended complaint sets forth claims for breach of fiduciary duty and breach of contract. These claims are both subject, as a general matter, to a limitations period of three years. FN9 The statute of limitations begins to run on such claims "at the time of the alleged wrongful act[s], even if the plaintiff[s][are] ignorant of the cause of action." FN10

> FN9. *In re Dean Witter*, mem. op. at 10; *Fike v. Ruger*, C.A. No. 16791, mem. op. at 11, Lamb, V.C. (Nov. 19, 1999); 10 Del. C. § 8106.

> FN10. *In re Dean Witter*, mem. op. at 11; *Fike*, mem. op. at 12.

In this case, the original complaint was filed on June 16, 1997 and thus if the plaintiffs' claims accrued before June 16, 1994, they are time-barred unless some tolling doctrine applies. Unsurprisingly, the plaintiffs contend that at least three such doctrines apply, the inherently unknowable injuries, fraudulent concealment, and equitable tolling doctrines. The plaintiffs bear the burden of pleading facts supporting the applicability of any of these tolling doctrines to their claims. FN11 The most the plaintiffs can rely on here is the doctrine of equitable tolling. FN12 Under that theory, "the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary." FN13

> FN11. *Id.* at 16.

> FN12. The plaintiffs cannot rely on the inherently unknowable injury and fraudulent concealment doctrines. It was not "a practical impossibility for the plaintiffs" to discover any of the wrongdoing alleged in the complaint; all of the allegedly wrongful acts were readily discoverable from the books and records of ML/EQ. *In re Dean Witter*, mem. op. at 14. Thus the first doctrine, which should in my view rarely, if ever, apply in the entity law context, is inapplicable. The second doctrine does not apply because the plaintiffs have not pled any "affirmative act of concealment" by the defendants that was "intended to put a plaintiff off the trail of inquiry." *Id.* at 14-15 (citation omitted). The closest the complaint comes to doing so is alleging that the defendants attempted to "conceal" a fact by disclosing it in an 8-K rather than a 10-K. *See* Compl. ¶ 87. That is, the complaint does not come close at all to adequately pleading fraudulent concealment.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                         Page 4
Not Reported in A.2d, 1999 WL 1271885
(Cite as: Not Reported in A.2d)

> FN13. *In re Dean Witter,* mem. op at 15.

\*3 But the equitable tolling doctrine does not afford a plaintiff the luxury of indolence at a defendant's expense. "Significantly, if the limitations period is tolled under [this] theor[y], it is tolled *only until* the plaintiff discovers (or by exercising reasonable diligence should have discovered) his injury. Thus, the limitations period begins to run when the plaintiff is *objectively* aware of the facts giving rise to the wrong, *i.e.,* on inquiry notice." FN14

> FN14. *Id.* at 16 (citations omitted) (emphasis in original); *see also Fike,* mem. op. at 12.

To establish that they filed this action in a timely manner, the plaintiffs must convince me that they were not on inquiry notice of their claims before June 16, 1994. If they received such notice, the equitable tolling doctrine cannot salvage their claims. FN15

> FN15. *Id.; Fike,* mem. op. at 12.

II. *Background On ML/EQ And The Other Defendants* FN16

> FN16. All facts are drawn from the amended complaint, which is cited to as simply the complaint, unless they come from a specifically cited source.

The defendants other than ML/EQ have the bewilderingly similar and unpronounceable names characteristic of limited partnerships. Defendant EREIM Managers Corp. is the managing general partner of ML/EQ (the "General Partner") and the managing venturer of the Joint Venture. As one would also fear, EREIM Managers is a wholly-owned subsidiary of defendant Equitable Real Estate Investment Management, Inc. (" EREIM, Inc."), which in turn is a wholly-owned, indirect subsidiary of defendant Equitable Life Assurance Society of the United States. Helpfully to clear thinking, Equitable also owns defendant EREIM LP Corp., which happens to be the co-General Partner, along with Equitable itself, of defendant EREIM LP Associates.

Before the reader gets too much insight into what it must feel like to be ex-heavyweight champion George Foreman, FN17 I hope to cut through this. All that the reader need know is:

> FN17. Each of whose several sons is also named George Foreman, with a different numerical suffix. The possibility of differentiating his sons by use of entity suffixes (George Foreman, L.P.; George Foreman, L.L.C.; George Foreman, L.L.P.; George Foreman, P.A., etc.) may have been nixed by Mr. Foreman's managers, who no doubt feared that it would limit his flexibility to undertake his various business ventures, such as the marketing of (it is claimed) fat-reducing hamburger grills.

• ML/EQ was formed in 1987. A public offering was made of units in 1987 and 1988, and over $108 million in capital was raised.
• A key selling point of the public offering was that Equitable guaranteed to Unitholders that they would receive, by the time ML/EQ terminates as a limited partnership, in the aggregate, no less than a 9.75% annual rate of return on their adjusted capital contributions plus the return of their initial invested capital (the "Guarantee"). FN18

> FN18. In the interests of simplicity, I am ignoring some niceties, including the fact that the Guarantee was originally held by the Joint Venture and was assigned to the Partnership in exchange for the Partnership's assumption of the Joint Venture's obligations, including the liability to pay a semiannual guarantee fee.

• Partnership distributions from available cash flow were to be made 95% to ML/EQ's Unitholders and 5% to EREIM Managers as General Partner, except

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 5
Not Reported in A.2d, 1999 WL 1271885
(Cite as: Not Reported in A.2d)

that any distributions to EREIM Managers were to be deferred if the Unitholders did not receive at least a 6% annualized return during any six-month fiscal period. FN19

> FN19. I am slighting the fact that MLH Real Estate Associates, which is a subsidiary of Merrill Lynch & Company and not a defendant in this suit, is the Associate General Partner of ML/EQ and received part of the payments.

- ML/EQ was formed to join with Equitable (through its affiliate, EREIM LP Associates) in a joint venture called EML Associates ("the Joint Venture").
- Eighty percent of the Joint Venture is owned by ML/EQ. The other twenty percent is owned by Equitable, which received that interest in exchange for certain zero coupon mortgage notes (discussed in greater detail below) that it contributed to the Joint Venture.
- Both ML/EQ and the Joint Venture are managed by an indirect, wholly-owned Equitable subsidiary, EREIM Managers.
*4 • Therefore, if ML/EQ or the Joint Venture engaged in transactions with Equitable or another wholly-owned Equitable affiliate, there was an obvious risk of self-dealing because Equitable in reality controls both sides of any such transactions.

### III. *Legal Analysis*

In general, the complaint alleges that EREIM Managers preferred the interests of its owner, Equitable, over the interests of the Unitholders of ML/EQ, to which EREIM Managers owed the traditional fiduciary duties of loyalty FN20 and care. For purposes of this motion, the claims in the complaint can be classified in three separate categories. The first is comprised of claims alleging that EREIM Managers caused ML/EQ to enter into unfavorable real estate transactions that involved the acquisition by ML/EQ from Equitable of interests in real estate properties that were "dogs" to the detriment of the Unitholders and the improper benefit of Equitable (the "real property claims"). The second category involves the claim that EREIM Managers caused ML/EQ to hoard cash that should have been distributed to the Unitholders but was instead held by ML/EQ to benefit Equitable at the expense of the Unitholders (the "hoarding claims"). The third and final category-asserted formally for the first time in the amended complaint filed August 31, 1999-alleges that EREIM Managers mischaracterized those distributions it caused ML/EQ to make to the Unitholders, again so as to unfairly advantage Equitable (the " mischaracterization claims").

> FN20. Within which would seem to be logically subsumed a duty to act with good rather than bad faith towards the Unitholders. Bad faith conduct toward the Unitholders would seem to be other than loyal conduct. *See Webster's Ninth New Collegiate Dictionary* 446 (1987) (indicating that: the primary definition of " faith" is "allegiance to duty or a person: LOYALTY"; the primary definition of " faithless" is "not true to allegiance or duty: TREACHEROUS, DISLOYAL"; "loyal" is a synonym for "faithful"; and "disloyal" is a synonym for "faithless").

Before addressing whether these claims are time-barred, it is worth mentioning two overriding points that color my entire analysis. It was no mystery to Unitholders that ML/EQ engaged in several transactions with Equitable affiliates. To the extent that the results of those transactions were timely reported, plaintiffs "reasonably attentive to their investment interests" therefore had information "to prompt inquiry" into whether these results were the product of fiduciary breaches in the transactions themselves. FN21 Nor did the plaintiffs just discover that ML/EQ's handling of cash could affect the defendants' obligations and the Unitholders' payouts under the Guarantee. This was obvious from the inception of the business.

> FN21. *In re Dean Witter,* mem. op at 25.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                            Page 6
Not Reported in A.2d, 1999 WL 1271885
(Cite as: Not Reported in A.2d)

### A. *The Real Property Claims*

There are three real property claims.

First, plaintiffs attack a transaction critical to the formation of the Joint Venture itself, which occurred in 1988. The Joint Venture was contemplated from the inception of ML/EQ and was outlined in the prospectus distributed in connection with the original offering of ML/EQ Units. FN22

> FN22. Zeldin Aff. Ex. 3 (Prospectus, dated April 23, 1987).

As discussed, the Joint Venture is owned 80% by ML/EQ and 20% by Equitable. ML/EQ contributed to the Joint Venture the cash it received in the public offering, some $108 million. In turn, Equitable contributed its interests in certain zero coupon mortgage notes (the "Zero Coupon Notes"), which were secured by mortgage liens on two shopping centers, the Northland Center in Michigan and the Brookdale Center in Minnesota. The complaint alleges that it was a breach of fiduciary duty for Equitable to contribute-and for EREIM Managers to accept-the Zero Coupon Notes because they were illiquid and inadequate consideration for a 20% interest in the Joint Venture. In addition, because the Zero Coupon Notes were secured by mortgages on poorly performing properties, ML/EQ was later forced to acquire those properties in the mid-1990s through foreclosure, "which also created an over concentration of Joint Venture assets in shopping centers, in violation of the Partnership's investment objective of diversification." FN23

> FN23. Compl. ¶ 91.

*5 But the prospectus disclosed that the Joint Venture was likely to acquire the Zero Coupon Notes:

> *Acquisition of Zero Notes from an Affiliate of the Managing General Partner.* The Venture may acquire an interest in some or all of the Zero Notes described under "Real Property Investments-The Zero Notes" from an affiliate of the Managing General Partner. *The terms of acquisition of the Zero Notes by the Venture from an affiliate of the Managing General Partner have not been determined by arm's length negotiation.*

The Venture will hold a diversified portfolio of real estate investments of which approximately 20% to 25% will consist of Zero Notes. Two of the Zero Notes which are expected to be acquired by the Venture are presently owned by Equitable.... See "Conflicts of Interest-Acquisition of Zero Notes from an Affiliate of the Managing General Partner." FN24

> FN24. Zeldin Aff. Ex. 3 at 13, 50 (second emphasis added).

The other real property claims involve the Joint Venture's acquisition of the Richland Mall in 1988 and a mortgage on the Bank of Delaware Building in 1989. Both acquisitions were publicly disclosed in the year they took place. FN25 Richland was acquired from Integrated Resources, Inc., a corporation that was owned 11.1% by Equitable at that time, a fact publicly reported in an ML/EQ 8-K. The mortgage was obtained from Merrill, Lynch, Pierce, Fenner & Smith, the parent corporation of the Merrill Lynch affiliate that serves as the Associate General Partner of ML/EQ.

> FN25. As to the Richland Mall, *see* Zeldin Aff. Exs. 8 at 2 (August 1988 Form 8-K) & 10 at 1-3 (Third Quarter Report dated November 29, 1988). As to the Bank of Delaware Building mortgage, *see* Zeldin Aff. Exs. 9 at 11 (December 1988 Form 8-K) & 11 at 1, 17-20 (1988 Annual Report, dated April 28, 1989).

During the early 1990s, each of these investments experienced difficulties. For example, ML/EQ disclosed in its 1992 Annual Report that "[o]ver the past two years, the general economic recession has severely hampered the [Richland Mall's] leasing efforts.... During this period Richland Mall suffered from lease expirations as well as cancellations by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d					Page 7

Not Reported in A.2d, 1999 WL 1271885
(Cite as: Not Reported in A.2d)

virtue of tenant expirations." FN26 As to the Bank of Delaware Building mortgage, ML/EQ's 1993 Annual Report, dated April 30, 1994, indicated that the building's occupancy had dropped to less than 68%, that the owner was not certain it would fund improvements necessary to maintain the building's occupancy, and that the owner had recently defaulted on the mortgage. FN27 That disclosure also indicated that ML/EQ had increased its working capital and reduced distributions to the Unitholders in part to "relet vacant space at ... the property secured by the Bank of Delaware Building mortgage loan." FN28 Indeed, the complaint itself cites to disclosures of poor performance of these properties in 1990 and years after. FN29

>FN26. Zeldin Aff. Ex. 12 at 12 (1992 Annual Report, dated March 26, 1993).

>FN27. Zeldin Aff. Ex. 7 at 6 (1993 Annual Report, dated April 30, 1994).

>FN28. *Id.* at 8.

>FN29. Compl. ¶¶ 87-89.

The plaintiffs contend that none of these disclosures put them on inquiry notice that the acquisitions of the Zero Coupon Notes, the Richland Mall, and the Bank of Delaware Building mortgage were suspect. According to them, it was not until the Zero Coupon Notes and the Bank of Delaware Building loans defaulted and ML/EQ acquired the underlying assets secured by those instruments that the plaintiffs "would have had reason to suspect that the defendants had breached their fiduciary duties in making the real property investments." FN30 This did not happen, plaintiffs say, until ML/EQ made the following disclosure in 1996:

>FN30. Pls. Br. at 14.

*6 The Partnership was formed to invest in a diversified portfolio of properties and mortgage loans. The Partnership considers its business to represent one industry segment, investment in real property. The partnership has, however, developed a concentration of retail real estate investments with the inclusion of the Venture's interests in Northland Center and Brookdale Center. FN31

>FN31. *Id.* (*quoting* Compl. ¶ 92; Zeldin Aff. Ex. 3 at 40).

The problem with this theory is manifest. The plaintiffs have known since 1988 that ML/EQ's interest in the Zero Coupon Notes was secured by the underlying Northland and Brookdale properties. In the event that those properties did not perform well and their owners were unable to make the required payments under the instruments, ML/EQ's recourse was to take direct ownership. Those properties would then become part and parcel of ML/EQ's direct portfolio and thereby affect its balance. Moreover, before June 16, 1994, ML/EQ had made public the difficulties being experienced at each of the properties, difficulties that obviously suggested a risk of default. FN32

>FN32. *E.g.,* Zeldin Aff. Ex. 7 at 1-2 (1993 Annual Report dated April 30, 1994) (discussing the delinquency on the Bank of Delaware Building mortgage loan, the difficulties posed by the Northland property that secured one of the Zero Coupon Notes and by the fact that the Joint Venture was likely to assume ownership of that property, and the renegotiation of the mortgage on the Brookdale property securing the other Zero Coupon Note).

The mere fact that the owners eventually fell into default did not provide the plaintiffs with information qualitatively more suggestive of a fiduciary breach than that which had been publicly available for many years. A reasonably diligent investor interested in tracking the performance of his investment was on inquiry notice before June 16, 1994. FN33

>FN33. *In re Dean Witter,* mem. op at 21-25 (where partnerships had suffered steady losses from the outset and the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 8
Not Reported in A.2d, 1999 WL 1271885
(Cite as: Not Reported in A.2d)

partnerships' public filings contained hard information suggesting potential problems, plaintiffs were on inquiry notice of claims); *Litman v. Prudential-Bache Properties, Inc.,* Del. Ch., C.A. No. 12137, mem. op at 12, Chandler, V.C. (Jan. 14, 1994) (disclosure of negative results "was enough to put a reasonable investor on a notice that some aspects of the Partnership were not performing as expected. Such information should prompt a reasonable investor concerned about her investment to inquire.... ").

In so holding, I am conscious of the plaintiffs' assertion that if I deem these disclosures sufficient to constitute inquiry notice, "a plaintiff would need to file a law suit every time a fiduciary disclosed a transaction involving possible conflicts of interest in order to avoid a time bar should it later be discovered that the transactions involved breaches of duty." FN34 While I would hesitate to make the trigger finger of the corporate plaintiffs' bar any itchier, FN35 no such threat is posed by my ruling. Once information is in the marketplace adequate to constitute inquiry notice, a plaintiff has three years to develop further information and decide to sue. He can use avenues such as a books and records request, if he wishes to proceed in a deliberate and responsible manner. What he may not do is sit on his hands and let more than three years pass and then attempt to hold the defendants accountable for actions they took many moons ago.

FN34. Pls. Br. at 16.

FN35. It is, of course, common for this court to receive numerous complaints attacking transactions within a day, if not hours, of their initial public announcement, based on little more than bald assertions that the transactions are unfair, usually because of some alleged conflict of interest. The deep and abiding trust that is reposed in directors by plaintiffs' lawyers rarely manifests itself outside of the statute of limitations context.

Although business fiduciaries are rightly subject to more onerous obligations than others in our society, they are not without rights. Business fiduciaries are often sued faster than any defendants in society; they should not also be left open to suit long after the actions for which they are sought to be held liable have been publicly disclosed.

Plaintiffs' argument is also flawed for another reason. Implicit in their reasoning is the contention that fiduciaries must engage in self-flagellating disclosures in order to preserve a statute of limitations defense. According to the plaintiffs, it is not enough that the fiduciaries disclose the material terms of a transaction and the facts necessary for investors to suspect that the transaction could implicate the entire fairness standard. Unless the fiduciaries go further and state that they acted improperly, the plaintiffs suggest, they have not provided the marketplace with information sufficient to put investors (and the sophisticated " private attorneys general" who advise them) on notice of a possible claim.

*7 Putting aside the otherworldly nature of this assertion, FN36 Delaware law has long held that fiduciaries need not beat themselves up in disclosures or plead guilty to fiduciary breaches. FN37 The policy basis for adding the words "unless they wish to thereby preserve their right to rely on a statute of limitations defense" to the preceding sentence is not apparent to me. For the fiduciary who is actually innocent of a breach, such an addition would mean incurring the aggravation and cost of defending baseless suits attacking acts that have long faded from the sight of the fiduciary's rear view mirror.

FN36. That is, the proposition that the very diligent corporate plaintiffs' bar lacks adequate ammunition for claims without fiduciary confessions is at odds with the reality that that bar effectively challenges the actions of corporate America on a daily basis without such self-incriminating statements.

FN37.    *E.g.,*    *Loudon    v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 9
Not Reported in A.2d, 1999 WL 1271885
(Cite as: Not Reported in A.2d)

*Archer-Daniels-Midland Co.,* Del Supr., 700 A.2d 135, 145 (1997) ; *Stroud v. Grace,* Del.Supr., 606 A.2d 75, 84 n. 1 (1992) *(citing Michelson v. Duncan,* Del. Ch., 386 A.2d 1144, 1155 (1978), *aff'd in part,* Del.Supr., 407 A.2d 211, 222 (1979)).

### B. *The Hoarding Claims*

The plaintiffs allege that the defendants failed to distribute out to the Unitholders "distributable cash" and instead held that cash in the Joint Venture and ML/EQ, generating interest to help the defendants meet their obligations under the Guarantee and denying interest rightly belonging to the Unitholders themselves.

According to the complaint, the Partnership Agreement states that "distributable cash" must be distributed from the Joint Venture to ML/EQ and then to the Unitholders on a semi-annual basis. The term "distributable cash" means all cash receipts other than "sale or financing proceeds" and capital contributions, less operating expenses and amounts set aside for working capital reserves, plus amounts no longer required to be held as reserves. "Sale or financing proceeds" are defined as all cash receipts arising from the sale or financing of Joint Venture property, less transaction costs.

In the words of the complaint:
> Defendants manipulated the cash receipts of the Partnership in such a way as to minimize their obligation under the Guarantee. Specifically, Defendants hoarded "distributable cash" at the venture level, earning interest thereon as a hedge toward their eventual obligation under the Guarantee. The hoarding of cash unjustly enriched the Defendants to the detriment of the Limited Partners. Instead of making payments of distributable cash to the Limited Partners on a semi-annual basis as required under the Partnership Agreement, Defendants held the cash in the Joint Venture earning interest. Every dollar of interest earned reduced Defendants' exposure under the Guarantee because it increased the cash which could be paid to the Limited Partners from the Partnership and therefore reduced the amount payable by the Defendants under the Guarantee.

However, the Limited Partners were entitled to receive the cash as it was earned by the Partnership. The Limited Partners were harmed because they were denied the use of the cash. FN38

FN38. Compl. ¶ 41.

The underlying facts regarding the defendants' so-called "hoarding" were, however, contemporaneously disclosed. During the period 1991 to 1997, the complaint alleges that the reserves of the Joint Venture went from $3.7 million to $25.3 million. But the major hoarding concern raised by the complaint is the "huge jump" in Joint Venture cash reserves-from $3.8 million to $19 million-that occurred in 1993. FN39

FN39. Compl. ¶ 45.

*8 This "huge jump" was publicly disclosed on March 25, 1994 in ML/EQ's 10-K, as was the fact that ML/EQ would be cutting back on distributions and increasing reserves:
> The Partnership withheld the distribution for the semi-annual period that would have been made in August 1993. The determination to withhold such distributions at that time was based upon the then anticipated needs of the Venture to fund capital improvements to the Northland Center in order to preserve the Venture's equity in the Northland Zero Note in addition to other working capital needs of the Venture. The levels of future cash distributions principally will be dependent on the distributions to the Partnership by the Venture, which in turn will be dependent on returns from the Venture's investments and future reserve requirements.
>
> It is anticipated that the Partnership will not make distributions of Distributable Cash from operations in 1994 which will equal or exceed the amount distributed in 1993, and such distributions will probably be less ... The Partnership has increased its working capital reserves, and reduced distributions of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 10

Not Reported in A.2d, 1999 WL 1271885
(Cite as: Not Reported in A.2d)

Distributable Cash in connection with its efforts to relet vacant space at certain of its Properties, most significantly at Sentry Park West and the property secured by the Bank of Delaware Mortgage Loan, and future distributions are expected to be reduced by amounts to be contributed by the Partnership in connection with the consummation of the proposed Northland transaction and the renovation of the Northland Center. The Partnership would be required to contribute $3.8 million upon the consummation of the proposed Northland transaction and thereafter contribute approximately $6.7 million towards the renovation of the Northland Center. There can be no assurance that distributions of Distributable Cash from operations will be made at any particular level or at all. FN40

>   FN40. Zeldin Aff. Ex. 6 at 21 (1993 Form 10-K, dated March 25, 1994).

ML/EQ's 1993 Annual Report, dated April 30, 1994, which was mailed to each Unitholder, likewise stated:
> It is anticipated that the Partnership will not make distributions of Distributable Cash from operations in 1994 which will equal or exceed the amount distributed in 1993, and such distributions will probably be less.... The Partnership has increased its working capital reserves, and reduced distributions of Distributable Cash in connection with its efforts to relet vacant space at certain of its Properties, .... FN41

>   FN41. Zeldin Aff. Ex. 7 at 8 (1993 Annual Report, dated April 30, 1994).

Plaintiffs contend that these disclosures did not put them on inquiry notice "that the Defendants were unjustifiably hoarding distributatable cash." FN42 Rather, they contend that inquiry notice was provided at the earliest on March 24, 1995, when ML/EQ supposedly disclosed that less than half the reserves had as of that time been expended for the property improvements for which they had been set aside. It was this fact, plaintiffs say, that first provided any reasonable investor with a reason to suspect wrongdoing. In this regard, the only specific evidence the plaintiffs cite to support the contention that less than half the reserves had been expended for their intended purpose are disclosures supposedly showing that less than half of what was set aside for the Northland transaction was actually used. FN43

>   FN42. Pls. Br. at 12.

>   FN43. See Zeldin Aff. Ex. 17 at 38 (1994 Form 10-K, dated March 24, 1995). The initial disclosure indicating ML/EQ's shift away from distributions toward heavier reserves enumerates several uses for reserved cash. The plaintiffs, who have the burden to show why their more than three year-old claims are not time-barred, fail to address any of these other uses.

*9 But the later disclosures to which plaintiffs cite do not seem to show any such thing. The 1993 10-K indicated that ML/EQ was supposed to incur $3.8 million in costs to close the Northland transaction. FN44 The subsequent disclosures cited by plaintiffs do not indicate that it cost the Partnership any less to do so. As to the Northland renovation costs, the 1993 10-K estimated that ML/EQ would have to contribute approximately $6.7 million. FN45 The 1994 10-K indicates that the Joint Venture's share of such renovations was "expected to be approximately $8.6 million," and 80% of $8.6 million (the Partnership's share) is $6.88 million. FN46 The 1995 10-K indicates that the Joint Venture's share turned out to be $7.9 million, and 80% of that is $6.32 million. FN47 Thus the Partnership saved a little less than $400,000 over the renovation costs estimated in the 1993 10-K.

>   FN44. Zeldin Aff. Ex. 6 at 21 (1993 Form 10-K, dated March 25, 1994).

>   FN45. Id.

>   FN46. Zeldin Aff. Ex. 17 at 38 (1993 Form 10-K, dated March 25, 1994).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d    Page 11
Not Reported in A.2d, 1999 WL 1271885
(Cite as: Not Reported in A.2d)

> FN47. Tikellis Aff. Ex. 1 at 49 (1995 Form 10-K, dated April 1, 1996).

This seems like a fact less likely to raise a hound's head than the "huge jump" in reserves that the plaintiffs bemoan in the complaint, a jump that was disclosed in March of 1994. Although the March 1994 10-K and April 1994 Annual Report did not confess that the defendants were "hoarding" cash, they straightforwardly indicated the General Partner's intentions and signaled a major shift in strategic direction whereby a substantial sum of cash was set aside for particular, identified purposes. In my view, a reasonable investor attentive to his own interests was at that time given information adequate to trigger a duty to inquire. I note that the complaint itself states that "[a]ctual operations *since 1992* have demonstrated that there was no reasonable operating need for the extraordinary and excessive cash accumulations." FN48

> FN48. Compl. ¶ 46 (emphasis added).

Therefore, I conclude that the plaintiffs are barred from attacking any decision not to distribute cash before July 16, 1994. Unlike the defendants, however, I view the effect of this ruling to be quite confined. The ruling does not limit the plaintiffs from contending that after June 16, 1994 EREIM Managers, as General Partner, wrongfully failed to pay out distributable cash in excess of what was necessary to be maintained as reserves. What the ruling does foreclose is any claim by the plaintiffs for damages related to the failure of EREIM Managers to distribute such cash before June 16, 1994. FN49 In contrast to the defendants, I believe that the plaintiffs adequately allege that after June 16, 1994 the defendants hoarded cash that they knew exceeded what was necessary to be maintained as reserves.

> FN49. Of course, any attack on the other defendants' conduct in that respect is also barred.

C. *The Mischaracterization Claims*

The mischaracterization claims are based on the assertion that the defendants distributed cash to Unitholders as sale or financing proceeds that should have been characterized as distributable cash. The financial significance of such a characterization is important to the Unitholders, because a distribution of sale or financing proceeds is treated as a return of capital to the Unitholders and reduces the "adjusted capital contributions" on which the 9.75% guaranteed return is due.

*10 Because the mischaracterization claims were pled FN50 for the first time in the amended complaint, defendants advance two arguments to support this aspect of their motion. First, the defendants contend that the mischaracterization claims are all stale regardless of whether the limitations date based on the original complaint-June 16, 1994-appropriately applies to those claims. Second, the defendants argue that the mischaracterization claims do not fairly relate back to the original complaint and must therefore be deemed time-barred if the plaintiffs had inquiry notice as of August 31, 1996, which was three years before the August 31, 1999 amended complaint was filed. I will address both arguments.

> FN50. I intentionally use this simpler form, although I readed (sic?) that the supposedly "best past-tense and past-participial form" is "pleaded." Bryan A. Garner, *A Dictionary of Modern Legal Usage* 667 (2d ed.1995). In my view, "pled " is less awkward than "pleaded" and more consistent with the similarly pronounced past tenses of read and lead.

1. *The Northland Shopping Center Claim*

First, the plaintiffs allege that a $6.6 million payment made by the Joint Venture in connection with its acquisition of the Northland Shopping Center in 1994 should have been treated as an additional capital contribution by the Unitholders, increasing the capital on which the guaranteed return was payable. ML/EQ's share of this payment was approximately $4.73 million. This transaction was disclosed in a 10-Q on May 15, 1994. FN51

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 12
Not Reported in A.2d, 1999 WL 1271885
**(Cite as: Not Reported in A.2d)**

FN51. Zeldin Aff. Ex. 16 at 9 (Form 10-Q for period ending March 31, 1994, dated May 15, 1994). The transaction was again disclosed in ML/EQ's 1994 10-K and Annual Reports, dated March 24 and April 28, 1995, respectively. Zeldin Aff. Ex. 17 at 10, Ex. 18 at 1, 5.

Plaintiffs argue that this disclosure did not put them on inquiry notice of wrongdoing. Yet the May 15, 1994 10-Q clearly indicated that the Joint Venture paid $6.6 million to Northland's owner at that time. The disclosure did not indicate that the payment was to be treated as an additional capital contribution by Unitholders and added to their capital accounts. Any reasonable investor who believed, unlike the General Partner, that the payment constituted an addition to Unitholders' capital accounts under the ML/EQ Partnership Agreement had information sufficient to give him reason to suspect that the $4.73 million had not been accounted for in this manner. Thus this claim is time-barred regardless of whether the amended complaint's mischaracterization claims relate back to the filing of the original complaint.

### 2. *The Merritt Loan Claim*

The second mischaracterization claim involves distributions resulting from payments made to the Joint Venture for the payoff of a mortgage loan secured by an office building in Norwalk, Connecticut (the "Merritt Loan"). Between 1994 and 1998, the proceeds of the payoff-a sum totalling over $8 million-were distributed to the Unitholders by ML/EQ. Plaintiffs claim that the distributions were improperly accounted for as distributions of sale or financing proceeds rather than of distributable cash. They also claim that they "did not know the characterization of all these distributions until after June 16, 1994" because it was not until ML/EQ's 1994 10-K, filed March 24, 1995, that the Unitholders knew that the distributions were to be characterized as sale or financing proceeds. FN52

FN52. Pls. Br. at 18 (*citing* Zeldin Aff. Ex. 17 at 17.)

But ML/EQ's 1993 10-K, dated March 25, 1994, clearly states:
In receiving $8.4 million, [the Partnership's] 80% share of the $10.5 million [payoff] payment, the Partnership realized the carrying value of the mortgage loan on its books. *The Partnership's share of the amount represents Sale or Financing Proceeds (as defined in the Partnership Agreement).* FN53

FN53. Zeldin Aff. Ex. 6 at 16 (emphasis added).

*11 Thus the Unitholders were given a clear indication of how the payoff proceeds were to be treated. As a result, regardless of whether the mischaracterization claims relate back, the plaintiffs' attack on the characterization of the Merritt Loan payoff proceeds is time-barred.

In so holding, I reject the plaintiffs' contention that even though there was timely notice of the characterization of these claims, the statute of limitations should be tolled because the plaintiffs required the assistance of an "expert" to determine from the public disclosures that these proceeds had been mischaracterized under the Partnership Agreement. The plaintiffs have failed to identify any material omission from ML/EQ's disclosures regarding the terms of the Merritt Loan and the basis on which it was paid off. Once again, the plaintiffs seem to believe that the statute of limitations should be tolled so long as the defendants refuse to make self-flagellating admissions of their own wrongdoing. Indeed, it is possible to understand the plaintiffs as arguing that the statute of limitations was tolled indefinitely on the Merritt Loan claims, or at least until such time as a Unitholder engaged an expert to examine the issue. The unfairness of this proposition seems to me to be self-evident.

I also reject the plaintiffs' assertion that they can challenge distributions made from the Merritt Loan proceeds after June 16, 1994. Unlike the issue of whether ML/EQ needs to retain certain reserves,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 13
Not Reported in A.2d, 1999 WL 1271885
(Cite as: Not Reported in A.2d)

which involves a continuing process of review by the General Partner, the General Partner's decision about the characterization of all the Merritt Loan proceeds was made and disclosed before June 16, 1994. However the plaintiffs try to look at it, they are challenging that initial decision, and an attack on that decision is untimely.

### 3. *The Saab Loan Claim*

The final mischaracterization claim involves a $1.1 million lease termination payment ML/EQ received from Saab in 1992. The Unitholders received $878,707 from that payment in the form of sale or financing proceeds. In ML/EQ's 1991 Annual Report, dated April 29, 1992, Unitholders were told that Saab had paid off the remaining amount of a lease it had with the Joint Venture for 100% occupancy of a warehouse/distribution facility in Atlanta, Georgia. FN54 Unitholders were specifically informed that "[t]he Partnership's share of this amount constitutes Sale or Financing Proceeds (as defined in the Partnership Agreement) and will be distributed ... together with the next scheduled semi-annual distribution in August." FN55 The plaintiffs' only contention is that they needed expert assistance to determine that these proceeds were mischaracterized and that therefore only a self-flagellating disclosure would have been sufficient to set the statute in motion. For reasons previously discussed, I reject this argument and find that this claim is time-barred.

> FN54. Zeldin Aff. Ex. 15 at 4 (1991 Annual Report, dated April 29, 1992).

> FN55. *Id.;* see also Zeldin Aff. Ex. 12 at 13 (1992 10-K, dated March 26, 1993) (making the same disclosure).

### 4. *Do The Mischaracterization Claims Relate Back To The Original Complaint?*

*12 The defendants also contend that the mischaracterization claims do not relate back to the June 16, 1997 original complaint and thus are barred so long as the plaintiffs were on inquiry notice of those claims before August 31, 1996, three years before the amended complaint was filed.

Under the only provision of Chancery Court Rule 15(c) pertinent to this case, "[a]n amendment of a pleading relates back to the date of the original pleading when ... (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading ...." FN56 For a plaintiff to invoke this subsection of Rule 15(c) successfully, she must show that the " 'defendant should have had notice from the original pleadings that the plaintiff's new claim might be brought against him." ' FN57

> FN56. Ch. Ct. R. 15(c)(2).

> FN57. *The Scott Fetzer Co. v. Douglas Components Corp.,* Del. Ch., C.A. No. 11327, mem. op. at 17, Hartnett, V.C. (April 12, 1994) (*quoting Atlantis Plastics Corp. v. Sammons,* Del. Ch., 558 A.2d 1062, 1065 (1989)).

The original complaint fairly raised the hoarding claims by alleging that ML/EQ had been accumulating distributable cash that should have been paid out to the Unitholders. That complaint also indicates that part of the motivation for that hoarding was to reduce the defendants' obligations under the Guarantee.

But the complaint nowhere complains about any mischaracterization of funds as sale or financing proceeds rather than distributable cash. Indeed, the original complaint never mentions the Saab transaction in any respect. As to the Merritt Loan, the original complaint states:
> [D]uring the later part of 1993, the Joint Venture received "sale or financing proceeds" in the approximate amount of $10.5 million in connection with the payoff of the Merritt Loan. Instead of distributing this money to the Partnership, and in turn to the Limited Partners, Defendants kept the bulk of the money in the Joint Venture ...." FN58

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                         Page 14

Not Reported in A.2d, 1999 WL 1271885
(Cite as: Not Reported in A.2d)

> FN58. Original Compl. ¶ 43; see also id. at ¶ 40 ("Moreover, according to the Partnership's 10-Ks, all of the amounts distributed by the Partnership to the Limited Partners from 1993 to the present were 'sale or financing proceeds' associated with the payoff of the 201 Merritt Seven Joint Venture Loan ('Merritt Loan') in 1993.").

Yet the original complaint does not challenge the characterizations of those loan payments.

Similarly, the original complaint mentions the Northland transaction, which required the Joint Venture to pay $6.6 million towards the purchase of that shopping center. FN59 The plaintiffs now allege that ML/EQ's $4.73 million share of that payment should have been credited to the Unitholders' capital accounts. But the original complaint in no respect puts the defendants on notice that they should have expected to later face such a claim.

> FN59. Original Compl. ¶ 62.

The original complaint simply does not provide any indication that ML/EQ's characterization of funds might become the subject of a specific claim later in the lawsuit. If anything, the original complaint's reference to the Merritt Loan payments as sale or financing proceeds without disputation of that characterization suggests the opposite. The complaint's total silence about the Saab transaction and its failure to focus on the payment involved in the Northland transaction also imply that the plaintiff had no gripe about the characterization of the funds involved in those transactions.

As a result, I conclude that the plaintiffs' mischaracterization claims do not relate back to the filing of the original complaint. The plaintiffs admit that they were on inquiry notice of the Merritt Loan claims at least as early as March 24, 1995. FN60 Therefore, those claims are time-barred even if I err in ruling that the plaintiffs received inquiry notice sufficient to bar the mischaracterization claims if they were deemed filed on June 16, 1997.

> FN60. Pls. Br. at 18.

*13 As to the Saab and Northland mischaracterization claims-claims with respect to which the plaintiffs contend that they never received inquiry notice before discovery was taken in this lawsuit-the fact that those claims do not relate back also bolsters their untimeliness. Between June 16, 1994 and August 31, 1996, additional public disclosures were made regarding the Northland transaction, none of which indicated that the Unitholders' capital accounts had been credited as a result of ML/EQ's $4.73 million payment. During that same period, ML/EQ made no disclosures indicating that the Saab transaction proceeds were being recharacterized from sale or financing proceeds to distributable cash.

Because the plaintiffs have the burden to demonstrate that the statute was tolled, this additional period during which the plaintiffs had access to material financial information about their claims reinforces my conclusion that they sat on their rights in a manner prohibited by the statute of limitations.

### IV. Conclusion

For the foregoing reasons, the defendants' motion is granted in substantial part and denied as to the plaintiffs' allegation that ML/EQ improperly hoarded cash after June 16, 1994 in excess of what was necessary for reserves. IT IS SO ORDERED.

Del.Ch.,1999.
In re ML/EQ Real Estate Partnership Litigation
Not Reported in A.2d, 1999 WL 1271885

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.