# EXHIBIT F

**CAUSE NO. D167370**

| | | |
|---|---|---|
| ROYAL INDEMNITY COMPANY, | § | IN THE DISTRICT COURT OF |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| vs. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| MP III HOLDINGS, INC. et al., | § | |
| | § | |
| **Defendants.** | § | 58TH JUDICIAL DISTRICT |

## ROYAL INDEMNITY COMPANY'S OPPOSITION TO MP III'S AMENDED MOTION FOR SANCTIONS AND MOTION FOR IN CAMERA INSPECTION OF PRIVILEGED DOCUMENTS

Plaintiff Royal Indemnity Company ("Royal") respectfully submits this memorandum in opposition to the amended motion for sanctions filed by defendant MP III Holdings, Inc. ("MP III").

### Introduction

MP III's rationale for its sanctions motion is transparent: to seek to transform Royal's voluntary review and production of documents from electronic backup files into a litigation advantage. MP III hotly charges that Royal belatedly disclosed relevant documents and that Royal witnesses provided "false sworn testimony," and demands a virtually unlimited array of monetary and other sanctions due to the purported prejudice MP III has suffered. The facts prove otherwise. Royal long ago produced virtually all of the documents MP III now claims to have seen for the first time in the supplemental production, and bent over backwards to ensure that MP III could explore the significance of the limited new material. Unfortunately, as Royal's accompanying motion to compel and for sanctions against MP III makes clear, MP III has not similarly fulfilled its own discovery obligations. MP III's motion should be denied.

The facts, rather than the rhetoric, underlying this motion are straightforward. *First*, when Royal discovered from its cautionary review of electronic backup files that a scattering of responsive documents had not been produced before, Royal:

- immediately notified MP III;

- produced a full set of the documents to MP III at Royal's expense;

- immediately advised MP III's counsel that the three Royal witnesses who had previously been deposed would be made available again to be deposed on the subject matter of the newly-disclosed documents;

- commenced and completed yet a further expensive and exhaustive review of backup email files, the fruits of which -- about 1,900 pages (not including non-relevant transactional documents) -- were produced on July 15; and

- at Royal's own expense, manually sifted through the supplemental production to identify duplicates for MP III, providing a list to MP III on July 17.

In short, Royal acted responsibly and did everything it could to avoid any potential harm to MP III.

*Second*, the scope of new material produced is far less extensive than MP III represents to the Court. MP III tries to bolster its motion by referring to a series of e-mails, claiming that each were withheld, including a June 4, 1999 email, an August 31, 2000 email, an April 5, 2001 email, an April 17, 2001 memorandum, and a December 4, 2001 email. (Amended Motion at 8-10). Not so. Each of these documents was made available in May, 2004 for MP III's initial document review in this case; some in multiple copies. MP III even used the December 4, 2001 email as an exhibit at the depositions of two Royal witnesses. Taking even a charitable view of MP III's claim not to have received these documents before -- i.e., they are simply mistaken and not seeking to mislead this Court -- it is apparent that MP III did not even notice these documents when it reviewed Royal's documents in February of this year.

*Third,* it is apparent from MP III's motion that only one document of any significance emerged from both supplemental productions that was not previously produced, an e-mail from Royal employee Tony McKenzie sent on September 28, 2000. Although the email describes the cash flows into a reserve called the "Experience Account" with the catch phrase "Ponzi scheme," the substance of the matters addressed in the email are also addressed in numerous other emails made available to MP III in May 2004, including a September 15, 2000 email marked and used as exhibit 19 at Mr. McKenzie's deposition. (*See* Barnowski aff, ex. L) In any event, Royal does not dispute the arguable relevance of that e-mail and that is why Royal offered that MP III can depose (or re-depose) the author and all recipients of that document.

It is nonsense, however, for MP III to claim that a "timely production" of the September 28, 2000 email "would have altered the course this lawsuit has taken over the last two years and eight months" (amended motion at 3), and that "Royal should have produced these critical documents on December 26, 2002" (*id.* at 16 ¶ 3). Neither statement is true. As for timing, by court order and then a Rule 11 agreement between the parties, Royal was first required to produce documents to MP III on May 28, 2004. Even then, MP III made no effort to review *any* of those (or any other) documents until February 11, 2005.

And MP III's defense strategy has been unwavering, both before and after it received the September 28, 2000 email: to try to establish that Royal was on notice of SFC's malfeasance before issuing some of the credit risk insurance policies. That effort has centered on trying to conjure from emails addressing cash flows and the reserve accounts a defense that Royal supposedly knew of "red flags" at SFC before issuing policies. In that effort, MP III has had and has used many of the very documents it now tells the Court it did not have before June 21. The September 28, 2000 email will not change MP III's pre-trial approach to the case at all, but only gives MP III another memo to urge its theory of the case.

- 3 -

251486151V-10

*Fourth*, no testimony of any witnesses was rendered "false" by the documents recently produced. Contrary to MP III's assertions in its brief, Royal's testimony that its underwriting files had previously been produced remains true. And the fact remains, as the Royal witnesses have sworn, that Royal did not learn of SFC's secret, default-masking forbearance payment scheme until March, 2002. Despite MP III's statements in its motion, the September 28, 2000 email does not address "forbearance payments," by that name or any other, and instead deals only with the cash flows to the Experience Account, which is an entirely separate issue. The substantive testimony of Royal's witnesses is corroborated, not contradicted, by the new document. MP III may not like that testimony, or may not want to credit it, but those are arguments for the jury, not grounds for making a sanctions motion.

*Fifth*, in similar fashion, MP III tries to turn Royal's supplemental review and recheck of its privilege log to MP III's litigative advantage. MP III discusses five documents to support its contention that Royal asserted the privilege without basis. But three of those documents plainly were prepared by Royal's attorneys, another contains a handwritten notation alluding to a request for advice from "outside legal" (and *four* copies of that same email were produced without the handwritten notation over a year ago), and the last reports on work done at the direction of counsel. The privilege claims were made in good faith and there is no basis to think otherwise.

MP III demands an *in camera* inspection of the documents that remain on the privilege log. Although MP III told Royal weeks ago that it was going to make a motion based on Royal's privilege assertions, MP III did not deliver the exhibits to the motion until mid-day Monday, July 25, and did not identify the privilege assertions being challenged until the same time. This is grounds enough to deny the motion. Given the shortness of time, we will explain the individual bases for the privilege assertions herein, and if the Court desires, will address the issue further in a separate filing with the Court.

- 4 -

Royal regrets that some documents slipped through the initial production prepared by predecessor counsel Ware Snow. We have told MP III just that. But the fact is that Royal has made every effort to ensure that MP III and its counsel are not harmed by the supplemental productions. Nothing was ever being hidden from MP III: if it were, Royal would not have voluntarily made the June 21 supplemental production, two months before trial and when no one was demanding it, or offered to allow MP III to re-depose the company witnesses based on this additional material. We respectfully request that MP III's motion be denied.

## I.   Royal's Supplemental Document Review and Production Were Voluntarily Undertaken In An Effort Diligently To Comply With All Discovery Obligations.

MP III would have the Court believe that Royal engaged in a bad faith effort to conceal documents throughout the course of this case. Nothing could be further from the truth.

When this case was first filed, Royal faced a daunting task. In the midst of uncovering a gargantuan fraud, reeling from an influx of hundreds of millions of dollars of policy claims, and being sued by the beneficiaries under its policies, Royal had to gather all documents and e-mails from a three and a half year business relationship with SFC, involving eleven credit risk insurance policies insuring $675 million of student loans. Like many complex cases, this is one with a substantial volume of paper and documents. In discovery in this action, Royal alone produced more than 500,000 pages from its own files or obtained from others. Thus, Royal and predecessor counsel Ware Snow did their utmost to retrieve and produce all relevant documents in a timely manner. While it is certainly regrettable, it is perhaps not surprising that a handful of Royal's documents fell through the cracks of the initial production.

But it was Royal's own self-initiative that rectified this shortcoming. No one in this case was complaining about Royal's discovery responses. And no one was requesting supplementation. Nevertheless, partly as a method of double-checking its production of emails and other documents in this litigation, Royal conducted searches of its back-up electronic files

- 5 -

for emails. (Barnowski aff ¶ 2.) This was a belts-and-suspenders double-check of the review done at the outset of the litigation by Royal and predecessor counsel, Ware, Snow in 2002. (*Id.*) The fact that Royal made this effort shows the fallacy of MP III's repeated assertions that Royal was engaged in a bad faith effort to hide documents. If it really were trying to hide evidence from MP III, why would Royal ever conduct a voluntary review of its backup electronic files?

Royal's supplemental review revealed a small number of documents that counsel recognized had not previously been produced in the case. (*Id.*) Royal immediately produced all responsive, non-privileged documents from these searches, rather than delay production while determining whether duplicate documents were in the production. (*Id.*) MP III now complains of Royal's failure to screen out duplicates as another ground for sanctions, but Royal does not have a computerized means to determine whether particular items in the production were duplicative. (*Id.* at ¶ 5.) And Royal's counsel performed an expensive, lengthy manual document-by-document review of the supplemental production, and provided MP III's counsel with a list of duplicative documents on July 17, 2005. (*Id.* at ¶¶ 5-6.)

Because it unexpectedly had found responsive documents not previously produced, Royal decided contemporaneously with the supplemental production to perform a complete search of the back-up electronic files for the members of the unit with primary responsibility for the SFC transactions. (Barnowski aff. ¶ 7.) Royal's counsel reviewed the results of these searches and produced all responsive, non-duplicative, non-privileged documents to MP III on Friday, July 15, 2005 (about 1,900 pages). (*Id.*)

As an accommodation to MP III, Royal also made a copy of the entire June 21 supplemental production, at Royal's expense, and sent the documents to MP III's counsel's offices in Austin, Texas on July 6, 2005. The cost to Royal was over $4,000. (*Id.* at. ¶ 9). Royal did the same for the documents it produced on July 15. (*Id.*) As a further accommodation,

- 6 -

Royal agreed to make the three Royal employees deposed by MP III prior to the supplemental production -- Tony McKenzie, William Hibberd, and David King -- available for continued depositions on documents contained within the supplemental productions that were not previously produced. (*Id.*)[1] In short, Royal made every effort to identify and produce all relevant information, and to minimize any prejudice caused thereby. Any suggestion to the contrary is belied by these facts.

## II.    MP III Identifies Only One Relevant Document Made Available For The First Time In The Supplemental Production -- All Of The Other Documents Cited In The Motion Were Produced In Royal's Very First Production In This Case.

In an effort to show that it has been prejudiced by the supplemental production, MP III misrepresents the discovery record in this case and greatly exaggerates how many relevant documents were produced in the supplemental production. In truth, Royal's supplemental production is only four months late and occurred well before trial. And MP III has cited to only one relevant document produced in the supplemental production -- all other cited documents which it claims never before to have seen were, in reality, made available to MP III in Royal's very first production in this case.

*First*, MP III argues that the supplemental production was made three years late -- thereby prejudicing MP III's preparation of its defense. Not true. Due to various jurisdictional challenges, a court-ordered discovery stay, several Rule 11 agreements, and MP III's own lack of diligence, *the supplemental production was made only four months after MP III first looked at documents in this case.* Thus, contrary to MP III's claims, immediate production of the

---

[1] MP III seeks to take the deposition of the Royal representative who "discovered" the documents. But the documents that make up the bulk of the supplemental production were not "discovered" by anyone at Royal. They were contained on backup files of Royal's e-mail system and were produced as part of counsel's backup document review.

- 7 -

September 28, 2000 email would not have altered three years, or even one year, of MP III litigation strategy in this case. At most, it would have affected four months of strategy.[2]

**Second,** MP III's assertion that Royal produced other critical documents late is demonstrably false. While MP III cites to numerous documents it claims were integral to the preparation of its defense, in reality, all but the September 28, 2000 email was in fact produced to MP III five months ago:

- MP III claims that a June 4, 1999 email from Andrew Jacobsen was "belatedly produced on June 22, 2005." Not true. Two copies of the text of the email, including the sentence quoted in MP III's brief, were made available twice in the original production, at ROY 035246 and ROY 074861. (Barnowski aff. ¶ 12 & ex. G)

- MP III contends that an April 5, 2001 email is another "belatedly produced email from Tony McKenzie." Not true. Two copies of that email were made available in May, 2004 at ROY 047333 and ROY 047334. (Barnowski aff. ¶ 13 & ex. H).

- MP III contends that an April 17, 2001 memo from Scott Schauer was not previously produced. But this memo was made available in May, 2004 at ROY 075796-802. (Barnowski aff. ¶ 14 & ex. I).

- "Another belatedly produced email," MP III asserts, "is from Royal employee David King to Bill Hibberd and Tony McKenzie [and] is entitled [sic] SFC-F/S Review. This email, dated August 31, 2000, contains Mr. King's notes and questions from his review of SFC's 1999 financial statements." This email was made available in May, 2004 at ROY 47361-64. (Barnowski aff. ¶ 15 & ex. J).

- MP III submits as another exhibit to its motion a December 4, 2001 e-mail from Mr. McKenzie. Not only were four copies of this e-mail made available to MP III in May, 2004 and it was listed in our July 17 letter as duplicative, but MP III questioned Mr. McKenzie and Mr. Hibberd about this document at their depositions and the document was marked as an exhibit at both depositions. (Barnowski aff. ¶ 16 & ex. K).

- Similarly, MP III recites from a number of emails at page 9 of its amended motion; a glance at exhibits O-T to its amended motion shows every one was

---

[2] For the reasons described above and below, it would not even be accurate to claim that MP III's strategy would have been different had the supplemental production been made earlier. The new email is entirely consistent with the unswerving strategy pursued by MP III since day one: to argue from as many memoranda and email as possible that Royal should have known or did know of SFC's malfeasance. The new production simply gives MP III one more document to use in this effort.

made available to MP III in May, 2004, and many were marked as deposition exhibits by MP III.[3]

Royal's voluntary production included exactly one document cited in MP III's motion as relevant to its case. This is far from what is required to prove sufficient prejudice to support sanctions.

### III.    Royal's Supplemental Production Has Not Harmed MP III.

MP III moves for sanctions despite the fact that it has not been harmed in any way by Royal's supplemental production. Royal offered to make Mr. McKenzie and Mr. Hibberd, a Royal employee who received the September 28, 2000 the e-mail, available for continued deposition. Mr. Van Epps, another Royal employee who received the e-mail, was deposed after its production, and was questioned at length about it. The deposition of David Schneider, the only other recipient of the e-mail, has yet to be scheduled. And Royal even offered to make available David King, the only other Royal employee previously deposed, despite that he did not even receive the September, 2000 email.

MP III can identify no actual prejudice to it resulting from Royal's supplemental production. MP III claims that "Royal has placed an enormous burden on MTA Schools by producing" the supplemental documents in June (Amended Motion at 5), but MP III cannot articulate what that burden is. It claims its strategy would have been different, but cannot articulate how -- since the defense it outlines in its brief is the same that it has pursuing throughout this case. The Texas Rules presume that an amended or supplemental discovery response made more than 30 days before trial has been made "reasonably promptly." *Cf.* Tex. R.

---

[3] MP III further claims that before June 21, 2005, Royal had only produced a "smattering" of emails (Amended Motion at 9) and that the "overwhelming majority" of emails that MP III deems significant "were recently produced." (*Id.* at 8). Actually, Royal made available over 600 emails before June 21, 2005, and (with the exception of the September 28, 2000 email) every email that MP III contends is significant (at pages 8-10 of its amended motion) was made available to MP III in May, 2004 (Barnowski aff. ¶ ¶ 10, 12-16).

Civ. P. 193.5(a). Royal's initial disclosure here was made 61 days before trial, and its second supplemental production was made 38 days before trial. (Barnowski aff. Ex. A.)

Because MP III will be questioning the witnesses about the new documents, it is being put to no greater expense than if it had the documents in the first place and had just taken longer depositions to begin with. There simply is no reason for Royal to pay MP III to take the depositions, since MP III is no worse off than if it had these documents when it first deposed the witnesses.

Defendants have pointed to no cases in which a party was sanctioned for supplementing a production voluntarily, well in advance of the discovery cut-off, with newly-discovered documents. Citing *Hill & Griffith Co. v. Bryant*, 139 S.W.3d 688 (Tex. App. 2004), defendants claim that it is proper to impose sanctions on a party for "failing to timely disclose a key document." (Amended Motion at 14). However, defendants fail to note that, in *Hill & Griffith*, counsel for the sanctioned party made a conscious decision not to produce the key document, despite the trial court's grant of a motion to compel requiring the document, and others, to be produced. 139 S.W.3d at 693-95. Similarly, defendants' reliance on *Patino v. Complete Tire, Inc.*, 158 S.W.3d 655 (Tex. App. 2005), is inapposite. In *Patino*, the plaintiff failed to provide complete written responses to the defendant's discovery requests, despite notification from the defendant that the written responses were inadequate. In upholding sanctions, the court of appeals explained that "[e]ven after providing supplemental answers, the trial court found those answers to be 'incomplete and evasive,'" and therefore sanctions were justified. *Id.* at 664.

The plaintiff's conduct in *Patino* and the other cases relied upon by MP III stand in sharp contrast to Royal's conduct in this case, where Royal, of its own initiative, supplemented its earlier document production as soon as it became aware of documents which it had not

- 10 -

previously produced. MP III has not provided any authority suggesting that sanctions are warranted here.

## IV.    None Of Royal's Witnesses Committed Perjury; The September 28, 2000 Email Does Not Show Otherwise.

MP III contends that the September 28, 2000 email shows the falsity of Royal's deposition testimony in this case. To the contrary, it is entirely consistent with the testimony of Messrs. McKenzie, Hibberd and King, who explained that underwriting on the Royal credit risk insurance policies relied heavily on the projected default rates on the student loans. (*See, e.g.,* McKenzie Dep. at 147-48.)   These projected default rates appeared to be confirmed by information supplied to Royal, including monthly servicer reports. (McKenzie Dep. at 59-60, 111-12.) Royal's witnesses have testified, and Royal has pled, that MP III and Coastal entered into a scheme with SFC, SLS and SMS to make as many loans as possible and to create the illusion that these loans were bona fide and receiving student payments. (McKenzie Dep. at 59-63, 71-72, 51-52.) MP III and Coastal turned their schools into loan mills and engaged in various forms of misconduct and fraud to get applicants in the door. (McKenzie Dep. at 474.) They then systematically made the first two payments on student loans using money orders that MP III and Coastal purchased but which they instructed the students to sign, in order to deceive Royal into believing that the students had a record of paying and that the loans were "seasoned." (McKenzie Dep. at 97-98, 476-77.)

SFC then carried the schools' fake payment fraud further, by itself making additional secret payments on the student loans which SFC called "forbearance payments" and which it reported to Royal as payments made by the students. (McKenzie Dep. at 97, 101-02.) MP III and Coastal repeatedly authorized SFC to make these "forbearance payments." (McKenzie Dep. at 103, 452.)    All the testimony and evidence in this case show that Royal had no contemporaneous knowledge of the forbearance payments. (*See, e.g.,* McKenzie Dep. at 47-48.)

- 11 -

The September 28, 2000 email says nothing about seasoning payments, forbearance payments or defaults, and plainly has nothing to do with those topics.

Royal's witnesses also have testified about the two accounts that functioned as deductible-like reserves to offset default claims under the Royal policies -- the Experience Account and the Reserve Escrow Account. These reserves were highly structured and governed by the documents involved in the deal and were important requirements for Royal to issue the policies. (McKenzie Dep. ex. 1 at ¶ 15.) The Experience Account, an uncollateralized demand note from SFC, was the first line of defense against defaults. (McKenzie Dep. at 218-19, 298-301.) As loans insured by a policy defaulted, a claim was submitted to Royal, and Royal submitted a demand against the Experience Account note. (McKenzie Dep. at 300-01; McKenzie Dep. ex. 1 at ¶ 17.) Claims paid under the Experience Account were fully transparent to Royal, as it first received a notice of claim from the securitization trustee or the servicer and then made a demand itself on the Experience Account note. (McKenzie Dep. at 300-01.) The Reserve Escrow Account was another reserve, often referred to as the Excess Spread Reserve. This reserve was held by an escrow agent. This account was funded by excess spread, extra cash after all parties are paid, which was deposited into the reserve each month by the trustee or the servicer. (McKenzie Dep. at 124-25.) The trustee or the servicer drew on the Reserve Escrow Account for amounts due to the securitization pools for delinquent loans if the securitization's Liquidity Reserve account was not adequate to cover shortfalls from delinquencies.[4] Amounts due on defaulted loans were also paid to the trustee from the Reserve Escrow Account prior to

---

[4] MP III contends that the e-mail from Scott Schauer discussing the payment of delinquencies from the Escrow Reserve Account means that Royal was on notice of forbearance payments. This is just plain misleading. Forbearance payments were payments made by SFC on delinquent loans for the purpose of not reporting delinquencies or defaults to Royal, while payments from the Reserve Escrow Account were made by the Escrow Agent and duly reported to Royal each month. Numerous documents have long been available to MP III's counsel explaining that the Reserve Escrow Account paid for delinquencies. For instance, the Private Placement Memorandum for Grantor Trust 2000-2, at page 15 (ROY 009741-42).

making a claim on the Royal policy if sufficient money was available in the account. (*See, e.g.,* Private Placement Memorandum at p. 16 (ROY 009742)).

Counsel for MP III repeatedly asked Mr. McKenzie in his deposition whether he had seen "red flags," or knew something was wrong, with SFC. Counsel asked these questions with specific reference to emails, such as the ones highlighted in MP III's motion, that address issues with the Experience Account or the failure of the Excess Spread Reserve Escrow Account to build as modeled. (*See, e.g.,* McKenzie Dep. at 357-58.) Mr. McKenzie testified that while problems were identified from time to time, and there were some running concerns, such problems typify any long term business relationship, and neither Mr. McKenzie nor Royal were alarmed or suspected a fraud on the part of SFC. (McKenzie Dep. at 88-89, 92-93, 384.) Certainly nothing put Mr. McKenzie or Royal on notice that the "seasoning payments" on the loans were made by MP III and Coastal, not the students, or that SFC was systematically making so-called "forbearance payments" on the loans. Some of Mr. McKenzie's testimony on this score is quoted in the motion for sanctions at pages 2-5, and some of the relevant pages of his deposition transcript are attached to the motion as exhibit A.

As Mr. McKenzie was performing due diligence for the third cover (issuing the last three insurance policies, totaling $350 million in covered loans), Mr. McKenzie and Royal noticed the possibility that funds might not be available in the future to make payments under the Experience Account. Mr. McKenzie noticed that SFC's loan operation was not generating enough cash, and that SFC's outflow for operations was roughly matching the inflow of borrowed money. (McKenzie Dep. At 403-04) Mr. McKenzie had a hunch that SFC was using the reserve holdbacks from new student loans to meet current needs, when these reserves should have been set aside to fund experience account obligations. (*Id.*; McKenzie Dep. ex. 19.) He spotlighted the potential that Royal would have a greater than expected exposure on the existing covers,

- 13 -

particularly the second cover, if in the future SFC was unable to continue generating loans. These are the issues the September 28, 2000 e-mail addresses. They also are the subject of a September 15, 2000 McKenzie email, which MP III marked in both the Hibberd and McKenzie depositions (*see* Barnowski aff. ex. L), and are issues about which Mr. McKenzie has testified (McKenzie dep. at 403-04).

When the e-mail uses the phrase "Ponzi scheme," it is plainly with respect to the funding of the experience account. (*See* exhibit D to the Motion for Sanctions). Indeed, Robert Van Epps, one of the recipients of the e-mail, testified in his deposition that this was the case. (Van Epps Dep. At 57-62)  Royal believed that it had resolved this problem with the structure it implemented for the third cover, which eliminated the experience account and required instead a deposit upfront to pay the first defaults under the third cover (which would have been paid under the experience account structure of the second cover), thereby allowing the excess spread account to grow as projected and meet future default experience. Mr. McKenzie's modeling, which was corroborated by Andrew Yao (the owner of SFC), showed that this would leave SFC with more cash than it needed to operate (including to make the experience account payments under the second cover).

## V.   Royal's Voluntary Decision To Withdraw Reasonable Privilege Assertions Does Not Warrant Sanctions.

Consistent with its conduct with respect to the supplemental production, MP III seeks to use to its litigative advantage Royal's good faith efforts in the preparation of its privilege log. In the course of supplementing its production of documents in the case, Royal decided to re-review its privilege log. Upon completion of that review, Royal chose to withdraw the privilege assertion with respect to several documents. But every one of those assertions was made in good faith initially; there was a more than reasonable basis for every assertion of privilege.

- 14 -

By way of example, MP III points to five newly-produced documents as evidence of Royal's bad faith assertion of the privilege. ***Incredibly, three of those documents were prepared by Royal's attorneys.*** The first document, ROY 73883, is an internal memorandum prepared by Royal's counsel, which outlines the potential tasks to be performed by Royal's forensic accountants in analyzing SFC's business practices. The document was properly withheld from production as privileged. Royal nevertheless decided to produce it because one of those forensic accountants is now testifying in this case as both a fact and expert witness, making the documents he received subject to discovery. That does not change the fact that there was a good faith basis to claim privilege on the memorandum prepared by Royal's attorneys.

Similarly, ROY 44360-426 and ROY 46759-73 are emails sent by Royal's inside counsel. One forwards a draft of the promissory note between Royal and SFC; the other forwards the Pledge Agreements regarding SFC's pledge of Interest-Only Strips by SFC to Royal. Although MP III now falsely contends to the contrary, the forwarded documents were produced to MP III in May, 2004. *See* ROY 20264-82 and ROY 16993-17011 (Pledge Agreements) and GT 004033-48 (draft promissory note), GT 528-41 (promissory note), GT 543-48 (same), GT 683-96 (same) and GT 698-703 (same). The only new documents produced were emails from Royal's inside counsel to the client attaching the drafts for review. There was a good faith basis to claim as privileged email communications between Royal's inside counsel to his client.

The fourth document, ROY 73797, is an email sent between several Royal employees in which they discuss the structure of the SFC transactions and the experience account. In clear handwriting at the top right corner of the document, Royal employee David King has recorded his intention to contact lawyers about those matters, by writing an arrow and then the words ***"outside legal."*** A client's stated intention to obtain legal advice on specific matters of course

- 15 -

provides a good faith basis for asserting privilege. Moreover, other copies of the same email, different only by date and lacking the handwriting, were produced long ago to MP III at ROY 001279, 001247, 045978, and 047332.

The last document challenged by MP III, ROY 46081-82, is an email between Royal employees about SFC's collapse. It is true that the document does not appear on its face to be privileged. But shortly before writing the document, its author Tony McKenzie was sent to SFC to assist in the forensic review of SFC's documents and business. (*See* McKenzie dep. at 50, 85-86). SFC had just informed Royal that it had been making secret forbearance payments on the student loans; that a significant number of loans would have defaulted but for the secret payments; and that numerous loans would soon default. (*Id.* at 43, 47). Royal sent Mr. McKenzie and others to SFC to investigate the propriety of SFC's business and to try to learn the extent and appropriateness of the forbearance payments. Litigation arising out of SFC's conduct was a substantial likelihood. At the instruction of counsel, Mr. McKenzie sent his mental impressions and findings from the review back to Royal employees, including Royal counsel. At first glance, ROY 46081-82 appeared to be one of Mr. McKenzie's reports, made in anticipation of litigation, and prepared at the express instruction of his lawyers. Upon further review, Royal decided not to assert the work product protection and the document was produced.

If Royal really were trying to hide documents during the discovery process, it would not have voluntarily chosen to conduct a time-consuming re-review of its privilege log, and to produce documents thereafter, months before trial. If Royal were trying to hide documents, it would have just continued with the unchallenged privilege assertions. Instead, Royal voluntarily took the step of making every effort possible to ensure that all possibly relevant documents were produced to all of the parties in this case, including documents that are arguably privileged.

**VI.    Because MP III Did Not Identify Which Privilege Assertions It Was Challenging Until Mid-Day Monday, Royal Is Not In A Position To Address Each Of Those Challenges Here.**

Although MP III told Royal weeks ago that it was going to make a motion based upon Royal's privilege assertions, MP III waited until 4:52 p.m. on Friday, July 22 to serve the motion -- and then chose not to deliver the exhibits to the motion until mid-day Monday. In particular, MP III's claims about the privilege log could not be meaningfully addressed without the exhibits, because that is the only place in which MP III sets forth the assertions it is challenging. Thus, despite Royal's repeated suggestions that the parties meet and confer over MP III's professed complaints, MP III has chosen to ignore entirely its meet and confer obligations on the privilege log issues. MP III's motion should be denied on this basis alone.

It appears that the documents which MP III would like the Court to review are mostly emails between Royal employees, either re-counting advice from counsel, made at the instruction of counsel, or made with the intent of reaching out to counsel for legal advice. All are, of course, privileged. For example:

- Of the 51 privilege assertions that MP III challenges, 30 of them are SFC emails that contain Mr. McKenzie's handwritten notes on them. *See* ROY 47773-95, ROY 47806-12, ROY 47814-17, ROY 47820-25 and ROY 51712.    The underlying emails, which are not privileged, were produced in discovery; the handwritten notes were redacted from the emails. The handwritten notes were redacted because Mr. McKenzie made them at the instruction of counsel, and sent them to counsel -- making them clearly privileged. Mr. McKenzie was instructed to make the handwritten notes by Royal attorneys in the investigation described in Section V above. The redactions are his mental impressions, made in anticipation of likely litigation, made at the instruction and direction of his attorneys, and made to his attorneys.

- Of the remaining 21 privilege assertions, 15 of them are communications between Royal employees that either repeat the advice received from counsel, discuss requests for advice that will be made of counsel, or forward communications with counsel. *See* ROY 295-299 (legal advice redacted only), ROY 1259 (expression of intent to contact inside counsel Gil Chandler), ROY 1914 (expression of intent to contact inside counsel Art Francis), ROY 2350-52 (repeating request for advice from inside counsel Art Francis), ROY 2356 (repeating advice from inside

- 17 -

counsel Art Francis), ROY 4572-659 (expression of work to be done by inside counsel Gil Chandler), ROY 5193-94 (expression of intent to seek advice from inside counsel Gil Chandler), ROY 22893-912 (notes on draft transactional documents repeat drafting advice from inside counsel), ROY 44318 (discussion of intention to retain attorneys and seek advice from them), ROY 47691-94 (expression of intent to seek advice from inside counsel), ROY 105764-68 (redactions only; they forward communications with general counsel and discuss requests for advice from inside counsel Gil Chandler), ROY 105814 (redaction only; describes discussions with inside counsel Gil Chandler) and ROY 105830 (redaction only; describes work done by inside counsel Gil Chandler and Art Francis).

- Of the remaining six privilege assertions, one of them involves one of two identical emails sent nearly simultaneously by Royal employee Robert Van Epps. Mr. Van Epps sent the emails with the intention of keeping his inside counsel apprised of what he was learning about the structure of the SFC transactions and his mental impressions of the transaction so the attorney could provide legal advice about the transactions in the future. On the first email, he accidentally forgot to include the attorney on his transmission list. *See* ROY 22511-15. He then re-sent the exact same email to the exact same recipient list, only adding the attorney to it this time. *See* ROY 1303-07. When a client attempts to communicate with his attorney for the purposes of receiving legal advice, the communication is privileged. That remains so, even if, by accident, the communication is received by someone instead of the attorney. Here, Mr. Van Epps attempted to send the communication to his attorney, but accidentally omitted the attorney. He remedied the omission immediately by re-transmitting the communication to his counsel.

- The remaining five privilege assertions forward memoranda prepared by legal counsel about the SFC transaction or memoranda prepared by Royal employees for counsel about the SFC transaction. *See* ROY 44584-86, ROY 73575-78, ROY 73886-91 and ROY 74085.

All of these claims of privilege are supported by the affidavit attached hereto. *See* Barnowski Affidavit. If MP III had complied with its obligation to meet and confer about its privilege challenges, or if it had served the exhibit setting forth the challenges in a timely manner (instead of holding it until less than 48 hours before the hearing), Royal would have had sufficient time to support the privilege assertions with an affidavit from Royal witnesses, instead of counsel. If the Court so desires, Royal will obtain that affidavit in short order.

**VII. Coastal's Claim of "Prejudice" Is Baseless.**

Coastal has purported to join in MP III's motion, claiming that it too has been "prejudiced" by the supplemental production. It is hard to know what prejudice Coastal believes it could have suffered since it has never bothered to review a single document produced by Royal at any point in time. If Royal had never produced a single document in this case, Coastal would be none the wiser.

**Conclusion**

For all of the foregoing reasons, plaintiff Royal Indemnity Company prays the Court to deny MP III's Motion for Sanctions, and to award to Royal Indemnity Company its costs of responding to this baseless motion.

Respectfully submitted,

WRIGHT BROWN & CLOSE, LLP

By: _____

Harvey G. Brown, Jr.
State Bar No. 03130500
Howard L. Close
State Bar No. 04406500
Three Riverway, Suite 1660
Houston, Texas 77056
Tel.: 713-572-4324
Fax.: 713-572-4320

OF COUNSEL:

Michael H. Barr
Alan S. Gilbert
Daniel D. Barnowski
SONNENSCHEIN NATH &
ROSENTHAL LLP
1221 Avenue of the Americas, 24th Floor
New York, New York  10020-1089
Tel.:  212-768-6700
Fax.:  212-768-6800

**Attorneys for Plaintiff
Royal Indemnity Company**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served on all

counsel of record in the following manner:

Certified Mail / Return Receipt Requested _____

Hand Delivery _____  *to the Clerk + Mr. Bernor*

Facsimile _____

U. S. Postal Service Regular Mail _____

Dated the 26th day of July, 2005.

_____
Howard L. Close

- 20 -

25148615\V-10