# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ROYAL INDEMNITY COMPANY,                )
                                        )
                          Plaintiff,    )   C.A. No. 05-165
                                        )
                                        )   Hon. Joseph J. Farnan, Jr.
                     v.                 )
                                        )
PEPPER HAMILTON LLP, RODERICK GAGNÉ,    )
FREED MAXICK & BATTAGLIA CPAs,          )
McGLADREY & PULLEN, LLP, and            )
MICHAEL AQUINO,                         )
                                        )
                          Defendants.   )
                                        )

## McGLADREY & PULLEN, LLP's and MICHAEL AQUINO's
## REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS

DUANE MORRIS LLP

Michael R. Lastowski (Bar No. 3892)
Christopher M. Winter (Bar No. 4163)
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246
Phone: 302-657-4951
Fax: 302-657-4901

-and-

ARNOLD & PORTER LLP

Richard P. Swanson
Veronica E. Rendon
Jason M. Butler
399 Park Avenue
New York, NY 10022
Phone: 212-715-1000
Fax: 212-715-1399

*Attorneys for McGladrey & Pullen, LLP
and Michael Aquino*

August 18, 2005

WLM\210672.1

## TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................... 1

Preliminary Statement .......................................................................................... 1

    Royal's Claims Are Untimely ......................................................................... 1

    Royal Fails To Plead Fraud ............................................................................ 4

    Royal Knew About Forbearance .................................................................... 5

ARGUMENT ........................................................................................................ 7

I.    ROYAL'S COMMON LAW CLAIMS ARE TIME BARRED ...................... 7

    A.    Royal's Claims Are Subject to Delaware's Borrowing Statute............ 7

    B.    Pennsylvania's Two Year Statute of Limitations Governs This Action ............ 8

        1.    Sections 145 and 6 Govern, Under Which Pennsylvania Law Applies ................ 9

        2.    Pennsylvania's Statute Of Limitations Applies Even Under Section 148............ 10

        3.    Royal Improperly Combines Its North Carolina And Delaware Contacts .......... 13

        4.    Royal's Claims Should Not Be Tolled Under Pennsylvania, Delaware Or North Carolina Law ............ 14

II.    ROYAL'S FRAUD CLAIMS SHOULD BE DISMISSED ........................... 19

    A.    Royal Fails To Allege *Scienter* ................................................... 20

    B.    Royal Fails to Allege Reasonable Reliance........................................ 22

III.    ROYAL'S RICO CLAIMS SHOULD BE DISMISSED ............................. 24

    A.    Aquino Did Not Operate Or Manage The Purported RICO Enterprise............... 24

    B.    Royal Fails To Allege A Pattern Of Racketeering Activity ................. 25

    C.    Royal's RICO Conspiracy Claim Should Be Dismissed...................... 27

IV.    ROYAL'S REMAINING COMMON-LAW CLAIMS SHOULD BE DISMISSED ............ 27

    A.    Royal's Civil Conspiracy Claims Should Be Dismissed...................... 27

    B.    Royal's Aiding And Abetting Claims Should Be Dismissed ............... 28

    C.    Royal's Deepening Insolvency Claims Should Be Dismissed ............ 29

    D.    Royal's Negligence and Negligent Misrepresentation Claims Should Be Dismissed ..... 30

CONCLUSION ................................................................................................... 30

# TABLE OF AUTHORITIES

## CASES

*AES Corp. v. Dow Chemical Co.,*
  2001 WL 34367296 (D. Del. Jan. 19, 2001) ..................................................................9, 12

*Air Products & Chemicals, Inc. v. Eaton Metal Products Co.,*
  272 F. Supp. 2d 482 (E.D. Pa. 2003) ..................................................................................12

*Allegaert v. Warren,*
  480 F. Supp. 817 (S.D.N.Y. 1979)........................................................................................8

*Anderson v. Airco, Inc.,*
  2004 WL 2827887 (Del. Super. Nov. 20, 2004)..................................................................28

*Banks v. Wolk,*
  918 F.2d 418 (3d Cir. 1990)..........................................................................................26, 27

*Becker v. Hamada, Inc.,*
  455 A.2d 353 (1982) ...........................................................................................................16

*Brown v. SAP America, Inc.,*
  1999 WL 803888 (D. Del. 1999) .........................................................................................11

*Cerullo v. Harper Collins Publishers,*
  2002 WL 243387 (Del. Super. Feb. 19, 2002)......................................................................7

*Cochran v. GAF Corp.,*
  633 A.2d 1195 (Pa. Super. 1993), *aff'd*, 666 A.2d 245 (Pa. 1995)........................................15

*D'Angelo v. Petroleos Mexicanos,*
  398 F. Supp. 72 (D. Del. 1975)............................................................................................8

*Dalrymple v. Brown,*
  701 A.2d 164 (Pa. 1997) .....................................................................................................15

*David B. Lilly Co. v. Fisher,*
  18 F.3d 1112 (3d Cir. 1994).......................................................................................8, 9, 10

*Davis v. West Center City Neigh. Planning Advisory Comm., Inc.,*
  2003 WL 908885 (Del. Super. Mar. 7, 2003), *aff'd*, 836 A.2d 513 (Del.) ............................28

*Department of Economic Development v. Arthur Andersen & Co. (U.S.A.),*
  924 F. Supp. 449 (S.D.N.Y. 1996).......................................................................................25

*E.F. Hutton Mortgage Corp. v. Pappas,*
  690 F. Supp. 1465 (D. Md. 1988).................................................................................passim

*Feinberg v. Saunders, Karp, & Megrue, L.P.,*
  1998 WL 863284 (D. Del. Nov. 13, 1998) ..........................................................................10

ii

*Financial Software Systems v. First Union National Bank*,
   1999 WL 1241088 (E.D. Pa. Dec. 16, 1999) ................................................................9

*Fine v. Checcio*,
   870 A.2d 850 (Pa. 2005) .......................................................................................15

*First Fin. Fed. Sav. & Loan Assoc. v. E.F. Hutton Mortgage Corp.*,
   834 F.2d 685 (8th Cir. 1987) ...........................................................................23-24

*Flanagan v. Shively*,
   783 F. Supp. 922 (M.D. Pa.), *aff'd*, 980 F.2d 722 (3d Cir. 1992),
   *cert. denied*, 510 U.S. 829 (1993) ........................................................................28

*Flood v. Makowski*,
   2004 WL 1908221 (M.D. Pa. Aug. 24, 2004) ....................................................28

*Garrison v. Mollers North American, Inc.*,
   820 F. Supp. 814 (D. Del. 1993) .........................................................................13

*Gemini Physical Therapy & Rehabilitation v. State Farm Mut. Automobile Ins. Co.*,
   40 F.3d 63 (3d Cir. 1994).......................................................................................9

*Goldstein v. Phillip Morris, Inc.*,
   854 A.2d 585 (Pa. Super. 2004).........................................................................28

*Guenther v. Quartucci*,
   1996 WL 67616 (E.D. Pa. Feb. 12, 1996) ..........................................................16

*Guy v. Liederbach*,
   459 A.2d 744 (Pa. 1983).......................................................................................30

*H.J., Inc. v. Northwestern Bell Telephone Co.*,
   492 U.S. 229 (1989)........................................................................................25, 26

*Hiatt v. Burlington Industries, Inc.*,
   286 S.E.2d 566 (N.C. App. 1982)........................................................................18

*Hill v. Equitable Trust Co.*,
   562 F. Supp. 1324 (D. Del. 1983)..........................................................................8

*Hindes v. Castle*,
   937 F.2d 868 (3d Cir. 1991)..................................................................................26

*Hockenberry v. Diversified Ventures, Inc.*,
   2005 WL 1458768 (M.D. Pa. Jun. 20, 2005)......................................................18

*Houston North Hosp. Props. v. Telco Leasing, Inc.*,
   688 F.2d 408 (5th Cir. 1982) ...............................................................................10

iii

*Iadanza v. Harper*,
    611 S.E.2d 217 (N.C. App. 2005).................................................................28

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)...................................................................21

*In re Dean Witter Partnership Litig.*,
    1998 WL 442456 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441 (Del. 1999).............15, 16, 17

*In re Fuehauf Trailer Corp.*,
    250 B.R. 168 (D. Del. 2000).....................................................................18

*In re ML/EQ Real Estate Partnership Litig.*,
    1999 WL 1271885 (Del. Ch. Dec. 21, 1999)..................................................17

*In re Student Finance Corp.*,
    2004 WL 609329 (D. Del. March 23, 2004)................................................21, 22,

*In re U.S. Office Prod. Co. Sec. Litig.*,
    251 F. Supp. 2d 77 (D.D.C. 2003)...............................................................9

*Investigative Group, Inc. v. Brooke Group Ltd., Inc.*,
    1997 WL 727484 (S.D.N.Y. Nov. 21, 1997)..................................................8

*Jardel Co. v. Hughes*,
    523 A.2d 518 (Del. 1987)........................................................................10

*Jeter v. Brown & Williamson Tobacco Co.*,
    294 F. Supp. 2d 681 (W.D. Pa. 2003), *aff'd*, 113 Fed. Appx. 463 (3d Cir. 2004)...................27

*Kehr Packages v. Fieldcor, Inc.*,
    926 F.2d 1406 (3d Cir.), *cert. denied*, 501 U.S. 1222 (1991)...................................26

*Koke v. Stifel, Nicolaus & Co.*,
    620 F.2d 1340 (8th Cir. 1980)..................................................................16

*Learning Works, Inc. v. Learning Annex, Inc.*,
    830 F.2d 541 (4th Cir. 1987)................................................................22, 23

*Litman v. Prudential-Bache Props. Inc.*,
    1994 WL 30529 (Del. Ch. Jan. 14, 1994), *aff'd*, 642 A.2d 837 (Del. 1994)..........................17

*Long v. ILA Corp.*,
    513 S.E.2d 812 (N.C. App. 1999)...........................................................13, 29

*Lord v. Souder*,
    748 A.2d 393 (Del. 2000).......................................................................13

*MBIA Insurance Corp. v. Royal Indemnity Co.*,
    286 F. Supp. 2d 347 (D. Del. 2003).........................................................3, 23

iv

WLM\210672.1

*MBIA Insurance Corp. v. Royal Indemnity Co.,*
   221 F.R.D. 419 (D. Del. 2004) ..........................................................................21

*McMahan & Co. v. Donaldson, Lufkin & Jenrette Sec. Corp.,*
   727 F. Supp. 833 (S.D.N.Y. 1989)......................................................................8

*Meehan v. Archdiocese of Philadelphia,*
   870 A.2d 912 (Pa. Super. 2005).......................................................................18

*Melder v. Morris,*
   27 F.3d 1097 (5th Cir.1994) ............................................................................21

*Molineux v. Reed,*
   532 A.2d 792 (Pa. 1987)...................................................................................18

*Myers & Chapman Inc. v. Thomas G. Evans, Inc.,*
   374 S.E.2d 385 (N.C. 1988)......................................................................13, 21

*Official Comm. of Unsec. Cred. v. Credit Suisse First Boston (In re Exide Techs., Inc.),*
   299 B.R. 732 (Bankr. Del. 2003) .....................................................................29

*Official Comm. of Unsec. Cred. v. R.F. Lafferty & Co.,*
   267 F.3d 340 (3d Cir. 2001)..............................................................................29

*Pell v. Weinstein,*
   759 F. Supp. 1107 (M.D. Pa. 1991), *aff'd,* 961 F.2d 1568 (3d Cir. 1992) ...............................22

*Pereira v. Cogan,*
   2001 WL 243537 (S.D.N.Y. March 8, 2001) ....................................................8

*Piedmont Institute v. Staton Foundation,*
   581 S.E.2d 68 (N.C. App. 2003)......................................................................18

*Privette v. University of North Carolina,*
   385 S.E.2d 185 (N.C. App. 1989).....................................................................28

*Production Resources Group, L.L.C. v. NCT Group, Inc.,*
   863 A.2d 772 (Del. Ch. 2004)..........................................................................29

*Quest Medical, Inc. v. Kirschner Medical Group, Inc.,*
   1992 WL 311193 (D. Md. July 29, 1992)....................................................20, 21

*RD & J Properties v. Lauralea-Dilton Enterprises, LLC,*
   600 S.E.2d 492 (N.C. App. 2004).....................................................................13

*Rahr v. Grant Thornton, LLP,*
   142 F. Supp. 2d 793 (N.D. Tex. 2000)..............................................................16

*Reliance Insurance Co. v. Eisner & Lubin,*
   685 F. Supp. 449 (D.N.J. 1988), *aff'd,* 897 F.2d 523 (3d Cir. 1990).......................................27

WLM\210672.1

*Reves v. Ernst & Young,*
 507 U.S. 170 (1993)........................................................................24, 25, 26

*Rodriguez v. Farm Family Casualty Insurance Co.,*
 2005 WL 1654019 (Del. Super. Apr. 19, 2005) ...................................16

*Rothman v. Gregor,*
 220 F.3d 81 (2d Cir. 2000)..................................................................16

*Saudi Basic Indus. Corp. v. Mobil Yanbu Petrochem. Co.,*
 866 A.2d 1 (Del. 2005) ........................................................................8

*Scansource, Inc. v. Datavision-Prologix, Inc.,*
 2005 WL 974933 (E.D. Pa. Apr. 26, 2005) ....................................22, 23

*Schnell v. Conseco, Inc.,*
 43 F. Supp. 2d 438 (S.D.N.Y.1999).....................................................21

*Shamrock Associates v. Sloane,*
 738 F. Supp. 109 (S.D.N.Y. 1990).........................................................8

*Skipworth v. Lead Industries Ass'n,*
 690 A.2d 169 (Pa. 1997).....................................................................28

*Smith v. Berg,*
 247 F.3d 532 (3d Cir. 2001).................................................................27

*Smith v. Smitty McGees, Inc.,*
 1998 WL 246681 (Del. Ch. May 8, 1998).............................................23

*Solow v. Aspect Resources, LLC,*
 2004 WL 2694916 (Del. Ch. Oct. 19, 2004)....................................16-17

*Steco, Inc. v. S&T Manufacturing, Inc.,*
 772 F. Supp. 1495 (E.D. Pa. 1991).......................................................26

*Stetser v. TAP Pharmaceutical Products, Inc.,*
 598 S.E.2d 570 (N.C. App. 2004)........................................................13

*Swain v. Preston Falls E., LLC,*
 576 S.E.2d 699 (N.C. App. 2003).........................................................13

*Tabas v. Tabas,*
 47 F.3d 1280 (3d Cir.), *cert. denied,* 515 U.S. 1118 (1995)...............25

*Thompson Coal Co. v. Pike Coal Co.,*
 412 A.2d 466 (1979)............................................................................28

*Township of South Fayette v. Allegheny County. Housing Authority,*
 27 F. Supp. 2d 582 (W.D. Pa. 1998), *aff'd,* 185 F.3d 863 (3d Cir. 1999) ................7

vi

*Tracinda Corp. v. DaimlerChrysler AG*,
    197 F. Supp. 2d 42 (D. Del. 2002)..................................................................13

*Travelers Indemnity Co. v. Lake*,
    594 A.2d 38 (Del. 1991) ................................................................................9

*Trierweiler v. Croxton & Trench Holding Corp.*,
    90 F.3d 1523 (10th Cir. 1996) ......................................................................12

*United States v. Parise*,
    159 F.3d 790 (3d Cir. 1998)..........................................................................25

*United States v. Schiffman*,
    124 F.3d 31 (1st Cir. 1997), *cert. denied*, 522 U.S. 1116 (1998) ...........................24

*United States v. Smith*,
    82 F.3d 1261 (3d Cir. 1996)..........................................................................27

*University of Maryland v. Peat, Marwick, Main & Co.*,
    996 F.2d 1534 (3d Cir. 1993)....................................................................24, 25

*Vernau v. Vic's Market, Inc.*,
    896 F.2d 43 (3d Cir. 1990)............................................................................17

*Ziemba v. Cascade International, Inc.*,
    256 F.3d 1194 (11th Cir. 2001) ................................................................20, 21

## STATUTES AND OTHER AUTHORITIES

10 Del. C. § 8121........................................................................................7, 8

10 Del. C. § 8132.........................................................................................13

Restatement (Second) of Conflict of Laws § 6........................................................9, 11

Restatement (Second) of Conflict of Laws § 145................................................9, 11, 13

Restatement (Second) of Conflict of Laws § 148............................................10, 11, 12, 13

## Introduction

Royal's Complaint should be dismissed in its entirety. Not only are Royal's common law claims untimely under the laws of Pennsylvania -- the state which has the most significant relationship to the issues in dispute -- they are also untimely were the laws of either Delaware or North Carolina to apply. Moreover, Royal has failed to plead fraud as a matter of law. Among other things, Royal has not and cannot allege *scienter* or its reasonable reliance on McGladrey's and Aquino's work. Finally, Royal's RICO claims are deficient under the seminal *Reves* and *University of Maryland* decisions, and Royal fails to establish either closed-ended or open-ended continuity.

Royal's early knowledge of forbearance and its decision to continue doing business with SFC, wholly unrelated to the work of McGladrey and Aquino, infects all of its claims and renders its Complaint deficient as a matter of law.

## Preliminary Statement

In their opening brief, McGladrey and Aquino set forth a clear and simple chronology of events, which Royal, in its 80 page opposition, does not dispute. Royal's many factual concessions are fatal to its Complaint against McGladrey and Aquino.[1]

### Royal's Claims Are Untimely

Royal argues that Delaware and not Pennsylvania law should apply to this matter. Royal concedes facts, however, which demonstrate why Pennsylvania has the most significant relationship to Royal's claims against the professionals. For example, it is undisputed that:

- All of the parties who allegedly were engaged in fraudulent conduct, namely, Yao, Gagne and Aquino, are and were based in Pennsylvania during all relevant periods of time;

- SFC is a Pennsylvania corporation, which is owned and controlled by Andrew Yao, a Pennsylvania resident;

- Yao, at all relevant times, maintained an office in Radnor, Pennsylvania from which he managed SFC, made executive decisions regarding the company, including the decisions that are ultimately at issue in the case;

---

[1]    The parties will be referred to as they were in McGladrey's and Aquino's opening brief.

WLM\210672.1

- Gary Hawthorne, another officer and director of SFC who allegedly engaged in fraudulent conduct, is a Pennsylvania resident;

- Yao (primarily) and Hawthorne (to a lesser extent), are alleged to have been the masterminds of SFC's fraud;

- Aquino is a Pennsylvania resident who provided the accounting services at issue from McGladrey's and FMSM's Philadelphia offices;

- McGladrey and FMSM issued the disputed auditing and AUP reports from their Philadelphia offices and addressed those reports to SFC in Radnor, Pennsylvania; and

- Pepper Hamilton is a Pennsylvania limited liability partnership, and Rod Gagne, who is alleged to be a co-conspirator, is a partner in the Philadelphia office of Pepper Hamilton, from where Gagne performed his disputed legal services.

These undisputed facts compel the conclusion that Pennsylvania law, including its two year statute of limitations, should apply to this matter and that Royal's common law claims are time barred. Royal's convoluted argument that somehow its contacts with *North Carolina* should require the application of *Delaware* law, is simply erroneous and should be rejected. So, too, should Royal's argument that, even if Pennsylvania law applies, its claims are timely.

Royal argues the Pennsylvania statute should be tolled since "Royal did not learn, and could not have learned, of Defendants' knowing participation in the fraud scheme until the fall of 2004." (Opp. 28) Royal offers no factual support for this statement, and it is belied by its very own counterclaim filed in this Court against Wells Fargo in the *MBIA* litigation. In that counterclaim, which was served on April 28, 2003, Royal explicitly referred to McGladrey and complained about its alleged failure to make adequate audit disclosures. (*See* Ex. A, ¶ 95)[2] Royal cannot now claim that it was not on notice of a potential claim against McGladrey until Fall 2004, *almost eighteen months after the filing of its counterclaim.* Royal also knew about McGladrey's and Aquino's role well before March 20, 2002, the day Yao purportedly confessed his fraud to Royal. For instance, if Royal truly received and relied upon SFC's audited financial statements for the year ended December 31, 2000 (the "2000 audited financial

---

[2]     References to the papers on this motion appear in the following format:   Royal's Complaint: ("¶_); McGladrey and Aquino's opening Memorandum of Law: "Br."; Royal's opposition brief: "Opp."; Appendix of Exhibits to this Reply Memorandum of Law: "Ex."

2

statements"), which were issued on April 30, 2001, as of that date, Royal had all the facts available to it to place it on inquiry (if not actual notice) of any claims it might have. Royal's claim that it was unaware of McGladrey and Aquino until Fall 2004 is but one of many instances in which Royal makes factual and legal statements that are demonstrably untrue.[3]

Additional undisputed facts demonstrate why Royal's common law claims are time barred even if Delaware's or North Carolina's three year statute of limitations were applied. For example, Royal concedes:

- The 2000 audited financial statements disclosed the existence, purpose and magnitude of the forbearance payments;

- In *three* separate notes to the 2000 audited financial statements (notes 1, 3 and 7), SFC's practice of making forbearance payments from its school reserves was referenced and discussed;

- Note 7 of the 2000 audited financial statements, "School Reserves," explicitly states that $9,515,841 in "forbearance payments" were made from SFC's school reserves in year 2000, and that $2,012,190 of "forbearance payments" were made from those very same reserves in 1999.

It is clear from these disclosures that "forbearance payments" were actual cash payments. Even if that somehow were not evident, and even if Royal somehow believed that SFC's forbearance program involved deferment of student payments and not actual cash payments, the import of McGladrey's 2000 audited financial statements disclosures is the same. Royal was on notice that SFC had not received $9,515,841 in student payments in 2000, which would have had an impact on SFC's delinquency and default curves. Royal is silent on this critically important fact.

---

[3]    In another instance, Royal cites to this Court's decision in *MBIA Insurance Corp. v. Royal Indemnity Co.*, 286 F. Supp. 2d 347 (D. Del. 2003) ("*MBIA I*"), as finding that SFC and defendants actively concealed the practice of making forbearance payments from Royal and that they knew that the default rates were expected to be higher than 25%. (Opp. 11) This Court, however, never made any such findings. On the pages cited by Royal, the Court was merely recounting Royal's contentions. *See MBIA I*, 286 F. Supp. 2d at 350-51.

3

**Royal Fails To Plead Fraud**

Royal's concessions also doom its fraud and RICO claims. In addition to conceding that McGladrey and Aquino made the 2000 audited financial statement disclosures discussed above, Royal also admits that:

- Aquino was the person who insisted upon the making of those disclosures;

- Aquino also sought assurances from Yao that Royal was aware of SFC's practice of making forbearance payments; and

- Neither McGladrey nor Aquino had any knowledge or involvement in the multitude of allegedly material misrepresentations and omissions made by Yao or his SFC affiliates in their individual communications with Royal.[4]

These facts demonstrate that, at most, Royal has pled a claim for fraud against Yao and his SFC affiliates -- not McGladrey or Aquino. This deficiency is not cured by Royal's conclusory and factually unsupported allegations of fraud and conspiracy.

Moreover, Royal concedes facts which demonstrate that Royal did not rely upon any audit or AUP reports when it issued credit insurance to SFC. For instance, it is undisputed that:

- Royal did not receive or rely on *any* audited financial statements or AUP report prior to issuing its first $75 million insurance policy to SFC;

- Royal issued its "Master Policy" to SFC in the amount of $200 million before it claims it received *any* report or communication from McGladrey or Aquino;

- Under the Master Policy, Royal committed to issue sub-policies, subject only to negligible criteria such as receipt of a schedule of loans to be included in the sub-policy and payment of the sub-policy premium;

- In July 2000, Royal committed to issue an additional $350 million in credit insurance coverage. This commitment was in addition to the initial $75 million policy and the $200 million Master Policy described above, which, when added together, constitutes *all* of the credit insurance coverage Royal would ever issue for SFC. As with the prior policies, Royal committed to the additional $350 million *before* it claims to have received any audit or AUP report for SFC.

---

[4]    While Royal makes general allegations that Aquino and McGladrey were complicit in Yao's fraud, Royal does not dispute that Aquino and McGladrey had no knowledge of and no participation in the specific misrepresentations and omissions that, according to Royal in its Complaint, were allegedly made by Yao and his SFC colleagues.

WLM\210672.1

Because it must concede these facts, Royal resorts to vague and ambiguous statements regarding its purported reliance on McGladrey's and Aquino's work. For instance, Royal does not state *when* it purportedly received McGladrey's and Aquino's audit and AUP reports, nor does it state *what* it did in reliance upon them. Royal merely creates a laundry list of wrongdoing by Yao and his SFC colleagues and then makes general claims of fraud and conspiracy. Conclusory allegations of reliance, however, without supporting factual allegations, are insufficient.

**Royal Knew About Forbearance**

If there were any doubt about Royal's knowledge or reliance on McGladrey's and Aquino's work, Royal concedes that it *knew about SFC's practice of making forbearance payments as early as March 2000.*

In its Complaint, Royal never claims that it was unaware of SFC's use of forbearance payments. Rather, in carefully constructed sentences, Royal claims that SFC's "use of ghost payments *to conceal defaults* was not disclosed to Royal before the negotiation and issuance of additional insurance policies." (¶ 43 (emphasis added)) Similarly, in describing Yao's purported March 2002 confession, Royal does not claim that Yao told Royal about SFC's use of forbearance payments for the first time. Rather, Royal claims that "Yao admitted to Royal for the very first time that SFC had been making the 'forbearance' payments *to prevent loans from being reported as defaults* and that a large number of student loans would default immediately if SFC stopped making those payments." (¶ 68 (emphasis added)) In its opposition brief, Royal continues its word play.[5]

As we pointed out in our opening brief, Royal's choice of language is not accidental. In the CDI/TDI litigation pending in Tennessee, Royal produced a March 6, 2000 letter which documents Yao telling Royal representatives that:

---

[5]     For instance, Royal claims it "did not know of SFC's practice of making the secret ghost payments before Yao's [March 20, 2002] confession." (Opp. 17) What Royal omits, however, is that it defined "secret ghost payments" as forbearance payments "*to prevent the loans from going to claims*." (¶ 38, emphasis added) Royal is engaging in a game of semantics to mask its knowledge of forbearance. Royal cannot escape so easily. As discussed above, documents produced by Royal in other litigations illustrate Royal's knowledge of forbearance.

WLM\210672.1

> Also for students who are in forbearance, the schools advance payment
> on behalf of the student until the student resumes paying or until he
> defaults ... *this, of course, also distorts the default curve.*

(Br., Ex. H ¶ 130 (emphasis added))  Tellingly, in its opposition, Royal does not dispute that it received

this letter or that the letter informed it about forbearance and the allegedly "distorting" effect that practice

had on the default curve.  Combined with the audit disclosures contained in the 2000 audited financial

statements, which quantified forbearance payments for 1999 and 2000, Royal had the information

available to it to understand the size and extent of forbearance and its effect, and to make an informed

decision about doing business with SFC.

　　　　Further evidencing Royal's knowledge is an extremely troubling document produced by Royal in

another litigation, *Royal Indemnity Company v. T.E. Moor & Co.*, No. D-167370 (Dist. Ct. Jefferson Co.,

Tex. July 20, 2005).  In that matter, Royal apparently produced one of its internal emails dated September

28, 2000.  In that email, Tony McKenzie of Royal wrote to Bill Hibberd and others at Royal, and made

the following, deeply disturbing, comment:

> Hopefully, this rambling makes some sense.  I guess what I am saying is,
> I think SFC is running some kind of Ponzi scheme.  They are using
> money, which should be held for tomorrow, to pay costs today and are
> hoping for fresh money coming in tomorrow until the securitizations
> finally start generating cash.  My original model shows that this would
> occur at the 5 year mark.  My new, improved model shows this to be at 6
> years.
>
> I guess the question is, "Can they stay in business about one year after
> we add the last loan that we are going to ensure [sic]?"

In his final question, Mr. McKenzie is asking whether SFC can stay afloat long enough to cover the one-

year recourse period SFC has to Royal under the terms of its insurance agreements.  This email bears a

Royal Bates-stamp number, and is attached to a counter-claim filed by one of the truck schools in the

Texas litigation.  (Exs. B, C)  The counterclaim, which was filed on July 20, 2005 (only after McGladrey

and Aquino submitted their opening brief), contains numerous other troubling allegations regarding

Royal's knowledge.

These documents and emails, which Royal asks the Court to simply disregard, show that if anyone was committing fraud in concert with Yao and SFC, it was *Royal* -- not McGladrey or Aquino, who made explicit audit disclosures which divulged the existence, purpose and magnitude of the forbearance payments.  Royal's Complaint should be dismissed.[6]

## ARGUMENT

### I.     ROYAL'S COMMON LAW CLAIMS ARE TIME BARRED

Royal waited until March 18, 2005 to file its complaint against McGladrey and Aquino.  That is true notwithstanding that Yao purportedly disclosed his alleged fraud to Royal on March 20, 2002, and Royal has been actively litigating against individuals and entities involved with SFC for years.  As discussed above, Royal's own pleadings in those other cases reveal that Royal has been aware of its purported theory of liability against McGladrey and Aquino since before those cases' inception, yet failed to file a claim at that time.  Royal's delay is not accidental and demonstrates Royal's hesitancy to file claims it knows to be flawed.

#### A.     Royal's Claims Are Subject to Delaware's Borrowing Statute

Royal incorrectly argues that Delaware's three year statute of limitations should apply because it is not subject to Delaware's borrowing statute, 10 Del. C. § 8121.  Royal claims that because it is incorporated in Delaware, it is a Delaware "resident," and thus not subject to Delaware's borrowing statute.  Royal's argument is flawed.

Royal is a Delaware corporation doing business in North Carolina.  (¶ 12)  In its argument, Royal presumes that state of incorporation is synonymous with residency for purposes of the borrowing statute.  That is incorrect.  *See Cerullo v. Harper Collins Publishers*, 2002 WL 243387, at *3 (Del. Super. Feb. 19, 2002) (cited at Opp. 25) (Delaware looks to New York law for interpretation of the borrowing statute due to the similarity of the two states' borrowing statutes and lack of Delaware precedent).

---

[6]     Contrary to Royal's assertion, the Court may consider the filings in these other cases.  *See Township of South Fayette v. Allegheny County Hous. Auth.*, 27 F. Supp. 2d 582 (W.D. Pa. 1998), *aff'd*, 185 F.3d 863 (3d Cir. 1999).

Under New York law, "residency" for purposes of the borrowing statute is not the place of incorporation, but the location of a company's principal place of business. *See, e.g., McMahan & Co. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 727 F. Supp. 833, 834 (S.D.N.Y. 1989). In *McMahan*, the court held that "[a] corporation's principal place of business, rather than its state of incorporation, determines its residence" for purposes of New York's borrowing statute. *Id.* The court went on to note that, while a company incorporated in New York "may be a 'creature of New York . . . law,' its residence is where it conducts its day-to-day affairs." *Id.* (citing *Allegaert v. Warren*, 480 F. Supp. 817, 820 (S.D.N.Y. 1979)). *See also Pereira v. Cogan*, 2001 WL 243537, at *17-18 (S.D.N.Y. Mar. 8, 2001); *Shamrock Assocs. v. Sloane*, 738 F. Supp. 109, 113 (S.D.N.Y. 1990); *Investigative Group, Inc. v. Brooke Group Ltd., Inc.*, 1997 WL 727484, at * 3 (S.D.N.Y. Nov. 21, 1997). Since Royal claims that its principal place of business is North Carolina, Royal is subject to Delaware's borrowing statute.[7]

If Royal's construction of the Delaware borrowing statute were correct, every Delaware corporation would be subject to the Delaware statute of limitations on every claim. The breadth of Royal's argument shows why it cannot be correct.

**B.   <u>Pennsylvania's Two Year Statute of Limitations Governs This Action</u>**

Under Delaware's borrowing statute, courts will apply either the limitations period of Delaware or of the state where the claim arises, "whichever is *shorter* . . . . " *See* 10 Del. C. § 8121 (emphasis added). Here, that state is Pennsylvania, the state from which McGladrey's audit and AUP reports were issued, and the state which has the most significant relationship to the claims against McGladrey and Aquino. Moreover, Pennsylvania has the shorter statute of limitations period -- a two year statute as compared to Delaware's three year statute. Royal's complaint is based on the issuance of allegedly

---

[7]   The cases cited by Royal are inapposite. *See, e.g., Saudi Basic Indus. Corp. v. Mobil Yanbu Petrochem. Co.*, 866 A.2d 1, 17 (Del. 2005) (failing to apply borrowing statute because to do so "would subvert the statute's fundamental purpose"); *David B. Lilly Co. v. Fisher*, 18 F.3d 1112, 1119 n.3 (3d Cir. 1994) (plaintiff's state of incorporation *and* principal place of business was Delaware); *Hill v. Equitable Trust Co.*, 562 F. Supp. 1324, 1333 n.15 (D. Del. 1983) (same); *D'Angelo v. Petroleos Mexicanos*, 398 F. Supp. 72, 79 (D. Del. 1975) (applying borrowing statute to individual who was a Delaware resident).

8

misleading audit and AUP reports. Those reports were issued from Philadelphia, Pennsylvania and addressed to SFC in Radnor, Pennsylvania, where common sense indicates the claims arose.

### 1.     Sections 145 and 6 Govern, Under Which Pennsylvania Law Applies

Royal tries to cloud this clear conclusion by engaging in a tortured choice of law analysis, in which it applies the wrong section of the *Restatement (Second) of Conflict of Laws* (the "Restatement") and improperly relies upon its contacts with North Carolina to support its argument that Delaware law should be applied. It is not that complicated. Were the Court to engage in a choice of law analysis, it would do so under sections 145 and 6 of the Restatement. Under those sections, Pennsylvania clearly has the most significant relationship to the issues in dispute.

As Royal notes, the Delaware Supreme Court in *Travelers Indemnity Company v. Lake* adopted the "most significant relationship test" of the Restatement. 594 A.2d 38, 47 (Del. 1991). Specifically, the *Travelers* court adopted sections 145, 146, and 6, but *not* section 148 (the section advanced by Royal). *Id.* at 47.[8] The proper choice of law analysis is thus contained in sections 145 and 6. *See, e.g., In re U.S. Office Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 77, 91-92 (D.D.C. 2003) (relying on *Travelers* and sections 145 and 6 to determine that misrepresentation and negligence claims were governed by District of Columbia law).[9]

McGladrey's and Aquino's moving brief correctly analyzes choice of law principles under sections 145 and 6. That analysis is supported by the undisputed facts set forth above, all of which

---

[8]     Royal wrongly assumes that because the *Travelers* court adopted one section of the Restatement, it necessarily adopted all sections. That is not so. *See, e.g., Financial Software Sys. v. First Union Nat'l Bank*, 1999 WL 1241088, at *7 n.7 (E.D. Pa. Dec. 16, 1999) (reasoning, in part, that because Pennsylvania had not adopted section 148, sections 145 and 6 should be applied). *See also Gemini Physical Therapy & Rehab. v. State Farm Mut. Auto. Ins. Co.*, 40 F.3d 63, 66 (3d Cir. 1994) (while Pennsylvania had adopted *Restatement (Second) of Torts* §§ 766 and 766B, Pennsylvania was unlikely to adopt § 766A); *David B. Lilly Co*, 18 F.3d at 1117 (refusing to apply section 142 because "Delaware has not explicitly adopted" it).

[9]     Delaware has not adopted section 148 and it should not be applied here. The three Delaware cases cited by Royal in favor of the application of section 148 are inapposite. Two of the cases, issued by the same judge, do not find that section 148 is controlling. The other decision cited by Royal, *AES Corp. v. Dow Chemical Co.*, 2001 WL 34367296 (D. Del. Jan. 19, 2001), issued by this Court, involved application of *Texas* choice of law principles, and Texas, unlike Delaware, *has* adopted Section 148. *Id.* at *6. Worse, the Court's analysis of section 148 in *AES* supports the application of Pennsylvania law in this case.

9

demonstrate that Pennsylvania has the most significant relationship to the issues in dispute in this lawsuit. Among other things, all of the parties who allegedly were engaged in fraudulent conduct are and were based in Pennsylvania; Pennsylvania is the place where the relationship between the allegedly fraudulent parties was centered; McGladrey and FMSM issued their disputed audit and AUP reports from their Philadelphia offices; and those audit and AUP reports were addressed to SFC in Radnor, Pennsylvania. Pennsylvania's two year statute of limitations should be applied.[10]

### 2. Pennsylvania's Statute Of Limitations Applies Even Under Section 148

In an attempt to avoid the application of Pennsylvania law, Royal incorrectly claims that section 148 should guide the Court and that, under that section, the Court is required to amalgamate the interests of North Carolina and Delaware and weigh those combined interests against Pennsylvania, in order to determine that the law of Delaware should be applied. Royal is wrong.

As discussed above, Delaware has not adopted section 148; it has only adopted sections 145 and 6. But, whether or not the choice of law analysis is performed under sections 145 and 6 or section 148, the conclusion is the same -- Pennsylvania's interests prevail. Royal's 148 arguments are, in many respects, a red herring. Section 148, by its very terms, requires consideration of the choice of law principles set forth in section 6, and further states that the place where the defendant made the allegedly false representations is a primary consideration.

Under its express terms, section 148(2) does not provide a comprehensive list of factors. Rather, the "relative importance [of those factors] should be determined in light of the choice-of-law principles

---

[10]    Royal does not dispute the weight afforded the Pennsylvania interests advanced by McGladrey and Aquino. Rather, Royal incorrectly suggests that McGladrey and Aquino are attempting to apply the *lex loci* choice of law rule. Royal is wrong. Post-*Travelers*, Delaware courts consider the place where the allegedly-fraudulent conduct occurred. *See, e.g., Feinberg v. Saunders, Karp, & Megrue, L.P.*, 1998 WL 863284, at *11 (D. Del. Nov. 13, 1998) (noting that the place where defendants made the false representations "'is as important as, and occupies a position wholly analogous to, the place of conduct that results in injury to person or to tangible things'") (citation omitted). Indeed, section 145 affords substantial deference to the state where the intentional tort occurred. *See, e.g, Houston North Hosp. Props. v. Telco Leasing, Inc.*, 688 F.2d 408, 409 n.3b (5th Cir. 1982) (citing section 145 cmt. e, stating that "in cases involving torts designed to deter or punish the defendants, the place the conduct occurred has particular significance for the choice-of-law decision."). To identify state interests implicated by a particular choice of law question, courts regularly rely on cases decided pre-*Travelers* for guidance. *See, e.g., David B. Lilly Co.*, 18 F.3d at 1120 (relying on *Jardel Co. v. Hughes*, 523 A.2d 518, 529 (Del. 1987)) (cited at Opp. 40).

10

stated in § 6, with emphasis upon the purpose sought to be achieved by the relevant tort rules of the

potentially interested states, the particular issue and the tort involved." Section 148, cmt. e.  Similarly,

the stated rationale for section 148 provides:

> The rule of this Section calls for application of the local law of the state
> selected on the basis of the stated contacts unless, with respect to the
> particular issue, some other state has a more significant relationship to
> the occurrence and the parties.  Whether there is such another state will
> be determined in the light of the choice-of-law principles stated in § 6.
> In large part the answer to this question will depend upon whether some
> other state has a greater interest in the determination of the particular
> issue than the state selected on the basis of the stated contacts.  The
> extent of the interest of each of the potentially interested states should be
> determined on the basis, among other things, of the purpose sought to be
> achieved by their relevant local rules and of the particular issue involved
> . . . .

Section 148, cmt. b.  Even under section 148, section 6, as set forth in section 145, is of primary

importance and is the lens through which choice of law contacts should be viewed.  This is consistent

with the choice of law analysis discussed above, which dictates in favor of Pennsylvania.  The cases cited

by Royal support this conclusion. *See, e.g., Brown v. SAP America, Inc.*, 1999 WL 803888, at *6 (D. Del.

Sept. 13, 1999) ("Since [the factors enumerated in section 148(2)] overlap the broad policy concerns

enumerated in § 6, the court shall analyze the more factually based contacts of § 145 in conjunction with

the more policy-oriented principles of § 6").  In other words, Royal's analysis improperly excludes

consideration of sections 145 and 6, and is therefore incorrect.  The Court should come to the same

conclusion under either type of analysis.

   This is especially true because, just as with sections 145 and 6, under section 148, the place where

the allegedly wrongful conduct occurred, here, Pennsylvania, is of primary importance.  Under section

148, "[t]he place where the defendant made his false representations, on the other hand, is as important a

contact in the selection of law governing actions for fraud and misrepresentation as is the place of the

defendant's conduct in the case of injuries to the persons or to tangible things." Section 148, cmt. c.

Unsurprisingly, Royal omits this comment from its discussion.  It should not have.  As this Court has

held, the place from which the allegedly fraudulent misrepresentation emanated is a primary consideration

under section 148. *See AES Corp*, 2001 WL 34367296, at *7 (holding that Texas had "the most significant relationship with the fraud" under section 148 because defendant sent documents containing alleged misrepresentations from Texas to a plaintiff located elsewhere).

Moreover, under section 148, Pennsylvania has a primary interest in regulating professionals located within its borders and punishing those professionals licensed under its laws. As noted above, section 148(2) is to be applied "with emphasis on the purpose sought to be achieved by the relevant tort rules of the potentially interested states, the particular issue and the tort involved." Section 148, cmt e. Pennsylvania's strong governmental interest must be considered under section 148. *See, e.g., Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1535-36, 1537 (10th Cir. 1996) (under 148, Colorado's policy of holding accountants for misconduct weighed in favor of applying Colorado law); *Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.*, 272 F. Supp. 2d 482, 507 (E.D. Pa. 2003) (under 148, Utah's interest in holding professionals accountable was implicated because misrepresentations were made in Utah).

Conversely, under section 148, the weight afforded to the place of reliance and the place of receipt of misrepresentation is considerably less when those contacts occurred in two or more states. *See, e.g, Air Prods.*, 272 F. Supp. 2d at 506 (citing Restatement § 148, cmt. f, and finding that the reliance contact "has less significance when the plaintiff's reliance occurred in more than one state"). Here, Royal claims that it relied and acted upon the alleged misrepresentations in *both* North Carolina and Delaware (*see* Opp. 32-33), significantly reducing the weight of those factors under section 148. Royal also wrongly relies on section 148's "two-contacts" rule. (Opp. 35) The "two contacts" rule states that when two or more of the section 148(2) factors favor application of one state's laws, that state's law should govern. *See* Section 148, cmt. j. This "general approach," however, applies only when the two contacts are located "wholly in a single state." *Id*. Because Royal asserts that its contacts occurred in both Delaware *and* North Carolina, the "two contacts" rule is inapplicable.

### 3.    Royal Improperly Combines Its North Carolina And Delaware Contacts

To confuse issues further, throughout its brief, Royal attempts to rely upon its contacts with *North Carolina* in support of its argument that *Delaware* law should apply. Again, Royal is wrong. In order to perform a combined interest analysis, North Carolina and Delaware must have *identical* law on the issues in dispute. *See* Section 148, cmt. m; Section 145, cmt. i. They do not. The laws of Delaware and North Carolina are materially different in key areas that could drastically affect the outcome of this matter.

*First*, Delaware and North Carolina have different *scienter* requirements for common law fraud. While Delaware may permit *scienter* to be established "by a showing of recklessness," *Lord v. Souder*, 748 A.2d 393, 402 (Del. 2000), North Carolina requires a knowing level of wrongdoing. Recklessness will not suffice. *See Myers Chapman Inc. v. Thomas G. Evans, Inc.*, 374 S.E.2d 385, 391 (N.C. 1988) ("Without the element of intent to deceive, the required *scienter* for *fraud* is not present") (emphasis in original); *see also RD & J Props. v. Lauralea-Dilton Entes., LLC*, 600 S.E.2d 492, 498 (N.C. App. 2004) ("The required *scienter* for fraud is not present without both knowledge and an intent to deceive, manipulate, or defraud").

*Second*, with respect to Royal's negligence claims, Delaware and North Carolina apportion damages differently. Delaware applies a comparative negligence statute which reduces plaintiff's recovery in proportion to its own negligence and bars recovery only if plaintiff's negligence is greater than that of the defendant. *See* 10 Del. C. § 8132; *see also Garrison v. Mollers North American, Inc.*, 820 F. Supp. 814, 821 n.5 (D. Del. 1993). Conversely, North Carolina applies the rule of strict contributory negligence. *See Swain v. Preston Falls E., LLC*, 576 S.E.2d 699, 702 (N.C. App. 2003).

*Third*, the elements for civil conspiracy differ under Delaware and North Carolina law. While Delaware requires the commission of an overt act in furtherance of the alleged conspiracy, *see Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42, 74 (D. Del. 2002), North Carolina law imposes no such requirement. *Stetser v. TAP Pharm. Prods., Inc.*, 598 S.E.2d 570, 582 (N.C. App. 2004).

*Finally*, North Carolina does not recognize the tort of deepening insolvency, *see Long v. ILA Corp.*, 513 S.E.2d 812, 823 (N.C. App. 1999), whereas Royal argues that Delaware does. (Opp. 56-57)

13

And, this list is based only on a quick sampling of the law. One wonders what a more comprehensive analysis would reveal. [11]

The interests of Delaware and North Carolina cannot be combined and weighed against Pennsylvania. Indeed, it is unclear how Royal can claim that Delaware and North Carolina "law is the same in all pertinent respects" (Opp. 37), or how it can instruct the Court that "[t]here is no need to determine the choice of law as between Delaware and North Carolina because the substantive law of those states is the same." (Opp. 32) Such statements appear to be patently incorrect and misleading.

The choice of law principles applicable to this case are straightforward and dictate one result, that Royal's claims are subject to Pennsylvania's two year statute of limitations and are thus time barred. But, even if a three year statute were to apply, Royal's claims are still untimely. Under either Pennsylvania, Delaware or North Carolina law, Royal's claims should not be tolled.

### 4. Royal's Claims Should Not Be Tolled Under Pennsylvania, Delaware Or North Carolina Law

In a final attempt to evade Pennsylvania's two year statute of limitations, Royal argues that, even if the statute were to apply, its claims should be tolled under Pennsylvania's discovery rule. Royal argues that because it "did not learn, and could not have learned, of Defendants' knowing participation in the fraud scheme until the fall of 2004" (Opp. 28), the running of the statute should be tolled until then. As discussed above, however, Royal's argument is demonstrably false and should be rejected, regardless of which state's statute of limitations may be applied.

As discussed above, in March 2000, Royal was on notice of the practice of forbearance and the allegedly "distorting" effect that it had on defaults; in September 2000, Royal wrote an internal email in

---

[11]   Given the critical differences between North Carolina and Delaware on the elements of fraud and damage allocation, in that Delaware may be more favorable to Royal on those issues, it is not surprising that Royal attempts to use its contacts with North Carolina to support its argument that Delaware, and not North Carolina, law should apply. Royal wants to have its cake and eat it, too. If a state's law other than Pennsylvania were to be applied, it should be North Carolina, not Delaware. Royal's contacts with North Carolina are stronger than its contacts with Delaware, and Royal asserts that part of its reliance and all of its damages occurred in North Carolina. (Opp. 32-34) But, it is apparent that Royal tries to lump its contacts with both states because even it recognizes that on a one-to-one basis, Pennsylvania's interests prevail.

14

which it openly stated that it believed that SFC was "some kind of Ponzi scheme"; and in or around April

2001, Royal purportedly received and read the 2000 audited financial statements, which contained

detailed forbearance disclosures, including an explicit disclosure quantifying forbearance for 1999 and

2000. By that date, Royal understood McGladrey's and Aquino's role as independent auditor and had all

the information available to it to be on reasonable notice of any claims it may have. Each of those dates is

more than three years before this suit was filed. At the latest, Royal was on notice of its claims in March

2002, when Yao purportedly confessed all.

     Royal's claim of lack of knowledge until Fall 2004 is demonstrably false. As discussed above, in

a counterclaim Royal filed against Wells Fargo back on April 18, 2003 in this Court, Royal explicitly

referred to McGladrey and complained about its audit disclosures. At that time, Royal clearly knew of its

potential claims, it simply chose not to assert them. Royal's mere pleading of ignorance, especially when

contradicted by other facts, is insufficient. *See Dalrymple v. Brown*, 701 A.2d 164, 167 (Pa. 1997); *see

also In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *6 (Del. Ch. July 17, 1998) (plaintiff has

burden to plead "specific facts that demonstrate that the statute of limitations was, in fact, tolled"), *aff'd,*

725 A.2d 441 (Del. 1999).

     Moreover, even if it could be said that Royal did not know of its claims against McGladrey and

Aquino until Fall 2004, Royal confuses the concept of actual knowledge with reasonable notice for

purposes of tolling. Under either Pennsylvania, Delaware or North Carolina law, Royal does not need to

have actual knowledge of its claims. It simply needs to be on reasonable notice of them. Given the early

dates on which Royal had at least constructive notice of its claims, this case may present a classic false

conflict of laws, as Royal's claims are time barred whether Pennsylvania's two year, or Delaware's or

North Carolina's three year, statute of limitations applies.

     "The polestar of the Pennsylvania discovery rule is not a plaintiff's actual acquisition of

knowledge but whether the information, through the exercise of due diligence, was knowable to the

plaintiff." *Cochran v. GAF Corp.*, 633 A.2d 1195, 1198 (Pa. Super. 1993), *aff'd,* 666 A.2d 245 (Pa.

1995) (citation omitted). *See also Fine v. Checcio*, 870 A.2d 850, 858 (Pa. 2005) ("'Reasonable

diligence' is an objective test" and "'[t]here are [very] few facts which diligence cannot discover . . . .'")

(citation omitted). This is especially true in the context of auditor liability. *See Rahr v. Grant Thornton,*

*LLP,* 142 F. Supp. 2d 793, 798-99 (N.D. Tex. 2000) ("A reasonable investor, armed with the knowledge

that [a company] had been engaged in fraud . . . would have continued investigating to determine whether

the [company's auditors] had also participated in [the] fraud. . . . [T]his knowledge of the possibility of a

claim is sufficient to put a plaintiff on inquiry notice and to trigger commencement of the limitations

period."); *accord Rothman v. Gregor,* 220 F.3d 81, 96 (2d Cir. 2000). Moreover, the alleged inability to

identify parties responsible for an injury does not toll the limitations period. *See, e.g, Guenther v.*

*Quartucci,* 1996 WL 67616, at *2 (E.D. Pa. Feb. 12, 1996) (collecting cases) (noting that Pennsylvania

does not apply the discovery rule "where a plaintiff was aware of an injury and its cause but had not

determined the identity of the defendants within the limitations period").

Delaware law is no different on this point. Under each of Delaware's tolling theories, the

limitations period is suspended only until the plaintiff has actual or "inquiry notice" of injury. *In re Dean*

*Witter,* 1998 WL 442456, at *7. Similar to Pennsylvania law, "[i]nquiry notice" does not require that the

plaintiff have "awareness of all of the aspects of the alleged wrongful conduct." *Id.* Nor does it require

that the plaintiff know the identity of all wrongdoers. *See Rodriguez v. Farm Family Cas. Ins. Co.,* 2005

WL 1654019, at *4 (Del. Super. Apr. 19, 2005) (limitations period not tolled where plaintiff had means to

locate and identify the defendant). Rather, inquiry notice simply requires possession of "'facts sufficient

to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the

discovery'" of the purported claims. *Becker v. Hamada, Inc.,* 455 A.2d 353, 356 (Del. 1982) (citation

omitted); *see also In re Dean Witter,* 1998 WL 442456, at *7 (same).

Moreover, under Delaware law, Royal was not free simply to ignore the forbearance disclosures

in the 2000 audited financial statements. *See Koke v. Stifel, Nicolaus & Co.,* 620 F.2d 1340, 1344 (8th

Cir. 1980) ("Even if [the plaintiff] did not understand [monthly account statements and trade confirmation

slips provided by her broker], she was not free to ignore them, and that is what she did; she did not

examine them carefully and did not ask anyone to explain them."). *See also Solow v. Aspect Resources,*

16

*LLC*, 2004 WL 2694916, at *3-4 (Del. Ch. Oct. 19, 2004) (barring plaintiff from pleading lack of actual or inquiry notice because of plaintiff's failure to allege that he made "any other request [for information] that a reasonable investor with doubts about the expertise and experience might make in regards to those persons with whom that investor will entrust more than $1 million").

Indeed, Royal's early apparent knowledge about forbearance and its stated belief in September 2000 that SFC was "something like a Ponzi scheme" are sufficient, in and of themselves, to have put Royal on inquiry notice about the default rates being reported by SFC. *See Litman v. Prudential-Bache Props. Inc.*, 1994 WL 30529, at *6 (Del. Ch. Jan. 14, 1994) (preliminary disclosure of negative results "was enough to put reasonable investor on notice that that some aspects of the Partnership were not performing as expected. Such information should prompt a reasonable investor concerned about her investment to inquire . . ."), *aff'd*, 642 A.2d 837 (Del. 1994). Certainly, once Royal purportedly received and read the 2000 audited financial statement disclosures, Royal was at least on inquiry (if not actual) notice of its potential claims.

Tellingly, Royal's 80 page opposition contains no discussion of its attempts to investigate the 2000 audited financial statement disclosures or how the $9,514,841 million in forbearance payments affected SFC's default rate. This dooms Royal's tolling arguments (and its false claims of reliance on McGladrey's work). *See Vernau v. Vic's Market, Inc.*, 896 F.2d 43, 46 (3d Cir. 1990) (trustee's failure to perform rudimentary analysis of ERISA contribution reports barred tolling of Pennsylvania's statute of limitations); *In re Dean Witter*, 1998 WL 442456, at *8 (under Delaware law, "It is not too much to ask investors to read beyond the first page of an annual report, to read past the rosy forecasts and actually look at the cold, hard figures provided to them."); *id.* at *9 ("Plaintiffs were not entitled to sit idly by, blindly relying on defendants' assurances, when the documents and disclosures plaintiffs received regularly were so suggestive of mismanagement.") (footnote omitted); *see In re ML/EQ Real Estate P'ship. Litig.*, 1999 WL 1271885, at *2 n.12 (Del. Ch. Dec. 21, 1999) (access to books and records barred application of inherently unknowable doctrine).

WLM\210672.1

Moreover, Royal cannot avail itself of the fraudulent concealment doctrine under either Pennsylvania, Delaware or North Carolina law. Royal fails to allege any fraudulent concealment by McGladrey or Aquino, something it has the burden of demonstrating by clear and convincing evidence. *See Molineux v. Reed*, 532 A.2d 792, 794 (Pa. 1987) ("the burden of proving . . . fraud or concealment, by evidence which is clear, precise and convincing, is upon the asserting party"); *accord In re Fuehauf Trailer Corp.*, 250 B.R. 168, 197-98 (D. Del. 2000); *In re Dean Witter*, 1998 WL 442456, at *5. In order to benefit from this doctrine, Royal must allege that McGladrey "committed some affirmative independent act of concealment upon which [Royal] justifiably relied." *Meehan v. Archdiocese of Philadelphia*, 870 A.2d 912, 921 (Pa. Super. 2005) (citation omitted); *See also Hockenberry v. Diversified Ventures, Inc.*, 2005 WL 1458768, at *2 (M.D. Pa. June 20, 2005) (pleadings of fraudulent concealment are subject to Rule 9(b)'s heightened pleading standards). Yet, Royal fails to allege either the making of any misrepresentation by McGladrey or Aquino subsequent to the issuance of the 2000 audited financial statements, or that Royal relied upon any such misrepresentation. And, of course, Royal could never make this showing.

Royal fares no better under North Carolina law. Like Pennsylvania and Delaware, North Carolina's discovery rule tolls a cause of action for fraud only until the plaintiff has actual or inquiry notice of its claims. *See Piedmont Inst. v. Staton Found.*, 581 S.E.2d 68, 74 (N.C. App. 2003). Moreover, if a plaintiff fails to exercise due diligence, the plaintiff is charged with knowledge of all the facts that could have been discovered using due diligence. *See id.*; *Hiatt v. Burlington Indus., Inc.*, 286 S.E.2d 566, 568 (N.C. App. 1982).

Royal's claims are untimely under either Pennsylvania's two year statute of limitations or Delaware's three year statute. Royal's common law claims should be dismissed.[12]

---

[12] While there may be significant differences among the substantive laws of North Carolina, Delaware and Pennsylvania, regardless of which state's law applies, Royal was on inquiry notice of its claims when it received the 2000 audited financial statements, and Royal's failure to exercise adequate due diligence is fatal to any claim it may make for tolling. Under any state's law, Royal's claims are untimely.

18

WLM\210672.1

## II.     ROYAL'S FRAUD CLAIMS SHOULD BE DISMISSED

Royal effectively fails to address *E.F. Hutton Mortgage Corp. v. Pappas*, 690 F. Supp. 1465, 1471 (D. Md. 1988), a case which is directly on point and which demonstrates that Royal's fraud claims against McGladrey and Aquino are fundamentally flawed.

In *E.F. Hutton*, Hutton purchased mortgage-backed notes issued by FAMCO (an entity similar to SFC), which originated the underlying sub-prime mortgages. Michael Clott (the Andrew Yao of FAMCO), allegedly concealed from Hutton "the high rate of delinquencies and defaults" of the sub-prime mortgages. *Id.* at 1468. Clott accomplished this by "forward[ing] monthly principal and interest payments due on loans sold to Hutton, whether or not FAMCO had received payments from the borrowers," which payments appeared to be "prepayments" made by the borrowers themselves. *Id.* Hutton (like Royal) failed to monitor the delinquency and default rates of the mortgages adequately, despite its right to do so and despite its knowledge that the mortgages were sub-prime, and therefore likely to default. *Id.*

Hutton sued Ernst & Whinney, FAMCO's accountants. Hutton's fraud theory was that Ernst "knew of Clott's fraud and participated in it" by "falsely represent[ing] 'that [it] had examined FAMCO's 1984 financial statements in accordance with GAAS . . . .'" *Id.* at 1471. The court disagreed, however, holding that Hutton's theory amounted "to no more than a rephrasing of plaintiff's negligence claim. If an accounting firm could be charged with fraud every time that its audit did not conform to [GAAS], then every claim of malpractice would also constitute a claim of fraud." *Id.*

Hutton (like Royal) contended that Ernst knew about FAMCO's business practice of using prepayments to cover defaults, but inadequately disclosed that practice in the audited financial statements. The Court analyzed the audit disclosures, and reasoned that audited financial statements specifically "accounted for the prepayments in a category entitled 'Due to purchasers of mortgage loans receivable.'" *Id.* at 1472. The court concluded "[w]hether or nor [Ernst's] description of the prepayments was sufficiently specific, it can hardly be considered fraudulent." *Id.* The Court also noted that an audit is

"relevant to FAMCO's financial stability" not "the investment quality of FAMCO-originated loans." *Id.*
at 1473-74

In its opposition, Royal attempts to distinguish *E.F. Hutton* on the basis that it is a "securities
fraud case." (Opp. 42 n. 22)  That simply is not true.  The case involved common law claims for fraud,
aiding and abetting fraud and negligence, similar to those raised by Royal here.  *E.F. Hutton*, 690 F.
Supp. at 1471.  The Court should dismiss Royal's fraud claims on this authority alone.

### A.    Royal Fails To Allege *Scienter*

Royal's arguments in support of *scienter* are belied by the undisputed fact that McGladrey and
Aquino disclosed the existence, purpose and magnitude of SFC's forbearance payments in the 2000
audited financial statements and, as pled by Royal in its Complaint, insisted that those disclosures be
made. (¶¶ 124-125)  And, whether or not those disclosures were sufficiently specific from Royal's point
of view, they hardly can be deemed fraudulent.  *See E.F. Hutton*, 690 F. Supp. at 1468; *see also Ziemba v.
Cascade Int'l, Inc.*, 256 F.3d 1194, 1211 (11th Cir. 2001) (the audit "disclosures actually made ...
significantly undermine any hint of fraud"); *Quest Med., Inc. v. Kirschner Med. Group*, 1992 WL
311193, at *4 (D. Md. July 29, 1992).

Faced with the detailed audit disclosures, Royal attacks McGladrey and Aquino's professional
judgment for not disclosing additional information.  But, Royal's argument overlooks that once it
purportedly received the 2000 audited financial statements, which explained forbearance and quantified
the amount of "forbearance payments" made in 1999 and 2000, Royal had all of the information available
to it to make an informed decision about continuing to do business with SFC.  Moreover, the 2000
audited financial statements were relevant to SFC's financial stability, not the insurability of SFC's
student loans.  *See, e.g., E.F. Hutton*, 690 F. Supp. at 1473-74 (the audit report was "relevant to
FAMCO's financial stability" not "the investment quality of FAMCO-originated loans").

Royal claims that McGladrey and Aquino failed to comply with GAAS and GAAP. (¶¶ 106-107,
110-111, 128, 131; Opp. 15, 17)  This, at most, sounds in malpractice, not fraud. "If an accounting firm
could be charged with fraud every time that its audit did not conform to [GAAS], then every claim of

malpractice would also constitute a claim of fraud." *E.F. Hutton*, 690 F. Supp. at 1471. The cases applying similar reasoning are legion. *See Ziemba*, 256 F.3d at 1208-09 (citing cases).[13]

Recognizing this obstacle, Royal argues that *scienter* "can be satisfied by a showing of recklessness" or a "drastic overstatement" in combination with GAAP and GAAS violations. (Opp. 42) First, Royal's assertion that North Carolina law permits a finding of "recklessness" to establish *scienter* is untrue. *See Myers & Chapman Inc.*, 374 S.E.2d at 391. Second, Royal posits no theory of "recklessness" or "drastic overstatement" by McGladrey or Aquino, nor does Royal make any *supporting factual allegations* sufficient to satisfy Rule 9(b) on those points. *See MBIA Ins. Corp. v. Royal Indem. Co.*, 221 F.R.D. 419, 421 (D. Del. 2004) ("*MBIA III*") ("[c]ollective allegations of fraud against a group of defendants generally do not satisfy Rule 9(b)"); *In re Student Finance Corp.*, 2004 WL 609329, at *4 n.3 (D. Del. March 23, 2004); *see also In re Burlington Coat Factory Sec. Litig*, 114 F.3d 1410, 1418 (3d Cir. 1997).[14] Indeed, rather than allege a "drastic overstatement," Royal concedes that the 2000 audited financial statements correctly disclosed, among other things, that $9,515,841 in "forbearance payments" were made in 2000, and $2,012,190 in 1999.

In a final attempt to salvage its fraud claims, Royal argues that *scienter* should be inferred from McGladrey's alleged receipt of approximately $1 million in professional fees. (Opp. 43 n. 23) Were this sufficient to establish *scienter*, however, every law firm, accountant, and investment advisor would have motive to commit fraud. *See Melder v. Morris*, 27 F.3d 1097, 1104 (5th Cir. 1994); *Schnell v. Conseco, Inc.*, 43 F. Supp. 2d 438, 449 (S.D.N.Y. 1999). And, by that standard, Royal, which received at least $34 million in premiums from SFC, had the greatest incentive to commit fraud.

---

[13]   Although Royal argues that this line of authority "does not apply to common-law fraud claims," courts have applied the principles embraced in *Ziemba* and its progeny to dismiss common-law fraud claims against accountants. *See, e.g.*, *E.F. Hutton*, 690 F. Supp. at 1471; *Quest Med.*, 1993 WL 311193, at *3.

[14]   Royal's fraud claim improperly groups allegations against "Defendants." (¶¶ 185-190) Royal's contention that its fraud claims against "these Defendants" are "far more detailed" than its fraud claims alleged against Andrew Yao and the SFC-related entities in *MBIA III* is hardly a justification. (Opp. 48) In *MBIA III*, this Court relaxed Rule 9(b)'s particularity standards regarding group pleading because Yao and the SFC-related entities were "closely related" corporations that shared Yao as a "controlling officer." 221 F.R.D. at 422. No such relaxation is justified here, where Pepper, FMSM and McGladrey are separate entities with distinct roles, actions and involvement with SFC.

21

### B.    Royal Fails to Allege Reasonable Reliance

Royal claims it "would never have issued the insurance policies at issue here without audited financials . . . ." (Opp. 2-3) Yet, Royal does not dispute that it issued its first $75 million policy and its $200 million "Master Policy" before it received *any* audited financial statements, and that it committed to issue the remaining $350 million in coverage almost *five months before* FMSM issued the 1999 audited financial statements. Tellingly, Royal fails to plead facts in support of its general allegations of reliance.

As a matter of law, Royal cannot have reasonably relied upon alleged misrepresentations made *after* it had already issued and committed to issue its policies. *See Learning Works, Inc. v. Learning Annex, Inc.*, 830 F.2d 541, 546 (4th Cir. 1987) ("The amended complaint is devoid of any factual allegations from which it could be inferred that [plaintiff's] course of conduct resulted from reasonable reliance on [defendant's] misrepresentation"); *Pell v. Weinstein*, 759 F. Supp. 1107, 1115 (M.D. Pa. 1991) (finding no reliance as a matter of law where the allegedly-misleading prospectus "did not even exist on . . . the date the plaintiffs committed themselves to the transaction"), *aff'd*, 961 F.2d 1568 (3d Cir. 1992); *Scansource, Inc. v. Datavision-Prologix, Inc.*, 2005 WL 974933, at *2 (E.D. Pa. Apr. 26, 2005) ("To survive a 9(b) motion, plaintiff must show that it acted upon the fraud or misrepresentation complained of").[15]

Unable to dispute the facts, Royal urges the Court to review the reasonableness of its reliance under a relaxed Rule 9(b) standard. (Opp. 21-22, 45) But, as this Court has recognized, reliance is appropriately considered on a Rule 12(b)(6) motion. *See In re Student Finance*, 2004 WL 609329, at *4 n.3. Moreover, "the clear weight of authority requires that the detrimental reliance element of a fraud

---

[15]    Royal urges the Court to disregard its $350 million "commitment," and look only to when "Royal actually issued the policies to beneficiaries other than SFC" under that commitment. (Opp. 44) This is both factually and legally incorrect. Royal does not dispute that Royal committed under the Master Policy to issue sub-policies subject only to negligible criteria, such as the policy premium. Moreover, the Master Policy expressly provided that "THIS MASTER POLICY MAY NOT BE CANCELED BY EITHER THE INSURED OR THE INSURER . . . ." and would terminate only (i) on the "Termination Date" of December 31, 2001, (ii) when all loans insured under the policy were repaid, or (iii) if the policy was commuted to another policy. (Br., Ex. C). The dates the sub-policies were actually issued are thus irrelevant for purposes of reliance. Royal indicated its willingness to issue policies long before it allegedly received any communication from McGladrey or Aquino. *See Pell*, 759 F. Supp. at 1115.

22

claim be pleaded with particularity under Rule 9(b)." *Scansource*, 2005 WL 974933, at *3; *see also Learning Works*, 830 F.2d at 546.

Under that authority, Royal's conclusory allegations of reliance, for example, that "Royal's reliance was reasonable and justifiable" (¶ 188), are insufficient as a matter of law. To satisfy Rule 9(b), a plaintiff must "link one or more of the alleged misrepresentations with a specific act of reliance." *Scansource*, 2005 WL 974933, at *2; *see also Learning Works*, 830 F.2d at 546. The same is true under Delaware law. *See Smith v. Smitty McGees, Inc.*, 1998 WL 246681, at *5 (Del. Ch. May 8, 1998) ("to plead reliance with particularity, plaintiff must explain what he did, or refrained from doing, in justifiable reliance on the statement").

Tellingly, Royal never alleges in its complaint nor explains in its papers *when* it received McGladrey and Aquino's audit and AUP reports; *who* interpreted the disclosures contained in those reports; *why* those disclosures allegedly were misleading; or *what* specific actions Royal took as a result of those allegedly-misleading disclosures. Notably, Royal even fails to identify the correct issuance dates for the 2000 audited financial statements and AUP report. Royal cannot avoid its lack of reliance by hiding behind Rule 9(b). *See Learning Works*, 830 F.2d at 546; *Scansource*, 2005 WL 974933, at *3 (dismissing fraud claim where "[p]laintiff offers no details whatsoever about the contours of this asserted justifiable reliance and it avers nothing regarding the decisions that it made as a result of Defendants' asserted misrepresentations"). Royal was not a passive investor in SFC with limited rights of investigation. As this Court has already recognized, Royal "is an experienced sophisticated party in the business of issuing "'Credit Risk Insurance,'" and the "Policies at issue were the product of negotiation . . . between Royal and SFC, which took place over a long period of time." *MBIA I*, 286 F. Supp. 2d at 358.

Moreover, Royal had the undisputed right under the insurance policies to "inspect and examine, at any time" SFC's "books, files and records relating to student loans." (Br., Ex. C, § VIII) Royal's apparent failure to exercise that right is yet another reason to dismiss its fraud claims for lack of reasonable reliance. In a litigation related to the *E.F. Hutton* case discussed above, the Eighth Circuit

affirmed dismissal under Rule 12(b)(6) of fraud claims brought against Hutton by other purchasers of the

mortgage-backed notes, finding no reasonable reliance as a matter of law:

> [Plaintiff] cannot claim that it reasonably relied on any
> misrepresentations made by the defendants when it could have
> discovered the true nature of the mortgages by exercising ordinary
> diligence.  As noted above, the mortgage purchase agreement stipulated
> that [plaintiff] had been given full access to all information and files
> concerning the mortgages.  Thus, [plaintiff] had the means available of
> knowing the true nature of the mortgages and by failing to make use of
> those means [plaintiff] cannot now complain that it was induced to enter
> the transaction by fraud.

*First Fin. Fed. Savs. & Loan Ass'n v. E.F. Hutton Mortgage Corp.*, 834 F.2d 685, 688 (8th Cir. 1987).

The same result is called for here.

## III.     ROYAL'S RICO CLAIMS SHOULD BE DISMISSED

### A.     Aquino Did Not Operate Or Manage The Purported RICO Enterprise

Royal concedes that the "operation or management" test, as enunciated by the Supreme Court in

*Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993), and as applied by the Third Circuit in *University of*

*Maryland  v. Peat, Marwick, Main & Co.*, 996 F.2d 1534 (3d Cir. 1993), is an essential element of its

purported section 1962(c) claim against Aquino.  (Opp. 72-73)  Yet, Royal fails to address the startling

similarities between the allegations made against the accounting firms in *Reves* and *University of*

*Maryland*, which were held plainly insufficient, and the allegations Royal raises here against Aquino.

(*See* Br. 22-23)

As *Reves* makes clear, the routine provision of accounting services does not rise to the level of

"control" necessary to meet the operation or management test.  507 U.S. at 185.  And, as held by the

Third Circuit in *University of Maryland*, the issuance of audited financial statements are "merely financial

services," and even if they "ultimately benefit the enterprise," or are "later found to be deficient," that

"does not mean that one becomes liable under RICO as a result."  996 F.2d at 1539.

Royal attempts to escape this dispositive authority by referring to standards applied in the First

Circuit to determine how far RICO liability extends to lower-rung employees of a RICO enterprise.

(Opp. 73 (citing *United States v. Schiffman*, 124 F.3d 31 (1st Cir. 1997))  But, these cases clearly are

24

inapplicable since the potential liability of lower-rung members of a RICO enterprise (for example, SFC's file clerks) is not at issue on this motion. *See e.g., United States v. Parise*, 159 F.3d 790, 797 (3d Cir. 1998).

Royal also attempts to distinguish *Reves* and *University of Maryland* on the ground that the individual accountants in those actions were not alleged to be "members" of the RICO enterprise, only the accounting firms were. (Opp. 74 n. 39) But, this is not a grounds to distinguish. Royal cannot establish that Aquino operated and managed the alleged RICO enterprise through his affiliation with FMSM or McGladrey. As an outside auditor, Aquino does not satisfy the operation or management test, just as the accounting firms in *Reves* and *University of Maryland* did not. *See Reves*, 507 U.S. at 184.

*Reves* and *University of Maryland* are directly on point and dispositive of Royal's purported RICO claims, which do not satisfy the operation or management test as a matter of law. *See Reves*, 507 U.S. at 185; *University of Maryland*, 996 F.2d at 1538; *Department of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*, 924 F. Supp. 449, 467, 469 (S.D.N.Y. 1996).

**B.      Royal Fails To Allege A Pattern Of Racketeering Activity**

Royal also fails to establish either closed-ended or open-ended continuity. Royal cannot demonstrate that the alleged RICO enterprise existed long enough in time to satisfy close-ended continuity, and Royal cannot establish that the alleged enterprise is ongoing. For these reasons as well, Royal's RICO claims should be dismissed.

Royal argues that the Court should evaluate closed-ended continuity by considering the length of the "entire scheme" engaged in by SFC and Yao. (Opp. 75) Yet, the Supreme Court has rejected "the employment of a definitional device, such as 'scheme,' to delineate racketeering activity'" because such terms "may be manipulated to satisfy the necessary criterion." *Tabas v. Tabas*, 47 F.3d 1280, 1293 (3d Cir.), *cert. denied*, 515 U.S. 1118 (1995) (citing *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241 and n.3 (1989)). That is precisely what Royal is attempting to do here by asking the Court to consider the alleged misrepresentations and omissions made by SFC and Yao *prior to the creation* of the alleged RICO enterprise.

25

Because Royal fails to allege any involvement, directly or indirectly, by McGladrey or Aquino in the alleged fraudulent representations and omissions made by SFC and Yao, these allegations cannot be considered in determining closed-ended continuity. *See, e.g., Banks v. Wolk*, 918 F.2d 418, 420-22 (3d Cir. 1990) (separately considering predicate acts by one group of RICO defendants where there were "no allegations" that these defendants "were involved in any way in the additional frauds" committed by another group of RICO defendants); *Kehr Packages v. Fieldcor, Inc.*, 926 F.2d 1406, 1418 (3d Cir.) (courts consider only the predicate acts that reflect "the defendant's deceptive or fraudulent activity."), *cert. denied*, 501 U.S. 1222 (1991); *see also Reves*, 507 U.S. at 185 (defendants must participate in "the '*enterprise's* affairs,' not just their *own* affairs") (emphasis in original).

Royal's inability to establish closed-ended continuity is also the result of the defective RICO enterprise-in-fact alleged in this matter. The purported association-in-fact of McGladrey, SFC, FMB and Pepper has no existence separate and apart from the alleged acts committed by the "RICO persons" Aquino, Gagne, Yao and Hawthorne. Indeed, the purported enterprise could not have been in existence before July 26, 2000 (the issuance of the 1999 audited financial statements) and necessarily ended on April 30, 2001 (the issuance of the 2000 audited financial statements and 2000 AUP reports). To establish "a pattern of racketeering activity, the predicate acts which make up the pattern of racketeering and the affairs of the enterprise through which the predicate acts are committed must be contemporaneous." *Steco, Inc. v. S&T Mfg., Inc.*, 772 F. Supp. 1495, 1501 (E.D. Pa. 1991).

Nor has Royal established open-ended continuity. Royal has failed to allege any facts showing that Aquino's conduct related to an "ongoing entity's regular way of doing business." *H.J., Inc.*, 492 U.S. at 242. *See Kehr Packages*, 926 F.2d at 1418 (to meet the "regular way of doing business" test, plaintiff must allege that defendants "treated other customers in a similar manner.").[16]

---

[16]    Although Royal argues that closed-ended continuity can be established by alleging that the conduct was the "regular way" of conducting McGladrey's business, that is incorrect. The "regular way of doing business" analysis relates to open-ended, not closed-ended, continuity. *See H.J., Inc.*, 492 U.S. at 242; *Hindes v. Castle*, 937 F.2d 868, 873 (3d Cir. 1991).

26

Moreover, Royal does not address the many cases cited in McGladrey's opening brief, holding that there is no threat of continued activity where "the alleged purpose of the scheme was achieved." (Br. 24-25 (citing cases)) Royal argues that the fraudulent scheme "at its core" was insurance fraud directed at Royal. (Opp. 2) Even if that were true, it "amounts to nothing more than an isolated incident of 'garden variety'" fraud, not a continuing RICO enterprise. *Banks,* 918 F.2d at 423; *Reliance Ins. Co. v. Eisner & Lubin,* 685 F. Supp. 449 (D.N.J. 1988), *aff'd,* 897 F.2d 523 (3d Cir. 1990).

### C.    Royal's RICO Conspiracy Claim Should Be Dismissed

Royal's arguments in support of its RICO conspiracy claim are misplaced. The standard put forward by Royal -- that RICO conspiracy is alleged whenever a defendant's activities are "mutually supportive to any degree" (Opp. 76) -- is simply wrong. The language highlighted by Royal was used by the Third Circuit in determining whether members of one alleged conspiracy could also be considered members of a second conspiracy. *See United States v. Smith,* 82 F.3d 1261, 1269 (3d Cir. 1996). Under the proper standard, Royal fails to allege any facts showing that Aquino agreed to join a conspiracy with Gagne, Yao and Hawthorne. *See Smith v. Berg,* 247 F.3d 532, 538 (3d Cir. 2001). The very authority cited by Royal supports this conclusion. *See United States v. Smith,* 82 F.3d at 1269 (where "a defendant is unaware of the overall objective of an alleged conspiracy or lacks any interest in, and therefore any commitment to, that objective, he is not a member of the conspiracy.").

## IV.    ROYAL'S REMAINING COMMON-LAW CLAIMS SHOULD BE DISMISSED

### A.    Royal's Civil Conspiracy Claims Should Be Dismissed

Royal's claims for civil conspiracy fail because Royal fails to allege that the "'sole purpose of the conspiracy is to cause harm'" to Royal. *See Jeter v. Brown & Williamson Tobacco Co.,* 294 F. Supp. 2d 681, 688 (W.D. Pa. 2003) (citation omitted), *aff'd,* 113 Fed. Appx. 465 (3d Cir. 2004). Royal cannot meet that standard of "malice" because it alleges that the purpose of the purported conspiracy was also to harm noteholders and lenders (not just Royal), and to generate student loan pools in furtherance of defendants' alleged business interests. (*See* Br. 32-33 (citing cases))

To avoid the malice standard, Royal essentially argues that every federal court considering this issue has misinterpreted *Thompson Coal Co. v. Pike Coal Co.* 412 A.2d 466 (1979). Yet, Royal offers no legal basis to deviate from this authority. To the contrary, the *Thompson* court held that the malice rule protects against conspiracy claims like this one, which are based on "bald accusations of a conspiracy" against businesspersons who were merely advancing their own business interests. *Id.* at 473.

Moreover, Royal has not alleged any facts demonstrating any agreement, a requirement for a claim of civil conspiracy. *See Privette v. University of North Carolina*, 385 S.E.2d 185, 193 (N.C. App. 1989); *Anderson v. Airco, Inc.*, 2004 WL 2827887, at *4 (Del. Super. Nov. 20, 2004); *Flanagan v. Shively*, 783 F. Supp. 922, 928 (M.D. Pa.), *aff'd*, 980 F.2d 722 (3d Cir. 1992), *cert. denied*, 510 U.S. 829 (1993). Indeed, the facts as alleged by Royal show the contrary. And, because civil conspiracy does not exist as an independent cause of action, Royal's claims for civil conspiracy fail for the same reasons its fraud claims fail. *Goldstein v. Phillip Morris, Inc.*, 854 A.2d 585, 590 (Pa. Super. 2004); *Davis v. West Ctr. City Neigh. Planning Advis. Comm., Inc.*, 2003 WL 908885, at *3 (Del. Super. Mar. 7, 2003), *aff'd*, 836 A.2d 513 (Del. 2003); *Iadanza v. Harper*, 611 S.E.2d 217 (N.C. App. 2005).

**B.    Royal's Aiding And Abetting Claims Should Be Dismissed**

*Royal's* arguments in support of its aiding and abetting claims are also unavailing.

*First*, Royal's argument that the Supreme Court of Pennsylvania has recognized a cause of action for aiding and abetting a breach of fiduciary duty is mistaken. *See Skipworth v. Lead Indus. Ass'n*, 690 A.2d 169, 174 (Pa. 1997) (adopting a "theory of alternative liability" in products liability cases based on tortfeasors who act in concert). The Court should not follow the older authority cited in Royal's opposition, which is neither controlling nor persuasive. *See, e.g., Flood v. Makowski*, 2004 WL 1908221, at *36 (M.D. Pa. Aug. 24, 2004) ("it is not the role of a federal court to expand state law in ways not foreshadowed by state precedent").

*Second*, even if Delaware or North Carolina law applied, Royal does not point to a single allegation in its complaint that meets the "substantial assistance" element of its purported aiding and

abetting a breach of fiduciary duty claim. This reason alone is sufficient to dismiss Royal's aiding and abetting claims. (*See* Br. 38-39 (citing cases))

  *Third*, Royal's characterization of Vice Chancellor Strine's opinion in *Production Resources Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 787-93 (Del. Ch. 2004), misses the point. Royal alleges no facts establishing when SFC owed a fiduciary duty to Royal, what that duty encompassed and how that duty was breached. *Id.* at 797. Royal's conclusory allegation that SFC was insolvent from its inception does not meet this standard. *See id.* at 782. And, Royal's bare allegation that SFC became insolvent under a balance-sheet test on May 2001 supports dismissal. (¶ 206) Simply put, McGladrey and Aquino could not have aided and abetted a fiduciary duty that did not exist until *after* the 2000 audited financial statements were issued.

### C.  Royal's Deepening Insolvency Claims Should Be Dismissed

  Royal's argument that the Third Circuit recognized deepening insolvency as an independent cause of action in *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 350 (3d Cir. 2001), is based only on a topical reading of the case. (Opp. 56-58) The issue in *Lafferty* was whether plaintiffs had suffered a *cognizable injury* sufficient to confer standing to support fraud, breach of fiduciary duty and related claims on behalf of the corporation. *Lafferty*, 267 F.3d at 344. In answering that question, the *Lafferty* court merely recognized deepening insolvency as a "type of injury," not an independent cause of action. *Id.* at 347. *See also Long*, 513 S.E.2d at 823 (implicitly recognizing deepening insolvency as a theory of damages); *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.)*, 299 B.R. 732, 752 (Bankr. Del. 2003) (deepening insolvency as damages for injury "to corporate property").

  In any event, whether considered independently or as a damages theory, Royal's purported claim for "deepening insolvency" depends entirely on the establishment of some underlying fraud by McGladrey and Aquino. (¶ 207, 208) Because Royal cannot make such a showing for the reasons discussed above, Royal's "deepening insolvency" claim should be dismissed.

29

WLM\210672.1

**D.     Royal's Negligence and Negligent Misrepresentation Claims**
        **Should Be Dismissed**

By its silence, Royal concedes that it cannot maintain any negligence claim as it lacks strict

privity with McGladrey and Aquino. *See Guy v. Liederbach*, 459 A.2d 744 (Pa. 1983). Royal's

negligence claims should therefore be dismissed outright.

Royal also fails to address McGladrey and Aquino's arguments relating to Royal's negligent

misrepresentation claims, which should be dismissed for failing to meet the essential element of

reasonable reliance. (*See supra* at 21-23).


## CONCLUSION

For the foregoing reasons, Royal's Complaint against McGladrey and Aquino should be

dismissed in its entirety.


Date:     August 18, 2005

                                    DUANE MORRIS LLP


                                    Michael R. Lastowski (Bar No. 3892)
                                    Christopher M. Winter (Bar No. 4163)
                                    1100 North Market Street, Suite 1200
                                    Wilmington, DE  19801-1246
                                    Phone:  302-657-4951
                                    Fax:  302-657-4901

                                    ARNOLD & PORTER LLP
                                    Richard P. Swanson
                                    Veronica E. Rendon
                                    Jason M. Butler
                                    399 Park Avenue
                                    New York, NY  10022
                                    Phone:  212-715-1000
                                    Fax:  212-715-1399

                                    *Attorneys for McGladrey & Pullen, LLP and Michael*
                                    *Aquino*

WLM\210672.1

30