# EXHIBIT A

REPORT ON AGREED-UPON PROCEDURES
REVIEW OF MONTHLY SERVICER REPORTS
SFC Grantor Trust Series 2000-3

**INDEPENDENT ACCOUNTANT'S REPORT**

To the Members
Student Loan Servicing, LLC
Christiana Executive Campus
111 Continental Drive, Suite 408
Newark, Delaware 19713

We have performed the procedures described below, which were agreed to by Student
Loan Servicing, LLC ("SLS") and Wells Fargo Bank Minnesota, N.A. ("Trustee"), to
selected securitization records and servicer reports of SLS for October and December
2000, for the sole purpose of determining whether SLS maintained documentation to
support the amounts contained in the servicer reports, as well as to verify the
mathematical accuracy of the amounts reported, as required by Section 3.17 of the SFC
Grantor Trust Series 2000-3 Pooling and Servicing Agreement ("PSA"). This
engagement to apply agreed-upon procedures was performed in accordance with
standards established by the American Institute of Certified Public Accountants. The
sufficiency of the procedures is solely the responsibility of Student Loan Servicing, LLC
as Servicer and Wells Fargo Bank Minnesota, N.A. as Trustee for the above mentioned
Trust. Consequently, we make no representation regarding the sufficiency of the
procedures described below, either for the purpose for which this report has been
requested or for any other purpose. These procedures were performed in accordance with
the arrangements set forth in our letter to you dated December 27, 2000.

The procedures we performed and our findings relative thereto are set forth in the
accompanying Description of Procedures and Findings for SFC Grantor Trust 2000-3,
which is an integral part of this report.

We were not engaged to, and did not, perform an audit of the securitization records in
accordance with generally accepted auditing standards, the objective of which would be
the expression of an opinion on the specified elements, accounts and items. Accordingly,
we do not express such an opinion.

Had we performed additional procedures or had we conducted an audit of the
securitization records in accordance with generally accepted auditing standards, other
matters might have come to our attention that would have been reported to you.

ACCT032819

This report relates only to the elements, accounts and items specified in the accompanying Description of Procedures and Findings for SFC Grantor Trust 2000-3 and does not extend to any financial statements of Student Loan Servicing, LLC taken as a whole.

This report is intended solely for the information and use of Student Loan Servicing, LLC and the Trustee, and is not intended to be, and should not be used by anyone other than the listed parties.

Philadelphia, PA
February 21, 2001

*McGladrey & Pullen, LLP*

2

ACCT032820

STUDENT LOAN SERVICING, LLC

DESCRIPTION OF PROCEDURES AND FINDINGS
FOR SFC GRANTOR TRUST 2000-3

### Detail Testing of Amounts Contained in the Monthly Servicer Report

This section should be read in conjunction with the October 31, 2000 and December 31, 2000 Monthly Servicer Reports ("MSR"). Items noted in *italics* refer to specific reports prepared by Student Loan Servicing, LLC ("SLS") used in preparing the MSR. Additionally, the procedures detailed below were performed on a sample of at least 25% of the MSRs issued since inception of Grantor Trust Series 2000-3, namely, the months of October and December 2000. In addition, as required by the PSA, the initial month of the Series (October 2000) was included in our sample.

The purpose of our procedures was to perform the following:

1) Test the above listed reports for accuracy, agreeing the amounts on the servicer reports to the detailed records of SLS. Such testing constituted a line-by-line verification of each amount on the servicer reports in our sample.

2) Examine the servicing procedures, manuals and guides of SLS, and records relating to the servicing of the student loans and the accounts and records of SLS relating to the student loan files contained in the Trust to ascertain compliance with the PSA.

Specific Procedures

We received Monthly Servicer Reports for the months of October and December 2000 from the Company's Finance Manager and performed the following:

1) Compared and recalculated the Payments Received including Prepayments to the *Schedule of Payments Received Report*.

2) Compared the Payments Received including Prepayments, 9/1/00 through 9/30/00 (October 2000 Servicer Report only), to the list of September 2000 payments on GT 2000-3.

3) Compared the Recoveries Received on Delinquent Student Loans to the *Principal Reconciliation* worksheet (Delinquent Principal Purchased Paid column).

4) Compared the Transfers from Liquidity Reserve Account for Interest Shortfalls or Other Delinquent Interest to the *Shortfall/Excess on Student Loans Report*.

5) Compared the Transfers from Reserve Escrow Account for Principal on Delinquent Student Loans to the *Scheduled Principal Payments Unpaid Report*.

3

ACCT032821

6) Compared the Transfers from Reserve Escrow Account for Defaulted Student Loans to the *Schedule of Defaulted Student Loans Report* (sum of principal balance and 90 days' interest).

7) Compared the Interest Earned on Trust Funds (December 2000 Servicer Report only) to the investment income statement from Wells Fargo Corporate Trust Services.

8) Recalculated the amount reported as "Collection Account Cash Available for Distribution."

9) Agreed the amount carried forward at the top of page #2, "Collection Account Cash Available for Distribution" to page #1.

10) Compared the Transfers to Servicer for Amounts Attributable to Delinquency, Default, Penalty and Similar Fees to the *Schedule of Payments Received Report* (Fee Paid column).

11) Recalculated the MBIA Insurance Premium (December 2000 MSR only) and verified the formula utilized in the calculation as defined in the PSA.

12) Recalculated the Senior Certificate Interest and Interest-Only Certificate Interest and verified the formulae utilized in these calculations as stated in the PSA.

13) Recalculated the Senior Certificate Principal Distribution and agreed the components thereof (Current Principal Payments, Prepayments on Principal, Recoveries on Principal Past Due, Delinquent Principal Due but not Received, Principal Portion of Defaulted Student Loans) to the corresponding Company detailed reports.

14) Recalculated the Trustee Fees Payable and verified the formula utilized in the calculation as defined in the PSA. Also, agreed the Custodian Fee payable to Wells Fargo Corporate Trust Services (December 2000 MSR only) to the Fee Invoice from Wells Fargo.

15) Recalculated the Escrow Agent Fees and verified the formula utilized in the calculation as defined in the PSA.

16) Compared the Master Servicer Fees Payable (December 2000 Servicer Report only) to the invoice from Finova Loan Administration and as defined in the PSA.

17) Recalculated the Expense Account Set-Aside and verified the formula utilized in the calculation as defined in the PSA.

18) Agreed the Replenishment of Liquidity Reserve Account from Previous Withdrawals to the supporting calculation on page #4 of the MSR (Liquidity Reserve Account).

4

ACCT032822

19) Recalculated the Servicing Fee payable to Student Loan Servicing (December 2000 Servicer Report only) and verified the formula utilized in the calculation as defined in the PSA.

20) Recalculated the Reserve Escrow Remittance Amount and verified the formula utilized in the calculation as defined in the PSA.

21) Recalculated the balance in the Collection Account to be zero at the end of each reporting period.

22) Agreed the Original Senior Certificate Principal Balance to the PSA.

23) Agreed the Beginning of Period Senior Certificate Holder Balance to the end of period principal balance for the previous month.

24) Compared the Payments Received including Prepayments, 9/1/00 through 9/30/00 (October 2000 Servicer Report only), to the list of September 2000 payments on GT 2000-3.

25) Compared the following types of principal payments to the corresponding Company detailed reports and schedules:

> Principal Payments
> Prepayments to Principal
> Principal Portion of Payments on Defaulted Student Loans
> Repurchases of Student Loans by Student Finance Corporation ("SFC")

26) Compared the Recoveries on Principal Paid Past Due to the *Principal Reconciliation* worksheet (Delinquent Principal Purchased Paid column).

27) Compared the Delinquent Principal to the *Scheduled Principal Payments Unpaid Report.*

28) Recalculated and compared the End of Period Senior Certificate Principal Balance to the *Outstanding Principal Balance Report.*

29) Recalculated the Required Interest on Senior Certificates and the I/O Certificate, and the Principal Distribution on Senior Certificates and verified the formulae utilized in the calculations as defined in the PSA.

30) Compared the Collateral Value to the *Student Loan Trial Balance.*

31) Compared the Original Liquidity Reserve Balance to the amount as defined and required in the PSA, to the general ledger and to the bank statement from Wells Fargo.

ACCT032823

32) Agreed the Beginning of Period Balance in the Liquidity Reserve Account to the bank statement from Wells Fargo and to the general ledger.

33) Compared the Interest Earned on Liquidity Reserve Account funds (December 2000 Servicer Report only) to the investment income statement from Wells Fargo Corporate Trust Services.

34) Compared the Transfers to the Collection Account representing Interest Shortfalls and/or Delinquent Interest to the *Shortfall/Excess on Student Loans Report*.

35) Recalculated the Transfers from the Collection Account for current period withdrawals, net of interest earned and compared this amount to the Wells Fargo bank statement and general ledger.

36) Recalculated and compared the End of Period balance in the Liquidity Reserve Account to the bank statement from Wells Fargo and to the general ledger.

37) Compared the Beginning Balance in the Reserve Escrow Account to the general ledger and to the bank statement from Wells Fargo.

38) Compared the Default Payments Received from Wilmington Trust and PNC Bank for Notices of Demand in November 2000 (December 2000 Servicer Report only) to the Wells Fargo bank statement and the general ledger.

39) Compared the Transfers into the Collection Account representing Principal Payments on Delinquent Student Loans to the *Scheduled Principal Payments Unpaid* report, to the bank statement from Wells Fargo and to the general ledger.

40) Compared the Transfers into the Collection Account representing Defaulted Student Loans to the *Schedule of Defaulted Student Loans* (sum of principal balance and 90 days' interest), to the bank statement from Wells Fargo and to the general ledger.

41) Recalculated the Reserve Remittance Amount and verified the formula utilized in the calculation as defined in the PSA. Also, compared the Reserve Remittance Amount to the bank statement from Wells Fargo and to the general ledger.

42) Recalculated and compared the Ending Balance in the Reserve Escrow Account to the bank statement from Wells Fargo and to the general ledger.

43) Recalculated the Maximum Reserve Amount and verified the formula utilized in the calculation as defined in the PSA.

44) Agreed the Beginning of Period Balance in the Expense Account to the end of period balance for the previous month.

45) Compared the Expense Account Interest to the bank statement from Wells Fargo.

6

ACCT032824

46) Agreed the amount carried forward as Expense Account Set-Aside to the amount reported on page 2 of the Monthly Servicer Report.

47) Recalculated the End of Period Balance in the Expense Account.

<u>Findings</u>

All amounts tested were found to be in agreement, except for the following:

4 & 6) During October 2000, the total defaulted student loans were $60,331. However, the Reserve Escrow Account, which is designed for absorbing such defaults, was inadequate to cover this amount. Therefore, an additional $23,973 was erroneously transferred from the Liquidity Reserve Account into the Reserve Escrow Account. On the October 2000 MSR, the transfer was reflected as an increase in the net interest shortfall (Line 7: $457,673 to $481,646) and a decrease in defaulted student loan obligations (Line 10: $60,331 to $36,358). The Liquidity Reserve was subsequently correctly replenished, and all claims were filed for the correct amounts in a timely manner.

35) During October 2000, the Transfers from Collection Account for Current Period Withdrawals were overstated by $513.08. The correct transfer amount, $370,924.19, was confirmed through the Wells Fargo bank statement. The Finance Manager stated that the Liquidity Reserve Account section of the MSR would be adjusted in the January 2001 MSR.

36) The ending balance in the Liquidity Reserve Account in the bank statements and general ledger was greater than the balance on the servicer reports. This difference represented the interest earned on Liquidity Reserve funds during the prior month, which is recorded by the Bank in the current month. Therefore, August 2000 interest is posted in September 2000, September 2000 interest is posted in October 2000, etc.

Because the interest earned on the Liquidity Reserve Account is subsequently transferred to the Collection Account at Wells Fargo, SLS correctly stated the ending Liquidity Reserve balance on the servicer reports.

37) On the October MSR, the beginning balance in the Reserve Escrow Account was reported as $58,623.64, which exceeded the estimated amount in the Pooling and Servicing Agreement of $54,718.39. This difference actually improved the reserve position of SFC Acceptance IV, the owner of the account.

43) On the October MSR, the Maximum Reserve Amount was calculated using the beginning investor principal balance, rather than the ending student loan balance. Accordingly, the Maximum Reserve was overstated by $212,894.50. Management indicated that the underlying formula on the servicer report would be amended to generate the correct value.

7

ACCT032825

37-42) The amounts reported on the MSR as transfers into/out of the Reserve Escrow Account are physically transferred by Wells Fargo in the succeeding month. Transfers into the Collection Account at Wells Fargo are made before the 20th of each month, which is the determination date for the MSR. Although the Reserve Escrow bank statement balances do not coincide with the account balances on the servicer reports, these timing differences appear to be acceptable and should not distort the integrity of the MSR.

### Verification of Opening Account Balances with the Pooling and Servicing Agreement

The SFC Grantor Trust Series 2000-3 Pooling and Servicing Agreement specifies a minimum opening balance for the Liquidity Reserve Account of $1,549,485. We agreed this balance to the Original Liquidity Reserve Balance on the servicer reports for October and December 2000. No exceptions were noted.

### Verifying Totals on the Detailed Reports in SFC 2000

We recalculated the December 2000 totals in each column on the detailed reports generated by the Company's data processing system (SFC 2000). No exceptions were noted.

### Testing of Cash Application

From the population of accounts comprising Grantor Trust Series 2000-3, we selected a sample of ten loans each from the months of October and December 2000. The Loan Transaction History screens were printed from the SFC 2000 system, which provided the following data:

>     Loan amount
>     Annual Percentage Rate (APR)
>     Actual payment amount
>     Transaction code
>     Transaction date
>     Posting date
>     Principal amount
>     Interest amount
>     New due date

- We determined the monthly accrued interest using the following formula: Average Daily Balance x APR/360 x Actual # days since last payment.

ACCT032826

- We recalculated the allocation between interest and principal for each loan in the sample and verified the accuracy of the new due date. The new due date serves as a proxy for the aging status of the account.

Findings

All amounts tested were found to be in agreement.

## Testing of Collection Activity

From the population of accounts comprising Grantor Trust Series 2000-3, we selected a sample of ten delinquent loans each from the months of October and December 2000. We reviewed the collection activity screens on SFC 2000 and observed that the accounts were contacted regularly and in a timely manner.

Findings

No exceptions were noted.

9

ACCT032827

# EXHIBIT B

CAUSE NO. D167370

| | | |
|---|---|---|
| ROYAL INDEMNITY COMPANY, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| DELTA CAREER INSTITUTE OF | § | |
| BEAUMONT, INC., et al. | § | |
| | § | |
| Defendants. | § | 58TH JUDICIAL DISTRICT |

## AGREED PROTECTIVE ORDER

IT IS HEREBY STIPULATED AND AGREED by Royal Indemnity Company and MP III Holdings, Inc., through their undersigned counsel, that the following provisions shall govern the disclosure of Confidential Settlement Agreements by Royal Indemnity Company in this lawsuit:

1.      This Agreed Protective Order (the "Order") shall govern all Confidential Settlement Agreements produced by Royal Indemnity Company ("ROYAL") to MP III Holdings, Inc. ("MP III"). *Confidential Settlement Agreements* means any settlement agreement entered into by ROYAL that contains a promise by Royal or any party to the settlement agreement not to disclose to any third party the terms of said settlement agreement.

2.      ROYAL may designate any Confidential Settlement Agreement produced by ROYAL as Confidential in accordance with and subject to the terms of this Order. Such designation by ROYAL shall only be made in the good faith belief that such Confidential Settlement Agreement contains a provision requiring confidentiality.

3.    MP III shall use any Confidential Settlement Agreements solely for purposes of this Action and, except as otherwise provided herein, shall not use Confidential Settlement Agreements for any other purpose, including, without limitation, any business, commercial or governmental purpose. MP III agrees not to share with any person or entity a copy or the contents of any Confidential Settlement Agreements produced by Royal in this Action.

4.    The designation of Confidential Settlement Agreements as Confidential for purposes of this Order shall be made in the following manner:

(a)    In the case of documents, by affixing (without obscuring or defacing the document) the legend "Confidential" to each page; and

(b)    In the case of depositions taken in the Action, (i) by a statement on the record by counsel for ROYAL at the time the testimony is given or (ii) by written notice sent by counsel for ROYAL to counsel for MP III within 30 days after receiving a copy of the transcript thereof, listing the specific pages and lines of the transcript that should be treated as Confidential. A copy of such written notice shall be attached to the face of the transcript and each copy thereof in the possession, custody or control of the parties and non-parties to the Action. All deposition transcripts shall be treated as Confidential in their entirety until the expiration of 5 business days after the final date for giving written notice of confidentiality as provided for in this paragraph. All deposition transcripts treated as confidential may be presented to or filed with the Court only in accordance with the procedure set forth in paragraph 11 below. To the extent possible, the court reporter shall segregate into separate transcripts information designated at the

2

deposition as Confidential with blank, consecutively numbered pages being provided in a non-designated main transcript. The separate transcript containing confidential information shall have page numbers that correspond to the blank pages in the main transcript.

5. Except as otherwise provided herein, Confidential Settlement Agreements may only be disclosed, summarized, described, characterized or otherwise communicated or made available in whole or in part to the following persons:

(a) Counsel for MP III, including in-house counsel and regular and temporary employees of such counsel assisting in the conduct of this Action;

(b) Experts or consultants (and their counsel) retained by MP III in connection with the prosecution or defense of this Action, as well as any mock jurors retained in connection with services provided by such experts or consultants;

(c) Witnesses or deponents, and their counsel, during the course of or to the extent necessary in preparation for testimony in this Action;

(d) The Court and Court personnel, including specifically the Court's law clerk(s) and the Clerk of the court;

(e) Any outside vendor retained by MP III to perform any photocopying, computer imaging, data processing, court reporting or other similar clerical services, but only for so long as necessary to perform such services;

(f) Any person who is indicated on the face of a document to have been an author, addressee or recipient thereof;

3

(g)    Counsel for any other defendant in this lawsuit, subject to the provisions of paragraph 7, below; and

(h)    Any other person upon order of the Court, after notice and a hearing, or upon written consent of ROYAL.

6.    Confidential Settlement Agreements may not be disclosed to any individual or entity employed by, or affiliated in any way with, any competitor of ROYAL who is in a position to take unfair advantage of such commercially or competitively sensitive information.

7.    Every person given access to Confidential Settlement Agreements or information contained therein shall be advised in writing that such Confidential Settlement Agreements are being disclosed pursuant and subject to the terms of this Order and may not be used or disclosed except as permitted herein, and that failure to abide by the terms hereof may be punished as a contempt of court. All persons, other than those listed in paragraphs 5(a) and (d) above, who are given access to Confidential Settlement Agreements or information contained therein, shall be required to confirm their understanding and agreement to abide by the terms of this Order by signing a copy of Exhibit A, provided that non-party witnesses (and their counsel) to whom Confidential Settlement Agreements are disclosed at a deposition need not be required to sign a copy of Exhibit A if they confirm their understanding and agreement to abide by the terms hereof on the record and recite the terms of Exhibit A into the record. Counsel for ROYAL and MP III shall (a) retain copies of all such agreements, and (b) maintain a log

4

of all Confidential Settlement Agreements disclosed to any person described in paragraphs 5(b), (c) or (g) above.

8.    Confidential Settlement Agreements unintentionally or inadvertently produced or disclosed without designation as Confidential may be retroactively designated as Confidential and shall be treated as such to the extent practicable from the date written notice of the designation is provided to the receiving party or parties.

9.    Confidential Settlement Agreements are to be inspected shall be treated as Confidential during inspection. Such inspected documents shall be identified by ROYAL as Confidential at or before the time of retrieval and copying, and shall be treated accordingly thereafter.

10.    All persons not subject to the terms of this Order or to whom disclosure is prohibited hereunder shall be excluded from those portions of a deposition in which reference to Confidential Settlement Agreements is made.

11.    Confidential Settlement Agreements are not court records. In the event that MP III desires to use any Confidential Settlement Agreements in any documents filed with or submitted to the Court, such documents shall be filed in a sealed envelope with an appropriate legend and instruction to the Clerk of the court that such documents be maintained separate from the public records to be released only upon further order from the Court. Nothing herein shall be construed to preclude provision of courtesy copies of all Confidential Settlement Agreements filed with the Clerk of the court in unredacted form to Chambers.

5

12.    MP III is not obligated to challenge the propriety of a designation as Confidential at the time made, and a failure to do so shall not preclude a subsequent challenge thereto.  MP III may in good faith object to the designation by ROYAL of any Confidential Settlement Agreements as Confidential, or to the limitations as to the use and disclosure of such information, by providing written notice of such objection to ROYAL.  The grounds for any objection shall be stated with reasonable particularity. ROYAL and MP III shall thereafter attempt to resolve such dispute in good faith on an informal basis.  If the dispute cannot be resolved within 10 days, ROYAL may, within 10 days thereafter, apply to the Court, on reasonable notice, for an order preserving the designated status or limitation as to the use and disclosure of such information, as the case may be, and the failure to do so shall result in the termination of the restricted status of such information.  The designated status of such information shall remain in effect pending the final determination of any application seeking to preserve such designated status.

13.    Nothing herein shall prevent counsel for MP III from utilizing any Confidential Settlement Agreements (i) on direct or cross-examination at any deposition, evidentiary hearing or trial in this Action or (ii) in conformity with paragraph 11 above, in motion practice in this Action.  ROYAL reserves the right to seek additional protective relief from the Court in connection with any such hearing or trial.

14.    Nothing herein shall be deemed or construed to restrict or prejudice in any manner the right of ROYAL or MP III, as the case may be, to:

6

     (a)    resist or object to the production of documents or disclosure of information on any other grounds;

     (b)    assert that certain information is so highly confidential as not to be subject to discovery;

     (c)    contest another party's basis for designating Confidential Settlement Agreements as Confidential;

     (d)    seek additional protective relief with respect to any document or information sought in the course of discovery;

     (e)    object to the admissibility, authenticity or use of any Confidential Settlement Agreements at any hearing or trial;

     (f)    compel additional discovery;

     (g)    modify, alter, amend or waive the provisions or protections provided for herein; or

     (h)    seek modification or other relief from the Court with respect to any or all of the provisions of this Order.

15.    Nothing herein shall restrict the right of ROYAL to use its own documents and information designated as Confidential for any purpose whatsoever.

16.    Confidential Settlement Agreements and all copies thereof in the possession of MP III, shall be maintained solely in the offices of counsel MP III; but counsel for MP III may temporarily furnish copies to experts and consultants to whom disclosure is otherwise permitted hereunder to the extent necessary for the preparation and trial of this Action.

17.    Nothing herein shall be deemed or construed as a waiver of any applicable privilege, right of privacy, or proprietary interest with respect to any Confidential Settlement Agreements. Inadvertent production or disclosure of any privileged document or communication or Confidential Settlement Agreements by ROYAL shall not be deemed or construed as a waiver of any applicable privilege or immunity from production, including the attorney-client or work product privileges, either generally or specifically with respect to particular documents, testimony or information or the subject matter thereof, provided that notice in writing that such privileged material was produced or disclosed inadvertently is given by ROYAL within 30 days after the date of the inadvertent production or disclosure. MP III may in good faith object to the designation of any Confidential Settlement Agreements as privileged or otherwise immune from discovery by providing written notice of such objection to ROYAL. The grounds for any objection shall be stated with reasonable particularity. MP III and ROYAL agree that the right to object to the designation of Confidential Settlement Agreements inadvertently produced as privileged or otherwise immune from discovery is limited to whether the underlying Confidential Settlement Agreements are in fact privileged or immune from discovery and does not give MP III the right to challenge or otherwise contest (i) whether the production of any such material was in fact inadvertent or (ii) whether the act of production constitutes a waiver of any applicable privilege or immunity. Following an objection to the underlying claim of privilege or immunity from disclosure, ROYAL and MP III shall attempt to resolve such dispute in good faith on an informal basis. If the dispute cannot be resolved within 10 days, the ROYAL may, within 10 days thereafter,

apply to the Court, on reasonable notice, for an order preserving the privileged status of Confidential Settlement Agreements, and the failure to do so shall result in the termination of the privileged status of such information. If a court upholds or affirms ROYAL's designation of its Confidential Settlement Agreements as privileged or immune from discovery, all privileged, inadvertently produced Confidential Settlement Agreements (including all copies thereof) shall promptly be returned to ROYAL.

18.    Within 45 days after receiving notice of the entry of a final non-appealable order, judgment or settlement with respect to the claims in this Action, MP III shall, absent a court order or agreement to the contrary, either return all Confidential Settlement Agreements and all copies thereof to ROYAL or, alternatively, shall destroy all such materials and certify in writing that such materials have been destroyed. The certification shall confirm that counsel for MP III has destroyed all documents within their possession as well as documents that have been provided to others in accordance with this Order. Notwithstanding the foregoing, counsel (including in-house counsel) for MP III shall be entitled to retain for their files a set of all pleadings, motion papers, court filings, discovery requests, expert reports, deposition, hearing and trial transcripts (including exhibits) and attorney work product (including legal research) which incorporate, contain or refer to any Confidential Settlement Agreements, provided that such materials remain subject to the terms and conditions of this Order.

19.    Neither the termination of this Action or any related proceedings nor the termination of employment of any person who has had access to any Confidential

9

Settlement Agreements or the contents thereof shall relieve such person of his or her obligations hereunder, which obligations shall survive this Action.

SO ORDERED this __9__ day of _November_, 2005.

_____
Judge Presiding

FILED

at _____ o'clock _____ M

NOV 0 9 2005

LOLITA RAMOS
CLERK, DISTRICT COURT OF JEFFERSON CO., TEXAS
BY_____DEPUTY

10

Submitted for Entry:

Amy Keith
Germer Gertz, L.L.P.
301 Congress Avenue, Suite 1825
Austin, Texas 78701

*Attorneys for Defendant*
*MP III Holdings, Inc.*

Harvey G. Brown, Jr.
Howard L. Close
Andrew Love
Wright Brown & Close, LLP
Three Riverway, Suite 600
Houston, Texas 77056

*Attorneys for Plaintiff*
*Royal Indemnity Company*

11

CAUSE NO. D167370

| | | |
|---|---|---|
| ROYAL INDEMNITY COMPANY, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| DELTA CAREER INSTITUTE OF | § | |
| BEAUMONT, INC., et al. | § | |
| | § | |
| Defendants. | § | 58TH JUDICIAL DISTRICT |

### AFFIDAVIT OF _____

Before me, the undersigned authority, personally appeared _____, a person whose identity is known to me, and who, being by me duly sworn, deposed as follows:

1.    My name is _____. I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated, all of which are true and correct. I have read the Agreed Protective Order (the "Order") entered in this action by the District Court of Jefferson County, Texas 58th Judicial District.

2.    I understand the terms of the Agreed Protective Order. I agree to be to be bound by the terms of the Order under the same terms as defendant MP III Holdings, Inc. I hereby submit my person and property to the jurisdiction of District Court of Jefferson County, Texas 58th Judicial District, or such other court as may be appropriate, for the purpose of enforcing the Order against me. I agree to any and all relief the Court may deem necessary

12