# Grant Thornton

Accountants and Business Advisors

March 18, 2005

Mr. Howard L. Close
Wright Brown & Close, LLP
Three Riverway, Suite 600
Houston, TX 77056

Re: Royal Indemnity Company v. T.E. Moor & Co., et al.

### Expert Report for Texas Litigation

In accordance with our engagement letter to Carruthers & Roth, dated April 4, 2002, we have performed certain forensic accounting and investigative procedures and provided certain consulting services related to student loans issued and financial activities of Student Finance Corporation (SFC) through May 17, 2002.

Student loans, originally financed through revolving warehouse lines of credit with Wilmington Trust Bank, PNC Bank and SWH, a lender, were sold to special purpose entities in connection with a series of eight securitization transactions. The transactions occurred from April 2000 to November 2001. In addition there is approximately $150,000,000 owed to PNC Bank and $25,000,000 owed to Wilmington Trust Bank by SFC under the warehouse lines of credit at the present time. The face amount of the student loans pledged as collateral underlying the securitization transactions aggregated $480,000,000 for a total of approximately $655,000,000.

We understand Royal Indemnity Company (Royal) issued credit insurance policies covering certain of the student loans. Under the policies, Royal is required to pay the outstanding principal plus 90 days accrued interest for loans that go into default, defined as becoming 90 days past due. A substantial number and amount of loans are in default and are likely to result in claims under the policies. Additional loans are aging and will become 90 days past due in coming months.

The student loans covered by Royal insurance policies were essentially all issued to finance tuition and related expenses at truck driving schools. There are approximately 107,000 loans outstanding and approximately 93,000 are covered by Royal insurance policies. In March 2002 Royal became aware that SFC has followed a practice of making forbearance payments on loans that were about to become 90 days past due to prevent them from going into default.

Our investigative and consulting services have been focused in the following general areas:

1. We have obtained certain reports to assist in evaluating the status of the portfolio of loans and issues related to the loans currently outstanding.
2. We have obtained descriptions of the forbearance policies and procedures and determined the amount of forbearance payments actually paid.
3. We have conducted a limited study of the credit underwriting and collection practices conducted by SFC and related entities (the SFC Group or SFG).

201 S. College Street
Suite 2500
Charlotte, NC 28244
704.632.3500
F 704.334.7701
W www.grantthornton.com

Grant Thornton LLP
US Member of Grant Thornton International


DEPOSITION EXHIBIT 3
Sears 4/14/05

**Grant Thornton**

Mr. Howard L. Close
Wright Brown & Close, LLP
May 18, 2005
Page 2 of 14

4. We have performed a partial cash flow analysis designed primarily to attempt to account for the cash proceeds from the sale or pledging of student loans by SFC and to determine to the extent possible how the money was spent. We have specifically attempted to determine how much money was paid or distributed to Andrew Yao or to entities or persons known to be related or affiliated with him. This analysis is in progress and is incomplete.
5. We have identified certain key accounting records and other documents of SFC and related entities and have electronically copied scanned images of those records.

**Abbreviations Used**

| | |
|---|---|
| SFG | Student Finance Group, or any entity within Student Finance Group including, but not limited to, Student Marketing Services, LLC (SMS), Student Finance Corp. (SFC) and Student Loan Servicing, LLC (SLS). |
| SFC Fin I | SFC Financial I, LLC – The entity that holds the loans for the Wilmington Trust Company warehouse line. |
| SFC Fin II | SFC Financial II, LLC – The entity that holds the loans for the PNC Bank warehouse line. |
| SFC Fin III | SFC Financial III, LLC – The entity that holds the loans for the SWH loans. |
| CD | CD-ROM containing computer data |
| PNC | PNC Bank |
| SWH | SWH (Lender) |
| WT | Wilmington Trust |

**Key Student Finance Group Personnel**

| | |
|---|---|
| Andrew Yao | SFC, Chairman |
| Gary Hawthorne | SFC, President |
| Perry Turnball | SMS, President |
| Jim Pearson | SMS, Vice President |
| David Zulauf | SFC, VP - Finance |
| Diane Messick | SFC, Controller and Assistant Treasurer |
| Guy DiSimplico | SMS, Director (Risk Manager) |
| Tian-Zhong Ding | SFC, Managing Director of Information Technology |
| Xiagin "Linda" Deng | SFC, Programmer |
| Rob Schrof | SFC, Manager (Investor Reporting) |
| Peter Klein | SFC, Senior Financial Analyst (Investor Reporting) |
| Chris Huffins | SLS, Credit Services Manager |
| Charlotte Harris | SLS, Credit Supervisor |
| Frank Martinez | SLS, Vice President |
| Charlotte Vickers | SLS, Collection Supervisor |

Grant Thornton

Mr. Howard L. Close
Wright Brown & Close, LLP
March 18, 2005
Page 3 of 14

1. Portfolio Evaluation

We have summarized certain portfolio performance information to assist you in evaluating the portfolio of loans. Exhibit A, is an analysis of the non-withdrawn loan delinquencies, all loans combined, all loans covered by Royal insurance policies and for each pool. These summaries exclude withdrawn loans. Based on these analyses, it appears that 1) the increased collection efforts have improved collection in the month of March 2002 and 2) approximately $4 million is being collected monthly on the loans in the pools insured by Royal.

Additional summarized information related to cash collections and delinquency of the loan portfolio is presented below.

**Summary of Payments Received by Pool**
In thousands

|  | Principal Balance | $ Received in Mar. | $ Received in Feb. | $ Received in Jan. | $ Received in Dec. | $ Received in Nov. | $ Received in Oct. |
|---|---|---|---|---|---|---|---|
| Wilmington Trust | $ 20,972 | $ 50 | $ 48 | $ 29 | $ 23 | $ 31 | $ 81 |
| PNC | 43,555 | 1,141 | 1,059 | 1,443 | 1,214 | 967 | 523 |
| 2000-1 | 40,437 | 541 | 445 | 357 | 316 | 380 | 417 |
| 2000-2 | 48,300 | 406 | 309 | 263 | 230 | 275 | 338 |
| 2000-3 | 44,137 | 328 | 273 | 222 | 212 | 215 | 272 |
| 2000-4 | 27,688 | 231 | 161 | 147 | 148 | 157 | 176 |
| 2001-1 | 52,845 | 42 | 351 | 281 | 268 | 297 | 351 |
| 2001-2 | 46,453 | 457 | 367 | 306 | 332 | 326 | 36 |
| 2001-3 | 76,786 | 724 | 531 | 493 | 447 | 455 | 776 |
| 2001-A1 | 101,687 | 983 | 781 | 666 | 641 | 756 | 812 |
| All Royal | 602,860 | 5,281 | 4,325 | 4,207 | 3,831 | 3,859 | 4,112 |
| All | $648,397 | $5,570 | $4,973 | $4,245 | $3,866 | $3,907 | $4,153 |

Mr. Howard L. Close
Wright Brown & Close, LLP
March 18, 2005
Page 4 of 14

# Grant Thornton

1. Portfolio Evaluation (continued)

## Aging by Pool
### In thousands

|  | Prepaid more than 3 months | Current to prepaid 2 months | 1 Month past due | 2 Months past due | 3 Months past due | 4 to 6 Months past due | 7 to 12 Months past due | More than 12 months past due |
|---|---|---|---|---|---|---|---|---|
| Wilmington Trust | $ 158 | $ 574 | $ 86 | $ 145 | $ 296 | $ 663 | $ 494 | $ 18,555 |
| PNC | 2,256 | 67,336 | 26,152 | 23,994 | 14,672 | 3,234 | 2,247 | 3,665 |
| 2000-1 | 2,987 | 7,735 | 943 | 723 | 584 | 1,450 | 2,823 | 23,202 |
| 2000-2 | 2,449 | 5,720 | 753 | 538 | 712 | 1,519 | 3,754 | 32,855 |
| 2000-3 | 1,694 | 4,663 | 579 | 611 | 552 | 1,609 | 4,534 | 29,854 |
| 2000-4 | 1,110 | 3,540 | 439 | 349 | 479 | 1,224 | 4,137 | 16,409 |
| 2001-1 | 1,635 | 7,437 | 1,077 | 934 | 883 | 3,158 | 19,252 | 18,469 |
| 2001-2 | 1,577 | 8,747 | 1,443 | 1,028 | 966 | 3,932 | 28,738 | 21 |
| 2001-3 | 1,344 | 14,868 | 3,850 | 3,792 | 11,774 | 40,741 | 418 | - |
| 2001-A1 | 2,415 | 19,452 | 3,814 | 4,812 | 4,391 | 28,567 | 38,236 | - |
| All Royal | 17,625 | 140,072 | 39,136 | 36,926 | 35,309 | 86,097 | 104,633 | 143,030 |
| All | $ 17,915 | $ 168,811 | $ 41,004 | $ 37,041 | $ 35,399 | $ 86,272 | $ 105,062 | $158,893 |

### Withdrawn Loans and Swaps

We have obtained and documented an understanding of SFC's general procedures for loans withdrawn by the schools and either swapped for new loans in the warehouse line or repurchased from the grantor trusts (securitizations).

If the withdrawn loans are held by a Grantor Trust, they are required by the Trust indenture to be repurchased within 30 days of identification. SFC transfers the funds to the Trust, which are treated as prepayments. In many cases, loans were not repurchased within the 30 days as required.

If the withdrawn loans are held in a warehouse facility, SFC may either repurchase them or swap them with newly originated loans within 30 days of identification. In many cases, loans were not repurchased within the 30 days as required.

As of the end of March 2002, there were a total of approximately $17.6 million of withdrawn loans that were outstanding which has not been repurchased or swapped.

As presented in Exhibit B, as of April 5, 2002, 820 loans (approximately $5.54 million) were outstanding to be repurchased from all the Trust Series, and 286 loans (totaling approximately $1.75 million) were repurchased during fiscal 2000. In addition, 1,463 PNC loans (approximately $11.81 million), 21 WTC Policy-1 loans (approximately $118,000), and 19 WTC Policy-61 loans (approximately $153,000) have been withdrawn by the school, but not repurchased or swapped.

Grant Thornton

Mr. Howard L. Close
Wright Brown & Close, LLP
March 18, 2005
Page 5 of 14

2. Forbearance Payments

We obtained from SFC, a copy of the Loan Forbearance Policy/Procedure (Rev. 7/05/00) (attached as Exhibit C). We also obtained an analysis of GL Account # 2178 "Forbearance Payments" (see Exhibit D), which we were told by Diane Messick, reflects all forbearance activity from January 1, 2000, through March 31, 2002, that totals approximately $60 million.

The Loan Forbearance Policy describes a forbearance payment as, "A temporary loan advance (forbearance payment) may be applied to a SFC loan balance...when the student misses a regular scheduled payment and the borrower meets collection forbearance eligibility criteria." The word "temporary" was in bold type in the policy. The policy states, "Qualifying accounts are determined based on the circumstances causing the late payment(s) and the potential of payment by the student borrower and/or (sp) the loan co-signor to cure any past due payment(s) outstanding." Based on this policy, it is clear that forbearance was intended and represented to be used in exceptional cases and only temporary in nature. It is also clear from the pattern and documentation obtained to date that the policy has not been followed. We are aware of no evidence indicating any evaluation of the ability or willingness of the students or the co-signors to repay or cure the forbearance payments was undertaken or any review of the circumstances causing each late payment, other than bankruptcy, incarceration or death.

Upon inquiry regarding the methodology for determining what loans for which forbearance payments would be made, Guy DiSimplico, provided samples of reports run to determine the amount of forbearance payments. In these reports, Cycle 1 are loans that will be 31 to 60 days past due at month end, Cycle 2 are loans that will be 61 to 90 days past due at month end, and Cycle 3 are loans that will be more than 90 days past due (in technical default) at month end. Mr. DiSimplico walked through the forbearance payment calculating methodology.

Mr. DiSimplico acknowledged and admitted that the reason forbearance payments were required to move loans from Cycle 2 to Cycle 1 was to prevent a large number and dollar amount of loans being reported in Cycle 2, which would raise concerns for the trustee, investors, and insurer.

We are in the process of investigating whether all forbearance payments paid according to Exhibit D were actually paid. We were unable to obtain the bank statements to support reported wire transfers of approximately $1.3 million in June 2000. We have requested copies of these bank statements but have not received them. It should be noted that the actual amount of forbearance paid to the trusts differs from the analysis by up to $20,000 per month. We were informed these differences result from payments received by SFC for forbearance reinstatements (amount repaid by the student borrower), which SFC deducts.

3. Credit Underwriting and Collection Practices

Student Marketing Services, LLC (SMS) markets and recruits truck driving schools to participate in the student loan financing activities of the SFG. SMS provides the framework for the schools to recruit and enroll students and to generate loan applications to cover tuition and other charges by the schools. The relationships with the schools are structured so that virtually all communication between SFG and the schools is handled or controlled by SMS.

We were told by the supervisors of the collections and credit departments and by the vice-president of Student Loan Servicing, LLC (SLS), effectively the loan servicing department, that complaints and issues involving schools were turned over to marketing for follow up and resolution. There is little feedback to the collections or credit underwriting departments. There is also no indication of any significant action to change schools', behavior or practices, which result in loan defaults.

Mr. Howard L. Close  
Wright Brown & Close, LLP  
March 18, 2005  
Page 6 of 14

**Grant Thornton**

### 3. Credit Underwriting and Collection Practices (continued)

It seems clear, based upon information and documentation obtained from the servicing and credit departments, that there is a pervasive pattern of activities engaged in by schools to generate loans through misrepresentations to student applicants and co-signers and to create loan applications that contain false or fraudulent information.

It is also evident that schools took steps to make sure one or two payments were made on new loans in order to trigger funding of the loans, i.e. payments to schools for tuition and other charges by SFC. An analysis by the collections department in October 2001, indicated that for loans outstanding 18 months at that time, two or fewer payments were received in the first six months on 55.8% of the loans.

Based upon logs maintained in the collections department and underlying documentation, it appears inconceivable that marketing was not aware of such activities by certain schools during 2000 and throughout 2001 and 2002 up until the time loan generation was curtailed.

There is evidence certain schools engaged in the following practices:

- Advertising guaranteed commercial drivers licenses, tuition, financing and jobs.
- Promising students their employer would pay the loan or that they would not have to pay the loan if they did not get a truck-driving job.
- False reference signature – many names shown as references for multiple loans. The names of such references often turned out to be a school employee with a school telephone number and address.
- False or fictitious co-signors. There is a log of hundreds of co-signors who claim they were told by the school they would never have to pay even if the borrower did not pay. Others state they were paid $50 to $150 to co-sign. There are also co-signor names that appear on multiple loans.
- Students physically or mentally impaired were enrolled, and loans were made to them.
- Criminal records.
- Students who did not graduate.

We have, so far, been unsuccessful in gaining access to any school correspondence files in SMS. We are in the process of investigating the degree of compliance by SLS with its own client underwriting policy from time to time.

**Payments to Schools and Loan Originations**

SFC uses a bank account referred to as the "settlement account" to make payments to schools on loan originations, based upon discussions with Diane Messick. Exhibit E, is a summary by year of payments from the settlement account from January 1, 1999, through April 5, 2002, extracted from Quickbooks data. The summary shows the schools were paid a total of $331 million in 1999 through April 5, 2002. They were paid $44 million in 1999, $71 million is 2000, $194 million in 2001 and $22 million in 2002. This summary shows that CDI/TDI, Franklin, and MTA were paid 23%, 34%, and 8% of the total, respectively. The top eight schools account for 80% ($261.6 million) of the total payments from January 1, 1999, through April 5, 2002.

Exhibit F is a list of the total loans (dollars and number) originated by school from inception to April 5, 2002. Originations by the CDI/TDI, Franklin, and MTA corporate entities are shown separately. The percentage of withdrawn loans to total loans originated for the three largest schools is close to the average percent of withdrawn loans for all schools. The analysis also presents the average non-withdrawn loan amount by school. Franklin's

Mr. Howard L. Close
Wright Brown & Close, LLP
March 18, 2005
Page 8 of 14

**Grant Thornton**

4. Cash Flow Analysis (continued)

   Transfers to Related Parties and Parties of Interest

   As part of the cash flow analysis, we have undertaken to identify related parties and transfers to same. We have attached (Exhibit J), a listing of the related parties identified at this time.

   We extracted from the Quickbooks file of Student Finance Corporation bank account activity from January 1, 1995, through April 6, 2002, for the related parties identified above and Other "Names" of interest. A summary of that activity is included as Exhibit K. Of particular note:

   - $26 million paid to Andrew Yao
   - $5.3 million paid to Electronic Cash Management, LLC
   - $4 million paid to DCC, DCC II, or aviation-related entities
   - $13 million paid to Robert Bast, reportedly for repayment of debt, interest and commitment fees
   - $12 million paid to or for the benefit of (FBO) persons with the last name, Gagné, reportedly for repayment of debt, interest and commitment fees.

5. Electronic Information and Analysis

   This section identifies the computer files of SFG obtained by Steve Haenchen, Grant Thornton, LLP (Grant Thornton), and Manager. Steve Haenchen copied the files to CDs as indicated below prior to viewing or making any changes to the data except as noted below to create the CDs. Steve has maintained the CDs under his control at all times. In addition, a complete copy of the files on CD was provided to Andrew Barbee, Grant Thornton, Director. The CD duplicates have been retained in original form obtained from SFG.

   Financial Accounting Records

   Data Received

   SFG uses Quickbooks Professional 1999 as its Financial Accounting Software. Diane Messick provided to Grant Thornton a CD purported to contain a copy of all the Quickbooks data files for SFG and the Grantor Trusts (Special Purpose Entity (SPE)). The files included Student Finance Corp. (100% owned by Andrew Yao), Student Loan Servicing, LLC (30% owned by SFC and 70% owned by Andrew Yao), and Student Marketing Services, LLC (100% owned by Andrew Yao). The files were purported to be current files from April 5, 2002 with the only change Diane Messick made being to convert the administrator password to "GT" prior to copying the files for Grant Thornton.

Mr. Howard L. Close
Wright Brown & Close, LLP
March 18, 2005
Page 9 of 14

**Grant Thornton**

5. Electronic Information and Analysis (continued)

   The files received are listed in the following directory.

   ```
   04/05/2002  07:51a            187,392 Fin1GP.QBW
   04/05/2002  10:04a            194,560 fin2gp.QBW
   04/05/2002  07:51a            822,272 fin3llc.QBW
   04/05/2002  07:51a            659,456 SFC Acceptance II.QBW
   04/05/2002  09:57a            674,816 SFC Acceptance III.QBW
   04/05/2002  07:51a            514,048 SFC Acceptance IV.QBW
   04/05/2002  07:51a            271,360 SFC Acceptance IX.QBW
   04/05/2002  07:51a            416,768 SFC Acceptance V.QBW
   04/05/2002  07:51a            388,096 SFC Acceptance VI.QBW
   04/05/2002  07:51a            286,720 SFC Acceptance VII.QBW
   04/05/2002  07:51a            285,696 SFC Acceptance VIII.QBW
   04/05/2002  07:51a            945,152 SFC Acceptance.QBW
   04/05/2002  07:51a          4,752,384 SFC Financial I LLC.QBW
   04/05/2002  07:51a          6,198,272 SFC Financial II, LLC.QBW
   04/05/2002  07:52a          7,311,360 SFC Grantor Trust 1996-1.QBW
   04/05/2002  07:52a          3,695,616 SFC Grantor Trust 2000-1.QBW
   04/05/2002  09:52a          2,723,840 SFC Grantor Trust 2000-2.QBW
   04/05/2002  07:52a          2,278,400 SFC Grantor Trust 2000-3.QBW
   04/05/2002  07:52a          1,961,984 SFC Grantor Trust 2000-4.QBW
   04/05/2002  07:50a          1,392,640 SFC Grantor Trust 2001-1.QBW
   04/05/2002  07:50a            974,848 SFC Grantor Trust 2001-2.QBW
   04/05/2002  07:50a            748,544 SFC Grantor Trust 2001-3.QBW
   04/05/2002  07:50a            424,960 SFC Members.QBW
   04/05/2002  07:50a            900,096 SFC Owner Trust 2001-A.QBW
   04/05/2002  07:50a            209,920 SLS Member.QBW
   04/05/2002  07:50a          5,149,696 SLSllc.QBW
   04/05/2002  07:50a          4,292,608 SMS, LLC.QBW
   04/05/2002  07:50a        101,780,480 student.qbw
   ```

   Note that "SFC Acceptance.QBW" is equivalent to "SFC Acceptance I.QBW" (I – IX exist above), each of the Grantor Trusts has a file, "student.qbw" is Student Finance Corp., "SLSllc.QBW" is Student Loan Services LLC and "SMS, LLC.QBW" is Student Marketing Services, LLC.

   **Bank Statements**

   Grant Thornton was allowed access to all bank statements on the premises of SFG. A few statements from late 1999, all statements for January 2000 through February 2002, and some from March 2002 were available. Grant Thornton scanned all these bank statements to image files.

   **Miscellaneous Files from Diane Messick**

   Diane Messick provided to Grant Thornton certain files by zipping the files on her computer and allowing Steve Haenchen to email the files using his email account from her computer to himself and Andrew Barbec. The files included:

   - SFG Consolidated Budget Spreadsheet with Actuals and Projections of combined Andrew Yao entities
   - Detail of Buybacks and Swaps
   - Information on Forbearance Payments

# Grant Thornton

Mr. Howard L. Close
Wright Brown & Close, LLP
March 18, 2005
Page 10 of 14

5. Electronic Information and Analysis (continued)

A directory listing of the files received were.

| | | |
|---|---|---|
| 05/03/2002 01:12p | 16,896 | Buybacks & Swaps for April 2002.xls |
| 05/03/2002 01:11p | 627,712 | Detail for Buybacks & Swaps for Apr 2002.xls |
| 05/03/2002 01:10p | 3,621,376 | McGForb_0101_2orLessThan2FBDetail.xls |
| 05/03/2002 01:10p | 26,624 | McGForb_0101_FBNumbers_3.xls |
| 05/03/2002 01:10p | 218,624 | SFG Budget Projection 2001 variance.xls |

**Analysis Performed**

- All Quickbooks files were opened to assure the password had been changed for Grant Thornton.
- All transactions were exported to Excel (SFGFinancialInformation.xls) to verify debits equaled credits.
- The primary financial bank account, in "student.qbw", was used to test the validity of the data. For January 2002, a proof of cash was performed by Grant Thornton reconciling beginning and ending balance as well as activity during the month to the bank statement. In addition, the cancelled checks were reviewed for endorsements, reasonable process times, and normal business purposes.

Loan Origination and Servicing – Student Loan Records

Data Received

According to Guy DiSimplico and David Zulauf, SFG's production and servicing data, including collection activity, are maintained in Microsoft SQL 7 database files. SFG copied these files to a stand-alone computer for Grant Thornton. Grant Thornton copied these files to Steve Haenchen's laptop. The files were then copied to CD along with necessary utility files to allow reconstruction of the files.

A copy of the files from April 5, 2002, has and is being used for testing and reporting purposes. All tables and fields added to the database by Grant Thornton are prefaced with "GT" (for Grant Thornton as opposed to Grantor Trust). These changes do not affect the copy of the original information stored on CD.

On May 3, 2002, Steve Haenchen requested Tian-Zhong Ding provide an updated copy of the SQL data. This copy of the updated data is stored in a similar fashion to the original data.

Data Dictionary

SFG provided access to the intranet site for the Data Dictionary to Grant Thornton. This site contains HTML files that identify the tables, stored procedures and views in the SFC_ProdData Database. In reviewing the table information, each field is listed, a short explanation about the field, and the data structure (format, size, etc.). References are made to code explanations in Microsoft Word Documents, but the links are not valid. Upon discussion with SFG personnel including Guy DiSimplico, the links have not been valid since server changes many months ago meaning the files exist only on backup tape and are out-of-date.

Grant Thornton zipped these Data Dictionary files to DataDict.zip and copied both the zip file and the entire intranet site to the CD with the SQL files referred to herein. Note that some file names in the entire copy had to be changed to comply with CD standards, but the original names were preserved in the zip file.

Grant Thornton

Mr. Howard L. Close
Wright Brown & Close, LLP
March 18, 2005
Page 11 of 14

5. Electronic Information and Analysis (continued)

Loan Origination Documents

Guy DiSimplico told Grant Thornton that all original student loan documents SFG had at the time the student's loan was "closed" were imaged on CD. The original loan documents were then transferred to the applicable Trustee for the applicable warehouse bank line or Grantor Trust.

Guy DiSimplico supplied Steve Haenchen with CDs purported to contain all the Loan Origination Document Images. These CDs appeared to be made by an outside vendor, or copies of CDs made by an outside vendor. The oldest dates were labeled "SFC01" and "SFC02". Subsequent CDs were labeled in a fashion that appeared to be a 2-digit month code "04" to "68" followed by a three-digit sequence code. For example, January 2002 had four CDs labeled "67001" through "67004".

Grant Thornton copied the CDs (purported to contain every loan SFG produced through February 2002), a total of 107 CDs.

Cash Processing (Check) Images

Based on the servicing data obtained, and discussions with SFG personnel, three primary classifications of payment processing exist as follows.

| | |
|---|---|
| Forbearance payments | 33% |
| Payments received directly at the SFG facility | 50% |
| Payments received via Lockbox Accounts | 17% |
| Total | 100% |

- Note 1: 75% (50%/(50%+17%)) of non-forbearance payments are processed in-house and 25% are processed via the Lockbox bank accounts.
- Note 2: Checks received via the Lockbox Account are copied and deposited. The check copy is forwarded to SFG for processing. The Lockbox Account has no function in how the check is processed by SFG (such as providing an electronic file of loan numbers and check amounts, etc.)

Grant Thornton learned that the non-forbearance payments processed in house were imaged by SFG. Grant Thornton asked to copy the CDs containing the check images. Tian-Zhong Ding supplied Grant Thornton with CDs to copy that appeared to date from August 11, 1999, through February 28, 2002. Grant Thornton copied these 212 CDs.

School Files

Grant Thornton was told that each school that supplies loan production to SFG has a file. These files are stored in the Marketing Department. Three 4-drawer lateral file cabinets contain the School files – 1/3 inactive files, 2/3 active files. The school files typically contain the following.

- Checklist of contents of file
- Financial Information on school
- Dunn & Bradstreet credit report on school
- Proof of business license and/or accreditation
- Statistics on school including number of students, graduation rates and placement rates.
- School catalog typically provided to students

Mr. Howard L. Close
Wright Brown & Close, LLP
March 18, 2005
Page 12 of 14

# Grant Thornton

5. Electronic Information and Analysis (continued)

Grant Thornton was requested to copy the files as part of the Work Product on this assignment. Grant Thornton began scanning the documents to image files beginning with "A" in the active files. After several days of scanning (which involved retrieving the file, removing staples, etc., scanning the contents, replacing staples, etc., and returning the file), a decision was made that further copying would be limited to schools with the greatest loan production plus a few inactive files. The additional files were selected by Tony McKenzie of Royal.

Grant Thornton scanned the requested files, which approximated 1/3 of all school files.

Analysis of Servicing Data

- We tested the application of cash receipts by performing the following procedures. No discrepancies greater than $1,000 were unexplained. We did note that significant amounts are received directly by SFC or by the wrong lockbox and subsequently transferred to the correct lockbox.
  1. Obtain the detailed payments by date by pool for one week in April 2001 and January 2002 from the SFC database (SH)
  2. Obtain the payment folders for the specific date
  3. Compare the total deposit ticket to the payment report (1. above) note any exceptions
  4. Trace the deposit to the bank statement of the trust and note any exceptions
  5. Compare the name, payment amount, and loan number of each item in the deposit package to the detailed payments report in item 1, above and note any exceptions
  6. Compare the deposit amount, trust number, and date to the Quickbooks file of the specific trust and note any exceptions
  7. Obtain the bank reconciliations for January 2002 and April 2001. Look for unusual reconciling items and manager approval.

- We tested the payments to schools from the servicing database to the supporting documentation as noted below. No significant discrepancies were noted.
  1. Obtain the detailed payments to schools for loan originations during January 2002 and April 2001 from the SFC database (SH).
  2. Obtain the school settlement payment record.
  3. Compare the risk classes, SSN, last name, booking date, loan amount, disbursement amount, note any late payments, and total disbursement amount by school in 1 and 2 above and note exceptions.
  4. Trace the school settlement record to the copy of the check/wire transfer and bank statement for SFC.
  5. Obtain the school contract and recalculate the payment, note any exceptions.

- Cash receipts in the loan servicing (SQL) files were compared to cash receipts on bank statements for each month July 2001 through March 2002. (SFGMonthlyCashReceiptsByBank.xls). Detailed receipt transactions were summarized for each month in the categories "Lockbox", "Forbearance" and "Other". The bank statements had comparable categories of "Lockbox", "Wire Transfers" and "EFT Credits". Each category for each Grantor Trust for each month was compared. Relatively large differences were investigated and the reasons for the differences identified. Based on this analysis, it appears the transactions approximate the bank activity.

# Grant Thornton

Mr. Howard L. Close
Wright Brown & Close, LLP
March 18, 2005
Page 13 of 14

5. Electronic Information and Analysis (continued)

- To document the process SFC/SLS utilizes for processing payments received, directly at SFC's offices, we interviewed Diane Messick, Controller; Lori Richards, Accounting Manager; and Mark Harris, Supervisor of Payment Processing. After obtaining and understanding of the process, we document it by walking three payments through the entire process without exception.

**Reports Created**

Using the servicing data, the following reports have been created solely for use by Royal and Royal's attorneys' in conjunction with this matter.

- Actual monthly payments received in last six months by number of months delinquent
- Loan originations and withdrawals by school
- Average loan amount by month

Loan Servicing – Investor Reporting Records

Data Received

SFG maintains the data for investor reporting in Microsoft Jet-Engine Database files (MDB). Linda Deng, at the direction of Tian – Zhong Ding, provided to Grant Thornton a copy of the Investor Reporting databases on April 5, 2002. She copied these files from SFG's Server SFCDB directly to Steve Haenchen's laptop. The files were then copied to CD. A separate unchanged copy of the CD was created for Andrew Barbee and are maintained on two CDs by Steve Haenchen.

Additional MDB File

On April 6, 2002, Gary Hawthorne informed Grant Thornton that an additional Investor MDB file should be provided to Grant Thornton that SFG had forgotten related to some older Grantor Trusts. This file, "4Loans.MDB" was copied to Grant Thornton by Tian – Zhong Ding in the folder "4 Year". This file is contained on the CDs with the SQL files referred to herein.

Pool Documents

Closing documents for each Grantor Trust and bank line (PNC, WT, and SWH) were requested by Grant Thornton. The documents for the bank lines were obtained (only part of the SWH documents were obtained) and scanned. The documents related to each Grantor Trust and for SWH (those not scanned above) were obtained from Diane Messick on CD. The CD was received in an unopened package from Diane Messick purportedly as she received it from Pepper Hamilton (SFG's law firm).

# Grant Thornton

Mr. Howard L. Close
Wright Brown & Close, LLP
March 18, 2005
Page 14 of 14

5. Electronic Information and Analysis (continued)

Backup Servicer Update Files

Data Received

Grant Thornton was informed by Tian-Zhong Ding that Wells Fargo, as backup servicer, is sent a weekly email of transaction files. Grant Thornton obtained a copy of these files for one week. The directory listing below shows the files received.

```
04/11/2002  05:26p        530,432 GT2-1 WeeklyEmailCompacted.mdb
04/11/2002  05:26p        434,176 GT2-2 WeeklyEmailCompacted.mdb
04/11/2002  05:25p        370,688 GT2-3 WeeklyEmailCompacted.mdb
04/16/2002  08:41a        292,864 GT2-4 WeeklyEmailCompacted.mdb
04/12/2002  10:02a        483,328 GT2K1-1 WeeklyEmailCompacted.mdb
04/16/2002  08:41a        419,840 GT2K1-2 WeeklyEmailCompacted.mdb
04/11/2002  05:17p      1,376,256 GT2K1-3 WeeklyEmailCompacted.mdb
04/11/2002  05:15p      1,280,000 OT2K1-A WeeklyEmailCompacted.mdb
```

Each file represents the data for a different Grantor Trust.

Analysis Performed

Grant Thornton opened the files to determine if the backup servicer was receiving sufficient data to be prepared to take over servicing, if necessary. It was determined that each file contains four tables. Two tables are control total tables for the other two tables. Of the two data tables, one contains a subset of the weekly collection comments and the other contains a subset of the weekly payment transactions. From this brief review, it was apparent that insufficient data was being sent to the backup servicer for the backup servicer to be able to have sufficient data to take over servicing. To wit, the backup servicer did not receive information on address and phone number changes, loan withdrawals, bankruptcies, nor deaths.

I have completed declarations in other litigation related to the SFC matter. These declarations are attached as Exhibits A through R.

Attached as Exhibit S are four documents identified as GT 00190 to GT 00193, which were obtained from Student Finance Corporation. Those documents present information related to "Coastal" student loans.

Very truly yours,

Grant Thornton LLP

*William J. Spears*
William J. Spears
Partner

Enclosures