# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROYAL INDEMNITY COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 05-165-JJF |
| | ) |
| PEPPER HAMILTON LLP, W. RODERICK | ) |
| GAGNÉ, FREED MAXICK & BATTAGLIA | ) |
| CPAs PC, MCGLADREY & PULLEN, LLP, | ) **JURY DEMANDED** |
| MICHAEL AQUINO and FREED MAXICK | ) |
| SACHS & MURPHY, P.C., | ) |
| | ) |
| Defendants. | ) |

## THIRD AMENDED COMPLAINT

For its Third Amended Complaint, Plaintiff Royal Indemnity Company ("Royal") avers as follows:

## INTRODUCTION

1.     Student Finance Corporation ("SFC"), a corporation that now is the subject of the bankruptcy proceedings more fully described below, claimed to be in the business of originating or purchasing tuition loans made to students enrolled at truck-driving schools. But SFC was never a legitimate student loan financing business. It was a loan mill. Its business depended entirely on borrowing money and maintaining its ability to continue borrowing money, which could not happen without insurance. Through numerous misrepresentations and omissions about SFC's operations and the historical and ongoing performance of its student loans, SFC and the Defendants induced Royal to issue credit risk insurance policies to provide coverage for loan defaults caused by students failing to make loan payments (the "SFC Policies").

2.    SFC, and its affiliated companies and officers, all as more fully described below, conspired with truck driving schools -- in particular, a handful who made more than 80% of the loans in question -- to generate as many loan applications as possible without regard to creditworthiness, employability or the veracity of application information or signatures.  To bolster the illusion of a portfolio of performing student loans, SFC covertly arranged with the schools to make the first one, two or three payments on the loans to their students.  SFC reported those payments as student loan payments.

3.    SFC borrowed voraciously using these "loans" as collateral, then packaged and sold the loans to institutional investors.  SFC systematically and secretly used the income from its borrowings and sales to itself make "payments" on behalf of defaulting students to investors who had purchased earlier pools.  Internally, SFC described these payments as "forbearance payments" or "ghost payments."  Externally, SFC reported these payments to Royal as if they had been made by the students, thus vastly understating SFC's default rates.  Initially used to bait Royal into issuing the first policy, this practice metastasized in monthly servicer reports SFC provided Royal in connection with each policy Royal issued.

4.    The falsified monthly servicer reports corroborated performance models that Royal had created based upon SFC's original representations about the historical performance of the student loan portfolios.  With its performance models appearing to operate as originally expected -- *i.e.*, modest default rates, covered by reserves -- Royal kept issuing policies, eventually insuring approximately $650 million of student loans between January 1999 and November 2001.

5.    In defrauding Royal, SFC had active, knowing and essential assistance from the Defendants, all professionals hired by and paid by SFC and/or its affiliates:  the law firm Pepper Hamilton LLP ("Pepper") and its partner W. Roderick Gagné ("Gagné") (together, the

- 2 -

"Lawyers"); and the accounting firm(s) of Freed Maxick Sachs & Murphy, P.C. and/or Freed Maxick & Battaglia CPAs, PC (collectively "Freed"), McGladrey & Pullen LLP ("McGladrey") and its partner Michael Aquino ("Aquino") (Freed, McGladrey and Aquino are further collectively referred to herein as the "Accountants") (Pepper, Gagné, Freed, McGladrey and Aquino are collectively referred to herein as the "Defendants"). The Defendants received millions of dollars in fees and interest on loans to SFC. They were SFC insiders and had every incentive to ensure the success of SFC's fraud.

6.    The Defendants were aware of SFC's practice of making ghost payments from early in their respective representations of SFC. SFC and the Defendants acted in concert to ensure that the ghost payments and the true default rates of SFC's loans were not disclosed to Royal. The Defendants made material omissions or misrepresentations, and issued, or participated in issuing, various false and misleading documents to perpetuate SFC's fraud. They intended that Royal rely on their false and misleading representations, omissions and documents. The Defendants certified and legitimized SFC's fraudulent conduct and were essential to SFC's success as a ponzi-like scheme.

7.    Had Royal known that the student loans were defaulting at rates wildly in excess of its expectations, or that supercharged default rates were masked by systematic payments made by SFC itself, Royal would never have issued the SFC Policies. But Royal never knew. In March 2000, SFC officers concluded that identifying "forbearance payments" on the servicer reports "could cause more questions than necessary to arise from the recipients of the reports," and consciously chose to hide the forbearance payments from Royal. In October 2000, SFC sent a cash flow projection to Royal which was altered to hide the forbearance payments. On at least two occasions in 2001, SFC officers orally misrepresented the actual default rates in response to Royal inquiries. None of the eight private placement memoranda drafted by Pepper or the

various reports issued by Freed or McGladrey revealed the nature of SFC's ghost payments or their effect on the default rates reported to Royal.

8.      From January 2000 through March 2002, SFC made almost $60 million in ghost payments, while SFC's servicing affiliate continued to report to Royal that the loan portfolios were performing as expected.  Only in March 2002 did Andrew Yao, SFC's sole owner, confess to Royal that SFC had been concealing its true default rates by making the extensive secret "forbearance" payments.

9.      The ghost payments were effective at concealing the actual default rates of the student loans.  For example, between 1999 and March 2002, Royal had been presented with claims for the unpaid principal balance of student loans of about $38.6 million, well within projected ranges and reserves which SFC had established for Royal's benefit.  A year later, Royal had been presented with claims totaling approximately $430 million.  These loans have defaulted at astonishing rates, over 87% at this point in time.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367, and applicable principles of pendant, ancillary and supplemental jurisdiction.

11.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## PARTIES

12.      Plaintiff Royal is a Delaware Capital Stock Insurance Company with its principal place of business in Charlotte, North Carolina.

13.      Defendant Pepper is a Pennsylvania Limited Liability General Partnership with its principal business address at 3000 Two Logan Square, 18th and Arch Streets, Philadelphia, Pennsylvania 19103.  Pepper also has offices at Hercules Plaza, Suite 5100, 1313 Market Street, Wilmington, Delaware 19899-1709.  Pepper provided legal services to SFC from  1996 until

- 4 -

2002, when SFC was forced into bankruptcy. All allegations, other than those made in Count I, made herein against Gagné are allegations asserted against Pepper as well.

14.     Defendant Gagné is natural person who is and was at all pertinent times a partner in the Philadelphia office of Pepper and is a resident of the Commonwealth of Pennsylvania. Gagné was also trustee of trusts that, along with relatives of Gagné, were shareholders in SFC. As someone directly involved in, or responsible for, the wrongful acts and omissions alleged herein, Gagné is liable both individually and in his capacity as a partner with Pepper.

15.     Defendant Freed (as defined above to include Freed Maxick & Battaglia CPAs, PC and Freed Maxick Sachs & Murphy, PC) is a New York accounting firm headquartered at a single location in Buffalo, New York. Upon information and belief, Freed provided accounting services for SFC, based in Delaware, from 1999 through 2001. Upon information and belief, Freed, or some part of Freed, was merged with McGladrey from approximately November, 2000, through September, 2001. All allegations, other than those made in Count I, made herein against Aquino are made against Freed as well.

16.     Defendant McGladrey is an Iowa accounting firm headquartered in Bloomington, Minnesota. McGladrey, out of its Philadelphia office, provided accounting services for SFC, based in Delaware, from 2000 until 2002. All allegations, other than those in Count I, made herein against Aquino are made against McGladrey as well.

17.     Defendant Aquino is a natural person who, upon information and belief, is a Managing Director and Partner at RSM McGladrey, Inc., and, upon information and belief, is a resident of the State of Pennsylvania. Aquino was formerly a partner and/or employee of Freed. Aquino provided accounting services to Yao and SFC from 1998 until 2002. As someone directly involved in, or responsible for, the wrongful acts and omissions alleged herein, Aquino is liable both individually and in his capacity as a partner with Freed and McGladrey.

- 5 -

## Relevant Unnamed Third-Parties

18.     Student Finance Corporation is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania which had its principal place of business at 170 Lukens Drive, New Castle, Delaware 19720.  It was at all times pertinent to this action ostensibly in the business of originating, purchasing and selling to investors tuition loans made primarily to truck driving school students.  Student Finance Corporation was the subject of an involuntary petition under Chapter 7 of the Bankruptcy Code filed by four petitioning creditors in the United States Bankruptcy Court for the District of Delaware on June 5, 2002.  The Chapter 7 bankruptcy case against Student Finance Corporation was converted on consent to a Chapter 11 case on November 4, 2002, and was converted back to a Chapter 7 case on November 14, 2003.  Although a prime conspirator in the fraudulent scheme more fully described herein, Student Finance Corporation is not named as a party in this action solely because the bankruptcy laws prevent Royal from doing so at this time.

19.     Student Loan Servicing, LLC ("SLS") is a limited liability company organized and existing under the laws of Delaware, and whose principal office address is, upon information and belief, 170 Lukens Drive, New Castle, Delaware, 19720.  SLS was responsible for servicing the student loans in the SFC programs and providing information on the performance and status of the SFC student loans to Royal and to other entities involved in the SFC program, including PNC Bank, Wells Fargo Bank Minnesota, N.A. ("WF"), and MBIA Insurance Corporation.  Royal has sued SLS, and a number of other SFC affiliates in a separate action pending in this district before the Honorable Joseph J. Farnan, Jr., case number 02-1294.

20.     Andrew N. Yao ("Yao") is a resident of Pennsylvania.  Yao at all times pertinent to this action owned and controlled SFC.  Yao at all times pertinent to this action was the sole owner of Student Finance Corporation and Student Marketing Services.  He was also at all times

- 6 -

pertinent to this action the 70% direct owner of SLS and indirectly owned the remaining 30% that was owned by Student Finance Corporation. He was at all times pertinent to this action an officer and director of all three entities.

21.    Gary Hawthorne ("Hawthorne") is a resident of Pennsylvania. At all times pertinent to this action Hawthorne was an officer and/or a director of SLS and/or SFC.

22.    Student Finance Corporation and SLS were at all times pertinent to this action under common ownership and control and are collectively referred to herein as "SFC".

## FACTUAL BACKGROUND

### Royal Was Fraudulently Induced To Provide Credit Risk Insurance For SFC Loans

23.    SFC completed a securitization transaction in 1996. On information and belief, the 1996 transaction involved the offering of trust certificates backed by a pool of truck driving school student loans which had been either purchased or originated by SFC. SFC obtained a credit risk insurance policy for the loans issued by AIU Insurance Company, an affiliate of American International Group ("AIU"). Royal was not involved in that transaction.

24.    In 1998 SFC sought to expand its student loan programs, and to that end, began looking for other potential insurers to provide credit risk insurance for the increasing number of loans SFC planned to purchase or originate. By 1998, Pepper and Aquino were providing legal and accounting services, respectively, to SFC.

25.    In the summer of 1998, Joe Domal of International Benefits Group ("IBG"), an insurance broker acting on behalf of SFC, contacted Ted Moor III, President of T.E. Moor & Co. ("T.E. Moor"), another insurance broker, about the possibility of Royal issuing credit risk insurance to SFC. T.E. Moor, in turn, contacted Royal. Moor explained that AIU had decided to

leave that line of business, creating an opportunity for another insurance company to work with SFC.

26.    Soon after the initial conversations between employees of T.E. Moor and Royal, SFC sent Royal documents that purported to describe SFC's business and the performance of loans SFC had previously made.  Throughout the negotiation, SFC continued to forward Royal information regarding its programs.  Those communications contained numerous material misrepresentations.

27.    Specifically, on November 13, 1998, through IBG, SFC sent Royal a letter and attachments, including (a) a proposed term sheet; (b) an "historical performance" chart, (c) a "loss reserve" chart; (d) the AIU credit risk insurance policy; and (e) an "information summary" regarding SFC ("November 13, 1998 Letter").  IBG sent the November 13, 1998 Letter on behalf of SFC, with SFC's knowledge, at the direction of SFC and Yao, and with information SFC and Yao supplied.

28.    The November 13, 1998 Letter "information summary" stated that SFC's program offered "100% recovery on defaults" and that the transaction's reserves would "protect[] the insurer" by growing in value to three times the expected defaults.  SFC knew at the time that these representations were false.  SFC and Yao made these false representations to induce Royal to issue credit risk insurance to SFC in reliance upon the representations.

29.    The November 13, 1998 Letter "historical performance" chart showed zero net losses incurred by AIU, low default rates for the insured student loans, and delinquency figures consistently under 20% for the same loans.  These representations were false.

30.    In reality, default rates for students' failure to pay SFC's loans were much higher, but had been artificially understated through SFC's use of undisclosed ghost payments, which SFC and the Defendants misleadingly came to refer to amongst themselves as

- 8 -

"forbearance payments," *i.e.*, payments SFC made on loans nearing default to prevent them from defaulting.

31.     On or about November 23, 1998, after reviewing the SFC materials, Royal posed a series of written questions to SFC, Yao, and their agents concerning the SFC student loan program.

32.     On or about November 30, 1998, IBG, on behalf of SFC, sent Royal answers to these questions. The answers had been prepared on behalf of SFC and Yao by its investment advisor, Loofbourrow & Associates, in the form of a memorandum that had been sent to IBG, with copies to Yao. In responding to Royal's questions, SFC and Yao represented:

     a.    That, based on historical performance, SFC's projected maximum cumulative default rate (before recoveries) on student loans was 25%;

     b.    In five years of originations, SFC had obtained nearly 100% recovery on loan defaults, across all credit classes, and obtained recoveries immediately from reserves that it retained from schools;

     c.    There was considerable loss coverage protection to Royal throughout the life of an SFC loan pool through reserves SFC established; and

     d.    Royal would have a loss coverage protection ratio of 3.4 times the defaults.

33.     SFC and Yao knew each of these representations was false when made. In reality, SFC's historic default rates were much higher than represented, but had been masked by SFC's secret ghost payments. In the loans it had originated, SFC had not obtained 100% recovery on defaults from the school reserve funds. SFC and Yao knew that Royal would not have a loss coverage protection of 3.4 times the size of the defaults. SFC and Yao knew there would not be considerable loss coverage protection to Royal throughout the life of the loan pool.

34.     SFC sent to Royal the underwriting guidelines it supposedly used in writing student loans. SFC represented that the guidelines had been used and would be used for loans

- 9 -

Royal insured. The guidelines required all schools whose students received SFC loans to, *inter alia*, maintain 67% graduation and job placement rates, have a CPA conduct an annual compliance audit of the school's financial aid policies and procedures, and comply with standards published by the United States Department of Education. In reality, most schools for which SFC provided student loans did not comply with these guidelines at the time SFC made these representations -- a fact well known to SFC and Yao. SFC had not enforced the guidelines and did not intend to enforce them.

35.    The foregoing misrepresentations and omissions were material and were made with the intention that Royal rely on them. At the time SFC made these misrepresentations to Royal and withheld material information from Royal, SFC and Yao knew that these misrepresentations were false and that material information was not disclosed.

36.    Justifiably relying on the information and documents provided to it by SFC, Yao and their agents, Royal decided to provide credit risk insurance for student loans under SFC's student loan program. The general purpose of the SFC Policies was to provide coverage, according to the terms and conditions of the insurance policies, for loan defaults caused by students failing to make loan payments. Initial student defaults were to be paid from reserves SFC established pursuant to the insurance policies (such as the Institutional Reserve or Experience Account).

37.    On January 22, 1999, Royal issued its first credit risk insurance policy to SFC, Policy No. RST321276, with a liability limit of $75 million. While this coverage was intended eventually to be used for securitized transactions, the first portion was used in connection with a "warehouse" loan from Wilmington Trust Company of Pennsylvania ("Wilmington Trust"). The policy named Wilmington Trust as a beneficiary. The loan proceeds were supposed to be used either to purchase student loans from truck driving schools or to make loans to such students

- 10 -

directly. The loans were then to be conveyed to, and remain in, the warehouse pending an asset securitization transaction. SFC and Yao created an affiliate, SFC Financial I, LLC, to hold the loans and to act as the insured under the policy. The student loans were said to be "warehoused" with SFC Financial I, LLC and Wilmington Trust was said to be the "warehouse lender." At the time of a securitization transaction, the loans would be removed from the warehouse, pooled and transferred to a trust. The trust would then issue certificates or floating rate notes to investors through private placements. In theory, the investors would then be repaid from the pool of payments made by the students on the underlying student loans. SFC would pay down the warehouse loan with the funds it obtained from the securitization of the student loans.

## SFC Made Ghost Payments
## On Student Loans Under The Royal Policies

38.     SFC itself made payments on behalf of borrowers to conceal defaults from the outside world. Internally, SFC misleadingly referred to these payments as "forbearance payments." SFC also referred to the payments from time to time as "ghost payments." If a borrower was 90 days delinquent in his repayment obligations, the loan was considered to be in default under the SFC Policies, and had to be reported to Royal as a defaulted loan. SFC and the Defendants wanted Royal to issue future policies insuring SFC's student loans and thus did not want Royal to know that a large number of the student loans were not performing. Thus, as loans approached 90 days delinquency, SFC made the secret ghost payments on behalf of the borrowers to prevent the loans from going to claims (*i.e.*, being claimed as a loss under the SFC Policies).

39.     While SFC's practice of making ghost payments was kept secret from Royal, by the time Royal issued the first SFC Policy on January 22, 1999, the Defendants were aware of

the ghost payments and the "distorting," "manipulative" effect they had on the loan default rates in the pools.

40.    In reports provided to Royal that were vetted and certified by the Accountants, SFC treated these ghost payments as having been made by the student borrowers, even though they were made by SFC itself. In reports provided to Royal, SFC did not treat these loans as defaulted loans or otherwise inform Royal that SFC was making payments to keep the loans from defaulting. Instead, SFC reported these payments as though they had been made by students. The Accountants, though aware that the ghost payments "distort[ed]" the default rates of the pools, assisted SFC in its cover-up and certified financial statements that intentionally failed to disclose that SFC was making the payments.

41.    The ghost payments were made by SFC at the direction of Yao, knowingly aided and abetted by the Defendants.

42.    SFC and Yao represented to Royal that the student loans under the SFC Policies were actually performing loans. No one, including SFC or the Defendants, disclosed to Royal that SFC was making ghost payments or that ghost payments were preventing massive amounts of otherwise-defaulting loans from being reported as defaults. Pepper knew that the ghost payments made it look like "SFC [was] manipulating the pool performance," *see, infra* ¶ 77. Freed and McGladrey knew that the practice "distort[ed] the delinquency and default ratios of the pool," *see, infra,* ¶ 96. Yet neither Pepper nor Freed nor McGladrey ever disclosed the ghost payments to Royal, or insisted the payments be disclosed in any document they drafted or certified. SFC and the Defendants concealed from Royal the true default rates, the ghost payments and their effect on the loan default rates.

43.    SFC's and Yao's use of ghost payments to conceal defaults was not disclosed to Royal before the negotiation and issuance of subsequent policies. Consequently, Royal

continued to believe that the SFC student loan program was performing as originally represented by SFC. None of the documents drafted, verified or issued by the Defendants in 2000 or 2001 ever disclosed the ghost payments. The documents issued to Royal by SFC, knowingly aided and abetted by the Defendants, confirmed Royal's understanding of the transactions as originally promised by SFC and as set forth in Royal's modeling, and intentionally failed to disclose the falsity of the representations made to Royal.

44.    Prior to Royal agreeing to issue credit risk insurance coverage to SFC, SFC had provided Royal with form agreements regarding student loans between SFC and individual schools. These agreements did not mention ghost payments or SFC's other misleading term for the payments, "forbearance payments." Later versions of the agreements between SFC and the schools included references to "forbearance payments." These revised forms were not provided to Royal until after Yao first revealed the fraud on March 20, 2002.

### SFC's Required Reporting To Royal Failed To Disclose The Ghost Payments And Understated The Loan Default Rates

45.    SFC, through SLS, provided Royal with monthly "servicer reports." These servicer reports, which were prepared under the supervision and at the direction of Yao, and which were later certified by McGladrey and Aquino, contained detailed information about the performance of the SFC student loans, the default and delinquency rates of the loans, and the payments received on the loans. SFC's servicer reports did not report as defaults those loans where the student had missed payments, but SFC had secretly made ghost payments. The Defendants knew that the servicer reports were sent to Royal and knew or should have known that Royal relied on them.

46.    The ghost payments were not disclosed in Aquino and McGladrey's 2001 Independent Accountant's Report regarding the servicer reports, even though McGladrey knew

that the servicer reports, as issued, "distort[ed] the delinquency and default ratios of the [loan] pool." Instead, the servicer reports listed the ghost payments in the general "payments received" column, thereby creating the false impression that these loans, some of which had received no student payments for years, were actually performing as expected (or better than expected). The servicer reports created the false impression that student default rates generally were low and in line with SFC's initial false representations.

## Royal Was Fraudulently Induced To Issue Credit
## Risk Insurance For Securitization Transactions

47.    When a sufficient number of student loans were warehoused, SFC packaged those student loans into a pool to be sold to a trust established to sell investors interests in the student loans.

48.    Based on the above material misrepresentations and omissions, including the monthly servicer reports issued from January 1999 forward, SFC and Yao, knowingly aided and abetted by the Defendants, induced Royal to issue a credit risk insurance policy for $50,000,000 to cover the warehoused student loans that were being sold to investors.

49.    Accordingly, on April 19, 2000, Royal issued its first securitization policy with Norwest as beneficiary (later, WF), bearing policy number RST 293334. The insured was SFC Acceptance II, LLC, and the policy had an inception date of January 22, 1999. The policy insured against loss caused by "a Student Loan becoming more than ninety (90) days delinquent" (as those terms were further defined in the Policy). The policy was written to cover student loans with the aggregate principal amount of $50,000,000.

## The Misrepresentations Continue As
## Royal Is Induced To Issue More Insurance

50.    Yao, knowingly aided and abetted by the Defendants, continued to expand SFC's student loan purchase and origination program through 2001. SFC and the Defendants

- 14 -

fraudulently induced Royal to issue additional credit risk insurance to SFC's Financial Entities for warehoused student loans and to seven more of SFC's specially created Acceptance Entities for additional securitization transactions.

    51.    SFC and Yao fraudulently induced Royal to issue, *inter alia*, the following additional credit risk insurance policies to cover defaulted SFC student loans:

    a.    Policy Number RST 293309, effective December 3, 1999. Policy No. 293309 was originally issued in connection with warehouse loans obtained by SFC Financial I, LLC and SFC Financial II, LLC and named both Wilmington Trust and Market Street Funding Corporation ("MSFC"), a commercial paper conduit sponsored by PNC, as beneficiary. On or about August 17, 2000, this policy was amended and restated to cover a securitization transaction. As amended, the insured under Policy No. 293309 was SFC Acceptance III, LLC, the beneficiary was WF, and the policy was written to cover $53,053,642 in SFC student loans.

    b.    Policy Number RST 147522, effective April 30, 2000. Policy No. 147522 was originally issued in connection with a warehouse loan obtained by SFC Financial I, LLC and SFC Financial II, LLC and named both Wilmington Trust and MSFC as beneficiary. On October 7, 2000, this policy was amended and restated to cover a securitization transaction. As amended, the insured under Policy No. 147522 was SFC Acceptance IV, WF was the beneficiary, and the policy was written to cover $48,459,255 in SFC student loans.

    c.    Policy Number RST 147524, effective August 30, 2000. Policy No. 147524 was originally issued in connection with a warehouse loan obtained by SFC Financial I, LLC and SFC Financial II, LLC and named both Wilmington Trust and MSFC as beneficiary. On December 16, 2000, this policy was amended and restated to cover a securitization transaction. As amended, the insured under Policy No. 147524 was SFC Acceptance V, LLC, the beneficiary was WF, and the policy was written to cover $29,999,999.94 in SFC student loans.

    d.    Policy No. RST 147525, effective November 27, 2000. Policy No. 147525 was originally issued in connection with a warehouse loan obtained by SFC Financial I, LLC and SFC Financial II, LLC and named Wilmington Trust and MSFC as beneficiary. On April 24, 2001, this policy was amended and restated to cover a securitization transaction. As amended, the insured under Policy No. 147525 was SFC Acceptance VI, LLC, the beneficiary was WF, and the policy was written to cover $55,616,550 in SFC student loans.

    e.    Policy No. RST 147526, effective January 31, 2001. Policy No. 147526 was originally issued in connection with a warehouse loan obtained by SFC Financial I, LLC and SFC Financial II, LLC and named Wilmington Trust and MSFC as beneficiary. On August 17, 2001, this policy was amended and restated to cover a

securitization transaction. As amended, the insured under Policy No. 147526 was SFC Acceptance VII, LLC, the beneficiary was WF, and the policy was written to cover $48,286,713 in SFC student loans.

f.    Policy No. RST 147529, effective June 19, 2001. Policy No. 147529 was issued in connection with a warehouse loan obtained by SFC Financial II, LLC from PNC Bank, N.A. The insured under Policy No. 147529 was SFC Financial II, LLC, the beneficiary was PNC Bank, N.A., and the policy was written to cover $150,000,000 in SFC student loans.

g.    Policy No. RST 147533, effective August 17, 2001. Policy No. 147533 was issued in connection with a warehouse loan obtained by SFC Financial I, LLC from Wilmington Trust. The insured under Policy No. 147533 was SFC Financial I, LLC, the beneficiary was Wilmington Trust, and the policy was written to cover $5,518,459 in SFC student loans.

h.    Policy No. RST 147538, effective October 19, 2001. The insured under Policy No. 147538 was SFC Acceptance IX, LLC, the beneficiary was WF, and the policy was written to cover $100,000,000 in SFC student loans.

i.    Policy No. RST 147536, effective November 15, 2001. The insured under Policy No. 147536 was SFC Acceptance VIII, LLC, the beneficiary was WF, and the policy was written to cover $80,000,000 in SFC student loans.

52.    When issuing each of these policies, Royal relied upon the original and continuing misrepresentations and material omissions of SFC and the Defendants set forth above, which created the false impression that SFC's student loan program was operating at the low default levels originally represented.

53.    Royal also relied on the fraudulent and misleading Private Placement Memorandums ("PPMs"), drafted by SFC and Pepper, who knew about the ghost payments. Despite the knowledge of SFC and Pepper, none of the PPMs, either in draft or final form, disclosed SFC's practice of making ghost payments.

54.    Royal relied on the fraudulent and misleading reports issued by the Accountants that certified SFC's financial statements. Specifically, Royal relied on McGladrey's 2001 Independent Accountant's Report, in which McGladrey intentionally did not disclose SFC's ghost payments and their distorting effect on the SFC loans' default rate. Royal also relied on

- 16 -

Freed's 2000 Independent Auditors' Report, upon information and belief issued under Aquino's supervision, which certified SFC's 1998 and 1999 financial statements even though the ghost payments are not disclosed or discussed in SFC's 1998 or 1999 financial statements or the notes thereto. Likewise, Royal relied on McGladrey's 2001 Independent Auditor's Report, issued under Aquino's supervision, which certified SFC's 2000 financial statements even though the ghost payments are not disclosed in SFC's 2000 financial statements or the notes thereto. McGladrey helped craft the notes to the 2000 financial statements, which cryptically and misleadingly mentioned the existence of "forbearance" payments, without acknowledging the true impact of such payments on the default rate, both past and anticipated, of the SFC loan pools.

**SFC And The Defendants**
**Continued To Conceal The Truth About The SFC Student Loans**

55.    On March 23, 2000, Yao and his officers specifically discussed the possibility of disclosing the existence of the ghost payments to Royal and other parties, and the possibility of amending the servicer reports to disclose the existence of the ghost payments. Yao decided that SFC would continue to conceal the payments, their effect on the default rates, and the true default rates of the loans. Royal issued ten more credit risk insurance policies to the SFC insureds after this decision was made.

56.    In October 2000, Yao prepared an internal Cash Flow Projection for 2001, which contained a line providing for $19 million in "Royal Forebearance" (sic) payments for the year. Not long after Yao prepared the Cash Flow Projection for 2001, Royal requested a copy of SFC's Cash Flow Projections for 2001. Yao did not send the existing cash flow statement to Royal; instead, SFC provided Royal with another document which omitted any references to the "forbearance payments," thereby continuing to conceal the payments and their enormity from

Royal. Royal issued seven more credit risk insurance policies to the SFC insureds after Yao provided this document to Royal.

57.     As early as November 2000 and as late as 2001, Royal again asked SFC to review and affirm the accuracy of the 25% maximum default rates SFC and Yao had originally represented, on or about November or December 1998, for the SFC student loan program. In response, an SFC officer provided its financial modeling to Royal, which reaffirmed the earlier representations by using the same 25% maximum default rates, even though the default rates at the time were substantially higher.

58.     In early 2001, Royal became concerned about the growing number of loans that were being reported as delinquent. Royal asked SFC and Yao to provide an explanation for the increasing percentage of delinquencies. In truth, the reports provided to Royal showed a high percentage of delinquencies because, unbeknownst to Royal, they included not only loans that were actually delinquent but also the enormous number of non-performing loans upon which SFC was making ghost payments. Thus, the delinquency reports were including not only all delinquent loans, but also the loans that would have defaulted but for the ghost payments. Rather than admitting the truth, an SFC officer told Royal on or about May 11, 2001, upon information and belief with Gagné present, that the high number of delinquencies was caused by students making advance payments on their loans prior to graduation. These students purportedly would then forget to begin making monthly payments after graduation and would always remain thirty to sixty days delinquent once they resumed making payments. This response was false and Yao and Gagné knew it was false.

59.     On July 26, 2000, Freed issued its 2000 Independent Auditor's Report certifying SFC's financial statements. On February 21, 2001, McGladrey issued its 2001 Independent Accountant's Report evaluating the servicer reports, and on April 6, 2001, McGladrey issued its

- 18 -

2001 Independent Auditor's Report certifying SFC's financial statements. Consistent with the

Defendants' scheme, none of Freed's or McGladrey's reports from 2000 or 2001 disclosed the

impact of SFC's ghost payments on default rates or in any way indicated that the true default

rates of SFC loans were other than as represented to Royal.

      60.     On or about October 22, 2001, SFC's collection manager prepared a

memorandum for SFC's Credit Committee that raised serious questions regarding the integrity of

SFC's student loan application process and demonstrated that some of the truck driving schools

were inventing large numbers of loan applications. This memorandum also detailed suspected

fraud on the part of the truck driving schools, including,

     a.     promising students that their employer would repay the loan, or
that they would not be required to repay the loan if they failed to
find employment;

     b.     issuing loans to students with criminal records and physical or
mental handicaps;

     c.     submitting loan applications with signatures of school employees
and false co-signors;

     d.     issuing loans to students who were not creditworthy or
employable;

     e.     failing to maintain adequate graduation and placement rates; and

     f.     charging tuitions exceeding what any student, even if successfully
placed, could be expected to repay on a truck driver's salary.

      61.     Neither this memorandum nor its contents were disclosed to Royal.

      62.     SFC and Yao conspired with the trucking schools to generate as many student

loans as possible for the schools, without regard for whether the students would have the ability

to repay their loans. The schools paid the students' first one, two or three payments on the loans.

Under the agreements between SFC and the schools, if the first two payments were made and the

student graduated, the school received the full disbursement that SFC determined the school was

entitled to for that student. These disbursements were made on a non-recourse basis without regard to whether the students were capable of gaining a job as commercial truck drivers or of keeping a job for more than a few weeks. Pepper was aware since at least 1999 that schools were making these payments to SFC.

63.    Once the school had made the first one, two or three payments for the student, SFC would then market the loans as "seasoned" loans -- that is, loans that were proven to be performing when in fact the borrower had not made a single payment, was not credit worthy, and was often unable to gain meaningful employment that would enable him to repay the loans. No part of the scheme between SFC, Yao and the trucking schools was disclosed to Royal.

64.    SFC, at Yao's direction, provided reports to Royal which appeared to show all payments as coming from the students with the intent that Royal would rely upon them in determining whether to continue to issue credit risk insurance covering the student loans.

65.    Upon information and belief, Kirk Monteverde (then a Managing Director with SFC) expressed concern with SFC's practice of making secret ghost payments and his belief that SFC had misrepresented its financial position. Mr. Monteverde quit after two weeks on the job but was paid $150,000 after signing a confidentiality agreement in which he agreed not to discuss his work or his concerns with third parties.

66.    Upon information and belief, on or around March 5, 2002, Yao admitted to SWH Funding Corp., a third party lender, that he had concealed the ghost payments and the true default rates from Royal, that Royal was, and had been, entitled to that information, and that Yao and SFC were obligated to provide that information to Royal.

67.    While the SFC student loan warehouse and securitization transactions were taking place, Yao was taking unusually large amounts of money out of SFC in the form of distributions of equity. Between June 2001 and February 2002 alone, Yao took $9.25 million in

distributions of equity from Student Finance Corporation and an additional $7.13 million in distributions from other SFC affiliates. From January 1995 through April 2002, Yao took approximately $45 million out of SFC.

## The Fraud Is Revealed

68.     On or about March 20, 2002, Yao admitted to Royal for the very first time that SFC had been making the "forbearance" payments to prevent student loans from being reported as defaults and that a large number of student loans would default immediately if SFC stopped making those payments.

69.     Royal was shocked by these revelations. Until this disclosure, Royal had always believed that the loans were experiencing relatively low default rates in line with SFC's initial representations and consistent with the representations made in the documents drafted, vetted and endorsed by the Defendants. This belief was based on SFC's original representations to that effect, and on the Defendants' re-affirmations of those representations, including in the monthly servicer reports vetted by McGladrey, which indicated that default rates were well below 25%.

70.     On or about April 10, 2002, an SFC officer sent Royal an email in which SFC admitted that it had made a total of more than $50 million in ghost payments between January 2001 and March 2002 on student loans covered by SFC Policies.

71.     In or about the fall of 2004, Royal discovered for the first time the Defendants' knowing participation in the SFC fraud and their acts of negligence. Among other things, prior to then, Royal did not know that the Lawyers were aware since 1998 of the trucking school's "seasoning" payments or the ghost payments; that the Accountants were aware since 1998 that SFC was making ghost payments and of the distorting effect those payments had on the loan pools; and did not know that its damages, in whole or any part, by Defendants' conduct. Nor could Royal have reasonably have discovered or known of any of the foregoing prior thereto.

- 21 -

## Pepper Hamilton's Knowledge Of And Participation In The SFC Fraud

### A.     Pepper's and Gagné's Role At SFC

72.     Gagné had represented Yao for approximately 11 years before he and Pepper began representing SFC. Over the roughly six years that Pepper and Gagné represented SFC, SFC paid Pepper approximately $3.2 million in fees. In exchange, Pepper functioned as SFC's general counsel. Pepper provided general corporate legal assistance and provided the legal support and necessary documentation for SFC's securitized loan transactions, which Royal insured.

73.     In addition to Pepper's long-term legal representation of SFC, Gagné facilitated numerous and repeated loans at above market interest rates between his family members and trusts (of which Gagné was trustee) and SFC. In total, Gagné's family members and trusts loaned and were repaid approximately $37 million by SFC.

### B.     Pepper/Gagné Knew Of SFC's Ghost Payments

74.     Pepper and Gagné were aware of SFC's practice of making payments to disguise student loan default rates from at least 1999. Pepper and Gagné hid this information from Royal and issued knowingly false and misleading Private Placement Memoranda ("PPM") that, among other things, ensured Royal continued issuing the SFC Policies.

75.     In 1999, Pepper represented SFC in *Nielsen Electronics Institute v. Student Finance Corp.*, Case No. 99285, D. Del. (filed May 6, 1999), litigation between SFC and a trade school, Nielsen Electronics ("Nielsen") that used SFC's loans. During that litigation, Pepper consulted with SFC about SFC's practice of making ghost payments.

76.     On November 11, 1999, Pepper also defended a deposition in the *Nielsen* action where a SFC employee described in detail SFC's practice of making payments to investors when students defaulted, "to buffer against defaults." The witness described in detail how these

- 22 -

payments would be "invisible" to the investors, that is, the investor had no way of knowing whether the payment actually originated from a student or SFC. Pepper, which was SFC's counsel in the *Nielsen* litigation, thus knew at least as early as 1999 that it was SFC's practice to make ghost payments.

77.     SFC also produced documents in the *Nielsen* action that revealed SFC's historical default rate greatly exceeded the 25% represented to Royal. SFC produced reports dated November 1999 which analyzed its portfolios for loans issued during 1994 through 1998. The reports revealed that a shocking total of 58.77% of its 1994 loans would have been considered to be in default, as that term was defined in SFC's own policies. Additionally, 70.25% of the 1995 loans, 68.82% of the 1996 loans, 52.84% of the 1997 loans, and 44.53% of the 1998 loans would have been considered to be in default. As SFC's counsel in the *Nielsen* action and in SFC's dealings with Royal, Pepper was aware of the material misrepresentations made to Royal by SFC about the historical default rates of SFC loans.

78.     Also at issue in the *Nielsen* litigation was Nielsen's practice of making "seasoning" payments to SFC -- that is, Nielsen would pay a borrower's first 3 loan payments to SFC. This allowed SFC to show the loan as "performing," even though the borrower had yet to make a payment. Pepper, through the *Nielsen* litigation, was aware of the "seasoning" payments as early as 1999. Royal was not told of this practice by anyone until 2002.

79.     In March 2000, Pepper and SFC discussed ways in which SFC's ghost payments "manipulated" the performance of the SFC loan pools. The following email, dated March 2, 2000 from Gagné to Yao, was sent before Royal began issuing policies in connection with SFC's securitizations:

> As you can tell, I think the use of the School Reserves to make monthly payments on the Student Loans will take a considerable amount of thought and work to wind through the bankruptcy issues, the consumer finance laws, the School

Agreements, the Royal Policy and the Term Securitizations. The confluence of parties and disciplines and the need to track the payments from another source may make the problem not feasible but we will take a crack at it.

In addition, we will have to see how the Capital Markets will react. I alluded to the fact that the market already is leery of how complicated the deals are for there size. Adding this factor will considerably compound the complexity. I know you said that they should not rely on it. **However, if they should not then it looks like SFC is manipulating the pool performance.** It seems to have some arbitrary elements. In short, this is something that we will need to bring on after discussing it with several parties, including Rusty Sailor (sic) and John.

**The final element is the Royal who will be directly affected and is if the plan is being used now.** The discussion with the Royal will be difficult. They are a little skittish right now because you are having difficulty going to market and laying a major restructuring on them may be untimely. In addition, if the payments have been made in this pool it would impact them and they will be concerned that it affects the experience account. I will also have to look at the Bankruptcy implications before the 3/22 meeting, which I have been asked to attend by the Royal, if it is okay with you.

To implement the new program is not impossible, but it will not be easy.

(Emphasis added.)

80.    This correspondence shows that Pepper and Gagné knew about the deceptive nature of SFC's ghost payments, and the domino effect such payments have on the participants in the SFC program, including, especially, Royal. The email reflects that Pepper and SFC were working together on the issue of the ghost payments. The email anticipates the disclosures SFC, upon information and belief, made to the trucking schools about the ghost payments. It also shows Gagné attended meetings with Royal, yet never disclosed the ghost payments to Royal.

### C.    Pepper/Gagné Drafted And Issued Knowingly False And Misleading PPMs

81.    To better attract investors -- thereby generating fees for Pepper -- Pepper and Gagné, with the participation of SFC and others, prepared Private Placement Memoranda ("PPMs"), and distributed them to potential investors and to Royal. The PPMs were issued in

- 24 -

order for SFC to make required disclosures to potential investors. The PPMs purported to describe the material characteristics of SFC's securitized loan pools.

82.    A total of eight PPMs were issued. The first PPM was finalized on April 11, 2000, approximately a month after Gagné discussed with Yao that SFC's ghost payments "look[ed] like . . . SFC [was] manipulating the pool performance." Despite Pepper's knowledge of SFC's fraudulent loan payment practices, the PPMs did not mention SFC's practice of making ghost payments, the impact of such payments on the actual default rate in the loan pools, or the actual default rate of the loan pools. The PPMs also did not disclose the schools' "seasoning payments" of which Pepper was aware.

83.    In addition to omitting material information about the actual performance of the loan pools (information of which Pepper and Gagné were aware), the PPMs included the following misleading, false and/or inaccurate statements:

- The PPMs acknowledged the material importance of historic default rates in a section titled "Certain Yield And Prepayment Considerations," which discussed the impact of prepayments, delinquencies and defaults would have on a pool, but did not provide true and accurate historical default information on loan pools.

- The PPMs stated that loan pool performance was "impossible to predict" and that "no estimate can be given." Both statements were false, as Pepper, Gagné and SFC knew. Gagné, Pepper and SFC knew that the anticipated default rate represented to Royal -- approximately 20% -- was significantly lower than the actual historical default rate of the previous loan pools.

- The PPMs intentionally and selectively discussed actual forbearance -- that is, the practice of allowing the borrower a period of time to suspend making loan payments -- but intentionally omitted SFC's practice of making the ghost payments, that is, payments made by SFC to artificially prevent loan defaults.

84.    In conjunction with its decision to issue additional SFC Policies, Royal was sent draft and final versions of the PPMs by Pepper. Pepper, Gagné and SFC knew that Royal reviewed the PPMs and intended that Royal rely on their content. Pepper, Gagné and SFC also knew that Royal was not aware of SFC's ghost payments, that Royal could not learn of the ghost

- 25 -

payments from the PPMs, and that the PPMs would not disabuse Royal of its belief that the loan payments were made by students.

**D.    Gagné's Further Incentive To Defraud Royal:  His Family Provided A Total Of $37 Million In Loans And Investments To SFC**

85.    Legal fees were not the only incentive Pepper and Gagné had to further SFC's fraud.  From 1996 until 2002, Gagné's family made various loans at above-market interest rates to SFC totalling approximately $37 million dollars, and Gagné arranged to get these amounts paid ahead of other creditors as SFC was collapsing.

86.    Pepper, which represented SFC in these transactions, drafted the transactional documentation for the loans and was paid for its work.  Upon information and belief, the Accountants knew about at least some of these transactions and advised both Gagné, his family, and SFC how to structure the transactions.  On or about February 3, 2000, for example, upon advice from Aquino, Gagné's uncle Robert Bast ("Bast"), a lawyer himself, restructured a proposed purchase of $6 million in SFC subordinated loan debentures to a purchase of $6 million of SFC common stock.  Bast privately noted to Gagné that Yao was guaranteeing the purchases and instructed Gagné to document the deal.

87.    The Gagné family loans to SFC in certain instances included "payoff premiums." In total, the Gagné family earned approximately $6 million dollars in interest and fees on their loans to SFC.

88.    Given Gagné's, Pepper's, and the Accountants' awareness of the ghost payments and SFC's precarious financial position, upon information and belief Gagné, Pepper, and the Accountants knew, or should have known, that the funds loaned to SFC by Gagné's family and trusts were being used to make ghost payments in furtherance of SFC's fraud upon Royal.

- 26 -

**E.    Pepper's Ostensible Withdrawal From The SFC Representation:  Gagné Acknowledged Possible Pepper Liability And Harm To Royal**

89.    Pepper did not stop representing SFC until May 2002 even though it knew of SFC's fraud and drafted and participated in issuing a series of materially fraudulent and misleading PPMs.

90.    On April 18, 2002, Gagné wrote a memo to his partners at Pepper addressing the following issues:

- Gagné discussed his concern about SFC's continuing ability to pay Pepper's fees and whether, if Pepper stops representing SFC, Pepper will get paid by SFC.

- Gagné discussed SFC's practice of "using its own funds to make payments on the student loans so that the student loans would not appear to be in default (90 days delinquent)." Gagné stated that "officers of SFC lied to investors and were complicit in misrepresenting this situation to investors, financial insurers and other parties." He also noted that to his knowledge no one at SFC "ever fully disclosed the use of the forbearance accounts" and that officers for SFC lied about the issue in Gagné's presence. While Gagné claimed in the memo to have recently discovered SFC's practice of making ghost payments, his statements are contradicted by correspondence with Yao from years earlier (*see* ¶ 77).

- Gagné was particularly concerned about Royal's reaction:  "*We also know that Royal was not aware of this situation, and now faces significant losses as a result of these loans becoming defaulted . . . .*" He acknowledged that Royal would face hundreds of millions of dollars in losses.

- In considering Pepper's continued representation of SFC, Gagné stated that the ethical considerations of the situation were compounded by his family members' and trusts' loans to SFC.

- Gagné also stated "we need to recognize the possibility that this firm will be sued" and that "it may be appropriate to consider whether one course of action or another might better mitigate this possibility."

Gagné stated at the end of his memo that he believed Pepper should resign its representation of SFC, but sought guidance from his partners.

91.     Approximately a week later, on April 24, 2002 Pepper ostensibly withdrew from representing SFC. The next day, a Gagné email instructed Pepper lawyers to stop working on SFC matters and to "not say anything to anyone on this matter outside of the firm."

**F.     Pepper Worked For Yao And SFC After Pepper's "Withdrawal" As SFC's Counsel.**

92.     Incredibly, even after Gagné wrote his memo recommending withdrawal of the SFC representation and after Pepper stated it had resigned as SFC's counsel, Pepper continued to perform work in order to facilitate the return of funds owed Gagné's family by SFC and Yao for which Pepper billed SFC.

93.     Subsequent to Pepper's withdrawal as SFC's counsel, Yao pledged assets to Gagné's family in fulfillment of obligations owed the family by SFC and ahead of other SFC creditors. Pepper and Gagné billed time to SFC in early May related to these transactions.

94.     In short, even after acknowledging in a memo to his partners that SFC was engaged in fraud, Gagné and Pepper continued to do work for, and bill, SFC, for transactions Gagné and Pepper oversaw in an effort by Gagné to recoup assets for his family and trusts and to the detriment of Royal.

## The Accountants' Knowledge Of And Participation In The SFC Fraud

**A.     The Accountants' Affiliation With SFC As SFC's Outside Accountants And Auditors**

95.     At least as early as 1998, Freed and McGladrey partner Aquino was first retained by SFC to perform accounting and audit services for SFC. Aquino was SFC's accountant and outside auditor continuously from 1998 through at least 2002. During that period Aquino changed employers several times. From 1998 until, upon information and belief, 1999, Aquino worked for BDO Seidman. Upon information and belief, from 1999 through 2000, Aquino worked for Freed, which, on or about November, 2000, merged with McGladrey. Upon

information and belief, in September, 2001, when McGladrey and Freed ended their merger, Aquino moved from Freed to McGladrey. Upon information and belief, McGladrey succeeded to the SFC representation when Freed and McGladrey merged in November, 2000.

96.    Freed issued at least one materially false and misleading report in support of SFC's fraud, as described more fully below. McGladrey was paid over $1 million in fees by SFC and issued two sets of materially false and misleading reports in support of SFC's fraud, as described more fully below. Both Freed's and McGladrey's reports legitimized SFC's finances and financial practices through material misrepresentations and omissions that hid from Royal the one statistic the Accountants knew Royal cared about most:  the level of actual student loan defaults.

### B.    The Accountants Knew Of SFC's Ghost Payments

97.    In 1998, as part of his SFC engagement while at BDO Seidman, Aquino, and associate Jeff Westad, reviewed student loan files and loan servicer reports that SFC provided to investors and creditors in connection with the securitizations and transactions relating to the maintenance of SFC's business.

98.    In particular, in 1998, Aquino and Westad reviewed SFC's servicer reports for SFC Grantor Trust Series 1996-1, reports that were similar to those sent to Royal starting in 1999. On May 22, 1998, Westad, then working under Aquino's supervision, faxed to SFC a draft audit report:

> The Servicer [SFC] has made a payment on behalf of two of the students tested in 1996. The effect of this is that the certificate holders receive a better yield than they would have, had the loan defaulted and the claim been filed. Also the insurance company does not have to pay on a claim at that time. Another effect of the practice is that it distorts the delinquency and default ratios of the pool.

99.    Tellingly, in 1998, the payments SFC made on behalf of students to prevent the underlying loan from defaulting are not described as "forbearance payments". They are

- 29 -

described as exactly what they are: SFC's payments on behalf of students. This 1998

communication shows that the Aquino team was aware of: (1) SFC's central fraudulent act --

paying defaulted loans on behalf of borrowers; (2) that SFC's payments on behalf of defaulted

borrowers "distorted" SFC's financial report; and (3) that entities extending credit to SFC would

be concerned about the practice.

100.    The May 22, 1998 draft triggered an internal SFC memo dated June 2, 1998,

expressing concern about the auditor's discovery:

> From all indications, the foundation of the auditor's opinion is that SFC (Servicer)
> is making payments on behalf of the borrowers using the Servicer's own funds
> and is relieving the borrower of having to make [these] payments. This tends to
> imply that the Servicer is implementing a new process after the fact specifically
> for the purpose [of] curing delinquencies and avoiding insurance claims. . . . This
> being said, compliance with the requirements should not be construed to distort,
> as if something is being done that shouldn't, but rather as an integral function in
> deriving the actual performance ratios.

101.    The June 2, 1998 memo is evidence of the role the McGladrey accountants

played in actually drafting SFC's financial statements.

102.    On June 17, 1998, Westad faxed another draft of the report containing

substantially the same statement as that described in paragraph 96. On July 24, 1998, following

requests for revisions from SFC, the Aquino team sent a third draft of the report to SFC. The

revised draft attempted to justify the payments for students, but still retained the plain language

regarding the distorting effect such payments had on default rates:

> Another effect of this practice is that it distorts the delinquency and default ratios
> of the pool. However, the distortion is comparable to the payments being made
> by any other co-maker of the loans.

103.    The July 24, 1998 draft also discloses that the Accountants were aware that (1)

loans were being paid by SFC using "liquidity reserves", but wrongly not reported as delinquent,

(2) loans were past due and not funded from any reserve, but were not being classified as delinquent, and (3) claims were not being filed on defaulted loans.

## C.    Freed's Materially False And Misleading 2000 "Independent Auditor's Report"

104.    On July 26, 2000, Freed issued its 2000 Independent Auditor's Report that provided Freed's opinion of SFC's 1998 and 1999 financial statements ("2000 Audit Report"). Upon information and belief, the audit of SFC underlying the 2000 Audit Report and the preparation of the 2000 Audit Report, were conducted and supervised by Aquino. Due to Royal's role in the SFC program, Freed and Aquino knew Royal was an intended recipient of the 2000 Auditor's Report. Between Royal's receipt of the 2000 Audit Report on or about July 26, 2000, and its receipt of McGladrey's 2001 Audit Report, on or about April 6, 2001, Royal issued approximately $132 million dollars worth of SFC Policies.

105.    While Aquino was aware of SFC's ghost payments at the time the 2000 Audit Report was issued, the 2000 Audit Report and the Financial Statements and Notes thereto neither disclose SFC's practice of making such payments nor account for the practice.

106.    Freed, which represented in the 2000 Audit Report that it had complied with Generally Accepted Accounting Principles ("GAAS"), stated:

> In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Student Finance Corporation and subsidiaries as of December 31, 1999 and 1998, and the consolidated results of their operations and their cash flows for the years then ended in conformity with generally accepted accounting principles.

107.    This statement was false and Freed and Aquino knew it was false when Freed issued the 2000 Audit Report. The SFC financial statements, as the Aquino team recognized three years earlier in 1998, included distorted delinquency and default rates by not accounting for or disclosing the payments SFC was making to cover borrower defaults.

- 31 -

108.    Royal received the 2000 Audit Report, and Freed and Aquino intended that Royal rely on it.  The Report corroborated the misrepresentations that had been made to Royal and did not correct those misrepresentations.

**D.    McGladrey's 2001 "Independent Auditor's Report":  McGladrey's Materially False And Misleading "Opinion" Certifying SFC's Fraudulent Financial Statement**

109.    On April 6, 2001, McGladrey issued the Independent Auditor's Report On Consolidated Financial Statements as of and for the year ended December 31, 2000 ("2001 Audit Report"), which provided McGladrey's opinion of SFC's 2000 financial statements.  Due to Royal's role in the SFC program, McGladrey knew Royal was an intended recipient of the 2001 Audit Report.  The Report corroborated the misrepresentations that had been made to Royal and did not correct those misrepresentations.  Subsequent to Royal's receipt of the 2001 Audit Report, Royal issued over $400 million dollars worth of SFC Policies.

110.    McGladrey, which represented in the 2001 Audit Report that it had complied with GAAS, stated:

> In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Student Finance Corporation and subsidiaries as of December 31, 2000, and the consolidated results of their operations and their cash flows for the year ended in conformity with generally accepted accounting principles.

111.    This statement is false and McGladrey knew it was false when McGladrey issued the 2001 Audit Report.  The SFC financial statements, as the Aquino team recognized three years earlier in 1998, included distorted delinquency and default rates by not accounting for or disclosing the payments SFC was making to cover borrower defaults.

- 32 -

**"Allowance For Credit Losses" Failed To Reflect Practice Of Making Ghost Payments**

112.    SFC purported to be in the business of lending money to vocational students. The default rate of the loans SFC securitized and sold was highly material to Royal, as McGladrey understood. The default rate, more than any other piece of financial information, reflected the quality and health of the loan pools SFC sought to sell. In the 2001 Audit Report, SFC's representation of its default rate was reflected in its "Allowance For Credit Losses." For McGladrey, this should have been a "Critical Audit Area."

113.    Section 2 of the Notes to Consolidated Financial Statements in the 2001 Audit Report ("Notes") relates to "Receivables and Allowance for Credit Losses," which were loans that SFC had available for sale. For the year 2000, the Notes disclose that there were $60.471 million in "loans receivable available for sale" and that there was a 10% -- $6.047 million -- "allowance for credit losses." McGladrey audited the figure in the Notes, describing the allowance as "based upon . . . [the] historical credit loss experience" of SFC. Properly reported, the allowance for credit losses would tell a potential creditor or investor the amount of funds that SFC is setting aside to cover future loan defaults based on the past performance of its loan pools. McGladrey knew that the 10% figure SFC listed in the Audit Report as allowance for credit losses for 2000 -- $6,047,000 -- was material, grossly understated, and false. McGladrey knew that the $6,047,000 did not reflect proper anticipated credit losses of SFC loans, but rather anticipated credit losses after accounting for SFC's massive ghost payments.

114.    McGladrey did not disclose, and certified SFC's nondisclosure, that the 10% figure for loan defaults -- "credit losses" -- in the 2001 Audit Report was based on SFC's ghost payments. Neither in the "Receivables" section of the Notes nor in the definition of "Credit Losses" is there any reference to SFC's having made "forbearance payments" or any other type

- 33 -

of payment on behalf of borrowers that would, as the McGladrey accountants had stated three years before and knew at the time of the 2001 Audit Report, "distort[] the delinquency and default ratios of the [loan pool]."

115.    The 10% "allowance for credit losses" figure is also flawed because it represents an approximate 9% reduction in "allowance for credit losses" from the 1999 figure at a time when McGladrey knew defaults on loans SFC had sold, and SFC's ghost payments on those loans, were skyrocketing. McGladrey certified SFC's reduction in "allowance for credit losses" for 2000, despite knowing that defaults impacting a critical audit area were exploding, and despite knowing that SFC was covering up those defaults.

### The Notes Adopted And Used The Deceptive Term "Forbearance"

116.    McGladrey endorsed the misleading and oblique references to "forbearance" contained in the "Securitization and Retained Beneficial Interest" section of the Notes. These references were intended to, and did, cover up SFC's fraudulent scheme. They did not disclose SFC's practice of making ghost payments.

117.    The "Securitization" section of the Notes addressed older loan pools that SFC had already sold but in which SFC still maintained a limited financial interest. As McGladrey knew, SFC made ghost payments on non-performing loans to mask true default rates. McGladrey's 2001 Audit Report corroborated misrepresentations made to Royal and did not alert Royal to the falsity of those misrepresentations.

118.    Like "ghost payments," SFC used the term "forbearance payments" to describe payments it made on behalf of borrowers to prevent loans from defaulting. The term "forbearance payments" only had meaning to SFC's insiders, like the Defendants. "Forbearance payments" does not accurately describe the payments. Forbearance in the student loan context typically means a temporary cessation of payments *by the borrower*, or an extension of time

provided *to the borrower* for making payments. SFC's ghost payments were not "forbearance" of any kind. Rather, they were loan payments made by SFC -- instead of the borrower -- to hide the actual default rate on SFC's loans.

119.    McGladrey certified and adopted SFC's intentionally deceptive and misleading term -- "forbearance" and, in one instance, "forbearance payments" -- in the Notes and then intentionally did not require an explanation in the Notes, though other, far less significant terms receive full explanations.

120.    "Forbearance" and "forbearance payments" are used in three places in the Notes in relation to sold loans. The 2001 Audit Report Notes mentioned "forbearance" after a table presenting "quantitative information about delinquencies, net credit losses and components of securitized financial assets," stating: "The above information reflects reserve forbearance." In the context of a section discussing loans 60 or more days past due and also discussing net credit losses, calling SFC's ghost payments to cover up loan defaults "forbearance" is intentionally misleading and does not disclose the truth -- that the principal balance of loans past due and the credit losses for the pools were all false because the true amounts of loans past due and percentage of credit losses were all "distorted" by the ghost payments.

121.    The Notes do not provide any clarification of "school reserve forbearance" in the "Summary of Significant Accounting Policies" section on "School Reserves." In the notes on "School Reserves" SFC states:

> The school reserve may include additional amounts designated to absorb forbearance made in accordance with school and borrower agreements and potential credit losses for sold loans based upon the deemed credit quality of the borrower.

The "school reserves" were loan funds to be paid to schools upon the satisfaction of certain criteria. They did not relate to funds to be paid to investors upon loan defaults.

- 35 -

Both the use of the term "forbearance" and its placement in the "School Reserves"
section of the Notes are intentionally misleading.

122.    Finally, the Notes state, in the "School Reserves" summary of activity, that
approximately $9.5 million in "forbearance payments" were made in 2000.  "Forbearance
payments" are a separate line item from "allowance for credit losses."  This created the
impression that they represented two different things when in fact they were the same thing:
money set aside (credit losses) or paid (forbearance) to address student loan defaults.  Thus, the
true amount of funds SFC allotted toward addressing student loan defaults in sold pools in 2000
was nearly $15 million, not the $9 million in "forbearance" or the $5 million in "allowance for
credit losses."

**E.    McGladrey's Discussion With SFC On "Forbearance" Terminology In The 2001 Audit Report**

123.    The use of the term "forbearance" in the 2001 Audit Report was carefully
calculated and thoroughly discussed by SFC and McGladrey.  McGladrey and SFC knew that the
ghost payments were material, yet only included the deceptive and misleading term
"forbearance" in the 2001 Audit Report.  McGladrey actively participated in formulating the
language of the 2001 Audit Report Notes.

124.    Upon information and belief, in a May 2, 2000 meeting, Yao and Aquino
discussed the ghost payments.  The following year, on March 27, 2001, on the eve of McGladrey
issuing the Audit Report, Diane Messick, SFC's controller and assistant treasurer, conveyed
Aquino's request that there be something in writing indicating that Royal "under[stood] [SFC's]
forbearance policy."  At the time Royal knew nothing about SFC's practice of making ghost
payments.

- 36 -

125.    On March 28, 2001, in an email to Gary Hawthorne, SFC's then President and Chief Operating Officer, Diane Messick again conveyed Aquino's interest in "forbearance":

> Mike Aquino has requested a meeting with you to discuss forbearance in further detail. He would like a management letter explaining how the process is being managed, in light of the increase in forbearance applied from 1999 to 2000.

126.    Aquino's reference is apparently to page 22 of the financial statements, reflecting an over $7 million increase in "forbearance payments" from 1999 to 2000. From 1999 to 2000, "forbearance payments" more than quadrupled -- from $2 million to over $9 million -- and yet neither McGladrey nor Aquino insisted on a disclosure in the financial statements explaining that "forbearance payments" actually were payments made by SFC to prevent loans from defaulting, with a consequent distortion of SFC's actual default rates.

127.    McGladrey knew and understood that the term "forbearance" was both material and misleading. Yet, in violation of GAAS standards, McGladrey allowed "forbearance" to be used in the financial statements, and then provided a false opinion in the Audit Report that the financial statements "fairly" presented SFC's financial picture in "all material respects" when McGladrey knew and believed the contrary: that the use of "forbearance payments" "distorts the delinquency and default ratios of the [loan pool]".

F.    **McGladrey's Knowingly False 2001 Accountant's Report**

128.    SFC issued Monthly Servicer Reports ("MSRs") that were supposed to reflect the current financial state, including the default rate, of the loans SFC was servicing. On February 21, 2001, McGladrey issued its Independent Accountant's Reports on Agreed-Upon Procedures ("2001 Accountant's Report") verifying the MSRs. McGladrey issued the Report allegedly pursuant to AICPA standards. Under AICPA standards, McGladrey had disclosure obligations regarding "knowledge of matters outside agreed-upon procedures." McGladrey

- 37 -

knew that it did not comply with its AICPA disclosure obligations. McGladrey's statement that the 2001 Accountant's Report complied with AICPA standards was knowingly false.

129.     From at least 1998, Aquino knew that the ghost payments had the effect of distorting the default rate in the loan pools. The MSRs, as McGladrey knew, did not disclose the true default rate of the loan pools. Regardless of McGladrey's use of agreed-upon procedures, McGladrey had knowledge of material information that contradicted the basis for the accounting in the MSRs. Under the AICPA standards that McGladrey was purporting to issue its Accountant's Report, McGladrey had a duty to disclose its knowledge of the distorting effect of the ghost payments. McGladrey did not do so. Instead, as it did every other time it had the opportunity, McGladrey decided not to disclose SFC's ghost payments and certified SFC's misleading financial reporting. McGladrey knew reports were going to Royal, and knew Royal would rely on those reports, and Royal did rely on the reports to its detriment in continuing to issue the SFC Policies.

## G.     McGladrey's Failure To Address SFC's Inability To Continue As A Going Concern

130.     McGladrey issued its Audit Report in April, 2001. By May, 2001 -- one month later -- SFC's liabilities exceeded its assets, *i.e.*, it was insolvent. McGladrey's Audit Report does not disclose, as it should have under the AICPA Professional Standards with which McGladrey claimed to have complied, that SFC was on the brink of insolvency. McGladrey's misleading Audit Report offered SFC's officers and directors the ability to sustain SFC as a going concern for approximately another year while SFC deepened its insolvency and while Royal, lacking McGladrey's knowledge of SFC's true financial state, issued hundreds of millions of dollars of SFC Policies.

- 38 -

## H.    The Accountants Breached Their Duties

131.    The Accountants falsely claimed in the 2000 and 2001 Audit Reports that the audits were conducted "in accordance with generally accepted auditing standards." Likewise, McGladrey falsely claimed that the 2001 Accountant's Report "was performed in accordance with standards established by the American Institute of Certified Public Accountants."

132.    Both generally accepted auditing standards and the standards established by the American Institute of Certified Public Accountants entail a variety of procedures, standards and duties with which the Accountants demonstrably did not comply and which make the Accountants' statements to the contrary false and misleading.

133.    The standards with which the Accountants falsely claimed to have complied included, but are not limited to, the following:

- The Accountants failed to maintain, an "independent" state of mind "in all matters relating to the assignment" and failed to exercise "[d]ue professional care . . . in the performance of the audit and the preparation of the report." The Accoutants also allowed client opinions and representations to substitute for auditing procedures.

- The Accoutants either ignored, or failed to determine, "the nature, timing, and extent of tests to be performed" based on a "sufficient understanding of internal control."

- The Accountants' 2000 and 2001 Audit Reports falsely stated that the financial statements were presented in accordance with generally accepted accounting principles, did not ensure the financial statements contained informative disclosures that were "reasonably adequate" by negative affirmation and did not express the Accountant's true opinion regarding the financial statements.

- The Accoutants did not exercise professional skepticism and willfully ignored their responsibility under GAAS to ensure that SFC's financial statements were free of material misstatement.

- McGladrey failed to disclose in the Accountant's Report matters that came to McGladrey's attention by means other than the agreed upon procedures in the Accountant's Report that contradicted the basis of accounting for the specified elements, accounts, or items in the 2001 Accountant's Report.

- McGladrey failed to evaluate SFC's status as a going concern and to disclose that SFC was on the brink of balance sheet insolvency at the time McGladrey issued its 2001 Audit Report in April, 2001.

134.    In reviewing the Accountant's 2000 and 2001 Audit Reports, and McGladrey's 2001 Accountant's Report, Royal reasonably believed and justifiably relied on the fact that all applicable accounting standards and requirements were followed, as the Accountants stated.  All applicable accounting standards and requirements were not followed and the Accountants knew they were not followed.\

**COUNT I**
**(Civil RICO — Violations of 18 U.S.C. §1962(c) against**
**Rodrick Gagné and Michael Aquino)**

135.    Paragraphs 1 through 134 of this Complaint are incorporated by reference as if set forth fully herein.

**THE RICO "Persons"**

136.    The RICO "Persons" in this case are non-parties Andrew Yao and Gary Hawthorne, and defendants Rodrick Gagné  and Michael Aquino (collectively "the RICO Persons").

137.    From no later than 1998 and continuing through at least the Spring of 2002, the RICO Persons unlawfully, knowingly, and intentionally conspired to conduct, and conducted, the affairs of the RICO Enterprise (as defined below in ¶ 141 *et seq.*) through a pattern of racketeering activity, consisting primarily of numerous and repeated acts of mail and wire fraud.

138.    The goal of the RICO Persons' racketeering conspiracy and activity was to generate, securitize,  and then sell to investors as many student loans as possible, irrespective of whether the loans had been properly underwritten and whether the borrowers were real students, were creditworthy, and were willing and able to repay the loans.  The RICO Persons accomplished their objective by conspiring to convince, and convincing, lenders to lend ever-

increasing amounts of money to Student Finance Corporation to use in funding the loans, convincing investors to purchase the loans and convincing insurers, specifically Royal, to issue insurance policies insuring the student loans to facilitate the securitization and sale of the loans. The RICO Persons obtained these funds and this insurance through the pattern of racketeering activity described below.

139.    RICO Persons Gagné and Aquino, in addition to participating in the Enterprise, conspired with Yao, Hawthorn and Turnbull to defraud, and did defraud, among others, Royal, and realize maximum legal and accounting fees from the Enterprise. Gagné and his family members also realized profits through interest and other fees on loans made to Student Finance Corporation.

140.    The RICO Persons accomplished their fraud through repeated misrepresentations about the nature, quality, and bona fides of the loans, the payments thereon, the borrowers, and the co-signors.

**The Enterprise**

141.    The Enterprise in this case was the association in fact between Student Finance Corporation, SMS, SLS, Pepper, McGladrey and Freed.

142.    The Enterprise was engaged in interstate commerce and its activities affected interstate commerce. For example, to conduct their business, Student Finance Corporation, SLS, and SMS borrowed money from out-of-state banks, lent money to out-of-state trucking schools, obtained insurance from out-of-state insurers, and, generally, conducted business between and among entities located throughout the United States. Student Finance Corporation, SLS and SMS could not have conducted their business without Pepper, McGladrey, and Freed, who are located throughout several states, and the legal and financial advice, guidance and information they each respectively provided and generated. The members of the Enterprise routinely

- 41 -

conducted interstate business with other members of the Enterprise, with business partners and with third parties. They transmitted money over the interstate mails and wires to one another and to third parties. They sent loan applications, contracts and related documents through the interstate mails and wires to one another and to third parties.

143.    The Enterprise was a group of entities associated in fact and by contract and agreement.

144.    Each RICO Person was associated with the RICO Enterprise.

145.    Yao was the owner and controller of Student Finance Corporation, SMS, SLS, and their affiliates at all times pertinent to this case. He was a director and either the President, Treasurer, or CEO of Student Finance Corporation and all of its affiliates. He participated in making all of the decisions for these entities that ultimately gave rise to the claims that are the subject of this complaint.

146.    Hawthorne was the President, Chief Operating Officer, and Secretary of Student Finance Corporation at the time at issue here. He ran the day-to-day operations of Student Finance Corporation and was one of three men who sat on the Company's board of directors. Hawthorne worked for Student Finance Corporation and SLS and served as an officer and/or director of Student Finance Corporation, SLS, and SMS.

147.    Gagné was a partner at Pepper and worked as *de facto* in-house counsel for Student Finance Corporation from 1998 until 2002 and advised Student Finance Corporations on all matters related to marketing and selling the fraudulent loans generated by the Enterprise.

148.    Aquino was a partner with both Freed and McGladrey. Aquino was Student Finance Corporation's outside auditor from 1998 until 2002. He advised Student Finance Corporation on compliance with necessary financial reporting requirements and the methods of disguising the Enterprise's fraudulent activities.

149.    All of the RICO Persons did business with some or all of the individual members of the RICO Enterprise and with the RICO Enterprise as a collective unit.

150.    All of the RICO Persons participated in, conducted the affairs of, directed the activities of, used, and Gagné and Aquino knowingly facilitated, the RICO Enterprise to consummate their massive fraud upon Royal.

151.    The Enterprise possessed a hierarchical or consensual decision-making structure, with representatives of Student Finance Corporation, SLS, and SMS in charge of deciding issues relating to loans, underwriting, insurance and borrowing.  Gagné advised and guided the enterprise on legal issues related to, among other things, securitizing and selling the loans to investors.  Aquino guided the enterprise on the effective representation of Student Finance Corporation's financial status to ensure continued securitizations and sales of loans.

152.    The RICO Enterprise functioned as a continuing unit from at.least 1998 through the Spring of 2002.  There is a threat of continued racketeering activity in the future because all of the RICO Persons continue in the same or similar lines of business today and because both Gagné and Aquino have worked with Yao since at least 1998.

**The Pattern of Racketeering Activity**

153.    To consummate their fraudulent goals, the RICO Persons conspired to conduct, and conducted, the affairs of the Enterprise through a pattern of racketeering activity.  The racketeering activity consisted primarily of repeated acts of mail and wire fraud, 18 U.S.C. §§1341 and 1343.  The acts of mail and wire fraud furthered the fraudulent scheme.

154.    The pattern of racketeering activity included, but was not limited to the following uses of the interstate mails and wires, all of which furthered the fraudulent scheme described above:

- 43 -

<u>Yao and Hawthorne</u>:

155.    Yao, Hawthorne and Turnbull directed, authorized, or made numerous transmissions by interstate wire and mail of numerous letters and faxes to Royal and to SFC's lenders and investors.  Gagné  and Aquino knew of, and facilitated, the fraudulent content of these transmissions.  These transmissions furthered the fraudulent scheme.

156.    By way of example:

a.    While the parties were negotiating the issuance of the first Royal policy, on November 13, 1998, SFC transmitted to Royal via interstate mail a letter with attachments including:  (1) a proposed term sheet, (2) an "historical performance" chart, (3) a "loss reserve" chart, (4) the AIU credit risk insurance policy, and (5) an "information summary" regarding SFC.  The mailing was made through SFC's broker in New Jersey to Royal's offices in North Carolina and at the direction of Yao, Hawthorne, and Turnbull.  The "historical performance" chart showed zero net losses incurred by the previous insurer, low default rates for the insured student loans, and delinquency figures consistently under 20% for the same loans.  These representations were false.  The "information summary" stated that SFC's program offered "100% recovery on defaults" and that the transaction's reserves would "protect[] the insurer" by growing in value to three times the expected defaults.  These representations were also false.

b.    After reviewing the SFC materials, Royal posed a series of written questions to SFC, Yao and their agents concerning the SFC student loan program.  In response, Yao, Hawthorne and Turnbull directed the transmission of an interstate e-mail on November 30, 1998, which represented:  (1) SFC's historic maximum cumulative default rate (before recoveries) on student loans was 25%, (2) in five years of originations, SFC had obtained nearly 100% recovery on loan defaults, across all credit classes, and obtained recoveries immediately, from reserves that it retained from schools, (3) there was considerable loss coverage protection to Royal throughout the life of an SFC loan pool through reserves SFC established, and (4) Royal would have a loss coverage protection to Royal ratio of 3.4 times the defaults.  Yao, Hawthorne and Turnbull knew each of these representations was false when made.  In reality, SFC's historic default rates were much higher than represented, but had been masked by SFC's secret "forbearance payments."  In the loans it had originated, SFC had not obtained 100% recovery on defaults from the school reserve funds.  SFC and Yao knew that Royal would not have a loss coverage protection of 3.4 times the size of the defaults.  SFC and Yao knew there would not be considerable loss coverage protection to Royal throughout the life of the loan pool.  The e-mail was sent from Yao's offices in

Pennsylvania to SFC's broker in New Jersey and then on to Royal in North Carolina.

c.    In November 1998, Yao and Hawthorne (and others) directed the transmission of SFC's supposed underwriting guidelines by interstate mail from Delaware to Royal in North Carolina. SFC represented that the guidelines had been used and would be used for all loans insured by Royal. The guidelines required all schools whose students received SFC loans to, *inter alia*, maintain 67% graduation and job placement rates, have a CPA conduct an annual compliance audit of the school's financial aid policies and procedures, and comply with standards published by the United States Department of Education. In reality, those guidelines were not followed.

d.    In March 2000, Yao and Hawthorne (and others) discussed the possibility of disclosing the existence of the "forbearance payments" to Royal and other parties, and the possibility of amending the servicer reports to disclose the existence of the "forbearance payments." In an e-mail sent by interstate wires on March 23, 2000, Yao directed that SFC not amend the servicer reports to disclose the forbearance payments, thereby continuing to conceal the payments, their effect on the default rates, and the true default rates of the loans. The e-mail was sent between Yao's office in Pennsylvania and SFC's offices in Delaware.

e.    In October 2000, Yao prepared a Cash Flow Projection for 2001, which contained a column providing for $19 million in "Royal Forbearance" (sic) payments for the year. Not long after Yao prepared the Cash Flow Projection for 2001, Royal requested a copy of SFC's Cash Flow Projections for 2001. In an e-mail sent by interstate wires on October 19, 2000, Yao directed that Royal not be provided a copy of this Projection. Instead, Royal was given a copy of a cash flow projection that excised all reference to the "forbearance payments," thereby continuing to conceal the payments and their enormity from Royal. The e-mail was sent between Yao's office in Pennsylvania and SFC's offices in Delaware.

f.    In every month from 1999 through March 2002, Yao and Hawthorne (and others) directed the transmission of a servicer report to Royal via interstate mail and wire from Delaware to North Carolina. Every one of those servicer reports materially understated the default rates of SFC's loan portfolio, failed to disclose the massive forbearance payments being made by SFC, treated the forbearance payments as student payments and treated the CDI/TDI Defendants' initial payments on the student loans as student payments. Aquino reviewed, evaluated and certified these false and misleading servicer reports in the 2001 Accountant's Report.

g.    From 1999 through March 2002, Yao and Hawthorne (and others) directed the payment of tens of millions of dollars of forbearance payments on the student loans. All of those payments were made by

interstate wire to SFC's banks and the lockbox account for the investors in the securitized loans.

157.    All of the above uses of the interstate wires and mails furthered the fraudulent scheme.

158.    Yao and Hawthorne directed, authorized, or made numerous other transmissions by interstate wire and mail, knowingly facilitated by Gagné and Aquino, which furthered the RICO Persons' fraudulent scheme.

<u>Rodrick Gagné and Michael Aquino</u>

159.    Rodrick Gagné and Michael Aquino directed, authorized, or made numerous transmissions by interstate wire and mail of numerous letters and faxes to Royal and to SFC's lenders and investors.  These transmissions furthered the fraudulent scheme.

160.    By way of example:

    a.    On at least six occasions, on or about April 19, 2000, August 16, 2000, October 4, 2000, December 18, 2000, April 23, 2001, and August 17, 2001, Gagné either sent, or caused to be sent, from Philadelphia, Pennsylvania, materially false and misleading PPMs via email to, among others, Royal, headquartered in Charlotte, North Carolina.  The PPMs both concealed the fraudulent scheme and, through concealing the truth of the fraudulent scheme, facilitated the scheme.

    b.    On at least three occasions, on or about July 26, 2000, February 21, 2001, and April 6, 2001, Aquino either sent, or caused to be sent, via the United States Mail, the fraudulent and misleading 2000 and 2001 Audit Report's and the 2001 Accountant's Report, from Pennsylvania to Delaware.  Yao then sent, or caused to be sent, the same three Reports via the United States mails and or by facsimile by from Delaware to, among others, Royal, in North Carolina.  Aquino knew that Yao would send the Reports, or cause the Reports to be sent, to Royal and others.

161.    All of the above uses of the interstate wire and mail furthered the fraudulent scheme.

162.    Each of the RICO Persons committed more than two predicate acts of mail or wire fraud.

- 46 -

163.     The acts of mail and wire fraud were related in that they were designed to, and did, further the plan to defraud Royal. Without the fraudulent mailings and wirings, Royal would not have issued the SFC Policies. The acts of mail and wire fraud also involved the same perpetrators and the same victims.

164.     Royal relied on the fraudulent representations described above. Without the fraudulent representations, Royal would not have insured the student loans.

165.     Royal was a target of the fraudulent scheme. The RICO Persons would not have been able to accomplish their objective of generating, securitizing, and selling to investors as many loans as possible unless the loans were insured. The RICO Persons obtained the necessary insurance from Royal through the predicate acts of racketeering.

166.     Royal has suffered injury that was proximately caused by the RICO Persons' predicate racketeering acts. Without the acts of mail and wire fraud, Royal never would have insured student loans that are now defaulting at a rate much higher than 80% and that it has been ordered to pay claims on.

WHEREFORE, Rodrick Gagné and Michael Aquino are liable for such compensatory, consequential, treble, and punitive damages, as provided by law, in an amount to be determined at trial, together with interests, costs, attorney's fees and such other legal and equitable relief as the Court deems appropriate.

## COUNT II
**(Conspiracy To Commit Civil RICO -- Violations of 18 U.S.C. § 1962(d)
against Rodrick Gagné and Michael Aquino)**

167.     Paragraphs 1 through 166 of this Complaint are incorporated by reference as if set forth fully herein.

168.     The RICO Persons, described in Count I above, conspired and formed an agreement or plan to violated 18 U.S.C. § 1962(c). Gagné and Aquino knowingly agreed to

facilitate the fraudulent scheme that included the operation and management of the RICO Enterprise described in Count I above.

169.    All of the RICO Persons knowingly adopted the goal of furthering and/or facilitating the RICO Enterprise described in Count I above. From no later than 1998 and continuing through at least the Spring of 2002, the RICO Persons unlawfully, knowingly, and intentionally conspired to conduct the affairs of the RICO Enterprise, described in Count I above, through a pattern of racketeering activity, consisting primarily of numerous and repeated acts of mail and/or wire fraud.

170.    The object of the agreement or plan was to securitize, through the use of insurance, and then sell as a security, as many pools of student loans as possible, without regard to the quality of the loans, the default rate or actual performance of the loans, whether the loans were properly underwritten, whether the loans were real, and whether the information contained in the loan applications and loan documents was true and accurate. The RICO Persons accomplished their objective by intentionally suppressing all evidence of the true default rate and performance of the loans in order to convince lenders to lend ever-increasing amounts of money to SFC to use in funding the loans, convincing insurers, Royal particularly, to issue insurance policies insuring the student loans in the securitized loan pools, and then selling the loan pools to investors. The RICO Persons facilitated the securitization and sale of the loan pools, including obtaining the SFC Policies from Royal, through the pattern of racketeing activity described in Count I above.

171.    All of the RICO Persons shared in the conspiratorial objective to violate the RICO Statute and they all knowingly facilitated that objective.

172.    As a consequence of this conspiracy, Royal was damaged in an amount to be proved at trial.

- 48 -

WHEREFORE, Rodrick Gagné and Michael Aquino are liable for such compensatory, consequential, treble, and punitive damages, as provided by law, in an amount to be determined at trial, together with interests, costs, attorney's fees and such other legal and equitable relief as the Court deems appropriate.

## COUNT III
### (Civil Conspiracy To Commit Fraud - All Defendants)

173.    Paragraphs 1 through 172 of this Complaint are incorporated by reference as if set forth fully herein.

174.    As described above, when applying for insurance from Royal, Yao and SFC made material misrepresentations and omissions to Royal and concealed material facts from Royal. Additionally, in connection with applying for additional insurance in the future, Yao and SFC re-affirmed their previous misrepresentations, and continued to conceal the truth.

175.    As described above, at numerous times in connection with the issuance of additional insurance to SFC, Yao and SFC were given the opportunity to correct their earlier misrepresentations and failed to do so. Instead, Yao and SFC continued to maintain that their initial representations were correct, and continued to go to great lengths to hide the truth of SFC's fraud, in particular the ghost payments and default rates, from Royal.

176.    As described above, Pepper and Gagné (the "Lawyers") had an integral role in advising, guiding and controlling SFC through all aspects of the fraud and were aware of SFC's fraud. In furtherance of the fraud, among other things, the Lawyers provided legal advice and guidance, issued and drafted, among other things, the knowingly false and misleading PPMs and, had such an integral role in the drafting and content of the PPMs that the PPMs were the Lawyers' documents as much as SFC's.

- 49 -

177.    As described above, at numerous times during the course of SFC's fraud, including during the issuance of each PPM and at any and each meeting with Royal, the Lawyers were given the opportunity to correct their earlier misrepresentations and SFC and Yao's misrepresentations, of which the Lawyers were aware, and failed to do so. Instead, the Lawyers, on their own and in agreement with Yao and SFC, continued to maintain that their, Yao's and SFC's initial representations were correct, and continued to go to great lengths to hide the truth of SFC's fraud, including in particular the ghost payments and the default rates, from Royal.

178.    As described above, the Accountants had an integral role in advising, guiding and controlling SFC through all aspects of the fraud and were aware of SFC's fraud. In furtherance of the fraud, among other things, the Accountants provided advice and guidance, issued and drafted, among other things, the knowingly false and misleading 2000 and 2001 Audit Reports and the 2001 Accountant's Report. The Accountants not only made knowingly false statements in those reports in their own right, they had such an integral role in the drafting and content of the SFC Financial Statements that the 2000 and 2001 Financial Statements and Notes thereto were the Accountants' documents as much as SFC's.

179.    As described above, at numerous times during the course of SFC's fraud, including during the issuance of each of their Reports, the Accountants were given the opportunity to correct their earlier misrepresentations and SFC and Yao's misrepresentations, of which the Accountants were aware, and failed to do so. Instead, the Accountants, on their own and in agreement with Yao and SFC, continued to maintain that their, Yao's and SFC's initial representations were correct, and continued to go to great lengths to hide the truth of SFC's fraud, including in particular the ghost payments and the default rates, from Royal.

180.    The Defendants, through their knowing aiding and abetting of SFC's fraud and through their own direct misrepresentations to Royal, formed an agreement or plan with SFC to

fraudulently induce Royal to issue insurance on securitized student loan pools that Royal would not have otherwise insured. As described above, the ultimate objective of the fraud was to generate and then sell to investors as many securitized student loan pools as possible without regard to the quality of the underlying loans, whether the loans were properly underwritten, whether the loans were real, and whether the information contained in the loan applications was true and accurate. A critical element of this plan was for SFC to obtain the SFC Policies from Royal so that the SFC loan pools could be marketed to the investors.

181.    The Defendants all shared the conspiratorial objective to commit an unlawful act, to wit, perpetrating a massive fraud against SFC's insurers and lenders, including Royal.

182.    None of the conspirators participated in the fraudulent scheme by accident, by inadvertence, or by negligence.

183.    As described above, the intended fraud was in fact completed against Royal when Royal, relying on misrepresentations and omissions knowingly made by the Defendants, issued insurance on various securitized student loan pools. For the reasons described above, Royal reasonably and justifiably relied on these fraudulent misrepresentations and omissions.

184.    As a direct, proximate and foreseeable result of the Defendant co-conspirators' actions, Royal has been damaged in an amount to be determined at trial.

WHEREFORE, the Defendants are liable for such compensatory, consequential, and punitive damages as provided by law, in an amount to be determined at trial, together with interests, costs, attorney's fees and such other legal and equitable relief as the Court deems appropriate.

## COUNT IV
**(Fraud, Fraudulent Inducement And Fraudulent Concealment - All Defendants)**

185.    Paragraphs 1 through 184 of this Complaint are incorporated by reference as if set forth fully herein.

186.    As described above, SFC, Yao and the Defendants perpetrated a massive fraud upon Royal, among others. Each of the SFC, Yao and the Defendants made knowingly false and misleading misrepresentations to Royal and knowingly withheld material information that needed to be disclosed to make SFC's, Yao, and the Defendants' representations not misleading.

187.    For all the reasons described above, SFC, Yao and the Defendants knew that their misrepresentations and omissions to Royal were material, and they intended that Royal would rely on those misrepresentations.

188.    Royal did rely on SFC's, Yao's and the Defendants' misrepresentations and omissions when determining whether to issue insurance coverage to SFC. Royal's reliance was reasonable and justifiable.

189.    Had Royal known of SFC's, Yao's and the Defendants' material misrepresentations and omissions, Royal would not have issued the SFC Policies.

190.    As a direct, proximate and foreseeable result of the material misrepresentations and omissions made, directed, or advised by the Defendants, Royal has been damaged in an amount to be determined at trial.

WHEREFORE, the Defendants are liable for such compensatory, consequential, and punitive damages as provided by law, in an amount to be determined at trial, together with interests, costs, attorney's fees and such other legal and equitable relief as the Court deems appropriate.

## COUNT V
### (Aiding and Abetting Fraud - All Defendants)

191.    Paragraphs 1 through 190 of this Complaint are incorporated by reference as if set forth fully herein.

192.    As described above, the assistance offered by the Defendants in perpetuating the fraud on Royal was substantial, necessary and material to SFC's fraudulent scheme. Without the documents generated by the Defendants, and without the veneer of legitimacy offered to SFC's scheme by the PPMs generated by Pepper and the Reports generated by the Accountants, as well as the advice and guidance offered to SFC by the Defendants, SFC would not have succeeded in its fraud.

193.    The Defendants were aware of SFC's fraudulent scheme.

194.    The Defendants knew that part of SFC's fraudulent scheme was to induce Royal to issue insurance to cover warehouse loans and student loan securitizations it would not otherwise insure so that SFC could sell those assets to third parties at a profit.

195.    The Defendants all gave SFC substantial assistance in the furtherance of SFC's fraudulent scheme.

196.    At the time the Defendants gave this assistance to SFC, they knew that Royal would rely on the above-described misrepresentations and omissions, and that their actions or inaction would further SFC's fraud.

197.    Royal relied on the above-described misrepresentations and omissions. For the reasons described above, that reliance was reasonable.

198.    As a direct, proximate and foreseeable result of the Defendants' actions, Royal has been damaged in an amount to be determined at trial.

WHEREFORE, the Defendants are liable for such compensatory, consequential, and punitive damages as provided by law, in an amount to be determined at trial, together with interests, costs, attorney's fees and such other legal and equitable relief as the Court deems appropriate.

### COUNT VI
**(Negligence and Negligent Misrepresentation - All Defendants)**

199.     Paragraphs 1 through 198 of this Complaint are incorporated by reference as if set forth fully herein.

200.     In the course of their furtherance of the SFC fraud, the Defendants made numerous misrepresentations and omissions as more fully set forth above.

201.     These representations and omissions were false. In the exercise of reasonable care, the Defendants should have known that the representations were false and that material omissions were being made.

202.     It was reasonably foreseeable to the Defendants that Royal would receive, rely upon, and act upon the misrepresentations and omissions at issue and, therefore, had a duty to exercise reasonable care to ensure the truthfulness of all representations to Royal and the absence of material omissions.

203.     Royal did, in fact, justifiably rely on the above-described misrepresentations and omissions. Such misrepresentations and omissions were material because, had Royal known the truth about the SFC fraud, Royal would not have issued the SFC Policies. For the reasons described above, Royal's reliance was reasonable.

204.     As a direct, proximate and foreseeable result of the Defendants' negligent misrepresentations and negligence, Royal has been damaged in an amount to be determined at trial.

- 54 -

WHEREFORE, the Defendants are liable for such compensatory, consequential, and punitive damages as provided by law, in an amount to be determined at trial, together with interests, costs, attorney's fees and such other legal and equitable relief as the Court deems appropriate.

## COUNT VII
### (Aiding And Abetting Breach Of Fiduciary Duty - All Defendants)

205.    Paragraphs 1 through 204 of this Complaint are incorporated by reference as if set forth fully herein.

206.    Because SFC began as or became a ponzi-like scheme, it was, by definition, insolvent from inception.  And, under a balance sheet test, SFC was insolvent as of May 2001, but continued in business for another year.  Once SFC was insolvent, its officers and directors had a fiduciary duty to SFC's creditors, including in particular Royal, to, among other things, not deepen the insolvency of the company.

207.    The Defendants knowingly aided and abetted SFC in deepening its insolvency and aided and abetted SFC's officers and directors in breaching their fiduciary duty to Royal.

208.    As a direct, proximate and foreseeable result of the foregoing acts by the Defendants, Royal has been damaged in an amount to be determined at trial.

WHEREFORE, the Defendants are liable for such compensatory, consequential, and punitive damages as provided by law, in an amount to be determined at trial, together with interests, costs, attorney's fees and such other legal and equitable relief as the Court deems appropriate.

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

Lawrence C. Ashby (I.D. #468)
Philip Trainer, Jr. (I.D. #2788)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
Wilmington, Delaware 19899
(302) 654-1888
(302) 654-2067 (Fax)

*Attorneys for Plaintiff Royal Indemnity Company*

Michael H. Barr
Kenneth J. Pfaehler
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, New York 10020-1089
(212) 768-6700
(212) 768-6800 (fax)
        and
John Grossbart
Steven L. Merouse
SONNENSCHEIN NATH & ROSENTHAL LLP
7800 Sears Tower
233 S. Wacker Drive
Chicago, Illinois 60606
(312) 876-8000
(312) 876-7934 (fax)

Dated: August 18, 2006

172259.1

- 56 -