# EXHIBIT C

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | CHAPTER 11 |
| STUDENT FINANCE CORPORATION, | : | CASE NO. 02-11620 (LK) |
| Debtor | : | |
| STUDENT FINANCE CORPORATION, | : | |
| Plaintiff, | : | Adversary Proceeding No. 02-_____ |
| v. | : | COMPLAINT FOR NEGLIGENT MISREPRESENTATION, FRAUD, BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING, UNJUST ENRICHMENT, RESCISSION OF PROMISSORY NOTES AND DECLARATORY JUDGMENT |
| ROYAL INDEMNITY CO., | : | |
| DEFENDANT. | : | |

Plaintiff, Student Finance Corp. ("SFC"), debtor and debtor in possession, by and through its counsel, Fox Rothschild O'Brien & Frankel, LLP (formed in the Commonwealth of Pennsylvania) hereby alleges in support of this Complaint against Defendant, Royal Indemnity Co. ("Royal"), as follows:

I.

**JURISDICTION, VENUE AND NATURE OF PROCEEDING.**

1. The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334, since the causes of action relate to a case under Title 11 of the United States Code.

2. This adversary proceeding is brought under and pursuant to: (a) Rule 7001 of the Federal Rules of Bankruptcy Procedure and § 544(b) and 548(a), of the United States Code, 11 U.S.C. § 101, et. seq. (the "Code"), and (b) other applicable states and local laws.

LN1 111384v2 11/20/02

3. Venue is proper in the District of Delaware under 28 U.S.C. § 1409 (a).

4. This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E) and (O).

## II.

## THE PARTIES.

5. Plaintiff, SFC, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 170 Lukens Drive, New Castle, Delaware, 19720. SFC is in the business of originating or purchasing student tuition loans, primarily from truck driving schools throughout the United States.

6. Defendant, Royal, is a Capital Stock Insurance Company organized and existing under the laws of the State of Delaware with its primary business address at 11111 Carmel Commons Blvd., Charlotte, North Carolina 28226. Royal is owned primarily by individuals or entities located in the United Kingdom. Royal writes various lines of insurance in the United States, and until 2002, it wrote credit risk insurance for SFC and its affiliates.

7. On June 5, 2002, four Petitioning Creditors, International Schools of New Mexico and Texas, Transport Training, Inc., National Tractor Trailer School, and Transportation Centers, Inc., who were schools from which SFC originated or purchased student tuition loans, filed an involuntary petition under Chapter 7 of the Bankruptcy Code in this Court against SFC. They claimed that they had standing to bring such an action because SFC had failed to fund student tuition loans purchased or originated by SFC. SFC contested the involuntary petition on the grounds that it had a bona fide dispute with the Petitioning Creditors.

8. On November 4, 2002, SFC filed a motion pursuant to the Bankruptcy Code to convert the case filed by the Petitioning Creditors to Chapter 11 of the Bankruptcy

Code. SFC is currently a debtor in possession, and it brings this action on behalf of the bankruptcy estate.

## III.

## FACTUAL BACKGROUND.

9. SFC was incorporated in 1993. It is a licensed lender which has operated from various locations in Delaware after its incorporation.

10. For the first years of its operation, SFC contracted directly with vocational schools to receive and review applications for student tuition loans, and if the applicants qualified, to purchase or originate student tuition loans from various truck driving schools. SFC also serviced the loans that it purchased and originated.

11. In 2000, Student Marketing Services, L.L.C. ("SMS") was created under the laws of Delaware to market SFC's services to the vocational schools and to receive student tuition loans for SFC's review.

12. On or about October 12, 2000, SMS began to enter into contracts with the truck driving schools to receive or review applications for student tuition loans for purchase or origination by SFC. SFC was an intended third party beneficiary of those contracts.

13. If SFC approved a loan application received by SMS, SFC would fund the student tuition loan, net of loan application fees, origination fees and reserves, upon payment terms mutually acceptable to SFC and the trade school.

14. In or about 2000, SFC transferred the loan servicing functions for the student tuition loans to another affiliate, Student Loan Servicing, L.L.C. ("SLS").

15. Until 1999, SFC obtained funds to purchase or originate student tuition loans from a warehouse line of credit provided to SFC's wholly owned subsidiary, SFC

LN1 111384v2 11/20/02                   3

Financial I, L.L.C. ("Financial I") by the Wilmington Trust Co. Financial I was organized under the laws of the state of Delaware.

16. The loans held by the Wilmington Trust Co. in its warehouse were subject to credit risk insurance issued by AIG. Under that credit risk policy, AIG was liable to repay the student tuition loan if there was a default by the student and the loan was not otherwise payable from reserves maintained by SFC.

17. When the warehouse line of credit was exhausted, SFC, through special purpose entities (e.g., SFC Acceptance III, L.L.C.), would combine the loans that SFC purchased or originated into portfolios and sell them through trust certificates in the secondary market to financial institutions and/or insurance companies. In order to make the loans more marketable, AIG provided credit risk insurance on behalf of the special purpose entity to the trustee of the certificates. If loans in the portfolio defaulted and were not paid by reserves held by SFC, AIG would pay the loan. The process of selling portfolios of student tuition loans in the market is called "securitization."

18. The proceeds from the securitizations were used to pay-off the warehouse line of credit and to provide working capital for SFC. SFC's profitability and continuity in business depends on its ability to originate or purchase student tuition loans with money borrowed from the warehouse line of credit, to sell student tuition loans through securitization, and to repay its warehouse line of credit through the proceeds of securitization. In order to borrow from the warehouse lines of credit and to engage in securitizations, SFC required credit risk insurance.

19. In about January, 1999, SFC determined that the warehouse line of credit provided by Wilmington Trust Co. lacked the volume required by SFC to expand its business of

purchasing and originating student tuition loans. As a result, SFC obtained a larger warehouse line of credit from PNC Bank.

20. Additionally, in 1999, AIG decided to discontinue its credit risk insurance line. As a result, SFC, through its insurance brokers, obtained credit risk insurance from Royal beginning in 1999.

21. Royal provided credit risk insurance for the loans in the PNC warehouse to SFC Financial II, L.L.C. ("Financial II"), another special purpose entity organized under the laws of the State of Delaware, and a wholly owned subsidiary of SFC. PNC was the beneficiary of that credit risk insurance policy. Royal received a premium for each loan in the PNC warehouse. It also received another premium per loan when the warehoused loans were securitized.

22. Royal also provided credit risk insurance for the securitizations that occurred after AIG's withdrawal from that market in 1999.

23. Through May, 2002, when the servicing of the warehoused loans was transferred from SLS to Wells Fargo Bank, Royal made no payments for defaulted loans under any credit risk policy applicable to the PNC warehouse line of credit. Reserves maintained by SFC took care of all loan defaults.

24. Throughout Royal's issuance of credit risk insurance policies, SFC provided Royal with monthly servicing reports, audited and unaudited financial reports, and special reports.

25. Royal provided credit risk insurance policy No. RST 147536 for the securitization that occurred on November 15, 2001 This was the last new policy of credit risk insurance provided to SFC.

26.   Following the November, 2001, securitization, SFC sought another credit risk policy from Royal for the loans held in the PNC warehouse line of credit and for another securitization. Royal's obligation to issue credit risk insurance was due to terminate on December 31, 2001. Additionally, SFC needed to expand the capacity of the PNC warehouse to cover the demand for new student tuition loans. Discussions about a new credit risk policy between Royal and SFC began shortly after November, 2001.

27.   In December, 2001, Royal verbally committed to issue one more credit risk policy to SFC in the amount of approximately $100 million to clean out the PNC warehouse line of credit. Based on Royal's commitment to issue another credit risk policy, PNC verbally committed to extend the warehouse line of credit by $25 million. PNC had made similar verbal commitments to expand or continue the warehouse line of credit during its course of dealing with SFC.

28.   In January, 2002, representatives of Royal and SFC met at SFC's offices to discuss the future business relationship between Royal and SFC. At the end of the two hour meeting, Royal reassured SFC that there would be another credit risk policy issued by Royal so long as SFC agreed to limit growth and retain some income. SFC had conceded those terms during the meeting. Further, SFC advised Royal that the new policy was needed by early March to meet SFC's funding commitment.

29.   In the latter part of February, 2002, SFC received a telephone call from Royal and was told that Royal's parent in the United Kingdom had instructed Royal to discontinue its credit risk insurance business in the United States.

30.   SFC had received no prior indication that Royal would withdraw, or was contemplating a withdrawal, from the credit risk insurance business. To the contrary, after the

events of September 11, 2001, SFC had contacted Royal to determine if Royal would be able to continue to offer SFC credit risk insurance because Royal had suffered significant claims arising from the destruction of the World Trade Center. In response to that inquiry, Royal assured SFC that it would issue at least one more policy ranging from $50 million to $400 million.

31. Despite Royal's announcement that it was going out of the credit risk business, Royal continued to represent to SFC that one more policy would be issued to SFC.

32. Sometime in March, 2002, after it became aware of Royal's announcement about credit risk insurance, PNC advised SFC that it would not extend its warehouse line of credit due to the lack of continued coverage of credit risk insurance.

33. Royal contacted Andrew Yao, CEO of SFC, at the end of February, 2002, and told him that Royal would consider providing credit risk insurance for another securitization if SFC agreed to borrow money from Royal to be used to make "forbearance payments" to Wells Fargo as the trustee of the securitizations. Royal wanted to avoid making any payments under its credit risk policies.

34. In March, 2002, representatives of Royal and SFC met in Delaware to discuss SFC business. After that meeting, SFC signed a Secured Promissory Note for $6,145,187.66 payable on demand to Royal. A true and correct copy of that Secured Promissory Note is attached to this Complaint, identified as Exhibit "A," and is incorporated herein by reference. Under that Note, all of the proceeds of the Loan went directly from Royal to Wells Fargo Bank to pay defaulted student tuition loans. The Note was secured by an interest-only Trust certificate in favor of Wells Fargo Bank.

35. On April 29, 2002, SFC signed an Amended and Restated Promissory Note for $12,302,150.88 payable on demand to Royal. A true and correct copy of that Amended

7

and Restated Secured Promissory Note is attached to this Complaint, identified at Exhibit "B" and incorporated herein by reference. Under that Amended and Restated Secured Promissory Note, all of the proceeds of the Loan went directly from Royal to Wells Fargo Bank to pay defaulted student tuition loans. Like the original Note, the Amended and Restated Secured Promissory Note was secured by SFC's interest in an interest-only trust certificate in favor of Wells Fargo Bank.

36. Besides requiring SFC to borrow over $12 million that provided no economic benefit to SFC, Royal also asked SFC to put together a "recovery plan," which included Royal's continuation of credit risk insurance. SFC complied, but Royal did not respond to it. In May, 2002, there was a meeting in Charlotte, North Carolina between representatives of Royal and SFC. SFC thought the meeting was to consider the recovery plan, and Royal indicated that it wanted to have further discussions about obtaining additional credit risk insurance. But, Royal's hidden agenda was different.

37. In June, 2002, Royal commenced a lawsuit in the Texas state court. Originally, the case was against SFC, SMS, SLS and other defendants. In amended pleadings, SFC, SMS and SLS were dropped from the case. Royal never advised representatives of SFC of the claims or the alleged factual basis for such claims made in the Texas case prior to filing of that case.

### COUNT I.

### Negligent Misrepresentation.

38. SFC incorporates by reference herein Paragraphs 1-37 of this Complaint.

39. Royal's acts described in the preceding paragraphs constitute repeated negligent misrepresentations or omissions to SFC or its subsidiaries about the availability after November, 2001, of additional credit risk insurance from Royal.

40. The information misrepresented or omitted by Royal was not within the fair and reasonable reach of SFC or its subsidiaries and affiliates.

41. Royal negligently made the misrepresentations or omissions with knowledge that they were inaccurate or conscious disregard that SFC and its subsidiaries and affiliates would rely on Royal's misrepresentations or omissions in deciding to continue SFC's program of accepting student tuition loans for purchase or origination from trucking schools.

42. It was reasonably foreseeable that SFC would justifiably rely upon Royal's misrepresentations or omissions and accept student tuition loans for purchase or origination.

43. In justifiable reliance on Royal's misleading statements and omissions to SFC's representatives, SFC continued to accept student tuition loans and to expect to fund such loans from the PNC warehouse line of credit supported by Royal's credit risk insurance, as promised.

44. As a result of SFC's justifiable reliance on Royal, SFC approved student tuition loans totaling approximately $25-30 million and committed to fund them during the period December, 2001, through late February, 2002.

45. At various times during the period that Royal made its misrepresentations and omissions about additional credit risk insurance, Royal received premiums from partially funded and fully funded loans, as well as from the securitization on November 15, 2001. As a

result, Royal received a pecuniary interest in SFC's business that SFC continued to generate based on Royal's misrepresentations or omissions.

46. Further, as a result of its negligent misrepresentations and omissions related to the continuation of credit risk insurance, Royal caused SFC to borrow over $12 million from Royal, which was used only to Royal's pecuniary advantage to cover defaulted student tuition loans. SFC received no economic benefit from the loan.

47. Royal's misrepresentations and omissions were substantial factors in SFC's decision to purchase or originate student tuition loans during the period December 1, 2001, to February 28, 2002.

48. As a result of Royal's negligent misrepresentations and omissions, SFC has suffered damages.

WHEREFORE, SFC respectfully requests that the Court enter judgment against Royal and in favor of SFC for compensatory damages in an amount to be determined at trial, but in excess of the limits of compulsory arbitration, together with interest, costs, attorneys' fees and such other and further relief as the Court or jury deem just and proper under the circumstances.

## COUNT II.

### Fraud.

49. SFC incorporates by reference herein Paragraphs 1-48 of this Complaint.

50. As described in the preceding paragraphs, Royal engaged in a fraudulent scheme to induce SFC to continue to purchase or originate student tuition loans and to enter into a Secured Promissory Note and an Amended and Restated Secured Promissory Note in the amount of $12,302,150.88, to avoid Royal's obligation under its credit risk insurance policies, to pay claims and to maintain its insurance rating.

51. Royal fraudulently induced SFC to agree to these loans by misrepresenting that it would issue an additional credit risk insurance policy so SFC could fully fund all of the student tuition loans that it had approved between December 1, 2001 and March, 2002.

52. At the time that Royal made these misrepresentations and omitted to state the correct facts, they were false or were reckless with regard to their truth.

53. In all respects and at all times material to this claim, Royal acted with knowledge of the fraud or at a minimum with conscious disregard of the fraud.

54. The false statements and omissions made by Royal were substantial factors in SFC's decision to agree to the loans and to continue its acceptance and approval of student tuition loans.

55. SFC reasonably relied on Royal's fraudulent statements and omissions when SFC agreed to the original Secured Promissory Note and the Amended and Restated Promissory Note and when it continued to accept and approve student tuition loans.

56. Royal's fraudulent statements and omissions were a proximate cause of the damages incurred by SFC, as set forth herein.

57. Royal's fraudulent statements and omissions were willful and malicious, and SFC is entitled to punitive damages.

WHEREFORE, SFC respectfully requests that the Court enter judgment against Royal and in favor of SFC for compensatory damages in an amount to be determined at trial, but in excess of the limits of compulsory arbitration, together with punitive damages, interest, costs, attorneys' fees and such other and further relief as the Court or jury deem just and proper under the circumstances.

## COUNT III.

### Breach Of The Duty Of Good Faith And Fair Dealing.

58. SFC incorporates by reference herein Paragraphs 1-57 of this Complaint.

59. SFC entered into a Secured Promissory Note and an Amended and Restated Promissory Note.

60. Royal breached its covenant of good faith and fair dealing with respect to these Notes by engaging in fraudulent concealments and non-disclosures about the promise to issue a new credit risk insurance policy which preceded the Notes.

61. Royal's actions constitute arbitrary and unreasonable conduct. The effect of Royal's conduct prevented SFC from receiving the benefit of its agreements to the two notes which was a new credit risk insurance policy from Royal.

62. The two notes had no economic benefit for SFC. Without the new credit risk insurance policy, they only benefited Royal.

63. Delaware law implies the covenant of good faith and fair dealing in every agreement.

64. As a result of the breach of the implied covenant, SFC suffered damages in the amount of $12,302,150.88, as well as the obligation to fund student tuition loans accepted and approved by SFC on the basis that there would be an additional credit risk insurance policy.

65. Royal's fraud, deceit and misrepresentations were willful and malicious, and SFC is entitled to punitive damages.

WHEREFORE, SFC respectfully requests that the Court enter judgment against Royal and in favor of SFC for compensatory damages in an amount to be determined at trial, but in excess of the limits of compulsory arbitration, together with punitive damages, interest, costs,

attorneys' fees and such other and further relief as the Court or jury deem just and proper under the circumstances.

## COUNT IV.

### Unjust Enrichment.

66. SFC incorporates by reference herein Paragraphs 1-65 of this Complaint.

67. Royal caused SFC to enter into the promissory notes identified in the preceding paragraphs through fraudulent statements and omissions.

68. The proceeds of the promissory notes were not paid to SFC, and they did not economically benefit SFC. On the contrary, the proceeds were used to pay defaulted loans so Royal would not be obligated to pay claims under its credit risk insurance policies.

69. As a result of these notes, Royal became unjustly enriched by avoiding the necessity of paying claims under its credit risk insurance policy.

70. Royal's fraud, deceit and misrepresentation were willful and malicious, and SFC is entitled to punitive damages.

WHEREFORE, SFC respectfully requests that the Court enter judgment against Royal and in favor of SFC for compensatory damages in an amount to be determined at trial, but in excess of the limits of compulsory arbitration, together with punitive damages, interest, costs, attorneys' fees and such other and further relief as the Court or jury deem just and proper under the circumstances.

## COUNT V.

### Rescission Of The Promissory Notes.

71. SFC incorporates by reference herein Paragraphs 1-70 of this Complaint.

72. As set forth in the preceding paragraphs, Royal made misrepresentations and omissions to SFC to cause it to enter into the promissory notes. As a result, SFC is entitled to common law rescission of the promissory notes.

73. Alternatively, or in addition, Royal fraudulently induced SFC into executing the promissory notes by making false statements and failing to disclose material facts about the issuance of a new credit risk insurance policy. Royal knew its statements were false when they made or with reckless disregard of their truth. Royal made them with the intent that SFC would rely and act on them. SFC acted in reliance on Royal's misrepresentations and omissions. As a result of Royal's acts, SFC has been injured.

WHEREFORE, SFC requests that the Court enter judgment in its favor and against Royal and declare that the promissory notes are rescinded and award compensatory damages, interest, costs and attorneys' fees and such other relief as the Court deems appropriate.

## COUNT VI.

### Declaratory Judgment.

74. SFC incorporates by reference herein Paragraphs 1-73 of this Complaint.

75. SFC seeks a declaratory judgment under 28 U.S.C. § 2201 that the promissory notes executed by SFC for the benefit of Royal are null, void and may not be enforced.

76. As the preceding paragraphs of this Complaint demonstrate, this case sets forth an actual controversy between Royal and SFC as to the promissory notes.

77. As the preceding paragraphs of this Complaint further demonstrate, Royal has no right to enforce the promissory notes executed by SFC.

WHEREFORE, SFC requests that the Court enter a declaratory judgment in its favor and against Royal declaring that Royal has no right to enforce the promissory notes against SFC.

Dated: November 20, 2002

FOX, ROTHSCHILD, O'BRIEN & FRANKEL, LLP
(formed in the Commonwealth of Pennsylvania)

By: _____/s/ L. Jason Cornell_____
    L. Jason Cornell (I.D. No. 3821)
    P.O. Box 2323
    824 North Market Street
    Wilmington, DE 19899-2323
    (302) 654-7444

    Hal Baume
    Princeton Pike Corporate Center
    997 Lenox Drive, Building 3
    Lawrenceville, NJ 08648-2311
    (609) 896-3302

    David A. Gradwohl (I.D. No. 18340)
    Andrew W. Bonekemper (I.D. No 84313)
    Anthony P. DeMichele (I.D. No. 87602)
    1250 South Broad Street
    Lansdale, PA 19446-0431
    (215) 699-6000
    Attorneys for Plaintiff/Debtor,
        Student Finance Corporation