IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROYAL INDEMNITY COMPANY, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ) C.A. No. 05-165-JJF <br> ) <br> PEPPER HAMILTON LLP, W. RODERICK ) **CONFIDENTIAL – FILED UNDER SEAL** <br> GAGNÉ, FREED MAXICK & BATTAGLIA ) <br> CPAs PC, McGLADREY & PULLEN, LLP, ) <br> MICHAEL AQUINO, and FREED MAXICK ) <br> SACHS & MURPHY, P.C., ) <br> ) <br> Defendants. ) | |

**MEMORANDUM IN SUPPORT OF MCGLADREY & PULLEN'S
MOTION TO COMPEL PLAINTIFF'S PRODUCTION OF DOCUMENTS**

**EXPEDITED CONSIDERATION REQUESTED**

DUANE MORRIS LLP
Michael R. Lastowski (Bar No. 3892)
Christopher M. Winter (Bar No. 4163)
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246
Phone: 302-657-4951
Fax: 302-657-4901

-and-

| | |
|---|---|
| ARNOLD & PORTER LLP <br> Veronica E. Rendon <br> Jason M. Butler <br> 399 Park Avenue <br> New York, NY 10022 <br> Phone: 212-715-1000 <br> Fax: 212-715-1399 <br><br> Attorneys for McGladrey & Pullen, LLP <br> and Michael Aquino | WILLIAMS & CONNOLLY LLP <br> Steven M. Farina <br> Thomas H. L. Selby <br> 725 Twelfth Street, N.W. <br> Washington, D.C. 20005 <br> Phone: 202-434-5000 <br> Fax: 202-434-5029 <br><br> Attorneys for McGladrey & Pullen, LLP |

## INTRODUCTION

Plaintiff Royal Indemnity Company ("Royal") refuses to produce documents in the possession of its parent company Royal & SunAlliance Insurance Group plc ("Royal UK") despite the fact that Royal UK was directly involved in the management not only of Royal's operations, but also in the Student Finance Corporation ("SFC") transactions. Royal does not deny the relevance of Royal UK's documents relating to Royal's transactions with SFC, but instead claims that it need not produce such documents simply because Royal UK is not a party. Under well-established Third Circuit precedent, however, Royal is in "control" of the documents in the possession of its parent for purposes of discovery. *See* Fed. R. Civ. P. 34(a); *Gerling Int'l Inr. Co. v. Comm.*, 839 F.2d 131, 140-41 (3d Cir. 1988); *Camden Iron & Metal v. Marubeni Am. Corp.*, 138 F.R.D. 438, 439 (D.N.J. 1991); *Afros S.P.A. v. Krauss-Maffei Corp.*, 113 F.R.D. 127, 132 (D. Del. 1986). Royal UK admittedly exercised control over Royal, and the distinction between the parent and subsidiary is blurred even in Royal's own communications. The companies exchanged documents regularly in the ordinary course of business. Royal UK had substantial involvement at all stages of the SFC transactions, including early in the deals and in a highly critical "lessons learned" assessment of the failures of Royal's management. Royal UK possesses highly relevant documents as a result of that involvement. On these facts, Royal has "control" over the documents and must produce them, and McGladrey respectfully requests an order compelling production. *See* Fed. R. Civ. P. 37.

## REQUEST FOR EXPEDITED CONSIDERATION

As Defendant McGladrey & Pullen, LLP ("McGladrey") recently learned, Royal UK has decided to spin-off its U.S. operations because it determined that the U.S. operations are not "core" to the business of Royal UK. *See* Royal UK Press Release, Sep. 28, 2006 (Ex. 1). Royal

UK's plans to complete this sale transaction <u>by the end of the year</u>, and has already voluntarily delisted itself from the New York stock exchange (and is today holding a shareholder meeting to approve the sale). Once such a transaction is consummated, the surviving U.S. company will no doubt assert that it no longer has any ability to procure documents from Royal UK. McGladrey, therefore, respectfully requests expedited consideration of this motion to compel prior to the time the sale transaction is to be completed.

## BACKGROUND

### A. The Relationship Between Royal and Royal UK

Royal Indemnity Company is a property and casualty insurance company and a wholly owned subsidiary of its London based parent, Royal UK.[1] Royal UK is the holding company for a group of Royal & SunAlliance general insurance companies that are located and operate in countries worldwide. As Royal UK itself notes, it operates a "global business model" including individual operations in various countries, including the U.S. *See* RSA 2000 Annual Report Excerpts, at 3, 46, 48 (Ex. 3); RSA 2005 Annual Report Excerpts, at 10, 37 (Ex. 2). Royal UK refers to its worldwide operations as the "Group" and Royal UK oversees what it claims is "a robust risk management and internal control culture . . . within the Group." RSA 2000 Annual Report Excerpts, at 49 (Ex. 3). The Royal UK Board of Directors has ultimate responsibility for "maintain[ing] full and effective control over" all of Royal UK's global operations though a comprehensive framework of management committees. *Id.* at 48.

The Board monitors its worldwide system of internal controls through a reporting framework in partnership with local management, which serves as the "first line of defense" by

---

[1] Royal is a wholly owned subsidiary of Royal & SunAlliance USA, Inc., a holding company established and wholly owned by Royal UK for its U.S. based general insurance businesses. RSA 2005 Annual Report Excerpts, at 109 (Ex. 2).

2

"setting strategy, performance, measurement, and establishment and maintenance of internal and risk management" within the local business operation. *See id.* at 40-42. Local business managers must submit detailed monthly and quarterly reports in accordance with the Board's "financial monitoring process." *See* RSA 2000 Annual Report Excerpts, at 48 (Ex. 3). And individual business managers certify each quarter that their local operations are in "compliance with Company policies, laws, rules and regulations." 2005 Annual Report Excerpts, at 42 (Ex. 2); *see also* RSA 2000 Annual Report Excerpts, at 49 (Ex. 3).

### B. Royal UK's Involvement in the SFC Transactions

Royal UK participated directly in the transactions between its U.S. subsidiary, Royal, and SFC, a company that originated and purchased sub-prime student loans, primarily for truck driving school students. Royal's own documents and testimony demonstrate that Royal UK was involved, to varying degrees, in key stages of the SFC transactions.

As this Court is aware, in mid-November 1998, Royal was approached about a new business opportunity. SFC sought "financial guaranty" insurance (also known as "credit enhancement" or "credit risk" insurance) from Royal, *i.e.*, a pledge that if the students did not pay back their loans, the banks and/or investors in SFC's programs would not suffer losses. Royal had never before issued financial guaranty insurance (or any insurance relating to sub-prime student loans), but Royal agreed to a deal with SFC nonetheless. After only cursory due diligence, Royal executed a $75,000,000 insurance policy in early 1999. *See* Third Am. Compl. at ¶ 37 (Ex. 4). This would be the first of several policies that form the basis of Royal's complaint in this matter. *Id.* at ¶¶ 48-49, 51.

Royal UK was engaged with the SFC transactions from the start. In order to underwrite the SFC transactions, individuals at Royal were required by policy to obtain underwriting authority specific to the SFC transactions from corporate management at Royal UK in

3

accordance with Royal UK's Delegated Authority Policy. *See* RSA 2005 Annual Report Excerpts, at 39 (Ex. 2) (system of delegation requiring UK approval); *see also* at ROY165153-54 (Ex. 5) (

). Additionally, Royal had to submit regular financial reports and business plans to Royal UK that provided financial performance updates and forecasts for the SFC transactions. *See e.g.* RSA 2000 Annual Report Excerpts, at 48 (Ex. 3); at ROY175032 (Ex. 6); E-mail from Hibberd, dated Nov. 15, 2000, at ROY106957 (Ex. 7).

Royal UK also worked with Royal during 1999 and 2000 to establish Royal's fledgling Financial Enhancements Unit ("FEU")—the group that was responsible for Royal's credit risk insurance business, including issuing and monitoring the SFC policies. *See* at ROY175091-94 (Ex. 8) (

); E-mail from Rood, dated Apr. 25, 2000, at ROY164148-57 (Ex. 9) (attaching draft of Structured Risk Financing Briefing Note). This process involved communications and face-to-face meetings between corporate management of Royal UK and local management of Royal to discuss the operation and structure of the business, and it would commonly involve discussions of the SFC transactions, by far the FEU's largest exposure. For example, and of Royal, traveled to London in December 1999 to meet with regarding the and to discuss a . *See* at ROY175031 (Ex. 10). Their presentation to specifically addressed

4

*See*

at ROY164301-26 (Ex. 11). In addition to regular performance reporting to Royal UK, Royal also frequently exchanged information regarding SFC and the Financial Enhancements business with Royal UK to aid in the development of the worldwide financial business and strategy. *See, e.g.*

at ROY165242-43 (Ex. 12).

Royal UK's involvement with the SFC transactions deepened in spring 2000, when Standard & Poor's ("S&P") raised concerns about the structure and internal controls of Royal UK's Structured Risk Financing business. Royal UK took the lead in coordinating a response and managing the S&P relationship. *See e.g.* E-mail from Hoover, dated Mar. 17, 2000, at ROY163744-45 (Ex. 13) ("[W]e need to arrange for WGO Treasury to coordinate any approaches to the rating agencies from the centre. . . ."); E-mail from Hoover, dated Mar. 23, 2000 at ROY 163743-4 (Ex. 13) ("As a Group, we must be thoughtfully mindful of any tensions and stresses on our rating."). Central coordination was crucial because the financial enhancement deals, including the SFC transactions, were dependent on the strength of Royal UK's rating. As            , of Royal UK, explained,

*See*

at ROY165356 (Ex. 14). To earn S&P's confidence, Royal UK sought a comprehensive understanding of the structure of the SFC transactions and their implications for the overall exposure of Royal UK.

5

Royal UK gathered information from Royal regarding the SFC transactions, and purported to require that any new exposure in the U.S. over $25 million receive approval from Royal UK. *See* E-mail from Hudson, dated Mar. 31, 2000, at ROY163742-3 (Ex. 13); at ROY165354-55 (Ex. 15). At a meeting in          , attended by                                                                                                       was discussed. *See*                                   at ROY164103.01-.03 (Ex. 16);

at ROY165363 (Ex. 14) (

).

It is clear from the events and communications surrounding the S&P credit rating issue that, at least as early as April 2000, information was flowing regularly between Royal and Royal UK with respect to Royal's FEU and its business transactions. Royal continued to send Royal UK information on the SFC portfolios, including financial reports and forecasts, and annual business plans. *See, e.g.*                           at ROY164105-06 (Ex. 17); at ROY164124-28 (Ex. 18); E-mail from Vezzosi, dated Nov. 5, 2001, at ROY165308-09 (Ex. 19); E-mail from McKenzie, dated May 10, 2002, at ROY106754-58 (Ex. 20). And Royal UK continued to require (at least by policy) approval of the FEU's large transactions. With regard to discussions of an SFC policy renewal in spring 2000, William J. Hibberd, manager of the FEU, wrote to fellow FEU members, "we are cleared for take-off from the UK." *See* E-mail from Hibberd, dated May 8, 2000, at ROY003086 (Ex. 21). Again in January 2001,

*See* ⎯⎯⎯⎯⎯⎯⎯⎯⎯ at ROY165369-75 (Ex. 22). At their request, Hibberd sent an analysis of the SFC transactions, and upon receiving positive feedback from S&P, Hibberd wrote, "we have lift off." *See* E-mail from Hibberd, dated Feb. 7, 2001, at ROY023676-80 (Ex. 23). Ultimately, however, Royal UK's oversight was not enough to prevent Royal's FEU from aggressively pursuing SFC insurance premiums, and agreeing over the next three years to insure approximately $500,000,000 in SFC student loans.

In fact, in spring 2002, when it became clear that the FEU's lack of experience in credit risk insurance and its failure to conduct adequate due diligence had exposed Royal to an unacceptable level of risk and to unprecedented losses resulting from the SFC transactions, Royal UK immediately intervened to assess the resulting damage and the internal failures that caused it. *See* ⎯⎯⎯⎯⎯⎯⎯⎯⎯ at ROY165278-79 (Ex. 24). In his April 17, 2002 e-mail to Royal UK executives, ⎯⎯⎯⎯⎯, Royal UK's ⎯⎯⎯⎯⎯, addressed ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ *Id.*[2] Bob Mendelsohn, Royal UK's Chief Executive Officer, and Bob Gunn, Royal UK's Chief Operating Officer, even made a trip from London to Charlotte to meet with Royal's in-house counsel, outside counsel, and advisors from Grant Thornton, who were engaged to investigate the SFC matter, to receive a presentation on the SFC situation and alternatives. *See* E-mail from Chandler, dated May 16,

---

[2] Ian Hutchinson, at Royal UK, also advised Joe Fisher, Royal's Chief Financial Officer, on how to address the SFC issue in its Quarterly Internal Control Self Appraisal Certificate, which was submitted to Royal UK's Group Audit Committee. *See* E-mail from Hutchinson, dated April 17, 2002, at ROY165280 (Ex. 25). And ⎯⎯⎯⎯⎯, at Royal UK, took the lead role in ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯. *See* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ at ROY-R018362-70 (Ex. 26) (⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯).

7

2002, at ROY166215 (Ex. 27); *see also* Spears Deposition Transcript Excerpts, at 10, 67 (stating that he had a video conference with Royal people overseas) (Ex. 28).

Furthermore, Royal UK was not only actively involved in resolving the SFC situation and mitigating the resulting losses, but Royal UK also actively participated in planning and strategy related to the SFC litigation. Although McGladrey does not seek these materials with the instant motion, Royal's privilege log discloses numerous communications between Royal UK executives and Royal's management, its in-house, and outside counsel related to legal advice, requests for legal advice, information provided to counsel, information requested from counsel, and litigation strategy. *See* Royal Privilege Log Excerpts (Ex. 29)

## DOCUMENTS REQUESTED

On September 7, 2005, McGladrey served Royal with McGladrey's First Request for Production of Documents ("First RFP"), requesting non-privileged documents falling into a number of categories relating to the SFC transactions in the possession, custody or control of Royal and Royal's parent company, Royal UK. *See* First RFP ¶ 1 (Ex. 30) ("The terms 'Royal' and 'you' mean Royal Indemnity Company, as well as its parents, subsidiaries, affiliates, officers, directors, employees, agents, attorneys and representatives at the present time and, where applicable, during the time period relevant to this action.").

On October 18, 2005, Royal served its Objections and Responses to McGladrey's Request ("Response"), attached as Exhibit 31. Royal objected to McGladrey's definition of "Royal," to the extent it sought "to cover persons or entities that are not parties to this action and/or did not have any role in the issuance of the Royal Polices or in the SFC Transactions."

8

Response ¶ 7 (Ex. 31).[3] Accordingly, Royal did not produce any documents in the possession of its parent company, Royal UK, and has not made any effort to collect documents in the possession of Royal UK.

After reviewing the voluminous Royal production, counsel for McGladrey reiterated the request for non-privileged, relevant, documents in the possession of Royal UK. *See* Letter from Thomas Selby, dated Oct. 5, 2006, at 1 (Ex. 32). Review of Royal's production revealed that Royal UK was engaged with the SFC transactions from inception to demise, and documents in Royal UK's possession are highly relevant to the claims and defenses in this litigation. Royal did not formally respond to that letter, though counsel conferred by phone and by an additional e-mail, dated October 24, 2006, attached as Exhibit 33.

Because attempts to resolve this matter without court intervention have failed, McGladrey is filing this Motion to Compel Plaintiff's Production of Documents in the possession of Royal UK. In compliance with D. Del. LR 7.1.1, McGladrey has made a reasonable effort to reach agreement with counsel for Royal with respect to the non-dispositive relief requested herein.

## ARGUMENT

Documents responsive to McGladrey's RFP and in the possession of Royal's parent corporation, Royal UK, are relevant and within the "control" of Royal and must therefore be

---

[3]   Although Royal prefers to adopt a narrow definition of "Royal" for the purposes of McGladrey's request for production of documents, it was willing to take a more expansive definition of "Royal" for the purposes of its own document requests and interrogatories to McGladrey. *See e.g.* Royal's Third RFP to McGladrey (Excerpts) ¶ 13 (Ex. 34) ("'Royal' shall mean plaintiff Royal Indemnity Company, and its current or former directors, officers, employees, agents and attorneys, each person acting on its behalf or under its control, <u>and any parent, subsidiary, predecessor or affiliated corporation</u>.") (emphasis added).

9

produced. *See* Fed. R. Civ. P. 26, 34.[4] Royal cannot hide behind Royal UK's non-party status to obstruct the production of relevant material in this litigation. Rule 34(a) provides that Royal must produce all relevant documents in its "possession, custody or control." Fed. R. Civ. P. 34(a). Where, as here, a litigating party is the subsidiary of a parent that was involved not only in the management of the subsidiary, but also in the transactions that are the center of the dispute, the subsidiary cannot hide behind corporate formalities—it will be found to have "control" over the documents in the possession of the parent, and it will be compelled to produce them. *See Gerling Int'l Ins. Co.*, 839 F.2d at 140-41; *Camden Iron & Metal*, 138 F.R.D. at 441-42; *Afros S.P.A.*, 113 F.R.D. at 130.[5] The parent-subsidiary relationship between Royal UK and Royal, the nature of Royal UK's global business model and structural organization of its worldwide operations, and the companies' mutual involvement and cooperation in resolving issues related to the SFC transactions and developing the financial enhancements business, reveal that Royal has "control" over the documents in Royal UK's possession.

---

[4] Under the liberal discovery standards, Royal must produce any documents that are relevant to the claims or defenses of any party, or reasonably calculated to lead to the discovery of admissible evidence. *See* Fed. R.Civ. P. 26(b)(1); *Pacitti v. Macy's*, 193 F.3d 766, 777 (3d Cir. 1999) ("It is well recognized that the federal rules allow broad and liberal discovery."); *Corning Inc v. SRU Biosystems, LLC*, 223 F.R.D. 191, 193 (D. Del. 2004). The request at issue here easily meets these standards.

[5] As this Court acknowledged in *Playboy Entm't Grp, Inc. v. US*, the application of this rule is fact-specific, but the rule itself is widely accepted. No. CIV.A.96-94-JJF, 1997 WL 873550, at *3 (D. Del. Dec. 11, 1997). Indeed, the circumstances of this case are quite different from those in *Playboy Entm't Grp*. There, the defendants could not establish a sufficiently close connection between the companies, making only "sparse submissions" related to the corporate structure and failing to even demonstrate that the subsidiary could access documents in the ordinary course of its business. *See id.* at *4. Here, however, Royal's own documents reveal its undeniably close connection to Royal UK, which extends beyond Royal UK's 100% ownership of Royal, the companies' interlocking management structures, and Royal UK's approval of Royal's major (and, in some cases, minor) business decisions. *Cf. id.* Even more significant, is Royal UK's active involvement in the SFC transactions at issue in this case, its possession of documents as a result of that involvement, clear proof of documents exchanged between the companies in the ordinary course of business, and Royal UK's significant financial interest in the outcome of this litigation.

10

Under Third Circuit precedent, four considerations determine whether a subsidiary can resist production of documents in the hands of its parent company. *See Gerling Int'l Ins. Co.*, 839 F.2d at 140-41 (internal citations omitted); *Camden Iron & Metal*, 138 F.R.D. at 441-42 (same); *Afros S.P.A.*, 113 F.R.D. at 131. The first consideration is the nature of the corporate structure and relationship between the parent and subsidiary corporations. *See Gerling Int'l Ins. Co.*, 839 F.2d at 140; *Camden Iron & Metal*, 138 F.R.D. at 441-42; *Afros S.P.A.*, 113 F.R.D. at 131. A second consideration is the ability of the subsidiary to procure documents from its parent in the ordinary course of business or for the purposes of litigation. *Gerling Int'l Ins. Co.*, 839 F.2d at 141. Third, the non-party parent's connection to the transaction at issue is an important factor, and whether its possession of documents is a consequence of that connection. *Camden Iron & Metal*, 138 F.R.D. at 441-42; *Afros S.P.A.*, 113 F.R.D. at 130. And lastly, whether the parent corporation will receive a benefit as a result of an award in its subsidiaries favor at the end of the litigation is also a relevant consideration. *Id.* Each of these considerations demonstrates Royal's control over documents in the possession of Royal UK.

A.   **Corporate Structure**

The primary considerations in analyzing the intracorporate relationship between a subsidiary and its parent for the purpose of evaluating one's control over documents possessed by the other are "the degree of ownership and control exercised by the parent over the subsidiary, a showing that the two entities operated as one, . . . and an agency relationship." *Camden Iron & Metal*, 138 F.R.D. at 442; *see also Afros S.P.A.*, 113 F.R.D. at 130 ("Whether a subsidiary is wholly or partially owned by the parent, the overlap of directors, officers, and employees, or the financial relationship between the corporations all aid in the analysis of control."). Here, these

factors establish that Royal has the requisite control to obtain documents in Royal UK's possession.

As an initial matter, Royal is a wholly owned subsidiary of Royal UK; Royal UK's degree of ownership is complete. RSA 2005 Annual Report Excerpts, at 109 (Ex. 2). Royal UK's global business model and organizational structure also enable Royal UK to exercise a tremendous amount of control over Royal's business operations. In fact, Royal UK takes great pride in its "embedded" and allegedly "rigorous control environment" and its established organizational structure, in which "responsibilities and delegation of authority [are] clearly defined." *See* Goldman Sachs Presentation, June 8, 2005, at 12-13 (Ex. 35) (outlining areas the operation of controls and disciplines); RSA 2000 Annual Report Excerpts, at 48 (Ex. 3).

Royal UK appoints Royal's Board members. RSA 2005 Annual Report Excerpts, at 25 (Ex. 2) (stating "we appointed Edward Muhl to the US Board in January 2006). Although Royal's management is responsible for setting its own policies and procedures to comply with Royal UK's policies, Royal UK sets specific and individualized financial targets and goals for Royal. *Id.* at 24. And Royal UK dictates specific internal management initiatives for Royal to implement at the local level, such as downsizing its employment force. *Id.*

Royal UK and Royal share common business interests, financial goals, and an interdependent underwriting and financing arrangement, and therefore, act as if they were a single unit. Royal UK and Royal have "interlocking" management structures, whereby Royal UK appoints Royal's board members, and Royal's executives report directly to Royal UK's management. *See Gerling Int'l Ins. Co.*, 839 F.2d at 140. And, in addition to the four regional divisions, Royal UK has also established a "network of practice groups and specialist functional groups" that "function across regional management boundaries." *See* RSA 2000 Annual Report

Excerpts, at 3, 48 (Ex. 3). This structure allows Royal to take advantage of Royal UK's "global knowledge base" and to access Royal UK's underwriting capacity. *Id.* at 3.

The integration and coordination of Royal UK's worldwide operations naturally leads to a common identity between Royal UK and Royal. For example, S&P's credit rating of Royal UK is crucial to the success of Royal's FEU deals, such as SFC, because investors do not distinguish between the two entities and rely on Royal UK's underwriting capacity in evaluating transactions with Royal. Indeed, even the companies themselves ignore the structural distinction and act as a single entity. The very fact that Royal has asserted attorney-client and work product privileges with respect to communications involving Royal UK individuals demonstrates that Royal does not view its parent company as a third-party. *See* Royal Privilege Log Excerpts (Ex. 29).

Even Royal UK's official communications do not recognize a distinction between the companies. In its press release describing the outcome of other SFC related litigation, in which Royal, not Royal UK, was the litigating party, Royal UK stated "We are disappointed by the Court's ruling. . . . Our filed lawsuit in Texas State Court alleges significant fraud and misrepresentation by various parties, entitling Royal Indemnity to rescind the policies, and we accordingly plan to appeal the decision." *See* Royal UK Press Release, Oct. 2, 2003 (Ex. 36) (emphasis added).

Accordingly, the corporate structure encompassing Royal UK and Royal's relationship demonstrates 100% ownership, a high degree of control, coordinated activities, and a shared identity, further illustrates Royal's ability to obtain documents in Royal UK's possession.

**B.     Access to Documents**

Likewise, the second consideration in determining whether a subsidiary has control over documents in its non-party parents' possession—access to documents in the ordinary course of business or for the purposes of litigation—weighs in favor of production. *Gerling Int'l Ins. Co.*, 839 F.2d at 141. Without question, Royal has had access, in the ordinary course of business, to documents possessed by Royal UK. Royal UK set policies and procedures to be followed by individual operations worldwide and created "detailed documents setting out best practice in key areas." RSA 2005 Annual Report Excerpts, at 41 (Ex. 2). Royal regularly reported its alleged compliance with the policies set by Royal UK. Information regularly transmitted between Royal UK and Royal included financial performance reports, forecasts and presentations, business plans, internal risk assessments, internal control audits, underwriting authority letters, transaction approvals and memoranda. The companies also collaborated and exchanged drafts when developing policies and guidelines specifically related to the Structured Risk Financing business and the FEU. *See e.g.* E-mail from Hibberd, Dated Apr. 25, 2000, at ROY164148-57 (Ex. 9); at ROY175091-94 (Ex. 8). A number of these exchanges are evidenced throughout Royals production and in its privilege log. *See e.g.* Royal Privilege Log (Ex. 29).

Royal's                                     also confirms Royal's access to documents in Royal UK's possession. In a section entitled

*See*                                     (Ex. 37). Even Royal's website directs web-goers to Royal UK to obtain information on the subsidiary's financial performance. *See* Royal's Financial Webpage (Ex. 38).

14

Furthermore, Royal UK has repeatedly promoted its investments in technology and e-business initiatives, such as intranets and worldwide networks and databases, as a means of streamlining worldwide operations and processes to increase efficiency. *See e.g.* RSA 2001 Annual Report Excerpts, at 4 (Ex. 39); RSA 2000 Annual Report Excerpts, at 3 (Ex. 3) (individual businesses benefit from the ability to "share our knowledge and expertise around the world effectively" using information technology). as well as our customers benefit fully from our global reach."). Royal UK manages the company's worldwide information technology infrastructure, which is organized into four regional data centers, through global arrangements with Microsoft and Oracle. *See* RSA 2001 Annual Report Excerpts, at 17 (Ex. 39). And Royal UK has also used its worldwide Intranet to implement information sharing networks such as "Virtual Global Exchange," which "contains hundreds of 'gems' of achievement gathered by businesses throughout the world," and "R&SALearning.com," a "virtual insurance university." *See id.* at 5, 42. This factor clearly weighs in favor of finding that Royal has the requisite control for Rule 34(a) purposes.

### C. Connection to SFC Transactions

The non-party parent's connection to the transaction and the circumstances under which it obtained the requested documents are also relevant considerations. *Afros S.P.A.*, 113 F.R.D. at 130. As previously discussed, Royal UK was connected to the SFC transactions from the beginning, and the documents requested are in Royal UK's possession as a direct consequence of its involvement with the SFC transactions. This too establishes Royal's control over the documents.

Initially, Royal UK granted underwriting authority to individuals at Royal specifically with regard to the SFC transactions. *See*                                          at

15

ROY165153-54 (Ex. 5). Royal UK monitored Royal's financial performance and the FEU's financial performance by requesting regular financial reports and business plans from Royal, which addressed the SFC transactions. Royal UK was also made aware of the details of the SFC transactions in the course of establishing its worldwide Structured Risk Financing Group and developing underwriting and risk management policies to apply worldwide. *See*

at ROY164124 (Ex. 18);

at ROY164301-26 (Ex. 11); *see also* E-mail from Hibberd, dated Apr. 25, 2000, at ROY164148-57 (Ex. 9).

Royal UK became more involved in the SFC transactions when it defended its S&P credit rating. Royal UK executives assured S&P that Royal UK

*See*                                                                                                       at ROY165356-66 (Ex. 14). Indeed Royal UK and Royal collaborated extensively in preparing a                    for the S&P meeting, and exchanged detailed information regarding the SFC transactions. *Id.* By policy, if not by practice, Royal UK's approval was required on any new transaction over $25 million, which also required communications between the companies.

As problems with the SFC transactions emerged, Royal UK's involvement increased further. Royal UK played a key role in assessing damages, assessing the U.S. management's poor performance, arranging for reinsurance on the SFC transactions, and even planning litigation strategy. (Notably, Royal has not produced any further correspondence related to the                    email sent by Royal UK. *See* Ex. 24.) As the parent company, Royal UK set the rules and guidelines according to which its subsidiary, Royal, was required to operate, monitored Royal's operations and performance though Royal's financial reports, quarterly self

16

assessments and compliance certifications, argued on its behalf before the credit agency, and helped pick up the pieces when Royal got into trouble. Surely, Royal UK possesses documents that are relevant to the claims and defenses at issue in this litigation as a direct consequence of its own involvement with the SFC transactions.

### D. Royal UK's Stake in Litigation Outcome

Lastly, "if the nonparty is to receive a benefit from the litigation, that fact along with others must be weighed in determining control for purposes of Rule 34." *Afros S.P.A.*, 113 F.R.D. at 130. Royal UK has always consolidated the financial performance of it U.S. operations with the larger global company. *See* RSA 2000 Annual Report Excerpts, at 1, 62-67, 97-99 (Ex. 3). Any benefit received by the US operation directly affects the bottom line for Royal UK. There could be no more direct link.

Moreover, even with the sale of its U.S. operations, the outcome of the litigation is potentially significant to Royal UK. First, the sale price likely reflects consideration of the litigation outcome. Second, as Royal UK's press release explained, Royal UK is selling the business for a deferred consideration to be funded from the future performance of the U.S. operations. *See* Royal UK Press Release, Sep. 28, 2006 (Ex. 1). Royal UK's ability to collect deferred payments on the sale of Royal are potentially impacted by the outcome of the various pending matters related to the SFC litigation. So, this factor too demonstrates that Royal can produce documents in Royal UK's possession.

## CONCLUSION

The documents that McGladrey seeks are in the possession of Royal's parent company, but they are within Royal's control, highly relevant to the present litigation, and not protected

from disclosure by any privilege. McGladrey respectfully asks that this Court order Royal to produce the requested materials.

Dated: November 1, 2006

                                            DUANE MORRIS LLP

                                            By: _____
                                            Michael R. Lastowski (Bar No. 3892)
                                            Christopher M. Winter (Bar No. 4163)
                                            1100 North Market Street, Suite 1200
                                            Wilmington, DE 19801-1246
                                            Phone: 302-657-4951
                                            Fax: 302-657-4901

                                            -and-

| ARNOLD & PORTER LLP | WILLIAMS & CONNOLLY LLP |
|---|---|
| Veronica E. Rendon | Steven M. Farina |
| Jason M. Butler | Thomas H. L. Selby |
| 399 Park Avenue | 725 Twelfth Street, N.W. |
| New York, NY 10022 | Washington, D.C. 20005 |
| Phone: 212-715-1000 | Phone: 202-434-5000 |
| Fax: 212-715-1399 | Fax: 202-434-5029 |
| | |
| Attorneys for McGladrey & Pullen, LLP and Michael Aquino | Attorneys for McGladrey & Pullen, LLP |