# EXHIBIT 1





news

**IMMEDIATE**                                    **28 SEPTEMBER 2006**

**Royal & SunAlliance – Sale of US operation and termination of Group SEC registration**

Royal & Sun Alliance Insurance Group plc (R&SA) today announces the sale of its US operation to Arrowpoint Capital, a vehicle set up by the R&SA US management team. R&SA is also announcing today the termination of its American Depositary Receipt (ADR) programme, its voluntary delisting from the New York Stock Exchange (NYSE) and action to terminate its US Securities and Exchange Commission (SEC) registration.

<u>Sale of US operation</u>

In September 2003 the Group announced that its US operation was strategically non core. The US operation was closed to new business and a restructuring plan was instigated with the objective of bringing certainty and finality to the Group's US exposure. In the last three years the Group has taken significant action to deliver this objective.

The Group is selling its US operation to Arrowpoint Capital for a deferred consideration of £158m ($300m), which will be funded from the future performance of the US operation. The transaction is conditional upon, inter alia, shareholder and regulatory approvals. On receipt of these approvals and with completion of the transaction, the Group will make a £151m ($287.5m) capital contribution into the US regulated entities. The net capital contribution, write off of US net assets and other related costs will result in an estimated pre tax loss on disposal of £443m[1].

Andy Haste, Group CEO commented, "Today's announcement is a significant step for the Group. The sale of the US operation is the right deal for our shareholders and US policyholders. The transaction will bring certainty and finality and delivers on our objective of a clean exit from the US.

…more

Issued by Royal & Sun Alliance Insurance Group plc  9th Floor  One Plantation Place  30 Fenchurch Street  London EC3M 3BD
Telephone +44 (0)20 7111 7136  Facsimile +44 (0)20 7111 7451

Over the last three years we have dealt with a number of legacy issues and in the Core Group built a high quality business focused on driving profitable growth and continuous operational improvement. We remain confident of continuing to deliver sustainable profitable performance."

Two existing arrangements will remain in place: the Adverse Development Cover (ADC) and the Letter of Credit supporting certain third party reinsurance recoverables (LOC). The ADC is a reinsurance cover put in place in 2003. It is at its policy limit and therefore not subject to further insurance risk. The prudent assumptions supporting the projected payment patterns give additional cover against potential timing risks for payment of claims. For the LOC of £79m a methodology has been agreed to step it down commencing two years after the completion of the transaction conditional on the financial health of the US regulated entities. In the event that the regulated entities are required to draw down on the LOC, a mechanism has been agreed for reimbursement to the Group.

Neither the ADC nor the LOC represent new exposures to the Group and the directors believe that they do not represent material risks to the Group given their nature, timing and likelihood.

As part of the disposal the Group has given minimal representations and warranties and the transaction represents a clean exit from the US. It is intended that the present value of the deferred consideration will be held as part of the general investment portfolio of R&SA.

With the completion of the transaction the Group will continue to be in a strong financial position with a pro forma IGD surplus of £1.1bn and IGD coverage ratio of 1.9 times.

The disposal is a related party transaction and under UK Listing Rules requires shareholder approval at an Extraordinary General Meeting of the Company.

It is anticipated that the formal notice of the meeting and the resolutions to be proposed, together with a circular setting out further details of the transaction, will be sent to shareholders in mid to late October with the EGM of R&SA to be held in early to mid November. Subject to receipt of shareholder and regulatory approvals, R&SA is targeting completion by the year end.

...more

Delisting and Deregistration

R&SA has been listed on the NYSE and registered in the US under the US Securities Exchange Act 1934 since 1999 when the listing and registration were identified as an important milestone in the continued global development of the Group. The purpose of the listing was to give the Group access to one of the world's largest capital markets and to provide the then large number of US employees with the opportunity to invest in the Group through ADRs.

The strategic benefits to the Group of having a US listing and registration no longer apply. Following the capital actions taken by the Group since 2003, R&SA is no longer dependent upon a US listing for capital raising, and today announced the sale of its US operation; in addition the size of the ADR programme is now at its lowest level since April 2004.

Given these reasons, the Group believes that it is no longer cost effective nor in the best interests of R&SA to maintain the NYSE listing, the ADR programme or its SEC registration. The Group estimates the ongoing costs of complying with SEC reporting and other requirements to be over £10m per annum.

R&SA's NYSE listing is expected to terminate on 30 October 2006. In order to terminate the SEC registration and suspend SEC reporting obligations, R&SA must certify that there are less than 300 US holders of each relevant class of security, whether held directly or indirectly, and thereafter must maintain the number of US holders at less than 300. As R&SA currently has over 300 US holders, it will be proposing to amend its Articles of Association to include provisions conferring upon the Board the power to require any US holder to sell securities and restrict the number of US holders. Subject to legal, fiduciary and regulatory requirements and costs, the compulsory transfer power would be applied first to those US holders with the smallest holdings of shares.

Deregistration from the SEC requires an amendment to R&SA's Articles of Association and as such, requires shareholder approval. A formal notice of the meeting and the resolutions to be proposed together with a circular setting out further details will be sent to shareholders on 2 October, with an EGM of R&SA being held on 26 October.

...more

Issued by Royal & Sun Alliance Insurance Group plc  9th Floor  One Plantation Place  30 Fenchurch Street  London EC3M 3BD
Telephone +44 (0)20 7111 7136  Facsimile +44 (0)20 7111 7451

The termination of the ADR programme and delisting from the NYSE will affect neither R&SA's high level of communication and disclosure for all shareholders including US investors, nor its listing of ordinary shares on the London Stock Exchange. In line with other companies listed on the London Stock Exchange, R&SA will resume half yearly reporting for 2007. R&SA maintains high standards of corporate governance and will continue to be subject to the listing rules, the prospectus rules and the disclosure rules made by the UK Listing Authority, and to the Combined Code on Corporate Governance.

R&SA will be hosting a conference call for Investors and Analysts at 9.30 am today. To access the call please dial 0800 358 5260 (UK Freephone) or +44 (0) 20 7190 1232, quoting R&SA. The conference call will also be broadcast live via our website www.royalsunalliance.com and will be available on demand later in the day. Copies of the slides to be presented will be available on the website from 9 am today.

--ENDS--

**For further information:**

| Analysts | Press |
|---|---|
| Helen Pickford | Phil Wilson-Brown |
| Tel: +44 (0) 20 7111 7212 | Tel: +44 (0) 20 7111 7047 |
| Andrew Wigg | Rupert Younger (Finsbury) |
| Tel: +44 (0) 20 7111 7138 | Tel: +44 (0) 20 7251 3801 |

**Notes to Editors**

Sale of US Operation

1. The estimated loss on disposal is calculated as follows:

|  | £m | £m |
|---|---|---|
| Net assets as at 30 June 2006 |  | (322) |
| Capital contribution | (151) |  |
| Present value of deferred consideration | 70 |  |
| Net contribution |  | (81) |
| Transaction and other costs |  | (29) |
| Foreign exchange previously taken to reserves |  | (11) |
| **Estimated pre tax loss on disposal** |  | **(443)** |

Subject to a closing net asset adjustment and foreign exchange

…more

2. The net asset value of the US operation being sold was £322m at 30 June 2006 and £433m at 31 December 2005. These net asset values include the impact of the deconsolidation of the ADC.

3. The US operation's loss before tax was £17m for the six months ended 30 June 2006 and £29m in the year ended 31 December 2005.

4. The gross assets of the US operation being sold were £5,594m at 31 December 2005 and £4,528m at 30 June 2006.

5. The deferred consideration of £158m ($300m) will be funded through dividends paid by the regulated entities to Arrowpoint Capital. No dividends are permitted before the fourth anniversary of the completion date.

6. Arrowpoint Capital Corp. of Delaware is a newly formed company comprised of R&SA US senior management and outside directors.

7. John Tighe, Sean A. Beatty, Dennis W. Cahill, Marc-Andre Lefebvre, Julie A. Fortune, James F. Meehan, Catherine A. Carlino, Robert J. Dixon, Daniel R. Keddie, David M. Davenport, David D. Shumway, Michael J. Crall, Larry G. Simmons and Edward J. Muhl are each a Related Party by virtue of each of them being a director of one or more subsidiaries of the Company which form part of the US Operation. The Purchaser is a Related Party by virtue of the fact the individuals named above are, in aggregate, able to exercise or control the exercise of 30 per cent or more of the votes able to be cast on all, or substantially all, matters at general meetings of the Purchaser.

8. The Group has a number of financial and contractual arrangements with the US operation. These were entered into in the ordinary course of business and continue after disposal of the US operation.

9. Assuming an exchange rate of £1 = 1.90 US$, which was the rate at 22 September 2006.

Delisting and Deregistration

10. As at 4 September 2006 US holdings beneficially held by US residents accounted for approximately 16.8% of R&SA's shares in issue.

11. The ADR programme represents both a small proportion of the Company's overall share capital and the shares held by US residents. As at 31 August 2006, the ADRs represented approximately 2.3% of R&SA's shares in issue. This is the lowest level since April 2004.

...more

12. There is low liquidity in the ADRs, with the average daily trading volumes in the 12 months to 22 September 2006 being 2.2% of the volumes for ordinary shares traded on the London Stock Exchange.

13. A notice terminating the ADR programme is being sent to ADR holders this week and will become effective on 30 October 2006 (the Termination Date). ADR holders have until 30 November 2006 to instruct Citigroup N.A (the Depositary) to exchange ADRs for R&SA ordinary shares. Holders who wish to exchange their ADRs for R&SA ordinary shares can call the Depositary on 877 248 4237 (in the US) or +1 781 575 4555 (from outside the US) for more information on this process.

14. The Depositary's usual charges will apply to all exchanges of ADRs. Any ADRs in existence after 30 November 2006 will be cancelled by the Depositary, who will then sell the R&SA ordinary shares underlying those ADRs with ADR holders being entitled to the sale proceeds net of the Depositary's expenses and other costs.

**Important Disclaimer**
This document contains forward-looking statements as defined in the US Private Securities Litigation Reform Act of 1995. It contains forward-looking statements and information relating to the Company's financial condition, results of operations, business, strategy and plans, and general industry outlook (including trends in results, prices, volumes, operations, margins, overall market conditions, risk management and exchange rates) based on currently available information. These statements are often, but not always, made through the use of words or phrases such as 'aim', 'anticipate', 'believe', 'continue', 'could', 'estimate', 'expect', 'intend', 'may', 'plan', 'seek', 'should' or 'will' or the negative of these terms or similar expressions. The specific forward-looking statements cover, among other matters, our strategy and operational objectives, estimated loss on disposal of the US operation, assumptions relating to the payout patterns under the ADC, the likelihood of draws on the LOC, payment of dividends by the US regulated entities and regulatory approval. The Company undertakes no obligation to update or revise any of the forward-looking statements publicly, whether as a result of new information, future events or otherwise, save in respect of any requirement under applicable law or regulation.

Issued by Royal & Sun Alliance Insurance Group plc  9th Floor  One Plantation Place  30 Fenchurch Street  London EC3M 3BD
Telephone +44 (0)20 7111 7136  Facsimile +44 (0)20 7111 7451

# EXHIBIT 2

# Annual Report & Accounts 2005

# Royal & SunAlliance today

Our strategic vision is a general insurance business with strong market positions delivering sustainable profitable performance

We are delivering strong financial results

| Core Group underlying return on capital — % | Core Group combined operating ratio (COR) — % |
|---|---|



17.7 — 2004
21.6 — 2005

96.1 — 2004
94.1 — 2005

We operate in 27 countries and provide insurance products and services in over 130 countries. We are committed to delivering sustainable returns, targeted profitable growth and continuous operational excellence. Our portfolio of businesses is diverse and provides exposure to markets at different stages of development and at different stages in the insurance cycle.

We have a strong reputation for our underwriting and claims expertise. We are focused on continuous operational improvement to enhance operational efficiency, controls and customer experience.

Key to delivering our strategy is embedding a performance management culture and having the right people. We are committed to developing talent and creating an environment where people are challenged, accountability assigned and performance rewarded.

As a result of the momentum generated, the shape and structure of the portfolio of businesses, our focus on core disciplines of underwriting, claims and expense management, the business has performed strongly. The Core Group COR improved in the year by 2 points to 94.1% and the underlying return on capital for the Core Group was 21.6%.

In 2005 we have delivered against our strategic objectives. We are confident in our ability to continue to deliver on our objective of running general insurance businesses with strong market positions delivering sustainable profitable returns.



**Core Group net written premiums**

UK    COMMERCIAL    PERSONAL

50%
£2,632m

34%
£1,802m
UK

16%
£830m
UK

13%
£703m
SCANDINAVIA

25%
£1,397m

25%
£1,324m

12%
£621m
SCANDINAVIA

15%
£812m
INTERNATIONAL

10%
£525m
INTERNATIONAL

INTERNATIONAL    SCANDINAVIA

We have strong positions in our chosen markets and segments. Underpinning this is our reputation for providing innovative insurance solutions and good customer service.

In the UK we are ranked number two and three in Commercial and Personal respectively. We have a 12% share of the commercial property segment and insure 40% of FTSE 100 companies. Our UK Personal business has a strong reputation for customer service and has 3.5 million covers in place.

In Scandinavia, our two largest operations, Denmark and Sweden, are ranked third overall in terms of market share. We are number one in Danish marine. Latvia and Lithuania are exciting markets with high growth potential and in these markets we are clear market leaders.

Our International business has operations in 21 countries, including Canada, Ireland, Italy and selected emerging markets in Latin America, Asia and the Middle East. We are focused on building our position in our chosen markets, trades and segments.

In Canada, Johnson Corporation, our direct business continues to deliver double digit growth. We have also consolidated our leading position in marine through the acquisition of ING's portfolio. We have a leading position in Irish personal household.

The diversity, strength and focus of our business positions us to deliver sustainable earnings with targeted profitable growth.

# Royal & SunAlliance today
continued

# We have good positions in markets at different stages of development providing us with a range of growth opportunities.

## Growth opportunities in each of our markets



|  |  |  | Strategy |
|---|---|---|---|
| **MATURE MARKETS** | CANADA<br>DENMARK<br>IRELAND<br>ITALY | NORWAY<br>SWEDEN<br>UNITED KINGDOM | DEVELOP DISTRIBUTION OPPORTUNITIES<br><br>GROWTH IN TARGET TRADES AND SEGMENTS<br><br>PROPOSITION DEVELOPMENT<br><br>CUSTOMER MANAGEMENT AND RETENTION |
| **EMERGING MARKETS** | ARGENTINA<br>BAHRAIN<br>BRAZIL<br>CHILE<br>CHINA<br>COLOMBIA<br>EGYPT<br>HONG KONG<br>INDIA<br>LATVIA | LITHUANIA<br>MALAYSIA<br>MEXICO<br>NETHERLANDS ANTILLES<br>OMAN<br>SAUDI ARABIA<br>SINGAPORE<br>UAE<br>URUGUAY<br>VENEZUELA | EXPAND FOOTPRINT<br><br>SELECTIVE INVESTMENT IN LONG TERM MARKETS<br><br>BUILD STRONG DISTRIBUTION<br><br>FOCUS ON TARGETED SEGMENTS |

We have businesses in markets at different stages of development presenting a range of strategic options to deliver growth.

Our strategies vary from market to market but there are a number of common themes supporting all of our businesses. These include leveraging Group expertise and focusing on continuous operational improvement.

We are developing our international marine proposition. Through this we are leveraging our technology, product skills, underwriting and claims expertise. We are number one insurer in Canada and Denmark and a leading marine insurer in the UK and Brazil.

One of our strengths is our ability to take successful initiatives from one market to another. The small and medium enterprise (SME) sector is an attractive, growing segment in a number of markets. In Canada we developed a proposition for the SME sector which we subsequently implemented in the UK and Ireland.

In Denmark we have continued to add to our bancassurance proposition and we have taken this knowledge and applied it to Sweden where the market has yet to develop. Our agreement with FöreningsSparbanken (Swedbank) gives us access to a potential four million customers.

We have been in Chile for 100 years. This year we achieved a market leading position by acquiring the number one Chilean general insurer, Cruz del Sur.

We are focused on building upon the strength of the businesses. Integral to this is our continued focus on the core disciplines of underwriting, claims and expense management.

Our continuous focus on our core disciplines of underwriting, claims and expense management is providing us with real competitive advantage.

## We are committed to operational excellence



| Expense savings — £m | | | | Core Group claims ratio — % | | |

2003: 144
2004: 190
2005: 240

2003*: 69.7
2004: 67.4
2005: 64.9
*On a UK GAAP basis

In 2003 we set out a plan to improve our core competencies; underwriting, claims and expense management and deliver annualised expense savings of £270m by the end of 2006. We have made good progress through restructuring the business, implementing new systems and focusing on underwriting, claims and customer service. At the end of 2005 we have delivered £240m of annualised expense savings.

Through the actions we have taken over the last three years we have reduced MORE TH>N's expense ratio by 14 points to 24.1% at the year end.

We have reduced the Core Group's claims ratio by 2.5 points over the year. In Canada and Ireland claims leakage has halved. In the UK we have built a market leading supply chain and have won contracts with two companies to use our supply chain infrastructure.

We are focused on continuous operational excellence and have a range of initiatives to improve efficiency, procedures and develop a culture of accountability. We continue to embed a performance culture. In the last two years we have strengthened the top management team and clearly aligned reward with personal performance for over 80% of employees and are targeting 90% by the end of 2006.

We have developed a Group risk appetite which defines the type and level of risk the Group wants to take. This is underpinned by a disciplined approach towards risk selection and underwriting with clearly defined levels of authority.

# US operating review

## 2005 has been a productive year with the continued reduction in exposure and infrastructure.

**US**

| £m | 2005 | 2004 |
|---|---|---|
| **General business** | | |
| Underwriting result | (145) | (462) |
| Insurance result | (29) | (372) |

During 2005, we continued our stabilisation and restructuring programme, moving significantly forward with plans to simplify our operations. Highlights included the sale of Nonstandard Auto (NSA), the strengthening of our Risk Based Capital (RBC) ratio, the reduction in regulated insurance entities and domiciliary states and the reduction in losses.

**Overview of major strategies**
Our major focus during 2005 was structural simplification, building on the successful implementation of our stabilisation plan. The overarching goal of our restructuring is to safeguard assets appropriately and minimise the risk of volatility in the overall operating result of the Group. Derisking the business and eliminating operational uncertainties also allows for greater flexibility in pursuing options for bringing certainty and finality to the US business.

To this end, we have sold our last ongoing business and our net written premiums have decreased by 98% since September 2003.

We cut our insurance result loss to £29m for 2005, down from £372m in 2004 and delivered a £3m profit in the fourth quarter.

**Business progress against strategies**
Achieving our stabilisation and restructuring strategy continues to be driven by the six critical drivers introduced in late 2003.

**Claims management**
Our efforts to accelerate the reduction in our claim inventory resulted in a 61% decrease in open claims since December 2003 and liabilities have reduced by $1.2bn in the year to $3.4bn at year end. Cost control initiatives included the introduction of a national litigation management strategy designed to control claim litigation costs, and an early resolution initiative that targets claims, where possible, for immediate settlement and resolution.

**Expense management**
In 2005 we reduced our expense base by $115m to $225m in line with our operational size. We also reduced headcount by 1,299 to 860 at the year end.

**Transition of resources and assets**
We are consolidating the operations whilst ensuring we have a stable, cost effective structure to support our continuing obligations. With the sale of NSA, the remaining US ongoing business is primarily personal insurance. Accordingly, we have filed personal insurance withdrawal plans in several states, with approvals received from four states by the end of February 2006.



Over the last few years, across the Group, we have restructured our portfolio, exited a number of lines of business, more clearly defined our risk appetite and established rigorous underwriting controls. In 2005 there were significant weather events in the Americas. However, through our focus on risk selection and our disciplined approach to underwriting, the Core Group delivered a 42% increase in underwriting profit and a 2 point improvement in the combined operating ratio to 94.1%.

### Legal

Through strong management we are focused on the resolution of claims and corporate litigation. Our proactive approach is successfully mitigating risk and positions us for the best possible litigation results.

### Investment management

We generated a strong investment result. This can be attributed to duration extensions, interest rate rises and additional income earned from higher coupons on the floating rate portfolio.

### Reinsurance recoverables

We aim to maximise the cash available to our operations through aggressive reinsurance collections and cash management. In addition, we are focused on managing and improving our statutory capital position. We collected $1.3bn in reinsurance balances during 2005, bringing our total collections to almost $4bn since the beginning of 2003.

### Sale of Nonstandard Auto

On 1 November 2005, we sold our remaining ongoing business to Sentry Insurance a Mutual Company. The sale included the transition of more than 600 NSA dedicated employees to Sentry. For the first 10 months of the year, NSA reported an operating profit of $37m and a COR of 88.8%.

The transaction provided a post tax gain under IFRS of £71m. It also strengthened our Risk Based Capital. At 31 December 2005, the US operation had an RBC ratio of 2.2.

The NSA sale also allowed for continued simplification of our regulatory structure in the US. The operation reduced the number of domiciliary states to two and insurance entities to four, down from 11 and 25 respectively, at the beginning of 2004. This restructuring streamlined the regulatory process, eliminated the costs associated with maintaining numerous legal entities and enhanced our ability to maximise investment return by reducing the number of separate, individual company portfolios.

Governance continued to be a top priority as evidenced by the process controls implemented across the operation, robust risk assessment and performance management initiatives. Our success in this area was substantiated by internal audits conducted during 2005.

We have continued to closely monitor regulatory and legislative matters in the US, especially the asbestos litigation reform process at the federal level. In February, debate by the senate resulted in Bill 852, the trust fund legislation, being sent back to the committee. As it stands today, it is possible that the focus could shift to a medical bill or another version of asbestos reform. We will continue to monitor developments.

### Outlook

During 2006, we will continue the work to identify a solution to the challenges we face in the US. We will maintain our focus on stabilising and restructuring the US organisation in a cost effective and efficient manner, while maintaining an appropriate control environment.

We appointed Edward Muhl to the US Board in January 2006. He brings with him nearly 40 years of insurance industry experience, having served in a regulatory capacity as Superintendent of Insurance, State of New York; Commissioner of Insurance, State of Maryland and President of the NAIC (National Association of Insurance Commissioners).

Achieving stabilisation has not been easy and we still face uncertainty associated with long tail reserves and litigation. On a business as usual basis, we anticipate broadly breaking even at the insurance level in 2006. We continue to focus on driving down claims and expenses and actively explore opportunities to accelerate coming off risk. Our objective is to bring certainty and finality to the US exposure. Execution of this is complex, will take time and will not be a totally smooth ride.

We continue to reduce our exposure and actively explore options to accelerate coming off risk.





# Directors' Report

The directors of Royal & Sun Alliance Insurance Group plc present their report and the audited financial statements of the Company for the year ended 31 December 2005.

**Principal activity**
The Company is the holding company of the Royal & SunAlliance Group of companies (the Group) whose principal activity is the transaction of personal and commercial general insurance business. The Group operates in 27 countries.

**Review of the year and future developments**
These are outlined in the Chairman's Statement and Group CEO's Review and the Operating Review beginning on page 4. The Group consolidated financial statements are shown on pages 54 to 57.

**Dividends**
The directors recommend a final dividend of 3.05p per share which, if approved, will be due for payment on 2 June 2006 to holders of ordinary shares on the register at the close of business on 17 March 2006. This, together with the interim dividend of 1.69p per share, will make a total dividend for the year of 4.74p per share.

The preferential dividend at the rate of 3.6875% for the period from 1 October 2005 to 31 March 2006 is to be paid on 3 April 2006 to holders of preference shares on the register at the close of business on 17 March 2006.

**Employment policy**
The Group's employment policy reflects our belief that motivated and skilled employees are critical to our success.

We promote equal opportunities and diversity across the Group. This involves recruiting, retaining, rewarding and developing people solely on the grounds of ability to do the job, and establishing and promoting a working environment which is free from discrimination.

The Group is committed to preventing discrimination on the grounds of disability. This includes ensuring that all job applicants, including those with a disability, are considered solely on the basis of ability to do the job, and making reasonable adjustments to working environment, working arrangements and working conditions to support disabled employees. We are committed, wherever possible, to supporting the rehabilitation and return to work of employees who become disabled during their career with us.

The Group is committed to fostering a constructive dialogue with independent trade unions wherever they are recognised, ensuring a regular and constructive dialogue on business issues and early consultation on changes affecting the workforce. In the UK, Amicus is formally recognised through a partnership agreement which covers collective consultation and bargaining on behalf of non management employees. The Management Association (TMA) represents managerial employees under a separate consultative agreement. In June 2005, 19 elected delegates from our European businesses attended the annual European Consultative Forum (ECF), which is a cross European body created to enable information sharing and consultation on transnational issues with the European workforce. In 2005, an amended ECF constitution was agreed which introduced streamlined consultation arrangements.

The Group continues to focus on the development of employees in order that they can deliver high levels of performance. In 2005 a particular focus has been the further development of the Executive Development Programme (EDP), a global programme which aims to accelerate the development of our in house executive talent. The EDP has been designed to support those who have the potential to take on Executive Team or direct report to Executive Team roles in the future, thus ensuring that we build a pipeline of strategic leadership capability within the business.

The web based Global Employee Survey was run for the first time in 2004 and repeated in 2005. In 2005, 91% of eligible employees took the opportunity to contribute. Our aim is to consistently seek feedback on the environment we are creating as an employer and to work constructively towards our objective of becoming an employer of choice. Our intention is to repeat this survey annually, to ensure we have a current picture of employees' views and also to track year on year movement in particular areas of priority. In this way, by asking our employees, we measure how the culture of our business is changing. For example, in 2005 we have seen a significant improvement in the proportion of employees who responded positively to the statement 'The better my performance, the better my pay will be'. We believe we can create real competitive advantage by building and maintaining a high performance culture across the Group. As in 2004, we have used the 2005 results to build a Groupwide action plan which requires every manager to identify and work on areas of particular importance to their team.

Our policy is to encourage employee share ownership. Employees from the majority of our global businesses are encouraged to participate in the International Sharesave Plan which is an Inland Revenue approved all employee sharesave scheme.

Employees are kept well informed of the performance and objectives of the Group.

The Group actively encourages employees to become involved in supporting their local communities. Further details are provided in the Corporate Responsibility section of this report on page 32.

**Environmental policy**
Details of our environmental policy can be found on our website at www.royalsunalliance.com.

**Corporate governance**
A report on corporate governance appears on pages 39 to 43.

**Supplier payment policy**
It is the Group's policy to agree appropriate terms and conditions in advance with its suppliers and to make payment in accordance with those terms and conditions, provided that the supplier has complied with them. In most cases, agreements for the supply of goods or services are made under standard terms of contract that lay down payment terms. In the UK these are available on request from UK Purchasing, Leadenhall Court, 1 Leadenhall Street, London EC3V 1PP.

The Company's outstanding indebtedness to trade creditors on 31 December 2005 amounted to £2,719,448 corresponding to 12 days' payment when averaged over the year.

# Directors' Report
continued

### Share capital
During the year, 2,137,513 ordinary shares of 27.5p each were issued in satisfaction of the exercise of employee share options for a total consideration of £2m, and 20,661,210 ordinary shares of 27.5p each were issued under the Company's scrip dividend scheme for a total consideration of £20m. An authority from the shareholders for the Company to purchase up to 291,236,359 of its own ordinary shares (representing 10% of its issued share capital as at 9 March 2005) remained in force at 31 December 2005.

### Substantial share interests
As at 8 March 2006, Brandes Investment Partners LLC and Legal & General Group plc had declared an interest in ordinary shares of 27.5p each in the Company representing 6.7% and 3.2% respectively of the issued ordinary share capital, in accordance with Part VI of the Companies Act 1985.

### Directors
Members of the Board of Directors are listed on page 35.

David Paige was appointed to the Board on 16 February 2005. Bridget McIntyre was appointed to the Board on 2 November 2005.

At the 2006 Annual General Meeting Bridget McIntyre will be eligible for reappointment under Article 110. John Napier and Andy Haste will retire by rotation under Article 106 and, being eligible, offer themselves for re-election.

### Related party transactions
Related party transactions are set out in note 34 on page 111.

### Charitable and political contributions
The Company and its subsidiaries worldwide made charitable donations of £744,412 during the year. The largest donation of £250,000 was made to the Samaritans Partnership. The Group did not make any donations to European Union (EU) political parties, nor to political parties outside the EU during 2005, and it is not the Group's policy to do so.

### Annual General Meeting
The Annual General Meeting will be held at the Queen Elizabeth II Conference Centre, Broad Sanctuary, Westminster, London SW1P 3EE on Monday 22 May 2006 at 11.00 am.

Enclosed with this report is a letter from the Chairman to shareholders. Attached to the letter is the Notice convening the meeting which will include items of ordinary and special business that are explained in the letter.

### Auditors
PricewaterhouseCoopers LLP have confirmed their willingness to continue in office as auditors of the Company and a resolution for their reappointment will be proposed at the Annual General Meeting.

By order of the directors
**Mark R Chambers**
General Counsel and Group Company Secretary
London
8 March 2006

# Corporate Governance

Compliance with the provisions of the Combined Code

The Group complied throughout 2005 with the Principles and Provisions of section 1 of the new Combined Code and with the Schedules except with respect to:

- The appointment of a senior independent director (Provision A.3.3).

- A majority of independent directors on the Nomination Committee (Provision A.4.1).

The required explanation for these exceptions is the significant restructuring of the Board in recent years, the relative size of the Board and the high frequency of meetings. All non-executive directors are encouraged to communicate directly with executive directors outside formal meetings and an active dialogue is maintained by the Board on ongoing issues. The non-executive directors have a unanimous view that the appointment of a senior independent director is not required at this time. Notwithstanding the composition of the Nomination Committee, all non-executive directors would be involved in any process for the appointment of an additional independent director.

## Sarbanes Oxley
The Group is required to comply with the Sarbanes Oxley Act 2002 as a result of its listing on the New York Stock Exchange. An internal programme established in 2003 to ensure compliance and to embed controls in the business is nearing completion.

The Group has placed on its website www.royalsunalliance.com a general summary of the significant ways in which the Group's corporate governance differs from that followed by domestic US companies under the New York Stock Exchange's listing rules.

## The Board
The Board is responsible for organising and directing the affairs of the Company and the Group in a manner that is in the best interests of the shareholders, meets legal and regulatory requirements and is also consistent with good corporate governance practices. There is a formal document setting out the way in which the Board operates.

The Board is also ultimately responsible to the Financial Services Authority (FSA) for ensuring compliance with the Group's UK regulatory obligations.

The principal matters reserved to the Board include:

- Approval of the Group's long term objectives and commercial strategy,

- Approval of changes to the Group's senior management structure,

- Approval of the Group's overall risk appetite,

- Annual review of the effectiveness of internal control arrangements,

- Approval of the annual operating and capital budgets,

- Changes to the Group's capital structure,

- Approval of the Group's financial results and any significant changes to accounting practices or policies.

The division of responsibilities between John Napier, the Chairman, and Andy Haste, the Group CEO, has been clearly established by way of written role statements, which have been approved by the Board.

The Chairman's main responsibilities are to lead the Board, liaising as necessary with the Group CEO on developments between meetings of the Board, and to ensure that the Group CEO and his executive management team have appropriate objectives and that their performance against those objectives is reviewed.

The Group CEO is responsible to the Board for the executive management of the Group and for liaising with the Chairman and keeping him informed on all material matters.

The Group's Delegated Authority Policy specifies how executive authority is delegated from the Board to the Group CEO and then on to the other executives in the Group. Individual executive licences issued by the Group CEO to each of his direct reports set out their specific limits of authority in terms of entering into financial, underwriting and other business commitments. Each direct report is responsible for ensuring a similar process of delegation is in place within their area of responsibility.

The Articles of Association of the Company require directors to submit themselves for reappointment at the first Annual General Meeting after their appointment and for re-election every three years thereafter. The Board met 12 times during 2005. In addition, there were five occasions when directors met as a Committee of the Board in order to authorise transactions already agreed in principle at Board meetings. On those occasions a quorum of two directors was required.

## Directors
Biographical details of all current directors can be found on page 35. The appointments of David Paige and Bridget McIntyre as executive directors, with effect from 16 February 2005 and 2 November 2005 respectively, were announced during the year.

In seeking new directors, the Chairman and the Nomination Committee have had regard to the size of the Board and the balance of executive and non-executive directors as well as of the skills and experience which are already represented and those which would be desirable on the Board going forward.

Attendance at meetings of the Board and the Group Audit, Nomination and Remuneration Committees is shown in the table on page 43.

In 2005 the Board undertook a formal evaluation of its performance and of all of its committees, as well as an appraisal of the Chairman's performance and that of the individual directors. This included the use of a comprehensive questionnaire.

At all times during the year, at least half of the Board was comprised of non-executive directors.

The Chairman meets regularly with the non-executive directors both individually and collectively without the executive directors.

The Board considers that all of the non-executive directors who have served during the year were independent.

The Chairman met the independence criteria in the Combined Code on his appointment in 2003. There have been no changes to his external commitments since then which might affect his responsibilities to the Group. None of the executive directors are on the board of another FTSE 100 company.

# Corporate Governance
continued

Non-executive directors are aware that they have to report any change in their circumstances or those of the members of their families that might lead to the Board reconsidering whether they are independent. Directors are also aware that they have to make the Board aware of any conflict of interest they might have in respect of any item of business and absent themselves from consideration of any such matter.

Directors have the right to have their concerns about the running of the Company minuted and documented in a written statement on resignation.

The Company has arranged appropriate insurance cover in respect of legal action against its directors and officers.

### Professional development and training
On appointment, new directors are subject to a formal induction programme and receive training and guidance on their duties and responsibilities. Continuing professional development is offered to all directors and the Board is given guidance on developments.

### Resources
Directors have access to the services and advice of the General Counsel and Group Company Secretary, and may take additional independent professional advice at the Group's expense in furtherance of their duties.

### Corporate Governance Framework
The Group's Corporate Governance Framework describes and prescribes how the Group is directed and managed by setting out the matters reserved for the Board, the terms of reference of Board and management committees, role statements, policies, systems, procedures and controls.

### Committees
Details of the chairmen and membership of the Group Audit, Nomination, Remuneration and Investment Committees are set out in the table on page 43 together with details of attendance at meetings.

The Investment Committee meets twice a year, now under the chairmanship of Malcom Le May. All non-executive directors are members of the Committee, which assists the Board in setting the Group's investment strategy and monitors the execution of that strategy and the Group's investment performance.

The Board Risk Committee was chaired by Andy Haste until February 2005. David Paige, the Group Risk Director, assumed the role of Chairman of the Committee with effect from March 2005. This Committee oversees all aspects of risk faced by the Group in accordance with the Board approved risk appetite, which is set out in policies, control limits and other mechanisms in relation to such risks.

The Board Risk Committee, which meets quarterly, comprises the executive directors with other executive management as regular attendees. Its purposes include: defining the Group's risk appetite prior to approval by the Board; approval of policy and minimum standards that are consistent with the appetite; ensuring that risks that are outside the appetite are mitigated in an appropriate manner; and overseeing and challenging the Group's risk management processes. The Committee achieves these objectives by considering reports from risk specialists both internal and external to the Group, and by reviewing Group level risk management information.

### Risk management and internal control
The Board has overall responsibility for the Group's systems of risk management and internal control and for reviewing their effectiveness

at least annually. The systems are designed to manage, rather than eliminate, the risk of failure to achieve business objectives and can only provide reasonable and not absolute assurance against material financial misstatement or loss.

Executive management has the responsibility for establishing and implementing appropriate systems and controls in their own areas of remit. The Group Risk Management Framework provides the mechanism through which risk management and control is embedded throughout the Group. Each business is required to follow a consistent process to identify, assess, manage and monitor their key risks. A central risk management function (the Group Risk function) oversees this process and reports progress to the Board Risk Committee and Group Audit Committee.

### Group risk appetite
The Group has established a statement of 'Group risk appetite' which sets business volumes for certain higher risk insurance classes, stipulates loss retention limits, reinsurance protection, targets for credit rating and solvency margins, and other appropriate measures. There is a formal escalation process for potential or emerging risks that are outside the risk appetite.

Further work was carried out during 2005 to integrate the capital and risk management frameworks and enable the Group to measure, on a consistent basis, the relative risk of its operations worldwide and to allocate capital on the basis of an assessment of risk and return.

### Risk framework
The Group has continued to adopt the risk management model known as the 'three lines of defence' governance model. The framework for the oversight and management of risk is as follows:

• Management – the first line of defence, in setting strategy, performance, measurement, establishment and maintenance of internal control and risk management in the business,

• Risk assessment – the second line, operating a formal risk management framework within which the Group policies and minimum standards are set and objective oversight and challenge of risk management across the Group is achieved. This includes the Board Risk Committee, supported by the Group Risk function and a Groupwide network of regional risk committees,

• Independent assurance – the third line of defence, providing independent and objective assurance of the effectiveness of the Group's systems of internal control established by the first and second lines of defence. This is the Group Audit Committee, supported by Group Internal Audit.

### Group risk policy statements
Group risk policy statements set out the minimum standards to be maintained by the Group's operations in order to manage their risks in a way that is consistent with the risk appetite. Business managers are responsible for complying with Group and local risk policies and for managing risk by taking mitigating actions where risks are outside the appetite. The Board Risk Committee's oversight and challenge role includes consideration of risk mitigation.

Policy statements are drafted by Group Risk in consultation with regional business units and approved by the Board Risk Committee.

They are mandatory policies that business units must comply with unless they obtain approval for a variation of or dispensation from a particular requirement. Breaches that are identified by Regions, or through monitoring activity, must be escalated to the appropriate level, with material breaches being reported to the Committee. Processes are in place to keep policies under review in order to reflect changes in circumstances and the risk appetite. Accompanying these policies there are a number of detailed documents setting out best practice in key areas.

Risk categories
Within the Group the risk elements are viewed under the following headings, which broadly correspond to headings used in the Financial Services Authority's Integrated Prudential Sourcebook (PRU):

• Insurance (underwriting and claims) risk.

• Reinsurance risk.

• Operational risk.

• Credit, market and liquidity risk.

• Regulatory risk.

Additional information is provided in note 28.

We also take account of strategy risk and of the contagion risk, whether financial, operational or reputational, faced by individual entities as a result of being members of the Group.

The following details some of the key current practices, tools and other arrangements for each risk category.

Insurance risk
The Group's general insurance activities are primarily concerned with the pricing, acceptance and management of risks arising from our contracts with customers. The management of the underwriting and claims risks uses a number of key tools, including territorial underwriting licences that authorise countries to write certain higher risk classes of business, reviewing the performance and management of all the individual insurance portfolios throughout the Group and the investigation of potential emerging insurance risks. We are continuously improving the oversight, and tools in support of it, in this area to ensure that we remain in control of our insurance business and the risks within it.

Claims development and reserving levels are closely monitored by Reserve Committees. Each Region's Reserve Committee determines a recommended level of outstanding claims reserves, the recommendations of which are determined in accordance with the Group Reserving Policy. The Group Reserve Committee then consider these recommendations before determining the final level of outstanding claims reserves to be carried by each Region and consequently by the Group in aggregate.

Reinsurance risk
The Group's reinsurance strategy and appetite are set and agreed by the Board Risk Committee and published and disseminated via the Group reinsurance policy statement. The Group Reinsurance Credit Committee oversees the implementation of the counterparty credit aspects of this strategy.

A combined Group and UK reinsurance team monitors and controls reinsurance activity throughout the Group, and has responsibility for the purchase of the Group's worldwide programme of treaties.

All major treaty purchases are analysed using various sophisticated modelling tools to ensure that the level of cover purchased is capital efficient and aligned with Group risk appetite and strategy.

Operational risk
Operational risk exists in every facet of the organisation, including those areas that are not viewed as 'operating units'. As such, all areas of the Group and its major outsourcing providers are involved in addressing and controlling operational risk.

The Group uses a suite of risk tools to help manage operational risk using a common categorisation of risk. These tools include Risk and Control Self Assessments, Key Risk Indicators, Scenario Analyses, Incident Management and Loss Data.

Risk and Control Self Assessments are undertaken on a regular basis as part of the Business Risk Assessment Process. This is a Groupwide risk assessment process and has three main elements: high level risk assessments, which review risks from the 'top down'; 'bottom up' risk self assessments; and external events and material change assessments, which assess risks during times of significant change to the organisation, infrastructure and business operating environment.

A series of forward looking key risk indicators are used to assess potential future trends in operational risks, whilst data collected on actual operational risk incidents and 'near misses' captures past experiences. In addition, the use of scenario analyses enables the Group to assess whether certain operational events that have occurred elsewhere could manifest themselves within the Group. When taken together, the tools provide a complementary set of indicators of the Group's operational risk profile.

Credit, market and liquidity risks
The primary sources of credit risk within the Group are investment and treasury activities and reinsurance counterparty risk. Within the investment management and treasury activities, a range of bank counterparty concentration and credit quality limits together with other controls are in place to ensure that exposure is managed within the Group risk appetite. New reinsurance cover is placed with reinsurers that are authorised as Approved Reinsurance Counterparties recommended by the Group Reinsurance Credit Committee under criteria approved by the Board Risk Committee. Target credit profiles and single name limits are set to manage and control the Group's reinsurance credit exposure within the Group's risk appetite. The overall risk appetite for credit risk within all of the Group's activity remains low.

Market risk arises from the Group's investment portfolios. The Global Asset Management Committee is the management committee that oversees the Group's investment strategy under the oversight of the Investment Committee and operating within risk limits set by the Board Risk Committee. During 2005 the Group has introduced enhanced risk analytical techniques in line with the Group's capital model to improve the quantification and understanding of the risk exposures.

Liquidity risk is considered to be a low risk category. Group liquidity is managed by Group Treasury and each operation is required to maintain a minimum level of cash or cash equivalents or highly liquid assets that can be liquidated within a maximum stated period of time. Contingency funding plans are prepared and monitored to ensure that these minimum levels are met even in stress conditions.

# Corporate Governance
continued

### regulatory risk

The Group operates in a number of geographical locations with diverse regulatory requirements. Internationally the regulatory environment is becoming more complex and demanding. In response to this the Group continues to strengthen its arrangements for regulatory compliance and to ensure that it maintains open and cooperative relationships with its regulators.

### Risk review visits

In addition to setting policy and standards, Group Risk undertakes risk review visits to regional operations to review regional risk management practices. These review visits are tailored to the risk profile for the operation and will consider inter alia insurance, operational, credit, market, liquidity, strategic and emerging risks.

### Annual General Meeting (AGM)

The AGM Notice is despatched to shareholders at least 20 working days before the meeting and contains separate resolutions including a resolution to adopt the Annual Report & Accounts. At AGMs, the Chairman of the Group and the chairmen of the Group Audit, Nomination and Remuneration Committees make themselves available to take questions from shareholders.

The Company has arrangements in place with its registrars to ensure that all proxy votes are received and accurately counted. The level of proxies lodged on each resolution, including votes for, against and abstained are published on the Group's website at www.royalsunalliance.com after each AGM.

### Directors' responsibilities

The directors are required to ensure that adequate accounting records are maintained so as to disclose at any time, and with reasonable accuracy, the financial position of the Group. They are also responsible for taking reasonable steps to safeguard the assets of the Group and to prevent and detect fraud and other irregularities.

They must present financial statements for each financial year which give a true and fair view of the state of affairs of the Company and Group and of the profit or loss for that period. In preparing such financial statements, they are required to:

• Select suitable accounting policies and apply them on a consistent basis using reasonable and prudent judgement,

• State whether or not applicable accounting standards have been followed and explain any material departures,

• Use the going concern basis unless it is inappropriate to do so.

### Basis of accounts

The directors have satisfied themselves that the Group has adequate resources to continue in operation for the foreseeable future having given consideration to the uncertainties and contingencies disclosed in the financial statements and have therefore prepared the financial statements on a going concern basis.

### Internal controls

The Board reviews annually the effectiveness of the Group's system of internal controls in order to safeguard the Group's assets and shareholders' investment. This system includes governance, financial controls, the risk management framework and operational, regulatory and compliance requirements.

The Board through the Group Audit Committee receives reports from the Group Chief Auditor and his team on the integrity of the control environment and also receives reports from the external auditors based upon their audit work. The Group Audit Committee also receives reports on the Group's arrangements for ensuring regulatory compliance. The Board, through the Board Risk Committee, considers reports from risk specialists both internal and external to the Group, and reviews Group level risk management information.

Each quarter there is a self certification process completed by business managers across the Group to confirm the adequacy of controls and their compliance with Company policies, laws, rules and regulations.

The Board considers that collectively this reporting framework gives it sufficient information upon which to monitor the systems of internal control and to review their effectiveness as required by the Combined Code. The Board therefore considers that there is an ongoing process for identifying, evaluating and managing the significant risks faced by the Group, that it has been in place for 2005 and up to the date of approval of the Annual Report & Accounts, that it is regularly reviewed by the Board and accords with the Turnbull Guidance on the Combined Code.

### Report of the Group Audit Committee
#### Membership

The membership of the Committee and the attendance record of directors in 2005 is shown in the table below. All members of the Committee are independent non-executive directors. Both Edward Lea and John Maxwell have recent and relevant financial experience.

In 2005, the Committee met seven times. The Chairman, Group CEO, Chief Financial Officer, Group Risk Director, Director Regulatory Risk and Compliance and the Group Chief Auditor are regular attendees. Other members of executive management are also invited to attend from time to time.

#### Principal duties

The Committee's principal duties are as follows:

• To coordinate and have oversight of the Group's financial reporting process,

• To monitor compliance,

• To have oversight of internal and external audit functions,

• To manage the systems of internal controls,

• To review all matters relating to the legal integrity of the Group,

• To provide assurance on the effectiveness of the Group's risk management.

The terms of reference of the Group Audit Committee, which explain its role and the authority delegated to it by the Board of Directors, are available on the Company's website at www.royalsunalliance.com or on request from the General Counsel and Group Company Secretary.

#### Internal audit

The Group has an internal audit function, whose activities and effectiveness are monitored and reviewed by the Committee. The Committee is responsible for approving the appointment and removal of the Group Chief Auditor, and for ensuring that adequate access to information and resources is given to the holder of that position.

The Committee meets regularly with internal and external auditors without management present. The partner of the Group's external auditors who is responsible for the audit is invited to attend all meetings. Each year, the Committee considers the performance of the external auditors prior to a resolution on their reappointment and remuneration at the AGM.

During the year, PricewaterhouseCoopers LLP were, on a number of occasions, engaged as advisors. In order to maintain their independence, such appointments are only made in accordance with a protocol developed by the Board (available on the Company's website). This gives guidance to businesses within the Group on the appropriateness of engaging the Group's external auditors as advisors and sets down the procedures to be followed to authorise such an engagement. The Committee is satisfied that this protocol has been followed and there are no matters that would compromise the independence of the auditors or affect the performance of their statutory duties. PricewaterhouseCoopers LLP have also considered their position and have confirmed their independence to the Company in writing.

The Board has accepted the Committee's recommendation that a resolution be put to the 2006 AGM for the reappointment of PricewaterhouseCoopers LLP as external auditors.

### Whistleblowing

It is the Committee's responsibility to keep the procedures laid out in the Group whistleblowing policy under review. This policy deals with employees who wish to raise serious concerns in good faith, and either do not feel comfortable raising the matter with local management or

are not satisfied with the local management response. They can raise their concerns with the Group Chief Auditor, who will either investigate or arrange for an investigation of the matter. Employees are offered such safeguards and support as may be necessary to protect their personal integrity and, where possible, identity.

## Report of the Nomination Committee

### Membership

The membership of the Committee and the attendance record of directors in 2005 are shown in the table below. The Committee met three times during 2005.

### Principal duties

The Committee's principal duties are to review the structure, size and composition of the Board and to evaluate the directors' skills, knowledge and experience. It has access to external recruitment consultants in order to help fill any vacancies. The Committee considers the leadership needs and succession planning of the Board when making decisions on new appointments. Resolutions to reappoint directors at an AGM are not proposed automatically, but are subject to the approval of the Board, taking into account the recommendations of the Committee.

The terms of reference of the Committee, which explains its role and the authority delegated to it by the directors, are available on the Company's website at www.royalsunalliance.com or on request from the General Counsel and Group Company Secretary. The terms and conditions of appointment of the non-executive directors will be available for inspection at the AGM.

### Board and board committee membership and attendance in 2005
Directors attending Board and board committees during 2005 was:

| | Notes | Board meetings | Board Committee | Group Audit Committee | Investment Committee | Nomination Committee | Remuneration Committee |
|---|---|---|---|---|---|---|---|
| **Total number of meetings in the year** | 4 | 12 | 5 | 7 | 2 | 3 | 7 |
| George Culmer | | 12 | 5 | – | 1 | – | – |
| Noel Harwerth | | 12 | – | 7 | 2 | – | – |
| Andy Haste | | 12 | 5 | – | 2 | – | – |
| Edward Lea | | 12 | – | 7* | 2 | – | 6 |
| Malcolm Le May | | 7 | – | – | 2* | – | 5 |
| John Maxwell | | 11 | – | 6 | 2 | 3 | 6* |
| Bridget McIntyre | 2 | 2 | – | – | – | – | – |
| John Napier | 3 | 12* | – | 4 | 2 | 3* | 3 |
| David Paige | 1 | 11 | – | – | 2 | – | – |

*Chairman of the Board or board committee

### Notes
1. David Paige was appointed to the Board on 16 February 2005.

2. Bridget McIntyre was appointed to the Board on 2 November 2005.

3. John Napier attended three meetings of the Remuneration Committee and four meetings of the Group Audit Committee by invitation.

4. In addition to attendance as above, Andy Haste and other executive directors regularly attend, by invitation, meetings of the Group Audit Committee and Remuneration Committee.

By order of the directors
**Mark R Chambers**
General Counsel and Group Company Secretary
London
8 March 2006

## 71. Subsidiaries

| Country of incorporation | | Principal activity |
|---|---|---|
| United Kingdom (note 1) | Royal Insurance Holdings plc (note 2) | Holding company |
| | Royal & Sun Alliance Insurance plc | General insurance |
| | British Aviation Insurance Company Limited (57.1%) | General insurance |
| | The Globe Insurance Company Limited | General insurance |
| | The Marine Insurance Company Limited | General insurance |
| | Royal International Insurance Holdings Limited | General insurance |
| | Royal & Sun Alliance Reinsurance Limited | General insurance |
| | Sun Alliance and London Insurance plc | General insurance |
| | Sun Insurance Office Limited | General insurance |
| Argentina | Royal & Sun Alliance Seguros (Argentina) SA | General insurance |
| | La Republica Compania Argentina de Seguros Generales SA | General insurance |
| Bahrain | Royal & Sun Alliance Insurance (Middle East) Limited E.C. (50.01%) | General insurance |
| Brazil | Royal & Sun Alliance Seguros (Brasil) SA | General insurance |
| Canada | Roins Financial Services Limited | Holding company |
| | Compagnie d'Assurance du Quebec | General insurance |
| | The Johnson Corporation | General insurance |
| | Royal & Sun Alliance Insurance Company of Canada | General insurance |
| | Western Assurance Company | General insurance |
| Chile | Royal & Sun Alliance Seguros (Chile) SA (97.5%) | General insurance |
| | Compania de Seguros Generales Cruz del Sur SA | General insurance |
| Colombia | Royal & Sun Alliance Seguros (Colombia) SA (86.5%) | General insurance |
| Denmark | Codan A/S (71.7%) | Holding company |
| | Codan Forsikring A/S (71.7%) | General insurance |
| Guernsey | Insurance Corporation of the Channel Islands Limited | General insurance |
| Hong Kong | Royal & Sun Alliance Insurance (Hong Kong) Limited | General insurance |
| Isle of Man | Tower Insurance Company Limited | General insurance |
| Mexico | Royal & Sun Alliance Seguros (Mexico) SA | General insurance |
| Netherlands Antilles | Royal & Sun Alliance Insurance (Antilles) NV (51.0%) | General insurance |
| Singapore | Royal & Sun Alliance Insurance (Singapore) Limited | General insurance |
| Sweden | Trygg-Hansa Försäkrings AB, Publikt (71.7%) | General insurance |
| United States of America | Royal & Sun Alliance USA, Inc | Holding company |
| | Guaranty National Insurance Company | General insurance |
| | Royal Indemnity Company | General insurance |
| | Royal Surplus Lines Insurance Company | General insurance |
| | Security Insurance Company of Hartford | General insurance |
| Uruguay | Royal & Sun Alliance Seguros (Uruguay) SA | General insurance |
| Venezuela | Royal & Sun Alliance Seguros (Venezuela) SA (99.9%) | General insurance |

**Notes:**

1. All UK companies are incorporated in Great Britain and are registered in England.

2. 100% direct subsidiary of Royal & Sun Alliance Insurance Group plc.

3. Except where indicated all holdings are of equity shares and represent 100% of the nominal issued capital. In all cases the proportion of voting power held equals the proportion of ownership interest.

4. Some subsidiaries have been omitted from this statement to avoid providing particulars of excessive length but none materially affects the results or assets of the Group.

# EXHIBIT 3

ANNUAL REPORT & ACCOUNTS 2000

Building on our
global strengths to set
the agenda for the
insurance industry

ROYAL &
SUNALLIANCE

# General business premiums written up 16%, life premiums written up 5%, investment product sales up 9%

# Group operating result (based on LTIR) £476m

# Dividend for the year 26.0p

GUIDE TO TERMS          FINANCIAL HIGHLIGHTS

**Net premium**
The amounts receivable from policyholders, less the amounts payable to our own reinsurers, in respect of policies that have commenced in the year

**Group operating result (based on longer term investment return)**
The Group's general business underwriting result plus the long run investment return arising on the related capital and technical provisions, together with the life and other activities results which are also calculated on long run investment returns

**Group operating earnings per ordinary share**
That part of Group operating result (based on LTIR) attributable to holders of ordinary shares, adjusted for tax; stated as the value per weighted average ordinary share in issue

**Total capital**
The assets invested in the business by (1) shareholders (2) minority shareholders in part owned subsidiaries (3) subscribers to dated loan capital issued

**Shareholders' funds**
The assets invested in the business by shareholders of ordinary and preference shares

**Net asset value per share**
Net assets attributable to holders of ordinary shares, adjusted for statutory provisions; stated as the assets per ordinary share in issue

|  | 2000 | 1999 |
|---|---|---|
| **Revenue** |  |  |
| General business net premiums written | **£8,372m** | £7,159m |
| Life business net premiums written | **£3,439m** | £3,284m |
| Investment products | **£755m** | £701m |
| **Results** [*] |  |  |
| Group operating result (based on LTIR) | **£476m** | £566m |
| Group operating earnings per ordinary share | **18.5p** | 25.2p |
| **Balance Sheet at 31 December** |  |  |
| Total capital | **£7,507m** | £7,500m |
| Shareholders' funds | **£6,323m** | £6,484m |
| Net asset value per share (adding back equalisation provisions) | **452p** | 463p |
| **Dividend** |  |  |
| Total dividend for the year per ordinary share | **26.0p** | 24.7p |
| Special dividend paid June 1999 | **–** | 48.0p |

[*] For a full explanation of 'Results', see the results section in the Group Finance Director's report on page 34.



# Forward looking since 1710

**WHO WE ARE:** A TRULY GLOBAL COMPANY

Jenkin Jones, secretary to the Phoenix Company for more than 30 years



Firemark from the Royal, founded in 1845

Firemark from the Sun, founded in 1710

Firemark from the Alliance, founded in 1824

## Who are we?

Royal & SunAlliance is one of the world's leading global insurers. We are also one of the world's oldest insurance companies tracing our roots back to 1710.

Approximately 70% of our business is general insurance with the rest in the life, savings and investment business. We have operations in around 50 countries and the ability to cover risks in over 130 countries, giving us one of the few truly global networks in the insurance industry. Worldwide we have around 50,000 employees providing services to over 20 million customers.

We operate local, focussed life operations, primarily in the UK, Australia, Denmark, Isle of Man, Chile and Canada, but we are placing our growth emphasis on the general insurance business, where we are strongest and we believe that the returns are going to be greatest over the next few years.

*Our aim is to use customer focus and operational excellence to deliver shareholder value.*

Robert Lewis 1866-1916, 50 years Chief Officer of the Alliance

## History

The history of Royal & Sun Alliance Insurance Group plc is really the story of how insurance began and has prospered over a period of 290 years. It involves the histories of many companies other than the three which you can find in the current name - the Sun (founded in 1710) which is now the oldest insurance company transacting business in its own name, the Alliance (founded in 1824) and the Royal (founded in 1845).

We have a long history of operating internationally: on the European mainland since the late 1700's; in the United States and Canada since 1804; in Australia since 1848; in South Africa since 1852; in Chile since 1856 and in Argentina since 1874. We also operated in India and China from 1852 until nationalisation and were the first UK general insurance company to return to both markets, re-opening in China in 1998 and in India in 2000.

The Group is therefore a product of a continuous process of amalgamation which has included Westminster Fire Office (founded in 1717); London (founded in 1720), Phoenix (founded in 1782), County, Sea, Beacon, Liverpool Fire & Life, Globe, Law Fire, Lancashire, Household & General and more recently Tyndall, Trygg-Hansa and Orion Capital.



Policy document from the Sun



US & Canada   South Africa
Europe   Australia   South America
Reopened in China and India

Royal & SunAlliance Worldwide Group Office, London

## Business Performance

Our focus on general insurance is driven by our return on capital (ROC) targets, where we believe that a well run general insurer can achieve excellent returns. We allocate capital to our operations based on a sophisticated risk based capital (RBC) model. This model allows us to compare risk based returns on each operation and influences our investment and reinsurance policies. It is also the driver behind our 103% target operating ratio for 2001.

### OUR TARGET

Is to generate a return on capital that is 4 points higher than our cost of capital, which is around 9.5%. This nominal ROC of 13.5% translates to a net real return of 10% i.e. the Group's long term ROC target. To achieve a 10% net real (i.e. after tax and inflation) ROC we need to achieve a 103% operating ratio (the ratio of claims and expenses to premiums) on our overall general insurance business.

Global businesses have an advantage because of their spread of risk. No single event will hit all of their operations. By contrast, single market businesses have to hold enough capital reserves to cover the worst loss that could happen in their particular country of operation. Therefore, we can run a global business with smaller amounts of capital attributed to each operation than is required by independent businesses in exactly the same countries. As a result, we have been able to return excess capital to shareholders in the past. The advantages of the diversification of risks have also led us to increase the proportion of the Group's exposures outside the UK.

## Strategy

Because our primary focus is on customers rather than products, we provide insurance solutions and services through multiple distribution channels, reaching the consumer the way the consumer chooses.

We are organised into four distinct regions based on time zones - the UK, EMEA (Europe, Middle East & Africa), the Americas and Asia Pacific.

We organise our business this way because we believe that our customers are best served by empowering people on the ground who understand local conditions and customer needs. At the same time, our regional managers have access to our underwriting capacity and global knowledge base through a network of technical and functional practice groups and support teams, which function across regional management boundaries.

With the internationalisation of business, our commercial customers are increasingly seeking seamless coverage in all of the markets where they operate. Accordingly, we anticipate that the ability of an insurer to provide global coverage will be an ever more important competitive advantage.

In contrast, global capabilities are much less relevant to our personal customers who seek coverage in local markets from insurers with local knowledge and expertise. Our multi local approach to personal customers means that we evaluate our business for personal customers on a market by market basis but share technical expertise across the Group.



Our global business model brings benefit to every location in which we work. We have a tremendous culture of knowledge sharing across the world. If we develop a good product or service in one part of the world, our people get to know of it via our Intranets, can access it immediately and duplicate it if it will work in their part of the world.

Throughout our business, actions are being taken, many centred on e-business initiatives, to streamline our processes with the aim of giving more efficient and cost effective customer service.

We are looking to build market share in a controlled fashion, focussing on areas where this can be done profitably. Our overall aim is to use customer focus and operational excellence to deliver shareholder value.

*We have a dual approach to customers which recognises that the needs of our personal customers are very different from those of our commercial customers.*

> **"By harnessing the benefits of virtual working with Intranet technology, our practice groups are ensuring that we share our knowledge and expertise around the world effectively and that our individual businesses, as well as our customers, benefit fully from our global reach."**

**Rick Hudson**
Group Director
Underwriting & Claims

Royal & SunAlliance Global Consulting brings together over 50 highly qualified consultants to provide risk assessment to underwriters and value added consultancy to customers around the world. One of the new business' first moves has been to develop and launch a state of the art Internet based Quantum Risk System (QRS) which enables consultants, underwriters and customers to see and work with the same shared risk data for any of their accounts and locations worldwide.

The ground breaking new system was developed in less than a year using the combined expertise of our risk engineering, underwriting, IT and marketing functions from the UK and USA. It's already delivering significant time and cost efficiencies to Global Consulting - which is now free to focus on true risk improvement - and to customers, who can use the system's accurate, customised reporting facilities to inform their decision making around the world.

> *"QRS provides a quick, efficient and paperless means of communicating loss prevention reports to our operating management. It reduces administration to the truly important task of measuring results and severely minimises activities that do not add value."*

**Bob Powell**
Risk Manager of Sonoco Products
South Carolina, USA

## SHARING EXPERIENCE BEARS FRUIT

Pictured left to right:
Chris Hodges, President
of NSDF Teleperformance,
R&SA's Dolores Medus,
and Norberto Varas,
CEO Teleperformance,
Argentina

Our direct marketing operation in Argentina, Answer Seguro-On-Line, is founded on knowledge sharing. The Argentine insurance market had traditionally been a broker/agency market and when Answer launched in early 1998, direct sales of insurance was a very new concept in the country. Royal & SunAlliance already had a number of highly successful direct marketing companies, particularly in Australia and Europe.

Answer used these models - importing knowledge and expertise and seconding an experienced senior manager to develop the customer proposition - to become an established brand in just three years. Learning and sharing is now second nature to the Answer team with staff regularly visiting other Group direct operations to develop their skills. And it has paid off. Answer recently won a 'First in Industry' award for its telemarketing performance in the International Grand Prix Customer Service Awards, sponsored by Teleperformance International.

# and knowledge

"Considerable progress was made in underlying business performance during the year, giving us confidence for a continued strong recovery in our general insurance business in 2001."

**FINANCIAL REVIEW: GROUP FINANCE DIRECTOR'S REPORT**



**Julian Hance**
Group Finance Director

### Group Financial Position

The extreme weather in the UK and other parts of Europe during the fourth quarter depressed the 2000 trading result. However, considerable progress was made in underlying business performance during the year, giving us confidence for a continued strong recovery in our general insurance business in 2001.

### Shareholder Value Added

The Group's main financial objective is to maximise the return to shareholders by ensuring that the return on capital (ROC) is significantly greater than its cost. Our continuing target is for the Group's return on equity to exceed its cost of equity consistently by 4 percentage points. An explanation of how this interacts with our other stated financial targets is included in the Group information on page 3.

### Results

The Group operating result based on longer term investment return (LTIR) of £476m, compared with £566m in 1999, was affected by the exceptional fourth quarter weather conditions which cost the Group in the region of £180m. We also accelerated our expenditure on investing in the future through e-technology, spending worldwide over £100m in the year.

We believe the Group operating result (based on LTIR), is the most appropriate measure to recognise performance of the operations. For general insurance business, this result comprises the underwriting result (excluding changes in equalisation provisions) together with the LTIR on the assets backing both the general business liabilities and the risk based capital required to support these businesses.

The main items excluded from the Group operating result (based on LTIR), but included in the profit on ordinary activities before tax are the short term investment fluctuations, the change in equalisation provisions, reorganisation costs (including losses on terminated business), amortisation of purchased goodwill (including goodwill in acquired claims provisions and amortisation of purchased value of long term business), dated loan capital interest and profits and losses arising on the disposal of businesses less provisions for losses on subsidiaries to be sold.

The longer term investment return or LTIR is calculated in accordance with the Statement of Recommended Practice on Accounting for Insurance Business issued by the Association of British Insurers. The objective of calculating this return is to recognise the total investment return over time while avoiding the distortions of short term investment market fluctuations.

The graph above shows the Group return on capital over the last 20 years: an average annual return on capital of 14%. A major Group objective is to reduce the volatility of this measure. In part the volatility results from our investment policy particularly the level of investment in equities. While current investment policy is being maintained it is subject to review and this could lead to a reduction in the proportion of equities held.

**Group ROC for the past 20 years (%)**



## General Business Result

Our risk based capital approach allows us to assess the returns being achieved by each part of the Group. The returns are calculated using the pre tax operating result on the longer term investment return basis, a comprehensive measure of performance not distorted by short term investment fluctuations.

The geographical analysis shows returns for the last four years for the general business operations. The UK in particular was affected by extreme weather conditions. Whilst most operations showed considerable improvement in their current trading, in a number of operations the effect of inadequate pricing in prior years continued to have an influence.

## Life Business Result

The shareholders' interest in life operations increased to £2,797m from £2,776m in 1999. This represents the value of the shareholders' interest in the various life operations, including the net present value of the profit expected to emerge from existing business. This increase is after payment of dividends to the general shareholders' funds of £128m.

## Other Activities

The result for other activities included in the Group operating result (based on LTIR) is made up of a number of elements. Firstly the operating result from non insurance activities such as Royal & SunAlliance Investments, our asset gathering and management arm,

Swintons our UK insurance intermediary, our UK estate agency chain Royal & SunAlliance Property Services and the cost of investment in a number of e-initiatives not directly related to individual insurance operations. Secondly it includes income from associates and a number of Group charges; our central Group expenses, the expenses of managing our investment portfolio, any interest charges on debt, other than dated loan capital, and any surplus or deficit of longer term investment return on risk based capital after allocation to the general insurance business result.

## Returns

The return on equity can be calculated on an accounting basis (including intangible items such as goodwill) or on a tangible net assets basis, in both cases making full provision for tax on unrealised investment gains and in 1999 adjusting for the timing of the special dividend.

The returns in 2000 and 1999 were below target, principally due to the poor underwriting conditions and exceptional claims events that prevailed throughout the period together with the impact of the investment market movements in 2000.

The introduction, over the last two years, of the subordinated debt, or dated loan capital, as an element of the Group's capital base, has improved the return on equity.

### General Business Return on Risk Based Capital

| % | 2000 | 1999 | 1998 | 1997 |
|---|------|------|------|------|
| UK | 4.9 | 9.2 | 10.3 | 19.3 |
| USA | 9.0 | 16.4 | 20.0 | 18.6 |
| Canada | 4.9 | 8.5 | 14.0 | 18.5 |
| Scandinavia | 3.4 | 6.7 | 20.5 | 7.7 |
| Australia | 11.0 | 1.7 | 7.6 | 14.2 |
| Other | (0.9) | (5.6) | (13.4) | 0.1 |
| | 5.0 | 5.7 | 6.1 | 14.2 |

### Returns on Equity

| % | 2000 | 1999 | 1998 |
|---|------|------|------|
| Accounting basis | 3.0 | 8.7 | 6.9 |
| Tangible net assets basis | 5.3 | 9.6 | – |



**FINANCIAL REVIEW: GROUP FINANCE DIRECTOR'S REPORT** *continued*

**Capital**

| £m | 2000 | 1999 | 1998 |
|---|---|---|---|
| Shareholders' equity | 6,198 | 6,359 | 7,144 |
| Non equity shareholders | 125 | 125 | 125 |
| Equity minority interests | 400 | 406 | 291 |
| Dated loan capital | 784 | 610 | – |
| | 7,507 | 7,500 | 7,560 |

## Portfolio Management

We have continued the process of disposing of those operations, and discontinuing those lines of business, where we cannot see reasonable prospects of achieving Group target returns on capital.

During 2000 we announced the disposal of our operations in Austria, Jamaica and Portugal. In Italy we announced agreements for the sale of our life operations and of Lloyd Italico. In the USA we stopped writing business in a number of mid market commercial business sectors which do not fit into our new US business model.

In the UK we are in the process of identifying blocks of commercial operations, principally in financial risks business, where activity will be terminated and liabilities run off.

## Risk Handling

Traditionally insurers have handled risk both by financing solvency through shareholder capital and with reinsurance. This is evolving through the use of new capital instruments and by new forms of finance orientated reinsurance.

There is much further to go, with new techniques still to evolve across a broad spectrum. Our target is to develop a range of options for handling risk allowing for the most efficient to be selected in each risk situation.

In time, we expect convergence of the capital and reinsurance markets, with this new financial market being the most efficient differentiator of risk and thereby having the lowest cost of capital.

Once that position is reached, our role of providing capital and solvency will diminish as will our balance sheet constraints. Our prime roles will become the understanding of, advising on and packaging of risk along with the servicing of those risks and with efficient claims handling.

## Goodwill

The fair value adjustments included in the accounts at 31 December 1999 in respect of the acquisitions of Orion Capital in the USA and Trygg-Hansa in Sweden, were provisional due to the recent ownership of the assets at that time.

These adjustments have since been reviewed and finalised, resulting in a further goodwill charge of £101m, principally in respect of Orion, reflecting strengthening of claims reserves arising from claims incurred prior to the acquisition. The Group's expectation with respect to acquisitions is to make its target return on capital on the whole purchase price rather than just the attributable risk based capital.

## Group Balance Sheet

The restructuring of the Group balance sheet in 1999, including the payment of a special dividend of £751m and the issuance of £610m of dated loan capital, led to a small surplus of capital over our risk based requirements at the 1999 year end. During 2000, the increasing solvency requirement, generated by the major acquisitions at the end of 1999, led us to increase the dated loan capital by £174m to £784m.

## Summary Capital Position

The Group's risk based capital requirement can be compared with actual capital to determine any surplus. The objective over time is to maintain a balance of risk based capital requirement with actual available capital although at any particular date there will be a difference, primarily attributable to short term investment fluctuations.

In making the comparison, the stated capital is adjusted for a number of items to bring it onto a consistent basis. These adjustments include making full provision for deferred tax on unrealised gains as well as adding back the statutory claims equalisation provision.

In respect of the Group's life insurance activities, in previous years the capital requirement has been set equal to the actual capital invested in the life operations. Preliminary analysis of the life position indicates that the capital requirement is less than the capital invested and accordingly an element of the invested capital has been deemed available to meet general insurance requirements.

At the end of 2000 the overall capital evaluation showed a small shortfall. As indicated above, small surpluses or deficiencies will usually arise as a result of investment market volatility. The prospective capital position is continuously monitored, taking into account planned changes in the level of business including acquisition, disposal and discontinuance of business. This enables changes to the Group's capital to be anticipated and managed effectively.

## US Listing

The Group obtained a full listing on the New York Stock Exchange in October 2000 with trading of its US$ American Depository Shares (ADSs). The restatement of the results using US Generally Accepted Accounting Principles (US GAAP), particularly for UK life business results, was a considerable challenge and highlights the problems of different accounting principles worldwide.

The Group is an active supporter of the International Accounting Standards Committee (IASC) and of the development of an International Insurance Accounting Standard. The benefits of comparability between organisations is obvious and, in addition, as a global organisation, the cost and administration advantages of a single standard would be significant. However, to reconcile the many current differences of policy and approach will require time and pragmatism. It will be some years before a standard can be expected.



**Julian Hance**
Group Finance Director

### Development of Adjusted Capital in 2000

| £m | |
|---|---:|
| Capital brought forward | 6,275 |
| Adjust for unprovided deferred tax | (29) |
| Capital generated from operations | 261 |
| Share capital issued | 19 |
| Unamortised goodwill and goodwill in acquired claims provisions | (51) |
| Increase in equalisation provisions | 24 |
| Decrease in minority interests | (6) |
| Increase in dated loan capital | 174 |
| | |
| Dividends | |
| Ordinary | (372) |
| Preference | (9) |
| | 6,286 |
| Capital carried forward | 6,286 |
| Risk based capital requirement | 6,349 |
| Deficit | (63) |

### Capital Requirements for Ongoing Business

| £m | |
|---|---:|
| General business and investment | 3,831 |
| Life business | 2,518 |
| | 6,349 |



FINANCIAL REVIEW: RISK ANALYSIS

| | Risk based capital | | Capital requirements | |
|---|---|---|---|---|
| | 2000 | 1999 | 2000 | 1999 |
| | % NPW | % NPW | £m | £m |
| UK | 41 | 42 | 1,281 | 1,301 |
| USA | 51 | 53 | 1,041 | 580 |
| Canada | 39 | 40 | 210 | 201 |
| Scandinavia | 44 | 45 | 319 | 206 |
| Australia | 51 | 53 | 251 | 270 |
| Other | 58 | 57 | 833 | 807 |
| | 47 | 47 | 3,935 | 3,365 |

## Introduction

As an insurance organisation, the Group's fundamental concern is the management of risk. We have well developed mechanisms to balance, on the one hand, the prudent need to maintain the appropriate financial resources to meet any losses which might arise with, on the other hand, the requirement to produce satisfactory returns on the capital employed.

The Group has continued to develop its risk based capital assessment techniques introduced in 1998. These complement the existing solvency assessments and provide an effective basis of evaluating performance at all levels in the Group. The approaches are based on the concept of the solvency of the insurance operation.

## Solvency

The solvency of an insurance company represents its ability to meet liabilities as they arise. Solvency is assessed in a number of different ways and the financial management of an insurance company is concerned with balancing these assessments and maximising the utilisation of the shareholders' funds. The principal solvency measures used by the Group are statutory, rating agency and risk based capital assessments.

## Statutory Solvency

Statutory solvency is calculated for each territory in accordance with local regulation. The requirements of local regulation vary quite considerably. Generally the regulatory solvency requirements for general business tend to be less onerous than those of either the rating agency or risk based capital assessments. The Group met all its statutory solvency requirements throughout the year.

## Rating Agency Solvency

Rating agencies such as Standard & Poor's, Moody's Investors Service and A M Best provide claims paying ratings for the Group and its principal subsidiaries. These ratings are based on the detailed financial modelling of the Group and regular review of Group strategic direction. The current claims paying ratings are 'AA-' from Standard & Poor's, 'Aa3' from Moody's Investors Service in the UK and 'A' from A M Best in the USA. In each case these ratings position the Group as being in a strong financial position.

## Risk Based Capital

The third basis of solvency assessment is the internal risk based capital review undertaken by the Group as the basis of its active capital management. The approach has been developed to provide a comprehensive identification of the Group's capital requirements. This in turn enables us to set target financial returns on the risk based capital for individual operations. It also identifies surplus and deficiency of capital that can be addressed by share repurchase or new capital issues respectively.

The methodology adopted is to produce a model of the Group's insurance and investment exposures to loss. Using both actual experience of the Group and market

# An insurance company's fundamental concern is the management of risk.

experience, it is then possible to estimate a probability distribution for the extent of losses that may arise. Criteria are established for the acceptable probability of loss that the Group should take and this determines the capital requirement.

The criterion adopted by the Group in respect of general insurance is that there should be a less than 1% chance of solvency falling below 25% of net written premiums over the next five years. Applying this criterion to the Group's general business and associated investment exposures implies a solvency requirement of 47% of net written premiums. This excludes the capital requirements in respect of life insurance and other activities which are separately assessed.

A key aspect of the 47% solvency requirement is the impact of certain policy decisions, notably investment policy. Having met its currency matching requirements so as to avoid unnecessary exchange exposure, an insurance company has reasonable discretion as to how to invest its portfolio of shareholder and technical provision funds. Investing in fixed interest investments can be expected to produce lower yields but with less volatility in value than investing in equities. The higher volatility of equities requires more capital to maintain the Group's solvency criteria.

Analysis of the expected returns and capital requirements indicates that the overall expected return on capital employed is maximised with an investment policy of investing all the shareholders' funds and 5% of the technical provisions in equities, with the balance invested in fixed interest investments and cash. This policy maximises the expected return on capital, although it does require a higher level of solvency due to the greater volatility of equity investments. This is the policy that the Group has followed and which drives the 47% capital requirement. The policy is continually reviewed in the light of changing market circumstances and shareholder requirements.

## Other Activities
The capital requirements for other activities are generally established at the actual level of shareholders' funds employed in the business.

## Risk Analysis
The overall Group approach to the identification, evaluation and management of risk is dealt with in the Corporate governance report.

### Geographic Spread of Shareholders' Funds

| £m | 2000 | 1999 |
|---|---|---|
| UK | 1,850 | 2,495 |
| EMEA | 1,431 | 1,487 |
| Americas | 2,909 | 2,682 |
| Asia Pacific | 651 | 654 |
| Other (inc borrowings / minorities) | (518) | (834) |
| | 6,323 | 6,484 |

# Directors' report

The directors of Royal & Sun Alliance Insurance Group plc submit their report and the audited financial statements of the Group for the year ended 31 December 2000.

**Principal activity**
The Company is the holding company of the Royal & SunAlliance group of companies whose principal activity is the transaction of insurance business and the provision of related financial services. The Group operates in around 50 countries worldwide.

**Review of the year and future developments**
These are outlined in the Chairman's and Chief Executive's review beginning on page 6. The Group's profit, appropriations and financial position are shown on pages 62 to 67.

**Employment policy**
The Group is committed to meeting all its statutory obligations in offering equal opportunities in recruitment, training and career development, irrespective of religion, ethnic origin, sex or physical disability. It is the policy of the Group that applications for employment by disabled persons are always fully considered and that training, career development and promotion of a disabled person should as far as possible, be identical to that of a person who does not suffer from a disability.

Significant investments are being made in the area of people management to help the organisation to achieve its business goals.

The Group seeks to engage its employees' commitment through:

- Encouraging participation in the ownership of the Company. In the course of 2000, the Group continued the policy of extending the international sharesave plan to employees outside the UK; this plan is now in place in 12 countries. No less than 76% of the Group's employees participate in at least one share plan.

- The establishment of communication and consultation processes. The formation of a European Employee Consultation Forum was reported on last year. This body met for the first time in June 2000, attended by over 20 management, employee and trades union representatives from around Europe. The meeting was addressed by a number of the Executive and Regional directors and the discussions, which were facilitated by simultaneous translation in seven languages, covered a wide ranging review of the Group's business goals and plans. Following this successful first phase, plans are well under way for the next meeting in Copenhagen in May 2001.

- Regular briefings for all staff on Group performance and plans.

Significant initiatives have also been under way in the area of training and development:

- The launch of RSALearning.com was a major breakthrough in the use of technology to increase the return on investment in training. This initiative brings a number of online learning solutions in key skill areas directly to employees at their place of work.

- Investment in management development and succession planning have focussed upon the growth of a leadership talent pool on a worldwide basis, based upon a series of development programmes run in conjunction with a number of leading international business schools and professional institutes.

It is also the policy of the Group to encourage and support our employees in taking an active interest in the community. Throughout 2000, the Group maintained a high level of support for both the Red Cross and Red Crescent Societies and Mission Antarctica activities, and this commitment will be maintained.

**Environmental policy**
A statement on environmental responsibility, which includes details of the Group's environmental policies, procedures and actions, appears on pages 42 and 43.

**Corporate governance**
A statement on corporate governance appears on pages 48 to 50.

**Charitable and political contributions**
The Company and its subsidiaries worldwide made charitable donations of £3.5m during the year and made no political donations.

**Supplier payment policy**
It is the Group's policy to agree appropriate terms and conditions in advance with its suppliers and of making payment in accordance with those terms and conditions, provided that the supplier has complied with them. In most cases a supplier of goods or services does so under standard terms of contract (which in the United Kingdom are available on request from UK Purchasing, 1 Leadenhall Street, London EC3V 1PP) that lay down terms of payment.

The Company's outstanding indebtedness to trade creditors on 31 December 2000 amounted to £1,901,607 corresponding to ten days payment when averaged over the year.

**Share capital**

During the year 6,426,718 ordinary shares of 27.5p each were issued on the exercise of employee share options for a total consideration of £19m. An authority from the shareholders for the Company to purchase up to 5% in total of its own shares remained in force at 31 December 2000.

**Substantial share interests**

As at 28 February 2001, CGNU plc has declared an interest in 44,039,973 ordinary shares of 27.5p each in the Company representing 3.07% of the issued share capital in accordance with Part VI of the Companies Act 1985.

**Dividends**

The directors recommend a final dividend of 17.2p per share which, if approved, will be due for payment on Friday 1 June 2001 to holders of ordinary shares on the register at the close of business on Friday 16 March 2001. This together with the interim dividend of 8.8p per share paid on 1 December 2000 will make a total dividend for the year of 26p per share.

The preferential dividend at the rate of 3.6875% for the period from 1 October 2000 to 31 March 2001 is to be paid on Monday 2 April 2001 to holders of preference shares on the register at the close of business on Friday 16 February 2001.

**Directors**

Members of the Board of directors during the year are listed on pages 22 and 23, except for H N L Keswick who retired from the Board on 31 December 2000 and J A Rowson who retired from the Board at the conclusion of the Annual General Meeting on 17 May 2000.

At the Annual General Meeting N C F Barber, R V Mendelsohn and C F St. Mark are retiring by rotation. All three, being eligible, offer themselves for re-election under Article 121. S G Hill, who became a director on 2 August 2000, being eligible, will offer himself for re-appointment under Article 123.

**Annual General Meeting**

The Annual General Meeting will be held at the Hotel Inter-Continental, One Hamilton Place, Hyde Park Corner, London W1V 0QY on Wednesday 16 May 2001 at 11.30am. Enclosed with this report is a letter from the Chairman to shareholders. Attached to the letter is the Notice convening the meeting which will include six items of special business which are explained in the letter.

**Auditors**

The auditors, PricewaterhouseCoopers, have expressed their willingness to continue to act and a resolution for their re-appointment will be submitted to the Annual General Meeting.

By order of the directors
**J V Miller**
*Group Company Secretary*
London, 28 February 2001

# Corporate governance

**Combined Code**

Royal & SunAlliance is committed to maintaining the highest standards of corporate governance and seeks to reinforce these through establishment of strong ethical values and applying integrity and professionalism in all of its activities. A Statement of Business Principles is in place across the Group to provide practical guidance on the standards expected. The directors consider that, throughout the year, with the exception of not having one year service contracts for all executive directors, Royal & SunAlliance has complied with the provisions set out in Section 1 of the Combined Code on Corporate Governance appended to the Listing Rules of the UK Listing Authority. This statement sets out how the Group has applied those provisions. The Remuneration report on pages 52 and 53 sets out the different notice periods, which apply to the executive directors under their service contracts.

**The Board and Committee structure**

The Board of directors meets on a regular basis, at least one meeting per year being held at an operating subsidiary and one extended meeting to consider strategy and business developments. The Board currently comprises five executive directors and seven non-executive directors, as identified on pages 22 and 23 of this document. The non-executive directors come from diversified backgrounds and have a wide range of outside business interests and are considered to be free from any business or other relationship, which could materially interfere with the exercise of their independent judgement. The Board has not separately appointed a senior independent non-executive director as it deemed that the position of Deputy Chairman meets this requirement.

Under the present Articles of Association one third of the directors are required to submit themselves for re-election each year. In practice, all directors have retired by rotation at intervals of no more than three years, however, to ensure that the Group complies strictly with the Combined Code provisions on re-election, a change to the wording of the Articles of Association is proposed for the Annual General Meeting requiring that directors seek re-election every three years. All proposals for re-election, which are not automatic, and all new appointments are considered by the Nomination Committee, chaired by Sir Patrick Gillam.

A schedule of matters reserved to the Board ensures that the directors maintain full and effective control over significant strategic, financial, organisational and compliance matters. The Group operates a comprehensive financial monitoring process involving monthly and detailed quarterly reporting to the Board to ensure that performance is continually assessed. There are also regular presentations

of, and reporting on, relevant non-financial matters.

There is an appropriate division of responsibilities on the Board. The Chairman is responsible for the running of the Board and the Group Chief Executive has executive responsibility for business matters. A number of separate Committees of the Board operate, all of which have formal terms of reference. Membership of these is largely comprised of non-executive directors, who deal with audit, compliance, remuneration and terms of service and nomination matters. The Chairmen and members of the various Committees are identified on pages 22 and 23 of this document.

All directors have access to the advice of the Company Secretary. A procedure is in place for any director, in furtherance of his or her duties, to take independent professional advice, if necessary at the Company's expense. New directors receive induction materials about the Group and are provided with appropriate training and briefings on appointment and subsequently as necessary. Non-executive directors have full access to management and are encouraged to make site visits to stay current on Group affairs.

**Operating structure**

Reflecting the time zone based Regional operations, an appropriate organisational structure is in place for the Group, with responsibilities and delegation of authority clearly defined. Financial objectives are set for all businesses and these are regularly reviewed against agreed criteria. There are periodic meetings of the senior management leadership team, comprising both Regional and Group management, to discuss business objectives and performance and other relevant issues.

As part of its control and operating environment, the Group has established a network of practice groups and specialist functional groups. These range from informal groupings of experts, linked via the Group's communications networks to exchange information on specific issues, to formal groups determining policy and best practice. Examples of the formal groups are the Group Investment Strategy Team and the Commercial Directors' Forum. The former is charged with determining Group investment policy and the latter considers and establishes underwriting and claims best practice and reviews business opportunities before these are presented for formal appraisal under the delegated authorities procedures.

**Risk management and internal control**

The Board has ultimate responsibility for the Group's systems of internal controls and risk management and for reviewing their effectiveness. The directors have

delegated to executive management responsibility for the evaluation and identification of key risks and for the establishment and implementation of systems of internal control appropriate to the various business environments in which the Group operates. Operational management are supported in the risk identification process by a Group Risk Review Committee. This Committee, with access to skills and representatives from across the Group, is charged with actively reviewing and evaluating emerging risks, aggregation exposures and other threats and with monitoring the Group's approach to managing risks. There is a regular reporting of risk management and internal control issues to both the Audit & Compliance Committee and the Board.

As required by the Combined Code, the Board has reviewed the effectiveness of the systems of internal control during the year and has taken account of any material developments since the end of the year. The directors are satisfied that the Group's systems of internal control do not contain any material deficiency or weakness. Control systems are designed to manage but not necessarily eliminate the risk of failure to meet business objectives. Any control environment can only provide reasonable, but not absolute, assurance that assets are safeguarded, transactions are appropriately authorised and recorded and that material errors and irregularities are either prevented or can be detected in a timely manner.

The review of the effectiveness of controls was carried out principally through a process of internal control self appraisal whereby each business unit systematically assessed its internal business control systems using a risk based evaluation. Where necessary programmes for corrective action or improvement have been initiated. Remedial action programmes are periodically reviewed for progress. Each business unit prepares a full report of their appraisal, which is reviewed by internal audit and shared with the external auditors and is summarised and presented to the Audit & Compliance Committee and the Board.

To further enhance the self appraisal process in 2000, and to reflect the guidance provided by the Turnbull Committee, more regular reporting has been introduced by way of a quarterly self appraisal update to the Audit & Compliance Committee. In addition, to ensure that strategic risks are given sufficient emphasis in the process, all Regions and significant operations have performed a risk assessment at management board level in 2000, to supplement the detailed business unit appraisals. Continuing focus is also being placed on internal control training and education, particularly in respect of our

recently acquired operations, to ensure that a robust risk management and internal control culture is fully embedded within the Group.

The chief executive and chief financial officer of each business are required quarterly to certify that the control environment for that business operated satisfactorily and that full compliance with Group policies and statutory requirements was achieved or report exceptions.

The internal control process is also monitored and supported by internal audit functions that operate on a Group and Regional basis and carry out regular reviews of operational and control procedures. The work of internal audit is focussed on areas of greatest risk to the Group as determined through the audit planning process. The formal reports resulting from such reviews are provided to the Audit & Compliance Committee. The Group Chief Auditor reports to the Group Chief Executive but has unrestricted access to the Audit & Compliance Committee.

The Audit & Compliance Committee has terms of reference which enable it to take an independent view of the appropriateness of the Group's accounting policies and practices for presentation of the report and accounts and compliance with Stock Exchange and other requirements. It also considers the appointment and remuneration of the external auditors and the effectiveness and work schedule of the internal audit function.

There are in place procedures for the review and authorisation of capital investments including formalised post investment and acquisition reviews and appraisals. Specific risk based techniques for managing Group capital have been developed and continue to be refined. These are explained more fully in the report of the Group Finance Director on pages 34 to 37 of this document.

**External review and regulation**
In common with other businesses Royal & SunAlliance is subject to review and regulation from a number of external bodies, including the insurance regulators for the financial services businesses, the tax authorities and the external auditors.

The Group's insurance businesses in all jurisdictions are subject to stringent rules on the minimum level of surplus assets that have to be carried, the type of investments that can be held and what classes of insurance business can be written and how this must be conducted. Monitoring of the compliance with these regulations is carried out through a mixture of formal annual returns, regular liaison with and visits from the regulator. The annual returns are usually also subject to external audit review. Regulatory requirements for all businesses were met throughout the year.

**Corporate governance** *continued*

The Group is required to account to the tax authorities on a regular basis for the results of its trading. The Group seeks to observe fully requirements of tax legislation and maintain sound working relationships with the authorities. Compliance visits by the tax authorities are regularly carried out.

The report of the external auditors on page 51 sets out the responsibilities of the external auditors with regard to reviewing the financial statements and the Group's compliance with both statutory and accounting standard requirements. The audit is not designed to review every piece of information but it is structured to provide sufficient evidence to give reasonable assurance that the financial statements are free from material misstatement, whether caused by fraud or other irregularity. The audit review will also consider the support for the directors' statements on going concern and adequacy of the control environment.

**Directors' remuneration**
Details of how the Board has exercised its obligations under the Combined Code in respect of directors' remuneration are reflected in the Remuneration report shown on pages 52 and 53 of this document.

**Shareholder communication**
The Company considers continuing and open communication with shareholders to be a priority. Results are published quarterly and there is a regular programme of dialogue with institutional investors and their representative bodies. Private investors are encouraged to attend the Annual General Meeting as it provides an opportunity to receive a presentation of the Group's financial position and plans, and allows shareholders to question directors both formally and informally. Shareholders are given at least six weeks notice of the Annual General Meeting and of the business with which it will deal. The Group's Internet site (www.royalsunalliance.com) has extensive information on the Group, its annual and interim reports and the price of its shares, and provides a regular update on business developments and other matters of interest.

**Statement of directors' responsibilities**
The directors are required to present for each accounting period financial statements which comply with the provisions of company law and which give a true and fair view of the state of affairs of the Company and the Group as at the end of the accounting period and of the result of the Group for that period.

Consolidated financial statements have to be presented in accordance with the Companies Act 1985. In preparing the financial statements suitable accounting policies, framed by reference to reasonable and prudent judgements and estimates, have to be used and applied consistently.

Applicable accounting standards also have to be followed subject to any material departures being disclosed and explained in the notes on the financial statements.

The directors are required to prepare the financial statements on a going concern basis unless it is inappropriate to presume that the Company will continue in business.

The directors are also responsible for the operation of appropriate systems of internal control and for maintaining adequate accounting records so as to prevent and detect fraud and other irregularities and disclose with reasonable accuracy at any time the financial position of the Group. They are also required to take reasonable steps to ensure the safeguarding of assets of the Group.

**Basis of accounts**
The Board of directors has satisfied itself that the Group has adequate resources to continue in operation for the foreseeable future. The Group financial statements therefore continue to be prepared on a going concern basis.

By order of the directors
**J V Miller**
*Group Company Secretary*
London, 28 February 2001

# Consolidated profit and loss account
## technical account – general business

For the year ended 31 December 2000

| | Notes | 2000 £m | Restated 1999 £m |
|---|---|---|---|
| Gross premiums written | | 10,096 | 8,260 |
| Outward reinsurance premiums | | (1,724) | (1,101) |
| Premiums written, net of reinsurance | | 8,372 | 7,159 |
| Change in the gross provision for unearned premiums | | (134) | (147) |
| Change in the provision for unearned premiums, reinsurers' share | | 16 | 5 |
| **Earned premiums, net of reinsurance** | | **8,254** | **7,017** |
| Allocated investment return transferred from the non-technical account | 12 | 1,119 | 1,007 |
| **Claims paid** | | | |
| Gross amount | | (8,179) | (6,637) |
| Reinsurers' share | | 1,377 | 1,043 |
| | | (6,802) | (5,594) |
| **Change in the provision for claims** | | | |
| Gross amount | | (153) | (25) |
| Reinsurers' share | | 392 | 179 |
| | | 239 | 154 |
| Unwind of discount in respect of claims outstanding | | (19) | (10) |
| **Claims incurred, net of reinsurance** | | **(6,582)** | **(5,450)** |
| Acquisition costs | | (2,149) | (1,853) |
| Change in deferred acquisition costs | | 37 | 24 |
| Administrative expenses | | (772) | (645) |
| Reinsurance commissions and profit participation | | 291 | 166 |
| **Net operating expenses** | 3 | **(2,593)** | **(2,308)** |
| Amortisation of goodwill in acquired claims provisions | 17 | (59) | (12) |
| **Underwriting result** | | **(961)** | **(743)** |
| Longer term investment return allocated to the general business technical account | | 1,119 | 1,007 |
| Unwind of discount in respect of claims outstanding | | (19) | (10) |
| Balance on the technical account before change in the equalisation provisions | | 139 | 254 |
| Change in the equalisation provisions | 10 | (24) | (12) |
| **Balance on the technical account for general business** | | **115** | **242** |

Current year discontinued and acquired operations do not form a material part of the figures above.

The Accounting policies and the notes form part of these financial statements.

# Consolidated profit and loss account
# technical account – long term business

For the year ended 31 December 2000

| | Notes | 2000 £m | 1999 £m |
|---|---|---|---|
| Gross premiums written | | 3,557 | 3,404 |
| Outward reinsurance premiums | | (118) | (120) |
| **Earned premiums, net of reinsurance** | | **3,439** | **3,284** |
| Investment income | 11 | 3,488 | 3,845 |
| Unrealised (losses)/gains on investments | | (2,149) | 417 |
| **Total technical income** | | **4,778** | **7,546** |
| **Claims paid** | | | |
| Gross amount | | (3,309) | (2,837) |
| Reinsurers' share | | 73 | 87 |
| | | (3,236) | (2,750) |
| **Change in the provision for claims** | | | |
| Gross amount | | (117) | (24) |
| Reinsurers' share | | 57 | – |
| | | (60) | (24) |
| **Claims incurred, net of reinsurance** | | **(3,296)** | **(2,774)** |
| **Change in long term business provision** | | | |
| Gross amount | | (1,785) | (932) |
| Reinsurers' share | | 386 | 47 |
| | | (1,399) | (885) |
| **Change in technical provisions for linked liabilities, net of reinsurance** | | **(209)** | **(1,640)** |
| **Change in other technical provisions, net of reinsurance** | | **(1,608)** | **(2,525)** |
| Acquisition costs | | (296) | (350) |
| Change in deferred acquisition costs | | (166) | 16 |
| Administrative expenses | | (222) | (242) |
| **Net operating expenses** | 3 | **(684)** | **(576)** |
| Investment expenses and charges | 11 | (83) | (60) |
| Tax attributable to the long term business | 14 | (222) | (240) |
| Other technical charges – amortisation of acquired present value of long term business | 19 | (9) | (4) |
| **Total technical charges** | | **(5,902)** | **(6,179)** |
| **Technical income less charges** | | **(1,124)** | **1,367** |
| Allocated investment return transferred to the non-technical account | | – | – |
| Transfers from/(to) the fund for future appropriations | | 1,302 | (1,191) |
| **Balance on the technical account for long term business** | | **178** | **176** |

Current year discontinued and acquired operations do not form a material part of the figures above.

The Accounting policies and the notes form part of these financial statements.

## Consolidated profit and loss account
## non-technical account

For the year ended 31 December 2000

| | Notes | 2000 £m | Restated 1999 £m |
|---|---|---|---|
| **Balance on the general business technical account** | | **115** | 242 |
| Balance on the long term business technical account | | 178 | 176 |
| Tax credit attributable to balance on the long term business technical account | | 61 | 59 |
| **Balance on the long term business technical account gross of tax** | | **239** | 235 |
| Investment income | 11 | 1,367 | 1,661 |
| Allocated investment return transferred from the long term business technical account | | – | – |
| Investment expenses and charges | 11 | (155) | (79) |
| Unrealised losses on investments | | (161) | (645) |
| Allocated investment return transferred to the general business technical account | | (1,119) | (1,007) |
| Income from other activities | | 315 | 282 |
| Charges from other activities | 2, 3 | (325) | (261) |
| Central expenses | 3 | (37) | (36) |
| Amortisation of goodwill | 17 | (56) | (14) |
| **Total Group operating profit** | | **167** | 290 |
| Share of results of associated undertakings | | 16 | 88 |
| | | **183** | 378 |
| **Analysis of profit on ordinary activities before exceptional items and tax** | | | |
| General business result | | 304 | 312 |
| Long term business result | | 252 | 243 |
| Other activities (including associated undertakings) | | (80) | 11 |
| Group operating result (based on longer term investment return) | | 476 | 566 |
| Interest on dated loan capital | | (55) | (10) |
| Change in the equalisation provisions | 10 | (24) | (12) |
| Amortisation of goodwill | 17 | (56) | (14) |
| Amortisation of goodwill in acquired claims provisions | 17 | (59) | (12) |
| Reorganisation costs and other items | 2 | (119) | (60) |
| **Group operating profit (based on longer term investment return)** | | **163** | 458 |
| Short term investment fluctuations | | 20 | (80) |
| **Profit on ordinary activities before exceptional items and tax** | | **183** | 378 |
| Profit on disposal of subsidiaries less provisions for losses on subsidiaries to be sold | 24 | (128) | – |
| **Profit on ordinary activities before tax** | | **55** | 378 |
| Tax on profit on ordinary activities | 14 | (71) | (270) |
| **(Loss)/profit on ordinary activities after tax** | | **(16)** | 108 |
| Attributable to equity minority interests | | 2 | (21) |
| **(Loss)/profit for the financial year attributable to shareholders** | | **(14)** | 87 |
| Dividends | 15 | (381) | (1,113) |
| **Transfer from retained profits** | | **(395)** | (1,026) |
| **Earnings per ordinary share** | 16 | **(1.6)p** | 5.3p |
| **Diluted earnings per ordinary share** | 16 | **(1.6)p** | 5.2p |
| Group operating earnings after tax per ordinary share (based on longer term investment return) | 16 | 18.5p | 25.2p |

Current year discontinued and acquired operations do not form a material part of the figures above.

The Accounting policies and the notes form part of these financial statements.

# Statement of total recognised gains and losses

For the year ended 31 December 2000

| | Other reserves £m | Profit and loss account £m | 2000 £m | 1999 £m |
|---|---|---|---|---|
| (Loss)/profit for the financial year | – | (14) | (14) | 87 |
| Movement in value of long term business (other than on acquisition) | (37) | – | (37) | 169 |
| Exchange: | | | | |
| Group | (9) | 178 | 169 | 34 |
| Share of associates | – | (19) | (19) | (3) |
| Shareholders' consolidated recognised gains/(losses) arising in the year | (46) | 145 | 99 | 287 |

Exchange includes a loss of **£6m** (1999 £1m) on exchange relating to foreign currency borrowings.

# Movements in shareholders' funds

For the year ended 31 December 2000

| | | Share capital £m | Capital redemption reserve £m | Share premium account £m | Profit and loss account £m | 2000 £m | 1999 £m |
|---|---|---|---|---|---|---|---|
| Shareholders' funds at 1 January | 27 | 688 | 8 | 1,626 | 4,162 | 6,484 | 7,269 |
| Shareholders' recognised gains/(losses) | | – | – | (46) | 145 | 99 | 287 |
| Issue of share capital | 28 | 2 | – | – | – | 2 | 2 |
| Increase in share premium | | 22 | – | – | (5) | 17 | 13 |
| Goodwill written back | 24 | – | – | – | 102 | 102 | 26 |
| Dividends | 15 | – | – | – | (381) | (381) | (1,113) |
| Shareholders' funds at 31 December | | 712 | 8 | 1,580 | 4,023 | 6,323 | 6,484 |

The Accounting policies and the notes form part of these financial statements.

# Consolidated balance sheet

As at 31 December 2000

| ASSETS | Notes | Shareholder consolidated 2000 £m | Shareholder consolidated 1999 £m | Combined consolidated 2000 £m | Combined consolidated 1999 £m |
|---|---|---|---|---|---|
| Intangible assets | 17 | 1,086 | 1,035 | 1,086 | 1,035 |
| **Investments** | | | | | |
| Land and buildings | 18 | 557 | 519 | 2,699 | 2,386 |
| Interests in associated undertakings | 22 | 241 | 221 | 242 | 222 |
| Other financial investments | | | | | |
| Shares and other variable yield securities and units in unit trusts | 18 | 4,647 | 4,866 | 17,780 | 18,742 |
| Debt securities and other fixed income securities | | 9,902 | 9,912 | 25,673 | 24,646 |
| Loans and deposits with credit institutions | | 852 | 787 | 1,422 | 1,396 |
| | | 15,401 | 15,565 | 44,875 | 44,784 |
| Value of long term business | 19, 44 | 1,729 | 1,784 | 1,729 | 1,784 |
| Deposits with ceding undertakings | | 111 | 96 | 131 | 115 |
| **Total investments** | | 18,039 | 18,185 | 49,676 | 49,291 |
| **Assets held to cover linked liabilities** | 18 | – | – | 8,713 | 8,304 |
| **Reinsurers' share of technical provisions** | | | | | |
| Provision for unearned premiums | | 499 | 507 | 499 | 507 |
| Long term business provision | | – | – | 785 | 394 |
| Claims outstanding | | 3,476 | 3,183 | 3,540 | 3,189 |
| Technical provisions for linked liabilities | | – | – | 13 | 14 |
| | | 3,975 | 3,690 | 4,837 | 4,104 |
| **Debtors** | | | | | |
| Debtors arising out of direct insurance operations | 20 | 2,691 | 2,620 | 2,798 | 2,710 |
| Debtors arising out of reinsurance operations | | 979 | 874 | 987 | 886 |
| Other debtors | 20 | 1,695 | 1,441 | 820 | 740 |
| | | 5,365 | 4,935 | 4,605 | 4,336 |
| **Other assets** | | | | | |
| Tangible assets | 21 | 216 | 228 | 253 | 268 |
| Cash at bank and in hand | | 434 | 497 | 754 | 822 |
| Own shares | 28 | 51 | 29 | 51 | 29 |
| | | 701 | 754 | 1,058 | 1,119 |
| **Prepayments and accrued income** | | | | | |
| Accrued interest and rent | | 196 | 193 | 452 | 443 |
| Deferred acquisition costs – long term | | – | – | 465 | 628 |
| Deferred acquisition costs – general | | 881 | 825 | 881 | 825 |
| Other prepayments and accrued income | | 141 | 104 | 188 | 121 |
| | | 1,218 | 1,122 | 1,986 | 2,017 |
| **Total assets** | | 30,384 | 29,721 | 71,961 | 70,206 |

The shareholder consolidated balance sheet represents the shareholder and general insurance business assets and liabilities. The combined balance sheet includes long term business assets and liabilities relating to long term business policyholders.

The Accounting policies and the notes form part of these financial statements.

| LIABILITIES | Notes | Shareholder consolidated 2000 £m | Shareholder consolidated 1999 £m | Combined consolidated 2000 £m | Combined consolidated 1999 £m |
|---|---|---|---|---|---|
| **Capital and reserves** | | | | | |
| Ordinary share capital | | 395 | 393 | 395 | 393 |
| Preference share capital | | 125 | 125 | 125 | 125 |
| Called up share capital | 28 | 520 | 518 | 520 | 518 |
| Share premium account | | 192 | 170 | 192 | 170 |
| Other reserves | | 1,580 | 1,626 | 1,580 | 1,626 |
| Capital redemption reserve | | 8 | 8 | 8 | 8 |
| Profit and loss account | | 4,023 | 4,162 | 4,023 | 4,162 |
| Equity shareholders | | 6,198 | 6,359 | 6,198 | 6,359 |
| Non-equity shareholders | | 125 | 125 | 125 | 125 |
| **Shareholders' funds** | | 6,323 | 6,484 | 6,323 | 6,484 |
| Equity minority interests in subsidiary undertakings | | 400 | 406 | 400 | 406 |
| **Subordinated liabilities** | | | | | |
| Dated loan capital | 29 | 784 | 610 | 784 | 610 |
| **Total capital, reserves and dated loan capital** | | 7,507 | 7,500 | 7,507 | 7,500 |
| **Fund for future appropriations** | | – | – | 3,540 | 4,840 |
| **Technical provisions** | | | | | |
| Provision for unearned premiums | | 4,685 | 4,476 | 4,685 | 4,476 |
| Long term business provision | 30 | – | – | 28,268 | 26,433 |
| Claims outstanding | | 14,468 | 14,017 | 14,731 | 14,162 |
| Equalisation provisions | 10 | 283 | 259 | 283 | 259 |
| | | 19,436 | 18,752 | 47,967 | 45,330 |
| **Technical provisions for linked liabilities** | | – | – | 8,726 | 8,318 |
| **Provisions for other risks and charges** | 31 | 330 | 306 | 367 | 363 |
| **Deposits received from reinsurers** | | 50 | 50 | 222 | 203 |
| **Creditors** | | | | | |
| Creditors arising out of direct insurance operations | | 460 | 437 | 505 | 504 |
| Creditors arising out of reinsurance operations | | 757 | 607 | 770 | 619 |
| Debenture loans | 32 | 324 | 535 | 325 | 540 |
| Amounts owed to credit institutions | 32 | 57 | 136 | 57 | 136 |
| Other creditors including taxation and social security | 33 | 784 | 807 | 1,244 | 1,238 |
| Proposed dividend | 15 | 247 | 233 | 247 | 233 |
| | | 2,629 | 2,755 | 3,148 | 3,270 |
| **Accruals and deferred income** | | 432 | 358 | 484 | 382 |
| **Total liabilities** | | 30,384 | 29,721 | 71,961 | 70,206 |

Except for certain debenture loans and amounts owed to credit institutions shown in note 32, all creditors are payable within a period of five years.

The Accounting policies and the notes form part of these financial statements.

# Principal subsidiary companies

As at 31 December 2000

| | | Principal activity |
|---|---|---|
| United Kingdom | Royal Insurance Holdings plc* | Holding company |
| | Royal & Sun Alliance Insurance plc | General insurance |
| | British Aviation Insurance Company Ltd (57.1%) | General insurance |
| | FirstAssist Group Ltd | Insurance services |
| | The Globe Insurance Company Ltd** | General insurance |
| | Legal Protection Group Holdings Ltd | Holding company |
| | The London Assurance | General insurance |
| | The Marine Insurance Company Ltd | General insurance |
| | Phoenix Assurance plc | Composite insurance |
| | Royal International Insurance Holdings Ltd | General insurance |
| | Royal & Sun Alliance Reinsurance Limited | General insurance |
| | Royal & Sun Alliance Property Services Ltd | Estate agencies |
| | Royal & Sun Alliance Life & Pensions Ltd | Life insurance |
| | Royal & Sun Alliance Linked Insurances Limited | Life insurance |
| | RSA E-Holdings Ltd | Holding company |
| | Sun Alliance and London Insurance plc | General insurance |
| | Sun Alliance and London Assurance Company Ltd | Life insurance |
| | Royal & Sun Alliance Life Holdings Ltd | Holding company |
| | Royal & Sun Alliance Trust Company Ltd* | Trust company |
| | Sun Insurance Office Ltd | General insurance |
| | Swinton (Holdings) Ltd | Holding company |
| Argentina | Royal & Sun Alliance Seguros (Argentina) SA | General insurance |
| | RSA Marketing (Latin America) SA | General insurance |
| Australia | Royal & Sun Alliance Australia Holdings Ltd | Holding company |
| | Royal & Sun Alliance Insurance Australia Ltd | General insurance |
| | Royal & Sun Alliance Financial Services Limited | Life insurance |
| Bahamas | Royal & Sun Alliance Insurance (Bahamas) Ltd (80.0%) | General insurance |
| Brazil | Royal & Sun Alliance Seguros (Brasil) SA | General insurance |
| Canada | Roins Financial Services Ltd | Holding company |
| | Compagnie d'Assurance du Quebec (99.8%) | General insurance |
| | The Johnson Corporation | General insurance |
| | Royal & Sun Alliance Insurance Company of Canada | General insurance |
| | Royal & Sun Alliance Life Insurance Company of Canada | Life insurance |
| | Western Assurance Company | General insurance |
| Chile | Royal & SunAlliance Seguros (Chile) SA (64.0%) | General insurance |
| | Compañia de Seguros de Vida La Construcción (51.0%) | Life insurance |
| Colombia | Royal & Sun Alliance Seguros (Colombia) SA (86.3%) | General insurance |
| | Royal & Sun Alliance Seguros de Vida (Colombia) SA (86.3%) | Life insurance |
| Denmark | Codan A/S (71.7%) | Holding company |
| | Codan Forsikring A/S (71.7%) | General insurance |
| | A/S Forsikringsselskabet Codan Liv (71.7%) | Life insurance |
| France | Royal & Sun Alliance SA | General insurance |
| Germany | Securitas Bremer Allgemeine Versicherungs AG (99.9%) | General insurance |
| | Securitas-Gilde Lebensversicherung AG (99.8%) | Life insurance |

| | | Principal activity |
|---|---|---|
| Guernsey | Insurance Corporation of Channel Islands Ltd | General insurance |
| Hong Kong | Royal & Sun Alliance Insurance (Hong Kong) Ltd | General insurance |
| Ireland | Royal & Sun Alliance Eurolife Ltd | Life insurance |
| Isle of Man | Royal & Sun Alliance International Financial Services Ltd | Life insurance |
| | Tower Insurance Company Ltd | General insurance |
| Netherlands | Royal & SunAlliance Schadeverzekering NV | General insurance |
| | Royal & SunAlliance Levensverzekering NV | Life insurance |
| Netherlands Antilles | Royal & Sun Alliance Insurance (Antilles) NV (51.0%) | General insurance |
| New Zealand | Royal & Sun Alliance Insurance (New Zealand) Ltd | General insurance |
| | Royal & Sun Alliance Life & Disability (New Zealand) Ltd | Life insurance |
| Peru | Compañía de Seguros La Fenix Peruana (64.9%) | General insurance |
| Puerto Rico | Royal & Sun Alliance Insurance (Puerto Rico) Inc (94.3%) | General insurance |
| Saudi Arabia | Royal & Sun Alliance Insurance (Middle East) Limited E.C. (50.01%) | General insurance |
| Singapore | Royal & Sun Alliance Insurance (Singapore) Ltd | General insurance |
| Spain | Regal Insurance Club Compañia Española de Seguros SA | General insurance |
| | Royal & Sun Alliance SA (99.9%) | General insurance |
| | Royal & Sun Alliance Vida y Pensiones SA (99.9%) | Life insurance |
| Sweden | Holmia Försäkring AB (71.7%) | General insurance |
| | Trygg-Hansa Försäkrings AB, Publikt (71.7%) | General insurance |
| United States of America | Royal & Sun Alliance USA, Inc | Holding company |
| | Royal Indemnity Company | General insurance |
| | Royal Insurance Company of America | General insurance |
| | Orion Capital Corporation | Holding company |
| | Security Insurance Company of Hartford | General insurance |
| | Guaranty National Insurance Company | General insurance |
| Uruguay | Royal & Sun Alliance Seguros (Uruguay) SA | General insurance |
| Venezuela | Royal & Sun Alliance Seguros (Venezuela) SA (99.4%) | General insurance |

**Notes:**

1. All UK companies are incorporated in Great Britain and are registered in England.

2. *100% direct subsidiaries of Royal & Sun Alliance Insurance Group plc.
   **100% of the issued ordinary share capital is owned by a Group company and 100% of the issued preference share capital is owned by Royal & Sun Alliance Insurance Group plc.

3. Except where indicated all holdings are of equity shares and represent 100% of the nominal issued capital.

4. Lloyd Italico Vita SpA (Italy), Lloyd Italico Assicurazioni SpA (Italy), Royal & Sun Alliance Vita SpA (Italy) and Sun Alliance Vita SpA (Italy) whilst being subsidiaries at the year end are omitted from the above list owing to the fact that they are in the course of disposal.

5. Some subsidiaries have been omitted from this statement to avoid providing particulars of excessive length but none materially affects the results or assets of the Group.

# Five year financial review

| CONSOLIDATED PROFIT AND LOSS ACCOUNT | Convenience translation (note 1) 2000 $m | 2000 £m | Restated 1999 £m | Restated 1998 £m | Restated 1997 £m | Restated 1996 £m |
|---|---|---|---|---|---|---|
| **Net premiums written** | | | | | | |
| General business | 12,474 | 8,372 | 7,159 | 6,867 | 6,634 | 6,814 |
| Long term business | 5,124 | 3,439 | 3,284 | 2,856 | 2,591 | 2,546 |
| **Total** | 17,598 | 11,811 | 10,443 | 9,723 | 9,225 | 9,360 |
| **Balance on the technical accounts** | | | | | | |
| General business (note 2) | 171 | 115 | 242 | 279 | 525 | 293 |
| Long term business gross of taxation | 356 | 239 | 235 | 230 | 231 | 223 |
| Investment income net of investment expenses and charges (note 2) | 1,806 | 1,212 | 1,582 | 1,509 | 1,094 | 1,142 |
| Unrealised (losses)/gains on investments | (240) | (161) | (645) | (139) | 965 | 136 |
| Allocated investment return transferred to the general business technical account | (1,667) | (1,119) | (1,007) | (999) | (983) | (991) |
| Income/(charges) from other activities/central expenses | (70) | (47) | (15) | (15) | (22) | (56) |
| Amortisation of goodwill | (83) | (56) | (14) | (1) | – | – |
| General business result | 453 | 304 | 312 | 352 | 683 | 582 |
| Long term business result | 375 | 252 | 243 | 230 | 231 | 233 |
| Other activities (including associated undertakings) | (119) | (80) | 11 | 20 | 74 | (22) |
| **Group operating result (based on longer term investment return)** | 709 | 476 | 566 | 602 | 988 | 793 |
| Change in the equalisation provisions | (36) | (24) | (12) | (51) | (84) | (90) |
| Reorganisation costs and other items | (430) | (289) | (96) | (150) | (61) | (213) |
| **Group operating profit (based on longer term investment return)** | 243 | 163 | 458 | 401 | 843 | 490 |
| Short term investment fluctuations | 30 | 20 | (80) | 463 | 967 | 257 |
| **Profit on ordinary activities before exceptional items and tax** | 273 | 183 | 378 | 864 | 1,810 | 747 |
| Profit on disposal of subsidiaries less provisions for losses on subsidiaries to be sold | (191) | (128) | – | – | – | – |
| **Profit on ordinary activities before tax** | 82 | 55 | 378 | 864 | 1,810 | 747 |
| Tax on profit on ordinary activities | (106) | (71) | (270) | (374) | (354) | (245) |
| **(Loss)/profit on ordinary activities after tax** | (24) | (16) | 108 | 490 | 1,456 | 502 |
| Attributable to equity minority interests | 3 | 2 | (21) | (33) | (40) | (44) |
| **(Loss)/profit for the financial year attributable to shareholders** | (21) | (14) | 87 | 457 | 1,416 | 458 |
| Earnings per ordinary share | (2.4)c | (1.6)p | 5.3p | 28.7p | 91.0p | 29.3p |
| Operating earnings after tax per ordinary share | 27.6c | 18.5p | 25.2p | 24.7p | 42.4p | 36.0p |

Note:

1. We have included a translation of the data for the year ended 31 December 2000, from sterling into US dollars, for the convenience of our US shareholders. The translation rate is US$1.49, the closing rate at 31 December 2000.

2. Prior years have been restated. The unwind of discount in respect of claims outstanding, previously netted against investment income, has been reclassified to the general business technical account to provide additional disclosure.

**Five year financial review** *continued*

| | Convenience translation (note 1) 2000 $m | 2000 £m | 1999 £m | 1998 £m | 1997 £m | 1996 £m |
|---|---|---|---|---|---|---|
| **STATEMENT OF TOTAL RECOGNISED GAINS AND LOSSES** | | | | | | |
| (Loss)/profit for the financial year attributable to shareholders | (21) | (14) | 87 | 457 | 1,416 | 458 |
| Movement in value of long term business | (55) | (37) | 169 | (115) | 179 | 113 |
| Exchange | 224 | 150 | 31 | (69) | (68) | (181) |
| **Shareholders' consolidated recognised gains** | 148 | 99 | 287 | 273 | 1,527 | 390 |
| | | | | | | |
| **MOVEMENTS IN SHAREHOLDERS' FUNDS** | | | | | | |
| **Shareholders' funds at 1 January** | 9,661 | 6,484 | 7,269 | 7,333 | 6,341 | 6,160 |
| Shareholders' consolidated recognised gains | 148 | 99 | 287 | 273 | 1,527 | 390 |
| Issue of share capital/increase in share premium | 28 | 19 | 15 | 32 | 36 | 19 |
| Purchase of own shares | – | – | – | – | (153) | – |
| Dividends | (568) | (381) | (1,113) | (369) | (334) | (305) |
| Other reserve movements (including write off of goodwill not capitalised up to 1997) | 152 | 102 | 26 | – | (84) | 77 |
| **Shareholders' funds at 31 December** | 9,421 | 6,323 | 6,484 | 7,269 | 7,333 | 6,341 |
| Total return to shareholders | 8.9c | 6.0p | 19.0p | 17.0p | 98.0p | 25.0p |
| Dividend per ordinary share | 38.7c | 26.0p | 72.7p | 23.0p | 21.0p | 19.0p |

Note:

1. We have included a translation of the data for the year ended 31 December 2000, from sterling into US dollars, for the convenience of our US shareholders. The translation rate is US$1.49, the closing rate at 31 December 2000.

2. Net assets per share is calculated on equity shareholders' funds and the number of ordinary shares in issue at the end of the year.

| COMBINED CONSOLIDATED BALANCE SHEET | Convenience translation (note 1) 2000 $m | 2000 £m | 1999 £m | 1998 £m | 1997 £m | 1996 £m |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Intangible assets | 1,618 | 1,086 | 1,035 | 13 | – | – |
| **Investments** | | | | | | |
| Land and buildings | 4,022 | 2,699 | 2,386 | 2,664 | 2,839 | 2,831 |
| Interests in associated undertakings | 361 | 242 | 222 | 218 | 314 | 235 |
| **Other financial investments** | | | | | | |
| Shares and other variable yield securities and units in unit trusts | 26,492 | 17,780 | 18,742 | 18,107 | 18,624 | 15,250 |
| Debt securities and other fixed income securities | 38,253 | 25,673 | 24,646 | 23,864 | 19,494 | 19,625 |
| Loans and deposits with credit institutions | 2,119 | 1,422 | 1,396 | 1,644 | 1,688 | 2,453 |
| | 66,864 | 44,875 | 44,784 | 43,615 | 39,806 | 37,328 |
| Value of long term business | 2,576 | 1,729 | 1,784 | 1,506 | 1,596 | 1,399 |
| Deposits with ceding undertakings | 195 | 131 | 115 | 110 | 100 | 100 |
| **Total investments** | 74,018 | 49,676 | 49,291 | 48,113 | 44,655 | 41,893 |
| **Assets held to cover linked liabilities** | 12,982 | 8,713 | 8,304 | 6,675 | 5,645 | 4,980 |
| **Reinsurers' share of technical provisions** | 7,207 | 4,837 | 4,104 | 3,010 | 3,088 | 2,971 |
| **Debtors** | 6,861 | 4,605 | 4,336 | 4,229 | 4,106 | 3,312 |
| **Other assets** | 1,576 | 1,058 | 1,119 | 844 | 1,162 | 654 |
| **Prepayments and accrued income** | 2,959 | 1,986 | 2,017 | 1,895 | 1,840 | 1,863 |
| **Total assets** | 107,221 | 71,961 | 70,206 | 64,779 | 60,496 | 55,673 |
| **LIABILITIES** | | | | | | |
| **Capital and reserves** | | | | | | |
| Called up share capital and share premium | 1,061 | 712 | 688 | 658 | 615 | 561 |
| Other reserves | 2,354 | 1,580 | 1,626 | 1,462 | 1,578 | 1,399 |
| Capital redemption reserve | 12 | 8 | 8 | 8 | 8 | – |
| Profit and loss account | 5,994 | 4,023 | 4,162 | 5,141 | 5,132 | 4,381 |
| **Shareholders' funds** | 9,421 | 6,323 | 6,484 | 7,269 | 7,333 | 6,341 |
| Equity minority interests in subsidiary undertakings | 596 | 400 | 406 | 291 | 254 | 245 |
| Dated loan capital | 1,168 | 784 | 610 | – | – | – |
| **Total capital, reserves and dated loan capital** | 11,185 | 7,507 | 7,500 | 7,560 | 7,587 | 6,586 |
| **Fund for future appropriations** | 5,274 | 3,540 | 4,840 | 3,785 | 3,737 | 3,553 |
| **Technical provisions** | | | | | | |
| Provision for unearned premiums | 6,981 | 4,685 | 4,476 | 3,755 | 3,652 | 3,698 |
| Long term business provision | 42,119 | 28,268 | 26,433 | 26,618 | 23,511 | 20,997 |
| Claims outstanding | 21,949 | 14,731 | 14,162 | 11,850 | 11,911 | 11,815 |
| Equalisation provisions | 422 | 283 | 259 | 250 | 194 | 112 |
| | 71,471 | 47,967 | 45,330 | 42,473 | 39,268 | 36,622 |
| **Technical provisions for linked liabilities** | 13,002 | 8,726 | 8,318 | 6,687 | 5,656 | 4,980 |
| **Provisions for other risks and charges** | 547 | 367 | 363 | 421 | 353 | 355 |
| **Borrowings** | 569 | 382 | 676 | 449 | 551 | 761 |
| **Other creditors** | 4,452 | 2,988 | 2,797 | 3,039 | 3,066 | 2,510 |
| **Accruals and deferred income** | 721 | 484 | 382 | 365 | 278 | 306 |
| **Total liabilities** | 107,221 | 71,961 | 70,206 | 64,779 | 60,496 | 55,673 |
| **Net assets per ordinary share (note 2)** | 644c | 432p | 445p | 457p | 464p | 399p |