# EXHIBIT B

# Final Private Placement Memorandum

**Confidential**

$29,999,999
**SFC GRANTOR TRUST,
SERIES 2000-4**
Student Loan Pass-Through Certificates

| STUDENT LOAN SERVICING LLC<br>Servicer | SFC ACCEPTANCE V, LLC<br>Settlor of the Trust | WELLS FARGO BANK MINNESOTA, NATIONAL ASSOCIATION<br>Trustee |
|---|---|---|

| Certificates Offered<br>7.174% Senior Pass-Through Certificates due May 20, 2016 | Rating<br>Moody's Investors Services, Inc.<br>Aaa | Rating<br>Fitch, Inc.<br>AAA |
|---|---|---|

SFC Grantor Trust, Series 2000-4, a trust formed under the laws of the State of Minnesota (the "Issuer" or the "Trust"), of which SFC Acceptance V, LLC (the "Company") is the settlor, hereby offers an aggregate of $29,999,999 of 7.174% Senior Pass-Through Certificates (the "Senior Certificates") due May 20, 2016 (the "Final Distribution Date"). See "DESCRIPTION OF THE CERTIFICATES AND POOLING AGREEMENT." The Senior Certificates will be sold with a minimum principal amount of $3,000,000 and $1,000,000 increments in excess thereof.

The Senior Certificates are being issued pursuant to a Pooling and Servicing Agreement (the "Pooling Agreement"), dated as of December 18, 2000, among the Company, as settlor, Wells Fargo Bank Minnesota, National Association, as trustee (the "Trustee"), and Student Loan Servicing LLC, as servicer (the "Servicer"). In addition to the Senior Certificates offered hereby, the Issuer will simultaneously issue its 3.43% Interest-Only Pass-Through Certificates (the "Interest-Only Certificates," and together with the Senior Certificates, the "Certificates"). The Certificates represent in the aggregate the entire ownership interest in the Issuer (other than certain residual amounts distributable to the Company). The assets of the Issuer consist primarily of a pool of student loans and tuition installment payment agreements (the "Student Loans") originated by Student Finance Corporation. The principal of the Student Loans and 90 days of interest at the rate set forth in the Student Loans are insured under a credit risk insurance policy (the "Insurance Policy") issued by Royal Indemnity Company, a Delaware capital stock insurance company ("Royal"). In addition, monthly payments of interest on the Senior Certificates and payment of the unpaid principal balance of the Senior Certificates on the Final Distribution Date are guaranteed under certain circumstances by a financial guaranty insurance policy (the "MBIA Policy") that the Company has obtained from MBIA Insurance Corporation ("MBIA").

**MBIA**

*(cover continued on next page)*

SEE "SPECIAL CONSIDERATIONS" COMMENCING ON PAGE 25 FOR A DISCUSSION OF CERTAIN RISK FACTORS THAT SHOULD BE CONSIDERED BY PROSPECTIVE INVESTORS.

PROCEEDS OF THE STUDENT LOANS AND PAYMENTS UNDER THE INSURANCE POLICY AND MBIA POLICY AND CERTAIN ESCROW AND RESERVE ACCOUNTS DESCRIBED HEREIN ARE THE SOLE SOURCES OF PAYMENT ON THE CERTIFICATES. THE CERTIFICATES REPRESENT NON-RECOURSE OBLIGATIONS OF THE ISSUER ONLY AND DO NOT REPRESENT INTERESTS IN OR OBLIGATIONS OF THE COMPANY, THE SERVICER, THE PLACEMENT AGENT, THE TRUSTEE, MBIA OR ANY OF THEIR AFFILIATES, EXCEPT AS DESCRIBED HEREIN. THE CERTIFICATES ARE NOT DEPOSITS OF A BANK. NEITHER THE CERTIFICATES NOR THE UNDERLYING LOANS ARE OR WILL BE INSURED OR GUARANTEED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION OR BY ANY OTHER GOVERNMENTAL AGENCY OR INSTRUMENTALITY.

The Senior Certificates are offered subject to the right of the Placement Agent to reject orders in whole or in part.

**PNC CAPITAL MARKETS**

**DECEMBER 15, 2000**

ROY 013104

PHLEGAL: #1008804 v1 (LM#C01!DOC)

*(cover continued from front cover)*

The holders of the Senior Certificates are entitled to receive all of the principal payments received from the obligors under the Student Loans during the related Collection Period or from the Insurance Policy or related Reserve Escrow Account, as described herein, together with monthly interest at the pass through rate of 7.174% per annum (the "Senior Pass Through Rate"), based upon a 360-day year consisting of twelve 30-day months, commencing with the month in which the Senior Certificates are issued. The Pooling Agreement establishes a record date (the "Record Date") for distributions, which is the last day of the calendar month immediately preceding the Distribution Date. Distributions of principal and interest on the Senior Certificates for the period ended on each Record Date will be made on the following distribution date, which the Pooling Agreement establishes to be the 20th day of each month or, if such day is not a business day, the next succeeding business day (the "Distribution Date"), commencing January 22, 2001 and continuing through May 20, 2016. On the first Distribution Date for the Senior Certificates (i) interest will be paid for the entire month in which the Senior Certificates are issued at the Senior Pass-Through Rate (as defined below) and (ii) all of the principal payments received from the obligors under the Student Loans or from the Insurance Policy or related Reserve Escrow Account for Defaulted Student Loans after November 30, 2000 through the end of the month in which the Senior Certificates are issued.

The Senior Certificates are being offered and sold to a limited number of "qualified institutional buyers" (each a "QIB") as defined in Rule 144A promulgated under the Securities Act of 1933, as amended (the "Securities Act"). The Senior Certificates may be transferred only in compliance with Rule 144A and the other conditions restricting transfer set forth in the Pooling Agreement. The Senior Certificates are subject to certain other restrictions on transfer as described herein. An investor may be required to hold and bear the economic risk of the Senior Certificates for their entire term. See "NOTICE TO INVESTORS", "PRIVATE PLACEMENT" and "DESCRIPTION OF THE CERTIFICATES AND POOLING AGREEMENT – The Certificates - *Transfer.*"

This Private Placement Memorandum (this "Memorandum") is highly confidential and has been prepared by the Issuer and the Company solely for the use of PNC Capital Markets, Inc. (the "Placement Agent") in connection with the proposed private placement of the Senior Certificates described herein. The Issuer, the Company and the Placement Agent each reserves the right to reject any offer to purchase the Senior Certificates in whole or in part, for any reason. This Memorandum is personal to each offeree and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire any of the Senior Certificates. Distribution of this Memorandum to any person other than an offeree and those persons, if any, retained to advise such offeree with respect thereto is unauthorized, and any disclosure of any of its contents, without the prior written consent of the Issuer or the Placement Agent, is prohibited. Each prospective purchaser, by accepting delivery of this Memorandum, agrees to the foregoing and to make no photocopies of this Memorandum, or any documents referred to herein, and, if the offeree does not purchase the Senior Certificates or if the offering is terminated, to return this Memorandum (and all documents referred to herein) to: PNC Capital Markets, Inc., One PNC Plaza, 3rd Floor, 249 Fifth Avenue, Pittsburgh, Pennsylvania 15222-2707.

The yields to maturity on the Senior Certificates will depend on, among other things, the rate of prepayments and the rate of defaults on the Student Loans. See "SPECIAL CONSIDERATIONS" and "CERTAIN YIELD AND PREPAYMENT CONSIDERATIONS."

It is a condition to the issuance of the Senior Certificates that they be rated "AAA" by Fitch, Inc. ("Fitch"), and "Aaa" by Moody's Investors Service, Inc. ("Moody's" and, together with Fitch, the "Rating Agencies").

The Senior Certificates will be represented by one or more global certificates registered in the name of Cede & Co. as nominee of the Depository Trust Company ("DTC"). The interests of beneficial owners of the Senior Certificates will be represented by book entries on the records of participating members of DTC ("Participants"). Definitive certificates will be available for the Senior Certificates only under the limited circumstances described herein. See "DESCRIPTION OF THE CERTIFICATES AND POOLING AGREEMENT – The Certificates – *Book-Entry Registration.*"

-ii-

ROY 013105

THE SENIOR CERTIFICATES ARE BEING OFFERED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OR APPLICABLE STATE SECURITIES LAWS AND MAY ONLY BE OFFERED IN TRANSACTIONS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. THIS MEMORANDUM HAS NOT BEEN FILED WITH OR REVIEWED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "COMMISSION") OR ANY COMPARABLE AGENCY OF ANY STATE PRIOR TO ITS ISSUANCE AND USE. NEITHER THE COMMISSION NOR COMPARABLE AGENCY OF ANY STATE HAS PASSED ON OR ENDORSED THE MERITS OF THE OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL AND IS A CRIMINAL OFFENSE ALSO, THERE IS NO PUBLIC OR OTHER MARKET FOR THE SENIOR CERTIFICATES AND THERE CAN BE NO ASSURANCE THAT SUCH A MARKET WILL DEVELOP OR, IF IT DOES DEVELOP, THAT IT WILL CONTINUE.

THIS MEMORANDUM SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY, NOR SHALL THERE BE ANY SALE OF THE SENIOR CERTIFICATES IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE WOULD BE UNLAWFUL PRIOR TO REGISTRATION OR QUALIFICATION UNDER, OR EXEMPTION FROM, THE SECURITIES LAWS OF ANY SUCH STATE OR OTHER JURISDICTION.

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OTHER THAN THE NOTES OFFERED HEREBY, NOR AN OFFER OF SUCH NOTES TO ANY PERSON IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH AN OFFER WOULD BE UNLAWFUL. THE DELIVERY OF THIS MEMORANDUM AT ANY TIME DOES NOT IMPLY THAT INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO ITS DATE.

THIS MEMORANDUM HAS BEEN PREPARED BY THE ISSUER AND THE COMPANY SOLELY FOR THE PURPOSE OF OFFERING THE SENIOR CERTIFICATES DESCRIBED HEREIN. THE PLACEMENT AGENT IS ACTING AS AGENT OF THE ISSUER AND THE COMPANY IN ARRANGING A PRIVATE SALE OF THE SENIOR CERTIFICATES. THIS MEMORANDUM IS FURNISHED TO YOU ON A CONFIDENTIAL BASIS SOLELY FOR THE PURPOSE OF EVALUATING THE INVESTMENT OFFERED HEREBY. THE INFORMATION CONTAINED HEREIN MAY NOT BE REPRODUCED OR USED IN WHOLE OR IN PART FOR ANY OTHER PURPOSE.

THE PLACEMENT AGENT HAS NOT CONDUCTED ANY INVESTIGATION WITH RESPECT TO THE INFORMATION CONTAINED IN THIS MEMORANDUM. THE PLACEMENT AGENT MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS MEMORANDUM; AND NOTHING HEREIN SHALL BE DEEMED TO CONSTITUTE SUCH A REPRESENTATION OR WARRANTY BY THE PLACEMENT AGENT NOR A PROMISE OR REPRESENTATION AS TO THE FUTURE PERFORMANCE OF THE POOL OF STUDENT LOANS.

THIS MEMORANDUM CONTAINS SUBSTANTIAL INFORMATION CONCERNING THE STUDENT LOANS AND THE OBLIGATIONS OF THE ISSUER, THE COMPANY, THE SERVICER, ROYAL, MBIA AND OTHERS WITH RESPECT THERETO. INVESTORS INTERESTED IN PURCHASING THE SENIOR CERTIFICATES ARE URGED TO REVIEW THIS MEMORANDUM. THE OBLIGATIONS OF THE PARTIES WITH RESPECT TO THE TRANSACTIONS CONTEMPLATED HEREIN ARE SET FORTH IN AND WILL BE GOVERNED BY CERTAIN DOCUMENTS DESCRIBED HEREIN, AND ALL

ROY 013106

PHLEGAL: #1008804 v1 (LM#C01!.DOC)

OF THE STATEMENTS AND INFORMATION HEREIN ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH DOCUMENTS.

IT IS EXPECTED THAT POTENTIAL INVESTORS WILL CONDUCT AN INDEPENDENT INVESTIGATION OF THE RISKS POSED BY AN INVESTMENT IN THE SENIOR CERTIFICATES. OFFICERS OF THE MANAGER OF THE COMPANY WILL BE AVAILABLE TO ANSWER QUESTIONS CONCERNING THE ISSUER, THE COMPANY AND THE SERVICER AND WILL, UPON REQUEST, MAKE AVAILABLE SUCH OTHER INFORMATION AS QUALIFIED, POTENTIAL INVESTORS MAY REASONABLY REQUEST.

THIS OFFERING IS MADE SUBJECT TO WITHDRAWAL, CANCELLATION OR MODIFICATION BY THE ISSUER, THE COMPANY AND THE PLACEMENT AGENT WITHOUT NOTICE AND IS SPECIFICALLY MADE SUBJECT TO THE TERMS DESCRIBED IN THIS MEMORANDUM. THE ISSUER, THE COMPANY AND THE PLACEMENT AGENT RESERVE THE RIGHT TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART OR TO ALLOT TO ANY PROSPECTIVE INVESTOR LESS THAN THE ORIGINAL AMOUNT OF SENIOR CERTIFICATES SUBSCRIBED FOR BY SUCH INVESTOR.

PROSPECTIVE INVESTORS SHOULD ALSO CONSULT THEIR OWN INVESTMENT, LEGAL, TAX AND ACCOUNTING ADVISORS TO DETERMINE WHETHER THE SENIOR CERTIFICATES CONSTITUTE APPROPRIATE INVESTMENTS FOR THEM AND THE APPLICABLE LEGAL, TAX, REGULATORY AND ACCOUNTING TREATMENT OF THE SENIOR CERTIFICATES. IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER, THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

EACH PURCHASER OF ANY OF THE SENIOR CERTIFICATES MUST COMPLY WITH ALL APPLICABLE LAWS AND REGULATIONS IN FORCE IN ANY JURISDICTION IN WHICH IT PURCHASES, OFFERS OR SELLS THE SENIOR CERTIFICATES OR POSSESSES OR DISTRIBUTES THIS MEMORANDUM AND MUST OBTAIN ANY CONSENT, APPROVAL OR PERMISSION REQUIRED BY IT FOR THE PURCHASE, OFFER OR SALE BY IT OF THE SENIOR CERTIFICATES UNDER THE LAWS AND REGULATIONS IN FORCE IN ANY JURISDICTION TO WHICH IT IS SUBJECT OR IN WHICH IT MAKES SUCH PURCHASES, OFFERS OR SALES, AND NEITHER THE ISSUER, THE COMPANY, NOR THE PLACEMENT AGENT SHALL HAVE ANY RESPONSIBILITY THEREFOR.

THE APPROPRIATE CHARACTERIZATION OF THE SENIOR CERTIFICATES UNDER VARIOUS LEGAL INVESTMENT RESTRICTIONS, AND THUS THE ABILITY OF INVESTORS SUBJECT TO THESE RESTRICTIONS TO PURCHASE THE SENIOR CERTIFICATES, IS SUBJECT TO SIGNIFICANT INTERPRETIVE UNCERTAINTIES. ACCORDINGLY, INVESTORS WHOSE INVESTMENT AUTHORITY IS SUBJECT TO LEGAL RESTRICTIONS SHOULD CONSULT THEIR OWN LEGAL ADVISORS TO DETERMINE WHETHER AND TO WHAT EXTENT THE SENIOR CERTIFICATES CONSTITUTE LEGAL REQUIREMENTS FOR THEM.

THE SENIOR CERTIFICATES MAY NOT BE PURCHASED BY OR TRANSFERRED TO ANY "EMPLOYEE BENEFIT PLAN" WITHIN THE MEANING OF SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") (WHETHER OR NOT SUBJECT TO ERISA, AND INCLUDING, WITHOUT LIMITATION, FOREIGN OR GOVERNMENT PLANS), ANY "PLAN" DESCRIBED BY SECTION 4975(e)(1) OF THE INTERNAL REVNUE CODE OF 1986, AS AMENDED, OR ANY ENTITY WHOSE UNDERLYING ASSETS ARE DEEMED TO INCLUDE "PLAN ASSETS" OF ANY OF THE FOREGOING BY REASON OF AN EMPLOYEE BENEFIT PLAN'S

ROY 013107

OR OTHER PLAN'S INVESTMENT IN SUCH ENTITY (EACH, A "BENEFIT PLAN INVESTOR"), EXCEPT FOR AN INSURANCE COMPANY USING THE ASSETS OF ITS GENERAL ACCOUNT THAT REPRESENTS, WARRANTS AND COVENANTS THAT, AT THE TIME OF ACQUISITION AND THROUGHOUT THE PERIOD IT HOLDS THE SENIOR CERTIFICATES, (I) IT IS ELIGIBLE FOR AND MEETS THE REQUIREMENTS OF DEPARTMENT OF LABOR PROHIBITED TRANSACTION CLASS EXEMPTION 95-60 AND (II) LESS THAN 25% OF THE ASSETS OF SUCH GENERAL ACCOUNT ARE (OR REPRESENT) ASSETS OF A BENEFIT PLAN INVESTOR.

-v-

ROY 013108

IF AND WHEN INCLUDED IN THIS MEMORANDUM OR IN DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE WORDS "EXPECTS," "INTENDS," "ANTICIPATES," "ESTIMATES" AND ANALOGOUS EXPRESSIONS ARE INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS AS DEFINED IN THE SECURITIES ACT. ANY SUCH STATEMENTS, WHICH MAY INCLUDE STATEMENTS CONTAINED IN "SPECIAL CONSIDERATIONS," INHERENTLY ARE SUBJECT TO A VARIETY OF RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE PROJECTED. SUCH RISKS AND UNCERTAINTIES INCLUDE, AMONG OTHERS, GENERAL ECONOMIC AND BUSINESS CONDITIONS, COMPETITION, CHANGES IN FOREIGN POLITICAL, SOCIAL AND ECONOMIC CONDITIONS, REGULATORY INITIATIVES AND COMPLIANCE WITH GOVERNMENTAL REGULATIONS AND VARIOUS OTHER MATTERS, MANY OF WHICH ARE BEYOND THE ISSUER'S CONTROL. THESE FORWARD-LOOKING STATEMENTS SPEAK ONLY AS OF THE DATE OF THIS MEMORANDUM. THE ISSUER EXPRESSLY DISCLAIMS ANY OBLIGATION OR UNDERTAKING TO RELEASE PUBLICLY ANY UPDATES OR REVISIONS TO ANY FORWARD-LOOKING STATEMENT CONTAINED HEREIN TO REFLECT ANY CHANGE IN THE ISSUER'S EXPECTATIONS WITH REGARD THERETO OR ANY CHANGE IN EVENTS, CONDITIONS OR CIRCUMSTANCES ON WHICH ANY SUCH STATEMENT IS BASED.

NOTICE TO NEW HAMPSHIRE RESIDENTS

FOR NEW HAMPSHIRE RESIDENTS: NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE UNIFORM SECURITIES ACT WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER CHAPTER 421-B IS TRUE, COMPLETE, AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT ANY EXEMPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE OF NEW HAMPSHIRE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

-vi-

ROY 013109

## TABLE OF CONTENTS

**Page**

NOTICE TO INVESTORS.................................................................................1

SUMMARY ......................................................................................................5

SPECIAL CONSIDERATIONS.........................................................................25

THE STUDENT LOANS...................................................................................31

    *General*................................................................................................*31*
    *The Student Loan Credit Scoring Models and Credit*...............................*32*
    *Underwriting Guidelines for Institutions*................................................*41*
    *Certain Legal Aspects of Student Loans*.................................................*41*

CREDIT ENHANCEMENT...............................................................................42

    *Reserve Escrow Account and Liquidity Reserve Account.*.......................*42*
    *The Insurance Policy*.............................................................................*43*

DESCRIPTION OF THE MBIA POLICY .........................................................45

CERTAIN YIELD AND PREPAYMENT CONSIDERATIONS..........................48

    *General*................................................................................................*48*
    *Yield and Prepayment Considerations*..................................................*48*

USE OF PROCEEDS.........................................................................................50

THE ISSUER ...................................................................................................50

THE COMPANY...............................................................................................50

    *General*................................................................................................*50*
    *Executive Officers and Directors of Company Member* ..........................*51*

THE ORIGINATOR ........................................................................................51

    *General*................................................................................................*51*
    *Executive Officers and Directors of SFC*...............................................*52*

THE SERVICER ..............................................................................................52

    *General*................................................................................................*52*
    *Executive Officers and Directors of Servicer*........................................*52*

DESCRIPTION OF MBIA .................................................................................53

-vii-

ROY 013110

**Page**

General.................................................................................. 53
Financial Information About MBIA .......................................... 54
Where You Can Obtain Additional Information About MBIA ........... 55
Financial Strength Ratings of MBIA ......................................... 55
DESCRIPTION OF ROYAL INDEMNITY COMPANY ...................... 56
General.................................................................................. 56
Where You Can Obtain Additional Information About Royal and Royal & SunAlliance. 56
Financial Information About Royal and Royal & SunAlliance........... 56
Financial Strength Ratings of Royal .......................................... 57
DESCRIPTION OF THE CERTIFICATES AND POOLING AGREEMENT .......... 57
The Certificates ..................................................................... 58
The Pooling Agreement............................................................ 67
CERTAIN FEDERAL INCOME TAX CONSIDERATIONS .................... 75
Classification of the Issuer as a Grantor Trust............................. 76
Income of Senior Certificateholders .......................................... 76
Premium ................................................................................ 81
Sale or Exchange of Senior Certificates ..................................... 81
Reporting and Backup Withholding ........................................... 82
STATE AND LOCAL TAX CONSIDERATIONS.................................. 82
FOREIGN INVESTORS AND EXEMPT ORGANIZATIONS ................. 83
CERTAIN ERISA CONSIDERATIONS ............................................ 83
CERTIFICATE RATINGS ............................................................. 84
PRIVATE PLACEMENT ............................................................... 85
LEGALITY OF THE SENIOR CERTIFICATES ................................. 86
ADDITIONAL INFORMATION ..................................................... 86
EXHIBIT A  FORM OF  CREDIT RISK INSURANCE POLICY ............. A-1
EXHIBIT B  FORM OF CERTIFICATE GUARANTY INSURANCE POLICY .......... B-1
EXHIBIT C  MBIA FINANCIAL STATEMENTS ................................. C-1
EXHIBIT D  FORM OF QIB INVESTOR LETTER (FOR TRANSFER OF SENIOR CERTIFICATES)........................................................................ D-1

-viii-

ROY 013111

PHLEGAL: #1008804 v1 (LM#C01!.DOC)

# NOTICE TO INVESTORS

*Because of the following restrictions, investors are advised to consult legal counsel prior to making any purchase, offer, pledge or other transfer of the Senior Certificates.*

Each purchaser of any of the Senior Certificates, by its acceptance thereof, will be deemed to have acknowledged, represented to and agreed with the Company, the Issuer, the Trustee and the Placement Agent as follows:

1.      It understands and acknowledges that the Senior Certificates have not been registered under the Securities Act or any other applicable securities laws, and may not be offered, sold or otherwise transferred except in compliance with the registration requirements of the Securities Act or any other applicable securities law, pursuant to an exemption therefrom or in a transaction not subject thereto, and in compliance with the applicable requirements of the Pooling Agreement.

2.      It acknowledges that none of the Company, the Issuer, the Trustee or the Placement Agent or any person representing the Company, the Issuer, the Trustee or the Placement Agent has made any representation to it with respect to the Company, the Issuer, any affiliate of the Company or Issuer, or the sale of any Senior Certificates, other than the information contained in this Memorandum, which Memorandum has been delivered to it and upon which it is relying in making its investment decision with respect to the Senior Certificates; accordingly, it acknowledges that no representation or warranty is made by the Company, the Issuer, any affiliate of the Company or the Issuer, the Trustee or the Placement Agent as to the accuracy or completeness of such materials; and it has had access to such financial and other information concerning the Company, the Issuer, any affiliate of the Company or the Issuer, and the Senior Certificates as it has deemed necessary in connection with its decision to purchase any of the Senior Certificates, including an opportunity to ask questions and request information from the Company, the Issuer, the Trustee and the Placement Agent.  It acknowledges that the delivery of this Memorandum at any time does not imply that information herein is correct as of any time subsequent to this date.

3.      It is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act ("QIB") and is purchasing for its own account (and not for the account of others) or as a fiduciary agent for others (which others are also QIBs and not executed a certificate substantially in the form attached as Exhibit D hereto or other agreement containing substantially the same representations contained in such certificate).  It is aware that it (or any account for which it is purchasing) may be required to bear the economic risk of an investment in the Senior Certificates for an indefinite period, and it (or such account) is able to bear such risk for an indefinite period.

ROY 013112

4.      No sale, pledge or other transfer of any Senior Certificate may be made by any person unless either (i) so long as the Senior Certificates are eligible for resale pursuant to Rule 144A under the Securities Act, such sale, pledge or other transfer is made to the person whom the seller reasonably believes after due inquiry is a QIB acting for its own account (and not for the account of others) or as a fiduciary or agent for others (which are also QIBs) to whom notice is given that the sale, pledge or transfer is being made in reliance on Rule 144A or (ii) such sale, pledge or other transfer is made in accordance with applicable securities laws of the United States.

5.      The Senior Certificates will bear the following legends, unless the Issuer determines otherwise in accordance with applicable law:

"THIS SENIOR CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED OR QUALIFIED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE IN THE UNITED STATES OR ANY FOREIGN SECURITIES LAWS.  BY ITS ACCEPTANCE OF THIS SENIOR CERTIFICATE THE HOLDER AND EACH BENEFICIAL OWNER OF THIS SENIOR CERTIFICATE IS DEEMED TO REPRESENT THAT IT (I) IS A "QUALIFIED INSTITUTIONAL BUYER" WITHIN THE MEAING OF RULE 144A UNDER THE SECURITIES ACT (A "QIB") AND IS ACQUIRING SUCH SENIOR CERTIFICATE FOR ITS OWN ACCOUNT (AND NOT FOR THE ACCOUNT OF OTHERS) OR AS A FIDUCIARY OR AGENT FOR OTHERS (WHICH OTHERS ARE ALSO QIBS) TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A OR (II) IS OTHERWISE ACQUIRING THIS SENIOR CERTIFICATE IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION.

NO SALE, PLEDGE OR OTHER TRANSFER OF THIS SENIOR CERTIFICATE MAY BE MADE BY ANY PERSON UNLESS (I) SO LONG AS THIS SENIOR CERTIFICATE IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT, SUCH SALE, PLEDGE OR OTHER TRANSFER IS MADE TO A PERSON WHOM THE TRANSFERROR REASONABLY BELIEVES AFTER DUE INQUIRY IS A QIB ACTING FOR ITS OWN ACCOUNT (AND NOT FOR THE ACCOUNT OF OTHERS) OR AS A

-2-

ROY 013113

FIDUCIARY AGENT FOR OTHERS (WHICH OTHERS ARE ALSO QIBS) TO WHOM NOTICE IS GIVEN THAT THE SALE, PLEDGE OR TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A OR (II) SUCH SALE, PLEDGE OR OTHER TRANSFER IS OTHERWISE MADE IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION." THIS SENIOR CERTIFICATE MAY NOT BE PURCHASED BY OR TRANSFERRED TO ANY "EMPLOYEE BENEFIT PLAN" WITHIN THE MEANING OF SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") (WHETHER OR NOT SUBJECT TO ERISA, AND INCLUDING, WITHOUT LIMITATION, FOREIGN OR GOVERNMENT PLANS), ANY "PLAN" DESCRIBED BY SECTION 4975(e)(1) OF THE INERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), OR ANY ENTITY WHOSE UNDERLYING ASSETS ARE DEEMED TO INCLUDE "PLAN ASSETS" OF ANY OF THE FOREGOING BY REASON OF AN EMPLOYEE BENEFIT PLAN'S OR OTHER PLAN'S INVESTMENT IN SUCH ENTITY (EACH, A "BENEFIT PLAN INVESTOR"), EXCEPT FOR AN INSURANCE COMPANY USING THE ASSETS OF ITS GENERAL ACCOUNT THAT REPRESENTS, WARRANTS AND COVENANTS THAT, AT THE TIME OF ACQUISITION AND THROUGHOUT THE PERIOD IT HOLDS THIS SENIOR CERTIFICATE, (I) IT IS ELIGIBLE FOR AND MEETS THE REQUIREMENTS OF DEPARTMENT OF LABOR PROHIBITED TRANSACTION CLASS EXEMPTION 95-60 AND (II) LESS THAN 25% OF THE ASSETS OF SUCH GENERAL ACCOUNT ARE (OR REPRESENT) ASSETS OF A BENEFIT PLAN INVESTOR.

6.   It represents and warrants that it is either (i) not a Benefit Plan Investor or (ii) an insurance company using the assets of its general account that represents, warrants and covenants that, at the time of acquisition and throughout the period it holds this Senior Certificate, (A) it is eligible for and meets the requirements of Department of Labor Prohibited Transaction Class Exemption 95-60 and (B) less than 25% of the assets of such general account are (or represent) assets of a Benefit Plan Investor.

7.   It acknowledges that the Company, the Issuer, the Trustee, the Placement Agent and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations, warranties and agreements and agrees that, if any of the acknowledgments,

-3-

ROY 013114

representations, warranties and agreements deemed to have been made by its purchase of the Senior Certificates are no longer accurate, it shall promptly notify the Placement Agent. If it is acquiring any Senior Certificates as a fiduciary or agent for one or more investor accounts, it represents that it has sole investment discretion with respect to each such investor account and that it has full power to make the foregoing acknowledgments, representations and agreements on behalf of each such investor account.

-4-

ROY 013115

# SUMMARY

*The following summary is qualified in its entirety by reference to the detailed information appearing elsewhere in this Memorandum and the specific provisions contained in, or to be contained in, the documents referenced herein. Capitalized terms used in the following summary may be defined elsewhere in this Memorandum. Capitalized terms used and not otherwise defined in this Memorandum have the meanings given to them under the Pooling Agreement.*

CERTIFICATES OFFERED:

$29,999,999 of 7.174% Senior Pass-Through Certificates due May 20, 2016 (the "Senior Certificates").

The purchase price of the Senior Certificates will be the sum of (i) the face amount of the Senior Certificates, which will be equal to the balance of the Student Loans as of November 30, 2000 (the "Cut-off Date"), plus (ii) an amount equal to that portion of the first Interest Payment (as defined below) that will be paid on the Senior Certificates corresponding to the portion of the month commencing with the first day of the month in which the closing on the issuance and sale of the Senior Certificates (the "Closing Date") occurs through and including the day before the Closing Date.

The holders of the Senior Certificates are entitled to receive monthly distributions of principal (as further defined below, the "Principal Distribution"), and with respect to any Distribution Date for the Senior Certificates, interest equal to the product of one-twelfth of 7.174% (the "Senior Pass-Through Rate") multiplied by the Senior Certificateholder Balance as of the immediately preceding Record Date (as defined below) (or, if said Distribution Date is the first Distribution Date, it shall be the original Senior Certificateholder Balance), plus the amount of interest previously due but not paid to the Senior Certificateholders, if any (plus interest on such unpaid interest at the Senior Pass-Through Rate) (the "Senior Interest Distribution").

Each monthly Principal Distribution on the Senior Certificates will be in an amount equal to (w) principal payments and prepayments received on the Student Loans during the applicable Collection Period, (x) principal payments due but not collected on Student Loans that are delinquent but are not yet Defaulted Student Loans (defined as loans 90 days or more delinquent from

-5-

ROY 013116

their respective due dates, applying any payment received after a delinquency to the earliest delinquency), to the extent funded from the Reserve Escrow Account described below, (y) the principal portion of payments received on account of Defaulted Student Loans from the Reserve Escrow Account or from any claims paid by Royal under the Insurance Policy described below, up to the Senior Certificateholder Balance (as defined below) with respect to each such Defaulted Student Loan, and (z) in the event of any repurchase of a Student Loan by SFC or the Company during the applicable Collection Period, based on a breach of their representations and warranties with respect thereto, the Senior Certificateholder Balance with respect to such Student Loan. The term "Collection Period" means, with respect to any Distribution Date, the calendar month preceding the month in which such Distribution Date occurs, provided, however, that with respect to the first Distribution Date; the Collection Period shall be the period commencing the day after the Cut-Off Date through and including the last day of the calendar month preceding such first Distribution Date. The term "Senior Certificateholder Balance" means, as to any Student Loan, the balance of the Student Loan as of the Cut-Off Date, less the amount of any Principal Distributions paid to the Senior Certificateholders on account of such Student Loan.

Distributions of principal and interest will be made on the twentieth (20th) day of each month or, if such date is not a business day, the next succeeding business day (the "Distribution Date"), commencing January 22, 2001, to the holders of record of the Senior Certificates on the last day of the immediately preceding calendar month (the "Record Date"). Interest will be paid on each Distribution Date for the period ended on the preceding Record Date. On the first Distribution Date for the Senior Certificates (i) interest will be paid for the entire month in which the Senior Certificates are issued at the Senior Pass-Through Rate and (ii) all of the principal payments received from the obligors under the Student Loans or from the Insurance Policy or related Reserve Escrow Account for Defaulted Student Loans after November 30, 2000 through the end of the month in which the Senior Certificates are issued.

The Senior Certificates will have a stated maturity of May 20, 2016 (the "Final Distribution Date"). However, the actual date on which payment in full may be made on the Senior Certificates

-6-

ROY 013117

may be earlier than the Final Distribution Date due to, among other factors, prepayments of principal and defaults on the Student Loans covered under the Insurance Policy or the Reserve Escrow Account, as described below, which payments are paid out to the Senior Certificateholders.  No assurances can be given as to the actual maturity date of the Senior Certificates or the payment experience of the Student Loans or the Senior Certificates. See "DESCRIPTION OF THE CERTIFICATES AND POOLING AGREEMENT"; "CERTAIN YIELD AND PREPAYMENT CONSIDERATIONS"; and "SPECIAL CONSIDERATIONS – Average Life of Certificates; Prepayment; Yields."

-7-

ROY 013118

PHLEGAL: #1008804 v1 (LM#C011.DOC)

INTEREST-ONLY
CERTIFICATES:

In addition to the Senior Certificates offered hereby, the Issuer will simultaneously issue its 3.43% Interest-Only Pass-Through Certificates (the "Interest-Only Certificates"). It is anticipated that Student Finance Corporation will purchase the Interest-Only Certificates. See "-- Originator."

The holders of the Interest-Only Certificates will be entitled to receive monthly distributions of interest (the "Interest-Only Distribution") in an amount equal to one-twelfth (1/12) of 3.43% (the "Interest-Only Pass-Through Rate") on the Interest-Only Notional Balance (defined as the Senior Certificateholder Balance, less the amount of the Senior Certificateholder Balance, if any, attributable to Defaulted Student Loans).

The Interest-Only Distribution will be made on each Distribution Date, commencing January 22, 2001, to the holders of record of the Interest-Only Certificates on the preceding Record Date. Interest will be paid on each Distribution Date for the period ended on the preceding Record Date. On the first Distribution Date for the Interest-Only Certificates, interest will be paid at the Interest-Only Pass-Through Rate for the entire month in which the Interest-Only Certificates are issued.

The Interest-Only Distribution will be made prior to payment of principal on the Senior Certificates. See "-- Collection Account" and "DESCRIPTION OF THE CERTIFICATES AND POOLING AGREEMENT -- The Certificates -- *The Lock Box Account and Collection Account.*"

The amount described in the prior sentences is, in effect, an "interest-only strip" of the interest collected on the Student Loans. Prepayments of the Student Loans and Student Loans becoming Defaulted Student Loans will affect the amounts due to the holders of the Interest-Only Certificates.

ISSUER:

SFC Grantor Trust, Series 2000-4 (the "Issuer") is a limited purpose trust organized under the laws of the State of Minnesota pursuant to the Pooling Agreement. The Certificates are limited obligations of the Issuer payable solely from the Assets of the Issuer (as described herein). None of the Company, the Servicer, the Trustee, the Placement Agent, or any other party will guarantee, or otherwise be obligated to repay, the Certificates. The Issuer will not have any significant assets or ownership

-8-

ROY 013119

interests other than the Assets. See "—Availability of Assets for Payments of the Senior and Interest-Only Certificates" and "THE ISSUER."

**COMPANY:**    SFC Acceptance V, LLC (the "Company") is a limited liability company organized and existing under the laws of the State of Delaware. The Company was organized for the special and limited purpose of entering into this transaction. See "THE COMPANY."

**ORIGINATOR:**    Student Finance Corporation ("SFC") is a Pennsylvania corporation in the business of originating and/or acquiring student loans and tuition installment payment agreements that are not guaranteed by any federal or state government. SFC originated the Student Loans in the ordinary course of its business or directly or indirectly acquired the Student Loans from educational institutions.

**SERVICER:**    Student Loan Servicing LLC (the "Servicer") is a limited liability company organized and existing under the laws of the State of Delaware. The Servicer was organized for the purpose of servicing student loans originated or purchased by SFC. See "ORIGINATOR." The Servicer will receive a monthly fee equal to one-twelfth of 2.0% of the then outstanding principal amount of each Outstanding Student Loan (as defined below) as of each Record Date (the "Servicing Fee") and shall be entitled to retain (x) all delinquency, default, penalty and similar fees collected with respect to and in accordance with the terms of the Student Loans and (y) any Simple Interest Excess to the extent the Servicer has made any advances of a Simple Interest Shortfall (as such terms are defined below).

"Simple Interest Shortfall" means, for each monthly Collection Period, an amount equal to the excess, if any, of (i) the amount of interest that was due during such Collection Period on all Student Loans (other than Defaulted Student Loans and Student Loans for which Delinquent Interest was owing on the last day of such Collection Period) assuming that the payment on each such Student Loan was received on its respective due date over (ii) all payments received during such Collection Period on all Student Loans to the extent such payments are allocable to interest other than Delinquent Interest.

-9-

ROY 013120

"Simple Interest Excess" means, for each monthly Collection Period, an amount equal to the excess, if any, of (i) all payments received during such Collection Period on all Student Loans to the extent such payments are allocable to interest other than Delinquent Interest over (ii) the amount of interest that was due during such Collection Period on all Student Loans (other than Defaulted Student Loans and Student Loans for which Delinquent Interest was owing on the last day of such Collection Period) assuming that the payment on each such Student Loan was received on its respective due date.

"Delinquent Interest" means, with respect to any Distribution Date, the amount of interest due on the Student Loans during the monthly Collection Period covered by such Distribution Date but not received, exclusive of the interest portion of any Pay Ahead Amounts received during such Collection Period.

The "Outstanding Student Loans," on which the Servicing Fee will be calculated, means those Student Loans that have not reached their maturity date, have not been paid in full, have not been repurchased by the Company as provided in the Pooling Agreement, and have not been the subject of a determination by the Servicer that liquidation proceeds or insurance proceeds under the Insurance Policy constitute the final amounts recoverable with respect thereto. The Servicing Fee is payable monthly. See "DESCRIPTION OF THE CERTIFICATES AND POOLING AGREEMENT – The Pooling Agreement – *Servicer's Compensation*." The Servicer will perform all of the collection and servicing functions for the Student Loans. See "DESCRIPTION OF THE CERTIFICATES AND POOLING AGREEMENT – The Pooling Agreement – *Servicing and Collection Processes and Procedures*." The Servicer shall serve for an initial 60 day term, and additional 60 day renewal terms thereafter, provided that the Servicer's term will not be renewed if Royal or, in certain circumstances, MBIA, does not deliver a notice of renewal by at least the 11th business day prior to the expiration of any such 60-day term. In addition, the Servicer may be terminated if an Event of Default occurs and is continuing, upon the written request of either MBIA or, if MBIA is in default under the MBIA Policy, the Majority Certificateholders (defined as the beneficial owners of 51% or more of the outstanding principal amount of the Senior Certificates as evidenced by a vote of the DTC Nominee as defined below, excluding Senior

-10-

ROY 013121

Certificates held by the Company, Royal, or any of their respective affiliates), effective immediately. Upon non-renewal or termination of the Servicer, the Trustee will become the servicer. See "DESCRIPTION OF THE CERTIFICATES AND POOLING AGREEMENT - The Pooling Agreement – *Servicing*" and "– *Servicer's Compensation*."

TRUSTEE:

Wells Fargo Bank Minnesota, National Association, a national banking association, serves as trustee under the Pooling Agreement (the "Trustee"). The Trustee may be changed if required by MBIA, or if required by Royal in connection with any failure by the Trustee to apply funds as required by the Pooling Agreement. The Assets will be held by the Trustee under the terms of the Pooling Agreement. In addition to its other responsibilities, the Trustee will actively monitor the servicing by the Servicer and will receive weekly information from the Servicer in order to enable the Trustee to take over the servicing in an expedited manner if required. The Trustee will receive a fee of eight basis points (0.08%) per year on the aggregate balance of the Senior Certificates, payable monthly and subject to a monthly minimum fee of $2,000, plus transaction fees associated with the Trustee's role as custodian of the Student Loan files as set forth in the Pooling Agreement; and will receive $150 per transfer of data from the Servicer to the Trustee and an annual on site examination fee of $3,000 (such fees are referred to hereinafter as the "Trustee's Fees"). In addition, the Trustee will receive certain initial set up fees, and reimbursement for reasonable expenses and costs, as set forth in the Pooling Agreement. Except if the Trustee is acting as successor Servicer, any expenses and costs must be recovered from the Expense Account, as described herein. During any time that the Trustee is acting as successor Servicer, the Trustee will be required to obtain approval of MBIA, the Majority Certificateholders and the Rating Agencies for transactions fees and other expenses and costs in excess of $10,000 in the aggregate during the term of the Pooling Agreement, to the extent that such expenses and costs are not covered by the Expense Account. In the event that the Trustee takes over as Servicer, it will be paid out-of-pocket expenses associated with the transfer of servicing, not to exceed $50,000, and as Servicer will receive the Servicing Fees described herein, with a minimum monthly Servicing Fee of $10,000. See "DESCRIPTION OF THE CERTIFICATES AND POOLING AGREEMENT – The Pooling Agreement – *The Trustee*", "–

-11-

ROY 013122

*Servicing"* and *"– Servicer's Compensation."*

**COLLECTION ACCOUNT:**

All amounts collected on the Student Loans, commencing with the date of the sale and issuance of the Certificates (the "Closing Date"), will be remitted directly to the account or accounts established by PNC Bank, National Association (the "Lock Box Bank") in the name of the Trustee on behalf of the Trust (the "Lock Box Account") held at the Lock Box Bank in the name of the Trustee and on a monthly basis remitted to another trust account or accounts held by the Trustee (collectively, the "Collection Account"), to be established by the Trustee for the benefit of the holders of the Certificates.

On or prior to each Distribution Date, amounts in the Collection Account that represent early payments of monthly Student Loan payments designated in writing by the related obligor under the Student Loan to be applied to monthly Student Loan payments due after the Record Date will be transferred to a Pay-Ahead Account established by the Trustee (the "Pay-Ahead Account"), and amounts previously remitted to the Pay-Ahead Account on account of scheduled payments due prior to the Record Date will be transferred from the Pay-Ahead Account into the Collection Account. Amounts in the Collection Account which represent recoveries of delinquent payments on Defaulted Student Loans will be paid into the Reserve Escrow Account (as defined herein). In addition, certain other amounts (including late fees and similar collections, Simple Interest Excess and payments on Student Loans no longer part of the Trust estate) will be paid to the party entitled thereto, as provided in the Pooling Agreement. For example, the Simple Interest Excess is payable to the Servicer to compensate it for making advances of Simple Interest Shortfall, with any amount not payable to the Servicer to be deposited into the Liquidity Reserve Account.

All remaining funds in the Collection Account on the Distribution Date will be available for application to the payment of principal, if applicable, and interest on the Certificates on the Distribution Date, as described below. The amount of Delinquent Interest with respect to the Student Loans for such period and any Simple Interest Shortfall for such period may be withdrawn from the Liquidity Reserve Account (as defined herein) and deposited into the Collection Account to the extent there are funds available in the Liquidity Reserve Account for this purpose. Delinquent

-12-

ROY 013123

principal payments on the Student Loans that are delinquent but are not yet Defaulted Student Loans, and any shortfall in the amounts due for interest with respect to such Student Loans not covered by the Liquidity Reserve Account, may be withdrawn from the Reserve Escrow Account and deposited into the Collection Account to the extent there are funds available in the Reserve Escrow Account for this purpose (the "Reserve Escrow Draw Amount"). The entire principal balance of Defaulted Student Loans and interest thereon to the date of default may be recovered from the Reserve Escrow Account or the Insurance Policy, as described herein, and deposited into the Collection Account. The Servicer may, in its sole discretion, advance sums to make up any shortfall between amounts held in the Collection Account and amounts due on any Distribution Date which resulted from any late or delinquent payment due under the Student Loans instead of requiring the Trustee to access the Liquidity Reserve Account and/or Reserve Escrow Account or pending receipt of funds under the Insurance Policy. The Servicer is under no obligation to make any such advances and will not make any such advances unless the Servicer has a high probability of recovery of the sums advanced. However, the Servicer shall deposit in the Collection Account from its own funds any Simple Interest Shortfall not funded by the Liquidity Reserve Account. In the event that there are insufficient funds in the Collection Account, after deposits from the Liquidity Reserve Account, the Reserve Escrow Account, the Insurance Policy and the MBIA Reserve Account, to pay interest due on the Senior Certificates or, on the Final Distribution Date, the unpaid balance of the Senior Certificates, then such deficiency may be recovered under the MBIA Policy, as described herein. No assurances can be made that funds will be available to make payments due under the Certificates on any Distribution Date.

*[handwritten margin note: even before MBIA has has to pay]*

On each Distribution Date, the Trustee will apply the amount available in the Collection Account, in the following order of priority (the "Payment Waterfall");

(1) To the extent of available funds, commencing with the Distribution Date in April, 2001 to the payment of the monthly insurance premium due to MBIA;

(2) To the extent of available funds, to the payment of the Senior Interest Distribution including any overdue amounts on the Senior

-13-

ROY 013124

Certificates, as to which MBIA is subrogated to the extent of payment under the MBIA Policy;

(3) To the extent of available funds, to the payment of the Interest-Only Distribution (not including overdue interest on the Interest-Only Certificates);

(4) To the extent of available funds, to the payment of the Principal Distribution;

(5) To the extent of available funds, to the payment of overdue interest on the Interest-Only Certificates;

(6) To the extent of available funds, to the payment of the Trustee Fees due the Trustee and to the payment of the Escrow Fees (as defined below "– The Reserve Escrow Account") due the Escrow Agent (as defined below "– The Reserve Escrow Account") for the respective Distribution Date and any previous Distribution Dates for which such fees have not been paid in whole or in part to the extent of such deficiency, which Trustee's Fees and Escrow Fees may not exceed $6,450 per month unless consented to by MBIA, Royal, and the Rating Agencies;

(7) To the extent of available funds, to the payment of an amount of $6,450 less the amounts paid to the Trustee and Escrow Agent pursuant to (6) above (the "Expense Account Set Aside") deposited to the Expense Account established by the Trustee under the Pooling Agreement (the "Expense Account") for such Distribution Date and any previous Distribution Dates for which such amount was not so deposited in whole or in part to the extent of such deficiency;

(8) To the extent of available funds, to the payment of additional expenses of the Trustee, during any time that Student Loan Servicing LLC is no longer the Servicer and the Trustee is acting as successor Servicer, to the extent that such additional expenses are not covered by the Expense Account; provided that if such additional expenses exceed $10,000 in the aggregate during the term of the Pooling Agreement, any payment to the Trustee for such additional expenses which exceed such $10,000 limit must be approved by MBIA, the Majority Certificateholders and the Rating Agencies;

-14-

ROY 013125

(9) To the extent of available funds, to replenish the Liquidity Reserve Account, to the extent of prior payments drawn from the Liquidity Reserve Account and not theretofore repaid, up to the Original Liquidity Reserve Amount (as defined below);

(10) To the extent of available funds, to the payment of any advances made by the Servicer not otherwise repaid to the Servicer by its receipt of any Simple Interest Excess;

(11) To the extent of available funds, to payment of the Servicing Fee due to the Servicer pursuant to the Pooling Agreement; and

(12) To the extent of available funds, for deposit into the Reserve Escrow Account (the "Reserve Remittance Amount"); provided, however, that if there was a Reserve Draw Deficiency (as defined below) for such Distribution Date, then the Reserve Remittance Amount, up to the amount of such Reserve Draw Deficiency, shall be deemed to be received from the Reserve Escrow Account as a payment of principal with respect to the Student Loans (allocated pro rata to any delinquent principal payments under the Student Loans and, after the Experience Account (as defined below) has expired or been exhausted, the entire principal balance of the Defaulted Student Loans for such Distribution Date, not recovered from the Reserve Escrow Account pursuant to the Reserve Escrow Draw Amount), and shall be applied to the payment of the Principal Distribution;

provided, however, in the event that Student Loan Servicing LLC no longer acts as Servicer and the Trustee or another party unrelated to Student Loan Servicing LLC, succeeds to the duties of Servicer under the Pooling Agreement, payments of amounts due to the Trustee or such successor Servicer as servicing fees shall be paid prior to any other payments listed above.

"Reserve Draw Deficiency" means the excess, if any, for any Distribution Date, of the amount set forth in clause (a) of the definition of Reserve Escrow Draw Amount over the amount set forth in clause (b) of such definition.

The Collection Account shall be invested as determined by the Trustee, pursuant to the restrictions imposed on such investments as provided in the Pooling Agreement.

-15-

ROY 013126

Any amounts remaining in the Collection Account immediately following required payments 1 through 11 above will be paid to the Reserve Escrow Account and distributed in accordance with its terms. See "CREDIT ENHANCEMENT"; "DESCRIPTION OF THE CERTIFICATES AND POOLING AGREEMENT – The Certificates – *Assets*" and "– The Pooling Agreement – *Servicing*"; and "SPECIAL CONSIDERATIONS."

THE INSURANCE POLICY:

The Company will be named as the insured under a Credit Risk Insurance Policy Number RST147524 (the "Insurance Policy") issued by Royal Indemnity Company ("Royal"). The Insurance Policy will be a successor policy to a policy issued by Royal and covering the Student Loans pursuant to certain warehouse financing (the "Predecessor Policy"). The Insurance Policy will name the Issuer as the beneficiary, and all claims paid thereunder will be paid directly to the Trustee. The Insurance Policy covers claims made for any Defaulted Student Loans ( Student Loans that are 90 days or more delinquent from their respective due dates, applying any payment received after a delinquency to the earliest delinquency) in an amount equal to the principal balance of the Student Loan and 90 days of interest at the stated interest rate (exclusive of any penalty interest, late payment fees and prepaid financing charges) as set forth in the Student Loan (the "Student Loan Rate"), but in no event shall Royal's aggregate liability exceed $29,999,999.94 (as reduced by principal payments on the Student Loans paid by the related obligor after the Cut-off Date) plus 90 days of interest determined at the applicable Student Loan Rate (the "Policy Limit"). Student Loans will be removed from coverage under the Policy, and the Policy Limit will reduce by an amount equal to the entire principal balance of the Student Loans, to the extent the Student Loans are paid in full or to the extent such Student Loans are paid for as a Defaulted Student Loan under the Insurance Policy.

An escrow account (the "Reserve Escrow Account"), as contemplated by the Insurance Policy, has been created, as further described below. See "— The Reserve Escrow Account." Initially, until the Experience Account (the "Experience Account") established under the Insurance Policy has expired or been exhausted, claims with respect to Defaulted Student Loans will be paid in the first instance by Royal under the Insurance Policy, without first seeking such funds from the Reserve Escrow Account. After the Experience Account is terminated or

-16-

ROY 013127

exhausted, the Reserve Escrow Account must be exhausted before a claim may be made under the Insurance Policy. Claims will be made by the Servicer and monitored by the Trustee. Payments under the Insurance Policy are required to be made 60 days after notice of the claim. The Servicer is required to make a claim within 10 days following the Distribution Date as of which the Student Loan is first a Defaulted Student Loan eligible for a claim under the Insurance Policy. The Reserve Escrow Account will pay to Royal any losses previously paid by Royal under the Insurance Policy not covered by the Experience Account. Funds received from Royal under the Insurance Policy will be used to pay interest due on the Certificates and principal on the Senior Certificates (acting as a prepayment of the Senior Certificates). If there are insufficient funds in the Reserve Escrow Account, the Liquidity Reserve Account and the Collection Account to make the interest and principal payments due under the Certificates pending receipt of proceeds under the Insurance Policy, and the Servicer does not make an advance and no payments are made under the MBIA Policy, a default may occur. See "DESCRIPTION OF THE CERTIFICATES AND POOLING AGREEMENT – The Certificates – *Assets*" and "– The Pooling Agreement – *Servicing*"; and "SPECIAL CONSIDERATIONS"; and "CREDIT ENHANCEMENT."

THE RESERVE ESCROW ACCOUNT:

The Issuer has entered into an escrow agreement with Wells Fargo Bank Minnesota, National Association, as the escrow agent (the "Escrow Agent"), pursuant to which an escrow account will be maintained for the benefit of the Issuer as a beneficiary thereunder and Royal as a third party beneficiary thereunder (the "Reserve Escrow Account").

The Reserve Escrow Account, which was initially established upon coverage of the Student Loans under the Predecessor Policy, will have a balance of approximately $59,500 as of the Closing Date and after giving effect to the transactions occurring on the Closing Date. On each Distribution Date, the Trustee will contribute to the Reserve Escrow Account the Reserve Remittance Amount, consisting of all funds remaining in the Collection Account after payments of items (1) through (11) in the Payment Waterfall as described under "-- The Collection Account" above. In addition, recoveries on delinquent Student Loans that are not yet Defaulted Student Loans will be paid into the Reserve Escrow Account as described above. At any time

-17-

ROY 013128

that the funds in the Reserve Escrow Account have a fair market value equal to or greater than the Maximum Reserve Amount (defined as 50% of the outstanding principal balances of the Student Loans, exclusive of Defaulted Student Loans), amounts in excess thereof will be distributed to certain other escrows established in connection with policies issued by Royal for the benefit of affiliates of the Company to the extent of any shortfalls in such escrows; then to the MBIA Reserve Account, up to the Required MBIA Reserve Amount, and any amounts in excess of the foregoing to the Company; provided, that, starting 6 months after the Senior Certificateholder Balance is less than 10% of the initial Senior Certificateholder Balance, the Company has agreed that purchasers of the Senior Certificates will receive such distributions up to an amount equal to .50% per annum on the Senior Certificate holder Balance.

Delinquent principal payments on the Student Loans that are delinquent but are not yet Defaulted Student Loans, and any shortfall in the amounts due for interest with respect to such Student Loans not covered by the Liquidity Reserve Account, may be withdrawn from the Reserve Escrow Account to the extent there are funds available in the Reserve Escrow Account for this purpose. In addition, after the Experience Account established under the Insurance Policy has been terminated or exhausted, funds may be withdrawn from the Reserve Escrow Account, to the extent of available funds, for the full unpaid amount with respect to Defaulted Student Loans and interest thereon to the date of default. The amounts withdrawn from the Reserve Escrow Account will be deposited in the Collection Account and disbursed as set forth in the Pooling Agreement.

The Reserve Escrow Account will be invested as determined by the Escrow Agent, pursuant to the restrictions imposed for such investments as set forth in the Escrow Agreement. Amounts deposited into the Reserve Escrow Account after the payment of a claim on a Defaulted Student Loan under the Insurance Policy, not covered by the Experience Account, will be paid to Royal to the extent of such payments. The Escrow Agent will receive a fee of $2,000 per year (the "Escrow Fees"). In addition, the Escrow Agent is entitled to reimbursement of certain expenses and costs, which must be recovered from the Expense Account. See "CREDIT ENHANCEMENT"; "DESCRIPTION OF THE CERTIFICATES AND POOLING AGREEMENT – The

-18-

ROY 013129

Certificates – *Assets*" and " – *The Lock Box Account and Collection Account*"; and "SPECIAL CONSIDERATIONS."

THE LIQUIDITY
RESERVE ACCOUNT:

The Trustee will establish and maintain a reserve account for the benefit of the holders of the Certificates (the "Liquidity Reserve Account") in an initial amount equal to $945,300 (the "Original Liquidity Reserve Amount"). On each Distribution Date, the amount of Delinquent Interest with respect to the Student Loans for such period and the Simple Interest Shortfall for such period may be withdrawn from the Liquidity Reserve Account to the extent there are funds available in the Liquidity Reserve Account (the "Liquidity Reserve Draw Amounts"). The amounts withdrawn from the Liquidity Reserve Account will be deposited in the Collection Account and disbursed as set forth in the Pooling Agreement. On each Distribution Date, the Trustee will repay to the Liquidity Reserve Account amounts to replenish the Liquidity Reserve Account, to the extent of prior payments drawn from the Liquidity Reserve Account and not theretofore repaid, up to the Original Liquidity Reserve Amount, to the extent that funds are available therefor in the Collection Account after payment of items (1) through (8) in the Payment Waterfall, as described under "-- Collection Account" above. The Liquidity Reserve Account will be invested as determined by the Trustee, pursuant to the restrictions imposed for such investments as set forth in the Pooling Agreement. See "CREDIT ENHANCEMENT"; "DESCRIPTION OF THE CERTIFICATES AND POOLING AGREEMENT – The Certificates – *Assets*" and "– *The Lock Box Account and Collection Account*"; and "SPECIAL CONSIDERATIONS."

THE MBIA POLICY; THE
MBIA RESERVE
ACCOUNT:

MBIA will issue a Certificate Guaranty Insurance Policy (the "MBIA Policy"), guaranteeing to the Senior Certificateholders that an amount equal to each Insured Payment (as defined below) will be received from MBIA by the Trustee on behalf of the Senior Certificateholders. The Insured Payment means (i) as of any Distribution Date, any shortfalls in amounts available in the Collection Account to pay the Senior Interest Distribution due on the Senior Certificates and, on the Final Distribution Date, any shortfall in amounts available in the Collection Account to pay the outstanding principal balance due on the Senior Certificates, and (ii) any amount previously distributed to a Senior Certificateholder on the Senior Certificates that is recoverable and sought to be recovered as a voidable preference by a trustee in

-19-

ROY 013130

PHLEGAL: #1008804 v1 (LM#C01!.DOC)

bankruptcy pursuant to the United States Bankruptcy Code, in accordance with a final nonappealable order of a court having competent jurisdiction. In the event that any Deficiency Amount (as defined in the MBIA Policy) would otherwise exist at any Distribution Date, such amount will be withdrawn from the MBIA Reserve Account established pursuant to the Pooling Agreement up to the full balance of such MBIA Reserve Account. In addition, the MBIA Reserve Account may be drawn to cover certain obligations of SFC, the Servicer and the Company to MBIA. The MBIA Reserve Account will be funded out of distributions otherwise payable to the Company from the Reserve Escrow Account, up to the Required MBIA Reserve Amount. See "—The Reserve Escrow Account."

AVAILABILITY OF ASSETS FOR PAYMENT OF THE SENIOR AND INTEREST-ONLY CERTIFICATES:

The Certificates represent in the aggregate the entire ownership interest in the Issuer other than amounts distributable to the Company. See "THE COMPANY" and "THE SERVICER." The Assets of the Issuer consist primarily of a pool of student loans and tuition installment payment agreements (the "Student Loans") originated and/or purchased by SFC. The Assets of the Issuer that will be available for payment of the Certificates consists of the proceeds from the Insurance Policy, the Student Loans, the Reserve Escrow Account and the Liquidity Reserve Account (collectively referred to as the "Assets"). See "CREDIT ENHANCEMENT." Moreover, the Trustee on behalf of the Senior Certificateholders will be entitled to payment of the Insured Payments pursuant to the MBIA Policy. See "DESCRIPTION OF THE MBIA POLICY."

TERMINATION OF THE TRUST:

The Trust will terminate upon the later to occur of (i) the maturity or other liquidation of the last Student Loan (including a repurchase of the Student Loans by the Company as described below) and the disposition of any amounts received upon liquidation of any remaining Student Loans in the Trust, and (ii) payment of all amounts required to be paid to the Certificateholders, the Trustee, Royal and MBIA under the Pooling Agreement, the Insurance Policy and the MBIA Policy. At the time when the Senior Certificateholder Balance is less than 10% of the original Senior Certificateholder Balance, the Company may at its option purchase all of the Student Loans and terminate the Trust, provided all payments required in clause (ii) above are made in connection therewith.

-20-

ROY 013131

| | |
|---|---|
| STUDENT LOAN POOL: | The Student Loan pool will consist of a pool of student loans and tuition installment payment agreements (the "Student Loans") with an aggregate principal balance outstanding as of the Cut-off Date of $29,999,999.94. None of the Student Loans will be Defaulted Student Loans. However, the Student Loans may have delinquent payments due and owing. |
| | As of the Cut-off Date of November 30, 2000, the Student Loans had individual principal balances at origination of at least $1,320 but not more than $11,959 with an average principal balance at origination of approximately $6,432. The Student Loans had terms to maturity from the date of origination or modification of 120 to 180 months, and had a calculated weighted average remaining term to maturity of approximately 162 months, as of the Cut-off Date. The Student Loans bear interest at a weighted average rate of approximately 20.59% per annum as of the Cut-off Date. See "THE STUDENT LOANS." |
| USE OF PROCEEDS: | The net proceeds from the sale of the Senior Certificates will be used to acquire the Student Loans, establish the Liquidity Reserve Account and fund the expenses of the offering and the operations of the Issuer. See "USE OF PROCEEDS." |
| SUITABILITY: | Subscriptions for the Senior Certificates will be accepted only from investors meeting the definition of an "qualified institutional buyer" as set forth in Rule 144A as promulgated under the Securities Act of 1933, as amended (the "Securities Act"). Each potential subscriber may be required to complete a Subscription Agreement and to represent that it meets the requirements of the definition of a "qualified institutional buyer" as set forth in Rule 144A. See "NOTICE TO INVESTORS" and "PRIVATE PLACEMENT." |
| REGISTRATION OF SENIOR CERTIFICATES: | The Senior Certificates will initially be represented by one or more certificates registered in the name of Cede & Co., or any other nominee for the Depository Trust Company ("DTC") (Cede & Co., or such other nominee, "DTC's Nominee"), and will not be registered in the names of the purchasers of the Senior Certificates or their nominees. Because of this, unless and until Definitive Certificates are issued, holders of such Senior Certificates will only be able to exercise the rights of Senior Certificateholders indirectly through DTC and its participating organizations. See "DESCRIPTION OF THE CERTIFICATES |

-21-

ROY 013132

AND POOLING AGREEMENT– The Certificates – *Book-Entry Registration*" and "*—Definitive Certificates.*"

While the aggregate principal balance of the Student Loans on the Cut-off Date is $29,999,999.94, the Senior Certificates are being issued to the nearest whole dollar, in the amount of $29,999,999, in order to facilitate the book-entry registration of such Senior Certificates through DTC.  References throughout this Memorandum, the Pooling and Servicing Agreement and the related documents and agreements to such amounts, whether stated to include the ninety-four cents or not, shall as to the Senior Certificates be deemed to mean the actual amount of the Senior Certificates as issued, without such ninety-four cents.

**RESTRICTIONS ON TRANSFER:**

The Senior Certificates are being offered pursuant to certain exemptions from the registration requirements of applicable federal and state securities laws.  As such, the Senior Certificates may not be transferred without an applicable exemption from registration under such laws. The Certificates will bear a legend to the effect that resales can only be made if such transfer is not in violation of the Securities Act, and upon determination that such transfer would neither cause the Company to become an "investment company" within the meaning of the Investment Company Act of 1940, as amended (the "Investment Company Act"), nor constitute a "prohibited transaction" under the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  Moreover, Senior Certificates may not be held by employee benefit plans if such ownership would cause the Issuer, Trustee or the Company to become fiduciaries under ERISA except as described in "CERTAIN ERISA CONSIDERATIONS." See also "DESCRIPTION OF THE CERTIFICATES AND POOLING AGREEMENT – The Certificates – *Transfer*"; and "FOREIGN INVESTORS AND EXEMPT ORGANIZATIONS."

**LIQUIDITY:**

There is currently no secondary market for the Senior Certificates, and there can be no assurance that one will develop.  There are a limited number of sources, such as nationally recognized statistical rating organizations, which provide certain limited information about obligations similar to the Senior Certificates. There can be no assurance that any of these sources will provide information related to the Senior Certificates, or, if provided, that such information will be current or sufficient for the holders'

-22-

ROY 013133

intended purpose. The limited information available for the Senior Certificates may adversely affect the ability of any holder to readily liquidate its investment in the Senior Certificates. See "SPECIAL CONSIDERATIONS—Limited Liquidity."

LEGAL INVESTMENT;
ERISA:

The appropriate characterization of the Senior Certificates under various legal investment restrictions, and thus the ability of investors subject to these restrictions to purchase the Senior Certificates, may be subject to significant interpretive uncertainties.

In addition, institutions whose investment activities are subject to review by certain regulatory authorities may be or may become subject to restrictions, which may be retroactively imposed by such regulatory authorities, on the investment by such institutions in certain forms of asset-backed securities. Accordingly, investors should consult their own legal advisors to determine whether and to what extent the Senior Certificates constitute legal investments for them. See "LEGALITY OF THE SENIOR CERTIFICATES."

The Senior Certificates may not be purchased or held by any "employee benefit plan" within the meaning of Section 3(3) of ERISA (whether or not subject to ERISA, including foreign and government plans), any "plan" described by Section 4975(e)(1) of the Code, or any entity deemed to hold "plan assets" for the foregoing, unless it is an insurance company general account meeting the specific requirements described under "CERTAIN ERISA CONSIDERATIONS".

FEDERAL INCOME TAX
CONSEQUENCES:

In the opinion of counsel for the Company, the Issuer will be classified for federal income tax purposes as a grantor trust and not as a publicly traded partnership or an association taxable as a corporation. Certificateholders will be required to report their respective allocable shares of income earned on the assets of the Issuer and, subject to certain limitations applicable to individuals, estates and trusts, may deduct their respective allocable shares of reasonable servicing fees and other expenses. The prospective purchasers of the Senior Certificates are urged to consult with their own tax advisors regarding the income tax consequences of an investment in and the ownership of the Senior Certificates and should carefully review the tax matters discussed under "CERTAIN FEDERAL INCOME TAX CONSIDERATIONS"

-23-

ROY 013134

and "STATE AND LOCAL TAX CONSIDERATIONS." Tax exempt purchasers and foreign purchasers are not intended to be purchasers of the Senior Certificates and the tax consequences to such purchasers are not described herein.

RATINGS:        It is a condition of the issuance that the Senior Certificates be rated "Aaa" by Moody's Investors Services, Inc. ("Moody's") and "AAA" by Fitch, Inc. ("Fitch" and collectively with Moody's, the "Rating Agencies"). Ratings of "Aaa," "Aa," "A," and "Baa" by Moody's and "AAA," "AA," "A," and "BBB" by Fitch are considered investment grade securities, with the rating of "Aaa" or "AAA" being the highest bond rating assigned by the Rating Agencies. A rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization. A rating does not address the frequency of prepayment of the Student Loans, or the corresponding effect on yield to investors. See "CERTIFICATE RATINGS."

-24-

ROY 013135

PHLEGAL: #1008804 v1 (LM#C01!.DOC)

## SPECIAL CONSIDERATIONS

*Prospective investors should bear in mind, among other factors, the following considerations in connection with a purchase of the Senior Certificates:*

Limited Liquidity. The Senior Certificates have not been registered under the Securities Act or under any state securities laws in reliance upon exemptions from registration provided under such laws. Any transfer of Senior Certificates may only be made pursuant to an applicable exemption under the Securities Act and in compliance with the requirements of the Pooling Agreement, including the requirements that such transfer may only be made to a "qualified institutional buyer" and that such transfer would not cause the Issuer to become an "investment company" under the Investment Company Act or a fiduciary of any employee benefit plan. Transferees generally will be required to execute a Transferee's Certificate substantially in the form included as Exhibit D hereto. None of the Issuer, the Servicer, the Company, or the Trustee has agreed to provide registration rights to any purchaser of the Senior Certificates. There is currently no market for the Senior Certificates being offered hereby and it is highly unlikely that such a market will develop and, if it does develop, that it will provide Senior Certificateholders with liquidity of investment or will continue for the life of the Senior Certificates. As a result, an investor must be prepared to hold the Senior Certificates until their stated maturity. See "NOTICE TO INVESTORS" and "DESCRIPTION OF THE SENIOR CERTIFICATES AND POOLING AGREEMENT -- The Certificates -- *Book Entry Registration*," "--*Definitive Certificates*," and "-- *Transfer*."

Book-Entry Certificates. Issuance of the Senior Certificates in book-entry form may reduce the liquidity of the Senior Certificates in the secondary trading market since some investors may be unwilling to purchase Senior Certificates for which they cannot obtain physical certificates. Since transactions in the Senior Certificates can be effected only through DTC, participating organizations, indirect participants and certain banks, the ability of a Senior Certificateholder to pledge its Senior Certificates to persons or entities that do not participate in the DTC system or otherwise to take actions in respect of the Senior Certificates may be limited due to lack of a physical certificate representing the Senior Certificates. Senior Certificateholders may experience some delay in their receipt of distributions of interest and principal on the Senior Certificates since such distributions will be forwarded by the Trustee to DTC's Nominee and DTC's Nominee will credit such distributions to the accounts of its Participants which will thereafter credit them to the accounts of Senior Certificateholders either directly or indirectly through indirect participants. See "DESCRIPTION OF THE CERTIFICATES AND POOLING AGREEMENT -- The Certificates -- *Book-Entry Registration*."

Average Life of Certificates; Prepayment; Yields. Prepayments on the Student Loans and Student Loans becoming Defaulted Student Loans (90 days or more delinquent from their respective due dates, applying any payment received after a delinquency to the earliest

-25-

ROY 013136

delinquency) will result in a faster rate of principal payments on the Senior Certificates. The unpaid balance with respect to Defaulted Student Loans will be recoverable from the Reserve Escrow Account or the Insurance Policy and will thereupon result in a prepayment of the Senior Certificates. There can be no assurances given as to the rates at which Student Loans may become Defaulted Student Loans or the corresponding effect on the yields or average life of the Certificates. In addition, the prepayment experience on the Student Loans may affect the average life and yield to maturity of the Certificates. The rate of principal payments on pools of student loans varies between pools and, from time to time, is influenced by a variety of economic, demographic, geographic, social, tax, legal and other factors. Also, since some of the Student Loans have delinquencies thereon of more than 60 days, although none are Defaulted Student Loans, the prepayment rate may be higher than if the Student Loans did not have delinquencies. As of the Cut-off Date of November 30, 2000, there were no Student Loans which were delinquent by 30 to 59 days, and there were no Student Loans which were delinquent by 60 to 89 days. There can be no assurance as to the rate of prepayment or default on the Student Loans or that the rate of payments will conform to any model described herein. If prevailing interest rates fall significantly below the applicable rates borne by the Student Loans, principal prepayments are likely to be higher than if prevailing rates remain at or above the rates borne by the Student Loans. Furthermore, there can be no assurance that increased funding and greater access to government student loan programs will not result in significant prepayment of the Student Loans and, consequently, the Certificates. Also, the Company's option to terminate the Issuer and prepay the Certificates by purchasing the Student Loans will affect the Certificates' yield to maturity. As a result, the retirement of the Certificates could occur significantly earlier than expected. See also "CERTAIN YIELD AND PREPAYMENT CONSIDERATIONS."

Limited Nature of Rating. The rating assigned by the Rating Agencies to the Senior Certificates reflects only its assessment of the likelihood that holders of the Senior Certificates will receive payments to which such Certificateholders are entitled under the Pooling Agreement. Such rating does not constitute an assessment of the likelihood that principal prepayments on the related Student Loans will be made, the degree to which the rate of such prepayments might differ from that originally anticipated or the likelihood of early retirement of the Senior Certificates. Nor does such rating address the possibility that prepayment at higher or lower rates than anticipated by an investor may cause such investor to experience a lower than anticipated yield or that an investor that purchases Senior Certificates at a significant premium might fail to recoup its initial investment under certain prepayment scenarios. Such ratings are subject to revision or withdrawal at any time by the Rating Agencies. See "CERTIFICATE RATINGS."

Failure to Comply With Loan Origination Procedures. SFC has certain rules and procedures applicable to originating the Student Loans. In addition, numerous federal and state consumer protection laws and related regulations impose substantial requirements upon the origination of the Student Loans. See "THE STUDENT LOANS – Certain Legal Aspects of Student Loans." Failure to originate properly a Student Loan in accordance with such rules,

-26-

ROY 013137

procedures or laws could adversely affect the total collections on the Student Loans and the Issuer's ability to pay principal and interest on the Certificates if insufficient funds are present in the Liquidity Reserve Account and the Reserve Escrow Account and if Royal does not satisfy claims made under the Insurance Policy. The failure to follow such rules, procedures and laws would not affect coverage under the Insurance Policy.

      <u>Failure to Comply With Loan Servicing Procedures and Servicer Default</u>. The Servicer has certain rules and procedures applicable to servicing the Student Loans. See "DESCRIPTION OF THE CERTIFICATES AND POOLING AGREEMENT – The Pooling Agreement – *Servicing and Collection Process and Procedures*." In addition, numerous federal and state consumer protection laws and related regulations impose substantial requirements upon the servicing of the Student Loans. See "THE STUDENT LOANS – Certain Legal Aspects of Student Loans." Failure to service properly a Student Loan in accordance with the rules, procedures or laws could adversely affect the total collections and the Issuer's ability to pay principal and interest on the Certificates if insufficient funds are present in the Liquidity Reserve Account and the Reserve Escrow Account and if Royal does not satisfy claims made under the Insurance Policy. The failure to comply under such rules, procedures and laws would not affect coverage under the Insurance Policy. The fraud or theft of monthly collections may delay payments on the Certificates if covered by insurance or, if not, will potentially cause a payment default on the Certificates if insufficient funds are present in the Liquidity Reserve Account and the Reserve Escrow Account. If the Servicer does not collect on the Student Loans in an efficient and timely manner, an increased number of Student Loans may become Defaulted Student Loans (90 days or more delinquent from their respective due dates, applying any payment received after a delinquency to the earliest delinquency) and will result in faster than anticipated principal payments on the Senior Certificates as such Defaulted Student Loans are paid by Royal. The Servicer only provides servicing for Student Loans that are originated or acquired by SFC and does not service loans for any other originators. The Servicer is a recently formed company which succeeded to servicing operations previously performed by SFC. There can be no assurances that the transfer of services from SFC to the Servicer, or the Servicer's limited history of servicing, will not have an adverse impact on the servicing of the Student Loans. In the event the Servicer is in default under the Pooling Agreement, MBIA or, if MBIA is in default under the MBIA Policy, the Majority Certificateholders may terminate the Servicer and replace it with another servicer. In such an event, there may be some disruption in the collection activities causing some of the Student Loans to become Defaulted Student Loans creating a more rapid rate of payment of principal on the Senior Certificates than anticipated. However, the bankruptcy, or failure to perform, of the Servicer will not affect Royal's or MBIA's requirement to pay under the Insurance Policy or under the MBIA Policy, respectively. See "CERTAIN YIELD AND PREPAYMENT CONSIDERATIONS." See "DESCRIPTION OF THE CERTIFICATES AND POOLING AGREEMENT – The Pooling Agreement – *Servicing*" and "THE SERVICER."

      <u>Actual Cash Flow Results May Be Materially and Adversely Different; Liability of Trustee to Liquidate Student Loans</u>. The interest and principal payments received with respect to

-27-

ROY 013138

the Student Loans from one Record Date to the next succeeding Record Date (the "Payment Period") may vary greatly in both timing and amount from the payments actually due on the Student Loans as of such Payment Period for a variety of economic, social and other factors, including both individual factors, such as additional periods of deferral, customary servicer forbearance or forbearance required by applicable bankruptcy or insolvency laws prior to or after a borrower's commencement of repayment, and general factors, such as a general economic downturn which could increase the amount of defaulting Student Loans. Failure by borrowers to pay timely the principal and interest on the Student Loans will affect the total collections during the Payment Period, which may reduce the amount of principal and interest paid to the Certificateholders on a Distribution Date, potentially causing a payment default under the terms of the Certificates. Moreover, the delay in payments under the Insurance Policy for a Defaulted Student Loan of up to 70 days following the Distribution Date as of which such Student Loan was first a Defaulted Student Loan may also adversely impact cash flow and cause a reduction in payments due on the Certificates, should there be insufficient funds available in the Liquidity Reserve Account or the Reserve Escrow Account. The occurrence of one or more of these factors is impossible to predict, and no estimate can be given of the point at which the effect of such factors would impair the Issuer's ability to pay principal and interest on the Certificates. The Trustee may attempt to sell nonperforming or Defaulted Student Loans, but the market for such Student Loans is extremely limited and the likelihood of a sale is very remote. The Trustee will incur no liability for failure to liquidate the Student Loans or attempt to sell the Student Loans. See "– Sale of Assets on Default."

Unsecured Nature of Student Loans. The Student Loans are not secured by any assets of the respective borrowers. If the Assets of the Trust are insufficient to make payments on the Certificates, no other assets will be available for payment of the deficiency. The Issuer will not have, nor will it be permitted or expected to have, any significant assets or sources of funds other than the Student Loans, the Reserve Escrow Account, the Liquidity Reserve Account and the Insurance Policy and all investment income thereon. The Certificates represent obligations solely of the Issuer and will be insured only under the MBIA Policy (in the case of the Senior Certificates) and will not be insured or guaranteed by any governmental agency or instrumentality, or by Royal, the Company, the Servicer, or any other person or entity related to those entities. Although the Trustee may attempt to sell the Student Loans following default under the Certificates (as discussed more fully below under "- Sale of Assets on Default"), there can be no assurance that the market value of the Student Loans will at any time be equal to or greater than the aggregate current principal amount of, and any accrued interest on, the outstanding Certificates or that there will be a market for the Student Loans. Therefore, upon an event of default with respect to the Certificates, there can be no assurances that sufficient funds will be available to repay the Certificateholders in full. In addition, although Royal insures the principal and 90 days of interest under the Student Loans, there is a delay in payment of up to 160 days from the Distribution Date as of which the first nonpayment under any Student Loan occurs to the time Royal pays under the Insurance Policy. If there are insufficient funds in the Reserve Escrow Account and the Liquidity Reserve Account to cover the lack of payments to be received under the Defaulted Student Loans until payment by Royal or MBIA under the

-28-

ROY 013139

PHLEGAL: #1008804 v1 (LM#C011.DOC)

Insurance Policy or MBIA Policy, respectively, holders of the Certificates will experience a delay in receiving the anticipated payments on their Certificates. Moreover, the insolvency of Royal or MBIA would impair the ability to collect on the Insurance Policy or the MBIA Policy, respectively, and may impair release of funds from the Reserve Escrow Account, potentially causing a default under the Certificates. Furthermore, any delay in payments by Royal or MBIA would adversely affect the yield under the Certificates and reduce the size of the Reserve Escrow Account, further impacting a Certificateholder's credit enhancement. See "CREDIT ENHANCEMENT;" "DESCRIPTION OF THE CERTIFICATES AND POOLING AGREEMENT – The Pooling Agreement"; "– Sale of Assets on Default."

    Bankruptcy Considerations.  The bankruptcy or insolvency of the Issuer would adversely affect payments on the Certificates.  The automatic stay imposed by Title 11 of the United States Code (the "Bankruptcy Code") could prevent enforcement of obligations of the Issuer, including obligations under the Certificates and the Pooling Agreement, or actions against any of the Issuer's property, including the Assets, prior to modification of the stay.  In addition, the trustee in bankruptcy for the Issuer may be able to accelerate payment of the Certificates and liquidate the Assets.  The bankruptcy or insolvency of SFC could give rise to claims against the Assets if the transfer of the Assets to the Company were deemed a "secured loan" and not a "true sale" or if the Company were ordered consolidated with SFC.  SFC is currently a party to certain litigation, as described under "THE ORIGINATOR – General," which, if adversely resolved could have an adverse effect on the financial condition or results of operations of SFC. Furthermore, SFC had a negative net worth as disclosed in its audited financial statement for the calendar year ending December 31, 1999.  The bankruptcy of the Company could also adversely affect the Assets if the Issuer were ordered consolidated with the Company.  In such event, the automatic stay provisions of the Bankruptcy Code could delay distributions on the Assets for an uncertain period of time.  The bankruptcy trustee for SFC or the Company would have the power to sell the Assets if the proceeds of such sale could satisfy the debt deemed owed by SFC or the Company.  The bankruptcy trustee could substitute other assets in lieu of the Assets to secure such debt, or such debt could be subject to adjustment by the bankruptcy court if SFC or the Company were to file for reorganization under Chapter 11 of the Bankruptcy Code.  In the event of any impairment or avoidance of the rights of the Issuer or the Company in a Student Loan arising from a bankruptcy or similar event or proceedings with respect to SFC or the Company, the full amount of the affected Student Loan with 90 days of interest may be recovered under the Insurance Policy.  The insolvency of Royal would significantly impair the ability to collect any amounts due under the Insurance Policy and the right to receive a return of the Reserve Escrow Account thereunder.  Royal's insolvency would be significant in its adverse affect on the Issuer's ability to realize all of the payments due under the Student Loans.

    Sale of Assets on Default.  If a default occurs with respect to the Certificates, the Trustee will be authorized, and shall take such actions in accordance with the instructions of MBIA so long as MBIA has not defaulted under any obligation pursuant to the MBIA Policy and is not insolvent, to sell or otherwise liquidate the Student Loans.  There can be no assurance, however, that the Trustee will be able to find a purchaser for the Student Loans in a timely manner or one

-29-

ROY 013140

who is willing to pay the aggregate outstanding principal and accrued interest due on such Certificates. The value of the Assets underlying the Certificates generally will fluctuate with changes in prevailing rates of interest. Consequently, the Assets may be liquidated at a discount, in which case the proceeds of liquidation might be less than the outstanding principal amount of and any accrued interest on the Certificates. In such event, the Issuer will be unable to pay in full the principal of and interest on the Certificates, and the Certificateholders may suffer a loss.

Limited Prior Operating History. Neither the Issuer nor the Company has any prior operating history, and the Servicer has only a seven month operating history as a separate legal entity. The Servicer will be performing administrative, bookkeeping and certain other operational functions for the Issuer and the Company. See "THE COMPANY" and "THE SERVICER."

ERISA Considerations. The Senior Certificates may not be purchased or held by any "employee benefit plan" within the meaning of Section 3(3) of ERISA (whether or not subject to ERISA, including foreign and government plans), any "plan" described by Section 4975(e)(1) of the Code, or any entity deemed to hold "plan assets" of the foregoing, unless it is an insurance company general account meeting the specific requirements described under "CERTAIN ERISA CONSIDERATIONS".

No Registration as an Investment Company. The Issuer will not be required to register, and will not register, as an investment company under the Investment Company Act. Registration under the Investment Company Act would subject the Issuer to numerous regulations and requirements regarding, among other things, independence of directors, diversification and conflicts of interest, which are intended to provide certain protections to investors in investment companies. The Issuer will not be subject to such regulations and requirements, and therefore investors will not have the benefit of such protection.

Year 2000 Problem. The Year 2000 problem is the result of computer programs being written using two digits, rather than four digits, to define the applicable year. Any systems, elements or applications that have time-sensitive software may recognize a date using "00" as the year 1900 rather than the Year 2000. While the advent of the Year 2000 has passed, and to date none of the parties to the Pooling Agreement have experienced any materially adverse effects related to the Year 2000 problem, it is too early to conclude whether any adverse effects could result from the Year 2000 problem or similar matters.

MBIA Has Controlling Rights. For so long as MBIA is not in default under the MBIA Policy, MBIA will be deemed to be treated as a 100% holder of the Senior Certificates. As a result, MBIA will have the right to exercise all of the rights of a Certificateholder, including the right to declare an event of default under the Pooling Agreement, direct the Trustee to liquidate the collateral, and for purposes of all approvals, consents, waivers, authorizations, directions, inspections and the institution of any action. See "DESCRIPTION OF THE CERTIFICATES AND POOLING AGREEMENT – The Pooling Agreement – *MBIA as Holder*".

-30-

ROY 013141

PHLEGAL: #1008804 v1 (LM#C011.DOC)

Economic Conditions.  For the limited period of time during which loans in the nature of the Student Loans have been originated, economic conditions nationally and in most regions of the country have been favorable.  A deterioration in economic conditions could be expected to adversely affect the ability or willingness of borrowers to repay the Student Loans.

Recent Origination of Student Loans.  Each of the Student Loans will have been originated a minimum of 30 days prior to the Cut-Off Date. Over ninety-eight percent of the Student Loans were originated within five months prior to the Cut-off Date.  This short period of time is insufficient to provide reliable performance data regarding the Student Loans.

THE STUDENT LOANS

General

        The Student Loans consist of education payment plan retail installment contracts ("Education Payment Plans") or student loan agreements ("Student Loan Agreements") with individual students of various educational institutions (the "Institutions").  The students reside in forty-six states, the District of Columbia and the Commonwealth of Puerto Rico and the Institutions are located in thirty-three states across the country.  The amount of each of the Student Loans is based upon the amount of the tuition or the cost of the education for a student at the particular Institution, less any amounts financed through other means.   Student Loan applications or Education Payment Plan applications are forwarded to SFC by the Institutions. Once SFC approves a Student Loan Agreement or Education Payment Plan, the agreement is either purchased by SFC or the loan proceeds are funded directly to the Institution.  The proceeds of the Student Loans and the Education Payment Plans are used to offset the cost of tuition, room, board, books and supplies and other direct expenses of the student incurred while attending classes at the Institution.  The Student Loan's interest rate is fixed over the entire life of the Student Loan or Education Payment Plan and is  determined at or about the time of issuance  or purchase.   Payments on the Student Loans are required to be made monthly commencing the month following the commencement of classes.  The portion of a payment under a Student Loan allocable to interest and the portion allocable to principal is determined in accordance with the method of allocating a fixed level payment on a Student Loan between principal and interest, pursuant to which the portion of such payment that is allocable to interest is equal to the product of the Student Loan Rate and the unpaid balance of the Student Loan multiplied by a fraction, the numerator of which is the actual number of days elapsed since the preceding payment of interest was made and the denominator of which is the actual number of days in the calendar year, and the remainder of such payment is allocable to principal.  A late payment charge of 5% of the amount due and not received by the due date will be assessed for each month a payment default occurs on the Student Loan.  The Student Loans may be prepaid at any time.  The terms of the Student Loans are generally fourteen to fifteen years in length, and the principal is paid in full over such period of time.  The Student Loans in the pool may have delinquencies of more than 60 days, but none of the Student Loans will be, as of the Cut-Off

-31-

ROY 013142

PHLEGAL: #1008804 v1 (LM#C01!.DOC)

Date, Defaulted Student Loans. As of the Cut-off Date, there were no Student Loans which were delinquent by 30 to 59 days, and there were no Student Loans which were delinquent by 60 to 89 days. Part of a student's loan application process for an approved student loan contains a request for seven references. These references are contacted in the event of a default. See "DESCRIPTION OF THE CERTIFICATES AND POOLING AGREEMENT – The Pooling Agreement – *Servicing*" and "– *Servicing and Collection Processes and Procedures*."

The Student Loan Credit Scoring Models and Credit

SFC internally rates each loan application pursuant to a proprietary credit method (the "Scoring Model") to develop a credit risk associated with each loan application. The Scoring Model was developed, in part, from a review of student files supplied by the Institutions across the country. The Scoring Model includes in its criteria frequency of delinquencies, the ratio of monthly payments to monthly income and projected monthly payments to projected monthly income, among other criteria and credit attributes. SFC reevaluates the Scoring Model periodically and makes changes to it based upon attributes of the student application mix. Currently, there are Multiple Risk Credit categories into which a student may fall. The following is a statistical analysis of the pool of Student Loans as of the Cut-off Date.

-32-

ROY 013143

PHLEGAL: #1008804 v1 (LM#C011.DOC)

| LOANS BY COUPON | | | | |
|---|---|---|---|---|
| RANGE | NUMBER OF LOANS | PERCENT | REMAINING PRINCIPAL BALANCE | PERCENT |
| 16.01% - 18.00% | 974 | 20.50% | 5,192,386.76 | 17.31% |
| 18.01% - 20.00% | 0 | 0.00% | 0.00 | 0.00% |
| 20.01% - 22.00% | 3,778 | 79.50% | 24,807,613.18 | 82.69% |
| 22.01% - 24.00% | 0 | 0.00% | 0.00 | 0.00% |
| TOTAL | 4,752 | 100.00% | $   29,999,999.94 | 100.00% |

| ORIGINAL PRINCIPAL BALANCE | | | | |
|---|---|---|---|---|
| RANGE | NUMBER OF LOANS | PERCENT | REMAINING PRINCIPAL BALANCE | PERCENT |
| 0 - 2,000 | 6 | 0.13% | 9,831.42 | 0.03% |
| 2,000.01 - 4,000 | 236 | 4.97% | 817,228.94 | 2.72% |
| 4,000.01 - 6,000 | 1,921 | 40.43% | 9,857,168.58 | 32.86% |
| 6,000.01 - 8,000 | 1,945 | 40.93% | 13,886,939.20 | 46.29% |
| 8,000.01 - 10,000 | 622 | 13.09% | 5,192,105.01 | 17.31% |
| 10,000.01 - 12,000 | 22 | 0.46% | 236,726.79 | 0.79% |
| 12,000.01 - 14,000 | 0 | 0.00% | 0.00 | 0.00% |
| 14,000.01 - 16,000 | 0 | 0.00% | 0.00 | 0.00% |
| 16,000.01 - 18,000 | 0 | 0.00% | 0.00 | 0.00% |
| TOTAL | 4,752 | 100.00% | $   29,999,999.94 | 100.00% |

| REMAINING PRINCIPAL BALANCE | | | | |
|---|---|---|---|---|
| RANGE | NUMBER OF LOANS | PERCENT | REMAINING PRINCIPAL BALANCE | PERCENT |
| 0 - 2,000 | 7 | 0.15% | 11,506.29 | 0.04% |
| 2,000.01 - 4,000 | 239 | 5.03% | 830,043.70 | 2.77% |
| 4,000.01 - 6,000 | 1,983 | 41.73% | 10,234,627.30 | 34.12% |
| 6,000.01 - 8,000 | 2,032 | 42.76% | 14,708,594.63 | 49.03% |
| 8,000.01 - 10,000 | 471 | 9.91% | 3,998,220.95 | 13.33% |
| 10,000.01 - 12,000 | 20 | 0.42% | 217,007.07 | 0.72% |
| 12,000.01 - 14,000 | 0 | 0.00% | 0.00 | 0.00% |
| 14,000.01 - 16,000 | 0 | 0.00% | 0.00 | 0.00% |
| 16,000.01 - 18,000 | 0 | 0.00% | 0.00 | 0.00% |
| TOTAL | 4,752 | 100.00% | $   29,999,999.94 | 100.00% |

-33-

ROY 013144

| LOAN SEASONING (MONTHS) | | | | |
|---|---|---|---|---|
| RANGE | NUMBER OF LOANS | PERCENT | REMAINING PRINCIPAL BALANCE | PERCENT |
| 0 | 0 | 0.00% | 0.00 | 0.00% |
| 1 | 2,078 | 43.73% | 13,121,515.95 | 43.74% |
| 2 | 2,614 | 55.01% | 16,499,943.90 | 55.00% |
| 3 | 60 | 1.26% | 378,540.09 | 1.26% |
| 4 | 0 | 0.00% | 0.00 | 0.00% |
| 5 | 0 | 0.00% | 0.00 | 0.00% |
| 6-10 | 0 | 0.00% | 0.00 | 0.00% |
| 11-15 | 0 | 0.00% | 0.00 | 0.00% |
| 16-20 | 0 | 0.00% | 0.00 | 0.00% |
| 21-25 | 0 | 0.00% | 0.00 | 0.00% |
| 26-30 | 0 | 0.00% | 0.00 | 0.00% |
| 31-35 | 0 | 0.00% | 0.00 | 0.00% |
| 36-40 | 0 | 0.00% | 0.00 | 0.00% |
| 41-45 | 0 | 0.00% | 0.00 | 0.00% |
| 46-50 | 0 | 0.00% | 0.00 | 0.00% |
| 51-75 | 0 | 0.00% | 0.00 | 0.00% |
| >75 | 0 | 0.00% | 0.00 | 0.00% |
| TOTAL | 4,752 | 100.00% | $    29,999,999.94 | 100.00% |

| ORIGINAL TERM | | | | |
|---|---|---|---|---|
| RANGE | NUMBER OF LOANS | PERCENT | REMAINING PRINCIPAL BALANCE | PERCENT |
| 21-40 | 0 | 0.00% | 0.00 | 0.00% |
| 41-60 | 0 | 0.00% | 0.00 | 0.00% |
| 61-80 | 0 | 0.00% | 0.00 | 0.00% |
| 81-100 | 0 | 0.00% | 0.00 | 0.00% |
| 100-170 | 1 | 0.02% | 6,811.27 | 0.02% |
| 171-180 | 4,751 | 99.98% | 29,993,188.67 | 99.98% |
| Total | 4,752 | 100.00% | $    29,999,999.94 | 100.00% |

| NUMBER OF TIMES 30 DAYS DELINQUENT | | | | |
|---|---|---|---|---|
| NUMBER OF TIMES 30 OR MORE DAYS DELINQUENT | NUMBER OF LOANS | PERCENT | REMAINING PRINCIPAL BALANCE | PERCENT |
| 0 | 4,744 | 99.83% | 29,953,691.29 | 99.85% |
| 1 | 8 | 0.17% | 46,308.65 | 0.15% |

-34-

ROY 013145

PHLEGAL: #1008804 v1 (LM#C01!.DOC)

| | | | | |
|---|---|---|---|---|
| 2 | 0 | 0.00% | 0.00 | 0.00% |
| 3 | 0 | 0.00% | 0.00 | 0.00% |
| 4 | 0 | 0.00% | 0.00 | 0.00% |
| 5 | 0 | 0.00% | 0.00 | 0.00% |
| 6 | 0 | 0.00% | 0.00 | 0.00% |
| 7 | 0 | 0.00% | 0.00 | 0.00% |
| 8 | 0 | 0.00% | 0.00 | 0.00% |
| 9 | 0 | 0.00% | 0.00 | 0.00% |
| 10 | 0 | 0.00% | 0.00 | 0.00% |
| 11 | 0 | 0.00% | 0.00 | 0.00% |
| 12 | 0 | 0.00% | 0.00 | 0.00% |
| 13 | 0 | 0.00% | 0.00 | 0.00% |
| 14 | 0 | 0.00% | 0.00 | 0.00% |
| 15 | 0 | 0.00% | 0.00 | 0.00% |
| 16 | 0 | 0.00% | 0.00 | 0.00% |
| 17 | 0 | 0.00% | 0.00 | 0.00% |
| 18 | 0 | 0.00% | 0.00 | 0.00% |
| 19 | 0 | 0.00% | 0.00 | 0.00% |
| 20+ | 0 | 0.00% | 0.00 | 0.00% |
| Total | 4,752 | 100.00% | $ 29,999,999.94 | 100.00% |

| NUMBER OF TIMES 60 DAYS DELINQUENT | | | | |
|---|---|---|---|---|
| NUMBER OF TIMES 60 OR MORE DAYS DELINQUENT | NUMBER OF LOANS | PERCENT | REMAINING PRINCIPAL BALANCE | PERCENT |
| 0 | 4,752 | 100.00% | 29,999,999.94 | 100.00% |
| 1 | 0 | 0.00% | 0.00 | 0.00% |
| 2 | 0 | 0.00% | 0.00 | 0.00% |
| 3 | 0 | 0.00% | 0.00 | 0.00% |
| 4 | 0 | 0.00% | 0.00 | 0.00% |
| 5 | 0 | 0.00% | 0.00 | 0.00% |
| 6 | 0 | 0.00% | 0.00 | 0.00% |
| 7 | 0 | 0.00% | 0.00 | 0.00% |
| 8 | 0 | 0.00% | 0.00 | 0.00% |
| 9 | 0 | 0.00% | 0.00 | 0.00% |
| 10 | 0 | 0.00% | 0.00 | 0.00% |
| 11 | 0 | 0.00% | 0.00 | 0.00% |
| 12+ | 0 | 0.00% | 0.00 | 0.00% |
| Total | 4,752 | 100.00% | $ 29,999,999.94 | 100.0% |

| LOAN TERMS | | | | |
|---|---|---|---|---|
| SUMMARY | | | | |
| Principal Amount | | | $29,999,999.94 | |

ROY 013146

| | | | | |
|---|---|---|---|---|
| **Original Principal Amount** | | | | |
| Minimum | | | $ | 1,320 | |
| Maximum | | | $ | 11,959 | |
| Average | | | $ | 6,432 | |
| | | | | |
| | | | | |
| **Original Term** | | | | |
| Minimum | | | | 120 | |
| Maximum | | | | 180 | |
| Average | | | | 180 | |
| Weighted Average | | | | | |
| Remaining Term | | | | 162 | |
| | | | | |
| | | | | |
| **APR** | | | | |
| Minimum | | | | 18.00% | |
| Maximum | | | | 21.99% | |
| Average | | | | 20.49% | |
| Weighted Average | | | | 20.59% | |
| | | | | |
| **Seasoning (Months)** | | | | |
| as of 12/1/00 | | | | | |
| Average | | | | 1.6 | |
| Weighted Average | | | | 1.6 | |
| | | | | |

-36-

ROY 013147

PHLEGAL: #1008804 v1 (LM#C011.DOC)

| Delinquency Report | | | | |
| --- | --- | --- | --- | --- |
| | | No. of | Percent of | Remaining Principal | Percent of |
| Range | | Loans | Loans | Balance | Principal |
| Current | | 4,744 | 99.83% | 29,953,691.29 | 99.85% |
| 30 to 59 Days Delinquent | | 8 | 0.17% | 46,308.65 | 0.15% |
| 60 to 89 Days Delinquent | | 0 | 0.00% | 0.00 | 0.00% |
| 90 Days Delinquent | | 0 | 0.00% | 0.00 | 0.00% |
| | | 4,752 | 100.00% | $29,999,999.94 | 100.00% |

| BORROWERS BY STATE | | | | |
| --- | --- | --- | --- | --- |
| STATE | NUMBER OF LOANS | PERCENT | REMAINING PRINCIPAL BALANCE | PERCENT |
| AL | 527 | 11.09% | 3,513,960.85 | 11.71% |
| GA | 460 | 9.68% | 2,827,287.76 | 9.42% |
| FL | 420 | 8.84% | 2,308,635.50 | 7.70% |
| MS | 333 | 7.01% | 2,284,214.83 | 7.61% |
| NC | 315 | 6.63% | 2,013,601.78 | 6.71% |
| TX | 345 | 7.26% | 1,994,018.45 | 6.65% |
| KY | 272 | 5.72% | 1,870,981.49 | 6.24% |
| TN | 252 | 5.30% | 1,594,264.09 | 5.31% |
| SC | 279 | 5.87% | 1,577,306.76 | 5.26% |
| LA | 223 | 4.69% | 1,421,191.56 | 4.74% |
| OH | 201 | 4.23% | 1,309,046.24 | 4.36% |
| IL | 148 | 3.11% | 1,134,368.92 | 3.78% |
| IN | 167 | 3.51% | 1,001,657.77 | 3.34% |
| MO | 94 | 1.98% | 685,330.96 | 2.28% |
| MI | 103 | 2.17% | 639,986.89 | 2.13% |
| PA | 92 | 1.94% | 528,758.62 | 1.76% |
| WV | 79 | 1.66% | 514,230.63 | 1.71% |
| VA | 80 | 1.68% | 497,968.72 | 1.66% |
| CA | 84 | 1.77% | 480,996.48 | 1.60% |
| AR | 30 | 0.63% | 213,498.67 | 0.71% |
| MD | 28 | 0.59% | 208,450.17 | 0.69% |
| UT | 29 | 0.61% | 144,800.77 | 0.48% |
| KS | 19 | 0.40% | 144,067.63 | 0.48% |
| WI | 18 | 0.38% | 137,591.83 | 0.46% |

-37-

ROY 013148

PHLEGAL: #1008804 v1 (LM#C01!.DOC)

| | | | | |
|---|---|---|---|---|
| OK | 16 | 0.34% | 122,837.77 | 0.41% |
| IA | 13 | 0.27% | 101,586.30 | 0.34% |
| NV | 15 | 0.32% | 99,256.17 | 0.33% |
| NY | 15 | 0.32% | 93,993.70 | 0.31% |
| NM | 20 | 0.42% | 89,446.83 | 0.30% |
| AZ | 13 | 0.27% | 86,908.33 | 0.29% |
| CO | 12 | 0.25% | 65,939.51 | 0.22% |
| NJ | 11 | 0.23% | 61,063.48 | 0.20% |
| DC | 7 | 0.15% | 40,931.39 | 0.14% |
| MA | 6 | 0.13% | 33,998.58 | 0.11% |
| DE | 3 | 0.06% | 21,699.44 | 0.07% |
| WY | 3 | 0.06% | 17,429.76 | 0.06% |
| RI | 4 | 0.08% | 15,603.06 | 0.05% |
| WA | 2 | 0.04% | 14,999.26 | 0.05% |
| OR | 2 | 0.04% | 14,373.24 | 0.05% |
| ID | 2 | 0.04% | 12,861.56 | 0.04% |
| MN | 2 | 0.04% | 10,052.24 | 0.03% |
| VI | 1 | 0.02% | 8,995.00 | 0.03% |
| AK | 1 | 0.02% | 7,989.18 | 0.03% |
| CT | 1 | 0.02% | 6,832.69 | 0.02% |
| MP | 1 | 0.02% | 6,491.91 | 0.02% |
| MT | 1 | 0.02% | 6,225.63 | 0.02% |
| NE | 1 | 0.02% | 5,290.79 | 0.02% |
| GU | 1 | 0.02% | 4,627.35 | 0.02% |
| ME | 1 | 0.02% | 4,349.40 | 0.01% |
| | 4,752 | 100.00% | 29,999,999.94 | 100.00% |

| Loans by School | | | | |
|---|---|---|---|---|
| SCHOOL | NUMBER OF LOANS | PERCENT | REMAINING PRINCIPAL BALANCE | PERCENT |
| FRANKLIN - MISS SOUTH | 803 | 6.38% | 2,324,960.63 | 7.75% |
| PROFESSIONAL TDS – PADUCAH | 208 | 4.38% | 1,454,650.69 | 4.85% |
| THOROUGHBRED TRUCK DRIVING SCHOOL | 154 | 3.24% | 1,231,556.31 | 4.11% |
| FRANKLIN – CROSSROADS | 135 | 2.84% | 1,052,775.45 | 3.51% |
| FRANKLIN – LOUISVILLE | 125 | 2.63% | 977,614.34 | 3.26% |
| TTT TRUCK SCHOOL | 115 | 2.42% | 916,212.37 | 3.05% |
| ALABAMA DRIVERS | 115 | 2.42% | 839,778.12 | 2.80% |
| TRUCK DRIVER INSTITUTE - III, INC | 153 | 3.22% | 803,740.94 | 2.68% |
| COMMERCIAL DRIVER INSTITUTE - I | 149 | 3.14% | 790,066.13 | 2.63% |
| HOOK UP DRIVERS | 89 | 1.87% | 789,791.45 | 2.63% |
| FRANKLIN – LEXINGTON | 92 | 1.94% | 723,243.59 | 2.41% |
| MTA SCHOOLS – 140 | 98 | 2.06% | 675,205.13 | 2.25% |
| MTA SCHOOLS – 111 | 112 | 2.36% | 675,057.55 | 2.25% |
| TRUCK DRIVER INSTITUTE - VII, INC | 115 | 2.42% | 642,269.52 | 2.14% |
| TRUCK DRIVER INSTITUTE - VI, INC | 121 | 2.55% | 632,263.10 | 2.11% |
| FRANKLIN - ST. LOUIS | 79 | 1.66% | 622,247.08 | 2.07% |

-38-

ROY 013149

| | | | | |
|---|---|---|---|---|
| FRANKLIN - INDIANAPOLIS | 74 | 1.56% | 587,560.45 | 1.96% |
| FRANKLIN - FT WORTH | 87 | 1.83% | 583,491.76 | 1.94% |
| COMMERCIAL DRIVER INSTITUTE - V | 107 | 2.25% | 571,267.71 | 1.90% |
| COMMONWEALTH - GEORGETOWN | 64 | 1.35% | 544,784.09 | 1.82% |
| MTA SCHOOLS - 116 | 83 | 1.75% | 534,393.11 | 1.78% |
| TRANSPORT TRAINING INC | 89 | 1.87% | 468,848.16 | 1.56% |
| FRANKLIN - IDA | 73 | 1.54% | 459,469.69 | 1.53% |
| FRANKLIN - PADUCAH | 55 | 1.16% | 434,495.21 | 1.45% |
| FRANKLIN - FRAZIERS | 54 | 1.14% | 418,714.17 | 1.40% |
| MTA SCHOOLS - 110 | 63 | 1.33% | 402,454.09 | 1.34% |
| TRANSPORT TRAINING INC - 3 | 71 | 1.49% | 397,524.44 | 1.33% |
| FRANKLIN - CDT | 50 | 1.05% | 381,777.73 | 1.27% |
| TTC - LEBANON | 57 | 1.20% | 337,271.59 | 1.12% |
| COMMERCIAL DRIVER INSTITUTE - IV | 62 | 1.30% | 329,441.11 | 1.10% |
| TRUCK DRIVER INSTITUTE - IV, INC | 58 | 1.22% | 303,368.71 | 1.01% |
| TRUCK DRIVER INSTITUTE - V, INC | 56 | 1.18% | 295,702.42 | 0.99% |
| FRANKLIN - FIVE STAR | 37 | 0.78% | 286,478.15 | 0.95% |
| DALY'S TRUCK DRIVING SCHOOL | 40 | 0.84% | 279,556.46 | 0.93% |
| NORTH ALABAMA DRIVING ACADEMY | 39 | 0.82% | 278,062.79 | 0.93% |
| TRUCK DRIVER INSTITUTE - VIII, INC | 52 | 1.09% | 277,389.82 | 0.92% |
| QUALITY COLLEGE - FRESNO | 40 | 0.84% | 273,928.62 | 0.91% |
| ROADMASTER DRIVER SCHOOL INC | 51 | 1.07% | 243,089.99 | 0.81% |
| MTA SCHOOLS - 143 | 37 | 0.78% | 231,060.52 | 0.77% |
| AMERI-MEX TRAINING CENTER, INC. | 39 | 0.82% | 228,456.08 | 0.76% |
| TRUCK DRIVER INSTITUTE - IX, INC | 51 | 1.07% | 227,728.12 | 0.76% |
| MTA SCHOOLS - 101 | 34 | 0.72% | 204,943.11 | 0.68% |
| KATLAW SCHOOL OF TRUCKING | 37 | 0.78% | 204,386.07 | 0.68% |
| TRUCK DRIVER INSTITUTE - I, INC | 36 | 0.76% | 195,770.72 | 0.65% |
| INTERSTATE - EVANSVILLE | 27 | 0.57% | 179,695.21 | 0.60% |
| ROADMASTER DRIVER SCHOOL OF OHIO | 40 | 0.84% | 178,973.58 | 0.60% |
| TRUCK DRIVER INSTITUTE - II, INC | 32 | 0.67% | 171,974.89 | 0.57% |
| INTERNATIONAL SCHOOLS - NM | 48 | 1.01% | 166,264.70 | 0.55% |
| ROADMASTER DRIVER SCHOOL OF JACKSONVILLE | 36 | 0.76% | 162,695.69 | 0.54% |
| DELTA TRUCK - OWENSBORO | 29 | 0.61% | 159,553.61 | 0.53% |
| COMMERCIAL DRIVER INSTITUTE - II | 29 | 0.61% | 155,304.39 | 0.52% |
| COMMERCIAL DRIVER INSTITUTE - III | 30 | 0.63% | 152,286.02 | 0.51% |
| COASTAL COLLEGE - ALEXANDRIA | 29 | 0.61% | 144,891.44 | 0.48% |
| ALLIANCE 5 TRACTOR-TRAILER TRAINING CENTER | 23 | 0.48% | 144,106.87 | 0.48% |
| MTA SCHOOLS - 121 | 28 | 0.59% | 140,581.25 | 0.47% |
| SHIPPERS CHOICE OF VIRGINIA | 32 | 0.67% | 139,897.32 | 0.47% |
| MTA SCHOOLS - 139 | 21 | 0.44% | 138,163.88 | 0.46% |
| NORTH CAROLINA-DIESEL DRIVING SCHOOL | 34 | 0.72% | 136,299.88 | 0.45% |
| COMMERCIAL DRIVER TRAINING INC OF AUGUSTA | 26 | 0.55% | 127,981.68 | 0.43% |
| ALLIANCE 3 TRACTOR-TRAILER TRAINING CENTER | 20 | 0.42% | 122,403.49 | 0.41% |
| SOUTH CAROLINA-DIESEL DRIVING SCHOOL | 28 | 0.59% | 118,939.26 | 0.40% |
| U.S. TRUCK - DETROIT | 26 | 0.55% | 117,665.69 | 0.39% |
| MTA SCHOOLS - 138 | 24 | 0.51% | 110,315.99 | 0.37% |

-39-

47

ROY 013150

PHLEGAL: #1008804 v1 (LM#C01!.DOC)

| | | | | |
|---|---|---|---|---|
| C.V.O.T. | 19 | 0.40% | 107,079.65 | 0.36% |
| CAREER DRIVING AND LEARNING CENTER | 15 | 0.32% | 99,702.11 | 0.33% |
| FRANKLIN - EAST PEORI | 12 | 0.25% | 98,979.06 | 0.33% |
| ALLIANCE 6 TRACTOR-TRAILER TRAINING CENTER | 14 | 0.29% | 89,489.85 | 0.30% |
| COASTAL COLLEGE - CALHOUN | 18 | 0.38% | 89,409.07 | 0.30% |
| MTA SCHOOLS - 141 | 18 | 0.38% | 86,959.47 | 0.29% |
| DIESEL INSTITUTE OF AMERICA | 18 | 0.38% | 78,478.03 | 0.26% |
| UNITED TDS | 21 | 0.44% | 77,896.19 | 0.26% |
| FRANKLIN - SIKESTON | 10 | 0.21% | 77,327.58 | 0.26% |
| NAPIER TRUCK DRIVER TRAINING | 21 | 0.44% | 74,469.37 | 0.25% |
| PITTSBURGH INSTITUTE OF AERONAUTICS | 18 | 0.38% | 74,398.49 | 0.25% |
| COASTAL COLLEGE - OPELOUSAS | 14 | 0.29% | 70,674.38 | 0.24% |
| COASTAL COLLEGE - HAMMOND | 14 | 0.29% | 67,165.09 | 0.22% |
| CHARLOTTE TRUCK DRIVER TRAINING SCHOOL-NC | 20 | 0.42% | 66,947.24 | 0.22% |
| HEALTH CARE INSTITUTE OF JACKSON | 16 | 0.34% | 54,588.02 | 0.18% |
| SOUTHEASTERN TRAINING CENTER | 9 | 0.19% | 50,529.41 | 0.17% |
| MTA SCHOOLS - 145 | 11 | 0.23% | 47,373.79 | 0.16% |
| PROFESSIONAL TDI - BATAVIA | 8 | 0.17% | 45,265.71 | 0.15% |
| COASTAL COLLEGE - BOSSIER CITY | 9 | 0.19% | 44,126.10 | 0.15% |
| ALLIANCE   TRACTOR-TRAILER TRAINING CENTER | 7 | 0.15% | 41,633.57 | 0.14% |
| MTA SCHOOLS - 144 | 9 | 0.19% | 39,962.38 | 0.13% |
| AMERICA'S DRIVING FORCE | 9 | 0.19% | 36,824.49 | 0.12% |
| J & C - OPELIKA | 5 | 0.11% | 34,351.88 | 0.11% |
| COASTAL COLLEGE - LAKE CHARLES | 7 | 0.15% | 34,282.74 | 0.11% |
| MTA SCHOOLS - 146 | 7 | 0.15% | 33,395.98 | 0.11% |
| R & E INC. | 9 | 0.19% | 30,993.96 | 0.10% |
| FRANKLIN - PROPER | 4 | 0.08% | 30,032.11 | 0.10% |
| NETTTS | 7 | 0.15% | 29,550.26 | 0.10% |
| ITEC | 4 | 0.08% | 28,378.14 | 0.09% |
| PACIFIC COAST TRUCK SCHOOL | 6 | 0.13% | 27,937.75 | 0.09% |
| PC/LAN SOLUTIONS, INC. | 4 | 0.08% | 25,783.93 | 0.09% |
| LUFKIN TRUCK DRIVING ACADEMY | 8 | 0.17% | 25,667.97 | 0.09% |
| MTA SCHOOLS - 137 | 5 | 0.11% | 24,094.06 | 0.08% |
| CDTA - GRAND BAY | 5 | 0.11% | 23,250.74 | 0.08% |
| ALLIANCE 2 TRACTOR-TRAILER TRAINING CENTER | 5 | 0.11% | 23,075.18 | 0.08% |
| COMMERICAL CARRIER SERVICES, INC | 6 | 0.13% | 22,707.15 | 0.08% |
| FRANKLIN - ACDL | 3 | 0.06% | 21,696.07 | 0.07% |
| MTA SCHOOLS - 136 | 5 | 0.11% | 20,970.18 | 0.07% |
| CDTA - GREENVILLE | 4 | 0.08% | 19,154.07 | 0.06% |
| NATIONAL TRAINING INSTITUTE - FRESNO | 4 | 0.08% | 16,766.25 | 0.06% |
| QUALITY COLLEGE - SAN JOSE | 2 | 0.04% | 15,458.14 | 0.05% |
| SHORE - FORKED RIVER | 3 | 0.06% | 15,214.00 | 0.05% |
| FUTURE TRUCKER OF AMERICA | 3 | 0.06% | 13,951.61 | 0.05% |
| MTA SCHOOLS - 135 | 2 | 0.04% | 8,355.36 | 0.03% |
| INTERNATIONAL SCHOOLS - TX | 2 | 0.04% | 7,145.33 | 0.02% |
| MIDWEST DRIVER DEVELOPMENT | 1 | 0.02% | 6,815.30 | 0.02% |
| HDS TRUCK DRIVING INSTITUTE | 2 | 0.04% | 6,400.89 | 0.02% |

47

ROY 013151

PHLEGAL: #1008804 v1 (LM#C011.DOC)

| | | | | |
|---|---|---|---|---|
| COMMERCIAL DRIVER INSTITUTE | 1 | 0.02% | 5,795.11 | 0.02% |
| NATIONAL TRAINING INSTITUTE - STOCKTON | 1 | 0.02% | 5,494.61 | 0.02% |
| ACROSS AMERICA INC. | 1 | 0.02% | 4,841.61 | 0.02% |
| NATIONAL TRAINING INSTITUTE - OAKLAND | 1 | 0.02% | 4,820.67 | 0.02% |
| MTA SCHOOLS - 142 | 1 | 0.02% | 4,188.95 | 0.01% |
| FOSTER ELITE TRUCK DRIVING SCHOOL | 1 | 0.02% | 3,545.00 | 0.01% |
| TRI-COUNTY DRIVING ACADEMY | 1 | 0.02% | 3,495.00 | 0.01% |
| UNLIMITED ACCESS INC | 1 | 0.02% | 2,268.76 | 0.01% |
| | 4,752 | 100.00% | 29,999,999.94 | 100.00% |

## Underwriting Guidelines for Institutions

An Institution must satisfy certain minimum guidelines before SFC, as the originator of the Student Loans, implements a loan program at an Institution or purchases Student Loans from the Institution (the "Institution Guidelines"). The guidelines are reviewed periodically and may be changed at any time by SFC. Generally, the Institution Guidelines require that an Institution must be either a post-secondary school or a four-year college that is licensed by the U.S. Department of Education, a state's Department of Higher Education, or other federal, state or local accrediting bodies. Additionally, the Institutions when requested must demonstrate their ongoing compliance with the standards set forth by the U.S. Department of Education, the Department of Higher Education for the state, any accrediting councils, Title IV of the Higher Education Act of 1964, as amended, and their continuing compliance with all rules and regulations under any applicable governing authority.

## Certain Legal Aspects of Student Loans

The following discussion contains general summaries of certain legal aspects of the Student Loans. Because such legal aspects are governed by applicable federal and state laws (which laws may differ substantially), the summaries do not purport to be complete or to reflect the laws of any particular state. Accordingly, the summaries are qualified in their entirety by reference to the applicable laws of those states.

Numerous federal and state consumer protection laws and related regulations impose substantial requirements upon lenders and servicers involved in consumer finance, including the making of the Student Loans. Also, some state laws impose finance charge ceilings and other restrictions on certain consumer transactions and require contract disclosures in addition to those required under federal law. These requirements impose specific statutory liabilities upon lenders who fail to comply with their provisions. In certain circumstances, the Company and the Trust may be liable for certain violations of consumer protection laws that apply to the Student Loans, either as assignee from SFC or as the party directly responsible for obligations arising after the transfer.

-41-

ROY 013152

PHLEGAL: #1008804 v1 (LM#C01!.DOC)