In addition to the consumer protection laws, numerous other statutory provisions, including federal bankruptcy laws and related state laws, may interfere with or affect the ability of the Servicer to collect payments on the Student Loans. For example, a bankruptcy court may reduce the monthly payments due under a contract or change the rate of finance charges and time for repayment of the indebtedness.

## CREDIT ENHANCEMENT

Reserve Escrow Account and Liquidity Reserve Account.

*Creation and Funding of Reserve Escrow Account.* As contemplated by the Insurance Policy, the Issuer has entered into an escrow agreement with Wells Fargo Bank Minnesota, National Association, as Escrow Agent, pursuant to which the Reserve Escrow Account will be maintained for the benefit of the Issuer, as beneficiary thereunder, and Royal, as a third party beneficiary thereunder. The Reserve Escrow Account, which was initially established upon coverage of the Student Loans under the Predecessor Policy, will have a balance of approximately $59,500 on the Closing Date after giving effect to the transactions occurring on the Closing Date. On each Distribution Date, the Trustee will contribute to the Reserve Escrow Account an amount (the "Reserve Remittance Amount") equal to the balance remaining in the Collection Account after payment of items (1) through (11) in the Payment Waterfall. In addition, recoveries on delinquent Student Loans that are not yet Defaulted Student Loans will be paid into the Reserve Escrow Account. At any time that the funds in the Reserve Escrow Account have a fair market value equal to or greater than the Maximum Reserve Amount (defined as 50% of the outstanding principal balances of the Student Loans, exclusive of Defaulted Student Loans), amounts in excess thereof will be distributed to certain other escrows established in connection with policies issued by Royal for the benefit of affiliates of the Company to the extent of any shortfalls in such escrows; then to the MBIA Reserve Account, up to the Required MBIA Reserve Amount, and any amounts in excess of the foregoing to the Company; provided, that, starting 6 months after the Senior Certificateholder Balance is less than 10% of the initial Senior Certificateholder Balance, the Company has agreed that purchasers of the Senior Certificates will receive such distributions up to an amount equal to .50% per annum on the Senior Certificateholder Balance. Amounts on deposit in the Reserve Escrow Account after the payment of a claim on a Defaulted Student Loan under the Insurance Policy, that is not covered by the Experience Account, will be disbursed to Royal to the extent of such payments.

The Escrow Agent will receive a fee of $2,000 per year (the "Escrow Fees"). In addition, the Escrow Agent is entitled to reimbursement of certain expenses and costs, which are limited to recovery from the Expense Account.

*Creation and Funding of the Liquidity Reserve Account.* As provided in the Pooling Agreement, the Trustee will establish and maintain a reserve fund (the "Liquidity Reserve Account") for the benefit of the holders of the Certificates. The Original Liquidity Reserve

ROY 013153

PHLEGAL: #1008804 v1 (LM#C011.DOC)

Amount, which will be deposited by the Company into the Liquidity Reserve Account on the Closing Date, will be $945,300. On each Distribution Date, the Trustee will repay to the Liquidity Reserve Account amounts to replenish the Liquidity Reserve Account, to the extent of prior payments drawn from the Liquidity Reserve Account and not theretofore repaid, up to the Original Liquidity Reserve Amount, to the extent that funds are available therefor in the Collection Account as of any Distribution Date after payment of items (1) through (8) in the Payment Waterfall. The Trustee shall invest the Liquidity Reserve Account in investments permitted under the Pooling Agreement. Upon repayment of all the Certificates and payment of all amounts due and owing to MBIA, Royal, the Trustee, and the Servicer, any amounts remaining in the Liquidity Reserve Account will be remitted to the Company.

_Availability of Funds from Reserve Escrow Account and Liquidity Reserve Account._ On or prior to any Distribution Date, the amount of any Delinquent Interest with respect to the Student Loans for such period and any Simple Interest Shortfall for such period may be withdrawn by the Trustee from the Liquidity Reserve Account and deposited into the Collection Account, to the extent of available funds in the Liquidity Reserve Account.

Delinquent principal payments on the Student Loans that are delinquent but are not yet Defaulted Student Loans, and any Delinquent Interest with respect to such Student Loans not covered by the Liquidity Reserve Account, may be withdrawn from the Reserve Escrow Account and deposited into the Collection Account to the extent there are funds available in the Reserve Escrow Account. In addition, after the Experience Account (as described in "—The Insurance Policy" below) has been terminated or exhausted, the full amount remaining unpaid with respect to principal on any Defaulted Student Loans, and interest to the date of default, may be withdrawn from the Reserve Escrow Account, to the extent of available funds therein, and deposited in the Collection Account and disbursed as set forth in the Pooling Agreement.

If there is a Reserve Draw Deficiency, the amount remaining in the Reserve Escrow Account will be allocated first, pro rata to Delinquent Interest on the delinquent Student Loans, and second, pro rata to the delinquent principal on the delinquent Student Loans and, after the Experience Account has expired or been exhausted, the entire principal balance of Defaulted Student Loans for such Distribution Date, and distributed as set forth in the Pooling Agreement.

Amounts deposited into the Reserve Escrow Account after the payment of a claim on a Defaulted Student Loan under the Insurance Policy that is not covered by the Experience Account (as described below) will be paid to Royal to the extent of such payments.

The Insurance Policy

The form of the Insurance Policy is attached to this Memorandum as Exhibit A. Royal does not accept any responsibility for the accuracy or completeness of this Memorandum or any information or disclosure contained herein, or omitted here from, other than with respect to the accuracy of the information regarding the Insurance Policy and Royal set forth under this

-43-

ROY 013154

heading "DESCRIPTION OF ROYAL." Additionally, Royal makes no representations regarding the Certificates or the advisability of investing in the Certificates.

Under the terms of the Insurance Policy, Royal insures, subject to a Limit of Liability of $29,999,999.94 in principal amount of the Student Loans (as adjusted for prepaid Loans), plus three months of interest at the stated interest rate contained in the Student Loans, amounts due under any Defaulted Student Loan at the time it became a Defaulted Student Loan or any impairment or avoidance of the rights of the Beneficiary or the Insured arising out of the bankruptcy or similar event or proceeding with respect to Student Finance Corporation or the Company).

Payments under the Insurance Policy are required to be made by Royal directly to the beneficiary within 60 days of the receipt of the Form of Claim Notice (the "Notice"). The principal portion of each payment made under the Insurance Policy reduces the Limit of Liability by a like amount. Upon payment of any claim under the Insurance Policy, the Insurer shall be subrogated to the extent of such payments to all of the beneficiary's and the insured's rights against the student(s) or other liable party to the extent of its obligations to pay. Any claim paid under the Insurance Policy will act as a prepayment for purposes of the Senior Certificates, and all the risks associated with a prepayment will be present, including, but not limited to, the potential loss of yield upon reinvestment of the principal proceeds.

Royal's obligation to pay any claim made under the Insurance Policy is absolute and unconditional and shall not in anyway be affected, mitigated or eliminated by any failure on the part of the insured or the beneficiary to observe or perform any covenant or condition contained in the Insurance Policy, including a breach of any representation or warranty made by the insured, of the failure of the insured to comply with the Underwriting Policies.

Initially, until the Experience Account described below terminates or is exhausted, claims with respect to Defaulted Student Loans will be paid in the first instance by Royal under the Insurance Policy, without first seeking such funds from the Reserve Escrow Account. At such time as the Experience Account is terminated or exhausted as described below, the Reserve Escrow Account must be exhausted prior to making a claim under the Insurance Policy.

The Experience Account was created with an initial balance equal to 18% of the balance of all of the student loans covered by the Insurance Policy at the time they were initially covered by the Insurance Policy, funded by one or more promissory notes from SFC to an affiliate of SFC, and assigned to Royal. The Experience Account is reduced (but not below zero) by (i) the amount of any claims paid by Royal under the Insurance Policy, and (ii) on the fifth (5th) day of each month commencing with September 5, 2001 and continuing until the Experience Account is reduced to zero, an amount equal to one-twelfth of the initial balance of the Experience Account. The Experience Account will terminate as of September 5, 2002.

-44-

ROY 013155

PHLEGAL: #1008804 v1 (LM#C011.DOC)

The Experience Account is created under the Insurance Policy solely for the benefit of Royal. Although the full principal amount of the Student Loans is covered by the Insurance Policy, the interest is not, except for 90 days of interest at the Student Loan Rate from the first delinquent payment. A Defaulted Student Loan will act as a prepayment, and all of the risks associated with a prepayment will be present, including, but not limited to, the potential loss of yield upon reinvestment of the principal proceeds. Payment of any losses on the Student Loans by Royal will not occur for up to 60 days from Royal's receipt of notice of any loss. Notice is to be given within 10 days following the Distribution Date as of which the Student Loan is first a Defaulted Student Loan. Because of the delay in payment under the Insurance Policy, there will be a delay in cash receipts if insufficient cash is available in the Reserve Escrow Account or the Liquidity Reserve Account to make the payments due under the Certificates for the period commencing with a payment default by the student until payment is made by Royal. Moreover, if Royal becomes insolvent, access to the Insurance Policy, and, possibly, the Reserve Escrow Account will be substantially restricted and may cause a default under the Certificates should there be defaults under the Student Loans

## DESCRIPTION OF THE MBIA POLICY

The following information has been supplied by MBIA Insurance Corporation ("MBIA") for inclusion in this Memorandum. The form of the MBIA Policy is attached to this Memorandum as Exhibit B. MBIA does not accept any responsibility for the accuracy or completeness of this Memorandum or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding the MBIA Policy and MBIA set forth under the headings "DESCRIPTION OF THE MBIA POLICY" and "DESCRIPTION OF MBIA." Additionally, MBIA makes no representations regarding the Certificates or the advisability of investing in the Certificates.

MBIA, in consideration of the payment of a premium and subject to the terms of the MBIA Policy, thereby unconditionally and irrevocably guarantees to any Senior Certificateholder that an amount equal to each full and complete Insured Payment will be received from MBIA by the Trustee or its successors, as Trustee for the Senior Certificateholders, on behalf of the Senior Certificateholders, for distribution by the Trustee to each Senior Certificateholder of that Senior Certificateholder's proportionate share of the Insured Payment.

MBIA's obligations under the MBIA Policy, with respect to a particular Insured Payment, will be discharged to the extent funds equal to the applicable Insured Payment are received by the Trustee, whether or not those funds are properly applied by the Trustee. Insured Payments will be made only at the time set forth in the MBIA Policy, and no accelerated Insured Payments will be made regardless of any acceleration of the Senior Certificates, unless the acceleration is at the sole option of MBIA.

-45-

ROY 013156

PHLEGAL: #1008804 v1 (LM#C011.DOC)

Notwithstanding the foregoing paragraph, the MBIA Policy does not cover shortfalls, if any, attributable to the liability of the Trust or the Trustee for withholding taxes, if any (including interest and penalties in respect of any liability for withholding taxes).

MBIA will pay any Insured Payment that is a Preference Amount on the business day following receipt on a business day by MBIA's fiscal agent of the following:

- a certified copy of the order requiring the return of a preference payment;

- an opinion of counsel satisfactory to MBIA that the order is final and not subject to appeal;

- an assignment in a form that is reasonably required by MBIA, irrevocably assigning to MBIA all rights and claims of the Senior Certificateholders relating to or arising under the Senior Certificates against the debtor which made the preference payment or otherwise with respect to the preference payment; and

- appropriate instruments to effect the appointment of MBIA as agent for the Senior Certificateholders in any legal proceeding related to the preference payment, which instruments are in a form satisfactory to MBIA;

provided that if these documents are received after 12:00 p.m., New York time, on that business day, they will be deemed to be received on the following business day. Payments by MBIA will be disbursed to the receiver or the trustee in bankruptcy named in the final order of the court exercising jurisdiction on behalf of the Senior Certificateholders and not to any Senior Certificateholders directly unless the Senior Certificateholders have returned principal or interest paid on the Senior Certificates to the receiver or trustee in bankruptcy, in which case that payment will be disbursed to the Senior Certificateholders.

MBIA will pay any other amount payable under the MBIA Policy no later than 12:00 p.m., New York time, on the later of the Distribution Date on which the related Deficiency Amount is due or the third business day following receipt in New York, New York, on a business day by State Street Bank and Trust Company, National Association, as fiscal agent for MBIA or any successor fiscal agent appointed by MBIA, of a notice from the Trustee specifying the Insured Payment which is due and owing on the applicable Distribution Date, provided that if the notice is received after 12:00 p.m., New York time, on that business day, it will be deemed to be received on the following business day. If any notice received by MBIA's fiscal agent is not in proper form or is otherwise insufficient for the purpose of making a claim under the MBIA Policy, it will be deemed not to have been received by MBIA's fiscal agent for the purposes of this paragraph, and MBIA or the fiscal agent, as the case may be, will promptly so advise the Trustee and the Trustee may submit an amended notice.

-46-

ROY 013157

Insured Payments due under the MBIA Policy, unless otherwise stated therein, will be disbursed by MBIA's fiscal agent to the Trustee, on behalf of the Senior Certificateholders, by wire transfer of immediately available funds in the amount of the Insured Payment less, in respect of Insured Payments related to Preference Amounts, any amount held by the Trustee for the payment of the Insured Payment and legally available therefor.

The fiscal agent is the agent of MBIA only, and the fiscal agent will in no event be liable to Senior Certificateholders for any acts of the fiscal agent or any failure of MBIA to deposit or cause to be deposited sufficient funds to make payments due under the MBIA Policy.

As used in the MBIA Policy, the following terms shall have the following meanings:

"*Deficiency Amount*" means (a) for any Distribution Date, any shortfalls in amounts available in the Collection Account to pay the Senior Interest Distribution with respect to the Senior Certificates and (b) on the Final Distribution Date, any shortfall in amounts available in the Collection Account to pay the outstanding principal on the Senior Certificates.

"*Insured Payment*" means (a) as of any Distribution Date, any Deficiency Amount and (b) any Preference Amount.

"*Preference Amount*" means any amount previously distributed to a Senior Certificateholder on the Senior Certificates that is recoverable and sought to be recovered as a voidable preference by a trustee in bankruptcy pursuant to the United States Bankruptcy Code (11 U.S.C.), as amended from time to time, in accordance with a final nonappealable order of a court having competent jurisdiction.

Capitalized terms used in the MBIA Policy and not otherwise defined in the MBIA Policy shall have the meanings set forth in the Pooling Agreement as of the date of execution of the MBIA Policy, without giving effect to any subsequent amendment or modification to the Pooling Agreement unless such amendment or modification has been approved in writing by MBIA.

The MBIA Policy is not cancelable for any reason. The premium on the MBIA Policy is not refundable for any reason including payment, or provision being made for payment, prior to the maturity of the Senior Certificates.

The MBIA Policy is being issued under and pursuant to, and will be construed under, the laws of the State of New York, without giving effect to the conflict of laws principles thereof.

**The insurance provided by the MBIA Policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.**

-47-

ROY 013158

## CERTAIN YIELD AND PREPAYMENT CONSIDERATIONS

General

    The yield on the Senior Certificates will depend on the price paid by the Senior Certificateholder for its interest in the Student Loans and other Assets of the Issuer as described in the Senior Certificates, the receipt and timing of the receipt of payments on the Senior Certificates and prepayment and default rates on the Student Loans.

Yield and Prepayment Considerations

    All principal payments received from the student on the Student Loans will be applied to reduce the principal balance of the Senior Certificates. To the extent of funds available in the Reserve Escrow Account, delinquent monthly payments on Student Loans that are not yet Defaulted Student Loans (90 days or more delinquent from their respective due dates, applying any payment received after a delinquency to the earliest delinquency) will be funded by the Reserve Escrow Account and also applied to reduce the principal balance of the Senior Certificates. In addition, prepayments received on the Student Loans, and payments equal to the entire principal balance of Defaulted Student Loans received pursuant to the Reserve Escrow Account or Insurance Policy, will be applied to reduce the principal balance of the Senior Certificates. Thus, the rate of payment on the Senior Certificates will be affected by the scheduled amortization of the Student Loans, the rate of prepayments thereon, and the rate of defaults thereon.

    Assuming the Senior Certificates are sold at par, a higher than anticipated rate of principal prepayments or defaults on the Student Loans will not affect the yield to maturity on the Senior Certificates, although it will affect the average life of the Senior Certificates, since the principal payments and Insurance Policy funds will be used to pay down principal on the Senior Certificates. Thus, although the Senior Certificates will be paid in full, they may be retired earlier than expected. The Senior Certificateholders may not be able to reinvest accelerated principal payments at the time of receipt at interest rates comparable to the Senior Certificates' interest rates, causing a potential loss of yield on the funds repaid. If the Senior Certificates are sold at a discount or at a premium, a higher or lower rate of prepayment or default under the Student Loans will increase or decrease, respectively, the yield to maturity on the Senior Certificates.

    Because the rates of payment of principal on the Student Loans or the number of defaults on the Student Loans covered by the Insurance Policy will depend on future events and a variety of factors (as described more fully below), no assurance can be given as to such rates or the rate of principal prepayments or defaults in particular. In general, the earlier a prepayment of principal or default on the Student Loans covered by the Reserve Escrow Account or the Insurance Policy is distributed on the Senior Certificates, the greater will be the affect on the investor's yield to maturity. As a result, the effect on such investor's yield of principal payments

-48-

ROY 013159

occurring at a rate higher (or lower) than the rate anticipated by the investor during any particular period would not be fully offset by a subsequent like reduction (or increase) in the rate of principal payments.

The extent of prepayments of principal or defaults on the Student Loans varies from time to time and may be affected by a number of factors including, without limitation, economic, demographic, geographic, social, legal and tax. The rate of defaults on the Student Loans may be higher since a portion of the Student Loans have up to two delinquent payments. As of the Cut-off Date, there were 8 Student Loans which were delinquent by 30 to 59 days, and there were no Student Loans which were delinquent by 60 to 89 days. The existence of Student Loans with delinquencies in the pool could cause the default rate to be higher. In addition, the rate of prepayment on the Student Loans may be affected by prevailing market interest rates for student loans. When the prevailing market interest rate is below that on the Student Loans, a borrower may have an increased incentive to refinance his or her Student Loan. There can be no assurance as to the rate or frequency of prepayments or defaults on the Student Loans in the Trust. Furthermore, there can be no assurance that increased access to or availability of private or public student loan programs will not result in significant prepayments on the Student Loans. The Issuer will and does not make any representation as to the particular factors that will affect the prepayments or defaults on the Student Loans, as to the relative importance of such factors, as to the percentage of the principal balance of the Student Loans that will be paid as of any date or as to the overall rate of prepayment on the Student Loans.

The rates at which principal payments are received on the Student Loans and the rate at which payments are made by Royal for Defaulted Student Loans may affect the ultimate maturity and the weighted average life of the Senior Certificates. Weighted average life refers to the average amount of time that will elapse from the date of issue of an instrument until each dollar of principal of such instrument is repaid to the investor.

The weighted average life of the Senior Certificates will be influenced by the rate at which principal on the related Student Loans, whether in the form of scheduled amortization, prepayments or payments under the Insurance Policy, is paid on such series of Senior Certificates. Prepayment rates on loans are commonly measured relative to a prepayment standard or model. However, there is no standard or model generally available for pools of student loans. Moreover, if the Servicer does not collect on the Student Loans in an efficient and timely manner or there are interruptions of its activities for any reason, an increased number of Student Loans may become Defaulted Student Loans (90 days or more delinquent from their respective due dates, applying any payment received after a delinquency to the earliest delinquency) and will result in faster than anticipated principal payments on the Senior Certificates as such Defaulted Student Loans are paid by Royal.

-49-

ROY 013160

## USE OF PROCEEDS

The Issuer anticipates that the net proceeds from the sale of the Certificates estimated at approximately $33,043,719 (after deducting Placement Agent fees and commissions), will be used to acquire the Assets, pay the other expenses of the offering, including the Insurance Premium and the MBIA Premium, and fund the Liquidity Reserve Account and the operations of the Issuer.

## THE ISSUER

The Issuer was created pursuant to the Pooling Agreement. Under the terms of the Pooling Agreement, the Company will transfer to the Issuer the Assets (including the pool of Student Loans, as well as rights under the Insurance Policy and the Reserve Escrow Account and funds for deposit into the Liquidity Reserve Account) in return for the Certificates. The Company will thereupon sell the Senior Certificates as provided herein.

The Trustee will hold the Assets for the purpose of paying the principal, if applicable, and interest due under the Certificates, inter alia, and holders of the Certificates will be entitled to an ownership interest in the Assets.

The Pooling Agreement provides that the Trustee, as Trustee on behalf of the Issuer, may not engage in any business, commercial or other activity for profit. The Pooling Agreement may be amended only with the prior written consent of the Trustee, the Company, the Servicer, MBIA, Royal and the Majority Certificateholders. The Company will not be liable for payment of principal or interest on the Certificates, and each of the holders of the Certificates will be deemed to have released the Company from any such claim, liability or obligation on or with respect to such Certificates.

The Pooling Agreement provides that the Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Pooling Agreement.

## THE COMPANY

### General

The Company is a limited liability company organized and existing under the laws of the State of Delaware. The Company was organized on November 30, 2000, for the special and limited purpose of entering into this financing. No other property, projects or substantial assets are owned by the Company. The members of the Company are a special purpose Delaware corporation named SFC Acceptance V G.P., Inc. (the "Company Member") and SFC. The daily business operations will be conducted by the Company Member. The Member Manager and the

-50-

ROY 013161

PHLEGAL: #1008804 v1 (LM#C01!.DOC)

Independent Directors of the Company Member will make all decisions on the filing of voluntary bankruptcy and certain other extraordinary events.

<u>Executive Officers and Directors of Company Member</u>

The directors and executive officers of the Company Member and their positions are as follows:

| <u>Name</u> | <u>Position</u> |
| --- | --- |
| Andrew N. Yao | Director and President |
| Craig D. Grear | Director and Secretary |

Andrew N. Yao's biography is set forth below under "THE SERVICER."

Craig D. Grear is currently a partner at Young, Conaway, Stargatt & Taylor, a law firm located in Wilmington, Delaware. From 1992 until 1996, Mr. Grear was an associate in the law firm of Clark, Ladner, Fortenbaugh & Young located in Philadelphia, Pennsylvania. Prior to 1992, Mr. Grear was an associate at Richards, Layton & Finger, a law firm in Wilmington, Delaware.

<b>THE ORIGINATOR</b>

<u>General</u>

The Student Loans were originated or purchased by SFC, and are being sold by SFC to the Company pursuant to a Student Loan Purchase Agreement concurrent with the contribution of such Student Loans by the Company to the Issuer. SFC is in the business of lending to students of various post-secondary schools or purchasing installment tuition agreements made with the students of post-secondary schools. The schools from which SFC purchases student tuition installment agreements or lends to the schools' students for tuition payments range from two month programs for transportation, computer, paralegal education or other trade schools to four year colleges with the student receiving a Bachelor of Arts Degree. The schools must satisfy the Institution Guidelines and the Student Loans must satisfy the Scoring Model.

SFC is a defendant in two pieces of litigation. The Federal Deposit Insurance Corporation, as receiver for BestBank, of Boulder, Colorado sued SFC in the United States District Court for the District of Colorado (Denver) at Civil Action No. 88-B-2703 on December 11, 1998. In addition, Nielson Electronics Institute, Inc. sued SFC in the United States District Court for the District of Delaware at Case No. 99-285-MNS in May of 1999. SFC is vigorously contesting both actions and has asserted significant counterclaims in both actions. The litigation is continuing and no opinions can be given on the likely outcome of the litigation. SFC believes

-51-

ROY 013162

that even if both cases were adversely decided against it, which SFC does not believe will occur, the damages awarded in the actions will not cause SFC to file for bankruptcy. Nevertheless no assurance can be given that if the litigation were adversely decided that SFC would not be required to file for bankruptcy. In any event, the Student Loans should not be affected, and if they were, upon any impairment or avoidance of the rights of the Issuer or the Company in a Student Loan arising from a bankruptcy or similar event or proceeding with respect to SFC, the full amount of the principal of the affected Student Loan with 90 days of interest at the Student Loan Rate may be recovered under the Insurance Policy.

Executive Officers and Directors of SFC

The following is an identification and description of the business experience of the executive officers and directors of SFC:

| | |
|---|---|
| Mr. Andrew N. Yao | President and Chief Executive Officer |
| Mr. Gary J. Hawthorne | Senior Vice President of Operations |
| Mr. Perry R. Turnbull | Senior Vice President of School Relations |

Mr. Andrew N. Yao's biography is set forth under "THE SERVICER."

Mr. Gary J. Hawthorne's biography is set forth under "THE SERVICER."

Mr. Perry R. Turnbull is senior vice president of school relations for the Servicer. He is responsible for managing the Servicer's relationship with its client schools. This includes presenting the Servicer's programs to qualified institutions, training the personnel at approved institutions, and maintaining client relations. Mr. Turnbull has been affiliated with the Servicer since July 1993. Prior to joining SFC in 1996, Mr. Turnbull was president of Educational Methods, Inc., an educational products company, a position he held since 1984.

## THE SERVICER

General

Pursuant to the Pooling Agreement, Student Loan Servicing LLC, is designated as Servicer. The Servicer was organized on March 1, 2000 to succeed to certain servicing functions previously performed by SFC with respect to student loans originated or acquired by SFC.

Executive Officers and Directors of Servicer

The following is an identification and description of the business experience of the executive officers and directors of the Servicer:

-52-

ROY 013163

| Mr. Andrew N. Yao | President and Chief Executive Officer |
| Mr. Gary J. Hawthorne | Senior Vice President |
| Mr. Frank Martinez | Vice President and Chief Operating Officer |

Mr. Andrew N. Yao is president and chief executive officer of the Servicer. He has general management responsibility for all areas of the Servicer's operations and financing. Mr. Yao founded the Servicer in March of 2000. Mr. Yao is also the president and chief executive officer of SFC. Mr. Yao also owns the general partner of CEC Partnership, L.P., which was formed in 1991 to invest in post-secondary education. Additionally, Mr. Yao is president and founder of Electronic Cash Management, LLC, which was formed in 1998 to service automated teller machines.

Mr. Gary J. Hawthorne is senior vice president for the Servicer. Mr. Hawthorne joined the Servicer upon its formation in March of 2000. Mr. Hawthorne has served as Senior Vice President of Operations for SFC since 1997. From October, 1983 until June of 1997, Mr. Hawthorne was Executive Vice President, Chief Operations Officer, and served on the board of directors with Service One International Corporation, a credit card servicing company. Prior to 1983, Mr. Hawthorne held positions of Director of Finance for a government manufacturing contractor, Senior Vice President and Controller, Executive Vice President and Managing Officer for two lending institutions in California, and a Savings Bank Examiner for the State of California.

Mr. Frank Martinez is vice president and chief operating officer for the Servicer. Prior to joining the Servicer, Mr. Martinez was Vice President of Account Services for SFC. Prior to joining SFC, Mr. Martinez was the Chief Operating Officer of Solomon & Solomon P.C., a law firm in Albany, New York specializing in creditor rights and third party collections. He has held executive positions in the credit and collections field at large and small financial institutions, most notably Citibank, Chase, and Key Federal Savings within their respective credit card and installment lending operations.

## DESCRIPTION OF MBIA

General

MBIA is the principal operating subsidiary of MBIA Inc., a New York Stock Exchange listed company. MBIA Inc. is not obligated to pay the debts of or claims against MBIA. MBIA is domiciled in the State of New York and licensed to do business in and is subject to regulation under the laws of all 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, the Virgin Islands of the United States and the Territory of Guam. MBIA has two European branches, one in the Republic of France and the other in the Kingdom of Spain. New York has laws prescribing minimum capital requirements,

-53-

ROY 013164

PHLEGAL: #1008804 v1 (LM#C011.DOC)

limiting classes and concentrations of investments and requiring the approval of policy rates and forms. State laws also regulate the amount of both the aggregate and individual risks that may be insured, the payment of dividends by MBIA, changes in control and transactions among affiliates. Additionally, MBIA is required to maintain contingency reserves on its liabilities in specified amounts and for specified periods of time.

Financial Information About MBIA

The consolidated financial statements of MBIA, a wholly owned subsidiary of MBIA Inc., and its subsidiary as of December 31, 1999 and December 31, 1998 and for each of the three years in the period ended December 31, 1999, prepared in accordance with generally accepted accounting principles, included in the Annual Report on Form 10-K of MBIA Inc. for the year ended December 31, 1999, and the consolidated financial statements of MBIA and its subsidiaries as of September 30, 2000 and for the nine months ended September 30, 2000 and September 30, 2000 included in the Quarterly Report on Form 10-Q of MBIA Inc. for the period ended September 30, 2000, are attached hereto as Exhibit C.

All financial statements of MBIA and its subsidiaries included in documents filed by MBIA Inc. pursuant to Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, subsequent to the date of this Private Placement Memorandum and prior to the termination of the offering of the Certificates shall be deemed to be incorporated by reference into this Private Placement Memorandum and to be a part hereof from the respective dates of filing those documents.

The tables below present selected financial information of MBIA determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities and generally accepted accounting principles:

-54-

ROY 013165

PHLEGAL: #1008804 v1 (LM#C01!.DOC)

## MBIA

| | Statutory Accounting Practices | |
|---|---|---|
| | December 31, 1999 (Audited) | September 30, 2000 (Unaudited) |
| | (In millions) | |
| Admitted Assets............................. | $7,045 | $7,525 |
| Liabilities.................................... | 4,632 | 5,701 |
| Capital and Surplus.......................... | 2,413 | 2,424 |

| | Generally Accepted Accounting Principles | |
|---|---|---|
| | December 31, 1999 (Audited) | September 30, 2000 (Unaudited) |
| | (In millions) | |
| Assets.............................. | $7,446 | $8,124 |
| Liabilities................................. | 3,218 | 3,531 |
| Shareholder's Equity........................ | 4,228 | 4,593 |

### Where You Can Obtain Additional Information About MBIA

Copies of MBIA's year-end audited financial statements prepared in accordance with statutory accounting practices are available, without charge, from MBIA. The address of MBIA is 113 King Street, Armonk, New York 10504. The telephone number of MBIA is (914) 273-4545.

### Financial Strength Ratings of MBIA

Moody's Investors Service, Inc. rates the financial strength of MBIA as "Aaa."

Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., rates the financial strength of MBIA as "AAA."

Fitch, Inc. rates the financial strength of MBIA as "AAA."

Each rating of MBIA should be evaluated independently. The ratings reflect each respective rating agency's current assessment of the creditworthiness of MBIA and its ability to pay claims on its policies of insurance. Any further explanation as to the significance of the above ratings may be obtained only from the applicable rating agency.

-55-

ROY 013166

The above ratings are not recommendations to buy, sell or hold the Senior Certificates, and the ratings may be subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of the Senior Certificates. MBIA does not guaranty the market price of the Senior Certificates nor does it guaranty that the ratings on the Senior Certificates will not be revised or withdrawn.

## DESCRIPTION OF ROYAL INDEMNITY COMPANY

General

The following description of Royal Indemnity Company and certain of its affiliates is based solely on the information provided by Royal and public research provided by Moody's Rating Service, Inc., Standard & Poor's Rating Services and A.M. Best Company, and has not been independently verified by the Issuer, the Company or the Placement Agent. The inclusion of this information is not, and should not be construed as, a representation by the Issuer, the Company or the Placement Agent as to its accuracy or completeness or otherwise.

Royal Indemnity Company ("Royal") is an indirect wholly-owned subsidiary of Royal Group, Inc., which is a wholly-owned subsidiary of Royal & SunAlliance USA, Inc. ("Royal & SunAlliance"), which in turn is a subsidiary of Royal & SunAlliance Insurance Group plc (the "Royal Insurance Group"). Royal is a Delaware capital stock insurance company and is the administrator for The Royal Indemnity Pool, which underwrites almost all classes of fire, casualty and marine insurance. All underwriting commitments of each member of The Royal Indemnity Pool are 100% reinsured with the Royal Indemnity Company, which retrocedes to the affiliated companies specified percentage participations of the underlying commitments. Current participations in the pool are as follows: Royal Insurance Company of America, 40%; Globe Indemnity Company, 26%; Royal Indemnity Company, 17%; Safeguard Insurance Company, 10%; and American and Foreign Insurance Company, 7%.

Where You Can Obtain Additional Information About Royal and Royal & SunAlliance

Copies of Royal's 1999 year end audited financial statements prepared in accordance with statutory accounting practices are available, without charge, from Royal. The address of Royal is 9300 Arrowpoint Boulevard, Charlotte, North Carolina 28273-8135. The telephone number is (704) 522-2000.

Financial Information About Royal and Royal & SunAlliance

As of December 31, 1999, Royal had admitted assets of $1,328 million, total liabilities of $752 million, and total capital and surplus of $576 million, determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities. As of March 31, 2000, Royal had admitted assets of $1,284 million (unaudited), total liabilities of $736

-56-

ROY 013167

million (unaudited), and total capital and surplus of $548 million (unaudited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities.

Statutory surplus of Royal & SunAlliance was $2.62 billion and $2.97 billion as of December 31, 1999 and December 31, 1998, respectively.

### Royal & SunAlliance USA, Inc.

| Fiscal Year (ooo's) | 1999 | 1998 | 1997 |
|---|---|---|---|
| Net Premiums Written | $1,785,950 | $1,525,169 | $1,435,735 |
| Statutory Income | $ 399,244 | $ 274,216 | $ 278,053 |
| Statutory Surplus | $2,616,208 | $2,966,165 | $2,756,488 |
| Loss Ratio | 72.4% | 71.1% | 68.5% |
| Expense Ratio | 32.9% | 34.2% | 35.2% |
| Policy Holder Dividend Ratios | 1.0% | 0.7% | 0.3% |
| Combined Ratio | 106.3% | 106.0% | 104.0% |

Financial Strength Ratings of Royal

The Royal Insurance Group, and each of its core insurance subsidiaries, including Royal Indemnity Company, is rated "A+" (Superior) by A.M. Best Company. Royal is rated "A1" by Moody's Investors Service, Inc. and "AA-" by Standard & Poor's Rating Services (Financial Strength Rating, Local Currency). These ratings reflect the respective rating agency's current assessment of the insurance financial strength of Royal and its ability to pay claims on its policies of insurance. Any further explanations as to the significance of the above ratings may be obtained from A.M. Best Company, Moody's Investors Service, Inc. and Standard & Poor's Rating Services.

## DESCRIPTION OF THE CERTIFICATES AND POOLING AGREEMENT

THE FOLLOWING SUMMARIES OF CERTAIN PROVISIONS OF THE CERTIFICATES, THE POOLING AGREEMENT AND OTHER AGREEMENTS DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, ALL OF THE PROVISIONS OF THE CERTIFICATES, THE POOLING AGREEMENT AND SUCH OTHER AGREEMENTS, INCLUDING THE

ROY 013168

PHLEGAL: #1008804 v1 (LM#C011.DOC)

DEFINITIONS THEREIN OF CERTAIN TERMS AND THE EXHIBITS THERETO. WHEREVER NOT OTHERWISE DEFINED, SUCH DEFINITIONS ARE INCORPORATED HEREIN BY REFERENCE.

<u>The Certificates</u>

*General.* The Certificates will be issued under the Pooling Agreement between the Issuer and the Trustee. The Certificates will be non-recourse obligations of the Issuer with a Final Distribution Date of May 20, 2016. However, the actual date on which payment in full may be made on the Certificates may be earlier than the Final Distribution Date due to, among other factors, prepayments of principal on Student Loans and payments received from the Reserve Escrow Account or the Insurance Policy on Defaulted Student Loans. No assurances can be given as to the actual maturity date of the Certificates or on the payment experience of the Student Loans or the Certificates. Interest will be distributed on the Senior Certificates at the Senior Pass Through Rate of 7.174% per annum. The Interest-Only Certificates will be entitled to receive interest on the notional principal balance of the Interest-Only Certificates at the rate of 3.43% per annum. See "– *Principal and Interest*" below. The Senior Certificates will be sold in minimum denominations of $3,000,000 and integral multiples of $1,000,000 in excess thereof.

As of the Closing Date, the Trustee will establish and maintain the Collection Account to which will be deposited for distribution to the Certificateholders all amounts collected on the Student Loans, or from the Liquidity Reserve Account, the Reserve Escrow Account or the Insurance Policy, as set forth in the Pooling Agreement.

Distributions of principal and interest on the Certificates will be made on the Distribution Dates by check mailed to the Certificateholders registered at the address of such Certificateholders appearing on the Certificate register, unless wire instructions are provided, in which case the distributions will be wire transferred. Notice will be mailed to the registered holders of such Senior Certificates not less than five days prior to the Distribution Date on which the final payment of principal on any Senior Certificate is expected to be made.

Distributions of principal and interest on the Certificates will be made by the Trustee as the paying agent for the Issuer out of the Collection Account established under the Pooling Agreement.

*The Lock Box Account and Collection Account.* All amounts collected from the obligors on the Student Loans, commencing with the Cut-Off Date, will be deposited directly into a lock box account established at PNC Bank, National Association (the "Lock Box Bank") in the name of the Issuer (the "Lock Box Account") and invested therein in investments permitted under the Pooling Agreement (U.S. treasury obligations, money market funds, certificates of deposit meeting the criteria set forth in the Pooling Agreement, provided that all investments mature not later than the Record Date, hereinafter referred to as the "Permitted Investments"). Any checks received by the Servicer will be deposited, within one business day, into the Lock Box Account.

-58-

ROY 013169

The cash balances in the Lock Box Account representing collections on the Student Loans during the preceding monthly Collection Period will be wire transferred prior to each Distribution Date directly to a trust account or accounts (collectively, the "Collection Account") to be established by the Trustee for the benefit of the holders of the Certificates. Any funds disbursed from the Lock Box Account may only be transferred to the Collection Account.

In addition to funds transferred from the Lock Box Account, amounts withdrawn from the Liquidity Reserve Account or the Reserve Escrow Account, or received from the Insurance Policy for a Defaulted Student Loan, shall also be deposited into the Collection Account by the Trustee. In addition, the Servicer, may, but need not, advance funds to make up any shortfalls resulting from any delinquent payment due under the Student Loans. The Servicer is under no obligation to make any such advances and will only do so to maintain regular payments to the Certificateholders, assuming there is a high probability of repayment of such advances from the Assets. However, Servicer shall deposit in the Collection Account from its own funds any Simple Interest Shortfall not funded by the Liquidity Reserve Account. Under no circumstances should any advance made by the Servicer be construed to be a guaranty or insurance against any loss under the Certificates or that the Servicer will make any further advances. No assurances can be made that sufficient funds will be available to meet all payments due under the Certificates.

The Trustee will invest the funds in the Collection Account in Permitted Investments.

On or prior to each Distribution Date, amounts in the Collection Account that represent advance payments designated in writing by the Obligor to be held and applied to monthly Student Loan payments due after the Record Date, instead of as an immediate prepayment of principal, will be transferred to a Pay-Ahead Account; and amounts in the Pay-Ahead Account on account of scheduled payments due prior to the Record Date will be transferred from the Pay-Ahead Account into the Collection Account. Amounts in the Collection Account which represent recoveries of delinquent payments funded by the Reserve Escrow Account or the Insurance Policy will be paid directly into the Reserve Escrow Account. In addition, certain other amounts (including late fees and similar collections, Simple Interest Excess and payments on Student Loans no longer part of the Trust estate) will be paid to the party entitled thereto, as provided in the Pooling Agreement. For example, the Simple Interest Excess is payable to the Servicer to compensate it for making advances of Simple Interest Shortfall, with any amount not payable to the Servicer to be deposited into Liquidity Reserve Account.

In the event that there are insufficient funds in the Collection Account to pay accrued and unpaid interest due on the Senior Certificates or, on the Final Distribution Date, the unpaid Senior Certificate Balance, then such deficiency may be recovered under the MBIA Policy, as described herein.

ROY 013170

PHLEGAL: #1008804 v1 (LM#C011.DOC)

On each Distribution Date, the Trustee will apply amounts remaining in the Colléction Account (including amounts drawn from the Liquidity Reserve Account and the Reserve Escrow Account) in accordance with the following Payment Waterfall:

(1)     To the extent of available funds, commencing with the Distribution Date in April, 2001 to the payment of the monthly insurance premium due MBIA;

(2)     To the extent of available funds, to the payment of the Senior Interest Distribution, including any overdue amounts on the Senior Certificates as to which MBIA is subrogated to the extent of payment under the MBIA Policy;

(3)     To the extent of available funds, to the payment of the Interest-Only Distribution (not including overdue interest on the Interest-Only Certificates);

(4)     To the extent of available funds, to the payment of the Principal Distribution;

(5)     To the extent of available Funds, to the payment of overdue interest on the Interest-Only Certificates;

(6)     To the extent of available funds, to the payment of Trustee Fees due the Trustee and to the payment of the Escrow Fees due the Escrow Agent for the respective Distribution Date and any previous Distribution Date for which such fees have not been paid in whole or in part to the extent of such deficiency, which Trustee's Fees and Escrow Fees may not exceed $6,450 per month unless consented to by MBIA, Royal, and the Rating Agencies;

(7)     To the extent of available funds, to the payment of an amount of $6,450 less the amounts paid to the Trustee and Escrow Agent pursuant to (6) above (the "Expense Account Set Aside") deposited to the Expense Account established by the Trustee under the Pooling Agreement (the "Expense Account") for such Distribution Date and any previous Distribution Dates for which such amount was not so deposited in whole or in part to the extent of such deficiency;

(8)     To the extent of available funds, to the payment of additional expenses of the Trustee, as applicable, during any time that Student Loan Servicing LLC is no longer the Servicer and the Trustee is acting as successor Servicer, to the extent that such additional expenses are not covered by the Expense Account; provided that if such additional expenses exceed

-60-

ROY 013171

$10,000 in the aggregate during the term of the Pooling Agreement, any payment to the Trustee for such additional expenses which exceed such $10,000 limit must be approved by MBIA, the Majority Certificateholders and the Rating Agencies;

(9)     To the extent of available funds, to replenish the Liquidity Reserve Account, to the extent of prior payments drawn from the Liquidity Reserve Account and not theretofore repaid, up to the Original Liquidity Reserve Amount;

(10)    To the extent of available funds, to the payment of any advances made by the Servicer not otherwise repaid to the Servicer by its receipt of any Simple Interest Excess;

(11)    To the extent of available funds, to the payment of the Servicing Fee due to the Servicer pursuant to the Pooling Agreement;  and

(12)    To the extent of available funds, for deposit into the Reserve Escrow Account; provided, however, that if there was a Reserve Draw Deficiency for such Distribution Date, then the Reserve Remittance Amount, up to the amount of such Reserve Draw Deficiency, shall be deemed to be received from the Reserve Escrow Account as a payment of principal with respect to the Student Loans (allocated pro rata to any delinquent principal payments under the Student Loans and, after the Experience Account (as defined below) has expired or been exhausted, the entire principal balance of the Defaulted Student Loans for such Distribution Date, not recovered from the Reserve Escrow Account pursuant to the Reserve Escrow Draw Amount), and shall be applied to the payment of the Principal Distribution;

provided, however, in the event that Student Loan Servicing LLC, no longer acts as Servicer and the Trustee or another party unrelated to Student Loan Servicing LLC, succeeds to the duties of Servicer under the Pooling Agreement, payments of amounts due to such successor Servicer as servicing fees shall be paid prior to any other payments listed above.

To the extent any amounts contained in the Collection Account are insufficient to pay all parties in any category of payments listed above, the amounts paid shall be prorated amongst the parties entitled to payments due under such category.

*Non-recourse.* The Certificates will be non-recourse obligations of the Issuer payable solely from the Assets. No recourse may be had by the holders of the Certificates against the Issuer, the Trustee, the Servicer, Royal, the Company or any of the Company's affiliates, or against the stockholders, directors, officers or employees of the Company Members or the other

-61-

ROY 013172

Members of the Company or the Servicer or their affiliates for the payment of principal, interest or additional amounts in respect of the Certificates.

*Assets*. The Assets will consist of a static pool of the Student Loans insured by the Insurance Policy, the Liquidity Reserve Account and the Reserve Escrow Account to the extent available. See "CREDIT ENHANCEMENT".

*Closing*. Proceeds from the sale and issuance of the Senior Certificates will be deposited in the Collection Account maintained with the Trustee for the benefit of the holders of the Certificates and applied substantially to purchase the Student Loans, fund the Liquidity Reserve Account and pay certain expenses. See "USE OF PROCEEDS." The costs of issuance of the Certificates, including initial set up fees due to the Trustee, will also be paid out of the proceeds at closing.

*Principal and Interest*. The holders of the Senior Certificates are entitled to receive monthly Principal Distributions and monthly Senior Interest Distributions.

Each monthly Principal Distribution on the Senior Certificates will be in an amount equal to (w) principal payments and prepayments received on the Student Loans during the applicable Collection Period, (x) principal payments due but not collected on Student Loans that are delinquent but are not yet Defaulted Student Loans (defined as loans 90 days or more delinquent from their respective due dates, applying any payment received after a delinquency to the earliest delinquency), to the extent funded from the Reserve Escrow Account described below, (y) the principal portion of payments received on account of Defaulted Student Loans from the Reserve Escrow Account or from any claims paid by Royal under the Insurance Policy described below, up to the Senior Certificateholder Balance with respect to each such Defaulted Student Loan, and (z) in the event of any repurchase of a Student Loan by SFC or the Company during the applicable Collection Period, based on a breach of their representations and warranties with respect thereto, the Senior Certificateholder Balance with respect to such Student Loan.

The Senior Interest Distribution will be equal to the product of one-twelfth of 7.174% (the "Senior Pass-Through Rate") multiplied by the Senior Certificateholder Balance as of the immediately preceding Record Date (as defined below) (or, if said Distribution Date is the first Distribution Date, it shall be the original Senior Certificateholder Balance) plus the amount of interest previously due but not paid to the Senior Certificateholders, if any (plus interest on such unpaid interest at the Senior Pass-Through Rate).

The term "Senior Certificateholder Balance" means, as to any Student Loan, the balance of the Student Loan as of the Cut-Off Date, less the amount of any Principal Distributions paid to the Senior Certificateholders on account of such Student Loan. The term "Collection Period" means, with respect to any Distribution Date, the calendar month preceding the month in which such Distribution Date occurs; provided, however, that with respect to the first Distribution Date,

-62-

ROY 013173

the Collection Period shall be the period commencing the day after the Cut-Off Date through and including the last day of the calendar month preceding such first Distribution Date.

Distributions of principal and interest will be made on the twentieth (20th) day of each month or, if such date is not a business day, the next succeeding business day (the "Distribution Date"), commencing January 22, 2001, to the holders of record of the Senior Certificates on the last day of the immediately preceding calendar month (the "Record Date"). Interest will be paid on each Distribution Date for the period ended on the preceding Record Date. On the first Distribution Date for the Senior Certificates (i) interest will be paid for the entire month in which the Senior Certificates are issued at the Senior Pass-Through Rate and (ii) all of the principal payments received from the obligors under the Student Loans or from the Insurance Policy or related Reserve Escrow Account for Defaulted Student Loans after November 30, 2000 through the end of the month in which the Senior Certificates are issued.

The Senior Certificates will have a stated maturity of May 20, 2016 (the "Final Distribution Date"). However, the actual date on which payment in full may be made on the Senior Certificates may be earlier than the Final Distribution Date due to, among other factors, prepayments of principal and defaults on the Student Loans covered under the Insurance Policy or the Reserve Escrow Account, as described below, which payments are paid out to the Senior Certificateholders. No assurances can be given as to the actual maturity date of the Senior Certificates or the payment experience of the Student Loans or the Senior Certificates.

The holders of the Interest-Only Certificates will be entitled to receive monthly distributions of interest (the "Interest-Only Distribution") in an amount equal to one-twelfth (1/12) of 3.43% (the "Interest-Only Pass-Through Rate") on the Interest-Only Notional Balance (defined as the Senior Certificateholder Balance, less the amount of the Senior Certificateholder Balance, if any, attributable to Defaulted Student Loans).

The Interest-Only Distribution will be made on each Distribution Date, commencing January 22, 2001, to the holders of record of the Interest-Only Certificates on the preceding Record Date. Interest will be paid on each Distribution Date for the period ended on the preceding Record Date. On the first Distribution Date for the Interest-Only Certificates, interest will be paid at the Interest-Only Pass-Through Rate for the entire month in which the Interest-Only Certificates are issued.

The amount described in the prior two paragraphs is, in effect, an "interest-only strip" of the interest collected on the Student Loans. Prepayments of the Student Loans and Student Loans becoming Defaulted Student Loans will affect the amounts due to the holders of the Interest-Only Certificates.

Book-Entry Registration. The Senior Certificates will be book-entry certificates (the "Book-Entry Certificates") represented by one or more certificates registered in the name of Cede & Co. or any other nominee of DTC ("DTC's Nominee"). While the aggregate principal balance of the

-63-

ROY 013174

Student Loans on the Cut-off Date is $29,999,999.94, the Senior Certificates are being issued to the nearest whole dollar, in the amount of $29,999,999, in order to facilitate the book-entry registration of such Senior Certificates through DTC. References throughout this Memorandum, the Pooling and Servicing Agreement and the related documents and agreements to such amounts, whether stated to include the ninety-four cents or not, shall as to the Senior Certificates be deemed to mean the actual amount of the Senior Certificates as issued, without such ninety-four cents.

DTC is a limited purpose trust company organized under the laws of the State of New York, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York UCC and a "clearing agency" registered pursuant to Section 17A of the Exchange Act. DTC was created to hold securities for its Participants and to facilitate the clearance and settlement of securities transactions between Participants through electronic book entries, thereby eliminating the need for physical movement of certificates. Participants include securities brokers and dealers, banks, trust companies and clearing corporations. Indirect access to the DTC system also is available to others such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Participant, either directly or indirectly ("Indirect Participants").

Investors that are not Participants or Indirect Participants but who desire to purchase, sell or otherwise transfer ownership of, or other interests in, the Book-Entry Certificates may do so only through Participants and Indirect Participants. In addition, Senior Certificateholders will receive all distributions of principal and interest from the Trustee through Participants. Under a book-entry format, Senior Certificateholders may experience some delay in their receipt of payments, since such payments will be forwarded by the Trustee to DTC's Nominee. DTC's Nominee will forward such payments to its Participants, which thereafter will forward them to Indirect Participants or Senior Certificateholders. The only "Senior Certificateholders" (as defined in the Pooling Agreement) will be DTC's Nominee. Senior Certificateholders will not be recognized by the Trustee as Senior Certificateholders, as such term is used in the Pooling Agreement, and Senior Certificateholders will be permitted to exercise the rights of Senior Certificateholders only indirectly through DTC and its Participants.

Under the rules, regulations and procedure creating and affecting DTC and its operations (the "Rules"), DTC is required to make book-entry transfers of the Senior Certificates among Participants on whose behalf its acts with respects to the Senior Certificateholders and to receive and transmit distributions of principal of, and interest on, the Senior Certificates. Participants and Indirect Participants with which Senior Certificateholders have accounts with respect to the Senior Certificates similarly are required to make book-entry transfers and receive and transmit such payments on behalf of their respective Senior Certificateholders. Accordingly, although Senior Certificateholders will not possess Senior Certificates, the Rules provide a mechanism by which Participants will receive payments and will be able to transfer their interest.

-64-

ROY 013175

Because DTC can only act on behalf of Participants, who in turn act on behalf of Indirect Participants and certain banks, the ability of a Senior Certificateholders to pledge Senior Certificates to persons or entities that do not participate in the DTC system, or otherwise act with respect to such Senior Certificates, may be limited due to the lack of a physical certificate for such Senior Certificates.

DTS has advised the Company and the Trustee that it will take any action permitted to be taken by a Senior Certificateholder under the Pooling Agreement only at the direction of one or more Participants to whose accounts with DTC the applicable Senior Certificates are credited.

Except as required by law, none of the Servicer, the Trustee, or the Issuer will have any liability for any aspect of the records relating to or payments made on account of beneficial ownership interests of the Senior Certificates held by DTC's Nominee, or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

_Definitive Certificates_.  The Senior Certificates will be issued in fully registered, certificated form ("Definitive Certificates") to Senior Certificateholders or their respective nominees, rather than to DTC or its nominee, only if (i) DTC or the Company advises the Trustee in writing that DTC is no longer willing or able to discharge properly its responsibilities as depository with respect to such Senior Certificates and the Company or the Trustee is unable to locate a qualified successor, (ii) the Company, at its option, elects to terminate the book-entry system through DTC or (iii) after the occurrence of an Event of Default with respect to such Senior Certificates, the Majority Certificateholders advise the Trustee through DTC in writing that the continuation of a book-entry system through DTC (or a successor thereto) with respect to such Senior Certificates is no longer in the best interest of the Senior Certificateholders.

Upon the occurrence of any event described in the immediately preceding paragraph, the Trustee will be required to notify DTC, which in turn will notify all applicable Senior Certificateholders of a given series through Participants of the availability of Definitive Certificates.  Upon surrender by DTC of the Definitive Certificates representing the corresponding Senior Certificates and receipt of instructions for re-registration, the Trustee will reissue such Senior Certificates as Definitive Certificates to such Senior Certificateholders.

Distribution of principal of, and interest on, such Definitive Certificates will thereafter be made by the Trustee in accordance with the procedures set forth in the Pooling Agreement, directly to holders of Definitive Certificates in whose names the Definitive Certificates were registered at the close of business on the Record Date.  Such distributions will be made by check mailed to the address of such Senior Certificateholder as it appears on the register maintained by the Trustee.  The final payment on any such Definitive Certificates, however, will be made only upon representation and surrender of such Definitive Certificates at the office or agency specified in the notice of final distribution to the applicable Senior Certificateholders.

-65-

ROY 013176

Definitive Certificates will be transferable and exchangeable at the offices of the Trustee or of a registrar named in a notice delivered to Senior Certificateholders of Definitive Certificates. No service charge will be imposed for any registration of transfer or exchange, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge imposed in connection therewith.

*Transfer.* Subject to the limitations on transferability described under "NOTICE TO INVESTORS," the Senior Certificates will be transferable only upon surrender for registration of transfer of any Senior Certificates at the office or agency maintained by the Trustee, as Certificate Registrar. The Trustee shall execute, authenticate and deliver in the name of the designated transferee or transferees, one or more new Senior Certificates in authorized denominations of a like aggregate amount dated the date of authentication by the Trustee or any authenticating agent. At the option of a Senior Certificateholder, Senior Certificates may be exchanged for other Senior Certificates of authorized denominations of a like aggregate amount upon surrender of the Senior Certificates to be exchanged at the office or agency referred to above.

The Trustee shall keep or cause to be kept, at the office or agency maintained pursuant to this paragraph, a Certificate Register in which, subject to such reasonable regulations as it may prescribe, the Trustee shall provide for the registration of Senior Certificates and transfers and exchanges of Senior Certificates as herein provided. The Trustee shall maintain an office or offices or agency or agencies where Senior Certificates may be surrendered for registration of transfer or exchange and where notices and demands to or upon the Trustee in respect of the Senior Certificates may be served. The Trustee initially designates Corporate Trust Office at 6th Street and Marquette Avenue, MAC N9311-161, Minneapolis, MN 55479, Attention: Asset Backed Securities Department as its offices for such purposes. The Trustee or its agent shall give prompt written notice to the Company, MBIA, Royal and the Senior Certificateholders of any change in the location of the Certificate Register or any such office or agency.

Notwithstanding the foregoing, no transfer of a Definitive Certificate shall be made unless the Trustee shall have received an investment letter certifying that the proposed transferee is a QIB (in substantially the form attached hereto as Exhibit D).

Every Senior Certificate presented or surrendered for registration of transfer or exchange shall be accompanied by a written instrument of transfer in form satisfactory to the Trustee duly executed by the Senior Certificateholder or such Senior Certificateholder's attorney duly authorized in writing. Each Senior Certificate surrendered for registration of transfer or exchange shall be canceled and subsequently disposed of by the Trustee in accordance with its customary practice.

No service charge shall be made for any registration of transfer or exchange of the Senior Certificates, but the Trustee may require payment of a sum sufficient to cover any tax or

-66-

ROY 013177

governmental charge that may be imposed in connection with any transfer or exchange of the Senior Certificates.

See "NOTICE TO INVESTORS," "—Book-Entry Registration" and "—Definitive Certificates" for a further description of the restrictions and procedures applicable to transfers of Senior Certificates.

The Pooling Agreement

*The Trustee*. The Trustee of the Pooling Agreement will be Wells Fargo Bank Minnesota, National Association. The Trustee will receive fees of eight basis points (0.08%) per year on the aggregate balance of the Senior Certificates, payable monthly and subject to a monthly minimum fee of $2,000, plus transaction fees associated with the Trustee's role as custodian of the Student Loan Documents and certain other fees as described in "– Servicer's Compensation" below (the "Trustee Fees"). The aggregate amount of Trustee Fees will not exceed $6,450 in any month. The Trustee will also receive certain initial set up fees, and reimbursement for reasonable expenses and costs, as set forth in the Pooling Agreement. Unless the Trustee has taken over as successor Servicer, any costs or expenses must be recovered solely from the Expense Account described herein. During any time that the Trustee is acting as successor Servicer, the Trustee is required to obtain approval for expenses and costs in excess of $10,000 in the aggregate during the term of the Pooling Agreement, to the extent such expenses and costs are not covered by the Expense Account. The Trustee may be terminated or may resign, and a successor Trustee appointed, as provided in the Pooling Agreement.

*Limitation on Business Activities*. The Trustee on behalf of the Issuer will agree that it will not engage in any business, commercial or other activity for profit.

*Servicing*. Pursuant to the Pooling Agreement, Student Loan Servicing LLC is designated as Servicer and is required to perform the servicing obligations as set forth in the Pooling Agreement. The Servicer will serve for an initial 60 day term, and additional 60 day renewal terms thereafter, provided that the Servicer's term will not be renewed if Royal or, in certain circumstances, MBIA, does not deliver notice of renewal by at least the 11th business day prior to the expiration of any such 60 day term. In addition, the Servicer may be terminated if an Event of Default occurs and is continuing, upon the written request of either MBIA or, if MBIA is in default under the MBIA Policy, the Majority Certificateholders, effective immediately.

The Trustee will actively monitor the servicing by the Servicer and will receive weekly information from the Servicer in order to enable the Trustee to take over the servicing in an expedited manner if required. Upon non-renewal or termination of the Servicer, the Trustee will act as Servicer or will designate a new Servicer. Until that time, the Servicer will continue to perform as Servicer. As used in the Pooling Agreement, the term "Servicer" refers to the Servicer or, if the Servicer has been terminated, the Trustee or replacement Servicer, as servicer of the Student Loan thereunder. The Servicer will follow all of the servicing procedures outlined

-67-

ROY 013178

hereinafter. See "– *Servicing and Collection Processes and Procedures*". Currently, the Servicer has had no lawsuits filed against it. If the Trustee is appointed, certain modifications of what constitutes an Event of Default and other obligations of the Trustee as the successor Servicer will occur as set forth in Section 9.3 of the Pooling and Servicing Agreement and the Trustee's compensation as successor Servicer will receive a higher priority of payment.

Pursuant to the Pooling Agreement, the Servicer will agree to perform all services and duties customary to servicing of the Student Loans on behalf of the Issuer, including, without limitation, the following:

(i)    Prepare schedules of repayment for each Student Loan;

(ii)   Collect all payments due under the Student Loans, institute collection proceedings if it, in its sole discretion, deems it worthwhile, follow collection procedures with respect to all Student Loans, process claims for losses under the Insurance Policy and timely file the appropriate monthly notice and claims for losses under the Insurance Policy and maintain records of all payments on the Student Loans;

(iii)  Remit any payments received on each Student Loan to the Lock Box Account on a daily basis (although all payments are to be made to the Lock Box Account directly);

(iv)   Respond to the inquiries and communications from the students regarding their Student Loans;

(v)    Ensure the safekeeping of loan documents delivered to the Servicer relating to the Student Loans in accordance with the procedure that the Servicer has established for such purposes;

(vi)   Furnish the Issuer, Royal, MBIA and each Certificateholder with monthly and quarterly reports of collection, defaults, payments and other data in writing or computer readable form;

(vii)  Provide accounting and reports on the Reserve Escrow Account, the Liquidity Reserve Account and the Collection Account;

(viii) Provide payment and Lock Box processing and procedures; and

(ix)   Provide all other reports, statements, data (both in physical form and computer readable form) and financial statements as set forth in the Pooling Agreement.

-68-

ROY 013179

Pursuant to the Pooling Agreement, the Servicer agrees to indemnify the Trustee and the Issuer for any claim, loss, liability or expense, including reasonable attorneys' fees, that arise out of or relate to the Servicer's acts or omissions with respect to servicing of the Student Loans under the Pooling Agreement or a final determination of liability on the part of the Servicer is established by an arbitrator, court of law or by way of settlement agreed to by the Servicer.

Servicer's Compensation. The Servicer will be entitled to a monthly fee for its services in an amount equal to 2.0% per annum of the then outstanding principal amount of each Outstanding Student Loan (the "Servicing Fee") and all delinquency, default, penalty and similar fees, pursuant to the Student Loans, recovered during the Payment Period, and, to the extent servicing advances have been made for a Simple Interest Shortfall, any Simple Interest Excess in an amount equal to any previously advanced Simple Interest Shortfall. The Servicing Fee is payable monthly. The Trustee will receive $150 per transfer of data from the Servicer to the Trustee and an annual on site examination fee of $3,000, as part of the Trustee's Fees. In addition, the Trustee will receive an initial set up fee, and reimbursement of out-of-pocket expenses associated with its annual on site examination. Unless the Trustee is acting as successor Servicer, any expenses must be recovered from the Expense Account. In the event that the Trustee takes over as Servicer, it will be paid out-of-pocket expenses associated with the transfer of servicing, not to exceed $50,000, and as Servicer will receive the Servicing Fees described above, with a minimum monthly Servicing Fee of $10,000. In addition, the Servicer, may, but need not, advance funds to make up any shortfalls resulting from any delinquent payment due under the Student Loans. The Servicer shall deposit in the Collection Account from its own funds any Simple Interest Shortfall not funded by the Liquidity Reserve Account. As consideration for agreeing to make such advances the Servicer shall receive all late fees and similar charges as set forth in the Student Loans.

Servicing and Collection Processes and Procedures. Subject to applicable law and the terms of the Pooling Agreement and the Student Loans, the Servicer is required to service the Student Loans in accordance with the customary and usual standards and practice employed with respect to the servicing of consumer loans of a nature similar to the Student Loans, which are intended to maximize the timely recovery of principal and interest payments on the Student Loans. The Servicer will send monthly statements to each student each month in which the payments are due on the Student Loans. If a payment is not received by the due date under the Student Loan, the Servicer will contact the student. After the third business day, a written notice of delinquency will be sent to the student and any co-signor. Follow-up contact will be made until payment is received. Contact of references listed in the application may also be instituted. A monthly delinquency report will be sent each month to the Issuer, Royal, MBIA and the Trustee. Failure to meet the foregoing servicing standards will not result in any loss of coverage under the Insurance Policy.

Events of Default. The occurrence of any one or more of the following events shall constitute an event of default under the Pooling Agreement:

ROY 013180

1.    Any failure by the Servicer (i) to make any payment, transfer or deposit or (ii) to give instructions or notice to the Trustee or otherwise be directly responsible for the failure of the Trustee to make a required payment hereunder, in each case on or before the date occurring one business day after the date of such payment, transfer, deposit or drawing or such instruction or notice is required to be made or given, as the case may be, under the terms of the Pooling Agreement, the Insurance Policy or the MBIA Policy, as the case may be;

2.    Any failure by the Servicer to deliver a Servicer report or other documents, tapes or electronic data as required by the Pooling Agreement, and such failure continues for two business days after the earlier of notice to the Servicer or any officer of the Servicer having actual knowledge of such failure;

3.    Any failure on the part of the Servicer duly to observe or perform in any respect any other covenants or agreements of the Servicer set forth in the Pooling Agreement, which failure materially adversely affects the rights of the holders of the Certificates, the Company or the Trustee and which continues unremedied for a period of 30 days after the earlier of (i) the date on which any officer of the Servicer obtains actual knowledge, or reasonably should have known, of any such failure or (ii) the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Trustee, or to the Servicer and the Trustee by the Company, MBIA or any holders of the Certificates;

4.    Any representation, warranty or certification made by the Servicer or the Company in the Pooling Agreement or in any certificate delivered pursuant to the Pooling Agreement shall prove to have been incorrect, which has a material adverse effect on the rights of the Company, or the holders of the Certificates or the Trustee and which continues unremedied for a period of 15 days after the earlier to occur of (i) the date on which written notice of such breach, requiring the same to be remedied, shall have been given to the Servicer by the Trustee, or to the Servicer and the Trustee by the Company, MBIA or any holders of the Certificates or (ii) the date on which any officer of the Servicer obtains actual knowledge, or reasonably should have known, of any such breach;

5.    The Servicer shall consent to the appointment of a custodian, receiver, trustee or liquidator (or other similar official) of itself, or of a substantial part of its property, or shall admit in writing its inability to pay its debts generally as they come due, or a court of competent jurisdiction shall determine that the Servicer is generally not paying its debts as they come due, or the Servicer shall make a general assignment for the benefit of creditors;

6.    The Servicer shall file a voluntary petition in bankruptcy or a voluntary petition or an answer seeking reorganization in a proceeding under any bankruptcy laws (as now or hereafter in effect) or an answer admitting the material allegation of a petition filed against the Servicer in any such proceeding, or the Servicer shall, by voluntary petition, answer or consent, seek relief under the provisions of any now existing or future bankruptcy or other similar law

-70-

ROY 013181

providing for the reorganization or winding up of debtors, or providing for an agreement, composition, extension or adjustment with its creditors;

7.      An order, judgment or decree shall be entered in any proceeding by any court of competent jurisdiction appointing, without the consent (express or legally implied) of the Servicer, a custodian, receiver, trustee or liquidator (or other similar official) of the Servicer or any substantial part of its property, or sequestering any substantial part of its property, and any such order, judgment or decree or appointment or sequestration shall remain in force undismissed, unstayed or unvacated for a period of 60 days after the date of entry thereof;

8.      A petition against the Servicer in a proceeding under applicable bankruptcy laws or other insolvency laws (as now or hereafter in effect) shall be filed and shall not be stayed, withdrawn or dismissed within 60 days thereafter, or if, under the provisions of any law providing for reorganization or winding-up of debtors which may apply to the Servicer, any court of competent jurisdiction shall assume jurisdiction, custody or control of the Servicer, or any substantial part of its property and such jurisdiction, custody or control shall remain in force unrelinquished, unstayed or unterminated for a period of 60 days;

9.      The failure of the Servicer to make one or more payments due with respect to recourse debt or other recourse obligations, which debt or other obligations in the aggregate exceed $250,000, or the occurrence of any condition, the effect of which event or condition is to cause (or permit one or more Persons to cause) more than $250,000 of aggregate recourse debt or other recourse obligations of the Servicer to become due before its (or their) stated maturity or before its (or their) regularly scheduled dates of payment so long as such failure, event or condition shall be continuing and shall not have been waived by the Person or Persons entitled to performance;

10.     The rendering against the Servicer of a final judgment, decree or order for the payment of money in excess of $1,000,000 and the continuance of such judgment, decree or order unsatisfied and in effect for any period of 60 days without a stay of execution;

11.     Failure by the Servicer to deliver an annual accountants servicing report as required by the Pooling Agreement, which failure (except with respect to the reports due April 30, 2001) continues unremedied for a period of 30 days after the earlier of (i) the date on which any officer of the Servicer obtains actual knowledge, or reasonably should have known, of any such failure or (ii) the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Trustee, or to the Servicer and the Trustee by the Company, MBIA or any holders of the Certificates;

12.     Any assignment by the Servicer to a delegate of its duties or rights under the Pooling Agreement, except as specifically permitted under the Pooling Agreement, or any attempt to make such an assignment;

ROY 013182

PHLEGAL: #1008804 v1 (LM#C011.DOC)

13.     Any change of control of Servicer in violation of the covenants set forth in the Pooling Agreement;

14.     The Servicer shall have entered into any agreement, instrument, pledges, obligations or performed any act that results in the creation of Liens (other than leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business; liens securing indebtedness of the Servicer incurred to finance the acquisition of fixed or capital assets, provided that (i) such liens shall be created substantially simultaneously with the acquisition of such fixed or capital assets, (ii) such liens do not at any time encumber any property other than the property financed by such indebtedness, (iii) the amount of indebtedness secured thereby is not increased and (iv) the principal amount of indebtedness secured by any such lien shall at no time exceed 100% of the original purchase price of such property at the time it was acquired; or other liens created in the ordinary course of its business) or other liens created in the ordinary course of its business) or entered into any guarantees (whether resulting in the creation of a Lien or not) the aggregate liability of which exceeds 5% of the Adjusted Tangible Net Worth (defined as tangible net worth, less the sum of receivables and advances due from stockholders or any affiliate of such stockholders, and all investments in affiliates of such stockholders) of the Servicer;

15.     Failure on the part of the Servicer to maintain an Adjusted Tangible Net Worth of at least $1,000,000;

16.     Failure of the Company to repurchase any Student Loans when required pursuant to the Pooling Agreement;

17.     The existence, as of any Distribution Date, of a Deficiency Amount, as defined in the MBIA Policy;

18.     The Servicer shall fail to obtain within 240 days after the closing date, or shall fail at a time thereafter to maintain, a Baker and Associates rating of at least A-; or

19.     The Servicer shall fail to submit claims for Defaulted Student Loans under the Insurance Policy within the time frames required pursuant to the Pooling Agreement.

The foregoing apply if Student Loan Servicing LLC is the Servicer hereunder. If the Trustee becomes the Successor Servicer, then the modifications set forth in Section 9.3 of the Pooling and Servicing Agreement will govern what constitutes on Event of Default and certain other obligations of the Trustee as Successor Servicer.

_Remedies_. If an Event of Default occurs and is continuing, the Trustee, upon the request of MBIA or, if MBIA is in default under the MBIA Policy, the Majority Certificateholders, will, by written notice to the Servicer, terminate all of the rights and obligations of the Servicer under the Pooling Agreement, and the same shall pass to and be vested in, and assumed by, the Trustee.

-72-

ROY 013183

MBIA or the Majority Certificateholders may, with the written consent of MBIA, waive any Event of Default.

No holder of any Certificate will have any right to institute any proceeding with respect to the Pooling Agreement or for any remedy thereunder, unless:

(a)     There is a continuing Event of Default and such Certificateholder has previously given written notice to the Trustee of a continuing Event of Default;

(b)     The Majority Certificateholders shall have made written request to the Trustee to institute proceedings in respect of such Event of Default as Trustee hereunder;

(c)     Such Certificateholder or Certificateholders have offered to the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request; and

(d)     The Trustee has not instituted such proceeding within 30 days of the occurrence of each of  (a), (b) and (c) above.

*Servicer Reports*.  The Servicer will be required to furnish a Servicer Report to the Trustee, Trustee, the Rating Agencies, Royal, MBIA and each Certificateholder five business days prior to each Distribution Date containing certain information with respect to the Student Loans.  In addition, the Servicer will be required to furnish Quarterly and Annual Pool Reports to the Trustee, each Certificateholder, the Company, the Trustee, Royal, MBIA and the Rating Agencies containing such information on a cumulative basis for each quarter and year, as appropriate, accountings for the Reserve Escrow Account and Collection Account, as well as other reports as provided for in the Pooling Agreement.  The reports will be provided to the Trustee in both computer readable form and physical form and to the other recipients in physical form of the reports requested.

*Payments and Collection of Student Loans*.  The Trustee will direct the Obligors of the Student Loans to send all payments due under the Student Loans to the Lock Box Account from and after the first payment date under the Student Loans due after the Closing Date.  The Lock-Box Account and the Collection Account will be maintained and administered as described in the Pooling Agreement, and on each Distribution Date, the Trustee will apply all amounts held in the Collection Account, in the priority set forth in the Pooling Agreement.  See "–The Certificates – *The Lock Box Account and Collection Account*."

Any prepayments of the Student Loans, or recoveries under the Insurance Policy or the Reserve Escrow Account for Defaulted Student Loans, will be treated as prepayments and remitted as principal payments acting as a redemption of the Senior Certificates, proportionately.

-73-

ROY 013184

*Reserve Escrow Account.* As contemplated under the Insurance Policy, a Reserve Escrow Account has been established for the benefit of the Issuer and Royal. See "CREDIT ENHANCEMENT – Reserve Escrow Account and Liquidity Reserve Account."

*Liquidity Reserve Account.* As provided in the Pooling Agreement, the Trustee will establish and maintain a reserve fund (the "Liquidity Reserve Account") for the benefit of the holders of the Certificates, as described under "CREDIT ENHANCEMENT – Reserve Escrow Account and Liquidity Reserve Account."

*MBIA Reserve Account.* As provided in the Pooling Agreement, the Trustee will establish and maintain a reserve fund (the "MBIA Reserve Account") for the benefit of MBIA. The MBIA Reserve Account will be funded out of amounts that would otherwise be distributed to the Company from the Reserve Escrow Account, up to the Required MBIA Reserve Amount. In the event that any Deficiency Amount (as defined in the MBIA Policy) would otherwise exist as of any Distribution Date, such amount will be withdrawn by the Trustee from the MBIA Reserve Account and deposited to the Collection Account to the extent necessary to cure such deficiency, up to the full amount of the MBIA Reserve Account. In addition, the MBIA Reserve Account may be drawn on upon demand by MBIA to cover certain obligations of SFC, the Servicer and the Company to MBIA.

*Modification and Waiver.* Modifications of or amendments to the Pooling Agreement may be made by the Company, the Servicer, the Trustee, and the Trustee, collectively, with the consent of the Majority Certificateholders, Royal and MBIA and notice to the Rating Agencies, to cure any ambiguity, to correct or supplement any provisions in the Pooling Agreement; provided, however, that no such amendment shall (i) increase or reduce in any manner the amount of, or accelerate or delay the timing of, collections of payment on the Student Loans or distributions that shall be required to be made on any Certificate; or (ii) reduce the aforesaid percentage required to consent to any such amendment, without the consent of the Certificateholders of all Certificates then outstanding.

*Termination of Trust.* The Trust and all obligations and responsibilities of the Company, the Servicer, and the Trustee shall terminate upon the later to occur of:

        (i)     the maturity or other liquidation of the last Student Loan (including a repurchase of the Student Loans by the Company as described below) and the disposition of any amounts received upon liquidation of any remaining Student Loans in the Trust, and

        (ii)    payment of all amounts required to be paid to the Certificateholders, the Trustee, Royal and MBIA under the Pooling Agreement, the Insurance Policy, the Insurance Agreement, Indemnification Agreement and the MBIA Policy.

At the time when the Senior Certificateholder Balance is less than 10% of the original Senior Certificateholder Balance, the Company may at its option purchase all of the Student

-74-

ROY 013185

Loans and terminate the Trust, provided all payments required to be made pursuant to clause (ii) above are made in connection therewith.

*Servicer Term; Termination of the Servicer.* The Servicer shall serve for an initial 60 day term, and additional 60 day renewal terms for so long as the Insurer (prior to the occurrence of an MBIA Control Event, as described below) or MBIA (after the occurrence of an MBIA Control Event) shall have delivered, not later than eleven (11) business days prior to the expiration of the then current term, a notice of renewal (a "Servicer Renewal Notice"). An MBIA Control Event is any of the following events or circumstances: (i) the A.M. Best rating of Royal falls below A-; (ii) Royal fails to pay any claim under the Insurance Policy when due; (iii) the Servicer fails to timely submit any claim under the Insurance Policy with respect to any Defaulted Student Loan; (iv) the shadow rating of the Senior Certificates issued by the Rating Agencies falls below A3 or equivalent; or (v) the aggregate principal balance of all Student Loans which have become Defaulted Student Loans, calculated at the time such Student Loans became Defaulted Student Loans, exceeds 30% of the initial aggregate principal balance of all of the Student Loans.

In addition, the Servicer may be terminated if an Event of Default occurs and is continuing, upon the written request of MBIA or, if MBIA is in default under the MBIA Policy, the Majority Certificateholders, effective immediately.

*Notices.* When and as provided in the Pooling Agreement, notice to holders of Certificates will be given in writing and mailed, first-class postage prepaid, overnight courier or facsimile transmission to each affected holders of the Certificates at their addresses as they appear in the Certificate Register.

*Applicable Law.* The Certificates and the Pooling Agreement will be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, except that the powers, obligations, duties and rights of the Trustee shall be governed by the laws of the State of Minnesota and the federal laws of the United States.

*MBIA as Holder.* So long as the MBIA Policy remains in effect with respect to the Senior Certificates and MBIA is not in default of its obligations to make payments thereunder, MBIA shall be deemed to be the owner of all Certificates then outstanding for all purposes, including approval of any amendments or waivers, except for the right to receive payments due under the Certificates.

# CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

The following discussion is a summary of certain anticipated federal income tax consequences of the purchase, disposition and ownership of the Senior Certificates. This summary is based upon the existing provisions of the Internal Revenue Code of 1986, as amended (the "Code"), existing and proposed regulations thereunder, and the current

-75-

ROY 013186

administrative rulings and other courts decisions, all of which are subject to change. There can be no assurances that any changes in the Code, regulations or court cases will not retroactively change the statements made herein. Further, the discussions herein are of a general nature only and are not intended and do not exhaust all possible aspects of federal income taxation that may be relevant to a potential holder of the Certificates based on his or her particular circumstances (including potential application of the alternative minimum tax). Moreover, this summary does not take into account or anticipate any changes in the law, whether by judicial, government or legislative discussion or action, nor does it take into account any state, local or foreign income tax consequences or considerations for any potential investors. No rulings on the federal, state or local tax issues considered relevant to the organization or operation of the Issuer or an investment in the Senior Certificates have been sought or obtained by the Issuer or the Company. The discussion herein is directed solely to Senior Certificateholders that hold the Senior Certificates as capital assets under Code Section 1221 and does not deal with the tax consequences of investors that do not hold the Senior Certificates as capital assets or who are subject to special tax treatment under the federal income tax laws (including without limitation, banks, thrifts, insurance companies, dealers in securities, real estate investment trusts and certain tax exempt organizations). Accordingly, prospective Senior Certificateholders are advised to consult their own tax advisors concerning the federal, state, local, foreign or other tax consequences to them from the purchase, sale and ownership of the Senior Certificates.

<u>Classification of the Issuer as a Grantor Trust</u>

Counsel to the Issuer has advised that, in its opinion, the Issuer will be classified as grantor trust for federal income tax purposes and not as an association taxable as a corporation or a publicly traded partnership. Classification as a grantor trust under Subpart E, Part I of Subchapter J of the Code will cause each Certificateholder to be treated for federal income tax purposes, generally, as the owner of an undivided fractional interest in the Assets of the Issuer and the ordinary income derived therefrom. No regulations, published rulings or judicial decisions discuss the federal income tax treatment of securities with terms substantially similar to those of the Certificates. **Because many of the issues discussed herein are complex and their resolution is uncertain, potential investors are urged to consult their own tax advisors to determine the federal, state and local tax consequences of the purchase, ownership and disposition of the Certificate.**

<u>Income of Senior Certificateholders</u>

Each Senior Certificateholder will be considered to own either (a) an undivided fractional interest in a single debt obligation held by the Issuer and having a principal amount equal to the total stated principal amount of the Student Loans, or (b) an undivided fractional interest in each of the Student Loans and other Assets of the Issuer. In general (subject to the rules described below relating to stripped bonds and original issue discount, and assuming Certificateholders are considered to own an interest in the Student Loans and other Assets of the Issuer), a Certificateholder will be required to include for federal income tax purposes its share of the

-76-

ROY 013187

PHLEGAL:#1006204-v1 (LM#C011.DOC)

income of the Issuer in accordance with its usual method of accounting. Because of stripped interest, original issue discount or premium, the amount includible in the income on account of a Senior Certificate may differ significantly from the amount distributable thereon representing interest on the Student Loans.

In addition, the Senior Certificateholders will be considered to have incurred the expenses of the Issuer and accordingly will be entitled to deduct their proportionate share of any reasonable servicing fees and other expenses paid or incurred by the Issuer. An individual, estate or trust holding a Senior Certificate, directly or through certain pass-through entities, will be allowed a deduction for such reasonable servicing fees and expenses only to the extent that the sum of such reasonable servicing fees and expense and the aggregate of such holder's other miscellaneous itemized deductions exceeds 2% of such holder's adjusted gross income. Further, Certificateholders (other than corporations) subject to the alternative minimum tax may not deduct such reasonable servicing fees and expenses in determining such holder's alternative minimum taxable income. Although it is not entirely clear, it appears that in transactions in which multiple classes of certificates (including for example, the Interest-Only Certificates) are issued, such fees and expenses should be allocated among the classes of certificates using the method that recognizes that each class benefits from the related services. In the absence of statutory or administrative clarification as to the method to be used, it is currently intended to base information returns or reports submitted to the Internal Revenue Service (the "IRS") and Certificateholders on a method that allocates such expenses among classes of the Certificates with respect to each month based on the distributions made to each such class during that month.

The federal income tax treatment of the Senior Certificates will depend on whether they are subject to the "stripped bond" rules of Code Section 1286. The "stripped bond" rules will apply if there is a retained ownership interest that constitutes a stripped coupon or where a stripped certificate is issued as part of the same series. The IRS has announced that an unreasonably high servicing fee retained by a seller or servicer will be treated as a retained ownership interest and constitutes a stripped coupon. Since the Interest-Only Certificates and the Senior Certificates will be issued as part of the same series of certificates, the Issuer believes and will file information returns or reports with the IRS under the assumption that the Senior Certificates will be treated as stripped bonds and the rules of Section 1286 of the Code will apply.

Since the stripped bond rules apply, the Student Loans will be treated as having been issued with "original issue discount" within the meaning of Code Section 1273(a) ("OID"), subject, however, to the discussion below regarding *de minimis* OID. Under the stripped bond rules, unless the *de minimis* OID rules apply, the Senior Certificateholder (whether a cash or accrual method taxpayer) will be required to report OID in respect of the Student Loans calculated under a constant yield method, in accordance with the rules of the Code relating to OID.

-77-

ROY 013188

Subject to the discussion below regarding *de minimis* OID, the OID on the Student Loans attributable to a Senior Certificate will be the excess of such Certificate's stated redemption price over its issue price. Subject to the discussion below regarding certain Senior Certificateholders that may become entitled to receive distributions from the Reserve Escrow Account, the issue price of a Senior Certificate will be equal to the price paid by the purchaser thereof for the Senior Certificate. The stated redemption price of the Senior Certificate will be the sum of all payments to be made on such Certificate, other than "qualified stated interest," if any, (which for this purpose would include the Senior Certificate's share of reasonable servicing fees and other expenses). In general, the amount of such income that accrues in any month would equal the product of such Senior Certificateholder's adjusted basis in such Certificate at the beginning of such month in the yield of such Senior Certificate to its Certificateholder. Such yield would be computed at the rate (assuming monthly compounding) that, if used to discount the Certificateholder's share of future payments on the Student Loans, would cause the present value of those future payments to equal the price at which the holder purchased such Senior Certificate. In computing yield under the stripped bond rules, a Senior Certificateholder's share of future payments on the Student Loans will not include any payments made in respect of any Interest-Only Certificate, but will include such Certificateholder's share of any reasonable servicing fees and other expenses.

As described above in "CREDIT ENHANCEMENT – Reserve Escrow Account and Liquidity Reserve Account," certain Senior Certificateholders may become entitled to receive distributions from the Reserve Escrow Account. Each Senior Certificateholder that is entitled to receive such distributions may be required to allocate a portion of the price paid for its Senior Certificates to the right to receive such distributions. Such Senior Certificateholders are advised to consult their own tax advisors concerning such allocation, its effect on the issue price of its Senior Certificates, as well as the U.S. federal income tax consequences of such Senior Certificateholder's entitlement to receive such distributions.

Code Section 1272(a)(6) requires that (i) a reasonable prepayment rate assumption (the "Prepayment Assumption") be used in computing the accrual of OID and (ii) adjustments be made in the amount and rate of accrual of such OID when the actual prepayment rate differs from the Prepayment Assumption. Section 1272(a)(6)(B)(iii) of the Code requires that the Prepayment Assumption used to calculate OID be determined in the manner prescribed in the Treasury Regulations. To date, no such regulations have been promulgated. The legislative history of the rules regulating OID indicate that the regulations will provide that the assumed prepayment rate must be the rate used by the parties in pricing the particular transaction. No representations may be made with respect to the prepayment rate at which the Student Loans will in fact be prepaid nor whether they will prepay at a rate conforming to the Prepayment Assumption or at any other rate. Moreover, it is not known whether the Prepayment Assumptions will be inconsistent with that required in any future Treasury regulations. Thus, the Prepayment Assumption may have to be adjusted. If the Student Loans prepay at rates faster than those underlying a Prepayment Assumption used in calculating OID, use of such Prepayment Assumption could accelerate a Senior Certificateholder's recognition of income. If,

-78-

ROY 013189

however, the Student Loans prepay at a rate slower that such Prepayment Assumption, in some circumstances the use of the Prepayment Assumption may decelerate a Senior Certificateholder's recognition of income. Each prospective purchaser of the Senior Certificates must make its own decision as to the appropriate Prepayment Assumption to be used in deciding whether or not to purchase the Senior Certificates.

Senior Certificateholders are advised to consult their own tax advisors concerning reporting OID in general and, in particular, whether the Prepayment Assumption used in reporting any OID with respect to the Senior Certificateholder's interest is appropriate. In particular, neither the Issuer, the Company, nor the Servicer make any representations that the Student Loans will in fact prepay at a rate conforming to the Prepayment Assumption or any other rate and the Senior Certificateholders should bear in mind that, all information, returns or reports, even if otherwise accepted as accurate by the IRS, will in any event be accurate only as to the initial Senior Certificateholders, since the Prepayment Assumption will be determined as of the Closing Date.

If the accrued interest to be paid on the first interest Distribution Date is computed with respect to a period that is prior to the Closing Date, a portion of the purchase price paid for a Senior Certificate will reflect such accrued interest. In any such case, information returns to be filed with the IRS and the holder of the Senior Certificates will be based on the position that the portion of the purchase price paid for the interest accrued with respect to the periods prior to the Closing Date is treated as part of the overall cost of such Senior Certificate (and not as a separate asset the cost of which is recovered entirely out of interest received on the first interest Distribution Date) and that portion of the interest paid on the first interest Distribution Date in excess of interest accrued for a number of days corresponding to the number of days from the Closing Date to the first interest Distribution Date should be included in the stated redemption price of such Senior Certificate. However, the OID Regulations provide that such accrued interest may be treated as a separate asset, the cost of which is recovered entirely out of interest paid on the first interest Distribution Date. It is unclear how an election to do so would be made under the OID Regulations and whether such an election could be made unilaterally by a holder of the Senior Certificates. If the interval between the issue date and the first interest Distribution Date on a Senior Certificate is either longer or shorter than the interval between the subsequent interest Distribution Date, all or part of the interest foregone, in the case of the longer interval, and all of the additional interest, in the case of the shorter interval, will be included in the stated redemption price at maturity and tested under the *de minimis* rules described below. The OID Regulations suggest that all interest on a long first period obligation note that is issued with non-*de minimis* OID may be treated as OID. The holders of the Senior Certificates should consult their own tax advisor to determine the issue price and stated redemption price at maturity of a Senior Certificate.

Notwithstanding the general definition of OID, OID on the Student Loans will be considered to be zero if such discount is less than 0.25% of the stated redemption price at maturity of the Senior Certificate multiplied by its weighted average life. For this purpose, the

ROY 013190

PHLEGAL: #1008804 v1 (LM#C01!.DOC)

weighted average life of the Senior Certificates is computed as the sum, for all payments of amounts included in the stated redemption price of such Senior Certificates, of each amount as determined by multiplying (i) the number of complete years (rounding down for partial years) from the issue date until each payment is expected to be made (presumably taking into account the Prepayment Assumption) by (ii) a fraction, the numerator of which is the amount of such payment and the denominator of which is the stated redemption price at maturity of such Senior Certificates.  If OID is treated as zero under this rule, the actual amount of OID must be allocated to the principal distribution on the Senior Certificates and, when such distribution is received, a capital gain equal to the discount allocated to such distribution will be realized.  The OID Regulations also would permit a holder of the Senior Certificates to elect to accrue *de minimis* OID into income on a current yield method.

If OID on the Student Loans is in excess of a *de minimis* amount, the holder of any Senior Certificate must include in ordinary gross income the sum of the "daily portions" of OID for each day during its taxable year on which it held such Senior Certificate, including the purchase date but excluding the disposition date.  In the case of an original holder of a Senior Certificate, the daily portion of OID will be determined as follows.  A calculation will first be made of the portion of the OID that accrued at each "accrual period."  An accrual period is the period that ends on a Distribution Date and begins on the date that immediately follows the preceding accrual period (or in the case of the first accrual period, beginning on the Closing Date).  Because the period from the Closing Date to the first Distribution Date is shorter than the interval between Distribution Dates such a period will constitute a short first accrual period.  The interest distributable to a holder of the Senior Certificates on the first Distribution Date in excess of the interest that accrued during the first short accrual period will not be treated as interest for tax purposes.  Instead, as indicated above (and subject to the election stated above), such amount is included in the stated redemption price at maturity of the Senior Certificates and taken into account in determining the amount of OID (or premium) with respect to the Senior Certificates.  The portion of OID treated as accruing for any accrual period will equal the excess, if any, of (i) the sum of (A) the present value, as of the end of the accrual period of all of the payments remaining to be made on the Senior Certificates as of the end of the future accrual periods and (B) the payments made on such Senior Certificates during the accrual period of amounts included in the stated redemption price at maturity, over (ii) the adjusted issue price of such Senior Certificates at the beginning of the accrual period.  The present value of the remaining payments referred to in the preceding sentence will be calculated based on (i) using a discount rate equal to the original yield to maturity of the Senior Certificates, calculated as of the Closing Date, giving effect to the Prepayment Assumption, (ii) the events (including actual prepayments) that have occurred prior to the end of the accrual period, and (iii) the Prepayment Assumption.  The adjusted issue price of the Senior Certificates at the beginning of any accrual period, will equal the issue price of the Senior Certificates, increased by the aggregate amount of OID with respect to the Senior Certificates that accrued in prior accrual periods and reduced by the amount of any payments made on the Senior Certificates in prior accrual periods that were included in the stated redemption price at maturity.  The OID accruing during any accrual period will then be allocated ratably to each day during the period to determine the daily portion of the OID for each

-80-

ROY 013191

day. The adjusted issue price of the Senior Certificates on any given day is equal to the sum of (x) the adjusted issue price of the Senior Certificates at the beginning of the accrual period during which such day occurs and (y) the daily portions of OID for all days during such accrual period prior to such day.

<u>Premium</u>

A purchaser of the Senior Certificates that purchases any Senior Certificate at a cost (not including accrued qualified stated interest) greater than its remaining stated redemption price at maturity will be considered to have purchased such Senior Certificate at a premium. Such a purchaser will not be required to include in income any remaining OID and may elect, under Section 171(c)(2) of the Code, to treat such premium as "amortizable bond premium." If the holder of such a Senior Certificate makes such an election, the amount of any interest payment that must be included in such Senior Certificateholder's income for each period ending on a Distribution Date will be reduced by the portion of the premium allocable to such period (with a corresponding reduction in such holder's basis) based on such Senior Certificate's yield to maturity. If such election is made by the holder of the Senior Certificates, the election will also apply to all bonds, the interest on which is not excludable from gross income ("fully taxable bonds") held by the holder of the Senior Certificates at the beginning of the first taxable year to which the election applies and to all such fully taxable bonds thereafter acquired by it, and the election may not be revoked without the consent of the IRS. If such an election is not made, (i) such Senior Certificateholder must include the full amount of each interest payment in income as it accrues and (ii) the premium must be allocated to the principal payments on the Senior Certificates and, when each such payment is received, an ordinary loss equal to the premium allocated to such payment will be recognized. Any tax benefit from the premium not previously recognized will be taken into account in computing gain or loss upon the sale or disposition of the Senior Certificates. It is unclear whether a Prepayment Assumption should be used in computing amortization of premium allowable under the Code Section 171. If a premium is not subject to amortization using a Prepayment Assumption, the holder of a Senior Certificate acquired at a premium should recognize the loss, if a Student Loan prepays in full, equal to the difference between the portion of the prepaid principal amount of the Student Loan that is allocable to the Senior Certificate and a portion of the adjusted basis of the Senior Certificate that is allocable to the Student Loan. If a Prepayment Assumption is used to amortize such premium, it appears that such a loss would be unavailable. Instead, a prepayment should be treated as a partial payment of the stated redemption price of the Senior Certificate and accounted for under a method similar to that described for taking account of OID. It is also not clear whether any other adjustments would be required to reflect differences between the Prepayment Assumption and the actual rate of payments.

<u>Sale or Exchange of Senior Certificates</u>

A holder of the Senior Certificates will recognize gain or loss on the sale of his or her Senior Certificates equal to the difference between the amount realized on the sale and his or her

-81-

ROY 013192

adjusted basis in the Senior Certificates. A holder of the Senior Certificates' adjusted basis generally will equal the cost of such Senior Certificates to the holder, increased by any OID and gain in respect of *de minimis* OID included in the Senior Certificateholders' gross income with respect to such Senior Certificates and reduced, but not below zero, by the portion of the adjusted basis of such Senior Certificates allocable to the payments of the amount included in the stated redemption price at maturity of such Senior Certificates previously received by the seller of such Senior Certificates and by any amortized premium. Except as provided in Section 582(c) of the Code, generally any such gain or loss will be capital gain or loss provided that such Senior Certificates are held as a "capital asset" (generally, property held for investment) within the meaning of Section 1221 of the Code.

Reporting and Backup Withholding

Reporting of interest income, including any OID, with respect to the Senior Certificates, will be required annually, and may be required more frequently under Treasury regulations. These information reports generally are required to be sent to individuals holders of the Senior Certificates and the IRS. Any holders of the Senior Certificates that are corporations, trusts, securities dealers and certain other non-individuals will be provided interest and OID income information and the information set forth in the following paragraphs upon request in accordance with the requirements of the applicable Treasury regulations.

Payments of interest and principal, as well as payment of proceeds from the sale of the Senior Certificates, to holders of the Senior Certificates who are not exempt recipients may be subject to the backup withholding tax under Section 3406 of the Code at a rate of 31% if the recipient of such payments fails to furnish to the payor certain information, including their taxpayer identification numbers, to the Trustee, its agent or the broker who effected the sale of the Senior Certificates or otherwise fails to establish an exemption from such tax. The amounts deducted and withheld from a distribution to a holder of the Senior Certificates would be allowed as a credit against such recipient's federal income tax. Furthermore, certain penalties may be imposed by the IRS on a holder of the Senior Certificates who is required to supply information but who does not do so in the proper manner.

## STATE AND LOCAL TAX CONSIDERATIONS

In addition to the federal income tax consequences described in "Certain Federal Income Tax Consequences," potential investors should consider the state and local income tax consequences of the acquisition, ownership and disposition of the Senior Certificates. State and local income tax laws may differ substantially from the corresponding federal law, and this discussion does not purport to describe any aspect of the income tax laws of any state. Therefore, potential investors should consult their own tax advisors with respect to the various state and local and foreign tax consequences of an investment in the Senior Certificates.

-82-

ROY 013193

## FOREIGN INVESTORS AND EXEMPT ORGANIZATIONS

The Senior Certificates are not intended to be sold to: (1) except as described in "CERTAIN ERISA CONSIDERATIONS" below, benefit plans subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA") ("Plans") and other entities exempt from tax under the Code ("Exempt Organizations") or (2) non-resident aliens, foreign corporations and other foreign entities ("foreign investors"). Moreover, the tax discussion in this Memorandum is limited to United States investors only and does not address the tax consequences to foreign investors. **EXEMPT ORGANIZATIONS AND FOREIGN INVESTORS ARE URGED TO CONSULT WITH THEIR OWN ADVISORS BEFORE INVESTING IN THE SENIOR CERTIFICATES.**

## CERTAIN ERISA CONSIDERATIONS

Except as described below, the Senior Certificates may not be purchased by any "employee benefit plan" within the meaning of Section 3(3) of ERISA (whether or not subject to ERISA, and including, without limitation, foreign or government plans), by any "plan" described in Section 4975(e)(1) of the Code, or any entity whose underlying assets are deemed to include plan assets by reason of an employee benefit plan's or other plan's investment in such entity (each, a "Benefit Plan Investor").

Section 406 of ERISA and Section 4975 of the Code prohibit plans subject to ERISA or Section 4975 of the Code ("Plans") from engaging in certain transactions involving "plan assets" with persons that are "parties in interest" under ERISA or "disqualified persons" under the Code with respect to the Plan. A violation of these "prohibited transaction" rules may generate excise tax and other liabilities under ERISA and the Code for such person. Certain transactions involving the issuer of the Senior Certificates (the "Issuer") might be deemed to constitute prohibited transactions under ERISA and the Code with respect to a Plan that purchased Senior Certificates if assets of the Issuer were deemed to be assets of the Plan. ERISA also imposes certain duties on persons who are fiduciaries of Plans subject to ERISA ("ERISA Plans") and prohibits certain transactions between an ERISA Plan and "parties in interest" with respect to such ERISA Plans. Under ERISA, any Person who exercises any authority or control respecting the management or disposition of the assets of an ERISA Plan is considered to be a fiduciary of such ERISA Plan (subject to certain exceptions not here relevant).

Under a regulation issued by the United States Department of Labor (the "Regulation"), the assets of the Issuer would be treated as plan assets of a Plan for the purposes of ERISA and the Code only if the Plan acquired an "equity interest" in the Issuer and none of the exceptions contained in the Regulation was applicable. An equity interest is defined under the Regulation as an interest other than an instrument which is treated as indebtedness under applicable local law and which has no substantial equity features.

-83-

ROY 013194

PHLEGAL:#1D08804-v1 (LM#C011.DOC)

The Senior Certificates are unlikely to be treated as indebtedness for purposes of the Regulation. Under one exception to the Regulation, however, the assets of the Issuer will not be treated as Plan assets if participation in the Issuer by Benefit Plan Investors is not "significant." Benefit Plan Investor participation will not be "significant" for purposes of the Regulation if less than 25% of each class of equity interests is held by Benefit Plan Investors (excluding interests held by persons (other than Benefit Plan Investors) that have discretionary authority or control with respect to the assets of Issuer, or who provide investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a Person (each, a "Controlling Person")). The Department of Labor has taken the position that for purposes of determining whether equity participation in an entity is "significant" for purposes of the Regulation, only the proportion of an insurance company general account's investment that represents Benefit Plan Investor assets should be taken into account.

Accordingly, the Senior Certificates may not be purchased by or transferred to, on behalf of or using the assets of any Benefit Plan Investor (including an insurance company general account, except as provided below) and each purchaser of the Senior Certificates will be deemed to represent and warrant that, except as provided below, no portion of the assets it uses to acquire Senior Certificates constitutes assets of any Benefit Plan Investor.

However, an insurance company investor will be permitted to acquire an interest in the Senior Certificates with assets from its general account if it represents, warrants and covenants that at the time of acquisition and throughout its holding of the Senior Certificates, (A) it is not a Controlling Person and (B) each of the accounts to which the Senior Certificates are allocated by such insurance company investor is an insurance company general account (i) that is eligible for and meets the requirements of Department of Labor Prohibited Transaction Class Exemption 95-60 and (ii) of which less than 25% of the assets are (or represent) assets of a Benefit Plan Investor. No Senior Certificates may be transferred to a Benefit Plan Investor or an entity using Benefit Plan Investor assets, except for insurance company general accounts meeting the requirements discussed above. Each investor in a Senior Certificate will be deemed to represent, warrant and covenant that it will not sell, pledge or otherwise transfer such Senior Certificate in violation of the foregoing.

## CERTIFICATE RATINGS

It is a condition of issuance of the Senior Certificates that they be rated "Aaa" by Moody's and "AAA" by Fitch. The Rating Agencies issue investment grade ratings ranging from "Aaa" to "Baa" (Moody's) and "AAA" to "BBB" (Fitch) to designate the relative investment qualities of this type of security. "Aaa" or "AAA" is the highest rating that either of the Rating Agencies assigns to obligations similar to the Senior Certificates.

Each Rating Agency's rating of the Senior Certificates addresses the likelihood of the receipt by the Senior Certificateholders of payments required under the Pooling Agreement.

ROY 013195

PHLEGAL: #1008804 v1 (LM#C01!.DOC)

Each Rating Agency's rating takes into consideration solely the credit quality of MBIA. An "Aaa" or "AAA" rating on the Senior Certificates does not, however, constitute a statement regarding frequency of prepayments on the Student Loans.

The rating of "Aaa" by Moody's and "AAA" by Fitch assigned to the Senior Certificates also addresses the likelihood of the receipt by Senior Certificateholders of all distributions to which such Senior Certificateholders are entitled. The ratings assigned to collateralized student loan pools do not represent any assessment of the likelihood or rate of principal prepayments. The ratings do not address the possibility that Senior Certificateholders might suffer a lower than anticipated yield or that they may fail to recoup their initial investment. See "CERTAIN YIELD AND PREPAYMENT CONSIDERATIONS."

A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization. Each security rating should be independently evaluated from any other security rating. The ratings on the Senior Certificates should be evaluated independently from similar ratings on other types of securities.

## PRIVATE PLACEMENT

Subject to the terms and conditions set forth in the placement agreement to be dated on or about December 18, 2000 (the "Placement Agreement"), among the Company, SFC and the Placement Agent, the Placement Agent will use its best efforts to place the Senior Certificates on an "all-or-nothing" basis. The Placement Agent has advised the Company that it proposes to privately place the Senior Certificates with a limited number of QIBs in transactions not required to be registered under the Securities Act. Such investors may be required to confirm in writing their eligibility as a QIB to purchase the Senior Certificates to be acquired by them. The Company and SFC have agreed to indemnify the Placement Agent against certain liabilities, including liabilities under the Securities Act, or to contribute payments that the Placement Agent may be required to make in respect thereof. The Senior Certificates have not been, and will not be, registered under the Securities Act and may not be offered or sold except as described under "DESCRIPTION OF THE CERTIFICATES AND POOLING AGREEMENT -- The Certificates — *Book Entry Registration*," "— *Definitive Certificates*" and "—*Transfer*," and "NOTICE TO INVESTORS."

Prior to the offering contemplated hereby, there has been no active market for the Senior Certificates and the Placement Agent has no intent to make a market in the Senior Certificates. Accordingly, no assurance can be given as to the liquidity or trading market for the Senior Certificates.

The Placement Agent (or affiliates thereof) have performed various investment banking, commercial banking, lending and other services for affiliates of the Issuer, the Company or SFC

ROY 013196

in the past, and may do so from time to time in the future. In addition, a commercial paper issuer administered by an affiliate of the Placement Agent has extended a warehouse loan facility to an affiliate of the Issuer. A portion of the Student Loans purchased by the Company from SFC will be acquired from such Issuer affiliate, which will then use the proceeds from such purchase to pay some or all of the outstanding amount of such warehouse loan facility. Accordingly, such commercial paper issuer that has that warehouse loan facility will receive a portion of the net proceeds of the offering of the Senior Certificates. See "USE OF PROCEEDS."

## LEGALITY OF THE SENIOR CERTIFICATES

The legality of the Senior Certificates will be passed upon for the Issuer by the law firm of Pepper Hamilton LLP, 3000 Two Logan Square, Eighteenth and Arch Streets, Philadelphia, Pennsylvania 19103-2799, and by Minnesota counsel to the Trustee.

## ADDITIONAL INFORMATION

Each person receiving this Memorandum acknowledges that such person has been afforded an opportunity to request from the Issuer and the Company, and has received and reviewed, all additional information considered by it to be necessary to verify the accuracy and completeness of the information herein.

The Company will allow qualified investors to which a copy of this Memorandum is delivered, upon reasonable advance notice, to inspect at the Company's principal office certain documents as hereinafter identified. Requests should be directed to the Company at its principal office, 5 Radnor Corporate Center, Suite 501, 100 Matsonford Road, Radnor, Pennsylvania 19087 (610) 964-9200). The following documents (or forms thereof) are included as those available.

1. Pooling and Servicing Agreement; and
2. Organizational documents of the Company.

The Company will furnish, upon the request of any purchaser of the Senior Certificates or of any beneficial owner therein, such information as is specified in paragraph (d)(4) of Rule 144A under the Securities Act (i) to such purchaser or beneficial owner, (ii) to a prospective purchaser of such Senior Certificates or interest therein who is a QIB designated by such owner or beneficial owner, or (iii) to the Trustee for delivery to such purchaser, beneficial owner or prospective purchaser, in order to permit compliance by such purchaser or beneficial owner with Rule 144A in connection with the resale of such Senior Certificates or beneficial interest therein by such purchaser or beneficial owner in reliance on Rule 144A unless, at the time of such request, the Issuer is subject to the reporting requirements of Section 13 or 15(d) of the United States Securities Exchange Act of 1934, as amended.

ROY 013197

PHLEGAL: #1008804 v1 (LM#C01!.DOC)