IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROYAL INDEMNITY COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) C.A. No. 05-165-JJF |
| PEPPER HAMILTON LLP, W. RODERICK | ) |
| GAGNÉ, FREED MAXICK & BATTAGLIA | ) **REDACTED** |
| CPAs PC, MCGLADREY & PULLEN, LLP, | ) **PUBLIC VERSION** |
| MICHAEL AQUINO and FREED MAXICK | ) |
| SACHS & MURPHY, P.C., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**ROYAL INDEMNITY COMPANY'S MEMORANDUM
IN OPPOSITION TO MCGLADREY & PULLEN, LLP'S
MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS**

Royal Indemnity Company ("RIC") hereby submits its memorandum in opposition to the

motion of McGladrey & Pullen, LLP ("McGladrey") to compel the production of documents in

the possession of non-party Royal & SunAlliance Insurance Group plc ("RSA plc"). In

opposition to the motion, RIC states the following:

**Introduction**

McGladrey asks this Court to compel RIC to produce unspecified documents that might

be in the possession of RSA plc, the ultimate parent of RIC located in London, England. The

relief sought by McGladrey is not warranted. A many-steps removed subsidiary may be

compelled to produce documents in the possession of its ultimate parent only, in the words of

this Court, in "rare circumstances." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l,*

*Inc.*, 233 F.R.D. 143, 145 (D. Del. 2005) (Farnan, .J.) (not cited in McGladrey's moving papers).

No such circumstances exist here, particularly because McGladrey cannot prove that RIC has the

"legal right to obtain the documents required on demand." *Power Integrations*, 233 F.R.D. at 145. Indeed, McGladrey makes no effort to establish that RIC, just one of over 70 indirect subsidiaries of RSA plc, has any legal ability to require RSA plc to hand over any documents. McGladrey cannot make this showing because a "subsidiary, by definition, does not control its parent corporation." *Id.*

This case presents no reasons to move beyond the dispositive import of this Court's decision that a subsidiary like RIC does not control its ultimate parent, RSA plc. No factors exist here that would permit McGladrey to ignore RIC's corporate distinctions and compel RIC to produce documents in the possession of RSA plc. After all, RIC and RSA plc are not alter egos and McGladrey does not suggest otherwise. RSA plc did not directly participate in any of the SFC insurance transactions; indeed, nobody from RSA plc communicated with any of the other parties involved in the transactions. RSA plc will receive no benefits from this litigation beyond what any parent corporation receives when a subsidiary prevails in a lawsuit: its ownership interest in the subsidiary will be worth more. That interest, certainly, is not an indicia of control by RIC.

Unable to meet the stringent requirements for obtaining the rare relief it requests, McGladrey instead stretches the facts and authorities, and relies on case holdings that this Court has expressly rejected, to contend that RIC should produce RSA plc's documents because (a) RIC allegedly has the "practical ability" to obtain documents from RSA plc, if it simply were to request them; (b) RSA plc and RIC share common business purposes and products; and (c) RSA plc knew about the Student Finance Corporation ("SFC") transactions, received financial reporting about them, and, (McGladrey wrongly claims) maybe even gave its approval to RIC to write the insurance.

This Court has rejected the "practical ability" test twice in the last year – in opinions that McGladrey fails to mention in its brief. *Inline Connection Corp. v. AOL Time Warner Inc.*, No. C A 02-272-MPT, 2006 WL 2864586, at *2-3 (D. Del. Oct. 5, 2006) (attached as exhibit 1); *Power Integrations*, 233 F.R.D. 143. The other factors McGladrey advances have not been adopted as the test in this District and, indeed, would render this District's test for production virtually meaningless. If a parent's knowledge that a subsidiary was transacting business, or sharing a business purpose with a subsidiary, justified veil piercing for Rule 34 purposes, then every prudent and informed parent corporation would fail the test. Prudent parent corporations monitor the performance of the companies they own. They review the financial performance of their subsidiaries' transactions. They request and receive information on the transactions being pursued by the subsidiary. These are things that owners of businesses like to know and should know; but it is nonsensical to suggest that they are proof that a subsidiary business controls its owner.

It is ironic that McGladrey asks this Court to ignore the typical conclusion that documents in the possession of an ultimate parent corporation are not within the control of an indirect subsidiary, when McGladrey's own motion reflects that McGladrey does not need these documents and that RIC has appropriately fulfilled its discovery obligations. RIC has already produced over 250,000 pages of documents to McGladrey that were in RIC's possession, custody or control. These documents include communications between RIC and RSA plc with respect to SFC, which McGladrey is already using to press its (erroneous) view of RIC's conduct. McGladrey is entitled to nothing more and its motion to compel should be denied.

## BACKGROUND FACTS

### A.     RSA plc Is A Distant Corporate Relative Of RIC, Not Its Direct Parent

RSA plc is not RIC's direct parent.  Instead, to borrow a term from genealogy, RSA plc is

RIC's eighth great-grandparent.  All of the following companies stand between RIC and RSA

plc:

- Royal Group, Inc., a Delaware company, and the owner of RIC.

- Royal & SunAlliance USA, Inc., a Delaware company and the owner of Royal Group, Inc.

- Arrowpoint General Partnership, a Delaware partnership and the owner of Royal & SunAlliance USA, Inc.

- RSA Overseas Holdings (No. 2), an Ireland-based company and the owner of 90% of Arrowpoint General Partnership.

- RSA Overseas Holdings (No. 1), an Ireland-based company that owns RSA Overseas Holdings (No. 2) and 10% of Arrowpoint General Partnership.

- Globe Insurance Company, Ltd., a UK-based company and the owner of RSA Overseas Holdings (No. 1) and RSA Overseas Holdings (No. 2).

- Royal International Insurance Holdings, Ltd., a UK-based company and the owner of Globe Insurance Company, Ltd.

- Royal & SunAlliance Insurance plc, the owner of Royal International Insurance Holdings, Ltd.

- Royal Insurance Holdings plc, a UK-based company and the owner of Royal & SunAlliance Insurance plc.

- Royal & SunAlliance Insurance Group, plc (or for the purposes of this motion "RSA plc"), the owner of Royal Insurance Holdings plc, and the party from whom McGladrey would have the Court compel documents.

(Affidavit of Linda Pettigrew, dated November 15, 2006 ("Pettigrew Aff.") at ¶ 4).  Ten

corporate generations separate RIC from its alleged "parent" RSA plc.

RIC and RSA plc are entirely independent of one another.  They are separately

incorporated in different countries.  (Pettigrew Aff. at ¶¶ 2, 3 & 5).  Each has its own board of

directors.  (*Id.* at ¶ 5).  No member of RIC's board of directors is also a member of the board of

RSA plc, or vice versa. (*Id.*). None of RSA plc's officers are also officers of RIC. (*Id.*). None of RIC's employees are employed by RSA plc. (*Id.*).

RIC and RSA plc are separate legal entities, separately incorporated and maintain separate places of business on separate continents. RIC is a Delaware capital stock insurance company with its principal place of business in Charlotte, North Carolina. (Pettigrew Aff. at ¶ 2). RSA plc is a British public limited company with its principal place of business in London, England. (*Id.* at ¶ 3). RSA plc has more than 70 direct and indirect subsidiaries operating in at least 27 countries. (Memorandum in Support of McGladrey's Motion to Compel Plaintiff's Production of Documents ("McGladrey mem.") (D.I. 295), exhibit 3 at 95). While the operations of the subsidiaries, including RIC, are consolidated by RSA plc for financial reporting purposes, they remain separate legal entities, operating in different markets, offering different products and targeting different customers. (*See id.*, ex. 2 at 10-13).

RSA plc is not a party to this action. If RIC prevails here, RSA plc's only benefit will be the extent to which, if at all, that value of its shares of those subsidiaries that own RIC is enhanced. Conversely, should RIC fail to prevail in this action, RSA plc's shares in its subsidiaries might be worth less – the same loss any owner of an insurance company would suffer if that company must pay fraudulent claims without having redress against the fraudfeasors. RSA plc is not liable on the credit risk insurance policies issued to SFC, will not be paying claims made on those policies, and has not reinsured those policies. RSA plc did not benefit directly from the underlying insurance transactions with SFC. The premiums were paid to RIC, not to RSA plc.

By the end of this year, it is unlikely that RSA plc will still be related to RIC at all. A transaction is under way for the sale of RIC that is scheduled to close by year's end. (Pettigrew Aff. at ¶ 6). To be sure, payments of the purchase price will be made in the future out of income

earned through the operations of the successor to RIC. But that is a common arrangement under purchase agreements where the proceeds of the purchase do not immediately change hands. The law of contracts would be turned on its head if this ordinary contractual arrangement were deemed sufficient to conclude that the purchased company (RIC) somehow "controls" its seller while payments are still being made on the purchase – much less that it somehow controls the seller's ultimate parent, as McGladrey asks the Court to find here.

**B.    RSA plc Does Not Supervise The Daily Operations Of RIC And Does Not Decide The Specific Risks That RIC Underwrites**

RSA plc does not supervise or participate in the day-to-day business activities of its numerous indirect subsidiaries, including RIC. Indeed, there would be no practical way for RSA plc to actively participate in and supervise the affairs of more than 70 subsidiaries. Instead and unsurprisingly, RSA plc sets high-level operating principles, policies and goals, and leaves it to its subsidiaries to determine how to implement them. As McGladrey itself admits, while RSA plc sets risk "strategies," RIC is "responsible for setting its own policies and procedures." (McGladrey mem. at 12). RIC decides which transactions to pursue, the underwriting standards to employ, how to conduct due diligence, and what pricing structure to use. (McGladrey mem. exs. 2 & 3). RIC handles the negotiation of its transactions and communicates directly with customers. (*Id.*). RSA plc does not identify specific business transactions for its subsidiaries to pursue, does not negotiate or underwrite those transactions, and does not participate in the day-to-day monitoring or performance of them. (*Id.*). RSA plc organizes its over 70 subsidiaries into regions, monitors their financial performance, reports that performance in consolidated financials, and sets macro-level strategies and models for them to follow. (*Id.*). But it does not control or participate in their day-to-day activities.

C.     **RSA plc Did Not "Participate" In The SFC Transactions**

Consistent with the operating principles outlined above, RSA plc did not "participate" in any meaningful way in RIC's issuance of credit risk insurance policies to SFC.  RSA plc's involvement was limited to receiving reports on the general nature of the transactions and their ongoing financial performance, and sharing information about RIC's credit enhancement business with Standard & Poors.  (Affidavit of William J. Hibberd, dated November 15, 2006 ("Hibberd Aff.") at ¶¶ 3-6).

1.     **The SFC Business Opportunity Came To RIC And Was Pursued By RIC, Not RSA plc**

In 1998, a broker approached RIC, not RSA plc, with the opportunity to provide credit risk insurance to SFC.  (Hibberd Aff. at ¶ 3).  RIC did not ask RSA plc for permission to explore the opportunity, but rather began due diligence on its own.  (*Id.* at ¶¶ 3-4).  RIC performed the due diligence on the transactions without the assistance of RSA plc.  (*Id.*).  RIC met with and talked to SFC's employees, lawyers, investment bankers and other representatives, and negotiated the language and structure of the policies.  (*Id.*).  RIC modeled the transactions on its own, explored the past performance history of SFC on its own, and communicated with SFC and its agents and representatives on its own.  (*Id.* at ¶¶ 4-6).

RSA plc had no involvement in these activities.  RSA plc never talked to a single SFC representative or to the other parties to the SFC warehouse or securitization transactions.  Unsurprisingly, McGladrey does not proffer a single document showing that RSA plc even knew that RIC was pursuing the SFC business opportunity in 1998.  RSA plc was not involved in any way in negotiating or writing the SFC business.  (*Id.* at ¶¶ 3-6).

2.     **Only RIC, Not RSA plc, Is Obligated Under The Insurance Policies**

RIC issued all of the insurance policies at issue in this case.  (*See, e.g.*, the insurance policy (which is representative of all the SFC policies) that is attached as exhibit A to the

Transmittal Declaration of Kenneth J. Pfaehler, dated November 16, 2006 ("Trans. decl.")).  RIC

is listed as the insurer in each policy and is liable for paying any valid claims properly made

under them.  RSA plc is not even mentioned in the insurance policies, and is certainly not liable

to pay claims made on them.

The transactional documents accompanying the SFC securitizations reflect that RIC, not

RSA plc, is the insurer of SFC student loan defaults.  For example, the Private Placement

Memoranda released with the 2000-4 securitization states:  "THE INSURANCE POLICY.  The

Company will be named as the insured under a Credit Risk Insurance Policy Number

RST293334 *issued by Royal Indemnity Company*."  (Trans. decl., ex. B at ROY 013127

(emphasis added)).  The same document emphasizes that the parties to the transactions believed

that Royal Indemnity Company was insuring against student loan defaults, not RSA plc:

"DESCRIPTION OF ROYAL.  Royal Indemnity Company is a subsidiary of the Royal &

SunAlliance USA Insurance Group..."[1]  The parties' understanding is confirmed by the payment

of all premiums to RIC, the filing of all policy claims with RIC, the delivery of all monthly

servicer reports and company financial information to RIC, and the direction of all

communications to RIC, not RSA plc.  (Hibberd Aff. at ¶¶ 3-6).

### 3. RSA plc's Involvement In The SFC Transactions Was Limited To Receiving Reports On The Transactions And Channeling Information To Standard & Poors

McGladrey emphasizes that RSA plc received information about the SFC transactions

from RIC.  But RSA plc's involvement was purely internal.  It did not deal with the other parties

to the SFC transactions, was not involved in negotiations, and was not involved in performing

---

[1] McGladrey makes the unsupported and incorrect assertion that the securitizations were rated in accordance with RSA plc's credit rating, not RIC's.  In reality, because RIC's rating was not sufficient to obtain the required "Aaa" rating on the securitizations from Moody's, the MBIA certificate guaranty policies were needed.  *MBIA's* credit rating was the sole rating considered in rating these securitizations.  As the private placement memoranda all explained, it was "a condition of issuance of the Senior Certificates that they be rated  "Aaa" by Moody's and "AAA" by Fitch [...] Each Rating Agency's rating takes into consideration *solely* the credit quality of MBIA."  (Trans. decl. ex. B at ROY 013195-96) (emphasis added).

the policies. That RSA plc received internal reports on the nature and performance of the SFC transactions establishes only that RSA plc knew about the transactions and had a proper interest in the financial performance of its subsidiary. Knowledge is not "participation."

McGladrey mischaracterizes and exaggerates the evidentiary crumbs it offers to support its "participation" contention. For instance:

(a) McGladrey claims that exhibit 6 to its motion is a "plan" for SFC that was provided to RSA plc. Exhibit 6 is actually a budget for the entire financial enhancements business unit for 1999, and is not specifically focused on SFC. There is nothing unusual about a parent company receiving a budget from its subsidiary and it certainly does not suggest that the parent is participating in its subsidiary's business transactions.

(b) McGladrey cites exhibit 6, and several other exhibits, for the proposition that RIC was required to provide RSA plc with "plans" on the SFC transactions. In reality, the cited exhibits show that RIC provided to RSA plc periodic reporting on all of its transactions. Again, this is not surprising, as a prudent owner of a business can be expected to monitor its financial performance.

(c) McGladrey claims that RSA plc "commonly" discussed the SFC transactions in face-to-face meetings and otherwise. McGladrey proffers but one document to support this contention; that document reflects only one discussion about "financial enhancements" generally and does not even mention SFC.

(d) McGladrey contends that RSA plc delegated underwriting authority to RIC employees to issue the SFC policies. That is not accurate. When the SFC policies were written, authority for credit enhancement deals was delegated by RIC's board. (Pettitgrew Aff. at ¶ 7). The document cited by McGladrey in support of its assertion, Exhibit 2, describes the present-day delegation system, which was not used in the period 1998-2001.

Most of the information that RIC actually provided to RSA plc was limited to periodic financial reports describing how all of RIC's various credit enhancement transactions, including SFC, were performing. (*See generally, e.g.,* McGladrey exs. 2, 3, 6 & 10). It is not surprising that RSA plc would want that information. RSA plc releases consolidated financial statements that include the performance of all of its over 70 subsidiaries; it needs to know how RIC is performing financially. Indeed, McGladrey's documents show that RSA plc was receiving

similar financial information on all of RIC's transactions, not just the SFC deals. It strains credulity to believe that RSA plc somehow was "participating" in every single one of those deals. It would not have had the time or resources to do so.

As McGladrey points out, RSA plc received substantially more information about all of RIC's credit enhancement deals, including SFC, after Standard & Poors began inquiring about RIC's credit enhancement business. But RSA plc's role with respect to Standard & Poors was simply to convey information about *all* of RIC's credit enhancement deals to Standard & Poors. Serving as a conduit for information requested by a rating agency did not transform RSA plc into a "participant" in the SFC transactions or an issuer of the SFC insurance policies. Nor does it mean, as McGladrey contends, that RSA plc interacted with any of the parties to the SFC transactions, as S&P was not a party to the transactions.

    **4. RSA plc Did Not Approve The Issuance Of The SFC Policies Or Delegate Underwriting Authority To RIC To Issue Them**

Finally, McGladrey cites two documents to contend that RSA plc "approved" RIC to issue the SFC deals. But this simply is not the case. RIC never sought RSA plc's approval to issue the SFC policies and RSA plc never gave it. (Hibberd Aff. at ¶ 6). RIC wrote the policies on its own.

General underwriting authority to issue credit enhancement insurance policies was given by RIC's board of directors. (Pettigrew Aff. at ¶ 7). RIC's Senior Leadership Team gave Mr. Hibberd its approval to use that authority to write the specific SFC policies. (Hibberd Aff. at ¶ 6).

**REDACTED**

    The SLT is *RIC's* Senior Leadership Team, not a part of RSA plc. (Hibberd Aff. at ¶ 6).

By the time of the SFC transactions, credit enhancement deals in general were being underwritten and supervised in the U.S., not the U.K.

**REDACTED**

To be sure, the same exhibit says that beginning in mid-2000 all deals with exposures greater than $25 million would need RSA plc approval. But that requirement was never implemented on the SFC deals. (Hibberd Aff. at ¶ 6).

Similarly, two exhibits to McGladrey's motion reflect Mr. Hibberd saying that RIC is cleared by RSA plc for "take-off" and "lift-off." But Mr. Hibberd does not mean that RSA plc had to approve the SFC transactions. (*Id*). He is merely reflecting that RIC's major credit enhancement deals were put on hold for a period of time while Standard & Poors made inquiries about credit enhancement generally. When Standard & Poors was done and the hold released, the SFC transactions were cleared for "take-off."

In short, McGladrey goes to great pains to show that RSA plc somehow was "involved" in the underlying SFC transactions, but the documents it proffers show only that RSA plc was aware of the SFC policies, received periodic financial reports about them (as well as about many other policies), served as a conduit of information to Standard & Poors about those policies (and many others), and became concerned about the policies and its subsidiary when it learned that RIC faced hundreds of millions of dollars in claims on policies that had been fraudulently procured. These documents fall far short of establishing that RSA plc "participated" in the underlying insurance transactions in any meaningful way.

## ARGUMENT

I.   **McGladrey Failed To Meet Its Burden Of Proving That RIC Has The Legal Right To Obtain On Demand The Documents From RSA plc**

Rule 34(a) requires a litigating party to produce only those documents that are within its "possession, custody, or control." Fed. R. Civ. P. 34(a). The burden is on McGladrey to prove that RSA plc's documents are actually within RIC's "control." *Inline Connection Corp. v. AOL Time Warner, Inc.*, No. CA 02-272-MPT, 2006 WL 2864586, at *1 (D. Del. Oct. 5, 2006) ("party seeking production bears the burden of establishing control") (Exhibit 1); *Playboy Entm't Group, Inc. v. U.S.*, No. CIV. A. 96-94-JJF, 1997 WL 873550, at *3 (D. Del Dec. 11, 1997) (Farnan, C.J.) ("party seeking production bears the burden of establishing control") (Exhibit 2).

Several factors may be considered when determining whether one corporate relative "controls" documents in the possession of another (those factors are discussed in detail below). But the overriding inquiry is whether the producing party has the *legal right* to require the party in possession of the documents to turn them over. "Control is defined as the legal right to obtain the documents required on demand." *Power Integrations*, 233 F.R.D. at 145 (D. Del. 2005). "In the context of F.R.C.P. 34(a), the Third Circuit defines 'control' as the legal right to obtain the documents required on demand." *Inline Connection*, 2006 WL 2864586, at *1.

Parent corporations often are required to produce documents in the possession of their subsidiaries because those parents, as the owners of the subsidiaries, have the power to require the subsidiaries to produce the documents. If a subsidiary ignores the requests, a parent can take remedial action to force compliance by, for example, disciplining or terminating employees or removing directors and officers. But the converse is rarely true. As this Court explained just eleven months ago:

> Although parent corporations have been required to produce
> documents held by their subsidiaries, the converse is not true. A
> subsidiary, by definition, does not control its parent corporation.

*Power Integrations*, 233 F.R.D. at 145 (the Court, analyzing "control" for purposes of Rule 45(a)(1)(C), used the same test that governs Rule 34 analysis).

Indirect subsidiaries obviously can request documents from their ultimate parents. But there is little that an indirect, many-steps removed subsidiary can do if its requests are refused. The subsidiary simply lacks a "legal right" or "legal ability" to force compliance.[2] In this case, McGladrey has given the Court no reason to believe that RIC somehow "controls" its eighth great-grandparent corporation, RSA plc.

**II.     McGladrey Has Failed To Prove That RIC Is An "Alter Ego" Of RSA plc, That RSA plc "Participated" In The Underlying Insurance Transactions, Or That RSA plc Will Receive Any Direct Benefit From This Litigation Beyond What Any Parent Would Receive When Its Subsidiary Prevails In Litigation**

In deciding whether a movant has established that a company has a legal right to obtain documents from a related company, courts in this and other districts sometimes analyze additional factors as part of the "control" inquiry. *See, e.g., Afros S.P.A. v. Krauss-Maffei Corp.*, 113 F.R.D. 127, 131 (D. Del. 1986); *Camden Iron & Metal, Inc. v. Marubeni Am. Corp.*, 138 F.R.D. 438, 441 (D.N.J. 1991). Avoiding the controlling authority of the recent *Power Integrations* and *Inline Connection Corp.* holdings, McGladrey grasps at four of these additional factors. In so doing, McGladrey applies factors that this Court has rejected and distorts the factors that this Court does consider.

---

[2] Given that RSA plc is not a party to this action and is not within the subpoena power of the Court, it is not at all certain that the Court has the power to require production by RSA plc either. The way to properly obtain RSA plc's documents is through the Hague Convention subpoena process, but McGladrey has steadfastly refused to follow that process.

### A.    RSA plc Is Not An "Alter Ego" Of RIC

Despite RIC's inability to legally require RSA plc to turn over documents, McGladrey argues that the documents should be produced anyway because RIC and RSA plc have a close corporate relationship. McGladrey locates this "close" relationship in four supposed facts:

> (1) RSA plc owns RIC;
>
> (2) RSA plc appoints board members of RIC;
>
> (3) RSA plc sets financial targets and goals for RIC; and
>
> (4) RSA plc and RIC share common business interests and purposes.

(McGladrey mem. at 11-13).

There are many errors in McGladrey's analysis. First, finding a "close relationship" is not the test in this Court for determining if an indirect subsidiary can be compelled to produce documents in the possession of its ultimate parent. As this Court has held, a subsidiary should be ordered to produce such documents *only* if the parent can be considered the "alter ego" of the subsidiary:

> The separate and distinct corporate identities of a parent and its subsidiary are not readily disregarded, except in rare circumstances justifying the application of the alter ego doctrine to pierce the corporate veil of the subsidiary.

*Power Integrations*, 233 F.R.D. at 145; *see also, e.g., Playboy Entm't Group*, 1997 WL 873550, at *3; *Camden Iron & Metal*, 138 F.R.D. at 441.

In *Power Integrations*, this Court analyzed the question of "control" in terms of a subpoena duces tecum issued to a non-litigant subsidiary that requested documents from its non-party parent. 233 F.R.D. 143. But the same test is used for Rule 45 and 34 purposes. *Inline Connection Corp.*, 2006 WL 2864586, at *1. In *Power Integrations* this Court held that, because the parent and subsidiary were separate legal entities, had separate places of business and functioned as separate entities in the business world, there was no justification to disregard the "discrete, corporate identity" of the subsidiary. 233 F.R.D. at 145.

- 14 -

Nor is it enough merely to show that some directors or officers overlap, or that a parent has approved the transactions of a subsidiary. This Court has held that a requesting party failed to establish that a subsidiary had control of documents in its parent's possession, *despite showing* that the subsidiary's president was an executive vice-president of the parent and that the parent had approved significant business decisions of the subsidiary. *Playboy Entm't Group*, 1997 WL 873550, at *4. Instead, the moving party must establish a nearly complete overlap of directors and management. *See Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. 257, 263 (D. Del. 1979) (refusing to compel production of documents held by a sister corporation even where there was some overlap in the boards of directors because "there is no evidence [that the sister companies] have identical boards of directors, or that their respective business operations are so intertwined as to render meaningless their separate corporate identities").

Here, as in *Power Integrations*, RIC and RSA plc are separate legal entities, with distinct places of incorporation and business, with distinct boards of directors, with distinct corporate officers, and with distinct employees. (*See* Pettigrew Aff. at ¶¶ 2, 3 & 5). None of the elements relied upon by McGladrey – that RSA plc owns RIC and elects its board members, that RSA plc sets performance goals for RIC, that the two companies share common business interests – would come close to satisfying the alter ego test for piercing the corporate veil. Instead, these are all factors inherent in nearly every parent-subsidiary relationship. As the owners of a subsidiary, nearly all ultimate parent corporations have a controlling say in the appointment of the subsidiary's boards of directors. Nearly all ultimate parent companies monitor the financial performance of their subsidiaries and set financial goals for them. Many ultimate parents share common business interests and financial goals with their subsidiaries. If control could be found based on such factors, then control would have to be found in nearly every parent-subsidiary

relationship – not in the "rare circumstances" described by this Court in *Power Integrations*. 233 F.R.D. at 145.[3]

**B.    RSA plc Did Not "Participate" In The SFC Insurance Transactions**

McGladrey says production should be compelled because "RSA plc was connected to the SFC transactions from the beginning." According to McGladrey, (a) RSA plc "granted underwriting authority to individuals specifically with regard to the SFC transactions," (b) RSA plc "monitored [RIC's] financial performance," (c) RSA plc was "made aware of the details of the SFC transactions," and (d) RSA plc became involved in trying to assess the losses incurred after the transactions blew up. (McGladrey mem. at 15-17).

Assertion (a) is simply wrong. RSA plc did not delegate underwriting authority to anyone for these transactions (and did approve the policies). Delegated authority came from RIC's board of directors and specific approval for the SFC transactions came from RIC's "SLT" – its Senior Leadership Team. (Pettigrew Aff. at ¶ 7; Hibberd Aff. at ¶ 6). Points (b) through (d), while factually accurate, do not support an order compelling production.

**1.    Production Will Not Be Compelled When A Parent's "Participation" In the Underlying Transaction Was Limited to Internal Monitoring**

In determining whether one corporate relative has control over documents held by another, a court can consider "the non-party's connection to the transaction at issue." *Playboy Entm't Group*, 1997 WL 873550, at *3. But it is not sufficient to show mere knowledge, approval or monitoring of the underlying transactions. Rather, control should be found only when "the subsidiary was an agent of the parent in the transaction giving rise to the lawsuit" (*Camden Iron & Metal*, 138 F.R.D. at 441) or the parent "itself participated in the transaction."

---

3

**REDACTED**

- 16 -

*Afros S.P.A. v. Krauss-Maffei Corp.*, 113 F.R.D. 127, 131 (D. Del. 1986).

The cases that find sufficient participation to justify piercing the veil for document control purposes all involve parents that were heavily involved in the negotiation and performance of the underlying transactions at issue in the litigation. No court in this Circuit has pierced the veil for document control purposes on a mere finding that the parent was internally monitoring the transaction, was being made aware of the details of the underlying transactions, or even that it was passing information about the transactions to a third party.

Thus, in *Camden Iron & Metal*, the District Court of New Jersey compelled a subsidiary to produce documents in its parent's possession because the parent "played a significant role in the transaction ... [including] continued participation in the negotiation process." 138 F.R.D. at 444. The non-party parent made the initial contacts with the third party, participated in the negotiations, directed its subsidiary to pursue the negotiations, had final approval rights over the negotiation and deal, and "can be viewed as [having] engineered the deal." *Id.* at 443. The court characterized the companies as having "acted as one" for the purposes of the transaction at issue. *Id.* Similarly, in *Afros S.P.A.*, the parent made critical decisions in the underlying transactions; developed the relevant patented technology itself; originally held the patents; and without even informing the subsidiary, the patents at issue to the subsidiary. 113 F.R.D. at 131-32. Only the presence of these facts caused the *Afros S.P.A.* court to conclude that the subsidiary had the requisite control of the documents of its parent to mandate their production.

> **2.     RSA plc Was Aware Of The Transactions, But Played No Meaningful Role In Their Consummation**

RSA plc's involvement in the SFC transactions was of an entirely different nature. Essentially, it was limited to internal monitoring. RSA plc never communicated with a single party to the transactions. RSA plc did not negotiate the deals or guide their negotiation. RSA

plc did not conduct RIC's due diligence nor guide it. RSA plc did not accept the benefits of the transactions.

RIC found the SFC business opportunity, pursued it, conducted the due diligence, negotiated and issued the policies, monitored the performance of the underlying loans, and handled the discussions with SFC representatives. (Hibberd Aff. at ¶¶ 3-6). RIC alone is liable for paying covered claims properly made under them. The parties understood that they were dealing with RIC, not RSA plc. SFC paid premiums on the policies to RIC, not RSA plc, filed notices of claims under the policy with RIC, and sent monthly servicer reports and company financial information to RIC. (*Id.*).

RSA plc's receipt of information about the SFC transactions establishes only that RSA plc knew about the SFC policies and was interested in the financial performance of its indirect subsidiary. Knowledge does not and cannot equate to "participation" in the underlying transactions. Otherwise any prudent parent corporation that pays attention to its subsidiary's business transactions will be subject to veil piercing for document production purposes.

Finally, even if RSA plc approved the SFC transactions internally – which is not the case – an order compelling production could not be entered here. No court in this Circuit has held that giving approval to a subsidiary to pursue a business opportunity exposes an ultimate parent to a veil piercing claim (whether for production of documents or any other purpose). *See, e.g., Playboy Entm't Group*, 1997 WL 873550, at * 3 (refusing to compel production even though

parent's CEO "approves significant decisions regarding the operation of [the subsidiary's] business").[4]

### C.    RSA plc Will Receive No Direct Benefit From The Outcome Of This Litigation

In determining whether one corporate relative controls the documents of another, a court also can consider "whether the non-party will receive *the* benefit of a favorable litigation outcome." *Playboy Entm't Group*, 1997 WL 873550, at *3 (emphasis added). "If a non-party will *directly receive* the benefit of an award, then it is unjust that it can frustrate the discovery process by … refusing to furnish documents in its possession." *Afros S.P.A.*, 113 F.R.D. at 127 (emphasis added).

It is not enough that a parent stands to benefit from its subsidiary's litigation victory because that victory will increase the value of the subsidiary. If that were the case, subsidiaries would *always* be required to produce documents in their parent's possession. Rather, the parent must stand to *directly* benefit from the litigation victory (*Afros S.P.A.*, 113 F.R.D. at 132) or must stand to gain the *entire* litigation award because the subsidiary is a mere instrumentality for the parent in the lawsuit (*Cf. Compagnie Francaise D'Assurance v. Phillips Petroleum*, 105 F.R.D. 16, 33 (S.D.N.Y. 1984)).

*Afros S.P.A.* involved a parent patent owner that had assigned its patent rights to its subsidiary for one dollar. The court required production of the parent's documents, but only because the parent "would receive *a direct benefit* from a favorable judgment" on the counterclaim, by eliminating the competitor-plaintiff who was in the same business as the parent

---

[4] McGladrey claims support for compelling production of RSA plc's documents because, when RIC began to suffer losses on the SFC transactions, RSA plc supposedly "intervened to assess the resulting damage." (McGladrey mem. at 7). However, the document McGladrey cites for this proposition demonstrates only that in April 2002, five months after the last Royal policy was issued to SFC, and one month after SFC disclosed the forbearance payments, RSA plc became interested in assessing the resulting damage likely to be incurred by its subsidiary. Any prudent parent corporation would want to understand the likely losses suffered by its subsidiary, especially when that loss is likely to exceed $100,000,000.

or by creating a situation in which the plaintiff would be required to acquire from it a license for the underlying patent. 113 F.R.D. at 132 (emphasis added).

Here, RSA plc's sales price for RIC is not linked in any way to the outcome of any litigation based on the SFC transactions. To be sure, the price will be paid in the future, from future earnings, but it is not contingent upon a litigation victory, and the price will not increase or decrease based on the result of this case. Furthermore, any favorable verdict may affect the value of RIC – but any recovery will go to RIC, and will not be shared with RSA plc.

### D.   In The Third Circuit, A Finding Of Control Cannot Be Based Upon A Subsidiary's "Practical Ability" To Obtain Documents In Its Parent's Possession

Finally, McGladrey contends that RIC supposedly shares documents in the ordinary course of business with RSA plc. Putting aside for now the inaccuracy of this contention, the voluntary sharing of documents simply is not relevant in the Third Circuit.

McGladrey argues that RIC should be found to have control of documents in RSA plc's possession if it has the practical ability to access "documents in the ordinary course of business or for the purposes of litigation." (McGladrey mem. at 14). In support of this argument McGladrey cites a single case, *Gerling Int'l Ins. Co. v. Comm'r of Internal Revenue*, 839 F.2d 131, 141 (3d Cir. 1988). As this court observed in *Playboy Entm't Group*, however, *Gerling* involved a corporation which sought to obtain documents from its president, not its parent, pursuant to Tax Court Rule 72(a)(1). 1997 WL 873550, at *3. Therefore this Court has found that *Gerling* is not applicable to a parent-subsidiary relationship, viewing "*Gerling* as fact-specific and unpersuasive as precedent in this matter." *Id.* Moreover, the "practical ability" test, while accepted in the Second Circuit, was rejected by this Court last year:

> [T]he Court is not persuaded that the Third Circuit has adopted as expansive a definition of "control" as that used by courts in the Second Circuit. Cases in the Second Circuit go beyond defining "control" as the *legal right* of the subpoenaed party to obtain

documents and include an inquiry into the *practical ability* of the
subpoenaed party to obtain those documents.

*Power Integrations*, 233 F.R.D. at 146 (emphasis in original).

In a case decided just last month, a court in this district cited with approval the above

holding from *Power Integrations* and held it to apply with equal force to Rule 34 cases. *Inline*

*Connection Corp.*, 2006 WL 2864586, at *1. But even if "practical ability" were the law in the

Third Circuit, McGladrey fails to satisfy that test. "The proper inquiry here is *whether the*

*documents sought* are considered records which [the subsidiary] is apt to request and obtain in its

normal course of business." *Camden Iron & Metal*, 138 F.R.D. at 443 (emphasis added).

McGladrey has not specified the documents it is seeking with this motion. Rather, McGladrey is

on a fishing expedition for something, anything, that might somehow be responsive to the over

100 document requests it has served on RIC in this case. Thus, its motion would capture any

document that makes mention in any way of SFC (regardless of whether it was shared with RIC),

or makes any mention of financial enhancements, or involves any communications about any

topic with any governmental body. McGladrey offers no basis to find that RIC "is apt to request

and obtain in its normal course of business" any of these categories of documents, or any other

documents McGladrey seeks.

Nor has McGladrey provided any evidence that RIC obtained any documents from RSA

plc on request. It has shown that RIC and RSA plc email one another, and that RIC often sends

documents *to* RSA plc. But McGladrey was required to prove the converse: that RIC, on

request, obtains documents in the ordinary course *from* RSA plc.[5]

---

[5] As this Court noted in *Power Integrations*, McGladrey has several options available to it to obtain the discovery it
seeks. For one, it can use the processes of the Hague Convention to subpoena RSA plc, the party that actually has
possession, custody and control of the documents it seeks. *Power Integrations*, 233 F.R.D. at 146.

## Conclusion

McGladrey has failed to meet its burden of establishing that RIC has control over its eighth great-grandparent corporation, RSA plc, or a legal right to obtain documents from it on demand. McGladrey has not shown and can never show that RSA plc is RIC's alter ego, that RSA plc participated in or used RIC as its agent in the SFC transactions, or that RSA plc stands to gain any direct benefit from the outcome of this litigation. Accordingly, RIC respectfully submits that this Court must deny McGladrey's motion to compel.

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

_____

Philip Trainer, Jr. (I.D. #2788)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
ptrainer@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff*
*Royal Indemnity Company*

*Of Counsel:*

Michael H. Barr
Kenneth J. Pfaehler
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, New York 10020-1089
(212) 768-6700

- and -

Alan S. Gilbert
John I. Grossbart
SONNENSCHEIN NATH & ROSENTHAL LLP
8000 Sears Tower
233 S. Wacker Drive
Chicago, Illinois 60606
(312) 876-8000

Dated: November 16, 2006
175265.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of November, 2006, the attached **REDACTED**

**PUBLIC VERSION OF ROYAL INDEMNITY COMPANY'S MEMORANDUM IN**

**OPPOSITION TO MCGLADREY & PULLEN, LLP'S MOTION TO COMPEL THE**

**PRODUCTION F DOCUMENTS** was served upon the below-named counsel of record at the

address and in the manner indicated:

William H. Sudell, Jr., Esquire                        ELECTRONIC MAIL
Morris Nichols Arsht & Tunnell
1201 North Market Street
Wilmington, DE  19899-1347

James L. Holzman, Esquire                             ELECTRONIC MAIL
J. Clayton Athey, Esquire
Prickett, Jones & Elliott, P.A.
1310 King Street
Wilmington, DE  19899

Michael R. Lastkowski, Esquire                        ELECTRONIC MAIL
Christopher M. Winter, Esquire
Duane Morris LLP
1100 North Market Street, Suite 1200
Wilmington, DE  19801

John W. Shaw, Esquire                                 ELECTRONIC MAIL
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19899

Karen Lee Turner, Esquire                             ELECTRONIC MAIL
Susan E. Poppiti, Esquire
Eckert Seamans Cherin & Mellott, LLC
300 Delaware Avenue, Suite 1210
Wilmington, DE  19801

Daniel K. Astin, Esquire                                    ELECTRONIC MAIL
Meg Augustine, Esquire
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE  19801

John H. Eickemeyer, Esquire                                 ELECTRONIC MAIL
Jonathan A. Wexler, Esquire
Vedder, Price, Kaufman & Kammholz, P.C.
805 Third Avenue
New York, NY  10022

Elizabeth K. Ainslie, Esquire                               ELECTRONIC MAIL
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103

Richard P. Swanson, Esquire                                 ELECTRONIC MAIL
Veronica E. Rendon, Esquire
Jason M. Butler, Esquire
Arnold & Porter LLP
399 Park Avenue
New York, NY  10022-4690

Steven M. Farina, Esquire                                   ELECTRONIC MAIL
Thomas H.L. Selby
Amber M. Mettler
Williams & Connolly LLP
725 Twelfth Street, NW.
Washington, DC  20005

Neil G. Epstein, Esquire                                    ELECTRONIC MAL
Eckert Seamans Cherin & Mellott, LLC
1515 Market Street, 9th Floor
Philadelphia, PA  19102

Michael S. Waters, Esquire                                  ELECTRONIC MAIL
Lois H. Goodman, Esquire
McElroy, Deutsch, Mulvaney & Carpenter, LLP
Three Gateway Center
100 Mulberry Street
Newark, NJ  07102-4079

James J. Rodgers, Esquire                          <u>ELECTRONIC MAIL</u>
Laura E. Vendzules, Esquire
Andrew M. Marble, Esquire
Dilworth Paxson LLP
3200 Mellon Bank Center
1735 Market Street
Philadelphia PA 19103-7595


Andre G. Castaybert, Esquire                       <u>ELECTRONIC MAIL</u>
Ronald Rauchberg, Esquire
Steven Obus, Esquire
David McTaggart, Esquire
Proskauer Rose LLP
1585 Broadway
New York, NY  10036-8299


Student Loan Servicing LLC                              <u>U.S. MAIL</u>
1405 Foulk Road, Suite 102
Wilmington, DE  19803-2769


Andrew N. Yao                                          <u>U.S. MAIL</u>
107 Leighton Drive
Bryn Mawr, PA  19010


*/s/ Tiffany Geyer Lydon*
_____
Tiffany Geyer Lydon

175499.1