IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROYAL INDEMNITY COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) C.A. No. 05-165-JJF |
| | ) |
| PEPPER HAMILTON LLP, W. RODERICK | ) **REDACTED** |
| GAGNÉ, FREED MAXICK & BATTAGLIA | ) |
| CPAs PC, McGLADREY & PULLEN, LLP, | ) |
| MICHAEL AQUINO, and FREED MAXICK | ) |
| SACHS & MURPHY, P.C., | ) |
| | ) |
| Defendants. | ) |

**REPLY MEMORANDUM IN SUPPORT OF MCGLADREY & PULLEN'S
MOTION TO COMPEL PLAINTIFF'S PRODUCTION OF DOCUMENTS**

**SET FOR HEARING: NOVEMBER 29, 2006 4:30 PM**

DUANE MORRIS LLP
Michael R. Lastowski (Bar No. 3892)
Christopher M. Winter (Bar No. 4163)
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246
Phone: 302-657-4951
Fax: 302-657-4901

-and-

| | |
|---|---|
| ARNOLD & PORTER LLP | WILLIAMS & CONNOLLY LLP |
| Veronica E. Rendon | Steven M. Farina |
| Jason M. Butler | Thomas H. L. Selby |
| 399 Park Avenue | 725 Twelfth Street, N.W. |
| New York, NY 10022 | Washington, D.C. 20005 |
| Phone: 212-715-1000 | Phone: 202-434-5000 |
| Fax: 212-715-1399 | Fax: 202-434-5029 |
| | |
| Attorneys for McGladrey & Pullen, LLP and Michael Aquino | Attorneys for McGladrey & Pullen, LLP |

**INTRODUCTION**

In its opposition to the motion to compel, Plaintiff Royal Indemnity Company ("Royal") principally argues against a "straw man" legal standard that McGladrey does not advance, misapplies case law from this Circuit establishing the test for "control," and ignores (or distorts) compelling evidence both of the intertwined operations of Royal and Royal & SunAlliance Insurance Group plc ("Royal UK") and of Royal UK's involvement in the Student Finance Corporation ("SFC") matters.

Royal asserts that McGladrey relies on Second Circuit precedent, despite the remarkable fact that McGladrey cites *not one case* from the Second Circuit. Instead, McGladrey relies on the well-established factors applied by this Court and in this Circuit to determine "whether sufficient control is exercised" by Royal over documents in the possession of Royal UK to order production. *Playboy Entm't Grp., Inc. v. United States*, No. CIV.A.96-94-JJF, 1997 WL 873550, at *3 (D. Del. Dec. 11, 1997) (Farnan, J.). In advancing its overly restrictive view of "control," Royal relies on cases that are self-distinguishing and factually distinct, and willingly ignores that in this Circuit the concept of "control" is "broadly construed." *Id.*

Royal exaggerates the separation of the firms, a distinction often blurred or ignored altogether in Royal UK's public statements. Royal here claims to be eight generations removed from Royal UK, but offers no explanation as to the relevance of the intervening layers of corporate form. Indeed, Royal UK itself regularly discounts these intervening layers in its public statements, *e.g.*, as "particulars of excessive length" that do not bear on the operations of Royal UK. Ex. 3, at 109 n.4. Royal UK ignores the corporate distinction Royal advances here, claiming ownership of the SFC-related litigation. *See, e.g.*, Ex. 36 (Royal UK: "We are disappointed by the Court's ruling. . . . Our filed lawsuit in Texas State Court alleges significant

fraud and misrepresentation by various parties, entitling Royal Indemnity to rescind the policies, and <u>we</u> accordingly plan to appeal the decision.") (emphasis added).

Most strikingly, Royal's opposition admits (*see* Opp. at 16) that Royal UK was directly involved in management of the SFC credit risk insurance policies, but relegates to a footnote (*see id.* at 19 n.4) its attempt to explain away Royal UK's role in assessing the "failing in underwriting" by Royal management. In fact, Royal's opposition highlights the failures of Royal US management: Royal's US management failed to abide by the company policy that all deals over $25 million had to be approved by Royal UK. *See* Opp. at 11.

It is documentation of precisely these breaches of company protocol that McGladrey seeks with the instant motion to compel. From the documents produced thus far, it is apparent that Royal UK has documents relating to the SFC policies, including among others (1) delegation (and the limits thereof) of authority for deals like SFC; (2) the "lessons learned," including failures of underwriting and control, by Royal as a result of the failure of SFC; and (3) other documents concerning the SFC deal, including communications about reinsurance (in which Royal UK played a primary role). Royal never disputes the relevance of the materials in Royal UK's possession.

At bottom, separate from the accusatory tone of Royal's opposition, the fundamental position of McGladrey's motion to compel is confirmed: under the factors applied by this Court and others in this Circuit, the volume of evidence submitted herewith establish that Royal has a legal right to obtain documents in Royal UK's possession. The motion should be granted.

## ARGUMENT

I.   **ROYAL SEEKS TO APPLY THE WRONG LEGAL STANDARD.**

The parties agree that this motion turns on application of this Circuit's rules to determine whether Royal will be found to have "control" over documents in the possession of Royal UK as required by Rule 34(a). Ignoring that the standard for "control" of documents under Rule 34 is "broadly construed," *see Playboy*, 1997 WL 873550, at *3, Royal advances a standard for production so restrictive it cannot ever be met. In doing so, Royal relies on two factually distinct cases, and accuses McGladrey of relying on Second Circuit case law, despite the fact that McGladrey cites not one Second Circuit case. Royal is misguided, and the Court should reject its attempt to subvert established case law in this Circuit.

Royal claims that McGladrey must prove that Royal "controls" Royal UK, an impossible standard for a subsidiary to meet. *See* Opp. at 13 ("McGladrey has given the Court no reason to believe that RIC somehow 'controls'" Royal UK). Of course, it is never the case that the subsidiary controls the parent. But control of the parent by the subsidiary is not the relevant test. Rather, this Court and others in this Circuit look to the factors outlined in McGladrey's brief (and which, at points, Royal begrudgingly admits are applicable) to determine whether a party has "control" over the <u>documents</u>. *See* Fed. R. Civ. P. 34(a); *Playboy*, 1997 WL 873550, at *3.

To support its assertion of an extremely restrictive test, Royal pursues two equally unavailing gambits. First, it accuses McGladrey of relying on the Second Circuit's "practical ability" test that this Court has questioned. This gambit is easily set aside: despite the dramatic tones in Royal's opposition, examination of McGladrey's brief reveals there is absolutely no citation of Second Circuit case law, and no reliance on the "practical ability" test adopted by the Second Circuit.

3

Second, Royal relies on two inapposite cases, *Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*, 233 F.R.D. 143 (D. Del. 2005) (Farnan, J.) and *Inline Connection Corp. v. AOL Time Warner Inc.*, No. CIV.A.02-272-MPT, 2006 WL 2864586 (D. Del. Oct. 5, 2006). Again, this ploy is easily rejected because these two cases shed no light on the factual circumstances of the present case.

As this Court is aware, *Power Integrations* involved a motion brought under Rule 45, not Rule 34, a distinction this Court highlighted:

> while several of the cases cited by the parties fail to draw a distinction between a party and a non-party for purposes of analyzing the issue of control, the Court observes, as a practical matter, that the cases cited by the parties from this Circuit refer to the application of Federal Rule of Civil Procedure 34(a), and thus, involve the exercise of the Court's authority over a party-litigant in the first instance as a means of ordering the production of documents in the joint control of a party litigant and a third party. . . . In this case LGE is not a party litigant, and interestingly, Power Integrations does not seek to make LGE a party litigant.

*Power Integrations*, 233 F.R.D. at 146 (internal citations omitted). This case specifically distinguishes itself from the instant Rule 34 case. Indeed, this Court has separately recognized that these cases "are very fact-specific," and in a decision under Rule 34 applied the very factors that McGladrey applies in its motion. *See Playboy*, 1997 WL 873550, at *3.

*Inline Connection Corp.*, is even more remote from the instant facts: in that case, the plaintiff moved to compel documents from the defendants, AOL and Earthlink, that were in the possession of completely unrelated, *third party telephone companies*. *See Inline Connection Corp.*, 2006 WL 2864586, at *1. Royal fails to mention this distinction. Indeed, the Court in *Inline* specifically relied on the absence of a parent-subsidiary relationship between the corporate entities in denying the motion. *See id.* at *2 ("AOL and Earthlink do not have a parent-subsidiary relationship with the telcos.").

4

In pursuing its rigidly restrictive view of "control," Royal has overplayed its hand. Contrary to the suggestion in Royal's opposition, this Court has recognized that "several courts have required the production of documents possessed by a party's corporate parent," relying on the factors cited by McGladrey. *Playboy*, 1997 WL 873550, at *3. This is consistent with Third Circuit case law applying these factors. *See, e.g., Gerling Int'l Ins. Co. v. Comm.*, 839 F.2d 131, 140; *Camden Iron and Metal, Inc. v. Marubeni Am. Corp.*, 138 F.R.D. 438, at 441 (D.N.J. 1991); *Afros S.P.A. v. Krauss-Maffei Corp.*, 113 F.R.D. 127, 130 (D. Del. 1986).

## II. ROYAL HAS CONTROL OVER DOCUMENTS IN ROYAL UK'S POSSESSION.

Even when it admits that the factors cited by McGladrey apply, Royal continues to distort the requirements under Third Circuit case law to try to avoid production here. Indeed, Royal's opposition only serves to highlight the fact that Royal and Royal UK are closely related, Royal UK was involved in the SFC transactions, Royal had access to (indeed, stored) documents at Royal UK, and Royal UK stands to benefit from the litigation.[1] In other words, all of the factors applied by Third Circuit cases support production. *See Gerling Int'l Ins. Co.*, 839 F.2d at 140; *Playboy*, 1997 WL 873550, at * 3; *Camden Iron and Metal*, 138 F.R.D. at 441; *Afros S.P.A.*, 113 F.R.D. at 130.

### A. McGladrey Need Not Prove Royal UK Is An "Alter Ego" To Prove Royal "Controls" Documents at Royal UK.

In its opposition, Royal concedes that it is a wholly-owned subsidiary of Royal UK, that Royal UK appoints the management of Royal, and that the parent and subsidiary are financially intertwined. *See* Opp. at 14-15. Nor does Royal deny that the companies are tied

---

[1] Royal's redactions of its document production may obscure the true extent of Royal UK's interrelationship with Royal. It appears that Royal has attempted to white-out references to Royal UK throughout the document production. *Compare* Ex. 9 at ROY164165 *with* Ex. 14 at ROY165363 (revealing "the UK" redacted from Ex. 9). Fortunately, Royal did not catch every reference to the UK.

5

together by what Royal UK claims is "a robust risk management and internal control culture . . . within the Group." *See* Ex. 3 at 49. To overcome the effect of these admissions, Royal asserts that the motion fails because McGladrey has not proved Royal is an "alter ego" of Royal UK. But Royal is again testing the motion by a legal standard that does not exist.

As a matter of law, McGladrey is not required to prove that Royal is an "alter ego" of Royal UK in order to prove control of documents under Rule 34.

> Rule 34(a) does not require plaintiff to demonstrate an alter ego relationship in order to show that a litigant 'controls' documents or things that are possessed by a parent corporation with respect to a specific transaction involving a parent and subsidiary.

*Camden Iron and Metal*, 138 F.R.D. at 442. To be sure, proving an alter ego relationship is sufficient to establish control, but it is not a prerequisite. *Id.* (compelling production despite finding that parent and subsidiary were not alter egos); *Gerling Int'l Ins. Co.*, 839 F.2d at 140-41 (alter ego one way of establishing control).[2] Indeed, if proving "alter ego" were required, the remaining factors considered under Third Circuit case law would be unnecessary.

Nor does the fact that Royal is an *indirect* subsidiary inform the Court's inquiry here. *See* Opp. at 4. As the district court stated in *Afros*, "[i]t is obvious that the particular form of the corporate relationship does not govern whether a party controls documents." *Afros S.P.A.*, 113 F.R.D. at 131. Instead, courts consider evidence of "the degree of ownership and control exercised by the parent over the subsidiary." *Camden Iron and Metal*, 138 F.R.D. at 442. Here, that degree of ownership is 100 percent, and the indicia of control are evident.

---

[2] To the extent that Royal asserts that this Court requires proof a parent is the alter ego of the subsidiary, it is over-reading the *Power Integrations* case. *Power Integrations* expressly relies on *Gerling*, which specifically enumerates alter ego as one of alternate methods of proving control. *See Gerling* 839 F.2d at 140-41. In fact, this Court in *Power Integrations*, as in the earlier *Playboy* case, considered the other indicia of control discussed herein. *See Power Integrations*, 233 F.R.D. at 145-46 (finding little more than vendor relationship between the companies and considering whether documents used "in the normal course of its business"); *see also Playboy*, 1997 WL 873550 at *3.

6

Specifically, Royal UK established global business operations in which functional groups, without reference to corporate form, work together to develop global business strategies and practices. *See* Ex. 3 at 3, 48. The cross-company functional group for credit enhancement insurance—the kind of insurance issued to SFC—

*See* Ex. 8 at ROY175091 ("

"); Ex. 14. Among other things, this group was charged with

. *See* Ex. 14 at ROY165360-66.

In addition to the interlocking functional operations, Royal and Royal UK are financially intertwined, with Royal UK including Royal operations in its financial statements, and continually investing funds to cover Royal's US losses. *See* Best's Rating and Report Update, Dec. 11, 2002, at WTC04228-33 (Ex. 40) (stating that "RSAUSA's capitalization . . . explicitly recognizes the financial support and commitment of the group's U.K. parent" and that negative cash flows since 1997 were offset by the "strong financial flexibility afforded RSAUS through the resources available from the parent"). And Royal actively promotes and advertises its close affiliation with its parent, touting "the STRENGTH AND STABILITY of the worldwide Royal & SunAlliance organization that is reflected in our nearly 300 year history and supported by $100 billion of assets and a strong balance sheet." RSA USA 1999 Annual Report Excerpts, at 7 (Ex. 41).

In addition, Royal UK directed Royal's US managers, placing specific limitations on their activities and requiring Royal UK's approval on others. *See* Ex. 14 at ROY165360

7

(          ) ("

"); *see also*

, at ROY164496-97 (Ex. 42) ("

"). By policy, Royal was required to get delegated authority from Royal UK. *See* RSA 2001 Annual Report Excerpts, at 45 (Ex. 43); RSA 2002 Annual Report Excerpts, at 41 (Ex. 44). In its opposition, Royal does not deny that Royal UK limited the authority of Royal US managers generally, but insists that Royal US managers ignored those limitations with respect to SFC. *See* Opp. at 11 (admitting that although all deals with exposures greater than $25 million required Royal UK's approval, the policy "was never implemented on the SFC deals"). This is one of the very issues on which McGladrey seeks discovery—the extent to which Royal US exceeded its authorities and disregarded Royal UK controls in issuing the SFC policies.[3]

The close relationship between the companies is confirmed in documents and testimony that reflect that Royal UK and Royal consider themselves to be one company. *See, e.g.,* Ex. 13 at ROY163742 ("<u>our</u> company") (emphasis added); Ex. 17 at ROY164105 ("

") (emphasis added); McKenzie Deposition Expert, July 20, 2005, at 373-74 (Ex. 45) (referring to World Group employees as "internal"). Mr. Robert Van Epps, a key employee of the financial enhancements unit that executed the SFC policies, claims in the signature block in

---

[3]     Royal asserts that Royal UK did not run the day-to-day operations of Royal. But this is not the standard for control over documents. In any case, whether Royal UK participated in day-to-day operations of Royal on a regular basis, it did take actions that significantly impacted those day-to-day operations and dictated Royal's business opportunities and direction. *See, e.g.,* RSA 2002 Annual Report Excerpts, at 19 (Ex. 44) ("In the USA we have introduced a new leadership team with strong experience in restructuring and turnaround initiatives. We have also streamlined operations to two divisions . . . . We also began the sale process for business no longer aligned with our mainstream property and casualty approach. We additionally launched a comprehensive expense management effort, which we anticipate will cut controllable expenses by $115 million and reduce headcount by 800 employees by mid year 2003. We also anticipate the transfer of another 725 jobs out of the company as businesses are sold.").

his externally routed e-mails that he is employed at Royal & SunAlliance Insurance Group (Royal UK). *See* E-mail from Van Epps, May 15, 2002, at ROY106768-70 (Ex. 46); Ex. 20 at ROY106754.[4]

Indeed, Royal's own privilege log demonstrates that Royal UK continued to guide the litigation, and create documents in anticipation of the litigation into 2002. *See, e.g.,* Ex. 29. Royal UK also shares these sentiments of mutual identity with Royal, as evidenced in its October 2, 2003 Press Release, discussing other SFC related litigation and stating "We are disappointed by the Court's ruling. . . . Our filed lawsuit in Texas State Court alleges significant fraud and misrepresentation by various parties, entitling Royal Indemnity to rescind the policies, and we accordingly plan to appeal the decision." *See* Ex. 36 (emphasis added).[5]

### B.     Royal UK Directly Managed Royal's Involvement With SFC.

Royal concedes that Royal UK was involved in the SFC insurance transactions. *See* Opp. at 7; 16-18. Given the substantial evidence reflecting the participation of Royal UK throughout the course of Royal's transactions with SFC, this is not surprising. Indeed, Royal fails to substantively address the most compelling evidence that McGladrey presents: that Royal

---

[4]     Notably, Royal's carefully worded declarations do not directly address the fundamental question here—whether Royal has "control" over documents in the possession of Royal UK.

[5]     The Pettigrew affidavit submitted by Royal states that "No employee of RIC is also an employee of RSA plc." Pettigrew Aff. ¶ 5. However, documents in Royal's production raise questions as to whether this has always been the case. For example, it appears that Bob Mendelsohn simultaneously served as Royal UK's Chief Executive Officer and Royal's Chief Executive Officer for at least two years. *See, e.g.,* RSA 1999 Annual Report Excerpts, at 17 (Ex. 41) (Bob Mendelsohn, Group Chief Executive Officer from December 1997. Chief Executive Officer of the Group's operation in the USA from 1994); RIC, Quarterly Statement, Mar. 1998, at ROY172260 (Ex. 47) (Naming Robert Victor Mendelsohn as Chief Executive Officer). In addition, Royal UK's 1999 Annual Report also discusses the "increased use of international assignments which enable staff to develop their careers in an international setting." RSA 1999 Annual Rpt. at 33 (Ex. 41). *See also* RIC, Annual Statement, Dec. 2002 (Ex. 48) (Mr. Rod Hoover, of Royal UK, signed RIC's compliance certification under the title, Chief Investment Officer).

9

UK was involved in a "lessons learned" exercise in which Royal UK asserted that there was an "underwriting failure" on the SFC account by Royal US management. *See* Ex. 24. Royal does not deny this involvement, but merely says this is normal for a parent company. *See* Opp. at 19 n.4. Whether it is normal or not, it is strong evidence of direct participation, particularly in the assessment of Royal's failures with respect to the SFC account.

Royal asks the Court to disregard this evidence simply because (1) Royal claims that Royal UK did not approve the SFC transactions, (2) Royal UK did not interact with third parties, and (3) Royal UK's involvement amounted only to internal monitoring. None of these arguments is availing.

### 1. Royal UK Authorized the SFC Transactions.

Royal asserts that it did not get authority from Royal UK for the SFC transactions. *See* Opp. at 10. This is an incredible claim, both because it is evidence of violation of company policy (requiring authority from Royal UK), but also because the documents produced by Royal demonstrate otherwise.

. *See* Ex. 5.

. *See id.* ("

.") (emphasis added).

Even if Royal US did not obtain authority, it was required to. Royal does not deny that                                                                                                                                          , *see, e.g.*, Ex. 14 at 2, but (incredibly) says that this was never done with the SFC deals, which made up the vast bulk of Royal's credit enhancement business. *See* Opp. at 11. Royal UK recognized this failing in the aftermath of Royal "discovering" the looming liability resulting

10

from the SFC deals. At that time, Royal UK acknowledged that the strength of "

" would need to be reassessed. Ex. 24 at ROY165279 (emphasis added). Contrary to Royal's suggestion, evidence that Royal US disregarded the requirements of its parent does not justify disregarding the parent's attempted management of the SFC exposure.

### 2.   Royal UK was Involved with Third Parties Related to SFC.

Royal also asserts that Royal UK did not interact with any third parties regarding SFC. This is legally irrelevant – Royal UK was involved with the SFC deals without regard to any communications with third parties. But it also is factually wrong. Royal UK executives Bob Mendelsohn and Bob Gunn participated in person at a meeting on May 28, 2002 with representatives from Grant Thornton, a forensic accounting firm engaged by Royal, and SFC. *See* Ex. 27; E-mail from McKenzie, May 23, 2002, at ROY107163-65 (Ex. 49) (outlining attendees for meeting with SFC on May 28, 2002); Agenda for Meeting, May 28, 2002, at ROY105515 (Ex. 50) Other representatives from Royal UK and around the world participated in the meeting by video conference. *See* Spears Deposition Transcript Excerpts, Aug. 29, 2003 at 67 (Ex. 51); Spears Deposition Transcript Excerpts, Nov. 1-2, 2006, at 222-24, 292-95, 412-13 (Ex. 52) Representatives from Royal UK also came to Charlotte, North Carolina, Royal's US headquarters, to work at Royal in May 2002, after SFC's demise, and aided in securing reinsurance for the transactions. *See* E-mail from Chris Ronayne, May 26, 2002, at ROY107749 (Ex. 53); Ex. 24 (                                                            ). In addition, Royal UK executives participated in Royal's litigation strategy in the aftermath of SFC's collapse. *See, e.g.*, Ex. 29. This degree of participation clearly supports McGladrey's motion to compel and Royal should not be permitted to use its parent-subsidiary relationship as both a sword, to claim privilege, and a shield, to claim there is no control over documents in Royal UK's possession.

11

### 3. Communications With Royal UK were More Than Internal Monitoring.

Contrary to the assertions by Royal, its communications with Royal UK amounted to much more than mere performance reporting. First, Royal attempts to downplay Royal UK involvement with SFC by claiming that Royal UK was actually monitoring *all* of Royal's credit enhancement transactions, including SFC. *See* Opp. at 9. But, SFC accounted for approximately                                . *See, e.g.*,                  , at ROY165570-72 (Ex. 54);                  , at ROY159607 (Ex. 55). Accordingly, evidence of the active dialogue and exchange of ideas about developing underwriting and risk management policies for Royal's credit enhancement business necessarily relates to SFC. *See, e.g.*, Exs. 9, 11, 18. Indeed, by August 2000, it was agreed that                                     , *see* Ex. 8,                                              .

Moreover, the handful of documents produced thus far that relate to Royal UK's attempt to protect its Standard & Poor's ("S&P") credit rating show that Royal UK did not merely serve as a "conduit" in passing information from Royal about the SFC transactions to S&P. *See* Opp. at 10. In fact, when S&P expressed its concerns over Royal UK's involvement in the structured finance business,                                             . *See, e.g.*, Exs. 14, 15, 16.

                                                                       . *See* Ex. 14 at 165360 (             ).

Remarkably, Royal acknowledges this policy, but argues that this does not show Royal UK's involvement because the "policy" was never actually enforced with regard to the SFC transactions! Opp. at 11. Simply implementing a policy demanding Royal receive approval

12

on particular transactions constitutes involvement – in fact, it amounts to outright management – regardless of the degree of enforcement. Indeed, it is also clear that Royal UK managed Royal's transactions with SFC by placing a hold on any new deals during the negotiations with S&P, and then dictating when Royal could proceed. *See* Ex. 21 at ROY003086 ("*We are cleared for take-off from the UK*.") (emphasis added). Royal explains that Mr. Hibberd's statements simply reflect that credit enhancement deals were put on hold and then later released, *see* Opp. at 11, but it is still quite clear, despite Royal's omission, that it was Royal UK who initiated the hold and then released it.

Finally, Royal admits that after it became clear that Royal was facing massive insurance liability as a result of the SFC transactions, Royal UK executives "became involved in trying to assess the losses incurred." Opp. at 16. Indeed, the evidence demonstrates substantial participation by Royal UK.


. *See* Ex. 24.


*Id.*; *see also* Ex. 25 at ROY165280 ("a report is being prepared for local management, WGO and the Group Audit Committee"). It is telling that Royal's meager response to this key piece of evidence is relegated to a footnote. *See* Opp. at 19 n.4. In addition to assessing the impending liability and lessons learned, Royal UK assisted Royal in its litigation strategy. *See, e.g.*, Ex. 24 (discussing legal team); Ex. 29.

Royal's only response is that Royal UK's involvement after the close of the last SFC transaction is insufficient to compel production. *See* Opp. at 19 n.4. But there is no basis for this proposition in the case law. In fact, the *Afros* court granted a motion to compel

documents in possession of a parent corporation when the parent corporation participated in decisions about litigation strategy and voluntarily provided documents to aid the subsidiary at trial. *See Afros S.P.A.*, 113 F.R.D. at 132.

### C. Royal Regularly Accessed Documents in Royal UK's possession in the Ordinary Course of its Business, and Has Done So in the Context of This Litigation.

Another factor weighing in favor of production is Royal's access to documents in Royal UK's possession in the ordinary course of business and for the purposes of this litigation. *See Gerling Int'l Ins. Co.*, 839 F.2d at 141; *Playboy*, 1997 WL 873550, at *3 (a factor considered in determining whether sufficient control is exercised by the party from whom documents are sought is "the ability of the party from whom documents are sought to obtain the documents upon demand") (citing *Camden Iron and Metal, Inc.*, 138 F.R.D. at 441 (noting that court held "subsidiary could obtain documents in normal course of business") and *Afros S.P.A.*, 113 F.R.D. at 132 (noting that court found "documents were accessible to subsidiary")).

*See* Ex. 37 at ROY 176684. A legal right to obtain documents could not be more clearly illustrated than by                                           . Royal does not respond to this.

Additionally Royal's privilege log demonstrates that documents and communications were exchanged between Royal and Royal UK for the purpose of aiding Royal in its litigation strategy. *See Gerling Int'l Ins. Co.*, 839 F.2d at 141 ("Where the relationship is thus such that the agent-subsidiary can secure documents of the principal-parent to meet its own business needs and documents helpful for use in the litigation, the courts will not permit the

agent-subsidiary to deny control for purposes of discovery by an opposing party."); *Afros S.P.A.*, 113 F.R.D. at 132.

In response, Royal seeks refuge in this Court's *Power Integrations* decision, claiming that access to documents in the regular course of conducting business is irrelevant. *See* Opp. at 20-21. But the Court in *Power Integrations* conducted the exact inquiry that Royal seeks to preclude here, *i.e.* whether the subsidiary "utilize[d] the information requested . . . in the normal course of its business." 233 F.R.D. at 146. Other courts in this Circuit similarly focus on whether the subsidiary regularly accessed records kept in the possession of the parent. *See Gerling Int'l Ins. Co.*, 839 F.2d at 141; *Playboy*, 1997 WL 873550, at *4; *Camden Iron and Metal*, 138 F.R.D. at 442, 443.

### D. RSA Will Directly Benefit if RIC is Successful in this Litigation.

As McGladrey has previously discussed, Royal and Royal UK have an interdependent financial relationship. Although the sale of Royal is pending, under the sale terms, Royal UK has not only agreed to a deferred purchase price, and an initial capital contribution to Royal, but also that "a number of financial and contractual arrangements with the US operation . . . [will] continue after disposal of the US operation." *See* Ex. 1 at n.8. Arrangements to "step down" payments under these contractual obligations are contingent upon Royal's future financial health. *Id.* at 2. In light of Royal's precarious financial position, Royal UK has little hope of recovering the deferred consideration from the sale of its US operations without success in the various related litigations.

## CONCLUSION

The documents that McGladrey seeks to compel are in the possession of Royal's parent company, but they are within Royal's control. Accordingly, McGladrey respectfully asks this Court to order Royal to produce the requested materials.

Dated: November 27, 2006

DUANE MORRIS LLP

By: _____
Michael R. Lastowski (Bar No. 3892)
Christopher M. Winter (Bar No. 4163)
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246
Phone: 302-657-4951
Fax: 302-657-4901

-and-

| | |
|---|---|
| ARNOLD & PORTER LLP | WILLIAMS & CONNOLLY LLP |
| Veronica E. Rendon | Steven M. Farina |
| Jason M. Butler | Thomas H. L. Selby |
| 399 Park Avenue | 725 Twelfth Street, N.W. |
| New York, NY 10022 | Washington, D.C. 20005 |
| Phone: 212-715-1000 | Phone: 202-434-5000 |
| Fax: 212-715-1399 | Fax: 202-434-5029 |
| | |
| Attorneys for McGladrey & Pullen, LLP and Michael Aquino | Attorneys for McGladrey & Pullen, LLP |