IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROYAL INDEMNITY COMPANY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-165-JJF |
| | ) | |
| PEPPER HAMILTON LLP, | ) | |
| W. RODERICK GAGNÉ, | ) | |
| FREED MAXICK & BATTAGLIA CPAs PC, | ) | |
| MCGLADREY & PULLEN, LLP, | ) | |
| MICHAEL ACQUINO and FREED MAXICK | ) | |
| SACHS & MURPHY, P.C., | ) | |
| | ) | |
| Defendants. | ) | |

**ROYAL INDEMNITY COMPANY'S BRIEF IN OPPOSITION TO
PEPPER HAMILTON'S AND W. RODERICK GAGNE'S
<u>MOTION TO COMPEL AND FOR SANCTIONS</u>**

**INTRODUCTION**

Despite this Court's February 7, 2007 ruling denying Royal Indemnity Company's ("Royal") own motion seeking discovery of certain employee evaluations, defendants Pepper Hamilton LLP ("Pepper") and W. Roderick Gagne ("Gagne") claim that discovery relating to the personnel evaluations of Royal employees (which were produced before the Court's Order) are subject to further discovery. The inconsistent interpretation urged by Pepper is both contrary to the Court's ruling and would lead to the incongruous and unfair result that only some parties must provide discovery with respect to their employees' personnel evaluations.

## FACTS

On November 2, 2006, Royal moved to compel, *inter alia*, the production of written employee evaluations of the McGladrey & Pulen LLP ("McGladrey") employees who worked on matters for Student Finance Corporation. (Royal's Memorandum in Support of its Motion to Compel Production of Documents, dated November 2, 2006 (D.I. 300), at p. 9.) McGladrey opposed that motion on the grounds that the evaluations were irrelevant and that producing those documents would violate public policy. (McGladrey's Memorandum in Opposition to Royal's Motion to Compel Production of Documents, dated November 20, 2006 (D.I. 319), at p. 9.)

On February 7, 2007, this Court ruled that Royal's motion "is going to be granted in all respects except with regard to the personnel files of accountants." (Transcript of February 7, 2007 Hearing ("Hearing Tr.") at p. 6, attached at Ex. 1.) In doing so, the Court also stated that "[d]own the road, I understand you may [move in limine], but…. But I would think, to give you my present thinking, manuals probably get in. Irrelevant personnel evaluations, generally, not specific to the issue don't. But I don't know. I'll have to wait and see." (Hearing Tr. 13.) When specifically asked by counsel whether "the Court's denial of our access to their personnel records also pertain[s] to the specific material where they may have you review that says your performance with respect to the Student Finance," the Court responded unequivocally in the affirmative. (Hearing Tr. 14.)

Based on that ruling, in subsequent depositions of certain Royal witnesses, Royal's counsel instructed those witnesses not to answer substantive questions directly concerning the written personnel evaluations that prior to the Court's February 7, 2007 Order had been produced by Royal, but made no attempt to prevent general questions regarding the evaluated employees,

or the performance evaluation process. Thus, when those types of questions were asked, they were answered.

For example, at the March 19, 2007 deposition of Stephen Mulready, Royal's former Chief Executive Officer, numerous questions regarding personnel evaluations were asked and answered. Instructions not to answer were made only in response to questions specifically directed to the substance of actual written personnel evaluations.

> Q. Did you ever partake in an employee evaluation of William Hibberd -- Bill Hibberd?
>
> A. I don't recall doing one direct. I may have signed off on one from the supervisor.
>
> Q. Do you recall when you would have signed off?
>
> A. Those were annual reviews, so typically done in the first quarter.
>
> Q. Do you recall taking part in any other employees -- employee evaluations?
>
> A. I don't specifically, but I would have had to do appraisals for any of my direct reports.
>
> Q. Show the witness what's been marked as Exhibit 353, Track I. Please take a minute to familiarize yourself with the document.
>
> \*       \*       \*
>
> Q. Have you ever seen this document before?
>
> A. I don't think so.

Q. Does this document look familiar to the performance evaluations that you have seen from Royal?

A. No.

Q. Would you please turn to the final page of the performance -- the second-to-the-last page of the performance evaluation under "Manager Signature." Do you see the name John Tighe?

A. Yes.

Q. Is it your understanding as of 2002, it was John Tighe's responsibility to evaluate Bill Hibberd's performance?

A. Again, I would have to be looking at the time frame that he took over this area.

Q. At the top of that page, there's a paragraph that starts, "Manager Comments." Do you see that?

A. Okay. I do.

Q. Second sentence -- just starting the first sentence, "High standards were set, but the results are unacceptable. I realize that most of this appraisal is with the benefit of hindsight, but the lack of discipline, missing information and disregard for underwriting guidelines that they put in place is unacceptable in the SFC account." Do you see that?

MR. BARNOWSKI: Object to the form. He's testified he never saw it before, he had no role in preparing it, and I'm going to instruct him not to answer based on the other grounds, as well.

(Stephen Mulready Dep. Tr., dated 3/19/07, at 296-301 ("Mulready Dep. Tr."), attached as Ex. 2 (form objections omitted)).  Mulready freely answered questions about his own personal opinion of Hibberd's performance:

> Q.  Did you ever have anything happen while you were managing -- while you were at Royal that caused you to question the abilities of Mr. Rood, Mr. Hibberd or Mr. Pugliese as underwriters?
>
> A.  I don't remember any incident.
>
> Q.  Did you trust them to do their jobs?
>
> A.  I did.

(Mulready Dep. Tr. at 308 (form objections omitted)).

     Similarly, at the deposition of Vincent Pugliese, Royal's Manager of the Custom Risk Division counsel, asked, and Mr. Pugliese answered, several questions about employee evaluations and performance generally:

> Q.  Mr. Pugliese, did you rely on Bill Hibberd to oversee the underwriting on the SFC policies?
>
> A.  I did.
>
> Q.  Do you trust Bill Hibberd?
>
> A.  I do.
>
> Q.  Do you believe that he adequately performed underwriting functions on the SFC policies?
>
> A.  I do.
>
> Q.  On what do you base that belief?

> A. His experience. He had been the chief actuary for Royal in the past, a very bright guy, a lot of integrity, knowledgeable, he communicated. So, yes, I thought he had good judgment and a good financial acumen.
>
> Q. Do you know if others within Royal shared your opinion of Bill Hibberd?
>
> A. You know, I can think of a few that did, yes.
>
> Q. Do you know of anyone who didn't?
>
> A. No.
>
> Q. Did anyone ever complain to you about Bill Hibberd's performance on the SFC program?
>
> A. No.
>
> Q. Did John Tighe ever complain to you about Bill Hibberd's performance?
>
> A. Not that I recall.
>
> Q. Steve Mulready, did he ever complain to you?
>
> A. Not that I recall.

(Vincent Pugliese Dep. Tr., dated 3/22/07 ("Pugliese Tr."), at 314-319, attached as Ex. 3 (form objections omitted)).

It was only when Pepper's counsel directly delved into substantive aspects of Hibberd's written evaluation -- the same type of written evaluation this Court excused McGladrey from having to produce -- that Mr. Pugliese was instructed not to answer:

> Q. After that it states "High standards were set but the results are unacceptable.

- 6 -

I realize that most of this appraisal is with the benefit of hindsight, but the lack of discipline, missing information and disregard for underwriting guidelines that they put in place is unacceptable in the SFC account." Do you see that?

MR. MARROCCO: I'm going to direct you not to answer the questions regarding the substance of this report. You can answer whether or not you see it on the page.

A. I see it.

Q. Do you agree with that statement?

MR. MARROCCO: I'm going to instruct him not to respond to that.

Q. Are you going to follow your counsel's instruction?

A. I am.

Q. Would you please turn to page marked RSA 4. Three-quarters of the way down the page, there is a manager comments section. Do you see that?

A. I do.

Q. The paragraph reads "Clearly Bill and the entire Financial Enhancement Group was far too trusting with the SFC account." Do you see that?

A. Yes.

Q. Do you agree with that statement?

MR. MARROCCO: I direct you not to answer questions relating to the substance of this report.

> Q. Are you going to follow your counsel's instructions?
>
> A. I am.
>
> MR. MARROCCO: I will let him answer questions generally, not tied to this report, but whether he agrees with those types of statements.
>
> MR. PELLETIER: Thank you for that clarification.

(Pugliese Dep. Tr. 319-321.)

Finally, at the deposition of Royal CEO John Tighe, the witness again was permitted to answer questions about multiple Royal employees' performances, and the performance evaluation process, not directly tied to the written evaluation:

> Q. Before March of 2002, did you have an opinion of Mr. Hibberd's professional competence?
>
> A. Before March of 2002 I don't think I really ever reflected on Bill's professional competence.
>
> Q. After March of 2002, did you ever reflect on Mr. Hibberd's professional competence?
>
> A: I had a professional view of our Corporate Actuarial Division as being strong and competent. And Bill being, part of that, you know, by association, I would say he's a competent guy, he had a good reputation. But I don't, I don't remember sitting down and, and reflecting on Bill as an individual. Obviously, when I took over the Custom Risk he was part of my report base. But prior to that I don't, I don't recall.

Q. You believe Mr. Hibberd was a, a strong actuary?

A. That's, that's correct.

Q. Did you ever reflect on whether he was a good manager?

A: When Bill reported to me in the Custom Risk Division I would evaluate him on the basis of his managerial skills, his leadership skills, results that he delivered. At that point I would reflect on, on his competence, you know, as a manager.

Q. And what was your view of Mr. Hibberd?

A. My view of Mr. Hibberd --

   *  *  *

Q. At any point in time with regard to his management skills.

A. I would say I'd characterize him as a no-nonsense guy who was financially principled, had a presence, knew what he wanted, was aggressive in pursuing goals and objectives, had a following of people who worked for him seemed to appreciate Bill.

Q. Did you think he was a good manager?

A. I did.

Q. Did you come to rely on Mr. Hibberd when you were President of the Custom Risk Division?

A. Rely on him in what form?

Q. In any form.

A. Yeah, I think he -- Bill was a -- he had a good head on his shoulders. If we had a session with one of the other direct reports and Bill would be invited I think he would add to those conversations that we would have about business broadly, yes.

Q. Did you rely on him to run the business units under his management?

A. He was obligated to run the businesses that he was managing and I held him accountable for that.

Q. Do you think he did a good job?

A. I do.

Q. After March of 2002, did you continue to
think he did a good job?

A. After March of 2002 did I think that Bill continued to do a good job?

Q. No. I'm sorry. Let me rephrase. Did your opinion of whether Mr. Hibberd had been doing a good job change after March of 2002?

A. My opinion did not change.

*    *    *

Q. At the time you took over as President of Custom Risks what position did Charlie Schuver hold?

A. Charlie worked in the Strategic Development Division, which is where Greg would have worked as well. Charlie was working for Paul Stuman.

*    *    *

Q. Did you respect Mr. Schuver's judgment?

A. I did.

Q. Was he someone you would turn to when you had a particularly thorny issue?

A: Not, not always, but on occasion I would, yes.

Q. Did you have occasion to work with Mr. Lefevre?

A. I would -- I met Andre and he would attend, you know, meetings here and there.

Q. Did you reach an opinion about his professional competence while you were President of Custom Risk?

A. I don't know that I -- I don't recall reflecting on Andre as an individual.

Q. Do you have an opinion about his professional competence?

A. I do. I do.

Q. And what's your opinion?

A. I have a lot of regard for Andre and his capabilities.

Q. Do you think he has expertise in underwriting?

A. He does.

Q. Do you think he is a good manager?

A. I, I believe he is.

Q. Do you think he has good judgment?

A. I believe he has good judgment.

Q. While you were President of Custom Risks what position did David King hold?

A. David King -- I'm not exactly sure what his title was. David King came to Royal & Sun through the Orion Capital Corp. acquisition. And David King was in the Hartford area and, kind of, worked as a -- I don't know if he was an advisor to, but he was working for Mulready and Pugliese and had an underwriting background.

Q. Do you recall that Mr. King is a CPA?

A. I do recall he's a CPA.

Q. Did you ever have occasion to work with Mr. King?

A. When? I mean, subsequent to --

Q. Subsequent to the Orion merger.

A. I, I didn't really have a chance to spend much time with David King until after I became CEO of the U.S. operations.

Q. Do you have an opinion about Mr. King's professional competence?

A. I have regard for Mr. King's professional competence.

Q. Do you think he is a good CPA?

A. I couldn't evaluate him as a CPA.

Q. What do you regard him as being skilled at?

A. He is a smart guy, willing to get into the details, can dig through an awful lot of information and simplify it for others, he is financially principled.

Q. Do you trust his judgment?

A. I do.

Q. When you were President of Custom Risks did you have occasion to interact with Tony McKenzie?

A. I would see Tony in the hallway, but I wouldn't characterize our interactions as being professional or detailed. It was more of an acquaintance, say hello, that kind of stuff.

Q. Other than knowing -- seeing him in the hall, did you form any opinion about Mr. McKenzie's professional competence?

A. I did not.

Q. Did you know that he was in the Financial Enhancements Unit?

A. I did. Certainly, I did.

Q. But in terms of the work that he did there, you didn't have occasion to review that work; is that fair?

A. That's correct.

Q. While you were President of Custom Risks did you come to know Rob Van Epps?

A. I, I knew who Rob Van Epps was, yes.

>Q. And who was Rob at that time?
>
>A. He worked in the Financial Enhancement
>
>Q. What position did Rob hold at that time?
>
>A. I can't tell you that.
>
>Q. He was within the Financial Enhancements Unit, though?
>
>A. He was.
>
>Q. Do you know what Mr. Van Epps' background is?
>
>A. I believe he's an actuary by training.
>
>Q. Have you ever reviewed Mr. Van Epps' work?
>
>A. What do you mean by reviewed his work?
>
>Q. Do you have any -- I'm wondering whether you have any basis to form an opinion about his professional work.
>
>A. I certainly would not have reviewed any of his actuarial work. You know, the fact that he was part of the unit I think was, in essence, where I gained my appreciation for him. Bill spoke highly of him.

(John Tighe Dep. Tr., dated March 28, 2007 ("Tighe Dep. Tr."), at 40-53, attached as Ex. 4

(form objections omitted)).

**ARGUMENT**

Under Rule 30(d)(1) of the Federal Rules of Civil Procedure, counsel may direct a witness not to answer a question at a deposition if it is "necessary to…enforce a limitation directed by the court…." Here, the Court ruled that written personnel evaluations are not the proper subject of discovery. (Hearing Tr. 11-14.) Pepper has made no attempt to explain why the McGladrey personnel evaluations exempted from the discovery by the Court as irrelevant, are any different from the personnel evaluations of Royal employees. Personnel evaluations of all parties' current and former employees are either relevant or are not relevant. The fact that Royal previously produced, subject to objection, the evaluations in question is of no moment. (*See* Royal's Objections and Responses to Pepper's Second Document Request, dated March 13, 2006, at ¶ 52, attached as Ex. 5.) The Court has ruled that personnel evaluations are not discoverable in this case because they are not relevant. (Hearing Tr. 11-14.) Any interpretation of that ruling that limits it solely to the McGladrey personnel evaluations actually at issue in that motion would be both unfair and irrational.

## CONCLUSION

For the reasons stated above and in its moving memorandum, Royal respectfully requests that this Court deny Pepper and Gagne's Motion to Compel and For Sanctions.

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

_____

| | |
|---|---|
| *Of Counsel:* | Philip Trainer, Jr. (I.D. #2788) |
| | Tiffany Geyer Lydon (I.D. #3950) |
| Michael H. Barr | Andrew D. Cordo (I.D. #4534) |
| Kenneth J. Pfaehler | 500 Delaware Avenue, 8th Floor |
| SONNENSCHEIN NATH & ROSENTHAL LLP | P.O. Box 1150 |
| 1221 Avenue of the Americas | Wilmington, Delaware 19899 |
| New York, New York 10020-1089 | (302) 654-1888 |
| (212) 768-6700 | (302) 654 2067 (fax) |
| (212) 768-6800 (fax) | ptrainer@ashby-geddes.com |
| | tlydon@ashby-geddes.com |
|  - and - | acordo@ashby-geddes.com |
| | |
| Alan S. Gilbert | *Attorneys for Plaintiff* |
| John I. Grossbart | *Royal Indemnity Company* |
| SONNENSCHEIN NATH & ROSENTHAL LLP | |
| 8000 Sears Tower | |
| 233 S. Wacker Drive | |
| Chicago, Illinois 60606 | |
| (312) 876-8000 | |
| (312) 876-7934 (fax) | |

Dated: May 2, 2007
180128.1