# **EXHIBIT G**

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 622557 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Page 1

**H**
Hansen v. Umtech Industrieservice Und Spedition, GmbH
D.Del.,1996.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Joseph A. HANSEN, Plaintiff,
v.
UMTECH INDUSTRIESERVICE UND SPEDITION, GMBH, a Foreign Corporation, Defendant.
Civ. A. No. 95-516 MMS.

July 3, 1996.

Jan R. Jurden, and Matthew P. Denn, Young, Conaway, Stargatt & Taylor, and Vincent A. Bifferato, Jr., Herrmann & Bifferato, Wilmington, DE, for plaintiff.
John S. Spadaro, and Patricia A. Garthwaite, Murphy, Welch & Spadaro, Wilmington, DE, for defendant.

*MEMORANDUM OPINION*
MURRAY M. SCHWARTZ, Senior District Judge.

I. Introduction

*1 The motions presently before the Court arise out of a personal injury action brought by plaintiff Joseph A. Hansen ("Hansen") against defendant Umtech Industrieservice Und Spedition, GmbH ("Umtech"). Hansen alleges personal injuries to his arm and hand, suffered while attempting to free his pant leg from a machine allegedly sold and installed by Umtech. Hansen sued under various theories of negligence, strict liability, and breach of implied warranty. Jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332.

II. Factual Background

The facts underlying the complaint giving rise to these motions are relatively simple. Hansen, a Maryland citizen, was employed by K-F Environmental Technologies, Inc. ("K-F"), and at all times relevant to this action, was assigned to work at the Kent County Waste Water Treatment Plant.[FN1] Docket Item ("D.I.") 6 ("Complaint") at ¶¶ 1, 4.[FN2] Umtech is a German corporation with its principal place of business in Edenkoben, Germany. *Id.* ¶ 2. On October 1, 1993, Hansen was working with a waste treatment dryer allegedly sold and installed by Umtech ("Dryer 2"). *Id.* ¶¶ 5, 6. While Hansen was working, the leg of his pants became caught in an exposed moving drive chain and sprocket assembly. In the attempt to free his pant leg from the assembly, his left hand became caught in the assembly. *Id.* ¶ 7. As a result, Hansen suffered the loss of three fingers, a fracture of his left arm, and pain and suffering. *Id.* ¶ 8.

FN1. K-F is not a party to this litigation.

FN2. All references to the complaint are made to plaintiff's Second Amended Complaint, D.I. 6, filed September 27, 1995.

Hansen filed this action against Umtech alleging liability arising out of the sale and installation of the dryer which caused Hansen's injury. The litigation has generated several motions. Hansen has moved to compel certain discovery from Umtech. D.I. 41. Umtech has moved to disqualify Hansen's vocational rehabilitation expert, D.I. 44, and has also moved to disqualify Hansen's medical experts and an economist. D.I. 60. Umtech has also moved for summary judgment on Hansen's negligence claim, D.I. 72, as well as on his claims for strict liability and for breach of implied warranty of merchantability. D.I. 70.

Oral argument was held on June 19, 1996. The Court denied in part Hansen's motion to compel, D.I. 41, and the remaining grounds for the motion, through the course of the argument, became moot. The Court also denied Umtech's motion to disqualify Hansen's medical experts and his economist, D.I. 60. The motions remaining for consideration are (1) Umtech's motion to disqualify Hansen's vocational rehabilitation expert, D.I. 44; (2) Umtech's motion for summary judgment on the negligence claim, D.I. 72; and (3) Umtech's motion for summary judgment on the strict liability and breach of implied warranty of merchantability claims, D.I. 70. Each motion will be addressed separately.

A. Umtech's Motion to Disqualify Plaintiff's Expert

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00165-JJF   Document 476-8   Filed 05/11/2007   Page 3 of 12

Not Reported in F.Supp.  
Not Reported in F.Supp., 1996 WL 622557 (D.Del.)  
(Cite as: Not Reported in F.Supp.)

Page 2

Castro

Umtech has moved to disqualify plaintiff's vocational rehabilitation expert Jose Castro ("Castro") from testifying as an expert witness, and from offering expert services or other assistance in the prosecution of this case. D.I. 44. Umtech further moved to disqualify Castro's employer, the Delaware Valley Rehabilitation Services, Inc. ("DVRS"), from participating in this case, *id.*, and moved to prevent plaintiff from relying on or otherwise making use of any work product or advice prepared or offered by DVRS.

*2 On December 4, 1995, Umtech's counsel Patricia Garthwaite ("Garthwaite") contacted Thomas L. Yohe ("Yohe"), a vocational rehabilitation expert employed by DVRS. D.I. 45 at 3. During the initial conversation with Yohe, Garthwaite inquired whether DVRS had any conflict of interest which might preclude it from consulting on the case. Yohe telephoned Garthwaite back promptly and responded that no conflict existed. *Id.* at 4. During this second telephone conversation, Garthwaite discussed certain substantive matters relating to the case with Yohe. According to a certification in the record, Garthwaite's discussion with Yohe included the following topics:

[A]t a minimum, we discussed the date of the plaintiff's accident; my knowledge (as of December 4) of the function and operation of the sludge dryer unit at issue in this case; my analysis (as of the same date) of how the accident might have occurred; specific facts relating to the plaintiff's job duties and salary that I regarded as potentially relevant to the issue of vocational rehabilitation; and the relative strengths and weaknesses of our defense posture on those issues, in light of the plaintiff's age, level of training and marketable skills.

*Id.*, Exhibit ("Exh.") A, ¶ 5. The following day, Garthwaite sent a confirmation letter confirming the retention of Yohe as an expert, and included a sentence requesting confidentiality. *Id.* at Exh. B. That same day, Yohe sent by facsimile a document entitled "Typical Records Needed in Personal Injury Cases" to Garthwaite. *Id.* at Exh. C. However, neither Yohe nor Garthwaite took any further action with respect to this facsimile in particular, or to the case in general.

Meanwhile, in February, 1996, Hansen retained the same firm of DVRS to consult for its case, specifically retaining expert Castro. Before the retainer was finalized, Hansen inquired as to whether any conflicts of interest existed which might affect or prohibit Castro from working on the case. Castro ran a conflicts check in the DVRS computer system which tracks conflicts of interest. However, Yohe's representation of Hansen's adversary did not surface, because Yohe had failed to enter the information regarding his representation of Umtech into the computer system, and because Yohe himself was on vacation at the time. Thus, Castro told Hansen that there was no conflict, and agreed to the representation.

In furtherance of the representation, Castro began to work on Hansen's case. On February 29, 1996, Castro, on behalf of DVRS, issued a 13-page, single-spaced report which analyzed topics including Hansen's medical status, social/educational factors, vocational history, transferable skills, career assessment, and wage earning capacity. D.I. 50 at B14-26. On March 7, 1996, Hansen's counsel sent a check in the amount of $1,440.02 to DVRS for its services. *Id.* at B27.

Umtech contends that Castro should be disqualified because Umtech's counsel, Garthwaite, retained DVRS in a confidential relationship and confidential information passed between them. D.I. 45. Umtech also urges that the disclosure of confidential information on the part of Castro should be irrebuttably presumed, and that policy considerations such as avoiding the appearance of impropriety support disqualification. Finally, Umtech argues that the interest in preventing jury confusion in the likely event that Umtech would cross-examine Castro on his affiliation with the same firm as Umtech's prior expert supports disqualification.

*3 Hansen responds by arguing that Castro should not be disqualified because Castro has not and will not discuss the case with Yohe. D.I. 49. Hansen argues that Umtech did not have a confidential relationship with Yohe and did not disclose confidential information. Further, Hansen argues that Umtech would not be prejudiced by Hansen's use of DVRS as expert consultants. Finally, Hansen disputes Umtech's analogy to attorney conflicts cases, where courts are more apt to disqualify attorneys with conflicting loyalties.

Central to resolution of this issue is what standard applies to the disqualification issue. After briefing was complete, the parties now agree that the standard for conflicts disqualification for attorneys is more stringent than that of experts. *Compare*, D.I. 49 at 14, and D.I. 51 at 14-15 (Umtech arguing that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 3
Not Reported in F.Supp., 1996 WL 622557 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

"irrespective of the "attorney rules" debate, disclosure of confidential information by DVRS to Hansen should be irrebuttably presumed). This proposition is amply supported by case law. *See, e.g., EEOC v. Locals 14 and 15, Int'l Union of Operating Engineers,* 24 Fair Empl. Prac. Cas. (BNA) 1821; 25 Empl. Prac. Dec. (CCH) ¶ 31,783 at 6 (S.D.N.Y. Feb. 11, 1981) (rejecting analogy to attorney-client disqualification); *Paul v. Rawlings Sporting Goods Co.,* 123 F.R.D. 271, 281 (S.D. Ohio 1988) (same); *English Feedlot, Inc. v. Norden Labs., Inc.,* 833 F. Supp. 1498, 1501 (D. Colo. 1993) (same); *Cordy v. Sherwin-Williams Co.,* 156 F.R.D. 575, 580 (D.N.J. 1994) (same).

There are two scenarios in which motions to disqualify experts typically arise. The first is where one expert is originally retained by one party to litigation, and that expert subsequently switches sides to consult as an expert for that party's adversary. These cases are referred to as "side-switching" cases, and form the most common basis for motions to disqualify. A second scenario, such as in the case *sub judice*, occurs where an expert is retained by a party to litigation, and then the adversary retains an expert who is in some way affiliated with the expert retained by the first party. In both cases, a conflict of interest may arise which may preclude one or both parties from using its retained expert, depending on the nature and extent of the relationship and the exchange of confidential information between each party and its expert.

While there is relatively sparse case law on expert disqualification concerning either factual scenario, analysis must begin with the recognition of the inherent power of federal courts to disqualify experts. *English Feedlot,* 833 F. Supp. at 1501; *Cordy,* 156 F.R.D. at 579-80; *Wang Labs., Inc. v. Toshiba Corp.,* 762 F. Supp 1246, 1248 (E.D. Va. 1991). This power exists to further the judicial duty to protect the integrity of the adversary process and to promote public confidence in the fairness and integrity of the legal process. *Wang,* 762 F. Supp at 1248; *Paul,* 123 F.R.D. at 278.

*4 Courts have fashioned a two-part inquiry used to determine whether disqualification is necessary:
First, was it objectively reasonable for the first party who claims to have retained the consultant to conclude that a confidential relationship existed?
Second, was any confidential or privileged information disclosed by the first party to the consultant?

*Paul,* 123 F.R.D. at 278; *Wang,* 762 F. Supp at 1248. In *Paul,* the plaintiff had suffered extensive head injuries from being struck by a baseball while wearing a helmet manufactured by defendant sporting goods company. Plaintiff retained an expert in mechanical engineering to consult in connection with his personal injury action against defendant. However, defendant had previously used the same expert for the purpose of engaging in extensive testing of its helmets, but the court found that the consultation was not specifically for the purpose of the lawsuit. Applying the two-part test, the court found that although defendant's counsel reasonably believed that a confidential relationship had been established with the expert, no confidential or privileged information passed from defendant to the expert. *Id.* at 280. Thus, disqualification was not warranted.

The result reached in *Paul* is appropriately characterized by a situation where "despite the existence of a formal contractual relationship, so little of substance occurs during the course of the relationship that neither the integrity of the trial process, nor the interests of the party who retained the expert, would be served by blanket disqualification." *Paul,* 123 F.R.D. at 278. In connection with the two-part test set forth in *Paul*, a negative answer to either prong should result in a finding of no disqualification. *Wang,* 762 F. Supp at 1248 ("But disqualification is likely inappropriate if either inquiry yields a negative result."). As the *Wang* court explained, in interpreting *Paul*, even if a confidential relationship exists, disqualification is inappropriate unless some privileged or confidential information passed; if this were not the rule, then a lawyer could potentially disqualify an expert merely by retaining him with no intention of actually using the expert's services, to disable his opponent from using the expert for himself. *Id.* at 1248.

The *Paul* two-part inquiry has been repeatedly cited and utilized by courts ruling on motions to disqualify experts who have engaged in side-switching. In *Wang,* 762 F. Supp. 1246, the court disqualified an expert who had consulted with plaintiff on the issue of the validity of plaintiff's patent, communicated to plaintiff's counsel that in his opinion the patent was invalid, and then was subsequently retained by defendant for the same litigation. The court found a confidential relationship existed because the plaintiff's attorney gave the expert a detailed memorandum used by the expert containing, *inter alia*, the patent file history and potential defenses to the lawsuit, both of which the court found to be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00165-JJF   Document 476-8   Filed 05/11/2007   Page 5 of 12

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 622557 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Page 4

protected confidential work product. *Id.* at 1249. Similarly, in *Cordy,* 156 F.R.D. 575, the court disqualified defendant's expert who had previously consulted with plaintiff's counsel in a personal injury action, and then changed sides to consult for the defendant. Plaintiff had made telephone calls to the expert, executed a retainer agreement, forwarded a retainer check, sent a three-ring binder of documents to the expert relating to the investigation of the injury, and had been billed for 27 hours of work in the amount of $2,094.23. Further, the expert had issued an oral report for plaintiff, all before the expert switched sides. *Id.* at 577.

*5 However, in *Mayer v. Dell,* 139 F.R.D. 1 (D.D.C. 1991), the court reached an opposite conclusion. That court declined to disqualify defendant's expert on plaintiff's motion, finding that plaintiff, who had purported to retain the same expert before defendant, had never actually retained the expert, had only met with the expert on one occasion, had only given the expert one document, which was the complaint, had not received the benefit of any of the expert's work, had never asked the expert to sign a confidentiality agreement, and had paid no fee to the expert. *Id.* at 2. In *English Feedlot,* 833 F. Supp. 1498, the court also denied a motion to disqualify plaintiff's expert who had previously consulted for defendant in prior litigation, because defendant had not disclosed confidential information to the expert. *Id.* at 1501.

These cases illustrate the types of factors considered by courts ruling on motions to disqualify. All of these cases, however, involved side-switching experts. There are even fewer cases dealing with conflicts caused by experts who are affiliated with experts consulting for the other side. *EEOC,* 25 Empl. Prac. Dec. (CCH) ¶ 31,783, addressed this situation. There, counsel for defendant contacted an expert for the purposes of consulting on Title VII litigation. Consultations were limited to two days, and included discussions about the relevant labor market, defense theories, and the strengths and weaknesses of the defense and the EEOC's positions. *Id.* at 3. Less than one year later, that expert founded a new consulting firm whose shares were owned in part by another expert who was subsequently retained by the EEOC for the same litigation. *Id.* at 4. The court found that because there was no evidence that any substantive information was exchanged among the expert-partners, nor was there evidence of danger of future inadvertent disclosure, disqualification was not warranted. *Id.* at 7. Indeed, the court found that because the experts had limited contact, separate offices, no mutual access to computer accounts in which they store data, separate file areas, and a strong ethic of maintaining client confidentiality, the danger of leakage of information was "minimal." *Id.*

The other case dealing with affiliated experts disqualification motion is *Great Lakes Dredge & Dock Co. v. Harnischfeger Corp.,* 734 F. Supp. 334 (N.D. Ill. 1990). There, plaintiff retained a consulting firm to determine the cause of failure of its ship's bearings. The consulting firm employed an expert in metallurgy to consult, with the intention to use his testimony at trial against the defendant who sold the ship to plaintiff. *Id.* at 335. Defendant filed a third-party complaint against the bearing manufacturer. The third-party defendant then retained its own expert. *Id.* Plaintiff moved to disqualify the third-party defendant's expert on the ground that he worked at the same consulting firm at which its own expert occasionally worked and, in fact, frequently supervised plaintiff's expert's work. *Id.*

*6 The court reviewed the *Paul* line of cases, noting that the facts of those cases were unlike those before it: "[t]he other cases involved the 'switching sides' expert who at one time or another did work for a party's adversary." *Id.* at 338. The only case with similar facts the *Great Lakes* court cited was *EEOC, supra.* Concluding that disqualification would be denied, the court noted the following relevant factors: neither party alleged it had disclosed confidential or privileged information to the opposing side's expert; plaintiff's expert had not discussed the case with the firm which employs defendant's expert; defendant's expert denied knowledge of plaintiff's expert's work; "no communication or 'leakage' whatsoever of any information, whether confidential, privileged, or otherwise" had occurred; and both parties were aware of the situation and could take steps to prevent inadvertent disclosure. *Id.* at 338-39. Thus, while not expressly applying the *Paul* test for side-switching experts, the court considered the same confidentiality concerns.

A party seeking to disqualify another party's expert bears the burden of demonstrating the existence of a confidential relationship and the passing of confidential information. *Cordy,* 156 F.R.D. at 580; *English Feedlot,* 833 F. Supp. at 1501-02. In this case, Umtech bears the burden of demonstrating that Umtech and Yohe had a confidential relationship and that confidential or privileged information passed between them, such that plaintiff should be prohibited from using his expert from the same firm.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00165-JJF    Document 476-8    Filed 05/11/2007    Page 6 of 12

Not Reported in F.Supp.                                                                 Page 5
Not Reported in F.Supp., 1996 WL 622557 (D.Del.)
(Cite as: Not Reported in F.Supp.)

### 1. *Confidential Relationship Between Umtech and Yohe*

Umtech argues that a confidential relationship existed between Umtech and Yohe. It argues that DVRS was retained in December, 1995, with the intent to use Yohe as a consulting, and possibly a testimonial, expert. According to Garthwaite's certification, she spoke with Yohe twice on the telephone to discuss the possibility of retaining him. D.I. 45 at Exh. A. Yohe was formally retained during the second conversation, which was confirmed by written letter (mistakenly) dated December 4, 1995. Also during that second conversation, Garthwaite discussed aspects of the case including the date of the plaintiff's accident, her knowledge (as of December 4) of the function and operation of the sludge dryer unit at issue in this case, her analysis (as of the same date) of how the accident might have occurred, specific facts relating to the plaintiff's job duties and salary that she regarded as potentially relevant to the issue of vocational rehabilitation, and the relative strengths and weaknesses of Umtech's defense posture on those issues, in light of the plaintiff's age, level of training and marketable skills. *Id.* ¶ 5. Garthwaite further states that she asked about the records Yohe would need to conduct his analysis, and the next day, she received a facsimile of a document entitled "Typical Records Needed in Personal Injury Cases." *Id.* ¶¶ 5, 6.

*7 *Paul* requires a court to determine whether counsel reasonably believes a confidential relationship has been established with the expert. *Paul,* 123 F.R.D. at 278. In this case, Garthwaite might reasonably have believed a confidential relationship was created between herself and Yohe, given the fact that she sent a confirmation letter regarding the retention of Yohe, which contained a reminder of the need for confidentiality. Whether that belief was reasonable need not be determined. It will be assumed that a confidential relationship between attorney an expert did exist.

### 2. *Exchange of Confidential Information*

Despite the existence of a confidential relationship, the amount of confidential information which passed to the expert is questionable. Garthwaite certifies that she has had no further personal contact with Yohe since December 5, 1995, and that she never forwarded any documentation to Yohe so that he might begin his analysis. The record does not indicate that Umtech or Garthwaite's law firm ever paid any money to Yohe or DVRS. Yohe, in a letter dated March 8, 1996, states that he "did not open a file [in December] as [he] was anticipating receiving materials in the near future." D.I. 45 at Exh. D. He explained that he typically opens a case upon receipt of the materials needed, *id.,* and it has been his experience that occasionally following initial attorney contact, he never hears about the case again. He further admitted that he "frankly, forgot about the matter until [his] phone call with [defense counsel]" on March 8, 1996. *Id.* He stated he "never had reason to speak about this case" with Castro until the conflict surfaced, *id.,* and that he does not, at any rate, work closely with Castro or participate in any details of Castro's work.

While counsel stated that she discussed her analysis of the case, including its strengths and weaknesses, with Yohe, Yohe has no recollection of the details of that conversation. D.I. 45 at Exh. D. Additionally, Garthwaite's disclosures in connection with the liability phase of the case are not germane to either Yohe's expertise or expert opinion. Further, Yohe forgot about the case entirely until the conflict was made known to him by Castro and Umtech's counsel. *Id.* It is clear, then, that to the extent that counsel disclosed confidential information, Yohe did not in any way use that information. Furthermore, and more importantly, Yohe never discussed the case with anyone, including Castro. Suffice it to say that if the expert himself can't remember any of the information, he certainly could not have passed it along to the other expert. Like *Paul,* this is a case where "despite the existence of a formal contractual relationship, so little of substance occurs during the course of the relationship that neither the integrity of the trial process, nor the interests of the party who retained the expert, would be served by blanket disqualification." *Paul,* 123 F.R.D. at 278.

*8 The most important consideration in expert disqualification cases, as noted above, is the preservation of confidentiality. The *Paul* inquiry relates to side-switching experts, and its rationale of confidentiality, rather than the two-part inquiry, guides this Court, as it is faced with a dissimilar factual context. Like the *EEOC* and *Great Lakes* courts, the absence of evidence that any substantive information was exchanged among the affiliated experts, and their being no prospect of future inadvertent disclosure, leads the Court to conclude that disqualification is not warranted. Like those cases, Yohe and Castro maintain separate practices and have limited contact beyond "pleasant conversation." D.I. 45 at Exh. D. Neither has a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00165-JJF    Document 476-8    Filed 05/11/2007    Page 7 of 12

Not Reported in F.Supp.                                                                                              Page 6
Not Reported in F.Supp., 1996 WL 622557 (D.Del.)
(Cite as: Not Reported in F.Supp.)

supervisory relationship over the other. *Id.* Accordingly, Umtech's motion to disqualify Castro will be denied. Similarly, Umtech's request to disqualify DVRS from participating in the case, and to prevent Hansen from relying on any work product or advice from DVRS, will be denied.

### B. Umtech's Motion for Summary Judgment: Negligence

Before examining the arguments in this motion, it is important to identify the theory under which Hansen asserts liability by Umtech. His complaint refers to Umtech's duty as *manufacturer* of Dryer 2. D.I. 5, ¶¶ 9-16. However, plaintiff appears to have abandoned his manufacturer theory and relies exclusively on theories of duty as seller to warn, and a duty as the installer to make the equipment safe.

Umtech moves for summary judgment on several grounds. First, Umtech argues that plaintiff's contributory negligence is the dominant, if not the sole, proximate cause of his injury, in that Hansen (1) was aware of the danger of exposure to the chain drive yet chose to clean the dryer without first shutting it off, and then (2) failed to shut off the machine once his pant leg was caught; (3) twice failed to look before attempting to free his pant leg; and (4) failed to immediately call for help. D.I. 73. Umtech further argues that it bears no liability for K-F's negligent operation of Dryer 2, that K-F was a sophisticated purchaser and was provided a safety manual with warnings, and that Umtech had no reason to know of a defect in Dryer 2. Umtech's reply brief more succinctly (if not differently) states its defense in legal terms: Umtech owed Hansen no duty; K-F's negligence is a superseding cause of Hansen's injuries; Hansen's own negligence is a superseding cause of his injuries; and at a minimum, Hansen's own negligence is the main proximate cause of his injuries. D.I. 86.

#### 1. *Negligence Standard*

In order to recover in an action for negligence, a plaintiff must show by a preponderance of the evidence that the defendant's negligent act or omission violated a duty which was owed to the plaintiff. *Culver v. Bennett*, 588 A.2d 1094, 1096-97 (Del. 1991).[FN3] Plaintiff must also show that the defendant's act of negligence was the proximate cause of plaintiff's injury. *Id.* at 1097. With respect to proximate cause, Delaware adheres to the "but for" rule: "a defendant's conduct is the cause of an event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it." *Reese v. Home Budget Ctr.*, 619 A.2d 907, 910 (Del. 1992). Delaware also recognizes there can be more than one proximate cause of an injury. *Id.; see also Culver*, 588 A.2d at 1097. The issue of proximate cause is ordinarily a question of fact to be submitted to the jury. *Id.; see also Duphily v. Delaware Elec. Coop., Inc.*, 662 A.2d 821, 830 (Del. 1995).

> FN3. The parties have stipulated that Delaware law applies to this dispute. *See infra* Part C(1).

#### 2. *Contributory Negligence*

*9 In 1984, Delaware enacted a modified comparative negligence statute, 10 Del. C. § 8132, which provides:
In all actions brought to recover damages for negligence which results in death or injury to person or property, the fact that the plaintiff may have been contributorily negligent shall not bar a recovery by the plaintiff or his legal representative where such negligence was not greater than the negligence of the defendant or the combined negligence of all defendants against whom recovery is sought, but any damages awarded shall be diminished in proportion to the amount of negligence attributed to the plaintiff.

This statute has been interpreted by the Supreme Court of Delaware as follows:[I]f the plaintiff's contributory negligence is 50% or less, the plaintiff is permitted to recover, although the recovery is reduced proportionally. However, if the plaintiff's contributory negligence is 51% or greater, it is an absolute bar to recovery according to the Delaware statute.

*Culver*, 588 A.2d at 1098.

Umtech's central argument is that Hansen's contributory negligence was the main, if not the sole, cause of his injury, and therefore, his claim is barred. Umtech argues that the accident would never have occurred but for Hansen's negligence. It argues that Hansen was aware of the danger of exposure to the chain drive yet chose to clean the dryer without first shutting it off, and then neglected three safe alternative courses of conduct by failing to shut off the machine once his pant leg was caught, failing to

Case 1:05-cv-00165-JJF   Document 476-8   Filed 05/11/2007   Page 8 of 12

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 622557 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Page 7

look before attempting to free his pant leg, and failing to immediately call for help. Umtech argues that these acts amount to the dominant, if not the sole, proximate cause of his injuries. D.I. 73. In short, Umtech argues that Hansen chose the risky path by attempting to clean the dryer without first shutting it off, and then failed to use reasonable methods to shut it off once his pants were caught.

Umtech relies heavily on *Johnson v. Hockessin Tractor, Inc.*, 420 A.2d 154 (Del. 1980). In that case, plaintiff was injured while attempting to shut off a tractor engine by reaching under the carburetor for a valve, without looking, and instead placed his fingers into an operating belt and pulley system. *Id.* at 155. The court found that plaintiff knew of the danger created by shutting off the tractor engine with that valve rather than with the "kill button," and his attempt to shut off the engine with that valve in any event, without looking, constituted contributory negligence. Accordingly, the court affirmed the trial court's grant of summary judgment in favor of defendants:

In addition, we note that plaintiff could have used an inherently safe method ... to shut off the tractor engine. Instead he chose to use ... a method which he knew was fraught with risk, particularly when done without looking. If a person has the choice of two alternate paths, one known to be safe, the other known to be risky, the unnecessary choice of the risky path constitutes contributory negligence.

*10 Accordingly, we find no error in the Trial Court's conclusion of contributory negligence as a matter of law.

*Id.* at 158-59 (citations omitted).

Reliance on *Johnson* is unavailing to Umtech. *Johnson* was decided in 1982, two years before the Delaware Legislature enacted the modified comparative negligence statute, 10 Del. C. § 8132. When *Johnson* was decided, the Supreme Court of Delaware was using the common law contributory negligence doctrine, which held that contributory negligence was an absolute bar to any recovery by a plaintiff in Delaware. See *Culver,* 588 A.2d at 1097. Thus, once the court found any negligence on the part of the plaintiff, summary judgment would necessarily be entered against him. Now, however, a finding of negligence on the part of the plaintiff does not necessarily yield the same result. Only upon a finding that the plaintiff was more than 50% negligent will summary judgment be granted against him. Stripped to its most basic element, Umtech is asking this Court to decide that the combination of Hansen's acts and omissions amounts to more than 50% of the negligence which led to his injury. This determination cannot be made as a matter of law, and therefore must be made by a jury. Summary judgment on the ground of contributory negligence will be denied.[FN4]

> FN4. Umtech's reply brief argues that Hansen's negligence was also the superseding cause of his injuries, which would absolve Umtech from liability. Despite the fact that Umtech raises a new legal defense in its reply brief, this argument is without merit. Superseding causes refer to new and independent acts, see *Duphily,* 662 A.2d at 829, not to the plaintiff's own negligence. The proper defense arising out of plaintiff's own negligence is contributory negligence, as Umtech had originally argued.

*3. Effect of Alleged Negligent Operation of Facility by K-F*

Umtech argues that it bears no liability for the negligent operation of Dryer 2 by Hansen's employer, K-F. Hansen stated in his deposition that K-F had increased production at the facility, which increased the frequency of clogging of the dryer. D.I. 74 at A-70-72. Increased production also rendered it infeasible, according to Hansen, to shut off the dryer when cleaning was needed. *Id.* at A-151-52. Further, Hansen alleges that the blower on the platform was broken, and this caused poor visibility on the platform, further adding to the danger. *Id.* at A-198. Umtech asserts these allegations are properly directed at K-F, not Umtech, and Umtech bears no responsibility for K-F's failures.

While not clearly stated in its opening brief, Umtech's reply brief argues that K-F's alleged acts of negligence are the superseding cause of Hansen's injuries. D.I. 86 at 15. A superseding cause is a new and independent act, itself a proximate cause, which breaks the causal connection between the original tortious conduct and the injury. *Duphily,* 662 A.2d at 829. If the intervening act of negligence was not reasonably foreseeable to the original tortfeasor, the intervening act supersedes and becomes the sole proximate cause of the plaintiff's injuries, relieving the original tortfeasor of liability. *Id.*

The Supreme Court of Delaware has held that the question of superseding cause is "fact-driven" and is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00165-JJF    Document 476-8    Filed 05/11/2007    Page 9 of 12

Not Reported in F.Supp. Page 8
Not Reported in F.Supp., 1996 WL 622557 (D.Del.)
(Cite as: Not Reported in F.Supp.)

a question for the jury. *Id.* The *Duphily* court explained:

[A]n intervening negligent act will not relieve the original tortfeasor from liability if: the original tortfeasor at the time of his negligence *should have realized* (foreseen) that another's negligence might cause harm; or, if a *reasonable person* would not consider the occurrence of the intervening act as *highly extraordinary;* or if the intervening act was not *extraordinarily negligent.* Considerations of foreseeability and what a reasonable person would regard as highly extraordinary are factual questions ordinarily reserved for the jury.

*11 *Id.* at 830-31 (emphasis in original); *see also* Restatement (Second) of Torts § 453 cmt. b (1965) ("[if] under the undisputed facts there is room for reasonable difference of opinion as to whether such act was negligent or foreseeable, the question should be left to the jury.").

As noted above, a superseding cause is a new and independent act, *itself a proximate cause,* which breaks the causal connection between the original tortious conduct and the injury. *Duphily*, 662 A.2d at 829 (emphasis supplied). Umtech has failed to demonstrate how K-F's alleged acts of negligence are the proximate cause of Hansen's injuries. According to both parties, the acts of K-F were (1) the increased production at the facility, coupled with the changes in chemicals used, which caused an exponential increase in dryer clogging, and (2) the failure to repair the blower on the top of the platform, which caused poor visibility and obscured Hansen's vision. Neither of these acts, alone or in the aggregate, was the "but for" cause of Hansen's injuries. Poor visibility did not cause Hansen's pant leg to become caught: the exposed chain drive was the cause of his entanglement. Increased production did not cause his pant leg to become caught: if anything, it made the number of occasions on which Hansen was on the platform greater. However, even if Hansen's job required him to stand on the platform all day long, a protected chain drive would have still prevented his accident. Thus, the superseding cause argument cannot prevail as a matter of law at this stage of the proceeding, because there has been no demonstration of proximate cause on the part of K-F.

Even if Umtech had demonstrated how K-F's alleged negligence proximately caused Hansen's injuries, the superseding cause argument would have to be left to the jury. The Court will not make factual determinations on summary judgment as to whether it was foreseeable to Umtech, at the time of its alleged negligent installation of the dryer, that K-F would increase productivity and/or change the formula for the sludge cake, which Umtech asserts causes more clogging of the dryer, or whether it was foreseeable that a blower might break, and cause poor visibility on the platform. Summary judgment on the ground of superseding cause will be denied.

*4. Sophisticated Purchaser Defense to Duty to Warn*

Umtech also argues that it supplied K-F with a detailed operating manual for Dryer 2, which was more than 60 pages in length. Umtech argues that it was entitled to rely on K-F to warn its employees of the dangers or defects as set out in the manual. The manual was provided by Umtech to K-F, in German; K-F's president, Petra Freuhbis, translated it into English. The safety manual provided to K-F by Umtech contains the following warnings:

3.1 MAKE SURE ALL COVERS AND DOORS ARE LOCKED AND SECURED TIGHTLY BEFORE START-UP!
3.2 KEEP ALL TROUGH COVERS AND DOORS AT CHAIN DRIVES CLOSED. Screws on covers and doors may only be opened during shutdowns. Ensure that it is not possible to accidentally start the equipment during cleaning and maintenance procedures (Lock Out Tag Out Systems!). Upon completion of cleaning and maintenance all covers and doors must be closed and secured.
*12 3.3 SAFETY COVERS ON CHAIN DRIVES may not be removed during operation. Equipment must be shut off for repairs and secured against accidental start-up (see 3.2).

D.I. 83 at B98 (emphasis in original).

The Supreme Court of Delaware has not addressed whether the so-called "sophisticated purchaser" defense has a place in Delaware jurisprudence. While Delaware trial court decisions do not control where the Delaware Supreme Court has not spoken, a decision of the Delaware state trial court may be considered when a federal court engages in the hazardous chore of divining state law. *Cf. Robinson v. Jiffy Executive Limousine Co.,* 4 F.3d 237 (3d Cir. 1993).

Several Delaware Superior Court decisions recognize the so-called "sophisticated purchaser" defense. This defense was first discussed in *In re Asbestos Litigation (Mergenthaler),* 542 A.2d 1205 (Del. Super. Ct. 1986) ("*Mergenthaler*"). There, plaintiffs had brought an action against several asbestos

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 622557 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Page 9

suppliers alleging, *inter alia,* failure to warn of the dangers associated with asbestos products. *Id.* at 1207. The defendants argued that plaintiffs' employers were sophisticated purchasers of the products and knew of the dangers of asbestos exposure. The court reviewed decisions of courts across the country and concluded that "some version of a 'sophisticated purchaser' defense is the norm in most jurisdictions." *Id.* at 1211. The standard which must be met to invoke the defense was set forth as follows:

[W]hen a supplier provides a product it knows to be dangerous to a purchaser/employer whom the supplier knows or reasonably believes is aware of that danger, there is no duty on the part of the supplier to warn the employees of that purchaser unless the supplier knows or has reason to suspect that the requisite warning will fail to reach the employees, the users of the product.

*Id.* at 1212.

This standard has been analyzed as a two-part inquiry to determine whether the sophisticated purchaser defense is available to a defendant:

First, did the supplier of the dangerous product know or reasonably believe that the purchaser was aware of the dangers of the product? If the answer is no, the supplier may not avail himself of this defense. If the answer is yes, the purchaser is considered "sophisticated," and the seller may rely on the purchaser to warn others of the danger of the product. The next inquiry is whether the supplier knew or had reason to suspect that the warning would fail to reach the purchaser's employees or the users of the product? If the answer is yes, the supplier is not relieved from his duty to warn.

*Sanderson v. Firestone Tire & Rubber Co.,* 1994 WL 807899 at *2 (Del. Super. Ct. July 28, 1994).

The *Mergenthaler* court, applying the standard above, ultimately concluded that summary judgment for defendants was improper. As to the first inquiry, the court found that the purchaser was sophisticated as a matter of law because it was involved with asbestos, had knowledge of the asbestos industry, and held itself out as following all OSHA regulations relating to asbestos. *Id.* at 1213. As to the second inquiry, however, the court held it was a jury question as to whether the supplier knew or had reason to suspect that the warnings were not being given to the purchaser's employees. *Id.* The court noted that while the supplier had never sent an agent to the purchaser's plant to observe its safety measures, in addition to the fact that the purchaser had represented that it was following OSHA regulations, the supplier was nonetheless aware of the purchaser's warnings because it had seen the purchaser's warning labels. The court stated that if a jury determined that the warning labels were inadequate, it may also find that the supplier was on notice that the purchaser's safety measures were inadequate. *Id.*

*13 In *Steffen v. Colt Indus. Operating Corp.,* 1987 WL 8689 (Del. Super. Ct. Feb. 4, 1987), the court, in dicta, discussed this defense in connection with an industrial accident similar to the accident in the case *sub judice.* There, plaintiff was injured at work while attempting to lubricate a pump manufactured by defendant. Defendant had sent plaintiff's employer a safety manual containing the warning "Do not relubricate the pump while it is running." *Id.* at *2. Plaintiff, however, had not been instructed by his employer to first shut off the pump before attempting to relubricate it. *Id.* The court rejected plaintiff's failure to warn argument against the defendant, finding that defendant discharged its duty to warn by providing the safety manual to the employer, and reasonably believed that the employer was aware of the dangers associated with relubricating a moving pump. *Id.* at *4. Further, the court noted that defendant had no reason to suspect that the employer was not providing the warning to its employees, as it has an "economic incentive in not exposing its employees to unnecessary dangers." *Id.*

Umtech argues its duty to warn did not extend to Hansen because the warnings provided to K-F, a sophisticated purchaser, should have satisfied its duty. Applying the two-part test of *Mergenthaler* to these facts, the first inquiry is whether Umtech knew or reasonably believed that K-F was aware of the dangers of the product. Umtech argues that K-F provides sophisticated services at the Kent County site, including "dewatering of waste-activated sludge" and "[sludge] drying services." D.I. 73 at 32. Umtech notes that K-F employs roughly thirty-five employees. *Id.* Further, Umtech states that K-F operates waste treatment facilities for other government and private entities in the United States. *Id.* Because of these factors, Umtech believes that K-F is a sophisticated purchaser of Dryer 2 as a matter of law.

After reviewing the record, the Court concludes that the issue of K-F's sophistication should be determined by a jury. As noted above, "sophistication" for the purpose of this defense refers

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00165-JJF    Document 476-8    Filed 05/11/2007    Page 11 of 12

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 622557 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Page 10

to the purchaser's awareness of the dangers of the product. This means K-F is sophisticated if Umtech reasonably believed K-F was aware of the dangers posed by Dryer 2. The record simply does not support that determination as a matter of law. Umtech provided a safety manual to K-F containing warnings about the dangers of exposed chain drives, and the necessity to replace guards if they are removed. However, one could argue that the absence of the guard over the chain drive which caused Hansen's injury suggests that Umtech did not believe this particular chain drive to pose a threat.

As an additional matter, the only evidence Umtech provided regarding K-F's sophistication is the number of persons K-F employs, its line of business, and its nationwide operations in this line of business. These facts do not necessarily support a conclusion that K-F is knowledgeable about all the individual component machines and constituent parts which comprise a waste treatment plant such as the one at Kent County. Furthermore, K-F's *lack* of sophistication with respect to this dryer could be reasonably inferred from the fact that Umtech had to supply the personnel to install the machine in the first place. *See* D.I. 74 at A-220. Finally, K-F's president testified that K-F currently manages only two or three facilities in the country. *Id.* at A-7. Whether this fact warrants a conclusion that K-F is "sophisticated" should be determined by a jury. *See Sanderson,* 1994 WL 807899 at *2 (because the record was unclear as to whether the defendant knew or reasonably believed that the purchaser was aware of the dangers, i.e., whether the purchaser was sophisticated, summary judgment for defendant was improper).

*14 Even assuming *arguendo* that K-F could be deemed "sophisticated," the next inquiry, whether Umtech knew or had reason to suspect that the warning would fail to reach K-F's employees, is also a jury question incapable of resolution at the summary judgment stage. First and foremost, Umtech had no on-site personnel overseeing operations at the Kent County plant after Dryer 2 was installed. Thus, it did not know if K-F was following its warnings in the safety manual regarding the importance of turning off the machine for cleaning. Further, after carefully reviewing the record, there is no evidence which supports an inference that Umtech knew or had any reason to suspect that warnings would reach K-F's employees. Therefore, the Court will not decide this issue as a matter of law at summary judgment. The "sophisticated purchaser" defense must be evaluated by a jury.

Umtech's final argument is that it had no duty to warn Hansen of defects, as it was merely the seller of a product which it did not manufacture. Umtech argues that a seller of goods has no duty to test or inspect a product for danger if the seller "neither knows nor has reason to know that [the product] is, or is likely to be, dangerous." D.I. 73 at 33 (quoting *Spaur v. Owens-Corning Fiberglas Corp.,* 510 N.W.2d 854, 864 (Iowa 1994)).

Hansen argues that "Umtech had a duty to be aware of defects in Dryer No. 2 that reasonably should have been discovered in light of Umtech's peculiar opportunity and competence as a dealer in this particular type of chattel." D.I. 82 at 10-11. Hansen argues that Umtech held itself out as a sophisticated seller and installer of waste dryers, and that Umtech was aware of the danger of unguarded chain drives, as evidenced by its extensive warnings in the safety manual regarding the need to replace chain guards that are removed. *Id.* at 11-14. Hansen argues that because Umtech was more than a mere seller, its duty to warn exceeded that of a mere seller.

Both parties cite *In re Asbestos Litigation,* C.A. No. 90C-10-72 (Del. Super. Ct. June 2, 1993), as authority for their arguments. Umtech urges that this case supports its position that a seller has only a limited duty to inspect for defects. Hansen argues that this case also held that where the seller of the product also engages in installation, it may be held to a higher standard of care. D.I. 82 at 11. Specifically, Hansen points to the following language from the *Asbestos* opinion:

[Defendant] ... was, however, more than just a supplier of products. It also conducted an insulation installation business according to evidence in the record. When, as here, a supplier exceeds its role as a mere supplier of goods, it may be held to a higher standard of care. In a case very similar to this case the Maryland Court of Appeal[s] rejected the standard sought by defendant. In particular, the Maryland Court held that a supplier of asbestos products who also installed those products had a duty to warn if it knew, or had reason to know, *or should have known* of these hazards.

*15 *Asbestos, supra* at 3 (citations omitted) (emphasis in original).

Whether Umtech or Hansen correctly states the limit of the *Asbestos* court's rule, the Court concludes that even if Umtech is held to the lower duty standard applicable to mere sellers, there is sufficient evidence of record which could demonstrate to a jury that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00165-JJF   Document 476-8   Filed 05/11/2007   Page 12 of 12

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 622557 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Page 11

Umtech breached this duty. Umtech cites to the Supreme Court of Iowa for the proposition that a seller of goods has no duty to test or inspect a product for danger "who neither knows nor has reason to know that it is, or is likely to be, dangerous." D.I. 73 at 33 (quoting *Spaur*, 510 N.W.2d at 864). Umtech then cites an analogous rule from lower court decisions in Delaware. D.I. 73 at 33. Assuming *arguendo* that this standard would be applied by the Supreme Court of Delaware, by Umtech's own admission in its safety manual, it *had knowledge* that the chain drives should be protected by guards. Umtech provided ample warning in the safety manual that the guards of moving chain drives must be replaced before the machine may safely be turned on. *See* D.I. 83 at B88, B100. Thus, even if Umtech's duty as seller was merely to warn of defects it knew to be dangerous, a reasonable jury may find that Umtech breached this duty. Umtech's motion for summary judgment on this ground will be denied.

C. Umtech's Motion for Summary Judgment: Breach of Implied Warranty and Strict Liability

Umtech also moves for summary judgment on Counts III and IV of the Complaint, which respectively set forth claims for breach of implied warranties and strict liability.

1. *Strict Liability*

On May 2, 1996, Umtech moved for summary judgment on the issue of choice of law. D.I. 65. Umtech's position was that Delaware law governs the dispute. *Id.* On May 17, 1996, counsel for Hansen responded to the motion by letter, advising that he did not contest the application of Delaware law to the dispute. D.I. 79. On May 22, 1996, the Court denied Umtech's motion for summary judgment on choice of law, given the agreement between the parties that Delaware law applies. D.I. 84.

Delaware does not recognize a claim for strict liability in tort arising out of the sale of a product, due to the adoption of the Uniform Commercial Code. *Cline v. Prowler Indus., Inc.*, 418 A.2d 968 (Del. 1980). In light of Hansen's agreement that Delaware law applies, Hansen has elected not to pursue its claim for strict liability. *See* D.I. 82 at 1. Accordingly, Umtech's motion for summary judgment on the strict liability claim is unopposed and will be granted.

2. *Breach of Implied Warranty of Merchantability*

Count III of Hansen's complaint alleges a breach of implied warranty of merchantability under 6 *Del. C.* § 2-314. A well-pleaded merchantability claim requires proof of the following elements:
(1) that a merchant sold goods;
(2) which were defective at the time of the sale;
(3) causing injury to the ultimate consumer;
*16 (4) the proximate cause of which was the defective nature of the goods; and
(5) that the seller received notice of the injury.

*Neilson Business Equip. Ctr. Inc. v. Monteleone*, 524 A.2d 1172, 1174 (Del. 1987); *DiIenno v. Libbey Glass Div., Owens-Ill., Inc.*, 668 F. Supp. 373, 377 (D. Del. 1987).

Umtech argues that this claim should be dismissed because Hansen's own contributory negligence was the dominant, if not the sole, proximate cause of his injuries. D.I. 71 at 4. Hansen argues that Umtech's argument is legally flawed because Delaware recognizes that there can be more than one proximate cause of a plaintiff's injury. The Court agrees. *See Reese*, 619 A.2d at 910; *see also Culver*, 588 A.2d at 1097. Umtech's argument is without merit, and summary judgment on this claim will be denied.

IV. Conclusion

Umtech's motion to disqualify Hansen's expert Castro will be denied. Umtech's motion for summary judgment on the negligence claim will be denied. Umtech's motion for summary judgment on the strict liability claim will be granted. Umtech's motion for summary judgment on the breach of implied warranty of merchantability claim will be denied. An appropriate order will be entered.

D.Del.,1996.
Hansen v. Umtech Industrieservice Und Spedition, GBmbH
Not Reported in F.Supp., 1996 WL 622557 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.