# EXHIBIT A

# Expert Report of Steven L. Schwarcz in

## *MBIA, et al. v. Royal Indemnity Co. (Civ. Action No. 02-1294JJF)*
## *Royal Indemnity Co. v. Pepper Hamilton LLP, et al. (Civ. Action No. 05-165JJF)*

## 1. INTRODUCTION AND QUALIFICATIONS

1.1  I am the Stanley A. Star Professor of Law & Business at Duke University School of Law and Founding Director of Duke University's Global Capital Markets Center. I have been retained as an expert witness for Royal Indemnity Company ("Royal") in connection with the above cases.

1.2  I have been involved in the securitization field since 1984. From 1984 through June of 1996, first as a partner at the law firm of Shearman & Sterling and then as a partner and Structured Finance Practice Group head at the law firm of Kaye Scholer LLP (then Kaye, Scholer, Fierman, Hays & Handler), I helped to pioneer the development of securitization as a discipline and also published articles and a book that provide both theoretical and practical grounding in securitization and structured finance. In that context, I created and taught the first law school courses on securitization and structured finance, first in the late 1980s at Benjamin N. Cardozo School of Law and then during the 1990s at the Yale and Columbia Law Schools. I also represented various banks and other financial institutions in at least hundreds of securitization transactions.

1.3  From July 1996 through the date of this Report I have taught at Duke University School of Law, first as Professor of Law and Adjunct Professor of Business Administration and, since July 2004, as the Stanley A. Star Professor of Law & Business.

In these capacities, I continue to teach a course on securitization, structured finance, and rating agencies (entitled "Structuring Commercial & Financial Transactions") and also to write extensively on securitization and structured finance, rating agencies, and related topics, including publication of the third edition of STRUCTURED FINANCE, A GUIDE TO THE PRINCIPLES OF ASSET SECURITIZATION and publication of the co-authored textbook, SECURITIZATION, STRUCTURED FINANCE AND CAPITAL MARKETS.

1.4   I also have both practice experience and scholarly expertise in the related fields of corporate finance, asset-based lending, bankruptcy, and commercial law.

1.5   My full curriculum vitae is contained in Appendix A to this Report.

1.6   Some of the documents and authorities I have considered are listed in the body of this Report. Appendix B to this Report lists additional documents and authorities I have considered in preparing this Report. I reserve the right to update, refine, or revise my opinions as appropriate.

1.7   Appendix C lists the matters in which I have given trial or deposition testimony in the past four years.

1.8   I am being compensated for my time in this matter at my normal billing rate, which is currently $900 per hour. This compensation is not contingent upon the nature of my findings or on the outcome of the litigation.

1.9   This Report examines whether (i) the due diligence procedures undertaken by Royal in connection with its issuance of a series of credit-risk insurance policies to cover defaults on tuition-payment loans ("Loans") originated or purchased by Student Finance Corporation ("SFC") were reasonable and within the norms of the securitization industry, and (ii) Pepper Hamilton LLP ("Pepper"), counsel to SFC, failed to meet the applicable standard of care in rendering true-sale and nonconsolidation legal opinions in connection with securitizations of the Loans.

## 2. ROYAL'S DUE DILIGENCE WAS REASONABLE

2.1  For the reasons set forth below, I believe that the due diligence procedures undertaken by Royal were reasonable and within the norms of the securitization industry. In the course of representing banks and other financial institutions in the hundreds of securitization transactions referenced above, I have observed what financial institutions focus on to protect themselves and investors. This Part of the Report is based on those observations as well as on my own intimate and detailed knowledge of the principles of securitization.

2.2  I believe that Royal took reasonable steps to perform due diligence. First, it reviewed data provided by SFC and by the servicer (the servicer initially being SFC itself and later being an affiliate of SFC). In this context, Royal reviewed SFC's reports of the historical and anticipated default rates on the underlying insured Loans. Royal ascertained that those default rates were generally within the range of rates reported on the Internet for defaults on these types of student loans. Royal also monitored monthly reports by the servicer on the continuing performance of the Loans, including data regarding payments received on the Loans, principal amounts that had defaulted, and the status of various reserves. Additionally, in analyzing the monthly reports, Royal ascertained that the monthly default rates were well within the range of representations made to Royal before the deals were entered into.

2.3  Second, Royal performed independent due diligence prior to the first securitization to help verify these data, reviewing, among other things, a sampling of the actual underlying Loan files. It is not unreasonable or unusual to review a sampling where there are thousands of very small loans.

2.4  Third, Royal relied on verification and certification of these data by independent third-party industry experts. For example, Royal reviewed reports by Virgil Baker & Associates Inc. ("Baker"), an independent auditor, which, among other things, verified a sampling of Loan files to confirm the Loans met underwriting, collection, and servicing standards. Royal also relied on certification by McGladrey & Pullen, LLP, a certified public accounting firm ("McGladrey"), of the accuracy of the servicer reports, including checking payment receipts against what was being reported as collected.[1] Additionally, Royal relied on John W. Loofbourrow Associates, Inc. ("Loofbourrow"), a small but well respected investment bank specializing, among other things, in sub-prime securitization. Loofbourrow conveyed SFC's answers to Royal's questions regarding the projected default curve based on historical performance of the Loans. Loofbourrow also conveyed to Royal a table that SFC prepared showing monthly default rates over a fifteen year period, which Royal used in cash flow modeling. Moreover, after Royal issued its first insurance policy, Loofbourrow provided Royal a document containing Loofbourrow's own modeling and default curves. These verifications and certifications should have given Royal significant comfort.

2.5  Fourth, Royal relied on Baker's audits of SFC and the servicer, including reviews of business practices, servicing practices, collections practices, and credit underwriting practices. Among other things, Baker concluded that SFC's "credit underwriting policies and procedures were found to be in keeping with industry standards" and that SFC's delinquency reports for the Loans were "accurate and in keeping with industry standards."[2] Baker also verified that SFC and the servicer, in accordance with their procedures manual, properly contacted student borrowers to confirm the existence of the Loans. Furthermore, beginning March 2000, prior to the first securitization, Royal received clean audited financial statements of SFC certified by certified public accounting firms (later including McGladrey).

---

[1] The Pooling and Servicing Agreements entered into in connection with the securitizations additionally required Wells Fargo Bank Minnesota, N.A., the Trustee, to verify information contained in the monthly servicer reports.

2.6  It was reasonable for Royal to rely on third-party industry experts, as discussed above in paragraphs 2.4 and 2.5. They were all independent companies with established reputations. Royal had no reason to believe that any of these industry experts would be in collusion with SFC as to fraud. That these industry experts were hired by SFC (or, in certain cases, jointly by SFC and the Trustee under the Pooling and Servicing Agreement), not by Royal directly, is not in my opinion problematic. In my experience, it is not unusual for financial institutions to rely on reports or audits by independent industry experts they have not personally retained. Furthermore, some of these industry experts were involved when the credit-risk insurance was initially provided by AIU Insurance Company, which is part of one of the world's largest insurers, American International Group (AIG). AIU apparently believed these experts were acceptable. It is reasonable and customary for parties to rely on the work of independent experts where doing so would be cost-effective and efficient.

2.7  Fifth, Royal performed independent due diligence to itself verify the reliability of SFC and the servicer. For example, Royal visited SFC's offices to investigate SFC and the servicer and also visited the offices of SFC's outside lawyers, Pepper.

2.8  Although Royal did not itself perform full background checks on SFC's owner and senior executives, less emphasis is placed in a securitization transaction on examining the "originator" of the transaction (in this case, SFC) and more emphasis is placed on examining the "receivables" (in this case, the Loans), including their performance data, and the structure of the transaction.[3] This is because securitization transactions are intended to withstand even a bankruptcy of the originator.[4]

---

[2] *See, e.g.*, Baker Reports dated Aug. 5, 1999 & March 22, 2000.
[3] As discussed above, Royal relied on expert independent third parties to examine the Loans, their performance data, and the transaction to the extent it did not itself make the examination.
[4] STEVEN L. SCHWARCZ, STRUCTURED FINANCE, A GUIDE TO THE PRINCIPLES OF ASSET SECURITIZATION §3:1 (3d ed. & supps. 2006).

2.9  To the extent there were any discrepancies in performance, Royal contacted SFC to understand why. For example, Royal asked SFC why there was a buildup in 60-day delinquencies but no corresponding increase in defaults. SFC gave a plausible response: that students make two payments at the outset and therefore do not always pay for the next 60 days, believing the first two payments cover that period. At or around the same time, Royal received McGladrey's audits of the servicer reports, which did not indicate any problems.

2.10  Parties to a securitization transaction do not typically expect there to be a fraud. It is normal to rely in part on representations and warranties of the originator (in this case, SFC) and to monitor performance of the receivables (in this case, the Loans). There is a presumption of trust in business transactions because, otherwise, nothing would ever get done.[5] In the face of a determined and intelligent perpetrator of fraud, it is extremely difficult to discover the fraud. Even a Moody's AAA rating does not protect against fraud.[6] There is no reason to believe that Royal would have learned more than what was learned by the industry experts that actually performed the due diligence on which Royal relied.

2.11  Furthermore, that SFC was represented by, and relied heavily on, Pepper, a large, prominent, and highly respected law firm, gave additional credibility to SFC's reputation and responses. The most agreed upon scholarly understanding of the value added by transactional lawyers is that, as repeat players in the transactional world, they add value by renting their good reputation to clients.[7] If, for example, a particular law firm (in this

---

[5] Cf. T. Volery & S. Mensik, *The Role of Trust in Creating Effective Alliances: A Managerial Perspective*, 17 J. BUS. ETHICS 987 (1998) (observing that trust plays a crucial role in creating and managing alliances because it reduces complex realities far more quickly and economically than prediction, authority or bargaining).

[6] *See, e.g.*, Steven L. Schwarcz, *Private Ordering of Public Markets: The Rating Agency Paradox*, 2002 U. ILLINOIS L. REV. 1, 6 (2002).

[7] This thesis of transactional lawyers as "reputational intermediaries" was first advanced in Ronald Gilson, *Value Creation by Business Lawyers: Legal Skills and Asset Pricing*, 94 YALE L. J. 239 (1984). *See also* Peter J. Gardner, *A Role for the Business Attorney in the Twenty-First Century: Adding Value to the Client's Enterprise in the Knowledge*

case, Pepper) is highly regarded, it will signal a measure of reliability and soundness to parties (such as Royal) dealing with that law firm and its client (in this case, SFC). This signal of reliability and soundness results primarily because the high-reputation law firm bonds itself to good performance, losing at least part of its reputation if it fails to perform well. Indeed, a high-reputation law firm adds the greatest relative value when the client does not already have a high reputation.

2.12  Likewise, that the securities were underwritten by PNC Capital Markets, an affiliate of PNC Bank, gave additional credibility to SFC.[8]

2.13  I understand that SFC had been making substantial payments on the Loans and other tuition-payment loans for many years with the effect of masking true default rates. In my experience, it is neither customary nor reasonable for an originator (in this case, SFC) to make gratuitous payments on securitized receivables (in this case, the Loans) that are not specifically contemplated by the securitization documents, and such payments would not be consistent with traditional lender forbearance. Without limiting the foregoing sentence, any such payments would at least have to be disclosed in the monthly servicer reports to avoid misleading investors and other parties to the securitization.

2.14  In examining Royal's due diligence, one should not conflate *results* with *process*. It is the latter that is important, and indeed even the underwriter due-diligence defense under the securities laws is based on process. Royal's due diligence procedures were reasonable, and the fact that it did not discover the fraud should not be held against it.

---

*Economy*, 7 MARQ. INTELL. PROP. L. REV. 17, 46-48 (2003); Karl S. Okamoto, *Reputation and the Value of Lawyers*, 74 OR. L. REV. 15, 43 (1995).
[8] It was not unreasonable for Royal to take some measure of additional comfort from the fact that other institutional parties to the securitizations engaged in their own due diligence and were comfortable with SFC.

## 3.  PEPPER FAILED TO MEET THE APPLICABLE STANDARD OF CARE IN RENDERING TRUE-SALE AND NONCONSOLIDATION LEGAL OPINIONS

3.1  To satisfy conditions precedent to the securitizations done during and after 2000, Pepper issued true-sale and nonconsolidation legal opinions, signed by Pepper partner W. Roderick Gagné (the "Pepper Legal Opinions").

3.2  True-sale and nonconsolidation opinions are legal opinions that address bankruptcy law issues.[9] Their primary purpose is to assure investors and others that the structure of the securitization transaction is "bankruptcy remote,"[10] in this case meaning that the transferred Loans and the special-purpose entities to which those Loans were transferred would not be affected by SFC's subsequent bankruptcy.

3.3  I have done hundreds of securitization transactions and, in that connection, have issued numerous true-sale and nonconsolidation legal opinions. In issuing these opinions, outside counsel often rely (in my experience) as to factual matters on certificates signed by officers of their client. However, outside counsel are not justified in relying on officer's certificates as to matters of which they have doubt.[11] Furthermore, such counsel "may not ignore information that comes to his or her attention that casts doubt on other information otherwise acceptable to establish facts. There can be no reliance on 'unreliable information,'"[12] which includes any information that "is not consistent with other information known to the opinion giver."[13] Specifically, "[o]pinion givers [such as

---

[9] Steven L. Schwarcz, *The Limits of Lawyering: Legal Opinions in Structured Finance*, 84 TEX. L. REV. 1, 5 (2005).
[10] *Id.* at 5-6.
[11] ARTHUR NORMAN FIELD & JEFFREY M. SMITH, LEGAL OPINIONS IN BUSINESS TRANSACTIONS § 5:8, at 5-11 (2d ed. 2003, as supplemented through 2006).
[12] FIELD & SMITH, *supra* note 11, § 5:8, at 5-11. See also *id.*, § 5:11, at 5-14 (defining unreliable information as "[a]ny information that is known to be false or which it is otherwise not reasonable to rely on under the circumstances"). *Accord*, TriBar Opinion Committee, *Third-Party "Closing" Opinions*, 53 BUS. LAW. 591, § 2.1.4 (1998).
[13] FIELD & SMITH, *supra* note 11, § 5:11, at 5-14 (citing TriBar II, § 2.1.4, in Appendix C).

Gagné, discussed below] cannot avert their eyes to avoid the obvious."[14] Instead, "all relevant information known to the opinion preparers . . . must be considered."[15]

3.4  The officer's certificates that Gagné, and thus Pepper, relied on in rendering the Pepper Legal Opinions did not mention SFC's forbearance payment practices. Gagné, however, had intimate familiarity with SFC and either knew, or should have known, of SFC's forbearance payment practices. He was the principal outside lawyer for SFC, effectively functioning as its general counsel, and also was extremely familiar with SFC's business.

3.5  Furthermore, in 2000, Gagné and other lawyers working with him at Pepper worked on changes to SFC's standard-form school contracts. These changes provided, unlike the prior contract forms, that SFC had no obligation to return so-called "forbearance reserve" funds to schools and that SFC could use such funds, at its discretion, to pay delinquent or defaulting Loans. Because these changes meant that the so-called "forbearance reserves" were not true reserves but simply SFC's money, they may have had bearing on the Pepper Legal Opinions and should have been discussed therein. SFC's use of its own money to pay otherwise delinquent or defaulting Loans would constitute non-arm's length, gratuitous transfers by SFC to the special-purpose entities to which the Loans were transferred. That, in turn, could potentially undermine the nonconsolidation conclusions of the Pepper Legal Opinions. And, to the extent those payments were pursuant to any arrangement or understanding between SFC and the special-purpose entities, that would constitute "recourse" that could undermine the true-sale conclusions of the Pepper Legal Opinions.

---

[14] *Id. See also* FIELD & SMITH, *supra* note 11, § 5:19, at 5-21 (observing that the "'fair play' obligation does not allow the opinion preparer to ignore relevant factual material available to it") and at § 3:8 (observing that "The opinion preparer cannot avert his or her eyes to avoid seeing factual material that would challenge the factual basis for an opinion. Verification is required for factual material that is challenged by other information.").

[15] TriBar Opinion Committee, *supra* note 12, § 2.2.

3.6  Although Gagné apparently claims that he did not know that SFC would actually implement the new school contracts, I have reviewed documents that belie that claim. For example, in a September 15, 2000 e-mail to Gagné from one of SFC's principals attaching a proposed new form of "Student Loan Processing Agreement," Gagné is asked to let SFC "know of [his] thoughts regarding the attached agreement" because SFC "need[s] to get this done in the next 10 days."[16] After that, Gagné and Pepper worked directly on revisions to these contracts. If Gagné had any doubt whether these contracts would be, or had been, implemented, he should have taken appropriate steps to resolve the doubt.

3.7  I also have reviewed documents that indicate that Gagné understood that the 2000 changes to the school contracts had been implemented and that the so-called forbearance reserves created by these changes were not true reserves but, instead, were intended to be used to manipulate Loan performance data. For example, in response to state regulatory inquiries regarding the new school contracts, Gagné's colleagues at Pepper sought to understand how the so-called forbearance reserves in those contracts worked. Before responding, they asked Gagné to explain when the reserve funds are to be returned, the new school contracts being "not clear" on that point.[17] Gagné responded that "The Reserve Account is not really for the benefit of the school" but, instead, is "[e]ssentially a way of evening out default issues and keep[ing] the Loans more current."[18]

3.8  Furthermore, in connection with the dispute that became *Nielsen Electronics Inst. v. SFC*, SFC had contractual recourse to Nielsen Electronics Institute ("NEI") for non-paying Loans. But NEI was confused when SFC requested payment because the reports sent to NEI mistakenly included SFC's forbearance payments, so it looked like the Loans were performing better than was actually the case. In the ensuing litigation, Pepper, which represented SFC through partner Duncan Grant, received and reviewed, among other things, (i) NEI's board minutes noting confusion why SFC's reports appeared to be

---

[16] Exh. 1344-I.
[17] Exh. 603-I.
[18] Exh. 603-I.

"comprised of accounts that had been placed in default but were in a current status,"[19] and (ii) notes on a telephone call between SFC and NEI in which an SFC executive told NEI that "Mr. Yao, in order to protect the NEI portfolio was making payments of his own monies against NEI accounts so that the 'portfolio auditors' for his lenders would see that they were 'current' on their payments" to comply with the requirements of the Loan agreements.[20] Grant claims never to have grasped the significance of these documents. Whether or not that is true, Grant regularly reported developments to Gagné during the litigation.

3.9  Gagné therefore should have known there was something irregular about the so-called forbearance reserves and forbearance payments. Indeed, the appearance of irregularity was exacerbated because the relevant officer's certificates attached to the Pepper Legal Opinions were not, as is customary, executed by officers of SFC in their individual capacities but, instead, were signed "not in an individual capacity but solely in [the signer's capacity as an officer of SFC] without any personal liability as to the matters contained in this certificate."[21] I have reviewed hundreds if not thousands of officer's certificates and I have never seen a similar exclusion of officer liability. I would not have accepted such an officer's certificate to backstop my legal opinion, and indeed the commentators discourage reliance on such certificates.[22]

3.10  Given the aforesaid, Gagné—and thus Pepper—either should not have issued the Pepper Legal Opinions, which would have prevented the securitization transactions from

---

[19] Exh. 261-I.

[20] Exh. 261-I.

[21] *See, e.g.,* paragraph 38 of Exhibit A-2, form of SFC Officer's Certificate attached to the November 15, 2001 Pepper Legal Opinion regarding the SFC Grantor Trust, Series 2001-3 Term Securitization (Exh. 86-I).

[22] *See, e.g.,* TriBar Opinion Committee, *supra* note 12, § 2.5.4 (explaining that "[b]y signing as an individual [according to the usual practice], the officer takes personal responsibility for the representations made in the certificate"); DONALD W. GLAZER ET AL., GLAZER AND FITZGIBBON ON LEGAL OPINIONS 107 (rev. 2d ed. Supp. 2005) (observing that "[n]ormally, certificates are cast as representations by an individual as the holder of a designed office . . . and are executed by the individual in that capacity," which

being consummated, or at least should have discussed SFC's forbearance payment practices in the reasoning of these opinions, which would have alerted Royal and others to the existence of those practices.[23]

_____

Steven L. Schwarcz

May 7, 2007

_____

"underscores for the officer the importance of getting the information in the certificate right").

[23] *See* Schwarcz, *The Limits of Lawyering, supra* note 9, at 10-14.

Royal Indemnity Expert Report.doc

# Appendix A

## Curriculum Vitae

### STEVEN L. SCHWARCZ

Duke Law School
Box 90360
Durham, N.C. 27708
(919) 613-7060
(919) 613-7231 (fax)
e-mail: schwarcz@law.duke.edu

## LAW TEACHING

Stanley A. Star Professor of Law & Business, Duke University School of Law, since 2004; Professor of Law, 1996-2004 (teaching courses in commercial law, bankruptcy, corporate reorganization, securitization, finance and international capital markets).

Founding Director, Duke University Global Capital Markets Center; Faculty Director, 1997- 2002 and Co-Academic Director since 2006.

Professor of Business Administration (Adjunct), Fuqua School of Business, Duke University, January 2001-August 2004; Stanley A. Star Professor of Law & Business since that date.

Visiting Professor, University of Geneva Faculty of Law, May-June since 2001, teaching advanced American business law courses in the Master of Business Law Programme.

Senior Fellow, The University of Melbourne Law School, spring 2004.

Visiting Lecturer, Yale Law School, 1992-96, teaching courses in commercial law, bankruptcy and finance.

Lecturer in Law, Columbia Law School, 1993-96, teaching courses in corporate reorganization, bankruptcy and structured finance.

Adjunct Professor of Law, Benjamin N. Cardozo School of Law, Yeshiva University, 1983-92, teaching seminars in bankruptcy and corporate reorganization.

Teaching Fellow in Property Law, Columbia Law School, 1974.

## LAW PRACTICE

Partner and Chairman of Structured Finance Practice Group, Kaye, Scholer, Fierman, Hays & Handler (now Kaye Scholer LLP), New York, 1989-96, concentrating in asset securitization, structured and corporate finance, bankruptcy and corporate reorganization, and secured lending. Also partner in charge of the firm's training program in domestic and international finance. Special Counsel July 1996-May 2004; Special Consultant since June 2004.

Partner, Shearman & Sterling, New York, 1983-89, concentrating in corporate finance, securitization, bankruptcy, corporate reorganization, commercial transactions and secured lending; associate, 1974-82.

## EDUCATION

Columbia University School of Law, 1974, J.D.

Research Assistant, Legislative Drafting Research Fund, 1972-74; Chairman, Environmental Law Council, 1973-74.

New York University School of Engineering and Science, 1971, B.S., Summa Cum Laude, Aeronautics and Astronautics.

Graduated number one in class (3.94/4.00). First prize, 1971, Sandham Public Speaking Contest (the University's public speaking contest). George Granger Brown Scholar. Tau Beta Pi (national engineering honor society —engineering equivalent of Phi Beta Kappa in liberal arts). Sigma Gamma Tau (national aeronautical engineering honor society).

Ranked number one in high school. Skipped senior year to begin college early on full academic scholarship. Declined invitation to begin college after sophomore year. While in high school, co-founded an "amateur rocket society" which built and launched the first non-governmental satellite, memorabilia of which have been acquired by the Smithsonian National Air and Space Museum in Washington, D.C.

## OTHER PROFESSIONAL HONORS AND ACTIVITIES

Fellow, American College of Commercial Finance Lawyers.

Founder and first Faculty Director, Duke University Global Capital Markets Center.

1996 Benjamin Weintraub Distinguished Professorship Lecture, Hofstra University School of Law.

4th AIIFL Distinguished Public Lecture, "Intermediary Risk in Global Financial Markets," The University of Hong Kong (2002).

Keynote Speaker, 2004 Annual Conference, Corporate Law Teachers' Association of Australia and New Zealand.

Founding Member, International Insolvency Institute

Senior Fellow, The University of Melbourne Law School (spring 2004).

Parsons Visitor, University of Sydney Law Faculty (spring 2004).

Member, The American Law Institute (Member of Consultative Groups on Uniform Commercial Code, Suretyship, and Transnational Insolvency).

Member of Expert Advisory Group to United Nations Commission on International Trade Law (UNCITRAL) regarding its International Receivables Financing Convention and proposals for an international insolvency convention.

Member, U.S. Secretary of State's Advisory Committee on Private International Law (since 1999).

Member, Academic Advisory Board, The University of Hong Kong Faculty of Law's Asian Institute of International Financial Law (since 2001).

Member, Academic Advisory Committee, Fudan [University] Civil & Commercial Law Review (since 2001).

Member, Editorial Advisory Board, American Securitization (since 2006).

Associate Editor, The Journal of Restructuring Finance (since 2002).

Senior Consultant, International Law Center for Inter-American Free Trade's Mexican Securitization Project (1997-99).

Member, American Law and Economics Association.

Member, Advisory Board, The Securitization Conduit (since 2000).

Member, Duke University Academic Council, 1999-2000; 2002-2003.

Member, North Carolina General Statutes Commission Drafting
Committee to review  revised Uniform Commercial Code Article 9, 1998-
99.

The Association of the Bar of the City of New York:  Chairman of Committee on
Science and Law, 1987-90; Chairman of Causation Subcommittee, 1985-86;
member, Committee on Uniform State Laws, 1993-96.

The New York Academy of Sciences:  Directed major Academy study on public
participation in the allocation of funds for scientific research, and Vice Chairman
of the Section on Science and Public Policy, 1974-78.

Founded and directed Friends of the Eldridge Street Synagogue, 1978-84, the
organization that first recognized the historic, religious and architectural
significance of this synagogue; represented the synagogue in obtaining National
and New York City Landmark status; and laid the foundation for the national
fundraising effort.

Special Master, Bank of America, N.A. v. Patriarch Partners, LLC, U.S. District
Court, W.D.N.C., Case # 3:01CV547-MU (2002).

Have lectured or chaired scholarly and policy-oriented programs at the Centre for
Corporate and Commercial Law of the University of Cambridge, the Centre for
Commercial Law Studies of the University of London, Australian National
University, The University of Melbourne, the University of Sydney, The
University of Tokyo, Catholic University of Chile (co-sponsored by the Ministry
of Finance of Chile), The University of Auckland Research Centre for Business
Law, National University of Singapore Centre for Commercial Law Studies, Asia
Institute of International Financial Law (Distinguished Visitor), the Asia-America
Institute in Transnational Law at The University of Hong Kong, the American
Securitization Forum, the Asian Securitisation Forum, University of Delhi Faculty
of Management Studies, the American Conference Institute, the American Law
and Economics Association, the Association of the Bar of the City of New York,
the Heyman Center on Corporate Governance at Cardozo Law School, the United
Nations Commission on International Trade Law, the U.S. Department of State,
the University of Oxford Banking Forum, the National Conference of Bankruptcy
Judges, the University of Cincinnati, The Institute for Law and Economics of the
University of Pennsylvania, The University of Hong Kong Faculty of Law
(Distinguished Public Lecture series), and The World Bank.

Have presented faculty workshops at Yale Law School, University of
Pennsylvania Law School, University of Michigan Law School, The
University of Chicago Law School, Harvard Law School, Georgetown
University Law Center, Vanderbilt University Law School, Washington
University School of Law (St. Louis), Boston College Law School,
University of North Carolina School of Law, Chapel Hill, University of

Illinois College of Law, Washington and Lee University School of Law, The University of Georgia School of Law, American University— Washington College of Law, The University of Melbourne Law School, the University of Sydney Faculty of Law, Monash University Law School, National University of Singapore, Victoria University Centre for International Corporate Governance Research, George Mason University School of Law, Wake Forest University (School of Law and Babcock School of Management), The University of Richmond School of Law, William & Mary, The University of Hong Kong, and Duke University (numerous School of Law faculty workshops; Fuqua School of Business Finance Workshop; Globalization, Equity & Democratic Governance University Seminar; and Global Capital Markets Center Interdisciplinary Workshops).

## GOVERNMENT TESTIMONY

Committee on Governmental Affairs of the U.S. Senate, on "Rating the Raters: Enron and the Credit Rating Agencies," Mar. 20, 2002 (written and oral testimony at Committee's request).

Committee on the Judiciary of the U.S. Senate, on proposed Section 912 (true sales in securitization transactions) of the Bankruptcy Reform Act of 2001 (S.420/H.R.333), Feb. 26, 2002 (written testimony at Committee's request).

Securities and Exchange Commission, on "Hearing on Credit Rating Agencies," Nov. 21, 2002 (oral testimony at Commission's request).

Committee on Financial Services of the U.S. House of Representatives, on H.R. 2990 (Credit Rating Agency Duopoly Relief Act of 2005) (declined invitation to testify on Nov. 29, 2005 due to conflicting schedule, but commented by telephone to Committee staff).

## MISCELLANEOUS

Chevalier, Confrerie de la Chaine des Rotisseurs
Commandeur, La Commanderie de Bordeaux

## PUBLICATIONS

"Systemic Risk" (work-in-progress).

"To Make or to Buy: In-House Lawyering and Value Creation," forthcoming 33 J. Corp. L., Issue No. 2 (Jan. 2008).

"Rethinking the Responsibility of Indenture Trustees After Default" (work-in-progress, with Gregory M. Sergi).

"Corporations As Debt Slaves: A Fundamental Inquiry Into Waiving Bankruptcy-Filing Protection" (work-in-progress).

"Explaining the Value of Transactional Lawyering," forthcoming 12 Stan. J. L. Bus. & Fin. issue no. 2 (Spring 2007).

"Substantive Consolidation of Corporate Groups in Insolvency Situations" and "Delaware Limited Liability Companies in the Zone of Insolvency," 81 Australian L. J. 15 (in *Overseas Law, Recent Developments in United States Insolvency Law*, Ross Buckley, ed.) (Jan. 2007).

"Financial Information Failure and Lawyer Responsibility," 31 J. Corp. L. 1097 (2006).

"Automatic Perfection of Sales of Payment Intangibles: A Trap for the Unwary," 68 Ohio St. L.J. 273 (2007) (symposium issue of essays on "Commercial Calamities," sponsored by the Association of American Law Schools).

"The Public Responsibility of Structured Finance Lawyers," 1 Capital Markets Law Journal 6 (Oxford University Press 2006), available at http://cmlj.oxfordjournals.org/cgi/reprint/1/1/6?ijkey=b5E6BhZydNsFibq&keytype=ref

"Ohio Supreme Court Decision Jeopardizes the Financeability of Government Receivables," 59 U.C.C. Bulletin 1 (Sept. 2006) (with Eric Marcus).

"We Are All Saying Much the Same Thing: A Rejoinder to the Comments of Professors Coffee, Macey, and Simon," 84 Texas L. Rev. 93 (2005).

"The Limits of Lawyering: Legal Opinions in Structured Finance," 84 Texas L. Rev. 1 (2005) (featured article, with commentaries by Professors John Coffee, Jonathan Macey, and William Simon). Columbia Law School's Center on Corporate Governance also held a symposium on this article in March 2005. This article was republished in 4 ICFAI JOURNAL OF BANKING LAW Issue no. 3, at 22 (July 2006).

"The Confused U.S. Framework for Foreign Bank Insolvency: An Open Research Agenda," 1 REV. L. & ECON. 81 (2005), issue no. 1, article no. 6, http://www.bepress.com/rle/vol1/iss1/art6 (republished 3 ICFAI JOURNAL OF BANKING LAW Issue no. 3, at 55 (July 2005)).

"Temporal Perspectives: Resolving the Conflict Between Current and Future Investors," 89 Minnesota L. Rev. 1044 (2005); forthcoming in Chinese translation through the School of Civil, Commercial and Economic Law of the China University of Politics and Law; republished in 3 ICFAI JOURNAL OF CORPORATE & SECURITIES LAW 49 (Feb. 2006). (This article also was selected by the Executive Committee of the Association of American Law Schools (AALS) Section on Securities Regulation for presentation at the AALS 2005 Annual Meeting.)

"'Looking Forward: 2005-2010' A Sovereign Debt Restructuring Reverie," 6 U. Chicago J. Int'l L. 381 (2005) (Symposium on Sovereign Debt Restructuring).

"Collapsing Corporate Structures: Resolving the Tension Between Form and Substance," 60 Bus. Law. 109 (Nov. 2004).

"Subnational Debt Restructuring and the Rule of Law," 1 J. Restructuring Finance 129 (2004).

"Securitization Post-Enron," 25 Cardozo Law Review 1539 (2004) (symposium issue on "Threats to Asset-Based Finance") (republished in 10 THE FINANCIER 46 (2003) and in 46 CORPORATE PRACTICE COMMENTATOR 963 (2004)).

"'Idiot's Guide' to Sovereign Debt Restructuring," 53 Emory L. J. 1189 (2004) (Georgetown Law School symposium on sovereign debt restructuring, published in special edition of Emory L.J.).

"Is Securitization Legitimate?," in INT'L FINANCIAL L. REV. 2004 GUIDE TO STRUCTURED FINANCE 115 (2004).

"Rethinking the Disclosure Paradigm in a World of Complexity," 2004 U. Illinois L. Rev. 1 (2004) (republished in SECURITIES LAW REVIEW 2006 (Donald C. Langevoort, ed.); and discussed by Malcolm Gladwell in "Open Secrets: Enron, Intelligence, and the Perils of Too Much Information," NEW YORKER (Jan. 8, 2007)).

SECURITIZATION, STRUCTURED FINANCE, AND CAPITAL MARKETS (2004) (with Bruce A. Markell and Lissa Lamkin Broome); Japanese edition forthcoming.

"Commercial Trusts as Business Organization: An Invitation to Comparatists," 13 Duke J. Comp. & Int'l L. 321 (2003) (special symposium issue in memory of Professor Herbert Bernstein); republished (in Chinese) in 2004 Fudan University Civil & Commercial Law Review, issue 12.

"Commercial Trusts as Business Organizations: Unraveling the Mystery," 58 Bus. Law. 559 (2003) (also translated into Chinese and republished in Nan Jing University Law Review (Spring 2006)).

"Cross-Border Collateral: Legal Risks and the Conflict of Laws," 2003 Canadian Bus. L. J./ Revue Canadienne du droit de commerce 150 (Feb. 2003) (book review).

"Taking Charge: Authorizing Most Credit-Rating Agencies Could Increase Economic Efficiency," 116 L.A. Daily J. 6 (Mar. 13, 2003) (OpEd).

"Private Ordering," 97 Nw. U. L. REV. 319 (2002).

Essays on the topics of securitization, credit rating agencies, and intermediary risk in ENCYCLOPEDIA OF FINANCIAL ENGINEERING AND RISK MANAGEMENT (forthcoming 2003 by Fitzroy Dearborn Publishers).

"Enron and the Use and Abuse of Special Purpose Entities in Corporate Structures," 70 U. Cin. L. Rev. 1309 (2002) (symposium issue on "Corporate Bankruptcy in the New Millennium") (republished in 9 THE FINANCIER 23 (2002); AEI-Brookings Joint Center for Regulatory Studies in Joint Center Update 02-10-03); __ SECURITIZATION CONDUIT __ (2004); and 1 INT'L J. FIN. EDUC. 7 (2005)).

"Global Decentralization and the Subnational Debt Problem," 51 Duke L. J. 1179 (2002); republished in redacted form as "Restructuring Subnational Debt," 23 Mun. Fin. J. 1 (Fall 2002). Also republished in Journal of International Business Law (a publication of the Institute of Chartered Financial Analysts of India).

"Private Ordering of Public Markets: The Rating Agency Paradox," 2002 U. Illinois L. Rev. 1 (2002) (republished by the AEI-Brookings Joint Center for Regulatory Studies in Joint Center Update 02-9).

"The Universal Language of International Securitization," 12 Duke J. Comparative & Int'l Law 285 (2002) (introduction to symposium issue on "International Securitization and Structured Finance").

"The Impact of Bankruptcy Reform on 'True Sale' Determination in Securitization Transactions," 7 Fordham J. Corp. & Fin. Law 353 (Spring 2002 symposium issue based on papers presented at the 2001 Eugene Murphy Conference on Corporate Law at Fordham University School of Law).

STRUCTURED FINANCE, A GUIDE TO THE PRINCIPLES OF ASSET SECURITIZATION (3d ed. 2002 & supplements); republished in Spanish translation by Univerdidad Finis Terrae Facultad de Derecho, as GUIA SOBRE LOS PRINCIPIOS DE SECURITIZACION DE ACTIVOS (Nov. 2002); republished in Korean translation by Maekyung (2003) and in Chinese translation by Tsinghua University Publishing House (2003).

"Intermediary Risk in a Global Economy," 50 Duke L. J. 1541 (2001); republished in redacted form as "Indirectly Held Securities and Intermediary Risk" in 6 Uniform Law Review/ Revue de droit uniforme 283 (2001) and also in 54 UCC Bulletin (Oct. & Nov. 2004 issues).

"The Role of Rating Agencies in Global Market Regulation," in REGULATING FINANCIAL SERVICES AND MARKETS IN THE 21ST CENTURY 297 (Eilis Ferran & Charles Goodhart eds., 2001).

"Sovereign Debt Restructuring: A Bankruptcy Reorganization Approach," 85 Cornell L. Rev. 956 (2000) (republished by the University of Oxford Banking Forum as part of the

proceedings of its September 14, 2000 conference on "The Future of Global Financial Regulation in the Digital Era").

"Judgment Proofing: A Rejoinder," 52 Stanford L. Rev. 77 (1999).

"The Inherent Irrationality of Judgment Proofing," 52 Stanford L. Rev. 1 (1999) (featured article, with commentaries by Professors Lynn LoPucki and Charles W. Mooney).

"Towards a Centralized Perfection System for Cross-Border Receivables Financing," 20 U. Penn. J. Int'l Econ. L. 455 (Fall 1999) (Symposium on Cross-Border Secured Transactions).

"The Impact on Securitization of Revised UCC Article 9," 74 Chicago-Kent L. Rev. 947 (1999) (Symposium on Revised Uniform Commercial Code Article 9), republished in 45 UCC Bulletin 1 (December 2001).

"Rethinking Freedom of Contract: A Bankruptcy Paradigm," 77 Texas L. Rev. 515 (1999).

"The Universal Language of Cross-Border Finance," 8 Duke J. Comparative & Int'l Law 235 (1998) (Symposium on International Issues in Cross-Border Securitization and Structured Finance), republished in 2 The Securitization Conduit 8 (Spring 1999); distributed by the U.S. Department of State as Document # ACPIL 49/G/3 at the May 10-11, 1999 meeting of the Secretary of State's Advisory Committee on Private International Law; translated into Chinese and republished in 2001 Contemporary Law Studies Issue No. 4, at 27 (Fudan University 2001).

"The Attraction of Law and Economics: Is Law An Autonomous Discipline?," 21 Harvard J. Law & Pub. Policy 85 (1998) (Symposium on Law and Economics and the Rule of Law).

"The Easy Case for the Priority of Secured Claims in Bankruptcy," 47 Duke L. J. 425 (1997), republished in installment in 35 UCC Bulletin 1 (July, August, September & October issues) (1998).

"Protecting Rights, Preventing Windfalls: A Model for Harmonizing State and Federal Laws on Floating Liens," 75 North Carolina L. Rev. 403 (1997), republished in installments in 34 UCC Bulletin 1 (May, June, July, & August issues) (1997).

"Rethinking the Role of Recourse in the Sale of Financial Assets," 52 Business Lawyer 159 (1996) [co-author].

"Rethinking A Corporation's Obligations to Creditors," 17 Cardozo L. Rev. 647 (1996).

"Law and Economics of Securitization," New Business Law issues 580 & 581 (1995) (in Japanese).

"A Fundamental Inquiry Into the Statutory Rulemaking Process of Private Legislatures," 29 Ga. L. Rev. 909 (1995).

"The Global Alchemy of Asset Securitization," 14 International Financial Law Review 30 (May 1995) (based on the Stanford article, but revised for an international audience).

"The Alchemy of Asset Securitization," 1 Stanford J. Law, Bus. & Finance 133 (1994). Republished in 1 The Financier 53 (December 1994), 32 UCC Bulletin 1 (August 1995), and 37 Corp. Prac. Commentator 783 (1996); translated into German and republished in 50 Der Betrieb 1289 (1997); translated into Chinese and republished in 2001 Fudan [University] Civil & Commercial L. Rev.310 (2001).

"A New Theory of Recourse in Structured Finance," 1994 Asset Sales Report 8 (February 14, 1994).

PEB Commentary No. 14 on Uniform Commercial Code Section 9-102(1)(b) [draftsman of the Commentary].

"Civil Forfeiture: A Higher Form of Commercial Law?" 62 Fordham L. Rev. 287 (1993) [with A. Rothman].  Republished in both 8 White-Collar Crime Reporter 1 (January 1994) and 31 UCC Bulletin 1 (April 1994), and also was the subject of a "Viewpoints" editorial in The New York Times (Sunday Business Section) 11 (April 3, 1994).

"The Parts Are Greater Than the Whole: How Securitization of Divisible Interests Can Revolutionize Structured Finance and Open the Capital Markets to Middle-Market Companies," 1993 Columbia Bus. L. Rev. 139 (1993).

"'Octagon Gas' Ruling Creates Turmoil for Commercial and Asset-Based Finance," 210 New York L.J. 1 (Aug. 4, 1993).

STRUCTURED FINANCE, A GUIDE TO THE PRINCIPLES OF ASSET SECURITIZATION (2d ed. 1993).

"Credit Lyonnais Case Clarifies ABS Issues In Bankruptcy," 1992 Asset Sales Rep. 1 (Oct. 12, 1992).
"Structuring and Legal Issues of Asset Securitization in the United States," Chapter 2 in Asset Securitization:  International Financial and Legal Perspectives (Basil Blackwell, 1991).

STRUCTURED FINANCE, A GUIDE TO THE FUNDAMENTALS OF ASSET SECURITIZATION (1990).

"Structured Finance: The New Way to Securitize Assets," 11 Cardozo L. Rev. 607 (1990).

"Guaranties and Other Third-Party Credit Supports," Chapter 16 in Commercial Loan Documentation Guide (1988 Matthew Bender) [with Gabe Shawn Varges].

"Sharing of Research Results in a Federally Sponsored Gene Mapping Project," 1987 Report to the Office of Technology Assessment in Congress by the Committee on Science and Law of The Association of the Bar of the City of New York, chaired by Schwarcz.

"The Impact of Fraudulent Conveyance Law on Future Advances Supported by Upstream Guaranties and Security Interests," 9 Cardozo L. Rev. 729 (1987).

"Basics of Business Reorganization in Bankruptcy," 68 J. Commercial Bank Lending 36 (1985), updated and republished November 1987; translated into Chinese and republished in 2 Grad. Stud. J. Issue No. 3, at 59 (Fudan University 2001).

"An Analysis of Proposed Changes in Substantive and Procedural Law in Response to Perceived Difficulties in Establishing Whether or Not Causation Exists in Mass Toxic Tort Litigation," 41 The Record 905, The Association of the Bar of the City of New York (December 1986) (was Chairman of Subcommittee that produced this Report).

"Leveraged Buyouts in Bankruptcy," 20 Ga. L. Rev. 73 (1985) (wrote this article jointly with Prof. David Gray Carlson, but withdrew my name prior to publication at request of my law firm).

"Repurchase Agreements and Bankruptcy Changes," National Law Journal, September 10, 1984, at 18 et seq.

"A Disturbing Decision," Scott Report (Dec. 1983) [an analysis of the effect of the Twistcap case on letters of credit].

"Dealing with Problems Faced in Bankruptcies, National Law Journal, November 7, 1983, at 15 et seq.

"Resolving Conflicts in Technological Disputes," 19 Jurimetrics Journal 424 (1979).

Peer Review Study, published in The Record (1975 New York Academy of Sciences) (was Chairman of Committee that produced the Study).

The Automobile and the Regulation of its Impact on the Environment (1975 Univ. of Oklahoma Press) (was Research Assistant).

Issues of Financial Protection in Nuclear Activities (1973 Columbia University) (was Research Assistant).

## EXPERT TESTIMONY, CONSULTING, MEDIATION AND OTHER DISPUTE RESOLUTION

List of representative transactions and references available upon request.

# APPENDIX B

## DATA AND INFORMATION CONSIDERED

Confidential Mediation Statement of Royal Indemnity Company

Appendix of Materials Submitted in Support of Royal's Mediation Statement

| | |
|---|---|
| Third Amended Complaint<br>*Royal Indemnity Co. v. Pepper Hamilton LLP, et al.* | C.A. No. 05-165-JJF<br>U.S.D.C., D. Del. |
| Plaintiff's Seventh Amended Petition<br>In re: *Royal Indemnity Co. v. Delta Career Institute of Beaumont, Inc., et al.* | Cause No. D167370<br>District Court, Jefferson County, TX |
| Memorandum from A. Yao to P. Hirst re:<br>*Collections,* dated November 26, 1996 | S053888 (also marked at Ex. 193-II) |
| The Platinum Student Loan Program Agreement, dated June 21, 2000 | GT 18122 - 18132 (also marked at Ex. 1174-I) |
| Memorandum from M. Aquino re: *Student Finance Corporation,* dated December 11, 2000 | ACCT032840 - 032846 |
| E-mail from P. Turnbull to M. J. Curry<br>re: *AgreementSMCStudent Loan Processing.WPD* | POWELL-SFC003913 |
| Delinquency/Default Statistics: Servicer Reports | ROY 072397, 072814, 073017, 073167, 073282, 073391, 073551, 073484 |
| Letter from J. Domal, President IBG, Inc. to W. Hibberd, dated November 9, 1998 | ROY 001570 |
| Memorandum from A. Yao to J. Loofbourrow, J. Domal, S. Schauer, R. Gagné re: *Talking Points for Multi-Line Insurance Companies,* dated November 11, 1998 | ROY 001525 (also marked at Ex. 946-I) |
| Letter from J. Domal to W. Hibberd, with attachments, dated November 13, 1998 | ROY 000001 - 00025 (also marked at Ex. 1262-I) |
| E-mail from J. Domal to T. McKenzie, W. Hibberd and G. Parker, with attached memorandum re: *Questions from Royal Insurance,* dated November | ROY 000260 - 000265 |

30, 1998

| | |
|---|---|
| E-mail from J. Domal to T. McKenzie, W. Hibberd and G. Parker, dated 11/30/98 with attachment re: *Default Vector* | ROY 001602 - 1606 (also marked at Ex. 969-I) |
| Underwriting Criteria for Schools/School Agreements/Loan Borrowers Contract | ROY 002281 - 002320 |
| Audit Client Engagement Evaluation | ACCT034110 - 034114 |
| Pepper Hamilton LLP Documents re: *Rod Gagné Compensation Information* | PEPPER 206386 - 206388 |
| E-mail from A. Yao to R. Gagné, dated January 5, 2001 | PEPPER 052700 (also marked at Ex. 1189-I) |
| E-mail from A. Yao to R. Gagné dated October 8, 1999 | PEPPER 052880 |
| First Amended Complaint In Re: *Student Finance Corporation, Debtor/ Stanziale Jr. v. Pepper Hamilton LLP, et al.* | Bankruptcy Case No.: 02-11620-JBR, Adversary No.: 04-56423-PBL, Civ. No. 04-1551-JJF |
| E-mail from A. Yao to R. Gagné re: SFC Risk Factors, dated April 23, 2002 | PEPPER 053624 (also marked at Ex. 1172-I) |
| *MBIA Ins. Corp. v. Royal Indemnity Co.*, 462 F.3d 204 (Oct. 3, 2005) | |
| Nielsen's Incorporated July 20, 1996 Special Meeting of the Board of Directors | EHB 003031 - 003032 (WSFC0810850 - 0810851) |
| Excerpts of Invoices from Law Offices of Powell, Trachtman, Logan, Carrle, Bowman & Lombardo dated June - August 2001, March - September 2000 except August 2000 | |
| Student Loan Processing Agreement dated October 19, 2000 | GT 14156 - 14159 (also marked at Ex. 410-I) |
| Accountant's Work Paper dated December 31, 2000 | ACCT007103 - ACCT007104 (also marked at Ex. 834-I) |
| Student Financial Corporation Process Narrative Loan Origination/Cash Receipt/Payroll Processing | ACCT019052 - 019070 |

| | |
|---|---|
| Accounts Payable/Revenue Cycle Forbearance and Charge-Off Policies | (also marked at Ex. 840-I) |
| SFC School Reserve Testing dated December 31, 2001 | ACCT009108 - 009109 (also marked at Ex. 843-I) |
| E-mail from P. Turnbull to M. Curry re: FORBEARANCE WORDING, dated May 16, 2000 | POWELL-SFC003910 (also marked at Ex. 1091-I) |
| E-mail from M. Curry to P. Turnbull re: SMCSFC Assignment.WPD | POWELL-SFC003878 |
| Student Loan Processing Agreement dated March 8, 2001 | GT 10488 - 10490 (WSFC0389685 - 0389687) |
| Student Loan Purchase Agreement dated May 23, 2001 | FOX-SFC007976 - 007999 |
| Student Loan Processing Agreement dated August 8, 2001 | WSFC0076810 - 0076813 |
| Student Loan Processing Agreement dated February 7, 2002 | WSFC0128468 - 0128471 |
| DRAFT Student Loan Processing Agreement | PH 036234 - 036242 |
| Annotated DRAFT Student Loan Processing Agreement | PH 036225 - 036233 (also marked at Ex. 370-I) |
| DRAFT Student Loan Processing Agreement | PEPPER 188430 - 188437 |
| Memorandum from A. Yao to J. Loofbourrow, J. Domal, S. Schauer and R. Gagné, dated November 11, 1998 | ROY 001525 (also marked at Ex. 946-I) |
| E-mail from D. Messick to T. McKenzie, et al., re: Spread Account Adjustment Analysis, dated April 26, 2001 | ROY 104936 - 104939 |
| E-mail from W. Hibberd to D. Schneider re: SFC-Conversation with Parker, dated February 4, 2001 | ROY 164328 (also marked at Ex. 715-I) |
| E-mail from T. McKenzie to P. Turnbull, G. Hawthorne, W. Hibberd, R. Van Epps, D. Schneider, R. Schrof, D. Messick re: Handling of Up Front Payments & Change in Paying Defaults, | ROY 023576 (also marked at Ex. 1153-I) |

dated September 26, 2001

| | |
|---|---|
| E-mail from G. Hawthorne to T. McKenzie dated October 2, 2001 | ROY 075693 |
| E-mail from W. Hibberd to T. McKenzie, D. Schneider, R. Van Epps re: SFC, dated July 5, 2001 | ROY 041146 |
| E-mail from W. Hibberd to T. McKenzie re: Handling of Up Front Payments & Change in Paying Defaults, dated September 28, 2001 | ROY 075699 - 075701 (also marked at Ex. 62-I) |
| SFC Financial II Monthly Servicer Report July 2001 | SFC 102819 - 102825 |
| E-mail from T. McKenzie to G. Hawthorne, W. Hibberd, D. Messick, D. Schneider, G. Hawthorne, P. Turnbull, R. Van Epps, R. Schrof re: Handling of Up Front Payments & Change in Paying Defaults, dated September 28, 2001 | ROY 023567 - 023570 (also marked at Ex. 1168-I) |
| E-mail from W. Hibberd to D. Schneider, R. Van Epps, T. McKenzie, dated October 25, 2000 | ROY 045055 - 045056 (also marked at Ex. 854-I) |
| Fax from Joe, IBG, Inc. to W. Hibberd, D. Schneider, T. McKenzie, BJ | ROY 035334 - 035338 (also marked at Ex. 496-II) |
| Letter from J. Domal to D. Schneider dated September 8, 2000 | IBG 00318 - 00319 (also marked at Ex. 495-II) |
| E-mail from D. Schneider to J. Domal re: SFC dated October 30, 2001 | IBG 00367 - 00368, (also marked at Ex. 728-I) |
| E-mail from T. McKenzie to D. Messick, W. Hibberd, R. Van Epps re: Servicer Report Questions, dated March 22, 2001 | ROY 164414 - 164415 (also marked at Ex. 753-I) |
| E-mail from R. Blake to C. Tilley re: SFC Cycle Two Delinquencies, dated May 16, 2002 | MBIA2_0001327 - 0001328 |
| E-mail from R. Blake to M. Stershic re: FW: SFC Cycle Two Delinquencies, dated October 16, 2001 | WFB 0045530 - 0045531 (also marked at Ex. 168-II) |
| E-mail from T. McKenzie to W. Hibberd, D. King, and D. Schneider re: Student Loan Due Diligence, dated September 28, 2000 | ROY 105161 (also marked at Ex. 332-I) |

| | |
|---|---|
| E-mail from W. Hibberd to T. McKenzie, D. Schneider, and R. Van Epps re: SFC, dated April 24, 2001 | ROY 045922 (also marked at Ex. 723-I) |
| E-mail from T. McKenzie to W. Hibberd, D. Schneider and R. Van Epps re: SFC, dated 07/10/01 | ROY 041141 (also marked at Ex. 724-II) |
| E-mail from T. McKenzie to D. Messick, et al., re: Spread Account Adjustment Analysis dated April 30, 2001 | ROY 075795 |
| E-mail from R. Schrof to T. McKenzie and D. Messick re: Responses to questions from 3.22.01, dated March 29, 2001 | ROY 104723 - 104732 |
| Description of the Current Forbearance Process | Ex. 24-I |
| E-mail from R. Gagné to A. Yao re: Forbearance Agreements dated March 2, 2000 | Ex. 29-I (PH 029345) |
| E-mail from W. Hibberd to T. McKenzie re: Handling of Up Front Payments and Change in Paying Defaults | Ex. 62-I (ROY 075699 - 075701, 045914) |
| Pepper Hamilton LLP Bills to SFC 1999 *Royal v. Pepper Hamilton, et al.* D. Del. No. 05-165 | Ex. 65-I (Excerpts: PEPPER 196374 - 196375, PH 151841, 117026, 117030, 116997 - 117000) |
| Pepper Hamilton LLP Bills to SFC 2000 *Royal v. Pepper Hamilton, et al.* D. Del. No. 05-165 | Ex. 66-I (Excerpts: PH 116974, 116955, PEPPER 047962 - 047963, PH 030720, PEPPER 047999 - 048001, 047987 - 047988, 048022, 048024, PH 116889, 116891, PEPPER 048088, 048091, 048101 - 048103, 048110, PH 030609, 116840, 116824, 095705, 116808) |
| Pepper Hamilton LLP Bills to SFC 2001 *Royal v. Pepper Hamilton, et al.* D. Del. No. 05-165 | Ex. 67-I (Excerpts: PH 030540, 095791, 116777, 095798 - 095799, 030518, 030520, 095804, 156662, 095826 - 095827, 116735 - |

|  |  |
|---|---|
|  | 116736, 116677 - 116678) |
| Pepper Hamilton LLP Bills to SFC 2002<br>*Royal v. Pepper Hamilton, et al.* D. Del. No. 05-165 | Ex. 68-I (Excerpts: PH 116655, 116640 - 116641, 116623) |
| Final Private Placement Memorandum | Ex. 69-I (Excerpts: ROY 019736 19839) |
| Pooling and Servicing Agreement dated as of November 15, 2001 - SFC Grantor Trust, Series 2001-3 | Ex. 70-I (Excerpts: PH 018715 - 018802) |
| Education Payment Plan / Retail Installment Contract | Ex. 74-I (PEPPER 143333 - 143339) |
| Fax from P. Turnbull, to R. Gagné dated October 12, 2000 | Ex. 75-I (PH 032570 - 032580) |
| E-mail from S. Gibson to P. Turnbull, R. Gagné re: Revised Student Loan Purchase and Processing Agreements dated August 21, 2001, with attachments | Ex. 76-I (PEPPER 063551 - 063582) |
| E-mail from S. Gibson to S. Bloch and R. Gagné re: Purchase Agreement - SFCI-II dated September 25, 2001 | Ex. 77-I (PEPPER 115330 - 115338) |
| E-mail from S. Schneider to M. DeCarlo re: School Agreements dated March 7, 2002, with attachments | Ex. 78-I (PEPPER 032417 - 032425) |
| SFC Grantor Trust, Series 2001-3 Term Securitization - True Sale and Nonconsolidated Opinions | Ex. 86-I (Excerpts: ROY 006095 - 006189) |
| E-mail from R. Gagné to P. Turnbull re: SFC New School Agreement (Draft) dated October 11, 2000, with attachment | Ex. 97-I (PH 036330 - 036337) |
| E-mail from R. Gagné to P. Turnbull re: School Processing Agreement for new school dated November 10, 2000, with attachment | Ex. 98-I (PH 036260 - 036266) |
| Memorandum from D. O'Neil to P. Kartha, G. Hawthorne, P. Turnbull, C. Pontius, F. Martinez | Ex. 190-II (S072948 - 072949) |

re: Transaction Codes, dated July 30, 1997

| | |
|---|---|
| E-mail from A. Chang to S. Scola re: Analysis Summary.xls, dated 05/11/01, with attachment | Ex. 227-II |
| Private Placement Memorandum | Ex. 247-II (ROY 075424 - 075497) |
| Excerpt from Deposition Transcript of Andrew N. Yao in re: *Nielsen Electronics v. Student Financial* - C.A. #99-285-MMS, dated October 14, 1999 | Ex. 255-I (WSFC0826715, 0826748) |
| Excerpts from Deposition Transcript of Perry R. Turnbull in re: *Nielsen Electronics v. Student Finance* - C.A. #99-285, dated November 9, 1999 | Ex. 258-I (WSFC0826427, 0826459) |
| Excerpts from Deposition Transcript of Patricia M. Kartha in re: *Nielsen Electronics v. Student Finance* - C.A. #99-285, dated November 11, 1999 | Ex. 260-I (WSFC0817672, 0817683 - 0817684) |
| Excerpts from Deposition Transcript of Konrad Smith in re: *Nielsen Electronics v. Student Financial* - C.A. #99-285-MMS, dated November 12, 1999, with selected exhibits | Ex. 261-I (WSFC0826069, 0826105, WSFC0826312, 0826316 - 0826328) |
| Excerpts from Deposition Transcript of Frank Martinez in re: *Nielsen Electronics v. Student Financial* - C.A. #99-285-MMS, dated November 4, 1999 | Ex. 262-I (WSFC0817889, 0817898) |
| E-mail from P. Turnbull to P. Kartha, F. Martinez re: Nielsen Electronics Institute, dated January 29, 1998 | Ex. 268-I (WSFC0785790) |
| Letter from E. McNally to M. Duncan Grant re: Nielsen Electronics Institute/SFC dated February 6, 1998 | Ex. 270-I (PH 128701 - 128703) |
| Letter from M. Duncan Grant to E. McNally re: Nielsen Electronics Institute - SFC dated March 11, 1998, with attachments | Ex. 273-I (WSFC0832755 - 0832761, 0832763 - 0832765, 0832772, 0832777, 0832779, 0832781) |
| Fax from M. Duncan Grant to F. Martinez, dated March 19, 1998 forwarding E. McNally's March | Ex. 277-I (WSFC0786408 - |

| | |
|---|---|
| 18 letter | WSFC0786410) |
| Complaint<br>*Nielsen Electronics Institute v. Student Finance<br>Corp. and A. Yao* | Ex. 279-I<br>(NLS 004674 - 4687, BAK<br>00193 - 00206) |
| Nielsen's Incorporated April 23, 1997 Special<br>Meeting of the Board of Directors | Ex. 281-I<br>(WSFC0818715,<br>NEI0011008) |
| SFC - Possible Deposition Questions for Chris<br>Huffins, Pat Kartha and Diane Messick | Ex. 285-I<br>(PEPPER 185151 -<br>185152) |
| List of Driving School Loans: 1994 to Present | Ex. 286-I<br>(SFC 117551 - 11770, NLS<br>003649 - 003669) |
| E-mail from P. Turnbull to A. Unterberger re: NEI<br>- Questions from Duncan, dated October 1, 1999 | Ex. 290-I<br>(WSFC0831786 -<br>0831787) |
| E-mail from P. Turnbull to P. Kartha, G.<br>Hawthorne, F. Martinez, R. Faix re: Neilson<br>Questions from my Meeting Today, dated<br>11/10/99 | Ex. 294-I |
| Report of Michael C. Sullivan, Partner, Arthur<br>Andersen LL with respect to the matter of *Nielsen<br>Electronics Institute v. SFC and A. Yao*, Case No.<br>99-285-MMS, dated May 1, 2000 | Ex. 295-I |
| E-mail from A. Yao to A. Unterberger and D.<br>Grant re: My Agenda for Tomorrow's Meeting,<br>dated October 27, 1999 | Ex. 296-I<br>(WSFC0831507 -<br>0831509) |
| SFC Agenda for Meeting with Attorneys | Ex. 297-I |
| E-mail from A. Yao to P. Turnbull and G.<br>Hawthorne re: Research of Exception found by<br>Arthur Andersen re Neilson | Ex. 298-I |
| Fax from A. Unterberger to C. Casey, Arthur<br>Andersen re: Transaction Codes, dated November<br>9, 1999 | Ex. 306-I<br>(WSFC0815838 -<br>0815841) |
| Memorandum from R. Gagné to J. Murray, L.<br>Shiekman, J. Pooler and A. Wilcox re: | Ex. 313-I |

| | |
|---|---|
| Representation of Student Finance Corporation, dated April 18, 2002 | (PH 027103 - 027108) |
| E-mail from T. McKenzie to W. Hibberd, D. King, D. Schneider re: Student Loan Due Diligence, dated 09/28/00 | Ex. 332-I (ROY 105161) |
| E-mail from D. Messick to T. McKenzie, G. Hawthorne, P. Turnbull, J. Domal, W. Hibberd, G. Chandler, R. Van Epps, D. Schneider, D. King, Scotts re: Additional Questions, dated April 25, 2001 | Ex. 337-I (IBG 00739 - 00740) |
| Letter from R. Gagné to G. Chandler re: Student Finance Corporation - Term Securitization Project, dated August 12, 1999 | Ex. 356-I |
| Letter from R. Gagné to G. Chandler re: Proposed Changes to the Escrow Agreement and the $200million Royal Indemnity Company Credit Risk Insurance Policy, dated October 25, 1999 | Ex. 357-I (PH 176236 - 176238) |
| Excerpts from Pepper Hamilton Attorney Policies Manual dated September 1, 2001 | Ex. 359-I (PEPPER 206153, 206198) |
| Memorandum from R. Gagné to J. Murray, L. Shiekman, J. Pooler and A. Wilcox re: Representation of Student Finance Corporation, dated April 17, 2002 | Ex. 361-I |
| Defendants W. Roderick Gagné, Robert L. Bast, Pamela Bashore Gagné and the Trusts' Responses to the Trustee's First Set of Interrogatories to the Family Defendants; *In re: Student Finance Coporation, Debtor/ Charles A. Stanziale, Jr. v. Pepper Hamilton* | Ex. 364-I Civ. No. 04-1551-JJF |
| Letter from A. H. Wilcox to S. Harmelin dated August 6, 2004 | Ex. 369-I (PEPPER 199212 - 199217) |
| Letter from R. Eckman to F. Mackin re: SFC - Lender License Application, dated April 27, 2001 | Ex. 373-I (PH 097231 - 097238) |
| Student Finance Corporation and Subsidiaries - Report on Consolidated Financial Statements Years Ended December 31, 2000 and 1999 | Ex. 418-I (GT 01079 - 01108) |

| | |
|---|---|
| Memorandum from G. Hawthorne to A. Yao re: Weekly Operations Update through Friday, July 20, 2001, dated July 23, 2001 | Ex. 471-I |
| Accountant's Chart | Ex. 506-I (ACCT008509 + two pages) |
| Memorandum from D. Lee to R. Eckman re: Generic Changes to be Made on Agreements, dated March 28, 2000 | Ex. 602-I (PEPPER 132843 - 132848) |
| E-mail from R. Gagné to D. Lee, P. Turnbull and R. Eckman re: Student Loan Processing Agreement, dated March 2, 2001 | Ex. 603-I (PH 032530 - 032531) |
| Fax from R. Gagné to D. Lee re: SFC - Lender License Application, dated February 26, 2001 | Ex. 605-I (PH 029040 - 029042) |
| Letter from D. Lee to F. Mackin re: Lender License Application for Student Finance Corporation, dated January 8, 2001 | Ex. 606-I (PEPPER 143826 - 143827) |
| Annotated Letter from D. Lee to F. Mackin re: Lender License Application for Student Finance Corporation, dated December 15, 2000 | Ex. 607-I (PH 030103 - 030104) |
| E-mail from R. Gagné to R. Eckman, J. B. Boericke and D. Lee, dated April 10, 2001, with attachment | Ex. 608-I (PEPPER 055486, 055482 - 055485) |
| E-mail from D. Lee to R. Gagné re: SFC NY Letter, dated April 27, 2001 | Ex. 609-I (PH 097239 - 097241) |
| Letter from D. Lee to S. Cayouett re: Request for Copies of School Contracts, dated October 31, 2000 | Ex. 619-I (PH 030068 - 030073) |
| Letter from D. Lee to S. Cayouett re: Request for Confirmation of Exemption from Licensing | Ex. 620-I (PEPPER 156081 - 156082) |
| DRAFT Student Loan Purchase Agreement | Ex. 621-I (PH 036178 - 036192) |
| Memorandum from D. Lee to R. Eckman re: Draft Letter to NY DOB for Your Review and Approval, | Ex. 622-I (PEPPER 157384 - |

| | |
|---|---|
| dated March 1, 2001 | 157385) |
| Letter from R. Eckman to F. Mackin re: SFC - Lender License Application, dated February 26, 2001 | Ex. 623-I (PEPPER 055499 - 055500) |
| SFC - Policy Committee Decisions/Actions, dated February 28, 2000 | Ex. 633-I (POWELL-SFC003833 - SFC003834) |
| Lawyer Profile for Paul Sefcovic, Attorney, Squire, Sanders & Dempsey LLP | Ex. 658-I |
| Excerpts from Deposition Transcript of Gil Chandler dated October 13, 2006 | Pages 231, 323 - 324 |
| Excerpts from Deposition Transcript of Richard Eckman dated November 28, 2006 | Pages 1-3, 13-16, 27-31, 62-75, 150-230 |
| Excerpts from Deposition Transcript of Sheilah Gibson dated September 7, 2006 | Pages 241-243, 321-324 |
| Excerpts from Deposition Transcript of Duncan Grant dated October 10, 2006 | Pages 1-3, 40-56, 85-105, 144-184, 200-206, 209-212, 282-288, 350-369 |
| Excerpts from Deposition Transcript of Gary Hawthorne dated July 2, 2003 | Pages 1, 279-282; Exhibit 13 |
| Excerpts from Deposition Transcripts of William Hibberd dated August 22, 2003 and March 24, 2005 | Pages 1, 195 (8/22/03 Transcript) |
| | Pages 1, 105-109 (03/24/05 Transcript) |
| Declaration of William J. Hibberd in Support of Royal Indemnity Company's Motion for an Order Appointing a Chapter 11 Trustee or in the Alternative Converting the Case to One under Chapter 7, dated September 2, 2003 | Case No. 02-11620, U.S.B.C. |
| Excerpts from Deposition of Patricia Kartha dated October 4, 2006 | Pages 1-3, 46-71 |
| Excerpts from Deposition Transcript of Darcy Malcolm dated October November 29, 2006 | Pages 1-3, 85-89, 109 - 113, 125-128, 139-149, 176-201 |

| | |
|---|---|
| Excerpts from Deposition Transcript of Michael Maransky dated December 7, 2006 | Pages 1-3, 13-22 |
| Excerpts from Deposition Transcripts of Tony McKenzie, Vols. 1 dated March 16, 2005 and July 20, 2005 | Pages 1, 42-44, 296, 359-360, 363-364 (Transcript dated 03/16/05) |
| | Pages 353-355 (Transcript dated 07/20/05) |
| Excerpts from Deposition Transcript of Diane Messick dated February 7, 2006 | Pages 1, 116-118, 353-355, 543-544 |
| Excerpts from Deposition Transcript of Roger Saylor dated October 30, 2006 | Pages 1-3, 213-216 |
| Excerpts from Deposition Transcript of Scott Schauer (Loofbourrow and Associates) dated January 23, 2006 | Page 2, 317-318, 426, 429-430, 434 |
| Excerpts from Deposition Transcript of David Schneider dated December 13, 2006 | Pages 1, 199-201, 592-595, 786-788, 797-800, 813-818, 838-839 |
| Excerpts from Deposition Transcript of Paul Sefcovic dated December 11, 2006 | Pages 1, 199-201 |
| Excerpts from Transcript of Konrad Smith dated December 4, 2006 | Pages 1, 18-23 |
| Declaration of William J. Spears in Opposition to Plaintiff's Motion for Partial Summary Judgment dated December 10, 2002 | Ex. 443-I<br><br>C.A. No. 02-1294 |
| Declaration of William J. Spears in Support of Motion of Royal Indemnity Company for an Order Appointing Chapter 11 Trustee or in the Alternative Converting the Case to One Under Chapter 7 of the Bankruptcy Code | Ex. 415-I<br><br>C.A. No. 02-11620 |
| Excerpts from Deposition Transcript of P. Turnbull dated March 17, 2003 | Pages 1-4, 57-64 |
| Excerpts from Deposition Transcript of P. Turnbull dated August 26, 2003 | Pages 1, 190-194<br><br>Turnbull Ex. 14 |

| | |
|---|---|
| Excerpts from Deposition Transcript of P. Turnbull dated September 3, 2003 | Pages 1-4, 49-56 |
| | Turnbull Exs. E, F, G, H, I, J. |
| Excerpts from Deposition Transcript of Andrea Unterberger dated November 13, 2006 | Pages 1-3, 35-42, 66-86 |
| Excerpts from Deposition Transcript of Robert Van Epps dated June 29, 2005 | Pages 1, 5762, 146-147, 160-161, 259-262 |
| Excerpts from Deposition Transcript of David Wilcox dated October 16, 2006 | Pages 1-3, 19-30, 82-93, 107-110, 210, 225-230, |
| | Ex. 360-I (PH 027103 - 027108) |
| Excerpts from Deposition Transcript of Andrew Yao dated August 26 and 27, 2004 | Pages 1, 65-66 (08/26/04 Tr.) |
| | Pages 83, 99-106 (08/27/04 Tr.) |
| Excerpts from Deposition Transcript of David Zulauf dated July 1, 2003 | Pages 1, 179-182 |
| | Ex. 10 |

Mediation Statement of W. Roderick Gagné and Pepper Hamilton

Appendix of Materials submitted in Support of Gagné's and Pepper's Mediation Statement

| | |
|---|---|
| Private Placement Memorandum | ROY 007992 - 008098 |
| Excerpts from Deposition Transcript of Theodore "Gil" Chandler, Vol. II, dated October 13, 2006 | |
| E-mail from W. Hibberd re: Student Loan Program, dated June 15, 1999 | ROY 035232 - 035233 |
| Financial Enhancements - Underwriting Manual, revised October 2000 | ROY 164741 - 164751 |
| E-mail from W. Hibberd to D. Schneider re: SFC - Conversation with Parker, dated February 4, 2000 | ROY 164328 |
| E-mail from T. McKenzie to W. Hibberd, D. King and D. Schneider re: Student Loan Due Diligence, dated September 28, 2000 | ROY 105161 |
| E-mail from W. Hibberd to D. Schneider, Robert Van Epps, T. McKenzie dated December 1, 2000 | ROY 045038 |
| E-mail from T. McKenzie to D. Messick, R. Schrof, B. Hibberd, R. Van Epps and D. Schneider re: Servicer Report Questions, dated March 22, 2001 | ROY 164414 - 164446 |
| E-mail from W. Hibberd to D. Schneider re: PPM Expedition, dated April 5, 2001 | ROY 001255 |
| E-mail from W. Hibberd to D. Schneider dated April 6, 2001 | ROY 045991 |
| E-mail from W. Hibberd to D. Schneider dated April 6, 2001 | ROY 045991 |
| E-mail from W. Hibberd to D. Schneider dated April 9, 2001 | ROY 045979 |
| E-mail from T. McKenzie to D. Messick, et al. re: Spread Account Adjustment Analysis, dated April 20, 2001 | ROY 165652 - 165690 |
| E-mail from W. Hibberd to T. McKenzie, D. | ROY 045922 |

| | |
|---|---|
| Schneider and R. Van Epps dated April 24, 2001 | |
| E-mail from T. McKenzie to D. Messick, et al. dated April 25, 2001 | ROY 045916 |
| E-mail from W. Hibberd to T. McKenzie, D. Schneider and R. Van Epps dated May 1, 2001 | ROY 045909 |
| E-mail from W. Hibberd to R. Van Epps, D. Schneider, and T. McKenzie dated SFC Pricing dated May 7, 2001 | ROY 045895 - 045896 |
| E-mail from W. Hibberd to D. King dated May 13, 2001 | ROY 047737 |
| E-mail from T. McKenzie to W. Hibberd, R. Van Epps and D. Schneider dated July 5, 2001 | ROY 041407 |
| E-mail from T. McKenzie to W. Hibberd, D. Schneider and R. Van Epps dated July 10, 2001 | ROY 041141 |
| E-mail from W. Hibberd to T. McKenzie, D. Schneider and R. Van Epps dated August 20, 2001 | ROY 040142 |
| E-mail from R. Van Epps to W. Hibberd, D. Schneider and T. McKenzie re: New SFC Model, dated August 22, 2001 | ROY 045458 - 045460 |
| E-mail from T. McKenzie to G. Hawthorne, D. Messick, W. Hibberd, D. Schneider, P. Turnbull, R. Van Epps, R. Schrof re: handling of Up Front Payments & Changes in Paying Defaults, dated September 28, 2001 | ROY 023567 - 023570 |
| Memorandum from D. Messick to P. Turnbull and G. Hawthorne dated September 28, 2001 | ROY 023574 - 023575 |
| Student Finance Corporation and Subsidiaries: Report on Consolidated Financial Statements, Years Ended December 31, 2000 and 1999 | ACCT006557 - 006586 |
| Excerpts from Deposition Transcript of Kirk Monteverde, Vol. 1, dated November 20, 2006 | |
| Fax from J. Domal to W. Hibberd, D. Schneider and T. McKenzie dated March 6, 2000 | ROY 075140 - 075144 |

| | |
|---|---|
| E-mail from W. Hibberd to D. Schneider, R. Van Epps and T. McKenzie dated October 25, 2000 | ROY 045055 - 045056 |
| E-mail from T. McKenzie re: SFC - Experience Accounts, dated December 31, 2001 | ROY 023800 - 023801 |
| E-mail from T. McKenzie re: SFC - Experience Accounts, dated December 31, 2001 | ROY 023800 - 023801 |
| Performance Assessment of W. J. Hibberd, 2001 process | RSA 0000001 - 000000 |
| Performance Assessment of R. McKenzie, 2001 Process | RSA 000029 - 000037 |
| Excerpts from Deposition Transcript of Diane Messick, Vol. 1, dated February 7, 2006 *Royal Indemnity Co v. T. E. Moore & Co., et al.,* Cause No. D167370 | |
| Excerpts from Deposition Transcript of E. David Schneider, Vol. 1, dated December 13, 2006 | |
| Student Finance Corporation - Officer's Certificate | ROY 021856 - 021863 |
| E-mail from R. Gagné to A. Yao re: Forebearance Agreements, dated March 2, 2000 | PH 029345 |
| E-mail from R. Gagné to P. Turnbull, G. Hawthorne and S. Gibson re: School Agreements, dated March 5, 2002 | PEPPER 053464 |
| E-mail from S. Gibson to R. Gagné re: Student Loan Purchase Agreements, dated January 28, 2002 | PH 042835 |
| E-mail from P. Turnbull to R. Gagné re: SMS school agreement, dated September 15, 2000, with attachment | Ex. 1344-I (PH 036340 - 036344) |
| E-mail from A. Yao to A. Unterberger and D. Grant re: My Agenda for Tomorrow's Meeting, with attached agenda, dated October 27, 1999 | Ex. 296-I (WSFC0831507 - 0831509) |
| SFC Grantor Trust, Series 2001-3 Term Securitization - Opinion Letter, with Certificates dated November 15, 2001 | ROY 006095 - 006189 |

| | |
|---|---|
| Report on Agreed-Upon Procedures, for the Grantor Trust Series 2000-1, 2000-2, 2000-3 and 2000-4, by McGladrey & Pullen, LLP (February 21, 2001) | ROY 23133-23167 |

Baker & Associates Reports:

| | |
|---|---|
| Due Diligence: Special Servicer Surveillance, July 30, 1996 | ROY 35022-43 |
| Due Diligence: Follow-up Servicer Review, June 17, 1997 | ROY 35045-53; ROY 35060-68 |
| Application and Approval Process, July 13, 1998 | ROY 761 - ROY 766 |
| Due Diligence: Special Compliance Review, April 8, 1999 | ROY 54610 - ROY 54636 |
| Due Diligence: Business Practices Review: Follow-up Report, August 5, 1999 | ROY 54095 - ROY 54129 |
| Due Diligence: Collection Activities Review Delinquent Student Loans: Follow-up Report, August 5, 1999 | ROY 54130 - ROY 54148 |
| E-mail from Andrew Yao to Domal, et al, re: Preliminary Baker and Associates Servicer Rating, August 9, 1999 | ROY 1003 |
| Due Diligence: Collection Activities Review Follow-up Report, November 24, 1999 | ROY 35069 - ROY 35082 |
| Due Diligence: Business Practices Review, March 22, 2000 | ROY 54169 - ROY 54188; ROY 2321-42 |
| Due Diligence: Limited Loan Servicing Review, June 14, 2000 | ROY 004136 - ROY 004143; ROY 073749 - ROY 073756; ROY 75202, ROY 4126 |
| Due Diligence: Business Practices Review, December 3, 2001 | ROY 0023105 - ROY 0023124; ROY 054149 - ROY 054168 |
| SFC's Reports on Consolidated Financial Statements (1998-1997, 1999-1998, 2000-1999) | ROY 003102-003121 ROY 0022608-0022632 ROY 0023179-0023207 |
| Monthly Servicer Reports for GT2000-4 | ROY 073162 - 073277 |

Declaration of William J. Hibberd (with exhibits),
dated September 2, 2003 (U.S. Bankr. Ct., D. Del.)

The Collected Tribar Legal Opinion Reports 1979 - 1988

The Collected ABA and Tribar Opinion Reports

| | |
|---|---|
| Excerpts from Pepper Invoice in the Nielsen Matter dated November 16, 1999 | PH 117029 - PH 117030 |
| Deposition Transcripts of W. Roderick Gagné, Vols. 1 through 4, dated February 23 and February 26 - 28, 2007 | |
| Opinion Letters for SFC Grantor Trust Series, 2000-1 | Ex. 79-I |
| Opinion Letters for SFC Grantor Trust Series, 2000-2 | Ex. 80-I |
| Opinion Letters for SFC Grantor Trust Series, 2000-3 | Ex. 81-I |
| Opinion Letters for SFC Grantor Trust Series, 2000-4 | Ex. 82-I |
| Opinion Letters for SFC Grantor Trust Series, 2001-I | Ex. 83-I |
| Opinion Letters for SFC Grantor Trust Series, 2001-1 | Ex. 84-I |
| Opinion Letters for SFC Grantor Trust Series, 2001-2 | Ex. 85-I |
| Opinion Letters for SFC Grantor Trust Series, 2001-3 | Ex. 86-I |
| Flowchart dated April 11, 2002 | ROY 165045 - 165051 |
| Royal Indemnity Company Credit Risk Insurance Policy, Policy Number RST293334 | ROY 008755 - 008769 |
| Royal Indemnity Company Credit Risk Insurance Policy, Policy Number RST147529 | ROY 019668 - 019678 |

"Financial Information Failure and Lawyer
Responsibility," 31 J. Corp. L. 1097 (2006)

Royal's Objections and Responses to McGladrey's First
Set of Interrogatories

Chapter 6, *Financial Company's Transactional Due
Diligence*, pp. 53-66, by Glenn Blumm & Michael A.
Mattera, contained in the Handbook of Structured
Financial Products, edited by Frank J. Fabozzi (1998)

| | |
|---|---|
| Commitment to Issue a Financial Guaranty Insurance Policy, Revised as of April 18, 2000 for SFC Grantor Trust Series, 2000-1 | ROY 008977.1 - 008981 |
| Commitment to Issue a Financial Guaranty Insurance Policy for SFC Grantor Trust, Series 2000-2 | ROY 010519.1 - ROY 010523 |
| Commitment to Issue a Financial Guaranty Insurance Policy for SFC Grantor Trust, Series 2000-3 | ROY 012551 - ROY 012555 |
| Commitment to Issue a Financial Guaranty Insurance Policy, Revised as of December 15, 2000 for SFC Grantor Trust, Series 2000-4 | ROY 14255 - ROY 14529 |
| SFC Owner Trust 2001-1 | ROY 020564 - ROY 020592 |
| Commitment to Issue a Financial Guaranty Insurance Policy, Revised as of April 24, 2001 for SFC Grantor Trust, Series 2001-1 | ROY 16117 - ROY 16121 |
| Commitment to Issue a Financial Guaranty Insurance Policy, Revised as of August 16, 2001 for SFC Grantor Trust, Series 2001-2 | ROY 17736 - ROY 17740 |
| Commitment to Issue a Financial Guaranty Insurance Policy, Revised as of November 14, 2001 for SFC Grantor Trust, Series 2001-3 | ROY 020287 - ROY 020291 |

## Appendix C

## Matters in Which I Have Given Trial or Deposition Testimony in the Past Four Years


People v. Huggins & Knight (for Manhattan D.A.'s Office), testified 2004

GMAC Commercial Mortgage Corporation v. Orix (for GMAC), deposed and testified 2004

United Air Lines make-whole litigation, deposed 2006

Enron (Newby class action), deposed 2006