# ASHBY & GEDDES

ATTORNEYS AND COUNSELLORS AT LAW

500 DELAWARE AVENUE

P. O. BOX 1150

WILMINGTON, DELAWARE 19899

TELEPHONE
302-654-1888

FACSIMILE
302-654-2067

August 10, 2007

The Honorable Joseph J. Farnan, Jr.  
United States District Court  
844 N. King Street  
Wilmington, Delaware 19801

VIA HAND DELIVERY  
and ELECTRONIC FILING

Re: *Royal v. Pepper Hamilton, et al.*,  
C.A. No. 05-165-JJF

Dear Judge Farnan:

We write on behalf of Royal Indemnity Company ("Royal") to oppose the request made by Pepper Hamilton LLP ("Pepper") and Pepper partner W. Roderick Gagné ("Gagné") seeking leave to brief various issues for summary judgment (D.I. 529; herein "Pepper's Letter"). As demonstrated herein, Pepper's summary judgment arguments will fail. Royal can point to record evidence rebutting every legal and factual basis offered by Pepper in support of summary judgment. The facts demonstrate that Pepper's arguments are wrong on their face or, at minimum, raise genuine issues of fact in Royal's favor. Further, many of Pepper's arguments are based on inapposite Pennsylvania law and are a rehash of legal arguments previously rejected by this Court in its denial of Pepper's motion to dismiss (D.I. 405; herein, the "Opinion"). Pepper cannot demonstrate, when all evidence is viewed in a light most favorable to Royal, that "there is no genuine issue of material fact and [that Pepper is entitled] to judgment as a matter of law." *A.W. v. Jersey City Public Schools*, 486 F.3d 791, *794 (3d Cir., 2007); *Matreale v. New Jersey Dept. of Military & Veterans Affairs*, 487 F.3d 150, *152 (3d Cir., 2007). We respectfully ask that you deny Pepper's request to file summary judgment papers.

We respond to each of Pepper's purported bases for summary judgment below in the order they were presented in Pepper's Letter.

**Royal's Civil RICO Claims Are Well-Founded**

In denying Pepper's motion to dismiss, this Court held that Royal "identifies an enterprise that existed apart from the underlying racketeering activity" by alleging "that SFC conducted the business of borrowing money, making loans, and obtaining insurance while Defendants Pepper, through Gagné, and McGladrey, through Aquino, provided the necessary legal and financial advice, guidance and information." Opinion, at 10. This Court also held that Gagné could be found to have participated in the operation or management of the enterprise if he "advised and guided the enterprise on legal issues," and "participated in, conducted the affairs of, directed the

The Honorable Joseph J. Farnan, Jr.
August 10, 2007
Page 2

activities of, used and… knowingly facilitated" the enterprise. Opinion, at 10-11. Discovery has shown that the enterprise was as alleged by Royal and that Gagné participated in the enterprise in exactly the manner noted by the Court.

The evidence demonstrating Gagné's participation in the SFC "enterprise" is overwhelming. Gagné knew Andrew Yao for approximately fifteen years and represented Yao and SFC for at least ten years. Gagné personally provided many hundreds of hours of legal assistance, guidance, and management to SFC on all aspects of SFC's business, ranging from writing transaction documents and prospectuses, to handling personnel matters, to coordinating the timing and implementation of business agreements, to arranging and brokering approximately $36 million of bridge financing for SFC from his own family's funds, to interfacing with SFC's investment bankers, and more. Gagné himself was personally involved in SFC's efforts to negotiate Royal's insurance structure for the securitizations. SFC had no in-house legal staff and given the depth and breadth of Gagné's involvement with SFC, he was viewed by SFC's other law firms and SFC's accountants as SFC's "general counsel" and functioned as such. SFC executives, including president Andrew Yao, considered Gagné to be "extremely intimately familiar with the Company, more so than perhaps any individual." Gary Hawthorne, another SFC executive, agreed that "by June of 2000, [Gagné] had taken responsibility for the new school agreements" that were an essential component to the SFC "enterprise" and SFC's fraud. In fact, Mr. Yao testified that Gagné had his complete confidence and did not need to consult with Yao before taking various actions on behalf of SFC. Gagné's own time entries confirm all of this.

The facts demonstrate Gagné's long-standing, broad role in conducting SFC's affairs. As such, Royal can easily meet the minimum participation threshold set by *Reves v. Ernst & Young*, 507 U.S. 170 (1993) (holding that liability under § 1962(c) can be established by showing that a defendant indirectly participated in the affairs of an enterprise if he played only some part in directing its affairs). Pepper's argument that summary judgment is proper because there is no evidence demonstrating Gagné's participation, even indirectly, in enterprise affairs, is simply wrong and contradicted by a voluminous factual record.

Pepper is also not, as it claims, automatically entitled to summary judgment on Royal's § 1962(d) claim if it succeeds in defeating Royal's § 1962(c) claim. The Third Circuit has expressly held that "§ 1962(c) liability is not a pre-requisite to § 1962(d) liability". *Smith v. Berg*, 247 F.3d 532, 537 (3d Cir. 2001). In so holding, the Third Circuit expressly rejected the precise argument made in Pepper's Letter: "[O]ne who opts into or participates in a conspiracy is liable for the acts of his co-conspirators which violate § 1962(c) even if the defendant did not personally agree to do, or conspire with respect to, *any* particular element." *Id.* (emphasis in original). Pepper's Letter raises no colorable basis for summary judgment on Royal's RICO claims.

### Delaware's Statute of Limitations Applies Here and Delaware Law Governs Royal's Common-Law Claims

Pepper's Letter presumes that Pennsylvania law applies to Pepper's statute of limitations defense and Royal's common law claims. By failing to argue that summary judgment would be proper if Delaware law applied, Pepper admits that summary judgment is not proper on its statute of limitations defense, nor on numerous Royal common-law claims, under Delaware law.

Pepper's assumption that Pennsylvania law applies is based on a fundamental misunderstanding of Delaware's choice of law doctrine.[1] As Royal argued exhaustively in its opposition to Pepper's motion to dismiss, the RESTATEMENT (SECOND) OF CONFLICT OF LAWS' "most significant relationship test" governs choice of law issues in Delaware, *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 43-48. (Del. 1991), not *lex loci delicti*, as Pepper argues now and as it argued in its motion to dismiss (D.I. 36, D.I. 51). Under the most significant relationship test, it is clear that Delaware law, not Pennsylvania law, applies to this case.

Pepper does not dispute that the factors articulated in Restatement sections 145 (generally) and 148 (concerning fraud and misrepresentation claims, specifically) militate in favor of applying Delaware law, nor could it. Delaware is: (i) the state of Royal's incorporation; (ii) the state where the transactions at the heart of this case were based, and where Royal acted in reliance on Pepper's false representations by insuring the loan portfolios; (iii) the state where SFC and Pepper both maintained offices, and where Pepper performed at least some of the work in furtherance of the fraud; and (iv) the state whose law this Court has already ruled governs the interpretation of the operative insurance policies. Moreover, the Restatement is crystal clear that Royal's state of incorporation (Delaware) is more important than the state where Pepper was formed (Pennsylvania). RESTATEMENT (SECOND) CONFLICT OF LAWS, § 148, cmt. i;. *see also Brown v. SAP America Inc.*, No. Civ. A. 98-507-SLR, 1999 WL 803888, at *6-7 (applying Restatement § 148 and comments).

### Statute of Limitations

Pepper seeks summary judgment on the statute of limitations only if Pennsylvania's two-year statute of limitations applies (Pepper's Letter, p. 2-3).[2] Pepper's request for summary judgment on these grounds should be denied because (1) Delaware's, not Pennsylvania's statute of limitations applies and (2) even under Pennsylvania's statute, there is minimally a question of fact as to when Royal could have discovered Pepper's role in SFC's fraud.

---

[1] A federal district court exercising its jurisdiction over state law claims will apply the choice of law principles followed by the venue in which the district court sits. *See System Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1136 (3d Cir. 1977) (*citing United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).

[2] Unlike Pennsylvania, Delaware permits claims for fraudulent and negligent conduct to be brought within three years of discovery. 10 Del. C. § 8106.

It is well settled that federal courts will apply the forum state's statute of limitations rules. *See David B. Lilly Co. v. Fisher*, 18 F.3d 1112, 1117 (3d Cir. 1994); *Ross v. Johns-Manville Corp.*, 766 F.2d 823, 826 (3d Cir. 1985); *Cavalier Clothes, Inc. v. Major Coat Co.*, No. 89-3325, 1991 WL 125179, at *3 (E.D. Pa. June 26, 1991) (court exercising supplemental jurisdiction). Pepper cites no relevant authority for the application of Pennsylvania's two-year statute of limitations. *See* Pepper's Letter, p. 2, *quoting Christ v. Cormick*, 2007 U.S. Dist. LEXIS 49825 at *19-20 (D.Del. July 10, 2007) (discussing application of Pennsylvania **substantive** not **procedural** law to Delaware action). Nor is there any merit to Pepper's unsupported assertion that Delaware's borrowing statute would operate to impose Pennsylvania's statute of limitations (Pepper's Letter, p. 2, n. 2). The borrowing statute provides that the Delaware limitations period will always apply when the plaintiff is a Delaware resident (*see* 10 Del. C. § 8121 (2005)), and under the caselaw Royal—a Delaware corporation—is a Delaware resident. *See D'Angelo v. Petroleos Mexicanos*, 398 F. Supp. 72, 79 (D. Del. 1975) (Delaware corporation entitled to benefit of § 8121); *see also Rollins Environ. Servs., Inc. v. WSMW Indus., Inc.*, 1979 WL 193328, *1 (Del. Super. 1979) (Delaware corporation conducting business in Delaware is "resident" for purposes of § 1821).[3] All of these issues were extensively briefed by Royal in its opposition to Pepper's motion to dismiss. (D.I. 44 at 22-26.)

Although Delaware's three-year limitations period applies here, Royal's claims are timely even within the shorter two year period. While Royal did receive two memoranda from its forensic accountants in the spring of 2002 speculating that Pepper may have been a "potentially responsible party", neither memorandum contained sufficient facts to permit Royal to assert claims against Pepper, as Royal's forensic accountants have testified. Indeed, Royal had no evidence at the time that Pepper intentionally or negligently made misrepresentations in legal opinions, private placement memoranda, or otherwise. *See Butala v. Agashiwala*, 1997 WL 79845, at *5 (S.D.N.Y. Feb. 24, 1997) ("[I]nquiry notice for statute of limitations purposes is only triggered when the plaintiff is placed on notice of the fraudulent activities *of the particular defendants being sued*") (emphasis added).

In any event, even if the bare speculation in the 2002 memoranda had put Royal on inquiry notice, it was not until late in 2004 that Royal could have discovered the fraud "by the exercise of due diligence". *Bhatla v. Resort Dev. Corp.*, 720 F. Supp. 501 (W.D. Pa. 1989). The reason is simple: until the bankruptcy Trustee waived SFC's attorney-client privilege in Fall 2004, no amount of diligence on Royal's part would have uncovered the evidence needed to assert fraud and negligence claims against Pepper. Royal can show that the documents that expose Pepper's fraud are formerly-privileged documents that had not been previously available. Indeed, Gagné even misrepresented to Royal's attorneys that he knew nothing of SFC's forbearance practices, a demonstrably false statement. Again, given all of this evidence, there is

---

[3] Pepper's disingenuousness on this score is made apparent by the fact that Pepper argues Royal is not a Delaware "resident" for purposes of Delaware's borrowing statute (Pepper Letter, p.2, n. 2), but Royal is a "Delaware licensed insurer" for purposes of Pepper's argument regarding 18 Del. C. § 909 (Pepper Letter, at 7-8.)

The Honorable Joseph J. Farnan, Jr.
August 10, 2007
Page 5

at minimum a question of fact as to whether Royal could have uncovered Pepper's and Gagné's role in the SFC fraud before Fall 2004.

### "Malice" Is Not An Element Of Civil Conspiracy In Delaware, But Will Nonetheless Be Proved

Pepper's argument regarding "malice" and civil conspiracy is only relevant if Pennsylvania law applies to Royal's civil conspiracy claim; as such, Pepper concedes that Royal's civil conspiracy claim is not subject to summary judgment if Delaware law applies. Even under Pennsylvania law, however, summary judgment is inappropriate. As this Court held when denying Pepper's motion to dismiss in response to the identical argument Pepper makes here, "malice exists where the defendant intends to injure the plaintiff without legal justification" (Opinion, at 16; citing *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979)). There is ample evidence in the record—and certainly enough to create a genuine issue of material fact—that Gagné and Pepper "intended to injure [Royal] without legal justification."[4]

Gagné's email records show Pepper knew as early as March 2, 2000, that SFC was manipulating loan repayment data in a way that would be deceptive to Royal. It nonetheless drafted, edited, and even submitted to state regulators, agreements between SFC and the trucking schools that were necessary to facilitate SFC's fraud. The evidence further shows that, at the same time Pepper and Gagné—who himself had millions of his family's money invested in SFC—were facilitating SFC's fraud, they continued to reassure Royal in writing that the transactions' reporting safeguards would give Royal an accurate view of how SFC's loans were performing. As part of those reassurances, Pepper drafted false and misleading private placement memoranda ("PPMs") stating, among other things, that SFC was just following the "customary and usual standards and practice employed with respect to the servicing of loans." Pepper then authored formal legal opinions representing that the PPMs were accurate. Indeed, Gagné himself wrote a memorandum to Pepper's finance committee in which he admitted that he thought the so-called forbearance accounts he had helped create would result in "misrepresentations...to Royal." Nonetheless, despite all of Pepper's knowledge and awareness that Royal was being misled, it never disclosed the truth. This is precisely the sort of evidence that Pennsylvania courts have held proves malice. *See Koch v. First Union Corp.*, 2002 WL 372939, *9 (Pa. Ct. Com. Pl. Jan. 10, 2002) (malice found where defendants misrepresented and concealed facts concerning loans to plaintiffs).

---

[4] There is no merit to Pepper's argument that malice can only be shown if Pepper's *sole* motivation was to injure Royal *without* any profit motive—put another way, Pepper attempts to shield itself behind its own greed. Pepper's interpretation constitutes a misreading of the *Thompson* holding, flies in the face of this Court's previous ruling, and is not the law. *See Koch v. First Union Corp.*, 2002 WL 372939, *9 (Pa. Ct. Com. Pl. Jan 10, 2002) (finding malice in case where defendants plainly expected to gain from their acts).

**Pepper and Gagné's Acts Caused Royal's Damages**

Pepper's claim that "Royal can adduce no evidence of causation between the actions of Pepper Hamilton or Mr. Gagné on the one hand and Royal's alleged damages on the other" is patently false (Pepper's Letter, p. 4). Tellingly, Pepper does not claim it did nothing wrong, but rather that summary judgment is appropriate because: (1) none of Pepper's false and misleading documents were "addressed" to Royal; (2) Pepper's false and misleading representations and omissions post-dated Royal's issuance of insurance; and (3) certain documents purportedly disclosed "forbearance" to Royal. Each of Pepper's arguments are rebutted by record evidence.

There can be no question that Pepper invited Royal to rely on its numerous formal legal opinions (which included their representations on the accuracy of the PPMs) and expected that Royal would do so. Pepper and Gagné well understood that Royal's insurance was an essential component to the securitizations of SFC's loans, a project on which Gagné worked nearly full time during 2000 and 2001. As part of the securitization process, Pepper sent hundreds of drafts of the opinion letters, PPMs, and key securitization transaction documents for review and comment by Royal, and provided final versions to Royal as well. Each of these draft and final opinion letters and PPMs contained misrepresentations and material omissions about SFC's "business" that misled Royal to issue more insurance. Having invited Royal to read, consider, and comment upon those false and misleading drafts, Pepper cannot now claim they played no role in the causation of Royal's damages. This is exactly the point made by Donald Glazer, Royal's expert on legal opinions,[5] and the RESTATEMENT OF THE LAW GOVERNING LAWYERS, § 51(2) (author of legal opinion owes non-addressees equal duty if the "lawyer or (with the lawyer's acquiescence) the lawyer's client invites [the non-addressee]... to rely"). Even Pepper's own expert, Ronald E. Mallen, concurs that an attorney will be liable to a non-client when the attorney invites the non-client to rely on his statements.[6] Pepper fed Royal a constant stream of misleading documents related to SFC's loan program for years. It participated in meetings where false statements were communicated to Royal. As such, there is at bare minimum a question of fact as to Pepper's role in the causation of Royal's damages sufficient to deny Pepper's bid for summary judgment. *See Kline v. First Western Gov't Sec's.*, 794 F. Supp. 542, 550 (E.D. Pa. 1992) (denying summary judgment where factual issue existed as to whether defendant either knew or intended that plaintiff non-addressee would rely on opinion letter).

Second, Pepper claims that the timing of its false and misleading legal opinions and PPMs was such that they could not have caused Royal's damages because they post-dated Royal's issuance of insurance. Royal issued insurance to SFC throughout 2000 and 2001 and Pepper provided Royal with numerous draft and final version false and misleading PPMs and opinion letters in that time period. Royal can easily show that it reviewed and relied on

---

[5] Mr. Glazer is author of *Glazer and FitzGibbon on Legal Opinions*, the leading treatise on legal opinions rendered in business transactions, current co-chair of the Tri-Bar Opinion Committee, and is a past chair of the ABA Legal Opinions Committee.

[6] Mr. Mallen incredibly claims to be aware of "no facts" that would show such an invitation. This presents yet another issue of fact for the jury to decide.

numerous of those false and misleading documents before issuing insurance to SFC and, further, that Royal could have halted SFC's adding loans to Royal's policies if Pepper's documents had properly disclosed the nature of SFC's fraud.[7]

Finally, Pepper points to two documents—a March 6, 2000 "talking points" summary sent by Andrew Yao to Royal, and SFC's 2000 financial statement—as "informing" Royal about "forbearance" and about an increase in "forbearance payments." As an initial matter, the use of the word "forbearance" by SFC and Pepper to describe SFC's practice of paying on defaulted loans to keep from reporting the loan defaults is one of Royal's central allegations of fraud. That an occasional document out of the thousands and thousands of SFC-related documents provided to Royal makes a stray, unadorned reference to "forbearance" is not evidence, and certainly not sufficient for summary judgment, that Royal was "informed" that SFC was systematically underreporting its loan default rates and lying about it.

The March 6, 2000 memorandum purports to be a set of talking points for a meeting held earlier that day, but *none* of the meeting attendees recall discussing the quoted subject matter—including non-Royal attendees. And, the sole reference to "forbearance" in that document affirmatively misrepresented what SFC was actually doing and did not "inform" Royal of SFC's fraud. The talking points indicated only that the schools, not SFC, had forbearance programs for students that assisted the students "until they resume paying or until they default," not keeping defaults from being reported, as was the case. It then stated that the worst case first year default rate was 17-22% when in fact it proved to be in excess of 50%. Furthermore, SFC failed to disclose that it had instituted a business rule setting a maximum number of loans it would allow to default in any given month, and then simply made payments on the rest. Finally, when Royal visited SFC just two weeks later to perform follow up due diligence, SFC misrepresented that its worst case default rate was between 25-30%—not higher than 85% as it eventually became. At the same time, a third party audit of SFC's business practices informed Royal that SFC's practices were appropriate and made no mention of "forbearance payments."

SFC's 2000 financial statement, with its unadorned use of the phrase "forbearance payments"—a phrase that is never explained anywhere in any financial statement—is one of the central documents evidencing SFC's fraud and formed the basis of Royal's suit against SFC's accountants. The evidence shows that the 2000 financial statement contains numerous affirmative misrepresentations about SFC's financial health and the performance of SFC's loans. Indeed, that statement repeatedly affirms that SFC's loan pools are on track for the predicted 25% cumulative default rate when in fact default rates were at 50% and climbing at the time they were issued. The appearance of the phrase "forbearance payment" without explanation, and in the context of other highly misleading information, in SFC's 2000 financial statement hardly "informed" Royal that SFC was systematically lying about its loan default rates. Indeed, numerous witnesses have discredited that misleading reference, including SFC's investment

---

[7] Additionally, the securitizations could not have gone forward unless Royal issued restated policies insuring the loans in the securitization. Royal would not have issued those policies if it had known the truth.

bankers—who described the reference to forbearance in the 2000 financials as "gobbledygook," and SFC's accountants—who admitted that the word "forbearance," standing alone, was meaningless.

Thus, while Royal can easily show Pepper's role in causing Royal's damages, at minimum the issue of causation is laced with so many material issues of fact that it can be resolved only at trial.[8]

**Royal Justifiably Relied On Pepper's Misrepresentations**

Pepper's request for summary judgment on whether Pepper made false representations to Royal and whether Royal relied on such representations must be rejected. As discussed, *supra*, there is record evidence of continuous and systematic material misrepresentations and omissions by Pepper and Gagné to Royal, so whether Pepper made false representations to Royal cannot seriously be challenged, and not on summary judgment. Regarding reliance, while Pepper concedes that Royal need only show it justifiably relied on Pepper's misrepresentations, it claims that Royal is "chargeable with the knowledge of what it may reasonably have found if it conducted an appropriate investigation" (Pepper's Letter, p. 5). This is not the law, and Pepper cites nothing in support of such a proposition.

To the contrary, as described by the Supreme Court in *Field v. Mans*, a plaintiff who relies on the defendant's fraudulent or negligent misrepresentation is "justified", so long as the truth would not have been obvious upon a "*cursory examination or investigation.*" 116 S.Ct. 437, 445 (1995) (citing both Delaware and Pennsylvania law). The Supreme Court's formulation is in line with both the RESTATEMENT (SECOND) OF TORTS, § 547, and the case law in Delaware and Pennsylvania. As described in *Craft v. Bariglio*:

> Where a representation is made of a fact…and relates to a matter as to which the parties have not equal means of information, but is peculiarly within the knowledge of the person making the representation, the person receiving and acting upon it in the making of a contract has an absolute right to rely on the truthfulness of the representation, *and is not required to seek means of information to determine its falsity*, although such means are available.

1984 WL 8207, *10 (Del. Ch. Mar. 1, 1984) (fraud concerning sale of a business; emphasis added); *quoted by S.C. Johnson & Son, Inc. v. Dowbrands, Inc.*, 111 Fed.Appx. 100, 108 (3d Cir. 2004). Pennsylvania courts apply the same analysis. *See Toy v. Metropolitan Life Ins. Co.*, 2007 WL 2048931 *14 (Pa. July 18, 2007). Moreover, the recipient of a misrepresentation who does elect to investigate is in no worse position. As made clear by Restatement section 547,

---

[8] Pepper includes a footnote (Pepper Letter, p.5, n. 3) citing *Christ v. Cormick* and seeking summary judgment on the ground that Pennsylvania does not recognize the tort of aiding and abetting fraud. Pepper's argument is irrelevant both because Delaware law governs Royal's common-law claims, and because this Court has already rejected Pepper's motion to dismiss Royal's aiding and abetting fraud claim. Opinion at 16-17.

The Honorable Joseph J. Farnan, Jr.
August 10, 2007
Page 9

comment (a), one who makes an investigation is charged with knowing only those facts that "must have been obvious to him" from whatever investigation he performed, and if the facts "are still somewhat inconclusive, it may be found that the recipient has relied upon both the investigation and the representation and that the latter has played a substantial part in inducing him to take action." *Accord Lock v. Schreppler*, 426 A.2d 856, 862 (Del.Super. 1981) (fraud will lie where plaintiff conducts partial investigation and continues to rely on the misrepresentation); *In re Student Finance Corp.*, 2004 WL 609329 (D. Del. March 23, 2004) (citing *Lock* and determining that Delaware courts follow the Restatement).[9]

Pepper's exclusive reliance on *Porreco v. Porreco*, 811 A.2d 566, 571 (Pa. 2002) is misplaced, even if Pennsylvania law applied. First, *Porreco*'s interpretation of justifiable reliance has been abandoned by the Pennsylvania Supreme Court. *See Toy v. Metropolitan Life Ins. Co.*, 2007 WL 2048931, *14 (Pa. July 18, 2007) (holding "justifiable reliance" imposes no duty to investigate; reaffirming the Restatement position and rejecting *Porreco*); *see also Air Prod. and Chem., Inc. v. Eaton Metal Prod. Co.*, 2003 WL 22133839, * 10 (E.D. Pa. Aug. 22, 2003) (distinguishing *Porreco*). But even under the discredited *Porreco* holding, Royal would have been found to have justifiably relied. The *Porreco* court found no justifiable reliance only because the plaintiff and defendant enjoyed equal access to the truth, and therefore equal opportunity to evaluate the defendant's misrepresentation. In this case, the facts show that Pepper's access to the truth was superior to Royal's – indeed, it *knew* the truth – and under those circumstances even *Porreco* conceded that "the representations of the person believed to possess superior information may be relied upon." *Id.*, citing *Siskin v. Cohen*, 70 A.2d 293, 295 (1950).

Delaware law is clear that the question of whether a plaintiff's reliance on a misrepresentation is justified is generally one "that cannot be determined on summary judgment," and the evidence in this case reinforces that generalization. *See Vague v. Bank One Corp.*, 850 A2d 303 (Del. 2004); *Wilmington Trust Co. v. Aetna Casualty And Surety Co.*, 690 A.2d 914, 916 (Del. Super. 1996). Here, not only is there an issue of fact as to whether Royal justifiably relied on Pepper's and SFC's misrepresentations, but the evidence is overwhelming that Royal was in fact justified. Going well beyond the mere "cursory" or "ordinary" investigation required of it, Royal performed rigorous due diligence of SFC by going on site several times; reviewing numerous audits of SFC's underwriting, servicing, and business practices; reviewing private placement memoranda and legal opinions; analyzing SFC's performance reports; reviewing third party audits of those reports and of SFC's financial statements; and communicating frequently with SFC about the performance of the loan portfolio. Nevertheless Royal never received anything that made it "obvious" that SFC had a business rule limiting the number of loans it would allow to default every month, and was making payments on the rest. Royal never received anything that made it "obvious" SFC was making payments on tens of thousands of loans in its portfolio for months, or often years, on end. And Royal never

---

[9] Justifiable reliance is even easier to prove under Pennsylvania law, where "it is presumed from the very materiality of the misrepresentation that the person deceived relied upon it." Pa. SSJI (Civ.) 13.14, comment (5) (Pennsylvania model jury instructions, 2005); *citing* RESTATEMENT (SECOND) OF TORTS, § 538(1) and *LaCourse v. Kiesel*, 77 A.2d 877 (Pa. 1951).

received anything that made it "obvious" that SFC's default rate was substantially higher than the approximate 10% rate reported in the performance reports. In short, despite tireless efforts that were well in excess of the mere "cursory glance" required of it, Royal never saw or heard anything that made SFC's fraud "obvious."

**Pepper Had A Legal Duty Not To Mislead Royal**

This Court has already rejected the legal argument Pepper seeks to reassert in Pepper's Letter—that Pepper could not have made negligent representations to Royal because Pepper owed no duty to Royal. *See* Opinion, at 17-18. Necessarily implied in the Court's decision is that Pepper cannot avoid liability to Royal simply because Royal was not Pepper's client in the SFC matter.

Section 552 of the RESTATEMENT (SECOND) OF TORTS, explicitly followed in both Delaware and Pennsylvania, provides that "[o]ne who, in the course of his business, profession or employment,...supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *See Carello v. PricewaterhouseCoopers LLP*, 2002 WL 1454111, *5-6 (Del. Super. July 3, 2002), *citing Danforth v. Acorn Structures*, 1991 WL 269956, *2 (Del. Super. Nov. 22, 1991); *see also Eisenberg v. Gagnon*, 766 F.2d 770, 779-80 (3d Cir. 1985) (under Pennsylvania law, attorney's representations in furtherance of a transaction created "duty of due diligence in the maker of the statements and a reasonable expectation of accuracy in the recipients, even without a specific formal relationship between the investors and [the attorney]"). Even Pepper's own expert, Ronald E. Mallen, concedes that lawyers may be held liable to non-clients for negligently made misrepresentations (Mallen, at 18).

As discussed, *supra*, Royal will show at trial that Pepper wrote, issued and purposefully distributed to Royal numerous draft and final version PPMs, opinion letters and securitization transaction documents that fundamentally misrepresented SFC's business, business practices, loan portfolios and the securitization transactions at the heart of the fraud. These documents were intended to inform Royal about the structure of the transactions. Royal was entitled to, and did, rely on those documents. *See generally* RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS, § 51 ("When a lawyer or that lawyer's client (with the lawyer's acquiescence) invites a nonclient to rely on the lawyer's opinion or other legal services, and the nonclient reasonably does so, the lawyer owes a duty to the nonclient to use care...."); *Kline v. First Western Gov't Secs.*, 749 F. Supp. 542, 549-50 (E.D. Pa. 1992), *and same action on appeal at* 24 F.3d 480, 487-88 (3rd Cir. 1994) (holding law firm may be held liable for negligent misrepresentations in legal opinions despite reliance disclaimers).[10]

---

[10] Pepper's legal citations do not stand for a contrary rule. The *Krauss* case holds merely that non-clients cannot assert legal malpractice claims, and *Nichols* holds the same for "professional negligence," which "amounts to malpractice." Here, Royal is not asserting malpractice claims or claims like malpractice against Pepper. As for the *Broad-Brussel* case cited by Pepper, the very next sentence of that opinion—

**Royal's Aiding And Abetting Breach Of Fiduciary Duty Claim Is Cognizable**

Although Pepper seeks summary judgment on Royal's aiding and abetting breach of fiduciary duty claim, it fails to make any factual arguments that would distinguish its current legal argument from the one it made on its motion to dismiss, and which this Court rejected. Opinion, at 18-19.

Pepper's reliance on the recent Delaware Supreme Court decision in *North Am. Catholic Educ. Prog. Found., Inc. v. Gheewalla*, 2007 WL 1453705 (Del. May 18, 2007) is misplaced. The *Gheewalla* court did not consider or rule upon an aiding and abetting claim, like Royal advances, nor did it rule that creditors can never assert a claim for breach of fiduciary duty against an insolvent company, as Pepper seems to imply. To the contrary, the court explicitly left open the possibility that the creditors of an insolvent corporation could bring a derivative breach of fiduciary duty claim, even as the court recognized that such a suit would ultimately benefit those very same creditors as the owners of the corporation's residual value. Thus, Royal's claim against Pepper for aiding and abetting that breach is proper.

The remainder of Pepper's argument is essentially a reiteration of its "no legal duty" argument addressed at length, *supra*, and its extra-jurisdictional case citations are equally unpersuasive. In brief, Pepper's cited cases all concern situations in which the defendant attorneys had not shouldered a duty to speak or correct misstatements—a crucial difference from the instant case in which Pepper took on that duty by supplying information for the guidance of others in a business transaction. Section 552 of the RESTATEMENT (SECOND) OF TORTS emphasizes the importance of this distinction.

**Royal Did Not Violate Delaware's Insurance Laws, And Was Not Negligent *Per Se***

Pepper's claim regarding Delaware Insurance Code § 909 ("Section 909") is without merit. Section 909 restricts Delaware domestic insurers from having any one "subject of insurance" exceeding 10% of that insurer's surplus to policy holders. Pepper argues that each of the individual student loans insured by Royal covering five years of student loans should be aggregated for purposes of Section 909; that when so aggregated, Royal's insurance of those aggregated loans exceeded 10% of Royal's surplus to policyholders; and that such a Section 909 violation is negligence *per se*. Not only are Pepper's arguments not properly subject to summary judgment, Royal will move *in limine* to have the Section 909 issue excluded from the trial.

First, Royal never violated Section 909 because the individual students Royal insured are not properly aggregated as "one risk." Royal did not insure SFC or any of the trucking schools— it insured individual trade school students' ability to pay on their student loans. The students came from all over the country and the schools were located throughout the United States as

---

omitted by Pepper—makes clear that an exception to the "no duty" rule applies where an attorney acts "for the intended benefit of a non-client." *Broad-Brussel Family LP v. Bayou Group LLC*, 472 F. Supp.2d 528, 531 (S.D.N.Y. 2007).

well. SFC represented that it underwrote the individual students through, among other things, applying a proprietary credit scoring evaluation. The risk Royal insured was the risk of whether each of these individual students would pay on their individual loans, not whether, in the aggregate, the students would collectively pay. Further, as a Delaware domestic insurer, Royal was under regular and routine regulatory oversight by the Delaware Department of Insurance. Despite being aware of Royal's exposure in the SFC matter since no later than 2002, the Department has never once stated or suggested that Royal violated Section 909 or should have aggregated the student loans as one risk. Indeed, Royal has submitted an expert report in this matter from the former Delaware Insurance Commissioner, Donna Lee Williams, stating that she does not consider the students loans Royal insured "one risk" for purposes of Section 909.

Second, there is no negligence *per se* here even if Royal were somehow found to have violated Section 909. Although Section 909 has never been cited in Delaware jurisprudence, courts in other states with substantively identical provisions have explained that the purpose of such laws is to ensure that insurers have adequate funds to pay claims. *See, e.g., Curiale v. Ardra Ins. Co.*, 88 N.Y.2d 268, 277 (1996) (stating that "Legislature's purpose" of enacting Insurance Law § 1115 "is ensuring the availability of funds within the State to pay losses on insurance policies issued here"). The purpose of Section 909 is of critical importance because "[t]he test for statutory negligence, or negligence *per se*, is whether the alleged violation of the statute caused injury to a member of the class that was intended to be protected by the legislation." *Nichols v. Twilley, Street & Braverman, P.A.*, 1991 WL 226777, *3 (D.Del. 1991); *see also Powell v. Megee*, 2004 WL 249589, *5 (Del.Super 2004); *Heine v. Receiving Area Personnel*, 711 F.Supp. 178, *183 (D.Del. 1989). Quite simply, Pepper and Gagné, seeking to reduce their negligence damages, have suffered no injury (nor has anyone else) by any purported violation of Section 909, and they plainly are not "a member of the class that was intended to be protected by the legislation."[11]

* * *

Royal has demonstrated herein that, either as a legal matter, a factual matter, or both, Pepper's and Gagné's request for summary judgment will be fruitless and, as such, the Court should reject Pepper's and Gagné's request and allow the parties to focus their energies on preparing for trial.

---

[11] Additionally, any claim for the hypothetical negligence *per se* would not accrue to Pepper as there does not appear to be a private right of action under the Delaware Insurance Code. *See generally, Thomas v. Hartford Mutual Insurance Company*, 2003 WL 220511 (Del. Super. Jan. 1, 2003)( No private right of action under the Delaware Insurance Fraud Prevention Act).

Case 1:05-cv-00165-JJF    Document 546    Filed 08/10/2007    Page 13 of 14

The Honorable Joseph J. Farnan, Jr.
August 10, 2007
Page 13

        Respectfully,

        */s/ Tiffany Geyer Lydon*

        Tiffany Geyer Lydon

cc:    Counsel of record on attached service list

183100.1

## SERVICE LIST

### By Hand Delivery

William H. Sudell, Jr., Esquire
Morris Nichols Arsht & Tunnell
1201 North Market Street
Wilmington, DE 19899-1347

Michael R. Lastkowski, Esquire
Christopher M. Winter, Esquire
Duane Morris LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801

Karen Lee Turner, Esquire
Eckert Seamans Cherin & Mellott, LLC
300 Delaware Avenue, Suite 1210
Wilmington, DE 19801

David E. Wilks, Esquire
Reed Smith LLP
1201 North Market Street, Suite 1500
Wilmington, DE 19801

John W. Shaw, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19899

Ashley Stitzer, Esquire
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19899

### By E-mail

John H. Eickemeyer, Esquire
Jonathan A. Wexler, Esquire
Vedder, Price, Kaufman & Kammholz, P.C.
1633 Broadway, 47th Floor
New York, NY 10019

Stephen Shapiro, Esquire
Elizabeth K. Ainslie, Esquire
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103

Michael S. Waters, Esquire
Lois H. Goodman, Esquire
McElroy, Deutsch, Mulvaney & Carpenter, LLP
Three Gateway Center
100 Mulberry Street
Newark, NJ 07102-4079

Neil G. Epstein, Esquire
Eckert Seamans Cherin & Mellott, LLC
1515 Market Street, 9th Floor
Philadelphia, PA 19102

Steven M. Farina, Esquire
Thomas H.L. Selby, Esquire
Williams & Connolly LLP
725 Twelfth Street, NW.
Washington, DC 20005

Charles A. Gillman, Esquire
M. Justin Lubeley, Esquire
Cahill Gordon & Reindel LLP
80 Pine Street
New York, NY 10005-1702

Richard P. Swanson, Esquire
Veronica E. Rendon, Esquire
Jason M. Butler, Esquire
Arnold & Porter LLP
399 Park Avenue
New York, NY 10022-4690

Andre G. Castaybert, Esquire
Ronald Rauchberg, Esquire
Steven Obus, Esquire
Proskauer Rose LLP
1585 Broadway
New York, NY 10036-8299