IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROYAL INDEMNITY COMPANY,<br><br>    Plaintiff,<br><br>  v.<br><br>PEPPER HAMILTON LLP, W. RODERICK GAGNÉ, FREED MAXICK & BATTAGLIA CPAs, McGLADREY & PULLEN LLP, and MICHAEL AQUINO,<br><br>    Defendants. | C.A. No. 05-165-JJF |
| CHARLES A. STANZIALE, JR.,<br>Chapter 7 Trustee of Student Finance Corporation,<br>    Plaintiff,<br><br>  v.<br><br>McGLADREY & PULLEN LLP and MICHAEL AQUINO,<br><br>    Defendants. | C.A. No. 05-72-JJF |
| CHARLES A. STANZIALE, JR.,<br>Chapter 7 Trustee of Student Finance Corporation,<br>    Plaintiff,<br><br>  v.<br><br>PEPPER HAMILTON LLP, et al.,<br><br>    Defendants. | C.A. No. 04-1551-JJF |

| | |
|---|---|
| MBIA INSURANCE CORPORATION and )<br>WELLS FARGO BANK, N.A. (f/k/a WELLS )<br>FARGO BANK MINNESOTA N.A.) as )<br>TRUSTEE OF SFC GRANTOR TRUST, )<br>SERIES 2000-1, SFC GRANTOR TRUST, )<br>SERIES 2000-2, SFC GRANTOR TRUST, )<br>SERIES 2000-3, SFC GRANTOR TRUST, )<br>SERIES 2000-4, SFC GRANTOR TRUST, )<br>SERIES 2001-1, SFC GRANTOR TRUST, )<br>SERIES 2001-2, SFC OWNER TRUST 2001-I, )<br>AND SFC GRANTOR TRUST, SERIES 2001-3, )<br>)<br>    Plaintiffs/Counterclaim Defendants, )<br>)<br>    v. )<br>)<br>ROYAL INDEMNITY COMPANY, )<br>)<br>    Defendant/Counterclaim Plaintiff. )<br>) | C.A. No. 02-1294-JJF |

## PLAINTIFF ROYAL INDEMNITY COMPANY'S MEMORANDUM
## IN SUPPORT OF ITS EMERGENCY MOTION TO COMPEL

### INTRODUCTION

Two of the expert witnesses designated by defendants Pepper Hamilton LLP and Roderick Gagné (collectively, "Pepper") based their opinions on factual assumptions provided to them by Pepper's attorneys. Yet although these experts did no factual investigation of their own and instead formed opinions dependent on Pepper's descriptions, Pepper refuses to disclose those very communications by which it informed its experts' opinions.

During the depositions of Professor Geoffrey Hazard and Mr. Peter Humphreys, both expert witnesses designated by Pepper, both witnesses described specific written information and documents that either had been prepared for or provided to them in connection with their expert-related work in these cases, but which were not identified in their expert reports. Upon learning of their existence, Royal immediately requested production. Pepper has repeatedly refused. The withheld documents include: (i) at least two emails containing draft report sections that were

- 2 -

prepared by Pepper's counsel and provided to Prof. Hazard as the starting point for, or first iteration of, his expert report; (ii) a memorandum drafted by an associate attorney employed by Mr. Humphreys that describes and summarizes certain deposition testimony from the discovery record in these cases which Mr. Humphreys used in preparing his report; and (iii) written communications from Pepper's counsel to both experts purporting to summarize case facts also used in preparing their reports.

Royal certainly appreciates that lawyers for parties typically work with their experts and discuss their drafts as new versions are prepared and improved. Such drafts, which are undoubtedly numerous and exist for each of the experts designated in this case, have not been sought by the parties and are not being generally sought by this motion. The materials specifically at issue here, however, are qualitatively different. The emails to Prof. Hazard apparently constituted a nearly complete draft of his report. The Humphreys materials admittedly were used by him as an aid in the formation of his opinions. All should have been disclosed in the reports ultimately submitted by Prof. Hazard and Mr. Humphreys. But even setting aside whether or not these materials should have been disclosed in the expert reports, they plainly are not immune from discovery and must now be produced after having been expressly requested. (Indeed, Royal previously provided Pepper, at Pepper's request, with similar materials used by one of its experts, David Pauker.) Royal respectfully requests that this Court direct Pepper to meet its obligations and produce these materials. Unless so ordered, Royal will be unfairly and improperly prejudiced in its ability to fully cross-examine these experts regarding their opinions.

## FACTUAL BACKGROUND

**Deposition of Professor Geoffrey Hazard, Jr.**

Pepper designated Professor Geoffrey Hazard, Jr., as an expert on the ethical duties of attorneys. Prof. Hazard's expert report is annexed as Exhibit A to the accompanying Declaration of Robert W. Gifford (the "Gifford Decl.").

Prof. Hazard was deposed on August 17, 2007. He testified that prior to submitting his report, he received at least two emails from Pepper's counsel, Charles A. Gilman of the firm Cahill Gordon & Reindel LLP ("Cahill"), consisting of statements of facts and pre-prepared draft sections of his expert report. (August 17, 2007, Deposition Transcript of Geoffrey Hazard, Jr. ("Hazard Dep. Tr."), at 108-110.)[1] Specifically, Prof. Hazard testified that "what I did was to ask Mr. Gilman to give me a beginning recitation of facts as he wanted me to proceed, and then I used that as a beginning place for writing my opinions." (Hazard Dep. Tr. 24.) Prof. Hazard continued:

> Q:  [The recitation of facts from Mr. Gilman] was an email?
>
> A:  Yeah.
>
> \* \* \* \*
>
> Q:  So is it fair to say, then, that you started with a document that was put into your computer from an e-mail from Mr. Gilman, and then you added to that?
>
> A:  That's my recollection, yeah.
>
> Q:  And the final document that came out of that process is the document that we have marked 2002-II [Prof. Hazard's expert report]?
>
> A:  Yeah.

---

[1] Pertinent excerpts are annexed to the Gifford Declaration as Exhibit B.

10001830\V-1

(Hazard Dep. Tr. 24-26.) Counsel's email(s) apparently were used as a close guide for Prof. Hazard's final report:

> Q: [A]nd tell me if you can identify for me, in [the final expert report] any paragraphs that you are certain you prepared completely by yourself and are not paragraphs that Mr. Gilman sent and you worked on?
>
> A: No. I think some of the description and qualifications of the witness is cast in terms that are different from the ones I ordinarily use, so I assume he put those in. For example, start from there.
>
> Q: Well, I'm asking you a narrower question. I'm asking you whether you can identify for me, in this document a specific paragraph that you can tell me you're certain that you prepared this document – this paragraph by typing it yourself, as distinct from modifying something that Mr. Gilman—
>
> A: No.
>
> Q: There's no paragraph you can point to and tell me that about it?
>
> A: I think that's right.

(Hazard Dep. Tr. 33.)[2] Prof. Hazard agreed that even the various quotations from Donald Glazer's treatise and the case law discussion that runs throughout his report were chosen for him by counsel:

> Q. All right. Do you have a copy of Mr. [Glazer's] book at your house?
>
> A. No.

---

[2] Later in the deposition, Prof. Hazard was asked and confirmed the same thing:

> Q: You've been through the report this morning. As a result of that exercise, are you able to identify a single paragraph within your report that you drafted entirely?
>
> A: No.

(Hazard Dep. Tr. 110.)

> Q. Did you go to the library to get it?
>
> A. No.
>
> Q. Were the quotes from Mr. [Glazer's] book that appear throughout the report provided to you in the [email] that was sent to you by counsel?
>
> A. In an e-mail. I think there were two, and I don't know whether it was the first or second.
>
> Q. So the block quotations selected for your report were selected for you by counsel; correct?
>
> A. Right, uh-huh.
>
> Q. Throughout your report, you cite to a number of reported cases. Did you read all of those cases?
>
> A. I have read all of them previously. I didn't read them on this occasion.
>
> Q. Okay. Were they selected for this report for you by counsel?
>
> A. Yes.

(Hazard Dep. Tr. 95-96.) Immediately upon learning of these emails from Pepper's counsel, and that Prof. Hazard had considered and relied upon them in creating his expert report, counsel for Royal and the Trustee requested that Pepper produce the emails for use at the deposition. (Hazard Dep. Tr. 33-37.) Pepper refused to do so at that time and continues to refuse to do so.

**Deposition of Peter Humphreys**

Pepper designated Peter Humphreys as an expert on securitizations and the concomitant duties of attorneys, and he likewise submitted an expert report. (Gifford Decl., Exh. C.) Mr. Humphreys is a partner at the McDermott, Will & Emery law firm. At his August 23, 2007, deposition, Mr. Humphreys testified that he considered and relied on memoranda and emails prepared by associates at his law firm summarizind case facts, including deposition testimony

given by defendant Gagné. (August 17, 2007, Deposition Transcript of Peter Humphreys ("Humphreys Dep. Tr.") 50.)[3]

> Q: What work did Ms. Avalos [a McDermott associate] do for you in connection with this matter?
>
> A: She summarized the deposition of Mr. Gagné, the long deposition, and she checked that the [Private Placement Memoranda] were substantially similar in form and that the [legal] opinions were substantially similar in form. That's probably the main scope of the work she did.
>
> Q: Did Ms. Avalos provide you a written summary of the Gagné deposition?
>
> A: She did.
>
> Q: Do you have a copy of that with you?
>
> A: No.
>
> \* \* \* \*
>
> Q: That's not listed on your list of documents reviewed, correct?
>
> A: No, it is not.
>
> \* \* \* \*
>
> Q: Did Ms. Avalos or anybody else, Mr. Davi or Mr. Mulligan [other McDermott legal staff] provide you any written communications in connection with this engagement?
>
> A: Yes, I'm sure I have e-mails that were being sent to me.

(Humphreys Dep. Tr. 53-55.) Mr. Humphreys utilized these materials as he prepared his opinions. Indeed, he read the voluminous five-day deposition of Roderick Gagné using Ms. Avalos' memorandum "as an index to help me." (Humphreys Dep. Tr. 333.)

---

[3] Pertinent excerpts of the deposition transcript are annexed to the Gifford Declaration as Exhibit D.

Q: Did you use the summary to help you determine what portions of Mr. Gagné's deposition would be of more interest to you or less interest to you?

A: Yes, I used it to help me identify which were of more interest or less interest, that's true.

Q: So you didn't sit down with all of Gagne's deposition and simply read it from on end to the other, correct?

A: Yes, I guess I read the whole thing but I moved more rapidly through some parts.

Q: So the memo was an aid in helping you hone in on that testimony that you thought would be more pertinent as opposed to less pertinent to the matters that you have been asked to opine about, correct?

A: Yes.

(Humphreys Dep. Tr. at 323-24.)

Mr. Humphreys also considered and relied upon various factual recitations prepared by Pepper's counsel:

Q. In forming your opinions here in this case you've made various assumptions; isn't that correct?

A. Yes.

Q. You've assumed facts, correct? You've assumed facts were true?

A. Yes.

Q. You've heard facts from the lawyers for Pepper Hamilton which you've relied upon in forming your opinions, correct?

A. Yes.

Q. You read this statement that Pepper Hamilton gave you that we are looking at here, Exhibit C, correct?

A. Yes.

Q. And you relied on what you were told there as being true as an assumption upon which you formed your opinion, correct?

A. Yes.

- 8 -

> Q. Now if assumptions that you relied upon in forming your opinion turned out to be untrue, that could mean your opinions may be changed or may not be accurate anymore; isn't that correct?
>
> A. Yes.

(Humphreys Dep. Tr. 80-81.) While one of these sets of factual assumptions comprises exhibit C to Mr. Humphrey's expert report (Gifford Decl., Exh. C), Mr. Humphreys made clear that other versions also had been provided to him:

> Q: Was there a prior version of [Exhibit C] that you got or was this the only version that you got?
>
> A: Of the facts?
>
> Q: Yes, of what's Exhibit C here.
>
> A: There is a prior version.
>
> Q: That is different from this one?
>
> A: Different from this one, yes.
>
> Q: And you reviewed that in connection with your work?
>
> A: Yes.

(Humphreys Dep. Tr. 85.)

None of these materials were identified in Mr. Humphreys' report. When discovered, all were requested immediately. These requests were refused and continue to be refused.

## ARGUMENT

Rule 26 requires a designated expert witness to disclose all "data or other information considered by the witness" in forming his or her opinions. Fed. R. Civ. P. 26(a)(2)(B). The touchstone for disclosure is whether the witness "considered" the information, irrespective of whether or not the witness ultimately relied upon it. *See Vitalo v. Cabot Corp.*, 212 F.R.D. 472, 474 (E.D. Pa. 2002) ("The only requirement of Rule 26(a)(2)(B) is that the expert 'consider' the information. The source of the information is irrelevant. It is also irrelevant whether or not the

- 9 -

expert ultimately relies on the information in forming his or her opinion"). An expert "considers" material when he or she "reviews, reflects upon, reads, and/or uses" it. *Dyson Tech. Ltd. Maytag Corp.*, 241 F.R.D. 247, 251 (D. Del. 2007), *citing Synthes Spine Co., L.P. v. Walden*, 232 F.R.D. 460, 463 (E.D. Pa. 2005).

The Rule 26 disclosure obligation encompasses documents and information furnished to the expert by counsel. The Advisory Committee Notes make this clear: "[G]iven this obligation of disclosure, litigants should no longer be able to argue that materials furnished to their experts to be used in forming their opinions – whether or not ultimately relied upon by the expert – are privileged or otherwise protected from disclosure when such persons are testifying or being deposed." Fed R. Civ. P. 26(a)(2) Advisory Committee Notes to 1993 Amendment. A party cannot refuse to produce information considered by its experts on the ground that it might constitute attorney work product or attorney-client communications. *See Dyson*, 241 F.R.D. at 251 ("putting privilege considerations aside, a testifying expert must disclose all information" that he or she considered); *CP Kelco U.S. Inc. v. Pharmacia Corp.*, 213 F.R.D. 176, 178-79 (D. Del. 2003) ("[i]t would be manifestly unfair to allow a party to use the privilege to shield information which it had deliberately chosen to use offensively…when it used the allegedly privileged documents to arm its expert for testimony"); *Synthes Spine*, 232 F.R.D. at 463-64 (collecting cases holding that "a party must disclose all information provided to its testifying expert for consideration in the expert's report, including information otherwise protected by the attorney-client privilege or the work product privilege").

Royal is entitled to cross-examine Pepper's experts with the benefit of knowing what information those experts considered. *See* Fed R. Civ. P. 26(a)(2) Advisory Committee Notes to 1993 Amendment (purpose of rule is "that opposing parties have a reasonable opportunity to prepare for effective cross examination…"); *see also Fidelity Nat. Title Ins. Co. of New York v.*

- 10 -

10001830\V-1

*Intercounty Nat. Title Ins. Co.*, 412 F.3d 75, 75 (7th Cir. 2005) ("A testifying expert must disclose and therefore retain whatever materials are given to him to review in preparing his testimony...because such materials often contain effective ammunition for cross-examination"); *Karn v. Ingersoll-Rand Co.*, 168 F.R.D. 633 (N.D. Ind. 1996) ("useful cross examination and possible impeachment can only be accomplished by gaining access to all of the information that shaped or potentially influenced the expert witness's opinion").

Of course, the primary method of testing an expert's opinion is to test the assumptions underlying that opinion which, in this case, consist of facts provided by Pepper's attorneys. Without access to a complete picture of the information Prof. Hazard and Mr. Humphreys considered when forming their opinions – be it information reviewed by them personally or summarized for them by others – Royal is effectively precluded from being able to probe fully their opinions. Pepper's refusal to give Royal access to those facts is prejudicial and unsupportable.

### 1. Draft Expert Reports Prepared By Pepper's Counsel

Prof. Hazard received at least two emails from Pepper's counsel, Mr. Gilman of the Cahill firm, that described purported or assumed case facts, and served as drafts of the expert report Prof. Hazard ultimately signed. These drafts were not only "a beginning place for writing [his] opinions" (Hazard Dep. Tr. 24), but apparently served as a paragraph-by-paragraph foundation for his final report. Indeed, Prof. Hazard was unable to identify a single paragraph of his final report that was entirely his own work. (Hazard Dep. Tr. 33, 110.)

Factual material and draft reports provided to an expert by counsel are precisely the kinds of material about which parties are entitled to cross-examine an expert, and accordingly must be disclosed under Rule 26(a)(2)(B). *See, e.g., Sparks v. Seltzer*, 2007 WL 295603, at *2 (E.D.N.Y. Jan 29, 2007) (directing production of "all correspondence from plaintiff's counsel to plaintiff's

experts" and "any draft reports by the experts"); *Synthes Spine*, 232 F.R.D. at 466 (directing production of "emails, [factual] summaries...and draft expert reports").[4]

### 2. Summaries Prepared By Mr. Humphreys' Associates

Mr. Humphreys is a partner at the law firm of McDermott, Will & Emery. In forming his opinions and preparing his report, he tasked an associate and a summer associate with writing memoranda condensing deposition testimony and reviewing various documents. (Humphreys Dep. Tr. 50-55.) Mr. Humphreys clearly considered, if not actually relied upon, these memoranda. He used the memorandum condensing Mr. Gagné's five-day deposition "as an index" to help him "hone in on that testimony that [he] thought would be more pertinent as opposed to less pertinent." (Humphreys Dep. Tr. 57,322.)

As with the factual summaries provided by Pepper's counsel discussed above, the memoranda prepared by Mr. Humphreys' own legal staff likewise must be disclosed. Such summaries fall squarely within the ambit of the Rule. *See, e.g., Derrickson v. Circuit City Stores, Inc.*, 1999 WL 1456538 (D. Md. March 19, 1999) (holding opposing party "cannot properly cross-examine [the expert] without first understanding how his assistant manipulated the data" and ordering disclosure of "supporting documentation created by [the expert's] assistants in the course of preparing [his] expert report and testimony"). Indeed, Pepper requested-and Royal provided-similar materials prepared by assistants to one of Royal's experts,

---

[4] During the meet and confer, Pepper's counsel directed Royal to *Isom v. Howmedica, Inc.*, 2002 WL 1052030 (N.D. Ill. May 22, 2002). If Pepper intends to rely on *Isom* to justify its refusal to disclose the factual summaries and draft reports it sent to Prof. Hazard, it is inapposite. The *Isom* court did not address the parties' *disclosure* obligations under Rule 26(a)(2)(B), but rather whether an expert report should be stricken in its entirety because it was partially written by the attorneys rather than the expert. Royal is not seeking to strike Mr. Hazard's expert report, only to obtain the material necessary to cross-examine him fully and effectively about his opinions.

David Pauker. There is simply no basis on which Pepper can resist producing materials prepared by Mr. Humphreys' own staff, and it should be compelled to do so.

### 3. Summaries of Case Facts Prepared By Pepper's Counsel

Both Prof. Hazard and Mr. Humphreys testified that Pepper's counsel provided them with factual summaries for their consideration in lieu of conducting their own factual investigation. Prof. Hazard testified that these were part of the draft reports discussed above.[5] Mr. Humphreys attached a factual summary prepared by Cahill as Exhibit C to his expert report, but he also testified that Cahill provided him with other versions of that statement as well. (Humphreys Dep. Tr. 85.) Mr. Humphreys reviewed at least one prior version – different from the final one – in connection with forming his opinion. *Id.* These summaries plainly must be disclosed. There is no justification for Pepper now to withhold the previous versions of that statement or any other factual recitations or descriptions given to its experts.

---

[5] It is unclear from Prof. Hazard's deposition testimony whether Pepper sent him information about the case facts separate from the draft reports. To the extent that any emails containing such information exist apart from the pre-prepared drafts, Royal also seeks their disclosure.

*Of Counsel:*

Michael H. Barr
Kenneth J. Pfaehler
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, New York 10020-1089
(212) 768-6700
(212) 768-6800 (fax)

- and -

John Grossbart
Steve Merouse
SONNENSCHEIN NATH & ROSENTHAL LLP
7800 Sears Tower
233 S. Wacker Drive
Chicago, Illinois 60606
(312) 876-8000
(312) 876-7934 (fax)

Dated: August 30, 2007
183719.1

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*
_____
Philip Trainer, Jr. (I.D. #2788)
Tiffany Geyer Lydon (I.D. #3950)
Andrew D. Cordo (I.D. #4534)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

*Attorneys for Royal Indemnity Company*