IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROYAL INDEMNITY COMPANY,<br><br>      Plaintiff,<br><br>v.<br><br>PEPPER HAMILTON LLP, W. RODERICK GAGNÉ, FREED MAXICK & BATTAGLIA CPAs PC, MCGLADREY & PULLEN, LLP and MICHAEL AQUINO,<br><br>      Defendants. | No. 05-165-JJF |

**MEMORANDUM IN OPPOSITION TO ROYAL INDEMNITY
COMPANY'S EMERGENCY MOTION TO COMPEL**

Royal Indemnity Company ("Royal") seeks to compel disclosure from Pepper Hamilton LLP ("Pepper Hamilton") of:

    1.    "at least two emails containing draft report sections that were prepared by Pepper's counsel and provided to Prof. Hazard as the starting point for, or first iteration of, his expert report";

    2.    "a memorandum drafted by an associate attorney employed by Mr. Humphreys that describes and summarizes certain deposition testimony from the discovery record in these cases which Mr. Humphreys used in preparing his report"; and

    3.    "written communications from Pepper's counsel to both experts purporting to summarize case facts also used in preparing their reports."

Because the factual summaries sought in Category 3 have <u>all</u> been produced, that aspect of the motion is moot. Royal is not entitled to the other two categories of documents.

**Category 1: "Draft Report Sections"**

Collectively, over 20 expert witnesses have been identified by the parties. Rule 26(a)(2)(B) disclosure reports for each have been exchanged, and witnesses have been made available for deposition. Royal concedes that the parties have agreed not to

seek from each other "drafts" of the expert reports. *See* Royal Mem. 3 ("Royal certainly appreciates that lawyers for parties typically work with their experts and discuss their drafts as new versions are prepared and improved. Such drafts, which are undoubtedly numerous and exist for each of the experts designated in this case, have not been sought by the parties . . . ."). Consistent with the parties' agreement, no drafts of any of the reports of any of the more than 20 experts designated by the parties have been produced in discovery. Now, claiming an "emergency," Royal asserts that it is entitled to drafts of the expert report of Professor Geoffrey C. Hazard, one of the nation's foremost experts on legal ethics and professional responsibility.

### A.    Factual Background

Plaintiffs Trustee and Royal took Professor Hazard's deposition on August 17, 2007, excerpts of which are annexed hereto at Exhibit A ("Hazard Dep.")..

Professor Hazard teaches and resides in San Francisco, California. Pepper Hamilton's counsel work and reside 2,500 miles away. At Professor Hazard's request, counsel for Pepper Hamilton forwarded to Professor Hazard the pleadings in both the Trustee and Royal actions, along with deposition transcripts and other documents — all of which have been identified to Royal and are listed in an exhibit to Professor Hazard's expert report. *See* Hazard Dep. 22-23, 29. In early May 2007, counsel for Pepper Hamilton, Charles A. Gilman of Cahill Gordon & Reindel LLP, transmitted via email a "shell" of an expert report to Professor Hazard. The email transmitting that document reads in relevant part:

"Dear Professor Hazard:

"Attached is the shell of your Report, addressing qualifications (which I have taken from published information) and compensation (per agreement), with placeholders for possible exhibits and disclosure of prior testimony. The section on opinions to be expressed and the basis and reasons therefore is blank, to be developed in connection with your work.

"Feel free to fax or email me revisions of the discussion on qualifications, There are also a couple of dates to be filled in.

"Pursuant to Fed. R. Civ. P. 26(a)(2)(B), we will need to provide a listing of other cases in which you have testified as an expert at trial or by deposition within the preceding four years. Please have your assistant send me this information.

"Also, please provide me with your current curriculum vitae."

As explained in detail at the deposition, the attachment to that email, which has not been produced because of the parties' agreement not to request or produce drafts of expert reports, was the "shell" that served as the starting point for Professor Hazard's drafting of his expert report. *See* Hazard Dep. 91-93. Following his review of the documents provided to him and extensive discussions with counsel,[1] Professor Hazard requested that counsel insert the facts he was to assume into a further revision to his draft report to reflect their discussions, *Id.* 23-24, 92, and a process began by which Professor Hazard added to and revised his report over time. *Id.* 24-26, 30-32. As Professor Hazard explained, "I mean, you start with what you've got, and you add to it and change it as you go along." *Id.* 25. The final document at the end of that process is Professor Hazard's signed expert report provided to all parties. *Id.* 25-26.

---

[1] It is incorrect for Royal to state as it does that Mr. Humphreys and Professor Hazard "did no factual investigation of their own. . . ." Royal Mem. 2. Both experts testified that they personally read the voluminous pleadings, depositions and other documents provided to them.

Some experts ask for freestanding statements of fact that they identify and append to their reports. Others work the facts into the body of their expert report. Some experts, like Professor Hazard, vary their practice from case to case. *See* Hazard Dep. 24:

> "I think the way we did this, it varies from case to case. Sometimes I ask a lawyer to write out a separate document called a statement of facts. Here, I think what I did was to ask Mr. Gilman to give me a beginning recitation of facts as he wanted me to proceed, and then I used that as a beginning place for writing my opinions."

The "shell" that started the process no longer exists, and, as revised over time, is now seamless part of the final signed expert report. *Id.* 24-26, 35-36, 92, 95. This was explained to counsel for the Trustee and Royal at the deposition. *Id.* at 92:

> "Mr. Gilman: The e-mail that you're talking about, and the way that this report began in its first instance is, I outlined a shell of a report, and the first e-mail that went with the shell of the report contained nothing other than the witness's qualifications. There were no opinions, no other sections in it, and the witness commented on his qualifications and revised that section. Thereafter, as a result of discussions with the witness, a factual set of assumptions was provided in the context of the first draft of his report, trying to put on paper everything that had been discussed. So what you're talking about is not, as we have said from the beginning, a separate set of facts to be assumed, but rather is a draft of the report. That draft does not exist. The final report incorporates all facts that were assumed by the witness, and they are there and nothing has been withheld from you, period."

Where counsel for the Trustee or Royal has asked for any freestanding statements of facts provided to experts, we have produced them all in full. Where there are no such freestanding documents and the facts provided to and assumed by the expert are set forth on the face of the expert report, we have so informed counsel. Thus, we provided counsel for the Trustee and Royal with the freestanding statements of facts provided to Mr. Humphreys, and we informed counsel for the Trustee and Royal that all facts assumed by Professor Hazard are set forth on the face of his report and that there is no separate statement of facts. *See* Email from Charles A. Gilman to counsel for the

Trustee dated August 14, 2007 ("I write in response to your letter dated August 10, 2007 concerning the upcoming deposition of Prof. Hazard. The only statement of facts provided to Prof. Hazard is that set forth in haec verba in Prof. Hazard's report."). On the record of Professor Hazard's deposition, we reiterated this disclosure:

> "Mr. Gilman: I have told you that there is no free-standing statement of facts and that all of the facts that are assumed by or were considered by Professor Hazard in his report are set forth in haec verba on the face of the document that you have marked as Exhibit 2002-II. So you have it." Hazard Dep. 34; *see also Id.* 92 (quoted above)

The process of Professor Hazard's document review, discussions with counsel and back and forth revisions to his report continued for a month, until the final report was signed on June 27, 2007. Hazard Dep. 24-26, 29-32. Professor Hazard testified that over the years he has worked with dozens of law firms all over the country, and that there was nothing "unusual about the procedure by which [his expert report in this case] has been prepared." *Id.* 166-67.

> "Prof. Hazard: I think not, given that this is a fairly complicated case, meaning both the underlying facts and that there are two different legal aspects to it [the Trustee and the Royal actions]. Often, more often, I will ask for a detailed statement of facts, and then I append that and say I'm relying on this. Here, we merged them, and I think that was better because, given the way — I mean the nature of the underlying transaction, it made a more concise report than would otherwise be possible, because otherwise, you would have a very detailed statement of facts, and then the report would have to reiterate in various ways." *Id.*

Professor Hazard made clear during his deposition that the opinions expressed in his final signed report are *his*. *See, e.g.,* Hazard Dep. 47-68, 81-86. Professor Hazard's expert report is thorough and detailed and fully meets the requirements of Rule 26 disclosure.

### B. Drafts Of Expert Reports Need Not Be Produced

"Royal is *not* seeking to strike [Professor] Hazard's expert report. . . ." Royal Mem. 12 n.4 (emphasis added). Although Royal acknowledges that all parties agreed not to request or produce draft expert reports, Royal now seeks to compel the disclosure of "draft[s]" of Professor Hazard's expert report. *Id.* 3. Royal does not explain how the drafts it now seeks are qualitatively different from all of the other drafts generated but by agreement not sought or disclosed in connection with more than 20 experts retained by the parties to this action. Nor can Royal do so given that the distinction it is trying to make is one without a difference. Royal concedes that "lawyers for parties typically work with their experts and discuss their drafts as new versions are prepared and improved." *Id.* 3. Preparation of the draft report that Royal now seeks is reflective of that process. *See* Hazard Dep. 29-32. The final signed report that has been provided is the document that reflects the opinions and expected testimony of Professor Hazard. Whether a draft is an early or nearly final draft, a draft is a draft and as Royal concedes the parties agreed that drafts of expert reports were out of bounds in terms of discovery. Royal's motion to compel production of drafts of Professor Hazard's expert report should be denied.

### Category II: The Deposition Index

Royal also seeks to compel disclosure of a deposition index.

### A. Factual Background

Peter Humphreys, a partner at McDermott, Will & Emery ("McDermott") and chair of that law firm's nationwide securitization practice, is an expert designated by Pepper Hamilton on securitizations and the standard of care of attorneys relative thereto.

Plaintiffs Trustee and Royal took Mr. Humphreys' deposition on August 23, 2007, excerpts of which are annexed hereto at Exhibit B ("Humphreys Dep.").

Counsel for Pepper Hamilton provided Mr. Humphreys with, among other things, the five-volume transcript of Mr. Gagné's deposition. Mr. Humphreys read Mr. Gagné's deposition in full. "I read Mr. Gagne's transcript." Humphreys Dep. 267. At his deposition, Mr. Humphreys testified that a first year associate in his law firm provided him with an index to the five volumes of transcript of Mr. Gagné's deposition. "It was a summary of what was being discussed at various parts of the deposition, some shorthand, some with more words." *Id.* 271. The inexperienced author of the index had no role in the Trustee or Royal actions; and counsel involved in the Trustee and Royal action had no role in the preparation of the index. Because, as demonstrated below, Mr. Humphreys did not consider the index in forming the opinions expressed in his report, Royal's motion to compel its production must be denied.

Mr. Humphreys testified that he read the entirety of the transcript of Mr. Gagné's deposition. Humphreys Dep. 267. Mr. Humphreys described the index as "helpful as an index to that deposition," *Id.* 57, in that it allowed him to identify blocks of transcript that were not relevant to his engagement, and thus permitted him to proceed through those sections expeditiously. *Id.* 323-24. Mr. Humphreys testified that he did not review the index "substantively," *Id.* 322-23, and that he relied on the actual testimony, not the index, in forming his opinions. *Id.* 87-89.

**B.    The Deposition Index Need Not Be Produced**

Rule 26(a)(2)(B) provides that a testifying expert shall submit an expert report containing "a complete statement of all opinions to be expressed and the basis and reasons therefor," and "the data or other information considered by the witness in form-

ing the opinions." Royal is entitled to that which Mr. Humphreys "considered" in forming the opinions expressed in his expert report. *See Dyson Technology Ltd.* v. *Maytag Corp.*, 241 F.R.D. 247, 250 (D. Del. 2007) ("Rule 26(a)(2)(B) requires disclosure of all information considered by a testifying expert in formulating his or her report, without regard to asserted privilege."). That has been produced.

Contrary to Royal's assertions, courts have interpreted the word "considered" as used in Rule 26(a)(2)(B) as encompassing only those materials that were considered by the witness in connection with the formulation of his or her opinion. *Id.* at 251 ("[A] testifying expert must disclose all information that he or she reviewed, reflected upon, read and/or used *in formulating his or her opinions*.") (emphasis added); *see also Synthes Spine Co., L.P.* v. *Walden*, 232 F.R.D. 460, 463 (E.D. Pa. 2005) (the term "considered" in Rule 26(a)(2)(B) refers "to any information furnished to a testifying expert that such an expert generates, reviews, reflects upon, reads, and/or uses *in connection with the formulation of his opinions*, even if such information is ultimately rejected") (citing cases) (emphasis added).

Mr. Humphreys disavowed during his deposition the possibility that he may have relied upon the index in formulating the opinions expressed in his report. *See* Humphreys Dep. 87-89. Indeed, Royal has failed to explain in its motion papers how one can "consider" an index of voluminous information in formulating his/her opinions where the voluminous information itself was read in its entirety. The materials sought by Royal are not subject to disclosure. *See Dyson*, 241 F.R.D. at 251-52 (limiting production "to only the information and documents considered by [the expert] in connection with formulating his expert opinions expressed in his report" and denying the motion to compel in-

sofar as the party sought documents the expert "did not consider in connection with formulating the opinions expressed in his . . . expert report").

*Derrickson,* the lone case cited by Royal in support of its position that the index should be produced, is not apposite. *Derrickson* involved a motion *in limine* to exclude a plaintiffs' expert under circumstances where the court did not even have occasion to interpret the term "considered" as set forth in Rule 26(a)(2)(B). In *Derrickson,* the plaintiffs' expert relied entirely upon data analyzed by his assistant without conducting any independent analysis, and the fruits of labor of the expert and his assistant were "indivisible." In contrast, here Mr. Humphreys has testified that he personally read Mr. Gagné's deposition transcript in its entirety and did not consider the index in formulating his opinions. That Mr. Humphreys used the index to key into sections of the deposition that he personally read is not the kind of use that falls within the meaning of the term "consider" as used in Rule 26(a)(2)(B) given that use of the index in such fashion is not use to formulate any opinion expressed in the report.

<u>All</u> of the materials Mr. Humphreys "considered" in formulating the opinions expressed in his expert report have been produced. Royal suffers no prejudice for not having the index to Mr. Gagné's five-volume deposition transcript prepared by a first year associate at McDermott — Royal assuredly has its own index to that deposition. Because Mr. Humphreys testified that he did not consider the materials that Royal now seeks in formulating the opinions expressed in his expert report, this portion of Royal's motion to compel should also be denied.[2]

---

[2] Royal asserts at pages 12-13 of its Memorandum that a similar data request was made of one of its experts, David Pauker. That is not true. *See* <u>Exhibit C</u> (email request that Royal

Footnote continued on next page.

## CONCLUSION

The Court should deny Royal's Emergency Motion to Compel.

Dated: September 4, 2007

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____
William H. Sudell, Jr. (No. 0463)
Daniel B. Butz (No. 4227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Attorneys for Defendant Pepper Hamilton LLP and W. Roderick Gagne, in his capacity as an attorney practicing at Pepper Hamilton LLP*

Of Counsel:

| | |
|---|---|
| Charles A. Gilman | Elizabeth K. Ainslie |
| David G. Januszewski | Stephen J. Shapiro |
| David G. Montone | Schnader Harrison Segal & Lewis LLP |
| Cahill Gordon & Reindel LLP | 1600 Market Street, Suite 3600 |
| 80 Pine Street | Philadelphia, PA 19103 |
| New York, NY 10005 | Telephone: (215) 751-2000 |
| Telephone: (212) 701-3000 | Facsimile: (215) 751-2205 |
| Facsimile: (212) 269-5420 | |
| *Attorneys for Defendant Pepper Hamilton LLP* | *Attorneys for Defendant Pepper Hamilton LLP and W. Roderick Gagne, in his capacity as an attorney practicing at Pepper Hamilton LLP* |

1226075

---

Footnote continued from previous page.

identify by Bates numbers documents referred to in Pauker's report).