**EXHIBIT A**

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

----------------------------------:
MBIA INSURANCE CORPORATION AND        :
WELLS FARGO BANK, N.A.(f/k/a          :
WELLS FARGO BANK MINNESOTA N.A.)      :
AS TRUSTEE OF SFC GRANTOR TRUST       :
SERIES 2000-1, SFC GRANTOR TRUST,     :
SERIES 2000-2, SFC GRANTOR TRUST,     :
SERIES 2000-3, SFC GRANTOR TRUST,     :
SERIES 2000-4, SFC GRANTOR TRUST,     :
SERIES 2001-1, SFC GRANTOR TRUST,     :
SERIES 2001-2, SFC OWNER TRUST,       :
SERIES 2000-I, AND SFC GRANTOR        :
TRUST, SERIES 2001-3,                 :
                                      :
        Plaintiffs/                   :
        Counterclaim Defendants,      :
                                      :
        vs.                           :
                                      :
ROYAL INDEMNITY COMPANY,              :
                                      :
        Defendant/                    : C.A. No.
        Counterclaim Plaintiff.       : 02-1294-JJF
----------------------------------:
ROYAL INDEMNITY COMPANY,              :
                                      :
        Third-Party Plaintiff,        :
                                      :
        vs.                           :
                                      :
ANDREW N. YAO, STUDENT LOAN           :
SERVICING LLC, STUDENT LOAN           :
ACCEPTANCE II LLC, STUDENT LOAN       :
ACCEPTANCE III LLC, STUDENT LOAN      :
ACCEPTANCE V LLC, STUDENT LOAN        : DATE:
ACCEPTANCE VIII LLC, STUDENT LOAN     : AUGUST 17, 2007
ACCEPTANCE IX LLC, SFC FINANCIAL      : TRACK II WITNESS:
LLC I, SFC FINANCIAL LLC II,          : GEOFFREY C. HAZARD, JR.
SFC FINANCIAL LLC VI, SFC             :
FINANCIAL LLC VII,                    :
                                      :
        Third-Party Defendants,       :
----------------------------------:
        DEPOSITION OF GEOFFREY C. HAZARD, JR.
               AUGUST 17, 2007

Page 22

1      Q.  Did you have any communication with anyone

2  at all, between this March-April phone call and your

3  early May 2007 communication with Mr. Gilman, with

4  respect to the subject of SFC, Pepper Hamilton, or

5  your retention?                        09:54:56

6      A.  No.

7      Q.  Did you receive any documents or material

8  from anyone with respect to those subjects during

9  that same time period?

10     A.  Not before I talked to Mr. Gilman, as far  09:55:11

11  as I can remember.

12     Q.  Okay.  What was the nature of your

13  communication with Mr. Gilman?  Was it a phone call?

14     A.  Yes.

15     Q.  Okay.  And did he convey any substantive  09:55:22

16  information to you in that conversation about the

17  engagement or the issues?

18     A.  Well, as I recall, he said -- I said what

19  happened to Schnader, because my first contact had

20  been with Ainslie.  He said, well, Cahill Gordon was  09:55:42

21  representing Pepper Hamilton, and he inferred that

22  Schnader would continue to represent Gagne, if I

23  understood it.  So he said, "I'm representing Pepper

24  Hamilton," and I said, "Fine.  We can proceed on that

25  basis."                             09:56:05

Page 23

1          Then he said it's a big messy lawsuit, and

2     I said I understood that, and I said I would like to

3     see, you know, various documents that tell me what

4     the case is about, and thereafter, he sent me some.

5          Q.  And is what he sent you the documents that    09:56:23

6     are described in the attachment to your expert

7     report?

8          A.  Yes.

9          Q.  If you would like to have it in front of

10    you, I'm happy to mark the expert report so --        09:56:38

11         A.  That's all right.  Whatever.

12         Q.  So we have it on the more formal basis.

13         A.  That's fine.  It's part of the report.

14    Maybe you want to mark the report.

15         MR. GROSSBART:  Let's mark the report --          09:56:52

16         MR. WATERS:  Yeah.

17         MR. GROSSBART:  -- just so we --

18         MR. WATERS:  Know what's in front of him.

19         MR. GROSSBART:  Just so we have a

20    consistent record.                                     09:56:58

21          (Deposition Exhibit 2002-II was marked

22          for identification.)

23    BY MR. WATERS:

24         Q.  Did you receive, from Mr. Gilman or anyone

25    else, a document that included facts that you were to  09:58:16

Page 24

1    assume for purposes of your opinions?

2        A.  I guess the answer is yes.  He sent me a

3    lot of stuff that's listed in this attachment to the

4    report, and a lot of those are facts and a lot of

5    them were not in dispute.  For example, Mr. Gagne did   09:58:43

6    represent SFC, et cetera, et cetera.

7        Q.  I'm talking about a specific document that

8    would have set forth certain specific facts which you

9    may have incorporated into your report as facts that

10   you would assume.                                       09:59:12

11       A.  I see.

12       Q.  Not the underlying documents.

13       A.  Documents, yeah.  I think the way we did

14   this, it varies from case to case.  Sometimes I ask a

15   lawyer to write out a separate document called a        09:59:23

16   statement of facts.  Here, I think what I did was to

17   ask Mr. Gilman to give me a beginning recitation of

18   facts as he wanted me to proceed, and then I used

19   that as a beginning place for writing my opinions.

20       Q.  And was that beginning recitation of facts    09:59:57

21   in a document?

22       A.  No, I think it was an e-mail.

23       Q.  It was an e-mail?

24       A.  Yeah.

25       Q.  I see.  Have you retained that e-mail?          10:00:05

Page 25

1          A.   Not as far as I know.

2          Q.   Okay.  How, physically, did you prepare

3     the report in this case?  Do you type it yourself --

4          A.   Well --

5          Q.   Okay.                                 10:00:21

6          A.   Yeah.

7          Q.   So do you use a laptop?

8          A.   Yeah.

9          Q.   I'm sorry.  You do?

10         A.   Yes.                                   10:00:30

11         Q.   On your laptop, you begin to create the

12    document, and as you revise it, do you write over, so

13    that there's --

14         A.   Yeah, yeah.

15         Q.   Okay.  So that there's one document, and  10:00:45

16    the changes are shown in the memory?

17         A.   Whatever happens.  I don't know.  I just,

18    in this case, I suspect it was probably mostly

19    augmentation, as distinct from writing over.

20         Q.   Okay.                                 10:01:08

21         A.   I mean, you start with what you've got,

22    and you add to it and change it as you go along.

23         Q.   So is it fair to say, then, that you

24    started with a document that was put into your

25    computer from an e-mail from Mr. Gilman, and then you 10:01:20

Page 26

1    added to that?

2         A.   That's my recollection, yeah.

3         Q.   And the final document that came out of

4    that process is the document that we have marked

5    Exhibit 2002-II?                              10:01:46

6         A.   Yeah.

7         Q.   Now, were the exhibits prepared

8    differently?  Let me ask you that.

9         A.   Yeah.  We prepared -- well, I sent him my

10   CV.  I think that's one of them.              10:01:56

11        Q.   Okay.  So you sent him your CV.  He put it

12   in electronic form and sent it back to you?

13        A.   No.  I sent it e-mail, and I told him to

14   make the list of stuff he'd sent me.  That's my usual

15   practice.                                     10:02:14

16        Q.   And that's Exhibit E?

17        A.   Whatever, yeah.

18        Q.   If you take a look, let's make sure.

19        A.   Yeah.

20        Q.   That's Exhibit E, and that was prepared by  10:02:22

21   Mr. Gilman?

22        A.   Yeah.

23        Q.   Have you reviewed it?

24        A.   Yeah.

25        Q.   And are these all the things that you look  10:02:29

Page 29

1          THE WITNESS:  I might say Richard hasn't

2    sent me the text, because I figure it's not done

3    until it's been reviewed.

4    BY MR. WATERS:

5          Q.  How long did this phone conversation        10:05:59

6    between you and Mr. Gilman in early May take,

7    approximately?

8          A.  I can't remember, but I would guess

9    probably 25 minutes.

10          Q.  What was your next communication with       10:06:11

11    anyone with respect to this litigation or your

12    activities with respect to this litigation?

13          A.  Well, I asked my wife to make up a file

14    sheet for it, and after that, everything is with

15    Mr. Gilman.                                           10:06:31

16          Q.  Okay.

17          A.  What was next was he sent me some stuff,

18    and I read it.  I think he sent me material in more

19    than one shipment.  So he sent me some stuff, and I

20    read that, and he sent me some more stuff.            10:06:45

21          Q.  And this would have been over the course

22    of the month of May?

23          A.  Approximately.

24          Q.  Do I take it from your last answer that,

25    between your first communication with Mr. Gilman and  10:06:56

Page 30

```
 1    the completion of your report on June --

 2         A.   Whatever it is.

 3         Q.   Yeah.  Let's get the date.  June 27th,

 4    2007.  Between those two dates, the only person that

 5    you communicated with with respect to the substance    10:07:22

 6    of this case or of your work on this case was

 7    Mr. Gilman?

 8         A.   Yes.

 9         Q.   No one else?

10         A.   No.                                           10:07:33

11         Q.   Okay.  After you received and reviewed the

12    materials from Mr. Gilman in May, when did you

13    receive the e-mail which contained the text from

14    which you worked on the report?

15         A.   I can't remember, but my guess would be      10:07:52

16    toward the end of May.

17         Q.   The end of May?  And did you add to the

18    material in that e-mail and produce an e-mail text

19    that was then sent back to Mr. Gilman?

20         A.   Yeah.                                         10:08:32

21         Q.   And during what period of time did you do

22    that task?

23         A.   The best I can remember was toward the end

24    of May and early June, because this thing was finally

25    signed in June, and that suggests to me that I did     10:08:44
```

Page 31

1    work in June, but I can't directly remember.  I have

2    a time sheet I can provide you that would show the

3    days when I did work.

4         Q.  I would like to see that.  Thank you.

5              Sometime in early June, you sent, to          10:09:10

6    Mr. Gilman, an e-mail of what you had prepared and

7    added to his initial e-mail?

8         A.  That's my recollection.

9         Q.  And between the time he sent you the

10   material and the time you sent him that e-mail, did     10:09:31

11   you have any conversations with Mr. Gilman?

12        A.  I know I had some about scheduling, but I

13   can't remember anything about the substance.  It

14   might well have been, but it wasn't very extensive,

15   if it was.                                              10:09:55

16        Q.  And after you sent Mr. Gilman that first

17   e-mail with the report, did there come a time that

18   you made additional changes and sent him a second

19   e-mail?

20        A.  I can't remember, but I'm sure there was.      10:10:16

21   I'm sure he made some comments, corrections about --

22   I can remember something about some dates, and so on,

23   but it was essentially tying down details.  I think

24   that's about it.

25        Q.  When did you send him that second e-mail       10:10:40

Page 32

1    with the report attached?

2         A.   I can't remember.

3         Q.   Well, is it fair to say it was somewhere

4    between early June and June 27th?

5         A.   Oh, sure.  Yeah.  Somewhere in there.      10:10:59

6         Q.   Okay.  Was there a third revision to the

7    report, or is that the final?

8         A.   I think that's it, but there could have

9    been some minor touches.  But I can't remember.

10        Q.   Oh, all right.  So do I take it, from your   10:11:17

11   testimony, sir, that you start with what Mr. Gilman

12   sent to you.  You do your work on that document.  You

13   send it back to Mr. Gilman.  You have some

14   conversations with him, and then you sent him either

15   the final of your report or something very close to    10:11:40

16   it?

17        A.   Exactly.

18        Q.   Okay.  Do you remember when you -- well,

19   you signed it on this date?

20        A.   Yeah.                                         10:11:49

21        Q.   June the 27th.  Can you work back from

22   that to tell me how long, prior to that, you had

23   finished it?

24        A.   No.  But I would guess three or four or

25   five days.                                              10:12:03

Page 34

1   me no document exists.  Did you mean to exclude an

2   electronic document?

3           MR. GILMAN:  No.  You asked if there was a

4   statement of facts, for example.

5           MR. WATERS:  No, if you go back --          10:13:54

6           MR. GILMAN:  I haven't interrupted you

7   once, Michael.  Please.

8           MR. WATERS:  Okay.

9           MR. GILMAN:  You asked if there was a

10  statement of facts that was provided to              10:14:00

11  Professor Hazard.  Expert witnesses, for example,

12  Mr. Humphreys, has appended, to his report, a

13  statement of facts.  Some witnesses may do that as a

14  separate exhibit, and then simply have an opinion

15  report that refers to it.  Other experts do things   10:14:16

16  differently.  They're all unique.

17          I have told you that there is no

18  free-standing statement of facts and that all of the

19  facts that are assumed by or were considered by

20  Professor Hazard in his report are set forth in haec  10:14:32

21  verba on the face of the document that you have

22  marked as Exhibit 2002-II.  So you have it.

23          MR. WATERS:  Bear with me just one moment.

24          Thank you.  I think that my request to you

25  was broader than just statement of facts, if you have 10:16:17

1    the letter.

2           MR. GILMAN:  I have my response back to

3    you.

4           MR. WATERS:  You don't have the letter?

5           MR. GILMAN:  I don't have your request to      10:16:29

6    me, but I have my response back to you that says the

7    only statements of facts provided to Professor Hazard

8    is that set forth in haec verba his report.  I assume

9    I was paraphrasing your request accurately.

10          MR. WATERS:  No.  I think my request was      10:16:42

11   broader -- we can go back and establish what it is --

12   so that the statement of facts will be an example of

13   documents provided to Professor Hazard that

14   constitute material that's included in his report,

15   specifically wording, whether it be by way of a       10:17:00

16   statement of facts or anything else.

17          The witness has testified that an e-mail

18   from you contained a document from which he began his

19   report and is unable to identify specific additions,

20   at least not yet -- we'll certainly spend some more   10:17:24

21   time on this -- that he made to that document.  I

22   think I'm entitled to have that e-mail document that

23   you sent to Professor Hazard.

24          Now, my question to you is, first, does

25   that exist?  Have you retained that document?         10:17:37

Page 36

1                    MR. GILMAN:  I don't think so.

2                    MR. WATERS:  It doesn't exist anymore?

3                    MR. GILMAN:  If you had listened to what

4       Professor Hazard said, he said --

5                    MR. WATERS:  You and I should not --        10:17:52

6                    MR. GILMAN:  You're interrupting me again.

7                    MR. WATERS:  No.  But you and I should not

8       have a kind of a conversation that might interfere --

9       if you want to have a conversation, you can ask the

10      witness --                                              10:17:58

11                   MR. GILMAN:  I'll tell you what we do.

12      You ask your questions so that we can get the

13      deposition over.  If you want to make any request for

14      me to produce things, make it to me, and I'll take it

15      under advisement.  Let's not waste the deposition.     10:18:03

16      Next question.

17                   MR. GROSSBART:  Well, I would like the

18      e-mail.  I will make the request.

19                   MR. GILMAN:  I'll take it under

20      advisement.                                             10:18:13

21                   MR. GROSSBART:  I would like the e-mail

22      today before the conclusion of the deposition.

23      That's under advisement, too?

24                   MR. GILMAN:  Sure.  Next question.

25                   MR. WATERS:  I would join in              10:18:26

Page 47

1   securitizations?

2        A.   I think that's right.

3        Q.   Okay.   Now --

4             MR. GILMAN:   We've been going for an hour.

5   If we're done with the stroll down memory lane and      10:38:05

6   about to move to another subject, could we take about

7   a two-minute break?

8             MR. WATERS:   I was going to take a

9   two-minute break.   I'm going to move to another

10  subject.                                                10:38:18

11            MR. GROSSBART:   Why don't we take a break

12  whether we're going to stroll any more than that.

13            MR. WATERS:   I was going to say something

14  about the stroll, but John beat me to it.

15            (A recess was taken.)                         10:38:32

16  BY MR. WATERS:

17       Q.   Professor, in preparing your report, you

18  intended to disclose to everyone certain opinions

19  that you had reached as to which you may testify as

20  an expert at trial; correct?                            10:48:00

21       A.   Yes, sir.

22       Q.   I looked through your report for specific

23  instances in which you said "it is my opinion," or

24  words to that effect, and I found three of them.   I

25  think you offer an opinion that Pennsylvania standard 10:48:25

Page 48

1    of care would apply?

2        A.   Well, I think I offered opinions before

3    getting to that.

4        Q.   Let me tell you the ones I found, and then

5    I'm going to back up and ask you to tell me exactly    10:48:55

6    what the opinions are.

7              On Page 10, you state it is my opinion

8    that "the applicable standard of care is that in

9    Pennsylvania."

10       A.   Yeah.                                           10:49:10

11       Q.   And is that one of the opinions you

12   reached in preparing your report in which you sought

13   to disclose?

14       A.   Yeah.

15       Q.   Okay.  On Page 17, you state in your        10:49:21

16   report:

17             "In my opinion, conversations that

18             Mr. Gagne had with SFC and Mr. Yao in the

19             August 27, 1998 and March 5, 2002 letters

20             fully satisfied the applicable standard of    10:49:57

21             care by informing SFC and Mr. Yao of the

22             circumstances relevant to informed

23             consent."

24             Is that one of the opinions that you

25   sought to disclose that you may offer at trial in       10:50:10

Page 49

1    this matter?

2         A.   Yes.

3         Q.   Okay.  And then, turn to Page 23.

4         A.   Yes, sir.

5         Q.   You say on that page:                    10:50:38

6              "In my opinion, Pepper Hamilton was

7         entitled to rely on the statements of fact

8         provided to it by SFC and certified as

9         accurate by responsible representatives of

10        SFC."                                          10:50:53

11             Is that one of the opinions you sought to

12   disclose?

13        A.   Yeah.

14        Q.   That you might testify to at trial in this

15   matter?                                             10:51:01

16        A.   Yes.

17        Q.   Those were the only instances that I could

18   find in which something was expressed specifically,

19   at least in my reading of it, as an opinion that you

20   were giving us notice of.                           10:51:17

21             Are there any other specific opinions that

22   you sought -- that you came to and that you sought to

23   disclose in this report that you may testify to at

24   trial?

25        A.   Sure.                                     10:51:30

Page 50

1          Q.  And would you tell me what they are?

2          A.  Well, we go back to Page 3.  Under the

3    heading 3, the second full paragraph, starting "The

4    relationships...," I say they are different, and

5    that's one of my opinions.  There's a difference in        10:52:09

6    the responsibilities owed to SFC and the ones that

7    might be owed to Royal.

8          Q.  A difference between a lawyer-client

9    relationship and a lawyer's relationship with people

10   who are not his clients?                                   10:52:30

11         A.  Yeah.

12         Q.  And that is one of your opinions?

13         A.  Yeah.

14         Q.  And does that accurately state what your

15   opinion is?                                                10:52:37

16         A.  Well, it's a very general summary, but

17   yes.

18         Q.  Okay.  All right, sir, if you would go on.

19         A.  If you look at the third paragraph, it

20   starts, "As recognized in Mr. Glazer's report...it is      10:52:59

21   routine...such as securitizations...for clients to

22   provide to their lawyers statements of relevant facts

23   on which the lawyer is to proceed and to rely on in

24   carrying out the matter for the client."

25              That's my opinion, and I think it's also        10:53:22

Page 51

1     Mr. Glazer's opinion, and if I may say so, Professor

2     Green's.  That's my opinion.  You have to get facts

3     somewhere.  You typically get them from the client.

4     Generally speaking, you can rely on them.

5          Q.  So your opinion is that it is routine in     10:53:41

6     complex corporate transactions --

7          A.  Yeah.

8          Q.  -- for that information.  Okay.

9          A.  Then I go on to say "...the lawyer is

10    generally entitled to rely on the accuracy of the      10:53:55

11    facts represented by responsible representatives of

12    its client."  I believe that, and I think that's well

13    established.  I don't think that either Mr. Glazer or

14    Professor Green, as a general proposition, would

15    disagree with that.                                    10:54:11

16          Then I go on saying, at the bottom of the

17    page, that, as I understand the facts, Royal does not

18    contend that it was a client in this matter.

19          Later on, we get to the point, which is

20    acknowledged, I think, that Royal had been a Pepper    10:54:35

21    Hamilton client in other matters, and may have still

22    been such in some unrelated matter.  Let me take note

23    of that, because that's kind of an amplification of

24    the opinion that I mentioned at the outset.

25          Q.  I'm only asking you, Professor, for the      10:54:54

Page 52

1    opinions that you are offering, and you're giving me

2    some facts.  You say Royal does not allege an

3    attorney-client relationship.  I'm not asking you on

4    what facts you might base an opinion that you would

5    testify to.  I've read three instances in which you      10:55:13

6    have said this is my opinion, and --

7              MR. GILMAN:  There are others that use

8    those words.

9    BY MR. WATERS:

10             Q.  And you've given me some other instances    10:55:25

11   in which that language isn't used, but you regard it

12   as your opinion, and I'm asking you to tell me what

13   other opinions you're going to offer to testify to,

14   and not facts underlying those opinions.

15             So that's by way of a clarification to my       10:55:43

16   question, if it helps you or not.

17             MR. GILMAN:  Do you wish him now to

18   continue paging through, paragraph by paragraph, in

19   answer to your question?

20             MR. WATERS:  If that's the way he wants to      10:55:53

21   answer this question and tell me every paragraph is

22   an opinion, I suppose I will have to sit through it;

23   but I would like to focus on things which are, more

24   specifically, opinions.  But the professor is the

25   witness, and he'll answer the question any way he        10:56:06

Page 54

1    that Pepper Hamilton demonstrated appropriate

2    sensitivity, or was that a line that came to you in

3    the document that came from Mr. Gilman?

4         A.    It might have been.  I can't remember

5    whether that's exactly the formulation, but it could    10:58:02

6    have been that I would have written "demonstrated

7    sensitivity," but I fully subscribe to what this is.

8    So I don't have any problem with it.

9              Yeah, and then the next paragraph, he

10   elaborates on this, and so I won't go into it.  I       10:58:31

11   wouldn't want to go beyond your request.

12             The next paragraph, the one, "The

13   representation of Royal in matters unrelated...," I

14   think goes on to say it does not impose obligations

15   with respect to the matters for SFC.  That makes the     10:58:51

16   point, which is my opinion, that if you represent a

17   client in one matter, that, as a general proposition,

18   certainly, you don't have any obligation to convey to

19   that client information in an unrelated matter unless

20   you have, for example, specific information             10:59:19

21   indicating that the client you're working for is

22   committing a fraud on your other client.

23             You would have an obligation to do

24   something about that anyway, but as a general

25   proposition, you don't have a responsibility to give     10:59:40

Page 55

1    information to a client in a matter that is not one

2    you're working on, in particular when it would

3    involve questions of confidentiality of the other

4    client.  So that's my opinion.

5             Now, we can go on, or you can ask more        11:00:03

6    questions.

7        Q.  I would like to know what the opinions are

8    that you're giving me notice of.

9        A.  Well, I just gave you one.

10        Q.  And if there are any others, tell me what     11:00:17

11    they are.

12             MR. GILMAN:  You're going to have to

13    proceed paragraph by paragraph --

14             MR. WATERS:  Don't tell him how to

15    proceed.                                               11:00:26

16             MR. GILMAN:  You're interrupting again.

17    Please, I have not interrupted you once --

18             MR. WATERS:  Yeah, but you're doing

19    something that's in violation of the court's order.

20             MR. GILMAN:  No, I'm not.                     11:00:32

21             MR. WATERS:  You're talking to your

22    witness about his answer --

23             MR. GROSSBART:  Yes, you are.

24             MR. WATERS:  And you really should be

25    interrupted for your own good.  If you refuse, if you 11:00:38

Page 56

```
 1   want to be blind to the order, go ahead.

 2          MR. GROSSBART:  There is an order,

 3   Mr. Gilman, that makes it improper --

 4          MR. GILMAN:  I understand.

 5          MR. GROSSBART:  -- other than to say      11:00:50

 6   objection.  And the lawyers have been religious,

 7   almost, in adhering to that point in this case, and

 8   reminding one another when they don't.  So I would

 9   join with Mr. Waters and ask you not to do it.

10          That's all I can do is ask.  The chips      11:01:05

11   will fall where they may.

12          MR. GILMAN:  I appreciate that.

13   Mr. Waters' question is, in this 20-some-odd-page,

14   single-spaced, typed document, identify all the

15   opinions that you may express at trial.  The only way 11:01:19

16   to do that is to go through it paragraph by

17   paragraph.

18          Please answer his question.

19          THE WITNESS:  Okay to resume?

20          MR. GILMAN:  Yes, sir.                     11:01:28

21          THE WITNESS:  On Page 4, in the last

22   paragraph, it says, "A number of sophisticated

23   professionals were involved in each securitization."

24          I think that's correct, and I think that's

25   a fair evaluation, appraisal, assessment of the      11:01:47
```

Page 57

1    relative competence of the other players in the

2    transaction, and that's a relevant fact.  I don't

3    think it's much disputed that they were experienced,

4    and therefore, relatively sophisticated lenders and

5    so on and so forth.  But that makes a difference.    11:02:07

6          It's also the case, as I understand it,

7    that they had rights of access to financial

8    information.  So I think that is very important in

9    setting the stage for what the situation was.

10   BY MR. WATERS:                                       11:02:28

11         Q.  Is that your opinion, or is that a fact

12   that you're relying on, they have rights of access?

13         A.  I think it's a fact, and I incorporate it

14   in my opinion.  If you said that these documents or

15   information had been provided under the cover of     11:02:46

16   confidentiality, it would make a difference, sure.

17         On the top of Page 5, it says "SFC

18   responded to...inquiries truthfully as far as

19   Mr. Gagne and Pepper Hamilton were aware."

20         I believe that's a fair assessment.           11:03:12

21   That's my interpretation of what -- of Mr. Gagne's

22   situation.  Now, obviously, that is a disputable

23   question, but I think it's fair for you to know what

24   my assumption is in that respect, because it affects

25   my opinion.                                          11:03:34

Page 58

```
 1        Q.  Is that a fact that you were asked by

 2   counsel to assume?

 3        A.  Yeah.

 4        Q.  "SFC responded to all inquiries truthfully

 5   as far as Mr. Gagne and Pepper Hamilton were aware"?   11:03:47

 6        A.  Yeah.

 7        Q.  And you based your opinions on that

 8   assumption?

 9        A.  Sure.  I don't think Gagne knew that Yao

10   was making false statements.                           11:03:58

11            Okay.  I won't reiterate whatever with

12   respect to the little paragraph, "In connection

13   with...."  I've already told you what my opinion is

14   about that.

15            Next, "It is customary for a lawyer...,"     11:04:19

16   and so on, in a complicated transaction, "...to

17   assume that other participants in the transaction are

18   doing their jobs."

19            I think that is -- that is my opinion.

20   You can call it a factual assumption.  I think it's    11:04:33

21   correct, and I think it's relevant in assessing

22   Mr. Gagne's conduct.

23        Q.  You would also be of the opinion that

24   other lawyers would assume that Mr. Gagne was doing

25   his job?                                               11:04:49
```

Page 59

1          A.  Sure.

2          Q.  And that he was availing himself of all

3     rights of access to information?

4          A.  Sure.

5          Q.  Okay.                                    11:04:58

6          A.  To assume, then, the conclusions reached

7     by other sophisticated personnel, and so on, that's

8     kind of amplification of that point, and then we go

9     on in considerable detail, but I won't -- I mean, you

10    can read what I say.  I think that holds for the      11:05:22

11    various players that are identified in the

12    transaction.  They all had financial people.  They

13    had access to lawyers and so on.

14              Then, at the top of Page 6, there is a

15    quote that calls particular attention to the fact     11:05:45

16    that independent auditors had repeatedly examined and

17    reported, and that they gave what you could call a

18    clean bill, and I think that that's very relevant for

19    a lawyer engaged in assisting in a financial

20    transaction, that there had been auditors and that    11:06:04

21    their reports say or imply that things are okay.

22              I guess the rest of the paragraphs in that

23    part are essentially amplifications of that point,

24    and therefore, there will be no need to reiterate

25    them.                                               11:06:31

Page 60

1              When we move to the next, under

2    Paragraph C, I think these are recitations of facts,

3    that are not disputed in the record, about the

4    situation of the other people involved in the family

5    making the loan.                               11:07:01

6         Q.   And you assumed all of these facts in

7    Paragraph C to be true?

8         A.   Yeah.

9         Q.   And you relied upon them in making your

10   opinion?                                       11:07:11

11        A.   Yes, I think they're all true.

12        Q.   If any material facts are not true, would

13   that cause you to reconsider your opinion?

14        A.   Sure.  Any of these and any others.  If

15   you tell me something was wrong, I would certainly  11:07:25

16   take it into account.

17        Q.   Okay.

18        A.   This is all context facts.  If you move to

19   Page 9, I give -- I say, after Paragraph 16, "These

20   facts support the conclusion that Mr. Gagne had a   11:08:31

21   genuine and good faith belief that the Family Loans

22   were known to and understood by SFC and were fair and

23   reasonable," and I think they do, and that's my

24   opinion.  They seem to be straightforward in terms of

25   the loan.                                       11:08:51

Page 61

1      Q.  Do you anticipate that you may be called

2   upon to offer an opinion as to Mr. Gagne's genuine

3   and good-faith belief at the time of trial?

4      A.  It's ultimately a question of fact for the

5   trier of fact.  Those circumstances, I assume, would    11:09:05

6   be the subject of proof, and my expert opinion would

7   be that a lawyer confronting that kind of fact could,

8   and ordinarily would, proceed on the basis that those

9   were known and understood by SFC.  That is, there is

10   nothing out of line in Gagne proceeding on that        11:09:29

11   basis.

12      Q.  So you're not going to offer an opinion as

13   to Mr. Gagne had a genuine and good-faith belief?

14   You're going to --

15      A.  Say that an ordinary practice, given this,   11:09:46

16   it would be reasonable for a lawyer to arrive at that

17   conclusion, and of course, the question of whether he

18   did is a question of fact for the trier of fact.  All

19   I can say is there was nothing surprising about it,

20   if a lawyer did that.                                  11:10:04

21      Q.  And the conclusion that his work in the

22   transaction was honest and competent, is that

23   something you may be called upon to offer an expert

24   opinion on?

25      A.  That follows from, certainly, honesty.       11:10:16

Page 62

1    That's the same thing I've just said.  Competent, I

2    didn't see anything that was incompetent about it, so

3    I don't pretend to be an expert in it, but I don't

4    see -- I mean, you have Glazer saying that maybe he

5    should have investigated further, but that depends on    11:10:35

6    whether you assume that the information available to

7    Mr. Gagne was such as to arouse suspicion or concern.

8    That's really what the question is.  I don't think it

9    was.

10         Q.  Are there any other opinions that you are    11:11:00

11    disclosing that you expect you may offer at trial?

12         A.  Let me see.  Well, we've got this business

13    in Paragraph 1 on Page 9, the question of whether the

14    information about the default rate, and if you assume

15    the default rate was far higher than 25 percent, that    11:11:22

16    would be an indication that could be the basis for

17    saying that it should have aroused attention on the

18    part of Mr. Gagne.  On the other hand, if the rate

19    was below that, then the question is whether it

20    seemed within normal limits.                              11:11:45

21         So that's a question of fact, and I'm

22    assuming that it appeared to be within normal limits,

23    and if it is, then that has that significance.  If it

24    was outside normal limits, or outside this higher

25    than the 25 percent rate, then that's a different    11:12:04

Page 63

```
 1   question.  So that's a question, ultimately, of fact,

 2   I suppose.

 3        Q.  Would it also be a factor if there were

 4   other security for the loans, besides the student

 5   loans?                                            11:12:20

 6             MR. PELLETIER:  Objection.

 7             THE WITNESS:  I guess I don't understand

 8   that question.  You mean if there was additional

 9   security, beyond this?

10   BY MR. WATERS:                                    11:12:30

11        Q.  Yes.

12             MR. PELLETIER:  Objection.

13             THE WITNESS:  Well, if there was

14   additional security, then that would mean that the

15   loans were, to that extent, more secure.  I guess I'm 11:12:34

16   not understanding --

17   BY MR. WATERS:

18        Q.  The loans by the family were more secure?

19             MR. PELLETIER:  Objection.

20             MR. GILMAN:  Than what?  Objection.      11:12:42

21             THE WITNESS:  I guess --

22   BY MR. WATERS:

23        Q.  I'll withdraw the question.

24        A.  I have a little trouble understanding it.

25        Q.  All right.  I'll withdraw the question.   11:13:07
```

Page 64

1      A.   Thank you.

2           Then, in Paragraph 2 on Page 9, you have

3      the question whether the family or Gagne had any

4      information indicating they knew of insolvency.   I

5      take it that they didn't and he didn't, but if you      11:13:20

6      assume that he did or they did, why, it would be a

7      different situation.

8           And, as I say, I think the fact that the

9      family -- in Paragraph 3, the family made a loan

10     there in early March, that's putting your money where  11:13:43

11     your mouth is, so to speak, or putting money on a

12     basis of a supposition in your mind.  So that's, I

13     think, a relevant circumstance, indicating that Gagne

14     thought it was okay.

15          Now, let's see.  I indicate on Page 9,        11:14:09

16     after D, the standard of care is generally the same

17     throughout the country, and I think that's true.   I

18     think this kind of transaction would be governed by

19     essentially the same standard of care whether it was

20     Pennsylvania or somewhere else.  I do think it's      11:14:36

21     governed by the concepts in Pennsylvania, but then I

22     elaborate why it would be properly considered to be

23     Pennsylvania; but I think, if it had been, say, in

24     California or Texas, I don't think the standard would

25     be any different.                                   11:14:55

Page 65

1            On E, "A lawyer is presumed to have

2    complied with his or her duties unless proven

3    otherwise."  In a way, that's a statement of law, and

4    as such, might be objected to as beyond what an

5    expert can testify on.  On the other hand, I think      11:15:21

6    it's a correct statement.  It just sort of

7    background.

8            I think it's also fair to say that an

9    expert, or anybody evaluating the conduct of anybody,

10   whether it's a lawyer or somebody else, needs --       11:15:43

11   we're now on Page 11 -- needs to visualize the

12   situation as it arose for the actor, in this case a

13   lawyer, rather than projecting backward information

14   subsequently learned.  That's what's meant by

15   hindsight, and I think that is something to be kept     11:16:09

16   in mind whenever you're considering, you know, the

17   propriety of somebody's conduct.

18           Again, I guess the rest of this is mostly

19   a legal conclusion, but I think it's appropriate to

20   advise you of what my frame of reference is.  I        11:16:34

21   wouldn't expect that I would be invited to testify to

22   that effect for the same reason, but I'm -- this

23   report tells you the frame of reference.

24           Moving on to F, I think it's also -- it is

25   my opinion, and I don't think anybody disagrees with    11:17:00

Page 66

1    it, that standards in the rules of professional

2    conduct do not, as such, create civil liabilities or

3    duties.  And, in particular, I don't think there was

4    a conflict of interest here, but if there were a

5    conflict of interest, somebody would say that.        11:17:18

6            That, of itself, is not a basis of

7    liability.  One has to show that there was injurious

8    action or inaction and that injury resulted.  The

9    fact that there might have been a conflict of

10   interest is not, as such, proof of that.  Again, I    11:17:45

11   think that's generally accepted, but I simply state

12   it to you.

13           On Page 12, in the paragraph that starts

14   "Asset-backed securitization transactions are complex

15   securities offerings," they do have significant       11:18:22

16   impacts and implications.  I don't think there's any

17   dispute about that, but it's a background fact in my

18   opinion.

19           I didn't understand that there was any

20   challenge to the fact that Mr. Gagne was competent to 11:18:36

21   do the things he was doing, and I think it's the case

22   that Royal, you know, was experienced in this kind of

23   transaction, and Gagne knew that, I think, and

24   certainly Royal knew it.  So that's, again, relevant

25   background, I think.                                   11:19:05

Page 67

1          On Page 13, we get to this business about

2     duties to clients do not run in favor of non-clients,

3     such as Royal; and then we get to the question, well,

4     what duty do you owe to a non-client?  And I think

5     it's certainly the case that you owe a duty not to      11:19:28

6     participate in fraud, and then the question is

7     whether Gagne's activity could properly be considered

8     to amount to that, and I agree that the -- as I say

9     on Page 13, second paragraph, "the concept of willful

10    blindness can apply."  I agree with that.              11:19:54

11          I think Professor Green and, also,

12    Mr. Glazer suggested, but then the question is

13    whether that happened, and that's, in the end, a

14    question of fact here, and I don't think either

15    Mr. Glazer or Professor Green would disagree that if   11:20:20

16    you assume Gagne wasn't averting his eyes and didn't

17    know, that he couldn't be said to have wrongfully

18    assisted Mr. Yao in these bad transactions.

19          So, on that assumption, I make the

20    opinion, at the bottom of the page, that Royal was in  11:20:55

21    the position to make inquiries about the financial

22    matters of SFC, and Mr. Gagne was obviously in a

23    position to assume that they had that capability.

24          On the conflict of interest addressed in

25    Paragraph G on 14, I think that -- from the point of   11:21:30

Page 68

1    view of Mr. Yao on behalf of SFC, they understood

2    that Mr. Gagne was with Pepper Hamilton, and that

3    Mr. Gagne had connections with the family, and that

4    the family and family trusts were providing loans.

5              I think Mr. Gagne's testimony is that he      11:22:00

6    explained the situation.  I rather think that any

7    explanation would have been superfluous, because, as

8    I read it, Mr. Yao was an experienced businessman,

9    and he knew what the transactions were.  And I think

10   that the transactions, the loans made to SFC, were on 11:22:23

11   terms fair and reasonable to SFC.  So that if there

12   were a conflict, which I don't think there is, the

13   deal was still fair and reasonable.

14             And I've assumed that the loans by the

15   family were as described and that they were fair and 11:22:48

16   reasonable, and if that is true, the fact that there

17   may have been a conflict, which I don't think there

18   was, would mean that there was no injury suffered by

19   SFC or Mr. Yao in the transactions.

20        Q.   Can I ask you, when you say conflict --     11:23:16

21        A.   Yeah.

22        Q.   -- you're addressing the conflict in

23   working on -- the law firm working on the transaction

24   between SFC and Mr. Yao and Mr. Gagne's family

25   members.  Is that the conflict you're addressing?     11:23:38

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

Page 81

```
 1        A.   And I've been doing my best to answer.

 2        Q.   Well, I'm interrupting your answer to my

 3   question.

 4        A.   Well, let's just see where we were.  Let's

 5   go back to Page 14.                                    11:41:57

 6        Q.   We're on Page 15, and I had asked you --

 7             MR. GILMAN:  Actually, we're on Page 14.

 8   BY MR. WATERS:

 9        Q.   Fourteen?  I'm sorry.  I had asked you, to

10   remind you of my question, to tell me if there are     11:42:06

11   any other opinions as to which you may testify as an

12   opinion at trial that are disclosed in this report,

13   other than the three that I was able to identify.

14   And you were giving me your answer to that question.

15             I would suggest to you, again, that I am     11:42:24

16   not calling for you to give me facts that you think

17   may support an opinion, but only the specific

18   opinions as to which you may testify.

19             Would you please continue your answer?

20        A.   Yes, I will.  But you will forgive me if I   11:42:38

21   occasionally intrude on supporting facts.

22        Q.   I will have to forgive you.

23        A.   There we go.

24             Well, on Page 14, I say it seems to me

25   that in documenting the family loans, he did not have  11:42:56
```

Page 82

1    a conflict vis-a-vis the family, meaning Bast and

2    Mrs. Gagne.  Again, they were both lawyers, and if

3    there was a conflict, they understood what it was

4    about.

5         MR. GROSSBART:  Please mute.  The person    11:43:23

6    on the phone is typing.

7              (Discussion off the record.)

8         THE WITNESS:  On Page 15, I say the

9    conflicts could be waived and were waived.  I guess

10   I've already talk about that.  This is sort of an    11:44:03

11   elaboration.  I don't think it's anything new.

12             On Page 16, I adhere to the proposition

13   that you don't need to tell a client things that they

14   already know, and that, obviously, has application

15   with reference to what is the state of knowledge and   11:44:48

16   background and business acumen, and so on, of the

17   relevant players.  I think I've assumed Mr. Yao was

18   an experienced businessman and that communications

19   with him should be evaluated in that light.

20             At the time -- I think it's still the rule   11:45:12

21   in Pennsylvania, but I'm not sure -- conflicts

22   waivers did not have to be confirmed in writing.  It

23   only said so many words in Pennsylvania.  There have

24   been efforts to change the rules in that respect,

25   since, but this hasn't been resolved, as of this    11:45:39

Page 83

1    time, in either Pennsylvania or Delaware.

2            On Page 16, Professor Green's opinion,

3    obviously, if you make different assumptions, you get

4    different conclusions.  I might say, I have high

5    respect for Professor Green.                    11:46:04

6    BY MR. WATERS:

7        Q.  Do you regard him as an expert --

8        A.  Yeah.

9        Q.  -- in ethics?

10       A.  Sure.  He's a good guy.                 11:46:10

11           So the rest of that's kind of an

12   elaboration on that point.

13           We have some letters; we have

14   conversations.  I think that adequately covered the

15   ground.  So I'm now down to the securitization    11:46:31

16   opinions.

17       Q.  What page are you on?

18       A.  On the bottom of Page 17, moving on over

19   to 18.  Most of these had to do with Royal.  I would

20   be glad to talk to you about that, but maybe I'll   11:46:59

21   wait on that.

22       Q.  I think we're so close to the end, we

23   might as well finish the questions so that I know all

24   the opinions.

25       A.  Well, I think it's clear that Pepper     11:47:10

Page 84

1    Hamilton did not represent Royal in regard to these

2    transactions.  Pepper Hamilton did some things, and

3    the question is whether those things generated any

4    legal obligation that could be the basis of a claim

5    by Royal.                                          11:47:43

6            I say that, in general, that kind of

7    obligation arises when a lawyer invites a reliance by

8    a third person, and I think that's well understood,

9    and the question is whether the conduct here did

10   that.  And in my opinion, the starting and usually   11:48:08

11   the ending of that is whether, particularly in this

12   kind of formal transaction -- this isn't casual

13   stuff -- who is the addressee of an opinion, and the

14   opinions were not addressed to Royal, and they have

15   these disclaimers that are listed on the bottom of   11:48:36

16   Page 18 and carried over on 19.

17           As I understand what's involved here, at

18   least some of the opinions were in draft form, at any

19   rate, and arrived with Royal, but there are several

20   problems with whether anything is to be made of that. 11:49:09

21   One is that they weren't addressed to Royal.  Second

22   is that Royal, as I understand it, had committed to

23   issuing the insurance before Pepper Hamilton letters

24   were forthcoming, and that the circulation to Royal

25   was essentially for information.  I don't think that  11:49:36

Page 85

1    amounts to an invitation, particularly in a

2    transaction of this formality.  So that's my opinion

3    about that.

4         Q.  Do you agree that Pepper Hamilton had

5    obligations to its client, SFC, in preparing all of     11:49:59

6    the paperwork on these transactions, of competence?

7         A.  Sure.  Sure.

8              Then I talk about, on Page 20, the

9    reliance on the information supplied by SFC to Pepper

10   Hamilton.  Mr. Glazer says that the officers'          11:50:30

11   certificates weren't in the usual form, and assuming

12   that to be true, I don't think it was the kind of

13   irregularity that would excite suspicion about the

14   truthfulness of what's being said.

15             The information was coming from SFC          11:50:57

16   people, and it was implicitly, if not explicitly,

17   supported by Mr. Yao, who Mr. Gagne knew.  So you get

18   this information from some staff person, having dealt

19   with the CEO, as Mr. Yao was.  I think that it was

20   the kind that a lawyer ordinarily may rely on, and     11:51:28

21   Mr. Gagne says he did rely on it, and in my opinion,

22   you can ordinarily take that as true in the absence

23   of some indication that you ought to be worried --

24   ought to be suspicion about it.

25             So that's, I guess you could say that that   11:51:57

Page 86

1    leads us to the opinion identified as such on

2    Page 23, that Pepper Hamilton was entitled to rely on

3    those statements of fact having been provided to

4    Pepper Hamilton by people at SFC.

5         Q.  Is that the end of your answer to my          11:52:28

6    question?

7         A.  I think so.

8         Q.  Okay.

9              MR. GILMAN:  It's been another full hour.

10             MR. WATERS:  Actually, I was going to          11:52:34

11   suggest, myself, that this was a good point to take a

12   10-minute break.

13             (A recess was taken.)

14   BY MR. WATERS:

15        Q.  Professor Hazard, you are one of the          12:05:39

16   authors of a book called The Law of Lawyering?

17        A.  Yes, sir.

18        Q.  And can you tell me what that is?

19        A.  It is a treatise about the rules of

20   professional conduct and related rules governing        12:05:51

21   lawyers.

22        Q.  And did you played a large part in writing

23   it?

24        A.  Yeah.  Bill Hodes and now -- oh, dear,

25   what was his name -- joined me.  But yeah, Bill and I 12:06:13

Page 91

1              AFTERNOON SESSION

2                    (Whereupon, all parties having

3              been duly noted for the record, the

4              deposition resumed at 1:01 p.m.)

5

6              GEOFFREY C. HAZARD, JR. Track II,

7    having been previously duly sworn, testified further

8    as follows:

9              MR. WATERS:  Are you ready, Professor?

10             THE WITNESS:  Yes, indeed.              13:01:57

11             MR. WATERS:  Before we broke for lunch,

12   and I should say during the morning session, we had a

13   colloquy about an e-mail.

14             Mr. Gilman, have you thought any further

15   on that issue?                                   13:02:11

16             MR. GILMAN:  Sure, and if it's all right

17   with you, I would like to make a representation, and

18   you can interrogate the witness, if you see fit, to

19   check me out on it.  The bottom line is I think there

20   is a misunderstanding.                           13:02:30

21             The only documents that were transmitted

22   to the witness are those documents which are appended

23   or identified in his report.  The waiver letters are

24   attached as exhibits to his report.  The other

25   documents that were provided to him for his         13:02:47

Page 92

1    consideration are itemized on Exhibit E or referred

2    to in the text of the report.  For example, treatises

3    and what not.

4            The e-mail that you're talking about, and

5    the way that this report began in its first instance    13:03:05

6    is, I outlined a shell of a report, and the first

7    e-mail that went with the shell of the report

8    contained nothing other than the witness's

9    qualifications.  There were no opinions, no other

10   sections in it, and the witness commented on his       13:03:26

11   qualifications and revised that section.

12           Thereafter, as a result of discussions

13   with the witness, a factual set of assumptions was

14   provided in the context of the first draft of his

15   report, trying to put on paper everything that had      13:03:45

16   been discussed.  So what you're talking about is not,

17   as we have said from the beginning, a separate set of

18   facts to be assumed, but rather is a draft of the

19   report.

20           That draft does not exist.  The final          13:04:01

21   report incorporates all facts that were assumed by

22   the witness, and they are there and nothing has been

23   withheld from you, period.

24           MR. GROSSBART:  Can we have the e-mail?

25           MR. GILMAN:  No.                                13:04:19

Page 93

1          MR. WATERS:  So you won't produce, because

2     it doesn't -- you refuse to produce the e-mail.

3          MR. GILMAN:  You have not provided drafts

4     of your reports.  We are not providing drafts of our

5     reports.  What we have done is complied with Rule 26. 13:04:33

6     We've provided you with all of the information and

7     materials that were considered by the witness, and we

8     have provided you with his final report.  So that's

9     where we are on that.  I don't know that any of this

10    stuff exists.  It doesn't exist in the witness's    13:04:47

11    files in any event.

12          MR. WATERS:  Well, what you are now

13    calling a draft of the report sounds to me, from the

14    witness's testimony, like a draft of a report that

15    you prepared and sent to him.                       13:04:59

16          MR. GILMAN:  I think you're not

17    understanding, Mike.  You can try to recharacterize

18    and put spins on things, but if you and I sit down

19    and have a conversation, and you explain to me what

20    you would like reflected, whether I put my fingers on 13:05:14

21    the keys or you put your fingers on the keys, it's

22    what you want reflected.  It's your report.

23          MR. WATERS:  This is a scrivener defense

24    that I've heard before, but --

25          MR. GILMAN:  Now, look, why don't we do    13:05:31

Page 95

1          Q.  Professor Hazard, the e-mail that started

2     the process of report preparation that's been the

3     subject of the colloquy you've just witnessed, do you

4     still have the e-mail in the original form sent to

5     you?                                          13:06:54

6          A.  I don't think so.

7          Q.  Okay.  Where were you, physically, when

8     you worked on the report?

9          A.  At home.

10         Q.  All right.  Do you have a copy of        13:07:01

11    Mr. Glazer's book at your house?

12         A.  No.

13         Q.  Did you go to the library to get it?

14         A.  No.

15         Q.  Were the quotes from Mr. Glazer's book    13:07:14

16    that appear throughout the report provided to you in

17    the e-mail that was sent to you by counsel?

18         A.  In an e-mail.  I think there were two, and

19    I don't know whether it was the first or second.

20         Q.  All right.  So the block quotations       13:07:30

21    selected for your report were selected for you by

22    counsel; correct?

23         A.  Right, uh-huh.

24         Q.  And throughout your report, you cite to a

25    number of reported cases.  Did you read all of those   13:07:46

Page 166

1                         EXAMINATION

2    BY MR. GILMAN:

3        Q.    Mr. Grossbart went through a few law

4    firms and asked you to describe what relationship, by

5    way of prior engagement, if any, you had.              15:00:31

6        A.    Yeah.

7        Q.    Sir, have you been engaged, from time to

8    time, by the Sonnenschein law firm?  That's

9    Mr. Grossbart's law firm.

10       A.    Yeah.  In one case that's, as far as I      15:00:46

11   know, still going on.  And some years ago, I had the

12   pleasure of being invited for some kind of a presence

13   in their Chicago office.  That was about 10-15 years

14   ago.

15       Q.    And, sir, have you, without getting into    15:01:04

16   any confidential or substantive information, have

17   you, from time to time, in connection with engagement

18   by Mr. Grossbart's Sonnenschein law firm, prepared

19   one or more expert reports?

20       A.    Yeah.  I mean, there was one in recent       15:01:22

21   time.

22       Q.    And, sir, have you, in connection with

23   expert engagements over the years, worked with a

24   number of other law firms?

25       A.    Oh, yeah.  All over the country.             15:01:35

Page 167

1      Q.  Dozens of other lawyer firms; correct?

2      A.  Yeah.

3      Q.  And, sir, was there anything unusual about

4  the procedure by which the expert report that has

5  been marked as Exhibit 2002-II, your expert report in  15:01:47

6  this case, is there anything unusual about the

7  procedure or process by which your report has been

8  prepared?

9      MR. WATERS:  Objection.

10     THE WITNESS:  I think not, given that this  15:02:02

11  is a fairly complicated case, meaning both the

12  underlying facts and that there are two different

13  legal aspects to it.  Often, more often, I will ask

14  for a detailed statement of facts, and then I append

15  that and say I'm relying on this.      15:02:23

16     Here, we merged them, and I think that was

17  better because, given the way -- I mean the nature of

18  the underlying transaction, it made a more concise

19  report than would otherwise be possible, because

20  otherwise, you would have a very detailed statement  15:02:48

21  of facts, and then the report would have to reiterate

22  in various ways.

23     But the idea, basic procedure is the same

24  one I follow.

25      Q.  I'm going to open, in front of you, two  15:03:01