EXHIBIT A

Expert Report of

Constance B. Foster

In the Matter of:

ROYAL INDEMNITY COMPANY

v.

PEPPER HAMILTON LLP, et al.

District Court for the
District of Delaware

C.A. No. 05-165-JJF

I.      INTRODUCTION

I have been engaged by counsel for defendant Pepper Hamilton, LLP to render an opinion on whether the "Credit Risk Insurance Policies" that were issued by Royal Indemnity Company ("Royal") from 1999 through 2001 relating to Student Finance Corporation ("SFC") violated 18 Del.C. §909, which prohibits insurers from writing "one risk" that exceeds ten percent of their surplus.

My opinion is based on my review of the policies, various deposition transcripts, and other documents provided by counsel, my prior experience as the Insurance Commissioner for the Commonwealth of Pennsylvania from 1987 to 1992, and my experience as a regulatory lawyer from 1992 to the present. I have formed my opinions expressed in this report to a reasonable degree of professional certainty. A copy of my Curriculum Vitae is attached as Exhibit A, including a listing of all the articles that I have written and the matters in which I have provided expert testimony. Exhibit B contains a listing of all the documents that I relied upon for the facts forming the basis for my opinions.

As Insurance Commissioner I was responsible for regulating hundreds of Pennsylvania domestic insurance companies, as well as foreign insurers, in accordance with Pennsylvania law and regulations. I am also very familiar with model laws promulgated by the National Association of Insurance Commissioners ("NAIC") as well as other guidelines and procedures promulgated by the NAIC.

In my current law practice, I regularly advise regulators, insurance companies and policyholders on insurance regulatory issues, including issues relating to financial regulation, annual statement requirements and regulatory compliance issues. My clients have included the insurance commissioners for the Commonwealth of Pennsylvania and the State of New Jersey.

-2-

My firm is being compensated at the rate of $535 per hour for my time. Other lawyers have assisted me in the preparation of this report and their time was billed at their regular rates. The compensation received by my firm is not tied to or dependent upon the results obtained by Pepper Hamilton LLP.

## II.      SUMMARY OF THE TRANSACTIONS

From 1999 through 2001, Royal entered into "Credit Risk Insurance Policies" (collectively the "Policies"),[1] that guaranteed payment to the trustees for certain lenders and investors relating to student loans made by SFC to students attending trucking schools ("Student Loans"). The Policies guaranteed that, up to the stated limits of liability, Royal would pay the trustees for the lenders and investors unpaid principal and ninety (90) days interest on any defaulted Student Loan, defined as any loan more than 90 days delinquent. The total limit of liability of the Policies was in excess of $640 million.

The SFC transactions had several components. SFC through a special purpose entity ("SPE") initially funded loans to trucking school students through funds borrowed from financial institutions ("the Lenders"). The Student Loans were at high interest rates, typically 18%-20%. Some, but not all, of the Student Loans held by the SPEs were subsequently securitized through a separate trust established solely for the securitization transaction. The trust would issue certificates or floating rate notes to investors through private placements at rates lower than the interest rates payable on the underlying Student Loans. The investors were to be repaid from the pool of payments made by the students on the securitized Student Loans and the Lenders would be repaid by the SPE from the funds obtained from the securitization.

---

[1]      See chart on page 7 of this report.

The Policies followed the Student Loans from the SPE to securitization with no change in coverage provisions. Because the securitized pools of Student Loans received a higher investment rating due in part to Royal's AA rating, interest rates payable to the investors ranged from 5.5% to 8.06%. The securitizations were structured in such a way that SFC not only received servicing fees to service the loans, but would also receive distributions to the extent that the payments received from the high interest trucking Student Loans exceeded the obligations of the securitization trustee to pay the lower interest debt service to the investors, repay certain reserve reductions, and pay any and all fees associated with the securitizations.

The Policies were drafted so that Royal would not be responsible for any claims relating to the securitized loans until the proceeds in two funds were exhausted. First, SFC agreed to fund an "Experience Account" equal to eighteen percent (18%) of the principal balance of the Student Loans under the policy. On most of the Policies, SFC funded the Experience Account through an uncollateralized note. If Royal paid a claim for a defaulted Student Loan, it was entitled to reimbursement from the Experience Account until such funds were exhausted.

The Policies also required an Excess Spread Reserve Escrow Account. The Excess Spread Reserve Escrow Account was originally funded with a minimum amount but was designed to be funded to a maximum level throughout the term of the securitization by the excess interest spread between the high interest rate trucking Student Loans and the lower securitization interest rate. The Excess Spread Reserve Escrow Account was intended to pay unpaid amounts to investors and if available, to reimburse Royal for claims paid under the policy. Any claim for a defaulted Student Loan under the Policies was specifically subject to the condition that either no funds remained in the "Excess Spread Reserve Escrow Account " or that its trustee would not make any payments.

Royal did not underwrite any single trucking student loan. Royal relied exclusively on the loan selection process in effect at SFC and the correctness of Royal's own estimate of the aggregate default rate on the entire portfolio of Student Loans. Royal believed that at the assumed likely default rate of twenty-five percent (25%) it would be adequately covered for any losses between the Experience Account and the Excess Spread Escrow Account. Royal recognized that a downturn in the economy would have a negative effect on the overall default rate of the Student Loans. Royal received more than 34 million dollars in premium for the issuance of the Policies.

III.    ANALYSIS

A.    Summary of Opinions

Royal is licensed in all 50 states as a multiline insurer. Delaware law, as well as the law of every state, has a version of the "one risk" rule that prohibits licensed insurers from writing "any risk on any one subject of insurance" that exceeds ten percent of its surplus to policyholders. The Policies, whether viewed in the aggregate, by calendar year or by Policy Group, exceeded ten percent of Royal's surplus to policyholders. Accordingly, it is my opinion that the Policies violated Delaware's "one risk" law.

B.    The Policies involve "single risks" in excess of Ten Percent of Royal Insurance Company's Surplus in Violation of 18 Del.C. §909

Royal is a Delaware licensed insurance carrier. Section 909 of the Delaware Insurance Code prohibits an "insurer" from retaining "any risk on any one subject of insurance, whether located or to be performed in this State or elsewhere, in an amount exceeding 10% of its surplus to policyholders." 18 Del.C. §909. Surplus are the funds that insurers are required to hold in excess of monies held to pay their liabilities. Surplus is designed to protect policyholders against large unexpected losses and/or economic downturns.

All states have statutes similar to Delaware Section 909 that apply, like the Delaware statute, to any insurance written in or outside of the state by any insurer licensed in that state. The purpose of the single risk provision is to protect policyholder surplus by preventing insurance companies from taking too large a risk. See Texas Attorney General Opinion JM-850 (February 3, 1988); NY Attorney General Opinion 06-02-19 (February 21, 2006). The definition of "one risk" depends upon the type of insurance but is generally recognized to be potential losses resulting from a single event. See NY Attorney General Opinion 03-01-07 (January 3, 2003). The Policies were underwritten and evaluated on the basis of aggregate losses across pools of Student Loans, and not on the risk of each individual Student Loan written. The risk of loss, as recognized by Royal as part of its underwriting process, was the default rates across the SFC pool of Student Loans. Royal further recognized that an economic downturn or other market event could have a significant impact on the default rate of the Student Loans.

Since all of the polices covered similar pools of Student Loans, subject to the risk of loss arising out an single event, namely an economic downturn, and were issued by a single originator, and were serviced by a single servicer (or a single back-up servicer), it is my opinion that the Policies constituted a single risk for purposes of Section 909.

Insurance Departments typically interpret risk limitation provisions such as 18 Del.C.§909 to prevent insurers from parsing risks piecemeal into amounts that individually meet the risk limitation provisions in order to avoid the 10% limitation. Allowing insurers to split up risks would defeat the purpose of the statute. Accordingly, the fact that the Polices were written over time to cover different pools of Student Loans does not impact the issue of whether or not they are collectively a single risk.

Between 1998 and 2001 Royal's surplus ranged from $291 million to $576 million. During that same period, Royal wrote policies covering SFC Student Loans ranging from $5 million to $150 million:

| Policy No. | Policy Amount | Year Issued/Surplus | Policy Group |
|---|---|---|---|
| RST 321276 | $75,000,000 | 1999/$576,277,272 | SFC 1 |
| RST 293309 | $53,053,642 | 2000/$361,524,314 | SFC 1 |
| RST 293334 | $50,000,000 | 2000[2]/ | SFC 2 |
| RST 147522 | $48,459,255 | 2000/ | SFC 2 |
| RST 147524 | $29,999,999.94 | 2000/ | SFC 2 |
| RST 147525 | $55,616,550 | 2001/$514,289,564 | SFC 2 |
| RST 147526 | $48,286,713 | 2001/ | SFC 2 |
| RST 147529 | $150,000,000 | 2001/ | SFC 3 |
| RST 147533 | $5,518,459 | 2001/ | SFC 2 |
| RST 147538 | $120,000,000 | 2001/ | SFC 3 |
| RST 147536 | $80,000,000 | 2001/ | SFC 3 |

In the aggregate, Royal guaranteed over $640 million, which amount far exceeds 100% of Royal's surplus in any year from 1999-2001. As evident from the chart above, even if the risks were aggregated for each year by issue date, effective date or by Policy Group, the risks exceeded the 10% limitation of 18 Del.C. §909. For example, in 2000 Royal issued sub-policies totaling in excess of $180 million, and in 2001 that amount rose to in excess of $459 million. 10% of Royal's surplus for those years equaled $36 million and $51 million respectfully. The total risk written issued in 2001 exceeded 100% of Royal's surplus for 2000 by more than $97 million.

Viewing policies by Policy Group reaches the same result. The group of policies denominated SFC-1, which spans 1999 and 2000, contained sub-policies totaling in excess of $128 million, which amount exceeds 10% of the surplus for either 1999 or 2000, ($57 million and $36 million respectively). The Policy Group SFC-2, which spanned 2000 and 2001,

---

[2]     Policy RST 293309 was written in 2000, but had an inception date of January 22, 1999. Similarly, Policy RST147525 was issued in April of 2001, but had an effective date of November 2000.

contained sub-policies totaling in excess of $237 million. That amount far exceeds 10% of the surplus amounts of 1999 through 2001. Policy Group SFC-3, contained sub-policies all written in 2001 that totaled $350 million, far exceeding 10% of Royal's surplus for years 2000 or 2001.

Royal contends that its pooling agreements with other members of the Royal Group should be taken into account in evaluating the 10% limitation of 18 Del.C. §909. The pooling agreements are agreements with other members of the Royal Insurance Group to share risks written by each of the insurers in the group. The amount of risk that Royal shared with the other members of the group ranged from 83% to 75% between 1999 and 2001, which meant that Royal retained between 17% and 25% of the risks that it wrote under the Policies.

Royal's argument is apparently premised on subsection (c) of Section 909 that states that "[r]einsurance ceded…shall be deducted in determining risk retained. " 18 Del.C. §909(c). It is my opinion Royal was not entitled to take credit for any of the pooled risks under the pooling agreements under 18 Del.C. §909 because the Policies are surety insurance under Delaware law.[3]

Delaware law defines "Surety Insurance" as "[i]nsurance guaranteeing the performance of contracts, other than insurance policies…" 18 Del. Code §905(a)(2). The Policies guaranteed the obligations of trucking school students to repay their loans. Each element of Section 905 is present. The Policies guarantee the performance of contracts (the Student Loans), which are not insurance policies, and are clearly surety insurance.

Section 909(c) states that if the risk is surety insurance, the reinsurance treaty must have what is commonly called a "drop down" provision:

---

[3]    Even if full credit was given for the pooling agreement, the aggregate Policies, the Policies issued in 2001, or grouped by Policy Group SFC 2 or SFC 3 exceed 10% of Royal's surplus for the years 2000 and 2001, respectively.

> reinsurance shall be allowed as a deduction only if such reinsurer is authorized to transact such reinsurance in this State, ***and*** is in such form as to enable the oblige or beneficiary to maintain an action thereon against the reinsured jointly with the reinsurer, and upon recovering judgment against the reinsured to have recovery against the reinsurer for payment to the extent in which it may be liable under such reinsurance and in discharge thereof.

18 Del.C. §909(c) (emphasis added.) This "drop down" provision allows the insureds under the original policies to seek recovery directly from the reinsurer. Here the pooling agreement does not contain any provisions to allow the beneficiary to proceed in any form against the members of the pool.

The Policies are not credit insurance under Delaware law, as has been suggested by Royal. Under Delaware law, a "credit transaction" as it relates to consumer credit insurance does not include transactions in which the cost of the insurance is not charged to the debtor, or transactions in which the term of the loan is in excess of 10 years. 18 Del.C. §3702(a)(2)(c) and (d). Here the insurance was not purchased by or charged to the students and many of the loans had terms in excess of 10 years. In addition, Royal's current allegation is directly contradicted by its Annual Statements filed with insurance regulators for the years 1998-2001 where it acknowledges that it did not write credit insurance.

Since the Policies are surety insurance under Delaware law, and the pooling agreements contain no "drop down" clause, no credit is allowed for the pooled insurance. Accordingly, whether viewed in the aggregate, or by Policy Group, or by issuance year, it is my opinion that the Policies violated 18 Del.C. §909. In my opinion, no insurance company adhering to a reasonable standard of care in the insurance industry would write a singe risk that exceeded 10% of its surplus.

Date: _July 13, 2007_

_Constance B Foster_

Constance Foster

EXHIBIT B

District Court for the District of Delaware

---

ROYAL INDEMNITY COMPANY

v.

PEPPER HAMILTON LLP, et al.

C.A. No. 05-165-JJF

---

MBIA INSURANCE CORPORATION, et al.

v.

ROYAL INDEMNITY COMPANY

C.A. No. 02-1294-JJF

---

Expert Report

of

Donna Lee Williams

**Purpose of this Report**

I have been engaged by counsel for Royal Indemnity Company ("Royal") to respond to the report of Constance Foster and offer an opinion concerning the application of section 909 of the Delaware Insurance Code to the credit risk policies issued by Royal to Student Finance Corporation ("SFC"), predominately insuring student loans made to students attending truck driving training schools. Specifically, I have been asked to opine on whether such loans are properly considered "1 subject of insurance" for purposes of 18 Delaware Code § 909.

**Background and Basis of Opinion**

From 1993 through 2005, I was the Insurance Commissioner for the State of Delaware. Prior to being elected Insurance Commissioner, I practiced law in the areas of insurance defense, regulation, licensing and compliance for 8 years in Delaware. I am currently employed at the AAA Mid-Atlantic. Headquartered in Delaware, the AAA Mid-Atlantic is the fifth largest club in a national federation known as the American Automobile Association. I am the director of government and industry affairs at the AAA Mid-Atlantic. My primary responsibility is directing legislative and regulatory affairs for our insurance group, including three proprietary insurance companies. My duties include monitoring and directing legislative and regulatory activities of the AAA Mid Atlantic in its six state territory.

I became a member of the National Association of Insurance Commissioners ("NAIC") in 1993. I was active in committee leadership for much of my tenure as Insurance Commissioner. I was a member of the NAIC executive committee for a total of eight years. I also served on the Financial Standards and Accreditation Committee ("FSAC") and was its chair in 2003. Among other things, the FSAC established and enforced the uniform standards for financial solvency oversight by state insurance departments over insurers.

As Insurance Commissioner, I was responsible for the solvency oversight of over 150 Delaware domestic insurance companies, including Royal. I was also responsible for regulating the activities of hundreds of insurers doing business in the state. My Curriculum Vitae is attached as exhibit A. A list of the materials I relied upon in forming my opinions is attached as exhibit B.

I have formed my opinions expressed in this report to a reasonable degree of professional certainty. I am being compensated at the rate of $350/hour and $400/hour (testimony) for my time. My compensation is not tied to or dependent upon the results obtained by Royal in these actions. I reserve the right to supplement this report.

**Opinion**

I have reviewed George Bernstein's report and I concur with both the reasoning of his report and his conclusions. I agree that each of the student loans insured by Royal in this case represented a single risk for purposes of 18 Delaware Code § 909. Each loan insured by Royal here presented a unique risk. Based on my education and experience I find no reason to aggregate these risks.

Like Mr. Bernstein, at no time in my 12 years as Delaware Insurance Commissioner, including my participation in the NAIC committee concerning solvency oversight, have I ever heard it suggested that the risk of "economic downturn" be the basis for aggregating the sort of risk Royal insured here, or similar risks.

While I was the Delaware Insurance Commissioner, I conducted monthly meetings with the senior members of my financial solvency oversight team. The purpose of these monthly meetings was to review the schedule for triennial examinations, triennial examinations in progress, market conduct examinations (scheduled or in progress), and annual and quarterly

financial statements. In those meetings, we would discuss issues and problems, including any issues of concern discovered by the examiners in the field, related to the insurers we were regulating, primarily Delaware domestic insurance companies, such as Royal. We also discussed the quarterly and annual financial statements and other filings as may have been required under Delaware law, and any issues or concerns that would come to light as a result of the information contained in such filings, including, among other things, issues regarding aggregation of risk. At no time did any of the senior members of my team raise any concerns regarding Royal's concentration of risk in regards to SFC. If the policies at issue in this case were perceived as one risk, then that aggregation issue would have been raised with me; it never was.

July 27, 2007
Date

Donna Lee Williams

-3-

EXHIBIT C

1

```
 1   IN THE UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF DELAWARE
 2
     MBIA INSURANCE CORPORATION  :
 3   and WELLS FARGO BANK,       :
     N.A. f/k/a WELLS FARGO      :
 4   BANK MINNESOTA N.A.) as     :
     TRUSTEE OF SFC GRANTOR      :
 5   TRUST, SERIES 2000-1, SFC   :
     GRANTOR TRUST, SERIES       :
 6   2000-2, SFC GRANTOR TRUST   : C.A. NO.
     SERIES 2000-3, SFC GRANTOR  : 02-1294-JJF
 7   TRUST, SERIES 2000-4, SFC   :
     GRANTOR TRUST, SERIES 2001-1:
 8   SFC GRANTOR TRUST, SERIES   :
     2001-2, SFC OWNER TRUST     :
 9   2001-I, AND SFC GRANTOR     :
     TRUST, SERIES 2001-3,       :
10       Plaintiffs/Counterclaim  :
           Defendants,           :
11                    : TRACK(0)WITNESS:
                      : DONNA LEE WILLIAMS
12   vs.              :
     ROYAL INDEMNITY COMPANY,    :
13       Defendant/Counterclaim  : DATE:
         Plaintiff.      : AUGUST 27, 2007
14   ROYAL INDEMNITY COMPANY,
         Third-Party Plaintiff,
15
     vs.
16
     ANDREW N. YAO, STUDENT LOAN
17   SERVICING LLC, STUDENT LOAN
     ACCEPTANCE II LLC, STUDENT LOAN
18   ACCEPTANCE III LLC, STUDENT LOAN
     ACCEPTANCE IV LLC, STUDENT LOAN
19   ACCEPTANCE V LLC, STUDENT LOAN
     ACCEPTANCE VIII LLC, STUDENT LOAN
20   ACCEPTANCE IX LLC, SFC FINANCIAL LLC
     I, SFC FINANCIAL LLC II, SFC
21   FINANCIAL LLC VI, SFC FINANCIAL LLC
     VII,
22       Third-Party Defendants.
23   ROYAL INDEMNITY COMPANY,
         Counter-Claimant,
24   vs.
     MBIA BANK and WELLS FARGO BANK
25   MINNESOTA, N.A.,
         Counter-Defendants.
```

2

```
 1   CHARLES A. STANZIALE, JR.,
 2   Chapter 7 Trustee of Student Finance
     Corporation,
 3       Plaintiff,
 4   vs.      C.A. No. 04-1551-JJF
 5   PEPPER HAMILTON LLP, et al,
         Defendants.
 6
     CHARLES A. STANZIALE, JR.,
 7   Chapter 7 Trustee of Student Finance
     Corporation,
 8       Plaintiff,
 9   vs.      C.A. No. 05-72-JJF
10   McGLADREY & PULLEN LLP
     and MICHAEL AQUINO,
11       Defendants.
12   ROYAL INDEMNITY COMPANY,
         Plaintiff,
13
     vs.      C.A. No. 05-165-JJF
14
     PEPPER HAMILTON LLP,
15   W. RODERICK GAGNE',
     FREED MAXICK & BATTAGLIA CPAs,
16   McGLADREY & PULLEN LLP,
     and MICHAEL AQUINO,
17       Defendants.
18
19
20
21
22
23
24
25
```

3

```
 1       Oral Deposition of
 2   DONNA LEE WILLIAMS was taken
 3   pursuant to notice at 500 Delaware
 4   Avenue, Wilmington, Delaware, on
 5   Monday, August 27, 2007, beginning
 6   at 1:30 p.m., before Jeanne
 7   Christian, Court Reporter-Notary
 8   Public, there being present.
 9
10   APPEARANCES:
11   SONNENSCHEIN NATH & ROSENTHAL, LLP
     BY: STEVEN L. MEROUSE, ESQUIRE
12   8000 Sears Tower
     233 South Wacker Drive
13   Chicago, Illinois 60606
     Phone: (312) 876-8079
14   Representing Royal Indemnity Company
15
16   SCHNADER HARRISON SEGAL & LEWIS, LLP
     BY: ELIZABETH AINSLIE, ESQUIRE
17   BY: DAVID PELLETIER, ESQUIRE
     1600 Market Street
18   Philadelphia, Pennsylvania 19103
     Phone: (215) 751-2259
19   Representing Pepper Hamilton, LLP
20
21
22
23
24
25
```

4

```
 1       I N D E X
 2       - - -
 3   DONNA LEE WILLIAMS
 4   EXAMINATION        PAGE
 5     BY MS. AINSLIE      5
 6     BY MR. MEROUSE     138
 7
 8       - - -
 9   E X H I B I T S
10       - - -
11   EXHIBIT NO. DESCRIPTION    PAGE
12   Exh 2066-I   Report        14
13
14
15
16
17
18
19
20
21
22
23
24
25
```

81

1    THE WITNESS: Persons with

2    worse credit scores generally

3    present a higher risk of default.

4    BY MS. AINSLIE:

5    Q.  Under what kinds of

6    circumstances would there be any

7    aggregation of risk in credit

8    enhancement insurance?

9        Again, I'm trying to --

10    let me make it a little clearer.

11    I'm trying to step back from this

12    circumstance.  I understand that

13    your opinion is that they are not --

14    the loans in this case are not

15    aggregated, so as to make them one

16    risk; is that right?

17    A.  That's correct.

18    Q.  Is there a circumstance that you

19    can think of where they would be

20    aggregated in the credit enhancement

21    arena?

22    A.  I don't know.  I mean, I can't

23    think of any off the top of my

24    head.

25    Q.  If something occurs to you later

Williams, Donna  8/27/2007  1:30:00 PM

103

1    THE WITNESS: No.
2    BY MS. AINSLIE:
3    Q. One of the — going on to the
4    next paragraph of your opinion on
5    Page 2, you say that you have not
6    heard it suggested in the course of
7    your time as insurance commissioner
8    that the risk of economic downturn
9    might be the basis for aggregating
10    the sort of risk that Royal insured
11    here or similar risks.
12        Am I paraphrasing at least
13    that accurately?
14    A. I think so, yes.
15    Q. What sorts of risks have you
16    seen be the basis for aggregating
17    the sort of risk that Royal insured
18    here?
19        MR. MEROUSE: Objection,
20    form.
21        THE WITNESS: To the best
22    of my recollection, this issue --
23    the specific issue of the
24    aggregation of credit risk was never
25    brought to my attention.

104

1    BY MS. AINSLIE:
2    Q. So you have never heard it
3    suggested that the risk of economic
4    downturn be the basis, but you have
5    not heard any other risk being
6    suggested as the basis for
7    aggregating the sort of risk that
8    Royal insured here; is that correct?
9    A. Aggregation issues come up very
10    infrequently.
11    Q. I'm just asking what —
12    A. So the answer to that — repeat
13    your question.
14    Q. I think you did answer it, but I
15    will try again, to be sure.
16        Am I correct in
17    understanding that you have not
18    heard the risk of economic downturn
19    suggested as the basis for
20    aggregating the sort of risk that
21    Royal insured here, but you have
22    likewise not heard any other risk be
23    suggested as the basis for
24    aggregating the sort of risk that
25    Royal insured here, either?

105

1    A. That's correct, because
2    aggregation issues are very
3    infrequent.
4    Q. Now, the next paragraph, you
5    point to the fact that you had
6    monthly meetings with the senior
7    members of your financial solvency
8    oversight team? I take it, that's
9    BERG?
10    A. Yes.
11    Q. And you say that in those
12    meetings, we would discuss issues
13    and problems, including issues of
14    concern discovered by examiners in
15    the field, and that at no time did
16    any of the senior members of your
17    team raise any concerns concerning
18    Royal's concentration of risk in
19    regards to SFC?
20    A. That's true.
21    Q. These meetings were held 12
22    times a year?
23        MR. MEROUSE: I object to
24    form.
25        THE WITNESS: They were

EXHIBIT D

1

```
 1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE
 2
    MBIA INSURANCE                :
 3  CORPORATION AND WELLS         :
    FARGO BANK, N.A. (f/k/a        :
 4  WELLS FARGO BANK              :
    MINNESOTA, N.A.) AS           :
 5  TRUSTEE OF SFC GRANTOR        :
    TRUST, SERIES 2000-1, SFC     :
 6  GRANTOR TRUST, SERIES         :
    2000-2, SFC GRANTOR           :
 7  TRUST, SERIES 2000-3, SFC     :
    GRANTOR TRUST, SERIES         :
 8  2000-4, SFC GRANTOR           :
    TRUST, SERIES 2001-1, SFC     :
 9  GRANTOR TRUST, SERIES         :
    2001-2, SFC OWNER TRUST       :
10  2001-I, AND SFC GRANTOR       :
    TRUST, SERIES 2001-3,         :
11     Plaintiffs/Counterclaim    :
            Defendants.           :
12                                :
        vs.                       :
13                                :
    ROYAL INDEMNITY COMPANY,      :
14     Defendant/Counterclaim  :C.A. NO.
            Plaintiff.  :02-1294-JJF
15  ——————————————————
    ROYAL INDEMNITY COMPANY,      :
16     Third-Party Plaintiff, :
17        vs.                     :
18  ANDREW N. YAO, STUDENT        :
    LOAN SERVICING LLC,           :
19  STUDENT LOAN ACCEPTANCE II:
    LLC, STUDENT LOAN             :
20  ACCEPTANCE III LLC,           :
    STUDENT LOAN ACCEPTANCE       :
21  III LLC, STUDENT              :
    LOAN ACCEPTANCE V LLC,        :
22  STUDENT LOAN ACCEPTANCE       :
    VIII LLC, STUDENT LOAN        :
23  ACCEPTANCE IX LLC, SFC   :WITNESS:
    FINANCIAL LLC I, SFC     :CONSTANCE B. FOSTER
24  FINANCIAL LLC II, SFC    :TRACK I
    FINANCIAL LLC VI, SFC         :
25  FINANCIAL LLC VII,       :DATE:
       Third-Party Defendants.:AUGUST 28th, 2007
```

2

```
 1  ROYAL INDEMNITY COMPANY, :
       Counter-Claimant,    :
 2                          :
        vs.                 :
 3                          :
    MBIA BANK AND WELLS FARGO :
 4  BANK MINNESOTA, N.A.,    :
       Counter-Defendants.  :
 5  ——————————————————
    CHARLES A. STANZIALE, JR.,:
 6  CHAPTER 7 TRUSTEE OF     :
    STUDENT FINANCE          :
 7  CORPORATION,             :
       Plaintiff,      :C.A. NO.
 8                     :04-1551-JJF
        vs.                 :
 9                          :
    PEPPER HAMILTON LLP,     :
10  et al.,                  :
       Defendants.          :
11  ——————————————————
    CHARLES A. STANZIALE, JR.,:
12  CHAPTER 7 TRUSTEE OF     :
    STUDENT FINANCE          :
13  CORPORATION,             :
       Plaintiff,      :C.A. NO.
14                     :05-72-JJF
        vs.                 :
15                          :
    McGLADREY & PULLEN LLP AND:
16  MICHAEL AQUINO,          :
       Defendants.          :
17  ——————————————————
    ROYAL INDEMNITY COMPANY, :
18     Plaintiff,           :
19                     :
        vs.           :C.A. NO.
20  PEPPER HAMILTON LLP, W.  :05-165-JJF
    RODERICK GAGNE, FREED    :
21  MAXICK & BATTAGLIA CPAs, :
    McGLADREY & PULLEN LLP,  :
22  AND MICHAEL AQUINO,      :
       Defendants.          :
23
24
25
```

3

```
 1          Oral deposition of CONSTANCE
 2  B. FOSTER, Track I, taken pursuant to notice,
 3  at the Law Offices of Schnader, Harrison,
 4  Segal & Lewis, LLP., 1600 Market Street, Suite
 5  3600, Philadelphia, Pennsylvania 19103, on
 6  Tuesday, August 28th, 2007, beginning at
 7  approximately 10:00 a.m., before David Walsh,
 8  Registered Professional Reporter and Notary
 9  Public, there being present:
10
11          - - -
12
    APPEARANCES:
13
14
15          SONNENSCHEIN, NATH & ROSENTHAL,
            LLP.
            BY:  STEVEN L. MEROUSE,
16          ESQUIRE
            7800 Sears Tower
17          233 South Wacker Drive
            Chicago, Illinois  60606
18          Phone: (312) 876-8079
            Representing Royal Indemnity
19          Company
20
            SCHNADER, HARRISON, SEGAL &
21          LEWIS, LLP.
            BY:  ELIZABETH AINSLIE, ESQUIRE
22          1600 Market Street, Suite 3600
            Philadelphia, Pennsylvania 19103
23          Phone: (215) 751-2359
            Representing Pepper Hamilton,
24          LLP and W. Roderick Gagne as
            Partner
25
```

4

```
 1  APPEARANCES CONTINUED:
 2
 3          PROSKAUER, ROSE, LLP.
            BY: LISA A. BAUER, ESQUIRE
 4          (Appearing via telephone)
            1585 Broadway
 5          New York, New York  10036
            Phone: (212) 969-3221
 6          Representing MBIA Insurance
            Corporation and Wells Fargo Bank
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

135

1  Q.   Okay.  I understand we have had some

2  discussions today about exactly how to

3  characterize the Royal policies.

4      So, setting that aside, are you aware in

5  your experience as a regulatory lawyer or as a

6  commissioner of the one risk rule ever being

7  applied to credit risk policies where the

8  aggregating factor used was the threat of

9  economic downturn?

10          MS. AINSLIE:  Objection.

11          THE WITNESS:  I'm not

12  aware -- and we looked, but I am not aware

13  that this issue has come up.  As the attorney

14  general opinion notes, despite the fact that

15  versions of these rules have been around for

16  a long time, there's very little that's out

17  there that assists in making these

18  determinations.  So, no, I'm not aware of any

19  situation where it was applied specifically

20  to a credit enhancement policy.

21  BY MR. MEROUSE:

22  Q.   Okay.  So, this is sort of an insurance

23  issue of first impression, if you will?

24  A.   I don't know if first impression is the

25  issue of how you treat asset backed -- asset

EXHIBIT E

1               UNITED STATES DISTRICT COURT

2                DISTRICT OF DELAWARE

3   ROYAL INDEMNITY COMPANY,     )

4        Plaintiff,     )

5        v.        ) No. 05-165-JJF

6   PEPPER HAMILTON LLP, et al.,    )

7        Defendants.    )

8   MBIA INSURANCE CORPORATION, et al., )

9        Plaintiffs,    )

10        v.        ) No. 02-1294-JJF

11  ROYAL INDEMNITY COMPANY,     )

12        Defendant.    )

13  - - - - - - - - - - - - - - - - - - -

14

15   DEPOSITION OF TRACK I WITNESS:  GEORGE K. BERNSTEIN

16          Wednesday, August 8, 2007

17            Washington, D.C.

18

19

20

21  Reported by:  Cheryl A. Lord, RPR, CRR

22

71

1    downturn, and I've never seen an insurance department

2    apply the concept of economic downturns to those lines

3    any more than I've seen it applied to credit risk

4    lines.

5        Q.    So the fact that you haven't seen – well,

6    have you seen insurance departments – take the

7    workers' comp example that you just gave us.

8        Have you seen insurance departments apply

9    the 909 analysis to workers' comp one way or the

10    other?

11        A.    No.

12        I'm trying to think of -- let me think that

13    through.

14        The answer is, I have not seen it done for

15    any line.

16        Q.    Okay.

17        MR. MEROUSE:  Liz, we can stop when it

18    makes sense?

19        We've been going almost an hour and a half,

20    so whenever is a logical time.

21        MS. AINSLIE:  Sure.

22        Let me just ask 1 or 2 more questions along

104

1   insureds is aggregated -- that company may go broke
2   because it wrote bad business or a lot of bad
3   business, but that's not an aggregation issue. I'm
4   talking aggregation.
5       You want to talk underwriting, that's a
6   totally different thing. You want to talk wisdom,
7   that's a totally different thing.
8       But in terms of aggregation, you can't
9   aggregate this until the statute says you have to
10  aggregate it, and I've never seen a statute that says
11  you have to aggregate it. I've never seen an
12  insurance department that said you had to aggregate
13  it.
14      And many companies writing credit risk
15  insurance would be in violation of 909 if the Foster
16  proposal were adopted.
17      BY MS. AINSLIE:
18  Q.  Do you know, then, that Constance Foster --
19  do you know her, by the way?
20  A.  I'm sure I've met her.
21  Q.  In what context?
22  A.  What were her years in the department in

105

1   Pennsylvania?
2       I don't have her report here.
3       (Pause.)
4       BY MS. AINSLIE:
5   Q.  Why don't we just go on.
6   A.  Okay.
7   Q.  It's not important.
8       Do you understand her to be proposing that
9   all credit risk insurance involving student loans
10  should always be aggregated or that this particular
11  book of business should have been aggregated?
12  A.  I don't think you can have the latter
13  without the former.
14      I mean, she can't just pick on Royal and
15  say, Royal is subject to this, and everybody else who
16  does the same thing isn't doing it.
17  Q.  That wasn't the question, Mr. Bernstein.
18  A.  Well, I think it is.
19      I think that's -- you can't have one
20  without the other. She's making a representation that
21  economic downturn is a factor that makes -- that
22  requires an insurance department to apply 909 the way

106

1   no other department has ever applied a statute like
2   909, whether you're talking about prime risks or
3   subprime risks.
4       Prime risks are also subject to economic
5   downturns. They may not be as subject. Are you going
6   to have the insurance departments evaluating the book
7   of business of a company and saying, now wait a
8   minute, this is prime risk, we're going to
9   aggregate -- this is subprime risk, we're going to
10  aggregate, these are prime risks, we're not going to
11  aggregate?
12      That's nonsense. I mean, she created this
13  theory for this case as far as I can see. I've never
14  heard it before. I've never heard anything resembling
15  it before.
16      And for her to apply it to Royal means
17  you've got to apply it to all credit insurance, all
18  credit risk insurance, and to mortgage guaranty
19  insurance, to all phases of insurance that have any --
20  are impacted at all by economic downturn.
21  Q.  Is it your understanding that -- well,
22  let's get back to your opinion.